**SIDLEY AUSTIN LLP**
Anthony Grossi
Ameneh Bordi
Juliana Hoffman* (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 839-5300
Facsimile:  (212) 839-5599
Email:      agrossi@sidley.com
            abordi@sidley.com
            jhoffman@sidley.com

*Counsel to the Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| China Evergrande Group, *et al.*[1] | Case No. 23-11332 (MEW) |
| Debtors in Foreign Proceedings. | Joint Administration Requested |

### DECLARATION OF SIDLEY AUSTIN AS HONG KONG COUNSEL TO EVERGRANDE AND TIANJI IN SUPPORT OF THE MOTION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDINGS, (II) RECOGNITION OF FOREIGN REPRESENTATIVES, AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE WITH RESPECT TO DEBTORS CHINA EVERGRANDE GROUP AND TIANJI HOLDING LIMITED

---

[1] The Debtors in these Chapter 15 Cases are (i) China Evergrande Group, incorporated in the Cayman Islands as an exempted company with limited liability with the registration number 170388, with its principal place of business located at 15th Floor, YF Life Centre, 38 Gloucester Road, Wanchai, Hong Kong; (ii) Tianji Holding Limited, incorporated in Hong Kong as a limited liability company with the registration number 1339269, with its principal place of business located at 17th Floor, One Island East, Taikoo Place, 18 Westlands Road, Quarry Bay, Hong Kong; and (iii) Scenery Journey Limited, incorporated in the British Virgin Islands ("BVI") as a limited liability company with the company number 1970476, with its principal place of business located at 2nd Floor Water's Edge Building, Wickham's Cay II, Road Town, Tortola, BVI.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

I, Ang Chee Khian, Desmond, pursuant to 28 U.S.C. § 1746, hereby declare under penalty

of perjury as follows:

## **INTRODUCTION**

1.       I am a solicitor admitted to practice in Hong Kong and a partner in the commercial

litigation and disputes group of the law firm Sidley Austin located at Two International Finance

Centre, 8 Finance St, Central, Hong Kong ("Sidley").  Sidley is acting as Hong Kong counsel to

(i) China Evergrande Group, an exempted company with limited liability incorporated under the

Cayman Companies Act of the Cayman Islands ("Evergrande") and (ii) Tianji Holding Limited, a

limited liability company incorporated under Part 6 of the Hong Kong Companies Ordinance and

an indirect non-wholly owned subsidiary of Evergrande ("Tianji", and together with Evergrande,

the "Hong Kong Debtors").[2]  Evergrande is the ultimate holding company of a group of companies

comprising the Hong Kong Debtors and their direct and indirect subsidiaries, including, without

limitation, Scenery Journey Limited, a limited liability company incorporated in the British Virgin

Islands under the BVI Companies Act and a direct wholly-owned subsidiary of Tianji ("Scenery

Journey", and together with the Hong Kong Debtors, the "Debtors"), and certain subsidiaries who

guarantee certain of the Group's existing debts (collectively, the "Subsidiary Guarantors") with

respect to the Debtors (collectively, the "Group").  The Group is principally engaged in property

development, property investment, property management, new energy vehicle development and

---

[2] Capitalized terms used in this Declaration but not defined are given their meaning in the Recognition Motion
(as defined herein). Reference is made to the *Declaration of Jimmy Fong in Support of the Motion for (I) Recognition
of Foreign Main Proceedings, (II) Recognition of Foreign Representatives, and (III) Related Relief under Chapter 15
of the Bankruptcy Code with Respect to Debtor China Evergrande Group* and the *Declaration of Jimmy Fong in
Support of the Motion for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representatives,
and (III) Related Relief under Chapter 15 of the Bankruptcy Code with Respect to Tianji Holding Limited*, together
the "Representative Declarations" filed by the "Foreign Representative".

production, and cultural tourism in China.

2.    I am over the age of 18 and, if called upon, could testify to all matters set forth in this declaration (this "Declaration").  The facts and matters contained in this Declaration are true and correct to the best of my information, knowledge, and belief.  In preparing this Declaration, I reviewed the final form drafts of: (a) the Chapter 15 *Petition for Recognition of a Foreign Proceeding* for each of Evergrande and Tianji (together, the "Chapter 15 Petitions"); (b) the *Motion for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief under Chapter 15 of the Bankruptcy Code* (the "Recognition Motion"); (c) copies of the scheme documents in connection with the Hong Kong Proceedings (as defined herein), including the Scheme Petitions, Practice Statement Letters, Convening Orders, and Explanatory Statements (each as defined and described herein and attached hereto as **Exhibits A** through **D**, respectively) for the Hong Kong Debtors; and (d) relevant provisions of Hong Kong Companies Ordinance (Cap. 622 of the Laws of Hong Kong) (the "Companies Ordinance") as they relate to this Declaration.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

3.    As of the date hereof, (i) Evergrande is the subject of a restructuring proceeding entitled *In the Matter of China Evergrande Group*, concerning a scheme of arrangement (the "Evergrande Scheme") between Evergrande and certain Scheme Creditors (as defined herein), currently pending before the High Court of Hong Kong (the "Hong Kong Court") (Case Number: HCMP 1091/2023), and (ii) Tianji is the subject of a restructuring proceeding entitled *In the Matter of Tianji Holding Limited*, concerning a scheme of arrangement (the "Tianji Scheme" and, together with the Evergrande Scheme, the "Hong Kong Schemes") between Tianji and certain Scheme Creditors, currently pending before the Hong Kong Court (Case Number: HCMP 1090/2023).

4.      I submit this Declaration in support of (a) the Chapter 15 Petitions with respect to the Hong Kong Debtors; (b) the Recognition Motion; and (c) the *Motion Pursuant to Federal Rules of Bankruptcy Procedure 2002 and 9007 Requesting Entry of an Order (I) Scheduling the Recognition Hearing, and (II) Approving the Form and Manner of Service of Notice*, each filed contemporaneously herewith.

5.      This Declaration comprises matters that are statements of my view of Hong Kong law or statements of fact.  Where the matters stated in this Declaration are statements regarding Hong Kong law, such statements represent my view of Hong Kong law as a solicitor admitted and authorized to practice in Hong Kong.  Where the matters stated in this Declaration are statements of fact that are within my personal knowledge, I believe them to be true.  Where the matters stated in this Declaration are statements of fact that are not within my personal knowledge, they are derived, as appropriate, from documents maintained by the Hong Kong Companies Registry (the "Hong Kong Registrar"), from the records maintained by Sidley as a result of advising the Hong Kong Debtors in connection with the Hong Kong Schemes, and/or from information supplied to me by or on behalf of the Hong Kong Debtors and are true to the best of my knowledge, information, and belief.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## PERSONAL BACKGROUND AND QUALIFICATIONS

6.      I obtained a Bachelor of Laws degree from the National University of Singapore (Dean's List) in 2004.  I am qualified to practice law in Hong Kong (as solicitor), Singapore (as advocate and solicitor), and in England and Wales (as solicitor).  I joined Sidley in 2016.

7.      I, together with other partners and associates at Sidley, have been advising the Hong Kong Debtors on various legal aspects of the Hong Kong Debtors' restructuring, conduct of the Hong Kong Schemes, and the extraterritorial effects and recognition of the same since early 2022.

8.      Although I am not admitted in the United States, I am generally familiar with recognition proceedings arising under Chapter 15 of title 11 of the United States Code (the "Bankruptcy Code") as a consequence of Sidley and Sidley Austin LLP's involvement with other schemes of arrangement involving companies that have required recognition proceedings under Chapter 15 of the Bankruptcy Code.

<div align="center">

**STATEMENTS OF HONG KONG LAW AND PRACTICE**

</div>

**I.      Hong Kong Legal System**

9.      From July 1, 1997, the Hong Kong Court of Final Appeal became the highest appellate court in Hong Kong (except for certain matters which can be referred to the Standing Committee of the National People's Congress of the People's Republic of China ("PRC"), but which are not relevant to these Chapter 15 Cases).  This was in place of the Privy Council of the United Kingdom, which was the highest appellate court for Hong Kong prior to PRC's resumption of exercise of sovereignty over Hong Kong on July 1, 1997.  Decisions of the Privy Council on Hong Kong appeals before July 1, 1997 remain binding in Hong Kong whereas other decisions of the Privy Council or the Supreme Court of the United Kingdom (formerly, the Appellate Committee of the House of Lords) are of persuasive authority only.

10.      The legislative regimes applicable to schemes of arrangement in England and Hong Kong are similar in nature.  Notably, Part 13, Division 2 of the Companies Ordinance and Part 26 of the Companies Act 2006 of England and Wales (the "Companies Act") are similar with provisions in the Companies Ordinance analogous to those of the Companies Act.  The primary difference is that section 674 of the Companies Ordinance has different provisions for voting majorities in the context of a takeover offer.  These provisions are not relevant to the financial restructuring of the Hong Kong Debtors.

11.    To the extent Hong Kong case law exists in relation to schemes of arrangement, the Hong Kong courts will be bound by such case law.  To the extent there are gaps in Hong Kong case law, the Hong Kong courts may be guided by English case law as persuasive authority due to the similarities between the two legislative regimes and the nature and treatment of English jurisprudence in Hong Kong.  This is recognized by Article 84 of the Basic Law of Hong Kong, which is a constitutional document for Hong Kong.

**I.    Overview of Hong Kong Law Governing the Hong Kong Debtors' Scheme Proceedings**

12.    Pursuant to the Hong Kong Schemes, the Hong Kong Debtors are seeking to utilize a scheme of arrangement under the Companies Ordinance to restructure their debt to avoid being placed into a liquidation process.

13.    A scheme of arrangement is a court-supervised arrangement between a company and its members or its creditors (or classes thereof).  Schemes of arrangement are particularly useful in circumstances in which holdout creditors seek an advantage as against similarly ranked creditors in workout negotiations because they enable companies and their creditors in certain instances to obtain court approval to effect restructuring measures without having to obtain approval from 100 percent of the affected creditors.

14.    In accordance with the Companies Ordinance, the scheme process involves one or more meetings of each of the relevant classes of creditors whose rights are to be affected by the scheme.  Such meetings are convened by the Hong Kong Court at an initial hearing, referred to as the "convening hearing," held upon the filing of an *ex parte* originating summons to commence the scheme of arrangement process.  Creditors whose rights are not so dissimilar that would prevent them from consulting together with a common interest are convened to the same meeting, which is referred to as the "scheme meeting."  At the convening hearing, the Hong Kong

6

Court would usually set a date for the substantive hearing for the sanctioning of the scheme, referred to as the "sanction hearing," notice of which is given to the creditors as part of the scheme solicitation.

15.    Notice summoning the meeting must be accompanied by access to an explanatory statement which is required to include all information reasonably necessary to allow scheme creditors to make an informed decision on the scheme of arrangement. The explanatory statement includes, among other things, information regarding the company and its financial position, the proposals for the scheme, the affected creditors, the constitution of the creditor class or classes, the scheme meeting or meetings, voting, and guidance on how scheme creditors may participate in the scheme of arrangement. I understand and have been advised by the Hong Kong Debtors' U.S. counsel, Sidley Austin LLP, that an explanatory statement is comparable to the disclosure statement required under section 1125 of the Bankruptcy Code for solicitation of votes on a Chapter 11 plan.

16.    At the convening hearing, the Hong Kong Court will direct that notice be given in a particular way. The debtor will be required to file affidavit evidence to show that it followed the prescribed process in relation to providing adequate notice of the scheme meeting together with all relevant materials to allow the scheme creditors to vote. After the debtor holds the scheme meeting(s) at which the scheme is approved by the requisite majority, the debtor will have to present a petition to seek the Hong Kong Court's sanction of the scheme.

17.    For the Hong Kong Court to sanction a scheme, the scheme must be approved by a majority in number (50% + 1), representing at least 75% in value, of the creditors voting in person or by proxy at each class meeting convened to approve the scheme of arrangement. Creditors are entitled to attend the scheme meeting in person, by authorized representative (if a corporate

entity), or by proxy, and may ask the scheme chairperson questions regarding the proposed scheme of arrangement.

18.     Notably, a scheme is a collective proceeding.  The effect of a scheme is that if the requisite majorities are obtained and the Hong Kong Court approves the scheme, then the terms of the scheme become binding on all members of the relevant class or classes of creditors as a matter of Hong Kong law, whether or not a creditor: (a) attended the scheme meeting, (b) voted for or against the scheme, or (c) changed its mind afterwards.

A.      Role of the Hong Kong Court.

19.     The Hong Kong Court's role in the scheme process is not to assess the commercial benefits of the proposal.  Once the requisite majorities are achieved at the scheme meeting, the Hong Kong Court will usually consider the creditors to be the best judge of their own commercial interests.  Nevertheless, the Hong Kong Court is not simply a "rubber stamp," and instead plays an active role in the scheme process, retaining discretion as to whether or not to sanction the scheme.  In considering whether or not it should exercise such discretion, the Hong Kong Court will apply the test set out by the Court of First Instance in Hong Kong:

> "In considering whether to sanction a scheme, the Court applies some well-established principles which were recently restated in *Re China Singyes Solar Technologies Holdings Ltd* [2020] HKCFI 467; [2020] HKCLC 379 1 such that the Court would consider in particular the following: (1) whether the scheme is for a permissible purpose; (2) whether creditors who were called on to vote as a single class had sufficiently similar legal rights such that they could consult together with a view to their common interest at a single meeting; (3) whether the meeting was duly convened in accordance with the Court's directions; (4) whether creditors have been given sufficient information about the scheme to enable them to make an informed decision on whether or not to support it; (5) whether the necessary statutory majorities have been obtained; (6) whether the Court is satisfied in the exercise of its discretion that an intelligent and honest man acting in accordance with his interests as a member of the class within which he voted might reasonably approve the scheme; and (7) in an international case, whether there is sufficient connection between the scheme and Hong Kong, and whether the scheme is effective in other relevant jurisdictions."

8

*Re China Bozza Development Holdings Ltd* [2023] HKCFI 1620, ¶12.

20.     Accordingly, the Hong Kong Court will be concerned to ensure that the prescribed procedure has been observed.  For example, the Hong Kong Court will confirm that all necessary disclosures have been made, that all notices were sent as required, the meetings were properly constituted (including that the classes were properly identified), and that other technical and procedural requirements have been satisfied.  Additionally, the court will need to (i) be satisfied the scheme creditors are properly classified such that scheme creditors who are called upon to vote as a single class must have sufficiently similar legal rights and consult one another with a view to their common interest at a single scheme meeting; (ii) be satisfied that the scheme is one that an intelligent and honest person acting in accordance with his interests as a member of the class within which he voted might reasonably approve; (iii) consider whether there is sufficient connection between the scheme and Hong Kong to justify the court sanctioning it, and (iv) determine whether the scheme is effective in other relevant jurisdictions.[3]  The court may hear arguments from the scheme creditors whose rights would be affected by the scheme.

21.     Any scheme creditor who objects to the scheme may appear at the relevant Hong Kong Court hearing to represent its position.  Scheme creditors may also make written submissions in advance of the sanction hearing.  Therefore, scheme creditors attending these proceedings will have a full and fair opportunity to vote on and be heard in connection with the scheme.

B.     <u>Overview of the Hearings</u>.

22.     The scheme process requires at least two Hong Kong Court hearings.  The purpose of the first hearing, namely, the convening hearing, is to ask the Hong Kong Court to convene one

---

[3] *Re China Oil Gangran Energy Group Holdings Ltd* [2021] 3 HKLRD 69; [2021] HKCFI 1592 at [15], [20] and [21].

or more meetings of creditors.  At the convening hearing, the Hong Kong Court's role is mainly

to give directions for the convening of scheme meetings and ensure that the scheme creditors will

receive sufficient notice of the scheme meetings.

23.    Additionally, at the convening hearing, the Hong Kong Court will appoint a person

to chair the scheme meetings.

24.    Provided the scheme is approved by the requisite majorities at the scheme meeting,

there will be a second hearing held at which the Hong Kong Court will be asked to sanction

the scheme—the sanction hearing.  At the sanction hearing, the debtor must demonstrate, in

addition to the matters established at the convening hearing, that:

(a)    the scheme is for a permissible purpose;

(b)    members who are called on to vote as a single class have sufficiently similar
legal rights that they can consult together with a view to their common interest
at a single meeting;

(c)    the meetings were duly convened in accordance with the Hong Kong Court's
directions;

(d)    the members have been given sufficient information about a scheme so as to
enable them to make an informed decision whether or not to support it;

(e)    a majority in number representing 75% in value of the members present and
voting agree to the arrangement;

(f)    the discretionary element of the sanctioning process and in particular whether
the Hong Kong Court is satisfied that a scheme is one that an intelligent and
honest man acting in respect of his interests as a member of the class within
which he votes, might reasonably approve; and

10

(g)    in an international case, whether there is sufficient connection between the scheme and Hong Kong and whether the scheme is effective in other relevant jurisdictions.[4]

25.    The sanction hearing is held in open court.  Any scheme creditor is entitled to be heard at the sanction hearing.  At the sanction hearing, representations may include that the Hong Kong Court should not approve the scheme.  However, an objection based solely on the grounds that the scheme is commercially a bad deal is unlikely to succeed if the scheme has the support of the requisite majorities.

26.    Once the Hong Kong Court holds the sanction hearing and if it sanctions or approves the applicable scheme, the court will enter the sanction order.  Once the court sanctions the scheme, the debtor must ensure that such order is properly filed with the Hong Kong Registrar; under Hong Kong law and pursuant to the Companies Ordinance, the scheme will become effective upon its terms on filing.

27.    Once filed, the scheme will bind all scheme creditors, including those creditors who voted in favor of the scheme, those creditors who voted against it, and those creditors who did not vote at all.

28.    The Hong Kong Debtors' various actions to seek approval and sanction of the Hong Kong Schemes are described in detail in the final section of this Declaration.

## THE HONG KONG SCHEMES

29.    I respectfully refer the Court to the Recognition Motion and the Representative Declarations, filed contemporaneously herewith, for a description of the history and business of each Debtor, the events leading up to filing the Scheme Petitions in Hong Kong,

---

[4] *Re China Oil Gangran Energy Group Holdings Ltd* [2021] 3 HKLRD 69; [2021] HKCFI 1592 at [14].

and the terms of the Hong Kong Schemes.

## THE HONG KONG DEBTORS' HONG KONG PROCEEDINGS

30.     On July 12, 2023, the Hong Kong Debtors filed originating summonses with the Hong Kong Court, true and correct copies of which are attached hereto as **Exhibit A.1 and A.2** (the "Scheme Petitions"), commencing the Hong Kong Schemes in the Hong Kong Court (the "Hong Kong Proceedings"), seeking, among other things, an order directing each Hong Kong Debtor to convene meetings for each class of creditors whose rights will be affected by the applicable creditor scheme (together, the "Scheme Meetings")—namely, the relevant "Scheme Creditors" (as defined in the applicable Explanatory Statement)—and requesting convening hearings (together, the "Convening Hearings").  Each Hong Kong Scheme provides that Hong Kong courts, including the Hong Kong Court, will have exclusive jurisdiction to hear and determine any suit, action, or proceeding, and to settle any dispute that arises out of or in connection with the terms of the Hong Kong Schemes or their implementation, or out of any action taken or omitted to be taken under the Hong Kong Schemes or in connection with the administration of the Hong Kong Schemes.

31.     On July 14, 2023, each Hong Kong Debtor issued practice statement letters to the relevant Scheme Creditors, informing such Scheme Creditors that the Hong Kong Debtors had filed the Scheme Petitions and that the Convening Hearings had been scheduled for July 24, 2023 (the "Practice Statement Letters").  The Practice Statement Letters are attached hereto as **Exhibit B.1 and B.2**.

32.     The Convening Hearings were held on July 24, 2023 before the Hong Kong Court. It was possible for Scheme Creditors to instruct legal representatives to attend, and make submissions during, the Convening Hearing.

33.     Following the respective Convening Hearings on July 24, 2023, the Hong Kong Court entered orders with respect to each Hong Kong Proceeding (with respect to Evergrande, the "Evergrande Convening Order", and with respect to Tianji, the "Tianji Convening Order", and collectively, the "Convening Orders") (i) scheduling the Scheme Meetings (a) with respect to Evergrande, for August 23, 2023, and (b) with respect to Tianji, for August 22, 2023;[5] and (ii) scheduling the hearings to sanction the Hong Kong Schemes for September 5 and 6, 2023 (the "Sanction Hearings").  The Convening Orders are attached hereto as **Exhibit C.1 and C.2**.

34.     The Hong Kong Court authorized and appointed Patrick Cowley of KPMG Advisory (Hong Kong) Limited as the individual to convene the Scheme Meetings both with respect to Evergrande on August 23, 2023 and respect to Tianji on August 22, 2023 (the "Scheme Chairperson").  Evergrande Convening Order, ¶¶ 15; Tianji Convening Order, ¶¶ 15.

35.     In accordance with the Convening Orders and section 671 of the Hong Kong Companies Ordinance, applicable notice of the Scheme Meetings, the Hong Kong Schemes themselves, an applicable explanatory statement (as supplemented from time to time, together, the "Explanatory Statements"),[6] and applicable solicitation materials were provided to the applicable Scheme Creditors by Morrow Sodali Limited, in its capacity as the Hong Kong Debtors' notification and information agent for the Hong Kong Schemes ("Morrow Sodali") and to Blocked Scheme Creditors (as defined in the Hong Kong Schemes) by GLAS Trustees Limited ("GLAS"). Such documents were provided or made available: (a)  on the following website maintained by

---

[5] As described in the supplemented Explanatory Statements (as defined herein) provided to the applicable Scheme Creditors on August 16, 2023 (see footnote 6 below), the Hong Kong Debtors announced that the Scheme Meetings are intended to be adjourned upon commencement thereof to August 28, 2023.

[6] The Explanatory Statement was made available to the applicable Scheme Creditors on July 31, 2023 and supplemented on August 16, 2023.

Morrow Sodali: https://projects.morrowsodali.com/evergrande; (b) on Evergrande's website: https://www.evergrande.com; (c) through the Euroclear Bank SA/NV and Clearstream Banking S.A. clearing systems, as applicable; and (d) by causing Morrow Sodali to send the notice via electronic mail to each Scheme Creditor for whom Morrow Sodali has contact information or by causing GLAS to send the notice via electronic mail to each Blocked Scheme Creditor. In addition, the Scheme Creditors were notified of the Scheme Meetings through announcements on the Main Board of The Stock Exchange of Hong Kong Limited and the Singapore Exchange Securities Trading Limited. Copies of the Hong Kong Debtors' Explanatory Statements are attached hereto as **Exhibit D.1 and D.2**.

36.     If the Hong Kong Debtors meet the requisite over fifty percent (50%+1) in number and seventy-five (75%) in value threshold of the Scheme Creditors present and voting, in person or by proxy, to approve the Schemes at the respective Scheme Meetings, the Hong Kong Debtors will apply to the Hong Kong Court to sanction the Hong Kong Schemes.

37.     Further, if the Hong Kong Schemes are approved at the Scheme Meetings, the Hong Kong Debtors, through Morrow Sodali and GLAS, as applicable, will provide notice to the applicable Scheme Creditors, informing them that the Hong Kong Schemes were approved and upcoming Sanction Hearings are scheduled. The Scheme Creditors will also be informed that they can attend and raise any issues or objections at the applicable Sanction Hearings. In anticipation of the Sanction Hearings, the Scheme Chairperson will file a report on the Scheme Meetings of both Evergrande and Tianji.

38.     If sanctioned by the Hong Kong Court, the Hong Kong Schemes will become effective on their terms once copies of the Sanction Orders approving the Hong Kong Schemes have been filed with the Hong Kong Registrar and in accordance with the provisions of the Hong

Kong Schemes themselves.  Each of the Scheme Creditors will be bound by the Hong Kong

Schemes as a matter of Hong Kong law, whether or not a particular Scheme Creditor participated

in the Scheme Meetings or voted in favor of the Hong Kong Schemes.  Accordingly, the Hong

Kong Debtors will cause the Hong Kong Schemes to be filed with the Hong Kong Registrar after

obtaining the Sanction Orders from the Hong Kong Court, upon which filing the Hong Kong

Schemes and satisfaction of conditions precedent (as set forth in relevant Explanatory Statements)

will become effective.

39.    As the Hong Kong Proceedings are ongoing in parallel to these Chapter 15 Cases,

with the Scheme Meetings being scheduled for August 22, 23 and 28, 2023, and the Sanction

Hearings being scheduled for September 5 and 6, 2023 a supplemental declaration will be filed to

update the Court on the status of the Hong Kong Proceedings and the outcomes of the Scheme

Meetings and the Sanction Hearings, as applicable, in advance of the Recognition Hearing.

*[Remainder of page intentionally left blank.]*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 17, 2023

*/s/ Ang Chee Khian, Desmond*
Ang Chee Khian, Desmond
Sidley Austin

**Exhibit A.1**

**Evergrande Scheme Petition**

> Claim nature:
> A. Non-monetary claim only
> B. Companies

Form No. 11

HCMP 1091 / 2023

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
MISCELLANEOUS PROCEEDINGS NO. 1091 OF 2023

---

IN THE MATTER of CHINA EVERGRANDE
GROUP 中國恒大集團

and

IN THE MATTER of Section 670 of the Companies
Ordinance (Cap. 622)

---

**EX PARTE ORIGINATING SUMMONS**

---

LET ALL PARTIES CONCERNED attend before the Honourable Madam Justice Linda Chan in Chambers, (open to the public) sitting at the High Court, 38 Queensway, Hong Kong on Monday, the 24th day of July 2023 at 11:30 o'clock in the fore-noon on the hearing of an application by China Evergrande Group (the "**Company**"), being a company incorporated in in the Cayman Islands, and listed on The Stock Exchange of Hong Kong Limited with stock code 3333, with its registered office situated at P.O. Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, and a principal place of business in Hong Kong at 15th Floor, YF Life Centre, 38 Gloucester Road, Wanchai, Hong Kong, for an ORDER THAT:

1.    The Company may be at liberty to convene a meeting ("**Scheme Meeting**") of the unsecured creditors of the Company ("**Scheme Creditors**") for the purpose of

considering and, if thought fit, approving, with or without modification, a scheme of arrangement under section 673 of the Companies Ordinance (Cap. 622) proposed to be made between the Company and the Scheme Creditors;

2.    Directions be given as to the method of convening the Scheme Meeting;

3.    The director, company secretary or officer of the Company, be appointed to act as the chairperson of the Scheme Meeting who shall be directed to report the result thereof to the Court;

4.    Such further or other orders and directions as the Court shall see fit; and

5.    There be liberty to apply.

Dated this 12th day of July 2023.

Registrar

This Summons was taken out by Sidley Austin of 39/F, Two International Finance Centre, 8 Finance Street, Central, Hong Kong, Solicitors for the Company.

*Sidley Austin*

**Sidley Austin**

Solicitors for the Company

Estimated Time: 1 hour

HCMP *1081* /2023

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
MISCELLANEOUS PROCEEDINGS NO. *1081* OF 2023

---

IN THE MATTER of CHINA EVERGRANDE
GROUP 中國恒大集團

- and –

IN THE MATTER of Section 670 of the Companies
Ordinance (Cap. 622)

---

---

## EX PARTE ORIGINATING SUMMONS

---

Dated this 12th day of July 2023.
Filed this 12th day of July 2023.

**SIDLEY AUSTIN**
Solicitors for China Evergrande Group
Level 39, Two International Finance Centre
8 Finance Street, Central
Hong Kong
Tel: 2509 7888
Fax: 2509 3110
Ref: DA/ST/DW/033817-30390

**Exhibit A.2**

**Tianji Scheme Petition**

Claim nature:
A. Non-monetary claim only
B. Companies

Form No. 11

HCMP *1080* / 2023

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
MISCELLANEOUS PROCEEDINGS NO. *1080* OF 2023

IN THE MATTER of TIANJI HOLDING LIMITED
天基控股有限公司

and

IN THE MATTER of Section 670 of the Companies
Ordinance (Cap. 622)

---

## EX PARTE ORIGINATING SUMMONS

---

LET ALL PARTIES CONCERNED attend before the Honourable Madam Justice Linda Chan in Chambers, (open to the public) sitting at the High Court, 38 Queensway, Hong Kong on Monday, the 24th day of July 2023 at 11:30 o'clock in the fore-noon on the hearing of an application by Tianji Holding Limited (the "**Company**"), being a company incorporated in Hong Kong with its registered office situated at 17th Floor, One Island East, Taikoo Place, 18 Westlands Road, Quarry Bay, Hong Kong, for an ORDER THAT:

1.  The Company may be at liberty to convene a meeting ("**Scheme Meeting**") of the unsecured creditors of the Company ("**Scheme Creditors**") for the purpose of considering and, if thought fit, approving, with or without modification, a scheme of arrangement under section 673 of the Companies Ordinance (Cap. 622) proposed to be made between the Company and the Scheme Creditors;

4869-9675-0184v.4

2.    Directions be given as to the method of convening the Scheme Meeting;

3.    The director of the Company or director of the Company's parent company China Evergrande Group ("**CEG**"), or company secretary of CEG, or officer of CEG, be appointed to act as the chairperson of the Scheme Meeting who shall be directed to report the result thereof to the Court;

4.    Such further or other orders and directions as the Court shall see fit; and

5.    There be liberty to apply.

Dated this 12th day of July 2023.

Registrar

This Summons was taken out by Sidley Austin of 39/F, Two International Finance Centre, 8 Finance Street, Central, Hong Kong, Solicitors for the Company.

**Sidley Austin**

Solicitors for the Company

Estimated Time: 1 hour

4869-9675-0184v.4

HCMP *10￼0* /2023

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
MISCELLANEOUS PROCEEDINGS NO. *10￼0* OF 2023

---

IN THE MATTER of TIANJI HOLDING
LIMITED 天基控股有限公司

- and -

IN THE MATTER of Section 670 of the Companies
Ordinance (Cap. 622)

---

---

**EX PARTE ORIGINATING SUMMONS**

---

Dated this 12th day of July 2023.
Filed this 12th day of July 2023.

**SIDLEY AUSTIN**
Solicitors for Tianji Holding Limited
Level 39, Two International Finance Centre
8 Finance Street, Central
Hong Kong
Tel: 2509 7888
Fax: 2509 3110
Ref: DA/ST/DW/033817-30390

**Exhibit B.1**

**Evergrande Practice Statement Letter**

**THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION**

**This Practice Statement Letter contains important information that is of interest to Scheme Creditors (as defined herein), and contains matters which may affect their legal rights and entitlements. Scheme Creditors are recommended to consult their own professional advisers as to legal, tax, financial or other aspects relevant to any action they might take in relation to contents of this Practice Statement Letter. All depositories, custodians and other intermediaries receiving this Practice Statement Letter are requested to expedite re-transmittal to the Scheme Creditors in a timely manner.**

**This Practice Statement Letter does not constitute an offer to sell or the solicitation of an offer to buy any securities. None of the securities referred to in this Practice Statement Letter may be sold, issued or transferred in any jurisdiction to or from any person to whom it is unlawful to make such an offer or invitation or solicitation in such jurisdiction, or in contravention of applicable law.**

**Nothing contained in this Practice Statement Letter constitutes a recommendation, or the giving of advice, by the Company (as defined herein) or any other member of the Group (as defined herein) or the Information Agent (as defined herein) to take a particular course of action or to exercise any right conferred by the Scheme Debts (as defined herein) in relation to, buying, selling, subscribing for, exchanging, redeeming, holding, underwriting, disposing of, or converting Scheme Debts or any other financial instruments, securities, assets or liabilities of the Company or any other member of the Group.**

_____

| **From:** | China Evergrande Group (the "**Company**" or "**CEG**") |
|-----------|----------------------------------------------------------|
| **To:** | The Scheme Creditors (defined in paragraph 3.13 below); |
| **To:** | Citicorp International Limited, in its capacity as the trustee in respect of the Existing Notes (defined in paragraph 3 below) (the "**Existing Notes Trustee**"); |
| **To:** | The other Existing Trustees and Agents (defined in paragraph 3.14 below); |
| **To:** | Morrow Sodali Limited, in its capacity as information agent in respect of the Schemes (the "**Information Agent**"); and |
| **To:** | GLAS Specialist Services Limited ("**GLAS**"). |

14 July 2023

Dear Sir/Madam

**Proposed schemes of arrangement in relation to the Company pursuant to: (i) section 86 of the Cayman Islands Companies Act (As Revised) (the "Cayman Companies Act"); and (ii) sections 670, 673 and 674 of the Companies Ordinance (Chapter 622 of the Laws of Hong Kong) (the "HK Companies Ordinance")**

| 1 | **PURPOSE OF THIS PRACTICE STATEMENT LETTER** |
|---|------------------------------------------------|

1.1    The Company is proposing linked and inter-conditional schemes of arrangement (as described below) in (i) the Cayman Islands pursuant to section 86 of the Cayman Companies Act, and (ii) Hong Kong pursuant to sections 670, 673 and 674 of the HK Companies Ordinance. You have

received this Practice Statement Letter because we believe you are a Scheme Creditor (as defined below).

1.2     In accordance with the procedures and guidance laid down by the Grand Court of the Cayman Islands (the "**Cayman Court**") in practice direction No. 2 of 2010 (pursuant to Order 1, rule 12 of the Cayman Islands Grand Court Rules, 1995 (As Revised)), the purpose of this Practice Statement Letter is to inform Scheme Creditors of:

(a)     the Company's intention to formally propose the Schemes (as defined below) to the Scheme Creditors;

(b)     the objectives which the Schemes are designed to achieve;

(c)     the Company's intention to apply to:

(i)     the Cayman Court at a court hearing (a "**Convening Hearing**") to be held on 25 July 2023, for an order granting certain directions in relation to the Company's Cayman Islands scheme of arrangement (the "**CEG Cayman Scheme**"), including permission to convene two meetings of classes of Scheme Creditors for the purpose of considering and, if thought fit, approving, the CEG Cayman Scheme (the "**Cayman Scheme Meetings**"); and

(ii)     the Court of First Instance of the High Court of Hong Kong Special Administrative Region ("**HK Court**") at a Convening Hearing to be held on 24 July 2023, for an order granting certain directions in relation to the Company's Hong Kong scheme of arrangement (the "**CEG HK Scheme**", and together with the CEG Cayman Scheme, the "**Schemes**"), including permission to convene two meetings of classes of Scheme Creditors for the purpose of considering and, if thought fit, approving the CEG HK Scheme (the "**HK Scheme Meetings**", and together with the Cayman Scheme Meetings, the "**Scheme Meetings**");

(d)     certain jurisdictional considerations in relation to the Schemes; and

(e)     the composition of the meetings of Scheme Creditors that the Company proposes to convene for the purposes of voting on the Schemes.

2     **WHAT IS A SCHEME OF ARRANGEMENT?**

2.1     A scheme of arrangement is an arrangement entered into between a company and its creditors, as provided for under (i) section 86 of the Cayman Companies Act; and (ii) sections 670, 673 and 674 of the HK Companies Ordinance.  A scheme of arrangement becomes legally binding on all holders of claims subject to the scheme, including both those voting against the scheme of arrangement and those not voting, if at least a majority in number of the relevant creditors, holding at least seventy-five per cent (75%) in value of claims, present and voting (either in person or by proxy) at the scheme meetings, vote in favour of the scheme of arrangement, the relevant Court then sanctions it and the scheme is delivered to the applicable registrar of companies with a copy of the Court order sanctioning the scheme.  Where there are two or more classes of scheme creditors (as there are in the Schemes), each class must satisfy the above voting requirements in order for the scheme to be approved and for the Court to have the power to sanction it.

2

2.2     A scheme of arrangement may be sanctioned by the relevant Court if it is satisfied that, among other things that: (i) the relevant provisions of Section 86 of the Cayman Companies Act or sections 670, 673 and 674 of the HK Companies Ordinance (as applicable) have been complied with; and (ii) the terms of the scheme of arrangement are such that an intelligent and honest creditor, a member of the class concerned and acting in respect of its own interest, might reasonably vote in favour of it.

3     **INTRODUCTION TO THE PROPOSED SCHEME CREDITORS**

3.1     The Company has incurred indebtedness which includes the "**Class A Debts**" and the "**Class C Debts**" (together, the "**Scheme Debts**"), to which the Schemes relate.

*Class A Debts*

3.2     The Class A Debts are obligations owed by the Company under the following instruments:

(a)     Senior notes and convertible bonds which are publicly-traded on a recognised exchange (the "**Existing Notes**"):

(i)     **CEG Existing January 2022 Notes** - being the 9.5% senior notes due January 30, 2022 (ISIN: XS1991102846, Common Code: 199110284);

(ii)     **CEG Existing March 2022 Notes** - being the 8.25% senior notes due March 23, 2022 (ISIN: XS1580431143, Common Code: 158043114);

(iii)     **CEG Existing April 2022 Notes** - being the 9.5% senior notes due April 11, 2022 (ISIN: XS1982036961, Common Code: 198203696);

(iv)     **CEG Existing January 2023 Notes** - being the 11.5% senior notes due January 22, 2023 (ISIN: XS2106834299, Common Code: 210683429);

(v)     **CEG Existing February 2023 Bonds** - being the 4.25% convertible bonds due February 14, 2023 (ISIN: XS1767800961, Common Code: 176780096);

(vi)     **CEG Existing April 2023 Notes** - being the 10.0% senior notes due April 11, 2023 (ISIN: XS1982037779, Common Code: 198203777);

(vii)     **CEG Existing June 2023 Notes** - being the 7.5% senior notes due June 28, 2023 (ISIN: XS1627599498, Common Code: 162759949);

(viii)     **CEG Existing January 2024 Notes** - being the 12.0% senior notes due January 22, 2024 (ISIN: XS2106834372, Common Code: 210683437);

(ix)     **CEG Existing March 2024** Notes - being the 9.5% senior notes due March 29, 2024 (ISIN: XS1587867539, Common Code: 158786753);

(x)     **CEG Existing April 2024 Notes** - being the 10.5% senior notes due April 11, 2024 (ISIN: XS1982040641, Common Code: 198204064); and

3

(xi)     **CEG Existing June 2025 Notes** - being the 8.75% senior notes due June 28, 2025 (ISIN: XS1627599654, Common Code: 162759965); and

(b)     A private loan agreement of US$100,000,000 with 15% interest p.a. due January 2022 owed by the Company (the "**Class A Private Loan**", and together with the Existing Notes, the "**Class A Debts**").

3.3     Certain direct and indirect subsidiaries of the Company have jointly and severally guaranteed to each Class A Scheme Creditor all of the obligations of the Company to pay the principal, premium (if any), and interest under each of the Class A Debts (the "**Subsidiary Guarantors**").

3.4     The Company has pledged, and each of the parent companies of the Subsidiary Guarantors have pledged (the "**Subsidiary Pledgors**"), as the case may be, all the shares of the Subsidiary Guarantors held by the Company or the relevant Subsidiary Pledgors, in order to secure the obligations under the Existing Notes (the "**Subsidiary Pledges**").  However, these Subsidiary Pledges currently have little to no material value.

3.5     The Company originally granted a pledge over the shares in Treasure Glory Global Limited (BVI) Limited ("**Treasure Glory**") for its liability under the Class A Private Loan.  However, this pledge has since been enforced and the creditor's appointed security agent has become the registered shareholder.

3.6     The Existing Notes are all governed by New York law, save for the CEG Existing February 2023 Bonds which are governed by English law.  The Class A Private Loan is governed by Hong Kong law.

3.7     The aggregate outstanding principal amount of the Existing Notes and the Class A Private Loan was approximately US$14 billion as at 31 December 2022.

*Class C Debts*

3.8     The Class C Debts are the offshore financial unsecured indebtedness, obligations or other liabilities of the Company listed in Appendix 1 to this Practice Statement Letter. They are all governed either by Hong Kong law or Peoples Republic of China ("**PRC**") law.

3.9     Each of the principal debt obligations underlying the Class C Debts, other than the CEG Put Options and CEG Loans (as defined in Appendix 1) are guaranteed by, secured by, and/or benefit from another type of credit support provided by, various different Group (and in some cases, non-Group) entities.

3.10    The claims (whether principal, guarantee and/or security) against any third-party (i.e. any party other than the Company) in respect of the Class C Debt  (the "**Claims Against Third Parties**") are not intended to be subject to the arrangement and compromise effected by the Schemes.

3.11    The aggregate outstanding principal amount of the Class C Debts was approximately US$13.83 billion as at 31 December 2022.

*Scheme Creditors*

4

3.12    The Company is proposing two substantially identical schemes of arrangement with holders of the Scheme Debts, being the "Schemes" described at paragraph 1 above.

3.13    "**Scheme Creditors**" for the purposes of the Schemes are:

(a)    (i) any person holding an economic or beneficial interest as principal in any of the Existing Notes (the "**Class A Noteholders**"); and (ii) any person holding a legal interest as principal in the Class A Private Loan, as at (1) the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or (2) the Entitlement Record Time (in respect of receiving Scheme Consideration (as defined below) on the distribution date(s), as applicable, under the terms of the Schemes) (together, the "**Class A Scheme Creditors**"); and

(b)    (i) any person holding an economic or beneficial interest as principal in any of the Dongpo Notes or Lake Notes (as defined in Appendix 1); and (ii) any person holding an economic interest as principal in the 15 Hengda 03 RMB bonds issued by Hengda Real Estate Group Company Limited (恒大地產集團有限公司) ("**Hengda**") and listed on the Shanghai Stock Exchange ("**RMB Bonds**") or any person holding a legal interest as principal in any of the other Class C Debts, as at (1) the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or (2) the Entitlement Record Time (in respect of receiving Scheme Consideration on the distribution date(s), as applicable, under the terms of the Schemes) (the "**Class C Scheme Creditors**").

3.14    The Existing Notes Trustee, the Existing Notes Depositary (being Citibank Europe plc as common depositary for the Clearing Systems (defined below), acting through its nominee as registered holder of the Existing Notes, Citivic Nominees Limited), China Construction Bank (Asia) Corporation Limited and Guotai Junan Securities Co., Ltd. as trustee under the Dongpo Notes, Lake Notes and/or RMB Bonds, and the facility and security agents in respect of the Class C Debts (together, the "**Existing Trustees and Agents**") are Scheme Creditors for the purpose of being bound by the Scheme. However, they will not be entitled to vote at the Scheme Meeting (to avoid double counting) or receive Scheme Consideration.

3.15    You have been identified as a person who may be a Scheme Creditor as set out in paragraph 3.13 above. If you are a Scheme Creditor, your legal rights and entitlements will be affected by the proposed Schemes (if approved by the requisite statutory majorities of the Scheme Creditors at the Scheme Meetings and then sanctioned by the Courts).

3.16    If the Courts each grant leave to convene the Scheme Meetings at the Convening Hearings, an explanatory statement will be made available to all Scheme Creditors in advance of those Scheme Meetings which will contain all information reasonably necessary for Scheme Creditors to make an informed decision about the merits of the proposed Schemes (the "**Explanatory Statement**").

3.17    A time and date (the "**Voting Record Time**") will be fixed for the purpose of identifying Scheme Creditors entitled to attend and vote at those Scheme Meetings. Details of the Voting Record Time will be set out in the Explanatory Statement.

3.18    The Company anticipates that the Scheme Meetings for the two Schemes will be held consecutively in Hong Kong, with full details to be made available in the Explanatory Statement.

3.19    If you have assigned, sold or otherwise transferred your interests in any Scheme Debts or intend to do so, you should forward a copy of this Practice Statement Letter immediately to the person or persons to whom you have assigned, sold or otherwise transferred such interests or to the proposed assignee and/or transferee. If you remain a lender of record under the Class A Private Loan or any Class C Debt or if you remain a beneficial holder as principal of the Existing Notes, Lake Notes or Dongpo Notes and will be such as at the Voting Record Time, you will be the person entitled to vote at the relevant Scheme Meetings and should read this Practice Statement Letter and the Explanatory Statement (when available).

4       **BACKGROUND TO THE COMPANY AND THE GROUP**

4.1     The Company was incorporated in the Cayman Islands under the Cayman Companies Act on 26 June 2006 as an exempted company with limited liability (registration number 169971). The Company's shares have been listed on the Main Board of the Stock Exchange of Hong Kong Limited ("**SEHK**") since 5 November 2009 with the stock code 3333. As at the date of this Practice Statement Letter, the authorised share capital of the Company is US$100,000,000,000 divided into 1,000,000,000 shares of par value US$0.01 each.

4.2     The Company is the ultimate holding company of a group of companies comprising the Company and its subsidiaries, including the Subsidiary Guarantors (as defined above) (the "**Group**"). The Group (formerly known as Evergrande Real Estate Group) was founded in 1996 and it is now headquartered in Guangzhou City, Guangdong Province, the PRC. The Group was originally a property development company and remains principally engaged in the development, investment and management of property in the PRC. The Group's business operations are primarily based in the PRC, where the majority of the Group's assets, being property development projects, are located.  In recent years, the Group has diversified into various other sectors, including new energy vehicle development and production, and the cultural tourism industry. The Group had also spun-off its property management services business into a listed company in Hong Kong.

4.3     The Company is the issuer or borrower of the Class A Debts and an obligor (i.e. as borrower, guarantor or creditor support provider) in respect of the Class C Debts. The principal assets of the Company include (indirectly held) majority or substantial shareholdings in the following subsidiaries:

(a)     Evergrande Property Services Group Limited ("**Evergrande PSG**"), a company incorporated in the Cayman Islands. Evergrande PSG is listed on the SEHK (stock code 6666) and its main business is the provision of comprehensive management services for property owners. It manages a portfolio of residential and commercial properties in the PRC and Hong Kong. Evergrande PSG has also been contracted to manage other types of properties such as theme parks, industrial parks, healthcare complexes, themed towns and schools, amongst others. Immediately prior to the suspension of trading of Evergrande PSG's shares, Evergrande PSG had a market capitalisation of over HK$24.86 billion (US$3.18 billion);

(b)     China Evergrande New Energy Vehicle Group Limited ("**Evergrande NEV**"), a company incorporated in Hong Kong and listed on the SEHK (stock code 0708). Evergrande NEV has two main business segments both onshore-based, (1) new energy vehicles and (2) health management. Immediately prior to the suspension of trading of Evergrande NEV's shares, Evergrande NEV had a market capitalisation of over HK$34.70 billion (US$4.42 billion);

6

(c)    Tianji Holding Limited ("**TJ**"), a company incorporated in Hong Kong with over 200 subsidiaries incorporated under the laws of the BVI and Hong Kong, and a handful of subsidiaries established under the laws of the PRC. TJ is an investment holding company and is also a guarantor of the certain offshore notes issued by Scenery Journey (BVI) Limited ("**SJ**") (the "**SJ Notes**"); and

(d)    Hengda, a company established in the PRC, and a key onshore subsidiary of the Company and the holding company for the Company's operating subsidiaries, project companies and assets in the PRC. It is also the 100% controlling shareholder of TJ and the keepwell provider for the SJ Notes and an issuer of the RMB Bonds (defined above). As of the date of this Practice Statement Letter, the Company indirectly holds approximately a 60% equity stake in Hengda.

## 5    BACKGROUND TO THE RESTRUCTURING

*Financial Position of the Company and the Group*

5.1    In recent years, the Group has been growing its real estate development business while at the same time seeking to diversify its business. To fund the Group's expanding business operations, the Group's interest-bearing borrowings increased to approximately RMB799.9 billion (US$119.21 billion) as of 31 December 2019 compared to RMB535.1 billion (US$79.74 billion) as of 31 December 2016.

5.2    For property development companies such as the Group, raising capital through financial instruments is a key source of cash flow to support continuing operations. The Company's last issuance of offshore notes occurred in January 2020. The Company has not been able to issue any new notes offshore since 2021. Financial institutions also reduced the number of loans granted to the Company's onshore subsidiaries. However, the Group made more than US$9.98 billion in principal repayments and US$4.09 billion in interest payments from March 2020 to June 2021 in relation to the Existing Notes, which consequently tightened the Company's cash flow.

5.3    In response to the market slow-down, the Group launched online sales of its houses, offering significant discounts and advertising heavily.  The Group prioritised maintaining revenue and cash flow ahead of making profits to ensure the continuation of its operations. In 2020, the Group's average per square meter selling price for property fell significantly, from RMB10,281/sqm (US$1,532.21) in 2019, to RMB8,945/sqm (US$1,333.1) in 2020. In the first half of 2021, the Group's contracted sales decreased and the contracted sales area fell (with a lower average selling price per square meter).

5.4    In the second half of 2021, the Group's liquidity situation declined significantly, and the Group suffered a serious operational crisis, as explained in the Company's SEHK announcement dated 14 September 2021.  Adverse reaction to unfavourable market conditions by offshore capital markets has limited the Group's funding sources to address upcoming maturities.  As a result, not only did the Company's financing become restricted, its debts also gradually became overdue. In addition, the impact from the slowdown in sales resulted in a decline in creditworthiness, which further restricted the Group's financing.  These strains on the Company's operations have continued through 2022 and into 2023.

5.5    Owing to these factors, the Company has been unable to meet its ongoing debt maturities despite the best efforts of the Group. This includes being unable to meet the principal amounts of the

Existing Notes listed in sub-paragraphs 3.2(a)(i) to (vii) above (and accrued but unpaid interest thereon) by their respective maturity dates.  These amounts remain unpaid as of the date of this Practice Statement Letter. The Company is therefore insolvent.

*Appointment of financial advisor and discussions with the Ad Hoc Group*

5.6    Since 2021, Houlihan Lokey (China) Ltd ("**Houlihan Lokey**") has been acting as the financial advisor to evaluate the Group's capital structure, liquidity position, to explore options for a restructuring of the Company's liabilities, and to assist the Company in its debt restructuring negotiations with the Scheme Creditors. China International Capital Corporation Hong Kong Securities Limited ("**CICC**") and BOCI Asia Limited ("**BOCI**") have also been acting as advisers to the Schemes (together with Houlihan Lokey, the "**Advisers**").

5.7    The Company, together with the Advisers and its legal advisers, have been involved in extensive negotiations and discussions with a group of Class A Noteholders holding approximately US$3.9 billion of the principal amount of the Existing Notes, representing approximately 27.2% of the aggregate outstanding principal amount of the Existing Notes as at the date of this Practice Statement Letter (the "**Ad Hoc Group**") regarding the restructuring of the Existing Notes and the Company's other liabilities. As a result of such negotiations, on 20 March 2023, the Company and Ad Hoc Group agreed to the terms of the proposed restructuring (the "**Term Sheet**").  A copy of the Term Sheet is appended to this Practice Statement Letter as "Appendix 2".

5.8    In order to facilitate a full and open communication with all Scheme Creditors and to address the Group's liquidity issue in an efficient and fair way, on 22 March 2023, the Company announced on the website of the SEHK a proposed restructuring plan in connection with the Existing Notes, the Class A Private Loan and the Class C Debts (the "**Restructuring**"). The announcement enclosed the Term Sheet and was followed by a further announcement on 3 April 2023 whereby the Company provided instructions to Scheme Creditors to visit the Transaction Website (as defined below) in order to access the following:

(a)    a restructuring support agreement signed by the Company, the Information Agent and certain holders of the Existing Notes including the Ad Hoc Group, in respect of the Class A Debts (the "**Class A RSA**"); and

(b)    a restructuring support agreement signed by the Company and the Information Agent in respect of the holders of Class C Debts (the "**Class C RSA**").

5.9    In that same 3 April 2023 announcement, each Scheme Creditor was invited to agree and support the proposed Restructuring (i.e. the Schemes) by acceding to the Class A RSA or the Class C RSA (as applicable) by 5:00 p.m. Hong Kong time on 27 April 2023 (the "**RSA Consent Fee Deadline**"). The RSA Consent Fee Deadline could be extended in accordance with the terms of the relevant RSA, and on 27 April 2023, the Company announced on the website of the SEHK an extension of the RSA Consent Fee Deadline for both RSAs to 5:00 p.m. Hong Kong time on 18 May 2023 in order to allow Scheme Creditors additional time to complete their internal processes of acceding to the relevant RSA in order to become eligible to receive the Consent Fee.

5.10    As at the date of this Practice Statement Letter:

(a)     Class A Scheme Creditors holding approximately 86% of the aggregate outstanding principal amount of the Class A Debts have entered into or acceded to the Class A RSA; and

(b)     Class C Scheme Creditors holding approximately 39.6% of the aggregate outstanding principal amount of the Class C Debts (which were at that time listed in the Class C RSA) have entered into or acceded to the Class C RSA.

5.11    The Scheme Creditors who have acceded to the Class A RSA or Class C RSA (as applicable) have agreed, *inter alia*, that they will:

(a)     use all commercially reasonable endeavours in order to support, facilitate, implement or otherwise give effect to the Restructuring as soon as reasonably practicable, including voting in favour of the Schemes at the Scheme Meetings;

(b)     not take any step that may interfere with or delay the Schemes including making any application to the relevant Court to object to or challenge any of the Schemes or commencing any enforcement action;

(c)     provide commercially reasonable support and assistance to the Company to prevent the occurrence of an insolvency proceeding; and

(d)     not formulate, encourage, procure or otherwise support any alternative proposal or alternate offer for the implementation of the Restructuring other than those contemplated by the Term Sheet.

*RSA Consent Fees*

5.12    It is a term of the Class A RSA that each Class A Scheme Creditor who:

(a)     entered into the Class A RSA as an initial participating creditor or acceded to it as an additional participating creditor by executing and delivering the requisite documents specified in the Class A RSA to the Information Agent in respect of all of its Existing Notes (or the Class A Private Loan, as the case may be) before 5:00 pm (Hong Kong time) on the RSA Consent Fee Deadline i.e. 18 May 2023 (thereby making them "**Eligible Restricted Debts**");

(b)     votes in favour of the Schemes at the Scheme Meetings; and

(c)     has not exercised its rights to terminate the Class A RSA and has not breached any provision of it (including terms relating to the restriction on transfer of the Existing Notes) in any material respect,

shall be an "**Eligible Participating Creditor**" entitled to receive a consent fee amount equal to 0.25% of the outstanding principal amount of the Eligible Restricted Debts held by such participating creditor (a "**Participating Creditor**") as of the Voting Record Time (the "**Consent Fee**"). The Consent Fee will be paid in kind by way of new notes to be issued by the Company in connection with the Restructuring.

5.13    The Consent Fee will be paid to Class A Scheme Creditors that are Eligible Participating Creditors:

9

(a)  on the Restructuring Effective Date (defined in paragraph 11 below), if the Class A Scheme Creditors are electing Option 2, described below at paragraph 7.3(b)); or

(b)  on the Final Distribution Date (defined in paragraph 5.14 below), if the Class A Scheme Creditors are electing Option 1, described at paragraph 7.3(a) below,

and all in accordance with the section headed "Consent Fee" in the Term Sheet and the Class A RSA.

5.14    It is a term of the Class C RSA that each Class C Scheme Creditor who:

(a)  acceded to it by executing and delivering the requisite documents specified in the Class C RSA to the Information Agent in respect of all of its Class C Debts before 5:00 pm (Hong Kong time) on the RSA Consent Fee Deadline i.e. 18 May 2023 (thereby making them Eligible Restricted Debts);

(b)  votes in favour of the Schemes at the Scheme Meetings; and

(c)  has not exercised its rights to terminate the Class C RSA and has not breached any provision of it (including terms relating to the restriction on transfer of the Eligible Restricted Debts) in any material respect,

shall be an Eligible Participating Creditor entitled to receive the Consent Fee to be paid on the final distribution date, which is expected to be 30 days after the completion of the claims valuation and adjudication procedure for Class C Scheme Creditors described in paragraph 12 of this Practice Statement Letter (the "**Final Distribution Date**").

5.15    The only other way in which a person may acquire an entitlement to the Consent Fee after the RSA Consent Fee Deadline is if there has been a valid transfer (as provided for in the Class A RSA and Class C RSA respectively) (or, if applicable, a chain of valid transfers) of an Eligible Restricted Debt in accordance with the terms of the applicable RSA, including that the relevant transferee is either a Participating Creditor or has first agreed to be bound by the terms of the applicable RSA as a Participating Creditor by acceding to the RSA in accordance with its terms.

5.16    The Consent Fee is considered by the Company to be appropriate in order to secure early support for the Restructuring from the Scheme Creditors and to provide the Group with stability and visibility over the implementation of the Restructuring. The Company's 3 April 2023 public announcement on the SEHK referred to at paragraphs 5.8 and 5.9 above gave all Scheme Creditors (who were at that time set out in the RSAs) notice of the opportunity to enter into the relevant RSA and to become eligible to receive the Consent Fee (provided they satisfy the aforementioned conditions). The announcement was also made available on the Transaction Website to all Scheme Creditors and distributed via Euroclear Bank SA/NV and Clearstream Banking S.A. (the "**Clearing Systems**") to the Class A Noteholders.

*Jurisdiction of the Cayman and HK Courts*

5.17    The Company considers that the Cayman Court and the HK Court respectively have jurisdiction in relation to the Schemes and jurisdiction to convene Scheme Meetings in respect of the Company.

10

5.18    The Cayman Court has jurisdiction in relation to the CEG Cayman Scheme and jurisdiction to convene the Scheme Meetings in respect of the Company, on the basis that the Company is a Cayman Islands incorporated and registered exempted company and is liable to be wound up under Part V of the Cayman Companies Act.

5.19    The HK Court has jurisdiction in relation to the scheme of a foreign company such as the CEG HK Scheme as there is sufficient connection between the CEG HK Scheme and Hong Kong, on the basis that, among other things: (i) the Company is registered in Hong Kong as a non-Hong Kong company under Part 16 of the HK Companies Ordinance; and (ii) the Company is listed on the SEHK and has shareholders present in Hong Kong.

6       **PURPOSE OF THE SCHEMES AND THE RESTRUCTURING**

6.1     The purpose of the Schemes and the Restructuring is to:

(a)     avoid the Company and other members of the Group entering into insolvent liquidation in the near future, as a result of which the anticipated recoveries for Scheme Creditors would likely be significantly less than if the Restructuring were to be completed successfully;

(b)     provide the Group with a more stable capital structure, which will enable the Group to comply with its obligations and liabilities following the Restructuring, to continue to trade on a going concern basis and to recover as the PRC property market stabilises; and

(c)     increase the prospect of delivering long-term value for all of the Scheme Creditors and all of the other stakeholders of the Company.

7       **OVERVIEW OF THE SCHEME AND THE RESTRUCTURING**

7.1     The Restructuring in respect of the Company shall be implemented through the Schemes. The Schemes will affect the rights of the Scheme Creditors under the Class A Debts and the Class C Debts (as applicable). The Schemes are linked with and inter-conditional upon one another.

7.2     The Schemes are part of a wider restructuring to comprehensively restructure the offshore indebtedness of the Group. In addition to the Schemes, the Group is intending to implement the restructuring by: (i) a scheme of arrangement in Hong Kong to be proposed by an indirectly held Hong Kong subsidiary of the Company, TJ (the "**TJ Scheme**"); and (ii) a scheme of arrangement in the BVI to be proposed by an indirect subsidiary of the Company, SJ (the "**SJ Scheme**"), in respect of creditor claims arising from the SJ Notes. The TJ Scheme and the SJ Scheme are inter-conditional as between themselves, but the Schemes are not inter-conditional with either the TJ Scheme or the SJ Scheme.

*Scheme Consideration Options*

7.3     Under the terms of the Schemes, each Scheme Creditor will be entitled to elect between two options for the consideration they wish to receive (the "**Scheme Consideration**"). In summary, Class A Scheme Creditors and Class C Scheme Creditors may elect to receive broadly similar types of new instruments under either option 1 or 2, as follows:

(a)     option 1 ("**Option 1**"): new notes to be issued by the Company with a tenor of 10 to 12 years (the "**A1 Notes**" and "**C1 Notes**" respectively); or

11

(b)    option 2 ("**Option 2**"):

    (i)    new notes to be issued by the Company with a tenor of 5 to 9 years (the "**A2 Notes**") or 7 to 9 years (the "**C2 Notes**");

    (ii)    a package of five equity-linked instruments to be issued by the Company including:

        (A)    mandatory convertible bonds convertible into shares of the Company;

        (B)    mandatory exchangeable bonds exchangeable into shares of Evergrande PSG;

        (C)    mandatory exchangeable bonds exchangeable into shares of Evergrande NEV;

        (D)    new notes linked to (among other things) the shares of Evergrande PSG; and

        (E)    new notes linked to (among other things) the shares of Evergrande NEV,

        (collectively, the "**A2 Package**" with respect to the equity-linked instruments to be issued to Class A Scheme Creditors, or the "**C2 Package**" with respect to the equity-linked instruments to be issued to Class C Scheme Creditors, as applicable); or

    (iii)    any combination of the A2 Notes and the A2 Package (or the C2 Notes and the C2 Package, as applicable),

subject to adjustment and reallocation in accordance with the terms of the Schemes.

7.4    Further details of the A1 Notes, A2 Notes, A2 Package, C1 Notes, C2 Notes and C2 Package (collectively referred to as the "**New Notes**" for the purposes of this Practice Statement Letter) can be found in the Term Sheet appended to this Practice Statement Letter.

7.5    As the same Scheme Debts will be compromised by each of the two Schemes, each Scheme Creditor will have a single Entitlement (as defined below) to Scheme Consideration for the purposes of both Schemes (i.e. Scheme Creditors will receive a single amount of Scheme Consideration in respect of their Entitlement and will not be entitled to receive two separate sets of Scheme Consideration).

7.6    In addition to the above, the Company may receive scheme consideration in its capacity as a scheme creditor in, and pursuant to the terms of, the TJ Scheme (the "**TJ Scheme Consideration**"). Any TJ Scheme Consideration received by the Company shall be distributed on a pro rata basis to those Class A Scheme Creditors and Class C Scheme Creditors who have validly elected by the applicable deadline to receive the A2 Package and the C2 Package respectively. If the Company receives the TJ Scheme Consideration prior to the conclusion of the claims valuation and adjudication process for Class C Scheme Creditors (explained in paragraph 12 below), the Company shall make an interim distribution of the TJ Scheme Consideration to the eligible Class A Scheme Creditors followed by a final distribution to the eligible Class A Scheme Creditors and Class C Scheme Creditors on the Final Distribution Date. If the Company receives the TJ Scheme Consideration after the Final Distribution Date, the TJ Scheme Consideration will

12

be distributed to the eligible Scheme Creditors on a date to be designated by the Company within three months thereafter. Any TJ Scheme Consideration distributed to Class A Scheme Creditors and Class C Scheme Creditors in accordance with the Schemes shall be in addition to and not reduce the Entitlement of those Scheme Creditors to Scheme Consideration.

*Scheme Creditors' Entitlement to Scheme Consideration*

7.7    For the purpose of <u>distribution</u> of the Scheme Consideration, the principles for determining the value of each Scheme Creditor's "**Entitlement**" are, in summary, as follows:

    (a)    With respect to a Class A Scheme Creditor, the Entitlement means the value equal to (i) the outstanding principal amount of the Class A Debt owing to the Class A Scheme Creditor at the "**Entitlement Record Time**" (which is currently expected to be the Restructuring Effective Date), and (ii) all accrued but unpaid interest on such Class A Debt up to (but excluding) the earlier of (a) the Entitlement Record Time; or (b) 1 October 2023 ("**Class A Scheme Creditor's Entitlement**").

    (b)    With respect to a Class C Scheme Creditor, the Entitlement shall be determined on a "**Deficiency Basis**" whereby, in summary, the value of the Class C Scheme Creditor's Claims Against Third Parties will be assessed by way of a claims valuation and adjudication procedure and deducted from the full outstanding amount of the Class C Debt.  This reflects that the Schemes will release the Class C Debts, but will not release any Class C Scheme Creditor's Claims against Third Parties (by contrast, the Schemes will release the Class A Debts and will also release any Class A Scheme Creditor's Claims against third parties). To illustrate, calculating the Entitlement of Class C Scheme Creditor on a Deficiency Basis would take:

        (i)    the aggregate outstanding amount of the Class C Debt owing to the Class C Scheme Creditor at the Entitlement Record Time;

        (ii)    plus (+) all accrued and unpaid interest the Company is liable for in respect of the Class C Debt up to (but excluding) the earlier of (i) the Entitlement Record Time; or (ii) 1 October 2023; and

        (iii)    minus (-) the assessed value of any Class C Scheme Creditor's Claims Against Third Parties ("**Class C Scheme Creditor's Entitlement**").  A similar approach will be taken to determine any net claim in respect of a put option/repurchase obligation.

    (c)    The determination of the value of a Class C Scheme Creditor's Entitlement will take place after the sanction of the Schemes by way of a claims valuation and adjudication procedure (as explained below).

*Voting*

7.8    For the avoidance of doubt, Scheme Creditors will have their claims admitted at full value for the purposes of voting on the Schemes at the Scheme Meetings (without double counting, and without permitting duplicative claims or portions of claims against the Company other than for US$1, and in any event subject to the discretion of the chairperson). This means that a Scheme Creditor's

13

claim will in principle (and subject to the exceptions above) be admitted for voting purposes at a value of (a) the outstanding principal amount of the Scheme Debt in which each Scheme Creditor held an economic or beneficial interest and/or legal interest (as applicable) as principal at the Voting Record Time; plus (b) all accrued and unpaid interest relating to such Scheme Debt up to (but excluding) the Voting Record Time.

7.9    Scheme Creditors (other than Blocked Scheme Creditors) will be required to submit (among other things) the relevant Scheme Creditor Forms to the Information Agent by the Voting Record Time in order to vote, or appoint a proxy to vote on its behalf, at the Scheme Meetings.

7.10    Details of the steps that each Scheme Creditor will need to take in order to vote at the Scheme Meetings, or appoint a proxy to vote on its behalf, will be set out in full in the Explanatory Statement and the accompanying solicitation packet (the "**Solicitation Packet**") to be made available to Scheme Creditors should the respective Courts grant orders convening the Scheme Meetings.

*Blocked Scheme Creditors*

7.11    There are also specific arrangements relating to voting and the distribution of Scheme Consideration to any "Blocked Scheme Creditors", being any Scheme Creditor (other than any Sanctioned Scheme Creditor, as described below) that is not entitled, able or permitted (whether directly or through a custodian) to submit instructions or settle through the Clearing Systems as a result of certain laws, regulations and/or orders relating to economic, financial or trade sanctions ("**Applicable Sanctions**")[1] affecting the Scheme Creditor or its custodian, as determined by the Clearing Systems.

7.12    Blocked Scheme Creditors will not be entitled, able or permitted to (i) submit voting instructions through the Clearing Systems or to the Information Agent on the Scheme or (ii) receive the Scheme Consideration on the Restructuring Effective Date (or such later date as is permitted under the Schemes) due to the Applicable Sanctions.

7.13    To vote, any Blocked Scheme Creditors in Class A or Class C will need to submit a validly completed "Blocked Scheme Creditor Form", which will be included in the Solicitation Packet, by the Voting Record Time to GLAS, who the Company has appointed to liaise with the Blocked Scheme Creditors. The Information Agent will not accept forms from the Blocked Scheme Creditors.

7.14    In terms of Scheme Consideration, only Class A Scheme Creditors who (i) submitted the required scheme creditor forms as will be set out in the Solicitation Packet (the "**Scheme Creditor Forms**")[2] by the required deadline (currently expected to be fourteen (14) calendar days after the date on which the Schemes become effective in accordance with the Schemes) (the "**Class A Options Deadline**"); and (ii) elected Option 2 for their Scheme Consideration, will be entitled to receive their Scheme Consideration on the Restructuring Effective Date.  The Scheme Consideration and any Consent Fee to which Blocked Scheme Creditors that are Class A Scheme Creditors would otherwise be entitled on the Restructuring Effective Date and any undistributed TJ Scheme Consideration, will first be held on trust (the "**Holding Period Trust**") pursuant to a Holding Period Trust Deed until the business day after the Final Distribution Date (the "**Holding Period Expiry**

---

[1] Including laws, regulations and/or orders relating to economic, financial or trade sanctions, restrictive measures or embargoes administered, maintained and/or enforced by the European Union, United States of America, the United Kingdom and the British Overseas Territories (including the Cayman Islands).

[2] See also the summary of the Scheme Creditor Forms at paragraph 18.1 of this Practice Statement Letter.

14

**Date**"). If the Applicable Sanctions are not lifted, or are otherwise no longer applicable, in respect of Blocked Scheme Creditors by the Holding Period Expiry Date, the Scheme Consideration, TJ Scheme Consideration and any Consent Fee payable to Blocked Scheme Creditors (whether a Class A Scheme Creditor or Class C Scheme Creditor) who have submitted their Blocked Scheme Creditor Form and supporting evidence by the applicable Bar Date (including interest accrued on such Scheme Consideration, TJ Scheme Consideration and any Consent Fee) (the "**Blocked Entitlements**") will be distributed to an escrow agent to hold on escrow in the "**Successor Escrow Account**" until the earlier of (i) 21 years from the Holding Period Expiry Date, and (ii) the lifting of all Applicable Sanctions that restrict the Blocked Scheme Creditor from receiving its Entitlement, with the Blocked Scheme Creditors thereafter given a reasonable period to recover from the Successor Escrow Account the Blocked Entitlements to which they are entitled.

7.15   As at the date of this Practice Statement Letter, the Company is not aware of any Blocked Scheme Creditors, but it is possible that there are Blocked Scheme Creditors given the difficulty of determining whether any Scheme Creditors under the Existing Notes, the Dongpo Notes and/or the Lake Notes are Blocked Scheme Creditors until they try to submit their voting instructions through the Clearing Systems.

*Sanctioned Scheme Creditors*

7.16   As will be more specifically described in the Explanatory Statement, any Scheme Creditor who is designated on any Applicable Sanctions lists or otherwise subject to a full asset freeze will be a "**Sanctioned Scheme Creditor**". Sanctioned Scheme Creditors will not be entitled to vote on the Schemes.

7.17   As of the date of this Practice Statement Letter, the Company is not aware of any Sanctioned Scheme Creditors or Blocked Scheme Creditors, but it is possible that there are Sanctioned Scheme Creditors or Blocked Scheme Creditors given the difficulty of determining whether any Scheme Creditors are Sanctioned Scheme Creditors or Blocked Scheme Creditors until they try to submit their voting instructions.

*Releases*

7.18   With effect from the Restructuring Effective Date, each Scheme Creditor, in consideration for its Entitlement to the Scheme Consideration, shall release:

(a)    all claims it has against, amongst others, the Company, the Subsidiary Guarantors, the Information Agent and the Group under the Scheme Debts (but excluding any Class C Scheme Creditor's Claims Against Third Parties); and

(b)    all claims (except for fraud, wilful default and wilful misconduct) against, among others, the Company, the Subsidiary Guarantors, the Information Agent, the Group and their respective directors, officers, employees and certain advisors (including the Ad Hoc Group and their advisors) in respect of: (i) the preparation and negotiation of the Schemes and the Restructuring and (ii) the implementation of the Schemes and the Restructuring.

8   **CLASS A OPTIONS DEADLINE AND BAR DATES**

8.1    The Class A Scheme Creditors (who are neither Blocked Scheme Creditors nor sanctioned Scheme Creditors) are encouraged to submit all relevant Scheme Creditor Forms to the Information Agent

as soon as possible and ahead of the Voting Record Time in order to vote at the Scheme Meeting, and in any case must validly submit the required Scheme Creditor Forms by the Class A Options Deadline to the satisfaction of the Information Agent in order to be able to elect Option 2 for their Scheme Consideration.

8.2    Any Class A Scheme Creditor who submits the required Scheme Creditor Forms after the Class A Options Deadline but before the Class A Bar Date (currently anticipated to be 1 month after the Restructuring Effective Date) to the satisfaction of the Information Agent will no longer be entitled to elect Option 2 and be automatically deemed to have elected Option 1 for their Scheme Consideration.

8.3    In summary:

(a)    Class A Scheme Creditors electing Option 2 by the Class A Options Deadline will receive an initial distribution of A2 Notes and/or A2 Package (as applicable) on the Restructuring Effective Date, and receive the remainder of their Scheme Consideration on the Final Distribution Date; and

(b)    Class A Scheme Creditors electing Option 1 by the Class A Bar Date will receive all of their Scheme Consideration on the Final Distribution Date.

8.4    The Class C Scheme Creditors (who are neither Blocked Scheme Creditors nor Sanctioned Scheme Creditors) are encouraged to submit all relevant Scheme Creditor Forms to the Information Agent as soon as possible and ahead of the Voting Record Time in order to vote at the Scheme Meeting, and in any case, must submit the required Scheme Creditor Forms by the Class C Bar Date (currently expected to be 135 days after the Restructuring Effective Date) to the satisfaction of the Information Agent in order to receive the Scheme Consideration on the Final Distribution Date.

8.5    Blocked Scheme Creditors are encouraged to submit their Blocked Scheme Creditor Form to GLAS as soon as possible and ahead of the Voting Record Time in order to vote at the Scheme Meeting, and in any case, must submit a validly completed Scheme Creditor Form by the applicable Bar Date to be entitled to Scheme Consideration.

9    **CONSTITUTION OF CLASSES**

9.1    It is the responsibility of the Company to determine whether more than one meeting of creditors is required and, if so, to ensure that the meeting(s) is/are properly constituted. Each class of creditors must be properly constituted so that any meeting of that class comprises creditors whose rights against the Company are not so dissimilar as to make it impossible for them to consult together with a view to their common interest. If the rights of Scheme Creditors in a class are so different or would be affected so differently by the respective Schemes as to make it impossible for them to consult together with a view to their common interest, they must be divided into separate classes and a separate scheme meeting must be held for each class of creditor.

9.2    For the purposes of assessing class, the Court considers the similarities and differences in (i) the existing rights of Scheme Creditors against the Company which are to be released or varied under the Schemes; and (ii) the new rights which the Schemes give to Scheme Creditors by way or compromise or arrangement. When assessing the existing rights of Scheme Creditors, the Court

16

considers the rights they would have in the applicable alternative scenario in the event that the Schemes are not sanctioned.

9.3     The Company has considered the existing rights of each of the Scheme Creditors against the Company and the way in which those rights would be affected by the Schemes. The existing rights of Scheme Creditors have been assessed on the basis that the alternative to the Schemes being sanctioned is a liquidation of the Group (as further explained in paragraph 14 below).

9.4     The Company has concluded that the Scheme Creditors fall into two classes for the purposes of voting on the Schemes (Class A and Class C) for the reasons explained below.

*Class A Scheme Creditors*

9.5     The Company considers that the rights of all Class A Scheme Creditors are sufficiently similar to enable them to consult together with a view to their common interest.

9.6     This is because:

(a)     The Existing Notes all have the benefit of the same security constituted by the Subsidiary Pledges. Each of the relevant subsidiaries is however insolvent, such that the security constituted by the Subsidiary Pledges is considered by the Company to be worthless. Accordingly, in the alternative to the Schemes, each of the Class A Noteholders in respect of the Existing Notes will effectively be an unsecured creditor of the Company. Further, to the extent that the Subsidiary Pledges have been granted by entities other than the Company, then they do not constitute rights against the Company itself.

(b)     The Class A Private Loan was secured over shares previously held by the Company in Treasure Glory, a direct subsidiary of the Company. The Class A Private Loan Scheme Creditors have enforced their security over those shares and are accordingly also unsecured creditors of the Company for the remaining balance.

(c)     In the event the Schemes fail, it is likely that the Company will enter into a liquidation. In those circumstances, the claims of all Class A Scheme Creditors will become immediately due and payable and the rights of all Class A Scheme Creditors against the Company would rank *pari passu* as between themselves. All Class A Scheme Creditors will have the same rights to have their claims determined through a proof of debt process or by way of a challenge to the liquidator's decision on a proof of debt or the liquidator permitting the continuation or commencement of court proceedings.

(d)     If the Schemes become effective, all Class A Scheme Creditors' have the same right to receive the same Scheme Consideration, calculated in the same way, as one another (i.e. they will all be entitled to choose from the same menu of Scheme Consideration and receive the Scheme Consideration assessed on a full accrued claim basis as set out in paragraph 7.7(a) above).

*Class C Scheme Creditors*

9.7     The Company considers that the rights of all Class C Scheme Creditors are sufficiently similar to enable them to consult together with a view to their common interest.

17

9.8    This is because:

(a)    All Class C Scheme Creditors have unsecured claims against the Company. In the event the Schemes fail, it is likely that the Company will enter into a liquidation. In those circumstances, the rights of all Class C Scheme Creditors against the Company would rank *pari passu* as between themselves and will have the same rights to have their claims determined through a proof of debt process or by way of a challenge to the liquidator's decision on a proof or debt or the liquidator permitting the continuation or commencement of court proceedings.

(b)    Whilst the Class C Scheme Creditors each have the benefit of materially different Claims Against Third Parties (whether principal, guarantee and/or secured claims), their rights against the Company itself are materially the same (i.e. an unsecured debt or damages claim). In any event, the Scheme will not release Claims Against Third Parties and instead the Class C Scheme Creditors will be entitled to receive the Scheme Consideration based on the Deficiency Basis.

(c)    If the Schemes become effective, the Class C Scheme Creditors' rights will be compromised in materially the same way as between themselves (i.e. they will all be entitled to choose from the same menu of Scheme Consideration and receive the Scheme Consideration assessed on the Deficiency Basis as set out in paragraph 7.7(b) above).

(d)    It is possible that, in the case of some Class C Scheme Creditors, the receipt of Scheme Consideration under the Schemes will result, as an operation of law, in a pro-tanto reduction in the amount of their Claims Against Third Parties whereas in the case of other Class C Scheme Creditors it will not. The Company does not consider this possibility to necessitate a different class composition from that which has been proposed. First, any such outcome would not be a consequence of any difference in rights conferred by the Schemes (see (c) above) but would be a consequence of how those rights interact with Class C Scheme Creditors' Claims Against Third Parties. Second, to the extent that (contrary to the Company's view) such an outcome could be said to be the consequence of a difference in rights conferred by the Schemes, that difference is not such as to prevent Class C Scheme Creditors from consulting together on the Schemes with a view to their common interest. Third, dividing Class C Scheme Creditors into different classes depending on whether (and to what extent) the receipt of Scheme Consideration will result in a pro-tanto reduction in the amount of their Claims Against Third Parties risks leading to an undesirable and unmanageable proliferation in classes.

9.9    The Company has formed the view that, while the Class A and Class C Scheme Creditors' rights as against the Company going into the Schemes are materially the same, the rights of the Class A and Class C Scheme Creditors coming out of the Schemes are so materially different that it would not be possible for the Class A and Class C Scheme Creditors to consult together. In particular, Class C Scheme Creditors' Entitlements to Scheme Consideration will be assessed on a Deficiency Basis (reflecting the fact that their Claims Against Third Parties will not be compromised by the Schemes) whereas Class A Scheme Creditors' Entitlements to Scheme Consideration will be assessed on a fully accrued basis.

*Blocked Scheme Creditors*

18

9.10    The Company has considered whether Blocked Scheme Creditors ought to be placed into a separate class for voting purposes. The Company has concluded that they should not be for the following reasons:

(a)    Blocked Scheme Creditors have the same entitlements to the Scheme Consideration as Scheme Creditors who are not Blocked Scheme Creditors.

(b)    Blocked Scheme Creditors are restricted from receiving their portion of the Scheme Consideration until any Applicable Sanctions affecting them have been lifted.

(c)    The Company considers that those restrictions are due to Blocked Scheme Creditors' own personal circumstances in the current regulatory environment and is not the result of their treatment under the Schemes or their rights against the Company. Under the terms of the Schemes, Blocked Scheme Creditors have the same ultimate entitlement to receive Scheme Consideration as other Scheme Creditors.

(d)    Accordingly, the Company does not consider that there is any difference, or any material difference, in the rights of Blocked Scheme Creditors as compared with Scheme Creditors who are not Blocked Scheme Creditors.

*Consent Fee*

9.11    The Company has also considered whether the terms of the Consent Fee offered to those Scheme Creditors who accede to the relevant RSA before the RSA Consent Fee Deadline and agree to vote in favour of the Schemes pursuant to the relevant RSA should have an impact on the classification of creditors for the purposes of the Schemes. The Company considers that they do not for the following reasons:

(a)    Those Scheme Creditors who were at that time set out in the RSAs were given an equal opportunity to accede to the relevant RSA and therefore to become entitled to receive the Consent Fee.

(b)    The Consent Fee is not material when considered against the differential in predicted returns that the Scheme Creditors will receive under the Schemes. The total Consent Fee comprises an amount equal to 0.25% of the aggregate principal amount of the Eligible Restricted Debts held by each Participating Creditor as of the RSA Consent Fee Deadline.

(c)    Therefore, it is very unlikely that a Scheme Creditor who considered the substantive aspects of the Schemes to be against their interests would be persuaded by virtue of the Consent Fee alone to enter into or accede to the relevant RSA and to vote in favour of the Schemes.

*The Ad Hoc Group*

9.12    The Company notes that certain Scheme Creditors in their capacity as members of the Ad Hoc Group shall, in addition to the Consent Fee, benefit from two additional fee payments in respect of the restructuring of the Group (which includes the SJ Scheme and TJ Scheme) which shall be made on or prior to the Restructuring Effective Date:

(a)     the "**AHG Work Fee**", which shall be paid in accordance with the terms set out in the Class A RSA and the letter agreement dated 20 March 2023 between the Company's Chairman and the members of the Ad Hoc Group (the "**AHG Work Fee Letter**").  The AHG Work Fee will be an amount estimated to represent approximately 1% of the Ad Hoc Group's aggregate holding of the principal amount of the Existing Notes; and

(b)     the "**AHG Advisor Fees**", being the reasonable fees, costs and expenses of the legal and financial advisers to the Ad Hoc Group which shall be paid by the Company in accordance with the terms set out in the relevant letter agreements between the Company and the legal and financial advisers to the Ad Hoc Group.

9.13    The Company does not consider that the effect of these payments (either taken alone or cumulatively) makes it impossible for members of the Ad Hoc Group to vote together with the other Scheme Creditors in the same class. This is because:

(a)     The payment of the AHG Advisor Fees does not confer a benefit upon a member of the Ad Hoc Group but instead represents a payment of costs necessarily incurred by them in undertaking that role and which would not otherwise have been incurred. The Company further considers that the arrangement is typical and proportionate for a transaction of this kind. Further, the obligation on the Company to pay these fees is not contingent on the sanction of the Scheme.

(b)     Payment of the AHG Work Fee is conditional upon the satisfaction of the conditions precedent to the Schemes, the TJ Scheme and the SJ Scheme. However, the AHG Work Fee represents recompense for the time and effort expended by the Ad Hoc Group in assisting to formulate the Term Sheet and the Schemes in the interests of all Scheme Creditors and confers no net benefit or disguised consideration on the members of the Ad Hoc Group.

(c)     It is unlikely that a Scheme Creditor who considered the substantive aspects of the Schemes to be against their interests would be persuaded by payment of either or both the AHG Advisor Fees and the AHG Work Fee to vote in favour of the Schemes. This is because in the alternative to the Schemes, being an insolvent liquidation, the Scheme Creditors would receive returns that are lower than the anticipated returns under the Schemes. The AHG Work Fee is not therefore a material factor which would influence a Scheme Creditor's decision in relation to the Schemes.

9.14    The Company and the Ad Hoc Group are continuing to negotiate terms relating to corporate governance.

## 10    SCHEME MEETINGS

10.1    The Company intends to hold the Scheme Meetings for both Schemes at the same address in Hong Kong.  Virtual attendance will be possible for any Scheme Creditors who are unable to attend in person.  Full details will be provided to Scheme Creditors if, at the Convening Hearings, the respective Courts grant orders convening the Scheme Meetings.

## 11    RESTRUCTURING EFFECTIVE DATE

20

11.1   The Scheme Consideration is provided to the Scheme Creditors upon the Restructuring Effective Date (and/or the Final Distribution Date, as explained in paragraph 8 above), in consideration for the Releases set out in paragraph 7.18 above.

11.2   The "**Restructuring Effective Date**" shall occur after the conditions precedent to the Restructuring Effective Date have been satisfied or waived (as the case may be), including but not limited to the following:

   (a)   the obtaining of all relevant approvals, pre-approvals or consents including, without limitation, delivery of respective court orders in respect of the Schemes and Chapter 15 Proceedings (as described in paragraph 17.1 below), and approval in principle for the listing and quotation of the New Notes on Singapore Exchange Securities Trading Limited (the "**SGX-ST**");

   (b)   the resumption of trading of the shares in each of CEG, Evergrande NEV and Evergrande PSG on the SEHK;

   (c)   the settlement of all professional fees associated with the Restructuring that the Company has agreed to pay and that have been duly invoiced to the Company (including but not limited to the AHG Advisor Fees);

   (d)   the payment of the AHG Work Fee; and

   (e)   the satisfaction of each of the other specific conditions precedent contained in each of the Restructuring Documents (as defined in the RSAs) including the Schemes.

11.3   As at the date of this Practice Statement Letter, the Restructuring Effective Date is expected to occur on or around 2 October 2023, provided always that such date shall be no later than the longstop date (the "**Longstop Date**"). If the Restructuring Effective Date has not occurred by the Longstop Date (being 15 December 2023, unless extended) the terms of the Schemes shall lapse and all compromises and arrangements provided by the Schemes shall have no force or effect.

12     **CLAIMS VALUATION AND ADJUDICATION PROCEDURE FOR CLASS C SCHEME CREDITORS' CLAIMS**

12.1   As noted at paragraph 7.7(c) above, the determination of the value of a Class C Scheme Creditor's Entitlement will take place after the sanction of the Scheme by way of a claims valuation and adjudication procedure.

12.2   Full details of the claims valuation and adjudication procedure will be included in the Explanatory Statement and the Scheme. As a high-level summary, the procedure will involve the following steps:

   (a)   The Schemes will appoint three independent and experienced scheme administrators (the "**Scheme Administrators**") and a panel of four retired senior judges as scheme adjudicators (the "**Scheme Adjudicators**").

   (b)   The Scheme Administrators will, with the assistance of specialist PRC real estate valuers and if necessary other professionals, assess the value of the Class C Scheme Creditor's Entitlement.

21

(c)     The Scheme Administrators will provide each Class C Scheme Creditor that submits a distribution confirmation deed prior to the Class C Bar Date with a notice of their assessment of the value of the Class C Scheme Creditor's Entitlement (the "**Estimation Notice**"), together with supporting information required for the Class C Scheme Creditor to make an informed choice of whether to agree or disagree with the valuation.

(d)     The Class C Scheme Creditor will have 30 days from receipt of the Estimation Notice to either agree or disagree with the valuation set out in the Estimation Notice. If the Class C Scheme Creditor agrees with the valuation in the Estimation Notice (or if the Class C Scheme Creditor has not indicated that it agrees or disagrees with said valuation within one month of receipt of the Estimation Notice), the valuation will be the Class C Scheme Creditor's Entitlement.

(e)     If the Class C Scheme Creditor disagrees with the valuation in the Estimation Notice, the Scheme Administrator and the Class C Scheme Creditor must seek to agree the value of the Class C Scheme Creditor's Entitlement bilaterally within a fixed consultation period (currently expected to be one month, with an option to extend for a further seven days). If the valuation is agreed, it will stand as the Class C Scheme Creditor's Entitlement. If the valuation is not agreed, the Class C Scheme Creditor will be referred to the adjudication procedure.

(f)     Once referred to the adjudication procedure, an independent Scheme Adjudicator will make a final and binding adjudication on the value of the Class C Scheme Creditor's Entitlement.

## 13    HOW CREDITORS WILL BE AFFECTED BY THE SCHEME

13.1    If the Schemes become effective, all Scheme Creditors will be bound by the terms of the Schemes (whether or not they voted for or against the Schemes or at all).

13.2    The terms of the Schemes (including the documentation referred to in this Practice Statement Letter) will be included with the Scheme Documents (as defined in paragraph 18.1 below).

## 14    CONSEQUENCES IF THE SCHEME IS NOT SUCCESSFUL

14.1    Deloitte Advisory (Hong Kong) Limited ("**Deloitte**") has been engaged by the Company to carry out a detailed analysis that estimates the likely returns to Scheme Creditors should the Company be placed into liquidation proceedings (which in turn would trigger a Group-wide liquidation) (the "**Liquidation Analysis**"). This is considered by the Company to be the likely alternative in the event that the Schemes are unsuccessful. This is in light of the fact that the Company is insolvent and there is an outstanding winding up petition against the Company filed in Hong Kong.

14.2    If the Schemes are not implemented in accordance with their terms, the Company and other members of the Group are likely to be required to enter into liquidation proceedings. Given the existence of the Hong Kong winding up petition, these proceedings would almost certainly be in Hong Kong.

14.3    The Liquidation Analysis outlines the estimated total recovery to the Scheme Creditors in the event of a liquidation of the Company and liquidations of other members of the Group in that scenario in order to meet the claims of Scheme Creditors. The Liquidation Analysis will be made available to

22

Scheme Creditors on the Transaction Website should the respective Courts grant orders convening the Scheme Meetings.

14.4    For the avoidance of doubt, the returns to Scheme Creditors in a liquidation scenario are expected to be worse than what is being offered to Scheme Creditors pursuant to the terms of the Schemes.

## 15    COURT HEARINGS AND SCHEME CREDITORS' RIGHTS

15.1    As noted at paragraph 1.2 above, the Company intends to apply to the respective Courts at the respective Convening Hearings to be held on 24 July 2023 (for the CEG HK Scheme) and 25 July 2023 (for the CEG Cayman Scheme) for an order granting directions in relation to the Schemes, including permission to convene two meetings of Scheme Creditors for each of the CEG HK Scheme and the CEG Cayman Scheme for the purpose of considering and, if thought fit, approving the Schemes.

15.2    Scheme Creditors have the right to attend in person or through counsel and make representations at the Convening Hearing(s), although they are not obliged to do so. Scheme Creditors (other than Blocked Scheme Creditors and Sanctioned Scheme Creditors) who wish to attend the Convening Hearing(s) in person or through counsel should in the first instance contact the Information Agent (using the contact details below) to obtain instructions for attending the Convening Hearing(s) preferably at least forty-eight (48) hours prior to it. Blocked Scheme Creditors who wish to attend the Convening Hearing(s) in person or through counsel should in the first instance contact GLAS (using the contact details below) to obtain instructions for attending the Convening Hearing(s) preferably at least forty-eight (48) hours prior to it. At the Convening Hearings, the Company will also draw to the Court's attention any material issues raised by Scheme Creditors in response to this Practice Statement Letter.

15.3    If the Schemes are approved by the requisite majorities at the Scheme Meetings, there will be a second and final Court hearing for each Scheme at which the relevant Court will decide whether to exercise its discretion to sanction the relevant Scheme. This second hearing (i) for the CEG HK Scheme will take place on 1 and/or 6 September 2023 before the Hong Kong Court (to be fixed by the Hong Kong Court) and (ii) for the CEG Cayman Scheme is currently listed to be held on 6 September 2023 (the "**Sanction Hearing(s)**").

15.4    Scheme Creditors will also have the opportunity to raise objections at the Sanction Hearing(s) (if the Schemes are approved at the Scheme Meetings by the requisite majorities).

15.5    This Practice Statement Letter is intended to provide Scheme Creditors with sufficient information regarding the Schemes and the Restructuring so that, should they wish to raise issues that relate to the jurisdiction of the Courts to sanctions the Schemes, or to argue that the proposals outlined above for the convening of the Scheme Meetings are inappropriate, or to raise any other issue in relation to the constitution of the Scheme Meetings, they may attend and be represented before the Courts at the relevant Convening Hearing.

15.6    Scheme Creditors should be aware that the Cayman Court has indicated that issues which may arise as to the constitution of the Scheme Meetings or which otherwise affect the conduct of those meetings ("**Meeting Issues**") or which affect the jurisdiction of the Cayman Court to sanction the Schemes should be raised at the Cayman Islands Convening Hearing. If they do not do so, while Scheme Creditors will still be able to appear and raise objections at the Cayman Islands Sanction Hearing, the Cayman Court is likely to expect them to show good reason why they did not previously

23

raise any Meeting Issues or jurisdictional issues in respect of the proposals for convening of the Scheme Meetings.

15.7 **IMPORTANT: If any Scheme Creditor (with the exception of Blocked Scheme Creditors and Sanctioned Scheme Creditors) has comments as to the constitution of the Scheme Meetings which are proposed, wishes to raise any other issues with the Court(s), or wishes to participate at the Convening Hearing(s) for the Scheme(s) and, for that purpose, obtain a copy of the relevant Court papers, they should in the first instance contact the Information Agent using the contact details set out below as soon as possible. Blocked Scheme Creditors should contact GLAS using the contact details set out below as soon as possible.**

16 **THE TRANSACTION WEBSITE, SCHEME INFORMATION AND COMMUNICATIONS WITH SCHEME CREDITORS**

16.1 Communications with Scheme Creditors will take place via the Transaction Website maintained by the Information Agent at https://projects.morrowsodali.com/evergrande.

16.2 The Information Agent has set up the Transaction Website to disseminate information in relation to the Scheme and to help facilitate the implementation of the Schemes. Scheme Creditors may download documents relating to the Schemes from the Transaction Website once they have registered their details via the registration page.

16.3 Scheme Creditors are encouraged to register their details on the Transaction Website so that they can receive notices from the Information Agent relating to the Scheme Meetings and other communications relating to the Schemes. Further, in the event that the Schemes will no longer proceed or will not become effective, Scheme Creditors will be notified by, among other means, a notice published on the Transaction Website.

16.4 In addition to this Practice Statement Letter being delivered to the Clearing Systems for further distribution to the Class A Noteholders (and the Class C Scheme Creditors under the Dongpo Notes and Lake Notes), the Information Agent will also make available an electronic copy of this Practice Statement Letter to all Scheme Creditors on the Transaction Website. The Company will also make an announcement on the HKEXnews website of the SEHK and the SGX-ST with a link to the Transaction Website where this Practice Statement Letter can be accessed.

16.5 The Class A Private Loan Scheme Creditors and the Class C Scheme Creditors (other than in respect of the Dongpo Notes and Lake Notes) do not hold their interests through the Clearing Systems as the relevant instruments are not publicly-traded. To communicate with these Scheme Creditors, the Information Agent will also send this Practice Statement Letter and all other communications directly to each person who the Company believes is or may be a Scheme Creditor (other than Blocked Scheme Creditors and Sanctioned Scheme Creditors), and for whom the Company has a valid e-mail address. As at the date hereof, the Information Agent has the email addresses for those Scheme Creditors who are party to or have acceded to the Class A RSA and Class C RSA, and has also been provided by the Company with email addresses for substantially all other known Scheme Creditors.

16.6 GLAS will send this Practice Statement Letter and all other communications directly to any known Blocked Scheme Creditors by email where the Company is in possession of their email addresses. The Company is not currently aware of any Blocked Scheme Creditors or Sanctioned Scheme Creditors.

24

16.7    You are advised that documents transmitted in electronic form may be altered or changed during the process of transmission and consequently the Information Agent nor any of its respective affiliates, directors, officers or employees, accept any liability or responsibility whatsoever in respect of any difference between the documents sent to you in electronic format and the version available to you for inspection on the Transaction Website.

16.8    Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers is acting for, or owes any duty to, any Scheme Creditor, nor will any of them be responsible for providing any advice to any Scheme Creditor in relation to the Scheme. Accordingly, neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers make any recommendations as to whether any Scheme Creditor should take any of the actions contemplated in the Schemes. The Information Agent expresses no opinion on the merits of the Schemes. The Information Agent has not been involved in negotiating or determining the terms of the Schemes and makes no representation that all relevant information has been disclosed to the Scheme Creditors in or pursuant to the Schemes. Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers has verified, or assumes any responsibility or liability for the accuracy or completeness of any of the information concerning the Scheme, or any factual statements contained in, or the effect or effectiveness of, the Scheme.

16.9    Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers will have any tortious, contractual or any other liability to any person in connection with the determination of whether a Scheme Creditor is a Blocked Scheme Creditor. Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers will accept any liability whatsoever to any person, regardless of the form of action, for any lost profits or lost opportunity, or for any indirect, special, consequential, incidental or punitive damages arising from the determination of whether a Scheme Creditor is a Blocked Scheme Creditor, even if the Information Agent or any of its directors, officers, employees, agents, affiliates or advisers have been advised of the possibility of such damages.

16.10   Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers is obliged, under the terms of the Schemes or otherwise, to engage in any transaction or conduct that may give rise to a liability under or in connection with Applicable Sanctions and/or may result in any person becoming a sanctioned person.

16.11   If compliance with any obligations under the terms of the Schemes or otherwise would result in the Information Agent or any of its directors, officers, employees, agents, affiliates or advisers breaching Applicable Sanctions, that obligation need not be complied with (but only to the extent of the breach).

16.12   Under no circumstances will the Information Agent be required to verify or determine the eligibility of any Scheme Creditor in relation to the Scheme. The Information Agent will check Scheme Claims against Custody Instructions and against the records of Scheme Creditors provided to the Information Agent by the Company. The Information Agent will assist the Company and the chairperson in checking the voting values of each Scheme Creditor (who is not a Blocked Scheme Creditor) based on such information.

17    **CROSS-BORDER RECOGNITION**

17.1    The Company, pursuant to the CEG HK Scheme, will appoint an appropriate person or persons who will be authorised to act as the representative of the Company, as relevant, on and in

25

connection with an application for recognition and assistance in relation to the CEG HK Scheme in the United States of America Bankruptcy Court pursuant to Chapter 15 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended) (the "**Chapter 15 Proceedings**"). The Chapter 15 Proceedings are necessary in order to ensure the discharge of the Company's New York law governed Scheme Debts as a matter of New York law.  The Company does not currently intend to seek recognition of any of the Schemes in any other jurisdictions, but this may be subject to change in future.

18   **NEXT STEPS**

18.1   If permission to convene the Scheme Meetings is granted by the respective Courts at the Convening Hearings, the Information Agent will make available to you via the Transaction Website the following important documents in electronic format:

(a)   a notice convening the Scheme Meetings;

(b)   the Explanatory Statement;

(c)   the relevant Scheme Creditor Forms will be available for reference, although all Scheme Creditors (who are neither Blocked Scheme Creditors nor Sanctioned Scheme Creditors) must complete the applicable Scheme Creditor Forms online via the Portal (as defined in paragraph 18.3 below). The Scheme Creditor Forms are –

(i)   in respect of the Class A Noteholders and the Class C Scheme Creditors that are the holders of Dongpo Notes or Lake Notes, an account holder letter;

(ii)   in respect of the Class A Private Loan Scheme Creditors, a Class A private lender proxy form; and

(iii)   in respect of all other Class C Scheme Creditors, a Class C Scheme Creditor proxy form,

in each case together with a distribution confirmation deed and designated recipient form (if applicable) (all such forms set out in this paragraph will be included with the Solicitation Packet); and

(d)   the Schemes and any accompanying documents.

(together, the "**Scheme Documents**").

18.2   If you are a Blocked Scheme Creditor, the Blocked Scheme Creditor Form and any other relevant Scheme Documents can be obtained from GLAS and will also be available on the Company's website.  Blocked Scheme Creditors must complete and submit their Blocked Scheme Creditor Form to GLAS (not via the Portal).

18.3   If you are a Scheme Creditor (who is neither a Blocked Scheme Creditor nor a Sanctioned Scheme Creditor) and wish to attend the Convening Hearing(s), or have any questions in relation to this Practice Statement Letter or the Schemes, you should, in the first instance, contact the Information Agent preferably at least forty-eight (48) hours prior to the relevant Convening Hearing using the contact details below:

26

| | |
|---|---|
| Name: | Morrow Sodali |
| Attention: | Debt Services Team |
| Telephone: | in Hong Kong +852 2319 4130; in London +44 20 4513 6933 |
| Email: | evergrande@investor.morrowsodali.com |
| Transaction Website: (document posting website) | https://projects.morrowsodali.com/evergrande |
| Portal: (form submission website) | https://portal.morrowsodali.com/EvergrandeScheme |

18.4    All Scheme Creditors (and designated recipients, if applicable) will need to hold an account (directly or through the intermediary chain) with an account holder or custodian which itself holds an account with the Clearing Systems (Euroclear or Clearstream) in order to receive the New Notes, the TJ Scheme Consideration (if applicable) and the Consent Fee (if applicable). To the extent that they do not already have such an account, all Class A Private Loan Scheme Creditors and Class C Scheme Creditors, and designated recipients (if applicable), are advised to open an account with Euroclear (if possible) or Clearstream (including many custodian banks and certain other financial institutions) as soon as possible, and in any event, by the relevant Bar Date. If you are unable to open a Clearing Systems account and are not a Blocked Scheme Creditor or Sanctioned Scheme Creditor, please contact the Information Agent immediately.

18.5    If you are a Blocked Scheme Creditor and wish to attend the Convening Hearing(s) or have any questions in relation to this Practice Statement Letter or the Schemes, you should, in the first instance, contact GLAS preferably at least forty-eight (48) hours prior to the relevant Convening Hearing using the contact details below:

| | |
|---|---|
| Name: | GLAS Specialist Services Limited |
| Address: | 55 Ludgate Hill, Level 1, West, London EC4M 7JW |
| Email: | lm@glas.agency |
| Attention: | Liability Management Team |

18.6    The Company considers that the Schemes are in the best interests of the Scheme Creditors. As explained above, any failure to conclude the Schemes is likely, in the view of the Company's board of directors, particularly in light of the existing winding up petition before the HK Court to force the Company and other the companies within the Group to enter into an insolvency procedure in the near future.

18.7    For this reason, all Scheme Creditors are encouraged to support and vote in favour of the Schemes.

Yours faithfully,

…………………………………………………

27

Authorised Signatory of the Company

**Appendix 1**

*Class C Debts*

*All values below are for reference, indicative only and subject to change. To the extent a balance of the principal is referred to, it is as at 31 December 2022. For items 16-116, the value refers to the principal amount as at 30 June 2023.*

1.  Amounts on-lent to CEG pursuant to the loan agreement relating to the provision of the Class A Private Loan (the "**On-Lent Loan**")

2.  CEG guarantee of the US$260 million 8.5% senior notes due October 3, 2021 (ISIN: XS2054446617, Common Code: 205444661) issued by Jumbo Fortune Enterprises Limited ("**Lake Notes**");

3.  CEG guarantee of the US$424 million 9.5% senior notes due January 22, 2023 (ISIN: XS2290369128, Common Code: 229036912) issued by Great Courage Global Limited ("**Dongpo Notes**");

4.  US$116 million put option granted by CEG in relation to certain Dongpo Notes ("**Dongpo Notes Put Option**");

5.  US$110 million put option granted by CEG in relation to shares of Graceful Court Limited ("**Graceful Court Put Option**", and together with the Dongpo Notes Put Option, the "**CEG Put Options**");

6.  CEG guarantee of the HK$160 million margin loan borrowed by New Chic Global Limited;

7.  CEG guarantee of the HK$575 million put option in respect of shares of Clear Star Investments Limited;

8.  HK$1.2 billion loan borrowed by CEG due 2 January 2022 ("**CEG Loan 1**");

9.  HK$600 million loan borrowed by CEG due 7 January 2022 ("**CEG Loan 2**", and together with the On-Lent Loan and CEG Loan 1, the "**CEG Loans**");

10. CEG guarantee of the US$20 million structured loan borrowed by Rainbow Ever Limited;

11. CEG guarantee of the US$355 million structured sale and purchase agreement of shares in Rainbow Ever Limited;

12. CEG guarantee of the HK$7.6 billion loan borrowed by Tianji Holding Limited pursuant to facilities agreement dated 21 November 2020;

13. US$712 million repurchase obligations of CEG in respect of Fangchebao Group Co. Ltd.;

14. CEG guarantee of the RMB8.2 billion 15 Hengda 03 RMB bond issued by Hengda Real Estate Group and listed in the Shanghai Stock Exchange, which is due on 8 July 2024;

15. CEG guarantee of Guangzhou Kailong Real Estate Company Limited's RMB5 billion repurchase obligation of shares in Hengda Real Estate Group Company Limited, together with interest and costs, which was awarded in an Arbitration Award rendered by Shenzhen Court of International

29

Arbitration where CEG, Guangzhou Kailong Real Estate Company Limited,and the Chairman of CEG (Mr. Hui Ka Yan) were responsible for the repayment accordingly;

16. CEG guarantee of the RMB1.29 billion loan borrowed by Tianjin Hengda Guorui New Energy Technology Co., Ltd;

17. CEG guarantee of the RMB788 million loan borrowed by Evergrande New Energy Automotive Investment Holdings Group Co., Ltd.;

18. CEG guarantee of the RMB664.4 million loan borrowed by Evergrande Financial Holding Group (Shenzhen) Co., Ltd.;

19. CEG guarantee of the RMB440 million loan borrowed by Evergrande Tourism Operation Management Group Co., Ltd.;

20. CEG guarantee of the RMB294 million loan borrowed by Evergrande New Energy Automotive Investment Holdings Group Co., Ltd.;

21. CEG guarantee of the RMB1.2676 billion loan borrowed by Zhoushan Yinyi Real Estate Development Co., Ltd.;

22. CEG guarantee of the RMB400 million loan borrowed by Tianjin Evergrande Guorui New Energy Technology Co., Ltd (RMB227 million) and Junfang Material Equipment (Guangdong) Co., Ltd. (RMB173 million);

23. CEG guarantee of the RMB180.5 million loan borrowed by Guiyang Evergrande Tongmeng Tiandi Tourism Development Co., Ltd.;

24. CEG guarantee of the RMB150 million loan borrowed by Evergrande High-Tech Group Co., Ltd.;

25. CEG guarantee of the RMB1,399,833,998 loan borrowed by Evergrande Intelligent Vehicle (Guangdong) Co., Ltd.;

26. CEG guarantee of the RMB324,960,454.47 loan borrowed by Cangzhou Yiju Real Estate Development Co., Ltd.;

27. CEG guarantee of the RMB85 million loan borrowed by Jurong Hengyi Tourism Development Co., Ltd.;

28. CEG guarantee of the RMB229,989,971.35 loan borrowed by Xi'an Tianhong Tourism Development Co., Ltd.;

29. CEG guarantee of the RMB136.5 million loan borrowed by Taicang Yutai Tourism Development Co., Ltd.;

30. CEG guarantee of the RMB138.03 million loan borrowed by Wuhan Chushui Yunshan Agricultural Development Co., Ltd.;

31. CEG guarantee of the RMB1.805 billion loan borrowed by Evergrande Fairyland Group Limited;

32. CEG guarantee of the RMB1.71 billion loan borrowed by Evergrande Health Industry Group Co., Ltd.;

33. CEG guarantee of the RMB1,659,649,830.75 loan borrowed by Wuhan Baden City Investment Co., Ltd.;

34. CEG guarantee of the RMB710 million loan borrowed by Yunnan Yuxing Zhongtian Real Estate Development Co., Ltd.;

35.     CEG guarantee of the RMB115 million loan borrowed by Yunnan Yuxing Zhongtian Real Estate Development Co., Ltd.;

36.     CEG guarantee of the RMB962.38 million loan borrowed by Hainan Boao Evergrande International Hospital Co., Ltd.;

37.     CEG guarantee of the RMB296 million loan borrowed by Gui'an Xinqu Evergrande Huading Tourism Development Co., Ltd.;

38.     CEG guarantee of the RMB70 million loan borrowed by Qidong Yuhao Real Estate Co., Ltd.;

39.     CEG guarantee of the RMB12.54 million loan borrowed by Gui'an Xinqu Evergrande Huading Tourism Development Co., Ltd.;

40.     CEG guarantee of the RMB1.13 billion loan borrowed by Guangdong Maoqi Investment Co., Ltd.;

41.     CEG guarantee of the RMB650 million loan borrowed by Wuhan Baden City Investment Co., Ltd.;

42.     CEG guarantee of the RMB600 million loan borrowed by Zhengzhou Hengzetong Health Real Estate Co., Ltd.;

43.     CEG guarantee of the RMB450 million loan borrowed by Zhengzhou Hengzetong Health Real Estate Co., Ltd.;

44.     CEG guarantee of the RMB440 million loan borrowed by Wuhan Baden City Investment Co., Ltd.;

45.     CEG guarantee of the RMB350 million loan borrowed by Zhengzhou Hengzetong Health Real Estate Co., Ltd.;

46.     CEG guarantee of the RMB937.106 million loan borrowed by Evergrande New Energy Vehicle (Guangdong) Co., Ltd.;

47.     CEG guarantee of the RMB549 million loan borrowed by Changsha Evergrande Fairyland Tourism Development Co., Ltd.;

48.     CEG guarantee of the RMB435 million loan borrowed by Qidong Evergrande Hot Spring City Development Co., Ltd.;

49.     CEG guarantee of the RMB214,603,797.65 loan borrowed by Hubei Hengxiang Tourism Development Co., Ltd.;

50.     CEG guarantee of the RMB150,473,333.33 loan borrowed by Shaanxi Haishen Construction Engineering Co., Ltd.;

51.     CEG guarantee of the RMB150.4 million loan borrowed by Kaifeng Kaize Tourism Development Co., Ltd.;

52.     CEG guarantee of the RMB1,638,803,164.71 loan borrowed by Kunming Jialize Tourism Culture Co., Ltd.;

53.     CEG guarantee of the RMB1.3 billion loan borrowed by Kunming Jialize Tourism Culture Co., Ltd.;

54.     CEG guarantee of the RMB1 billion loan borrowed by Yangzhong Hengrui Real Estate Co., Ltd.;

55.     CEG guarantee of the RMB176,117,602.18 loan borrowed by Evergrande Fairyland Group Limited;

56.     CEG guarantee of the RMB1,042,069,759.76 loan borrowed by Wuhan Chushui Yunshan Agricultural Development Co., Ltd;

57.     CEG guarantee of the RMB120 million loan borrowed by Chongqing Hengjin Health Industry Co., Ltd.;

31

58.     CEG guarantee of the RMB800 million loan borrowed by Evergrande Fairyland Group Limited;

59.     CEG guarantee of the RMB272 million loan borrowed by Guangxi Fusui Hengli Health Industry Development Co., Ltd.;

60.     CEG guarantee of the RMB203,023,644.35 loan borrowed by Wuzhou Hengmei Health Industry Co., Ltd.;

61.     CEG guarantee of the RMB410,046,058.86 loan borrowed by Hubei Herui Tourism Development Co., Ltd.;

62.     CEG guarantee of the RMB272,422,383.12 loan borrowed by Wuhan Chushui Yunshan Agricultural Development Co., Ltd;

63.     CEG guarantee of the RMB180 million loan borrowed by Evergrande Ruibo Power Technology (Shenzhen) Co., Ltd.;

64.     CEG guarantee of the RMB445,633,820.41 loan borrowed by Evergrande New Energy Technology Group Co., Ltd.;

65.     CEG guarantee of the RMB256,674,595.17 loan borrowed by Evergrande New Energy Automotive Investment Holdings Group Co., Ltd.;

66.     CEG guarantee of the RMB62.54 million loan borrowed by Meishan Longhe Tourism Development Co., Ltd.;

67.     CEG guarantee of the RMB359,472,266.26 loan borrowed by Taicang Yutai Tourism Development Co., Ltd.;

68.     CEG guarantee of the RMB381 million loan borrowed by Evergrande New Energy Technology Group Co., Ltd.;

69.     CEG guarantee of the RMB68.3 million loan borrowed by Cangzhou Yiju Real Estate Development Co., Ltd.;

70.     Guarantee in relation to RMB147.2 million loan borrowed by Nanjing Hengkang Real Estate Co., Ltd.;

71.     CEG guarantee of the RMB999 million loan borrowed by Evergrande Fairyland Group Limited;

72.     CEG guarantee of the RMB499,357,862.03 loan borrowed by Danzhou Hengle Culture Development Co., Ltd.;

73.     CEG guarantee of the RMB485,885,774.81 loan borrowed by Jurong Fairyland Tourism Development Co., Ltd.;

74.     CEG guarantee of the RMB217,198,571.40 loan borrowed by Changsha Evergrande Fairyland Tourism Development Co., Ltd.;

75.     CEG guarantee of the RMB200 million loan borrowed by Cangzhou Fairyland Tourism Development Co., Ltd.;

76.     CEG guarantee of the RMB200 million loan borrowed by Danzhou Zhiyuan Tourism Development Co., Ltd.;

77.     CEG guarantee of the RMB200 million loan borrowed by Danzhou Yibei Tourism Development Co., Ltd.;

78.     CEG guarantee of the RMB200 million loan borrowed by Danzhou Shengbang Tourism Development Co., Ltd.;

32

79.     CEG guarantee of the RMB388,418,616.68 loan borrowed by Qianhai Jiesuan Commercial Factoring (Shenzhen) Co., Ltd;

80.     CEG guarantee of the RMB280 million loan borrowed by Hainan Boao Evergrande International Hospital Co., Ltd.;

81.     CEG guarantee of the RMB244 million loan borrowed by Shenzhen Qianhai Xingbang Commercial Factoring Co., Ltd.;

82.     CEG guarantee of the RMB200 million loan borrowed by Hainan Hengqian Material Equipment Co., Ltd.;

83.     CEG guarantee of the RMB159,999,090.88 loan borrowed by Xi'an Changde Tourism Development Co., Ltd.;

84.     CEG guarantee of the RMB126,998,890.81 loan borrowed by Kaifeng Fairyland Development Co., Ltd.;

85.     CEG guarantee of the RMB120 million loan borrowed by Jurong Fairyland Tourism Development Co., Ltd.;

86.     CEG guarantee of the RMB64 million loan borrowed by Kaifeng Shengbang Tourism Development Co., Ltd.;

87.     CEG guarantee of the RMB11 million loan borrowed by Kaifeng Shengbang Tourism Development Co., Ltd.;

88.     CEG guarantee of the RMB98,245,776.78 loan borrowed by Guiyang Evergrande Tongmeng Tiandi Tourism Development Co., Ltd.;

89.     CEG guarantee of the RMB62,030,672.18 loan borrowed by Guiyang Evergrande Tongmeng Tiandi Tourism Development Co., Ltd.;

90.     CEG guarantee of the RMB55,104,092.72 loan borrowed by Changsha Evergrande Fairyland Tourism Development Co., Ltd.;

91.     CEG guarantee of the RMB35 million loan borrowed by Xi'an Evergrande Fairyland Tourism Development Co., Limited;

92.     CEG guarantee of the RMB35 million loan borrowed by Xi'an Evergrande Fairyland Tourism Development Co., Limited;

93.     CEG guarantee of the RMB897.5 million loan borrowed by Danzhou Jiayuan Tourism Development Co., Ltd.;

94.     CEG guarantee of the RMB386.2 million loan borrowed by Danzhou Ruifeng Tourism Development Co., Ltd.;

95.     CEG guarantee of the RMB378.4 million loan borrowed by Qidong Tongyu Real Estate Co., Ltd.;

96.     CEG guarantee of the RMB210.4 million loan borrowed by Qidong Baofeng Real Estate Co., Ltd.;

97.     CEG guarantee of the RMB85 million loan borrowed by Danzhou Dongtuo Tourism Development Co., Ltd.;

98.     CEG guarantee of the RMB22 million loan borrowed by Danzhou Shengbang Tourism Development Co., Ltd.;

99.     CEG guarantee of the RMB710 million loan borrowed by Evergrande New Energy Automotive Investment Holdings Group Co., Ltd.;

100. CEG guarantee of the RMB1.4 billion loan borrowed by Hengning Health Industry Nanjing Co., Ltd.;

101. CEG guarantee of the RMB540 million loan borrowed by Xianning Hengchen Real Estate Co., Ltd.;

102. CEG guarantee of the RMB200 million loan borrowed by Hohhot Hengpeng Health Industry Co., Ltd.;

103. CEG guarantee of the RMB200 million loan borrowed by Hengpeng Health Industry Liaoning Co., Ltd.;

104. CEG guarantee of the RMB103,135,896.70 loan borrowed by Xianning Hengyang Real Estate Co., Ltd.;

105. CEG guarantee of the RMB600 million loan borrowed by Jiangyin Hengpeng Real Estate Co., Ltd.;

106. CEG guarantee of the RMB2,982,370,000 loan borrowed by Grandland Holding Group Co., Ltd.;

107. CEG guarantee of the RMB2.8 billion loan borrowed by Renhe Investment Holding Co., Ltd.;

108. CEG guarantee of the RMB2.6 billion loan borrowed by Harbin Jurong New Energy Co., Ltd.;

109. CEG guarantee of the RMB1,734,928,916.67 loan borrowed by Sichuan Juhe Ecological Agriculture Development Co., Ltd.;

110. CEG guarantee of the RMB2.1 billion loan borrowed by Chengdu Jiacheng Tianxia Public Facilities Co., Ltd.;

111. CEG guarantee of the RMB1.5 billion loan borrowed by Shenzhen Construction Engineering Co., Ltd.;

112. CEG guarantee of the RMB1 billion loan borrowed by Shenzhen Construction Engineering Co., Ltd.;

113. CEG guarantee of the RMB480 million loan borrowed by Liaoning Donglin Reinas Co., Ltd.;

114. CEG guarantee of the RMB336,809,471.63 loan borrowed by Shenzhen Grandland Hi-Tech New Material Co., Ltd.;

115. CEG guarantee of the RMB110,919,594.87 loan borrowed by Liaoning Hengyang Health Real Estate Co., Ltd.;

116. CEG guarantee of the RMB100 million loan borrowed by Shenzhen Grandland Hi-Tech New Material Co., Ltd; and

117. Any other unsecured liability of CEG arising under a guarantee, indemnity, put option, repurchase obligation, judgement, arbitration, other obligation or liability arising in connection with the liabilities of the entities identified in 16 to 116 above.

34

**Appendix 2**

Execution Version
签署版本

China Evergrande Group

("CEG")

中国恒大集团

("恒大")

Binding Restructuring Term Sheet

具有约束力的重组条款清单

20 March 2023 (as amended to the date of the Restructuring Support Agreement)

2023 年 3 月 20 日（经修订至重组支持协议之日）

4881-6270-1653v.29

This binding term sheet (**"this CEG Term Sheet"**) signed and dated 20 March 2023, between Mr. Hui Ka Yan (the **"Chairman"**), CEG and an ad hoc group of holders of the offshore notes issued by CEG or investment managers for or investment advisers to such holders, as constituted from time to time, who are advised by the AHG Advisers (defined below) (the **"CEG AHG"**[1], together with the Chairman, CEG and any Acceding Creditors (defined below), the **"Parties"**), sets forth certain agreed heads of terms in connection with the proposed restructuring which will be consistent in all material respects with this CEG Term Sheet (the **"Restructuring"**) of certain indebtedness of CEG and its subsidiaries (together, the **"Group"**).

具约束力的本重组条款清单（"**本репCEG重组条款清单**"）签署日期为2023年3月20日，由许家印先生（"**主席**"）、恒大以及由恒大发行的境外票据的持有人或这等持有人的投资经理或投资顾问而在各时组成的，且由持有人特别团体组（定义见下文）提供建议的特别团体（"**恒大持有人特别团体**"，与主席、恒大和任何加入的债权人（定义见下文）统称为"**当事方**"）签署，列明了与拟议的重组有关的某些条款的概要，该重组针对于恒大及其全公司（统称为"**集团**"）的某些债务而言将在所有重大方面与本恒大条款清单一致（"**重组**"）。

The execution of this CEG Term Sheet by the Parties signifies a substantial positive milestone in achieving the Restructuring and is representative of the Parties' significant progress towards achieving the Restructuring.

当事方签署本恒大条款清单，标志着重组实现了重大而积极的里程碑，代表着当事方在实现重组方面取得了重大的实际进展。

This CEG Term Sheet forms the basis of the agreement between the Parties and the Parties accordingly agree and undertake to work together in good faith and use best endeavours to (a) agree further detailed terms in a long-form term sheet and/or restructuring support agreement (the **"RSA"**), and (b) subsequently conclude further agreements as necessary to effect the Restructuring, such that they are consistent in all material respects with this CEG Term Sheet (though this shall not require a creditor of CEG who is a Party to make any payment or incur out of pocket expenses). The Parties acknowledge and agree that this CEG Term Sheet records certain key agreed commercial provisions only, and that no other terms and conditions should be implied. It is intended that the Restructuring shall be facilitated by way of the long-form term sheet and/or RSA and subsequent further agreements as necessary to effect the Restructuring. CEG will procure the subsidiary guarantors of the Class A debts and subsequent further agreements as necessary to comply with this CEG Term Sheet in connection with the Restructuring.

本恒大条款清单构成当事方之间协议的基础，因此，当事方同意并在诚其成合作作尽最大努力，以（a）在长版本条款清单和/或重组支持协议（"**重组支持协议**"）中商定更详细的条款，并（b）随后签署发行重组所需的进一步协议，以使其在所有重大方面与本恒大条款清单保持一致（但这不应要求作为当事方的恒大债权人支付任何款项或产生开支）。当事方承认并同意，本恒大条款清单仅记录某些经商定的关键商业条款，不应暗示其他任何条款和条件。重组旨在通过长版本条款清单和/或重组支持协议以及随后为实现重组所需的进一步协议及协议文件来促进。恒大将促使A组债务的担保子公司和恒大地产集团有限公司在重组中遵守本恒大条款清单。

---

[1]  The members of the CEG AHG as of the date of this CEG Term Sheet are listed in Schedule 6.
截至本恒大条款清单之日的恒大持有人特别团体成员名单见附表6。

This CEG Term Sheet does not constitute an offer to sell or a solicitation of an offer to buy any securities in the United States or any other jurisdiction. No securities may be offered or sold in the United States absent registration or an applicable exemption from registration requirements. Any public offering of securities to be made in the United States will be made by means of a prospectus. Such prospectus will contain detailed information about CEG and its management, as well as financial statements. No public offer of securities is to be made by CEG or any of the subsidiary guarantors of the Class A Debts in the United States. This CEG Term Sheet is not a prospectus for the purposes of Regulation (EU) 2017/1129, including as it forms part of domestic law in the United Kingdom by virtue of the European Union (Withdrawal) Act 2018, as amended by the European Union (Withdrawal Agreement) Act 2020.

本恒大条款清单并不构成在美国或任何其他司法管辖区销售任何证券的要约或对购买任何证券的要约的招揽。如果没有登记或没有适用的对登记要求的豁免，不得在美国发行或销售证券。任何在美国进行的证券公开发售都将以证券发行说明书的形式进行。此种证券发行说明书将包含有关恒大及其管理层的详细信息及财务报表。恒大或A组债务的任何担保子公司将不会在美国公开发售证券。本恒大条款清单并不是针对第2017/1129号条例（EU）（包括根据《2018年欧盟（退出）法案》（经《2020年欧盟（退出协议）法案》修订）构成英国国内法律的一部分）而言的证券发行说明书。

This CEG Term Sheet is governed by and construed in accordance with Hong Kong law. The courts of Hong Kong shall have exclusive jurisdiction to settle any disputes that may arise out of or in connection with this CEG Term Sheet.

本恒大条款清单适用香港法律，并根据香港法律进行解释。香港法院应拥有专属管辖权，以解决因本恒大条款清单而产生的或与之相关的任何争议。

## Heads of Terms
## 条款概要

*Unless otherwise made clear / clear from the context, in this CEG Term Sheet (including all the schedules), (a) numbers for any Principal Amount and numbers so derived from such Principal Amount assume a restructuring effective date ("**RED**") of 1 October 2023; (b) number of shares in each of CEG, Evergrande Property Services Group Limited ("**EVPS**") and China Evergrande New Energy Vehicle Group Limited ("**NEV**") and numbers so derived from such number of shares, are based on the date of this CEG Term Sheet.*

*除非上下文另有明确说明，在本恒大条款清单（包括所有附表）中，（a）任何本金数额的数字和由该本金数额得出的数字均假定以2023年10月1日为重组生效日（"**重组生效日**"）；（b）恒大、恒大物业集团有限公司（"**恒大物业**"）和中国恒大新能源汽车集团有限公司（"**恒大新能源汽车**"）各自的股份数量以及由该等股份数量得出的数字均以本恒大条款清单的日期为准。*

| General 一般信息 | |
|---|---|
| **Schemes jurisdictions** 协议安排司法管辖区 | CEG plans to implement the Restructuring through, *inter alia*, schemes of arrangement or other arrangements in the Cayman Islands, Hong Kong and/or other applicable jurisdictions (the "**CEG Schemes**"). The purpose of the Restructuring is to provide a sustainable capital structure going forward, including among other things deleveraging of the Group's indebtedness.<br><br>恒大计划通过，*其中包括*，在开曼群岛、香港和/或其他适用司法管辖区的协议安排或其他安排实施重组（"**恒大协议安排**"）。重组的目的是为未来继续提供可持续的资本结构包括集团降外负债的去杠杆化及其他。 |
| **Summary of debts intended to be included in the CEG Schemes** 拟列入恒大协议安排的债务汇总 | "**Class A**" means the offshore notes or bonds issued, and the loan borrowed, by CEG set out in Schedule 1.<br><br>"**A组**" 指附表1中列出的恒大发行的境外票据或债券和所借的贷款。<br><br>"**Class C**" means the offshore financial indebtedness (including guarantees and put options) of CEG set out in Schedule 2.<br><br>"**C组**" 指附表2中列出的恒大境外金融负债（包括担保和认沽期权）。<br><br>"**Class**" means Class A or Class C.<br><br>"**组别**" 指A组或C组。 |
| **Voting** 投票 | Both Class A and Class C will be voting on the full accrued claim basis, as of the voting record time (for this purpose interest accrues to this time rather than the RED).<br><br>A组和C组都将根据其截至投票记录时间的全部应计索偿进行投票（就此目的而言，利息计至本时刻而非重组生效日前止）。 |

4

| | |
|---|---|
| **Entitlement to distribution**<br><br>待分配的可获偿金额 | Class A's entitlement to distribution will be on a Full Accrued Claim Basis while Class C's entitlement to distribution will be on a Deficiency Claim Basis, as of the scheme entitlement record time. For the avoidance of doubt, the calculation of a Class' entitlement to distribution shall include all interest accrued up to (but excluding) the RED on the debt instruments held by such Class. To illustrate:<br><br>A 组的待分配的可获偿金额按截至协议安排可获偿金额记录时间在差额索偿基础上计算，而 C 组的待分配的可获偿金额按截至协议安排可获偿金额记录时间在差额索偿基础上计算。为避免疑义，某一组别的待分配的可获偿金额的计算应包括该组别所持债务工具截至（但不包括）重组生效日当日的所有应计利息。说明如下：<br><br>**"Full Accrued Claim Basis"** means an amount that equals to the sum of (x) the outstanding principal amount of the relevant debt instrument; and (y) accrued and unpaid interest on such debt instrument up to (but excluding) RED.<br><br>**"全额应计索偿基础"** 是指以下两项之和的金额：（x）相关债务工具的未偿还本金；以及（y）该债务工具截至（但不包括）重组生效日当日的应计及未付利息。<br><br>**"Deficiency Claim Basis"** means, in respect of a debt instrument, (x) the Full Accrued Claim Basis *minus* (y) the assessed value (determined pursuant to adjudication principles and procedures set out in the Scheme Documents) of any related rights (whether principal, guarantee or collateral support) which are against any party who is not CEG. A similar approach will be taken to determine any net claim in respect of a put option.<br><br>**"差额索偿基础"** 是指，就债务工具而言，（x）全额应计索偿基础*减去*（y）针对非恒大的任一方的任何相关权利（无论是本金、担保或质押支持）的评估价值（根据协议安排文件列明的裁决原则和程序确定）。与认沽期权有关的任何净索偿将采取类似的方法去确定。 |
| **RED / Original Issue Date / Reference Date**<br><br>重组生效日期 / 初始发行日期 / 参考日期 | As soon as reasonably practicable after the Conditions Precedent have been satisfied or waived and anticipated to be 1 October 2023, provided that it shall be no later than 15 December 2023 (or such other date as agreed in writing between CEG and the CEG AHG) (the "**Longstop Date**").<br><br>在前提条件得到满足或豁免后，在合理可行的情况下尽快发生，预计为 2023 年 10 月 1 日（或经恒大和债大持有人特别团体书面商定的其他日期），并不迟于 2023 年 12 月 15 日（"**最后期限日**"）。<br><br>In the event that the RED or Original Issue Date is at a date which is later than 1 October 2023:<br><br>若重组生效日或初始发行日期为 2023 年 10 月 1 日之后的某一天：<br><br>(a) the interest (if any) on the new debt or equity-linked instruments issued pursuant to Option 1 or Option 2 below shall begin to accrue on 1 October 2023; and |

|  |  |
|---|---|
| | (b) the repayment and amortisation schedules of the new debt or equity-linked instruments (as applicable) issued pursuant to Option 1 or Option 2 below shall remain the same as if the RED or Original Issue Date were 1 October 2023,<br><br>根据以下方案 1 或方案 2 发行的新债务或股权挂钩票据的偿付和摊销时间表（按各自所适用的）应按照如同重组生效日或初始发行日期仍为 2023 年 10 月 1 日而保持不变。<br><br>notwithstanding that any such new debt or equity-linked instruments may be issued at a later date.<br><br>尽管任何该等新债务或股权挂钩票据可能会在之后的日期发行。<br><br>In light of the above, the interest on the Class A and Class C existing debt instruments will only accrue up to (but excluding) the earlier of 1 October 2023 and the RED (the "**Reference Date**") (for the purpose of determining entitlement to distribution and the Accrued Claims Ratio).<br><br>鉴于上述情况，A 组和 C 组现有债务工具的利息将只计至（但不包括）2023 年 10 月 1 日与重组生效日之间较早的日期（"**参考日期**"）（出于决定分配应计可获偿金额以及应计率偿比率的目的）。 |
| **Scheme Documents**<br>协议安排文件 | "**Scheme Documents**" means as applicable (a) the composite documents to be circulated by CEG to the As and Cs in relation to the CEG Schemes, which will include (among other things) an explanatory statement and the terms of the CEG Schemes; and (b) the long-form term sheet and/or RSA (to be entered into between, among others, CEG and the CEG AHG in respect of the CEG Schemes.<br><br>"协议安排文件"指（根据所适用的情况）：(a) 由恒大向 A 组债权人和 C 组债权人发送的有关恒大协议安排的综合性文件，其将包括解释性声明和恒大协议安排的条款（以及其他内容）；以及 (b) 由恒大和恒大持有人特别团体及其他方就恒大协议安排签署的长版本条款清单和/或重组支持协议。 |
| **AHG Advisers**<br>持有人特别团体顾问 | "**AHG Advisers**" means Moelis & Company, Kirkland & Ellis and other professional advisers as may be appointed by the AHG from time to time.<br><br>"持有人特别团体顾问"指美驰投行、凯易律师事务所及其他可不在各时由持有人特别团体委任的专业顾问。 |
| **AHG**<br>持有人特别团体 | "**AHG**" means the ad hoc group of holders of the offshore notes issued by CEG and/or Scenery Journey Limited or investment managers for or investment advisers to such holders as constituted from time to time, who are advised by the AHG Advisers.<br><br>"持有人特别团体"指由恒大和/或景程有限公司发行的境外票据持有人，或该等持有人的投资经理或投资顾问在各时组成的，且由持有人特别团体顾问提供建议的特别团体。 |
| **Restructuring consideration: Options available to Class A and Class C** | |

6

| 重组对价：提供给 A 组和 C 组的方案 | |
|---|---|
| **Two options with respect to treatment of creditors' entitlements**<br><br>处理债权人的可获偿金额方面有两种方案 | Both Class A creditors ("**As**") and Class C creditors ("**Cs**") can elect from two options. The two options available to As have the same methodology as the two options available to Cs, i.e., As and Cs choosing the same option will receive broadly similar types of instruments as set out below:<br><br>A 组债权人（"**A 债权人**"）和 C 组债权人（"**C 债权人**"）都有两种方案可供选择。供 A 组债权人选择的两个方案与供 C 组债权人选择的两个方案采用相同的方式，即选择相同方案的 A 债权人和 C 债权人将收到如下所述类型大致相似的票据：<br><br>(a) **Option 1:** new notes with a tenor of 10-12 years at a conversion ratio of 1x and which is also the default option for creditors who have not made their elections in their submission of claims before the relevant deadline (the A1/C1 Notes); or<br><br>　　**方案 1:** 期限为 10-12 年、按 1 比 1 转换率转换的新票据，亦为未在相关截止日期前提交的索偿中表明其选择的债权人的默认选项（A1/C1 票据）；或<br><br>(b) **Option 2:** A2 Notes and C2 Notes, respectively, unless the As or Cs elect to convert their entitlement into (a) 100% of the A2/C2 Package (see below), or (b) any combination of the A2/C2 Package and A2/C2 Notes;<br><br>　　**方案 2:** 分别为 A2 票据和 C2 票据，除非 A 债权人或 C 债权人选择将其可获偿金额转换为（a） 100%的 A2/C2 组合（见下文），或（b）任何 A2/C2 组合加上 A2/C2 票据的任意搭配。<br><br>　　subject to adjustment and reallocation.<br><br>　　受限于调整及重新分配。<br><br>As and Cs electing Option 2 are respectively "**A2s**" and "**C2s**." The A2 Package and C2 Package are, together, the "**Option 2 Packages**".<br><br>选择方案 2 的 A 债权人和 C 债权人分别称为 "**A2 债权人**" 和 "**C2 债权人**"。A2 组合和 C2 组合统称为 "方案 2 组合" 。 |
| **Overview of Option 2**<br><br>方案 2 概述 | |

| Conversion of US$1,000 entitlement electing A2 / C2 Package[2]<br><br>选择 A2/C2 组合的 1,000 美元可获偿金额的转换[2] | *Illustrative conversion ratio and entitlement per US$1,000 is calculated based on the A2 / C2 Package Initial Portion (see further below for details) – these numbers are subject to change following determination of the A2 / C2 Package Adjusted Portion.<br><br>* 每 1,000 美元示意性的转换率和可获偿金额将根据 A2/C2 组合初始部分计算（详见下文）–这些数字受受限于 A2/C2 组合调整部分确定之后的变化。<br><br>An A2's / C2's entitlement will be converted to the A2/C2 Package and/or A2/C2 Notes at a conversion ratio of 1x, i.e.::<br><br>A2 债权人/C2 债权人的可获偿金额将按 1 比 1 的转换率转换为 A2/C2 组合和/或 A2/C2 票据，即：<br><br>• For A2:<br>  对于 A2 债权人：<br>  o US$1 of entitlement will be converted to US$1 of the A2 Package consisting of US$0.108 of EVPS MEBs, US$0.345 of NEV MEBs, US$0.046 of CEG MCBs, US$0.225 of A2 EVPS SLNs and US$0.276 of A2 NEV SLNs; and<br>  1 美元的可获偿金额将转换为 1 美元的 A2 组合，其构成为 0.108 美元的恒大物业强制可交换债券、0.345 美元的恒大新能源汽车强制可交换债券、0.046 美元的恒大强制可转换债券、0.225 美元的 A2 恒大物业挂钩票据和 0.276 美元的 A2 恒大新能源汽车股票挂钩票据；及<br>  o US$1 of entitlement will be converted to US$1 of A2 Notes (which will be allocated in sequential order starting from A2 Tranche A)<br>  1 美元的可获偿金额将转换为 1 美元的 A2 票据（其将从 A2 票据 A 开始按顺序分配）<br><br>• For C2:<br>  对于 C2 债权人：<br>  o US$1 of entitlement will be converted to US$1 of the C2 Package consisting of US$0.049 of EVPS MEBs, US$0.446 of NEV MEBs, US$0.059 of CEG MCBs, US$0.092 of C2 EVPS SLNs and US$0.354 of C2 NEV SLNs; and |

---

[2] Based on A2 / C2 Package Initial Portion and subject to change after determination of A2/C2 Package Adjusted Portion.

基于 A2/C2 组合初始部分，并受限于 A2/C2 组合调整部分确定之后的变化。

- 1美元的可获偿金额将转换为1美元的C2组合，其构成为0.049美元的恒大物业强制可交换债券、0.446美元的恒大新能源汽车强制可交换债券和0.059美元的恒大强制可转换债券、0.092美元的C2恒大物业股票挂钩票据和0.354美元的C2恒大新能源汽车股票挂钩票据；及

  - US$1 of entitlement will be converted to US$1,000 of C2 Notes (which will be allocated in sequential order starting from C2 Tranche A).

  - 1美元的可获偿金额将转换为1美元C2票据（其将从C2票据A开始按顺序分配）

An illustrative table showing conversion of US$1,000 of As and Cs electing A2/C2 Package is set out below. This is calculated based on the A2/C2 Package Initial Portion and subject to adjustment following determination of the A2/C2 Package Adjusted Portion (which will be subject to reallocation if there is an undersubscription or oversubscription).

下方为供示意的表格显示选择了 A2/C2组合的1,000美元的A债权人和C债权人的转换。这是根据A2/C2组合初始部分计算的，受限于A2/C2组合调整部分确定之后的调整（如果出现认购不足或超额认购，则受限于重新分配）。

| Option 2 (per US$1,000)<br>方案 A2（每 1,000 美元） | A's entitlement<br>A 债权人的可获偿金额 | C's entitlement<br>C 债权人的可获偿金额 |
| --- | --- | --- |
| **Entitlement amount**<br>可获偿金额金额 | 1,000 | 1,000 |
| **EVPS MEBs Principal Amount**<br>恒大物业可交换债券本金金额 | 108 | 49 |
| **NEV MEBs Principal Amount**<br>恒大新能源汽车强制可交换债券本金金额 | 345 | 446 |
| **CEG MCBs Principal Amount**<br>恒大强制可转换债券本金金额 | 46 | 59 |
| **A2/C2 EVPS SLNs Principal Amount** | 225 | 92 |

| | |
|---|---|
| | <table><tr><td>**A2/C2 恒大物业股票挂钩票据本金金额**</td><td></td><td></td></tr><tr><td>**A2/C2 NEV SLNs Principal Amount**<br>**A2/C2 恒大新能源汽车股票挂钩票据本金金额**</td><td>276</td><td>354</td></tr></table> |
| **Option 2 Package for Class A and Class C**[3]<br><br>**A 组及 C 组的方案 2 组合** [3] | **A2 Package Initial Portion and C2 Package Initial Portion** is calculated based on the ratio of the estimated total accrued claims of Class A to that of Class C as of the RED (the "**Accrued Claims Ratio**") (except in respect of the EVPS MEBs and EVPS SLNs, where 50% of each instrument is solely allocated to Class A and the other 50% is allocated to both Class A and Class C on a pro-rata basis based on the Accrued Claims Ratio).<br><br>**A2 组合初始部分和 C2 组合初始部分**：根据截至重组生效日 A 组和 C 组的预估全额应计索偿总额的比率（"**应计索偿比率**"）来计算（恒大物业强制可交换债券和恒大物业股票挂钩票据除外，该等票据各自的 50%仅分配给 A 组，另外 50%根据应计索偿比率按比例分配给 A 组和 C 组）。<br><br>**A2 Package Adjusted Portion and C2 Package Adjusted Portion**:<br>**A2 组合调整部分和 C2 组合调整部分**：<br><br>(a) **C2 Package Adjusted Portion** is equal to: (i) the total entitlements of Class C (on a Deficiency Claim Basis) after all Class C entitlement has been determined on such date as set by CEG (the "**Option 2 Package Adjustment Date**"); *divided by* (ii) the estimated total accrued claims of Class C (on a Full Accrued Claim Basis); and *multiplied by* (iii) the C2 Package Initial Portion. For the purpose of this CEG Term Sheet, "**C2 Package Unadmitted Portion**" means a portion equal to (i) C2 Package Initial Portion *minus* (ii) C2 Package Adjusted Portion; and<br><br>**C2 组合调整部分**等于（i）所有 C 组可获偿金额于恒大设定的该等日期（"**方案 2 组合调整日期**"）确定之后，C 组可获偿金额总额（基于差额索偿基础）；*除以*（ii）C 组（基于全额应计索偿基础）的预估应计索偿总额；并*乘以*（iii）C2 组合初始部分。就本恒大条款清单而言，"**C2 组合未接受部分**"等于（i）C2 组合初始部分*减去*（ii）C2 组合调整部分的部分；以及 |

[3] Same as footnote 2 above.
同上脚注 2。

**(b) A2 Package Adjusted Portion is equal to (i) A2 Package Initial Portion; *plus* (ii) C2 Package Unadmitted Portion.**

**A2 组合调整部分等于 (i) A2 组合初始部分；*加上* (ii) C2 组合未接受部分。**

| Class<br>组别 | Principal Amount under the Option 2 Package (based on A2 / C2 Package Initial Portion and subject to change after determination of the A2/C2 Package Adjusted Portion)<br>方案 2 组合下的本金总金额（基于 A2/C2 组合初始部分，并受限于 A2/C2 组合调整部分确定之后的变化） | | Total Amount<br>总额 |
|---|---|---|---|
| | Class A<br>A 组 | Class C<br>C 组 | |
| A2 Package and C2 Package Ratio Split<br><br>A2 组合和 C2 组合的比率划分 | Estimated accrued claims for Class A is US$17,066 million as of the RED<br>截至重组生效日，A 组的应计求偿预计为 170.66 亿美元<br><br>A2 Package Initial Portion for NEV MEBs, CEG MCBs and A2 NEV SLNs is calculated to be 53.78% of the total amount available<br>经计算，用于恒大新能源汽车强制可交换债券、恒大强制可转换债券和 A2 恒大新能源汽车股票挂钩票据的 A2 组合初始部分占可用供总额的 53.78%<br><br>A2 Package Initial Portion for EVPS MEBs and A2 EVPS SLNs is calculated to be 76.89% of the total amount available<br>经计算，用于恒大物业强制可交换债券和 A2 恒大物业股票挂钩票据 | Estimated accrued claims for Class C is US$14,665 million as of the RED<br>截至重组生效日，C 组的应计求偿预计为 146.65 亿美元<br><br>C2 Package Initial Portion for NEV MEBs, CEG MCBs and C2 NEV SLNs is calculated to be 46.22% of the total amount available<br>经计算，用于恒大新能源汽车强制可交换债券、恒大强制可转换债券和 C2 恒大新能源汽车股票挂钩票据的 C2 组合初始部分占可用总额的 46.22%<br><br>C2 Package Initial Portion for EVPS MEBs and C2 EVPS SLNs is calculated to be 23.11% of the total amount available<br>经计算，用于恒大物业强制可交换债券和 C2 恒大物业股票挂钩票据 | Estimated accrued claims for Class A and Class C is US$31,731 million as of the RED<br>截至重组生效日，A 组和 C 组的应计求偿预计为 317.31 亿美元 |

11

| Option Package 2<br>方案 2 组合 | A2 Package Initial Portion<br>A2 组合初始部分 | C2 Package Initial Portion<br>C2 组合初始部分 | A2 Package and C2 Package Initial Portion<br>A2 组合和 C2 组合初始部分 |
|---|---|---|---|
| | 据的 A2 组合初始部分占可提供总额的 76.89% | 据的 C2 组合初始部分占可用总额的 23.11% | |
| | A2 Package Initial Portion of US$ 4,892 million will consist of:<br>A2 组合初始部分（48.92 亿美元）将包括：<br><br>• HKS1,749 million (equivalent to c. US$225 million) of CEG MCBs<br>17.49 亿港元（相当于约 2.25 亿美元）的恒大强制可转换债券<br><br>• HKS4,124 million (equivalent to c. US$530 million) of EVPS MEBs<br>41.24 亿港元（相当于约 5.3 亿美元）的恒大物业强制可交换债券 | C2 Package Initial Portion of US$ 3,253 million will consist of:<br>C2 组合初始部分（32.53 亿美元）将包括：<br><br>• HKS1,503 million (equivalent to c. US$193 million) of CEG MCBs<br>15.03 亿港元（相当于约 1.93 亿美元）的恒大强制可转换债券<br><br>• HKS1,239 million (equivalent to c. US$159 million) of EVPS MEBs<br>12.39 亿港元（相当于约 1.59 亿美元）的恒大物业强制可交换债券<br><br>• HKS11,281 million (equivalent to c. US$1,450 million) of NEV MEBs, on a pro forma basis[4]<br>112.81 亿港元（相当于约 14.5 亿美元）的恒大新能源 | A2 Package and C2 Package Initial Portion of US$ 8,145 million will consist of:<br>A2 组合和 C2 组合初始部分（81.45 亿美元）将包括：<br><br>• HKS3,253 million (equivalent to c. US$418 million) of CEG MCBs<br>32.53 亿港元（相当于约 4.18 亿美元）的恒大强制可转换债券<br><br>• HKS5,364 million (equivalent to c. US$689 million) of EVPS MEBs<br>53.64 亿港元（相当于约 6.89 亿美元）的恒大物业强制可交换债券<br><br>• HKS24,409 million (equivalent to c. |

12

| | | |
|---|---|---|
| • HK$13,128 million (equivalent to c. US$1,687 million) of NEV MEBs, on a pro forma basis[4]<br>131.28 亿港元（相当于约 16.87 亿美元）的恒大新能源汽车强制可交换债券，按预估值计算[4]<br><br>• US$1,100 million of A2 EVPS SLNs[5]<br>11 亿美元的A2恒大物业股票挂钩票据[5]<br><br>• US$1,350 million of A2 NEV SLNs[4][5]<br>13.5 亿美元的A2恒大新能源汽车股票挂钩票据[4][5]<br><br>**NB**: *the above is subject to adjustment on or after the Option 2 Package Adjustment Date to derive the A2 Package Adjusted Portion.*<br>*注：上述内容受限于在方案2组合调整日期当日或之后进行调整，以计算的A2组合调整部分。* | • US$300 million of C2 EVPS SLNs[5]<br>3 亿美元的C2恒大物业股票挂钩票据[5]<br><br>• US$1,150 million of C2 NEV SLNs[4][5]<br>11.5 亿美元的C2恒大新能源汽车股票挂钩票据[4][5]<br><br>**NB**: *the above is subject to adjustment on or after the Option 2 Package Adjustment Date to derive the C2 Package Adjusted Portion.*<br>*注：上述内容受限于在方案2组合调整日期当日或之后进行调整，以计算的C2组合调整部分。* | • US$3,137 million) of NEV MEBs, on a pro forma basis[4]<br>244.09 亿港元（相当于约 31.37 亿美元）的恒大新能源汽车强制可交换债券，按预估值计算[4]<br><br>• US$1,400 million of EVPS SLNs[5]<br>14 亿美元的恒大物业股票挂钩票据[5]<br><br>• US$2,500 million of NEV SLNs[4][5]<br>25 亿美元的恒大新能源汽车股票挂钩票据[5] |

[4] Assuming the equitisation set out in "Treatment of Shareholder's Loans to NEV and CEG's Loan to NEV" and "Treatment of other loan to NEV" have occurred.
假设"股东对恒大新能源汽车的贷款和恒大对恒大新能源汽车的贷款的处理"和"恒大新能源汽车其他贷款的处理"中规定的股权化已发生。

[5] After applying the package ratio split, the principal amounts are then rounded down to the nearest 50 million.
采用组合的比率划分之后，本金金额将向下舍入至最接近的5000万。

| **Oversubscription and undersubscription of A2/C2 Package[6]** A2/C2 组合的超额认购和不足额认购[9] | If a Class' election results in the total entitlement to be converted to the A2/C2 Package to be more than the A2/C2 Package Adjusted Portion, there is an oversubscribed entitlement of that Class and the oversubscribed entitlement exceeding the relevant Class' Adjusted Portion will be converted to A2 Notes and C2 Notes, as applicable. 如果某个组别进行选择之后转换为 A2/C2 组合的可获偿金额总额多于 A2/C2 组合调整部分，则该组别即有超额认购的可获偿金额，且超过相关组别调整部分的超额认购的超额金额将被转换为 A2 票据和 C2 票据（按各自所适用的）。 If Class A's election results in the total entitlement to be converted to the A2 Package to be less than the A2 Package Initial Portion, As who elected for the A2 Package shall be allocated the A2 Package, and any underutilised portion of the A2 Package Initial Portion shall be allocated to the As who elected for the A2 Notes on a pro rata basis (a conversion ratio of 1x for the As' entitlement will be applied). Then, if the A2 Package Initial Portion is still underutilised after allocating to the As who elected for the A2 Notes, any such underutilised A2 Initial Portion shall be allocated to the As who elected for the A1 Notes on a pro rata basis (a conversion ratio of 1x for the As' entitlement will be applied). Under such circumstance, the C2 Package Unadmitted Portion will constitute the underutilized A2 Package Adjusted Portion and any shares associated with the C2 Package Unadmitted Portion shall be allocated as part of the respective pool of underlying shares for A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs and C2 NEV SLNs. 如果 A 组的选择导致转换为 A2 组合的可获偿金额总额少于 A2 组合初始部分，则 A2 组合应按照 A 债权人的选择分配给选择 A2 票据的 A 债权人，且 A2 组合初始部分中任何未充分使用的部分应按比例分配给选择 A2 票据的 A 债权人（将就 A 债权人可获偿金额采用 1 比 1 的转换率）。然后，如果在分配给选择 A2 票据的 A 债权人后，A2 组合初始部分仍未充分使用，任何未充分使用的 A2 初始部分应按比例分配给选择 A1 票据的 A 债权人（将就 A 债权人可获偿金额采用 1 倍的转换率）。在此情况下，C2 组合未接受部分将构成未充分使用的 A2 组合调整部分，而任何与 C2 组合未接受部分相关的股份应作为 A2 恒大物业股票挂钩票据、C2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据和 C2 恒大新能源汽车股票挂钩票据的各自相关底层股份的一部分予以分配。 If Class A's election results in the total entitlement to be converted to the A2 Package to be equal to or more than the A2 Package Initial Portion but less than the A2 Package Adjusted Portion, any shares associated with the underutilised portion of the A2 |
| --- | --- |

[6] Based on A2/C2 Package Adjusted Portion.
基于 A2/C2 组合调整部分。

| | |
|---|---|
| | Package Adjusted Portion shall be allocated as part of the respective pool of underlying shares for A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs and C2 NEV SLNs.

如果 A 组的选择导致转换为 A2 组合的可获偿金额总额等于或多于 A2 组合初始部分，但少于 A2 组合调整部分，则 A2 组合调整部分中任何与未充分使用部分相关的股份应作为 A2 恒大物业股票挂钩票据、C2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据和 C2 恒大新能源汽车股票挂钩票据的各自相关底层股份的一部分予以分配。

If Class C's election results in the total entitlement to be converted to the C2 Package to be less than the C2 Package Adjusted Portion, any underutilised portion of the C2 Package Adjusted Portion shall be allocated to the Cs who elected for the C2 Notes on a pro rata basis (a conversion ratio of 1x for the Cs' entitlement will be applied). Then, if the C2 Package Adjusted Portion is still underutilised after allocating to the Cs who elected for the C2 Notes, any such underutilised C2 Adjusted Portion shall be allocated to the Cs who elected for the C1 Notes on a pro rata basis (a conversion ratio of 1x for the Cs' entitlement will be applied).

如果 C 组的选择导致转换为 C2 组合的可获偿金额总额少于 C2 组合调整部分，则 C2 组合调整部分中任何未充分使用的部分将按比例分配给选择 C2 票据的 C 组（将就 C 组可获偿金额采用 1 比 1 的转换率）。然后，如果在分配给选择 C2 票据的 C 组后，C2 组合调整部分仍未充分使用，任何未充分使用的 C2 初始部分按应比例分配给选择 C1 票据的 C 债权人（将就 C 债权人可获偿金额采用 1 比 1 的转换率）。 |
| **Overview of the CEG MCBs, EVPS MEBs and NEV MEBs[7]**

恒大强制可转换债券、恒大物业强制可交换债券和恒大新能源汽车强制可交换债券概述[10] | Each of the A2 Package Initial Portion and C2 Package Initial Portion will include its pro-rata portion of the US$4.245 million equity bundle (US$689 million EVPS MEBs, US$3,137 million NEV MEBs and US$418 million CEG MCBs) based on the Accrued Claims Ratio (except in respect of the EVPS MEBs, where 50% is solely allocated to Class A and the other 50% is allocated to both Class A and Class C on a pro-rata basis based on the Accrued Claims Ratio).

A2 组合初始部分和 C2 组合初始部分将基于应计索赔比率，包括各自在 42.45 亿美元的股权组合（6.89 亿美元的恒大物业强制可交换债券、31.37 亿美元的恒大新能源汽车强制可交换债券和 4.18 亿美元的恒大强制可转换债券）中的部分（恒大物业强制可交换债券除外，其 50% 仅分配给 A 组，另外 50% 则根据应计索赔比率按比率分配给 A 组和 C 组）。 |

[7] Same as footnote 2 above.
同上脚注 2。

Each of the A2 Package Adjusted Portion and C2 Package Adjusted Portion will include its portion of the US$4,245 million equity bundle (US$689 million EVPS MEBs, US$3,137 million NEV MEBs and US$418 million CEG MCBs) based on the A2 Package Initial Portion and C2 Package Initial Portion each with adjustment made by adding or deducting (as applicable) the C2 Package Unadmitted Portion.

A2 组合调整部分及 C2 组合调整部分将基于 A2 组合初始部分和 C2 组合初始部分，包括各自在 42.45 亿美元的股权组合（6.89 亿美元恒大物业强制可交换债券、31.37 亿美元恒大新能源汽车强制可交换债券及 4.18 亿美元恒大强制可转换债券）中的部分，各自通过增加或扣除（按各自所适用的）C2 组合未接受部分进行调整。

Further details of the CEG MCBs, EVPS MEBs and NEV MEBs are set out in the table below.

下表列明有关恒大强制可转换债券、恒大物业强制可交换债券和恒大新能源汽车强制可转换债券的进一步细节。

| Equity-linked instruments<br>股权挂钩票据 | EVPS MEBs<br>恒大物业强制可交换债券 | NEV MEBs<br>恒大新能源汽车强制可交换债券 | CEG MCBs<br>恒大强制可转换债券 |
|---|---|---|---|
| Total amount available under all equity-linked instruments for allocation to all A2s and C2s<br>所有股权挂钩票据下可供分配给所有 A2 和 C2 的总金额 | HK$33,026 million (equivalent to c. US$4,245 million), being the sum of the EVPS MEBs, NEV MEBs and CEG MCBs, whose available amounts are HK$5,364 million (equivalent to c. US$689 million), HK$24,409 million (equivalent to c. US$3,137 million) and HK$3,253 million (equivalent to c. US$418 million), respectively<br>330.26 亿港元（相当于约 42.45 亿美元），为恒大物业可交换债券、恒大新能源汽车可交换债券和恒大强制可转换债券可供债券金额的总和，其各自的可用金额分别为 53.64 亿港元（相当于约 6.89 亿美元）、244.09 亿港元（相当于约 31.37 亿美元）及 32.53 亿港元（相当于约 4.18 亿美元） | | |
| Amounts available under each equity-linked | HK$5,364 million (equivalent to c. US$689 million), of which 50% is | HK$24,409 million (equivalent to c. US$3,137 million), after assuming full | HK$3,253 million (equivalent to c. US$418 million). The maximum |

| | | | |
|---|---|---|---|
| **instrument for allocation to all A2s and C2s**<br><br>每个股权挂钩票据下可分配给所有 A2 和 C2 的金额 | solely available for allocation to As and the other 50% is to be shared between A2s and C2s on a pro-rata basis<br><br>*53.64 亿港元（相当于约 6.89 亿美元），其中 50%仅供分配给 A 债权人，另外 50%由 A2 和 C2 组按比例共享* | conversion of the Shareholder's Loans to NEV and CEG's Loan to NEV[8]. The maximum amount is to be shared between A2s and C2s on a pro-rata basis<br><br>*244.09 亿港元（相当于约 31.37 亿美元），已考虑新能源汽车股东贷款和恒大对新能源汽车贷款的转换[11]。最高总额将由 A2 和 C2 组按比例共享* | amount is to be shared between A2s and C2s on a pro-rata basis<br><br>*32.53 亿港元（相当于约 4.18 亿美元）最高总额将由 A2 和 C2 组按比例共享* |
| **Fixed Conversion Price or Exchange Price**<br><br>固定转换价或兑换价 | HK$2.30 per share, i.e., 1x the last trading price of EVPS<br><br>*每股 2.30 港元，即恒大物业最后交易价乘以 1.0* | HK$3.84 per share, i.e., 1.2x the last trading price of NEV<br><br>*每股 3.84 港元，即恒大新能源汽车最后交易价乘以 1.2* | HK$0.5775 per share, i.e., 0.35x the last trading price of CEG<br><br>*每股 0.5775 港元，即恒大最后交易价乘以 0.35* |
| **Voluntary conversion or exchange**<br><br>自愿转换或兑换 | Subject to certain conditions, holders have the option to exchange or convert (as applicable)<br><br>*受限于某些条件，持有人可以选择转换或兑换（按所适用的）* | | |
| **Mandatory conversion or exchange**<br><br>强制转换或兑换 | Two (2) years after the Reference Date | | Five (5) years after the Reference Date |

17

---

8 Same as footnote 4 above.
同上脚注 4。

**Overview of the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs and C2 NEV SLNs[9]**

A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、C2 恒大物业股票挂钩票据和 C2 恒大新能源汽车股票挂钩票据概述[12]

| 强制转换或交换 | 参考日期后的两（2）年 | 参考日期后的五（5）年 |
|---|---|---|
| | Each of the A2 Package Initial Portion and C2 Package Initial Portion will include its portion of the US$1,400 million EVPS SLNs, where 50% is solely allocated to Class A and the other 50% is allocated to both Class A and Class C on a pro-rata basis based on the Accrued Claims Ratio.<br><br>A2 组合初始部分和 C2 组合初始部分将包括各自在 14 亿美元的恒大物业股票挂钩票据中的部分，其 50%仅分配给 A 组，另外 50%基于应计求偿比率按比率分配给 A 组和 C 组。 | Each of the A2 Package Initial Portion and C2 Package Initial Portion will include its pro-rata portion of the US$2,500 million NEV SLNs based on the Accrued Claims Ratio.<br><br>A2 组合初始部分和 C2 组合初始部分将基于应计求偿比率，包括各自在 25 亿美元的恒大新能源汽车股票挂钩票据中的部分。 |

Each of A2 Package Adjusted Portion and C2 Package Adjusted Portion will include its portion of the US$1,400 million EVPS SLNs based on the A2 Package Initial Portion and C2 Package Initial Portion each with adjustment made by adding or deducting (as applicable) the C2 Package Unadmitted Portion.

A2 组合调整部分及 C2 组合调整部分将基于 A2 组合初始部分和 C2 组合初始部分，包括各自在 14 亿美元的恒大物业股票挂钩票据中的部分，各自通过增加或减除（按各自所适用的）C2 组合未接受部分进行调整。

Further details of the A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs and C2 NEV SLNs are set out in the table below.

有关恒大物业股票挂钩票据、C2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据和 C2 恒大新能源汽车股票挂钩票据的更多详述详情见下表。

| SLNs<br>股票挂钩票据 | EVPS SLNs<br>恒大物业股票挂钩票据 | | NEV SLNs<br>恒大新能源汽车股票挂钩票据 | |
|---|---|---|---|---|
| | A2 EVPS SLNs | C2 EVPS SLNs | A2 NEV SLNs | C2 NEV SLNs |

---

9 Same as footnote 2 above.

同上脚注 2。

*The information below is a summary only. Further details, defined terms and assumptions are set out in the principal terms of the respective SLNs (see Schedule 4).*

以下信息仅为摘要。更多详细信息、术语定义和假设见各自股票挂钩票据的主要条款中所载（见附表4）。

| | 恒大物业股票挂钩票据 | 恒大物业股票挂钩票据 | 恒大新能源汽车股票挂钩票据 | 恒大新能源汽车股票挂钩票据 |
|---|---|---|---|---|
| **Aggregate Principal Amount (as of the RED)**<br>**本金总额（截至重组生效日）** | US$1,100 million<br>• Tranche A: US$ 550 million<br>• Tranche B: US$ 550 million<br><br>11 亿美元：<br>• 票据A: 5.5 亿美元<br>• 票据B: 5.5 亿美元 | US$300 million<br>• Tranche A: US$ 150 million<br>• Tranche B: US$ 150 million<br><br>3 亿美元：<br>• 票据A: 1.5 亿美元<br>• 票据B: 1.5 亿美元 | US$1,350 million<br>• Tranche A: US$ 600 million<br>• Tranche B: US$ 750 million<br><br>13.5 亿美元：<br>• 票据A: 6 亿美元<br>• 票据B: 7.5 亿美元 | US$1,150 million<br>• Tranche A: US$ 500 million<br>• Tranche B: US$ 650 million<br><br>11.5 亿美元：<br>• 票据A: 5 亿美元<br>• 票据B: 6.5 亿美元 |
| **Tenor**<br>年期 | Tranche A: 5 years<br>Tranche B: 6 years<br>票据A: 5 年<br>票据B: 6 年 | Tranche A: 7 years<br>Tranche B: 8 years<br>票据A: 7 年<br>票据B: 8 年 | Tranche A: 5 years<br>Tranche B: 6 years<br>票据A: 5 年<br>票据B: 6 年 | Tranche A: 7 years<br>Tranche B: 8 years<br>票据A: 7 年<br>票据B: 8 年 |
| **Underlying shares[10]** | 2,493,778,025 shares in EVPS in | 749,465,275 shares in total to be in EVPS in total to be | 2,633,536,337 shares in NEV in total to be | 2,263,062,099 shares in total in NEV in total to be |

[10] Calculated based on outstanding shares as of the date of this CEG Term Sheet but assuming the equitisation set out in "Treatment of Shareholder's Loans to NEV and CEG's Loan to NEV" and "Treatment of other loan to NEV" have occurred.

| 底层股份 [13] | | total to be allocated pro-rata to the respective tranches by principal amount 将依据本金按比例分配给各票据的恒大物业股份,总计 2,493,778,025 股 | be allocated pro-rata to the respective tranches by principal amount 将依据本金按比例分配给各票据的恒大新能源汽车股份,总计 749,465,275 股 | allocated pro-rata to the respective tranches by principal amount 将依据本金按比例分配给各票据的恒大汽车股份,总计 2,633,536,337 股 | allocated pro-rata to the respective tranches by principal amount 将依据本金按比例分配给恒大新能源汽车股份,总计 2,263,062,099 股 |
|---|---|---|---|---|---|
| **Interest** 利息 | Cash 现金 | Tranche A: 5.0% Tranche B: 5.5% 票据A: 5.0% 票据B: 5.5% | Tranche A: 6.0% Tranche B: 6.5% 票据A: 6.0% 票据B: 6.5% | Tranche A: 5.0% Tranche B: 5.5% 票据A: 5.0% 票据B: 5.5% | Tranche A: 6.0% Tranche B: 6.5% 票据A: 6.0% 票据B: 6.5% |
| | PIK 实物支付 | If any interest with respect to an interest payment period is paid in kind, the interest rate will be 1.0% higher than the respective interest rates above, with respect to such interest payment period 如果某次付息期中有任何利息是以实物支付的,则就该付息期而言,利率将比相应的上述利率提高 1.0% | | | |
| | General 一般 | • Interest is payable semi-annually in arrears on the outstanding principal amount of the respective tranche 各笔票据的未偿还本金金额,每半年期末支付一次利息 <br> • For the first two and a half years after the Reference Date, interest may be paid in cash or in kind, at the election of CEG 对参考日期后的最初两年半,可由恒大选择用现金或实物支付利息 <br> • From 31 months after the Reference Date to 36 months after the Reference Date: interest in an amount equal to at least 0.5% of the outstanding principal amount of each tranche shall | | | |

20

基于截至本恒大条款清单之日发行在外的股份进行计算,但假设"股东对恒大新能源汽车的债权及恒大新能源汽车的债权的处置"和"恒大新能源汽车其他债权的处置"中规定的购股权转化已发生。

| | |
|---|---|
| | be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of CEG<br><br>对于参考日期后的第 31 个月至第 36 个月，应以现金支付相当于各笔票据未偿本金的至少 0.5%的利息；其余部分的利息可由恒大选择以现金或实物支付<br><br>• For the fourth year after the Reference Date: interest in an amount equal to at least 3.0% of the outstanding principal amount of each tranche shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of CEG<br><br>对于参考日期后的第四年：应以现金支付各笔票据未偿本金的至少 3.0%的利息；其余部分的利息可由恒大选择以现金或实物支付；<br><br>• Starting from the fifth year after the Reference Date: interest shall be paid in cash<br><br>从参考日期后的第五年开始：利息应以现金支付 |
| **Consideration received by CEG from the restructuring of Tianji Holding Limited's ("Tianji") offshore indebtedness**<br><br>恒大从天基控股有限公司（"天基"）的境外债务重组中收到的对价 | Any consideration ("**TJ Scheme Consideration**") received by CEG as a scheme creditor as part of the restructuring, including by way of scheme(s) of arrangement, of Tianji offshore indebtedness (the "**Tianji Scheme**") shall be distributed to A2s and C2s electing A2/C2 Package on a pro rata basis. For the avoidance of doubt, the TJ Scheme Consideration distributed to A2s and C2s electing A2/C2 Package will not be taken into account when applying a conversion ratio of 1x for the A2s' or C2s' entitlement under the above section "Conversion of US$1,000 entitlement electing A2/C2 Package".<br><br>恒大在天基境外债务重组（包括通过协议安排）之中作为协议安排债权人收到的任何对价（"**天基协议安排对价**"），应按比例分配给选择 A2/C2 组合的 A2 和 C2 组合债权人。为避免疑义，当根据上文"选择 A2/C2 组合的 1,000 美元可获偿金额应用 1 比 1 转换率时，将不会把分配给选择 A2/C2 组合的 A2 和 C2 组合债权人的天基协议安排对价考虑在内。<br><br>Class A's entitlement to distribution of the TJ Scheme Consideration will be on a Full Accrued Claim Basis, and Class C's entitlement to distribution of the TJ Scheme Consideration will be on a Deficiency Claim Basis.<br><br>A 组在天基协议安排对价中的待分配的可获偿金额应在全额应计索赔基础上计算，C 组在天基协议安排金额中待分配的可获偿金额将在差额索赔基础上计算。<br><br>A2s will first receive their share of the TJ Scheme Consideration based on the A2 Package Initial Portion and the Accrued Claims Ratio once the adjudication process for the Tianji Scheme is completed. The allocation of the TJ Scheme Consideration between A2s and C2s will be adjusted once the adjudication process for the Cs is completed, based on the A2 Package Adjusted Portion and C2 Package Adjusted Portion. |

21

| | 天基协议安排的裁决程序一旦完成后，A2 将首先根据 A2 组合初始部分和应计索偿比率收取其在天基协议安排对价中的部分。待 C 债权人的裁决程序完成后，天基协议安排对价在 A2 债权人和 C 债权人之间的分配将根据 A2 组合调整部分和调整部分和 C2 组合进行调整。 |
|---|---|
| **Loans / contribution**<br>**贷款 / 分配** | |
| **Treatment of Shareholder's Loans to NEV and CEG's Loan to NEV**<br>股东对恒大新能源汽车的贷款和恒大对恒大新能源汽车的贷款的处理 | Subject to obtaining the relevant approvals:<br>受限于获得相关批准:<br><br>(a) the loans by the Chairman and Xin Xin (BVI) Limited to NEV totalling HKS2,650,000,000 (equivalent to c. US$340,616,967) will be applied toward conversion into new shares in NEV at an issue price of HKS3.84 per share; and<br>主席和 Xin Xin (BVI) Limited 对恒大新能源汽车总计 2,650,000,000 港元（相当于约 340,616,967 美元）的贷款将用于转换为恒大新能源汽车的新股，发行价为每股 3.84 港元；及<br><br>(b) the loan by CEG to NEV totalling US$1,768 million will be applied toward conversion into new shares in NEV at a conversion price of HKS3.84 per share (which shall be based on the total accrued claim through to either the RED or an earlier conversion date).<br>恒大对恒大新能源汽车总计 17.68 亿美元的贷款将用于转换为恒大新能源汽车的新股，转换价格为每股 3.84 港元（应基于截至重组生效日或更早的转换日期的应计索偿总额）。<br><br>The treatment of the new shares in NEV is further set out in the "*Principal Terms of the China Evergrande New Energy Vehicle Limited Mandatory Exchangeable Bonds ("NEV MEBs") - Exchange Property*" in Schedule 4, Part B – SLNs.<br>对恒大新能源汽车的新股的处理的详见中国恒大新能源汽车集团有限公司强制可交换债券（"恒大新能源汽车强制可交换债券"）的主要条款，"交换财产"部分（B 部分—股票挂钩票据，附表 4）。 |
| **Treatment/contribution of Chairman's Notes**<br>主席票据的处理/分配情况 | Offshore notes issued by CEG and Scenery Journey Limited in a combined total principal amount of c. US$650 million held by the Chairman will be used to support the restructuring, as set forth in separate documentation.<br>主席共所持本金金额约 6.5 亿美元的恒大发行的现有境外债券和景程有限公司所发行的境外票据（合计）将用于支持重组，如另外文件所述。 |

| | |
|---|---|
| **Treatment of other loan to NEV**<br><br>恒大新能源汽车其他贷款的处理 | Subject to obtaining the relevant approvals, CEG shall use best endeavours to procure that the loans provided by Ms. Ding Yumei and Good Bond Limited (wholly-owned by Ms. Ding Yumei) to NEV totalling HKS2,200,000,000 (equivalent to c. US$282,776,350) will be applied toward conversion into new shares in NEV at an issue price of HKS3.84 per share. The NEV shares so converted will not be used as part of the restructuring consideration (neither MEBs nor SLNs).<br><br>受限于获得相关地准，恒大应尽最大努力以使丁玉梅女士及 Good Bond Limited（由丁玉梅女士全资持有）向恒大新能源汽车提供的总计 2,200,000,000 港元（相当于约 282,776,350 美元）贷款将用于转换为以每股 3.84 港元的发行价发行的恒大新能源汽车的新股份。如此转换的恒大新能源汽车股份将不会被用作重组对价的一部分（既不是强制可交换债券也不是股票挂钩票据）。 |
| **Fees and Designated Restructuring Account**<br><br>费用和重组专用账户 | |
| | 0.25% of the outstanding principal amount of Class A and Class C debts held at the voting record time set by CEG. The Consent Fee is contemplated to be paid by way of PIK notes.<br><br>截至恒大设定的投票记录时间持有的 A 组和 C 组债务的未偿还本金的 0.25%。同意费拟将以实物支付票据的方式支付。<br><br>As electing Option 1 will receive PIK notes in the form of Tranche A1 Tranche A, which is for the avoidance of doubt, due 10 years from the Reference Date.<br><br>选择方案 1 的 A 债权人将收到以票据 A1 票据 A 为形式的实物支付票据，为避免疑义，从参考日期开始的 10 年后到期。 |
| **Consent Fee**<br><br>同意费 | As electing Option 2 will receive PIK notes in the form of Tranche A2 Tranche C, which is for the avoidance of doubt, due 7 years from the Reference Date.<br><br>选择方案 2 的 A 债权人将收到以票据 A2 票据 C 为形式的实物支付票据，为避免疑义，从参考日期开始的 7 年后到期。<br><br>Cs electing Option 1 will receive PIK notes in the form of Tranche C1 Tranche A, which is for the avoidance of doubt, due 10 years from the Reference Date.<br><br>选择方案 1 的 C 债权人将收到以票据 C1 票据 A 为形式的实物支付票据，为避免疑义，从参考日期开始的 10 年后到期。 |

| | |
|---|---|
| | Cs electing Option 2 will receive PIK notes in the form of Tranche C2 Tranche A, which is for the avoidance of doubt, due 7 years from the Reference Date.<br><br>选择方案 2 的 C 债权人将收到以票据 C2 票据 A 为形式的实物支付票据。为避免疑义，从参考日期开始的 7 年后到期。<br><br>For the avoidance of doubt, the notes to be issued as Consent Fee are additional notes and form the same series of notes in the form of Tranche A1 Tranche A or Tranche A2 Tranche C (as applicable) and will not impact the number of notes to be issued as scheme consideration for As and Cs.<br><br>为避免疑义，有待作为同意费发行的票据属于额外票据，以票据 A1 票据 A 或票据 A2 票据 C 为形式（按各自所适用的）形成同系列的票据，且对作为 A 债权人和 C 债权人的重组对价发行的票据的数量不会造成影响。 |
| **CEG AHG Work Fee**<br>恒大持有人特别团体工作费 | To be set out in a separate AHG work fee letter.<br><br>将在另外的持有人特别团体工作费用函中列出。 |
| **Designated Restructuring Account**<br>重组专用账户 | Any residual cash in the Designated Restructuring Account following payment of all restructuring fees and expenses shall be used according to the terms of the Restructuring Account Deed Poll or otherwise agreed between CEG and the AHG in separate documentation.<br><br>在支付所有重组费用和支出后，重组专用账户中任何剩余现金将根据重组专用账户单边契约的条款或现大和特有人特别团体在另外文件中所商定的方式使用。<br><br>"**Designated Restructuring Account**" means any "Account" as defined under the Restructuring Account Deed Poll.<br><br>"**重组专用账户**" 指重组账户单边契约所定义的任何 "账户"。<br><br>"**Restructuring Account Deed Poll**" means the Deed Poll for Designated Restructuring Account Arrangement dated 31 October 2022 entered into by China Evergrande Group.<br><br>"**重组账户单边契约**" 是指由中国恒大集团于 2022 年 10 月 31 日签署的重组专用账户安排的单边契约。 |
| **Other**<br>其他 | |
| **Bar date/valuation and adjudication process**<br>截止日期/估值和裁决程序 | Subject to consultation with the scheme administrator to be appointed, the last date for As and Cs to submit their claims for entitlement will be approximately 1 month and 4.5 months, respectively, following the RED. |

24

受限于与有待委任的协议安排管理人的协商，A 债权人和 C 债权人提交其可获偿金额索偿的最后日期将分别在重组生效日之后约 1 个和 4.5 个月。

Any As submitting claims for entitlement after the relevant deadline before the RED set by CEG will only be allocated with Option 1.

The independent valuation and adjudication process for Class C which will be conducted on the Deficiency Claim Basis may take approximately 4 to 5 months from the date a Class C creditor submits its claims and elections for restructuring consideration. The independent valuation and adjudication process and principles are to be agreed with the CEG AHG and set out in the Scheme Documents.

从 C 组债权人提交索偿和选择重组对价的日期起算，将在差额索偿基础上进行的有关 C 组的独立估值和裁决程序可能需要大约 4 至 5 个月。独立估值和裁决程序和原则将与恒大特有人特别团体商定，并在协议安排文件中列出。

| **Conditions Precedent**<br>前提条件 | The following conditions must be satisfied or waived by the relevant regulator or court or the relevant persons receiving the fees or the CEG AHG (acting reasonably), as applicable, prior to or on the RED:<br><br>以下条件必须在重组生效日之前或当日得到满足或由相关监管机构或法院或收到费用的相关人士或恒大特有人特别团体（合理行事之下）（按所适用的）予以豁免：<br><br>(a) the delivery of the relevant corporate authorisations to effect the Restructuring and entry into the relevant Scheme Documents by the parties thereto;<br>交付就实行重组相关的公司授权书，并由各方签署相关的协议安排文件；<br><br>(b) the obtaining of applicable and relevant approvals or other consents (including relevant court orders or other consents in respect of the CEG Schemes and any relevant shareholders' approval);<br>获得适用的和相关的批准或其他同意（包括有关恒大协议安排的相关法院命令和任何相关股东批准）；<br><br>(c) the formulation of a management incentive plan with EVPS management following consultation with the AHG Advisers;<br>在与特有人特别团体顾问协商后，与EVPS管理层制定管理层激励计划；<br><br>(d) the formulation of a management incentive plan with NEV management following consultation with the AHG Advisers;<br>在与特有人特别团体顾问协商后，与恒大新能源汽车管理层制定管理层激励计划；<br><br>(e) payment in full of all professional fees associated with the Restructuring that CEG is contractually obliged to pay;<br>全额支付所有与重组有关的且恒大根据合同有义务支付的专业人士费用；<br><br>(f) the payment in full of the CEG AHG Work Fee (subject to the separate AHG work fee letter) and the Consent Fee; |

全额支付恒大特别团体工作数（受限于另外的持有人特别团体有关费用函）和同意数；

(g) the resumption of trading of the shares in each of CEG, NEV and EVPS on The Stock Exchange of Hong Kong Limited;

恒大、恒大新能源汽车和恒大物业各自的股份在香港联合交易所恢复交易；

(h) each key Scheme Document (scope to be agreed in the RSA) is in the form agreed in writing between CEG and the CEG AHG (or the AHG Advisers expressly on their behalf), each acting reasonably;

每份关键协议文件（范围有待于在重组支持协议中商定）的形式都经由恒大和恒大特有人特别团体（或明确代表他们的持有人特别团体顾问）各自合理地行事所作而商定；

(i) subject to obtaining relevant approvals and CEG's best endeavours to procure, conversion of the loan by Ms. Ding Yumei and Good Bond Limited (wholly-owned by Ms. Ding Yumei) to NEV totalling HKS2,200,000,000 (equivalent to c. US$282,776,350) into new shares in NEV at an issue price of HKS3.84 per share;

受限于获得相关批准，恒大尽最大努力促使丁玉梅女士及 Good Bond Limited（由丁玉梅女士全资持有）对恒大新能源汽车的总计 2,200,000,000 港元（相当于约 282,776,350 美元）的贷款用于转换为以每股 3.84 港元的发行价发行的恒大新能源汽车的新股份；

(j) CEG's intercompany claim owed by Tianji being included in the Tianji Scheme and, for the purpose of receiving scheme consideration under the Tianji Scheme ,treated as a pari passu claim with the other scheme claims under the Tianji Scheme and this condition can be waived by the CEG AHG; and

恒大针对的天基的公司间索偿被纳入天基协议安排，从收取天基协议安排的目的而言，得到和天基协议安排下的其他协议安排索偿同等的待遇。本条件可由恒大特有人特别团体豁免；及

(k) other conditions to be agreed/ the satisfaction of each of the other conditions precedent contained in the Scheme Documents.

其他条件有待商定／协议安排文件中所包含的每个的前提条件得到满足。

The following conditions must be satisfied or waived, as soon as practicable after the RED:

以下条件必须在重组生效日之后在实际可行的情况下尽快得到满足或被豁免；

(a) the dismissal (or withdrawal) of any winding-up petition that may be filed against CEG, including the winding-up petition filed by Top Shine Global Limited against CEG before the Hong Kong High Court; and

驳回（或撤回）可能针对恒大提出的任何清盘呈请，包括 Top Shine Global Limited 在香港特别行政区高等法院针对恒大提出的清盘呈请；及

(b) other conditions to be agreed/the satisfaction of each of the other conditions subsequent contained in the Scheme Documents.

**Conditions subsequent**
后续条件

| | |
|---|---|
| **Support**<br>支持 | 其他条件有待商定 / 协议安排文件中所列的每个其他后续条件有待满足。<br><br>Subject to the terms of the RSA, each Party shall assist, cooperate and take all steps as may be reasonably necessary to implement the Restructuring in a timely manner materially consistent with the terms and conditions as set out in this CEG Term Sheet (though this shall not require a creditor who is a Party to make any payment or incur out of pocket expenses).<br>受限于重组支持协议的条款，各当事方应协助、合作并采取一切合理必要的步骤，及时妥适地与本恒大条款清单规定的条款和条件在重大方面一致的重组（但这不应要求作为当事方的债权人支付任何款项或产生开支）。 |
| **Accession**<br>加入 | Other creditors, who are not initial Parties to this CEG Term Sheet, may accede to this CEG Term Sheet (any such creditor, being an "**Acceding Creditor**") by contacting CEG's financial advisers: China International Corporation Limited (Evergrande@cicc.com.cn), Houlihan Lokey (China) Limited (Evergrande@HL.com) and/or BOCI Asia Limited (Evergrande@bocigroup.com) to complete an accession form available on request.<br>其他不属于本恒大条款清单最初的当事方的债权人（任何该等债权人均为"**加入的债权人**"），可通过联系恒大的财务顾问，即中国国际金融股份有限公司（Evergrande@cicc.com.cn）、华利安诺基（中国）有限公司及（Evergrande@HL.com）和/或中银国际亚洲有限公司（Evergrande@bocigroup.com），以填写加入表格加入本恒大条款清单，该表格待索要后即会提供。 |
| **No Alternative Transactions**<br>无替代交易 | Subject to the terms of the RSA, on or prior to the RED, each Party:<br>受限于重组支持协议的条款，在重组生效日当日或之前，各当事方：<br><br>(a) shall, and shall cause its respective subsidiaries, representatives, affiliates and advisors to, cease and terminate immediately all solicitations, initiations, encouragements, activities, discussions and/or negotiations with any person or entity conducted prior to the date hereof with respect to any proposed, potential or contemplated Alternative Transactions; and<br>应并应促使其各自的子公司、代表、关联人士和顾问，立即停止和终止在本协议日期之前就任何拟议的、潜在的拟议替代交易与任何个人或实体进行的所有招揽、发起、鼓励、活动、讨论和/或谈判；且<br><br>(b) shall not, and shall cause its respective subsidiaries, representatives, affiliates and advisors not to, directly or indirectly, (i) solicit, initiate or encourage the submission of, any proposal or indication of interest relating to an Alternative Transaction, (ii) participate in any discussions or negotiations regarding, or furnish to any person any information with respect to, or take any other action to facilitate any inquiries or the making of any proposal that constitutes, or may reasonably be expected to lead to, any Alternative Transaction, (iii) authorize, engage in or enter into any agreement or understanding (whether definitive or preliminary) with respect to, any Alternative Transaction, or (iv) accept any offer or propose any transaction or scheme in relation to any Alternative Transaction, in each case, without the prior written consent of the CEG AHG.<br>在任一情况之下，未经恒大特设人特别团体的事先书面同意，均不得非应促使其各自的子公司、代表、关联人士和顾问不得直接或间接地：(i) 招揽、发起或敦促提交与替代交易有关的任何建议或意向，(ii) 参与有关的任何 |

| | |
|---|---|
| | 讨论或谈判，或向任何人提供有关的任何信息，或采取任何其他行动，以促进构成或成替代交易或在合理预期下可导致替代交易或的任何询问或任何提议、(iii) 授权、参与或签署与任何替代交易有关的任何替代交易或要约或或提出与任何替代交易有关的任何交易协议最终的还是初步的步伐），或 (iv) 接受与任何替代交易有关的任何要约或或提出与任何替代交易有关的任何交易协议安排。<br><br>"替代交易" 是指与本恒大条款清单规定的条款和条件存在重大不一致的有关 A 组或 C 组债务的拟议重组前任何交易（方括号内的任何项目除外，这些项目应由在恒大特别团体和公司之间本着诚意进行该判）。<br><br>"**Alternative Transactions**" means any transaction for the proposed restructuring of the Class A or Class C debts which are materially inconsistent with the terms and conditions set out in this CEG Term Sheet (except any item which are in square brackets which shall be negotiated in good faith between the CEG AHG and the Company). |
| **Restructuring Milestones**<br>**重组里程碑** | CEG shall ensure that each of the following conditions are satisfied on or before the specified date below (each of the following, a "**Restructuring Milestone**"):<br><br>恒大应确保以下各项条件在以下指定日期当日或之前得到满足（以下各项皆为一项 "重组里程碑"）：<br><br>(a) By no later than 22 March 2023, unless otherwise agreed between CEG and the CEG AHG (which can be by email through their respective advisers), CEG to publish a cleansing statement containing Sufficient Disclosure (including with respect to (i) this CEG Term Sheet; (ii) (if agreed) restructuring term sheets relating to the offshore notes issued by Scenery Journey Limited; and (iii) any other relevant information received by the CEG AHG). For the purpose of this provision, "**Sufficient Disclosure**" has the meaning given to it in the non-disclosure agreements dated 6 December 2022 and 9 January 2023 entered into between CEG and certain members of the AHG (the "**NDA**" which continues in full force and effect in accordance with the terms of the NDA).<br><br>不迟于 2023 年 3 月 22 日，除非恒大与恒大特别团体双方另有约定（可通过各自的顾问以电子邮件的方式进行），恒大发布一份包含充分披露的清除声明（包括有关 (i) 本恒大条款清单；(ii)（如已商定）有关景程发行的离岸票据的重组条款清单；以及 (iii) 恒大特别团体收到的任何其他相关信息）。就本款而言，"充分披露" 的定义又依循恒大与特别人持有人特别团体某些成员于 2022 年 12 月 6 日和 2023 年 1 月 9 日签订的保密协议（"保密协议"，跟据保密协议条款继续完全有效）。<br><br>(b) By no later than 31 March 2023 (provided that no additional or long-form term sheet (other than this CEG Term Sheet) is required), CEG and other relevant members of the Group to (i) enter into a RSA in form and substance satisfactory to the CEG AHG (acting reasonably) with the CEG AHG in relation to the restructuring of the offshore indebtedness of the Group |

28

and (ii) announce the signed RSA to the market on the website of The Stock Exchange of Hong Kong Limited and through the clearing systems.

不迟于 2023 年 3 月 31 日（前提是不需要额外的或成长版条款清单（除了本恒大条款清单之外）），恒大和集团的其他相关成员（i）就重组集团的境外债务与恒大持有人特别团体签订形式和内容令恒大持有人特别团体（在合理行事之下）满意的重组支持协议，以及（ii）在香港联合交易所有限公司网站并通过清算系统向市场发布公告已签署的重组支持协议。

(c) By no later than 31 March 2023, CEG to reach a written agreed general position or schedule with the CEG AHG on (i) a whitelist of potential scheme administrators and adjudicators; and (ii) high-level principles and high-level process relating to the valuation and adjudication in respect of the schemes of arrangement of CEG, in each case, in form and substance satisfactory to the CEG AHG and CEG, both acting reasonably (with the details to be agreed in the Scheme Documents).

不迟于 2023 年 3 月 31 日，恒大与恒大持有人特别团体就（i）潜在的协议安排管理人和裁决人的白名单；以及（ii）有关恒大协议安排的评估和裁决的概括性原则和概括性程序在书面上达成大致设立场或时间表，两者的形式和内容均应令恒大持有人特别团体和恒大都在合理行事之下满意（细节将在协议安排文件中商定）。

Each of the Restructuring Milestones can be extended with the written agreement of the CEG AHG (which can be by email through its advisers).

每项重组里程碑都可在恒大持有人特别团体的书面同意下延长（可通过其顾问以电子邮件的方式进行）。

CEG agrees that it shall not, and it shall cause the Group and their respective Affiliates not to, in any event disclose Schedule 6 to this CEG Term Sheet or any of its content or any signature or identity of the CEG AHG members to any person (other than the Group's legal and financial advisers or such information or other agent for the purposes of the Restructuring) without the prior written consent of the CEG AHG, *provided* that CEG may disclose such information:

恒大同意，在任何情况下，未经恒大持有人特别团体的事先书面同意，其不得且应促使集团及其各自的关联人士不得，向任何人士（不包括出于重组目的披露集团的法律或财务顾问或或等向或其他代理）披露本恒大条款清单的附表 6 或其任何内容或恒大持有人人特别团体成员的任何签名或身份，*前提是*恒大可在以下情况披露该等信息：

(a) to the extent requested or required (as applicable) by any court or regulatory body or by any applicable rule or law;

在任何法院或监管机构或任何适用规则或政法律所要求或被要求（按所适用的）的范围内；

(b) to any of its Affiliates provided that any such information is shared on a confidential basis and CEG is responsible for any contravention of this section by its Affiliates;

| | |
|---|---|
| **Confidentiality**<br>保密 | |

(c) to the extent such information has been disclosed by a member of the CEG AHG or its Affiliates to any Court, Regulatory Body, or to a relevant participating party (other than on a without prejudice basis) in a legal, regulatory or security enforcement proceeding or process (other than any proceedings arising from any breach of this section by CEG), against any member of the Group or its Affiliates commenced or supported by a member of the CEG AHG or its Affiliates;

披露给其任何关联人士，只要任何该等信息是在保密的基础上提供的，并且恒大对其关联人士违反本节的任何行为负责；

如果某位恒大持有人特别团体成员或其关联人士启动或支持的针对集团或其关联人士的法律、监管或执行质押程序或过程（不包括因恒大违反本节规定而产生的任何程序）中，该等信息已由某位恒大持有人特别团体成员或其关联人士向任何法院、监管机构或相关参与方披露（在无损害基础上披露的除外）；

(d) to the extent such information has been disclosed in the public domain other than in the contravention of this section;

如果该等信息已在公共领域披露，违反本节规定的披露除外；

(e) with the written permission of the CEG AHG; and

得到恒大持有人特别团体的书面允许；以及

(f) at any time after the end of one year from the date of this CEG Term Sheet.

在本恒大重组条款清单签署之日起一年结束后的任何时间。

Capitalised terms used in this section but not defined in this section or this CEG Term Sheet have the meanings given to them, *mutatis mutandis*, in the NDA.

本节中使用的但未在本节或本恒大重组条款清单中定义的大写术语，其意义依据保密协议对其的定义（经必要的修改）。

| | |
|---|---|
| **Variation / Termination**<br>变更 / 终止 | This CEG Term Sheet ceases to bind:<br>在下列情况下，本恒大条款清单对下列人士不再有约束力：<br><br>(a) any member of the CEG AHG, if (i) any of the Restructuring Milestones is not satisfied (save that failure to meet the RSA milestone may be cured within 3 Business Days), or (ii) the Chairman or CEG fails to comply with any material provision of this CEG Term Sheet (and such failure to comply is not remedied within 5 Business Days); or |

恒大持有人特别团体的任何成员，如果（i）任何重组里程碑未得到满足（但是未满足重组支持协议里程碑之行为可在 3 个工作日内得到补救）；或（ii）主席或恒大未遵守本恒大条款清单的任何重要规定（且该未遵守之行为未在 5 个工作日内得到补救）；或

(b) the Chairman or CEG, if the CEG AHG or any Acceding Creditor (the "**Default Creditor**") fails to comply with any material provision of this CEG Term Sheet (and such failure to comply is not remedied within 5 Business Days), provided that the effect of termination shall only apply to the Chairman's and CEG's obligations to such Default Creditor and does not impact their obligations to other CEG AHG members or Acceding Creditors under this CEG Term Sheet.

主席或恒大，如果恒大持有人特别团体或任何加入的债权人（"**违约债权人**"）未能遵守本恒大条款清单的任何重要规定（且该未遵守之行为未在 5 个工作日内得到补救），前提是约束力的终止仅适用于主席和恒大对该违约债权人的义务，不影响他们在本恒大条款清单下对其他恒大持有人特别团体之间的义务。

This CEG Term Sheet ceases to bind any Party automatically at the earlier of: (i) the Longstop Date; and (ii) the termination of RSA (if entered into between, among others, the Chairman, CEG and the CEG AHG) in accordance with the terms of the RSA.

本恒大条款清单在以下时间内较早的时间自动终止对任何当事方的约束：（i）最后期限日；和（ii）根据重组支持协议的条款，终止重组支持协议（如果主席、恒大和持有人特别团体之间已签订该协议）。

Any term of this CEG Term Sheet may be amended, varied or waived in writing by CEG and the CEG AHG. Notwithstanding the foregoing, CEG may amend, vary or waive any terms of this CEG Term Sheet (including any terms of any Schedule hereto) at its sole discretion (but without any obligation to do so) to: (a) cure any ambiguity, defect, omission or inconsistency in this CEG Term Sheet; or (b) make any other change to this CEG Term Sheet that is beneficial to the rights of the CEG AHG and Acceding Creditors, provided that in each of the foregoing cases there is no material adverse effect on, the rights of the CEG AHG or any Acceding Creditor when compared to the terms then in effect. Such amendments, variations or waivers shall be binding on all the Parties.

本恒大条款清单的任何条款可由恒大和恒大持有人特别团体以书面形式修改、变更或豁免。尽管有上述规定，恒大可自行决定（但无任何义务）修改、变更或放弃本恒大条款清单的任何条款（包括任何附表的任何条款）（但无任何义务这样做）以：（a）纠正本恒大条款清单的任何模糊、缺陷、遗漏或不一致之处；以及（b）对本恒大条款清单作出有利于恒大持有人特别团体和加入的债权人权利的任何其他修改，前提是，以上所述的各项更改与当时有效的条款相比，对恒大持有人特别团体或加入的债权人的权利没有任何重大不利影响。此种修改、变更或豁免对所有当事方都有约束力。

31

| | |
|---|---|
| **Language**<br>语言 | "**Business Day**" means any day which is not a Saturday, Sunday, legal holiday or other day on which banking institutions in the City of New York, London, Cayman Islands, British Virgin Islands, Hong Kong or the PRC are authorised or required by law or governmental regulation to close.<br>"工作日"指除周六、周日、法定节假日或这律或政府规定授权或要求纽约、伦敦、开曼群岛、英属维尔京群岛、香港或中国银行机构停业的其他日即以外的任何一天。<br><br>The Chinese provisions of this CEG Term Sheet are for reference only. If there is any inconsistency between the English and Chinese provisions of this CEG Term Sheet, the English provisions shall govern.<br>本恒大条款清单中的中文条款仅供参考。如果本恒大条款清单的中英文条款存在任何不一致之处，应以英文条款为准。 |
| **New instruments**<br>新票据和新债券 | |
| **Overview**<br>概述 | Terms of the following new instruments (together, the "**New Instruments**") are set out in Schedule 3 to Schedule 5 of this CEG Term Sheet.<br>以下新票据以及新债券（统称为"**新票据和新债券**"）的条款载于本恒大条款清单的附表 3 至附表 5。<br><br>(a) **Instruments for Option 1**: A1 Notes and C1 Notes (see Schedule 3)<br>**方案 1 的票据**：A1 票据和 C1 票据（见附表 3）<br>(b) **Instruments for Option 2 Package**:<br>**方案 2 组合的票据**：<br>  ○  EVPS MEBs;<br>恒大物业强制可交换债券；<br>  ○  NEV MEBs;<br>恒大新能源汽车强制可交换债券；<br>  ○  CEG MCBs;<br>恒大强制可转换债券；<br>  ○  A2 EVPS SLNs;<br>A2 恒大物业股票挂钩票据；<br>  ○  A2 NEV SLNs;<br>A2 恒大新能源汽车股票挂钩票据， |

| | |
|---|---|
| | ○ C2 EVPS SLNs; and<br>C2 恒大物业股票挂钩票据；和<br>○ C2 NEV SLNs<br>C2 恒大新能源汽车股票挂钩票据<br>(see Schedule 4)<br>（见附表 4）<br><br>(c) **Instruments for Option 2 Notes: A2 Notes and C2 Notes (see Schedule 5)**<br>**方案 2 票据的票据：A2 票据和 C2 票据（见附表 5）**<br><br>On the RED, As will receive initial restructuring consideration consisting of an initial amount of the relevant New Instruments (including the A2 Package Initial Portion if election allows) in accordance with the terms of the Scheme Documents. Cs will be subject to the valuation and adjudication process and only receive their relevant New Instruments after the deficiency claims are determined.<br><br>重组生效日当日，A 债权人将收到初始重组对价，包括了根据协议安排文件的条款发行的相关新票据和新债务的初始金额（如果选择允许，包括 A2 组合初始部分）。C 债权人将受限于估值和裁决程序，只有在差额索偿确定后，才会收到其相关新票据和新债务。<br><br>In respect of the entitlement of the As which was not converted into the A2 Package in the initial distribution due to an oversubscription of the A2 Package Initial Portion, the intention is that such entitlement shall be converted into a special series of notes/instruments for A2s capable of transfer and being exchanged into instruments for the C2 Package Unadmitted Portion in accordance with the terms of the Scheme Documents reflecting the restructuring consideration. CEG and the CEG AHG can separately agree other solutions if viable for distribution of restructuring consideration as early as practicable.<br><br>就初始分配中 A 债权人由于 A2 组合初始部分的超额认购而未转换为 A2 组合的可获偿金额而言，旨在将该剩余可获偿金额应转换为 A2 债权人的特殊系列的票据/工具，该票据可转让并可根据协议安排文件的条款交换为 C2 组合未接受部分的票据，以反映重组对价。在可行的情况下，恒大和恒大持有人特别团体可另外商定尽早分配重组对价的其他解决方案。 |

| | |
|---|---|
| **Initial distribution of restructuring consideration**<br>**重组对价的初始分配** | |

**Schedule 1**

**附表 1**

<u>Class A</u>
<u>A 组</u>

(a)  8.25% senior notes due March 23, 2022 (ISIN: XS1580431143, Common Code: 158043114);
2022 年 3 月 23 日到期的 8.25% 优先票据（ISIN：XS1580431143，通用代码：158043114）;

(b)  9.5% senior notes due April 11, 2022 (ISIN: XS1982036961, Common Code: 198203696);
2022 年 4 月 11 日到期的 9.5% 优先票据（ISIN：XS1982036961，通用代码：198203696）;

(c)  11.5% senior notes due January 22, 2023 (ISIN: XS2106834299, Common Code: 210683429);
2023 年 1 月 22 日到期的 11.5% 优先票据（ISIN：XS2106834299，通用代码：210683429）;

(d)  4.25% convertible bonds due February 14, 2023 (ISIN: XS1767800961, Common Code: 176780096);
2023 年 2 月 14 日到期的 4.25% 可转换债券（ISIN：XS1767800961，通用代码：176780096）;

(e)  10.0% senior notes due April 11, 2023 (ISIN: XS1982037779, Common Code: 198203777);
2023 年 4 月 11 日到期的 10.0% 优先票据（ISIN：XS1982037779，通用代码：198203777）;

(f)  7.5% senior notes due June 28, 2023 (ISIN: XS1627599498, Common Code: 162759949);
2023 年 6 月 28 日到期的 7.5% 优先票据（ISIN：XS1627599498，通用代码：162759949）;

(g)  12% senior notes due January 22, 2024 (ISIN: XS2106834372, Common Code: 210683437);
2024 年 1 月 22 日到期的 12% 优先票据（ISIN：XS2106834372，通用代码：210683437）;

(h)  9.5% senior notes due March 29, 2024 (ISIN: XS1587867539, Common Code: 158786753);
2024 年 3 月 29 日到期的 9.5% 优先票据（ISIN：XS1587867539，通用代码：158786753）;

(i)  10.5% senior notes due April 11, 2024 (ISIN: XS1982040641, Common Code: 198204064);
2024 年 4 月 11 日到期的 10.5% 优先票据（ISIN：XS1982040641，通用代码：198204064）;

(j)  8.75% senior notes due June 28, 2025 (ISIN: XS1627599654, Common Code: 162759965);
2025 年 6 月 28 日到期的 8.75% 优先票据（ISIN：XS1627599654，通用代码：162759965）;

(k)  9.5% senior notes due January 30, 2022; and

2022 年 1 月 30 日到期的 9.5% 优先票据; 及

(I) 15.0% private loan due July 19, 2022.

2022 年 7 月 19 日到期的 15.0%私募贷款。

**Schedule 2**[11]

**附表 2**[16]

Class C

C组

(a) US$260 million Lake Notes;
  2.6 亿美元湘明项目票据;

(b) US$424 million Dongpo II Notes;
  4.24 亿美元眉山项目票据;

(c) US$116 million put option – Lender E;
  1.16 亿美元沽出期权 – 贷方 E;

(d) US$110 million put option – Lender F;
  1.1 亿美元沽出期权 – 贷方 F;

(e) HK$160 million Bank A Margin Loan;
  1.6 亿港元银行 A 保证金贷款;

(f) HK$575 million put option – Lender B;
  5.75 亿港元沽出期权 – 贷方 B;

(g) HK$1.2 billion loan – Lender A;
  12 亿港元贷款 – 贷方 A;

(h) HK$600 million loan – Lender A;
  6 亿港元贷款 – 贷方 A;

(i) US$20 million structured loan facility – Lender I;

[11] Unless otherwise agreed or separate agreement can be reached with the creditors of such debts. The numbers in this Schedule represent the principal outstanding as of 31 December 2022 and are subject to change.
除非另有约定或能与这些债务的债权人达成单独协议。本附表中的数字代表截至 2022 年 12 月 31 日的未偿还本金，并且可能发生变化。

2000 万美元结构性贷款合同 – 贷方 I;

(j) US$355 million structured SPA – Equity Investor B;

3.55 亿美元结构性买卖合约 – 股权投资者 B;

(k) HK$7.6 billion Hero Loan;

76 亿港元 Hero 贷款;

(l) US$712 million CEG repurchase obligation for Fangchebao;

7.12 亿美元恒大对房车宝的回购义务;

(m) RMB 8.2 billion RMB bond with put option due July 2022; and

2022 年 7 月到期的 82 亿附认沽期权的人民币票据；及

(n) US$8,090 million guarantees provided by CEG to onshore creditors/third parties in respect of onshore debts.

由恒大就境内债务为境内债权人/第三方提供的 80.9 亿美元担保。

**Schedule 3**

**附表 3**

<u>Part A – A1 Notes</u>

<u>A 部分 – A1 票据</u>

**Principal Terms of the China Evergrande Group New Notes A1 ("A1 Notes")**

中國恒大集團新票據 A1（"A1 票据"）的主要条款

| | |
|---|---|
| **Principal Terms of the China Evergrande Group New Notes A1 ("A1 Notes")**<br>中国恒大集团新票据 A1（"A1 票据"）的主要条款 | |
| **Issuer**<br>发行人 | China Evergrande Group, an exempted company incorporated in the Cayman Islands with limited liability<br>中国恒大集团，一家在开曼群岛注册成立的有限责任的豁免公司 |
| **Principal Amount**<br>本金金额 | The A1 Notes shall comprise three tranches as follows, with the following maximum aggregate principal amounts:<br>A1 票据应包括以下三笔，其最大本金总金额为：<br><br>1. A1 Tranche A: Option A1's proportion in Option 1 multiplied by US$3,000 million;<br>A1 票据 A：方案 A1 在方案 1 的占比乘以 30 亿美元；<br><br>2. A1 Tranche B: Option A1's proportion in Option 1 multiplied by US$3,000 million; and<br>A1 票据 B：方案 A1 在方案 1 的占比乘以 30 亿美元；及<br><br>3. A1 Tranche C: As entitlement under Option A1 minus the sum of the principal amounts of A1 Tranche A and B.<br>A1 票据 C：A 组在方案 A1 下的可获偿金额减去 A1 票据 A 和 B 的本金金额之和。<br><br>Subject to the participation of Option 1, A1 Notes will be allocated in sequential order by maturity date starting from A1 Tranche A.<br>受限于方案 1 的参与情况，A1 票据将按到期日顺序从 A1 票据 A 开始分配。 |
| **Maturity/Principal Repayment**<br>到期日/本金偿付 | 1. Tranche A: 10 years from the earlier of October 1, 2023 and the RED (the "**Reference Date**");<br>票据 A：自 2023 年 10 月 1 日和重组生效日中较早的日期（"**参考日期**"）起 10 年；<br><br>2. Tranche B: 11 years from the Reference Date; and<br>票据 B: 自参考日期起 11 年；及<br><br>3. Tranche C: 12 years from the Reference Date.<br>票据 C: 自参考日期起 12 年。<br><br>The outstanding principal amount of each tranche shall be repaid on maturity, together with any accrued and unpaid interest.<br>每一笔的未偿还本金应在到期日连同任何应计及未付利息一起偿还。 |
| **Interest (PIK and cash)**<br>利息（实物付息和现金） | Interest on the outstanding principal amount of the A1 Notes shall be paid in cash or in kind, at the election of the Issuer.<br>A1 票据未偿还本金的利息可由发行人选择用现金或实物支付利息。 |

| | |
|---|---|
| | Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the A1 Notes at the following interest rates with respect to each interest payment period: |
| | 利息将在参考日期起计息，并将每半年期末就 A1 票据的未偿还本金支付一次利息，每个付息期的利率如下： |
| | 1.  A1 Tranche A: 2.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 3.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); |
| | A1 票据 A：每年 2.0%（如果与该付息期有关的所有利息以现金支付）或每年 3.0%（如果与该付息期有关的任何部分利息以实物支付）； |
| | 2.  A1 Tranche B: 2.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 3.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); and |
| | A1 票据 B：每年 2.5%（如果与该付息期有关的所有利息以现金支付）或每年 3.5%（如果与该付息期有关的任何部分利息以实物支付）；及 |
| | 3.  A1 Tranche C: 3.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 4.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); |
| | A1 票据 C：每年 3.0%（如果与该付息期有关的所有利息以现金支付）或每年 4.0%（如果与该付息期有关的任何部分利息以实物支付）； |
| | All interest paid in kind with respect to the A1 Notes will be added to the then current outstanding principal amount of the A1 Notes. |
| | 所有 A1 票据以实物支付的利息均计入届时 A1 票据 的未偿还本金金额。 |
| | If the Issuer pays cash interest under any tranche of the A1 Notes with respect to any interest payment period, it shall also pay cash interest under all other outstanding tranches of the A1 Notes, A2 Notes, C1 Notes and C2 Notes with respect to such interest payment period. The amount of such cash payments shall be allocated among the A1 Notes, A2 Notes, C1 Notes and C2 Notes (and among each tranche of such instruments) on a pro rata basis by outstanding principal amount. |
| | 如果发行人就 A1 票据的任何一笔就任何付息期支付现金利息，则发行人还应就 A1 票据、A2 票据、C1 票据和 C2 票据中其他所有未偿还票据就该付息期支付现金利息。该现金支付的金额应根据未偿还本金金额按比例在 A1 票据、A2 票据、C1 票据和 C2 票据之间（并且在该等票据中各笔之间）进行分配。 |
| **Guarantees**<br>担保 | The same Subsidiary Guarantors as those guaranteeing the Existing Notes, other than (i) certain shell subsidiaries of CEG to be agreed to be deregistered prior to the Original Issue Date, and (ii) certain significant offshore subsidiaries to be agreed (collectively the "**A1 Notes** |

| | |
|---|---|
| | **Guarantors**", and such guarantees, the "**A1 Notes Guarantees**"). The A1 Notes Guarantees shall be subordinated to the A2 Notes Guarantees, the A2 EVPS SLN Guarantees and the A2 NEV SLN Guarantees. |
| | 担保子公司与目前为现有票据提供担保的担保子公司相同，但不包括（i）某些有待商定在初始发行日期前注销的恒大空壳子公司，以及（ii）某些有待商定的重要境外子公司（统称为"**A1 票据担保公司**"，该担保统称为"**A1 票据担保**"）。A1 票据担保将劣后于 A2 票据担保、A2 恒大物业股票挂钩票据担保及 A2 恒大新能源汽车股票挂钩票据。 |
| **Auditor** 审计师 | The Issuer will engage a Whitelist Auditor to audit its annual financial statements starting no later than the audit of the fiscal year ending December 31, 2023. |
| | 发行人将聘请一家白名单审计师对其年度财务报表进行审计，开始时间不晚于截至 2023 年 12 月 31 日止的财务年度审计。 |
| | The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms: |
| | "**白名单审计师**"应为以下任何会计师事务所或其各自的关联所或成员所： |
| | (a)  Baker Tilly International; |
| |    天职国际； |
| | (b)  BDO; |
| |    立信； |
| | (c)  Crowe Global; |
| |    国富浩华； |
| | (d)  Deloitte; |
| |    德勤； |
| | (e)  Ernst & Young; |
| |    安永； |
| | (f)  Grant Thornton; |
| |    致同； |
| | (g)  KPMG; |
| |    毕马威； |
| | (h)  Mazars; |
| |    中审众环； |
| | (i)  Moore Global; |
| |    大华国际； |
| | (j)  Prism; and |
| |    上会栢诚； |

| | |
|---|---|
| | (k) RSM International.<br>RSM 国际。 |
| **Trustee**<br>信托人 | Madison Pacific or another internationally recognized financial institution as agreed between the Issuer and the CEG AHG.<br>麦迪森太平洋或由发行人和恒大持有人特别团体商定的另一家国际公认的金融机构。 |
| **General**<br>一般 | The Issuer and the CEG AHG will discuss and agree additional covenants and other provisions to be included under the A1 Notes and the related legal documentation, including among others, related to (i) restrictions on indebtedness, restricted payments, liens, affiliate transactions, asset sales, open market and other repurchases and other actions, (ii) events of default, (iii) the rights of holders of, and owners of beneficial interests in, the A1 Notes (a) to obtain periodic financial and other information and documents from the trustee, (b) to appoint or replace the trustee, and (c) to direct the trustee and to enforce remedies, and (iv) the listing of the A1 Notes.<br>发行人和恒大持有人特别团体将讨论并商定将纳入 A1 票据的额外限制和其他条款以及相关法律文件，包括但不限于有关（i）对负债、受限支付、质押权、关联交易、资产出售，公开市场和其他回购和其他行动的限制，（ii）违约事件，（iii）A1 票据持有人和实益权益持有人的权利，包括：（a）从信托人获取定期财务和其他信息和文件的权利、（b）任命或更换信托人的权利及（c）指示信托人以及执行救济措施的权利，以及（iv）A1 票据的上市。 |
| **Language**<br>语言 | The Chinese provisions contained herein are for reference only. If there is any inconsistency between the English and Chinese provisions, the English provisions shall prevail.<br>此处的中文条款仅作参考。如英文和中文条款有任何不一致之处，应以英文条款为准。 |

Part B – C1 Notes

B 部分 – C1 票据

**Principal Terms of the China Evergrande Group New Notes C1 ("C1 Notes")**

中国大集团新票据 C1 ("C1 票据") 的主要条款

| **Principal Terms of the China Evergrande Group New Notes C1 ("C1 Notes")** <br> 中国恒大集团新票据 C1（"C1 票据"）的主要条款 | |
|---|---|
| **Issuer** <br> 发行人 | China Evergrande Group, an exempted company incorporated in the Cayman Islands with limited liability <br> 中国恒大集团，一家在开曼群岛注册成立的有限责任的豁免公司 |
| **Principal Amount** <br> 本金金额 | The C1 Notes shall comprise three tranches as follows, with the following maximum aggregate principal amounts: <br> C1 票据应包括以下三笔，其最大本金总金额为： <br><br> 1. C1 Tranche A: Option C1's proportion in Option 1 multiplied by US$3,000 million; <br> C1 票据 A：方案 C1 在方案 1 的占比乘以 30 亿美元； <br><br> 2. C1 Tranche B: Option C1's proportion in Option 1 multiplied by US$3,000 million; and <br> C1 票据 B：方案 C1 在方案 1 的占比乘以 30 亿美元；及 <br><br> 3. C1 Tranche C: Cs entitlement under Option 1 minus the sum of the principal amounts of C1 Tranche A and B. <br> C1 票据 C：方案 C1 下的可获偿金额减去 C1 票据 A 和 B 的本金金额之和）。 <br><br> Subject to the participation of Cs under Option 1, C1 Notes will be allocated in sequential order by maturity date starting from C1 Tranche A. <br> 受限于 C 组在方案 1 中的参与情况，C1 票据将按到期日顺序从 C1 票据 A 开始分配。 |
| **Maturity/Principal Repayment** <br> 到期日/本金偿付 | 1. C1 Tranche A: 10 years from the Reference Date; <br> C1 票据 A：自参考日期起 10 年； <br><br> 2. C1 Tranche B: 11 years from the Reference Date; and <br> C1 票据 B：自参考日期起 11 年；及 <br><br> 3. C1 Tranche C: 12 years from the Reference Date; <br> C1 票据 C：自参考日期起 12 年； <br><br> The outstanding principal amount of each tranche shall be repaid on maturity, together with any accrued and unpaid interest. <br> 每一笔的未偿还本金应在到期日连同任何应计及未付利息一起偿还。 |
| **Interest (PIK and cash)** <br> 利息（实物付息和现金） | Interest on the outstanding principal amount of the C1 Notes shall be paid in cash or in kind, at the election of the Issuer. <br> C1 票据未偿还本金的利息可由发行人选择用现金或实物支付利息。 |

|  | Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the C1 Notes at the following interest rates with respect to each interest payment period: |
|--|--|
|  | 利息将在参考日期起计息，并将每半年期末就 C1 票据的未偿还本金支付一次利息，每个付息期的利率如下： |
|  | 1. C1 Tranche A: 2.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 3.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); |
|  | C1 票据 A：每年 2.0%（如果与该付息期有关的所有利息以现金支付）或每年 3.0%（如果与该付息期有关的任何部分利息以实物支付）； |
|  | 2. C1 Tranche B: 2.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 3.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); and |
|  | C1 票据 B：每年 2.5%（如果与该付息期有关的所有利息以现金支付）或每年 3.5%（如果与该付息期有关的任何部分利息以实物支付）；及 |
|  | 3. C1 Tranche C: 3.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 4.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); |
|  | C1 票据 C：每年 3.0%（如果与该付息期有关的所有利息以现金支付）或每年 4.0%（如果与该付息期有关的任何部分利息以实物支付）； |
|  | All interest paid in kind with respect to the C1 Notes will be added to the then current outstanding principal amount of the C1 Notes. |
|  | 所有 C1 票据以实物支付的利息均计入届时 C1 票据的未偿还本金金额。 |
|  | If the Issuer pays cash interest under any tranche of the C1 Notes with respect to any interest payment period, it shall also pay cash interest under all other outstanding tranches of the A1 Notes, A2 Notes, C1 Notes and C2 Notes with respect to such interest payment period. The amount of such cash payments shall be allocated among the A1 Notes, A2 Notes, C1 Notes and C2 Notes (and among each tranche of such instruments) on a pro rata basis by outstanding principal amount. |
|  | 如果发行人就 C1 票据的任何一笔就任何付息期支付现金利息，则发行人还应就 A1 票据、A2 票据、C1 票据及 C2 票据中其他所有未偿还票据就该付息期支付现金利息。该现金支付的金额应根据未偿还本金金额按比例在 A1 票据、A2 票据、C1 票据和 C2 票据之间（并且在该等票据中各笔之间）进行分配。 |
| **Auditor**<br>**审计师** | The Issuer will engage a Whitelist Auditor to audit its annual financial statements starting no later than the audit of the fiscal year ending December 31, 2023. |

| | |
|---|---|
| | 发行人将聘请一家白名单审计师对其年度财务报表进行审计，开始时间不晚于截至 2023 年 12 月 31 日止的财务年度审计。<br><br>The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms:<br><br>"**白名单审计师**"应为以下任何会计师事务所或其各自的关联所或成员所：<br><br>(a) Baker Tilly International;<br>　　天职国际；<br><br>(b) BDO;<br>　　立信；<br><br>(c) Crowe Global;<br>　　国富浩华；<br><br>(d) Deloitte;<br>　　德勤；<br><br>(e) Ernst & Young;<br>　　安永；<br><br>(f) Grant Thornton;<br>　　致同；<br><br>(g) KPMG;<br>　　毕马威；<br><br>(h) Mazars;<br>　　中审众环；<br><br>(i) Moore Global;<br>　　大华国际；<br><br>(j) Prism; and<br>　　上会栢诚；<br><br>(k) RSM International.<br>　　RSM 国际。 |
| **Trustee**<br>信托人 | Madison Pacific or another internationally recognized financial institution as agreed between the Issuer and the CEG AHG.<br><br>麦迪森太平洋或由发行人和恒大持有人特别团体商定的另一家国际公认的金融机构。 |
| **General**<br>一般 | The Issuer and the CEG AHG will discuss and agree additional covenants and other provisions to be included under the C1 Notes and the related legal documentation, including among others, related to (i) restrictions on indebtedness, restricted payments, liens, affiliate transactions, asset sales, open market and other repurchases and other actions, (ii) events of default, |

|  | (iii) the rights of holders of, and owners of beneficial interests in, the C1 Notes (a) to obtain periodic financial and other information and documents from the trustee, (b) to appoint or replace the trustee, and (c) to direct the trustee and to enforce remedies, and (iv) the listing of the C1 Notes. |
|  | 发行人和恒大持有人特别团体将讨论并商定将纳入 C1 票据的额外限制和其他条款以及相关法律文件，包括但不限于有关（i）对负债、受限支付、质押权、关联交易、资产出售，公开市场和其他回购和其他行动的限制，（ii）违约事件，（iii）C1 票据持有人和实益权益持有人的权利，包括：（a）从信托人获取定期财务和其他信息和文件的权利、（b）任命或更换信托人的权利及（c）指示信托人以及执行救济措施的权利，以及（iv）C1 票据的上市。 |
| **Language**<br>语言 | The Chinese provisions contained herein are for reference only. If there is any inconsistency between the English and Chinese provisions, the English provisions shall prevail.<br>此处的中文条款仅作参考。如英文和中文条款有任何不一致之处，应以英文条款为准。 |

**Schedule 4**

**附表 4**

Part A – Equity-Linked Instruments

A 部分－股权挂钩票据

Part A1 – EVPS MEBs

A1 部分－恒大物业强制可交换债券

**Principal Terms of the Evergrande Services Mandatory Exchangeable Bonds ("EVPS MEBs")**

恒大物业强制可交换债券（"恒大物业强制可交换债券"）的主要条款

| | |
|---|---|
| **Principal Terms of the Evergrande Services Mandatory Exchangeable Bonds ("EVPS MEBs")**<br>恒大物业强制可交换债券（"恒大物业强制可交换债券"）的主要条款 | |
| **Issuer**<br>发行人 | China Evergrande Group, an exempted company incorporated in the Cayman Islands with limited liability<br>中国恒大集团，一家在开曼群岛注册成立的有限责任的豁免公司 |
| **Exchangeable Bonds to be Issued**<br>待发行的可交换债券 | Exchangeable Bonds (the "**EVPS MEBs**") exchangeable into ordinary shares of Evergrande Property Services Group Limited ("**EVPS**") listed on the Stock Exchange of Hong Kong Limited (the "**HKSE**") (the "**EVPS Shares**")<br>可交换债券（"**恒大物业强制可交换债券**"），可交换为恒大物业集团有限公司（"**恒大物业**"）在香港联合交易所有限公司（"**港交所**"）上市的普通股（"**恒大物业股份**"）。 |
| **Exchange Property**<br>交换财产 | The Exchange Property will comprise 2,331,985,700 EVPS Shares, which represents approximately 21.57% of the total issued EVPS Shares as of the date of this CEG Term Sheet (the "**Exchange Property**").<br>交换财产将包括 2,331,985,700 股恒大物业股份，占截至 本恒大条款清单日期已发行的恒大物业股份总数约 21.57%（"**交换财产**"）。 |
| **Principal Amount**<br>本金金额 | The EVPS MEBs shall comprise one tranche, with a maximum aggregate principal amount of approximately HK$5,364 million (equivalent to approximately US$689 million at an exchange rate of US$1.00 to HK$7.78).<br>恒大物业强制可交换债券应为一笔，其最大本金总额约为 53.64 亿港元（以 1.00 美元兑 7.78 港元的汇率计算，约 6.89 亿美元）。 |
| **Maturity/Principal Repayment**<br>到期日/本金偿付 | 24 months from the Reference Date. The outstanding principal amount of the EVPS MEBs shall be mandatorily exchanged into EVPS Shares at maturity. All exchanges shall be settled in EVPS Shares (and not in cash).<br>自参考日期起 24 个月。恒大物业可交换债券的未偿还本金应在到期日被强制性转换为恒大物业股份。所有的交换必须以恒大物业股份（而不是以现金）结清。 |
| **Security**<br>质押 | Charge of securities account holding the Exchange Property, subject to customary releases.<br>以持有交换财产的证券账户作为质押，受限于惯常的解除。<br>The Issuer or its subsidiary, as applicable, shall maintain the signatories nominated by a collateral agent in respect of the charged account.<br>发行人或其子公司（按所适用的）应保留质押代理人就质押账户提名的签字人。<br>Prior to the account charge becoming enforceable, the collateral agent shall have joint signatory rights with the Issuer or its subsidiary, as applicable, in relation to any withdrawal or transfer from, and any closure of, the charged |

|  | account. The Issuer or its subsidiary, as applicable, shall not withdraw or transfer from the charged account except in circumstances to be agreed.

在账户质押可执行之前，质押代理人就质押账户的任何提款或划转以及任何关闭应与发行人或其子公司（按所适用的）拥有共同签字权。发行人或其子公司（按所适用的）不得从质押账户中提款或划转，在商定的情况下除外。

Upon the account charge becoming enforceable, the collateral agent shall have the right to deliver a notice of control to the account bank and shall have sole signatory rights in relation to any withdrawal or transfer from, and any closure of, the charged account, without any need for the signatory of the Issuer or its subsidiary, as applicable, to co-sign.

一旦账户质押可以执行，质押代理人应有权向账户银行递送控制通知，并对质押账户的任何提款或划转以及任何关闭拥有唯一的签字权，而无需发行人或其子公司（按所适用的）的签字人共同签署。

The collateral agent nominated signatory shall have been deemed to have consented or signed, as applicable, if it does not object within three (3) business days upon request to act or sign, as applicable, in relation to transfers, withdrawals and other actions expressly permitted under the indenture and the security documents.

在被要求就债券契约和质押文件明确允许的转账/提款和其他行动采取行动或签署（按所适用的）时，如质押代理人指定的签字人在三（3）个工作日内没有提出异议，则其应被视为已予同意或签署（按所适用的）。 |
|---|---|
| **Exchange Period**<br>交换期 | - From the later of (i) 41 days after the Original Issue Date and (ii) the date upon which EVPS Shares have resumed trading on the HKSE to 10 trading days prior to maturity.<br><br>　自(i)参考日期后 41 天及(ii)恒大物业股份在港交所恢复交易的日期（以较晚者为准）起至到期前的 10 个交易日。<br><br>- Exchanges of the EVPS MEBs to EVPS Shares during any calendar month shall not exceed one-third (1/3) of the aggregate principal amount of the EVPS MEBs that were originally issued.<br><br>　每个日历月恒大物业强制可交换债券向恒大物业股份的交换量，将不可超过最初发行的恒大物业强制可交换债券的本金总额的三分之一(1/3)。<br><br>- All exchanges shall be settled in EVPS Shares (and not in cash).<br><br>　所有的交换必须以恒大物业股份（而不是以现金）结清。 |
| **Exchange Price**<br>交换价格 | HK$2.30 per share<br>每股 2.30 港元 |
| **Anti-dilution and Corporate Governance** | Certain anti-dilution protections (including against dividends and other distributions, consolidations, subdivisions, redesignations and reclassifications of shares, and certain other dilutive events) and corporate governance rights to be agreed between the Issuer and the CEG AHG, tailored to the requirements of the underlying businesses. |

| 反稀释和公司治理 | 某些反稀释保护措施（包括针对分红和其他分配、合并、拆分、重新划定和重新分类股份以及某些其他稀释事件）和公司治理权利，将由发行人和恒大持有人特别团体商定，并根据相关业务的要求进行调整。 |
|---|---|
| **Events of Default**<br><br>**违约事件** | Customary events of default, applicable to the Issuer and its Principal Subsidiaries. Remedy limited to exchange rights for EVPS MEBs.<br><br>惯常违约事件，适用于发行人及其主要子公司。救济措施仅限于恒大强制可转换债券的转换权。<br><br>"**Principal Subsidiary**" means any Subsidiary of the Issuer, on a consolidated basis, which exceeds (i) 5% of the consolidated gross revenue, (ii) 5% of the consolidated pre-tax profit, or (iii) 5% of consolidated net assets of the Issuer, in each case as shown by its latest audited consolidated financial statements.<br><br>"**主要子公司**"是指发行人的任何子公司，且其在合并基础上，超过发行人的(i)发行人合并总收入的 5%，(ii)合并税前利润的 5%，或(iii)合并净资产的 5%，均以其最新的经审计的合并财务报表显示为准。 |
| **Auditor**<br><br>**审计师** | The Issuer will engage a Whitelist Auditor to audit its annual financial statements starting no later than the audit of the fiscal year ending December 31, 2023.<br><br>发行人将聘请一家白名单审计师对其年度财务报表进行审计，开始时间不晚于截至 2023 年 12 月 31 日止的财务年度审计。<br><br>The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms:<br><br>"**白名单审计师**"应为以下任何会计师事务所或其各自的关联所或成员所：<br><br>(a)  Baker Tilly International;<br><br>     天职国际；<br><br>(b)  BDO;<br><br>     立信；<br><br>(c)  Crowe Global;<br><br>     国富浩华；<br><br>(d)  Deloitte;<br><br>     德勤；<br><br>(e)  Ernst & Young;<br><br>     安永；<br><br>(f)  Grant Thornton;<br><br>     致同；<br><br>(g)  KPMG;<br><br>     毕马威； |

|  | (h) Mazars; |
|  | 中审众环； |
|  | (i) Moore Global; |
|  | 大华国际； |
|  | (j) Prism; and |
|  | 上会栢诚； |
|  | (k) RSM International. |
|  | RSM 国际。 |
| **Trustee**<br>**信托人** | Madison Pacific or another internationally recognized financial institution as agreed between the Issuer and the CEG AHG.<br>麦迪森太平洋或由发行人和恒大持有人特别团体商定的另一家国际公认的金融机构。 |
| **General**<br>**一般** | The Issuer and the CEG AHG will discuss and agree additional covenants and other provisions to be included under the EVPS MEBs and the related legal documentation, including among others, related to (i) restrictions on indebtedness, restricted payments, liens, affiliate transactions, asset sales, open market and other repurchases and other actions, (ii) events of default, (iii) the rights of holders of, and owners of beneficial interests in, the EVPS MEBs (a) to obtain periodic financial and other information and documents from the trustee and the collateral agent, (b) to appoint or replace the trustee, and (c) to direct the trustee and collateral agent and to enforce remedies, and (iv) the listing of the EVPS MEBs.<br>发行人和恒大持有人特别团体将讨论并商定将纳入恒大物业强制可交换债券的额外限制和其他条款以及相关法律文件，包括但不限于有关（i）对负债、受限支付、质押权、关联交易、资产出售，公开市场和其他回购和其他行动的限制，（ii）违约事件，（iii）恒大物业强制可交换债券持有人和实益权益持有人的权利，包括：（a）从信托人获取定期财务和其他信息和文件的权利、（b）任命或更换信托人的权利及（c）指示信托人以及执行救济措施的权利，以及（iv）恒大物业强制可交换债券的上市。 |
| **Language**<br>**语言** | The Chinese provisions contained herein are for reference only. If there is any inconsistency between the English and Chinese provisions, the English provisions shall prevail.<br>此处的中文条款仅作参考。如英文和中文条款有任何不一致之处，应以英文条款为准。 |

Part A2 – NEV MEBs

A2 部分 – 恒大新能源汽车强制可交换债券

**Principal Terms of the China Evergrande New Energy Vehicle Group Limited Mandatory Exchangeable Bonds ("NEV MEBs")**

恒大新能源汽车强制可交换债券（"恒大新能源汽车强制可交换债券"）的主要条款

| Principal Terms of the China Evergrande New Energy Vehicle Group Limited Mandatory Exchangeable Bonds ("NEV MEBs")<br>中国恒大新能源汽车集团强制可交换债券（"恒大新能源汽车强制可交换债券"）的主要条款 | |
|---|---|
| **Issuer**<br>**发行人** | China Evergrande Group, an exempted company incorporated in the Cayman Islands with limited liability<br>中国恒大集团，一家在开曼群岛注册成立的有限责任的豁免公司 |
| **Exchangeable Bonds to be Issued**<br>**待发行的可交换债券** | Exchangeable Bonds (the "**NEV MEBs**") exchangeable into ordinary shares of China Evergrande New Energy Vehicle Group Limited ("**NEV**") listed on the Stock Exchange of Hong Kong Limited (the "**HKSE**") (the "**NEV Shares**")<br>可交换债券（"**恒大新能源汽车强制可交换债券**"），可交换为中国恒大新能源汽车集团有限公司（"**恒大新能源汽车**"）在香港联合交易所有限公司（"**港交所**"）上市的普通股（"**恒大新能源汽车股份**"）。 |
| **Exchange Property**<br>**交换财产** | The Exchange Property will initially comprise 3,094,810,100 NEV Shares, which represents approximately 28.54% of the total issued NEV Shares as of the date of this CEG Term Sheet (the "**Exchange Property**").<br>交换财产最初将包括 3,094,810,100 股恒大新能源汽车股份，占已发行的恒大新能源汽车股份截至 本恒大条款清单日期总数约 28.54%（"**交换财产**"）。<br><br>As part of the Restructuring and as set forth under "Treatment of shareholder's loans to NEV and CEG's loan to NEV" in this CEG Term Sheet, the relevant shareholder's loans to NEV and CEG's loan to NEV and any accrued and unpaid interest thereon will be applied to convert into new NEV Shares at the conversion price of HK$3.84 per share. A portion of such NEV Shares so converted will be deposited into the A2 NEV Escrow Accounts and C2 NEV Escrow Accounts on a pro rata basis such that the A2 NEV Escrow Accounts and C2 NEV Escrow Accounts will together hold NEV Shares representing 30% of the total issued NEV Shares on a fully diluted basis. The remaining NEV Shares so converted will be added to the Exchange Property under the NEV MEBs. As set forth under "Treatment of other loan to NEV" in this CEG Term Sheet, the loans by Ms. Ding Yumei and Good Bond Limited to NEV are also expected to be applied toward conversion into new shares in NEV at an issue price of HK$3.84 per share. The NEV shares so converted will not be used as part of the restructuring consideration (neither the NEV MEBs nor the A2 NEV SLNs and the C2 NEV SLNs).<br><br>作为重组的一部分，并根据本恒大条款清单中"股东对恒大新能源汽车的贷款和恒大对恒大新能源汽车贷款的处理"所列明的，恒大新能源汽车的相关股东贷款和恒大对新能源汽车贷款及其任何应计且未付利息将用于以转换价每股 3.84 港元转换为恒大新能源汽车的新股份。部分如此转换的恒大新能源汽车股份将按比例存入 A2 恒大新能源汽车托管账户和 C2 恒大新能源汽车托管账户，从而使 A2 恒大新能源汽车托管账户和 C2 恒大新能源汽车托管账户共同持有的恒大新能源汽车股份在完全稀释的基础上占已发行恒大新能源汽车股份总数的 30% 。剩余如此转换的恒大新能源汽车股份将加入恒大新能源汽车强制可交换债 |

| | |
|---|---|
| | 券的交换财产。如本恒大条款清单中"恒大新能源汽车其他贷款的处理"所述，丁玉梅女士及 Good Bond Limited 向恒大新能源汽车提供的贷款也预期将用于以发行价每股 3.84 港元转换为恒大新能源汽车的新股份。 如此转换的恒大新能源汽车股份将不会被用作重组对价的一部分（既不是恒大新能源汽车强制可交换债券也不是 A2 恒大新能源汽车股票挂钩票据及 C2 恒大新能源汽车股票挂钩票据）。 |
| **Principal Amount**<br>**本金金额** | The NEV MEBs shall comprise one tranche, with a maximum aggregate principal amount of approximately HK$24,409 million (equivalent to approximately US$3,137 million at an exchange rate of US$1.00 to HK$7.78) (after taking into account the conversion of the relevant shareholder's loans to NEV and CEG's loan to NEV as set forth under "Treatment of shareholder's loans to NEV and CEG's loan to NEV" in this CEG Term Sheet). Such maximum principal amount is subject to changes based on Option 2 election under this CEG Term Sheet.<br><br>恒大新能源汽车强制可交换债券应为一笔，其最大本金总额约为244.09 亿港元（以 1.00 美元兑 7.78 港元的汇率计算，约 31.37 亿美元）（数值反映考虑到本恒大条款清单中"股东对恒大新能源汽车的贷款和恒大对恒大新能源汽车的贷款的处理"中列明的恒大新能源汽车的相关股东贷款和恒大对恒大新能源汽车贷款的转换后），该最大本金金额可能会根据本恒大条款清单下的方案 2 的 选择而改变。 |
| **Maturity/Principal Repayment**<br>**到期日/本金偿付** | 24 months from the Reference Date. The outstanding principal amount of the NEV MEBs shall be exchanged at maturity All exchanges shall be settled in NEV Shares (and not in cash).<br><br>自参考日期起 24 个月。恒大新能源汽车强制可交换债券的未偿还本金应在到期日被强制性转换为恒大新能源汽车股份。所有的交换必须以恒大新能源汽车股份（而不是以现金）结清。 |
| **Security**<br>**质押** | Charge of securities account holding the Exchange Property, subject to customary releases.<br><br>以持有交换财产的证券账户作为质押，受限于惯常的解除。<br><br>The Issuer or its subsidiary, as applicable, shall maintain the signatories nominated by a collateral agent in respect of the charged account at all times.<br><br>发行人或其子公司（按所适用的）应保留质押代理人就质押账户提名的签字人。<br><br>Prior to the occurrence of any enforcement trigger under the account charge, the collateral agent shall have joint signatory rights with the Issuer or its subsidiary, as applicable, in relation to any withdrawal or transfer from, and any closure of, the charged account. The Issuer or its subsidiary, as applicable, shall not withdraw or transfer from the charged account except in circumstances to be agreed.<br><br>在账户质押下的任何执行被触发之前，质押代理人就质押账户的任何提款或划转以及任何关闭应与发行人或其子公司（按所适用的）拥有共同签字权。 发行人或其子公司（按所适用的）不得从质押账户中提款或划转，在商定的情况下除外。 |

|  | Upon the occurrence of any enforcement trigger under the account charge, the collateral agent shall have the right to deliver a notice of control to the account bank and shall have sole signatory rights in relation to any withdrawal or transfer from, and any closure of, the charged account, without any need for the signatory of the Issuer or its subsidiary, as applicable, to co-sign. |
|  | 一旦账户质押下的任何执行被触发,质押代理人应有权向账户银行发出控制通知,并对质押账户的任何提款或划转以及任何关闭拥有唯一的签字权,而不需要发行人或其子公司(按所适用的)的签字人共同签署。 |
|  | The collateral agent nominated signatory shall have been deemed to have consented or signed, as applicable, if it does not object within three (3) business days upon request to act or sign, as applicable, in relation to transfers, withdrawals and other actions expressly permitted under the indenture and the security documents. |
|  | 在被要求就债券契约和质押文件明确允许的转账、提款和其他行动采取行动或签署(按所适用的)时,如质押代理人指定的签字人在三(3)个工作日内没有提出异议,则其应被视为已予同意或签署(按所适用的)。 |
| **Exchange Period**<br>交换期 | - From the later of (i) 41 days after the Original Issue Date and (ii) the date upon which NEV Shares have resumed trading on the HKSE to 10 trading days prior to maturity.<br><br>自(i)参考日期后 41 天及(ii)恒大新能源汽车股份在港交所恢复交易的日期(以较晚者为准)起至到期前的 10 个交易日。<br><br>- Exchanges of the NEV MEBs to NEV Shares during any calendar month shall not exceed one-third (1/3) of the aggregate principal amount of the NEV MEBs that were originally issued.<br><br>每个日历月恒大新能源汽车强制可交换债券向恒大新能源汽车股份的交换量,将不可超过最初已发行的恒大新能源汽车强制可交换债券的本金总额的三分之一(1/3)。<br><br>- All exchanges shall be settled in NEV Shares (and not in cash)<br><br>所有的交换必须以恒大新能源汽车股份(而不是以现金)结清。 |
| **Exchange Price**<br>交换价格 | HK$3.84 per share<br>每股 3.84 港元 |
| **Anti-dilution and Corporate Governance**<br>反稀释和公司治理 | Certain anti-dilution protections (including against dividends and other distributions, consolidations, subdivisions, redesignations and reclassifications of shares, and certain other dilutive events) and corporate governance rights to be agreed between the Issuer and the CEG AHG, tailored to the requirements of the underlying businesses.<br><br>某些反稀释保护措施(包括针对分红和其他分配、合并、拆分、重新划定和重新分类股份以及某些其他稀释事件)和公司治理权利,将由发行人和恒大持有人特别团体商定,并根据相关业务的要求进行调整。 |

| | |
|---|---|
| **Events of Default**<br><br>**违约事件** | Customary events of default, applicable to the Issuer and its Principal Subsidiaries. Remedy limited to exchange rights for NEV MEBs.<br><br>惯常违约事件，适用于发行人及其主要子公司。救济措施仅限于恒大新能源汽车强制可交换债券的转换权。<br><br>"**Principal Subsidiary**" means any Subsidiary of the Issuer, on a consolidated basis, which exceeds (i) 5% of the consolidated gross revenue, (ii) 5% of the consolidated pre-tax profit, or (iii) 5% of consolidated net assets of the Issuer, in each case as shown by its latest audited consolidated financial statements<br><br>"**主要子公司** "是指发行人的任何子公司，且其在合并基础上，超过发行人的(i)合并总收入的 5%，(ii)合并税前利润的 5%，或(iii)合并净资产的 5%，均以其最新的经审计的合并财务报表显示为准。 |
| **Auditor**<br><br>**审计师** | The Issuer will engage a Whitelist Auditor to audit its annual financial statements starting no later than the audit of the fiscal year ending December 31, 2023.<br><br>发行人将聘请一家白名单审计师对其年度财务报表进行审计，开始时间不晚于截至 2023 年 12 月 31 日止的财务年度审计。<br><br>The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms:<br><br>"**白名单审计师**"应为以下任何会计师事务所或其各自的关联所或成员所：<br><br>(a)  Baker Tilly International;<br><br>天职国际；<br><br>(b)  BDO;<br><br>立信；<br><br>(c)  Crowe Global;<br><br>国富浩华；<br><br>(d)  Deloitte;<br><br>德勤；<br><br>(e)  Ernst & Young;<br><br>安永；<br><br>(f)  Grant Thornton;<br><br>致同；<br><br>(g) KPMG;<br><br>毕马威；<br><br>(h)  Mazars;<br><br>中审众环；<br><br>(i)  Moore Global; |

|  | 大华国际; |
|---|---|
|  | (l)  Prism; and |
|  | 上会栢诚; |
|  | (j)  RSM International. |
|  | RSM 国际。 |
| **Trustee**<br>**信托人** | Madison Pacific or another internationally recognized financial institution as agreed between the Issuer and the CEG AHG.<br>麦迪森太平洋或由发行人和恒大持有人特别团体商定的另一家国际公认的金融机构。 |
| **General**<br>**一般** | The Issuer and the CEG AHG will discuss and agree additional covenants and other provisions to be included under the NEV MEBs and the related legal documentation, including among others, related to (i) restrictions on indebtedness, restricted payments, liens, affiliate transactions, asset sales, open market and other repurchases and other actions, (ii) events of default, (iii) the rights of holders of, and owners of beneficial interests in, the NEV MEBs (a) to obtain periodic financial and other information and documents from the trustee and the collateral agent, (b) to appoint or replace the trustee, and (c) to direct the trustee and collateral agent and to enforce remedies, and (iv) the listing of the NEV MEBs.<br>发行人和恒大持有人特别团体将讨论并商定将纳入恒大新能源汽车强制可交换债券的额外限制和其他条款以及相关法律文件，包括但不限于有关（i）对负债、受限支付、质押权、关联交易、资产出售，公开市场和其他回购和其他行动的限制，（ii）违约事件，（iii）恒大新能源汽车强制可交换债券持有人和实益权益持有人的权利，包括：（a）从信托人获取定期财务和其他信息和文件的权利、（b）任命或更换信托人的权利及（c）指示信托人以及执行救济措施的权利，以及（iv）恒大新能源汽车强制可交换债券的上市。 |
| **Language**<br>**语言** | The Chinese provisions contained herein are for reference only. If there is any inconsistency between the English and Chinese provisions, the English provisions shall prevail.<br>此处的中文条款仅作参考。如英文和中文条款有任何不一致之处，应以英文条款为准。 |

Part A3 – CEG MCBs

A3 部分– 恒大强制可转换债券

**Principal Terms of the Mandatory Convertible Bonds ("CEG MCBs")**

恒大强制可转换债券（"恒大强制可转换债券"）的主要条款

| Principal Terms of the Mandatory Convertible Bonds ("CEG MCBs") 强制可转换债券（"恒大强制可转换债券"）的主要条款 | |
|---|---|
| **Issuer** 发行人 | China Evergrande Group, an exempted company incorporated in the Cayman Islands with limited liability 中国恒大集团，一家在开曼群岛注册成立的有限责任的豁免公司 |
| **Convertible Bonds to be Issued** 待发行的可转换债券 | Mandatory Convertible Bonds (the "**CEG MCBs**") convertible into ordinary shares of the Issuer listed on the Stock Exchange of Hong Kong Limited (the "**HKSE**") (the "**Shares**") 强制可转换债券（"**恒大强制可转换债券**"），可转换为发行人在香港联合交易所有限公司（"**港交所**"）上市的普通股（"**股份**"） |
| **Principal Amount** 本金金额 | The CEG MCBs shall comprise one tranche, with a maximum aggregate principal amount equal to approximately HK$3,253 million (approximately US$418 million at an exchange rate of US$1.00 to HK$7.78). 恒大强制可转换债券应为一笔，其最大本金总额约为 32.53 亿港元（以 1.00 美元兑 7.78 港元的汇率计算，约 4.18 亿美元）。 |
| **Maturity/Principal Repayment** 到期日/本金偿付 | Five (5) years from the Reference Date. The outstanding principal amount of the CEG MCBs shall be mandatorily converted into the Shares at maturity. All conversions shall be settled in Shares (and not in cash) 自参考日期起五（5）年。恒大强制可转换债券的未偿还本金应在到期日被强制性转换为发行人的股份。所有的交换必须以股份（而不是以现金）结清。 |
| **Conversion Period** 转换期 | - From the later of (i) 41 days after the Original Issue Date and (ii) the date upon which the Shares have resumed trading on the HKSE to 10 trading days prior to maturity. 自(i)参考日期后 41 天及(ii)股份在港交所恢复交易的日期（以较晚者为准）起至到期前的 10 个交易日。<br><br>- Conversions of the CEG MCBs to Shares during any calendar month shall not exceed one-third (1/3) of the aggregate principal amount of the CEG MCBs that were originally issued. 每个日历月恒大强制可转换债券向股份的转换量，将不可超过最初发行的恒大强制可转换债券的本金总额的三分之一(1/3)。<br><br>- All conversions shall be settled in Shares (and not in cash). 所有的转换必须以股份（而不是以现金）结清。 |
| **Conversion Price** 初始转换价格 | HK$0.5775 per share (CEG Scheme Creditors' shares in CEG will be approximately 29.9% immediately after full conversion of the CEG MCBs, and Professor Hui Ka Yan's shares in CEG will be approximately 41.9% immediately after full conversion of the CEG MCBs, assuming (i) all CEG MCBs are issued on the Reference Date at the maximum aggregate principal amount of HK$3,253 million, and are immediately converted in full upon issuance, and (ii) the number of total issued Shares is 13,204,300,900 |

| | immediately before such conversion and 18,836,377,889 immediately after such conversion). |
| | 每股 0.5775 港元 （恒大协议安排债权人于恒大强制可转换债券完全转换后的那一刻的恒大股份将约为 29.9%，许家印教授于恒大强制可转换债券完全转换后的那一刻的恒大股份将约为41.9%，），假设 (i) 所有恒大强制可转换债券均在参考日期当日发行，最大本金金额为 32.53 亿港元，并在发行后立即全部转换，以及 (ii)已发行股份总数在该转换前的那一刻为 13,204,300,900 且该转换后的那一刻为 18,836,377,889。 |
| **Anti-dilution and Corporate Governance** 反稀释和公司治理 | Certain anti-dilution protections (including against dividends and other distributions, consolidations, subdivisions, redesignations and reclassifications of shares, and certain other dilutive events) and corporate governance rights to be agreed between the Issuer and the CEG AHG, tailored to the requirements of the underlying businesses. |
| | 某些反稀释保护措施（包括针对分红和其他分配、合并、拆分、重新划定和重新分类股份以及某些其他稀释事件）和公司治理权利，将由发行人和恒大持有人特别团体商定，并根据相关业务的要求进行调整。 |
| **Events of Default** 违约事件 | Customary events of default, applicable to the Issuer and its Principal Subsidiaries. Remedy limited to conversion rights for CEG MCB. |
| | 惯常违约事件，适用于发行人及其主要子公司。救济措施仅限于恒大强制可转换债券的转换权。 |
| | "**Principal Subsidiary**" means any Subsidiary of the Issuer, on a consolidated basis, which exceeds (i) 5% of the consolidated gross revenue, (ii) 5% of the consolidated pre-tax profit, or (iii) 5% of consolidated net assets of the Issuer, in each case as shown by its latest audited consolidated financial statements |
| | "**主要子公司**"是指发行人的任何子公司，且其在合并基础上，超过发行人的(i)合并总收入的 5%，(ii)合并税前利润的 5%，或(iii)合并净资产的 5%，均以其最新的经审计的合并财务报表显示为准。 |
| **Auditor** 审计师 | The Issuer will engage a Whitelist Auditor to audit its annual financial statements starting no later than the audit of the fiscal year ending December 31, 2023. |
| | 发行人将聘请一家白名单审计师对其年度财务报表进行审计，开始时间不晚于截至2023 年 12 月 31 日止的财务年度审计。 |
| | The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms: |
| | "**白名单审计师**"应为以下任何会计师事务所或其各自的关联所或成员所： |
| | (a) Baker Tilly International; |
| | 天职国际； |
| | (b) BDO; |
| | 立信； |

|  | (c) Crowe Global;<br><br>国富浩华;<br><br>(d) Deloitte;<br><br>德勤;<br><br>(e) Ernst & Young;<br><br>安永;<br><br>(f) Grant Thornton;<br><br>致同;<br><br>(g) KPMG;<br><br>毕马威;<br><br>(h) Mazars;<br><br>中审众环;<br><br>(i) Moore Global;<br><br>大华国际;<br><br>(j) Prism; and<br><br>上会栢诚; 和<br><br>(k) RSM International.<br><br>RSM 国际。 |
|---|---|
| **Trustee**<br>**信托人** | Madison Pacific or another internationally recognized financial institution as agreed between the Issuer and the CEG AHG.<br><br>麦迪森太平洋或由发行人和恒大持有人特别团体商定的另一家国际公认的金融机构。 |
| **General**<br>**一般** | The Issuer and the CEG AHG will discuss and agree additional covenants and other provisions to be included under the CEG MCBs and the related legal documentation, including among others, related to (i) restrictions on indebtedness, restricted payments, liens, affiliate transactions, asset sales, open market and other repurchases and other actions, (ii) events of default, (iii) the rights of holders of, and owners of beneficial interests in, the CEG MCBs (a) to obtain periodic financial and other information and documents from the trustee, (b) to appoint or replace the trustee, and (c) to direct the trustee and to enforce remedies, and (iv) the listing of the CEG MCBs.<br><br>发行人和恒大持有人特别团体将讨论并商定将纳入恒大强制可转换债券的额外限制和其他条款以及相关法律文件，包括但不限于有关（i）对负债、受限支付、质押权、关联交易、资产出售，公开市场和其他回购和其他行动的限制，（ii）违约事件，（iii）恒大强制可转换债券持有人和实益权益持有人的权利，包括：（a）从信托人获取定期财务和其他信息和文件的权利、（b）任命或更换信托人的权利及（c） |

| | 指示信托人以及执行救济措施的权利，以及（iv）恒大强制可转换债券的上市。 |
| **Language**<br>语言 | The Chinese provisions contained herein are for reference only. If there is any inconsistency between the English and Chinese provisions, the English provisions shall prevail.<br>此处的中文条款仅作参考。如英文和中文条款有任何不一致之处，应以英文条款为准。 |

Part B – SLNs

B 部分 – 股票挂钩票据

Part B1 – A2 EVPS SLNs

B1 部分– A2 恒大物业股票挂钩票据

**Principal Terms of the China Evergrande Group EVPS Secured New Notes A2 ("A2 EVPS SLNs")**

中国恒大集团恒大物业有质押的新票据 A2 ("A2 恒大物业股票挂钩票据") 的主要条款

| **Principal Terms of the China Evergrande Group EVPS Secured New Notes A2 ("A2 EVPS SLNs")**<br>**中国恒大集团恒大物业有质押的新票据 A2（"A2 恒大物业股票挂钩票据")的主要条款** | |
|---|---|
| **Issuer**<br>**发行人** | China Evergrande Group, an exempted company incorporated in the Cayman Islands with limited liability<br><br>中国恒大集团，一家在开曼群岛注册成立的有限责任的豁免公司 |
| **Principal Amount**<br>**本金金额** | The A2 EVPS SLNs shall comprise two tranches as follows, with the following maximum aggregate principal amount:<br><br>A2 恒大物业股票挂钩票据应包含以下两笔，其最大本金总额为：<br><br>1.　A2 EVPS SLN Tranche A: US$550 million; and<br><br>　　A2 恒大物业股票挂钩票据 A：5.5 亿美元；及<br><br>2.　A2 EVPS SLN Tranche B: US$550 million.<br><br>　　A2 恒大物业股票挂钩票据 B：5.5 亿美元。； |
| **Maturity/Principal Repayment**<br>**到期日/本金偿付** | 1.　A2 EVPS SLN Tranche A: 5 years from the Reference Date; and<br><br>　　A2 恒大物业股票挂钩票据 A：自参考日期起 5 年；及<br><br>2.　A2 EVPS SLN Tranche B: 6 years from the Reference Date.<br><br>　　A2 恒大物业股票挂钩票据 B：自参考日期起 6 年。<br><br>The outstanding principal amount of each tranche shall be repaid on maturity, together with any accrued and unpaid interest.<br><br>每一笔的未偿还本金应在到期日连同任何应计和未付利息一起偿还。 |
| **Interest (PIK and cash)**<br>**利息（实物付息和现金）** | Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the A2 EVPS SLN Tranche A at 5.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 6.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind) with respect to each interest payment period.<br><br>利息将在参考日期起计息，并将每半年期末就 A2 恒大物业股票挂钩票据 A 未偿还本金支付一次利息，每个付息期的利率为每年 5.0%（如果与该付息期有关的所有利息以现金支付），或者每年 6.0%（如果与该付息期有关的任何部分利息以实物支付）。<br><br>Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the A2 EVPS SLN Tranche B at 5.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 6.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind) with respect to each interest payment period.<br><br>利息将在参考日期起计息，并将每半年期末就 A2 恒大物业股票挂钩票据 B 未偿还本金支付一次利息，每个付息期的利率为每年 5.5% |

（如果与该付息期有关的所有利息以现金支付），或者每年 6.5%（如果与该付息期有关的任何部分利息以实物支付）。

Interest on the outstanding principal amount of the A2 EVPS SLN shall be paid in the following manner:

A2 恒大物业股票挂钩票据未偿还本金的利息应按以下方式支付：

1. For the first two and a half years after the Reference Date: interest may be paid in cash or in kind, at the election of the Issuer;

   对于参考日期后的最初两年半：可由发行人选择用现金或实物支付利息；

2. From the 31st month to the 36th month after the Reference Date, interest in an amount equal to at least 0.5% of the outstanding principal amount of each tranche of the A2 EVPS SLN shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Issuer;

   对于参考日期后的第 31 个月至第 36 个月：应以现金支付相当于各笔 A2 恒大物业股票挂钩票据未偿本金的至少 0.5%的利息；其余部分的利息可由发行人选择以现金或实物支付；

3. For the fourth year after the Reference Date: interest in an amount equal to at least 3.0% p.a. of the outstanding principal amount of each tranche of the A2 EVPS SLN shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Issuer; and

   对于参考日期后的第四年：应以现金支付相当于各笔 A2 恒大物业股票挂钩票据未偿本金的至少每年 3.0%的利息；其余部分的利息可由发行人选择以现金或实物支付；及

4. Starting from the fifth year after the Reference Date: interest shall be paid in cash.

   对于从参考日期后的第五年开始：利息应以现金支付。

All interest paid in kind with respect to the A2 EVPS SLN will be added to the then current outstanding principal amount of the A2 EVPS SLN.

所有 A2 恒大物业股票挂钩票据以实物支付的利息均计入届时 A2 恒大物业股票挂钩票据的未偿还本金金额。

If the Issuer pays cash interest under any tranche of the A2 EVPS SLNs with respect to any interest payment period in an amount greater than the amount of cash interest required to be paid on such tranche with respect to such interest payment period, it shall also pay additional cash interest under all other outstanding tranches of the A2 EVPS SLNs, A2 NEV SLNs, A2 Notes, C2 EVPS SLNs, C2 NEV SLNs and C2 Notes. The amount of such additional cash payments shall be allocated among each of the A2 EVPS SLNs, A2 NEV SLNs, A2 Notes, C2 EVPS SLNs, C2 NEV SLNs and C2 Notes (and among each tranche of such instruments) on a pro rata basis by outstanding principal amount.

如果发行人就 A2 恒大物业股票挂钩票据的任何一笔就任何付息期支付的现金利息大于该笔票据在该付息期所需支付的现金利息，则发行人还应就 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂

| | |
|---|---|
| | 钩票据、A2 票据、C2 恒大物业股票挂钩票据、C2 恒大新能源汽车股票挂钩票据及 C2 票据中其他所有未偿还票据支付额外的现金利息。该额外现金支付的金额应根据未偿还本金金额，按比例在 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、A2 票据、C2 恒大物业股票挂钩票据、C2 恒大新能源汽车股票挂钩票据及 C2 票据之间（并且在该等票据中各笔之间）进行分配。 |
| **Guarantees**<br>担保 | The same Subsidiary Guarantors as those guaranteeing the Existing Notes, other than (i) certain shell subsidiaries of CEG to be agreed to be deregistered prior to the Original Issue Date, and (ii) certain significant offshore subsidiaries to be agreed (collectively the "**A2 EVPS SLN Guarantors**", and such guarantees, the "**A2 EVPS SLN Guarantees**"). A1 Notes Guarantees to be subordinated to A2 EVPS SLN Guarantees.<br><br>担保子公司与目前为现有票据提供担保的担保子公司相同，但不包括（i）某些有待商定在初始发行日期前注销的恒大空壳子公司以及（ii）某些有待商定的重要境外子公司，（统称为 "**A2 恒大物业股票挂钩票据担保公司**"，该担保统称为"**A2 恒大物业股票挂钩票据担保**"）。A1 票据担保将劣后于 A2 恒大物业股票挂钩票据担保。 |
| **Share Security**<br>股份质押 | Charges of securities accounts in the aggregate holding 2,493,778,025 EVPS Shares (equivalent to approximately 23.1% of EVPS Shares as of the date of this CEG Term Sheet) (the "**A2 EVPS Shares Account Charges**") for securing the A2 EVPS SLNs. Each tranche of A2 EVPS SLNs will have its own A2 EVPS Shares Account Charge holding such EVPS Shares in corresponding proportion to its principal amount over all A2 EVPS SLNs.<br><br>将持有共计 2,493,778,025 股恒大物业股份（相当于截至 本恒大条款清单日期恒大物业股份的约 23.1%）的证券账户作为质押（"**A2 恒大物业股票账户质押**"），以为 A2 恒大物业股票挂钩票据提供质押。每一笔 A2 恒大物业股票挂钩票据都将有其专属的 A2 恒大物业股票账户质押，该账户所持恒大物业股份与这笔票据的本金金额在全部 A2 恒大物业股票挂钩票据中的比例相对应。<br><br>EVPS Shares subject to an A2 EVPS Shares Account Charge may be released for sale to a strategic investor, upon (i) the redemption of all A2 EVPS SLN secured by such charge, at par plus accrued and unpaid interest (the "**A2 EVPS Redemption Amount**") or (ii) the deposit of an amount equal to the A2 EVPS Redemption Amount into an account charged to the benefit of the holders of the A2 EVPS SLNs, or (iii) an amount equal to the A2 EVPS Redemption Amount being subject to an escrow or other arrangement to be agreed. Prior consultation or approval will not be required from the trustee, collateral agent or any noteholder for releasing EVPS Shares for sale to a strategic investor so long as the net proceeds of such sale are not lower than the A2 EVPS Redemption Amount and are used to redeem the A2 EVPS SLN as aforesaid. Any sale of EVPS Shares to a strategic investor shall be made on a pro rata basis between the A2 EVPS SLNs on the one hand and the C2 EVPS SLNs on the other hand.<br><br>一旦（i）由该等质押担保的全部 A2 恒大物业股票挂钩票据按票面价值并加上应计及未付利息被赎回（"**A2 恒大物业赎回金额**"），或（ii）当金额为 A2 恒大物业赎回金额的款项存入一个以 A2 恒大物业股票挂钩票据持有人为受益人的质押账户，或（iii）当金额为 A2 恒 |

大物业赎回金额的款项受限于有待商定的托管或其他安排, 受限于 A2 恒大物业股份账户质押的恒大物业股份即可被解除, 以处置给一位战略投资者。解除恒大物业股份以出售给战略投资者时, 无需事先咨询或取得信托人、质押代理人或任何票据持有人的批准, 前提是该出售的净所得款不低于 A2 恒大物业赎回金额并用于赎回上述 A2 恒大物业票据挂钩票据。向一位战略投资者出售恒大物业股份应在 A2 恒大物业股票挂钩票据和 C2 恒大物业股票挂钩票据之间按比例进行。

An A2 EVPS Shares Account Charge shall become enforceable only upon (i) failure to pay principal of or interest on the A2 EVPS SLN secured by such charge, (ii) failure to apply the net proceeds from the sale of such EVPS Shares to redeem such A2 EVPS SLN, or (iii) with respect to A2 EVPS SLN Tranche A, failure to pay principal of or interest on C2 EVPS SLN Tranche A, and with respect to A2 EVPS SLN Tranche B, failure to pay principal of or interest on C2 EVPS SLN Tranche B.

A2 恒大物业股份账户质押仅在以下情况下方可执行: (i)获该等质押的 A2 恒大物业股票挂钩票据的本金或利息未能支付, (ii)出售该等恒大物业股份的净所得款未能用于赎回该等 A2 恒大物业票据挂钩票据, 或 (iii) 对于 A2 恒大物业股票挂钩票据 A 而言, 若未能支付 C2 恒大物业股票挂钩票据 A 的本金或利息, 及对于 A2 恒大物业股票挂钩票据 B 而言, 未能支付 C2 恒大物业股票挂钩票据 B 的本金或利息。Cash dividends received from EVPS Shares under an A2 EVPS Shares Account Charge shall be applied to redeem on a pro rata basis the A2 EVPS SLN secured by such charge at par plus accrued and unpaid interest.

来自 A2 恒大物业股份账户质押下的恒大物业股份的现金分红应用于依比例按票面价值并加上应计及未付利息赎回该等质押的相关 A2 恒大物业票据挂钩票据。

The Issuer or its subsidiary, as applicable, shall maintain the signatories nominated by a collateral agent in respect of the charged account at all times.

发行人或其子公司（按所适用的）应保留质押代理人就质押账户提名的签字人。

Prior to the occurrence of any enforcement trigger under the account charge, the collateral agent shall have joint signatory rights with the Issuer or its subsidiary, as applicable, in relation to any withdrawal or transfer from, and any closure of, the charged account. The Issuer or its subsidiary, as applicable, shall not withdraw or transfer from the charged account except to a strategic investor as described above or in other circumstances to be agreed.

在账户质押下的任何执行被触发之前, 质押代理人就质押账户的任何提款或划转以及任何关闭应与发行人或其子公司（按所适用的）拥有共同签字权。发行人或其子公司（按所适用的）不得从质押账户中提款或划转, 除依上文所述处置给战略投资者及其他商定的情况以外。

Upon the occurrence of any enforcement trigger under the account charge, the collateral agent shall have the right to deliver a notice of control to the

|  | account bank and shall have sole signatory rights in relation to any withdrawal or transfer from, and any closure of, the charged account, without any need for the signatory of the Issuer or its subsidiary, as applicable, to co-sign. |
|  | 一旦账户质押下的任何执行被触发，质押代理人应有权向账户银行发出控制通知，并对质押账户的任何提款或划转以及任何关闭拥有唯一的签字权，而不需要发行人或其子公司（按所适用的）的签字人共同签 |
|  | The collateral agent nominated signatory shall have been deemed to have consented or signed, as applicable, if it does not object within three (3) business days upon request to act or sign, as applicable, in relation to transfers, withdrawals and other actions expressly permitted under the indenture and the security documents. For the avoidance of doubt, the sale of EVPS Shares to strategic investors as provided above shall be considered expressly permitted under the indenture and security documents. |
|  | 在被要求就债券契约和质押文件明确允许的转账/提款和其他行动采取行动或签署（按所适用的）时，如质押代理人指定的签字人在三（3）个工作日内没有提出异议，则应视为已予同意或签署（按所适用的）。为避免疑义，按上述规定向战略投资者出售恒大物业股份应被视为债券契约和担保文件明确允许的行为。. |
| **Asset Security**<br>资产质押 | Security interest over the shares of subsidiaries directly holding the assets set forth under Annex A ("**Asset List 1**")**,** to be shared among A2 EVPS SLNs and A2 NEV SLNs**.** |
|  | 持有附件 A（"资产清单 1"）所列资产的子公司股份的质押权益，将在 A2 恒大物业股票挂钩票据与 A2 恒大新能源汽车股票挂钩票据之间共享。 |
|  | Security interest over the shares of subsidiaries directly holding the assets set forth under Annex B ("**Asset List 2**")**,** to be shared among A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, and C2 NEV SLNs**.** |
|  | 持有附件 B 所列资产（"资产清单 2"）的子公司股份的质押权益，将在 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、C2恒大物业股票挂钩票据和C2恒大新能源汽车股票挂钩票据之间共享。 |
|  | The relevant security interest will be released upon any sale of such assets or the shares of the subsidiaries directly holding such assets (or receipt of proceeds from recovery on relevant loans or receivables, as applicable) and (i) the application of the proceeds thereof in accordance with the provisions under "Mandatory Redemption" below or (ii) the deposit of such proceeds into an account charged to the benefit of the holders of the relevant instruments, or (iii) such proceeds being subject to an escrow or other arrangement to be agreed. |
|  | 当有等等资产的任何出售（或收到相关贷款或应收款的回收的所得款，如适用），相关质押权益将被解除，并且，（i）将根据下文"强制赎回"的条款来应用该所得款，或（ii）将该所得款存入一个以相关票据持有人为受益人的质押账户，或（iii）该所得款将受限于待经商定的托管或其他安排。 |

| **Mandatory Redemption** 强制赎回 | The Issuer shall use the net proceeds from the sale of any asset listed in Asset List 1 (or the shares of the subsidiary holding such asset) to purchase, by way of reverse Dutch auction, any of the A2 EVPS SLNs and A2 NEV SLNs at a minimum purchase price equal to the then current market price plus a premium of US$0.1 per US$1 of principal amount, plus accrued and unpaid interest (but in any event the purchase price shall not exceed 100% of the principal amount plus accrued and unpaid interest), within 45 business days of its receipt of such net proceeds. If any net proceeds from such sale remains unused after such reverse Dutch auction, the Issuer shall redeem the security with the shortest maturity among the A2 EVPS SLNs and A2 NEV SLNs at par plus accrued and unpaid interest. |
| :--- | :--- |
| | 出售资产清单 1 所列的任何资产的净所得款将在收到该等款项的 45 个工作日内，通过最低购买价格等于当时的市场价格加上每 1 美元本金金额 0.1 美元的溢价，加上应计及未付利息（但在任何情况下，购买价格不得超过本金加应计及未付利息的 100%）的反向荷兰式拍卖方式收购 A2 恒大物业股票挂钩票据和 A2 恒大新能源汽车股票挂钩票据中的任意一笔。如果在反向荷兰式拍卖之后，仍有未使用的该等出售净所得款，发行人应按票面价值加上应计及未付利息赎回 A2 恒大物业股票挂钩票据和 A2 恒大新能源汽车股票挂钩票据最快到期的一笔。 |
| | The Issuer shall use the net proceeds from the sale of any asset listed in Asset List 2 (or the shares of the subsidiary holding such asset) to purchase or redeem, by way of reverse Dutch auction, any of the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, and C2 NEV SLNs at a minimum purchase price equal to the then current market price plus a premium of US$0.1 per US$1 of principal amount, plus accrued and unpaid interest (but in any event the purchase price shall not exceed 100% of the principal amount plus accrued and unpaid interest), within 45 business days of its receipt of such net proceeds, provided that the net proceeds shall be allocated for such purchase between A2 EVPS SLNs and the A2 NEV SLNs on the one hand and the C2 EVPS SLNs and C2 NEV SLNs on the other hand on a pro rata basis according to their aggregate outstanding principal amounts. If any net proceeds from such sale remains unused after such reverse Dutch auction, the Issuer shall redeem the security with the shortest maturity among the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, and C2 NEV SLNs at par plus accrued and unpaid interest. |
| | 发行人应将出售资产清单 2 所列的任何资产（或持有该资产的子公司的股份）的净所得款，在收到该等款项的 45 个工作日内，用于通过最低购买价格等于当时的市场价格加上每 1 美元本金金额 0.1 美元的溢价，加上应计及未付利息（但在任何情况下，购买价格不得超过本金加应计及未付利息的 100%）的反向荷兰式拍卖方式收购或赎回 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、C2 恒大物业股票挂钩票据和 C2 恒大新能源汽车股票挂钩票据中的任意一笔，前提是用于收购的净所得款应根据 A2 恒大物业股票挂钩票据和 A2 恒大新能源汽车股票挂钩票据以及 C2 恒大物业股票挂钩票据和 C2 恒大新能源汽车股票挂钩票据的未偿还本金金额总额，按比例在 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、C2 恒大物业股票挂钩票据、C2 恒大新能源汽车股票挂钩票据之间进行分配。如果在反向荷兰式拍卖之后，仍有未使用的该等出售净所 |

| | |
|---|---|
| | 得款，发行人应按票面价值加上应计及未付利息赎回 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、C2 恒大物业股票挂钩票据和 C2 恒大新能源汽车股票挂钩票据中最快到期的一笔。<br><br>All securities so purchased or redeemed shall be cancelled.<br><br>所有如此收购或赎回的质押应被注销。 |
| **Anti-dilution and Corporate Governance**<br><br>反稀释和公司治理 | Certain anti-dilution protections (including against dividends and other distributions, consolidations, subdivisions, redesignations and reclassifications of shares, and certain other dilutive events) and corporate governance rights to be agreed between the Issuer and the CEG AHG, tailored to the requirements of the underlying businesses.<br><br>某些反稀释保护措施（包括针对分红和其他分配、合并、拆分、重新划定和重新分类股份以及某些其他稀释事件）和公司治理权利，将由发行人和恒大持有人特别团体商定，并根据相关业务的要求进行调整。 |
| **Auditor**<br><br>审计师 | The Issuer will engage a Whitelist Auditor to audit its annual financial statements starting no later than the audit of the fiscal year ending December 31, 2023.<br><br>发行人将聘请一家白名单审计师对其年度财务报表进行审计，开始时间不晚于截至 2023 年 12 月 31 日止的财务年度审计。<br><br>The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms:<br><br>"**白名单审计师**"应为以下任何会计师事务所或其各自的关联所或成员所：<br><br>(a)  Baker Tilly International;<br><br>    天职国际；<br><br>(b)  BDO;<br><br>    立信；<br><br>(c)  Crowe Global;<br><br>    国富浩华；<br><br>(d)  Deloitte;<br><br>    德勤；<br><br>(e)  Ernst & Young;<br><br>    安永；<br><br>(f)  Grant Thornton;<br><br>    致同；<br><br>(g)  KPMG;<br><br>    毕马威；<br><br>(h)  Mazars; |

|  |  |
|---|---|
|  | 中审众环； |
|  | (i)  Moore Global; |
|  | 大华国际； |
|  | (j)  Prism; and |
|  | 上会栢诚； |
|  | (k)  RSM International. |
|  | RSM 国际。 |
| **Trustee**<br>信托人 | Madison Pacific or another internationally recognized financial institution as agreed between the Issuer and the CEG AHG.<br>麦迪森太平洋或由发行人和恒大持有人特别团体商定的另一家国际公认的金融机构。 |
| **General**<br>一般 | The Issuer and the CEG AHG will discuss and agree additional covenants and other provisions to be included under the A2 EVPS SLNs and the related legal documentation, including among others, related to (i) restrictions on indebtedness, restricted payments, liens, affiliate transactions, asset sales, open market and other repurchases and other actions, (ii) the timing, manner and other aspects of sales of assets referred to under "Mandatory Redemption", (iii) events of default, (iv) the rights of holders of, and owners of beneficial interests in, the A2 EVPS SLNs (a) to obtain periodic financial and other information and documents from the trustee and the collateral agent, (b) to appoint or replace the trustee, and (c) to direct the trustee and collateral agent and to enforce remedies, and (v) the listing of the A2 EVPS SLNs.<br>发行人和恒大持有人特别团体将讨论并商定将纳入 A2 恒大物业股票挂钩票据的额外限制和其他条款以及相关法律文件，包括但不限于有关（i）对负债、受限支付、质押权、关联交易、资产出售，公开市场和其他回购和其他行动的限制，（ii）"强制赎回"中提到的资产出售的时间安排、方式和其他方面，（iii）违约事件，（iv）A2 恒大物业股票挂钩票据持有人和实益权益持有人的权利，包括：（a）从信托人获取定期财务和其他信息和文件的权利、（b）任命或更换信托人的权利及（c）指示信托人以及执行救济措施的权利，以及（iv）A2 恒大物业股票挂钩票据的上市。 |
| **Language**<br>语言 | The Chinese provisions contained herein are for reference only. If there is any inconsistency between the English and Chinese provisions, the English provisions shall prevail.<br>此处的中文条款仅作参考。如英文和中文条款有任何不一致之处，应以英文条款为准。 |

**Annex A**

**附件 A**

**Asset List 1[1]**

**资产清单 1**

**(Subject to Contract)**

（受限于合同）

- Equity interest in Greater Bay Area Homeland Development Fund LP (大湾区共同家园发展基金有限合伙) held by Fine Propitious Limited;

  Fine Propitious Limited 所持大湾区共同家园发展基金有限合伙的股权；

- Equity interest in Pacific Venture Opportunity Fund I, L.P. held by Jiajian (BVI) Limited (嘉建(BVI)有限公司);

  嘉建(BVI)有限公司所持 Pacific Venture Opportunity Fund I, L.P.的股权；

- Equity interest in PPLive Corporation Limited held by Jiajian (BVI) Limited (嘉建(BVI)有限公司);

  嘉建(BVI)有限公司所持 PPLive Corporation Limited 的股权；

- Equity interest in Suning Sports Group Limited held by Jiajian (BVI) Limited (嘉建(BVI)有限公司);

  嘉建(BVI)有限公司所持 Suning Sports Group Limited 的股权；

- Equity interest in Satinu Resources Group Ltd held by Jiajian (BVI) Limited (嘉建(BVI)有限公司); and

  嘉建(BVI)有限公司所持 Satinu Resources Group Ltd 的股权；及

- Equity interest in Millennium Golden Jiachen International Hotels Group Limited  held by Anji (BVI) Limited (安基(BVI)有限公司).

  安基(BVI)有限公司所持 Millennium Golden Jiachen International Hotels Group Limited 的股权。

---

[1] This list may be modified as agreed between the Issuer and the CEG AHG.
该清单可由发行人和恒大持有人特别团体商定修改。

**Annex B**

**附件 B**

**Asset List 2[2]**

**资产清单 2**

**(Subject to Contract)**

**(受限于合同)**

- Shareholder loan owed to Solution Key Holdings Limited from China Ruyi Holdings Limited (中国儒意控股有限公司) in the amount of approximately RMB1,847,784,000;

  中国儒意控股有限公司所欠 Solution Key Holdings Limited 的金额为约人民币 1,847,784,000 元的股东贷款；

- Receivables owed to Solution Key Holdings Limited by (i) Pumpkin Films Limited in the amount of approximately RMB1,579,682,000 and (ii) Ocean Fund SPC in the amount of approximately RMB527,938,000;

  Solution Key Holdings Limited 对(i) Pumpkin Films Limited 金额为约人民币 1,579,682,000 元及对(ii) Ocean Fund SPC 金额为约人民币 527,938,000 元的应收款；

- Equity interest in Xingsheng Preference Electronic Business Limited held by Rosy Sage Investments Limited;

  Rosy Sage Investments Limited 所持 Xingsheng Preference Electronic Business Limited 的股权；

- Shares in Bank of Jinzhou Co., Ltd held by New Chic Global Limited;

  New Chic Global Limited 所持 Bank of Jinzhou Co., Ltd 的股权；

- Equity interest in Butterfly Hop Holdings Limited held by Watershine Holdings Limited;

  Watershine Holdings Limited 所持 Butterfly Hop Holdings Limited 的股权；

- Equity interest in Integra Wealth Investments Limited held by Global Power Limited;

  Global Power Limited 所持 Integra Wealth Investments Limited 的股权；

- Shares in Solar Power, Inc. held by Smart Range Investments Limited; and

  Smart Range Investments Limited 所持 Solar Power, Inc.的股权；及

- Receivables owed to China Evergrande Group by Shengyu (BVI) Limited in the amount of approximately US$217 million.

  中国恒大集团对 Shengyu (BVI) Limited 金额为 2.17 亿美元的应收款。

---

[2] This list may be modified as agreed between the Issuer and the CEG AHG.
该清单可由发行人和恒大持有人特别团体商定修改。

Part B2 – A2 NEV SLNs

B2 部分– A2 恒大新能源汽车股票挂钩票据

**Principal Terms of the China Evergrande Group NEV Linked New Notes A2 ("A2 NEV SLNs")**

**中国恒大集团与恒大新能源汽车挂钩的新票据 A2（"A2 恒大新能源汽车股票挂钩票据"）的主要条款**

| | |
|---|---|
| **Principal Terms of the China Evergrande Group NEV Linked New Notes A2 ("A2 NEV SLNs")**<br><br>中国恒大集团与恒大新能源汽车挂钩的新票据 A2（"A2 恒大新能源汽车股票挂钩票据"）的主要条款 | |
| **Issuer**<br>发行人 | China Evergrande Group, an exempted company incorporated in the Cayman Islands with limited liability<br><br>中国恒大集团，一家在开曼群岛注册成立的有限责任的豁免公司 |
| **Principal Amount**<br>本金金额 | The A2 NEV SLN shall comprise two tranches as follows, with the following maximum aggregate principal amount:<br><br>A2 恒大新能源汽车股票挂钩票据应包含以下 两笔，其最大本金总额为：<br><br>  1.  A2 NEV SLN Tranche A: US$600 million;<br><br>     A2 恒大新能源汽车股票挂钩票据 A：6 亿美元；<br><br>  2.  A2 NEV SLN Tranche B: US$750 million.<br><br>     A2 恒大新能源汽车股票挂钩票据 B：7,5 亿美元。 |
| **Maturity/Principal Repayment**<br>到期日/本金偿付 |   1.  A2 NEV SLN Tranche A: 5 years from the Reference Date;<br><br>     A2 恒大新能源汽车股票挂钩票据 A：自参考日期起 5 年；<br><br>  2.  A2 NEV SLN Tranche B: 6 years from the Reference Date.<br><br>     A2 恒大新能源汽车股票挂钩票据 B：自参考日期起 6 年。<br><br>The outstanding principal amount of each tranche shall be repaid on maturity, together with any accrued and unpaid interest.<br><br>每一笔的未偿还本金应在到期日连同任何应计和未付利息一起偿还。 |
| **Interest (PIK and cash)**<br>利息（实物付息和现金） | Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the A2 NEV SLN Tranche A at 5.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 6.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind) with respect to each interest payment period.<br><br>利息将在参考日期起计息，并将每半年期末就 A2 恒大新能源汽车股票挂钩票据 A 未偿还本金支付一次利息，每个付息期的利率为每年 5.0%（如果与该付息期有关的所有利息以现金支付），或者每年 6.0%（如果与该付息期有关的任何部分利息以实物支付）。<br><br>Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the A2 NEV SLN Tranche B at 5.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 6.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind) with respect to each interest payment period. |

利息将在参考日期起计息，并将每半年期末就 A2 恒大新能源汽车股票挂钩票据 B 未偿还本金支付一次利息，每个付息期的利率为每年 5.5%（如果与该付息期有关的所有利息以现金支付），或者每年 6.5%（如果与该付息期有关的任何部分利息以实物支付）。

Interest on the outstanding principal amount of the A2 NEV SLNs shall be paid in the following manner:

A2 恒大新能源汽车股票挂钩票据未偿还本金的利息应按以下方式支付：

1.  For the first two and a half years after the Reference Date: interest may be paid in cash or in kind, at the election of the Issuer;

    对于参考日期后的最初两年半：可由发行人选择用现金或实物支付利息；

2.  From the 31st month to the 36th month after the Reference Date, interest in an amount equal to at least 0.5% of the outstanding principal amount of each tranche of the A2 NEV SLN shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Issuer;

    对于参考日期后的第 31 个月至第 36 个月：应以现金支付相当于各笔 A2 恒大新能源汽车股票挂钩票据未偿本金的至少 0.5%的利息；其余部分的利息可由发行人选择以现金或实物支付；

3.  For the fourth year after the Reference Date: interest in an amount equal to at least 3.0% p.a. of the outstanding principal amount of each tranche of the A2 NEV SLN shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Issuer; and

    对于参考日期后的第四年：应以现金支付相当于各笔 A2 恒大新能源汽车股票挂钩票据未偿本金的至少 3.0%的利息；其余部分的利息可由发行人选择以现金或实物支付；

4.  Starting from the fifth year after the Reference Date: interest shall be paid in cash.

    对于从参考日期后的第五年开始：利息应以现金支付。

All interest paid in kind with respect to the A2 NEV SLN will be added to the then current outstanding principal amount of the A2 NEV SLN.

所有 A2 恒大新能源汽车股票挂钩票据以实物支付的利息均计入届时 A2 恒大新能源汽车股票挂钩票据的未偿还本金金额。

If the Issuer pays cash interest under any tranche of the A2 NEV SLNs with respect to any interest payment period in an amount greater than the amount of cash interest required to be paid on such tranche with respect to such interest payment period, it shall also pay additional cash interest under all other tranches of the A2 EVPS SLNs, A2 NEV SLNs, A2 Notes, C2 EVPS SLNs, C2 NEV SLNs and C2 Notes. The amount of such additional cash payments shall be allocated among each of the A2 EVPS SLNs, A2 NEV SLNs, A2 Notes, C2 EVPS SLNs, C2 NEV SLNs and C2 Notes (and among

| | |
|---|---|
| | each tranche of such instruments) on a pro rata basis by outstanding principal amount. |
| | 如果发行人就 A2 恒大新能源汽车股票挂钩票据的任何一笔就任何付息期支付的现金利息大于该笔票据在该付息期所需支付的现金利息，则发行人还应就 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、A2 票据、C2 恒大物业股票挂钩票据、C2 恒大新能源汽车股票挂钩票据及 C2 票据中其他所有票据支付额外的现金利息。该额外现金支付的金额应根据票据未偿还本金金额，按比例在 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、A2 票据、C2 恒大物业股票挂钩票据、C2 恒大新能源汽车股票挂钩票据及 C2 票据之间（并且在该等票据中各笔之间）进行分配。 |
| **Guarantees**<br>担保 | The same Subsidiary Guarantors as those guaranteeing the Existing Notes, other than (i) certain shell subsidiaries of CEG to be agreed to be deregistered prior to the Original Issue Date, and (ii) certain significant offshore subsidiaries to be agreed (collectively the "**A2 NEV SLN Guarantors**", and such guarantees, the "**A2 NEV SLN Guarantees**"). A1 Notes Guarantees to be subordinated to A2 NEV SLN Guarantees. |
| | 担保子公司与目前为现有票据提供担保的担保子公司相同，但不包括（i）某些有待商定在初始发行日期前注销的恒大空壳子公司以及（ii）某些有待商定的重要境外子公司（统称为 "**A2 恒大新能源汽车股票挂钩票据担保公司**"，该担保统称为 "**A2恒大新能源汽车股票挂钩票据担保**"）。A1 票据担保将劣后于 A2 恒大新能源汽车股票挂钩票据担保。 |
| **Escrow Arrangement to be Granted to A2 NEV SLNs**<br>就 A2 恒大新能源汽车股票挂钩票据的托管安排 | Deposit of a total of 1,749,634,360 NEV Shares (equivalent to approximately 16.1% of NEV Shares as of the date of this CEG Term Sheet) into escrow accounts (the "**A2 NEV Escrow Accounts**") of an independent bank in the name of the Issuer or an offshore subsidiary of the Issuer, subject to an escrow account agreement between the Issuer or such subsidiary as account holder and such independent bank. Each tranche of A2 NEV SLNs will have its own A2 NEV Escrow Account holding such NEV Shares in corresponding proportion to its principal amount over all A2 NEV SLNs. |
| | 将 1,749,634,360 股恒大新能源汽车股份（相当于截至 本恒大条款清单日期其全部股份的约 16.1%）存入以发行人或发行人一家境外子公司名义设立的独立银行托管账户（"**A2 恒大新能源汽车托管账户**"）中，受限于作为账户持有者的发行人或该子公司和该独立银行之间的托管账户协议。每笔 A2 恒大新能源汽车股票挂钩票据都将有其专属的 A2 恒大新能源汽车托管账户，该账户所持恒大新能源汽车股份与该笔票据的本金金额在全部 A2 恒大新能源汽车股票挂钩票据中的比例相对应。 |
| | As part of the Restructuring and as set forth under "Treatment of shareholder's loans to NEV and CEG's loan to NEV" in this CEG Term Sheet, the relevant shareholder's loans to NEV and CEG's loan to NEV and any accrued and unpaid interest thereon will be applied to convert into new NEV Shares at the conversion price of HK$3.84 per share. A portion of such NEV Shares so converted will be deposited into the A2 NEV Escrow Accounts and the C2 NEV Escrow Accounts on a pro rata basis such that |

the A2 NEV Escrow Accounts and C2 NEV Escrow Accounts will together hold NEV Shares representing approximately 30% of the total issued NEV Shares on a fully diluted basis. The remaining NEV Shares so converted will be added to the Exchange Property under the NEV EBs. As set forth under "Treatment of other loan to NEV" in this CEG Term Sheet, the loans by Ms. Ding Yumei and Good Bond Limited to NEV are also expected to be applied toward conversion into new shares in NEV at an issue price of HK$3.84 per share. The NEV shares so converted will not be used as part of the restructuring consideration (neither the NEV MEBs nor the A2 NEV SLNs and the C2 NEV SLNs).

作为重组的一部分，并根据本恒大条款清单中"股东对恒大新能源汽车的贷款和恒大对恒大新能源汽车的贷款的处理"中所列明，的，恒大新能源汽车的相关股东贷款和恒大对新能源汽车贷款及其任何应计且未付利息将用于以转换价每股 3.84 港元转换为恒大新能源汽车的新股份。部分如此转换的恒大新能源汽车股份将按比例存入 A2 恒大新能源汽车托管账户和 C2 恒大新能源汽车托管账户，从而使 A2 恒大新能源汽车托管账户和 C2 恒大新能源汽车托管账户共同持有的恒大新能源汽车股份在完全稀释的基础上占已发行恒大新能源汽车股份总数的约 30% 。剩余如此转换的恒大新能源汽车股份将加入恒大新能源汽车强制可交换债券的交换财产。如本恒大条款清单中"恒大新能源汽车其他贷款的处理"所述，丁玉梅女士及 Good Bond Limited 向恒大新能源汽车提供的贷款也预期将用于以发行价每股 3.84 港元转换为恒大新能源汽车的新股份。 如此转换的恒大新能源汽车股份将不会被用作重组对价的一部分（不是恒大新能源汽车强制可交换债券也不是 A2 恒大新能源汽车股票挂钩票据及 C2 恒大新能源汽车股票挂钩票据）。

NEV Shares held under the A2 NEV Escrow Accounts may be released from escrow for sale to a strategic investor, upon (i) the redemption of all A2 NEV SLN subject to such escrow arrangement, at par plus accrued and unpaid interest (the "**A2 NEV Redemption Amount**"), (ii) the deposit of an amount equal to the A2 NEV Redemption Amount into an account charged to the benefit of the holders of the A2 NEV SLNs, or (iii) an amount equal to the A2 NEV Redemption Amount being subject to an escrow or other arrangement to be agreed. Prior consultation or approval will not be required from the trustee, the escrow agent or any noteholder for releasing NEV Shares for sale to a strategic investor so long as the net proceeds of such sale are not lower than the A2 NEV Redemption Amount and are used to redeem the A2 NEV SLN as aforesaid. Any sale of NEV Shares to a strategic investor shall be made on a pro rata basis between the A2 NEV SLNs on the one hand and the C2 NEV SLNs on the other hand.

一旦（i）受限于该等托管安排的全部 A2 恒大新能源汽车股票挂钩票据按票面价值并加上应计及未付利息被赎回 （"**A2 恒大新能源汽车赎回金额**"），(ii) 当金额为 A2 恒大新能源汽车赎回金额的款项存入一个以 A2 恒大新能源汽车股票挂钩票据持有人为受益人的质押账户，或（iii）当金额为 A2 恒大新能源汽车赎回金额的款项受限于有待商定的托管或其他安排，受限于 A2 恒大新能源汽车股份托管账户的恒大新能源汽车股份即可被解除，以处置给一位战略投资者。解除恒大新能源汽车股份以出售给战略投资者时，无需事先咨询或取得信托人、托管代理人或任何票据持有人的批准，前提是该出售的

净所得款不低于 A2 恒大新能源汽车赎回金额并用于赎回上述 A2 恒大新能源汽车股票挂钩票据。向一位战略投资者出售恒大新能源汽车股份应在 A2 恒大新能源汽车股票挂钩票据和 C2 恒大物业股票挂钩票据之间按比例进行。

An A2 NEV Escrow Account shall become enforceable only upon (i) failure to pay principal of or interest on the A2 NEV SLN linked to such escrow arrangement, (ii) failure to apply the net proceeds from the sale of such NEV Shares to redeem such A2 NEV SLN, or (iii) with respect to A2 NEV SLN Tranche A, failure to pay principal of or interest on C2 NEV SLN Tranche A, and with respect to A2 NEV SLN Tranche B, failure to pay principal of or interest on C2 NEV SLN Tranche B.

A2 恒大新能源汽车托管账户仅在以下情况下方可执行：(i) 与该等托管安排挂钩的 A2 恒大新能源汽车股票挂钩票据的本金或利息未能支付，(ii) 出售该等恒大新能源汽车股份的净所得款未能用于赎回该等 A2 恒大新能源汽车股票挂钩票据，或 (iii) 对于 A2 恒大新能源汽车股票挂钩票据 A 而言，若未能支付 C2 恒大新能源汽车股票挂钩票据 A 的本金或利息，及对于 A2 恒大新能源汽车股票挂钩票据 B 而言，未能支付 C2 恒大新能源汽车股票挂钩票据 B 的本金或利息。Cash dividends received from NEV Shares under an A2 NEV Escrow Account shall be applied to redeem the A2 NEV SLN linked to such escrow arrangement at par plus accrued and unpaid interest.

来自 A2 恒大新能源汽车股份托管账户中的恒大新能源汽车股份的分红应用于按票面价值并加上应计及未付利息赎回与该等托管安排挂钩的 A2 恒大新能源汽车股票挂钩票据。

The Issuer or its subsidiary, as applicable, shall maintain the signatories nominated by the trustee in respect of the escrow account at all times.

发行人或其子公司（按所适用的）应保持信托人就质押账户提名的签字人。

Prior to the occurrence of any enforcement trigger under the escrow agreement, the trustee shall have joint signatory rights with the Issuer or its subsidiary, as applicable, in relation to any withdrawal or transfer from, and any closure of, the escrow account.  The Issuer or its subsidiary, as applicable, shall not withdraw or transfer from the escrow account except in circumstances to be agreed.

在托管账户下的任何执行被触发之前，信托人就质押账户的任何提款或划转以及任何关闭应与发行人或其子公司（按所适用的）拥有共同签字权。 发行人或其子公司（按所适用的）不得从质押账户中提款或划转，在商定的情况下除外。

Upon the occurrence of any enforcement trigger under the escrow agreement, the trustee shall have the right to deliver a notice of control to the account bank and shall have sole signatory rights in relation to any withdrawal or transfer from, and any closure of, the escrow account, without any need for the signatory of the Issuer or its subsidiary, as applicable, to co-sign.

一旦托管账户下的任何执行被触发，信托人应有权向账户银行发出控制通知，并对质押账户的任何提款或划转以及任何关闭拥有唯一

| | |
|---|---|
| | 的签字权，而不需要发行人或其子公司（按所适用的）的签字人共同签署。<br><br>The trustee nominated signatory shall have been deemed to have consented or signed, as applicable, if it does not object within three (3) business days upon request to act or sign, as applicable, in relation to transfers, withdrawals and other actions expressly permitted under the indenture and the security documents. For the avoidance of doubt, the sale of NEV Shares to strategic investors as provided above shall be considered expressly permitted under the indenture and security documents.<br><br>在被要求就债券契约和质押文件明确允许的转账/提款和其他行动采取行动或签署（按所适用的）时，如信托人指定的签字人在三（3）个工作日内没有提出异议，则其应被视为已予同意或签署（按所适用的）。为避免疑义，按上述规定向战略投资者出售恒大新能源汽车股份应被视为债券契约和担保文件明确允许的行为。. |
| **Asset Security**<br>资产质押 | Security interest over the shares of subsidiaries holding the assets set forth under Annex A ("**Asset List 1**")**,** to be shared among A2 EVPS SLNs and A2 NEV SLNs**.**<br><br>持有附件 A（"资产清单 1"）所列资产的子公司股份的质押权益，将在 A2 恒大物业股票挂钩票据和 A2 恒大新能源汽车股票挂钩票据之间共享。<br><br>Security interest over the shares of subsidiaries holding the assets set forth under Annex B ("**Asset List 2**")**,** to be shared among A2 EVPS SLNs and A2 NEV SLNs, C2 EVPS SLNs, and C2 NEV SLNs**.**<br><br>持有附件 B 所列资产（"资产清单 2"）的子公司股份的质押权益，将在 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、C2恒大物业股票挂钩票据和C2恒大新能源汽车股票挂钩票据之间共享。<br><br>The relevant security interest will be released upon any sale of such assets (or receipt of proceeds from recovery on relevant loans or receivables, as applicable) and (i) the application of the proceeds thereof in accordance with the provisions under "Mandatory Redemption" below or (ii) the deposit of such proceeds into an account charged to the benefit of the holders of the relevant instruments, or (iii) such proceeds being subject to an escrow or other arrangement to be agreed.<br><br>当有该等资产的任何出售（或收到相关贷款或应收款的回收的所得款，如适用），相关质押权益将被解除，并且，（i）将根据下文"强制赎回"的条款来应用该所得款，或（ii）将该所得款存入一个以相关票据持有人为受益人的质押账户，或（iii）该所得款将受限于待经商定的托管或其他安排。 |
| **Mandatory Redemption**<br>强制赎回 | The Issuer shall use the net proceeds from the sale of any asset listed in Asset List 1 (or the shares of the subsidiary holding such asset) to purchase, by way of reverse Dutch auction , any of the A2 EVPS SLNs and A2 NEV SLNs at a minimum purchase price equal to the then current market price plus a premium of US$0.1 per US$1 of principal amount, plus accrued and unpaid interest (but in any event the purchase price shall not exceed 100% of the principal amount plus accrued and unpaid interest), within 45 |

business days of its receipt of such net proceeds.  If any net proceeds from such sale remains unused after such reverse Dutch auction, the Issuer shall redeem the security with the shortest maturity among the A2 EVPS SLNs and A2 NEV SLNs at par plus accrued and unpaid interest.

出售资产清单 1 所列的任何资产的净所得款将在收到该等款项的 45 个工作日内，通过最低购买价格等于当时的市场价格加上每 1 美元本金金额 0.1 美元的溢价，加上应计及未付利息（但在任何情况下，购买价格不得超过本金加应计及未付利息的 100%）的反向荷兰式拍卖方式收购 A2 恒大物业股票挂钩票据和 A2 恒大新能源汽车股票挂钩票据中的任意一笔。如果在反向荷兰式拍卖之后，仍有未使用的该等出售净所得款，发行人应按票面价值加上应计及未付利息赎回 A2 恒大物业股票挂钩票据和 A2 恒大新能源汽车股票挂钩票据中最快到期的一笔。

The Issuer shall use the net proceeds from the sale of any asset listed in Asset List 2 (or the shares of the subsidiary holding such asset) to purchase or redeem, by way of reverse Dutch auction, any of the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, and C2 NEV SLNs at a minimum purchase price equal to the then current market price plus a premium of US$0.1 per US$1 of principal amount, plus accrued and unpaid interest (but in any event the purchase price shall not exceed 100% of the principal amount plus accrued and unpaid interest), within 45 business days of its receipt of such net proceeds, provided that the net proceeds shall be allocated for such purchase between A2 EVPS SLNs and the A2 NEV SLNs on the one hand and the C2 EVPS SLNs and C2 NEV SLNs on the other hand on a pro rata basis according to their aggregate outstanding principal amounts. If any net proceeds from such sale remains unused after such reverse Dutch auction, the Issuer shall redeem the security with the shortest maturity among the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, and C2 NEV SLNs at par plus accrued and unpaid interest.

发行人应将出售资产清单 2 所列的任何资产（或持有该资产的子公司的股份）的净所得款，在收到该等款项的 45 个工作日内，用于通过最低购买价格等于当时的市场价格加上每 1 美元本金金额 0.1 美元的溢价，加上应计及未付利息（但在任何情况下，购买价格不得超过本金加应计及未付利息的 100%）的反向荷兰式拍卖方式收购或赎回 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、C2 恒大物业股票挂钩票据和 C2 恒大新能源汽车股票挂钩票据中的任意一笔，前提是用于收购的净所得款应根据 A2 恒大物业股票挂钩票据和 A2 恒大新能源汽车股票挂钩票据以及 C2 恒大物业股票挂钩票据和 C2 恒大新能源汽车股票挂钩票据的未偿还本金金额总额，按比例在 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据和 C2 恒大物业股票挂钩票据、C2 恒大新能源汽车股票挂钩票据之间进行分配。如果在反向荷兰式拍卖之后，仍有未使用的该等出售净所得款，发行人应按票面价值加上应计及未付利息赎回 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、C2 恒大物业股票挂钩票据和 C2 恒大新能源汽车股票挂钩票据中最快到期的一笔。

All securities so purchased or redeemed shall be cancelled.

| | 所有如此收购或赎回的质押应被注销。 |
|---|---|
| **Anti-dilution and Corporate Governance**<br>**反稀释和公司治理** | Certain anti-dilution protections (including against dividends and other distributions, consolidations, subdivisions, redesignations and reclassifications of shares, and certain other dilutive events) and corporate governance rights to be agreed between the Issuer and the CEG AHG, tailored to the requirements of the underlying businesses.<br><br>某些反稀释保护措施（包括针对分红和其他分配、合并、拆分、重新划定和重新分类股份以及某些其他稀释事件）和公司治理权利，将由发行人和恒大持有人特别团体商定，并根据相关业务的要求进行调整。 |
| **Auditor**<br>**审计师** | The Issuer will engage a Whitelist Auditor to audit its annual financial statements starting no later than the audit of the fiscal year ending December 31, 2023.<br><br>发行人将聘请一家白名单审计师对其年度财务报表进行审计，开始时间不晚于截至 2023 年 12 月 31 日止的财务年度审计。<br><br>The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms:<br><br>"**白名单审计师**"应为以下任何会计师事务所或其各自的关联所或成员所：<br><br>(a)  Baker Tilly International;<br><br>　　天职国际；<br><br>(b)  BDO;<br><br>　　立信；<br><br>(c)  Crowe Global;<br><br>　　国富浩华；<br><br>(d)  Deloitte;<br><br>　　德勤；<br><br>(e)  Ernst & Young;<br><br>　　安永；<br><br>(f)  Grant Thornton;<br><br>　　致同；<br><br>(g)  KPMG;<br><br>　　毕马威；<br><br>(h)  Mazars;<br><br>　　中审众环；<br><br>(i)  Moore Global;<br><br>　　大华国际；<br><br>(j)  Prism; and |

| | |
|---|---|
| | 上会栢诚； <br><br> (k) RSM International. <br><br> RSM 国际。 |
| **Trustee** <br> 信托人 | Madison Pacific or another internationally recognized financial institution as agreed between the Issuer and the CEG AHG. <br><br> 麦迪森太平洋或由发行人和恒大持有人特别团体商定的另一家国际公认的金融机构。 |
| **General** <br> 一般 | The Issuer and the CEG AHG will discuss and agree additional covenants and other provisions to be included under the A2 NEV SLNs and the related legal documentation, including among others, related to (i) restrictions on indebtedness, restricted payments, liens, affiliate transactions, asset sales, open market and other repurchases and other actions, (ii) the timing, manner and other aspects of sales of assets referred to under "Mandatory Redemption", (iii) events of default, (iv) the rights of holders of, and owners of beneficial interests in, the A2 NEV SLNs (a) to obtain periodic financial and other information and documents from the trustee and the collateral agent, (b) to appoint or replace the trustee, and (c) to direct the trustee and collateral agent and to enforce remedies, and (v) the listing of the A2 NEV SLNs. <br><br> 发行人和恒大持有人特别团体将讨论并商定将纳入 A2 恒大新能源汽车股票挂钩票据的额外限制和其他条款以及相关法律文件，包括但不限于有关（i）对负债、受限支付、质押权、关联交易、资产出售，公开市场和其他回购和其他行动的限制，（ii）"强制赎回"中提到的资产出售的时间安排、方式和其他方面，（iii）违约事件，（iv）A2 恒大新能源汽车股票挂钩票据持有人和实益权益持有人的权利，包括：（a）从信托人获取定期财务和其他信息和文件的权利、（b）任命或更换信托人的权利及（c）指示信托人以及执行救济措施的权利，以及（iv）A2 恒大新能源汽车股票挂钩票据的上市。 |
| **Language** <br> 语言 | The Chinese provisions contained herein are for reference only. If there is any inconsistency between the English and Chinese provisions, the English provisions shall prevail. <br><br> 此处的中文条款仅作参考。如英文和中文条款有任何不一致之处，应以英文条款为准。 |

**Annex A**

**附件 A**

**Asset List 1[1]**

**资产清单 1**

**(Subject to Contract)**

**（受限于合同）**

- Equity interest in Greater Bay Area Homeland Development Fund LP (大湾区共同家园发展基金有限合伙) held by Fine Propitious Limited;

  Fine Propitious Limited 所持大湾区共同家园发展基金有限合伙的股权；

- Equity interest in Pacific Venture Opportunity Fund I, L.P. held by Jiajian (BVI) Limited (嘉建(BVI)有限公司);

  嘉建(BVI)有限公司所持 Pacific Venture Opportunity Fund I, L.P.的股权；

- Equity interest in PPLive Corporation Limited held by Jiajian (BVI) Limited (嘉建(BVI)有限公司);

  嘉建(BVI)有限公司所持 PPLive Corporation Limited 的股权；

- Equity interest in Suning Sports Group Limited held by Jiajian (BVI) Limited (嘉建(BVI)有限公司);

  嘉建(BVI)有限公司所持 Suning Sports Group Limited 的股权；

- Equity interest in Satinu Resources Group Ltd held by Jiajian (BVI) Limited (嘉建(BVI)有限公司); and

  嘉建(BVI)有限公司所持 Satinu Resources Group Ltd 的股权；及

- Equity interest in Millennium Golden Jiachen International Hotels Group Limited  held by Anji (BVI) Limited (安基(BVI)有限公司).

  安基(BVI)有限公司所持 Millennium Golden Jiachen International Hotels Group Limited 的股权。

---

[1] This list may be modified as agreed between the Issuer and the CEG AHG.
该清单可由发行人和恒大持有人特别团体商定修改。

**Annex B**

**附件 B**

**Asset List 2[2]**

**资产清单 2**

**(Subject to Contract)**

**（受限于合同）**

- Shareholder loan owed to Solution Key Holdings Limited from China Ruyi Holdings Limited (中国儒意控股有限公司) in the amount of approximately RMB1,847,784,000;

  中国儒意控股有限公司所欠 Solution Key Holdings Limited 的金额为约人民币 1,847,784,000 元的股东贷款；

- Receivables owed to Solution Key Holdings Limited by (i) Pumpkin Films Limited in the amount of approximately RMB1,579,682,000 and (ii) Ocean Fund SPC in the amount of approximately RMB527,938,000;

  Solution Key Holdings Limited 对(i) Pumpkin Films Limited 金额为约人民币 1,579,682,000 元及对(ii) Ocean Fund SPC 金额为约人民币 527,938,000 元的应收款；

- Equity interest in Xingsheng Preference Electronic Business Limited held by Rosy Sage Investments Limited;

  Rosy Sage Investments Limited 所持 Xingsheng Preference Electronic Business Limited 的股权；

- Shares in Bank of Jinzhou Co., Ltd held by New Chic Global Limited;

  New Chic Global Limited 所持 Bank of Jinzhou Co., Ltd 的股权；

- Equity interest in Butterfly Hop Holdings Limited held by Watershine Holdings Limited;

  Watershine Holdings Limited 所持 Butterfly Hop Holdings Limited 的股权；

- Equity interest in Integra Wealth Investments Limited held by Global Power Limited;

  Global Power Limited 所持 Integra Wealth Investments Limited 的股权；

- Shares in Solar Power, Inc. held by Smart Range Investments Limited; and

  Smart Range Investments Limited 所持 Solar Power, Inc.的股权； 及

- Receivables owed to China Evergrande Group by Shengyu (BVI) Limited in the amount of approximately US$217 million.

  中国恒大集团对 Shengyu (BVI) Limited 金额为 2.17 亿美元的应收款。

---

[2] This list may be modified as agreed between the Issuer and the CEG AHG.
该清单可由发行人和恒大持有人特别团体商定修改。

Part B3 – C2 EVPS SLNs

B3 部分– C2 恒大物业股票挂钩票据

**Principal Terms of the China Evergrande Group EVPS Secured New Notes C2 ("C2 EVPS SLNs")**

中国恒大集团恒大物业有质押的新票据 C2 ("C2 恒大物业股票挂钩票据") 的主要条款

| Principal Terms of the China Evergrande Group EVPS Secured New Notes C2 ("C2 EVPS SLNs") 中国恒大集团恒大物业有质押的新票据 C2（"C2 恒大物业股票挂钩票据"）的主要条款 | |
|---|---|
| **Issuer**<br>发行人 | China Evergrande Group, an exempted company incorporated in the Cayman Islands with limited liability<br><br>中国恒大集团，一家在开曼群岛注册成立的有限责任的豁免公司 |
| **Principal Amount**<br>本金金额 | The C2 EVPS SLNs shall comprise two tranches as follows, with the following maximum aggregate principal amount:<br><br>C2 恒大物业股票挂钩票据应包含以下两笔，其最大本金总额为：<br><br>1. C2 EVPS SLN Tranche A: US$150 million;<br><br>   C2 恒大物业股票挂钩票据 A：1.5 亿美元；<br><br>2. C2 EVPS SLN Tranche B: US$150 million.<br><br>   C2 恒大物业股票挂钩票据 B：1.5 亿美元。 |
| **Maturity/Principal Repayment**<br>到期日/本金偿付 | 1. C2 EVPS SLN Tranche A: 7 years from the Reference Date;<br><br>   C2 恒大物业股票挂钩票据 A：自参考日期起 7 年；<br><br>2. C2 EVPS SLN Tranche B: 8 years from the Reference Date.<br><br>   C2 恒大物业股票挂钩票据 B：自参考日期起 8 年。<br><br>The outstanding principal amount of each tranche shall be repaid on maturity, together with any accrued and unpaid interest.<br><br>每一笔的未偿还本金应在到期日连同任何应计和未付利息一起偿还。 |
| **Interest (PIK and cash)**<br>利息（实物付息和现金） | Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the C2 EVPS SLN Tranche A at 6.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind) with respect to each interest payment period.<br><br>利息将在参考日期起计息，并将每半年期末就 C2 恒大物业股票挂钩票据 A 未偿还本金支付一次利息，每个付息期的利率为每年 6.0%（如果与该付息期有关的所有利息以现金支付），或者每年 7.0%（如果与该付息期有关的任何部分利息以实物支付）。<br><br>Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the C2 EVPS SLN Tranche B at 6.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind) with respect to each interest payment period.<br><br>利息将在参考日期起计息，并将每半年期末就 C2 恒大物业股票挂钩票据 B 未偿还本金支付一次利息，每个付息期的利率为每年 6.5% |

（如果与该付息期有关的所有利息以现金支付），或者每年 7.5%（如果与该付息期有关的任何部分利息以实物支付）。

Interest on the outstanding principal amount of the C2 EVPS SLN shall be paid in the following manner:

C2 恒大物业股票挂钩票据未偿还本金的利息应按以下方式支付：

1. For the first two and a half years after the Reference Date: interest may be paid in cash or in kind, at the election of the Issuer;

   对于参考日期后的最初两年半：可由发行人选择用现金或实物支付利息；

2. From the 31st month to the 36th month after the Reference Date, interest in an amount equal to at least 0.5% of the outstanding principal amount of each tranche of the C2 EVPS SLN shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Issuer;

   对于参考日期后的第 31 个月至第 36 个月：应以现金支付相当于各笔 C2 恒大物业股票挂钩票据未偿本金的至少 0.5%的利息；其余部分的利息可由发行人选择以现金或实物支付；

3. For the fourth year after the Reference Date: interest in an amount equal to at least 3.0% p.a. of the outstanding principal amount of each tranche of the C2 EVPS SLN shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Issuer; and

   对于参考日期后的第四年：应以现金支付相当于各笔 C2 恒大物业股票挂钩票据未偿本金的至少每年 3.0%的利息；其余部分的利息可由发行人选择以现金或实物支付；

4. Starting from the fifth year after the Reference Date: interest shall be paid in cash.

   对于从参考日期后的第五年开始：利息应以现金支付。

All interest paid in kind with respect to the C2 EVPS SLN will be added to the then current outstanding principal amount of the C2 EVPS SLN.

所有 C2 恒大物业股票挂钩票据以实物支付的利息均计入届时 C2 恒大物业股票挂钩票据的未偿还本金金额。

If the Issuer pays cash interest under any tranche of the C2 EVPS SLNs with respect to any interest payment period in an amount greater than the amount of cash interest required to be paid on such tranche with respect to such interest payment period, it shall also pay additional cash interest under all other tranches of the A2 EVPS SLNs, A2 NEV SLNs, A2 Notes, C2 EVPS SLNs, C2 NEV SLNs and C2 Notes. The amount of such additional cash interest payments shall be allocated among each of the A2 EVPS SLNs, A2 NEV SLNs, A2 Notes, C2 EVPS SLNs, C2 NEV SLNs and C2 Notes (and among each tranche of such instruments) on a pro rata basis by outstanding principal amount.

如果发行人就 C2 恒大物业股票挂钩票据的任何一笔就任何付息期支付的现金利息大于该笔票据在该付息期所需支付的现金利息，则发行人还应就 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂

| | |
|---|---|
| | 钩票据、A2 票据、C2 恒大物业股票挂钩票据、C2 恒大新能源汽车股票挂钩票据及 C2 票据中其他所有票据支付额外的现金利息。该额外现金支付的金额应根据未偿还本金金额，按比例在 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、A2 票据、C2 恒大物业股票挂钩票据、C2 恒大新能源汽车股票挂钩票据及 C2 票据之间（并且在该等票据中各笔之间）进行分配。 |
| **Share Security**<br>**股份质押** | Charges of securities accounts in the aggregate holding 749,465,275 EVPS Shares (equivalent to approximately 6.9% of EVPS Shares as of the date of this CEG Term Sheet (the "**C2 EVPS Shares Account Charges**") for securing the C2 EVPS SLNs. Each tranche of C2 EVPS SLNs will have its own C2 EVPS Shares Account Charge holding such EVPS Shares in corresponding proportion to its principal amount over all C2 EVPS SLNs.<br><br>将持有共计 749,465,275 股恒大物业股份（相当于截至 本恒大条款清单日期 恒大物业股份的约 6.9%）的证券账户作为质押（"**C2 恒大物业股份账户质押**"），以为 C2 恒大物业股票挂钩票据提供质押。每一笔 C2 恒大物业股票挂钩票据都将有其专属的 C2 恒大物业股份账户质押，该账户所持恒大物业股份与该笔票据的本金金额在全部 C2 恒大物业股票挂钩票据中的比例相对应。<br><br>EVPS Shares subject to a C2 EVPS Shares Account Charge may be released for sale to a strategic investor, upon (i) the redemption of all C2 EVPS SLN secured by such charge, at par plus accrued and unpaid interest (the "**C2 EVPS Redemption Amount**") "), (ii) the deposit of an amount equal to the C2 EVPS Redemption Amount into an account charged to the benefit of the holders of the C2 EVPS SLNs, or (iii) an amount equal to the C2 EVPS Redemption Amount being subject to an escrow or other arrangement to be agreed. Prior consultation or approval will not be required from the trustee, collateral agent or any noteholder for releasing EVPS Shares for sale to a strategic investor so long as the net proceeds of such sale are not lower than the C2 EVPS Redemption Amount and are used to redeem the C2 EVPS SLN as aforesaid. Any sale of EVPS Shares to a strategic investor shall be made on a pro rata basis between the A2 EVPS SLNs on the one hand and the C2 EVPS SLNs on the other hand.<br><br>一旦（i）由该等质押担保的全部 C2 恒大物业股票挂钩票据按票面价值并加上应计及未付利息被赎回 （"**C2 恒大物业赎回金额**"），（ii）当金额为 C2 恒大物业赎回金额的款项存入一个以 C2 恒大物业股票挂钩票据持有人为受益人的质押账户，或（iii）当金额为 C2 恒大物业赎回金额的款项受限于有待商定的托管或其他安排，受限于 C2 恒大物业股份账户质押的恒大物业股份可被解除，以处置给一位战略投资者。解除恒大物业股份以出售给战略投资者时，无需事先咨询或取得信托人、质押代理人或任何票据持有人的批准，前提是该出售的净所得款不低于 C2 恒大物业赎回金额并用于赎回上述 C2 恒大物业股票挂钩票据。向一位战略投资者出售恒大物业股份应在 A2 恒大物业股票挂钩票据和 C2 恒大物业股票挂钩票据之间按比例进行。<br><br>A C2 EVPS Shares Account Charge shall become enforceable only upon (i) failure to pay principal of or interest on the C2 EVPS SLN secured by such charge, (ii) failure to apply the net proceeds from the sale of such EVPS Shares to redeem such C2 EVPS SLN, or (iii) with respect to C2 EVPS SLN Tranche A, failure to pay principal of or interest on A2 EVPS |

SLN Tranche A, and with respect to C2 EVPS SLN Tranche B, failure to pay principal of or interest on A2 EVPS SLN Tranche B.

C2 恒大物业股份账户质押仅在以下情况下方可执行： (i)获该等质押的 C2 恒大物业股票挂钩票据的本金或利息未能支付， (ii) 出售该等恒大物业股份的净所得款未能用于赎回该等 C2 恒大物业股票挂钩票据，或 (iii) 对于 C2 恒大物业股票挂钩票据 A 而言，若未能支付 A2 恒大物业股票挂钩票据 A 的本金或利息，及对于 C2 恒大物业股票挂钩票据 B 而言，未能支付 A2 恒大物业股票挂钩票据 B 的本金或利息。

Cash dividends received from EVPS Shares under a C2 EVPS Shares Account Charge shall be applied to redeem on a pro rata basis the C2 EVPS SLN secured by such charge at par plus accrued and unpaid interest.

来自 C2 恒大物业股份账户质押下的恒大物业股份现金分红应用于按票面价值并加上应计及未付利息按比例赎回获该等质押的 C2 恒大物业股票挂钩票据。

The Issuer or its subsidiary, as applicable, shall maintain the signatories nominated by a collateral agent in respect of the charged account at all times.

发行人或其子公司（按所适用的）应保留质押代理人就质押账户提名的签字人。

Prior to the occurrence of any enforcement trigger under the account charge, the collateral agent shall have joint signatory rights with the Issuer or its subsidiary, as applicable, in relation to any withdrawal or transfer from, and any closure of, the charged account.  The Issuer or its subsidiary, as applicable, shall not withdraw or transfer from the charged account except in circumstances to be agreed.

在账户质押下的任何执行被触发之前，质押代理人就质押账户的任何提款或划转以及任何关闭应与发行人或其子公司（按所适用的）拥有共同签字权。 发行人或其子公司（按所适用的）不得从质押账户中提款或划转，在商定的情况下除外。

Upon the occurrence of any enforcement trigger under the account charge, the collateral agent shall have the right to deliver a notice of control to the account bank and shall have sole signatory rights in relation to any withdrawal or transfer from, and any closure of, the charged account, without any need for the signatory of the Issuer or its subsidiary, as applicable, to co-sign.

一旦账户质押下的任何执行被触发，质押代理人应有权向账户银行发出控制通知，并对质押账户的任何提款或划转以及任何关闭拥有唯一的签字权，而不需要发行人或其子公司（按所适用的）的签字人共同签署。

The collateral agent nominated signatory shall have been deemed to have consented or signed, as applicable, if it does not object within three (3) business days upon request to act or sign, as applicable, in relation to transfers, withdrawals and other actions expressly permitted under the indenture and the security documents. For the avoidance of doubt, the sale

| | |
|---|---|
| | of EVPS Shares to strategic investors as provided above shall be considered expressly permitted under the indenture and security documents. |
| | 在被要求就债券契约和质押文件明确允许的转账/提款和其他行动采取行动或签署（按所适用的）时，如质押代理人指定的签字人在三（3）个工作日内没有提出异议，则其应被视为已予同意或签署（按所适用的）。为避免疑义，按上述规定向战略投资者出售恒大物业股份应被视为债券契约和担保文件明确允许的行为。 |
| **Asset Security** 资产质押 | Security interest over the shares of subsidiaries holding the assets set forth under Annex B ("**Asset List 2**")**,** to be shared among A2 EVPS SLNs and A2 NEV SLNs, C2 EVPS SLNs, and C2 NEV SLNs**.** |
| | 持有附件 B 所列资产（"资产清单 2"）的子公司股份的质押权益，将与 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、C2 恒大物业股票挂钩票据和 C2 恒大新能源汽车股票挂钩票据之间共享。 |
| | The relevant security interest will be released upon any sale of such assets (or receipt of proceeds from recovery on relevant loans or receivables, as applicable) and (i) the application of the proceeds thereof in accordance with the provisions under "Mandatory Redemption" below or (ii) the deposit of such proceeds into an account charged to the benefit of the holders of the relevant instruments, or (iii) such proceeds being subject to an escrow or other arrangement to be agreed. |
| | 当有该等资产的任何出售（或收到相关贷款或应收款的回收的所得款，如适用）时，相关质押权益将被解除，并且，（i）将根据下文"强制赎回"的条款来应用该所得款，或（ii）将该所得款存入一个以相关票据持有人为受益人的质押账户，或（iii）该所得款将受限于待经商定的托管或其他安排。 |
| **Mandatory Redemption** 强制赎回 | The Issuer shall use the net proceeds from the sale of any asset listed in Asset List 2 (or the shares of the subsidiary holding such asset) to purchase or redeem, by way of reverse Dutch auction, any of the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, and C2 NEV SLNs at a minimum purchase price equal to the then current market price plus a premium of US\$0.1 per US\$1 of principal amount, plus accrued and unpaid interest (but in any event the purchase price shall not exceed 100% of the principal amount plus accrued and unpaid interest), within 45 business days of its receipt of such net proceeds, provided that the net proceeds shall be allocated for such purchase between A2 EVPS SLNs and the A2 NEV SLNs on the one hand and the C2 EVPS SLNs and C2 NEV SLNs on the other hand on a pro rata basis according to their aggregate outstanding principal amounts. If any net proceeds from such sale remains unused after such reverse Dutch auction, the Issuer shall redeem the security with the shortest maturity among the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, and C2 NEV SLNs at par plus accrued and unpaid interest. |
| | 发行人应将出售资产清单 2 所列的任何资产（或持有该资产的子公司的股份）的净所得款，在收到该等款项的 45 个工作日内，用于通过最低购买价价格等于当时的市场价格加上每 1 美元本金金额 0.1 美元的溢价，加上应计及未付利息（但在任何情况下，购买价格不得超过本金加应计及未付利息的 100%）的反向荷兰式拍卖方式收购或赎回 |

| | A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、C2 恒大物业股票挂钩票据和 C2 恒大新能源汽车股票挂钩票据中的任意一笔，前提是用于收购的净所得款项应根据 A2 恒大物业股票挂钩票据和 A2 恒大新能源汽车股票挂钩票据以及 C2 恒大物业股票挂钩票据和 C2 恒大新能源汽车股票挂钩票据的未偿还本金金额总额，按比例在 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据和 C2 恒大物业股票挂钩票据、C2 恒大新能源汽车股票挂钩票据之间进行分配。如果在反向荷兰式拍卖之后，仍有未使用的该等出售净所得款，发行人应按票面价值加上应计及未付利息赎回 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、C2 恒大物业股票挂钩票据和 C2 恒大新能源汽车股票挂钩票据中最快到期的一笔。 |
| | All securities so purchased or redeemed shall be cancelled. |
| | 所有如此收购或赎回的质押应被注销。 |
| **Anti-dilution and Corporate Governance**<br><br>反稀释和公司治理 | Certain anti-dilution protections (including against dividends and other distributions, consolidations, subdivisions, redesignations and reclassifications of shares, and certain other dilutive events) and corporate governance rights to be agreed between the Issuer and the CEG AHG, tailored to the requirements of the underlying businesses.<br><br>某些反稀释保护措施（包括针对分红和其他分配、合并、拆分、重新划定和重新分类股份以及某些其他稀释事件）和公司治理权利，将由发行人和恒大持有人特别团体商定，并根据相关业务的要求进行调整。 |
| **Auditor**<br><br>审计师 | The Issuer will engage a Whitelist Auditor to audit its annual financial statements starting no later than the audit of the fiscal year ending December 31, 2023.<br><br>发行人将聘请一家白名单审计师对其年度财务报表进行审计，开始时间不晚于截至 2023 年 12 月 31 日止的财务年度审计。<br><br>The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms:<br><br>"**白名单审计师**"应为以下任何会计师事务所或其各自的关联所或成员所：<br><br>(a)  Baker Tilly International;<br><br>  天职国际；<br><br>(b)  BDO;<br><br>  立信；<br><br>(c)  Crowe Global;<br><br>  国富浩华；<br><br>(d)  Deloitte;<br><br>  德勤；<br><br>(e)  Ernst & Young; |

|  | 安永； |
|---|---|
|  | (f)  Grant Thornton; |
|  | 致同； |
|  | (g)  KPMG; |
|  | 毕马威； |
|  | (h)  Mazars; |
|  | 中审众环； |
|  | (i)  Moore Global; |
|  | 大华国际； |
|  | (j)  Prism; and |
|  | 上会栢诚； |
|  | (k)  RSM International. |
|  | RSM 国际。 |
| **Trustee**<br>信托人 | Madison Pacific or another internationally recognized financial institution as agreed between the Issuer and the CEG AHG.<br>麦迪森太平洋或由发行人和恒大持有人特别团体商定的另一家国际公认的金融机构。 |
| **General**<br>一般 | The Issuer and the CEG AHG will discuss and agree additional covenants and other provisions to be included under the C2 EVPS SLNs and the related legal documentation, including among others, related to (i) restrictions on indebtedness, restricted payments, liens, affiliate transactions, asset sales, open market and other repurchases and other actions, (ii) the timing, manner and other aspects of sales of assets referred to under "Mandatory Redemption", (iii) events of default, (iv) the rights of holders of, and owners of beneficial interests in, the C2 EVPS SLNs (a) to obtain periodic financial and other information and documents from the trustee and the collateral agent, (b) to appoint or replace the trustee, and (c) to direct the trustee and collateral agent and to enforce remedies, and (v) the listing of the C2 EVPS SLNs.<br>发行人和恒大持有人特别团体将讨论并商定将纳入 C2 恒大物业股票挂钩票据的额外限制和其他条款以及相关法律文件，包括但不限于有关（i）对负债、受限支付、质押权、关联交易、资产出售，公开市场和其他回购和其他行动的限制，（ii）"强制赎回"中提到的资产出售的时间安排、方式和其他方面，(iii) 违约事件，（iv）C2 恒大物业股票挂钩票据持有人和实益权益持有人的权利，包括：（a）从信托人获取定期财务和其他信息和文件的权利、（b）任命或更换信托人的权利及（c）指示信托人以及执行救济措施的权利，以及（iv）C2 恒大物业股票挂钩票据的上市。 |

| **Language**<br>语言 | The Chinese provisions contained herein are for reference only. If there is any inconsistency between the English and Chinese provisions, the English provisions shall prevail.<br><br>此处的中文条款仅作参考。如英文和中文条款有任何不一致之处，应以英文条款为准。 |
| --- | --- |

**Annex B**

**附件 B**

**Asset List 2[2]**

**资产清单 2**

**(Subject to Contract)**

**（受限于合同）**

- Shareholder loan owed to Solution Key Holdings Limited from China Ruyi Holdings Limited (中国儒意控股有限公司) in the amount of approximately RMB1,847,784,000;

  中国儒意控股有限公司所欠 Solution Key Holdings Limited 的金额为约人民币 1,847,784,000 元的股东贷款；

- Receivables owed to Solution Key Holdings Limited by (i) Pumpkin Films Limited in the amount of approximately RMB1,579,682,000 and (ii) Ocean Fund SPC in the amount of approximately RMB527,938,000;

  Solution Key Holdings Limited 对(i) Pumpkin Films Limited 金额为约人民币 1,579,682,000 元及对(ii) Ocean Fund SPC 金额为约人民币 527,938,000 元的应收款；

- Equity interest in Xingsheng Preference Electronic Business Limited held by Rosy Sage Investments Limited;

  Rosy Sage Investments Limited 所持 Xingsheng Preference Electronic Business Limited 的股权；

- Shares in Bank of Jinzhou Co., Ltd held by New Chic Global Limited;

  New Chic Global Limited 所持 Bank of Jinzhou Co., Ltd 的股权；

- Equity interest in Butterfly Hop Holdings Limited held by Watershine Holdings Limited;

  Watershine Holdings Limited 所持 Butterfly Hop Holdings Limited 的股权；

- Equity interest in Integra Wealth Investments Limited held by Global Power Limited;

  Global Power Limited 所持 Integra Wealth Investments Limited 的股权；

- Shares in Solar Power, Inc. held by Smart Range Investments Limited; and

  Smart Range Investments Limited 所持 Solar Power, Inc.的股权； 及

- Receivables owed to China Evergrande Group by Shengyu (BVI) Limited in the amount of approximately US$217 million.

  中国恒大集团对 Shengyu (BVI) Limited 金额为 2.17 亿美元的应收款。

---

[2] This list may be modified as agreed between the Issuer and the CEG AHG.
该清单可由发行人和恒大持有人特别团体商定修改。

Part B4 – C2 NEV SLNs

B4 部分– C2 恒大新能源汽车股票挂钩票据

Principal Terms of the China Evergrande Group NEV Linked New Notes C2 ("C2 NEV SLNs")

中国恒大集团与新能源汽车挂钩的新票据 C2 ("C2 恒大新能源汽车股票挂钩票据") 的主要条款

| | |
|---|---|
| **Principal Terms of the China Evergrande Group NEV Linked New Notes C2 ("C2 NEV SLNs")** 中国恒大集团与恒大新能源汽车挂钩的新票据 C2（"C2 恒大新能源汽车股票挂钩票据"）的主要条款 | |
| **Issuer** 发行人 | China Evergrande Group, an exempted company incorporated in the Cayman Islands with limited liability 中国恒大集团，一家在开曼群岛注册成立的有限责任的豁免公司 |
| **Principal Amount** 本金金额 | The C2 NEV SLN shall comprise two tranches as follows, with the following maximum aggregate principal amount: C2 恒大新能源汽车股票挂钩票据应包含以下两笔，其最大本金总额为： 1. C2 NEV SLN Tranche A: US\$500 million; C2 恒大新能源汽车股票挂钩票据 A：5.0 亿美元； 2. C2 NEV SLN Tranche B: US\$650 million; C2 恒大新能源汽车股票挂钩票据 B：6.5 亿美元； |
| **Maturity/Principal Repayment** 到期日/本金偿付 | 1. C2 NEV SLN Tranche A: 7 years from the Reference Date; C2 恒大新能源汽车股票挂钩票据 A：自参考日起 7 年； 2. C2 NEV SLN Tranche B: 8 years from the Reference Date. C2 恒大新能源汽车股票挂钩票据 B：自参考日起 8 年。 The outstanding principal amount of each tranche shall be repaid on maturity, together with any accrued and unpaid interest. 每一笔的未偿还本金应在到期日连同任何应计但未付利息一起偿还。 |
| **Interest (PIK and cash)** 利息（实物付息和现金） | Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the C2 NEV SLN Tranche A at 6.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind) with respect to each interest payment period. 利息将在参考日期起计息，并将每半年期末就 C2 恒大新能源汽车股票挂钩票据 A 未偿还本金支付一次利息，每个付息期的利率为每年 6.0%（如果与该付息期有关的所有利息以现金支付），或者每年 7.0%（如果与该付息期有关的任何部分利息以实物支付）。 Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the C2 NEV SLN Tranche B at 6.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind) with respect to each interest payment period. |

利息将在参考日期起计息，并将每半年期末就 C2 恒大物业股票挂钩票据 B 未偿还本金支付一次利息，每个付息期的利率为每年 6.5%（如果与该付息期有关的所有利息以现金支付），或者每年 7.5%（如果与该付息期有关的任何部分利息以实物支付）。

Interest on the outstanding principal amount of the C2 NEV SLNs shall be paid in the following manner:

C2 恒大新能源汽车股票挂钩票据未偿还本金的利息应按以下方式支付：

1.  For the first two and a half years after the Reference Date: interest may be paid in cash or in kind, at the election of the Issuer;

    对于参考日期后的最初两年半：可由发行人选择用现金或实物支付利息；

2.  From the 31st month to the 36th month after the Reference Date: interest in an amount equal to at least 0.5% of the outstanding principal amount of each tranche of the C2 NEV SLNs shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Issuer;

    对于参考日期后的第 31 个月至第 36 个月：应以现金支付相当于各笔 C2 恒大新能源汽车股票挂钩票据未偿本金的至少 0.5%的利息；其余部分的利息可由发行人选择以现金或实物支付；

3.  For the fourth year after the Reference Date: interest in an amount equal to at least 3.0% p.a. of the outstanding principal amount of each tranche of the C2 NEV SLN shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Issuer; and

    对于参考日期后的第四年：应以现金支付相当于各笔 C2 恒大新能源汽车股票挂钩票据未偿本金的至少每年 3.0%的利息；其余部分的利息可由发行人选择以现金或实物支付；

4.  Starting from the fifth year after the Reference Date: interest shall be paid in cash.

    从参考日期后的第五年开始：利息应以现金支付。

All interest paid in kind with respect to the C2 NEV SLN will be added to the then current outstanding principal amount of the C2 NEV SLN.

所有 C2 恒大新能源汽车股票挂钩票据以实物支付的利息均计入届时 C2 恒大新能源汽车股票挂钩票据的未偿还本金金额。

If the Issuer pays cash interest under any tranche of the C2 NEV SLNs with respect to any interest payment period in an amount greater than the amount of cash interest required to be paid on such tranche with respect to such interest payment period, it shall also pay additional cash interest under all other tranches of the A2 EVPS SLNs, A2 NEV SLNs, A2 Notes, C2 EVPS SLNs, C2 NEV SLNs and C2 Notes. The amount of such additional cash payments shall be allocated among each of the A2 EVPS SLNs, A2 NEV SLNs, A2 Notes, C2 EVPS SLNs, C2 NEV SLNs and C2 Notes (and among

| | each tranche of such instruments) on a pro rata basis by outstanding principal amount. |
| | 如果发行人就 C2 恒大新能源汽车股票挂钩票据的任何一笔就任何付息期支付的现金利息大于该笔票据在该付息期所需支付的现金利息，则发行人还应就 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、A2 票据、C2 恒大物业股票挂钩票据、C2 恒大新能源汽车股票挂钩票据及 C2 票据中其他所有票据支付额外的现金利息。该额外现金支付的金额应根据未偿还本金金额，按比例在 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、A2 票据、C2 恒大物业股票挂钩票据、C2 恒大新能源汽车股票挂钩票据及 C2 票据之间（并且在该等票据中各笔之间）进行分配。 |
| **Escrow Arrangement to be Granted to C2 NEV SLNs**<br><br>就 C2 恒大新能源股票挂钩票据的托管安排 | Deposit of a total of 1,503,503,540 NEV Shares (equivalent to approximately 13.9% of NEV Shares as of the date of this CEG Term Sheet) into escrow accounts (the "**C2 NEV Escrow Accounts**") of an independent bank in the name of the Issuer or an offshore subsidiary of the Issuer, subject to an escrow account agreement between the Issuer or such subsidiary as account holder and such independent bank. Each tranche of C2 NEV SLNs will have its own C2 NEV Escrow Account holding such NEV Shares in corresponding proportion to its principal amount over all C2 EVPS SLNs.<br><br>将 1,503,503,540 股恒大新能源汽车股份（相当于截至 本恒大条款清单日期其全部股份的约 13.9%）存入以发行人或发行人一家境外子公司名义设立的独立银行托管账户（"**C2 恒大新能源汽车托管账户**"）中，受限于作为账户持有者的 发行人或该子公司和该独立银行之间的托管账户协议。每笔 C2 恒大新能源汽车股票挂钩票据都将有其专属的 C2 恒大新能源汽车托管账户，该账户所持恒大新能源汽车股份与其与该笔票据的本金金额在全部 C2 恒大新能源汽车股票挂钩票据中的比例相对应。<br><br>As part of the Restructuring and as set forth under "Treatment of shareholder's loans to NEV and CEG's loan to NEV" in this CEG Term Sheet, the relevant shareholder's loans to NEV and CEG's loan to NEV and any accrued and unpaid interest thereon will be applied to convert into new NEV Shares at the conversion price of HK$3.84 per share. A portion of such NEV Shares so converted will be deposited into the A2 NEV Escrow Accounts and C2 NEV Escrow Accounts on a pro rata basis such that the A2 NEV Escrow Accounts and C2 NEV Escrow Accounts will together hold NEV Shares representing approximately 30% of the total issued NEV Shares on a fully diluted basis. The remaining NEV Shares so converted will be added to the Exchange Property under the NEV EBs. As set forth under "Treatment of other loan to NEV" in this CEG Term Sheet, the loans by Ms. Ding Yumei and Good Bond Limited to NEV are also expected to be applied toward conversion into new shares in NEV at an issue price of HK$3.84 per share. The NEV shares so converted will not be used as part of the restructuring consideration (neither the NEV MEBs nor the A2 NEV SLNs and the C2 NEV SLNs).<br><br>作为重组的一部分，并根据本恒大条款清单中"股东对恒大新能源汽车的贷款和恒大对恒大新能源汽车的贷款的处理"中所列明的，恒大新能源汽车的相关股东贷款和恒大对新能源汽车贷款及其任何应计且未付利息将用于以转换价每股 3.84 港元转换为恒大新能源汽 |

车的新股份。部分如此转换的恒大新能源汽车股份将按比例存入 A2 恒大新能源汽车托管账户和C2 恒大新能源汽车托管账户，从而使A2 恒大新能源汽车托管账户和C2 恒大新能源汽车托管账户共同持有的恒大新能源汽车股份在完全稀释的基础上占已发行恒大新能源汽车股份总数的约 30% 。剩余如此转换的恒大新能源汽车股份将加入恒大新能源汽车强制可交换债券的交换财产。如本恒大条款清单中"恒大新能源汽车其他贷款的处理"所述，丁玉梅女士及 Good Bond Limited 向恒大新能源汽车提供的贷款也预期将用于以发行价每股 3.84 港元转换为恒大新能源汽车的新股份。 如此转换的恒大新能源汽车股份将不会被用作重组对价的一部分（不是恒大新能源汽车强制可交换债券也不是 A2 恒大新能源汽车股票挂钩票据及 C2 恒大新能源汽车股票挂钩票据）。

NEV Shares held under the C2 NEV Escrow Accounts may be released from escrow for sale to a strategic investor, upon (i) the redemption of all C2 NEV SLN subject to such escrow arrangement, at par plus accrued and unpaid interest (the "**C2 NEV Redemption Amount**"), (ii) the deposit of an amount equal to the C2 NEV Redemption Amount into an account charged to the benefit of the holders of the C2 NEV SLNs, or (iii) an amount equal to the C2 NEV Redemption Amount being subject to an escrow or other arrangement to be agreed. Prior consultation or approval will not be required from the trustee, the escrow agent or any noteholder for releasing NEV Shares for sale to a strategic investor so long as the net proceeds of such sale are not lower than the C2 NEV Redemption Amount and are used to redeem the C2 NEV SLN as aforesaid. Any sale of NEV Shares to a strategic investor shall be made on a pro rata basis between the A2 NEV SLNs on the one hand and the C2 NEV SLNs on the other hand

一旦（i）受限于该等托管安排的全部 C2 恒大新能源汽车股票挂钩票据按票面价值并加上应计及未付利息被赎回 （"**C2 恒大新能源汽车赎回金额**"），(ii) 当金额为 C2 恒大新能源汽车赎回金额的金额存入一个以 C2 恒大新能源汽车股票挂钩票据持有人为受益人的质押账户，或（iii）当金额为 C2 恒大新能源汽车赎回金额的金额受限于有待商定的托管或其他安排，受限于 C2 恒大新能源汽车股份托管账户的恒大新能源汽车股份可被解除，以处置给一位战略投资者。解除恒大新能源汽车股份以出售给战略投资者时，无需事先咨询或取得信托人、托管代理人或任何票据持有人的批准，前提是该出售的净所得款不低于 C2 恒大新能源汽车赎回金额并用于赎回上述 C2 恒大新能源汽车股票挂钩票据。向一位战略投资者出售恒大物业股份应在 A2 恒大新能源汽车股票挂钩票据和 C2 恒大物业股票挂钩票据之间按比例进行。

A C2 NEV Escrow Account shall become enforceable only upon (i) failure to pay principal of or interest on the C2 NEV SLN linked to such escrow arrangement, (ii) failure to apply the net proceeds from the sale of such NEV Shares to redeem such C2 NEV SLN, or (iii) with respect to C2 NEV SLN Tranche A, failure to pay principal of or interest on A2 NEV SLN Tranche A, and with respect to C2 NEV SLN Tranche B, failure to pay principal of or interest on A2 NEV SLN Tranche B.

C2 恒大新能源汽车托管账户仅在以下情况下方可执行：(i) 与该等托管安排挂钩的 C2 恒大新能源汽车股票挂钩票据的本金或利息未能支付，(ii) 出售该恒大新能源汽车股份的净所得款未能用于赎回该

等 C2 恒大新能源汽车股票挂钩票据，或（iii）对于 C2 恒大新能源
汽车股票挂钩票据 A 而言，若未能支付 A2 恒大新能源汽车股票挂钩
票据 A 的本金或利息，及对于 C2 恒大新能源汽车股票挂钩票据 B 而
言，未能支付 A2 恒大新能源汽车股票挂钩票据 B 的本金或利息。

Cash dividends received from NEV Shares under a C2 NEV Escrow
Account shall be applied to redeem the C2 NEV SLN linked to such escrow
arrangement at par plus accrued and unpaid interest.

来自 C2 恒大新能源汽车股份托管账户中的恒大新能源汽车股份的现
金分红应用于按票面价值并加上应计及未付利息赎回与该等托管安
排挂钩的 C2 恒大新能源汽车股票挂钩票据。

The Issuer or its subsidiary, as applicable, shall maintain the signatories
nominated by the trustee in respect of the escrow account at all times.

发行人或其子公司（按所适用的）应保留信托人就质押账户提名的
签字人。

Prior to the occurrence of any enforcement trigger under the escrow
agreement, the trustee shall have joint signatory rights with the Issuer or its
subsidiary, as applicable, in relation to any withdrawal or transfer from, and
any closure of, the escrow account. The Issuer or its subsidiary, as
applicable, shall not withdraw or transfer from the escrow account except
in circumstances to be agreed.

在托管账户下的任何执行被触发之前，信托人就质押账户的任何提
款或划转以及任何关闭应与发行人或其子公司（按所适用的）拥有
共同签字权。发行人或其子公司（按所适用的）不得从质押账户中
提款或划转，在商定的情况下除外。

Upon the occurrence of any enforcement trigger under the escrow
agreement, the trustee shall have the right to deliver a notice of control to
the account bank and shall have sole signatory rights in relation to any
withdrawal or transfer from, and any closure of, the escrow account,
without any need for the signatory of the Issuer or its subsidiary, as
applicable, to co-sign.

一旦托管账户下的任何执行被触发，信托人应有权向账户银行发出
控制通知，并对质押账户的任何提款或划转以及任何关闭拥有唯一
的签字权，而不需要发行人或其子公司（按所适用的）的签字人共
同签署。

The trustee nominated signatory shall have been deemed to have consented
or signed, as applicable, if it does not object within three (3) business days
upon request to act or sign, as applicable, in relation to transfers,
withdrawals and other actions expressly permitted under the indenture and
the security documents. For the avoidance of doubt, the sale of NEV Shares
to strategic investors as provided above shall be considered expressly
permitted under the indenture and security documents.

在被要求就债券契约和质押文件明确允许的转账/提款和其他行动采
取行动或签署（按所适用的）时，如信托人指定的签字人在三（3）
个工作日内没有提出异议，则其应被视为已予同意或签署（按所适
用的）。为避免疑义，按上述规定向战略投资者出售恒大新能源汽车
股份应视为债券契约和担保文件明确允许的行为。.

| | |
|---|---|
| **Asset Security**<br>资产质押 | Security interest over the shares of subsidiaries holding the assets set forth under Annex B ("**Asset List 2**"), to be shared among A2 EVPS SLNs and A2 NEV SLNs, C2 EVPS SLNs, and C2 NEV SLNs.<br><br>持有附件 B 所列资产（"资产清单 2"）的子公司股份的质押权益，将在 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、C2 恒大物业股票挂钩票据和 C2 恒大新能源汽车股票挂钩票据之间共享。<br><br>The relevant security interest will be released upon any sale of such assets (or receipt of proceeds from recovery on relevant loans or receivables, as applicable) and (i) the application of the proceeds thereof in accordance with the provisions under "Mandatory Redemption" below or (ii) the deposit of such proceeds into an account charged to the benefit of the holders of the relevant instruments, or (iii) such proceeds being subject to an escrow or other arrangement to be agreed.<br><br>当有"该等资产的任何出售（或收到相关贷款或应收款的回收的所得款，如适用），相关质押权益将被解除，并且，（i）将根据下文"强制赎回"的条款来应用该所得款，或（ii）将该所得款存入一个以相关票据持有人为受益人的质押账户，或（iii）该所得款将受限于待经商定的托管或其他安排。 |
| **Mandatory Redemption**<br>强制赎回 | The Issuer shall use the net proceeds from the sale of any asset listed in Asset List 2 (or the shares of the subsidiary holding such asset) to purchase or redeem, by way of reverse Dutch auction, any of the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, and C2 NEV SLNs at a minimum purchase price equal to the then current market price plus a premium of US$0.1 per US$1 of principal amount, plus accrued and unpaid interest (but in any event the purchase price shall not exceed 100% of the principal amount plus accrued and unpaid interest), within 45 business days of its receipt of such net proceeds, provided that the net proceeds shall be allocated for such purchase between A2 EVPS SLNs and the A2 NEV SLNs on the one hand and the C2 EVPS SLNs and C2 NEV SLNs on the other hand on a pro rata basis according to their aggregate outstanding principal amounts. If any net proceeds from such sale remains unused after such reverse Dutch auction, the Issuer shall redeem the security with the shortest maturity among the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, and C2 NEV SLNs at par plus accrued and unpaid interest.<br><br>发行人应将出售资产清单 2 所列的任何资产（或持有该资产的子公司的股份）的净所得款，在收到该等款项的 45 个工作日内，用于通过最低购买价格等于当时的市场价格加上每 1 美元本金金额 0.1 美元的溢价，加上应计及未付利息（但在任何情况下，购买价格不得超过本金加应计及未付利息的 100%）的反向荷兰式拍卖方式收购或赎回 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、C2 恒大物业股票挂钩票据和 C2 恒大新能源汽车股票挂钩票据中的任意一笔，前提是用于收购的净所得款应根据 A2 恒大物业股票挂钩票据和 A2 恒大新能源汽车股票挂钩票据以及 C2 恒大物业股票挂钩票据和 C2 恒大新能源汽车股票挂钩票据的未偿还本金金额总额，按比例在 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据和 C2 恒大物业股票挂钩票据、C2 恒大新能源汽车股票挂钩票据之间进行分配。如果在反向荷兰式拍卖之后，仍有未使用的该等出售净所 |

|  |  |
|---|---|
|  | 得款，发行人应按票面价值加上应计及未付利息赎回 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、C2 恒大物业股票挂钩票据和 C2 恒大新能源汽车股票挂钩票据中最快到期的一笔。<br><br>All securities so purchased or redeemed shall be cancelled.<br><br>所有如此收购或赎回的质押应被注销。 |
| **Anti-dilution and Corporate Governance**<br><br>反稀释和公司治理 | Certain anti-dilution protections (including against dividends and other distributions, consolidations, subdivisions, redesignations and reclassifications of shares, and certain other dilutive events) and corporate governance rights to be agreed between the Issuer and the CEG AHG, tailored to the requirements of the underlying businesses.<br><br>某些反稀释保护措施（包括针对分红和其他分配、合并、拆分、重新划定和重新分类股份以及某些其他稀释事件）和公司治理权利，将由发行人和恒大持有人特别团体商定，并根据相关业务的要求进行调整。 |
| **Auditor**<br><br>审计师 | The Issuer will engage a Whitelist Auditor to audit its annual financial statements starting no later than the audit of the fiscal year ending December 31, 2023.<br><br>发行人将聘请一家白名单审计师对其年度财务报表进行审计，开始时间不晚于截至 2023 年 12 月 31 日止的财务年度审计。<br><br>The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms:<br><br>"**白名单审计师**"应为以下任何会计师事务所或其各自的关联所或成员所：<br><br>(a) Baker Tilly International;<br><br>     天职国际；<br><br>(b) BDO;<br><br>     立信；<br><br>(c) Crowe Global;<br><br>     国富浩华；<br><br>(d) Deloitte;<br><br>     德勤；<br><br>(e) Ernst & Young;<br><br>     安永；<br><br>(f) Grant Thornton;<br><br>     致同；<br><br>(g) KPMG;<br><br>     毕马威；<br><br>(h) Mazars; |

4861-9866-1973v.17

| | |
|---|---|
| | 中审众环； |
| | (i) Moore Global; |
| | 大华国际； |
| | (j) Prism; and |
| | 上会栢诚； |
| | (k) RSM International. |
| | RSM 国际。 |
| **Trustee**<br>信托人 | Madison Pacific or another internationally recognized financial institution as agreed between the Issuer and the CEG AHG.<br>麦迪森太平洋或由发行人和恒大持有人特别团体商定的另一家国际公认的金融机构。 |
| **General**<br>一般 | The Issuer and the CEG AHG will discuss and agree additional covenants and other provisions to be included under the C2 NEV SLNs and the related legal documentation, including among others, related to (i) restrictions on indebtedness, restricted payments, liens, affiliate transactions, asset sales, open market and other repurchases and other actions, (ii) the timing, manner and other aspects of sales of assets referred to under "Mandatory Redemption", (iii) events of default, (iv) the rights of holders of, and owners of beneficial interests in, the C2 NEV SLNs (a) to obtain periodic financial and other information and documents from the trustee and the collateral agent, (b) to appoint or replace the trustee, and (c) to direct the trustee and collateral agent and to enforce remedies, and (v) the listing of the C2 NEV SLNs.<br>发行人和恒大持有人特别团体将讨论并商定将纳入 C2 恒大新能源汽车股票挂钩票据的额外限制和其他条款以及相关法律文件，包括但不限于有关（ⅰ）对负债、受限支付、质押权、关联交易、资产出售，公开市场和其他回购和其他行动的限制，（ⅱ）"强制赎回"中提到的资产出售的时间安排、方式和其他方面，（ⅲ）违约事件，（ⅳ）C2 恒大新能源汽车股票挂钩票据持有人和实益权益持有人的权利，包括：（a）从信托人获取定期财务和其他信息和文件的权利、（b）任命或更换信托人的权利及（c）指示信托人以及执行救济措施的权利，以及（ⅳ）C2 恒大新能源汽车股票挂钩票据的上市。 |
| **Language**<br>语言 | The Chinese provisions contained herein are for reference only. If there is any inconsistency between the English and Chinese provisions, the English provisions shall prevail.<br>此处的中文条款仅作参考。如英文和中文条款有任何不一致之处，应以英文条款为准。 |

**Annex B**

**附件 B**

**Asset List 2**[2]

**资产清单 2**

**(Subject to Contract)**

**（受限于合同）**

- Shareholder loan owed to Solution Key Holdings Limited from China Ruyi Holdings Limited (中国儒意控股有限公司) in the amount of approximately RMB1,847,784,000;

  中国儒意控股有限公司所欠 Solution Key Holdings Limited 的金额为约人民币 1,847,784,000 元的股东贷款；

- Receivables owed to Solution Key Holdings Limited by (i) Pumpkin Films Limited in the amount of approximately RMB1,579,682,000 and (ii) Ocean Fund SPC in the amount of approximately RMB527,938,000;

  Solution Key Holdings Limited 对(i) Pumpkin Films Limited 金额为约人民币 1,579,682,000 元及对(ii) Ocean Fund SPC 金额为约人民币 527,938,000 元的应收款；

- Equity interest in Xingsheng Preference Electronic Business Limited held by Rosy Sage Investments Limited;

  Rosy Sage Investments Limited 所持 Xingsheng Preference Electronic Business Limited 的股权；

- Shares in Bank of Jinzhou Co., Ltd held by New Chic Global Limited;

  New Chic Global Limited 所持 Bank of Jinzhou Co., Ltd 的股权；

- Equity interest in Butterfly Hop Holdings Limited held by Watershine Holdings Limited;

  Watershine Holdings Limited 所持 Butterfly Hop Holdings Limited 的股权；

- Equity interest in Integra Wealth Investments Limited held by Global Power Limited;

  Global Power Limited 所持 Integra Wealth Investments Limited 的股权；

- Shares in Solar Power, Inc. held by Smart Range Investments Limited; and

  Smart Range Investments Limited 所持 Solar Power, Inc.的股权；及

- Receivables owed to China Evergrande Group by Shengyu (BVI) Limited in the amount of approximately US$217 million.

  中国恒大集团对 Shengyu (BVI) Limited 金额为 2.17 亿美元的应收款。

---

[2] This list may be modified as agreed between the Issuer and the CEG AHG.
该清单可由发行人和恒大持有人特别团体商定修改。

**Schedule 5**

**附表 5**

Part A – A2 Notes

A 部分 –A2 票据

**Principal Terms of the China Evergrande Group New Notes A2 ("A2 Notes")**

**中国恒大集团新票据 A2 ("A2 票据") 的主要条款**

| | |
|---|---|
| **Principal Terms of the China Evergrande Group New Notes A2 ("A2 Notes")**<br>中国恒大集团新票据 A2（"A2 票据"）的主要条款 | |
| **Issuer**<br>发行人 | China Evergrande Group, an exempted company incorporated in the Cayman Islands with limited liability<br>中国恒大集团，一家在开曼群岛注册成立的有限责任的豁免公司 |
| **Principal Amount**<br>本金金额 | The A2 Notes shall comprise four tranches as follows, with the following maximum aggregate principal amount:<br>A2 票据应包括以下四笔，其最大本金总金额为：<br><br>1.   A2 Tranche A: US$500 million;<br><br>　　A2 票据 A：5 亿美元；<br><br>2.   A2 Tranche B: US$650 million;<br><br>　　A2 票据 B：6.5 亿美元；<br><br>3.   A2 Tranche C: US$3,800 million;<br><br>　　A2 票据 C：38 亿美元；<br><br>4.   A2 Tranche D: As entitlement under Option A2 minus Option A2's portion of the principal amount of CEG MCB, Option A2's portion of the principal amount of EVPS MEBs, Option A2's portion of the principal amount of NEV MEBs, the principal amount of A2 NEV SLN, the principal amount of A2 EVPS SLN and the principal amounts of A2 Tranche A, B, and C.<br><br>　　A2 票据 D：方案 A2 下的可获偿金额减去恒大强制可转换债券的本金金额中方案 A2 的部分、恒大物业强制可交换债券的本金金额中方案 A2 的部分、恒大新能源汽车强制可交换债券的本金金额中方案 A2 的部分、A2 恒大新能源汽车股票挂钩票据的本金金额、A2 恒大物业股票挂钩票据的本金金额以及 A2 票据 A、B、C 的本金金额。<br><br>Subject to the participation of A's under Option 2, A2 Notes will be allocated in sequential order by maturity date starting from A2 Tranche A.<br>受限于 A 组在方案 A2 中的参与情况，票据 A2 将按到期日顺序从 A2 票据 A 开始分配。 |
| **Maturity/Principal Repayment**<br>到期日/本金偿付 | 1.   A2 Tranche A: 5 years from the Reference Date;<br><br>　　A2 票据 A：自参考日期起 5 年；<br><br>2.   A2 Tranche B: 6 years from the Reference Date;<br><br>　　A2 票据 B：自参考日期起 6 年；<br><br>3.   A2 Tranche C: 7 years from the Reference Date; and<br><br>　　A2 票据 C：自参考日期起 7 年；及<br><br>4.   A2 Tranche D: 8 years from the Reference Date;<br><br>　　A2 票据 D：自参考日期起 8 年； |

| | |
|---|---|
| | The outstanding principal amount of each tranche shall be repaid on maturity, together with any accrued and unpaid interest.<br><br>每一笔的未偿还本金应在到期日连同任何应计和未付利息一起偿还。 |
| **Interest (PIK and cash)**<br>利息（实物付息和现金） | Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the A2 Notes at the following interest rates with respect to each interest payment period:<br><br>利息将在参考日期起计息，并将每半年期末就 A2 票据的未偿还本金支付一次利息，每个付息期的利率如下：<br><br>1.  A2 Tranche A: 5.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 6.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind);<br><br>A2 票据 A：每年 5.0 %（如果与该付息期有关的所有利息以现金支付）或每年 6.0%（如果与该付息期有关的任何部分利息以实物支付）；<br><br>2.  A2 Tranche B: 5.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 6.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind);<br><br>A2 票据 B：每年 5.5%（如果与该付息期有关的所有利息以现金支付）或每年 6.5%（如果与该付息期有关的任何部分利息以实物支付）；<br><br>3.  A2 Tranche C: 6.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); and<br><br>A2 票据 C：每年 6.0%（如果与该付息期有关的所有利息以现金支付）或每年 7.0 %（如果与该付息期有关的任何部分利息以实物支付）；及<br><br>4.  A2 Tranche D: 6.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind);<br><br>A2 票据 D：每年 6.5 %（如果与该付息期有关的所有利息以现金支付）或每年 7.5 %（如果与该付息期有关的任何部分利息以实物支付）；<br><br>Interest on the outstanding principal amount of the A2 Notes shall be paid in the following manner:<br><br>A2 票据未偿还本金的利息应按以下方式支付：<br><br>1.  For the first two and a half years after the Reference Date: interest may be paid in cash or in kind, at the election of the Issuer:<br><br>对于参考日期后的最初两年半：可由发行人选择用现金或实物支付利息； |

| | |
|---|---|
| | 2. From the 31st month to the 36th month after the Reference Date: interest in an amount equal to at least 0.5% of the outstanding principal amount of each tranche of the A2 Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Issuer; |
| | 对于参考日期后的第 31 个月至参考日期后的第 36 个月：应以现金支付相当各笔 A2 票据未偿本金的至少 0.5%的利息；其余部分的利息可由发行人选择以现金或实物支付； |
| | 3. For the fourth year after the Reference Date: interest in an amount equal to at least 3.0% p.a. of the outstanding principal amount of each tranche of the A2 Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Issuer; and |
| | 对于参考日期后的第四年：应以现金支付相当于各笔 A2 票据未偿本金的至少每年 3.0%的利息；其余部分的利息可由发行人选择以现金或实物支付;及 |
| | 4. Starting from the fifth year after the Reference Date: interest shall be paid in cash. |
| | 对于从参考日期后的第五年开始：利息应以现金支付。 |
| | All interest paid in kind with respect to the A2 Notes will be added to the then current outstanding principal amount of the A2 Notes. |
| | 所有 A2 票据以实物支付的利息均计入届时 A2 票据的未偿还本金额。 |
| | If the Issuer pays cash interest under any tranche of the A2 Notes with respect to any interest payment period in an amount greater than the amount of cash interest required to be paid on such tranche with respect to such interest payment period, it shall also pay additional cash interest under all other tranches of the A2 EVPS SLNs, A2 NEV SLNs, A2 Notes, C2 EVPS SLNs, C2 NEV SLNs and C2 Notes. The amount of such additional cash payments shall be allocated among each of the A2 EVPS SLNs, A2 NEV SLNs, A2 Notes, C2 EVPS SLNs, C2 NEV SLNs and C2 Notes (and among each tranche of such instruments) on a pro rata basis by outstanding principal amount. |
| | 如果发行人就 A2 票据的任何一笔就任何付息期支付的现金利息大于该笔票据在该付息期所需支付的现金利息，则发行人还应就 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、A2 票据、C2 恒大物业股票挂钩票据、C2 恒大新能源汽车股票挂钩票据及 C2 票据其他所有票据支付额外的现金利息。该额外现金支付的金额应根据未偿还本金金额，按比例在 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、A2 票据、C2 恒大物业股票挂钩票据、C2 恒大新能源汽车股票挂钩票据及 C2 票据之间（并且在该等票据中各笔之间）进行分配。 |
| **Guarantees**<br>担保 | The same Subsidiary Guarantors as those guaranteeing the Existing Notes, other than (i) certain shell subsidiaries of CEG to be agreed to be deregistered prior to the Original Issue Date, and (ii) certain significant offshore subsidiaries to be agreed (collectively the "**A2 Notes** |

| | |
|---|---|
| | **Guarantors**", and such guarantees, the "**A2 Notes Guarantees**"). A1 Notes Guarantees to be subordinated to A2 Notes Guarantees.<br><br>担保子公司与目前为现有票据提供担保的担保子公司相同，但不包括（i）某些有待商定在初始发行日期前将注销的恒大空壳子公司，以及（ii）某些有待商定的重要境外子公司（统称为"**A2 票据担保公司**"，该担保统称为"**A2 票据担保**"）。A1 票据担保将劣后于 A2 票据担保。 |
| **Auditor**<br>审计师 | The Issuer will engage a Whitelist Auditor to audit its annual financial statements starting no later than the audit of the fiscal year ending December 31, 2023.<br><br>发行人将聘请一家白名单审计师对其年度财务报表进行审计，开始时间不晚于截至 2023 年 12 月 31 日止的财务年度审计。<br><br>The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms:<br><br>"**白名单审计师**"应为以下任何会计师事务所或其各自的关联所或成员所：<br><br>(a)  Baker Tilly International;<br><br>天职国际；<br><br>(b)  BDO;<br><br>立信；<br><br>(c)  Crowe Global;<br><br>国富浩华；<br><br>(d)  Deloitte;<br><br>德勤；<br><br>(e)  Ernst & Young;<br><br>安永；<br><br>(f)  Grant Thornton;<br><br>致同；<br><br>(g)  KPMG;<br><br>毕马威；<br><br>(h)  Mazars;<br><br>中审众环；<br><br>(i)  Moore Global;<br><br>大华国际；<br><br>(j)  Prism; and<br><br>上会栢诚；<br><br>(k)  RSM International. |

| | |
|---|---|
| | RSM 国际。 |
| **Trustee**<br>信托人 | Madison Pacific or another internationally recognized financial institution as agreed between the Issuer and the CEG AHG.<br>麦迪森太平洋或由发行人和恒大持有人特别团体商定的另一家国际公认的金融机构。 |
| **General**<br>一般 | The Issuer and the CEG AHG will discuss and agree additional covenants and other provisions to be included under the A2 Notes and the related legal documentation, including among others, related to (i) restrictions on indebtedness, restricted payments, liens, affiliate transactions, asset sales, open market and other repurchases and other actions, (ii) events of default, (iii) the rights of holders of, and owners of beneficial interests in, the A2 Notes (a) to obtain periodic financial and other information and documents from the trustee, (b) to appoint or replace the trustee, and (c) to direct the trustee and to enforce remedies, and (iv) the listing of the A2 Notes.<br>发行人和恒大持有人特别团体将讨论并商定将纳入 A2 票据的额外限制和其他条款以及相关法律文件，包括但不限于有关（i）对负债、受限支付、质押权、关联交易、资产出售，公开市场和其他回购和其他行动的限制，（ii）违约事件，（iii）A2 票据持有人和实益权益持有人的权利，包括：（a）从信托人获取定期财务和其他信息和文件的权利、（b）任命或更换信托人的权利及（c）指示信托人以及执行救济措施的权利，以及（iv）A2 票据的上市。 |
| **Language**<br>语言 | The Chinese provisions contained herein are for reference only. If there is any inconsistency between the English and Chinese provisions, the English provisions shall prevail.<br>此处的中文条款仅作参考。如英文和中文条款有任何不一致之处，应以英文条款为准。 |

4861-9866-1973v.17

Part B – C2 Notes

B 部分 – C2 票據

**Principal Terms of the China Evergrande Group New Notes C2 ("C2 Notes")**

中國恒大集團新票據 C2 （"C2 票據"） 的主要條款

| | |
|---|---|
| **Principal Terms of the China Evergrande Group New Notes C2 ("C2 Notes")**<br>**中国恒大集团新票据 C2（"C2 票据"）的主要条款** | |
| **Issuer**<br>**发行人** | China Evergrande Group, an exempted company incorporated in the Cayman Islands with limited liability<br>中国恒大集团，一家在开曼群岛注册成立的有限责任的豁免公司 |
| **Principal Amount**<br>**本金金额** | The C2 Notes shall comprise three tranches as follows, with the following maximum aggregate principal amount:<br>恒大票据 C2 应包括以下三笔，其最大本金总金额为：<br><br>1.  C2 Tranche A: US$200 million;<br>    C2 票据 A：2 亿美元；<br><br>2.  C2 Tranche B: US$2,740 million; and<br>    C2 票据 B：27.4 亿美元：及<br><br>3.  C2 Tranche C: Cs entitlement under Option C2 minus Option C2's portion of the principal amount of CEG MCB, Option C2's portion of the principal amount of EVPS MEBs, Option C2's portion of the principal amount of NEV MEBs, the principal amount of C2 NEV SLN, the principal amount of C2 EVPS SLN and the principal amounts of C2 Tranche A and B).<br>    C2 票据 C：方案 C2 下的可获偿金额减去恒大强制可转换债券的本金金额中方案 C2 的部分、恒大物业强制可交换债券的本金金额中方案 C2 的部分、恒大新能源汽车强制可交换债券的本金金额中方案 C2 的部分、C2 恒大新能源汽车股票挂钩票据的本金金额、C2 恒大物业股票挂钩票据的本金金额以及 C2 票据 A 和 B 的本金金额。<br><br>Subject to the participation of Cs under Option 2, C2 Notes will be allocated in sequential order by maturity date starting from C2 Tranche A.<br>受限于 C 组在方案 2 中的参与情况，C2 票据将按到期日顺序从 C2 票据 A 开始分配。 |
| **Maturity/Principal Repayment**<br>**到期日/本金偿付** | 1.  C2 Tranche A: 7 years from the Reference Date;<br>    C2 票据 A：自参考日期起 7 年；<br><br>2.  C2 Tranche B: 8 years from the Reference Date; and<br>    C2 票据 B：自参考日期起 8 年：及<br><br>3.  C2 Tranche C: 9 years from the Reference Date.<br>    C2 票据 C：自参考日期起 9 年；<br><br>The outstanding principal amount of each tranche shall be repaid on maturity, together with any accrued and unpaid interest. |

4861-9866-1973v.19

| | 每一笔的未偿还本金应在到期日连同任何应计和未付利息一起偿还。 |
|---|---|
| **Interest (PIK and cash)**<br>利息（实物付息和现金） | Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the C2 Notes Tranche A at 6.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind) with respect to each interest payment period.<br><br>利息将在参考日期起计息，并将每半年期末就 C2 票据 A 的未偿还本金支付一次利息，每个付息期的利率每年 6.0%（如果与该付息期有关的所有利息以现金支付）或，或者每年 7.0%（如果与该付息期有关的任何部分利息以实物支付）；<br><br>Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the C2 Notes Tranche B at 6.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind) with respect to each interest payment period.<br><br>利息将在参考日期起计息，并将每半年期末就 C2 票据 B 的未偿还本金支付一次利息，每个付息期的利率为每年 6.5%（如果与该付息期有关的所有利息以现金支付）或，或者每年 7.5%（如果与该付息期有关的任何部分利息以实物支付）；<br><br>Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the C2 Notes Tranche C at 7.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 8.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind) with respect to each interest payment period.<br><br>利息将在参考日期起计息，并将每半年期末就 C2 票据 C 的未偿还本金支付一次利息，每个付息期的利率为 7.0%（如果与该付息期有关的所有利息以现金支付）或，或者每年 8.0%（如果与该付息期有关的任何部分利息以实物支付）；<br><br>Interest on the outstanding principal amount of the C2 Notes shall be paid in the following manner:<br><br>C2 票据未偿还本金的利息应按以下方式支付：<br><br>1.  For the first two and a half years after the Reference Date: interest may be paid in cash or in kind, at the election of the Issuer;<br><br>   对于参考日期后的最初两年半：可由发行人选择用现金或实物支付利息；<br><br>2.  From the 31st month to the 36th month after the Reference Date, interest in an amount equal to at least 0.5% of the outstanding principal amount of each tranche of the C2 Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Issuer; |

4861-9866-1973v.19

|  | 对于参考日期后的第 31 个月至参考日期后的第 36 个月：应以现金支付相当相当于各笔 C2 票据未偿本金的至少 0.5%的利息；其余部分的利息可由发行人选择以现金或实物支付；ow |
|  | 3. For the fourth year after the Reference Date: interest in an amount equal to at least 3.0% p.a. of the outstanding principal amount of each tranche of the C2 Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Issuer; and |
|  | 对于参考日期后的第四年：应以现金支付相当于各笔 C2 票据未偿本金的至少 3.0%的利息；其余部分的利息可由发行人选择以现金或实物支付;及 |
|  | 4. Starting from the fifth year after the Reference Date: interest shall be paid in cash. |
|  | 对于从参考日期后的第五年开始：利息应以现金支付。 |
|  | All interest paid in kind with respect to the C2 Notes will be added to the then current outstanding principal amount of the C2 Notes. |
|  | 所有 C2 票据以实物支付的利息均计入届时 C2 票据的未偿还本金总额。 |
|  | If the Issuer pays cash interest under any tranche of the C2 Notes with respect to any interest payment period in an amount greater than the amount of cash interest required to be paid on such tranche with respect to such interest payment period, it shall also pay additional cash interest under all other tranches of the A2 EVPS SLNs, A2 NEV SLNs, A2 Notes, C2 EVPS SLNs, C2 NEV SLNs and C2 Notes. The amount of such additional cash payments shall be allocated among each of the A2 EVPS SLNs, A2 NEV SLNs, A2 Notes, C2 EVPS SLNs, C2 NEV SLNs and C2 Notes (and among each tranche of such instruments) on a pro rata basis by outstanding principal amount. |
|  | 如果发行人就 C2 票据的任何一笔就任何付息期支付的现金利息大于该笔票据在该付息期所需支付的现金利息，则发行人还应就 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、A2 票据、C2 恒大物业股票挂钩票据、C2 恒大新能源汽车股票挂钩票据及 C2 票据中其他所有票据支付额外的现金利息。该额外现金支付的金额应根据票据未偿还本金金额，按比例在 A2 恒大物业股票挂钩票据、A2 恒大新能源汽车股票挂钩票据、A2 票据、C2 恒大物业股票挂钩票据、C2 恒大新能源汽车股票挂钩票据及 C2 票据之间（并且在该等票据中各笔之间）进行分配。 |
| **Auditor**<br>**审计师** | The Issuer will engage a Whitelist Auditor to audit its annual financial statements starting no later than the audit of the fiscal year ending December 31, 2023.<br><br>发行人将聘请一家白名单审计师对其年度财务报表进行审计，开始时间不晚于截至 2023 年 12 月 31 日止的财务年度审计。 |

| | |
|---|---|
| | The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms: |
| | "白名单审计师"应为以下任何会计师事务所或其各自的关联所或成员所: |
| | (a)  Baker Tilly International; |
| | 　　　天职国际; |
| | (b)  BDO; |
| | 　　　立信; |
| | (c)  Crowe Global; |
| | 　　　国富浩华; |
| | (d)  Deloitte; |
| | 　　　德勤; |
| | (e)  Ernst & Young; |
| | 　　　安永; |
| | (f)  Grant Thornton; |
| | 　　　致同; |
| | (g)  KPMG; |
| | 　　　毕马威; |
| | (h)  Mazars; |
| | 　　　中审众环; |
| | (i)  Moore Global; |
| | 　　　大华国际; |
| | (j)  Prism; and |
| | 　　　上会栢诚; |
| | (k)  RSM International. |
| | 　　　RSM 国际。 |
| **Trustee**<br>信托人 | Madison Pacific or another internationally recognized financial institution as agreed between the Issuer and the CEG AHG.<br>麦迪森太平洋或由发行人和恒大持有人特别团体商定的另一家国际公认的金融机构。 |
| **General**<br>一般 | The Issuer and the CEG AHG will discuss and agree additional covenants and other provisions to be included under the C2 Notes and the related legal documentation, including among others, related to (i) restrictions on indebtedness, restricted payments, liens, affiliate transactions, asset sales, open market and other repurchases and other actions, (ii) events of default, (iii) the rights of holders of, and owners of beneficial interests in, the C2 Notes (a) to obtain periodic financial and other information and documents |

| | |
|---|---|
| | from the trustee, (b) to appoint or replace the trustee, and (c) to direct the trustee and to enforce remedies, and (iv) the listing of the C2 Notes.<br><br>发行人和恒大持有人特别团体将讨论并商定将纳入 C2 票据的额外限制和其他条款以及相关法律文件，包括但不限于有关（i）对负债、受限支付、质押权、关联交易、资产出售，公开市场和其他回购和其他行动的限制，（ii）违约事件，（iii）C2 票据持有人和实益权益持有人的权利，包括：（a）从信托人获取定期财务和其他信息和文件的权利、（b）任命或更换信托人的权利及（c）指示信托人以及执行救济措施的权利，以及（iv）C2 票据的上市。 |
| **Language**<br>语言 | The Chinese provisions contained herein are for reference only. If there is any inconsistency between the English and Chinese provisions, the English provisions shall prevail.<br><br>此处的中文条款仅作参考。如英文和中文条款有任何不一致之处，应以英文条款为准。 |



**Schedule 6**

附表 6

**CEG AHG Members**
恒大持有人特别团体成员

Sch 6 - 1

Sch 6 – 2

**Exhibit B.2**

**Tianji Practice Statement Letter**

<u>**THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION**</u>

**This practice statement letter (the "Practice Statement Letter") contains important information that is of interest to Scheme Creditors (as defined herein), and contains matters which may affect their legal rights and entitlements. Scheme Creditors are recommended to consult their own professional advisers as to legal, tax, financial or other aspects relevant to any action they might take in relation to contents of this Practice Statement Letter. All depositories, custodians and other intermediaries receiving this Letter are requested to expedite re-transmittal to the Scheme Creditors in a timely manner.**

**This Practice Statement Letter does not constitute an offer to sell or the solicitation of an offer to buy any securities. None of the securities referred to in this Practice Statement Letter may be sold, issued or transferred in any jurisdiction to or from any person to whom it is unlawful to make such an offer or invitation or solicitation in such jurisdiction, or in contravention o f applicable law.**

**Nothing contained in this Practice Statement Letter constitutes a recommendation, or the giving of advice, by the Company (as defined herein) or any other member of the Group (as defined herein) or the Information Agent to take a particular course of action or to exercise any right conferred by the Scheme Debts (as defined herein) in relation to, buying, selling, subscribing for, exchanging, redeeming, holding, underwriting, disposing of, or converting Scheme Debts or any other financial instruments, securities, assets or liabilities of the Company or any other member of the Group.**

_____

| | |
|---|---|
| **From:** | Tianji Holding Limited (the "**Company**") |
| **To:** | The Scheme Creditors (defined in paragraph 3.7 below); |
| **To:** | Citicorp International Limited, in its capacity as the trustee in respect of the SJ Notes (defined in paragraph 3 below) (the "**SJ Notes Trustee**"); |
| **To:** | China Construction Bank (Asia) Corporation Limited, in its capacity as the trustee in respect of the Lake Notes (defined below) (the "**Lake Notes Trustee**"); |
| **To:** | The other Existing Trustees and Agents (both defined in paragraph 3.8 below) (the "**Existing Agents**"); and |
| **To:** | Morrow Sodali Limited, in its capacity as information agent in respect of the Scheme (the "**Information Agent**") |

14 July 2023

Dear Sir/Madam

**Proposed scheme of arrangement in relation to the Company pursuant to sections 670, 673 and 674 of the Companies Ordinance (Chapter 622 of the Laws of Hong Kong) (the "Companies Ordinance")**

1.    **PURPOSE OF THIS PRACTICE STATEMENT LETTER**

1.1    The Company is proposing a scheme of arrangement with the Scheme Creditors (each as defined below) in Hong Kong pursuant to sections 670, 673 and 674 of the Companies Ordinance (the "**Scheme**").

1.2    You have received this Practice Statement Letter because we believe you are a Scheme Creditor (as defined below). The purposes of this Practice Statement Letter is to inform Scheme Creditors of:

(a)     the Company's intention to formally propose the Scheme (as defined below) to the Scheme Creditors;

(b)     the objectives which the Scheme is designed to achieve and its effects;

(c)     the Company's intention to apply to the Court of First Instance of the High Court of Hong Kong Special Administrative Region Court (the "**Court**") at a court hearing (the "**Convening Hearing**") to be held on 24 July 2023 at 11:30 am, for an order granting certain directions in relation to the Company's scheme of arrangement, including permission to convene a meeting of Scheme Creditors to consider and, if thought fit, approve the Scheme (the "**Scheme Meeting**");

(d)     certain jurisdictional considerations in relation to the Scheme; and

(e)     the composition of the meetings of Scheme Creditors that the Company proposes to convene for the purposes of voting on the Scheme.

## 2     WHAT IS A SCHEME OF ARRANGEMENT?

2.1     A scheme of arrangement is an arrangement entered into between a company and its creditors, as provided for under sections 670, 673 and 674 of the Companies Ordinance. A scheme of arrangement becomes legally binding on all holders of a class of claims subject to the scheme, including both those voting against the scheme of arrangement and those not voting, if at least a majority in number of the relevant creditors, holding at least seventy-five per cent (75%) in value of claims, present and voting (either in person or by proxy) at the scheme meeting, vote in favour of the scheme of arrangement, the Court then sanctions it and the scheme is delivered to the applicable registrar of companies with a copy of the Court order sanctioning the scheme.

2.2     A scheme of arrangement may be sanctioned by the Court if it is satisfied, among other things, that: (i) the relevant provisions of sections 670, 673 and 674 of the Companies Ordinance have been complied with; and (ii) the terms of the scheme of arrangement are such that an intelligent and honest creditor, a member of the class concerned and acting in respect of its own interest, might reasonably vote in favour of it.

## 3     INTRODUCTION TO THE PROPOSED SCHEME CREDITORS

*The Scheme Debts*

3.1     The Company has incurred indebtedness which includes the "**SJ Notes**" and the "**Other Debts**", to which the Scheme relates.

3.2     The SJ Notes are senior notes issued by Scenery Journey Limited ("**SJ**") and which have been guaranteed by the Company which comprise of:

(a)     Senior notes issued by SJ which are publicly-traded on a recognised exchange (the "**SJ Notes**"):

(i)      **SJ Existing November 2022 Notes**- being the 13.0% senior notes in the aggregate principal amount of US$645,000,000 due November 6, 2022 (ISIN: XS1903671854, Common Code: 190367185);

2

    (ii)    **SJ Existing November 2023 Notes**- being the 13.75% senior notes in the aggregate principal amount of US$590,000,000 due November 6, 2023 (ISIN: XS1903671938, Common Code: 190367193);

    (iii)    **SJ Existing October 2022 Notes**- being the 11.5% senior notes in the aggregate principal amount of US$2,000,000,000 due October 24, 2022 (ISIN: XS2109191986, Common Code: 210919198); and

    (iv)    **SJ Existing October 2023 Notes**- being the 12.0% senior notes in the aggregate principal amount of US$2,000,000,000 due October 24, 2023 (ISIN: XS2109192109, Common Code: 210919210).

3.3    Interest payments are payable by the Company in relation to the SJ Notes pursuant to the terms of the underlying indentures (the "**SJ Notes Indentures**") relating to the SJ Notes.

3.4    The SJ Notes Indentures are all governed by New York law, and the payment obligations under each series of SJ Notes are guaranteed by the Company and 103 of China Evergrande Group's subsidiaries incorporated under the laws of the BVI or Hong Kong (the "**SJ Notes Subsidiary Guarantors**").

3.5    The aggregate outstanding principal amount of the SJ Notes is approximately US$5.2 billion as at 31 December 2022.

3.6    The Other Debts are obligations owed by or guaranteed by the Company under the following instruments:

    (a)    Guarantee in relation to US$260 million 8.5% senior notes due 3 October 2021 (ISIN: XS2054446617 Common Code: 205444661) issued by Jumbo Fortune Enterprises Limited ("**Lake Notes**");

    (b)    HK$575 million put option granted by the Company in relation to shares in Clear Star Investments Limited;

    (c)    US$258 million put option granted by the Company in relation to shares in Sky Joy Holdings Limited;

    (d)    US$258 million put option granted by the Company in relation to a private loan borrowed by Sky Joy Holdings Limited (the "**Castle Loan Put Option**");

    (e)    HK$7.6 billion loan borrowed by the Company pursuant to a facilities agreement dated 21 November 2020 (the "**Hero Loan**");

    (f)    Approximately HK$1.4 billion put options granted by the Company in relation to a project located in Tuen Mun, Hong Kong; and

    (g)    Intercompany balance owed by the Company to China Evergrande Group ("**CEG**") which on 31 December 2022 was in an amount equal to US$5.03 billion (on a non-voting basis)[1],

    (together the "**Other Debts**" and the SJ Notes and Other Debts together being the "**Scheme Debts**").

---

[1] For the avoidance of doubt, CEG is entitled to receive the scheme consideration in respect of its intercompany claim against the Company under the Scheme as an Other Debt Scheme Creditor.

3

3.7    The aggregate outstanding principal amount of the Other Debts is approximately US$6.9 billion as at 31 December 2022.

*Scheme Creditors*

3.8    The Company is proposing a scheme of arrangement with holders of the Scheme Debts, being the "Scheme" described at paragraph 1.1 above.

3.9    "**Scheme Creditors**" for the purposes of the Scheme are:

    (a)    a person holding an economic or beneficial interest as principal in the SJ Notes held in global form or global restricted form through Euroclear Bank SA/NV and/or Clearstream Banking S.A., or any applicable successor thereto (the "**Clearing Systems**") as at (1) the Voting Record Time (as defined below) (in respect of voting purposes at the Scheme Meeting) and/or (2) the Entitlement Record Time (as defined below) (in respect of receiving Scheme Consideration (as defined below) on the distribution date(s), as applicable, under the terms of the Scheme) (the "**SJ Notes Scheme Creditors**"); and

    (b)    (i) a person holding an economic or beneficial interest as principal in the Lake Notes (the "**Lake Noteholders**"); and (ii) any person holding a legal interest as principal in any of the Other Debts, as at as at (1) the Voting Record Time (for voting purposes at the Scheme Meetings) and/or (2) the Entitlement Record Time (in respect of receiving Scheme Consideration on the distribution date(s), as applicable, under the terms of the Scheme) (the "**Other Debt Scheme Creditors**").

3.10    The SJ Notes Trustee, Citibank Europe plc as common depositary for the Clearing Systems, acting through its nominee as registered holder of the SJ Notes ("**SJ Notes Depositary**"), the Lake Notes Trustee, and the facility and security agents in respect of the Other Debts (together the "**Existing Trustees and Agents**") are Scheme Creditors for the purpose of being bound to the Scheme. However they will not be entitled to vote at the Scheme Meeting (to avoid double counting) or to receive Scheme Consideration (as defined below).

3.11    You have been identified as a person who may be a Scheme Creditor as set out in paragraph 3.9 above. If you are a Scheme Creditor, your legal rights and entitlements will be affected by the proposed Scheme (if approved by the requisite statutory majorities of the Scheme Creditors at the Scheme Meeting and then sanctioned by the Court).

3.12    If the Court grants leave to convene the Scheme Meeting at the Convening Hearing, an explanatory statement will be made available to all Scheme Creditors in advance of the Scheme Meeting which will contain all information reasonably necessary for Scheme Creditors to make an informed decision about the merits of the proposed Scheme (the "**Explanatory Statement**").

3.13    A time and date (the "**Voting Record Time**") will be fixed for the purpose of identifying Scheme Creditors entitled to attend and vote at the Scheme Meeting. Details of the Voting Record Time will be set out in the Explanatory Statement.

3.14    If you have assigned, sold or otherwise transferred your interests in any Scheme Debts or intend to do so, you should forward a copy of this Practice Statement Letter immediately to the person or persons to whom you have assigned, sold or otherwise transferred such interests or to the proposed assignee and/or transferee. If you remain a holder of any Other Debts or if you remain a beneficial holder as principal of the SJ Notes or Lake Notes, and will be such as at the Voting Record Time, you will be the

4

person entitled to vote at the relevant Scheme Meeting and should read this Practice Statement Letter and the Explanatory Statement (when available).

## 4    BACKGROUND TO THE COMPANY AND THE GROUP

*CEG*

4.1    CEG was incorporated in the Cayman Islands under the Cayman Companies Act on 26 June 2006 as an exempted company with limited liability (registration number 169971).  CEG's shares have been listed on the Main Board of the Stock Exchange of Hong Kong Limited ("**SEHK**") since 5 November 2009 with the stock code 3333.

4.2    CEG is the ultimate holding company of a group of companies comprising CEG and its subsidiaries, including the Company, SJ and the SJ Notes Subsidiary Guarantors (as defined above) (the "**Group**"). The Group (formerly known as Evergrande Real Estate Group) was founded in 1996 and it is now headquartered in Guangzhou City, Guangdong Province, the People's Republic of China (the "**PRC**"). The Group was originally a property development company and remains principally engaged in the development, investment and management of property in the PRC. The Group's business operations are primarily based in the PRC, where the majority of the Group's assets, being property development projects, are located.  In recent years, the Group has diversified into various other sectors, including new energy vehicle development and production, and the cultural tourism industry. The Group had also spun-off its property management services business into a listed company in Hong Kong.

*The Company*

4.3    The Company is a majority-owned indirect subsidiary of CEG. It was incorporated in Hong Kong under the Companies Ordinance as a limited liability company (registration number 1339269). As at the date of this Practice Statement Letter, the authorised share capital of the Company is HK$10,000.00 divided into 10,000 shares of HK$1.00 each.

4.4    The Company is the borrower, put option provider and/or guarantor of the Other Debts (see paragraph 3.6 above).

4.1    The Company is also a guarantor of the SJ Notes issued by SJ, a wholly-owned subsidiary of the Company. Pursuant to such guarantee, the Company and the SJ Notes Subsidiary Guarantors have jointly and severally guaranteed to each SJ Notes Scheme Creditor all of the obligations of SJ to pay the principal, premium (if any), and interest under each of the SJ Notes (see paragraphs 3.2 – 3.4 above).

## 5    BACKGROUND TO THE RESTRUCTURING

*Financial Position of the Company and the Group*

5.1    In recent years, the Group has been growing its real estate development business while at the same time seeking to diversify its business. To fund the Group's expanding business operations, the Group's interest-bearing borrowings increased to approximately RMB799.9 billion (US$119.21 billion) as of 31 December 2019 compared to RMB535.1 billion (US$79.74 billion) as of 31 December 2016.

5.2    For property development companies such as the Group, raising capital through financial instruments is a key source of cash flow to support continuing operations. CEG's last issuance of offshore notes occurred in January 2020. CEG has not been able to issue any new notes offshore since 2021. Financial

5

institutions also reduced the number of loans granted to CEG's onshore subsidiaries. However, the Group made more than US$9.98 billion in principal repayments and US$4.09 billion in interest payments from March 2020 to June 2021 in relation to the SJ Notes, which consequently tightened CEG's cash flow.

5.3    In response to the market slow-down, the Group launched online sales of its houses, offering significant discounts and advertising heavily.  The Group prioritised maintaining revenue and cash flow ahead of making profits to ensure the continuation of its operations. In 2020, the Group's average per square meter selling price for property fell significantly, from RMB10,281/sqm (US$1,532.21) in 2019, to RMB8,945/sqm (US$1,333.1) in 2020. In the first half of 2021, the Group's contracted sales decreased and the contracted sales area fell (with a lower average selling price per square meter).

5.4    In the second half of 2021, the Group's liquidity situation declined significantly, and the Group suffered a serious operational crisis, as explained in CEG's SEHK announcement dated 14 September 2021. Adverse reaction to unfavourable market conditions by offshore capital markets has limited the Group's funding sources to address upcoming maturities.  As a result, not only did CEG's financing become restricted, its debts also gradually became overdue. In addition, the impact from the slowdown in sales resulted in a decline in creditworthiness, which further restricted the Group's financing. These strains on CEG's operations have continued through 2022 and into 2023.

5.5    Owing to these factors, CEG and the Company have been unable to meet their ongoing debt maturities despite the best efforts of the Group. This includes being unable to meet its guarantor obligations in respect of the SJ Notes listed in sub paragraphs 3.2(a)(i) to (iv) above (and accrued but unpaid interest thereon) by their respective maturity dates. These amounts remain unpaid as of the date of this Practice Statement Letter. The Company is therefore insolvent.

*Appointment of financial advisor and discussions with the Ad Hoc Group*

5.6    Since 2021, Houlihan Lokey (China) Ltd ("**Houlihan Lokey**") has been acting as the financial advisor to evaluate the Group's capital structure, liquidity position, to explore options for a restructuring of the Group's liabilities, and to assist CEG and the Group in its debt restructuring negotiations with the Scheme Creditors. China International Capital Corporation Hong Kong Securities Limited ("**CICC**") and BOCI Asia Limited ("**BOCI**") have also been acting as advisers to the Scheme (together with Houlihan Lokey, (the "**Advisers**")).

5.7    CEG and the Company together with the Advisers and their legal advisers, have been involved in extensive negotiations and discussions with a group of holders of SJ Notes (the "**Ad Hoc Group**") holding approximately US$1.9 billion of the principal amount of the SJ Notes, representing approximately 36.5% of the aggregate outstanding principal amount of the SJ Notes as at the date of this Practice Statement Letter and their financial and legal advisers regarding the restructuring of the SJ Notes and the Other Debts (the "**Restructuring**"). As a result of such negotiations, the RSA was entered into on 3 April 2023 between the Company and certain Scheme Creditors setting out the terms of the Restructuring. As a result of such negotiations, the Company and the Ad Hoc Group agreed to the terms of the proposed Restructuring (the "**Term Sheet**") on 20 March 2023 following which a restructuring support agreement was entered into on 3 April 2023 between the Company and the members of the Ad Hoc Group setting out the terms of the proposed Restructuring (the "**RSA**"). A copy of the Term Sheet is appended to this Practice Statement Letter as "Appendix 1".

5.8    In order to facilitate a full and open communication with all Scheme Creditors and to address the Group's liquidity issue in an efficient and fair way, on 22 March 2023], CEG announced on the website of the SEHK a proposed restructuring plan in connection with the SJ Notes and the Other Debts. The announcement enclosed the Term Sheet and was followed by a further announcement on 3 April 2023

6

whereby CEG provided instructions to Scheme Creditors to visit the Transaction Website (defined below) in order to access the RSA.

5.9    In the announcement published by CEG on 3 April 2023 (the "**RSA Announcement**"), each Scheme Creditor was invited to agree and support the proposed Restructuring (i.e. the Scheme) by acceding to the RSA by 5.00p.m. Hong Kong time on 27 April 2023 (the "**RSA Consent Fee Deadline**"). The RSA Consent Fee Deadline could be extended in accordance with the terms of the RSA, and on 27 April 2023, CEG announced on the website of the SEHK an extension of the RSA Consent Fee Deadline for the RSA to 5.00 p.m. Hong Kong time on 18 May 2023 in order to allow Scheme Creditors additional time to complete their internal processes of acceding to the RSA in order to become eligible to receive the Consent Fee.

5.10    As at the date of this Practice Statement Letter Scheme Creditors holding approximately over 71% of the aggregate outstanding principal amount of the SJ Notes and Other Debts have entered into or acceded to the RSA.

5.11    The Scheme Creditors who have acceded to the RSA have agreed, *inter alia*, that they will:

(a)    use all commercially reasonable endeavours in order to support, facilitate, implement or otherwise give effect to the Restructuring as soon as reasonably practicable, including voting in favour of the Scheme at the Scheme Meeting;

(b)    not take any step that may interfere with or delay the Scheme including making any application to the Court to object to or challenge the Scheme or commencing any Enforcement Action (as defined in the RSA);

(c)    provide commercially reasonable support and assistance to the Company to prevent the occurrence of an Insolvency Proceeding (as defined in the RSA); and

(d)    not formulate, encourage, procure or otherwise support any alternative proposal or alternate offer for the implementation of the Restructuring other than those contemplated by the Term Sheet.

_RSA Consent Fees_

5.12    It is a term of the RSA that each Scheme Creditor who:

(a)    entered into the RSA as an initial participating creditor or acceded to it as an additional participating creditor by executing and delivering the requisite documents specified in the RSA to the Information Agent in respect of all of its SJ Notes or Other Debts before 5:00pm (Hong Kong time) on the RSA Consent Fee Deadline (thereby making them "**Eligible Restricted Debts**");

(b)    votes in favour of the Scheme at the Scheme Meeting; and

(c)    has not exercised its rights to terminate the RSA and has not breached any provision of it (including terms relating to the restriction on transfer of the Eligible Restricted Debts) in any material respect,

shall be an "**Eligible Participating Creditor**" entitled to receive a consent fee amount equal to 0.25% of the outstanding principal amount of the Eligible Restricted Debts held by such participating creditor

as of the Voting Record Time (the "**Consent Fee**"). The Consent Fee will be paid as follows in kind by way of new notes to be issued by the Company in connection with the restructuring:

(a)     to the SJ Notes Scheme Creditors on the Restructuring Effective Date; and

(b)     to the Other Debt Scheme Creditors on the final distribution date, which is expected to be 30 days after the completion of the claims Valuation and Adjudication Procedure (as defined in the Scheme) for Other Debt Scheme Creditors described in paragraph 11 of this Practice Statement Letter (the "**Final Distribution Date**").

5.13    The Consent Fee is considered by the Company to be appropriate in order to secure early support for the Restructuring from the Scheme Creditors and to provide the Group with stability and visibility over the implementation of the Restructuring. The RSA Announcement gave all Scheme Creditors (who were at that time set out in the RSA) notice of the opportunity to enter into the RSA and to become entitled to receive the Consent Fee (provided they satisfy the aforementioned conditions). The RSA Announcement was also made available on the Transaction Website to all Scheme Creditors and distributed via the Clearing Systems to the SJ Notes Scheme Creditors.

5.14    The only other way in which a person may acquire an entitlement to the Consent Fee is if there has been a valid Transfer (as defined in the RSA) (or, if applicable, a chain of valid Transfers) of an Eligible Restricted Debt in accordance with the terms of the RSA, including that the relevant transferee is either a Participating Creditor or has first agreed to be bound by the terms of the RSA as a Participating Creditor by acceding to the RSA in accordance with its terms.

*Jurisdiction of the Court*

5.15    The Company considers that the Court has jurisdiction in relation to the Scheme and jurisdiction to convene the Scheme Meeting in respect of the Company, on the basis that the Company is incorporated and registered company in Hong Kong.

6      **PURPOSE OF THE SCHEME AND THE RESTRUCTURING**

6.1     The purpose of the Scheme and the Restructuring is to:

(a)     avoid the Company and other members of the Group entering into insolvent liquidation in the near future, as a result of which the anticipated recoveries for Scheme Creditors would likely be significantly less than if the Restructuring were to be completed successfully;

(b)     provide the Group with a more stable capital structure, which will enable the Group to comply with its obligations and liabilities following the Restructuring, to continue to trade on a going concern basis and to recover as the PRC property market stabilises; and

(c)     increase the prospect of delivering long-term value for all of the Scheme Creditors and all of the other stakeholders of the Company.

7      **OVERVIEW OF THE SCHEME AND THE RESTRUCTURING**

7.1     The Restructuring in respect of the Company shall be implemented through the Scheme. The Scheme will affect the rights of the Scheme Creditors under the SJ Notes and the Other Debts (as applicable).

8

7.2    The Scheme is part of a wider restructuring to comprehensively restructure the offshore indebtedness of the Group. In addition to the Scheme, the Group is intending to implement the restructuring by:

(a)    a scheme of arrangement in the BVI to be proposed by SJ (the "**SJ Scheme**"). The Scheme and the SJ Scheme are inter-conditional as between themselves which means that the effectiveness of the Scheme shall depend on effectiveness of the SJ Scheme, and vice versa; and

(b)    linked and inter-conditional schemes of arrangement to be proposed by CEG, the ultimate holding company of the Group, in the Cayman Islands and Hong Kong (the "**CEG Schemes**"). The CEG Schemes are not inter-conditional with either the Scheme or the SJ Scheme.

*Scheme Consideration*

7.3    Under the terms of the Scheme, each Scheme Creditor will receive a pro rata portion of the Scheme Consideration, pro-rated across each of the four traches of the new notes to be issued by the Company in an aggregate principal amount equal to US$800 million (the "**New Instruments**") based on its Entitlement (as defined below) (the "**Scheme Consideration**").

7.4    The terms of the New Instruments will be set out in the New Instruments Documents (as defined in the Explanatory Statement). A summary of the terms of each of the New Instruments Documents is set out in the Explanatory Statement. Scheme Creditors are urged to refer to the form of the New Instruments Documents as made available on the Transaction Website.

*Scheme Creditors' Entitlement to Scheme Consideration*

7.5    For the purpose of <u>distribution</u> of the Scheme Consideration (as defined below), the principles for determining the value of each Scheme Creditor's "**Entitlement**" are in summary as follows:

7.6    With respect to a SJ Notes Scheme Creditor, the Entitlement shall be determined on a "**Deficiency Basis**", which in broad terms means that a deduction is made for the recoveries such Scheme Creditor received for the compromise of its claims against SJ under the SJ Scheme.

7.7    The Deficiency Basis will be calculated as follows:

(a)    the sum of the full accrued claims for the particular SJ Notes Scheme Creditor being the (i) outstanding principal amount of the SJ Notes held by such SJ Notes Scheme Creditors at the Entitlement Record Time (as defined below) and (ii) the accrued and unpaid interest on such SJ Notes up to (but excluding) the earlier of (x) 1 October 2023 and (y) the Restructuring Effective Date;

(b)    *minus* (-) the net present value (the "**NPV**") of the SJ New Notes received by such SJ Notes Scheme Creditor under the SJ Scheme (the "**NPV Amount**") as determined by the Scheme Administrators (as defined in the Scheme). The Scheme Administrators will (i) calculate the amount of SJ New Notes received by such SJ Notes Scheme Creditor based on the information provided to the Scheme Administrator, and (ii) determine the NPV on the Scheme Effective Date (as defined in the Scheme) based on the guiding principles set out in the Scheme.

7.8    On the Restructuring Effective Date, the determination of each Scheme Creditor's Entitlement for the purposes of distribution of the Scheme Consideration will occur at the "**Entitlement Record Time**". For the avoidance of doubt, this shall not prevent the Valuation and Adjudication Procedure from taking

9

place after the Restructuring Effective Date and/or taking into account prevailing circumstances at such time.

7.9    The determination of the SJ Notes Scheme Creditors' Entitlement in respect of the SJ Notes (including the NPV Amount) will take place after the sanction of the Scheme, prior to the Restructuring Effective Date, and be determined by the Scheme Administrators, pursuant to the terms of the Scheme. This will be on the basis that all Claims of the SJ Notes Scheme Creditors in respect of the SJ Notes shall be compromised and consideration provided through a combination of the Scheme and the SJ Scheme (without double counting).

7.10   With respect to Other Debt Scheme Creditor's, the Entitlement shall be determined on a "**Deficiency Basis**". In summary, the value of Other Debt Scheme Creditor's claims against any person other than the Company (the "**Third Party**") will be assessed by way of a claims Valuation and Adjudication Procedure and deducted from the full outstanding amount of the Other Debt. This reflects that the Scheme will release the Other Debt Scheme Creditor's claims against the Company, but will not release any Other Debt Scheme Creditor's claims against third parties.

7.11   The Deficiency Basis will be calculated as follows:

(a)    The sum of:

(A)    the outstanding principal amount of Other Debts held by the Other Debt Scheme Creditor at the Entitlement Record Time;

(B)    *plus* (+) all accrued but unpaid interest on such Other Debts up to (but excluding) the earlier of (x) the Restructuring Effective Date or (y) 1 October 2023;

(b)    *minus* (-) the Assessed Value (as defined below) of any liability of a Third Party who has an obligation in respect of the Other Debts which will not be subject to the Scheme (the "**Excluded Liabilities**") and any security or other form of assurance granted by a Third Party in respect of the Other Debts (the "**Excluded Collateral**") (as further described in the Scheme), as determined in accordance with the valuation and adjudication procedure described below; and

(c)    *minus* (-) in respect of a put option and/or repurchase obligation, the Assessed Value of any securities retained by the put option holder and/or the creditor of the repurchase obligation to which the put option and/or the repurchase obligation relates, as determined in accordance with the Valuation and Adjudication Procedure.

7.12   The determination of the value recoverable by an Other Debt Scheme Creditors in respect of the relevant Excluded Liabilities, Excluded Collateral, put option and/or repurchase obligation under the Other Debts (the "**Assessed Value**") will take place after the sanction of the Scheme by way of a Valuation and Adjudication Procedure described below.

7.13   Subject to paragraphs 7.17 to 7.21 the Scheme Consideration will be paid (i) on the Restructuring Effective Date to SJ Notes Scheme Creditors (who are not Blocked Scheme Creditors or Sanctioned Scheme Creditors) who have validly completed and submitted the required Scheme Creditor Forms (as defined below) as will be set out in the Solicitation Packet (as defined below) by the required deadline (currently anticipated to be fourteen (14) calendar days after the date on which the Scheme become effective in accordance with its terms) (the "**SJ RED Distribution Deadline**"); and (ii) on the Final Distribution Date to those Scheme Creditors (who are not Blocked Scheme Creditors or Sanctioned Scheme Creditors) who have validly completed and submitted the correct Scheme Creditor Forms by the Bar Date (i.e. 140 days after the Restructuring Effective Date), as further detailed below.

10

*Voting*

7.14    For the avoidance of doubt, Scheme Creditors will have their claims admitted at full value for the purposes of voting on the Scheme at the Scheme Meeting (without double counting, and without permitting duplicative claims or portions of claims against the Company other than for US$1, and in any event subject to the discretion of the Chairperson). This means that a Scheme Creditor's claim will in principle be admitted for voting purposes at a value of (a) the outstanding principal amount of the Scheme Debt in which each Scheme Creditor held an economic or beneficial interest and/or legal interest (as applicable) as principal at the Voting Record Time; plus (b) all accrued and unpaid interest relating to such Scheme Debt up to (but excluding) the Voting Record Time.

7.15    Scheme Creditors (other than Blocked Scheme Creditors) will be required to submit (among other things) the relevant Scheme Creditor Forms to the Information Agent by the Voting Record Time in order to vote, or appoint a proxy to vote on its behalf, at the Scheme Meetings.

7.16    Details of the steps that each Scheme Creditor will need to take in order to vote at the Scheme Meeting, or appoint a proxy to vote on its behalf, will be set out in full in the Explanatory Statement and the accompanying solicitation packet (the "**Solicitation Packet**") to be made available to Scheme Creditors should the respective Courts grant orders convening the Scheme Meetings.

*Blocked Scheme Creditors*

7.17    There are also specific arrangements relating to voting and the distribution of Scheme Consideration to any "Blocked Scheme Creditors", being any Scheme Creditor (other than any Sanctioned Scheme Creditor, as described below) that is not entitled, able or permitted (whether directly or through a custodian) to submit instructions or settle through the Clearing Systems as a result of certain laws, regulations and/or orders relating to economic, financial or trade sanctions ("**Applicable Sanctions**")[2] affecting the Scheme Creditor or its custodian, as determined by the Clearing Systems.

7.18    Blocked Scheme Creditors will not be entitled, able or permitted to (i) submit voting instructions through the Clearing Systems or to the Information Agent on the Scheme or (ii) receive the Scheme Consideration on the Restructuring Effective Date (or such later date as is permitted under the Scheme) due to the Applicable Sanctions.

7.19    To vote, any Blocked Scheme Creditors will need to submit a validly completed "Blocked Scheme Creditor Form", which will be included in the Solicitation Packet, by the Voting Record Time to GLAS Specialist Services Limited ("**GLAS**"), who the Company has appointed to liaise with the Blocked Scheme Creditors. The Information Agent will not accept forms from the Blocked Scheme Creditors.

7.20    The Scheme Consideration to which Blocked Scheme Creditors that are SJ Notes Scheme Creditors would otherwise be entitled on the Restructuring Effective Date, will first be held on trust (the "**Holding Period Trust**") pursuant to a Holding Period Trust Deed until the business day after the Final Distribution Date (the "**Holding Period Expiry Date**"). If the Applicable Sanctions are not lifted or otherwise not applicable in respect of Blocked Scheme Creditors by the Holding Period Expiry Date, the Scheme Consideration and any Consent Fee payable to Blocked Scheme Creditors (whether an SJ Notes Scheme Creditor or Other Debt Scheme Creditor) who have submitted their Blocked Scheme Creditor Form and supporting evidence by the Bar Date (including interest accrued on such Scheme Consideration and any Consent Fee) (the "**Blocked Entitlements**") will be distributed to an escrow agent (the "**Successor Escrow**

---

[2] Including laws, regulations and/or orders relating to economic, financial or trade sanctions, restrictive measures or embargoes administered, maintained and/or enforced by the European Union, United States of America, the United Kingdom and the British Overseas Territories (including the Cayman Islands).

11

**Agent**") to hold on escrow until the earlier of (i) 21 years from the Holding Period Expiry Date, and (ii) the lifting of all applicable sanctions that restrict the Blocked Scheme Creditor from receiving its entitlement, with the Blocked Scheme Creditors thereafter given a reasonable period to recover from the Escrow Account the Blocked Entitlements to which they are entitled.

7.21    As at the date of this Practice Statement Letter, the Company is not aware of any Blocked Scheme Creditors, but it is possible that there are Blocked Scheme Creditors given the difficulty of determining whether any Scheme Creditors under the SJ Notes and/or the Lake Notes are Blocked Scheme Creditors until they try to submit their voting instructions through the Clearing Systems.

*Sanctioned Scheme Creditors*

7.22    Any Scheme Creditors who are the target of "full asset freeze", "full blocking" or similar Applicable Sanctions will be a Sanctioned Scheme Creditor. Sanctioned Scheme Creditors will not be entitled to vote on the Scheme.

7.23    As of the date of this Practice Statement Letter, the Company is not aware of any Sanctioned Scheme Creditors, but it is possible that there are Sanctioned Scheme Creditors given the difficulty of determining whether any Scheme Creditors under the SJ Notes and/or the Lake Notes are Sanctioned Scheme Creditors or Blocked Scheme Creditors until they try to submit their voting instructions through the Clearing Systems.

<u>*Releases*</u>

7.24    With effect from the Restructuring Effective Date, each Scheme Creditor, in consideration for its Entitlement to the Scheme Consideration, shall release:

    (a)    all claims it has against, among others, the Company under the Scheme Debts and the Information Agent, but excluding any Scheme Creditor's claims against any other Third Parties (including any claims directly against SJ the SJ Notes Subsidiary Guarantor in relation to the SJ Notes); and

    (b)    all claims (except for fraud, wilful default and wilful misconduct) against, among others the Company, its directors, officers and employees, the Information Agent , and certain advisers (including the Ad Hoc Group's Advisors) in respect of: (i) the preparation and negotiation of the Scheme and the Restructuring; and (ii) the implementation of the Scheme and the Restructuring.

<u>*Initial Distribution of Scheme Consideration to SJ Notes Scheme Creditors*</u>

7.25    On the Restructuring Effective Date:

    (a)    the Company shall make the Initial Distribution to SJ Notes Scheme Creditors (who are not Blocked Scheme Creditors or Sanctioned Scheme Creditors) where such creditors have submitted the required Scheme Creditor Forms by the SJ RED Distribution Deadline (as defined in the Scheme); and

    (b)    the Company shall pay the Residual New Instruments and Blocked Consent Fee (as defined in the Scheme, and if applicable) to which Scheme Creditors are entitled to the Holding Period Trustee, to be held on trust under the terms of the Holding Period Trust Deed.

12

*Final Distribution of the Scheme Consideration*

7.26    On the Final Distribution Date, the Holding Period Trustee, on behalf of the Company, shall:

    (a)    make the Final Distribution, to Scheme Creditors who are not Blocked Scheme Creditors, where such creditors have submitted the required Scheme Creditor Forms by the Bar Date; and

    (b)    in relation to Blocked Scheme Creditors who have submitted the required Scheme Creditor Forms by the Bar Date:

        (i)    shall make the Final Distribution to the Blocked Scheme Creditors where the Applicable Sanctions no longer prevent the payment of Scheme Consideration to such creditors; or

        (ii)    where the Applicable Sanctions continue to prevent the payment of Scheme Consideration to Blocked Scheme Creditors, shall make the Final Distribution to which Blocked Scheme Creditors are entitled to the Successor Trustee, to be held on trust under the terms of the Successor Trust Deed.

7.27    The Other Debt Scheme Creditors (who are neither Blocked Scheme Creditors nor Sanctioned Scheme Creditors) are encouraged to submit all relevant Scheme Creditor Forms to the Information Agent as soon as possible and ahead of the Voting Record Time in order to vote at the Scheme Meeting, and in any case, must submit the required Scheme Creditor Forms by the Bar Date (currently expected to be 135 days after the Restructuring Effective Date) to the satisfaction of the Information Agent in order to receive the Scheme Consideration on the Final Distribution Date.

7.28    Blocked Scheme Creditors are encouraged to submit their Blocked Scheme Creditor Form to GLAS as soon as possible and ahead of the Voting Record Time in order to vote at the Scheme Meeting, and in any case, must submit the required Scheme Creditor Forms by the Bar Date to be entitled to Scheme Consideration.

## 8    CONSTITUTION OF CLASSES

8.1    It is the responsibility of the Company to determine whether more than one meeting of creditors is required and, if so, to ensure that the meeting(s) is/are properly constituted. Each class of creditors must be properly constituted so that any meeting of that class comprises creditors whose rights against the Company are not so dissimilar as to make it impossible for them to consult together with a view to their common interest. If the rights of Scheme Creditors in a class are so different or would be affected so differently by the Scheme as to make it impossible for them to consult together with a view to their common interest, they must be divided into separate classes and a separate scheme meeting must be held for each class of creditor.

8.2    For the purposes of assessing class, the Court considers the similarities and differences in (i) the existing rights of Scheme Creditors against the Company which are to be released or varied under the Scheme; and (ii) the new rights which the Scheme gives to Scheme Creditors by way of compromise or arrangement. When assessing the existing rights of Scheme Creditors, the Court considers the rights they would have in the applicable alternative scenario in the event that the Scheme is not sanctioned.

8.3    The Company has considered the existing rights of each of the Scheme Creditors against the Company and the way in which those rights would be affected by the Scheme. The existing rights of Scheme

13

Creditors have been assessed on the basis that the alternative to the Scheme being sanctioned is a liquidation of the Group (as further explained in paragraph 13 below).

8.4    The Company has concluded that the Scheme Creditors fall into a single class for the purposes of voting on the Scheme for the reasons explained below.

### Different third party rights

8.5    The Scheme Creditors hold different rights against third parties (i.e. other group companies) in respect of their SJ Notes and/or Other Debts (as applicable), being the Excluded Liabilities. While the Scheme will not release the Excluded Liabilities or Excluded Collateral, the Scheme Claims (as defined in the Scheme) of the Scheme Creditors are being admitted on a Deficiency Basis, such that no Scheme Consideration shall be payable in respect of the Excluded Liabilities and each Scheme Creditor shall be entitled to receive the same Scheme Consideration as each other Scheme Creditor in respect of its Scheme Claim. All Scheme Claims against the Company are unsecured claims, and would rank *pari passu* as between themselves on an insolvency of the Company. Accordingly, the Company considers, through admitting the Scheme Debts on a Deficiency Basis, that the rights of the Scheme Creditors are not so dissimilar as to make it impossible for them to consult together with a view to their common interest.

### Timing of distributions

8.6    The timing of the distribution of Scheme Consideration to SJ Notes Scheme Creditors is different to the timing adopted for Other Debt Scheme Creditors. In particular, SJ Notes Scheme Creditors (who are not Blocked Scheme Creditors or Sanctioned Scheme Creditors) may receive an Initial Distribution of Scheme Consideration on the Restructuring Effective Date (subject to submitting scheme documentation by the SJ RED Distribution Deadline (as defined in the Scheme)), while Other Debt Scheme Creditors may only receive Scheme Consideration on the Final Distribution Date. This is on the basis that Other Debt Scheme Creditors must be subject to the Valuation and Adjudication Process in order to determine their Entitlement to Scheme Consideration while, in relation to SJ Notes Scheme Creditors, the Claims of SJ Notes Scheme Creditors in respect of the SJ Notes shall be released in full by the SJ Scheme and the Scheme, such that such Claims do not need to be subject to the Valuation and Adjudication Procedure. The Company does not consider the difference in timing to distribute Scheme Consideration to be material, such that there remain more substantial factors to unite than to divide the single class of Scheme Creditors.

### Blocked Scheme Creditors

8.7    The Company has considered whether Blocked Scheme Creditors ought to be placed into a separate class for voting purposes. The Company has concluded that they should not be for the following reasons:

(a)    Blocked Scheme Creditors have the same entitlements to the Scheme Consideration as Scheme Creditors who are not Blocked Scheme Creditors.

(b)    Blocked Scheme Creditors are restricted from receiving their portion of the Scheme Consideration until any Applicable Sanctions affecting them have been lifted.

(c)    The Company considers that those restrictions are due to Blocked Scheme Creditors' own personal circumstances in the current regulatory environment and is not the result of their treatment under the Scheme or their rights against the Company. Under the terms of the Scheme Blocked Scheme Creditors have the same ultimate entitlement to receive Scheme Consideration as other Scheme Creditors.

14

(d)    Accordingly, the Company does not consider that there is any difference, or any material difference, in the rights of Blocked Scheme Creditors as compared with Scheme Creditors who are not Blocked Scheme Creditors.

*Consent Fee*

8.8    The Company shall pay the Consent Fee to:

(a)    those Scheme Creditors that are Eligible Participating Creditors (who are not Blocked Scheme Creditors), who hold Eligible Restricted Debts in accordance with the terms of the RSA on the Restructuring Effective Date or the Final Distribution Date (as applicable and pursuant to the terms of the Scheme); and

(b)    in respect of Blocked Scheme Creditors that are Eligible Participating Creditors and who hold Eligible Restricted Debts in accordance with the terms of the RSA, the Holding Period Trustee, to be held on trust under the terms of the Holding Period Trust Deed.

8.9    The Company has considered whether the terms of the Consent Fee offered to those Scheme Creditors who accede to the RSA before the RSA Consent Fee Deadline and agree to vote in favour of the Scheme pursuant to the RSA should have an impact on the classification of creditors for the purposes of the Scheme. The Company considers that they do not for the following reasons:

(a)    those Scheme Creditors who were at that time set out in the RSA were given an equal opportunity to accede to the RSA and therefore to become entitled to receive the Consent Fee;

(b)    the Consent Fee is not material when considered against the differential in predicted returns that the Scheme Creditors will receive under the Scheme. The total Consent Fee comprises an amount equal to 0.25% of the aggregate principal amount of the Eligible Restricted Debts held by each Participating Creditor as of the RSA Consent Fee Deadline; and

(c)    therefore, it is very unlikely that a Scheme Creditor who considered the substantive aspects of the Scheme to be against their interests would be persuaded by virtue of the Consent Fee alone to enter into or accede to the RSA and to vote in favour of the Scheme.

8.10    The Company has considered whether the payment of the Consent Fee to Eligible Participating Creditors has an impact on the constitution of the class of Scheme Creditors for the purposes of the Scheme, and has concluded that it does not for the following reasons:

(a)    the existence and terms of the RSA have been made publicly available to all Scheme Creditors and all Scheme Creditors were given an equal opportunity to accede to the RSA and therefore to become entitled to receive the Consent Fee on an equal basis, provided that they became a party to the RSA as a Participating Creditor by the relevant deadlines stated therein and vote in favour of the Scheme at the Scheme Meeting; and

(b)    it is unlikely that a Scheme Creditor who is not eligible to receive an Consent Fee would be persuaded to vote against (or a Scheme Creditor who is eligible to receive an Consent Fee would be persuaded to vote for) the Scheme by reason of the existence of the relevant Consent Fee because: (a) the Consent Fee only represents approximately 0.25% of the aggregate outstanding principal amount of the SJ Notes; and (b) the alternative of an insolvent liquidation would result in the Scheme Creditors receiving returns that are significantly lower than the anticipated returns under the Scheme. In this context, the Consent Fee is not a material factor.

15

_The Ad Hoc Group_

8.11    The Company notes that certain Scheme Creditors in their capacity as members of the Ad Hoc Group shall, in addition to the Consent Fee, benefit from two additional fee payments in respect of the restructuring of the Group (which includes the CEG Scheme and SJ Scheme) which shall be made on or prior to the Restructuring Effective Date:

(a)    The "**AHG Work Fee**", which shall be paid in accordance with the terms set out in the restructuring support agreement dated 3 April 2023 in respect of the SJ Scheme and the letter agreement dated 20 March 2023 between the CEG's Chairman and the members of the Ad Hoc Group (the "**AHG Work Fee Letter**").  The AHG Work Fee will be an amount estimated to represent approximately 1% of the Ad Hoc Group's aggregate holding of the principal amount of the SJ Notes; and

(b)    The "**AHG Advisor Fees**", being the reasonable fees, costs and expenses of the legal and financial advisers to the Ad Hoc Group which shall be paid by the Company in accordance with the terms set out in the relevant letter agreements between the Company and the legal and financial advisers to the Ad Hoc Group.

8.12    The Company does not consider that the effect of these payments (either taken alone or cumulatively) makes it impossible for members of the Ad Hoc Group to vote together with the other Scheme Creditors in the same class. This is because:

(a)    The payment of the AHG Advisor Fees does not confer net a benefit upon a member of the Ad Hoc Group but instead represents a payment of costs necessarily incurred by them in undertaking that role and which would not otherwise have been incurred. The Company further considers that the arrangement is typical and proportionate for a transaction of this kind. Further, the obligation on the Company to pay these fees is not conditional on the sanction of the Scheme;

(b)    Payment of the AHG Work Fee represents recompense for the time and effort expended by the Ad Hoc Group in assisting with formulation of the Term Sheet and the Scheme in the interests of all Scheme Creditors and again does not confer any net benefit or disguised consideration on the members of the Ad Hoc Group; and

(c)    It is unlikely that a Scheme Creditor who considered the substantive aspects of the Schemes to be against their interests would be persuaded by payment of either or both the AHG Advisor Fees and the AHG Work Fee to vote in favour of the Scheme. This is because in the alternative to the Schemes, being an insolvent liquidation, the Scheme Creditors would receive returns that are lower than the anticipated returns under the Schemes. The AHG Work Fee is not therefore a material factor which would influence a Scheme Creditor's decision in relation to the Scheme.

8.13    The Company and the Ad Hoc Group are continuing to negotiate terms relating to corporate governance.

9    **SCHEME MEETING**

9.1    The Company intends to hold the Scheme Meeting for the Scheme in Hong Kong. Virtual attendance will be possible for any Scheme Creditors who are unable to attend in person. Full details will be provided to Scheme Creditors if, at the Convening Hearing, the Court grants an order convening the Scheme Meeting.

16

10      **RESTRUCTURING EFFECTIVE DATE**

10.1    The Scheme Consideration is provided to the Scheme Creditors who have submitted the relevant Scheme Creditor Forms by the applicable deadlines upon the Restructuring Effective Date (or the Final Distribution Date, as the case may be), in exchange for each Scheme Creditor agreeing that it shall fully release all of its claims against the Company in respect of the SJ Notes, the Other Debts, the RSA and/or the Restructuring (subject to carve-outs for fraud, wilful default and wilful misconduct).

10.2    The "**Restructuring Effective Date**" shall occur after all of the conditions precedent to the Restructuring Effective Date have been satisfied or waived (as the case may be), including but not limited to the following:

(a)      The obtaining of all relevant approvals, pre-approvals or consents including, without limitation, delivery of respective court orders in respect of the Scheme and Chapter 15 Proceedings (as described in paragraph 16.1 below), and approval in principle for the listing and quotation of the New Instruments on the SGX-ST;

(b)      The settlement of all professional fees associated with the Restructuring that the Company has agreed to pay and that have been duly invoiced to the Company (including but not limited to the AHG Legal Fees);

(c)      The payment of the Consent Fee to the Participating Creditors in accordance with the terms of the RSA (in the amounts set out in the RSA); and

(d)      The satisfaction of each of the other specific conditions precedent contained in each of the Restructuring Documents (as defined in the RSA) including the Scheme.

10.3    As at the date of this Practice Statement Letter, the Restructuring Effective Date is expected to occur on or 2 October 2023, provided always that such date shall be no later than the longstop date (15 December) (the "**Longstop Date**").  If the Restructuring Effective Date has not occurred by the longstop Date (being 15 December 2023, unless extended) the terms of the Scheme shall lapse and all compromises and arrangements provided by the Scheme shall have no force or effect.

11      **CLAIMS VALUATION ASSESSMENT AND ADJUDICATION PROCEDURE FOR OTHER DEBT SCHEME CREDITORS' CLAIMS**

11.1    As noted at paragraph 7 above, the determination of the value of an Other Debt Scheme Creditor's Entitlement will take place after the sanction of the Scheme by way of a Valuation and Adjudication Procedure.

11.2    Full details of the Valuation and Adjudication Procedure will be included in the Explanatory Statement and the Scheme. As a high-level summary, the procedure will involve the following steps:

(a)      The Scheme will appoint three independent and experienced scheme administrators (the "**Scheme Administrators**") and a panel of four retired senior judges as scheme adjudicators (the "**Scheme Adjudicators**").

(b)      The Scheme Administrators will, with the assistance of specialist PRC real estate valuers and if necessary other professionals, assess the value of an Other Debt Scheme Creditor's Entitlement.

17

(c)      The Scheme Administrators will provide each Other Debt Scheme Creditor that submits a distribution confirmation deed  prior to the Bar Date with a notice of their  assessment of the value of the Other Debt Scheme Creditor's Entitlement (the "**Estimation Notice**"), together with supporting information required for the Other Debt Scheme Creditor to make an informed choice of whether to agree or disagree with the valuation.

(d)      If the Other Debt Scheme Creditor agrees with the valuation in the Estimation Notice (or if the Other Debt Scheme Creditor has not indicated that they disagree with said valuation within thirty days of receipt of the Estimation Notice), the valuation will be the Other Debt Scheme Creditor's Entitlement.

(e)      The Other Debt Scheme Creditor will have thirty days from receipt of the Estimation Notice to either agree or disagree with the valuation set out in the Estimation Notice. If the Other Debt Scheme Creditor disagrees with the valuation in the Estimation Notice, the Scheme Administrator and the Other Debt Scheme Creditor must seek to agree the value of the Other Debt Scheme Creditor's Entitlement bilaterally within a fixed consultation period. If the valuation is agreed, it will stand as the Other Debt Scheme Creditor's Entitlement. If the valuation is not agreed, the Other Debt Scheme Creditor will be referred to the adjudication procedure.

(f)      Once referred to the adjudication procedure, an independent Scheme Adjudicator will make a final and binding adjudication on the value of the Other Debt Scheme Creditor's Entitlement.

## 12    HOW CREDITORS WILL BE AFFECTED BY THE SCHEME

12.1      If the Scheme becomes effective, all Scheme Creditors will be bound by the terms of the Scheme (whether or not they voted for or against the Scheme or at all).

12.2      The terms of the Scheme (including the documentation referred to in this Practice Statement Letter) will be included with the Scheme Documents (as defined in paragraph 17.1 below).

## 13    CONSEQUENCES IF THE SCHEME IS NOT SUCCESSFUL

13.1      Deloitte Advisory (Hong Kong) Limited ("**Deloitte**") has been engaged by CEG to carry out a detailed analysis that estimates the likely returns to Scheme Creditors should the Company be placed into liquidation proceedings (which in turn would trigger a Group-wide liquidation) (the "**Liquidation Analysis**"). This is considered by the Company to be the likely alternative in the event that the Scheme is unsuccessful. This is in light of the fact that the Company is insolvent.

13.2      If the Scheme is not implemented in accordance with its terms, the Company and other members of the Group are likely to be required to enter into liquidation proceedings.

13.3      The Liquidation Analysis outlines the estimated total recovery to the Scheme Creditors in the event of a liquidation of the Company and liquidations of other members of the Group in that scenario in order to meet the claims of Scheme Creditors. The Liquidation Analysis will be made available to Scheme Creditors on the Transaction Website should the respective Courts grant orders convening the Scheme Meeting.

13.4      For the avoidance of doubt, the returns to Scheme Creditors in a liquidation scenario are expected to be worse than what is being offered to Scheme Creditors pursuant to the terms of the Scheme.

## 14    COURT HEARINGS AND SCHEME CREDITORS' RIGHTS

14.1    As noted at paragraph 1.1 above, the Company intends to apply to the  Court at the Convening Hearing to be held on 24 July 2023 for an order granting directions in relation to the Scheme, including permission to convene a single meeting of Scheme Creditors for the purpose of considering and, if thought fit, approving, the Scheme.

14.2    Scheme Creditors have the right to attend in person or through counsel and make representations at the Convening Hearing, although they are not obliged to do so. Scheme Creditors (other than Blocked Scheme Creditors or Sanctioned Scheme Creditors) who wish to attend the Convening Hearing in person or through counsel should in the first instance contact the Information Agent (using the contact details below) to obtain instructions for attending the Convening Hearing preferably at least forty-eight (48) hours prior to it. Blocked Scheme Creditors who wish to attend the Convening Hearing(s) in person or through counsel should in the first instance contact GLAS (using the contact details below) to obtain instructions for attending the Convening Hearing preferably at least forty-eight (48) hours prior to it. At the Convening Hearing, the Company will also draw to the Court's attention any material issues raised by Scheme Creditors in response to this Practice Statement Letter.

14.3    If the Scheme is approved by the requisite majorities at the Scheme Meeting, there will be a second and final Court hearing for the Scheme at which the Court will decide whether to exercise its discretion to sanction the Scheme. This second hearing before the Hong Kong Court will take place on 1 and/or 6 September 2023 (to be fixed by the Hong Court) (the "**Sanction Hearing**").

14.4    Scheme Creditors will also have the opportunity to raise objections at the Sanction Hearing (if the Scheme is approved at the Scheme Meeting by the requisite majorities).

14.5    This Practice Statement Letter is intended to provide Scheme Creditors with sufficient information regarding the Schemes and the Restructuring so that, should they wish to raise issues that relate to the jurisdiction of the Courts to sanctions the Schemes, or to argue that the proposals outlined above for the convening of the Scheme Meetings are inappropriate, or to raise any other issue in relation to the constitution of the Scheme Meetings, they may attend and be represented before the Courts at the relevant Convening Hearing.

14.6    **IMPORTANT: If any Scheme Creditor (with the exception of Blocked Scheme Creditors and Sanctioned Scheme Creditors) has comments as to the constitution of the Scheme Meeting which is proposed, wishes to raise any other issues with the Court, or wishes to participate at the Convening Hearing and, for that purpose, obtain a copy of the relevant Court papers, they should in the first instance contact the Information Agent using the contact details set out below as soon as possible. Blocked Scheme Creditors should contact GLAS using the contact details set out below as soon as possible.**

15    **THE TRANSACTION WEBSITE, SCHEME INFORMATION AND COMMUNICATIONS WITH SCHEME CREDITORS**

15.1    Communications with Scheme Creditors will take place via the Transaction Website maintained by the Information Agent at https://projects.morrowsodali.com/evergrande.

15.2    The Information Agent has set up the Transaction Website to disseminate information in relation to the Scheme and to help facilitate the implementation of the Scheme.  Scheme Creditors may download documents relating to the Scheme from the Transaction Website once they have registered their details via the registration page.

15.3    Scheme Creditors are encouraged to register their details on the Transaction Website, which is the document posting website, so that they can receive notices from the Information Agent relating to the

19

Scheme Meeting and other communications relating to the Scheme. Further, in the event that the Scheme will no longer proceed or will not become effective, Scheme Creditors will be notified by way of a notice published on the Transaction Website.

15.4    In addition to this Practice Statement Letter being delivered to the Clearing Systems for further distribution to the SJ Scheme Creditors (and the Other Scheme Creditors under the Lake Notes), the Information Agent will also make available an electronic copy of this Practice Statement Letter to all Scheme Creditors on the Transaction Website. Likewise, the Company will also make available an electronic copy of this Practice Statement Letter to all Scheme Creditors by announcement on CEG's website. The Company will also make an announcement on the HKEX news website of the SEHK with a link to the Transaction Website where this Letter can be accessed.

15.5    The Other Debt Scheme Creditors (other than in respect of the Lake Notes) do not hold their interests through the Clearing Systems as the relevant instruments are not publicly-traded. To communicate with these Scheme Creditors, the Information Agent will also send this Practice Statement Letter and all other communications directly to each person who the Company believes is or may be a Scheme Creditor (other than Blocked Scheme Creditors or Sanctioned Scheme Creditors), and for whom the Company has a valid e-mail address. As at the date hereof, the Information Agent has the email addresses for those Scheme Creditors who are party to or have acceded to the RSA and has also been provided by the Company with the email addresses of substantially all other known Scheme Creditors.

15.6    GLAS will send this Practice Statement Letter and all other communications directly to any known Blocked Scheme Creditors by email where the Company is in possession of their email addresses. The Company is not currently aware of any Blocked Scheme Creditors or Sanctioned Scheme Creditors.

15.7    You are advised that documents transmitted in electronic form may be altered or changed during the process of transmission and consequently the Information Agent nor any of its respective affiliates, directors, officers or employees, accept any liability or responsibility whatsoever in respect of any difference between the documents sent to you in electronic format and the version available to you for inspection on the Transaction Website.

15.8    Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers is acting for, or owes any duty to, any Scheme Creditor, nor will any of them be responsible for providing any advice to any Scheme Creditor in relation to the Scheme. Accordingly, neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers make any recommendations as to whether any Scheme Creditor should take any of the actions contemplated in the Scheme. The Information Agent expresses no opinion on the merits of the Scheme. The Information Agent has not been involved in negotiating or determining the terms of the Scheme and makes no representation that all relevant information has been disclosed to the Scheme Creditors in or pursuant to the Scheme. Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers has verified, or assumes any responsibility or liability for the accuracy or completeness of any of the information concerning the Scheme, or any factual statements contained in, or the effect or effectiveness of, the Scheme.

15.9    Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers will have any tortious, contractual or any other liability to any person in connection with the determination of whether a Scheme Creditor is a Blocked Scheme Creditor. Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers will accept any liability whatsoever to any person, regardless of the form of action, for any lost profits or lost opportunity, or for any indirect, special, consequential, incidental or punitive damages arising from the determination of whether a Scheme Creditor is a Blocked Scheme Creditor, even if the Information Agent or any of its directors, officers, employees, agents, affiliates or advisers have been advised of the possibility of such damages.

20

15.10   Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers is obliged, under the terms of the Scheme or otherwise, to engage in any transaction or conduct that may give rise to a liability under or in connection with Applicable Sanctions and/or may result in any person becoming a sanctioned person.

15.11   If compliance with any obligations under the terms of the Scheme or otherwise would result in the Information Agent or any of its directors, officers, employees, agents, affiliates or advisers breaching Applicable Sanctions, that obligation need not be complied with (but only to the extent of the breach).

15.12   Under no circumstances will the Information Agent be required to verify or determine the eligibility of any Scheme Creditor in relation to the Scheme. The Information Agent will check Scheme Claims against Custody Instructions and against the records of Scheme Creditors provided to the Information Agent by the Company. The Information Agent will assist the Company and the chairperson in checking the voting values of each Scheme Creditor (who is not a Blocked Scheme Creditor) based on such information.

16      **CROSS-BORDER RECOGNITION**

16.1    The Company, pursuant to the Scheme, will appoint an appropriate person or persons who will be authorised to act as the representative of the Company, as relevant, on and in connection with an application for recognition and assistance in relation to the Scheme in the United States of America Bankruptcy Court pursuant to Chapter 15 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended) (the "**Chapter 15 Proceedings**").  The Chapter 15 Proceedings are necessary in order to ensure the discharge of the Company's New York law governed Scheme Debts as a matter of New York law. The Company does not currently intend to seek recognition of any of the Schemes in any other jurisdictions, but this may be subject to change in future.

17      **NEXT STEPS**

17.1    If permission to convene the Scheme Meeting is granted by the Court at the Convening Hearing, the Information Agent will make available to you via the Transaction Website the following important documents in electronic format:

(a)     a notice convening the Scheme Meeting;

(b)     the Explanatory Statement;

(c)     the relevant Scheme Creditor Forms will be available for reference, although all Scheme Creditors (who are not Blocked Scheme Creditors or Sanctioned Scheme Creditors) must complete the applicable Scheme Creditor Forms online via the Portal (as defined in paragraph 17.2), being:

(i)     in respect of the SJ Notes Scheme Creditors or the Lake Notes (who are not Blocked Scheme Creditors or Sanctioned Scheme Creditors), an account holder letter; and

(ii)    in respect of the Other Debt Scheme Creditors (other than the Lake Notes), a proxy form; and

in each case together with a distribution confirmation deed and designated recipient form (if applicable) (all such forms set out in this section will be included with the Solicitation Packet); and

21

(d)      the Scheme and any accompanying documents.

(together, the "**Scheme Documents**").

17.2    If you are a Blocked Scheme Creditor, the Blocked Scheme Creditor Form and any other relevant Scheme Documents can be obtained from GLAS and will also be available on the Company's website. Blocked Scheme Creditors must complete and submit their Blocked Scheme Creditor Form to GLAS (not via the Portal).

17.3    If you are a Scheme Creditor (who is neither a Blocked Scheme Creditor nor Sanctioned Scheme Creditor) and wish to attend the Convening Hearing, or have any questions in relation to this Practice Statement Letter or the Scheme, you should, in the first instance, contact the Information Agent preferably at least forty-eight (48) hours prior to it, using the contact details below:

| | |
|---|---|
| Name: | Morrow Sodali |
| Attention: | Debt Services Team |
| Telephone: | in Hong Kong +852 2319 4130; in London: +44 20 4513 6933 |
| Email: | evergrande@investor.morrowsodali.com |
| Transaction Website: | https://projects.morrowsodali.com/evergrande |
| Portal | https://portal.morrowsodali.com/EvergrandeScheme |

17.4    All Scheme Creditors (and designated recipients, if applicable) will need to hold an account (directly or through the intermediary chain) with an account holder or custodian which itself holds an account  with the Clearing Systems in order to receive the New Notes and the Consent Fee (if applicable). To the extent that they do not already have such an account, all Scheme Creditors, and designated recipients (if applicable) are advised to open an account with the Euroclear (if possible) or Clearstream (including many custodian banks and certain other financial institutions) as soon as possible, and in any event, by the relevant Bar Date. If you are unable to open a Clearing Systems account and are not a Blocked Scheme Creditor or Sanctioned Scheme Creditor, please contact the Information Agent immediately.

17.5    If you are a Blocked Scheme Creditor and wish to attend the Convening Hearing or have any questions in relation to this Practice Statement Letter or the Scheme, you should, in the first instance, contact GLAS preferably at least forty-eight (48) hours prior to the relevant Convening Hearing using the contact details below:

Name: GLAS Specialist Services Limited

Address: 55 Ludgate Hill, Level 1, West, London EC4M 7JW

Email:   lm@glas.agency

Attention: Liability Management Team

17.6    The Company considers that the Scheme is in the best interests of the Scheme Creditors. As explained above, any failure to conclude the Scheme is likely, in the view of the Company's board of directors to

force the Company and other the companies within the Group to enter into an insolvency procedure in the near future.

17.7    For this reason, all Scheme Creditors are encouraged to support and vote in favour of the Scheme.

Yours faithfully,

……………………………………………………

Authorised Signatory of the Company

**APPENDIX 1**

Execution Version
签署版本

**Tianji Holding Limited**

天基控股有限公司

**("TJ")**

（"天基"）

**Restructuring Term Sheet**

重组条款清单

**20 March 2023 (as amended to the date of the Restructuring Support Agreement)**

**2023 年 3 月 20 日（经修订至重组支持协议之日）**

This term sheet ("**this TJ Term Sheet**") signed and dated 20 March 2023, between TJ and the SJ AHG (together, the "**Parties**"), sets forth certain material terms and conditions in connection with the proposed restructuring of the TJ Existing Debt Instruments which will be consistent in all material respects with this TJ Term Sheet (the "**Restructuring**").

本条款清单（"**本天基条款清单**"）的签署日期为2023年3月20日，由天基和景程持有人特别团体（统称为"**当事方**"）签署，列明了与将在所有重大方面与本天基条款清单一致的天基现有债务工具的拟议重组（"**重组**"）有关的某些重大条款和条件。

The execution of this TJ Term Sheet by the Parties signifies a substantial positive milestone in achieving the Restructuring and is representative of the Parties' significant practical progress towards achieving the Restructuring.

当事方签署本天基条款清单，标志着重组实现了重大而积极的里程碑，代表着当事方在实现重组方面取得了重大的实际进展。

This TJ Term Sheet forms the basis of the agreement between the Parties and the Parties accordingly agree and undertake to work together in good faith and use best endeavours to (a) agree further detailed terms in the restructuring support agreement (the "**RSA**"), and (b) subsequently conclude further agreements and scheme documentation as necessary to effect the Restructuring, such that they are consistent in all material respects with this TJ Term Sheet (though this shall not require a creditor who is a Party to make any payment or incur out of pocket expenses). The Parties acknowledge and agree that this TJ Term Sheet records certain key agreed commercial provisions only, and that no other terms and conditions should be implied. It is intended that the Restructuring shall be facilitated by way of the RSA and subsequent further agreements and scheme documentation as necessary to effect the Restructuring.

本天基条款清单构成当事方之间协议的基础，因此，当事方同意并承诺真诚合作并尽最大努力，以（a）在重组支持协议（"**重组支持协议**"）中商定更详细的条款，并（b）随后签署实行重组所需的进一步协议和协议安排文件，以使其在所有重大方面与本天基条款清单保持一致（但这不应要求作为当事方的债权人支付任何款项或产生开支）。当事方承认并同意，本天基条款清单仅记录某些经商定的关键商业条款，不应暗示其他任何条款和条

件。重组旨在通过重组支持协议及随后为实现重组所需的进一步协议及协议安排文件来促进。

This TJ Term Sheet does not constitute an offer to sell or a solicitation of an offer to buy any securities in the United States or any other jurisdiction. No securities may be offered or sold in the United States absent registration or an applicable exemption from registration requirements. Any public offering of securities to be made in the United States will be made by means of a prospectus. Such prospectus will contain detailed information about TJ, SJ and their management, as well as financial statements. No public offer of securities is to be made by SJ and TJ or any of the subsidiary guarantors of the SJ Existing Notes (which for the avoidance of doubt excludes TJ) ("**SJ Subsidiary Guarantors**") in the United States.

本天基条款清单并不构成在美国或任何其他司法管辖区销售任何证券的要约或对购买任何证券的要约的招揽。如果没有登记或没有适用的对登记要求的豁免，不得在美国发行或销售证券。任何在美国进行的证券公开发售都将以证券发行说明书的形式进行。此种证券发行说明书书将包含有关天基，景程及其各自管理层的详细信息及财务报表。景程和天基或景程现有票据的任何担保子公司（为避免疑义，其中不包括天基）（"**景程担保子公司**"）将不会在美国公开发售证券。

This TJ Term Sheet is not a prospectus for the purposes of Regulation (EU) 2017/1129, including as it forms part of domestic law in the United Kingdom by virtue of the European Union (Withdrawal) Act 2018, as amended by the European Union (Withdrawal Agreement) Act 2020.

本天基条款清单并不是针对第2017/1129号条例（EU）（包括根据《2018年欧盟（退出）法案》（经《2020年欧盟（退出协议）法案》修订）构成英国国内法律的一部分）而言的证券发行说明书。

**PART A: PRINCIPAL TERMS OF THE TJ PROPOSED RESTRUCTURING**
**A 部分：天基拟议重组的主要条款**

| GENERAL INFORMATION 一般信息 | |
|---|---|
| **TJ**<br>天基 | "**TJ**" means Tianji Holding Limited, a company incorporated in Hong Kong with limited liability.<br>"**天基**"指天基控股有限公司，一家在香港注册的有限责任公司。 |
| **SJ**<br>景程 | "**SJ**" means Scenery Journey Limited, a company incorporated in the British Virgin Islands with limited liability.<br>"**景程**"指景程有限公司，一家在英属维尔京群岛注册的有限责任公司。 |
| **CEG**<br>恒大 | "**CEG**" means China Evergrande Group, an exempted company incorporated in the Cayman Islands with limited liability.<br>"**恒大**"指中国恒大集团，一家在开曼群岛注册成立的获豁免有限公司。 |
| **Group**<br>集团 | "**Group**" means TJ and its subsidiaries from time to time.<br>"**集团**"指天基及其各时期下的子公司。 |
| **AHG**<br>持有人特别团体 | "**AHG**" means the ad hoc group of holders of the SJ Existing Notes or the offshore notes issued by CEG or investment managers for or investment advisers to certain holders of the SJ Existing Notes or the offshore notes issued by CEG as constituted from time to time, who are advised by the AHG Advisers.<br>"**持有人特别团体**"指由景程现有票据持有人或恒大发行的境外票据持有人，或某些景程现有票据持有人或恒大发行的境外票据持有人的投资经理或投资顾问，在各时组成的特别团体，且该特别团体由持有人特别团体顾问提供建议。 |
| **AHG Advisers**<br>持有人特别团体顾问 | "**AHG Advisers**" means Moelis & Company, Kirkland & Ellis and other professional advisers as the AHG may appoint from time to time.<br>"**持有人特别团体顾问**"指美驰、凯易和持有人特别团体各时任命的其他专业顾问。 |
| **SJ AHG**<br>景程持有人特别团体 | "**SJ AHG**" means the ad hoc group of holders of the SJ Existing Notes or investment managers for or investment advisers to certain holders of the SJ Existing Notes as constituted from time to time, who are advised by the AHG Advisers. The members of the SJ AHG (each an "**SJ AHG Member**", and collectively the "**SJ AHG**" |

| | |
|---|---|
| | Members") as of the date of this TJ Term Sheet are listed in Schedule 1 (*SJ AHG*).<br><br>"景程持有人特别团体" 指由景程现有票据持有人或某些景程现有票据持有人的投资经理或投资顾问各时期组成的特别团体，且该团体由持有人特别团体顾问提供建议。截至本天基条款清单之日的景程持有人特别团体成员（每一位均为"**景程持有人特别团体成员**"，统称"**景程持有人特别团体成员**"）列表见附表 1（*景程持有人特别团体*）。 |
| **TJ PROPOSED RESTRUCTURING**<br><br>天基拟议重组 | |
| **TJ Proposed Restructuring**<br><br>天基拟议重组 | The "**TJ Proposed Restructuring**" is expected to involve a compromise of all claims against TJ and any related claims against TJ's shareholders, officers, directors, advisers, representatives, and office-holders under, or in connection with the TJ Existing Debt Instruments in exchange for the TJ Restructuring Consideration in accordance with the terms of the composite documents to be circulated by TJ to the TJ Scheme Creditors in relation to the TJ Scheme(s)   (which will include (among other things) an explanatory statement and the terms of the TJ Scheme(s)) (collectively, the "**Scheme Documents**") (subject to carve outs for fraud, dishonesty, wilful default and wilful misconduct).<br><br>"**天基拟议重组**"预计将涉及妥协基于或与天基现有债务工具相关的针对天基的所有索偿及针对天基股东、高级职员、董事、顾问、代表和高管人员的任何相关索偿，以换取根据天基将分发给天基协议安排债权人的与天基协议安排有关的汇总文件（其中将包括解释性声明和天基协议安排的条款（及其他））（统称为，"**协议安排文件**"）的条款所设定的天基重组对价（受限于欺诈、不诚实、故意违约和故意不当行为的例外情况）。<br><br>TJ plans to implement the TJ Proposed Restructuring through, *inter alia*, a scheme of arrangement in Hong Kong and/or other applicable jurisdictions (each a "**TJ Scheme**").<br><br>天基计划通过，*其中包括*，在香港和/或其他适用司法管辖区的协议安排实施天基拟议重组（"**天基协议安排**"）。<br><br>The Hong Kong scheme of arrangement will be governed by the laws of Hong Kong and subject to the exclusive jurisdiction of the courts of Hong Kong. A scheme of arrangement in any other jurisdiction will be governed by the laws of such jurisdiction and |

| | |
|---|---|
| | subject to the exclusive jurisdiction of the courts in that jurisdiction.<br><br>香港的重组协议将适用香港法律，并受香港法院的专属管辖。任何其他司法管辖区的重组协议将适用该司法管辖区的法律，并受该司法管辖区法院的专属管辖。 |
| **TJ Existing Debt Instruments**<br>天基现有债务工具 | "**TJ Existing Debt Instruments**" mean the SJ Existing Notes and the TJ Other Existing Debt Instruments.<br>"**天基现有债务工具**" 指景程现有票据和天基其他现有债务工具。 |
| **SJ Existing Notes**<br>景程现有票据 | All of the following notes, which are governed by New York law, issued by SJ and unconditionally and irrevocably guaranteed by TJ and the SJ Subsidiary Guarantors (collectively, the "**SJ Existing Notes**"):<br>适用纽约法律，由景程发行，并由天基和景程担保子公司无条件且不可撤销地担保的以下所有票据（统称为 "**景程现有票据**"）：<br><br>(a) The 11.5% senior notes due October 24, 2022 (the "**SJ Existing October 2022 Notes**") (ISIN: XS2109191986, Common Code: 210919198). As of the date of this TJ Term Sheet, the aggregate principal amount of the SJ Existing October 2022 Notes outstanding is US$1,999,000,000;<br>2022 年 10 月 24 日到期的 11.5% 优先票据（"**景程现有 2022 年 10 月票据**"）（ISIN：XS2109191986，通用代码：210919198）。 截至本天基条款清单之日，景程现有 2022 年 10 月票据的未偿还本金总额为 1,999,000,000 美元；<br><br>(b) The 13.0% senior notes due November 6, 2022 (the "**SJ Existing November 2022 Notes**") (ISIN: XS1903671854, Common Code: 190367185). As of the date of this TJ Term Sheet, the aggregate principal amount of the SJ Existing November 2022 Notes outstanding is US$644,000,000;<br>2022 年 11 月 6 日到期的 13.0% 优先票据（"**景程现有 2022年11月票据**"）（ISIN：XS1903671854，通用代码：190367185）。 截至本天基条款清单之日，景程现有 2022 年 11 月票据的未偿还本金总额为 644,000,000 美元；<br><br>(c) The 12.0% senior notes due October 24, 2023 (the "**SJ Existing October 2023 Notes**") (ISIN: XS2109192109, Common Code: 210919210). As of the date of this TJ Term Sheet, the aggregate principal amount of the SJ Existing October 2023 Notes outstanding is US$1,994,000,000; and |

| | |
|---|---|
| | 2023 年 10 月 24 日到期的 12.0% 优先票据（"**景程现有 2023 年 10 月票据**"）（ISIN：XS2109192109，通用代码：210919210）。 截至本天基条款清单之日，景程现有 2023 年 10 月票据的未偿还本金总额为 1,994,000,000 美元；及<br><br>(d) The 13.75% senior notes due November 6, 2023 (the "**SJ Existing November 2023 Bonds**") (ISIN: XS1903671938, Common Code: 190367193). As of the date of this TJ Term Sheet, the aggregate principal amount of the SJ Existing November 2023 Bonds outstanding is US$589,000,000.<br><br>2023 年 11 月 6 日到期的 13.75%优先票据（"**景程现有 2023 年 11 月票据**"）（ISIN：XS1903671938，通用代码：190367193）。 截至本天基条款清单之日，景程现有 2023 年 11 月票据的未偿还本金总额为 589,000,000 美元。 |
| **TJ Other Existing Debt Instruments**<br>天基其他现有债务工具 | The "**TJ Other Existing Debt Instruments**" that are subject to the TJ Proposed Restructuring are the offshore financial indebtedness set out in Schedule 2 (which may be amended by TJ after obtaining consent from the SJ AHG (or AHG Advisers acting on behalf of the SJ AHG)).<br><br>"**天基其他现有债务工具**"指受限于天基拟议重组的附表 2 中列出的境外金融负债（在获得景程持有人特别团体（或代表景程持有人特别团体的持有人特别团体顾问）的同意后，天基可对其进行修改））。 |
| **TJ Scheme Creditors (and each, a TJ Scheme Creditor)**<br>天基协议安排债权人（且每位均为，天基协议安排债权人） | "**TJ Scheme Creditors**" means the TJ Existing Notes Scheme Creditors and the TJ Other Existing Debt Instruments Scheme Creditors, each in their capacity as a creditor of TJ, and a "**TJ Scheme Creditor**" means any one of them.<br>"**天基协议安排债权人**"指天基现有票据协议安排债权人和天基其他现有债务工具协议安排债权人，均各自作为天基的债权人，且天基协议安排债权人指其中任何一位。<br><br>"**TJ Existing Notes Scheme Creditor**" means a person holding beneficial interests as principal in any of the SJ Existing Notes as at the TJ Voting Record Time.<br>"**天基现有票据协议安排债权人**"指截至天基投票记录时间，以主体身份持有任何景程现有票据实益权益者。<br><br>"**TJ Other Existing Debt Instruments Scheme Creditor**" means a person holding the relevant interests as principal in any of the TJ Other Existing Debt Instruments as at the TJ Voting Record Time. |

|  | "天基其他现有债务工具协议安排债权人" 指截至天基投票记录时间，以主体身份持有任何天基其他现有债务工具的相关权益者。 |
|  |  |
|  | "**TJ Voting Record Time**" means the time designated by TJ for the determination of the claims of the TJ Scheme Creditors for the purposes of voting at the TJ Scheme Creditors' meeting in respect of the TJ Scheme convened pursuant to orders of the court(s) (and any adjournment of such meetings). |
|  | "**天基投票记录时间**" 指天基为确定天基协议安排债权人的索偿而指定的时间，其用意是在根据法院命令召集有关天基协议安排的天基债权人会议（以及该等会议的任何延期会议）上进行投票。 |
| **TJ Scheme Creditors' Voting Claims and TJ Scheme Creditors' Entitlement** 天基协议安排债权人的表决权和天基协议安排债权人的可获偿金额 | For the purpose of <u>voting</u> on the TJ Scheme(s) at the TJ Scheme Creditors' meetings convened pursuant to orders of the court(s) (and any adjournment of such meetings), the value of each "**TJ Scheme Creditor's Voting Claim**", regardless of whether the TJ Scheme Creditor is a TJ Existing Notes Scheme Creditor or a TJ Other Existing Debt Instruments Scheme Creditor, shall be the sum of: 为了在根据法院命令召开的天基协议安排债权人会议（以及这些会议的任何延期会议）上对天基协议安排进行<u>投票表决</u>，每项 "**天基协议安排债权人的表决权** " 的价值，无论该天基协议安排债权人是天基现有票据协议安排债权人还是天基其他现有债务工具协议安排债权人，都应是以下各项的总和： |
|  |  |
|  | (a) the outstanding principal amount of the TJ Existing Debt Instruments held by the TJ Scheme Creditor at the TJ Voting Record Time; and 天基协议安排债权人截至天基投票记录时间所持有的天基现有债务工具的未偿还本金金额；和 |
|  | (b) all accrued and unpaid interests on the TJ Existing Debt Instruments held by the TJ Scheme Creditor up to (but excluding) the TJ Voting Record Time. 由天基协议安排债权人持有的天基现有债务工具的截至（但不包括）天基投票记录时间所有应计且未付利息。 |
|  |  |
|  | <u>Determining TJ Restructuring Consideration for a TJ Scheme Creditor</u> <u>确定天基协议安排债权人的天基重组对价</u> |

For the purpose of distribution of the TJ Restructuring Consideration, the principles for determining the value of each "**TJ Scheme Creditor's Entitlement**" shall be on a "**Deficiency Basis**" with regard to the third-party (i.e., non-scheme company) rights relating to the debt. To illustrate, a TJ Scheme Creditor's Entitlement shall be in an amount equal to: (x) the sum of (1) the outstanding principal amount of the TJ Existing Debt Instruments held by the TJ Scheme Creditor at the TJ Entitlement Record Time, and (2) accrued and unpaid interest on such TJ Existing Debt Instruments up to (but excluding) the RED; *minus* (y) the assessed value of any related rights (whether principal, guarantee or collateral support) which are (i) against any party who is not TJ but is an obligor or provides credit support; and (ii) in connection with such TJ Existing Debt Instruments. Each TJ Scheme Creditor will receive a pro rata portion of the TJ Restructuring Consideration (pro-rated across each of the four tranches of the TJ New Notes) based on its TJ Scheme Creditor's Entitlement.

为分配天基重组对价，每位 "天基协议安排债权人的可获偿金额"的价值的确认原则应根据针对与债务相关之第三方（即非协议安排公司）权利的 "差额基础"来确认。示例而言，一位天基协议安排债权人的可获偿金额应等于：(x)(1)截至天基可获偿金额记录时间天基协议安排债权人持有的天基现有债务工具的未偿还本金金额，及(2)截至（但不包括）重组生效日天基其他现有债务工具的应计且未付利息之和；减去（y）任何相关权利（无论是本金、担保或质押物支持）的估值，这些权利：（i）针对任何天基之外的义务人或提供信贷支持的一方；以及（ii）与该等天基现有债务工具有关。每位天基协议安排债权人将根据天基协议安排债权人的可获偿金额，按比例获得天基重组对价（四笔天基新票据的每一笔都按比例分配）的一部分。

The determination of a TJ Scheme Creditor's Entitlement can take place after the sanction of the TJ Scheme(s) by way of a valuation and adjudication procedure to be agreed and set out in the Scheme Documents (involving, as applicable, sufficiently independent scheme administrator, specialist real estate valuer and an independent adjudicator in case of objection to be agreed between TJ and the SJ AHG). A similar approach will be taken to determine any net claim in respect of a put option.

天基协议安排债权人的可获偿金额，可在天基协议安排获得批准后，通过协议安排文件中商定和规定的估值和裁决程序进行确认（按所适用的，将包含由天基和景程持有人特别团体商定充分独立的协议安排管理人、专业房地产估价师及在

<table>
<tr><td></td><td>出现反对意见的情况下，一位独立裁决人）。确定与认沽期权有关的任何净索偿权将采取类似的方式来进行。<br><br>"**TJ Entitlement Record Time**" means the 'as of' time designated by TJ for the determination of entitlements of the TJ Scheme Creditors for the purposes of distribution consideration after sanction of the TJ Scheme(s) on or prior to RED.<br>"天基可获偿金额记录时间"指在协议安排批准后，重组生效日当日或之前，天基为确定债权人的可获偿金额以分配对价而指定的'截止时间'。</td></tr>
<tr><td colspan="2">**FEES**<br>费用</td></tr>
<tr><td>**TJ Consent Fee**<br>天基同意费</td><td>Subject to structuring and the terms of the applicable Scheme Documents (including any applicable RSA(s)), a consent fee of 0.25% of the outstanding principal amount of TJ Existing Debt Instruments held at the TJ Voting Record Time set by TJ. The TJ Consent Fee is contemplated to be paid in kind in the form of Tranche A of the TJ New Notes (as set out in Schedule 3 (*TJ New Notes Short Form Term Sheet*)).<br><br>受限于适用的协议安排文件的结构和条款（包括任何适用的重组支持协议），截至天基设定的天基投票记录时间持有的天基现有债务工具未偿还本金的 0.25%的同意费。天基同意费拟将通过天基新票据 A（如附表 3（*天基新票据简版条款清单*）所载）的形式以实物付息票据的方式支付。<br><br>For the avoidance of doubt, the TJ New Notes to be issued as TJ Consent Fee are additional TJ New Notes and form the same series of notes as Tranche A of the TJ New Notes and will not impact the number of TJ New Notes to be issued as TJ Scheme Consideration for the TJ Scheme Creditors.<br><br>为避免疑义，将作为天基同意费发行的天基新票据是额外的天基新票据，并与天基新票据 A 成为同一系列票据，不会影响将作为天基协议安排对价发行给天基协议安排债权人的天基新票据数量。</td></tr>
<tr><td colspan="2">**TJ RESTRUCTURING CONSIDERATION**<br>天基重组对价</td></tr>
<tr><td>**TJ Restructuring Consideration**</td><td>"**TJ Restructuring Consideration**" means the four tranches of new notes to be issued by TJ in an aggregate principal amount</td></tr>
</table>

| | |
|---|---|
| 天基重组对价 | equal to US$800 million (the "**TJ New Notes**"), the terms of which are set forth in Schedule 3 (*TJ New Notes Short Form Term Sheet*).<br><br>"天基重组对价"指天基所发行的四笔新票据，其本金总额为 8 亿美元（"**天基新票据**"），其条款如附表 3（*天基新票据简版条款清单*）所载。 |
| **SUPPORT FOR RESTRUCTURING**<br>对重组的支持 | |
| **Support**<br>支持 | Subject to the Limitations and the terms of the RSA, TJ and each TJ Scheme Creditor acceding to the RSA (the "**TJ Participating Creditors**") intend to, with respect to the TJ Existing Debt Instruments, among other things:<br><br>受限于限制和重组支持协议的条款，就天基现有债务工具而言，天基和每位加入重组支持协议的天基协议安排债权人（"**天基参与债权人**"）的意图为（以及其他事项）：<br><br>(a) assist, cooperate and take all steps as may be necessary or desirable to implement or consummate the TJ Proposed Restructuring in a timely manner;<br><br>协助、合作并采取一切可能必要或适宜的步骤，及时实施或完成天基拟议重组；<br><br>(b) not take, encourage, assist, or support (or procure that any other person takes, encourages, assists, or supports) any action which would, or would reasonably be expected to, breach or be inconsistent with this TJ Term Sheet taken as a whole, or delay, impede, or prevent the implementation or consummation of the TJ Proposed Restructuring;<br><br>不采取、鼓励、协助或支持（或促使任何其他人采取、鼓励、协助或支持）任何会或合理预期会违反或不符合本天基条款清单整体的行动，或拖延、阻碍或阻止天基拟议重组的实施或完成；<br><br>(c) in the case of TJ, procure that each other member of the Group does the same in respect of clauses (a) and (b) above;<br><br>就天基而言，促使集团的其他每一位成员对上述第（a）和（b）项采取同样的措施；<br><br>(d) not solicit, encourage, facilitate, consent to or enter into any proposal or transaction for the restructuring of the TJ Existing Debt Instruments other than the TJ Proposed Restructuring; and<br><br>不征求、鼓励、促进、同意或进行除天基拟议重组以外的有关天基现有债务工具的重组的任何方案或交易；及 |

| | |
|---|---|
| | (e) in the case of each TJ Participating Creditor, provide reasonable assistance to TJ and any other member of the Group (in each case, at TJ's cost) in defending against any adverse action taken by another creditor which may delay, impede or prevent the implementation or consummation of the TJ Proposed Restructuring, including without limitation: (i) confirming that such TJ Participating Creditor supports the TJ Proposed Restructuring; and (ii) preparing and filing any submission or appearing at any court proceeding which is reasonably requested by any member of the Group and is necessary or desirable to support, facilitate, implement, consummate or otherwise give effect to the TJ Proposed Restructuring. |
| | 就每一位天基参与债权人而言，向天基和集团的其他任何成员提供合理的协助（在每种情况下，都由天基承担费用），以抵御其他债权人采取的可能延迟、阻碍或阻止天基拟议重组的实施或完成的任何不利行动，包括但不限于：（i）确认该天基参与债权人支持天基拟议重组；以及（ii）准备和提交集团任何成员合理要求的对支持、促进、实施、完成以及以其他方式实现天基拟议重组而言必要或可取的任何呈件或出席任何法院程序。 |
| **Limitations**<br><br>限制 | Nothing in this TJ Term Sheet shall, among others:<br>本天基条款清单中的任何内容均不得，包括以下及其他：<br><br>(a) require either TJ, any other member of the Group or any TJ Participating Creditor (or any of their, and/or their respective managers' or investment advisers', respective affiliates or funds) to take any action which would breach any legal or regulatory requirement beyond its control or any order or direction of any relevant court or governmental body and which impediment cannot be avoided or removed by taking reasonable steps;<br>要求天基、集团的任何其他成员或任何天基参与债权人（或任何他们的，和/或他们各自的管理人或投资顾问的，各自的关联人士或基金）采取任何行动，违反任何在其控制之外的法律或监管规定或任何有关法院或政府机构的任何命令或指示，并且该障碍无法通过采取合理措施来避免或消除；<br><br>(b) restrict, or attempt to restrict, any officer of any member of the Group from complying with any legal or fiduciary duty or obligation to commence insolvency proceedings in respect of that entity; |

|  | 限制或试图限制集团任何成员的任何职员遵守任何法律或信托责任或义务，对该实体启动破产程序； |
|  | (c) require TJ, any other member of the Group or any TJ Participating Creditor (or any of their, and/or their respective managers' or investment advisers', respective affiliates or funds) to make any payment or incur or take any action that would result in it incurring any out-of-pocket expense or other financial obligation or to incur any liability to any person other than as expressly set out in this TJ Term Sheet; or |
|  | 除了本天基条款清单中明确规定的，要求天基、集团的任何其他成员或任何天基参与债权人（或任何他们的，和/或他们各自的管理人或投资顾问的，各自的关联人士或基金）支付任何款项或招致或采取任何行动，导致其产生任何实付费用或其他财务义务，或对任何人产生任何责任；或 |
|  | (d) require TJ or any TJ Participating Creditor (or any of their, and/or their respective managers' or investment advisers', respective affiliates or funds) to make any additional equity or debt financing available to any member of the Group other than as expressly set out in this TJ Term Sheet, |
|  | 除了本天基条款清单中明确规定的，要求天基或任何天基参与债权人（或任何他们的，和/或他们各自的管理人或投资顾问的，各自的关联人士或基金）向集团的任何成员提供任何额外的股权或债务融资， |
|  | (each a "**Limitation**" and together the "**Limitations**"). |
|  | （各自为一项 "**限制**"，统称 "**限制**"）。 |
| **MILESTONES AND RESTRUCTURING EFFECTIVE DATE**<br>里程碑与重组生效日期 | |
| **Milestones**<br>里程碑 | TJ shall ensure or procure that each of the following conditions are satisfied on or before the specified date below (each of the following, a "**Restructuring Milestone**"):<br><br>天基应确保或促使以下各项条件在以下指定日期当日或之前得到满足（以下各项皆为一项 "**重组里程碑**"）：<br><br>(a) By no later than 22 March 2023, unless otherwise agreed between TJ and the SJ AHG (which can be by email through their respective advisers), CEG to publish a cleansing statement containing Sufficient Disclosure (including with respect to (i) (if agreed) the restructuring term sheets relating to the offshore indebtedness of CEG; (ii) this TJ Term Sheet; (iii) (if agreed) the restructuring term sheet relating to SJ's |

|  | offshore indebtedness and (iv) any other relevant information received by the SJ AHG). For the purpose of this provision, "**Sufficient Disclosure**" has the meaning given to it in the non-disclosure agreements dated 6 December 2022 and 9 January 2023 entered into between CEG and certain members of the AHG (the "**NDA**" which continues in full force and effect in accordance with the terms of the NDA). |
|  | 不迟于 2023 年 3 月 22 日，除非天基与景程持有人特别团体双方另有约定（可通过各自的顾问以电子邮件的方式进行），恒大发布一份包含充分披露的脱敏声明（包括有关（ⅰ）（如已商定）有关恒大境外负债的重组条款清单；（ⅱ）本天基条款清单；（ⅲ）（如已商定）有关景程境外负债的重组条款清单；以及（ⅳ）景程持有人特别团体收到的任何其他相关信息）。就本条款而言，"充分披露 "的定义依据恒大与持有人特别团体某些成员于 2022 年 12 月 6 日和 2023 年 1 月 9 日签订的保密协议（"**保密协议**"，根据保密协议条款继续完全有效）。 |
|  | (b) By no later than 31 March 2023 (provided that no additional or long-form term sheet (other than this TJ Term Sheet) is required), TJ and other relevant members of the Group to (i) enter into an RSA in form and substance satisfactory to the SJ AHG (acting reasonably) with the SJ AHG in relation to the restructuring of the offshore indebtedness of the Group and (ii) announce the signed RSA to the market on the website of The Stock Exchange of Hong Kong Limited and through the clearing systems. |
|  | 不迟于 2023 年 3 月 31 日（前提是不需要额外的或长版条款清单（除本天基条款清单之外）），天基和集团的其他相关成员（ⅰ）就重组集团的境外债务与（合理行事的）景程持有人特别团体签订形式和内容令景程持有人特别团体（在合理行事之下）满意的重组支持协议，以及（ⅱ）在香港联合交易所有限公司网站并通过清算系统向市场发布公告已签署的重组支持协议。 |
|  | (c) By no later than 31 March 2023, TJ to reach a written agreed general position or schedule with the SJ AHG on (i) a whitelist of potential scheme administrators and adjudicators; and (ii) high-level principles and high-level process relating to the valuation and adjudication in respect of the TJ Scheme, in each case, in form and substance satisfactory to the SJ AHG and TJ, both acting reasonably (with the details to be agreed in the Scheme Documents). |
|  | 不迟于 2023 年 3 月 31 日，天基与景程持有人特别团体就（ⅰ）潜在的协议安排管理人和裁决人的白名单；以及 |

|  | （ii）有关天基协议安排的评估和裁决的概括性原则和概括性程序在书面上达成大致立场或时间表的协议，两者的形式和内容均应令景程持有人特别团体和天基都在合理行事之下满意（细节将在协议安排文件中商定）。<br><br>Each of the Restructuring Milestones can be extended with the written agreement of the SJ AHG (which can be by email through its advisers).<br>每项重组里程碑都可在景程持有人特别团体的书面同意下延长（可通过其顾问以电子邮件的方式进行）。 |
|---|---|
| **Conditions Precedent**<br>**前提条件** | The following conditions must be satisfied or waived by the relevant regulator or court, the recipients of the relevant fees or the SJ AHG (acting reasonably), as applicable, prior to or on the RED:<br>以下条件必须在重组生效日之前或当日得到满足或由相关监管机构或法院或相关费用的接收方或在合理行事之下的景程持有人特别团体（按所适用的）予以豁免：<br><br>(a) the delivery by the relevant members of the Group of corporate authorisations in respect of the TJ Proposed Restructuring and their entry into the Scheme Documents to which they are a party;<br>集团的相关成员就天基拟议重组交付公司授权书，并签署其作为一方的协议安排文件；<br><br>(b) the obtaining, if and as applicable, of all relevant regulatory approvals or other consents (including, without limitation, delivery of relevant court sanction orders in respect of the TJ Scheme(s), any relevant shareholders' approval, and the Singapore Stock Exchange's or another internationally recognized exchange's approvals in-principle for the listing of and permission to deal in each of the TJ Restructuring Consideration (where applicable));<br>获得所有适用及相关的监管批准或其他同意（包括但不限于交付有关天基协议安排的相关法院批准令、任何相关股东的批准，以及新加坡交易所或另一个国际公认的交易所对每项天基重组对价（按所适用的）的上市和交易许可的原则性批准）；<br><br>(c) the obtaining of the relevant court sanction order(s) in respect of the SJ Scheme and the SJ Scheme becoming effective in accordance with the terms of the SJ Scheme;<br>获得关于景程协议安排的相关法院批准令，且景程协议安排按照景程协议安排的条款生效； |

| | |
|---|---|
| | (d) the settlement in full of all fees and expenses payable under contracts or other arrangements entered into by any member of the Group with financial or legal advisers, members of the SJ AHG or other professional parties for their services rendered in relation to the TJ Proposed Restructuring;<br><br>全额结清集团任何成员与财务或法律顾问、景程持有人特别团体或其他专业人士就其提供的与天基拟议重组有关的服务所签订的合同或其他安排下的所有应付费用和开支；<br><br>(e) each key document (scope to be agreed in the RSA) to be entered into by certain parties to implement the terms of the TJ Proposed Restructuring are in the form agreed in writing between TJ and the SJ AHG (or the AHG Advisers expressly on their behalf), each acting reasonably; and<br><br>某些当事方为实施天基拟议重组条款而订立的每份关键文件（范围有待于在重组支持协议中商定），均采用天基和景程持有人特别团体（或明确代表他们的持有人特别团体顾问）各自合理行事所书面商定的形式；及<br><br>(f) other conditions precedent to be further agreed / satisfaction of each of the other conditions precedent contained in the Scheme Documents.<br><br>其他前提条件有待进一步商定/ 协议安排文件中所载的每个其他前提条件得到满足。 |
| **Restructuring Effective Date**<br>重组生效日期 | The Restructuring Effective Date (the "**RED**") shall occur as soon as reasonably practicable and after the Conditions Precedent have been satisfied or waived and anticipated to be 1 October 2023, provided that it shall be no later than 15 December 2023 (or such other date as agreed in writing between TJ and the SJ AHG) (the "**Longstop Date**").<br><br>重组生效日期（"**重组生效日**"），应在前提条件得到满足或豁免后，在合理可行的情况下尽快发生，预计为 2023 年 10 月 1 日，前提是不迟于 2023 年 12 月 15 日（或经天基和景程持有人特别团体书面商定的其他日期）（"**最后期限日**"）。<br><br>In the event that the RED is at a date which is later than 1 October 2023:<br><br>若重组生效日为 2023 年 10 月 1 日之后的某一天：<br><br>(a) the interests on the TJ New Notes shall begin to accrue on 1 October 2023; and<br><br>天基新票据的利息应于 2023 年 10 月 1 日开始计息；以及 |

|  | (b) the repayment and amortisation schedules of the TJ New Notes shall remain the same as if the RED were 1 October 2023, |
|  | 天基新票据的偿付和摊销时间表应按照如同重组生效日仍为 2023 年 10 月 1 日而保持不变, |
|  | notwithstanding that any such TJ New Notes may be issued at a later date. |
|  | 尽管任何此类天基新票据可能会在之后的日期发行。 |
|  | In light of the above, the interests on the TJ Existing Debt Instruments will only accrue up to (and excluding) 1 October 2023 (for the purpose of calculating entitlement to distribution). |
|  | 鉴于上述情况,天基现有债务工具的利息将只计至(且不包括)2023 年 10 月 1 日(出于待分配的可获偿金额的目的)。 |
|  | On the RED, |
|  | 在重组生效日当日, |
|  | (a) any fees (including but not limited to the TJ Consent Fee) not paid prior to the RED shall be paid to the relevant recipients; and |
|  | 在重组生效日前未支付的任何费用(包括但不限于天基同意费)应支付给相关接收方;以及 |
|  | (b) the TJ New Notes shall be issued by TJ in accordance with the terms of the Scheme Documents. |
|  | 天基新票据应由天基根据协议安排文件的条款发行。 |
| **Inter-conditionality of Schemes**<br>**协议安排的相互条件性** | Effectiveness of TJ Scheme shall depend on effectiveness of the SJ Scheme (as defined in the restructuring term sheet for the SJ Scheme).<br>天基协议安排的有效性应取决于景程协议安排的有效性(见景程重组条款清单中的定义)。 |

**OPERATIVE TERMS OF THIS TJ TERM SHEET**
**本天基条款清单的执行条款**

| **Confidentiality**<br>**保密** | TJ agrees that it shall not, and it shall cause the Group and their respective Affiliates not to, in any event disclose Schedule 1 (*SJ AHG*) to this TJ Term Sheet or any of its content or any signature or identity of the SJ AHG Members to any person (other than the Group's legal and financial advisers or such information or other agent for the purposes of the Restructuring) without the prior written consent of the SJ AHG, *provided* that TJ may disclose such information: |

天基同意，在任何情况下，未经持有人特别团体的事先书面同意，其不得且应促使集团及其各自的关联人士不得，向任何人士（不包括出于重组目的披露集团的法律或财务顾问或此类信息或其他代理）披露本天基条款清单的附表 1（*景程持有人特别团体*）或其任何内容或景程持有人特别团体成员的任何签名或身份，*前提*是天基可在以下情况披露该等信息：

(a) to the extent requested or required (as applicable) by any court or regulatory body or by any applicable rule or law;

在任何法院或监管机构或任何适用规则或法律所要求或规定（按所适用的）的范围内；

(b) to any of its Affiliates provided that any such information is shared on a confidential basis and TJ is responsible for any contravention of this section by its Affiliates;

披露给其任何关联人士，只要任何此类信息是在保密的基础上提供的，并且天基对其关联人士违反本节的任何行为负责；

(c) to the extent such information has been disclosed by a member of the SJ AHG or its Affiliates to any Court, Regulatory Body, or to a relevant participating party (other than on a without prejudice basis) in a legal, regulatory or security enforcement proceeding or process (other than any proceedings arising from any breach of this section by TJ), against any member of the Group or its Affiliates commenced or supported by a member of the SJ AHG or its Affiliates;

如果在由某位景程持有人特别团体成员或其关联人士启动或支持的针对集团或其关联人士的法律、监管或执行质押的程序或过程（不包括因天基违反本节规定而产生的任何程序）中，该等信息已由某位景程持有人特别团体成员或其关联人士向任何法院、监管机构或相关参与方披露（在无损权益基础上披露的除外）；

(d) to the extent such information has been disclosed in the public domain other than in the contravention of this section;

如果此信息已经在公共领域被披露，违反本节规定的披露除外；

(e) with the written permission of the SJ AHG;

得到景程持有人特别团体的书面允许；

(f) at any time after the end of one year from the date of this TJ Term Sheet.

---

|  | 在本天基重组条款清单签署之日起一年结束后的任何时间。

Capitalised terms used in this section but not defined in this section or this TJ Term Sheet have the meanings given to them, *mutatis mutandis*, in the NDA.
本节中使用但未在本节或本天基条款清单中定义的大写术语，其意义依据保密协议对其的定义（经必要的修改）。 |
| **Variation and Termination**

变更和终止 | This TJ Term Sheet ceases to bind:

在下列情况下，本天基条款清单不再对下列人士有约束力：

(a) any member of the SJ AHG, if (i) any Restructuring Milestone is not satisfied (save that failure to meet the RSA milestone may be cured within 3 Business Days), or (ii) TJ fails to comply with any material provision of this TJ Term Sheet (and such failure to comply is not remedied within 5 Business Days); or
景程持有人特别团体的任何成员，如果（i）任何重组里程碑未得到满足（但是未满足重组支持协议里程碑之行为可在 3 个工作日内得到补救除外）；或（ii）天基未遵守本天基条款清单的任何重要规定（且该未遵守之行为未在 5 个工作日内得到补救）；或

(b) TJ, if any member of the SJ AHG (such creditor being a "**Default Creditor**") fails to comply with any material provision of this TJ Term Sheet (and such failure to comply is not remedied within 5 Business Days), provided that the effect of termination shall only apply to TJ's obligations to such Default Creditor and does not impact its obligations to other SJ AHG members under this TJ Term Sheet.
天基，如果任何景程持有人特别团体成员（该等债权人称为"**违约债权人**"）未能遵守本天基条款清单的任何重要规定（且该未遵守之行为未在 5 个工作日内得到补救），前提是约束力的终止仅适用于天基对该违约债权人的义务，不影响在本天基条款清单下天基对其他景程持有人特别团体成员的义务。

This TJ Term Sheet ceases to bind any Party automatically at the earlier of: (i) the Longstop Date; and (ii) the termination of RSA (if entered into between, among others, TJ and the SJ AHG) in accordance with the terms of the RSA. |

|  | 本天基条款清单在以下时间中较早的时间自动停止对任何一方的约束：(i) 最后期限日；和 (ii) 根据重组支持协议的条款，终止重组支持协议（如果天基和景程持有人特别团体之间达成协议）。 |
| --- | --- |
|  | Any term of this TJ Term Sheet may be amended, varied or waived in writing by TJ and the SJ AHG. Notwithstanding the foregoing, TJ may amend, vary or waive any terms of this TJ Term Sheet (including any terms of any Schedule hereto) at its sole discretion (but without any obligation to do so) to: (a) cure any ambiguity, defect, omission or inconsistency in this TJ Term Sheet; or (b) make any other change to this TJ Term Sheet that is beneficial to the rights of the SJ AHG, provided that in each of the foregoing case there is no material adverse effect on, the rights of the SJ AHG when compared to the terms then in effect. Such amendments, variations or waivers shall be binding on all the Parties. |
|  | 本天基条款清单的任何条款可由天基和景程持有人特别团体以书面形式修改、变更或豁免。尽管有上述规定，天基可自行决定修改、变更或放弃本天基条款清单的任何条款（包括任何附表的任何条款）（但无任何义务这样做）以：(a) 纠正本天基条款清单的任何模糊、缺陷、遗漏或不一致之处；以及 (b) 对本天基条款清单作出有利于景程持有人特别团体的任何其他修改，前提是，以上所述的各项更改与当时有效的条款相比，对景程持有人特别团体的权利没有重大不利影响。此种修改、变更或豁免对所有当事方都有约束力。 |
|  | "**Business Day**" means any day which is not a Saturday, Sunday, legal holiday or other day on which banking institutions in the City of New York, London, Cayman Islands, British Virgin Islands, Hong Kong or the PRC are authorised or required by law or governmental regulation to close. |
|  | "工作日"指周六、周日、法定节假日或法律或政府法规授权或要求纽约、伦敦、开曼群岛、英属维尔京群岛、香港或中国银行机构停业的其他日期以外的任何一天。 |
| **Governing Law**<br>适用法律 | This TJ Term Sheet will be governed by and construed in accordance with Hong Kong law.<br>本天基条款清单将适用香港法律，并根据香港法律进行解释。 |

| | |
|---|---|
| | The courts of Hong Kong are to have exclusive jurisdiction to settle any disputes that may arise out of or in connection with this TJ Term Sheet.<br><br>香港法院拥有专属管辖权，以解决可能因本天基条款清单而产生的或与之相关的任何争议。 |
| **Language**<br>语言 | The Chinese provisions of this TJ Term Sheet are for reference only. If there is any inconsistency between the English and Chinese provisions of this TJ Term Sheet, the English provisions shall govern.<br>本天基条款清单的中文条款仅供参考。 如果本天基条款清单的中英文条款存在任何不一致之处，应以英文条款为准。 |

**Schedule 1**
<u>附表 1</u>
**SJ AHG**
景程持有人特别团体



**Schedule 2**[1]
**附表 2**[1]
**TJ Other Existing Debt Instruments**
**天基其他现有债务工具**

1. Guarantee in relation to US$260 million senior notes issued by Jumbo Fortune Enterprises Limited
与 Jumbo Fortune Enterprises Limited 所发行的 2.6 亿美元优先票据有关的担保

2. HK$575 million put option in relation to shares of Clear Star Investments Limited
与 Clear Star Investments Limited 股份有关的 5.75 亿港元认沽期权

3. US$258 million put option in relation to shares of Sky Joy Holdings Limited
与 Sky Joy Holdings Limited 股份有关的 2.58 亿美元认沽期权

4. US$258 million put option in relation to private loan borrowed by Sky Joy Holdings Limited
与 Sky Joy Holdings Limited 所借的私募贷款有关的 2.58 亿美元认沽期权

5. HK$7.6 billion loan borrowed by TJ due 24 November 2023
天基所借的将于 2023 年 11 月 24 日到期的 76 亿港元贷款

6. Approximately HK$1.4 billion put options in relation to a project located in Tuen Mun, Hong Kong
与位于香港屯门的项目有关的约 14 亿港元的认沽期权

7. US$5 billion intercompany balance owed to CEG from TJ (on a non-voting basis)[2]
天基欠恒大的 50 亿美元公司间余额（在非投票的基础上）

---

[1] The numbers in this Schedule represent the principal outstanding as of 31 December 2022 and are subject to change.
本附表中的数字代表截至 2022 年 12 月 31 日的未偿还本金，并且可能发生变化。

[2] For the avoidance of doubt, this intercompany claim by CEG against TJ is entitled to receive scheme consideration as a scheme creditor in the TJ Scheme as with other TJ Other Existing Debt Instruments creditors.
为避免疑义，如同其他的天基其他现有债务工具，恒大针对天基的公司间索赔权有权作为天基协议安排中的协议安排债权人获得协议安排对价。

**Schedule 3**
**TJ New Notes Short Form Term Sheet**

| Principal Terms of the Tianji New Notes ("TJ New Notes")<br>天基新票据（"天基新票据"）的主要条款 | |
|---|---|
| **Issuer**<br>发行人 | Tianji Holding Limited, a company incorporated with limited liability under the laws of Hong Kong ("**TJ**")<br><br>天基控股有限公司，一家根据香港法律注册成立的有限责任公司（"**天基**"） |
| **Principal Amount**<br>本金金额 | The TJ New Notes shall comprise four tranches as follows, with the following maximum principal amounts:<br><br>天基新票据应包括以下四笔，最大本金金额如下：<br><br>1. TJ Tranche A: US$100 million;<br><br>　 天基票据 A: 1 亿美元；<br><br>2. TJ Tranche B: US$200 million;<br><br>　 天基票据 B: 2 亿美元；<br><br>3. TJ Tranche C: US$300 million; and<br><br>　 天基票据 C: 3 亿美元；和<br><br>4. TJ Tranche D: US$200 million.<br><br>　 天基票据 D: 2 亿美元。<br><br>In addition, it is contemplated that the TJ Consent Fee will be paid in the form of notes under TJ Tranche A, which has not been reflected in the maximum principal amount above.<br><br>此外，天基同意费将以纳入天基票据 A 下的票据形式支付，此并未反映在上述最大本金金额中。 |
| **Maturity Dates / Principal Repayment**<br>到期日/本金偿付 | 1. TJ Tranche A: five (5) years from the earlier of October 1, 2023 and the RED (the "**Reference Date**");<br><br>　 天基票据 A: 自 2023 年 10 月 1 日和重组生效日中较早的日期（"**参考日期**"）起五（5）年；<br><br>2. TJ Tranche B: six (6) years from the Reference Date;<br><br>　 天基票据 B: 自参考日期起六（6）年；<br><br>3. TJ Tranche C: seven (7) years from the Reference Date; and<br><br>　 天基票据 C: 自参考日期起七（7）年；和<br><br>4. TJ Tranche D: eight (8) years from the Reference Date.<br><br>　 天基票据 D: 自参考日期起八（8）年。<br><br>The outstanding principal amount of each tranche shall be repaid at maturity, together with any accrued but unpaid interest. |

| | |
|---|---|
| | 每一笔的未偿还本金应在上述到期日当日连同任何应计及未付利息一起偿还。 |
| **Interest (PIK and cash)**<br>利息（实物付息和现金） | Interest will be payable semi-annually in arrears on the outstanding principal amount of the TJ New Notes at the following interest rates with respect to each interest payment period:<br>天基新票据的未偿还本金金额将于每半年期末支付一次利息，每个付息期的利率如下：<br><br>1. <u>TJ Tranche A</u>: 6.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind);<br><br>天基票据 A：每年 6.0% （如果与该付息期相关的所有利息均以现金支付）或每年 7.0%（如果与该付息期相关的任何部分利息以实物支付）；<br><br>2. <u>TJ Tranche B</u>: 6.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind);<br><br>天基票据 B：每年 6.5% （如果与该付息期相关的所有利息均以现金支付）或每年 7.5%（如果与该付息期相关的任何部分利息以实物支付）；<br><br>3. <u>TJ Tranche C</u>: 7.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 8.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); and<br><br>天基票据 C：每年 7.0% （如果与该付息期相关的所有利息均以现金支付）或每年 8.0%（如果与该付息期相关的任何部分利息以实物支付）；和<br><br>4. <u>TJ Tranche D</u>: 7.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 8.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind).<br><br>天基票据 D：每年 7.5% （如果与该付息期相关的所有利息均以现金支付）或每年 8.5%（如果与该付息期相关的任何部分利息以实物支付）。<br><br>Interest on the outstanding principal amount of the TJ New Notes shall be paid in the following manner:<br>天基新票据未偿还本金的利息应按以下方式支付：<br><br>1. For the first two and a half years after the Reference Date: interest may be paid in cash or in kind, at the election of the Issuer;<br><br>对于参考日期后的最初的 2.5 年：可由发行人选择用现金或实物支付利息；<br><br>2. From the 31st month after the Reference Date to the 36th month after the Reference Date, interest in an amount equal to at least |

0.7% of the outstanding principal amount of each tranche of the TJ New Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Issuer;

对于参考日期后的第 31 个月至第 36 个月：应以现金支付相当于各笔天基新票据未偿本金的至少 0.7%的利息；其余部分的利息可由发行人选择以现金或实物支付；

3. the fourth year after the Reference Date: interest in an amount equal to at least 3.0% p.a. of the outstanding principal amount of each tranche of the TJ New Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Issuer; and

对于参考日期后的第四年：应以现金支付相当于各笔天基新票据未偿本金的至少每年 3.0%的利息；其余部分的利息可由发行人选择以现金或实物支付；和

4. Starting from the fifth year after the Reference Date: interest shall be paid in cash.

对于参考日期后的第五年开始：利息应以现金支付。

All interest paid in kind with respect to the TJ New Notes will be added to the then current outstanding principal amount of the TJ New Notes.

所有天基新票据以实物支付的利息均计入届时天基新票据的未偿还本金金额。

If the Issuer pays cash interest under any tranche of the TJ New Notes with respect to any interest payment period in an amount greater than the amount of cash interest required to be paid on such tranche with respect to such interest payment period, it shall also pay additional cash interest under the other tranches of the TJ New Notes and all tranches of the SJ New Notes. The amount of such additional cash payments shall be allocated between SJ New Notes on the one hand and TJ New Notes on the other hand on a 90:10 basis, with adjustments to be agreed if the ratio of the principal amounts of the SJ New Notes and the TJ New Notes has changed from such ratio as of the Original Issue Date other than due to scheduled principal repayments. All such additional cash payments allocated to the SJ New Notes shall be applied pro rata among the tranches of the SJ New Notes based on their outstanding principal amounts and all such additional cash payments allocated to the TJ New Notes shall be applied pro rata among the tranches of the TJ New Notes based on their outstanding principal amounts.

如果发行人就天基新票据的任何一笔就任何付息期支付的现金利息大于该票据在该付息期所需支付的现金利息金额，则发行人还应就天基新票据的其他笔债券和景程新票据的所有笔债券支付额外的现金利息。该等额外现金支付的金额应按 90：10 的比例在景程新票据和天基新票据之间进行分配，但如果景程新票据和天基新票据的本金金额比率相比于截至初始发行日期时有变化（由于按计划的本金偿付之外的原因），则该比例有待商定调整。所有分配给景程新票据的该等额外现金支付应根据其未偿还本金金额按比例应用于各笔景程新票据，而分配给天基新票据的该等额外现金支付应根据其未偿还本金金额按比例应用于各笔天基新票据。

| Security<br>质押 | Collateral for TJ New Notes ("TJ Collateral"):<br>天基新票据的质押物（"天基质押物"）<br><br>1. Share charge given by Assemble Harmony Limited over shares of Greet Delight Limited which holds Cordoba Homes Limited.<br><br>    Assemble Harmony Limited 对持有 Cordoba Homes Limited 的 Greet Delight Limited 的股份作出股份质押。<br><br>2. Share charge given by TJ over shares it holds in All Peace Investments Limited.<br><br>    天基对其持有的 All Peace Investments Limited 的股份作出质押。<br><br>3. Share charge given by TJ over the Class F shares it holds in Nexus Emerging Opportunities Fund Property SP.<br><br>    天基对其持有 Nexus Emerging Opportunities Fund Property SP 的 F 类股份作出质押。<br><br>4. Share charge given by Central Sino Global Limited over shares it holds in Jovial Idea Developments Limited, which holds shares in E-House (China) Enterprise Holdings Limited (HKEX:2048).<br><br>    Central Sino Global Limited 对持有易居（中国）企业控股有限公司（港交所代码：2048）股票的 Jovial Idea Developments Limited 的股份作出质押。<br><br>The security interest over any TJ Collateral will be released upon any sale or disposal of such TJ Collateral and (i) the application of the proceeds thereof in accordance with the provisions under "Mandatory Redemption" below or (ii) the deposit of such proceeds into an account charged to the benefit of the holders of the TJ New Notes, or (iii) such proceeds being subject to an escrow or other arrangement to be agreed.<br><br>当根据下文"强制赎回"的条款对任何天基质押物进行任何出售或处置时，该天基质押物上的质押权益将被解除，并且，（i）将根据下文"强制赎回"的条款来应用该所得款，或（ii）将该所得款存入一个以天基新票据持有人为受益人的质押账户，或（iii）该所得款将受限于待经商定的托管或其他安排。 |
|---|---|
| Mandatory Redemption<br>强制赎回 | 1. Net consideration received by TJ and its offshore subsidiaries that is attributable to TJ from the sale of China Evergrande Centre ;<br><br>    中国恒大中心出售后天基及其境外子公司收到的归属于天基的净对价；<br><br>2. Net consideration from the sale of any TJ Collateral attributable to TJ;<br><br>    归属于天基的任何天基质押物出售后收到的净对价；<br><br>3. Dividends/distributions (if any) received by TJ from its onshore and offshore restricted subsidiaries;<br><br>    天基收到的其境内外受限子公司产生的分红/分配（如有）；<br><br>4. Receipt by TJ of repayments of unsubordinated intercompany receivables from subsidiaries; and |

天基收到的子公司归还的非次级公司间往来应收款；及

5. Repayment received by TJ from Nexus Emerging Opportunities Fund Property SP under the HK$521,000,000 loan owed to TJ.

   天基从 Nexus Emerging Opportunities Fund Property SP 收到的基于 521,000,000 港元贷款的还款。

Cash proceeds under clauses (1), (2) and (5) above shall be used to purchase, by way of reverse Dutch auction, within 45 business days of receipt of such cash proceeds, either or both of the two tranches of TJ New Notes with the shortest maturities at that time, provided that the purchase price is at a minimum purchase price equal to the then current market price plus a premium of US$0.1 per US$1 of principal amount plus accrued and unpaid interest (but in any event the purchase price shall not exceed 100% of principal amount plus accrued and unpaid interest). If any such cash proceeds remain unused after such purchase, the Issuer shall use such remaining proceeds to redeem the TJ New Notes by tranche in the order of maturity, at par plus accrued and unpaid interest.

上述第（1）、（2）和（5）项下的现金所得款将在收到该等现金所得款的 45 个工作日内通过反向荷兰式拍卖用于收购天基新票据中届时最快到期的两笔中的其中一笔或全部两笔，前提是最低收购价格等于届时的市场价加上每 1 美元本金金额 0.1 美元溢价加上应计及未付利息（但在任何情况下，收购价格不得超过本金金额的 100%加上应计及未计利息）。如果该等收购后仍有未使用的该等所得款，发行人应将该剩余所得款用于以票面价值加应计和未付利息的方式按到期顺序分批赎回天基新票据。如果该等收购后仍有任何未使用的该等现金所得款，发行人应用剩余的所得款按票面价值加应计及未付利息按到期顺序分批赎回天基新票据。

Cash proceeds under clauses (3) and (4) above shall be used to redeem either or both of the two tranches  of SJ New Notes with the shortest maturities at that time and either or both of the two tranches  of TJ New Notes with the shortest maturities at that time, at par plus accrued and unpaid interest, provided that 90% of such proceeds shall be allocated to purchase SJ New Notes and 10% of such proceeds shall be allocated to purchase TJ New Notes (with adjustments to be agreed if the ratio of the principal amounts of the SJ New Notes and the TJ New Notes has changed from such ratio as of the Original Issue Date other than due to scheduled principal repayments). If any such cash proceeds remain unused after such purchase, the Issuer shall use (i) 90% of such remaining proceeds to redeem the SJ New Notes by tranche in the order of maturity and (ii) 10% of such remaining proceeds to redeem the TJ New Notes by tranche in the order of maturity, at par plus accrued and unpaid interest (with adjustments to be agreed if the ratio of the principal amounts of the SJ New Notes and

|  | the TJ New Notes has changed from such ratio as of the Original Issue Date other than due to scheduled principal repayments). |
|---|---|
|  | 上述第（3）和（4）项下的现金所得款将用于按票面价值并加上应计及未付利息赎回景程新票据中届时最快到期的两笔中的其中一笔或全部两笔以及天基新票据中届时最快到期的两笔中的其中一笔或全部两笔，前提是该等所得款的 90% 应分配用于收购景程新票据，而该等所得款的 10% 应分配用于收购天基新票据（如果景程新票据和天基新票据的本金金额比率相比于截至初始发行日期时有变化（由于按计划的本金偿付之外的原因），则该比例有待商定调整）。如果该等收购后仍有未使用的该所得款，发行人应按票面价值加上应计及未付利息将 (i) 该等剩余的所得款的 90%用于按到期顺序分批赎回景程新票据并将（ii）该等剩余所得款的 10%用于按到期顺序分批赎回天基新票据（如果景程新票据和天基新票据的本金金额比率相比于截至初始发行日期时有变化（由于按计划的本金偿付之外的原因），则该比例有待商定调整）。 |
|  | All SJ New Notes and TJ New Notes so repurchased or redeemed shall be cancelled. |
|  | 所有以这样方式回购或赎回的景程新票据和天基新票据应被注销。 |
| **Covenant**<br>限制 | Cash proceeds from disposals and operations of the existing 35 onshore projects held (directly and indirectly) by TJ and cash received by TJ and its subsidiaries on repayment of intercompany receivables (as referred to in clause (4) of "Mandatory Redemption" above), including from CEG and its subsidiaries (other than TJ and its subsidiaries) and dividends received by TJ and its subsidiaries from these projects (as referred to in clause (3) of "Mandatory Redemption" above), shall be used to: |
|  | 天基（直接或间接）所持的现有 35 个境内项目的处置和运营的现金所得款，以及天基及其子公司收到的公司间应收款现金（如上文"强制赎回"第（4）项所述），包括恒大及其子公司（天基及其子公司除外）所偿付的）以及天基从这些项目中收到的分红（如上文"强制赎回"第（3）项所述），应用于： |
|  | (i)　discharge any onshore liabilities associated with the project disposed or required or necessary to be discharged in connection with such disposal,<br><br>解除与处置的项目相关的任何境内负债，或与进行该等处置相关所需要或必须解除的负债， |
|  | (ii)　fund the development, operations and delivery of these projects, and/or<br><br>为这些项目的开发、运营和交付提供资金，及/或 |

| | |
|---|---|
| | (iii)    pay liabilities and fulfil obligations of TJ and its subsidiaries (other than intercompany payables (other than non-interest-bearing trade payables incurred in the ordinary course of business and consistent with past practice that are on arm's length terms and otherwise comply with the affiliate transactions covenant in the indentures) to CEG and its subsidiaries (other than TJ and its subsidiaries)),<br><br>支付天基及其子公司的负债并履行天基及其子公司的义务（不包括对恒大及其子公司（天基及其子公司除外）的公司间应付款（不包括在正常业务过程中产生且符合过去惯例，符合公平交易，以及符合债券契约中的关联交易条款的无息贸易应付款项）），<br><br>provided that such cash proceeds and cash received shall not be used to fund the investment, acquisition, development, operation or delivery of new projects, and in each case above, subject to compliance with applicable laws, regulations, rules, and policies, measures, orders or demands from judicial, regulatory or governmental bodies (provided, in the case of any demand, that TJ provides the trustee and the holders with an officer's certificate setting forth, among other things, the terms of such demand).<br><br>前提是该等现金所得款和收到的现金不得用于资助新项目的投资、收购、开发、运营或交付，并且在上述每种情况下，均须遵守司法、监管或政府机构的适用法律、法规、规则和政策、措施、命令或要求（前提是如有任何要求，天基需向信托人和持有人提供一份高管证书，列明包括但不限于该要求的条款）。 |
| **Auditor**<br>审计师 | TJ will engage a Whitelist Auditor to audit its annual financial statements starting no later than the audit of the fiscal year ending December 31, 2023.<br><br>天基将聘请一家白名单审计师对其年度财务报表进行审计，开始时间不晚于截至 2023 年 12 月 31 日止的财务年度审计。<br><br>The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms:<br><br>"白名单审计师" 应为以下任何会计师事务所或其各自的关联所或成员所：<br><br>(a)  Baker Tilly International;<br><br>     天职国际；<br><br>(b)  BDO;<br><br>     立信；<br><br>(c)  Crowe Global;<br><br>     国富浩华； |

| | |
|---|---|
| | (d)  Deloitte;<br><br>德勤；<br><br>(e)  Ernst & Young;<br><br>安永；<br><br>(f)  Grant Thornton;<br><br>致同；<br><br>(g)  KPMG;<br><br>毕马威；<br><br>(h)  Mazars;<br><br>中审众环；<br><br>(i)  Moore Global;<br><br>大华国际；<br><br>(j)  Prism; and<br><br>上会栢诚；和<br><br>(k)  RSM International.<br><br>RSM 国际。 |
| **Trustee**<br>信托人 | Madison Pacific or another internationally recognized financial institution as agreed between the Issuer and the SJ AHG.<br><br>Madison Pacific 或由发行人和景程持有人特别团体商定的另一家国际公认的金融机构。 |
| **General**<br>一般 | The Issuer and the SJ AHG will discuss and agree additional covenants and other provisions to be included under the TJ New Notes and the related legal documentation, including among others, related to (i) restrictions on indebtedness, restricted payments, liens, affiliate transactions, asset sales, open market and other repurchases and other actions, (ii) the timing, manner and other aspects of sales of assets referred to under "Mandatory Redemption", (iii) events of default (and any applicable default interest), (iv) the rights of holders of, and owners of beneficial interests in, the TJ New Notes (a) to obtain periodic financial and other information and documents from the trustee and the collateral agent, (b) to appoint or replace trustee, and (c) to direct the trustee and collateral agent and to enforce remedies, and (v) the listing of the TJ New Notes.<br><br>发行人和景程持有人特别团体将讨论并商定将纳入天基新票据的额外限制和其他条款以及相关法律文件，包括但不限于（i）对负债、受限支付、质押权、关联交易、资产出售、公开市场和其他回购和其他行动的限制，（ii）"强制赎回"中提到的资产出售的时间安排、方式和其他方面；（iii）违约事件（及任何适用的违约利息），（iv）天基新票据持有人和实益权益持有人的权利，包括：（a）从信托人 |

|  | 和质押物代理人获得定期财务和其他信息和文件的权利，（b）任命或更换信托人的权利，和（c）指示信托人和质押物代理人以及执行救济措施的权利，以及（v）天基新票据的上市。 |
|---|---|
| **Language**<br>**语言** | The Chinese provisions contained herein are for reference only. If there is any inconsistency between the English and Chinese provisions, the English provisions shall prevail.<br>此处的中文条款仅作参考。如英文和中文条款有任何不一致之处，应以英文条款为准。 |

**Exhibit C.1**

**Evergrande Convening Order**

**HCMP 1091 / 2023**

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

MISCELLANEOUS PROCEEDINGS NO. 1091 OF 2023



IN THE MATTER of CHINA EVERGRANDE GROUP 中國恒大集團

and

IN THE MATTER of Section 670 of the Companies Ordinance (Cap. 622)

27 JUL 2023

**BEFORE THE HONOURABLE MADAM JUSTICE LINDA CHAN IN CHAMBERS**

**ORDER**

UPON THE APPLICATION of the above named China Evergrande Group 中國恒大集團 (the "**Company**") by way of *Ex Parte* Originating Summons filed herein on 12 July 2023 ("**Originating Summons**").

AND UPON READING the Originating Summons, the Affirmation of Hui Ka Yan filed herein on 20 July 2023 together with the exhibits referred to therein, including but not limited to the draft explanatory statement for the Scheme ("**Explanatory Statement**"), the Affirmation of Neil Edward McGregor McDonald filed herein on 21 July 2023 together with the exhibits referred to therein, and the Affirmation of Wu Tin Long filed herein on 24 July 2023 together with the exhibits referred to therein.

AND UPON HEARING leading counsel for the Company and counsel for the ad hoc group of creditors of the Company.

IT IS ORDERED that:-

1.      The Company be at liberty to convene, for the purposes of the proposed scheme of

arrangement under sections 670, 673 and 674 of the Companies Ordinance (Cap. 622) (the "**Scheme**") to be made between the Company and the Scheme Creditors (as defined under the Scheme), the following meetings of its Scheme Creditors each for the purpose of considering and, if thought fit, approving (with or without modification) the Scheme:

    a.   one meeting of the Class A Scheme Creditors (as defined in the Scheme) (the "**Class A Hong Kong Scheme Meeting**")

    b.   one meeting of the Class C Scheme Creditors (as defined in the Schemes) (the "**Class C Hong Kong Scheme Meeting**", together with the Class A Hong Kong Scheme Meeting, the "**Scheme Meetings**", and each a "**Scheme Meeting**"),

2.    The Scheme Meetings will be held on 23 August 2023 in Hong Kong at 39/F, Two International Finance Centre, 8 Finance Street, Central, Hong Kong (subject to any adjournment as my be approved by the chairperson of the Scheme Meetings ("**Chairperson**")) as follows:

    a.   The Class A Hong Kong Scheme Meeting will commence at 8:00 p.m. (Hong Kong time).

    b.   The Class C Hong Kong Scheme Meeting will commence at 9:30 pm (Hong Kong time).

3.    Scheme Creditors be able to attend the applicable Scheme Meeting(s) to vote in respect of the Scheme, in person, by a duly authorised representative (if a corporation) or by proxy, including via video conference.

4.    In respect of attendance by video conference:

    a.   For Scheme Creditors who are not Blocked Scheme Creditors (as defined in the Scheme), video conferencing details will be published on https://projects.morrowsodali.com/evergrande (the "**Transaction Website**") at least 21 days before the day appointed for the Scheme Meetings and the passcode notified to individual Scheme Creditors by Morrow Sodali Limited as the information agent in respect of the Scheme (the "**Information Agent**") at least 2 business days before the day appointed for the Scheme Meetings.

b. For Blocked Scheme Creditors, GLAS Specialist Services Limited ("**GLAS**") will provide Blocked Scheme Creditors with the details of how to attend and vote at the Scheme Meetings at least 21 days before the day appointed for the Scheme Meetings and will notify Blocked Scheme Creditors of the meeting passcode at least 2 business days before the day appointed for the Scheme Meetings.

5.    The Chairperson may require Scheme Creditors attending the Scheme Meetings by video conference to turn on their camera throughout the Scheme Meetings and log on to the video conference using their full name (as registered with the Information Agent) and the creditor identifier number provided to them by the Information Agent prior to the Scheme Meetings.

6.    At least 21 days before the day appointed for the Scheme Meetings, a copy of the notice of the Scheme Meetings (the "**Notice of Scheme Meetings**"), together with any forms required for voting purposes (the "**Scheme Creditor Voting Forms**"), shall be circulated to the Scheme Creditors by:

(a)    publication on the Transaction Website;

(b)    publication by way of public announcement by the Company on the HKEXnews website of The Stock Exchange of Hong Kong Limited at http://www.hkexnews.hk;

(c)    publication by way of public announcement by China Evergrande Group on the website of the Singapore Exchange Limited at https://www.sgx.com/;

(d)    publication on the website of the Company at http://www.evergrande.com;

(e)    by causing the Information Agent to send via electronic mail to each person who the Company believes is or may be a Scheme Creditor, and for whom the Company has a valid e-mail address; and

(f)    distribution via Euroclear Bank SA/NV and/or Clearstream Banking S.A.

7.    GLAS shall circulate copies of the Notice of Scheme Meetings and the Scheme Creditor Voting Forms to any Blocked Scheme Creditors by email not less than 21 days before the Scheme Meetings.

8.    When providing the Notice of Scheme Meetings in accordance with paragraphs 6 and 7 above, the Information Agent or GLAS (as applicable) shall provide copies of the following documents (or a link to the Transaction Website to enable the Scheme Creditors to access electronic copies of the following documents):

(a)    the Scheme;

(b)    the Explanatory Statement; and

(c)    the Solicitation Packet (as defined in the Explanatory Statement), being instructions as to the registration of claims and voting procedures for the purposes of the Scheme Meetings including the Scheme Creditor Voting Forms.

9.    The accidental omission to serve any Scheme Creditor with the Notice of Scheme Meetings, or the non-receipt by any Scheme Creditor of the Notice of Scheme Meetings, shall not invalidate the proceedings at the Scheme Meetings.

10.    At least 21 days before the day appointed for the Scheme Meetings, the Company shall place an advertisement substantially in the form of the draft hereby approved in (1) *The Standard*, which is an English language newspaper, and (2) a Traditional and Simplified Chinese translation thereof in *Hong Kong Economic Times*, which is a Chinese language newspaper in circulation in Hong Kong, and (3) a Simplified Chinese translation thereof in "*Nanfang Daily*" and "*Securities Times*" both of which are Chinese language newspapers in circulation in the PRC.

11.    Certified Chinese translation of the Notice of Scheme Meetings and the proposed advertisement in newspapers be dispensed with.

12.    An affirmation is to be filed by a solicitor of Sidley Austin who is fluent in both English and Chinese languages confirming the accuracy of the Chinese translation of the Notice of Scheme Meetings and the proposed advertisement in newspapers.

13.   The Chairperson be permitted to declare and announce the results of the Scheme Creditors' votes in respect of the Scheme, either during the Scheme Meetings or after the conclusion of the Scheme Meetings.

14.   The substantive hearing of the petition at which the Court will determine whether or not to sanction the Scheme shall be heard at 10:00 a.m. (Hong Kong time) on 5 and 6 September 2023 (subject to the Court's further directions) before the Honourable Madam Justice Linda Chan.

15.   There be liberty to apply generally.

AND THE COURT HEREBY APPROVES the:-

1.   Notice of Scheme Meetings substantially in the form of Annexure 1 hereto; and

2.   Notice of Scheme Meetings to be advertised on newspapers in the aforesaid manner substantially in the form of Annexure 2 hereto.

AND THE COURT HEREBY APPOINTS Mr. Patrick Cowley of KPMG Advisory (Hong Kong) Limited ("**KPMG**") or, failing Mr. Cowley, another representative of KPMG nominated by him, as the Chairperson of the Scheme Meetings on behalf of the Company.

AND THE COURT ORDERS that the Chairperson do report the results of the Scheme Meetings to the Court.

Dated this 24th day of July 2023.

Registrar

## <u>ANNEXURE 1</u>

**Notice of the Scheme Meetings**

IN THE HIGH COURT OF THE HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE

HCMP 1091 OF 2023

IN THE MATTER OF SECTIONS 670, 673 & 674 OF THE COMPANIES ORDINANCE,
CHAPTER 622 OF THE LAWS OF HONG KONG

AND

IN THE MATTER OF CHINA EVERGRANDE GROUP (中國恒大集團)

---

NOTICE OF SCHEME MEETINGS

---

Unless otherwise defined herein, terms used in this Notice have the same meanings as in the explanatory statement (the "**Explanatory Statement**") relating to the proposed schemes of arrangement between China Evergrande Group (中國恒大集團) (the "**Company**") and the Scheme Creditors (as defined therein) under section 86 of the Companies Act (2023 Revision) (the "**Cayman Scheme**") and section 670 of the Companies Ordinance (Cap. 622) (the "**Hong Kong Scheme**").

Copies of the Scheme, the Explanatory Statement and the Solicitation Packet (including the documentation to be completed by or on behalf of Scheme Creditors in order to vote and/or receive Scheme Consideration) are available to download from the Transaction Website (https://projects.morrowsodali.com/evergrande), save for voting forms for Blocked Scheme Creditors, which are available (along with any other relevant scheme documents or from the Company's website (www.evergrande.com).

**NOTICE IS HEREBY GIVEN** that by orders of the Grand Court of the Cayman Islands (the "**Cayman Court**") and the High Court of the Hong Kong Special Administrative Region Court of First Instance (the "**Hong Kong Court**"), dated 25 July 2023 and 24 July 2023 respectively (the "**Scheme Convening Orders**"), meetings of Scheme Creditors (the "**Scheme Meetings**") be convened for the purpose of considering and, if thought fit, approving (with or without modification) the Cayman Scheme and Hong Kong Scheme (together the "**Schemes**") proposed by the Company.

**Venue, times and video conference availability for the Scheme Meetings**

The Scheme Meetings will be held on 23 August 2023 in Hong Kong at the offices of Sidley Austin at 39/F, Two International Finance Centre, 8 Finance St, Central, Hong Kong as follows:

1. Hong Kong Scheme – The Class A Scheme Meeting will commence at 8:00 p.m. (Hong Kong time) / 7:00 a.m. (Cayman Islands time);

2. Cayman Scheme - The Class A Scheme Meeting will commence at 8:45 p.m. (Hong Kong time) / 7:45 a.m. (Cayman Islands time) / (or, if later, as soon as the Class A Scheme Meeting for the Hong Kong Scheme has concluded);

3. Hong Kong Scheme – The Class C Scheme Meeting will commence at 9:30 pm (Hong Kong time) / 8:30 a.m. (Cayman Islands time); and

4.  Cayman Scheme – The Class C Scheme Meeting will commence at 10:15 pm (Hong Kong time) / 9:15 a.m. (Cayman Islands time) / (or, if later, as soon as the Class C Scheme Meeting for the Hong Kong Scheme has concluded),

with any adjournment as may be necessary or appropriate, and subject to applicable COVID-19 restrictions, policies or guidance then in force in Hong Kong, and in which case any changes in arrangements relating to the Scheme Meetings shall be communicated to Scheme Creditors in advance of the Scheme Meetings on the Transaction Website, the Company's website, and by a public announcement published on the HKEXnews website of The Stock Exchange of Hong Kong Limited (the **"SEHK"**) and the website of the Singapore Exchange Securities Trading Limited (the **"SGX-ST"**).

A video conferencing facility will be made available. Scheme Creditors will be able to obtain the relevant dial-in details for the Scheme Meetings from the Transaction Website, the Company's website, and by written request from the Information Agent (if you are a Scheme Creditor who is not a Blocked Scheme Creditor), or GLAS Specialist Services Limited (**"GLAS"**) (if you are a Blocked Scheme Creditor).

Scheme Creditors who attend the Scheme Meetings in person, or by video conference, will be able to vote (and to change their vote, if they wish).

**Methods of voting**

In order to vote at the relevant Scheme Meeting, a Scheme Creditor must either vote itself (if an individual), appoint a duly authorised corporate representative (if a corporation), or appoint a proxy (which must be an individual).

Scheme Creditors may appoint a proxy to vote at the relevant Scheme Meeting by completing and returning a validly completed and signed Account Holder Letter, Class A Private Lender Proxy Form, or Class C Scheme Creditor Proxy Form (as applicable) to the Information Agent via the Portal. All Blocked Scheme Creditor Forms must be returned to GLAS by email at lm@glas.agency.

**Scheme Creditors are strongly encouraged to appoint a proxy (either the Chairperson or another individual of their own choice who is willing and able to attend the relevant Scheme Meeting) by indicating their choice of proxy in the relevant section of the relevant form.**

Scheme Creditors wanting to attend the relevant Scheme Meeting in person are encouraged to appoint a proxy even if they intend to attend and vote in person, in case such Scheme Creditors are unable to do so for any reason.

The Existing Notes Trustee, the Existing Notes Depositary, China Construction Bank (Asia) Corporation Limited and Guotai Junan Securities Co., Ltd. as trustee under the Dongpo Notes, Lake Notes and/or RMB Bonds and the Existing Agents are each Scheme Creditors, but will not be permitted to vote in respect of the Existing Notes, the Dongpo Notes, the Lake Notes and/or the RMB Bonds (as applicable) at the Scheme Meetings (to avoid double counting).

**Completion and deadline for submitting voting forms**

The **"Voting Record Time"** for the Schemes, being the deadline for the submission of the relevant forms in order to vote on the Schemes and attend the relevant Scheme Meetings, is **5:00 p.m. (Hong Kong time) on 18 August 2023, the equivalent time being 4:00 a.m. (Cayman Islands time) on 18 August 2023**.

In order to vote on the Schemes and attend the relevant Scheme Meetings (in person, by a duly authorised representative (if a corporation) or by proxy), a Scheme Creditor must ensure that:

(i) in the case of a Class A Noteholder, a Dongpo Noteholder or a Lake Noteholder that is not a Blocked Scheme Creditor:

    a.  a Custody Instruction is submitted on their behalf via the relevant Clearing System by the **Custody Instruction Deadline** (being 5:00 p.m. (Hong Kong time) / 4:00 a.m.. (Cayman Islands time) on 15 August 2023) in accordance with the instructions set out in the Account Holder Letter and the remainder of the Solicitation Packet; and

    b.  Parts 1, 2 and 3 of the Account Holder Letter have been validly completed and submitted to and received by the Information Agent via the Portal by no later than the **Voting Record Time** in accordance with the instructions set out in the Account Holder Letter and the remainder of the Solicitation Packet (allowing sufficient time for their respective Account Holders to give instructions to the Clearing Systems, in accordance with the procedures established between them, to ensure that the Account Holder Letter is submitted to and received online by the Voting Record Time);

(ii) in the case of a Class A Private Lender:

    a.  Sections 2 to 6 of the Class A Private Lender Proxy Form have been validly completed and submitted to and received by the Information Agent via the Portal by no later than the **Voting Record Time** in accordance with the instructions set out in the Class A Private Lender Proxy Form and the rest of the Solicitation Packet, including supporting evidence of the Class A Private Lender's identity, its status as a Scheme Creditor, and the value of its holding of the Class A Debts;

(iii) in the case of a Class C Scheme Creditor that is not a Dongpo Noteholder, a Lake Noteholder or a Blocked Scheme Creditor:

    a.  Sections 2 to 6 of the Class C Scheme Creditor Proxy Form have been validly completed and submitted to and received by the Information Agent via the Portal by no later than the **Voting Record Time** in accordance with the instructions set out in the Class C Scheme Creditor Proxy Form and the rest of the Solicitation Packet, including supporting evidence of the Class C Scheme Creditor's identity, its status as a Scheme Creditor, and the value of its holding of the Class C Debts; and

(iv) in the case of a Blocked Scheme Creditor:

    a.  Sections 2 to 6 of the Blocked Scheme Creditor Form have been validly completed and submitted to and received by GLAS via email by no later than the **Voting Record Time** in accordance with the instructions set out in the Blocked Scheme Creditor Form and the remainder of the Solicitation Packet, including supporting evidence of the Blocked Scheme Creditor's identity, its status as a Scheme Creditor, and the value of its holding of the Existing Debts.

**Registration prior to Scheme Meetings**

Each Scheme Creditor (or, if a corporation, its duly authorised representative) or its proxy intending to attend the Scheme Meeting will be required to register its attendance at the relevant Scheme Meeting no later than 15 minutes prior to the scheduled start time of the relevant Scheme Meeting.

Any Scheme Creditor, or its proxy, attending the Scheme Meeting in person must produce the following documents upon registration:

- a duplicate copy of the Account Holder Letter, Class A Private Lender Proxy Form, Class C Scheme Creditor Proxy Form or Blocked Scheme Creditor Form (as applicable), that has been

validly completed and submitted electronically by or on behalf of that Scheme Creditor, and (where relevant) authorising the proxy to act as such on behalf of that Scheme Creditor;

- evidence of personal identity with photo identification (for example, a valid original passport, or other original government-issued photographic identification); and

- in the case of a corporation, evidence of corporate authority (for example, a valid power of attorney and/or board resolutions).

If appropriate personal identification or evidence of authority is not produced, that person will only be permitted to attend and vote at the relevant Scheme Meeting at the discretion of the Chairperson.

**Chairperson**

Pursuant to the Scheme Convening Orders, the Cayman Court and the Hong Kong Court appointed Patrick Cowley of KPMG Advisory (Hong Kong) Limited ("**KPMG**") in his capacity as Scheme Administrator to act as the Chairperson of the Scheme Meetings, or failing that, another representative of KPMG nominated by him, and directed the Chairperson to report the results of the Scheme Meetings to the Cayman Court and Hong Kong Court. The results of the Scheme Meetings will also be made available on the Transaction Website, the Company's website, and by a public announcement published on the HKEXnews website of the SEHK and the website of the SGX-ST.

**Scheme Sanction Hearing**

The Schemes, if approved at the Scheme Meetings, will be subject to the subsequent approval and sanction of the Cayman Court and the Hong Kong Court. The Cayman Scheme Sanction Hearing is presently scheduled to take place at 10.00 a.m. Cayman Islands time (11.00 p.m. Hong Kong time) on 1 September 2023. The Hong Kong Scheme Sanction Hearing is presently scheduled to take place at 10:00 a.m. Hong Kong time on 5 and 6 September 2023 (to be fixed by the Hong Kong Court) (9:00 p.m. Cayman Islands time 4 and 5 September 2023).  Any Scheme Creditor is entitled (but not obliged) to attend the Scheme Sanction Hearings, through legal counsel, to support or oppose the approval and sanction of the Schemes.

## SCHEME CREDITORS OTHER THAN BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:

### Morrow Sodali Limited

| | |
|---|---|
| Telephone: | in Hong Kong +852 2319 4130; in London +44 20 4513 6933 |
| Email: | evergrande@investor.morrowsodali.com |
| Attention: | Debt Services Team |
| Transaction Website: | https://projects.morrowsodali.com/evergrande |
| Portal: | https://portal.morrowsodali.com/EvergrandeScheme |

## ANY BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:

### GLAS Specialist Services Limited

| | |
|---|---|
| Email: | lm@glas.agency |
| Attention: | Liability Management Team |

## FOR COMPANY ANNOUNCEMENTS REGARDING THIS SCHEME (INCLUDING THOSE RELEVANT TO BLOCKED SCHEME CREDITORS)

Company's Website: www.evergrande.com

HKEXnews website of the SEHK: https://www.hkexnews.hk/

SGX-ST website: https://www.sgx.com/

**CHINA EVERGRANDE GROUP (中國恒大集團)**

Dated: [*] 2023

5

## ANNEXURE 2

**Proposed advertisement in newspapers**

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

FSD 89 OF 2023(IKJ)

IN THE MATTER OF SECTION 86 OF THE COMPANIES ACT (2022 REVISION)
AND IN THE MATTER OF CHINA EVERGRANDE GROUP (中國恒大集團)

and

IN THE HIGH COURT OF THE HONG KONG SPECIAL ADMINISTRATIVE
REGION COURT OF FIRST INSTANCE

HCMP 1091/ 2023

IN THE MATTER OF CHINA EVERGRANDE GROUP 中國恒大集團 AND IN THE
MATTER OF SECTION 670 OF THE COMPANIES ORDINANCE (CAP 622)

---

Unless otherwise defined herein, terms used in this Notice have the same meanings as in the explanatory statement (the "**Explanatory Statement**") relating to the proposed schemes of arrangement between China Evergrande Group (中國恒大集團) (the "**Company**") and the Scheme Creditors (as defined in the Explanatory Statement) under section 86 of the Cayman Islands Companies Act (2023 Revision) (the "**Cayman Scheme**") and section 670 of the Hong Kong Companies Ordinance (Cap. 622) (the "**Hong Kong Scheme**", and together with the Cayman Scheme, the "**Schemes**").

Copies of the Scheme, the Explanatory Statement and the Solicitation Packet (including the documentation to be completed by or on behalf of Scheme Creditors in order to vote and/or receive Scheme Consideration) are available to download from the Transaction Website (https://projects.morrowsodali.com/evergrande) save for voting forms for Blocked Scheme Creditors which are available (along with any other relevant scheme documents) from the Company's website (www.evergrande.com).

**NOTICE IS HEREBY GIVEN** that by orders of the Grand Court of the Cayman Islands (the "**Cayman Court**") and the High Court of the Hong Kong Special Administrative Region Court of First Instance (the "**Hong Kong Court**"), dated 25 July 2023 and 24 July 2023 respectively, meetings of Scheme Creditors (the "**Scheme Meetings**") for the purpose of considering and, if thought fit, approving (with or without modification) each of the Schemes, will be convened.

The Scheme Meetings will be held at the offices of Sidley Austin, at 39/F, Two International Finance Centre, Central, Hong Kong, on 23 August 2023 with any adjournment as may be necessary or appropriate, at the following times:

- Hong Kong Scheme – Class A Creditors Scheme Meeting: at 8:00 pm Hong Kong time.
- Cayman Scheme – Class A Creditors Scheme Meeting: at 8:45 pm Hong Kong time, the equivalent time being 7:45 am Cayman Islands time (or immediately following the conclusion of the (Hong Kong Scheme) Class A Creditors Scheme Meeting, if later).
- Hong Kong Scheme – Class C Creditors Scheme Meeting: at 9:30 pm Hong Kong time (or immediately following the conclusion of the (Cayman Scheme) Class A Creditors Scheme Meeting, if later).
- Cayman Scheme – Class C Creditors Scheme Meeting: at 10:15 pm Hong Kong time, the equivalent time being 9:15 am Cayman Islands time (or immediately following the conclusion of the (Hong Kong Scheme) Class C Creditors Scheme Meeting, if later).

All Scheme Creditors are requested to attend and vote at the relevant Scheme Meeting(s). Attendance and voting at the Scheme Meetings can be in person or by proxy in accordance with the voting instructions set out in the Explanatory Statement. A video-conference facility will be made available for any Scheme Creditors who wish to attend and vote remotely.

Scheme Creditors who wish to vote at one or more of the Scheme Meetings should carefully read the Explanatory Statement and follow the instructions contained therein. Scheme Creditors should take particular note that the Voting Record Time, being the deadline for voting, is **5:00 pm Hong Kong time/ 4:00 am Cayman Islands time on 18 August 2023**.

**NOTICE IS FURTHER GIVEN** that, if the Schemes are approved at the Scheme Meetings, the Schemes will be subject to a subsequent hearing in each of the Cayman Court and the Hong Kong Court, at which the Company will seek the Courts' sanction of the Schemes ("the **Sanction Hearings**"). The Sanction Hearing before the Cayman Court will take place on 1 September 2023. The Sanction Hearing before the Hong Kong Court will take place on 5 and 6 September 2023 (to be fixed by the Hong Kong Court). Any Scheme Creditor is entitled (but not obliged) to attend the Sanction Hearings, through legal counsel, to support or oppose the approval and sanction of the Schemes.

### SCHEME CREDITORS OTHER THAN BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:

#### Morrow Sodali Limited

| | |
|---|---|
| Telephone: | in Hong Kong +852 2319 4130; in London +44 20 4513 6933 |
| Email: | evergrande@investor.morrowsodali.com |
| Attention: | Debt Services Team |
| Transaction Website: | https://projects.morrowsodali.com/evergrande |
| Portal: | https://portal.morrowsodali.com/EvergrandeScheme |

### ANY BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:

#### GLAS Specialist Services Limited

| | |
|---|---|
| Email: | lm@glas.agency |
| Attention: | Liability Management Team |

Dated the        day of July 2023

**China Evergrande Group (中國恒大集團)**

HCMP 1091 / 2023

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
MISCELLANEOUS PROCEEDINGS NO. 1091 OF 2023

IN THE MATTER OF CHINA
EVERGRANDE GROUP 中國恒大集團

and

IN THE MATTER OF SECTION 670 OF
THE COMPANIES ORDINANCE (CAP.
622)

---

**ORDER**

---

Filed this 27th day of July 2023

**SIDLEY AUSTIN**
Solicitors for China Evergrande Group
Level 39, Two International Finance Centre
8 Finance Street, Central
Hong Kong
Tel: 2509 7888
Fax: 2509 3110
Ref: DA/ST/DW/033817-30390

**<u>Exhibit C.2</u>**

**Tianji Convening Order**

HCMP 1090 / 2023

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

MISCELLANEOUS PROCEEDINGS NO. 1090 OF 2023



IN THE MATTER of TIANJI HOLDING LIMITED

天基控股有限公司

and

IN THE MATTER of Section 670 of the Companies
Ordinance (Cap. 622)

**BEFORE THE HONOURABLE MADAM JUSTICE LINDA CHAN IN CHAMBERS**

**ORDER**

UPON THE APPLICATION of the above named Tianji Holding Limited 天基控股有
限公司 (the "**Company**") by way of *Ex Parte* Originating Summons filed herein on 12 July
2023 ("**Originating Summons**").

AND UPON READING the Originating Summons, the Affirmation of Hui Ka Yan
filed herein on 20 July 2023 together with the exhibits referred to therein, including but not
limited to the draft explanatory statement for the Scheme ("**Explanatory Statement**"), the
Affirmation of Neil Edward McGregor McDonald filed herein on 21 July 2023 together with
the exhibits referred to therein, and the Affirmation of Wu Tin Long filed herein on 24 July
2023 together with the exhibits referred to therein.

AND UPON HEARING leading counsel for the Company and counsel for the ad hoc
group of creditors of the Company.

IT IS ORDERED that:-

1.    The Company be at liberty to convene a meeting of the Scheme Creditors ("**Scheme**

Meeting") for the purpose of considering and, if thought fit, approving (with or without modification) a scheme of arrangement (the "**Scheme**") proposed to be made between the Company and its Scheme Creditors under sections 670, 673 and 674 of the Companies Ordinance (Cap. 622).

2.    The Scheme Meeting will be held in Hong Kong at 39/F, Two International Finance Centre, 8 Finance Street, Central, Hong Kong on 22 August 2023 at 8:00 p.m. (Hong Kong time), subject to any adjournment as my be approved by the chairperson of the Scheme Meetings ("**Chairperson**").

3.    Scheme Creditors be able to attend the Scheme Meeting to vote in respect of the Scheme, in person, by a duly authorised representative (if a corporation) or by proxy, including via video conference.

4.    In respect of attendance by video conference:

      a.    For Scheme Creditors who are not Blocked Scheme Creditors (as defined in the Scheme), dial-in details will be published on https://projects.morrowsodali.com/evergrande (the "**Transaction Website**") at least 21 days before the day appointed for the Scheme Meeting and the passcode notified to individual Scheme Creditors by Morrow Sodali Limited as the information agent in respect of the Scheme (the "**Information Agent**") at least 2 business days before the day appointed for the Scheme Meeting.

      b.    For Blocked Scheme Creditors, GLAS Specialist Services Limited ("**GLAS**") will provide Blocked Scheme Creditors with the details of how to attend and vote at the Scheme Meeting at least 21 days before the day appointed for the Scheme Meeting and will notify Blocked Scheme Creditors of the meeting passcode at least 2 business days before the day appointed for the Scheme Meeting.

5.    The Chairperson may require Scheme Creditors attending the Scheme Meeting by video conference to turn on their camera throughout the Scheme Meeting and log on to the video conference using their full name (as registered with the Information Agent) and the creditor identifier number provided to them by the Information Agent prior to the Scheme Meeting.

6.    At least 21 days before the day appointed for the Scheme Meeting, a copy of the notice of the Scheme Meeting (the "**Notice of Scheme Meeting**"), together with any forms required for voting purposes (the "**Scheme Creditor Voting Forms**"), shall be circulated to the Scheme Creditors by:

    (a)    publication on the Transaction Website;

    (b)    publication by way of public announcement by China Evergrande Group (stock code 3333) on the HKEXnews website of The Stock Exchange of Hong Kong Limited at http://www.hkexnews.hk;

    (c)    publication by way of public announcement by China Evergrande Group on the website of the Singapore Exchange Limited at https://www.sgx.com/;

    (d)    publication on the website of China Evergrande Group at http://www.evergrande.com;

    (e)    by causing the Information Agent to send via electronic mail to each person who the Company believes is or may be a Scheme Creditor, and for whom the Company has a valid e-mail address; and

    (f)    distribution via Euroclear Bank SA/NV and/or Clearstream Banking S.A.

7.    GLAS shall circulate copies of the Notice of Scheme Meeting and the Scheme Creditor Voting Forms to any Blocked Scheme Creditors by email not less than 21 days before the Scheme Meeting.

8.    When providing the Notice of Scheme Meeting in accordance with paragraphs 6 and 7 above, the Information Agent or GLAS (as applicable) shall provide copies of the following documents (or a link to the Transaction Website to enable the Scheme Creditors to access electronic copies of the following documents):

    (a)    the Scheme;

    (b)    the Explanatory Statement; and

    (c)    the Solicitation Packet (as defined in the Explanatory Statement) being instructions as to the registration of claims and voting procedures for the

purposes of the Scheme Meeting including the Scheme Creditor Voting Forms.

9.     The accidental omission to serve any Scheme Creditor with the Notice of Scheme Meeting, or the non-receipt by any Scheme Creditor of the Notice of Scheme Meeting, shall not invalidate the proceedings at the Scheme Meeting.

10.    At least 21 days before the day appointed for the Scheme Meeting, the Company shall place an advertisement substantially in the form of the draft hereby approved in (1) *The Standard*, which is an English language newspaper, and (2) a Traditional and Simplified Chinese translation thereof in *Hong Kong Economic Times*, which is a Chinese language newspaper in circulation in Hong Kong, and (3) a Simplified Chinese translation thereof in "*Nanfang Daily*" and "*Securities Times*" both of which are Chinese language newspapers in circulation in the PRC.

11.    Certified Chinese translation of the Notice of Scheme Meeting and the proposed advertisement in newspapers be dispensed with.

12.    An affirmation is to be filed by a solicitor of Sidley Austin who is fluent in both English and Chinese languages confirming the accuracy of the Chinese translation of the Notice of Scheme Meeting and the proposed advertisement in newspapers.

13.    The Chairperson be permitted to declare and announce the results of the Scheme Creditors' votes in respect of the Scheme, either during the Scheme Meeting or after the conclusion of the Scheme Meeting.

14.    The substantive hearing of the petition at which the Court will determine whether or not to sanction the Scheme shall be heard at 10:00 a.m. (Hong Kong time) on 5 and 6 September 2023 (subject to the Court's further directions) before the Honourable Madam Justice Linda Chan.

15.    There be liberty to apply generally.

AND THE COURT HEREBY APPROVES the:-

1.     Notice of Scheme Meeting substantially in the form of Annexure 1 hereto; and

2.     Notice of Scheme Meeting to be advertised on newspapers in the aforesaid manner substantially in the form of Annexure 2 hereto.

AND THE COURT HEREBY APPOINTS Mr. Patrick Cowley of KPMG Advisory (Hong Kong) Limited ("**KPMG**"), or, failing Mr. Cowley, another representative of KPMG nominated by him, as the Chairperson of the Scheme Meetings on behalf of the Company.

AND THE COURT ORDERS that the Chairperson do report the results of the Scheme Meeting to the Court.

Dated this 24th day of July 2023.

Registrar

**ANNEXURE 1**

**Notice of the Scheme Meeting**

IN THE HIGH COURT OF THE HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE

HCMP 1090 OF 2023

IN THE MATTER OF SECTIONS 670, 673 & 674 OF THE COMPANIES ORDINANCE,
CHAPTER 622 OF THE LAWS OF HONG KONG

AND

IN THE MATTER TIANJI HOLDING LIMITED (天基控股有限公司)

---

### NOTICE OF SCHEME MEETING

---

Unless otherwise defined herein, terms used in this Notice have the same meanings as in the explanatory statement (the "**Explanatory Statement**") relating to the proposed scheme of arrangement between Tianji Holding Limited (the "**Company**") and the Scheme Creditors (as defined therein) under section 670 of the Companies Ordinance (Cap. 622) (the "**Scheme**").

Copies of the Scheme, the Explanatory Statement and the Solicitation Packet (including the documentation to be completed by or on behalf of Scheme Creditors in order to vote and/or receive Scheme Consideration) are available to download from the Transaction Website (https://projects.morrowsodali.com/evergrande), or from CEG's website (www.evergrande.com).

**NOTICE IS HEREBY GIVEN** that by order of the High Court of the Hong Kong Special Administrative Region Court of First Instance (the  "**Hong Kong Court**"), dated 24 July 2023 ("**Convening Order**"), meeting of Scheme Creditors (the "**Scheme Meeting**") be convened for the purpose of considering and, if thought fit, approving (with or without modification) the Scheme proposed by the Company.

**Venue, times and video conference availability for the Scheme Meeting**

The Scheme Meeting will be held on 22 August 2023 at 8:00 p.m. (Hong Kong time) at the offices of Sidley Austin at 39/F, Two International Finance Centre, 8 Finance St, Central, Hong Kong, with any adjournment as may be necessary or appropriate, and subject to applicable COVID-19 restrictions, policies or guidance then in force in Hong Kong, and in which case any changes in arrangements relating to the Scheme Meeting shall be communicated to Scheme Creditors in advance of the Scheme Meeting on the Transaction Website, CEG's website, and by a public announcement published on the HKEXnews website of The Stock Exchange of Hong Kong Limited (the "**SEHK**") and the website of the Singapore Exchange Securities Trading Limited (the "**SGX-ST**").

A video conferencing facility will be made available. Scheme Creditors will be able to obtain the relevant dial-in details for the Scheme Meeting from the Transaction Website, and by written request from the Information Agent (if you are a Scheme Creditor who is not a Blocked Scheme Creditor), or GLAS Specialist Services Limited ("**GLAS**") (if you are a Blocked Scheme Creditor).

Scheme Creditors who attend the Scheme Meeting in person, or by video conference, will be able to vote (and to change their vote, if they wish).

**Methods of voting**

In order to vote at the relevant Scheme Meeting, a Scheme Creditor must either vote itself (if an individual), appoint a duly authorised corporate representative (if a corporation), or appoint a proxy (which must be an individual).

Scheme Creditors may appoint a proxy to vote at the relevant Scheme Meeting by completing and returning a validly completed and signed Account Holder Letter and/or Other Debt Scheme Creditor Proxy Form to the Information Agent via the Portal. All Blocked Scheme Creditor Forms must be returned to GLAS by email at lm@glas.agency.

**Scheme Creditors are strongly encouraged to appoint a proxy (either the Chairperson or another individual of their own choice who is willing and able to attend the relevant Scheme Meeting) by indicating their choice of proxy in the relevant section of the relevant form.**

Scheme Creditors wanting to attend the relevant Scheme Meeting in person are encouraged to appoint a proxy even if they intend to attend and vote in person, in case such Scheme Creditors are unable to do so for any reason.

**Completion and deadline for submitting voting forms**

The "**Voting Record Time**" for the Scheme, being the deadline for the submission of the relevant forms in order to vote on the Scheme and attend the relevant Scheme Meeting, is **5:00 p.m. (Hong Kong Time) on 18 August 2023**.

In order to vote on the Scheme and attend the relevant Scheme Meeting (in person, by a duly authorised representative (if a corporation) or by proxy), a Scheme Creditor must ensure that the following validly completed and executed Scheme Creditor Forms, as applicable, and further pursuant to the terms of the Schemes, must be submitted by the Voting Record Time:

- SJ Notes Scheme Creditors and Lake Noteholders (who are not Blocked Scheme Creditors): (1) Custody Instructions to be submitted via the Clearing Systems prior to the submission of the Account Holder Letter (and in any case by the Custody Instruction Deadline) and (2) Account Holder Letter via the Portal to the Information Agent by no later than the Voting Record Time.

- Other Debt Scheme Creditors (who are not Lake Noteholders): Other Debt Scheme Creditor Proxy Form, together with supporting evidence via the Portal to the Information Agent in accordance with the instructions set out therein.

- Blocked Scheme Creditors: Blocked Scheme Creditor Form to GLAS.

**Registration prior to Scheme Meeting**

Each Scheme Creditor (or, if a corporation, its duly authorised representative) or its proxy intending to attend the Scheme Meeting will be required to register its attendance at the relevant Scheme Meeting no later than 15 minutes prior to the scheduled start time of the relevant Scheme Meeting.

On registration at the Scheme Meeting, a Scheme Creditor attending the Scheme Meeting in person should produce a duplicate copy of:

- the applicable Scheme Creditor Form that was executed and delivered by it or on its behalf via https://portal.morrowsodali.com/TJScheme (the "**Portal**") to the Information Agent;

- evidence of personal identity with photo identification (for example, a passport, driving license

2

or other photo identification); and

- in the case of a corporation, evidence of corporate authority (for example, a valid power of attorney and/or board minutes).

Similarly, where a proxy other than the Chairperson is appointed, the proxy must also produce, on registration at the relevant Scheme Meeting:

- a copy of the Scheme Creditor Form of the Scheme Creditor who appointed him or her as proxy, having been validly completed, signed and submitted to the Information Agent via the Portal, authorising him or her to act as proxy on behalf of the Scheme Creditor; and

- evidence of personal identity with photo identification (for example, a passport, driving license or other photo identification).

If appropriate personal identification or evidence of authority is not produced, that person will only be permitted to attend and vote at the relevant Scheme Meeting at the discretion of the Chairperson.

### Chairperson

Pursuant to the Scheme Convening Order, the Hong Kong Court appointed Patrick Cowley of KPMG Advisory (Hong Kong) Limited ("KPMG") in his capacity as Scheme Administrator to act as the Chairperson of the Scheme Meeting, or failing that, another representative of KPMG nominated by him, and directed the Chairperson to report the results of the Scheme Meeting to the Hong Kong Court. The results of the Scheme Meeting will also be made available on the Transaction Website, CEG's website, and by a public announcement published on the HKEXnews website of the SEHK and the website of the SGX-ST.

### Scheme Sanction Hearing

The Scheme, if approved at the Scheme Meeting, will be subject to the subsequent approval and sanction of the Hong Kong Court. The Scheme Sanction Hearing is presently scheduled to take place at 10:00 a.m. Hong Kong time on 5 and 6 September 2023 (to be fixed by the Hong Kong Court). Any Scheme Creditor is entitled (but not obliged) to attend the Scheme Sanction Hearings, through legal counsel, to support or oppose the approval and sanction of the Scheme.

### SCHEME CREDITORS OTHER THAN BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:

**Morrow Sodali Limited**

| | |
|---|---|
| Telephone: | in Hong Kong +852 2319 4130; in London +44 20 4513 6933 |
| Email: | evergrande@investor.morrowsodali.com |
| Attention: | Debt Services Team |
| Transaction Website: | https://projects.morrowsodali.com/evergrande |
| Portal: | https://portal.morrowsodali.com/EvergrandeScheme |

### ANY BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:

**GLAS Specialist Services Limited**

| | |
|---|---|
| Email: | lm@glas.agency |
| Attention: | Liability Management Team |

3

<u>**FOR CEG ANNOUNCEMENTS REGARDING THIS SCHEME (INCLUDING THOSE
RELEVANT TO BLOCKED SCHEME CREDITORS)**</u>

| | |
|---|---|
| CEG's Website: | www.evergrande.com |
| HKEXnews website of the SEHK: | https://www.hkexnews.hk/ |
| SGX-ST website: | https://www.sgx.com/ |

**TIANJI HOLDING LIMITED 天基控股有限公司**

Date: [*] 2023

## ANNEXURE 2

**Proposed advertisement in newspapers**

IN THE HIGH COURT OF THE HONG KONG SPECIAL ADMINISTRATIVE
REGION COURT OF FIRST INSTANCE

HCMP 1090/ 2023

IN THE MATTER OF TIANJI HOLDING LIMITED (天基控股有限公司)

AND IN THE MATTER OF SECTION 670 OF THE COMPANIES ORDINANCE (CAP 622)

---

Unless otherwise defined herein, terms used in this Notice have the same meanings as in the explanatory statement (the "**Explanatory Statement**") relating to the proposed scheme of arrangement between Tianji Holding Limited (天基控股有限公司)(the "**Company**") and the Scheme Creditors (as defined in the Explanatory Statement) under section 670 of the Hong Kong Companies Ordinance (Cap. 622) (the "**Scheme**").

Copies of the Scheme, the Explanatory Statement and the Solicitation Packet (including the documentation to be completed by or on behalf of Scheme Creditors in order to vote and/or receive Scheme Consideration) are available to download from the Transaction Website (https://projects.morrowsodali.com/evergrande) save for voting forms for Blocked Scheme Creditors which are available (along with any other relevant scheme documents) from the Company's website (www.evergrande.com).

**NOTICE IS HEREBY GIVEN** that by order of the High Court of the Hong Kong Special Administrative Region Court of First Instance (the "**Hong Kong Court**") dated 24 July 2023, a meeting of Scheme Creditors (the "**Scheme Meeting**") for the purpose of considering and, if thought fit, approving (with or without modification) the Scheme, will be convened.

The Scheme Meeting will be held at the offices of Sidley Austin, at 39/F, Two International Finance Centre, Central, Hong Kong, on 22 August 2023 with any adjournment as may be necessary or appropriate, at 8:00 pm Hong Kong time.

All Scheme Creditors are requested to attend and vote at the Scheme Meeting. Attendance and voting at the Scheme Meeting can be in person or by proxy in accordance with the voting instructions set out in the Explanatory Statement. A video-conference facility will be made available for any Scheme Creditors who wish to attend and vote remotely.

Scheme Creditors who wish to vote at the Scheme Meeting should carefully read the Explanatory Statement and follow the instructions contained therein. Scheme Creditors should take particular note that the Voting Record Time, being the deadline for voting, is **5:00 pm Hong Kong time/ 4:00 am Cayman Islands time on 18 August 2023.**

**NOTICE IS FURTHER GIVEN** that, if the Scheme is approved at the Scheme Meeting, the Scheme will be subject to a subsequent hearing in the Hong Kong Court, at which the Company will seek the Hong Kong Court's sanction of the Scheme (the "**Sanction Hearing**"). The Sanction Hearing before the Hong Kong Court will take place on 5 and 6 September 2023 (to be fixed by the Hong Kong Court). Any Scheme Creditor is entitled (but not obliged) to attend the Sanction Hearing, through legal counsel, to support or oppose the approval and sanction of the Scheme.

**SCHEME CREDITORS OTHER THAN BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:**

**Morrow Sodali Limited**

| | |
|---|---|
| Telephone: | in Hong Kong +852 2319 4130; in London +44 20 4513 6933 |
| Email: | evergrande@investor.morrowsodali.com |
| Attention: | Debt Services Team |
| Transaction Website: | https://projects.morrowsodali.com/evergrande |
| Portal: | https://portal.morrowsodali.com/EvergrandeScheme |

**ANY BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:**

**GLAS Specialist Services Limited**

| | |
|---|---|
| Email: | lm@glas.agency |
| Attention: | Liability Management Team |

Dated the       day of July 2023

**Tianji Holding Limited (天基控股有限公司)**

HCMP 1090 / 2023

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
MISCELLANEOUS PROCEEDINGS NO. 1090 OF 2023

IN THE MATTER OF TIANJI HOLDING

LIMITED 天基控股有限公司

and

IN THE MATTER OF SECTION 670 OF
THE COMPANIES ORDINANCE (CAP.
622)

───────────────────────────

**ORDER**

───────────────────────────

Filed this 27th day of July 2023

**SIDLEY AUSTIN**
Solicitors for Tianji Holding Limited
Level 39, Two International Finance Centre
8 Finance Street, Central
Hong Kong
Tel: 2509 7888
Fax: 2509 3110
Ref: DA/ST/DW/033817-30390

**Exhibit D.1**

**Evergrande Explanatory Statement**

---

### THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION

---

### EXPLANATORY STATEMENT IN RELATION TO LINKED AND INTER-CONDITIONAL SCHEMES OF ARRANGEMENT
**(pursuant to Section 86 of the Cayman Islands Companies Act (2023 Revision) and Sections 670, 673 and 674 of the Companies Ordinance (Cap. 622 of the Laws of Hong Kong))**

**between**

### CHINA EVERGRANDE GROUP
中國恒大集團

**(a company incorporated with limited liability under the laws of the Cayman Islands with registration number 169971)**

**and**

### THE SCHEME CREDITORS
**(as defined in this Explanatory Statement)**

**in the Grand Court of the Cayman Islands**

**and**

**in the High Court of Hong Kong**

**31 July 2023**

This document comprises an explanatory statement in relation to linked and inter-conditional schemes of arrangement proposed by China Evergrande Group (中國恒大集團) ("**CEG**" or the "**Company**") provided pursuant to Section 86 of the Cayman Companies Act (2023 Revision) and Section 671 of the Companies Ordinance (Cap. 622 of the Laws of Hong Kong) (the "**Explanatory Statement**"). Reference is made to the definitions set out in Schedule 1 (*Definitions and Interpretation*) to this Explanatory Statement.

This Explanatory Statement is being sent to persons who it is believed are or may be Scheme Creditors as at the date of this Explanatory Statement. If you have assigned, sold, or otherwise transferred your interests in the Existing Debts you must forward this Explanatory Statement and the accompanying documents at once to the person or persons to whom you have assigned, sold or otherwise transferred your interests in the Existing Debts.

This Explanatory Statement has been sent to you in an electronic form. You are advised that documents transmitted in electronic form may be altered or changed during the process of transmission and consequently none of the Company, the Information Agent, the Existing Notes Trustee, the Existing Agent, the Dongpo Notes Trustee and Existing Agents, the Lake Notes Trustee and Existing Agent, the RMB Bonds Trustee nor any of their respective Affiliates, directors, officers or employees, accept any liability or responsibility whatsoever in respect of any difference between the Explanatory Statement distributed to you in electronic format and the version available to you for inspection on the Transaction Website.

**WARNING** – The contents of this Explanatory Statement have not been reviewed by any regulatory authority in the Cayman Islands, Hong Kong, the British Virgin Islands, Singapore or in any other jurisdiction. Neither the US Securities and Exchange Commission ("**SEC**") nor any United States state securities commission has approved or disapproved of the Scheme Consideration or determined if this Explanatory Statement is truthful or complete. Any representation to the contrary is a criminal offence.

You are strongly encouraged to exercise caution in relation to any offer pursuant to the scheme of arrangement set out in this Explanatory Statement.

**You are recommended to seek your own independent financial, legal and/or tax advice immediately from your financial, legal and/or tax adviser with respect to the contents of this Explanatory Statement or the documents that accompany it or what action you should take.**

This Explanatory Statement does not constitute an offer to sell or the solicitation of an offer to buy any securities. None of the securities referred to in this Explanatory Statement may be sold, issued or transferred in any jurisdiction in contravention of applicable law. The securities proposed to be issued pursuant to the Schemes will not be registered with the SEC under the US Securities Act of 1933, as amended (the "**US Securities Act**"), or the securities law of any state or other jurisdiction, and are being transferred and delivered in reliance upon certain exemptions from the registration requirements of the US Securities Act. The securities proposed to be issued pursuant to the Schemes will be issued and delivered only (i) in the United States to "qualified institutional buyers" ("**QIBs**") as defined in Rule 144A under the US Securities Act ("**Rule 144A**") and institutional "accredited investors" ("**Accredited Investors**") as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the US Securities Act ("**Regulation D**"); and (ii) outside the United States to non-US persons in offshore transactions, in reliance on Regulation S under the US Securities Act ("**Regulation S**").

An application will be made for the listing and quotation of the New Instruments on the Singapore Exchange Securities Trading Limited ("**SGX-ST**"). The SGX-ST assumes no responsibility for the correctness of any of the statements made or opinions expressed or reports contained herein. Approval in-principle for the listing and quotation of the New Instruments on the SGX-ST is not to be taken as an indication of the merits of the New Instruments or of the issuers of them, any guarantees, any guarantors, their respective subsidiaries (if any), their respective associated companies (if any) or their respective joint venture companies (if any). For so long as such New Instruments are listed on the SGX-ST and the rules of the SGX-ST so require, such New Instruments will be traded on the SGX-ST in a minimum board lot size of at least S$200,000 (or its equivalent in foreign currencies). To the extent that CEG is required to disclose additional information solely for the purposes of the application to list the New Instruments on the SGX-ST, such information will be made available to Scheme Creditors on the Transaction Website (where legally and commercially permissible).

**Section 309B(1) Notification**—In connection with Section 309B of the Securities and Futures Act, Chapter 289 of Singapore, as modified or amended from time to time (the "**SFA**") and the Securities and Futures (Capital Markets Products) Regulations 2018 (the "**CMP Regulations 2018**"), we have determined, and hereby notify all relevant persons (as defined in Section 309A(1) of the SFA) that the New Instruments are prescribed capital markets products (as defined in the CMP Regulations 2018) and Excluded Investment Products (as defined in MAS Notice SFA 04-N12: Notice on the Sale of Investment Products and MAS Notice FAA-N16: Notice on Recommendations on Investment Products).

This Explanatory Statement should be read carefully with the Solicitation Packet, which is also available on the Transaction Website for Scheme Creditors to download.

The Solicitation Packet contains: (i) the Account Holder Letter (for Class A Noteholders, Lake Noteholders and Dongpo Noteholders who are not Sanctions-Affected Scheme Creditors), (ii) the Class A Private Lender Proxy Form (for the Class A Lenders), (iii) the Class C Scheme Creditor Proxy Form (for the Class C Scheme Creditors other than the Lake Noteholders and the Dongpo Noteholders) and (iv) the Blocked Scheme Creditor Form (for Blocked Scheme Creditors), all of which also encloses the Designated Recipient Form and the Distribution Confirmation Deed (if applicable), and instructions and guidance for Scheme Creditors and any Person with an interest in the Existing Debts as to how to complete the required documents.

All Scheme Creditors (and Designated Recipients, if applicable) will need to hold an account (directly or indirectly through the intermediary chain) with an account holder or custodian which itself holds an

account with Euroclear or Clearstream in order to receive the New Instruments, the TJ Scheme Consideration (if applicable) and the Consent Fee (if applicable). To the extent that they do not already have such an account, all Class A Lenders and Class C Scheme Creditors who are not Dongpo Noteholders or Lake Noteholders, and Designated Recipients (if applicable) are advised to open an account (directly or indirectly through the intermediary chain) with an account holder or custodian which itself holds an account with Euroclear (if possible) or Clearstream (including many custodian banks and certain other financial institutions) and provide the Information Agent with the required details of such account (as required in the relevant Scheme Creditor Forms) as soon as possible, and in any event, by the relevant Bar Date. If you do not have such an account and are unable to open such an account and are not a Sanctions-Affected Scheme Creditor, please contact the Information Agent immediately.

Further important information is set out under Section 2 (*Important Securities Law Notices*) and Section 3 (*Important Notices to Scheme Creditors*) of this Explanatory Statement.

The Information Agent provides the contact for Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) in relation to questions the Scheme Creditors have in relation to this Explanatory Statement, the Solicitation Packet, the Schemes or the Restructuring. The Information Agent will be assisting the Chairperson in co-ordinating the voting process for the Schemes, including (a) creating and managing the Transaction Website and the Portal, (b) communicating with Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) regarding voting in the Schemes, in particular via the Transaction Website, (c) communicating with the Clearing Systems (where relevant) regarding voting in the Schemes (for further distribution to Scheme Creditors (who are not Sanctions-Affected Scheme Creditors)), and (d) assisting the Chairperson in checking the voting values of each Scheme Creditor (who is not a Sanctions-Affected Scheme Creditor) for/at the Scheme Meetings against the relevant Custodian Instructions or, as the case may be, the records supplied by the Company. GLAS will be managing the voting process for the Schemes for Blocked Scheme Creditors.

Queries in relation to this Explanatory Statement or the completion of an Account Holder Letter or Proxy Voting Form (as applicable) should be directed to the Information Agent as follows:

**Morrow Sodali Limited**
Telephone: in Hong Kong +852 2319 4130; in London: +44 20 4513 6933
Email: evergrande@investor.morrowsodali.com
Transaction Website (document posting website): https://projects.morrowsodali.com/evergrande
Portal (form submission website): https://portal.morrowsodali.com/EvergrandeScheme
Attention: Debt Services Team

**Blocked Scheme Creditors should direct any questions in relation to this Explanatory Statement, the Blocked Scheme Creditor Form, the Schemes or the Restructuring to:**

**GLAS Specialist Services Limited**
Email: lm@glas.agency
Attention: Liability Management Team

**For submitting Blocked Scheme Creditor Forms**

please refer to the Solicitation Packet

**For Company announcements regarding the Schemes, including those relevant for Blocked Scheme Creditors**

**http://www.evergrande.com/**

**TABLE OF CONTENTS**

1.    EXPECTED TIMETABLE OF KEY EVENTS ......................................................................... 1

2.    IMPORTANT SECURITIES LAW NOTICES ........................................................................... 5

3.    IMPORTANT NOTICES TO SCHEME CREDITORS ........................................................... 11

4.    QUESTIONS AND ANSWERS ............................................................................................... 20

5.    SUMMARY OF ACTIONS TO BE TAKEN BY SCHEME CREDITORS .......................... 38

6.    SUMMARY EXPLANATION OF THE SCHEMES ............................................................... 72

7.    LETTER FROM THE BOARD TO THE SCHEME CREDITORS ....................................... 78

8.    BACKGROUND TO CEG, THE GROUP AND THE RESTRUCTURING ........................ 89

9.    EFFECT OF THE SCHEMES ............................................................................................... 102

10.    TWO OPTIONS OF SCHEME CONSIDERATION FOR BOTH CLASS A AND CLASS C
...................................................................................................................................... 111

11.    RESUMPTION OF TRADING ............................................................................................. 144

12.    JURISDICTION OF THE COURTS PURSUANT TO THE RESTRUCTURING .............. 145

13.    SCHEME CLASS .................................................................................................................. 147

14.    THE SCHEME MEETINGS ................................................................................................. 153

15.    ASSESSMENT OF SCHEME CLAIMS FOR VOTING PURPOSES ................................ 154

16.    SCHEME SANCTION HEARINGS ..................................................................................... 155

17.    RESTRUCTURING EFFECTIVE DATE ............................................................................. 155

18.    AUTHORITY AND INSTRUCTIONS ................................................................................. 156

19.    FOREIGN RECOGNITION OF THE SCHEMES ............................................................... 163

20.    HOLDING PERIOD TRUST ................................................................................................ 164

21.    SUCCESSOR ESCROW ACCOUNT .................................................................................. 165

22.    STAY OF PROCEEDINGS .................................................................................................. 166

23.    MODIFICATIONS TO THE SCHEMES AND THE RESTRUCTURING DOCUMENTS 167

24.    GOVERNING LAW AND JURISDICTION ........................................................................ 167

25.    RESTRUCTURING DOCUMENTS ..................................................................................... 168

26.    SUMMARY OF THE NEW INSTRUMENTS ..................................................................... 173

27.    FRACTIONAL ADJUSTMENTS ........................................................................................ 174

28.    RISK FACTORS ................................................................................................................ 176

29.    TAXATION......................................................................................................................... 202

SCHEDULE 1 DEFINITIONS AND INTERPRETATION

SCHEDULE 2 LIQUIDATION ANALYSIS

SCHEDULE 3 SCHEME RECOVERY ANALYSIS

SCHEDULE 4 THE SCHEMES

SCHEDULE 5 NOTICE OF SCHEME MEETING

SCHEDULE 6 VALUATION AND ADJUDICATION FLOW CHART

SCHEDULE 7 SCHEME MEETING CONVENING ORDER

SCHEDULE 8 SUMMARY OF TERMS OF THE NEW INSTRUMENTS

SCHEDULE 9 GROUP STRUCTURE CHART

1.      **EXPECTED TIMETABLE OF KEY EVENTS**[1]

| Event | | Expected date | Cayman Islands time | Hong Kong time |
|---|---|---|---|---|
| **Custody Instruction Deadline** | The latest time for Account Holders to submit Custody Instructions to block Existing Notes, Lake Notes or Dongpo Notes (as applicable) held with Euroclear or Clearstream. | 15 August 2023 being three (3) Business Days prior to the Voting Record Time | 4.00 a.m. on 15 August 2023 | 5.00 p.m. on 15 August 2023 |
| **Voting Record Time** | The latest time for Scheme Creditors to lodge Account Holder Letters or Proxy Voting Forms (as applicable) with the Information Agent for the purpose of voting at the Scheme Meetings.[2] | 18 August 2023 | 4.00 a.m. on 18 August 2023 | 5.00 p.m. on 18 August 2023 |
| | The time on which all Voting Scheme Claims are determined as at the Voting Record Time.[3] | Following the close of business and cessation of trading on the Clearing Systems on 18 August 2023. | | |

---

[1] The dates in this timetable and those mentioned throughout this Explanatory Statement assume that none of the Court hearings or the Scheme Meetings are adjourned or delayed. It is also possible that the drawing up or registration of the Scheme Sanction Order may be delayed if any person appeals the order (other events may delay the registration of the Scheme Sanction Order). If there is any change to the date or time listed in this timetable, the revised date or time will be announced as soon as practicable when it is known to CEG.

[2] Scheme Creditors should confirm as early as possible with their Account Holders and/or Intermediaries (as applicable) whether there are any applicable deadlines to ensure that their Account Holder Letter is returned online via the Portal to the Information Agent prior to the Voting Record Time in order to vote.

[3] All Scheme Claims for voting purposes are determined as at the Voting Record Time. The Chairperson shall be under no obligation to recognize any assignment or transfer of rights, benefits or interests in the Scheme Claims after the Voting Record Time for the purposes of calculating the value of Scheme Claims for voting nor Entitlements to receive Scheme Consideration and has no obligations hereunder to any Person other than the Scheme Creditors, provided that, where the Chairperson has received from the relevant parties notice in writing of such assignment or transfer prior to the Restructuring Effective Date, the Chairperson may, in its sole discretion and subject to the production of such other evidence in relation to such assignment or transfer as it may reasonably require and to any other terms and conditions which the Chairperson and/or Scheme Administrator may consider necessary or desirable, agree to recognize such assignment or transfer for the purposes of the Scheme Administrators calculating Entitlements to receive Scheme Consideration under the Schemes.

1

| Event | | Expected date | Cayman Islands time | Hong Kong time |
|---|---|---|---|---|
| **Class A Hong Kong Scheme Meeting**[4] | This is the meeting of the Class A Scheme Creditors for the purpose of considering and, if thought fit, approving the Hong Kong Scheme. | 23 August 2023 | 7:00 a.m. on 23 August 2023 | 8:00 p.m. on 23 August 2023 |
| **Class A Cayman Scheme Meeting**[4] | This is the meeting of the Class A Scheme Creditors for the purpose of considering and, if thought fit, approving the Cayman Scheme. | 23 August 2023 | 7.45 a.m. on 23 August 2023 | 8.45 p.m. on 23 August 2023 |
| **Class C Hong Kong Scheme Meeting**[4] | This is the meeting of the Class C Scheme Creditors for the purpose of considering and, if thought fit, approving the Hong Kong Scheme | 23 August 2023 | 8:30 a.m. on 23 August 2023 | 9:30 p.m. on 23 August 2023 |
| **Class C Cayman Scheme Meeting**[4] | This is the meeting of the Class C Scheme Creditors for the purpose of considering and, if thought fit, approving the Cayman Scheme. | 23 August 2023 | 9:15 a.m. on 23 August 2023 | 10:15 p.m. on 23 August 2023 |
| **Hong Kong Scheme Sanction Hearing**[5] | This is the hearing at the Hong Kong Court where the Court will hear the petition in respect of sanctioning the Hong Kong Scheme. | 5 and/or 6 September 2023 | 9.00 p.m. on 4 and/or 5 September 2023 | 10.00 a.m. on 5 and/or 6 September 2023 |
| **Cayman Scheme Sanction Hearing**[5] | This is the hearing at the Cayman Court where the Court will hear the petition in respect of | 1 September 2023 | 10.00 a.m. on 1 September 2023 | 11.00 p.m. on 1 September 2023 |

[4]The Scheme Meetings will commence at the time stated. Any Scheme Creditor that wishes to attend the Scheme Meetings in person should produce a duplicate copy of the Account Holder Letter or Proxy Voting Form (as applicable) that was executed and delivered on their behalf, evidence of personal identity (for example, a passport or other picture identification) and, in the case of a corporation, evidence of corporate authority (for example, a valid power of attorney and/or board minutes) at the registration desk by no later than 15 minutes before the scheduled time of the Scheme Meetings. The Chairperson of the Scheme Meetings may at his or her sole discretion allow a Scheme Creditor to provide the relevant documents up to the time of the commencement of the relevant Scheme Meeting. These will apply to those attending by video as well and there may be a virtual registration desk.
[5]Notice will be provided to all Scheme Creditors if the dates of the Scheme Sanction Hearings change.

| Event | | Expected date | Cayman Islands time | Hong Kong time |
|---|---|---|---|---|
| | sanctioning the Cayman Scheme. | | | |
| **Class A Options Deadline** | The latest time for Class A Scheme Creditors to submit the Scheme Creditor Forms to receive the initial amount of A2 Notes/A2 Package on the Restructuring Effective Date, this is also the latest time for Class A Scheme Creditors to elect Option 2 Scheme Consideration. | The date which is 14 calendar days after the Scheme Effective Date, to be announced by the Company. | | |
| **Entitlement Record Time** | Irrespective of when the Scheme Creditors submit the required documents, this is the time when the Entitlements of Scheme Creditors to Scheme Consideration will be determined. The Valuation and Adjudication Procedure for the Class C Debts taking place after the Restructuring Effective Date can still take into account prevailing circumstances at such time. | Restructuring Effective Date. | | |
| **Restructuring Effective Date**[6] | The date after all Restructuring Effective Date conditions have been satisfied or waived (as the case may be). | To be announced by the Company. | | |
| **Class A Bar Date** | This is the last day for Class A Scheme Creditors, that did not participate before the Class A Options Deadline, to submit the necessary | The date which is 30 days after the Restructuring Effective Date. | | |

[6] This is also an estimated date and will depend upon when conditions precedent to the Restructuring Effective Date have been satisfied or waived.

| Event | | Expected date | Cayman Islands time | Hong Kong time |
|---|---|---|---|---|
| | documentation in order to receive Scheme Consideration on the Final Distribution Date. | | | |
| **First issuance of Estimation Notice** | This is the target date on which the Scheme Administrators will start issuing Estimation Notices. | The date which is no later than 30 calendar days after:<br><br>(a) the Restructuring Effective Date, for Scheme Claims submitted before the Restructuring Effective Date; and<br>(b) the Distribution Confirmation Deed is received by the Scheme Administrators, for Scheme Claims submitted (i) on or after the Restructuring Effective Date, but (ii) on or before the Bar Date. | | |
| **Class C Bar Date** | This is the last day for Class C Scheme Creditors, that did not participate before the Bar Date, to submit the necessary documentation in order to receive Scheme Consideration on the Final Distribution Date. | The date which is 135 calendar days after the Restructuring Effective Date. | | |
| **Completion of the Valuation and Adjudication Procedure** | This is the target date on which the Valuation and Adjudication Procedure for all Class C Debts is completed. | The date which is 295 calendar days after the Restructuring Effective Date. | | |
| **Final Distribution Date** | The final date on which the Scheme Consideration shall be distributed to Scheme Creditors (that are not Blocked Scheme Creditors) or to the Successor Escrow Agent on behalf of the Blocked Scheme Creditors. | The date which is 30 calendar days after the completion of the Valuation and Adjudication Procedure. | | |

4

2.      **IMPORTANT SECURITIES LAW NOTICES**

**This Explanatory Statement does not constitute an offer to sell or the solicitation of an offer to buy any securities in any jurisdiction in contravention of applicable law. None of the securities referred to in this Explanatory Statement shall be sold, issued or transferred in any jurisdiction in contravention of applicable law.**

2.1    **General**

(a)    The distribution of this Explanatory Statement and the offering, sale or delivery of the New Instruments are subject to restrictions and may not be made except pursuant to registration with or authorisation by the relevant securities regulatory authorities or an exemption therefrom. Therefore, Persons who may come into possession of this Explanatory Statement are advised to consult with their own legal advisers as to what restrictions may be applicable to them and to observe such restrictions. This Explanatory Statement may not be used for the purpose of an offer or invitation in any circumstances in which such offer or invitation is not authorised.

(b)    No action has been or will be taken in any jurisdiction by the Company that would or is intended to permit a public offering, or any other offering under circumstances not permitted by applicable law, of the New Instruments. Persons into whose hands this Explanatory Statement comes are required by the Company and the Group to comply with all applicable laws and regulations in each country or jurisdiction in which they purchase, offer, sell or deliver New Instruments or have in their possession, distribute or publish this Explanatory Statement or any other materials relating to the New Instruments, in all cases at their own expense.

(c)    Each Scheme Creditor will be required to submit the validly completed Scheme Creditor Forms and Blocked Scheme Creditor Forms (as applicable) in order to receive the New Instruments.

2.2    **US securities law considerations**

(a)    The New Instruments have not been and will not be registered under the US Securities Act or with any securities regulatory authority of any state of the United States.

(b)    In connection with the issue of the New Instruments, the Distribution Confirmation Deed will require each Scheme Creditor (or its Designated Recipient) who wishes to receive its New Instruments to confirm, amongst other things, that it (or its Designated Recipient) is an Eligible Person and will require any Scheme Creditor (or its Designated Recipient) who is located in the United States or who is a US person (as defined in Regulation S) and intends to receive its New Instruments to make certain representations and covenants in the Distribution Confirmation Deed. If the confirmations, the representations and the covenants required by the Distribution Confirmation Deed cannot be or are not given by a Scheme Creditor (or its Designated Recipient), such Scheme Creditor (or its Designated Recipient) will not be eligible to receive the relevant New Instruments.

(c)    Unless otherwise approved by the Company, the New Instruments will be transferred and delivered within the United States solely to QIBs and Accredited Investors. Outside the United States, the New Instruments will be transferred and delivered solely to non-US persons in offshore transactions in reliance on Regulation S.

5

(d)    If you are a US person, or are located in the United States, but you are not a QIB or an Accredited Investor, you are eligible to receive this Explanatory Statement and to participate in the Schemes and the meetings described herein but you will not be eligible to receive any New Instruments.

(e)    The New Instruments will not be listed on any US securities exchange or with any inter-dealer quotation system in the United States. The Company does not intend to take action to facilitate a market of the New Instruments in the United States. Consequently, the Company believes that it is unlikely that an active trading market in the United States will develop for such Notes.

**The New Instruments have not been and will not be registered with the SEC or any US federal, state or other securities commission or regulatory authority and neither the SEC nor any US federal, state or other securities commission or regulatory authority has approved or disapproved this Explanatory Statement. Any representation to the contrary is a criminal offence in the United States.**

**Scheme Creditors who are citizens or residents of the United States should consult their own legal, financial and tax advisers with respect to the legal, financial and tax consequences of the Schemes in their particular circumstances.**

2.3    **European Economic Area**

(a)    The New Instruments are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the European Economic Area ("**EEA**"). For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU ("**MiFID II**"); or (ii) a customer within the meaning of Directive 2002/92/EC (as amended or superseded), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II. Consequently, no key information document required by Regulation (EU) No 1286/2014 (the "**PRIIPs Regulation**") for offering or selling the New Instruments or otherwise making it available to retail investors in the EEA has been prepared and therefore offering or selling the New Instruments or otherwise making it available to any retail investor in the EEA may constitute a breach of the PRIIPs Regulation.

(b)    In addition, this Explanatory Statement has been prepared on the basis that all offers of the New Instruments in the EEA will be made pursuant to an exemption under Regulation (EU) 2017/1129 (the "**Prospectus Regulation**"), from the requirement to produce a prospectus for offers of the New Instruments. Accordingly, any person making or intending to make any offer within the EEA of the New Instruments should only do so in circumstances in which no obligation arises for the Company to produce a prospectus for such offer. The Company has not authorised and does not authorise the making of an offer of any of the New Instruments through any financial intermediary.

(c)    In relation to each member state of the EEA ("**Member State**"), no offer of New Instruments to the public in that Member State may be made other than to any legal entity which is a qualified investor as defined in the Prospectus Regulation (an "**EEA Qualified Investor**") or in any other circumstances falling within Article 1(3) or Article 1(4) of the Prospectus Regulation, provided that no such offer of New Instruments shall require the

6

Company to publish a prospectus pursuant to Article 3(1) or Article 3(3) of the Prospectus Regulation.

(d)     In connection with the issue of the New Instruments, the Distribution Confirmation Deed will require each Scheme Creditor (or its Designated Recipient) who wishes to receive its Scheme Consideration to confirm, amongst other things, that it (or its Designated Recipient) is an Eligible Person and will require any Scheme Creditor (or Designated Recipient) who is located in the UK and intends to receive its New Instruments to make certain representations and covenants in the Distribution Confirmation Deed, including that it is a UK Qualified Investor. If the confirmations, the representations and the covenants required by the Distribution Confirmation Deed cannot be or are not given by a Scheme Creditor (or its Designated Recipient), such Scheme Creditor (or its Designated Recipient) will not be eligible to receive the relevant New Instruments.

(e)     For the purposes of this provision, the expression an "offer to the public" in relation to the New Instruments in any Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the New Instruments to be offered so as to enable an investor to decide to purchase or subscribe for the New Instruments, as the same may be varied in that Member State by any measure adopted in that Member State pursuant to the Prospectus Regulation (and amendments thereto).

2.4     **United Kingdom**

(a)     The New Instruments are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the United Kingdom ("**UK**"). For these purposes, a retail investor is defined in the UK PRIIPs Regulation to include a client or customer which is not a professional client within the meaning of UK MiFID II. Consequently, no key information document required by the UK PRIIPs Regulation for offering or selling the New Instruments or otherwise making it available to retail investors in the UK has been prepared and therefore offering or selling the New Instruments or otherwise making it available to any retail investor in the UK may constitute a breach of the UK PRIIPs Regulation.

(b)     In addition, this Explanatory Statement has been prepared on the basis that all offers of the New Instruments in the UK will be made pursuant to an exemption under the UK Prospectus Regulation from the requirement to produce a prospectus for offers of the New Instruments. Accordingly, any person making or intending to make any offer in the UK of the New Instruments should only do so in circumstances in which no obligation arises for the Company to produce a prospectus for such offer. The Company has not authorised and does not authorise the making of an offer of any of the New Instruments through any financial intermediary.

(c)     No offer of New Instruments to the public in the UK may be made other than to any legal entity which is a qualified investor as defined in the UK Prospectus Regulation (a "**UK Qualified Investor**") or in any other circumstances falling within Article 1(3) or Article 1(4) of the UK Prospectus Regulation, provided that no such offer of New Instruments shall require the Company to publish a prospectus pursuant to Article 3(1) or Article 3(3) of the UK Prospectus Regulation.

(d)     In connection with the issue of the New Instruments, the Distribution Confirmation Deed will require each Scheme Creditor (or its Designated Recipient) who wishes to receive its

7

Scheme Consideration to confirm, amongst other things, that it (or its Designated Recipient) is an Eligible Person and will require any Scheme Creditor (or Designated Recipient) who is located in the UK and intends to receive their New Instruments to make certain representations and covenants in the Distribution Confirmation Deed, including that it is a UK Qualified Investor. If the confirmations required by the Distribution Confirmation Deed cannot be or are not given by a Scheme Creditor (or its Designated Recipient), such Scheme Creditor (or its Designated Recipient) will not be eligible to receive the relevant New Instruments.

(e)     For the purposes of this provision, the expression an "offer to the public" in relation to the New Instruments in the UK means the communication in any form and by any means of sufficient information on the terms of the offer and the New Instruments to be offered so as to enable an investor to decide to purchase or subscribe for the New Instruments.

(f)     For the purposes of paragraphs (a) to (e) above, "**UK PRIIPs Regulation**" is defined to mean the PRIIPS Regulation as retained as UK law by the European (Withdrawal) Act 2018 ("**EUWA**") and as amended by UK domestic law; "**UK Prospectus Regulation**" means the Prospectus Regulation as retained as UK law by EUWA and as amended by UK domestic law; and "**UK MiFID II**" means MiFID II as retained as UK law by EUWA and as amended by UK domestic law

(g)     This Explanatory Statement has not been approved by an authorised person for the purposes of Section 21 of the UK Financial Services and Markets Act 2000 ("**FSMA**"). Accordingly, this Explanatory Statement is not being distributed to, and must not be passed on to, the general public in the UK. In the UK, this Explanatory Statement is for distribution only to persons who: (i) are investment professionals, as it is defined in Article 19(5) of the Financial Promotion Order; (ii) are persons falling within Article 49(2)(a) to (d) (high net-worth companies, unincorporated associations, etc.), of the Financial Promotion Order; or (iii) are persons to whom this Explanatory Statement may be provided pursuant to Section 4.12 of the Conduct of Business Sourcebook of the UK Financial Conduct Authority (all such persons together being referred to as "**Relevant Persons**"). This Explanatory Statement is directed only at Relevant Persons and must not be acted on or relied on by persons who are not Relevant Persons. Any investment or investment activity to which this Explanatory Statement relates is available only to Relevant Persons and will be engaged in only with Relevant Persons.

## 2.5    Hong Kong

This Explanatory Statement has not been and will not be registered with the Securities and Futures Commission of Hong Kong or the Hong Kong Companies Registrar. The New Instruments have not been and will not be offered or sold in Hong Kong, by means of any document, other than: (a) to Professional Investors; or (b) in other circumstances which do not result in the document being a "prospectus" as defined in the C(WUMP)O or which do not constitute an offer to the public within the meaning of C(WUMP)O. No advertisement, invitation or document relating to the New Instruments may be issued or may be in the possession of any person other than with respect to the New Instruments which are or are intended to be disposed of only to persons outside Hong Kong or only to Professional Investors.

2.6    **PRC**

This Explanatory Statement, if circulated or distributed in the PRC, shall be for information purposes only, and no securities will be offered or sold directly or indirectly to any resident of the PRC, or offered or sold to any person for reoffering or resale directly or indirectly to any resident of the PRC except pursuant to applicable laws and regulations of the PRC. Accordingly, no offer, promotion, solicitation for sales or sale of or for, as the case may be, any New Instruments in the PRC will be made, except where permitted by the China Securities Regulatory Commission or where the activity otherwise is permitted under the laws of the PRC.

2.7    **Singapore**

(a)    This Explanatory Statement has not been and will not be registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this Explanatory Statement and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of New Instruments may not be circulated or distributed, nor may New Instruments be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to any person in Singapore other than:

(i)    to an institutional investor (as defined in Section 4A of the SFA) pursuant to Section 274 of the SFA;

(ii)    to a relevant person (as defined in Section 275(2) of the SFA) pursuant to Section 275(1) of the SFA, or any person pursuant to Section 275(1A) of the SFA, and in accordance with the conditions specified in Section 275 of the SFA and (where applicable) Regulation 3 of the Securities and Futures (Classes of Investors) Regulations 2018; or

(iii)    otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

(b)    Where New Instruments are subscribed or purchased under Section 275 of the SFA by a relevant person which is:

(i)    a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(ii)    a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor,

(iii)    securities or securities-based derivatives contracts (each term as defined in Section 2(1) of the SFA) of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the New Instruments pursuant to an offer made under Section 275 of the SFA except:

(A)    to an institutional investor, or to a relevant person, or to any person arising from an offer referred to in Section 275(1A) or r 276(4)(i)(B) of the SFA;

(B)     where no consideration is or will be given for the transfer;

(C)     where the transfer is by operation of law;

(D)     as specified in Section 276(7) of the SFA; or

(E)     as specified in Regulation 37A of the Securities and Futures (Offers of Investments) (Securities and Securities-based Derivatives Contracts) Regulations 2018.

(c)     Any reference to the SFA is a reference to the Securities and Futures Act, Chapter 289 of Singapore and a reference to any term as defined in the SFA or any provision in the SFA is a reference to that term or provision as modified or amended from time to time including by such of its subsidiary legislation as may be applicable at the relevant time.

## 2.8    Cayman Islands

There is no registration required or made under the Securities Investment Business Act in the Cayman Islands or with the Cayman Islands Monetary Authority in relation to this Explanatory Statement and this Explanatory Statement is only distributed to Scheme Creditors such that it does not represent an offer to the public in the Cayman Islands under any law in the Cayman Islands.

## 2.9    British Virgin Islands

This Explanatory Statement has not been and will not be registered with the British Virgin Islands Financial Services Commission. No security is or shall be offered to the public in the British Virgin Islands for purchase or subscription for the purposes of the Securities and Investment Business Act, 2010 (as amended).

## 2.10    Scheme Creditor who is not an Eligible Person

(a)     Without limiting the information set out in this Section 2 (*Important Securities Law Notices*).

*Important Securities Law Notices*

(b)     the New Instruments will not be issued to a Scheme Creditor pursuant to the Schemes where such Scheme Creditor is not an Eligible Person.

(c)     However, a Scheme Creditor who is not an Eligible Person may designate a Designated Recipient (who itself must be an Eligible Person) to receive the Scheme Consideration, *provided, however*, that when designating a Designated Recipient, a Scheme Creditor will be required to represent and warrant to the Company that it will retain no beneficial interest in the New Instruments designated to be held by the Designated Recipient.

(d)     If a Scheme Creditor is not an Eligible Person and fails to designate a Designated Recipient on or before the applicable Bar Date, the Scheme Creditor's rights under the Schemes shall be extinguished and such Scheme Creditor will have no further rights with respect to the Scheme Consideration.

10

3.      **IMPORTANT NOTICES TO SCHEME CREDITORS**

**This section contains a number of important notices to Scheme Creditors. Scheme Creditors are strongly encouraged to carefully review the notices in this section and, if necessary, seek and obtain independent legal, tax and/or financial advice.**

3.1     **Defined terms**

Unless the context otherwise requires, all capitalised terms used in this Explanatory Statement shall have the meanings set out in Schedule 1 (*Definitions and Interpretation*) to this Explanatory Statement.

3.2     **Information**

This Explanatory Statement has been prepared in connection with linked and inter-conditional schemes of arrangement proposed by CEG pursuant to Section 671 of the Hong Kong Companies Ordinance and pursuant to Section 86 of the Cayman Companies Act in relation to the Schemes between CEG and the Scheme Creditors, and has been prepared solely for the purpose of providing information to Scheme Creditors in relation to the Schemes.

Nothing in this Explanatory Statement or any other document issued with or appended to it should be relied on for any purpose other than for Scheme Creditors to make a decision on the Schemes. In particular and without limitation, nothing in this Explanatory Statement should be relied on in connection with the purchase or acquisition of any Scheme Claim or any other financial instruments, securities, assets or liabilities of CEG or any other member of the Group.

Nothing contained in this Explanatory Statement constitutes a recommendation, or the giving of advice, by the Board, CEG or any other member of the Group, or the Information Agent to take a particular course of action or to exercise any right conferred by the Existing Debts in relation to, buying, selling, subscribing for, exchanging, redeeming, holding, underwriting, disposing of, or converting Existing Debts or any other financial instruments, securities, assets, claims, property interests or liabilities of CEG or any other member of the Group.

3.3     **Financial statements**

The financial information in this Explanatory Statement for the Group is from the audited consolidated financial results for the years ended 31 December 2021 (the "**FY21 Audited Group Consolidated Financial Results**") and 31 December 2022 (the "**FY22 Audited Group Consolidated Financial Results**") which informed (respectively) the 'Announcement of Results for the Year Ended 31 December 2021' and the 'Announcement of Results for the Year Ended 31 December 2022' of CEG published on CEG's website (http://www.evergrande.com) and the website of the HKEX (https://www.hkexnews.hk) on 17 July 2023. The auditor provided a disclaimer of opinion for the results contained in the announcements and noted that there are material uncertainties related to the going concern basis for the Group.

Once published, the Annual Reports for the Group for FY21 (containing the FY21 Audited Group Consolidated Financial Results in full) and FY22 (containing the FY22 Audited Group Consolidated Financial Results) will also be made available on the Transaction Website.

11

3.4    **Scheme Creditors**

This Explanatory Statement is to be distributed to all Persons who, according to CEG's records, are believed to be or may be Scheme Creditors as at the date of this Explanatory Statement. Information on the actions that Scheme Creditors are required to take under the Schemes is set out in Section 5 (*Summary of Actions to be Taken by Scheme Creditors*) of this Explanatory Statement and set out in the Solicitation Packet.

3.5    **Blocked Scheme Creditors**

Blocked Scheme Creditors are Scheme Creditors who are not entitled, able or permitted (whether directly or through a custodian) to submit instructions or settle though the Clearing Systems as a result of Applicable Sanctions affecting the Scheme Creditor or its custodian. In these circumstances, the issue may be caused by the technical application of Applicable Sanctions to the Blocked Scheme Creditor's custodian. Whilst Applicable Sanctions remain in place in respect of Blocked Scheme Creditors, such Blocked Scheme Creditors will not be entitled, able or permitted to (i) submit Account Holder Letters or have a Custody Instruction submitted on its behalf (if applicable) through the Clearing Systems or to the Information Agent in the relevant Scheme, or (ii) receive the Scheme Consideration. It is not possible for the custodian of a Blocked Scheme Creditor to be bypassed by the Company, as to do so would be a breach of the anti-circumvention measures imposed by Applicable Sanctions.

As a result, the Blocked Scheme Creditors (other than Sanctions-Affected Scheme Creditors) must submit (or procure the submission of, as applicable) a Blocked Scheme Creditor Form, together with supporting evidence and other materials as required, to GLAS in order to vote on the Schemes. Sanctioned Scheme Creditors will not be entitled to vote on the Schemes.

Subject to the further provisions in this Section 3.5 below, a Blocked Scheme Creditor that is a Class A Noteholder must ensure that a validly completed and executed Blocked Scheme Creditor Form, together with supporting evidence is received by GLAS by:

(a)    the Class A Options Deadline, in order to be eligible to receive Option 2 Scheme Consideration on the Restructuring Effective Date and the Final Distribution Date, if the Applicable Sanctions are lifted; or

(b)    the Class A Bar Date, in order to be eligible to receive Option 1 Scheme Consideration on the Final Distribution Date, if Applicable Sanctions are lifted.

A Blocked Scheme Creditor that submits a Blocked Scheme Creditor Form must provide sufficient supporting evidence to allow GLAS to reliably establish that Blocked Scheme Creditor's identity, status as a Scheme Creditor and the value of its relevant holding. GLAS will review each Blocked Scheme Creditor Form and the accompanying evidence submitted by the Voting Record Time to assess whether the Blocked Scheme Creditor Form has been completed correctly and whether there is sufficient evidence to reliably establish the Blocked Scheme Creditor's identity, status as a Scheme Creditor and the value of its holding.[7]

---

[7]Class A Noteholders and Class C Noteholders who are Blocked Scheme Creditors do not need to submit a Custody Instruction because their Existing Notes or Class C Notes (as applicable) are already blocked from trading as their accounts were blocked by the Clearing Systems at the time the Applicable Sanctions were put in place. As such, Blocked Scheme Creditors would be unable to submit instructions to the Clearing Systems.

For the avoidance of doubt, Blocked Scheme Creditors will not be able to receive the Scheme Consideration on the Restructuring Effective Date and/or the Final Distribution Date if the Applicable Sanctions remain in place and the Blocked Scheme Creditors remain subject to such Applicable Sanctions. Instead, on the Restructuring Effective Date, any Scheme Consideration (including the A2 Package and/or A2 Notes), TJ Scheme Consideration (if applicable) and any Consent Fee (if applicable) to which Blocked Scheme Creditors may be entitled on the Restructuring Effective Date will be issued to and held by the Holding Period Trustee on trust under the Holding Period Trust Deed for the benefit of such Blocked Scheme Creditors during the Holding Period.

If the Applicable Sanctions are still in place upon the expiration of the Holding Period, CEG will appoint the Successor Escrow Agent to hold the Blocked Assets for the Blocked Scheme Creditors as described in Section 21 (*Successor Escrow Account*) below, and further in accordance with the terms of the Schemes.

The inability of Blocked Scheme Creditors to receive their portion of the Scheme Consideration until the Applicable Sanctions are lifted is due to their own personal circumstances and is not considered by the Company to give rise to any difference, or any material difference, in their rights as Scheme Creditors under the Schemes as compared with Scheme Creditors who are not Blocked Scheme Creditors. The Company considers that restrictions on the ability of Blocked Scheme Creditors to receive their portion of the Scheme Consideration is due to the current regulatory environment and is not connected to their treatment under the Schemes or their rights against CEG. Blocked Scheme Creditors have the same Entitlement to the Scheme Consideration as Scheme Creditors who are not Blocked Scheme Creditors.

For further details about the arrangements for the Blocked Scheme Creditors, please read this Explanatory Statement carefully as a whole, in particular Section 5 (*Summary of Actions to be Taken by Scheme Creditors*) and Section 6 (*Summary Explanation of the Schemes*) of this Explanatory Statement.

3.6     **Sanctioned Scheme Creditors**

Sanctioned Scheme Creditors must contact the Company in writing pursuant to the notice details set out in Clause 41 (*Notice*) to the Schemes to bring its status as a Sanctioned Scheme Creditor to the attention of the Company on or before the Class A Options Deadline (if the Sanctioned Scheme Creditor is a Class A Scheme Creditor and wishes to elect Option 2 Scheme Consideration), the Class A Bar Date or the Class C Bar Date, as applicable. Any Sanctioned Scheme Creditor that fails to comply with this Section 3.6 shall have its rights under the Schemes extinguished, including any right which it may have to receive Scheme Consideration or TJ Scheme Consideration under the Schemes.

3.7     **Notice to Scheme Creditors**

Without prejudice to any representations and warranties to be given by CEG in the Restructuring Documents, nothing contained in this Explanatory Statement shall constitute a representation, warranty, undertaking or guarantee of any kind, express or implied, nor any admission of any fact or liability on the part of CEG or any other member of the Group with respect to any asset to which it may be entitled or any claim against it. Without prejudice to the generality of the foregoing, nothing in this Explanatory Statement or the distribution thereof evidences to any person, or constitutes any admission by CEG or any other member of the Group, that a liability is owed to any person in respect of any claim (including without limitation any Scheme Claim) or that any person

13

is or may be a Scheme Creditor. The failure to distribute this Explanatory Statement to any Scheme Creditor shall not constitute an admission or determination by CEG or any other member of the Group that such person is not a Scheme Creditor.

No person has been authorised by CEG to give any information or make any representations concerning the Restructuring Documents or the Schemes which is/are inconsistent with this Explanatory Statement and, if made, such representations shall not be relied upon as having been so authorised.

The information contained in this Explanatory Statement has been prepared based upon information available to CEG prior to the date of this Explanatory Statement. The delivery of this Explanatory Statement does not imply that the information herein is correct as at any time subsequent to the date hereof. To the best of CEG's knowledge, information and belief, the information contained in this Explanatory Statement is in accordance with the facts and does not omit anything likely to affect the import of such information, each in a material respect. CEG has taken all reasonable steps to ensure that this Explanatory Statement contains the information reasonably necessary to enable Scheme Creditors to make an informed decision about how the Schemes and Restructuring affects them.

None of CEG's advisers have verified that the information contained in this Explanatory Statement is materially in accordance with facts and does not omit anything likely to affect the import of such information in any material way, and each of those persons expressly disclaims responsibility for such information.

This Explanatory Statement has not been reviewed, verified or approved by any rating agency or any regulatory authority. Without prejudice to any representations and warranties to be given by CEG or any other member of the Group in the Restructuring Documents, to the fullest extent permitted by law, CEG and any other member of the Group will have no tortious, contractual or any other liability to any person in connection with the use of this Explanatory Statement and CEG and any other member of the Group will not accept any liability whatsoever to any person, regardless of the form of action, for any lost profits or lost opportunity, or for any indirect, special, consequential, incidental or punitive damages arising from any use of this Explanatory Statement, its contents or preparation or otherwise in connection with it, even if CEG or any other member of the Group has been advised of the possibility of such damages.

Unless otherwise made clear / clear from the context, in this Explanatory Statement (including all the Schedules), all the principal amounts (and accordingly, any principal amount of New Instruments forming part of the Total Package derived from such principal amounts), assumes (a) a Restructuring Effective Date of 1 October 2023; (b) the number of Shares, EVPS Shares and NEV Shares and the numbers so derived from such number of shares are based on the date of this Explanatory Statement; and (c) that the Conversion of Shareholders' Loans to NEV Shares will take place on 14 August 2023.

3.8    **Restrictions**

The distribution of this Explanatory Statement to or in certain jurisdictions may be restricted by law or regulation and persons into whose possession this Explanatory Statement comes are requested to inform themselves about, and to observe, any such restrictions. Failure to comply with any such restrictions could result in a violation of the laws of such jurisdictions.

3.9     **Summary only**

The summary of the principal provisions of the Schemes contained in this Explanatory Statement is subject to the terms of the Schemes themselves. The full text of the Schemes is set out in Schedule 4 (*The Schemes*) to this Explanatory Statement. Each Scheme Creditor is strongly encouraged to read and consider the text of the Schemes carefully. This Explanatory Statement has been prepared solely to assist Scheme Creditors in respect of voting on the Schemes.

3.10    **Conflicts**

In the event of a conflict between the information and terms described in:

(a)      this Explanatory Statement; and

(b)      the Schemes or the Restructuring Documents;

the terms of the Schemes or the Restructuring Documents shall prevail.

Subject to the terms of the RSAs and the Schemes, any order of the Hong Kong Court or Cayman Court, the Schemes and applicable law, CEG reserves the right to take steps to, subject to obtaining the written consent of the Majority CEG AHG (where the CEG AHG holds the Minimum CEG AHG Threshold), modify the Schemes, or to propose a different scheme or schemes of arrangement, at any time prior to sanction of the Schemes and delivery of the Scheme Sanction Orders to the Hong Kong Companies Registrar and the Cayman Registrar of Companies. The Courts may also impose modifications, additions or conditions on the Schemes.

3.11    **Forward-looking statements**

**Nothing in this Explanatory Statement shall be deemed to be a forecast, projection or estimate of the future financial performance of CEG and/or any member of the Group except where otherwise specifically stated.**

**This Explanatory Statement contains statements, estimates, opinions and projections with respect to CEG and the Group and certain plans and objectives of CEG and the Group. These forward-looking statements can be identified by the fact that they do not relate only to historical or current facts. Forward-looking statements often use words such as "*anticipate*", "*target*", "*expect*", "*estimate*", "*intend*", "*plan*", "*goal*", "*believe*", "*will*", "*may*", "*should*", "*would*", "*could*" or other words of similar import. These statements are based on numerous assumptions and assessments made by CEG as appropriate in light of their experience and perception of historical trends, current conditions, expected future developments and other factors which they believe appropriate. No assurance can be given that such expectations will prove to be correct. Forward-looking statements involve significant risks and uncertainties, should not be read as guarantees of future performance or results, and will not necessarily be accurate indications of whether or not such results will be achieved. Such forward-looking statements only speak as at the date of this Explanatory Statement. A number of factors could cause actual results to differ materially from the results discussed in the forward-looking statements, including, but not limited to, the factors and uncertainties set out in Section 28 (*Risk Factors*) of this Explanatory Statement. Each Scheme Creditor is urged to make its own assessment of the validity of such forward-looking statements and their underlying assumptions and no liability is accepted by CEG in respect of the achievement or failure thereof of such forward-looking statements and assumptions. Without limiting the above,**

**none of the boards of directors of CEG and other companies within the Group assumes any obligation to update or correct any forward-looking statements contained in this Explanatory Statement to reflect any change of expectations with respect thereto or any change in event, situation or circumstances on which any such forward-looking statement was based.**

3.12    **Risk factors**

Scheme Creditors' attention is drawn to certain risks and uncertainties associated with the Restructuring that are set out in Section 28 (*Risk Factors*) of this Explanatory Statement.

These important risk factors could cause CEG's and the Group's actual results and future prospects to differ materially from those expressed in this Explanatory Statement (including any forward-looking statements).

**Each Scheme Creditor should carefully read and analyse such risk factors and uncertainties, and fully understand their impact, which may be material and adverse, on its financial condition and prospects. The statement of risk factors is not and is not intended to be an exhaustive statement of such factors or of all possible factors which might influence the decision of Scheme Creditors as regards the Schemes or any investment decision.**

3.13    **Disclaimer regarding preparation of the Liquidation Analysis and Scheme Recovery Analysis**

(a)    Deloitte Advisory (Hong Kong) Limited ("**Deloitte**") was engaged by CEG, SJ and Tianji to prepare: (i) a report analyzing the recovery rates for the creditors of CEG, SJ and Tianji under a hypothetical liquidation scenario of the Group as at 1 January 2023 ("**Liquidation Analysis**") and (ii) a report analyzing the recovery rates for the scheme creditors of CEG, SJ and Tianji under the Restructuring ("**Scheme Recovery Analysis**", together with the Liquidation Analysis, the "**Reports**"). Copies of the Reports are set out in this Explanatory Statement at Schedule 2 (*Liquidation Analysis*) and Schedule 3 (*Scheme Recovery Analysis*), respectively.

(b)    As explained below in paragraph 9 (What happens if the Restructuring Fails?) of Section 7 (*Letter from the Board to the Scheme Creditors*), the Directors believe that the most likely outcome in the event that the Restructuring were not to go ahead would be for the Company to be placed into insolvent liquidation, and that this would result in a substantially lower return to creditors of the Company than if the Restructuring were approved and successfully implemented as proposed.

(c)    By reviewing the Reports, the Scheme Creditors and any other party who gains access to the Reports shall be deemed to have read, and to have irrevocably acknowledged and agreed to comply with, the following contents of this disclaimer:

(i)    the Reports were prepared solely for the benefit of CEG, SJ and Tianji and, save in respect of CEG, SJ and Tianji, Deloitte accepts no duty of care or liability to any other party regardless of whether or not a party was shown or gained access to any of the Reports, or is a Scheme Creditor placing any reliance on any of the Reports;

(ii)    with respect to dealing in shares, the Reports may contain material non-public information of CEG. Thus, any disclosure, copying, or distribution of the Reports

16

or the taking of any action based on them, which would constitute insider dealing with respect to shares in CEG, is strictly prohibited;

(iii)   the Reports were prepared for indicative and illustrative purposes only.  In respect of the Liquidation Analysis, the actual recoveries may vary subject to, among other things, the actual proceeds of realisation of the assets, the costs and expenses actually incurred incidental to the liquidation/disposal and the amounts of the claims submitted and ultimately admitted as claims against the Company and its subsidiaries. In respect of the Scheme Recovery Analysis, the actual recoveries may vary subject to, among other things, the ability of the Company to fulfill the repayment obligations under the Restructuring and the amounts of claims submitted and ultimately admitted as claims under the Schemes. Thus, the actual recoveries could be materially different from the estimated recoveries set out in the Reports.

(iv)   the Liquidation Analysis and the Scheme Recovery Analysis were prepared on the basis of information, including unaudited information, received by Deloitte up to 14 July 2023 and 20 July 2023 respectively, and Deloitte has not updated the Reports since the respective dates.  Deloitte relied on the financials and other information provided to it and on representations made to it by management of CEG and CEG's subsidiaries, and the relevant companies' respective staff and advisors. Deloitte did not audit or verify the correctness and accuracy of the information provided to it and Deloitte does not express an audit opinion on its findings and analysis. Deloitte accepts no responsibility for the reliability of such information to the extent it is inaccurate, incomplete or misleading;

(v)   the Reports may not contain all facts and information that a Scheme Creditor may regard as relevant or potentially relevant; and

(vi)   finally, the Scheme Creditors and any other party who gains access to the Reports shall refer to the full disclaimers, limitations, source of information, and terms and conditions therein.

(d)   As outlined in this Section 3 (*Important Notices to Scheme Creditors*), each Scheme Creditor should examine, conduct and make its own assessment in relation to this Explanatory Statement, including the Reports.

## 3.13   Legal, tax and financial advice

**Without limiting any of the above, Scheme Creditors should not construe the contents of this Explanatory Statement or any other document in connection with the Restructuring as legal, tax and/or financial advice.**

This Explanatory Statement has been prepared without taking into account the objectives, financial or tax situation or needs of any particular recipient of it, and consequently, the information contained in this Explanatory Statement may not be sufficient or appropriate for the purposes for which a recipient might use it. Each Scheme Creditor should conduct its own due diligence and consider the information in this Explanatory Statement having regard to its own objectives, financial situations and needs. Scheme Creditors are also recommended to consult their own professional advisers as to legal, tax, financial or other aspects relevant to any action Scheme

Creditors might take in relation to the Schemes and the Restructuring, or the implications or consequences of such action.

This Explanatory Statement is addressed to Scheme Creditors for their information only and no Person should rely on it in formulating or reaching any investment decision other than for Scheme Creditors to make a decision whether or not to approve the Schemes. **Scheme Creditors must rely on their own due diligence and their professional advisers in their decisions with respect to the Schemes and the Restructuring.**

3.14    **Other jurisdictions**

The implications of the Restructuring for Scheme Creditors who are residents or citizens of jurisdictions other than the Cayman Islands or Hong Kong may be affected by the laws of other relevant jurisdictions. Such overseas Scheme Creditors should inform themselves about and observe any applicable legal requirements in their respective jurisdictions. Any person outside of the Cayman Islands or Hong Kong who is resident in, or who has a registered address in, or is a citizen of, an overseas jurisdiction should consult independent professional advisers and satisfy themselves as to the full observance of the laws of the relevant jurisdiction in connection with the Schemes and the Restructuring, including obtaining any requisite governmental or other consents, observing any other requisite formalities and paying any issue, transfer or other taxes due in such jurisdiction.

3.15    **The Existing Notes Trustee**

Neither the Existing Notes Trustee nor any of its directors, officers, employees, agents, affiliates or advisers is acting for, or owes any duty to, any Scheme Creditor, nor will any of them be responsible for providing any advice to any Scheme Creditor in relation to the terms of the New Instruments. Accordingly, neither the Existing Notes Trustee nor any of its directors, officers, employees, agents, affiliates or advisers make any recommendations as to whether any Scheme Creditor should take any of the actions contemplated in the Schemes. The Existing Notes Trustee expresses no opinion on the merits of the Schemes and the terms of the New Instruments. The Existing Notes Trustee has not been involved in negotiating or determining the terms of the Schemes and makes no representation that all relevant information has been disclosed to the Scheme Creditors in or pursuant to the Schemes.

The Existing Notes Trustee shall not be responsible for calculating, verifying or paying any amounts payable in relation to the Schemes, including but not limited to, amount of the New Instruments to be issued, Scheme Claims or any accrued and unpaid interest. The Existing Notes Trustee shall not be required to take any steps to ascertain whether a Scheme Creditor is eligible to receive any Consent Fee or Scheme Consideration. The Existing Notes Trustee and the New Instruments Trustee will not be responsible for determining or verifying the claims of any Scheme Creditor to receive the New Instruments.

The Existing Notes Trustee has not determined or verified the eligibility of Scheme Creditors, Account Holders or Designated Recipients for the purposes of the Schemes nor has the Existing Notes Trustee reviewed the Account Holder Letters, Distribution Confirmation Deeds, Custody Instructions or Designated Recipient Form.

The Existing Notes Trustee shall not be responsible for monitoring the Schemes and shall not be required to take any steps to monitor or ascertain whether any event that triggers the termination of

18

the RSA(s) has occurred and will not be responsible to the Scheme Creditors or any other person for any loss arising from any failure to do so.

The Existing Notes Trustee is a Scheme Creditor however, they shall not be entitled to vote at the Scheme Meetings or receive Scheme Consideration and will only be required to take actions expressly required or permitted under the Schemes and described herein.  Notwithstanding the foregoing, the Existing Notes Trustee may attend the Scheme Meetings as an observer.

3.16    **RMB Bonds Trustee**

The RMB Bonds Trustee could be instructed to vote and to receive Scheme Consideration when duly instructed to do so by pursuant to the terms of the RMB Bond (if applicable).

3.17    **The Information Agent**

Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers is acting for, or owes any duty to, any Scheme Creditor, nor will any of them be responsible for providing any advice to any Scheme Creditor in relation to the Scheme. Accordingly, neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers make any recommendations as to whether any Scheme Creditor should take any of the actions contemplated in the Schemes. The Information Agent expresses no opinion on the merits of the Schemes or the terms of the New Instruments. The Information Agent has not been involved in negotiating or determining the terms of the Schemes and makes no representation that all relevant information has been disclosed to the Scheme Creditors in or pursuant to the Schemes. Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers has verified, determined or calculated, or assumes any responsibility or liability for the accuracy or completeness of any of the information concerning the Schemes, or any factual statements contained in, or the effect or effectiveness of, the Schemes. Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers will have any tortious, contractual or any other liability to any person in connection with the determination of whether a Scheme Creditor is a Blocked Scheme Creditor or a Sanctioned Scheme Creditor. Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers will accept any liability whatsoever to any person, regardless of the form of action, for any lost profits or lost opportunity, or for any indirect, special, consequential, incidental or punitive damages arising from the determination of whether a Scheme Creditor is a Blocked Scheme Creditor or a Sanctioned Scheme Creditor, even if the Information Agent or any of its directors, officers, employees, agents, affiliates or advisers have been advised of the possibility of such damages.

Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers is obliged, under the terms of the Schemes or otherwise, to engage in any transaction or conduct that may give rise to a liability under or in connection with Applicable Sanctions and/or may result in any person becoming targeted by Applicable Sanctions.

If compliance with any obligations under the terms of the Schemes or otherwise would result in the Information Agent or any of its directors, officers, employees, agents, affiliates or advisers breaching the Blocking Regulation, that obligation need not be complied with (but only to the extent of the breach).

The Information Agent will check Scheme Claims against Custody Instructions and against the records of Scheme Creditors provided to the Information Agent by the Company. Under no circumstances will the Information Agent be required to verify or determine the eligibility of any

Scheme Creditor in relation to the Scheme. The Information Agent will check Scheme Claims against Custody Instructions and against the records of Scheme Creditors provided to the Information Agent by the Company. The Information Agent will assist the Company and the Chairperson in checking the voting values of each Scheme Creditor (who is not a Sanctions-Affected Scheme Creditor) based on such information.

Each Scheme Creditor and/or Account Holder will, in accordance with the Schemes, unconditionally and irrevocably waive and release any claims which may arise against the Information Agent from all actual or potential liability, arising directly or indirectly, in each case, in relation to the Information Agent's performance of its roles and all other actions which they may take in connection with the Schemes, save for any liability resulting from the Information Agent's own fraud or wilful misconduct.

## 4.    QUESTIONS AND ANSWERS

*This overview is intended to be a high-level summary for reference only.*

### 4.1    What is the purpose of the Explanatory Statement and the Schemes?

The purpose of the Explanatory Statement is to explain the key aspects of the Schemes to Scheme Creditors, and to provide sufficient information to them to enable them to make a reasonable judgment as to whether the proposed Schemes are in their commercial interests or not. It also sets out the expected timetable for the Schemes process. The Schemes as appended at Schedule 4 (*The Schemes*) to this Explanatory Statement are the documents which give legal effect to the contemplated compromises or arrangements.

### 4.2    What is a Scheme of Arrangement?

A scheme of arrangement is a compromise or arrangement between a company and its creditors (or a class of them) in respect of that company's debts and/or obligations owed to those creditors. As part of the Restructuring, the Company has proposed parallel Schemes, namely the Scheme in Hong Kong and the Scheme in the Cayman Islands.

A scheme of arrangement becomes legally binding on its creditors if such an arrangement is sanctioned by the relevant court pursuant to certain criteria being met, including at least a majority in number of the relevant creditors, holding at least seventy-five per cent (75%) in value of claims, present and voting (either in person or by proxy) at the relevant scheme meeting, voting in favour of the scheme of arrangement.

If a scheme of arrangement becomes effective, it will bind the company and all creditors to whom it applies, being in this case CEG and the Scheme Creditors respectively under the Schemes, whether or not each creditor voted (in favour or against of the scheme(s)).

### 4.3    How many classes of Scheme Creditors are there?

The Schemes will proceed on the basis that Scheme Creditors constitute two classes of creditors of the Company, namely Class A and Class C. Class A Debts consist of ten series of USD senior secured notes, one series of HKD convertible bonds and one private loan, all issued and/or borrowed by CEG, while Class C Debts consist of obligations owed or guaranteed by CEG under a range of instruments. In summary, they include: (i) certain private debts or obligations where CEG is a guarantor or a borrower; (ii) onshore debts that have been guaranteed by CEG; (iii) certain

private debts where CEG has provided a put or repurchase option (or obligation akin to a put option) to a creditor, the creditor being able to "put" the shares or securities to CEG for a pre-agreed price.

The Courts have given permission to the Company to convene the respective Scheme Meetings, which are meetings of: (i) the Class A Scheme Creditors; and (ii) the Class C Scheme Creditors, to consider and vote on the Schemes.

The Company has obtained the Scheme Convening Orders, which are orders from the respective Courts granting permission to convene the respective Scheme Meetings for the Scheme Creditors to consider and vote on the respective Schemes. A copy of each Scheme Convening Order (regarding the convening of such meetings of Scheme Creditors) is reproduced in Schedule 7 (*Scheme Meeting Convening Order*) to this Explanatory Statement.

## 4.4    Who is a Blocked Scheme Creditor?

A Blocked Scheme Creditor is a Class A Noteholder, Lake Noteholder or Dongpo Noteholder that is not entitled, able or permitted (whether directly or through a custodian) to submit instructions or settle through the Clearing Systems as a result of Applicable Sanctions affecting the Class A Noteholder, Lake Noteholder or Dongpo Noteholder or their custodian as determined by the Clearing Systems.

As Blocked Scheme Creditors are unable to receive Scheme Consideration through the Clearing Systems, the Scheme Consideration, any Consent Fee, and any TJ Scheme Consideration in which Blocked Scheme Creditors may be entitled to shall be paid to the Holding Period Trustee (where such amounts are otherwise payable to the relevant Blocked Scheme Creditor prior to the Final Distribution Date), or, where Applicable Sanctions remain in place in respect of Blocked Scheme Creditors on the Holding Period Expiry Date, to be held by the Successor Escrow Agent thereafter.

## 4.5    What is the purpose and effect of the Schemes?

The purpose of the Schemes and the Restructuring of which the Schemes are a part is to stabilise the financial position of CEG to allow it to continue as a going concern, with a significantly healthier balance sheet. In particular, in relation to each class of Scheme Claims:

(a)    **Scheme Claims of Class A Scheme Creditors:** All Scheme Claims will be released pursuant to the Schemes. This will include all claims against the Existing Notes Subsidiary Guarantors and Existing Notes Subsidiary Pledgors in respect of the Class A Debts. The discharge of all Scheme Claims in relation to the Class A Debts will considerably improve and stabilise the financial health of CEG.

(b)    **Scheme Claims of Class C Scheme Creditors:** All Scheme Claims will be released pursuant to the Schemes. The Class C Scheme Creditors hold different rights against obligors or credit support providers who are non-CEG parties in connection with their Class C Debts, being the Excluded Liabilities and Excluded Collateral. The Schemes will not release the Excluded Liabilities and Excluded Collateral. The Excluded Liabilities and Excluded Collateral are the rights held by Class C Scheme Creditors against third parties (i.e. non-CEG parties) in respect of the Class C Debts. Instead, the Schemes will only release Class C Scheme Creditors' claims against CEG in respect of the Class C Debts.

As such, for the purposes of calculating the Class C Scheme Creditors' Entitlements to Scheme Considerations, their claims will be admitted on a Deficiency Basis, such that no

21

Scheme Consideration shall be payable in respect of the Excluded Liabilities or Excluded Collateral. Deficiency Basis is explained in more detail at paragraphs 9.35-9.38 of this Explanatory Statement.

**Why has the Deficiency Basis been adopted for Class C Scheme Creditors?** The Deficiency Basis has been adopted because:

1.  This approach helps ensure an equal treatment of Class C Scheme Creditors and to prevent an unmanageable number of scheme creditor classes, thus rendering a restructuring practically impossible. The discharge of all Scheme Claims in connection with the Class C Debts (which does not include the Excluded Liabilities and the Excluded Collateral) will considerably improve and stabilise the financial health of CEG.

2.  Class C Scheme Creditors will continue to be able to recover their Class C Debts from the non-CEG obligors and/or creditor support providers. Hence, it is appropriate for the value of those claims to be taken into account for the purposes of calculating Class C Scheme Creditors' Entitlements to Scheme Consideration. Otherwise, Class C Scheme Creditors would be potentially overcompensated in respect of the compromise of their claims because they would receive Scheme Consideration from CEG as if the full accrued value of their Class C Debts was being released when, in fact, some or all of that value will remain recoverable from relevant non-CEG parties if the Schemes are sanctioned.

4.6     **What are the actions that a Class A Scheme Creditor needs to take?**

(a)     **Forms to be submitted to vote at the Scheme Creditor Meetings:** Class A Scheme Creditors must submit the following validly completed and executed Scheme Creditor Forms, as applicable, and further pursuant to the terms of the Schemes, by the Voting Record Time:

○   Class A Noteholders (who are not Sanctions-Affected Scheme Creditors): (1) Custody Instruction to be submitted via the Clearing Systems prior to the submission of the Account Holder Letter (and in any case by the Custody Instruction Deadline) and (2) Account Holder Letter via the Portal to the Information Agent by no later than the Voting Record Time (including the section where each Class A Noteholder elects between Option 1 Scheme Consideration and Option 2 Scheme Consideration to be completed before Class A Options Deadline).

○   Class A Lenders: Class A Private Lender Proxy Form (including the section where each Class A Lender elects between Option 1 Scheme Consideration and Option 2 Scheme Consideration to be completed before Class A Options Deadline) via the Portal to the Information Agent.

○   Blocked Scheme Creditors: Blocked Scheme Creditor Form (including a section allowing each Blocked Scheme Creditor to elect between Option 1 Scheme Consideration and Option 2 Scheme Consideration) to GLAS.

(b)     **To receive the Consent Fee:** Class A Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) must submit their relevant Scheme Creditor Forms via the Portal to the

Information Agent by no later than the Voting Record Time to receive the Consent Fee (if applicable).

(c)     **To receive Option 2 Scheme Consideration, including in an Initial Distribution on the Restructuring Effective Date:** Class A Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) must submit their relevant Scheme Creditor Forms via the Portal to the Information Agent by no later than the Class A Options Deadline, which will be prior to the Restructuring Effective Date, to elect to receive Option 2 Scheme Consideration, including as part of the Initial Distribution on the Restructuring Effective Date.

(d)     **To amend the Scheme Consideration option elected**: Class A Scheme Creditors are able to change the option for Scheme Consideration they have elected for after the Voting Record Time. However, such amended election shall be final and must be made prior to or by the Class A Options Deadline. Class A Scheme Creditors wishing to make amendments to their elected option will be required to resubmit particular documents to the Information Agent via the Portal or to GLAS as applicable, as further set out in the Solicitation Packet.

(e)     **Class A Options Deadline**: Class A Scheme Creditors who did not make their elections validly by the Class A Options Deadline will be deemed to have elected Option 1 Scheme Consideration by default.

(f)     **To receive Option 1 Scheme Consideration**: Class A Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) must submit their relevant Scheme Creditor Forms via the Portal to the Information Agent by no later than the Class A Bar Date (i.e. 30 days after the Restructuring Effective Date) in order to be entitled to receive the Final Distribution of the Scheme Consideration on the Final Distribution Date pursuant to the terms of the Schemes.

(g)     **To nominate a Designated Recipient to receive your Scheme Consideration**: Class A Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) who wish to nominate a Designated Recipient to receive the Scheme Consideration on their behalf, should submit a validly completed and executed Designated Recipient Form, along with the other documents noted above in the Portal to the Information Agent by (i) the Voting Record Time in order to vote on the Schemes, (ii) the Class A Options Deadline in order to receive the Initial Distribution to the Scheme Consideration (if applicable); and (iii) the Class A Bar Date in order to receive the Final Distribution on the Final Distribution Date.

(h)     **Class A Bar Date**: For the avoidance of doubt, Class A Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) that fail to submit their Distribution Confirmation Deeds via the Portal to the Information Agent by the Class A Bar Date will not be entitled to receive any Scheme Consideration but will have their Scheme Claims released and extinguished in accordance with Clause 28 (*Releases*) of the Schemes.

4.7     **What are the actions that a Class C Scheme Creditor need to take?**

(a)     **Forms to be submitted to vote at the Scheme Creditor Meetings:** Class C Scheme Creditors must submit the following validly completed and executed Scheme Creditor Forms, as applicable, and further pursuant to the terms of the Schemes, by the Voting Record Time:

23

- ○ <u>Class C Scheme Creditors (who are not Sanctions-Affected Scheme Creditors or Class C Noteholders)</u>: Class C Scheme Creditor Proxy Form (including the section where such Class C Creditors elects between Option 1 Scheme Consideration and Option 2 Scheme Consideration to be completed before Class C Bar Date) via the Portal to the Information Agent.

- ○ <u>Class C Noteholders (who are not Sanctions-Affected Scheme Creditors)</u>: (1) Custody Instructions to be submitted via the Clearing Systems prior to the submission of the Account Holder Letter (and in any case by the Custody Instruction Deadline) and (2) Account Holder Letter via the Portal to the Information Agent before Voting Record Time (including the section where such Class C Noteholders elect between Option 1 Scheme Consideration and Option 2 Scheme Consideration to be completed before Class C Bar Date).

- ○ <u>Blocked Scheme Creditors:</u> Blocked Scheme Creditor Form (including the section where each Blocked Scheme Creditor elects between Option 1 Scheme Consideration and Option 2 Scheme Consideration) to GLAS.

(b) **To receive the Consent Fee:** Class C Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) must submit their relevant Scheme Creditor Forms via the Portal to the Information Agent by no later than the Voting Record Time to receive the Consent Fee (if applicable).

(c) **To amend the Scheme Consideration option elected:** Class C Scheme Creditors are able to change the option for Scheme Consideration they have elected for after the Voting Record Time. However, any final election must be made prior to or by the Class C Bar Date, which will be after the Restructuring Effective Date. Class C Scheme Creditors wishing to make amendments to their elected option will be required to resubmit particular documents to the Information Agent via the Portal or to GLAS as applicable, as further set out in the Solicitation Packet. Class C Scheme Creditors who submit their relevant Scheme Creditor Forms by the Class C Bar Date but who do not make their elections validly by the Class C Bar Date, will be deemed to have elected Option 1 Scheme Consideration by default.

(d) **To nominate a Designated Recipient to receive your Scheme Consideration:** Class C Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) who wish to nominate a Designated Recipient to receive the Scheme Consideration on their behalf, should submit a validly completed and executed Designated Recipient Form, along with the other documents noted above, further pursuant to the terms of the Schemes, via the Portal to the Information Agent by the Class C Bar Date in order to receive Scheme Consideration on the Final Distribution Date.

(e) **To receive Scheme Consideration**: Class C Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) must submit their relevant Scheme Creditor Forms by no later than the Class C Bar Date (i.e. 135 days after the Restructuring Effective Date) via the Portal to the Information Agent in order to be entitled to receive any Scheme Consideration on the Final Distribution Date pursuant to the terms of the Schemes. Class C Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) who submit their relevant Scheme Creditor Forms (including the Distribution Confirmation Deed) via the Portal to the Information Agent by the Class C Bar Date, but fail to validly elect their option by the Class C Bar Date, will receive Option 1 Scheme Consideration by default. For the

avoidance of doubt, Class C Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) that fail to submit their Distribution Confirmation Deeds via the Portal to the Information Agent by the Class C Bar Date will not be entitled to receive any Scheme Consideration but will have their Scheme Claims released and extinguished in accordance with Clause 28 (*Releases*) of the Schemes.

4.8     **How do Scheme Creditors Vote?**

(a)     Scheme Creditors may nominate a proxy to vote on the Scheme Creditor's behalf at the Scheme Meetings. Such nomination is made within the Account Holder Letter, Class A Private Lender Proxy Form, Class C Scheme Creditor Proxy Form, or Blocked Scheme Creditor Form (as applicable) and must be submitted to the Information Agent or GLAS within the applicable deadline described in Section 4.7 above.

(b)     Alternatively, Class A Scheme Creditors may attend (by indicating their intention to attend in the applicable Scheme Creditor Form) and vote at both:

(i)     the Class A Hong Kong Scheme Meeting at 8:00 p.m. Hong Kong time on 23 August 2023, the equivalent time being 7:00 a.m. Cayman Islands time on 23 August 2023; and

(ii)    the Class A Cayman Scheme Meeting at 8.45 p.m. Hong Kong time on 23 August 2023, the equivalent time being 7.45 a.m. Cayman Islands time on 23 August 2023 (or at such time as the Class A Hong Kong Scheme Meeting has finished, if later).

(b)     Class C Scheme Creditors may attend (by indicating their intention to attend in the applicable Scheme Creditor Form) and vote at both:

(i)     the Class C Hong Kong Scheme Meeting at 9:30 p.m. Hong Kong time on 23 August 2023, the equivalent time being 8:30 a.m. Cayman Islands time on 23 August 2023 (or at such time as the Class A Cayman Scheme Meeting has finished, if later); and

(ii)    the Class C Cayman Scheme Meeting at 10:15 p.m. Hong Kong time on 23 August 2023, the equivalent time being 9:15 a.m. Cayman Islands time on 23 August 2023 (or at such time as the Class C Hong Kong Scheme Meeting has finished, if later).

(c)     Further details of the Cayman Scheme Meetings and the Hong Kong Scheme Meetings including instructions on how each Scheme Creditor may vote at the relevant Scheme Meetings, as divided between the Class A Scheme Creditors and Class C Scheme Creditors, respectively, are set out in Sections 5 (*Summary of Actions to be Taken by Scheme Creditors*) and 14 (*The Scheme Meetings*) of this Explanatory Statement.

4.9     **How is the value of a Scheme Creditor's Claim for voting purposes at the Scheme Meetings determined?**

For the purpose of voting at the relevant Scheme Meetings, the Voting Scheme Claim for each Class A Scheme Creditor and Class C Scheme Creditor is to be determined on a Full Accrued Claim Basis, based on the amount up to the Voting Record Time (i.e. generally the outstanding principal amount of the Existing Debts *plus* any accrued and unpaid interest (if applicable)), subject to the Chairperson's discretion.

25

4.10    **How is a Scheme Creditor's Entitlement determined?**

(a)    A Class A Scheme Creditor's Entitlement will be based on the Full Accrued Claim Basis.

(b)    A Class C Scheme Creditor's Entitlement will be based on the Deficiency Basis, as further explained in Section 9.35 below, which will be determined through the Valuation and Adjudication Procedure. As set out at Section 4.5(b) above, the Deficiency Basis has been adopted for the Class C Debts to reflect the fact that Scheme Consideration will only be provided in respect of CEG's obligations relating to the relevant Class C Debt, with no Scheme Consideration to be paid in respect of the Excluded Liabilities or the Excluded Collateral (both of which are left in place by the Schemes).

Specifically on the Valuation and Adjudication Procedure, further details are set out in Sections 9.42 to 9.62 in this Explanatory Statement as well as Clauses 37 to 40 of the Schemes. To further illustrate the process of the Valuation and Adjudication Procedure, there is also a flow-chart set out at Schedule 6 (*Valuation and Adjudication Flow Chart*).

4.11    **Model and charts illustrating the distribution of the Scheme Consideration**

A Scheme Creditor may wish to visit the Transaction Website where an indicative-only model and a summary of Scheme Consideration power point are available. The model and the summary power point aim to illustrate the Scheme Consideration that a Scheme Creditor may receive under the Schemes, depending on their Scheme Creditor's Entitlement and elections. Further details are also set out at Section 10 of this Explanatory Statement, which is accompanied by illustrative decision trees / flow-charts regarding the distribution of the Scheme Consideration. The illustrative decision trees / flow-charts is also available on the Transaction Website, accompanied by a further simplified overview.

4.12    **What are the two options of Scheme Consideration available to each Class of Scheme Creditors?**

*Class A Scheme Creditors*

(a)    Each Class A Scheme Creditor will be entitled to elect between two options for scheme consideration: (a) Option 1 Scheme Consideration, or (b) Option 2 Scheme Consideration.

(b)    Class A Scheme Creditors electing for **Option 1 Scheme Consideration** will receive new notes (namely, the A1 Notes) issued by CEG. The A1 Notes will consist of three tranches (with maturities of 10, 11 and 12 years) carrying interest at 2% – 3% (with payment-in-kind ("**PIK**") interest of 3% – 4%). The A1 Notes will be guaranteed by certain subsidiaries of CEG. Detailed explanations of the terms of the A1 Notes can be found at Schedule 8 (*Summary of Terms of the New Instruments*) to this Explanatory Statement.

(c)    Class A Scheme Creditors electing for **Option 2 Scheme Consideration** will be entitled to choose between: (a) new notes issued by CEG (namely, the A2 Notes); or (b) an equity package (namely, the A2 Package); or (c) a combination of the A2 Notes and the A2 Package. As to this:

(i)    The A2 Notes comprise four tranches of notes (with maturities of 5, 6, 7 and 8 years) carrying interest at 5%-6.5% (with PIK interest of 6% –7.5%);

26

(ii)    The A2 Package consists of a mixture of new notes and convertible instruments issued by the CEG. They include:

(A)    **the EVPS MEBs and the NEV MEBs**, which are two sets of mandatory exchangeable bonds (namely, the EVPS MEBs and the NEV MEBs). These are exchangeable, at the option of each bondholder, for EVPS Shares or NEV Shares at any time during an "exchange period". The principal amount outstanding at the maturity of these mandatorily exchangeable bonds will be mandatorily converted into EVPS Shares or NEV Shares (as applicable);

(B)    **the CEG MCBs**, which are mandatory convertible bonds. These are convertible, at the option of each bondholder, for CEG Shares during a "conversion period" . The principal amount outstanding at the maturity of the CEG MCBs will be mandatorily converted into CEG Shares;

(C)    **the A2 EVPS SLNs**, which are new notes issued by CEG secured, amongst other things, by charges over EVPS Shares and charges over shares of certain of CEG's subsidiaries. The A2 EVPS SLNs will be guaranteed by certain subsidiaries of CEG. The A2 EVPS SLNs consist of two tranches of notes with maturities of 5 and 6 years and interest rates of 5% – 5.5% (with PIK interest of 6% – 6.5%); and

(D)    **the A2 NEV SLNs**, which are new notes issued by CEG supported by custody arrangements over NEV Shares and secured by charges over shares of certain of CEG's subsidiaries. The A2 NEV SLNs will be guaranteed by certain subsidiaries of CEG. The A2 NEV SLNs consist of two tranches of notes with maturities of 5 and 6 years and interest rates of 5% – 5.5% (with PIK interest of 6% – 6.5%).

### *Class C Scheme Creditors*

(d)    Each Class C Scheme Creditor will also be entitled to elect between two options for scheme consideration: (a) Option 1 Scheme Consideration, or (b) Option 2 Scheme Consideration.

(e)    Class C Scheme Creditors electing for **Option 1 Scheme Consideration** will receive new notes (namely, the C1 Notes) issued by CEG. The C1 Notes will consist of three tranches (with maturities of 10, 11 and 12 years) carrying interest at 2% – 3% (with PIK interest of 3% – 4%). Detailed explanations of the terms of the C1 Notes can be found at Schedule 8 (*Summary of Terms of the New Instruments*) to this Explanatory Statement.

(f)    Class C Scheme Creditors electing for **Option 2 Scheme Consideration** will be entitled to choose between: (a) new notes issued by CEG (namely, the C2 Notes); or (b) an equity package (namely, the C2 Package); or (c) a combination of C2 Notes and C2 Package . As to this:

(i)    The C2 Notes comprise four tranches of notes (with maturities of 7, 8 and 9 years) carrying interest at 6% – 7% (with PIK interest of 7% – 8%);

(ii)    The C2 Package consists of a mixture of new notes and convertible instruments issued by the CEG. They include:

27

(A)     **the EVPS MEBs, NEV MEBs and CEG MCBs** (as described above);

(B)     **the C2 EVPS SLNs**, which are new notes issued by CEG which are secured by a charge over a securities account holding EVPS Shares and charges over shares of certain of CEG's subsidiaries . The C2 EVPS SLNs consist of two tranches of notes with maturities of 7 and 8 years and interest rates of 6% – 6.5% (with PIK interest of 7% – 7.5%); and

(C)     **the C2 NEV SLNs**, which are new notes issued by CEG which are secured by a charge over a securities account holding NEV Shares and secured by charges over shares of certain of CEG's subsidiaries. The C2 NEV SLNs consist of two tranches of notes with maturities of 5 and 6 years and interest rates of 6% – 6.5% (with PIK interest of 7% – 7.5%).

(g)     The composition of the A2 Package and C2 Package available for distribution to Class A and Class C Scheme Creditors will initially depend on the Full Accrued Claims of the Class A Scheme Creditors as compared to the Class C Scheme Creditors, and be subject to adjustment once the Entitlements of Class C Scheme Creditors are determined after Valuation and Adjudication Procedure has been completed.

(h)     Both Class A Scheme Creditors and Class C Scheme Creditors may not receive their respective Scheme Consideration in the amounts they elected for if there is an Undersubscription or Oversubscription of the A2 Package and/or C2 Package, respectively. The procedure for the re-allocation and adjustment of the Scheme Consideration is set out in Section 10 (*Two Options of Scheme Consideration for Both Class A and Class C*) below and Part D of the Schemes. In any event, each Scheme Creditor will be entitled to receive (or have the Holding Period Trustee or the Successor Escrow Agent receive on its behalf, if applicable) Scheme Consideration which is equal to the value of its Scheme Creditor's Entitlement.

4.13    **What is the composition of the A2 Package Initial Portion and C2 Package Initial Portion?**

(a)     The A2 Package Initial Portion is the minimum amount of the A2 Package which will be distributed to Class A Scheme Creditors.

(b)     The C2 Package Initial Portion is the maximum amount of the C2 Package which could be distributed to Class C Scheme Creditors as part of their Scheme Consideration.

(c)     The total amount of the New Instruments under the A2 Package Initial Portion and C2 Package Initial Portion is in aggregate equal to the Total Package as set out in Clause 15.1 of the Schemes. The Total Package encompasses the aggregate amount of all the CEG MCBs, EVPS MEBs, NEV MEBs, A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs and C2 NEV SLNs which will be issued.

(d)     In respect of the CEG MCBs and NEV MEBs, the total amount of the CEG MCBs and NEV MEBs (approximately US$3,543 million) will initially be divided into the A2 Package Initial Portion and C2 Package Initial Portion based on the A2 Accrued Claims Ratio or C2 Accrued Claims Ratio (as applicable). Effectively, the use of the ratios is such that the total amount of the CEG MCBs and NEV MEBs are divided pro rata between Class A Scheme Creditors and Class C Scheme Creditors on a Full Accrued Claim Basis as at

the Entitlement Record Time. Taking Class C as an example, the CEG MCBs and NEV MEBs in C2 Package Initial Portion will be calculated as follows:

$$\frac{\text{Full Accrued Claims of Class C Scheme Creditors}}{\text{Total Full Accrued Claims of Class A Scheme Creditors and Class C Scheme Creditors}} \times \begin{array}{c}\text{Total amount of the CEG MCBs and NEV} \\ \text{MEBs in the Total Package} \\ \text{(c. US\$3,543 million)}\end{array}$$

(e)    In respect of the EVPS MEBs, the total amount of EVPS MEBs (approximately c. US\$689 million) will be initially divided into the A2 Package Initial Portion and C2 Package Initial Portion, where: (i) 50% of the total amount is solely available for allocation to Class A Scheme Creditors only and (ii) the remaining 50% is to be shared between Class A and Class C based on the A2 Accrued Claims Ratio or C2 Accrued Claims Ratio (as applicable).

(f)    In respect of the EVPS SLNs and NEV SLNs, the total amount of the EVPS SLNs and the NEV SLNs will be initially divided into the A2 Package Initial Portion (as A2 EVPS SLNs and A2 NEV SLNs) and C2 Package Initial Portion (as C2 EVPS SLNs and C2 NEV SLNs) as follows:

| New Instrument in the A2 Package Initial Portion and C2 Package Initial Portion | A2 Package Initial Portion | | C2 Package Initial Portion | |
|---|---|---|---|---|
| | A2 EVPS SLNs | A2 NEV SLNs | C2 EVPS SLNs | C2 NEV SLNs |
| Total principal amount of the New Instruments | US\$1,100 million | US\$1,350 million | US\$300 million | US\$1,150 million |

### 4.14    What are the A2 Package Adjusted Portion and C2 Package Adjusted Portion and what are they for?

(a)    The total amount of the New Instruments allocated between each of the A2 Package Initial Portion and C2 Package Initial Portion will be adjusted after all the Class C Scheme Creditors' Entitlements have been determined pursuant to the Valuation and Adjudication Procedure to determine the A2 Package Adjusted Portion and C2 Package Adjusted Portion, respectively.

(b)    Essentially, the C2 Package Adjusted Portion reflects Class C Scheme Creditors' Entitlement determined on a Deficiency Basis (rather than Full Accrued Claim Basis, which is the basis used to determine the C2 Package Initial Portion). The C2 Package Adjusted Portion is determined as follows:

$$\text{All Class C Scheme Creditors' Deficiency Claims determined through the Valuation and Adjudication Procedure} \times \text{C2 Package Initial Portion}$$

---
All Class C Scheme Creditors' Full
Accrued Claims

(c)     Following the adjustment of the C2 Package Initial Portion, an amount of the C2 Package Initial Portion (the "**C2 Package Unadmitted Portion**") will be allocated to Class A Scheme Creditors to create the "A2 Package Adjusted Portion". The C2 Package Unadmitted Portion is equal to (i) the C2 Package Initial Portion *minus* (ii) the C2 Package Adjusted Portion i.e. this amount reflects the difference between the (x) Full Accrued Claim Basis of all Class C Scheme Creditors and (y) the Class C Scheme Creditors' Entitlements which are determined on a Deficiency Basis through the Valuation and Adjudication Procedure. The A2 Package Adjusted Portion is accordingly determined as follows:

A2 Package Initial Portion     +     C2 Package Unadmitted Portion

(d)     The total amount of the New Instruments under the A2 Package Adjusted Portion and C2 Package Adjusted Portion will be equal to the Total Package, as set out in Section 4.13(c) above.

(e)     The A2 Package Adjusted Portion is the maximum amount of the A2 Package which may be distributed to Class A Scheme Creditors. While Class A Scheme Creditors must collectively receive a minimum of the A2 Package Initial Portion as their Scheme Consideration, they will only receive A2 Package up to (and including) the A2 Package Adjusted Portion if their combined elections for A2 Package exceed the A2 Package Initial Portion.

(f)     The C2 Package Adjusted Portion is the amount of the C2 Package which shall be distributed to Class C Scheme Creditors as part of their Scheme Consideration (and as such, Class C Scheme Creditors will not receive any C2 Package greater or less than the C2 Package Adjusted Portion) irrespective of their elections for Scheme Consideration. For example, in the case of an Oversubscription of the C2 Package Adjusted Portion, Class C Scheme Creditors who elected to receive C2 Package shall be distributed the C2 Package Adjusted Portion on a pro rata basis, and then receive C2 Notes in an amount equal to any remaining Entitlement not converted into C2 Package.

4.15    **As an illustrative summary, what does each of the A2 Initial Portion and C2 Package Initial Portion include?**

| Option 2 Package | A2 Package Initial Portion | C2 Package Initial Portion | Total Package |
|---|---|---|---|
| | | | |

| | A2 Package Initial Portion of US$4,822 million will consist of: | C2 Package Initial Portion of US$3,310 million will consist of: | Total Package of US$8,132 million will consist of: |
|---|---|---|---|
| | HK$1,696 million (equivalent to c. US$218 million) of CEG MCBs | HK$1,556 million (equivalent to c. US$200 million) of CEG MCBs | HK$3,253 million (equivalent to c. US$418 million) of CEG MCBs |
| | HK$4,080 million (equivalent to c. US$524 million) of EVPS MEBs | HK$1,283 million (equivalent to c. US$165 million) of EVPS MEBs | HK$5,364 million (equivalent to c. US$689 million) of EVPS MEBs |
| | HK$12,678 million (equivalent to c. US$1,630 million) of NEV MEBs, on a pro forma basis | HK$11,632 million (equivalent to c. US$1,495 million) of NEV MEBs, on a pro forma basis | HK$24,310 million (equivalent to c. US$3,125 million) of NEV MEBs, on a pro forma basis[8] |
| | US$1,100 million of A2 EVPS SLNs | US$300 million of C2 EVPS SLNs | US$1,400 million of EVPS SLNs |
| | US$1,350 million of A2 NEV SLNs | US$1,150 million of C2 NEV SLNs | US$2,500 million of NEV SLNs |
| | *Note: The above is subject to adjustment pursuant to the Valuation and Adjudication Procedure after which the A2 Package Adjusted Portion will be determined.* | | |

### 4.16 What are Forced A2 Notes and under what circumstances would the Forced A2 Notes be distributed?

(a)     The A2 Notes will be issued as either Forced A2 Notes or Plain A2 Notes. Plain A2 Notes are issued to those Class A Scheme Creditors who validly elect to receive A2 Notes as part of their Scheme Consideration.

(b)     Forced A2 Notes will only be distributed when the A2 Package Initial Portion is Oversubscribed, i.e. when the total Entitlement of Class A Scheme Creditors elected for the A2 Package exceeds the A2 Package Initial Portion.

(c)     Forced A2 Notes are instruments which are on terms essentially identical to the Plain A2 Notes, save that a portion of which are equal to the value of the C2 Package Unadmitted

---

[8] The principal amount of HK$24,310 million will be issued where the Liabilities of NEV in respect of the agreements contemplated in the section titled "Treatment of Shareholder's Loans to NEV in the Term Sheet are converted to NEV MEBs on 14 August 2023.

Portion would be redeemed, exchanged and/or converted into the New Instruments constituting the C2 Package Unadmitted Portion on the Final Distribution Date (and the Interim Distribution Date, if applicable). This would be (i) on a pro rata basis amongst holders of the Forced A2 Notes and (ii) starting from the tranche of the Forced A2 Notes with the longest maturity and in reverse chronological order. Any principal amount of the Forced A2 Notes in excess of the C2 Package Unadmitted Portion would remain as Forced A2 Notes.

### 4.17    Additional Scheme Consideration - TJ Scheme Consideration

CEG is a non-voting scheme creditor in the TJ Scheme. The TJ Scheme Consideration is in the form of USD notes to be issued by Tianji, in the total principal amount of US$800 million (the "**TJ New Notes**"), to be distributed pro rata amongst the scheme creditors of the TJ Scheme based on their respective Entitlements (as defined in the TJ Scheme). To further evidence CEG's commitment to implement the Restructuring, any TJ New Notes received by CEG will be distributed to the Class A Scheme Creditors and Class C Scheme Creditors who have validly elected by the applicable deadline pursuant to Clause 10 (*Deadlines and Bar Dates*) of the Schemes to receive the A2 Package and the C2 Package respectively, on a pro rata basis as set out in Section 4.18 below. The TJ Scheme Consideration distributed to Scheme Creditors (as applicable) will be in addition to their Entitlements to Scheme Consideration. For the avoidance of doubt, no TJ Scheme Consideration shall be distributed to Scheme Creditors who are issued New Instruments which form part of the A2 Package or the C2 Package as part of their Scheme Consideration as a result an Undersubscription of the A2 Package Initial Portion or the C2 Package Adjusted Portion (as applicable) rather than such Scheme Creditors' elections.

### 4.18    When are the distribution dates?

(a)    Subject to paragraph (b) below, broadly speaking there are two distribution dates:

    (i)    <u>Initial Distribution on Restructuring Effective Date</u>: Only Class A Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) who validly elected for Option 2 Scheme Consideration before the Class A Options Deadline may receive the Initial Distribution; and

    (ii)    <u>Final Distribution on the Final Distribution Date</u>: This will be a date after the completion of the Valuation and Adjudication Procedure. Class A Scheme Creditors who validly elected (or are deemed to have validly elected) Option 1 Scheme Consideration and Class C Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) will only receive Scheme Consideration at the Final Distribution Date, as will the Successor Escrow Agent (for the Blocked Scheme Creditors).

(b)    There may be a distribution between the Initial Distribution and Final Distribution Date if one or both of the following scenarios occur:

    (i)    First, where TJ Scheme Consideration is received by CEG prior to the completion of the Valuation and Adjudication Procedure, but after the Restructuring Effective Date. In such a scenario, then a partial distribution of TJ Scheme Consideration will be made to Class A Scheme Creditors who validly elected to receive the A2 Package; and/or

(ii)     Second, where the Valuation and Adjudication Procedure is delayed such that the Final Distribution Date does not occur on the date ending 295 calendar days after the Restructuring Effective Date, there will be an interim distribution of Scheme Consideration and TJ Scheme Consideration on the date ending 295 calendar days after the Restructuring Effective Date.

**4.19**    **What is being distributed on the respective distribution dates?**

(a)    On the Restructuring Effective Date:

(i)     the A2 Package Initial Portion will be distributed to the Class A Scheme Creditors and, in the event where the combined elections of Class A Scheme Creditors for Option 2 Scheme Consideration are less than the A2 Package Initial Portion, both the Class A Scheme Creditors and the Holding Period Trustee; and

(ii)    A2 Notes (comprising of Forced A2 Notes, if applicable, and Plain A2 Notes) will be distributed to the Class A Scheme Creditors (or the Holding Period Trustee, as applicable).

(b)    On the Final Distribution Date, following conclusion of the Valuation and Adjudication Procedure (and except for (iv) below, on the Interim Distribution Date, if conclusion of the Valuation and Adjudication Procedure does not occur within 295 calendar days after the Restructuring Effective Date):

(i)     the A1 Notes (and C2 Package Unadmitted Portion, if applicable) will be distributed to Class A Scheme Creditors;

(ii)    the amount of Forced A2 Notes equivalent to the amount up to and including the C2 Package Unadmitted Portion will be redeemed, exchanged and/or converted into New Instruments constituting the C2 Package Unadmitted Portion or will remain as Forced A2 Notes, if applicable;

(iii)    the C1 Notes, C2 Notes and the C2 Package Adjusted Portion will be distributed to the Class C Scheme Creditors; and

(iv)    in addition to any partial distribution which may be made (as further described in Sections 10.30 and 10.52 below), the TJ New Notes will be distributed to Class A Scheme Creditors and Class C Scheme Creditors elected for the A2 Package and C2 Package, respectively.

**4.20**    **When will the Consent Fee be paid?**

Subject to the Notes Minimum Denomination (see Section 27 (*Fractional Adjustments*) of this Explanatory Statement and Clause 22 (*Consent Fee*) of the Schemes), the Consent Fee will be paid to Eligible Participating Creditors (who are not Sanctions-Affected Scheme Creditors) who vote in favour of the Schemes on (i) the Restructuring Effective Date (in respect of Class A Scheme Creditors electing Option 2 Scheme Consideration) or (ii) the Final Distribution Date (in respect of Class A Scheme Creditors electing Option 1 Scheme Consideration and Class C Scheme Creditors), subject to such Eligible Participating Creditors also validly completing and submitting the required forms by the Custody Instruction Deadline and/or the Voting Record Time (as applicable) as set

33

out in Section 5 (*Summary of Actions to be Taken by Scheme Creditors*) and Section 6 (*Summary Explanation of the Schemes*) below.

## 4.21    Overview on distribution

| Distribution to Scheme Creditors electing: | Class A Scheme Creditors | Class C Scheme Creditors | Holding Period Trustee/Successor Escrow Agent | |
|---|---|---|---|---|
| | | | To be held on trust or in escrow for Blocked Scheme Creditors | To be held on trust or in escrow for all Scheme Creditors |
| **Restructuring Effective Date** | | | | |
| **Option 1** | 1. No distribution of New Instruments | No distribution of New Instruments | No distribution of New Instruments | A2 Package Initial Portion (only if the total Entitlements elected for A2 Package and A2 Notes are less than the A2 Package Initial Portion) |
| **Option 2** | 1. A2 Notes (comprising of Plain A2 Notes and, if applicable, Forced A2 Notes)<br><br>2. A2 Package Initial Portion (or, if Undersubscribed by those Scheme Creditors who validly elected for Option 2 Scheme Consideration, that lesser amount)<br><br>3. Consent Fee (for Eligible Participating Creditors) | No distribution of New Instruments | 1. Initial Distribution for Class A Scheme Creditors electing Option 2 who are Blocked Scheme Creditors in Holding Period Trust<br><br>2. Consent Fee for Class A Scheme Creditors electing Option 2 who are Blocked Scheme Creditors (if eligible) in Holding Period Trust | No distribution of New Instruments |
| **Interim distribution (i.e. between the Restructuring Effective Date and the Final Distribution Date) of TJ Scheme Consideration** | | | | |
| **Option 2** | Initial distribution of TJ Scheme Consideration (only to those Scheme Creditors who validly | No distribution of TJ Scheme Consideration | Initial distribution of the TJ Scheme Consideration for Class A Scheme Creditors electing A2 Package who are Blocked Scheme | The remaining amount of the TJ Scheme Consideration not distributed to Class A Scheme Creditors in |

| Distribution to Scheme Creditors electing: | Class A Scheme Creditors | Class C Scheme Creditors | Holding Period Trustee/Successor Escrow Agent | |
|---|---|---|---|---|
| | | | To be held on trust or in escrow for Blocked Scheme Creditors | To be held on trust or in escrow for all Scheme Creditors |
| | elected for A2 Package) | | Creditors in Holding Period Trust | Holding Period Trust |
| **Interim distribution, in the event that Final Distribution does not occur within 295 calendar days after Restructuring Effective Date** | | | | |
| **Option 1 and Option 2** | Distribution will be the same as if the Final Distribution Date save that the Company shall reserve a maximum amount of Scheme Consideration and TJ Scheme Consideration for those Class C Scheme Creditors whose Entitlements are not fully determined (as if the Entitlement of such Class C Scheme Creditors were calculated on a Full Accrued Claim Basis) | | Relevant distribution to Blocked Scheme Creditors electing Option 1 or Option 2 | No distribution |
| **Final Distribution Date** | | | | |
| **Option 1** | 1. A1 Notes (and if applicable, an amount of A2 Package Initial Portion if the A2 Package Initial Portion is sufficiently Undersubscribed) <br> 2. Consent Fee (for Eligible Participating Creditors) | 1. C1 Notes <br> 2. Consent Fee (for Eligible Participating Creditors) | 1. Final Distribution for Blocked Scheme Creditors electing Option 1 Scheme Consideration in Successor Escrow Account <br> 2. Consent Fee for Blocked Scheme Creditors (if eligible) | No distribution |
| **Option 2** | 1. The amount of Forced A2 Notes equivalent to the amount of up to and including the C2 Package Unadmitted Portion will be converted into the C2 Package | 1. C2 Notes <br> 2. Consent Fee (for Eligible Participating Creditors) <br> 3. C2 Package Adjusted Portion <br> 4. TJ Scheme Consideration (only to those Scheme Creditors | 1. Final Distribution for Blocked Scheme Creditors electing Option 2 Scheme Consideration in Successor Escrow Account (and Initial Distribution for Blocked Scheme | No distribution |

| Distribution to Scheme Creditors electing: | Class A Scheme Creditors | Class C Scheme Creditors | Holding Period Trustee/Successor Escrow Agent | |
|---|---|---|---|---|
| | | | To be held on trust or in escrow for Blocked Scheme Creditors | To be held on trust or in escrow for all Scheme Creditors |
| | Unadmitted Portion 2. The remaining amount of TJ Scheme Consideration (only to those Scheme Creditors who elected for A2 Package) | who elected for C2 Package) | Creditors from Holding Period Trust to Successor Escrow Account) 3. Consent Fee for Blocked Scheme Creditors (if eligible) | |

4.22    **AHG fees**

For completeness, the Company notes that certain Scheme Creditors in their capacity as members of the CEG AHG shall, in addition to the Consent Fee, benefit from two additional fee payments in respect of the restructuring of the Group (which includes the SJ Scheme and the TJ Scheme) which shall be made on or prior to the Restructuring Effective Date:

(a)    The "**AHG Work Fee**", which shall be paid by the Company's Chairman (Mr. Hui Ka Yan) in accordance with the terms set out in the Class A RSA and the letter agreement dated 20 March 2023 between the Chairman and the members of the CEG AHG (the "**AHG Work Fee Letter**"). The AHG Work Fee will be represent approximately 1% of the CEG AHG's aggregate holding of the principal amount of the Existing Notes); and

(b)    The "**AHG Advisor Fees**", being the reasonable fees, costs and expenses of the legal and financial advisers to the CEG AHG which shall be paid by the Company in accordance with the terms set out in the relevant letter agreements between the Company and the AHG Advisors.

The Company does not consider that the effect of these payments (either taken alone or cumulatively) makes it impossible for members of the CEG AHG to vote together with the other Scheme Creditors in the same class.

4.23    **Where is the Transaction Website?**

The Transaction Website can be found at https://projects.morrowsodali.com/evergrande. The Transaction Website will contain documents which are substantially in the form of such Restructuring Documents as are to be made available at the Transaction Website.

4.24    **Request for Information**

Any request for information can be directed to:

(a)    **The Information Agent (if from a party other than the Sanctions-Affected Scheme Creditors):** evergrande@investor.morrowsodali.com

(b)     **GLAS, in respect of Blocked Scheme Creditor queries**: lm@glas.agency

(c)     **Houlihan Lokey, in its capacity as  offshore restructuring financial advisor to the Schemes**: Evergrande@HL.com

(d)     **Moelis & Company, in its capacity as the CEG AHG's financial advisor:** Project_Evergrande_Ext@moelis.com

5.    **SUMMARY OF ACTIONS TO BE TAKEN BY SCHEME CREDITORS**

*Different types of Scheme Creditors*

5.1    Scheme Creditors will be required to take certain actions in respect of their specific interests in the Scheme Claims, which will be dependent on the type of indebtedness and creditor class applicable to each Scheme Creditor (including those who are Sanctions-Affected Scheme Creditors).

The following Persons have interests in the Class A Debts and Class C Debts as Scheme Creditors (for the avoidance of doubt, but without double counting in each case):

A.    <u>Class A Scheme Creditors</u>

(a)    You are a "**Class A Noteholder**" (for the purpose of voting) if: you have a beneficial interest as principal in the Existing Notes held in global form or global restricted form through the Clearing Systems as at the Voting Record Time. Each Class A Noteholder will need to give instructions to its Account Holder(s) as to voting, as further set out in Sections 5.4 to 5.63 (*Actions to be taken by the Class A Scheme Creditors*) below.

(b)    You are a "**Class A Lender**" (for the purpose of voting) if: you have a legal interest as principal in the Class A Private Loan and have provided evidence (including all supporting documentation) of your interest which has been verified by the Chairperson, in consultation with the Company and/or the Information Agent.

B.    <u>Class C Scheme Creditors</u>

You are a "**Class C Scheme Creditor**" (for the purpose of voting) if: you have a beneficial interest and/or legal interest (as applicable) in any of the Class C Debts identified in Schedule 2 to the Schemes and have provided evidence (including all supporting documentation) of your interest which has been verified by the Chairperson, in consultation with the Company and/or the Information Agent. In summary, you are a Class C Scheme Creditor if:

(a)    **Put option / repurchase obligation / loan**: you are a creditor in respect of the put options amongst the Class C Debts if you have a legal interest as principal in the put options amongst the Class C Debts and have provided evidence (including all supporting documentation) of your interest which has been verified by the Chairperson, in consultation with the Company and/or the Information Agent.

(b)    **Guarantee**: you are a creditor in respect of the guarantees amongst the Class C Debts if you have legal interest as principal in the guarantees amongst the Class C Debts and have provided evidence (including all supporting documentation) of your interest which has been verified by the Chairperson, in consultation with the Company and/or the Information Agent.

(c)    **Class C Notes**: you are a creditor of the Class C Notes (i.e. Dongpo Notes or Lake Notes) if you have a beneficial interest as principal in the Class C Notes (as applicable) held in global form or global restricted form through the Clearing Systems as at the Voting Record Time. Each creditor of the Class C Notes will need to give instructions to its Account Holder(s) as to voting, as further set out in Sections 5.75 to 5.79 below.

C.     **Blocked Scheme Creditors**

Class A Noteholders and Class C Noteholders who are also Blocked Scheme Creditors, by definition, will not be able to access the Clearing Systems. They will therefore be unable to submit an Account Holder Letter or receive Scheme Consideration in the same way as Class A Noteholders and Class C Noteholders who are not Blocked Scheme Creditors, whilst Applicable Sanctions remain in place.

D.     **Account Holders**

You are an "**Account Holder**" of either of the Class A Scheme Creditors or Class C Scheme Creditors if you are recorded directly in the books or other records maintained by the Clearing Systems as holding an interest at the Voting Record Time (for the purpose of voting) in the Existing Notes or the Class C Notes (as applicable). For example, a bank or brokerage house, with a securities account at a Clearing System. For the avoidance of doubt, an Account Holder is not a Scheme Creditor unless and to the extent that they are noteholders of the Existing Notes or the Class C Notes. Notwithstanding the foregoing sentence, the assistance of Account Holders will be required to submit on behalf of the Class A Noteholders or Class C Noteholders, Custody Instructions via the Clearing Systems by the Custody Instruction Deadline and Account Holder Letters via the Portal by the relevant deadlines, in accordance with the instructions contained in this Explanatory Statement.

For the avoidance of doubt, Custody Instructions may only be submitted in principal amounts of US$1,000 and integral multiples of US$1,000 in excess thereof for all Class A Notes and Class C Notes, apart from the CEG Existing February 2023 Bonds where Custody Instructions may only be submitted in principal amounts of HK$1,000,000 and integral multiples of HK$1,000,000 in excess thereof.

E.     **Intermediaries**

You are an "**Intermediary**" of either of the Class A Scheme Creditors or Class C Scheme Creditors if you hold an interest at the Voting Record Time in the Existing Notes or the Class C Notes (as applicable) on behalf of another Person or other Persons and you do not hold that interest as an Account Holder. An Intermediary is commonly a bank or a brokerage house which does not have an account with any of the Clearing Systems.

F.     **The Existing Notes Depositary (and its nominee), the Existing Notes Trustee, the Dongpo Notes Trustee, the Lake Notes Trustee and Agent, the RMB Bonds Trustee and the Existing Agents**

Unless otherwise agreed by the Company, the Existing Notes Depositary, the Existing Notes Trustee, the Dongpo Notes Trustee, the Lake Notes Trustee and Agent, the RMB Bonds Trustee and the Existing Agents:

(a)     are each Scheme Creditors, however, will not be entitled to vote at the Scheme Meetings (except for the RMB Bonds Trustee who are entitled to vote at the Class C Scheme Meetings); and

(b)     will further not be entitled to receive any Scheme Consideration under the Schemes (except for the RMB Bonds Trustee who are entitled to receive Scheme Consideration under the Schemes).

A diagrammatic representation of the Existing Notes Depositary, the Existing Notes Trustee and Intermediaries in their various capacities in relation to the Class A Noteholders with debts held in global note form, in respect of the Existing Notes, is set out below to assist your understanding of the structure of the Existing Notes and the Clearing Systems. A similar structure would apply for Class C Scheme Creditors in respect of the Class C Notes held within the Clearing Systems.

\* In respect of interests in the Existing Notes held at the Record Time.

5.2     If you are a Class A Scheme Creditor, please read Sections 5.4 – 5.63 below for the required actions to be taken pursuant to the Schemes.

5.3     If you are a Class C Scheme Creditor, please read Sections 5.64 – 5.127 below for the required actions to be taken pursuant to the Schemes.

23-11332-mew    Doc 9    Filed 08/17/23    Entered 08/17/23 21:56:28    Main Document
Pg 316 of 1553

**SCHEME CREDITORS NEED TO CAREFULLY REVIEW THE BELOW ACTIONS TO BE TAKEN DEPENDING UPON WHAT TYPE OF SCHEME CREDITOR THEY ARE.**

(A)     **ACTIONS REQUIRED FOR CLASS A SCHEME CREDITORS**

   *Summary of Actions Table*

5.4     The table below is designed to be a summary only of the key actions and relevant deadlines that all Class A Scheme Creditors should and/or are required to take for the purposes of attending and voting at the Scheme Meetings and ability to elect their type of Scheme Consideration (if applicable). The table should be read in conjunction with the detailed explanations below at Section 5.5 onwards relevant to Class A Scheme Creditors and the Solicitation Packet published on the Transaction Website.

| Actions to be taken | Deadline |
|---|---|
| **To vote at the Scheme Meeting** | |
| **Class A Noteholders (who are <u>not</u> Sanctions-Affected Scheme Creditors)**[9] | |
| Custody Instructions to be submitted via the Clearing Systems prior to the submission of the Account Holder Letter and in any case by the Custody Instruction Deadline | <u>**Custody Instruction Deadline (4.00 a.m. Cayman Islands time on 15 August 2023 and 5.00 p.m. Hong Kong time on 15 August 2023)]**</u>[10] |
| The Account Holder Letter (to include Custody Instruction Reference Number and Voting Instructions) submitted via the Portal by the Voting Record Time | <u>**Voting Record Time (4.00 a.m. Cayman Islands time on 18 August 2023 and 5.00 p.m. Hong Kong time on 18 August 2023)**</u> |
| **Class A Lenders (who are <u>not</u> Sanctioned Scheme Creditors)**[11] | |
| The Class A Private Lender Proxy Form, including supporting evidence and Voting Instructions, signed and submitted via the Portal by the Voting Record Time | <u>**Voting Record Time (4.00 a.m. Cayman Islands time on 18 August 2023 and 5.00 p.m. Hong Kong time on 18 August 2023)**</u> |
| **Class A Noteholders (who <u>are</u> Blocked Scheme Creditors)** | |
| The Blocked Scheme Creditor Form, including supporting evidence submitted to GLAS by any submission method(s) described in the Solicitation Packet by the Voting Record Time | <u>**Voting Record Time (4.00 a.m. Cayman Islands time on 18 August 2023 and 5.00 p.m. Hong Kong time on 18 August 2023)**</u> |

---

[9]In relation to Class A Noteholders who are not Blocked Scheme Creditors, all documents must be submitted to the Information Agent via the Portal by Account Holders. In relation to Blocked Scheme Creditors, the Blocked Scheme Creditor Form and supporting evidence must be submitted to GLAS by any submission method(s) described in the Solicitation Packet.

[10]Class A Noteholders who are not Blocked Scheme Creditors are required to contact Account Holders/Intermediaries (where relevant) to ensure that their Existing Notes are blocked and that their instructions are received with sufficient time to enable Account Holder Letters to be submitted via the Portal and received by the Information Agent prior to the Voting Record Time.

[11]In relation to Class A Lenders, all documents must be submitted to the Information Agent via the Portal.

| Actions to be taken | Deadline |
|---|---|
| **Actions required by Class A Scheme Creditors (who are Eligible Participating Creditors) to be able to receive the Consent Fee** | |
| **Class A Noteholders (who are <u>not</u> Sanctions-Affected Scheme Creditors)** | |
| Custody Instructions (including the Accession Code) to be submitted via the Clearing Systems prior to the submission of the Account Holder Letter and in any case by the Custody Instruction Deadline | **<u>Custody Instruction Deadline (4.00 a.m. Cayman Islands time on 15 August 2023 and 5.00 p.m. Hong Kong time on 15 August 2023)</u>** |
| The Account Holder Letter submitted via the Portal by the Voting Record Time; including supporting evidence and the Accession Code (in addition to voting in favour of the Schemes and other conditions) in order to receive the Consent Fee | **<u>Voting Record Time (4.00 a.m. Cayman Islands time on 18 August 2023 and 5.00 p.m. Hong Kong time on 18 August 2023)</u>** |
| Distribution Confirmation Deed submitted via the Portal by the Voting Record Time | |
| (optional) Designated Recipient Form (for either a Scheme Creditor who is not an Eligible Person or who wishes to appoint a Designated Recipient to receive the Scheme Consideration) submitted via the Portal by the Voting Record Time | |
| **Class A Lenders (who are <u>not</u> Sanctioned Scheme Creditors)** | |
| The Class A Private Lender Proxy Form, including supporting evidence, signed and submitted via the Portal by the Voting Record Time; including supporting evidence and the Accession Code (in addition to voting in favour of the Schemes and other conditions) in order to receive the Consent Fee | **<u>Voting Record Time (4.00 a.m. Cayman Islands time on 18 August 2023 and 5.00 p.m. Hong Kong time on 18 August 2023)</u>** |
| (optional) Designated Recipient Form (for a Scheme Creditor who is an Eligible Person and who wishes to appoint a Designated Recipient to receive the Scheme Consideration) signed and submitted via the Portal by the Voting Record Time | |
| Distribution Confirmation Deed executed and submitted via the Portal by the Voting Record Time | |

43

| Actions to be taken | Deadline |
|---|---|
| **Class A Noteholders (who <u>are</u> Blocked Scheme Creditors)**[12] | |
| The Blocked Scheme Creditor Form, including supporting evidence, and the Accession Code (if relevant, in addition to voting in favour of the Schemes and other conditions) signed and submitted to GLAS by any submission method(s) described in the Solicitation Packet by the Voting Record Time | <u>**Voting Record Time (4.00 a.m. Cayman Islands time on 18 August 2023 and 5.00 p.m. Hong Kong time on 18 August 2023)**</u> |
| **Actions required to (a) receive the Initial Distribution on the Restructuring Effective Date (if electing Option 2 Scheme Consideration only) and (b) select between the Option 1 Scheme Consideration and the Option 2 Scheme Consideration** | |
| **Class A Noteholders (who are <u>not</u> Sanctions-Affected Scheme Creditors)** | |
| Custody Instructions to be submitted via the Clearing Systems prior to the submission of the Account Holder Letter and in any case by the Custody Instruction Deadline | <u>**Custody Instruction Deadline (4.00 a.m. Cayman Islands time on 15 August 2023 and 5.00 p.m. Hong Kong time on 15 August 2023)**</u> |
| The Account Holder Letter submitted via the Portal by the Class A Options Deadline | <u>**Class A Options Deadline being the date which is 14 days after the Scheme Effective Date**</u> |
| Distribution Confirmation Deed submitted via the Portal by the Class A Options Deadline | |
| (optional) Designated Recipient Form (for either a Scheme Creditor who is not an Eligible Person or who wishes to appoint a Designated Recipient to receive the Scheme Consideration) submitted via the Portal by the Class A Options Deadline | |
| **Class A Lenders (who are <u>not</u> Sanctioned Scheme Creditors)** | |
| The Class A Private Lender Proxy Form, including supporting evidence, signed and submitted via the Portal; including supporting evidence and the Accession Code by the Class A Options Deadline | <u>**Class A Options Deadline being the date which is 14 days after the Scheme Effective Date**</u> |
| (optional) Designated Recipient Form (for a Scheme Creditor who is an Eligible Person and who wishes to appoint a Designated Recipient to receive the Scheme Consideration) signed and submitted via the Portal by the Class A Options Deadline | |

---

[12]To be entitled to receive the Consent Fee upon the Final Distribution Date or the lifting of Applicable Sanctions (whichever is later) from either (i) the Holding Period Trust, if within the Holding Period or (ii) the Successor Escrow Account, if during the Perpetuity Period.

| Actions to be taken | Deadline |
|---|---|
| Distribution Confirmation Deed executed and submitted via the Portal by the Class A Options Deadline | |
| **Class A Noteholders (who <u>are</u> Blocked Scheme Creditors)**[13] | |
| The Blocked Scheme Creditor Form, including supporting evidence submitted to GLAS by any submission method(s) described in the Solicitation Packet by the Class A Options Deadline | **<u>Class A Options Deadline being the date which is 14 days after the Scheme Effective Date</u>** |
| **Actions required by Class A Scheme Creditors to be able to receive the Final Distribution (Option 1 Scheme Consideration only) on the Final Distribution Date** | |
| **Class A Noteholders (who are <u>not</u> Sanctions-Affected Scheme Creditors)**[14] | |
| Custody Instructions to be submitted via the Clearing Systems prior to the submission of the Account Holder Letter and in any case by the Holding Period Custody Instruction Deadline | **<u>Class A Holding Period Custody Instruction Deadline 5:00 p.m. (Hong Kong time) / 4.00 a.m. (Cayman Islands time) on the date which is 5 Business Days prior to the Class A Bar Date</u>** |
| The Account Holder Letter submitted via the Portal by the Class A Bar Date | **<u>Class A Bar Date, being the date which is 30 days after the Restructuring Effective Date</u>** |
| Distribution Confirmation Deed submitted via the Portal by the Class A Bar Date | |
| (optional) Designated Recipient Form (for a Scheme Creditor who is not an Eligible Person and who wishes to appoint a Designated Recipient to receive the Scheme Consideration) (if applicable) submitted via the Portal by the Class A Bar Date | |
| **Class A Lenders (who are <u>not</u> Sanctioned Scheme Creditors)**[15] | |
| The Class A Private Lender Proxy Form, including supporting evidence, signed and submitted via the Portal by the Class A Bar Date | **<u>Class A Bar Date, being the date which is 30 days after the Restructuring Effective Date</u>** |

[13]To elect Option 2 Scheme Consideration and have any Initial Distribution to which the Blocked Scheme Creditor would be entitled on the Restructuring Effective Date paid into the Holding Period Trust, which may be distributed to the Blocked Scheme Creditor on the Final Distribution Date or the lifting of Applicable Sanctions (whichever is later) from either (i) the Holding Period Trust, if within the Holding Period or (ii) the Successor Escrow Account, if during the period of the Perpetuity Period.

[14]In respect of Class A Noteholders who do not validly submit the relevant Scheme Creditor Forms before the Class A Options Deadline, such Class A Noteholders will only be eligible to receive the Option 1 Scheme Consideration.

[15]In respect of Class A Lenders, who do not validly submit the relevant Scheme Creditor Forms before the Class A Options Deadline, such Class A Lenders will only be eligible to receive the Option 1 Scheme Consideration.

| Actions to be taken | Deadline |
|---|---|
| Distribution Confirmation Deed executed and submitted via the Portal by the Class A Bar Date | |
| (optional) Designated Recipient Form (for a Scheme Creditor who is an Eligible Person and who wishes to appoint a Designated Recipient to receive the Scheme Consideration) signed and submitted via the Portal by the Class A Bar Date | |
| **Class A Noteholders (who <u>are</u> Blocked Scheme Creditors)** | |
| The Blocked Scheme Creditor Form, including supporting evidence submitted to GLAS by any submission method(s) described in the Solicitation Packet by the Class A Bar Date | <u>**Class A Bar Date, being the date which is 30 days after the Restructuring Effective Date**</u> |

*General Instructions*

5.5    Class A Scheme Creditors (including Sanctions-Affected Scheme Creditors) and any Persons with an interest in the Class A Debts, Account Holder or Intermediary (as applicable) should read the full instructions set out in the Solicitation Packet as published on the Transaction Website and should read the Explanatory Statement as a whole, in conjunction with the Solicitation Packet. More specifically:

(a)    If you are a Class A Scheme Creditor (including a Sanctions-Affected Scheme Creditor), you should read the Explanatory Statement carefully.

(b)    If you are a Class A Noteholder who is not an Account Holder and who is not a Sanctions-Affected Scheme Creditor, you should contact your Account Holder (through any Intermediaries, if applicable) to ensure that your Account Holder takes appropriate action(s) described in the Explanatory Statement and the Solicitation Packet.

(c)    It will be the responsibility of Account Holders, who are not Class A Noteholders, to obtain from the Class A Noteholder (through any Intermediaries if applicable) on whose behalf they are acting, in accordance with the procedures established between them, whatever information or instructions they may require to identify in an Account Holder Letter of the relevant Class A Noteholder and to provide the information, instructions and confirmations required by the Account Holder Letter. None of the Company, the Information Agent or any other Person will be responsible for any loss or liability incurred by a Class A Noteholder as a result of any determination by the Information Agent that an Account Holder Letter contains an error or is incomplete, even if this is subsequently shown not to have been the case.

(d)    If you are a Class A Noteholder who is an Account Holder, you should take the appropriate actions described in this Section 5 (*Summary of Actions to be Taken by Scheme Creditors*) and throughout this Explanatory Statement and the Solicitation Packet.

5.6     If you are a Class A Noteholder (who is not a Sanctions-Affected Scheme Creditor):

(a)     please give ample time to allow your Account Holder and/or Intermediary (as applicable) to process your instructions and submit the required Scheme Creditor Forms (and any other documentation as may be requested) on your behalf. To ensure timely submission of your Account Holder Letter or Proxy Voting Form in accordance with the timetable set out below, please check with your Account Holder (if applicable) for clarification as to the processing time required and deliver the appropriate materials well before that time; and

(b)     please note that the Clearing System, Account Holder and/or Custodian through which your interest in the Existing Notes is held may impose an earlier deadline for the submission of Custody Instructions. To ensure timely submission of your Custody Instructions, and Account Holder Letter, please ask your Account Holder to check with the relevant Clearing System, Account Holder and/or Custodian as to whether any earlier deadline is applicable and ensure your Custody Instructions are submitted well before any applicable deadlines.

5.7     **A Class A Scheme Creditor that fails to validly submit the required documentation prior to the relevant deadlines as set out above will not be entitled to vote at the Scheme Meetings**. A Class A Scheme Creditor will, however, be bound by the terms of the Schemes in the event that they become effective and any Class A Debts held by such Scheme Creditor will be cancelled on the Restructuring Effective Date in accordance with the terms of the Schemes.

### *Details of the Scheme Meetings*

5.8     On 25 July 2023, the Cayman Court ordered that a meeting of the Class A Scheme Creditors be convened to consider and, if thought fit, approve the Cayman Scheme proposed by the Company (the "**Class A Cayman Scheme Meeting**").

5.9     On 24 July 2023, the Hong Kong Court ordered that a meeting of the Class A Scheme Creditors be convened to consider and, if thought fit, approve the Hong Kong Scheme proposed by the Company (the "**Class A Hong Kong Scheme Meeting**", and collectively with the Class A Cayman Scheme Meeting, the "**Class A Scheme Meetings**").

5.10    Formal notices convening the Class A Scheme Meetings are set out at Schedule 5 (*Notice of Scheme Meeting*) to this Explanatory Statement.

5.11    The Class A Scheme Meetings to consider and, if thought fit, approve the Cayman Scheme and Hong Kong Scheme respectively, with or without modification, will be held as follows:

(a)     the Class A Hong Kong Scheme Meeting will be held at Sidley Austin at 39th Floor, Two International Finance Centre, 8 Finance Street, Central, Hong Kong with any adjournment as may be appropriate, at 8:00 p.m. Hong Kong time on 23 August 2023, the equivalent time being 7:00 a.m. Cayman Islands time on 23 August 2023; and

(b)     the Class A Cayman Scheme Meeting will be held at Sidley Austin at 39th Floor, Two International Finance Centre, 8 Finance Street, Central, Hong Kong with any adjournment as may be appropriate, at 8.45 p.m. Hong Kong time on 23 August 2023, the equivalent time being 7.45 a.m. Cayman Islands time on 23 August 2023 (or at such time as the Class A Hong Kong Scheme Meeting has finished, if later).

47

5.12    Class A Scheme Creditors (including Blocked Scheme Creditors) will be able to attend the Class A Scheme Meetings in person by a duly authorised representative (if a corporation) or by proxy. Class A Scheme Creditors (including Blocked Scheme Creditors) will also be able to attend the Class A Scheme Meetings by video conference using dial-in details which may be obtained on request from the Information Agent (for Class A Scheme Creditors who are not Sanctions-Affected Scheme Creditors) or from GLAS (for Blocked Scheme Creditors).

***Relevant documents to be completed by each Class A Scheme Creditor***

5.13    Each Class A Scheme Creditor will be required to submit the relevant Scheme Creditor Forms (as applicable) in order to receive the Scheme Consideration, pursuant further to the terms of the Schemes. A summary of each relevant document pertaining to each Class A Scheme Creditor is set out below, including the consequences of failing to submit such documents in accordance with the requirements under the Schemes.

A.    **Class A Noteholder - Account Holder Letter**

5.14    Among other things, the Account Holder Letter is the document that allows Class A Noteholders (who are not Sanctions-Affected Scheme Creditors) to vote on the Schemes and to become eligible to receive Scheme Consideration on the occurrence of the Restructuring Effective Date.

5.15    A failure by such Class A Noteholder to procure that its Account Holder validly submits on its behalf, the Account Holder Letter via the Portal such that it is received by the Voting Record Time will mean that the voting instructions contained in that Account Holder Letter will be disregarded for the purposes of voting at the Class A Scheme Meetings and the relevant Class A Noteholders will, subject to the Chairperson's discretion, not be entitled to vote at the Class A Scheme Meetings.

5.16    Class A Noteholders (who are not Sanctions-Affected Scheme Creditors) (or their Account Holders on their behalf as agent, if applicable) will be required to submit an instruction to block the Existing Notes via the Clearing Systems (the "**Custody Instruction**"), prior to submitting the Account Holder Letter, and in any case prior to the Custody Instruction Deadline.

5.17    A failure by a Class A Noteholder (who is an Eligible Participating Creditor) to procure that its Account Holder validly submits on its behalf (if applicable), the Account Holder Letter via the Portal such that it is received by the Voting Record Time will mean that such Class A Noteholder will not be eligible to receive the Consent Fee (if applicable) on the Restructuring Effective Date or the Final Distribution Date (depending on whether Option 1 Scheme Consideration or Option 2 Scheme Consideration is elected) .

5.18    A failure by a Class A Noteholder to procure that its Account Holder validly submits on its behalf, the Account Holder Letter via the Portal such that it is received by either the (i) Class A Options Deadline or (ii) Class A Bar Date will also mean that such Class A Noteholder will not be eligible to participate in the distribution of the New Instruments on the Restructuring Effective Date (if electing Option 2 Scheme Consideration) or the Final Distribution Date, respectively.

B.    **Class A Lender – Class A Private Lender Proxy Form**

5.19    The Class A Private Lender Proxy Form is the document that allows Class A Lenders to vote on the Schemes and to become eligible to receive Scheme Consideration should the Restructuring Effective Date occur.

5.20    Class A Lenders who wish to vote on the Schemes are requested to ensure that the Class A Private Lender Proxy Form is completed and validly submitted to the Information Agent via the Portal as soon as possible in accordance with the instructions set out in the Class A Private Lender Proxy Form and, in any event, no later than the Voting Record Time, irrespective of whether such Class A Lender intends to attend the Class A Scheme Meetings in order to exercise its right to vote in relation to the approval of the Schemes. A failure by a Class A Lender to submit the Class A Private Lender Proxy Form via the Portal and received by the Voting Record Time will mean that the relevant Class A Lenders will, subject to the Chairperson's discretion, not be entitled to vote at the Class A Scheme Meetings.

5.21    A failure by a Class A Lender (who is an Eligible Participating Creditor) to validly submit the Class A Private Lender Proxy Form via the Portal such that it is received by the Voting Record Time will mean that such Class A Noteholder will not be eligible to receive the Consent Fee (if applicable) on the Restructuring Effective Date or the Final Distribution Date (depending on whether Option 1 Scheme Consideration or Option 2 Scheme Consideration is elected) .

5.22    A failure by a Class A Lender to validly submit the Class A Private Lender Proxy Form via the Portal such that it is received by either the (i) Class A Options Deadline or (ii) Class A Bar Date will also mean that such Class A Lender will not be eligible to participate in the distribution of the New Instruments on the Restructuring Effective Date (if electing Option 2 Scheme Consideration) or the Final Distribution Date, respectively.

### C.    All Class A Scheme Creditors - Distribution Confirmation Deed

5.23    The Distribution Confirmation Deed is a document that Class A Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) (or their Account Holder on their behalf as their agent, as applicable) must complete in order to confirm, among other things, that such Class A Scheme Creditor (or its Designated Recipient) may lawfully be issued the New Instruments. Please refer to the instructions above for the relevant deadlines required to submit a Distribution Confirmation Deed along with the other documents required to be submitted.

### D.    All Class A Scheme Creditors - Designated Recipient Form

5.24    The Designated Recipient Form is an optional form that Class A Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) may complete in order to appoint, should they wish, a Designated Recipient to be the recipient of some or all of the New Instruments that would otherwise be issued to such Class A Scheme Creditor. The Designated Recipient Form is appended to the Account Holder Letter and/or the Private Lender Proxy Form.

5.25    All Class A Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) wishing to nominate a Designated Recipient to receive any New Instruments on the Restructuring Effective Date or the Final Distribution Date must ensure that a duly completed and executed Designated Recipient Form is also submitted online via the Portal, alongside the applicable documents noted above, to be submitted to the Information Agent (for Class A Scheme Creditors who are not Sanctions-Affected Scheme Creditors) or by any submission method(s) described in the Solicitation Packet to GLAS (for Blocked Scheme Creditors) with full supporting evidence by the relevant deadlines set out in Section 5.4 above.

E.       **Blocked Scheme Creditor Form**

5.26    The Blocked Scheme Creditor Form is the document that allows Class A Noteholders who are
Blocked Scheme Creditors to (i) vote on the Schemes at the Scheme Meetings, and (ii) to become
eligible to receive the relevant Scheme Consideration if Applicable Sanctions in respect of them
are lifted should the Schemes be approved, in accordance with the terms of the Schemes. A failure
by a Blocked Scheme Creditor to submit, or a failure by a Blocked Scheme Creditor to procure the
submission of, the Blocked Scheme Creditor Form to GLAS by any submission method(s)
described in the Solicitation Packet such that it is received by the Voting Record Time will mean
that the voting instructions contained in that Blocked Scheme Creditor Form will be disregarded
for the purposes of voting at the Scheme Meetings and the relevant Blocked Scheme Creditor will,
subject to the Chairperson's discretion, not be entitled to vote at the Scheme Meetings.

**SUBMISSION OF COMPLETED FORMS BY CLASS A SCHEME CREDITORS:**

5.27    All completed documents should be submitted online at the Portal
(https://portal.morrowsodali.com/EvergrandeScheme) to the Information Agent (for Class A
Scheme Creditors who are not Sanctions-Affected Scheme Creditors) or by any submission
method(s) described in the Solicitation Packet to GLAS (for Blocked Scheme Creditors) with full
supporting evidence before the important deadlines set out above and further detailed in the
Explanatory Statement and the Solicitation Packet.

5.28    We would encourage all Class A Scheme Creditors (including Blocked Scheme Creditors) to start
the process for submitting their votes for the Class A Scheme Meetings and submitting the
documentation required to participate in a distribution of Scheme Consideration as soon as possible.

5.29    If you are in any doubt as to what action you should take in connection with the Explanatory
Statement and/or the Schemes, the proposals contained in them or the documents that accompany
them, you are recommended to:

(a)      contact the Information Agent (for Class A Scheme Creditors who are not Sanctions-
Affected Scheme Creditors);

(b)      contact GLAS (for Blocked Scheme Creditors): and

(c)      seek your own independent advice immediately from your legal, financial, tax or other
independent adviser.

All documents relevant to the Schemes such as this Explanatory Statement, the Schemes, the
Solicitation Packet and all relevant announcements will be available online at the Transaction
Website.

**ANY CLASS A SCHEME CREDITOR (WHO IS NOT A SANCTIONS-AFFECTED
SCHEME CREDITOR) THAT FAILS TO ENSURE THAT A VALIDLY COMPLETED
AND EXECUTED ACCOUNT HOLDER LETTER OR CLASS A PRIVATE LENDER
PROXY FORM (AS APPLICABLE), DISTRIBUTION CONFIRMATION DEED AND, IF
APPLICABLE, DESIGNATED RECIPIENT FORM ARE SUBMITTED TO AND
RECEIVED BY THE INFORMATION AGENT VIA THE PORTAL BY NO LATER THAN
THE DEADLINES SET OUT IN THE SOLICITATION PACKET AS PUBLISHED ON
THE TRANSACTION WEBSITE AND IN ACCORDANCE WITH THE INSTRUCTIONS
SET OUT THEREIN SHALL NOT RECEIVE ANY SCHEME CONSIDERATION OR**

**ANY OTHER BENEFITS UNDER THE TERMS OF THE SCHEMES BUT SHALL HAVE ITS SCHEME CLAIMS RELEASED IN ACCORDANCE WITH THE TERMS OF THE SCHEMES.**

*Actions to be taken by Class A Scheme Creditors*

A.        **Actions to be taken before the Voting Record Time**

5.30    Class A Scheme Creditors should further refer to Section 1 (*Expected Timetable of Key Events*) for the key expected timings of the Schemes and Section 5.4 (*Summary of Actions Table*) when reviewing this section.

5.31    If you are a Class A Noteholder who is not an Account Holder, you should contact your Account Holder (through any Intermediaries, if applicable) to ensure that your Account Holder takes the appropriate action(s). Such Class A Noteholders must also ensure that a Custody Instruction is submitted via the Clearing Systems prior to the Custody Instruction Deadline.

5.32    Class A Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) who wish to vote in respect of the Schemes at the Class A Scheme Meetings must ensure the actions and Scheme Creditor Forms (as applicable) as set out in Section (B) below, are validly completed and executed and received by the Information Agent via the Portal by the Voting Record Time.

5.33    Whether the required Scheme Creditor Forms have been duly completed shall be determined by the Information Agent or by GLAS (in respect of Blocked Scheme Creditor Forms) at their discretion, provided that, if the Information Agent and/or GLAS (in respect of Blocked Scheme Creditor Forms) consider any such document not to have been validly completed, they shall promptly:

(i)        prepare a written statement of its reasons for that conclusion; and

(ii)       send that written statement via the Portal (in respect of the Information Agent) or by any submission method(s) described in the Solicitation Packet (in respect of GLAS) to the party that provided the relevant document.

5.34    Where a Scheme Creditor Form is considered not to have been validly completed, and the Class A Bar Date has not yet occurred at the time of such determination, the relevant Scheme Creditor may resubmit the Scheme Creditor Form.

5.35    None of the Company, the Information Agent, GLAS, or any other person will be responsible for any loss or liability incurred by a Class A Scheme Creditor as a result of any determination by the Information Agent or GLAS.

B.        **To vote at the Class A Scheme Meetings**

5.36    Class A Scheme Creditors will be entitled to attend and vote in person or by proxy at the Class A Scheme Meetings. If you are a Class A Scheme Creditor, you should read this Explanatory Statement and the Solicitation Packet carefully. In order to vote on the Schemes, attend the Class A Scheme Meetings and be eligible to receive Scheme Consideration, it is of the utmost importance that Class A Scheme Creditors (including Blocked Scheme Creditors) ensure that they follow the voting and other documentary instructions set out below and throughout the Explanatory Statement.

5.37    For the purpose of voting at the Class A Scheme Meetings, the value of each Class A Scheme Creditor's Scheme Claim shall be an amount equal to its Voting Scheme Claim. For completeness, subject to the Chairperson's discretion, the Voting Scheme Claim shall generally be calculated on a Full Accrued Claim Basis, in accordance with the calculation of (i) the Existing Notes Trustee (for Class A Noteholders), subject to the Information Agent's reconciliation of the Custody Instruction reference number specified in the Account Holder Letter submitted by or on behalf of such Class A Noteholder with the records of the Clearing Systems, and (ii) of the Company and/or the Information Agent as checked by the Information Agent against the books and records supplied by the Company (for Class A Lenders) at the Voting Record Time, subject to the Chairperson's discretion.

5.38    As noted above at paragraph (F) of Section 5.1, the Existing Notes Trustee and the Existing Notes Depositary (and its nominee) are Scheme Creditors; however, they shall not be entitled to vote in respect of the Existing Notes at the Class A Scheme Meeting and accordingly they will not vote at such meeting.

5.39    Class A Noteholders (who are not Sanctions-Affected Scheme Creditors) who wish to vote in respect of the Schemes are requested to ensure that the relevant Custody Instruction is submitted via the Clearing Systems prior to the Custody Instruction Deadline and the applicable Scheme Creditor Form is duly completed, executed and returned in accordance with the instructions set out therein so that it is submitted to and received by the Information Agent via the Portal by the Voting Record Time being no later than 5.00 p.m. Hong Kong time on 18 August 2023, the equivalent being 4.00 a.m. Cayman Islands time on 18 August 2023.

5.40    Class A Lenders who wish to vote in respect of the Schemes are requested to ensure that the applicable Scheme Creditor Form is completed in respect of the Class A Scheme Meetings. Once completed, the applicable Scheme Creditor Form should be submitted to the Information Agent via the Portal by the Voting Record Time being no later than 5.00 p.m. Hong Kong time on 18 August 2023, the equivalent being 4.00 a.m. Cayman Islands time on 18 August 2023. If a Class A Lender (who is not a Sanctions-Affected Scheme Creditor) wishes to attend the Class A Scheme Meetings in person or by authorised representative, they should complete the applicable Scheme Creditor Form and return it as set out above, and such Class A Lender or its authorised representative (as applicable) should bring a copy of the completed Scheme Creditor Form in person to the Class A Scheme Meetings and submit it at the registration desk. Any such Class A Lender, authorised representative, or proxy (as applicable) who wishes to attend the Class A Scheme Meetings in person will be required to provide evidence of personal identity (by way of photo identification, such as a passport) and any individual attending on behalf of a body corporate must provide evidence of authority to represent that body corporate at the Class A Scheme Meetings (by way of board resolution or power of attorney or similar Authorisation).

5.41    Class A Noteholders who are Blocked Scheme Creditors who wish to vote in respect of the Schemes, are requested to ensure that the Blocked Scheme Creditor Form (including any other evidence) is duly completed, executed and returned in accordance with the instructions set out therein so that it is submitted to and received by GLAS by any submission method(s) described in the Solicitation Packet by the Voting Record Time, being no later than 5.00 p.m. Hong Kong time on 18 August 2023, the equivalent being 4.00 a.m. Cayman Islands time on 18 August 2023.

5.42    As part of the key actions to be taken, and further pursuant to Clause 14 (*Scheme Consideration Options*) of the Schemes, each Class A Scheme Creditor has the opportunity to elect the type of Scheme Consideration it wishes to receive from two options, being the Option 1 Scheme

Consideration and Option 2 Scheme Consideration, as set out in Section 10 (*Two Options of Scheme Consideration for Both Class A and Class C*) below.

5.43    Class A Scheme Creditors may make an election of their option of Scheme Consideration prior to the Voting Record Time, with any amendments to the previous election or any final election (as applicable) required to be made by each Class A Scheme Creditor by the Class A Options Deadline. Each Scheme Creditor will be bound by the latest validly submitted election as of the Class A Options Deadline. Further details as to the forms required to be submitted and the specific deadlines can be found at Section 6 (*Summary Explanation of the Schemes*) as well as the summary table set out at Section 5.4 (*Summary of Actions Table*) above.

5.44    For the avoidance of doubt, the Existing Notes Trustee and the Existing Notes Depositary in respect of the Existing Notes shall not be entitled to vote at the Scheme Meetings (to avoid double counting).

C.    **Custody Instructions and Undertaking not to Transfer for Class A Noteholders (who are not Sanctions-Affected Scheme Creditors)**

5.45    Custody Instructions are irrevocable instructions which prevent transfers of the Existing Notes until the Restructuring Effective Date, or until the Existing Notes are unblocked in accordance with Section 5.51 below. These restrictions are necessary to prevent the same holding of Existing Notes being voted on at the Scheme Meetings more than once. A separate Custody Instruction must be submitted on behalf of each Class A Noteholder.

5.46    Any Class A Scheme Creditor that procures the submission of an Account Holder Letter (to vote at the Scheme Meeting and/or receive any Scheme Consideration on the Restructuring Effective Date if electing Option 2 Scheme Consideration) must block its Existing Notes. To do this, Scheme Creditors must ensure that their Account Holder, prior to delivering the Account Holder Letter to the Information Agent, submits a Custody Instruction to Euroclear or Clearstream (as applicable) to block its Existing Notes held with Euroclear or Clearstream by the Custody Instruction Deadline. Scheme Creditors must include in the relevant Account Holder Letter reference to the Custody Instruction Reference Number. An Account Holder Letter that does not contain reference to a valid Custody Instruction Reference Number will not be valid for the purposes of voting at the Scheme Meeting or receiving the Scheme Consideration on the Restructuring Effective Date, and the Company reserves the right to reject any such Account Holder Letter.

5.47    By completion of the Account Holder Letter with inclusion of the Custody Instruction Reference Number, the Scheme Creditor will be deemed to have given the undertaking that it will not, from the date of delivery of its Account Holder Letter, sell, transfer, assign or otherwise dispose of its interest in all or any part of its specified Existing Notes until the Restructuring Effective Date, or until the Existing Notes are unblocked in accordance with Section 5.51 below.

5.48    For the avoidance of doubt, all Existing Notes (even those in respect of which no Custody Instructions were given) will be blocked from trading by the Clearing Systems on or around five (5) Business Days prior to the Restructuring Effective Date.

5.49    If the Restructuring Effective Date occurs before the Longstop Date, all of the Existing Notes will be cancelled in the Clearing Systems on the Restructuring Effective Date, in accordance with the Scheme and thereafter will not be capable of being traded in the Clearing Systems.

5.50   Any documentation and relevant Custody Instruction submitted by or on behalf of a Scheme Creditor shall be irrevocable for all purposes in connection with the Scheme unless and until Company has provided an irrevocable unblock instruction to the Information Agent in accordance with Section 5.51 below.

5.51   The Company shall provide an irrevocable instruction to the Information Agent to immediately cause the Existing Notes to be unblocked within two (2) Business Days after one of the circumstances below occurs:

(a)   any of the Schemes is not approved by the requisite majorities of the Scheme Creditors at the Scheme Meeting, is withdrawn or is terminated in accordance with terms of the relevant Scheme;

(b)   the Scheme is not sanctioned by a final and unappealable order of the Court;

(c)   the Restructuring does not become effective by the Longstop Date; or

(d)   subject to sub-paragraph (d) above, the Company at its sole discretion consents to unblock the Existing Notes.

5.52   If the Restructuring Effective Date occurs before the Longstop Date, the Scheme Claims will be irrevocably released and cancelled in full in accordance with the Schemes in consideration for which the Eligible Creditors and Designated Recipients will receive the New Instruments and the Scheme Creditors will receive the Scheme Consideration, all in accordance with the terms of the Scheme.

**D.    To receive the Consent Fee (if applicable) on the Restructuring Effective Date**

5.53   Class A Scheme Creditors (who are not Sanctions-Affected Scheme Creditors), who are also Eligible Participating Creditors and who have voted in support of the Schemes, are entitled to receive the Consent Fee on the Restructuring Effective Date or the Final Distribution Date (depending on whether Option 1 Scheme Consideration or Option 2 Scheme Consideration is elected) if they have duly completed and submitted the relevant Scheme Creditor Forms (as set out in Section 5.4 (*Summary of Actions Table*) above) via the Portal and received by the Voting Record Time.

**E.    To receive your Entitlement to the Scheme Consideration on the Restructuring Effective Date or Final Distribution Date (as applicable)**

*On the Restructuring Effective Date*

5.54   If you are a Class A Scheme Creditor (and are not a Sanctions-Affected Scheme Creditor) and wish to receive your Entitlement to the Scheme Consideration on the Restructuring Effective Date, in accordance with the terms of the Schemes, please ensure that the Custody Instruction is submitted via the Clearing Systems, by the Custody Instruction Deadline (if applicable), prior to the Account Holder Letter or the Class A Private Lender Proxy Form being submitted and, for receiving New Instruments, the Distribution Confirmation Deed is validly completed, executed and returned online via the Portal in accordance with the instructions set forth therein so that they are submitted to and received by the Information Agent by the Class A Options Deadline. You must elect to receive Option 2 Scheme Consideration within the relevant Scheme Creditor Form in order to be eligible to receive Scheme Consideration on the Restructuring Effective Date.

*On the Final Distribution Date*

5.55    If you are a Class A Scheme Creditor (and are not a Sanctions-Affected Scheme Creditor), who has failed to submit the relevant Scheme Creditor Forms by the Class A Options Deadline, and still wish to receive your Entitlement to the Scheme Consideration by the Final Distribution Date, in accordance with the terms of the Schemes, please ensure that the Custody Instruction is submitted via the Clearing Systems, by the Class A Holding Period Custody Instruction Deadline (if applicable), prior to the Account Holder Letter or the Class A Private Lender Proxy Form being submitted and, for receiving New Instruments, the Distribution Confirmation Deed is validly completed, executed and returned online via the Portal in accordance with the instructions set forth therein so that they are submitted to and received by the Information Agent by the Class A Bar Date. You will be deemed to have elected to receive Option 1 Scheme Consideration if you submit your Scheme Creditor Forms after the Class A Options Deadline and on or before the Class A Bar Date.

*Appointment of a Designated Recipient*

5.56    If you are not an Eligible Person (i.e. a person who cannot make affirmative securities law confirmations set out in Annex B to the Distribution Confirmation Deed) nor a Sanctions-Affected Scheme Creditor, you may designate a Designated Recipient who is an Eligible Person in order to receive your Entitlement to the Scheme Consideration by submission of a Designated Recipient as described below at Section (F), to be read with the instructions set forth in the Solicitation Packet as published on the Transaction Website.

*Blocked Scheme Creditors*

5.57    If you are a Class A Noteholder who is a Blocked Scheme Creditor, by definition, you will be unable to receive your Entitlement to the Scheme Consideration on the Restructuring Effective Date. Instead, such Blocked Scheme Creditors' Scheme Consideration and any Consent Fee (if applicable) to which a Blocked Scheme Creditor would otherwise be entitled on the Restructuring Effective Date will be paid to the Holding Period Trustee to hold in the Holding Period Trust until the expiration of the Holding Period. If the Applicable Sanctions are still in place upon the expiration of the Holding Period, the Company will appoint the Successor Escrow Agent to hold in the Successor Escrow Account any Blocked Assets to be transferred after the expiration of the Holding Period, until the earlier of (i) the expiry of the Perpetuity Period, or (ii) the lifting of Applicable Sanctions with the Blocked Scheme Creditors being given a reasonable period of time thereafter to recover their Entitlement to the Scheme Consideration in accordance with the terms of the Successor Escrow Agreement.

5.58    Blocked Scheme Creditors need to submit the Blocked Scheme Creditor Form to GLAS via any submission method(s) described in the Solicitation Packet by the Voting Record Time in order to vote and be eligible to receive the Consent Fee (if applicable), by the Class A Options Deadline in order to elect to receive Option 2 Scheme Consideration, or by the Class A Bar Date in order to be eligible to receive Option 1 Scheme Consideration upon the lifting of the Applicable Sanctions, further pursuant to the terms of the Schemes. Upon the lifting of all Applicable Sanctions, such Blocked Scheme Creditors will cease to be considered Blocked Scheme Creditors for the purposes of the Schemes, and then would be able to, and required to, validly complete and submit the relevant documents as further described in the Solicitation Packet as published on the Transaction Website.

F.    **To nominate a Designated Recipient to receive your Scheme Consideration**

5.59    For Class A Scheme Creditors, who are not Sanctions-Affected Scheme Creditors, if you wish to nominate a Designated Recipient to receive your Scheme Consideration on the Restructuring Effective Date or the Final Distribution Date, to which you may be entitled, please ensure that a duly completed and executed Designated Recipient Form is also submitted online via the Portal with an Account Holder Letter or Class A Private Lender Proxy Form (as applicable) and a Distribution Confirmation Deed to be submitted to the Information Agent by the Voting Record Time (in order to vote on the Schemes), by the Class A Options Date (to receive Scheme Consideration on the Restructuring Effective Date), if electing Option 2 Scheme Consideration), or by the Class A Bar Date (to receive Scheme Consideration on the Final Distribution Date), respectively.

G.    **Upload of documents**

5.60    All completed documents should be submitted online via the Portal (https://portal.morrowsodali.com/EvergrandeScheme) to the Information Agent (for Class A Scheme Creditors who are not Sanctions-Affected Scheme Creditors) or by any submission method(s) described in the Solicitation Packet to GLAS with full supporting evidence (for Blocked Scheme Creditors) before the important deadlines set out above and further detailed in the Explanatory Statement and the Solicitation Packet, as set out in the Solicitation Packet, as published on the Transaction Website.

5.61    The Company would encourage all Class A Scheme Creditors (including Blocked Scheme Creditors) to start the process for submitting their votes for the Class A Scheme Meetings and submitting the documentation required to participate in a distribution of Scheme Consideration as soon as possible.

5.62    If you are in any doubt as to what action you should take in connection with this Explanatory Statement and/or the Schemes, the proposals contained in them or the documents that accompany them, you are recommended to:

   (a)    contact the Information Agent (for Class A Scheme Creditors who are not Sanctions-Affected Scheme Creditors);

   (b)    contact GLAS (for Blocked Scheme Creditors): and

   (c)    seek your own independent advice immediately from your legal, financial, tax or other independent adviser.

5.63    All documents relevant to the Schemes such as this Explanatory Statement, the Scheme, the Solicitation Packet and all relevant announcements will be available online at the Transaction Website.

**ANY CLASS A SCHEME CREDITOR (WHO IS NOT A SANCTIONS-AFFECTED SCHEME CREDITOR) THAT FAILS TO ENSURE THAT A VALIDLY COMPLETED AND EXECUTED ACCOUNT HOLDER LETTER OR CLASS A PRIVATE LENDER PROXY FORM (AS APPLICABLE), DISTRIBUTION CONFIRMATION DEED AND, IF APPLICABLE, DESIGNATED RECIPIENT FORM ARE SUBMITTED TO AND RECEIVED BY THE INFORMATION AGENT VIA THE PORTAL BY NO LATER THAN THE DEADLINES SET OUT IN THE SOLICITATION PACKET AS PUBLISHED ON**

**THE TRANSACTION WEBSITE AND IN ACCORDANCE WITH THE INSTRUCTIONS SET OUT THEREIN SHALL NOT RECEIVE ANY SCHEME CONSIDERATION OR ANY OTHER BENEFITS UNDER THE TERMS OF THE SCHEMES BUT SHALL HAVE ITS SCHEME CLAIMS RELEASED IN ACCORDANCE WITH THE TERMS OF THE SCHEMES.**

(B)    **ACTIONS REQUIRED FOR CLASS C SCHEME CREDITORS**

*Summary of Actions Table*

5.64    The table below is designed to be a summary only of the key actions and relevant deadlines that all Class C Scheme Creditors should and/or are required to take prior to the Scheme Meetings for the purposes of attending and voting at the Scheme Meetings and ability to elect their type of Scheme Consideration (if applicable). The table should be read in conjunction with the detailed explanations below at Section 5.65 onwards relevant to Class C Scheme Creditors and in the Solicitation Packet, as published on the Transaction Website.

| Actions to be taken | Deadline |
| --- | --- |
| **To vote at the Scheme Meetings** | |
| **Class C Scheme Creditors excluding the Class C Noteholders** [16] | |
| The Class C Scheme Creditor Proxy Form, including supporting evidence and Voting Instructions, signed and submitted via the Portal by the Voting Record Time | **Voting Record Time (4.00 a.m. Cayman Islands time on 18 August 2023 and 5.00 p.m. Hong Kong time on 18 August 2023)** |
| **Class C Noteholders (who are not Sanctions-Affected Scheme Creditors)** | |
| A Custody Instruction must be submitted via the Clearing Systems prior to the submission of an Account Holder Letter and in any case by the Custody Instruction Deadline | **Custody Instruction Deadline (4.00 a.m. Cayman Islands time on 15 August 2023 and 5.00 p.m. Hong Kong time on 15 August 2023)** |
| The Account Holder Letter (to include Custody Instruction Reference Number and Voting Instructions) submitted via the Portal by the Voting Record Time | **Voting Record Time (4.00 a.m. Cayman Islands time on 18 August 2023 and 5.00 p.m. Hong Kong time on 18 August 2023)** |
| **Class C Scheme Creditors (who are Blocked Scheme Creditors)** | |
| The Blocked Scheme Creditor Form, including supporting evidence and Voting Instructions, signed and submitted to GLAS by any submission method(s) described in the Solicitation Packet by the Voting Record Time | **Voting Record Time (4.00 a.m. Cayman Islands time on 18 August 2023 and 5.00 p.m. Hong Kong time on 18 August 2023)** |

---

[16] In relation to Class C Scheme Creditors, other than Class C Noteholders who are Blocked Scheme Creditors, all documents must be submitted to the Information Agent via the Portal.

| Actions to be taken | Deadline |
|---|---|
| **Actions required by Class C Scheme Creditors (who are Eligible Participating Creditors) to be able to receive the Consent Fee *only* on the Final Distribution Date** | |
| **Class C Scheme Creditors (other than the Class C Noteholders)** | |
| The Class C Scheme Creditor Proxy Form, including supporting evidence and Accession Code (in addition to voting in favour of the Schemes and other conditions), signed and submitted via the Portal by the Voting Record Time | **Voting Record Time (4.00 a.m. Cayman Islands time on 18 August 2023 and 5.00 p.m. Hong Kong time on 18 August 2023)** |
| Distribution Confirmation Deed executed and submitted via the Portal by the Voting Record Time | |
| (optional) Designated Recipient Form (for either a Scheme Creditor who is not an Eligible Person or who wishes to appoint a Designated Recipient to receive the Scheme Consideration) submitted via the Portal by the Voting Record Time | |
| **Class C Noteholders (who are <u>not</u> Sanctions-Affected Scheme Creditors)** | |
| A Custody Instruction must be submitted via the Clearing Systems prior to the submission of an Account Holder Letter and in any case by the Custody Instruction Deadline | **Custody Instruction Deadline (4.00 a.m. Cayman Islands time on 15 August 2023 and 5.00 p.m. Hong Kong time on 15 August 2023)** |
| The Account Holder Letter (to include Custody Instruction Reference Number and for Eligible Participating Creditors to be eligible to receive the Consent Fee, to include the Accession Code) submitted via the Portal by the Voting Record Time | **Voting Record Time (4.00 a.m. Cayman Islands time on 18 August 2023 and 5.00 p.m. Hong Kong time on 18 August 2023)** |
| Distribution Confirmation Deed submitted via the Portal by the Voting Record Time | |
| (optional) Designated Recipient Form (for either a Scheme Creditor who is not an Eligible Person or who wishes to appoint a Designated Recipient to receive the Scheme Consideration) submitted via the Portal by the Voting Record Time | |
| **Class C Scheme Creditors (who <u>are</u> Blocked Scheme Creditors)**[17] | |

---

[17]To receive the Consent Fee upon the Final Distribution Date or the lifting of Applicable Sanctions (whichever is later) from either (i) the Company on the Final Distribution Date or (ii) the Successor Escrow Account, if during the period of the Perpetuity Period.

| Actions to be taken | Deadline |
|---|---|
| The Blocked Scheme Creditor Form, including supporting evidence submitted to the Company, and the Accession Code (if relevant) signed and submitted to GLAS by any submission method(s) described in the Solicitation Packet by the Voting Record Time | **Voting Record Time (4.00 a.m. Cayman Islands time on 18 August 2023 and 5.00 p.m. Hong Kong time on 18 August 2023)** |
| **Actions required by Class C Scheme Creditors to be able to receive their Scheme Consideration (either Option 1 Scheme Consideration or Option 2 Scheme Consideration) on the Final Distribution Date** | |
| **Class C Scheme Creditors (other than the Class C Noteholders)** | |
| The Class C Scheme Creditor Proxy Form, including supporting evidence and Voting Instructions, signed and submitted via the Portal by the Class C Bar Date | **Class C Bar Date, being the date which is 135 days after the Restructuring Effective Date** |
| Distribution Confirmation Deed to be executed and submitted via the Portal by the Class C Bar Date | |
| (optional) Designated Recipient Form (for a Scheme Creditor who is not an Eligible Person and who wishes to appoint a Designated Recipient to receive the Scheme Consideration) (if applicable) submitted via the Portal by the Class C Bar Date | |
| **Class C Noteholders (who are <u>not</u> Sanctions-Affected Scheme Creditors)** | |
| A Custody Instruction (including the Accession Code) must be submitted via the Clearing Systems prior to the submission of an Account Holder Letter and in any case by the Holding Period Custody Instruction Deadline | **Class C Holding Period Custody Instruction Deadline 5:00 p.m. (Hong Kong time) / 4.00 a.m. (Cayman Islands time) on the date which is 5 Business Days prior to the Class C Bar Date** |
| The Account Holder Letter (to include Custody Instruction Reference Number and for Eligible Participating Creditors to be eligible to receive the Consent Fee, to include the Accession Code) submitted via the Portal by the Class C Bar Date | **Class C Bar Date, being the date which is 135 days after the Restructuring Effective Date** |
| Distribution Confirmation Deed executed and submitted via the Portal by the Class C Bar Date | |
| (optional) Designated Recipient Form (for either a Scheme Creditor who is not an Eligible Person or who wishes to appoint a | |

| Actions to be taken | Deadline |
|---|---|
| Designated Recipient to receive the Scheme Consideration) (if applicable) submitted via the Portal by the Class C Bar Date | |
| **Class C Scheme Creditors (who <u>are</u> Blocked Scheme Creditors)**[18] | |
| The Blocked Scheme Creditor Form, including supporting evidence, and the Accession Code (if relevant) signed and submitted to GLAS by any submission method(s) described in the Solicitation Packet by the Class C Bar Date | <u>**Class C Bar Date, being the date which is 135 days after the Restructuring Effective Date**</u> |

### *General Instructions*

5.65    Class C Scheme Creditors (including Sanctions-Affected Scheme Creditors) and any Persons with an interest in the Class C Debts (whether as a Class C Scheme Creditor or Intermediary) should read the full instructions set out in the Solicitation Packet and should read the Explanatory Statement as a whole, in conjunction with the Solicitation Packet. More specifically:

(a)    If you are a Class C Scheme Creditor (including a Sanctions-Affected Scheme Creditor), you should read the Explanatory Statement carefully.

(b)    If you are a Class C Scheme Creditor in respect of the Class C Notes who is not an Account Holder and who is not a Sanctions-Affected Scheme Creditor, you should contact your Account Holder (through any Intermediaries, if applicable) to ensure that your Account Holder takes appropriate action(s) described in the Explanatory Statement and the Solicitation Packet.

(c)    In respect of Class C Scheme Creditors of the Class C Notes, it will be the responsibility of Account Holders, who are not also the Class C Scheme Creditor, to obtain from the Class C Scheme Creditor (through any Intermediaries if applicable) on whose behalf they are acting, in accordance with the procedures established between them, whatever information or instructions they may require to identify in an Account Holder Letter of the relevant Class C Scheme Creditor and to provide the information, instructions and confirmations required by the Account Holder Letter. None of the Company, the Information Agent or any other Person will be responsible for any loss or liability incurred by such Class C Scheme Creditor as a result of any determination by the Information Agent that an Account Holder Letter contains an error or is incomplete, even if this is subsequently shown not to have been the case.

(d)    If you are a Class C Scheme Creditor in respect of the Class C Notes, who is an Account Holder, you should take the appropriate actions described in this Section 5 (*Summary of*

---

[18]To receive either Option 1 Scheme Consideration or Option 2 Scheme Consideration, as elected, upon the Final Distribution Date or the lifting of Applicable Sanctions (whichever is later) from either (i) the Company on the Final Distribution Date or (ii) the Successor Escrow Account, if during the period of the Perpetuity Period.

*Actions to be Taken by Scheme Creditors*) and throughout this Explanatory Statement and the Solicitation Packet.

5.66    If you are a Dongpo Noteholder or Lake Noteholder (who is not a Sanctions-Affected Scheme Creditor):

(a)    please give ample time to allow your Account Holder and/or Intermediary (as applicable) to process your instructions and submit the required Scheme Creditor Forms (and any other documentation as may be requested) on your behalf. To ensure timely submission of your Account Holder Letter or Proxy Voting Form in accordance with the timetable set out below, please check with your Account Holder (if applicable) for clarification as to the processing time required and deliver the appropriate materials well before that time; and

(b)    please note that the Clearing System through which your interest in the Existing Notes is held may impose an earlier deadline for the submission of Custody Instructions and/or Account Holder Letters. To ensure timely submission of your Custody Instructions, and Account Holder Letter, please ask your Account Holder to check with the relevant Clearing System as to whether any earlier deadline is applicable and ensure your Custody Instructions and Account Holder Letter are submitted well before any applicable deadlines.

5.67    **A Class C Scheme Creditor that fails to submit the required documentation prior to the relevant deadlines as set out above will not be entitled to vote at the Scheme Meetings**. A Class C Scheme Creditor will, however, be bound by the terms of the Schemes in the event that they become effective and any Class C Debts held by such Scheme Creditor will be cancelled on the Restructuring Effective Date in accordance with the terms of the Schemes (which, for the avoidance of doubt, will not extend to the Excluded Liabilities or Excluded Collateral).

### *Details of the Scheme Meetings*

5.68    On 25 July 2023, the Cayman Court ordered that a meeting of the Class C Scheme Creditors be convened to consider and, if thought fit, approve the Cayman Scheme proposed by the Company (the "**Class C Cayman Scheme Meeting**").

5.69    On 24 July 2023, the Hong Kong Court ordered that a meeting of the Class C Scheme Creditors be convened to consider and, if thought fit, approve the Hong Kong Scheme proposed by the Company (the "**Class C Hong Kong Scheme Meeting**", and collectively with the Class C Cayman Scheme Meeting, the "**Class C Scheme Meetings**").

5.70    Formal notices convening the Class C Scheme Meetings are set out at Schedule 5 (*Notice of Scheme Meeting*) to this Explanatory Statement.

5.71    The Class C Scheme Meetings to consider and, if thought fit, approve the Schemes, with or without modification, will be held as follows:

(a)    the Class C Hong Kong Scheme Meeting will be held at Sidley Austin at 39th Floor, Two International Finance Centre, 8 Finance Street, Central, Hong Kong with any adjournment as may be appropriate, at 9:30 p.m. Hong Kong time on 23 August 2023, the equivalent time being 8:30 a.m. Cayman Islands time on 23 August 2023 (or at such time as the Class A Cayman Scheme Meeting has finished, if later); and

(b)    the Class C Cayman Scheme Meeting will be held at Sidley Austin at 39th Floor, Two International Finance Centre, 8 Finance Street, Central, Hong Kong with any adjournment as may be appropriate, at 10:15 p.m. Hong Kong time on 23 August 2023, the equivalent time being 9:15 a.m. Cayman Islands time on 23 August 2023 (or at such time as the Class C Hong Kong Scheme Meeting has finished, if later).

5.72    Class C Scheme Creditors (including Blocked Scheme Creditors) will be able to attend the Class C Scheme Meetings in person by a duly authorised representative (if a corporation) or by proxy. Class C Scheme Creditors (including Blocked Scheme Creditors) will also be able to attend the Class C Scheme Meetings by video conference using dial-in details which may be obtained on request from the Information Agent.

### *Relevant documents to be completed by each Class C Scheme Creditor*

5.73    Each Class C Scheme Creditor will be required to submit the relevant Scheme Creditor Forms (as applicable) in order to receive the Scheme Consideration, pursuant further to the terms of the Schemes.

5.74    A summary of each relevant document pertaining to each Scheme Creditor is set out below, including the consequences of failing to submit such documents in accordance with the requirements under the Schemes.

### A.    Class C Noteholders only – Account Holder Letter

5.75    Among other things, the Account Holder Letter is the document that allows Class C Noteholders (who are not Sanctions-Affected Scheme Creditors) to vote on the Schemes and to become eligible to receive Scheme Consideration on the occurrence of the Restructuring Effective Date. A failure by such Noteholder to procure that its Account Holder submits on its behalf, the Account Holder Letter via the Portal such that it is received by the Voting Record Time will mean that the voting instructions contained in that Account Holder Letter will be disregarded for the purposes of voting at the Class C Scheme Meetings and the relevant Noteholders will, subject to the Chairperson's discretion, not be entitled to vote at the Class C Scheme Meetings.

5.76    The Class C Noteholders (who are not Sanctions-Affected Scheme Creditors) (or their Account Holders on their behalf as agent, if applicable) will be required to submit an instruction to block the Class C Notes via the Clearing Systems (the "**Custody Instruction**"), prior to submitting the Account Holder Letter, and in any case prior to the Custody Instruction Deadline in order to vote on the Schemes. A separate Custody Instructions must be submitted on behalf of each Class C Noteholders. Any block in respect of the Class C Notes subject to a Custody Instruction shall be lifted on or around the Restructuring Effective Date. Otherwise, any Class C Noteholder that held position on the Entitlement Record Time who did not previously submit a validly accepted Custody Instruction, in order to receive Scheme Consideration, such Class C Noteholder must submit a Custody Instruction by no later than the Holding Period Custody Instruction Deadline and the relevant Scheme Creditor Forms by the Class C Bar Date. Any Custody Instructions submitted by Class C Noteholders after the Restructuring Effective Date will not block their Class C Notes and they will be freely transferable.

5.77    Further to Section 5.76 above, for the avoidance of doubt, notwithstanding any other provision in this Explanatory Statement, only Class C Noteholders that held position in the Class C Notes on the Entitlement Record Time (and no other subsequent transferees) will be entitled to claim any Scheme Consideration (or Consent Fee (if applicable) from the Restructuring Effective Date  and

prior to or on the Final Distribution Date (as applicable), in accordance with the terms of the Scheme.

5.78    A failure by a Class C Noteholder (who is not a Sanctions-Affected Scheme Creditor), who is an Eligible Participating Creditor, to procure that its Account Holder submits on its behalf, the Account Holder Letter via the Portal such that it is received by the Voting Record Time will mean that such Dongpo Noteholder or Lake Noteholder will not be eligible to receive the Consent Fee (if applicable) on the Final Distribution Date.

5.79    A failure by a Dongpo Noteholder or Lake Noteholder (who is not a Sanctions-Affected Scheme Creditor) to procure that its Account Holder submits on its behalf, the Account Holder Letter via the Portal such that it is received by the Class C Bar Date will also mean that such Dongpo Noteholder or Lake Noteholder will not be eligible to participate in the distribution of the New Instruments on the Final Distribution Date.

### B.    Class C Scheme Creditors (other than Class C Noteholders) – Proxy Form

5.80    The Class C Scheme Creditor Proxy Form is the document that allows Class C Scheme Creditors (other than Class C Noteholders) to vote on the Schemes and to become eligible to receive Scheme Consideration should the Restructuring Effective Date occur.

5.81    Class C Scheme Creditors (other than Class C Noteholders) who wish to vote on the Schemes are requested to ensure that the Class C Scheme Creditor Proxy Form is completed and submitted to the Information Agent via the Portal as soon as possible in accordance with the instructions set out in the Class C Scheme Creditor Proxy Form and, in any event, no later than the Voting Record Time, irrespective of whether such Class C Scheme Creditor intends to attend the Class C Scheme Meetings in order to exercise its right to vote in relation to the approval of the Schemes.

5.82    A failure by a Class C Scheme Creditor (other than Class C Noteholders) to submit the Class C Scheme Creditor Proxy Form via the Portal, such that it is received by the Voting Record Time, will mean that the relevant Class C Scheme Creditors will, subject to the Chairperson's discretion, not be entitled to vote at the Class C Scheme Meetings.

5.83    A failure by a Class C Scheme Creditor (other than Class C Noteholders), who is an Eligible Participating Creditor, to submit, or a failure by Class C Scheme Creditor Proxy Form via the Portal such that it is received by the Voting Record Time will mean that such Class C Scheme Creditor will not be eligible to receive the Consent Fee (if applicable) on the Final Distribution Date.

5.84    A failure by a Class C Scheme Creditor (other than Class C Noteholders) to submit the Class C Scheme Creditor Proxy Form via the Portal and received by the Class C Bar Date will mean that such Class C Scheme Creditor will not be eligible to participate in the distribution of the New Instruments on the Final Distribution Date.

### C.    All Class C Scheme Creditors – Distribution Confirmation Deed

5.85    The Distribution Confirmation Deed is a document that Class C Scheme Creditors (or an Intermediary on their behalf as their agent, as applicable) (who are not Sanctions-Affected Scheme Creditors) must complete in order to confirm, among other things, that the Class C Scheme Creditor (or its Designated Recipient) may lawfully be issued the New Instruments. Please refer to the instructions above for the relevant deadlines required to submit a Distribution Confirmation Deed along with the other documents required to be submitted.

D.    **All Class C Scheme Creditors – Designated Recipient Form**

5.86    The Designated Recipient Form is an optional form that Class C Scheme Creditors (other than Sanctions-Affected Scheme Creditors) may complete in order to appoint, should they wish, a Designated Recipient to be the recipient of some or all of the New Instruments that would otherwise be issued to such Class C Scheme Creditor.

5.87    For Class C Scheme Creditors, who are not Sanctions-Affected Scheme Creditors, if you wish to nominate a Designated Recipient to receive any New Instruments to which you may be entitled, please ensure that a validly completed and executed Designated Recipient Form is also submitted online via the Portal, along with the applicable documents noted above, to be submitted to the Information Agent (for Class C Scheme Creditors who are not Sanctions-Affected Scheme Creditors) to GLAS by any submission method(s) described in the Solicitation Packet with full supporting evidence (for Blocked Scheme Creditors) by the relevant deadlines set out in Section 5.64 above.

E.    **Blocked Scheme Creditor Form**

5.88    The Blocked Scheme Creditor Form is the document that allows Class C Scheme Creditors in respect of the Class C Noteholders who are Blocked Scheme Creditors to (i) vote on the Schemes at the Scheme Meetings, and (ii) become eligible to receive the Scheme Consideration if Applicable Sanctions in respect of them are lifted and should the Schemes be approved, in accordance with the terms of the Schemes. A failure by a Blocked Scheme Creditor to submit, or a failure by a Blocked Scheme Creditor to procure the submission of, the Blocked Scheme Creditor Form to GLAS by any submission method(s) described in the Solicitation Packet such that it is received by the Voting Record Time will mean that the voting instructions contained in that Blocked Scheme Creditor Form will be disregarded for the purposes of voting at the Scheme Meetings and the relevant Blocked Scheme Creditor will, subject to the Chairperson's discretion, not be entitled to vote at the Scheme Meetings.

**SUBMISSION OF COMPLETED FORMS BY CLASS C SCHEME CREDITORS:**

5.89    All completed documents should be submitted online at the Portal (https://portal.morrowsodali.com/EvergrandeScheme) to the Information Agent (for Class C Scheme Creditors who are not Sanctions-Affected Scheme Creditors) or by any submission method(s) described in the Solicitation Packet to GLAS with full supporting evidence (for Blocked Scheme Creditors) before the important deadlines set out above and further detailed in the Explanatory Statement and the Solicitation Packet.

5.90    We would encourage all Class C Scheme Creditors (including Blocked Scheme Creditors to start the process for submitting their votes for the Class C Scheme Meetings and submitting the documentation required to participate in a distribution of Scheme Consideration as soon as possible.

5.91    If you are in any doubt as to what action you should take in connection with the Explanatory Statement and/or the Schemes, the proposals contained in them or the documents that accompany them, you are recommended to:

(a)    contact the Information Agent (for Class C Scheme Creditors who are not Sanctions-Affected Scheme Creditors);

(b)    contact GLAS (for Blocked Scheme Creditors): and

(c)     seek your own independent advice immediately from your legal, financial, tax or other independent adviser.

5.92     All documents relevant to the Schemes such as this Explanatory Statement, the Scheme, the Solicitation Packet and all relevant announcements will be available online at the Transaction Website.

**ANY CLASS C SCHEME CREDITOR (WHO IS NOT A SANCTIONS-AFFECTED SCHEME CREDITOR) THAT FAILS TO ENSURE THAT A VALIDLY COMPLETED AND EXECUTED CLASS C SCHEME CREDITOR PROXY FORM, DISTRIBUTION CONFIRMATION DEED AND, IF APPLICABLE, DESIGNATED RECIPIENT FORM ARE SUBMITTED TO AND RECEIVED BY THE INFORMATION AGENT VIA THE PORTAL BY NO LATER THAN THE DEADLINES SET OUT IN THE SOLICITATION PACKET AS PUBLISHED ON THE TRANSACTION WEBSITE AND IN ACCORDANCE WITH THE INSTRUCTIONS SET OUT THEREIN SHALL NOT RECEIVE ANY SCHEME CONSIDERATION OR ANY OTHER BENEFITS UNDER THE TERMS OF THE SCHEMES BUT SHALL HAVE ITS SCHEME CLAIMS RELEASED IN ACCORDANCE WITH THE TERMS OF THE SCHEMES.**

*Actions to be taken by the Class C Scheme Creditors*

A.     **Actions to be taken before the Voting Record Time**

5.93     Class C Scheme Creditors should further refer to Section 1 (*Expected Timetable of Key Events*) for the key expected timings of the Schemes and Section 5 (*Summary of Actions to be Taken by Scheme Creditors*) when reviewing this section.

5.94     If you are a Class C Scheme Creditor in respect of the Class C Notes, who is not an Account Holder, you should contact your Account Holder (through any Intermediaries, if applicable) to ensure that your Account Holder takes the appropriate action(s). Such Class C Scheme Creditors must also ensure that a Custody Instruction is submitted via the Clearing Systems prior to the Custody Instruction Deadline.

5.95     Class C Scheme Creditors who wish to vote in respect of the Schemes at the Class C Scheme Meetings must ensure the actions and Scheme Creditor Forms (as applicable) as set out in Section (B) below, are validly completed and executed and received by the Information Agent via the Portal by the Voting Record Time.

5.96     Whether the required Scheme Creditor Forms have been validly completed shall be determined by the Information Agent and/or GLAS at their discretion, provided that, if the Information Agent and/or GLAS considers any such document not to have been validly completed, they shall promptly:

(i)     prepare a written statement of its reasons for that conclusion; and

(ii)     send that written statement via the Portal (in respect of the Information Agent) or by any submission method(s) described in the Solicitation Packet (in respect of GLAS) to the party that provided the relevant document.

5.97    Where a Scheme Creditor Form is considered not to have been validly completed, and the Class C Bar Date has not yet occurred at the time of such determination, the relevant Scheme Creditor may resubmit the Scheme Creditor Form.

5.98    None of the Company, the Information Agent, GLAS, or any other person will be responsible for any loss or liability incurred by a Class C Scheme Creditor as a result of any determination by the Information Agent or GLAS.

**B.    To vote at the Class C Scheme Meetings**

5.99    Class C Scheme Creditors will be entitled to attend and vote in person or by proxy at the Class C Scheme Meetings. If you are a Class C Scheme Creditor, you should read this Explanatory Statement and the Solicitation Packet carefully. In order to vote on the Schemes, attend the Scheme Meetings and be eligible to receive Scheme Consideration, it is of the utmost importance that Class C Scheme Creditors (including Blocked Scheme Creditors) ensure that they follow the voting and other documentary instructions set out below and throughout the Explanatory Statement.

5.100    For the purpose of voting at the Class C Scheme Meetings, the value of each Class C Scheme Creditor's Scheme Claim shall be an amount equal to its Voting Scheme Claim. For completeness, the Voting Scheme Claim shall be the sum, together in aggregate, of:

(a)    the outstanding principal amount of the Class C Debts held by each Class C Scheme Creditor at the Voting Record Time; *plus*

(b)    all accrued and unpaid interest on the Class C Debt instruments (if applicable) up to the Voting Record Time, based on the Chairperson's fair and reasonable discretion.

5.101    In respect of the Treasure Glory On-Lent Loan, it is the intended approach of the Chairperson to allow this claim for a nominal amount of US$1 as its Voting Scheme Claim. The Treasure Glory On-Lent Loan and the Class A Private Loan are considered to be duplicative and substantially the same debt owed by the Company. The Treasure Glory On-Lent Loan, being the secondary claim, is therefore considered to be of no value in a liquidation of the Company due to the rule against "double proof" and/or on a contractual basis.

5.102    As noted above at Section 5.1, paragraph (F), the Existing Notes Depositary, the Existing Notes Trustee and the Existing Agents are Scheme Creditors; however, they shall not be entitled to vote at the Scheme Meetings and accordingly they will not vote at such meetings.

5.103    As noted above at paragraph (F) of Section 5.1, the Existing Agents are Scheme Creditors; however, they shall not be entitled to vote in respect of the Class C Debts at the Class C Scheme Meeting and accordingly they will not vote at such meeting.

5.104    Class C Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) who wish to vote in respect of the Schemes are requested to ensure that the applicable Scheme Creditor Proxy Form is completed in respect of the Scheme Meetings. Once completed, the Scheme Creditor Form should be submitted to the Information Agent via the Portal by the Voting Record Time being no later than 5.00 p.m. Hong Kong time on 18 August 2023, the equivalent being 4.00 a.m. Cayman Islands time on 18 August 2023.

5.105    Class C Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) who wish to attend the Scheme Meetings in person or by authorised representative should complete the applicable

Scheme Creditor Form and return it as set out above, and the Class C Scheme Creditor or its authorised representative (as applicable) should bring a copy of the completed Scheme Creditor Form in person to the Scheme Meetings and submit it at the registration desk. Any such Class C Scheme Creditor, authorised representative, or proxy (as applicable) who wishes to attend the Scheme Meetings in person will be required to provide evidence of personal identity (by way of photo identification, such as a passport) and any individual attending on behalf of a body corporate must provide evidence of authority to represent that body corporate at the Scheme Meetings (by way of board resolution or power of attorney or similar Authorisation).

5.106    Class C Scheme Creditors, who are Blocked Scheme Creditors, who wish to vote in respect of the Schemes, are requested to ensure that the Blocked Scheme Creditor Form (including any other evidence) is validly completed, executed and returned in accordance with the instructions set out therein so that it is submitted to and received by GLAS by any submission method(s) described in the Solicitation Packet by the Voting Record Time, being no later than 5.00 p.m. Hong Kong time on 18 August 2023, the equivalent being 4.00 a.m. Cayman Islands time on 18 August 2023.

5.107    As part of the key actions to be taken, and further pursuant to Clause 14 (*Scheme Consideration Options*) of the Schemes, each Class C Scheme Creditor has the opportunity to elect the type of Scheme Consideration it wishes to receive from two options, being the Option 1 Scheme Consideration and Option 2 Scheme Consideration, as set out in Section 10 (*Two Options of Scheme Consideration for Both Class A and Class C*) below.

5.108    Class C Scheme Creditors may make a *non-binding* election of their option of Scheme Consideration prior to the Voting Record Time, with any final election required to be made by each Class C Scheme Creditor by the Class C Bar Date. Further details as to the forms required to be submitted and the specific deadlines can be found at Section 6 (*Summary Explanation of the Schemes*) as well as the summary table set out at Section 5.4 (*Summary of Actions Table*) above.

5.109    For the avoidance of doubt, (i) the Lake Notes Trustee and Agent in respect of the Lake Notes; (ii) the Dongpo Notes Trustee in respect of the Dongpo Notes and (iv) the Existing Agents in in respect of the applicable Class C Debts, shall not be entitled to vote at the Scheme Meetings (to avoid double counting).

### C.    Custody Instructions and Undertaking for Class C Noteholders (who are not Sanctions-Affected Scheme Creditors)

5.110    Custody Instructions are irrevocable instructions which prevent transfers of the Class C Notes until the Restructuring Effective Date, or until the Class C Notes are unblocked in accordance with Section 5.114 below. These restrictions are necessary to prevent the same holding of Class C Notes being voted on at the Scheme Meetings more than once. A separate Custody Instruction must be submitted on behalf of each Class C Noteholder.

5.111    Any Class C Noteholder that procures the submission of an Account Holder Letter to vote at the Scheme Meeting must block its Class C Notes. To do this, Class C Noteholders must ensure that their Account Holder, prior to delivering the Account Holder Letter to the Information Agent, submits a Custody Instruction to block its Class C Notes held with Euroclear or Clearstream by the Custody Instruction Deadline. Class C Noteholders must include in the relevant Account Holder Letter reference to the Custody Instruction Reference Number. An Account Holder Letter that does not contain reference to a valid Custody Instruction Reference Number will not be valid for the purposes of voting at the Scheme Meeting or receiving Scheme Consideration, and the Company reserves the right to reject any such Account Holder Letter.

5.112   By completion of the Account Holder Letter with inclusion of the Custody Instruction Reference Number, the Class C Noteholder will be deemed to have given the undertaking that it will not, from the date of delivery of its Account Holder Letter, sell, transfer, assign or otherwise dispose of its interest in all or any part of its specified Class C Notes until the Restructuring Effective Date, or until the Class C Notes are unblocked in accordance with Section 5.114 below.

5.113   Any documentation and relevant Custody Instruction submitted by or on behalf of a Scheme Creditor shall be irrevocable for all purposes in connection with the Scheme unless and until the Company has provided an irrevocable unblock instruction to the Information Agent in accordance with Section 5.114 below.

5.114   The Company shall provide an irrevocable instruction to the Information Agent to immediately cause the Class C Notes to be unblocked within two (2) Business Days after one of the circumstances below occurs:

(a)     any of the Schemes is not approved by the requisite majorities of the Scheme Creditors at the Scheme Meeting, is withdrawn or is terminated in accordance with terms of the relevant Scheme;

(b)     the Scheme is not sanctioned by a final and unappealable order of the Court;

(c)     the Restructuring does not become effective by the Longstop Date; or

(d)     subject to sub-paragraph (d) above, the Company at its sole discretion consents to unblock the Existing Notes.

5.115   If the Restructuring Effective Date occurs before the Longstop Date, the Scheme Claims will be irrevocably released and cancelled in full in accordance with the Schemes in consideration for which the Eligible Creditors and Designated Recipients will receive the New Instruments and the Scheme Creditors will receive the Scheme Consideration, all in accordance with the terms of the Scheme.

5.116   For the avoidance of doubt, the Class C Notes will not be cancelled in the Clearing Systems on the Restructuring Effective Date and will be capable of being traded in the Clearing Systems after the Restructuring Effective Date. Notwithstanding the foregoing, any sold, assigned or transferred Class C Notes must be disclosed to the Scheme Administrators and/or the Scheme Adjudicator (as applicable) in accordance with the terms of the Schemes, and shall be taken into account for the purpose of calculating the Entitlement of the Class C Noteholder to Scheme Consideration.

**D.      To receive the Consent Fee (if applicable) on the Final Distribution Date**

5.117   Class C Scheme Creditors (who are not Sanctions-Affected Scheme Creditors), who are also Eligible Participating Creditors, are entitled to receive the Consent Fee on the Final Distribution Date if they have validly completed and submitted the relevant Scheme Creditor Forms (as set out above in Section 5.64) via the Portal and received by the Voting Record Time.

**E.      To receive your Entitlement to the Scheme Consideration on the Final Distribution Date**

*Final Distribution*

5.118   If you are a Class C Scheme Creditor (other than a Dongpo Noteholder or Lake Noteholder) and wish to receive the Scheme Consideration on the Final Distribution Date, in accordance with the terms of the Scheme, please ensure that the Class C Scheme Creditor Proxy Form and, for receiving New Instruments, Distribution Confirmation Deed are validly completed, executed and returned online via the Portal in accordance with the instructions set forth therein so that they are submitted to and received by the Information Agent by the Class C Bar Date.

5.119   If you are a Dongpo Noteholder or Lake Noteholder (and are not a Sanctions-Affected Scheme Creditor) and wish to receive the Scheme Consideration on the Final Distribution Date, in accordance with the terms of the Scheme, please ensure that the Custody Instruction is submitted via the Clearing Systems, by the Class C Holding Period Custody Instruction Deadline, prior to the Account Holder Letter being submitted and, for receiving New Instruments, the Distribution Confirmation Deed is validly completed, executed and returned online via the Portal in accordance with the instructions set forth therein so that they are submitted to and received by the Information Agent by the Class C Bar Date.

*Appointment of a Designated Recipient*

5.120   If you are not an Eligible Person (i.e. a person who cannot make affirmative securities law confirmations set out in Annex B to the Distribution Confirmation Deed) nor a Sanctions-Affected Scheme Creditor, you may designate a Designated Recipient who is an Eligible Person in order to receive your Entitlement to the Scheme Consideration by submission of a Designated Recipient Form in accordance with the terms of the Schemes and the instructions set forth contained therein as described below at Section (F), to be read with the instructions set forth in the Solicitation Packet as published on the Transaction Website.

*Blocked Scheme Creditors*

5.121   If you are a Dongpo Noteholder or Lake Noteholder who is a Blocked Scheme Creditor, by definition, you may be unable to receive your Entitlement to the Scheme Consideration on the Final Distribution Date. If the Applicable Sanctions are still in place upon the Final Distribution Date, the Company will appoint the Successor Escrow Agent to hold in the Successor Escrow Account any Blocked Assets to which Class C Noteholders who are Blocked Scheme Creditors would otherwise be entitled on the Final Distribution Date, until the earlier of (i) the expiry of the Perpetuity Period, or (ii) the lifting of Applicable Sanctions with the Blocked Scheme Creditors being given a reasonable period of time thereafter to recover their Entitlement to the Scheme Consideration in accordance with the terms of the Successor Escrow Agreement.

5.122   Blocked Scheme Creditors need to submit the Blocked Scheme Creditor Form to GLAS by any submission method(s) described in the Solicitation Packet by the Class C Bar Date in order to be eligible to receive the Scheme Consideration (and Consent Fee if an Eligible Participating Creditor (if applicable)) upon the Final Distribution Date or the lifting of the Applicable Sanctions, whichever is later, further pursuant to the terms of the Schemes. Upon the lifting of all Applicable Sanctions, such Blocked Scheme Creditors will cease to be considered Blocked Scheme Creditors for the purposes of the Schemes, and then would be able to, and required to, validly complete and submit the relevant documents as further described in the Solicitation Packet as published on the Transaction Website.

F. **To nominate a Designated Recipient to receive your Scheme Consideration**

5.123   For Class C Scheme Creditors, who are not Sanctions-Affected Scheme Creditors, if you wish to nominate a Designated Recipient to receive your Scheme Consideration on the Final Distribution Date, to which you may be entitled, please ensure that a validly completed and executed Designated Recipient Form is also submitted online via the Portal with a Class C Scheme Creditor Proxy Form and a Distribution Confirmation Deed to be submitted to the Information Agent by the Voting Record Time (in order to vote on the Schemes) or by the Class C Bar Date (to receive Scheme Consideration).

G. **Upload of documents**

5.124   All completed documents should be submitted online via the Portal (https://portal.morrowsodali.com/EvergrandeScheme) to the Information Agent (for Class C Scheme Creditors who are not Sanctions-Affected Scheme Creditors) or by any submission method(s) described in the Solicitation Packet to GLAS with full supporting evidence (for Blocked Scheme Creditors) before the important deadlines set out above and further detailed in the Explanatory Statement and the Solicitation Packet as published on the Transaction Website.

5.125   The Company would encourage all Class C Scheme Creditors (including Blocked Scheme Creditors) to start the process for submitting their votes for the Class C Scheme Meetings and submitting the documentation required to participate in a distribution of Scheme Consideration as soon as possible.

5.126   If you are in any doubt as to what action you should take in connection with this Explanatory Statement and/or the Schemes, the proposals contained in them or the documents that accompany them, you are recommended to:

(a)     contact the Information Agent (for Class C Scheme Creditors who are not Sanctions-Affected Scheme Creditors);

(b)     contact GLAS (for Blocked Scheme Creditors): and

(c)     seek your own independent advice immediately from your legal, financial, tax or other independent adviser.

5.127   All documents relevant to the Schemes such as this Explanatory Statement, the Scheme, the Solicitation Packet and all relevant announcements will be available online at the Transaction Website.

**ANY CLASS C SCHEME CREDITOR (WHO IS NOT A SANCTIONS-AFFECTED SCHEME CREDITOR) THAT FAILS TO ENSURE THAT A VALIDLY COMPLETED AND EXECUTED CLASS C SCHEME CREDITOR PROXY FORM, DISTRIBUTION CONFIRMATION DEED AND, IF APPLICABLE, DESIGNATED RECIPIENT FORM ARE SUBMITTED TO AND RECEIVED BY THE INFORMATION AGENT VIA THE PORTAL BY NO LATER THAN THE DEADLINES SET OUT IN THE SOLICITATION PACKET AS PUBLISHED ON THE TRANSACTION WEBSITE AND IN ACCORDANCE WITH THE INSTRUCTIONS SET OUT THEREIN SHALL NOT RECEIVE ANY SCHEME CONSIDERATION OR ANY OTHER BENEFITS UNDER THE TERMS OF THE SCHEMES BUT SHALL HAVE ITS SCHEME CLAIMS RELEASED IN ACCORDANCE WITH THE TERMS OF THE SCHEMES.**

6.       **SUMMARY EXPLANATION OF THE SCHEMES**

This section contains a brief overview of the Schemes. The summary information contained herein does not purport to be complete and should be read in conjunction with, and is qualified in its entirety by references to, the more detailed information presented elsewhere in this Explanatory Statement and by the full text of the Schemes as set out in Schedule 4 (*The Schemes*) to this Explanatory Statement.

6.1      **Structure and objectives of the Schemes**

(a)      A scheme of arrangement enables a company to propose to its creditors, or one or more classes of its creditors, a compromise or arrangement in respect of its debts or obligations owed to those creditors. The relevant court will consider whether it is appropriate to convene a meeting of a class or meetings of classes of creditors, and, if so, the composition of the class or classes necessary so as to ensure that the meeting(s) consists of creditors whose rights against CEG which are to be compromised are not so dissimilar as to make it impossible for them to consult together with a view to their common interest.

(b)      As part of the Restructuring, the Schemes are proposed in order to restructure the Liabilities of the Company under and/or in connection with the Existing Debts and the Existing Finance Documents. Additionally, schemes of arrangements in the British Virgin Islands and Hong Kong are also proposed as part of the Restructuring in order to restructure the Liabilities of SJ and Tianji, respectively (i.e. the "**SJ Scheme**" and "**TJ Scheme**", respectively), which are not interconditional with the Schemes.

(c)      The principal compromise and arrangement to be given effect to by the Schemes is the release in full of all the Scheme Claims of the Scheme Creditors, and in exchange, the Eligible Creditors and/or their Designated Recipients, as applicable, will be entitled to receive the Scheme Consideration in accordance with the terms of the relevant Scheme.

6.2      **What is required for a scheme of arrangement to be effective?**

**Cayman Scheme**

In the Cayman Islands, a scheme of arrangement requires the following to occur in order for it to become legally binding:

(a)      the convening of a meeting of the Company's creditors or meetings of classes of its creditors who are proposed to be bound by the scheme of arrangement in accordance with directions given by the Cayman Court;

(b)      at each such meeting the approval of at least a majority in number representing 75% or more in value of the relevant creditors of the Company present in person or by proxy and voting at the meeting;

(c)      the approval of the scheme by the Cayman Court by the granting of an order sanctioning the scheme of arrangement; and

(d)      the delivery of a sealed copy of an order of the Cayman Court sanctioning the scheme of arrangement to the Cayman Registrar of Companies.

**Hong Kong Scheme**

In Hong Kong, a scheme of arrangement requires the following to occur in order for it to become legally binding:

(a)    the convening of a meeting of the Company's creditors or meetings of classes of its creditors who are proposed to be bound by the scheme of arrangement in accordance with directions given by the Hong Kong Court;

(b)    at each such meeting the approval of at least a majority in number representing 75% or more in value of the relevant creditors of the Company present in person or by proxy and voting at the meeting;

(c)    the approval of the scheme by the Hong Kong Court by the making of an order sanctioning the scheme of arrangement; and

(d)    the registration of an office copy of the Hong Kong Court Order sanctioning the scheme of arrangement by the Hong Kong Companies Registrar.

**Satisfaction of the Courts**

The Cayman Scheme and the Hong Kong Scheme will not be sanctioned by the Cayman Court and the Hong Kong Court (as applicable) unless the relevant Court is satisfied, among other things, that:

(i)    the relevant Scheme Meeting was summoned and held in accordance with the respective Scheme Convening Order;

(ii)    the respective Scheme was approved by the requisite majorities of those who voted at the relevant Scheme Meeting in person or by proxy; and

(iii)    the respective Scheme is such as an intelligent and honest man, a member of the class concerned and acting in respect of his interest, might reasonably approve.

The Courts will consider whether:

(i)    the classes of creditors have been properly constituted;

(ii)    the provisions of the applicable statute and any applicable subsidiary rules have been complied with;

(iii)    each class was fairly represented by those who attended the meeting and the statutory majority were acting bona fide and were not coercing the minority in order to promote interests adverse to those of the class whom they purport to represent; and

(iv)    there is any blot on the scheme of arrangement.

If the Schemes are approved by the requisite majorities of creditors at the Scheme Meeting and sanctioned by the Cayman Court and the Hong Kong Court (as applicable), and the Scheme Sanction Orders are delivered (or registered, as appropriate) to the Hong Kong Companies Registrar and the Cayman Registrar of Companies (as applicable) as set out above, the Schemes

will bind all Scheme Creditors, including those Scheme Creditors who voted in favour of the Scheme, those Scheme Creditors who voted against it, and those Scheme Creditors who did not vote at all.

6.3    **Are you a "Scheme Creditor" for the purposes of the Scheme Meetings?**

Information on which persons constitute Scheme Creditors and on the actions that Scheme Creditors are required to take under the Schemes is set out in the following sections:

(a)    Section 5 (*Summary of Actions to be taken by Scheme Creditors*) of this Explanatory Statement; and

(b)    the Solicitation Packet, which can be found published on the Transaction Website.

6.4    **Determination of Voting Scheme Claims**

(a)    All Voting Scheme Claims for voting purposes will be determined as at the Voting Record Time.

(b)    For completeness, all Scheme Creditors' Entitlements for the purpose of calculating distribution of the Scheme Consideration will be determined as at the Entitlement Record Time (this shall not prevent the Valuation and Adjudication Procedure from taking into account the prevailing circumstances at such time as applicable).

(c)    Scheme Creditors should refer to the detailed instructions in relation to voting at the Scheme Meetings in Section 5 (*Summary of Actions to be Taken by Scheme Creditors*) and the Solicitation Packet as published on the Transaction Website.

(d)    Pursuant to the Schemes:

**<u>Class A Scheme Creditors</u>**

(i)    For Class A Scheme Creditors who are not Sanctions-Affected Scheme Creditors:

(A)    Scheme Creditors will acknowledge and agree that the Chairperson shall use: (i) for Class A Noteholders, the Account Holder Letter submitted by or on behalf of each Scheme Creditor, in accordance with the calculation of the Existing Notes Trustee, as checked by the Information Agent against the Custody Instructions submitted through the Clearing Systems (i.e. reconciliation of the Custody Instruction reference number specified in the Account Holder Letter) and, if applicable, the accession records, at the Voting Record Time, and (ii) for Class A Lenders, the Class A Private Lender Proxy Voting Form submitted by or on behalf of each Scheme Creditor, as checked by the Information Agent against the books and records supplied by the Company at the Voting Record Time, to determine the Voting Scheme Claims and any such determination by the Chairperson shall (in the absence of wilful default, wilful misconduct or fraud) be conclusive and binding on the Scheme Creditors and the Company; and

(B)    the Chairperson and Information Agent will use reasonable endeavours to review each Account Holder Letter (for Class A Noteholders) and Class A

Private Lender Proxy Form (for Class A Lenders) promptly after receipt. Notwithstanding the foregoing it is the responsibility of each Scheme Creditor to ensure that any Account Holder Letter (for Class A Noteholders) or Class A Private Lender Proxy Form (for Class A Lenders) submitted in respect of its Scheme Claim has been validly completed. Furthermore, each Scheme Creditor acknowledges that the Information Agent is an agent of the Company, and owes no duty or responsibility towards any Scheme Creditor.

(ii)    For Blocked Scheme Creditors:

(A)    all Persons claiming to be Blocked Scheme Creditors must submit to (or procure the submission on their behalf) GLAS a validly completed Blocked Scheme Creditor Form, together with supporting evidence and other materials as required, in respect of their Scheme Claims;

(B)    the Chairperson shall assess Voting Scheme Claims for the purposes of determining the number of votes to be assigned to a Blocked Scheme Creditor by reference to the outstanding principal amount of Existing Notes in which the relevant Blocked Scheme Creditor held the beneficial interest as at the Voting Record Time, as verified by GLAS in consultation with the Company against all supporting evidence provided by the relevant Blocked Scheme Creditor; and

(C)    the Chairperson, with the support of the Company (its agent or person instructed by it) and GLAS, shall use the Blocked Scheme Creditor Form submitted by or on behalf of a Class A Scheme Creditor, as verified against the records of the Company, including any additional evidence as required by GLAS and requested from the Blocked Scheme Creditor to be provided in relation to its Scheme Claim, to determine the Voting Scheme Claims and the Scheme Claim of each Blocked Scheme Creditor, and any such determinations shall (in the absence of wilful default, wilful misconduct or fraud) be conclusive and binding on the relevant Blocked Scheme Creditors and CEG; and

*Discretion of the Chairperson*

(iii)    The Chairperson shall have absolute discretion (in the absence of wilful default, wilful misconduct or fraud) to permit any Scheme Creditor to vote at the Scheme Meetings, notwithstanding that the Account Holder Letter or Blocked Scheme Creditor Form (as applicable) had not been validly completed in accordance with the instructions set out in the Solicitation Packet published on the Transaction Website or has been submitted to the Information Agent or the Company (as applicable) after the Voting Record Time, provided that the Chairperson considers that the information contained therein is sufficient to establish the right of the Scheme Creditor to vote at the Scheme Meetings.

## Class C Scheme Creditors

Each Class C Scheme Creditor (including a Blocked Scheme Creditor) will be entitled to vote at the Scheme Meetings, in accordance with the terms of the Schemes, in respect of

which it owns an economic or beneficial interest and/or legal interest (as applicable) in the Class C Debts as at the Voting Record Time, and its Voting Scheme Claims will be assessed by the Chairperson in respect of each Class C Scheme Creditor's relevant submitted Scheme Creditor Forms, as verified by the Chairperson, in consultation with the Company and/or the Information Agent, against all supporting evidence provided by the relevant Class C Scheme Creditor.

6.5    **Assignments and transfers of Scheme Claims after the Voting Record Time**

(a)    Subject to paragraph (c) below, the Scheme Administrators shall not be under any obligation to recognise any sale, assignment or transfer of any Scheme Claim after the Voting Record Time for the purposes of determining the Entitlement of each Scheme Creditor (and/or their Designated Recipient, as applicable) under the Schemes. The Scheme Administrators may, in their sole discretion and subject to the production of such evidence as it may reasonably require and to any other terms and conditions which the Scheme Administrators may consider necessary or desirable, agree to recognise such assignment or transfer for the purposes of determining Entitlements to Scheme Consideration under the Schemes.

(b)    Any assignee or transferee of a Scheme Creditor so recognised by the Company shall be bound by the terms of the Schemes in the event that they become effective as if it were a Scheme Creditor and shall produce such evidence as the Company may reasonably require to confirm that it has agreed to be bound by the terms of the Schemes. None of the Existing Notes Trustee or the Existing Notes Paying and Transfer Agent and Registrar will be responsible for confirming Class A Noteholders as at the Voting Record Time or for monitoring, acknowledging or processing any assignments that occur after the Voting Record Time.

(c)    Class C Scheme Creditors are not prevented by this Cayman Scheme from selling, assigning or transferring any Excluded Liability or Excluded Collateral after the Restructuring Effective Date. Where the Class C Notes are sold, assigned or transferred by a Class C Noteholder after the Restructuring Effective Date, the Class C Noteholder as at the Entitlement Record Time shall remain entitled to receive the Scheme Consideration pursuant to the terms of the Cayman Scheme (rather than the assignee, purchaser or transferee of the relevant Class C Notes). Notwithstanding the foregoing, any sold, assigned or transferred Excluded Liability or Excluded Collateral shall be disclosed to the Scheme Administrators and/or the Scheme Adjudicator (as applicable) in accordance with the terms of the Schemes, and shall be taken into account for the purpose of calculating the Assessed Value when determining relevant Scheme Creditor's Entitlement. Notwithstanding the foregoing, any sold, assigned or transferred Excluded Liability or Excluded Collateral shall be disclosed to the Scheme Administrators and/or the Scheme Adjudicator (as applicable) in accordance with the terms of the Schemes, and shall be taken into account for the purpose of calculating the Assessed Value when determining relevant Class C Scheme Creditor's Entitlement.

6.6    **Third parties**

(a)    By no later than the Cayman Scheme Sanction Hearing or the Hong Kong Scheme Sanction Hearing, whichever is earlier, each of the Deed of Undertaking Parties shall enter into

the Deed of Undertaking (in substantially the form to be made available on the Transaction Website) pursuant to which they will broadly:

(i)    undertake to the Scheme Creditors, the Company and the relevant Court to be bound by the terms of the respective Schemes, in such form as may be sanctioned by the relevant Court as applicable; and

(ii)    agree, upon instructions by the Company or, if applicable, the Information Agent, to execute and do or procure to be executed and done all such documents, acts or things as may be necessary or desirable to be executed or done by them for the purposes of giving effect to the terms of the Scheme that apply to them.

7.    **LETTER FROM THE BOARD TO THE SCHEME CREDITORS**

31 July 2023

Dear Scheme Creditor,

**CHINA EVERGRANDE GROUP 中國恒大集團**

1.    **INTRODUCTION**

The Board writes to you in your capacity as a Person who is, or appears to be, a Scheme Creditor. This letter forms part of the Explanatory Statement for the Schemes proposed by CEG as part of the Restructuring, the details of which are explained below. Unless otherwise specified, capitalised words or phrases used in this letter have the meanings attributed to them in Schedule 1 (*Definitions and Interpretation*) to the Explanatory Statement.

2.    **SCHEMES THAT THE COMPANY IS PROPOSING**

As you may be aware, CEG plans to implement the Restructuring to support an orderly recovery of the Group's operations and maximise returns for all stakeholders of CEG and the Group. The Restructuring will be implemented by parallel Schemes at CEG, comprising of the Hong Kong Scheme and the Cayman Scheme, which are two substantially identical schemes of arrangement.

A scheme of arrangement is an arrangement entered into between a company and its creditors, as provided for under (i) Section 86 of the Cayman Companies Act; and (ii) Sections 670, 673 and 674 of the Hong Kong Companies Ordinance. A scheme of arrangement becomes legally binding on all holders of claims subject to the scheme, including both those voting against the scheme of arrangement and those not voting, if at least a majority in number of the relevant creditors, holding at least seventy-five per cent (75%) in value of claims, present and voting (either in person or by proxy) at the scheme meetings, vote in favour of the scheme of arrangement, the relevant Court then sanctions it and the scheme is delivered to the applicable registrar of companies with a copy of the Court order sanctioning the scheme. As there are two classes of Scheme Creditors, namely Class A and Class C, each class must satisfy the above voting requirements in order for the Schemes to be approved and for the Courts to be able to sanction it.

A scheme of arrangement will be sanctioned by the relevant Court if it is satisfied that, among other things: (i) the relevant provisions of Section 86 of the Companies Act or Sections 670, 673 and 674 of the Hong Kong Companies Ordinance (as applicable) have been complied with; and (ii) the terms of the scheme of arrangement are such that an intelligent and honest creditor, a member of the class concerned and acting in respect of its own interest, might reasonably vote in favour of it.

3.    **THE PURPOSE OF THE EXPLANATORY STATEMENT**

The Explanatory Statement, which is provided pursuant to Order 102, Rule 20(4)(e) of the GCR and in order to satisfy the requirements of the Cayman Islands Practice Direction No. 2 of 2010 (GCR Order 1, Rule 12) and Section 671 of the Hong Kong Companies Ordinance and is distributed for the purpose of providing Scheme Creditors with all the information reasonably necessary to enable the Scheme Creditors to make an informed decision on whether to approve the Schemes. A short explanation of the reasons for the Restructuring and the proposed Schemes is included below, as part of this letter.

4.      **ADVISORS**

Houlihan Lokey, CICC and BOCI are acting as financial advisors, and Sidley Austin, Maples and Calder and Commerce & Finance Law Offices are acting as legal advisors, in relation to the Schemes and the Restructuring. Morrow Sodali Limited is acting as the Information Agent.

5.      **FINANCIAL POSITION OF THE COMPANY AND THE GROUP**

Due to, among other factors, unfavourable market conditions of the PRC real estate industry and capital markets during the second half of 2021 and the adverse impact of the COVID-19 pandemic on macroeconomic conditions and certain credit events in 2022, the Group, along with other Chinese property developers, has experienced significant liquidity pressures due to limited access to external capital to refinance its existing indebtedness and reduced cash generated from contracted sales. Against this backdrop, the Group has been working closing with its stakeholders, onshore as well as offshore creditors to formulate a holistic restructuring. Following extensive and thorough consideration, consultation and negotiation, the Board has determined that the Restructuring, is in the best interests of CEG and those with an economic interest in CEG, including, in particular, the Scheme Creditors.

Further, CEG believes that the Restructuring will provide the necessary conditions for CEG to resume business operations, thereby facilitating the orderly resumption of the Group's business operations.

6.      **OVERVIEW OF THE RESTRUCTURING**

The Restructuring comprises the restructuring of CEG's existing offshore indebtedness under the Existing Debts. The Restructuring will take place under and pursuant to the Schemes and the Restructuring Documents.

The Restructuring envisages that Scheme Creditors will release their Scheme Claims in return for receiving (or being entitled to receive) Scheme Consideration (comprising the relevant portion of the rights and interests in the New Instruments) in accordance with the terms of the Schemes.

The Restructuring is part of a wider plan to comprehensively restructure the offshore indebtedness of the Group. In addition to the Schemes, the Group is intending to implement (i) a scheme of arrangement in Hong Kong to be proposed by an indirect subsidiary of CEG, Tianji Holding Limited ("**Tianji**") (the "**TJ Scheme**"); and (ii) a scheme of arrangement in the BVI to be proposed by an indirect subsidiary of CEG, Scenery Journey Limited ("**SJ**") (the "**SJ Scheme**"). The TJ Scheme and the SJ Scheme are inter-conditional as between themselves. However, the Schemes proposed by CEG are not inter-conditional with either the TJ Scheme or the SJ Scheme. The Hong Kong Scheme and the Cayman Scheme are inter-conditional between themselves only.

7.      **CREDITOR SUPPORT FOR THE RESTRUCTURING**

On 3 April 2023, the Company and certain Scheme Creditors entered into the Class A RSA under which the parties agreed to cooperate in order to facilitate the implementation of the Restructuring. On the same day, the Company also launched the Class C RSA which provides that each Participating Creditor confirms that it shall use its beneficial interest in its debts to approve and support the Restructuring on the terms and conditions of the Class C RSA. Details regarding the RSAs are set out in Section 25.2 (*Summary of the RSAs*) of the Explanatory Statement. In addition, copies of the execution versions of the RSAs are available on the Transaction Website.

Additionally, on 3 April 2023, SJ and TJ also announced the launch of the respective restructuring support agreements for the SJ Scheme and TJ Scheme.

The entering into of the RSAs is typical in financial restructurings such as the Restructuring and helps to secure a critical mass of creditor support to enable the successful implementation of the Restructuring. As at the date of the Explanatory Statement, certain Scheme Creditors holding an aggregate principal amount of approximately US$12.3 billion of Class A Debts (representing approximately 86.50% of the aggregate outstanding principal amount of all Class A Debts) and approximately US$5.0 billion of Class C Debts (representing approximately 39.6% of the aggregate outstanding principal amount of all Class C Debts) have acceded to the Class A RSA and Class C RSA respectively, meaning that the holders of such Class A Debts and Class C Debts are obliged to vote their holdings of such Class A Debts and Class C Debts in favour of the Schemes, subject to the terms of the respective RSAs.

Under the terms of the RSAs, CEG has agreed to pay the Consent Fee to those Scheme Creditors who are Eligible Participating Creditors who became party to the RSAs by the Consent Fee Deadline (strictly in accordance with the terms of the RSAs). The Consent Fee is payable by way of payment-in-kind new notes to be issued by CEG. Full details of the Consent Fee and the conditions to be satisfied in order for Scheme Creditors to be entitled to the payment of the Consent Fee are set out in Section 25.2 (*Summary of the RSAs*) of the Explanatory Statement.

Scheme Creditors who are not already party to the RSAs may no longer accede to it in order to receive the Consent Fee because the Consent Fee Deadline has now passed. However, that is without prejudice to the rights of Eligible Participating Creditors who hold, at the Voting Record Time, Existing Debts which validly became Eligible Restricted Debts before the Consent Fee Deadline (as applicable) to receive any portion of the Consent Fee remaining unpaid in accordance with the terms of the RSAs.

## 8.    CEG'S COMMITMENT TO THE RESTRUCTURING

To further evidence CEG's commitment to the Restructuring, CEG and its substantial shareholders will be equitising:

(a)    the loans by the Chairman and Xin Xin (BVI) Limited to NEV totalling HK$2,650,000,000 (equivalent to c. US$340,616,967), which will be applied toward conversion into new NEV Shares at an issue price of HK$3.84 per share; and

(b)    the loan by CEG to NEV totalling approximately HK$16,044,613,901 (including accrued but unpaid interest calculated up to and including 14 August 2023), which will be applied toward conversion into new NEV Shares at a conversion price of HK$3.84 per share (which shall be based on the total accrued claim through to either the Restructuring Effective Date or an earlier conversion date) (the shareholders' loans and equitizations referred to in this paragraph (b), together with the paragraph (a) immediately above, the "**Shareholders' Loans**" and "**Conversion of Shareholders' Loans to NEV Shares**", respectively). The above remains subject to obtaining the necessary approval, including the approval of the independent shareholders of NEV at an extraordinary general meeting of NEV to be convened and held, and the approval for the listing of, and permission to deal in, the new NEV Shares to be issued by the listing committee of the HKEX.

The purpose of the Conversion of Shareholders' Loans to NEV Shares is to deleverage NEV's balance sheet, to allow easier access to financing going forward, and to pave way for a strategic

investor should opportunities arise. In addition, the Conversion of Shareholders' Loans to NEV Shares also reflects the long-term support from CEG and its substantial shareholders to NEV, a key listed subsidiary of CEG, through conversion of their debt claims into equity. To further support the Restructuring, those converted NEV Shares will be added to the underlying shares of the A2 NEV SLNs, the C2 NEV SLNs and NEV MEBs. Further details regarding the terms of A2 NEV SLNs, C2 NEV SLNs and NEV MEBs are set out at Schedule 8 (*Summary of Terms of the New Instruments*) to the Explanatory Statement.

Further details regarding the terms of A2 NEV SLNs, C2 NEV SLNs and NEV MEBs are set out at Schedule 8 (*Summary of Terms of the New Instruments*) to the Explanatory Statement.

Further details regarding the commercial terms of the Restructuring are set out at Section 10 (*Two Options of Scheme Consideration for Both Class A and Class C*) of this Explanatory Statement.

9.    **WHAT HAPPENS IF THE RESTRUCTURING FAILS?**

As explained above, in light of the unfavourable market conditions of the PRC real estate industry and capital markets during the second half of 2021 and the adverse impact of the COVID-19 pandemic on macroeconomic conditions and certain credit events in 2022, the Board believes that should the Schemes not proceed, CEG will be unable to comply with its obligations under the Existing Debts as well as in connection with the other outstanding indebtedness of the Group. In those circumstances, there is a material risk that certain of the Scheme Creditors as well as onshore and offshore lenders of the Group will pursue Enforcement Actions against CEG and/or the Existing Notes Subsidiary Guarantors and/or the Existing Notes Subsidiary Pledgors and/or any other subsidiary of CEG in respect of their outstanding obligations. This is especially the case given the prevailing conditions in the property industry and wider economic environment. In these circumstances, the Board would seek to maximise recoveries for creditors as best as it can, but anticipates that members of the Group would likely be required to make, or cause CEG to make, an application to the Courts, or courts in other relevant jurisdictions, as applicable, to place CEG and/or certain other members of the Group into liquidation or other appropriate Insolvency Proceedings to facilitate an orderly winding-up and realisation of their assets for the benefit of the creditors of CEG and/or the relevant members of the Group.

Accordingly, the Board believes that an insolvent liquidation of CEG and some or all members of the Group is the most likely alternative outcome if the Restructuring fails.

Such an insolvent liquidation is likely to result in a substantially lower return to creditors of CEG (including the Scheme Creditors) than if the Restructuring is approved and implemented. The estimated recoveries for Scheme Creditors in such scenario are described in the Liquidation Analysis prepared by Deloitte (see Schedule 2 (*Liquidation Analysis*) to this Explanatory Statement).

The recovery range outlined in the Liquidation Analysis should be compared with the anticipated recovery rates to Scheme Creditors if the Restructuring is completed successfully as outlined in the Scheme Recovery Analysis (see Schedule 3 (*Scheme Recovery Analysis*) to this Explanatory Statement). In this regard, we note as follows:

A. **Estimated Recovery on an Insolvent Liquidation**: Based on the Company's financial position as at 31 December 2022 and the assumptions set out in the Liquidation Analysis, the estimated total recovery to Scheme Creditors upon an insolvent liquidation of the Company and other members of the Group based on the Liquidation Analysis is as follows:

Class A Scheme Creditors

| Class A Scheme Creditors | Estimated recovery in liquidation from CEG | Estimated recovery in liquidation from Existing Notes Subsidiary Guarantors | Estimated total recovery in liquidation |
|---|---|---|---|
| CEG Existing Notes | 2.26% | 1.08% | 3.34% |
| Class A Private Loan | 2.26% | 1.08% | 3.34% |

Class C Scheme Creditors

| Class C Scheme Creditors (non-put option) | Estimated recovery in liquidation from CEG | Estimated recovery in liquidation from obligors other than CEG† | Estimated total recovery in liquidation |
|---|---|---|---|
| Lake Notes | 2.26% | 6.65% | 8.91% |
| Dongpo Notes | 2.26% | 0.26% | 2.52% |
| New Chic Margin Loan | 2.26% | 26.22% | 28.48% |
| CEG Loan 1 | 2.26% | 0.00% | 2.26% |
| CEG Loan 2 | 2.26% | 0.00% | 2.26% |
| Venice Loan | 2.26% | 58.99% | 61.25% |
| Venice SPA | 2.26% | 59.02% | 61.28% |
| Hero Loan | 2.26% | 51.42% | 53.68% |
| CEG Guarantees of PRC Liabilities | 2.26% | 14.45% | 16.71% |
| On-Lent Loan | 0.00% | 0.00% | 0.00% |

† *For the avoidance of doubt, the rights of Class C Scheme Creditors against non-scheme company obligors are not compromised by the Schemes.*

82

| Class C Scheme Creditors (put option) | Estimated recovery from unreturned securities subject to put option | Claim in liquidation against CEG (deficiency) | Estimated recovery in liquidation from CEG* | Estimated recovery in liquidation from obligors other than CEG† | Estimated total recovery in liquidation |
|---|---|---|---|---|---|
| | A | B = (100% - A) | C | D | E = A + (B x C) + D |
| Dongpo Put Option | 1.53% | 98.47% | 2.26% | 0.00% | 3.76% |
| Graceful Court Put Option | 1.53% | 98.47% | 2.26% | 0.00% | 3.76% |
| Clear Star Put Option | 0.00% | 100.00% | 2.26% | 2.31% | 4.57% |
| FCB Put Option | 0.00% | 100.00% | 2.26% | 21.07% | 23.33% |
| RMB Bond Put Option | 4.34% | 95.66% | 2.26% | 0.00% | 6.50% |
| Kailong Arbitration Award | 0.00% | 100.00% | 2.26% | 0.00% | 2.26% |

† *For the avoidance of doubt, the rights of Class C Scheme Creditors against non-scheme company obligors are not compromised by the Schemes.*

*With respect to the put options, the claim at CEG is for a deficiency amount, accounting for the value of the securities subject to the put option not being returned.*

**B. Estimated Recovery following the Restructuring**: Under the Proposed Restructuring, Scheme Creditors will be allocated with instruments including (as applicable) new notes of various tenors and notes that are mandatorily convertible or exchangeable into equities of CEG/ EVPS/NEV. Assuming that the Restructuring Effective Date occurs on 31 December 2022 and the Group would continue to operate as a going concern, the recoveries of Scheme Creditors are calculated as the net present value of the future cashflows associated with the new notes/converted equities allocated to each respective creditor by applying a discount to the face value of future cashflows. A discount rate of 25.5% was adopted by considering the yields of CEG's USD bonds prior to defaults, adjusting for changes in risk-free market rates and credit spread over the period; and then adding an additional premium which could be demanded by investors in instruments issued by CEG/SJ/Tianji after considering factors including (but not limited to) changes in the PRC real estate industry, the latest published financial information of the Group and the Group (including onshore operations) undergoing a restructuring. Further information on the basis of estimation of scheme recoveries can be found in the sections 'Calculation Methodology' and 'Scheme Recovery Analysis Assumptions' in the Scheme Recovery Analysis.

Class A Scheme Creditors

| Class A Scheme Creditors | Estimated recovery in the Restructuring |
|---|---|
| CEG Existing Notes | 22.5% |
| Class A Private Loan | 22.5% |

Class C Scheme Creditors

| Class C Scheme Creditors | Estimated recovery in the Schemes from CEG (deficiency claim) | Estimated recovery on the deficiency claim in the Schemes from CEG (against the accrued claim) | Estimated recovery from obligors other than CEG (third-party rights) | Estimated total recovery in the Restructuring |
|---|---|---|---|---|
| | A | B = (100% - C) x A | C | D = B + C |
| Lake Notes | 20.1% | 18.8% | 6.8[†]% | 25.5% |
| Dongpo Notes | 20.1% | 20.1% | 0.3% | 20.4% |
| New Chic Margin Loan | 20.1% | 14.9% | 26.2% | 41.1% |
| CEG Loan 1 | 20.1% | 20.1% | N/A | 20.1% |
| CEG Loan 2 | 20.1% | 20.1% | N/A | 20.1% |

| Class C Scheme Creditors | Estimated recovery in the Schemes from CEG (deficiency claim) | Estimated recovery on the deficiency claim in the Schemes from CEG (against the accrued claim) | Estimated recovery from obligors other than CEG (third-party rights) | Estimated total recovery in the Restructuring |
|---|---|---|---|---|
| | A | B = (100% - C) x A | C | D = B + C |
| Venice Loan | 20.1% | 8.3% | 59.0% | 67.3% |
| Venice SPA | 20.1% | 8.3% | 59.0% | 67.3% |
| Hero Loan | 20.1% | 10.0% | 50.5[†]% | 60.4% |
| Dongpo Put Option | 20.1% | 19.8% | 1.5% | 21.4% |
| Graceful Court Put Option | 20.1% | 19.8% | 1.5% | 21.4% |
| Clear Star Put Option | 20.1% | 19.6% | 2.5[†]% | 22.2% |
| FCB Put Option | 20.1% | 15.9% | 21.1% | 37.0% |
| RMB Bond Put Option | 20.1% | 19.3% | 4.3% | 23.6% |
| CEG Guarantees of PRC Liabilities | 20.1% | 17.2% | 14.5% | 31.8% |
| Kailong Arbitration Award | 20.1% | 20.1% | 0.0% | 20.1% |
| On-Lent Loan | 20.1% | 20.1% | N/A | 20.1% |

† *Figure includes recoveries from scheme consideration received pursuant to the TJ Scheme.*

The actual recoveries from non-scheme company obligors may be greater given any recoveries from such companies could be on a 'going-concern' basis rather than on a discounted 'fire-sale' basis.

The Liquidation Analysis and Scheme Recovery Analysis were prepared using audited consolidated financial statements of the Group as at 31 December 2022, subject to the limitations set out in the section 'Limitations' of the Reports. In the event of inconsistency between the estimated recoveries shown in the tables above and the Reports, the estimated recoveries in the

Scheme Recovery Analysis shall prevail. All figures shown in the tables above are subject to rounding.

As anticipated, the estimated recoveries from CEG are considerably higher for all Scheme Creditors if the Restructuring is successful than in the alternative of an insolvent liquidation of CEG and other members of the Group. In addition, estimated overall recoveries (i.e. taking into account third party rights) are also higher for all Scheme Creditors if the Restructuring is successful than in the alternative of an insolvency liquidation of CEG and other members of the Group. Accordingly, the Directors believe that the Schemes offer the Scheme Creditors a better estimated recovery in light of the potential economic consequences of insolvency.

10.    **LISTING REQUIREMENTS – SINGAPORE**

It is anticipated that the New Instruments will be listed on the SGX-ST. To the extent that the Company is required to disclose additional information solely for the purposes of the application to list the New Instruments on the SGX-ST, such information will be made available to Scheme Creditors on the Transaction Website.

11.    **THE DIRECTORS AND THE EFFECTS OF THE SCHEMES ON THEIR INTERESTS**

The current Board of CEG consists of nine Directors. The details of the Directors are listed in Section 8 (*Background to CEG, the Group and the Restructuring*) of the Explanatory Statement.

12.    **RISK FACTORS**

CEG and the Group of which it is a part, like many in the same industry in the current business environment, are faced with significant business risks. Since CEG is the ultimate holding company of the Group, its financial condition and operations are necessarily affected by the operations and financial conditions of its subsidiaries on a consolidated basis. In addition to the risks associated with the implementation of the Restructuring, CEG has identified a number of factors that may affect the Group's operating results, liquidity and financial condition. CEG believes that the successful implementation of the Restructuring is a key step towards mitigating these risks and will allow the Group to focus on its operations and principal business activities.

Certain principal risk factors that CEG and the Group will likely face in connection with and following the Restructuring are set out in Section 28 (*Risk Factors*) of the Explanatory Statement. However, those risk factors are not an exhaustive list of all the potential risks and uncertainties which may be involved.

13.    **DIRECTORS' RECOMMENDATION**

In relation to the New Instruments, the Company's first required cash interest payment occurs 3 years from the Reference Date and the first principal repayment occurs 5 years from the Reference Date under the A2 EVPS SLNs, A2 NEV SLNs and A2 Notes. The Company envisages servicing its debt through multiple sources, including residual cash flows from its projects and sale offshore assets. If CEG can obtain an additional RMB250-300 billion in financing in the next three years, CEG expects to achieve an annual unlevered free cash flow of approximately RMB110 billion to RMB 150 billion for the period 2026 to 2036. However, there is uncertainty about whether CEG can obtain the aforementioned financing. Further, the remaining cash flow of some projects will be required to pay existing debts on CEG's projects. Most of the Group's projects in the PRC are subject to the risk of default and litigation, which may cause additional cash flow losses for CEG and hinder the normal development progress of the projects. Certain shares of EVPS and assets of NEV are being pledged in relation to certain of the New Notes, if sold or used to raise further financing they will be available for us in repayment of the obligations under the relevant New Notes. Whether these sales take place and the amount of consideration received will depend on the prevailing market conditions. As a result, it is the management's opinion that, subject to the uncertainties set out above, the above sources of funds may be available to be used to repay its near and longer term liabilities under the New Instruments.

The Board has reviewed this Explanatory Statement and the documents referred to in it and approves the form and content of this Explanatory Statement. For the reasons set out in this letter and the Explanatory Statement, the Board also believes that the Schemes and the Restructuring are in the best interests of the Scheme Creditors and the Company and its creditors as a whole. Accordingly, the Board strongly recommend that the Scheme Creditors vote in favour of the Schemes at the Scheme Meetings.

Yours faithfully,

Hui Ka Yan
Chairman
for and on behalf of the Board of
China Evergrande Group
中國恒大集團

8.    **BACKGROUND TO CEG, THE GROUP AND THE RESTRUCTURING**

8.1    **Background of CEG**

(a)    CEG was incorporated in the Cayman Islands under the Cayman Companies Act on 26 June 2006, as an exempted company with limited liability (registration number KY1 1104).

(b)    CEG is also registered in Hong Kong as a non-Hong Kong company under Part XVI of the Hong Kong Companies Ordinance. CEG's principal place of business in Hong Kong is located at 15th Floor, YF Life Centre, 38 Gloucester Road, Wanchai, Hong Kong. Meanwhile, CEG's headquarters in the PRC is located at No. 1126, Haide 3rd Road, Nanshan District, Shenzhen, Guangdong Province, PRC.

(c)    CEG's Shares have been listed on the Main Board of the HKEX since 5 November 2009 with the stock code 3333. As at the date of this Explanatory Statement, CEG has 13,204,300,900 Shares in issue, all of which are fully paid up and the authorised share capital of CEG is US$1,000,000,000 divided into 100,000,000,000 shares of par value US$0.01 each. Based on the published information of CEG on the website of the HKEX, CEG has a place of business in Hong Kong. CEG maintains a branch share register in Hong Kong. The last shareholders' meeting of CEG was its annual general meeting held in Hong Kong, on 11 June 2021, with shareholders attending in person.

(d)    CEG is the ultimate holding company of a group of companies comprising of CEG and its subsidiaries including, *inter alia*, EVPS, NEV, Tianji, Hengda Real Estate and the Existing Notes Subsidiary Guarantors (together, the "**Group**") that carries on business primarily in the PRC through operating subsidiaries in the PRC. CEG has no material operations and derives its income exclusively from dividend payments by its subsidiaries in order to service its offshore debts (including the Class A Debts and Class C Debts). CEG is a Hong Kong tax resident. On a stand-alone basis, CEG's books and records are located in Hong Kong. CEG has certain directors and employees based in Hong Kong, who currently focus on the restructuring of the Group's offshore debts.

(e)    Further details of the Group, including its business operations, indebtedness and financial condition are set out at Sections 8.11 to 8.13 below whilst additional information can be found on CEG's website at: www.evergrande.com.

(f)    CEG is the issuer of the Existing Notes and debtor of the Class A Private Loan, in respect of the Class A Debts, whilst also being an obligor in respect of the Class C Debts. As an investment holding company with no business operations, the Company has minimal directly owned assets both offshore and onshore. For instance, CEG had bank balances held in Hong Kong bank accounts of approximately HK$4.9 million as of 31 December 2022. As of 31 December 2022, the Company had receivables (loan, current accounts, interest and dividends receivables) of approximately RMB89.1. billion due from its onshore and BVI subsidiaries. Of this, approximately RMB1.4 billion was related to receivables from onshore subsidiaries and approximately RMB87.7 billion was related to receivables from BVI subsidiaries. At the same time, as of 31 December 2022, the Company also had RMB94.8 billion in payables to its various subsidiaries. Of this, approximately all of such payables were due to onshore subsidiaries. In addition, the Company also has direct and indirect shareholdings in EVPS and NEV.

(g)    From September 2021 (marking the appointment of financial and legal advisors for the Restructuring), restructuring negotiations became CEG's dominant activity. As a

89

holding company, CEG had few or no operational activities outside of Hong Kong after restructuring activities began. The advisors to CEG each have Hong Kong offices and we led by Hong Kong situated personnel. Meetings were held in Hong Kong or virtually with significant participation by Hong Kong parties. The CEG AHG comprise of 16 members, six of which are based in Hong Kong. The CEG AHG's advisors are Hong Kong based or led.

(h)    The Existing Notes Subsidiary Guarantors have jointly and severally guaranteed to each Scheme Creditor all of the obligations of CEG to pay the principal, premium (if any), and interest under each of the Existing Notes. The Company has pledged, and each of the Existing Notes Subsidiary Pledgors have pledged, as the case may be, all the Capital Stock of the Existing Notes Subsidiary Guarantors held by the Company or the relevant Existing Notes Subsidiary Pledgors, in order to secure the obligations under the Existing Notes.

### *Beneficial ownership of CEG*

8.2    The following table sets forth information regarding beneficial ownership of CEG Shares as at 31 December 2022, by (i) its Directors and senior management and (ii) those persons known to CEG to beneficially own 5% or more of the outstanding Shares.

| Name of substantial shareholder | Capacity | Number of Shares/underlying Shares interested | Approximate percentage of the issued share capital of CEG |
| --- | --- | --- | --- |
| The Chairman[19] | Interest in controlled corporation | 7,893,031,497 | 59.78% |
| Xin Xin (BVI) Limited[20] | Beneficial owner | 7,893,031,497 | 59.78% |
| Ding Yu Mei ("**Ms. Ding**")[21] | Interest in controlled corporation | 791,248,238 | 5.99% |
| Even Honour Holdings Limited[22] | Beneficial owner | 791,248,238 | 5.99% |
| Yaohua Limited[23] | Interest in controlled corporation | 791,248,238 | 5.99% |

### *Directors of CEG*

---

[19] The 7,893,031,497 Shares were held by Xin Xin (BVI) Limited, a company wholly-owned by the Chairman.
[20] Xin Xin (BVI) Limited is beneficially wholly-owned by the Chairman.
[21] The 791,248,238 Shares were held by Even Honour Holdings Limited, a company wholly-owned by Yaohua Limited which is in turn wholly-owned by Ms. Ding.
[22] See footnote 21 above.
[23] See footnote 21 above.

8.3    The Board consists of nine Directors, including five executive Directors, one non-executive Director and three independent non-executive Directors.

*Current Board composition*

8.4    As of the date of this Explanatory Statement, the Board is comprised as follows:

| Name | Position |
|---|---|
| Mr. Hui Ka Yan (the Chairman) | Chairman and executive Director |
| Mr. Siu Shawn | Executive Director and Chief Executive Officer |
| Mr. Shi Junping | Executive Director |
| Mr. Liu Zhen | Executive Director |
| Mr. Qian Cheng | Executive Director and Chief Financial Officer |
| Mr. Liang Senlin | Non-executive Director |
| Mr. Chau Shing Yim, David | Independent non-executive Director |
| Mr. He Qi | Independent non-executive Director |
| Ms. Xie Hongxi | Independent non-executive Director |

No recent changes to the Board of directors have taken place.

*Directors' interests in the Group and the Restructuring*

8.5    As at the date of this Explanatory Statement, the following Directors hold the following interests and short positions in CEG:

| Name of Director | Nature of interest | Number of Shares/underlying Shares interested | Approximate percentage of the issued share capital of CEG |
|---|---|---|---|
| Mr. Hui Ka Yan (the Chairman)[24] | Interest in controlled corporation | 7,893,031,497 | 59.78% |
| Mr. Siu Shawn | Beneficial owner | 20,600,000 (share options) | 0.16% |
| Mr. Shi Junping | Beneficial owner | 6,500,000 (share options) | 0.05% |

---

[24] The 7,893,031,497 shares were held by Xin Xin (BVI) Limited, a company wholly-owned by the Chairman.

| Name of Director | Nature of interest | Number of Shares/underlying Shares interested | Approximate percentage of the issued share capital of CEG |
|---|---|---|---|
| Mr. Liu Zhen | Beneficial owner | 3,400,000 (share options) | 0.03% |
| Mr. Qian Cheng | Beneficial owner | 3,200,000 (share options) | 0.02% |
| Mr. Chau Shing Yim, David | Beneficial owner | 1,000,000 | 0.01% |
| Mr. He Qi | Beneficial owner | 209,000 | 0.002% |
| Ms. Xie Hongxi | Beneficial owner | 600,000 | 0.005% |

8.6   As at the date of this Explanatory Statement, the following Directors hold the following interests and short positions in NEV:

| Name of Director | Nature of interest | Number of shares/underlying shares interested | Approximate percentage of the issued share capital of NEV |
|---|---|---|---|
| Mr. Siu Shawn | Beneficial owner | 4,600,000 (shares) 20,000,000 (share options) | 0.23% |
| Mr. Liu Zhen | Beneficial owner | 150,000 (shares) 1,500,000 (share options) | 0.02% |
| Mr. Chau Shing Yim, David | Beneficial owner | 300,000 (share options) | 0.003% |

8.7   As at the date of this Explanatory Statement, the following Directors hold the following interests and short positions in EVPS:

| Name of Director | Nature of interest | Number of shares/underlying shares interested | Approximate percentage of the issued share capital of NEV |
|---|---|---|---|
| Mr. Hui Ka Yan (the Chairman) | Interest in controlled corporation | 5,590,229,000 (shares) | 51.71% |
| Mr. Liu Zhen | Beneficial owner | 200,000 (shares) | 0.02% |

(a)   Save for those disclosures made above, none of the Directors has any direct, indirect or non-beneficial interest in the CEG Shares, NEV Shares or EVPS Shares. Further,

none of the Directors has any material interest (whether as a director, member, creditor or otherwise) in the Schemes, except as disclosed in this Explanatory Statement.

(b)     Each Director has provided confirmation that he or she:

(i)     is not subject to any unspent convictions relating to indictable offences;

(ii)    has not been declared bankrupt or has not been the subject of any voluntary arrangement or like proceeding;

(iii)   has not been convicted in relation to a fraudulent offence;

(iv)    has not been associated with any bankruptcy, receivership, insolvent liquidation, voluntary agreement or any composition or arrangement with creditors generally or any class of creditors of such company while acting in the capacity of a member of the administrative, management or supervisory body or as senior manager of any company;

(v)     has not been subject to any official public incrimination and/or sanction by statutory or regulatory authorities (including designated professional bodies); and

(vi)    has not been disqualified by a court from acting as a member of the administrative, management or supervisory bodies of any company.

## 8.8     Structure of the Group

A simplified Group structure chart showing the relationship between certain key members of the Group as at the date of this Explanatory Statement is set out in Schedule 9 (*Group Structure Chart*).

## 8.9     Operations of the Company

CEG is the ultimate holding company of the Group that carries on business primarily in the PRC. The Company has no material operations and derives its income exclusively from dividend payments by its subsidiaries in order to service its offshore debts (including the Class A Debts and Class C Debts).

## 8.10    Business Operations of the Group

The Group is a conglomerate principally engaged in property development, property investment, property management, new energy vehicle development and production, and cultural tourism business in the PRC.

The Group's revenue for the year ended 31 December 2021 and 2022 amounted to RMB250.0 billion and RMB230.1 billion, respectively. The Group recorded loss for the year ended 31 December 2021 and 2022 of RMB686.2 billion and RMB125.8 billion, respectively.

A summary of the Group's three key business segments is set out below:

(i)     **Property development business:** The property development business is the main business line of the Group. In 2021, the Group had contracted sales of approximately RMB443 billion and contracted sales area of approximately 54.3 million square meters of gross floor area. In 2022, the Group had contracted sales of approximately RMB31.7 billion (or approximately

RMB19.6 billion after deducting properties transferred to construction companies or suppliers for payment in kind) and contracted sales area of approximately 3.9 million square meters of gross floor area. During January to May 2023, the Group had contracted sales of approximately RMB33.8 billion (or approximately RMB20.1 billion after deducting properties transferred to construction companies or suppliers for payment in kind) and contracted sales area of approximately 4.9 million square meters of gross floor area.

(ii)     **Property management business:** The property management business of the Group is operated through EVPS. EVPS provides property management services primarily to real estate projects developed by the Group's property development business. As at 31 May 2023, approximately 71.5% of properties under management by EVPS are properties developed by the Group. The Company holds approximately 51.7% equity interest in EVPS as at the date of this Explanatory Statement.

As at 31 May 2023, EVPS and its subsidiaries had approximately 2,759 projects under management with total area under management of approximately 506 million square meters, providing property management services to more than 2.3 million property owners. These projects under management covered 22 provinces, 5 autonomous regions, 4 municipalities and Hong Kong. As at 31 May 2023, EVPS and its subsidiaries' total contracted area was approximately 817 million square meters of gross floor area, with a total of approximately 3,152 contracted projects.

Among the total area under management and total contracted area of EVPS and its subsidiaries as at 31 May 2023, approximately 362 million square meters of gross floor area and 623 million square meters of gross floor area, respectively, were developed by the Group. EVPS and its subsidiaries continue to seek engagement for property management contracts in relation to property projects developed by independent third-party property developers. During the five months ended 31 May 2023, EVPS and its subsidiaries obtained 100 projects under management developed by independent third-party property developers with the area under management of approximately 6.1 million square meters of gross floor area, and 122 contracted projects developed by independent third-party property developers with contracted area of approximately 10.9 million square meters of gross floor area.

(iii)     **New energy vehicle business:** NEV conducts industrial park development and health management businesses, as well as the new energy vehicle and battery businesses. The Company holds approximately 58.5% equity interest in NEV as at the date of this Explanatory Statement.

The mass production of Hengchi 5, one of the Hengchi vehicle series, officially started on 16 September 2022 with delivery of the first batch of production vehicles having begun on 29 October 2022. As at 31 May 2023, NEV has and its subsidiaries had delivered over 1,000 units of Hengchi 5.

Currently, NEV and its subsidiaries are still facing shortage of funds. NEV's management has been continuously promoting cost-saving measures, actively expanding financing channel and doing their best to maintain the business operations.

As NEV announced on 24 April 2023, NEV entered into a sale and purchase agreement (the "**NEV Disposal Agreement**") with Anxin Holding Limited

("**Anxin**"), a subsidiary of the Company, and the Company, pursuant to which Anxin conditionally agreed to purchase and NEV conditionally agreed to sell as the beneficial owner (the "**NEV Disposal**"), the entire issued share capital of Assemble Guard Limited (薈保有限公司) ("**Assemble Guard**") and Flaming Ace Limited ("**Flaming Ace**"), subject to the terms and conditions thereunder. Assemble Guard and Flaming Ace were wholly-owned subsidiaries of NEV and collectively held 47 existing health and living projects directly or indirectly at the time of the NEV Disposal Agreement. The NEV Disposal is subject to reporting, announcement, circular and independent shareholders' approval requirements under the Listing Rules, and is also conditioned upon the satisfaction or waiver, if applicable, of certain conditions precedent. After the completion of the NEV Disposal, NEV would become a company purely focusing on research, development and production of new energy vehicle businesses, save that NEV will continue to hold two residential and property development projects in the short term. In view of the significant capital commitment required by technology research and development and manufacturing of, and sales services in respect of new energy vehicles business segment of NEV (the "**NEV Segment**"), and having considered the current resources, NEV is of the view that committing further resources in health and living projects would not be in line with its overall strategy to de-leverage and may pose limitations to the development of the NEV Segment.

Due to the tight liquidity situation and in order to maintain basic business operations, NEV has taken initiatives to cut costs, such as reducing its workforce headcount. As at 31 May 2023, NEV had a total of 2,169 employees (including 531 employees that have suspended work, of which 233 are in the new energy vehicle segment and 298 are in the battery segment), compared to 3,742 as at 30 June 2022. The Group and NEV are actively seeking potential strategic investors' investment in NEV in order to inject cash capital to sustain NEV's business as a going concern. However, the Company cannot assure that such efforts will be successful. In the absence of new funding, NEV will face the risk of shutdown.

8.11    **The financial indebtedness and assets of CEG**

(a)    As at 31 December 2022, CEG had total liabilities of RMB198.3 billion including:

    (i)    current borrowings of RMB2.3 billion;

    (ii)    non-current borrowings of RMB99.6 billion;

    (iii)    amounts due to subsidiaries of RMB94.8 billion and

    (iv)    dividend payable of RMB1.7 billion.

(b)    The non-current assets of CEG on a stand-alone basis as at 31 December 2022 amounted to approximately RMB1 million, which primarily consisted of property, plant and equipment;

(c)    The current assets of CEG on a stand-alone basis as at 31 December 2022 amounted to approximately RMB98.8 billion. As at 31 December 2022, key items of CEG's current assets consist of the following:

    (i)    amounts due from subsidiaries of approximately RMB98.4 billion; and

(ii)    other receivables of RMB0.4 billion.

8.12    **Indebtedness, liabilities and assets of the Group**

(a)    As at 31 December 2022, the Group had total liabilities of RMB2,437.4 billion, primarily including:

(i)    current borrowings of RMB587.1 billion;

(ii)    non-current borrowings of RMB25.3 billion;

(iii)    trade and other payables of RMB1,002.3 billion;

(iv)    contract liabilities of RMB721.0 billion;

(v)    deferred income tax liabilities of RMB47.9 billion; and

(vi)    other payable of RMB11.3 billion.

(b)    Furthermore, the current liabilities of the Group comprise the principal amount owing under the Class A Debts, representing a book value of US$14,242 million as at 31 December 2022. Interest continues to accrue on the principal amount owing under the Class A Debts in accordance with the terms of the Class A Debts.

(c)    CEG's liabilities in respect of the Class C Debts are approximately US$13,445 million in principal amount as at 31 December 2022 (calculated based on the FX rate as at 31 December 2022).

(d)    The non-current assets of the Group on a consolidated basis as at 31 December 2022 amounted to approximately RMB173.1 billion. As at 31 December 2022, key items of the Group's non-current assets consist of the following:

(i)    Property, plant and equipment of approximately RMB56.4 billion;

(ii)    Right-of-use assets of approximately RMB14.5 billion;

(iii)    Investment properties of approximately RMB63.1 billion;

(iv)    Goodwill of approximately RMB1.1 billion;

(v)    Trade and other receivables of approximately RMB1.3 billion;

(vi)    Prepayments of approximately RMB0.4 billion;

(vii)    Investments accounted for using equity method of approximately RMB25.9 billion;

(viii)    Financial assets at fair value through other comprehensive income of approximately RMB1.3 billion;

(ix)    Financial assets at fair value through profit or loss of approximately RMB3.0 billion; and

(x)    Deferred income tax assets of approximately RMB66 million.

(e)     Based on the Company's financial data, the current assets of the Group on a consolidated basis as at 31 December 2022 amounted to approximately RMB1,665.2 billion.

(f)     The majority of the Group's current assets cannot be collected or converted into cash immediately. As at 31 December 2022, these assets were located in the PRC and certain of the assets were pledged to secure certain banking and other facilities granted to the Group and mortgage loans granted to buyers of sold properties. As at 31 December 2022, key items of the Group's current assets consist of the following:

(i)      Inventory of approximately RMB0.5 billion;

(ii)     Properties under development for sale of approximately RMB1,136.1 billion;

(iii)    Completed properties held for sale of approximately RMB102.9 billion;

(iv)    Trade and other receivables of approximately RMB228.9 billion;

(v)     Restricted cash of approximately RMB10.0 billion (or approximately RMB8.1 billion if the restricted cash held by the listed subsidiaries of the Company, EVPS and NEV, and their respective subsidiaries were excluded); and

(vi)    Cash and cash equivalents of approximately RMB4.3 billion (or approximately RMB2.5 billion if the bank balances and cash held by the listed subsidiaries of the Company, EVPS and NEV, and their respective subsidiaries were excluded).

(g)     Further details regarding the assets of the Group are set out in the Liquidation Analysis at Schedule 2 (*Liquidation Analysis*) to this Explanatory Statement.

## 8.13    The Group's deteriorating financial condition and mitigating actions taken

(a)     During the second half of 2021, Chinese property developers and the capital markets that have funded growth and development of the sector experienced an inflection point. Reduced bank lending for real estate development resulted in reduced access by property developers to onshore capital. In addition, reduced bank lending for mortgage finance for buyers, as well as concerns of buyers about the ability of property developers to complete projects, resulted in reduced consumer spending and therefore property sales. Further, adverse reaction to these onshore events by offshore capital markets has limited the Group's funding sources to address upcoming maturities.

(b)     Since the beginning of 2022, the property sector in China has continued to experience volatility. Reduced bank lending for real estate development, coupled with the adverse impact of the COVID-19 pandemic on macroeconomic conditions and certain negative credit events, have intensified market concerns over the operations of Chinese property developers. As a result, the pre-sales of properties by Chinese developers has generally decreased. The Group has also experienced a noticeable decline in its aggregate contracted sales as a result. Even after the COVID-19 pandemic, bank lending for real estate development continues to be weak and the debt crisis faced by the property industry continues to affect many property developers in the PRC. Against the backdrop of these adverse market conditions, the Group has also experienced liquidity pressures due to limited access to external capital to refinance its existing indebtedness and reduced cash generated from contracted sales. As announced by the Company on 30 June, 2022, as at the end of May 2023, Hengda Real Estate's unpaid debts due amounted to approximately RMB277.7 billion, and Hengda Real Estate's overdue

commercial bills amounted to approximately RMB245.4 billion. Hengda Real Estate is a principal subsidiary of the Company and its indebtedness accounts for a significant share of the Group's total indebtedness. As at 31 May 2023, the principal amount of the matured and unpaid debts of the Group amounted to approximately US$67.3 billion. These amounts remain unpaid as at the date of this Explanatory Statement.

(c)     Since then, the Group has been actively engaging with its customers, suppliers, creditors and shareholders to stabilise its credit lines and day-to-day operations. It implemented further measures by reducing capital expenditure and other expenses such as management remuneration.

(d)     Since December 2021, the Company has introduced several initiatives to reduce operational costs and increase efficiency. These initiatives included streamlining the organisation and consolidating job posts. As at 31 May 2023: (1) job posts at every entity within the Group have been redesignated and restructured; (2) the number of headquarter departments at the Group level has been reduced from 31 to 11; (3) the number of headquarter personnel has been reduced from 2,176 to 617, representing a cumulative reduction of 71.6%; (4) the number of mid-to-senior level employees in the headquarters of the provincial offices has been reduced from 1,706 to 780, representing a cumulative reduction of 54.3%; and (5) the Group's salary expenses have been reduced significantly in an effort to reduce management costs.]

(e)     The Company has since prioritised the resumption of construction and production, in order to ensure the delivery of property units. To facilitate these efforts, the Company has maintained close communication with upstream and downstream business partners as well as relevant creditors, and has received significant support. As at 31 May 2023, more than 6,800 construction companies and 385 material suppliers are involved in the Company's efforts at resumption of construction and production. Further, as of 30 September 2022, the Group's pre-sold and undelivered projects within Chinese mainland had resumed work, with 270,000 constructions workers being involved in such projects at the peak of these efforts. Since July 2021 and up to May 2023, the Company has completed the delivery of 509,000 units and 58.86 million square meters in gross floor area for 557 projects. Of these 509,000 units and 58.86 million square meters in gross floor area that have been delivered, 423,000 units and 48.22 million square meters in gross floor area were delivered between January 2022 and May 2023, while 122,000 units and 13.89 million square meters were delivered between January 2023 and May 2023.

(f)     The Group also promptly commenced discussions with the CEG AHG representing certain Scheme Creditors to explore a consensual resolution for the events of default for the Existing Notes.

(g)     From September 2021 (marking the appointment of financial and legal advisers for the restructuring), restructuring negotiations became CEG's dominant activity. As a holding company, CEG had few or no operational activities outside of Hong Kong after restructuring activities began. The advisors to CEG each have Hong Kong offices and are led by Hong Kong-situated personnel. Meetings were held in Hong Kong or virtually with significant participation by Hong Kong parties. The CEG AHG comprises 16 members, six of which are based in Hong Kong. The CEG AHG's advisors are Hong Kong-based or led.

8.14    **Class A Debts events of default**

*Existing Notes*

On 2 December 2021, the Company received a demand to perform its obligations under a guarantee in the amount of approximately US$260 million in relation to the 8.5% notes due 2021 issued by Jumbo Fortune Enterprises Limited, with which the Company failed to comply. The Company's failure to perform its obligations under this guarantee constituted events of default under the indentures governing the Existing Notes. The Company has since ceased to make payments for the principal and interest amounts due under the Existing Notes.

*Private Loans*

There have been payment defaults, cross defaults and/or other events of default in relation to the Class A Private Loan. Further, lenders of the Class A Private Loan have sought to enforce the share charge as provided for under the relevant transaction documents. The Company and other obligors under the Class A Private Loan have not made full repayment of all outstanding principal, interest and other amounts due under the Class A Private Loan.

8.15    **Class C Debts events of default**

There have been payment defaults, cross defaults and/or other events of default in relation to the Class C Debts. Further, certain creditors of the Class C Debts have sought to enforce the relevant security, including by appointing receivers and/or enforcing share charges, as provided for under the relevant transaction documents. The Company and other obligors under the Class C Debts have not made full repayment of all outstanding principal, interest and other amounts due under such Class C Debts.

*Material Contracts*

8.16    There are no contracts, other than contracts entered into in the ordinary course of business, to which the Group is party, for the two years immediately preceding the date of this Explanatory Statement, which contain any provisions under which CEG has any obligation or entitlement material to it as at the date hereof.

8.17    Additionally, as at the date of this Explanatory Statement, a number of material contracts have been entered into in furtherance of the Restructuring, including without limitation the RSAs as described at Section 8 (*Background to CEG, The Group and the Restructuring*) of this Explanatory Statement. The occurrence of the Restructuring Effective Date is an automatic termination event under the RSAs.

*Costs of the Restructuring*

8.18    Pursuant to Clause 30 (*Costs and Indemnity*) of the Schemes, CEG has agreed to meet certain costs, charges, expenses and disbursements reasonably incurred by the Advisors, the CEG AHG (including the AHG Advisors), Deloitte, the Information Agent, the Existing Notes Trustee, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary, the Existing Notes Collateral Agent, the Collateral Agent, the Holding Period Trustee, GLAS, and all other professional advisor fees, in connection with any and/or all actions taken pursuant to the negotiation, preparation and implementation of the Schemes, in each case as respectively agreed with the Company in separate arrangements. Further details of the fees payable to the AHG are set out in Section 13.4 (*AHG Fees*) of this Explanatory Statement.

*Proceedings*

8.19    A winding-up petition against the Company (the "**Petition**") dated 24 June 2022 was presented by Top Shine Global Limited ("**FCB Investor A**") in the Hong Kong Court, in case number HCCW 220 of 2022. The debt that is subject of the Petition is HK$862.5 million in connection with certain investments in respect of Fangchebao Group Co. Ltd. The Company has vigorously opposed the Petition. Reference is made to the announcements of the Company on HKEX website dated 27 June 2022, 5 September 2022, 8 September 2022, 28 November 2022 and 20 March 2023 regarding the Petition. As at the date of this Explanatory Statement, the hearing date of the Petition has been further adjourned to 30 October 2023.

8.20    In August 2022, an investor (the "**FCB Investor B**") of certain investments in respect of Fangchebao Group Co. Ltd. commenced a Hong Kong arbitration against, inter alia, the Company claiming payment of HK$862.5 million (the "**FCB Investor B Arbitration**"). On 8 September 2022, the Company commenced proceedings in the Hong Kong Court against FCB Investor B (the "**FCB Investor B S.181 Proceedings**") to, inter alia, (a) restrain FCB Investor B from taking any further steps in relation to the FCB Investor B Arbitration; and (b) a stay of the FCB Investor B Arbitration. As at the date of this Explanatory Statement, both FCB Investor B Arbitration and FCB Investor B S.181 Proceedings remain pending final decisions.

8.21    In October 2022, another investor (the "**FCB Investor C**") of certain investments in respect of Fangchebao Group Co. Ltd. commenced a Hong Kong arbitration against, inter alia, the Company claiming payment of approximately RMB127.7 million (the "**FCB Investor C Arbitration**"). On 11 November 2022, the Company commenced court proceedings against FCB Investor C (the "**FCB Investor C S.181 Proceedings**") to seek to, inter alia, (a) restrain FCB Investor C from taking any further steps in relation to the FCN Investor C Arbitration; and (b) a stay of the FCB Investor C Arbitration. As at the date of this Explanatory Statement, both FCB Investor C Arbitration and FCB Investor C S.181 Proceedings remain pending final decisions.

8.22    In September 2022, Mr. Wang Yun and Mr. Law Chup Shing Daniel commenced litigation proceedings against Shengyu (BVI) Limited and Chengdu Xinyi Real Estate Development Co. Ltd. (indirect subsidiaries of CEG) before the Hong Kong Court (HCA 1151 / 2022). The plaintiffs claim for, among other things, alleged unpaid sums of RMB65,000,000 under an agreement for the sale and purchase of shares in a Hong Kong company, which in turn indirectly holds a real estate project in the PRC. The defendants' case is (among other things) that the alleged unpaid sums were withheld for PRC tax withholding purposes. The litigation proceedings are ongoing as at the date of this Explanatory Statement.

8.23    As announced by the Company on 12 May 2023, the Company received an enforcement notice issued by the Guangzhou Intermediate People's Court of Guangdong Province in relation to the arbitral award of the Court of Guangdong Province, further in relation to the arbitral award of the Shenzhen Court of International Arbitration. The Company and a subsidiary namely Guangzhou Kailong Real Estate Company Limited and the Chairman are the parties subject to enforcement under the enforcement notice.

8.24    In addition to the foregoing, a number of onshore creditors have taken legal action against the Group, involving disputes mainly related to financial loans and other borrowings, construction and other service contracts, share transfer and other cooperation transactions. As at 6 July 2023, the number of pending court cases involving amounts over RMB100 million exceeds 680, involving a total of approximately RMB240.8 billion, and the number of pending arbitration cases is 37, involving a total of approximately RMB55.5 billion. In particular, as announced by the Company on 30 June, 2023, Hengda Real Estate had a total of 1,601 pending litigation cases which involved more than RMB30 million each, and the total amount involved was approximately RMB382.94 billion as at the end of May 2023.

8.25     To the best of the Board's knowledge and belief, as at the date of this Explanatory Statement and except for the Proceedings noted above, the Board is not aware of any adverse Proceedings, pending or threatened against the Group, which on a standalone basis would have a material adverse effect on its business operations and/or implementation of the Restructuring, taken as a whole.

### *Independent investigation in relation to EVPS Pledges*

8.26     On 21 March 2022, the Company announced that in the review of EVPS's financial report for the year ended 31 December 2021, it was found that deposits of EVPS in the amount of approximately RMB13.4 billion were pledged as security in favor of third parties (the "**EVPS Pledges**") which had been enforced by the relevant banks. An independent investigation committee comprising a non-executive Director and two independent non-executive Directors, and an independent investigation committee comprising the independent non-executive director of EVPS, were established to investigate the matter. Key findings of the independent investigations were announced by the Company and EVPS, respectively, on 15 February 2023.

8.27     In the interests of transparency, the Company would like to inform creditors that the results of the independent investigation is being taken seriously and actioned upon. The Company is currently in discussion with EVPS regarding a potential resolution. Reference is made to the announcements of the Company dated 21 March 2022, 29 March 2022, 22 July 2022 and 15 February 2023, and the announcements of EVPS dated 21 March 2022, 29 March 2022, 22 July 2022 and 15 February 2023 regarding the EVPS Pledges.

8.28     The Company will continue to coordinate and work with the relevant regulatory bodies in respect of the EVPS Pledges and will endeavour to make further announcements as and when updates are available.

9.    **EFFECT OF THE SCHEMES**

9.1    The principal object and purpose of the Schemes is to effect a compromise and arrangement between the Company and the Scheme Creditors so as to implement a financial restructuring of the Liabilities of the Company, the Group and the Existing Notes Subsidiary Guarantors under and/or in respect of the Existing Debts.

A.    **Release of Claims**

9.2    Broadly, subject to the terms of the Schemes, the effect of the Schemes will be to release, aside from the Excluded Liabilities and the Excluded Collateral, the Released Claims, specifically:

(a)    the Scheme Claims;

(b)    the Class A Group Claims;

(c)    the Released Persons from any Ancillary Claims; and

(d)    the Released Persons from any Restructuring Claims,

of Scheme Creditors in return for which Scheme Creditors will be entitled to receive distributions of Scheme Consideration in accordance with the terms of the Schemes and the Restructuring Documents. This is described more fully in Section 18.7 (*Releases*).

B.    **Effect on the Class A Scheme Creditors**

*Entitlement to receive Scheme Consideration*

9.3    If you wish to receive the Initial Distribution (if applicable) on the Restructuring Effective Date, the Consent Fee (if eligible), and Final Distribution on the Final Distribution Date, in accordance with the terms of the Schemes, please ensure that the required documents set out in Section 5 (*Summary of Actions to be Taken by Scheme Creditors*) above are validly completed, executed and returned online via the Portal in accordance with the instructions set forth therein so that they are submitted to and received by the Information Agent (or GLAS, if you are a Blocked Scheme Creditor, see further at Section 9.55) by the Voting Record Time, the Class A Options Deadline or the Class A Bar Date (as relevant). If you are not an Eligible Person (i.e. a person who cannot make affirmative securities law confirmations set out in Annex B to the Distribution Confirmation Deed), you may designate a Designated Recipient who is an Eligible Person in order to receive your New Instruments by submission of a (optional) Designated Recipient Form in accordance with the terms of the Scheme and the instructions set forth contained therein.

9.4    The Scheme Consideration (except for the Blocked Assets) will be distributed through Euroclear and Clearstream. It is advised that Scheme Creditors who do not have an account with Euroclear or Clearstream open such an account in order to receive the Scheme Consideration pursuant to the Schemes. If details of a Euroclear or Clearstream account are not provided before the Final Distribution Date (or the Interim Distribution Date, if applicable), the Scheme Creditor, on whose behalf the Account Holder Letter is being submitted, will not be entitled to receive any share of the Scheme Consideration.

9.5    For the avoidance of doubt, the Existing Notes Trustee and the Existing Notes Depositary in respect of the Existing Notes shall not be entitled to receive any Scheme Consideration.

*Form of Scheme Consideration and election of Scheme Consideration options*

9.6    The Scheme Consideration will be formed of New Instruments to be distributed by the Company to the Class A Scheme Creditors. The New Instruments comprise: (i) A1 Notes, (ii) EVPS MEBs, (iii) NEV MEBs, (iv) CEG MCBs, (v) A2 EVPS SLNs, (vi) A2 NEV SLNs and (vii) A2 Notes (by way of the adjustment following the completion of the Valuation and Adjudication Procedure, C2 EVPS SLNs and C2 NEV SLNs).

9.7    A summary of the terms of the relevant New Instruments available to be distributed to Class A Scheme Creditors, subject to their elected Option (as described below), can be found at Schedule 8 (*Summary of Terms of the New Instruments*) to this Explanatory Statement.

***Opportunity for Class A Scheme Creditors to make elections***

9.8    The nature of the Scheme Consideration allocated to Class A Scheme Creditors depends on the Option elected (or deemed to have been elected) by each Class A Scheme Creditor, namely the Option 1 Scheme Consideration or the Option 2 Scheme Consideration.

9.9    Class A Scheme Creditors can make indicative elections before the Voting Record Time between two options of the Scheme Consideration with respect to "**Option 1 Scheme Consideration**" or "**Option 2 Scheme Consideration**" (each, an "**Option**").

9.10   In order to make an election, Class A Scheme Creditors must carefully follow the instructions set out in the Solicitation Packet. Such elections shall be made within either: (i) an Account Holder Letter (for Class A Noteholders, other than Sanctions-Affected Scheme Creditors), (ii) a Class A Private Lender Proxy Form (for Class A Lenders, other than Sanctions-Affected Scheme Creditors), or (iii) a Blocked Scheme Creditor Form (for Blocked Scheme Creditors). Please see Section 5 (*Summary of Actions to be Taken by Scheme Creditors*) for further details.

9.11   Class A Scheme Creditors' elections will be *non-binding* if elected (as part of their Distribution Confirmation Deed) before the Voting Record Time. A Class A Scheme Creditor is required to make a non-binding election to qualify to vote at the Scheme Meetings.

9.12   After the Scheme Meetings, Class A Scheme Creditors who wish to amend their indicative elected Option (or to make an election for the first time) can do so by resubmitting the relevant part of the Account Holder Letter or the Class A Private Lender Proxy Form (as applicable) (effectively replacing the relevant part submitted previously), in accordance with the instructions set out therein so that it is duly submitted and received via the Portal by the Information Agent (or GLAS, if you are a Blocked Scheme Creditor, see further at Section 9.55). The last time for the Class A Scheme Creditors to amend their elected Option is before the Class A Options Deadline.

9.13   Class A Scheme Creditors must submit a valid election by the Class A Options Deadline to be able to elect either Option 1 Scheme Consideration or Option 2 Scheme Consideration.

9.14   Class A Scheme Creditors who fail to make a valid election by the Class A Options Deadline, but submit a valid Scheme Creditor Form(s) (as applicable) by the Class A Bar Date, will be automatically deemed to have elected Option 1 Scheme Consideration in respect of their Entitlement.

9.15   Class A Scheme Creditors selecting A2 Package as part of electing Option 2 Scheme Consideration may also receive the TJ Scheme Consideration to be received by CEG, in its capacity as a non-voting scheme creditor of TJ pursuant to the offshore restructuring under the TJ Scheme. Further details of how the TJ Scheme Consideration will be

calculated and distributed to Class A Scheme Creditors is set out in Section 10.30 of this Explanatory Statement and Clause 20 (*TJ Scheme Consideration*) of the Schemes.

9.16    In respect of Class A Scheme Creditors, the New Instruments constituting the A2 Package to be distributed as Scheme Consideration will be no less than the A2 Package Initial Portion and no more than the A2 Package Adjusted Portion. The description of the composition of the A2 Package is further set out in Section 10 (*Two Options of Scheme Consideration for Both Class A and Class C*) of this Explanatory Statement and Clause 15 (*Total Package, A2 Package and C2 Package*) of the Schemes.

9.17    Class A Scheme Creditors might not receive the Scheme Consideration they elected to receive where there is an Undersubscription or Oversubscription of the Option 2 Scheme Consideration. The adjustment and reallocation process for the allocation of the Scheme Consideration is set out in Section 10 (*Two Options of Scheme Consideration for Both Class A and Class C*) of this Explanatory Statement and Part D of the Schemes.

### *Calculation of Class A Scheme Creditor's Entitlement*

9.18    For the purpose of distribution of the Scheme Consideration, the value of each Class A Scheme Creditor's "**Entitlement**" to the Scheme Consideration shall be calculated on a Full Accrued Claim Basis.

### C.    **Effect on the Class C Scheme Creditors**

### *Entitlement to receive Scheme Consideration*

9.19    If you wish to receive the Scheme Consideration on the Final Distribution Date, in accordance with the terms of the Scheme, please ensure that the required documents set out in Section 5 (*Summary of Actions to be Taken by Scheme Creditors*) above duly completed, executed and returned online via the Portal in accordance with the instructions set forth therein so that they are submitted to and received by the Information Agent (or GLAS, if you are a Blocked Scheme Creditor, see further at Section 9.55) by the Class C Bar Date.

9.20    If you are not an Eligible Person (i.e. a person who cannot make affirmative securities law confirmations set out in Annex B to the Distribution Confirmation Deed), you may designate a Designated Recipient who is an Eligible Person in order to receive your New Instruments by submission of a (optional) Designated Recipient Form in accordance with the terms of the Scheme and the instructions set forth contained therein.

9.21    The Scheme Consideration (except for the Blocked Assets) will be distributed through Euroclear and Clearstream. It is advised that Scheme Creditors who do not have an account with Euroclear or Clearstream open such an account in order to receive the Scheme Consideration pursuant to the Schemes. If details of a Euroclear or Clearstream account are not provided before the Final Distribution Date (or Interim Distribution Date, if applicable), the Scheme Creditor will not be entitled to receive any share of the Scheme Consideration, as further set out in the Distribution Confirmation Deed.

9.22    For the avoidance of doubt, (i) the Lake Notes Trustee in respect of the Lake Notes; (ii) the Dongpo Notes Trustee in respect of the Dongpo Notes, and (iii) the Existing Agents in in respect of the applicable Class C Debts, shall not be entitled to receive any Scheme Consideration.

### *Form of Scheme Consideration and election of Scheme Consideration options*

9.23    The Scheme Consideration will be formed of New Instruments to be distributed by the Company to the Class C Scheme Creditors, pursuant to the terms of the Schemes,

including: (i) C1 Notes, (ii) EVPS MEBs, (iii) NEV MEBs, (iv) CEG MCBs, (v) C2 EVPS SLNs, (vi) C2 NEV SLNs and (vii) C2 Notes.

9.24    A summary of the terms of the relevant New Instruments available to be distributed to Class C Scheme Creditors, subject to their elected Option (as described below), can be found at Schedule 8 (*Summary of Terms of the New Instruments*) to this Explanatory Statement.

### *Opportunity for Class C Scheme Creditors to make elections*

9.25    Class C Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) and who have submitted the required Scheme Creditor Forms to the Information Agent by the Class C Bar Date will be allocated either the Option 1 Scheme Consideration or the Option 2 Scheme Consideration on the Final Distribution Date, depending on the Option elected (or deemed to have elected) by each Class C Scheme Creditor.

9.26    Class C Scheme Creditors must make their election before the Class C Bar Date between two options of the Scheme Consideration with respect to "**Option 1 Scheme Consideration**" or "**Option 2 Scheme Consideration**" (each, an "**Option**").

9.27    In order to make an election, Class C Scheme Creditors must carefully follow the instructions set out in the Solicitation Packet. Such elections shall be made within either: (i) an Account Holder Letter (for Class C Noteholders, other than Sanctions-Affected Scheme Creditors), (ii) a Class C Scheme Creditor Proxy Form (for Class C Scheme Creditors, other than the Class C Noteholders), or (iii) a Blocked Scheme Creditor Form (for Blocked Scheme Creditors). Please see Section 5 (*Summary of Actions to be Taken by Scheme Creditors*) for further details.

9.28    Class C Scheme Creditors' elections will be non-binding if elected (as part of the relevant Scheme Creditor Form as described above) before the Voting Record Time. A Class C Scheme Creditor is required to make a non-binding election to qualify to vote at the Scheme Meetings.

9.29    After the Scheme Meetings, Class C Scheme Creditors who wish to amend their indicative elected Option (or to make an election for the first time) can do so by resubmitting the relevant part of the Scheme Creditor Form (effectively replacing the relevant part submitted previously), in accordance with the instructions set out therein so that it is duly submitted and received via the Portal by the Information Agent. The last time for the Class C Scheme Creditors to amend their elected Option is before the Class C Bar Date.

9.30    Class C Scheme Creditors must submit a valid election by the Class C Bar Date to be able to elect either Option 1 Scheme Consideration or Option 2 Scheme Consideration.

9.31    Class C Scheme Creditors who fail to make a valid election by the Class C Bar Date, but submit a valid Scheme Creditor Form(s) (as applicable) by the Class C Bar Date, **will be** automatically deemed to have elected Option 1 Scheme Consideration in respect of their Entitlement.

9.32    Class C Scheme Creditors selecting C2 Package as part of election Option 2 Scheme Consideration may also receive the TJ Scheme Consideration to be received by CEG, in its capacity as a scheme creditor of TJ pursuant to the offshore restructuring under the TJ Scheme. Further details of how the TJ Scheme Consideration will be calculated and distributed to Class C Scheme Creditors is set out in Section 10.52 of this Explanatory Statement and Clause 20 (*TJ Scheme Consideration*) of the Schemes.

9.33    In respect of Class C Scheme Creditors, the New Instruments constituting the C2 Package to be distributed as Scheme Consideration to Class C Scheme Creditors in respect of their Entitlement shall be the C2 Package Adjusted Portion. The description of the composition of the C2 Package is further set out in Section 10 (*Two Options of Scheme Consideration for Both Class A and Class C*) of this Explanatory Statement and Clause 15 (*Total Package, A2 Package and C2 Package*) of the Schemes.

9.34    Class C Scheme Creditors may not receive the Scheme Consideration they elected to receive where there is an Undersubscription or Oversubscription of the Option 2 Scheme Consideration. The adjustment and reallocation process for the allocation of the Scheme Consideration is set out in Section 10 (*Two Options of Scheme Consideration for Both Class A and Class C*) of this Explanatory Statement and Part D of the Schemes.

**Calculation of Class C Scheme Creditor's Entitlement**

9.35    For the purpose of distribution of the Scheme Consideration the value of each Class C Scheme Creditor's "**Entitlement**" to the Scheme Consideration shall be calculated on a "**Deficiency Basis**" in accordance with the following formula:

"**Deficiency Basis**"        =        A        -        (B        +        C)

where:

A =        the value of the Scheme Creditor's Scheme Claims on a Full Accrued Claim Basis, as determined by the Scheme Administrators or the Scheme Adjudicator (as applicable).

B =        the Assessed Value of any Excluded Liabilities and Excluded Collateral, as determined in accordance with the Valuation and Adjudication Procedure, further set out in Clauses 38 (*Valuation Procedure*) and 40 (*Adjudication Procedure*) of the Schemes. Scheme Creditors are referred to the definitions of "Excluded Liabilities" and "Excluded Collateral" but in summary, they are Liabilities granted by any Person other then CEG who is an obligor, guarantor, security or other Credit Support provider of or in respect of a Class C Debt owed to a Class C Scheme Creditor.

C =        in respect of a put option and/or repurchase obligation, the Assessed Value of any securities retained by the put option holder and/or the creditor of the repurchase obligation, to which the put option and/or the repurchase obligation relates, as determined in accordance with the Valuation and Adjudication Procedure, further set out in Clauses 38 (*Valuation Procedure*) and 40 (*Adjudication Procedure*) of the Schemes.[25]

9.36    In summary, the Deficiency Basis takes account of the value of Class C Scheme Creditors' claims against any third party (i.e. any party other than the Company) in respect of the relevant Class C Debt when determining Class C Scheme Creditors' Entitlements to Scheme Consideration. This reflects the fact that the Schemes will release the Class C Debts against the Company, but will not release any Class C Scheme Creditor's claims against such third parties.

9.37    The Deficiency Basis has been adopted as a matter of fairness and practicality. The rights that the Class C Scheme Creditors have against third party obligors, namely the Excluded Liabilities, will not be released pursuant to the Schemes. Class C Scheme Creditors will not be

---

[25]This treatment is on the basis that a Class C Scheme Creditor who has a Scheme Claim against CEG pursuant to a put option and/or a repurchase obligation will have a right to damages (rather than the right to specific performance against CEG to fulfil the relevant put and/or repurchase obligation). This treatment regarding such Class C Scheme Creditor's Entitlement is consistent with the treatment regarding other Class C Scheme Creditors, whose Scheme Claims against CEG are unsecured.

restricted by the terms of the Schemes from recovering their claims (or the balance thereof) from such third parties. To reflect this, the Deficiency Basis operates so that Scheme Creditors will not receive Scheme Consideration in respect of the value of the claims which can be recovered from those third party obligors.

9.38    Class C comprises (i) selected private debts where CEG is a guarantor (where the principal obligor is an entity within the offshore group) or a borrower; (ii) onshore debts that have been guaranteed by CEG; and (iii) selected private debts where CEG has provided a put option or repurchase obligation to a creditor. Class C Scheme Creditors have, among themselves, a wide variety of financial instruments with different governing laws and securities. Moreover, the Class C Scheme Creditors hold different rights against third parties (i.e. other group companies) in respect of their Class C Debts. The Deficiency Basis has been adopted as a practical measure so as to prevent differences in Class C Scheme Creditors' rights against third parties from requiring an unmanageable number of classes, thereby rendering the Scheme unworkable.

### *Valuation and Adjudication Procedure for Class C Scheme Creditors*

9.39    As noted above, the Deficiency Basis takes account of the value of Class C Scheme Creditors' claims against any third party (i.e. any party other than the Company) in respect of the relevant Class C Debt when determining Class C Scheme Creditors' Entitlements to Scheme Consideration. In order to assess the value of such third party claims or (as applicable) securities retained by the Class C Scheme Creditor, the Schemes contain a Valuation Procedure and an Adjudication Procedure (together, the "**Valuation and Adjudication Procedure**"). That procedure is set out in Part D of the Schemes (and is summarized below).

9.40    The purpose of the Valuation and Adjudication Procedure is to provide a fair and efficient means of determining the value of each Class C Scheme Creditor's Entitlements. The Company has sought to ensure that the procedure for determining the value of a Class C Scheme Creditor's Entitlement is objective, fair and efficient, involving impartial decision making carried out by an independent Scheme Administrator and/or the Scheme Adjudicators (as applicable) by way of a structured process available to each of the Class C Scheme Creditors.

9.41    Each and every action undertaken by the Scheme Administrators pursuant to the Schemes are affirmed and ratified upon the Scheme Effective Date.

### **Valuation Procedure**

9.42    The Scheme Administrators, each as an independent third party, shall assess each Class C Scheme Creditor's Entitlements by taking into account the value of any Excluded Liabilities, Excluded Collateral and, in the case of a put option / repurchase obligation, the value of any retained securities (such value being the "**Assessed Value**") estimated by an independent Scheme Administrator (the "**Scheme Administrator Estimate**") by reference to the formulae set out in Clause 13 (*Calculation of a Scheme Creditor's Entitlement*) of the Schemes. Further details of the procedure for determining the Scheme Administrator Estimate can be found in Clause 38 (*Valuation Procedure*) of the Schemes.

9.43    The Scheme Administrators shall issue an Estimation Notice to each Class C Scheme Creditor who has submitted a Class C Scheme Claim notifying them of the Scheme Administrator Estimate and enclosing a blank Scheme Administration Estimate Acceptance or Rejection Form and any materials which the Scheme Administrators in their sole discretion consider necessary to allow that Class C Scheme Creditor to consider and evaluate the Scheme Administrator Estimate.

9.44    The Estimation Notice will be issued within either: (i) thirty (30) days after the Restructuring Effective Date (for Class C Scheme Claims submitted before the Restructuring Effective Date);

107

or (ii) thirty (30) days after the Class C Scheme Claim was submitted (for Class C Scheme Claims submitted on or after the Restructuring Effective Date and on or before the Class C Bar Date) to the Scheme Administrators.

9.45    The Class C Scheme Creditor shall have one (1) month from the date of the Estimation Notice to either accept or reject the Scheme Administrator Estimate by submitting a completed Scheme Administrator Estimate Acceptance or Rejection Form to the Scheme Administrators.

9.46    Upon the acceptance of the Scheme Administrator Estimate (or failure to submit a Scheme Administrator Estimate Acceptance or Rejection Form) within the specified time period under the Schemes, the Scheme Administrator will then send the Class C Scheme Creditor a Deed of Agreed Valuation to be executed by the Class C Scheme Creditor as a condition precedent to receiving Scheme Consideration.

9.47    If a Class C Scheme Creditor rejects the Scheme Administrator Estimate within the time period under the Schemes, that Class C Scheme Creditor and the Scheme Administrators will be required to seek to agree the value of the Class C Scheme Creditor's Entitlement by agreement during a Consultation Period, pursuant to the terms of the Schemes. A Class C Scheme Creditor rejecting the Scheme Administrator Estimate must provide an explanation of its reasons for such rejection and all evidence which it intends to rely upon in support of its position in the Scheme Administrator Estimate Acceptance or Rejection Form.

9.48    Further details as to the process and obligations performed as part of the Valuation Procedure between the Scheme Administrators, the Company and the relevant Class C Scheme Creditors, can be found in Clause 38 (*Valuation Procedure*) of the Schemes.

**Adjudication Procedure**

9.49    If, following the Consultation Period, the Scheme Administrator Estimate is not agreed or remains disputed, the Class C Scheme Claim will be referred to the Adjudication Procedure (such a claim being a "**Referred Scheme Claim**"). The relevant Scheme Administrator is required promptly to refer any such Referred Scheme Claim and the relevant Estimation Notice (together with all supporting documents provided to or by the Class C Scheme Creditor, and other relevant valuation evidence exchanged by the Scheme Administrators and the Class C Scheme Creditor during the Consultation Period), to a Scheme Adjudicator for review.

9.50    The Scheme Administrators will assign a Scheme Adjudicator to each Referred Scheme Claim, pursuant to the terms of the Schemes. The Scheme Adjudicator will be selected from a group of appointed individuals comprising independent senior barristers and retired senior judges. The appointed Scheme Adjudicator will then review the Referred Scheme Claim and relevant evidence before him/her and decide whether to:

(a)    make a final and binding adjudication on the Referred Scheme Claim; or

(b)    request further evidence from the Class C Scheme Creditor and/or the Scheme Administrators.

9.51    Pursuant to the Schemes, the Scheme Adjudicator shall have discretion to extend the appointed timeframes and/or adopt procedures (including, without limitation, requesting written submissions and further evidence from the parties, requesting oral hearings and/or the provision of expert evidence) as he or she considers appropriate for the purposes of providing a fair, efficient and expeditious means for the final resolution of the Referred Scheme Claim.

9.52    Once a Scheme Adjudicator has determined the value of a Referred Scheme Claim, that determination will be final and binding (insofar as permitted by law) and the relevant Class C

Scheme Creditor will be sent a Deed of Agreed Valuation recording its Entitlement. Each Class C Scheme Creditor will need to execute the Deed of Agreed Valuation as a condition of receiving Scheme Consideration.

9.53    The costs of the Adjudication Procedure (including the costs of the Scheme Adjudicator and any legal and other expenses incurred by the Company and such relevant Class C Scheme Creditor) will be within the discretion of the Scheme Adjudicator. Payment to the Company in full of any such costs ordered against the Scheme Creditor is a condition precedent to that Scheme Creditor's Entitlement to and receipt of its allotted Scheme Consideration.

9.54    Further details as to the process and obligations performed as part of the Adjudication Procedure between the Scheme Adjudicators, the Scheme Administrators, the Company and the relevant Class C Scheme Creditors, can be found in Clauses 39 (*The Scheme Adjudicators*) and 40 (*Adjudication Procedure*) of the Schemes.

### D.    Effect on the Blocked Scheme Creditors

9.55    Blocked Scheme Creditors are not a separate class of Scheme Creditors and their rights against the Company are not treated any differently to Scheme Creditors who are not Blocked Scheme Creditors. However, whilst Applicable Sanctions remain in place, an affected Blocked Scheme Creditor will not be entitled, able or permitted to (i) submit Account Holder Letters or have a Custody Instruction submitted on its behalf (if applicable) through the Clearing Systems or to the Information Agent in the relevant Scheme, or (ii) receive the Scheme Consideration on the Restructuring Effective Date or the Final Distribution Date, as further described below.

9.56    As a result, Blocked Scheme Creditors must submit (or procure the submission of, as applicable) a Blocked Scheme Creditor Form, together with supporting evidence and other materials as required, to GLAS in order to vote on the Schemes.

9.57    Blocked Scheme Creditors must ensure that validly completed and executed Blocked Scheme Creditor Forms, together with supporting evidence, is received by the Company in accordance with Section 5 (*Summary of Actions to be Taken by Scheme Creditors*) of this Explanatory Statement.

9.58    A Blocked Scheme Creditor that submits a Blocked Scheme Creditor Form must provide sufficient supporting evidence to allow for GLAS to reliably establish that Blocked Scheme Creditor's identity, status as a Scheme Creditor and the value of its relevant holding. GLAS will review each Blocked Scheme Creditor Form and the accompanying evidence submitted by the Voting Record Time to assess whether the Blocked Scheme Creditor Form has been completed correctly and whether there is sufficient evidence to reliably establish the Blocked Scheme Creditor's identity, status as a Scheme Creditor and the value of its holding.[26]

9.59    For the avoidance of doubt, Blocked Scheme Creditors will not be able to receive the Scheme Consideration on the Restructuring Effective Date, as applicable, if the Applicable Sanctions remain in place and the Blocked Scheme Creditors remain subject to such Applicable Sanctions. Instead, on the Restructuring Effective Date, any Scheme Consideration (including the A2 Package and/or A2 Notes) and any Consent Fee (if applicable) to which Blocked Scheme Creditors (who are Eligible Participating Creditors) may be entitled will be issued to and held

---

[26] Blocked Scheme Creditors do not need to submit a Custody Instruction because their Existing Notes or Class C Notes (as applicable) are already blocked from trading as their accounts were blocked by the Clearing Systems at the time the Applicable Sanctions were put in place. As such, Blocked Scheme Creditors are unable to submit instructions to the Clearing Systems.

by the Holding Period Trustee on trust under the Holding Period Trust Deed for the benefit of such Blocked Scheme Creditors during the Holding Period.

9.60    If the Applicable Sanctions are still in place upon the expiration of the Holding Period, CEG will appoint the Successor Escrow Agent to hold the Blocked Assets for the Blocked Scheme Creditors as described in Section 20 (*Holding Period Trust*) below, and further in accordance with the terms of the Schemes.

9.61    Any Residual Instruments (including the TJ Scheme Consideration and Consent Fee (if applicable)) that are transferred to the Holding Period Trust to be held by the Holding Period Trustee (and to the Successor Escrow Account to be held by the Successor Escrow Agent as Blocked Assets, if applicable) for the benefit of the Blocked Scheme Creditors will accrue interest from the Reference Date. Blocked Scheme Creditors will therefore be entitled to interest from the Reference Date (notwithstanding that the New Instruments may be distributed at a later date), ensuring that such Blocked Scheme Creditors are no worse off as compared with Scheme Creditors who are not Blocked Scheme Creditors.

9.62    For further details about the arrangements for the Blocked Scheme Creditors, please read this Explanatory Statement carefully as a whole, in particular Section 1 (*Expected Timetable of Key Events*) and Section 5 (*Summary of Actions to be Taken by Scheme Creditors*) of this Explanatory Statement.

10.      **TWO OPTIONS OF SCHEME CONSIDERATION FOR BOTH CLASS A AND CLASS C**

10.1    Each Class A Scheme Creditor and Class C Scheme Creditor is given the choice to elect between two options of Scheme Consideration – namely, Option 1 Scheme Consideration and Option 2 Scheme Consideration.

10.2    The following table provides a high-level overview of the Scheme Creditors' Entitlements to Scheme Consideration and the different Scheme Consideration that Class A Scheme Creditors and Class C Scheme Creditors can elect between. There is no option to elect a combination of Option 1 Scheme Consideration and Option 2 Scheme Consideration, i.e. a Scheme Creditor must elect to convert 100% of its Scheme Creditor's Entitlement to either Option 1 Scheme Consideration or Option 2 Scheme Consideration.

| **Overview of Scheme Creditors' Entitlement to and options of Scheme Consideration** | | |
|---|---|---|
| **Scheme Class** | Class A | Class C |
| **Scheme Creditors' Entitlement** | **Full Accrued Claim Basis** | **Deficiency Basis**, Scheme Creditors' Entitlement to be determined in accordance with the Valuation and Adjudication Procedure |
| **Scheme Consideration** | **Option 1 Scheme Consideration:**<br>• **100% of the Scheme Creditor's Entitlement to be converted into A1 Notes** (consisting of 3 tranches of USD notes with a tenor of 10 to 12 years, to be issued by CEG) | **Option 1 Scheme Consideration:**<br>• **100% of the Scheme Creditor's Entitlement to be converted into C1 Notes** (consisting of 3 tranches of USD notes with a tenor of 10 to 12 years, to be issued by CEG) |
| | **Option 2 Scheme Consideration, consisting of one of the following:**<br><br>• **100% of the Scheme Creditor's Entitlement to be converted to A2 Notes** (consisting of 4 tranches of USD notes with a tenor of 5 to 8 years, to be issued by CEG);<br>• **100% of the Scheme Creditor's Entitlement to be converted to A2 Package** (consisting of equity-linked instruments which are either exchangeable, convertible, or linked to shares in CEG, EVPS and NEV); or<br>• **A combination of the above-mentioned A2 Notes and A2 Package** (provided that the percentage of the Class A | **Option 2 Scheme Consideration, consisting of one of the following:**<br><br>• **100% of the Scheme Creditor's Entitlement to be converted C2 Notes** (consisting of 3 tranches of USD notes with a tenor of 7 to 9 years, to be issued by CEG);<br>• **100% of the Scheme Creditor's Entitlement to be converted to C2 Package** (consisting of equity-linked instruments which are either exchangeable, convertible, or linked to shares in CEG, EVPS and NEV); or<br>• **A combination of the above-mentioned C2 Notes and C2 Package** (provided that the percentage of the Class C |

111

| | | |
|---|---|---|
| | Scheme Creditor's Entitlement elected for each of the A2 Notes and the A2 Package shall be an integral multiple of 10%). <br><br> (all subject to adjustments and re-allocations) | Scheme Creditor's Entitlement elected for each of the C2 Notes and the C2 Package shall be an integral multiple of 10%). <br><br> (all subject to adjustments and re-allocations) |

10.3     If you are a Class A Scheme Creditor, please see Sections 10.5 – 10.31 below for details of the Option 1 Scheme Consideration and Option 2 Scheme Consideration that will be distributed to you. Additionally, please see Section 10.54 for illustrative diagrams further setting out the Scheme Consideration that you will receive, in accordance with your election.

10.4     If you are a Class C Scheme Creditor, please see Sections 10.32 – 10.53 below for details of the Option 1 Scheme Consideration and Option 2 Scheme Consideration that will be distributed to you. Additionally, please see Section 10.54 for illustrative diagrams further setting out the Scheme Consideration that you will receive, in accordance with your election.

### *Class A Scheme Creditors*

**Class A Scheme Creditors: Option 1 Scheme Consideration**

10.5     Subject to Section 10.6 below, on the Final Distribution Date, a Class A Scheme Creditor who has validly elected for Option 1 Scheme Consideration or a Class A Scheme Creditor who is deemed to have elected Option 1 Scheme Consideration (each an "**A1 Scheme Creditor**", together the "**A1 Scheme Creditors**") will receive A1 Notes in the principal amount equal to 100% of its Entitlement, i.e. the Class A Scheme Creditor will convert all of its Entitlement into A1 Notes at a conversion ratio of 1x, i.e., US$1 of the Class A Scheme Creditor's Entitlement as US$1 of the A1 Notes.

10.6     However, there is a possibility that a certain portion of an A1 Scheme Creditor's Entitlement will be converted to the A2 Package. This would occur when the A2 Package Initial Portion is so Undersubscribed that (x) the Class A Scheme Creditors' total Entitlements elected for A2 Package *plus* total Entitlements elected for A2 Notes; is *less than* (y) the A2 Package Initial Portion. In those circumstances, on the Final Distribution Date, an A1 Scheme Creditor will receive the following:

(a)     A2 Package Initial Portion, in the principal amount determined in accordance with the below; and

$$\frac{\text{Entitlement of an A1 Scheme Creditor}}{\text{Total Entitlements of all A1 Scheme Creditors}} \times \begin{array}{l}\text{A2 Package Initial Portion } \textit{minus} \text{ total} \\ \text{Entitlements elected for A2 Package and A2} \\ \text{Notes}\end{array}$$

(b)     A1 Notes, in the principal amount equal to the A1 Scheme Creditor's Entitlement *minus* the principal amount of the A2 Package Initial Portion determined above.

In essence, the aggregate value of the A1 Notes and A2 Package Initial Portion that the A1 Scheme Creditor will receive on the Final Distribution Date will be equal to 100% of the A1

Scheme Creditor's Entitlement. In the event of an Undersubscription of the A2 Package, A1 Scheme Creditors will be required to make up that shortfall by taking some A2 Package in place of A1 Notes.

10.7    The following table sets out certain selective terms on principal amount, maturity and interest of the A1 Notes, more details are set out at Schedule 8 (*Summary of Terms of the New Instruments*):

| Overview of the A1 Notes | | |
|---|---|---|
| **Principal amount** | | A1 Notes shall comprise three tranches as follows, with the following maximum aggregate principal amounts:<br>(a) Tranche A: the aggregate Class A Scheme Creditors' Entitlement's proportion in Option 1 multiplied by US$3,000 million;<br>(b) Tranche B: the aggregate Class A Scheme Creditors' Entitlement's proportion in Option 1 multiplied by US$3,000 million; and<br>(c) Tranche C: the aggregate Class A Scheme Creditors' Entitlements under Option 1 *minus* the sum of the principal amounts of A1 Notes Tranches A and B. |
| **Maturity** | | (a) Tranche A: 10 years from the Reference Date;<br>(b) Tranche B: 11 years from the Reference Date; and<br>(c) Tranche C: 12 years from the Reference Date. |
| **Interest** | **Rate** | (a) Tranche A: 2.0% or 3.0%;<br>(b) Tranche B: 2.5% or 3.5%; and<br>(c) Tranche C: 3.0% or 4.0%. |
| | **PIK** | All interest paid in kind with respect to any tranche will be added to the then current outstanding principal amount of such tranche. |
| | **General** | • Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount.<br>• The lower interest rate figure above reflects the rate per annum if all interest with respect to such interest payment period is paid in cash.<br>• The higher interest rate figure above reflects the rate per annum if any portion of interest with respect to such interest payment period is paid in kind.<br>• If the Company pays cash interest under any tranche of the A1 Notes with respect to any interest payment period, it shall also pay cash interest under all other outstanding tranches of the A1 Notes, Plain A2 Notes, C1 Notes, C2 Notes and Forced A2 Notes with respect to such interest payment period. The amount of such cash payments shall be allocated among the A1 Notes, Plain A2 Notes, C1 Notes, C2 Notes and (with respect to any interest payment period ending after the Final Distribution Date) Forced A2 Notes (and among each tranche of such instruments) on a pro rata basis by each tranche's outstanding principal amount at the time of the payment (subject to relevant provisions in the indentures for the Forced A2 Notes). |

10.8    As set out in the "*Principal amount*" row in the table above, the principal amount of each of the Tranches A and B of the A1 Notes is determined by:

$$\underline{\text{Total Entitlements of A1 Scheme Creditors}} \quad \times \quad \text{US\$3,000 million}$$

Total Entitlements of all Scheme Creditors
(i.e. both Class A Scheme Creditors and
Class C Scheme Creditors) validly elected
for Option 1 Scheme Consideration

10.9    As such, the principal amount of each Tranche of the A1 Notes can only be ascertained when the following are known:

(a)    the total A1 Scheme Creditors' Entitlements, which can only be known after the Class A Bar Date; and

(b)    the total C1 Scheme Creditors' Entitlements, which can only be known after the conclusion of the Valuation and Adjudication Procedure.

Therefore, the A1 Notes will only be distributed on the Final Distribution Date (or the Interim Distribution Date, if applicable).

On the Final Distribution Date, there may be adjustment (if required) to take into account any accrued and unpaid interest under the A1 Notes

**Class A Scheme Creditors: Option 2 Scheme Consideration**

10.10    A Class A Scheme Creditor electing Option 2 Scheme Consideration (an "**A2 Scheme Creditor**", together the "**A2 Scheme Creditors**") can elect to convert all or part of its Entitlement to any of the following:

(a)    A2 Notes (consisting of 4 tranches of USD notes with a tenor of 5 to 8 years, to be issued by CEG); or

(b)    A2 Package (consisting of equity-linked instruments which are either exchangeable, convertible, or linked to shares in CEG, EVPS and NEV).

10.11    Hence, as set out in the overview table at Section 10.2, an A2 Scheme Creditor can elect for 100% of its Entitlement to be converted into either A2 Notes or A2 Package, or, alternatively, it may elect for a combination of A2 Notes and A2 Package (provided that the percentage of the Class A Scheme Creditor's Entitlement elected for each of the A2 Notes and the A2 Package shall be an integral multiple of 10%).

10.12    Regardless of the election of A2 Notes and/or A2 Package made by an A2 Scheme Creditor, its Entitlement will be converted to the A2 Notes and/or A2 Package at a conversion ratio of 1x, i.e., US$1 of the A2 Scheme Creditor's Entitlement will be equal to US$1 of the A2 Notes and/or A2 Package. In other words, each A2 Scheme Creditor will be entitled to receive A2 Notes and/or A2 Package, the combined value of which is equal to the value of its Entitlement.

10.13    However, A2 Scheme Creditors may not receive the A2 Notes or the A2 Package in the amount they elected to receive where there is an Undersubscription of the A2 Package Initial Portion or Oversubscription of the A2 Package Initial Portion and/or the A2 Package Adjusted Portion (which are further described and illustrated in Sections 10.21 and 10.23 below and Part D of the Schemes).

10.14    To further explain and illustrate the A2 Notes and the A2 Package that an A2 Scheme Creditor may receive on the Restructuring Effective Date and the Final Distribution Date (or the Interim Distribution Date, if applicable), the following Sections will:

114

(a)     explain what the Total Package is and what it means to an A2 Scheme Creditor, see Section 10.15;

(b)     explain the composition of the A2 Package Initial Portion and A2 Package Adjusted Portion and what it means to an A2 Scheme Creditor, see Sections 10.16 to 10.20;

(c)     explain the concept of Undersubscription and Oversubscription of the A2 Package Initial Portion and how each impacts the distribution of the A2 Notes and A2 Package, see Sections 10.21 to 10.23;

(d)     explain the concept of Undersubscription and Oversubscription of the A2 Package Adjusted Portion and how each impacts the distribution of the A2 Notes and A2 Package, see Sections 10.24 to 10.25;

(e)     set out the distribution dates and the circumstances in which an Interim Distribution will be made, see Section 10.26;

(f)     set out certain selective terms of the A2 Notes, see Section 10.27;

(g)     provide further details on the exchangeable and convertible bonds included in the A2 Package, namely CEG MCBs, EVPS MEBs and NEV MEBs, see Section 10.28 (and for more details on the New Instruments, see Schedule 8 (*Summary of Terms of the New Instruments*));

(h)     provide further details on the securities-linked notes included in the A2 Package Initial Portion, namely A2 EVPS SLNs and A2 NEV SLNs and the securities-linked notes included in the A2 Package Adjusted Portion, namely C2 EVPS SLNs and C2 EVPS SLNs, see Section 10.29 (and for more details on the New Instruments, see Schedule 8 (*Summary of Terms of the New Instruments*));

(i)     provide further details on the distribution of the TJ Scheme Consideration to A2 Scheme Creditors, see Section 10.30; and

(j)     explain in general terms the distribution to Class A Scheme Creditors who are Blocked Scheme Creditors, see Section 10.31.

10.15   **What is the Total Package and what does it mean to an A2 Scheme Creditor?**

The Total Package is, in essence, the maximum aggregate amount of CEG MCBs, EVPS MEBs, NEV MEBs, EVPS SLNs and NEV SLNs (collectively, the "**Equity-Linked Instruments**") that CEG will be distributing as Scheme Consideration to all Class A Scheme Creditors and Class C Scheme Creditors.

For the purpose of making distributions to A2 Scheme Creditors on the Restructuring Effective Date, the Total Package is divided into the A2 Package Initial Portion and the C2 Package Initial Portion, calculated on the assumption that Class C Scheme Creditors' Entitlement will be determined on a Full Accrued Claim Basis. Such assumption is needed because the Class C Class C Scheme Creditors' Entitlement is calculated on a Deficiency Basis, which will only be determined approximately 9.5 months after the Restructuring Effective Date (due to the Class C Bar Date falling on a date approximately 4.5 months after Restructuring Effective Date, and the expected time required to complete the Valuation and Adjudication Procedure). Taking the approach of assuming a Full Accrued Claim Basis in determining the Initial Portion for Class C Scheme Creditors also allow an Initial Distribution to Class A Scheme Creditors on Restructuring Effective Date, without needing to wait for Scheme Creditors to come forward before the respective bar dates.

115

After the Valuation and Adjudication Procedure, the C2 Package Initial Portion will ultimately be adjusted, and will most likely be a smaller C2 Package Adjusted Portion (because the value of the Class C Scheme Creditors' claims on a Deficiency Basis will in all likelihood be smaller than on the Full Accrued Claim Basis); On the other hand, the A2 Package Initial Portion will ultimately be adjusted, most likely to be a larger A2 Package Adjusted Portion to reflect the reduced portion of the Total Package which will be allocated to Class C Scheme Creditors.

Accordingly, the A2 Package Initial Portion would represent the minimum share of the Total Package that would be distributable to A2 Scheme Creditors on the Restructuring Effective Date (except where the A2 Package Initial Portion is Undersubscribed by A2 Scheme Creditors), without the need to wait for the value of C2 Scheme Creditors' Entitlement being determined (as the C2 Package Initial Portion represents the maximum share of the Total Package that would be distribution to C2 Scheme Creditors).

10.16   **What does the A2 Package Initial Portion and the A2 Package Adjusted Portion mean to an A2 Scheme Creditor?**

The A2 Package Initial Portion comprises the minimum amount of the A2 Package which will be distributed to Class A Scheme Creditors.

The A2 Package Adjusted Portion is the maximum amount of the A2 Package which may be distributed to Class A Scheme Creditors. While Class A Scheme Creditors must collectively receive a minimum of the A2 Package Initial Portion as their Scheme Consideration, they will only receive A2 Package up to (and including) the A2 Package Adjusted Portion if their combined elections for A2 Package exceed the A2 Package Initial Portion.

10.17   **What is the value of the A2 Package Initial Portion?**

As an illustration[27], the value of the A2 Package Initial Portion is US$4,822 million and will consist of:

(a)   HK$1,696 million (equivalent to c. US$218 million) of CEG MCBs;

(b)   HK$4,080 million (equivalent to c. US$524 million) of EVPS MEBs;

(c)   HK$12,678 million (equivalent to c. US$1,630 million) of NEV MEBs (on a pro forma basis[28]);

(d)   US$1,100 million of A2 EVPS SLNs; and

(e)   US$1,350 million of A2 NEV SLNs.

10.18   **What will an A2 Scheme Creditor get for every US$1 of its Entitlement under the A2 Package?**

---

[27] All the principal amounts (and accordingly, any principal amount of New Instruments forming part of the Total Package derived from such principal amounts), assumes (a) the conversion of the Shareholder Loans into NEV Shares will take place on 14 August 2023; (b) a Restructuring Effective Date of 1 October 2023 and (c) the number of Shares, EVPS Shares and NEV Shares and the numbers so derived from such number of shares are based on the date of this Explanatory Statement.

[28] The principal amount of HK$24,310,300,516 will be issued where the Liabilities of NEV in respect of the agreements contemplated in the section titled "Treatment of Shareholder's Loans to NEV in the Term Sheet are converted to NEV MEBs on 14 August 2023 . If the Conversion of Shareholders' Loans to NEV Shares takes place at any other date, the principal amount of the NEV MEBs shall be adjusted by the Company based on the date of such conversion, in accordance with Clause 15.2 of the Schemes.

As an illustration, every US$1 of an A2 Scheme Creditor's Entitlement will be converted to US$1 of the A2 Package and will consist of:

(a)    US$0.109 of EVPS MEBs;

(b)    US$0.338 of NEV MEBs;[29]

(c)    US$0.045 of CEG MCBs;

(d)    US$0.228 of A2 EVPS SLNs comprising of:

    (i)    US$0.114 of tranche A of the A2 EVPS SLNs; and

    (ii)    US$0.114 of tranche B of the A2 EVPS SLNs; and

(e)    US$0.280 of A2 NEV SLNs comprising of:

    (i)    US$0.124 of tranche A of the A2 NEV SLNs; and

    (ii)    US$0.156 of tranche B of the A2 NEV SLNs.

**10.19    How are the principal amounts of the Equity-Linked Instruments included in the A2 Package Initial Portion calculated?**

As noted above at Section 10.17, the A2 Package Initial Portion will consist of (a) CEG MCBs; (b) EVPS MEBs; (c) NEV MEBs; (d) A2 EVPS SLNs; and (e) A2 NEV SLNs. The principal amount of each of these Equity-Linked Instruments included in the A2 Package Initial Portion is calculated based on the following:

(a)    **In respect of the CEG MCBs and NEV MEBs**: (x) the maximum principal amount of each of CEG MCBs and NEV MEBs in the Total Package; *multiplied by* (y) the A2 Accrued Claims Ratio (i.e. the A2 Scheme Creditors' Full Accrued Claims *divided by* the total Full Accrued Claims of A2 Scheme Creditors and C2 Scheme Creditors);

(b)    **In respect of the EVPS MEBs**: (x) 50% of the maximum principal amount of EVPS MEBs in the Total Package; *plus* (y) 50% of the maximum principal amount of EVPS MEBs *multiplied by* the A2 Accrued Claims Ratio;

(c)    **In respect of the A2 EVPS SLNs**: US$1,100 million, being a fixed amount of the EVPS SLNs allocated to the A2 Package Initial Portion, as determined by the estimated A2 Accrued Claims Ratio and the C2 Accrued Claims Ratio as contemplated under the CEG Term Sheet as at 2 April 2023; and

(d)    **In respect of the A2 NEV SLNs:** US$1,350 million, being a fixed amount of the NEV SLNs out of the Total Package allocated to the A2 Package Initial Portion determined by the estimated A2 Accrued Claims Ratio and the C2 Accrued Claims Ratio as contemplated under the CEG Term Sheet as at 2 April 2023.

**10.20    What is the A2 Package Adjusted Portion?**

The A2 Package Adjusted Portion is the maximum amount of the A2 Package which may be distributed to Class A Scheme Creditors.

---

[29] This is subject to the adjustment set out in footnote 28 above and Clause 15.2 of the Schemes.

The A2 Package Adjusted Portion is the sum of (a) the A2 Package Initial Portion; and (b) the C2 Package Initial Portion *minus* the C2 Package Adjusted Portion.

The rationale is to allow the Class A Scheme Creditors to take up more Equity-Linked Instruments, following the determination of the Class C Scheme Creditors' Entitlements after the conclusion of the Valuation and Adjudication Procedure. To explain more specifically:

(a)     the C2 Package Adjusted Portion reflects the Class C Scheme Creditors' Entitlements, which is on a Deficiency Basis determined through the Valuation and Adjudication Procedure (rather than assuming that all Class C Scheme Creditors' Entitlements are on a Full Accrued Claim Basis, which is the basis used to determine the C2 Package Initial Portion);

(b)     Following the determination of the C2 Package Adjusted Portion (which is most likely to be less than the C2 Package Initial Portion), the difference between the C2 Package Initial Portion and the C2 Package Adjusted Portion is added to the A2 Package Initial Portion such that, together with the A2 Package Initial Portion, constituting the A2 Package Adjusted Portion.

**10.21   What is an Oversubscription of the A2 Package Initial Portion and how does it impact the distribution of the A2 Notes / A2 Package?**

An Oversubscription of the A2 Package Initial Portion occurs when the total A2 Scheme Creditors' Entitlements elected for the A2 Package is *higher than* the value of the A2 Package Initial Portion.

As described above in Section 10.16 above, the A2 Package Initial Portion and the A2 Package Adjusted Portion are, respectively, the minimum and maximum amounts of the Equity-Linked Instruments that could be distributed to Class A Scheme Creditors. The value of the A2 Package Initial Portion is fixed and thus can and will be distributed on the Restructuring Effective Date, (except where the A2 Package Initial Portion is Undersubscribed by A2 Scheme Creditors) whereas the value of the C2 Package Adjusted Portion – and accordingly, the A2 Package Adjusted Portion – will only be known after the conclusion of the Valuation and Adjudication Procedure.

In the event of an Oversubscription of the A2 Package Initial Portion, on the Restructuring Effective Date:

(a)     The A2 Package Initial Portion will be distributed to Class A Scheme Creditors in respect of their Entitlements elected for the A2 Package, on a pro rata basis;

(b)     For the remaining Entitlements elected for the A2 Package, i.e. the Oversubscribed Portion of the A2 Package Initial Portion, this Entitlement will be distributed as Forced A2 Notes. The Forced A2 Notes will be redeemed, exchanged and/or converted into the C2 Package Unadmitted Portion starting from the tranche of Forced A2 Notes with the longest maturity and in reverse chronological order, amongst holders of the Forced A2 Notes, whereas any remaining Forced A2 Notes which is not redeemed, exchanged and/or converted into the C2 Package Unadmitted Portion will remain as Forced A2 Notes.

Please refer to the flowcharts in Section 10.54 below for an illustration of distribution of an Oversubscription of the A2 Package Initial Portion and the implications on Scheme Consideration distribution in the event of such an Oversubscription.

10.22    **How will Forced A2 Notes and Plain A2 Notes be distributed when the A2 Package Initial Portion is Oversubscribed?**

In an Oversubscription of the A2 Package Initial Portion described in Section 10.21 above, Forced A2 Notes and Plain A2 Notes will be distributed to Class A Scheme Creditors elected for the A2 Package and the A2 Notes, respectively. Each of these Class A Scheme Creditors are referred to as "**A2 Notes Recipients**".

The Company, in consultation with the Information Agent and/or the Scheme Administrators, will determine the issuance and distribution of the A2 Notes (as Forced A2 Notes *and* Plain A2 Notes) on the Restructuring Effective Date in the following manner:

(a)    *first*, the Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the aggregate principal amounts of the tranche A, tranche B, tranche C and, if any, tranche D of the A2 Notes that will be issued on the Restructuring Effective Date in accordance with the total amount of Entitlements of the A2 Notes Recipient as set out below:

    (i)    the aggregate principal amount of tranche A shall be up to US$500 million;

    (ii)    the aggregate principal amount of tranche B shall be up to US$650 million;

    (iii)    the aggregate principal amount of tranche C shall be up to US$3,800 million; and

    (iv)    the aggregate principal amount of tranche D if any shall be the total amount of the Entitlements of the A2 Notes Recipients *less* the aggregate principal amounts of tranche A, tranche B and tranche C;

(b)    *second*, the Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the allocation of tranche A, tranche B, tranche C and, if any, tranche D of the A2 Notes that will be issued and distributed to A2 Notes Recipients on a pro rata basis and allocation will be made in sequential order by maturity date. An A2 Notes Recipient will receive an equal amount of tranche A, tranche B, tranche C and, if any, tranche D of A2 Notes in respect of each dollar of Entitlement converted to A2 Notes as compared to such other A2 Notes Recipient;

(c)    *third,* the Company, in consultation with the Information Agent and/or the Scheme Administrators, shall allocate the appropriate A2 Notes to each A2 Notes Recipient:

    (i)    A2 Notes allocated by the Company to A2 Notes Recipients who elected for the A2 Notes shall be the Plain A2 Notes; and

    (ii)    A2 Notes allocated by the Company to A2 Notes Recipients who elected for the A2 Package shall be the Forced A2 Notes.

10.23    **What is an Undersubscription of the A2 Package Initial Portion and how does it impact the distribution of the A2 Notes / A2 Package?**

An Undersubscription of the A2 Package Initial Portion occurs when the total A2 Scheme Creditors' Entitlement elected for the A2 Package is *lower than* the value of the A2 Package Initial Portion.

In the event of an Undersubscription of the A2 Package Initial Portion, the A2 Package Initial Portion will be distributed, in this order, to Class A Scheme Creditors electing for (a) the A2

Package; (b) the A2 Notes; and (c) where applicable, the A1 Notes (i.e. A1 Scheme Creditors), as follows:

(a)    For Entitlements elected for the A2 Package, there will be a distribution of the A2 Package Initial Portion in an amount equal to the value of such Entitlements on the Restructuring Effective Date;

(b)    For Entitlements elected for the A2 Notes, there will be a distribution of the remaining portion of the A2 Package Initial Portion on a pro rata basis on the Restructuring Effective Date; and

(c)    For Entitlements elected for the A1 Notes, there will only be a distribution of the A2 Package Initial Portion if there remains an undistributed portion of the A2 Package Initial Portion despite the re-allocation described in the preceding paragraph, which would be the case if the A2 Package Initial Portion is higher than the sum of Entitlements elected for the A2 Package and A2 Notes. Any such undistributed A2 Package Initial Portion will be distributed to Entitlements elected for Option 1 Scheme Consideration on a pro rata basis on the Final Distribution Date (or the Interim Distribution Date, if applicable).[30]

Please refer to the flowcharts in Section 10.54 below for an illustration of distribution of an Undersubscription of the A2 Package Initial Portion and the implications on Scheme Consideration distribution in the event of such an Undersubscription.

10.24    **What is an Oversubscription of the A2 Package Adjusted Portion and how does it impact the distribution of the A2 Notes / A2 Package?**

An Oversubscription of the A2 Package Adjusted Portion occurs when the total A2 Scheme Creditors' Entitlements elected for the A2 Package is *higher than* the value of the A2 Package Adjusted Portion, as determined after the conclusion of the Valuation and Adjudication Procedure.

As noted in Section 10.21 above, for any Entitlement elected for the A2 Package in excess of the A2 Package Initial Portion, an A2 Scheme Creditor will be distributed Forced A2 Notes instead on the Restructuring Effective Date. Where there is an Oversubscription of the A2 Package Adjusted Portion, on the Final Distribution Date (and the Interim Distribution Date, if applicable), there will be a redemption, exchange and/or conversion of Forced A2 Notes into the C2 Package Unadmitted Portion starting from the tranche of Forced A2 Notes with the longest maturity and in reverse chronological order, on a pro rata basis amongst holders of the Forced A2 Notes, whereas any remaining Forced A2 Notes which is not converted into the C2 Package Unadmitted Portion will remain as Forced A2 Notes but will become on terms identical to for the Plain A2 Notes distributed to Class A Scheme Creditors elected for the A2 Notes.

10.25    **What is an Undersubscription of the A2 Package Adjusted Portion and how does it impact the distribution of the A2 Notes / A2 Package?**

An Undersubscription of the A2 Package Adjusted Portion occurs when the total A2 Scheme Creditors' Entitlements elected for the A2 Package is *lower than* the value of the A2 Package Adjusted Portion, as determined after the conclusion of the Valuation and Adjudication Procedure.

---

[30] This distribution could not be made on the Restructuring Effective Date as the particular tranches of A1 Notes to be issued to A1 Scheme Creditors would only be known after the completion of the Valuation and Adjudication Procedure. Accordingly, a pro rata distribution of the remaining portion of the A2 Package Initial Portion to all A1 Scheme Creditors is made on the Final Distribution Date (or the Interim Distribution Date, if applicable).

If the A2 Package Initial Portion was Oversubscribed but the A2 Package Adjusted Portion is Undersubscribed, the Forced A2 Notes will all be redeemed, exchanged and/or converted into the C2 Package Unadmitted Portion.

The EVPS Shares and NEV Shares associated with the New Instruments constituting the Undersubscribed Portion of the A2 Package Adjusted Portion (including the EVPS MEBs, NEV MEBs, C2 EVPS SLNs and C2 NEV SLNs) will be allocated to the respective pools of underlying shares for the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs and C2 NEV SLNs in accordance with Clause 18.5 of the Schemes. The Shares associated with the CEG MCBs of such Undersubscribed Portion will not be issued or will be extinguished (as applicable) on the Final Distribution Date.

10.26    **What are the dates on which Scheme Consideration would be distributed and when would an Interim Distribution be made?**

There are generally two distribution dates for Class A Scheme Creditors:

(a)    **Initial Distribution on Restructuring Effective Date.** A2 Scheme Creditors may receive an Initial Distribution on the Restructuring Effective Date; and

(b)    **Final Distribution on the Final Distribution Date.** This will be a date after the completion of the Valuation and Adjudication Procedure. A1 Scheme Creditors will only receive Scheme Consideration at the Final Distribution Date. On the Final Distribution Date, there may be adjustment (if required) to take into account any accrued and unpaid interest under the relevant New Instruments.

On the Final Distribution Date, the Company shall redeem, exchange and/or convert the amount of Forced A2 Notes equivalent to the amount up to and including the C2 Package Unadmitted Portion (if applicable) starting from the tranche of the Forced A2 Notes with the longest maturity and in reverse chronological order and on a dollar-for-dollar basis (with any adjustment required (if any) to take into account any accrued and unpaid interest under the Forced A2 Notes).

To cater for any unforeseen circumstances which may delay the completion of the Valuation and Adjudication Procedure, an interim distribution of Scheme Consideration (including the redemption, exchange and/or conversion of the C2 Package Unadmitted Portion with respect to the Forced A2 Notes in accordance with Clause 18.4 of the Schemes) will be made to Class A Scheme Creditors (except for Blocked Scheme Creditors if the Applicable Sanctions remain in place) whose Entitlements have been determined, on the "**Interim Distribution Date**", being the date which is 295 calendar days after the Restructuring Effective Date.

The amount of the interim distribution to be provided shall be determined by reserving a maximum amount of Scheme Consideration for those Class C Scheme Creditors whose Entitlements are not fully determined (as if the Entitlement of such Class C Scheme Creditors were calculated on a Full Accrued Claim Basis), as further set out in Clause 21 (*Interim Distribution*) of the Schemes.

Where an interim distribution is made, the amount of Scheme Consideration to be distributed on the Final Distribution Date would be reduced accordingly such that each Scheme Creditor shall receive Scheme Consideration which is equal to (and not greater than) the value of its Entitlement.

10.27    **Terms of the A2 Notes**

The illustrative table below sets out certain selective terms on principal amount, maturity and interest of the A2 Notes, more details are set out at Schedule 8 (*Summary of Terms of the New Instruments*):

| Overview of principal terms on A2 Notes | | |
|---|---|---|
| **Principal amount** | | A2 Notes shall comprise four tranches as follows, with the following maximum aggregate principal amounts:<br>(a) Tranche A: US$500 million;<br>(b) Tranche B: US$650 million;<br>(c) Tranche C: US$3,800 million; and<br>(d) Tranche D: the aggregate A2 Scheme Creditors' Entitlement *minus* (i) Class A Scheme Creditors' Entitlement's portion of the principal amounts of EVPS MEBs, NEV MEBs and CEG MCBs; (ii) the principal amounts of A2 EVPS SLNs and A2 NEV SLNs; and (iii) the principal amounts of A2 Notes Tranches A, B and C. |
| **Maturity** | | (a) Tranche A: 5 years from the Reference Date;<br>(b) Tranche B: 6 years from the Reference Date;<br>(c) Tranche C: 7 years from the Reference Date; and<br>(d) Tranche D: 8 years from the Reference Date.<br>With respect to each tranche of the A2 Notes, any outstanding principal amount under such A2 Notes shall be repaid on maturity, together with any accrued but unpaid interest. |
| **Interest** | **Rate** | (a) Tranche A: 5.0% or 6.0%;<br>(b) Tranche B: 5.5% or 6.5%;<br>(c) Tranche C: 6.0% or 7.0%; and<br>(d) Tranche D: 6.5% or 7.5%. |
| | **PIK** | All interest paid in kind with respect to any tranche will be added to the then current outstanding principal amount of such tranche. |
| | **General** | • Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount.<br>• The lower interest rate figure above reflects the rate per annum if all interest with respect to such interest payment period is paid in cash.<br>• The higher interest rate figure above reflects the rate per annum if any portion of interest with respect to such interest payment period is paid in kind.<br>• Interest on the outstanding principal amount shall be paid in the following manner:<br>  o For the first two and a half years after the Reference Date: interest may be paid in cash or in kind, at the election of the Company;<br>  o From the 31st month to the 36th month after the Reference Date: interest in an amount equal to at least 0.5% of the outstanding principal amount of each tranche of the A2 Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company;<br>  o For the fourth year after the Reference Date: interest in an amount equal to at least 3.0% p.a. of the outstanding principal amount of each tranche of the A2 Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company;<br>  o Starting from the fifth year after the Reference Date: interest shall be paid in cash; and |

122

|  |  |  | o   If the Company pays cash interest under any tranche of the Plain A2 Notes or Forced A2 Notes with respect to any interest payment period in an amount greater than the amount of cash interest required to be paid on such tranche with respect to such interest payment period, it shall also pay additional cash interest under all other tranches of the A2 EVPS SLNs, A2 NEV SLNs, Plain A2 Notes, C2 EVPS SLNs, C2 NEV SLNs, C2 Notes and Forced A2 Notes. The amount of such additional cash payments shall be allocated among each of the A2 EVPS SLNs, A2 NEV SLNs, Plain A2 Notes, C2 EVPS SLNs, C2 NEV SLNs, C2 Notes and (with respect to any interest payment period ending after the Final Distribution Date) Forced A2 Notes (and among each tranche of such instruments) on a pro rata basis by outstanding principal amount at the time of the payment (subject to relevant provisions in the indentures for the Forced A2 Notes). |

10.28    **Terms of the exchangeable and convertible bonds included in the A2 Package**

The illustrative table below sets out certain selective terms on the exchangeable and convertible bonds included in the A2 Package, more details are set out at Schedule 8 (*Summary of Terms of the New Instruments*):

| Exchangeable and convertible bonds | EVPS MEBs* | NEV MEBs* | CEG MCBs |
|---|---|---|---|
| Total amount available under the New Instruments for allocation to all Scheme Creditors | HK$32,926 million (equivalent to c. US$4,232 million), being the sum of the EVPS MEBs, NEV MEBs and CEG MCBs, whose available amounts are HK$5,364 million (equivalent to c. US$689 million), HK$24,311 million (equivalent to c. US$3,125 million) and HK$3,253 million (equivalent to c. US$418 million), respectively | | |
| Fixed Conversion Price or Exchange Price | HK$2.30 per share, i.e., 1x the last trading price of EVPS prior to its trading suspension | HK$3.84 per share, i.e., 1.2x the last trading price of NEV prior to its trading suspension | HK$0.5775 per share, i.e., 0.35x the last trading price of CEG prior to its trading suspension |
| Voluntary conversion or exchange | Subject to certain conditions, holders have the option to exchange or convert (as applicable) | | |
| Mandatory conversion or exchange | 24 months from the Reference Date | | 5 years from the Reference Date |

*The Exchange Property for the NEV MEBs and EVPS MEBs shall be placed into the securities accounts established pursuant to the terms of the NEV MEBs Trust Deed and the EVPS MEBs Trust Deed respectively

10.29    **Terms of the securities-linked notes included in the A2 Package Initial Portion and A2 Package Adjusted Portion**

The illustrative table below sets out certain selective terms on the securities-linked notes included in the A2 Package Initial Portion and the C2 Package Unadmitted Portion (being the Equity-Linked Instruments constituting the enlarged A2 Package Adjusted Portion), more details are set out at Schedule 8 (*Summary of Terms of the New Instruments*):

| Securities-linked notes | | A2 Package Initial Portion | | C2 Package Unadmitted Portion | |
|---|---|---|---|---|---|
| | | A2 EVPS SLNs | A2 NEV SLNs | C2 EVPS SLNs** | C2 NEV SLNs*** |
| **Aggregate principal amount as of the Restructuring Effective Date** | | US$1,100 million<br>• Tranche A: US$550 million<br>• Tranche B: US$550 million | US$1,350 million<br>• Tranche A: US$600 million<br>• Tranche B: US$750 million | US$300 million<br>• Tranche A: US$150 million<br>• Tranche B: US$150 million | US$1,150 million<br>• Tranche A: US$500 million<br>• Tranche B: US$650 million |
| **Tenor** | | • Tranche A: 5 years<br>• Tranche B: 6 years | • Tranche A: 5 years<br>• Tranche B: 6 years | • Tranche A: 7 years<br>• Tranche B: 8 years | • Tranche A: 7 years<br>• Tranche B: 8 years |
| **Underlying shares**[31] | | 2,493,778,025 EVPS Shares in total to be allocated pro rata to the respective tranches by principal amount | 2,627,583,193 NEV Shares in total to be allocated pro rata to the respective tranches by principal amount | 749,465,275 EVPS Shares in total to be allocated pro rata to the respective tranches by principal amount | 2,257,946,417 NEV Shares in total to be allocated pro rata to the respective tranches by principal amount |
| **Interest** | **Rate** | • Tranche A: 5.0%<br>• Tranche B: 5.5% | • Tranche A: 5.0%<br>• Tranche B: 5.5% | • Tranche A: 6.0%<br>• Tranche B: 6.5% | • Tranche A: 6.0%<br>• Tranche B: 6.5% |
| | **PIK** | If any interest with respect to an interest payment period is paid in kind, the interest rate will be 1.0% higher than the respective interest rates above, with respect to such interest payment period. | | | |
| | **General** | • Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the respective tranche.<br>• For the first two and a half years after the Reference Date, interest may be paid in cash or in kind, at the election of CEG.<br>• For 31 months after the Reference Date to 36 months after the Reference Date, interest in an amount equal to at least 0.5% of the outstanding principal amount of each tranche shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of CEG.<br>• For the fourth year after the Reference Date, interest in an amount equal to at least 3.0% of the outstanding principal amount of each tranche shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of CEG.<br>• Starting from the fifth year after the Reference Date, interest shall be paid in cash. | | | |

---

[31] The number of underlying shares is reached under the assumption that the Conversion of Shareholders' Loans to NEV Shares and the conversion of the Related Party Loan into new NEV Shares have occurred. Additionally, if the A2 Package Adjusted Portion is Undersubscribed, shares associated with such Undersubscribed Portion will be allocated to the respective pools of underlying shares for the security-linked notes included in the A2 Package and C2 Package, with the A2 EVPS SLNs and A2 NEV SLNs included in the former.

| | | • If the Company pays cash interest under any tranche with respect to any interest payment period in an amount greater than the amount of cash interest required to be paid on such tranche with respect to such interest payment period, it shall also pay additional cash interest under all other outstanding tranches of the A2 EVPS SLNs, A2 NEV SLNs, Plain A2 Notes, C2 EVPS SLNs, C2 NEV SLNs, C2 Notes and Forced A2 Notes. The amount of such additional cash payments shall be allocated among the A2 EVPS SLNs, A2 NEV SLNs, Plain A2 Notes, C2 EVPS SLNs, C2 NEV SLNs, C2 Notes and (with respect to any interest payment period ending after the Final Distribution Date) Forced A2 Notes (and among each tranche of such instruments) on a pro rata basis by outstanding principal amount (subject to relevant provisions in the indentures for the Forced A2 Notes). |
|---|---|---|

\*\* Share certificate of 749,465,275 EVPS Shares which will form part of the Security for the C2 EVPS SLNs shall be delivered to the New Instruments Collateral Agent to be held in custody pending the issuance of the C2 EVPS SLNs on the Final Distribution Date.

\*\*\* (x) 1,503,503,540 NEV Shares; and (y) the NEV Shares with respect to the NEV Custody Account Transfer, each of which will form part of the custody arrangement for the C2 NEV SLNs shall be held in a securities account in the name of the of the Company or an offshore subsidiary of the Company, the withdrawal of which will be restricted other than for the issuance of the C2 NEV SLNs on the Final Distribution Date.

10.30   **What is the additional TJ Scheme Consideration to be distributed to A2 Scheme Creditors and when would it be distributed?**

The Company may receive consideration in its capacity as a scheme creditor in, and pursuant to the terms of, the TJ Scheme (the "**TJ Scheme Consideration**"). Any TJ Scheme Consideration received by the Company will be distributed on a pro rata basis to those A2 Scheme Creditors and C2 Scheme Creditors who have validly elected by the applicable deadline to receive the A2 Package and the C2 Package respectively (calculation methodology is set out at Clauses 20.3 and 20.4 of the Schemes). Any such TJ Scheme Consideration distributed would be in addition to and would not reduce the Scheme Consideration to be paid in an amount equal to the relevant Scheme Creditors' Entitlements.

If the Company receives the TJ Scheme Consideration prior to the conclusion of the Valuation and Adjudication Procedure, the Company will make an interim distribution of the TJ Scheme Consideration to the eligible Class A Scheme Creditors prior to the Final Distribution Date. If the Company receives the TJ Scheme Consideration after the Final Distribution Date, the TJ Scheme Consideration will be distributed to such eligible Scheme Creditors on a date to be designated by the Company but no later than three months after the date on which the Company receives the TJ Scheme Consideration to be designated by the Company.

The amount of the interim distribution to be provided will be determined by reserving a maximum amount of TJ Scheme Consideration for those Class C Scheme Creditors whose Entitlements are not fully determined (as if the Entitlement of such Class C Scheme Creditors were calculated on a Full Accrued Claim Basis), as further set out in Clause 20 (*TJ Scheme Consideration*) of the Schemes.

Where an interim distribution is made, the amount of TJ Scheme Consideration to be distributed on the Final Distribution Date would be reduced accordingly such that each Scheme Creditor shall receive TJ Scheme Consideration which is equal to (and not greater than) the value of its Entitlement.

10.31    **How would Scheme Consideration be distributed to Class A Scheme Creditors who are Blocked Scheme Creditors?**

For Class A Scheme Creditors who are Blocked Scheme Creditors, any Initial Distribution, interim distribution of Scheme Consideration, TJ Scheme Consideration and Consent Fee that such Class A Scheme Creditors would otherwise be entitled to receive would be issued to the Holding Period Trustee to hold on trust for such Class A Scheme Creditors under the terms of the Holding Period Trust Deed, on the Restructuring Effective Date and/or the Interim Distribution Date (as applicable).

**Class C Scheme Creditors: Option 1 Scheme Consideration**

10.32    Subject to Section 10.33 below, on the Final Distribution Date, a Class C Scheme Creditor who validly elected Option 1 Scheme Consideration or a Class C Scheme Creditor who is deemed to have elected Option 1 Scheme Consideration (each a "**C1 Scheme Creditor**", together the "**C1 Scheme Creditors**") will receive C1 Notes in the principal amount equal to 100% of its Entitlement, i.e. the Class C Scheme Creditor will convert all of its Entitlement into C1 Notes at a conversion ratio of 1x, i.e., US$1 of the Class C Scheme Creditor's Entitlement as US$1 of the C1 Notes.

10.33    However, there is a possibility that a certain portion of a C1 Scheme Creditor's Entitlement will be converted to the C2 Package Adjusted Portion. This would occur when the C2 Package Adjusted Portion is so Undersubscribed that (x) the Class C Scheme Creditors' total Entitlements elected for C2 Package *plus* total Entitlements elected for C2 Notes; is *less than* (y) the C2 Package Adjusted Portion. In those circumstances, on the Final Distribution Date, a C1 Scheme Creditor will receive the following:

(a)    C2 Package Adjusted Portion, in the principal amount determined in accordance with the below; and

$$\frac{\text{Class C Scheme Creditor's Entitlement, as determined on a Deficiency Basis through the Valuation and Adjudication Procedure}}{\text{All Class C Scheme Creditor's Entitlement, as determined on a Deficiency Basis through the Valuation and Adjudication Procedure}} \times \begin{array}{c}\text{C2 Package Adjusted Portion } minus \\ \text{total Entitlements elected for C2} \\ \text{Package and C2 Notes}\end{array}$$

(b)    C1 Notes, in the principal amount equal to the C1 Scheme Creditor's Entitlement *minus* the principal amount of the C2 Package Adjusted Portion determined above.

In essence, the aggregate value of the C1 Notes and the C2 Package Adjusted Portion that the C1 Scheme Creditor will receive on the Final Distribution Date will equal to 100% of the C1 Scheme Creditors' Entitlement. In the event of an Undersubscription of the C2 Package Adjusted Portion, C1 Scheme Creditors will be required to make up that shortfall by taking some C2 Package in place of C1 Notes.

10.34    The following table sets out certain selective terms on principal amount, maturity and interest of the C1 Notes, more details are set out at Schedule 8 (*Summary of Terms of the New Instruments*):

| Overview of the C1 Notes | |
|---|---|
| **Principal amount** | C1 Notes shall comprise three tranches as follows, with the following maximum aggregate principal amounts: <br>(a) Tranche A: the aggregate Class C Scheme Creditors' Entitlement's proportion in Option 1 multiplied by US$3,000 million; <br>(b) Tranche B: the aggregate Class C Scheme Creditors' Entitlement's proportion in Option 1 multiplied by US$3,000 million; and <br>(c) Tranche C: the aggregate Class C Scheme Creditors' Entitlement under Option 1 minus the sum of the principal amounts of C1 Notes Tranches A and B. |
| **Maturity** | (a) Tranche A: 10 years from the Reference Date; |

| | | (b) Tranche B: 11 years from the Reference Date; and<br>(c) Tranche C: 12 years from the Reference Date; |
|---|---|---|
| **Interest** | **Rate** | Tranche A: 2.0% or 3.0%;<br>Tranche B: 2.5% or 3.5%; and<br>Tranche C: 3.0% or 4.0%. |
| | **PIK** | All interest paid in kind with respect to any tranche will be added to the then current outstanding principal amount of such tranche. |
| | **General** | • Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount.<br>• The lower interest rate figure above reflects the rate per annum if all interest with respect to such interest payment period is paid in cash.<br>• The higher interest rate figure above reflects the rate per annum if any portion of interest with respect to such interest payment period is paid in kind.<br>• If the Company pays cash interest under any tranche of the C1 Notes with respect to any interest payment period, it shall also pay cash interest under all other outstanding tranches of the A1 Notes, Plain A2 Notes, C1 Notes, C2 Notes and Forced A2 Notes with respect to such interest payment period. The amount of such cash payments shall be allocated among the A1 Notes, Plain A2 Notes, C1 Notes, C2 Notes and (with respect to any interest payment period ending after the Final Distribution Date) Forced A2 Notes (and among each tranche of such instruments) on a pro rata basis by each tranche's outstanding principal amount at the time of the payment (subject to relevant provisions in the indentures for the Forced A2 Notes). |

10.35   As set out in the "*Principal amount*" row in the table above, the principal amount of each of the Tranches A and B of the C1 Notes is determined by:

$$\frac{\text{Total Entitlements of C1 Scheme Creditors}}{\begin{array}{c}\text{Total Entitlements of all Scheme Creditors}\\\text{(i.e. both Class A Scheme Creditors and}\\\text{Class C Scheme Creditors) validly elected}\\\text{for Option 1 Scheme Consideration}\end{array}} \times \text{US\$3,000 million}$$

Therefore, the principal amount of each Tranche of the C1 Notes can only be ascertained when the total C1 Scheme Creditors' Entitlements on the Deficiency Basis is known, which would only take place after the conclusion of the Valuation and Adjudication Procedure. As such, the C1 Notes will only be distributed on the Final Distribution Date (or the Interim Distribution Date, if applicable). On the Final Distribution Date, there may be adjustment (if required) to take into account any accrued and unpaid interest under the C1 Notes

**Class C Scheme Creditors: Option 2 Scheme Consideration**

10.36   A Class C Scheme Creditor electing Option 2 Scheme Consideration (a "**C2 Scheme Creditor**", together the "**C2 Scheme Creditors**") can elect to convert all or part of its Entitlement to any of the following:

(a)      C2 Notes (consisting of 3 tranches of USD notes with a tenor of 7 to 9 years, to be issued by CEG); or

(b)    C2 Package (consisting of equity-linked instruments which are either exchangeable, convertible, or linked to shares in CEG, EVPS and NEV).

10.37    Hence, as set out in the overview table at Section 10.2, a C2 Scheme Creditor can elect for 100% of its Entitlement to be converted into either C2 Notes or C2 Package, or, alternatively, it may elect for a combination of C2 Notes and C2 Package (provided that the percentage of the Class C Scheme Creditor's Entitlement elected for each of the C2 Notes and the C2 Package shall be an integral multiple of 10%).

10.38    Regardless of the election of C2 Notes and/or C2 Package made by a C2 Scheme Creditor, its Entitlement will be converted to the C2 Notes and/or C2 Package at a conversion ratio of 1x, i.e., US$1 of the C2 Scheme Creditor's Entitlement will be equal to US$1 of the C2 Notes and/or C2 Package. In other words, each C2 Scheme Creditor will be entitled to receive C2 Notes and/or C2 Package, the combined value of which is equal to the value of its Entitlement.

10.39    However, C2 Scheme Creditors may not receive the C2 Notes or the C2 Package in the amount they elected to receive where there is an Undersubscription or Oversubscription of the C2 Package Adjusted Portion.

10.40    To further explain and illustrate the C2 Notes and the C2 Package that a C2 Scheme Creditor may receive on the Final Distribution Date (or the Interim Distribution Date, if applicable), the following Sections will:

(a)    explain the composition of the C2 Package Initial Portion and C2 Package Adjusted Portion and what it means to a C2 Scheme Creditor, see Sections 10.41 to 10.45;

(b)    explain the concept of Undersubscription and Oversubscription of the C2 Package Adjusted Portion and how each impacts the distribution of C2 Notes and C2 Package, see Sections 10.46 to 10.47;

(c)    set out the distribution dates and the circumstances in which an Interim Distribution will be made, see Section 10.48;

(d)    set out certain selective terms of the C2 Notes, see Section 10.49;

(e)    provide further details on the exchangeable and convertible bonds included in the C2 Package, namely CEG MCBs, EVPS MEBs and NEV MEBs, see Section 10.50 (and for more details on the New Instruments, see Schedule 8 (*Summary of Terms of the New Instruments*)); and

(f)    provide further details on the securities-linked notes included in the C2 Package, namely C2 EVPS SLNs and C2 NEV SLNs, see Section 10.51 (and for more details on the New Instruments, see Schedule 8 (*Summary of Terms of the New Instruments*));

(g)    provide further details on the distribution of the TJ Scheme Consideration to C2 Scheme Creditors, see Section 10.52; and

(h)    explain in general terms the distribution to Class A Scheme Creditors who are Blocked Scheme Creditors, see Section 10.53.

10.41    **What does the C2 Package Initial Portion and the C2 Package Adjusted Portion mean to a C2 Scheme Creditor?**

The C2 Package Initial Portion is calculated on a Full Accrued Claim Basis and comprises the maximum amount of the Equity-Linked Instruments which may be distributed to Class C Scheme Creditors.

The C2 Package Adjusted Portion is calculated on a Deficiency Basis, i.e. the basis on which the Class C Scheme Creditors' Entitlement under the Schemes is determined. Class C Scheme Creditors' Entitlements are only fully determined at the conclusion of the Valuation and Adjudication Procedure. As such, distribution to C2 Scheme Creditors could only occur on the Final Distribution Date (and the Interim Distribution Date, if applicable).

10.42    **What is the value of the C2 Package Initial Portion?**

As an illustration[32], the value of the C2 Package Initial Portion is US$3,310 million and will consist of:

(a)    HK$1,556 million (equivalent to c. US$200 million) of CEG MCBs;

(b)    HK$1,283 million (equivalent to c. US$165 million) of EVPS MEBs;

(c)    HK$11,632 million (equivalent to c. US$1,495 million) of NEV MEBs (on a pro forma basis[33]);

(d)    US$300 million of C2 EVPS SLNs; and

(e)    US$1,150 million of C2 NEV SLNs.

10.43    **What will a C2 Scheme Creditor get for every US$1 of its Entitlement under the C2 Package?**

As an illustration, every US$1 of a C2 Scheme Creditor's Entitlement will be converted to US$1 of the C2 Package consists of:

(a)    US$0.050 of EVPS MEBs;

(b)    US$0.452 of NEV MEBs;[34]

(c)    US$0.060 of CEG MCBs;

(d)    US$0.091 of C2 EVPS SLNs; and

(e)    US$0.347 of C2 NEV SLNs.

10.44    **How is the principal amount of the Equity-Linked Instruments included in the C2 Package Initial Portion calculated?**

As noted above at Section 10.43, the C2 Package Initial Portion will consist of (a) CEG MCBs; (b) EVPS MEBs; (c) NEV MEBs; (d) C2 EVPS SLNs; and (e) C2 NEV SLNs. The principal

---

[32] All the principal amounts (and accordingly, any principal amount of New Instruments forming part of the Total Package derived from such principal amounts), assumes (a) the conversion of the Shareholder Loans into NEV Shares will take place on 14 August 2023; (b) a Restructuring Effective Date of 1 October 2023 and (c) the number of Shares, EVPS Shares and NEV Shares and the numbers so derived from such number of shares are based on the date of this Explanatory Statement.
[33] See footnote 28 above.
[34] See footnote 29 above.

amount of each of these Equity-Linked Instruments included in the C2 Package is calculated based on the following:

(a)  **In respect of the CEG MCBs and NEV MEBs**: (x) the maximum principal amount of each of CEG MCBs and NEV MEBs under the Total Package; *multiplied by* (y) the C2 Accrued Claims Ratio (i.e. the C2 Scheme Creditors' Full Accrued Claims *divided by* the total Full Accrued Claims of A2 Scheme Creditors and C2 Scheme Creditors);

(b)  **In respect of the EVPS MEBs**: 50% of the maximum principal amount of the EVPS MEBs under the Total Package *multiplied by* the C2 Accrued Claims Ratio;

(c)  **In respect of the C2 EVPS SLNs**: US$300 million, being a fixed amount of the EVPS SLNs allocated to the C2 Package Initial Portion, as determined by the estimated A2 Accrued Claims Ratio and the C2 Accrued Claims Ratio as contemplated under the CEG Term Sheet as at 2 April 2023; and

(d)  **In respect of the C2 NEV SLNs**: US$1,150 million, being a fixed amount of the EVPS SLNs allocated to the C2 Package Initial Portion, as determined by the estimated A2 Accrued Claims Ratio and the C2 Accrued Claims Ratio as contemplated under the CEG Term Sheet as at 2 April 2023.

10.45  **What is the C2 Package Adjusted Portion?**

The C2 Package Adjusted Portion reflects Class C Scheme Creditors' Entitlement, which is on a Deficiency Basis determined through the Valuation and Adjudication Procedure (rather than assuming that Class C Scheme Creditors' Entitlement is on a Full Accrued Claim Basis, which is the basis used to determine the C2 Package Initial Portion).

The C2 Package Adjusted Portion is calculated in accordance with the below:

$$\frac{\text{Deficiency Claims of all Class C Scheme Creditors}}{\text{Full Accrued Claims of all Class C Scheme Creditors}} \times \text{C2 Package Initial Portion}$$

10.46  **What is an Oversubscription of the C2 Package Adjusted Portion and how does it impact the distribution of the C2 Notes / C2 Package?**

An Oversubscription of the C2 Package Adjusted Portion occurs when the total C2 Scheme Creditors' Entitlements elected for the C2 Package is *higher than* the value of the C2 Package Adjusted Portion.

In the event of an Oversubscription of the C2 Package Adjusted Portion, the C2 Package Adjusted Portion will be distributed on a pro rata basis for Entitlements elected for the C2 Package on the Final Distribution Date (and the Interim Distribution Date, if applicable). For the remaining Entitlements elected for the C2 Package, a C2 Scheme Creditor will be distributed C2 Notes instead, on the Final Distribution Date (and the Interim Distribution Date) as well.

Please refer to the flowcharts in Section 10.54 below for an illustration of distribution of an Oversubscription of the A2 Package Initial Portion and the implications on Scheme Consideration distribution in the event of such an Oversubscription.

10.47 **What is an Undersubscription of the C2 Package Adjusted Portion and how does it impact the distribution of the C2 Notes / C2 Package?**

An Undersubscription of the C2 Package Adjusted Portion occurs when the total C2 Scheme Creditors' Entitlements elected for the C2 Package is *lower than* the value of the C2 Package Adjusted Portion.

In the event of an Undersubscription of the C2 Package Adjusted Portion, the C2 Package Adjusted Portion will be distributed to Class C Scheme Creditors electing for (a) the C2 Package; (b) the C2 Notes; and (c) where applicable, the C1 Notes (i.e. C1 Scheme Creditors), on the Final Distribution Date (and the Interim Distribution Date, if applicable), in this order, as follows:

(a)     there will be a distribution of the C2 Package Initial Portion in an amount equal to the Entitlements elected for the C2 Package;

(b)     for the remaining portion of the C2 Package Adjusted Portion, there will be a distribution on a pro rata basis to Entitlements elected for the C2 Notes;

(c)     if there remains an undistributed portion of the C2 Package Adjusted Portion despite the re-allocation described in the preceding paragraph, there will be a distribution on a pro rata basis to Entitlements elected for the C1 Notes.

Please refer to the flowcharts in Section 10.54 below for an illustration of distribution of an Undersubscription of the C2 Package Adjusted Portion and the implications on Scheme Consideration distribution in the event of such an Undersubscription.

10.48 **What are the dates on which Scheme Consideration would be distributed and when would an Interim Distribution be made?**

Generally, all Class C Scheme Creditors regardless of their elections will only receive a distribution of Scheme Consideration in the form of Final Distribution on the Final Distribution Date, which will be a date after the completion of the Valuation and Adjudication Procedure. On the Final Distribution Date, there may be adjustment (if required) to take into account any accrued and unpaid interest under the relevant New Instruments.

To cater for any unforeseen circumstances which may delay the completion of the Valuation and Adjudication Procedure, an interim distribution of Scheme Consideration will be made to Class C Scheme Creditors (except for Blocked Scheme Creditors) whose Entitlements have been determined, on the "**Interim Distribution Date**", being the date which is 295 calendar days after the Restructuring Effective Date.

The amount of the interim distribution to be provided shall be determined by reserving a maximum amount of Scheme Consideration and TJ Scheme Consideration for those Class C Scheme Creditors whose Entitlements are not fully determined (as if the Entitlement of such Class C Scheme Creditors were calculated on a Full Accrued Claim Basis), as further set out in Clause 21 (*Interim Distribution*) of the Schemes.

Where an interim distribution is made, the amount of Scheme Consideration to be distributed on the Final Distribution Date would be reduced accordingly such that each Scheme Creditor shall receive Scheme Consideration which is equal to (and not greater than) the value of its Entitlement.

10.49 **Terms of the C2 Notes**

The illustrative table below sets out certain selective terms on principal amount, maturity and interest of the C2 Notes, more details are set out at Schedule 8 (*Summary of Terms of the New Instruments*):

| Overview of principal terms on C2 Notes | | |
|---|---|---|
| **Principal amount** | | C2 Notes shall comprise four tranches as follows, with the following maximum aggregate principal amounts:<br>(a) Tranche A: US$200 million;<br>(b) Tranche B: US$2,740 million;<br>(c) Tranche C: the aggregate C2 Scheme Creditors' Entitlements *minus* (i) Class C Scheme Creditors' Entitlement's portion of the principal amounts of EVPS MEBs, NEV MEBs and CEG MCBs; (ii) the principal amounts of C2 EVPS SLNs and C2 NEV SLNs; and (iii) the principal amounts of C2 Notes Tranches A and B. |
| **Maturity** | | (a) Tranche A: 7 years from the Reference Date;<br>(b) Tranche B: 8 years from the Reference Date; and<br>(c) Tranche C: 9 years from the Reference Date.<br>With respect to each tranche of the C2 Notes, any outstanding principal amount under such C2 Notes shall be repaid on maturity, together with any accrued but unpaid interest. |
| **Interest** | **Rate** | (a) Tranche A: 6.0% or 7.0%;<br>(b) Tranche B: 6.5% or 7.5%; and<br>(c) Tranche C: 7.0% or 8.0%. |
| | **PIK** | All interest paid in kind with respect to any tranche will be added to the then current outstanding principal amount of such tranche. |
| | **General** | • Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount.<br>• The lower interest rate figure above reflects the rate per annum if all interest with respect to such interest payment period is paid in cash.<br>• The higher interest rate figure above reflects the rate per annum if any portion of interest with respect to such interest payment period is paid in kind.<br>• Interest on the outstanding principal amount shall be paid in the following manner:<br>   o For the first two and a half years after the Reference Date: interest may be paid in cash or in kind, at the election of the Company;<br>   o From the 31st month to the 36th month after the Reference Date: interest in an amount equal to at least 0.5% of the outstanding principal amount of each tranche of the C2 Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company;<br>   o For the fourth year after the Reference Date: interest in an amount equal to at least 3.0% p.a. of the outstanding principal amount of each tranche of the C2 Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company;<br>   o Starting from the fifth year after the Reference Date: interest shall be paid in cash; and<br>   o If the Company pays cash interest under any tranche of the C2 Notes with respect to any interest payment period in an amount greater than the amount of cash interest required to be paid on |

| | | such tranche with respect to such interest payment period, it shall also pay additional cash interest under all other tranches of the A2 EVPS SLNs, A2 NEV SLNs, Plain A2 Notes, C2 EVPS SLNs, C2 NEV SLNs, C2 Notes and Forced A2 Notes. The amount of such additional cash payments shall be allocated among each of the A2 EVPS SLNs, A2 NEV SLNs, Plain A2 Notes, C2 EVPS SLNs, C2 NEV SLNs, C2 Notes and (with respect to any interest payment period ending after the Final Distribution Date) Forced A2 Notes (and among each tranche of such instruments) on a pro rata basis by outstanding principal amount at the time of the payment (subject to relevant provisions in the indentures for the Forced A2 Notes). |
|---|---|---|

10.50   **Terms of the exchangeable and convertible bonds included in the C2 Package**

The illustrative table below sets out certain selective terms on the exchangeable and convertible bonds included in the C2 Package, more details are set out at Schedule 8 (*Summary of Terms of the New Instruments*):

| Exchangeable and convertible bonds | EVPS MEBs* | NEV MEBs* | CEG MCBs |
|---|---|---|---|
| Total amount available under the New Instruments for allocation to all Scheme Creditors | HK$32,926 million (equivalent to c. US$4,232 million), being the sum of the EVPS MEBs, NEV MEBs and CEG MCBs, whose available amounts are HK$5,364 million (equivalent to c. US$689 million), HK$24,310 million (equivalent to c. US$3,125 million) and HK$3,253 million (equivalent to c. US$418 million), respectively | | |
| Fixed Conversion Price or Exchange Price | HK$2.30 per share, i.e., 1x the last trading price of EVPS prior to its trading suspension | HK$3.84 per share, i.e., 1.2x the last trading price of NEV prior to its trading suspension | HK$0.5775 per share, i.e., 0.35x the last trading price of CEG prior to its trading suspension |
| Voluntary conversion or exchange | Subject to certain conditions, holders have the option to exchange or convert (as applicable) | | |
| Mandatory conversion or exchange | 24 months from the Reference Date | | 5 years from the Reference Date |

\*   The Exchange Property for the NEV MEBs and EVPS MEBs shall be placed into the securities accounts established pursuant to the terms of the NEV MEBs Trust Deed and the EVPS MEBs Trust Deed respectively.

10.51   **Terms of the securities-linked notes included in the C2 Package**

The illustrative table below sets out certain selective terms on the securities-linked notes included in the C2 Package, more details are set out at Schedule 8 (*Summary of Terms of the New Instruments*):

| Securities-linked notes | C2 EVPS SLNs** | C2 NEV SLNs***s |
|---|---|---|
| Aggregate principal amount as of the Restructuring Effective Date | US$300 million<br>• Tranche A: US$150 million<br>• Tranche B: US$150 million | US$1,150 million<br>• Tranche A: US$500 million<br>• Tranche B: US$650 million |

| Tenor | | • Tranche A: 7 years<br>• Tranche B: 8 years | • Tranche A: 7 years<br>• Tranche B: 8 years |
|---|---|---|---|
| Underlying shares[35] | | 749,465,275 EVPS Shares in total to be allocated pro rata to the respective tranches by principal amount | 2,257,946,417 NEV Shares in total to be allocated pro rata to the respective tranches by principal amount |
| Interest | Rate | • Tranche A: 6.0%<br>• Tranche B: 6.5% | • Tranche A: 6.0%<br>• Tranche B: 6.5% |
| | PIK | If any interest with respect to an interest payment period is paid in kind, the interest rate will be 1.0% higher than the respective interest rates above, with respect to such interest payment period. | |
| | General | • Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the respective tranche.<br>• For the first two and a half years after the Reference Date, interest may be paid in cash or in kind, at the election of CEG.<br>• For 31 months after the Reference Date to 36 months after the Reference Date, interest in an amount equal to at least 0.5% of the outstanding principal amount of each tranche shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of CEG.<br>• For the fourth year after the Reference Date, interest in an amount equal to at least 3.0% of the outstanding principal amount of each tranche shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of CEG.<br>• Starting from the fifth year after the Reference Date, interest shall be paid in cash.<br>• If the Company pays cash interest under any tranche with respect to any interest payment period in an amount greater than the amount of cash interest required to be paid on such tranche with respect to such interest payment period, it shall also pay additional cash interest under all other outstanding tranches of the A2 EVPS SLNs, A2 NEV SLNs, Plain A2 Notes, C2 EVPS SLNs, C2 NEV SLNs, C2 Notes and Forced A2 Notes. The amount of such additional cash payments shall be allocated among the A2 EVPS SLNs, A2 NEV SLNs, Plain A2 Notes, C2 EVPS SLNs, C2 NEV SLNs, C2 Notes and (with respect to any interest payment period ending after the Final Distribution Date) Forced A2 Notes (and among each tranche of such instruments) on a pro rata basis by outstanding principal amount (subject to relevant provisions in the indentures for the Forced A2 Notes). | |

**       749,465,275 EVPS Shares which will form part of the Security for the C2 EVPS SLNs shall be held in custody pending the issuance of the C2 EVPS SLNs on the Final Distribution Date in accordance with the terms of the relevant New Instruments Documents and/or Security Documents.

***       1,503,503,540 NEV Shares; and the NEV Shares with respect to the NEV Escrow Account Transfer, each of which will form part of the escrow arrangement for the C2 NEV SLNs shall be held in a securities account in accordance with the terms of the relevant New Instruments Documents and/or Security Documents.

---

[35] See footnote 31 above.

10.52    **What is the additional TJ Scheme Consideration to be distributed to C2 Scheme Creditors and when would it be distributed?**

As noted in Section 10.30 above, the Company may receive TJ Scheme Consideration in its capacity as a scheme creditor in, and pursuant to the terms of, the TJ Scheme. Any TJ Scheme Consideration received by the Company shall be distributed on a pro rata basis to those A2 Scheme Creditors and C2 Scheme Creditors who have validly elected by the applicable deadline to receive the A2 Package and the C2 Package respectively (calculation methodology is set out at Clauses 20.3 and 20.4 of the Schemes). Any such TJ Scheme Consideration distributed would be in addition to and would not reduce the Scheme Consideration to be paid in an amount equal to the relevant Scheme Creditors' Entitlements.

If the Company receives the TJ Scheme Consideration prior to the conclusion of the Valuation and Adjudication Procedure, the Company will make an interim distribution of the TJ Scheme Consideration to the eligible Class C Scheme Creditors prior to the Final Distribution Date. If the Company receives the TJ Scheme Consideration after the Final Distribution Date, the TJ Scheme Consideration will be distributed to such eligible Scheme Creditors on a date to be designated by the Company (which will be no later than three months after the date on which the Company receives the TJ Scheme Consideration).

The amount of the interim distribution to be provided will be determined by reserving a maximum amount of TJ Scheme Consideration for those Class C Scheme Creditors whose Entitlements are not fully determined (as if the Entitlement of such Class C Scheme Creditors were calculated on a Full Accrued Claim Basis), as further set out in Clause 20 (*TJ Scheme Consideration*) of the Schemes.

Where an interim distribution is made, the amount of TJ Scheme Consideration to be distributed on the Final Distribution Date would be reduced accordingly such that each Scheme Creditor shall receive TJ Scheme Consideration which is equal to (and not greater than) the value of its Entitlement.

10.53    **How would Scheme Consideration be distributed to Class C Scheme Creditors who are Blocked Scheme Creditors?**

For Class C Scheme Creditors who are Blocked Scheme Creditors, any interim distribution of Scheme Consideration, TJ Scheme Consideration and Consent Fee that such Class C Scheme Creditors would otherwise be entitled to receive would be issued to the Holding Period Trustee to hold on trust for such Class C Scheme Creditors under the terms of the Holding Period Trust Deed, on the Interim Distribution Date (if applicable).

The Holding Period Trustee will release these Blocked Assets for the Blocked Scheme Creditors on the Final Distribution Date if the relevant requirements under the Holding Period Trust Deed are satisfied, including, among others, that the Applicable Sanctions have been lifted in respect of the Blocked Scheme Creditors. If the Applicable Sanctions are still in place in respect of the Blocked Scheme Creditors, these entitlements to the Blocked Assets (along with the Final Distribution) will instead be held by the Successor Escrow Agent in the Successor Escrow Account, until the earlier of (i) the expiry of the Perpetuity Period; or (ii) the lifting of the Applicable Sanctions in respect of the Blocked Scheme Creditors. Further details on the Holding Period Trust and the Successor Escrow Account are set out in Sections 20 (*Holding Period Trust*) and 21 (*Successor Escrow Account*), respectively.

**Illustrative overview of the distribution to the Class A and Class C Scheme Creditors**

10.54    The following illustrative diagrams aim to provide an overview of the distribution of Scheme
Consideration to Class A Scheme Creditors and Class C Scheme Creditors in accordance with
their elections and in the event of any Undersubscription or Oversubscription of the A2 Package
Initial Portion, A2 Package Adjusted Portion or C2 Package Adjusted Portion (as applicable).
The illustrative diagrams do not account for any distribution of TJ Scheme Consideration or
Consent Fee, and it is assumed that there will be no interim distribution of Scheme
Consideration. The illustrative diagrams are for Scheme Creditors' reference only and in the
event of any inconsistency between the illustrative diagrams and the terms of the Schemes, the
latter will prevail.

The following is an illustration of the scenarios which may occur depending on the election made by Class A Scheme Creditors in relation to the **A2 Package** (which can only be made before the Class A Options Deadline). The illustrative diagram below aims to provide an overview of the distribution on Restructuring Effective Date and/or Final Distribution Date, in the event of an Oversubscription or Undersubscription. Unless stated otherwise, distribution described in each scenario is made on a pro rata basis, i.e. Entitlements of a Scheme Creditor elected for the particular Scheme Consideration *divided by* the aggregate Entitlements of all Scheme Creditors elected for the particular Scheme Consideration.

| Abbreviations in all diagrams: |
| --- |
| **RED:** Restructuring Effective Date |
| **FDD:** Final Distribution Date |
| **V&A:** Valuation and Adjudication Procedure |



Notes:

(1) The value of the C2 Package Unadmitted Portion will vary depending on the value of Class C Scheme Creditors' Entitlement determined through the Valuation and Adjudication Procedure. As such, the value of the C2 Package Unadmitted Portion could be zero in the case where none of the Class C Scheme Creditors' Entitlement, determined on Deficiency Basis, is less than their Full Accrued Claims, resulting in the C2 Package Initial Portion being the same as the C2 Package Adjusted Portion, thus there is no C2 Package Unadmitted Portion.

(2) While this portion of the Forced A2 Notes in excess of the C2 Package Unadmitted Portion will remain as Forced A2 Notes, on the Final Distribution Date, their terms become identical to the Plain A2 Notes which Class A Scheme Creditors elected for A2 Notes would be entitled to receive.

(3) While this portion of the A2 Package Initial Portion is only distributed to A1 Scheme Creditors on the Final Distribution Date, this portion will nonetheless be issued to the Holding Period Trust on the Restructuring Effective Date.

**Class A Scheme Creditors: When the A2 Package Initial Portion is Oversubscribed, what is being distributed on the Restructuring Effective Date and Final Distribution Date?**

The following illustrative diagram sets out (a) a breakdown of the Class A Scheme Creditors' Entitlements where there is an Oversubscription of the A2 Package Initial Portion (i.e. the Class A Scheme Creditor's Entitlements elected for the A2 Package is more than the A2 Package Initial Portion); and (b) the New Instruments that constitute the Scheme Creditor's Entitlements will be distributed at Restructuring Effective Date and at the Final Distribution Date.



Notes:

[1] By the Restructuring Effective Date, the aggregate Class A Scheme Creditors' Entitlements elected for Option 2 Scheme Consideration will be determined. This is because the Class A Scheme Creditors who wish to elect Option 2 Scheme Consideration must submit the relevant Scheme Creditor Forms by no later than Class A Options Deadline, which will be before the Restructuring Effective Date.

[2] On the Restructuring Effective Date, the A2 Package Initial Portion will be distributed on a pro-rata basis, determined as follows:

$$\frac{\text{Entitlements of the Class A Scheme Creditor elected for the A2 Package}}{\text{Aggregate Entitlements of all Class A Scheme Creditors elected for the A2 Package}} \times \text{A2 Package Initial Portion}$$

[3] While this diagram illustrates the Oversubscribed Portion of the A2 Package Initial Portion as being larger than the C2 Package Unadmitted Portion, it is not necessarily the case – the C2 Package Unadmitted Portion is ultimately determined only after conclusion of the Valuation and Adjudication Procedure. See note (3) in the previous diagram, as well as note (4) below.

[4] The A2 Package Adjusted Portion will only be known after the determination of the C2 Package Unadmitted Portion (i.e. after the Class C Scheme Claims have been determined on a Deficiency Basis), which will be after conclusion of the Valuation and Adjudication Procedure.

[5] Each of the Forced A2 Notes and the Plain A2 Notes have four tranches of notes. The principal amount of each tranche across the Forced A2 Notes and the Plain A2 Notes is shared pro rata between the Class A Scheme Creditors receiving the Forced A2 Notes and the Plain A2 Notes. The tranches shall be distributed in sequential order by maturity date, i.e. starting from the tranche that matures the earliest. Please refer to Section 10.22 for a detailed explanation on how each tranche of the A2 Notes will be allocated.

[6] On the Final Distribution Date, the Entitlements of the Class A Scheme Creditors initially distributed as Forced A2 Notes will (i) be redeemed, exchanged and/or converted into the C2 Package Unadmitted Portion (if any) on a pro rata basis and (ii) where applicable, remain as Forced A2 Notes, as set out below:

- **Undersubscribed:** If the aggregate Entitlements of Class A Scheme Creditors elected for the A2 Package is *less than or equal to* the A2 Package Adjusted Portion, all Forced A2 Notes will be redeemed, exchanged and/or converted into **the C2 Package Unadmitted Portion**. Such C2 Package Unadmitted Portion will be distributed to the holders of Forced A2 Notes on a dollar-for-dollar basis. In this scenario, no Forced A2 Notes will remain after the Final Distribution Date.
- **Oversubscribed:** If the aggregate Entitlements of Class A Scheme Creditors elected for the A2 Package is *more than* the A2 Package Adjusted Portion:
  (i) Forced A2 Notes in an amount equal to the C2 Package Unadmitted Portion, starting from the tranche of Forced A2 Notes with the longest maturity and in reverse chronological order shall be redeemed, exchanged and/or converted into the C2 Package Unadmitted Portion on a pro rata basis;
  (ii) the residual Forced A2 Notes shall remain as Forced A2 Notes. The principal amount of the remaining Forced A2 Notes will be equal to: (x) the Class A Scheme Creditor's Entitlements elected for A2 Package *minus* (y) the A2 Package Initial Portion that such Class A Scheme Creditor is distributed at RED; *minus again* (z) the C2 Package Unadmitted Portion that such Class A Scheme Creditor is distributed at (i) above.

**Class A Scheme Creditors: Distribution (Part 1 of 2)**   *For Illustrative Purposes Only*

(A)   **Oversubscription of the A2 Package Initial Portion**, i.e. where the total Entitlements of Class A Scheme Creditors elected for the A2 Package is *more than* the A2 Package Initial Portion



[1] The principal amount of the each tranche of the A1 Notes can only be ascertained when the total Class C Scheme Creditors' Entitlements elected for Option 1 is ascertained and this will only be ascertained after the conclusion of the Valuation and Adjudication Procedure (see Sections 10.6 and 10.35 of the Explanatory Statement for details on how the principal amount of each tranche of A1 / C1 Notes is determined). As such, the A1 Notes will only be distributed on the Final Distribution Date, i.e. after the Entitlements of Class C Scheme Creditors are determined after the conclusion of the Valuation and Adjudication Procedure.

[2] Class A Scheme Creditors' Entitlements elected for the A2 Notes and A2 Package will be converted into "**Plain A2 Notes**" and "**Forced A2 Notes**", respectively. Each of the Plain A2 Notes and Forced A2 Notes comprise of four tranches (tranches A, B, C and D (if any)), with fixed aggregate principal amounts shared under each tranche across both the Plain A2 Notes and the Forced A2 Notes. On the Restructuring Effective Date, the principal amount of each tranche across the Forced A2 Notes and the Plain A2 Notes is shared pro rata between the Class A Scheme Creditors receiving the Forced A2 Notes and the Plain A2 Notes. The tranches shall be distributed in sequential order by maturity date, i.e. starting from the tranche that matures the earliest.

[3] If the A2 Package Adjusted Portion is ultimately Undersubscribed, after the conclusion of the Valuation and Adjudication Procedure, the A2 Package will benefit from the shares associated with the Undersubscribed portion of the C2 Package Unadmitted Portion which will be allocated as part of the respective pool of underlying shares for A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs and C2 NEV SLNs.

[4] On the Final Distribution Date, CEG shall redeem, exchange and/or convert the Forced A2 Notes into the C2 Package Unadmitted Portion (if any) starting from the tranche with the longest maturity and in reverse chronological order on a dollar-for-dollar basis.

*For Illustrative Purposes Only*

(B)   **Entitlements equal to the A2 Package Initial Portion**, i.e. where the total Entitlements of Class A Scheme Creditors elected to be converted to the A2 Package is *equal to* the A2 Package Initial Portion



(C)   **Undersubscription of the A2 Package Initial Portion**, i.e. where the total Entitlements of Class A Scheme Creditors elected to be converted to the A2 Package is *less than* the A2 Package Initial Portion.



[1] To ensure pro rata allocation to all Class A Scheme Creditors receiving Option 1 Scheme Consideration (including those who have not made their elections by the Class A Options Deadline but have submitted a valid Distribution Confirmation Deed by the Class A Bar Date), such A2 Package Initial Portion (if any) can only be distributed on the Final Distribution Date. Nonetheless, this portion will be distributed to the Holding Period Trustee on the Restructuring Effective Date.

[2] The principal amount of the each tranche of the A1 Notes can only be ascertained when the total Class C Scheme Creditors' Entitlements elected for Option 1 is ascertained and this will only be ascertained after the conclusion of the Valuation and Adjudication Procedure (see Sections 10.6 and 10.35 of the Explanatory Statement for details on how the principal amount of each tranche of A1 / C1 Notes is determined). As such, the A1 Notes will only be distributed on the Final Distribution Date, i.e. after the Entitlements of Class C Scheme Creditors are determined after the conclusion of the Valuation and Adjudication Procedure.

[3] After the conclusion of the Valuation and Adjudication Procedure, the A2 Package will benefit from the shares associated with the entire C2 Package Unadmitted Portion which will be allocated as part of the respective pool of underlying shares for A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs and C2 NEV SLNs.

141

**Class C Scheme Creditors: Overview of Methodology and Distribution (1 of 2)**    *For Illustrative Purposes Only*

The following is an illustration of the three scenarios which may occur depending on the elections made by Class C Scheme Creditors for **the C2 Package** (such elections to be made before the Class C Bar Date) and an overview of the distribution on Final Distribution Date in the event of an Oversubscription or Undersubscription. Unless stated otherwise, in each scenario distribution is made on a pro rata basis, i.e. Entitlements of a Scheme Creditor elected for the particular Scheme Consideration *divided by* the aggregate Entitlements of all Scheme Creditors elected for the particular Scheme Consideration.



(A)    **Oversubscription of the C2 Package Adjusted Portion**, i.e. where the total Entitlements of Class C Scheme Creditors elected to be converted to the C2 Package is *more than* the C2 Package Adjusted Portion.



(B)    **Entitlements equal to the C2 Package Adjusted Portion:** Where the total Entitlements of Class C Scheme Creditors elected to be converted to the C2 Package is *equal to* the C2 Package Adjusted Portion.



142

Class C Scheme Creditors: Overview and Distribution (Part 2 of 2)                          *For Illustrative Purposes Only*

(C)     **Undersubscription of the C2 Package Adjusted Portion**, i.e. where the total Entitlements of Class C Scheme Creditors elected to be converted to the C2 Package is *less than* the C2 Package Adjusted Portion.



| Election | Final Distribution on Final Distribution Date |
|---|---|
| **Option 1** — C1 Notes | (1) **C2 Package Adjusted Portion (if any)**, being any remaining Undersubscribed portion of C2 Package Adjusted Portion post-reallocation to Entitlements elected for C2 Notes (see point (1) in the row below for C2 Notes), distributed pro rata to Class C Scheme Creditors elected for the C1 Notes; and<br><br>(2) **C1 Notes**:<br>• if (1) above occurs, in the principal amount equal to the Class C Scheme Creditor's remaining Entitlements elected for the C1 Notes, i.e. the Class C Scheme Creditor's Entitlements elected for C1 Notes *minus* the C2 Package Adjusted Portion received at (1) above;<br>• otherwise, in the principal amount equal to the Class C Scheme Creditors' Entitlements elected for the C1 Notes. |
| **Option 2** — C2 Notes | (1) **C2 Package Adjusted Portion**, being the Undersubscribed portion of C2 Package Adjusted Portion, distributed pro rata to Class C Scheme Creditors elected for the C2 Notes; and<br><br>(2) **C2 Notes**, in the principal amount equal to the Class C Scheme Creditor's remaining Entitlements elected for the C2 Notes, i.e. the Class C Scheme Creditor's Entitlements elected for the C2 Package *minus* the C2 Package Adjusted Portion that such Class C Scheme Creditor is distributed at point (1) above. |
| **Option 2** — C2 Package | **C2 Package Adjusted Portion**, in the principal amount equal to the Class C Scheme Creditor's Entitlements elected for the C2 Package |

143

11.    **RESUMPTION OF TRADING**

The Group is aware of the importance of resumption of trading and has been diligently working with all relevant parties to satisfy the resumption guidance issued by HKEX to each of CEG, EVPS and NEV. The Group endeavours to provide updates on the status of the resumption of trading to the extent available, reasonably practicable and legally permissible to do so.

12. **JURISDICTION OF THE COURTS PURSUANT TO THE RESTRUCTURING**

12.1    The Cayman Court and Hong Kong Court has jurisdiction to sanction a scheme in relation to any "company" within the meaning of (i) Section 86 of the Cayman Companies Act; and (ii) Sections 670, 673 and 674 of the Hong Kong Companies Ordinance.

12.2    The Company considers that the Cayman Court and the HK Court respectively have jurisdiction in relation to the Schemes and jurisdiction to convene Scheme Meetings in respect of the Company.

12.3    The Cayman Court has jurisdiction in relation to the CEG Cayman Scheme and jurisdiction to convene the Scheme Meetings in respect of the Company, on the basis that the Company is a Cayman Islands incorporated and registered exempted company and is liable to be wound up under Part V of the Cayman Companies Act.

12.4    The HK Court has jurisdiction in relation to the scheme of a foreign company such as the CEG HK Scheme as there is sufficient connection between the CEG HK Scheme and Hong Kong, on the basis that, among other things: (i) the Company is registered in Hong Kong as a non-Hong Kong company under Part 16 of the HK Companies Ordinance; and (ii) the Company is listed on the SEHK and has shareholders present in Hong Kong.

12.5    CEG considers that the Cayman Scheme is required, for the reasons set out below and that these reasons should be sufficient such that the Cayman Court should exercise its discretion to sanction the Cayman Scheme.

*Rationale for parallel Cayman and Hong Kong Schemes*

12.6    The indebtedness of CEG that is subject to the Restructuring is governed by the laws of Hong Kong, New York, England and Wales and the PRC. The reason that Schemes have been proposed in Hong Kong and in the Cayman Islands is to ensure the effective compromise and/or release and discharge (as applicable) of all of the Scheme Claims, as further described below:

   (a)    In respect of Hong Kong law-governed indebtedness of CEG, the rule in *Gibbs*[36] would apply, which provides that the question of whether an obligation has been discharged is governed by its proper law. As such, in order to achieve the effective releases, discharges and/or compromises required to effect the Restructuring, CEG has proposed the Hong Kong Scheme in order to have an effective compromise and/or release and discharge (as applicable) of its indebtedness which is governed by the laws of Hong Kong.

   (b)    For CEG's indebtedness which is governed by the laws of the PRC or the laws of England and Wales, the rule in *New Zealand Loan and Mercantile Agency Company Limited v. Morrison* (1898) is applied in both the Cayman Islands and Hong Kong. The rule provides that the relevant Scheme prevents any scheme creditor from enforcing any debt that was the subject of that scheme in the scheme jurisdiction, regardless of the governing law of the debt. Accordingly, in the event that the Schemes are sanctioned, the indebtedness of CEG that is governed by the laws of the PRC or the laws of England and Wales, will not be enforceable against CEG in Hong Kong or the Cayman Islands, where some of the material assets of CEG are based, thereby ensuring the substantive effectiveness of the Schemes.

---

[36] As established in the case of *Antony Gibbs & Sons v. La Société Industrielle et Commerciale des Métaux* (1890) ("***Gibbs***").

(c)     As CEG is incorporated in the Cayman Islands, there is a genuine need for a Cayman Scheme to be implemented to ensure the effectiveness of the Schemes since the parallel Schemes prevents creditor action in the Cayman Islands, including a winding-up petition being brought against CEG in the jurisdiction. Given the size of the its debts, CEG considers it prudent to have the full protection of a Scheme in the Cayman Islands. This is particularly the case for such creditors who have claims or contracts against CEG that are not subject to Hong Kong or New York law (e.g. onshore creditors with guarantee and other claims against CEG that are subject to PRC law).

(d)     In respect of New York-law governed indebtedness of CEG, in the event the Schemes are sanctioned, the Recognition Filings will be made by CEG, which shall include a petition for recognition of the Hong Kong Scheme under Chapter 15 of the US Bankruptcy Code and a request to grant the Chapter 15 Recognition Order to recognise the Hong Kong Scheme as a foreign main proceeding (or in the alternative, a foreign non-main proceeding) and to give effect to certain aspects of the compromise and arrangement set out in the Hong Kong Scheme (which will be substantively identical to that set out in the Cayman Scheme). On a Chapter 15 Recognition Order being made by the US Bankruptcy Court in respect of the Hong Kong Scheme, the indebtedness of CEG which is governed by New York law will also be effectively compromised and/or released as a matter of federal and New York law on the terms set out in the Schemes.

12.7    The combined effect of the Schemes, together with the Recognition Filings, will be the effective compromise and/or release and discharge (as applicable) of all of the Scheme Claims. For the avoidance of doubt, the proposed treatment of the Scheme Creditors is the same under each Scheme.

12.8    The Hong Kong Scheme and the Cayman Scheme will not create separate or incremental rights to Scheme Consideration for Scheme Creditors. Instead, they will create one Entitlement to Scheme Consideration for the Scheme Claims.

146

13.    **SCHEME CLASS**

13.1    It is the responsibility of CEG to determine whether more than one meeting of creditors is required and, if so, to ensure that the meeting(s) is/are properly constituted. Each class of creditors must be properly constituted so that any meeting of that class comprises creditors whose rights against CEG are not so dissimilar as to make it impossible for them to consult together with a view to their common interest. If the rights of Scheme Creditors in a class are so different or would be affected so differently by the Scheme as to make it impossible for them to consult together with a view to their common interest, they must be divided into separate classes and a separate scheme meeting must be held for each class of creditor.

13.2    CEG has considered the present rights of each of the Scheme Creditors and the way in which those rights will be affected under the Schemes and, having taken into account the previous decisions of the Court of Hong Kong and the Cayman Islands (as applicable), has concluded that the Scheme Creditors constitute two (2) separate classes for the purposes of the Schemes:

(a)    a class comprised of the Class A Scheme Creditors; and

(b)    a class comprised of the Class C Scheme Creditors.

13.3    In reaching the decision of the above classes to be constituted, CEG has considered if the rights of the creditors are so different, or would be affected so differently, under the Schemes as to make it impossible for them to consult together with a view to their common interest, as to require to be divided into separate classes for the purposes of voting on the Schemes, pursuant further to the factors set out below.

*Class A Scheme Creditor*

(a)    The Class A Debts comprise of – (i) 10 series of USD senior secured notes issued by CEG and a single series of HKD convertible bonds issued by CEG due 14 February 2023 (referred to as the "**Existing Notes**"); and (ii) the Class A Private Loan.

(b)    Notwithstanding that the 10 series of USD senior secured notes issued by CEG each have different maturity dates and interest rate, CEG considers that the rights of each of the holders of these USD senior secured notes are the same, or not so dissimilar as to make it impossible for them to consult together with a view to their common interest, because each of these holders has materially the same rights against CEG. CEG is of this view because all 10 series of the above-mentioned USD senior secured notes:

(i)    have identical terms, aside from the maturity dates and interest rates;

(ii)    share the same security package;

(iii)    share the same subsidiary guarantors; and

(iv)    will rank equally in an insolvent liquidation of CEG.

(c)    The Scheme Claims of Class A Scheme Creditors are being treated the same under the Schemes as to calculation of Scheme Creditor's Entitlement to the Scheme Consideration via a Full Accrued Claim Basis.

(d)    Class A, among other things, benefit from a guarantee package granted by certain subsidiary guarantors of CEG (see (b)(iii) above) which the Class C Debts do not. The Class C, which isolated as unsupported / unsecured class at CEG, by taking a Deficiency Approach and leaving in place rights against non-scheme company. As

147

such, Class A, having both unsecured claims against CEG as well as the Subsidiary Guarantors, will have a higher realization in an insolvent liquidation of the offshore Group than Class C.

(e)    In addition, although the single series of HKD convertible bonds issued by CEG due 14 February 2023 have different contractual terms to the 10 series of USD senior secured notes issued by CEG, they would still rank equally with the USD senior secured notes in a liquidation of CEG. The security and guarantor packages for these HKD convertible bonds are also identical to those provided for under the USD senior secured notes. The preceding analysis also applies to the Class A Private Loan vis-à-vis the Existing Notes.

(f)    In respect of the Class A Private Loan, CEG was initially a co-borrower under the loan alongside Treasure Glory. The Class A Private Loan (i) was secured by certain share pledges (which for the avoidance of doubt, are not part of the security package for the Existing Notes) and (ii) is guaranteed by the same subsidiary guarantors as the Existing Notes. Following enforcement action taken by the private lenders under the Class A Private Loan, CEG became the sole borrower under the Class A Private Loan and accordingly there remains an unsecured claim for the balance of the Class A Private Loan. On the basis of the above, the Class A Private Loan has been included as a Class A Debt. On this basis, CEG considers that the Existing Notes and the Class A Private Loan should fall into the same creditor class.

(g)    In respect of the CEG AHG, CEG has considered their present rights in relation to the relevant Class A Debts, and concluded it to be appropriate for such CEG AHG creditors to be categorised in the same class as the other Class A Scheme Creditors, who are not a part of the CEG AHG, due to essentially holding the same underlying Class A Debts with such rights to be treated in the same manner under the provisions of the Schemes. For completeness, CEG has considered the effect of the mechanics available only to the CEG AHG (i.e., the AHG Work Fee, AHG Legal Fees, AHG Advisor Fees etc.) has an impact on the constitution of the Scheme Creditor classes, and has concluded that it does not.

(h)    Each of the Class A Scheme Creditors will receive identical rights out from the Scheme. More specifically, each Class A Scheme Creditor will be eligible to receive the same Scheme Consideration as each other Class A Scheme Creditor. In comparison, the Scheme Consideration to be issued between a Class A Scheme Creditor and a Class C Scheme Creditor is different in terms of the type of instrument and if such instrument is secured, as further described in Schedule 8 (*Summary of Terms of the New Instruments*). For example, the A1 Notes payable to Class A Scheme Creditors will be guaranteed by the New Instruments Subsidiary Guarantors whilst the C1 Notes payable to Class C Scheme Creditors will not benefit from any credit support.

***Class C Scheme Creditor***

(i)    The Class C Debts comprise of – (i) selected private debts or obligations where CEG is a guarantor (where the principal obligor is an entity within the offshore group); (ii) onshore debts that have been guaranteed by CEG; and (iii) selected private debts where CEG has provided a put option or repurchase obligation.

(j)    The Class C Scheme Creditors hold different rights against third party obligors (i.e. other group companies) in respect of their relevant Class C Debt, being the Excluded Liabilities and/or the Excluded Collateral. The Schemes will not release the Excluded Liabilities or the Excluded Collateral. Instead, the Class C Scheme Creditors' Entitlements are being admitted on a Deficiency Basis in the Schemes, such that no

Scheme Consideration shall be payable in respect of the Excluded Liabilities or the Excluded Collateral and each Class C Scheme Creditor shall be entitled to receive the same Scheme Consideration as each other Class C Scheme Creditor in respect of its Scheme Claim.

(k)     All Class C Scheme Creditor's Scheme Claims against CEG are unsecured claims, and would rank equally in a liquidation of CEG. Accordingly, CEG considers that, because the Class C Debts are admitted on a Deficiency Basis, the rights of the Class C Scheme Creditors are not so dissimilar as to make it impossible for them to consult together with a view to their common interest.

13.4    **AHG Fees**

(a)     The Company notes that certain Scheme Creditors in their capacity as members of the CEG AHG shall, in addition to the Consent Fee, benefit from two additional fee payments in respect of the restructuring of the Group (which includes the SJ Scheme and the TJ Scheme) which shall be made on or prior to the Restructuring Effective Date:

(i)     The "**AHG Work Fee**", which shall be paid by the Company's Chairman (Mr. Hui Ka Yan) in accordance with the terms set out in the Class A RSA and the letter agreement dated 20 March 2023 between the Chairman and the members of the CEG AHG (the "**AHG Work Fee Letter**"). The AHG Work Fee will be represent approximately 1% of the CEG AHG's aggregate holding of the principal amount of the Existing Notes); and

(ii)     The "**AHG Advisor Fees**", being the reasonable fees, costs and expenses of the legal and financial advisers to the CEG AHG which shall be paid by the Company in accordance with the terms set out in the relevant letter agreements between the Company and the AHG Advisors.

(b)     The Company does not consider that the effect of these payments (either taken alone or cumulatively) makes it impossible for members of the CEG AHG to vote together with the other Scheme Creditors in the same class. This is because:

(i)     The payment of the AHG Advisor Fees does not confer a benefit upon a member of the CEG AHG but instead represents a payment of costs necessarily incurred by them in undertaking that role and which would not otherwise have been incurred. The Company further considers that the arrangement is typical and proportionate for a transaction of this kind. Further, the obligation on the Company to pay these fees is not contingent on the sanction of the Scheme;

(ii)     Payment of the AHG Work Fee is conditional upon the satisfaction of the conditions precedent to the Schemes, the TJ Scheme and the SJ Scheme. However, the AHG Work Fee represents recompense for the time and effort expended by the Ad Hoc Group in assisting to formulate the Term Sheet and the Scheme in the interests of all Scheme Creditors and confers no net benefit or disguised consideration on the members of the CEG AHG; and

(iii)     It is unlikely that a Scheme Creditor who considered the substantive aspects of the Schemes to be against their interests would be persuaded by payment of either or both the AHG Legal Fees and the AHG Work Fee to vote in favour of the Scheme. This is because: (a) the AHG Work Fee represents only approximately 1% of the CEG AHG's aggregate holding of the principal amount of the Existing Notes; and (b) in the alternative to the Schemes, being

an insolvent liquidation, the Scheme Creditors would receive returns that are lower than the anticipated returns under the Schemes. The AHG Work Fee is not therefore a material factor which would influence a creditor's decision in relation to the Schemes.

13.5    **Corporate Governance**

(a)    Please refer to Part G and Annex D of Schedule 8 (*Summary of Terms of the New Instruments*) for the terms in relation to corporate governance.

13.6    **Consent Fee**

(a)    Under the terms of the RSAs and the Term Sheet, CEG has undertaken to pay, or procure the payment of, the Consent Fee to:

(i)    Eligible Participating Creditors who are not Sanctions-Affected Scheme Creditors, who hold Eligible Restricted Debts at the Voting Record time and fulfill the conditions in accordance with the terms of the RSAs; and

(ii)    the Holding Period Trustee, to be held on trust for Eligible Participating Creditors who are Blocked Scheme Creditors and who hold Eligible Restricted Debts at the Voting Record time and fulfill the conditions in accordance with the terms of the RSAs, under the terms of the Holding Period Trust Deed.

(b)    It is a term of the RSAs that each Scheme Creditor who:

(i)    entered into and/or acceded to the applicable RSA, by executing and delivering the requisite documents specified in the applicable RSA to the Information Agent in respect of all of its Existing Debts before 5:00 p.m. (Hong Kong time) on the Consent Fee Deadline (thereby making them Eligible Restricted Debts);

(ii)    votes in favour of the Schemes at the Scheme Meetings; and

(iii)    has not exercised its rights to terminate the relevant RSA and has not breached any provision of it (including terms relating to the restriction on transfer of the Eligible Restricted Debts) in any material respect,

shall be an Eligible Participating Creditor entitled to receive the Consent Fee after the Consent Fee Deadline and pursuant to the terms of the RSAs.

(c)    Subject to the terms of the RSAs, the Consent Fee payable to the Scheme Creditors is 0.25% of the outstanding principal amount of Eligible Restricted Debts held by such Scheme Creditors at the Voting Record Time. The Consent Fee will be paid by way of payment-in-kind ("**PIK**") new notes to be issued by the Company on the Restructuring Effective Date or Final Distribution Date (as applicable) in connection with the Restructuring, as follows:

(i)    Class A Scheme Creditors electing Option 1 Scheme Consideration will receive PIK notes in the form of Tranche A of the A1 Notes, due 10 years from the Reference Date;

(ii)    Class A Scheme Creditors electing Option 2 Scheme Consideration will receive PIK notes in the form of Tranche C of the A2 Notes, due 7 years from the Reference Date;

(iii)    Class C Scheme Creditors electing Option 1 Scheme Consideration will receive PIK notes in the form of Tranche A of the C1 Notes, due 10 years from the Reference Date; and

(iv)    Class C Scheme Creditors electing Option 2 Scheme Consideration will receive PIK notes in the form of Tranche A of the C2 Notes, due 7 years from the Reference Date.

For the avoidance of doubt, the notes to be issued as Consent Fee are additional notes and form the same series of notes in the form of Tranche A of the A1 Notes, Tranche C of the A2 Notes, Tranche A of the C1 Notes and Tranche A of the C2 Notes (as applicable) and will not impact the number of notes to be issued as Scheme Consideration for the Scheme Creditors.

(d)    The Consent Fee will be paid to Eligible Participating Creditors who vote in favour of the Schemes on (i) the Restructuring Effective Date, in respect of Class A Scheme Creditors electing Option 2 Scheme Consideration, or (ii) the Final Distribution Date, in respect of Class A Scheme Creditors electing Option 1 Scheme Consideration and Class C Scheme Creditors.

(e)    The payment of the Consent Fee on the Final Distribution Date in respect of Class A Scheme Creditors electing Option 1 Scheme Consideration and Class C Scheme Creditors is considered appropriate as the A1 Notes, C1 Notes and C2 Notes would not be issued as Initial Distribution on the Restructuring Effective Date. Accordingly, if such New Instruments were to be payable to the aforesaid Scheme Creditors solely as Consent Fee on the Restructuring Effective Date, it is envisaged that certain Scheme Creditors would have their Consent Fee effectively forfeited in its entirety due to the Notes Minimum Denomination (as defined in Section 27.2) not being met. Please refer to Section 27 (*Fractional Adjustments*) for further details relating to fractional adjustments to the New Instruments.

(f)    For completeness, the Board has considered whether the payment of the Consent Fee to Eligible Participating Creditors has an impact on the constitution of classes of Scheme Creditors for the purposes of the Schemes, and has concluded that it does not, for the following reasons:

(i)    the existence and terms of the RSAs were made publicly available to all Scheme Creditors (who were at that time set out in the RSAs) via, among others, the Transaction Website and distributed via the Clearing Systems to the Class A Noteholders. All Scheme Creditors (who were at that time set out in the RSAs) were given an equal opportunity to accede to the RSAs and therefore to become entitled to receive the Consent Fee on an equal basis, provided that they became a party to the RSAs as a Participating Creditor by the applicable Consent Fee Deadline and vote in favour of the Schemes at the Scheme Meetings;

(ii)    the Company, on 3 April 2023, made a public announcement on the HKEX that gave the Scheme Creditors (who were at that time set out in the RSAs) notice of the opportunity to enter into the relevant RSA and to become eligible to receive the Consent Fee (provided they satisfy certain conditions as set out in the relevant RSA); and

(iii)    it is unlikely that a Scheme Creditor who is not eligible to receive an Consent Fee would be persuaded to vote against (or a Scheme Creditor who is eligible to receive an Consent Fee would be persuaded to vote for) the Scheme by

151

reason of the existence of the relevant Consent Fee because: (a) the Consent Fee only represents approximately 0.25% of the aggregate outstanding principal amount of the Eligible Restricted Debts (payable in PIK notes); and (b) in the alternative to the Schemes (an insolvent liquidation) the Scheme Creditors would receive returns that are significantly lower than the anticipated returns under the Schemes. In this context, the Board does not consider the Consent Fee a material factor which would influence a Scheme Creditor's decision in relation to the Schemes.

14.     **THE SCHEME MEETINGS**

14.1    The Schemes will proceed on the basis that Scheme Creditors constitute two (2) classes of creditors of the Company, namely Class A and Class C. The Courts have given permission to the Company to convene the respective Scheme Meetings, that is a meeting of: (i) the Class A Scheme Creditors; and (ii) the Class C Scheme Creditors, to consider and vote on the Schemes.

14.2    The Company has obtained the Scheme Convening Orders, which are orders from the respective Courts granting permission to convene the respective Scheme Meetings for the Scheme Creditors to consider and vote on the respective Schemes. A copy of the Scheme Convening Orders (regarding the convening of such meetings of Scheme Creditors) is at Schedule 7 (*Scheme Meeting Convening Order*) to this Explanatory Statement.

14.3    Details of the relevant Scheme Meetings are as follows:

*Cayman Scheme Meetings*

(a)     The Cayman Scheme Meetings will be chaired by Mr Patrick Cowley, or, failing him, another representative of KPMG Advisory (Hong Kong) Limited.

(b)     The Hong Kong Scheme Meetings will be held at Sidley Austin at 39th Floor, Two International Finance Centre, 8 Finance Street, Central, Hong Kong, with any adjournment as may be appropriate, at 7 p.m. Hong Kong time on 23 August 2023, the equivalent time being 6 a.m. Cayman Islands time on 23 August 2023.

*Hong Kong Scheme Meetings*

(c)     The Hong Kong Scheme Meetings will be chaired by Mr Patrick Cowley, or, failing him, another representative of KPMG Advisory (Hong Kong) Limited.

(d)     The Hong Kong Scheme Meetings will be held at Sidley Austin at 39th Floor, Two International Finance Centre, 8 Finance Street, Central, Hong Kong, with any adjournment as may be appropriate, at 7 p.m. Hong Kong time on 23 August 2023, the equivalent time being 6 a.m. Cayman Islands time on 23 August 2023.

14.4    The dates referred to in Section 14.3 above is subject to the assumption that none of the Scheme Meetings will be adjourned or delayed.

Any Scheme Creditor that wishes to attend the Scheme Meetings in person or by proxy should review the information regarding the attending of the Scheme Meetings set out in the Solicitation Packet and in the respective formal notices convening the Scheme Meetings set out in Schedule 5 (*Notice of Scheme Meeting*) to this Explanatory Statement.

15.    **ASSESSMENT OF SCHEME CLAIMS FOR VOTING PURPOSES**

15.1    The relevant majorities required to approve each of the Schemes at the respective Scheme Meetings are that at least a majority in number representing 75 per cent (by value) or more of the Voting Scheme Claims of the Scheme Creditors present and voting (whether in person or by proxy) at the Scheme Meeting have voted to approve the relevant Scheme.

15.2    The assessment of Voting Scheme Claims for voting purposes shall be carried out by the Chairperson:

    (a)    in respect of Scheme Creditors (who are not Sanctions-Affected Scheme Creditors), by relying on the relevant Scheme Creditor Forms submitted by the Scheme Creditors, as verified by the Chairperson, in consultation with the Company and/or the Information Agent against the books and records of the Clearing Systems and all supporting evidence provided by the relevant Scheme Creditor, respectively; and

    (b)    in respect of all Blocked Scheme Creditors, by relying on the relevant Blocked Scheme Creditor Forms submitted by the Blocked Scheme Creditors, as verified by GLAS against the Company's records, including all supporting evidence provided by the relevant Blocked Scheme Creditor.

15.3    The Chairperson may reject a Voting Scheme Claim for voting purposes in whole or in part if he or she considers that (i) it does not constitute a fair and reasonable assessment of the relevant sums or (ii) if the relevant Scheme Creditor has not complied with the applicable procedures pursuant to the terms of the Schemes.

15.4    If the Voting Scheme Claim of a Scheme Creditor is unascertained, contingent or disputed (in part) but the Chairperson is able to estimate a minimum value of the Voting Scheme Claim, the Chairperson may nonetheless, in his or her sole discretion, admit the Scheme Claim for voting purposes at such minimum value.

15.5    If the Chairperson is unable to place a minimum value on a Voting Scheme Claim, it shall be rejected by the Chairperson in its entirety for voting purposes.

15.6    The Voting Scheme Claims admitted for voting purposes by the Chairperson will be notified to the Scheme Creditors at the Scheme Meeting, but such notification does not (of itself) constitute an admission of the existence or amount of any liability of any member of the Group.

15.7    The Chairperson will be entitled to defer the announcement of the result of the vote until after the respective Scheme Meetings should the Chairperson consider it appropriate to do so (in his or her sole discretion).

15.8    The Chairperson shall report to the Courts at the Scheme Sanction Hearings, if so requested to by the relevant Court, his or her decision to reject any Voting Scheme Claims for voting purposes and provide the relevant Court with details of such Voting Scheme Claims and the reasons for rejection.

16.    **SCHEME SANCTION HEARINGS**

16.1    After the requisite majorities of the Scheme Creditors vote to approve the Schemes at the Scheme Meetings, the Scheme Sanction Hearing will then be required in respect of the sanction of the Schemes by the relevant Courts.

16.2    In relation to the Cayman Scheme Sanction Hearing, Scheme Creditors are entitled (but not obliged) to attend by their appointed legal counsel, to support or oppose the sanction of the Schemes. Scheme Creditors should be aware that they were afforded an opportunity to raise any issues in relation to the constitution of the Scheme Meetings at the Cayman Scheme Convening Hearing, as stated in the practice statement letter dated 14 July 2023 sent to the Scheme Creditors. If Scheme Creditors have not already raised any such issues, the Courts will expect any Scheme Creditor who wishes to do so at the Cayman Scheme Sanction Hearing to show a good reason why such issues were not raised at the Cayman Scheme Convening Hearing.

16.3    In relation to the Hong Kong Scheme Sanction Hearing, Scheme Creditors will have the right to attend and be heard at such hearing.

*The Scheme Effective Date*

16.4    As soon as reasonably practicable after receiving the Scheme Sanction Orders, CEG intends to deliver the Scheme Sanction Orders to the Hong Kong Companies Registrar and the Cayman Registrar of Companies (as applicable).

16.5    Upon the delivery of the Scheme Sanction Orders (sanctioning the respective Schemes) to the Hong Kong Companies Registrar and the Cayman Registrar of Companies (as applicable), the Schemes will take effect in accordance with their terms and become binding on all Scheme Creditors, wherever they are and regardless of whether they have voted for or against the Schemes or whether they have voted at all.

16.6    For the avoidance of doubt, the key provisions of the Schemes that serve to compromise the Scheme Creditors' Scheme Claims will not become effective until the Restructuring Effective Date has occurred in accordance with the terms of the Schemes.

17.    **RESTRUCTURING EFFECTIVE DATE**

17.1    The Company shall announce and specify the Restructuring Effective Date in a notice confirming satisfaction of the above steps and the Restructuring Effective Date Conditions, and enclosing a copy of the Scheme Sanction Orders and the Chapter 15 Recognition Order in accordance with Clause 6.1 of the Schemes (the "**Completion Notice**"), to Scheme Creditors, the Existing Notes Trustee and the New Instruments Trustee as soon as reasonably practicable after satisfaction of the Restructuring Effective Date Conditions.

17.2    The Restructuring Effective Date shall occur after satisfaction or waiver (to the extent permitted by law and the RSAs (applied *mutatis mutandis*)), of the Restructuring Effective Date Conditions set out in Schedule 3 to the Schemes, which include, among others, the satisfaction of the Scheme Conditions, and the occurrence of the Scheme Effective Date.

17.3    On the Restructuring Effective Date, the Company shall, among other things, make the Initial Distribution in accordance with Clauses 16 (*Initial Distribution*) and 17 (*Initial Distribution to Holding Period Trustee*) (as applicable) of the Schemes.

17.4    Following the Restructuring Effective Date, the Company shall take steps to satisfy the Restructuring Effective Date Conditions Subsequent, unless waived to the extent permitted

by law and the RSAs (applied *mutatis mutandis*), which include, among others, the dismissal (or withdrawal) of any winding-up petition filed against CEG prior to the Restructuring Effective Date and relating to any Scheme Claims of the Schemes, including the winding-up petition filed by Top Shine Global Limited against CEG before the Hong Kong Court.

18.    **AUTHORITY AND INSTRUCTIONS**

18.1    With effect from the Scheme Effective Date, in consideration of the rights provided to the Scheme Creditors under the Scheme and solely for the purposes of giving effect to the terms of the Schemes, each Scheme Creditor appoints the Company as its attorney and agent and irrevocably authorizes, directs, instructs and empowers the Company (represented by any duly authorized representative) to, as applicable:

(a)    enter into, execute and deliver (whether as a deed or otherwise) for and on behalf of that Scheme Creditor, in its capacity as a Scheme Creditor, including any Person, successor, assignee or transferee, to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time (to the extent applicable) sufficient original copies of (as agreed between the parties thereto):

(i)    the Restructuring Documents (in each case in the Agreed Form) to which such Scheme Creditor is a party, each substantially in the form attached to the Scheme or this Explanatory Statement (as applicable) or otherwise in the form circulated to Scheme Creditors or otherwise made available to them including on the Transaction Website, subject to any non-material modification approved or imposed by the Courts in accordance with the terms of the Schemes; and

(ii)    any and all such other documents (in each case in the Agreed Form) that the Company and the CEG AHG reasonably consider necessary to give effect to the terms of the relevant Scheme,

in each case to be held to the order of the relevant parties thereto (for the avoidance of doubt, to the order of the Company on behalf of each Scheme Creditor) until the Restructuring Effective Date or, in respect of the Restructuring Documents for the New Instruments which are to be first issued on the Final Distribution Date, on the Final Distribution Date, in accordance with the Scheme Steps for the purposes of giving effect to the terms of the relevant Scheme.

(b)    take or carry out any other step or procedure reasonably required to effect the settlement of the Schemes; and

(c)    to the extent applicable, in respect of Existing Debts (other than the Existing Notes and RMB Bonds), instruct each of the Existing Agents, the Dongpo Notes Trustee and Agents, the Lake Notes Trustee and Agent, acting in their capacity as Existing Agent, the Dongpo Notes Trustee and Agents or the Lake Notes Trustee and Agent respectively, and each of their employees and agents to promptly take or carry out any step, procedure or execute and comply with any Restructuring Documents reasonably required to give effect to the terms of the Schemes.

18.2    On or as soon as possible after the Scheme Effective Date, as applicable:

(a)    the Company shall carry out the steps set out in Section 18.1 and this Section 18.2, acting on the instructions and pursuant to the authority of the Scheme Creditors; and

(b)    the Company, each Existing Notes Subsidiary Guarantor, each New Instruments Subsidiary Guarantor, each Existing Notes Subsidiary Pledgor, each New Instruments Subsidiary Pledgor, the Existing Notes Trustee, the Existing Agents, the Dongpo Notes Trustee and Agents, the Lake Notes Trustee and Agent, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary, the Existing Notes Collateral Agent, the Collateral Agent and the Holding Period Trustee shall enter into, execute and deliver (whether as a deed or otherwise) sufficient original copies of (as agreed between the parties thereto):

    (i)    the Restructuring Documents (in each case in the Agreed Form) to which the Company, such Existing Notes Subsidiary Guarantor, such New Instruments Subsidiary Guarantor, the Existing Notes Trustee, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the Existing Agents, the Dongpo Notes Trustee and Agents, the Lake Notes Trustee and Agent, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary, the Existing Notes Collateral Agent and the Collateral Agent is a party, each substantially in the form attached to the relevant Scheme or the Explanatory Statement (as applicable) or otherwise in the form circulated to Scheme Creditors or otherwise made available to them, subject to any non-material modification approved or imposed by the Courts in accordance with the terms of the Schemes; and

    (ii)    any and all such other documents (in each case in the Agreed Form) that the Company and the CEG AHG reasonably consider necessary to give effect to the terms of the Schemes,

in each case to be held to the order of the relevant parties thereto until the Restructuring Effective Date or, in respect of the Restructuring Documents for the New Instruments which are to be first issued on the Final Distribution Date, on the Final Distribution Date, in accordance with the Scheme Steps for the purposes of giving effect to the terms of the Schemes.

18.3    With effect from the Scheme Effective Date, each of the Scheme Creditors irrevocably authorises and instructs the Existing Notes Trustee, the Existing Agents, the Dongpo Notes Trustee and Agents, the Lake Notes Trustee and Agent, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary, the Existing Notes Collateral Agent, the Collateral Agent and the Holding Period Trustee to enter into, execute and deliver (whether as a deed or otherwise) sufficient original copies of (as agreed between the parties thereto), as applicable:

    (a)    the Restructuring Documents (in each case in the Agreed Form) to which the Existing Notes Trustee, the Existing Agents, the Dongpo Notes Trustee and Agents, the Lake Notes Trustee and Agent, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary, the Existing Notes Collateral Agent, the Collateral Agent and the Holding Period Trustee is a party, each substantially in the form attached to the relevant Scheme or this Explanatory Statement (as applicable) or otherwise in the form circulated to Scheme Creditors or otherwise made available to them, subject to any non-material modification approved or imposed by the Court in accordance with the relevant Scheme; and

(b)     any and all such other documents (in each case in the Agreed Form) that the Company and the CEG AHG reasonably consider necessary to give effect to the terms of the Schemes,

in each case to be held to the order of the relevant parties thereto until the Restructuring Effective Date or, in respect of the Restructuring Documents for the New Instruments which are to be first issued on the Final Distribution Date, on the Final Distribution Date, in accordance with the Scheme Steps for the purposes of giving effect to the terms of the relevant Scheme.

18.4    On the Restructuring Effective Date, each Class A Noteholder hereby irrevocably authorises and instructs, as applicable:

(a)     the Company, the Existing Notes Trustee, the Existing Notes Depositary, the Existing Notes Paying and Transfer Agent and Registrar, the Existing Notes Collateral Agent and the Information Agent to take all such actions as may be necessary or appropriate to deliver, cancel, mark down and discharge the Global Certificates, terminate and discharge the Existing Notes Documents and otherwise give effect to the terms of the Scheme including without limitation the delivery by the Company (for and on behalf of the Scheme Creditors) of the Existing Notes Trustee Instruction to the Existing Notes Trustee at the time prescribed in the Scheme Steps;

(b)     the Company as its attorney and agent and irrevocably authorises, directs, instructs and empowers the Company (represented by any authorised representative) to in respect of the Existing Notes, instruct the Existing Notes Collateral Agent, acting in its capacity as Existing Notes Collateral Agent and each of its employees and agents promptly take or carry out any step or procedure to execute and comply with any Restructuring Documents reasonably required to give effect to the terms of the Schemes;

(c)     the Existing Notes Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the Existing Notes Collateral Agent and the Existing Notes Depositary, to act and rely upon the Existing Notes Trustee Instruction and the provisions of the relevant Scheme, without any duty to investigate further and without incurring any liability for doing so (other than any liability arising as a result of the fraud, wilful default or wilful misconduct of the Existing Notes Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the Existing Notes Collateral Agent or the Existing Notes Depositary); and

(d)     the Existing Notes Depositary, the New Instruments Depositary and the Information Agent to rely upon the provisions of the relevant Scheme, without any duty to investigate further and without incurring any liability for doing so (other than any liability arising as a result of the fraud, wilful default or wilful misconduct of the Existing Notes Depositary or the actual fraud, wilful default or wilful misconduct of the Information Agent).

18.5    The authority granted under the Schemes as referred to in Sections 18.1 to 18.4 (inclusive) shall be treated, for all purposes whatsoever and without limitation, as having been granted by deed and the Company shall be entitled to delegate the authority granted and conferred by this Section 18 (*Authority and Instructions*) to any duly authorized officer or agent of the Company as necessary.

18.6    Each Scheme Creditor (for itself and, if applicable, for its Designated Recipient and any person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time) on and from the Scheme Effective Date and on and from the Restructuring

Effective Date, irrevocably ratifies and confirms any act or omission done, caused or purported to be done by:

(a)     the Company, the Existing Notes Subsidiary Guarantors, the New Instruments Subsidiary Guarantors, the Existing Notes Collateral Agent, the Collateral Agent and the Information Agent, or any of their respective directors, managers, officers, partners or Affiliates, pursuant to or for the purposes of giving effect to the relevant Scheme, other than any act or omission done or made as a result of fraud, wilful default or wilful misconduct; and

(b)     the Existing Notes Trustee, the Existing Agents, the Dongpo Notes Trustee and Agents, the Lake Notes Trustee and Agent, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary, or any of their respective directors, managers, officers, partners or Affiliates, pursuant to or for the purposes of giving effect to the relevant Scheme, other than any act or omission done or made as a result of actual fraud, wilful default or wilful misconduct.

18.7    **Releases**

(a)     In consideration for the Entitlement to the Scheme Consideration, each Scheme Creditor will be required to give the undertakings, releases and waivers set out in this Section 18.7 and in accordance with Clause 28 (*Releases*) of the Schemes (the "**Releases**").

(b)     Broadly, the effect of the Releases will mean that, following the completion of the Restructuring:

   (i)      the Class A Debts, these being debts under which the Company is the borrower, will have been fully and finally discharged and released together with the Group, the Existing Notes Subsidiary Guarantors and Existing Notes Subsidiary Pledgors under any related Credit Support;

   (ii)     the Company's obligations under the Class C Debts, these being a mixture of different obligations including guarantee, put and repurchase obligations, will have been fully and finally discharged and released; however,

   (iii)    where there are other obligors under the Class C Debts, whether PRC onshore entities or onshore Group entities, the Scheme release will not release them from their obligations or Liabilities under the Class C Debts (such obligors are referred to 'Excluded Liabilities Party Persons'). This is in keeping with the Deficiency Basis explained in Section 4.10(b) in connection with valuing Scheme Claims for Scheme Consideration.

(c)     To achieve the post-Restructuring position contemplated at Section 18.7(b) above, pursuant to the terms of the Schemes and the Deeds of Release, with immediate effect on and from the Restructuring Effective Date, each of the Scheme Creditors on behalf of itself and each of its predecessors, successors and assigns (including any Person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time), as relevant, (collectively, the "**Scheme Creditor Releasing Parties**") shall and shall be deemed to completely, forever, irrevocably and unconditionally:

(i)    release, waive, void, acquit, forgive, extinguish and discharge (and to the fullest extent permitted by law) the Released Persons from the relevant Released Claims, specifically:

    (A)    'Scheme Claims': broadly, this captures claims against the Company under both Class A Debt and Class C Debt;

    (B)    'Class A Group Claims': as it is intended that the Class A Debts and related Existing Class A Debt Documents are discharged in full by the Schemes, it is appropriate that releases are provided with respect to the Group, Existing Notes Subsidiary Guarantors and Existing Notes Subsidiary Pledgors to properly ensure that the Class A Debts are discharged in full;

    (C)    'Ancillary Claims': the release in respect of Ancillary Claims is intended to capture any claim against Released Person as a result of the effecting, adhering to or complying with the releases to be effected in relation to the Scheme Claims and Class A Group Claims (discussed above); and

    (D)    'Restructuring Claims': the release in respect of Restructuring Claims releases the Released Persons from, broadly, any claim in relation to the preparation, negotiation or implementation of the Restructuring,

in each case, as discussed more fully below, the foregoing releases do not apply to any Excluded Liabilities or Excluded Collateral;

(ii)    release, forfeit, waive, void, acquit, forgive, extinguish and discharge (and to the fullest extent permitted by law) any and all Relevant Collateral (to the extent not already covered by (i)above);

(iii)    ratify and confirm everything which any Released Person may lawfully do or cause to be done in accordance with any authority conferred by the Schemes and agree not to challenge:

    (A)    the validity of any act done or omitted to be done as permitted by the terms of the Schemes; or

    (B)    the exercise or omission to exercise of any power conferred in accordance with the terms of the Schemes,

in each case in good faith by any Released Person;

(iv)    reassign all of the Released Persons' property, assets and undertaking assigned to any Scheme Creditor by or pursuant to any Existing Finance Documents save for any with respect to any Excluded Liabilities Party Person under the Existing Class C Debt Documents; and

(v)    acknowledge and agree that all powers of attorney granted under any Existing Finance Documents are revoked save for any granted by any Excluded Liabilities Party Person under the Existing Class C Debt Documents.

(d)    Pursuant to the terms of the Schemes, each Scheme Creditor will appoint the Company as its attorney and agent and irrevocably authorizes, directs, instructs and empowers the Company (represented by any duly authorized representative), on and from the

160

Restructuring Effective Date, to (i) enter into, execute and deliver as a deed on behalf of each Scheme Creditor and any person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim or its Class A Group Claim after the Voting Record Time or who acquires any interest in or arising out of a Scheme Claim or an Class A Group Claim after the Voting Record Time, the Deeds of Release whereby any and all Released Claims, referred to in Section 18.7(c)(i) shall be waived and released fully and absolutely from the Restructuring Effective Date, and (ii) do all such acts and/or execute all such documents (including without limitation, assignments, transfers, notices, instructions, supplements and amendments) as the Company may consider necessary or desirable to effect the release of any and all Released Claims referred to in Section 18.7(c)(i).

(e)     The Deeds of Release (in each case in the Agreed Form) are to be approved and executed pursuant to approval and the authority conferred by Clause 28 (*Releases*) of the Schemes and each will be substantially in the forms to be made available on the Transaction Website subject to any modifications required or approved by the Cayman Court or, as the case may be, the Hong Kong Court, and each shall take effect in relation to such Claims and Liabilities on the Restructuring Effective Date.

(f)     Each Scheme Creditor will acknowledge and agree on its own behalf and on behalf of its Scheme Creditor Releasing Parties that:

(i)     it may later discover facts in addition to or different from those which it presently knows or believes to be true with respect to the subject matter of the Schemes;

(ii)     it is its intention to fully, and finally forever settle and release any and all matters, disputes and differences, whether known or unknown, suspected or unsuspected, which presently exist, may later exist or may previously have existed between it and the Released Persons in respect of all Released Claims or any past, present and/or future Claim which is released by the Releases provided in Clause 28 (*Releases*) of the Schemes and by the Deeds of Release; and

(iii)     in furtherance of this intention, the waivers, releases and discharges given in the Schemes shall be and shall remain in effect as full and complete general waivers, releases and discharges notwithstanding the discovery or existence of any such additional or different facts.

(g)     The Schemes only purport to release the Company's obligations and Liabilities under the Class C Debts. Where there are other obligors under the Class C Debts (such persons being 'Excluded Liabilities Party Persons'), the Schemes do not purport to release such persons from their Liabilities or obligations under the Class C Debts (however, please consider the risk factor at Section 28.1(m) on pro-tanto release in connection with this point). The Liabilities and collateral of the Excluded Liabilities Party Persons are referred to as 'Excluded Liabilities' and 'Excluded Collateral' respectively: they are excluded from the releases described in Section 18.7(c) above. This is in keeping with the Deficiency Basis (described more fully in Section 9.35) whereby Scheme Consideration will only be provided in respect of the Company's Liabilities and obligations which are being released, and not in respect of the Liabilities and obligations of the Excluded Liabilities Party Person's as their Liabilities and obligations under the Class C Debts are not purported to be released under the Schemes.

(h)     Therefore, notwithstanding any other provision in this Explanatory Statement, the effect of the Restructuring under the terms of the Schemes will not waive, release,

impair or otherwise compromise any of the Excluded Liabilities or any of the Excluded Collateral.

(i)    Further, the effect of the Restructuring under the terms of the Schemes shall not:

    (i)    prejudice or impair any right or benefit of any Scheme Creditor Releasing Party:

        (A)    created under the Schemes or other Restructuring Document including without limitation any right to commence and/or continue and/or instruct any other Person to commence or continue any Proceeding to enforce its rights under or in relation to the New Instruments Documents; or

        (B)    which arises as a result of a failure by the Company or any other Released Person to comply with the terms of the Schemes or any Restructuring Document; and

    (ii)    prejudice or impair Claims against the Company or any other Released Person arising from fraud, wilful default or wilful misconduct.

(j)    As well as the releases being provided by the Scheme Creditors pursuant to the terms of the Schemes detailed in Section 18.7(c), the following intra-Group releases are being effected as part of the Restructuring:

    (i)    the release of the Company by companies within the Group of as many as possible of any 'ricochet' intra-Group Liabilities that may arise (whether by indemnity, contribution, subrogation or similar) in connection with the Scheme Claims that are being released through the Scheme; and

    (ii)    the release of as many as possible, taking into account all the circumstances, of the intra-Group Liabilities owed by the Company and the subsidiary obligors to other companies within the Group.

(k)    The purposes of the releases described at Section 18.7(j) above include helping to ensure that the Schemes are substantially effective and to reduce the Company's and the subsidiary obligors' actual and contingent debts, in each case for the benefit of their creditors as a whole. These releases will be implemented as a step of the Schemes and in accordance with the Deeds of Release, in circumstances where the relevant alternative is a value destructive Group insolvency.

(l)    For the avoidance of doubt, nothing contained in the Schemes shall be construed or interpreted as precluding, limiting or in any way diminishing the right of any parties (be they Scheme Creditors or otherwise) from instituting, pursing, or maintaining a claim, litigation, or any other legal or equitable action against the Company in relation to any claims, liabilities, obligations, or issues arising from, associated with, or related to the EVPS Pledges.

19.    **FOREIGN RECOGNITION OF THE SCHEMES**

19.1    A director of the Company, or any other authorised representative, will be appointed as the Company's foreign representative, authorised to act as such for the purposes of any proceedings commenced under Chapter 15 of the US Bankruptcy Code and such other relief as the Hong Kong Court may deem appropriate, in the United States or elsewhere under the relevant local laws (the "**Foreign Representative**"). The Foreign Representative will be authorised on behalf of the Company to take any and all steps deemed necessary or desirable to carry out the purpose and intent of the Schemes including filing the Recognition Filings and any petition or other request for relief intended to be filed under Chapter 15 of the US Bankruptcy Code and/or under other relevant local laws.

19.2    Chapter 15 of the US Bankruptcy Code is intended to give, as a matter of US law, effect to a foreign court's decision approving a scheme or similar plan by recognizing and enforcing the terms of such scheme or plan and applicable orders of the foreign court – including, for instance, by giving effect to a discharge of indebtedness, pursuant to such scheme or plan, of any debts governed by US law that were subject to the foreign proceeding.

19.3    If the Schemes are sanctioned by the relevant Courts, the Company intends to seek the recognition of the Hong Kong Scheme as a foreign main proceeding (or in the alternative, a foreign non-main proceeding) under Chapter 15 of the US Bankruptcy Code by making the Recognition Filings. No creditor has raised issues about the propriety of Hong Kong as the centre of main interests ("**COMI**") of the Company or about any actions of management in proffering a Hong Kong COMI and establishment in Hong Kong. The Company intends to request, upon notice to parties with an interest in the relief sought and after the opportunity for such parties to be heard, that the US Bankruptcy Court makes an order that recognizes and enforces the Hong Kong Scheme and the Hong Kong Scheme Sanction Order and thus confirms that the existing New York law debt is discharged in accordance with its governing law. The Company intends to request that the US Bankruptcy Court order be made shortly following the granting of the Scheme Sanction Orders.

19.4    Provided the Chapter 15 Recognition Order is granted and the Hong Kong Scheme is recognized and enforced as a matter of New York and federal law, the Company is advised that the Schemes and the releases of the Existing Notes Subsidiary Guarantors pursuant to the Schemes will likely be given effect in the United States further to a legal opinion obtained from an independent expert.

19.5    Any director of the Company (whether holding office now or in the future) shall be authorised to act as the representative of the Company on and in connection with any application for recognition and assistance in relation to this Hong Kong Scheme in any jurisdiction and under whatever law, including (without limitation) Chapter 15 of the US Bankruptcy Code, Part XIX of the BVI Insolvency Act, 2003 as amended and any other law derived from or similar to the UNCITRAL Model Law on Cross-Border Insolvency Proceedings.

20. **HOLDING PERIOD TRUST**

20.1    On the Restructuring Effective Date, the Holding Period Trust will come into effect pursuant to the terms of the Holding Period Trust Deed to be entered into between the Company and the Holding Period Trustee.

20.2    The Holding Period Trust is a trust account which shall hold certain Scheme Consideration and Consent Fees, including: (i) undistributed TJ Scheme Consideration which shall be distributed on the Interim Distribution Date (if applicable) or the Final Distribution Date in accordance with the terms of the Schemes, and (ii) any A2 Package, A2 Notes, TJ Scheme Consideration or Consent Fees (if applicable) unable to be distributed as the Scheme Creditor entitled to it is a Blocked Scheme Creditor, which shall be distribution to such Blocked Scheme Creditor if they are no longer subject to the Applicable Sanctions on the Final Distribution Date.

20.3    The Holding Period Trust will expire at the end of the Holding Period (i.e. one Business Day following the Final Distribution Date). If Blocked Scheme Creditors remain affected by Applicable Sanctions, their Blocked Trust Assets will be transferred to the Successor Escrow Agent on the Final Distribution Date pursuant to the terms of the Schemes and the Successor Escrow Account Deed. Thereafter, the Holding Period Trust will be wound up in accordance with the terms of the Holding Period Trust Deed.

21.    **SUCCESSOR ESCROW ACCOUNT**

21.1    Upon the expiration of the Holding Period, if Applicable Sanctions continue to prevent the payment of Scheme Consideration, in the form of Blocked Assets (as applicable), to Blocked Scheme Creditors, the Successor Escrow Account will come into effect pursuant to the terms of the Successor Escrow Agreement to be entered into between the Company and the Successor Escrow Agent.

21.2    The Successor Escrow Account is an escrow account designed to hold any Scheme Consideration, in the form of Blocked Assets, unable to be distributed prior to the expiration of the Holding Period to Blocked Scheme Creditors, who have validly submitted a Blocked Scheme Creditor Form together with supporting evidence to GLAS prior to the relevant Bar Date that remain affected by the Applicable Sanctions. For the avoidance of doubt, the Information Agent will not be performing any services in relation to the Successor Escrow Account, and any ongoing communications between the Company and Scheme Creditors (as the case may be) from the expiry of the Holding Period Trust should be directed to GLAS.

21.3    Following the expiration of the Holding Period, such Blocked Assets (as applicable) will be issued to GLAS in its capacity as successor escrow agent (the "**Successor Escrow Agent**") to be held on escrow under the terms of the Successor Escrow Agreement.

21.4    During the period the Successor Escrow Account is in force, any Blocked Scheme Creditors that failed to previously complete and submit a Blocked Scheme Creditor Form before the Voting Record Time should complete and submit the same before the relevant Bar Date in order to be entitled to receive their Scheme Consideration of the Blocked Assets upon the expiration of the Successor Escrow Account pursuant to the terms under the Successor Escrow Agreement.

21.5    Blocked Scheme Creditors will be notified of the terms of the Successor Escrow Account and the process and conditions for distribution on, or immediately after, the expiration of the Holding Period through such public medium as the Company considers to be appropriate at that time.

### *Termination of the Successor Escrow Account*

21.6    The Blocked Assets will be held on trust until either: (i) the Perpetuity Period expires, this being a period of 21 years following the date that the Successor Escrow Account is established (or such further date as determined by the Successor Escrow Agent; or (ii) the Applicable Sanctions are lifted, in respect of any Blocked Scheme Creditor, whichever date is first.

21.7    Following the expiration of the Successor Escrow Account, the Blocked Scheme Creditors will be given a reasonable period of time to recover their Entitlement to the Blocked Assets in accordance with the terms of both the Successor Escrow Account and the Schemes.

22.    **STAY OF PROCEEDINGS**

22.1    The Schemes will provide that:

(a)     from the Scheme Effective Date, no Scheme Creditor Releasing Party, nor any party on behalf of a Scheme Creditor Releasing Party shall be entitled to commence, continue, instruct, direct, permit or authorise any other Person to commence or continue, any Proceeding, whether directly or indirectly, against any of the Released Persons or in respect of any property of any of the Released Persons in respect of Claims or Liabilities that are to be released in accordance with the Schemes; and

(b)     subject to any existing contractual restrictions, a Scheme Creditor Releasing Party may commence a Proceeding against the Released Person after the Restructuring Effective Date in respect of Claims or Liabilities that are not to be released in accordance with the Schemes.

23.    **MODIFICATIONS TO THE SCHEMES AND THE RESTRUCTURING DOCUMENTS**

23.1    Further pursuant to Clause 31 (*Modifications to the Scheme and the Restructuring Documents*) of the Schemes, CEG may, before or at any hearing before the relevant Court to sanction the respective Schemes, and subject to obtaining the written consent of the Majority CEG AHG (where the CEG AHG holds the Minimum CEG AHG Threshold) consent on behalf of all Scheme Creditors to any modifications of the Schemes and/or the Restructuring Documents or any additional terms or conditions including those which the relevant Court may think fit to approve or impose which would not directly or indirectly have a material adverse effect on the rights of the Scheme Creditors.

23.2    On the identification of a Sanctioned Scheme Creditor:

(a)    the Company may modify the Schemes and/or the Restructuring Documents to the extent reasonably necessary and in a manner to ensure that the Schemes are not contrary to Applicable Sanctions; and

(b)    each of the New Instruments Trustees and New Instruments Paying and Transfer Agents and Registrars is authorised to make any amendment to the New Instruments Documents and take any action necessary or desirable to give effect to a modification to such New Instruments Documents on and following receipt of an officers' certificate from the Company that such modification is reasonably necessary to ensure that the Schemes are not contrary to Applicable Sanctions, which the New Instruments Trustees and New Instruments Paying and Transfer Agents and Registrars are entitled to rely on conclusively.

23.3    Nothing in the Scheme shall prevent the modification of any executed Restructuring Document in accordance with its terms, including, but not limited to, minor or technical modifications to correct manifest or proven error or to comply with mandatory provisions of law.

24.    **GOVERNING LAW AND JURISDICTION**

24.1    The Cayman Scheme and the Hong Kong Scheme and any non-contractual obligations arising out of or in connection with the respective Schemes shall be governed by, and construed in accordance with, the laws of the Cayman Islands and Hong Kong, respectively, and the Company and the Scheme Creditors will agree that the courts of the Cayman Islands and Hong Kong shall have exclusive jurisdiction to hear and determine any Proceeding and to settle any dispute which arises out of or is connected with the terms of the Cayman Scheme and the Hong Kong Scheme respectively or their implementation or out of any Proceeding taken or omitted to be taken under the respective Schemes or in connection with the administration of the respective Schemes and for such purposes, each of CEG and the Scheme Creditors irrevocably submit to the jurisdiction of the courts of the Cayman Islands and Hong Kong, *provided, however*, that nothing shall affect the validity of other provisions determining governing law and jurisdiction as between CEG and any of the Scheme Creditors whether contained in any contract or for any other purpose, including, but not limited to, submission and/or enforcement under the jurisdiction of the US Bankruptcy Court in relation to the Recognition Filings and the Chapter 15 Recognition Order.

24.2    The terms of the Schemes and the obligations imposed on CEG under them shall take effect subject to any prohibition or condition imposed by any applicable law.

25.     **RESTRUCTURING DOCUMENTS**

This Section 25 lists the principal Restructuring Documents and directs all Scheme Creditors to view copies of the same on the Transaction Website.

25.1    **The Restructuring Documents**

(a)     The Restructuring Documents comprise all documents, agreements, instruments, board resolutions, shareholder approvals, releases and notices necessary to implement or consummate the Restructuring in accordance with the terms of the Scheme.

(b)     The Restructuring Documents include, but are not limited to, the following principal documents:

(i)     the Schemes;

(ii)    this Explanatory Statement;

(iii)   the Deeds of Release;

(iv)    the Deed of Undertaking;

(v)     the New Instruments Documents;

(vi)    the Security Documents;

(vii)   the Holding Period Trust Deed;

(viii)  the New Intercreditor Agreement; and

(ix)    all other documents, agreements, instruments, board resolutions, shareholder approvals, releases and notices necessary to implement or consummate the Restructuring in accordance with the terms of the RSAs and Schemes, in each case as amended, supplemented, extended, restated or novated from time to time, or any document or instrument creating or evidencing any security interest or guarantee, any fee letter, intercreditor agreement or similar documents under or in connection with the New Instruments and/or the Security Documents in each case in the Agreed Form. For the avoidance of doubt, any documents and accompanying evidence (including, but not limited to, foreign law expert opinions and all other affidavit evidence filed by the Company in respect of the Proceedings before the Courts to convene the Scheme Meetings and/or to sanction the Schemes)) specifically required as part of the Courts' proceedings are not included.

(c)     Copies of all of the above listed principal Restructuring Documents will be available for viewing on the Transaction Website. All Scheme Creditors are strongly encouraged to review the detailed terms of the Restructuring Documents in full and are recommended to seek their own independent financial, legal and/or tax advice from their financial, legal and/or tax adviser with respect to the contents of the same.

(d)     Nothing in the Schemes shall prevent the modification of any executed Restructuring Document in accordance with its terms, including, but not limited to, formal, but not limited to, formal, minor or technical modifications to correct manifest or proven error or to comply with mandatory provisions of law.

25.2    **Summary of the RSAs**

On 3 April 2023, CEG entered into the Class A RSA with, among others, members of the CEG AHG and launched the Class C RSA, each providing that the Participating Creditors under the respective RSAs undertake that they shall use its beneficial interest in its Existing Debts to approve and support the Proposed Restructuring on the terms and conditions of the respective RSAs. Other key provisions of the RSAs include:

*CEG's undertakings under the RSAs*

(a)    Subject to the provisions of the respective RSAs, CEG shall and (in respect of the Class A RSA only) shall procure that each Existing Notes Subsidiary Guarantor (as applicable) will, among other things:

    (i)    pay or procure payment of the Consent Fee;

    (ii)    implement the Restructuring and the Schemes in the manner envisaged by, and materially on the terms and conditions set out in, the respective RSAs including the Term Sheet;

    (iii)    perform all actions as are reasonably necessary in order to support, facilitate, implement or otherwise give effect to the Restructuring (provided that such action is consistent in all material respects with the Term Sheet) as soon as reasonably practicable;

    (iv)    upon the Restructuring Documents being finalised, file and pursue expeditiously any legal process or proceedings contemplated by or required to implement the Restructuring, including (without limitation) the Schemes;

    (v)    take any actions pursuant to any order of, or sanction by, any courts (including, without limitation, the Cayman Court and the Hong Kong Court) as may be required or necessary to implement or give effect to the Restructuring;

    (vi)    perform all actions as are reasonably necessary to procure that: (i) each Scheme Effective Date occurs; and (ii) the Restructuring Effective Date occurs as soon as practicable following the occurrence of all the Scheme Effective Dates and on or before the Longstop Date;

    (vii)    convene all meetings of the shareholders and/or creditors of any member of the Group (as applicable) which are required to consider any resolutions and/or decisions in relation to the Restructuring;

    (viii)    obtain, using all reasonable endeavours, any necessary regulatory or statutory approval required to permit or facilitate the Restructuring (including, without limitation, any approval of the CSRC, the NDRC, the HKEX, the SGX-ST or any Clearing Systems as may be required);

    (ix)    keep the Participating Creditors reasonably informed in relation to the status and progress of the Restructuring, including following a reasonable request by any advisor to the Participating Creditors via the Information Agent or CEG's advisors; and

    (x)    notify the Participating Creditors of any matter or thing that would be reasonably likely to be a material impediment to the implementation of the Restructuring promptly upon becoming aware of the same.

*Participating Creditors' undertakings under the RSAs*

(b)     Subject to the provisions of the respective RSAs and the compliance by CEG (and, in respect of the Class A RSA, the Sponsors) with its/their respective obligations under the RSA(s), each Scheme Creditor who has acceded to the respective RSAs will:

    (i)     use all commercially reasonable endeavours in order to support, facilitate, implement or otherwise give effect to the Restructuring (provided that such action is consistent in all material respects with the Term Sheet) as soon as reasonably practicable;

    (ii)    progress and implement the Restructuring in accordance with the terms set out in the Class A RSA;

    (iii)   support any actions taken by the Group to obtain recognition or protection of the Restructuring in any court of any jurisdiction (including any Recognition Filing) and take all other commercially reasonable actions reasonably requested by CEG to implement or protect the Restructuring;

    (iv)    if any Insolvency Proceeding is commenced in respect of any member of the Group in any jurisdiction, take all commercially reasonable actions reasonably requested by CEG to implement or protect the Restructuring through the relevant Insolvency Proceedings;

    (v)     take all such actions as are necessary to:

        (A)     validly establish its standing to vote at each Scheme Meeting by causing its Account Holder (if applicable) to submit to the Information Agent a validly completed Account Holder Letter including a valid Accession Code and (with respect to Class A Noteholders only) any other documentation required by the Information Agent, in respect of the outstanding principal amount of the Existing Debts in which it holds a beneficial and/or legal interest (as applicable) as principal for the purposes of voting its holdings at the Voting Record Time for each Scheme by the relevant deadline;

        (B)     attend each Scheme Meeting either in person or by proxy; and

        (C)     vote and deliver within any applicable time periods any proxies, instructions, directions or consents in respect of all Restricted Debts in which it holds a beneficial and/or legal interest (as applicable) as principal to vote in favour of each Scheme in respect of the aggregate outstanding principal amount of all Restricted Debts in which it holds a beneficial and/or legal interest (as applicable) as principal at the Voting Record Time at each Scheme Meeting;

    (vi)    use commercially reasonable endeavours to prepare, file, make or otherwise support CEG in any application in a legal or regulatory process or proceeding that is reasonably requested by CEG and necessary to give effect to the Restructuring (including, without limitation, each Scheme) or oppose any legal process or proceedings that may negatively impact the Restructuring;

    (vii)   provide commercially reasonable support and assistance to CEG as reasonably requested by CEG to prevent the occurrence of an Insolvency Proceeding in respect of CEG (or, under the Class A RSA only, the Existing Notes Subsidiary

Guarantors) (other than the Schemes or any Recognition Filing or similar recognition, moratorium or protection proceedings in the Cayman Islands, Hong Kong, United States or elsewhere);

(viii)   not:

(A)   object to or challenge any Scheme (or any application made by CEG in respect of any Scheme), or

(B)   otherwise commence, join, support or assist any proceedings to oppose or alter any Restructuring Document filed by CEG in connection with the confirmation of the Restructuring,

in each case, provided that the Restructuring, any Scheme and/or any such Restructuring Document are consistent in all material respects with the terms as set out in the Term Sheet;

(ix)   not take any actions inconsistent with, or that would, or are intended to, or would be likely to delay approval or confirmation of, the Restructuring or any of the Restructuring Documents, provided that the Restructuring and/or any of the Restructuring Documents are consistent in all material respects with the terms set out in the RSAs including the Term Sheet;

(x)   not formulate, encourage, procure or otherwise support any alternative proposal or alternate offer for the implementation of the Restructuring other than those contemplated by the Term Sheet or to otherwise engage in any such discussions or take any action which would delay or impede any approvals for the Restructuring, provided that the Restructuring and/or any of the Restructuring Documents are consistent in all material respects with the terms as set out in the Term Sheet; and

(xi)   not take, commence or continue any Enforcement Action, whether directly or indirectly, to delay any Scheme Effective Date, interfere with the implementation of the Restructuring and/or the Schemes, or the consummation of the transactions contemplated thereby.

***The Sponsors' undertakings under the Class A RSA***

(c)   Subject to the provisions of the Class A RSA, each of the Chairman and Xin Xin (BVI) Limited (a company wholly-owned by the Chairman) (collectively, the "**Sponsors**") shall, among other things:

(i)   perform all actions as are commercially reasonably necessary in order to assist, support, facilitate, implement or otherwise give effect to the Restructuring (provided that such action is consistent in all material respects with the Term Sheet) as soon as reasonably practicable and use commercially reasonable endeavours to procure the Group to preserve assets, business and operations of the Group pending completion of the Restructuring;

(ii)   progress and implement the Restructuring in accordance with the terms of the Class A RSA;

(iii)   use best endeavours to perform all actions within its control necessary to implement the Conversion of Shareholders' Loans to NEV Shares in respect

of the loans by the Chairman and Xin Xin (BVI) Limited to NEV in accordance with the Term Sheet;

(iv)    in respect of the Chairman only, perform all obligations applicable to the Chairman under and in accordance with the AHG Work Fee Letter (including the payment of the AHG Work Fee); and

(v)    in respect of the Chairman, use best endeavours to exercise any and all of his voting rights in his capacity as a director and/or shareholder of any member of the Group to assist, support, facilitate, implement or otherwise give effect to the Restructuring.

26.    **SUMMARY OF THE NEW INSTRUMENTS**

The Company shall issue the New Instruments as Scheme Consideration to be distributed to each Eligible Creditor under and pursuant to the terms of the Schemes.

26.1   **Summary of the New Instruments**

(a)    The terms of the New Instruments will be set out in the New Instruments Documents.

(b)    A summary of the key commercial terms of each the New Instruments Documents is set out in Schedule 8 (*Summary of Terms of the New Instruments*). A substantially final form of the indentures or trust deeds for the A1 Notes, C1 Notes, EVPS MEBs, NEV MEBs, CEG MCBs, A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, C2 NEV SLNs, Plain A2 Notes and C2 Notes and Forced A2 Notes will be made available on the Transaction Website. Unless otherwise indicated, all capitalised terms used in the following summary shall have the meanings assigned to those terms in the relevant New Instruments Documents.

(c)    No cash proceeds will be received by the Company in consideration for the issuance of the New Instruments.

(d)    In the event that any New Instruments, which will be issued exclusively in global form, are exchanged for definitive notes or certificates:

(i)    for so long as the New Instruments are listed on the SGX-ST and the rules of the SGX-ST so require, the Company shall appoint and maintain a paying agent in Singapore, where the New Instruments may be presented or surrendered for payment or redemption; and

(ii)   an announcement of such exchange shall be made by or on behalf of the Company through the SGX-ST, and such announcement shall include all material information with respect to the delivery of such definitive notes or certificates, including details of the paying agent in Singapore.

For so long as such New Instruments are listed on the SGX-ST and the rules of the SGX-ST so require, such New Instruments will be traded on the SGX-ST in a minimum board lot size of at least S$200,000 (or its equivalent in foreign currencies).

With respect to the New Instruments, Madison Pacific is appointed to act as trustee and various agent roles and China Construction Bank (Asia) Corporation Limited is appointed as account bank (and is anticipated to take up other roles).

27.    **FRACTIONAL ADJUSTMENTS**

27.1    Notwithstanding any other provision of this Explanatory Statement:

(a)    the aggregate number of New Instruments to which an Eligible Creditor is entitled shall be rounded down to the nearest whole number; and

(b)    if the conversion or exchange of any CEG MCBs, EVPS MEBs or NEV MEBs would result in the relevant Scheme Creditor having a fractional entitlement to shares of CEG, EVPS or NEV, such fractional entitlement shall be forfeited.

27.2    If the allocation of the New Instruments in accordance with the Schemes would result in any Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee receiving less than US$500 (the "**Notes Minimum Denomination**") of any tranche of any series of the A1 Notes, C1 Notes, A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, C2 NEV SLNs, A2 Notes and C2 Notes, then such Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee would instead receive an allocation in one or more tranches of any series of the New Instruments, as determined by the Company, in consultation with the Information Agent and/or the Scheme Administrators, in its discretion in good faith and based on information provided and reviewed against the records of the Clearing Systems (in respect of the Class A Noteholders and the Class C Noteholders) or the Company's books and records (in respect of the Class A Lenders and the Class C Scheme Creditors other than the Class C Noteholders) (including accounting for the weighted average maturity of the Scheme Consideration), to ensure that such Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee holds at least the Notes Minimum Denomination for at least one tranche of any series of the New Instruments, provided that:

(a)    any fraction of any tranche of A1 Notes, C1 Notes, A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, C2 NEV SLNs, A2 Notes and C2 Notes that is remaining after the adjustment set out above in this Section 29 will be forfeited;

(b)    the interests in the global certificates for the New Instruments to which a Scheme Creditor is entitled under the terms of this Cayman Scheme will be credited to the Clearing System account in which that Scheme Creditor held its interests in the Existing Notes at the Entitlement Record Time (through the relevant Account Holder where applicable); and

(c)    the interests in the New Instruments will be recorded in the New Instruments register by the New Instruments Paying and Transfer Agent and Registrar.]

27.3    If the allocation of the New Instruments in accordance with this Cayman Scheme would result in any Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee receiving less than HK$2,300 (the "**EVPS MEB Minimum Denomination**") of EVPS MEBs, HK$3,840 (the "**NEV MEB Minimum Denomination**") of NEV MEBs, or HK$5,775 (the "**CEG MCB Minimum Denomination**") of CEG MCBs, any fraction of EVPS MEBs, NEV MEBs and CEG MCBs below the EVPS MEB Minimum Denomination, NEV MEB Minimum Denomination and the CEG MCB Minimum Denomination, respectively, will instead be issued as Plain A2 Notes or C2 Notes (as applicable) in the tranche(s) determined by the Company, in consultation with the Information Agent and/or the Scheme Administrators, in good faith, provided that such issuance will be equal to or greater than the Notes Minimum Denomination, or shall otherwise be forfeited.

27.4    If the conversion or exchange of any Forced A2 Notes for a Class A Scheme Creditor would result in any tranches of a series of New Instruments issued to that Class A Scheme Creditor as part of such conversion to be less than the Notes Minimum Denomination, EVPS MEB Minimum Denomination, NEV MEB Minimum Denomination or CEG MCB Minimum Denomination (as applicable), then:

(a)    the relevant Forced A2 Notes shall not be converted into New Instruments forming part of the C2 Package Unadmitted Portion; and

(b)    any excess shares for the NEV MEBs or EVPS MEBs as a result of such conversion not taking place shall be transferred to the New Instruments Collateral Agent of the A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs and C2 NEV SLNs in accordance with Clauses 18.5(a) and 18.5(b) of the Schemes.

28.    **RISK FACTORS**

**The following summarises some of the principal risks and uncertainties that may arise in connection with the Schemes. It should be read in conjunction with all of the other information contained in this Explanatory Statement. Additional risks and uncertainties not presently known to CEG or that CEG currently deems immaterial may become material and have a material adverse effect on the business, financial condition or results of operations of the Group. This Explanatory Statement also contains forward-looking statements, which involve risks and uncertainties of their own. Actual results may differ materially from those anticipated in these forward-looking statements as a result of various factors and circumstances, including the risks and uncertainties described in this Explanatory Statement.**

For ease of reference only, the risk factors set out below have been grouped into the following categories:

(a)    risks relating to the implementation of the Schemes;

(b)    risks relating to a failure to implement or a delay in implementing the Schemes;

(c)    risks following the implementation of the Schemes;

(d)    risks relating to the New Instruments; and

(e)    risks relating to the New Instruments Subsidiary Guarantees and the Collateral.

In addition, Scheme Creditors are liable for any taxes that may arise in respect of such Scheme Creditor as a result of the Schemes and the Restructuring, and shall have no recourse to CEG, the New Instruments Subsidiary Guarantors, the New Instruments Subsidiary Pledgors, the New Instruments Trustee, the Information Agent or any other person in respect of such taxes or any filing obligation with respect thereto.

28.1    **Risks relating to the implementation of the Schemes**

*Scheme Creditors may not approve the Schemes*

(a)    In order for the Schemes to become effective, each of the Schemes must be approved by a majority in number representing 75% or more in value of the Scheme Creditors present, in person or by proxy, and voting at the relevant Scheme Meeting. If the requisite majorities of Scheme Creditors do not vote in favour of the Schemes at the respective Scheme Meetings, then the Restructuring will not be undertaken pursuant to the Schemes or possibly at all.

(b)    Under the RSAs, some Scheme Creditors have given undertakings to vote in favour of the Schemes; however, such undertakings may cease to be binding in certain circumstances under the terms of the RSAs or if the RSAs are terminated.

*Even if the Scheme Creditors approve the Schemes, the Schemes may not be approved by the Court*

(c)    In order for the Schemes to become effective under Cayman Islands law and Hong Kong law respectively, the relevant Court must sanction the Schemes. The Courts have discretion whether or not to sanction the relevant Scheme and will need to be satisfied that, among other matters: (i) the meeting of Scheme Creditors was convened and held in accordance with the Scheme Convening Orders, (ii) the Scheme was approved by

the requisite majorities of those Scheme Creditors who voted at the Scheme Meeting in person or by proxy; and (iii) the relevant Scheme is such as an intelligent and honest man, a member of the class concerned and acting in respect of his interest, might reasonably approve. Among other factors, the Courts are likely to have regard to whether (1) the class of Scheme Creditors voting in respect of the relevant Scheme has been properly constituted, (2) the provisions of the Cayman Companies Act and the Hong Kong Companies Ordinance (as applicable) and related subsidiary legislation have been complied with, and (3) the class was fairly represented by those who attended the meeting and the statutory majority are acting bona fide and are not coercing the minority in order to promote interests adverse to those of the class whom they purport to represent.

(d)     Even if the Schemes are approved at the respective Scheme Meetings, any Scheme Creditor who voted (or gave instructions to someone to vote on their behalf) at the Scheme Meetings may appear by counsel at the relevant Scheme Sanction Hearing in order to make representations that the relevant Scheme should not be approved and to object to the granting of the relevant Scheme Sanction Order. The Court may also be prepared to hear such representations and objections by counsel for any other person whom they are satisfied has a substantial economic interest in the relevant Scheme. Therefore, it is possible that objections will be made at or before the Scheme Sanction Hearings and that any such objections will delay or possibly prevent the Scheme(s) from being sanctioned and becoming effective.

(e)     There can be no assurance that the Courts will approve the Schemes. If the Courts do not approve the respective Schemes, or approves them subject to conditions or amendments which (i) CEG deems unacceptable or (ii) would have (directly or indirectly) a material adverse effect on the interests of any Scheme Creditors and such conditions and amendments are not approved by the Scheme Creditors, the Schemes will remain ineffective.

(f)     Further, even if the Courts approve the respective Schemes, it is possible for any person who opposed the sanctioning of a Scheme at the relevant Scheme Sanction Hearing to appeal against the granting of the relevant Scheme Sanction Order. Any such appeals and/or subsequent litigation could delay the Schemes becoming effective or possibly prevent the Schemes from becoming effective at all.

*There is no guarantee that the Chapter 15 Recognition Order will be granted in respect of the Schemes*

(g)     The Schemes are conditional on the granting of the Chapter 15 Recognition Order, unless waived by the Company. If the Cayman Court and/or the Hong Kong Court grants the sanctioning orders but makes sanction subject to the granting of the Chapter 15 Recognition Order (i.e. removing the ability of the Company to waive the condition), the failure to obtain a Chapter 15 Recognition Order will result in the Schemes not becoming effective.

(h)     In addition, there can be no assurance that the US Bankruptcy Court will grant the Chapter 15 Recognition Order in connection with the Schemes. It is subject to a number of considerations by the US Bankruptcy Court under the laws of the United States. If the US Bankruptcy Court does not recognize the Hong Kong Scheme and does not enter the Chapter 15 Recognition Order, the terms and effect of the Schemes, including the discharge of the US law-governed debt, may not be given effect or be binding in the US.

*Even if the Schemes are approved by the Courts in Cayman Islands and Hong Kong, there is no guarantee that the Schemes will be recognized by courts in other jurisdictions, including the PRC.*

(i)    Even if the Schemes become effective under Cayman Islands law and Hong Kong law respectively, it may not be recognized by courts in other jurisdictions, including the PRC. According to a guidance issued by the Supreme Court of China, PRC courts would recognize insolvency proceedings approved by the Hong Kong High Court with respect to, among others, compulsory winding-ups, voluntary winding-ups initiated by creditors, and debt restructuring procedures proposed by a liquidator or provisional liquidator. It is uncertain whether the Schemes fall under such scope of recognition, given that the Schemes are initiated by the Company itself in the relevant jurisdictions.

*The implementation of the Schemes and the Restructuring may result in adverse and/or complex tax consequences to Scheme Creditors*

(j)    The Company is not providing tax advice to any Scheme Creditor in connection with the Restructuring, and each Scheme Creditor should consult its own tax adviser regarding tax consequences of the Restructuring in any relevant jurisdiction.

*Risk relating to the effect of the Schemes*

(k)    The claims of Class C Scheme Creditors against Excluded Liabilities Party Persons are expressly not released under the Scheme and, as a result, Class C Scheme Creditors are not receiving any consideration under the Schemes in respect of any claims they may have against Excluded Liabilities Party Persons.

(l)    An Excluded Liabilities Party Person is an obligor, guarantor, security or collateral pledgor or other credit support provider of or in respect of a Class C Debt owed to a Class C Scheme Creditor. The claims of Class C Scheme Creditors against Excluded Liabilities Party Person are estimated under the Scheme to arrive at that Class C Scheme Creditor's claims on a Deficiency Basis (being, in broad terms, the total outstanding amount of principal and interest owed to the Class C Scheme Creditor under its Class C Debt less the estimated amount of its recoveries from Excluded Liabilities Party Persons) which forms the basis for its Entitlement for Scheme Consideration.

(m)    Class C Scheme Creditors should be aware that by operation of law receipt of the Scheme Consideration may result in a pro tanto release of the relevant Excluded Liabilities Party Persons. However, whether that is the case is likely to depend on the operative law and the relevant contractual terms. Further as a general principle it may be the case that a Class C Scheme Creditor will not be able to recover more than 100% of the value of its debt in total from the Company and the Excluded Liabilities Party Persons.

*The Company has short-term funding needs to continue operations till the implementation of the Schemes and the Restructuring*

(n)    While Management believes that its cash position should suffice to continue operations until the implementation of the Schemes and the Restructuring, there may be unforeseen circumstances, including a delay in the implementation of the Schemes, which may cause the Company to require additional short-term funding. If the Company is unable to obtain, at favourable rates or at all, such additional short-term funding, it may be unable to implement the Schemes and the Restructuring.

*The allocation of the New Instruments to Scheme Creditors may be subject to adjustments as provided in the Term Sheet and/or at the Company's direction*

(o)     The allocation of the New Instruments to Scheme Creditors may be subject to adjustment due to participation of the Scheme Creditors in Option 1 Scheme Consideration and Option 2 Scheme Consideration, for Class A Scheme Creditors, their selection of A2 Package, A2 Notes or any combination of both, or for Class C Scheme Creditors, their selection of C2 Package, C2 Notes or any combination of both, any adjustment based on Deficiency Basis, any adjustment due to Oversubscription and/or Undersubscription under Option 2 Scheme Consideration and any other adjustment as provided in the Term Sheet.

(p)     In addition, if the allocation of the New Instruments in accordance with the Scheme would result in any Eligible Creditor, Designated Recipient or the Holding Period Trustee receiving less than the Notes Minimum Denominatoin of any series of the New Instruments, then such Eligible Creditor, Designated Recipient or the Holding Period Trustee would instead receive an allocation in one or more of the other series of the New Instruments, as determined by the Company in its discretion in good faith, to ensure that such Eligible Creditor, Designated Recipient or the Holding Period Trustee holds at least the Minimum Denomination for at least one series of the New Instruments, in accordance with the Schemes.

(q)     As such, the final allocation of the New Instruments is subject to adjustments at the Company's discretion in order to satisfy the requirements for the Minimum Denomination. The factors to be taken into consideration are subject to change depending on a number of variables, including the number of Eligible Creditors as well as the size of their respective position of the Existing Notes, and the size of each tranche of each series of the New Instruments. It is possible that the New Instruments payable to each Scheme Creditor may not be allocated to each tranche of each series of the New Instruments on a pro rata basis based on their respective aggregate principal amount on the Restructuring Effective Date.

28.2    **Risks relating to a failure to implement or a delay in implementing the Schemes**

*The Restructuring may not be completed in accordance with the timeline envisaged by this Explanatory Statement*

(a)     Factors unknown to the Company as at the date of this Explanatory Statement may result in delays to the completion of the Restructuring. There is no guarantee that the Restructuring Effective Date will occur by the Longstop Date, at which time those Scheme Creditors who are parties to the relevant RSA will no longer be bound by their obligations under the relevant RSA to support the Restructuring and not to take action against the Company and/or any member of the Group, and the Schemes will lapse, respectively.

(b)     The Longstop Date may, however, be extended in accordance with the terms of the Schemes and RSAs.

*Insolvency Proceedings if the Restructuring is not implemented promptly*

(c)     The maturity dates of Existing Notes have passed and, therefore, the Company is currently obliged to repay the principal amount and accrued but unpaid interest thereon under the Existing Notes.

(d)      The Company currently has limited available cash and, should the Restructuring not proceed, would be unable to repay its overdue indebtedness under and in connection with the Existing Indebtedness.

(e)      If CEG and other members of the Group are placed into a formal insolvency procedure, the proceeds available to Scheme Creditors will likely be reduced to a level that is materially lower than the potential value of the consideration they would receive under the Scheme (as per the Liquidation Analysis summarised in paragraph 9 (*What Happens if the Restructuring Fails?*) of Section 7 (*Letter from the Board to the Scheme Creditors*) and set out in Schedule 2 (*Liquidation Analysis*)).

28.3     **Risks following the implementation of the Schemes**

*The New Instruments received by Scheme Creditors as Scheme Consideration are subject to certain risks*

(a)      There may be no market for the New Instruments or any securities issued in exchange thereof. To the extent any such securities become tradable, the price and trading volume thereof may be highly volatile. Factors such as variations in the Group's revenues, earnings and cash flows, proposals for new investments, strategic alliances and/or acquisitions, changes in interest rates, fluctuations in price for comparable companies, government regulations and changes thereof applicable to the Group's industry and general economic conditions nationally or internationally could cause the price of such securities to change. Any such developments may result in large and sudden changes in the trading volume and price of such securities. There can be no assurance that these developments will not occur in the future. Each Scheme Creditor should conduct its own due diligence and consider the appropriateness of the information in this Explanatory Statement having regard to its own objectives, financial situations and needs. Scheme Creditors are also recommended to consult their own professional advisers as to legal, tax, financial or other aspects relevant to any action Scheme Creditors might take in relation to the Schemes and the Restructuring, or the implications/consequences of such action.

*CEG may be subject to PRC withholding taxes on interest it pays on the New Instruments.*

(b)      According to relevant PRC laws and regulations, if the PRC tax authorities consider CEG to be a PRC tax resident enterprise, any gain realised by a non PRC resident enterprise or a non PRC resident individual holder from the transfer of the New Instruments would be regarded as being derived from sources within the PRC and would accordingly be subject to PRC income tax at the rate of 20% (or lower treaty rate, if any).

*CEG's financial performance and business operations have been and may continue to be affected by adverse market conditions, and the Company may not be able to generate sufficient cash to fully address its financial commitments.*

(c)      Beginning in the second half of 2021 and continuing into 2023, Chinese property developers and the capital markets that have funded growth and development of the sector have experienced an inflection point characterized by a number of adverse developments, including the following:

(i)      reduced bank lending for real estate development adversely affected access by property developers to onshore capital;

(ii)    reduced bank lending for mortgage finance for buyers, combined with buyers' concerns towards the ability of property developers to complete projects, has adversely affected property sales;

(iii)    tightened restrictions on the use of pre-sale proceeds under the applicable PRC law; and

(iv)    more recently, a material decrease in aggregate contracted sales and a substantial reduction in prices for residential units across the sector.

(d)    The negative news relating to certain Chinese property companies including defaults on their indebtedness have had a further negative impact on, and resulted in increased volatility in, the property sector in China. Such recent defaults make it difficult for Chinese property developers, management companies and potential property purchasers to obtain onshore and offshore financing, and result in very low market confidence in and very low demand for China real estate and increased market volatility.

(e)    Reduced bank lending for real estate development, coupled with certain negative credit events, has intensified market concerns over the operations of Chinese property developers. As a result, pre-sales of properties by Chinese developers have generally decreased. The Group has also experienced a noticeable decline in its aggregate contracted sales in recent months. Against the backdrop of the adverse market conditions, the Group has experienced liquidity pressures due both to its limited access to external capital to refinance its existing indebtedness and the reduction in cash generated from contracted sales. As a result, the repayment arrangements of the principal and interest amount of the Existing Notes due dates. These amounts remain unpaid as at the date of this Explanatory Statement.

(f)    Since then, the Group has been actively engaging with its customers, suppliers, creditors and shareholders to stabilize its credit lines and day-to-day operations. It implemented further measures in reducing capital expenditure and other expenses such as management remuneration. The Group also commenced discussions with the CEG AHG representing certain Scheme Creditors in exploring a consensual resolution for the Events of Default for the Class A Debts and the Class C Debts.

(g)    However, the Company cannot assure you that these efforts will be successful. Even if the Schemes are successful, the Group still have indebtedness in the PRC that is either in default or face imminent risks of default. The Group's operation may continue to be affected by the decrease in sales and property prices, suspension on construction work, restraints on obtaining new financing, ongoing and potential disputes with creditors, business partners, customers and others, volatility in the property sector and the capital markets and other factors. In particular, the viable financing alternatives available to the Group have been significantly impacted by unfavourable changes to lending and investment policies by financial institutions and capital markets investors. The Group's reduced cash generated from operations and its existing level of indebtedness and obligations may give rise to investors' and market's doubt about its ability to continue operating as a going concern. The Group's ability to continue its operations, to realize the carrying value of its assets, and to discharge its liabilities in the normal course of business are dependent upon its ability to raise new capital sufficient to fund its commitments and on continuously generating profitable operations.

*The Group's operations are subject to China's and global economic and social condition and extensive governmental policies and regulations in the PRC.*

(h)     Substantially all of the Group's business and operations are conducted in the PRC. Accordingly, the Group's business, financial condition, results of operations and prospects are, to a significant degree, subject to economic, political and social developments in the PRC.

(i)     The economy of the PRC differs from the economies of most developed countries in many respects, including but not limited to structure, level of government involvement, level of development, growth rate, control of foreign exchange, and allocation of resources. The PRC economy has grown significantly in recent decades, but there can be no assurance that this growth will continue or continue at the same pace.

(j)     Geo-political conflicts have also negatively impacted on the global economy. For example, the recent conflict between Russia and Ukraine is still evolving and the impact of such geo-political conflicts on global economy is still unclear. China's economic condition, and the property sector in the PRC and hence our business, results of operations, financial condition and prospects may be materially and adversely affected by such geo-political conflicts and changes in global macro-economic environment.

(k)     In addition, demand for the Group's services and its business, financial position and results of operations may be adversely affected by (i) changes in laws, regulations or policies or the interpretation of laws, regulations or policies and social conditions in the PRC; (ii) measures which may be introduced to control inflation or deflation; (iii) changes in the rate or method of taxation; and (iv) imposition of additional restrictions on currency conversion and remittances abroad.

(l)     Moreover, sustainable growth and success of the Group's business significantly depend on its ability to continue acquiring additional land reserves in desirable locations at commercially reasonable prices that are suitable for the residential and commercial development. Its ability to acquire land depends on a variety of factors, some of which are beyond its control, such as overall economic conditions, availability of land parcels provided by the PRC government and competition for land parcels which are suitable for development. Any increase in its land cost resulting from any reason, such as shortages of supply or our inability to acquire suitable land parcels at commercially acceptable prices could have a material and adverse effect on the Group's business, financial condition, result of operations and prospects. Even if the Schemes are successful, in the foreseeable future, it may be difficult for the Group to acquire additional land reserves due to many factors affecting the Group's operation results and financial performance, including the decrease in sales and property price, suspension on construction work, restraints on obtaining new financing, ongoing and potential disputes with creditors, business partners, customers and others, volatility in the property sector and the capital markets and other factors.

*The Group is involved from time to time in disputes and administrative, legal and other proceedings arising out of its operations and may face significant liabilities as a result.*

(m)     As of the date of this Explanatory Statement, a number of creditors have initiated legal proceedings or enforcement actions against the Group and its assets. It is possible that more legal proceedings, enforcement actions or winding-up petitions may be filed against any member of the Group, including the Company.

(n)     The Group is involved in disputes with various parties arising out of its operations, including but not limited to its customers, suppliers, contractors, construction workers, tenants, business partners, creditors and administrative and regulatory bodies, or other third parties. These disputes may lead to legal, administrative or other proceedings and

may result in damage to the Group's reputation, incurrence of substantial costs and diversion of resources and management's attention. There is no assurance that the Group will not be subject to any disputes and legal, administrative and other proceedings arising out of its operations, that the Group will successfully resolve such disputes and proceedings to its satisfaction, or that any judgment or ruling in respect of such disputes and proceedings would be in favour of the Group. Any involvement in these disputes may materially and adversely affect the Group's business, financial condition and results of operation.

(o)    The Group has received, and may continue to receive, claims from third parties, such as its customers, suppliers, contractors, business partners and/or creditors in respect of its financial and other obligations. Such third parties have taken, and may continue to take, enforcement actions against the Group and the Group's assets. There is no assurance that the Group may successfully defend itself against such enforcement actions. Such enforcement actions may disrupt the Group's business operation and materially and adversely affect the Group's business, financial condition, results of operation and its ability to service its debts, including the New Instruments.

(p)    Although the Group strives to maintain proper internal control measures, there is no assurance that its internal control measures will be effective and there will not be non-compliance incidents in the future. The Group has been involved in certain incidents related to its internal control and may be involved in such potential incidents and in the PRC, Hong Kong and other applicable jurisdictions in the future. The EVPS Pledges exposed the deficiency in the Group's internal control measures and there is no assurance that there will not be other similar incidents. Such incidents may result in fines, financial and business losses, reputational damages and other material adverse effect on the Group's business operation and financial performance.

(q)    Since the recent downturn of the Chinese property sector, the applicable laws and regulations in relation to the property industry have been closely enforced by the regulatory bodies in order to stabilise the market and promote a healthy recovery of the industry. The Group cannot assure you that it has been, or will be, in strict compliance with all applicable laws and regulations. In addition, PRC laws, rules or regulations regulating the real estate industry and other aspects of the Company have been evolving rapidly, and there can be no assurance that the Group will not be subject to fines or penalties arising from non-compliance incidents if it fails to adapt to the new regulatory regime in a timely manner, or at all, which may have a material adverse effect on its business, financial condition and results of operations.

*Trading in CEG Shares, EVPS Shares and NEV Shares has been suspended and may not resume as planned, which may cause the listing of the Company, EVPS and NEV to be cancelled.*

(r)    Trading in CEG Shares and EVPS Shares on HKEX has been suspended since 21 March 2022. Trading in NEV Shares has been suspended since 1 April 2022. Resumption of trading in CEG Shares, EVPS Shares and NEV Shares is conditioned on the satisfaction of certain resumption guidance from HKEX by the prescribed deadlines, including, among other things, publishing all outstanding financial results required under the Listing Rules and addressing any audit modifications. Particularly the resumption of trading in CEG Shares and EVPS Shares also require the appropriate remedial measures to be taken in relation to the EVPS Pledges. Under Rule 6.01A(1) of the Listing Rules, HKEX may cancel the listing of any securities that have been suspended from trading for a continuous period of 18 months. In the case of the Company and EVPS, the 18-month period expires on 20 September 2023, and in the case of NEV, the 18-month period expires on 30 September 2023. If the Company, EVPS and NEV fail to remedy the issues causing its trading suspension, fulfill the

183

resumption guidance and fully comply with the Listing Rules to the HKEX's satisfaction and resume trading in its respective shares by the respective prescribed deadlines, the Listing Division of HKEX will recommend the Listing Committee to proceed with the cancellation of the listing of the Company, EVPS and NEV.

(s)    Although the Group is working towards this goal, the Group cannot assure you that the Company, EVPS or NEV can fulfill the resumption guidance and fully comply with the Listing Rules to the HKEX's satisfaction in a timely fashion or at all, which may cause the listing of the Company, EVPS or NEV to be cancelled. If this happens, business operation and financial performance of the Group may be materially adversely affected, the implementation of the Schemes may also be materially adversely affected as the terms of certain New Instruments are predicated on the resumption of trading in CEG Shares, EVPS Shares and NEV Shares.

*From time to time, the Group, including EVPS and NEV and their respective subsidiaries, may evaluate and consider introducing strategic investors to invest in the Group, EVPS or NEV.*

(t)    The Group, including EVPS and NEV, may evaluate and consider obtaining strategic investments, combinations, acquisitions or alliances to obtain additional cash capital or other commercial purposes from time to time in the future. These transactions could be material to the financial condition and results of operations of the Group, EVPS or NEV if consummated. If either of the Group, EVPS or NEV is able to identify an appropriate strategic investor, it may not be able to successfully consummate the transaction and, even if such a transaction is consummated, it may be unable to gain the desired benefits or avoid the difficulties and risks of such transaction, which may result in adverse effect on its financial position and results of operations. Any future investments or acquisitions by any strategic investors may not be successful, may not benefit the business strategy of the Group, EVPS or NEV, may not generate enough cash capital or sufficient synergy to offset the associated costs or may not generate the intended benefits.

(u)    In addition, future strategic investments by the strategic investors in the Group, EVPS or NEV, could result in additional dilution to the stakeholders of the shares of the Group, EVPS or NEV. The Group, EVPS or NEV may require additional cash resources to finance its respective continued growth or other future developments. The Company cannot assure you that financing will be available in the amounts or on terms acceptable to the Group, EVPS or NEV, if at all. If the efforts to raise additional funds fail, the Group, EVPS or NEV may need to sell additional equity securities to strategic investors or other purchasers on the market. The dilution caused by selling additional equity securities of the Group may adversely affect the value of the Shares which may be issued upon conversion of the CEG MCBs, and accordingly the value of the CEG MCBs themselves. The dilution caused by selling additional equity securities of EVPS may adversely affect the value of the Exchange Properties of the EVPS MEBs and the value of the EVPS Shares held in the accounts charged for the benefits of the EVPS SLNs, and accordingly, the value of the EVPS MEBs and EVPS SLNs themselves. The dilution caused by selling additional equity securities of NEV may adversely affect the value of the Exchange Properties of the NEV MEBs and the value of the NEV Shares held in the escrow accounts for the benefits of the NEV SLNs, and accordingly, the value of the NEV MEBs and NEV SLNs themselves.

(v)    The Company holds a 51.7% equity interest in EVPS and a 58.5% equity interest in NEV as at the date of this Explanatory Statement. EVPS and NEV are important subsidiaries of the Group and they are integral parts of the Group's business. Selling additional equity securities of EVPS or NEV may also cause EVPS or NEV to stop being a consolidated subsidiary of the Group and/or result in the Group losing control

184

over EVPS or NEV. Losing either of EVPS or NEV as a consolidated subsidiary of the Group, or losing control over either of them, may materially and adversely affect the Group's business, financial position and results of operations, and as a result, the Group's ability to service the New Instruments and the value of the New Instruments.

28.4    **Risks Relating to the New Instruments**

*The Company is a holding company and payments with respect to the New Instruments are structurally subordinated to liabilities, contingent liabilities and obligations of the Company's subsidiaries which are not providing guarantees under the New Instruments.*

(a)    The Company is a holding company with no material operations. The Company conducts its operations primarily through its subsidiaries. The New Instruments will not be guaranteed by any current or future PRC subsidiaries or certain other non-guarantor subsidiaries. The Company's primary assets are ownership interests in its PRC subsidiaries, which are primarily held through the New Instruments Subsidiary Guarantors. Accordingly, the Company's ability to pay principal and interest on the New Instruments and the ability of the New Instruments Subsidiary Guarantors to satisfy their obligations under the New Instruments Subsidiary Guarantees will depend upon their receipt of principal and interest payments on the intercompany loans and distributions of dividends from the Company's subsidiaries, including the PRC subsidiaries. If the Company or New Instruments Subsidiary Guarantors experience difficulties in receiving funds from the PRC subsidiaries, due to regulatory or other reasons, the Company may in turn experience difficulties in servicing its offshore debt, including but not limited to the New Instruments.

(b)    Creditors, including trade creditors of the non-guarantor subsidiaries and any holders of preferred shares in such entities, would have a claim on such subsidiaries' assets that would be prior to the claims of holders of the New Instruments (other than assets pledged by the New Instruments Subsidiary Pledgors to secure the New Instruments, as applicable). As a result, the Company's payment obligations under the New Instruments will be effectively subordinated to all existing and future obligations of such subsidiaries, and all claims of creditors of the non-guarantor subsidiaries will have priority as to the assets of such entities over the Company's claims and those of the Company's creditors, including holders of the New Instruments. The New Instruments and the New Instruments Documents permit the Company, the New Instruments Subsidiary Guarantors and the non-guarantor subsidiaries to incur additional indebtedness and issue additional guarantees, subject to certain limitations. In addition, the Company's secured creditors or those of any New Instruments Subsidiary Guarantors would have priority as to our assets or the assets of such New Instruments Subsidiary Guarantors to the extent pledged to secure their obligations over claims of holders of the New Instruments.

*The Group has substantial indebtedness and may incur substantial additional indebtedness in the future, which could adversely affect the Group's financial health and its ability to generate sufficient cash to satisfy its outstanding and future debt obligations.*

(c)    The Group now has incurred, and may continue to incur after the Restructuring, a substantial amount of indebtedness. As summarised in Section 8 (*Background to CEG, the Group and the Restructuring*) of this Explanatory Statement, the Group's total borrowings as at 31 December 2022 was RMB612.4 million. The Group's substantial indebtedness could have important consequences to a holder of the New Instruments. For example, it could:

(i)  limit the Company's ability to satisfy its obligations under the New Instruments and other debt;

(ii)  increase its vulnerability to adverse general economic and industry conditions;

(iii)  require it to dedicate a substantial portion of its cash flow from operations to servicing and repaying its indebtedness, thereby reducing the availability of its cash flow to fund working capital, capital expenditures and for other general corporate purposes;

(iv)  limit its flexibility in planning for or reacting to changes in its businesses and the industry in which it operates;

(v)  limit, along with the financial and other restrictive covenants of its indebtedness, its ability to borrow additional funds; and

(vi)  increase the cost of additional financing.

(d)  The Group may from time to time incur additional indebtedness and contingent liabilities. Although the New Instruments Documents restrict the Company and the Restricted Subsidiaries (as defined in the New Instruments Documents) from incurring additional debt and contingent liabilities, these restrictions are subject to important exceptions and qualifications. If the Group incurs additional debt, the risks that it faces as a result of its existing indebtedness and leverage could intensify.

(e)  Prism does not express an opinion on the consolidated financial statements of the Group in the audited reports for the year ended 31 December 2021 and 2022, and states that the Group's financial conditions, along with other matters, indicate the existence of material uncertainties which may cast significant doubt about the Group's ability to continue as a going concern. If the Group's operations continue to deteriorate and its financial pressures cannot be effectively relieved, risks associated with the Group's capacity for sustained operations may be aggravated.

(f)  Furthermore, the successful implementation of the Restructuring to a large extent is contingent on the orderly resumption of the Group's onshore business operation. However, the Group's onshore business operation is subject to uncertainties caused by various factors, including economic and social conditions in China and globally, extensive governmental policies and regulatory environment and market conditions. In the event that the Group is unable to orderly resume its business operation, that may affect its ability to pay its debt from both onshore and offshore sectors, which would in turn have material adverse effect on the implementation of the Restructuring.

(g)  In addition, the terms of the New Instruments Documents prohibit the Company and the Restricted Subsidiaries from incurring additional indebtedness unless they are able to meet certain applicable restrictions. Their ability to meet such applicable restrictions may be affected by events beyond their control. Such restrictions in the New Instruments and the other financing arrangements may impair the Group's ability to react to changes in market conditions, take advantage of business opportunities it believes to be desirable, obtain future financing, fund required capital expenditures or withstand a continuing or future downturn in its business. Any of these factors could materially and adversely affect the Company's ability to satisfy its obligations under the New Instruments and other debt.

*Servicing the Group's indebtedness will require a significant amount of cash and its ability to generate cash depends on many factors beyond its control.*

186

(h)      The Group's ability to make payments on and to refinance its indebtedness, including these New Instruments, and to fund planned capital expenditures and project development will depend on its ability to generate cash. This, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond the Group's control, which may result in uncertainties in the Group's ability to repay its indebtedness, including these New Instruments.

(i)      The Group's business might not generate cash flow from operations in an amount sufficient to enable it to pay its indebtedness, including the New Instruments, or to fund its other liquidity needs. The Group's operation, financial performance and ability to service its indebtedness may continue to be affected by the decrease in sales and property price, suspension on construction work, restraints on obtaining new financing, ongoing and potential disputes with creditors, business partners, customers and others, volatility in the property sector and the capital markets and other factors. The Group may need to refinance all or a portion of its indebtedness (some of which matures prior to the New Instruments), including the New Instruments, on or before maturity. The Group might not be able to refinance any of its indebtedness on commercially reasonable terms or at all.

(j)      If the Company or a Restricted Subsidiary (as defined in the New Instruments Documents) is unable to comply with the terms in the New Instruments Documents or its existing or future debt obligations and other agreements, there could be a default under those agreements. If that occurs, the holders of the debt could accelerate repayment of the debt and declare all outstanding amounts due and payable or terminate the agreements, as the case may be. Furthermore, the New Instruments Documents contain, and the Group's future debt agreements are likely to contain, cross-acceleration and cross-default provisions. As a result, the default of the Company or any of the Restricted Subsidiaries under one debt agreement may cause the acceleration of repayment of not only such debt but also other debt, including the New Instruments, or result in a default under the Group's other debt agreements, including the New Instruments Documents. If any of these events occur, the Group's assets and cash flow might not be sufficient to repay in full all of its indebtedness that has been accelerated and it might not be able to find alternative financing to repay such indebtedness on commercially reasonable terms or at all.

*Issuance of the New Instruments is be subject to approvals from the PRC regulators.*

(k)      The issuance of the New Instruments by the Company is subject to approvals and filings from the PRC regulators, including without limitation, the approval of National Development and Reform Commission and the filing with China Securities Regulatory Commission. However, as of the date of this Explanatory Statement, all the necessary approvals for the issuance of the New Instruments from the PRC regulators have not been received. There is no assurance that the Company will be able to obtain such approvals in a timely manner, and as a result, the issuance of the New Instruments may be delayed.

*The Group's operations are restricted by the terms of the New Instruments, which could limit its ability to plan for or to react to market conditions or meet its capital needs, which could increase the credit risk of a holder of these New Instruments.*

(l)      The New Instruments Documents include a number of significant restrictive covenants. These covenants restrict, among other things, the Company's ability and/or the ability of the Restricted Subsidiaries, to:

    (i)       incur or guarantee additional indebtedness and issue disqualified or preferred stock;

    (ii)     make investments or specified restricted payments;

    (iii)    declare dividends on Capital Stock or purchase or redeem Capital Stock;

    (iv)    issue or sell Capital Stock of Restricted Subsidiaries;

    (v)     guarantee indebtedness;

    (vi)    sell, lease or transfer assets;

    (vii)   create liens;

    (viii)  enter into sale and leaseback transactions;

    (ix)    enter into agreements that restrict the Restricted Subsidiaries' ability to pay dividends, transfer assets or make intercompany loans;

    (x)     enter into transactions with shareholders or affiliates; and

    (xi)    effect a consolidation or merger.

(m)    These covenants could limit the Group's ability to plan for or react to market conditions or to meet its capital needs. The Group's ability to comply with these covenants may be affected by events beyond its control, and it may have to curtail some of its operations and growth plans to maintain compliance.

*The Company may be able to redeem all or any part of the New Instruments prior to maturity.*

(n)    The Company may be able to redeem all or any part of the New Instruments at its option on a date prior to the maturity date. The optional redemption feature of the New Instruments may limit the market value of such New Instruments. During any period when the Company may elect to redeem the New Instruments, the market value of the New Instruments may not rise substantially above the price at which they can be redeemed. This may also be true prior to any redemption period.

(o)    The Company may also be expected to redeem the New Instruments with optional redemption feature when its cost of borrowing is lower than the interest rate on the New Instruments. At those times, an investor may not be able to reinvest the redemption proceeds at an effective interest rate as high as the interest rate on the New Instruments being redeemed and may only be able to do so at a significantly lower rate. Potential investors should consider reinvestment risk in light of other investments available at that time.

*The liquidity and price of the New Instruments following the Restructuring may be volatile.*

(p)    The price and trading volume of the New Instruments may be highly volatile. Factors such as variations in the Group's revenues, earnings and cash flows and proposals for new investments, strategic alliances and acquisitions, interest rates, the general state of the securities market and fluctuations in price for comparable companies could cause the price of the New Instruments to change. Any such developments may result in large and sudden changes in the trading volume and price of the New Instruments. There is no assurance that these developments will not occur in the future.

*A trading market for the New Instruments may not develop, and there are restrictions on the resale of some of the New Instruments.*

(q)      The New Instruments are a new issue of securities for which there is currently no trading market. While application will be made for the listing and quotation of the New Instruments on the SGX-ST, there is no assurance that the Company will be able to obtain or maintain a listing on the SGX-ST or on any other recognized securities exchange and, even if listed, a liquid trading market might not develop. If no active trading market develops, a holder of the New Instruments may not be able to resell its New Instruments at their fair market value or at all. Future trading prices of the New Instruments will depend on many factors, including prevailing interest rates, the Group's operating results and the market for similar securities, which may be beyond the Group's control. In addition, the New Instruments are being offered pursuant to exemptions from registration under the US Securities Act and, as a result, a holder of the New Instruments will only be able to resell its New Instruments in transactions that have been registered under the US Securities Act or in transactions not subject to or exempt from registration under the US Securities Act. It cannot be predicted whether an active trading market for the New Instruments will develop or be sustained. If an active trading market for the New Instruments does not develop or is not sustained, the market price and liquidity of the New Instruments may be adversely affected.

*The transfer of the New Instruments may be restricted, which may adversely affect their liquidity and the price at which they may be sold.*

(r)      The New Instruments have not been registered under, and the Company is not obligated and does not plan to register the New Instruments under, the US Securities Act or the securities laws of any other jurisdiction. The New Instruments, unless so registered, may not be offered or sold except pursuant to an exemption from, or a transaction not subject to, the registration requirements of the US Securities Act and any other applicable laws. See "Important Securities Law Notices" at Section 2 (*Important Securities Law Notices*) of this Explanatory Statement. The Group has not agreed to or otherwise undertaken to register the New Instruments with the SEC or the securities regulatory authority of any other jurisdiction, and the Group has no intention of doing so.

*The New Instruments will initially be held in book-entry form, and therefore a holder of the New Instruments must rely on the procedures of the relevant clearing systems to exercise any rights and remedies.*

(s)      The New Instruments will initially only be issued in global certificated form and held through Euroclear and Clearstream. Interests in one or more global New Instruments representing the New Instruments will trade in book-entry form only, and New Instruments in definitive registered form will be issued in exchange for book-entry interests only in very limited circumstances. Owners of book-entry interests will not be considered owners or holders of the New Instruments for purposes of the New Instruments Documents. The nominee for the New Instruments Depositary will be the sole registered holder of the global New Instruments. Accordingly, a holder of the New Instruments must rely on the procedures of Euroclear or Clearstream, and if the holder is not a participant in Euroclear or Clearstream, on the procedures of the participant through which it owns its interest to exercise any rights and obligations of a holder of the New Instruments under the New Instruments Documents. Upon the occurrence of an event of default under the New Instruments Documents, unless and until definitive registered New Instruments are issued with respect to all book-entry interests, if a holder of the New Instruments owns a book-entry interest, it will be restricted to acting through Euroclear or Clearstream. The procedures to be implemented through

189

Euroclear and Clearstream may not be adequate to ensure the timely exercise of rights under the New Instruments.

*The Company will follow the applicable corporate disclosure standards for debt securities listed on the SGX-ST, which standards may be different from those applicable to debt securities listed in certain other countries.*

(t)    The Company will be subject to reporting obligations in respect of the New Instruments to be listed on the SGX-ST. The disclosure standards imposed by the SGX-ST may be different from those imposed by securities exchanges in other countries such as the United States or Hong Kong. As a result, the level of information that is available may not correspond to what investors in the New Instruments are accustomed to.

*Disclosure standards that apply to the Group may differ from those in the United States or other jurisdictions.*

(u)    The Group's consolidated financial information is prepared in accordance with IFRS, which differs in certain respects from US GAAP. As a result, the Group's consolidated financial information and reported earnings could be significantly different if they were prepared in accordance with US GAAP. No attempt has been made to quantify the impact of those differences. This Explanatory Statement does not contain reconciliation of the Group's consolidated financial information to US GAAP, and there is no assurance that such reconciliation would not reveal material differences. Potential investors should consult their own professional advisers for an understanding of the differences between IFRS and US GAAP, and how these differences might affect the financial information herein.

*An investment in the New Instruments is subject to exchange rate risks, and exchange controls may result in a Holder receiving less interest or principal than expected.*

(v)    The Company will pay principal and interest on the New Instruments in US dollars. This presents certain risks relating to currency conversions if a holder's financial activities are denominated principally in a currency or currency unit (the "**Investor's Currency**") other than US dollars. These include the risk that exchange rates may significantly change (including changes due to devaluation of the US dollar or revaluation of the Investor's Currency) and the risk that authorities with jurisdiction over the Investor's Currency may impose or modify exchange controls. An appreciation in the value of the Investor's Currency relative to the US dollar would decrease (i) the Investor's Currency equivalent yield on the New Instruments; (ii) the Investor's Currency equivalent value of the principal payable on the New Instruments; and (iii) the Investor's Currency equivalent market value of the New Instruments. Governments and monetary authorities may impose (as some have done in the past) exchange controls that could adversely affect an applicable exchange rate. As a result, a holder of the New Instruments may receive less interest or principal (in terms of the Investor's Currency) than expected.

*Certain major terms of the New Instruments Documents may be modified, amended or waived without the consent of each holder being affected, which may adversely affect the interest of the holders of such series of New Instruments and increase the credits risks of such series of New Instruments.*

(w)    Certain major terms of the Existing Notes Indentures may only be modified, amended or waived with the consent of each holder being affected. However, as part of the purpose of the Scheme is to improve the Group's overall financial condition, the indentures governing the A1 Notes, C1 Notes, A2 EVPS SLNs, C2 EVPS SLNs, A2

NEV SLNs, C2 NEV SLNs, A2 Notes and C2 Notes allow modification, amendments or waivers of certain major terms to be made with the consent of holders of not less than 80% in aggregate principal amount of the relevant series of outstanding New Instruments, including the waiver of payment defaults, the reduction of the principal amount of, or premium, if any, or interest on, any relevant New Note, and the release of any relevant New Instruments Subsidiary Guarantor or JV Subsidiary Guarantor (as defined in the New Instruments Documents) from the relevant New Instruments Subsidiary Guarantee or JV Subsidiary Guarantee (as defined in the New Instruments Documents), as the case may be, except as provided in the relevant New Instruments Documents. The conditions and the trust deeds governing the EVPS MEBs, NEV MEBs and CEG MCBs contain provisions for calling meetings of bondholders to consider matters affecting their interests generally. These provisions permit defined majorities to bind all bondholders including bondholders who did not attend and vote at the relevant meeting and bondholders who voted in a manner contrary to the majority. Such provisions would reduce the protection afforded to the holders of the New Instruments and potentially increase the credits risks of the New Instruments.

*The New Instruments Trustee may request that the holders of the New Instruments provide an indemnity and/or security and/or prefunding to its satisfaction.*

(x)     In certain circumstances, the New Instruments Trustee may (at its sole and absolute discretion) request the holders of the New Instruments to provide an indemnity and/or security and/or prefunding to its satisfaction before it takes actions and/or steps and/or institute proceeding on behalf of holders of the New Instruments. The New Instruments Trustee shall not be obliged to take any such actions and/or steps and/or institute proceeding if not indemnified and/or secured and/or prefunded to its satisfaction. Negotiating and agreeing to any indemnity and/or security and/or prefunding can be a lengthy process and may impact on when such actions can be taken. The New Instruments Trustee may not be able to take actions and/or steps and/or institute proceeding notwithstanding the provision of an indemnity and/or security and/or prefunding to it, in breach of the terms of the New Instruments Documents and in circumstances where there is uncertainty or dispute as to the applicable laws or regulations and, to the extent permitted by the agreements and the applicable law, it will be for the holders of New Instruments to take such actions and/or steps and/or institute proceeding directly.

*Cross default or final judgments or orders in connection with event or circumstance existing as of the Original Issue Date will not be an Event of Default under the New Instruments Documents.*

(y)     Certain of the New Instruments Documents will provide that the Event of Default triggered by cross default, final judgments or orders, involuntary or voluntary cases, other proceedings or orders under any applicable bankruptcy, insolvency or other similar law, consents to the appointment of or taking possession by a receiver, liquidator or similar official or general assignment for the benefit of creditors shall not apply to any cross default, final judgments or orders, involuntary or voluntary cases, other proceedings or orders under any applicable bankruptcy, insolvency or other similar law, consents to the appointment of or taking possession by a receiver, liquidator or similar official or general assignment for the benefit of creditors arising or resulting from or related to any event or circumstance existing as of the Original Issue Date. Please refer to the events of defaults provisions of Schedule 8 (*Summary of Terms of the New Instruments*) for further details.

*Conversion of certain loans owed by NEV to the Company, Chairman and Xin Xin (BVI) Limited into new NEV Shares may not be successful in a timely fashion or at all.*

191

(z)    It is contemplated that certain NEV Shares to be deposited into escrow accounts for the benefit of holders of A2 NEV SLNs and C2 NEV SLNs and to constitute a part of the Exchange Property for NEV MEBs are new shares to be issued by NEV and converted from certain loans owed by NEV to the Company, Chairman and Xin Xin (BVI) Limited. Subject to the HKEX's confirmation, such conversion and issue of new shares are subject to, among other conditions, NEV's independent shareholder's approval and the listing approval of the new NEV shares. The Company cannot assure you that the Group will obtain such approvals and satisfy every condition in a timely fashion, or at all. Any delay or failure in obtaining such approvals and satisfying every condition may affect number of NEV Shares available for credit enhancement for the holders of A2 NEV SLNs and C2 NEV SLNs and for the exchange to be exercised by the holders of the NEV MEBs, and eventually the value of the relevant New Instruments and/or increase the credit risks of such New Instruments.

*Holders of CEG MCBs, EVPS MEBs and NEV MEBs bear the risk of fluctuations in the price of the relevant underlying shares, and will have no rights as holders of the relevant underlying shares prior to conversion or exchange, but are subject to changes made with respect to the underlying shares.*

(aa)    The market price of the CEG MCBs, EVPS MEBs and NEV MEBs at any time will be affected by, amongst other things, fluctuations in the trading price of the relevant underlying shares. It is impossible to predict whether the trading price of the underlying shares will rise or fall. Trading prices of the underlying shares will be influenced by, among other things, the results of operations of CEG, EVPS or NEV, as the case may be, adoption or modification of regulations, policies, procedures or programs applicable to real estate industry, property management industry, new energy vehicle and battery industries and political, economic, financial and other factors that can affect the markets in which the relevant underlying shares are traded and relevant industries in the PRC, Hong Kong and internationally. In addition, if the stock markets experience a loss of investor confidence, the trading price of the relevant underlying shares could decline for reasons unrelated to CEG, EVPS or NEV's business, financial condition or operating results, as the case may be. Any decline in the price of the relevant underlying shares would adversely affect the secondary market price of the CEG MCBs, EVPS MEBs or NEV MEBs. There can be no assurance that the price at which the relevant underlying shares have historically traded will correspond to the price at which the relevant underlying shares will trade in the market subsequent to the issue of the CEG MCBs, EVPS MEBs and NEV MEBs.

(bb)    Unless and until the holders of CEG MCBs, EVPS MEBs and NEV MEBs acquire the shares upon conversion of the CEG MCBs or exchange of the EVPS MEBs or NEV MEBs, they will have no rights with respect to the relevant underlying shares, including any voting rights or rights to receive any regular dividends or other distributions with respect to the relevant underlying shares. In the event that there are legal or regulatory restrictions on delivery of shares that may be issued pursuant to the conversion right or exchange right, as the case may be, under the trust deeds, the Company may not be able to make the delivery to converting or exchanging bondholders upon the exercise of their conversion or exchange rights. The Company cannot assure you that the conversion or exchange exercised by the holders of CEG MCBs, EVPS MEBs and NEV MEBs will be successful. Upon conversion of the CEG MCBs or exchange of the EVPS MEBs or NEV MEBs, these holders will be entitled to exercise the rights of holders of the relevant underlying shares only as to actions for which the applicable record date occurs after the date of conversion or exchange. However, such holders are subject to all changes affecting the relevant underlying shares. For example, in the event that an amendment is proposed to the issuer's articles requiring shareholder approval, and the record date for determining the shareholders of record entitled to vote

192

on the amendment occurs prior to the date of conversion of the CEG MCBs or exchange of the EVPS MEBs or NEV MEBs for such relevant underlying shares and (as applicable) the date of registration by the relevant CEG MCB holder or EVPS MEB or NEV MEB holder as the holder thereof, that CEG MCB holder or EVPS MEB or NEV MEB holder would not be entitled to vote on the amendment but would nevertheless be subject to any resulting changes in the powers, preferences or special rights that affect the relevant underlying shares after conversion or exchange.

*The conversion or exchange of some or all of the CEG MCBs, EVPS MEBs or NEV MEBs will dilute the ownership interests of relevant existing shareholders.*

(cc)    The conversion or exchange of some or all of the CEG MCBs, EVPS MEBs or NEV MEBs will dilute the ownership interests of relevant existing shareholders. Any sales in the public market of the shares issuable upon such conversion or exchange could affect prevailing market prices for the relevant underlying shares.

*There are risks associated with the business of EVPS, which may affect the value of its shares and hence the value of the relevant EVPS MEBs and EVPS SLNs*

(dd)    A substantial portion of EVPS's revenue from property management services was generated from services provided in relation to properties developed by the Group. There is also no assurance that all of EVPS's property management service contracts with the Group or in relation to properties developed by the Group will be renewed successfully upon their expiration. Further, the Group has experienced a noticeable decline in its aggregate contracted sales in recent months, and liquidity pressures due both to its limited access to external capital to refinance its existing indebtedness and the reduction in cash generated from contracted sales. In addition, any measures in the future that the PRC government may adopt to further regulate the real estate market, for example, tightened control over real estate financing or the macro-economic or other factors may affect the business operations and prospects of the Group. The deterioration in the Group's property development operations and financial performance may in turn adversely affect EVPS's business operation and financial performance. Although EVPS endeavours to procure more property management service contracts from independent third parties. However, there is no assurance that EVPS will be able to procure property management service contracts from third-party developers to make up for any lost business opportunities with respect to properties developed by the Group in a timely manner or on similar or commercially acceptable terms.

(ee)    EVPS primarily engages in the provision of property management services. EVPS's business may be affected by a number of factors, most of which are beyond EVPS's control. Such factors include:

(i)      changes in disposable personal income in the PRC;

(ii)     changes in government regulations;

(iii)    changes in the supply of and demand for property management and value-added services;

(iv)    EVPS's ability to generate sufficient liquidity internally and obtain external financing;

(v)     EVPS's ability to recruit and train competent employees;

(vi)      EVPS's ability to select and work with suitable sub-contractors and suppliers;

(vii)     EVPS's ability to understand the needs of residents in the properties where EVPS provides property management services;

(viii)    EVPS's ability to adapt to new markets where EVPS has no prior experience and in particular, whether EVPS can adapt to the administrative, regulatory and tax environments in such markets;

(ix)     EVPS's ability to leverage its brand names and to compete successfully in new markets, particularly against the incumbent players in such markets who might have more resources and experience than EVPS; and

(x)      EVPS's ability to improve its administrative, technical, operational and financial infrastructure.

(ff)     Some of EVPS's property management service contracts are obtained through tender processes. The selection of a property management company depends on a number of factors, including but not limited to the quality of services, the level of pricing and the operating history of the property management company. There is no assurance that EVPS will be able to procure new property management service contracts in the future at all or on acceptable terms.

(gg)    EVPS primarily generates revenue from property management services on a lump sum basis. On a lump sum basis, EVPS charges property management fees at a pre-determined fixed lump sum price per sq.m. per month, representing "all-inclusive" fees for the property management services provided. In the event that the amount of property management fees that EVPS charges is insufficient to cover all the costs for property management service EVPS incurs, EVPS is not entitled to collect the shortfall from the relevant property owners or property developers. As a result, EVPS may suffer losses. If EVPS is unable to raise property management fee rates and there is a shortfall of working capital after deducting the property management costs, EVPS may seek to cut costs with a view to reducing the shortfall. However, EVPS's ability to mitigate against such losses through cost-saving initiatives such as operation automation measures to reduce labor costs and energy-saving measures to reduce energy costs may not be successful, and EVPS's cost-saving efforts may negatively affect the quality of EVPS's property management services, which in turn would further reduce the owners' willingness to pay EVPS the property management fees.

(hh)    EVPS may not be able to collect property management fees from property owners and property developers and as a result, may incur impairment losses on receivables. EVPS may encounter difficulties in collecting property management fees from property owners especially in communities where the vacancy rate is relatively high. Even though EVPS may seek to collect overdue property management fees through a number of collection measures, there is no assurance that such measures will be effective or enable EVPS to accurately predict its future collection rate. In the event that the actual recoverability is lower than expected, or that EVPS's past allowance for impairment of trade receivables becomes insufficient in light of any new information, EVPS may need to provide for additional allowance for impairment of trade receivables, which may in turn materially and adversely affect its business, financial position and results of operations.

(ii)     Termination or non-renewal of EVPS's property management service contracts to a significant number of properties could have a material adverse effect on EVPS's business, financial position and results of operations. There is no assurance that EVPS's

property management contracts will not be terminated prior to expiration or will be renewed when their terms expire. Termination or non-renewal of a significant number of property management contracts could have a material adverse impact on EVPS's business, financial position and results of operations.

(jj)     EVPS relies on third-party sub-contractors to perform certain property management services. EVPS delegates certain property management services, including cleaning, greening, gardening and repairs and maintenance services, to third-party sub-contractors. EVPS may not be able to monitor their services as directly and efficiently as with its own services. They may take actions contrary to EVPS or EVPS's customers' instructions or requests, or be unable or unwilling to fulfill their obligations. As a result, EVPS may have disputes with its sub-contractors, or may be held responsible for their actions, either of which could lead to damages to EVPS's reputation, additional expenses and business disruptions and potentially expose EVPS to litigation and damage claims. There is no assurance that upon the expiration of EVPS's agreements with EVPS's current third-party sub- contractors, EVPS will be able to renew such agreements or find suitable replacements in a timely manner, on terms acceptable to EVPS, or at all.

(kk)     EVPS's operations are affected by the regulatory environment and measures affecting the PRC property management industry. In particular, the fees that property management companies may charge in connection with property management services are strictly regulated and supervised by relevant PRC authorities.

*There are risks associated with the business of NEV, which may affect the value of its shares and hence the value of the relevant NEV MEBs and NEV SLNs*

(ll)     NEV has been experiencing a short of liquidity to fund its continuous vehicle production, research and development and other operating activities, which has caused temporary suspension of productions and significant downsizing of its employee force. The Company cannot assure that NEV may obtain any financing to solve the current liquidity issue or may obtain such financing needed to maintain its business as a going concern in the future. If NEV cannot obtain new financing, its operating activities, including vehicle production and delivery, research and development, will be materially adversely affected, and NEV may not be able to fulfill the customers' orders or generate adequate cashflow to settle its payables or service its indebtedness, and may be involved in disputes with customers, suppliers and creditors, all of which may in turn cause its operation results and financial performance deteriorate.

(mm)   NEV primarily engages in new energy vehicle and battery businesses. These industries are experiencing rapid technological changes, and NEV needs to invest significant resources in research and development to lead technological advances in order to remain competitive in the market. Research and development activities are inherently uncertain, and there can be no assurance that NEV will continue to achieve technological breakthroughs and successfully commercialize such breakthroughs. If NEV's research and development efforts fail to keep up with the latest technological developments, it could suffer a decline in our competitive position.

(nn)     There can be no assurance that NEV will be able to accurately identify consumer preferences, and effectively address such preferences in the design of its vehicles. Moreover, customers may experience difficulties in adapting to the driving experience of the smart new energy vehicles produced by NEV. As consumer preferences are continuously evolving, NEV may fail to introduce desirable product features in a timely manner.

195

(oo)    The autonomous driving technologies involved in NEV's vehicles are subject to risks and from time to time there have been accidents associated with such technologies. Moreover, autonomous driving technology is still evolving and is yet to achieve wide market acceptance. The safety of autonomous driving technologies depends in part on driver interaction, and drivers may not be accustomed to using such technologies. To the extent accidents associated with our autonomous driving systems occur, NEV could be subject to liability, government scrutiny and further regulation. Furthermore, accidents or defects caused by third parties' autonomous driving technology may negatively affect public perception, or result in regulatory restrictions, with respect to autonomous driving technology.

(pp)    China's passenger vehicle market is highly competitive, and demand for electronic vehicles may be cyclical and volatile. Competition in this industry may intensify in the future in light of increased demand and regulatory push for alternative fuel vehicles, continuing globalization and consolidation in the worldwide automotive industry. Factors affecting competition include, among others, product quality and features, innovation and development time, pricing, reliability, safety, energy efficiency, sales and marketing capabilities, distribution network, customer service and financing terms.

(qq)    In the future, NEV may at various times, voluntarily or involuntarily, initiate a recall if any of its vehicles or battery products, including any systems or parts sourced from its suppliers, prove to be defective or noncompliant with applicable laws and regulations. Such recalls, whether voluntary or involuntary or caused by systems or components engineered or manufactured by NEV or its suppliers, could involve significant expenses and could adversely affect NEV's brand image, business and results of operations.

(rr)    NEV operates in China's electric vehicle market, which is rapidly evolving and may not develop as NEV anticipates. The regulatory framework governing the industry is currently uncertain and may remain uncertain for the foreseeable future. As NEV's industry and our business develop, it may need to modify its business model or change its products and services. These changes may not achieve expected results, which could have a material adverse effect on NEV's results of operations and prospects.

(ss)    Developments in alternative technologies, such as advanced diesel, ethanol, fuel cells or compressed natural gas, or improvements in the fuel economy of the internal combustion engine, may materially and adversely affect NEV's business and prospects in ways that NEV does not currently anticipate. In addition, a sustained depression of petroleum price could make the ownership of internal combustion engine vehicles more attractive to consumers. Any failure by NEV to successfully react to changes in alternative technologies and market conditions could materially harm our competitive position and growth prospects.

(tt)    Other factors that may influence the adoption of new energy vehicles, and specifically electric vehicles ("**EV**"), include:

(i)    perceptions about EV quality, safety, design, performance and cost, especially if adverse events or accidents occur that are linked to the quality or safety of EVs;

(ii)    perceptions about vehicle safety in general, in particular safety issues that may be attributed to the use of advanced technologies, such as autonomous driving and lithium battery cells;

196

(iii)    the limited range over which EVs may be driven on a single battery charge and the speed at which batteries can be charged;

(iv)    the decline of an EV's range resulting from deterioration over time in the battery's ability to hold a charge;

(v)    the availability of other types of NEVs, including plug-in hybrid electric vehicles;

(vi)    improvements in the fuel economy of the internal combustion engine;

(vii)    the availability of after-sales service for EVs;

(viii)    the environmental consciousness of consumers;

(ix)    access to charging stations, standardization of EV charging systems and consumers' perceptions about convenience and cost for charging an EV;

(x)    the availability of tax and other governmental incentives to purchase and operate EVs or future regulation requiring increased use of nonpolluting vehicles;

(xi)    perceptions about and the actual cost of alternative fuel; and

(xii)    macroeconomic factors.

(uu)    Other risks associated with NEV's battery business include:

(i)    market fluctuations of lithium prices;

(ii)    tensions in international economic relations, which may affect supply chains;

(iii)    competition in the lithium industry;

(iv)    potentially onerous and costly compliance with environmental, chemical manufacturing, health and safety laws and regulations and production standards;

(v)    changes in the regulatory landscape for the lithium industry and the end markets of battery products, especially in the PRC;

(vi)    disruption in supply of lithium raw materials or utilities such as electricity, oil fuel, water and other chemicals;

(vii)    potential obsolescence of inventory; and

(viii)    uncertainties surrounding estimated resources and reserves of lithium.

### 28.5   Risks Relating to the New Instruments Subsidiary Guarantees and the Collateral

*Certain of the Company's subsidiaries will not provide subsidiary guarantees and certain of its initial New Instruments Subsidiary Guarantors do not currently have significant operations.*

(a)    The CEG MCBs, the EVPS MEBs, the NEV MEBs, the C2 EVPS SLNs, the C2 NEV SLNs, the C1 Notes and the C2 Notes do not have the benefit of guarantees from the Company's subsidiaries. Under the A1 Notes, the A2 EVPS SLNs, A2 NEV SLNs,

and the A2 Notes, certain subsidiaries, including all of the Company's PRC subsidiaries and certain of its existing non-PRC subsidiaries, are not providing subsidiary guarantees. Subsidiaries that are organized under the laws of the PRC, certain non-PRC subsidiaries accounting for a de minimis portion of the Group's total assets and any subsidiaries that are Exempted Subsidiaries or designated Unrestricted Subsidiaries in accordance with the applicable New Instruments Documents will not be required to provide subsidiary guarantees. As a result, the New Instruments will effectively be subordinated to all the debt and other obligations, including contingent obligations and trade payables, of the subsidiaries that are not New Instruments Subsidiary Guarantors, and a number of such subsidiaries will have significant assets and operations and will be able to incur potentially significant indebtedness within the limits provided in the New Instruments Documents. In addition, the subsidiary guarantees of the A1 Notes shall be subordinated to the subsidiary guarantees of the A2 Notes, A2 EVPS SLNs and A2 NEV SLNs.

*Certain of the initial New Instruments Subsidiary Guarantors do not have significant operations.*

(b)    We cannot assure you that the initial New Instruments Subsidiary Guarantors or any subsidiaries that may become New Instruments Subsidiary Guarantors in the future will have the funds necessary to satisfy the Company's financial obligations under the New Instruments if we are unable to do so.

*The New Instruments Subsidiary Guarantees may be challenged under applicable financial assistance, insolvency, corporate benefit or fraudulent transfer or unfair preference laws, which could impair the enforceability of the New Instruments Subsidiary Guarantees.*

(c)    Under bankruptcy laws, insolvency laws, fraudulent transfer laws, corporate benefit, financial assistance, insolvency or unfair preference or similar laws in the British Virgin Islands, Hong Kong, or other jurisdictions where future New Instruments Subsidiary Guarantors may be established, a guarantee could be voided, or claims in respect of a guarantee could be subordinated to all other debts of that New Instruments Subsidiary Guarantor if, among other things, the New Instruments Subsidiary Guarantor, at the time it incurred the indebtedness evidenced by, or when it gives its guarantee:

(i)     incurred the debt with the intent to hinder, delay or defraud creditors or was influenced by a desire to put the beneficiary of the New Instruments Subsidiary Guarantee in a position which, in the event of the guarantor's insolvency, would be better than the position the beneficiary would have been in had the New Instruments Subsidiary Guarantee not been given;

(ii)    received less than the reasonably equivalent value or fair consideration for the incurrence of such New Instruments Subsidiary Guarantee and/or there was otherwise an absence of or insufficient corporate benefit under applicable laws;

(iii)   was, by entering into the New Instruments Subsidiary Guarantee, agreeing a transaction that requires grossly exorbitant payments;

(iv)    was insolvent or rendered insolvent by reason of such incurrence;

(v)     was engaged in a business or transaction for which the New Instruments Subsidiary Guarantor's remaining assets constituted unreasonably small capital; or

(vi)     intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature.

(d)     The measure of insolvency for purposes of the foregoing will vary depending on the law of the relevant jurisdiction. A New Instruments Subsidiary Guarantor would commonly be considered insolvent at a particular time if it is unable to pay its debts as they fall due.

(e)     If a New Instruments Subsidiary Guarantee is voided or is subordinated to other indebtedness of the New Instruments Subsidiary Guarantor, or held unenforceable for any other reason, holders of the New Instruments would, among other things, cease to have a claim against that New Instruments Subsidiary Guarantor based upon such guarantee or would be subject to the prior payment of all liabilities (including trade payables) and any preferred stock of such New Instruments Subsidiary Guarantor and would solely be creditors of us and any remaining New Instruments Subsidiary Guarantors. We cannot assure you that, after the voiding or subordination of any Subsidiary Guarantee, the Company and any remaining New Instruments Subsidiary Guarantees will be able to satisfy the claims of holders of the New Instruments in full.

*The pledges of certain Collateral may in some circumstances be voidable.*

(f)     The pledge of the Collateral may be voidable as a preference under insolvency or fraudulent transfer or similar laws of Cayman Islands, Hong Kong and the British Virgin Islands if the creation of the pledge takes place at any time within six months prior to the onset or insolvency or, under some circumstances, within a longer period. Pledges of shares of future New Instruments Subsidiary Guarantors may also be voidable as a preference under relevant insolvency or fraudulent transfer or similar laws. If the pledge of any Collateral was to be voided for any reason, holders of the relevant New Instruments will face increasing credit risks. If the pledges of the Collateral were to be voided for any reason, holders of the New Instruments would have only an unsecured claim against us, the Subsidiary Guarantor Pledgor and other obligors under the New Instruments.

*The Collateral may be released.*

(g)     The Collateral will consist of (i) the Capital Stock of certain initial New Instruments Subsidiary Guarantors to be charged for the A2 Notes, A2 EVPS SLNs and A2 NEV SLNs, (ii) certain EVPS Shares or securities accounts holding EVPS Shares to be charged for the EVPS MEBs, A2 EVPS SLNs and C2 EVPS SLNs, (iii) certain securities accounts holding NEV Shares to be charged or certain NEV Shares to be subject to custody arrangement for the NEV MEBs, A2 NEV SLNs and C2 NEV SLNs, (iv) in relation to Asset List 1, the Capital Stock of the Asset List 1 Holding Subsidiaries (as defined in the relevant New Instruments Documents) to be charged for the A2 EVPS SLNs and A2 NEV SLNs, and (v) in relation to Asset List 2, the Capital Stock of the Asset List 2 Holding Subsidiaries (as defined in the relevant New Instruments Documents) to be charged and certain receivables to be assigned by way of security for the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs and C2 NEV SLNs. The security interest in respect of certain Collateral may be released upon the disposition of such Collateral in compliance with the covenants under the New Instruments Documents.

*The value of the Collateral is unlikely to be sufficient to satisfy our obligations under the New Instruments and/or the New Instruments Subsidiary Guarantees and certain New Instruments do not have the benefits of any Collateral.*

(h)       The ability of the Collateral Agent, on behalf of the New Instruments Trustee, to foreclose on the Collateral upon the occurrence of an Event of Default or otherwise, will be subject in certain instances to perfection and priority issues. Although procedures will be undertaken to support the validity and enforceability of the security interests, we cannot assure you that the Collateral Agent, the New Instruments Trustee or holders of the New Instruments will be able to enforce the security interest.

(i)        The value of the Collateral in the event of a liquidation will depend upon market and economic conditions, the availability of buyers and similar factors. No independent appraisals of any of the Collateral have been prepared by or on behalf of us in connection with the New Instruments. Accordingly, we cannot assure you that the proceeds of any sale of the Collateral following an acceleration of the New Instruments would be sufficient to satisfy, or would not be substantially less than, amounts due and payable on the New Instruments or the New Instruments Subsidiary Guarantees. By their nature, some or all of the Collateral may be illiquid and may have no readily ascertainable market value. Likewise, we cannot assure you that the Collateral will be saleable or, if saleable, that there will not be substantial delays in its liquidation.

(j)        In addition, certain New Instruments, such as the CEG MCBs, the C1 Notes and the C2 Notes, will not have the benefit of any Collateral. Therefore, you may face additional credit risks with respect to the CEG MCBs, the C1 Notes and the C2 Notes, compared to other series of the New Instruments.

*We will in certain cases have certain degrees of control over the Collateral.*

(k)       Although the New Instruments Documents, the Security Documents and the New Intercreditor Agreements provide restrictions on selling, transferring, disposing of the Collateral, these documents may still permit the New Instruments Subsidiary Pledgors and other obligors and us to remain in possession of, to retain certain degrees of control over, to operate, and/or to collect, invest and/or dispose of any income from, the Collateral under certain circumstances, subject to the provisions of the New Instruments Documents, the Security Documents and the New Intercreditor Agreements.These rights may adversely affect the value of the Collateral at any time.

*It may be difficult to realise the value of the Collateral.*

(l)        The security interest of the Collateral Agent may be subject to practical problems generally associated with the realization of security interests in the Collateral. For example, the Collateral Agent may need the cooperation from third-parties, or to obtain the consent of a third-party or governmental agency, in order to obtain or enforce a security interest or to otherwise dispose of the Collateral. We cannot assure you that the Collateral Agent will be able to obtain any such cooperation or consent. If the Collateral Agent exercises its rights to foreclose on certain assets, transferring to, or obtaining new approvals by, a purchaser of assets may require cooperation from third-parties or governmental proceedings with consequent delays.

(m)      In addition, the Collateral Agent may need to evaluate the impact of potential liabilities before determining to foreclose on the Collateral. In this regard, the Collateral Agent may decline to foreclose on the Collateral or exercise remedies available if it does not receive indemnification to its satisfaction from the holders of the New Instruments.

*Rights of holders of the New Instruments in the Collateral may be adversely affected by the failure to perfect the security interests.*

(n)      The Collateral Agent's ability to foreclose on the Collateral may be subject to restrictions, including but not limited to priority issues, state and provincial law requirements, applicable bankruptcy law, prior liens and practical problems associated with the realization of the Collateral Agent's lien on the Collateral, including cure rights, foreclosing on the Collateral within the time periods permitted by third parties or prescribed by laws, obtaining third-party consents, making additional filings, statutory rights of redemption and the effect of the order of foreclosure. There can be no assurance that the consents of any third parties and approvals by governmental entities or courts of competent jurisdiction will be given when required to facilitate a foreclosure on such assets or that foreclosure on the Collateral will be sufficient to make all payments on the New Instruments and/or the New Instruments Subsidiary Guarantees.

29.    **TAXATION**

29.1    **Overview**

The Company has not analysed, and this Explanatory Statement does not discuss, the tax
consequences to any Scheme Creditor of the Restructuring. Such tax consequences may be
complex and each Scheme Creditor is urged to consult its own tax adviser with respect to the
tax consequences of the Restructuring in light of such person's particular circumstances,
including the tax consequences in any jurisdiction of the exchange of interests in the Existing
Notes for any Scheme Consideration, and the receipt, ownership and disposition of such
Scheme Consideration. Scheme Creditors are liable for any taxes that may arise in respect of
such Scheme Creditor as a result of the Scheme and the Restructuring, and shall have no
recourse to the Company, the Group, the Existing Notes Subsidiary Guarantors, the Existing
Notes Trustee, the Information Agent or any other person in respect of such taxes or any filing
obligation with respect thereto.

**SCHEDULE 1**

**DEFINITIONS AND INTERPRETATION**

1.      **DEFINITIONS**

In this Explanatory Statement:

| | |
|---|---|
| "**A1/A2 Intercreditor Agreement**" | means the intercreditor agreement to be entered into between, among others, the Company, the Collateral Agent and the respective trustee for each tranche of the A1 Notes, A2 Notes, A2 EVPS SLNs and A2 NEV SLNs, in substantially the form to be made available on the Transaction Website subject to any modifications required or approved in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*) of the Schemes, which shall be in the Agreed Form. |
| "**A1 Notes**" | means the new tranches A, B and C of the new A1 notes to be issued by the Company and governed by the A1 Notes Indentures. |
| "**A1 Notes Indentures**" | means the New York law governed indentures governing the A1 Notes to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the A1 Notes and with the modifications required to reflect the different terms of the different tranches of the A1 Notes as set out in this Explanatory Statement, each of which shall be in the Agreed Form. |
| "**A2 Accrued Claims Ratio**" | has the meaning set out in Clause 15.7 of the Schemes. |
| "**A2 EVPS SLNs**" | means tranches A and B of the US dollar denominated secured new A2 notes linked to the EVPS Shares to be issued by the Company and governed by the A2 EVPS SLNs Indentures. |
| "**A2 EVPS SLNs Indentures**" | means the New York law governed indentures governing the A2 EVPS SLNs to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the A2 EVPS SLNs and with the modifications required to reflect the different terms of the different tranches of the A2 EVPS SLNs as set out in this Explanatory Statement, each of which shall be in the Agreed Form. |
| "**A2 NEV Custody Accounts**" | has the meaning set out in Schedule 8 (*Summary of Terms of the New Instruments*) to this Explanatory Statement. |
| "**A2 NEV SLNs**" | means tranches A and B of the US dollar denominated secured new A2 notes linked to the ordinary shares of NEV to be issued by the Company and governed by the A2 NEV SLNs Indentures. |

| | |
|---|---|
| **"A2 NEV SLNs Indentures"** | means the New York law governed indentures governing the A2 NEV SLNs to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the A2 NEV SLNs and with the modifications required to reflect the different terms of the different tranches of the A2 NEV SLNs as set out in this Explanatory Statement, each of which shall be in the Agreed Form. |
| **"A2 Notes"** | means the Plain A2 Notes and the Forced A2 Notes. |
| **"A2 Notes Indentures"** | means the Plain A2 Notes Indentures and the Forced A2 Notes Indentures, each of which shall be in the Agreed Form. |
| **"A2 Package"** | means the CEG MCBs, NEV MEBs, EVPS MEBs, A2 EVPS SLNs and A2 NEV SLNs available to Class A Scheme Creditors who elect Option 2 Scheme Consideration, in accordance with the terms of the Restructuring Documents. |
| **"A2 Package Adjusted Portion"** | has the meaning set out in Clause 15.9 of the Schemes. |
| **"A2 Package Initial Portion"** | has the meaning set out in Clause 15.6 of the Schemes. |
| **"Accession Code"** | means a unique code provided by the Information Agent to a Scheme Creditor following its valid accession to the Class A RSA or the Class C RSA, and which must be included by such Scheme Creditor in its voting instructions within the relevant Scheme Creditor Form in respect of the relevant Scheme. |
| **"Accession Letter"** | means a letter substantially in the form set out in Schedule 3 (*Form of Accession Letter and Restricted Debts Notice*) to the Class A RSA or Schedule 2 (*Form of Accession Letter and Restricted Debts Notice*) to the Class C RSA (as applicable). |
| **"Account Bank"** | means China Construction Bank (Asia) Corporation Limited in its capacity as account bank or any successor account bank under and as defined in the New Instruments Documents. |
| **"Account Holder"** | means any Person who is recorded in the books of a Clearing System as being a holder of a book-entry interest in the Existing Notes or the Class C Notes in an account with that Clearing System or, as the context may require, is or was recorded in such books as being such a holder of Existing Notes or the Class C Notes in such an account at the Voting Record Time. |
| **"Account Holder Letter"** | means the form of account holder letter which is appended to the Solicitation Packet, as published on the Transaction Website. |

204

| | |
|---|---|
| "**Adjudication Procedure**" | means the procedure for the resolution of a Referred Scheme Claim as set out in Clause 40 (*Adjudication Procedure*) of the Schemes. |
| "**Advisors**" | means (i) Sidley Austin, (ii) Houlihan Lokey, (iii) Maples and Calder, (iv) BOCI, (v) CICC, and (vi) Commerce & Finance Law Offices. |
| "**Affiliate**" | means, with respect to any Person, any other Person: (a) directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person; or (b) who is a director or officer of such Person or any Subsidiary of such Person or of any Person referred to in clause (a) of this definition, and, with respect to any Participating Creditor, any of its managers, investment managers or investment advisors and any entity managed or advised by that manager, investment manager or investment advisor. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. |
| "**Agreed Form**" | means in the form agreed in writing between each of: |

(a)  the Company (or the Advisors acting on its behalf);

(b)  the Majority CEG AHG (or the AHG's Counsel acting on their behalf);

(c)  only in relation to the New Instruments Documents, the New Instruments Trustee; and

(d)  only in relation to the Holding Period Trust Deed and any other documents to which the Holding Period Trustee is party, the Holding Period Trustee,

in each case each acting reasonably.

| | |
|---|---|
| "**AHG Advisors**" | means Moelis & Company Asia Limited, Kirkland & Ellis, Harney Westwood & Riegels, Fangda Partners, and other professional advisors as the CEG AHG may appoint from time to time. |
| "**AHG Financial Advisor Fees**" | means the reasonable fees, costs and expenses of the financial advisor (Moelis & Company Asia Limited) to the CEG AHG that the Company has agreed to pay in accordance with the terms set out in the fee letter agreement dated 6 April 2022. |
| "**AHG Legal Fees**" | means the reasonable fees, costs and expenses of the legal advisors (including local counsel and barristers) to |

205

the CEG AHG that the Company has agreed to pay in accordance with the terms set out in the following:

(a) the fee letter agreement dated 4 April 2022 between the Company and Kirkland & Ellis;

(b) the fee letter agreement dated 6 March 2023 between the Company and Harney Westwood & Riegels; and

(c) the fee letter agreement dated 6 March 2023 between the Company and Fangda Partners.

| | |
|---|---|
| **"AHG Work Fee"** | means the "**Work Fee**" as defined in the AHG Work Fee Letter. |
| **"AHG Work Fee Letter"** | means the letter dated 20 March 2023 from the Chairman to the members of the CEG AHG in connection with payment of the AHG Work Fee. |
| **"AHG's Counsel"** | means Kirkland & Ellis. |

**"Ancillary Claim"** means any Claim by a Scheme Creditor against a Released Person under or in respect of the Existing Finance Documents arising as a result of effecting, adhering to or complying with the releases in Clauses 28.2(a)(i) and 28.2(a)(ii) of the Schemes (excluding for the avoidance of doubt any Claim in respect of any Liability (i) of any Released Person which arises as a result of a failure to comply with any of the terms of the Schemes or any Restructuring Document (including but not limited to the New Instruments Document) and (ii) arising from or in connection with any Excluded Liability or Excluded Collateral).

**"Applicable Sanctions"** means laws, regulations, rules and/or orders relating to economic, financial or trade sanctions, restrictive measures or embargoes administered, enacted, maintained and/or enforced by any Governmental Entity of the United States of America (including by the US Office of Foreign Assets Control or the US Department of State), the European Union, the United Kingdom and the British Overseas Territories (including, for the avoidance of doubt, The Russia (Sanctions) (EU Exit) Regulations 2019, as amended from time to time and as applicable in the Cayman Islands pursuant to The Russia (Sanctions) (Overseas Territories) Order 2020 (as amended).

**"Applicable Sanctions List"** means each of:

(a) the lists of Specially Designated Nationals and Blocked Persons or "Foreign Sanctions Evaders" or any other list of Persons subject to, or targeted by, similar sanctions as administered, maintained and/or enforced by the Office of Foreign Assets Control of the US Treasury, the US Department of

Commerce, the US Department of State and any other Governmental Entity of the United States;

(b) the Consolidated List of Persons, Groups and Entities Subject to EU Financial Sanctions maintained by the European Commission, Annex XIX of Regulation (EU) No 833/2014, or any other list of Persons subject to, or targeted by, similar sanctions as administered, maintained and/or enforced by the European Union or any Governmental Entity in any Member State of the European Union; or

(c) the Consolidated List of Financial Sanctions Targets in the United Kingdom maintained by the Office of Financial Sanctions Implementation, His Majesty's Treasury of the United Kingdom, the United Kingdom Sanctions List maintained by the Foreign, Commonwealth and Development Office, or any other list of Persons subject to, or targeted by, similar sanctions administered, maintained and/or enforced by any Governmental Entity of the United Kingdom or the Cayman Islands,

or any other similar sanctions list of persons and entities subject to a prohibition to transact with, that is developed, maintained and published by any Governmental Entity of the United States of America (including by the U.S. Office of Foreign Assets Control or the U.S. Department of State), the European Union, the United Kingdom and the British Overseas Territories in connection with Sanctions, in each case as amended, supplemented or substituted from time to time, and "Applicable Sanctions Lists" includes, collectively, (a), (b) and (c) of this definition.

**"Assessed Value"** means an amount equal to the value recoverable by a Class C Scheme Creditor in respect of the relevant Excluded Liabilities, Excluded Collateral, put option and/or repurchase obligation as determined by the Scheme Administrators (or, if applicable, the Scheme Adjudicator) in accordance with the terms of the Schemes and set out in the Deed of Agreed Valuation.

**"Asset List 1"** means the security interest over such assets securing the A2 EVPS SLNs and A2 NEV SLNs, as described under Annex A in the Term Sheet, subject to and in accordance with the terms of the Restructuring Documents.

**"Asset List 1 Intercreditor Agreement"** means the intercreditor agreement to be entered into between, among others, the Company, the Collateral Agent and the respective trustee for each tranche of the A2 EVPS SLNs and A2 NEV SLNs, in substantially the form to be made available on the Transaction Website subject to any modifications required or approved in accordance with Clause 31 (*Modifications to the Scheme and the*

207

|                                          | *Restructuring Documents*) of the Schemes, which shall be in the Agreed Form. |
|------------------------------------------|-------------------------------------------------------------------------------|
| **"Asset List 2"**                       | means the security interest over such assets securing the A2 EVPS SLNs A2 NEV SLNs, C2 EVPS SLNs, and C2 NEV SLNs, as described under Annex A in the Term Sheet, subject to and in accordance with the terms of the Restructuring Documents. |
| **"Asset List 2 Intercreditor Agreement"** | means the intercreditor agreement to be entered into between, among others, the Company, the Collateral Agent and the respective trustee for each tranche of the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs and C2 NEV SLNs, in substantially the form to be made available on the Transaction Website subject to any modifications required or approved in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*) of the Schemes, which shall be in the Agreed Form. |

**"Authorisation"**  means:

(a) an authorisation, consent, approval, resolution, license, exemption, filing, notarisation, lodgment or registration; or

(b) in relation to anything that will be fully or partly prohibited or restricted by law if a Governmental Agency intervenes or acts in any way within a specified period after lodgment, filing, registration or notification, the expiry of that period without intervention or action.

| **"Bar Date"**              | means the Class A Bar Date or the Class C Bar Date, as applicable. |
|-----------------------------|---------------------------------------------------------------------|
| **"Blocked Assets"**        | means, collectively, the Blocked New Instruments, the Blocked TJ Scheme Consideration, and any Consent Fee to which Blocked Scheme Creditors may be entitled, in accordance with the terms of the Schemes and Applicable Sanctions. |
| **"Blocked New Instruments"** | means, in respect of the Holding Period, the Residual New Instruments constituting the A2 Package and A2 Notes to which Blocked Scheme Creditors are entitled in accordance the terms of the Schemes and Applicable Sanctions or, in respect of the period on or after the Final Distribution Date, any Residual New Instruments to which Blocked Scheme Creditors are entitled in accordance with the terms of the Schemes and Applicable Sanctions. |
| **"Blocked Scheme Creditor"** | means a Scheme Creditor (other than a Sanctioned Scheme Creditor) that is not entitled, able or permitted (whether directly or through a custodian) to submit instructions or settle through the Clearing Systems as a result of any Applicable Sanctions affecting the Scheme Creditor or its custodian as reasonably determined by the Clearing |

208

Systems, and which does not have a sanctions licence in respect of the Applicable Sanctions which would allow that Scheme Creditor to freely deal in the Scheme Consideration and submit instructions or settle through the Clearing Systems.

"**Blocked Scheme Creditor Form**"    means a form from a Blocked Scheme Creditor substantially in the form of the blocked scheme creditor form set out in the Solicitation Packet.

"**Blocked TJ Scheme Consideration**"    means the TJ Scheme Consideration held on trust for the benefit of the Blocked Scheme Creditors who are Class A Noteholders who have nominated to receive A2 Package as part of their Scheme Consideration by the Class A Options Deadline, pursuant to the terms of the Holding Period Trust Deed by the Holding Period Trustee during the Holding Period Trust.

"**Blocking Regulation**"    means:

(a) Council Regulation (EC) No 2271/1996 of 22 November 1996 (as amended) and/or any applicable national law or regulation relating to it;

(b) Council Regulation (EC) No 2271/1996 of 22 November 1996 (as amended) as it forms part of domestic law of the United Kingdom by virtue of the European Union (Withdrawal) Act 2018; or

(c) The Protection of Trading Interests Act 1980 of the United Kingdom.

"**Board**"    means the board of Directors.

"**BOCI**"    means BOCI Asia Limited.

"**Business Day**"    means any day which is not a Saturday, Sunday, legal holiday or other day on which banking institutions in the City of New York, the City of London, the Cayman Islands, Hong Kong or the PRC are authorised or required by law or governmental regulation (as applicable) to close.

"**BVI**"    means the British Virgin Islands.

"**C1 Notes**"    means tranches A, B and C of the new C1 notes to be issued by the Company and governed by the C1 Notes Indentures.

"**C1 Notes Indentures**"    means the New York law governed indentures governing the C1 Notes to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the C1 Notes and with the modifications required to reflect the different terms of the different tranches of the C1 Notes as set out in this Explanatory Statement, each of which shall be in the Agreed Form.

"**C2 Accrued Claims Ratio**"    has the meaning set out in Clause 15.13 of the Schemes.

| | |
|---|---|
| "**C2 EVPS SLNs**" | means tranches A and B of the US dollar denominated secured new A2 notes linked to the EVPS Shares to be issued by the Company and governed by the C2 EVPS SLNs Indentures. |
| "**C2 EVPS SLNs Indentures**" | means the New York law governed indentures governing the C2 EVPS SLNs to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the C2 EVPS SLNs and with the modifications required to reflect the different terms of the different tranches of the C2 EVPS SLNs as set out in this Explanatory Statement, each of which shall be in the Agreed Form. |
| "**C2 NEV Custody Accounts**" | has the meaning set out in Schedule 8 (*Summary of Terms of the New Instruments*) to this Explanatory Statement. |
| "**C2 NEV SLNs**" | means tranches A and B of the US dollar denominated secured new C2 notes linked to the NEV Shares to be issued by the Company and governed by the C2 NEV SLNs Indentures. |
| "**C2 NEV SLNs Indentures**" | means the New York law governed indentures governing the C2 NEV SLNs to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the C2 NEV SLNs and with the modifications required to reflect the different terms of the different tranches of the C2 NEV SLNs as set out in this Explanatory Statement, each of which shall be in the Agreed Form. |
| "**C2 Notes**" | means tranches A, B and C of the new C2 notes to be issued by the Company and governed by the C2 Notes Indentures. |
| "**C2 Notes Indentures**" | means the New York law governed indentures governing the C2 Notes to be entered into between the Company and the New Instruments Trustee substantially in the form appended to this Explanatory Statement. |
| "**C2 Package**" | means the CEG MCBs, NEV MEBs, EVPS MEBs, C2 EVPS SLNs and C2 NEV SLNs available to Class C Scheme Creditors who elect Option 2 Scheme Consideration in accordance with the terms of the Restructuring Documents. |
| "**C2 Package Adjusted Portion**" | has the meaning set out in Clause 15.15 of the Schemes. |
| "**C2 Package Initial Portion**" | has the meaning set out in Clause 15.12 of the Schemes. |
| "**C2 Package Unadmitted Portion**" | has the meaning set out in Clause 15.10 of the Schemes. |
| "**Capital Stock**" | means, with respect to any Person, any and all shares, interests (including partnership interests), rights to purchase, warrants, options, participations or other |

|  | equivalents of or interests in (however designated, whether voting or non-voting) equity of such Person. |
|---|---|
| "**Cayman Companies Act**" | means the Cayman Companies Act (2023 Revision) as amended, modified or re-enacted from time to time. |
| "**Cayman Court**" | means the Grand Court of the Cayman Islands and any court capable of hearing appeals therefrom. |
| "**Cayman Registrar of Companies**" | means the Registrar of Companies (including any deputy registrar and/or assistant registrar or similar) appointed under the Cayman Companies Act in the Cayman Islands. |
| "**Cayman Scheme**" | means the scheme of arrangement effected pursuant to Section 86 of the Cayman Companies Act between the Company and the Scheme Creditors, in its present form or with or subject to any non-material modifications, additions or conditions that the Court may think fit to approve or impose and agreed to by the Company and the Majority CEG AHG (provided that the CEG AHG satisfies the Minimum CEG AHG Threshold). |
| "**Cayman Scheme Meetings**" | means collectively the Class A Cayman Scheme Meeting and the Class C Cayman Scheme Meeting. |
| "**Cayman Scheme Sanction Hearing**" | means the hearing at the Cayman Court of the petition in respect of the sanctioning of the Cayman Scheme. |
| "**Cayman Scheme Sanction Order**" | means the sealed copy of the order of the Cayman Court sanctioning the Cayman Scheme. |
| "**CEG**" or "**Company**" | means China Evergrande Group, an exempted company incorporated with limited liability under the laws of the Cayman Islands with registration number 169971 and having its registered office at P.O. Box 309, Ugland House, Grand Cayman, KY1-1104, the Cayman Islands and the shares of which are listed on the Main Board of the HKEX. |
| "**CEG AHG**" | means the ad hoc group of Participating Creditors or investment managers or investment advisors to such Participating Creditors, who: (i) have agreed to be bound by the terms of the Class A RSA; (ii) have been constituted from time to time and as notified to CEG (subject to and in accordance with the transfer provisions under the Class A RSA); and (ii) are advised, by the AHG Advisors from time to time and which such Participating Creditors, as at the date of the Class A RSA, include the Initial Participating Creditors. |
| "**CEG Existing April 2022 Notes**" | means the 9.5% senior notes in the aggregate principal amount of US$1,250,000,000 due April 11, 2022 (ISIN: XS1982036961, Common Code: 198203696) issued by the Company. |

"**CEG Existing April 2023 Notes**"    means the 10.0% senior notes in the aggregate principal amount of US$450,000,000 due April 11, 2023 (ISIN: XS1982037779, Common Code: 198203777) issued by the Company.

"**CEG Existing April 2024 Notes**"    means the 10.5% senior notes in the aggregate principal amount of US$300,000,000 due April 11, 2024 (ISIN: XS1982040641, Common Code: 198204064) issued by the Company.

"**CEG Existing February 2023 Bonds**"    means the 4.25% convertible bonds in the aggregate principal amount of HK$18,000,000,000 due February 14, 2023 (ISIN: XS1767800961, Common Code: 176780096) issued by the Company.

"**CEG Existing January 2022 Notes**"    means the 9.5% senior notes in the aggregate principal amount of US$300,000,000 due January 30, 2022 (ISIN: XS1991102846, Common Code: 19911028) issued by the Company.

"**CEG Existing January 2023 Notes**"    means the 11.5% senior notes in the aggregate principal amount of US$1,000,000,000 due January 22, 2023 (ISIN: XS2106834299, Common Code: 210683429) issued by the Company.

"**CEG Existing January 2024 Notes**"    means the 12.0% senior notes in the aggregate principal amount of US$1,000,000,000 due January 22, 2024 (ISIN: XS2106834372, Common Code: 210683437) issued by the Company.

"**CEG Existing June 2023 Notes**"    means the 7.5% senior notes in the aggregate principal amount of US$1,344,921,000 due June 28, 2023 (ISIN: XS1627599498, Common Code: 162759949) issued by the Company.

"**CEG Existing June 2025 Notes**"    means the 8.75% senior notes in the aggregate principal amount of US$4,680,476,000 due June 28, 2025 (ISIN: XS1627599654, Common Code: 162759965) issued by the Company.

"**CEG Existing March 2022 Notes**"    means the 8.25% senior notes in the aggregate principal amount of US1,000,000,000 due March 23, 2022 (ISIN: XS1580431143, Common Code: 158043114) issued by the Company.

"**CEG Existing March 2024 Notes**"    means the 9.5% senior notes in the aggregate principal amount of US$1,000,000,000 due March 29, 2024 (ISIN: XS1587867539, Common Code: 158786753) issued by the Company.

"**CEG MCB Minimum Denomination**"    has the meaning set out in Section 27.3 of this Explanatory Statement.

212

| | |
|---|---|
| "**CEG MCBs**" | means the Hong Kong dollar denominated mandatory convertible bonds to be issued by the Company and governed by the CEG MCBs Trust Deed. |
| "**CEG MCBs Trust Deed**" | means the Hong Kong law governed trust deed governing the CEG MCBs to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website and which shall be in the Agreed Form. |
| "**CEG Shares**" or "**Shares**" | means the ordinary shares of CEG. |
| "**Chairman**" | means Mr. Hui Ka Yan. |
| "**Chairperson**" | means the chairperson of the Scheme Meeting. |
| "**Change of Control**" | has the meaning given to that term under the New Instruments Documents. |
| "**Chapter 15 Recognition Order**" | means an order or orders of the US Bankruptcy Court recognising the Hong Kong Scheme as a foreign main proceeding (or in the alternative, a foreign non-main proceeding) and giving effect to certain aspects of the compromise and arrangement set out in the Hong Kong Scheme (which will be substantively identical to that set out in the Cayman Scheme), including the Releases under Clause 28 (*Releases*) of the Hong Kong Scheme. |
| "**Chapter 15 Recognition Proceeding**" | means the recognition proceeding before a US Bankruptcy Court to recognize the Scheme pursuant to chapter 15 of the United States Bankruptcy Code. |
| "**CICC**" | means China International Capital Corporation Hong Kong Securities Limited. |
| "**Claim**" | means all and any present and future Liabilities together with any refinancing, novation, deferral or extensions relating to or arising in respect of those Liabilities, actions, causes of action, claims, counterclaims, suits, debts, set-offs, sums of money, accounts, contracts, agreements, promises, contribution, subrogation, indemnification, damages, judgments, executions, court or arbitration awards, demands or rights whatsoever or howsoever arising, whether present, future, prospective or contingent, known or unknown, whether directly or indirectly, whether in person or through another Person, whether or not for a fixed or unliquidated amount, whether or not involving the payment of money or the performance of an act or obligation or any failure to perform any obligation or any omission, whether arising at common law, in equity or by statute in or under the laws of the Cayman Islands, Hong Kong, PRC, New York or under any other law or in any other jurisdiction howsoever arising and "Claims" shall be construed accordingly. |

213

| | |
|---|---|
| "**Class A Bar Date**" | means, in respect of Class A Scheme Creditors, the date which is 30 days after the Restructuring Effective Date. |
| "**Class A Cayman Scheme Meeting**" | means a meeting of the Class A Scheme Creditors in relation to the Cayman Scheme as convened by an order of the Cayman Court for the purpose of considering and, if thought fit, approving, with or without modification, the Cayman Scheme, and any adjournment thereof. |
| "**Class A Debts**" | means the Existing Notes and the Class A Private Loan, (including any Credit Support and Claims of any kind (if any) in connection or in respect thereof, arising therefrom or relating thereto). |
| "**Class A Group Claims**" | means any Claim by a Scheme Creditor against the Group, the Existing Notes Subsidiary Guarantors and the Existing Notes Subsidiary Pledgors, under or in respect of the Existing Class A Debt Documents, but excluding for the avoidance of doubt any Claim in respect of any Liability of the Group, the Existing Notes Subsidiary Guarantors and the Existing Notes Subsidiary Pledgors which arises as a result of a failure to comply with any of the terms of the Schemes of any Restructuring Document (including but not limited to the New Instruments Documents). |
| "**Class A Holding Period Custody Instruction Deadline**" | means 5:00 p.m. (Hong Kong time) / 4.00 a.m. (Cayman Islands time) on the date which is five (5) Business Days prior to the Class A Bar Date. |
| "**Class A Hong Kong Scheme Meeting**" | means a meeting of the Class A Scheme Creditors in relation to the Hong Kong Scheme as convened by an order of the Hong Kong Court for the purpose of considering and, if thought fit, approving, with or without modification, the Hong Kong Scheme, and any adjournment thereof. |
| "**Class A Lenders**" | persons with a legal interest as principal in the Class A Private Loan as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of the determination of such persons' Entitlements). |
| "**Class A Noteholders**" | means persons with an economic or beneficial interest as principal in the Existing Notes held in global form or global restricted form through the Clearing Systems as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of the determination of such persons' Entitlements), each of whom has a right, upon satisfaction of certain conditions, to be issued definitive registered notes in accordance with the terms of the Existing Notes and the Indentures, and (but without double counting in each case) the Existing Notes Depositary and the Existing Notes Trustee. |

"**Class A Options Deadline**" means the date which is fourteen (14) calendar days after the Scheme Effective Date, which will be the final date by which Class A Scheme Creditors must submit all relevant forms in order to elect to receive either Option 1 Scheme Consideration or Option 2 Scheme Consideration in accordance with the terms of the Schemes and the Restructuring Documents.

"**Class A Private Lender Proxy Form**" means the proxy form for Class A Lenders which is appended to the Solicitation Packet.

"**Class A Private Loan**" means the private loan of US$100,000,000 with 15% interest p.a. due January 2022 owed by the Company.

"**Class A RSA**" means the restructuring support agreement dated 3 April 2023 between, among others, the Company and the Initial Participating Creditors, as amended or varied from time to time, including by the accession or cessation of parties thereto.

"**Class A Scheme Creditor**" means one of the (i) Class A Noteholders or (ii) Class A Lenders.

"**Class A Scheme Meetings**" means the Class A Cayman Scheme Meeting and the Class A Hong Kong Scheme Meeting.

"**Class C Bar Date**" means, in respect of Class C Scheme Creditors, the date which is 135 days after the Restructuring Effective Date.

"**Class C Cayman Scheme Meeting**" means a meeting of the Class C Scheme Creditors in relation to the Cayman Scheme as convened by an order of the Cayman Court for the purpose of considering and, if thought fit, approving, with or without modification, the Cayman Scheme, and any adjournment thereof.

"**Class C Debts**" means the offshore financial unsecured indebtedness, obligations or other liabilities (including, without limitation, guarantees, repurchase obligations, put options, indemnity, court/arbitration awards and claims of any kind) of CEG listed in Schedule 2 to the Schemes (including any related Credit Support provided by and Claims of any kind against CEG) or in respect thereof.

"**Class C Holding Period Custody Instruction Deadline**" means 5:00 p.m. (Hong Kong time) / 4.00 a.m. (Cayman Islands time) on the date which is five (5) Business Days prior to the Class C Bar Date.

"**Class C Hong Kong Scheme Meeting**" means a meeting of the Class C Scheme Creditors in relation to the Hong Kong Scheme as convened by an order of the Hong Kong Court for the purpose of considering and, if thought fit, approving, with or without modification, the Hong Kong Scheme, and any adjournment thereof

"**Class C Noteholders**" means the Dongpo Noteholders and the Lake Noteholders.

| | |
|---|---|
| "**Class C Notes**" | means the Dongpo Notes and the Lake Notes. |
| "**Class C RSA**" | means the restructuring support agreement dated 3 April 2023 launched by the Company, as amended or varied from time to time, including by the accession or cessation of parties thereto. |
| "**Class C Scheme Claims**" | means any Scheme Claim of a Class C Scheme Creditor in respect of the Class C Debts on, before or after the Voting Record Time. |
| "**Class C Scheme Creditor**" | means (i) a person holding an economic or beneficial interest as principal in the Class C Notes (ii) an RMB Bondholder or (ii) a person holding a legal interest as principal in any other Class C Debts, as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of the determination of such person's Entitlement), including (but without double counting in each case) Guotai Junan Securities Co. Ltd. as trustee under the RMB Bonds, the Dongpo Notes Trustee and Agents, the Lake Notes Trustee and Agent and the Existing Agents. |
| "**Class C Scheme Creditor Proxy Form**" | means the proxy form for Class C Scheme Creditors (other than Class C Noteholders) which is appended to the Solicitation Packet. |
| "**Class C Scheme Creditor's Entitlement**" | means the amount calculated pursuant to Clause 13.3 of the Schemes. |
| "**Class C Scheme Meetings**" | means collectively the Class C Cayman Scheme Meeting and the Class C Hong Kong Scheme Meeting. |
| "**Clearing System Instruction**" | means an instruction to each of the Clearing Systems substantially in relation to the Restructuring Effective Date. |
| "**Clearing Systems**" | means Euroclear and Clearstream, as applicable, and any successor thereto. |
| "**Clearstream**" | means Clearstream Banking S.A. |
| "**CMP Regulations 2018**" | means the Securities and Futures (Capital Markets Products) Regulations 2018. |
| "**Collateral**" | all collateral securing, or purported to be securing, directly or indirectly, the New Instruments, any New Instruments Subsidiary Guarantee (as applicable) pursuant to the Security Documents, which shall, in each case, be in the Agreed Form. |
| "**Collateral Agent**" | means the collateral agent or any successor collateral agent as appointed under the New Instruments Documents and with respect to the Security Documents. |

216

| | |
|---|---|
| "**Completion Notice**" | has the meaning given to it in Section 17.1 of this Explanatory Statement. |
| "**Consent Fee**" | means, with respect to each Participating Creditor and subject to and in accordance with Clause 5 *(Consent Fee)* of the Class A RSA or the Class C RSA (as applicable), an amount equal to 0.25% of the outstanding principal amount of the Eligible Restricted Debts held by such Participating Creditor as of the Voting Record Time, payable in kind in the form of new notes to be issued by the Company in accordance with the section headed "Consent Fee" in the Term Sheet. |
| "**Consent Fee Deadline**" | means 5:00 p.m. Hong Kong time, with the original date on 27 April 2023 and subsequently extended to 18 May 2023. |
| "**Consultation Period**" | means the 30 calendar day period commencing on and from the date that a Class C Scheme Creditor submits the Scheme Administrator Estimate Acceptance or Rejection Form to the Scheme Administrators rejecting the Scheme Administrator Estimate (unless extended by the Scheme Administrators in accordance with Clause 38.7(c) of the Schemes). |
| "**Conversion of Shareholders' Loans to NEV Shares**" | has the meaning given to that term under in paragraph 8 (*CEG's Commitment to the Restructuring)* of Section 7 (*Letter from the Board to the Scheme Creditors*) of this Explanatory Statement. |
| "**Court**" | means the Cayman Court and/or the Hong Kong Court. |
| "**Credit Support**" | means any security, encumbrance, collateral, guarantee, bond, indemnity, repurchase obligation, put option, assumption of any Liability or other form of credit support or assurance or arrangement having the same economic effect. |
| "**Credit Support Document**" | means any document or instrument documenting or constituting or purporting to document or constitute any Credit Support (howsoever described), as amended, varied and supplemented from time to time. |
| "**Custody Instruction**" | means an instruction to the relevant Clearing System to block the Existing Notes or the Class C Notes (up to the Restructuring Effective Date) from trading in the relevant Clearing System, or, in respect of the Class C Notes on or after the Restructuring Effective Date, to verify the Scheme Claims in respect of the Class C Notes of the Class C Noteholder. |
| "**Custody Instruction Deadline**" | means 5.00 p.m. Hong Kong time on 15 August 2023 or 4.00 a.m. Cayman Islands time on 15 August 2023. |
| "**Custody Instruction Reference Number**" | means, the unique reference provided by Euroclear or Clearstream, following an instruction from an Account Holder to block the relevant Existing Notes in accordance |

| | |
|---|---|
| | with the instructions contained in this Explanatory Statement. |
| "**C(WUMP)O**" | means the Companies (Winding Up and Miscellaneous Provisions) Ordinance (Cap. 32 of the Laws of Hong Kong), as amended, modified or re-enacted from time to time. |
| "**Deed of Agreed Valuation**" | means a deed to be entered into between a Class C Scheme Creditor, the Scheme Administrators and the Company recording (i) the Class C Scheme Creditor's Entitlement as determined by the Scheme Administrators or, if required, the Scheme Adjudicator and (ii) a release of the relevant Class C Scheme Creditor's Scheme Claim pursuant to the governing law of the underlying Existing Debt (as applicable), pursuant to the terms of the Schemes, which shall be in the Agreed Form. |
| "**Deeds of Release**" | shall include the form of (i) New York law governed global deed of release in respect of, among other things, the Existing Notes; (ii) Hong Kong law governed deed of release in respect of, among other things, the Class A Private Loan, the Class C Debts, and the Hong Kong law governed share charges as provided by the Existing Notes Subsidiary Pledgors for the Existing Notes; and (iii) PRC law global deed of release for, among other things, Class C Debts governed under PRC law with offshore guarantees, each of which shall be executed pursuant to the authority conferred by Clause 28 (*Releases*) of the Schemes in respect of the Scheme Creditors in substantially the form to be made available on the Transaction Website and which shall be in the Agreed Form, subject to any modifications required or approved in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*) of the Schemes. |
| "**Deed of Undertaking**" | means a deed of undertaking substantially in the form set out on the Transaction Website, which shall be in the Agreed Form. |
| "**Deed of Undertaking Parties**" | means the parties to the Deed of Undertaking, which it is intended shall include: the Existing Notes Subsidiary Guarantors, the New Instruments Subsidiary Guarantors, the Existing Notes Subsidiary Pledgors, the New Instruments Subsidiary Pledgors, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the Existing Notes Collateral Agent, the Collateral Agent, the Scheme Administrators, the Information Agent, and such other additional parties to the Deed of Undertaking (which shall be in the Agreed Form). |

| | |
|---|---|
| "**Deficiency Basis**" | has the meaning set out in Section 9.35 of this Explanatory Statement. |
| "**Deloitte**" | means Deloitte Advisory (Hong Kong) Limited. |
| "**Designated Recipient**" | means in relation to any Scheme Creditor (who is not a Sanctions-Affected Scheme Creditor) that can make affirmative Sanctions Law Representations by submission of a duly completed Distribution Confirmation Deed, any single entity that is designated as such by a Scheme Creditor in accordance with a valid Designated Recipient Form as the recipient of the New Instruments to be issued to such Scheme Creditor as Scheme Consideration, subject to limitations in accordance with applicable securities laws and provided that (i) the Designated Recipient shall only be validly designated if it or an Account Holder on its behalf has submitted a Distribution Confirmation Deed and/or any other applicable forms that its designating Scheme Creditor is required to submit pursuant to the Scheme; (ii) a Scheme Creditor may designate only one such entity and if such entity is a nominee holder it may only hold on behalf of one beneficial holder; and (iii) the Designated Recipient is an Eligible Person. |
| "**Designated Recipient Form**" | means the form enclosed with the Solicitation Packet published on the Transaction Website by which a Scheme Creditor may appoint a Designated Recipient to be the recipient of all of the New Instruments that would otherwise be issued to that Scheme Creditor as Scheme Consideration or as any Consent Fee payable to that Scheme Creditor. |
| "**Director(s)**" | means the director(s) of CEG from time to time. |
| "**Distribution Confirmation Deed**" | means the form of deed enclosed with the Solicitation Packet published on the Transaction Website confirming amongst other things that the Eligible Creditor or the Designated Recipient may lawfully be issued the New Instruments as Scheme Consideration, which shall be in the Agreed Form. |
| "**Dongpo Noteholders**" | means persons with an economic or beneficial interest as principal in the Dongpo Notes held in global form or global restricted form through the Clearing Systems as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of the determination of such persons' Entitlements), each of whom has a right, upon satisfaction of certain conditions, to be issued definitive registered notes in accordance with the terms of the Dongpo Notes and the Dongpo Notes Trust Deed, and (but without double counting in each case) any depository or trustee of the Dongpo Notes. |

| | |
|---|---|
| "**Dongpo Notes**" | means the US$424 million 9.0% senior notes due January 22, 2023 (ISIN: XS2290369128, Common Code: 229036912) issued by Great Courage Global Limited. |
| "**Dongpo Notes Existing Agents**" | means, collectively, in their separate capacities (A) Huatai Financial Holdings (Hong Kong) Limited and TFI Securities And Futures Limited each in its capacity as arranger under the Dongpo Notes; and (B) China Construction Bank (Asia) Corporation Limited as (i) security agent and (ii) principal paying agent, transfer agent and registrar under the Dongpo Notes. |
| "**Dongpo Notes Trust Deed**" | means the trust deed dated 22 January 2021, as amended, supplemented or otherwise modified from time to time, between Great Courage Global Limited, CEG, Charm Wealth Asia Pacific Limited, Global Power Development Holdings Limited and China Construction Bank (Asia) Corporation Limited as trustee governing the Dongpo Notes. |
| "**Dongpo Notes Trustee**" | means China Construction Bank (Asia) Corporation Limited solely in its capacity as trustee under the Dongpo Notes. |
| "**Dongpo Notes Trustee and Agents**" | means collectively, the Dongpo Notes Trustee and the Dongpo Notes Existing Agents. |
| "**EEA**" | means the European Economic Area. |
| "**EEA Qualified Investor**" | has the meaning given to it at Section 2.3 (*European Economic Area*) of this Explanatory Statement. |
| "**Eligible Creditor**" | means a Scheme Creditor who is an Eligible Person and who has submitted or caused to be submitted the Scheme Creditor Forms, as applicable, such that they are submitted and received by the Information Agent in accordance with the terms of the Schemes, before the applicable deadline set out in the Solicitation Packet, as published on the Transaction Website. |
| "**Eligible Participating Creditor**" | means a Participating Creditor who holds, at the Voting Record Time, Existing Debts which validly became Eligible Restricted Debts before the Consent Fee Deadline (as applicable) in accordance to the terms of the Class A RSA or Class C RSA (as applicable). |
| "**Eligible Person**" | means a person who has provided affirmative Securities Law Representations and Sanctions Law Representations to the Information Agent before the applicable deadline set out in the Solicitation Packet as published on the Transaction Website. |
| "**Eligible Restricted Debt**" | means a Restricted Debt which was made subject to the terms of the relevant RSA by a Participating Creditor on or |

prior to the Consent Fee Deadline; and "**Eligible Restricted Debts**" means all of them.

"**Enforcement Action**"    means:

(a)    the acceleration of any sum payable or the making of any declaration that any sum payable is due and payable or payable on demand;

(b)    the making of any demand against any member of the Group under any guarantee or surety provided by that member of the Group;

(c)    the suing for, commencing, or joining of any legal or arbitration proceedings against any member of the Group to recover any sums payable or under any guarantee or surety provided by any member of the Group;

(d)    the taking of any steps to enforce or require the enforcement of any security granted by any member of the Group;

(e)    the levying of any attachment, garnishment, sequestration or other legal process over or in respect of any assets of the Group;

(f)    the petitioning, applying, or voting for any Insolvency Proceedings in relation to any member of the Group;

(g)    the commencing or continuation of any legal action or other proceedings against any member of the Group (or any director or officer thereof) or any of their respective assets;

(h)    joining any other entity or person in the exercise of any of the foregoing rights;

(i)    exercising any right, power, privilege or remedy in connection with the foregoing; or

(j)    directing any trustee or agent to do any of the foregoing,

other than (x) as contemplated by the Restructuring, and (y) any action falling within (a) to (j) above which is necessary, but only to the extent necessary, to preserve the validity, existence, or priority of claims in respect of the Existing Notes, including the registration of such claims before any court or governmental authority and the bringing, supporting or joining of proceedings to prevent the loss of the right to bring, support, or join proceedings by reason of applicable limitation periods.

"**Entitlement**"    has the meaning given to it in Clause 13 (*Calculation of a Scheme Creditor's Entitlement*) of the Schemes.

"**Entitlement Record Time**"    means the Restructuring Effective Date. This is the time designated by CEG for the determination of Entitlements of the Scheme Creditors for the purposes of distribution of

221

Scheme Consideration (for the avoidance of doubt, this shall not prevent the Valuation and Adjudication Procedure for the Class C Debts taking place after the Restructuring Effective Date and/or taking into account prevailing circumstances at such time, including without limitation the release or extinguishment of rights or benefits of any Excluded Collateral or Excluded Liabilities resulting in a reduction of the relevant Assessed Value, as applicable).

| | |
|---|---|
| **"Escrow Agent"** | means the escrow agent or any escrow agent under and as defined in the New Instruments Documents. |
| **"Estimation Notice"** | means a notice from the Scheme Administrators to each Class C Scheme Creditor notifying such Class C Scheme Creditor of the Scheme Administrator Estimate. |
| **"Euroclear"** | means Euroclear Bank SA/NV. |
| **"EUWA"** | means the European (Withdrawal) Act 2018. |
| **"Event of Default"** | has the meaning given to that term under the New Instruments Documents. |
| **"EVPS"** | means Evergrande Property Services Group Limited, a subsidiary of the Company the shares of which are listed on the HKEX (Stock Code: 6666). |
| **"EVPS MEB Minimum Denomination"** | has the meaning set out in Section 27.3 of this Explanatory Statement. |
| **"EVPS MEBs"** | means the Hong Kong dollar denominated mandatory exchangeable bonds to be issued by the Company and governed by the EVPS MEBs Trust Deed. |
| **"EVPS MEBs Trust Deed"** | means the Hong Kong law governed trust deed governing the EVPS MEBs to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website, which shall be in the Agreed Form. |
| **"EVPS Pledges"** | has the meaning set out in Section 8.26 of this Explanatory Statement. |
| **"EVPS Shares"** | means the ordinary shares of EVPS. |
| **"EVPS SLNs"** | means A2 EVPS SLNs and C2 EVPS SLNs. |
| **"Exchange and Conversion Agent"** | means the exchange and conversion agent or any successor exchange and conversion agent under and as defined in the New Instruments Documents. |
| **"Exchange Property"** | means: |

(a) in respect of the NEV MEBs, 3,094,810,100 NEV Shares listed on the HKEX, together with any remaining NEV Shares issued as part of the conversion of the

222

|  | Shareholder Loans into shares of NEV after the NEV Custody Account Transfers are made, subject to any adjustment made in accordance with Clause 15.2 of the Schemes; or |
|---|---|
|  | (b) in respect of the EVPS MEBs, 2,331,985,700 EVPS Shares listed on the HKEX. |
| **"Excluded Collateral"** | means any security, collateral, guarantee, bond, indemnity, keepwell agreement or other form of assurance granted by an Excluded Liabilities Party Person for the purpose of securing and/or guaranteeing against and/or supporting any Class C Debt. |
| **"Excluded Liability"** | means any Liability of an Excluded Liabilities Party Person and **"Excluded Liabilities"** shall be construed accordingly. |
| **"Excluded Liabilities Party Person"** | means certain Persons other than the Company who is an obligor, guarantor, security or collateral pledgor or other Credit Support provider of or in respect of a Class C Debt owed to a Class C Scheme Creditor. |
| **"Existing Agents"** | means the Existing Facility Agents and the Existing Security Agent. |
| **"Existing Class A Debt Documents"** | means the Existing Notes Documents, the loan agreement in respect of the Class A Private Loan and any related Credit Support Document, as amended, varied and supplemented from time to time. |
| **"Existing Class C Debt Documents"** | means any document or instrument documenting or constituting or purporting to document or constitute any Class C Debt. |
| **"Existing Debts"** | means, collectively, the Class A Debts and the Class C Debts. |
| **"Existing Facility Agents"** | means: |

"Existing Facility Agents"

means:

(a) China Construction Bank (Asia) Corporation Limited, in its capacity as (i) agent, (ii) escrow agent and (iii) account bank under the Venice Loan;

(b) China Construction Bank (Asia) Corporation Limited, in its capacity as (i) escrow agent and (ii) account bank under the Venice SPA;

(c) (i) China CITIC Bank International Limited; (ii) China Everbright Bank Co., Ltd. Hong Kong Branch and (iii) Tai Fung Bank Limited, in their capacity as arrangers under the Hero Loan; and

(d) China CITIC Bank International Limited, in its capacity as (i) agent and (ii) account bank under the Hero Loan.

| **"Existing Finance Documents"** | means the Existing Notes Documents, the loan agreement in respect of the Class A Private Loan, the Existing Class C Debt Documents, and any other Credit Support Document entered into in respect thereof, as amended, varied and supplemented from time to time. |
|---|---|

| | |
|---|---|
| "**Existing Notes**" | means the CEG Existing January 2022 Notes, the CEG Existing March 2022 Notes, the CEG Existing April 2022 Notes, the CEG Existing January 2023 Notes, the CEG Existing February 2023 Bonds, the CEG Existing April 2023 Notes, the CEG Existing June 2023 Notes, the CEG Existing January 2024 Notes, the CEG Existing March 2024 Notes, the CEG Existing April 2024 Notes, and the CEG Existing June 2025 Notes. |
| "**Existing Notes Collateral Agent**" | means Citicorp International Limited. |
| "**Existing Notes Depositary**" | means Citibank Europe plc as common depositary for the Clearing Systems, acting through its nominee as registered holder of the Existing Notes, Citivic Nominees Limited. |
| "**Existing Notes Documents**" | means the Indentures and any other documents entered into by the Company or any other person guaranteeing or securing liabilities due under or in respect of the Existing Notes. |
| "**Existing Notes Paying and Transfer Agent and Registrar**" | means Citibank, N.A., London Branch in its capacity as paying agent, transfer agent, and registrar in respect of the Existing Notes. |
| "**Existing Notes Subsidiary Guarantors**" | means the entities listed in Schedule 4 (*Existing Notes Subsidiary Guarantors*) to the Schemes. |
| "**Existing Notes Subsidiary Pledgors**" | means: |
| | (a)  ANJI (BVI) Limited (安基(BVI)有限公司); |
| | (b)  Fengyu (BVI) Limited (丰域(BVI)有限公司); |
| | (c)  Pyramid Wealth Holdings Limited; |
| | (d)  Value Depot Holdings Limited; and |
| | (e)  Yitong (BVI) Limited (亿通(BVI)有限公司). |
| "**Existing Notes Trustee**" | means Citicorp International Limited solely in its capacity as trustee under the Indentures. |
| "**Existing Notes Trustee Instruction**" | means an instruction to the Existing Notes Trustee substantially in the form to be made available on the Transaction Website or such other form as the Existing Notes Trustee may reasonably accept. |
| "**Existing Security Agent**" | means: |
| | (a)  Paperbark, LLC, in its capacity as security agent under the Class A Private Loan; |
| | (b)  China CITIC Bank International Limited, in its capacity as security agent under the Hero Loan; and |

|  | (c) China Construction Bank (Asia) Corporation Limited, in its capacity as security agent of the Venice Loan. |
|---|---|
| **"Final Distribution"** | means the Scheme Consideration to be distributed on the Final Distribution Date from the Residual New Instruments to each Scheme Creditor that is not a Sanctions-Affected Scheme Creditor (or, in respect of Blocked Scheme Creditors, to the Successor Escrow Agent) or to a Designated Recipient (if applicable), in each case in accordance with their respective entitlements and the terms under the Schemes (and, without double counting any Initial Distribution received, if applicable). |
| **"Final Distribution Date"** | means the final date on which the Scheme Consideration shall be distributed to Scheme Creditors (that are not a Sanctions-Affected Scheme Creditor) that are entitled to a portion of the Residual New Instruments, or to the Successor Escrow Agent on behalf of the Blocked Scheme Creditors, in accordance with the terms of the Schemes and Restructuring Documents, and within one month of the completion of the Valuation and Adjudication Procedure set out in Clauses 38 (*Valuation Procedure*) and 40 (*Adjudication Procedure*). This date is to be designated by the Company and communicated to the Scheme Creditors in writing via the Transaction Website and/or through such public medium as may be appropriate at the time. The Final Distribution Date will be a date after the conclusion of the Valuation and Adjudication Procedure. |
| **"Financial Promotion Order"** | means the UK Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (as amended). |
| **"Forced A2 Notes"** | means tranches A, B, C and D of the new A2 notes to be issued by the Company and governed by the Forced A2 Notes Indentures, and to be distributed to Class A Scheme Creditors referred to in Clause 16.5(b) of the Schemes in accordance with the terms of the Restructuring Documents. |
| **"Forced A2 Notes Indentures"** | means the New York law governed indenture governing the Forced A2 Notes to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the Forced A2 Notes and with the modifications required to reflect the different terms of the different tranches of the Forced A2 Notes as set out in this Explanatory Statement, each of which shall be in Agreed Form. |
| **"FSMA"** | means the UK Financial Services and Markets Act 2000. |
| **"Full Accrued Claim Basis"** | means the value of the Scheme Creditor's Scheme Claims calculated on a Full Accrued Claim Basis being a "**Scheme Creditor's Full Accrued Claims**" at the relevant time (as |

applicable, depending on whether this is looking to scheme consideration or voting purposes) calculated as:

$$A \; + \; B$$

where:

**A** = the outstanding principal amount or (in the case of a put option or repurchase obligation) price amount of the Scheme Creditor's Scheme Claims at the Entitlement Record Time or Voting Record Time (as applicable), without permitting duplicative claims or portions of claims against the Company other than for US$1, as determined by the Company, in consultation with the Scheme Administrators.

**B** = all accrued but unpaid interest on such Scheme Claims up to (but excluding) the Reference Date or Voting Record Time (as applicable), as determined by the Company, in consultation with the Scheme Administrators.

| | |
|---|---|
| "**FY21**" | means the year ended 31 December 2021. |
| "**FY21 Audited Group Consolidated Financial Results**" | has the meaning given to it in Section 3.3 of this Explanatory Statement. |
| "**FY22**" | means the year ended 31 December 2022. |
| "**FY22 Audited Group Consolidated Financial Results**" | has the meaning given to it in Section 3.3 of this Explanatory Statement. |
| "**GCR**" | means the Cayman Islands Grand Court Rules (2023 Revision). |
| "**GLAS**" | means GLAS Specialist Services Limited, who the Company has appointed to liaise with Blocked Scheme Creditors including the processing of any Blocked Scheme Creditor Forms, under the Schemes. |
| "**Global Certificates**" | means the global certificates evidencing the Existing Notes. |
| "**Governmental Entity**" | means any federal, national or local government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal or judicial body of Hong Kong, the PRC, the United States of America, the European Union, the United Kingdom, the British Overseas Territories, the Cayman Islands or any other relevant jurisdiction. |
| "**Group**" | means CEG and its subsidiaries from time to time. |
| "**Hengda Real Estate**" | means Hengda Real Estate Group Company Limited (恒大地產集團有限公司), a principal subsidiary of CEG. |
| "**Hero Loan**" | has the meaning set out in Schedule 2 of the Schemes. |

226

| | |
|---|---|
| "**HKEX**" | means The Stock Exchange of Hong Kong Limited. |
| "**Holding Period**" | means the period from the Restructuring Effective Date, up to and including one Business Day after the Final Distribution Date. |
| "**Holding Period Custody Instruction Deadline**" | means, in respect of a Class A Noteholder, three Business Days prior to the Class A Bar Date or, in respect of a Class C Noteholder, three (3) Business Days prior to the Class C Bar Date. |
| "**Holding Period Trust**" | means the holding period trust constituted pursuant to the Holding Period Trust Deed. |
| "**Holding Period Trust Deed**" | means the holding period trust deed to be entered into between, among others, CEG and the Holding Period Trustee, in substantially the form to be made available on the Transaction Website subject to and in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*) of the Schemes. |
| "**Holding Period Trustee**" | means GLAS Trustees Limited, holding the relevant Scheme Consideration, TJ Scheme Consideration and any Consent Fee (if applicable), for and on behalf of the Scheme Creditors, in accordance with this Cayman Scheme and the Restructuring Documents, or any additional or replacement trustee at any time. |
| "**Hong Kong**" | means the Hong Kong Special Administrative Region of the PRC. |
| "**Hong Kong Companies Ordinance**" | means the Companies Ordinance (Cap. 622 of the Laws of Hong Kong), as amended, modified or re-enacted from time to time. |
| "**Hong Kong Companies Registrar**" | means the Hong Kong Registrar of Companies appointed under the Hong Kong Companies Ordinance. |
| "**Hong Kong Court**" | means the High Court of Hong Kong and any court capable of hearing appeals therefrom. |
| "**Hong Kong Scheme**" | means the scheme of arrangement effected pursuant to Section 673 of the Hong Kong Companies Ordinance between the Company and the Scheme Creditors, in its present form or with or subject to any non-material modifications, additions or conditions that the Hong Kong Court may think fit to approve or impose and agreed to by the Company. |
| "**Hong Kong Scheme Meetings**" | means collectively, the Class A Hong Kong Scheme Meeting and the Class C Hong Kong Scheme Meeting. |

227

"**Hong Kong Scheme Sanction Hearing**" means the hearing at the Hong Kong Court of the petition in respect of the sanctioning of the Hong Kong Scheme.

"**Hong Kong Scheme Sanction Order**"    means the sealed copy of the order of the Hong Kong Court sanctioning the Hong Kong Scheme.

"**Houlihan Lokey**"    means Houlihan Lokey (China) Limited.

"**IFRS**"    means the International Financial Reporting Standards.

"**Indentures**"    means each of:

(a) the indenture dated March 23, 2017, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing March 2022 Notes;

(b) the indenture dated April 11, 2019, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing April 2022 Notes;

(c) the indenture dated January 22, 2020, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing January 2023 Notes;

(d) the trust deed dated 14 February 2018, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing February 2023 Bonds;

(e) the indenture dated April 11, 2019, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing April 2023 Notes;

(f) the indenture dated June 28, 2017, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing June 2023 Notes;

(g) the indenture dated January 22, 2020, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International

228

(h) the indenture dated March 29, 2017, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing March 2024 Notes;

Limited as trustee governing the CEG Existing January 2024 Notes;

(i) the indenture dated April 11, 2019, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing April 2024 Notes;

(j) the indenture dated June 28, 2017, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing June 2025 Notes; and

(k) the indenture dated April 30, 2019, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing January 2022 Notes,

and collectively, the "**Indentures**", each governed by and construed in accordance with the laws of the State of New York.

| | |
|---|---|
| "**Information Agent**" | means Morrow Sodali Limited in its capacity as the Company's information agent. |
| "**Initial Distribution**" | means the A2 Package Initial Portion and the A2 Notes to be distributed on the Restructuring Effective Date to the Class A Scheme Creditors and/or the Holding Period Trustee in accordance with the Schemes. |
| "**Initial Participating Creditors**" | means the list of initial participating creditors listed in Schedule 1 (*The Initial Participating Creditors*) of the RSAs. |
| "**Initial Restricted Debts Notice**" | means the Restricted Debts Notices (as defined therein) to be provided by the Initial Participating Creditors in accordance with Clause 7.1 of the Class A RSA. |
| "**Initial Restricted Notes**" | means, in the case of: |

(a) an Initial Participating Creditor, the aggregate outstanding principal amount of the Class A Debts in which it has an economic or beneficial interest as principal at the date of the Class A RSA (as set out in its Initial Restricted Debts Notice); and

|  | (b) an Additional Participating Creditor, the aggregate outstanding principal amount of the Class A Debts in which it has an economic or beneficial interest as principal at the date of its Accession Letter (as set out in its Initial Restricted Debts Notice). |

**"Insolvency Event"** means a court of competent jurisdiction granting an order to commence any Insolvency Proceedings.

**"Insolvency Proceeding"** means, in any jurisdiction:

(a) the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration, bankruptcy, provisional supervision or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Company;

(b) a composition or arrangement with any creditor of the Company, or an assignment for the benefit of creditors generally of the Company or a class of such creditors;

(c) the appointment of a liquidator, receiver, administrator, administrative receiver, compulsory manager, provisional liquidator, provisional supervisor, restructuring officer or other similar officer in respect of the Company or any of its assets (other than the shares of a Subsidiary of the Company or as required to implement the Restructuring);

(d) enforcement of any security over any assets of the Company (other than the shares of a Subsidiary of the Company); or

(e) any procedure or step taken in any jurisdiction analogous to those set out in paragraphs (a) to (d) above.

**"Intermediary"** means a Person (other than an Account Holder) who holds an interest in the Existing Notes on behalf of another Person or other Persons.

**"Investor's Currency"** has the meaning given to it in Section 28.4 (*Risks Relating to the New Instruments*) of this Explanatory Statement.

**"Lake Noteholders"** means persons with an economic or beneficial interest as principal in the Lake Notes held in global form or global restricted form through the Clearing Systems as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of the determination of such persons' Entitlements), each of whom has a right, upon satisfaction of certain conditions, to be issued definitive registered notes in accordance with the terms of the Lake Notes and the Lake

230

|  | Notes Trust Deed, and (but without double counting in each case) any depository or trustee of the Lake Notes. |
|---|---|
| **"Lake Notes"** | means the US$260 million 8.5% senior notes due October 3, 2021 (ISIN: XS2054446617, Common Code: 205444661) issued by Jumbo Fortune Enterprises Limited. |
| **"Lake Notes Existing Agent"** | means China Construction Bank (Asia) Corporation Limited in its various capacities as (i) settlement agent, (ii) principal agent, transfer agent, calculation agent, registrar and (iii) original account bank under the Lake Notes. |
| **"Lake Notes Trust Deed"** | means the trust deed dated 3 October 2019, as amended, supplemented or otherwise modified from time to time, between Jumbo Fortune Enprises Limited, CEG, Tianji and China Construction Bank (Asia) Corporation Limited as trustee governing the Lake Notes. |
| **"Lake Notes Trustee"** | means China Construction Bank (Asia) Corporation Limited in its capacity as trustee under the Lake Notes. |
| **"Lake Notes Trustee and Agent"** | means collectively, the Lake Notes Trustee and the Lake Notes Existing Agent. |
| **"Liability"** | means any debt, liability or obligation whatsoever, whether it is present, future, prospective or contingent, whether directly or indirectly, whether or not its amount is fixed or undetermined, whether or not it involves the payment of money or the performance of an act or obligation, and whether arising at common law, in equity or by statute in or under the laws of the Cayman Islands, Hong Kong, the PRC, New York or under any other law or in any other jurisdiction howsoever arising and **"Liabilities"** shall be construed accordingly. |
| **"Liquidation Analysis"** | means the liquidation analysis prepared by Deloitte as set out in Schedule 2 (*Liquidation Analysis*) to this Explanatory Statement. |
| **"Listing Rules"** | means the Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited. |
| **"Longstop Date"** | means 15 December 2023, unless extended pursuant to Clause 3.6 of the Schemes. |
| **"Majority CEG AHG"** | means the member(s) of the CEG AHG holding a majority of the aggregate outstanding principal amount of the Restricted Debts (as defined under the Class A RSA) held by the CEG AHG at the relevant time. |
| **"Management"** | means the key management personnel of the Group, including the Board. |
| **"Maples and Calder"** | means Maples and Calder (Hong Kong) LLP, Maples and Calder (Cayman) LLP, and Maples and Calder (BVI) LLP, |

231

|  | in their capacity as advisors to the Company as to matters of Cayman Islands law and British Virgin Islands law. |
|---|---|
| "**Member States**" | means a member state of the EEA. |
| "**Minimum Denomination**" | means one of the Notes Minimum Denomination, EVPS MEB Minimum Denomination, NEV MEB Minimum Denomination or CEG MCB Minimum Denomination. |
| "**MiFID II**" | means Directive 2014/65/EU. |
| "**Minimum CEG AHG Threshold**" | means an aggregate outstanding principal amount of the Restricted Debts (as defined under the Class A RSA) constituting at least 10% of the outstanding principal amount of the Class A Debts, in accordance with the terms of the Class A RSA. |
| "**NEV**" | means China Evergrande New Energy Vehicle Group Limited, a subsidiary of the Company the shares of which are listed on the HKEX (Stock Code: 708). |
| "**NEV Custody Account Transfers**" | means the portion of NEV Shares converted from the Shareholder Loans which are required to be transferred to the escrow accounts of the relevant entity prescribed by the terms of the applicable Restructuring Documents (which shall be in the Agreed Form) in respect of the A2 NEV SLNs and the C2 NEV SLNs in order for such accounts to together hold NEV Shares representing approximately 30% of the total issued NEV Shares on a fully diluted basis (noting this may be subject to change in the event of a strategic investor) as of the Restructuring Effective Date. |
| "**NEV MEB Minimum Denomination**" | has the meaning set out in Section 27.3 of this Explanatory Statement. |
| "**NEV MEBs**" | means the Hong Kong dollar denominated mandatory exchangeable bonds to be issued by the Company and governed by the NEV MEBs Trust Deed. |
| "**NEV MEBs Trust Deed**" | means the Hong Kong law governed trust deed governing the NEV MEBs to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website, which shall be in the Agreed Form. |
| "**NEV Shares**" | means the ordinary shares of NEV. |
| "**NEV SLNs**" | means A2 NEV SLNs and C2 NEV SLNs. |
| "**New Instruments**" | means the A1 Notes, C1 Notes, EVPS MEBs, NEV MEBs, CEG MCBs A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs, C2 NEV SLNs, A2 Notes and C2 Notes, as further summarised in Schedule 8 (*Summary of Terms of the New Instruments*) to this Explanatory Statement. |

"**New Instruments Collateral Agent**"        means the collateral agent or any successor collateral agent under the New Instruments Documents and with respect to the Security Documents.

"**New Instruments Depositary**"        means the common depositary for the Clearing Systems, acting through its nominee as registered holder of the New Instruments, as set out in the New Instruments Documents.

"**New Instruments Documents**"        means:

(a)        the A1 Notes Indentures;

(b)        the C1 Notes Indentures;

(c)        the A2 Notes Indentures;

(d)        the C2 Notes Indentures;

(e)        the A2 EVPS SLNs Indentures;

(f)        the C2 EVPS SLNs Indentures;

(g)        the A2 NEV SLNs Indentures;

(h)        the C2 NEV SLNs Indentures;

(i)        the CEG MCBs Trust Deed;

(j)        the EVPS MEBs Trust Deed;

(k)        the NEV MEBs Trust Deed;

(l)        the Security Documents; and

(m)        any documents in respect of the New Instruments to be issued pursuant to the Restructuring,

which in each case shall be in the Agreed Form and in substantially the form to be made available on the Transaction Website.

"**New Instruments Paying and Transfer Agent and Registrar**"        means the paying agent, transfer agent, and/or registrar or any successor paying agent, transfer agent, and/or registrar in respect of the New Instruments.

"**New Instruments Subsidiary Guarantees**"        means such guarantees by the New Instruments Subsidiary Guarantors in respect of the New Instruments pursuant to the relevant New Instruments Documents.

"**New Instruments Subsidiary Guarantors**"        means such Persons who will guarantee the obligations of the Company and/or other obligors in respect of the New Instruments pursuant to the New Instruments Documents as at the relevant date (as applicable).

"**New Instruments Subsidiary Pledgors**" means such Persons who will provide and/or grant Security in respect of the obligations of the Company and/or other obligors in respect of the applicable New Instruments pursuant to the relevant New Instruments Documents, as at the Restructuring Effective Date.

"**New Instruments Trustee**"    means the trustee or any successor trustee under and as defined in the New Instruments Documents.

"**New Intercreditor Agreements**"    means the A1/A2 Intercreditor Agreement, Asset List 1 Intercreditor Agreement and the Asset List 2 Intercreditor Agreement, in substantially the form to be made available on the Transaction Website subject to any modifications required or approved in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*) of the Schemes.

"**Notes Minimum Denomination**"    has the meaning set out in Section 27.2 of this Explanatory Statement.

"**On-Lent Loan**"    means amounts on-lent to CEG pursuant to the loan agreement relating to the provision of the Class A Private Loan

"**Option 1 Scheme Consideration**"    means the relevant portion of the rights and interests in the A1 Notes and C1 Notes as elected by the relevant Scheme Creditor to be distributed to Scheme Creditors (and/or their Designated Recipients, as applicable) under and pursuant to the terms of the respective Schemes (and, without double counting, any Residual New Instruments and Blocked New Instruments), set out in Clause 13 (*Calculation of a Scheme Creditor's Entitlement*) of the Schemes.

"**Option 2 Scheme Consideration**"    means the relevant portion of the rights and interests in the A2 Notes, C2 Notes, EVPS MEBs, NEV MEBs, CEG MCBs, EVPS SLNs and NEV SLNs as elected by the relevant Scheme Creditor to be distributed to Scheme Creditors (and/or their Designated Recipients, as applicable) under and pursuant to the terms of the respective Schemes (and, without double counting, any Residual New Instruments and Blocked New Instruments), set out in Clause 13 (*Calculation of a Scheme Creditor's Entitlement*) of the Schemes.

"**Original Issue Date**"    has the meaning given to it in Schedule 8 (*Summary of Terms of the New Instruments*).

"**Oversubscription**" or    means a scenario where the total valid elections of Scheme
"**Oversubscribed**"    Creditors for Option 2 Scheme Consideration results in, either:

(a)    (x) the total amount of the Class A Scheme Creditors' Entitlement elected for the A2 Package, being greater than (y) the total aggregate principal amount of all

234

instruments included in the A2 Package Initial Portion; or

(b)  (x) the total amount of the Class C Scheme Creditors' Entitlement elected for the C2 Package, being greater than (y) the total aggregate principal amount of all instruments included in the C2 Package Adjusted Portion,

and the "**Oversubscribed Portion**" means the amount representing (x) *minus* (y) in (a) or (b) above (as applicable).

| | |
|---|---|
| "**Participating Creditor**" | means a Scheme Creditor who has agreed to be bound by an RSA as a Participating Creditor in accordance with the terms of the respective RSA. |
| "**Perpetuity Period**" | means the period from the date the Successor Escrow Account is established until 21 years after that date, or such further period as the Successor Escrow Agent determines in its sole discretion (and without any obligation to do so). |
| "**Person**" | means any natural person, corporation, limited or unlimited liability company, trust, joint venture, association, corporation, partnership, Governmental Entity or other entity whatsoever. |
| "**Personnel**" | means, in relation to any Person, its current and former officers, partners, directors, employees, staff, agents, counsel and other representatives. |
| "**Plain A2 Notes**" | means tranches A, B, C and D of the new A2 notes to be issued by the Company and governed by the Plain A2 Notes Indenture, and to be distributed to Class A Scheme Creditors referred to in Clause 16.8(c)(i) of the Schemes in accordance with the terms of the Restructuring Documents. |
| "**Plain A2 Notes Indentures**" | means the New York law governed indentures governing the Plain A2 Notes to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the Plain A2 Notes and with the modifications required to reflect the different terms of the different tranches of the Plain A2 Notes as set out in this Explanatory Statement, each of which shall be in the Agreed Form. |
| "**Portal**" | means https://portal.morrowsodali.com/EvergrandeScheme. |
| "**PRC**" | means the People's Republic of China, which for the purposes of the Schemes, excludes Taiwan, Hong Kong and the Macao Special Administrative Region of the PRC. |
| "**PRIIPs Regulation**" | means Regulation (EU) No 1286/2014. |
| "**Prism**" | means Prism Hong Kong and Shanghai Limited, in their capacity as auditor of the Company. |

"**Proceeding**"    means any process, suit, action, legal or other legal proceeding including without limitation any arbitration, mediation, alternative dispute resolution, judicial review, adjudication, demand, statutory demand, execution, distraint, forfeiture, re-entry, seizure, lien, enforcement of judgment, enforcement of any security or insolvency proceedings in any jurisdiction.

"**Prospectus Directive**"    means Directive 2003/71/EC (and amendments thereto, including Directive 2010/73/EU) and includes any relevant implementing measure in each member state.

"**Prospectus Regulation**"    means Regulation (EU) 2017/1129.

"**Proxy Voting Forms**"    means, as applicable, a proxy voting form submitted in the form appended to the Account Holder Letter, and/or a Class C Scheme Creditor Proxy Form and/or a Class A Private Lender Proxy Form.

"**QIBs**"    means "**qualified institutional buyers**" as defined in Rule 144A under the US Securities Act.

"**Recognition Filings**"    means (i) the filing of a petition for recognition of the Hong Kong Scheme under Chapter 15 of the US Bankruptcy Code; (ii) the filing of a request for the US Bankruptcy Court to grant the Chapter 15 Recognition Order; and (iii) any other filings submitted in the US Bankruptcy Court that are necessary to effectuate the Chapter 15 Recognition Proceeding.

"**Record Date Balance**"    means a credit balance created by the Clearing Systems and maintained in the records of the Clearing Systems and Existing Notes Depositary in favour of those Class A Noteholders at the Entitlement Record Time who did not submit or did not have submitted on their behalf Custody Instructions by the Custody Instruction Deadline and/or a validly completed Account Holder Letter, Distribution Confirmation Deed and, if applicable, Designated Recipient Form by the Class A Options Deadline.

"**Reference Date**"    means the earlier of October 1, 2023 and the Restructuring Effective Date.

"**Referred Scheme Claim**"    means a Class C Scheme Creditor's Entitlement that is:

(a) not agreed by the Class C Scheme Creditor and the Scheme Administrator during the Consultation Period; or

(b) adjusted by the Scheme Administrators and disputed by the Class C Scheme Creditor pursuant to Clause 37.10, and

is referred to the Scheme Adjudicator for determination in accordance with Clause 40 (Adjudication Procedure) of the Schemes.

"**Regulation D**"    means Regulation D under the US Securities Act.

236

| | |
|---|---|
| "**Regulation S**" | means Regulation S under the US Securities Act. |
| "**Related Party Loan**" | means the HK$2,200,000,000 (equivalent to c. US$282,776,350) loans to NEV, pursuant to (a) the loan agreement in respect of HK$1,400,000,000 dated 7 January 2022 provided by Ms. Ding Yumei, (b) the loan agreement in respect of HK$200,000,000 dated 8 September 2023 provided by Ms. Ding Yumei and (c) the loan agreement in respect of HK$600,000,000 dated 10 November 2021 provided by Good Bond Limited (wholly-owned by Ms. Ding Yumei). |
| "**Released Claims**" | means any (i) Scheme Claims, (ii) Class A Group Claims, (ii) Ancillary Claims or (iii) Restructuring Claims. |
| "**Released Persons**" | means (i) the Company, the Existing Notes Subsidiary Pledgors, the Existing Notes Subsidiary Guarantors and the Group, (ii) the Existing Notes Trustee, the Existing Notes Collateral Agent, the Existing Notes Depositary, the Existing Notes Paying and Transfer Agent and Registrar, (iii) the New Instruments Depositary, the New Instruments Paying and Transfer Agent and Registrar, and the New Instruments Trustee, and the New Instruments Collateral Agent, (iv) the Holding Period Trustee, (v) the Exchange and Conversion Agent, (vi) the Escrow Agent, (vii) the Account Bank, (viii) the Information Agent, (ix) the Scheme Administrators, (x) the Scheme Adjudicators, (xi) the CEG AHG (including each CEG AHG member's respective managers and investment managers' and investment advisors' Affiliates and funds and in each case, including any of its respective directors, managers or officers), (xii) the Advisors and (xiii) the AHG Advisors; and, regarding each of the above, includes each of their respective predecessors, successors and assigns (where applicable) and their respective Personnel in their capacities as such, and "**Released Person**" shall be construed accordingly. |
| "**Releases**" | has the meaning given to it in Clause 28 (*Releases*) of the Schemes. |
| "**Relevant Collateral**" | means any security, collateral, guarantee, bond, indemnity or other form of assurance granted for the purpose of securing and/or guaranteeing (i) any Class A Debt, provided by the Company and any of its subsidiaries, and/or (ii) any Class C Debt, provided by the Company only. |
| "**Relevant Persons**" | has the meaning given to it in Section 2.4 (*United Kingdom*) of this Explanatory Statement. |
| "**Residual New Instruments**" | means the portion of New Instruments which remains available for distribution to the Eligible Creditors, Blocked Scheme Creditors and/or Designated Recipients (as applicable) after the distribution of Scheme Consideration on the Restructuring Effective Date, in accordance with the |

|  | terms of the Schemes, including New Instruments which are not issued on the Restructuring Effective Date. |
|---|---|
| "**Restricted Debts**" | means, with respect to a Participating Creditor at any time, the aggregate outstanding principal amount of Class A Debts or Class C Debts (as the case may be) set out in the Restricted Debts Notice (as defined in the relevant RSA) then most recently delivered by that Participating Creditor, as modified from time to time by any Transfer Notices (as defined in the relevant RSA) (as applicable) delivered by Participating Creditors to the Information Agent, subject to evidence satisfactory to the Information Agent , in accordance with the terms of the RSAs; and "Restricted Debt" means any portion of the Restricted Debts. |
| "**Restricted Subsidiaries**" | has the meaning given to that term under the New Instruments Documents. |
| "**Restructuring**" | means the restructuring of the debt and other offshore financial obligations of CEG and the Existing Notes Subsidiary Guarantors and certain other offshore subsidiaries of CEG as contemplated by, *inter alia*, the Restructuring Documents and the Schemes. |
| "**Restructuring Claims**" | means any past, present and/or future Claim by a Scheme Creditor against a Released Person in respect of: (A) the preparation, negotiation, execution, sanction or implementation of the Schemes and/or the Restructuring and/or the Restructuring Documents; and/or (B) the execution of the Restructuring Documents and the carrying out of the steps and transactions contemplated therein in accordance with their terms, but, in each case, excluding for the avoidance of doubt, any Claim in respect of any Liability (i) of any Released Person which arises as a result of a failure to comply with any of the terms of the Schemes or any Restructuring Document (including but not limited to the New Instruments Documents) and (ii) arising from or in connection with any Excluded Liability or Excluded Collateral, and "**Restructuring Claim**" shall be construed accordingly. |
| "**Restructuring Documents**" | means the documents to be entered into by certain parties to implement the terms of the Restructuring including, but not limited to, the New Instruments Documents and the documents listed in Schedule 1 (*Restructuring Documents*) to the Schemes in each case shall be in the Agreed Form. |
| "**Restructuring Effective Date**" | means the date on which all of the Restructuring Effective Date Conditions have been satisfied or waived (as the case may be). |
| "**Restructuring Effective Date Conditions**" | means the conditions set out in Schedule 3 (*Restructuring Effective Date Conditions*) to the Schemes. |

| | |
|---|---|
| "**Restructuring Effective Date Conditions Subsequent**" | means the conditions set out in Clause 6.6 of the Schemes. |
| "**RMB Bondholders**" | means persons with a legal interest as principal in the RMB Bonds held in through the Shanghai Stock Exchange as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of the determination of such persons' Entitlements), each of whom has a right, upon satisfaction of certain conditions, to be repaid the outstanding principal and coupon of the RMB Bonds. |
| "**RMB Bonds**" | means the 15 Hengda 03 RMB bonds issued by Hengda Real Estate and listed on the Shanghai Stock Exchange, in which the Company guaranteed the repurchase of the RMB Bonds at the Redemption Date (as defined in the indenture for the RMB Bonds) if Hengda Real Estate failed to ensure sufficient funds in the bank account to repay the RMB Bondholders 3 business days prior to the Redemption Date and the RMB Bondholders so demanded. The outstanding principal amount of the RMB Bonds is RMB8.2 billion. |
| "**RMB Bonds Trustee**" | means Guotai Junan Securities Co., Ltd., as trustee manager of the RMB Bonds. |
| "**RSAs**" | means collectively, the Class A RSA and the Class C RSA, and "**RSA**" means either one of the RSAs. |
| "**Rule 144A**" | means Rule 144A under the US Securities Act. |
| "**Sanctioned Country**" | means any country or territory that is the target of any comprehensive country or territory-wide Applicable Sanctions (being, as at the date of the Explanatory Statement, the territories of Crimea, Donetsk and Luhansk, and the countries of Cuba, Iran, North Korea and Syria). |
| "**Sanctioned Scheme Creditor**" | means a Scheme Creditor that is: |

    (a)    designated on any Applicable Sanctions List;

    (b)    resident in, ordinarily located in, or incorporated or domiciled under the laws of any Sanctioned Country;

    (c)    in the aggregate, 50 percent or greater owned, directly or indirectly, or otherwise controlled, directly or indirectly, (in each case with reference to Applicable Sanctions) by any Person or Persons described in (a) or (b) above of this definition; or

    (d)    acting on behalf of or at the direction of any Person or Persons described in (a) or (b) above of this definition,

and which does not have a sanctions licence in respect of the Applicable Sanctions which would allow that Scheme

|  | Creditor to freely deal in the Scheme Consideration and submit instructions or settle through the Clearing Systems. |
|---|---|
| "**Sanctions-Affected Scheme Creditor**" | means a Blocked Scheme Creditor or a Sanctioned Scheme Creditor. |
| "**Sanctions Law Representations**" | means the sanctions law confirmations and undertakings set out in the Distribution Confirmation Deed forming part of the Solicitation Packhet, as published on the Transaction Website. |
| "**Scheme Adjudicator**" | means an adjudicator appointed by the Company under Clause 40.2 of the Schemes. |
| "**Scheme Administrator**" | means Mr P Cowley, Ms Y M Lui or Mr C Ball of KPMG Advisory (Hong Kong) Limited and any individual who is appointed Scheme Administrator under Clause 37 (*The Scheme Administrators*) of the Schemes, and "**Scheme Administrators**" shall be construed accordingly. |
| "**Scheme Administrator Estimate**" | means the Scheme Administrators' estimate of a Class C Scheme Creditor's Entitlement pursuant to Clause 38.2 of the Schemes. |
| "**Scheme Administrator Estimate Acceptance or Rejection Form**" | means the form to be submitted by a Class C Scheme Creditor in response to the Estimation Notice indicating their acceptance or rejection of the Scheme Administrator Estimate, pursuant to Clause 38.4 of the Schemes. |
| "**Scheme Claim**" | means any Claim by a Scheme Creditor against CEG under or in respect of the Existing Finance Documents whether at, before or after the Voting Record Time (including, for the avoidance of doubt, all accrued and unpaid interest on the Existing Finance Documents up to (but excluding) the Restructuring Effective Date, or accretions arising in respect of, such Claims before, at or after the Voting Record Time but, excluding for the avoidance of doubt, (i) any Claim in respect of any Liability of CEG which arises as a result of a failure to comply with any of the terms of the Schemes or any Restructuring Document (including but not limited to the New Instruments Documents), or (ii) in respect of Class C Scheme Creditors, any Claim not against CEG arising from or in connection with any Excluded Liability or Excluded Collateral). |
| "**Scheme Conditions**" | means: |
|  | (a) the sanction with or without modification (but subject to any such modification being acceptable to the Company and in accordance with the terms of the Cayman Scheme) of the Cayman Scheme by the Cayman Court; |

(b) the sanction with or without modification (but subject to any such modification being acceptable to the Company and in accordance with the terms of the Hong Kong Scheme) of the Hong Kong Scheme by the Hong Kong Court;

(c) the delivery of the Cayman Scheme Sanction Order to the Cayman Registrar of Companies for registration; and

(d) the delivery of the Hong Kong Scheme Sanction Order to the Hong Kong Companies Registrar for registration.

| | |
|---|---|
| "**Scheme Consideration**" | means the relevant portion of the rights and interests in the New Instruments as elected by the relevant Scheme Creditor to be distributed to Scheme Creditors (and/or their Designated Recipients, as applicable) under and pursuant to the terms of the respective Schemes (and, without double counting, any Residual New Instruments and Blocked New Instruments). |
| "**Scheme Convening Hearings**" | means the hearing before the Cayman and Hong Kong Courts following which the Cayman and Hong Kong Courts issued the Scheme Convening Orders. |
| "**Scheme Convening Orders**" | means the order of the Cayman and Hong Kong Court dated 25 July 2023 and 24 July 2023 respectively, ordering, amongst other things, that CEG be at liberty to convene Class A Scheme Meetings and Class C Scheme Meetings for the purpose of considering and, if thought fit, approving the respective Schemes. |
| "**Scheme Creditor Form**" | means: |

(a) in respect of the Class A Noteholders and the Class C Noteholders (who are not Sanctions-Affected Scheme Creditors), a validly completed Account Holder Letter;

(b) in respect of the Class A Private Lenders (who are not Sanctioned Scheme Creditors), a validly completed Class A Private Lender Proxy Form;

(c) in respect of the Class C Scheme Creditors other than the Class C Noteholders (who are not Sanctioned Scheme Creditors), a validly completed Class C Scheme Creditor Proxy Form; and

(d) in respect of Blocked Scheme Creditors, a validly completed Blocked Scheme Creditor Form,

in each case (other than for Blocked Scheme Creditors) together with a validly completed Distribution Confirmation Deed and Designated Recipient Form (if applicable).

| | |
|---|---|
| "**Scheme Creditor Releasing Parties**" | has the meaning given to it in Clause 28.2 of the Schemes. |
| "**Scheme Creditors**" | means, collectively, the Class A Scheme Creditors and the Class C Scheme Creditors, and "**Scheme Creditor**" means one of the Scheme Creditors. |
| "**Scheme Effective Date**" | means the first Business Day on which all of the Scheme Conditions are satisfied and the Schemes become effective, as specified in the Scheme Effective Date Notice. |
| "**Scheme Effective Date Notice**" | means the notice to be issued by the Company and delivered to the Information Agent in accordance with Clause 7.1 of the Schemes confirming satisfaction of the Scheme Conditions and specifying the Scheme Effective Date. |
| "**Scheme Meetings**" | means collectively, the Cayman Scheme Meetings and the Hong Kong Scheme Meetings, and "**Scheme Meeting**" means either one of the Scheme Meetings. |
| "**Scheme Recovery Analysis**" | means the recovery analysis prepared by Deloitte as set out in Schedule 3 (*Scheme Recovery Analysis*) to this Explanatory Statement. |
| "**Scheme Sanction Hearings**" | means collectively, the Cayman Scheme Sanction Hearing and the Hong Kong Scheme Sanction Hearing, and "**Scheme Sanction Hearing**" means either one of the Scheme Sanction Hearings. |
| "**Scheme Sanction Orders**" | means collectively, the Cayman Scheme Sanction Order and the Hong Kong Scheme Sanction Order. |
| "**Scheme Steps**" | means the steps set out in Clause 6 (*Scheme Steps*) of the Schemes. |
| "**Schemes**" | means, collectively, the Cayman Scheme and the Hong Kong Scheme, and "**Scheme**" means either one of the Schemes. |
| "**SEC**" | means the US Securities and Exchange Commission. |
| "**Securities Law Representations**" | means the securities law confirmations and undertakings set out in the Distribution Confirmation Deed forming part of the Solicitation Packet, as published on the Transaction Website. |
| "**Security**" | means the security constituted pursuant to the Security Documents. |
| "**Security Documents**" | means the security documents to be entered into in connection with Collateral of the New Instruments which will be made available (in substantially final form) on the |

|  | Transaction Website, each of which shall be in the Agreed Form. |
|---|---|
| "**SFA**" | means the Securities and Futures Act, Chapter 289 of Singapore, as modified or amended from time to time. |
| "**SFO**" | means the Securities and Futures Ordinance (Cap. 571 of the Laws of Hong Kong), as modified or amended from time to time. |
| "**SGX-ST**" | means Singapore Exchange Securities Trading Limited. |
| "**Shareholder Loans**" | means: |

(a) the loans by the Chairman and Xin Xin (BVI) Limited to NEV totaling HK$2,650,000,000 (equivalent to approximately US$340,616,967); and

(b) the loan by CEG to NEV totaling Hk$16,044,613,901.

| "**Singapore**" | means the Republic of Singapore. |
|---|---|
| "**Solicitation Packet**" | means the packet of materials, including the Account Holder Letter and accompanying instructions, the Designated Recipient Form, the Distribution Confirmation Deed, the Proxy Voting Forms and the Blocked Scheme Creditor Form, all of which are available to Scheme Creditors on the Transaction Website. |
| "**Successor Escrow Account**" | means an escrow account to be established for the Perpetuity Period or until the lifting of Applicable Sanctions in respect of all Blocked Scheme Creditors, whichever is earlier, by an agent to be appointed by CEG pursuant to the Successor Escrow Agreement for the purposes of holding the Blocked Assets after the expiration of the Holding Period for the Blocked Scheme Creditors who have submitted a validly completed Blocked Scheme Creditor Form together with supporting evidence to CEG prior to the Class A Bar Date or Class C Bar Date (as applicable). |
| "**Successor Escrow Agent**" | means the Person to be appointed by CEG as escrow agent for the Successor Escrow Account. |
| "**Successor Escrow Agreement**" | means the agreement providing for the creation of the Successor Escrow Account, under which the Successor Escrow Agent shall hold the Blocked Assets for the Company, in a form approved by the Successor Escrow Agent. |
| "**Super Majority Participating Creditors**" | means, at any time, Participating Creditors who: (i) have agreed to be bound by the terms of the Class A RSA and (ii) hold (beneficially or legally (as applicable), as principal) in aggregate at least 66 2/3% of the outstanding principal amount of the Restricted Debts (as defined under the Class |

243

|   |   |
|---|---|
|   | A RSA) held in aggregate by all Participating Creditors who have agreed to be bound by the terms of the Class A RSA at that time (for the avoidance of doubt, excluding the Existing Notes beneficially and/or legally (as applicable) held by the Sponsors and their (as applicable) Affiliates which are in the aggregate amount of US$50,000,000 as at the date of the RSAs). |
| "**Term Sheet**" | means the restructuring term sheet in respect of CEG's offshore indebtedness dated 20 March 2023 between (among others) CEG and the Chairman, as amended, restated and/or supplemented from time to time. A redacted copy of the Term Sheet as of the date of the RSAs, incorporating amendments made by CEG to cure certain defects and omissions in accordance with the terms thereto, can be found on the Transaction Website specified in the Company's announcement on the HKEX at: https://www1.hkexnews.hk/listedco/listconews/sehk/2023/0403/2023040304093.pdf |
| "**TJ Scheme**" | means the scheme of arrangement to be proposed by Tianji Holding Limited under Sections 670, 673 and 674 of the Hong Kong Companies Ordinance. |
| "**TJ Scheme Consideration**" | means any consideration received by CEG as a scheme creditor as part of the restructuring, pursuant to the TJ Scheme (and, without double counting, any Blocked TJ Scheme Consideration). |
| "**Total Package**" | has the meaning set out in Clause 15.1 of the Schemes. |
| "**Transaction Website**" | means https://projects.morrowsodali.com/evergrande. |
| "**Treasure Glory**" | means Treasure Glory Global Limited. |
| "**UK**" | means the United Kingdom. |
| "**UK MiFIR**" | means Regulation (EU) 600/2014 as retained by UK law by EUWA and as amended by UK domestic law. |
| "**UK PRIIPs Regulation**" | means Regulation (EU) No 1286/2014 as retained as UK law by EUWA and as amended by the UK Prospectus Regulation. |
| "**UK Prospectus Regulation**" | means Regulation (EU) 2017/1129 as retained as UK law by EUWA and as amended by UK domestic law. |
| "**UK Qualified Investor**" | has the meaning given to it at Section 2.4 (*United Kingdom*) of this Explanatory Statement. |
| "**Undersubscription**" or "**Undersubscribed**" | means a scenario where the total valid elections of Scheme Creditors for Option 2 Scheme Consideration results in, either: |
|   | (a)  (x) the total amount of the Class A Scheme Creditors' Entitlement elected for the A2 Package, being less than |

(y) the total aggregate principal amount of all instruments included in the A2 Package Initial Portion; or

(b) (x) the total amount of the Class C Scheme Creditors' Entitlement elected for the C2 Package, being less than (y) the total aggregate principal amount of all instruments included in the C2 Package Adjusted Portion,

and the "**Undersubscribed Portion**" means the amount representing (y) *minus* (x) in (a) or (b) above (as applicable).

| | |
|---|---|
| "**United States**" or "**US**" | means the United States of America. |
| "**United States Code**" | means the codification by subject matter of the general and permanent laws of the United States. |
| "**Unrestricted Subsidiary**" | means (1) any subsidiary of CEG that at the time of determination shall be designated an Unrestricted Subsidiary by the Board in the manner provided in the Indenture; and (2) any subsidiary of an Unrestricted Subsidiary. |
| "**US Bankruptcy Code**" | means Title 11 of the United States Code, as in effect on the date of the Recognition Filing. |
| "**US Bankruptcy Court**" | means the United States Bankruptcy Court for the Southern District of New York. |
| "**US GAAP**" | means the United States Generally Accepted Accounting Principles. |
| "**US Securities Act**" | means the US Securities Act of 1933, as amended, including the rules and regulations promulgated by the SEC thereunder. |
| "**US$**" | the lawful currency for the time being of the United States. |
| "**Valuation and Adjudication Procedure**" | means, together, the Valuation Procedure and the Adjudication Procedure. |
| "**Valuation Procedure**" | means the procedure for determining the value of a Class C Scheme Creditor's Entitlement, as set out in Clause 38 (*Valuation Procedure*) of the Schemes. |
| "**Valuer**" | means a suitably qualified and experienced valuer(s) (in the reasonable opinion of the Scheme Administrators) specialising in the valuation of onshore real estate projects and the companies associated with such projects, who is engaged by the Scheme Administrators under Clause 37.6(e) of the Schemes. |
| "**Venice Loan**" | has the meaning set out in Schedule 2 of the Schemes. |
| "**Venice SPA**" | has the meaning set out in Schedule 2 of the Schemes. |

245

| | |
|---|---|
| "**Voting Record Time**" | means 5.00 p.m. Hong Kong time on 18 August 2023, the equivalent being 4.00 a.m. Cayman Islands time on 18 August 2023. |
| "**Voting Scheme Claims**" | means, for assessing a Scheme Creditor's Scheme Claims for voting purposes at the Voting Record Time, (without double-counting, and without permitting duplicative claims or portions of claims against the Company other than for US$1). |

Generally, in respect of Class A Scheme Creditors or Class C Scheme Creditors, a value equal to the sum of (i) the outstanding principal amount or (in the case of a put option or repurchase obligation) price amount of the relevant Class A Debts or Class C Debts, and (ii) all accrued and unpaid interest relating to such debts up to (but excluding) the Voting Record Time, subject to the Chairperson's discretion;

(a) in respect of Existing Notes, Dongpo Notes and Lake Notes, in which each Class A Noteholder and Dongpo Noteholder or Lake Noteholder held an economic or beneficial interest as principal at the Voting Record Time each determined in accordance with the typical calculations of the Existing Notes Trustee, Dongpo Notes Trustee and Lake Notes Trustee, and subject to the Information Agent's reconciliation of the Account Holder Letters with any blocking instructions recorded by the Clearing Systems and the Chairperson's discretion;

(b) in respect of Class A Lenders and Class C Scheme Creditors (other than the Class C Noteholders), subject to paragraphs (c) and (d) below, a value equal to the amount which the Chairperson, based on information provided by the Company (its agent or person instructed by it) (as relevant), considers is a fair and reasonable assessment of the Scheme Claim of such Scheme Creditor at the Voting Record Time;

(c) in respect of the Class C Scheme Claims, without deducting any amount for the value of the Excluded Liabilities and Excluded Collateral; and/or

(d) in respect of a Class C Scheme Claims relating to a put option or repurchase obligation, without deducting any amount for the value of any securities retained by the holder to which the put option or repurchase obligation relates.

2.    **INTERPRETATION**

In this Explanatory Statement, unless the context otherwise requires or otherwise expressly provided:

(a)    words denoting the singular number only shall include the plural number also and vice versa;

(b)    words denoting one gender only shall include the other genders;

(c)    words denoting persons only shall include firms and corporations and vice versa;

(d)    references to an agreement, deed or document shall be deemed also to refer to such agreement, deed or document as amended, supplemented, restated, verified, replaced and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto;

(e)    references to any statutory provision shall be deemed also to refer to any statutory modification or re-enactment thereof or any statutory instrument, order or regulation made thereunder or under any such re-enactment;

(f)    unless expressed otherwise, references to US dollars or US$ are references to the currency of the United States of America;

(g)    any reference in this Part 2 (*Interpretation*) of Schedule 1 (*Definitions and Interpretation*) to any document whose meaning is stated to be the meaning given to a document as defined in the Explanatory Statement shall be construed as a reference to that document as amended, varied, novated, restated, modified, supplemented or re-enacted or replaced prior to the date of this Explanatory Statement;

(h)    the words "**include**" and "**including**" are to be construed without limitation, general words introduced by the word "**other**" are not to be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things and general words are not to be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words; clause, section and schedule headings are for ease of reference only;

(i)    a company is a "**subsidiary**" of another company, its "**holding company**", if that other company: (a) holds a majority of the voting rights in it; (b) is a member of it and has the right to appoint or remove a majority of its board of directors; or (c) is a member of it and controls alone, pursuant to an agreement with other members, a majority of the voting rights in it, or, if it is a subsidiary of a company that is itself a subsidiary of that other company;

(j)    an "**undertaking**" means a body corporate or partnership; or an unincorporated association carrying on a trade or business, with or without a view to profit; and an undertaking is a parent undertaking in relation to another undertaking, a "**subsidiary undertaking**", if: (a) it holds the majority of voting rights in the undertaking; (b) it is a member of the undertaking and has the right to appoint or remove a majority of its board of directors; (c) it has the right to exercise a dominant influence over the undertaking: (i) by virtue of provisions contained in the undertaking's articles; or (ii) by virtue of a control contract; or (d) it is a member of the undertaking and controls alone, pursuant to an agreement with other shareholders or members, a majority of the voting rights in the undertaking;

(k)    clause, section and schedule headings are for ease of reference only;

(l)    the word "c." denotes an approximation of a figure;

(m)     unless otherwise stated, a reference to a time of day shall be construed as a reference to Hong Kong time;

(n)     to the extent that there is any conflict or inconsistency between the terms of this Cayman Scheme and the Explanatory Statement, the terms of this Cayman Scheme shall prevail;

(o)     any formulas, numbers, calculation methodology may have accounted for and/or is subject to rounding;

(p)     a reference to this Explanatory Statement includes a reference to the preliminary sections and schedules of this Explanatory Statement; and

(q)     references to any person shall include references to its successors, transferees and assigns and any Person deriving title under or through it.

248

## SCHEDULE 2

## LIQUIDATION ANALYSIS







China Evergrande Group
Liquidation Analysis Report

**17 July 2023**

Deloitte.

# Deloitte.

德勤

Deloitte Financial Advisory Services
A division of Deloitte Advisory
(Hong Kong) Limited
35/F One Pacific Place
88 Queensway
Hong Kong

Tel: +852 2852 1600
Fax: +852 2541 1911
Email: enquiry@deloitte.com.hk
www.deloitte.com/cn

**Glen Ho**
Engagement Partner
+852 2852 1643
gleho@deloitte.com.hk

**Cindy Sun**
Engagement Partner
+86 755 33538380
xysun@deloitte.com.cn

**Karen Chu**
Engagement Partner
+852 2852 1680
karchu@deloitte.com.hk

**Kevin Feng**
Engagement Director
+86 755 33538038
kevfeng@deloitte.com.cn

China Evergrande Group
15th Floor, YF Life Centre
38 Gloucester Road
Wanchai, Hong Kong

Scenery Journey Limited
15th Floor, YF Life Centre
38 Gloucester Road
Wanchai, Hong Kong

Tianji Holding Limited
15th Floor, YF Life Centre
38 Gloucester Road
Wanchai, Hong Kong

Dear Sirs,

**RE: Liquidation Analysis Report**

We enclose our report (the **"Report"**) in connection with the limited scope liquidation analysis of the offshore debts of China Evergrande Group (**"CEG"**, the **"Company"**), Scenery Journey Limited (**"SJ"**) and Tianji Holding Limited (**"Tianji"**) on an entity-by-entity basis based on a hypothetical liquidation scenario in accordance with our engagement letter dated 15 July 2022, the first supplementary agreement dated 20 June 2023 and the second supplementary agreement dated 17 July 2023 (collectively referred to as the **"Agreement"**).

The Report was prepared solely for the benefit of the Company, SJ and Tianji only. No other party is entitled to rely on the Report for any purpose whatsoever and we accept no duty of care or liability to any other party who is shown or gains access to the Report.

The Report has been prepared based on the limited information provided to Deloitte Advisory (Hong Kong) Limited (**"DAHK"**). The scenarios presented in the Report involve extensive use of estimates and assumptions, which are inherently subject to uncertainties and contingencies beyond the control of the Group, its management and advisors. The assumptions will need to be reviewed and revised to reflect any future changes in the circumstances of any of the companies or the underlying assets. We draw your attention to the "Disclaimers" (page3) and the sections titled "Scope of Work" (page 9), "Sources of Information" (page 11) and "Limitations" (pages 41-42) of the Report.

The Report is prepared based on information received up to 14 July 2023 (**"Cut-Off Date"**), we have not updated our work since then.

Yours faithfully,
For and on behalf of
**Deloitte Advisory (Hong Kong) Limited**

© 2023. For information, contact Deloitte China.

# Disclaimers

- This Report (the **"Report"**) was prepared in connection with the results of the limited scope analysis on the estimated recoveries of certain debts of China Evergrande Group (the **"Company"** or **"CEG"**), Scenery Journey Limited (**"SJ"**) and Tianji Holding Limited (**"Tianji"**) on an entity-by-entity basis under a hypothetical liquidation scenario of CEG and its subsidiaries (the **"Group"**) as at 1 January 2023 (the **"Liquidation Analysis"**) in accordance with the terms of the engagement agreement dated 15 July 2022, the first supplementary agreement dated 20 June 2023 and the second supplementary agreement dated 17 July 2023 entered into between the Company, SJ, Tianji and Deloitte Advisory (Hong Kong) Limited (**"DAHK"** or **"we"** or **"us"**).

- Information contained in the Report is subject to the disclaimers, scope of work, sources of information, assumptions and limitations set out herein.

- By reviewing the Report, the creditors of the schemes of arrangement of CEG, SJ and Tianji (the **"Scheme Creditors"**) and other party who gains access to the Report shall be deemed to have read, and to have irrevocably acknowledged and agreed to comply with, the following contents of this disclaimer:

  - The Report was prepared solely for the benefit of the Company, SJ and Tianji and, save in respect of the Company, SJ and Tianji, we accept no duty of care or liability to any other party regardless of whether or not a party was shown or gained access to the Report, or is a Scheme Creditor placing reliance on the Report;

  - With respect to dealing in shares, the Report may contain material non-public information of the Company. Thus, any disclosure, copying, or distribution of the Report or the taking of any action based on it, which would constitute insider dealing with respect to shares in the Company, is strictly prohibited;

  - The Liquidation Analysis was prepared for indicative and illustrative purposes only. The actual recoveries may vary subject to, among other things, the actual proceeds of realisation of the assets, the costs and expenses actually incurred incidental to the liquidation/ disposal and the amounts of the claims submitted and ultimately admitted as claims against the Company and its subsidiaries. Thus, the actual recoveries could be materially different from the estimated recoveries set out in the Report;

  - The Report was prepared on the basis of information, including unaudited information, received by DAHK up to 14 July 2023 and DAHK has not updated the Report since that date. DAHK relied on the financials and other information provided to it and on representations made to it by management of the Group, and the relevant companies' respective staff and advisors. DAHK did not audit or verify the correctness and accuracy of the information provided to it and DAHK does not express an audit opinion on its findings and analysis. DAHK accepts no responsibility for the reliability of such information to the extent it is inaccurate, incomplete or misleading;

  - The Report may not contain all facts and information that a Scheme Creditor may regard as relevant or potentially relevant; and

  - Finally, the Scheme Creditors and any other party who gains access to the Report shall refer to the full disclaimers, limitations, sources of information set out herein.

© 2023. For information, contact Deloitte China.

# Content

| Section | Page |
|---|---|
| Glossary of Terms | 4 |
| Scope of Work | 8 |
| Sources of Information | 10 |
| Overview of Financial Position as at 31 December 2022 | 12 |
| Liquidation Analysis | 18 |
| - Methodology | |
| - Key Assumptions | |
| - Entity-by-entity Liquidation Analysis – Payment Waterfall | |
| - Estimated liquidation analysis for CEG, SJ and Tianji | |
| - Limitations | |
| Appendices | 43 |

| Appendices | Page |
|---|---|
| List of Subject Entities | 43 |
| Estimated Recoveries of Offshore Debts | 58 |
| List of Subsequent Events Considered | 64 |
| Scenario Analysis | 66 |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

# Glossary of Terms

| Abbreviations | Definition |
|---|---|
| approx. | approximately |
| Auditor | Prism Hong Kong and Shanghai Limited (the auditor of the Company) |
| B/b | Billion |
| CEG/ Company | China Evergrande Group, a company listed on the SEHK with stock code 3333.hk |
| CEG Group/ 3333 Group | CEG and its subsidiaries, for the purpose of this Liquidation Analysis, excluding Evergrande Property Group and Evergrande Auto Group |
| CEG Existing Notes | Loan No.1 – 11 as referred in Glossary of Terms - Definition of Offshore Debts (page6) |
| CFO | Chief Financial Officer |
| CIP | Construction in progress |
| Encumbered Assets | Pre-sale proceeds restricted accounts, unpledged deposits, PHS, PUD, Properties and CIP of PRC companies |
| ERV | Estimated realizable value (under a forced-sale scenario) |
| Evergrande Auto | China Evergrande New Energy Vehicle Group Limited, a company listed on the SEHK with stock code 708.hk |
| Evergrande Auto Group / 708 Group | Evergrande Auto and its subsidiaries |
| Evergrande Property Group | Evergrande Property Services Group Limited, a company listed on the SEHK with stock code 6666.hk |
| Evergrande Property Group/ 6666 Group | Evergrande Property and its subsidiaries |
| Group | CEG and its subsidiaries |
| Hengda Real Estate | Hengda Real Estate Group Company Limited |
| Hengten Networks | Hengten Networks Group Limited, a company listed on the SEHK with stock code 136.hk (currently known as China Ruyi Holdings Limited) |
| HKD | Hong Kong Dollars, the lawful currency of Hong Kong |
| Hong Kong | Hong Kong Special Administrative Region |
| IP(s) | Investment property(ies) |
| Lei Shing Hong Loan | HK$236.5 million loan borrowed by Profit Concept Finance Limited |
| M/ m | Million |
| Management Account(s) | Entity-level unaudited management account of CEG and 3,523 subsidiaries of the Group as at 31 December 2022 as provided by management of the Group |
| Maples | Legal advisors of the Company in respect of laws of Cayman Islands and British Virgin Islands |
| NAV | Net asset value |
| NBV | Net book value |

| Abbreviations | Definition |
|---|---|
| Obligor(s) | Borrower(s)/ Issuer(s), guarantor(s), put option obligor(s), security provider(s) of the Offshore Debts (including share chargor(s), entity(ies) where shares are pledged, debenture provider(s), mortgagor(s), assignor(s) of receivables, etc.), as set out in Appendix 1 |
| Offshore Debts | Debts of CEG, SI and Tianji as set out on pages 6-7 |
| Out-scope Entity(ies) | Entity(ies) of the Group which are not Subject Entities |
| PHS | Properties held for sale |
| PPE | Property, plant and equipment |
| PRC | The People's Republic of China, which for the purpose of the Report, excludes Hong Kong and Macau Special Administrative Region |
| PUD | Properties under development |
| RMB | Renminbi, the lawful currency of the PRC |
| RMB Bonds | 15 Hengda 03 RMB bond issued by Hengda Real Estate and listed in the Shanghai Stock Exchange, in which the Company guaranteed the repurchase of the RMB bond at the Redemption Date (as defined in the 15 Hengda 03 RMB bond indenture) if Hengda Real Estate failed to ensure sufficient funds in the bank account to repay the RMB Bondholders 3 business days prior to the Redemption Date and the RMB Bondholders so demanded.  The outstanding principal of the 15 Hengda 03 RMB bond is RMB8.2 billion. |
| SAFE | State Administration for Foreign Exchange, the PRC |
| SEHK | Stock Exchange of Hong Kong |
| Sidley Austin | Legal advisors of the Company in respect of Hong Kong laws and English laws |
| SJ | Scenery Journey Limited |
| SJ Existing Notes | Loan No.13 – 16 as referred in Glossary of Terms - Definition of Offshore Debts (page6) |
| Sqm | Square meter |
| Subject Entity(ies) | Entity(ies) of the Group that are included in the entity-by-entity Liquidation Analysis as set out in Appendix 1 |
| Subsequent Events | Events after 31 December 2022 |
| Tianji | Tianji Holding Limited |
| Type 1 Guarantee | A certain category of offshore guarantee provided by CEG for onshore debts of non-Group entities, which requires the lender to exhaust its rights of recovery against the primary obligor before it can claim against a guarantor (i.e. CEG) |
| USD | United States Dollar, the lawful currency of the United States of America |

© 2023. For information, contact Deloitte China.

# Glossary of Terms – Definition of Offshore Debts

| No. | Class | Terms | Definition |
|-----|-------|-------|------------|
| 1 | A | CEG Existing March 2022 Notes | 8.25% senior notes due March 23, 2022 (ISIN: XS1580431143, Common Code: 158043114) |
| 2 | A | CEG Existing April 2022 Notes | 9.5% senior notes due April 11, 2022 (ISIN: XS1982036961, Common Code: 198203696) |
| 3 | A | CEG Existing January 2023 Notes | 11.5% senior notes due January 22, 2023 (ISIN: XS2106834299, Common Code: 210683429) |
| 4 | A | CEG Existing February 2023 Bonds | 4.25% convertible bonds due February 14, 2023 (ISIN: XS1767800961, Common Code: 176780096) |
| 5 | A | CEG Existing April 2023 Notes | 10.0% senior notes due April 11, 2023 (ISIN: XS1982037779, Common Code: 198203777) |
| 6 | A | CEG Existing June 2023 Notes | 7.5% senior notes due June 28, 2023 (ISIN: XS1627599498, Common Code: 162759949) |
| 7 | A | CEG Existing January 2024 Notes | 12.0% senior notes due January 22, 2024 (ISIN: XS2106834372, Common Code: 210683437) |
| 8 | A | CEG Existing March 2024 Notes | 9.5% senior notes due March 29, 2024 (ISIN: XS1587867539, Common Code: 158786753) |
| 9 | A | CEG Existing April 2024 Notes | 10.5% senior notes due April 11, 2024 (ISIN: XS1982040641, Common Code: 198204064) |
| 10 | A | CEG Existing June 2025 Notes | 8.75% senior notes due June 28, 2025 (ISIN: XS1627599654, Common Code: 162759965) |
| 11 | A | CEG Existing January 2022 Notes | 9.5% senior notes due January 30, 2022 (ISIN: XS1991102846, Common Code: 199110284) |
| 12 | A | Class A Private Loan | Private loan of US$100,000,000 with 15% interest p.a. due January 2022 owed by the Company |
| 13 | B, D | SJ Existing October 2022 Notes | 11.5% senior notes due October 24, 2022 (ISIN: XS2109191986, Common Code: 10919198) |
| 14 | B, D | SJ Existing November 2022 Notes | 13.0% senior notes due November 6, 2022 (ISIN: XS1903671854, Common Code: 190367185) |
| 15 | B, D | SJ Existing October 2023 Notes | 12.0% senior notes due October 24, 2023 (ISIN: XS2109192109, Common Code: 210919210) |
| 16 | B, D | SJ Existing November 2023 Notes | 13.75% senior notes due November 6, 2023 (ISIN: XS1903671938, Common Code: 190367193) |
| 17 | C, D | Lake Notes | US$260 million 8.5% senior notes due October 3, 2021 (ISIN: XS2054446617, Common Code: 205444661) issued by Jumbo Fortune Enterprises Limited |
| 18 | C | Dongpo Notes | US$424 million 9.0% senior notes due January 22, 2023 (ISIN: XS2290369128, Common Code: 229036912) issued by Great Courage Global Limited |
| 19 | C | Dongpo Put Option | US$116 million put option granted by CEG in relation to certain Dongpo Notes |
| 20 | C | Graceful Court Put Option | US$110 million put option granted by CEG in relation to shares of Graceful Court Limited |
| 21 | C | New Chic Margin Loan | HK$160 million margin loan borrowed by New Chic Global Limited |
| 22 | C, D | Clear Star Put Option | HK$575 million put option granted by Tianji in respect of shares of Clear Star Investments Limited |
| 23 | C | CEG Loan 1 | HK$1.2 billion loan borrowed by CEG due 2 January 2022 |
| 24 | C | CEG Loan 2 | HK$600 million loan borrowed by CEG due 7 January 2022 |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

6

# Glossary of Terms – Definition of Offshore Debts (cont'd)

| No. | Class | Terms | Definition |
|-----|-------|-------|------------|
| 25 | C | Venice Loan | US$20 million structured loan borrowed by Rainbow Ever Limited |
| 26 | C | Venice SPA | US$355 million structured sale and purchase agreement of shares in Rainbow Ever Limited |
| 27 | C, D | Hero Loan | HK$7.6 billion loan borrowed by Tianji pursuant to facilities agreement dated 21 November 2020 |
| 28 | C | FCB Put Option | US$712 million repurchase obligations granted by CEG, Alpha Beauty Limited and New Gains Group Limited in respect of Fangchebao Group Co. Ltd |
| 29 | C | RMB Bond Put Option | Repurchase obligations of CEG in relation to the RMB Bond |
| 30 | C | CEG Guarantees of PRC Liabilities | Unsecured liabilities of CEG arising in connection with the liabilities of entities incorporated the PRC |
| 31 | C | Kailong Arbitration Award | Arbitration award rendered by the Shenzhen Court of International Arbitration where CEG, Guangzhou Kailong Real Estate Company Limited, and the Chairman of CEG (Mr. Hui Ka Yan) were responsible for the repayment accordingly |
| 32 | C | On-Lent Loan | Amounts on-lent to CEG pursuant to the loan agreement relating to the provision of the Class A Private Loan |
| 33 | D | Castle Loan Put Option | US$258 million put option granted by Tianji in relation to a private loan borrowed by Sky Joy Holdings Limited |
| 34 | D | Castle Share Put Option | US$258 million put option granted by the Tianji in relation to shares of Sky Joy Holdings Limited |
| 35 | D | Tuen Mun Put Options | HK$1.4 billion put options granted by Tianji in relation to a project located in Tuen Mun, Hong Kong |
| 36 | D | CEG-Tianji Intercompany Balance | Intercompany balance owed by the Tianji to CEG which on 31 December 2022 was in an amount equal to approximately US$5.03 billion |

No.1 – 11 are collectively referred to as CEG Existing Notes while No. 13–16 are collectively referred to as SJ Existing Notes in this Report

© 2023. For information, contact Deloitte China.

# Content

| Section | Page |
| --- | --- |
| Glossary of Terms | 4 |
| Scope of Work | 8 |
| Sources of Information | 10 |
| Overview of Financial Position as at 31 December 2022 | 12 |
| Liquidation Analysis | 18 |
| - Methodology | |
| - Key Assumptions | |
| - Entity-by-entity Liquidation Analysis – Payment Waterfall | |
| - Estimated liquidation analysis for CEG, SJ and Tianji | |
| - Limitations | |
| Appendices | 43 |

| Appendices | Page |
| --- | --- |
| List of Subject Entities | 43 |
| Estimated Recoveries of Offshore Debts | 58 |
| List of Subsequent Events Considered | 64 |
| Scenario Analysis | 66 |

© 2023. For information, contact Deloitte China.

# Scope of Work

- The Liquidation Analysis provides estimates of recoveries to creditors holding the Offshore Debts in respect of their various rights against the Obligors including CEG, SJ and Tianji and all other entities of the Group (as relevant) that have provided credit enhancement (including guarantees, share charges, mortgages and pledges or other security), should the restructuring fail and the Group be liquidated. The analysis has been conducted on an entity-by-entity basis, i.e. assets and liabilities of each entity have been assessed individually in arriving at the estimated recoveries to unsecured creditors and shareholders of an entity, to the extent possible.

- Funds available for distribution to creditors/ shareholders of an Obligor in the event of a Group-wide liquidation would depend on the recoveries from, *inter alia*, its intercompany receivables or equity investments, which would in turn depend on the estimated distributions by the respective group debtors/ subsidiaries of the Obligor based on their respective assets (including intercompany receivables from and equity investments in other Group entities) and liabilities (including intercompany payables to other Group entities).

- The Liquidation Analysis, in respect of the Offshore Debts, shall take account of the recoveries to the Obligors from their inter-company receivables and equity investments.

- Given the size of the Group and the information and time constraints, it was agreed with the Company and advisors that the entity-by-entity Liquidation Analysis would not cover all subsidiaries of the Group, instead it would cover subsidiaries that might affect the prospect of material recoveries to the Obligors through intercompany balances or equity investments. A top-down approach from the perspective of the Obligors, subject to a threshold amount of RMB1b, was adopted in setting the scope of the Group's entities to be subject to the entity-by-entity Liquidation Analysis (the "Subject Entities"), i.e. assets and liabilities of the Subject Entities would be individually assessed in arriving at the estimated recoveries to unsecured creditors of each of these entities.

- The following entities of the Group were included in the Liquidation Analysis. A list of Subject Entities is set out in Appendix 1.

**All Obligors**

Subsidiaries with NAV >= RMB1b
→ Subsidiaries with NAV >= RMB1b
→ Group debtors with receivables >= RMB1b

Group debtors with receivables >= RMB1b
→ Subsidiaries with NAV >= RMB1b
→ Group debtors with receivables >= RMB1b

......until the NAV (in the case of investment) or the receivables (in the case of Group debtors) is less than RMB1b

Subsidiaries of the Group which hold PHS or PUD jointly with the Subject Entities

**+**

**794** Subject Entities with combined NAV of RMB 1,101b, representing over 80% of the combined NAV of the Group [1]

1. Only subsidiaries with positive NAV were considered in arriving at the coverage of the Subject Entities' combined NAV to the Group's combined NAV.

© 2023. For information, contact Deloitte China.

# Content

| Section | Page |
| --- | --- |
| Glossary of Terms | 4 |
| Scope of Work | 8 |
| **Sources of Information** | **10** |
| Overview of Financial Position as at 31 December 2022 | 12 |
| Liquidation Analysis | 18 |
| - Methodology | |
| - Key Assumptions | |
| - Entity-by-entity Liquidation Analysis – Payment Waterfall | |
| - Estimated liquidation analysis for CEG, SJ and Tianji | |
| - Limitations | |
| Appendices | 43 |

| Appendices | Page |
| --- | --- |
| List of Subject Entities | 43 |
| Estimated Recoveries of Offshore Debts | 58 |
| List of Subsequent Events Considered | 64 |
| Scenario Analysis | 66 |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

# Sources of Information

Information used in the Liquidation Analysis

| | | |
|---|---|---|
| | **Group Structure** | • List of entities of the Group, their respective shareholders (with % of shareholding), and their respective places of incorporation and nature of business |
| | **Financial information** | • Management accounts of Subject Entities and consolidated balance sheet of the Group (including entity-level balance sheets) as at 31 December 2022 provided by the Company and the Auditor (received up to 4 July 2023)<br>• Entity-level breakdown of assets and liabilities of the Subject Entities (received up to 4 July 2023)<br>• Working schedules of audit adjustments and consolidation adjustments as at 31 December 2022 provided by the Company and the Auditor (received up to 4 July 2023) |
| | **IP, PHS & PUD** | • List of PHS and PUD of the Group showing information on area, status of delivery, status of sale, management/ independent valuer's estimates on selling price per sqm, indebtedness, management estimates on cost to completion and management estimates on future expenditure (sales and marketing, taxes). |
| | **Indebtedness and security package schedule** | • Information and representations from the management of CEG in relation to the onshore interest-bearing borrowings and their security packages (including guarantees, security and pledges)<br>• Information from the Company or its advisors in relation to the Offshore Debts and their security packages (including guarantees, security and pledges). For the avoidance of doubt, information on guarantees provided by offshore entities were provided by the management of CEG |
| | **Payment waterfall** | • Analysis from Maples and Sidley Austin on the treatment of guarantees in favor of holders of Offshore Debts (excluding guarantees in respect of debts of onshore entities) and put option obligations in the liquidation of offshore Obligors<br>• Analysis from PRC legal advisors in relation to the payment priority pursuant to the relevant PRC bankruptcy laws for the real estate industry and treatment of guarantees in favor of the holders of onshore debts |
| | **Management representation & assumption** | • During our work, we interviewed and held discussions with the following members of management team of the Group to obtain an understanding of the nature, quality of various assets held by the Subject Entities and estimated recoveries from the same.<br>  ➢ PAN Darong, former Executive Director and CFO (up to 22 July 2022)<br>  ➢ QIAN Cheng, Executive Director and CFO<br>  ➢ LIN Xiaobin, General Manager, Finance<br>  ➢ WU Rundong, Manager, Finance<br>  ➢ BAI Chaoyang, Manager, Finance<br>  ➢ Peng Zhenan, Manager, Accounting<br>  ➢ Chen Daiping, Manager, Accounting<br>  ➢ Wang Jing, Deputy Manager, Finance |

© 2023. For information, contact Deloitte China.

# Content

| Section | Page |
|---|---|
| Glossary of Terms | 4 |
| Scope of Work | 8 |
| Sources of Information | 10 |
| **Overview of Financial Position as at 31 December 2022** | **12** |
| Liquidation Analysis | 18 |
| - Methodology | |
| - Key Assumptions | |
| - Entity-by-entity Liquidation Analysis – Payment Waterfall | |
| - Estimated liquidation analysis for CEG, SJ and Tianji | |
| - Limitations | |
| Appendices | 43 |

| Appendices | Page |
|---|---|
| List of Subject Entities | 43 |
| Estimated Recoveries of Offshore Debts | 58 |
| List of Subsequent Events Considered | 64 |
| Scenario Analysis | 66 |

© 2023. For information, contact Deloitte China.

# Overview of Financial Position as at 31 December 2022

## CEG

- CEG is listed on the Main Board of the SEHK. It is principally engaged in investment holding, whilst its subsidiaries are principally engaged in property development.
- CEG Group holds 51.7% of Evergrande Property and 58.5% of Evergrande Auto, of which CEG directly holds 1.9% of Evergrande Property and 1.2% of Evergrande Auto.
- Major assets of CEG are amounts due from group companies and dividends receivable.
- Major liabilities of CEG are borrowings, amounts due to group companies, guarantees granted by CEG in relation to indebtedness of its subsidiaries and put option obligations.

| Adjusted Balance Sheet of CEG as at 31 December 2022 | NBV for |
|---|---|
| RMB million | Liquidation Analysis |
| **Assets** | |
| Cash and cash equivalents | 7 |
| Dividends receivable | 59,080 |
| Other receivables and prepayment (including receivables from Out-Scope Entities) | 6,787 |
| Intercompany receivables from Subject Entities | 106,486 |
| Long-term equity investments | 4,727 |
| Fixed assets | 1 |
| **Total assets** | **177,088** |
| **Liabilities** | |
| Borrowings (interest inclusive) | (2,276) |
| Notes payable (interest inclusive) | (111,904) |
| Intercompany payables to Subject Entities | (83,380) |
| Other liabilities (including payables to Out-Scope Entities) | (1,828) |
| Contingent liabilities - put option obligations | (21,362) |
| Contingent liabilities – guarantees | (81,336) |
| Dividends payable | (1,652) |
| **Total liabilities** | **(303,738)** |
| **Net liabilities** | **(126,650)** |

*Source: Management Account of CEG as at 31 December 2022 and supporting schedules provided by management and the Auditor*

### Dividends receivable

- A summary of dividends receivable is as follows:

| Company | As at 31 Dec 2022 RMB million | Obligor ? | Relevant Obligation |
|---|---|---|---|
| ANJI (BVI) Limited安基(BVI)有限公司 | 45,750 | Y | Offshore Debts under Class A |
| FENGYU (BVI) Limited丰毓(BVI)有限公司 | 210 | Y | Offshore Debts under Class A |
| UNIVERSAL STAR GLOBAL LIMITED | 4,000 | N | |
| LIONFORT INVESTMENTS LIMITED | 320 | N | |
| NEW GARLAND LIMITED | 8,800 | N | |
| **Grand Total** | **59,080** | | |

### Intercompany receivables from Subject Entities

- A summary of intercompany receivables due from Subject Entities is as follows, a majority of which are Obligors.

| Name of Group Companies | As at 31 Dec 2022 RMB million | Obligor? | Relevant Obligation |
|---|---|---|---|
| 1. Tianji | 39,076 | Y | Offshore Debts under Class D |
| 2. Evergrande Auto | 13,673 | N | |
| 3. BILLION MARK LIMITED | 10,905 | Y | Offshore Debts under Class A |
| 4. 恒大養健有限公司 | 8,311 | N | |
| 5. STATE HERO HOLDINGS LIMITED 國雄控股有限公司 | 6,265 | N | |
| 6. JIAJIAN (BVI) LIMITED 嘉建(BVI)有限公司 | 5,882 | Y | Offshore Debts under Class A |
| 7. NICE DRAGON CAPITAL INVESTMENT LIMITED 騰陽創富有限公司 | 3,115 | N | |
| 8. WELLY GOLD LIMITED 世鑫有限公司 | 3,103 | N | |
| 9. YITONG (BVI) LIMITED 亿通(BVI)有限公司 | 2,949 | Y | Offshore Debts under Class A |
| 10. NOBLE BEAUTY LIMITED 貴美有限公司 | 2,582 | N | |
| 11. Obligors with individual balance less than RMB2.5b | 4,094 | Y | Various |
| 12. Other entities of the Group with individual balance less than RMB2.5b | 6,531 | N | |
| **Grand Total** | **106,486** | | |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report    13

# Overview of Financial Position as at 31 December 2022

## CEG (con't)

| Adjusted Balance Sheet of CEG as at 31 December 2022 | |
|---|---|
| RMB million | NBV for Liquidation Analysis |
| **Assets** | |
| Cash and cash equivalents | 7 |
| Dividends receivable | 59,080 |
| Other receivables and prepayment (including receivables from Out-Scope Entities) | 6,787 |
| Intercompany receivables from Subject Entities | 106,486 |
| Long-term equity investments | 4,727 |
| Fixed assets | 1 |
| **Total assets** | **177,088** |
| **Liabilities** | |
| Borrowings (interest inclusive) | (2,276) |
| Notes payable (interest inclusive) | (111,904) |
| Intercompany payables to Subject Entities | (83,380) |
| Other liabilities (including payables to Out-Scope Entities) | (1,828) |
| Contingent liabilities - put option obligations | (21,362) |
| Contingent liabilities – guarantees | (81,336) |
| Dividends payable | (1,652) |
| **Total liabilities** | **(303,738)** |
| **Net liabilities** | **(126,650)** |

*Source: Management Account of CEG as at 31 December 2022 and supporting schedules provided by management and the Auditor*

## Borrowings, notes payable and contingent liabilities

- CEG's indebtedness included offshore senior notes, private debts and guarantees granted in respect of indebtedness of subsidiaries and obligations arising from various put options

| | | | Outstanding amount as at 31 Dec 2022 | | |
|---|---|---|---|---|---|
| No. | Category | Tranche | Principal RMB million | Interest RMB million | Principal + Interest RMB million |
| 1 | Borrowings | Class A Private Loan | (65) | (22) | (87) |
| 2 | Borrowings | CEG Loan 1 | (1,071) | (389) | (1,460) |
| 3 | Borrowings | CEG Loan 2 | (536) | (193) | (729) |
| | | **Total borrowings** | **(1,672)** | **(604)** | **(2,276)** |
| 4 | Notes payable | CEG Existing Notes | (99,126) | (12,778) | (111,904) |
| | | **Total notes payable** | **(99,126)** | **(12,778)** | **(111,904)** |
| 5 | Put option obligations | Dongpo Put Option | (808) | (193) | (1,001) |
| 6 | Put option obligations | Graceful Court Put Option | (766) | (73) | (839) |
| 7 | Put option obligations | FCB Put Option | (4,957) | - | (4,957) |
| 8 | Put option obligations | RMB Bond Put Option | (8,200) | (560) | (8,760) |
| 9 | Put option obligations | Kailong Arbitration Award | (5,000) | (805) | (5,805) |
| | | **Total put option obligations** | **(19,731)** | **(1,631)** | **(21,362)** |
| 10 | Guarantees | Various debts under the Offshore Debts | (14,812) | (2,034) | (16,846) |
| 11 | Guarantees | CEG Guarantees of PRC Liabilities | (56,818) | (7,672) | (64,490) |
| | | **Total guarantees** | **(71,630)** | **(9,706)** | **(81,336)** |

© 2023. For information, contact Deloitte China.

# Overview of Financial Position as at 31 December 2022

## SJ

- SJ is the issuer of 4 series of USD senior notes.
- SJ does not have any subsidiaries and its major assets are amounts due from group companies.
- Major liabilities of SJ are the USD senior notes issued and interest accrued.

### Adjusted Balance Sheet of SJ as at 31 December 2022

| RMB million | NBV for Liquidation Analysis |
| --- | --- |
| **Assets** | |
| Intercompany receivables from Subject Entities | 25,780 |
| **Total assets** | **25,780** |
| **Liabilities** | |
| Notes payable (interest inclusive) | (42,994) |
| **Total liabilities** | **(42,994)** |
| **Net liabilities** | **(17,214)** |

*Source: Management Account of SJ and supporting schedules as at 31 December 2022 provided by the management of the Group and the Auditor*

### Intercompany receivables from Subject Entities

- The below receivables represent all assets of SJ

| Company | As at 31 Dec 2022 RMB million | Obligor? | Relevant Obligation |
| --- | --- | --- | --- |
| 1. Shengyu (BVI) Limited 盛譽(BVI)有限公司 | 15,044 | Yes | SJ Existing Notes |
| 2. Tianji | 10,736 | Yes | SJ Existing Notes and various private debts |
| **Grand Total** | **25,780** | | |

### Notes payable

- Notes payable represent SJ Existing Notes

| Tranche | Outstanding amount as at 31 Dec 2022 | | |
| --- | --- | --- | --- |
| | Principal RMB million | Interest RMB million | Principal + Interest RMB million |
| SJ Existing October 2022 Notes | (13,922) | (2,304) | (16,226) |
| SJ Existing November 2022 Notes | (4,485) | (964) | (5,449) |
| SJ Existing October 2023 Notes | (13,887) | (2,398) | (16,285) |
| SJ Existing November 2023 Notes | (4,102) | (932) | (5,034) |
| **Grand Total** | **(36,396)** | **(6,598)** | **(42,994)** |

© 2023. For information, contact Deloitte China.

# Overview of Financial Position as at 31 December 2022

## Tianji

- Tianji is principally engaged in investment holding, whilst its subsidiaries are principally engaged in property development.
- Major assets of Tianji are amounts due from group companies and investments in subsidiaries.
- Major liabilities of Tianji are amounts due to group companies, guarantees granted by Tianji in relation to indebtedness of the Group (including SJ Existing Notes) and put option obligations

### Adjusted Balance Sheet of Tianji as at 31 December 2022

| RMB million | NBV for Liquidation Analysis |
| --- | --- |
| **Assets** | |
| Cash and cash equivalents | 4 |
| Accounts receivable | 21 |
| Prepayment | 120 |
| Other receivables (including receivables from Out-scope Entities) | 3,870 |
| Intercompany receivables from Subject Entities | 97,493 |
| Long-term equity investments | 2,862 |
| **Total assets** | **104,370** |
| **Liabilities** | |
| Long-term borrowings (interest inclusive) | (6,922) |
| Intercompany payables to Subject Entities | (109,884) |
| Other liabilities (including payables to Out-scope Entities) | (1,986) |
| Contingent liabilities - put option obligations | (4,236) |
| Contingent liabilities - guarantees | (45,121) |
| **Total liabilities** | **(168,149)** |
| **Net liabilities** | **(63,779)** |

*Source: Management Account of Tianji and supporting schedules as at 31 December 2022 provided by the management of the Group and the Auditor*

### Long-term equity investments

- Major investees of Tianji are as follows:

| Name of Subsidiaries | NAV of investee as at 31 Dec 2022 RMB million | Obligor? | Relevant Obligation |
| --- | --- | --- | --- |
| 1. EVER GRACE GROUP LIMITED恒盛集团有限公司 | 6,612 | Yes | SJ Existing Notes |
| 2. Fortune Walker Limited | 1,030 | Yes | Lake Notes |

### Intercompany receivables from Subject Entities

- A majority of the key Group debtors of Tianji are Obligors

| Name of Group Companies | As at 31 Dec 2022 RMB million | Obligor? | Relevant Obligation |
| --- | --- | --- | --- |
| 1. Shengyu (BVI) Limited 盛誉(BVI)有限公司 | 54,151 | Yes | SJ Existing Notes |
| 2. EV Wanchai 1 Holdings Limited | 11,609 | No | |
| 3. EV Wanchai 1 Land Holdings Limited | 6,608 | Yes | Hero Loan |
| 4. LOFTY REAP LIMITED 上丰有限公司 | 4,640 | Yes | Castle Loan Put Option & Castle Share Put Option |
| 5. LAGUNA HEIGHTS LIMITED | 4,179 | No | |
| 6. URBAN EAGLE LIMITED | 3,989 | No | |
| 7. Shengtong Holding Limited 盛通控股有限公司 | 3,026 | Yes | SJ Existing Notes |
| 8. Greet Delight Limited 迎悦有限公司 | 2,680 | No | |
| 9. JOVIAL IDEA DEVELOPMENTS LIMITED乐思发展有限公司 | 1,714 | No | |
| 10. More Hero Limited添英有限公司 | 1,198 | No | |
| 11. Other Obligors with individual balance less than RMB 1b | 2,083 | Yes | Various |
| 12. Other entities of the Group with individual balance less than RMB 1b | 1,616 | No | |
| **Grand Total** | **97,493** | | |

© 2023. For information, contact Deloitte China.

# Overview of Financial Position as at 31 December 2022

## Tianji (con't)

| Adjusted Balance Sheet of Tianji as at 31 December 2022 | |
| --- | --- |
| RMB million | NBV for Liquidation Analysis |
| **Assets** | |
| Cash and cash equivalents | 4 |
| Accounts receivable | 21 |
| Prepayment | 120 |
| Other receivables (including receivables from Out-scope Entities) | 3,870 |
| Intercompany receivables from Subject Entities | 97,493 |
| Long-term equity investments | 2,862 |
| **Total assets** | **104,370** |
| **Liabilities** | |
| Long-term borrowings (interest inclusive) | (6,922) |
| Intercompany payables to Subject Entities | (109,884) |
| Other liabilities (including payables to Out-scope Entities) | (1,986) |
| Contingent liabilities - put option obligations | (4,236) |
| Contingent liabilities - guarantees | (45,121) |
| **Total liabilities** | **(168,149)** |
| **Net liabilities** | **(63,779)** |

### Long-term borrowings and contingent liabilities

- Long-term borrowings mainly represented Hero Loan while contingent liabilities included guarantees granted by Tianji in respect of indebtedness of Group companies, and obligations arising from various put options

| | | | Outstanding amounts as at 31 Dec 2022 | | |
| --- | --- | --- | --- | --- | --- |
| No. | Category | Tranche | Principal RMB million | Interest RMB million | Principal + Interest RMB million |
| 1 | Long-term borrowings | Hero Loan | (6,785) | (137) | (6,922) |
| | | **Total long-term borrowings** | **(6,785)** | **(137)** | **(6,922)** |
| 2 | Put option obligations | Clear Star Put Option | (513) | - | (513) |
| 3 | Put option obligations | Castle Share Put Option | (1,797) | (363) | (2,160) |
| 4 | Put option obligations | Tuen Mun Put Options | (1,258) | (305) | (1,563) |
| | | **Total put option obligations** | **(3,568)** | **(668)** | **(4,236)** |
| 5 | Guarantees | SI Existing Notes | (36,396) | (6,598) | (42,994) |
| 6 | Guarantees | Lake Notes | (1,810) | (240) | (2,050) |
| 7 | Guarantees | Lei Shing Hong Loan[1] | (77) | - | (77) |
| | | **Total guarantees** | **(38,283)** | **(6,838)** | **(45,121)** |

Note 1: The facility has been fully repaid by the borrower in January 2023, please refer to Appendix 3 for details.

*Source: Management Account of Tianji and supporting schedules as at 31 December 2022 provided by the management of the Group and the Auditor*

© 2023. For information, contact Deloitte China.

# Content

| Section | Page |
|---|---|
| Glossary of Terms | 4 |
| Scope of Work | 8 |
| Sources of Information | 10 |
| Overview of Financial Position as at 31 December 2022 | 12 |
| **Liquidation Analysis** | **18** |
| - Methodology | |
| - Key assumptions | |
| - Entity-by-entity Liquidation Analysis – Payment Waterfall | |
| - Estimated liquidation analysis for CEG, SJ and Tianji | |
| - Limitations | |
| Appendices | 43 |

| Appendices | Page |
|---|---|
| List of Subject Entities | 43 |
| Estimated Recoveries of Offshore Debts | 58 |
| List of Subsequent Events Considered | 64 |
| Scenario Analysis | 66 |

© 2023. For information, contact Deloitte China.

# Illustration of Methodology

The Liquidation Analysis has been prepared on the assumptions that every entity of the Group would be put into liquidation, such that assets of each entity would be realized under a forced-sale scenario for distribution to creditors and shareholders, after taking account of secured claims/ priority claims over its assets (for its own obligations or obligations of other entities) with any shortfall ranking *pari passu* with other unsecured claims of the entity. Proceeds from forced-sale of the remaining unsecured assets (including any surplus from secured assets) would be distributed first to preferential creditors and then to general unsecured creditors (including any deficiency of secured/ priority claims) of that entity on a *pari passu* basis. Any surplus after settling general unsecured claims would first be used to settle dividends declared but not paid, and then distributed to the shareholders of that entity.



China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

19

# Key Assumptions

## General Assumptions

| | |
|---|---|
| **General principles** | • Each entity of the Group would be placed into liquidation where<br><br>• Assets of each Subject Entity would be realized under a forced-sale scenario for distribution to its creditors, taking account of the super priority claims over Encumbered Assets and the relevant security provided by the Subject Entity (for its own indebtedness and indebtedness of other companies) with any shortfall of its secured indebtedness ranking *pari passu* with other unsecured creditors of the respective entity.<br><br>• Proceeds from realization of the remaining unsecured assets of the entity (including any surplus from the secured assets) would be distributed according to the stipulated preferential order.<br><br>• Any remaining proceeds from realization would be distributed to unsecured creditors (including deficiency of secured and priority claims, intercompany claims and corporate guarantee claims) on a *pari passu* basis.<br><br>• Any surplus after settling unsecured creditors would first be used to settle dividends payable, and then be distributed to shareholder(s) of the entity. |
| **Liquidation Process** | • All entities of the Group are assumed to be put into insolvent liquidation on 1 January 2023. Subsequent Events and their possible impacts on the financial position, including accrual of interest subsequent to 31 December 2022, are not considered, except for those events set out in Appendix 3.<br><br>• The liquidation process is assumed to be conducted on an entity-by-entity basis in accordance with the rules and regulations of the respective jurisdiction, with no consolidation of bankruptcy proceedings or coordination between liquidators/ administrators.<br><br>• Assets of companies in liquidation would be realized under a distressed sale. Estimated realization rates (see pages 26 to 30) shall be applied to different types of assets of the Group to reflect the discount in value of assets under a forced-sale scenario.<br><br>• Assets of PRC entities in liquidation would be realised through a court controlled auction process, which would be in the form of a distressed sale.<br><br>• It was assumed that recorded liabilities of the Group are valid and would be admitted in full by liquidators/ administrators. |

© 2023. For information, contact Deloitte China.

# Key Assumptions

## General Assumptions

| | |
|---|---|
| **Inter-company Balances (including inter-company interests)** | *Validity and ranking of intercompany payables*<br>• Intercompany liabilities are assumed to be valid and would be admitted in full by liquidators/ administrators after set-off.<br>• Interests were properly charged and recorded and would be admitted in full by liquidators/ administrators.<br>• Save for the cases of subordination which are assumed to be valid and enforceable, intercompany payables would rank *pari passu* with other unsecured claims.<br><br>*Reconciliation and adjustment of intercompany balance matrix*<br>• We noted from the intercompany balance matrix that there were certain differences in balances between entities of the Group.<br>• In cases of unreconciled difference in intercompany balances between two entities of the Group, a higher absolute amount would be adopted in the Liquidation Analysis.<br>• If both entities record a receivable due from the other, it is assumed that the one with higher amount of receivable would be the creditor and the amount would be adopted in the Liquidation Analysis. If both entities record a payable due to the other, it is assumed the one with higher amount of payable would be the debtor and the amount would be adopted in the Liquidation Analysis.<br><br>*Estimating recoveries from intercompany receivables*<br>• Estimated recoveries from intercompany receivables from the Subject Entities are computed based on the estimated return of each Subject Entity to its unsecured creditors.<br>• The limited scope entity-by-entity Liquidation Analysis does not cover all entities of the Group. In order to account for the potential recoveries from the Out-scope Entities (either through intercompany receivables or equity investments in the Out-scope Entities), reference was made to the estimated recoveries to unsecured creditors of the Subject Entities which represented majority of the Group's assets. As the estimated recoveries to unsecured claims of majority of the Subject Entities are within 0 to 5%, a nominal recovery rate of 5% is applied to estimate recoveries from intercompany receivables from the Out-scope Entities. |
| **Dividends** | • Any dividend payables recorded on the balance sheet of the Subject Entities are assumed to be duly declared but unpaid.<br>• Dividends payable would rank after general unsecured claims of the respective subsidiary.<br>• In the case where the dividends receivable and the dividends payable did not reconcile, a lower absolute amount would be adopted in the Liquidation Analysis. |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

# Key Assumptions

## General Assumptions

**Guarantee, put option obligations and contingent liabilities**

*Validity and ranking of guarantee and put option obligations*
- Guarantee and put option obligations are assumed to be valid and enforceable, and rank *pari passu* with other unsecured claims.
- Save and except for guarantee claims and put option obligations, it is assumed that there is no other contingent liabilities (e.g. claims for breach of contracts) which would otherwise further reduce the recoveries to unsecured creditors.

*Amount of guarantee claims and put option obligations*
- A creditor (onshore debts and Offshore Debts) would claim in full in respect of guarantee(s) granted by any of the Group entities, except for guarantee provided for certain onshore debts of non-Group entities ("Type 1 Guarantee") where creditors would need to exhaust recoveries from principal obligors and security before claiming against guarantors.
- The amount of claims against guarantors would be reduced by amounts of realisations from borrowers and security only if the realizations were made prior to the date of submission of claims against guarantors. For the purpose of this Liquidation Analysis, since it is assumed all entities would be put into liquidation on 1 January 2023, therefore creditors, with the view to maximize recoveries, would claim against guarantors for 100% of the debts without deducting any recoveries from borrowers and security.
- As borrowers and security of Type 1 Guarantee are outside the Group, relevant information for assessing recoveries from borrowers and security are not available. A scenario analysis, i.e. 0% (base case), 50%, 75% or 100% recoveries from the borrowers and security to pay off the debts respectively, would be performed.
- In the event that a guarantor also provided security for an Offshore Debt, the creditor could realize recoveries on the security provided by the guarantor and claim the deficiency against the guarantor as an unsecured claim. For onshore debts, the amount of unsecured claim against the guarantor would not be reduced by the amount of recoveries on security provided by that guarantor.
- In relation to put option obligations in Offshore Debts, i.e. the Obligors are obliged to acquire assets (mainly shares of the Group entities and notes issued by the Group entities), it is assumed that the put option holders (i.e. the creditors) would realize the assets (on behalf of the Group, without transferring the assets to the Group) under a forced-sale scenario and claim against the put option Obligors for the shortfall (i.e. put option exercise price plus agreed return minus estimated realizable value of the assets under a forced-sale scenario).

*Estimating recoveries from guarantee*
- Unless and until the debt is fully repaid, the Obligors of an Offshore Debt do not have and may not file proof for subrogation claims or other potential claims against borrowers or other obligors. As such it is uncertain that any such claims would be claimed or materially impact the analysis. For the purpose of this Liquidation Analysis, we adopted a similar approach in certain other entity-priority-models to assume that there was no subrogation claims or similar claims against borrowers or other obligors, except if an Offshore Debt had been fully repaid, it is assumed that the other Obligors would claim against the principal borrower for security/guarantees provided.
- The limited scope entity-by-entity Liquidation Analysis does not cover all entities of the Group. In order to account for the potential recoveries from guarantees provided by the Out-scope Entities, reference was made to the estimated recoveries to unsecured creditors of the Subject Entities which represented majority of the Group's assets. As the estimated recoveries to unsecured claims of majority of the Subject Entities are within 0 to 5%, a nominal recovery rate of 5% is applied to estimate recoveries from guarantee in respect of onshore debts provided by the Out-scope Entities (i.e. general unsecured claims).

© 2023. For information, contact Deloitte China.

# Key Assumptions

## General Assumptions

| | |
|---|---|
| | - Secured creditors of Subject Entities would enforce all security granted to them or make claims at all security providers, including assets owned by the Out-scope Entities. |
| | - Due to limitation in information in respect of the ranking of onshore secured indebtedness, it is assumed that all secured claims in respect of a secured asset shall rank *pari passu*, i.e. estimated realization from the secured asset would be distributed to the secured creditors pro-rata to their claims. |
| | - Secured assets of the borrower would be realized to settle the secured indebtedness. Any shortfall (i.e. secured indebtedness minus estimated realizable value of the secured assets of the borrower) would become unsecured claims of the borrower. Any surplus would be made available for distribution to unsecured creditors of the borrower. |
| | - Secured assets of other security providers would be realized to settle the secured indebtedness. Any surplus after deducting the secured indebtedness would be made available for distribution to unsecured creditors of the security provider. |
| | *Circumstances where indebtedness is fully secured and/or guaranteed* |
| | - For indebtedness that are fully secured with multiple assets and guarantees (i.e. > 100% recovery of debts), creditors are entitled to recover outstanding amounts only and any surplus will be made available for distribution to unsecured creditors of the respective security providers/ guarantors. |
| | - As there is no specific rules on order of security to be realized, it is assumed that the creditors would recover from: |
| |    • First, secured assets of the borrower. |
| |    • Second, in the case of onshore debts, secured assets of Out-scope Entities. If there are multiple Out-scope Entities providing security, it is assumed that all security of the Out-scope Entities would be realized for distribution to the secured creditors and any surplus would be made available to the respective Out-scope Entities pro-rata to the estimated realizable value of the secured assets. |
| |    • Third, assets secured by Subject Entities. If there are multiple Subject Entities providing security, it is assumed that all security of the Subject Entities would be realized for distribution to secured creditors and any surplus would be made available to the respective Subject Entities pro-rata to the estimated realizable value of the secured assets. |
| |    • Fourth, guarantees. Full amount of the debts (i.e. before deducting any realization from security and guarantees) shall be claimed and admitted as unsecured claims against the guarantors' liquidation estate. Any distribution from guarantors in excess of the secured indebtedness would become unsecured assets of guarantors. |
| **Secured claims** | |

# Key Assumptions

## General Assumptions

| | |
|---|---|
| **PUD, PHS & pre-sale proceeds** | • Sale and purchase agreements of property units would be terminated upon liquidation. Accordingly, legal titles of PUD and PHS are assumed to be retained with the Group for disposal via tender process upon liquidation.<br><br>• Funds in pre-sale proceeds restricted accounts would be returned to property buyers.<br><br>• Property buyers are assumed to be natural persons who purchased the properties for living purposes and settled purchase consideration in full, and therefore, would satisfy the criteria of holding priority claims.<br><br>• According to the Reply on Commodity Housing Consumer Protection issued by The Supreme People's Court of the PRC on 20 April 2023 and the analysis from the PRC legal advisors, claims from qualified property buyers would rank before claims from contractors, secured indebtedness and other creditors. There was no express provision set out in the aforesaid Reply on whether the priority claims of qualified property buyers would cover all assets of an entity.<br><br>• For the purpose of this Liquidation Analysis, in view of the general practice of courts to protect property buyers, it is assumed that property buyers would have first priority (before construction payables and secured claims) over unpledged deposits and realization from PUD and PHS.<br><br>• Receivables from banks (arose due to delay in release of mortgage loan(s) by relevant financial institutions) are assumed to be non-recoverable, as legal titles of properties are yet to be passed to property buyers and would be retained in the Group for disposal. |
| **Government Relief Loans** | • We noted that certain onshore project companies of the Group had recorded liabilities in respect of relief loans advanced by local governments specifically for ensuring completion and delivery of properties. Generally, funds advanced were kept in specific accounts maintained by local governments and could only be drawn to settle construction-related expenses.<br><br>• It is assumed that unsecured portion of the government relief loans would be preferential unsecured claims. |
| **Tax / SAFE** | • For purpose of this Liquidation Analysis, the realization of assets in the course of the liquidation of the Group is assumed to have no tax impact. In the event any disposal would give rise to tax liability, the return to creditors would be lower than that of the current scenario.<br><br>• For purpose of this Liquidation Analysis, it is assumed that there is no withholding tax payable on distribution. In the event any distribution would give rise to tax liability, the return to creditors would be lower than that of the current scenario.<br><br>• This Liquidation Analysis has considered recorded tax liabilities (after deducting tax recoverable) and deferred tax liabilities (after deducting deferred tax assets) and it is assumed that there is no unrecorded tax liabilities which would otherwise further reduce recovery to unsecured creditors.<br><br>• Proceeds arising from the realisation of assets in the PRC are assumed to be able to remit to offshore creditors smoothly, without SAFE issues. |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

24

# Key Assumptions

## General Assumptions

| | |
|---|---|
| **Costs** | • Liquidation costs of each Subject Entity of the Group, including liquidators' fees and remuneration, legal costs and costs and expenses incidental to the disposal (except for tax expense) are assumed to be paid in priority (i) in the case of a Subject Entity in the PRC, at 0.8% of estimated realizable value of unsecured assets (including surplus from secured assets) by reference to the guidance issued by The Supreme People's Court of the PRC; and (ii) in the case of a Subject Entity outside the PRC, at 5% of estimated realizable value of unsecured assets (including surplus from secured assets), which is within the reasonable range of liquidation costs observed in the market. |
| | • The Group principally operates in the PRC. According to the Article 47 of the Labour Contract Law of the PRC, upon redundancy, an employee would be entitled to financial compensation on the basis of the number of years he/ she has worked in a unit, the rate being one month's salary for the work of one full year. After taking into account of the average years of service of the employees of the Group, preferential remuneration / retrenchment costs of the Subject Entities in CEG Group, Evergrande Property Group and Evergrande Auto Group are computed at 5.8 times, 3.7 times and 3.2 times of current employees' monthly wages respectively. |
| **Exchange rate** | • The exchange rates adopted for purpose of this analysis are HKD/RMB: 0.8933 and USD/RMB: 6.9646, being the published rates as at 30 December 2022 as set out on the SAFE official website. |
| **Others** | • Time value of money is not considered for purpose of this Liquidation Analysis. |

© 2023. For information, contact Deloitte China.

# Key Assumptions

## Asset-specific Assumptions

The table below sets out assumptions on each key line item of assets under a liquidation scenario, based on discussions with the management of the Group and having regard to experience from previous liquidations:

| Assets | Estimated Realisation Rate | Remarks |
|---|---|---|
| Cash and bank balances (excluding balances in pre-sale proceed accounts and guaranteed deposits) | 100% | - Guaranteed deposits would be utilized by financial institutions to settle bills payable<br>- Pre-sale proceeds restricted balances would be returned to property buyers<br>- Property buyers would have first priority over unpledged deposits |
| Unlisted equity investments (not including investments in subsidiaries) | 20% | - Lower of (i) NBV of the investments and (ii) NAV of the investee attributable to the % held by the Subject Entity based on management account of the investee as at 31 December 2022, if available |
| Listed equity investments (not including Evergrande Property and Evergrande Auto) | 80% | - Market value as at 31 December 2022 |
| Investments in funds | 80% | - NBV |
| Bills receivable from third parties | Various | - Bank's acceptance bills: 100%<br>- Commercial acceptance bills: 30% for due receivables and 50% for current receivables |
| Accounts receivable from third parties | Various based on aging | - These mainly represent receivables from sale of construction materials and property management fee receivables. Estimated realization on NBV will depend on aging:<br>  - Within 1 year: 50% (3333 Group & 708 Group); 80% (6666 Group)<br>  - 1-2 years: 30%<br>  - 2-3 years: 10%<br>  - Above 3 years: 0% |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

26

# Key Assumptions

## Asset-specific Assumptions

The table below sets out assumptions on each key line item of assets under a liquidation scenario, based on discussions with the management of the Group and having regard to experience from previous liquidations:

| Assets | Estimated Realisation Rate | Remarks |
|---|---|---|
| Receivables from banks regarding mortgage proceeds | 0% | - It is assumed that pre-sale proceeds from property sale would be refunded to property buyers and the relevant properties (with legal titles retained with the Group) would be disposed by auction. As no properties would be delivered to property buyers, the Group could not receive the receivables from banks |
| Prepayments for acquisition of land use rights | 0% | - The Group would not continue to perform the contractual obligations and might be liable of contractual claims<br>- No information on whether the relevant contracts are assignable or whether the prepayments are refundable<br>- It is expected that these prepayments would have no recovery value |
| Prepaid taxes | 0% | - Advised by the Group's management that prepaid taxes could only be utilised by the relevant Subject Entities and could not be refunded, transferred or assigned. Accordingly, it is assumed that the realisable value of prepaid taxes would be nil under a liquidation scenario |
| Construction-related prepayments | 0% | - These represent prepayments made to contractors and suppliers of construction materials. As the Group would fail to continue to perform the contractual obligations and might become liable of contractual claims, it is expected that these prepayments would have no recovery value |
| Prepayments to property agencies | 0% | - As the Group would cease its business of sale of properties upon liquidation, it would fail to continue to perform the contractual obligations and might become liable of contractual claims, it is expected that these prepayments would have no recovery value |
| Deposits for acquisition of equity investments | 10% | - It includes deposits paid for acquisition of equity investments<br>- No information on whether the relevant contracts are assignable or whether the deposits are refundable. The Group would not continue to perform the share acquisition agreements under a liquidation scenario. It is assumed that these deposits would not be recoverable |

# Key Assumptions

## Asset-specific Assumptions

The table below sets out assumptions on each key line item of assets under a liquidation scenario, based on discussions with the management of the Group and having regard to experience from previous liquidations:

| Assets | Estimated Realisation Rate | Remarks |
|---|---|---|
| Other deposits | 10% | - These represent mainly rental deposit and deposits paid to relevant government authorities in respect of real estate development<br>- The Group would cease its business of real estate development upon liquidation, it is expected that deposits paid to relevant government authorities for real estate development would not be returned<br>- Rental deposits might be forfeited for early termination of rental agreements upon liquidation |
| Other receivables from third parties | Various | - Receivables from Hengten Networks (including the receivables from the disposal of the Group's interest in Hengten Networks) and other receivables in relation to financing provided to individual home purchasers in Hong Kong are assumed to be fully recoverable<br>- Certain other receivables represented pre-sale proceeds and government relief loan proceeds which are kept in escrow accounts in the name of non-Group entities. These other receivables are cash in nature and are assumed to be fully recoverable<br>- For the remaining other receivables from third parties, estimated realization on NBV would depend on aging<br>  - Within 1 year: 20%<br>  - 1-2 years: 10%<br>  - Over 2 years: 0% |
| Intercompany receivables | Various | - Including accounts receivable/ payable, bills receivable/ payable, prepayments, deposits, interests and dividends<br>- From Subject Entities: estimated recovery rate of unsecured claims of the respective Group debtor<br>- Out-scope Entities: 5% |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

28

# Key Assumptions

## Asset-specific Assumptions

The table below sets out assumptions on each key line item of assets under a liquidation scenario, based on discussions with the management of the Group and having regard to experience from previous liquidations:

| Assets | Estimated Realisation Rate | Remarks |
|---|---|---|
| Investments in joint ventures | 10% | - Investments in joint ventures are recognized at cost and adjusted thereafter for the Group's share of post-acquisition profits or losses.<br>- Joint ventures are mainly engaged in real estate development. With the Group being put into liquidation, it is expected that the Group would no longer fund the joint ventures. Unless the joint ventures have sufficient assets or the joint venture partners agree to provide funding (which might dilute the Group's interests in joint ventures), it is likely that the joint ventures would need to be liquidated. Given the current real estate market condition in the PRC, it is unlikely that the joint ventures would realize sufficient assets to repay liabilities and have surplus assets for distribution to the Group in the event of liquidation. After considering the above, it is assumed that only 10% of NBV would be realized. |
| Investment properties in PRC | Various | - Investment properties of Subject Entities consist of offices and shopping malls in the PRC held for rental and capital appreciation<br>- They are recorded at fair value which represent market value based on independent valuation determined at each reporting date, i.e. 31 December 2022.<br>- Various recovery rates, depending on the location of the property, are applied to the fair value of investment properties as estimated by the management of the Group,<br>   - 1st tier cities: 55%<br>   - 2nd tier cities: 35%<br>   - 3rd tier cities: 25%<br>   - Below 3rd tier cities: 15% |
| Land use rights | 30% | - NBV representing costs of acquiring the rights to use certain land for self-use buildings/ properties |
| Other intangible assets | 20% | - Mainly represents capitalized research and development costs, and patent/ proprietary technology rights of Evergrande Auto |

# Key Assumptions

## Asset-specific Assumptions

The table below sets out assumptions on each key line item of assets under a liquidation scenario, based on discussions with the management of the Group and having regard to experience from previous liquidations:

| Assets | Estimated Realisation Rate | Remarks |
|---|---|---|
| Inventories of PRC real estate projects (including PHS and PUD) | Various | - Various recovery rates, depending on the location of the projects, are applied to (i) the net realizable value of real estate projects as estimated by the management of the Group; (ii) independent valuation on the fair value of the PHS or PUD; or (iii) net book value of PHS or PUD if (i) and (ii) are not available |
| | |    - 1st tier cities: 60% |
| | |    - 2nd tier cities: 40% |
| | |    - 3rd tier cities:  30% |
| | |    - Below 3rd tier cities: 20% |
| | | - Net realizable value of a real estate project is estimated by the management of the Group based on |
| | |   (i)  estimated sales proceeds = area available for sale (based on revenue recognition policies) multiplied by sqm market price of comparable developments (independent valuation were performed on the average selling price of certain projects) |
| | | Less: |
| | |   (i)  Unpaid land cost and construction costs |
| | |   (ii)  Costs to complete construction (i.e. total construction contract value x management estimate on % of incomplete portion x 10-15% buffer on cost adjustments) |
| | |   (iii)  Estimated tax expenses |
| | |   (iv)  Estimated selling and administrative expenses |
| | | - Without any independent valuation on the Group's PHS and PUD, we consider the net realizable value of a project could be an alternative estimate of the fair value of the PHS/PUD as the net realizable value represents approximate value of what willing buyers would pay for an incomplete project, i.e. estimated sales proceeds less estimated costs to completion (which reflect the status of completion) |
| Inventories of Hong Kong real estate projects (PHS) | 80% | - NBV |
| Inventories of Evergrande Auto Group | 10% | - NBV |

© 2023. For information, contact Deloitte China.

# Illustration of Payment Waterfall of a PRC Company

## 1. PRC Real Estate Projects Specific Waterfall – Super Priority Claims and Encumbered Assets

## 2. Secured Liabilities

## 3. Unsecured Liabilities

China Evergrande Group | Liquidation Analysis Report

31

© 2023. For information, contact Deloitte China.

# Illustration of Payment Waterfall of an Offshore Entity

## 1. Secured Liabilities

**Secured assets**

**Secured liabilities**

Surplus of secured assets

## 2. Unsecured Liabilities

Deficiencies will be treated as unsecured claims of the borrower

### Unsecured Assets

- Surplus of secured assets
- General unsecured assets
- Intercompany receivables
- Return from investment in solvent subsidiaries

### Preferential Claims

- Liquidation costs
- Employees claims
- Tax payables

### Unsecured Claims

- General unsecured claims
- Guarantee claims (full except Type 1 Guarantee) and put option obligation (deficiency)
- Deficiencies of secured claims
- Intercompany Payables
- Dividend Payables
- Residual to shareholders (if the entity is solvent)

*Iterative distribution process through matrices of intercompany balances, dividends & shareholding*

**Legend:**

- Distribution
- Source of distribution
- Deficiencies
- Intercompany related
- Proceeds from asset realization
- Liabilities
- Surplus net of priority claims
- Deficiency claims

© 2023. For information, contact Deloitte China.

# Estimated Liquidation Analysis for CEG

| RMB in million | Adjusted NBV as at 31 Dec 2022 | ERV | Average realization rate |
|---|---|---|---|
| **Unencumbered current assets:** | | | |
| Cash and cash equivalents | 7 | 7 | 100% |
| Dividends receivable | 59,080 | 3,277 | 6% |
| Other receivables and prepayment (including receivables from Out-scope Entities) | 6,787 | 264 | 4% |
| Intercompany receivables from Subject Entities | 106,486 | 3,600 | 3% |
| Distribution from CEG in excess of guaranteed liabilities | - | 21 | |
| **Total unencumbered current assets** | 172,360 | 7,169 | |
| | | | |
| **Unencumbered non-current assets:** | | | |
| Long-term equity investments | 4,727 | - | - |
| Fixed assets | 1 | 0 | 20% |
| **Total unencumbered non-current assets** | 4,728 | 0 | |
| | | | |
| **Total unencumbered assets** | 177,088 | 7,169 | |
| | | | |
| **Preferential claims** | | | |
| 1.Liquidation costs | | (358) | |
| 2.Employee claims | | (4) | |
| 3.Tax payables | | - | |
| **Estimated surplus available for unsecured claims** | | 6,807 | |
| | | | |
| Unsecured interest-bearing liabilities | | - | |
| Intercompany payables to Subject Entities | | (83,380) | |
| Other liabilities | | (1,828) | |
| Deficiencies of secured claims & put option obligations | | (135,134) | |
| *Secured liabilities/put option obligations* | | (135,542) | |
| *-Less recoveries from secured assets/unreturned security under put options* | | 408 | |
| **Total liabilities, excluding dividend payables** | | (220,342) | |
| | | | |
| Contingent liabilities- *Guarantees* | | (81,336) | |
| **Total obligations, excluding dividend payables** | | (301,678) | |
| | | | |
| **Estimated recovery rate of CEG's unsecured creditors** | | 2.26% | |

**Estimated recovery rate for CEG Existing Notes at CEG and all Obligors** | | 3.34% |

| Estimated Recoveries of CEG Existing Notes | Estimated distribution to noteholders (RMB in million) |
|---|---|
| From CEG (estimated recovery of unsecured claims of CEG) | 2,523 |
| | |
| **From Guarantors** | |
| ANJI (BVI) Limited安基(BVI)有限公司 | 556 |
| Jiajian (BVI) Limited嘉夏里(BVI)有限公司 | 453 |
| Billion Mark Limited | 90 |
| YITONG (BVI) Limited亿通(BVI)有限公司 | 69 |
| FENGYU (BVI) Limited丰域(BVI)有限公司 | 23 |
| Others | 21 |
| | 1,212 |
| | |
| From share pledge | - |
| | |
| **Total estimated distribution** | 3,735 |
| | |
| **Total CEG Existing Notes** | 111,904 |
| | |
| **Estimated recovery rate under the CEG Existing Notes** | 3.34% |

Notes: Figures above are subject to rounding. NBV, ERV and average realization rate that are less than RMB1m / 1% may be illustrated as "0"/ "0%". The use of "-" will be present to illustrate no monetary amount.

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

# Estimated Liquidation Analysis for SJ

| RMB in million | Adjusted NBV as at 31 Dec 2022 | ERV | Average realization rate | Estimated Recoveries of SJ Existing Notes | Estimated distribution to noteholders (RMB in million) |
|---|---|---|---|---|---|
| **Unencumbered current assets:** | | | | | |
| Intercompany receivables from Subject Entities | 25,780 | 734 | 3% | From SJ (estimated recovery from unsecured claims of SJ) | 69 |
| Total unencumbered current assets | 25,780 | 734 | | **From Guarantors** | |
| | | | | Shengyu (BVI) Limited盛誉(BVI)有限公司 | 1,389 |
| | | | | Tianji 天骥 | 989 |
| | | | | Win Peak Group Limited㮥峰集团有限公司 | 542 |
| | | | | Marche Limited丽寒华嵘斑玶有限公司 | 356 |
| | | | | Shengtong Holding Limited盛通控股有限公司 | 11 |
| **Preferential claims** | | | | Ever Grace Group Limited恒惠集团有限公司 | 113 |
| 1.Liquidation costs | | (37) | | Joy Wealthy Investment Limited悦才投资有限公司 | 105 |
| 2.Employee claims | | - | | South Honest Limited诚衡有限公司 | 9 |
| 3.Tax payables | | - | | Spread Glory Investments Limited广兆投资有限公司 | 8 |
| | | | | Rise Eagle Worldwide Limited鹰环球有限公司 | 2 |
| Total unencumbered assets | 25,780 | 734 | | Others | 522 |
| Estimated surplus available for unsecured claims | | 697 | | | 4,627 |
| | | | | | |
| Unsecured interest-bearing liabilities | | (42,994) | | **Total estimated distribution from SJ and guarantors** | 5,317 |
| Intercompany payables to Subject Entities | | - | | | |
| Other liabilities | | - | | From Keepwell Provider: Hengda Real Estate | 531 |
| Deficiencies of secured claims | | - | | | |
| Total liabilities | | (42,994) | | **Total estimated distribution (assuming keepwell was valid)** | 7,188 |
| | | | | | |
| | | | | **Total SJ Existing Notes** | 42,990 |
| Contingent liabilities | | - | | | |
| | | | | Estimated recovery rate under the SJ Existing Notes (assuming keepwell was invalid) | 12.37% |
| Total obligations | | (42,994) | | | |
| | | | | Estimated recovery rate under the SJ Existing Notes (assuming keepwell was valid) | 16.71% |

| | |
|---|---|
| **Estimated recovery rate of SJ's unsecured creditors** | 1.62% |
| **Estimated recovery rate for SJ Existing Notes at SJ and all Obligors (assuming keepwell was invalid)** | 12.37% |
| **Estimated recovery rate for SJ Existing Notes at SJ and all Obligors (assuming keepwell was valid)** | 16.71% |

Notes: Figures above are subject to rounding. NBV, ERV and average realization rate that are less than RMB1m / 1% may be illustrated as "0"/ "0%". The use of "-" will be present to illustrate no monetary amount.
© 2023. For information, contact Deloitte China.

# Estimated Liquidation Analysis for Tianji

| RMB in million | Adjusted NBV as at 31 Dec 2022 | ERV | Average realization rate |
|---|---|---|---|
| **Unencumbered current assets:** | | | |
| Cash and cash equivalents | 4 | 4 | 100% |
| Accounts receivable | 21 | 6 | 30% |
| Prepayment | 120 | - | - |
| Other receivables (including receivables from Out-scope Entities) | 3,870 | 826 | 21% |
| Intercompany receivables from Subject Entities | 97,493 | 3,234 | 3% |
| Distribution by Tianji in excess of guaranteed liabilities | - | 2 | |
| **Total unencumbered current assets** | **101,508** | **4,072** | |
| | | | |
| **Unencumbered non-current assets:** | | | |
| Long-term equity investment | 2,862 | - | - |
| **Total unencumbered non-current assets** | **2,862** | **-** | |
| | | | |
| **Total unencumbered assets** | **104,370** | **4,072** | |
| | | | |
| **Preferential claims** | | | |
| 1.Liquidation costs | | (204) | |
| 2.Employee claims | | - | |
| 3.Tax payables | | - | |
| **Estimated surplus available for unsecured claims** | | **3,868** | |
| | | | |
| Unsecured interest-bearing liabilities | | - | |
| Intercompany payables to Subject Entities | | (109,884) | |
| Other liabilities | | (1,986) | |
| Deficiencies of secured claims/ put option obligations | | (10,355) | |
| *Secured liabilities/ put option obligations* | | *(11,158)* | |
| *Less recoveries from secured assets/ unreturned security under put options* | | *803* | |
| **Total liabilities** | | **(122,225)** | |
| | | | |
| Contingent liabilities-*Guarantees* | | **(45,121)** | |
| **Total obligations** | | **(167,346)** | |
| | | | |
| **Estimated recovery rate of Tianji's unsecured creditors** | | **2.31%** | |

Notes: Figures above are subject to rounding. NBV, ERV and average realization rate that are less than RMB1m/ 1% may be illustrated as "0"/ "0%". The use of "-" will be present to illustrate no monetary amount.

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

# Estimated Liquidation Analysis for Hengda Real Estate

| RMB in million | Adjusted NBV as at 31 Dec 2022 | ERV | Average realization rate |
|---|---|---|---|
| **Unencumbered current assets:** | | | |
| Cash and cash equivalents | 1,073 | 1,073 | 100% |
| Financial assets held for trading | 138 | 28 | 20% |
| Accounts receivable, prepayment and other receivables (including receivables from Out-scope Entities) | 37,773 | 2,300 | 6% |
| Dividends receivable | 74,159 | 349 | 0% |
| Intercompany receivables from Subject Entities | 258,744 | 25,375 | 10% |
| Distribution by Hengda Real Estate in excess of guaranteed liabilities | - | 474 | |
| **Total unencumbered current assets** | 371,887 | 29,599 | |
| | | | |
| **Unencumbered non-current assets:** | | | |
| Debt investments and equity investments | 471 | 94 | 20% |
| Long-term equity investments | 105,284 | 355 | 0% |
| PUD, PHS, PPE and CIP | 2,021 | 565 | 28% |
| IP, intangible asset and others | 1,545 | 826 | 53% |
| Surplus of secured assets | | 1,870 | |
| **Total unencumbered non-current assets** | 109,321 | 3,710 | |
| | | | |
| **Total unencumbered assets** | 481,208 | 33,309 | |
| | | | |
| **Preferential claims** | | | |
| 1.Bankruptcy expenses | | (266) | |
| 2.Employee claims | | (74) | |
| 3.Tax payables | | (1,165) | |
| **Estimated surplus available for unsecured claims** | | 31,804 | |
| | | | |
| Unsecured interest-bearing liabilities | | (49,737) | |
| Intercompany payables to Subject Entities | | (149,401) | |
| Other liabilities | | (125,410) | |
| Deficiencies of secured claims | | (18,480) | |
| *Secured liabilities* | | (19,865) | |
| *Less recoveries from secured assets* | | 1,385 | |
| **Total liabilities, excluding dividend payables** | | (343,028) | |

| RMB in million | NBV as at 31 Dec 2022 | ERV | Average realization rate |
|---|---|---|---|
| **Contingent liabilities** | | | |
| *Full guarantees* | | (389,191) | |
| *Keepwell/Deed* | | (344,147) | |
| | | (45,044) | |
| **Total obligations, excluding dividend payables** | | (732,219) | |
| | | | |
| Estimated recovery rate of Hengda Real Estate's unsecured creditors | | 4.34% | |

Notes: Figures above are subject to rounding. NBV, ERV and average realization rate that are less than RMB1m/ 1% may be illustrated as "0"/ "0%". The use of "-" will be present to illustrate no monetary amount.

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

36

# Major Offshore Assets as at 31 December 2022
Unsecured

* Obligors

| Category | Details | Owner | NBV RMB million | ERV RMB million | Assumption for estimating ERV (please refer to pages 26-30) |
|---|---|---|---|---|---|
| | China Evergrande New Energy Vehicle Group Ltd. (708.HK) | Evergrande Health Industry Holdings Limited | 17,778.8 (closing price before suspension of trading) | Nil | Estimated return to shareholders of 708 Group based on this Liquidation Analysis |
| | | China Evergrande Group* | 367.0 (closing price before suspension of trading) | Nil | |
| | | 708 Sub-total: | 18,145.8 | Nil | |
| | Evergrande Property Services Group Limited (6666.HK) | China Evergrande Group* | 425.6 (closing price before suspension of trading) | Nil | Estimated return to shareholders of 6666 Group based on this Liquidation Analysis |
| | | CEG Holdings (BVI) Limited | 11,060.0 (closing price before suspension of trading) | Nil | |
| | | 6666 Sub-total: | 11,485.6 | Nil | |
| Financial assets – listed equity investments | Bank of Jinzhou Co., Ltd. (416.HK) | New Chic Global Limited* | 46.0 (market value based on Closing price) | 36.8 | |
| | Faraday Future Intelligent Electric Inc. (FFIE. NASDAQ) | Season Smart Limited | 134.3 (market value based on Closing price) | 107.4 | 80% of market value as of 31 December 2022 |
| | E-House (China) Enterprise Holdings Limited (2048.HK) | Jovial Idea Developments Limited | 96.6 (market value based on Closing price) | 77.3 | |
| | | Listed equity investments sub-total: | 29,908.3 | 221.5 | |

© 2023. For information, contact Deloitte China.

# Major Offshore Assets as at 31 December 2022

Unsecured

* Obligors

| Category | Details | Owner | NBV RMB million | ERV RMB million | Assumption for estimating ERV (please refer to pages 26-30) |
|---|---|---|---|---|---|
| Financial assets – unlisted equity investments | Seekers Partners Limited (formerly known as Satinu Resources Group Ltd.) | Jiajian (BVI) Limited* | 1,285.1 | 257.0 | 20% of NBV |
| | Cordoba Homes Limited | Greet Delight Limited | 2,598.3 | 519.7 | 20% of NBV |
| | Unlisted equity investments Sub-total: | | 3,883.4 | 776.7 | |
| Financial assets – unlisted funds investment | Pacific Venture Opportunity Fund I,L.P. | Jiajian (BVI) Limited* | 306.8 | 245.5 | 80% of NBV |
| Loans & proceeds from disposal of HengTen Networks Group Limited (136.HK) | Hengten Networks Group Limited | | 1,698.6 | 1,698.6 | Fully recoverable based on discussion with the management |
| | Pumpkin Films Limited | Solution Key Holdings Limited | 1,452.1 | 1,452.1 | |
| | Ocean Fund SPC-Lakers Fund SP | | 485.3 | 485.3 | |
| | HengTen Network related Sub-total: | | 3,636.0 | 3,636.0 | |
| Other Receivables | Yingjia International Properties Limited | State Hero Holdings Limited | 4,466.4 | 446.6 | 10% of NBV (aging within 1-2 years) |
| | Victoria Fortune Group (China) Investment Limited | | 1,786.5 | 178.7 | |
| | Other receivables Sub-total: | | 6,252.9 | 625.3 | |

# Major Offshore Assets as at 31 December 2022

Unsecured

* Obligors

| Category | Details | Owner | NBV RMB million | ERV RMB million | Assumption for estimating ERV (please refer to pages 26-30) |
|---|---|---|---|---|---|
| **Property project – Emerald Bay** | Investment costs in OCI Investment Fund SPC | Tianji Holding Limited* | 855.8 | Nil | Estimated residual value based on the Liquidation Analysis |
| | Due from Fortune Choice Development Limited (project company) | Tianji Holding Limited* | 359.2 | 226.3 | Estimated recovery to unsecured creditors of Fortune Choice based on the Liquidation Analysis. |
| | Due from Fortune Choice Development Limited (project company) | Profit Concept Finance Limited* | 152.7 | 96.2 | |
| | Due from OCI Investment Fund SPC | All Peace Investments Limited* | 929.0 | Nil | Estimated recovery based on the Liquidation Analysis |
| | Emerald Bay related Sub-total: | | 2,296.7 | 322.5 | |
| **Other receivables in Property projects - Emerald Bay & The Vertex** | Other receivables in relation to financing provided to individual home purchasers (业主款) | Profit Concept Finance Limited* | 259.2 | 259.2 | Fully recoverable based on discussion with the management |
| **Others** | Art collections | Butterfly Hop Holdings Limited | 405.2 | 81.0 | 20% of NBV |
| | Total: | | 46,948.5 | 6,167.7 | |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

# Major Offshore Assets as at 31 December 2022

## Secured

*Obligors

| Category | Details | Owner | NBV RMB million | ERV RMB million | Assumption (page refer to pages 26-30) |
|---|---|---|---|---|---|
| | China Bohai Bank Co., Ltd. (9668.HK) | New Chic Global Limited* | 49.8 (market value based on closing price) | 39.9 | 80% of market value as of 31 Dec 2022 |
| Financial assets – listed equity investments | Evergrande Property Services Group Limited (6666.HK) | New Chic Global Limited* | 24.6 (closing price before suspension of trading) | Nil | Estimated return to shareholders of 6666 Group based on the Liquidation Analysis |
| | | State Charm Holdings Limited[1] | 410.9 (closing price before suspension of trading) | Nil | |
| | | Eagleville Holdings Limited[2] | 308.2 (closing price before suspension of trading) | Nil | |
| | | Empire Choice Investments Limited[3] | 719.2 (closing price before suspension of trading) | Nil | |
| | | Listed equity investments Sub-total: | 1,512.7 | 39.9 | |
| YF Life Centre (formerly known as China Evergrande Center) | Investment property located at Wanchai, Hong Kong | Pioneer Time Investment Limited*# | 5,506.5 | 3,303.9 | 60% of NBV |
| | | Total: | 7,019.2 | 3,343.8 | |

Notes:
1. State Charm Holdings Limited ceased to be a member of the Group and an obligor following the transfer of shares in State Charm in connection with CEG Loan 2 during 2022.
2. Eagleville Holdings Limited ceased to be a member of the Group and an obligor following the transfer of shares in Eagleville in connection with the Clear Star Put Option during 2022.
3. Empire Choice Investments Limited ceased to be a member of the Group and an obligor following the transfer of shares in Empire Choice in connection with CEG Loan 1 during 2022.

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

40

# Limitations

## Limited scope analysis

- Given the size of the Group and availability of information, it was agreed that the Liquidation Analysis would cover Subject Entities which represent possible material recovery (intercompany balances/ equity) to the Obligors.

- Without information on the financial position of the Out-scope Entities and without an analysis of the estimated realizations of their assets in the event of liquidation, the Liquidation Analysis assumes that there is nil recovery from equity investments in Out-scope Entities and there is 5% recovery from receivables due from Out-scope Entities. Should the financial positions of the Out-scope entities be individually considered, the estimated return to creditors might change.

## Accuracy and completeness of information

- We relied heavily upon the accuracy, validity and completeness of the financial and other information provided to us by the Company, its staff and advisors. We have not sought to audit or independently verify the information provided to us. Where information has been provided to us, we have assumed that it is accurate and current.

- In particular, known liabilities are assumed to be properly recorded and guarantees are properly identified. The actual claims and debts admitted in liquidation proceedings could be different from those adopted in the Liquidation Analysis.

- Balance sheets of certain Subject Entities are not available due to enforcement action by creditors (including appointment of receivers).

## Subsequent events are not considered

- Events after 31 December 2022 were not considered, except for those set out in Appendix 3.
- Interest and default interest were accrued up to 31 December 2022.
- Returns to creditors might change if account is taken of the above.

## Audit and consolidation adjustments

- The Liquidation Analysis has been conducted on an entity-by-entity basis, i.e. based on standalone balance sheets of Subject Entities.
- We noted that certain audit adjustments and consolidation adjustments were made to the figures for assets and liabilities of the Group recorded in the books. In this Liquidation Analysis, we have taken account of audit adjustments and consolidation adjustments that were provided to us on or before 4 July 2023 and if (i) the adjustment can be attributed to the entity-level balance sheet based on discussions with the Auditor; and (ii) impacts of the adjustment on the assets or the liabilities of the Group is larger than the threshold of RMB1b.
- Should account be taken of all the audit adjustments and consolidation adjustments included in the published audited consolidated financial statements of the Group, the recoveries to creditors may change.

## Use of estimates and assumptions

- This Liquidation Analysis involved extensive use of estimates and assumptions, which are inherently subject to uncertainties and contingencies beyond the control of the Company, its management and advisors. As a result, the actual recovery from the liquidation could be materially different from the estimated recovery set forth in the liquidation scenario.

## Intercompany balances

- Differences in intercompany balances were noted and we sought further clarification from the Company on discrepancies in intercompany balances between Subject Entities (of RMB1b and above). There remained unreconciled differences which were adjusted as set out in detail in the Key Assumptions, for the purpose of the Liquidation Analysis.
- Should the difference be fully reconciled by the Company, there could be changes in the assets and liabilities of Subject Entities, and ultimately the expected returns to creditors.

© 2023. For information, contact Deloitte China.

# Limitations

### Valuation

- We were not provided with independent valuations of the forced-sale values of all properties (including PHS and PUD) and investments, which are the major assets of the Group.

- We understand from the management that independent valuations were performed in respect of certain properties (including IPs, PHS and PUD) of Subject Entities. We have not received the relevant valuation reports as of the Cut-off Date and we have relied on certain valuation schedules provided by the management of the Group containing information on the fair value as assessed by independent valuers.

- For properties (including PHS and PUD) for which independent valuations were not available, we have relied on management estimates of the forced-sale value of properties. Results of the Liquidation Analysis in respect of these properties may be different if independent valuations on forced-sale values were available.

### Remittance of funds from the PRC

- We have assumed that all proceeds (if any) generated from realisation of assets of the Group including intercompany balances can be remitted to creditors outside PRC under a liquidation scenario. Should the assumption be invalid, the estimated recoveries may be higher than those which would actually be received.

### Taking possession and realization of assets

- A majority of the Group's fixed assets are located in the PRC. Experience suggests that in the event of a liquidation, it may take extra time and effort to effect the transfer of assets located in the PRC and complications may arise in transferring the title of assets in PRC, and effort to transfer assets located in the PRC may or may not be successful.

### Security provided by third parties

- Due to unavailability of information, the Liquidation Analysis has not taken account of possible recoveries from realization of security granted in respect of indebtedness of Subject Entities by parties outside the Group.

- Expected return to creditors could increase if realizable values of the security provided by third parties were included in the analysis.

### Tax issues

- It is assumed that all proposed disposal of fixed assets of the Group and distribution are not subject to payment of any taxes; however, in certain cases, disposal and distribution may give rise to tax liability. If tax liability should arise, expected return to the creditors would decrease.

### Contingent liabilities

- Given the scope of our work has been limited by the information made available to us, we have not taken account of any other contingent liabilities of the Group, save for the known corporate guarantees on borrowings and put option obligations

### Guarantee claims

- Please refer to the section "General Assumptions" for treatment of guarantee.

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

42

# Appendix 1 – List of Subject Entities

# List of Subject Entities

| No. | Company name | On/Offshore | Group | No. | Company name | On/Offshore | Obligor Group |
|---|---|---|---|---|---|---|---|
| 1 | Forbidden City Culture Co., Limited紫禁城弘华文化有限公司 | Offshore | 3333 Group | 31 | City Faith Limited都信有限公司 | Offshore | 3333 Group |
| 2 | EVER SURE INDUSTRIES LIMITED永祺实业有限公司 | Offshore | 3333 Group | 32 | South Honest Limited温盛有限公司 | Offshore | 3333 Group |
| 3 | China Evergrande Group中国恒大集团 | Offshore | 3333 Group | 33 | EVER GRACE GROUP LIMITED恒睿集团有限公司 | Offshore | 3333 Group |
| 4 | ANJI (BVI) Limited安基(BVI)有限公司 | Offshore | 3333 Group | 34 | MINSIN INTERNATIONAL (HOLDINGS) LIMITED明诚国际(集团)有限公司 | Offshore | 3333 Group |
| 5 | Shengjian (BVI) Limited盛建(BVI)有限公司 | Offshore | 3333 Group | 35 | Merry Full Investments Limited怡满投资有限公司 | Offshore | 3333 Group |
| 6 | SUCCESS WILL GROUP LIMITED建立集团有限公司 | Offshore | 6666 Group | 36 | Million Castle Investments Limited | Offshore | 3333 Group |
| 7 | Shengyu (BVI) Limited盛源(BVI)有限公司 | Offshore | 3333 Group | 37 | Accord Sino Group Limited协华集团有限公司 | Offshore | 3333 Group |
| 8 | Jiajian (BVI) Limited嘉建(BVI)有限公司 | Offshore | 3333 Group | 38 | Benefit East Investments Limited益东投资有限公司 | Offshore | 3333 Group |
| 9 | FENGYU (BVI) Limited丰域(BVI)有限公司 | Offshore | 3333 Group | 39 | Champion Globe Limited恒爭有限公司 | Offshore | 3333 Group |
| 10 | YITONG (BVI) Limited亿通(BVI)有限公司 | Offshore | 3333 Group | 40 | Champion King Investments Limited必康投资有限公司 | Offshore | 3333 Group |
| 11 | LANBOWAN (BVI) Limited兰博湾(BVI)有限公司 | Offshore | 3333 Group | 41 | Champion Glory Holdings Limited必康集团有限公司 | Offshore | 3333 Group |
| 12 | CHUANGFENG (BVI) Limited创丰(BVI)有限公司 | Offshore | 3333 Group | 42 | LUCKYUP GROUP LIMITED昇祺集团有限公司 | Offshore | 3333 Group |
| 13 | ACELIN GLOBAL LIMITED | Offshore | 3333 Group | 43 | First Key Investments Limited元基投资有限公司 | Offshore | 3333 Group |
| 14 | GLOBAL POWER LIMITED | Offshore | 3333 Group | 44 | Pioneer Time Investment Limited | Offshore | 3333 Group |
| 15 | NEW CHIC GLOBAL LIMITED | Offshore | 3333 Group | 45 | GREAT COURAGE GLOBAL LIMITED | Offshore | 3333 Group |
| 16 | WELLY GOLD LIMITED世睿有限公司 | Offshore | 3333 Group | 46 | CHARM WEALTH ASIA PACIFIC LIMITED宝曜亚太有限公司 | Offshore | 3333 Group |
| 17 | Shengtong (BVI) Limited盛通(BVI)有限公司 | Offshore | 3333 Group | 47 | INVESTOR NETWORK GLOBAL LIMITED | Offshore | 3333 Group |
| 18 | Universal Star Global Limited | Offshore | 3333 Group | 48 | FAST TALENT INVESTMENT LIMITED迅杰投资有限公司 | Offshore | 3333 Group |
| 19 | Peace Top Limited | Offshore | 3333 Group | 49 | WILL GLORY HOLDINGS LIMITED好耀控股有限公司 | Offshore | 3333 Group |
| 20 | Solution Key Holdings Limited | Offshore | 3333 Group | 50 | Butterfly Hop Holdings Limited | Offshore | 3333 Group |
| 21 | Shengheng Holding Limited盛恒控股有限公司 | Offshore | 3333 Group | 51 | Dragon Joy (China) Limited龙悦（中国）有限公司 | Offshore | 3333 Group |
| 22 | Evergrande Health Industry Holdings Limited恒大健康产业控股有限公司 | Offshore | 0708 Group | 52 | White Heron Limited | Offshore | 3333 Group |
| 23 | 中国恒大新能源汽车集团有限公司 | Offshore | 0708 Group | 53 | Superb Capital Enterprises Limited | Offshore | 3333 Group |
| 24 | Tianji Holding Limited天基控股有限公司 | Offshore | 3333 Group | 54 | Dragon Fortune Ltd. | Offshore | 3333 Group |
| 25 | XING HONG HOLDINGS LIMITED兴鸿控股有限公司 | Offshore | 3333 Group | 55 | Palm Island Resort Limited棕榈岛渡假村有限公司 | Offshore | 3333 Group |
| 26 | ROSY DYNASTY LIMITED源婷有限公司 | Offshore | 3333 Group | 56 | Lucky Gow Holdings Limited智嘉控股有限公司 | Offshore | 3333 Group |
| 27 | Starthigh International limited高原国际有限公司 | Offshore | 3333 Group | 57 | FORTUNE LUCK CORPORATION LIMITED顺所有限公司 | Offshore | 3333 Group |
| 28 | Lucky Benefit Limited | Offshore | 3333 Group | 58 | SHUI WAH INVESTMENT LIMITED瑞华投资有限公司 | Offshore | 3333 Group |
| 29 | Loyal Power Investments Limited旺权投资有限公司 | Offshore | 3333 Group | 59 | WISDOM GAIN GROUP LIMITED智盈集团有限公司 | Offshore | 3333 Group |
| 30 | Rising Sheen Limited升亮有限公司 | Offshore | 3333 Group | 60 | GROW RISING INVESTMENT LIMITED晋廷投资有限公司 | Offshore | 3333 Group |

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|-----|--------------|-------------|-------|
| 61 | Marche Limited恒滘华集团有限公司 | Offshore | 3333 Group |
| 62 | Baojun Limited保骏有限公司 | Offshore | 3333 Group |
| 63 | Perfect Vantage Investments Limited万冠投资有限公司 | Offshore | 3333 Group |
| 64 | Ace Score Holdings Limited | Offshore | 3333 Group |
| 65 | S.I. FengTao Properties (BVI) Limited上实丰涛置业(BVI)有限公司 | Offshore | 3333 Group |
| 66 | S.I. Feng Tao Properties Limited上实丰涛置业有限公司 | Offshore | 3333 Group |
| 67 | Charisma City Limited | Offshore | 3333 Group |
| 68 | S.I. Feng Shun Properties (BVI) Limited上实丰顺置业(BVI)有限公司 | Offshore | 3333 Group |
| 69 | Jiayu Holdings Limited嘉睿控股有限公司 | Offshore | 3333 Group |
| 70 | Ever Shiny International Limited | Offshore | 3333 Group |
| 71 | Future Lead Enterprises Limited天华企业有限公司 | Offshore | 3333 Group |
| 72 | Hinto Developments Limited | Offshore | 3333 Group |
| 73 | SPREAD GLORY INVESTMENTS LIMITED广亮达投资有限公司 | Offshore | 3333 Group |
| 74 | Triumph Hero International Limited胜雄国际有限公司 | Offshore | 3333 Group |
| 75 | Rise Eagle Worldwide Limited飞鹰环球有限公司 | Offshore | 3333 Group |
| 76 | Jiaying Holdings Limited嘉颖控股有限公司 | Offshore | 3333 Group |
| 77 | Jiashi Holdings Limited嘉誉控股有限公司 | Offshore | 3333 Group |
| 78 | New Insight Holdings Limited创凯控股有限公司 | Offshore | 3333 Group |
| 79 | Easy Gain Investment Holdings Limited盈润投资控股有限公司 | Offshore | 3333 Group |
| 80 | Starlet Development Limited星盈发展有限公司 | Offshore | 3333 Group |
| 81 | Honor Business Investment Limited荣商投资有限公司 | Offshore | 3333 Group |
| 82 | Honour In Investments Limited啟悦投资有限公司 | Offshore | 3333 Group |
| 83 | Link Care Limited环照有限公司 | Offshore | 3333 Group |
| 84 | Grace Target Holdings Limited嘉志集团有限公司 | Offshore | 3333 Group |
| 85 | Jiading Holdings Limited嘉鼎控股有限公司 | Offshore | 3333 Group |
| 86 | Menkia Holdings Limited万家控股有限公司 | Offshore | 3333 Group |
| 87 | Glory Sign Development Limited皇志荣发展有限公司 | Offshore | 3333 Group |
| 88 | Vast Wheel Company Limited宏霜有限公司 | Offshore | 3333 Group |
| 89 | Prosper Power Development Limited盛晨发展有限公司 | Offshore | 3333 Group |
| 90 | Reago Group Limited锐高集团有限公司 | Offshore | 3333 Group |
| 91 | Sharp Goal Investments Limited铿怡投资有限公司 | Offshore | 3333 Group |
| 92 | On Lucky Holdings Limited安利达控股有限公司 | Offshore | 3333 Group |
| 93 | Pacific Plus Enterprises Limited汇太企业有限公司 | Offshore | 3333 Group |
| 94 | Silver Opportunity Investment Limited银机投资有限公司 | Offshore | 3333 Group |
| 95 | Prime Light Holdings Limited柏天集团有限公司 | Offshore | 3333 Group |
| 96 | Full Hill Limited | Offshore | 3333 Group |
| 97 | Dragon Charm Investments Limited发创投资有限公司 | Offshore | 3333 Group |
| 98 | Crown Wise Investment Limited冠惠投资有限公司 | Offshore | 3333 Group |
| 99 | Luck Fortune Holdings Limited | Offshore | 3333 Group |
| 100 | Upper East Property Holdings Company Limited上东置业控股有限公司 | Offshore | 3333 Group |
| 101 | Full Jolly Investments Limited满怡投资有限公司 | Offshore | 3333 Group |
| 102 | Win Harbour Investments Limited凯港投资有限公司 | Offshore | 3333 Group |
| 103 | Joy Wealthy Investment Limited悦才发投资有限公司 | Offshore | 3333 Group |
| 104 | JICHENG INTERNATIONAL (HK) LIMITED集成国际(香港)有限公司 | Offshore | 3333 Group |
| 105 | Billion Mark Limited | Offshore | 3333 Group |
| 106 | Healthy Time International Limited健时国际有限公司 | Offshore | 3333 Group |
| 107 | Oriental Fame Holdings Limited东荣控股有限公司 | Offshore | 3333 Group |
| 108 | Goldbridge Limited | Offshore | 3333 Group |
| 109 | Sunny Net Development Limited日讯发展有限公司 | Offshore | 3333 Group |
| 110 | Cheer Champ Investment Limited志昂投资有限公司 | Offshore | 3333 Group |
| 111 | Cheer Motion Development Limited致能发展有限公司 | Offshore | 3333 Group |
| 112 | Opal House Development Limited | Offshore | 3333 Group |
| 113 | Gold Ascot Limited金士福有限公司 | Offshore | 3333 Group |
| 114 | East Best Investments Limited东卓投资有限公司 | Offshore | 3333 Group |
| 115 | Trend Rich Investment Limited数富投资有限公司 | Offshore | 3333 Group |
| 116 | JIA SHAN HOLDINGS LIMITED嘉善控股有限公司 | Onshore | 3333 Group |
| 117 | BAI CHANG LIMITED百昌有限公司 | Onshore | 3333 Group |
| 118 | CENTRALSINO GLOBAL LIMITED中华环球有限公司 | Onshore | 3333 Group |
| 119 | JOVIAL IDEA DEVELOPMENTS LIMITED乐意发展有限公司 | Onshore | 3333 Group |
| 120 | Billion Sino Investments Limited亿中投资有限公司 | Offshore | 3333 Group |

*Obligor Group* (column header)

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|---|---|---|---|
| 121 | Allywing Investments Limited荣邦投资有限公司 | Offshore | 3333 Group |
| 122 | California Place Dalian Limited加州豪庭大连有限公司 | Offshore | 3333 Group |
| 123 | Win Peak Group Limited凯峰集团有限公司 | Offshore | 3333 Group |
| 124 | CHINA AGRICULTURE TECHNOLOGY LIMITED中国农业科技有限公司 | Offshore | 3333 Group |
| 125 | Dragon Pioneer Development Limited龙念发展有限公司 | Offshore | 3333 Group |
| 126 | Goldenway Land Development Limited金道置业有限公司 | Offshore | 3333 Group |
| 127 | China Sea Group (Hong Kong) Investment Limited中海集团(香港)投资有限公司 | Offshore | 3333 Group |
| 128 | EXCEL SKY (HONG KONG) LIMITED俊天(香港)有限公司 | Offshore | 3333 Group |
| 129 | GOOD WAVE INTERNATIONAL LIMITED佳海国际有限公司 | Offshore | 3333 Group |
| 130 | INFINITY REAL ESTATE HOLDINGS PTE | Offshore | 3333 Group |
| 131 | Fortune Ascent Property Management Limited升裕物业管理有限公司 | Offshore | 6666 Group |
| 132 | INSTANT CHOICE DEVELOPMENT LTD. | Offshore | 3333 Group |
| 133 | LUCKY UNIVERSE HOLDING LIMITED瑞宇集团有限公司 | Offshore | 3333 Group |
| 134 | SCENERY JOURNEY LIMITED景程有限公司 | Offshore | 3333 Group |
| 135 | Faith Honor Group Limited信荣集团有限公司 | Offshore | 3333 Group |
| 136 | Shiny Profit Enterprises Limited(BVI) | Offshore | 3333 Group |
| 137 | LEADING VIEW INTERNATIONAL LIMITED | Offshore | 3333 Group |
| 138 | EASE TRIUMPH INTERNATIONAL LIMITED拓业国际有限公司 | Offshore | 3333 Group |
| 139 | EV Wanchai 1 Holdings Limited | Offshore | 3333 Group |
| 140 | EV Wanchai 1 Land Holdings Limited | Offshore | 3333 Group |
| 141 | THOUSAND GRAND HOLDING LIMITED千宏控股有限公司 | Offshore | 3333 Group |
| 142 | SEASON SMART LIMITED时颖有限公司 | Offshore | 0708 Group |
| 143 | PRIME SUN HOLDING LIMITED盛日控股有限公司 | Offshore | 0708 Group |
| 144 | Evergrande New Energy Automotive Holdings (Hong Kong) Limited | Offshore | 0708 Group |
| 145 | Solution King Investments Limited | Offshore | 0708 Group |
| 146 | Mini Minor Limited | Offshore | 0708 Group |
| 147 | TOTAL ACCORD LIMITED鹰全有限公司 | Offshore | 0708 Group |
| 148 | ASSEMBLE GUARD LIMITED汇汇有限公司 | Offshore | 0708 Group |
| 149 | AMPLE TREASURE HOLDING LIMITED宝丰集团控股有限公司 | Offshore | 3333 Group |
| 150 | FLOURISHING FILL LIMITED股盛有限公司 | Offshore | 0708 Group |
| 151 | Kind World Corporation Limited良世有限公司 | Offshore | 0708 Group |
| 152 | GODSIB LIMITED | Offshore | 3333 Group |
| 153 | LAGUNA HEIGHTS LIMITED | Offshore | 3333 Group |
| 154 | URBAN EAGLE LIMITED | Offshore | 3333 Group |
| 155 | CHANG XING HOLDINGS LIMITED昌兴控股有限公司 | Offshore | 3333 Group |
| 156 | NOBLE BEAUTY LIMITED | Offshore | 3333 Group |
| 157 | STATE HERO HOLDINGS LIMITED | Offshore | 3333 Group |
| 158 | CHEUNGFU DEPARTMENT STORE ENTERPRISE LIMITED象富百货集团有限公司 | Offshore | 3333 Group |
| 159 | NICE DRAGON CAPITAL INVESTMENT LIMITED | Offshore | 3333 Group |
| 160 | Profit Concept Finance Limited创嘉财务有限公司 | Offshore | 3333 Group |
| 161 | A476 National Electric Vehicle Sweden AB | Offshore | 0708 Group |
| 162 | AMPLE TREASURE GROUP LIMITED宝丰集团有限公司 | Offshore | 3333 Group |
| 163 | All Peace Investments Limited诚通泰投资有限公司 | Offshore | 3333 Group |
| 164 | LUCKY UNIVERSE ENTERPRISES LIMITED瑞宇企业有限公司 | Offshore | 3333 Group |
| 165 | Greet Delight Limited迎悦有限公司 | Offshore | 3333 Group |
| 166 | PRIME SUN ENTERPRISES LIMITED盛日企业有限公司 | Offshore | 3333 Group |
| 167 | LOFTY REAP LIMITED上丰有限公司 | Offshore | 3333 Group |
| 168 | More Hero Limited添英有限公司 | Offshore | 3333 Group |
| 169 | NEW GAINS GROUP LIMITED新得集团有限公司 | Offshore | 3333 Group |
| 170 | ALPHA BEAUTY LIMITED领美有限公司 | Offshore | 3333 Group |
| 171 | ACE PERFECTION GLOBAL LIMITED | Offshore | 708 Group |
| 172 | MEGA WISE INTERNATIONAL LIMITED | Offshore | 0708 Group |
| 173 | PROMINENT TEAM LIMITED | Offshore | 0708 Group |
| 174 | Best Wealth Investments Limited佳裕投资有限公司 | Offshore | 3333 Group |
| 175 | Rise Gain Development Limited昇益发展有限公司 | Offshore | 3333 Group |
| 176 | CEG Holdings (BVI) Limited | Offshore | 3333 Group |
| 177 | Eagle Investment (BVI) Limited | Offshore | 6666 Group |
| 178 | Knight Honour Global Limited | Offshore | 6666 Group |
| 179 | Stay Wealth Limited保常有限公司 | Offshore | 3333 Group |
| 180 | Oceanic Hero Holdings Limited英海控股有限公司 | Offshore | 3333 Group |

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|---|---|---|---|
| 181 | Global City Development Ltd | Offshore | 3333 Group |
| 182 | Profit Point Enterprises Limited盈利企业有限公司 | Offshore | 3333 Group |
| 183 | Flying Bloom Investments Limited飞玎投资有限公司 | Offshore | 3333 Group |
| 184 | Evergrande Property Services Group Limited | Offshore | 6666 Group |
| 185 | CITY EXPERT LIMITED城博有限公司 | Offshore | 3333 Group |
| 186 | CAPTAIN CHEER LIMITED | Offshore | 3333 Group |
| 187 | KEY ALLIANCE INVESTMENTS LIMITED建欧投资有限公司 | Offshore | 3333 Group |
| 188 | Rainbow Ever Limited | Offshore | 3333 Group |
| 189 | 恒大恒通新能源汽车控股（香港）有限公司 | Offshore | 0708 Group |
| 190 | Sky Joy Holdings Limited创天天控股有限公司 | Offshore | 3333 Group |
| 191 | Earn Success Development Limited成得发展有限公司 | Offshore | 3333 Group |
| 192 | RAY SHINE GROUP LIMITED利辉集团有限公司 | Offshore | 3333 Group |
| 193 | IDEAL MARKET HOLDINGS LIMITED恒智控股有限公司 | Offshore | 3333 Group |
| 194 | FORTUNE WALKER LIMITED | Offshore | 3333 Group |
| 195 | JUMBO FORTUNE ENTERPRISES LIMITED | Offshore | 3333 Group |
| 196 | Garden Blossom Limited | Offshore | 3333 Group |
| 197 | METRO WISDOM LIMITED慧都有限公司 | Offshore | 3333 Group |
| 198 | HONOUR OASIS LIMITED | Offshore | 3333 Group |
| 199 | MARVEL FIRST DEVELOPMENTS LIMITED | Offshore | 3333 Group |
| 200 | PYRAMID WEALTH HOLDINGS LIMITED | Offshore | 3333 Group |
| 201 | VALUE DEPOT HOLDINGS LIMITED | Offshore | 3333 Group |
| 202 | JI FENG LIMITED吉丰有限公司 | Offshore | 3333 Group |
| 203 | Fortune Star International Investment Limited福星国际投资有限公司 | Offshore | 3333 Group |
| 204 | JOY VISION HOLDINGS LIMITED乐意控股有限公司 | Offshore | 3333 Group |
| 205 | SANLI (CHINA) HOLDINGS LIMITED三立(中国)控股有限公司 | Offshore | 3333 Group |
| 206 | ABLE KEY DEVELOPMENT LIMITED启能发展有限公司 | Onshore | 3333 Group |
| 207 | NEW GARLAND LIMITED | Onshore | 3333 Group |
| 208 | GLOBAL DEVELOPMENT LIMITED | Offshore | 3333 Group |
| 209 | Eagleville Holdings Limited | Offshore | 3333 Group |
| 210 | Empire Choice Investments Limited | Offshore | 3333 Group |
| 211 | Max Lead Corporation Limited | Offshore | 3333 Group |
| 212 | State Charm Holdings Limited | Offshore | 3333 Group |
| 213 | TREASURE GLORY GLOBAL LIMITED | Offshore | 3333 Group |
| 214 | 恒大地产集团有限公司 | Onshore | 3333 Group |
| 215 | 恒大地产集团武汉有限公司 | Onshore | 3333 Group |
| 216 | 恒大地产集团重庆有限公司 | Onshore | 3333 Group |
| 217 | 恒大地产集团成都有限公司 | Onshore | 3333 Group |
| 218 | 广州市超怡置业有限公司 | Onshore | 3333 Group |
| 219 | 广州市凯圃置业有限公司 | Onshore | 3333 Group |
| 220 | 恒大地产集团山西(彤山)有限公司 | Onshore | 3333 Group |
| 221 | 恒大长基（沈阳）置业有限公司 | Onshore | 3333 Group |
| 222 | 恒大金丰（鞍山）置业有限公司 | Onshore | 3333 Group |
| 223 | 清远市俊鑫房地产开发有限公司 | Onshore | 3333 Group |
| 224 | 启东赛赛置业有限公司 | Onshore | 3333 Group |
| 225 | 启东双兴置业有限公司 | Onshore | 3333 Group |
| 226 | 启东菊盛置业有限公司 | Onshore | 3333 Group |
| 227 | 启东隽黄置业有限公司 | Onshore | 3333 Group |
| 228 | 启东鑫华置业有限公司 | Onshore | 3333 Group |
| 229 | 启东通善置业有限公司 | Onshore | 3333 Group |
| 230 | 启东宝丰置业有限公司 | Onshore | 3333 Group |
| 231 | 重庆恒大茶园置业有限公司 | Onshore | 3333 Group |
| 232 | 恒大地产集团郑州有限公司 | Onshore | 3333 Group |
| 233 | 金碧物业有限公司 | Onshore | 6666 Group |
| 234 | 广州市金碧华府物业有限公司 | Onshore | 6666 Group |
| 235 | 广州市金碧世家物业服务有限公司 | Onshore | 6666 Group |
| 236 | 恒大地产集团西安有限公司 | Onshore | 3333 Group |
| 237 | 恒大地产集团洛阳有限公司 | Onshore | 3333 Group |
| 238 | 恒大地产集团南宁有限公司 | Onshore | 3333 Group |
| 239 | 恒大地产集团贵阳置业有限公司 | Onshore | 3333 Group |
| 240 | 恒大地产集团合肥有限公司 | Onshore | 3333 Group |

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group | No. | Company name | On/Offshore | Group |
|---|---|---|---|---|---|---|---|
| 241 | 恒大地产集团昆明长沙置业有限公司 | Onshore | 3333 Group | 271 | 儋州恒大春林岛投投资开发有限公司 | Onshore | 3333 Group |
| 242 | 恒大园林集团有限公司 | Onshore | 3333 Group | 272 | 恒大地产集团南京置业有限公司 | Onshore | 3333 Group |
| 243 | 恒大地产集团广东房地产开发有限公司 | Onshore | 3333 Group | 273 | 天津滨州投资有限公司 | Onshore | 3333 Group |
| 244 | 陕西金运投资有限公司 | Onshore | 3333 Group | 274 | 哈尔滨市恒大伟业房地产开发有限公司 | Onshore | 3333 Group |
| 245 | 恒大集团（南昌）有限公司 | Onshore | 3333 Group | 275 | 清远市银湖城投资有限公司 | Onshore | 3333 Group |
| 246 | 恒大地产集团石家庄有限公司 | Onshore | 3333 Group | 276 | 海南世纪通投资有限公司 | Onshore | 3333 Group |
| 247 | 恒山地产集团济南置业有限公司 | Onshore | 3333 Group | 277 | 恒大地产集团乌鲁木齐有限公司 | Onshore | 3333 Group |
| 248 | 恒大地产集团天津有限公司 | Onshore | 3333 Group | 278 | 五家渠卓越房地产开发有限公司 | Onshore | 3333 Group |
| 249 | 江西省茱林山庄有限公司 | Onshore | 3333 Group | 279 | 阳江市鼎丰实业有限公司 | Onshore | 3333 Group |
| 250 | 恒大地产集团上海盛建置业有限公司 | Onshore | 3333 Group | 280 | 贫阳万城建业有限公司 | Onshore | 3333 Group |
| 251 | 恒大地产集团海南有限公司 | Onshore | 3333 Group | 281 | 恒大地产集团（深圳）有限公司 | Onshore | 3333 Group |
| 252 | 天津市沛丽丽投资有限公司 | Onshore | 3333 Group | 282 | 南昌中电投燕新置业有限公司 | Onshore | 3333 Group |
| 253 | 天津汇联创展置业有限公司 | Onshore | 3333 Group | 283 | 恒大足球学校 | Onshore | 3333 Group |
| 254 | 沈阳悦盛置业有限公司 | Onshore | 3333 Group | 284 | 济南恒大翡翠华庭置业有限公司 | Onshore | 3333 Group |
| 255 | 贵州广聚源房地产开发有限公司 | Onshore | 3333 Group | 285 | 恩平市鹏尚房地产开发有限公司 | Onshore | 3333 Group |
| 256 | 恒大地产集团大邑有限公司 | Onshore | 3333 Group | 286 | 天津金碧投资有限公司 | Onshore | 3333 Group |
| 257 | 上海穗伟冀置业有限公司 | Onshore | 3333 Group | 287 | 自贡鑫茂置业有限公司 | Onshore | 3333 Group |
| 258 | 恒大地产集团兰州置州有限公司 | Onshore | 3333 Group | 288 | 城博（宁波）置业有限公司 | Onshore | 3333 Group |
| 259 | 恒大地产集团（沈阳）投资有限公司 | Onshore | 3333 Group | 289 | 宁波御城置业有限公司 | Onshore | 3333 Group |
| 260 | 辽阳恒盛置业有限公司 | Onshore | 3333 Group | 290 | 无锡盛东房产开发有限公司 | Onshore | 3333 Group |
| 261 | 儋州恒大洪海投资有限公司 | Onshore | 3333 Group | 291 | 儋州兴合谷投资有限公司 | Onshore | 3333 Group |
| 262 | 恒大地产集团昆明辉煌有限公司 | Onshore | 3333 Group | 292 | 儋州诺亚投资有限公司 | Onshore | 3333 Group |
| 263 | 沈阳盛刚置业有限公司 | Onshore | 3333 Group | 293 | 儋州军民投资有限公司 | Onshore | 3333 Group |
| 264 | 鞍山慧瑞置业有限公司 | Onshore | 3333 Group | 294 | 儋州辉镇投资有限公司 | Onshore | 3333 Group |
| 265 | 恒大地产集团呼和浩特和信有限公司 | Onshore | 3333 Group | 295 | 儋州祥都投资有限公司 | Onshore | 3333 Group |
| 266 | 盘锦鼎鼎置业有限公司 | Onshore | 3333 Group | 296 | 海口外滩域房地产有限公司 | Onshore | 3333 Group |
| 267 | 重庆坤茂置业有限公司 | Onshore | 3333 Group | 297 | 上海颖骏投资管理有限公司 | Onshore | 3333 Group |
| 268 | 合肥孝宇置业有限公司 | Onshore | 3333 Group | 298 | 衢州恒大盛建置业有限公司 | Onshore | 3333 Group |
| 269 | 天津山水城投资有限公司 | Onshore | 3333 Group | 299 | 哈尔滨市恒大房地产开发有限公司 | Onshore | 3333 Group |
| 270 | 恒大地产集团哈尔滨尔滨有限公司 | Onshore | 3333 Group | 300 | 林芝恒大旅游发展有限公司 | Onshore | 3333 Group |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

# List of Subject Entities

| No. | Company name | On/Offshore | Group | No. | Company name | On/Offshore | Group |
|---|---|---|---|---|---|---|---|
| 301 | 广州敏皓房地产有限责任公司 | Onshore | 3333 Group | 331 | 上海增鹏置业有限公司 | Onshore | 3333 Group |
| 302 | 广州市鑫诚谊置业有限公司 | Onshore | 3333 Group | 332 | 天津华隽房地产开发有限公司 | Onshore | 3333 Group |
| 303 | 重庆恒大鑫泰置业有限公司 | Onshore | 3333 Group | 333 | 恒大集团有限公司 | Onshore | 3333 Group |
| 304 | 恒大地产集团大连有限公司 | Onshore | 3333 Group | 334 | 广州市悦朗投资有限公司 | Onshore | 3333 Group |
| 305 | 合肥峰诚置业有限公司 | Onshore | 3333 Group | 335 | 广州市昱博投资有限公司 | Onshore | 3333 Group |
| 306 | 合肥峰祥置业有限公司 | Onshore | 3333 Group | 336 | 广州市奕辉投资有限公司 | Onshore | 3333 Group |
| 307 | 合肥峰翔商业运营管理有限公司 | Onshore | 3333 Group | 337 | 广州市朗轩投资有限公司 | Onshore | 3333 Group |
| 308 | 合肥峰黎置业有限公司 | Onshore | 3333 Group | 338 | 深圳市鑫珶投资有限公司 | Onshore | 3333 Group |
| 309 | 合肥峰乔商业运营管理有限公司 | Onshore | 3333 Group | 339 | 太原金世恒房地产开发有限公司 | Onshore | 3333 Group |
| 310 | 合肥峰丰置业有限公司 | Onshore | 3333 Group | 340 | 北京恒世投资有限公司 | Onshore | 3333 Group |
| 311 | 恒大产业集团北京科园发展有限公司 | Onshore | 3333 Group | 341 | 北京崇置业有限公司 | Onshore | 3333 Group |
| 312 | 南宁恒大城市建设有限公司 | Onshore | 3333 Group | 342 | 郑州恒林置业有限公司 | Onshore | 3333 Group |
| 313 | 柳州恒大金碧置业有限公司 | Onshore | 3333 Group | 343 | 济南东进沙鼎置业有限公司 | Onshore | 3333 Group |
| 314 | 杭州穆华置业有限公司 | Onshore | 3333 Group | 344 | 成都恒大东乐城置业有限公司 | Onshore | 3333 Group |
| 315 | 南京美旭房地产开发有限公司 | Onshore | 3333 Group | 345 | 东莞市鸿远房地产开发有限公司 | Onshore | 3333 Group |
| 316 | 呼和浩特市金瓯天下房地产开发有限公司 | Onshore | 3333 Group | 346 | 莆田金碧置业有限公司 | Onshore | 3333 Group |
| 317 | 北京恒兴盛房地产开发有限公司 | Onshore | 3333 Group | 347 | 广州市慧宇贸易有限公司 | Onshore | 0708 Group |
| 318 | 恒大地产集团福州有限公司 | Onshore | 3333 Group | 348 | 恒大健康云业运营有限公司 | Onshore | 3333 Group |
| 319 | 深圳市厦村村房地产开发有限公司 | Onshore | 3333 Group | 349 | 前海君拓实业发展（深圳）有限公司 | Onshore | 3333 Group |
| 320 | 广州市鑫源投资有限公司 | Onshore | 3333 Group | 350 | 张家港盛盈置业有限公司 | Onshore | 3333 Group |
| 321 | 广州鑫通投资有限公司 | Onshore | 3333 Group | 351 | 恒大鑫世界集团有限公司 | Onshore | 3333 Group |
| 322 | 广州市欣盛投资有限公司 | Onshore | 3333 Group | 352 | 四川若愚房地产开发有限公司 | Onshore | 3333 Group |
| 323 | 深圳市闽亨置业有限公司 | Onshore | 3333 Group | 353 | 厦门恒大置业有限公司 | Onshore | 3333 Group |
| 324 | 深圳市华超实业有限公司 | Onshore | 3333 Group | 354 | 宁波声拓置业有限公司 | Onshore | 3333 Group |
| 325 | 深圳市图超投资有限公司 | Onshore | 3333 Group | 355 | 中山长信宏置业有限公司 | Onshore | 3333 Group |
| 326 | 深圳市夏建房地产开发有限公司 | Onshore | 3333 Group | 356 | 佛山市长宏龙房地产有限公司 | Onshore | 3333 Group |
| 327 | 深圳市三溪房地产开发有限公司 | Onshore | 3333 Group | 357 | 广东贸琪投资有限公司 | Onshore | 3333 Group |
| 328 | 广州穆通道投投资有限公司 | Onshore | 3333 Group | 358 | 海南名鸿投资有限公司 | Onshore | 3333 Group |
| 329 | 上海金碧置业有限公司 | Onshore | 3333 Group | 359 | 海南鼎昌投资有限公司 | Onshore | 3333 Group |
| 330 | 上海悦安置业有限公司 | Onshore | 3333 Group | 360 | 北京恒隆兴置业有限公司 | Onshore | 3333 Group |

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|-----|--------------|-------------|-------|
| 361 | 昆明恒翰置业有限公司 | Onshore | 3333 Group |
| 362 | 武汉恒大金碧房地产开发有限公司 | Onshore | 3333 Group |
| 363 | 大连恒创房地产有限公司 | Onshore | 3333 Group |
| 364 | 大连恒科房地产有限公司 | Onshore | 3333 Group |
| 365 | 恒大童业（深圳）有限公司 | Onshore | 3333 Group |
| 366 | 儋州盛邦旅游开发有限公司 | Onshore | 3333 Group |
| 367 | 儋州鑫云旅游开发有限公司 | Onshore | 3333 Group |
| 368 | 儋州中海旅游开发有限公司 | Onshore | 3333 Group |
| 369 | 儋州浩恒旅游开发有限公司 | Onshore | 3333 Group |
| 370 | 怀来恒天房地产开发有限公司 | Onshore | 3333 Group |
| 371 | 重庆宽墅房地产有限公司 | Onshore | 3333 Group |
| 372 | 儋州锦丰旅游开发有限公司 | Onshore | 3333 Group |
| 373 | 恒大金融控股集团（深圳）有限公司 | Onshore | 3333 Group |
| 374 | 恒大盈融投资（深圳）有限公司 | Onshore | 3333 Group |
| 375 | 儋州嘉伟旅游开发有限公司 | Onshore | 3333 Group |
| 376 | 儋州睿和投资有限公司 | Onshore | 3333 Group |
| 377 | 儋州威焕旅游开发有限公司 | Onshore | 3333 Group |
| 378 | 儋州宜馆旅游开发有限公司 | Onshore | 3333 Group |
| 379 | 儋州昂投投资有限公司 | Onshore | 3333 Group |
| 380 | 儋州泛合投资有限公司 | Onshore | 3333 Group |
| 381 | 儋州名璐旅游开发有限公司 | Onshore | 3333 Group |
| 382 | 儋州长宇旅游开发有限公司 | Onshore | 3333 Group |
| 383 | 儋州智源旅游开发有限公司 | Onshore | 3333 Group |
| 384 | 儋州东拓旅游开发有限公司 | Onshore | 3333 Group |
| 385 | 儋州胜伦旅游开发有限公司 | Onshore | 3333 Group |
| 386 | 儋州明良旅游开发有限公司 | Onshore | 3333 Group |
| 387 | 恒大耀荣丰桥置业（深圳）有限公司 | Onshore | 3333 Group |
| 388 | 深圳市鸿腾投资管理有限公司 | Onshore | 3333 Group |
| 389 | 南宁诚龙庭房地产开发有限公司 | Onshore | 3333 Group |
| 390 | 海南恒牧材料设备有限公司 | Onshore | 3333 Group |

| No. | Company name | On/Offshore | Group |
|-----|--------------|-------------|-------|
| 391 | 南京临江御景房地产开发有限公司 | Onshore | 3333 Group |
| 392 | 恒大集团华东有限公司 | Onshore | 3333 Group |
| 393 | 杭州晶立宝置业有限公司 | Onshore | 3333 Group |
| 394 | 贵阳新世界房地产有限公司 | Onshore | 3333 Group |
| 395 | 武汉新世界康居发展有限公司 | Onshore | 3333 Group |
| 396 | 上海丰顺置业有限公司 | Onshore | 3333 Group |
| 397 | 上海丰潇置业有限公司 | Onshore | 3333 Group |
| 398 | 恒大地产集团珠三角房地产开发有限公司 | Onshore | 3333 Group |
| 399 | 恒大大方环境管理有限公司 | Onshore | 3333 Group |
| 400 | 恒大互联网集团控股有限公司 | Onshore | 3333 Group |
| 401 | 庶宇投资管理（深圳）有限公司 | Onshore | 3333 Group |
| 402 | 青岛金湾置业有限公司 | Onshore | 3333 Group |
| 403 | 佛山市顺德区珠亚方舟地产有限公司 | Onshore | 3333 Group |
| 404 | 北京丽来房地产开发有限公司 | Onshore | 3333 Group |
| 405 | 儋州恒乐文化发展有限公司 | Onshore | 3333 Group |
| 406 | 儋州恒悦文化投资有限公司 | Onshore | 3333 Group |
| 407 | 深圳市心怡房地产有限公司 | Onshore | 3333 Group |
| 408 | 柳州御景龙恒房地产开发有限公司 | Onshore | 3333 Group |
| 409 | 佛山市裕朗通房地产开发有限公司 | Onshore | 3333 Group |
| 410 | 太原恒大盛鹏房地产开发有限公司 | Onshore | 3333 Group |
| 411 | 沈阳慕兴置业有限公司 | Onshore | 3333 Group |
| 412 | 河南恒池置业有限公司 | Onshore | 3333 Group |
| 413 | 大连安兴投资有限公司 | Onshore | 3333 Group |
| 414 | 莆田恒晟置业有限公司 | Onshore | 3333 Group |
| 415 | 哈尔滨溪蓉置业有限公司 | Onshore | 3333 Group |
| 416 | 哈尔滨溪盛置业有限公司 | Onshore | 3333 Group |
| 417 | 哈尔滨溪都恒置业有限公司 | Onshore | 3333 Group |
| 418 | 济南昊馨投资有限公司 | Onshore | 3333 Group |
| 419 | 济南红树林置业有限公司 | Onshore | 3333 Group |
| 420 | 济南熹隆置业有限公司 | Onshore | 3333 Group |

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group | No. | Company name | On/Offshore | Group |
|---|---|---|---|---|---|---|---|
| 421 | 株洲湘楚房地产开发有限公司 | Onshore | 3333 Group | 451 | 重庆和生裕房地产开发有限公司 | Onshore | 3333 Group |
| 422 | 南京恒仁晶盛企业管理有限公司 | Onshore | 3333 Group | 452 | 贵阳恒大融世界旅游开发有限公司 | Onshore | 3333 Group |
| 423 | 成都孚宇置业有限公司 | Onshore | 3333 Group | 453 | 贵阳佳鑫文旅旅游开发有限公司 | Onshore | 3333 Group |
| 424 | 沈阳惠风置业有限公司 | Onshore | 3333 Group | 454 | 贵阳安佳盛鑫旅游开发有限公司 | Onshore | 3333 Group |
| 425 | 沈阳骞所置业有限公司 | Onshore | 3333 Group | 455 | 无锡盛建置业有限公司 | Onshore | 3333 Group |
| 426 | 东莞市翠畴实业有限公司 | Onshore | 3333 Group | 456 | 大原恒林劲地产有限公司 | Onshore | 3333 Group |
| 427 | 启东市淞湾城开发有限公司 | Onshore | 3333 Group | 457 | 深圳市雅华坊投资有限公司 | Onshore | 3333 Group |
| 428 | 常州恒远房地产开发有限公司 | Onshore | 3333 Group | 458 | 广州瑞行房地产开发有限公司 | Onshore | 3333 Group |
| 429 | 湖南沁成投资有限公司 | Onshore | 3333 Group | 459 | 成都莱盛置业有限公司 | Onshore | 3333 Group |
| 430 | 珠海市鄹融颐置业有限公司 | Onshore | 3333 Group | 460 | 上海佳靖投资有限公司 | Onshore | 3333 Group |
| 431 | 梅州大百汇品牌产业园有限公司 | Onshore | 3333 Group | 461 | 天津景秀置业投资有限公司 | Onshore | 3333 Group |
| 432 | 乌鲁木齐市恒创佳城房地产开发有限公司 | Onshore | 3333 Group | 462 | 重庆顶溪置业有限公司 | Onshore | 3333 Group |
| 433 | 成都紫铠置业有限公司 | Onshore | 3333 Group | 463 | 重庆同景置业有限公司 | Onshore | 3333 Group |
| 434 | 广东莱廷峰房地产开发有限公司 | Onshore | 3333 Group | 464 | 重庆联星投资有限公司 | Onshore | 3333 Group |
| 435 | 肇庆高尔夫发展有限公司 | Onshore | 3333 Group | 465 | 恒大地产集团渭南平有限公司 | Onshore | 3333 Group |
| 436 | 广东莱廷峰酒店有限公司 | Onshore | 3333 Group | 466 | 宁波城市之光置业有限公司 | Onshore | 3333 Group |
| 437 | 宁波御都置业有限公司 | Onshore | 3333 Group | 467 | 西安耀凯置业有限公司 | Onshore | 3333 Group |
| 438 | 绍兴永恒置业有限公司 | Onshore | 3333 Group | 468 | 山东丰前置地有限公司 | Onshore | 3333 Group |
| 439 | 汕头市恒昌置业有限公司 | Onshore | 3333 Group | 469 | 上海景麟投资有限公司 | Onshore | 3333 Group |
| 440 | 天津恒房房地产开发有限公司 | Onshore | 3333 Group | 470 | 深圳市佛美汀堡地产开发有限公司 | Onshore | 3333 Group |
| 441 | 重庆莫凡实业有限公司 | Onshore | 3333 Group | 471 | 沈阳金道恒合房地产开发有限公司 | Onshore | 3333 Group |
| 442 | 苏州凤相置业有限公司 | Onshore | 3333 Group | 472 | 沈阳金道房地产开发有限公司 | Onshore | 3333 Group |
| 443 | 苏州盛置置业有限公司 | Onshore | 3333 Group | 473 | 靖江新时代房地产开发有限公司 | Onshore | 3333 Group |
| 444 | 苏州恒三房产开发有限公司 | Onshore | 3333 Group | 474 | 河北鼎慕琪琪地产开发有限公司 | Onshore | 3333 Group |
| 445 | 肇庆茵声缔城技术材料有限公司 | Onshore | 3333 Group | 475 | 重庆同景博达置地有限公司 | Onshore | 3333 Group |
| 446 | 长沙恒大雅世界旅游开发有限公司 | Onshore | 3333 Group | 476 | 肇庆市团晟房地产开发有限公司 | Onshore | 3333 Group |
| 447 | 重庆昭锦企业管理有限公司 | Onshore | 3333 Group | 477 | 汕头市恒朗房地产开发有限公司 | Onshore | 3333 Group |
| 448 | 南京胜智商贸有限公司 | Onshore | 3333 Group | 478 | 南昌恒博置业有限公司 | Onshore | 3333 Group |
| 449 | 武汉市韵江鸿房地产开发有限公司 | Onshore | 3333 Group | 479 | 佛山市三水区帆高置业投资有限公司 | Onshore | 3333 Group |
| 450 | 成都万浩置业有限公司 | Onshore | 3333 Group | 480 | 恒大地产集团山西有限公司 | Onshore | 3333 Group |

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group | No. | Company name | On/Offshore | Group |
|-----|-------------|-------------|-------|-----|-------------|-------------|-------|
| 481 | 扬州盛基房地产开发有限公司 | Onshore | 3333 Group | 511 | 句容恒歆旅游开发有限公司 | Onshore | 3333 Group |
| 482 | 安庆粤骏置业有限公司 | Onshore | 3333 Group | 512 | 句容恒瑞旅游开发有限公司 | Onshore | 3333 Group |
| 483 | 肇庆鼎恒园星璽业投资有限公司 | Onshore | 3333 Group | 513 | 句容恒远旅游开发有限公司 | Onshore | 3333 Group |
| 484 | 四川川太科技园（南区）开发有限公司 | Onshore | 3333 Group | 514 | 贵阳恒大童梦天地旅游发展有限公司 | Onshore | 3333 Group |
| 485 | 深圳市万京投资有限公司 | Onshore | 3333 Group | 515 | 贵阳恒大珊源旅游开发有限公司 | Onshore | 3333 Group |
| 486 | 佛山三水区能润道地房地产开发有限公司 | Onshore | 3333 Group | 516 | 贵阳恒大水境旅游开发有限公司 | Onshore | 3333 Group |
| 487 | 佛山市西明南协和地产开发有限公司 | Onshore | 3333 Group | 517 | 贵阳恒大珊瑚旅游开发有限公司 | Onshore | 3333 Group |
| 488 | 佛山市南海南力房地产开发有限公司 | Onshore | 3333 Group | 518 | 贵阳恒大裕格旅游开发有限公司 | Onshore | 3333 Group |
| 489 | 句容东大童世界旅游开发有限公司 | Onshore | 3333 Group | 519 | 贵阳恒大瞧祥旅游开发有限公司 | Onshore | 3333 Group |
| 490 | 太仓东大童世界旅游开发有限公司 | Onshore | 3333 Group | 520 | 贵阳恒大宏辰旅游开发有限公司 | Onshore | 3333 Group |
| 491 | 太原恒钠润房地产开发有限公司 | Onshore | 3333 Group | 521 | 贵安新区恒大华鼎旅游开发有限公司 | Onshore | 3333 Group |
| 492 | 沧州恒祥房地产开发有限公司 | Onshore | 3333 Group | 522 | 沧州恒大童世界旅游开发有限公司 | Onshore | 3333 Group |
| 493 | 无锡恒瑞璽业有限公司 | Onshore | 3333 Group | 523 | 沧州益慕房地产开发有限公司 | Onshore | 3333 Group |
| 494 | 肇庆鼎恒园星璽房地产开发有限公司 | Onshore | 3333 Group | 524 | 沧州聘凯房地产开发有限公司 | Onshore | 3333 Group |
| 495 | 郑州恒启置业有限公司 | Onshore | 3333 Group | 525 | 沧州元聘房地产开发有限公司 | Onshore | 3333 Group |
| 496 | 杭州杰涛置业有限公司 | Onshore | 3333 Group | 526 | 沧州凯进房地产开发有限公司 | Onshore | 3333 Group |
| 497 | 福州金禧璽业有限公司 | Onshore | 3333 Group | 527 | 沧州沸安房地产开发有限公司 | Onshore | 3333 Group |
| 498 | 恒大口口半岛置业（深圳）有限公司 | Onshore | 3333 Group | 528 | 沧州昌捷房地产开发有限公司 | Onshore | 3333 Group |
| 499 | 哈尔滨而腾业房地产开发有限公司 | Onshore | 3333 Group | 529 | 沧州丰汇房地产开发有限公司 | Onshore | 3333 Group |
| 500 | 哈尔滨市祥业房地产开发有限公司 | Onshore | 3333 Group | 530 | 沧州瑞丰房地产开发有限公司 | Onshore | 3333 Group |
| 501 | 哈尔滨市骏业房地产开发有限公司 | Onshore | 3333 Group | 531 | 沧州庆和房地产开发有限公司 | Onshore | 3333 Group |
| 502 | 恒大地产集团（江西）有限公司 | Onshore | 3333 Group | 532 | 沧州通广房地产开发有限公司 | Onshore | 3333 Group |
| 503 | 温州悦安璽业有限公司 | Onshore | 3333 Group | 533 | 沧州宏长房地产开发有限公司 | Onshore | 3333 Group |
| 504 | 连平县森林房地产有限公司 | Onshore | 3333 Group | 534 | 沧州裕宝房地产开发有限公司 | Onshore | 3333 Group |
| 505 | 珠海途天璽业有限公司 | Onshore | 3333 Group | 535 | 沧州源美房地产开发有限公司 | Onshore | 3333 Group |
| 506 | 深圳鑫宇投资咨询有限公司 | Onshore | 3333 Group | 536 | 沧州长鑫房地产开发有限公司 | Onshore | 3333 Group |
| 507 | 镇江盛鑫房地产开发有限公司 | Onshore | 3333 Group | 537 | 成都鑫景璽业有限公司 | Onshore | 3333 Group |
| 508 | 句容开润旅游开发有限公司 | Onshore | 3333 Group | 538 | 泰州恒骏通房地产开发有限公司 | Onshore | 3333 Group |
| 509 | 句容童世界旅游发展有限公司 | Onshore | 3333 Group | 539 | 湖州恒跃房地产开发有限公司 | Onshore | 3333 Group |
| 510 | 句容恒炎旅游开发有限公司 | Onshore | 3333 Group | 540 | 三亚华创七星岛房地产开发有限公司 | Onshore | 3333 Group |

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|-----|-------------|-------------|-------|
| 541 | 三亚森特房地产开发有限公司 | Onshore | 3333 Group |
| 542 | 佛山市顺利润房地产开发有限公司 | Onshore | 3333 Group |
| 543 | 沈阳恒宜置业有限公司 | Onshore | 3333 Group |
| 544 | 杭州盛腾置业有限公司 | Onshore | 3333 Group |
| 545 | 峨眉山阳光绿源农业农业科技有限公司 | Onshore | 3333 Group |
| 546 | 四川峨眉山宏远实业有限公司 | Onshore | 3333 Group |
| 547 | 四川德胜集团文化旅游投资发展有限公司 | Onshore | 3333 Group |
| 548 | 上海鹏仓置业有限公司 | Onshore | 3333 Group |
| 549 | 上海鹏力置业有限公司 | Onshore | 3333 Group |
| 550 | 温州晶鹏翼业有限公司 | Onshore | 3333 Group |
| 551 | 宜昌科利房地产开发有限公司 | Onshore | 3333 Group |
| 552 | 深圳市建意房地产开发有限公司 | Onshore | 3333 Group |
| 553 | 深圳市紫熙股权投资有限公司 | Onshore | 3333 Group |
| 554 | 太原天鸿博房地产开发有限公司 | Onshore | 3333 Group |
| 555 | 福鼎恒大置业有限公司 | Onshore | 3333 Group |
| 556 | 成都怀宁置业有限公司 | Onshore | 3333 Group |
| 557 | 宁波穗怡置业有限公司 | Onshore | 3333 Group |
| 558 | 安吉建腾置业有限公司 | Onshore | 3333 Group |
| 559 | 肇庆市西新区恒裕通房地产开发有限公司 | Onshore | 3333 Group |
| 560 | 湖南恒盛健雄产业有限公司 | Onshore | 0708 Group |
| 561 | 太仓郡泰旅游开发有限公司 | Onshore | 3333 Group |
| 562 | 太仓郡泰旅游开发有限公司 | Onshore | 3333 Group |
| 563 | 太仓穗泰旅游开发有限公司 | Onshore | 3333 Group |
| 564 | 太仓恒泰旅游开发有限公司 | Onshore | 3333 Group |
| 565 | 太仓隆泰旅游开发有限公司 | Onshore | 3333 Group |
| 566 | 太仓裕泰旅游开发有限公司 | Onshore | 3333 Group |
| 567 | 湖北恒大世界旅游开发有限公司 | Onshore | 3333 Group |
| 568 | 鄂州朗恒旅游开发有限公司 | Onshore | 3333 Group |
| 569 | 太仓盛产文化产业发展有限公司 | Onshore | 3333 Group |
| 570 | 鄂州碧旭旅游开发有限公司 | Onshore | 3333 Group |
| 571 | 鄂州腾翔旅游开发有限公司 | Onshore | 3333 Group |
| 572 | 鄂州疆梦兴四旅游发展有限公司 | Onshore | 3333 Group |
| 573 | 鄂州信佳旅游开发有限公司 | Onshore | 3333 Group |
| 574 | 启东添泰旅游开发有限公司 | Onshore | 3333 Group |
| 575 | 鄂州裕隆旅游开发有限公司 | Onshore | 3333 Group |
| 576 | 鄂州佳裕旅游开发有限公司 | Onshore | 3333 Group |
| 577 | 鄂州弘隆旅游开发有限公司 | Onshore | 3333 Group |
| 578 | 武汉瑞恒旅游开发有限公司 | Onshore | 3333 Group |
| 579 | 鄂州裕恒旅游开发有限公司 | Onshore | 3333 Group |
| 580 | 恒大现代农业集团有限公司 | Onshore | 3333 Group |
| 581 | 山东恒大重世界旅游开发有限公司 | Onshore | 3333 Group |
| 582 | 眉山恒大重世界旅游开发有限公司 | Onshore | 3333 Group |
| 583 | 眉山恒和旅游开发有限公司 | Onshore | 3333 Group |
| 584 | 眉山嘉泰旅游开发有限公司 | Onshore | 3333 Group |
| 585 | 眉山嘉泰旅游开发有限公司 | Onshore | 3333 Group |
| 586 | 眉山裕和旅游开发有限公司 | Onshore | 3333 Group |
| 587 | 眉山睿信旅游开发有限公司 | Onshore | 3333 Group |
| 588 | 眉山瑞隆旅游开发有限公司 | Onshore | 3333 Group |
| 589 | 眉山泽瑞旅游开发有限公司 | Onshore | 3333 Group |
| 590 | 武汉巴登林旅游有限公司 | Onshore | 3333 Group |
| 591 | 西安恒大世界旅游开发有限公司 | Onshore | 3333 Group |
| 592 | 扬中市恒骊置业有限公司 | Onshore | 0708 Group |
| 593 | 深圳市永福置业有限公司 | Onshore | 3333 Group |
| 594 | 绵阳市永合万盈置业有限公司 | Onshore | 3333 Group |
| 595 | 湖南辰置业有限公司 | Onshore | 3333 Group |
| 596 | 太原领倍房地产开发有限公司 | Onshore | 3333 Group |
| 597 | 常州恒宸企业管理有限公司 | Onshore | 3333 Group |
| 598 | 成都菁凌昌心房地产开发有限责任公司 | Onshore | 3333 Group |
| 599 | 佛山市恒璟地产开发有限公司 | Onshore | 3333 Group |
| 600 | 贵阳恒大尚云房地产开发有限公司 | Onshore | 3333 Group |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|---|---|---|---|
| 601 | 深圳市飞逸投投资有限公司 | Onshore | 3333 Group |
| 602 | 重庆翔林企业管理咨询有限公司 | Onshore | 3333 Group |
| 603 | 深圳市谦珵投资有限公司 | Onshore | 3333 Group |
| 604 | 肇庆市文耀绵投资有限公司 | Onshore | 3333 Group |
| 605 | 肇庆海博贸易有限公司 | Onshore | 3333 Group |
| 606 | 重庆恒永房地产开发有限公司 | Onshore | 3333 Group |
| 607 | 溧阳恒运房地产开发有限责任公司 | Onshore | 3333 Group |
| 608 | 沈阳鑫盈置业有限公司 | Onshore | 3333 Group |
| 609 | 成都岭凯置业有限公司 | Onshore | 3333 Group |
| 610 | 沈阳慧源置业有限公司 | Onshore | 3333 Group |
| 611 | 贵州尚明房地产开发有限公司 | Onshore | 3333 Group |
| 612 | 成都津瑞置业有限公司 | Onshore | 3333 Group |
| 613 | 成都心澜置业有限公司 | Onshore | 3333 Group |
| 614 | 成都心澜置业有限公司 | Onshore | 3333 Group |
| 615 | 郑州城丰置业有限公司 | Onshore | 3333 Group |
| 616 | 成都领运恒域地产建设有限公司 | Onshore | 3333 Group |
| 617 | 柳州恒大璟睿房地产开发有限公司 | Onshore | 3333 Group |
| 618 | 深圳市恒宁商业发展有限公司 | Onshore | 3333 Group |
| 619 | 西安长德旅游开发有限公司 | Onshore | 3333 Group |
| 620 | 西安曦世界旅游发展有限公司 | Onshore | 3333 Group |
| 621 | 西安凯悦旅游开发有限公司 | Onshore | 3333 Group |
| 622 | 西安优合旅游开发有限公司 | Onshore | 3333 Group |
| 623 | 西安雅枫旅游开发有限公司 | Onshore | 3333 Group |
| 624 | 西安腾飞旅游开发有限公司 | Onshore | 3333 Group |
| 625 | 西安汉鸿旅游开发有限公司 | Onshore | 3333 Group |
| 626 | 西安昌晨旅游开发有限公司 | Onshore | 3333 Group |
| 627 | 西安城格旅游开发有限公司 | Onshore | 3333 Group |
| 628 | 西安瑞源旅游开发有限公司 | Onshore | 3333 Group |
| 629 | 恒大时代新城开发（武汉）有限公司 | Onshore | 3333 Group |
| 630 | 南京恒腾置业有限公司 | Onshore | 0708 Group |
| 631 | 恒鹏健康产业有限公司 | Onshore | 0708 Group |
| 632 | 眉山盛世界旅游开发有限公司 | Onshore | 3333 Group |
| 633 | 恒鹏健康产业有限公司 | Onshore | 0708 Group |
| 634 | 陕西恒鹏健康产业有限公司 | Onshore | 0708 Group |
| 635 | 四川恒鹏健康产业有限公司 | Onshore | 0708 Group |
| 636 | 恒大旅游经营管理集团有限公司 | Onshore | 3333 Group |
| 637 | 恒大恒物业有限公司 | Onshore | 6666 Group |
| 638 | 恒大高科农业（沈阳）有限公司 | Onshore | 3333 Group |
| 639 | 恒大现代城地产开发（沈阳）有限公司 | Onshore | 3333 Group |
| 640 | 常州江恒房地产开发有限公司 | Onshore | 3333 Group |
| 641 | 佛山市顺德区怡创房地产有限公司 | Onshore | 3333 Group |
| 642 | 佛山市怡创贸易有限公司 | Onshore | 3333 Group |
| 643 | 广州曦峰商务服务有限公司 | Onshore | 3333 Group |
| 644 | 贵阳恒大云乾房地产开发有限公司 | Onshore | 3333 Group |
| 645 | 清远市恒碧地产开发有限公司 | Onshore | 3333 Group |
| 646 | 太原恒彬房地产开发有限公司 | Onshore | 3333 Group |
| 647 | 太原恒瑶房地产开发有限公司 | Onshore | 3333 Group |
| 648 | 大原恒珀房地产开发有限公司 | Onshore | 3333 Group |
| 649 | 北京东方墨禾建筑材料有限公司 | Onshore | 3333 Group |
| 650 | 美丽之冠（黄山）文化旅游发展有限公司 | Onshore | 3333 Group |
| 651 | 赤峰市恒锦房地产开发有限公司 | Onshore | 3333 Group |
| 652 | 南宁悦龙天瑞房地产开发有限公司 | Onshore | 3333 Group |
| 653 | 重庆天利辉利置业有限公司 | Onshore | 3333 Group |
| 654 | 广州同创城园域文化有限公司 | Onshore | 3333 Group |
| 655 | 重庆宏泉企业管理有限公司 | Onshore | 3333 Group |
| 656 | 重庆天祥至诚实业有限公司 | Onshore | 3333 Group |
| 657 | 恒大高科技集团有限公司 | Onshore | 3333 Group |
| 658 | 广州恒憧设备科技有限公司 | Onshore | 0708 Group |
| 659 | 吉林省恒大世界旅游开发有限公司 | Onshore | 3333 Group |
| 660 | 公主岭恒泽旅游开发有限公司 | Onshore | 3333 Group |

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group | No. | Company name | On/Offshore | Group |
|-----|--------------|-------------|-------|-----|--------------|-------------|-------|
| 661 | 公主岭市爱众旅游开发有限公司 | Onshore | 3333 Group | 691 | 恒大新能源科技集团有限公司 | Onshore | 0708 Group |
| 662 | 公主岭市慧旅游开发有限公司 | Onshore | 3333 Group | 692 | 恒大淀欣货汽车有限公司 | Onshore | 0708 Group |
| 663 | 眉山沐泽旅游开发有限公司 | Onshore | 3333 Group | 693 | 天津恒大国瑞新能源科技有限责任公司 | Onshore | 0708 Group |
| 664 | 眉山沐泽旅游开发有限公司 | Onshore | 3333 Group | 694 | 国能汽车技术开发有限责任公司 | Onshore | 0708 Group |
| 665 | 眉山恒博旅游开发有限公司 | Onshore | 3333 Group | 695 | 恒大恒驰新能源汽车（上海）有限公司 | Onshore | 0708 Group |
| 666 | 南充市沱水湖商科技农业有限公司 | Onshore | 3333 Group | 696 | 恒大新能源汽车（陕西）有限公司 | Onshore | 0708 Group |
| 667 | 眉山市恒然旅游开发有限公司 | Onshore | 3333 Group | 697 | 金驰生活服务（河南）有限公司 | Onshore | 708 Group |
| 668 | 眉山市恒熙旅游开发有限公司 | Onshore | 3333 Group | 698 | 恒大新能源汽车（辽宁）有限公司 | Onshore | 0708 Group |
| 669 | 广州翼然企业管理咨询有限公司 | Onshore | 3333 Group | 699 | 恒大汽车产业园投资（深圳）集团有限公司 | Onshore | 0708 Group |
| 670 | 恒大租赁住房一号第一期私募投资基金 | Onshore | 3333 Group | 700 | 恒大瑞博地产科技（深圳）有限公司 | Onshore | 0708 Group |
| 671 | 恒大凯璇智能汽车集团有限公司 | Onshore | 0708 Group | 701 | 沈阳智慧农业开发有限公司 | Onshore | 3333 Group |
| 672 | 贵阳恒万观云房地产开发有限公司 | Onshore | 3333 Group | 702 | 恒大恒驰新能源汽车研究院（上海）有限公司 | Onshore | 708 Group |
| 673 | 昆明恒鹏房地产开发有限公司 | Onshore | 3333 Group | 703 | 郑州超益生活服务有限公司 | Onshore | 0708 Group |
| 674 | 嵩明中楙鼎床花房地产开发有限公司 | Onshore | 3333 Group | 704 | 郑州超拓生活服务有限公司 | Onshore | 708 Group |
| 675 | 嵩明中楙国丰房地产开发有限公司 | Onshore | 3333 Group | 705 | 郑州超悦生活服务有限公司 | Onshore | 708 Group |
| 676 | 南京沱海企业管理有限公司 | Onshore | 3333 Group | 706 | 扬中市恒和置业有限公司 | Onshore | 0708 Group |
| 677 | 嵩明中楙商骏房地产开发有限公司 | Onshore | 3333 Group | 707 | 湖北恒祥地产开发有限公司 | Onshore | 3333 Group |
| 678 | 嵩明中楙广鹿地产开发有限公司 | Onshore | 3333 Group | 708 | 南京恒茗地产开发有限公司 | Onshore | 3333 Group |
| 679 | 嵩明中楙广达房地产开发有限公司 | Onshore | 3333 Group | 709 | 深圳市宝腾实业投资有限公司 | Onshore | 3333 Group |
| 680 | 云南德鹏房地产开发有限公司 | Onshore | 3333 Group | 710 | 大风风驰动力科技（深圳）有限公司 | Onshore | 0708 Group |
| 681 | 昆明桅祺科技有限公司 | Onshore | 3333 Group | 711 | 河北恒大高科农业开发有限公司 | Onshore | 3333 Group |
| 682 | 深圳市保通远投资咨询有限责任公司 | Onshore | 3333 Group | 712 | 元氏县恒成房地产开发有限公司 | Onshore | 3333 Group |
| 683 | 重庆五恒投资发展有限公司 | Onshore | 3333 Group | 713 | 内蒙古恒大旅游开发有限公司 | Onshore | 3333 Group |
| 684 | 河源市沅翔投资发展有限公司 | Onshore | 3333 Group | 714 | 内蒙古恒大旅游开发有限公司 | Onshore | 3333 Group |
| 685 | 西安盛筻置业有限公司 | Onshore | 3333 Group | 715 | 武汉整水云山实业开发有限公司 | Onshore | 3333 Group |
| 686 | 重庆新金企业管理有限公司 | Onshore | 3333 Group | 716 | 昆明赛丽泽特色小镇置业有限公司 | Onshore | 0708 Group |
| 687 | 重庆泽阎企业管理有限公司 | Onshore | 3333 Group | 717 | 昆明寨丽泽旅游文化有限公司 | Onshore | 0708 Group |
| 688 | 重庆腾翁企业管理有限公司 | Onshore | 3333 Group | 718 | 儋州一帆旅游运营管理有限公司 | Onshore | 3333 Group |
| 689 | 舟山市新诚瑞丰房地产开发有限公司 | Onshore | 3333 Group | 719 | 匈容恒朗旅游开发有限公司 | Onshore | 3333 Group |
| 690 | 恒大新能源汽车（广东）有限公司 | Onshore | 0708 Group | 720 | 沧州国恒企业管理咨询中心（有限合伙） | Onshore | 0708 Group |

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|-----|--------------|-------------|-------|
| 721 | 温州盛鑫置业有限公司 | Onshore | 3333 Group |
| 722 | 佛山市禅城区恒盛隆房地产开发有限公司 | Onshore | 3333 Group |
| 723 | 太原恒信房地产开发有限公司 | Onshore | 3333 Group |
| 724 | 哈尔滨市都源房地产开发有限公司 | Onshore | 3333 Group |
| 725 | 宁波典颐置业有限公司 | Onshore | 3333 Group |
| 726 | 毅县(沈阳)房地产开发有限公司 | Onshore | 3333 Group |
| 727 | 北京鑫辉中传科技投资有限公司 | Onshore | 3333 Group |
| 728 | 宁波御峰置业有限公司 | Onshore | 3333 Group |
| 729 | 公主岭裕源房地产开发有限公司 | Onshore | 3333 Group |
| 730 | 公主岭俊辉房地产开发有限公司 | Onshore | 3333 Group |
| 731 | 航发投资管理有限公司 | Onshore | 3333 Group |
| 732 | 北京航信投资发展有限公司 | Onshore | 3333 Group |
| 733 | 北京志舟投资管理有限公司 | Onshore | 3333 Group |
| 734 | 深圳市富铭投资发展有限责任公司 | Onshore | 3333 Group |
| 735 | 厦门富铭杏博置业有限公司 | Onshore | 3333 Group |
| 736 | 厦门富铭九天湖置业有限公司 | Onshore | 3333 Group |
| 737 | 中航富铭(厦门)置业有限公司 | Onshore | 3333 Group |
| 738 | 沈阳航运置业有限公司 | Onshore | 3333 Group |
| 739 | 重庆盛环房地产开发有限公司 | Onshore | 3333 Group |
| 740 | 重庆航远置业有限公司 | Onshore | 3333 Group |
| 741 | 重庆航之置业有限公司 | Onshore | 3333 Group |
| 742 | 重庆江航投资发展有限公司 | Onshore | 3333 Group |
| 743 | 新世界中国地产(海口)有限公司 | Onshore | 3333 Group |
| 744 | 深圳市瑾瑞实业有限公司 | Onshore | 3333 Group |
| 745 | 贵州市焕涛房地产开发有限公司 | Onshore | 3333 Group |
| 746 | 南宁弘昌房地产开发有限公司 | Onshore | 3333 Group |
| 747 | 昆明恒盛置业有限公司 | Onshore | 3333 Group |
| 748 | 恒大华地实业(深圳)有限公司 | Onshore | 3333 Group |
| 749 | 广州市番禺区瑞德房地产开发有限公司 | Onshore | 3333 Group |
| 750 | 广州市番禺区瑞锐地产开发有限公司 | Onshore | 3333 Group |
| 751 | 广州市番禺区瑞路房地产开发有限公司 | Onshore | 3333 Group |
| 752 | 广州市番禺区瑞森体育有限公司 | Onshore | 3333 Group |
| 753 | 扬中恒鹏置业有限公司 | Onshore | 0708 Group |
| 754 | 扬中恒源置业有限公司 | Onshore | 0708 Group |
| 755 | 扬中恒嘉置业有限公司 | Onshore | 0708 Group |
| 756 | 三亚天云云文投资有限公司 | Onshore | 3333 Group |
| 757 | 贵阳恒大森主房地产开发有限公司 | Onshore | 3333 Group |
| 758 | 中山市悦房地产开发有限公司 | Onshore | 3333 Group |
| 759 | 广州市裕拓房地产开发有限公司 | Onshore | 3333 Group |
| 760 | 北京恒云盛置业有限公司 | Onshore | 3333 Group |
| 761 | 福州恒腾盛置业有限公司 | Onshore | 3333 Group |
| 762 | 重庆航曦房地产开发有限公司 | Onshore | 3333 Group |
| 763 | 北京恒原兴置业有限公司 | Onshore | 3333 Group |
| 764 | 北京恒原置置业有限公司 | Onshore | 3333 Group |
| 765 | 贵阳恒大嘉瑞房地产开发有限公司 | Onshore | 3333 Group |
| 766 | 广州裕荣通企业管理有限公司 | Onshore | 3333 Group |
| 767 | 湖北台瑞旅游开发有限公司 | Onshore | 3333 Group |
| 768 | 深圳市盈智投资有限公司 | Onshore | 3333 Group |
| 769 | 房车宝集团股份有限公司 | Onshore | 3333 Group |
| 770 | 深圳市房宝宝销售有限公司 | Onshore | 3333 Group |
| 771 | 太仓晟泰文化产业发展有限公司 | Onshore | 3333 Group |
| 772 | 沈阳恒达房地产开发有限公司 | Onshore | 3333 Group |
| 773 | 太仓祥泰旅游开发有限公司 | Onshore | 3333 Group |
| 774 | 恒大恒驰新能源汽车科技(广东)有限公司 | Onshore | 0708 Group |
| 775 | 广州市南沙区领潮企业咨询有限公司 | Onshore | 3333 Group |
| 776 | 宁波泰化恒熙置业有限公司 | Onshore | 3333 Group |
| 777 | 眉山恒赛旅游开发有限公司 | Onshore | 3333 Group |
| 778 | 眉山恒思旅游开发有限公司 | Onshore | 3333 Group |
| 779 | 武汉恒投文化开发有限公司 | Onshore | 3333 Group |
| 780 | 内蒙古恒悦旅游开发有限公司 | Onshore | 3333 Group |

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group | No. | Company name | On/Offshore | Group |
|-----|-------------|-------------|-------|-----|-------------|-------------|-------|
| 781 | 福州金碧投资有限公司 | Onshore | 3333 Group | | | | |
| 782 | 恒大恒驰新能源汽车（广东）有限公司 | Onshore | 0708 Group | | | | |
| 783 | 房车宝信息技术（深圳）有限公司 | Onshore | 3333 Group | | | | |
| 784 | 济南市恒凯投资管理有限公司 | Onshore | 3333 Group | | | | |
| 785 | 金碧恒康物业（北京）有限公司 | Onshore | 6666 Group | | | | |
| 786 | 惠安弘康置业有限公司 | Onshore | 3333 Group | | | | |
| 787 | 眉山嘉旅旅游开发有限公司 | Onshore | 3333 Group | | | | |
| 788 | 广州疆投资有限公司 | Onshore | 3333 Group | | | | |
| 789 | 内蒙古恒鑫旅游开发有限公司 | Onshore | 3333 Group | | | | |
| 790 | 深圳市钜恒实业有限责任公司 | Onshore | 3333 Group | | | | |
| 791 | 内蒙古恒荣旅游开发有限公司 | Onshore | 3333 Group | | | | |
| 792 | 湖南金盈置业有限公司 | Onshore | 3333 Group | | | | |
| 793 | 广州恒湖南企业信息咨询有限公司 | Onshore | 3333 Group | | | | |
| 794 | 恒大新能源汽车投资控股集团有限公司 | Onshore | 0708 Group | | | | |

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

# Appendix 2 – Estimated Recoveries of Offshore Debts

# Estimated Recoveries of the Offshore Debts (Liquidation Scenario) – Class A

RMB in million

| Ref No. | Tranche | Accrued claims as of 31 December 2022 | Estimated Realization | | | | Total recovery amount E=A+B+C+D | Recovery amount from CEG | Recovery amount from Tianji | Recovery rate |
| | | | From security (assets / shares / receivables) intercompany principal obligors A | From unencumbered assets of guarantors B | From guarantors C | From keepwell provider D | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | CEG Existing March 2022 Notes | 15,560 | - | 351 | 168 | - | 519 | 351 | | 3.34% |
| 2 | CEG Existing April 2022 Notes | 11,271 | - | 254 | 122 | - | 376 | 254 | | 3.34% |
| 3 | CEG Existing January 2023 Notes | 8,110 | - | 183 | 88 | - | 271 | 183 | | 3.34% |
| 4 | CEG Existing February 2023 Bonds | 76 | - | 2 | 1 | - | 3 | 2 | | 3.34% |
| 5 | CEG Existing April 2023 Notes | 6,520 | - | 147 | 71 | - | 218 | 147 | | 3.34% |
| 6 | CEG Existing June 2023 Notes | 10,323 | - | 233 | 112 | - | 345 | 233 | | 3.34% |
| 7 | CEG Existing January 2024 Notes | 8,129 | - | 183 | 88 | - | 271 | 183 | | 3.34% |
| 8 | CEG Existing March 2024 Notes | 7,413 | - | 167 | 80 | - | 247 | 167 | | 3.34% |
| 9 | CEG Existing April 2024 Notes | 5,429 | - | 122 | 59 | - | 181 | 122 | | 3.34% |
| 10 | CEG Existing June 2025 Notes | 36,653 | - | 826 | 397 | - | 1,223 | 826 | | 3.34% |
| 11 | CEG Existing January 2022 Notes | 2,420 | - | 55 | 26 | - | 81 | 55 | | 3.34% |
| 12 | Class A Private Loan | 87 | - | 2 | 1 | - | 3 | 2 | | 3.34% |
| | Class A Total: | 111,991 | - | 2,525 | 1,213 | - | 3,738 | 2,525 | | 3.34% |

Note: Figures above are subject to rounding.

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

59

# Estimated Recoveries of the Offshore Debts (Liquidation Scenario) – Class B

RMB in million

| Ref No. | Tranche | Accrued claims as of 31 December 2022 | Estimated Realization | | | | Total recovery amount | Recovery amount from CEG | Recovery amount from Tianji | Recovery rate |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | From security (assets/shares/intercompany receivables) | From unencumbered assets of principal obligors | From guarantors | From keepwell provider | E=A+B+C+D | | | |
| | | | A | B | C | D | | | | |
| 1 | SJ Existing October 2022 Notes | 16,226 | - | 263 | 1,744 | 705 | 2,712 | - | 373 | 16.71% |
| 2 | SJ Existing November 2022 Notes | 5,449 | - | 88 | 586 | 237 | 911 | - | 125 | 16.71% |
| 3 | SJ Existing October 2023 Notes | 16,285 | - | 264 | 1,751 | 707 | 2,722 | - | 375 | 16.71% |
| 4 | SJ Existing November 2023 Notes | 5,034 | - | 82 | 541 | 219 | 842 | - | 116 | 16.71% |
| | Class B Total: | 42,994 | - | 697 | 4,622 | 1,868 | 7,187 | - | 989 | 16.71% |

*Note: Figures above are subject to rounding.*

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

60

## Estimated Recoveries of the Offshore Debts (Liquidation Scenario) – Class C

RMB in million

| Ref No. | Tranche | Accrued claims as of 31 December 2022 | Estimated Realization | | | | Total recovery amount E=A+B+C+D | Recovery amount from CEG | Recovery amount from Tianji | Recovery rate |
| | | | From security (assets/shares/intercompany receivables) A | From unencumbered assets of principal obligors B | From guarantors C | From keepwell provider D | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Lake Notes | 2,050 | - | - | 94 | 89 | 183 | 46 | 47 | 8.91% |
| 2 | Dongpo Notes | 3,070 | 8 | - | 69 | - | 77 | 69 | | 2.52% |
| 3 | Dongpo Put Option | 1,001 | 15 | 22 | - | - | 37 | 22 | | 3.76% |
| 4 | Graceful Court Put Option | 839 | 13 | 19 | - | - | 32 | 19 | | 3.76% |
| 5 | New Chic Margin Loan | 138 | 30 | 6 | 3 | - | 39 | 3 | | 28.48% |
| 6 | Clear Star Put Option | 513 | - | 12 | 12 | - | 24 | 12 | 12 | 4.57% |
| 7 | CEG Loan 1 | 1,460 | - | 33 | - | - | 33 | 33 | | 2.26% |
| 8 | CEG Loan 2 | 729 | - | 16 | - | - | 16 | 16 | | 2.26% |
| 9 | Venice Loan | 173 | 102 | - | 4 | - | 106 | 4 | | 61.25% |
| 10 | Venice SPA | 3,979 | 2,348 | - | 90 | - | 2,438 | 90 | | 61.28% |
| 11 | Hero Loan | 6,922 | 3,400 | 160 | 156 | - | 3,716 | 156 | 160 | 53.68% |
| 12 | FCB Put Option | 4,957 | - | 1,157 | - | - | 1,157 | 112 | | 23.33% |

*Note: Figures above are subject to rounding.*

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

61

# Estimated Recoveries of the Offshore Debts (Liquidation Scenario) – Class C (cont'd)

RMB in million

| Ref No. | Tranche | Accrued claims as of 31 December 2022 | Estimated Realization | | | | Total recovery amount E=A+B+C+D | Recovery amount from CEG | Recovery amount from Tianji | Recovery rate |
| | | | From security (assets/shares/intercompany receivables) A | From unencumbered assets of principal obligors B | From guarantors C | From keepwell provider D | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 13 | RMB Bond Put Option | 8,760 | 380 | 189 | - | - | 569 | 189 | - | 6.50% |
| 14 | CEG Guarantees of PRC Liabilities | 64,490 | 2,934 | 3,680 | 4,160 | - | 10,774 | 1,395 | - | 16.71% |
| 15 | Kailong Arbitration Award | 5,805 | - | 131 | - | - | 131 | 131 | - | 2.26% |
| 16 | On-Lent Loan | -² | -² | -² | -² | -² | -² | -² | -² | - |
| | Class C Total: | 104,886 | 9,230 | 5,425 | 4,588 | 89 | 19,332 | 2,297 | 219 | 18.43% |

Notes:
1. Figures above are subject to rounding.
2. The On-Lent Loan and Class A Private Loan are considered to be duplicative and substantially the same debt owed by CEG. Therefore, the On-Lent Loan is considered to be of no value in a liquidation of CEG due to the rule against 'double proof' and/or on a contractual basis

© 2023. For information, contact Deloitte China.

62

# Estimated Recoveries of the Offshore Debts (Liquidation Scenario) – Class D

RMB in million

| Ref No. | Tranche | Accrued claims as of 31 December 2022 | Estimated Realization | | | | Total recovery amount | Recovery amount from CEG | Recovery amount from Tianji | Recovery rate |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | From security (assets/ shares/ intercompany receivables) | From unencumbered assets of principal obligors | From guarantors | From keepwell provider | | | | |
| | | | A | B | C | D | E=A+B+C+D | CEG | Tianji | |
| 1 | SJ Existing October 2022 Notes | 16,226 | - | 263 | 1,744 | 705 | 2,712 | - | 373 | 16.71% |
| 2 | SJ Existing November 2022 Notes | 5,449 | - | 88 | 586 | 237 | 911 | - | 125 | 16.71% |
| 3 | SJ Existing October 2023 Notes | 16,285 | - | 264 | 1,751 | 707 | 2,722 | - | 375 | 16.71% |
| 4 | SJ Existing November 2023 Notes | 5,034 | - | 82 | 541 | 219 | 842 | - | 116 | 16.71% |
| 5 | Lake Notes | 2,050 | - | - | 94 | 89 | 183 | 46 | 47 | 8.91% |
| 6 | Clear Star Put Option | 513 | - | 12 | 12 | - | 24 | 12 | 12 | 4.57% |
| 7 | Castle Share Put Option | 2,160 | 9 | 50 | 1 | - | 60 | - | 50 | 2.79% |
| 8 | Hero Loan | 6,922 | 3,400 | 160 | 156 | - | 3,716 | 156 | 160 | 53.68% |
| 9 | Tuen Mun Put Options | 1,563 | 793 | 18 | - | - | 811 | - | 18 | 51.90% |
| 10 | CEG-Tianji Intercompany Balance | 35,065 | - | 811 | - | - | 811 | - | 811 | 2.31% |
| 11 | Castle Loan Put Option | -[2] | -[2] | -[2] | -[2] | -[2] | -[2] | -[2] | -[2] | -[2] |
| | Class D Total: | 91,267 | 4,202 | 1,748 | 4,885 | 1,957 | 12,792 | 214 | 2,087 | 13.99% |

Notes:
1. Figures above are subject to rounding.
2. The Castle Loan Put Option is considered to be duplicative of a portion of the Castle Share Put Option and substantially the same debt owed by Tianji. Therefore, the Castle Loan Put Option is considered to be of no value in a liquidation of Tianji due to the rule against 'double proof' and/or on a contractual basis
© 2023. For information, contact Deloitte China.

# Appendix 3 – List of Subsequent Events considered

# List of Subsequent Events considered

For the purpose of the Liquidation Analysis, we have considered the following Subsequent Events based on the Company's announcements or information provided by management:

1. **Disposal of subsidiaries of 708 Group**

   On April 24, 2023, Evergrande Auto entered into a Sale and Purchase Agreement with Anxin Holding Limited ("Anxin") and CEG, where Anxin (a wholly-owned subsidiary of CEG) will acquire the entire issued share capital of Assemble Guard Limited and Flaming Ace Limited for a consideration of RMB2 (subject to consideration adjustment).

   Flaming Ace Limited is an Out-scope Entity. By reference to the selection criteria set out on page 9, it is unlikely that there are material recoveries from Flaming Ace Limited and its subsidiaries to CEG in terms of shareholder value.

   Based on the Liquidation Analysis, the return to the shareholder of Assemble Guard Limited is estimated to be nil.

2. **Arbitral award against certain entities of 3333 Group**

   On 12 May 2023, the Company announced that it had received an enforcement notice issued by the Guangzhou Intermediate People's Court of Guangdong Province (the "Enforcement Notice") in relation to the arbitral award of the Shenzhen Court of International Arbitration (the "Arbitral Award") against the Company and its subsidiary Guangzhou Kailong Real Estate Company Limited ("Guangzhou Kailong"), arising from repurchase obligation of the Company, Hengda Real Estate and Guangzhou Kailong in respect of the capital increase and other relevant matters of Hengda Real Estate.

   The obligations of the Company and Guangzhou Kailong under the Arbitral Award were considered in the Liquidation Analysis.

3. **Full repayment of Lei Shing Hong Loan**

   As at 31 December 2022, Profit Concept Finance Limited ("Profit Concept"), an indirect subsidiary of Tianji, had an outstanding secured liabilities in the sum of approx. HK$77m under the Lei Shing Hong Loan which was guaranteed by Tianji. The amount has been fully repaid by Profit Concept in January 2023.

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

# Appendix 4 – Scenario Analysis

# Scenario Analysis | Treatment of CEG's Onshore Debt Guarantee & Keepwell Agreement of SJ Existing Notes

Scenario analysis was performed to estimate recoveries to the Offshore Debts under different possible outcomes in respect of (i) the Keepwell arrangement of the SJ Existing Notes; and (ii) potential recoveries from primary obligors and security to debts relating to Type 1 Guarantee.

### Keepwell Agreement

Considering that there remains uncertainty as to if the keepwell arrangement provided by Hengda Real Estate is enforceable and at the time of the preparation of the Liquidation Analysis, there are a number of on-going court cases in this regard, scenario analysis was performed by assuming (i) the keepwell arrangement was valid and the claim would be admitted into the bankruptcy of Hengda Real Estate; and (ii) the keepwell arrangement was invalid.

### Type 1 Guarantee

In relation to Type 1 Guarantee provided by CEG in respect of debts of non-Group entities, based on the analysis from the PRC legal advisors, creditors would need to exhaust recoveries from principal obligors and security before claiming against CEG, i.e. creditors could claim against CEG for the deficiency only. As borrowers and security of Type 1 Guarantee are outside the Group, no information was available for assessing recoveries from borrowers and security. Scenario analysis were performed by assuming there were **0%, 50%, 75% or 100%** recoveries from the principal obligors and security.

### The Liquidation Analysis

Estimated recoveries set out on pages 33-36 and 59-63 were computed based on (i) the keepwell arrangement was valid and the claim would be admitted into bankruptcy of Hengda Real Estate; and (ii) there were 0% recovery from the primary obligors and security in respect of onshore debts under Type 1 Guarantee so that 100% of the guaranteed debts would be claimed and admitted in the liquidation of CEG.

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

## Scenario Analysis | Treatment of CEG's Onshore Debt Guarantee & Keepwell Agreement of SJ Existing Notes

| Scenario | Assumptions | Recovery of CEG Existing Notes | Recovery of SJ Existing Notes | Recovery for CEG's unsecured creditors | Recovery for TJ's unsecured creditors |
|---|---|---|---|---|---|
| 1 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): 100% Claim<br>• CEG's Type1 Guarantee : 100% Claim<br>• Keepwell : 100% Valid | 3.34% | 16.71% | 2.26% | 2.31% |
| 2 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): 100% Claim<br>• CEG's Type1 Guarantee : 50% Claim<br>• Keepwell : 100% Valid | 3.44% | 16.71% | 2.32% | 2.31% |
| 3 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): 100% Claim<br>• CEG's Type1 Guarantee : 100% Claim<br>• Keepwell : 0% Valid (i.e Invalid) | 3.34% | 12.37% | 2.26% | 2.31% |
| 4 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): 100% Claim<br>• CEG's Type1 Guarantee : 50% Claim<br>• Keepwell : 0% Valid (i.e Invalid) | 3.43% | 12.37% | 2.32% | 2.31% |
| 5 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): 50% Claim<br>• CEG's Type1 Guarantee : 50% Claim<br>• Keepwell : 100% Valid | 3.61% | 16.71% | 2.48% | 2.31% |
| 6 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): 50% Claim<br>• CEG's Type1 Guarantee : 50% Claim<br>• Keepwell : 0% Valid (i.e Invalid) | 3.61% | 12.37% | 2.48% | 2.31% |
| 7 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): 25% Claim<br>• CEG's Type1 Guarantee : 25% Claim<br>• Keepwell : 100% Valid | 3.86% | 16.71% | 2.68% | 2.31% |
| 8 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): 25% Claim<br>• CEG's Type1 Guarantee : 25% Claim<br>• Keepwell : 0% Valid (i.e Invalid) | 3.86% | 12.37% | 2.68% | 2.31% |
| 9 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): 0% Claim<br>• CEG's Type1 Guarantee : 0% Claim<br>• Keepwell : 100% Valid | 4.22% | 16.71% | 2.98% | 2.31% |
| 10 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): 0% Claim<br>• CEG's Type1 Guarantee : 0% Claim<br>• Keepwell : 0% Valid (i.e Invalid) | 4.22% | 12.37% | 2.98% | 2.31% |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

68





About Deloitte

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited ("DTTL"), its global network of member firms, and their related entities (collectively, the "Deloitte organization"). DTTL (also referred to as "Deloitte Global") and each of its member firms and related entities are legally separate and independent entities, which cannot obligate or bind each other in respect of third parties. DTTL and each DTTL member firm and related entity is liable only for its own acts and omissions, and not those of each other. DTTL does not provide services to clients. Please see www.deloitte.com/about to learn more.

Deloitte is a leading global provider of audit and assurance, consulting, financial advisory, risk advisory, tax and related services. Our global network of member firms and related entities in more than 150 countries and territories (collectively, the "Deloitte organization") serves four out of five Fortune Global 500® companies. Learn how Deloitte's approximately 345,000 people make an impact that matters at www.deloitte.com.

Deloitte Asia Pacific Limited is a company limited by guarantee and a member firm of DTTL. Members of Deloitte Asia Pacific Limited and their related entities, each of which are separate and independent legal entities, provide services from more than 100 cities across the region, including Auckland, Bangkok, Beijing, Hanoi, Hong Kong, Jakarta, Kuala Lumpur, Manila, Melbourne, Osaka, Seoul, Shanghai, Singapore, Sydney, Taipei and Tokyo.

The Deloitte brand entered the China market in 1917 with the opening of an office in Shanghai. Today, Deloitte China delivers a comprehensive range of audit & assurance, consulting, financial advisory, risk advisory and tax services to local, multinational and growth enterprise clients in China. Deloitte China has also made—and continues to make—substantial contributions to the development of China's accounting standards, taxation system and professional expertise. Deloitte China is a locally incorporated professional services organization, owned by its partners in China. To learn more about how Deloitte makes an impact that Matters in China, please connect with our social media platforms at www2.deloitte.com/cn/en/social-media.

This communication contains general information only, and none of Deloitte Touche Tohmatsu Limited ("DTTL"), its global network of member firms or their related entities (collectively, the "Deloitte organization") is, by means of this communication, rendering professional advice or services. Before making any decision or taking any action that may affect your finances or your business, you should consult a qualified professional adviser.

No representations, warranties or undertakings (express or implied) are given as to the accuracy or completeness of the information in this communication, and none of DTTL, its member firms, related entities, employees or agents shall be liable or responsible for any loss or damage whatsoever arising directly or indirectly in connection with any person relying on this communication. DTTL and each of its member firms, and their related entities, are legally separate and independent entities.

© 2023. For information, contact Deloitte China.

## SCHEDULE 3

## SCHEME RECOVERY ANALYSIS





**China Evergrande Group**
*Scheme Recovery Analysis Report*

**21 July 2023**

**Deloitte.**

# Deloitte.

**Glen Ho**
Engagement Partner
+852 2852 1643
gleho@deloitte.com.hk

**Karen Chu**
Engagement Partner
+852 2852 1680
karchu@deloitte.com.hk

**Cyrus Ng**
Engagement Partner
+852 2852 1024
cyng@deloitte.com.hk

**Andre Davidovic**
Engagement Director
+852 2852 6432
andavidovic@deloitte.com.hk

Deloitte Financial Advisory Services
A division of Deloitte Advisory
(Hong Kong) Limited
35/F One Pacific Place
88 Queensway
Hong Kong

Tel: +852 2852 1600
Fax: +852 2541 1911
Email: enquiry@deloitte.com.hk
www.deloitte.com/cn

德勤

China Evergrande Group
15th Floor, YF Life Centre
38 Gloucester Road
Wanchai, Hong Kong

Scenery Journey Limited
15th Floor, YF Life Centre
38 Gloucester Road
Wanchai, Hong Kong

Tianji Holding Limited
15th Floor, YF Life Centre
38 Gloucester Road
Wanchai, Hong Kong

Dear Sirs,

**RE:  Scheme Recovery Analysis Report**

We enclose our report (the "**Report**") in connection with the high-level scheme recovery analysis of the offshore debts of China Evergrande Group ("**CEG**", the "**Company**"), Scenery Journey Limited ("**SJ**") and Tianji Holding Limited ("**Tianji**") under the proposed scheme terms as announced by the Company on 22 March 2023 in accordance with our engagement letter dated 15 July 2022, the first supplementary agreement dated 20 June 2023 and the second supplementary agreement dated 17 July 2023 (collectively referred to as the "**Agreement**").

The Report was prepared solely for the benefit of the Company, SJ and Tianji only. No other party is entitled to rely on the Report for any purpose whatsoever and we accept no duty of care or liability to any other party who is shown or gains access to the Report.

The Report has been prepared based on limited information provided to Deloitte Advisory (Hong Kong) Limited ("**DAHK**"). The scenarios presented in the Report involve extensive use of estimates and assumptions, which are inherently subject to uncertainties and contingencies beyond the control of the Group, its management and advisors.  The assumptions will need to be reviewed and revised to reflect any future changes in the circumstances of any of the Company and its subsidiaries.  We draw your attention to the sections titled "Disclaimers" (page 2) and "Limitations" (page 3) of the Report.

The Report is prepared based on information received up to 20 July 2023 ("**Cut-Off Date**"), we have not updated our work since then.

Yours faithfully,
For and on behalf of
**Deloitte Advisory (Hong Kong) Limited**




© 2023 Deloitte China.

# Disclaimers

- The Scheme Recovery Analysis Report (the "Report", "Scheme Recovery Analysis") has been prepared in connection with the results of the high-level analysis on the estimated recoveries of certain debts of China Evergrande Group (the "Company" or "CEG"), Scenery Journey Limited ("SJ") and Tianji Holding Limited ("Tianji") under the proposed restructuring of the offshore debts of the Company and its subsidiaries (collectively the "Group") as announced by the Company on 22 March 2023 (the "Restructuring") in accordance with the terms of the engagement agreement dated 15 July 2022, the first supplementary agreement dated 20 June 2023 and the second supplementary agreement on or around 17 July 2023 entered into between the Company, SJ, Tianji and Deloitte Advisory (Hong Kong) Limited ("DAHK" or "we" or "us") (collectively referred to as the "Agreement").

- Information contained in the Report is subject to the disclaimers, sources of information, assumptions and limitations set out herein.

- By reviewing the Report, the creditors of the schemes of CEG, SJ and Tianji ("Scheme Creditors") and any other party who gains access to the Report shall be deemed to have read, and to have irrevocably acknowledged and agreed to comply with, the following contents of this disclaimer:

  (i)    the Report was prepared solely for the benefit of CEG, SJ and Tianji and, save in respect of CEG, SJ and Tianji, DAHK accepts no duty of care or liability to any other party regardless of whether or not a party was shown or gained access to the Report, or is a Scheme Creditor placing any reliance on the Report;

  (ii)   With respect to dealing in shares, the Report may contain material non-public information of CEG. Thus, any disclosure, copying, or distribution of the Report or the taking of any action based on it, which would constitute insider dealing with respect to shares in CEG, is strictly prohibited;

  (iii)  the Report was prepared for indicative and illustrative purposes only. The actual recoveries may vary subject to, among other things, the ability of the Company to fulfil the repayment obligations under the Restructuring and the amounts of claims submitted and ultimately admitted as claims under the respective scheme of arrangement of the Company, SJ and Tianji. Thus the actual recoveries could be materially different from the estimated recoveries set out in the Report;

  (iv)   the Report was prepared on the basis of information, including unaudited information, received by DAHK up to 20 July 2023 and DAHK has not updated the Report since that date. DAHK relied on the financials and other information provided to it and on representations made to it by management of CEG and CEG's subsidiaries, and the relevant companies' respective staff and advisors. DAHK did not audit or verify the correctness and accuracy of the information provided to it and DAHK does not express an audit opinion on its findings and analysis. DAHK accepts no responsibility for the reliability of such information to the extent it is inaccurate, incomplete or misleading;

  (v)    the Report may not contain all facts and information that a Scheme Creditor may regard as relevant or potentially relevant; and

  (vi)   the Scheme Creditors and any other party who gains access to the Report shall refer to the disclaimers, limitations and sources of information set out herein.

© 2023 Deloitte China.

China Evergrande Group | Scheme Recovery Analysis Report



# Limitations

## Limited scope Scheme Recovery Analysis under the assumption that the Group would operate as a going concern

- The Scheme Recovery Analysis set out estimates of the recoveries to Class A Scheme Creditors, Class C Scheme Creditors, Class B (SJ) Scheme Creditors and Class D (TJ) Scheme Creditors under the terms of the Proposed Restructuring set out in the Restructuring Announcements.

- The analysis was performed on the following principal assumptions:
  (i)   that the Group would operate as a going concern;
  (ii)  that the Group would have sufficient financial resources to meet all obligations under the Proposed Restructuring;
  (iii) that there would not be any restrictions on the Group remitting funds offshore; and
  (iv)  that the Proposed Restructuring would be successfully implemented.

- An assessment of the capacity of the Group to adhere to and implement the Proposed Restructuring, including an assessment of the Group's ability to generate sufficient cash flow to meet debt servicing and maturity obligations has not been considered because it is outside of our high level analysis.

## Subsequent events were not considered

- Events after 31 December 2022 were not taken account of, except for those set out in the section "Adjustments to FY22 Accounts" on page 32.
- Interest and default interest was accrued up to 31 December 2022.

## Use of estimates and assumptions

- Preparation of the Scheme Recovery Analysis involved extensive use of estimates and assumptions, which are inherently subject to uncertainties and contingencies beyond the control of the Company, its management and advisors. As a result, the actual recoveries from the Schemes could be materially different from the estimated recoveries set forth in the Scheme Recovery Analysis.

## Accuracy and completeness of information

- We relied heavily upon the accuracy, validity and completeness of the financial and other information provided to us by the Company, its staff and advisors. We have not sought to audit or independently verify the information provided to us. Where information has been provided to us, we have assumed that it is accurate and current.
- In particular, we have assumed that known liabilities have been fully and properly recorded and all guarantees have been identified and properly accounted for. The actual claims and debts finally admitted in the respective Schemes could be different from those estimated in the Scheme Recovery Analysis.
- Details of balances of claims against CEG/SJ/Tianji and relevant exchange rates were provided by the Company and were adopted in the Scheme Recovery Analysis.

## Estimated recoveries from Third-Party Rights

- Class B (SJ) Debts, Class C Debts and Class D (TJ) Debts were to be admitted to the SJ Scheme, the CEG Scheme, and the Tianji Scheme for the deficiency amounts only, after deducting estimated recoveries from Third-Party Rights.
- We are not provided with independent valuation on the fair value of Third-Party Rights in relation to Class C Debts and Class D (TJ) Debts. We adopted the estimated realization value of the Third-Party Rights as estimated by the Liquidation Analysis (i.e. under the hypothetical liquidation scenario) in estimating the deficiency claims of Class C Scheme Creditors and Class D (TJ) Scheme Creditors to be admitted in the CEG Schemes and the Tianji Scheme.
- Should there be independent valuation of the fair value of the Third-Party Rights prepared on the basis of the Schemes had become effective and the Group had continued as a going concern, the actual recoveries of creditors under the respective Schemes might be different.

## Tax issues

- It is assumed that distributions to Scheme Creditors would not be subject to payment of any taxes. Should distributions to Scheme Creditors give rise to tax obligations, the actual recoveries would be lower than those set forth in the Scheme Recovery Analysis.

© 2023 Deloitte China.




# Glossary of terms

| Abbreviations | Definition |
|---|---|
| A1 Notes | CEG New Notes to be issued to Class A Scheme Creditors electing Option 1 |
| A2 Notes | CEG New Notes to be issued to Class A Scheme Creditors electing Option 2 |
| A2 Package | Equity Package to be issued to Class A Scheme Creditors electing Option 2 |
| approx. | approximately |
| Auditor | Prism Hong Kong and Shanghai Limited, the auditor of the Company |
| B/b | Billion |
| C1 Notes | CEG New Notes to be issued to Class C Scheme Creditors electing Option 1 |
| C2 Notes | CEG New Notes to be issued to Class C Scheme Creditors electing Option 2 |
| C2 Package | Equity Package to be issued to Class C Scheme Creditors electing Option 2 |
| CEG / Company | China Evergrande Group, a company listed on the SEHK with stock code 3333.hk |
| CEG New Notes | New notes to be issued by CEG under the Proposed Restructuring |
| CEG Schemes | The schemes of arrangement to be entered into between CEG and its creditors in relation to Class A Debts and Class C Debts |
| CEG Scheme Creditors | Class A Scheme Creditors and Class C Scheme Creditors |
| Class A Scheme Creditors | Scheme Creditors holding Class A Debts |
| Class A Debts | Certain debts of CEG, consisting of the public notes issued by CEG, the convertible bonds issued by CEG and Class A Private Loan, as set out on pages 6 - 7 |
| Class B (SJ) Scheme Creditors | Scheme Creditors holding Class B (SJ) Debts |
| Class B (SJ) Debts | Debts of SJ, as set out on pages 6 - 7 |
| Class C Scheme Creditors | Scheme Creditors holding Class C Debts |
| Class C Debts | Certain debts of CEG, consisting of the private debt obligations of CEG (except the Class A Private Loan), put option obligations of CEG and debts guaranteed by CEG, as set out on pages 6 - 7 |
| Class D (TJ) Scheme Creditors | Scheme Creditors holding Class D (TJ) Debts |
| Class D (TJ) Debts | Debts of Tianji, as set out on pages 6 - 7 |

| Abbreviations | Definition |
|---|---|
| EBITDA | Earnings before interest, tax, depreciation and amortisation |
| Equity Package | a package of five equity-linked instruments, which are either secured over, linked to, mandatorily exchangeable into, or mandatorily convertible into (as applicable) listed shares of EVPS, NEV, or the Company |
| EV | Enterprise value |
| EVPS | Evergrande Property Services Group Limited, a company listed on the SEHK with stock code 6666.hk |
| FY22 Accounts | Audited financial information of CEG for the year ended 31 December 2022 |
| Evergrande Property Group/ 6666 Group | Evergrande Property and its subsidiaries |
| Group | CEG and its subsidiaries |
| Hengda Real Estate | Hengda Real Estate Group Company Limited |
| HKD | Hong Kong Dollars, the lawful currency of Hong Kong |
| Hong Kong | Hong Kong Special Administrative Region |
| Liquidation Analysis | Analysis performed by DAHK in estimating recoveries to certain offshore debts of CEG, SJ and Tianji under a hypothetical liquidation scenario of the Group as at 1 January 2023 |
| M/m | Million |
| Management | Management of the Group |
| Maples | Legal advisors of the Company in respect of laws of Cayman Islands and British Virgin Islands |
| MCBs | Mandatory convertible bonds |
| MEBs | Mandatory exchangeable bonds |
| NEV | China Evergrande New Energy Vehicle Group Limited, a company listed on the SEHK with stock code 708.hk |
| New Notes | CEG New Notes, SJ New Notes, and TJ New Notes |
| Offshore Debts | Debts of CEG, SJ and Tianji as set out on pages 6 - 7 |
| Option 1 | An option under which CEG Scheme Creditors would receive CEG New Notes (a tenor of 10 to 12 years) at a 1:1 conversion ratio of their claims |
| Option 2 | An option under which CEG Scheme Creditors would elect to convert their entitlements into (1) CEG New Notes (a tenor of five to nine years) on a 1:1 conversion ratio of their claims ; (2) Equity Package; or (3) a combination of (1) and (2) |



# Glossary of terms

| Abbreviations | Definition |
|---|---|
| PRC | The People's Republic of China, which for the purpose of the Report, excludes Hong Kong and Macau Special Administrative Region |
| Proposed Restructuring | The proposed restructuring of the indebtedness of CEG, SJ and Tianji by way of schemes of arrangement as set out in the Restructuring Announcements |
| PIK | Payment in kind |
| Reference Date | Restructuring effective date. For the purpose of this Scheme Recovery Analysis, it is assumed to be 31 December 2022 |
| Restructuring Announcements | Announcements of CEG dated 22 March 2023 and 3 April 2023 |
| Restructuring Consideration | The notes or equities to be offered to the Scheme Creditors in exchange for the Scheme Creditors releasing their claims against CEG/ SJ/ Tianji under the Proposed Restructuring |
| RMB | Renminbi, the lawful currency of the PRC |
| RMB Bonds | 15 Hengda 03 RMB bond issued by Hengda Real Estate and listed in the Shanghai Stock Exchange, in which the Company guaranteed the repurchase of the RMB bond at the Redemption Date (as defined in the 15 Hengda 03 RMB bond indenture) if Hengda Real Estate failed to ensure sufficient funds in the bank account to repay the RMB Bondholders 3 business days prior to the Redemption Date and the RMB Bondholders so demanded. The outstanding principal of the 15 Hengda 03 RMB bond is RMB8.2 billion |
| SAFE | State Administration for Foreign Exchange, the PRC |
| Scheme Creditors | Creditors of any of the CEG Schemes, the SJ Scheme and the Tianji Scheme |
| Schemes | Collectively the CEG Schemes, the SJ Scheme and the Tianji Scheme |
| SEHK | Stock Exchange of Hong Kong |
| Sidley Austin | Legal advisors of the Company in respect of Hong Kong laws and English laws |
| SJ | Scenery Journey Limited |
| SJ New Notes | New Notes to be issued to Class B (SJ) Scheme Creditors |
| SJ Scheme | the scheme of arrangement to be entered into between SJ and its creditors in relation to Class B (SJ) Debts |
| SLNs | Security-linked notes |
| Subsequent Events | Events after 31 December 2022 |

| Abbreviations | Definition |
|---|---|
| Tianji / TJ | Tianji Holding Limited |
| TJ New Notes | New Notes to be issued to Class D (TJ) Scheme Creditors |
| Tianji Scheme/TJ Scheme | The scheme of arrangement to be entered into between Tianji and its creditors, in relation to Class D (TJ) Debts |
| Third-Party Rights | Rights against any person other than CEG, SJ and/or Tianji (as applicable) who is an obligor, guarantor, security or provider of any other credit support (including where applicable, Restructuring Consideration received from the CEG Schemes, SJ Scheme or TJ Scheme (as applicable)) |
| USD | United States Dollar, the lawful currency of the United States of America |
| VDate | Valuation date being 31 December 2022 |

China Evergrande Group | Scheme Recovery Analysis Report

© 2023 Deloitte China.



# Glossary Definition of Offshore Debts

| Class | Terms | Definition |
|---|---|---|
| A | CEG Existing March 2022 Notes | 8.25% senior notes due March 23, 2022 (ISIN: XS1580431143, Common Code: 158043114) |
| A | CEG Existing April 2022 Notes | 9.5% senior notes due April 11, 2022 (ISIN: XS1982036961, Common Code: 198203696) |
| A | CEG Existing January 2023 Notes | 11.5% senior notes due January 22, 2023 (ISIN: XS2106834299, Common Code: 210683429) |
| A | CEG Existing February 2023 Bonds | 4.25% convertible bonds due February 14, 2023 (ISIN: XS1767800961, Common Code: 176780096) |
| A | CEG Existing April 2023 Notes | 10.0% senior notes due April 11, 2023 (ISIN: XS1982037779, Common Code: 198203777) |
| A | CEG Existing June 2023 Notes | 7.5% senior notes due June 28, 2023 (ISIN: XS1627599498, Common Code: 162759949) |
| A | CEG Existing January 2024 Notes | 12.0% senior notes due January 22, 2024 (ISIN: XS2106834372, Common Code: 210683437) |
| A | CEG Existing March 2024 Notes | 9.5% senior notes due March 29, 2024 (ISIN: XS1587867539, Common Code: 158786753) |
| A | CEG Existing April 2024 Notes | 10.5% senior notes due April 11, 2024 (ISIN: XS1982040641, Common Code: 198204064) |
| A | CEG Existing June 2025 Notes | 8.75% senior notes due June 28, 2025 (ISIN: XS1627599654, Common Code: 162759965) |
| A | CEG Existing January 2022 Notes | 9.5% senior notes due January 30, 2022 (ISIN: XS1991102846, Common Code: 199110284) |
| A | Class A Private Loan | Private loan of US$100,000,000 with 15% interest p.a. due January 2022 owed by the Company |
| B, D | SJ Existing October 2022 Notes | 11.5% senior notes due October 24, 2022 (ISIN: XS2109191986, Common Code: 10919198) |
| B, D | SJ Existing November 2022 Notes | 13.0% senior notes due November 6, 2022 (ISIN: XS1903671854, Common Code: 190367185) |
| B, D | SJ Existing October 2023 Notes | 12.0% senior notes due October 24, 2023 (ISIN: XS2109192109, Common Code: 210919210) |
| B, D | SJ Existing November 2023 Notes | 13.75% senior notes due November 6, 2023 (ISIN: XS1903671938, Common Code: 190367193) |
| C, D | Lake Notes | US$260 million 8.5% senior notes due October 3, 2021 (ISIN: XS2054446617, Common Code: 205444661) issued by Jumbo Fortune Enterprises Limited |
| C | Dongpo Notes | US$424 million 9.0% senior notes due January 22, 2023 (ISIN: XS2290369128, Common Code: 229036912) issued by Great Courage Global Limited |
| C | Dongpo Put Option | US$116 million put option granted by CEG in relation to certain Dongpo Notes |
| C | Graceful Court Put Option | US$110 million put option granted by CEG in relation to shares of Graceful Court Limited |
| C | New Chic Margin Loan | HK$160 million margin loan borrowed by New Chic Global Limited |

© 2023 Deloitte China.

China Evergrande Group | Scheme Recovery Analysis Report

6




# Glossary Definition of Offshore Debts

| Class | Terms | Definition |
|---|---|---|
| C, D | Clear Star Put Option | HK$575 million put option granted by Tianji in respect of shares of Clear Star Investments Limited |
| C | CEG Loan 1 | HK$1.2 billion loan borrowed by CEG due 2 January 2022 |
| C | CEG Loan 2 | HK$600 million loan borrowed by CEG due 7 January 2022 |
| C | Venice Loan | US$20 million structured loan borrowed by Rainbow Ever Limited |
| C | Venice SPA | US$355 million structured sale and purchase agreement of shares in Rainbow Ever Limited |
| C, D | Hero Loan | HK$7.6 billion loan borrowed by Tianji pursuant to facilities agreement dated 21 November 2020 |
| C | FCB Put Option | US$712 million repurchase obligations granted by CEG, Alpha Beauty Limited and New Gains Group Limited in respect of Fangchebao Group Co. Ltd |
| C | RMB Bond Put Option | Repurchase obligations of CEG in relation to the RMB Bond |
| C | CEG Guarantees of PRC Liabilities | Unsecured liabilities of CEG arising in connection with the liabilities of entities incorporated the PRC |
| C | Kailong Arbitration Award | Arbitration award rendered by the Shenzhen Court of International Arbitration where CEG, Guangzhou Kailong Real Estate Company Limited, and the Chairman of CEG (Mr. Hui Ka Yan) were responsible for the repayment accordingly |
| C | On-Lent Loan | Amounts on-lent to CEG pursuant to the loan agreement relating to the provision of the Class A Private Loan |
| D | Castle Loan Put Option | US$258 million put option granted by Tianji in relation to a private loan borrowed by Sky Joy Holdings Limited |
| D | Castle Share Put Option | US$258 million put option granted by Tianji in relation to shares of Sky Joy Holdings Limited |
| D | Tuen Mun Put Options | HK$1.4 billion put options granted by Tianji in relation to a project located in Tuen Mun, Hong Kong |
| D | CEG-Tianji Intercompany Balance | Intercompany balance owed by the Tianji to CEG which on 31 December 2022 was in an amount equal to approximately US$5.03 billion |

© 2023 Deloitte China.


# Basis of our analysis

## Source of information

| Key information / documents obtained | We have obtained the following information from the Management, their advisors or public domain as the basis of our Scheme Recovery Analysis up to the Cut-Off Date: |
|---|---|
| | • Announcement dated 22 March 2023 issued by CEG in relation to the Proposed Restructuring of Offshore Debts |
| | • Presentation material dated 3 April 2023 issued by CEG in relation to the Offshore Restructuring Proposal |
| | • Presentation material dated 3 April 2023 issued by SJ/ Tianji in relation to the Restructuring Proposal |
| | • Announcement dated 3 April 2023 issued by CEG in relation to the Proposed Restructuring of Offshore Debts |
| | • Announcement dated 24 April 2023 issued by CEG in relation to the Restructuring of the Target Group |
| | • Circular dated 25 April 2023 issued by NEV in relation to the disposal of NEV's healthcare segment |
| | • CEG Annual Report for the year ended 31 December 2020 |
| | • CEG Interim Report for the six months ended 30 June 2021 |
| | • Results announcements of CEG for the years ended 31 December 2021 and 2022 |
| | • Results announcements of CEG for the six months ended 30 June 2022 |
| | • NEV Annual Report for the year ended 31 December 2020 |
| | • NEV Interim Report for the six months ended 30 June 2021 |
| | • EVPS Annual Reports for the years ended 31 December 2020, 2021 and 2022 |
| | • Consolidated financial statements (including entity-level balance sheets) of CEG (including the listed groups of NEV and EVPS) as at 31 December 2021 and 31 December 2022 and working schedules provided by Management and the Auditor |
| | • Information on Offshore Debts claim as at 31 December 2022 |
| | • Peer financial metrics as at 31 December 2022 extracted from CapitalIQ |

China Evergrande Group | Scheme Recovery Analysis Report

© 2023 Deloitte China.

**Summary of scheme recoveries by class**          **09**

Proposed Restructuring          11

Scheme Recovery Analysis scenarios          14

Calculation methodology          21

Scheme Recovery Analysis assumptions          25

Estimated recoveries          33

Appendices          41

China Evergrande Group | Scheme Recovery Analysis Report



© 2023 Deloitte China.

# Summary of Scheme Recoveries by Class

**Estimated recoveries to Scheme Creditors**

Under the Proposed Restructuring, CEG Scheme Creditors are entitled to elect one of two options with respect to the treatment of their entitlement to distribution. Each option features different Restructuring Consideration and as such, returns to CEG Scheme Creditors will not be known until final selections are made upon the Schemes becoming effective.

Based on the assumptions that the Group would operate as going concern and be able to honor its payment obligations, we have estimated recoveries to the Schemes Creditors based on the calculation methodology (pages 22 – 24), assumptions (pages 26 – 32) and different scenarios on the options to be elected by CEG Scheme Creditors (pages 15 – 18).

The three scenarios presented as below represent the scenarios giving the maximum, middle and minimum estimated recoveries based on different scenarios on the options to be elected by CEG Scheme Creditors.

| | Max | Base case | Min |
|---|---|---|---|
| CEG Schemes – Class A Debts | 32.5% | 22.5% | 17.7% |
| SJ Scheme – Class B (SJ) Debts | 39.9% | 39.9% | 39.9% |
| CEG Schemes – Class C Debts | 28.9% | 20.1% | 14.9% |
| TJ Scheme – Class D (TJ) Debts | 3.1% | 3.1% | 3.1% |

The above estimated recoveries to unsecured claims under the Schemes do not include recovery from Third-Party Rights such as underlying securities and guarantees which may further increase total recovery of each respective class. A full table of recoveries (based on Base Case) can be found on pages 34-40 of this Report.

**Limitations of the analysis**

The Scheme Recovery Analysis does not include an assessment of the Group's financial capacity and ability to meet its obligations under the Proposed Restructuring. The Scheme Recovery Analysis assumes the Group would continue as a going concern and have sufficient financial resources (including but not limited from onshore projects which are still undergoing restructuring) to satisfy its obligations under the Proposed Restructuring, and the Schemes would be implemented successfully. Should the assumptions not be valid, the actual recoveries may be lower than those estimated.

Our analysis was based on the latest published financial information and terms of the Proposed Restructuring. Any changes required to be made to the information provided may have an adverse impact on the Group's ability to successfully implement the proposed terms.


© 2023 Deloitte China.

Summary of scheme recoveries by class          09

**Proposed Restructuring**                     **11**

Scheme Recovery Analysis scenarios             14

Calculation methodology                        21

Scheme Recovery Analysis assumptions           25

Estimated recoveries                           33

Appendices                                     41

© 2023 Deloitte China.



# Proposed Restructuring

## CEG Schemes

**Class A Debts:**

☐ 10 public notes issued by CEG, 1 private note and 1 private loan

- Claims in this class include claims against _CEG and 13 subsidiary guarantors;_
- Estimated accrued claims of USD 16,080m

**Class C Debts:**

☐ Guarantees, repurchase obligations and private debts at CEG

- Class C Debts only include unsecured claims against CEG. Third-Party Rights to remain in place and not compromised in the scheme
- _Class C Debts will be admitted to the CEG Schemes on a deficiency claim basis (i.e., accrued claims minus valuation of Third-Party Rights)_, which is subject to an independent valuation and adjudication process to be set out in the scheme documents

☐ Class C Debts do not have claims against any subsidiary guarantors and thus will be allocated longer dated CEG New Notes under Option 2

## Restructuring Consideration

At election of Class A Scheme Creditors and Class C Scheme Creditors

**Option 1 :**

- CEG New Notes (A1/C1 Notes): tenor of 10 to 12 years and interest rate of 2.0% to 3.0% p.a., 1.0% PIK penalty
- _Option 1 is the default option for CEG Scheme Creditors who have not made their elections in their submission of claims before the relevant deadline._

**Option 2:**

- CEG Scheme Creditors can choose to receive 1) CEG New Notes (A2/C2 Notes), 2) Equity Package (A2/C2 Package), or 3) a combination of both
- CEG New Notes (A2/C2 Notes): tenor of 5 to 9 years and interest rate of 5.0% to 7.0% p.a., 1.0% PIK penalty
- Equity Package (A2/C2 Package): bundle of 3 types of equity-linked instruments – MEBs, MCBs and SLNs
- There is a minimum debt for equity conversion in the CEG Schemes, i.e., at least USD 4,245m of claims need to be allocated to Equity Package. _If such conversion is not met, CEG Scheme Creditors who elect Option 2 New Notes (A2/C2 Notes) may be mandatorily allocated with the MEBs and MCBs to fill the shortfall_
- In addition, any consideration received by CEG as part of the Tianji Scheme shall be distributed to creditors electing Equity Package on a pro-rata basis (without offsetting any claims)

**MEBs, MCBs, and SLNs:**

- EVPS MEBs: bonds exchangeable into shares of EVPS within 24 months from the Reference Date
- NEV MEBs: bonds exchangeable into shares of NEV within 24 months from the Reference Date
- CEG MCBs: bonds convertible into shares of CEG within 5 years from the Reference Date
- EVPS SLNs: new notes with tenor of 5 to 8 years, interest rate of 5.0% to 6.5% p.a., 1.0% PIK penalty and charge of securities account holding shares of EVPS, amongst other credit enhancements
- NEV SLNs: new notes with tenor of 5 to 8 years, interest rate of 5.0% to 6.5% p.a., 1.0% PIK penalty and linked to a custody account containing shares of NEV, amongst other credit enhancements

China Evergrande Group | Scheme Recovery Analysis Report    12

© 2023 Deloitte China.



## Proposed Restructuring
### SJ & TJ Schemes

Existing SJ Noteholders will participate in both the SJ Scheme and the TJ Scheme. Certain debts borrowed by TJ and creditors who benefit from guarantees and/or put options provided by TJ ("TJ Other Existing Debt Instruments") will participate in the TJ Scheme.

Existing SJ Noteholders will receive Restructuring Consideration from both the SJ Scheme and TJ Scheme on a deficiency claim basis, while creditors of TJ Other Existing Debt Instruments will only receive Restructuring Consideration from TJ Scheme on a deficiency claim basis.

**Existing SJ Noteholders**
1) SJ as borrower
2) 103 subsidiary guarantors,
3) Keepwell agreement from Hengda Real Estate, and
4) Guarantee from TJ

**TJ Other Existing Debt Instruments**
1) Debts borrowed by TJ,
2) Guarantees provided by TJ (other than Existing SJ Notes)
3) Other obligations of TJ



**Under SJ Scheme**

| SJ New Notes | | |
| --- | --- | --- |
| (USDm) | Tenor | Principal |
| SJ Tranche A | 4 years | 300 |
| SJ Tranche B | 5 years | 1,100 |
| SJ Tranche C | 6 years | 1,100 |
| SJ Tranche D | 7 years | 1,200 |
| SJ Tranche E | 8 years | 2,800 |
| Total | | 6,500 |

Class B (SJ) Debts

**Under TJ Scheme**

| TJ New Notes | | |
| --- | --- | --- |
| (USDm) | Tenor | Principal |
| TJ Tranche A | 5 years | 100 |
| TJ Tranche B | 6 years | 200 |
| TJ Tranche C | 7 years | 300 |
| TJ Tranche D | 8 years | 200 |
| **Total** | | **800** |

Class D (TJ) Debts

© 2023 Deloitte China.



Summary of scheme recoveries by class          09

Proposed Restructuring                         11

**Scheme Recovery Analysis scenarios**         **14**

Calculation methodology                        21

Scheme Recovery Analysis assumptions           25

Estimated recoveries                           33

Appendices                                     41

China Evergrande Group | Scheme Recovery Analysis Report

© 2023 Deloitte China.



# Scheme Recovery Analysis scenarios

## Election of Option 1 and Option 2 under the CEG Schemes

**Overview of the recovery scenarios**

The returns to Scheme Creditors are influenced by, inter alia, the final allocations of the Restructuring Consideration. Two key factors that determine the allocations are: (1) the election of Option 1 and Option 2 by CEG Scheme Creditors and (2) the value of the deficiency claims by Class C Scheme Creditors and Class D (TJ) Scheme Creditors.

As the election of Option 1 or Option 2 by CEG Scheme Creditors is unknown at the time of preparing the Scheme Recovery Analysis, to demonstrate a range of potential recoveries, we have conducted the Scheme Recovery Analysis based on seven scenarios illustrating how CEG Scheme Creditors may elect among Option 1 and Option 2.

The election of Option 1 or Option 2 is subject to a minimum claim when selecting the Equity Package, as illustrated on page 20.





© 2023 Deloitte China.

# Scheme Recovery Analysis scenarios

## Election of Option 1 and Option 2 under the CEG Schemes

**Overview of the recovery scenarios**

The scenarios seek to demonstrate the range of potential recoveries starting with full allocation of claims to Option 1 (i.e. CEG New Notes only), a combination of Option 1 and Option 2 (i.e. a combination of CEG New Notes and Equity Package), and to full allocation to the Option 2 (i.e Equity Package only). If no election is made, claims under the CEG Schemes will by default be allocated to Option 1.

In the following table, we have outlined these seven scenarios and the reallocation treatment if there are under or over subscription for the Equity Package in the CEG Schemes based on the reallocation mechanism set out in the Restructuring Announcements.

Under all the scenarios, it is assumed that Class A Scheme Creditors and Class C Scheme Creditors will elect the same options.

**Election of Option 1 and Option 2 by CEG Scheme Creditors**

| # | Election (%) | Reallocation for over/under subscription of Equity Package |
|---|---|---|
| 1.0 | 100% Option 1 (A1/C1 Notes) | The Equity Package under Option 2 would be undersubscribed, and claims elected for Option 1 would be reallocated to Equity Package under Option 2 on a pro-rata basis. |

© 2023 Deloitte China.



# Scheme Recovery Analysis scenarios

Election of Option 1 and Option 2 under the CEG Schemes

## Election of Option 1 and Option 2 by CEG Scheme Creditors

| # | Election (%) | Reallocation for over/under subscription of Equity Package |
|---|---|---|
| 2.1 | 50% Option 1 A1/C1 Notes, 50% Option 2 A2/C2 Notes | The Equity Package would be undersubscribed. Part of the claims selecting Option 2 A2/C2 Notes would be reallocated to the Equity Package on a pro-rata basis.<br><br>An underutilised adjusted portion of the A2 Package will be allocated to the respective pools of the underlying shares for the A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs and C2 NEV SLNs. |
| 2.2 | 50% Option 1 A1/C1 Notes, 25% Option 2 A2/C2 Notes, 25% Option 2 Equity Package | The Equity Package would be undersubscribed for Class A and oversubscribed for Class C. Option 2 A2/C2 Notes will be reallocated to address the over/under subscription of the respective classes.<br><br>An underutilised adjusted portion of the A2 Package will be allocated to the respective pools of the underlying shares for the A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs and C2 NEV SLNs. |
| 2.3 | 50% Option 1 A1/C1 Notes, 50% Option 2 Equity Package | A 50% equity allocation would exceed the Equity Package allocation and the oversubscription would be transferred to Option 2 A2/C2 Notes.<br><br>The unadmitted portion of the C2 Package will be reallocated to the A2 Package. |



China Evergrande Group | Scheme Recovery Analysis Report

17

© 2023 Deloitte China.

# Scheme Recovery Analysis scenarios

Election of Option 1 and Option 2 under the CEG Schemes

**Election of Option 1 and Option 2 by CEG Scheme Creditors**

| # | Election (%) | Reallocation for over/under subscription of Equity Package |
|---|---|---|
| 3.1 | 100% Option 2 A2/C2 Notes | The Equity Package would be undersubscribed for both classes and part of Option 2 A2/C2 Notes allocation would be reallocated to the equity instruments under Option 2 on a pro-rata basis. |
| | | An underutilised adjusted portion of the A2 Package will be allocated to the respective pools of the underlying shares for the A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs and C2 NEV SLNs. |
| 3.2 | 50% Option 2 A2/C2 Notes, 50% Option 2 Equity Package | A 50% equity allocation would exceed the Equity Package allocation and the oversubscription would be transferred to Option 2 A2/C2 Notes. |
| | | The unadmitted portion of the C2 Package will be reallocated to the A2 Package. |
| 3.3 | 100% Option 2 Equity Package | A 100% equity allocation would exceed the Equity Package allocation and the oversubscription would be transferred to Option 2 A2/C2 Notes. |
| | | The unadmitted portion of the C2 Package will be reallocated to the A2 Package. |

China Evergrande Group | Scheme Recovery Analysis Report

18



© 2023 Deloitte China.

# Scheme Recovery
# Analysis scenarios
## Deficiency claims in the Schemes

### Value of the deficiency claims by Class B (SJ) Debts, Class C Debts and Class D (TJ) Debts creditors

Class B (SJ) Debts, Class C Debts and Class D (TJ) Debts are to be admitted to the respective Schemes on a deficiency basis, i.e. accrued claims minus value of Third-Party Rights. In the absence of independent valuation on the Third-Party Rights, to calculate the deficiency amount, the Scheme Recovery Analysis has adopted the estimated recoveries from Third-Party Rights from the Liquidation Analysis (i.e. assuming the Group, including the security providers, put option obligors and guarantors, would be put into liquidation and their assets would be realised under a forced-sale scenario).

We note that the adoption of the Liquidation Analysis assumption in estimating the value of Third-Party Rights may present a conservative case in the Scheme Recovery Analysis. Under the scenario of successfully implementing the Schemes, the deficiency claims under Class C Debts and Class D (TJ) Debts may be lower and an overall improvement in the unsecured recovery under the Schemes could be expected for the following reasons:

- Realisation of the underlying security would be higher under a going concern (i.e., under the Scheme Recovery Analysis) compared to a forced sale environment; and
- The deficiency calculation only took account of security from entities subject to the Liquidation Analysis. Additional recoveries might be available from entities outside of the Liquidation Analysis scope, thereby reducing the deficiency claim.

### Other deficiency claim adjustments for cross-Schemes claims

Existing SJ Noteholders will also participate in the TJ Scheme as a Class D (TJ) Scheme Creditors through the guarantee provided by TJ. The deficiency claim of the Existing SJ Notes in the TJ Scheme is calculated as the accrued claims as at 31 December 2022 minus the estimated recovery from Class B (SJ) Debts in the SJ Scheme. Further, the deficiency claim of the Existing SJ Notes in the SJ Scheme is calculated as the accrued claims as at 31 December 2022 minus the estimated recovery from the TJ Scheme.

The Class C Hero Loan will also participate in the TJ Scheme as a Class D (TJ) Scheme Creditor through the guarantee provided by TJ. This facility will participate on a deficiency basis after subtracting the assumed value of its Third-Party Rights (adopted from the Liquidation Analysis) and their recoveries as a Class C Scheme Creditor.

The Class C Lake Notes and Clear Star Put Option will also participate in the TJ Scheme as a Class D (TJ) Scheme Creditor claiming through the guarantee provided by TJ. These two facilities will participate on a deficiency basis after subtracting the assumed value of its Third-Party Rights and their recoveries as a Class C Scheme Creditor.

© 2023 Deloitte China.



# Scheme Recovery Analysis scenarios

## Class A and C allocations

### Summary of Class A and C Allocations (USD'm)

After taking account of the deficiency adjustments and reallocating claims into different options to ensure the required amount of Equity Package has been met, the final allocations to the respective CEG New Notes or Equity Package under each of the seven scenario has been estimated below.

| # | Scenario | Class A Allocation | | | Class C Allocation | | |
|---|---|---|---|---|---|---|---|
| | | A1 Notes | A2 Notes | A2 Equity | C1 Notes | C2 Notes | C2 Equity |
| 1.0 | 100% Option 1 Notes | 11,272 | - | 4,808 | 9,841 | - | 2,798 |
| 2.1 | 50% Option 1 Notes, 50% Option 2 Notes | 8,040 | 3,232 | 4,808 | 6,320 | 3,522 | 2,798 |
| 2.2 | 50% Option 1 Notes, 25% Option 2 Notes, 25% Option 2 Equity | 8,040 | 3,232 | 4,808 | 6,320 | 3,522 | 2,798 |
| 2.3 | 50% Option 1 Notes, 50% Option 2 Equity | 8,040 | 2,693 | 5,347 | 6,320 | 3,522 | 2,798 |
| 3.1 | 100% Option 2 Notes | - | 11,272 | 4,808 | - | 9,844 | 2,799 |
| 3.2 | 50% Option 2 Notes, 50% Option 2 Equity | - | 10,734 | 5,346 | - | 9,844 | 2,799 |
| 3.3 | 100% Option 2 Equity | - | 10,734 | 5,346 | - | 9,844 | 2,799 |

Notes

1. Under the scenario where C's do not have any deficiency and A's all elect A2 Notes, the minimum equitization amount would be USD 2,358m

© 2023 Deloitte China.



China Evergrande Group | Scheme Recovery Analysis Report

Summary of scheme recoveries by class — 09

Proposed Restructuring — 11

Scheme Recovery Analysis scenarios — 14

**Calculation methodology** — **21**

Scheme Recovery Analysis assumptions — 25

Estimated recoveries — 33

Appendices — 41

© 2023 Deloitte China.



# Calculation methodology

Discounted Cash Flow

**Scheme recovery calculation**

Scheme Creditors' recoveries are estimated based on the net present value of the cashflows associated with New Notes and/or Equity Package allocated to each respective creditor as part of the Restructuring Consideration. To model the cashflows, the following steps were taken:

1) **Claim amounts determined** – The accrued claim amounts as at 31 December 2022 were used for Class A Debts. The deficiency claim (i.e. accrued claims as at 31 December 2022 minus estimated value of Third-Party Rights) was calculated for Class B (SJ) Debts, Class C Debts and Class D (TJ) Debts.

2) **Restructuring Consideration allocated to Scheme Creditors** – The amount of New Notes or Equity Package allocated to the respective classes is calculated according to the terms of Restructuring Proposal. Class A Debts and Class C Debts may be subject to a reallocation between CEG New Notes and Equity Package to address any under or over subscription of Equity Package. The estimated allocations for the seven scenarios in the Scheme Recovery Analysis have been included on page 20 of this Report.

3) **Cash flows calculated** – The cash flows for each tranche of New Notes are calculated separately according to the amount allocated from the previous step and an assumption on when cash interest payments will be made as detailed on page 29 of this report. The exchange of scheme claims into MEBs and MCBs was calculated in accordance with the prices set out in the Restructuring Announcements and an assumption was made on the conversion date and prices as detailed on pages 28, 30 - 32 of this Report. Aggregate cash flows from New Notes and Equity Package were then discounted to calculate a net present value return for each instrument and class.

4) **Recovery calculation** – The net present value of each instrument and class is measured against the claim amounts determined based on point 1 above, to produce an estimated recovery rate for unsecured claims. In addition, the assumed value of Third-Party Rights is added to the scheme recovery amount to calculate a total recovery when measured against the accrued claim as at 31 December 2022. For further detail please refer to pages 34-40 and appendix 1.

China Evergrande Group | Scheme Recovery Analysis Report

22



© 2023 Deloitte China.

# Calculation methodology

Valuation

| MEBs and MCBs conversion price valuation methodology | To estimate a conversion price for converting the respective MEBs and MCBs into equity of CEG/ EVPS/ NEV (the "Issuers"), the Guideline Companies Method under a market approach was adopted.

An Enterprises Value ("EV") multiple was applied based on sales/ EBITDA given the Issuers were loss making in the past year.

Financial metrics of comparable companies were used to understand how the Issuers were performing relative to their peers, thereby benchmarking their market position in order to select an appropriate market multiple. A valuation date of 31 December 2022 ("VDate") was set.

To estimate a conversion price, the following methodology was followed:

1) The closing prices of the respective Issuers as at 18 March 2022 (i.e. last trading day) ("Day 1") were taken as the starting point of the valuation analysis. Based on our proposed valuation framework, we first back tested the model to ensure our proposed valuation framework could reconcile to the market capitalisation of respective Issuers as at Day 1 (which allowed us to consider the appropriateness of our approach and valuation parameters).

2) Then, we compared the market positioning of each respective Issuer on Day 1 relative to its peer - whether historically it had been trading below or above its peers and where it should be as at the VDate given its performance comparing to its peers.

3) Taking into account the performance (i.e. revenue growth, margin growth, changes in assets value) of each respective Issuer during the recent financial year and comparing that to its market peers (i.e. benchmarking analysis), we considered whether any change regarding the market positioning of the respective Issuer relative to peers was needed. Then, an appropriate multiple was selected and an EV of the respective Issuer as at VDate was derived. |

China Evergrande Group | Scheme Recovery Analysis Report



© 2023 Deloitte China.

# Calculation methodology
## Valuation

**MEBs and MCBs conversion price valuation methodology (cont'd)**

4) Based on the value derived in point 3 and regarding the value changes between Day 1 and VDate, such movements were also cross checked with the change in market capitalisation of comparable companies between Day 1 and VDate to further assess the reasonableness of the concluded results.

5) EV of each respective Issuer was adjusted for cash, debts, non-operating assets, non-operating liabilities, minority interests in arriving at the equity value of each respective Issuer.

6) Conversion price was then calculated by dividing the equity value of each respective Issuer with the corresponding enlarged share capital.

As the market capitalisation of CEG includes EVPS and NEV and the main business under CEG is property development, in order to derive an appropriate value for the property development segment of CEG as at Day 1 and value of CEG as a whole as at the VDate, a sum-of-parts analysis was performed (as standalone value of EVPS and NEV were concluded).

We note that the conversion of MEBs and MCBs may only happen in year 2 and 5. In theory, a future unit price of a company (not fair value) can be calculated with the assistance of financial forecasts and a supporting business plan. In the absence of such information, it is assumed that the unit value of the respective Issuers at conversion timing (i.e. year 2 or 5) will remain the same as that as of VDate, with the assumption that the capitalisation of the loans due by NEV to CEG and issuance of new shares (see page 32) were completed as of VDate.

We note that the financial information received from public announcements and that from Management have significant differences in the balance and classification of the items. No reconciliation was available at the time of the analysis. As such, our analysis was primarily performed based on public announcements of EVPS, NEV and CEG.

Further, the equity value of the respective Issuers might be subject to discount due to a lack of marketability as they remained suspended as at the VDate, as compared to other trading listed companies referenced in the valuation.

© 2023 Deloitte China.



Summary of scheme recoveries by class — 09

Proposed Restructuring — 11

Scheme Recovery Analysis scenarios — 14

Calculation methodology — 21

**Scheme Recovery Analysis assumptions** — **25**

Estimated recoveries — 33

Appendices — 41

© 2023 Deloitte China.



## Scheme Recovery Analysis assumptions

| | |
|---|---|
| **Discount Rate** | 25.5% is used to discount cash flows in the Scheme Recovery Analysis under the assumption that CEG, SJ and Tianji will fully honor the payment obligations as rescheduled during the tenor.<br><br>Relevant cash flows include:<br>• Principal payments upon maturity of the respective instruments;<br>• Proceeds from disposal of equity; and<br>• Cash payment of interest.<br><br>The discount rate for an instrument is typically assessed by making reference to the risk-free market rate and adjusting for the risks of the instrument which could in turn be affected by the overall industry environment, its marketability, the projections regarding cash flows (e.g. timing and amount of repayment), risks of the issuer in terms of its performance and leverage as compared to the industry.<br><br>Based on the assumptions that the Schemes would come into effect on 31 December 2022 and CEG would continue as a going concern and be able to meet the repayment obligations under the Proposed Restructuring, reference was made to CEG's bond yields before the crisis (i.e. assuming a return to normal operations upon implementation of the Schemes) in assessing the discount rate. It was noted that CEG's commercial bills were first overdue in November 2020. After rumors of financial difficulties surfaced in the summer of 2021, CEG first announced such overdue events on 7 June 2021 and the relevant bond prices plummeted.<br><br>Based on the above, a yield between 20% to 21% ("Range") was derived after making reference to the average spread (over the risk free rate) of the USD bonds issued by CEG in the first quarter of 2021 (i.e. the last quarter before the announcement of defaults) and adjusting for the movements in risk-free rate and credit spread from the first quarter of 2021 to December 2022.<br><br>Due to limitation of data, no further comment could be made regarding the yield differential between unsecured bonds and secured bonds with real assets as collateral. |

© 2023 Deloitte China.



# Scheme Recovery Analysis assumptions

| Discount Rate (Cont.) | Compared to the mid-point of the Range, the discount rate of 25.5% would indicate an additional premium of 5 percentage points ("Additional Premium").

An Additional Premium may be demanded by investors for instruments to be issued by CEG/ SI/ Tianji, even upon the Schemes becoming effective, after considering factors including but not limited to:

- The PRC real estate industry has undergone a drastic change and the industry outlook remains uncertain.
- The latest published financial information of the Group indicated a notable increase in liabilities and a substantial net liabilities position.
- The Group (including onshore operations) is undergoing restructuring.

However, it is worth noting that:-

- The level of Additional Premium to be applied in this case is very subjective in nature;
- Given the scale of the real estate crisis in China is unprecedented, there is no readily available reference to use to assess the appropriate discount rate;
- Some of the other real estate developers in China are currently undergoing debt restructurings, which are at various stages of implementation, and none of which have been completed. The yield to maturity ("YTM") observed on comparable issuers' bonds varies widely. The appropriateness of direct reference to comparable issuers' data is a matter to be carefully considered; and
- Existing YTM primarily reflect bond yields based on the bonds' existing terms (including but not limited to tenor, etc). In theory, with longer maturities (such as in the Proposed Restructuring which has tenors of up to 12 years), and with all else being the same (i.e. coupon rate, overall bond price, etc.), the implied YTM for the extended maturity instruments would normally be lower than the current YTM.

A discount rate of 25.5% (with an implied 5 percentage points Additional Premium over the mid-point of the Range) may not be considered unreasonable, to reflect CEG's unique circumstances and varying expectations of different creditors regarding the Additional Premium (which depend on the respective creditor's individual specific circumstances).

The above discount rate analysis is based on the material assumption that CEG will fully meet its debt servicing and maturity obligations, and an assessment of the appropriateness of this assumption is outside the scope of our analysis. |

© 2023 Deloitte China.



# Scheme Recovery Analysis assumptions

| | |
|---|---|
| **Exchange rates** | USD/HKD 7.8016, USD/RMB 6.8986 and RMB/HKD 1.0805. |
| | The existing debt instruments are denominated in USD, HKD and RMB. To convert into USD claim amounts, the Scheme Recovery Analysis uses the above exchange rate assumptions. |
| | The USD/HKD is also used in the Scheme Recovery Analysis to calculate the number of shares available to recipients of the MEBs and MCBs by converting the HKD conversion price into a USD price. |
| | The RMB/HKD is used to convert the calculated equity value of CEG, NEV and EVPS into a HKD conversion price. |
| **Redemptions for SLNs and TJ/SJ New Notes** | No disposals are assumed for the collateral pledged to the SLNs or TJ New Notes. |
| | The Issuer shall purchase or redeem the SLNs or TJ New Notes upon disposal of their respective collateral under the Proposed Restructuring terms. |
| | In the Scheme Recovery Analysis, we have assumed there are no disposals and therefore no redemptions are modelled into the recovery calculations. |
| **Equity conversion dates** | No exchanges or conversions for the MEBs and MCBs until the mandatory exchange and conversion dates. |
| | Holders of the respective MEBs and MCBs can elect during any calendar month to exchange or convert up to one-third (1/3) of the aggregate principal amount of the instrument that were originally issued. |
| | In the Scheme Recovery Analysis, it is assumed that holders of the instruments will not convert their instruments until the mandatory dates of 2 years for the EVPS MEBs and NEV MEBs and 5 years for the CEG MCBs. |

China Evergrande Group | Scheme Recovery Analysis Report

28

© 2023 Deloitte China.



# Scheme Recovery Analysis assumptions

| | |
|---|---|
| **Cash payment election – CEG Schemes – Option 1 A1/C1 Notes** | Cash payment of interest commences in year 9. |
| | CEG can elect to PIK interest at 1.00% higher than the cash interest rate for the entirety of the A1/C1 Notes. |
| | In the Scheme Recovery Analysis, we have assumed that CEG will elect to PIK interest for the first 8 years and cash payments will commence in year 9 and continue until the maturity of the notes. We note that the final maturity for A2/C2 Notes is in year 9 and we consider it is reasonable to assume CEG may elect to pay cash interest on A1/C1 Notes from year 9 onwards. |
| **Cash payment election – CEG Schemes – Option 2 SLN, A2/C2 Notes** | Cash payment of interest partially commences in year 3 with full payment commencing from year 5 onwards. |
| | CEG can elect PIK interest for the first 4 years, with a minimum level of cash paid in year 3 and 4. |
| | In the Scheme Recovery Analysis, we have assumed the issuer will elect to PIK interest until year 4 and pay the minimum required amount of 0.50% from the 31st month to the 36th month and 3.00% in year 4. |
| **Cash payment election – SJ/TJ Scheme – SJ New Notes and TJ New Notes** | Cash payment of interest partially commences in year 3 with full payment commencing from year 5 onwards. |
| | SJ/Tianji can elect PIK interest for the first 4 years, with a minimum level of cash paid in year 3 and 4. |
| | In the Scheme Recovery Analysis, we have assumed the issuer will elect to PIK interest until year 4 and pay the minimum required amount of 0.70% from the 31st month to the 36th month and 3.00% in year 4. |

© 2023 Deloitte China.



# Scheme Recovery Analysis assumptions

**EVPS MEBs conversion price**

Equity is converted at a price of RMB1.54 per share at the conversion date.

As at VDate, an EV/EBITDA of 8.0x was adopted (mean of the market range, consistent with that implied from Day 1 calibration). An EV was estimated based on the EBITDA provided. The EV was then adjusted for debt, cash, minority interest, non-operating assets and non-operating liabilities in arriving at the estimated equity value of RMB 16,666 million. Market capitalization would drop 17.6% from Day 1 to Vdate, which fell between the lower quartile to median of the market range. The number of outstanding shares would remain unchanged between Day 1 and VDate, as such, price per share was estimated to be RMB1.54.

**NEV MEBs conversion price**

Equity is converted at a price of RMB0.69 per share at the conversion date.

As at VDate, EV/Sales of 1.9x was adopted (mean of the market range). An EV was estimated based on the sales provided. The EV was then adjusted for debt (adjusted for the capitalization of loans due by NEV to CEG), cash, minority interest, non-operating assets and non-operating liabilities in deriving at the estimated equity value. The number of outstanding shares as at the VDate would increase due to the capitalization of loans due by NEV to CEG of US$2,704 million (debt would decrease with new shares issued), as such, price per share was estimated to be RMB0.69.

© 2023 Deloitte China.



# Scheme Recovery
## Analysis assumptions

| CEG MCBs conversion price | No value is ascribed to equity at the conversion date. |
|---|---|
| | CEG's market capitalization would consist of (i) the equity value of the property development segment of CEG; (ii) the equity value of the healthcare segment to be transferred from NEV to CEG; and (iii) CEG's holdings in EVPS and NEV after considering the impacts of the capitalisation of loans due from NEV to CEG and the conversion of MCBs and MEBs. |
| | The implied market capitalisation of the property development segment of CEG at Day 1 was obtained after deducting the respective share of market capitalisation of NEV and EVPS from CEG's market capitalisation. We note that, historically, the property development segment had a negative market capitalisation. |
| | Similarly, the financial information of property development segment were extracted by deducting those of EVPS and NEV (with certain assumptions made given no full set of 2022 balance sheet was available) from CEG's financial information. |
| | As at VDate, EV of each of the property development segment and the healthcare segment was estimated based on EV/Sales multiple of 1.8x (average of median and low quartile of the market range) and 0.1x (minimum of market range) respectively. The EVs were then adjusted for debts, cash, minority interests, non-operating assets and non-operating liabilities in order to deriving the respective equity values of the two segments. |
| | Adding the value of CEG's holdings in EVPS and NEV (after considering the impacts of the capitalization of loans due from NEV to CEG and the conversion of MCBs and MEBs), equity value of CEG would remain negative, primarily due to the significant debt balance. |



© 2023 Deloitte China.

# Scheme Recovery
## Analysis assumptions

| Adjustments to FY22 Accounts | In calculating the estimated conversion price for the MEBs and MCBs, consideration was given to significant announcements after the valuation date and the following adjustments were made: |
|---|---|
| | • CEG – Issuance and conversion of EVPS MEBs, NEV MEBs and CEG MCBs were considered, as such, CEG's debts would be reduced by RMB29,546 million; 5,632 million CEG new shares would be issued, 2,332 million EVPS shares and 6,357 million NEV shares held by CEG would be given to CEG's creditors such that CEG holdings of EVPS and NEV would decrease to 30%. |
| | • NEV – (1) Loans with CEG amounting to approximately US$2,704 million (including accrued interest up to 1 October 2023) would be converted into new shares in NEV; (2) Healthcare segment would be excluded due to the proposed disposal to CEG and 3) construction in progress was considered as a non-operating asset as we understand the financial metrics used in determining the EV cannot properly reflect such value. |
| | • EVPS – Additional consideration/adjustment in the analysis: significant one-off impairment loss in financial assets incurred in 2022 was normalised to analyse EVPS performance vs comparable companies. |

China Evergrande Group | Scheme Recovery Analysis Report

© 2023 Deloitte China.



China Evergrande Group | Scheme Recovery Analysis Report

Summary of scheme recoveries by class    09

Proposed Restructuring    11

Scheme Recovery Analysis scenarios    14

Calculation methodology    21

Scheme Recovery Analysis assumptions    25

**Estimated recoveries**    **33**

Appendices    41

© 2023 Deloitte China.



# Estimated recoveries

## Scheme recovery range

### Scheme Recovery Range Estimates

Class A and C Scheme Creditors may elect to receive (i) A1/C1 Notes; (ii) A2/C2 Notes or A2/C2 Package or a combination of both. We have assessed recovery by discounting the cash flow from each of the respective options. As each option offers different instruments, with different returns and maturities, the estimated recoveries for Class A Debts and Class C Debts vary according to the creditors' option selection.

The minimum and maximum scheme recoveries have been calculated by discounting the cash flows for each creditor class under the seven scenarios as illustrated below. The recoveries in the table below are calculated as the discounted cash flow value of the Restructuring Consideration divided by the accrued claim for Class A or deficiency claim for Classes B, C and D.

| # Scenario | Class A | Class B | Class C | Class D |
|---|---|---|---|---|
| 1.0 100% Option 1 Notes | 17.7% | 39.9% | 14.9% | 3.1% |
| 2.1 50% Option 1 Notes, 50% Option 2 Notes | 22.5% | 39.9% | 20.1% | 3.1% |
| 2.2 50% Option 1 Notes, 25% Option 2 Notes, 25% Option 2 Equity | 22.5% | 39.9% | 20.1% | 3.1% |
| 2.3 50% Option 1 Notes, 50% Option 2 Equity | 21.7% | 39.9% | 20.1% | 3.1% |
| 3.1 100% Option 2 Notes | 32.5% | 39.9% | 28.9% | 3.1% |
| 3.2 50% Option 2 Notes, 50% Option 2 Equity | 31.8% | 39.9% | 28.9% | 3.1% |
| 3.3 100% Option 2 Equity | 31.8% | 39.9% | 28.9% | 3.1% |

### Selection of a Base Case scenario

For the purposes of demonstrating estimated recovery for each class and providing a comparison to recoveries under the Liquidation Analysis, we have selected scenario 2.2 as the base case scenario.

Under Scenario 2.2, 50% of CEG Scheme Creditors elect Option 1 Notes, 25% in Option 2 Notes and 25% in Option 2 Equity Package. The estimated recoveries for Class A Debts and Class C Debts under scenario 2.2 represent the mid-range of the above seven scenarios.

| | Class A | Class B | Class C | Class D |
|---|---|---|---|---|
| 3.1 Max | 32.5% | 39.9% | 28.9% | 3.1% |
| 2.2 Base case | 22.5% | 39.9% | 20.1% | 3.1% |
| 1.0 Min | 17.7% | 39.9% | 14.9% | 3.1% |

China Evergrande Group | Scheme Recovery Analysis Report

© 2023 Deloitte China.



# Estimated recoveries

Recovery tables

## Scheme Recovery Range Estimates

The estimated recoveries to creditors from the Schemes and creditors' total recovery have been calculated for each class of creditors by reference to the accrued claim or deficiency claim. Consideration has also been given to the Third-Party Rights to calculate the total recovery for each respective claimant and the creditor's unsecured recovery under a liquidation scenario.

| | |
|---|---|
| **Scheme Recovery** | Accrued Claim - The sum of the outstanding principal amount of the relevant debt instrument and accrued and unpaid interest on such debt instrument as at 31 December 2022. |
| | Third-Party Rights - The estimated value based on the Liquidation Analysis of any related rights including any underlying security, guarantees or keepwell, except when pursuant to the Schemes (from the perspective of the scheme companies) is being released under the Schemes. |
| | Deficiency Claim – The Accrued Claim minus the assumed value from the Liquidation Analysis of Third-Party Rights valid under the scheme and cross scheme recovery where applicable. |
| | Recovery is illustrated first in the amount of USD distributed to each claimant under column D, followed by the % recovery from the deficiency claim if applicable in column E and the % recovery on a full claim or accrued claim basis in column F. Contribution of Third-Party Rights to recovery by % is then illustrated in column G, and total recovery in USD and % calculated on a full claim basis in columns H and I respectively. |
| **Liquidation Recovery** | Liquidation recovery and Third-Party Rights values have been extracted from the Liquidation Analysis for illustration purposes. |
| | Note: Unsecured recovery is measured on a full claim or accrued claim basis. Some claimants will claim on a deficiency basis. As a result, unsecured recovery may differ within the same class. |

China Evergrande Group | Scheme Recovery Analysis Report

35

© 2023 Deloitte China.



# Estimated recoveries

## CEG Scheme – Class A Creditors

### Class A Recovery Estimate under Base Case (USD'm)

| # | Facility/Instrument | Accrued Claim | Third-Party Rights | Deficiency Claim[1] | Unsecured Recovery | Deficiency | Accrued | Third-Party Rights | Total Recovery | | Unsecured Recovery | | Third-Party Rights | Total Recovery | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Liquidation Recovery | | | | |
| | | A | B | C=A-B | D | E=D/C | F=D/A | G=B/A | H=B+D | I=H/A | J | K=J/A | L | M=J+L | N=M/A |
| 1 | CEG Existing March 2022 Notes | 2,234 | - | - | 502.7 | - | 22.5% | - | 502.7 | 22.5% | 50.8 | 2.3% | 24.2 | 75.0 | 3.4% |
| 2 | CEG Existing April 2022 Notes | 1,618 | - | - | 364.1 | - | 22.5% | - | 364.1 | 22.5% | 36.8 | 2.3% | 17.5 | 54.3 | 3.4% |
| 3 | CEG Existing January 2023 Notes | 1,164 | - | - | 262.0 | - | 22.5% | - | 262.0 | 22.5% | 26.5 | 2.3% | 12.6 | 39.1 | 3.4% |
| 4 | CEG Existing February 2023 Bonds | 11 | - | - | 2.5 | - | 22.5% | - | 2.5 | 22.5% | 0.2 | 2.3% | 0.1 | 0.4 | 3.4% |
| 5 | CEG Existing April 2023 Notes | 936 | - | - | 210.6 | - | 22.5% | - | 210.6 | 22.5% | 21.3 | 2.3% | 10.1 | 31.4 | 3.4% |
| 6 | CEG Existing June 2023 Notes | 1,482 | - | - | 333.5 | - | 22.5% | - | 333.5 | 22.5% | 33.7 | 2.3% | 16.0 | 49.7 | 3.4% |
| 7 | CEG Existing January 2024 Notes | 1,167 | - | - | 262.6 | - | 22.5% | - | 262.6 | 22.5% | 26.5 | 2.3% | 12.6 | 39.2 | 3.4% |
| 8 | CEG Existing March 2024 Notes | 1,064 | - | - | 239.5 | - | 22.5% | - | 239.5 | 22.5% | 24.2 | 2.3% | 11.5 | 35.7 | 3.4% |
| 9 | CEG Existing April 2024 Notes | 779 | - | - | 175.4 | - | 22.5% | - | 175.4 | 22.5% | 17.7 | 2.3% | 8.4 | 26.2 | 3.4% |
| 10 | CEG Existing June 2025 Notes | 5,263 | - | - | 1,184.0 | - | 22.5% | - | 1,184.0 | 22.5% | 119.7 | 2.3% | 56.9 | 176.6 | 3.4% |
| 11 | CEG Existing January 2022 Notes | 348 | - | - | 78.2 | - | 22.5% | - | 78.2 | 22.5% | 7.9 | 2.3% | 3.8 | 11.7 | 3.4% |
| 12 | Class A Private Loan | 13 | - | - | 2.8 | - | 22.5% | - | 2.8 | 22.5% | 0.3 | 2.3% | 0.1 | 0.4 | 3.4% |
| | **Total** | 16,080 | - | - | 3,618 | | 22.5% | - | 3,618 | 22.5% | 366 | 2.3% | 174 | 540 | 3.4% |

*Notes*
1. As Class A Debts will be admitted on an accrued basis, the deficiency claim column C is not populated.
2. All figures shown in the table above are subject to rounding.

© 2023 Deloitte China.

China Evergrande Group | Scheme Recovery Analysis Report

36



# Estimated recoveries

## CEG Scheme – Class C Creditors

### Class C Recovery Estimate under Base Case (USD'm)

| # | Facility/Instrument | Accrued Claim A | Third-Party Rights B | Deficiency Claim C=A-B | Unsecured Recovery D | Deficiency Recovery E=D/C | Accrued Recovery F=D/A | Third-Party Rights G=B/A | Total Recovery[1] H=B+D | I=H/A | Unsecured Recovery[2] J | K=J/A | Third-Party Rights L | Total Recovery M=J+L | N=M/A |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 | Lake Notes[1] | 294 | 19.8 | 275 | 55.3 | 20.1% | 18.8% | 6.8% | 75.2 | 25.5% | 6.6 | 2.3% | 19.6 | 26.2 | 8.9% |
| 14 | Dongpo Notes | 441 | 1.2 | 440 | 88.6 | 20.1% | 20.1% | 0.3% | 89.7 | 20.4% | 9.9 | 2.3% | 1.2 | 11.1 | 2.5% |
| 15 | Dongpo Put Option | 144 | 2.2 | 141 | 28.5 | 20.1% | 19.8% | 1.5% | 30.7 | 21.4% | 3.2 | 2.2% | 2.2 | 5.4 | 3.7% |
| 16 | Graceful Court Put Option | 120 | 1.9 | 119 | 23.9 | 20.1% | 19.8% | 1.5% | 25.8 | 21.4% | 2.7 | 2.2% | 1.9 | 4.5 | 3.7% |
| 17 | New Chic Margin Loan | 20 | 5.2 | 15 | 2.9 | 20.1% | 14.9% | 26.2% | 8.2 | 41.1% | 0.4 | 2.3% | 5.2 | 5.6 | 28.1% |
| 18 | Clear Star Put Option[1] | 74 | 1.8 | 72 | 14.5 | 20.1% | 19.6% | 2.5% | 16.3 | 22.2% | 1.7 | 2.3% | 1.7 | 3.4 | 4.6% |
| 19 | CEG Loan 1 | 210 | - | 210 | 42.2 | 20.1% | 20.1% | - | 42.2 | 20.1% | 4.7 | 2.3% | - | 4.7 | 2.2% |
| 20 | CEG Loan 2 | 105 | - | 105 | 21.1 | 20.1% | 20.1% | - | 21.1 | 20.1% | 2.4 | 2.3% | - | 2.4 | 2.3% |
| 21 | Venice Loan | 25 | 14.7 | 10 | 2.1 | 20.1% | 8.3% | 59.0% | 16.7 | 67.3% | 0.6 | 2.3% | 14.7 | 15.2 | 61.3% |
| 22 | Venice SPA | 571 | 337.2 | 234 | 47.2 | 20.1% | 8.3% | 59.0% | 384.4 | 67.3% | 12.9 | 2.3% | 337.2 | 350.1 | 61.3% |

Scheme Recovery | Liquidation Recovery

Notes

1. Third-Party Rights column B for the Lake Notes, Clear Star Put Option and Hero Loan claims include recoveries from TJ Scheme.
2. Under the liquidation scenario, put option obligations of CEG would be admitted on a deficiency basis. CEG's guarantee of PRC liabilities would be admitted on a full claim, but subject to the maximum limit of CEG's obligation under respective guarantees. As column K measures unsecured recovery on a full claim or accrued basis, therefore the recovery rates for the put options and CEG's guarantee of PRC liabilities shown in column K will differ from the recovery rate of other claimants.
3. All figures shown in the table above are subject to rounding.



© 2023 Deloitte China.

# Estimated recoveries

## CEG Scheme – Class C Creditors (cont.)

### Class C Recovery Estimate under Base Case (USD'm)

| | | | | | Scheme Recovery | | | | | | Liquidation Recovery | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Accrued Claim | Third-Party Rights | Deficiency Claim | Unsecured Recovery | Deficiency Recovery | Accrued Deficiency | Third-Party Rights | Total Recovery[1] | | Unsecured Recovery[2] | | Third-Party Rights | Total Recovery | |
| # | Facility/Instrument | A | B | C=A-B | D | E=D/C | F=D/A | G=B/A | H=B+D | I=H/A | J | K=J/A | L | M=J+L | N=M/A |
| 23 | Hero Loan[1] | 994 | 501.5 | 492 | 99.2 | 20.1% | 10.0% | 50.5% | 600.7 | 60.4% | 22.4 | 2.3% | 511.1 | 533.5 | 53.7% |
| 24 | FCB Put Option | 712 | 150.0 | 562 | 113.2 | 20.1% | 15.9% | 21.1% | 263.2 | 37.0% | 16.0 | 2.3% | 150.0 | 166.1 | 23.3% |
| 25 | RMB Bond Put Option | 1,311 | 57.0 | 1,255 | 252.7 | 20.1% | 19.3% | 4.3% | 309.7 | 23.6% | 28.3 | 2.2% | 57.0 | 85.2 | 6.6% |
| 26 | CEG Guarantees of PRC Liabilities | 9,221 | 1,341.1 | 7,880 | 1,587.4 | 20.1% | 17.2% | 14.5% | 2,928.6 | 31.8% | 199.5 | 2.2% | 1,341.1 | 1,540.6 | 16.6% |
| 27 | Kailong Arbitration Award | 834 | - | 834 | 167.9 | 20.1% | 20.1% | - | 167.9 | 20.1% | 18.8 | 2.3% | - | 18.8 | 2.2% |
| 28 | On-Lent Loan | 0 | - | 0 | 0.0 | 20.1% | 20.1% | - | 0.0 | 20.1% | - | - | - | - | - |
| | Total | 15,075 | 2,434 | 12,641 | 2,547 | 20.1% | 16.9% | 16.1% | 4,980 | 33.0% | 330 | 2.2% | 2,443 | 2,764 | 18.4% |

Notes

1. Third-Party Rights column B for the Lake Notes, Clear Star Put Option and Hero Loan claims include recoveries from TJ Scheme.
2. Under the liquidation scenario, put option obligations of CEG would be admitted on a deficiency basis. CEG's guarantee of PRC liabilities would be admitted on a full claim, but subject to the maximum limit of CEG's obligation under respective guarantees. As column K measures unsecured recovery on a full claim or accrued basis, therefore the recovery rates for the put options and CEG's guarantee of PRC liabilities shown in column K will differ from the recovery rate of other claimants.
3. USD'm are used in the above table, claims or recoveries that are less than USD1m may be illustrated by 0. The use of '-' will be present to illustrate no monetary amount.
4. All figures shown in the table above are subject to rounding.

© 2023 Deloitte China.

China Evergrande Group | Scheme Recovery Analysis Report

38



# Estimated recoveries

## SJ Scheme – Class B Creditors

Class B Recovery Estimate under Base Case (USD'm)

| # | Facility/Instrument | Accrued Claim | Third-Party Rights | Deficiency Claim | Unsecured Recovery | Accrued | Third-Party Rights | Total Recovery[1] | | Unsecured Recovery | | Third-Party Rights | Total Recovery | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | A | B | C=A-B | D | F=D/A | G=B/A | H=B+D | I=H/A | J | K=J/A | L | M=J+L | N=M/A |
| 29 | SJ Existing October 2022 Notes | 2,330 | 44.1 | 2,286 | 929.2 | 39.9% | 1.89% | 973.4 | 41.8% | 37.7 | 1.6% | 351.6 | 389.3 | 16.7% |
| 30 | SJ Existing November 2022 Notes | 782 | 14.8 | 768 | 312.1 | 39.9% | 1.89% | 326.9 | 41.8% | 12.7 | 1.6% | 118.1 | 130.7 | 16.7% |
| 31 | SJ Existing October 2023 Notes | 2,338 | 44.3 | 2,294 | 932.6 | 39.9% | 1.89% | 976.9 | 41.8% | 37.9 | 1.6% | 352.9 | 390.8 | 16.7% |
| 32 | SJ Existing November 2023 Notes | 723 | 13.7 | 709 | 288.3 | 39.9% | 1.89% | 302.0 | 41.8% | 11.7 | 1.6% | 109.1 | 120.8 | 16.7% |
| | Total | 6,173 | 117 | 6,056 | 2,462 | 39.9% | 1.89% | 2,579 | 41.8% | 100 | 1.6% | 932 | 1,032 | 16.7% |

Header spans: Scheme Recovery; Liquidation Recovery

Notes
1. Third-Party Rights column B for the SJ Existing Notes claims include from recoveries from TJ Scheme.
2. All figures shown in the table above are subject to rounding.




© 2023 Deloitte China.

**Estimated recoveries**

TJ Scheme – Class D Creditors

Class D Recovery Estimate under Base Case (USD'm)

| # | Facility/Instrument | Accrued Claim | Third-Party Rights | Deficiency Claim | Scheme Recovery Unsecured Recovery | Deficiency Recovery | Accrued | Third-Party Rights | Total Recovery[1,2] | | Liquidation Recovery Unsecured Recovery[3] | | Third-Party Rights | Total Recovery | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | A | B | C=A-B | D | E=D/C | F=D/A | G=B/A | H=B+D | I=H/A | J | K=J/A | L | M=J+L | N=M/A |
| 33 | SJ Existing October 2022 Notes | 2,330 | 929.2 | 1,401 | 44.1 | 3.1% | 1.9% | 39.9% | 973.4 | 41.8% | 53.6 | 2.3% | 335.5 | 389.1 | 16.7% |
| 34 | SJ Existing November 2022 Notes | 782 | 312.1 | 470 | 14.8 | 3.1% | 1.9% | 39.9% | 326.9 | 41.8% | 18.0 | 2.3% | 112.7 | 130.7 | 16.7% |
| 35 | SJ Existing October 2023 Notes | 2,338 | 932.6 | 1,406 | 44.3 | 3.1% | 1.9% | 39.9% | 976.9 | 41.8% | 53.8 | 2.3% | 336.7 | 390.5 | 16.7% |
| 36 | SJ Existing November 2023 Notes | 723 | 288.3 | 435 | 13.7 | 3.1% | 1.9% | 39.9% | 302.0 | 41.8% | 16.6 | 2.3% | 104.1 | 120.7 | 16.7% |
| 37 | Lake Notes | 294 | 68.1 | 226 | 7.1 | 3.1% | 2.4% | 23.1% | 75.2 | 25.5% | 6.8 | 2.3% | 19.4 | 26.2 | 8.9% |
| 38 | Clear Star Put Option | 74 | 14.5 | 59 | 1.9 | 3.1% | 2.5% | 19.6% | 16.3 | 22.2% | 1.7 | 2.3% | 1.7 | 3.4 | 4.6% |
| 39 | Castle Share Put Option | 310 | 1.5 | 309 | 9.7 | 3.1% | 3.1% | 0.5% | 11.2 | 3.6% | 7.1 | 2.3% | 1.5 | 8.6 | 2.8% |
| 40 | Castle Loan Put Option | 0 | - | 0 | 0.0 | 3.1% | 3.1% | - | 0.0 | 3.1% | 0.0 | 0.0% | - | - | - |
| 41 | Hero Loan | 994 | 587.9 | 406 | 12.8 | 3.1% | 1.3% | 59.2% | 600.7 | 60.4% | 22.9 | 2.3% | 510.5 | 533.4 | 53.7% |
| 42 | Tuen Mun Put Options | 224 | 113.9 | 111 | 3.5 | 3.1% | 1.6% | 50.8% | 117.4 | 52.3% | 2.5 | 1.1% | 113.9 | 116.5 | 51.9% |
| 43 | CEG-Tianji Intercompany Balance | 5,035 | - | 5,035 | 158.6 | 3.1% | 3.1% | - | 158.6 | 3.1% | 115.8 | 2.3% | - | 115.8 | 2.3% |
| | Total | 13,105 | 3,248 | 9,857 | 310 | 3.1% | 2.4% | 24.8% | 3,559 | 27.2% | 299 | 2.3% | 1,536 | 1,835 | 14.0% |

Notes

1. Total scheme recovery for the SJ Existing Notes include recoveries from SJ Scheme.
2. Third-Party Rights column B for Lake Notes, Clear Star Put Option and Hero Loan claims include recoveries from CEG Schemes.
3. Under the liquidation scenario, put option obligations of CEG would be admitted on a deficiency basis. As column K measures unsecured recovery on a full claim or accrued basis, therefore the recovery rates for the put options and CEG's guarantee of PRC liabilities shown in column K will differ from the recovery rate of other claimants.
4. USD'm are used in the above table, claims or recoveries that are less than USD1m may be illustrated by 0. The use of "-" will be present to illustrate no monetary amount.
5. All figures shown in the table above are subject to rounding.

© 2023 Deloitte China.

Summary of scheme recoveries by class — 09

Proposed Restructuring — 11

Scheme Recovery Analysis scenarios — 14

Calculation methodology — 21

Scheme Recovery Analysis assumptions — 25

Estimated recoveries — 33

**Appendices** — **41**

China Evergrande Group | Scheme Recovery Analysis Report

© 2023 Deloitte China.



# Appendix 1

## Sources of Recovery - CEG Scheme – Class A Creditors

### Class A Sources of Recovery under Base Case (USD'm)

| # | Facility/Instrument | Accrued Claim | Third-Party Rights | A1 Notes | A2 Notes | MEBs / MCBs | EVPS SLNs | NEV SLNs | TJ intercom | Total Recovery |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | *Estimated Recoveries* | | | | |
| 1 | CEG Existing March 2022 Notes | 2,234 | - | 129 | 162 | 63 | 62 | 75 | 12 | 503 |
| 2 | CEG Existing April 2022 Notes | 1,618 | - | 93 | 117 | 45 | 45 | 54 | 9 | 364 |
| 3 | CEG Existing January 2023 Notes | 1,164 | - | 67 | 84 | 33 | 32 | 39 | 6 | 262 |
| 4 | CEG Existing February 2023 Bonds | 11 | - | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| 5 | CEG Existing April 2023 Notes | 936 | - | 54 | 68 | 26 | 26 | 31 | 5 | 211 |
| 6 | CEG Existing June 2023 Notes | 1,482 | - | 85 | 108 | 42 | 41 | 50 | 8 | 333 |
| 7 | CEG Existing January 2024 Notes | 1,167 | - | 67 | 85 | 33 | 32 | 39 | 6 | 263 |
| 8 | CEG Existing March 2024 Notes | 1,064 | - | 61 | 77 | 30 | 29 | 36 | 6 | 239 |
| 9 | CEG Existing April 2024 Notes | 779 | - | 45 | 57 | 22 | 22 | 26 | 4 | 175 |
| 10 | CEG Existing June 2025 Notes | 5,263 | - | 303 | 382 | 148 | 145 | 177 | 29 | 1,184 |
| 11 | CEG Existing January 2022 Notes | 348 | - | 20 | 25 | 10 | 10 | 12 | 2 | 78 |
| 12 | Class A Private Loan | 13 | - | 1 | 1 | 0 | 0 | 0 | 0 | 3 |
| | **Total** | **16,080** | **-** | **927** | **1,167** | **452** | **444** | **541** | **89** | **3,618** |

*Notes*
1. *All figures shown in the table above are subject to rounding.*
2. *Claims or recoveries that are less than USD1m may be illustrated by 0. The use of "-" will be present to illustrate no monetary amount.*

© 2023 Deloitte China.

China Evergrande Group | Scheme Recovery Analysis Report



# Appendix 1

## Sources of Recovery - CEG Scheme – Class C Creditors

**Class C Sources of Recovery under Base Case (USD'm)**

| # Facility/Instrument | Accrued Claim | Third-Party Rights | Estimated Recoveries | | | | | | Total Recovery |
| | | | C1 Notes | C2 Notes | MEBs / MCBs | EVPS SLNs | NEV SLNs | TJ Intercom | |
|---|---|---|---|---|---|---|---|---|---|
| 13 Lake Notes | 294 | 20 | 16 | 24 | 4 | 2 | 8 | 2 | 75 |
| 14 Dongpo Notes | 441 | 1 | 25 | 38 | 7 | 3 | 13 | 2 | 90 |
| 15 Dongpo Put Option | 144 | 2 | 8 | 12 | 2 | 1 | 4 | 1 | 31 |
| 16 Graceful Court Put Option | 120 | 2 | 7 | 10 | 2 | 1 | 3 | 1 | 26 |
| 17 New Chic Margin Loan | 20 | 5 | 1 | 1 | 0 | 0 | 0 | 0 | 8 |
| 18 Clear Star Put Option | 74 | 2 | 4 | 6 | 1 | 1 | 2 | 0 | 16 |
| 19 CEG Loan 1 | 210 | - | 12 | 18 | 3 | 2 | 6 | 1 | 42 |
| 20 CEG Loan 2 | 105 | - | 6 | 9 | 2 | 1 | 3 | 1 | 21 |
| 21 Venice Loan | 25 | 15 | 1 | 1 | 0 | 0 | 0 | 0 | 17 |
| 22 Venice SPA | 571 | 337 | 13 | 20 | 4 | 2 | 7 | 1 | 384 |
| 23 Hero Loan | 994 | 502 | 28 | 42 | 8 | 4 | 14 | 3 | 601 |
| 24 FCB Put Option | 712 | 150 | 32 | 48 | 9 | 4 | 16 | 3 | 263 |
| 25 RMB Bond Put Option | 1,311 | 57 | 72 | 108 | 19 | 10 | 37 | 7 | 310 |
| 26 CEG Guarantees of PRC Liabilities | 9,221 | 1,341 | 454 | 678 | 121 | 60 | 230 | 44 | 2,929 |
| 27 Kailong Arbitration Award | 834 | - | 48 | 72 | 13 | 6 | 24 | 5 | 168 |
| 28 On-Lent Loan | 0 | - | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **15,075** | **2,434** | **728** | **1,087** | **195** | **97** | **370** | **70** | **4,980** |

Notes
1. All figures shown in the table above are subject to rounding.
2. Claims or recoveries that are less than USD1m may be illustrated by 0. The use of " - " will be present to illustrate no monetary amount.

© 2023 Deloitte China.

## Appendix 2

Debt Schedule - CEG Scheme – Class A Creditors

| Offshore Debt Schedule – Class A (USD'm) | Principal O/S As of Dec 2022 | Accrued Claims As of Dec 2022 | Value of Third Party Rights As of Dec 2022 |
|---|---|---|---|
| # Facility/Instrument | | | |
| 1  CEG Existing March 2022 Notes | 2,022 | 2,234 | - |
| 2  CEG Existing April 2022 Notes | 1,450 | 1,618 | - |
| 3  CEG Existing January 2023 Notes | 999 | 1,164 | - |
| 4  CEG Existing February 2023 Bonds | 10 | 11 | - |
| 5  CEG Existing April 2023 Notes | 834 | 936 | - |
| 6  CEG Existing June 2023 Notes | 1,332 | 1,482 | - |
| 7  CEG Existing January 2024 Notes | 995 | 1,167 | - |
| 8  CEG Existing March 2024 Notes | 951 | 1,064 | - |
| 9  CEG Existing April 2024 Notes | 691 | 779 | - |
| 10  CEG Existing June 2025 Notes | 4,649 | 5,263 | - |
| 11  CEG Existing January 2022 Notes | 300 | 348 | - |
| 12  Class A Private Loan | 9 | 13 | - |
| **Total** | **14,242** | **16,080** | **-** |

*Notes*
*1.  All figures shown in the table above are subject to rounding.*




© 2023 Deloitte China.

China Evergrande Group | Scheme Recovery Analysis Report

# Appendix 2

## Debt Schedule - CEG Scheme – Class C Creditors

Offshore Debt Schedule – Class C (USD'm)

| # Facility/Instrument | Principal O/S As of Dec 2022 | Accrued Claims As of Dec 2022 | Value of Third Party Rights As of Dec 2022 | Deficiency Claims As of Dec 2022 |
|---|---|---|---|---|
| 13 Lake Notes | 260 | 294 | 20 | 274 |
| 14 Dongpo Notes | 424 | 441 | 1 | 440 |
| 15 Dongpo Put Option | 116 | 144 | 2 | 141 |
| 16 Graceful Court Put Option | 110 | 120 | 2 | 119 |
| 17 New Chic Margin Loan | 20 | 20 | 5 | 15 |
| 18 Clear Star Put Option | 74 | 74 | 2 | 72 |
| 19 CEG Loan 1 | 154 | 210 | - | 210 |
| 20 CEG Loan 2 | 77 | 105 | - | 105 |
| 21 Venice Loan | 20 | 25 | 15 | 10 |
| 22 Venice SPA | 355 | 571 | 337 | 234 |
| 23 Hero Loan | 974 | 994 | 502 | 492 |
| 24 FCB Put Option | 712 | 712 | 150 | 562 |
| 25 RMB Bond Put Option | 1,189 | 1,311 | 57 | 1,255 |
| 26 CEG Guarantees of PRC Liabilities | 8,961 | 9,221 | 1,341 | 7,880 |
| 27 Kailong Arbitration Award | | 834 | - | 834 |
| 28 On-Lent Loan | 0 | 0 | - | 0 |
| **Total** | **13,445** | **15,075** | **2,434** | **12,641** |

*Notes*
1. *All figures shown in the table above are subject to rounding.*

China Evergrande Group | Scheme Recovery Analysis Report

45

© 2023 Deloitte China.




## Appendix 2

## Debt Schedule - SJ Scheme – Class B Creditors

| Offshore Debt Schedule – Class B (USD'm) | Principal O/S | Accrued Claims | Value of Third Party Rights | Deficiency Claims |
|---|---|---|---|---|
| # Facility/Instrument | As of Dec 2022 | As of Dec 2022 | As of Dec 2022 | As of Dec 2022 |
| 29  SJ Existing October 2022 Notes | 1,999 | 2,330 | 44 | 2,286 |
| 30  SJ Existing November 2022 Notes | 644 | 782 | 15 | 768 |
| 31  SJ Existing October 2023 Notes | 1,994 | 2,338 | 44 | 2,294 |
| 32  SJ Existing November 2023 Notes | 589 | 723 | 14 | 709 |
| **Total** | **5,226** | **6,173** | **117** | **6,056** |

*Notes*
1. *All figures shown in the table above are subject to rounding.*




© 2023 Deloitte China.

**Appendix 2**

Debt Schedule - TJ Scheme – Class D Creditors

Offshore Debt Schedule – Class D (USD'm)

| # Facility/Instrument | Principal O/S As of Dec 2022 | Accrued Claims As of Dec 2022 | Value of Third Party Rights As of Dec 2022 | Deficiency Claims As of Dec 2022 |
|---|---|---|---|---|
| 33 SJ Existing October 2022 Notes | 1,999 | 2,330 | 929 | 1,401 |
| 34 SJ Existing November 2022 Notes | 644 | 782 | 312 | 470 |
| 35 SJ Existing October 2023 Notes | 1,994 | 2,338 | 933 | 1,406 |
| 36 SJ Existing November 2023 Notes | 589 | 723 | 288 | 435 |
| 37 Lake Notes | 260 | 294 | 68 | 226 |
| 38 Clear Star Put Option | 74 | 74 | 14 | 59 |
| 40 Castle Share Put Option | 258 | 310 | 1 | 309 |
| 39 Castle Loan Put Option | 0 | 0 | - | 0 |
| 41 Hero Loan | 974 | 994 | 588 | 406 |
| 42 Tuen Mun Put Options | 181 | 224 | 114 | 111 |
| 43 CEG-Tianji Intercompany Balance | 5,035 | 5,035 | - | 5,035 |
| **Total** | **12,008** | **13,105** | **3,248** | **9,857** |

*Notes*
1. *All figures shown in the table above are subject to rounding.*



© 2023 Deloitte China.

China Evergrande Group | Scheme Recovery Analysis Report



德勤



Deloitte.

**About Deloitte**

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited ("DTTL"), its global network of member firms, and their related entities (collectively, the "Deloitte organization"). DTTL (also referred to as "Deloitte Global") and each of its member firms and related entities are legally separate and independent entities, which cannot obligate or bind each other in respect of third parties. DTTL and each DTTL member firm and related entity is liable only for its own acts and omissions, and not those of each other. DTTL does not provide services to clients. Please see www.deloitte.com/about to learn more.

Deloitte is a leading global provider of audit and assurance, consulting, financial advisory, risk advisory, tax and related services. Our global network of member firms and related entities in more than 150 countries and territories (collectively, the "Deloitte organization") serves four out of five Fortune Global 500® companies. Learn how Deloitte's approximately 345,000 people make an impact that matters at www.deloitte.com.

Deloitte Asia Pacific Limited is a company limited by guarantee and a member firm of DTTL. Members of Deloitte Asia Pacific Limited and their related entities, each of which are separate and independent legal entities, provide services from more than 100 cities across the region, including Auckland, Bangkok, Beijing, Hanoi, Hong Kong, Jakarta, Kuala Lumpur, Manila, Melbourne, Osaka, Seoul, Shanghai, Singapore, Sydney, Taipei and Tokyo.

The Deloitte brand entered the China market in 1917 with the opening of an office in Shanghai. Today, Deloitte China delivers a comprehensive range of audit & assurance, consulting, financial advisory, risk advisory and tax services to local, multinational and growth enterprise clients in China. Deloitte China has also made—and continues to make—substantial contributions to the development of China's accounting standards, taxation system and professional expertise. Deloitte China is a locally incorporated professional services organization, owned by its partners in China. To learn more about how Deloitte makes an impact that Matters in China, please connect with our social media platforms at www2.deloitte.com/cn/en/social-media.

This communication contains general information only, and none of Deloitte Touche Tohmatsu Limited ("DTTL"), its global network of member firms or their related entities (collectively, the "Deloitte organization") is, by means of this communication, rendering professional advice or services. Before making any decision or taking any action that may affect your finances or your business, you should consult a qualified professional adviser.

No representations, warranties or undertakings (express or implied) are given as to the accuracy or completeness of the information in this communication, and none of DTTL, its member firms, related entities, employees or agents shall be liable or responsible for any loss or damage whatsoever arising directly or indirectly in connection with any person relying on this communication. DTTL and each of its member firms, and their related entities, are legally separate and independent entities.

© 2023. For information, contact Deloitte China.

**SCHEDULE 4**

**THE SCHEMES**

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
MISCELLANEOUS PROCEEDINGS NO. 1091 OF 2023

**HCMP 1091/2023**

_____

**IN THE MATTER OF CHINA EVERGRANDE GROUP (中國恒大集團)**

**and**

**IN THE MATTER of Section 670 of the Companies Ordinance (Cap. 622)**

_____

_____

**SCHEME OF ARRANGEMENT**

*(under section 670 of the Hong Kong Companies Ordinance (Cap. 622))*

_____

**BETWEEN**

**CHINA EVERGRANDE GROUP**

中國恒大集團

*(an exempted company incorporated with limited liability under the laws of the*

*Cayman Islands with registration number 169971, and its registered office at Ugland House, PO Box 309, Grand Cayman, KY1-1104, Cayman Islands)*

**AND**

**THE SCHEME CREDITORS**

*(as herein defined)*

1

TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | DEFINITIONS | 1 |
| 2. | INTERPRETATION | 38 |
| 3. | APPLICATION AND EFFECTIVENESS OF THIS HONG KONG SCHEME | 40 |
| 4. | COMPROMISE AND ARRANGEMENT WITH THE SCHEME CREDITORS | 41 |
| 5. | AUTHORITY AND INSTRUCTIONS | 42 |
| 6. | SCHEME STEPS | 45 |
| 7. | NOTICES TO SCHEME CREDITORS AND OTHERS | 49 |
| 8. | ENTITLEMENT RECORD TIME AND SCHEME CLAIMS | 49 |
| 9. | ACCEPTANCE OF DOCUMENTATION | 50 |
| 10. | DEADLINES AND BAR DATES | 51 |
| 11. | ASSIGNMENTS OR TRANSFERS OF SCHEME CLAIMS | 53 |
| 12. | GENERAL PRINCIPLES | 55 |
| 13. | CALCULATION OF A SCHEME CREDITOR'S ENTITLEMENT | 57 |
| 14. | SCHEME CONSIDERATION OPTIONS | 58 |
| 15. | TOTAL PACKAGE, A2 PACKAGE AND THE C2 PACKAGE | 59 |
| 16. | INITIAL DISTRIBUTION | 63 |
| 17. | INITIAL DISTRIBUTION TO HOLDING PERIOD TRUSTEE | 66 |
| 18. | FINAL DISTRIBUTION | 67 |
| 19. | DISTRIBUTION TO SUCCESSOR ESCROW ACCOUNT FOR BLOCKED SCHEME CREDITORS | 71 |
| 20. | TJ SCHEME CONSIDERATION | 72 |

21.   INTERIM DISTRIBUTION      73

22.   CONSENT FEE      74

23.   ISSUANCE OF THE NEW INSTRUMENTS      75

24.   RESTRICTIONS      75

25.   FRACTIONAL ADJUSTMENTS      75

26.   MODIFICATIONS OF THE RIGHTS ATTACHING TO THE NEW INSTRUMENTS      78

27.   SECURITIES LAW CONSIDERATIONS      78

28.   RELEASES      78

29.   STAY OF PROCEEDINGS      80

30.   COSTS AND INDEMNITY      80

31.   MODIFICATIONS TO THE SCHEME AND THE RESTRUCTURING DOCUMENTS      81

32.   OBLIGATIONS ON DATES OTHER THAN A BUSINESS DAY      82

33.   NO ADMISSION OF LIABILITY      82

34.   THE INFORMATION AGENT      82

35.   THE HOLDING PERIOD TRUSTEE      83

36.   THE SUCCESSOR ESCROW AGENT      84

37.   THE SCHEME ADMINISTRATORS      85

38.   VALUATION PROCEDURE      88

39.   THE SCHEME ADJUDICATORS      92

40.   ADJUDICATION PROCEDURE      93

41.   NOTICE      98

42.  CORRESPONDING DISCHARGE OF PERFORMANCE                    99

43.  APPLICATION TO THE HONG KONG COURT FOR DIRECTIONS         99

44.  FOREIGN REPRESENTATIVE                                    99

45.  THIRD PARTIES                                             99

46.  TERMINATION OF THIS SCHEME                                99

47.  CONFLICT AND INCONSISTENCY                                100

48.  SEVERABILITY                                              100

49.  GOVERNING LAW AND JURISDICTION                            100

SCHEDULE 1. RESTRUCTURING DOCUMENTS

SCHEDULE 2. CLASS C DEBTS

SCHEDULE 3. RESTRUCTURING EFFECTIVE DATE CONDITIONS

SCHEDULE 4. EXISTING NOTES SUBSIDIARY GUARANTORS

SCHEDULE 5. COURT ORDER

PART A
PRELIMINARY

1.    **DEFINITIONS**

In this Hong Kong Scheme, unless the context otherwise requires or unless otherwise expressly provided for, the following capitalised expressions shall bear the following meanings:

| | |
|---|---|
| **"A1/A2 Intercreditor Agreement"** | means the intercreditor agreement to be entered into between, among others, the Company, the Collateral Agent and the respective trustee for each tranche of the A1 Notes, A2 Notes, A2 EVPS SLNs and A2 NEV SLNs, in substantially the form to be made available on the Transaction Website, subject to any modifications required or approved in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*) of this Hong Kong Scheme, which shall be in the Agreed Form. |
| **"A1 Notes"** | means the new tranches A, B and C of the new A1 notes to be issued by the Company and governed by the A1 Notes Indentures. |
| **"A1 Notes Indentures"** | means the New York law governed indentures governing the A1 Notes to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the A1 Notes and with the modifications required to reflect the different terms of the different tranches of the A1 Notes as set out in the Explanatory Statement, each of which shall be in the Agreed Form. |
| **"A1 Notes Recipient"** | has the meaning set out in Clause 18.6 of this Hong Kong Scheme. |
| **"A2 Accrued Claims Ratio"** | has the meaning set out in Clause 15.7 of this Hong Kong Scheme. |
| **"A2 EVPS SLNs"** | means tranches A and B of the US dollar denominated secured new A2 notes linked to the EVPS Shares to be issued by the Company and governed by the A2 EVPS SLNs Indentures. |
| **"A2 EVPS SLNs Indentures"** | means the New York law governed indentures governing the A2 EVPS SLNs to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the A2 EVPS SLNs and with the modifications required to reflect the different terms of the different tranches of the A2 EVPS SLNs as set out in the Explanatory Statement, each of which shall be in the Agreed Form. |
| **"A2 NEV SLNs"** | means tranches A and B of the US dollar denominated secured new A2 notes linked to the NEV Shares to be issued by the Company and governed by the A2 NEV SLNs Indentures. |
| **"A2 NEV SLNs Indentures"** | means the New York law governed indentures governing the A2 NEV SLNs to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the A2 NEV SLNs and with the modifications required to reflect the different terms of the |

| | |
|---|---|
| | different tranches of the A2 NEV SLNs as set out in the Explanatory Statement, each of which shall be in the Agreed Form. |
| **"A2 Notes"** | means the Plain A2 Notes and the Forced A2 Notes. |
| **"A2 Notes Indentures"** | means the Plain A2 Notes Indentures and the Forced A2 Notes Indentures, each of which shall be in the Agreed Form. |
| **"A2 Notes Recipient"** | has the meaning set out in Clause 16.7 of this Hong Kong Scheme. |
| **"A2 Package"** | means the CEG MCBs, NEV MEBs, EVPS MEBs, A2 EVPS SLNs and A2 NEV SLNs available to Class A Scheme Creditors who elect Option 2 Scheme Consideration, in accordance with the terms of the Restructuring Documents. |
| **"A2 Package Adjusted Portion"** | has the meaning set out in Clause 15.9 of this Hong Kong Scheme. |
| **"A2 Package Initial Portion"** | has the meaning set out in Clause 15.6 of this Hong Kong Scheme. |
| **"A2 Package Recipient"** | has the meaning set out in Clause 15.16 of this Hong Kong Scheme. |
| **"Accession Code"** | means a unique code provided by the Information Agent to a Scheme Creditor following its valid accession to the Class A RSA or the Class C RSA, and which must be included by such Scheme Creditor in its voting instructions within the relevant Scheme Creditor Form in respect of this Hong Kong Scheme. |
| **"Account Bank"** | means  China Construction Bank (Asia) Corporation Limited in its capacity as account bank or any successor account bank under and as defined in the New Instruments Documents. |
| **"Account Holder"** | means any Person who is recorded in the books of a Clearing System as being a holder of a book-entry interest in the Existing Notes or the Class C Notes in an account with that Clearing System or, as the context may require, is or was recorded in such books as being such a holder of Existing Notes or the Class C Notes in such an account at the Voting Record Time. |
| **"Account Holder Letter"** | means the form of account holder letter which is appended to the Solicitation Packet, as published on the Transaction Website. |
| **"Adjudication Procedure"** | means the procedure for the resolution of a Referred Scheme Claim as set out in Clause 40 (*Adjudication Procedure*) of this Hong Kong Scheme. |
| **"Advisors"** | means (i) Sidley Austin, (ii) Houlihan Lokey, (iii) Maples and Calder, (iv) BOCI Asia Limited (v) China International Capital Corporation Hong Kong Securities Limited; and (vi) Commerce & Finance Law Offices. |
| **"Affiliate"** | means, with respect to any Person, any other Person: (a) directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person; or (b) who is a director or officer of such Person or any Subsidiary of such Person or of any |

2

Person referred to in clause (a) of this definition, and, with respect to any Participating Creditor, any of its managers, investment managers or investment advisors and any entity managed or advised by that manager, investment manager or investment advisor. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

**"Agreed Form"**    means in the form agreed in writing between each of:

    (a) the Company (or the Advisors acting on its behalf);

    (b) the Majority CEG AHG (or the AHG's Counsel acting on their behalf);

    (c) only in relation to the New Instruments Documents, the New Instruments Trustee; and

    (d) only in relation to the Holding Period Trust Deed and any other documents to which the Holding Period Trustee is party, the Holding Period Trustee,

in each case each acting reasonably.

**"AHG Advisors"**    means Moelis & Company Asia Limited, Kirkland & Ellis, Harney Westwood & Riegels, Fangda Partners, and other professional advisors as the CEG AHG may appoint from time to time.

**"AHG's Counsel"**    means Kirkland & Ellis.

**"AHG Financial Advisor Fees"**    means the reasonable fees, costs and expenses of the financial advisor (Moelis & Company Asia Limited) to the CEG AHG that the Company has agreed to pay in accordance with the terms set out in the fee letter agreement dated 6 April 2022.

**"AHG Legal Fees"**    means the reasonable fees, costs and expenses of the legal advisors (including local counsel and barristers) to the CEG AHG that the Company has agreed to pay in accordance with the terms set out in the following:

    (a) the fee letter agreement dated 4 April 2022 between the Company and Kirkland & Ellis;

    (b) the fee letter agreement dated 6 March 2023 between the Company and Harney Westwood & Riegels; and

    (c) the fee letter agreement dated 6 March 2023 between the Company and Fangda Partners.

3

| | |
|---|---|
| **"AHG Work Fee"** | means the "**Work Fee**" as defined in the AHG Work Fee Letter. |
| **"AHG Work Fee Letter"** | means the letter dated 20 March 2023 from the Chairman to the members of the CEG AHG in connection with payment of the AHG Work Fee. |
| **"Ancillary Claim"** | means any Claim by a Scheme Creditor against a Released Person under or in respect of the Existing Finance Documents arising as a result of effecting, adhering to or complying with the releases in Clauses 28.2(a)(i) and 28.2(a)(ii) (excluding for the avoidance of doubt any Claim in respect of any Liability (i) of any Released Person which arises as a result of a failure to comply with any of the terms of the Schemes or any Restructuring Document (including but not limited to the New Instruments Documents) and (ii) arising from or in connection with any Excluded Liability or Excluded Collateral). |
| **"Applicable Sanctions"** | means laws, regulations, rules and/or orders relating to economic, financial or trade sanctions, restrictive measures or embargoes administered, enacted, maintained and/or enforced by any Governmental Entity of the United States of America (including by the US Office of Foreign Assets Control or the US Department of State), the European Union, the United Kingdom and the British Overseas Territories (including, for the avoidance of doubt, The Russia (Sanctions) (EU Exit) Regulations 2019, as amended from time to time and as applicable in the Cayman Islands pursuant to The Russia (Sanctions) (Overseas Territories) Order 2020 (as amended). |
| **"Applicable Sanctions List"** | means each of: |

    (a) the lists of Specially Designated Nationals and Blocked Persons or "Foreign Sanctions Evaders" or any other list of Persons subject to, or targeted by, similar sanctions as administered, maintained and/or enforced by the Office of Foreign Assets Control of the US Treasury, the US Department of Commerce, the US Department of State and any other Governmental Entity of the United States;

    (b) the Consolidated List of Persons, Groups and Entities Subject to EU Financial Sanctions maintained by the European Commission, Annex XIX of Regulation (EU) No 833/2014, or any other list of Persons subject to, or targeted by, similar sanctions as administered, maintained and/or enforced by the European Union or any Governmental Entity in any Member State of the European Union; or

    (c) the Consolidated List of Financial Sanctions Targets in the United Kingdom maintained by the Office of Financial Sanctions Implementation, His Majesty's Treasury of the United Kingdom, the United Kingdom Sanctions List maintained by the Foreign, Commonwealth and Development Office, or any other list of Persons subject to, or targeted by, similar sanctions administered, maintained

4

and/or enforced by any Governmental Entity of the United Kingdom or the Cayman Islands,

or any other similar sanctions list of persons and entities subject to a prohibition to transact with, that is developed, maintained and published by any Governmental Entity of the United States of America (including by the U.S. Office of Foreign Assets Control or the U.S. Department of State), the European Union, the United Kingdom and the British Overseas Territories in connection with Sanctions, in each case as amended, supplemented or substituted from time to time, and "Applicable Sanctions Lists" includes, collectively, (a), (b) and (c) of this definition.

| | |
|---|---|
| **"Asserted Amount"** | has the meaning set out in Clause 40.17(b)(i)(A) of this Hong Kong Scheme. |
| **"Assessed Value"** | means an amount equal to the value recoverable by a Class C Scheme Creditor in respect of the relevant Excluded Liabilities, Excluded Collateral, put option and/or repurchase obligation as determined by the Scheme Administrators (or, if applicable, the Scheme Adjudicator) in accordance with the terms of this Hong Kong Scheme and as set out in the Deed of Agreed Valuation. |
| **"Asset List 1 Intercreditor Agreement"** | means the intercreditor agreement to be entered into between, among others, the Company, the Collateral Agent and the respective trustee for each tranche of the A2 EVPS SLNs and A2 NEV SLNs, in substantially the form to be made available on the Transaction Website, subject to any modifications required or approved in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*) of this Hong Kong Scheme, which shall be in the Agreed Form. |
| **"Asset List 2 Intercreditor Agreement"** | means the intercreditor agreement to be entered into between, among others, the Company, the Collateral Agent and the respective trustee for each tranche of the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs and C2 NEV SLNs, in substantially the form to be made available on the Transaction Website, subject to any modifications required or approved in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*) of this Hong Kong Scheme, which shall be in the Agreed Form. |
| **"Bar Date"** | means the Class A Bar Date or the Class C Bar Date, as applicable. |
| **"Blocked Assets"** | means, collectively, the Blocked New Instruments, the Blocked TJ Scheme Consideration, and any Consent Fee to which Blocked Scheme Creditors may be entitled, in accordance with the terms of this Hong Kong Scheme and the Applicable Sanctions. |
| **"Blocked New Instruments"** | means, in respect of the Holding Period, the Residual New Instruments constituting the A2 Package and A2 Notes to which Blocked Scheme Creditors are entitled in accordance the terms of this Hong Kong Scheme and Applicable Sanctions or, in respect of the period on or after the Final Distribution Date, any Residual New Instruments to which Blocked Scheme Creditors are entitled in |

5

|  | accordance with the terms of this Hong Kong Scheme and the Applicable Sanctions. |
|---|---|
| **"Blocked Scheme Creditor"** | means a Scheme Creditor (other than a Sanctioned Scheme Creditor) that is not entitled, able or permitted (whether directly or through a custodian) to submit instructions or settle through the Clearing Systems as a result of any Applicable Sanctions affecting the Scheme Creditor or its custodian as reasonably determined by the Clearing Systems, and which does not have a sanctions licence in respect of the Applicable Sanctions which would allow that Scheme Creditor to freely deal in the Scheme Consideration and submit instructions or settle through the Clearing Systems. |
| **"Blocked Scheme Creditor Form"** | means a form from a Blocked Scheme Creditor substantially in the form of the blocked scheme creditor form set out in the Solicitation Packet. |
| **"Blocked TJ Scheme Consideration"** | means the TJ Scheme Consideration held on trust for the benefit of the Blocked Scheme Creditors who are Class A Noteholders who have nominated to receive A2 Package as part of their Scheme Consideration by the Class A Options Deadline, pursuant to the terms of the Holding Period Trust Deed by the Holding Period Trustee during the Holding Period Trust. |
| **"Blocking Regulation"** | means: |

      a.  Council Regulation (EC) No 2271/1996 of 22 November 1996 (as amended) and/or any applicable national law or regulation relating to it;

      b.  Council Regulation (EC) No 2271/1996 of 22 November 1996 (as amended) as it forms part of domestic law of the United Kingdom by virtue of the European Union (Withdrawal) Act 2018; or

      c.  The Protection of Trading Interests Act 1980 of the United Kingdom.

| **"Board"** | means the board of Directors. |
|---|---|
| **"Business Day"** | means any day which is not a Saturday, Sunday, legal holiday or other day on which banking institutions in the City of New York, the City of London, the Cayman Islands, Hong Kong or the PRC are authorised or required by law or governmental regulation (as applicable) to close. |
| **"C1 Notes"** | means tranches A, B and C of the new C1 notes to be issued by the Company and governed by the C1 Notes Indentures. |
| **"C1 Notes Indentures"** | means the New York law governed indentures governing the C1 Notes to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the C1 Notes and with the modifications required to reflect the different terms of the |

different tranches of the C1 Notes as set out in the Explanatory Statement, each of which shall be in the Agreed Form.

| | |
|---|---|
| **"C1 Notes Recipients"** | has the meaning set out in Clause 18.8 of this Hong Kong Scheme. |
| **"C2 Accrued Claims Ratio"** | has the meaning set out in Clause 15.13 of this Hong Kong Scheme. |
| **"C2 EVPS SLNs"** | means tranches A and B of the US dollar denominated secured new A2 notes linked to the EVPS Shares to be issued by the Company and governed by the C2 EVPS SLNs Indentures. |
| **"C2 EVPS SLNs Indentures"** | means the New York law governed indentures governing the C2 EVPS SLNs to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the C2 EVPS SLNs and with the modifications required to reflect the different terms of the different tranches of the C2 EVPS SLNs as set out in the Explanatory Statement, each of which shall be in the Agreed Form. |
| **"C2 NEV SLNs"** | means tranches A and B of the US dollar denominated secured new C2 notes linked to the NEV Shares to be issued by the Company and governed by the C2 NEV SLNs Indentures. |
| **"C2 NEV SLNs Indentures"** | means the New York law governed indentures governing the C2 NEV SLNs to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the C2 NEV SLNs and with the modifications required to reflect the different terms of the different tranches of the C2 NEV SLNs as set out in the Explanatory Statement, each of which shall be in the Agreed Form. |
| **"C2 Notes"** | means tranches A, B and C of the new C2 notes to be issued by the Company and governed by the C2 Notes Indentures. |
| **"C2 Notes Indentures"** | means the New York law governed indentures governing the C2 Notes to be entered into between the Company and the New Instruments Trustee substantially in the form appended to the Explanatory Statement. |
| **"C2 Notes Recipient"** | has the meaning set out in Clause 18.13 of this Hong Kong Scheme. |
| **"C2 Package"** | means the CEG MCBs, NEV MEBs, EVPS MEBs, C2 EVPS SLNs and C2 NEV SLNs available to Class C Scheme Creditors who elect Option 2 Scheme Consideration in accordance with the terms of the Restructuring Documents. |
| **"C2 Package Adjusted Portion"** | has the meaning set out in Clause 15.15 of this Hong Kong Scheme. |
| **"C2 Package Initial Portion"** | has the meaning set out in Clause 15.12 of this Hong Kong Scheme. |
| **"C2 Package Recipient"** | has the meaning set out in Clause 15.17 of this Hong Kong Scheme. |

7

| | |
|---|---|
| **"C2 Package Unadmitted Portion"** | has the meaning set out in Clause 15.10 of this Hong Kong Scheme. |
| **"Capital Stock"** | means, with respect to any Person, any and all shares, interests (including partnership interests), rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting) equity of such Person. |
| **"Cayman Companies Act"** | means the Cayman Islands Companies Act (2023 Revision) as amended, modified or re-enacted from time to time. |
| **"Cayman Court"** | means the Grand Court of the Cayman Islands and any court capable of hearing appeals therefrom. |
| **"Cayman Registrar of Companies"** | means the Registrar of Companies (including any deputy registrar and/or assistant registrar or similar) appointed under the Cayman Companies Act in the Cayman Islands. |
| **"Cayman Scheme"** | means the scheme of arrangement effected pursuant to section 86 of the Cayman Companies Act between the Company and the Scheme Creditors, in its present form or with or subject to any non-material modifications, additions or conditions that the Court may think fit to approve or impose and agreed to by the Company and the Majority CEG AHG (provided that the CEG AHG satisfies the Minimum CEG AHG Threshold). |
| **"Cayman Scheme Meetings"** | means collectively the Class A Cayman Scheme Meeting and the Class C Cayman Scheme Meeting. |
| **"Cayman Scheme Sanction Order"** | means the sealed copy of the order of the Cayman Court sanctioning the Cayman Scheme. |
| **"CEG"** or **"Company"** | means China Evergrande Group, an exempted company incorporated with limited liability under the laws of the Cayman Islands with registration number 169971 and having its registered office at P.O. Box 309, Ugland House, Grand Cayman, KY1-1104, the Cayman Islands and the shares of which are listed on the Main Board of the HKEX. |
| **"CEG AHG"** | means the ad hoc group of Participating Creditors or investment managers or investment advisors to such Participating Creditors, who (i) have agreed to be bound by the terms of the Class A RSA; (ii) have been constituted from time to time and as notified to CEG (subject to and in accordance with the transfer provisions under the Class A RSA); and (iii) are advised by the AHG Advisors from time to time and which such Participating Creditors, as at the date of the Class A RSA, include the Initial Participating Creditors. |
| **"CEG Existing April 2022 Notes"** | means the 9.5% senior notes in the aggregate principal amount of US$1,250,000,000 due April 11, 2022 (ISIN: XS1982036961, Common Code: 198203696) issued by the Company. |

8

| | |
|---|---|
| "**CEG Existing April 2023 Notes**" | means the 10.0% senior notes in the aggregate principal amount of US$450,000,000 due April 11, 2023 (ISIN: XS1982037779, Common Code: 198203777) issued by the Company. |
| "**CEG Existing April 2024 Notes**" | means the 10.5% senior notes in the aggregate principal amount of US$300,000,000 due April 11, 2024 (ISIN: XS1982040641, Common Code: 198204064) issued by the Company. |
| "**CEG Existing February 2023 Bonds**" | means the 4.25% convertible bonds in the aggregate principal amount of HK$18,000,000,000 due February 14, 2023 (ISIN: XS1767800961, Common Code: 176780096) issued by the Company. |
| "**CEG Existing January 2022 Notes**" | means the 9.5% senior notes in the aggregate principal amount of US$300,000,000 due January 30, 2022 (ISIN: XS1991102846, Common Code: 19911028) issued by the Company. |
| "**CEG Existing January 2023 Notes**" | means the 11.5% senior notes in the aggregate principal amount of US$1,000,000,000 due January 22, 2023 (ISIN: XS2106834299, Common Code: 210683429) issued by the Company. |
| "**CEG Existing January 2024 Notes**" | means the 12.0% senior notes in the aggregate principal amount of US$1,000,000,000 due January 22, 2024 (ISIN: XS2106834372, Common Code: 210683437) issued by the Company. |
| "**CEG Existing June 2023 Notes**" | means the 7.5% senior notes in the aggregate principal amount of US$1,344,921,000 due June 28, 2023 (ISIN: XS1627599498, Common Code: 162759949) issued by the Company. |
| "**CEG Existing June 2025 Notes**" | means the 8.75% senior notes in the aggregate principal amount of US$4,680,476,000 due June 28, 2025 (ISIN: XS1627599654, Common Code: 162759965) issued by the Company. |
| "**CEG Existing March 2022 Notes**" | means the 8.25% senior notes in the aggregate principal amount of US1,000,000,000 due March 23, 2022 (ISIN: XS1580431143, Common Code: 158043114) issued by the Company. |
| "**CEG Existing March 2024 Notes**" | means the 9.5% senior notes in the aggregate principal amount of US$1,000,000,000 due March 29, 2024 (ISIN: XS1587867539, Common Code: 158786753) issued by the Company. |
| "**CEG MCB Minimum Denomination**" | has the meaning set out in Clause 25.3 of this Hong Kong Scheme. |
| "**CEG MCBs**" | means the Hong Kong dollar denominated mandatory convertible bonds to be issued by the Company and governed by the CEG MCBs Trust Deed. |
| "**CEG MCBs Trust Deed**" | means the Hong Kong law governed trust deed governing the CEG MCBs to be entered into between the Company and the New |

Instruments Trustee substantially in the form to be made available on the Transaction Website and which shall be in the Agreed Form.

| | |
|---|---|
| "**Chairman**" | means Mr Hui Ka Yan. |
| "**Chairperson**" | means the chairperson of the Scheme Meeting. |
| "**Chapter 15 Recognition Order**" | means an order or orders of the US Bankruptcy Court recognising this Hong Kong Scheme as a foreign main proceeding (or in the alternative, a foreign non-main proceeding) and giving effect to certain aspects of the compromise and arrangement set out in this Hong Kong Scheme (which will be substantively identical to that set out in this Hong Kong Scheme), including the Releases under Clause 28 (*Releases*) of this Hong Kong Scheme. |
| "**Chapter 15 Recognition Proceeding**" | means the recognition proceeding before a US Bankruptcy Court to recognize this Hong Kong Scheme pursuant to chapter 15 of the United States Bankruptcy Code. |
| "**Claim**" | means all and any present and future Liabilities together with any refinancing, novation, deferral or extensions relating to or arising in respect of those Liabilities, actions, causes of action, claims, counterclaims, suits, debts, set-offs, sums of money, accounts, contracts, agreements, promises, contribution, subrogation, indemnification, damages, judgments, executions, court or arbitration awards, demands or rights whatsoever or howsoever arising, whether present, future, prospective or contingent, known or unknown, whether directly or indirectly, whether in person or through another Person, whether or not for a fixed or unliquidated amount, whether or not involving the payment of money or the performance of an act or obligation or any failure to perform any obligation or any omission, whether arising at common law, in equity or by statute in or under the laws of the Cayman Islands, Hong Kong, PRC, New York or under any other law or in any other jurisdiction howsoever arising and "**Claims**" shall be construed accordingly. |
| "**Class A Asserted Amount**" | has the meaning given to it in Clause 40.17(c)(i)(A). |
| "**Class A Bar Date**" | means, in respect of Class A Scheme Creditors, the date which is 30 days after the Restructuring Effective Date. |
| "**Class A Cayman Scheme Meeting**" | means a meeting of the Class A Scheme Creditors in relation to the Cayman Scheme as convened by an order of the Cayman Court for the purpose of considering and, if thought fit, approving, with or without modification, the Cayman Scheme, and any adjournment thereof. |
| "**Class A Debts**" | means the Existing Notes and the Class A Private Loan, including any Credit Support and Claims of any kind (if any) in connection or in respect thereof, arising therefrom or relating thereto. |
| "**Class A Group Claims**" | means any Claim by a Scheme Creditor against the Group, the Existing Notes Subsidiary Guarantors and the Existing Notes Subsidiary Pledgors, under or in respect of the Existing Class A Debt |

10

|  | Documents, but excluding for the avoidance of doubt any Claim in respect of any Liability of the Group, the Existing Notes Subsidiary Guarantors and the Existing Notes Subsidiary Pledgors which arises as a result of a failure to comply with any of the terms of the Schemes of any Restructuring Document (including but not limited to the New Instruments Documents). |
|---|---|
| **"Class A Hong Kong Scheme Meeting"** | means a meeting of the Class A Scheme Creditors in relation to this Hong Kong Scheme as convened by an order of the Hong Kong Court for the purpose of considering and, if thought fit, approving, with or without modification, this Hong Kong Scheme, and any adjournment thereof. |
| **"Class A Lenders"** | persons with a legal interest as principal in the Class A Private Loan as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of the determination of such persons' Entitlements). |
| **"Class A Noteholders"** | means persons with an economic or beneficial interest as principal in the Existing Notes held in global form or global restricted form through the Clearing Systems as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of the determination of such persons' Entitlements), each of whom has a right, upon satisfaction of certain conditions, to be issued definitive registered notes in accordance with the terms of the Existing Notes and the Indentures, and (but without double counting in each case) the Existing Notes Depositary and the Existing Notes Trustee. |
| **"Class A Options Deadline"** | means the date which is fourteen (14) calendar days after the Scheme Effective Date, which will be the final date by which Class A Scheme Creditors must submit all relevant forms in order to elect to receive either Option 1 Scheme Consideration or Option 2 Scheme Consideration in accordance with the terms of the Schemes and the Restructuring Documents. |
| **"Class A Private Lender Proxy Form"** | means the proxy form for Class A Lenders which is appended to the Solicitation Packet. |
| **"Class A Private Loan"** | means the private loan of US$100,000,000 with 15% interest p.a. due January 2022 owed by the Company. |
| **"Class A RSA"** | means the restructuring support agreement dated 3 April 2023 between, among others, the Company and the Initial Participating Creditors, as amended or varied from time to time, including by the accession or cessation of parties thereto. |
| **"Class A Scheme Creditor"** | means one of the (i) Class A Noteholders or (ii) Class A Lenders. |
| **"Class A Scheme Meetings"** | means the Class A Cayman Scheme Meeting and the Class A Hong Kong Scheme Meeting. |

11

| | |
|---|---|
| **"Class C Bar Date"** | means, in respect of Class C Scheme Creditors, the date which is 135 days after the Restructuring Effective Date. |
| **"Class C Cayman Scheme Meeting"** | means a meeting of the Class C Scheme Creditors in relation to the Cayman Scheme as convened by an order of the Cayman Court for the purpose of considering and, if thought fit, approving, with or without modification, the Cayman Scheme, and any adjournment thereof. |
| **"Class C Debts"** | means the offshore financial unsecured indebtedness, obligations or other liabilities (including, without limitation, guarantees, repurchase obligations, put options, indemnity, court/arbitration awards and claims of any kind) of CEG listed in Schedule 2 to this Hong Kong Scheme (including any related Credit Support provided by and Claims of any kind against CEG) or in respect thereof. |
| **"Class C Hong Kong Scheme Meeting"** | means a meeting of the Class C Scheme Creditors in relation to this Hong Kong Scheme as convened by an order of the Hong Kong Court for the purpose of considering and, if thought fit, approving, with or without modification, this Hong Kong Scheme, and any adjournment thereof |
| **"Class C Noteholders"** | means the Dongpo Noteholders and the Lake Noteholders. |
| **"Class C Notes"** | means the Dongpo Notes and the Lake Notes. |
| **"Class C RSA"** | means the restructuring support agreement dated 3 April 2023 launched by the Company, as amended or varied from time to time, including by the accession or cessation of parties thereto. |
| **"Class C Scheme Claims"** | means any Scheme Claim of a Class C Scheme Creditor in respect of the Class C Debts on, before or after the Voting Record Time. |
| **"Class C Scheme Creditor"** | means (i) a person holding an economic or beneficial interest as principal in the Class C Notes or (ii) an RMB Bondholder or (iii) a person holding a legal interest as principal in any other Class C Debts, as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of the determination of such person's Entitlement), including (but without double counting in each case) Guotai Junan Securities Co., Ltd. as trustee under the RMB Bonds, the Dongpo Notes Trustee and Agents, the Lake Notes Trustee and Agent and the Existing Agents. |
| **"Class C Scheme Creditor's Entitlement"** | means the amount calculated pursuant to Clause 13.3 of this Hong Kong Scheme. |
| **"Class C Scheme Creditor Proxy Form"** | means the proxy form for Class C Scheme Creditors (other than Class C Noteholders) which is appended to the Solicitation Packet. |

| | |
|---|---|
| **"Class C Scheme Meetings"** | means, collectively, the Class C Cayman Scheme Meeting and the Class C Hong Kong Scheme Meeting. |
| **"Clearing Systems"** | means Euroclear and Clearstream, as applicable, and any successor thereto. |
| **"Clearing System Instruction"** | means an instruction to each of the Clearing Systems in relation to the Restructuring Effective Date. |
| **"Clearstream"** | means Clearstream Banking S.A. |
| **"Collateral"** | all collateral securing, or purported to be securing, directly or indirectly, the New Instruments, any New Instruments Subsidiary Guarantee (as applicable) pursuant to the Security Documents, which shall, in each case, be in the Agreed Form. |
| **"Collateral Agent"** | means the collateral agent or any successor collateral agent as appointed under the New Instruments Documents and with respect to the Security Documents. |
| **"Company Information"** | means information in the possession or control of the Company or the Group that the Scheme Administrators consider in their sole discretion relevant to evaluate the Class C Scheme Creditors' Entitlements. |
| **"Company Website"** | means www.evergrande.com. |
| **"Completion Notice"** | has the meaning given to it in Clause 6.1 of this Hong Kong Scheme. |
| **"Consent Fee"** | means, with respect to each Participating Creditor and subject to and in accordance with Clause 5 *(Consent Fee)* of the Class A RSA or the Class C RSA (as applicable), an amount equal to 0.25% of the outstanding principal amount of the Eligible Restricted Debts held by such Participating Creditor as of the Voting Record Time, payable in kind in the form of new notes to be issued by the Company in accordance with the section headed "Consent Fee" in the Term Sheet. |
| **"Consent Fee Deadline"** | means 5:00 p.m. Hong Kong time, with the original date on 27 April 2023 and subsequently extended to 18 May 2023. |
| **"Consultation Period"** | means the 30 calendar day period commencing on and from the date that a Class C Scheme Creditor submits the Scheme Administrator Estimate Acceptance or Rejection Form to the Scheme Administrators rejecting the Scheme Administrator Estimate (unless extended by the Scheme Administrators in accordance with Clause 38.7(c)). |
| **"Court"** | means the Cayman Court and/or the Hong Kong Court. |
| **"Credit Support"** | means any security, encumbrance, collateral, guarantee, bond, indemnity, repurchase obligation, put option, assumption of any |

13

|  | Liability or other form of credit support or assurance or arrangement having the same economic effect. |
|---|---|
| **"Credit Support Document"** | means any document or instrument documenting or constituting or purporting to document or constitute any Credit Support (howsoever described), as amended, varied and supplemented from time to time. |
| **"Custody Instruction"** | means an instruction to the relevant Clearing System to block the Existing Notes or the Class C Notes (up to the Restructuring Effective Date) from trading in the relevant Clearing System or, in respect of the Class C Notes on or after the Restructuring Effective Date, to verify the Scheme Claims in respect of the Class C Notes of the Class C Noteholder. |
| **"Custody Instruction Deadline"** | means 5:00 p.m. on 15 August 2023 (Hong Kong time) or 4:00 a.m. on 15 August 2023 (Cayman Islands time). |
| **"Deed of Agreed Valuation"** | means a deed to be entered into between a Class C Scheme Creditor, the Scheme Administrators and the Company recording (i) the Class C Scheme Creditor's Entitlement as determined by the Scheme Administrators or, if required, the Scheme Adjudicator and (ii) a release of the relevant Class C Scheme Creditor's Scheme Claim pursuant to the governing law of the underlying Existing Debt (as applicable), pursuant to the terms of this Hong Kong Scheme which shall be in the Agreed Form. |
| **"Deeds of Release"** | shall include the form of (i) New York law governed global deed of release in respect of, among other things, the Existing Notes; (ii) Hong Kong law governed deed of release in respect of, among other things, the Class A Private Loan, the Class C Debts, and the Hong Kong law governed share charges as provided by the Existing Notes Subsidiary Pledgors for the Existing Notes; and (iii) PRC law global deed of release for, among other things, Class C Debts governed under PRC law with offshore guarantees, each of which shall be executed pursuant to the authority conferred by Clause 28 (*Releases*) of this Hong Kong Scheme and the Cayman Scheme in respect of the Scheme Creditors in substantially the form to be made available on the Transaction Website and which shall be in the Agreed Form, subject to any modifications required or approved in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*) of this Hong Kong Scheme. |
| **"Deed of Undertaking"** | means a deed of undertaking substantially in the form set out on the Transaction Website which shall be in the Agreed Form. |
| **"Deed of Undertaking Parties"** | means the parties to the Deed of Undertaking, which it is intended shall include: the Existing Notes Subsidiary Guarantors, the New Instruments Subsidiary Guarantors, the Existing Notes Subsidiary Pledgors, the New Instruments Subsidiary Pledgors, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the Existing Notes Collateral Agent, |

14

|  |  |
|---|---|
|  | the Collateral Agent, the Scheme Administrators, the Information Agent, and such other additional parties to the Deed of Undertaking (which shall be in the Agreed Form). |
| **"Deficiency Basis"** | has the meaning set out in Clause 13.3 of this Hong Kong Scheme. |
| **"Designated Recipient"** | means in relation to any Scheme Creditor (who is not a Sanctions-Affected Scheme Creditor) that can make affirmative Sanctions Law Representations by submission of a duly completed Distribution Confirmation Deed, any single entity that is designated as such by a Scheme Creditor in accordance with a valid Designated Recipient Form as the recipient of the New Instruments to be issued to such Scheme Creditor as Scheme Consideration, subject to limitations in accordance with applicable securities laws and provided that (i) the Designated Recipient shall only be validly designated if it or an Account Holder on its behalf has submitted a Distribution Confirmation Deed and/or any other applicable forms that its designating Scheme Creditor is required to submit pursuant to this Hong Kong Scheme; (ii) a Scheme Creditor may designate only one such entity and if such entity is a nominee holder it may only hold on behalf of one beneficial holder; and (iii) the Designated Recipient is an Eligible Person. |
| **"Designated Recipient Form"** | means the form enclosed with the Solicitation Packet published on the Transaction Website by which a Scheme Creditor may appoint a Designated Recipient to be the recipient of all of the New Instruments that would otherwise be issued to that Scheme Creditor as Scheme Consideration or as any Consent Fee payable to that Scheme Creditor. |
| **"Director(s)"** | means the director(s) of CEG from time to time. |
| **"Distribution Confirmation Deed"** | means the form of deed enclosed with the Solicitation Packet published on the Transaction Website confirming amongst other things that the Eligible Creditor or the Designated Recipient may lawfully be issued the New Instruments as Scheme Consideration which shall be in the Agreed Form. |
| **"Dongpo Noteholders"** | means persons with an economic or beneficial interest as principal in the Dongpo Notes held in global form or global restricted form through the Clearing Systems as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of the determination of such persons' Entitlements), each of whom has a right, upon satisfaction of certain conditions, to be issued definitive registered notes in accordance with the terms of the Dongpo Notes and the Dongpo Notes Trust Deed, and (but without double counting in each case) any depository or trustee of the Dongpo Notes. |
| **"Dongpo Notes"** | means the US$424 million 9.0% senior notes due January 22, 2023 (ISIN: XS2290369128, Common Code: 229036912) issued by Great Courage Global Limited. |

15

| | |
|---|---|
| **"Dongpo Notes Trust Deed"** | means the trust deed dated 22 January 2021, as amended, supplemented or otherwise modified from time to time, between Great Courage Global Limited, CEG, Charm Wealth Asia Pacific Limited, Global Power Development Holdings Limited and China Construction Bank (Asia) Corporation Limited as trustee governing the Dongpo Notes. |

**"Dongpo Notes Trustee and Agents"**

means:

(a)  Huatai Financial Holdings (Hong Kong) Limited and TFI Securities and Futures Limited each in its capacity as arranger under the Dongpo Notes; and

(b)  China Construction Bank (Asia) Corporation Limited in its various capacities as (i) trustee, (ii) security agent and (iii) principal paying agent, transfer agent and registrar under the Dongpo Notes.

| | |
|---|---|
| **"Eligible Creditor"** | means a Scheme Creditor who is an Eligible Person and who has submitted or caused to be submitted the Scheme Creditor Forms, as applicable, such that they are submitted and received by the Information Agent in accordance with the terms of the Schemes, before the applicable deadline set out in the Solicitation Packet, as published on the Transaction Website. |
| **"Eligible Participating Creditor"** | means a Participating Creditor who holds, at the Voting Record Time, Existing Debts which validly became Eligible Restricted Debts before the Consent Fee Deadline (as applicable) in accordance to the terms of the Class A RSA or Class C RSA (as applicable). |
| **"Eligible Person"** | means a person who has provided affirmative Securities Law Representations and Sanctions Law Representations to the Information Agent before the applicable deadline set out in the Solicitation Packet, as published on the Transaction Website. |
| **"Eligible Restricted Debt"** | means a Restricted Debt which was made subject to the terms of the relevant RSA by a Participating Creditor on or prior to the Consent Fee Deadline; and "**Eligible Restricted Debts**" means all of them. |
| **"Entitlement"** | has the meaning given to it in Clause 13 (*Calculation of a Scheme Creditor's Entitlement*) of this Hong Kong Scheme. |
| **"Entitlement Record Time"** | means the Restructuring Effective Date. This is the time designated by CEG for the determination of Entitlements of the Scheme Creditors for the purposes of distribution of Scheme Consideration (for the avoidance of doubt, this shall not prevent the Valuation and Adjudication Procedure for the Class C Debts taking place after the Restructuring Effective Date and/or taking into account prevailing circumstances at such time, including without limitation the release or extinguishment of rights or benefits of any Excluded Collateral or Excluded Liabilities resulting in a reduction of the relevant Assessed Value, as applicable). |

16

| | |
|---|---|
| **"Escrow Agent"** | means the escrow agent or any escrow agent under and as defined in the New Instruments Documents. |
| **"Estimation Notice"** | means a notice from the Scheme Administrators to each Class C Scheme Creditor notifying such Class C Scheme Creditor of the Scheme Administrator Estimate. |
| **"Euroclear"** | means Euroclear Bank SA/NV. |
| **"EVPS"** | means Evergrande Property Services Group Limited, a subsidiary of the Company the shares of which are listed on the HKEX (Stock Code: 6666). |
| **"EVPS MEB Minimum Denomination"** | has the meaning set out in Clause 25.3 of this Hong Kong Scheme. |
| **"EVPS MEBs"** | means the Hong Kong dollar denominated mandatory exchangeable bonds to be issued by the Company and governed by the EVPS MEBs Trust Deed. |
| **"EVPS MEBs Trust Deed"** | means the Hong Kong law governed trust deed governing the EVPS MEBs to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website, which shall be in the Agreed Form. |
| **"EVPS Shares"** | means the ordinary shares of EVPS. |
| **"EVPS SLNs"** | means A2 EVPS SLNs and C2 EVPS SLNs. |
| **"Exchange and Conversion Agent"** | means the exchange and conversion agent or any successor exchange and conversion agent under and as defined in the New Instruments Documents. |
| **"Exchange Property"** | means: |

(a) in respect of the NEV MEBs, 3,094,810,100 NEV Shares listed on the HKEX, together with any remaining NEV Shares issued as part of the conversion of the Shareholder Loans into NEV Shares after the NEV Custody Account Transfers are made, subject to any adjustment made in accordance with Clause 15.2 below; or

(b) in respect of the EVPS MEBs, 2,331,985,700 EVPS Shares listed on the HKEX.

| | |
|---|---|
| **"Excluded Collateral"** | means any security, collateral, guarantee, bond, indemnity, keepwell agreement or other form of assurance granted by an Excluded Liabilities Party Person for the purpose of securing and/or guaranteeing against and/or supporting any Class C Debt" |
| **"Excluded Liability"** | means any Liability of an Excluded Liabilities Party Person and "**Excluded Liabilities**" shall be construed accordingly. |

17

| | |
|---|---|
| **"Excluded Liabilities Party Person"** | means certain Persons other than the Company who is an obligor, guarantor, security or collateral pledgor or other Credit Support provider of or in respect of a Class C Debt owed to a Class C Scheme Creditor. |
| **"Existing Agents"** | means the Existing Facility Agents and the Existing Security Agent. |
| **"Existing Class A Debt Documents"** | means the Existing Notes Documents, the loan agreement in respect of the Class A Private Loan and any related Credit Support Document, as amended, varied and supplemented from time to time. |
| **"Existing Class C Debt Documents"** | means any document or instrument documenting or constituting or purporting to document or constitute any Class C Debt. |
| **"Existing Debts"** | means, collectively, the Class A Debts and the Class C Debts. |

**"Existing Facility Agents"** means:

(a) China Construction Bank (Asia) Corporation Limited, in its capacity as (i) agent, (ii) escrow agent and (iii) account bank under the Venice Loan;

(b) China Construction Bank (Asia) Corporation Limited, in its capacity as (i) escrow agent and (ii) account bank under the Venice SPA;

(c) (i) China CITIC Bank International Limited; (ii) China Everbright Bank Co., Ltd. Hong Kong Branch and (iii) Tai Fung Bank Limited, in their capacity as arrangers under the Hero Loan; and

(d) China CITIC Bank International Limited, in its capacity as (i) agent and (ii) account bank under the Hero Loan.

| | |
|---|---|
| **"Existing Finance Documents"** | means the Existing Notes Documents, the loan agreement in respect of the Class A Private Loan, the Existing Class C Debt Documents, and any other Credit Support Document entered into in respect thereof, as amended, varied and supplemented from time to time. |
| **"Existing Notes"** | means the CEG Existing January 2022 Notes, the CEG Existing March 2022 Notes, the CEG Existing April 2022 Notes, the CEG Existing January 2023 Notes, the CEG Existing February 2023 Bonds, the CEG Existing April 2023 Notes, the CEG Existing June 2023 Notes, the CEG Existing January 2024 Notes, the CEG Existing March 2024 Notes, the CEG Existing April 2024 Notes, and the CEG Existing June 2025 Notes. |
| **"Existing Notes Collateral Agent"** | means Citicorp International Limited. |
| **"Existing Notes Depositary"** | means Citibank Europe plc as common depositary for the Clearing Systems, acting through its nominee as registered holder of the Existing Notes, Citivic Nominees Limited. |

18

| | |
|---|---|
| **"Existing Notes Documents"** | means the Indentures and any other documents entered into by the Company or any other person guaranteeing or securing liabilities due under or in respect of the Existing Notes. |
| **"Existing Notes Paying and Transfer Agent and Registrar"** | means Citibank, N.A., London Branch in its capacity as paying agent, transfer agent, and registrar in respect of the Existing Notes. |
| **"Existing Notes Subsidiary Guarantors"** | means the entities listed in Schedule 4 (*Existing Notes Subsidiary Guarantors*) of this Hong Kong Scheme. |
| **"Existing Notes Subsidiary Pledgors"** | means:<br><br>(a) ANJI (BVI) Limited (安基(BVI)有限公司);<br><br>(b) Fengyu (BVI) Limited (丰域(BVI)有限公司);<br><br>(c) Pyramid Wealth Holdings Limited;<br><br>(d) Value Depot Holdings Limited; and<br><br>(e) Yitong (BVI) Limited (亿通(BVI)有限公司). |
| **"Existing Notes Trustee"** | means Citicorp International Limited solely in its capacity as trustee under the Indentures. |
| **"Existing Notes Trustee Instruction"** | means an instruction to the Existing Notes Trustee substantially in the form to be made available on the Transaction Website or such other form as the Existing Notes Trustee may reasonably accept. |
| **"Existing Security Agent"** | means:<br><br>(a) Paperbark, LLC, in its capacity as security agent under the Class A Private Loan;<br>(b) China CITIC Bank International Limited, in its capacity as security agent under the Hero Loan; and<br>(c) China Construction Bank (Asia) Corporation Limited, in its capacity as security agent of the Venice Loan. |
| **"Explanatory Statement"** | means the composite document addressed to Scheme Creditors in relation to this Hong Kong Scheme pursuant to section 671 of the Hong Kong Companies Ordinance. |
| **"Final Distribution"** | means the Scheme Consideration to be distributed on the Final Distribution Date from the Residual New Instruments to each Scheme Creditor that is not a Sanctions-Affected Scheme Creditor (or, in respect of Blocked Scheme Creditors, to the Successor Escrow Agent) or to a Designated Recipient (if applicable), in each case in accordance with their respective entitlements and the terms under the Schemes (and, without double counting any Initial Distribution received, if applicable). |

19

| | |
|---|---|
| **"Final Distribution Date"** | means the final date on which the Scheme Consideration shall be distributed to Scheme Creditors (that are not a Sanctions-Affected Scheme Creditor) that are entitled to a portion of the Residual New Instruments, or to the Successor Escrow Agent on behalf of the Blocked Scheme Creditors, in accordance with the terms of the Schemes and Restructuring Documents, and within one month of the completion of the Valuation and Adjudication Procedure set out in Clauses 38 (*Valuation Procedure*) and 40 (*Adjudication Procedure*). This date is to be designated by the Company and communicated to the Scheme Creditors in writing via the Transaction Website and/or through such public medium as may be appropriate at the time. The Final Distribution Date will be a date after the conclusion of the Valuation and Adjudication Procedure. |
| **"Forced A2 Notes"** | means tranches A, B, C and D of the new A2 notes to be issued by the Company and governed by the Forced A2 Notes Indentures, and to be distributed to Class A Scheme Creditors referred to in Clause 16.5(b) in accordance with the terms of the Restructuring Documents. |
| **"Forced A2 Notes Indentures"** | means the New York law governed indenture governing the Forced A2 Notes to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the Forced A2 Notes and with the modifications required to reflect the different terms of the different tranches of the Forced A2 Notes as set out in the Explanatory Statement, each of which shall be in Agreed Form. |
| **"Full Accrued Claim Basis"** | has the meaning set out in Clause 13.2 of this Hong Kong Scheme. |
| **"Further Documentation"** | has the meaning set out in Clause 40.5(a)(i) of this Hong Kong Scheme. |
| **"GLAS"** | means GLAS Specialist Services Limited, who the Company has appointed to liaise with Blocked Scheme Creditors including the processing of any Blocked Scheme Creditor Forms, under the Schemes. |
| **"Global Certificates"** | means the global certificates evidencing the Existing Notes. |
| **"Governmental Entity"** | means any federal, national or local government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal or judicial body of Hong Kong, the PRC, the United States of America, the European Union, the United Kingdom, the British Overseas Territories, the Cayman Islands or any other relevant jurisdiction. |
| **"Group"** | means CEG and its subsidiaries from time to time. |
| **"Hengda Real Estate"** | means Hengda Real Estate Group Company Limited (恒大地產集團有限公司), a principal subsidiary of CEG. |

20

| | |
|---|---|
| **"Hero Loan"** | has the meaning set out in Schedule 2 of this Hong Kong Scheme. |
| **"HKEX"** | means The Stock Exchange of Hong Kong Limited. |
| **"Holding Period"** | means the period from the Restructuring Effective Date, up to and including one Business Day after the Final Distribution Date. |
| **"Holding Period Custody Instruction Deadline"** | means, in respect of a Class A Noteholder, five Business Days prior to the Class A Bar Date or, in respect of a Class C Noteholder, five Business Days prior to the Class C Bar Date. |
| **"Holding Period Trust Deed"** | means the holding period trust deed to be entered into between, among others, CEG and the Holding Period Trustee, in substantially the form to be made available on the Transaction Website subject to and in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*) of this Hong Kong Scheme. |
| **"Holding Period Trustee"** | means GLAS Trustees Limited, holding the relevant Scheme Consideration, TJ Scheme Consideration, and any Consent Fee (if applicable), for and on behalf of the Scheme Creditors, in accordance with this Hong Kong Scheme and the Restructuring Documents, or any additional or replacement trustee at any time. |
| **"Hong Kong"** | means the Hong Kong Special Administrative Region of the PRC. |
| **"Hong Kong Companies Ordinance"** | means the Companies Ordinance (Cap. 622 of the Laws of Hong Kong), as amended, modified or re-enacted from time to time. |
| **"Hong Kong Companies Registrar"** | means the Hong Kong Registrar of Companies appointed under the Hong Kong Companies Ordinance. |
| **"Hong Kong Court"** | means the High Court of Hong Kong and any court capable of hearing appeals therefrom. |
| **"Hong Kong Scheme"** | means this scheme of arrangement effected pursuant to section 673 of the Hong Kong Companies Ordinance between the Company and the Scheme Creditors, in its present form or with or subject to any non-material modifications, additions or conditions that the Hong Kong Court may think fit to approve or impose and agreed to by the Company. |
| **"Hong Kong Scheme Meetings"** | means collectively, the Class A Hong Kong Scheme Meeting and the Class C Hong Kong Scheme Meeting. |
| **"Hong Kong Scheme Sanction Order"** | means the sealed copy of the order of the Hong Kong Court sanctioning this Hong Kong Scheme. |
| **"Houlihan Lokey"** | means Houlihan Lokey (China) Limited, in their capacity as advisors to the Company. |

21

| **"Indemnified Party"** | has the meaning given to it in Clause 30.1 of this Hong Kong Scheme. |
|---|---|

| **"Indentures"** | means each of: |
|---|---|

(a) the indenture dated March 23, 2017, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing March 2022 Notes;

(b) the indenture dated April 11, 2019, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing April 2022 Notes;

(c) the indenture dated January 22, 2020, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing January 2023 Notes;

(d) the trust deed dated 14 February 2018, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing February 2023 Bonds;

(e) the indenture dated April 11, 2019, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing April 2023 Notes;

(f) the indenture dated June 28, 2017, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing June 2023 Notes;

(g) the indenture dated January 22, 2020, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing January 2024 Notes;

(h) the indenture dated March 29, 2017, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing March 2024 Notes;

(i) the indenture dated April 11, 2019, as amended, supplemented or otherwise modified from time to time,

between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing April 2024 Notes;

(j) the indenture dated June 28, 2017, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing June 2025 Notes; and

(k) the indenture dated April 30, 2019, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing January 2022 Notes,

and collectively, the "**Indentures**", each governed by and construed in accordance with the laws of the State of New York.

| | |
|---|---|
| **"Information Agent"** | means Morrow Sodali Limited in its capacity as the Company's information agent. |
| **"Initial Distribution"** | means the A2 Package Initial Portion and the A2 Notes to be distributed on the Restructuring Effective Date to the Class A Scheme Creditors and/or the Holding Period Trustee in accordance with Clause 16 (*Initial Distribution*) of this Hong Kong Scheme. |
| **"Initial Participating Creditors"** | means the list of initial participating creditors listed in Schedule 1 (*The Initial Participating Creditors)* of the RSAs. |
| **"Interim Distribution"** | has the meaning set out in Clause 21.1 of this Hong Kong Scheme. |
| **"Interim Distribution Date"** | has the meaning set out in Clause 21.1 of this Hong Kong Scheme. |
| **"Lake Noteholders"** | means persons with an economic or beneficial interest as principal in the Lake Notes held in global form or global restricted form through the Clearing Systems as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of the determination of such persons' Entitlements), each of whom has a right, upon satisfaction of certain conditions, to be issued definitive registered notes in accordance with the terms of the Lake Notes and the Lake Notes Trust Deed and (but without double counting in each case) any depository or trustee of the Lake Notes. |
| **"Lake Notes"** | means the US$260 million 8.5% senior notes due October 3, 2021 (ISIN: XS2054446617, Common Code: 205444661) issued by Jumbo Fortune Enterprises Limited. |
| **"Lake Notes Trust Deed"** | means the trust deed dated 3 October 2019, as amended, supplemented or otherwise modified from time to time, between Jumbo Fortune Enterprises Limited, CEG, Tianji and China |

23

|  | Construction Bank (Asia) Corporation Limited as trustee governing the Lake Notes. |
|---|---|
| **"Lake Notes Trustee and Agent"** | means China Construction Bank (Asia) Corporation Limited in its various capacities as (i) notes trustee and security trustee, (ii) settlement agent, (iii) principal agent, transfer agent, calculation agent, registrar and (iv) original account bank under the Lake Notes. |
| **"Liability"** | means any debt, liability or obligation whatsoever, whether it is present, future, prospective or contingent, whether directly or indirectly, whether or not its amount is fixed or undetermined, whether or not it involves the payment of money or the performance of an act or obligation, and whether arising at common law, in equity or by statute in or under the laws of the Cayman Islands, Hong Kong, the PRC, New York or under any other law or in any other jurisdiction howsoever arising and "**Liabilities**" shall be construed accordingly. |
| **"Longstop Date"** | means 15 December 2023, unless extended pursuant to Clause 3.6 of this Hong Kong Scheme. |
| **"Longstop Date Extension"** | has the meaning given to it in Clause 3.6 of this Hong Kong Scheme. |
| **"Longstop Date Extension Notice"** | has the meaning given to it in Clause 3.7 of this Hong Kong Scheme. |
| "**Majority CEG AHG**" | means the member(s) of the CEG AHG holding a majority of the aggregate outstanding principal amount of the Restricted Debts (as defined under the Class A RSA) held by the CEG AHG at the relevant time. |
| **"Management"** | means the key management personnel of the Group, including the Board. |
| **"Maples and Calder"** | means Maples and Calder (Hong Kong) LLP, Maples and Calder (Cayman) LLP, and Maples and Calder (BVI) LLP, in their capacity as advisors to the Company as to matters of Cayman Islands law and British Virgin Islands law. |
| "**Minimum CEG AHG Threshold**" | means an aggregate outstanding principal amount of the Restricted Debts (as defined under the Class A RSA) constituting at least 10% of the outstanding principal amount of the Class A Debts, in accordance with the terms of the Class A RSA. |
| **"NEV"** | means China Evergrande New Energy Vehicle Group Limited, a subsidiary of the Company the shares of which are listed on the HKEX (Stock Code: 708). |
| **"NEV Custody Account Transfers"** | means the portion of NEV Shares converted from the Shareholder Loans which are required to be transferred to the custody accounts of the relevant entity prescribed by the terms of the applicable Restructuring Documents (which shall be in the Agreed Form) in respect of the A2 NEV SLNs and the C2 NEV SLNs in order for such accounts to together hold NEV Shares representing 30% of the |

24

aggregate issued NEV Shares as at the date of the Explanatory Statement plus any NEV Shares issued as a result of the conversion of the Shareholder Loans on a fully diluted basis as of the Restructuring Effective Date.

**"NEV MEB Minimum Denomination"**

has the meaning set out in Clause 25.3 of this Hong Kong Scheme.

**"NEV MEBs"**

means the Hong Kong dollar denominated mandatory exchangeable bonds to be issued by the Company and governed by the NEV MEBs Trust Deed.

**"NEV MEBs Trust Deed"**

means the Hong Kong law governed trust deed governing the NEV MEBs to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website, which shall be in the Agreed Form.

**"NEV Shares"**

means the ordinary shares of NEV.

**"NEV SLNs"**

means A2 NEV SLNs and C2 NEV SLNs.

**"New Instruments"**

means the A1 Notes, C1 Notes, EVPS MEBs, NEV MEBs, CEG MCBs A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs, C2 NEV SLNs, A2 Notes and C2 Notes, as further summarised in the Explanatory Statement.

**"New Instruments Collateral Agent"**

means the collateral agent or any successor collateral agent under the New Instruments Documents and with respect to the Security Documents.

**"New Instruments Depositary"**

means the common depositary for the Clearing Systems, acting through its nominee as registered holder of the New Instruments, as set out in the New Instruments Documents.

**"New Instruments Documents"**

means:

(a)    the A1 Notes Indentures;

(b)    the C1 Notes Indentures;

(c)    the A2 Notes Indentures;

(d)    the C2 Notes Indentures;

(e)    the A2 EVPS SLNs Indentures;

(f)    the C2 EVPS SLNs Indentures;

(g)    the A2 NEV SLNs Indentures;

(h)    the C2 NEV SLNs Indentures;

(i)    the CEG MCBs Trust Deed;

25

(j)      the EVPS MEBs Trust Deed;

(k)      the NEV MEBs Trust Deed;

(l)      the Security Documents; and

(m)      any documents in respect of the New Instruments to be issued pursuant to the Restructuring,

which in each case shall be in the Agreed Form and in substantially the form to be made available on the Transaction Website.

| | |
|---|---|
| **"New Instruments Paying and Transfer Agent and Registrar"** | means a corporation organized and existing under the laws of [*] with limited liability, in its capacity as paying agent, transfer agent, and/or registrar or any successor paying agent, transfer agent, and/or registrar in respect of the New Instruments. |
| **"New Instruments Subsidiary Guarantees"** | means such guarantees by the New Instruments Subsidiary Guarantors in respect of the New Instruments pursuant to the relevant New Instruments Documents. |
| **"New Instruments Subsidiary Guarantors"** | means such Persons who will guarantee the obligations of the Company and/or other obligors in respect of the New Instruments pursuant to the New Instruments Documents as at the relevant date (as applicable). |
| **"New Instruments Subsidiary Pledgors"** | means such Persons who will provide and/or grant Security in respect of the obligations of the Company and/or other obligors in respect of the applicable New Instruments pursuant to the relevant New Instruments Documents as at the Restructuring Effective Date. |
| **"New Instruments Trustee"** | means the trustee or any successor trustee under and as defined in the New Instruments Documents. |
| **"New Intercreditor Agreements"** | means the A1/A2 Intercreditor Agreement, Asset List 1 Intercreditor Agreement and the Asset List 2 Intercreditor Agreement, in substantially the form to be made available on the Transaction Website subject to any modifications required or approved in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*) of this Hong Kong Scheme. |
| **"Notes Minimum Denomination"** | has the meaning set out in Clause 25.2 of this Hong Kong Scheme. |
| **"Option A1 Proportion"** | means the ratio equal to the total amount of Entitlements of A1 Notes Recipients to be converted into A1 Notes *divided* by the total amount of Entitlements of A1 Notes Recipients and C1 Notes Recipients to be converted into A1 Notes. |
| **"Option C1 Proportion"** | means the ratio equal to the total amount of Entitlements of C1 Notes Recipients to be converted into C1 Notes *divided by* the total amount of Entitlements of A1 Notes Recipients and C1 Notes Recipients to be converted into C1 Notes. |

26

| | |
|---|---|
| **"Option 1 Scheme Consideration"** | means the relevant portion of the rights and interests in the A1 Notes and C1 Notes as elected by the relevant Scheme Creditor to be distributed to Scheme Creditors (and/or their Designated Recipients, as applicable) under and pursuant to the terms of the respective Schemes (and, without double counting, any Residual New Instruments and Blocked New Instruments), set out in Clause 13 (*Calculation of a Scheme Creditor's Entitlement*) of this Hong Kong Scheme. |
| **"Option 2 Scheme Consideration"** | means the relevant portion of the rights and interests in the A2 Notes, C2 Notes, EVPS MEBs, NEV MEBs, CEG MCBs, EVPS SLNs and NEV SLNs as elected by the relevant Scheme Creditor to be distributed to Scheme Creditors (and/or their Designated Recipients, as applicable) under and pursuant to the terms of the respective Schemes (and, without double counting, any Residual New Instruments and Blocked New Instruments), set out in Clause 13 (*Calculation of a Scheme Creditor's Entitlement*) of this Hong Kong Scheme. |
| **"Oversubscription"** | means a scenario where the total valid elections of Scheme Creditors for Option 2 Scheme Consideration results in, either: |

    (a) (x) the total amount of the Class A Scheme Creditors' Entitlement elected for the A2 Package, being greater than (y) the total aggregate principal amount of all instruments included in the A2 Package Initial Portion; or

    (b) (x) the total amount of the Class C Scheme Creditors' Entitlement elected for the C2 Package, being greater than (y) the total aggregate principal amount of all instruments included in the C2 Package Adjusted Portion,

and the "**Oversubscribed Portion**" means the amount representing (x) *minus* (y) in (a) or (b) above (as applicable).

| | |
|---|---|
| **"Participating Creditor"** | means a Scheme Creditor who has agreed to be bound by an RSA as a Participating Creditor in accordance with the terms of the respective RSA. |
| **"Pending Referral Creditor"** | has the meaning set out in Clause 40.17 of this Hong Kong Scheme. |
| **"Perpetuity Period"** | means the period from the date the Successor Escrow Account is established until 21 years after that date, or such further period as the Successor Escrow Agent determines in its sole discretion (and without any obligation to do so). |
| **"Person"** | means any natural person, corporation, limited or unlimited liability company, trust, joint venture, association, corporation, partnership, Governmental Entity or other entity whatsoever. |
| **"Personnel"** | means, in relation to any Person, its current and former officers, partners, directors, employees, staff, agents, counsel and other representatives. |

27

| | |
|---|---|
| **"Plain A2 Notes"** | means tranches A, B, C and D of the new A2 notes to be issued by the Company and governed by the Plain A2 Notes Indenture, and to be distributed to Class A Scheme Creditors referred to in Clause 16.8(c)(i) in accordance with the terms of the Restructuring Documents. |
| **"Plain A2 Notes Indentures"** | means the New York law governed indentures governing the Plain A2 Notes to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the Plain A2 Notes and with the modifications required to reflect the different terms of the different tranches of the Plain A2 Notes as set out in the Explanatory Statement, each of which shall be in the Agreed Form. |
| **"PRC"** | means the People's Republic of China, which for the purposes of this Hong Kong Scheme, excludes Taiwan, Hong Kong and the Macao Special Administrative Region of the PRC. |
| **"Proceeding"** | means any process, suit, action, legal or other legal proceeding including without limitation any arbitration, mediation, alternative dispute resolution, judicial review, adjudication, demand, statutory demand, execution, distraint, forfeiture, re-entry, seizure, lien, enforcement of judgment, enforcement of any security or insolvency proceedings in any jurisdiction. |
| **"Proxy Voting Forms"** | means, as applicable, a proxy voting form submitted in the form appended to the Account Holder Letter, and/or a Class C Scheme Creditor Proxy Form and/or a Class A Private Lender Proxy Form. |
| **"Recognition Filings"** | means (i) the filing of a petition for recognition of this Hong Kong Scheme under Chapter 15 of the US Bankruptcy Code; (ii) the filing of a request for the US Bankruptcy Court to grant the Chapter 15 Recognition Order; and (iii) any other filings submitted in the US Bankruptcy Court that are necessary to effectuate the Chapter 15 Recognition Proceeding. |
| **"Record Date Balance"** | means a credit balance created by the Clearing Systems and maintained in the records of the Clearing Systems and Existing Notes Depositary in favour of those Class A Noteholders at the Entitlement Record Time who did not submit or did not have submitted on their behalf Custody Instructions by the Custody Instruction Deadline and/or a validly completed Account Holder Letter, Distribution Confirmation Deed and, if applicable, Designated Recipient Form by the Class A Options Deadline. |
| **"Reference Date"** | means the earlier of October 1, 2023 and the Restructuring Effective Date. |
| **"Referred Scheme Claim"** | means a Class C Scheme Creditor's Entitlement that is:<br><br>(a) not agreed by the Class C Scheme Creditor and the Scheme Administrator during the Consultation Period; or |

28

(b) adjusted by the Scheme Administrators and disputed by the Class C Scheme Creditor pursuant to Clause 37.10, and

is referred to the Scheme Adjudicator for determination in accordance with Clause 40 (*Adjudication Procedure*) of this Hong Kong Scheme.

| | |
|---|---|
| **"Regulation D"** | means Regulation D under the US Securities Act. |
| **"Regulation S"** | means Regulation S under the US Securities Act. |
| **"Related Party Loan"** | means the HK$2,200,000,000 (equivalent to c. US$282,776,350) loans to NEV, pursuant to (a) the loan agreement in respect of HK$1,400,000,000 dated 7 January 2022 provided by Ms. Ding Yumei, (b) the loan agreement in respect of HK$200,000,000 dated 8 September 2023 provided by Ms. Ding Yumei and (c) the loan agreement in respect of HK$ 600,000,000 dated 10 November 2021 provided by Good Bond Limited (wholly-owned by Ms. Ding Yumei). |
| **"Releases"** | has the meaning given to it in Clause 28 (*Releases*) of this Hong Kong Scheme. |
| **"Released Claims"** | means any of the (i) Scheme Claims, (ii) Class A Group Claims, (iii) Ancillary Claims or (iv) Restructuring Claims. |
| **"Released Persons"** | means (i) the Company, the Existing Notes Subsidiary Pledgors, the Existing Notes Subsidiary Guarantors and the Group,  (ii) the Existing Notes Trustee, the Existing Notes Collateral Agent, the Existing Notes Depositary, the Existing Notes Paying and Transfer Agent and Registrar, (iii) the New Instruments Depositary, the New Instruments Paying and Transfer Agent and Registrar, and the New Instruments Trustee, and the New Instruments Collateral Agent, (iv) the Holding Period Trustee, (v) the Exchange and Conversion Agent, (vi) the Escrow Agent, (vii) the Account Bank, (viii) the Information Agent, (ix) the Scheme Administrators; (x) the Scheme Adjudicators, (xi) the CEG AHG (including each CEG AHG member's respective managers and investment managers' and investment advisors' Affiliates and funds and in each case, including any of its respective directors, managers or officers), (xii) the Advisors and (xiii) the AHG Advisors; and, regarding each of the above, includes each of their respective predecessors, successors and assigns (where applicable) and their respective Personnel in their capacities as such, and "**Released Person**" shall be construed accordingly. |
| **"Relevant Collateral"** | means any security, collateral, guarantee, bond, indemnity or other form of assurance granted for the purpose of securing and/or guaranteeing (i) any Class A Debt, provided by the Company and any of its subsidiaries, and/or (ii) any Class C Debt, provided by the Company only. |
| **"Residual New Instruments"** | means the portion of New Instruments which remains available for distribution to the Eligible Creditors, Blocked Scheme Creditors and/or Designated Recipients (as applicable) after the distribution of |

29

|  | Scheme Consideration on the Restructuring Effective Date in accordance with the terms of the Schemes, including New Instruments which are not issued on the Restructuring Effective Date. |
|---|---|
| **"Residual A2/C2 Package"** | means the EVPS MEBs, NEV MEBs, CEG MCBs, A2 EVPS SLNs and A2 NEV SLNs which have not been distributed to Class A Scheme Creditors on the Restructuring Effective Date, and any C2 EVPS SLNs and C2 NEV SLNs. |
| **"Restricted Debts"** | means, with respect to a Participating Creditor at any time, the aggregate outstanding principal amount of Class A Debts or Class C Debts (as the case may be) set out in the Restricted Debts Notice (as defined in the relevant RSA) then most recently delivered by that Participating Creditor, as modified from time to time by any Transfer Notices (as defined in the relevant RSA) (as applicable) delivered by Participating Creditors to the Information Agent, subject to evidence satisfactory to the Information Agent, in accordance with the terms of the RSAs; and "**Restricted Debt**" means any portion of the Restricted Debts. |
| **"Restricted Subsidiaries"** | has the meaning given to that term under the New Instruments Documents. |
| **"Restructuring"** | means the restructuring of the debt and other offshore financial obligations of CEG and the Existing Notes Subsidiary Guarantors and certain other offshore subsidiaries of CEG as contemplated by, *inter alia*, the Restructuring Documents and the Schemes. |
| **"Restructuring Claims"** | means any Claim by a Scheme Creditor against a Released Person in respect of: (A) the preparation, negotiation, execution, sanction or implementation of the Schemes and/or the Restructuring and/or the Restructuring Documents; and/or (B) the execution of the Restructuring Documents and the carrying out of the steps and transactions contemplated therein in accordance with their terms, but, in each case, excluding for the avoidance of doubt, any Claim in respect of any Liability (i) of any Released Person which arises as a result of a failure to comply with any of the terms of the Schemes or any Restructuring Document (including but not limited to the New Instruments Documents) and (ii) arising from or in connection with any Excluded Liability or Excluded Collateral, and "**Restructuring Claim**" shall be construed accordingly. |
| **"Restructuring Documents"** | means the documents to be entered into by certain parties to implement the terms of the Restructuring including, but not limited to, the New Instruments Documents and the documents listed in Schedule 1 (*Restructuring Documents*) of this Hong Kong Scheme in each case shall be in the Agreed Form. |
| **"Restructuring Effective Date"** | means the date on which all of the Restructuring Effective Date Conditions have been satisfied or waived (as the case may be). |

| | |
|---|---|
| **"Restructuring Effective Date Conditions"** | means the conditions set out in Schedule 3 (*Restructuring Effective Date Conditions*) of this Hong Kong Scheme. |
| **"Restructuring Effective Date Conditions Subsequent"** | means the conditions set out in Clause 6.6 of this Hong Kong Scheme. |
| **"RMB Bondholders"** | means persons with a legal interest as principal in the RMB Bonds held in through the Shanghai Stock Exchange as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of the determination of such persons' Entitlements), each of whom has a right, upon satisfaction of certain conditions, to be repaid the outstanding principal and coupon of the RMB Bonds. |
| **"RMB Bonds"** | means the 15 Hengda 03 RMB bonds issued by Hengda Real Estate and listed on the Shanghai Stock Exchange, in which the Company guaranteed the repurchase of the RMB Bonds at the Redemption Date (as defined in the indenture for the RMB Bonds) if Hengda Real Estate failed to ensure sufficient funds in the bank account to repay the RMB Bondholders 3 business days prior to the Redemption Date and the RMB Bondholders so demanded.  The outstanding principal amount of the RMB Bonds is RMB8.2 billion. |
| **"RSAs"** | means collectively, the Class A RSA and the Class C RSA, and "**RSA**" means either one of the RSAs. |
| **"Rules"** | has the meaning given to it in Clause 35.5 of this Hong Kong Scheme. |
| **"Sanctioned Country"** | means any country or territory that is the target of any comprehensive country or territory-wide Applicable Sanctions (being, as at the date of the Explanatory Statement, the territories of Crimea, Donetsk and Luhansk, and the countries of Cuba, Iran, North Korea and Syria). |
| **"Sanctioned Scheme Creditor"** | means a Scheme Creditor that is: |

(a)  designated on any Applicable Sanctions List;

(b)  resident in, ordinarily located in, or incorporated or domiciled under the laws of any Sanctioned Country;

(c)  in the aggregate, 50 percent or greater owned, directly or indirectly, or otherwise controlled, directly or indirectly, (in each case with reference to Applicable Sanctions) by any Person or Persons described in (a) or (b) above of this definition; or

(d)  acting on behalf of or at the direction of any Person or Persons described in (a) or (b) above of this definition,

31

and which does not have a sanctions licence in respect of the Applicable Sanctions which would allow that Scheme Creditor to freely deal in the Scheme Consideration and submit instructions or settle through the Clearing Systems..

**"Sanctions-Affected Scheme Creditor"**    means a Blocked Scheme Creditor or a Sanctioned Scheme Creditor.

**"Sanctions Law Representations"**    means the sanctions law confirmations and undertakings set out in the Distribution Confirmation Deed.

**"Schemes"**    means, together, the Cayman Scheme and this Hong Kong Scheme.

**"Scheme Adjudicator"**    means an adjudicator appointed by the Company under Clause 40.2 of this Hong Kong Scheme.

**"Scheme Administrator"**    means Mr P Cowley, Ms YM Lui and Mr C Ball of KPMG Advisory (Hong Kong) Limited or any individual who is appointed Scheme Administrator under Clause 37 (*The Scheme Administrators*) of this Hong Kong Scheme, and "**Scheme Administrators**" shall be construed accordingly.

**"Scheme Administrator Estimate"**    means the Scheme Administrators' estimate of a Class C Scheme Creditor's Entitlement pursuant to Clause 38.2 of this Hong Kong Scheme.

**"Scheme Administrator Estimate Acceptance or Rejection Form"**    means the form to be submitted by a Class C Scheme Creditor in response to the Estimation Notice indicating their acceptance or rejection of the Scheme Administrator Estimate, pursuant to Clause 38.4 of this Hong Kong Scheme.

**"Scheme Claim"**    means any Claim by a Scheme Creditor against CEG under or in respect of the Existing Finance Documents whether at, before or after the Voting Record Time (including, for the avoidance of doubt, all accrued and unpaid interest on the Existing Finance Documents up to (but excluding) the Restructuring Effective Date, or accretions arising in respect of, such Claims before, at or after the Voting Record Time but, excluding for the avoidance of doubt, (i) any Claim in respect of any Liability of CEG which arises as a result of a failure to comply with any of the terms of the Schemes or any Restructuring Document (including but not limited to the New Instruments Documents), or (ii) in respect of Class C Scheme Creditors, any Claim not against CEG arising from or in respect of any Excluded Liability or Excluded Collateral).

**"Scheme Conditions"**    means:

(a)    the sanction with or without modification (but subject to any such modification being acceptable to the Company and in accordance with the terms of the Cayman Scheme) of the Cayman Scheme by the Cayman Court;

(b)    the sanction with or without modification (but subject to any such modification being acceptable to the Company

|                              |                                                                                                                                                                                                                                                                                            |
|------------------------------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                              | and in accordance with the terms of this Hong Kong Scheme) of this Hong Kong Scheme by the Hong Kong Court;                                                                                                                                                                                 |
|                              | (c) the delivery of the Cayman Scheme Sanction Order to the Cayman Registrar of Companies for registration; and                                                                                                                                                                             |
|                              | (d) the delivery of the Hong Kong Scheme Sanction Order to the Hong Kong Companies Registrar for registration.                                                                                                                                                                              |
| **"Scheme Consideration"**   | means the relevant portion of the rights and interests in the New Instruments as elected by the relevant Scheme Creditor to be distributed to Scheme Creditors (and/or their Designated Recipients, as applicable) under and pursuant to the terms of the respective Schemes (and, without double counting, any Residual New Instruments and Blocked New Instruments). |
| **"Scheme Creditor Form"**   | means:                                                                                                                                                                                                                                                                                     |
|                              | (a) in respect of the Class A Noteholders and the Class C Noteholders (who are not Sanctions-Affected Scheme Creditors), a validly completed Account Holder Letter;                                                                                                                         |
|                              | (b) in respect of the Class A Private Lenders (who are not Sanctioned Scheme Creditors), a validly completed Class A Private Lender Proxy Form;                                                                                                                                             |
|                              | (c) in respect of the Class C Scheme Creditors other than the Class C Noteholders (who are not Sanctioned Scheme Creditors), a validly completed Class C Scheme Creditor Proxy Form; and                                                                                                    |
|                              | (d) in respect of Blocked Scheme Creditors, a validly completed Blocked Scheme Creditor Form,                                                                                                                                                                                              |
|                              | in each case (other than for Blocked Scheme Creditors) together with a validly completed Distribution Confirmation Deed and Designated Recipient Form (if applicable).                                                                                                                       |
| **"Scheme Creditor Releasing Parties"** | has the meaning given to it in Clause 28.2 of this Hong Kong Scheme.                                                                                                                                                                                                             |
| **"Scheme Creditors"**       | means, collectively, the Class A Scheme Creditors and the Class C Scheme Creditors, and "**Scheme Creditor**" means one of the Scheme Creditors.                                                                                                                                           |
| **"Scheme Effective Date"**  | means the first Business Day on which all of the Scheme Conditions are satisfied and the Schemes become effective, as specified in the Scheme Effective Date Notice.                                                                                                                         |
| **"Scheme Effective Date Notice"** | means the notice to be issued by the Company and delivered to the Information Agent in accordance with Clause 7.1 confirming satisfaction of the Scheme Conditions and specifying the Scheme Effective Date.                                                                           |

| | |
|---|---|
| **"Scheme Meetings"** | means collectively, the Cayman Scheme Meetings and the Hong Kong Scheme Meetings, and "**Scheme Meeting**" means either one of the Scheme Meetings. |
| **"Scheme Sanction Orders"** | means collectively, the Cayman Scheme Sanction Order and the Hong Kong Scheme Sanction Order. |
| **"Scheme Steps"** | means the steps set out in Clause 6 (*Scheme Steps*) of this Hong Kong Scheme. |
| **"SEC"** | means the US Securities and Exchange Commission. |
| **"Security"** | means the security constituted pursuant to the Security Documents. |
| **"Security Documents"** | means the security documents to be entered into in connection with Collateral of the New Instruments which will be made available (in substantially final form) on the Transaction Website, each of which shall be in the Agreed Form. |
| **"Securities Law Representations"** | means the securities law confirmations and undertakings set out in the Distribution Confirmation Deed forming part of the Solicitation Packet, as published on the Transaction Website. |
| **"SGX-ST"** | means Singapore Exchange Securities Trading Limited. |
| **"Shareholder Loans"** | means: |

(a) the loans by the Chairman and Xin Xin (BVI) Limited to NEV totaling HK$2,650,000,000 (equivalent to approximately US$340,616,967); and

(b) the loan by CEG to NEV totaling US$1,768 million.

| | |
|---|---|
| **"Shares"** | means the ordinary shares of the Company. |
| **"Singapore"** | means the Republic of Singapore. |
| "**Solicitation Packet**" | means the packet of materials, including the Account Holder Letter and accompanying instructions, the Designated Recipient Form, the Distribution Confirmation Deed, the Proxy Voting Forms and the Blocked Scheme Creditor Form, all of which are available to Scheme Creditors on the Transaction Website. |
| **"Successor Escrow Account"** | means an escrow account to be established for the Perpetuity Period or until the lifting of Applicable Sanctions in respect of all Blocked Scheme Creditors, whichever is earlier, by an agent to be appointed by CEG pursuant to the Successor Escrow Agreement for the purposes of holding the Blocked Assets after the expiration of the Holding Period for the Blocked Scheme Creditors who have submitted a validly completed Blocked Scheme Creditor Form together with supporting evidence to CEG prior to the Class A Bar Date or Class C Bar Date (as applicable). |

34

| | |
|---|---|
| **"Successor Escrow Agent"** | means the Person to be appointed by CEG as escrow agent for the Successor Escrow Account. |
| **"Successor Escrow Agreement"** | means the agreement providing for the creation of the Successor Escrow Account, under which the Successor Escrow Agent shall hold the Blocked Assets for the Company, in a form approved by the Successor Escrow Agent. |
| **"Super Majority Participating Creditors"** | means, at any time, Participating Creditors who: (i) have agreed to be bound by the terms of the Class A RSA and (ii) hold (beneficially or legally (as applicable), as principal) in aggregate at least 66 2/3% of the outstanding principal amount of the Restricted Debts (as defined under the Class A RSA) held in aggregate by all Participating Creditors who have agreed to be bound by the terms of the Class A RSA at that time (for the avoidance of doubt, excluding the Existing Notes beneficially and/or legally (as applicable) held by Xin Xin (BVI) Limited and the Chairman and their (as applicable) Affiliates which are in the aggregate amount of US$50,000,000 as at the date of the RSAs). |
| **"Term Sheet"** | means the restructuring term sheet in respect of CEG's offshore indebtedness dated 20 March 2023 between (among others) CEG and the Chairman, as amended, restated and/or supplemented from time to time. A redacted copy of the Term Sheet as of the date of this Agreement, incorporating amendments made by CEG to cure certain defects and omissions in accordance with the terms thereto, can be found on the transaction website specified in the Company's announcement on the HKEX at: https://www1.hkexnews.hk/listedco/listconews/sehk/2023/0403/2023040304093.pdf. |
| **"TJ Scheme"** | means the scheme of arrangement to be proposed by Tianji Holding Limited under sections 670, 673 and 674 of the Hong Kong Companies Ordinance. |
| **"TJ Scheme Consideration"** | means any consideration received by CEG as a scheme creditor as part of the restructuring, pursuant to the TJ Scheme (and, without double counting, any Blocked TJ Scheme Consideration). |
| **"Total Package"** | has the meaning set out in Clause 15.1 of this Hong Kong Scheme. |
| **"Transaction Website"** | means https://projects.morrowsodali.com/evergrande. |
| **"Treasure Glory"** | means Treasure Glory Global Limited. |
| **"Undersubscription"** or **"Undersubscribed"** | means a scenario where the total valid elections of Scheme Creditors for Option 2 Scheme Consideration results in, either:<br><br>(a) (x) the total amount of the Class A Scheme Creditors' Entitlement elected for the A2 Package, being less than (y) the total aggregate principal amount of all instruments included in the A2 Package Initial Portion; or |

(b) (x) the total amount of the Class C Scheme Creditors' Entitlement elected for the C2 Package, being less than (y) the total aggregate principal amount of all instruments included in the C2 Package Adjusted Portion,

and the "**Undersubscribed Portion**" means the amount representing (y) *minus* (x) in (a) or (b) above (as applicable).

| | |
|---|---|
| **"United States" or "US"** | means the United States of America. |
| **"United States Code"** | means the codification by subject matter of the general and permanent laws of the United States. |
| **"US Bankruptcy Code"** | means Title 11 of the United States Code, as in effect on the date of the Recognition Filing. |
| **"US Bankruptcy Court"** | means the United States Bankruptcy Court for the Southern District of New York. |
| **"US Securities Act"** | means the US Securities Act of 1933, as amended, including the rules and regulations promulgated by the SEC thereunder. |
| **"Valuation and Adjudication Procedure"** | means, together, the Valuation Procedure and the Adjudication Procedure. |
| **"Valuation Procedure"** | means the procedure for determining the value of a Class C Scheme Creditor's Entitlement, as set out in Clause 38 (*Valuation Procedure*) of this Hong Kong Scheme. |
| **"Valuer"** | means a suitably qualified and experienced valuer(s) (in the reasonable opinion of the Scheme Administrators) specialising in the valuation of onshore real estate projects and the companies associated with such projects, who is engaged by the Scheme Administrators under Clause 37.6(e). |
| **"VAT"** | means value added tax or any equivalent goods and services tax levied by a Governmental Entity. |
| **"Venice Loan"** | has the meaning set out in Schedule 2 of this Hong Kong Scheme. |
| **"Venice SPA"** | has the meaning set out in Schedule 2 of this Hong Kong Scheme. |
| **"Voting Record Time"** | means 5:00 p.m. Hong Kong time on 18 August 2023, the equivalent being 4:00 a.m. Cayman Islands time on 18 August 2023. |
| **"Voting Stock"** | means, with respect to any Person, Capital Stock of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person. |

| | |
|---|---|
| **"Whitelist Scheme Administrators"** | means such persons agreed in writing by the Majority CEG AHG and the Company, including persons agreed in writing prior to the date of this Hong Kong Scheme. |

2.        **INTERPRETATION**

In this Hong Kong Scheme, unless the context otherwise requires or otherwise expressly provides:

2.1      references to Clauses are, unless otherwise stated, references to the clauses set out in Parts B to E (inclusive) of this Hong Kong Scheme;

2.2      references to Recitals, Parts and Schedules are, unless otherwise stated, references to the recitals, parts and schedules respectively of or to this Hong Kong Scheme;

2.3      references to a "person" include references to an individual, firm, partnership, company, corporation, other legal entity, unincorporated body of persons or any state or state agency;

2.4      references to a statute or a statutory provision include the same as subsequently modified, amended or re-enacted from time to time;

2.5      references to an agreement, deed or document shall be deemed also to refer to such agreement, deed or document as amended, supplemented, restated, verified, replaced, and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto;

2.6      the singular includes the plural and vice versa and words importing one gender shall include all genders;

2.7      headings to Recitals, Parts, Clauses and Sub-Clauses are for ease of reference only and shall not affect the interpretation of this Hong Kong Scheme;

2.8      references to times and dates (unless stated otherwise) are to times and dates in Hong Kong;

2.9      references to "**US$**" and "**HK$**" are references to the lawful currency of the United States of America and the lawful currency of Hong Kong, respectively;

2.10     the words "**include**" and "**including**" are to be construed without limitation, general words introduced by the word "**other**" are not to be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things, and general words are not to be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words;

2.11     a company is a "**subsidiary**" of another company, its "**holding company**", if that other company (a) holds a majority of the voting rights in it; (b) is a member of it and has the right to appoint or remove a majority of its board of directors; or (c) is a member of it and controls alone, pursuant to an agreement with other members, a majority of the voting rights in it, or, if it is a subsidiary of a company that is itself a subsidiary of that other company;

2.12     an "**undertaking**" means a body corporate or partnership; or an unincorporated association carrying on a trade or business, with or without a view to profit; and an undertaking is a parent undertaking in relation to another undertaking, a "**subsidiary undertaking**", if (a) it holds the majority of voting rights in the undertaking; (b) it is a member of the undertaking and has the right to appoint or remove a majority of its board of directors; (c) it has the right to exercise a dominant influence over the undertaking (i) by virtue of provisions contained in the undertaking's articles, or (ii) by virtue of a control contract; or (d) it is a member of the undertaking and controls alone, pursuant to an agreement with other shareholders or members, a majority of the voting rights in the undertaking;

2.13    to the extent that there is any conflict or inconsistency between the terms of this Hong Kong Scheme and the Explanatory Statement, the terms of this Hong Kong Scheme shall prevail; and

2.14    any formulas, numbers, calculation methodology may have accounted for and/or is subject to rounding.

**PART B**

**THE HONG KONG SCHEME**

**3.    APPLICATION AND EFFECTIVENESS OF THIS HONG KONG SCHEME**

3.1    The compromise and arrangement effected by this Hong Kong Scheme shall apply to all Scheme Claims and shall be binding on the Company, the Existing Notes Subsidiary Guarantors, and all Scheme Creditors, and their respective successors, assigns and transferees (including any modifications to this Hong Kong Scheme are made in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*) of this Hong Kong Scheme). Subject to Clause 3.2 of this Hong Kong Scheme, the Scheme Creditors shall be eligible to receive certain rights in accordance with the terms of this Hong Kong Scheme in full and final settlement of their Scheme Claims.

3.2    Notwithstanding any other provisions of this Hong Kong Scheme, Excluded Liabilities and Excluded Collateral shall not be subject to Clause 28 (*Releases*) of this Hong Kong Scheme.

3.3    The terms of this Hong Kong Scheme shall become effective on and from the Scheme Effective Date.

3.4    The Company or the Information Agent (acting on behalf of the Company) shall notify the Scheme Creditors, the Existing Notes Trustee, the New Instruments Trustee, and the Collateral Agent (as required), in writing that the Scheme Effective Date has occurred in accordance with Clause 7.1 below.

3.5    If the Restructuring Effective Date has not occurred on or before the Longstop Date (as may be extended pursuant to Clause 3.6 below), the terms of, and obligations on the parties under or pursuant to, this Hong Kong Scheme shall lapse and all compromises and arrangements provided for by this Hong Kong Scheme shall have no force or effect and any Restructuring Documents held in escrow shall be promptly destroyed by or on behalf of the Company.

3.6    The Company may at any time before the occurrence of the Longstop Date (or any extension thereof in accordance with this Clause) extend the Longstop Date until such later date and time as CEG may elect to extend with the prior written consent of:

(a)    the Majority CEG AHG; or

(b)    (without prejudice to the foregoing) if the CEG AHG does not hold the Minimum CEG AHG Threshold, the Super Majority Participating Creditors,

(a "**Longstop Date Extension**").

3.7    Subject to compliance with Clause 3.6 above, the Company shall promptly notify the Information Agent of any Longstop Date Extension by delivering a notice confirming the Longstop Date Extension (a "**Longstop Date Extension Notice**") to the Information Agent, and the Information Agent shall promptly notify Scheme Creditors of the Longstop Date Extension by:

(a)    sending the Longstop Date Extension Notice to the Existing Notes Trustee and the New Instruments Trustee;

(b)    circulating the Longstop Date Extension Notice to the Class A Noteholders via the Clearing Systems;

40

(c)     posting the Longstop Date Extension Notice on the Transaction Website;

(d)     posting the Longstop Date Extension Notice on the Company's Website; and

(e)     sending the Longstop Date Extension Notice via email to each Person who the Company believes may be a Scheme Creditor who has been registered as a Scheme Creditor with the Information Agent or has otherwise notified the Company or the Information Agent of its valid email address; and

(f)     publishing an announcement of the Longstop Date Extension on the respective websites of HKEX and SGX-ST.

3.8     On and following the Restructuring Effective Date, the Scheme Claims of each Scheme Creditor, and any Person, including a successor, assignee or transferee, who acquires any interest in or arising out of a Scheme Claim after the Voting Record Time, shall be subject to the compromises and arrangements set out in this Hong Kong Scheme.

**4.      COMPROMISE AND ARRANGEMENT WITH THE SCHEME CREDITORS**

4.1     On the Restructuring Effective Date:

(a)     in respect of the Class A Noteholders, the Company shall ensure that the Global Certificates representing the Existing Notes are cancelled by the Existing Notes Depositary and shall give all such instructions as are required to be given by it (or for and on behalf of each Class A Noteholder) to the Existing Notes Trustee, the Existing Notes Depositary and/or the Existing Notes Collateral Agent for such purpose;

(b)     the Company shall, for and on behalf of each Scheme Creditor, execute the Deeds of Release; and

(c)     the respective rights and obligations of the Scheme Creditors (including, for the avoidance of doubt, any Person, including a successor, assignee or transferee, that acquires an interest in the Existing Debts after the Voting Record Time), the Company, the Existing Agents and, in respect of the Existing Notes, the Existing Notes Subsidiary Guarantors, the Existing Notes Subsidiary Pledgors, the Existing Notes Trustee, the Existing Notes Depositary and the Existing Notes Collateral Agent and, in respect of the Dongpo Notes, the Dongpo Notes Trustee and Agents and, in respect of the Lake Notes, the Lake Notes Trustee and Agent, towards one another under the Existing Notes Documents, the Class A Private Loan, and the Class C Debts and in respect of any other Scheme Claim (except for the Excluded Liabilities and Excluded Collateral) will terminate and be discharged,

in consideration for which the Company shall issue the Scheme Consideration on the Restructuring Effective Date and/or the Final Distribution Date to the Scheme Creditors (other than to the Sanctions-Affected Scheme Creditors, the Existing Agents, the Dongpo Notes Trustee and Agents and the Lake Notes Trustee and Agent), the Designated Recipients and/or to the Holding Period Trustee to be held on trust for and on behalf of such relevant Blocked Scheme Creditors during the Holding Period, and/or to the Successor Escrow Agent, subject to Clause 25 (*Fractional Adjustments*) and the terms of Part D (*Scheme Consideration*) below.

4.2     Each Scheme Creditor hereby acknowledges and agrees that any action taken by the Company in accordance with this Hong Kong Scheme or the Restructuring Documents will not constitute a breach of or any default (howsoever described) under the Existing Finance Documents or any

other agreement or document governing the terms of the Class A Private Loan, any Class C Debt or any Scheme Claim and irrevocably waives and releases any such breach or default.

## 5. AUTHORITY AND INSTRUCTIONS

5.1 With effect from the Scheme Effective Date, in consideration of the rights provided to the Scheme Creditors under this Hong Kong Scheme and solely for the purposes of giving effect to the terms of this Hong Kong Scheme, each Scheme Creditor hereby appoints the Company as its attorney and agent and irrevocably authorizes, directs, instructs and empowers the Company (represented by any duly authorized representative) to, as applicable:

(a) enter into, execute and deliver (whether as a deed or otherwise) for and on behalf of that Scheme Creditor, in its capacity as a Scheme Creditor, including any Person, successor, assignee or transferee, to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time (to the extent applicable), sufficient original copies of (as agreed between the parties thereto):

(i) the Restructuring Documents (in each case in the Agreed Form) to which such Scheme Creditor is a party, each substantially in the form attached to this Hong Kong Scheme or the Explanatory Statement (as applicable) or otherwise in the form circulated to Scheme Creditors or otherwise made available to them, including on the Transaction Website, subject to any non-material modification approved or imposed by the Court in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*); and

(ii) any and all such other documents (in each case in the Agreed Form) that the Company and the CEG AHG reasonably consider necessary to give effect to the terms of this Hong Kong Scheme,

in each case to be held to the order of the relevant parties thereto (for the avoidance of doubt, to the order of the Company on behalf of each Scheme Creditor) until the Restructuring Effective Date or, in respect of the Restructuring Documents for the New Instruments which are to be first issued on the Final Distribution Date, on the Final Distribution Date, in accordance with the Scheme Steps for the purposes of giving effect to the terms of this Hong Kong Scheme;

(b) take or carry out any other step or procedure reasonably required to effect the settlement of this Hong Kong Scheme; and

(c) to the extent applicable, in respect of Existing Debts (other than the Existing Notes and RMB Bonds), instruct each of the Existing Agents, the Dongpo Notes Trustee and Agents, the Lake Notes Trustee and Agent, acting in their capacity as Existing Agent, the Dongpo Notes Trustee and Agents or the Lake Notes Trustee and Agent respectively, and each of their employees and agents to promptly take or carry out any step, procedure or execute and comply with any Restructuring Documents reasonably required to give effect to the terms of this Hong Kong Scheme.

5.2 On or as soon as possible after the Scheme Effective Date, as applicable:

(a) the Company shall carry out the steps set out in Clause 5.1 and this Clause 5.2, acting on the instructions and pursuant to the authority of the Scheme Creditors; and

(b)    the Company, each Existing Notes Subsidiary Guarantor, each New Instruments Subsidiary Guarantor, each Existing Notes Subsidiary Pledgor, each New Instruments Subsidiary Pledgor, the Existing Notes Trustee, the Existing Agents, the Dongpo Notes Trustee and Agents, the Lake Notes Trustee and Agent, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary, the Existing Notes Collateral Agent, the Collateral Agent and the Holding Period Trustee shall enter into, execute and deliver (whether as a deed or otherwise) sufficient original copies of (as agreed between the parties thereto):

    (i)    the Restructuring Documents (in each case in the Agreed Form) to which the Company, such Existing Notes Subsidiary Guarantor, such New Instruments Subsidiary Guarantor, the Existing Notes Trustee, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the Existing Agents, the Dongpo Notes Trustee and Agents, the Lake Notes Trustee and Agent, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary, the Existing Notes Collateral Agent and the Collateral Agent is a party, each substantially in the form attached to this Hong Kong Scheme or the Explanatory Statement (as applicable) or otherwise in the form circulated to Scheme Creditors or otherwise made available to them, subject to any non-material modification approved or imposed by the Court in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*); and

    (ii)    any and all such other documents (in each case in the Agreed Form) that the Company and the CEG AHG reasonably consider necessary to give effect to the terms of this Hong Kong Scheme,

in each case to be held to the order of the relevant parties thereto until the Restructuring Effective Date or, in respect of the Restructuring Documents for the New Instruments which are to be first issued on the Final Distribution Date, on the Final Distribution Date, in accordance with the Scheme Steps for the purposes of giving effect to the terms of this Hong Kong Scheme.

5.3    With effect from the Scheme Effective Date, each of the Scheme Creditors irrevocably authorises and instructs the Existing Notes Trustee, the Existing Agents, the Dongpo Notes Trustee and Agents, the Lake Notes Trustee and Agent, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary, the Existing Notes Collateral Agent, the Collateral Agent and the Holding Period Trustee to enter into, execute and deliver (whether as a deed or otherwise) sufficient original copies of (as agreed between the parties thereto), as applicable:

    (i)    the Restructuring Documents (in each case in the Agreed Form) to which the Existing Notes Trustee, the Existing Agents, the Dongpo Notes Trustee and Agents, the Lake Notes Trustee and Agent, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary, the Existing Notes Collateral Agent, the Collateral Agent and the Holding Period Trustee is a party, each substantially in the form attached to this Hong Kong Scheme or the Explanatory Statement (as applicable) or otherwise in the form circulated to Scheme Creditors or otherwise made available to them,

subject to any non-material modification approved or imposed by the Court in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*); and

(ii)     any and all such other documents (in each case in the Agreed Form) that the Company and the CEG AHG reasonably consider necessary to give effect to the terms of this Hong Kong Scheme,

in each case to be held to the order of the relevant parties thereto until the Restructuring Effective Date or, in respect of the Restructuring Documents for the New Instruments which are to be first issued on the Final Distribution Date, on the Final Distribution Date, in accordance with the Scheme Steps for the purposes of giving effect to the terms of this Hong Kong Scheme.

5.4     On the Restructuring Effective Date, each Class A Noteholder hereby irrevocably authorises and instructs, as applicable:

(a)     the Company, the Existing Notes Trustee, the Existing Notes Depositary, the Existing Notes Paying and Transfer Agent and Registrar, the Existing Notes Collateral Agent, and the Information Agent to take all such actions as may be necessary or appropriate to deliver, cancel, mark down and discharge the Global Certificates, terminate and discharge the Existing Notes Documents and otherwise give effect to the terms of this Hong Kong Scheme including without limitation the delivery by the Company (for and on behalf of the Scheme Creditors) of the Existing Notes Trustee Instruction to the Existing Notes Trustee at the time prescribed in the Scheme Steps;

(b)     the Company as its attorney and agent and irrevocably authorises, directs, instructs and empowers the Company (represented by any authorised representative) to in respect of the Existing Notes, instruct the Existing Notes Collateral Agent, acting in its capacity as Existing Notes Collateral Agent and each of its employees and agents promptly take or carry out any step or procedure or to execute and comply with any Restructuring Documents reasonably required to give effect to the terms of this Hong Kong Scheme;

(c)     the Existing Notes Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the Existing Notes Collateral Agent, and the Existing Notes Depositary, to act and rely upon the Existing Notes Trustee Instruction and the provisions of this Hong Kong Scheme, without any duty to investigate further and without incurring any liability for doing so (other than any liability arising as a result of the fraud, wilful default or wilful misconduct of the Existing Notes Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the Existing Notes Collateral Agent, or the Existing Notes Depositary); and

(d)     the Existing Notes Depositary, the New Instruments Depositary and the Information Agent to rely upon the provisions of this Hong Kong Scheme, without any duty to investigate further and without incurring any liability for doing so (other than any liability arising as a result of the fraud, wilful default or wilful misconduct of the Existing Notes Depositary or the actual fraud, wilful default or wilful misconduct of the Information Agent).

5.5     The authority granted under Clauses 5.1 to 5.4 (inclusive) shall be treated, for all purposes whatsoever and without limitation, as having been granted by deed and the Company shall be entitled to delegate the authority granted and conferred by this Clause 5 to any duly authorized officer or agent of the Company as necessary.

5.6     Each Scheme Creditor (for itself and, if applicable, for its Designated Recipient and any person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time) on and from the Scheme Effective Date and on and from the Restructuring Effective Date, irrevocably ratifies and confirms any act or omission done, caused or purported to be done by:

(a)     the Company, the Existing Notes Subsidiary Guarantors, the New Instruments Subsidiary Guarantors, the Existing Notes Collateral Agent, the Collateral Agent and the Information Agent or any of their respective directors, managers, officers, partners or Affiliates, pursuant to or for the purposes of giving effect to this Hong Kong Scheme, other than any act or omission done or made as a result of fraud, wilful default or wilful misconduct; and

(b)     the Existing Notes Trustee, the Existing Agents, the Dongpo Notes Trustee and Agents, the Lake Notes Trustee and Agent, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary or any of their respective directors, managers, officers, partners or Affiliates, pursuant to or for the purposes of giving effect to this Hong Kong Scheme, other than any act or omission done or made as a result of actual fraud, wilful default or wilful misconduct.

## 6.     SCHEME STEPS

*Prior to the Restructuring Effective Date*

6.1     The Company shall announce and specify the Restructuring Effective Date in a notice confirming satisfaction of the Restructuring Effective Date Conditions and enclosing a copy of the Scheme Sanction Orders and the Chapter 15 Recognition Order in accordance with Clause 7.1 below (the "**Completion Notice**") to Scheme Creditors, the Existing Notes Trustee and the New Instruments Trustee as soon as reasonably practicable after satisfaction of the Restructuring Effective Date Conditions.

6.2     The Restructuring Effective Date shall occur after satisfaction or waiver (to the extent permitted by law and the RSAs (applied *mutatis mutandis*)), of the Restructuring Effective Date Conditions.

6.3     The Restructuring Documents may be executed at any time after the Scheme Effective Date, but shall only take effect in accordance with their terms and the terms of this Hong Kong Scheme, including the satisfaction of the Restructuring Effective Date Conditions, on the Restructuring Effective Date or, in respect of the Restructuring Documents for the New Instruments which are to be first issued on the Final Distribution Date, on the Final Distribution Date.

6.4     The Company, in consultation with the Information Agent and/or Scheme Administrators, shall calculate the amount of the Scheme Consideration to be issued to the Class A Scheme Creditors and the Holding Period Trustee on the Restructuring Effective Date in accordance with the terms of this Hong Kong Scheme and the Restructuring Documents.

*On the Restructuring Effective Date*

6.5     On the Restructuring Effective Date, the following steps shall occur (in the order set out below to the extent possible or practicable):

(a)     the duly executed Restructuring Documents (save for the Deeds of Release and the Existing Notes Trustee Instruction (which are the subject of sub-clauses (g) and (i) below), and the Restructuring Documents for the New Instruments which are to be first issued on the Final Distribution Date) shall be released from escrow and delivered by the relevant parties or otherwise become effective in accordance with their terms;

(b)     each Scheme Creditor and each Designated Recipient (if applicable) shall, subject to Clause 25 (*Fractional Adjustments*) and the terms of Part D (*Scheme Consideration*) below, become entitled to receive its respective proportion of the Scheme Consideration as calculated and in accordance with Part D (*Scheme Consideration*) below;

(c)     the Company shall issue and distribute the Initial Distribution of the New Instruments to the Class A Scheme Creditors (who are Eligible Creditors), the Designated Recipients and/or the Holding Period Trustee (as applicable) in each case in accordance with their respective entitlements under the Schemes and subject to and in accordance with Part D (*Scheme Consideration*) below;

(d)     the Existing Notes Depositary shall take such action as may be required to credit the Record Date Balance in the records of the Clearing Systems in favour of those Class A Noteholders at the Entitlement Record Time who did not submit, or did not have submitted on their behalf, Custody Instructions by the Custody Instruction Deadline and/or a validly completed Account Holder Letter, Distribution Confirmation Deed and, if applicable, Designated Recipient Form by the Class A Options Deadline;

(e)     any A2 Package or A2 Notes which are payable to Blocked Scheme Creditors that are Class A Scheme Creditors, and any Consent Fee (if applicable) which is payable to Class C Scheme Creditors or to which Blocked Scheme Creditors that are Class A Scheme Creditors are entitled (who are Eligible Participating Creditors), will be issued to and held by the Holding Period Trustee on trust for the benefit of those Scheme Creditors in accordance with the terms of the Holding Period Trust Deed, during the Holding Period subject to and in accordance with Part D (*Scheme Consideration*) below;

(f)     the Company shall pay the Consent Fee to each Eligible Participating Creditor (and/or their Designated Recipient) who is a Class A Scheme Creditor who has elected to receive Option 2 Scheme Consideration and is entitled to such payment pursuant to the terms of the applicable RSA, subject to and in accordance with Part D (*Scheme Consideration*) below.

(g)     the steps described in Clause 4 (*Compromise and Arrangement with the Scheme Creditors*) shall occur and the releases contained in Clause 28 (*Releases*) of this Hong Kong Scheme and the Deeds of Release shall be effective and shall be binding on all parties in accordance with their terms;

(h)     the Company via the Information Agent shall deliver the Clearing System Instruction to each of the Clearing Systems;

(i)     the Company, acting as agent for the Class A Noteholders, shall deliver the executed Existing Notes Trustee Instruction to the Existing Notes Trustee; and

(j)     the Existing Notes Trustee and the Existing Notes Paying and Transfer Agent and Registrar shall, upon receipt of the Existing Notes Trustee Instruction, cancel the Existing Notes and take such other action as may be required to effect the

46

cancellation, mark down and discharge of the Existing Notes under the Existing Notes Documents, such that the respective rights and obligations of the Class A Noteholders (including, for the avoidance of doubt, any Person that acquires an interest in the Existing Notes after the Voting Record Time), the Company, the Existing Notes Subsidiary Guarantors, the Existing Notes Trustee, the Existing Notes Paying and Transfer Agent and the Existing Notes Depositary towards one another under the Existing Notes Documents will terminate.

*Subsequent to the Restructuring Effective Date*

6.6     Following the Restructuring Effective Date, the Company shall take steps to satisfy the Restructuring Effective Date Conditions Subsequent, unless waived to the extent permitted by law and the RSAs (applied *mutatis mutandis*):

(a)     the dismissal (or withdrawal) of any winding-up petition filed against CEG prior to the Restructuring Effective Date and relating to any Scheme Claims of the Schemes, including the winding-up petition filed by Top Shine Global Limited against CEG before the Hong Kong High Court;

(b)     the completion of the Valuation and Adjudication Procedure in respect of each Class C Scheme Creditor's Entitlement under this Hong Kong Scheme and the distribution of Scheme Consideration as part of the Interim Distribution or the Final Distribution to Scheme Creditors in accordance with Part D (*Scheme Consideration*) below;

(c)     where TJ Scheme Consideration is received by CEG (if any), the distribution of the TJ Scheme Consideration to eligible Scheme Creditors on a pro rata basis pursuant to Clause 20 (*TJ Scheme Consideration*) ;

(d)     prior to the Final Distribution Date, the Company, in consultation with the Information Agent and/or Scheme Administrator, shall calculate the amount of the Scheme Consideration to be issued to the Scheme Creditors or transferred by the Holding Period Trustee to the Scheme Creditors on the Final Distribution Date in accordance with the terms of this Hong Kong Scheme and the Restructuring Documents; and

(e)     the satisfaction of each of the specific conditions subsequent contained in each of the Restructuring Documents (in each case in the Agreed Form) and any corporate governance term sheet forming part of the Explanatory Statement (as and to the extent applicable).

6.7     On the Final Distribution Date:

(a)     the duly executed Restructuring Documents for the New Instruments which are to be first issued on the Final Distribution Date shall be released from escrow and delivered by the relevant parties or otherwise become effective in accordance with their terms;

(b)     the Company shall issue and distribute any C2 Package Unadmitted Portion as is required for the conversion of any Forced A2 Notes, together with the C2 Package Adjusted Portion, to the relevant Scheme Creditors in accordance with this Hong Kong Scheme and the Restructuring Documents;

(c)     the Company shall issue and distribute the A1 Notes, C1 Notes and C2 Notes to the relevant Scheme Creditors in accordance with the instructions of the Scheme Administrators, this Hong Kong Scheme and the Restructuring Documents; and

47

(d)     the Company shall pay the Consent Fee to each Eligible Participating Creditor (and/or their Designated Recipient) who is a Scheme Creditor entitled to such payment (and did not receive such payment on the Restructuring Effective Date) pursuant to the terms of the applicable RSA, subject to and in accordance with Part D (*Scheme Consideration*) below.

6.8     If applicable, the Company shall issue and distribute the Interim Distribution on the Interim Distribution Date in accordance with Clause 21.1.

**PART C**

**NOTICES AND SCHEME CLAIMS**

**7.    NOTICES TO SCHEME CREDITORS AND OTHERS**

7.1    The Company or the Information Agent (acting on behalf of the Company) shall promptly notify the Scheme Creditors, the Existing Notes Trustee, the New Instruments Trustee and the Collateral Agent of:

(a)    the satisfaction of the Scheme Conditions and the occurrence of the Scheme Effective Date via a Scheme Effective Date Notice; and

(b)    the satisfaction of the Restructuring Effective Date Conditions and the designation of the Restructuring Effective Date via a Completion Notice,

by:

(a)    sending the relevant notice to the Existing Notes Trustee and the New Instruments Trustee;

(c)    circulating the relevant notice through the Clearing Systems;

(d)    posting the relevant notice on the Transaction Website;

(e)    posting the relevant notice on the Company's Website;

(f)    posting an announcement on the respective websites of HKEX and SGX-ST; and

(g)    sending the relevant notice via email to each Person who the Company believes may be a Scheme Creditor and which is registered as a Scheme Creditor with the Information Agent or has otherwise notified the Company or Information Agent of its valid email address.

7.2    All other notices under this Clause 7 (*Notices to Scheme Creditors and Others*) to Scheme Creditors may be given by the Company in the following ways:

(a)    by notice on the Transaction Website;

(b)    by notice on the Company's Website;

(c)    by notice through the Clearing Systems by the Information Agent;

(d)    by notice via email to each person who the Company believes may be a Scheme Creditor, and who has registered as a Scheme Creditor with the Company or the Information Agent or otherwise notified the Company or the Information Agent of its valid email address; and

(e)    by the publishing of an announcement on the respective websites of HKEX and SGX-ST.

**8.    ENTITLEMENT RECORD TIME AND SCHEME CLAIMS**

8.1    The Scheme Creditors' Entitlement shall be determined by the Scheme Administrators in accordance with the Scheme Creditors' Scheme Claims as at the Entitlement Record Time.

8.2     The Scheme Creditors acknowledge and agree that the Scheme Administrators shall:

(a)     in respect of the Class A Noteholders and Class C Noteholders who are not Sanctions-Affected Scheme Creditors, use the appropriate Scheme Creditor Form submitted by or on behalf of each Class A Noteholder or Class C Noteholder and based on the calculation of the Existing Notes Trustee (in respect of Class A Noteholders only), as verified against the books and records of the Existing Notes Depositary (or its nominee) and/or the Clearing Systems in respect of the Class A Noteholders or the books and records of the depository (or its nominee) and/or the Clearing Systems of the Class C Notes in respect of the Class C Noteholders;

(b)     in respect of all other Scheme Creditors who are not Sanctions-Affected Scheme Creditors, use the appropriate Scheme Creditor Form submitted by or on behalf of each relevant Scheme Creditor, and seek to verify the relevant Scheme Creditor's identity, status as a Scheme Creditor, and value of its holding to the best of its ability based on the information provided in the respective Scheme Creditor Form; and

(c)     in respect of Blocked Scheme Creditors, use the appropriate Blocked Scheme Creditor Form submitted by or on behalf of each Blocked Scheme Creditor, as verified against the books and records of GLAS and/or the Company, including any additional evidence as reasonably required by GLAS and the Company and requested from the Blocked Scheme Creditor to be provided in relation to its Scheme Claim,

in each case, by the applicable Bar Date, or, in respect of Class A Scheme Creditors who qualify to receive the Initial Distribution, by the Class A Options Deadline, to determine the value of the Scheme Claims of each Scheme Creditor for the purposes of calculating their Entitlement to the Scheme Consideration (in respect of Class C Scheme Creditors, as further determined by the Valuation and Adjudication Procedure), and any such determination shall (in the absence of manifest error, willful default, willful misconduct or fraud) be conclusive and binding on the Scheme Creditors and the Company.

8.3     The Information Agent shall use reasonable endeavours to review each Scheme Creditor Form other than Blocked Scheme Creditor Forms, and all Custody Instructions (if applicable) promptly after receipt, against the records of the Clearing Systems (in respect of the Class A Noteholders and the Class C Noteholders) or the Company's books and records (in respect of the Class A Lenders and the Class C Scheme Creditors other than the Class C Noteholders), to assist the Scheme Administrators in determining each Scheme Claim. Notwithstanding the foregoing it is the sole responsibility of each Scheme Creditor to ensure that any Scheme Creditor Form submitted in respect of its Scheme Claim has been validly completed, including the Accession Code, if applicable, and that any Custody Instruction has been validly submitted via the Clearing Systems.

8.4     Where the Information Agent reasonably considers a Class A Noteholder or a Class C Noteholder to be a Sanctions-Affected Scheme Creditor, it shall promptly refer the relevant Scheme Creditor to the Company and the relevant Scheme Creditor shall be treated and administered as a Blocked Scheme Creditor or Sanctioned Scheme Creditor (as applicable) for the purposes of the Schemes.

9.      **ACCEPTANCE OF DOCUMENTATION**

9.1     Any Scheme Creditor Forms submitted, as applicable, shall be submitted in accordance with the instructions set out in the relevant Scheme Creditor Form and the Solicitation Packet.

9.2    Whether a Scheme Creditor Form has been validly completed shall be determined by the Scheme Administrators, based on information checked by the Information Agent against the records of the Clearing Systems (in respect of the Class A Noteholders and the Class C Noteholders) or the Company's books and records (in respect of the Class A Lenders and the Class C Scheme Creditors other than the Class C Noteholders), or reviewed by GLAS against the Company's books and records (in respect of Blocked Scheme Creditors), at their discretion, provided that, if the Scheme Administrators considers any such document not to have been validly completed, they shall promptly:

(a)    prepare a written statement of its reasons for that conclusion; and

(b)    send that written statement by email to the party that provided the relevant document.

9.3    Where a Scheme Creditor Form is considered not to have been validly completed, and the applicable Bar Date has not yet occurred at the time of such determination, the relevant Scheme Creditor may resubmit the Scheme Creditor Form. No Scheme Creditor Forms may be resubmitted after the applicable Bar Date and Clauses 10.4, 10.6, 10.9 and 10.11 (as applicable) shall then apply.

9.4    Except in respect of a determination made as a result of actual fraud, wilful default or wilful misconduct, none of the Scheme Administrators, the Information Agent or GLAS will be responsible for any loss or liability incurred by a Scheme Creditor as a result of any determination by the Scheme Administrators.

**10.    DEADLINES AND BAR DATES**

10.1    All Scheme Claims will be released on the Restructuring Effective Date, in accordance with the terms of the Schemes.

*Class A Scheme Creditors*

10.2    In addition to the documentation specified in Clause 10.3 below, a Class A Noteholder (other than a Sanctions-Affected Scheme Creditor) must ensure that its Account Holder submits a validly completed and executed Custody Instruction via the Clearing Systems prior to the submission of an Account Holder Letter and, in any event, before:

(a)    the Custody Instruction Deadline, in order to receive Scheme Consideration on the Restructuring Effective Date; or

(b)    the Holding Period Custody Instruction Deadline, in order to receive Scheme Consideration on the Final Distribution Date.

10.3    A Class A Scheme Creditor who is not a Sanctions-Affected Scheme Creditor must ensure that:

(a)    in respect of Class A Noteholders other than Sanctions-Affected Scheme Creditors, the following Scheme Creditor Forms are received by the Information Agent in relation to the Existing Notes held by that Class A Noteholder: (i) a validly completed and executed Account Holder Letter, (ii) Distribution Confirmation Deed, and (iii) Designated Recipient Form (if applicable); and

(b)    in respect of Class A Lenders, the following Scheme Creditor Forms are received by the Information Agent in relation to the Class A Private Loan: (i) a validly completed and executed Class A Private Lender Proxy Form, (ii) Distribution

51

Confirmation Deed, and (iii) Designated Recipient Form (if applicable), together with supporting evidence to establish the Scheme Claim of the relevant Class A Lender,

by:

(c)     the Class A Options Deadline, in order to be eligible to receive either Option 1 Scheme Consideration on the Final Distribution Date or Option 2 Scheme Consideration on the Restructuring Effective Date and on the Final Distribution Date and as described further in Part D (*Scheme Consideration*); or

(d)     the Class A Bar Date, in order to receive Option 1 Scheme Consideration on the Final Distribution Date.

10.4    Any Class A Scheme Creditor who is not a Sanctions-Affected Scheme Creditor that fails to comply with Clause 10.3 shall have its rights under this Hong Kong Scheme extinguished and shall not be entitled to receive Scheme Consideration under this Hong Kong Scheme.

10.5    Subject to Clauses 17 (*Initial Distribution to Holding Period Trustee*) and 19 (*Distribution to Successor Escrow Account for Blocked Scheme Creditors*) below, a Blocked Scheme Creditor that is a Class A Scheme Creditor must ensure that a validly completed and executed Blocked Scheme Creditor Form, together with supporting evidence, is received by the Company by:

(a)     the Class A Options Deadline, in order to be eligible to receive either Option 1 Scheme Consideration or Option 2 Scheme Consideration on the Final Distribution Date or the lifting of Applicable Sanctions, whichever is later; or

(b)     the Class A Bar Date, in order to receive Option 1 Scheme Consideration on the Final Distribution Date or the lifting of Applicable Sanctions, whichever is later.

10.6    Any Blocked Scheme Creditor that is a Class A Scheme Creditor that fails to comply with Clause 10.5 shall have its rights under this Hong Kong Scheme extinguished and shall not be entitled to receive the Scheme Consideration under this Hong Kong Scheme.

*Class C Scheme Creditors*

10.7    In addition to the documentation specified in Clause 10.8 below, a Class C Noteholder (other than a Sanctions-Affected Scheme Creditor) must ensure that its Account Holder submits a validly completed and executed Custody Instruction via the Clearing Systems prior to the submission of an Account Holder Letter and, in any event, before:

(a)     the Custody Instruction Deadline, in order to receive the Consent Fee (if applicable) on the Final Distribution Date (provided the other conditions to receive the Consent Fee described in the RSA are satisfied); or

(b)     the Holding Period Custody Instruction Deadline, in order to receive Scheme Consideration on the Final Distribution Date.

10.8    A Class C Scheme Creditor who is not a Sanctions-Affected Scheme Creditor must ensure that:

(a)     in respect of Class C Scheme Creditors other than Class C Noteholders, the following Scheme Creditor Forms are received by the Information Agent by the

Class C Bar Date in relation to the Class C Scheme Creditor's Class C Debts: (i) a validly completed and executed Class C Scheme Creditor Proxy Form, (ii) Distribution Confirmation Deed, and (iii) Designated Recipient Form (if applicable), together with supporting evidence to establish the Scheme Claim of the relevant Class C Scheme Creditor; or

(b) in respect of Class C Noteholders, the following Scheme Creditor Forms are received by the Information Agent by the Class C Bar Date in relation to the Class C Notes held by that Class C Noteholder: (i) a validly completed and executed Account Holder Letter, (ii) Distribution Confirmation Deed, and (iii) Designated Recipient Form (if applicable).

10.9 Any Class C Scheme Creditor who is not a Sanctions-Affected Scheme Creditor that fails to comply with Clauses 10.7 and 10.8 shall have its rights under this Hong Kong Scheme extinguished and shall not be entitled to receive the Scheme Consideration under this Hong Kong Scheme.

10.10 Subject to Clauses 17 (*Initial Distribution to Holding Period Trustee*) and 19 (*Distribution to Successor Escrow Account for Blocked Scheme Creditors*) below, a Blocked Scheme Creditor that is a Class C Scheme Creditor must ensure that a validly completed and executed Blocked Scheme Creditor Form, together with supporting evidence to establish the Scheme Claim of the relevant Blocked Scheme Creditor, is received by the Company by the Class C Bar Date in order to be entitled to receive Scheme Consideration.

10.11 Any Blocked Scheme Creditor that is a Class C Scheme Creditor that fails to comply with Clause 10.10 shall have its rights under this Hong Kong Scheme extinguished and shall not be entitled to receive the Scheme Consideration under this Hong Kong Scheme.

10.12 Sanctioned Scheme Creditors must contact the Company in writing pursuant to the notice details set out in Clause 41 (*Notice*) to bring its status as a Sanctioned Scheme Creditor to the attention of the Company on or before the Class A Options Deadline (if the Sanctioned Scheme Creditor is a Class A Scheme Creditor and wishes to elect Option 2 Scheme Consideration), the Class A Bar Date or the Class C Bar Date, as applicable. Any Sanctioned Scheme Creditor that fails to comply with this Clause 10.12 shall have its rights under this Hong Kong Scheme extinguished, including any right which it may have to receive Scheme Consideration or TJ Scheme Consideration under this Hong Kong Scheme.

**11. ASSIGNMENTS OR TRANSFERS OF SCHEME CLAIMS**

11.1 Subject to Clause 11.3 below, the Scheme Administrators shall not be under any obligation to recognise any sale, assignment or transfer of any Scheme Claim after the Entitlement Record Time for the purposes of determining the Entitlement of each Scheme Creditor (and/or their Designated Recipient, as applicable) under the Schemes. The Scheme Administrators may, in their sole discretion and subject to the production of such evidence as they may reasonably require and to any other terms and conditions which the Scheme Administrators may consider necessary or desirable, agree to recognise such assignment or transfer for the purposes of determining Entitlements to Scheme Consideration under this Hong Kong Scheme.

11.2 Any assignee or transferee of a Scheme Creditor so recognised by the Scheme Administrators shall be bound by the terms of this Hong Kong Scheme in the event that they become effective as if it were a Scheme Creditor and shall produce such evidence as the Scheme Administrators may reasonably require to confirm that it has agreed to be bound by the terms of this Hong Kong Scheme. None of the Existing Notes Trustee or the Existing Notes Paying and Transfer Agent and Registrar will be responsible for confirming

Class A Noteholders as at the Entitlement Record Time or for monitoring, acknowledging or processing any assignments that occur after the Entitlement Record Time.

11.3    Class C Scheme Creditors are not prevented by this Hong Kong Scheme from selling, assigning or transferring any Excluded Liability or Excluded Collateral after the Restructuring Effective Date. Where the Class C Notes are sold, assigned or transferred by a Class C Noteholder after the Restructuring Effective Date, the Class C Noteholder as at the Entitlement Record Time shall remain entitled to receive the Scheme Consideration pursuant to the terms of this Hong Kong Scheme (rather than the assignee, purchaser or transferee of the relevant Class C Notes). Notwithstanding the foregoing, any sold, assigned or transferred Excluded Liability or Excluded Collateral shall be disclosed to the Scheme Administrators and/or the Scheme Adjudicator (as applicable) in accordance with the terms of this Hong Kong Scheme, and shall be taken into account for the purpose of calculating the Assessed Value when determining the relevant Class C Scheme Creditor's Entitlement.

## PART D

## SCHEME CONSIDERATION

**12.      GENERAL PRINCIPLES**

*Calculation of Scheme Creditor's Entitlement*

12.1     Each Class A Scheme Creditor's Entitlement will be determined by the Scheme Administrators on a Full Accrued Claim Basis as set out in Clause 13.2.

12.2     Each Class C Scheme Creditor's Entitlement will be determined by the Scheme Administrators on a Deficiency Basis as set out in Clause 13.3.

*Election of Scheme Consideration*

12.3     As set out in Clause 14.2, subject to the terms of this Hong Kong Scheme, each Class A Scheme Creditor can elect to receive:

(a)      Option 1 Scheme Consideration comprising of A1 Notes; or

(b)      Option 2 Scheme Consideration comprising of A2 Notes only, A2 Package only, or, provided that the percentage of the Class A Scheme Creditor's Entitlement elected for each of the A2 Notes and the A2 Package shall be an integral multiple of 10%, a combination of the A2 Notes and A2 Package.

12.4     As set out in Clause 14.4, subject to the terms of the Schemes, each Class C Scheme Creditor can elect to receive:

(a)      Option 1 Scheme Consideration comprising of the C1 Notes; or

(b)      Option 2 Scheme Consideration comprising of C2 Notes only, C2 Package only, or, provided that the percentage of the Class C Scheme Creditor's Entitlement elected for each of the C2 Notes and the C2 Package shall be an integral multiple of 10%, a combination of the C2 Notes and C2 Package.

12.5     In the event there is an Undersubscription or Oversubscription of the A2 Package or the C2 Package, Scheme Creditors may not receive the Scheme Consideration they have elected to receive. The procedure for the re-allocation of the Scheme Consideration is set out in Clauses 16 (*Initial Distribution*) and 18 (*Final Distribution*).

*Composition of the A2 Package and C2 Package*

12.6     The maximum total amount of the New Instruments available for distribution under the A2 Package and C2 Package is in aggregate equal to the Total Package as set out in Clause 15.1 below. The minimum size of the A2 Package is the A2 Package Initial Portion and the maximum size is the A2 Package Adjusted Portion. The C2 Package available for distribution to Class C Scheme Creditors is the C2 Package Adjusted Portion.

12.7     The Total Package will initially be divided into the A2 Package Initial Portion and C2 Package Initial Portion based on the Accrued Claims Ratio between the respective amounts of all Class A Scheme Creditor's Entitlement and Class C Scheme Creditor's Entitlement, each of which shall be calculated on a Full Accrued Claim Basis as at the Entitlement Record Time.

55

12.8    The A2 Package Initial Portion will be distributed to the Class A Scheme Creditors (or Holding Period Trustee, as applicable) on the Restructuring Effective Date. Any A2 Package Initial Portion issued to the Holding Period Trustee on the Restructuring Effective Date in respect of Class A Scheme Creditors who are not Blocked Scheme Creditors shall be distributed to those Class A Scheme Creditors on the Final Distribution Date, in accordance with Clauses 16 (*Initial Distribution*) to 18 (*Final Distribution*).

12.9    The Company shall transfer the EVPS Shares and NEV Shares forming part of the Exchange Property and the Security for the New Instruments which are part of the C2 Package to the New Instruments Collateral Agent on the Restructuring Effective Date pending conclusion of the Valuation and Adjudication Procedure with respect to the Class C Debt as set out in Clause 16.10 below. Following the conclusion of the Valuation and Adjudication Procedure:

(a)    the adjusted portion calculated based on a Deficiency Basis, referred to as the C2 Package Adjusted Portion, will be issued and distributed to the Class C Scheme Creditors as set out in Clauses 18.10 to 18.12 below; and

(b)    the excess portion as a result of the adjustment from the Full Accrued Claim Basis to the Deficiency Basis, referred to as the C2 Package Unadmitted Portion, will be issued and distributed to the Class A Scheme Creditors who have originally elected to receive the A2 Package but were allocated Forced A2 Notes instead as set out in Clause 18.4 below, to the extent required to make such distribution.

### TJ Scheme Consideration

12.10    TJ Scheme Consideration will be distributed to the Class A Scheme Creditors and Class C Scheme Creditors (and, in respect of Blocked Scheme Creditors, the Holding Period Trustee or Successor Escrow Agent) who have validly elected by the applicable deadline pursuant to Clause 10 (*Deadlines and Bar Dates*) to receive the A2 Package and the C2 Package respectively, on a pro rata basis as set out in Clause 20 (*TJ Scheme Consideration*) below.

### Consent Fee

12.11    The Consent Fee will be paid to the Scheme Creditors that are Eligible Participating Creditors (or, in respect of Blocked Scheme Creditors, to the Holding Period Trustee or the Successor Escrow Agent) as set out in Clause 22 (*Consent Fee*) below on the Restructuring Effective Date (with respect to Class A Scheme Creditors who are Eligible Participating Creditors and have validly elected to receive the Option 2 Scheme Consideration only) and the Final Distribution Date (with respect to all other Scheme Creditors who are Eligible Participating Creditors).

### Valuation and Adjudication Procedure

12.12    As described in Clause 12.2, each Class C Scheme Creditor's Entitlement will be determined by the Scheme Administrators on a Deficiency Basis. The Deficiency Basis amount shall be first determined through the Valuation Procedure, as set out in Clause 38 (*Valuation Procedure*) below.

12.13    Any disagreement regarding the calculation or determination of any Class C Scheme Creditor's Entitlement shall be, following the Consultation Period, be resolved by the Adjudication Procedure, as set out in Clause 40 (*Adjudication Procedure*) below.

*Distribution Dates*

12.14 The Scheme Consideration shall be distributed to the Scheme Creditors, the Holding Period Trustee or the Successor Escrow Agent (as applicable) on the Restructuring Effective Date, Final Distribution Date and the Interim Distribution Date (if applicable) as set out in Clauses 16 (*Initial Distribution*), 18(*Final Distribution*) and 21 (*Interim Distribution*) below.

**13.     CALCULATION OF A SCHEME CREDITOR'S ENTITLEMENT**

13.1 Each Scheme Creditor will be entitled to receive (or have the Holding Period Trustee or the Successor Escrow Agent receive on its behalf, if applicable) Scheme Consideration which is equal to the value of its "**Entitlement**".

13.2 A Class A Scheme Creditor's Entitlement shall be calculated by the Scheme Administrators on a "**Full Accrued Claim Basis**" in accordance with the formula set out below:

$$\text{"Full Accrued Claim Basis"} = A + B$$

where:

**A** =   the outstanding principal amount or, in the case of a put option or repurchase obligation, the price amount, of the Scheme Creditor's Scheme Claims at the Entitlement Record Time, as determined by the Company, in consultation with the Scheme Administrators.

**B** =   all accrued but unpaid interest on such Scheme Claims up to (but excluding) the Reference Date, as determined by the Company, in consultation with the Scheme Administrators.

13.3 A Class C Scheme Creditor's Entitlement shall be calculated by the Scheme Administrators on a Full Accrued Claim Basis for the purpose of determining the allocation of the Total Package between the A2 Package Initial Portion and the C2 Package Initial Portion, or on a "**Deficiency Basis**" for the purpose of determining the entitlement of a Class C Scheme Creditor to Scheme Consideration in accordance with the formula set out below:

$$\text{"Deficiency Basis"} = A - (B + C)$$

where:

**A** =   the value of the Scheme Creditor's Scheme Claims on a Full Accrued Claim Basis, as determined by the Scheme Administrators or the Scheme Adjudicator (as applicable).

**B** =   the Assessed Value of any Excluded Liabilities and Excluded Collateral, as determined by the Scheme Administrators or the Scheme Adjudicator (as applicable) in accordance with the Valuation and Adjudication Procedure set out in Clauses 38 (*Valuation Procedure*) and 40 (*Adjudication Procedure*).

**C** =   in respect of a put option and/or repurchase obligation, the Assessed Value of any securities retained by the put option holder and/or the creditor of the repurchase obligation, to which the put option and/or the repurchase obligation relates, as determined by the Scheme Administrators or the Scheme Adjudicator (as applicable) in accordance with the Valuation and Adjudication

57

Procedure set out in Clauses 38 (*Valuation Procedure*) and 40 (*Adjudication Procedure*).

13.4    The value of a Scheme Creditor's Scheme Claims as at the Entitlement Record Time shall be determined by the Scheme Administrators in accordance with Clause 8 (*Entitlement Record Time and Scheme Claims*).

13.5    The determination by the Scheme Administrators or the Scheme Adjudicator (as applicable) of each Class C Scheme Creditor's Entitlement will take place after the sanction of the Schemes by way of the Valuation and Adjudication Procedure set out in Clauses 38 (*Valuation Procedure*) and 40 (*Adjudication Procedure*) below. All Class C Scheme Creditors' Entitlements will be valued as at the Entitlement Record Time, irrespective of when their Distribution Confirmation Deeds are submitted.

13.6    For the avoidance of doubt, (i) the Existing Notes Trustee and the Existing Notes Depositary in respect of the Existing Notes; (ii) the Dongpo Notes Trustee and Agents in respect of the Dongpo Notes; (iii) the Lake Notes Trustee and Agent in respect of the Lake Notes; and (iv) the Existing Agents in respect of the applicable Class C Debts, shall not be entitled to vote at the Scheme Meetings (to avoid double counting) or receive any Scheme Consideration, unless otherwise agreed by the Company.

**14.    SCHEME CONSIDERATION OPTIONS**

14.1    Subject to Clause 10 (*Deadlines and Bar Dates*), each Scheme Creditor is entitled to elect between two options in respect of its Scheme Consideration. Such elections shall be made within an Account Holder Letter (for Class A Noteholders or Class C Noteholders, other than Sanctions-Affected Scheme Creditors), Class A Private Lender Proxy Form (for Class A Lenders), Class C Scheme Creditor Proxy Form (for Class C Scheme Creditors, other than Class C Noteholders), or Blocked Scheme Creditor Form (for Blocked Scheme Creditors). The election made by a Scheme Creditor is subject to the adjustment and reallocation process, as set out in Clauses 16 (*Initial Distribution*) and 18(*Final Distribution*).

14.2    Each Class A Scheme Creditor is entitled to elect:

(a)    Option 1 Scheme Consideration which is comprised of A1 Notes; and

(b)    Option 2 Scheme Consideration which is comprised of:

(i)    A2 Notes only;

(ii)    A2 Package only; or

(iii)    provided that the percentage of the Class A Scheme Creditor's Entitlement elected for each of the A2 Notes and the A2 Package shall be an integral multiple of 10%, any combination of the A2 Notes and the A2 Package.

14.3    Class A Scheme Creditors who do not submit the required validly completed and executed Scheme Creditor Forms by the Class A Options Deadline (but do submit such validly completed and executed Scheme Creditor Forms by the Class A Bar Date) shall only be eligible to receive Option 1 Scheme Consideration, as set out in Clause 10 (*Deadlines and Bar Dates*).

14.4    Each Class C Scheme Creditor is entitled to elect:

(a)    Option 1 Scheme Consideration which is comprised of C1 Notes; and

(b)    Option 2 Scheme Consideration which is comprised of:

(i)    C2 Notes only;

(ii)    C2 Package only; or

(iii)    provided that the percentage of the Class C Scheme Creditor's Entitlement elected for each of the C2 Notes and the C2 Package shall be an integral multiple of 10%, any combination of the C2 Notes and the C2 Package.

14.5    In the event where there is an Undersubscription or Oversubscription of the A2 Package Initial Portion, A2 Package Adjusted Portion or C2 Package Adjusted Portion (as applicable), Scheme Creditors may not receive the Scheme Consideration they elected to receive. The adjustment and reallocation process for the allocation of the Scheme Consideration is set out in Clauses 16 (*Initial Distribution*) and 18 (*Final Distribution*).

14.6    Scheme Creditors who do not submit the required Scheme Creditor Forms by the Class A Bar Date or the Class C Bar Date (as applicable) shall have their rights under this Hong Kong Scheme extinguished and shall not be entitled to receive Scheme Consideration under this Hong Kong Scheme, as set out in Clause 10 (*Deadlines and Bar Dates*).

## 15.    TOTAL PACKAGE, A2 PACKAGE AND THE C2 PACKAGE

### *Total Package*

15.1    Subject to Clauses 15.2 and 15.3 below, the "**Total Package**" means the A2 Package and the C2 Package which have a combined value of approximately US$8,132,000,000 and is comprised of:

(a)    HK$3,252,524,460 (equivalent to approximately US$418,000,000) in aggregate principal amount of CEG MCBs;

(b)    HK$5,363,567,110 (equivalent to approximately US$689,000,000) in aggregate principal amount of EVPS MEBs;

(c)    HK$24,310,300,515 (equivalent to approximately US$3,125,000,000) in aggregate principal amount of NEV MEBs;

(d)    US$1,400,000,000 in aggregate principal amount of EVPS SLNs, in respect of which:

(i)    US$1,100,000,000 in aggregate principal amount of the A2 EVPS SLNs will be made available for distribution to Class A Scheme Creditors and form part of the A2 Package Initial Portion; and

(ii)    US$300,000,000 in aggregate principal amount of the C2 EVPS SLNs will be made available for distribution to Class C Scheme Creditors (and, subject to the Entitlement of Class C Scheme Creditors, to Class A Scheme Creditors) and form part of the C2 Package Initial Portion; and

(e)    US$2,500,000,000 in aggregate principal amount of the NEV SLNs, in respect of which:

    (i)    US$1,350,000,000 in aggregate principal amount of the A2 NEV SLNs; and

    (ii)    US$1,150,000,000 in aggregate principal amount of the C2 NEV SLNs will be made available for distribution to Class C Scheme Creditors (and, subject to the Entitlement of Class C Scheme Creditors, to Class A Scheme Creditors) and form part of the C2 Package Initial Portion.

15.2    The aggregate principal amount of the NEV MEBs which shall form part of the Total Package is subject to adjustment by the Company, in consultation with the Scheme Administrators, in the event the Shareholder Loans are converted prior to 14 August 2023. The aggregate principal amount of HK$24,310,300,515 (equivalent to approximately US$3,125,000,000) in aggregate principal amount of NEV MEBs as set out in Clause 15.1 shall be issued in the event the Shareholder Loans are converted into NEV Shares at an issue price of HK$3.84 per share on 14 August 2023. If the conversion takes place at any other date, the aggregate principal amount of NEV MEBs shall be adjusted by the Company, in consultation with the Scheme Administrators, based on the date of the conversion of the Shareholder Loans in accordance with the formula set out below:

$$P = (A - B) \times C$$

where:

    **P =**    The aggregate principal amount of the NEV MEBs which form part of the Total Package.

    **A =**    The aggregate issued NEV Shares beneficially owned (whether directly or through one or more Subsidiaries) by the Company, the Chairman and Xin Xin (BVI) Limited (including the NEV Shares issued with respect to the conversion of the Shareholder Loans) as of the Restructuring Effective Date.

    **B =**    30% of the aggregate issued NEV Shares, in respect of existing issued NEV Shares as at the date of the Explanatory Statement plus any NEV Shares issued as a result of the conversion of the Shareholder Loans, as of the Restructuring Effective Date.

    **C =**    HK$3.84.

15.3    All the principal amounts set out at Clause 15.1 (and accordingly, any principal amount of New Instruments forming part of the Total Package derived from such principal amounts), assumes (a) the conversion of the Shareholder Loans into NEV Shares will take place on 14 August 2023; (b) a Restructuring Effective Date of 1 October 2023 and (c) the number of Shares, EVPS Shares and NEV Shares and the numbers so derived from such number of shares are based on the date of the Explanatory Statement.

15.4    For the purposes of calculating the allocation of any New Instruments to Scheme Creditors which are not denominated in USD, the Company shall convert any Entitlement that is in:

(a)    US$ to HK$ at an exchange rate of US$1 to HK$7.7800; and

(b)    US$ to RMB at an exchange rate of US$1 to RMB7.1102.

60

*A2 Package*

15.5    The A2 Package comprises of:

(a)    A2 Package Initial Portion which will form part of the Initial Distribution on the Restructuring Effective Date; and

(b)    C2 Package Unadmitted Portion (if any) which will become part of the A2 Package Adjusted Portion and distributed on the Final Distribution Date.

*Calculation of the A2 Package Initial Portion*

15.6    The "**A2 Package Initial Portion**" shall be comprised of:

(a)    CEG MCBs in aggregate principal amount equal to A2 Accrued Claims Ratio multiplied by HK$3,252,524,4610;

(b)    EVPS MEBs in aggregate principal amount equal to:

(i)    HK$2,681,783,555; *plus*

(ii)    A2 Accrued Claims Ratio multiplied by HK$2,681,783,555;

(c)    subject to Clause 15.8 below, NEV MEBs in aggregate principal amount equal to A2 Accrued Claims Ratio multiplied by HK$24,315,300,515;

(d)    A2 EVPS SLNs in an aggregate principal amount of US$1,100,000,000; and

(e)    A2 NEV SLNs in an aggregate principal amount of US$1,350,000,000.

15.7    The "**A2 Accrued Claims Ratio**" shall be calculated in accordance with the following formula:

$$\text{"\textbf{A2 Accrued Claims Ratio}"} \quad = \quad \frac{\textit{Class A Scheme Creditor's Full Accrued Claims}}{\textit{Total Scheme Creditor Full Accrued Claims}}$$

15.8    The aggregate principal amount of the NEV MEBs which shall form part of the A2 Package Initial Portion is subject to adjustment by the Company, in consultation with the Scheme Administrators, in the event the Shareholder Loans are converted prior to 14 August 2023. In the event the conversion of the Shareholder Loans into NEV Shares does not take place on 14 August 2023, the A2 Package Initial Portion shall be comprised of NEV MEBs in aggregate principal amount equal to A2 Accrued Claims Ratio multiplied by the total aggregate principal amount of NEV MEBs which form part of the Total Package, calculated and adjusted by the Company, in consultation with the Scheme Administrators, in accordance with Clause 15.2 above.

*Calculation of the A2 Package Adjusted Portion and C2 Package Unadmitted Portion*

15.9    The "**A2 Package Adjusted Portion**" means (i) the A2 Package Initial Portion *plus* (ii) the C2 Package Unadmitted Portion.

15.10    The "**C2 Package Unadmitted Portion**" means (i) the C2 Package Initial Portion *minus* (ii) the C2 Package Adjusted Portion.

*C2 Package*

15.11    The C2 Package shall comprise of:

(a)    C2 Package Initial Portion, which represents the maximum possible size of the C2 Package; or

(b)    if there is any C2 Package Unadmitted Portion, the C2 Package Adjusted Portion, which will form part of the Final Distribution on the Final Distribution Date.

*Calculation of C2 Package Initial Portion*

15.12    The "**C2 Package Initial Portion**" shall be comprised of:

(a)    CEG MCBs in aggregate principal amount equal to C2 Accrued Claims Ratio multiplied by HK$3,253,000,000;

(b)    EVPS MEBs in aggregate principal amount equal to C2 Accrued Claims Ratio multiplied by HK$2,682,000,000;

(c)    subject to Clause 15.14 below, NEV MEBs in aggregate principal amount equal to C2 Accrued Claims Ratio multiplied by HK$24,311,000,000;

(d)    C2 EVPS SLNs in an aggregate principal amount of US$300,000,000; and

(e)    C2 NEV SLNs in an aggregate principal amount of US$1,150,000,000,

in each case, in addition to and including any accrued interest capitalised and/or paid in cash during the period between the Reference Date and the Interim Distribution Date and/or the Final Distribution Date, as applicable.

15.13    The "**C2 Accrued Claims Ratio**" shall be calculated in accordance with the following formula:

$$\text{"C2 Accrued Claims Ratio"} = \frac{\textit{Class C Scheme Creditor's Full Accrued Claims}}{\textit{Total Scheme Creditor Full Accrued Claims}}$$

15.14    The aggregate principal amount of the NEV MEBs which shall form part of the C2 Package Initial Portion is subject to adjustment by the Company, in consultation with the Scheme Administrators, in the event the Shareholder Loans are converted prior to 14 August 2023. In the event the Shareholder Loans into NEV Shares does not take place on 14 August 2023, the C2 Package Initial Portion shall be comprised of NEV MEBs in aggregate principal amount equal to C2 Accrued Claims Ratio multiplied by the total aggregate principal amount of NEV MEBs which form part of the Total Package, calculated and adjusted by the Company, in consultation with the Scheme Administrators, in accordance with Clause 15.2 above.

*Calculation of C2 Package Adjusted Portion*

15.15    The "**C2 Package Adjusted Portion**" shall be calculated in accordance with the following formula:

"**C2 Package Adjusted Portion**"          $=$          $\dfrac{A}{B}$          $\times$          $C$

where:

       $A$ =          the total Entitlement of Class C Scheme Creditors, calculated on a Deficiency Basis in accordance with Clause 13.3, as determined by the Scheme Administrators and the Scheme Adjudicators.

       $B$ =          the total Scheme Claims of Class C Scheme Creditors, calculated by the Scheme Administrators on a Full Accrued Claim Basis.

       $C$ =          the C2 Package Initial Portion, as determined pursuant to Clause 15.12.

*Allocation of the A2 Package and the C2 Package*

15.16    The Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the allocation of the New Instruments (including the relevant tranches thereof) comprising the A2 Package to the Scheme Creditors entitled to receive the A2 Package (each, an "**A2 Package Recipient**") on a pro rata basis such that each A2 Package Recipient will receive an equal amount of CEG MCBs, EVPS MEBs, NEV MEBs, A2 EVPS SLNs and A2 NEV SLNs for each dollar of Entitlement converted into the A2 Package as compared to such other A2 Package Recipient.

15.17    The Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the allocation of the New Instruments (including the relevant tranches thereof) comprising the C2 Package to the Scheme Creditors entitled to receive the C2 Package (each, a "**C2 Package Recipient**") on a pro rata basis such that each C2 Package Recipient will receive an equal amount of CEG MCBs, EVPS MEBs, NEV MEBs, C2 EVPS SLNs and C2 NEV SLNs for each dollar of Entitlement converted into the C2 Package as compared to such other C2 Package Recipient.

16.    **INITIAL DISTRIBUTION**

***General Provisions***

16.1    The Initial Distribution is comprised of the A2 Package Initial Portion and the A2 Notes, each of which will be issued by the Company on the Restructuring Effective Date.

16.2    On the Restructuring Effective Date:

    (a)    the Company shall make the Initial Distribution to Class A Scheme Creditors who are not Sanctions-Affected Scheme Creditors where such Class A Scheme Creditors have submitted the required Scheme Creditor Forms by the Class A Options Deadline pursuant to Clause 10 (*Deadlines and Bar Dates*);

    (b)    in relation to Blocked Scheme Creditors who are Class A Scheme Creditors and have submitted the required Scheme Creditor Forms by the Class A Options Deadline pursuant to Clause 10 (*Deadlines and Bar Dates*), the Company shall make the Initial Distribution to the Holding Period Trustee to which such Blocked Scheme

63

Creditors are entitled, to be held on trust under the terms of the Holding Period Trust Deed;

(c)    where an Undersubscription of the A2 Package Initial Portion occurs as described in Clause 16.4(c), the Company shall distribute the remaining Undersubscribed Portion of the A2 Package Initial Portion as described therein to the Holding Period Trustee; and

(d)    the Company shall issue such New Instruments as are required to make the Initial Distribution set out in this clause in accordance with the terms of the New Instruments Documents in global registered form in the name of the New Instruments Depositary or its nominee.

***Initial Distribution of the A2 Package Initial Portion on the Restructuring Effective Date***

16.3    If the combined elections of Class A Scheme Creditors for the A2 Package are equal to the A2 Package Initial Portion (such that there is neither an Undersubscription nor an Oversubscription of the A2 Package Initial Portion), then on the Restructuring Effective Date Class A Scheme Creditors who elected to receive the A2 Package as part of their Scheme Consideration shall receive the A2 Package in a principal amount equal to their converted Entitlement on a dollar-for-dollar basis in accordance with their election.

16.4    If the combined elections of Class A Scheme Creditors result in an Undersubscription of the A2 Package Initial Portion, then on the Restructuring Effective Date:

(a)    Class A Scheme Creditors who elected to receive the A2 Package as part of their Scheme Consideration shall receive the A2 Package on a dollar-for-dollar basis in accordance with their election;

(b)    any Undersubscribed Portion of the A2 Package Initial Portion after the allocation in Clause 16.4(a) shall be allocated to the Class A Scheme Creditors who elected to receive A2 Notes on a pro rata basis and in exchange of their Entitlements on a dollar-for-dollar basis; and

(c)    if the A2 Package Initial Portion is still Undersubscribed after the allocation in Clause 16.4(b) above, any such remaining Undersubscribed Portion of the A2 Package Initial Portion shall be issued to the Holding Period Trustee, for distribution on the Final Distribution Date to Class A Scheme Creditors who are eligible to receive A1 Notes on a pro rata basis and in exchange of their Entitlements on a dollar-for-dollar basis,

in all cases, where the amount of any converted Entitlement shall be exchanged on a dollar-for-dollar basis for an equal amount of Scheme Consideration (such that, where a Class A Scheme Creditor receives Scheme Consideration on the Restructuring Effective Date in respect of part of its Entitlement, the value of the Scheme Consideration received shall be equal to the value of the portion of Entitlement in respect of which that Scheme Consideration has been paid).

16.5    If the combined elections of Class A Scheme Creditors result in an Oversubscription of the A2 Package Initial Portion, then on the Restructuring Effective Date:

(a)    A2 Package Initial Portion shall be distributed to Class A Scheme Creditors who elected to receive the A2 Package as part of their Scheme Consideration on a pro rata basis, where the amount of any Entitlement which is to be converted to A2 Package shall be exchanged on a dollar-for-dollar basis for an equal amount of Scheme Consideration; and

(b) Scheme Consideration in the form of the Forced A2 Notes shall be issued and distributed to such Class A Scheme Creditors in respect of the Oversubscribed Portion of the A2 Package Initial Portion of such Class A Scheme Creditors' Entitlement on a dollar-for-dollar basis.

16.6 In respect of any Class A Scheme Creditor who is a Blocked Scheme Creditor, its Initial Distribution of the A2 Package Initial Portion and/or Forced A2 Notes (as applicable) will be issued to the Holding Period Trustee on the Restructuring Effective Date.

### *Initial Distribution of A2 Notes on the Restructuring Effective Date*

16.7 On the Restructuring Effective Date, the Company shall issue A2 Notes to (each of the following, being an "**A2 Notes Recipient**"):

(a) subject to any adjustment required in accordance with Clause 16.4(b) above where there is an Undersubscription of the A2 Package Initial Portion, Class A Scheme Creditors who have validly elected to convert their Entitlement into A2 Notes on a dollar-for-dollar basis; and

(b) Class A Scheme Creditors who have validly elected to convert their Entitlement into the A2 Package in the event of an Oversubscription of the A2 Package Initial Portion and to the extent of the Oversubscribed Portion of the A2 Package Initial Portion in accordance with Clause 16.5 above.

16.8 The Company, in consultation with the Information Agent and/or the Scheme Administrators, shall calculate the issuance and distribution of the A2 Notes on the Restructuring Effective Date in the following manner:

(a) *first*, the Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the aggregate principal amounts of the tranche A, tranche B, tranche C and, if any, tranche D of the A2 Notes that will be issued on the Restructuring Effective Date in accordance with the total amount of Entitlements of the A2 Notes Recipient as set out below:

(i) the aggregate principal amount of tranche A shall be up to US$500 million;

(ii) the aggregate principal amount of tranche B shall be up to US$650 million;

(iii) the aggregate principal amount of tranche C shall be up to US$3,800 million; and

(iv) the aggregate principal amount of tranche D if any shall be the total amount of the Entitlements of the A2 Notes Recipients less the aggregate principal amounts of tranche A, tranche B and tranche C;

(b) *second*, the Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the allocation of tranche A, tranche B, tranche C and, if any, tranche D of the A2 Notes that will be issued and distributed to A2 Notes Recipients on a pro rata basis and allocation will be made in sequential order by maturity date. An A2 Notes Recipient will receive an equal amount of tranche A, tranche B, tranche C and, if any, tranche D of A2 Notes in respect of each dollar of Entitlement converted to A2 Notes as compared to such other A2 Notes Recipient; and

(c) *third*, the Company, in consultation with the Information Agent and/or the Scheme Administrators, shall allocate the appropriate A2 Notes to each A2 Notes Recipient:

65

> (i) A2 Notes allocated by the Company, in consultation with the Information Agent and/or the Scheme Administrators, to Class A Scheme Creditors referred to in Clause 16.7(a) shall be the Plain A2 Notes; and
>
> (ii) A2 Notes allocated by the Company, in consultation with the Information Agent and/or the Scheme Administrators, to Class A Scheme Creditors referred to in Clause 16.7(b) shall be the Forced A2 Notes.

16.9   In respect of any Class A Scheme Creditor who is a Blocked Scheme Creditor, its A2 Notes (as applicable) will be issued to the Holding Period Trustee on the Restructuring Effective Date.

### *Treatment of NEV Shares and EVPS Shares for C2 Package New Instruments*

16.10   On the Restructuring Effective Date:

> (a) the Exchange Property for the NEV MEBs and EVPS MEBs shall be placed into the securities accounts established pursuant to the terms of the NEV MEBs Trust Deed and the EVPS MEBs Trust Deed (each of which shall be in the Agreed Form) respectively;
>
> (b) share certificate of 749,465,275 EVPS Shares which will form part of the Security for the C2 EVPS SLNs shall be delivered to the New Instruments Collateral Agent to be held in custody pending the issuance of the C2 EVPS SLNs on the Final Distribution Date; and
>
> (c) (x) 1,503,503,540 NEV Shares; and (y) the NEV Shares with respect to the NEV Custody Account Transfer, each of which will form part of the custody arrangement for the C2 NEV SLNs shall be held in a securities account in the name of the Company or an offshore subsidiary of the Company, the withdrawal of which will be restricted other than for the issuance of the C2 NEV SLNs on the Final Distribution Date.

## 17.   INITIAL DISTRIBUTION TO HOLDING PERIOD TRUSTEE

17.1   The following New Instruments will be issued to and held by the Holding Period Trustee on trust under the Holding Period Trust Deed for the benefit of such Scheme Creditors during the Holding Period:

> (a) any initial distribution of A2 Package, A2 Notes and Consent Fee that Blocked Scheme Creditors (who are Eligible Participating Creditors) are entitled to;
>
> (b) any remaining Undersubscribed Portion of the A2 Package Initial Portion in relation to the Undersubscription referred to in Clause 16.4(c); and
>
> (c) TJ Scheme Consideration which does not form part of the partial distribution of such consideration to Class A Scheme Creditors who elected to receive A2 Package pursuant to Clause 20.3 payable to Scheme Creditors who elected to receive A2 Package or C2 Package (as applicable).

17.2   If a Scheme Creditor (who is not a Sanctions-Affected Scheme Creditor) complies with Clause 10 (*Deadlines and Bar Dates*) and any requirements specified in the Holding Period Trust Deed and the Company is satisfied that such Scheme Creditor is entitled to the TJ Scheme Consideration and any Consent Fee (if applicable), the Holding Period Trustee will issue to such Scheme Creditor or its Designated Recipient its portion of the TJ Scheme Consideration and any Consent Fee (if applicable) to which it may be entitled pursuant to Part D (*Scheme Consideration*) of this Hong Kong Scheme.

17.3    If a Blocked Scheme Creditor who has complied with Clause 10 (*Deadlines and Bar Dates*) also complies with any requirements specified in the Holding Period Trust Deed and the Company is satisfied that such Blocked Scheme Creditor is entitled to the Scheme Consideration, and the Applicable Sanctions have been lifted in respect of Blocked Scheme Creditors, the Holding Period Trustee will issue to such Blocked Scheme Creditor or its Designated Recipient (if applicable) its portion of the Blocked Assets to which it may be entitled pursuant to Part D (*Scheme Consideration*) of this Hong Kong Scheme, on the Final Distribution Date.

17.4    The Company may, in its sole discretion in consultation with the Scheme Administrators, issue any Scheme Consideration to which Scheme Creditors may be entitled to the Holding Period Trustee to hold on trust under the Holding Period Trust Deed for the benefit of the relevant Scheme Creditors during the Holding Period.

17.5    For the avoidance of doubt, each of the Schemes will contain the same obligation settle the Scheme Consideration on trust and the performance of that obligation will discharge the obligation under both Schemes.

## 18.    FINAL DISTRIBUTION

### *General Provisions*

18.1    On the Final Distribution Date:

(a)    the Company shall make the Final Distribution to Class A Scheme Creditors who are not Sanctions-Affected Scheme Creditors and Class C Scheme Creditors who are not Sanctions-Affected Scheme Creditors where such creditors have submitted the required Scheme Creditor Forms by the applicable deadline pursuant to Clause 10 (*Deadlines and Bar Dates*);

(b)    in relation to Blocked Scheme Creditors who have submitted the required Scheme Creditor Forms by the applicable deadline pursuant to Clause 10 (*Deadlines and Bar Dates*):

(i)    the Company shall make the Final Distribution to the Blocked Scheme Creditors where the Applicable Sanctions no longer prevent the payment of Scheme Consideration to such creditors; or

(ii)    where the Applicable Sanctions continue to prevent the payment of Scheme Consideration to Blocked Scheme Creditors, the Company shall make the Final Distribution to which Blocked Scheme Creditors are entitled to the Successor Escrow Agent, to be held under the terms of the Successor Escrow Agreement; and

(c)    to the extent that the required New Instruments have not been issued on the Restructuring Effective Date, the Company shall issue such New Instruments as are required to make the Final Distribution set out in this Clause 18 (*Final Distribution*) in accordance with the terms of the New Instruments Documents in global registered form in the name of the New Instruments Depositary or its nominee.

18.2    The Holding Period Trustee, on behalf of the Company, may also distribute TJ Scheme Consideration on the Final Distribution Date to certain Class A Scheme Creditors and Class C Scheme Creditors pursuant to Clause 20 (*TJ Scheme Consideration*).

***Final Distribution of any remaining A2 Package Initial Portion (if applicable)***

18.3    On the Final Distribution Date, where the circumstances in Clause 16.4(c) apply, any remaining Undersubscribed A2 Package Initial Portion shall be released by the Holding Period Trustee and allocated by the Company, in consultation with the Information Agent and/or the Scheme Administrators, to the Class A Scheme Creditors who have validly elected (or were deemed to have elected) to receive A1 Notes on a pro rata basis and in exchange for its Entitlement on a dollar-for-dollar basis.

***Final Distribution of C2 Package Unadmitted Portion***

18.4    On the Final Distribution Date, the Company shall redeem, exchange and/or convert the amount of Forced A2 Notes equivalent to the amount up to and including the C2 Package Unadmitted Portion (if any) starting from the tranche of the Forced A2 Notes with the longest maturity and in reverse chronological order and on a dollar-for-dollar basis (with any adjustment required (if any) to take into account any accrued and unpaid interest under the Forced A2 Notes).

18.5    In respect of any underlying shares for the unutilized C2 Package Unadmitted Portion, the Company shall transfer the underlying EVPS Shares and NEV Shares to the Collateral Agent of the A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs, C2 NEV SLNs (as applicable) as follows:

(a)    in respect of EVPS MEBs, add the unutilized underlying shares to the underlying shares of the A2 EVPS SLNs and the C2 EVPS SLNs on a pro rata basis;

(b)    in respect of NEV MEBs, add the unutilized underlying shares to the underlying shares of the A2 NEV SLNs and the C2 NEV SLNs on a pro rata basis;

(c)    in respect of C2 EVPS SLNs, add the unutilized underlying shares to the underlying shares of the A2 EVPS SLNs; and

(d)    in respect of C2 NEV SLNs, add the unutilized underlying shares to the underlying shares of the A2 NEV SLNs.

***Final Distribution of A1 Notes***

18.6    On the Final Distribution Date, the Company shall issue A1 Notes to Class A Scheme Creditors who have validly elected (or are deemed to have elected) to receive Option 1 Scheme Consideration to convert their Entitlement into the A1 Notes on a dollar-for-dollar basis if and to the extent their Entitlements have not been converted to the A2 Package pursuant to Clause 18.3 ("**A1 Notes Recipients**").

18.7    The Company, in consultation with the Information Agent and/or the Scheme Administrators, shall calculate the issuance and distribution of the A1 Notes on the Final Distribution Date in the following manner:

(a)    *first*, the Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the aggregate principal amount of the tranche A, tranche B and, if any, tranche C of the A1 Notes that will be issued on the Restructuring Effective Date in accordance with the total amount of Entitlements of the A1 Notes Recipient as set out below:

(i)    the aggregate principal amount of tranche A shall be the Option A1 Proportion multiplied by US$3,000 million;

(ii)     the aggregate principal amount of tranche B shall be the Option A1 Proportion multiplied by US$3,000 million; and

(iii)    the Entitlements of the A1 Notes Recipients to be converted into A1 Notes less the aggregate principal amounts of tranche A and tranche B; and

(b)     *second*, the Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the allocation of tranche A, tranche B, and, if any, tranche C of the A1 Notes that will be issued and distributed to A1 Notes Recipients on a pro rata basis and allocation will be made in sequential order by maturity date. Each A1 Notes Recipient will receive an equal amount of tranche A, tranche B, and, if any, tranche C of A1 Notes in respect of each dollar of Entitlement converted to A1 Notes as compared to such other A1 Notes Recipient.

### Final Distribution of C1 Notes

18.8    On the Final Distribution Date, the Company shall issue C1 Notes to Class C Scheme Creditors who have validly elected to receive Option 1 Scheme Consideration to convert their Entitlement into the C1 Notes on a dollar-for-dollar basis if and to the extent their Entitlements have not been converted to C2 Package pursuant to Clause 18.11(c) ("**C1 Notes Recipients**").

18.9    The Company, in consultation with the Information Agent and/or the Scheme Administrators, shall calculate the issuance and distribution of the C1 Notes on the Final Distribution Date in the following manner:

(a)     *first*, the Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the aggregate principal amount of the tranche A, tranche B and, if any, tranche C of the C1 Notes that will be issued on the Restructuring Effective Date in accordance with the total amount of Entitlements of the C1 Notes Recipient as set out below:

(i)      the aggregate principal amount of tranche A shall be the Option C1 Proportion multiplied by US$3,000 million;

(ii)     the aggregate principal amount of tranche B shall be the Option C1 Proportion multiplied by US$3,000 million; and

(iii)    the Entitlements of the C1 Notes Recipients to be converted into C1 Notes less the aggregate principal amounts of tranche A and tranche B; and

(b)     *second*, the Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the allocation of tranche A, tranche B, and, if any, tranche C of the C1 Notes that will be issued and distributed to C1 Notes Recipients on a pro rata basis and allocation will be made in sequential order by maturity date. Each C1 Notes Recipient will receive an equal amount of tranche A, tranche B, and, if any, tranche C of C1 Notes in respect of each dollar of Entitlement converted to C1 Notes as compared to such other C1 Notes Recipient.

### Final Distribution of C2 Package Adjusted Portion

18.10   If the combined elections of Class C Scheme Creditors for the C2 Package are equal to the C2 Package Adjusted Portion (such that there is neither an Undersubscription nor an Oversubscription of the C2 Package Adjusted Portion), then on the Final Distribution Date Class C Scheme Creditors who elected to receive the C2 Package as part of their Scheme

Consideration shall receive the C2 Package in a principal amount equal to their converted Entitlement on a dollar-for-dollar basis in accordance with their election.

18.11    If the combined elections of Class C Scheme Creditors result in an Undersubscription of the C2 Package Adjusted Portion, then on the Final Distribution Date:

    (a)    Class C Scheme Creditors who elected to receive the C2 Package as part of their Scheme Consideration shall receive the C2 Package on a dollar-for-dollar basis in accordance with their election;

    (b)    any Undersubscribed Portion of the C2 Package Adjusted Portion after the allocation in Clause 18.11(a) shall be allocated and distributed to the Class C Scheme Creditors who elected to receive C2 Notes on a pro rata basis and in exchange of their Entitlements on a dollar-for-dollar basis; and

    (c)    if the C2 Package Adjusted Portion is still Undersubscribed after the allocation in Clause 18.11(b) above, any such remaining Undersubscribed Portion of the C2 Package Adjusted Portion shall be allocated and distributed to the Class C Scheme Creditors who elected to receive C1 Notes on a pro rata basis and in exchange of their Entitlements on a dollar-for-dollar basis,

in all cases, where the amount of any converted Entitlement shall be exchanged on a dollar-for-dollar basis for an equal amount of Scheme Consideration (such that, where a Class C Scheme Creditor receives Scheme Consideration on the Final Distribution Date in respect of its Entitlement, the value of the Scheme Consideration received shall be equal to the value of the Entitlement in respect of which that Scheme Consideration has been paid).

18.12    If the combined elections of Class C Scheme Creditors result in an Oversubscription of the C2 Package Adjusted Portion, then:

    (a)    on the Final Distribution Date, the C2 Package Adjusted Portion shall be distributed to Class C Scheme Creditors who elected to receive the C2 Package as part of their Scheme Consideration on a pro rata basis, where the amount of any Entitlement which is to be converted to C2 Package shall be exchanged on a dollar-for-dollar basis for an equal amount of Scheme Consideration; and

    (b)    Scheme Consideration in the form of the C2 Notes shall be issued and distributed to such Class C Scheme Creditors in respect of the Oversubscribed Portion of such Class C Scheme Creditors' Entitlement on a dollar-for-dollar basis.

***Final Distribution of C2 Notes***

18.13    On the Final Distribution Date, the Company shall issue C2 Notes to (each of the following, being an "**C2 Notes Recipient**"):

    (a)    subject to any adjustment required in accordance with Clause 18.11(b) above where there is an Undersubscription of the C2 Package Adjusted Portion, Class C Scheme Creditors who have validly elected to convert their Entitlement into the C2 Notes on a dollar-for-dollar basis; and

    (b)    Class C Scheme Creditors who have validly elected to convert their Entitlement into the C2 Package in the event of an Oversubscription of the C2 Package Adjusted Portion and to the extent of the Oversubscribed Portion of the C2 Package Adjusted Portion in accordance with Clause 18.12(b) above.

18.14    The Company, in consultation with the Information Agent and/or the Scheme Administrators, shall calculate the issuance and distribution of the C2 Notes on the Final Distribution Date in the following manner:

(a)    *First*, the Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the aggregate principal amount of the tranche A, tranche B and, if any, tranche C of the C2 Notes that will be issued on the Final Distribution Date in accordance with the total amount of Entitlements of the C2 Notes Recipient as set out below:

(i)    the aggregate principal amount of tranche A shall be up to US$200 million;

(ii)    the aggregate principal amount of tranche B shall be up to US$2,740 million; and

(iii)    the aggregate principal amount of tranche C if any shall be the total amount of the Entitlements less the aggregate principal amounts of tranche A and tranche B; and

(b)    *second*, the Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the allocation of tranche A, tranche B, tranche C and, if any, tranche D of the A2 Notes that will be issued and distributed to C2 Notes Recipients on a pro rata basis and allocation will be made in sequential order by maturity date. Each C2 Notes Recipient will receive an equal amount of tranche A, tranche B and, if any, tranche C of A2 Notes in respect of each dollar of Entitlement converted to C2 Notes as compared to such other C2 Notes Recipient.

## 19.    DISTRIBUTION TO SUCCESSOR ESCROW ACCOUNT FOR BLOCKED SCHEME CREDITORS

19.1    Upon the expiration of the Holding Period, if any Applicable Sanctions are still in place in respect of any Blocked Scheme Creditors, the Company undertakes to:

(a)    appoint an agent (the "**Successor Escrow Agent**") to hold the entitlements to the Blocked Assets in the Successor Escrow Account for the Blocked Scheme Creditors who have complied with Clause 10 (*Deadlines and Bar Dates*) until the earlier of:

(i)    the expiry of the Perpetuity Period; or

(ii)    the lifting of Applicable Sanctions in respect of any Blocked Scheme Creditors,

with the Blocked Scheme Creditors being given a reasonable period of time thereafter to recover their Entitlement to the Blocked Assets in accordance with the terms of the Successor Escrow Agreement and the Schemes;

(b)    bring information relating to the Successor Escrow Account to the attention of the Blocked Scheme Creditors on, or immediately after, the expiration of the Holding Period on the Transaction Website and/or through other such public medium as the Company considers to be appropriate at that time; and

(c)    put in place a reasonable and fair process for Blocked Scheme Creditors to claim and recover their Entitlement to the Scheme Consideration of the Blocked Assets upon Applicable Sanctions no longer preventing the payment of such Scheme Consideration (including any Consent Fee (if applicable)) to Blocked Scheme Creditors (who are Eligible Participating Creditors) through a Successor Escrow Agreement.

71

19.2   Upon expiry of the Perpetuity Period, and subject to any action necessary to ensure compliance with Applicable Sanctions by the Company or the Successor Escrow Agent, any Scheme Consideration and any Consent Fee (if applicable) which remains unable to be paid to Blocked Scheme Creditors in compliance with Applicable Sanctions will be returned to the Company in accordance with the terms of the Escrow Account Agreement. The rights of Blocked Scheme Creditors under this Hong Kong Scheme shall be extinguished on the return of such Blocked Assets to the Company, including any rights of Blocked Scheme Creditors to payment of any Scheme Consideration, TJ Scheme Consideration, and any Consent Fee.

## 20.   TJ SCHEME CONSIDERATION

20.1   Any TJ Scheme Consideration received by the Company shall be distributed to Class A Scheme Creditors and Class C Scheme Creditors (or, in respect of Blocked Scheme Creditors, to the Holding Period Trustee or Successor Escrow Agent, as applicable) who have validly elected by the applicable deadline pursuant to Clause 10 (*Deadlines and Bar Dates*) to receive the A2 Package and the C2 Package respectively, on a pro rata basis, in accordance with this Clause 20 (*TJ Scheme Consideration*). No TJ Scheme Consideration shall be distributed to Scheme Creditors who are issued New Instruments which form part of the A2 Package or the C2 Package as part of their Scheme Consideration, but who have not validly elected by the applicable deadline to receive the A2 Package or the C2 Package (as applicable).

20.2   Any TJ Scheme Consideration distributed to Class A Scheme Creditors and Class C Scheme Creditors in accordance with this Clause shall be in addition to and not reduce the Entitlement of those Scheme Creditors.

20.3   Where the Company receives TJ Scheme Consideration prior to the completion of the Valuation and Adjudication Procedure set out in Clauses 38 (*Valuation Procedure*) and 40 (*Adjudication Procedure*), the Company shall make a partial distribution of such TJ Scheme Consideration to Class A Scheme Creditors or, in respect of Blocked Scheme Creditors who are Class A Scheme Creditors, to the Holding Period Trustee, who have validly elected by the applicable deadline pursuant to Clause 10 (*Deadlines and Bar Dates*) to receive the A2 Package, calculated in accordance with the following formula, as applicable:

$$\text{Distribution of TJ Scheme Consideration to the relevant Class A Scheme Creditor} = A \times B \times \frac{C}{D}$$

where:

A =   the total amount of TJ Scheme Consideration received by the Company;

B =   the A2 Accrued Claims Ratio, as set out in Clause 15.7;

C =   the Entitlement of the relevant Class A Scheme Creditor who has validly elected to receive the A2 Package; and

D =   the aggregate amount of the Entitlements of all Class A Scheme Creditors who have validly elected to receive the A2 Package.

20.4   On the completion of the Valuation and Adjudication Procedure set out in Clauses 38 (*Valuation Procedure*) and 40 (*Adjudication Procedure*), the Company shall distribute the remaining TJ Scheme Consideration on the Final Distribution Date to Class A Scheme Creditors and Class C Scheme Creditors or, in respect of Blocked Scheme Creditors, to the Holding Period Trustee or the Successor Escrow Agent (as applicable), who have validly

elected by the applicable deadline pursuant to Clause 10 (*Deadlines and Bar Dates*) to receive the A2 Package and the C2 Package respectively, on a pro rata basis. The allocation of the TJ Scheme Consideration between the relevant Class A Scheme Creditors and Class C Scheme Creditors shall be determined as follows:

(a) the entitlement of the relevant Class C Scheme Creditors shall be calculated in accordance with the following formula:

$$\text{Distribution of TJ Scheme Consideration to the relevant Class C Scheme Creditor} = A \times B \times \frac{C}{D}$$

where:

A = the total amount of TJ Scheme Consideration received by the Company;

B = the C2 Package Adjusted Portion *divided by* the Total Package;

C = the Entitlement of the Class C Scheme Creditor who has validly elected to receive the C2 Package; and

D = the aggregate amount of the Entitlements of all Class C Scheme Creditors who have validly elected to receive the C2 Package; and

(b) any remaining TJ Scheme Consideration which is not allocated to the relevant Class C Scheme Creditors in accordance with Clause 20.4(a) shall be distributed to the relevant Class A Scheme Creditors (or the Holding Period Trustee or Successor Escrow Agent, as applicable) who elected to receive the A2 Package on a pro rata basis with respect to their Entitlements.

20.5 Where TJ Scheme Consideration is received by the Company after the Final Distribution Date, such TJ Scheme Consideration shall be distributed on a date to be designated by the Company within three months of the date of receipt of such TJ Scheme Consideration, to those Scheme Creditors who would have been eligible to receive such TJ Scheme Consideration pursuant to Clause(s) 20.3 and/or 20.4 if that TJ Scheme Consideration had been received by the Company prior to the Final Distribution Date.

## 21.    INTERIM DISTRIBUTION

21.1 Where the Final Distribution Date has not taken place within 295 calendar days after the Restructuring Effective Date, there will be an interim distribution of Scheme Consideration (including the redemption, exchange and/or conversion of the Forced A2 Notes into the C2 Package Unadmitted Portion in accordance with Clause 18.4 above) to Class A Scheme Creditors and Class C Scheme Creditors (the "**Interim Distribution**"), other than Sanctions-Affected Scheme Creditors, whose Entitlements have been determined, on the date which is 295 calendar days after the Restructuring Effective Date (the **"Interim Distribution Date"**).

21.2 The amount of the Interim Distribution provided by this Clause 21 (*Interim Distribution*) shall be made to the same Persons and be of the same size as if it were the Final Distribution determined pursuant to Clauses 18 (*Final Distribution*) and 20 (*TJ Scheme Consideration*), save that the Company shall reserve a maximum amount of Scheme Consideration and TJ Scheme Consideration for those Class C Scheme Creditors whose Entitlements are not fully determined (as if the Entitlement of such Class C Scheme Creditors were calculated on a Full Accrued Claims Basis). The amount of Scheme Consideration and TJ Scheme Consideration

reserved shall reduce the size of the Interim Distribution to be made to Scheme Creditors on a pro rata basis.

21.3    The Interim Distribution made to Scheme Creditors shall be taken into account for the purposes of calculating the Final Distribution, such that each Scheme Creditor shall receive Scheme Consideration which is equal to (and not greater than) the value of its Entitlement.

## 22.    CONSENT FEE

22.1    In addition to the Initial Distribution, on the Restructuring Effective Date, the Company shall pay the Consent Fee to:

(a)    those Class A Scheme Creditors who have validly elected to receive Option 2 Scheme Consideration and that are Eligible Participating Creditors (who are not Blocked Scheme Creditors), who hold Eligible Restricted Debts in accordance with the terms of the RSAs; and

(a)    in respect of Blocked Scheme Creditors that are Class A Scheme Creditors who have validly elected to receive Option 2 Scheme Consideration and that are Eligible Participating Creditors, who hold Eligible Restricted Debts in accordance with the terms of the RSAs, the Holding Period Trustee, to be held on trust under the terms of the Holding Period Trust Deed.

22.2    In addition to the Final Distribution, on the Final Distribution Date, the Company shall pay the Consent Fee to:

(a)    those Class A Scheme Creditors who have validly elected (or are deemed to have elected) to receive A1 Notes and that are Eligible Participating Creditors (who are not Sanctions-Affected Scheme Creditors), who hold Eligible Restricted Debts in accordance with the terms of the RSAs;

(b)    those Class C Scheme Creditors that are Eligible Participating Creditors (who are not Sanctions-Affected Scheme Creditors), who hold Eligible Restricted Debts in accordance with the terms of the RSAs; and

(b)    in respect of Blocked Scheme Creditors that either Class A Scheme Creditors who have validly elected (or are deemed to have elected) to receive A1 Notes or are Class C Scheme Creditors, and that are Eligible Participating Creditors, who hold Eligible Restricted Debts in accordance with the terms of the RSAs, the Successor Escrow Agent, to be held pursuant to the Successor Escrow Agreement.

22.3    If the sum of the Consent Fee to be paid to a Class A Scheme Creditor pursuant to Clause 22.1 for a particular series of New Instruments, together with the Initial Distribution (if any) to be made to the Class A Scheme Creditor in respect of the same series of New Instruments, is less than the applicable Notes Minimum Denomination as described in Clause 25 (*Fractional Adjustments*), then the Consent Fee which would be issued to that Class A Scheme Creditor shall instead be issued to the Holding Period Trustee to hold on trust for the Class A Scheme Creditor until the Final Distribution Date. If the sum of the Consent Fee is less than the Notes Minimum Denomination, the Company in its discretion and in good faith may allocate the Consent Fee to be paid to a Class A Scheme Creditor or a Class C Scheme Creditor in one or more of any series of the New Instruments or, where any potential reallocation would be less than the applicable Notes Minimum Denomination, the Class A Scheme Creditor or Class C Scheme Creditor shall forfeit their Consent Fee.

22.4    For the avoidance of doubt, the notes to be issued as a Consent Fee in accordance with the terms of the RSAs are additional notes and will not impact the number of New Instruments to be received as Scheme Consideration by the Scheme Creditors.

## 23.    ISSUANCE OF THE NEW INSTRUMENTS

23.1    The Scheme Consideration (except for the Blocked New Instruments) will be distributed, in accordance with the terms of this Hong Kong Scheme, through Euroclear and Clearstream to Scheme Creditors (who are not Sanctions-Affected Scheme Creditors). If details of a Euroclear or Clearstream account are not provided, such Scheme Creditor, on whose behalf the Scheme Creditor Form is being submitted, will not be entitled to receive any share of the relevant Scheme Consideration.

23.2    If a Scheme Creditor is a Blocked Scheme Creditor, their Entitlement to the Scheme Consideration will be determined by reference to the principal amount of the Existing Debts outstanding and owed to that Blocked Scheme Creditor as at the Entitlement Record Time and all accrued and unpaid interest relating to such Existing Debts up to but excluding the Restructuring Effective Date.

23.3    The obligations of the Company to issue the New Instruments to each Person entitled to receive them under this Hong Kong Scheme shall be satisfied by the Company depositing the New Instruments in global registered form with the New Instruments Depositary or its nominee with interests in the New Instruments being further credited in the relevant amounts to the accounts in the Clearing Systems designated by the Scheme Creditors in their relevant Scheme Creditor Forms.

23.4    The holders of the New Instruments shall have the benefit of the new Security.

23.5    For the avoidance of doubt, no Eligible Creditor, Designated Recipient (if applicable), on behalf of its designating Scheme Creditor, and/or the Holding Period Trustee on behalf of certain Scheme Creditors (if applicable) shall be entitled to receive New Instruments (including any Residual New Instruments or Blocked New Instruments) under more than one Scheme. Without prejudice to the generality of Clause 42 (*Corresponding Discharge of Performance*), the performance by the Company of its obligations under this Clause 23 (*Issuance of the New Instruments*) shall operate to discharge any corresponding obligations of the Company under the Cayman Scheme.

## 24.    RESTRICTIONS

24.1    The Company will not distribute an Initial Distribution on the Restructuring Effective Date to a Class A Scheme Creditor (if applicable) unless that Class A Scheme Creditor is also an Eligible Creditor or has nominated on or before the Class A Options Deadline a Designated Recipient, who is an Eligible Person to receive the Initial Distribution, in accordance with the terms of the Schemes. A Sanctions-Affected Scheme Creditor cannot appoint a Designated Recipient.

24.2    The Company shall not distribute any Residual A2/C2 Package as Scheme Consideration to a Scheme Creditor (if applicable) unless that Scheme Creditor is also an Eligible Creditor or has nominated on or before the relevant Bar Date a Designated Recipient who is an Eligible Person to receive the Residual A2/C2 Package, in accordance with the terms of the Schemes.

## 25.    FRACTIONAL ADJUSTMENTS

25.1    Notwithstanding any other provision of this Hong Kong Scheme:

(a)     the aggregate number of New Instruments to which an Eligible Creditor is entitled shall be rounded down to the nearest whole number; and

(b)     if the conversion or exchange of any CEG MCBs, EVPS MEBs or NEV MEBs would result in the relevant Scheme Creditor having a fractional entitlement to shares of CEG, EVPS or NEV, such fractional entitlement shall be forfeited.

25.2    If the allocation of the New Instruments in accordance with this Hong Kong Scheme would result in any Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee receiving less than US$500 (the "**Notes Minimum Denomination**") of any tranche of any series of the A1 Notes, C1 Notes, A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, C2 NEV SLNs, A2 Notes and C2 Notes, then such Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee would instead receive an allocation in one or more tranches of any series of the New Instruments, as determined by the Company, in consultation with the Information Agent and/or the Scheme Administrators, in its discretion in good faith and based on information provided and reviewed against the records of the Clearing Systems (in respect of the Class A Noteholders and the Class C Noteholders) or the Company's books and records (in respect of the Class A Lenders and the Class C Scheme Creditors other than the Class C Noteholders) (including accounting for the weighted average maturity of the Scheme Consideration), to ensure that such Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee holds at least the Notes Minimum Denomination for at least one tranche of any series of the New Instruments, provided that:

(a)     any fraction of any tranche of A1 Notes, C1 Notes, A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, C2 NEV SLNs, A2 Notes and C2 Notes that is remaining after the adjustment set out above in this Clause 25.2 will be forfeited;

(b)     the interests in the global certificates for the New Instruments to which a Scheme Creditor is entitled under the terms of this Hong Kong Scheme will be credited to the Clearing System account in which that Scheme Creditor held its interests in the Existing Notes at the Entitlement Record Time (through the relevant Account Holder where applicable); and

(c)     the interests in the New Instruments will be recorded in the New Instruments register by the New Instruments Paying and Transfer Agent and Registrar.

25.3    If the allocation of the New Instruments in accordance with this Hong Kong Scheme would result in any Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee receiving less than HK$2,300 (the "**EVPS MEB Minimum Denomination**") of EVPS MEBs, HK$3,840 (the "**NEV MEB Minimum Denomination**") of NEV MEBs, or HK$5,775 (the "**CEG MCB Minimum Denomination**") of CEG MCBs, any fraction of EVPS MEBs, NEV MEBs and CEG MCBs below the EVPS MEB Minimum Denomination, NEV MEB Minimum Denomination and the CEG MCB Minimum Denomination, respectively, will instead be issued as Plain A2 Notes or C2 Notes (as applicable) in the tranche(s) determined by the Company, in consultation with the Information Agent and/or the Scheme Administrators, in good faith, provided that such issuance will be equal to or greater than the Notes Minimum Denomination, or shall otherwise be forfeited.

25.4    If the conversion or exchange of any Forced A2 Notes for a Class A Scheme Creditor would result in any tranches of a series of New Instruments issued to that Class A Scheme Creditor as part of such conversion to be less than the Notes Minimum Denomination, EVPS MEB Minimum Denomination, NEV MEB Minimum Denomination or CEG MCB Minimum Denomination (as applicable), then:

(a)    the relevant Forced A2 Notes shall not be converted into New Instruments forming part of the C2 Package Unadmitted Portion; and

(b)    any excess shares for the NEV MEBs or EVPS MEBs as a result of such conversion not taking place shall be transferred to the New Instruments Collateral Agent of the A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs and C2 NEV SLNs in accordance with Clauses 18.5(a) and 18.5(b).

PART E

**GENERAL SCHEME PROVISIONS**

26.  **MODIFICATIONS OF THE RIGHTS ATTACHING TO THE NEW INSTRUMENTS**

On and after the Restructuring Effective Date, and/or the Final Distribution Date, nothing in this Hong Kong Scheme shall prevent the modification of the New Instruments in accordance with their terms.

27.  **SECURITIES LAW CONSIDERATIONS**

27.1  The New Instruments will not be registered under the US Securities Act or any state or other securities laws of the United States of America or any other jurisdiction.

27.2  Accordingly, the New Instruments will be available only: (a) in the United States to "qualified institutional buyers" as defined in Rule 144A under the US Securities Act and institutional "accredited investors" as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the US Securities Act; and (b) outside the United States to non-US persons in offshore transactions, in reliance on Regulation S under the US Securities Act.

28.  **RELEASES**

28.1  In consideration for the Entitlement to the Scheme Consideration, on and from the Restructuring Effective Date, each Scheme Creditor hereby gives the undertakings, releases and waivers in this Clause 28 (*Releases*) (the "**Releases**").

28.2  Subject to Clause 28.6, with immediate effect on and from the Restructuring Effective Date and pursuant to this Hong Kong Scheme and the Deeds of Release, each Scheme Creditor on behalf of itself and each of its predecessors, successors and assigns (including any Person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time), as relevant, (collectively, the "**Scheme Creditor Releasing Parties**"), shall and shall be deemed to completely and forever and unconditionally:

(a)  release, waive, void, acquit, forgive, extinguish and discharge (and to the fullest extent permitted by law) each of the Released Persons from the relevant Released Claims, specifically:

(i)  any and all Scheme Claims (except for fraud, wilful default or wilful misconduct) arising prior to, on or after the Restructuring Effective Date;

(ii)  any and all Class A Group Claims arising prior to, on or after the Restructuring Effective Date;

(iii)  to the extent not already covered in (i) and (ii) above, any and all Ancillary Claims arising prior to, on or after the Restructuring Effective Date; and

(iv)  any and all Restructuring Claims arising prior to, on or after the Restructuring Effective Date;

(b)  for the avoidance of doubt and to the extent not already released under Clause 28.2(a) above, release, forfeit, waive, void, acquit, forgive, extinguish and discharge (and to the fullest extent permitted by law) any and all Relevant Collateral;

78

(c)     ratify and confirm everything which any Released Person may lawfully do or cause to be done in accordance with any authority conferred by the Schemes and agree not to challenge:

(A) the validity of any act done or omitted to be done as permitted by the terms of the Schemes; or

(B) the exercise or omission to exercise of any power conferred in accordance with the terms of the Schemes,

in each case in good faith by any Released Person; and

(d)     acknowledge and agree that all powers of attorney granted under any Existing Finance Documents are revoked save for those granted by any Excluded Liabilities Party Person under the Existing Class C Debt Documents.

28.3    Each of the Scheme Creditors hereby appoints the Company as its attorney and agent and irrevocably authorizes, directs, instructs and empowers the Company (represented by any duly authorized representative), on and from the Restructuring Effective Date, to (i) enter into, execute and deliver as a deed on behalf of each Scheme Creditor and any person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim or its Class A Group Claims after the Voting Record Time or who acquires any interest in or arising out of a Scheme Claim or a Class A Group Claim after the Voting Record Time, the Deeds of Release whereby any and all Released Claims and any and all Relevant Collateral, referred to in Clause 28.2 shall be waived and released fully and absolutely from the Restructuring Effective Date, and (ii) do all such acts and/or execute all such documents (including without limitation, assignments, transfers, notices, instructions, supplements and amendments) as the Company may consider necessary or desirable to effect the release of any and all Released Claims and any Relevant Collateral (other than the Excluded Liabilities and the Excluded Collateral) referred to in Clause 28.2.

28.4    Each of the Scheme Creditors hereby approves the Deeds of Release (and the releases therein) (in each case in the Agreed Form) to be executed pursuant to the authority and approvals conferred by this Clause 28 (*Releases*) and each shall be substantially in the form to be made available on the Transaction Website subject to any modifications required or approved by the Hong Kong Court or, as the case may be, the Cayman Court, and each shall take effect in relation to such Claims and Liabilities on the Restructuring Effective Date.

28.5    Each Scheme Creditor acknowledges and agrees on its own behalf and on behalf of its Scheme Creditor Releasing Parties that:

(a)     it may later discover facts in addition to or different from those which it presently knows or believes to be true with respect to the subject matter of this Hong Kong Scheme;

(b)     it is its intention to fully, and finally forever settle and release any and all matters, disputes and differences, whether known or unknown, suspected or unsuspected, which presently exist, may later exist or may previously have existed between it and the Released Persons in respect of all Released Claims or any past, present and/or future Claim which is released by the Releases provided in this Clause 28 (*Releases*) and by the Deeds of Release; and

(c)     in furtherance of this intention, the waivers, releases and discharges given in this Hong Kong Scheme shall be and shall remain in effect as full and complete general waivers,

releases and discharges notwithstanding the discovery or existence of any such additional or different facts.

28.6    Subject to Clause 28.7, notwithstanding any other provision in this Hong Kong Scheme, the effect of the Restructuring under the terms of the Schemes will not:

(a)    waive, release, impair or otherwise compromise any of the Excluded Liabilities or any of the Excluded Collateral;

(b)    prejudice or impair any right or benefit of any Scheme Creditor Releasing Party:

(i)    created under this Hong Kong Scheme or any other Restructuring Documents including without limitation any right to commence and/or continue and/or instruct any other Person to commence or continue any Proceeding to enforce its rights under or in relation to the New Instruments Documents; and/or

(ii)    which arises as a result of a failure by the Company or any other Released Person to comply with the terms of this Hong Kong Scheme or any Restructuring Document; and

(c)    prejudice or impair Claims against the Company or any other Released Person arising from fraud, wilful default or wilful misconduct.

28.7    Each relevant Excluded Liabilities Party Person shall, to the extent legally and practically permissible, enter into any relevant Deeds of Release to release, waive, void, acquit, forgive, extinguish and discharge unconditionally (and to the fullest extent permitted by law), any and all claims of contribution, subrogation, reimbursement, indemnity, set-off or payment of any kind howsoever arising against the Company in connection with the Existing Class C Debt Documents (including for the avoidance of doubt the Excluded Liabilities and Excluded Collateral).

## 29.    STAY OF PROCEEDINGS

29.1    From the Scheme Effective Date, no Scheme Creditor Releasing Party, nor any party on behalf of a Scheme Creditor Releasing Party, shall be entitled to commence, continue or procure the commencement or continuation of any Proceeding, whether directly or indirectly, against any of the Released Persons or in respect of any property of any of the Released Persons in respect of any Claims or Liabilities that are to be released in accordance with Clause 28 (*Releases*).

29.2    Subject to any existing contractual restrictions, a Scheme Creditor Releasing Party may commence a Proceeding against a Released Person after the Restructuring Effective Date, in respect of Claims or Liabilities that are not to be released in accordance with Clause 28 (*Releases*).

## 30.    COSTS AND INDEMNITY

30.1    The Company shall pay all fees, costs and expenses properly incurred by the Existing Notes Trustee, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary, the Existing Notes Collateral Agent, the Collateral Agent, the Holding Period Trustee, GLAS and the Information Agent, (each, an "**Indemnified Party**" and together the "**Indemnified Parties**"), in connection with any and/or all actions taken pursuant to the Schemes and the Restructuring, including (without limitation) any and/or all actions taken pursuant to the Existing Notes Trustee Instruction and the distribution of the Scheme Consideration, (provided that, with respect to each party,

the relevant fees, costs and expenses have been incurred in accordance with the Existing Notes Documents or such other arrangement as may have been agreed between the Company and that party).

30.2    The Company shall hold each Indemnified Party harmless from, and shall indemnify such Indemnified Party from and against any claims, actions, demands, damages, charges, losses, liabilities, obligations, judgments, costs, fees, and expenses which may be incurred by, or asserted or awarded against it in taking any of the steps contemplated by the Scheme, including, without limitation, executing and delivering any documents pursuant to the Existing Notes Trustee Instruction and cancelling the Global Certificates, except to the extent that the same arises from the fraud, gross negligence or wilful misconduct of such Indemnified Party.

**31.    MODIFICATIONS TO THE SCHEME AND THE RESTRUCTURING DOCUMENTS**

31.1    The Company may, before or at any hearing before the Cayman Court or Hong Kong Court to sanction the Schemes, and subject to obtaining the written consent of the Majority CEG AHG (where the CEG AHG holds the Minimum CEG AHG Threshold), consent on behalf of all Scheme Creditors to any modifications of the Schemes and/or the Restructuring Documents or any additional terms or conditions including those which the Cayman Court and/or the Hong Kong Court may think fit to approve or impose, which would not directly or indirectly have a material adverse effect on the rights of the Scheme Creditors.

31.2    On the identification of a Sanctioned Scheme Creditor, including where a Scheme Creditor becomes a Sanctioned Scheme Creditor while this Hong Kong Scheme is in effect:

(a)    the Company may modify the Schemes and/or the Restructuring Documents to the extent reasonably necessary and in a manner to ensure that the Schemes are not contrary to Applicable Sanctions  (and is authorized to instruct the Existing Notes Trustee, Existing Agents, Existing Notes Collateral Agent, Existing Notes Paying and Transfer Agent and Registrar, and any other administrative party as required in order to achieve the same); and

(b)    each of the New Instruments Trustees, New Instruments Paying and Transfer Agents and Registrars, Collateral Agent and any other administrative party as required is authorized to make any amendment to the New Instruments Documents and take any action necessary or desirable to give effect to a modification to such New Instruments Documents on and following receipt of an officers' certificate from the Company that such modification is reasonably necessary to ensure that the Schemes are not contrary to Applicable Sanctions, which the New Instruments Trustees, New Instruments Paying and Transfer Agents and Registrars, Collateral Agent and any other administrative party as required are entitled to rely on conclusively.

31.3    Where the Company reasonably considers that this Hong Kong Scheme or the transactions contemplated by this Scheme are at risk of being contrary to Applicable Sanctions:

(a)    the Company may modify the Schemes and/or the Restructuring Documents to the extent reasonably necessary and in a manner to ensure that the Schemes are not contrary to Applicable Sanctions (and is authorized to instruct the Existing Notes Trustee, Existing Agents, Existing Notes Collateral Agent, Existing Notes Paying and Transfer Agent and Registrar, and any other administrative party as required in order to achieve the same); and

81

(b)     each of the New Instruments Trustees, New Instruments Paying and Transfer Agents and Registrars, Collateral Agent and any other administrative party as required is authorized to make any amendment to the New Instruments Documents and take any action necessary or desirable to give effect to a modification to such New Instruments Documents on and following receipt of an officers' certificate from the Company that such modification is reasonably necessary to ensure that the Schemes will not be contrary to the Applicable Sanctions in whatever form that they may apply to this Hong Kong Scheme, which the New Instruments Trustees, New Instruments Paying and Transfer Agents and Registrars, Collateral Agent and any other administrative party as required are entitled to rely on conclusively.

31.4    The Scheme Administrators may, on or after the Restructuring Effective Date, modify the Schemes in respect of the Valuation and Adjudication Procedure to the extent reasonably necessary for this Hong Kong Scheme to achieve its purpose, and provided that any such modifications have no material prejudicial effect on Scheme Creditors.

31.5    Nothing in this Hong Kong Scheme shall prevent the modification of any executed Restructuring Document in accordance with its terms, including, but not limited to, minor or technical modifications to correct manifest or proven error or to comply with mandatory provisions of law.

## 32.    OBLIGATIONS ON DATES OTHER THAN A BUSINESS DAY

If any sum is due or obligation is to be performed or any Bar Date occurs under the terms of this Hong Kong Scheme on a day other than a Business Day, the relevant payment shall be made, or obligation performed, or the Bar Date shall occur, on the next Business Day.

## 33.    NO ADMISSION OF LIABILITY

Save as expressly set out in this Hong Kong Scheme, nothing in this Hong Kong Scheme or the Explanatory Statement, or the circulation thereof to any person, evidences or constitutes any admission by the Company, the Information Agent, or the Scheme Administrators, that the person is a Scheme Creditor or that a Liability is owed to any person in respect of any Claim or right.

## 34.    THE INFORMATION AGENT

34.1    Each Scheme Creditor and/or Account Holder hereby unconditionally and irrevocably waives and releases any claims which may arise against the Information Agent from all actual or potential liability, arising directly or indirectly, in each case, in relation to the Information Agent's performance of its roles and all other actions which they may take in connection with this Hong Kong Scheme, save for any liability resulting from the Information Agent's own fraud or wilful misconduct.

34.2    Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers is acting for, or owes any duty to, any Scheme Creditor, nor will any of them be responsible for providing any advice to any Scheme Creditor in relation to this Hong Kong Scheme. Accordingly, neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers make any recommendations as to whether any Scheme Creditor should take any of the actions contemplated in the Schemes. The Information Agent expresses no opinion on the merits of the Schemes or the terms of the New Instruments. The Information Agent has not been involved in negotiating or determining the terms of the Schemes and makes no representation that all relevant information has been disclosed to the Scheme Creditors in or pursuant to the Schemes. Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers has verified, or assumes any

responsibility or liability for the accuracy or completeness of any of the information concerning this Hong Kong Scheme, or any factual statements contained in, or the effect or effectiveness of, this Hong Kong Scheme.

34.3    Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers will have any tortious, contractual or any other liability to any person in connection with the determination of whether a Scheme Creditor is a Sanctions-Affected Scheme Creditor. Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers will accept any liability whatsoever to any person, regardless of the form of action, for any lost profits or lost opportunity, or for any indirect, special, consequential, incidental or punitive damages arising from the determination of whether a Scheme Creditor is a Sanctions-Affected Scheme Creditor, even if the Information Agent or any of its directors, officers, employees, agents, affiliates or advisers have been advised of the possibility of such damages.

34.4    Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers is obliged, under the terms of the Schemes or otherwise, to engage in any transaction or conduct that may give rise to a liability under or in connection with Applicable Sanctions and/or may result in any person becoming targeted by Applicable Sanctions.

34.5    If compliance with any obligations under the terms of the Schemes or otherwise would result in the Information Agent or any of its directors, officers, employees, agents, affiliates or advisers breaching the Blocking Regulation, that obligation need not be complied with (but only to the extent of the breach).

34.6    Under no circumstances will the Information Agent be required to verify or determine the eligibility of any Scheme Creditor in relation to this Hong Kong Scheme. The Information Agent will check Scheme Claims against Custody Instructions and against the records of Scheme Creditors provided to the Information Agent by the Company. The Information Agent will assist the Company and the Chairperson in checking the voting values of each Scheme Creditor (who is not a Blocked Scheme Creditor) based on such information.

## 35.    THE HOLDING PERIOD TRUSTEE

35.1    The duties, rights, responsibilities and interests of the Holding Period Trustee shall be governed by the Holding Period Trust Deed and nothing in this Clause 35 (*The Holding Period Trustee*) shall in any way amend, alter, or override the Holding Period Trust Deed.

35.2    The Holding Period Trustee's role will be solely mechanical and administrative in nature. As such, in accepting its appointment, the Holding Period Trustee will act only as the bare trustee of the Holding Period Trust and not in any other capacity. In this regard, the Holding Period Trustee will not be permitted to sell, pledge, re-hypothecate, assign, invest, use, commingle, dispose of, or otherwise use in its business, any of the Residual New Instruments or Blocked Assets held by it, except as permitted pursuant to the Holding Period Trust Deed.

35.3    The Holding Period Trustee will have no economic or beneficial interest in the Residual New Instruments or Blocked Assets it holds and shall not, except as set out in the Holding Period Trust Deed, permit any other Person to have any interest, estate, right, title or benefit in the Residual New Instruments or Blocked Assets.

35.4    The Holding Period Trustee shall be provided with any information it reasonably requires to satisfy itself that any action it chooses to take, or not take, shall be in compliance with any applicable laws. The Holding Period Trustee shall not be responsible for determining the status of a Sanctions-Affected Scheme Creditor.

35.5    The Holding Period Trustee shall not be required to perform any of its obligations under the Holding Period Trust Deed or any other Restructuring Documents if it is prevented from so doing by the occurrence of any event due to any cause beyond its control or if such performance would result in the Holding Period Trustee or its Affiliates being in breach of any law, regulation, ordinance, rule, directive, judgment, order or decree (collectively, the "**Rules**") binding on the Holding Period Trustee or its property or on any of its Affiliates (including but not limited to Rules relating to money laundering, bribery and corruption, prevention of tax evasion, financial or economic sanctions, trade and export controls, supply chain transparency, blocking regulations or anti-boycott requirements). The Holding Period Trustee may act or refrain from acting under the Holding Period Trust Deed and may do anything which in its reasonable opinion is necessary to comply with such Rules. The Holding Period Trustee is not required to take any action or step (including by omission) which would cause or create a risk of liability under the Blocked Regulation.

35.6    The Holding Period Trustee shall bear no responsibility for any action it does, or does not, take in circumstances where a Scheme Creditor, or the Company, does not provide sufficient information to enable the Holding Period Trustee to adequately assess the extent to which any of the Rules as set out in Clause 35.5 may be breached either by the action, or inaction, of the Holding Period Trustee.

35.7    The Holding Period Trustee shall bear no responsibility with regards to any deficiency which might arise because of the Holding Period Trustee or by virtue of any tax which may be payable (i) in respect of the Residual New Instruments or Blocked Assets held by it, (ii) any income which may arise therefrom or (iii) any proceeds which may arise thereof.

## 36.    THE SUCCESSOR ESCROW AGENT

36.1    The duties, rights, responsibilities and interests of the Successor Escrow Agent shall be governed by the Successor Escrow Agreement and nothing in this Clause 36 shall in any way amend, alter, or override the Successor Escrow Agreement.

36.2    The Successor Escrow Agent's role will be solely mechanical and administrative in nature. As such, in accepting its appointment, the Successor Escrow Agent will act only as a bare agent of the Successor Escrow Account and not in any other capacity. In this regard, the Successor Escrow Agent will not be permitted to sell, pledge, re-hypothecate, assign, invest, use, commingle, dispose of, or otherwise use in its business, any of the Blocked Assets, except as permitted pursuant to the Successor Escrow Agreement.

36.3    The Successor Escrow Agent will have no economic or beneficial interest in the Blocked Trust Assets it holds and shall not, except as set out in the Successor Escrow Agreement, permit any other Person to have any interest, estate, right, title or benefit in the Blocked Assets.

36.4    The Successor Escrow Agent will be afforded the right to be provided with, and request, any information it requires to satisfy itself that any action it chooses to take, not note take shall be in compliance with any applicable laws. The Successor Escrow Agent shall not, however, be responsible for determining the status of a Sanctions-Affected Scheme Creditor.

36.5    The Successor Escrow Agent shall not be required to perform any of its obligations under the Successor Escrow Agreement or any other Restructuring Documents if it is prevented from so doing by the occurrence of any event due to any cause beyond its control or if such performance would result in the Successor Escrow Agent or its Affiliates being in breach of any Rules binding on the Successor Escrow Agent or its property or on its Affiliates (including but not limited to Rules relating to money laundering, bribery and corruption, prevention of tax evasion, financial or economic sanctions, trade and export controls, supply chain transparency, blocking regulations or anti-boycott requirements). The Successor Escrow Agent may act or

refrain from acting under the Successor Escrow Agreement and may do anything which in its reasonable opinion is necessary to comply with such Rules. The Successor Escrow Agent is not required to take any action or step (including by omission) which would cause or create a risk of liability under the Blocked Regulation.

36.6   The Successor Escrow Agent shall bear no responsibility for any action it does, or does not, take in circumstances where a Blocked Scheme Creditor, or the Company, does not provide sufficient information to enable the Successor Escrow Agent to adequately assess the extent to which any of the Rules as set out in Clause 36.5 may be breached either by the action, or inaction, of the Successor Escrow Agent.

36.7   The Successor Escrow Agent shall bear no responsibility with regards to any deficiency which might arise because of the Successor Escrow Agent or by virtue of any tax which may be payable (i) in respect of the Blocked Assets, (ii) any income which may arise therefrom or (iii) any proceeds which may arise thereof.

## 37.   THE SCHEME ADMINISTRATORS

*Appointment and removal*

37.1   In consideration for each Scheme Creditor granting the releases pursuant to Clause 28 (*Releases*) and the Deeds of Release, each Scheme Creditor shall be entitled to have its Entitlement determined by the Scheme Administrators and, if applicable, the Scheme Adjudicator.

37.2   On the Scheme Effective Date, the Company shall appoint the Scheme Administrators, with the powers, rights, duties and functions conferred upon the Scheme Administrators by this Hong Kong Scheme.

37.3   The office of a Scheme Administrator shall be vacated if the holder of such office becomes subject to any conflict of interest which would impact in any way his/her ability to perform the functions of Scheme Administrator as set out in this Hong Kong Scheme, dies, is convicted of an indictable offence, resigns from his/her office (which shall be permissible and effective only if he/she gives at least two (2) months' written notice to the Company prior to such resignation), becomes bankrupt, is disqualified from membership of a professional body of which he/she is a member, or becomes mentally disordered or incapacitated.

37.4   In the event of a vacancy in the office of a Scheme Administrator (unless there is no further work to be done by the Scheme Administrator under the Schemes), the Company shall in its sole discretion promptly appoint an alternative person from the Whitelist Scheme Administrators who must be a fit and proper person and be able to adequately discharge the function of a Scheme Administrator under this Hong Kong Scheme.

37.5   The Scheme Administrators have agreed to be bound by this Hong Kong Scheme, and have executed, the Deed of Undertaking.

*Functions, powers and rights*

37.6   The Scheme Administrators (in their own name or as agents of the Company) shall have the power to act on behalf of the Company in relation to all matters relating to each Scheme Creditor's Entitlement.  In carrying out their duties and functions under this Hong Kong Scheme, the Scheme Administrators shall (pursuant to the terms of this Hong Kong Scheme) be empowered to:

(a) make a determination of each Scheme Creditor's Scheme Claim and Entitlement for distribution purposes under this Hong Kong Scheme;

(b) have full access to the Company Information and to receive full cooperation from the Management, on any reasonable requests for finance documents or other information or documents in the possession or control of the Company or the Group;

(c) where reasonably appropriate to employ and remunerate accountants, actuaries, lawyers and other professional advisors (including their partners and the partners and staff of all associated firms, associations and companies or successors or any of them) in connection with the evaluation of each Scheme Creditor's Entitlement and the costs and expenses of such engagement shall form part of the costs and expenses incurred by the Scheme Administrators for the purposes of Clause 37.15;

(d) to delegate in writing to any person qualified as set out in paragraph (c) above all or any of the powers and discretion conferred upon the Scheme Administrators under this Hong Kong Scheme, and from time to time to revoke any such delegation, provided that the Scheme Administrators shall be personally responsible for any act or omission of any such delegate to the same extent as if they had expressly authorised it;

(e) to employ and remunerate Valuer(s) and experts (appointed by the Scheme Adjudicator pursuant to Clause 40.4(d) and the costs and expenses of such engagement shall form part of the costs and expenses incurred by the Scheme Administrators for the purposes of Clause 37.15(b);

(f) to nominate a replacement or additional Scheme Adjudicator in accordance with Clauses 39.3 and 39.7;

(g) to do all acts and to execute in the name and, insofar as permitted by law, on behalf of the Company, any deed, transfer, instrument, cheque, bill of exchange, receipt or other document which may be necessary for or incidental to the full and proper implementation of this Hong Kong Scheme;

(h) to make any payments and distributions which are necessary for or incidental to the Scheme Administrators' performance of their functions under this Hong Kong Scheme;

(i) to open, maintain and operate bank accounts in the name of the Company and/or in the name of the Scheme Administrators, as required or convenient under or in connection with this Hong Kong Scheme and to close any such bank account;

(j) to receive and review all information provided by each Scheme Creditor as part of the Valuation Procedure;

(k) to communicate with and seek further information from each Scheme Creditor, and the Management to assist with the evaluation of each Scheme Creditor's Entitlement;

(l) to extend the timetable for the determination of each Scheme Creditor's Entitlement;

(m) to refer and assign a Referred Scheme Claim (as applicable) to a Scheme Adjudicator to be further determined pursuant to the Adjudication Procedure;

(n)    to apply to the Hong Kong Court for directions in relation to any particular matter arising under, or in the course of the operation of, this Hong Kong Scheme;

(o)    to do all such acts and make all such decisions in connection with or for the purposes of making distributions and reservations of the Scheme Consideration to the Scheme Creditors;

(p)    to do all other things incidental to the exercise of the foregoing powers; and

(q)    to exercise any other powers necessary for or incidental to the full and proper implementation of his/her obligations under this Hong Kong Scheme,

provided that the Scheme Administrators cannot and shall not exercise any power that would result in them assuming control of any of the Company's business or affairs.

37.7    The Scheme Administrators (in their capacity as such):

(a)    shall have only those duties and responsibilities expressly specified in this Hong Kong Scheme and shall not have any implied duties or responsibilities whatsoever; and

(b)    may refrain from doing anything which would or might in their opinion be contrary to any law, directive or regulation of any applicable jurisdiction and may do anything which is, in their opinion, necessary to comply with any such law, directive or regulation and each Scheme Administrator shall not be liable for any loss occasioned thereby.

37.8    In exercising their powers and carrying out their duties and functions under this Hong Kong Scheme, the Scheme Administrators shall be independent and impartial, shall act in good faith and with due care and diligence, and shall exercise their powers under this Hong Kong Scheme for the purpose of ensuring that this Hong Kong Scheme is implemented in compliance with its terms and in the interests of the Scheme Creditors as a whole.

37.9    The Scheme Administrators are obliged, and agree, to report to the Scheme Creditors via publication on the Transaction Website and/or the Company Website on a quarterly basis up until the conclusion of the Valuation and Adjudication Procedure on the completion and results of the Valuation and Adjudication Procedure, including the aggregate Entitlement determined for the Class C Scheme Creditors.

37.10    Except in the case of actual fraud or wilful default, the Scheme Administrators will not be liable to the Company or any Scheme Creditor for any act or omission by the Scheme Administrators in the performance or purported performance of their powers, rights, duties and functions under this Hong Kong Scheme.

37.11    Except to the extent required by law, no Scheme Creditor shall be entitled to challenge the validity of (a) any act done or omitted to be done in good faith by the Scheme Administrators; or (b) the exercise by the Scheme Administrators in good faith of any power conferred upon them, if such act, omission or exercise of power is in accordance with, and to implement, the provisions of this Hong Kong Scheme.

37.12    The Company agrees to indemnify the Scheme Administrators out of the property of the Company for:

(a)    the costs, fees and expenses incurred and payable by the Scheme Administrators in accordance with Clause 37.15; and

(b)    any liability incurred by the Scheme Administrators as a result of any act or omission in carrying out their functions other than such liability (if any) that the Scheme Administrators may incur by their own actual fraud or wilful default,

in connection with this Hong Kong Scheme, and their role as Scheme Administrators. The Scheme Administrators shall not be found to have committed actual fraud or wilful default unless or until a court of competent jurisdiction has made a finding to that effect.

37.13    The indemnity set out in Clause 37.12 shall take effect on and from the Scheme Effective Date and shall endure without limitation as to time for the benefit of the Scheme Administrators notwithstanding:

(a)    the termination of this Hong Kong Scheme for any reason whatsoever;

(b)    the removal or replacement of a Scheme Administrator; or

(c)    the invalidity of or any defect whatsoever in the appointment of a Scheme Administrator.

37.14    The Scheme Administrators' right to indemnity conferred by Clause 37.12 has priority over the Scheme Claims and the Scheme Creditors generally and ranks equally to any claims for indemnity by the Scheme Adjudicators.

37.15    The Scheme Administrators shall be:

(a)    remunerated in respect of any work done by the Scheme Administrators and any agent, partner or employee of the Scheme Administrators acting on behalf of the Scheme Administrators, in connection with the exercise of their powers and discretions and the performance of their duties, obligations and responsibilities as Scheme Administrators under this Hong Kong Scheme on a time-cost basis, unless otherwise agreed; and

(b)    reimbursed in respect of all costs, fees, disbursements, taxation liabilities (including VAT), and expenses incurred in connection with the performance of their duties, obligations and responsibilities as Scheme Administrators under this Hong Kong Scheme, including but not limited to the fees of any accountants, actuaries, lawyers and other professional advisors or agents engaged by the Scheme Administrators pursuant to Clause 37.6(c) and the fees of the Valuer(s) and experts pursuant to Clause 37.6(e).

37.16    Fees and expenses incurred by the Scheme Administrators shall be invoiced monthly (or such other period as the Company and the Scheme Administrators may determine) to the Company and shall be paid in full promptly.

## 38.    VALUATION PROCEDURE

38.1    The Scheme Administrators shall assess each Class C Scheme Creditor's Entitlement on a Deficiency Basis by reference to the formulae set out in Clause 13 (*Calculation of a Scheme Creditor's Entitlement*).

38.2    The Scheme Administrators shall comply with the following procedure in ascertaining the Scheme Administrator Estimate:

(a)    the Scheme Administrator Estimate will be based on the evidence available to the Scheme Administrators including, among other things and as they deem applicable,

any Company Information provided to them, a valuation report prepared by a Valuer (if applicable) and/or a liquidation analysis;

(b)     where appropriate (and among other things) the Scheme Administrators may:

    (i)     discount future claims to their present value (with the discount rate to be used to be agreed between Houlihan Lokey, Moelis & Company Asia Limited and the Scheme Administrators and such rate is to be used as consistently as reasonably possible);

    (ii)     estimate contingent or unascertained claims;

    (iii)     convert foreign currency claims (if any) to US$, applying the foreign currency exchange rates set out in Clause 15.4; and

    (iv)     take into account the rules of the relevant jurisdiction (being the place of incorporation of the relevant Excluded Liabilities Party Person, or other jurisdiction in which the relevant Excluded Liabilities Party Person is wound up) in respect of set-off;

(c)     the Scheme Administrator Estimate shall be determined in good faith, to the best of the Scheme Administrators' ability based on the information available to the Scheme Administrators; and

(d)     the Scheme Administrator Estimate shall be determined as quickly and efficiently as possible with the aim of ensuring that the valuation of each Class C Scheme Creditor's Entitlement is completed and agreed or adjudicated as expeditiously as possible and in accordance with the timetable set out in this Hong Kong Scheme.

38.3     The Scheme Administrators shall issue an Estimation Notice to each Class C Scheme Creditor who has submitted a Class C Scheme Claim notifying them of the Scheme Administrator Estimate and enclosing a blank Scheme Administrator Estimate Acceptance or Rejection Form and any materials which the Scheme Administrators in their sole discretion considers necessary to allow that Class C Scheme Creditor to consider and evaluate the Scheme Administrator Estimate. The Estimation Notice will be issued within either: (a) for Class C Scheme Claims submitted before the Restructuring Effective Date, 30 calendar days after the Restructuring Effective Date; or (b) for Class C Scheme Claims submitted on or after the Restructuring Effective Date and on or before the Class C Bar Date, 30 calendar days after the Distribution Confirmation Deed was received by the Scheme Administrator.

38.4     The Class C Scheme Creditor shall have 30 calendar days from the date of the Estimation Notice to either accept or reject the Scheme Administrator Estimate by submitting a completed Scheme Administrator Estimate Acceptance or Rejection Form to the Scheme Administrators. If the Class C Scheme Creditor rejects the Scheme Administrator Estimate:

(a)     the Scheme Administrator Estimate Acceptance or Rejection Form submitted by that Scheme Creditor must include an explanation of its reasons for rejecting the Scheme Administrator Estimate and all evidence which it intends to rely upon in support of its position; and

(b)     if, in the sole opinion of the Scheme Administrators, the Scheme Administrator Estimate Acceptance or Rejection Form fails to enclose reasonably sufficient information and/or credible evidence, the Scheme Administrators will notify the Class C Scheme Creditor as soon as reasonably practicable specifying the

deficiencies in the information and evidence provided by the Class C Scheme Creditor and the additional information and evidence required by the Scheme Administrators.

38.5    If a Class C Scheme Creditor accepts the Scheme Administrator Estimate within the time specified in Clause 38.4, the amount of the Scheme Administrator Estimate will be the final and binding value of that Class C Scheme Creditor's Entitlement. The Scheme Administrators will then send the Class C Scheme Creditor a Deed of Agreed Valuation to be executed by the Class C Scheme Creditor as a condition precedent to receiving Scheme Consideration.

38.6    If a Class C Scheme Creditor fails to submit a Scheme Administrator Estimate Acceptance or Rejection Form within the time specified in Clause 38.4, that Class C Scheme Creditor will be deemed to have accepted the Scheme Administrator Estimate and therefore the amount of the Scheme Administrator Estimate will be that Class C Scheme Creditor's Entitlement. The Scheme Administrators will then send the Class C Scheme Creditor a Deed of Agreed Valuation to be executed by the Class C Scheme Creditor as a condition precedent to receiving Scheme Consideration.

38.7    If a Class C Scheme Creditor rejects the Scheme Administrator Estimate within the time specified in Clause 38.4, that Class C Scheme Creditor and the Scheme Administrators shall seek to agree the value of the Class C Scheme Creditor's Entitlement during the Consultation Period, in respect of which:

(a)    If the value of the Class C Scheme Creditor's Entitlement is agreed during the Consultation Period, that agreed value shall be the final and binding value of that Class C Scheme Creditor's Entitlement. Upon such agreement, the Scheme Administrators will send the Class C Scheme Creditor a Deed of Agreed Valuation to be executed by the Class C Scheme Creditor as a condition precedent to receiving Scheme Consideration.

(b)    If the value of the Class C Scheme Creditor's Entitlement is not agreed during the Consultation Period, and the Scheme Administrators in their sole discretion consider that it is not appropriate to extend the Consultation Period, the Scheme Administrators must refer the Referred Scheme Claim to the Scheme Adjudicator in accordance with Clause 40 (*Adjudication Procedure*).

(c)    If the value of the Class C Scheme Creditor's Entitlement is not agreed during the Consultation Period but in the Scheme Administrators' sole opinion there is a reasonable likelihood that the Class C Scheme Creditor and the Scheme Administrators may reach an agreement on the value of the Class C Scheme Creditor's Entitlement, the Scheme Administrators may extend the Consultation Period by seven (7) calendar days, in respect of which:

(i)    If an agreement is ultimately reached at the end of the seven (7) day extension, that agreed value shall be the final and binding value of that Class C Scheme Creditor's Entitlement. The Scheme Administrators will then send the Class C Scheme Creditor a Deed of Agreed Valuation to be executed by the Class C Scheme Creditor as a condition precedent to receiving Scheme Consideration; or

(ii)    If an agreement is not reached at the end of the seven (7) day extension, the Scheme Administrators must refer the Referred Scheme Claim to the Scheme Adjudicator in accordance with Clause 40 (*Adjudication Procedure*).

38.8    Upon the acceptance, deemed acceptance or agreement (as the case may be) of a Class C Scheme Creditor's Entitlement pursuant to Clauses 38.5 to 38.7, the Scheme Administrators will promptly send the Class C Scheme Creditor a Deed of Agreed Valuation to be executed by the Class C Scheme Creditor as a condition precedent to receiving the Scheme Consideration.

38.9    During the Consultation Period, either the Scheme Administrators or a Class C Scheme Creditor may provide additional information, further evidence and/or brief written submissions to the other or request additional information, further evidence and/or brief written submissions from the other in respect of that Class C Scheme Creditor's Scheme Claim. Notwithstanding the foregoing sentence, the Scheme Administrators, in their sole discretion, acting reasonably, are only required to accede to a Class C Scheme Creditor's requests for additional information, further information and/or brief written submissions if they consider it reasonable to do so and shall not be required to accede to requests which are the same, or substantially the same, as one which has previously been responded to.

38.10   For the avoidance of doubt and without prejudice to Clauses 38.5 to 38.7, the Scheme Administrators shall, in their reasonable discretion, have the power, prior to the execution of the Deed of Agreed Valuation by the relevant Class C Scheme Creditor, to adjust any prior determination of that Scheme Creditor's Entitlement based on intervening factors and/or changes in circumstance, including (but not limited to) any changes in the rights or benefits of the relevant Scheme Creditor's Scheme Claim. The Scheme Administrators shall give notice to such Scheme Creditor informing them of the relevant adjustment, and if disputed by the relevant Scheme Creditor, such adjusted Entitlement will be referred to the Adjudication Procedure as a Referred Scheme Claim and as if the valuation of the relevant Scheme Creditor's Entitlement had not been agreed or accepted.

*Company's Obligations in the Valuation Procedure*

38.11   The Company and the Group are obliged, and agree, to provide the Scheme Administrators with full access to any Company Information reasonably requested and to cooperate and comply with any reasonable requests by the Scheme Administrators for the Company Information, finance documents or other information or documents in the possession or control of the Company or the Group, unless provision of such information or documents would be contrary to any law (including for the avoidance of doubt any obligations of confidentiality imposed on the Company).

38.12   Management are obliged, and agree, to cooperate fully with the Scheme Administrators in relation to reasonable requests in respect of the Valuation Procedure.

38.13   The Company and the Group are obliged, and agree, to use their best endeavours to provide the Scheme Administrators with any information or documents reasonably requested by the Scheme Administrators which are relevant to a Class C Scheme Creditor's Entitlement, unless provision of such documents would be contrary to any law.

*Class C Scheme Creditor's Obligations in the Valuation Procedure*

38.14   Each Class C Scheme Creditor is obliged, and agrees, to cooperate fully with the Scheme Administrators in the Scheme Administrators' exercise of powers in assessing the value of the Class C Scheme Creditor's Entitlement.

38.15   Each Class C Scheme Creditor is obliged, and agrees, to use its best endeavours to provide the Scheme Administrators with any information or documents reasonably requested by the Scheme Administrators which are relevant to its Entitlement, unless provision of such documents would be contrary to any law.

39.    **THE SCHEME ADJUDICATORS**

*Qualification, appointment and removal*

39.1    On the Scheme Effective Date, the Company shall appoint individuals as Scheme Adjudicators under this Hong Kong Scheme, who shall initially be: Sir William Blair, Lord David Neuberger, Dame Elizabeth Gloster and Lady Mary Arden.

39.2    The office of each Scheme Adjudicator shall be vacated if the holder of such office becomes subject to any conflict of interest which would impact in any way his/her ability to perform the functions of Scheme Adjudicator as set out in this Hong Kong Scheme, dies, is convicted of an indictable offence, resigns from his/her office (which shall be permissible and effective only if he/she gives at least two (2) months' written notice to the Company prior to such resignation), becomes bankrupt, is disqualified from membership of a professional body of which he/she is a member, or becomes mentally disordered or incapacitated.

39.3    In the event of a vacancy in the office of any Scheme Adjudicator, the Scheme Administrators shall nominate and the Company shall appoint a replacement Scheme Adjudicator, who meets the criteria specified in Clause 39.5.

39.4    Each Scheme Adjudicator shall have the powers, duties and functions, and the rights, conferred upon him/her by this Hong Kong Scheme. In exercising his/her powers and carrying out his/her duties and functions under this Hong Kong Scheme, each Scheme Adjudicator shall be independent and impartial, shall act in good faith and with due care and diligence and shall exercise his/her powers under this Hong Kong Scheme for the purpose of ensuring that this Hong Kong Scheme is implemented in compliance with its terms and in the interests of the Scheme Creditors as a whole.

39.5    In the event that a replacement or additional Scheme Adjudicator is required pursuant to Clause 39.3 or 39.7, he/she shall (a) be a senior barrister, or a retired judge of a Court of England and Wales or of a Hong Kong Court, or such other individuals of comparable qualification, and (b) be independent and impartial from the Company and the Scheme Administrators.

39.6    Each Scheme Adjudicator will agree to be bound by this Hong Kong Scheme.

39.7    At any given time, having regard to the number of Referred Scheme Claims which remain unresolved, the number of Scheme Adjudicators appointed and all other circumstances, the Scheme Administrators may nominate and the Company shall pursuant to the Scheme Administrators' nomination appoint one or more individuals who meet the criteria specified in Clause 39.5 as additional Scheme Adjudicator(s).

*Functions, powers and rights*

39.8    Each Scheme Adjudicator shall act as an expert and not as an arbitrator. He/she shall be responsible for the determination of Referred Scheme Claims referred to him/her under this Hong Kong Scheme and shall have the powers, rights, duties and functions conferred upon him/her by this Hong Kong Scheme.

39.9    The Scheme Adjudicators shall review all the available evidence to determine the value of the Referred Scheme Claim.

39.10    Except in the case of actual fraud or wilful default, none of the Scheme Adjudicators will be liable to the Scheme Administrators, the Company or any Scheme Creditor for any act

or omission by the relevant Scheme Adjudicator in the performance or purported performance of his/her powers, rights, duties and functions under this Hong Kong Scheme.

39.11   The Company agrees to indemnify each Scheme Adjudicator out of the property of the Company for:

(a)   the costs, fees and expenses incurred and payable by the Scheme Adjudicator in accordance with Clause 39.14; and

(b)   any liability incurred by the Scheme Adjudicator as a result of any act or omission in carrying out his/her functions other than such liability (if any) that the Scheme Adjudicator may incur by his/her own actual fraud or wilful default,

in connection with this Hong Kong Scheme, and his/her role as Scheme Adjudicator. None of the Scheme Adjudicators shall be found to have committed actual fraud or wilful default unless or until a court of competent jurisdiction has made a finding to that effect.

39.12   The indemnity set out in Clause 39.11 shall take effect on and from the Scheme Effective Date and shall endure without limitation as to time for the benefit of each Scheme Adjudicator notwithstanding:

(a)   the termination of this Hong Kong Scheme for any reason whatsoever;

(b)   the removal or replacement of the Scheme Adjudicator; or

(c)   the invalidity of or any defect whatsoever in the appointment of the Scheme Adjudicator.

39.13   Each Scheme Adjudicator's right to indemnity conferred by Clause 39.11 has priority over the Scheme Claims and the Scheme Creditors generally and ranks equally to any claims for indemnity by the Scheme Administrators and each other Scheme Adjudicator.

39.14   Each Scheme Adjudicator shall be:

(a)   remunerated in respect of any work done by the Scheme Adjudicator and any agent, partner or employee of the Scheme Adjudicator acting on behalf of the Scheme Adjudicator, in connection with the exercise of his/her powers and discretions and the performance of his/her duties, obligations and responsibilities as Scheme Adjudicator under this Hong Kong Scheme on a time-cost basis; and

(b)   reimbursed in respect of all costs, fees, disbursements, taxation liabilities (including VAT), and expenses incurred in connection with the performance of his/her duties, obligations and responsibilities as Scheme Adjudicator under this Hong Kong Scheme.

39.15   Fees and expenses incurred by the Scheme Adjudicators shall be invoiced monthly (or such other period as the Scheme Administrators and the Scheme Adjudicators may determine) to the Scheme Administrators and, following the approval by the Scheme Administrator of such fees and expenses, shall be paid in full by the Company within one calendar month of the Scheme Administrators' approval.

## 40.   ADJUDICATION PROCEDURE

40.1   When the Scheme Administrators are obliged to refer a Referred Scheme Claim to the Scheme Adjudicator pursuant to Clause 38.7(b), 38.7(c)(ii) or 38.10, they shall promptly

refer the Referred Scheme Claim (together with the relevant Estimation Notice, all supporting documents provided to or by the Class C Scheme Creditor, and all other relevant valuation evidence exchanged between the Scheme Administrators and the Class C Scheme Creditor during the Consultation Period), to a Scheme Adjudicator for review.

40.2    The Scheme Administrators shall refer each Referred Scheme Claim to a Scheme Adjudicator. The Referred Scheme Claims shall be assigned to a Scheme Adjudicator according to the alphabetical order of the Scheme Adjudicators' surnames (such that the first Referred Scheme Claim shall be assigned to the Scheme Adjudicator whose surname appears first in the alphabet, and this process shall be repeated until all Referred Scheme Claims have been assigned). Notwithstanding the aforesaid:

(a)    the Scheme Administrators may consider, in their sole discretion, select a different Scheme Adjudicator to determine a Referred Scheme Claim because of practicality or efficiency reasons, for example, when the Referred Scheme Claim involves a commonality of issues with another Referred Scheme Claim that has been, or is being, determined by that Scheme Adjudicator, and subject to that Scheme Adjudicator confirming with the Scheme Administrators that he/she has no conflict of interest in respect of adjudicating the second Referred Scheme Claim. For the purpose of this paragraph (a), the Scheme Adjudicator shall endeavor to complete such conflicts checks within three (3) Business Days of receipt of the second Referred Scheme Claim; and

(b)    where a Scheme Adjudicator has been unable to accept a Referred Scheme Claim due to a conflict of interest, that Scheme Adjudicator will be approached first in respect of the next Referred Scheme Claim.

40.3    The Scheme Adjudicator shall review the Referred Scheme Claim and relevant evidence before him/her and decide whether to:

(a)    make a final and binding adjudication on the Referred Scheme Claim; or

(b)    request further evidence from the Class C Scheme Creditor and/or the Scheme Administrators.

40.4    The Scheme Adjudicator shall have the power to make directions, extend the prescribed timeframes and/or adopt procedures as he or she considers appropriate for the purposes of providing a fair, efficient and expeditious means for the adjudication of the Referred Scheme Claim. Specifically, the Scheme Adjudicator may, in his/her sole discretion:

(a)    provide directions on the overall conduct of the Adjudication Procedure;

(b)    provide additional directions to the relevant Class C Scheme Creditor, the Company, the Excluded Liabilities Party Person (to the extent relevant and where the Company possesses the direct contact details for such person) and/or the Scheme Administrators to submit written submissions and/or further evidence;

(c)    convene an oral hearing and make directions as to the date, form, content, procedure and time limits of such hearing, provided that each of the relevant Class C Scheme Creditor, the Company, the Scheme Administrators and any other participating party is given reasonable notice in writing of any such hearing;

(d)    appoint one or more experts (who shall be and remain impartial and independent of the Company and the relevant Class C Scheme Creditor and shall be engaged by

94

the Scheme Administrators) to report in writing to him/her on specific issues relating to the Referred Scheme Claim;

(e)    extend the timetable set out in Clause 40.5; and

(f)    make an order as to costs against either the Company or the Class C Scheme Creditor.

40.5    If a Referred Scheme Claim is referred to the Scheme Adjudicator, the following timetable shall apply:

(a)    within fourteen (14) calendar days of the Scheme Adjudicator receiving and being assigned the Referred Scheme Claim:

(i)    the Scheme Adjudicator may request the Scheme Administrators, the Company, the Excluded Liabilities Party Person (to the extent relevant and where the Company possesses the direct contact details for such person) and/or the relevant Class C Scheme Creditor to produce any further documents or other information which he/she deems necessary (the "**Further Documentation**"); or

(ii)    if the Scheme Adjudicator does not require any Further Documentation, he/she shall provide the Scheme Administrators, the Company and the relevant Class C Scheme Creditor with a copy of his/her written decision setting out the adjudicated value of that Class C Scheme Creditor's Entitlement, which shall be final and binding on that Class C Scheme Creditor, the Scheme Administrators and the Company, insofar as the law allows.

(b)    if such Further Documentation is not received (in full or in part) within fourteen (14) calendar days from the date of the Scheme Adjudicator's request, the Scheme Adjudicator shall make his/her determination on the basis of the documents provided to him/her; and

(c)    within fourteen (14) calendar days of: (i) receipt of the Further Documentation; or (ii) the expiry of the period provided for in paragraph (b) above, the Scheme Adjudicator shall provide the Scheme Administrators, the Company and the relevant Class C Scheme Creditor with a copy of his/her written decision setting out the adjudicated value of that Class C Scheme Creditor's Entitlement, which shall be final and binding on that Class C Scheme Creditor, the Scheme Administrators and the Company, insofar as the law allows.

40.6    Upon receipt of the Scheme Adjudicator's decision as set out in Clause 40.5, the Scheme Administrators will send the Class C Scheme Creditor a Deed of Agreed Valuation to be executed by the Class C Scheme Creditor as a condition precedent to receiving the Scheme Consideration.

40.7    The costs of the Adjudication Procedure (including the costs of the Scheme Adjudicator and any legal and other expenses incurred by the Company and the relevant Class C Scheme Creditor) are matters within the discretion of the Scheme Adjudicator. In exercising his/her discretion as to costs the Scheme Adjudicator shall:

(a)    as a starting point, be guided by the principle that costs follow the event; and

(b)    have regard to the principles applied by the Hong Kong Court in respect of costs orders from time to time.

40.8    Payment to the Company in full of any costs ordered against a Class C Scheme Creditor shall be a condition precedent to that Scheme Creditor's entitlement to and receipt of its Scheme Consideration.

40.9    Communications between the Scheme Adjudicator, the Scheme Administrators, the Company and the relevant Class C Scheme Creditors shall be conducted by email and in English or Chinese, as the Scheme Adjudicator or the Scheme Administrators (as applicable) in their sole discretion deem appropriate, taking into consideration the needs of the Class C Scheme Creditor. The Scheme Adjudicator may also, at his or her discretion, direct oral submissions to be made in either English or Chinese.

40.10    The Adjudication Procedure shall be conducted in English or Chinese, as directed by the Scheme Adjudicator in their sole discretion. The relevant Class C Scheme Creditor shall ensure that all documents submitted to the Scheme Adjudicator (or the relevant parts of those documents) are in English or accompanied by an English translation at the Class C Scheme Creditor's expense, if so required by the Scheme Adjudicator.

*Company's Obligations in the Adjudication Procedure*

40.11    Management are obliged, and agree, to cooperate fully with the Scheme Adjudicator in relation to any reasonable requests in respect of the Adjudication Procedure.

40.12    The Deed of Undertaking Parties, the Company and the Group are obliged, and agree, to use their best endeavours to provide the Scheme Adjudicator with any information or documents reasonably requested by the Scheme Adjudicator which are relevant to a Referred Scheme Claim, unless provision of such documents would be contrary to any law.

*Class C Scheme Creditor's Obligations in the Adjudication Procedure*

40.13    Each Class C Scheme Creditor is obliged, and agrees, to cooperate fully with the Scheme Adjudicator in relation to the Adjudication Procedure.

40.14    Each Class C Scheme Creditor is obliged, and agrees, to use its best endeavours to provide the Scheme Adjudicator with any information or documents reasonably requested by the Scheme Adjudicator which are relevant to its Referred Scheme Claim, unless provision of such documents would be contrary to any law.

*Scheme Administrators' Obligations in the Adjudication Procedure*

40.15    The Scheme Administrators are obliged, and agree, to cooperate fully with the Scheme Adjudicator in relation to the Adjudication Procedure.

40.16    The Scheme Administrators are obliged, and agree, to use their best endeavours to provide the Scheme Adjudicator with any information or documents reasonably requested by the Scheme Adjudicator which are relevant to a Referred Scheme Claim, unless provision of such documents would be contrary to any law.

*Reserving process*

40.17    Notwithstanding any other provisions of this Hong Kong Scheme:

(a)    the Company and the Scheme Administrators are not required to postpone any payment or distribution to the Scheme Creditors (excluding any Class C Scheme Creditor whose Referred Scheme Claim has not been finally determined pursuant to the Adjudication Procedure (a "**Pending Referral Creditor**")) on the Final Distribution Date, in the event that any Referred Scheme Claim has not been finally determined by the Scheme Adjudicator prior to the Final Distribution Date;

(b)    where an adjudication of a Pending Referral Creditor's Referred Scheme Claim is underway and the Scheme Adjudicator's decision in respect of that Referred Scheme Claim is pending as at the Final Distribution Date:

    (i)    the Company and the Scheme Administrators shall:

        (A) solely for the purposes of calculating the amount distributable to other Class C Scheme Creditors and Class A Scheme Creditors, treat the value of the Pending Referral Creditor's Entitlement as being equal to the value being proposed by that Pending Referral Creditor in the Adjudication Procedure (the "**Asserted Amount**");

        (B) not make any distribution to the Pending Referral Creditor pending conclusion of the Adjudication Procedure; but reserve the Asserted Amount, or such greater amount, of the relevant Scheme Consideration as the Scheme Administrators consider necessary;

        (C) as soon as reasonably practicable after the Scheme Adjudicator concludes the adjudication of the Referred Scheme Claim of the Pending Referral Creditor, make a catch-up payment to the Pending Referral Creditor calculated by reference to the adjudicated value of that Pending Referral Creditor's Entitlement; and

    (ii)    to the extent the amount reserved under Clause 40.17(b)(i)(B) is greater than the amount to which the Pending Referral Creditor is actually entitled, the Company shall on the instruction of the Scheme Administrators distribute the excess amount to other Class C Scheme Creditors and Class A Scheme Creditors who have been elected to receive the Option 1 Scheme Consideration or Option 2 Scheme Consideration as applicable (depending on the Scheme Consideration reserved)and are entitled to receive Scheme Consideration on a pro-rata basis; and

(c)    where a Class A Scheme Creditor commences a Proceeding in a court against the Company or the Scheme Administrators to dispute the determination of its Entitlement:

    (i)    the Company and the Scheme Administrators may:

        (A) solely for the purposes of calculating the amount distributable to other Class A Scheme Creditors, treat the value of the relevant Class A Scheme Creditor's Entitlement as being equal to the value being proposed by that Class A Scheme Creditor in the Proceeding ("**Class A Asserted Amount**");

        (B) not make any distribution to the relevant Class A Scheme Creditor pending conclusion of the Proceeding; but reserve the Class A Asserted Amount, or such greater amount, of the relevant Scheme Consideration as the Scheme Administrators consider necessary;

(C) as soon as reasonably practicable after the Proceeding is fully and finally determined (and not subject to any appeal) or settled, make a catch-up payment if required to the relevant Class A Scheme Creditor calculated by reference to the value of its Entitlement as determined in the Proceeding or agreed under the settlement agreement;

(ii) if no amount is reserved under Clause 40.17(c)(i)(B) and a catch-up payment is required pursuant to Clause 40.17(c)(i)(C), the Company shall issue A1 Notes on a dollar-for-dollar basis to the relevant Class A Scheme Creditor in respect of any Entitlement for which it has not received Scheme Consideration; and

(iii) to the extent the amount reserved under Clause 40.17(c)(i)(B) is greater than the amount to which the relevant Class A Scheme Creditor is actually entitled, the Company shall extinguish the reserved Scheme Consideration.

## 41.    NOTICE

41.1    Any notice or other written communication to be given under or in relation to this Hong Kong Scheme shall be given in writing and shall be deemed to have been duly given if it is delivered by hand, or sent by courier, post, fax or email to:

(a)    in the case of the Company:

(i)    by courier or registered post to China Evergrande Group, 15th Floor, YF Life Centre, 38 Gloucester Road, Wanchai, Hong Kong;

(ii)    for the attention of: Jimmy Fong; and

(iii)    by email to jfong@evergrande.com;

(b)    in the case of the Scheme Administrators, by email to: evergrande.scheme@kpmg.com;

(c)    in the case of a Scheme Creditor, its last known address according to the records of the Company or the Information Agent or by corporate action notice through the Clearing Systems (i.e., the Existing Notes Depositary or New Instruments Depository, as applicable); and

(d)    in the case of any other person, any address set forth for that person in any agreement entered into in connection with this Hong Kong Scheme or the last known address according to the Company or by fax to its last known fax number according to the Company.

41.2    Any notice or other written communication to be given under this Hong Kong Scheme shall be deemed to have been served:

(a)    if delivered by hand or courier, on the first Business Day following delivery;

(b)    if sent by post, on the second Business Day after posting if the recipient is in the country of dispatch, otherwise on the tenth Business Day after posting; and

(c)    if by fax or email, on the Business Day sent.

41.3    In proving service, it shall be sufficient proof in the case of a notice sent by post that the envelope was properly stamped, addressed and placed in the post.

41.4    The accidental omission to send any notice, written communication or other document in accordance with this Clause 41 (*Notice*) or the non-receipt of any such notice by any Scheme Creditor, shall not affect the provisions of this Hong Kong Scheme.

41.5    The Company shall not be responsible for any loss or delay in the transmission of any notices, other documents or payments posted by or to any Scheme Creditors which shall be posted at the risk of such Scheme Creditors.

41.6    This Clause 41 (*Notice*) shall not apply to the documents comprising the Solicitation Packet, which should be completed and returned in accordance with the instructions set out therein.

## 42.    CORRESPONDING DISCHARGE OF PERFORMANCE

The performance by the Company, the Information Agent and the Scheme Administrators or Scheme Adjudicator (if applicable) of any obligation under one Scheme (including pursuant to a Deed of Undertaking in respect of such Scheme) shall operate to discharge any corresponding obligation under the other Scheme and vice-versa.

## 43.    APPLICATION TO THE HONG KONG COURT FOR DIRECTIONS

Without prejudice to any rights that the Company might otherwise have in connection with this Hong Kong Scheme or any aspect of it, the Company shall be entitled to make an application to the Hong Kong Court for directions at any time in connection with any matter arising under or in relation to this Hong Kong Scheme.

## 44.    FOREIGN REPRESENTATIVE

Any Director (whether holding office now or in the future) or person appointed by resolution of the Directors shall be authorised or ratified to act as the representative of the Company on and in connection with any application for recognition and assistance in relation to this Hong Kong Scheme in any jurisdiction and under whatever law, including (without limitation) Chapter 15 of the US Bankruptcy Code and any other law derived from or similar to the UNCITRAL Model Law on Cross-Border Insolvency Proceedings.

## 45.    THIRD PARTIES

45.1    Subject to Clause 45.2, no Person who is not a party to this Hong Kong Scheme has any right under the Contracts (Rights of Third Parties) Ordinance (Cap. 623 of the Laws of Hong Kong) (as amended) to enforce any of the terms of this Hong Kong Scheme.

45.2    The Released Persons may enforce the relevant terms of this Hong Kong Scheme in accordance with the Contracts (Rights of Third Parties) Ordinance (Cap. 623 of the Laws of Hong Kong) (as amended). For these purposes, the parties to this Hong Kong Scheme agree that the Contracts (Rights of Third Parties) Ordinance (Cap. 623 of the Laws of Hong Kong) (as amended) shall be deemed to apply to this Hong Kong Scheme.

## 46.    TERMINATION OF THIS SCHEME

46.1    The Company may terminate this Hong Kong Scheme at any time prior to the Restructuring Effective Date, by notice to the Scheme Creditors, provided that:

       (a)      the Company also exercises its right to terminate the Cayman Scheme; and

       (b)      written consent for the termination is obtained by the Company from:

             (i)      the Majority CEG AHG; or

             (ii)     (without prejudice to the foregoing) if the CEG AHG does not hold the Minimum CEG AHG Threshold, the Super Majority Participating Creditors.

46.2    In the event that this Hong Kong Scheme is terminated pursuant to the terms of this Clause 46 (*Termination of this Scheme*), each Scheme Creditor shall be entitled to exercise any and all of its rights, powers and remedies against the Company under the terms and conditions of the documents governing the Existing Debts as though this Hong Kong Scheme had never been contemplated or implemented.

46.3    This Hong Kong Scheme shall terminate automatically, and be of no further force and effect in the event that the Restructuring Effective Date, including all of the steps outlined in paragraphs (a) to (j) of Clause 6.5, has not occurred by the Longstop Date.

## 47.    CONFLICT AND INCONSISTENCY

In the case of a conflict or inconsistency between the terms of the Schemes and the terms of the Explanatory Statement, the terms of the Schemes will prevail.

## 48.    SEVERABILITY

If at any time any provision of this Hong Kong Scheme, the Restructuring Documents (or any other document to be executed under or in accordance with this Hong Kong Scheme) is or becomes illegal, invalid or unenforceable in any respect under the laws of any jurisdiction, such provision shall be severed from this Hong Kong Scheme or such Restructuring Document or such other document (as the case may be) and neither the legality, validity or enforceability under the law of any other jurisdiction of that or any provision of this Hong Kong Scheme shall be affected or impaired.

## 49.    GOVERNING LAW AND JURISDICTION

49.1    This Hong Kong Scheme and any non-contractual obligations arising out of or in connection with this Hong Kong Scheme shall be governed by, and construed in accordance with, the laws of Hong Kong.

49.2    The Company and the Scheme Creditors hereby agree that the courts of Hong Kong shall have exclusive jurisdiction to hear and determine any Proceeding and to settle any dispute which arises out of or is connected with the terms of this Hong Kong Scheme or its implementation or out of any Proceeding taken or omitted to be taken under this Hong Kong Scheme or in connection with the administration of this Hong Kong Scheme.

49.3    For the purposes set out in Clause 49.2, each of the Company and the Scheme Creditors irrevocably submit to the jurisdiction of the courts of Hong Kong, *provided, however,* that nothing in this Clause 49 (*Governing Law and Jurisdiction*) shall affect the validity of other provisions determining governing law and jurisdiction as between the Company and any of the Scheme Creditors whether contained in any contract or for any other purpose including, but not limited to, submission and/or enforcement under the jurisdiction of the US Bankruptcy Court in relation to the Chapter 15 Recognition Proceeding, including (but not limited to) the Recognition Filings and the Chapter 15 Recognition Order.

49.4    The terms of this Hong Kong Scheme and the obligations imposed on the Company hereunder shall take effect subject to any prohibition or condition imposed by any applicable law.

## SCHEDULE 1

## RESTRUCTURING DOCUMENTS

1.      the Schemes;

2.      the Explanatory Statement;

3.      Existing Notes Trustee Instruction;

4.      Deeds of Release;

5.      Deed of Undertaking;

6.      New Instrument Documents;

7.      Security Documents;

8.      Holding Period Trust Deed;

9.      New Intercreditor Agreements; and

10.     all other documents, agreements, instruments, board resolutions, shareholder approvals, releases, and notices necessary to implement or consummate the Restructuring in accordance with the terms of the RSAs and Schemes, in each case as amended, supplemented, extended, restated or novated from time to time, or any document or instrument creating or evidencing any security interest or guarantee, any fee letter, intercreditor agreement or similar documents under or in connection with the New Instruments and/or the Security Documents, in each case in the Agreed Form. For the avoidance of doubt, any documents and accompanying evidence (including, but not limited to, foreign law expert opinions and all other affidavit evidence filed by the Company in respect of the Proceedings before the Hong Kong Court to convene the Hong Kong Scheme Meetings and/or to sanction this Hong Kong Scheme) specifically required as part of the Hong Kong Court's proceedings are not included.

## SCHEDULE 2

## CLASS C DEBTS

*All values below are for reference, indicative only, and subject to change. To the extent a balance of the principal is referred to, it is as at 31 December 2022. For items 16 to 116, the value refers to the principal amount as at 30 June 2023.*

1.    Amounts on-lent to CEG pursuant to the loan agreement relating to the provision of the Class A Private Loan;

2.    CEG guarantee of the US$260 million 8.5% senior notes due October 3, 2021 (ISIN: XS2054446617, Common Code: 205444661) issued by Jumbo Fortune Enterprises Limited;

3.    CEG guarantee of the US$424 million 9.0% senior notes due January 22, 2023 (ISIN: XS2290369128, Common Code: 229036912) issued by Great Courage Global Limited;

4.    US$116 million put option granted by CEG in relation to certain Dongpo Notes;

5.    US$110 million put option granted by CEG in relation to shares of Graceful Court Limited;

6.    CEG guarantee of HK$160 million margin loan borrowed by New Chic Global Limited;

7.    CEG guarantee of the HK$575 million put option in respect of shares of Clear Star Investments Limited;

8.    HK$1.2 billion loan borrowed by CEG due 2 January 2022;

9.    HK$600 million loan borrowed by CEG due 7 January 2022;

10.   CEG guarantee of the US$20 million structured loan borrowed by Rainbow Ever Limited (the "**Venice Loan**");

11.   CEG guarantee of the US$355 million structured sale and purchase agreement of shares in Rainbow Ever Limited (the "**Venice SPA**");

12.   CEG guarantee of the HK$7.6 billion loan borrowed by Tianji Holding Limited pursuant to facilities agreement dated 21 November 2020 (the "**Hero Loan**");

13.   US$712 million repurchase obligations of CEG in respect of Fangchebao Group Co. Ltd;

14.   Repurchase obligation of CEG in relation to the RMB Bonds;

15.   CEG guarantee of Guangzhou Kailong Real Estate Company Limited's RMB5 billion repurchase obligation of shares in Hengda Real Estate, together with interest and costs, which was awarded in an Arbitration Award rendered by Shenzhen Court of International Arbitration where CEG, Guangzhou Kailong Real Estate Company Limited, and the Chairman were responsible for the repayment accordingly;

16.   CEG guarantee of the RMB1.29 billion loan borrowed by Tianjin Hengda Guorui New Energy Technology Co., Ltd;

17.   CEG guarantee of the RMB788 million loan borrowed by Evergrande New Energy Automative Investment Holdings Group Co. Ltd.;

18.    CEG guarantee of the RMB664.4 million loan borrowed by Evergrande Financial Holding Group (Shenzhen) Co., Ltd.;

19.    CEG guarantee of the RMB440 million loan borrowed by Evergrande Tourism Operation Management Group Co., Ltd.;

20.    CEG guarantee of the RMB294 million loan borrowed by Evergrande New Energy Automotive Investment Holdings Group Co. Ltd.;

21.    CEG guarantee of the RMB1.2676 billion loan borrowed by Zhoushan Yinyi Real Estate Development Co., Ltd.;

22.    CEG guarantee of the RMB400 million loan borrowed by Tianjin Evergrande Guorui New Energy Technology Co., Ltd (RMB227 million) and Junfang Material Equipment (Guangdong) Co., Ltd. (RMB173 million);

23.    CEG guarantee of the RMB180.5 million loan borrowed by Guiyang Evergrande Tongmeng Tiandi Tourism Development Co., Ltd.;

24.    CEG guarantee of the RMB150 million loan borrowed by Evergrande High-Tech Group Co., Ltd.;

25.    CEG guarantee of the RMB1,399,833,998 loan borrowed by Evergrande Intelligent Vehicle (Guangdong) Co., Ltd.;

26.    CEG guarantee of the RMB324,960,454.47 loan borrowed by Cangzhou Yiju Real Estate Development Co., Ltd.;

27.    CEG guarantee of the RMB85 million loan borrowed by Jurong Hengyi Tourism Development Co., Ltd.;

28.    CEG guarantee of the RMB229,989,971.35 loan borrowed by Xi'an Tianhong Tourism Development Co., Ltd.;

29.    CEG guarantee of the RMB136.5 million loan borrowed by Taicang Yutai Tourism Development Co., Ltd.;

30.    CEG guarantee of the RMB138.03 million loan borrowed by Wuhan Chushui Yunshan Agricultural Development Co., Ltd.;

31.    CEG guarantee of the RMB1.805 billion loan borrowed by Evergrande Fairyland Group Limited;

32.    CEG guarantee of the RMB1.71 billion loan borrowed by Evergrande Health Industry Group Co., Ltd.;

33.    CEG guarantee of the RMB1,659,649,830.75 loan borrowed by Wuhan Baden City Investment Co., Ltd.;

34.    CEG guarantee of the RMB710 million loan borrowed by Yunnan Yuxing Zhongtian Real Estate Development Co., Ltd.;

35.    CEG guarantee of the RMB115 million loan borrowed by Yunnan Yuxing Zhongtian Real Estate Development Co., Ltd.;

36.     CEG guarantee of the RMB962.38 million loan borrowed by Hainan Boao Evergrande International Hospital Co., Ltd.;

37.     CEG guarantee of the RMB296 million loan borrowed by Gui'an Xinqu Evergrande Huading Tourism Development Co., Ltd.;

38.     CEG guarantee of the RMB70 million loan borrowed by Qidong Yuhao Real Estate Co., Ltd.;

39.     CEG guarantee of the RMB12.54 million loan borrowed by Gui'an Xinqu Evergrande Huading Tourism Development Co., Ltd.;

40.     CEG guarantee of the RMB1.13 billion loan borrowed by Guangdong Maoqi Investment Co., Ltd.;

41.     CEG guarantee of the RMB650 million loan borrowed by Wuhan Baden City Investment Co., Ltd.;

42.     CEG guarantee of the RMB600 million loan borrowed by Zhengzhou Hengzetong Health Real Estate Co., Ltd.;

43.     CEG guarantee of the RMB450 million loan borrowed by Zhengzhou Hengzetong Health Real Estate Co., Ltd.;

44.     CEG guarantee of the RMB440 million loan borrowed by Wuhan Baden City Investment Co., Ltd.;

45.     CEG guarantee of the RMB350 million loan borrowed by Zhengzhou Hengzetong Health Real Estate Co., Ltd.;

46.     CEG guarantee of the RMB937.106 million loan borrowed by Evergrande New Energy Vehicle (Guangdong) Co., Ltd.;

47.     CEG guarantee of the RMB549 million loan borrowed by Changsha Evergrande Fairyland Tourism Development Co., Ltd.;

48.     CEG guarantee of the RMB435 million loan borrowed by Qidong Evergrande Hot Spring City Development Co., Ltd.;

49.     CEG guarantee of the RMB214,603,797.65 loan borrowed by Hubei Hengxiang Tourism Development Co., Ltd.;

50.     CEG guarantee of the RMB150,473,333.33 loan borrowed by Shaanxi Haishen Construction Engineering Co., Ltd.;

51.     CEG guarantee of the RMB150.4 million loan borrowed by Kaifeng Kaize Tourism Development Co., Ltd.;

52.     CEG guarantee of the RMB1,638,803,164.71 loan borrowed by Kunming Jialize Tourism Culture Co., Ltd.;

53.     CEG guarantee of the RMB1.3 billion loan borrowed by Kunming Jialize Tourism Culture Co., Ltd.；

54.     CEG guarantee of the RMB1 billion loan borrowed by Yangzhong Hengrui Real Estate Co., Ltd.;

55.    CEG guarantee of the RMB176,117,602.18 loan borrowed by Evergrande Fairyland Group Limited;

56.    CEG guarantee of the RMB1,042,069,759.76 loan borrowed by Wuhan Chushui Yunshan Agricultural Development Co., Ltd;

57.    CEG guarantee of the RMB120 million loan borrowed by Chongqing Hengjin Health Industry Co., Ltd.;

58.    CEG guarantee of the RMB800 million loan borrowed by Evergrande Fairyland Group Limited;

59.    CEG guarantee of the RMB272 million loan borrowed by Guangxi Fusui Hengli Health Industry Development Co., Ltd.;

60.    CEG guarantee of the RMB203,023,644.35 loan borrowed by Wuzhou Hengmei Health Industry Co., Ltd.;

61.    CEG guarantee of the RMB410,046,058.86 loan borrowed by Hubei Herui Tourism Development Co., Ltd.;

62.    CEG guarantee of the RMB272,422,383.12 loan borrowed by Wuhan Chushui Yunshan Agricultural Development Co., Ltd;

63.    CEG guarantee of the RMB180 million loan borrowed by Evergrande Ruibo Power Technology (Shenzhen) Co., Ltd.;

64.    CEG guarantee of the RMB445,633,820.41 loan borrowed by Evergrande New Energy Technology Group Co., Ltd.;

65.    CEG guarantee of the RMB256,674,595.17 loan borrowed by Evergrande New Energy Automotive Investment Holdings Group Co. Ltd.;

66.    CEG guarantee of the RMB62.54 million loan borrowed by Meishan Longhe Tourism Development Co., Ltd.;

67.    CEG guarantee of the RMB359,472,266.26 loan borrowed by Taicang Yutai Tourism Development Co., Ltd.;

68.    CEG guarantee of the RMB381 million loan borrowed by Evergrande New Energy Technology Group Co., Ltd.;

69.    CEG guarantee of the RMB68.3 million loan borrowed by Cangzhou Yiju Real Estate Development Co., Ltd.;

70.    Guarantee in relation to the RMB147.2 million loan borrowed by Nanjing Hengkang Real Estate Co., Ltd.;

71.    CEG guarantee of the RMB999 million loan borrowed by Evergrande Fairyland Group Limited;

72.    CEG guarantee of the RMB499,357,862.03 loan borrowed by Danzhou Hengle Culture Development Co., Ltd.;

73.    CEG guarantee of the RMB485,885,774.81 loan borrowed by Jurong Fairyland Tourism Development Co., Ltd.;

106

74. CEG guarantee of the RMB217,198,571.40 loan borrowed by Changsha Evergrande Fairyland Tourism Development Co., Ltd.;

75. CEG guarantee of the RMB200 million loan borrowed by Cangzhou Fairyland Tourism Development Co., Ltd.;

76. CEG guarantee of the RMB200 million loan borrowed by Danzhou Zhiyuan Tourism Development Co., Ltd.;

77. CEG guarantee of the RMB200 million loan borrowed by Danzhou Yibei Tourism Development Co., Ltd.;

78. CEG guarantee of the RMB200 million loan borrowed by Danzhou Shengbang Tourism Development Co., Ltd.;

79. CEG guarantee of the RMB388,418,616.68 loan borrowed by Qianhai Jiesuan Commercial Factoring (Shenzhen) Co., Ltd;

80. CEG guarantee of the RMB280 million loan borrowed by Hainan Boao Evergrande International Hospital Co., Ltd.;

81. CEG guarantee of the RMB244 million loan borrowed by Shenzhen Qianhai Xingbang Commercial Factoring Co., Ltd.;

82. CEG guarantee of the RMB200 million loan borrowed by Hainan Hengqian Material Equipment Co., Ltd.;

83. CEG guarantee of the RMB159,999,090.88 loan borrowed by Xi'an Changde Tourism Development Co., Ltd.;

84. CEG guarantee of the RMB126,998,890.81 loan borrowed by Kaifeng Fairyland Development Co., Ltd.;

85. CEG guarantee of the RMB120 million loan borrowed by Jurong Fairyland Tourism Development Co., Ltd.;

86. CEG guarantee of the RMB64 million loan borrowed by Kaifeng Shengbang Tourism Development Co., Ltd.;

87. CEG guarantee of the RMB11 million loan borrowed by Kaifeng Shengbang Tourism Development Co., Ltd.;

88. CEG guarantee of the RMB98,245,776.78 loan borrowed by Guiyang Evergrande Tongmeng Tiandi Tourism Development Co., Ltd.;

89. CEG guarantee of the RMB62,030,672.18 loan borrowed by Guiyang Evergrande Tongmeng Tiandi Tourism Development Co., Ltd.;

90. CEG guarantee of the RMB55,104,092.72 loan borrowed by Changsha Evergrande Fairyland Tourism Development Co., Ltd.;

91. CEG guarantee of the RMB35 million loan borrowed by Xi'an Evergrande Fairyland Tourism Development Co., Limited;

92. CEG guarantee of the RMB35 million loan borrowed by Xi'an Evergrande Fairyland Tourism Development Co., Limited;

93.     CEG guarantee of the RMB897.5 million loan borrowed by Danzhou Jiayuan Tourism Development Co., Ltd.;

94.     CEG guarantee of the RMB386.2 million loan borrowed by Danzhou Ruifeng Tourism Development Co., Ltd.;

95.     CEG guarantee of the RMB378.4 million loan borrowed by Qidong Tongyu Real Estate Co., Ltd.;

96.     CEG guarantee of the RMB210.4 million loan borrowed by Qidong Baofeng Real Estate Co., Ltd.;

97.     CEG guarantee of the RMB85 million loan borrowed by Danzhou Dongtuo Tourism Development Co., Ltd.;

98.     CEG guarantee of the RMB22 million loan borrowed by Danzhou Shengbang Tourism Development Co., Ltd.;

99.     CEG guarantee of the RMB710 million loan borrowed by Evergrande New Energy Automotive Investment Holdings Group Co. Ltd.;

100.    CEG guarantee of the RMB1.4 billion loan borrowed by Hengning Health Industry Nanjing Co., Ltd.;

101.    CEG guarantee of the RMB540 million loan borrowed by Xianning Hengchen Real Estate Co., Ltd.;

102.    CEG guarantee of the RMB200 million loan borrowed by Hohhot Hengpeng Health Industry Co., Ltd.;

103.    CEG guarantee of the RMB200 million loan borrowed by Hengpeng Health Industry Liaoning Co., Ltd.;

104.    CEG guarantee of the RMB103,135,896.70 loan borrowed by Xianning Hengyang Real Estate Co., Ltd.;

105.    CEG guarantee of the RMB600 million loan borrowed by Jiangyin Hengpeng Real Estate Co., Ltd.;

106.    CEG guarantee of the RMB2,982,370,000 loan borrowed by Grandland Holding Group Co., Ltd.;

107.    CEG guarantee of the RMB2.8 billion loan borrowed by Renhe Investment Holding Co., Ltd.;

108.    CEG guarantee of the RMB2.6 billion loan borrowed by Harbin Jurong New Energy Co., Ltd.;

109.    CEG guarantee of the RMB1,734,928,916.67 loan borrowed by Sichuan Juhe Ecological Agriculture Development Co., Ltd.;

110.    CEG guarantee of the RMB2.1 billion loan borrowed by Chengdu Jiacheng Tianxia Public Facilities Co., Ltd.;

111.    CEG guarantee of the RMB1.5 billion loan borrowed by Shenzhen Construction Engineering Co., Ltd.;

112.    CEG guarantee of the RMB1 billion loan borrowed by Shenzhen Construction Engineering Co., Ltd.;

113.    CEG guarantee of the RMB480 million loan borrowed by Liaoning Donglin Reinas Co., Ltd.;

114.    CEG guarantee of the RMB336,809,471.63 loan borrowed by Shenzhen Grandland Hi-Tech New Material Co., Ltd.;

115.    CEG guarantee of the RMB110,919,594.87 loan borrowed by Liaoning Hengyang Health Real Estate Co., Ltd.;

116.    CEG guarantee of the RMB100 million loan borrowed by Shenzhen Grandland Hi-Tech New Material Co., Ltd; and

117.    Any other unsecured liability of CEG arising under a guarantee, indemnity, put option, repurchase obligation, judgment, arbitration, or other obligation or liability arising in connection with the liabilities of the entities identified in items 16 to 116 of this Schedule.

**SCHEDULE 3**

**RESTRUCTURING EFFECTIVE DATE CONDITIONS**

1.   **Satisfaction of Scheme Conditions:** the satisfaction of the Scheme Conditions, and the occurrence of the Scheme Effective Date.

2.   **Resumption of trading:** the resumption of trading of the shares in each of CEG, NEV and EVPS on the HKEX, following certain conditions being met (as applicable, to the extent required by the HKEX), including:

    (a)   publishing all outstanding financial information required under the Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited (the "**Listing Rules**") and addressing any audit modifications;

    (b)   submission of evidence demonstrating compliance with Rule 13.24 of the Listing Rules;

    (c)   publication of announcements from time to time to inform the market of all material information for shareholders and other investors to appraise the company's position;

    (d)   completion of an independent investigation by CEG and EVPS into the enforcement by relevant banks of pledge guarantee of EVPS, in the amount of RMB13.4 billion, publication of the findings by way of announcement and adoption of appropriate remedial measures;

    (e)   completion of an independent internal control review of CEG and EVPS to demonstrate that the company has in place adequate internal controls and procedures to meet the obligations under the Listing Rules; and

    (f)   submission of evidence by CEG and EVPS demonstrating that there is no reasonable regulatory concern about management integrity and/or the integrity of any persons with substantial influence over the company's management and operations, which may pose a risk to investors and damage market confidence.

3.   **Equitization of Related Party Loan:** subject to obtaining relevant approvals, CEG to use best endeavours to procure the conversion of the Related Party Loan into new NEV Shares at an issue price of HK$3.84 per share.

4.   **Relevant approvals of Scheme Consideration:** the delivery of all relevant approvals, pre-approvals or consents, as applicable, in connection with the Restructuring having been obtained, including, as applicable:

    (a)   delivery of respective court orders in respect of the Schemes and Chapter 15 Recognition Proceeding (and in the case of Chapter 15 unless waived by the Company);

    (b)   approval in-principle for the listing and quotation of the New Instruments on the SGX-ST;

    (c)   submission to HKEX and confirmation by HKEX that the issuance of the NEV MEBs will constitute only a disclosable transaction for CEG under Chapter 14 of the Listing Rules;

    (d)   approval by the Board for the issuance of the New Instruments;

(e)     publication of announcements of CEG, NEV and EVPS on the issuance of the New Instruments (as applicable);

(f)     submission of draft circular of CEG to HKEX in relation to the CEG MCBs and approval and clearance of the circular by HKEX;

(g)     dispatch of circular and notice of an extraordinary general meeting of CEG to shareholders of CEG to approve, among other things, the issuance of the CEG MCBs and the issuance of the new CEG Shares upon conversion of the CEG MCBs;

(h)     submission of application for and obtaining the listing approval by the Listing Committee of the HKEX for the listing of, and the permission to deal in, the new CEG Shares to be issued under the CEG MCBs;

(i)     approval by the shareholders of CEG at the extraordinary general meeting for the issuance of the CEG MCBs;

(j)     publication of poll result announcement of the extraordinary general meeting of CEG; and

(k)     any required governmental or regulatory approval, filings or registration (including but not limited to any procedures required by the NDRC in connection with the issuance of the New Instruments) in connection with the Restructuring and with respect to the execution, delivery or performance of the Restructuring Documents under any applicable PRC laws, regulations, orders and decrees of any PRC Governmental Entities has been obtained and made. This condition is unable to be waived;

5.     **MIPs:**

(a)     the formulation of a management incentive plan with EVPS Management following consultation with the AHG Advisors; and

(b)     the formulation of a management incentive plan with NEV Management following consultation with the AHG Advisors.

6.     **Payment of fees:**

(a)     settlement of all professional fees associated with the Restructuring that the Company has agreed to pay and that have been duly invoiced to the Company namely (i) the AHG Legal Fees and the AHG Financial Advisor Fees, (ii) the fees, costs and expenses of all of its Affiliates, the Advisors, the Information Agent, the Scheme Administrators, the Holding Period Trustee, (ii) the fees, costs and expenses of the Existing Notes Trustee, the Existing Notes Collateral Agent, the Existing Notes Depositary, the Existing Notes Paying and Transfer Agent and Registrar, and (iii) the fees, costs and expenses of the New Instruments Depositary, the New Instruments Paying and Transfer Agent and Registrar, the New Instruments Trustee and the Collateral Agent; and

(b)     payment in full of the AHG Work Fee (subject to the AHG Work Fee Letter).

7.     **Other conditions:**

(a)     the receipt of written confirmation from (A) Kirkland & Ellis (on behalf of the CEG AHG); and (B) Sidley Austin (on behalf of CEG) that each Restructuring Document is in Agreed Form;

111

(b)    the execution of all necessary corporate authorizations to implementation of the Restructuring and entry into the relevant Restructuring Documents by the relevant parties thereto (not otherwise included in (1)-(6) above);

(c)    the satisfaction of each of the specific conditions precedent contained in each of the Restructuring Documents (in each case in the Agreed Form) and any corporate governance term sheet forming part of the Explanatory Statement (as and to the extent applicable).

**SCHEDULE 4**

**EXISTING NOTES SUBSIDIARY GUARANTORS**

1.     Anji (BVI) Limited;

2.     Billion Mark Limited;

3.     Fengyu (BVI) Limited;

4.     Full Hill Limited;

5.     Goldbridge Limited;

6.     Honour Oasis Limited;

7.     Jiading Holdings Limited;

8.     Jiajian (BVI) Limited;

9.     Jiaying Holdings Limited;

10.    Jiayu Holdings Limited;

11.    Pyramid Wealth Holdings Limited;

12.    Value Depot Holdings Limited; and

13.    Yitong (BVI) Limited.

**SCHEDULE 5**

**COURT ORDER**

**HCMP 1091 / 2023**

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

MISCELLANEOUS PROCEEDINGS NO. 1091 OF 2023



IN THE MATTER of CHINA EVERGRANDE GROUP 中國恒大集團

and

IN THE MATTER of Section 670 of the Companies Ordinance (Cap. 622)

27 JUL 2023

---

**BEFORE THE HONOURABLE MADAM JUSTICE LINDA CHAN IN CHAMBERS**

**ORDER**

UPON THE APPLICATION of the above named China Evergrande Group 中國恒大集團 (the "**Company**") by way of *Ex Parte* Originating Summons filed herein on 12 July 2023 ("**Originating Summons**").

AND UPON READING the Originating Summons, the Affirmation of Hui Ka Yan filed herein on 20 July 2023 together with the exhibits referred to therein, including but not limited to the draft explanatory statement for the Scheme ("**Explanatory Statement**"), the Affirmation of Neil Edward McGregor McDonald filed herein on 21 July 2023 together with the exhibits referred to therein, and the Affirmation of Wu Tin Long filed herein on 24 July 2023 together with the exhibits referred to therein.

AND UPON HEARING leading counsel for the Company and counsel for the ad hoc group of creditors of the Company.

IT IS ORDERED that:-

1.     The Company be at liberty to convene, for the purposes of the proposed scheme of

arrangement under sections 670, 673 and 674 of the Companies Ordinance (Cap. 622) (the "**Scheme**") to be made between the Company and the Scheme Creditors (as defined under the Scheme), the following meetings of its Scheme Creditors each for the purpose of considering and, if thought fit, approving (with or without modification) the Scheme:

    a.   one meeting of the Class A Scheme Creditors (as defined in the Scheme) (the "**Class A Hong Kong Scheme Meeting**")

    b.   one meeting of the Class C Scheme Creditors (as defined in the Schemes) (the "**Class C Hong Kong Scheme Meeting**", together with the Class A Hong Kong Scheme Meeting, the "**Scheme Meetings**", and each a "**Scheme Meeting**"),

2.    The Scheme Meetings will be held on 23 August 2023 in Hong Kong at 39/F, Two International Finance Centre, 8 Finance Street, Central, Hong Kong (subject to any adjournment as my be approved by the chairperson of the Scheme Meetings ("**Chairperson**")) as follows:

    a.   The Class A Hong Kong Scheme Meeting will commence at 8:00 p.m. (Hong Kong time).

    b.   The Class C Hong Kong Scheme Meeting will commence at 9:30 pm (Hong Kong time).

3.    Scheme Creditors be able to attend the applicable Scheme Meeting(s) to vote in respect of the Scheme, in person, by a duly authorised representative (if a corporation) or by proxy, including via video conference.

4.    In respect of attendance by video conference:

    a.   For Scheme Creditors who are not Blocked Scheme Creditors (as defined in the Scheme), video conferencing details will be published on https://projects.morrowsodali.com/evergrande (the "**Transaction Website**") at least 21 days before the day appointed for the Scheme Meetings and the passcode notified to individual Scheme Creditors by Morrow Sodali Limited as the information agent in respect of the Scheme (the "**Information Agent**") at least 2 business days before the day appointed for the Scheme Meetings.

    b.   For Blocked Scheme Creditors, GLAS Specialist Services Limited ("**GLAS**") will provide Blocked Scheme Creditors with the details of how to attend and vote at the Scheme Meetings at least 21 days before the day appointed for the Scheme Meetings and will notify Blocked Scheme Creditors of the meeting passcode at least 2 business days before the day appointed for the Scheme Meetings.

5.    The Chairperson may require Scheme Creditors attending the Scheme Meetings by video conference to turn on their camera throughout the Scheme Meetings and log on to the video conference using their full name (as registered with the Information Agent) and the creditor identifier number provided to them by the Information Agent prior to the Scheme Meetings.

6.    At least 21 days before the day appointed for the Scheme Meetings, a copy of the notice of the Scheme Meetings (the "**Notice of Scheme Meetings**"), together with any forms required for voting purposes (the "**Scheme Creditor Voting Forms**"), shall be circulated to the Scheme Creditors by:

    (a)    publication on the Transaction Website;

    (b)    publication by way of public announcement by the Company on the HKEXnews website of The Stock Exchange of Hong Kong Limited at http://www.hkexnews.hk;

    (c)    publication by way of public announcement by China Evergrande Group on the website of the Singapore Exchange Limited at https://www.sgx.com/;

    (d)    publication on the website of the Company at http://www.evergrande.com;

    (e)    by causing the Information Agent to send via electronic mail to each person who the Company believes is or may be a Scheme Creditor, and for whom the Company has a valid e-mail address; and

    (f)    distribution via Euroclear Bank SA/NV and/or Clearstream Banking S.A.

7.    GLAS shall circulate copies of the Notice of Scheme Meetings and the Scheme Creditor Voting Forms to any Blocked Scheme Creditors by email not less than 21 days before the Scheme Meetings.

8.    When providing the Notice of Scheme Meetings in accordance with paragraphs 6 and 7 above, the Information Agent or GLAS (as applicable) shall provide copies of the following documents (or a link to the Transaction Website to enable the Scheme Creditors to access electronic copies of the following documents):

      (a)    the Scheme;

      (b)    the Explanatory Statement; and

      (c)    the Solicitation Packet (as defined in the Explanatory Statement), being instructions as to the registration of claims and voting procedures for the purposes of the Scheme Meetings including the Scheme Creditor Voting Forms.

9.    The accidental omission to serve any Scheme Creditor with the Notice of Scheme Meetings, or the non-receipt by any Scheme Creditor of the Notice of Scheme Meetings, shall not invalidate the proceedings at the Scheme Meetings.

10.   At least 21 days before the day appointed for the Scheme Meetings, the Company shall place an advertisement substantially in the form of the draft hereby approved in (1) *The Standard*, which is an English language newspaper, and (2) a Traditional and Simplified Chinese translation thereof in *Hong Kong Economic Times*, which is a Chinese language newspaper in circulation in Hong Kong, and (3) a Simplified Chinese translation thereof in *"Nanfang Daily"* and *"Securities Times"* both of which are Chinese language newspapers in circulation in the PRC.

11.   Certified Chinese translation of the Notice of Scheme Meetings and the proposed advertisement in newspapers be dispensed with.

12.   An affirmation is to be filed by a solicitor of Sidley Austin who is fluent in both English and Chinese languages confirming the accuracy of the Chinese translation of the Notice of Scheme Meetings and the proposed advertisement in newspapers.

13.    The Chairperson be permitted to declare and announce the results of the Scheme Creditors' votes in respect of the Scheme, either during the Scheme Meetings or after the conclusion of the Scheme Meetings.

14.    The substantive hearing of the petition at which the Court will determine whether or not to sanction the Scheme shall be heard at 10:00 a.m. (Hong Kong time) on 5 and 6 September 2023 (subject to the Court's further directions) before the Honourable Madam Justice Linda Chan.

15.    There be liberty to apply generally.

AND THE COURT HEREBY APPROVES the:-

1.    Notice of Scheme Meetings substantially in the form of Annexure 1 hereto; and

2.    Notice of Scheme Meetings to be advertised on newspapers in the aforesaid manner substantially in the form of Annexure 2 hereto.

AND THE COURT HEREBY APPOINTS Mr. Patrick Cowley of KPMG Advisory (Hong Kong) Limited ("**KPMG**") or, failing Mr. Cowley, another representative of KPMG nominated by him, as the Chairperson of the Scheme Meetings on behalf of the Company.

AND THE COURT ORDERS that the Chairperson do report the results of the Scheme Meetings to the Court.

Dated this 24th day of July 2023.

Registrar

## ANNEXURE 1

### Notice of the Scheme Meetings

**IN THE HIGH COURT OF THE HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE**

**HCMP 1091 OF 2023**

**IN THE MATTER OF SECTIONS 670, 673 & 674 OF THE COMPANIES ORDINANCE,
CHAPTER 622 OF THE LAWS OF HONG KONG**

**AND**

**IN THE MATTER OF CHINA EVERGRANDE GROUP** (中國恒大集團)

---

### NOTICE OF SCHEME MEETINGS

---

Unless otherwise defined herein, terms used in this Notice have the same meanings as in the explanatory statement (the "**Explanatory Statement**") relating to the proposed schemes of arrangement between China Evergrande Group (中國恒大集團)  (the **"Company"**) and the Scheme Creditors (as defined therein) under section 86 of the Companies Act (2023 Revision) (the "**Cayman Scheme**") and section 670 of the Companies Ordinance (Cap. 622) (the "**Hong Kong Scheme**").

Copies of the Scheme, the Explanatory Statement and the Solicitation Packet (including the documentation to be completed by or on behalf of Scheme Creditors in order to vote and/or receive Scheme Consideration) are available to download from the Transaction Website (https://projects.morrowsodali.com/evergrande), save for voting forms for Blocked Scheme Creditors, which are available (along with any other relevant scheme documents or from the Company's website (www.evergrande.com).

**NOTICE IS HEREBY GIVEN** that by orders of the Grand Court of the Cayman Islands (the "**Cayman Court**") and the High Court of the Hong Kong Special Administrative Region Court of First Instance (the "**Hong Kong Court**"), dated 25 July 2023 and 24 July 2023 respectively (the "**Scheme Convening Orders**"), meetings of Scheme Creditors (the "**Scheme Meetings**") be convened for the purpose of considering and, if thought fit, approving (with or without modification) the Cayman Scheme and Hong Kong Scheme (together the "**Schemes**") proposed by the Company.

**Venue, times and video conference availability for the Scheme Meetings**

The Scheme Meetings will be held on 23 August 2023 in Hong Kong at the offices of Sidley Austin at 39/F, Two International Finance Centre, 8 Finance St, Central, Hong Kong as follows:

1. Hong Kong Scheme – The Class A Scheme Meeting will commence at 8:00 p.m. (Hong Kong time) / 7:00 a.m. (Cayman Islands time);

2. Cayman Scheme - The Class A Scheme Meeting will commence at 8:45 p.m. (Hong Kong time) / 7:45 a.m. (Cayman Islands time) / (or, if later, as soon as the Class A Scheme Meeting for the Hong Kong Scheme has concluded);

3. Hong Kong Scheme – The Class C Scheme Meeting will commence at 9:30 pm (Hong Kong time) / 8:30 a.m. (Cayman Islands time); and

4.  Cayman Scheme – The Class C Scheme Meeting will commence at 10:15 pm (Hong Kong time) / 9:15 a.m. (Cayman Islands time) / (or, if later, as soon as the Class C Scheme Meeting for the Hong Kong Scheme has concluded),

with any adjournment as may be necessary or appropriate, and subject to applicable COVID-19 restrictions, policies or guidance then in force in Hong Kong, and in which case any changes in arrangements relating to the Scheme Meetings shall be communicated to Scheme Creditors in advance of the Scheme Meetings on the Transaction Website, the Company's website, and by a public announcement published on the HKEXnews website of The Stock Exchange of Hong Kong Limited (the "**SEHK**") and the website of the Singapore Exchange Securities Trading Limited (the "**SGX-ST**").

A video conferencing facility will be made available. Scheme Creditors will be able to obtain the relevant dial-in details for the Scheme Meetings from the Transaction Website, the Company's website, and by written request from the Information Agent (if you are a Scheme Creditor who is not a Blocked Scheme Creditor), or GLAS Specialist Services Limited ("**GLAS**") (if you are a Blocked Scheme Creditor).

Scheme Creditors who attend the Scheme Meetings in person, or by video conference, will be able to vote (and to change their vote, if they wish).

**Methods of voting**

In order to vote at the relevant Scheme Meeting, a Scheme Creditor must either vote itself (if an individual), appoint a duly authorised corporate representative (if a corporation), or appoint a proxy (which must be an individual).

Scheme Creditors may appoint a proxy to vote at the relevant Scheme Meeting by completing and returning a validly completed and signed Account Holder Letter, Class A Private Lender Proxy Form, or Class C Scheme Creditor Proxy Form (as applicable) to the Information Agent via the Portal. All Blocked Scheme Creditor Forms must be returned to GLAS by email at lm@glas.agency.

**Scheme Creditors are strongly encouraged to appoint a proxy (either the Chairperson or another individual of their own choice who is willing and able to attend the relevant Scheme Meeting) by indicating their choice of proxy in the relevant section of the relevant form.**

Scheme Creditors wanting to attend the relevant Scheme Meeting in person are encouraged to appoint a proxy even if they intend to attend and vote in person, in case such Scheme Creditors are unable to do so for any reason.

The Existing Notes Trustee, the Existing Notes Depositary, China Construction Bank (Asia) Corporation Limited and Guotai Junan Securities Co., Ltd. as trustee under the Dongpo Notes, Lake Notes and/or RMB Bonds and the Existing Agents are each Scheme Creditors, but will not be permitted to vote in respect of the Existing Notes, the Dongpo Notes, the Lake Notes and/or the RMB Bonds (as applicable) at the Scheme Meetings (to avoid double counting).

**Completion and deadline for submitting voting forms**

The "**Voting Record Time**" for the Schemes, being the deadline for the submission of the relevant forms in order to vote on the Schemes and attend the relevant Scheme Meetings, is **5:00 p.m. (Hong Kong time) on 18 August 2023, the equivalent time being 4:00 a.m. (Cayman Islands time) on 18 August 2023**.

In order to vote on the Schemes and attend the relevant Scheme Meetings (in person, by a duly authorised representative (if a corporation) or by proxy), a Scheme Creditor must ensure that:

2

(i) in the case of a Class A Noteholder, a Dongpo Noteholder or a Lake Noteholder that is not a Blocked Scheme Creditor:

    a.  a Custody Instruction is submitted on their behalf via the relevant Clearing System by the **Custody Instruction Deadline** (being 5:00 p.m. (Hong Kong time) / 4:00 a.m.. (Cayman Islands time) on 15 August 2023) in accordance with the instructions set out in the Account Holder Letter and the remainder of the Solicitation Packet; and

    b.  Parts 1, 2 and 3 of the Account Holder Letter have been validly completed and submitted to and received by the Information Agent via the Portal by no later than the **Voting Record Time** in accordance with the instructions set out in the Account Holder Letter and the remainder of the Solicitation Packet (allowing sufficient time for their respective Account Holders to give instructions to the Clearing Systems, in accordance with the procedures established between them, to ensure that the Account Holder Letter is submitted to and received online by the Voting Record Time);

(ii) in the case of a Class A Private Lender:

    a.  Sections 2 to 6 of the Class A Private Lender Proxy Form have been validly completed and submitted to and received by the Information Agent via the Portal by no later than the **Voting Record Time** in accordance with the instructions set out in the Class A Private Lender Proxy Form and the rest of the Solicitation Packet, including supporting evidence of the Class A Private Lender's identity, its status as a Scheme Creditor, and the value of its holding of the Class A Debts;

(iii) in the case of a Class C Scheme Creditor that is not a Dongpo Noteholder, a Lake Noteholder or a Blocked Scheme Creditor:

    a.  Sections 2 to 6 of the Class C Scheme Creditor Proxy Form have been validly completed and submitted to and received by the Information Agent via the Portal by no later than the **Voting Record Time** in accordance with the instructions set out in the Class C Scheme Creditor Proxy Form and the rest of the Solicitation Packet, including supporting evidence of the Class C Scheme Creditor's identity, its status as a Scheme Creditor, and the value of its holding of the Class C Debts; and

(iv) in the case of a Blocked Scheme Creditor:

    a.  Sections 2 to 6 of the Blocked Scheme Creditor Form have been validly completed and submitted to and received by GLAS via email by no later than the **Voting Record Time** in accordance with the instructions set out in the Blocked Scheme Creditor Form and the remainder of the Solicitation Packet, including supporting evidence of the Blocked Scheme Creditor's identity, its status as a Scheme Creditor, and the value of its holding of the Existing Debts.

**Registration prior to Scheme Meetings**

Each Scheme Creditor (or, if a corporation, its duly authorised representative) or its proxy intending to attend the Scheme Meeting will be required to register its attendance at the relevant Scheme Meeting no later than 15 minutes prior to the scheduled start time of the relevant Scheme Meeting.

Any Scheme Creditor. or its proxy, attending the Scheme Meeting in person must produce the following documents upon registration:

•   a duplicate copy of the Account Holder Letter, Class A Private Lender Proxy Form, Class C Scheme Creditor Proxy Form or Blocked Scheme Creditor Form (as applicable), that has been

3

validly completed and submitted electronically by or on behalf of that Scheme Creditor, and
(where relevant) authorising the proxy to act as such on behalf of that Scheme Creditor;

- evidence of personal identity with photo identification (for example, a valid original passport,
  or other original government-issued photographic identification); and

- in the case of a corporation, evidence of corporate authority (for example, a valid power of
  attorney and/or board resolutions).

If appropriate personal identification or evidence of authority is not produced, that person will only be
permitted to attend and vote at the relevant Scheme Meeting at the discretion of the Chairperson.

**Chairperson**

Pursuant to the Scheme Convening Orders, the Cayman Court and the Hong Kong Court appointed
Patrick Cowley of KPMG Advisory (Hong Kong) Limited ("**KPMG**") in his capacity as Scheme
Administrator to act as the Chairperson of the Scheme Meetings, or failing that, another representative
of KPMG nominated by him, and directed the Chairperson to report the results of the Scheme Meetings
to the Cayman Court and Hong Kong Court. The results of the Scheme Meetings will also be made
available on the Transaction Website, the Company's website, and by a public announcement published
on the HKEXnews website of the SEHK and the website of the SGX-ST.

**Scheme Sanction Hearing**

The Schemes, if approved at the Scheme Meetings, will be subject to the subsequent approval and
sanction of the Cayman Court and the Hong Kong Court. The Cayman Scheme Sanction Hearing is
presently scheduled to take place at 10.00 a.m. Cayman Islands time (11.00 p.m. Hong Kong time) on
1 September 2023. The Hong Kong Scheme Sanction Hearing is presently scheduled to take place at
10:00 a.m. Hong Kong time on 5 and 6 September 2023 (to be fixed by the Hong Kong Court) (9:00
p.m. Cayman Islands time 4 and 5 September 2023). Any Scheme Creditor is entitled (but not
obliged) to attend the Scheme Sanction Hearings, through legal counsel, to support or oppose the
approval and sanction of the Schemes.

### SCHEME CREDITORS OTHER THAN BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:

**Morrow Sodali Limited**

| | |
|---|---|
| Telephone: | in Hong Kong +852 2319 4130; in London +44 20 4513 6933 |
| Email: | evergrande@investor.morrowsodali.com |
| Attention: | Debt Services Team |
| Transaction Website: | https://projects.morrowsodali.com/evergrande |
| Portal: | https://portal.morrowsodali.com/EvergrandeScheme |

### ANY BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:

**GLAS Specialist Services Limited**

| | |
|---|---|
| Email: | lm@glas.agency |
| Attention: | Liability Management Team |

4

**FOR COMPANY ANNOUNCEMENTS REGARDING THIS SCHEME (INCLUDING THOSE RELEVANT TO BLOCKED SCHEME CREDITORS)**

Company's Website:  www.evergrande.com

HKEXnews website of the SEHK: https://www.hkexnews.hk/

SGX-ST website: https://www.sgx.com/

**CHINA EVERGRANDE GROUP (中國恒大集團)**

Dated: [*] 2023

5

## ANNEXURE 2

**Proposed advertisement in newspapers**

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

FSD 89 OF 2023(IKJ)

IN THE MATTER OF SECTION 86 OF THE COMPANIES ACT (2022 REVISION)
AND IN THE MATTER OF CHINA EVERGRANDE GROUP (中國恒大集團)

and

IN THE HIGH COURT OF THE HONG KONG SPECIAL ADMINISTRATIVE
REGION COURT OF FIRST INSTANCE

HCMP 1091/ 2023

IN THE MATTER OF CHINA EVERGRANDE GROUP 中國恒大集團 AND IN THE
MATTER OF SECTION 670 OF THE COMPANIES ORDINANCE (CAP 622)

Unless otherwise defined herein, terms used in this Notice have the same meanings as in the explanatory statement (the "**Explanatory Statement**") relating to the proposed schemes of arrangement between China Evergrande Group (中國恒大集團) (the "**Company**") and the Scheme Creditors (as defined in the Explanatory Statement) under section 86 of the Cayman Islands Companies Act (2023 Revision) (the "**Cayman Scheme**") and section 670 of the Hong Kong Companies Ordinance (Cap. 622) (the "**Hong Kong Scheme**", and together with the Cayman Scheme, the "**Schemes**").

Copies of the Scheme, the Explanatory Statement and the Solicitation Packet (including the documentation to be completed by or on behalf of Scheme Creditors in order to vote and/or receive Scheme Consideration) are available to download from the Transaction Website (https://projects.morrowsodali.com/evergrande) save for voting forms for Blocked Scheme Creditors which are available (along with any other relevant scheme documents) from the Company's website (www.evergrande.com).

**NOTICE IS HEREBY GIVEN** that by orders of the Grand Court of the Cayman Islands (the "**Cayman Court**") and the High Court of the Hong Kong Special Administrative Region Court of First Instance (the "**Hong Kong Court**"), dated 25 July 2023 and 24 July 2023 respectively, meetings of Scheme Creditors (the "**Scheme Meetings**") for the purpose of considering and, if thought fit, approving (with or without modification) each of the Schemes, will be convened.

The Scheme Meetings will be held at the offices of Sidley Austin, at 39/F, Two International Finance Centre, Central, Hong Kong, on 23 August 2023 with any adjournment as may be necessary or appropriate, at the following times:

- Hong Kong Scheme – Class A Creditors Scheme Meeting: at 8:00 pm Hong Kong time.
- Cayman Scheme – Class A Creditors Scheme Meeting: at 8:45 pm Hong Kong time, the equivalent time being 7:45 am Cayman Islands time (or immediately following the conclusion of the (Hong Kong Scheme) Class A Creditors Scheme Meeting, if later).
- Hong Kong Scheme – Class C Creditors Scheme Meeting: at 9:30 pm Hong Kong time (or immediately following the conclusion of the (Cayman Scheme) Class A Creditors Scheme Meeting, if later).
- Cayman Scheme – Class C Creditors Scheme Meeting: at 10:15 pm Hong Kong time, the equivalent time being 9:15 am Cayman Islands time (or immediately following the conclusion of the (Hong Kong Scheme) Class C Creditors Scheme Meeting, if later).

All Scheme Creditors are requested to attend and vote at the relevant Scheme Meeting(s). Attendance and voting at the Scheme Meetings can be in person or by proxy in accordance with the voting instructions set out in the Explanatory Statement. A video-conference facility will be made available for any Scheme Creditors who wish to attend and vote remotely.

Scheme Creditors who wish to vote at one or more of the Scheme Meetings should carefully read the Explanatory Statement and follow the instructions contained therein. Scheme Creditors should take particular note that the Voting Record Time, being the deadline for voting, is **5:00 pm Hong Kong time/ 4:00 am Cayman Islands time on 18 August 2023**.

**NOTICE IS FURTHER GIVEN** that, if the Schemes are approved at the Scheme Meetings, the Schemes will be subject to a subsequent hearing in each of the Cayman Court and the Hong Kong Court, at which the Company will seek the Courts' sanction of the Schemes ("the **Sanction Hearings**"). The Sanction Hearing before the Cayman Court will take place on 1 September 2023. The Sanction Hearing before the Hong Kong Court will take place on 5 and 6 September 2023 (to be fixed by the Hong Kong Court). Any Scheme Creditor is entitled (but not obliged) to attend the Sanction Hearings, through legal counsel, to support or oppose the approval and sanction of the Schemes.

### SCHEME CREDITORS OTHER THAN BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:

**Morrow Sodali Limited**

| | |
|---|---|
| Telephone: | in Hong Kong +852 2319 4130; in London +44 20 4513 6933 |
| Email: | evergrande@investor.morrowsodali.com |
| Attention: | Debt Services Team |
| Transaction Website: | https://projects.morrowsodali.com/evergrande |
| Portal: | https://portal.morrowsodali.com/EvergrandeScheme |

### ANY BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:

**GLAS Specialist Services Limited**

| | |
|---|---|
| Email: | lm@glas.agency |
| Attention: | Liability Management Team |

Dated the          day of July 2023

**China Evergrande Group (中國恒大集團)**

2

HCMP 1091 / 2023

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
MISCELLANEOUS PROCEEDINGS NO. 1091 OF 2023

IN THE MATTER OF CHINA
EVERGRANDE GROUP 中國恒大集團

and

IN THE MATTER OF SECTION 670 OF
THE COMPANIES ORDINANCE (CAP.
622)

---

**ORDER**

---

Filed this 27th day of July 2023

**SIDLEY AUSTIN**
Solicitors for China Evergrande Group
Level 39, Two International Finance Centre
8 Finance Street, Central
Hong Kong
Tel: 2509 7888
Fax: 2509 3110
Ref: DA/ST/DW/033817-30390

**IN THE GRAND COURT OF THE**

**CAYMAN ISLANDS FINANCIAL**

**SERVICES DIVISION**

**CAUSE NO. FSD 89 OF 2023 (IKJ)**

**IN THE MATTER OF SECTION 86 OF THE COMPANIES ACT (2023 REVISION)**
**AND**
**IN THE MATTER OF CHINA EVERGRANDE GROUP**

———————————————————————————

**SCHEME OF ARRANGEMENT**

*(under section 86 of the Cayman Islands Companies Act (2023 Revision))*

———————————————————————————

**BETWEEN**

**CHINA EVERGRANDE GROUP**

中國恒大集團

*(an exempted company incorporated with limited liability under the laws of the*

*Cayman Islands with registration number 169971, and its registered office at Ugland House, PO*
*Box 309, Grand Cayman, KY1-1104, Cayman Islands)*

**AND**

**THE SCHEME CREDITORS**

*(as herein defined*)

1

TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | DEFINITIONS | 1 |
| 2. | INTERPRETATION | 38 |
| 3. | APPLICATION AND EFFECTIVENESS OF THIS CAYMAN SCHEME | 40 |
| 4. | COMPROMISE AND ARRANGEMENT WITH THE SCHEME CREDITORS | 41 |
| 5. | AUTHORITY AND INSTRUCTIONS | 42 |
| 6. | SCHEME STEPS | 45 |
| 7. | NOTICES TO SCHEME CREDITORS AND OTHERS | 49 |
| 8. | ENTITLEMENT RECORD TIME AND SCHEME CLAIMS | 49 |
| 9. | ACCEPTANCE OF DOCUMENTATION | 50 |
| 10. | DEADLINES AND BAR DATES | 51 |
| 11. | ASSIGNMENTS OR TRANSFERS OF SCHEME CLAIMS | 53 |
| 12. | GENERAL PRINCIPLES | 55 |
| 13. | CALCULATION OF A SCHEME CREDITOR'S ENTITLEMENT | 57 |
| 14. | SCHEME CONSIDERATION OPTIONS | 58 |
| 15. | TOTAL PACKAGE, A2 PACKAGE AND THE C2 PACKAGE | 59 |
| 16. | INITIAL DISTRIBUTION | 63 |
| 17. | INITIAL DISTRIBUTION TO HOLDING PERIOD TRUSTEE | 66 |
| 18. | FINAL DISTRIBUTION | 67 |
| 19. | DISTRIBUTION TO SUCCESSOR ESCROW ACCOUNT FOR BLOCKED SCHEME CREDITORS | 71 |
| 20. | TJ SCHEME CONSIDERATION | 72 |

21.  INTERIM DISTRIBUTION                                                      73

22.  CONSENT FEE                                                               74

23.  ISSUANCE OF THE NEW INSTRUMENTS                                           75

24.  RESTRICTIONS                                                              75

25.  FRACTIONAL ADJUSTMENTS                                                    75

26.  MODIFICATIONS OF THE RIGHTS ATTACHING TO THE NEW
     INSTRUMENTS                                                               78

27.  SECURITIES LAW CONSIDERATIONS                                            78

28.  RELEASES                                                                  78

29.  STAY OF PROCEEDINGS                                                       80

30.  COSTS AND INDEMNITY                                                       80

31.  MODIFICATIONS TO THE SCHEME AND THE RESTRUCTURING
     DOCUMENTS                                                                 81

32.  OBLIGATIONS ON DATES OTHER THAN A BUSINESS DAY                            82

33.  NO ADMISSION OF LIABILITY                                                 82

34.  THE INFORMATION AGENT                                                     82

35.  THE HOLDING PERIOD TRUSTEE                                                83

36.  THE SUCCESSOR ESCROW AGENT                                                84

37.  THE SCHEME ADMINISTRATORS                                                 85

38.  VALUATION PROCEDURE                                                       88

39.  THE SCHEME ADJUDICATORS                                                   92

40.  ADJUDICATION PROCEDURE                                                    93

41.  NOTICE                                                                    98

42.  CORRESPONDING DISCHARGE OF PERFORMANCE                         99

43.  APPLICATION TO THE CAYMAN COURT FOR DIRECTIONS                99

44.  FOREIGN REPRESENTATIVE                                        99

45.  THIRD PARTIES                                                 99

46.  TERMINATION OF THIS SCHEME                                    99

47.  CONFLICT AND INCONSISTENCY                                   100

48.  SEVERABILITY                                                 100

49.  GOVERNING LAW AND JURISDICTION                               100

SCHEDULE 1. RESTRUCTURING DOCUMENTS

SCHEDULE 2. CLASS C DEBTS

SCHEDULE 3. RESTRUCTURING EFFECTIVE DATE CONDITIONS

SCHEDULE 4. EXISTING NOTES SUBSIDIARY GUARANTORS

SCHEDULE 5. COURT ORDER

PART A
PRELIMINARY

1.    **DEFINITIONS**

In this Cayman Scheme, unless the context otherwise requires or unless otherwise expressly provided for, the following capitalised expressions shall bear the following meanings:

| | |
|---|---|
| **"A1/A2 Intercreditor Agreement"** | means the intercreditor agreement to be entered into between, among others, the Company, the Collateral Agent and the respective trustee for each tranche of the A1 Notes, A2 Notes, A2 EVPS SLNs and A2 NEV SLNs, in substantially the form to be made available on the Transaction Website, subject to any modifications required or approved in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*) of this Cayman Scheme, which shall be in the Agreed Form. |
| **"A1 Notes"** | means the new tranches A, B and C of the new A1 notes to be issued by the Company and governed by the A1 Notes Indentures. |
| **"A1 Notes Indentures"** | means the New York law governed indentures governing the A1 Notes to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the A1 Notes and with the modifications required to reflect the different terms of the different tranches of the A1 Notes as set out in the Explanatory Statement, each of which shall be in the Agreed Form. |
| **"A1 Notes Recipient"** | has the meaning set out in Clause 18.6 of this Cayman Scheme. |
| **"A2 Accrued Claims Ratio"** | has the meaning set out in Clause 15.7 of this Cayman Scheme. |
| **"A2 EVPS SLNs"** | means tranches A and B of the US dollar denominated secured new A2 notes linked to the EVPS Shares to be issued by the Company and governed by the A2 EVPS SLNs Indentures. |
| **"A2 EVPS SLNs Indentures"** | means the New York law governed indentures governing the A2 EVPS SLNs to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the A2 EVPS SLNs and with the modifications required to reflect the different terms of the different tranches of the A2 EVPS SLNs as set out in the Explanatory Statement, each of which shall be in the Agreed Form. |
| **"A2 NEV SLNs"** | means tranches A and B of the US dollar denominated secured new A2 notes linked to the NEV Shares to be issued by the Company and governed by the A2 NEV SLNs Indentures. |
| **"A2 NEV SLNs Indentures"** | means the New York law governed indentures governing the A2 NEV SLNs to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the A2 NEV SLNs and with the modifications required to reflect the different terms of the |

1

|  |  |
|---|---|
|  | different tranches of the A2 NEV SLNs as set out in the Explanatory Statement, each of which shall be in the Agreed Form. |
| **"A2 Notes"** | means the Plain A2 Notes and the Forced A2 Notes. |
| **"A2 Notes Indentures"** | means the Plain A2 Notes Indentures and the Forced A2 Notes Indentures, each of which shall be in the Agreed Form. |
| **"A2 Notes Recipient"** | has the meaning set out in Clause 16.7 of this Cayman Scheme. |
| **"A2 Package"** | means the CEG MCBs, NEV MEBs, EVPS MEBs, A2 EVPS SLNs and A2 NEV SLNs available to Class A Scheme Creditors who elect Option 2 Scheme Consideration, in accordance with the terms of the Restructuring Documents. |
| **"A2 Package Adjusted Portion"** | has the meaning set out in Clause 15.9 of this Cayman Scheme. |
| **"A2 Package Initial Portion"** | has the meaning set out in Clause 15.6 of this Cayman Scheme. |
| **"A2 Package Recipient"** | has the meaning set out in Clause 15.16 of this Cayman Scheme. |
| **"Accession Code"** | means a unique code provided by the Information Agent to a Scheme Creditor following its valid accession to the Class A RSA or the Class C RSA, and which must be included by such Scheme Creditor in its voting instructions within the relevant Scheme Creditor Form in respect of this Cayman Scheme. |
| **"Account Bank"** | means China Construction Bank (Asia) Corporation Limited in its capacity as account bank or any successor account bank under and as defined in the New Instruments Documents. |
| **"Account Holder"** | means any Person who is recorded in the books of a Clearing System as being a holder of a book-entry interest in the Existing Notes or the Class C Notes in an account with that Clearing System or, as the context may require, is or was recorded in such books as being such a holder of Existing Notes or the Class C Notes in such an account at the Voting Record Time. |
| **"Account Holder Letter"** | means the form of account holder letter which is appended to the Solicitation Packet, as published on the Transaction Website. |
| **"Adjudication Procedure"** | means the procedure for the resolution of a Referred Scheme Claim as set out in Clause 40 (*Adjudication Procedure*) of this Cayman Scheme. |
| **"Advisors"** | means (i) Sidley Austin, (ii) Houlihan Lokey, (iii) Maples and Calder, (iv) BOCI Asia Limited (v) China International Capital Corporation Hong Kong Securities Limited; and (vi) Commerce & Finance Law Offices. |
| **"Affiliate"** | means, with respect to any Person, any other Person: (a) directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person; or (b) who is a director or officer of such Person or any Subsidiary of such Person or of any |

2

Person referred to in clause (a) of this definition, and, with respect to any Participating Creditor, any of its managers, investment managers or investment advisors and any entity managed or advised by that manager, investment manager or investment advisor. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

**"Agreed Form"** means in the form agreed in writing between each of:

(a) the Company (or the Advisors acting on its behalf);

(b) the Majority CEG AHG (or the AHG's Counsel acting on their behalf);

(c) only in relation to the New Instruments Documents, the New Instruments Trustee; and

(d) only in relation to the Holding Period Trust Deed and any other documents to which the Holding Period Trustee is party, the Holding Period Trustee,

in each case each acting reasonably.

**"AHG Advisors"** means Moelis & Company Asia Limited, Kirkland & Ellis, Harney Westwood & Riegels, Fangda Partners, and other professional advisors as the CEG AHG may appoint from time to time.

**"AHG's Counsel"** means Kirkland & Ellis.

**"AHG Financial Advisor Fees"** means the reasonable fees, costs and expenses of the financial advisor (Moelis & Company Asia Limited) to the CEG AHG that the Company has agreed to pay in accordance with the terms set out in the fee letter agreement dated 6 April 2022.

**"AHG Legal Fees"** means the reasonable fees, costs and expenses of the legal advisors (including local counsel and barristers) to the CEG AHG that the Company has agreed to pay in accordance with the terms set out in the following:

(a) the fee letter agreement dated 4 April 2022 between the Company and Kirkland & Ellis;

(b) the fee letter agreement dated 6 March 2023 between the Company and Harney Westwood & Riegels; and

(c) the fee letter agreement dated 6 March 2023 between the Company and Fangda Partners.

3

| | |
|---|---|
| **"AHG Work Fee"** | means the "**Work Fee**" as defined in the AHG Work Fee Letter. |
| **"AHG Work Fee Letter"** | means the letter dated 20 March 2023 from the Chairman to the members of the CEG AHG in connection with payment of the AHG Work Fee. |
| **"Ancillary Claim"** | means any Claim by a Scheme Creditor against a Released Person under or in respect of the Existing Finance Documents arising as a result of effecting, adhering to or complying with the releases in Clauses 28.2(a)(i) and 28.2(a)(ii) (excluding for the avoidance of doubt any Claim in respect of any Liability (i) of any Released Person which arises as a result of a failure to comply with any of the terms of the Schemes or any Restructuring Document (including but not limited to the New Instruments Documents) and (ii) arising from or in connection with any Excluded Liability or Excluded Collateral). |
| **"Applicable Sanctions"** | means laws, regulations, rules and/or orders relating to economic, financial or trade sanctions, restrictive measures or embargoes administered, enacted, maintained and/or enforced by any Governmental Entity of the United States of America (including by the US Office of Foreign Assets Control or the US Department of State), the European Union, the United Kingdom and the British Overseas Territories (including, for the avoidance of doubt, The Russia (Sanctions) (EU Exit) Regulations 2019, as amended from time to time and as applicable in the Cayman Islands pursuant to The Russia (Sanctions) (Overseas Territories) Order 2020 (as amended). |
| **"Applicable Sanctions List"** | means each of: |

(a) the lists of Specially Designated Nationals and Blocked Persons or "Foreign Sanctions Evaders" or any other list of Persons subject to, or targeted by, similar sanctions as administered, maintained and/or enforced by the Office of Foreign Assets Control of the US Treasury, the US Department of Commerce, the US Department of State and any other Governmental Entity of the United States;

(b) the Consolidated List of Persons, Groups and Entities Subject to EU Financial Sanctions maintained by the European Commission, Annex XIX of Regulation (EU) No 833/2014, or any other list of Persons subject to, or targeted by, similar sanctions as administered, maintained and/or enforced by the European Union or any Governmental Entity in any Member State of the European Union; or

(c) the Consolidated List of Financial Sanctions Targets in the United Kingdom maintained by the Office of Financial Sanctions Implementation, His Majesty's Treasury of the United Kingdom, the United Kingdom Sanctions List maintained by the Foreign, Commonwealth and Development Office, or any other list of Persons subject to, or targeted by, similar sanctions administered, maintained

4

and/or enforced by any Governmental Entity of the United Kingdom or the Cayman Islands,

or any other similar sanctions list of persons and entities subject to a prohibition to transact with, that is developed, maintained and published by any Governmental Entity of the United States of America (including by the U.S. Office of Foreign Assets Control or the U.S. Department of State), the European Union, the United Kingdom and the British Overseas Territories in connection with Sanctions, in each case as amended, supplemented or substituted from time to time, and "Applicable Sanctions Lists" includes, collectively, (a), (b) and (c) of this definition.

| | |
|---|---|
| **"Asserted Amount"** | has the meaning set out in Clause 40.17(b)(i)(A) of this Cayman Scheme. |
| **"Assessed Value"** | means an amount equal to the value recoverable by a Class C Scheme Creditor in respect of the relevant Excluded Liabilities, Excluded Collateral, put option and/or repurchase obligation as determined by the Scheme Administrators (or, if applicable, the Scheme Adjudicator) in accordance with the terms of this Cayman Scheme and as set out in the Deed of Agreed Valuation. |
| **"Asset List 1 Intercreditor Agreement"** | means the intercreditor agreement to be entered into between, among others, the Company, the Collateral Agent and the respective trustee for each tranche of the A2 EVPS SLNs and A2 NEV SLNs, in substantially the form to be made available on the Transaction Website, subject to any modifications required or approved in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*) of this Cayman Scheme, which shall be in the Agreed Form. |
| **"Asset List 2 Intercreditor Agreement"** | means the intercreditor agreement to be entered into between, among others, the Company, the Collateral Agent and the respective trustee for each tranche of the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs and C2 NEV SLNs, in substantially the form to be made available on the Transaction Website, subject to any modifications required or approved in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*) of this Cayman Scheme, which shall be in the Agreed Form. |
| **"Bar Date"** | means the Class A Bar Date or the Class C Bar Date, as applicable. |
| **"Blocked Assets"** | means, collectively, the Blocked New Instruments, the Blocked TJ Scheme Consideration, and any Consent Fee to which Blocked Scheme Creditors may be entitled, in accordance with the terms of this Cayman Scheme and the Applicable Sanctions. |
| **"Blocked New Instruments"** | means, in respect of the Holding Period, the Residual New Instruments constituting the A2 Package and A2 Notes to which Blocked Scheme Creditors are entitled in accordance the terms of this Cayman Scheme and Applicable Sanctions or, in respect of the period on or after the Final Distribution Date, any Residual New Instruments to which Blocked Scheme Creditors are entitled in |

5

|  | accordance with the terms of this Cayman Scheme and the Applicable Sanctions. |
|---|---|
| **"Blocked Scheme Creditor"** | means a Scheme Creditor (other than a Sanctioned Scheme Creditor) that is not entitled, able or permitted (whether directly or through a custodian) to submit instructions or settle through the Clearing Systems as a result of any Applicable Sanctions affecting the Scheme Creditor or its custodian as reasonably determined by the Clearing Systems, and which does not have a sanctions licence in respect of the Applicable Sanctions which would allow that Scheme Creditor to freely deal in the Scheme Consideration and submit instructions or settle through the Clearing Systems. |
| **"Blocked Scheme Creditor Form"** | means a form from a Blocked Scheme Creditor substantially in the form of the blocked scheme creditor form set out in the Solicitation Packet. |
| **"Blocked TJ Scheme Consideration"** | means the TJ Scheme Consideration held on trust for the benefit of the Blocked Scheme Creditors who are Class A Noteholders who have nominated to receive A2 Package as part of their Scheme Consideration by the Class A Options Deadline, pursuant to the terms of the Holding Period Trust Deed by the Holding Period Trustee during the Holding Period Trust. |
| **"Blocking Regulation"** | means: |

a. Council Regulation (EC) No 2271/1996 of 22 November 1996 (as amended) and/or any applicable national law or regulation relating to it;

b. Council Regulation (EC) No 2271/1996 of 22 November 1996 (as amended) as it forms part of domestic law of the United Kingdom by virtue of the European Union (Withdrawal) Act 2018; or

c. The Protection of Trading Interests Act 1980 of the United Kingdom.

| **"Board"** | means the board of Directors. |
|---|---|
| **"Business Day"** | means any day which is not a Saturday, Sunday, legal holiday or other day on which banking institutions in the City of New York, the City of London, the Cayman Islands, Hong Kong or the PRC are authorised or required by law or governmental regulation (as applicable) to close. |
| **"C1 Notes"** | means tranches A, B and C of the new C1 notes to be issued by the Company and governed by the C1 Notes Indentures. |
| **"C1 Notes Indentures"** | means the New York law governed indentures governing the C1 Notes to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the C1 Notes and with the modifications required to reflect the different terms of the |

6

|  | different tranches of the C1 Notes as set out in the Explanatory Statement, each of which shall be in the Agreed Form. |
|---|---|
| **"C1 Notes Recipients"** | has the meaning set out in Clause 18.8 of this Cayman Scheme. |
| **"C2 Accrued Claims Ratio"** | has the meaning set out in Clause 15.13 of this Cayman Scheme. |
| **"C2 EVPS SLNs"** | means tranches A and B of the US dollar denominated secured new A2 notes linked to the EVPS Shares to be issued by the Company and governed by the C2 EVPS SLNs Indentures. |
| **"C2 EVPS SLNs Indentures"** | means the New York law governed indentures governing the C2 EVPS SLNs to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the C2 EVPS SLNs and with the modifications required to reflect the different terms of the different tranches of the C2 EVPS SLNs as set out in the Explanatory Statement, each of which shall be in the Agreed Form. |
| **"C2 NEV SLNs"** | means tranches A and B of the US dollar denominated secured new C2 notes linked to the NEV Shares to be issued by the Company and governed by the C2 NEV SLNs Indentures. |
| **"C2 NEV SLNs Indentures"** | means the New York law governed indentures governing the C2 NEV SLNs to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the C2 NEV SLNs and with the modifications required to reflect the different terms of the different tranches of the C2 NEV SLNs as set out in the Explanatory Statement, each of which shall be in the Agreed Form. |
| **"C2 Notes"** | means tranches A, B and C of the new C2 notes to be issued by the Company and governed by the C2 Notes Indentures. |
| **"C2 Notes Indentures"** | means the New York law governed indentures governing the C2 Notes to be entered into between the Company and the New Instruments Trustee substantially in the form appended to the Explanatory Statement. |
| **"C2 Notes Recipient"** | has the meaning set out in Clause 18.13 of this Cayman Scheme. |
| **"C2 Package"** | means the CEG MCBs, NEV MEBs, EVPS MEBs, C2 EVPS SLNs and C2 NEV SLNs available to Class C Scheme Creditors who elect Option 2 Scheme Consideration in accordance with the terms of the Restructuring Documents. |
| **"C2 Package Adjusted Portion"** | has the meaning set out in Clause 15.15 of this Cayman Scheme. |
| **"C2 Package Initial Portion"** | has the meaning set out in Clause 15.12 of this Cayman Scheme. |
| **"C2 Package Recipient"** | has the meaning set out in Clause 15.17 of this Cayman Scheme. |

7

| | |
|---|---|
| **"C2 Package Unadmitted Portion"** | has the meaning set out in Clause 15.10 of this Cayman Scheme. |
| **"Capital Stock"** | means, with respect to any Person, any and all shares, interests (including partnership interests), rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting) equity of such Person. |
| **"Cayman Companies Act"** | means the Cayman Islands Companies Act (2023 Revision) as amended, modified or re-enacted from time to time. |
| **"Cayman Court"** | means the Grand Court of the Cayman Islands and any court capable of hearing appeals therefrom. |
| **"Cayman Registrar of Companies"** | means the Registrar of Companies (including any deputy registrar and/or assistant registrar or similar) appointed under the Cayman Companies Act in the Cayman Islands. |
| **"Cayman Scheme"** | means this scheme of arrangement effected pursuant to section 86 of the Cayman Companies Act between the Company and the Scheme Creditors, in its present form or with or subject to any non-material modifications, additions or conditions that the Court may think fit to approve or impose and agreed to by the Company and the Majority CEG AHG (provided that the CEG AHG satisfies the Minimum CEG AHG Threshold). |
| **"Cayman Scheme Meetings"** | means collectively the Class A Cayman Scheme Meeting and the Class C Cayman Scheme Meeting. |
| **"Cayman Scheme Sanction Order"** | means the sealed copy of the order of the Cayman Court sanctioning this Cayman Scheme. |
| **"CEG"** or **"Company"** | means China Evergrande Group, an exempted company incorporated with limited liability under the laws of the Cayman Islands with registration number 169971 and having its registered office at P.O. Box 309, Ugland House, Grand Cayman, KY1-1104, the Cayman Islands and the shares of which are listed on the Main Board of the HKEX. |
| **"CEG AHG"** | means the ad hoc group of Participating Creditors or investment managers or investment advisors to such Participating Creditors, who (i) have agreed to be bound by the terms of the Class A RSA; (ii) have been constituted from time to time and as notified to CEG (subject to and in accordance with the transfer provisions under the Class A RSA); and (iii) are advised by the AHG Advisors from time to time and which such Participating Creditors, as at the date of the Class A RSA, include the Initial Participating Creditors. |
| **"CEG Existing April 2022 Notes"** | means the 9.5% senior notes in the aggregate principal amount of US$1,250,000,000 due April 11, 2022 (ISIN: XS1982036961, Common Code: 198203696) issued by the Company. |

8

| | |
|---|---|
| "**CEG Existing April 2023 Notes**" | means the 10.0% senior notes in the aggregate principal amount of US$450,000,000 due April 11, 2023 (ISIN: XS1982037779, Common Code: 198203777) issued by the Company. |
| "**CEG Existing April 2024 Notes**" | means the 10.5% senior notes in the aggregate principal amount of US$300,000,000 due April 11, 2024 (ISIN: XS1982040641, Common Code: 198204064) issued by the Company. |
| "**CEG Existing February 2023 Bonds**" | means the 4.25% convertible bonds in the aggregate principal amount of HK$18,000,000,000 due February 14, 2023 (ISIN: XS1767800961, Common Code: 176780096) issued by the Company. |
| "**CEG Existing January 2022 Notes**" | means the 9.5% senior notes in the aggregate principal amount of US$300,000,000 due January 30, 2022 (ISIN: XS1991102846, Common Code: 19911028) issued by the Company. |
| "**CEG Existing January 2023 Notes**" | means the 11.5% senior notes in the aggregate principal amount of US$1,000,000,000 due January 22, 2023 (ISIN: XS2106834299, Common Code: 210683429) issued by the Company. |
| "**CEG Existing January 2024 Notes**" | means the 12.0% senior notes in the aggregate principal amount of US$1,000,000,000 due January 22, 2024 (ISIN: XS2106834372, Common Code: 210683437) issued by the Company. |
| "**CEG Existing June 2023 Notes**" | means the 7.5% senior notes in the aggregate principal amount of US$1,344,921,000 due June 28, 2023 (ISIN: XS1627599498, Common Code: 162759949) issued by the Company. |
| "**CEG Existing June 2025 Notes**" | means the 8.75% senior notes in the aggregate principal amount of US$4,680,476,000 due June 28, 2025 (ISIN: XS1627599654, Common Code: 162759965) issued by the Company. |
| "**CEG Existing March 2022 Notes**" | means the 8.25% senior notes in the aggregate principal amount of US1,000,000,000 due March 23, 2022 (ISIN: XS1580431143, Common Code: 158043114) issued by the Company. |
| "**CEG Existing March 2024 Notes**" | means the 9.5% senior notes in the aggregate principal amount of US$1,000,000,000 due March 29, 2024 (ISIN: XS1587867539, Common Code: 158786753) issued by the Company. |
| "**CEG MCB Minimum Denomination**" | has the meaning set out in Clause 25.3 of this Cayman Scheme. |
| "**CEG MCBs**" | means the Hong Kong dollar denominated mandatory convertible bonds to be issued by the Company and governed by the CEG MCBs Trust Deed. |
| "**CEG MCBs Trust Deed**" | means the Hong Kong law governed trust deed governing the CEG MCBs to be entered into between the Company and the New |

9

|   | Instruments Trustee substantially in the form to be made available on the Transaction Website and which shall be in the Agreed Form. |
|---|---|
| "**Chairman**" | means Mr Hui Ka Yan. |
| "**Chairperson**" | means the chairperson of the Scheme Meeting. |
| "**Chapter 15 Recognition Order**" | means an order or orders of the US Bankruptcy Court recognising the Hong Kong Scheme as a foreign main proceeding (or in the alternative, a foreign non-main proceeding) and giving effect to certain aspects of the compromise and arrangement set out in the Hong Kong Scheme (which will be substantively identical to that set out in the Cayman Scheme), including the Releases under Clause 28 (*Releases*) of the Hong Kong Scheme. |
| "**Chapter 15 Recognition Proceeding**" | means the recognition proceeding before a US Bankruptcy Court to recognize this Scheme pursuant to chapter 15 of the United States Bankruptcy Code. |
| "**Claim**" | means all and any present and future Liabilities together with any refinancing, novation, deferral or extensions relating to or arising in respect of those Liabilities, actions, causes of action, claims, counterclaims, suits, debts, set-offs, sums of money, accounts, contracts, agreements, promises, contribution, subrogation, indemnification, damages, judgments, executions, court or arbitration awards, demands or rights whatsoever or howsoever arising, whether present, future, prospective or contingent, known or unknown, whether directly or indirectly, whether in person or through another Person, whether or not for a fixed or unliquidated amount, whether or not involving the payment of money or the performance of an act or obligation or any failure to perform any obligation or any omission, whether arising at common law, in equity or by statute in or under the laws of the Cayman Islands, Hong Kong, PRC, New York or under any other law or in any other jurisdiction howsoever arising and "**Claims**" shall be construed accordingly. |
| "**Class A Asserted Amount**" | has the meaning given to it in Clause 40.17(c)(i)(A). |
| "**Class A Bar Date**" | means, in respect of Class A Scheme Creditors, the date which is 30 days after the Restructuring Effective Date . |
| "**Class A Cayman Scheme Meeting**" | means a meeting of the Class A Scheme Creditors in relation to the Cayman Scheme as convened by an order of the Cayman Court for the purpose of considering and, if thought fit, approving, with or without modification, the Cayman Scheme, and any adjournment thereof. |
| "**Class A Debts**" | means the Existing Notes and the Class A Private Loan, including any Credit Support and Claims of any kind (if any) in connection or in respect thereof, arising therefrom or relating thereto. |
| "**Class A Group Claims**" | means any Claim by a Scheme Creditor against the Group, the Existing Notes Subsidiary Guarantors and the Existing Notes |

10

|  | Subsidiary Pledgors, under or in respect of the Existing Class A Debt Documents, but excluding for the avoidance of doubt any Claim in respect of any Liability of the Group, the Existing Notes Subsidiary Guarantors and the Existing Notes Subsidiary Pledgors which arises as a result of a failure to comply with any of the terms of the Schemes of any Restructuring Document (including but not limited to the New Instruments Documents). |
|---|---|
| **"Class A Hong Kong Scheme Meeting"** | means a meeting of the Class A Scheme Creditors in relation to the Hong Kong Scheme as convened by an order of the Hong Kong Court for the purpose of considering and, if thought fit, approving, with or without modification, the Hong Kong Scheme, and any adjournment thereof. |
| **"Class A Lenders"** | persons with a legal interest as principal in the Class A Private Loan as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of the determination of such persons' Entitlements). |
| **"Class A Noteholders"** | means persons with an economic or beneficial interest as principal in the Existing Notes held in global form or global restricted form through the Clearing Systems as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of the determination of such persons' Entitlements), each of whom has a right, upon satisfaction of certain conditions, to be issued definitive registered notes in accordance with the terms of the Existing Notes and the Indentures, and (but without double counting in each case) the Existing Notes Depositary and the Existing Notes Trustee. |
| **"Class A Options Deadline"** | means the date which is fourteen (14) calendar days after the Scheme Effective Date, which will be the final date by which Class A Scheme Creditors must submit all relevant forms in order to elect to receive either Option 1 Scheme Consideration or Option 2 Scheme Consideration in accordance with the terms of the Schemes and the Restructuring Documents. |
| **"Class A Private Lender Proxy Form"** | means the proxy form for Class A Lenders which is appended to the Solicitation Packet. |
| **"Class A Private Loan"** | means the private loan of US$100,000,000 with 15% interest p.a. due January 2022 owed by the Company. |
| **"Class A RSA"** | means the restructuring support agreement dated 3 April 2023 between, among others, the Company and the Initial Participating Creditors, as amended or varied from time to time, including by the accession or cessation of parties thereto. |
| **"Class A Scheme Creditor"** | means one of the (i) Class A Noteholders or (ii) Class A Lenders. |
| **"Class A Scheme Meetings"** | means the Class A Cayman Scheme Meeting and the Class A Hong Kong Scheme Meeting. |

| | |
|---|---|
| **"Class C Bar Date"** | means, in respect of Class C Scheme Creditors, the date which is 135 days after the Restructuring Effective Date. |
| **"Class C Cayman Scheme Meeting"** | means a meeting of the Class C Scheme Creditors in relation to the Cayman Scheme as convened by an order of the Cayman Court for the purpose of considering and, if thought fit, approving, with or without modification, the Cayman Scheme, and any adjournment thereof. |
| **"Class C Debts"** | means the offshore financial unsecured indebtedness, obligations or other liabilities (including, without limitation, guarantees, repurchase obligations, put options, indemnity, court/arbitration awards and claims of any kind) of CEG listed in Schedule 2 to this Cayman Scheme (including any related Credit Support provided by and Claims of any kind against CEG) or in respect thereof. |
| **"Class C Hong Kong Scheme Meeting"** | means a meeting of the Class C Scheme Creditors in relation to the Hong Kong Scheme as convened by an order of the Hong Kong Court for the purpose of considering and, if thought fit, approving, with or without modification, the Hong Kong Scheme, and any adjournment thereof |
| **"Class C Noteholders"** | means the Dongpo Noteholders and the Lake Noteholders. |
| **"Class C Notes"** | means the Dongpo Notes and the Lake Notes. |
| **"Class C RSA"** | means the restructuring support agreement dated 3 April 2023 launched by the Company, as amended or varied from time to time, including by the accession or cessation of parties thereto. |
| **"Class C Scheme Claims"** | means any Scheme Claim of a Class C Scheme Creditor in respect of the Class C Debts on, before or after the Voting Record Time. |
| **"Class C Scheme Creditor"** | means (i) a person holding an economic or beneficial interest as principal in the Class C Notes or (ii) an RMB Bondholder or (iii) a person holding a legal interest as principal in any other Class C Debts, as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of the determination of such person's Entitlement), including (but without double counting in each case) Guotai Junan Securities Co., Ltd. as trustee under the RMB Bonds, the Dongpo Notes Trustee and Agents, the Lake Notes Trustee and Agent and the Existing Agents. |
| **"Class C Scheme Creditor's Entitlement"** | means the amount calculated pursuant to Clause 13.3 of this Cayman Scheme. |
| **"Class C Scheme Creditor Proxy Form"** | means the proxy form for Class C Scheme Creditors (other than Class C Noteholders) which is appended to the Solicitation Packet. |

| | |
|---|---|
| **"Class C Scheme Meetings"** | means, collectively, the Class C Cayman Scheme Meeting and the Class C Hong Kong Scheme Meeting. |
| **"Clearing Systems"** | means Euroclear and Clearstream, as applicable, and any successor thereto. |
| **"Clearing System Instruction"** | means an instruction to each of the Clearing Systems in relation to the Restructuring Effective Date. |
| **"Clearstream"** | means Clearstream Banking S.A. |
| **"Collateral"** | all collateral securing, or purported to be securing, directly or indirectly, the New Instruments, any New Instruments Subsidiary Guarantee (as applicable) pursuant to the Security Documents, which shall, in each case, be in the Agreed Form. |
| **"Collateral Agent"** | means the collateral agent or any successor collateral agent as appointed under the New Instruments Documents and with respect to the Security Documents. |
| **"Company Information"** | means information in the possession or control of the Company or the Group that the Scheme Administrators consider in their sole discretion relevant to evaluate the Class C Scheme Creditors' Entitlements. |
| **"Company Website"** | means www.evergrande.com. |
| **"Completion Notice"** | has the meaning given to it in Clause 6.1 of this Cayman Scheme. |
| **"Consent Fee"** | means, with respect to each Participating Creditor and subject to and in accordance with Clause 5 *(Consent Fee)* of the Class A RSA or the Class C RSA (as applicable), an amount equal to 0.25% of the outstanding principal amount of the Eligible Restricted Debts held by such Participating Creditor as of the Voting Record Time, payable in kind in the form of new notes to be issued by the Company in accordance with the section headed "Consent Fee" in the Term Sheet. |
| **"Consent Fee Deadline"** | means 5:00 p.m. Hong Kong time, with the original date on 27 April 2023 and subsequently extended to 18 May 2023. |
| **"Consultation Period"** | means the 30 calendar day period commencing on and from the date that a Class C Scheme Creditor submits the Scheme Administrator Estimate Acceptance or Rejection Form to the Scheme Administrators rejecting the Scheme Administrator Estimate (unless extended by the Scheme Administrators in accordance with Clause 38.7(c)). |
| **"Court"** | means the Cayman Court and/or the Hong Kong Court. |
| **"Credit Support"** | means any security, encumbrance, collateral, guarantee, bond, indemnity, repurchase obligation, put option, assumption of any |

13

|  | Liability or other form of credit support or assurance or arrangement having the same economic effect. |
|---|---|
| **"Credit Support Document"** | means any document or instrument documenting or constituting or purporting to document or constitute any Credit Support (howsoever described), as amended, varied and supplemented from time to time. |
| **"Custody Instruction"** | means an instruction to the relevant Clearing System to block the Existing Notes or the Class C Notes (up to the Restructuring Effective Date) from trading in the relevant Clearing System or, in respect of the Class C Notes on or after the Restructuring Effective Date, to verify the Scheme Claims in respect of the Class C Notes of the Class C Noteholder. |
| **"Custody Instruction Deadline"** | means 5:00 p.m. on 15 August 2023 (Hong Kong time) or 4:00 a.m. on 15 August 2023 (Cayman Islands time). |
| **"Deed of Agreed Valuation"** | means a deed to be entered into between a Class C Scheme Creditor, the Scheme Administrators and the Company recording (i) the Class C Scheme Creditor's Entitlement as determined by the Scheme Administrators or, if required, the Scheme Adjudicator and (ii) a release of the relevant Class C Scheme Creditor's Scheme Claim pursuant to the governing law of the underlying Existing Debt (as applicable), pursuant to the terms of this Cayman Scheme which shall be in the Agreed Form. |
| **"Deeds of Release"** | shall include the form of (i) New York law governed global deed of release in respect of, among other things, the Existing Notes; (ii) Hong Kong law governed deed of release in respect of, among other things, the Class A Private Loan, the Class C Debts, and the Hong Kong law governed share charges as provided by the Existing Notes Subsidiary Pledgors for the Existing Notes; and (iii) PRC law global deed of release for, among other things, Class C Debts governed under PRC law with offshore guarantees, each of which shall be executed pursuant to the authority conferred by Clause 28 (*Releases*) of this Cayman Scheme and the Hong Kong Scheme in respect of the Scheme Creditors in substantially the form to be made available on the Transaction Website and which shall be in the Agreed Form, subject to any modifications required or approved in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*) of this Cayman Scheme. |
| **"Deed of Undertaking"** | means a deed of undertaking substantially in the form set out on the Transaction Website which shall be in the Agreed Form. |
| **"Deed of Undertaking Parties"** | means the parties to the Deed of Undertaking, which it is intended shall include: the Existing Notes Subsidiary Guarantors, the New Instruments Subsidiary Guarantors, the Existing Notes Subsidiary Pledgors, the New Instruments Subsidiary Pledgors, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the Existing Notes Collateral Agent, |

14

the Collateral Agent, the Scheme Administrators, the Information Agent, and such other additional parties to the Deed of Undertaking (which shall be in the Agreed Form).

**"Deficiency Basis"**     has the meaning set out in Clause 13.3 of this Cayman Scheme.

**"Designated Recipient"**     means in relation to any Scheme Creditor (who is not a Sanctions-Affected Scheme Creditor) that can make affirmative Sanctions Law Representations by submission of a duly completed Distribution Confirmation Deed, any single entity that is designated as such by a Scheme Creditor in accordance with a valid Designated Recipient Form as the recipient of the New Instruments to be issued to such Scheme Creditor as Scheme Consideration, subject to limitations in accordance with applicable securities laws and provided that (i) the Designated Recipient shall only be validly designated if it or an Account Holder on its behalf has submitted a Distribution Confirmation Deed and/or any other applicable forms that its designating Scheme Creditor is required to submit pursuant to the Scheme; (ii) a Scheme Creditor may designate only one such entity and if such entity is a nominee holder it may only hold on behalf of one beneficial holder; and (iii) the Designated Recipient is an Eligible Person.

**"Designated Recipient Form"**     means the form enclosed with the Solicitation Packet published on the Transaction Website by which a Scheme Creditor may appoint a Designated Recipient to be the recipient of all of the New Instruments that would otherwise be issued to that Scheme Creditor as Scheme Consideration or as any Consent Fee payable to that Scheme Creditor.

**"Director(s)"**     means the director(s) of CEG from time to time.

**"Distribution Confirmation Deed"**     means the form of deed enclosed with the Solicitation Packet published on the Transaction Website confirming amongst other things that the Eligible Creditor or the Designated Recipient may lawfully be issued the New Instruments as Scheme Consideration which shall be in the Agreed Form.

**"Dongpo Noteholders"**     means persons with an economic or beneficial interest as principal in the Dongpo Notes held in global form or global restricted form through the Clearing Systems as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of the determination of such persons' Entitlements), each of whom has a right, upon satisfaction of certain conditions, to be issued definitive registered notes in accordance with the terms of the Dongpo Notes and the Dongpo Notes Trust Deed, and (but without double counting in each case) any depository or trustee of the Dongpo Notes.

**"Dongpo Notes"**     means the US$424 million 9.0% senior notes due January 22, 2023 (ISIN: XS2290369128, Common Code: 229036912) issued by Great Courage Global Limited.

15

| | |
|---|---|
| **"Dongpo Notes Trust Deed"** | means the trust deed dated 22 January 2021, as amended, supplemented or otherwise modified from time to time, between Great Courage Global Limited, CEG, Charm Wealth Asia Pacific Limited, Global Power Development Holdings Limited and China Construction Bank (Asia) Corporation Limited as trustee governing the Dongpo Notes. |

**"Dongpo Notes Trustee and Agents"** means:

(a)  Huatai Financial Holdings (Hong Kong) Limited and TFI Securities and Futures Limited each in its capacity as arranger under the Dongpo Notes; and

(b)  China Construction Bank (Asia) Corporation Limited in its various capacities as (i) trustee, (ii) security agent and (iii) principal paying agent, transfer agent and registrar under the Dongpo Notes.

| | |
|---|---|
| **"Eligible Creditor"** | means a Scheme Creditor who is an Eligible Person and who has submitted or caused to be submitted the Scheme Creditor Forms, as applicable, such that they are submitted and received by the Information Agent in accordance with the terms of the Schemes, before the applicable deadline set out in the Solicitation Packet, as published on the Transaction Website. |
| **"Eligible Participating Creditor"** | means a Participating Creditor who holds, at the Voting Record Time, Existing Debts which validly became Eligible Restricted Debts before the Consent Fee Deadline (as applicable) in accordance to the terms of the Class A RSA or Class C RSA (as applicable). |
| **"Eligible Person"** | means a person who has provided affirmative Securities Law Representations and Sanctions Law Representations to the Information Agent before the applicable deadline set out in the Solicitation Packet, as published on the Transaction Website. |
| **"Eligible Restricted Debt"** | means a Restricted Debt which was made subject to the terms of the relevant RSA by a Participating Creditor on or prior to the Consent Fee Deadline; and "**Eligible Restricted Debts**" means all of them. |
| **"Entitlement"** | has the meaning given to it in Clause 13 (*Calculation of a Scheme Creditor's Entitlement*) of this Cayman Scheme. |
| **"Entitlement Record Time"** | means the Restructuring Effective Date. This is the time designated by CEG for the determination of Entitlements of the Scheme Creditors for the purposes of distribution of Scheme Consideration (for the avoidance of doubt, this shall not prevent the Valuation and Adjudication Procedure for the Class C Debts taking place after the Restructuring Effective Date and/or taking into account prevailing circumstances at such time, including without limitation the release or extinguishment of rights or benefits of any Excluded Collateral or Excluded Liabilities resulting in a reduction of the relevant Assessed Value, as applicable). |

16

| | |
|---|---|
| **"Escrow Agent"** | means the escrow agent or any escrow agent under and as defined in the New Instruments Documents. |
| **"Estimation Notice"** | means a notice from the Scheme Administrators to each Class C Scheme Creditor notifying such Class C Scheme Creditor of the Scheme Administrator Estimate. |
| **"Euroclear"** | means Euroclear Bank SA/NV. |
| **"EVPS"** | means Evergrande Property Services Group Limited, a subsidiary of the Company the shares of which are listed on the HKEX (Stock Code: 6666). |
| **"EVPS MEB Minimum Denomination"** | has the meaning set out in Clause 25.3 of this Cayman Scheme. |
| **"EVPS MEBs"** | means the Hong Kong dollar denominated mandatory exchangeable bonds to be issued by the Company and governed by the EVPS MEBs Trust Deed. |
| **"EVPS MEBs Trust Deed"** | means the Hong Kong law governed trust deed governing the EVPS MEBs to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website, which shall be in the Agreed Form. |
| **"EVPS Shares"** | means the ordinary shares of EVPS. |
| **"EVPS SLNs"** | means A2 EVPS SLNs and C2 EVPS SLNs. |
| **"Exchange and Conversion Agent"** | means the exchange and conversion agent or any successor exchange and conversion agent under and as defined in the New Instruments Documents. |
| **"Exchange Property"** | means: |
| | (a) in respect of the NEV MEBs, 3,094,810,100 NEV Shares listed on the HKEX, together with any remaining NEV Shares issued as part of the conversion of the Shareholder Loans into NEV Shares after the NEV Custody Account Transfers are made, subject to any adjustment made in accordance with Clause 15.2 below; or |
| | (b) in respect of the EVPS MEBs, 2,331,985,700 EVPS Shares listed on the HKEX. |
| **"Excluded Collateral"** | means any security, collateral, guarantee, bond, indemnity, keepwell agreement or other form of assurance granted by an Excluded Liabilities Party Person for the purpose of securing and/or guaranteeing against and/or supporting any Class C Debt" |
| **"Excluded Liability"** | means any Liability of an Excluded Liabilities Party Person and "**Excluded Liabilities**" shall be construed accordingly. |

17

| | |
|---|---|
| **"Excluded Liabilities Party Person"** | means certain Persons other than the Company who is an obligor, guarantor, security or collateral pledgor or other Credit Support provider of or in respect of a Class C Debt owed to a Class C Scheme Creditor. |
| **"Existing Agents"** | means the Existing Facility Agents and the Existing Security Agent. |
| **"Existing Class A Debt Documents"** | means the Existing Notes Documents, the loan agreement in respect of the Class A Private Loan and any related Credit Support Document, as amended, varied and supplemented from time to time. |
| **"Existing Class C Debt Documents"** | means any document or instrument documenting or constituting or purporting to document or constitute any Class C Debt. |
| **"Existing Debts"** | means, collectively, the Class A Debts and the Class C Debts. |
| **"Existing Facility Agents"** | means: |

(a) China Construction Bank (Asia) Corporation Limited, in its capacity as (i) agent, (ii) escrow agent and (iii) account bank under the Venice Loan;

(b) China Construction Bank (Asia) Corporation Limited, in its capacity as (i) escrow agent and (ii) account bank under the Venice SPA;

(c) (i) China CITIC Bank International Limited; (ii) China Everbright Bank Co., Ltd. Hong Kong Branch and (iii) Tai Fung Bank Limited, in their capacity as arrangers under the Hero Loan; and

(d) China CITIC Bank International Limited, in its capacity as (i) agent and (ii) account bank under the Hero Loan.

| | |
|---|---|
| **"Existing Finance Documents"** | means the Existing Notes Documents, the loan agreement in respect of the Class A Private Loan, the Existing Class C Debt Documents, and any other Credit Support Document entered into in respect thereof, as amended, varied and supplemented from time to time. |
| **"Existing Notes"** | means the CEG Existing January 2022 Notes, the CEG Existing March 2022 Notes, the CEG Existing April 2022 Notes, the CEG Existing January 2023 Notes, the CEG Existing February 2023 Bonds, the CEG Existing April 2023 Notes, the CEG Existing June 2023 Notes, the CEG Existing January 2024 Notes, the CEG Existing March 2024 Notes, the CEG Existing April 2024 Notes, and the CEG Existing June 2025 Notes. |
| **"Existing Notes Collateral Agent"** | means Citicorp International Limited. |
| **"Existing Notes Depositary"** | means Citibank Europe plc as common depositary for the Clearing Systems, acting through its nominee as registered holder of the Existing Notes, Citivic Nominees Limited. |

18

| | |
|---|---|
| **"Existing Notes Documents"** | means the Indentures and any other documents entered into by the Company or any other person guaranteeing or securing liabilities due under or in respect of the Existing Notes. |
| **"Existing Notes Paying and Transfer Agent and Registrar"** | means Citibank, N.A., London Branch in its capacity as paying agent, transfer agent, and registrar in respect of the Existing Notes. |
| **"Existing Notes Subsidiary Guarantors"** | means the entities listed in Schedule 4 (*Existing Notes Subsidiary Guarantors*) of this Cayman Scheme. |

**"Existing Notes Subsidiary Pledgors"**

means:

(a)  ANJI (BVI) Limited (安基(BVI)有限公司);

(b)  Fengyu (BVI) Limited (丰域(BVI)有限公司);

(c)  Pyramid Wealth Holdings Limited;

(d)  Value Depot Holdings Limited; and

(e)  Yitong (BVI) Limited (亿通(BVI)有限公司).

| | |
|---|---|
| **"Existing Notes Trustee"** | means Citicorp International Limited solely in its capacity as trustee under the Indentures. |
| **"Existing Notes Trustee Instruction"** | means an instruction to the Existing Notes Trustee substantially in the form to be made available on the Transaction Website or such other form as the Existing Notes Trustee may reasonably accept. |

**"Existing Security Agent"**

means:

(a)  Paperbark, LLC, in its capacity as security agent under the Class A Private Loan;

(b)  China CITIC Bank International Limited, in its capacity as security agent under the Hero Loan; and

(c)  China Construction Bank (Asia) Corporation Limited, in its capacity as security agent of the Venice Loan.

| | |
|---|---|
| **"Explanatory Statement"** | means the composite document addressed to Scheme Creditors in relation to this Cayman Scheme pursuant to Order 102, Rule 20 (4)(e) of the Cayman Islands Grand Court Rules (2023 Revision). |
| **"Final Distribution"** | means the Scheme Consideration to be distributed on the Final Distribution Date from the Residual New Instruments to each Scheme Creditor that is not a Sanctions-Affected Scheme Creditor (or, in respect of Blocked Scheme Creditors, to the Successor Escrow Agent) or to a Designated Recipient (if applicable), in each case in accordance with their respective entitlements and the terms under the Schemes (and, without double counting any Initial Distribution received, if applicable). |

19

| | |
|---|---|
| **"Final Distribution Date"** | means the final date on which the Scheme Consideration shall be distributed to Scheme Creditors (that are not a Sanctions-Affected Scheme Creditor) that are entitled to a portion of the Residual New Instruments, or to the Successor Escrow Agent on behalf of the Blocked Scheme Creditors, in accordance with the terms of the Schemes and Restructuring Documents, and within one month of the completion of the Valuation and Adjudication Procedure set out in Clauses 38 (*Valuation Procedure*) and 40 (*Adjudication Procedure*). This date is to be designated by the Company and communicated to the Scheme Creditors in writing via the Transaction Website and/or through such public medium as may be appropriate at the time. The Final Distribution Date will be a date after the conclusion of the Valuation and Adjudication Procedure. |
| **"Forced A2 Notes"** | means tranches A, B, C and D of the new A2 notes to be issued by the Company and governed by the Forced A2 Notes Indentures, and to be distributed to Class A Scheme Creditors referred to in Clause 16.5(b) in accordance with the terms of the Restructuring Documents. |
| **"Forced A2 Notes Indentures"** | means the New York law governed indenture governing the Forced A2 Notes to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the Forced A2 Notes and with the modifications required to reflect the different terms of the different tranches of the Forced A2 Notes as set out in the Explanatory Statement, each of which shall be in Agreed Form. |
| **"Full Accrued Claim Basis"** | has the meaning set out in Clause 13.2 of this Cayman Scheme. |
| **"Further Documentation"** | has the meaning set out in Clause 40.5(a)(i) of this Cayman Scheme. |
| **"GLAS"** | means GLAS Specialist Services Limited, who the Company has appointed to liaise with Blocked Scheme Creditors including the processing of any Blocked Scheme Creditor Forms, under the Schemes. |
| **"Global Certificates"** | means the global certificates evidencing the Existing Notes. |
| **"Governmental Entity"** | means any federal, national or local government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal or judicial body of Hong Kong, the PRC, the United States of America, the European Union, the United Kingdom, the British Overseas Territories, the Cayman Islands or any other relevant jurisdiction. |
| **"Group"** | means CEG and its subsidiaries from time to time. |
| **"Hengda Real Estate"** | means Hengda Real Estate Group Company Limited (恒大地產集團有限公司), a principal subsidiary of CEG. |

20

| | |
|---|---|
| **"Hero Loan"** | has the meaning set out in Schedule 2 of this Cayman Scheme. |
| **"HKEX"** | means The Stock Exchange of Hong Kong Limited. |
| **"Holding Period"** | means the period from the Restructuring Effective Date, up to and including one Business Day after the Final Distribution Date. |
| **"Holding Period Custody Instruction Deadline"** | means, in respect of a Class A Noteholder, five Business Days prior to the Class A Bar Date or, in respect of a Class C Noteholder, five Business Days prior to the Class C Bar Date. |
| **"Holding Period Trust Deed"** | means the holding period trust deed to be entered into between, among others, CEG and the Holding Period Trustee, in substantially the form to be made available on the Transaction Website subject to and in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*) of this Cayman Scheme. |
| **"Holding Period Trustee"** | means GLAS Trustees Limited, holding the relevant Scheme Consideration, TJ Scheme Consideration, and any Consent Fee (if applicable), for and on behalf of the Scheme Creditors, in accordance with this Cayman Scheme and the Restructuring Documents, or any additional or replacement trustee at any time. |
| **"Hong Kong"** | means the Hong Kong Special Administrative Region of the PRC. |
| **"Hong Kong Companies Ordinance"** | means the Companies Ordinance (Cap. 622 of the Laws of Hong Kong), as amended, modified or re-enacted from time to time. |
| **"Hong Kong Companies Registrar"** | means the Hong Kong Registrar of Companies appointed under the Hong Kong Companies Ordinance. |
| **"Hong Kong Court"** | means the High Court of Hong Kong and any court capable of hearing appeals therefrom. |
| **"Hong Kong Scheme"** | means the scheme of arrangement effected pursuant to section 673 of the Hong Kong Companies Ordinance between the Company and the Scheme Creditors, in its present form or with or subject to any non-material modifications, additions or conditions that the Hong Kong Court may think fit to approve or impose and agreed to by the Company. |
| **"Hong Kong Scheme Meetings"** | means collectively, the Class A Hong Kong Scheme Meeting and the Class C Hong Kong Scheme Meeting. |
| **"Hong Kong Scheme Sanction Order"** | means the sealed copy of the order of the Hong Kong Court sanctioning the Hong Kong Scheme. |
| **"Houlihan Lokey"** | means Houlihan Lokey (China) Limited, in their capacity as advisors to the Company. |

21

| **"Indemnified Party"** | has the meaning given to it in Clause 30.1 of this Cayman Scheme. |
| --- | --- |
| **"Indentures"** | means each of: |

(a) the indenture dated March 23, 2017, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing March 2022 Notes;

(b) the indenture dated April 11, 2019, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing April 2022 Notes;

(c) the indenture dated January 22, 2020, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing January 2023 Notes;

(d) the trust deed dated 14 February 2018, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing February 2023 Bonds;

(e) the indenture dated April 11, 2019, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing April 2023 Notes;

(f) the indenture dated June 28, 2017, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing June 2023 Notes;

(g) the indenture dated January 22, 2020, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing January 2024 Notes;

(h) the indenture dated March 29, 2017, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing March 2024 Notes;

(i) the indenture dated April 11, 2019, as amended, supplemented or otherwise modified from time to time,

between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing April 2024 Notes;

(j)   the indenture dated June 28, 2017, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing June 2025 Notes; and

(k)   the indenture dated April 30, 2019, as amended, supplemented or otherwise modified from time to time, between the Company, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the CEG Existing January 2022 Notes,

and collectively, the "**Indentures**", each governed by and construed in accordance with the laws of the State of New York.

| | |
|---|---|
| **"Information Agent"** | means Morrow Sodali Limited in its capacity as the Company's information agent. |
| **"Initial Distribution"** | means the A2 Package Initial Portion and the A2 Notes to be distributed on the Restructuring Effective Date to the Class A Scheme Creditors and/or the Holding Period Trustee in accordance with Clause 16 (*Initial Distribution*) of this Cayman Scheme. |
| **"Initial Participating Creditors"** | means the list of initial participating creditors listed in Schedule 1 (*The Initial Participating Creditors)* of the RSAs. |
| **"Interim Distribution"** | has the meaning set out in Clause 21.1 of this Cayman Scheme. |
| **"Interim Distribution Date"** | has the meaning set out in Clause 21.1 of this Cayman Scheme. |
| **"Lake Noteholders"** | means persons with an economic or beneficial interest as principal in the Lake Notes held in global form or global restricted form through the Clearing Systems as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of the determination of such persons' Entitlements), each of whom has a right, upon satisfaction of certain conditions, to be issued definitive registered notes in accordance with the terms of the Lake Notes and the Lake Notes Trust Deed and (but without double counting in each case) any depository or trustee of the Lake Notes. |
| **"Lake Notes"** | means the US$260 million 8.5% senior notes due October 3, 2021 (ISIN:  XS2054446617, Common Code: 205444661) issued by Jumbo Fortune Enterprises Limited. |
| **"Lake Notes Trust Deed"** | means the trust deed dated 3 October 2019, as amended, supplemented or otherwise modified from time to time, between Jumbo Fortune Enterprises Limited, CEG, Tianji and China |

23

|  |  |
|---|---|
|  | Construction Bank (Asia) Corporation Limited as trustee governing the Lake Notes. |
| **"Lake Notes Trustee and Agent"** | means China Construction Bank (Asia) Corporation Limited in its various capacities as (i) notes trustee and security trustee, (ii) settlement agent, (iii) principal agent, transfer agent, calculation agent, registrar and (iv) original account bank under the Lake Notes. |
| **"Liability"** | means any debt, liability or obligation whatsoever, whether it is present, future, prospective or contingent, whether directly or indirectly, whether or not its amount is fixed or undetermined, whether or not it involves the payment of money or the performance of an act or obligation, and whether arising at common law, in equity or by statute in or under the laws of the Cayman Islands, Hong Kong, the PRC, New York or under any other law or in any other jurisdiction howsoever arising and "**Liabilities**" shall be construed accordingly. |
| **"Longstop Date"** | means 15 December 2023, unless extended pursuant to Clause 3.6 of this Cayman Scheme. |
| **"Longstop Date Extension"** | has the meaning given to it in Clause 3.6 of this Cayman Scheme. |
| **"Longstop Date Extension Notice"** | has the meaning given to it in Clause 3.7 of this Cayman Scheme. |
| "**Majority CEG AHG**" | means the member(s) of the CEG AHG holding a majority of the aggregate outstanding principal amount of the Restricted Debts (as defined under the Class A RSA) held by the CEG AHG at the relevant time. |
| **"Management"** | means the key management personnel of the Group, including the Board. |
| **"Maples and Calder"** | means Maples and Calder (Hong Kong) LLP, Maples and Calder (Cayman) LLP, and Maples and Calder (BVI) LLP, in their capacity as advisors to the Company as to matters of Cayman Islands law and British Virgin Islands law. |
| "**Minimum CEG AHG Threshold**" | means an aggregate outstanding principal amount of the Restricted Debts (as defined under the Class A RSA) constituting at least 10% of the outstanding principal amount of the Class A Debts, in accordance with the terms of the Class A RSA. |
| **"NEV"** | means China Evergrande New Energy Vehicle Group Limited, a subsidiary of the Company the shares of which are listed on the HKEX (Stock Code: 708). |
| **"NEV Custody Account Transfers"** | means the portion of NEV Shares converted from the Shareholder Loans which are required to be transferred to the custody accounts of the relevant entity prescribed by the terms of the applicable Restructuring Documents (which shall be in the Agreed Form) in respect of the A2 NEV SLNs and the C2 NEV SLNs in order for such accounts to together hold NEV Shares representing 30% of the |

|  | aggregate issued NEV Shares as at the date of the Explanatory Statement plus any NEV Shares issued as a result of the conversion of the Shareholder Loans on a fully diluted basis as of the Restructuring Effective Date. |
|---|---|
| **"NEV MEB Minimum Denomination"** | has the meaning set out in Clause 25.3 of this Cayman Scheme. |
| **"NEV MEBs"** | means the Hong Kong dollar denominated mandatory exchangeable bonds to be issued by the Company and governed by the NEV MEBs Trust Deed. |
| **"NEV MEBs Trust Deed"** | means the Hong Kong law governed trust deed governing the NEV MEBs to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website, which shall be in the Agreed Form. |
| **"NEV Shares"** | means the ordinary shares of NEV. |
| **"NEV SLNs"** | means A2 NEV SLNs and C2 NEV SLNs. |
| **"New Instruments"** | means the A1 Notes, C1 Notes, EVPS MEBs, NEV MEBs, CEG MCBs A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs, C2 NEV SLNs, A2 Notes and C2 Notes, as further summarised in the Explanatory Statement. |
| **"New Instruments Collateral Agent"** | means the collateral agent or any successor collateral agent under the New Instruments Documents and with respect to the Security Documents. |
| **"New Instruments Depositary"** | means the common depositary for the Clearing Systems, acting through its nominee as registered holder of the New Instruments, as set out in the New Instruments Documents. |
| **"New Instruments Documents"** | means: |

    (a)     the A1 Notes Indentures;

    (b)     the C1 Notes Indentures;

    (c)     the A2 Notes Indentures;

    (d)     the C2 Notes Indentures;

    (e)     the A2 EVPS SLNs Indentures;

    (f)     the C2 EVPS SLNs Indentures;

    (g)     the A2 NEV SLNs Indentures;

    (h)     the C2 NEV SLNs Indentures;

    (i)     the CEG MCBs Trust Deed;

(j)    the EVPS MEBs Trust Deed;

(k)    the NEV MEBs Trust Deed;

(l)    the Security Documents; and

(m)    any documents in respect of the New Instruments to be issued pursuant to the Restructuring,

which in each case shall be in the Agreed Form and in substantially the form to be made available on the Transaction Website.

| | |
|---|---|
| **"New Instruments Paying and Transfer Agent and Registrar"** | means a corporation organized and existing under the laws of [\*] with limited liability, in its capacity as paying agent, transfer agent, and/or registrar or any successor paying agent, transfer agent, and/or registrar in respect of the New Instruments. |
| **"New Instruments Subsidiary Guarantees"** | means such guarantees by the New Instruments Subsidiary Guarantors in respect of the New Instruments pursuant to the relevant New Instruments Documents. |
| **"New Instruments Subsidiary Guarantors"** | means such Persons who will guarantee the obligations of the Company and/or other obligors in respect of the New Instruments pursuant to the New Instruments Documents as at the relevant date (as applicable). |
| **"New Instruments Subsidiary Pledgors"** | means such Persons who will provide and/or grant Security in respect of the obligations of the Company and/or other obligors in respect of the applicable New Instruments pursuant to the relevant New Instruments Documents as at the Restructuring Effective Date. |
| **"New Instruments Trustee"** | means the trustee or any successor trustee under and as defined in the New Instruments Documents. |
| **"New Intercreditor Agreements"** | means the A1/A2 Intercreditor Agreement, Asset List 1 Intercreditor Agreement and the Asset List 2 Intercreditor Agreement, in substantially the form to be made available on the Transaction Website subject to any modifications required or approved in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*) of this Cayman Scheme. |
| **"Notes Minimum Denomination"** | has the meaning set out in Clause 25.2 of this Cayman Scheme. |
| **"Option A1 Proportion"** | means the ratio equal to the total amount of Entitlements of A1 Notes Recipients to be converted into A1 Notes *divided* by the total amount of Entitlements of A1 Notes Recipients and C1 Notes Recipients to be converted into A1 Notes. |
| **"Option C1 Proportion"** | means the ratio equal to the total amount of Entitlements of C1 Notes Recipients to be converted into C1 Notes *divided by* the total amount of Entitlements of A1 Notes Recipients and C1 Notes Recipients to be converted into C1 Notes. |

26

| | |
|---|---|
| **"Option 1 Scheme Consideration"** | means the relevant portion of the rights and interests in the A1 Notes and C1 Notes as elected by the relevant Scheme Creditor to be distributed to Scheme Creditors (and/or their Designated Recipients, as applicable) under and pursuant to the terms of the respective Schemes (and, without double counting, any Residual New Instruments and Blocked New Instruments), set out in Clause 13 (*Calculation of a Scheme Creditor's Entitlement*) of this Cayman Scheme. |
| **"Option 2 Scheme Consideration"** | means the relevant portion of the rights and interests in the A2 Notes, C2 Notes, EVPS MEBs, NEV MEBs, CEG MCBs, EVPS SLNs and NEV SLNs as elected by the relevant Scheme Creditor to be distributed to Scheme Creditors (and/or their Designated Recipients, as applicable) under and pursuant to the terms of the respective Schemes (and, without double counting, any Residual New Instruments and Blocked New Instruments), set out in Clause 13 (*Calculation of a Scheme Creditor's Entitlement*) of this Cayman Scheme. |
| **"Oversubscription"** | means a scenario where the total valid elections of Scheme Creditors for Option 2 Scheme Consideration results in, either: |

    (a) (x) the total amount of the Class A Scheme Creditors' Entitlement elected for the A2 Package, being greater than (y) the total aggregate principal amount of all instruments included in the A2 Package Initial Portion; or

    (b) (x) the total amount of the Class C Scheme Creditors' Entitlement elected for the C2 Package, being greater than (y) the total aggregate principal amount of all instruments included in the C2 Package Adjusted Portion,

and the "**Oversubscribed Portion**" means the amount representing (x) *minus* (y) in (a) or (b) above (as applicable).

| | |
|---|---|
| **"Participating Creditor"** | means a Scheme Creditor who has agreed to be bound by an RSA as a Participating Creditor in accordance with the terms of the respective RSA. |
| **"Pending Referral Creditor"** | has the meaning set out in Clause 40.17 of this Cayman Scheme. |
| **"Perpetuity Period"** | means the period from the date the Successor Escrow Account is established until 21 years after that date, or such further period as the Successor Escrow Agent determines in its sole discretion (and without any obligation to do so). |
| **"Person"** | means any natural person, corporation, limited or unlimited liability company, trust, joint venture, association, corporation, partnership, Governmental Entity or other entity whatsoever. |
| **"Personnel"** | means, in relation to any Person, its current and former officers, partners, directors, employees, staff, agents, counsel and other representatives. |

27

| | |
|---|---|
| **"Plain A2 Notes"** | means tranches A, B, C and D of the new A2 notes to be issued by the Company and governed by the Plain A2 Notes Indenture, and to be distributed to Class A Scheme Creditors referred to in Clause 16.8(c)(i) in accordance with the terms of the Restructuring Documents. |
| **"Plain A2 Notes Indentures"** | means the New York law governed indentures governing the Plain A2 Notes to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website for tranche A of the Plain A2 Notes and with the modifications required to reflect the different terms of the different tranches of the Plain A2 Notes as set out in the Explanatory Statement, each of which shall be in the Agreed Form. |
| **"PRC"** | means the People's Republic of China, which for the purposes of this Cayman Scheme, excludes Taiwan, Hong Kong and the Macao Special Administrative Region of the PRC. |
| **"Proceeding"** | means any process, suit, action, legal or other legal proceeding including without limitation any arbitration, mediation, alternative dispute resolution, judicial review, adjudication, demand, statutory demand, execution, distraint, forfeiture, re-entry, seizure, lien, enforcement of judgment, enforcement of any security or insolvency proceedings in any jurisdiction. |
| **"Proxy Voting Forms"** | means, as applicable, a proxy voting form submitted in the form appended to the Account Holder Letter, and/or a Class C Scheme Creditor Proxy Form and/or a Class A Private Lender Proxy Form. |
| **"Recognition Filings"** | means (i) the filing of a petition for recognition of the Hong Kong Scheme under Chapter 15 of the US Bankruptcy Code; (ii) the filing of a request for the US Bankruptcy Court to grant the Chapter 15 Recognition Order; and (iii) any other filings submitted in the US Bankruptcy Court that are necessary to effectuate the Chapter 15 Recognition Proceeding. |
| **"Record Date Balance"** | means a credit balance created by the Clearing Systems and maintained in the records of the Clearing Systems and Existing Notes Depositary in favour of those Class A Noteholders at the Entitlement Record Time who did not submit or did not have submitted on their behalf Custody Instructions by the Custody Instruction Deadline and/or a validly completed Account Holder Letter, Distribution Confirmation Deed and, if applicable, Designated Recipient Form by the Class A Options Deadline. |
| **"Reference Date"** | means the earlier of October 1, 2023 and the Restructuring Effective Date. |
| **"Referred Scheme Claim"** | means a Class C Scheme Creditor's Entitlement that is:

(a) not agreed by the Class C Scheme Creditor and the Scheme Administrator during the Consultation Period; or |

(b) adjusted by the Scheme Administrators and disputed by the Class C Scheme Creditor pursuant to Clause 37.10, and

is referred to the Scheme Adjudicator for determination in accordance with Clause 40 (*Adjudication Procedure*) of this Cayman Scheme.

**"Regulation D"**    means Regulation D under the US Securities Act.

**"Regulation S"**    means Regulation S under the US Securities Act.

**"Related Party Loan"**    means the HK$2,200,000,000 (equivalent to c. US$282,776,350) loans to NEV, pursuant to (a) the loan agreement in respect of HK$1,400,000,000 dated 7 January 2022 provided by Ms. Ding Yumei, (b) the loan agreement in respect of HK$200,000,000 dated 8 September 2023 provided by Ms. Ding Yumei and (c) the loan agreement in respect of HK$ 600,000,000 dated 10 November 2021 provided by Good Bond Limited (wholly-owned by Ms. Ding Yumei).

**"Releases"**    has the meaning given to it in Clause 28 (*Releases*) of this Cayman Scheme.

**"Released Claims"**    means any of the (i) Scheme Claims, (ii) Class A Group Claims, (iii) Ancillary Claims or (iv) Restructuring Claims.

**"Released Persons"**    means (i) the Company, the Existing Notes Subsidiary Pledgors, the Existing Notes Subsidiary Guarantors and the Group,   (ii) the Existing Notes Trustee, the Existing Notes Collateral Agent, the Existing Notes Depositary, the Existing Notes Paying and Transfer Agent and Registrar, (iii) the New Instruments Depositary, the New Instruments Paying and Transfer Agent and Registrar, and the New Instruments Trustee, and the New Instruments Collateral Agent, (iv) the Holding Period Trustee, (v) the Exchange and Conversion Agent, (vi) the Escrow Agent, (vii) the Account Bank, (viii) the Information Agent, (ix) the Scheme Administrators; (x) the Scheme Adjudicators, (xi) the CEG AHG (including each CEG AHG member's respective managers and investment managers' and investment advisors' Affiliates and funds and in each case, including any of its respective directors, managers or officers), (xii) the Advisors and (xiii) the AHG Advisors; and, regarding each of the above, includes each of their respective predecessors, successors and assigns (where applicable) and their respective Personnel in their capacities as such, and "**Released Person**" shall be construed accordingly.

**"Relevant Collateral"**    means any security, collateral, guarantee, bond, indemnity or other form of assurance granted for the purpose of securing and/or guaranteeing (i) any Class A Debt, provided by the Company and any of its subsidiaries, and/or (ii) any Class C Debt, provided by the Company only.

**"Residual New Instruments"**    means the portion of New Instruments which remains available for distribution to the Eligible Creditors, Blocked Scheme Creditors and/or Designated Recipients (as applicable) after the distribution of

29

|  | Scheme Consideration on the Restructuring Effective Date in accordance with the terms of the Schemes, including New Instruments which are not issued on the Restructuring Effective Date. |
|---|---|
| **"Residual A2/C2 Package"** | means the EVPS MEBs, NEV MEBs, CEG MCBs, A2 EVPS SLNs and A2 NEV SLNs which have not been distributed to Class A Scheme Creditors on the Restructuring Effective Date, and any C2 EVPS SLNs and C2 NEV SLNs. |
| **"Restricted Debts"** | means, with respect to a Participating Creditor at any time, the aggregate outstanding principal amount of Class A Debts or Class C Debts (as the case may be) set out in the Restricted Debts Notice (as defined in the relevant RSA) then most recently delivered by that Participating Creditor, as modified from time to time by any Transfer Notices (as defined in the relevant RSA) (as applicable) delivered by Participating Creditors to the Information Agent, subject to evidence satisfactory to the Information Agent, in accordance with the terms of the RSAs; and "**Restricted Debt**" means any portion of the Restricted Debts. |
| **"Restricted Subsidiaries"** | has the meaning given to that term under the New Instruments Documents. |
| **"Restructuring"** | means the restructuring of the debt and other offshore financial obligations of CEG and the Existing Notes Subsidiary Guarantors and certain other offshore subsidiaries of CEG as contemplated by, *inter alia*, the Restructuring Documents and the Schemes. |
| **"Restructuring Claims"** | means any Claim by a Scheme Creditor against a Released Person in respect of: (A) the preparation, negotiation, execution, sanction or implementation of the Schemes and/or the Restructuring and/or the Restructuring Documents; and/or (B) the execution of the Restructuring Documents and the carrying out of the steps and transactions contemplated therein in accordance with their terms, but, in each case, excluding for the avoidance of doubt, any Claim in respect of any Liability (i) of any Released Person which arises as a result of a failure to comply with any of the terms of the Schemes or any Restructuring Document (including but not limited to the New Instruments Documents) and (ii) arising from or in connection with any Excluded Liability or Excluded Collateral, and "**Restructuring Claim**" shall be construed accordingly. |
| **"Restructuring Documents"** | means the documents to be entered into by certain parties to implement the terms of the Restructuring including, but not limited to, the New Instruments Documents and the documents listed in Schedule 1 (*Restructuring Documents*) of this Cayman Scheme in each case shall be in the Agreed Form. |
| **"Restructuring Effective Date"** | means the date on which all of the Restructuring Effective Date Conditions have been satisfied or waived (as the case may be). |

30

| | |
|---|---|
| **"Restructuring Effective Date Conditions"** | means the conditions set out in Schedule 3 (*Restructuring Effective Date Conditions*) of this Cayman Scheme. |
| **"Restructuring Effective Date Conditions Subsequent"** | means the conditions set out in Clause 6.6 of this Cayman Scheme. |
| **"RMB Bondholders"** | means persons with a legal interest as principal in the RMB Bonds held in through the Shanghai Stock Exchange as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of the determination of such persons' Entitlements), each of whom has a right, upon satisfaction of certain conditions, to be repaid the outstanding principal and coupon of the RMB Bonds. |
| **"RMB Bonds"** | means the 15 Hengda 03 RMB bonds issued by Hengda Real Estate and listed on the Shanghai Stock Exchange, in which the Company guaranteed the repurchase of the RMB Bonds at the Redemption Date (as defined in the indenture for the RMB Bonds) if Hengda Real Estate failed to ensure sufficient funds in the bank account to repay the RMB Bondholders 3 business days prior to the Redemption Date and the RMB Bondholders so demanded. The outstanding principal amount of the RMB Bonds is RMB8.2 billion. |
| **"RSAs"** | means collectively, the Class A RSA and the Class C RSA, and "**RSA**" means either one of the RSAs. |
| **"Rules"** | has the meaning given to it in Clause 35.5 of this Cayman Scheme. |
| **"Sanctioned Country"** | means any country or territory that is the target of any comprehensive country or territory-wide Applicable Sanctions (being, as at the date of the Explanatory Statement, the territories of Crimea, Donetsk and Luhansk, and the countries of Cuba, Iran, North Korea and Syria). |
| **"Sanctioned Scheme Creditor"** | means a Scheme Creditor that is: |

(a)  designated on any Applicable Sanctions List;

(b)  resident in, ordinarily located in, or incorporated or domiciled under the laws of any Sanctioned Country;

(c)  in the aggregate, 50 percent or greater owned, directly or indirectly, or otherwise controlled, directly or indirectly, (in each case with reference to Applicable Sanctions) by any Person or Persons described in (a) or (b) above of this definition; or

(d)  acting on behalf of or at the direction of any Person or Persons described in (a) or (b) above of this definition,

and which does not have a sanctions licence in respect of the Applicable Sanctions which would allow that Scheme Creditor to

freely deal in the Scheme Consideration and submit instructions or settle through the Clearing Systems.

**"Sanctions-Affected Scheme Creditor"**      means a Blocked Scheme Creditor or a Sanctioned Scheme Creditor.

**"Sanctions Law Representations"**      means the sanctions law confirmations and undertakings set out in the Distribution Confirmation Deed.

**"Schemes"**      means, together, this Cayman Scheme and the Hong Kong Scheme.

**"Scheme Adjudicator"**      means an adjudicator appointed by the Company under Clause 40.2 of this Cayman Scheme.

**"Scheme Administrator"**      means Mr P Cowley, Ms YM Lui and Mr C Ball of KPMG Advisory (Hong Kong) Limited or any individual who is appointed Scheme Administrator under Clause 37 (*The Scheme Administrators*) of this Cayman Scheme, and "**Scheme Administrators**" shall be construed accordingly.

**"Scheme Administrator Estimate"**      means the Scheme Administrators' estimate of a Class C Scheme Creditor's Entitlement pursuant to Clause 38.2 of this Cayman Scheme.

**"Scheme Administrator Estimate Acceptance or Rejection Form"**      means the form to be submitted by a Class C Scheme Creditor in response to the Estimation Notice indicating their acceptance or rejection of the Scheme Administrator Estimate, pursuant to Clause 38.4 of this Cayman Scheme.

**"Scheme Claim"**      means any Claim by a Scheme Creditor against CEG under or in respect of the Existing Finance Documents whether at, before or after the Voting Record Time (including, for the avoidance of doubt, all accrued and unpaid interest on the Existing Finance Documents up to (but excluding) the Restructuring Effective Date, or accretions arising in respect of, such Claims before, at or after the Voting Record Time but, excluding for the avoidance of doubt, (i) any Claim in respect of any Liability of CEG which arises as a result of a failure to comply with any of the terms of the Schemes or any Restructuring Document (including but not limited to the New Instruments Documents), or (ii) in respect of Class C Scheme Creditors, any Claim not against CEG arising from or in respect of any Excluded Liability or Excluded Collateral).

**"Scheme Conditions"**      means:

    (a)  the sanction with or without modification (but subject to any such modification being acceptable to the Company and in accordance with the terms of this Cayman Scheme) of this Cayman Scheme by the Cayman Court;

    (b)  the sanction with or without modification (but subject to any such modification being acceptable to the Company and in accordance with the terms of this Hong Kong

<table>
<tr><td></td><td>Scheme) of the Hong Kong Scheme by the Hong Kong Court;</td></tr>
</table>

    (c)  the delivery of the Cayman Scheme Sanction Order to the Cayman Registrar of Companies for registration; and

    (d)  the delivery of the Hong Kong Scheme Sanction Order to the Hong Kong Companies Registrar for registration.

**"Scheme Consideration"** means the relevant portion of the rights and interests in the New Instruments as elected by the relevant Scheme Creditor to be distributed to Scheme Creditors (and/or their Designated Recipients, as applicable) under and pursuant to the terms of the respective Schemes (and, without double counting, any Residual New Instruments and Blocked New Instruments).

**"Scheme Creditor Form"** means:

    (a)  in respect of the Class A Noteholders and the Class C Noteholders (who are not Sanctions-Affected Scheme Creditors), a validly completed Account Holder Letter;

    (b)  in respect of the Class A Private Lenders (who are not Sanctioned Scheme Creditors), a validly completed Class A Private Lender Proxy Form;

    (c)  in respect of the Class C Scheme Creditors other than the Class C Noteholders (who are not Sanctioned Scheme Creditors), a validly completed Class C Scheme Creditor Proxy Form; and

    (d)  in respect of Blocked Scheme Creditors, a validly completed Blocked Scheme Creditor Form,

in each case (other than for Blocked Scheme Creditors) together with a validly completed Distribution Confirmation Deed and Designated Recipient Form (if applicable).

**"Scheme Creditor Releasing Parties"** has the meaning given to it in Clause 28.2 of this Cayman Scheme.

**"Scheme Creditors"** means, collectively, the Class A Scheme Creditors and the Class C Scheme Creditors, and "**Scheme Creditor**" means one of the Scheme Creditors.

**"Scheme Effective Date"** means the first Business Day on which all of the Scheme Conditions are satisfied and the Schemes become effective, as specified in the Scheme Effective Date Notice.

**"Scheme Effective Date Notice"** means the notice to be issued by the Company and delivered to the Information Agent in accordance with Clause 7.1 confirming satisfaction of the Scheme Conditions and specifying the Scheme Effective Date.

| | |
|---|---|
| **"Scheme Meetings"** | means collectively, the Cayman Scheme Meetings and the Hong Kong Scheme Meetings, and "**Scheme Meeting**" means either one of the Scheme Meetings. |
| **"Scheme Sanction Orders"** | means collectively, the Cayman Scheme Sanction Order and the Hong Kong Scheme Sanction Order. |
| **"Scheme Steps"** | means the steps set out in Clause 6 (*Scheme Steps*) of this Cayman Scheme. |
| **"SEC"** | means the US Securities and Exchange Commission. |
| **"Security"** | means the security constituted pursuant to the Security Documents. |
| **"Security Documents"** | means the security documents to be entered into in connection with Collateral of the New Instruments which will be made available (in substantially final form) on the Transaction Website, each of which shall be in the Agreed Form. |
| **"Securities Law Representations"** | means the securities law confirmations and undertakings set out in the Distribution Confirmation Deed forming part of the Solicitation Packet, as published on the Transaction Website. |
| **"SGX-ST"** | means Singapore Exchange Securities Trading Limited. |
| **"Shareholder Loans"** | means: |

(a)  the loans by the Chairman and Xin Xin (BVI) Limited to NEV totaling HK$2,650,000,000 (equivalent to approximately US$340,616,967); and

(b)  the loan by CEG to NEV totaling US$1,768 million.

| | |
|---|---|
| **"Shares"** | means the ordinary shares of the Company. |
| **"Singapore"** | means the Republic of Singapore. |
| "**Solicitation Packet**" | means the packet of materials, including the Account Holder Letter and accompanying instructions, the Designated Recipient Form, the Distribution Confirmation Deed, the Proxy Voting Forms and the Blocked Scheme Creditor Form, all of which are available to Scheme Creditors on the Transaction Website. |
| **"Successor Escrow Account"** | means an escrow account to be established for the Perpetuity Period or until the lifting of Applicable Sanctions in respect of all Blocked Scheme Creditors, whichever is earlier, by an agent to be appointed by CEG pursuant to the Successor Escrow Agreement for the purposes of holding the Blocked Assets after the expiration of the Holding Period for the Blocked Scheme Creditors who have submitted a validly completed Blocked Scheme Creditor Form together with supporting evidence to CEG prior to the Class A Bar Date or Class C Bar Date (as applicable). |

34

| | |
|---|---|
| **"Successor Escrow Agent"** | means the Person to be appointed by CEG as escrow agent for the Successor Escrow Account. |
| **"Successor Escrow Agreement"** | means the agreement providing for the creation of the Successor Escrow Account, under which the Successor Escrow Agent shall hold the Blocked Assets for the Company, in a form approved by the Successor Escrow Agent. |
| **"Super Majority Participating Creditors"** | means, at any time, Participating Creditors who: (i) have agreed to be bound by the terms of the Class A RSA and (ii) hold (beneficially or legally (as applicable), as principal) in aggregate at least 66 2/3% of the outstanding principal amount of the Restricted Debts (as defined under the Class A RSA) held in aggregate by all Participating Creditors who have agreed to be bound by the terms of the Class A RSA at that time (for the avoidance of doubt, excluding the Existing Notes beneficially and/or legally (as applicable) held by Xin Xin (BVI) Limited and the Chairman and their (as applicable) Affiliates which are in the aggregate amount of US$50,000,000 as at the date of the RSAs). |
| **"Term Sheet"** | means the restructuring term sheet in respect of CEG's offshore indebtedness dated 20 March 2023 between (among others) CEG and the Chairman, as amended, restated and/or supplemented from time to time. A redacted copy of the Term Sheet as of the date of this Agreement, incorporating amendments made by CEG to cure certain defects and omissions in accordance with the terms thereto, can be found on the transaction website specified in the Company's announcement on the HKEX at: https://www1.hkexnews.hk/listedco/listconews/sehk/2023/0403/2023040304093.pdf. |
| **"TJ Scheme"** | means the scheme of arrangement to be proposed by Tianji Holding Limited under sections 670, 673 and 674 of the Hong Kong Companies Ordinance. |
| **"TJ Scheme Consideration"** | means any consideration received by CEG as a scheme creditor as part of the restructuring, pursuant to the TJ Scheme (and, without double counting, any Blocked TJ Scheme Consideration). |
| **"Total Package"** | has the meaning set out in Clause 15.1 of this Cayman Scheme. |
| **"Transaction Website"** | means https://projects.morrowsodali.com/evergrande. |
| **"Treasure Glory"** | means Treasure Glory Global Limited. |
| **"Undersubscription"** or **"Undersubscribed"** | means a scenario where the total valid elections of Scheme Creditors for Option 2 Scheme Consideration results in, either: |

> (a) (x) the total amount of the Class A Scheme Creditors' Entitlement elected for the A2 Package, being less than (y) the total aggregate principal amount of all instruments included in the A2 Package Initial Portion; or

(b) (x) the total amount of the Class C Scheme Creditors' Entitlement elected for the C2 Package, being less than (y) the total aggregate principal amount of all instruments included in the C2 Package Adjusted Portion,

and the "**Undersubscribed Portion**" means the amount representing (y) *minus* (x) in (a) or (b) above (as applicable).

| | |
|---|---|
| **"United States" or "US"** | means the United States of America. |
| **"United States Code"** | means the codification by subject matter of the general and permanent laws of the United States. |
| **"US Bankruptcy Code"** | means Title 11 of the United States Code, as in effect on the date of the Recognition Filing. |
| **"US Bankruptcy Court"** | means the United States Bankruptcy Court for the Southern District of New York. |
| **"US Securities Act"** | means the US Securities Act of 1933, as amended, including the rules and regulations promulgated by the SEC thereunder. |
| **"Valuation and Adjudication Procedure"** | means, together, the Valuation Procedure and the Adjudication Procedure. |
| **"Valuation Procedure"** | means the procedure for determining the value of a Class C Scheme Creditor's Entitlement, as set out in Clause 38 (*Valuation Procedure*) of this Cayman Scheme. |
| **"Valuer"** | means a suitably qualified and experienced valuer(s) (in the reasonable opinion of the Scheme Administrators) specialising in the valuation of onshore real estate projects and the companies associated with such projects, who is engaged by the Scheme Administrators under Clause 37.6(e). |
| **"VAT"** | means value added tax or any equivalent goods and services tax levied by a Governmental Entity. |
| **"Venice Loan"** | has the meaning set out in Schedule 2 of this Cayman Scheme. |
| **"Venice SPA"** | has the meaning set out in Schedule 2 of this Cayman Scheme. |
| **"Voting Record Time"** | means 5:00 p.m. Hong Kong time on 18 August 2023, the equivalent being 4:00 a.m. Cayman Islands time on 18 August 2023. |
| **"Voting Stock"** | means, with respect to any Person, Capital Stock of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person. |

| **"Whitelist Scheme Administrators"** | means such persons agreed in writing by the Majority CEG AHG and the Company, including persons agreed in writing prior to the date of this Cayman Scheme. |

**2.    INTERPRETATION**

In this Cayman Scheme, unless the context otherwise requires or otherwise expressly provides:

2.1    references to Clauses are, unless otherwise stated, references to the clauses set out in Parts B to E (inclusive) of this Cayman Scheme;

2.2    references to Recitals, Parts and Schedules are, unless otherwise stated, references to the recitals, parts and schedules respectively of or to this Cayman Scheme;

2.3    references to a "person" include references to an individual, firm, partnership, company, corporation, other legal entity, unincorporated body of persons or any state or state agency;

2.4    references to a statute or a statutory provision include the same as subsequently modified, amended or re-enacted from time to time;

2.5    references to an agreement, deed or document shall be deemed also to refer to such agreement, deed or document as amended, supplemented, restated, verified, replaced, and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto;

2.6    the singular includes the plural and vice versa and words importing one gender shall include all genders;

2.7    headings to Recitals, Parts, Clauses and Sub-Clauses are for ease of reference only and shall not affect the interpretation of this Cayman Scheme;

2.8    references to times and dates (unless stated otherwise) are to times and dates in the Cayman Islands;

2.9    references to "**US$**" and "**HK$**" are references to the lawful currency of the United States of America and the lawful currency of Hong Kong, respectively;

2.10    the words "**include**" and "**including**" are to be construed without limitation, general words introduced by the word "**other**" are not to be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things, and general words are not to be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words;

2.11    a company is a "**subsidiary**" of another company, its "**holding company**", if that other company (a) holds a majority of the voting rights in it; (b) is a member of it and has the right to appoint or remove a majority of its board of directors; or (c) is a member of it and controls alone, pursuant to an agreement with other members, a majority of the voting rights in it, or, if it is a subsidiary of a company that is itself a subsidiary of that other company;

2.12    an "**undertaking**" means a body corporate or partnership; or an unincorporated association carrying on a trade or business, with or without a view to profit; and an undertaking is a parent undertaking in relation to another undertaking, a "**subsidiary undertaking**", if (a) it holds the majority of voting rights in the undertaking; (b) it is a member of the undertaking and has the right to appoint or remove a majority of its board of directors; (c) it has the right to exercise a dominant influence over the undertaking (i) by virtue of provisions contained in the undertaking's articles, or (ii) by virtue of a control contract; or

(d) it is a member of the undertaking and controls alone, pursuant to an agreement with other shareholders or members, a majority of the voting rights in the undertaking;

2.13    to the extent that there is any conflict or inconsistency between the terms of this Cayman Scheme and the Explanatory Statement, the terms of this Cayman Scheme shall prevail; and

2.14    any formulas, numbers, calculation methodology may have accounted for and/or is subject to rounding.

39

**PART B**

**THE CAYMAN SCHEME**

**3.      APPLICATION AND EFFECTIVENESS OF THIS CAYMAN SCHEME**

3.1     The compromise and arrangement effected by this Cayman Scheme shall apply to all Scheme Claims and shall be binding on the Company, the Existing Notes Subsidiary Guarantors, and all Scheme Creditors, and their respective successors, assigns and transferees (including any modifications to this Cayman Scheme are made in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*) of this Cayman Scheme). Subject to Clause 3.2 of this Cayman Scheme, the Scheme Creditors shall be eligible to receive certain rights in accordance with the terms of this Cayman Scheme in full and final settlement of their Scheme Claims.

3.2     Notwithstanding any other provisions of this Cayman Scheme, Excluded Liabilities and Excluded Collateral shall not be subject to Clause 28 (*Releases*) of this Cayman Scheme.

3.3     The terms of this Cayman Scheme shall become effective on and from the Scheme Effective Date.

3.4     The Company or the Information Agent (acting on behalf of the Company) shall notify the Scheme Creditors, the Existing Notes Trustee, the New Instruments Trustee, and the Collateral Agent (as required), in writing that the Scheme Effective Date has occurred in accordance with Clause 7.1 below.

3.5     If the Restructuring Effective Date has not occurred on or before the Longstop Date (as may be extended pursuant to Clause 3.6 below), the terms of, and obligations on the parties under or pursuant to, this Cayman Scheme shall lapse and all compromises and arrangements provided for by this Cayman Scheme shall have no force or effect and any Restructuring Documents held in escrow shall be promptly destroyed by or on behalf of the Company.

3.6     The Company may at any time before the occurrence of the Longstop Date (or any extension thereof in accordance with this Clause) extend the Longstop Date until such later date and time as CEG may elect to extend with the prior written consent of:

(a)      the Majority CEG AHG; or

(b)      (without prejudice to the foregoing) if the CEG AHG does not hold the Minimum CEG AHG Threshold, the Super Majority Participating Creditors,

(a "**Longstop Date Extension**").

3.7     Subject to compliance with Clause 3.6 above, the Company shall promptly notify the Information Agent of any Longstop Date Extension by delivering a notice confirming the Longstop Date Extension (a "**Longstop Date Extension Notice**") to the Information Agent, and the Information Agent shall promptly notify Scheme Creditors of the Longstop Date Extension by:

(a)      sending the Longstop Date Extension Notice to the Existing Notes Trustee and the New Instruments Trustee;

(b)      circulating the Longstop Date Extension Notice to the Class A Noteholders via the Clearing Systems;

40

(c)      posting the Longstop Date Extension Notice on the Transaction Website;

(d)      posting the Longstop Date Extension Notice on the Company's Website; and

(e)      sending the Longstop Date Extension Notice via email to each Person who the Company believes may be a Scheme Creditor who has been registered as a Scheme Creditor with the Information Agent or has otherwise notified the Company or the Information Agent of its valid email address; and

(f)      publishing an announcement of the Longstop Date Extension on the respective websites of HKEX and SGX-ST.

3.8      On and following the Restructuring Effective Date, the Scheme Claims of each Scheme Creditor, and any Person, including a successor, assignee or transferee, who acquires any interest in or arising out of a Scheme Claim after the Voting Record Time, shall be subject to the compromises and arrangements set out in this Cayman Scheme.

## 4.      COMPROMISE AND ARRANGEMENT WITH THE SCHEME CREDITORS

4.1      On the Restructuring Effective Date:

(a)      in respect of the Class A Noteholders, the Company shall ensure that the Global Certificates representing the Existing Notes are cancelled by the Existing Notes Depositary and shall give all such instructions as are required to be given by it (or for and on behalf of each Class A Noteholder) to the Existing Notes Trustee, the Existing Notes Depositary and/or the Existing Notes Collateral Agent for such purpose;

(b)      the Company shall, for and on behalf of each Scheme Creditor, execute the Deeds of Release; and

(c)      the respective rights and obligations of the Scheme Creditors (including, for the avoidance of doubt, any Person, including a successor, assignee or transferee, that acquires an interest in the Existing Debts after the Voting Record Time), the Company, the Existing Agents and, in respect of the Existing Notes, the Existing Notes Subsidiary Guarantors, the Existing Notes Subsidiary Pledgors, the Existing Notes Trustee, the Existing Notes Depositary and the Existing Notes Collateral Agent and, in respect of the Dongpo Notes, the Dongpo Notes Trustee and Agents and, in respect of the Lake Notes, the Lake Notes Trustee and Agent, towards one another under the Existing Notes Documents, the Class A Private Loan, and the Class C Debts in respect of any other Scheme Claim (except for the Excluded Liabilities and Excluded Collateral) will terminate and be discharged,

in consideration for which the Company shall issue the Scheme Consideration on the Restructuring Effective Date and/or the Final Distribution Date to the Scheme Creditors (other than to the Sanctions-Affected Scheme Creditors, the Existing Agents, the Dongpo Notes Trustee and Agents and the Lake Notes Trustee and Agent), the Designated Recipients and/or to the Holding Period Trustee to be held on trust for and on behalf of such relevant Blocked Scheme Creditors during the Holding Period, and/or to the Successor Escrow Agent, subject to Clause 25 (*Fractional Adjustments*) and the terms of Part D (*Scheme Consideration*) below.

4.2      Each Scheme Creditor hereby acknowledges and agrees that any action taken by the Company in accordance with this Cayman Scheme or the Restructuring Documents will not constitute a breach of or any default (howsoever described) under the Existing Finance Documents or any

other agreement or document governing the terms of the Class A Private Loan, any Class C Debt or any Scheme Claim and irrevocably waives and releases any such breach or default.

## 5.    AUTHORITY AND INSTRUCTIONS

5.1    With effect from the Scheme Effective Date, in consideration of the rights provided to the Scheme Creditors under this Cayman Scheme and solely for the purposes of giving effect to the terms of this Cayman Scheme, each Scheme Creditor hereby appoints the Company as its attorney and agent and irrevocably authorizes, directs, instructs and empowers the Company (represented by any duly authorized representative) to, as applicable:

(a)    enter into, execute and deliver (whether as a deed or otherwise) for and on behalf of that Scheme Creditor, in its capacity as a Scheme Creditor, including any Person, successor, assignee or transferee, to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time (to the extent applicable), sufficient original copies of (as agreed between the parties thereto):

(i)    the Restructuring Documents (in each case in the Agreed Form) to which such Scheme Creditor is a party, each substantially in the form attached to this Cayman Scheme or the Explanatory Statement (as applicable) or otherwise in the form circulated to Scheme Creditors or otherwise made available to them, including on the Transaction Website, subject to any non-material modification approved or imposed by the Court in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*); and

(ii)    any and all such other documents (in each case in the Agreed Form) that the Company and the CEG AHG reasonably consider necessary to give effect to the terms of this Cayman Scheme,

in each case to be held to the order of the relevant parties thereto (for the avoidance of doubt, to the order of the Company on behalf of each Scheme Creditor) until the Restructuring Effective Date or, in respect of the Restructuring Documents for the New Instruments which are to be first issued on the Final Distribution Date, on the Final Distribution Date, in accordance with the Scheme Steps for the purposes of giving effect to the terms of this Cayman Scheme;

(b)    take or carry out any other step or procedure reasonably required to effect the settlement of this Cayman Scheme; and

(c)    to the extent applicable, in respect of Existing Debts (other than the Existing Notes and RMB Bonds), instruct each of the Existing Agents, the Dongpo Notes Trustee and Agents, the Lake Notes Trustee and Agent, acting in their capacity as Existing Agent, the Dongpo Notes Trustee and Agents or the Lake Notes Trustee and Agent respectively, and each of their employees and agents to promptly take or carry out any step, procedure or execute and comply with any Restructuring Documents reasonably required to give effect to the terms of this Cayman Scheme.

5.2    On or as soon as possible after the Scheme Effective Date, as applicable:

(a)    the Company shall carry out the steps set out in Clause 5.1 and this Clause 5.2, acting on the instructions and pursuant to the authority of the Scheme Creditors; and

(b)     the Company, each Existing Notes Subsidiary Guarantor, each New Instruments Subsidiary Guarantor, each Existing Notes Subsidiary Pledgor, each New Instruments Subsidiary Pledgor, the Existing Notes Trustee, the Existing Agents, the Dongpo Notes Trustee and Agents, the Lake Notes Trustee and Agent, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary, the Existing Notes Collateral Agent, the Collateral Agent and the Holding Period Trustee shall enter into, execute and deliver (whether as a deed or otherwise) sufficient original copies of (as agreed between the parties thereto):

> (i)     the Restructuring Documents (in each case in the Agreed Form) to which the Company, such Existing Notes Subsidiary Guarantor, such New Instruments Subsidiary Guarantor, the Existing Notes Trustee, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the Existing Agents, the Dongpo Notes Trustee and Agents, the Lake Notes Trustee and Agent, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary, the Existing Notes Collateral Agent and the Collateral Agent is a party, each substantially in the form attached to this Cayman Scheme or the Explanatory Statement (as applicable) or otherwise in the form circulated to Scheme Creditors or otherwise made available to them, subject to any non-material modification approved or imposed by the Court in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*); and

> (ii)    any and all such other documents (in each case in the Agreed Form) that the Company and the CEG AHG reasonably consider necessary to give effect to the terms of this Cayman Scheme,

in each case to be held to the order of the relevant parties thereto until the Restructuring Effective Date or, in respect of the Restructuring Documents for the New Instruments which are to be first issued on the Final Distribution Date, on the Final Distribution Date, in accordance with the Scheme Steps for the purposes of giving effect to the terms of this Cayman Scheme.

5.3     With effect from the Scheme Effective Date, each of the Scheme Creditors irrevocably authorises and instructs the Existing Notes Trustee, the Existing Agents, the Dongpo Notes Trustee and Agents, the Lake Notes Trustee and Agent, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary, the Existing Notes Collateral Agent, the Collateral Agent and the Holding Period Trustee to enter into, execute and deliver (whether as a deed or otherwise) sufficient original copies of (as agreed between the parties thereto), as applicable:

> (i)     the Restructuring Documents (in each case in the Agreed Form) to which the Existing Notes Trustee, the Existing Agents, the Dongpo Notes Trustee and Agents, the Lake Notes Trustee and Agent, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary, the Existing Notes Collateral Agent, the Collateral Agent and the Holding Period Trustee is a party, each substantially in the form attached to this Cayman Scheme or the Explanatory Statement (as applicable) or otherwise in the form circulated to Scheme Creditors or otherwise made available to them, subject to any

non-material modification approved or imposed by the Court in accordance with Clause 31 (*Modifications to the Scheme and the Restructuring Documents*); and

(ii)    any and all such other documents (in each case in the Agreed Form) that the Company and the CEG AHG reasonably consider necessary to give effect to the terms of this Cayman Scheme,

in each case to be held to the order of the relevant parties thereto until the Restructuring Effective Date or, in respect of the Restructuring Documents for the New Instruments which are to be first issued on the Final Distribution Date, on the Final Distribution Date, in accordance with the Scheme Steps for the purposes of giving effect to the terms of this Cayman Scheme.

5.4    On the Restructuring Effective Date, each Class A Noteholder hereby irrevocably authorises and instructs, as applicable:

(a)    the Company, the Existing Notes Trustee, the Existing Notes Depositary, the Existing Notes Paying and Transfer Agent and Registrar, the Existing Notes Collateral Agent, and the Information Agent to take all such actions as may be necessary or appropriate to deliver, cancel, mark down and discharge the Global Certificates, terminate and discharge the Existing Notes Documents and otherwise give effect to the terms of this Cayman Scheme including without limitation the delivery by the Company (for and on behalf of the Scheme Creditors) of the Existing Notes Trustee Instruction to the Existing Notes Trustee at the time prescribed in the Scheme Steps;

(b)    the Company as its attorney and agent and irrevocably authorises, directs, instructs and empowers the Company (represented by any authorised representative) to in respect of the Existing Notes, instruct the Existing Notes Collateral Agent, acting in its capacity as Existing Notes Collateral Agent and each of its employees and agents promptly take or carry out any step or procedure or to execute and comply with any Restructuring Documents reasonably required to give effect to the terms of this Scheme;

(c)    the Existing Notes Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the Existing Notes Collateral Agent, and the Existing Notes Depositary, to act and rely upon the Existing Notes Trustee Instruction and the provisions of this Cayman Scheme, without any duty to investigate further and without incurring any liability for doing so (other than any liability arising as a result of the fraud, wilful default or wilful misconduct of the Existing Notes Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the Existing Notes Collateral Agent, or the Existing Notes Depositary); and

(d)    the Existing Notes Depositary, the New Instruments Depositary and the Information Agent to rely upon the provisions of this Cayman Scheme, without any duty to investigate further and without incurring any liability for doing so (other than any liability arising as a result of the fraud, wilful default or wilful misconduct of the Existing Notes Depositary or the actual fraud, wilful default or wilful misconduct of the Information Agent).

5.5    The authority granted under Clauses 5.1 to 5.4 (inclusive) shall be treated, for all purposes whatsoever and without limitation, as having been granted by deed and the Company shall be entitled to delegate the authority granted and conferred by this Clause 5 to any duly authorized officer or agent of the Company as necessary.

5.6    Each Scheme Creditor (for itself and, if applicable, for its Designated Recipient and any person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time) on and from the Scheme Effective Date and on and from the Restructuring Effective Date, irrevocably ratifies and confirms any act or omission done, caused or purported to be done by:

(a)    the Company, the Existing Notes Subsidiary Guarantors, the New Instruments Subsidiary Guarantors, the Existing Notes Collateral Agent, the Collateral Agent and the Information Agent or any of their respective directors, managers, officers, partners or Affiliates, pursuant to or for the purposes of giving effect to this Cayman Scheme, other than any act or omission done or made as a result of fraud, wilful default or wilful misconduct; and

(b)    the Existing Notes Trustee, the Existing Agents, the Dongpo Notes Trustee and Agents, the Lake Notes Trustee and Agent, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary or any of their respective directors, managers, officers, partners or Affiliates, pursuant to or for the purposes of giving effect to this Cayman Scheme, other than any act or omission done or made as a result of actual fraud, wilful default or wilful misconduct.

## 6.    SCHEME STEPS

*Prior to the Restructuring Effective Date*

6.1    The Company shall announce and specify the Restructuring Effective Date in a notice confirming satisfaction of the Restructuring Effective Date Conditions and enclosing a copy of the Scheme Sanction Orders and the Chapter 15 Recognition Order in accordance with Clause 7.1 below (the "**Completion Notice**") to Scheme Creditors, the Existing Notes Trustee and the New Instruments Trustee as soon as reasonably practicable after satisfaction of the Restructuring Effective Date Conditions.

6.2    The Restructuring Effective Date shall occur after satisfaction or waiver (to the extent permitted by law and the RSAs (applied *mutatis mutandis*)), of the Restructuring Effective Date Conditions.

6.3    The Restructuring Documents may be executed at any time after the Scheme Effective Date, but shall only take effect in accordance with their terms and the terms of this Cayman Scheme, including the satisfaction of the Restructuring Effective Date Conditions, on the Restructuring Effective Date or, in respect of the Restructuring Documents for the New Instruments which are to be first issued on the Final Distribution Date, on the Final Distribution Date.

6.4    The Company, in consultation with the Information Agent and/or Scheme Administrators, shall calculate the amount of the Scheme Consideration to be issued to the Class A Scheme Creditors and the Holding Period Trustee on the Restructuring Effective Date in accordance with the terms of this Cayman Scheme and the Restructuring Documents.

*On the Restructuring Effective Date*

6.5    On the Restructuring Effective Date, the following steps shall occur (in the order set out below to the extent possible or practicable):

(a)    the duly executed Restructuring Documents (save for the Deeds of Release and the Existing Notes Trustee Instruction (which are the subject of sub-clauses (g) and (i)

45

below), and the Restructuring Documents for the New Instruments which are to be first issued on the Final Distribution Date) shall be released from escrow and delivered by the relevant parties or otherwise become effective in accordance with their terms;

(b)    each Scheme Creditor and each Designated Recipient (if applicable) shall, subject to Clause 25 (*Fractional Adjustments*) and the terms of Part D (*Scheme Consideration*) below, become entitled to receive its respective proportion of the Scheme Consideration as calculated and in accordance with Part D (*Scheme Consideration*) below;

(c)    the Company shall issue and distribute the Initial Distribution of the New Instruments to the Class A Scheme Creditors (who are Eligible Creditors), the Designated Recipients and/or the Holding Period Trustee (as applicable) in each case in accordance with their respective entitlements under the Schemes and subject to and in accordance with Part D (*Scheme Consideration*) below;

(d)    the Existing Notes Depositary shall take such action as may be required to credit the Record Date Balance in the records of the Clearing Systems in favour of those Class A Noteholders at the Entitlement Record Time who did not submit, or did not have submitted on their behalf, Custody Instructions by the Custody Instruction Deadline and/or a validly completed Account Holder Letter, Distribution Confirmation Deed and, if applicable, Designated Recipient Form by the Class A Options Deadline;

(e)    any A2 Package or A2 Notes which are payable to Blocked Scheme Creditors that are Class A Scheme Creditors, and any Consent Fee (if applicable) which is payable to Class C Scheme Creditors or to which Blocked Scheme Creditors that are Class A Scheme Creditors are entitled (who are Eligible Participating Creditors), will be issued to and held by the Holding Period Trustee on trust for the benefit of those Scheme Creditors in accordance with the terms of the Holding Period Trust Deed, during the Holding Period subject to and in accordance with Part D (*Scheme Consideration*) below;

(f)    the Company shall pay the Consent Fee to each Eligible Participating Creditor (and/or their Designated Recipient) who is a Class A Scheme Creditor who has elected to receive Option 2 Scheme Consideration and is entitled to such payment pursuant to the terms of the applicable RSA, subject to and in accordance with Part D (*Scheme Consideration*) below.

(g)    the steps described in Clause 4 (*Compromise and Arrangement with the Scheme Creditors*) shall occur and the releases contained in Clause 28 (*Releases*) of this Cayman Scheme and the Deeds of Release shall be effective and shall be binding on all parties in accordance with their terms;

(h)    the Company via the Information Agent shall deliver the Clearing System Instruction to each of the Clearing Systems;

(i)    the Company, acting as agent for the Class A Noteholders, shall deliver the executed Existing Notes Trustee Instruction to the Existing Notes Trustee; and

(j)    the Existing Notes Trustee and the Existing Notes Paying and Transfer Agent and Registrar shall, upon receipt of the Existing Notes Trustee Instruction, cancel the Existing Notes and take such other action as may be required to effect the cancellation, mark down and discharge of the Existing Notes under the Existing Notes Documents, such that the respective rights and obligations of the Class A

Noteholders (including, for the avoidance of doubt, any Person that acquires an interest in the Existing Notes after the Voting Record Time), the Company, the Existing Notes Subsidiary Guarantors, the Existing Notes Trustee, the Existing Notes Paying and Transfer Agent and the Existing Notes Depositary towards one another under the Existing Notes Documents will terminate.

*Subsequent to the Restructuring Effective Date*

6.6     Following the Restructuring Effective Date, the Company shall take steps to satisfy the Restructuring Effective Date Conditions Subsequent, unless waived to the extent permitted by law and the RSAs (applied *mutatis mutandis*):

   (a)     the dismissal (or withdrawal) of any winding-up petition filed against CEG prior to the Restructuring Effective Date and relating to any Scheme Claims of the Schemes, including the winding-up petition filed by Top Shine Global Limited against CEG before the Hong Kong High Court;

   (b)     the completion of the Valuation and Adjudication Procedure in respect of each Class C Scheme Creditor's Entitlement under this Cayman Scheme and the distribution of Scheme Consideration as part of the Interim Distribution or the Final Distribution to Scheme Creditors in accordance with Part D (*Scheme Consideration*) below;

   (c)     where TJ Scheme Consideration is received by CEG (if any), the distribution of the TJ Scheme Consideration to eligible Scheme Creditors on a pro rata basis pursuant to Clause 20 (*TJ Scheme Consideration*) ;

   (d)     prior to the Final Distribution Date, the Company, in consultation with the Information Agent and/or Scheme Administrator, shall calculate the amount of the Scheme Consideration to be issued to the Scheme Creditors or transferred by the Holding Period Trustee to the Scheme Creditors on the Final Distribution Date in accordance with the terms of this Cayman Scheme and the Restructuring Documents; and

   (e)     the satisfaction of each of the specific conditions subsequent contained in each of the Restructuring Documents (in each case in the Agreed Form) and any corporate governance term sheet forming part of the Explanatory Statement (as and to the extent applicable).

6.7     On the Final Distribution Date:

   (a)     the duly executed Restructuring Documents for the New Instruments which are to be first issued on the Final Distribution Date shall be released from escrow and delivered by the relevant parties or otherwise become effective in accordance with their terms;

   (b)     the Company shall issue and distribute any C2 Package Unadmitted Portion as is required for the conversion of any Forced A2 Notes, together with the C2 Package Adjusted Portion, to the relevant Scheme Creditors in accordance with this Cayman Scheme and the Restructuring Documents;

   (c)     the Company shall issue and distribute the A1 Notes, C1 Notes and C2 Notes to the relevant Scheme Creditors in accordance with the instructions of the Scheme Administrators, this Cayman Scheme and the Restructuring Documents; and

47

(d)     the Company shall pay the Consent Fee to each Eligible Participating Creditor (and/or their Designated Recipient) who is a Scheme Creditor entitled to such payment (and did not receive such payment on the Restructuring Effective Date) pursuant to the terms of the applicable RSA, subject to and in accordance with Part D (*Scheme Consideration*) below.

6.8     If applicable, the Company shall issue and distribute the Interim Distribution on the Interim Distribution Date in accordance with Clause 21.1.

**PART C**

**NOTICES AND SCHEME CLAIMS**

**7.      NOTICES TO SCHEME CREDITORS AND OTHERS**

7.1     The Company or the Information Agent (acting on behalf of the Company) shall promptly notify the Scheme Creditors, the Existing Notes Trustee, the New Instruments Trustee and the Collateral Agent of:

   (a)     the satisfaction of the Scheme Conditions and the occurrence of the Scheme Effective Date via a Scheme Effective Date Notice; and

   (b)     the satisfaction of the Restructuring Effective Date Conditions and the designation of the Restructuring Effective Date via a Completion Notice,

by:

   (a)     sending the relevant notice to the Existing Notes Trustee and the New Instruments Trustee;

   (c)     circulating the relevant notice through the Clearing Systems;

   (d)     posting the relevant notice on the Transaction Website;

   (e)     posting the relevant notice on the Company's Website;

   (f)     posting an announcement on the respective websites of HKEX and SGX-ST; and

   (g)     sending the relevant notice via email to each Person who the Company believes may be a Scheme Creditor and which is registered as a Scheme Creditor with the Information Agent or has otherwise notified the Company or Information Agent of its valid email address.

7.2     All other notices under this Clause 7 (*Notices to Scheme Creditors and Others*) to Scheme Creditors may be given by the Company in the following ways:

   (a)     by notice on the Transaction Website;

   (b)     by notice on the Company's Website;

   (c)     by notice through the Clearing Systems by the Information Agent;

   (d)     by notice via email to each person who the Company believes may be a Scheme Creditor, and who has registered as a Scheme Creditor with the Company or the Information Agent or otherwise notified the Company or the Information Agent of its valid email address; and

   (e)     by the publishing of an announcement on the respective websites of HKEX and SGX-ST.

**8.      ENTITLEMENT RECORD TIME AND SCHEME CLAIMS**

8.1     The Scheme Creditors' Entitlement shall be determined by the Scheme Administrators in accordance with the Scheme Creditors' Scheme Claims as at the Entitlement Record Time.

49

8.2     The Scheme Creditors acknowledge and agree that the Scheme Administrators shall:

(a)     in respect of the Class A Noteholders and Class C Noteholders who are not Sanctions-Affected Scheme Creditors, use the appropriate Scheme Creditor Form submitted by or on behalf of each Class A Noteholder or Class C Noteholder and based on the calculation of the Existing Notes Trustee (in respect of Class A Noteholders only), as verified against the books and records of the Existing Notes Depositary (or its nominee) and/or the Clearing Systems in respect of the Class A Noteholders or the books and records of the depository (or its nominee) and/or the Clearing Systems of the Class C Notes in respect of the Class C Noteholders;

(b)     in respect of all other Scheme Creditors who are not Sanctions-Affected Scheme Creditors, use the appropriate Scheme Creditor Form submitted by or on behalf of each relevant Scheme Creditor, and seek to verify the relevant Scheme Creditor's identity, status as a Scheme Creditor, and value of its holding to the best of its ability based on the information provided in the respective Scheme Creditor Form; and

(c)     in respect of Blocked Scheme Creditors, use the appropriate Blocked Scheme Creditor Form submitted by or on behalf of each Blocked Scheme Creditor, as verified against the books and records of GLAS and/or the Company, including any additional evidence as reasonably required by GLAS and the Company and requested from the Blocked Scheme Creditor to be provided in relation to its Scheme Claim,

in each case, by the applicable Bar Date, or, in respect of Class A Scheme Creditors who qualify to receive the Initial Distribution, by the Class A Options Deadline, to determine the value of the Scheme Claims of each Scheme Creditor for the purposes of calculating their Entitlement to the Scheme Consideration (in respect of Class C Scheme Creditors, as further determined by the Valuation and Adjudication Procedure), and any such determination shall (in the absence of manifest error, willful default, willful misconduct or fraud) be conclusive and binding on the Scheme Creditors and the Company.

8.3     The Information Agent shall use reasonable endeavours to review each Scheme Creditor Form other than Blocked Scheme Creditor Forms, and all Custody Instructions (if applicable) promptly after receipt, against the records of the Clearing Systems (in respect of the Class A Noteholders and the Class C Noteholders) or the Company's books and records (in respect of the Class A Lenders and the Class C Scheme Creditors other than the Class C Noteholders), to assist the Scheme Administrators in determining each Scheme Claim. Notwithstanding the foregoing it is the sole responsibility of each Scheme Creditor to ensure that any Scheme Creditor Form submitted in respect of its Scheme Claim has been validly completed, including the Accession Code, if applicable, and that any Custody Instruction has been validly submitted via the Clearing Systems.

8.4     Where the Information Agent reasonably considers a Class A Noteholder or a Class C Noteholder to be a Sanctions-Affected Scheme Creditor, it shall promptly refer the relevant Scheme Creditor to the Company and the relevant Scheme Creditor shall be treated and administered as a Blocked Scheme Creditor or Sanctioned Scheme Creditor (as applicable) for the purposes of the Schemes.

**9.     ACCEPTANCE OF DOCUMENTATION**

9.1     Any Scheme Creditor Forms submitted, as applicable, shall be submitted in accordance with the instructions set out in the relevant Scheme Creditor Form and the Solicitation Packet.

9.2    Whether a Scheme Creditor Form has been validly completed shall be determined by the Scheme Administrators, based on information checked by the Information Agent against the records of the Clearing Systems (in respect of the Class A Noteholders and the Class C Noteholders) or the Company's books and records (in respect of the Class A Lenders and the Class C Scheme Creditors other than the Class C Noteholders), or reviewed by GLAS against the Company's books and records (in respect of Blocked Scheme Creditors), at their discretion, provided that, if the Scheme Administrators considers any such document not to have been validly completed, they shall promptly:

(a)    prepare a written statement of its reasons for that conclusion; and

(b)    send that written statement by email to the party that provided the relevant document.

9.3    Where a Scheme Creditor Form is considered not to have been validly completed, and the applicable Bar Date has not yet occurred at the time of such determination, the relevant Scheme Creditor may resubmit the Scheme Creditor Form. No Scheme Creditor Forms may be resubmitted after the applicable Bar Date and Clauses 10.4, 10.6, 10.9 and 10.11 (as applicable) shall then apply.

9.4    Except in respect of a determination made as a result of actual fraud, wilful default or wilful misconduct, none of the Scheme Administrators, the Information Agent or GLAS will be responsible for any loss or liability incurred by a Scheme Creditor as a result of any determination by the Scheme Administrators.

## 10.    DEADLINES AND BAR DATES

10.1    All Scheme Claims will be released on the Restructuring Effective Date, in accordance with the terms of the Schemes.

*Class A Scheme Creditors*

10.2    In addition to the documentation specified in Clause 10.3 below, a Class A Noteholder (other than a Sanctions-Affected Scheme Creditor) must ensure that its Account Holder submits a validly completed and executed Custody Instruction via the Clearing Systems prior to the submission of an Account Holder Letter and, in any event, before:

(a)    the Custody Instruction Deadline, in order to receive Scheme Consideration on the Restructuring Effective Date; or

(b)    the Holding Period Custody Instruction Deadline, in order to receive Scheme Consideration on the Final Distribution Date.

10.3    A Class A Scheme Creditor who is not a Sanctions-Affected Scheme Creditor must ensure that:

(a)    in respect of Class A Noteholders other than Sanctions-Affected Scheme Creditors, the following Scheme Creditor Forms are received by the Information Agent in relation to the Existing Notes held by that Class A Noteholder: (i) a validly completed and executed Account Holder Letter, (ii) Distribution Confirmation Deed, and (iii) Designated Recipient Form (if applicable); and

(b)    in respect of Class A Lenders, the following Scheme Creditor Forms are received by the Information Agent in relation to the Class A Private Loan: (i) a validly completed and executed Class A Private Lender Proxy Form, (ii) Distribution

51

Confirmation Deed, and (iii) Designated Recipient Form (if applicable), together with supporting evidence to establish the Scheme Claim of the relevant Class A Lender,

by:

(c)      the Class A Options Deadline, in order to be eligible to receive either Option 1 Scheme Consideration on the Final Distribution Date or Option 2 Scheme Consideration on the Restructuring Effective Date and on the Final Distribution Date and as described further in Part D (*Scheme Consideration*); or

(d)      the Class A Bar Date, in order to receive Option 1 Scheme Consideration on the Final Distribution Date.

10.4      Any Class A Scheme Creditor who is not a Sanctions-Affected Scheme Creditor that fails to comply with Clause 10.3 shall have its rights under this Cayman Scheme extinguished and shall not be entitled to receive Scheme Consideration under this Cayman Scheme.

10.5      Subject to Clauses 17 (*Initial Distribution to Holding Period Trustee*) and 19 (*Distribution to Successor Escrow Account for Blocked Scheme Creditors*) below, a Blocked Scheme Creditor that is a Class A Scheme Creditor must ensure that a validly completed and executed Blocked Scheme Creditor Form, together with supporting evidence, is received by the Company by:

(a)      the Class A Options Deadline, in order to be eligible to receive either Option 1 Scheme Consideration or Option 2 Scheme Consideration on the Final Distribution Date or the lifting of Applicable Sanctions, whichever is later; or

(b)      the Class A Bar Date, in order to receive Option 1 Scheme Consideration on the Final Distribution Date or the lifting of Applicable Sanctions, whichever is later.

10.6      Any Blocked Scheme Creditor that is a Class A Scheme Creditor that fails to comply with Clause 10.5 shall have its rights under this Cayman Scheme extinguished and shall not be entitled to receive the Scheme Consideration under this Cayman Scheme.

*Class C Scheme Creditors*

10.7      In addition to the documentation specified in Clause 10.8 below, a Class C Noteholder (other than a Sanctions-Affected Scheme Creditor) must ensure that its Account Holder submits a validly completed and executed Custody Instruction via the Clearing Systems prior to the submission of an Account Holder Letter and, in any event, before:

(a)      the Custody Instruction Deadline, in order to receive the Consent Fee (if applicable) on the Final Distribution Date (provided the other conditions to receive the Consent Fee described in the RSA are satisfied); or

(b)      the Holding Period Custody Instruction Deadline, in order to receive Scheme Consideration on the Final Distribution Date.

10.8      A Class C Scheme Creditor who is not a Sanctions-Affected Scheme Creditor must ensure that:

(a)      in respect of Class C Scheme Creditors other than Class C Noteholders, the following Scheme Creditor Forms are received by the Information Agent by the Class C Bar Date in relation to the Class C Scheme Creditor's Class C Debts: (i) a

validly completed and executed Class C Scheme Creditor Proxy Form, (ii) Distribution Confirmation Deed, and (iii) Designated Recipient Form (if applicable), together with supporting evidence to establish the Scheme Claim of the relevant Class C Scheme Creditor; or

(b)     in respect of Class C Noteholders, the following Scheme Creditor Forms are received by the Information Agent by the Class C Bar Date in relation to the Class C Notes held by that Class C Noteholder: (i) a validly completed and executed Account Holder Letter, (ii) Distribution Confirmation Deed, and (iii) Designated Recipient Form (if applicable).

10.9     Any Class C Scheme Creditor who is not a Sanctions-Affected Scheme Creditor that fails to comply with Clauses 10.7 and 10.8 shall have its rights under this Cayman Scheme extinguished and shall not be entitled to receive the Scheme Consideration under this Cayman Scheme.

10.10     Subject to Clauses 17 (*Initial Distribution to Holding Period Trustee*) and 19 (*Distribution to Successor Escrow Account for Blocked Scheme Creditors*) below, a Blocked Scheme Creditor that is a Class C Scheme Creditor must ensure that a validly completed and executed Blocked Scheme Creditor Form, together with supporting evidence to establish the Scheme Claim of the relevant Blocked Scheme Creditor, is received by the Company by the Class C Bar Date in order to be entitled to receive Scheme Consideration.

10.11     Any Blocked Scheme Creditor that is a Class C Scheme Creditor that fails to comply with Clause 10.10 shall have its rights under this Cayman Scheme extinguished and shall not be entitled to receive the Scheme Consideration under this Cayman Scheme.

10.12     Sanctioned Scheme Creditors must contact the Company in writing pursuant to the notice details set out in Clause 41 (*Notice*) to bring its status as a Sanctioned Scheme Creditor to the attention of the Company on or before the Class A Options Deadline (if the Sanctioned Scheme Creditor is a Class A Scheme Creditor and wishes to elect Option 2 Scheme Consideration), the Class A Bar Date or the Class C Bar Date, as applicable. Any Sanctioned Scheme Creditor that fails to comply with this Clause 10.12 shall have its rights under this Cayman Scheme extinguished, including any right which it may have to receive Scheme Consideration or TJ Scheme Consideration under this Cayman Scheme.

**11.     ASSIGNMENTS OR TRANSFERS OF SCHEME CLAIMS**

11.1     Subject to Clause 11.3 below, the Scheme Administrators shall not be under any obligation to recognise any sale, assignment or transfer of any Scheme Claim after the Entitlement Record Time for the purposes of determining the Entitlement of each Scheme Creditor (and/or their Designated Recipient, as applicable) under the Schemes. The Scheme Administrators may, in their sole discretion and subject to the production of such evidence as they may reasonably require and to any other terms and conditions which the Scheme Administrators may consider necessary or desirable, agree to recognise such assignment or transfer for the purposes of determining Entitlements to Scheme Consideration under this Cayman Scheme.

11.2     Any assignee or transferee of a Scheme Creditor so recognised by the Scheme Administrators shall be bound by the terms of this Cayman Scheme in the event that they become effective as if it were a Scheme Creditor and shall produce such evidence as the Scheme Administrators may reasonably require to confirm that it has agreed to be bound by the terms of this Cayman Scheme. None of the Existing Notes Trustee or the Existing Notes Paying and Transfer Agent and Registrar will be responsible for confirming Class A

Noteholders as at the Entitlement Record Time or for monitoring, acknowledging or processing any assignments that occur after the Entitlement Record Time.

11.3    Class C Scheme Creditors are not prevented by this Cayman Scheme from selling, assigning or transferring any Excluded Liability or Excluded Collateral after the Restructuring Effective Date. Where the Class C Notes are sold, assigned or transferred by a Class C Noteholder after the Restructuring Effective Date, the Class C Noteholder as at the Entitlement Record Time shall remain entitled to receive the Scheme Consideration pursuant to the terms of this Cayman Scheme (rather than the assignee, purchaser or transferee of the relevant Class C Notes). Notwithstanding the foregoing, any sold, assigned or transferred Excluded Liability or Excluded Collateral shall be disclosed to the Scheme Administrators and/or the Scheme Adjudicator (as applicable) in accordance with the terms of this Cayman Scheme, and shall be taken into account for the purpose of calculating the Assessed Value when determining the relevant Class C Scheme Creditor's Entitlement.

## PART D

## SCHEME CONSIDERATION

**12.     GENERAL PRINCIPLES**

*Calculation of Scheme Creditor's Entitlement*

12.1     Each Class A Scheme Creditor's Entitlement will be determined by the Scheme Administrators on a Full Accrued Claim Basis as set out in Clause 13.2.

12.2     Each Class C Scheme Creditor's Entitlement will be determined by the Scheme Administrators on a Deficiency Basis as set out in Clause 13.3.

*Election of Scheme Consideration*

12.3     As set out in Clause 14.2, subject to the terms of this Cayman Scheme, each Class A Scheme Creditor can elect to receive:

(a)      Option 1 Scheme Consideration comprising of A1 Notes; or

(b)      Option 2 Scheme Consideration comprising of A2 Notes only, A2 Package only, or, provided that the percentage of the Class A Scheme Creditor's Entitlement elected for each of the A2 Notes and the A2 Package shall be an integral multiple of 10%, a combination of the A2 Notes and A2 Package.

12.4     As set out in Clause 14.4, subject to the terms of the Schemes, each Class C Scheme Creditor can elect to receive:

(a)      Option 1 Scheme Consideration comprising of the C1 Notes; or

(b)      Option 2 Scheme Consideration comprising of C2 Notes only, C2 Package only, or, provided that the percentage of the Class C Scheme Creditor's Entitlement elected for each of the C2 Notes and the C2 Package shall be an integral multiple of 10%, a combination of the C2 Notes and C2 Package.

12.5     In the event there is an Undersubscription or Oversubscription of the A2 Package or the C2 Package, Scheme Creditors may not receive the Scheme Consideration they have elected to receive. The procedure for the re-allocation of the Scheme Consideration is set out in Clauses 16 (*Initial Distribution*) and 18 (*Final Distribution*).

*Composition of the A2 Package and C2 Package*

12.6     The maximum total amount of the New Instruments available for distribution under the A2 Package and C2 Package is in aggregate equal to the Total Package as set out in Clause 15.1 below. The minimum size of the A2 Package is the A2 Package Initial Portion and the maximum size is the A2 Package Adjusted Portion. The C2 Package available for distribution to Class C Scheme Creditors is the C2 Package Adjusted Portion.

12.7     The Total Package will initially be divided into the A2 Package Initial Portion and C2 Package Initial Portion based on the Accrued Claims Ratio between the respective amounts of all Class A Scheme Creditor's Entitlement and Class C Scheme Creditor's Entitlement, each of which shall be calculated on a Full Accrued Claim Basis as at the Entitlement Record Time.

55

12.8    The A2 Package Initial Portion will be distributed to the Class A Scheme Creditors (or Holding Period Trustee, as applicable) on the Restructuring Effective Date. Any A2 Package Initial Portion issued to the Holding Period Trustee on the Restructuring Effective Date in respect of Class A Scheme Creditors who are not Blocked Scheme Creditors shall be distributed to those Class A Scheme Creditors on the Final Distribution Date, in accordance with Clauses 16 (*Initial Distribution*) to 18 (*Final Distribution*).

12.9    The Company shall transfer the EVPS Shares and NEV Shares forming part of the Exchange Property and the Security for the New Instruments which are part of the C2 Package to the New Instruments Collateral Agent on the Restructuring Effective Date pending conclusion of the Valuation and Adjudication Procedure with respect to the Class C Debt as set out in Clause 16.10 below. Following the conclusion of the Valuation and Adjudication Procedure:

(a)    the adjusted portion calculated based on a Deficiency Basis, referred to as the C2 Package Adjusted Portion, will be issued and distributed to the Class C Scheme Creditors as set out in Clauses 18.10 to 18.12 below; and

(b)    the excess portion as a result of the adjustment from the Full Accrued Claim Basis to the Deficiency Basis, referred to as the C2 Package Unadmitted Portion, will be issued and distributed to the Class A Scheme Creditors who have originally elected to receive the A2 Package but were allocated Forced A2 Notes instead as set out in Clause 18.4 below, to the extent required to make such distribution.

### TJ Scheme Consideration

12.10    TJ Scheme Consideration will be distributed to the Class A Scheme Creditors and Class C Scheme Creditors (and, in respect of Blocked Scheme Creditors, the Holding Period Trustee or Successor Escrow Agent) who have validly elected by the applicable deadline pursuant to Clause 10 (*Deadlines and Bar Dates*) to receive the A2 Package and the C2 Package respectively, on a pro rata basis as set out in Clause 20 (*TJ Scheme Consideration*) below.

### Consent Fee

12.11    The Consent Fee will be paid to the Scheme Creditors that are Eligible Participating Creditors (or, in respect of Blocked Scheme Creditors, to the Holding Period Trustee or the Successor Escrow Agent) as set out in Clause 22 (*Consent Fee*) below on the Restructuring Effective Date (with respect to Class A Scheme Creditors who are Eligible Participating Creditors and have validly elected to receive the Option 2 Scheme Consideration only) and the Final Distribution Date (with respect to all other Scheme Creditors who are Eligible Participating Creditors).

### Valuation and Adjudication Procedure

12.12    As described in Clause 12.2, each Class C Scheme Creditor's Entitlement will be determined by the Scheme Administrators on a Deficiency Basis. The Deficiency Basis amount shall be first determined through the Valuation Procedure, as set out in Clause 38 (*Valuation Procedure*) below.

12.13    Any disagreement regarding the calculation or determination of any Class C Scheme Creditor's Entitlement shall be, following the Consultation Period, be resolved by the Adjudication Procedure, as set out in Clause 40 (*Adjudication Procedure*) below.

*Distribution Dates*

12.14    The Scheme Consideration shall be distributed to the Scheme Creditors, the Holding Period Trustee or the Successor Escrow Agent (as applicable) on the Restructuring Effective Date, Final Distribution Date and the Interim Distribution Date (if applicable) as set out in Clauses 16 (*Initial Distribution*), 18(*Final Distribution*) and 21 (*Interim Distribution*) below.

**13.    CALCULATION OF A SCHEME CREDITOR'S ENTITLEMENT**

13.1    Each Scheme Creditor will be entitled to receive (or have the Holding Period Trustee or the Successor Escrow Agent receive on its behalf, if applicable) Scheme Consideration which is equal to the value of its "**Entitlement**".

13.2    A Class A Scheme Creditor's Entitlement shall be calculated by the Scheme Administrators on a "**Full Accrued Claim Basis**" in accordance with the formula set out below:

$$\text{"Full Accrued Claim Basis"} = A + B$$

where:

**A** =    the outstanding principal amount or, in the case of a put option or repurchase obligation, the price amount, of the Scheme Creditor's Scheme Claims at the Entitlement Record Time, as determined by the Company, in consultation with the Scheme Administrators.

**B** =    all accrued but unpaid interest on such Scheme Claims up to (but excluding) the Reference Date, as determined by the Company, in consultation with the Scheme Administrators.

13.3    A Class C Scheme Creditor's Entitlement shall be calculated by the Scheme Administrators on a Full Accrued Claim Basis for the purpose of determining the allocation of the Total Package between the A2 Package Initial Portion and the C2 Package Initial Portion, or on a "**Deficiency Basis**" for the purpose of determining the entitlement of a Class C Scheme Creditor to Scheme Consideration in accordance with the formula set out below:

$$\text{"Deficiency Basis"} = A - (B + C)$$

where:

**A** =    the value of the Scheme Creditor's Scheme Claims on a Full Accrued Claim Basis, as determined by the Scheme Administrators or the Scheme Adjudicator (as applicable).

**B** =    the Assessed Value of any Excluded Liabilities and Excluded Collateral, as determined by the Scheme Administrators or the Scheme Adjudicator (as applicable) in accordance with the Valuation and Adjudication Procedure set out in Clauses 38 (*Valuation Procedure*) and 40 (*Adjudication Procedure*).

**C** =    in respect of a put option and/or repurchase obligation, the Assessed Value of any securities retained by the put option holder and/or the creditor of the repurchase obligation, to which the put option and/or the repurchase obligation relates, as determined by the Scheme Administrators or the Scheme Adjudicator (as applicable) in accordance with the Valuation and Adjudication

57

Procedure set out in Clauses 38 (*Valuation Procedure*) and 40 (*Adjudication Procedure*).

13.4    The value of a Scheme Creditor's Scheme Claims as at the Entitlement Record Time shall be determined by the Scheme Administrators in accordance with Clause 8 (*Entitlement Record Time and Scheme Claims*).

13.5    The determination by the Scheme Administrators or the Scheme Adjudicator (as applicable) of each Class C Scheme Creditor's Entitlement will take place after the sanction of the Schemes by way of the Valuation and Adjudication Procedure set out in Clauses 38 (*Valuation Procedure*) and 40 (*Adjudication Procedure*) below. All Class C Scheme Creditors' Entitlements will be valued as at the Entitlement Record Time, irrespective of when their Distribution Confirmation Deeds are submitted.

13.6    For the avoidance of doubt, (i) the Existing Notes Trustee and the Existing Notes Depositary in respect of the Existing Notes; (ii) the Dongpo Notes Trustee and Agents in respect of the Dongpo Notes; (iii) the Lake Notes Trustee and Agent in respect of the Lake Notes; and (iv) the Existing Agents in respect of the applicable Class C Debts, shall not be entitled to vote at the Scheme Meetings (to avoid double counting) or receive any Scheme Consideration, unless otherwise agreed by the Company.

**14.    SCHEME CONSIDERATION OPTIONS**

14.1    Subject to Clause 10 (*Deadlines and Bar Dates*), each Scheme Creditor is entitled to elect between two options in respect of its Scheme Consideration. Such elections shall be made within an Account Holder Letter (for Class A Noteholders or Class C Noteholders, other than Sanctions-Affected Scheme Creditors), Class A Private Lender Proxy Form (for Class A Lenders), Class C Scheme Creditor Proxy Form (for Class C Scheme Creditors, other than Class C Noteholders), or Blocked Scheme Creditor Form (for Blocked Scheme Creditors). The election made by a Scheme Creditor is subject to the adjustment and reallocation process, as set out in Clauses 16 (*Initial Distribution*) and 18(*Final Distribution*).

14.2    Each Class A Scheme Creditor is entitled to elect:

(a)    Option 1 Scheme Consideration which is comprised of A1 Notes; and

(b)    Option 2 Scheme Consideration which is comprised of:

(i)    A2 Notes only;

(ii)    A2 Package only; or

(iii)    provided that the percentage of the Class A Scheme Creditor's Entitlement elected for each of the A2 Notes and the A2 Package shall be an integral multiple of 10%, any combination of the A2 Notes and the A2 Package.

14.3    Class A Scheme Creditors who do not submit the required validly completed and executed Scheme Creditor Forms by the Class A Options Deadline (but do submit such validly completed and executed Scheme Creditor Forms by the Class A Bar Date) shall only be eligible to receive Option 1 Scheme Consideration, as set out in Clause 10 (*Deadlines and Bar Dates*).

14.4    Each Class C Scheme Creditor is entitled to elect:

(a)    Option 1 Scheme Consideration which is comprised of C1 Notes; and

(b)    Option 2 Scheme Consideration which is comprised of:

(i)    C2 Notes only;

(ii)    C2 Package only; or

(iii)    provided that the percentage of the Class C Scheme Creditor's Entitlement elected for each of the C2 Notes and the C2 Package shall be an integral multiple of 10%, any combination of the C2 Notes and the C2 Package.

14.5    In the event where there is an Undersubscription or Oversubscription of the A2 Package Initial Portion, A2 Package Adjusted Portion or C2 Package Adjusted Portion (as applicable), Scheme Creditors may not receive the Scheme Consideration they elected to receive. The adjustment and reallocation process for the allocation of the Scheme Consideration is set out in Clauses 16 (*Initial Distribution*) and 18 (*Final Distribution*).

14.6    Scheme Creditors who do not submit the required Scheme Creditor Forms by the Class A Bar Date or the Class C Bar Date (as applicable) shall have their rights under this Cayman Scheme extinguished and shall not be entitled to receive Scheme Consideration under this Cayman Scheme, as set out in Clause 10 (*Deadlines and Bar Dates*).

## 15.    TOTAL PACKAGE, A2 PACKAGE AND THE C2 PACKAGE

### *Total Package*

15.1    Subject to Clauses 15.2 and 15.3 below, the "**Total Package**" means the A2 Package and the C2 Package which have a combined value of approximately US $8,132,000,000 and is comprised of:

(a)    HK$3,252,524,460 (equivalent to approximately US$418,000,000) in aggregate principal amount of CEG MCBs;

(b)    HK$5,363,567,110(equivalent to approximately US$689,000,000) in aggregate principal amount of EVPS MEBs;

(c)    HK$24,310,300,515 (equivalent to approximately US$3,125,000,000) in aggregate principal amount of NEV MEBs;

(d)    US$1,400,000,000 in aggregate principal amount of EVPS SLNs, in respect of which:

(i)    US$1,100,000,000 in aggregate principal amount of the A2 EVPS SLNs will be made available for distribution to Class A Scheme Creditors and form part of the A2 Package Initial Portion; and

(ii)    US$300,000,000 in aggregate principal amount of the C2 EVPS SLNs will be made available for distribution to Class C Scheme Creditors (and, subject to the Entitlement of Class C Scheme Creditors, to Class A Scheme Creditors) and form part of the C2 Package Initial Portion; and

59

(e)    US$2,500,000,000 in aggregate principal amount of the NEV SLNs, in respect of which:

    (i)    US$1,350,000,000 in aggregate principal amount of the A2 NEV SLNs; and

    (ii)    US$1,150,000,000 in aggregate principal amount of the C2 NEV SLNs will be made available for distribution to Class C Scheme Creditors (and, subject to the Entitlement of Class C Scheme Creditors, to Class A Scheme Creditors) and form part of the C2 Package Initial Portion.

15.2    The aggregate principal amount of the NEV MEBs which shall form part of the Total Package is subject to adjustment by the Company, in consultation with the Scheme Administrators, in the event the Shareholder Loans are converted prior to 14 August 2023. The aggregate principal amount of HK$24,310,300,515 (equivalent to approximately US$3,125,000,000) in aggregate principal amount of NEV MEBs as set out in Clause 15.1 shall be issued in the event the Shareholder Loans are converted into NEV Shares at an issue price of HK$3.84 per share on 14 August 2023. If the conversion takes place at any other date, the aggregate principal amount of NEV MEBs shall be adjusted by the Company, in consultation with the Scheme Administrators, based on the date of the conversion of the Shareholder Loans in accordance with the formula set out below:

$$P = (A - B) \times C$$

where:

    **P =**    The aggregate principal amount of the NEV MEBs which form part of the Total Package.

    **A =**    The aggregate issued NEV Shares beneficially owned (whether directly or through one or more Subsidiaries) by the Company, the Chairman and Xin Xin (BVI) Limited (including the NEV Shares issued with respect to the conversion of the Shareholder Loans) as of the Restructuring Effective Date.

    **B =**    30% of the aggregate issued NEV Shares, in respect of existing issued NEV Shares as at the date of the Explanatory Statement plus any NEV Shares issued as a result of the conversion of the Shareholder Loans, as of the Restructuring Effective Date.

    **C =**    HK$3.84.

15.3    All the principal amounts set out at Clause 15.1 (and accordingly, any principal amount of New Instruments forming part of the Total Package derived from such principal amounts), assumes (a) the conversion of the Shareholder Loans into NEV Shares will take place on 14 August 2023; (b) a Restructuring Effective Date of 1 October 2023 and (c) the number of Shares, EVPS Shares and NEV Shares and the numbers so derived from such number of shares are based on the date of the Explanatory Statement.

15.4    For the purposes of calculating the allocation of any New Instruments to Scheme Creditors which are not denominated in USD, the Company shall convert any Entitlement that is in:

(a)    US$ to HK$ at an exchange rate of US$1 to HK$7.7800; and

(b)    US$ to RMB at an exchange rate of US$1 to RMB7.1102.

*A2 Package*

15.5    The A2 Package comprises of:

    (a)    A2 Package Initial Portion which will form part of the Initial Distribution on the Restructuring Effective Date; and

    (b)    C2 Package Unadmitted Portion (if any) which will become part of the A2 Package Adjusted Portion and distributed on the Final Distribution Date.

*Calculation of the A2 Package Initial Portion*

15.6    The "**A2 Package Initial Portion**" shall be comprised of:

    (a)    CEG MCBs in aggregate principal amount equal to A2 Accrued Claims Ratio multiplied by HK$3,252,524,4610;

    (b)    EVPS MEBs in aggregate principal amount equal to:

        (i)    HK$2,681,783,555; *plus*

        (ii)    A2 Accrued Claims Ratio multiplied by HK$2,681,783,555;

    (c)    subject to Clause 15.8 below, NEV MEBs in aggregate principal amount equal to A2 Accrued Claims Ratio multiplied by HK$24,315,300,515;

    (d)    A2 EVPS SLNs in an aggregate principal amount of US$1,100,000,000; and

    (e)    A2 NEV SLNs in an aggregate principal amount of US$1,350,000,000.

15.7    The "**A2 Accrued Claims Ratio**" shall be calculated in accordance with the following formula:

$$\text{"\textbf{A2 Accrued Claims Ratio}"} \quad = \quad \frac{\textit{Class A Scheme Creditor's Full Accrued Claims}}{\textit{Total Scheme Creditor Full Accrued Claims}}$$

15.8    The aggregate principal amount of the NEV MEBs which shall form part of the A2 Package Initial Portion is subject to adjustment by the Company, in consultation with the Scheme Administrators, in the event the Shareholder Loans are converted prior to 14 August 2023. In the event the conversion of the Shareholder Loans into NEV Shares does not take place on 14 August 2023, the A2 Package Initial Portion shall be comprised of NEV MEBs in aggregate principal amount equal to A2 Accrued Claims Ratio multiplied by the total aggregate principal amount of NEV MEBs which form part of the Total Package, calculated and adjusted by the Company, in consultation with the Scheme Administrators, in accordance with Clause 15.2 above.

*Calculation of the A2 Package Adjusted Portion and C2 Package Unadmitted Portion*

15.9    The "**A2 Package Adjusted Portion**" means (i) the A2 Package Initial Portion *plus* (ii) the C2 Package Unadmitted Portion.

15.10    The "**C2 Package Unadmitted Portion**" means (i) the C2 Package Initial Portion *minus* (ii) the C2 Package Adjusted Portion.

61

*C2 Package*

15.11   The C2 Package shall comprise of:

(a)     C2 Package Initial Portion, which represents the maximum possible size of the C2 Package; or

(b)     if there is any C2 Package Unadmitted Portion, the C2 Package Adjusted Portion, which will form part of the Final Distribution on the Final Distribution Date.

*Calculation of C2 Package Initial Portion*

15.12   The "**C2 Package Initial Portion**" shall be comprised of:

(a)     CEG MCBs in aggregate principal amount equal to C2 Accrued Claims Ratio multiplied by HK\$3,253,000,000;

(b)     EVPS MEBs in aggregate principal amount equal to C2 Accrued Claims Ratio multiplied by HK\$2,682,000,000;

(c)     subject to Clause 15.14 below, NEV MEBs in aggregate principal amount equal to C2 Accrued Claims Ratio multiplied by HK\$24,311,000,000;

(d)     C2 EVPS SLNs in an aggregate principal amount of US\$300,000,000; and

(e)     C2 NEV SLNs in an aggregate principal amount of US\$1,150,000,000,

in each case, in addition to and including any accrued interest capitalised and/or paid in cash during the period between the Reference Date and the Interim Distribution Date and/or the Final Distribution Date, as applicable.

15.13   The "**C2 Accrued Claims Ratio**" shall be calculated in accordance with the following formula:

$$\text{"C2 Accrued Claims Ratio"} \quad = \quad \frac{\textit{Class C Scheme Creditor's Full Accrued Claims}}{\textit{Total Scheme Creditor Full Accrued Claims}}$$

15.14   The aggregate principal amount of the NEV MEBs which shall form part of the C2 Package Initial Portion is subject to adjustment by the Company, in consultation with the Scheme Administrators, in the event the Shareholder Loans are converted prior to 14 August 2023. In the event the Shareholder Loans into NEV Shares does not take place on 14 August 2023, the C2 Package Initial Portion shall be comprised of NEV MEBs in aggregate principal amount equal to C2 Accrued Claims Ratio multiplied by the total aggregate principal amount of NEV MEBs which form part of the Total Package, calculated and adjusted by the Company, in consultation with the Scheme Administrators, in accordance with Clause 15.2 above.

*Calculation of C2 Package Adjusted Portion*

15.15   The "**C2 Package Adjusted Portion**" shall be calculated in accordance with the following formula:

"**C2 Package Adjusted Portion**"              $= \quad \dfrac{A}{B} \quad \times \quad C$

where:

   A =    the total Entitlement of Class C Scheme Creditors, calculated on a Deficiency Basis in accordance with Clause 13.3, as determined by the Scheme Administrators and the Scheme Adjudicators.

   B =    the total Scheme Claims of Class C Scheme Creditors, calculated by the Scheme Administrators on a Full Accrued Claim Basis.

   C =    the C2 Package Initial Portion, as determined pursuant to Clause 15.12.

*Allocation of the A2 Package and the C2 Package*

15.16   The Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the allocation of the New Instruments (including the relevant tranches thereof) comprising the A2 Package to the Scheme Creditors entitled to receive the A2 Package (each, an "**A2 Package Recipient**") on a pro rata basis such that each A2 Package Recipient will receive an equal amount of CEG MCBs, EVPS MEBs, NEV MEBs, A2 EVPS SLNs and A2 NEV SLNs for each dollar of Entitlement converted into the A2 Package as compared to such other A2 Package Recipient.

15.17   The Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the allocation of the New Instruments (including the relevant tranches thereof) comprising the C2 Package to the Scheme Creditors entitled to receive the C2 Package (each, a "**C2 Package Recipient**") on a pro rata basis such that each C2 Package Recipient will receive an equal amount of CEG MCBs, EVPS MEBs, NEV MEBs, C2 EVPS SLNs and C2 NEV SLNs for each dollar of Entitlement converted into the C2 Package as compared to such other C2 Package Recipient.

## 16.   INITIAL DISTRIBUTION

### General Provisions

16.1    The Initial Distribution is comprised of the A2 Package Initial Portion  and the A2 Notes, each of which will be issued by the Company on the Restructuring Effective Date.

16.2    On the Restructuring Effective Date:

   (a)    the Company shall make the Initial Distribution to Class A Scheme Creditors who are not Sanctions-Affected Scheme Creditors where such Class A Scheme Creditors have submitted the required Scheme Creditor Forms by the Class A Options Deadline pursuant to Clause 10 (*Deadlines and Bar Dates*);

   (b)    in relation to Blocked Scheme Creditors who are Class A Scheme Creditors and have submitted the required Scheme Creditor Forms by the Class A Options Deadline pursuant to Clause 10 (*Deadlines and Bar Dates*), the Company shall make the Initial Distribution to the Holding Period Trustee to which such Blocked Scheme

Creditors are entitled, to be held on trust under the terms of the Holding Period Trust Deed;

(c)     where an Undersubscription of the A2 Package Initial Portion occurs as described in Clause 16.4(c), the Company shall distribute the remaining Undersubscribed Portion of the A2 Package Initial Portion as described therein to the Holding Period Trustee; and

(d)     the Company shall issue such New Instruments as are required to make the Initial Distribution set out in this clause in accordance with the terms of the New Instruments Documents in global registered form in the name of the New Instruments Depositary or its nominee.

### *Initial Distribution of the A2 Package Initial Portion on the Restructuring Effective Date*

16.3    If the combined elections of Class A Scheme Creditors for the A2 Package are equal to the A2 Package Initial Portion (such that there is neither an Undersubscription nor an Oversubscription of the A2 Package Initial Portion), then on the Restructuring Effective Date Class A Scheme Creditors who elected to receive the A2 Package as part of their Scheme Consideration shall receive the A2 Package in a principal amount equal to their converted Entitlement on a dollar-for-dollar basis in accordance with their election.

16.4    If the combined elections of Class A Scheme Creditors result in an Undersubscription of the A2 Package Initial Portion, then on the Restructuring Effective Date:

(a)     Class A Scheme Creditors who elected to receive the A2 Package as part of their Scheme Consideration shall receive the A2 Package on a dollar-for-dollar basis in accordance with their election;

(b)     any Undersubscribed Portion of the A2 Package Initial Portion after the allocation in Clause 16.4(a) shall be allocated to the Class A Scheme Creditors who elected to receive A2 Notes on a pro rata basis and in exchange of their Entitlements on a dollar-for-dollar basis; and

(c)     if the A2 Package Initial Portion is still Undersubscribed after the allocation in Clause 16.4(b) above, any such remaining Undersubscribed Portion of the A2 Package Initial Portion shall be issued to the Holding Period Trustee, for distribution on the Final Distribution Date to Class A Scheme Creditors who are eligible to receive A1 Notes on a pro rata basis and in exchange of their Entitlements on a dollar-for-dollar basis,

in all cases, where the amount of any converted Entitlement shall be exchanged on a dollar-for-dollar basis for an equal amount of Scheme Consideration (such that, where a Class A Scheme Creditor receives Scheme Consideration on the Restructuring Effective Date in respect of part of its Entitlement, the value of the Scheme Consideration received shall be equal to the value of the portion of Entitlement in respect of which that Scheme Consideration has been paid).

16.5    If the combined elections of Class A Scheme Creditors result in an Oversubscription of the A2 Package Initial Portion, then on the Restructuring Effective Date:

(a)     A2 Package Initial Portion shall be distributed to Class A Scheme Creditors who elected to receive the A2 Package as part of their Scheme Consideration on a pro rata basis, where the amount of any Entitlement which is to be converted to A2 Package shall be exchanged on a dollar-for-dollar basis for an equal amount of Scheme Consideration; and

64

(b)      Scheme Consideration in the form of the Forced A2 Notes shall be issued and distributed to such Class A Scheme Creditors in respect of the Oversubscribed Portion of the A2 Package Initial Portion of such Class A Scheme Creditors' Entitlement on a dollar-for-dollar basis.

16.6    In respect of any Class A Scheme Creditor who is a Blocked Scheme Creditor, its Initial Distribution of the A2 Package Initial Portion and/or Forced A2 Notes (as applicable) will be issued to the Holding Period Trustee on the Restructuring Effective Date.

### *Initial Distribution of A2 Notes on the Restructuring Effective Date*

16.7    On the Restructuring Effective Date, the Company shall issue A2 Notes to (each of the following, being an "**A2 Notes Recipient**"):

(a)      subject to any adjustment required in accordance with Clause 16.4(b) above where there is an Undersubscription of the A2 Package Initial Portion, Class A Scheme Creditors who have validly elected to convert their Entitlement into A2 Notes on a dollar-for-dollar basis; and

(b)      Class A Scheme Creditors who have validly elected to convert their Entitlement into the A2 Package in the event of an Oversubscription of the A2 Package Initial Portion and to the extent of the Oversubscribed Portion of the A2 Package Initial Portion in accordance with Clause 16.5 above.

16.8    The Company, in consultation with the Information Agent and/or the Scheme Administrators, shall calculate the issuance and distribution of the A2 Notes on the Restructuring Effective Date in the following manner:

(a)      *first*, the Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the aggregate principal amounts of the tranche A, tranche B, tranche C and, if any, tranche D of the A2 Notes that will be issued on the Restructuring Effective Date in accordance with the total amount of Entitlements of the A2 Notes Recipient as set out below:

   (i)       the aggregate principal amount of tranche A shall be up to US$500 million;

   (ii)      the aggregate principal amount of tranche B shall be up to US$650 million;

   (iii)     the aggregate principal amount of tranche C shall be up to US$3,800 million; and

   (iv)     the aggregate principal amount of tranche D if any shall be the total amount of the Entitlements of the A2 Notes Recipients less the aggregate principal amounts of tranche A, tranche B and tranche C;

(b)      *second*, the Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the allocation of tranche A, tranche B, tranche C and, if any, tranche D of the A2 Notes that will be issued and distributed to A2 Notes Recipients on a pro rata basis and allocation will be made in sequential order by maturity date. An A2 Notes Recipient will receive an equal amount of tranche A, tranche B, tranche C and, if any, tranche D of A2 Notes in respect of each dollar of Entitlement converted to A2 Notes as compared to such other A2 Notes Recipient; and

(c)      *third*, the Company, in consultation with the Information Agent and/or the Scheme Administrators, shall allocate the appropriate A2 Notes to each A2 Notes Recipient:

        (i)       A2 Notes allocated by the Company, in consultation with the Information Agent and/or the Scheme Administrators, to Class A Scheme Creditors referred to in Clause 16.7(a) shall be the Plain A2 Notes; and

        (ii)      A2 Notes allocated by the Company, in consultation with the Information Agent and/or the Scheme Administrators, to Class A Scheme Creditors referred to in Clause 16.7(b) shall be the Forced A2 Notes.

16.9    In respect of any Class A Scheme Creditor who is a Blocked Scheme Creditor, its A2 Notes (as applicable) will be issued to the Holding Period Trustee on the Restructuring Effective Date.

***Treatment of NEV Shares and EVPS Shares for C2 Package New Instruments***

16.10   On the Restructuring Effective Date:

        (a)      the Exchange Property for the NEV MEBs and EVPS MEBs shall be placed into the securities accounts established pursuant to the terms of the NEV MEBs Trust Deed and the EVPS MEBs Trust Deed (each of which shall be in the Agreed Form) respectively;

        (b)      share certificate of 749,465,275 EVPS Shares which will form part of the Security for the C2 EVPS SLNs shall be delivered to the New Instruments Collateral Agent to be held in custody pending the issuance of the C2 EVPS SLNs on the Final Distribution Date; and

        (c)      (x) 1,503,503,540 NEV Shares; and (y) the NEV Shares with respect to the NEV Custody Account Transfer, each of which will form part of the custody arrangement for the C2 NEV SLNs shall be held in a securities account in the name of the Company or an offshore subsidiary of the Company, the withdrawal of which will be restricted other than for the issuance of the C2 NEV SLNs on the Final Distribution Date.

## 17.    INITIAL DISTRIBUTION TO HOLDING PERIOD TRUSTEE

17.1    The following New Instruments will be issued to and held by the Holding Period Trustee on trust under the Holding Period Trust Deed for the benefit of such Scheme Creditors during the Holding Period:

        (a)      any initial distribution of A2 Package, A2 Notes and Consent Fee that Blocked Scheme Creditors (who are Eligible Participating Creditors) are entitled to;

        (b)      any remaining Undersubscribed Portion of the A2 Package Initial Portion in relation to the Undersubscription referred to in Clause 16.4(c); and

        (c)      TJ Scheme Consideration which does not form part of the partial distribution of such consideration to Class A Scheme Creditors who elected to receive A2 Package pursuant to Clause 20.3 payable to Scheme Creditors who elected to receive A2 Package or C2 Package (as applicable).

17.2    If a Scheme Creditor (who is not a Sanctions-Affected Scheme Creditor) complies with Clause 10 (*Deadlines and Bar Dates*) and any requirements specified in the Holding Period Trust Deed and the Company is satisfied that such Scheme Creditor is entitled to the TJ Scheme Consideration and any Consent Fee (if applicable), the Holding Period Trustee will issue to such Scheme Creditor or its Designated Recipient its portion of the TJ Scheme Consideration and any Consent Fee (if applicable) to which it may be entitled pursuant to Part D (*Scheme Consideration*) of this Cayman Scheme.

17.3    If a Blocked Scheme Creditor who has complied with Clause 10 (*Deadlines and Bar Dates*) also complies with any requirements specified in the Holding Period Trust Deed and the Company is satisfied that such Blocked Scheme Creditor is entitled to the Scheme Consideration, and the Applicable Sanctions have been lifted in respect of Blocked Scheme Creditors, the Holding Period Trustee will issue to such Blocked Scheme Creditor or its Designated Recipient (if applicable) its portion of the Blocked Assets to which it may be entitled pursuant to Part D (*Scheme Consideration*) of this Cayman Scheme, on the Final Distribution Date.

17.4    The Company may, in its sole discretion in consultation with the Scheme Administrators, issue any Scheme Consideration to which Scheme Creditors may be entitled to the Holding Period Trustee to hold on trust under the Holding Period Trust Deed for the benefit of the relevant Scheme Creditors during the Holding Period.

17.5    For the avoidance of doubt, each of the Schemes will contain the same obligation settle the Scheme Consideration on trust and the performance of that obligation will discharge the obligation under both Schemes.

## 18.    FINAL DISTRIBUTION

### *General Provisions*

18.1    On the Final Distribution Date:

(a)    the Company shall make the Final Distribution to Class A Scheme Creditors who are not Sanctions-Affected Scheme Creditors and Class C Scheme Creditors who are not Sanctions-Affected Scheme Creditors where such creditors have submitted the required Scheme Creditor Forms by the applicable deadline pursuant to Clause 10 (*Deadlines and Bar Dates*);

(b)    in relation to Blocked Scheme Creditors who have submitted the required Scheme Creditor Forms by the applicable deadline pursuant to Clause 10 (*Deadlines and Bar Dates*):

(i)    the Company shall make the Final Distribution to the Blocked Scheme Creditors where the Applicable Sanctions no longer prevent the payment of Scheme Consideration to such creditors; or

(ii)    where the Applicable Sanctions continue to prevent the payment of Scheme Consideration to Blocked Scheme Creditors, the Company shall make the Final Distribution to which Blocked Scheme Creditors are entitled to the Successor Escrow Agent, to be held under the terms of the Successor Escrow Agreement; and

(c)    to the extent that the required New Instruments have not been issued on the Restructuring Effective Date, the Company shall issue such New Instruments as are required to make the Final Distribution set out in this Clause 18 (*Final Distribution*) in accordance with the terms of the New Instruments Documents in global registered form in the name of the New Instruments Depositary or its nominee.

18.2    The Holding Period Trustee, on behalf of the Company, may also distribute TJ Scheme Consideration on the Final Distribution Date to certain Class A Scheme Creditors and Class C Scheme Creditors pursuant to Clause 20 (*TJ Scheme Consideration*).

***Final Distribution of any remaining A2 Package Initial Portion (if applicable)***

18.3    On the Final Distribution Date, where the circumstances in Clause 16.4(c) apply, any remaining Undersubscribed A2 Package Initial Portion shall be released by the Holding Period Trustee and allocated by the Company, in consultation with the Information Agent and/or the Scheme Administrators, to the Class A Scheme Creditors who have validly elected (or were deemed to have elected) to receive A1 Notes on a pro rata basis and in exchange for its Entitlement on a dollar-for-dollar basis.

***Final Distribution of C2 Package Unadmitted Portion***

18.4    On the Final Distribution Date, the Company shall redeem, exchange and/or convert the amount of Forced A2 Notes equivalent to the amount up to and including the C2 Package Unadmitted Portion (if any) starting from the tranche of the Forced A2 Notes with the longest maturity and in reverse chronological order and on a dollar-for-dollar basis (with any adjustment required (if any) to take into account any accrued and unpaid interest under the Forced A2 Notes).

18.5    In respect of any underlying shares for the unutilized C2 Package Unadmitted Portion, the Company shall transfer the underlying EVPS Shares and NEV Shares to the Collateral Agent of the A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs, C2 NEV SLNs (as applicable) as follows:

(a)    in respect of EVPS MEBs, add the unutilized underlying shares to the underlying shares of the A2 EVPS SLNs and the C2 EVPS SLNs on a pro rata basis;

(b)    in respect of NEV MEBs, add the unutilized underlying shares to the underlying shares of the A2 NEV SLNs and the C2 NEV SLNs on a pro rata basis;

(c)    in respect of C2 EVPS SLNs, add the unutilized underlying shares to the underlying shares of the A2 EVPS SLNs; and

(d)    in respect of C2 NEV SLNs, add the unutilized underlying shares to the underlying shares of the A2 NEV SLNs.

***Final Distribution of A1 Notes***

18.6    On the Final Distribution Date, the Company shall issue A1 Notes to Class A Scheme Creditors who have validly elected (or are deemed to have elected) to receive Option 1 Scheme Consideration to convert their Entitlement into the A1 Notes on a dollar-for-dollar basis if and to the extent their Entitlements have not been converted to the A2 Package pursuant to Clause 18.3 ("**A1 Notes Recipients**").

18.7    The Company, in consultation with the Information Agent and/or the Scheme Administrators, shall calculate the issuance and distribution of the A1 Notes on the Final Distribution Date in the following manner:

(a)    *first*, the Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the aggregate principal amount of the tranche A, tranche B and, if any, tranche C of the A1 Notes that will be issued on the Restructuring Effective Date in accordance with the total amount of Entitlements of the A1 Notes Recipient as set out below:

(i)    the aggregate principal amount of tranche A shall be the Option A1 Proportion multiplied by US$3,000 million;

68

    (ii)    the aggregate principal amount of tranche B shall be the Option A1 Proportion multiplied by US$3,000 million; and

    (iii)    the Entitlements of the A1 Notes Recipients to be converted into A1 Notes less the aggregate principal amounts of tranche A and tranche B; and

(b)    *second*, the Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the allocation of tranche A, tranche B, and, if any, tranche C of the A1 Notes that will be issued and distributed to A1 Notes Recipients on a pro rata basis and allocation will be made in sequential order by maturity date. Each A1 Notes Recipient will receive an equal amount of tranche A, tranche B, and, if any, tranche C of A1 Notes in respect of each dollar of Entitlement converted to A1 Notes as compared to such other A1 Notes Recipient.

### Final Distribution of C1 Notes

18.8    On the Final Distribution Date, the Company shall issue C1 Notes to Class C Scheme Creditors who have validly elected to receive Option 1 Scheme Consideration to convert their Entitlement into the C1 Notes on a dollar-for-dollar basis if and to the extent their Entitlements have not been converted to C2 Package pursuant to Clause 18.11(c) ("**C1 Notes Recipients**").

18.9    The Company, in consultation with the Information Agent and/or the Scheme Administrators, shall calculate the issuance and distribution of the C1 Notes on the Final Distribution Date in the following manner:

(a)    *first*, the Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the aggregate principal amount of the tranche A, tranche B and, if any, tranche C of the C1 Notes that will be issued on the Restructuring Effective Date in accordance with the total amount of Entitlements of the C1 Notes Recipient as set out below:

    (i)    the aggregate principal amount of tranche A shall be the Option C1 Proportion multiplied by US$3,000 million;

    (ii)    the aggregate principal amount of tranche B shall be the Option C1 Proportion multiplied by US$3,000 million; and

    (iii)    the Entitlements of the C1 Notes Recipients to be converted into C1 Notes less the aggregate principal amounts of tranche A and tranche B; and

(b)    *second*, the Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the allocation of tranche A, tranche B, and, if any, tranche C of the C1 Notes that will be issued and distributed to C1 Notes Recipients on a pro rata basis and allocation will be made in sequential order by maturity date. Each C1 Notes Recipient will receive an equal amount of tranche A, tranche B, and, if any, tranche C of C1 Notes in respect of each dollar of Entitlement converted to C1 Notes as compared to such other C1 Notes Recipient.

### Final Distribution of C2 Package Adjusted Portion

18.10    If the combined elections of Class C Scheme Creditors for the C2 Package are equal to the C2 Package Adjusted Portion (such that there is neither an Undersubscription nor an Oversubscription of the C2 Package Adjusted Portion), then on the Final Distribution Date Class C Scheme Creditors who elected to receive the C2 Package as part of their Scheme

Consideration shall receive the C2 Package in a principal amount equal to their converted Entitlement on a dollar-for-dollar basis in accordance with their election.

18.11   If the combined elections of Class C Scheme Creditors result in an Undersubscription of the C2 Package Adjusted Portion, then on the Final Distribution Date:

(a)   Class C Scheme Creditors who elected to receive the C2 Package as part of their Scheme Consideration shall receive the C2 Package on a dollar-for-dollar basis in accordance with their election;

(b)   any Undersubscribed Portion of the C2 Package Adjusted Portion after the allocation in Clause 18.11(a) shall be allocated and distributed to the Class C Scheme Creditors who elected to receive C2 Notes on a pro rata basis and in exchange of their Entitlements on a dollar-for-dollar basis; and

(c)   if the C2 Package Adjusted Portion is still Undersubscribed after the allocation in Clause 18.11(b) above, any such remaining Undersubscribed Portion of the C2 Package Adjusted Portion shall be allocated and distributed to the Class C Scheme Creditors who elected to receive C1 Notes on a pro rata basis and in exchange of their Entitlements on a dollar-for-dollar basis,

in all cases, where the amount of any converted Entitlement shall be exchanged on a dollar-for-dollar basis for an equal amount of Scheme Consideration (such that, where a Class C Scheme Creditor receives Scheme Consideration on the Final Distribution Date in respect of its Entitlement, the value of the Scheme Consideration received shall be equal to the value of the Entitlement in respect of which that Scheme Consideration has been paid).

18.12   If the combined elections of Class C Scheme Creditors result in an Oversubscription of the C2 Package Adjusted Portion, then:

(a)   on the Final Distribution Date, the C2 Package Adjusted Portion shall be distributed to Class C Scheme Creditors who elected to receive the C2 Package as part of their Scheme Consideration on a pro rata basis, where the amount of any Entitlement which is to be converted to C2 Package shall be exchanged on a dollar-for-dollar basis for an equal amount of Scheme Consideration; and

(b)   Scheme Consideration in the form of the C2 Notes shall be issued and distributed to such Class C Scheme Creditors in respect of the Oversubscribed Portion of such Class C Scheme Creditors' Entitlement on a dollar-for-dollar basis.

***Final Distribution of C2 Notes***

18.13   On the Final Distribution Date, the Company shall issue C2 Notes to (each of the following, being an "**C2 Notes Recipient**"):

(a)   subject to any adjustment required in accordance with Clause 18.11(b) above where there is an Undersubscription of the C2 Package Adjusted Portion, Class C Scheme Creditors who have validly elected to convert their Entitlement into the C2 Notes on a dollar-for-dollar basis; and

(b)   Class C Scheme Creditors who have validly elected to convert their Entitlement into the C2 Package in the event of an Oversubscription of the C2 Package Adjusted Portion and to the extent of the Oversubscribed Portion of the C2 Package Adjusted Portion in accordance with Clause 18.12(b) above.

18.14   The Company, in consultation with the Information Agent and/or the Scheme Administrators, shall calculate the issuance and distribution of the C2 Notes on the Final Distribution Date in the following manner:

(a)   *First*, the Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the aggregate principal amount of the tranche A, tranche B and, if any, tranche C of the C2 Notes that will be issued on the Final Distribution Date in accordance with the total amount of Entitlements of the C2 Notes Recipient as set out below:

(i)   the aggregate principal amount of tranche A shall be up to US$200 million;

(ii)   the aggregate principal amount of tranche B shall be up to US$2,740 million; and

(iii)   the aggregate principal amount of tranche C if any shall be the total amount of the Entitlements less the aggregate principal amounts of tranche A and tranche B; and

(b)   *second*, the Company, in consultation with the Information Agent and/or the Scheme Administrators, shall determine the allocation of tranche A, tranche B, tranche C and, if any, tranche D of the A2 Notes that will be issued and distributed to C2 Notes Recipients on a pro rata basis and allocation will be made in sequential order by maturity date. Each C2 Notes Recipient will receive an equal amount of tranche A, tranche B and, if any, tranche C of A2 Notes in respect of each dollar of Entitlement converted to C2 Notes as compared to such other C2 Notes Recipient.

## 19.   DISTRIBUTION TO SUCCESSOR ESCROW ACCOUNT FOR BLOCKED SCHEME CREDITORS

19.1   Upon the expiration of the Holding Period, if any Applicable Sanctions are still in place in respect of any Blocked Scheme Creditors, the Company undertakes to:

(a)   appoint an agent (the "**Successor Escrow Agent**") to hold the entitlements to the Blocked Assets in the Successor Escrow Account for the Blocked Scheme Creditors who have complied with Clause 10 (*Deadlines and Bar Dates*) until the earlier of:

(i)   the expiry of the Perpetuity Period; or

(ii)   the lifting of Applicable Sanctions in respect of any Blocked Scheme Creditors,

with the Blocked Scheme Creditors being given a reasonable period of time thereafter to recover their Entitlement to the Blocked Assets in accordance with the terms of the Successor Escrow Agreement and the Schemes;

(b)   bring information relating to the Successor Escrow Account to the attention of the Blocked Scheme Creditors on, or immediately after, the expiration of the Holding Period on the Transaction Website and/or through other such public medium as the Company considers to be appropriate at that time; and

(c)   put in place a reasonable and fair process for Blocked Scheme Creditors to claim and recover their Entitlement to the Scheme Consideration of the Blocked Assets upon Applicable Sanctions no longer preventing the payment of such Scheme Consideration (including any Consent Fee (if applicable)) to Blocked Scheme Creditors (who are Eligible Participating Creditors) through a Successor Escrow Agreement.

71

19.2    Upon expiry of the Perpetuity Period, and subject to any action necessary to ensure compliance with Applicable Sanctions by the Company or the Successor Escrow Agent, any Scheme Consideration and any Consent Fee (if applicable) which remains unable to be paid to Blocked Scheme Creditors in compliance with Applicable Sanctions will be returned to the Company in accordance with the terms of the Escrow Account Agreement. The rights of Blocked Scheme Creditors under this Cayman Scheme shall be extinguished on the return of such Blocked Assets to the Company, including any rights of Blocked Scheme Creditors to payment of any Scheme Consideration, TJ Scheme Consideration, and any Consent Fee.

## 20.    TJ SCHEME CONSIDERATION

20.1    Any TJ Scheme Consideration received by the Company shall be distributed to Class A Scheme Creditors and Class C Scheme Creditors (or, in respect of Blocked Scheme Creditors, to the Holding Period Trustee or Successor Escrow Agent, as applicable) who have validly elected by the applicable deadline pursuant to Clause 10 (*Deadlines and Bar Dates*) to receive the A2 Package and the C2 Package respectively, on a pro rata basis, in accordance with this Clause 20 (*TJ Scheme Consideration*). No TJ Scheme Consideration shall be distributed to Scheme Creditors who are issued New Instruments which form part of the A2 Package or the C2 Package as part of their Scheme Consideration, but who have not validly elected by the applicable deadline to receive the A2 Package or the C2 Package (as applicable).

20.2    Any TJ Scheme Consideration distributed to Class A Scheme Creditors and Class C Scheme Creditors in accordance with this Clause shall be in addition to and not reduce the Entitlement of those Scheme Creditors.

20.3    Where the Company receives TJ Scheme Consideration prior to the completion of the Valuation and Adjudication Procedure set out in Clauses 38 (*Valuation Procedure*) and 40 (*Adjudication Procedure*), the Company shall make a partial distribution of such TJ Scheme Consideration to Class A Scheme Creditors or, in respect of Blocked Scheme Creditors who are Class A Scheme Creditors, to the Holding Period Trustee, who have validly elected by the applicable deadline pursuant to Clause 10 (*Deadlines and Bar Dates*) to receive the A2 Package, calculated in accordance with the following formula, as applicable:

$$\text{Distribution of TJ Scheme Consideration to the relevant Class A Scheme Creditor} = A \times B \times \frac{C}{D}$$

where:

**A** =    the total amount of TJ Scheme Consideration received by the Company;

**B** =    the A2 Accrued Claims Ratio, as set out in Clause 15.7;

**C** =    the Entitlement of the relevant Class A Scheme Creditor who has validly elected to receive the A2 Package; and

**D** =    the aggregate amount of the Entitlements of all Class A Scheme Creditors who have validly elected to receive the A2 Package.

20.4    On the completion of the Valuation and Adjudication Procedure set out in Clauses 38 (*Valuation Procedure*) and 40 (*Adjudication Procedure*), the Company shall distribute the remaining TJ Scheme Consideration on the Final Distribution Date to Class A Scheme Creditors and Class C Scheme Creditors or, in respect of Blocked Scheme Creditors, to the Holding Period Trustee or the Successor Escrow Agent (as applicable), who have validly

elected by the applicable deadline pursuant to Clause 10 (*Deadlines and Bar Dates*) to receive the A2 Package and the C2 Package respectively, on a pro rata basis. The allocation of the TJ Scheme Consideration between the relevant Class A Scheme Creditors and Class C Scheme Creditors shall be determined as follows:

(a)     the entitlement of the relevant Class C Scheme Creditors shall be calculated in accordance with the following formula:

$$\text{Distribution of TJ Scheme Consideration to the relevant Class C Scheme Creditor} = A \times B \times \frac{C}{D}$$

where:

$A$ =     the total amount of TJ Scheme Consideration received by the Company;

$B$ =     the C2 Package Adjusted Portion *divided by* the Total Package;

$C$ =     the Entitlement of the Class C Scheme Creditor who has validly elected to receive the C2 Package; and

$D$ =     the aggregate amount of the Entitlements of all Class C Scheme Creditors who have validly elected to receive the C2 Package; and

(b)     any remaining TJ Scheme Consideration which is not allocated to the relevant Class C Scheme Creditors in accordance with Clause 20.4(a) shall be distributed to the relevant Class A Scheme Creditors (or the Holding Period Trustee or Successor Escrow Agent, as applicable) who elected to receive the A2 Package on a pro rata basis with respect to their Entitlements.

20.5    Where TJ Scheme Consideration is received by the Company after the Final Distribution Date, such TJ Scheme Consideration shall be distributed on a date to be designated by the Company within three months of the date of receipt of such TJ Scheme Consideration, to those Scheme Creditors who would have been eligible to receive such TJ Scheme Consideration pursuant to Clause(s) 20.3 and/or 20.4 if that TJ Scheme Consideration had been received by the Company prior to the Final Distribution Date.

## 21.    INTERIM DISTRIBUTION

21.1    Where the Final Distribution Date has not taken place within 295 calendar days after the Restructuring Effective Date, there will be an interim distribution of Scheme Consideration (including the redemption, exchange and/or conversion of the Forced A2 Notes into the C2 Package Unadmitted Portion in accordance with Clause 18.4 above) to Class A Scheme Creditors and Class C Scheme Creditors (the "**Interim Distribution**"), other than Sanctions-Affected Scheme Creditors, whose Entitlements have been determined, on the date which is 295 calendar days after the Restructuring Effective Date (the "**Interim Distribution Date**").

21.2    The amount of the Interim Distribution provided by this Clause 21 (*Interim Distribution*) shall be made to the same Persons and be of the same size as if it were the Final Distribution determined pursuant to Clauses 18 (*Final Distribution*) and 20 (*TJ Scheme Consideration*), save that the Company shall reserve a maximum amount of Scheme Consideration and TJ Scheme Consideration for those Class C Scheme Creditors whose Entitlements are not fully determined (as if the Entitlement of such Class C Scheme Creditors were calculated on a Full Accrued Claims Basis). The amount of Scheme Consideration and TJ Scheme Consideration

reserved shall reduce the size of the Interim Distribution to be made to Scheme Creditors on a pro rata basis.

21.3    The Interim Distribution made to Scheme Creditors shall be taken into account for the purposes of calculating the Final Distribution, such that each Scheme Creditor shall receive Scheme Consideration which is equal to (and not greater than) the value of its Entitlement.

## 22.    CONSENT FEE

22.1    In addition to the Initial Distribution, on the Restructuring Effective Date, the Company shall pay the Consent Fee to:

(a)    those Class A Scheme Creditors who have validly elected to receive Option 2 Scheme Consideration and that are Eligible Participating Creditors (who are not Blocked Scheme Creditors), who hold Eligible Restricted Debts in accordance with the terms of the RSAs; and

(a)    in respect of Blocked Scheme Creditors that are Class A Scheme Creditors who have validly elected to receive Option 2 Scheme Consideration and that are Eligible Participating Creditors, who hold Eligible Restricted Debts in accordance with the terms of the RSAs, the Holding Period Trustee, to be held on trust under the terms of the Holding Period Trust Deed.

22.2    In addition to the Final Distribution, on the Final Distribution Date, the Company shall pay the Consent Fee to:

(a)    those Class A Scheme Creditors who have validly elected (or are deemed to have elected) to receive A1 Notes and that are Eligible Participating Creditors (who are not Sanctions-Affected Scheme Creditors), who hold Eligible Restricted Debts in accordance with the terms of the RSAs;

(b)    those Class C Scheme Creditors that are Eligible Participating Creditors (who are not Sanctions-Affected Scheme Creditors), who hold Eligible Restricted Debts in accordance with the terms of the RSAs; and

(b)    in respect of Blocked Scheme Creditors that either Class A Scheme Creditors who have validly elected (or are deemed to have elected) to receive A1 Notes or are Class C Scheme Creditors, and that are Eligible Participating Creditors, who hold Eligible Restricted Debts in accordance with the terms of the RSAs, the Successor Escrow Agent, to be held pursuant to the Successor Escrow Agreement.

22.3    If the sum of the Consent Fee to be paid to a Class A Scheme Creditor pursuant to Clause 22.1 for a particular series of New Instruments, together with the Initial Distribution (if any) to be made to the Class A Scheme Creditor in respect of the same series of New Instruments, is less than the applicable Notes Minimum Denomination as described in Clause 25 (*Fractional Adjustments*), then the Consent Fee which would be issued to that Class A Scheme Creditor shall instead be issued to the Holding Period Trustee to hold on trust for the Class A Scheme Creditor until the Final Distribution Date. If the sum of the Consent Fee is less than the Notes Minimum Denomination, the Company in its discretion and in good faith may allocate the Consent Fee to be paid to a Class A Scheme Creditor or a Class C Scheme Creditor in one or more of any series of the New Instruments or, where any potential reallocation would be less than the applicable Notes Minimum Denomination, the Class A Scheme Creditor or Class C Scheme Creditor shall forfeit their Consent Fee.

22.4    For the avoidance of doubt, the notes to be issued as a Consent Fee in accordance with the terms of the RSAs are additional notes and will not impact the number of New Instruments to be received as Scheme Consideration by the Scheme Creditors.

## 23.    ISSUANCE OF THE NEW INSTRUMENTS

23.1    The Scheme Consideration (except for the Blocked New Instruments) will be distributed, in accordance with the terms of this Cayman Scheme, through Euroclear and Clearstream to Scheme Creditors (who are not Sanctions-Affected Scheme Creditors). If details of a Euroclear or Clearstream account are not provided, such Scheme Creditor, on whose behalf the Scheme Creditor Form is being submitted, will not be entitled to receive any share of the relevant Scheme Consideration.

23.2    If a Scheme Creditor is a Blocked Scheme Creditor, their Entitlement to the Scheme Consideration will be determined by reference to the principal amount of the Existing Debts outstanding and owed to that Blocked Scheme Creditor as at the Entitlement Record Time and all accrued and unpaid interest relating to such Existing Debts up to but excluding the Restructuring Effective Date.

23.3    The obligations of the Company to issue the New Instruments to each Person entitled to receive them under this Cayman Scheme shall be satisfied by the Company depositing the New Instruments in global registered form with the New Instruments Depositary or its nominee with interests in the New Instruments being further credited in the relevant amounts to the accounts in the Clearing Systems designated by the Scheme Creditors in their relevant Scheme Creditor Forms.

23.4    The holders of the New Instruments shall have the benefit of the new Security.

23.5    For the avoidance of doubt, no Eligible Creditor, Designated Recipient (if applicable), on behalf of its designating Scheme Creditor, and/or the Holding Period Trustee on behalf of certain Scheme Creditors (if applicable) shall be entitled to receive New Instruments (including any Residual New Instruments or Blocked New Instruments) under more than one Scheme. Without prejudice to the generality of Clause 42 (*Corresponding Discharge of Performance*), the performance by the Company of its obligations under this Clause 23 (*Issuance of the New Instruments*) shall operate to discharge any corresponding obligations of the Company under the Hong Kong Scheme.

## 24.    RESTRICTIONS

24.1    The Company will not distribute an Initial Distribution on the Restructuring Effective Date to a Class A Scheme Creditor (if applicable) unless that Class A Scheme Creditor is also an Eligible Creditor or has nominated on or before the Class A Options Deadline a Designated Recipient, who is an Eligible Person to receive the Initial Distribution, in accordance with the terms of the Schemes. A Sanctions-Affected Scheme Creditor cannot appoint a Designated Recipient.

24.2    The Company shall not distribute any Residual A2/C2 Package as Scheme Consideration to a Scheme Creditor (if applicable) unless that Scheme Creditor is also an Eligible Creditor or has nominated on or before the relevant Bar Date a Designated Recipient who is an Eligible Person to receive the Residual A2/C2 Package, in accordance with the terms of the Schemes.

## 25.    FRACTIONAL ADJUSTMENTS

25.1    Notwithstanding any other provision of this Cayman Scheme:

75

(a)     the aggregate number of New Instruments to which an Eligible Creditor is entitled shall be rounded down to the nearest whole number; and

(b)     if the conversion or exchange of any CEG MCBs, EVPS MEBs or NEV MEBs would result in the relevant Scheme Creditor having a fractional entitlement to shares of CEG, EVPS or NEV, such fractional entitlement shall be forfeited.

25.2    If the allocation of the New Instruments in accordance with this Cayman Scheme would result in any Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee receiving less than US$500 (the "**Notes Minimum Denomination**") of any tranche of any series of the A1 Notes, C1 Notes, A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, C2 NEV SLNs, A2 Notes and C2 Notes, then such Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee would instead receive an allocation in one or more tranches of any series of the New Instruments, as determined by the Company, in consultation with the Information Agent and/or the Scheme Administrators, in its discretion in good faith and based on information provided and reviewed against the records of the Clearing Systems (in respect of the Class A Noteholders and the Class C Noteholders) or the Company's books and records (in respect of the Class A Lenders and the Class C Scheme Creditors other than the Class C Noteholders) (including accounting for the weighted average maturity of the Scheme Consideration), to ensure that such Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee holds at least the Notes Minimum Denomination for at least one tranche of any series of the New Instruments, provided that:

(a)     any fraction of any tranche of A1 Notes, C1 Notes, A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, C2 NEV SLNs, A2 Notes and C2 Notes that is remaining after the adjustment set out above in this Clause 25.2 will be forfeited;

(b)     the interests in the global certificates for the New Instruments to which a Scheme Creditor is entitled under the terms of this Cayman Scheme will be credited to the Clearing System account in which that Scheme Creditor held its interests in the Existing Notes at the Entitlement Record Time (through the relevant Account Holder where applicable); and

(c)     the interests in the New Instruments will be recorded in the New Instruments register by the New Instruments Paying and Transfer Agent and Registrar.

25.3    If the allocation of the New Instruments in accordance with this Cayman Scheme would result in any Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee receiving less than HK$2,300 (the "**EVPS MEB Minimum Denomination**") of EVPS MEBs, HK$3,840 (the "**NEV MEB Minimum Denomination**") of NEV MEBs, or HK$5,775 (the "**CEG MCB Minimum Denomination**") of CEG MCBs, any fraction of EVPS MEBs, NEV MEBs and CEG MCBs below the EVPS MEB Minimum Denomination, NEV MEB Minimum Denomination and the CEG MCB Minimum Denomination, respectively, will instead be issued as Plain A2 Notes or C2 Notes (as applicable) in the tranche(s) determined by the Company, in consultation with the Information Agent and/or the Scheme Administrators, in good faith, provided that such issuance will be equal to or greater than the Notes Minimum Denomination, or shall otherwise be forfeited.

25.4    If the conversion or exchange of any Forced A2 Notes for a Class A Scheme Creditor would result in any tranches of a series of New Instruments issued to that Class A Scheme Creditor as part of such conversion to be less than the Notes Minimum Denomination, EVPS MEB Minimum Denomination, NEV MEB Minimum Denomination or CEG MCB Minimum Denomination (as applicable), then:

(a)     the relevant Forced A2 Notes shall not be converted into New Instruments forming part of the C2 Package Unadmitted Portion; and

(b)     any excess shares for the NEV MEBs or EVPS MEBs as a result of such conversion not taking place shall be transferred to the New Instruments Collateral Agent of the A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs and C2 NEV SLNs in accordance with Clauses 18.5(a) and 18.5(b).

PART E

**GENERAL SCHEME PROVISIONS**

26.    **MODIFICATIONS OF THE RIGHTS ATTACHING TO THE NEW INSTRUMENTS**

On and after the Restructuring Effective Date, and/or the Final Distribution Date, nothing in this Cayman Scheme shall prevent the modification of the New Instruments in accordance with their terms.

27.    **SECURITIES LAW CONSIDERATIONS**

27.1    The New Instruments will not be registered under the US Securities Act or any state or other securities laws of the United States of America or any other jurisdiction.

27.2    Accordingly, the New Instruments will be available only: (a) in the United States to "qualified institutional buyers" as defined in Rule 144A under the US Securities Act and institutional "accredited investors" as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the US Securities Act; and (b) outside the United States to non-US persons in offshore transactions, in reliance on Regulation S under the US Securities Act.

28.    **RELEASES**

28.1    In consideration for the Entitlement to the Scheme Consideration, on and from the Restructuring Effective Date, each Scheme Creditor hereby gives the undertakings, releases and waivers in this Clause 28 (*Releases*) (the "**Releases**").

28.2    Subject to Clause 28.6, with immediate effect on and from the Restructuring Effective Date and pursuant to this Cayman Scheme and the Deeds of Release, each Scheme Creditor on behalf of itself and each of its predecessors, successors and assigns (including any Person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time), as relevant, (collectively, the "**Scheme Creditor Releasing Parties**"), shall and shall be deemed to completely and forever and unconditionally:

(a)    release, waive, void, acquit, forgive, extinguish and discharge (and to the fullest extent permitted by law) each of the Released Persons from the relevant Released Claims, specifically:

(i)    any and all Scheme Claims (except for fraud, wilful default or wilful misconduct) arising prior to, on or after the Restructuring Effective Date;

(ii)    any and all Class A Group Claims arising prior to, on or after the Restructuring Effective Date;

(iii)    to the extent not already covered in (i) and (ii) above, any and all Ancillary Claims arising prior to, on or after the Restructuring Effective Date; and

(iv)    any and all Restructuring Claims arising prior to, on or after the Restructuring Effective Date;

(b)    for the avoidance of doubt and to the extent not already released under Clause 28.2(a) above, release, forfeit, waive, void, acquit, forgive, extinguish and discharge (and to the fullest extent permitted by law) any and all Relevant Collateral;

78

(c)    ratify and confirm everything which any Released Person may lawfully do or cause to be done in accordance with any authority conferred by the Schemes and agree not to challenge:

(A) the validity of any act done or omitted to be done as permitted by the terms of the Schemes; or

(B) the exercise or omission to exercise of any power conferred in accordance with the terms of the Schemes,

in each case in good faith by any Released Person; and

(d)    acknowledge and agree that all powers of attorney granted under any Existing Finance Documents are revoked save for those granted by any Excluded Liabilities Party Person under the Existing Class C Debt Documents.

28.3    Each of the Scheme Creditors hereby appoints the Company as its attorney and agent and irrevocably authorizes, directs, instructs and empowers the Company (represented by any duly authorized representative), on and from the Restructuring Effective Date, to (i) enter into, execute and deliver as a deed on behalf of each Scheme Creditor and any person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim or its Class A Group Claims after the Voting Record Time or who acquires any interest in or arising out of a Scheme Claim or a Class A Group Claim after the Voting Record Time, the Deeds of Release whereby any and all Released Claims and any and all Relevant Collateral, referred to in Clause 28.2 shall be waived and released fully and absolutely from the Restructuring Effective Date, and (ii) do all such acts and/or execute all such documents (including without limitation, assignments, transfers, notices, instructions, supplements and amendments) as the Company may consider necessary or desirable to effect the release of any and all Released Claims and any Relevant Collateral (other than the Excluded Liabilities and the Excluded Collateral) referred to in Clause 28.2.

28.4    Each of the Scheme Creditors hereby approves the Deeds of Release (and the releases therein) (in each case in the Agreed Form) to be executed pursuant to the authority and approvals conferred by this Clause 28 (*Releases*) and each shall be substantially in the form to be made available on the Transaction Website subject to any modifications required or approved by the Cayman Court or, as the case may be, the Hong Kong Court, and each shall take effect in relation to such Claims and Liabilities on the Restructuring Effective Date.

28.5    Each Scheme Creditor acknowledges and agrees on its own behalf and on behalf of its Scheme Creditor Releasing Parties that:

(a)    it may later discover facts in addition to or different from those which it presently knows or believes to be true with respect to the subject matter of this Cayman Scheme;

(b)    it is its intention to fully, and finally forever settle and release any and all matters, disputes and differences, whether known or unknown, suspected or unsuspected, which presently exist, may later exist or may previously have existed between it and the Released Persons in respect of all Released Claims or any past, present and/or future Claim which is released by the Releases provided in this Clause 28 (*Releases*) and by the Deeds of Release; and

(c)    in furtherance of this intention, the waivers, releases and discharges given in this Cayman Scheme shall be and shall remain in effect as full and complete general

waivers, releases and discharges notwithstanding the discovery or existence of any such additional or different facts.

28.6    Subject to Clause 28.7, notwithstanding any other provision in this Cayman Scheme, the effect of the Restructuring under the terms of the Schemes will not:

(a)    waive, release, impair or otherwise compromise any of the Excluded Liabilities or any of the Excluded Collateral;

(b)    prejudice or impair any right or benefit of any Scheme Creditor Releasing Party:

(i)    created under this Cayman Scheme or any other Restructuring Documents including without limitation any right to commence and/or continue and/or instruct any other Person to commence or continue any Proceeding to enforce its rights under or in relation to the New Instruments Documents; and/or

(ii)    which arises as a result of a failure by the Company or any other Released Person to comply with the terms of this Cayman Scheme or any Restructuring Document; and

(c)    prejudice or impair Claims against the Company or any other Released Person arising from fraud, wilful default or wilful misconduct.

28.7    Each relevant Excluded Liabilities Party Person shall, to the extent legally and practically permissible, enter into any relevant Deeds of Release to release, waive, void, acquit, forgive, extinguish and discharge unconditionally (and to the fullest extent permitted by law), any and all claims of contribution, subrogation, reimbursement, indemnity, set-off or payment of any kind howsoever arising against the Company in connection with the Existing Class C Debt Documents (including for the avoidance of doubt the Excluded Liabilities and Excluded Collateral).

## 29.    STAY OF PROCEEDINGS

29.1    From the Scheme Effective Date, no Scheme Creditor Releasing Party, nor any party on behalf of a Scheme Creditor Releasing Party, shall be entitled to commence, continue or procure the commencement or continuation of any Proceeding, whether directly or indirectly, against any of the Released Persons or in respect of any property of any of the Released Persons in respect of any Claims or Liabilities that are to be released in accordance with Clause 28 (*Releases*).

29.2    Subject to any existing contractual restrictions, a Scheme Creditor Releasing Party may commence a Proceeding against a Released Person after the Restructuring Effective Date, in respect of Claims or Liabilities that are not to be released in accordance with Clause 28 (*Releases*).

## 30.    COSTS AND INDEMNITY

30.1    The Company shall pay all fees, costs and expenses properly incurred by the Existing Notes Trustee, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary, the Existing Notes Collateral Agent, the Collateral Agent, the Holding Period Trustee, GLAS and the Information Agent, (each, an "**Indemnified Party**" and together the "**Indemnified Parties**"), in connection with any and/or all actions taken pursuant to the Schemes and the Restructuring, including (without limitation) any and/or all actions taken pursuant to the Existing Notes Trustee Instruction and the distribution of the Scheme Consideration, (provided that, with respect to each party,

the relevant fees, costs and expenses have been incurred in accordance with the Existing Notes Documents or such other arrangement as may have been agreed between the Company and that party).

30.2    The Company shall hold each Indemnified Party harmless from, and shall indemnify such Indemnified Party from and against any claims, actions, demands, damages, charges, losses, liabilities, obligations, judgments, costs, fees, and expenses which may be incurred by, or asserted or awarded against it in taking any of the steps contemplated by the Scheme, including, without limitation, executing and delivering any documents pursuant to the Existing Notes Trustee Instruction and cancelling the Global Certificates, except to the extent that the same arises from the fraud, gross negligence or wilful misconduct of such Indemnified Party.

## 31.    MODIFICATIONS TO THE SCHEME AND THE RESTRUCTURING DOCUMENTS

31.1    The Company may, before or at any hearing before the Cayman Court or Hong Kong Court to sanction the Schemes, and subject to obtaining the written consent of the Majority CEG AHG (where the CEG AHG holds the Minimum CEG AHG Threshold), consent on behalf of all Scheme Creditors to any modifications of the Schemes and/or the Restructuring Documents or any additional terms or conditions including those which the Cayman Court and/or the Hong Kong Court may think fit to approve or impose, which would not directly or indirectly have a material adverse effect on the rights of the Scheme Creditors.

31.2    On the identification of a Sanctioned Scheme Creditor, including where a Scheme Creditor becomes a Sanctioned Scheme Creditor while this Scheme is in effect:

(a)    the Company may modify the Schemes and/or the Restructuring Documents to the extent reasonably necessary and in a manner to ensure that the Schemes are not contrary to Applicable Sanctions (and is authorized to instruct the Existing Notes Trustee, Existing Agents, Existing Notes Collateral Agent, Existing Notes Paying and Transfer Agent and Registrar, and any other administrative party as required in order to achieve the same); and

(b)    each of the New Instruments Trustees, New Instruments Paying and Transfer Agents and Registrars, Collateral Agent and any other administrative party as required is authorized to make any amendment to the New Instruments Documents and take any action necessary or desirable to give effect to a modification to such New Instruments Documents on and following receipt of an officers' certificate from the Company that such modification is reasonably necessary to ensure that the Schemes are not contrary to Applicable Sanctions, which the New Instruments Trustees, New Instruments Paying and Transfer Agents and Registrars, Collateral Agent and any other administrative party as required are entitled to rely on conclusively.

31.3    Where the Company reasonably considers that this Scheme or the transactions contemplated by the Scheme are at risk of being contrary to Applicable Sanctions:

(a)    the Company may modify the Schemes and/or the Restructuring Documents to the extent reasonably necessary and in a manner to ensure that the Schemes are not contrary to Applicable Sanctions (and is authorized to instruct the Existing Notes Trustee, Existing Agents, Existing Notes Collateral Agent, Existing Notes Paying and Transfer Agent and Registrar, and any other administrative party as required in order to achieve the same); and

81

(b)  each of the New Instruments Trustees, New Instruments Paying and Transfer Agents and Registrars, Collateral Agent and any other administrative party as required is authorized to make any amendment to the New Instruments Documents and take any action necessary or desirable to give effect to a modification to such New Instruments Documents on and following receipt of an officers' certificate from the Company that such modification is reasonably necessary to ensure that the Schemes will not be contrary to the Applicable Sanctions in whatever form that they may apply to this Scheme, which the New Instruments Trustees, New Instruments Paying and Transfer Agents and Registrars, Collateral Agent and any other administrative party as required are entitled to rely on conclusively.

31.4  The Scheme Administrators may, on or after the Restructuring Effective Date, modify the Schemes in respect of the Valuation and Adjudication Procedure to the extent reasonably necessary for this Cayman Scheme to achieve its purpose, and provided that any such modifications have no material prejudicial effect on Scheme Creditors.

31.5  Nothing in this Cayman Scheme shall prevent the modification of any executed Restructuring Document in accordance with its terms, including, but not limited to, minor or technical modifications to correct manifest or proven error or to comply with mandatory provisions of law.

## 32.    OBLIGATIONS ON DATES OTHER THAN A BUSINESS DAY

If any sum is due or obligation is to be performed or any Bar Date occurs under the terms of this Cayman Scheme on a day other than a Business Day, the relevant payment shall be made, or obligation performed, or the Bar Date shall occur, on the next Business Day.

## 33.    NO ADMISSION OF LIABILITY

Save as expressly set out in this Cayman Scheme, nothing in this Cayman Scheme or the Explanatory Statement, or the circulation thereof to any person, evidences or constitutes any admission by the Company, the Information Agent, or the Scheme Administrators, that the person is a Scheme Creditor or that a Liability is owed to any person in respect of any Claim or right.

## 34.    THE INFORMATION AGENT

34.1  Each Scheme Creditor and/or Account Holder hereby unconditionally and irrevocably waives and releases any claims which may arise against the Information Agent from all actual or potential liability, arising directly or indirectly, in each case, in relation to the Information Agent's performance of its roles and all other actions which they may take in connection with this Scheme, save for any liability resulting from the Information Agent's own fraud or wilful misconduct.

34.2  Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers is acting for, or owes any duty to, any Scheme Creditor, nor will any of them be responsible for providing any advice to any Scheme Creditor in relation to this Cayman Scheme. Accordingly, neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers make any recommendations as to whether any Scheme Creditor should take any of the actions contemplated in the Schemes. The Information Agent expresses no opinion on the merits of the Schemes or the terms of the New Instruments. The Information Agent has not been involved in negotiating or determining the terms of the Schemes and makes no representation that all relevant information has been disclosed to the Scheme Creditors in or pursuant to the Schemes. Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers has verified, or assumes any

responsibility or liability for the accuracy or completeness of any of the information concerning this Cayman Scheme, or any factual statements contained in, or the effect or effectiveness of, this Cayman Scheme.

34.3    Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers will have any tortious, contractual or any other liability to any person in connection with the determination of whether a Scheme Creditor is a Sanctions-Affected Scheme Creditor. Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers will accept any liability whatsoever to any person, regardless of the form of action, for any lost profits or lost opportunity, or for any indirect, special, consequential, incidental or punitive damages arising from the determination of whether a Scheme Creditor is a Sanctions-Affected Scheme Creditor, even if the Information Agent or any of its directors, officers, employees, agents, affiliates or advisers have been advised of the possibility of such damages.

34.4    Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers is obliged, under the terms of the Schemes or otherwise, to engage in any transaction or conduct that may give rise to a liability under or in connection with Applicable Sanctions and/or may result in any person becoming targeted by Applicable Sanctions.

34.5    If compliance with any obligations under the terms of the Schemes or otherwise would result in the Information Agent or any of its directors, officers, employees, agents, affiliates or advisers breaching the Blocking Regulation, that obligation need not be complied with (but only to the extent of the breach).

34.6    Under no circumstances will the Information Agent be required to verify or determine the eligibility of any Scheme Creditor in relation to this Cayman Scheme. The Information Agent will check Scheme Claims against Custody Instructions and against the records of Scheme Creditors provided to the Information Agent by the Company. The Information Agent will assist the Company and the Chairperson in checking the voting values of each Scheme Creditor (who is not a Blocked Scheme Creditor) based on such information.

## 35.    THE HOLDING PERIOD TRUSTEE

35.1    The duties, rights, responsibilities and interests of the Holding Period Trustee shall be governed by the Holding Period Trust Deed and nothing in this Clause 35 (*The Holding Period Trustee*) shall in any way amend, alter, or override the Holding Period Trust Deed.

35.2    The Holding Period Trustee's role will be solely mechanical and administrative in nature. As such, in accepting its appointment, the Holding Period Trustee will act only as the bare trustee of the Holding Period Trust and not in any other capacity. In this regard, the Holding Period Trustee will not be permitted to sell, pledge, re-hypothecate, assign, invest, use, commingle, dispose of, or otherwise use in its business, any of the Residual New Instruments or Blocked Assets held by it, except as permitted pursuant to the Holding Period Trust Deed.

35.3    The Holding Period Trustee will have no economic or beneficial interest in the Residual New Instruments or Blocked Assets it holds and shall not, except as set out in the Holding Period Trust Deed, permit any other Person to have any interest, estate, right, title or benefit in the Residual New Instruments or Blocked Assets.

35.4    The Holding Period Trustee shall be provided with any information it reasonably requires to satisfy itself that any action it chooses to take, or not take, shall be in compliance with any applicable laws. The Holding Period Trustee shall not be responsible for determining the status of a Sanctions-Affected Scheme Creditor.

35.5    The Holding Period Trustee shall not be required to perform any of its obligations under the Holding Period Trust Deed or any other Restructuring Documents if it is prevented from so doing by the occurrence of any event due to any cause beyond its control or if such performance would result in the Holding Period Trustee or its Affiliates being in breach of any law, regulation, ordinance, rule, directive, judgment, order or decree (collectively, the "**Rules**") binding on the Holding Period Trustee or its property or on any of its Affiliates (including but not limited to Rules relating to money laundering, bribery and corruption, prevention of tax evasion, financial or economic sanctions, trade and export controls, supply chain transparency, blocking regulations or anti-boycott requirements). The Holding Period Trustee may act or refrain from acting under the Holding Period Trust Deed and may do anything which in its reasonable opinion is necessary to comply with such Rules. The Holding Period Trustee is not required to take any action or step (including by omission) which would cause or create a risk of liability under the Blocked Regulation.

35.6    The Holding Period Trustee shall bear no responsibility for any action it does, or does not, take in circumstances where a Scheme Creditor, or the Company, does not provide sufficient information to enable the Holding Period Trustee to adequately assess the extent to which any of the Rules as set out in Clause 35.5 may be breached either by the action, or inaction, of the Holding Period Trustee.

35.7    The Holding Period Trustee shall bear no responsibility with regards to any deficiency which might arise because of the Holding Period Trustee or by virtue of any tax which may be payable (i) in respect of the Residual New Instruments or Blocked Assets held by it, (ii) any income which may arise therefrom or (iii) any proceeds which may arise thereof.

## 36.    THE SUCCESSOR ESCROW AGENT

36.1    The duties, rights, responsibilities and interests of the Successor Escrow Agent shall be governed by the Successor Escrow Agreement and nothing in this Clause 36 shall in any way amend, alter, or override the Successor Escrow Agreement.

36.2    The Successor Escrow Agent's role will be solely mechanical and administrative in nature. As such, in accepting its appointment, the Successor Escrow Agent will act only as a bare agent of the Successor Escrow Account and not in any other capacity. In this regard, the Successor Escrow Agent will not be permitted to sell, pledge, re-hypothecate, assign, invest, use, commingle, dispose of, or otherwise use in its business, any of the Blocked Assets, except as permitted pursuant to the Successor Escrow Agreement.

36.3    The Successor Escrow Agent will have no economic or beneficial interest in the Blocked Trust Assets it holds and shall not, except as set out in the Successor Escrow Agreement, permit any other Person to have any interest, estate, right, title or benefit in the Blocked Assets.

36.4    The Successor Escrow Agent will be afforded the right to be provided with, and request, any information it requires to satisfy itself that any action it chooses to take, not note take shall be in compliance with any applicable laws. The Successor Escrow Agent shall not, however, be responsible for determining the status of a Sanctions-Affected Scheme Creditor.

36.5    The Successor Escrow Agent shall not be required to perform any of its obligations under the Successor Escrow Agreement or any other Restructuring Documents if it is prevented from so doing by the occurrence of any event due to any cause beyond its control or if such performance would result in the Successor Escrow Agent or its Affiliates being in breach of any Rules binding on the Successor Escrow Agent or its property or on its Affiliates (including but not limited to Rules relating to money laundering, bribery and corruption, prevention of tax evasion, financial or economic sanctions, trade and export controls, supply chain transparency, blocking regulations or anti-boycott requirements). The Successor Escrow Agent may act or

refrain from acting under the Successor Escrow Agreement and may do anything which in its reasonable opinion is necessary to comply with such Rules. The Successor Escrow Agent is not required to take any action or step (including by omission) which would cause or create a risk of liability under the Blocked Regulation.

36.6   The Successor Escrow Agent shall bear no responsibility for any action it does, or does not, take in circumstances where a Blocked Scheme Creditor, or the Company, does not provide sufficient information to enable the Successor Escrow Agent to adequately assess the extent to which any of the Rules as set out in Clause 36.5 may be breached either by the action, or inaction, of the Successor Escrow Agent.

36.7   The Successor Escrow Agent shall bear no responsibility with regards to any deficiency which might arise because of the Successor Escrow Agent or by virtue of any tax which may be payable (i) in respect of the Blocked Assets, (ii) any income which may arise therefrom or (iii) any proceeds which may arise thereof.

## 37.   THE SCHEME ADMINISTRATORS

*Appointment and removal*

37.1   In consideration for each Scheme Creditor granting the releases pursuant to Clause 28 (*Releases*) and the Deeds of Release, each Scheme Creditor shall be entitled to have its Entitlement determined by the Scheme Administrators and, if applicable, the Scheme Adjudicator.

37.2   On the Scheme Effective Date, the Company shall appoint the Scheme Administrators, with the powers, rights, duties and functions conferred upon the Scheme Administrators by this Cayman Scheme.

37.3   The office of a Scheme Administrator shall be vacated if the holder of such office becomes subject to any conflict of interest which would impact in any way his/her ability to perform the functions of Scheme Administrator as set out in this Cayman Scheme, dies, is convicted of an indictable offence, resigns from his/her office (which shall be permissible and effective only if he/she gives at least two (2) months' written notice to the Company prior to such resignation), becomes bankrupt, is disqualified from membership of a professional body of which he/she is a member, or becomes mentally disordered or incapacitated.

37.4   In the event of a vacancy in the office of a Scheme Administrator (unless there is no further work to be done by the Scheme Administrator under the Schemes), the Company shall in its sole discretion promptly appoint an alternative person from the Whitelist Scheme Administrators who must be a fit and proper person and be able to adequately discharge the function of a Scheme Administrator under this Cayman Scheme.

37.5   The Scheme Administrators have agreed to be bound by this Cayman Scheme, and have executed, the Deed of Undertaking.

*Functions, powers and rights*

37.6   The Scheme Administrators (in their own name or as agents of the Company) shall have the power to act on behalf of the Company in relation to all matters relating to each Scheme Creditor's Entitlement.   In carrying out their duties and functions under this Cayman Scheme, the Scheme Administrators shall (pursuant to the terms of this Cayman Scheme) be empowered to:

(a)    make a determination of each Scheme Creditor's Scheme Claim and Entitlement for distribution purposes under this Cayman Scheme;

(b)    have full access to the Company Information and to receive full cooperation from the Management, on any reasonable requests for finance documents or other information or documents in the possession or control of the Company or the Group;

(c)    where reasonably appropriate to employ and remunerate accountants, actuaries, lawyers and other professional advisors (including their partners and the partners and staff of all associated firms, associations and companies or successors or any of them) in connection with the evaluation of each Scheme Creditor's Entitlement and the costs and expenses of such engagement shall form part of the costs and expenses incurred by the Scheme Administrators for the purposes of Clause 37.15;

(d)    to delegate in writing to any person qualified as set out in paragraph (c) above all or any of the powers and discretion conferred upon the Scheme Administrators under this Cayman Scheme, and from time to time to revoke any such delegation, provided that the Scheme Administrators shall be personally responsible for any act or omission of any such delegate to the same extent as if they had expressly authorised it;

(e)    to employ and remunerate Valuer(s) and experts (appointed by the Scheme Adjudicator pursuant to Clause 40.4(d) and the costs and expenses of such engagement shall form part of the costs and expenses incurred by the Scheme Administrators for the purposes of Clause 37.15(b);

(f)    to nominate a replacement or additional Scheme Adjudicator in accordance with Clauses 39.3 and 39.7;

(g)    to do all acts and to execute in the name and, insofar as permitted by law, on behalf of the Company, any deed, transfer, instrument, cheque, bill of exchange, receipt or other document which may be necessary for or incidental to the full and proper implementation of this Cayman Scheme;

(h)    to make any payments and distributions which are necessary for or incidental to the Scheme Administrators' performance of their functions under this Cayman Scheme;

(i)    to open, maintain and operate bank accounts in the name of the Company and/or in the name of the Scheme Administrators, as required or convenient under or in connection with this Cayman Scheme and to close any such bank account;

(j)    to receive and review all information provided by each Scheme Creditor as part of the Valuation Procedure;

(k)    to communicate with and seek further information from each Scheme Creditor, and the Management to assist with the evaluation of each Scheme Creditor's Entitlement;

(l)    to extend the timetable for the determination of each Scheme Creditor's Entitlement;

(m)    to refer and assign a Referred Scheme Claim (as applicable) to a Scheme Adjudicator to be further determined pursuant to the Adjudication Procedure;

(n)    to apply to the Cayman Court for directions in relation to any particular matter arising under, or in the course of the operation of, this Cayman Scheme;

(o)    to do all such acts and make all such decisions in connection with or for the purposes of making distributions and reservations of the Scheme Consideration to the Scheme Creditors;

(p)    to do all other things incidental to the exercise of the foregoing powers; and

(q)    to exercise any other powers necessary for or incidental to the full and proper implementation of his/her obligations under this Cayman Scheme,

provided that the Scheme Administrators cannot and shall not exercise any power that would result in them assuming control of any of the Company's business or affairs.

37.7    The Scheme Administrators (in their capacity as such):

(a)    shall have only those duties and responsibilities expressly specified in this Cayman Scheme and shall not have any implied duties or responsibilities whatsoever; and

(b)    may refrain from doing anything which would or might in their opinion be contrary to any law, directive or regulation of any applicable jurisdiction and may do anything which is, in their opinion, necessary to comply with any such law, directive or regulation and each Scheme Administrator shall not be liable for any loss occasioned thereby.

37.8    In exercising their powers and carrying out their duties and functions under this Cayman Scheme, the Scheme Administrators shall be independent and impartial, shall act in good faith and with due care and diligence, and shall exercise their powers under this Cayman Scheme for the purpose of ensuring that this Cayman Scheme is implemented in compliance with its terms and in the interests of the Scheme Creditors as a whole.

37.9    The Scheme Administrators are obliged, and agree, to report to the Scheme Creditors via publication on the Transaction Website and/or the Company Website on a quarterly basis up until the conclusion of the Valuation and Adjudication Procedure on the completion and results of the Valuation and Adjudication Procedure, including the aggregate Entitlement determined for the Class C Scheme Creditors.

37.10    Except in the case of actual fraud or wilful default, the Scheme Administrators will not be liable to the Company or any Scheme Creditor for any act or omission by the Scheme Administrators in the performance or purported performance of their powers, rights, duties and functions under this Cayman Scheme.

37.11    Except to the extent required by law, no Scheme Creditor shall be entitled to challenge the validity of (a) any act done or omitted to be done in good faith by the Scheme Administrators; or (b) the exercise by the Scheme Administrators in good faith of any power conferred upon them, if such act, omission or exercise of power is in accordance with, and to implement, the provisions of this Cayman Scheme.

37.12    The Company agrees to indemnify the Scheme Administrators out of the property of the Company for:

(a)    the costs, fees and expenses incurred and payable by the Scheme Administrators in accordance with Clause 37.15; and

(b)    any liability incurred by the Scheme Administrators as a result of any act or omission in carrying out their functions other than such liability (if any) that the Scheme Administrators may incur by their own actual fraud or wilful default,

in connection with this Cayman Scheme, and their role as Scheme Administrators. The Scheme Administrators shall not be found to have committed actual fraud or wilful default unless or until a court of competent jurisdiction has made a finding to that effect.

37.13    The indemnity set out in Clause 37.12 shall take effect on and from the Scheme Effective Date and shall endure without limitation as to time for the benefit of the Scheme Administrators notwithstanding:

(a)    the termination of this Cayman Scheme for any reason whatsoever;

(b)    the removal or replacement of a Scheme Administrator; or

(c)    the invalidity of or any defect whatsoever in the appointment of a Scheme Administrator.

37.14    The Scheme Administrators' right to indemnity conferred by Clause 37.12 has priority over the Scheme Claims and the Scheme Creditors generally and ranks equally to any claims for indemnity by the Scheme Adjudicators.

37.15    The Scheme Administrators shall be:

(a)    remunerated in respect of any work done by the Scheme Administrators and any agent, partner or employee of the Scheme Administrators acting on behalf of the Scheme Administrators, in connection with the exercise of their powers and discretions and the performance of their duties, obligations and responsibilities as Scheme Administrators under this Cayman Scheme on a time-cost basis, unless otherwise agreed; and

(b)    reimbursed in respect of all costs, fees, disbursements, taxation liabilities (including VAT), and expenses incurred in connection with the performance of their duties, obligations and responsibilities as Scheme Administrators under this Cayman Scheme, including but not limited to the fees of any accountants, actuaries, lawyers and other professional advisors or agents engaged by the Scheme Administrators pursuant to Clause 37.6(c) and the fees of the Valuer(s) and experts pursuant to Clause 37.6(e).

37.16    Fees and expenses incurred by the Scheme Administrators shall be invoiced monthly (or such other period as the Company and the Scheme Administrators may determine) to the Company and shall be paid in full promptly.

## 38.    VALUATION PROCEDURE

38.1    The Scheme Administrators shall assess each Class C Scheme Creditor's Entitlement on a Deficiency Basis by reference to the formulae set out in Clause 13 (*Calculation of a Scheme Creditor's Entitlement*).

38.2    The Scheme Administrators shall comply with the following procedure in ascertaining the Scheme Administrator Estimate:

(a)    the Scheme Administrator Estimate will be based on the evidence available to the Scheme Administrators including, among other things and as they deem applicable,

any Company Information provided to them, a valuation report prepared by a Valuer (if applicable) and/or a liquidation analysis;

(b)     where appropriate (and among other things) the Scheme Administrators may:

    (i)     discount future claims to their present value (with the discount rate to be used to be agreed between Houlihan Lokey, Moelis & Company Asia Limited and the Scheme Administrators and such rate is to be used as consistently as reasonably possible);

    (ii)    estimate contingent or unascertained claims;

    (iii)   convert foreign currency claims (if any) to US$, applying the foreign currency exchange rates set out in Clause 15.4; and

    (iv)    take into account the rules of the relevant jurisdiction (being the place of incorporation of the relevant Excluded Liabilities Party Person, or other jurisdiction in which the relevant Excluded Liabilities Party Person is wound up) in respect of set-off;

(c)     the Scheme Administrator Estimate shall be determined in good faith, to the best of the Scheme Administrators' ability based on the information available to the Scheme Administrators; and

(d)     the Scheme Administrator Estimate shall be determined as quickly and efficiently as possible with the aim of ensuring that the valuation of each Class C Scheme Creditor's Entitlement is completed and agreed or adjudicated as expeditiously as possible and in accordance with the timetable set out in this Cayman Scheme.

38.3    The Scheme Administrators shall issue an Estimation Notice to each Class C Scheme Creditor who has submitted a Class C Scheme Claim notifying them of the Scheme Administrator Estimate and enclosing a blank Scheme Administrator Estimate Acceptance or Rejection Form and any materials which the Scheme Administrators in their sole discretion considers necessary to allow that Class C Scheme Creditor to consider and evaluate the Scheme Administrator Estimate. The Estimation Notice will be issued within either: (a) for Class C Scheme Claims submitted before the Restructuring Effective Date, 30 calendar days after the Restructuring Effective Date; or (b) for Class C Scheme Claims submitted on or after the Restructuring Effective Date and on or before the Class C Bar Date, 30 calendar days after the Distribution Confirmation Deed was received by the Scheme Administrator.

38.4    The Class C Scheme Creditor shall have 30 calendar days from the date of the Estimation Notice to either accept or reject the Scheme Administrator Estimate by submitting a completed Scheme Administrator Estimate Acceptance or Rejection Form to the Scheme Administrators. If the Class C Scheme Creditor rejects the Scheme Administrator Estimate:

(a)     the Scheme Administrator Estimate Acceptance or Rejection Form submitted by that Scheme Creditor must include an explanation of its reasons for rejecting the Scheme Administrator Estimate and all evidence which it intends to rely upon in support of its position; and

(b)     if, in the sole opinion of the Scheme Administrators, the Scheme Administrator Estimate Acceptance or Rejection Form fails to enclose reasonably sufficient information and/or credible evidence, the Scheme Administrators will notify the Class C Scheme Creditor as soon as reasonably practicable specifying the

deficiencies in the information and evidence provided by the Class C Scheme Creditor and the additional information and evidence required by the Scheme Administrators.

38.5    If a Class C Scheme Creditor accepts the Scheme Administrator Estimate within the time specified in Clause 38.4, the amount of the Scheme Administrator Estimate will be the final and binding value of that Class C Scheme Creditor's Entitlement. The Scheme Administrators will then send the Class C Scheme Creditor a Deed of Agreed Valuation to be executed by the Class C Scheme Creditor as a condition precedent to receiving Scheme Consideration.

38.6    If a Class C Scheme Creditor fails to submit a Scheme Administrator Estimate Acceptance or Rejection Form within the time specified in Clause 38.4, that Class C Scheme Creditor will be deemed to have accepted the Scheme Administrator Estimate and therefore the amount of the Scheme Administrator Estimate will be that Class C Scheme Creditor's Entitlement. The Scheme Administrators will then send the Class C Scheme Creditor a Deed of Agreed Valuation to be executed by the Class C Scheme Creditor as a condition precedent to receiving Scheme Consideration.

38.7    If a Class C Scheme Creditor rejects the Scheme Administrator Estimate within the time specified in Clause 38.4, that Class C Scheme Creditor and the Scheme Administrators shall seek to agree the value of the Class C Scheme Creditor's Entitlement during the Consultation Period, in respect of which:

(a)    If the value of the Class C Scheme Creditor's Entitlement is agreed during the Consultation Period, that agreed value shall be the final and binding value of that Class C Scheme Creditor's Entitlement. Upon such agreement, the Scheme Administrators will send the Class C Scheme Creditor a Deed of Agreed Valuation to be executed by the Class C Scheme Creditor as a condition precedent to receiving Scheme Consideration.

(b)    If the value of the Class C Scheme Creditor's Entitlement is not agreed during the Consultation Period, and the Scheme Administrators in their sole discretion consider that it is not appropriate to extend the Consultation Period, the Scheme Administrators must refer the Referred Scheme Claim to the Scheme Adjudicator in accordance with Clause 40 (*Adjudication Procedure*).

(c)    If the value of the Class C Scheme Creditor's Entitlement is not agreed during the Consultation Period but in the Scheme Administrators' sole opinion there is a reasonable likelihood that the Class C Scheme Creditor and the Scheme Administrators may reach an agreement on the value of the Class C Scheme Creditor's Entitlement, the Scheme Administrators may extend the Consultation Period by seven (7) calendar days, in respect of which:

(i)    If an agreement is ultimately reached at the end of the seven (7) day extension, that agreed value shall be the final and binding value of that Class C Scheme Creditor's Entitlement. The Scheme Administrators will then send the Class C Scheme Creditor a Deed of Agreed Valuation to be executed by the Class C Scheme Creditor as a condition precedent to receiving Scheme Consideration; or

(ii)    If an agreement is not reached at the end of the seven (7) day extension, the Scheme Administrators must refer the Referred Scheme Claim to the Scheme Adjudicator in accordance with Clause 40 (*Adjudication Procedure*).

38.8    Upon the acceptance, deemed acceptance or agreement (as the case may be) of a Class C Scheme Creditor's Entitlement pursuant to Clauses 38.5 to 38.7, the Scheme Administrators will promptly send the Class C Scheme Creditor a Deed of Agreed Valuation to be executed by the Class C Scheme Creditor as a condition precedent to receiving the Scheme Consideration.

38.9    During the Consultation Period, either the Scheme Administrators or a Class C Scheme Creditor may provide additional information, further evidence and/or brief written submissions to the other or request additional information, further evidence and/or brief written submissions from the other in respect of that Class C Scheme Creditor's Scheme Claim. Notwithstanding the foregoing sentence, the Scheme Administrators, in their sole discretion, acting reasonably, are only required to accede to a Class C Scheme Creditor's requests for additional information, further information and/or brief written submissions if they consider it reasonable to do so and shall not be required to accede to requests which are the same, or substantially the same, as one which has previously been responded to.

38.10    For the avoidance of doubt and without prejudice to Clauses 38.5 to 38.7, the Scheme Administrators shall, in their reasonable discretion, have the power, prior to the execution of the Deed of Agreed Valuation by the relevant Class C Scheme Creditor, to adjust any prior determination of that Scheme Creditor's Entitlement based on intervening factors and/or changes in circumstance, including (but not limited to) any changes in the rights or benefits of the relevant Scheme Creditor's Scheme Claim. The Scheme Administrators shall give notice to such Scheme Creditor informing them of the relevant adjustment, and if disputed by the relevant Scheme Creditor, such adjusted Entitlement will be referred to the Adjudication Procedure as a Referred Scheme Claim and as if the valuation of the relevant Scheme Creditor's Entitlement had not been agreed or accepted.

*Company's Obligations in the Valuation Procedure*

38.11    The Company and the Group are obliged, and agree, to provide the Scheme Administrators with full access to any Company Information reasonably requested and to cooperate and comply with any reasonable requests by the Scheme Administrators for the Company Information, finance documents or other information or documents in the possession or control of the Company or the Group, unless provision of such information or documents would be contrary to any law (including for the avoidance of doubt any obligations of confidentiality imposed on the Company).

38.12    Management are obliged, and agree, to cooperate fully with the Scheme Administrators in relation to reasonable requests in respect of the Valuation Procedure.

38.13    The Company and the Group are obliged, and agree, to use their best endeavours to provide the Scheme Administrators with any information or documents reasonably requested by the Scheme Administrators which are relevant to a Class C Scheme Creditor's Entitlement, unless provision of such documents would be contrary to any law.

*Class C Scheme Creditor's Obligations in the Valuation Procedure*

38.14    Each Class C Scheme Creditor is obliged, and agrees, to cooperate fully with the Scheme Administrators in the Scheme Administrators' exercise of powers in assessing the value of the Class C Scheme Creditor's Entitlement.

38.15    Each Class C Scheme Creditor is obliged, and agrees, to use its best endeavours to provide the Scheme Administrators with any information or documents reasonably requested by the Scheme Administrators which are relevant to its Entitlement, unless provision of such documents would be contrary to any law.

### 39.    THE SCHEME ADJUDICATORS

*Qualification, appointment and removal*

39.1    On the Scheme Effective Date, the Company shall appoint individuals as Scheme Adjudicators under this Cayman Scheme, who shall initially be: Sir William Blair, Lord David Neuberger, Dame Elizabeth Gloster and Lady Mary Arden.

39.2    The office of each Scheme Adjudicator shall be vacated if the holder of such office becomes subject to any conflict of interest which would impact in any way his/her ability to perform the functions of Scheme Adjudicator as set out in this Cayman Scheme,  dies, is convicted of an indictable offence, resigns from his/her office (which shall be permissible and effective only if he/she gives at least two (2) months' written notice to the Company prior to such resignation), becomes bankrupt, is disqualified from membership of a professional body of which he/she is a member, or becomes mentally disordered or incapacitated.

39.3    In the event of a vacancy in the office of any Scheme Adjudicator, the Scheme Administrators shall nominate and the Company shall appoint a replacement Scheme Adjudicator, who meets the criteria specified in Clause 39.5.

39.4    Each Scheme Adjudicator shall have the powers, duties and functions, and the rights, conferred upon him/her by this Cayman Scheme. In exercising his/her powers and carrying out his/her duties and functions under this Cayman Scheme, each Scheme Adjudicator shall be independent and impartial, shall act in good faith and with due care and diligence and shall exercise his/her powers under this Cayman Scheme for the purpose of ensuring that this Cayman Scheme is implemented in compliance with its terms and in the interests of the Scheme Creditors as a whole.

39.5    In the event that a replacement or additional Scheme Adjudicator is required pursuant to Clause 39.3 or 39.7, he/she shall (a) be a senior barrister, or a retired judge of a Court of England and Wales or of a Hong Kong Court, or such other individuals of comparable qualification, and (b) be independent and impartial from the Company and the Scheme Administrators.

39.6    Each Scheme Adjudicator will agree to be bound by this Cayman Scheme.

39.7    At any given time, having regard to the number of Referred Scheme Claims which remain unresolved,  the number of Scheme Adjudicators appointed and all other circumstances, the Scheme Administrators may nominate and the Company shall pursuant to the Scheme Administrators' nomination appoint one or more individuals who meet the criteria specified in Clause 39.5 as additional Scheme Adjudicator(s).

*Functions, powers and rights*

39.8    Each Scheme Adjudicator shall act as an expert and not as an arbitrator. He/she shall be responsible for the determination of Referred Scheme Claims referred to him/her under this Cayman Scheme and shall have the powers, rights, duties and functions conferred upon him/her by this Cayman Scheme.

39.9    The Scheme Adjudicators shall review all the available evidence to determine the value of the Referred Scheme Claim.

39.10    Except in the case of actual fraud or wilful default, none of the Scheme Adjudicators will be liable to the Scheme Administrators, the Company or any Scheme Creditor for any act

or omission by the relevant Scheme Adjudicator in the performance or purported performance of his/her powers, rights, duties and functions under this Cayman Scheme.

39.11    The Company agrees to indemnify each Scheme Adjudicator out of the property of the Company for:

(a)      the costs, fees and expenses incurred and payable by the Scheme Adjudicator in accordance with Clause 39.14; and

(b)      any liability incurred by the Scheme Adjudicator as a result of any act or omission in carrying out his/her functions other than such liability (if any) that the Scheme Adjudicator may incur by his/her own actual fraud or wilful default,

in connection with this Cayman Scheme, and his/her role as Scheme Adjudicator. None of the Scheme Adjudicators shall be found to have committed actual fraud or wilful default unless or until a court of competent jurisdiction has made a finding to that effect.

39.12    The indemnity set out in Clause 39.11 shall take effect on and from the Scheme Effective Date and shall endure without limitation as to time for the benefit of each Scheme Adjudicator notwithstanding:

(a)      the termination of this Cayman Scheme for any reason whatsoever;

(b)      the removal or replacement of the Scheme Adjudicator; or

(c)      the invalidity of or any defect whatsoever in the appointment of the Scheme Adjudicator.

39.13    Each Scheme Adjudicator's right to indemnity conferred by Clause 39.11 has priority over the Scheme Claims and the Scheme Creditors generally and ranks equally to any claims for indemnity by the Scheme Administrators and each other Scheme Adjudicator.

39.14    Each Scheme Adjudicator shall be:

(a)      remunerated in respect of any work done by the Scheme Adjudicator and any agent, partner or employee of the Scheme Adjudicator acting on behalf of the Scheme Adjudicator, in connection with the exercise of his/her powers and discretions and the performance of his/her duties, obligations and responsibilities as Scheme Adjudicator under this Cayman Scheme on a time-cost basis; and

(b)      reimbursed in respect of all costs, fees, disbursements, taxation liabilities (including VAT), and expenses incurred in connection with the performance of his/her duties, obligations and responsibilities as Scheme Adjudicator under this Cayman Scheme.

39.15    Fees and expenses incurred by the Scheme Adjudicators shall be invoiced monthly (or such other period as the Scheme Administrators and the Scheme Adjudicators may determine) to the Scheme Administrators and, following the approval by the Scheme Administrator of such fees and expenses, shall be paid in full by the Company within one calendar month of the Scheme Administrators' approval.

**40.    ADJUDICATION PROCEDURE**

40.1    When the Scheme Administrators are obliged to refer a Referred Scheme Claim to the Scheme Adjudicator pursuant to Clause 38.7(b), 38.7(c)(ii) or 38.10, they shall promptly

refer the Referred Scheme Claim (together with the relevant Estimation Notice, all supporting documents provided to or by the Class C Scheme Creditor, and all other relevant valuation evidence exchanged between the Scheme Administrators and the Class C Scheme Creditor during the Consultation Period), to a Scheme Adjudicator for review.

40.2    The Scheme Administrators shall refer each Referred Scheme Claim to a Scheme Adjudicator. The Referred Scheme Claims shall be assigned to a Scheme Adjudicator according to the alphabetical order of the Scheme Adjudicators' surnames (such that the first Referred Scheme Claim shall be assigned to the Scheme Adjudicator whose surname appears first in the alphabet, and this process shall be repeated until all Referred Scheme Claims have been assigned). Notwithstanding the aforesaid:

(a)    the Scheme Administrators may consider, in their sole discretion, select a different Scheme Adjudicator to determine a Referred Scheme Claim because of practicality or efficiency reasons, for example, when the Referred Scheme Claim involves a commonality of issues with another Referred Scheme Claim that has been, or is being, determined by that Scheme Adjudicator, and subject to that Scheme Adjudicator confirming with the Scheme Administrators that he/she has no conflict of interest in respect of adjudicating the second Referred Scheme Claim. For the purpose of this paragraph (a), the Scheme Adjudicator shall endeavor to complete such conflicts checks within three (3) Business Days of receipt of the second Referred Scheme Claim; and

(b)    where a Scheme Adjudicator has been unable to accept a Referred Scheme Claim due to a conflict of interest, that Scheme Adjudicator will be approached first in respect of the next Referred Scheme Claim.

40.3    The Scheme Adjudicator shall review the Referred Scheme Claim and relevant evidence before him/her and decide whether to:

(a)    make a final and binding adjudication on the Referred Scheme Claim; or

(b)    request further evidence from the Class C Scheme Creditor and/or the Scheme Administrators.

40.4    The Scheme Adjudicator shall have the power to make directions, extend the prescribed timeframes and/or adopt procedures as he or she considers appropriate for the purposes of providing a fair, efficient and expeditious means for the adjudication of the Referred Scheme Claim. Specifically, the Scheme Adjudicator may, in his/her sole discretion:

(a)    provide directions on the overall conduct of the Adjudication Procedure;

(b)    provide additional directions to the relevant Class C Scheme Creditor, the Company, the Excluded Liabilities Party Person (to the extent relevant and where the Company possesses the direct contact details for such person) and/or the Scheme Administrators to submit written submissions and/or further evidence;

(c)    convene an oral hearing and make directions as to the date, form, content, procedure and time limits of such hearing, provided that each of the relevant Class C Scheme Creditor, the Company, the Scheme Administrators and any other participating party is given reasonable notice in writing of any such hearing;

(d)    appoint one or more experts (who shall be and remain impartial and independent of the Company and the relevant Class C Scheme Creditor and shall be engaged by

the Scheme Administrators) to report in writing to him/her on specific issues relating to the Referred Scheme Claim;

(e)      extend the timetable set out in Clause 40.5; and

(f)      make an order as to costs against either the Company or the Class C Scheme Creditor.

40.5    If a Referred Scheme Claim is referred to the Scheme Adjudicator, the following timetable shall apply:

(a)      within fourteen (14) calendar days of the Scheme Adjudicator receiving and being assigned the Referred Scheme Claim:

(i)      the Scheme Adjudicator may request the Scheme Administrators, the Company, the Excluded Liabilities Party Person (to the extent relevant and where the Company possesses the direct contact details for such person) and/or the relevant Class C Scheme Creditor to produce any further documents or other information which he/she deems necessary (the "**Further Documentation**"); or

(ii)     if the Scheme Adjudicator does not require any Further Documentation, he/she shall provide the Scheme Administrators, the Company and the relevant Class C Scheme Creditor with a copy of his/her written decision setting out the adjudicated value of that Class C Scheme Creditor's Entitlement, which shall be final and binding on that Class C Scheme Creditor, the Scheme Administrators and the Company, insofar as the law allows.

(b)      if such Further Documentation is not received (in full or in part) within fourteen (14) calendar days from the date of the Scheme Adjudicator's request, the Scheme Adjudicator shall make his/her determination on the basis of the documents provided to him/her; and

(c)      within fourteen (14) calendar days of: (i) receipt of the Further Documentation; or (ii) the expiry of the period provided for in paragraph (b) above, the Scheme Adjudicator shall provide the Scheme Administrators, the Company and the relevant Class C Scheme Creditor with a copy of his/her written decision setting out the adjudicated value of that Class C Scheme Creditor's Entitlement, which shall be final and binding on that Class C Scheme Creditor, the Scheme Administrators and the Company, insofar as the law allows.

40.6    Upon receipt of the Scheme Adjudicator's decision as set out in Clause 40.5, the Scheme Administrators will send the Class C Scheme Creditor a Deed of Agreed Valuation to be executed by the Class C Scheme Creditor as a condition precedent to receiving the Scheme Consideration.

40.7    The costs of the Adjudication Procedure (including the costs of the Scheme Adjudicator and any legal and other expenses incurred by the Company and the relevant Class C Scheme Creditor) are matters within the discretion of the Scheme Adjudicator. In exercising his/her discretion as to costs the Scheme Adjudicator shall:

(a)      as a starting point, be guided by the principle that costs follow the event; and

(b)    have regard to the principles applied by the Cayman Court in respect of costs orders from time to time.

40.8    Payment to the Company in full of any costs ordered against a Class C Scheme Creditor shall be a condition precedent to that Scheme Creditor's entitlement to and receipt of its Scheme Consideration.

40.9    Communications between the Scheme Adjudicator, the Scheme Administrators, the Company and the relevant Class C Scheme Creditors shall be conducted by email and in English or Chinese, as the Scheme Adjudicator or the Scheme Administrators (as applicable) in their sole discretion deem appropriate, taking into consideration the needs of the Class C Scheme Creditor. The Scheme Adjudicator may also, at his or her discretion, direct oral submissions to be made in either English or Chinese.

40.10   The Adjudication Procedure shall be conducted in English or Chinese, as directed by the Scheme Adjudicator in their sole discretion. The relevant Class C Scheme Creditor shall ensure that all documents submitted to the Scheme Adjudicator (or the relevant parts of those documents) are in English or accompanied by an English translation at the Class C Scheme Creditor's expense, if so required by the Scheme Adjudicator.

*Company's Obligations in the Adjudication Procedure*

40.11   Management are obliged, and agree, to cooperate fully with the Scheme Adjudicator in relation to any reasonable requests in respect of the Adjudication Procedure.

40.12   The Deed of Undertaking Parties, the Company and the Group are obliged, and agree, to use their best endeavours to provide the Scheme Adjudicator with any information or documents reasonably requested by the Scheme Adjudicator which are relevant to a Referred Scheme Claim, unless provision of such documents would be contrary to any law.

*Class C Scheme Creditor's Obligations in the Adjudication Procedure*

40.13   Each Class C Scheme Creditor is obliged, and agrees, to cooperate fully with the Scheme Adjudicator in relation to the Adjudication Procedure.

40.14   Each Class C Scheme Creditor is obliged, and agrees, to use its best endeavours to provide the Scheme Adjudicator with any information or documents reasonably requested by the Scheme Adjudicator which are relevant to its Referred Scheme Claim, unless provision of such documents would be contrary to any law.

*Scheme Administrators' Obligations in the Adjudication Procedure*

40.15   The Scheme Administrators are obliged, and agree, to cooperate fully with the Scheme Adjudicator in relation to the Adjudication Procedure.

40.16   The Scheme Administrators are obliged, and agree, to use their best endeavours to provide the Scheme Adjudicator with any information or documents reasonably requested by the Scheme Adjudicator which are relevant to a Referred Scheme Claim, unless provision of such documents would be contrary to any law.

*Reserving process*

40.17   Notwithstanding any other provisions of this Cayman Scheme:

(a)    the Company and the Scheme Administrators are not required to postpone any payment or distribution to the Scheme Creditors (excluding any Class C Scheme Creditor whose Referred Scheme Claim has not been finally determined pursuant to the Adjudication Procedure (a "**Pending Referral Creditor**")) on the Final Distribution Date, in the event that any Referred Scheme Claim has not been finally determined by the Scheme Adjudicator prior to the Final Distribution Date;

(b)    where an adjudication of a Pending Referral Creditor's Referred Scheme Claim is underway and the Scheme Adjudicator's decision in respect of that Referred Scheme Claim is pending as at the Final Distribution Date:

   (i)    the Company and the Scheme Administrators shall:

      (A) solely for the purposes of calculating the amount distributable to other Class C Scheme Creditors and Class A Scheme Creditors, treat the value of the Pending Referral Creditor's Entitlement as being equal to the value being proposed by that Pending Referral Creditor in the Adjudication Procedure (the "**Asserted Amount**");

      (B) not make any distribution to the Pending Referral Creditor pending conclusion of the Adjudication Procedure; but reserve the Asserted Amount, or such greater amount, of the relevant Scheme Consideration as the Scheme Administrators consider necessary;

      (C) as soon as reasonably practicable after the Scheme Adjudicator concludes the adjudication of the Referred Scheme Claim of the Pending Referral Creditor, make a catch-up payment to the Pending Referral Creditor calculated by reference to the adjudicated value of that Pending Referral Creditor's Entitlement; and

   (ii)   to the extent the amount reserved under Clause 40.17(b)(i)(B) is greater than the amount to which the Pending Referral Creditor is actually entitled, the Company shall on the instruction of the Scheme Administrators distribute the excess amount to other Class C Scheme Creditors and Class A Scheme Creditors who have been elected to receive the Option 1 Scheme Consideration or Option 2 Scheme Consideration as applicable (depending on the Scheme Consideration reserved)and are entitled to receive Scheme Consideration on a pro-rata basis; and

(c)    where a Class A Scheme Creditor commences a Proceeding in a court against the Company or the Scheme Administrators to dispute the determination of its Entitlement:

   (i)    the Company and the Scheme Administrators may:

      (A) solely for the purposes of calculating the amount distributable to other Class A Scheme Creditors, treat the value of the relevant Class A Scheme Creditor's Entitlement as being equal to the value being proposed by that Class A Scheme Creditor in the Proceeding ("**Class A Asserted Amount**");

      (B) not make any distribution to the relevant Class A Scheme Creditor pending conclusion of the Proceeding; but reserve the Class A Asserted Amount, or such greater amount, of the relevant Scheme Consideration as the Scheme Administrators consider necessary;

(C) as soon as reasonably practicable after the Proceeding is fully and finally determined (and not subject to any appeal) or settled, make a catch-up payment if required to the relevant Class A Scheme Creditor calculated by reference to the value of its Entitlement as determined in the Proceeding or agreed under the settlement agreement;

(ii) if no amount is reserved under Clause 40.17(c)(i)(B) and a catch-up payment is required pursuant to Clause 40.17(c)(i)(C), the Company shall issue A1 Notes on a dollar-for-dollar basis to the relevant Class A Scheme Creditor in respect of any Entitlement for which it has not received Scheme Consideration; and

(iii) to the extent the amount reserved under Clause 40.17(c)(i)(B) is greater than the amount to which the relevant Class A Scheme Creditor is actually entitled, the Company shall extinguish the reserved Scheme Consideration.

**41.    NOTICE**

41.1    Any notice or other written communication to be given under or in relation to this Cayman Scheme shall be given in writing and shall be deemed to have been duly given if it is delivered by hand, or sent by courier, post, fax or email to:

(a)    in the case of the Company:

(i)    by courier or registered post to China Evergrande Group, 15th Floor, YF Life Centre, 38 Gloucester Road, Wanchai, Hong Kong;

(ii)    for the attention of: Jimmy Fong; and

(iii)    by email to jfong@evergrande.com;

(b)    in the case of the Scheme Administrators, by email to: evergrande.scheme@kpmg.com;

(c)    in the case of a Scheme Creditor, its last known address according to the records of the Company or the Information Agent or by corporate action notice through the Clearing Systems (i.e., the Existing Notes Depositary or New Instruments Depository, as applicable); and

(d)    in the case of any other person, any address set forth for that person in any agreement entered into in connection with this Cayman Scheme or the last known address according to the Company or by fax to its last known fax number according to the Company.

41.2    Any notice or other written communication to be given under this Cayman Scheme shall be deemed to have been served:

(a)    if delivered by hand or courier, on the first Business Day following delivery;

(b)    if sent by post, on the second Business Day after posting if the recipient is in the country of dispatch, otherwise on the tenth Business Day after posting; and

(c)    if by fax or email, on the Business Day sent.

41.3    In proving service, it shall be sufficient proof in the case of a notice sent by post that the envelope was properly stamped, addressed and placed in the post.

41.4    The accidental omission to send any notice, written communication or other document in accordance with this Clause 41 (*Notice*) or the non-receipt of any such notice by any Scheme Creditor, shall not affect the provisions of this Cayman Scheme.

41.5    The Company shall not be responsible for any loss or delay in the transmission of any notices, other documents or payments posted by or to any Scheme Creditors which shall be posted at the risk of such Scheme Creditors.

41.6    This Clause 41 (*Notice*) shall not apply to the documents comprising the Solicitation Packet, which should be completed and returned in accordance with the instructions set out therein.

## 42.    CORRESPONDING DISCHARGE OF PERFORMANCE

The performance by the Company, the Information Agent and the Scheme Administrators or Scheme Adjudicator (if applicable) of any obligation under one Scheme (including pursuant to a Deed of Undertaking in respect of such Scheme) shall operate to discharge any corresponding obligation under the other Scheme and vice-versa.

## 43.    APPLICATION TO THE CAYMAN COURT FOR DIRECTIONS

Without prejudice to any rights that the Company might otherwise have in connection with this Cayman Scheme or any aspect of it, the Company shall be entitled to make an application to the Cayman Court for directions at any time in connection with any matter arising under or in relation to this Cayman Scheme.

## 44.    FOREIGN REPRESENTATIVE

Any Director (whether holding office now or in the future) or person appointed by resolution of the Directors shall be authorised or ratified to act as the representative of the Company on and in connection with any application for recognition and assistance in relation to this Hong Kong Scheme in any jurisdiction and under whatever law, including (without limitation) Chapter 15 of the US Bankruptcy Code and any other law derived from or similar to the UNCITRAL Model Law on Cross-Border Insolvency Proceedings.

## 45.    THIRD PARTIES

45.1    Subject to Clause 45.2, no Person who is not a party to this Cayman Scheme has any right under the Cayman Islands Contracts (Rights of Third Parties) Act 2014 (as amended) to enforce any of the terms of this Cayman Scheme.

45.2    The Released Persons may enforce the relevant terms of this Cayman Scheme in accordance with the Cayman Islands Contracts (Rights of Third Parties) Act 2014 (as amended). For these purposes, the parties to the Cayman Scheme agree that the Cayman Islands Contracts (Rights of Third Parties) Act 2014 (as amended) shall be deemed to apply to this Cayman Scheme.

## 46.    TERMINATION OF THIS SCHEME

46.1    The Company may terminate this Cayman Scheme at any time prior to the Restructuring Effective Date, by notice to the Scheme Creditors, provided that:

(a)    the Company also exercises its right to terminate the Hong Kong Scheme; and

(b)    written consent for the termination is obtained by the Company from:

(i)    the Majority CEG AHG; or

(ii)    (without prejudice to the foregoing) if the CEG AHG does not hold the Minimum CEG AHG Threshold, the Super Majority Participating Creditors.

46.2    In the event that this Cayman Scheme is terminated pursuant to the terms of this Clause 46 (*Termination of this Scheme*), each Scheme Creditor shall be entitled to exercise any and all of its rights, powers and remedies against the Company under the terms and conditions of the documents governing the Existing Debts as though the Cayman Scheme had never been contemplated or implemented.

46.3    This Cayman Scheme shall terminate automatically, and be of no further force and effect in the event that the Restructuring Effective Date, including all of the steps outlined in paragraphs (a) to (j) of Clause 6.5, has not occurred by the Longstop Date.

## 47.    CONFLICT AND INCONSISTENCY

In the case of a conflict or inconsistency between the terms of the Schemes and the terms of the Explanatory Statement, the terms of the Schemes will prevail.

## 48.    SEVERABILITY

If at any time any provision of this Cayman Scheme, the Restructuring Documents (or any other document to be executed under or in accordance with this Cayman Scheme) is or becomes illegal, invalid or unenforceable in any respect under the laws of any jurisdiction, such provision shall be severed from this Cayman Scheme or such Restructuring Document or such other document (as the case may be) and neither the legality, validity or enforceability under the law of any other jurisdiction of that or any provision of this Cayman Scheme shall be affected or impaired.

## 49.    GOVERNING LAW AND JURISDICTION

49.1    This Cayman Scheme and any non-contractual obligations arising out of or in connection with this Cayman Scheme shall be governed by, and construed in accordance with, the laws of the Cayman Islands.

49.2    The Company and the Scheme Creditors hereby agree that the courts of the Cayman Islands shall have exclusive jurisdiction to hear and determine any Proceeding and to settle any dispute which arises out of or is connected with the terms of this Cayman Scheme or its implementation or out of any Proceeding taken or omitted to be taken under this Cayman Scheme or in connection with the administration of this Cayman Scheme.

49.3    For the purposes set out in Clause 49.2, each of the Company and the Scheme Creditors irrevocably submit to the jurisdiction of the courts of the Cayman Islands, *provided, however*, that nothing in this Clause 49 (*Governing Law and Jurisdiction*) shall affect the validity of other provisions determining governing law and jurisdiction as between the Company and any of the Scheme Creditors whether contained in any contract or for any other purpose including, but not limited to, submission and/or enforcement under the jurisdiction of the US Bankruptcy Court in relation to the Chapter 15 Recognition Proceeding, including (but not limited to) the Recognition Filings and the Chapter 15 Recognition Order.

49.4    The terms of this Cayman Scheme and the obligations imposed on the Company hereunder shall take effect subject to any prohibition or condition imposed by any applicable law.

## SCHEDULE 1

## RESTRUCTURING DOCUMENTS

1.      the Schemes;

2.      the Explanatory Statement;

3.      Existing Notes Trustee Instruction;

4.      Deeds of Release;

5.      Deed of Undertaking;

6.      New Instrument Documents;

7.      Security Documents;

8.      Holding Period Trust Deed;

9.      New Intercreditor Agreements; and

10.     all other documents, agreements, instruments, board resolutions, shareholder approvals, releases, and notices necessary to implement or consummate the Restructuring in accordance with the terms of the RSAs and Schemes, in each case as amended, supplemented, extended, restated or novated from time to time, or any document or instrument creating or evidencing any security interest or guarantee, any fee letter, intercreditor agreement or similar documents under or in connection with the New Instruments and/or the Security Documents, in each case in the Agreed Form. For the avoidance of doubt, any documents and accompanying evidence (including, but not limited to, foreign law expert opinions and all other affidavit evidence filed by the Company in respect of the Proceedings before the Hong Kong Court to convene the Hong Kong Scheme Meetings and/or to sanction this Hong Kong Scheme) specifically required as part of the Hong Kong Court's proceedings are not included.

## SCHEDULE 2

## CLASS C DEBTS

*All values below are for reference, indicative only, and subject to change. To the extent a balance of the principal is referred to, it is as at 31 December 2022. For items 16 to 116, the value refers to the principal amount as at 30 June 2023.*

1. Amounts on-lent to CEG pursuant to the loan agreement relating to the provision of the Class A Private Loan;

2. CEG guarantee of the US$260 million 8.5% senior notes due October 3, 2021 (ISIN: XS2054446617, Common Code: 205444661) issued by Jumbo Fortune Enterprises Limited;

3. CEG guarantee of the US$424 million 9.0% senior notes due January 22, 2023 (ISIN: XS2290369128, Common Code: 229036912) issued by Great Courage Global Limited;

4. US$116 million put option granted by CEG in relation to certain Dongpo Notes;

5. US$110 million put option granted by CEG in relation to shares of Graceful Court Limited;

6. CEG guarantee of HK$160 million margin loan borrowed by New Chic Global Limited;

7. CEG guarantee of the HK$575 million put option in respect of shares of Clear Star Investments Limited;

8. HK$1.2 billion loan borrowed by CEG due 2 January 2022;

9. HK$600 million loan borrowed by CEG due 7 January 2022;

10. CEG guarantee of the US$20 million structured loan borrowed by Rainbow Ever Limited (the "**Venice Loan**");

11. CEG guarantee of the US$355 million structured sale and purchase agreement of shares in Rainbow Ever Limited (the "**Venice SPA**");

12. CEG guarantee of the HK$7.6 billion loan borrowed by Tianji Holding Limited pursuant to facilities agreement dated 21 November 2020 (the "**Hero Loan**");

13. US$712 million repurchase obligations of CEG in respect of Fangchebao Group Co. Ltd;

14. Repurchase obligation of CEG in relation to the RMB Bonds;

15. CEG guarantee of Guangzhou Kailong Real Estate Company Limited's RMB5 billion repurchase obligation of shares in Hengda Real Estate, together with interest and costs, which was awarded in an Arbitration Award rendered by Shenzhen Court of International Arbitration where CEG, Guangzhou Kailong Real Estate Company Limited, and the Chairman were responsible for the repayment accordingly;

16. CEG guarantee of the RMB1.29 billion loan borrowed by Tianjin Hengda Guorui New Energy Technology Co., Ltd;

17. CEG guarantee of the RMB788 million loan borrowed by Evergrande New Energy Automative Investment Holdings Group Co. Ltd.;

18.    CEG guarantee of the RMB664.4 million loan borrowed by Evergrande Financial Holding Group (Shenzhen) Co., Ltd.;

19.    CEG guarantee of the RMB440 million loan borrowed by Evergrande Tourism Operation Management Group Co., Ltd.;

20.    CEG guarantee of the RMB294 million loan borrowed by Evergrande New Energy Automotive Investment Holdings Group Co. Ltd.;

21.    CEG guarantee of the RMB1.2676 billion loan borrowed by Zhoushan Yinyi Real Estate Development Co., Ltd.;

22.    CEG guarantee of the RMB400 million loan borrowed by Tianjin Evergrande Guorui New Energy Technology Co., Ltd (RMB227 million) and Junfang Material Equipment (Guangdong) Co., Ltd. (RMB173 million);

23.    CEG guarantee of the RMB180.5 million loan borrowed by Guiyang Evergrande Tongmeng Tiandi Tourism Development Co., Ltd.;

24.    CEG guarantee of the RMB150 million loan borrowed by Evergrande High-Tech Group Co., Ltd.;

25.    CEG guarantee of the RMB1,399,833,998 loan borrowed by Evergrande Intelligent Vehicle (Guangdong) Co., Ltd.;

26.    CEG guarantee of the RMB324,960,454.47 loan borrowed by Cangzhou Yiju Real Estate Development Co., Ltd.;

27.    CEG guarantee of the RMB85 million loan borrowed by Jurong Hengyi Tourism Development Co., Ltd.;

28.    CEG guarantee of the RMB229,989,971.35 loan borrowed by Xi'an Tianhong Tourism Development Co., Ltd.;

29.    CEG guarantee of the RMB136.5 million loan borrowed by Taicang Yutai Tourism Development Co., Ltd.;

30.    CEG guarantee of the RMB138.03 million loan borrowed by Wuhan Chushui Yunshan Agricultural Development Co., Ltd.;

31.    CEG guarantee of the RMB1.805 billion loan borrowed by Evergrande Fairyland Group Limited;

32.    CEG guarantee of the RMB1.71 billion loan borrowed by Evergrande Health Industry Group Co., Ltd.;

33.    CEG guarantee of the RMB1,659,649,830.75 loan borrowed by Wuhan Baden City Investment Co., Ltd.;

34.    CEG guarantee of the RMB710 million loan borrowed by Yunnan Yuxing Zhongtian Real Estate Development Co., Ltd.;

35.    CEG guarantee of the RMB115 million loan borrowed by Yunnan Yuxing Zhongtian Real Estate Development Co., Ltd.;

36.     CEG guarantee of the RMB962.38 million loan borrowed by Hainan Boao Evergrande International Hospital Co., Ltd.;

37.     CEG guarantee of the RMB296 million loan borrowed by Gui'an Xinqu Evergrande Huading Tourism Development Co., Ltd.;

38.     CEG guarantee of the RMB70 million loan borrowed by Qidong Yuhao Real Estate Co., Ltd.;

39.     CEG guarantee of the RMB12.54 million loan borrowed by Gui'an Xinqu Evergrande Huading Tourism Development Co., Ltd.;

40.     CEG guarantee of the RMB1.13 billion loan borrowed by Guangdong Maoqi Investment Co., Ltd.;

41.     CEG guarantee of the RMB650 million loan borrowed by Wuhan Baden City Investment Co., Ltd.;

42.     CEG guarantee of the RMB600 million loan borrowed by Zhengzhou Hengzetong Health Real Estate Co., Ltd.;

43.     CEG guarantee of the RMB450 million loan borrowed by Zhengzhou Hengzetong Health Real Estate Co., Ltd.;

44.     CEG guarantee of the RMB440 million loan borrowed by Wuhan Baden City Investment Co., Ltd.;

45.     CEG guarantee of the RMB350 million loan borrowed by Zhengzhou Hengzetong Health Real Estate Co., Ltd.;

46.     CEG guarantee of the RMB937.106 million loan borrowed by Evergrande New Energy Vehicle (Guangdong) Co., Ltd.;

47.     CEG guarantee of the RMB549 million loan borrowed by Changsha Evergrande Fairyland Tourism Development Co., Ltd.;

48.     CEG guarantee of the RMB435 million loan borrowed by Qidong Evergrande Hot Spring City Development Co., Ltd.;

49.     CEG guarantee of the RMB214,603,797.65 loan borrowed by Hubei Hengxiang Tourism Development Co., Ltd.;

50.     CEG guarantee of the RMB150,473,333.33 loan borrowed by Shaanxi Haishen Construction Engineering Co., Ltd.;

51.     CEG guarantee of the RMB150.4 million loan borrowed by Kaifeng Kaize Tourism Development Co., Ltd.;

52.     CEG guarantee of the RMB1,638,803,164.71 loan borrowed by Kunming Jialize Tourism Culture Co., Ltd.;

53.     CEG guarantee of the RMB1.3 billion loan borrowed by Kunming Jialize Tourism Culture Co., Ltd.；

54.     CEG guarantee of the RMB1 billion loan borrowed by Yangzhong Hengrui Real Estate Co., Ltd.;

55.    CEG guarantee of the RMB176,117,602.18 loan borrowed by Evergrande Fairyland Group Limited;

56.    CEG guarantee of the RMB1,042,069,759.76 loan borrowed by Wuhan Chushui Yunshan Agricultural Development Co., Ltd;

57.    CEG guarantee of the RMB120 million loan borrowed by Chongqing Hengjin Health Industry Co., Ltd.;

58.    CEG guarantee of the RMB800 million loan borrowed by Evergrande Fairyland Group Limited;

59.    CEG guarantee of the RMB272 million loan borrowed by Guangxi Fusui Hengli Health Industry Development Co., Ltd.;

60.    CEG guarantee of the RMB203,023,644.35 loan borrowed by Wuzhou Hengmei Health Industry Co., Ltd.;

61.    CEG guarantee of the RMB410,046,058.86 loan borrowed by Hubei Herui Tourism Development Co., Ltd.;

62.    CEG guarantee of the RMB272,422,383.12 loan borrowed by Wuhan Chushui Yunshan Agricultural Development Co., Ltd;

63.    CEG guarantee of the RMB180 million loan borrowed by Evergrande Ruibo Power Technology (Shenzhen) Co., Ltd.;

64.    CEG guarantee of the RMB445,633,820.41 loan borrowed by Evergrande New Energy Technology Group Co., Ltd.;

65.    CEG guarantee of the RMB256,674,595.17 loan borrowed by Evergrande New Energy Automotive Investment Holdings Group Co. Ltd.;

66.    CEG guarantee of the RMB62.54 million loan borrowed by Meishan Longhe Tourism Development Co., Ltd.;

67.    CEG guarantee of the RMB359,472,266.26 loan borrowed by Taicang Yutai Tourism Development Co., Ltd.;

68.    CEG guarantee of the RMB381 million loan borrowed by Evergrande New Energy Technology Group Co., Ltd.;

69.    CEG guarantee of the RMB68.3 million loan borrowed by Cangzhou Yiju Real Estate Development Co., Ltd.;

70.    Guarantee in relation to the RMB147.2 million loan borrowed by Nanjing Hengkang Real Estate Co., Ltd.;

71.    CEG guarantee of the RMB999 million loan borrowed by Evergrande Fairyland Group Limited;

72.    CEG guarantee of the RMB499,357,862.03 loan borrowed by Danzhou Hengle Culture Development Co., Ltd.;

73.    CEG guarantee of the RMB485,885,774.81 loan borrowed by Jurong Fairyland Tourism Development Co., Ltd.;

74.     CEG guarantee of the RMB217,198,571.40 loan borrowed by Changsha Evergrande Fairyland Tourism Development Co., Ltd.;

75.     CEG guarantee of the RMB200 million loan borrowed by Cangzhou Fairyland Tourism Development Co., Ltd.;

76.     CEG guarantee of the RMB200 million loan borrowed by Danzhou Zhiyuan Tourism Development Co., Ltd.;

77.     CEG guarantee of the RMB200 million loan borrowed by Danzhou Yibei Tourism Development Co., Ltd.;

78.     CEG guarantee of the RMB200 million loan borrowed by Danzhou Shengbang Tourism Development Co., Ltd.;

79.     CEG guarantee of the RMB388,418,616.68 loan borrowed by Qianhai Jiesuan Commercial Factoring (Shenzhen) Co., Ltd;

80.     CEG guarantee of the RMB280 million loan borrowed by Hainan Boao Evergrande International Hospital Co., Ltd.;

81.     CEG guarantee of the RMB244 million loan borrowed by Shenzhen Qianhai Xingbang Commercial Factoring Co., Ltd.;

82.     CEG guarantee of the RMB200 million loan borrowed by Hainan Hengqian Material Equipment Co., Ltd.;

83.     CEG guarantee of the RMB159,999,090.88 loan borrowed by Xi'an Changde Tourism Development Co., Ltd.;

84.     CEG guarantee of the RMB126,998,890.81 loan borrowed by Kaifeng Fairyland Development Co., Ltd.;

85.     CEG guarantee of the RMB120 million loan borrowed by Jurong Fairyland Tourism Development Co., Ltd.;

86.     CEG guarantee of the RMB64 million loan borrowed by Kaifeng Shengbang Tourism Development Co., Ltd.;

87.     CEG guarantee of the RMB11 million loan borrowed by Kaifeng Shengbang Tourism Development Co., Ltd.;

88.     CEG guarantee of the RMB98,245,776.78 loan borrowed by Guiyang Evergrande Tongmeng Tiandi Tourism Development Co., Ltd.;

89.     CEG guarantee of the RMB62,030,672.18 loan borrowed by Guiyang Evergrande Tongmeng Tiandi Tourism Development Co., Ltd.;

90.     CEG guarantee of the RMB55,104,092.72 loan borrowed by Changsha Evergrande Fairyland Tourism Development Co., Ltd.;

91.     CEG guarantee of the RMB35 million loan borrowed by Xi'an Evergrande Fairyland Tourism Development Co., Limited;

92.     CEG guarantee of the RMB35 million loan borrowed by Xi'an Evergrande Fairyland Tourism Development Co., Limited;

107

93.    CEG guarantee of the RMB897.5 million loan borrowed by Danzhou Jiayuan Tourism Development Co., Ltd.;

94.    CEG guarantee of the RMB386.2 million loan borrowed by Danzhou Ruifeng Tourism Development Co., Ltd.;

95.    CEG guarantee of the RMB378.4 million loan borrowed by Qidong Tongyu Real Estate Co., Ltd.;

96.    CEG guarantee of the RMB210.4 million loan borrowed by Qidong Baofeng Real Estate Co., Ltd.;

97.    CEG guarantee of the RMB85 million loan borrowed by Danzhou Dongtuo Tourism Development Co., Ltd.;

98.    CEG guarantee of the RMB22 million loan borrowed by Danzhou Shengbang Tourism Development Co., Ltd.;

99.    CEG guarantee of the RMB710 million loan borrowed by Evergrande New Energy Automotive Investment Holdings Group Co. Ltd.;

100.    CEG guarantee of the RMB1.4 billion loan borrowed by Hengning Health Industry Nanjing Co., Ltd.;

101.    CEG guarantee of the RMB540 million loan borrowed by Xianning Hengchen Real Estate Co., Ltd.;

102.    CEG guarantee of the RMB200 million loan borrowed by Hohhot Hengpeng Health Industry Co., Ltd.;

103.    CEG guarantee of the RMB200 million loan borrowed by Hengpeng Health Industry Liaoning Co., Ltd.;

104.    CEG guarantee of the RMB103,135,896.70 loan borrowed by Xianning Hengyang Real Estate Co., Ltd.;

105.    CEG guarantee of the RMB600 million loan borrowed by Jiangyin Hengpeng Real Estate Co., Ltd.;

106.    CEG guarantee of the RMB2,982,370,000 loan borrowed by Grandland Holding Group Co., Ltd.;

107.    CEG guarantee of the RMB2.8 billion loan borrowed by Renhe Investment Holding Co., Ltd.;

108.    CEG guarantee of the RMB2.6 billion loan borrowed by Harbin Jurong New Energy Co., Ltd.;

109.    CEG guarantee of the RMB1,734,928,916.67 loan borrowed by Sichuan Juhe Ecological Agriculture Development Co., Ltd.;

110.    CEG guarantee of the RMB2.1 billion loan borrowed by Chengdu Jiacheng Tianxia Public Facilities Co., Ltd.;

111.    CEG guarantee of the RMB1.5 billion loan borrowed by Shenzhen Construction Engineering Co., Ltd.;

112.    CEG guarantee of the RMB1 billion loan borrowed by Shenzhen Construction Engineering Co., Ltd.;

113.    CEG guarantee of the RMB480 million loan borrowed by Liaoning Donglin Reinas Co., Ltd.;

114.    CEG guarantee of the RMB336,809,471.63 loan borrowed by Shenzhen Grandland Hi-Tech New Material Co., Ltd.;

115.    CEG guarantee of the RMB110,919,594.87 loan borrowed by Liaoning Hengyang Health Real Estate Co., Ltd.;

116.    CEG guarantee of the RMB100 million loan borrowed by Shenzhen Grandland Hi-Tech New Material Co., Ltd; and

117.    Any other unsecured liability of CEG arising under a guarantee, indemnity, put option, repurchase obligation, judgment, arbitration, or other obligation or liability arising in connection with the liabilities of the entities identified in items 16 to 116 of this Schedule.

**SCHEDULE 3**

**RESTRUCTURING EFFECTIVE DATE CONDITIONS**

1.    **Satisfaction of Scheme Conditions:** the satisfaction of the Scheme Conditions, and the occurrence of the Scheme Effective Date.

2.    **Resumption of trading:** the resumption of trading of the shares in each of CEG, NEV and EVPS on the HKEX, following certain conditions being met (as applicable, to the extent required by the HKEX), including:

(a)    publishing all outstanding financial information required under the Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited (the "**Listing Rules**") and addressing any audit modifications;

(b)    submission of evidence demonstrating compliance with Rule 13.24 of the Listing Rules;

(c)    publication of announcements from time to time to inform the market of all material information for shareholders and other investors to appraise the company's position;

(d)    completion of an independent investigation by CEG and EVPS into the enforcement by relevant banks of pledge guarantee of EVPS, in the amount of RMB13.4 billion, publication of the findings by way of announcement and adoption of appropriate remedial measures;

(e)    completion of an independent internal control review of CEG and EVPS to demonstrate that the company has in place adequate internal controls and procedures to meet the obligations under the Listing Rules; and

(f)    submission of evidence by CEG and EVPS demonstrating that there is no reasonable regulatory concern about management integrity and/or the integrity of any persons with substantial influence over the company's management and operations, which may pose a risk to investors and damage market confidence.

3.    **Equitization of Related Party Loan:** subject to obtaining relevant approvals, CEG to use best endeavours to procure the conversion of the Related Party Loan into new NEV Shares at an issue price of HK$3.84 per share.

4.    **Relevant approvals of Scheme Consideration:** the delivery of all relevant approvals, pre-approvals or consents, as applicable, in connection with the Restructuring having been obtained, including, as applicable:

(a)    delivery of respective court orders in respect of the Schemes and Chapter 15 Recognition Proceeding (and in the case of Chapter 15 unless waived by the Company);

(b)    approval in-principle for the listing and quotation of the New Instruments on the SGX-ST;

(c)    submission to HKEX and confirmation by HKEX that the issuance of the NEV MEBs will constitute only a disclosable transaction for CEG under Chapter 14 of the Listing Rules;

(d)    approval by the Board for the issuance of the New Instruments;

(e)     publication of announcements of CEG, NEV and EVPS on the issuance of the New Instruments (as applicable);

(f)     submission of draft circular of CEG to HKEX in relation to the CEG MCBs and approval and clearance of the circular by HKEX;

(g)     dispatch of circular and notice of an extraordinary general meeting of CEG to shareholders of CEG to approve, among other things, the issuance of the CEG MCBs and the issuance of the new CEG Shares upon conversion of the CEG MCBs;

(h)     submission of application for and obtaining the listing approval by the Listing Committee of the HKEX for the listing of, and the permission to deal in, the new CEG Shares to be issued under the CEG MCBs;

(i)     approval by the shareholders of CEG at the extraordinary general meeting for the issuance of the CEG MCBs;

(j)     publication of poll result announcement of the extraordinary general meeting of CEG; and

(k)     any required governmental or regulatory approval, filings or registration (including but not limited to any procedures required by the NDRC in connection with the issuance of the New Instruments) in connection with the Restructuring and with respect to the execution, delivery or performance of the Restructuring Documents under any applicable PRC laws, regulations, orders and decrees of any PRC Governmental Entities has been obtained and made. This condition is unable to be waived;

5.     **MIPs:**

(a)     the formulation of a management incentive plan with EVPS Management following consultation with the AHG Advisors; and

(b)     the formulation of a management incentive plan with NEV Management following consultation with the AHG Advisors.

6.     **Payment of fees:**

(a)     settlement of all professional fees associated with the Restructuring that the Company has agreed to pay and that have been duly invoiced to the Company namely (i) the AHG Legal Fees and the AHG Financial Advisor Fees, (ii) the fees, costs and expenses of all of its Affiliates, the Advisors, the Information Agent, the Scheme Administrators, the Holding Period Trustee, (ii) the fees, costs and expenses of the Existing Notes Trustee, the Existing Notes Collateral Agent, the Existing Notes Depositary, the Existing Notes Paying and Transfer Agent and Registrar, and (iii) the fees, costs and expenses of the New Instruments Depositary, the New Instruments Paying and Transfer Agent and Registrar, the New Instruments Trustee and the Collateral Agent; and

(b)     payment in full of the AHG Work Fee (subject to the AHG Work Fee Letter).

7.     **Other conditions:**

(a)     the receipt of written confirmation from (A) Kirkland & Ellis (on behalf of the CEG AHG); and (B) Sidley Austin (on behalf of CEG) that each Restructuring Document is in Agreed Form;

(b)     the execution of all necessary corporate authorizations to implementation of the Restructuring and entry into the relevant Restructuring Documents by the relevant parties thereto (not otherwise included in (1)-(6) above);

(c)     the satisfaction of each of the specific conditions precedent contained in each of the Restructuring Documents (in each case in the Agreed Form) and any corporate governance term sheet forming part of the Explanatory Statement (as and to the extent applicable).

**SCHEDULE 4**

**EXISTING NOTES SUBSIDIARY GUARANTORS**

1.    Anji (BVI) Limited;

2.    Billion Mark Limited;

3.    Fengyu (BVI) Limited;

4.    Full Hill Limited;

5.    Goldbridge Limited;

6.    Honour Oasis Limited;

7.    Jiading Holdings Limited;

8.    Jiajian (BVI) Limited;

9.    Jiaying Holdings Limited;

10.    Jiayu Holdings Limited;

11.    Pyramid Wealth Holdings Limited;

12.    Value Depot Holdings Limited; and

13.    Yitong (BVI) Limited.

## SCHEDULE 5

## COURT ORDER



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

In Chambers
25 July 2023
Before the Honourable Justice Kawaley

CAUSE NO: FSD 89 OF 2023 (IKJ)

**IN THE MATTER OF SECTION 86 OF THE COMPANIES ACT (2023 REVISION)**

**AND**

**IN THE MATTER OF CHINA EVERGRANDE GROUP**

---

**ORDER**

---

**UPON** the application of China Evergrande Group (the "**Company**") by its summons dated 12 April 2023, and its further summons dated 18 July 2023 (the "**Further Summons**")

**AND UPON** reading the petition dated 12 April 2023 (the "**Petition**"), and the amended petition dated 18 July 2023 attached to the Further Summons (the "**Amended Petition**")

**AND UPON** reading the First Affirmation of Hui Ka Yan, the First Affirmation of Jacqueline Yorke, the First Affidavit of Damian Watkin, the First Affirmation of Cheng Chung Hon, the First Affirmation of Rajan Menon Smitha, the First Affidavit of Rachel Catherine Baxendale and the exhibits thereto

**AND UPON** hearing Leading Counsel for the Company and Leading Counsel for the CEG AHG

This ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103)

**AND UPON** the basis that all capitalised terms not otherwise defined in this Order shall have the meaning given to them in the draft scheme of arrangement (the "**Scheme**") and the draft explanatory statement in relation to the Scheme (the "**Explanatory Statement**"), in the form exhibited in Exhibit HKY-1 to the First Affirmation of Hui Ka Yan

**AND IT IS HEREBY ORDERED AND DIRECTED THAT**:

1    The Company has leave to amend the Petition in the terms set out in the Amended Petition annexed to this Order.

2    The Company has permission to convene one meeting of the Class A Scheme Creditors (the "**Class A Cayman Scheme Meeting**") and one meeting of the Class C Scheme Creditors (the "**Class C Cayman Scheme Meeting**") (each a "**Scheme Meeting**") each for the purpose of considering and, if thought fit, approving (with or without modification) the Scheme.

3    The Class A Cayman Scheme Meeting will take place at 7:45am (Cayman Islands time) / 8:45pm (Hong Kong time) (or, if later, as soon as the Class A scheme meeting for the Company's Hong Kong scheme of arrangement has concluded) on 23 August 2023 at the offices of Sidley Austin LLP at 39/F, Two International Finance Centre, 8 Finance St, Central, Hong Kong.

4    The Class C Cayman Scheme Meeting will take place at 9:15am (Cayman Islands time) / 10:15pm (Hong Kong time) (or, if later, as soon as the Class C scheme meeting for the Company's Hong Kong scheme of arrangement has concluded) on 23 August 2023 at the offices of Sidley Austin LLP at 39/F, Two International Finance Centre, 8 Finance St, Central, Hong Kong.

5    Attendance and voting at the Scheme Meetings will also be possible by video conference, using details which will be published on the Transaction Website at least 21 days before the day appointed for the Scheme Meetings and the meeting passcode notified to Scheme Creditors who are not Blocked Scheme Creditors by the Information Agent at least 2 business days before the day appointed for the Scheme Meetings.

This ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103)

6    GLAS Specialist Services Limited ("**GLAS**") will provide Blocked Scheme Creditors with the details of how to attend and vote at the Scheme Meetings as soon as reasonably practicable once the Company becomes aware of any such creditor and will notify such Blocked Scheme Creditors of the meeting passcode at least 2 business days before the day appointed for the Scheme Meetings.

7    The Chairperson (as defined in paragraph 17 below) may require Scheme Creditors attending the Scheme Meetings by video conference to turn on their camera throughout the Scheme Meetings and to log on to the video conference using their full name (as registered with the Information Agent) and the creditor identifier number provided to them by the Information Agent prior to the Scheme Meetings.

8    The Company has permission to set a record time of 4:00 a.m. (Cayman Islands time) / 5:00 p.m. (Hong Kong time) on 18 August 2023 (the "**Voting Record Time**") for the purpose of determining each Scheme Creditor's Voting Scheme Claim. The Voting Scheme Claims as at the Voting Record Time determine the number of votes to be assigned to a Scheme Creditor when voting on the Scheme at the applicable Scheme Meeting.

9    The Company has permission to set the Voting Record Time as the latest time by which (a) the Information Agent must receive a valid Non-Blocked Scheme Creditor Form (as defined in paragraph 14.1 below) from Scheme Creditors who are not Blocked Scheme Creditors, and (b) GLAS must receive a valid Blocked Scheme Creditor Form (as defined in paragraph 14.2 below) from Blocked Scheme Creditors in order for the Scheme Creditors' voting instructions to be taken into account for the purposes of the Scheme Meetings.

10    Notice of the Scheme Meetings ("**Scheme Meetings Notice**") shall be given to Scheme Creditors not less than 21 days before the Scheme Meetings:

(a)    by the Information Agent posting the notice on the Transaction Website;

(b)    by announcement on the HKEXnews website of The Stock Exchange of Hong Kong Limited;

(c)    by announcement on the website of the Singapore Exchange Limited;

This ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103)

(d)    by advertisement in newspapers in Hong Kong (The Standard and Hong Kong Economic Times) and the People's Republic of China (Securities Times and Nanfang Daily);

(e)    for certain Scheme Creditors identified in the First Affidavit of Damian Watkin, by the Information Agent giving notice through the Clearing Systems in accordance with the procedures described therein; and

(f)    by the Information Agent sending the notice via email to each person who the Company believes is or may be a Scheme Creditor (other than Blocked Scheme Creditors), and for whom the Company has a valid e-mail address.

11    GLAS will give a Schemes Meeting Notice to any Blocked Scheme Creditors by email (i) not less than 21 days before the Scheme Meetings to the extent the Company is aware of any Blocked Scheme Creditors and their email addresses at that time; or (ii) as soon as reasonably practicable after the Company becomes aware of the existence of a Blocked Scheme Creditor and their email details.

12    The Scheme Meetings Notice shall be in substantially the same form as appended to the Explanatory Statement exhibited in Exhibit HKY-1 to the First Affirmation of Hui Ka Yan.

13    When distributing the Scheme Meetings Notice in accordance with paragraphs 10 and 11 above, the Information Agent (or GLAS, in the case of Blocked Scheme Creditors) shall also include a copy of the final form of the Explanatory Statement (or a link to the Transaction Website where it and other relevant documents can be accessed), which contains, amongst other things, the Scheme at Schedule 4.

14    On the same date as distributing the Scheme Meetings Notice in accordance with paragraph 10 above, the Information Agent shall post a Solicitation Packet including:

14.1    the Account Holder Letter, Class A Private Lender Proxy Form, and Class C Scheme Creditor Proxy Form (each a "**Non-Blocked Scheme Creditor Form**"), including the forms of proxy and appendices contained therein; and

14.2    the "**Blocked Scheme Creditor Form**", including the form of proxy contained therein,

This ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103)

on the Transaction Website together with copies of any other relevant documents.

15    The final form of the Explanatory Statement and its schedules shall be substantially in the form exhibited in Exhibit HKY-1 to the First Affirmation of Hui Ka Yan (save for where the schedules were not available at the time of the First Affirmation of Hui Ka Yan).

16    The accidental omission to serve any Scheme Creditor with the Scheme Meetings Notice, or the non-receipt by any Scheme Creditor of the Scheme Meetings Notice, shall not invalidate the proceedings at the Scheme Meetings.

17    Patrick Cowley of KPMG, in his capacity as Scheme Administrator, or, failing that, another representative of KPMG nominated by him, be appointed Chairperson of the Scheme Meetings ("**Chairperson**") on behalf of the Company.

18    The Chairperson be entitled to accept, without further investigation, the signature on any Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable, as being genuine and as authority of the signatory to cast the votes in accordance with the instructions outlined in the Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable, and the Solicitation Packet.

19    The Chairperson be responsible for determining, in accordance with the relevant provisions in the Explanatory Statement, the Voting Scheme Claim of any Scheme Creditor and the validity of the appointment of any person permitted to act as proxy for a Scheme Creditor by reference to the information provided in each Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable.

20    The Chairperson be at liberty to accept any Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable, and the amount of a Voting Scheme Claim in respect of which a Scheme Creditor seeks to vote, notwithstanding that such form has not been completed or submitted in accordance with any instructions contained therein or has been submitted after the Voting Record Time, provided that the Chairperson considers that the information contained therein is sufficient to establish that Scheme Creditor's Voting Scheme Claim.

This ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103)

21      Any person validly appointed as proxy for a Scheme Creditor in accordance with the instructions set out in the Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable, and the Solicitation Packet may attend and speak at the Class A Cayman Scheme Meeting or the Class C Cayman Scheme Meeting, as applicable.

22      The Chairperson be at liberty to adjourn either or both of the Scheme Meetings, or terminate either or both of the Scheme Meetings and adjourn to a later date, in their sole discretion provided that, if adjourned, the Scheme Meeting(s) will recommence as soon as reasonably practicable thereafter. In the event that the Chairperson considers in their sole discretion that it is necessary or appropriate to adjourn either or both of the Scheme Meetings, the Company shall cause the Scheme Creditors to be notified that there is an adjournment of the Scheme Meeting(s) and as to the time of the adjourned Scheme Meeting(s) as soon as practicable and in the same manner as notice was given to the Scheme Creditors pursuant to paragraph 10.

23      The Chairperson be permitted to declare and announce the results of the Scheme Creditors' votes in respect of the Scheme, either during the Scheme Meetings or as soon as reasonably possible after the conclusion of the Scheme Meetings.

24      Within seven days after the Scheme Meetings have been held, the Company must file an affidavit sworn by the Chairperson verifying that notice was duly sent in accordance with this Order; that the Scheme Meetings were duly held; and giving particulars of the results.

25      The Petition (as amended pursuant to paragraph 1) be listed to be heard on 1 September 2023 at 10am (Cayman Islands time).

This ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103)

26      There be liberty to apply generally.

DATED this 25  day of July 2023

FILED this 26  day of July 2023

**The Honourable Justice Kawaley**
**JUDGE OF THE GRAND COURT**

This ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103)

## ANNEXURE 1: AMENDED PETITION

This ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103)



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

<div align="right">

**CAUSE NO: FSD 89 OF 2023 (IKJ)**

</div>

**IN THE MATTER OF SECTION 86 OF THE COMPANIES ACT (2023 REVISION)**
**AND**

**IN THE MATTER OF CHINA EVERGRANDE GROUP**

---

<div align="center">

**AMENDED PETITION**

</div>

---

**To the Grand Court**

This humble amended petition (the "**Amended Petition**") of China Evergrande Group (the "**Scheme Company**" or "**CEG**"), of PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, shows that:

**INTRODUCTION**

1      The Scheme Company was incorporated in the Cayman Islands under the Companies Act (2023 Revision) (the "**Companies Act**") on 26 June 2006 as an exempted company with

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)

FSD2023-0089    Page 10 of 40    2023-07-26

limited liability (registration number 169971).

2       The Scheme Company's registered office is at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.

3       The Scheme Company envisages proposing entry into a scheme of arrangement (the "**Scheme**") between ~~it and certain of its creditors~~ the Class A Scheme Creditors and Class C Scheme Creditors (defined in paragraphs 36 and 41 respectively) (together, the "**Scheme Creditors**") pursuant to section 86 of the Companies Act. The object of this Amended Petition is to seek the sanction of this Honourable Court pursuant to section 86 of the Companies Act of the Scheme between the Scheme Company and its Scheme Creditors. A copy of the Scheme will be exhibited to an affirmation made by a director or an authorised representative of the Scheme Company (the "**Company Affirmation**"), which will be filed with this Honourable Court.

4       A scheme of arrangement in effectively identical terms as the Scheme will also be filed with the High Court of Hong Kong (the "**Hong Kong Scheme**", and together with the Scheme, the "**Schemes**"), and implementation of the Scheme will be linked to and inter-conditional upon the court approval to the Hong Kong Scheme and vice versa. ~~The Scheme Company anticipates amending this Petition in good time prior to the first hearing in these proceedings, so as to include such further details as are necessary and appropriate.~~

**THE SCHEME COMPANY**

5       The Scheme Company was incorporated in the Cayman Islands under the name "Evergrande Real Estate Group Limited".

6       At an Annual General Meeting of the shareholders of the Scheme Company held on 16 June 2016, a special resolution was passed providing that the Scheme Company's name be

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/~~7414214~~675109215)                                  2

FSD2023-0089    Page 10 of 40    2023-07-26
Page 2 of 52

changed from "Evergrande Real Estate Group Limited" to "China Evergrande Group".

7    The shares of the Scheme Company have been listed on the main board of the Stock Exchange of Hong Kong ("**SEHK**") since 5 November 2009, with Stock Code 3333. Trading in the Scheme Company's shares was suspended on 21 March 2022 and remains suspended as at the date of this Amended Petition.

8    As at the date of this Amended Petition, the Scheme Company has 13,204,300,900 shares in issue, all of which are fully paid up. The authorised share capital of the Scheme Company is US$1,000,000,000 divided into 100,000,000,000 shares of a nominal or par value of US$0.01 each.

9    The objects for which the Scheme Company was established are unrestricted as set out in its Amended and Restated Memorandum and Articles of Association (which were adopted on 21 June 2016).

**BUSINESS OF THE GROUP**

10   The Scheme Company is the ultimate holding company of a group of approximately 3,500 companies (together, the "**Group**"). The Scheme Company also serves as one of the main financing platforms for the Group outside the People's Republic of China (the "**PRC**", which for the purpose of this Amended Petition does not include Hong Kong Special Administrative Region ("**Hong Kong SAR**"), Macau Special Administrative Region or Taiwan), raising offshore capital to support its subsidiaries' operations through capital investment and shareholder loans.

11   The Group is headquartered in Guangzhou, PRC. The Group is principally engaged in property development, property investment and property management in the PRC. The Group's business operations are primarily based in the PRC, where the majority of the Group's assets

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)    3

– which are property development projects – are located. The Group companies are incorporated in the PRC, the British Virgin Islands (the "**BVI**"), the Cayman Islands, Hong Kong SAR, and Bermuda. A summary of the Group's three key business segments is set out below:

11.1    Property development business: The property development business is the main business line of the Group. Most of the Group's property development projects are directly or indirectly owned by Hengda Real Estate Group Co Ltd ("**Hengda**", a PRC-incorporated company), while Tianji Holding Limited ("**Tianji**") – another subsidiary of the Scheme Company – also holds equity interests in approximately 30 projects located in the PRC. As at the date of this Amended Petition, Hengda is the 100% controlling shareholder of Tianji, and the Scheme Company indirectly holds approximately a 60% equity interest in Hengda.

11.2    Property management business: The property management business of the Group is operated through Evergrande Property Services Group Limited ("**EVPS**", a Cayman Islands incorporated company). EVPS provides property management services primarily to real estate projects developed by the Group's property development business. EVPS has also been contracted to manage other types of properties such as theme parks, industrial parks, healthcare complexes, themed towns and schools, among others. EVPS has been listed on the SEHK since 2 December 2020, with Stock Code 6666, however trading in EVPS' shares was suspended on 21 March 2022, and remains suspended as at the date of this Amended Petition. The Scheme Company holds a 51.6% equity interest in EVPS as at the date of this Amended Petition.

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)    4

11.3    New energy vehicle and battery business: China Evergrande New Energy Vehicle Group Limited ("**NEV**", a Hong Kong incorporated company) conducts the Group's new energy vehicle and battery businesses. NEV is also listed on the SEHK under Stock Code 0708, however trading in NEV's shares was suspended on 1 April 2022, and remains suspended as at the date of this Amended Petition. The Scheme Company holds a 58.5% equity interest in NEV as at the date of this Amended Petition.

**THE FINANCIAL POSITION OF THE SCHEME COMPANY AND THE GROUP**

*Assets*

12    As the ultimate holding company of the Group, the Scheme Company's principal assets are its ownership interests in its subsidiaries. All other companies in the Group are, directly or indirectly, either wholly owned, or controlled and majority-owned, by the Scheme Company. The Scheme Company has no other material assets.

13    As at 31 December 2022, on a standalone basis the Scheme Company's total current assets were approximately RMB 98.8 billion (US$ 14.32 billion) and total non-current assets (consisting primarily of property, plant and equipment) were approximately RMB 1 million (US$ 0.14 million).  Key items of the Scheme Company's current assets include the following:

13.1    amounts due from subsidiaries of approximately RMB 98.4 billion (US$ 14.27 billion); and

13.2    other receivables of approximately RMB 0.4 billion (US$ 0.06 billion).

14    At the Group level, the current assets of the Group on a consolidated basis as at 31 December 2022 amounted to approximately RMB 1,665.2 billion (US$ 241.41 billion).  This includes:

14.1    trade and other receivables of approximately RMB 228.9 billion (US$ 33.18 billion);

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)    5

14.2   properties under development for sale of approximately RMB 1,136.1 billion (US$ 164.7 billion); and

14.3   properties held for sale of approximately RMB 102.9 billion (US$ 14.92 billion).

15   The majority of the Group's current assets cannot be collected or converted into cash immediately. As at 31 December 2022, these assets were located in the PRC and certain of the assets were pledged to secure certain banking and other facilities granted to the Group and mortgage loans granted to buyers of sold properties.

16   As at 31 December 2022, the Group's non-current assets totalled approximately RMB 173.2 billion (US$ 25.11 billion). This includes:

16.1   property, plant and equipment of approximately RMB 56.4 billion (US$ 8.18 billion);

16.2   investment properties of approximately RMB 63.1 billion (US$ 9.15 billion); and

16.3   other investments accounted for using the equity method of approximately RMB 25.9 billion (US$ 3.75 billion).

**_Liabilities_**

17   As at 31 December 2022, the Scheme Company's total liabilities were approximately RMB 198.3 billion (US$ 28.75 billion), which include:

17.1   current borrowings of RMB 2.3 billion (US$ 0.33 billion);

17.2   non-current borrowings of RMB 99.6 billion (US$ 14.4 billion);

17.3   amounts due to subsidiaries of RMB 94.8 billion (US$ 13.74 billion); and

17.4   dividend payable of RMB 1.7 billion (US$ 0.25 billion).

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)                          6

18    The Scheme Company is insolvent. As outlined later in this Amended Petition from paragraph 21, it was unable to repay certain sums due under the Existing Notes and remains unable to do so.

19    At the Group level, as at 31 December 2022, the Group had total indebtedness of RMB 2,437.4 billion (US$ 353.35 billion), primarily including:

19.1    current borrowings of RMB 587.1 billion (US$ 85.11 billion);

19.2    non-current borrowings of RMB 25.3 billion (US$ 3.67 billion);

19.3    trade and other payables of RMB 1,002.3 billion (US$ 145.31 billion);

19.4    contract liabilities of RMB 721 billion (US$ 104.52 billion);

19.5    deferred income tax liabilities of RMB 47.9 billion (US$ 6.94 billion); and

19.6    other payable of RMB 11.3 billion (US$ 1.64 billion).

20    Certain of the Scheme Company's major offshore and onshore liabilities (excluding its intercompany liabilities) are proposed to be restructured by way of the Scheme. Those liabilities are detailed in paragraphs 29, 34, 37 and 38 of this Amended Petition.

## BACKGROUND TO THE RESTRUCTURING

21    Since the second half of 2021, the Scheme Company's transactions in the domestic PRC real estate market have slipped, and the area sold and amount of sales have drastically reduced, and the overall scale of financing continued to shrink. The Group has also experienced a noticeable decline in its aggregate contracted sales. Against the backdrop of these adverse market conditions, the Group has also experienced liquidity pressures due to limited access to offshore capital to refinance its existing indebtedness and reduced cash generated from sales.

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)          7

22      Notwithstanding the Group's efforts, some of the Scheme Company's debts became overdue, which led to a significant drop in sales, and further limited the Scheme Company's access to financing. As a result of this increased financial pressure, the Scheme Company has defaulted on several obligations, in particular:

   (a)   The Scheme Company's liquid assets have been insufficient to pay the outstanding principal and interest owing under the Existing Notes and the Class A Private Loan (defined below at paragraph 34);

   (b)   The Scheme Company has failed to comply with a demand to perform its obligations under a guarantee in the amount of approximately US$ 260 million regarding the Lake Notes (defined below at paragraph 38.1), which itself constituted events of default under the indentures governing the Existing Notes; and

   (c)   The Scheme Company has since ceased to make payments for the principal and interest amounts due under the Existing Notes and the Class A Private Loan.

23      There have been other payment defaults, cross defaults and/or other events in relation to the Class C Debts (defined below at paragraph 37). Further, certain creditors of Class C Debts have sought to enforce the relevant security, including by appointing receivers and/or enforcing share charges, as provided for under the relevant transaction documents. The Scheme Company and other obligors under the Class C Debts have not made full payment of all outstanding principal, interest and other amounts due under such Class C Debts.

24      Since 2021, several enforcement actions, including court proceedings and arbitration proceedings, have been taken by various parties against the Scheme Company or other members of the Group. In particular, winding up proceedings were commenced against the

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)          8

Scheme Company in the Hong Kong High Court (HCCW 220 of 2022), by Top Shine Global Limited in respect of its investment in Fangchebao Group Co. Ltd, a company within the Group. The proceedings were filed on 24 June 2022 in connection with a debt of HK$ 862.5 million (approximately US$ 110.39 million). At the latest hearing held on 20 March 2023, the Honourable Madam Justice Linda Chan approved the Scheme Company's application to adjourn the winding up petition until 31 July 2023. At that next hearing, the Scheme Company intends to seek a further adjournment to allow sufficient time for the Schemes to progress and become effective.

25    The above events of default and enforcement actions, as well as other enforcement actions taken against the Scheme Company and other members of the Group, will be further explained in the Company Affirmation.

26    During this period, the Group has been actively engaging with its customers, suppliers, creditors and shareholders to stabilise its credit lines and day-to-day operations. The Group has launched online sales of its development properties, offering significant discounts and advertising heavily, and has also taken steps to dispose of or restructure a number of its assets to alleviate the Group's working capital pressure. It has also reduced capital expenditure and other expenses such as management remuneration, and commenced discussions with an ad hoc group of certain Scheme Creditors to explore a restructuring plan that will support an orderly recovery of the Group's operations and maximise returns for all stakeholders.

27    As at the date of this Amended Petition:

27.1    Class A Noteholders and Class A Lenders (both defined below at paragraph 35) holding approximately 86.44% of the aggregate outstanding principal amount of the Class A Debts (defined below at paragraph 28.1) have entered into, or acceded to, a Restructuring Support Agreement in respect of the Class A Debts (the "**Class A RSA**"),

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)    9

FSD2023-0089
FSD2023-0089
Page 18 of 49
Page 10 of 52
2023-07-26
2023-07-18

which appended a term sheet setting out the terms of the proposed restructuring (the "**Restructuring**").

27.2 Noteholders and lenders holding approximately 39.60% of the aggregate outstanding principal amount of the Class C Debts have entered into, or acceded to, a Restructuring Support Agreement in respect of the Class C Debts (the "**Class C RSA**", together with the Class A RSA, the "**RSAs**"), which appended a term sheet setting out the terms of the Restructuring.

## TYPES OF DEBTS SUBJECT TO THE SCHEME

28    The Scheme relates to the compromise of debts owed and/or guaranteed by the Scheme Company, which are split into two classes:

28.1    The "**Class A Debts**", which comprise the Existing Notes and the Class A Private Loan; and

28.2    The "**Class C Debts**", which comprise the debts set out below at paragraph 37 and in Schedule 1 to this Amended Petition

(together, the "**Existing Debts**").

## CLASS A DEBTS

29    The Scheme Company has issued certain senior notes or convertible bonds which are – subject to paragraph 30 of this Amended Petition – publicly traded on the Singapore Stock Exchange ("**SGX**"), and which are listed in the table below (together, the "**Existing Notes**").

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)                    10

FSD2023-0089
FSD2023-0089
Page 18 of 49
Page 10 of 52
2023-07-26
2023-07-18

FSD2023-0089
Page 19 of 40
2023-07-26
FSD2023-0089
Page 11 of 32
2023-07-18

| Notes | Outstanding Principal | Interest Rate (per annum) | Maturity Date |
|---|---|---|---|
| a) CEG Existing January 2022 Notes (ISIN: XS1991102846, Common Code: 19911028) | US$ 300 million | 9.5% | 30 January 2022 |
| b) CEG Existing March 2022 Notes (ISIN: XS1580431143, Common Code: 158043114) | US$ 2,022 million | 8.25% | 23 March 2022 |
| c) CEG Existing April 2022 Notes (ISIN: XS1982036961, Common Code: 198203696) | US$ 1,450 million | 9.5% | 11 April 2022 |
| d) CEG Existing January 2023 Notes (ISIN: XS2106834299, Common Code: 210683429) | US$ 998.8 million | 11.5% | 22 January 2023 |
| e) CEG Existing February 2023 Bonds (ISIN: XS1767800961, Common Code: 176780096) | HK$ 81 million (US$ 10.37 million) | 4.25% | 14 February 2023 |
| f) CEG Existing April 2023 Notes (ISIN: XS1982037779, Common Code: 198203777) | US$ 834.2 million | 10.0% | 11 April 2023 |

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)    11

FSD2023-0089
Page 19 of 40
2023-07-26
FSD2023-0089
Page 11 of 32
2023-07-18

FSD2023-0089
FSD2023-0089
Page 20 of 40
Page 12 of 32
2023-07-26
2023-07-18

| | | | |
|---|---|---|---|
| g) CEG Existing June 2023 Notes (ISIN: XS1627599498, Common Code: 162759949) | US$ 1,331.5 million | 7.5% | 28 June 2023 |
| h) CEG Existing January 2024 Notes (ISIN: XS2106834372, Common Code: 210683437) | US$ 995 million | 12.0% | 22 January 2024 |
| i) CEG Existing March 2024 Notes (ISIN: XS1587867539, Common Code: 158786753) | US$ 951 million | 9.5% | 29 March 2024 |
| j) CEG Existing April 2024 Notes (ISIN: XS1982040641, Common Code: 198204064) | US$ 690.8 million | 10.5% | 11 April 2024 |
| k) CEG Existing June 2025 Notes (ISIN: XS1627599654, Common Code: 162759965) | US$ 4,649.2 million | 8.75% | 28 June 2025 |

30    The CEG Existing January 2022 Notes listed above at (a) have never been listed on the SGX.

31    The Existing Notes are guaranteed by certain direct and indirect subsidiaries of the Scheme Company (the "**CEG Subsidiary Guarantors**"). The CEG Subsidiary Guarantors are incorporated under the laws of the Cayman Islands, the BVI or Hong Kong. Further, the shares of the CEG Subsidiary Guarantors held by the Scheme Company or by other CEG Subsidiary Guarantors are pledged for the benefit of the Class A Noteholders to secure the Scheme Company's payment obligations under the Existing Notes (the "**Subsidiary Pledges**").

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)          12

FSD2023-0089
FSD2023-0089
Page 20 of 40
Page 12 of 32
2023-07-26
2023-07-18

However, the Subsidiary Pledges have no material value as each of the relevant subsidiary companies is insolvent.

32    Each of the Existing Notes indentures or trust deed (as applicable) are governed by the laws of the state of New York, except for the CEG Existing February 2023 Bonds, which are governed by English law.

33    Interest payments are payable by the Scheme Company pursuant to the terms of the Existing Notes indentures or trust deed, and interest payments are generally made semi-annually.

34    In addition to the Existing Notes, the Scheme Company (together with its subsidiary, Treasure Glory Global Limited) entered into a US$ 100,000,000 15% loan due July 2022 (the "**Class A Private Loan**"). The Class A Private Loan is also guaranteed by the CEG Subsidiary Guarantors. It is not publicly traded or listed on any exchange. The Scheme Company originally granted a Hong Kong law governed pledge over the shares in Treasure Glory Global Limited for the Scheme Company's liability under the Class A Private Loan. However, this pledge has since been enforced and the creditor's appointed security agent has become the registered shareholder.

35    In this Amended Petition:

35.1    the persons with an economic or beneficial interest as principal in any of the Existing Notes held in global form or global restricted form through the Clearing Systems as at the "**Voting Record Time**" (to be set by this Honourable Court) in respect of voting purposes at the Scheme Meetings (defined at paragraph 47.2 below) and/or the "**Entitlement Record Time**" (in respect of determining such persons' entitlements to Scheme Consideration (defined at paragraph 45.1 below)), each of whom has a right, upon satisfaction of certain conditions, to be issued definitive registered notes in accordance with the terms of the Existing Notes and their respective indentures or trust

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/~~7414214~~675109215)                              13

FSD2023-0089
FSD2023-0089

Page 22 of 40
Page 14 of 32

2023-07-26
2023-07-18

deed (as applicable), and (but without double counting in each case) the depositary and trustee of the Existing Notes, are referred to as "**Class A Noteholders**"; and

35.2    the persons with a legal interest as principal in the Class A Private Loan as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of determining such persons' entitlements to Scheme Consideration) are referred to as "**Class A Lenders**".

36    Together, the Class A Noteholders and the Class A Lenders comprise the "**Class A Scheme Creditors**".

## CLASS C DEBTS

37    The "**Class C Debts**" are the offshore financial unsecured indebtedness, obligations and other liabilities owed by the Scheme Company listed in Schedule 1 to this Amended Petition, all of which are governed by either Hong Kong law or PRC law.  There are 117 Class C Debts, and the approximate total principal outstanding on these Class C Debts, as at 31 December 2022, is US$ 13.445 billion.

38    The Class C Debts include, inter alia, the following:

38.1    a guarantee in relation to US$ 260 million senior notes issued by Jumbo Fortune Enterprises Limited (the "**Lake Notes**");

38.2    a guarantee in relation to US$ 424 million senior notes issued by Great Courage Global Limited (the "**Dongpo Notes**"); and

38.3    a put option in relation to RMB 8.2 billion (US$ 1.19 billion) corporate bonds issued by Hengda (the "**RMB Bonds**").

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)                    14

FSD2023-0089
FSD2023-0089

Page 22 of 40
Page 14 of 32

2023-07-26
2023-07-18

39    Each of the Class C Debts is guaranteed and/or secured or benefits from another type of credit support by various different Group (and some cases, non-Group) entities.

40    In this Amended Petition:

40.1    the persons with an economic or beneficial interest as principal in the Dongpo Notes or Lake Notes held in global form or global restricted form through the Clearing Systems as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of determining such persons' entitlements to Scheme Consideration), each of whom has a right, upon satisfaction of certain conditions, to be issued definitive registered notes in accordance with the terms of the Dongpo Notes or the Lake Notes (as applicable) and their respective trust deeds, and (but without double counting in each case) any depositary or trustee of the Dongpo Notes or the Lake Notes, are referred to as "**Dongpo Noteholders**" and "**Lake Noteholders**" respectively, or together the "**Class C Noteholders**"; and

40.2    the persons with a legal interest as principal in any other Class C Debts (excluding the Dongpo Notes and the Lake Notes but including the RMB Bonds) as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of determining such persons' entitlements to Scheme Consideration), and (but without double counting) the arranger, trustee, security agent, principal paying agent, transfer agent and registrar of the Dongpo Notes, the notes trustee, security trustee, settlement agent, principal agent, transfer agent, calculation agent, registrar, and original account bank in respect of the Lake Notes, the trustee of the RMB Bonds, and certain other facility and security agents in respect of certain other Class C Debts, are referred to as "**Other Class C Scheme Creditors**".

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/~~7414214~~675109215)    15

41    Together, the Class C Noteholders and the Other Class C Scheme Creditors comprise the "**Class C Scheme Creditors**".

## OBJECTS AND MECHANICS OF THE SCHEME AND THE RESTRUCTURING

42    The purpose of the Restructuring is threefold:

42.1    To avoid the Scheme Company and other members of the Group potentially entering into insolvent liquidation in the near future, as a result of which the anticipated recoveries for the Scheme Creditors may be significantly less than if the Restructuring were to be completed successfully;

42.2    To provide the Group with a more stable capital structure, which will enable the Group to comply with its obligations and liabilities following the Restructuring, and gradually return to stable operations; and

42.3    To increase the prospect of delivering long-term value for the Scheme Creditors and all of the other stakeholders of the Scheme Company.

43    The Restructuring is intended to be implemented through the Schemes, both of which will affect the rights of the Class A Scheme Creditors and the Class C Scheme Creditors (as applicable). In summary, pursuant to the terms of the Schemes, the Scheme Creditors will agree to release in full all claims under and in connection with the Existing Debts against the Scheme Company, the Subsidiary Guarantors, their respective affiliates and personnel, and other persons in return for receiving (or being entitled to receive) certain consideration (the "**Scheme Consideration**").

44    For the purposes of voting at the Scheme Meetings, all Scheme Creditors will have their claims admitted at the full value of the relevant Class A Debt or Class C Debt – therefore, unlike the manner in which their entitlement to Scheme Consideration will be determined, a Class C

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)    16

Scheme Creditor's claims for voting purposes will not be assessed on a "deficiency basis" (which is described at paragraph 45.5 below). Any such claims will be admitted without double counting, and without permitting duplicative claims or portions of claims against the Scheme Company other than for US$1, and in any event subject to the discretion of the chairperson of the Scheme Meetings.

45    The Scheme Consideration to which a Scheme Creditor may be entitled depends upon the class of debt being schemed:

*Class A*

45.1    Class A Scheme Creditors will be entitled to elect one of two options in receiving Scheme Consideration under the Schemes:

(a)    Under Option 1, Class A Scheme Creditors can elect to receive new notes to be issued by the Scheme Company at a 1:1 conversion ratio of their entitlement to Scheme Consideration (the "**A1 Notes**"). The A1 Notes will comprise three tranches, with a tenor of 10 to 12 years, and will be repaid over time at interest rates of between 2.0% p.a. and 3.0% p.a. The A1 Notes will be issued pursuant to and governed by indentures which will be governed by New York law.

(b)    Under Option 2, Class A Scheme Creditors can elect to convert their entitlements into:

(i)    New notes to be issued by the Scheme Company with a tenor of 5 to 8 years (the "**A2 Notes**");

(ii)    A package of five equity-linked instruments, which are either secured over, linked to, mandatorily exchangeable into, or mandatorily

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)          17

FSD2023-0089
FSD2023-0089
Page 26 of 40
Page 18 of 32
2023-07-26
2023-07-18

convertible into (as applicable) listed shares of the Scheme Company, EVPS or NEV (together, the "**A2 Package**"); or

(iii)     A combination of the A2 Notes, and the A2 Package,

subject to adjustment and reallocation in accordance with the terms of the Schemes.

(c)     In addition to their entitlement to Scheme Consideration under the Schemes, Scheme Creditors who elect to receive the A2 Package may also receive "**TJ Scheme Consideration**" (scheme consideration in the form of notes payable under a related, but not inter-conditional scheme of arrangement before the High Court of Hong Kong) pursuant to the terms of the Schemes.

45.2     The Scheme Consideration to which a Class A Scheme Creditor will be entitled will be distributed to the Class A Scheme Creditor pursuant to the terms of the Schemes. In summary, a Class A Scheme Creditor's entitlement to Scheme Consideration will be calculated on the basis of (i) the full outstanding principal amount (or in the case of a put option or repurchase obligation, the price amount) of the Class A Debt owed to such Class A Scheme Creditor as at the Entitlement Record Time, and (ii) the accrued and unpaid interest on such Class A Debt up to (but excluding) the earlier of 1 October 2023, and the Entitlement Record Time.

*Class C*

45.3     Class C Scheme Creditors (including the Class C Noteholders) will be entitled to elect one of two options in receiving Scheme Consideration under the Schemes:

(a)     Under Option 1, they can elect to receive new notes to be issued by the Scheme Company at a 1:1 conversion ratio of its entitlement to Scheme Consideration

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)                    18

FSD2023-0089
FSD2023-0089
Page 26 of 40
Page 18 of 32
2023-07-26
2023-07-18

(the "**C1 Notes**"). The C1 Notes will comprise three tranches, with a tenor of between 10 to 12 years, and will be repaid over time at interest rates of between 2.0% p.a. and 3.0% p.a. The C1 Notes will be issued pursuant to and governed by indentures which will be governed by New York law.

(b)     Under Option 2, they can elect to convert its entitlements into:

      (i)     New notes to be issued by the Scheme Company with a tenor of 7 to 9 years (the "**C2 Notes**");

      (ii)     A package of five equity-linked instruments, which are either secured over, linked to, mandatorily exchangeable into, or mandatorily convertible into (as applicable) listed shares of the Scheme Company, EVPS or NEV (together, the "**C2 Package**"); or

      (iii)     A combination of the C2 Notes, and the C2 Package,

      subject to adjustment and reallocation in accordance with the terms of the Schemes.

(c)     In addition to their entitlement to Scheme Consideration under the Schemes, Scheme Creditors who elect to receive the C2 Package may also receive TJ Scheme Consideration pursuant to the terms of the Schemes.

45.4     The Scheme Consideration to which a Class C Scheme Creditor (including any Class C Noteholder) will be entitled will be distributed to the Class C Scheme Creditor pursuant to the terms of the Schemes.

45.5     For the purposes of distribution, the Scheme Consideration to which a Class C Scheme Creditor (including Class C Noteholders) will be entitled shall be determined on a

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)          19

"deficiency basis" whereby the value of any such Class C Scheme Creditor's claims against any third party (i.e. any party other than the Scheme Company) in respect of the Class C Debt will be deducted from the sum of (i) the full outstanding principal amount (or in the case of a put option or repurchase obligation, the price amount) of the Class C Debt owed to such Class C Scheme Creditor as at the Entitlement Record Time, and (ii) the accrued and unpaid interest on such Class C Debt up to (but excluding) the earlier of 1 October 2023 and the Entitlement Record Time. The balance shall be the value of the Class C Scheme Creditor's entitlement to Scheme Consideration.

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/~~7414214~~675109215)    20

*Consent fee*

46    In addition to the above Scheme Consideration, the Scheme Company will, subject to certain conditions specified in the RSAs and the Scheme, pay each Scheme Creditor who complied with the consent fee provisions of the relevant RSA by the "**Consent Fee Deadline**" of 5:00pm Hong Kong time on 18 May 2023 (each a "**Participating Creditor**"), a "**Consent Fee**" in an amount equal to 0.25 per cent of the outstanding principal amount of the Existing Debts held by such Participating Creditor as of the Voting Record Time.  The Consent Fee will be paid in kind by way of new notes to be issued by the Scheme Company in connection with the Restructuring.

**ORDERS AND DIRECTIONS**

5 47    The Scheme Company intends to make an application for, among other things, orders and directions:

5.1    As to the listing for hearing of this Petition;

5.2 47.1    As to That the relevant classes of Scheme Creditors affected by the Scheme are those referred to in paragraph 3 above;

5.3 47.2    That the Scheme Company be at liberty to convene one or more two meetings of Scheme Creditors (together, the "**Scheme Meetings**") for the purpose of considering and, if thought fit, approving (with or without modification) the Scheme;

5.4    That the resolution intended to be put to the Scheme Creditors at the Scheme Meeting is:

"*THAT the Scheme of Arrangement, a copy of which has been tabled at this Scheme Meeting, be approved subject to any modification, addition or condition*

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)    21

*that the Grand Court of the Cayman Islands may think fit to approve or impose,*
*which would not directly or indirectly have a material adverse effect on the rights*
*of the Scheme Creditors*".

5.5 47.3    As to the mode of delivery of a scheme document (which includes an explanatory statement and notice of the Scheme Meetings) to the Scheme Creditors and that a record date be set for the purposes of voting at the Scheme Meetings;

5.6 47.4    As to the appointment of a chairperson of the Scheme Meetings, including directions that the chairperson report the result thereof to the Court; and

47.5    That the resolution intended to be put to the Scheme Creditors at the Scheme Meetings is:

"*THAT the Scheme of Arrangement, a copy of which has been tabled at*
*this Scheme Meeting, be approved subject to any modification, addition*
*or condition that the Grand Court of the Cayman Islands may think fit to*
*approve or impose, which would not directly or indirectly have a material*
*adverse effect on the rights of the Scheme Creditors*"; and

5.7    As to the advertisement of this Petition.

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/74142146 75109215)    22

**YOUR PETITIONER THEREFORE HUMBLY PRAYS THAT:**

(1)    The Scheme may be sanctioned by the Court so as to be binding on each party thereto in accordance with its terms.

(2)    To this end, all necessary inquiries may be made and directions may be made and given.

(3)    Such further or other relief may be granted as the Court sees fit.

Dated the 12th day of April 2023

Amended the 18th day of July 2023

*Maples and Calder (Cayman) LLP*

**Maples and Calder (Cayman) LLP**

**Attorneys-at-Law for the Scheme Company**

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)    23

## SCHEDULE 1

## CLASS C DEBTS

*All values below are for reference, indicative only, and subject to change. To the extent a balance of the principal is referred to, it is as at 31 December 2022. For items 16 to 116, the value refers to the principal amount as at 30 June 2023.*

1.  Amounts on-lent to CEG pursuant to the loan agreement relating to the provision of the Class A Private Loan

2.  CEG guarantee of the US$260 million 8.5% senior notes due October 3, 2021 (ISIN: XS2054446617, Common Code: 205444661) issued by Jumbo Fortune Enterprises Limited;

3.  CEG guarantee of the US$424 million 9.5% senior notes due January 22, 2023 (ISIN: XS2290369128, Common Code: 229036912) issued by Great Courage Global Limited;

4.  US$116 million put option granted by CEG in relation to certain Dongpo Notes;

5.  US$110 million put option granted by CEG in relation to shares of Graceful Court Limited;

6.  CEG guarantee of the HK$160 million margin loan borrowed by New Chic Global Limited;

7.  CEG guarantee of the HK$575 million put option in respect of shares of Clear Star Investments Limited;

8.  HK$1.2 billion loan borrowed by CEG due 2 January 2022;

9.  HK$600 million loan borrowed by CEG due 7 January 2022;

10. CEG guarantee of the US$20 million structured loan borrowed by Rainbow Ever Limited;

11. CEG guarantee of the US$355 million structured sale and purchase agreement of shares in Rainbow Ever Limited;

12. CEG guarantee of the HK$7.6 billion loan borrowed by Tianji pursuant to facilities agreement dated 21 November 2020;

13. US$712 million repurchase obligations of CEG in respect of Fangchebao Group Co. Ltd.;

14. Repurchase obligation of CEG in relation to the RMB Bonds;

15. CEG guarantee Guangzhou Kailong Real Estate Company Limited's RMB5 billion repurchase obligation of shares in Hengda, together with interest and costs, which was awarded in an Arbitration Award rendered by the Shenzhen Court of International Arbitration where CEG,

---

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)    24

Guangzhou Kailong Real Estate Company Limited, and the Chairman of CEG (Mr. Hui Ka Yan) were responsible for the repayment accordingly;

16.    CEG guarantee of the RMB1.29 billion loan borrowed by Tianjin Hengda Guorui New Energy Technology Co., Ltd;

17.    CEG guarantee of the RMB788 million loan borrowed by Evergrande New Energy Automotive Investment Holdings Group Co. Ltd.;

18.    CEG guarantee of the RMB664.4 million loan borrowed by Evergrande Financial Holding Group (Shenzhen) Co., Ltd.;

19.    CEG guarantee of the RMB440 million loan borrowed by Evergrande Tourism Operation Management Group Co., Ltd.;

20.    CEG guarantee of the RMB294 million loan borrowed by Evergrande New Energy Automotive Investment Holdings Group Co. Ltd;

21.    CEG guarantee of the RMB1.2676 billion loan borrowed by Zhoushan Yinyi Real Estate Development Co., Ltd.;

22.    CEG guarantee of the RMB400 million loan borrowed by Tianjin Evergrande Guorui New Energy Technology Co., Ltd (RMB227 million) and Junfang Material Equipment (Guangdong) Co., Ltd. (RMB173 million);

23.    CEG guarantee of the RMB180.5 million loan borrowed by Guiyang Evergrande Tongmeng Tiandi Tourism Development Co., Ltd.;

24.    CEG guarantee of the RMB150 million loan borrowed by Evergrande High-Tech Group Co., Ltd.;

25.    CEG guarantee of the RMB1,399,833,998 loan borrowed by Evergrande Intelligent Vehicle (Guangdong) Co., Ltd.;

26.    CEG guarantee of the RMB324,960,454.47 loan borrowed by Cangzhou Yiju Real Estate Development Co., Ltd.;

27.    CEG guarantee of the RMB85 million loan borrowed by Jurong Hengyi Tourism Development Co., Ltd.;

28.    CEG guarantee of the RMB229,989,971.35 loan borrowed by Xi'an Tianhong Tourism Development Co., Ltd.;

29.    CEG guarantee of the RMB136.5 million loan borrowed by Taicang Yutai Tourism Development Co., Ltd.;

30.    CEG guarantee of the RMB138.03 million loan borrowed by Wuhan Chushui Yunshan Agricultural Development Co., Ltd.;

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)    25

31. CEG guarantee of the RMB1.805 billion loan borrowed by Evergrande Fairyland Group Limited;

32. CEG guarantee of the RMB1.71 billion loan borrowed by Evergrande Health Industry Group Co., Ltd.;

33. CEG guarantee of the RMB1,659,649,830.75 loan borrowed by Wuhan Baden City Investment Co., Ltd.;

34. CEG guarantee of the RMB710 million loan borrowed by Yunnan Yuxing Zhongtian Real Estate Development Co., Ltd.;

35. CEG guarantee of the RMB115 million loan borrowed by Yunnan Yuxing Zhongtian Real Estate Development Co., Ltd.;

36. CEG guarantee of the RMB962.38 million loan borrowed by Hainan Boao Evergrande International Hospital Co., Ltd.;

37. CEG guarantee of the RMB296 million loan borrowed by Gui'an Xinqu Evergrande Huading Tourism Development Co., Ltd.;

38. CEG guarantee of the RMB70 million loan borrowed by Qidong Yuhao Real Estate Co., Ltd.;

39. CEG guarantee of the RMB12.54 million loan borrowed by Gui'an Xinqu Evergrande Huading Tourism Development Co., Ltd.;

40. CEG guarantee of the RMB1.13 billion loan borrowed by Guangdong Maoqi Investment Co., Ltd.;

41. CEG guarantee of the RMB650 million loan borrowed by Wuhan Baden City Investment Co., Ltd.;

42. CEG guarantee of the RMB600 million loan borrowed by Zhengzhou Hengzetong Health Real Estate Co., Ltd.;

43. CEG guarantee of the RMB450 million loan borrowed by Zhengzhou Hengzetong Health Real Estate Co., Ltd.;

44. CEG guarantee of the RMB440 million loan borrowed by Wuhan Baden City Investment Co., Ltd.;

45. CEG guarantee of the RMB350 million loan borrowed by Zhengzhou Hengzetong Health Real Estate Co., Ltd.;

46. CEG guarantee of the RMB937.106 million loan borrowed by Evergrande New Energy Vehicle (Guangdong) Co., Ltd.;

47. CEG guarantee of the RMB549 million loan borrowed by Changsha Evergrande Fairyland Tourism Development Co., Ltd.;

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)        26

48.    CEG guarantee of the RMB435 million loan borrowed by Qidong Evergrande Hot Spring City Development Co., Ltd.;

49.    CEG guarantee of the RMB214,603,797.65 loan borrowed by Hubei Hengxiang Tourism Development Co., Ltd.;

50.    CEG guarantee of the RMB150,473,333.33 loan borrowed by Shaanxi Haishen Construction Engineering Co., Ltd.;

51.    CEG guarantee of the RMB150.4 million loan borrowed by Kaifeng Kaize Tourism Development Co., Ltd.;

52.    CEG guarantee of the RMB1,638,803,164.71 loan borrowed by Kunming Jialize Tourism Culture Co., Ltd.;

53.    CEG guarantee of the RMB1.3 billion loan borrowed by Kunming Jialize Tourism Culture Co., Ltd.;

54.    CEG guarantee of the RMB1 billion loan borrowed by Yangzhong Hengrui Real Estate Co., Ltd.;

55.    CEG guarantee of the RMB176,117,602.18 loan borrowed by Evergrande Fairyland Group Limited;

56.    CEG guarantee of the RMB1,042,069,759.76 loan borrowed by Wuhan Chushui Yunshan Agricultural Development Co., Ltd;

57.    CEG guarantee of the RMB120 million loan borrowed by Chongqing Hengjin Health Industry Co., Ltd.;

58.    CEG guarantee of the RMB800 million loan borrowed by Evergrande Fairyland Group Limited;

59.    CEG guarantee of the RMB272 million loan borrowed by Guangxi Fusui Hengli Health Industry Development Co., Ltd.;

60.    CEG guarantee of the RMB203,023,644.35 loan borrowed by Wuzhou Hengmei Health Industry Co., Ltd.;

61.    CEG guarantee of the RMB410,046,058.86 loan borrowed by Hubei Herui Tourism Development Co., Ltd.;

62.    CEG guarantee of the RMB272,422,383.12 loan borrowed by Wuhan Chushui Yunshan Agricultural Development Co., Ltd;

63.    CEG guarantee of the RMB180 million loan borrowed by Evergrande Ruibo Power Technology (Shenzhen) Co., Ltd.;

64.    CEG guarantee of the RMB445,633,820.41 loan borrowed by Evergrande New Energy Technology Group Co., Ltd.;

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/~~7414214~~675109215)          27

65.    CEG guarantee of the RMB256,674,595.17 loan borrowed by China Evergrande New Energy Vehicle Investment Holding Group Limited;

66.    CEG guarantee of the RMB62.54 million loan borrowed by Meishan Longhe Tourism Development Co., Ltd.;

67.    CEG guarantee of the RMB359,472,266.26 loan borrowed by Taicang Yutai Tourism Development Co., Ltd.;

68.    CEG guarantee of the RMB381 million loan borrowed by Evergrande New Energy Technology Group Co., Ltd.;

69.    CEG guarantee of the RMB68.3 million loan borrowed by Cangzhou Yiju Real Estate Development Co., Ltd.;

70.    Guarantee in relation to RMB147.2 million loan borrowed by Nanjing Hengkang Real Estate Co., Ltd.;

71.    CEG guarantee of the RMB999 million loan borrowed by Evergrande Fairyland Group Limited;

72.    CEG guarantee of the RMB499,357,862.03 loan borrowed by Danzhou Hengle Culture Development Co., Ltd.;

73.    CEG guarantee of the RMB485,885,774.81 loan borrowed by Jurong Fairyland Tourism Development Co., Ltd.;

74.    CEG guarantee of the RMB217,198,571.40 loan borrowed by Changsha Evergrande Fairyland Tourism Development Co., Ltd.;

75.    CEG guarantee of the RMB200 million loan borrowed by Cangzhou Fairyland Tourism Development Co., Ltd.;

76.    CEG guarantee of the RMB200 million loan borrowed by Danzhou Zhiyuan Tourism Development Co., Ltd.;

77.    CEG guarantee of the RMB200 million loan borrowed by Danzhou Yibei Tourism Development Co., Ltd.;

78.    CEG guarantee of the RMB200 million loan borrowed by Danzhou Shengbang Tourism Development Co., Ltd.;

79.    CEG guarantee of the RMB388,418,616.68 loan borrowed by Qianhai Jiesuan Commercial Factoring (Shenzhen) Co., Ltd;

80.    CEG guarantee of the RMB280 million loan borrowed by Hainan Boao Evergrande International Hospital Co., Ltd.;

81.    CEG guarantee of the RMB244 million loan borrowed by Shenzhen Qianhai Xingbang Commercial Factoring Co., Ltd.;

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/~~7414214~~675109215)

28

82.    CEG guarantee of the RMB200 million loan borrowed by Hainan Hengqian Material Equipment Co., Ltd.;

83.    CEG guarantee of the RMB159,999,090.88 loan borrowed by Xi'an Changde Tourism Development Co., Ltd.;

84.    CEG guarantee of the RMB126,998,890.81 loan borrowed by Kaifeng Fairyland Development Co., Ltd.;

85.    CEG guarantee of the RMB120 million loan borrowed by Jurong Fairyland Tourism Development Co., Ltd.;

86.    CEG guarantee of the RMB64 million loan borrowed by Kaifeng Shengbang Tourism Development Co., Ltd.;

87.    CEG guarantee of the RMB11 million loan borrowed by Kaifeng Shengbang Tourism Development Co., Ltd.;

88.    CEG guarantee of the RMB98,245,776.78 loan borrowed by Guiyang Evergrande Tongmeng Tiandi Tourism Development Co., Ltd.;

89.    CEG guarantee of the RMB62,030,672.18 loan borrowed by Guiyang Evergrande Tongmeng Tiandi Tourism Development Co., Ltd.;

90.    CEG guarantee of the RMB55,104,092.72 loan borrowed by Changsha Evergrande Fairyland Tourism Development Co., Ltd.;

91.    CEG guarantee of the RMB35 million loan borrowed by Xi'an Evergrande Fairyland Tourism Development Co., Limited;

92.    CEG guarantee of the RMB35 million loan borrowed by Xi'an Evergrande Fairyland Tourism Development Co., Limited;

93.    CEG guarantee of the RMB897.5 million loan borrowed by Danzhou Jiayuan Tourism Development Co., Ltd.;

94.    CEG guarantee of the RMB386.2 million loan borrowed by Danzhou Ruifeng Tourism Development Co., Ltd.;

95.    CEG guarantee of the RMB378.4 million loan borrowed by Qidong Tongyu Real Estate Co., Ltd.;

96.    CEG guarantee of the RMB210.4 million loan borrowed by Qidong Baofeng Real Estate Co., Ltd.;

97.    CEG guarantee of the RMB85 million loan borrowed by Danzhou Dongtuo Tourism Development Co., Ltd.;

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)    29

98.   CEG guarantee of the RMB22 million loan borrowed by Danzhou Shengbang Tourism Development Co., Ltd.;

99.   CEG guarantee of the RMB710 million loan borrowed by NEV;

100.  CEG guarantee of the RMB1.4 billion loan borrowed by Hengning Health Industry Nanjing Co., Ltd.;

101.  CEG guarantee of the RMB540 million loan borrowed by Xianning Hengchen Real Estate Co., Ltd.;

102.  CEG guarantee of the RMB200 million loan borrowed by Hohhot Hengpeng Health Industry Co., Ltd.;

103.  CEG guarantee of the RMB200 million loan borrowed by Hengpeng Health Industry Liaoning Co., Ltd.;

104.  CEG guarantee of the RMB103,135,896.70 loan borrowed by Xianning Hengyang Real Estate Co., Ltd.;

105.  CEG guarantee of the RMB600 million loan borrowed by Jiangyin Hengpeng Real Estate Co., Ltd.;

106.  CEG guarantee of the RMB2,982,370,000 loan borrowed by Grandland Holding Group Co., Ltd.;

107.  CEG guarantee of the RMB2.8 billion loan borrowed by Renhe Investment Holding Co., Ltd.;

108.  CEG guarantee of the RMB2.6 billion loan borrowed by Harbin Jurong New Energy Co., Ltd.;

109.  CEG guarantee of the RMB1,734,928,916.67 loan borrowed by Sichuan Juhe Ecological Agriculture Development Co., Ltd.;

110.  CEG guarantee of the RMB2.1 billion loan borrowed by Chengdu Jiacheng Tianxia Public Facilities Co., Ltd.;

111.  CEG guarantee of the RMB1.5 billion loan borrowed by Shenzhen Construction Engineering Co., Ltd.;

112.  CEG guarantee of the RMB1 billion loan borrowed by Shenzhen Construction Engineering Co., Ltd.;

113.  CEG guarantee of the RMB480 million loan borrowed by Liaoning Donglin Reinas Co., Ltd.;

114.  CEG guarantee of the RMB336,809,471.63 loan borrowed by Shenzhen Grandland Hi-Tech New Material Co., Ltd.;

115.  CEG guarantee of the RMB110,919,594.87 loan borrowed by Liaoning Hengyang Health Real Estate Co., Ltd.;

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)                                30

116.    CEG guarantee of the RMB100 million loan borrowed by Shenzhen Grandland Hi-Tech New Material Co., Ltd; and

117.    Any other unsecured liability of CEG arising under a guarantee, indemnity, put option, repurchase obligation, judgment, arbitration, or other obligation or liability arising in connection with the liabilities of the entities identified in 16 to 116 of this Schedule.

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)          31

**ENDORSEMENT**

This Amended Petition has been presented to the Grand Court of the Cayman Islands on the        day

of April 2023 and will be heard by the Grand Court of the Cayman Islands on the                        day

of                2023 at        a.m. / p.m. in the fore/after noon (or as soon thereafter as the Amended

Petition can be heard).

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the
Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-
1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)                                32

**SCHEDULE 5**

**NOTICE OF SCHEME MEETING**

IN THE GRAND COURT OF THE CAYMAN ISLANDS

开曼群岛大法院

FINANCIAL SERVICES DIVISION

金融服务部

FSD CAUSE NO. 89 OF 2023 (IKJ)

IN THE MATTER OF SECTION 86 OF THE COMPANIES ACT (2023 REVISION)

公司法（2023 年修订版）第 86 条事宜

AND

及

IN THE MATTER OF CHINA EVERGRANDE GROUP (中國恒大集團)

中国恒大集团事宜

---

NOTICE OF SCHEME MEETINGS

协议安排会议通知

---

Unless otherwise defined herein, terms used in this Notice have the same meanings as in the explanatory statement (the "**Explanatory Statement**") relating to the proposed schemes of arrangement between China Evergrande Group (中國恒大集團) (the "**Company**") and the Scheme Creditors (as defined therein) under section 86 of the Companies Act (2023 Revision) (the "**Cayman Scheme**") and section 670 of the Companies Ordinance (Cap. 622) (the "**Hong Kong Scheme**").

除非本通知另有定义，否则本通知所使用的术语与中国恒大集团（"**公司**"）和协议安排债权人 (Scheme Creditors)（定义于说明陈述）之间根据开曼群岛公司法（2023 年修订版）第 86 条（"**开曼协议安排**"）及香港公司条例（第 622 章）第 670 条（"**香港协议安排**"）的拟议协议安排有关的说明陈述（"**说明陈述**"）的含义相同。

Copies of the Schemes, the Explanatory Statement and the Solicitation Packet (including samples of the documentation to be completed by or on behalf of Scheme Creditors in order to vote and/or receive Scheme Consideration) are available to download from the Transaction Website (https://projects.morrowsodali.com/evergrande). The scheme creditor forms (for voting purposes) are also available to download from the Company's website (www.evergrande.com).

协议安排、说明陈述和征求文件集 (Solicitation Packet) 的副本（包括由协议安排债权人或其代表完成的文件样本，以便投票和/或获得协议安排对价 (Scheme Consideration)）可从交易网站 (Transaction Website)（https://projects.morrowsodali.com/evergrande）下载。协议安排债权人的投票表格 （为投票的目的）还可从公司网站（www.evergrande.com）下载。

**NOTICE IS HEREBY GIVEN** that by orders of the Grand Court of the Cayman Islands (the "**Cayman Court**") and the High Court of the Hong Kong Special Administrative Region Court of First Instance (the "**Hong Kong Court**"), dated 25 and 24 July 2023 respectively (the "**Scheme Convening Orders**"), meetings of Scheme Creditors (the "**Scheme Meetings**") be convened for the purpose of considering and, if thought fit, approving (with or without modification) the Cayman Scheme and Hong Kong Scheme (together the "**Schemes**") proposed by the Company.

兹通知，根据开曼群岛大法院（"**开曼法院**"）及香港特别行政区高等法院原讼法庭（"**香港法院**"）分别于 2023 年 7 月 25 日及 2023 年 7 月 24 日的命令（"**协议安排召集命令**"），将召开协议安排债权人会议（"**协议安排会议**"），以审议并在认为合适的情况下批准（不论是否修改）公司提出的开曼协议安排与香港协议安排（统称为"**协议安排**"）。

**Venue, times and video conference availability for the Scheme Meetings**

**协议安排会议的方式、时间及视讯会议可行性**

The Scheme Meetings will be held on 23 August 2023 in Hong Kong at the offices of Sidley Austin at 39/F, Two International Finance Centre, 8 Finance St, Central, Hong Kong as follows:

协议安排会议将于 2023 年 8 月 23 日在香港中环国际金融中心二期 39 楼盛德律师事务所办公室于以下时间召开：

1. <u>Hong Kong Scheme – The Class A Scheme Meeting</u> will commence at 8:00 p.m. (Hong Kong time) / 7:00 a.m. (Cayman Islands time);

   <u>香港协议安排 – A 类协议安排会议</u>将于晚上 8 时（香港时间）/上午 7 时（开曼群岛时间）开始；

2. <u>Cayman Scheme - The Class A Scheme Meeting</u> will commence at 8:45 p.m. (Hong Kong time) / 7:45 a.m. (Cayman Islands time) / (or, if later, as soon as the Class A Scheme Meeting for the Hong Kong Scheme has concluded);

   <u>开曼协议安排 – A 类协议安排会议</u>将于晚上 8 时 45 分（香港时间）/上午 7 时 45 分（开曼群岛时间）/（如果晚于前述时间，则于香港协议安排 A 类协议安排会议结束后）开始；

3. <u>Hong Kong Scheme – The Class C Scheme Meeting</u> will commence at 9:30 pm (Hong Kong time) / 8:30 a.m. (Cayman Islands time); and

   <u>香港协议安排 – C 类协议安排会议</u>将于晚上 9 时 30 分（香港时间）/上午 8 时 30 分（开曼群岛时间）开始；以及

4. <u>Cayman Scheme - The Class C Scheme Meeting</u> will commence at 10:15 pm (Hong Kong time) / 9:15 a.m. (Cayman Islands time) / (or, if later, as soon as the Class C Scheme Meeting for the Hong Kong Scheme has concluded),

   <u>开曼协议安排 – C 类协议安排会议</u>将于晚上 10 时 15 分（香港时间）/上午 9 时 15 分（开曼群岛时间）/（如果晚于前述时间，则于香港协议安排 C 类协议安排会议结束后）开始，

with any adjournment as may be necessary or appropriate, and subject to applicable COVID-19 restrictions, policies or guidance then in force in Hong Kong, and in which case any changes in arrangements relating to the Scheme Meetings shall be communicated to Scheme Creditors in advance

of the Scheme Meetings on the Transaction Website, the Company's website and by a public announcement published on the HKEXnews website of The Stock Exchange of Hong Kong Limited (the "**SEHK**") and the website of the Singapore Exchange Securities Trading Limited (the "**SGX-ST**").

如有必要或合适并受限于香港届时有效的新冠疫情限制、政策或指引，会议所作的任何延期以及在该等情况下任何有关于协议安排会议安排的变化，都应当在协议安排债权人会议之前，在交易网站以及公司网站向协议安排债权人传达，并在香港联合交易所有限公司（"**SEHK**"）的披露易网站以及新加坡交易所证券交易有限公司（"**SGX-ST**"）的网站上发布公告。

A video conferencing facility will be made available. Scheme Creditors will be able to obtain the relevant dial-in details for the Scheme Meetings from the Transaction Website, and by written request from the Information Agent (if you are a Scheme Creditor who is not a Blocked Scheme Creditor), or GLAS Specialist Services Limited ("**GLAS**") (if you are a Blocked Scheme Creditor).

视讯会议设备将被设置。协议安排债权人将能够从交易网站上，以及通过信息代理人（如果您是协议安排债权人且并非受阻协议安排债权人）或通过向 GLAS Specialist Services Limited（"**GLAS**"）（如果您是受阻协议安排债权人）书面请求，获得协议安排会议的相关拨入信息详情。

Scheme Creditors who attend the Scheme Meetings in person, or by video conference, will be able to vote (and to change their vote, if they wish).

通过线下或视讯会议方式参与协议安排会议的协议安排债权人都将可以投票（或变更投票，如有意愿）。

**Methods of voting**

**投票方式**

In order to vote at the relevant Scheme Meeting, a Scheme Creditor must either vote itself (if an individual), appoint a duly authorised corporate representative (if a corporation), or appoint a proxy (which must be an individual), by validly completing, signing and submitting an Account Holder Letter, Class A Private Lender Proxy Form, or Class C Scheme Creditor Proxy Form (as applicable) to the Information Agent via the Portal. All Blocked Scheme Creditor Forms must be returned to GLAS by email at lm@glas.agency.

为在相关协议安排会议上投票，协议安排债权人必须透过有效完成，签署及通过门户网站提交账户持有人信函（Account Holder Letter）、A 类私募出借人代理表格（Class A Private Lender Proxy Form）或 C 类协议安排债权人代理表格（Class C Scheme Creditor Proxy Form）（如适用）予信息代理人以自行投票（如为个人），或委派获正式授权的公司代表（如为公司），或委派一名代理人（必须为个人）。所有受阻协议安排债权人表格都必须通过电邮发送予 GLAS 的邮箱地址：lm@glas.agency。

**Scheme Creditors are strongly encouraged to appoint a proxy (either the Chairperson or another individual of their own choice who is willing and able to attend the relevant Scheme Meeting) by indicating their choice of proxy in the relevant section of the relevant form.**

**强烈建议协议安排债权人在相关表格的相关章节，通过展示其对代理人的选择，委派一名代理人（不论是主席或是协议安排债权人选择的其他能够参与相关协议安排会议的个人）。**

Scheme Creditors wanting to attend the relevant Scheme Meeting in person are encouraged to appoint a proxy (either the Chairperson or someone of their choice who would be willing to attend the Scheme

3

Meeting) in any event, even if they intend to attend and vote in person or, if a corporation, by a duly authorized representative, in case such Scheme Creditors are unable to do so for any reason.

即使是有意于线下亲身（或如为公司，通过获正式授权的代表）参与相关协议安排会议并投票的协议安排债权人，也鼓励其无论如何委派一名代理人（不论是主席或是协议安排债权人选择的其他能够参与相关协议安排会议的个人），以免该等协议安排债权人因任何原因无法线下参与并投票。

The Existing Notes Trustee, the Existing Notes Depositary, China Construction Bank (Asia) Corporation Limited and Guotai Junan Securities Co., Ltd. as trustee under the Dongpo Notes, Lake Notes and/or RMB Bonds and the Existing Agents are each Scheme Creditors, but will not be permitted to vote in respect of the Existing Notes, the Dongpo Notes, and/or the Lake Notes (as applicable) at the Scheme Meetings (to avoid double counting). Guotai Junan Securities Co., Ltd. as trustee under the RMB Bonds may be instructed to vote at the Class C Scheme Meetings when duly instructed to do so pursuant to the terms of the RMB Bond (if applicable).

现有票据托管人 (Existing Notes Trustee)、现有票据保管人 (Existing Notes Depositary)、眉山项目票据 (Dongpo Notes) 与湘阴项目票据 (Lake Notes) 和/或人民币债券 (RMB Bonds) 项下作为托管人的中国建设银行（亚洲）股份有限公司及国泰君安证券股份有限公司以及现有代理人，各为协议安排债权人，但将不被允许就现有票据、眉山项目票据和/或湘阴项目票据（如适用）在协议安排会议上投票（以避免重复投票）。国泰君安证券股份有限公司作为人民币债券的信托人，根据人民币债券条款（如适用）获得正式指示后，可经指示于 C 类协议安排会议上投票。

**Completion and deadline for submitting voting forms**

**投票表格的完成及提交截止时间**

The "**Voting Record Time**" for the Schemes, being the deadline for the submission of the relevant forms in order to vote on the Schemes and attend the relevant Scheme Meetings, is **5:00 p.m. (Hong Kong time) on 18 August 2023, the equivalent time being 4:00 a.m. (Cayman Islands time) on 18 August 2023**.

协议安排的"**投票记录时间**"，即为就协议安排投票并参与相关协议安排会议提交相关表格的截止时间，为 **2023 年 8 月 18 日下午 5 时（香港时间）与 2023 年 8 月 18 日上午 4 时（开曼群岛时间）**。

In order to vote on the Schemes and attend the relevant Scheme Meetings (in person, by a duly authorised representative (if a corporation) or by proxy), a Scheme Creditor must ensure that:

为就协议安排投票并参与相关协议安排会议（亲身，通过获正式授权的代表（如为公司）或通过代理人），协议安排债权人必须确认：

(i)   in the case of a Class A Noteholder, a Dongpo Noteholder or a Lake Noteholder that is not a Blocked Scheme Creditor:

在 A 类票据持有人、眉山项目票据持有人或湘阴票据持有人（非受阻协议安排债权人）的情况下：

a.   a Custody Instruction is submitted on their behalf via the relevant Clearing System by the **Custody Instruction Deadline** (being 5:00 p.m. (Hong Kong time) / 4:00 a.m.. (Cayman Islands time) on 15 August 2023) in accordance with the instructions set out in the Account Holder Letter and the remainder of the Solicitation Packet; and

4

根据账户持有人信函及征求文件集其余部分所列指示，在**保管人指示截止日期**(Custody Instruction Deadline)（2023 年 8 月 15 日下午 5 时（香港时间）/上午 4 时（开曼群岛时间））前通过相关结算系统代表他们提交保管人指示(Custody Instruction)；以及

b.  Parts 1, 2 and 3 of the Account Holder Letter have been validly completed and submitted to and received by the Information Agent via the Portal by no later than the **Voting Record Time** in accordance with the instructions set out in the Account Holder Letter and the remainder of the Solicitation Packet (allowing sufficient time for their respective Account Holders to give instructions to the Clearing Systems, in accordance with the procedures established between them, to ensure that the Account Holder Letter is submitted to and received online by the Voting Record Time);

根据账户持有人信函及征求文件集其余部分所列指示，不晚于**投票记录时间**，有效完成、通过门户网站提交并由信息代理人收到账户持有人信函第 1、2、3 部分（根据他们之间所设立的程序，给予他们各自的账户持有人充足的时间向结算系统提供指示，以确保账户持有人信函在投票记录时间之前完成线上提交及收集）；

(ii) in the case of a Class A Private Lender:

在 A 类私募出借人的情况下：

a.  Sections 2 to 6 of the Class A Private Lender Proxy Form have been validly completed and submitted to and received by the Information Agent via the Portal by no later than the **Voting Record Time** in accordance with the instructions set out in the Class A Private Lender Proxy Form and the rest of the Solicitation Packet, including supporting evidence of the Class A Private Lender's identity, its status as a Scheme Creditor, and the value of its holding of the Class A Debts;

根据 A 类私募出借人代理表格及征求文件集其余部分所列指示，不晚于**投票记录时间**，有效完成、通过门户网站提交并由信息代理人收到 A 类私募出借人代理表格第 2 至 6 节，包括证明 A 类私募出借人身份、其作为协议安排债权人的身份及其持有 A 类债务数额价值的支持性证据；

(iii) in the case of a Class C Scheme Creditor that is not a Dongpo Noteholder, a Lake Noteholder or a Blocked Scheme Creditor:

在 C 类协议安排债权人（非眉山项目票据持有人、湘阴项目票据持有人或受阻协议安排债权人）的情况下：

a.  Sections 2 to 6 of the Class C Scheme Creditor Proxy Form have been validly completed and submitted to and received by the Information Agent via the Portal by no later than the **Voting Record Time** in accordance with the instructions set out in the Class C Scheme Creditor Proxy Form and the rest of the Solicitation Packet, including supporting evidence of the Class C Scheme Creditor's identity, its status as a Scheme Creditor, and the value of its holding of the Class C Debts; and

根据 C 类协议安排债权人代理表格及征求文件集其余部分所列指示，不晚于**投票记录时间**，有效完成、通过门户网站提交并由信息代理人收到 C 类协议安排债权人代理表格第 2 至 6 节，包括证明 C 类协议安排债权人身份、其作为协议安排债权人的身份及其持有 C 类债务数额价值的支持性证据；以及

(iv) in the case of a Blocked Scheme Creditor:

在受阻协议安排债权人的情况下：

a. Sections 2 to 6 of the Blocked Scheme Creditor Form have been validly completed and submitted to and received by GLAS via email by no later than the **Voting Record Time** in accordance with the instructions set out in the Blocked Scheme Creditor Form and the remainder of the Solicitation Packet, including supporting evidence of the Blocked Scheme Creditor's identity, its status as a Scheme Creditor, and the value of its holding of the Existing Debts.

根据受阻协议安排债权人代理表格及征求文件集其余部分所列指示，不晚于**投票记录时间**，有效完成、通过电邮提交并由信息代理人收到受阻协议安排债权人代理表格第 2 至 6 节，包括证明受阻协议安排债权人身份、其作为协议安排债权人的身份及其持有现有债务数额价值的支持性证据。

**Registration prior to Scheme Meetings**

**协议安排会议前的登记**

Each Scheme Creditor (or, if a corporation, its duly authorised representative) or its proxy intending to attend the Scheme Meeting will be required to register its attendance at the relevant Scheme Meeting no later than 15 minutes prior to the scheduled start time of the relevant Scheme Meeting.

有意于参与协议安排会议的各协议安排债权人（或若为公司，则获正式授权的代表人）或其代理人，需要在相关协议安排会议预计开始时间前至少 15 分钟，在相关协议安排会议登记其参与会议。

Any Scheme Creditor or its proxy, attending the Scheme Meeting in person must produce the following documents upon registration:

任何线下参与协议安排会议的协议安排债权人及其代理人都需于登记时提供以下文件：

- a duplicate copy of the Account Holder Letter, Class A Private Lender Proxy Form, Class C Scheme Creditor Proxy Form or Blocked Scheme Creditor Form (as applicable), that has been validly completed and submitted electronically by or on behalf of that Scheme Creditor, and (where relevant) authorising the proxy to act as such on behalf of that Scheme Creditor;

  账户持有人信函、A 类私募出借人代理表格、C 类协议安排债权人代理表格或受阻协议安排债权人表格（如适用）的副本，并且该等文件已被有效完成并通过电子方式自行或代表协议安排债权人提交予信息代理人，（如相关）授权代理人代表协议安排债权人行动；

- evidence of personal identity with photo identification (for example, a valid original passport, or other original government-issued photographic identification); and

  附带照片的个人身份证明（如有效的护照原件或其他政府出具的身份证件原件）；以及

- in the case of a corporation, evidence of corporate authority (for example, a valid power of attorney and/or board resolutions).

  如为公司，则公司授权证明（如有效的授权委托书和/或董事会纪要）。

If appropriate personal identification or evidence of authority is not produced, that person will only be permitted to attend and vote at the relevant Scheme Meeting at the discretion of the Chairperson.

如果合适的个人身份证明或授权证据未被提供，该等个人仅可经主席酌情决定被允许参与并在相关协议安排会议上投票。

**Chairperson**

**主席**

Pursuant to the Scheme Convening Orders, the Cayman Court and the Hong Kong Court appointed Patrick Cowley of KPMG Advisory (Hong Kong) Limited ("**KPMG**") in his capacity as Scheme Administrator to act as the Chairperson of the Scheme Meetings, or failing that, another representative of KPMG nominated by him, and directed the Chairperson to report the results of the Scheme Meetings to the Cayman Court and Hong Kong Court. The results of the Scheme Meetings will also be made available on the Transaction Website, the Company's website, and by a public announcement published on the HKEXnews website of the SEHK and the website of the SGX-ST.

根据协议安排召集命令 (Scheme Convening Order)，香港法院任命毕马威咨询（香港）有限公司（"**KPMG**"）的 Patrick Cowley，以其协议安排管理人的身份作为协议安排会议的主席，如果其无法担任主席一职，则由其提名的另一位 KPMG 的代表作为主席，并指示其向开曼法院与香港法院汇报协议安排结果。协议安排结果亦将可见于交易网站、公司网站以及 SEHK 披露易网站与 SGX-ST 网站上所公示的公告。

**Scheme Sanction Hearing**

**协议安排批准聆讯**

The Schemes, if approved at the Scheme Meetings, will be subject to the subsequent approval and sanction of the Cayman Court and the Hong Kong Court. The Cayman Scheme Sanction Hearing is presently scheduled to take place at 10.00 a.m. Cayman Islands time (11.00 p.m. Hong Kong time) on 1 September 2023. The Hong Kong Scheme Sanction Hearing is presently scheduled to take place at 10:00 a.m. Hong Kong time on 5 and 6 September 2023 (to be fixed by the Hong Kong Court) (9:00 p.m. Cayman Islands time on 4 and 5 September 2023).  Any Scheme Creditor is entitled (but not obliged) to attend the Scheme Sanction Hearings, through legal counsel, to support or oppose the approval and sanction of the Schemes.

协议安排如在协议安排会议上被批准，将需获得开曼法院与香港法院随后的通过与批准。开曼协议安排批准聆讯 (Cayman Scheme Sanction Hearing) 现定为 2023 年 9 月 1 日开曼群岛时间上午 10 时（香港时间晚上 11 时）。香港协议安排批准聆讯 (Hong Kong Scheme Sanction Hearing) 现定为 2023 年 9 月 5 日及 6 日香港时间上午 10 时（待香港法院确认）（开曼群岛时间 2023 年 9 月 4 日及 5 日晚上 9 时）。任何协议安排债权人有权（但无义务）通过法律顾问出席批准聆讯，以支持或反对协议安排的通过和批准。

**SCHEME CREDITORS (OTHER THAN BLOCKED SCHEME CREDITORS[1]) REQUIRING ASSISTANCE SHOULD CONTACT:**

需要协助的协议安排债权人（受阻协议安排债权人[2]除外）应联络：

**Morrow Sodali Limited**

| | |
|---|---|
| Telephone: | in Hong Kong +852 2319 4130; in London +44 20 4513 6933 |
| 电话: | 香港：+852 2319 4130; 伦敦：+44 20 4513 6933 |
| Email: | evergrande@investor.morrowsodali.com |
| 电邮: | |
| Attention: | Debt Services Team |
| 收件人: | |
| Transaction Website: | https://projects.morrowsodali.com/evergrande |
| 交易网站: | |
| Portal: | https://portal.morrowsodali.com/EvergrandeScheme |
| 门户网站: | |

**ANY BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:**

任何需要协助的受阻协议安排债权人应联络：

**GLAS Specialist Services Limited**

| | |
|---|---|
| Email: | lm@glas.agency |
| 电邮: | |
| Attention: | Liability Management Team |
| 收件人: | |

**FOR COMPANY ANNOUNCEMENTS REGARDING THIS SCHEME (INCLUDING THOSE RELEVANT TO BLOCKED SCHEME CREDITORS)**

**与本协议安排有关的公司公告（包括有关于受阻协议安排债权人的公告）**

Company's Website: www.evergrande.com
公司网站:

HKEXnews website of the SEHK: https://www.hkexnews.hk/
SEHK的披露易网站:

SGX-ST website: https://www.sgx.com/
SGX-ST网站:

**CHINA EVERGRANDE GROUP (中國恒大集團)**
中国恒大集团

---

[1] as defined in the Explanatory Statement and the Schemes.

[2] 定义见说明陈述及协议安排。

Dated: 31 July 2023
日期：2023 年 7 月 31 日

**IN THE HIGH COURT OF THE HONG KONG SPECIAL ADMINISTRATIVE REGION COURT OF FIRST INSTANCE**

香港特别行政区高等法院原讼法庭

**HCMP 1091 OF 2023**

**IN THE MATTER OF SECTIONS 670, 673 & 674 OF THE COMPANIES ORDINANCE, CHAPTER 622 OF THE LAWS OF HONG KONG**

香港法例第 622 章公司条例第 670、673 及 674 条事宜

**AND**

及

**IN THE MATTER OF CHINA EVERGRANDE GROUP (中國恒大集團)**

中国恒大集团事宜

---

**NOTICE OF SCHEME MEETINGS**

协议安排会议通知

---

Unless otherwise defined herein, terms used in this Notice have the same meanings as in the explanatory statement (the "**Explanatory Statement**") relating to the proposed schemes of arrangement between China Evergrande Group (中國恒大集團) (the "**Company**") and the Scheme Creditors (as defined therein) under section 86 of the Companies Act (2023 Revision) (the "**Cayman Scheme**") and section 670 of the Companies Ordinance (Cap. 622) (the "**Hong Kong Scheme**").

除非本通知另有定义，否则本通知所使用的术语与中国恒大集团（"**公司**"）和协议安排债权人 (Scheme Creditors)（定义于说明陈述）之间根据开曼群岛公司法（2023 年修订版）第 86 条（"**开曼协议安排**"）及香港公司条例（第 622 章）第 670 条（"**香港协议安排**"）的拟议协议安排有关的说明陈述（"**说明陈述**"）的含义相同。

Copies of the Schemes, the Explanatory Statement and the Solicitation Packet (including samples of the documentation to be completed by or on behalf of Scheme Creditors in order to vote and/or receive Scheme Consideration) are available to download from the Transaction Website (https://projects.morrowsodali.com/evergrande). The scheme creditor forms (for voting purposes) are also available to download from the Company's website (www.evergrande.com).

协议安排、说明陈述和征求文件集 (Solicitation Packet) 的副本（包括由协议安排债权人或其代表完成的文件样本，以便投票和/或获得协议安排对价 (Scheme Consideration)）可从交易网站 (Transaction Website)（https://projects.morrowsodali.com/evergrande）下载。协议安排债权人的投票表格（为投票的目的）还可从公司网站（www.evergrande.com）下载。

**NOTICE IS HEREBY GIVEN** that by orders of the Grand Court of the Cayman Islands (the "**Cayman Court**") and the High Court of the Hong Kong Special Administrative Region Court of First Instance (the "**Hong Kong Court**"), dated 25 and 24 July 2023 respectively (the "**Scheme Convening Orders**"), meetings of Scheme Creditors (the "**Scheme Meetings**") be convened for the purpose of considering

and, if thought fit, approving (with or without modification) the Cayman Scheme and Hong Kong Scheme (together the "**Schemes**") proposed by the Company.

兹通知，根据开曼群岛大法院（"**开曼法院**"）及香港特别行政区高等法院原讼法庭（"**香港法院**"）分别于 2023 年 7 月 25 日及 2023 年 7 月 24 日的命令（"**协议安排召集命令**"），将召开协议安排债权人会议（"**协议安排会议**"），以审议并在认为合适的情况下批准（不论是否修改）公司提议的开曼协议安排与香港协议安排（统称为"**协议安排**"）。

**Venue, times and video conference availability for the Scheme Meetings**

协议安排会议的方式、时间及视讯会议可行性

The Scheme Meetings will be held on 23 August 2023 in Hong Kong at the offices of Sidley Austin at 39/F, Two International Finance Centre, 8 Finance St, Central, Hong Kong as follows:

协议安排会议将于 2023 年 8 月 23 日在香港中环国际金融中心二期 39 楼盛德律师事务所办公室于以下时间召开：

1. Hong Kong Scheme – The Class A Scheme Meeting will commence at 8:00 p.m. (Hong Kong time) / 7:00 a.m. (Cayman Islands time);

   香港协议安排 – A 类协议安排会议将于晚上 8 时（香港时间）/上午 7 时（开曼群岛时间）开始；

2. Cayman Scheme - The Class A Scheme Meeting will commence at 8:45 p.m. (Hong Kong time) / 7:45 a.m. (Cayman Islands time) / (or, if later, as soon as the Class A Scheme Meeting for the Hong Kong Scheme has concluded);

   开曼协议安排 – A 类协议安排会议将于晚上 8 时 45 分（香港时间）/上午 7 时 45 分（开曼群岛时间）/（如果晚于前述时间，则于香港协议安排 A 类协议安排会议结束后）开始；

3. Hong Kong Scheme – The Class C Scheme Meeting will commence at 9:30 pm (Hong Kong time) / 8:30 a.m. (Cayman Islands time); and

   香港协议安排 – C 类协议安排会议将于晚上 9 时 30 分（香港时间）/上午 8 时 30 分（开曼群岛时间）开始；以及

4. Cayman Scheme - The Class C Scheme Meeting will commence at 10:15 pm (Hong Kong time) / 9:15 a.m. (Cayman Islands time) / (or, if later, as soon as the Class C Scheme Meeting for the Hong Kong Scheme has concluded),

   开曼协议安排 – C 类协议安排会议将于晚上 10 时 15 分（香港时间）/上午 9 时 15 分（开曼群岛时间）/（如果晚于前述时间，则于香港协议安排 C 类协议安排会议结束后）开始，

with any adjournment as may be necessary or appropriate, and subject to applicable COVID-19 restrictions, policies or guidance then in force in Hong Kong, and in which case any changes in arrangements relating to the Scheme Meetings shall be communicated to Scheme Creditors in advance of the Scheme Meetings on the Transaction Website, the Company's website and by a public announcement published on the HKEXnews website of The Stock Exchange of Hong Kong Limited (the "**SEHK**") and the website of the Singapore Exchange Securities Trading Limited (the "**SGX-ST**").

如有必要或合适并受限于香港届时有效的新冠疫情限制、政策或指引，会议所作的任何延期以及在该等情况下任何有关于协议安排会议安排的变化，都应当在协议安排债权人会议之前，在交易网站以及公司网站向协议安排债权人传达，并在香港联合交易所有限公司（"**SEHK**"）的披露易网站以及新加坡交易所证券交易有限公司（"**SGX-ST**"）的网站上发布公告。

A video conferencing facility will be made available. Scheme Creditors will be able to obtain the relevant dial-in details for the Scheme Meetings from the Transaction Website, and by written request from the Information Agent (if you are a Scheme Creditor who is not a Blocked Scheme Creditor), or GLAS Specialist Services Limited ("GLAS") (if you are a Blocked Scheme Creditor).

视讯会议设备将被设置。协议安排债权人将能够从交易网站上，以及通过信息代理人（如果您是协议安排债权人且并非受阻协议安排债权人）或通过向 GLAS Specialist Services Limited（"**GLAS**"）（如果您是受阻协议安排债权人）书面请求，获得协议安排会议的相关拨入信息详情。

Scheme Creditors who attend the Scheme Meetings in person, or by video conference, will be able to vote (and to change their vote, if they wish).

通过线下或视讯会议方式参与协议安排会议的协议安排债权人都将可以投票（或变更投票，如有意愿）。

**Methods of voting**

**投票方式**

In order to vote at the relevant Scheme Meeting, a Scheme Creditor must either vote itself (if an individual), appoint a duly authorised corporate representative (if a corporation), or appoint a proxy (which must be an individual), by validly completing, signing and submitting an Account Holder Letter, Class A Private Lender Proxy Form, or Class C Scheme Creditor Proxy Form (as applicable) to the Information Agent via the Portal. All Blocked Scheme Creditor Forms must be returned to GLAS by email at lm@glas.agency

为在相关协议安排会议上投票，协议安排债权人必须透过有效完成，签署及通过门户网站提交账户持有人信函（Account Holder Letter）、A 类私募出借人代理表格（Class A Private Lender Proxy Form）或 C 类协议安排债权人代理表格（Class C Scheme Creditor Proxy Form）（如适用）予信息代理人以自行投票（如为个人），或委派获正式授权的公司代表（如为公司），或委派一名代理人（必须为个人）。所有受阻协议安排债权人表格都必须通过电邮发送予 GLAS 的邮箱地址：lm@glas.agency。

**Scheme Creditors are strongly encouraged to appoint a proxy (either the Chairperson or another individual of their own choice who is willing and able to attend the relevant Scheme Meeting) by indicating their choice of proxy in the relevant section of the relevant form.**

**强烈建议协议安排债权人在相关表格的相关章节，通过展示其对代理人的选择，委派一名代理人（不论是主席或是协议安排债权人选择的其他能够参与相关协议安排会议的个人）。**

Scheme Creditors wanting to attend the relevant Scheme Meeting in person are encouraged to appoint a proxy (either the Chairperson or someone of their choice who would be willing to attend the Scheme Meeting) in any event, even if they intend to attend and vote in person or, if a corporation, by a duly authorized representative, in case such Scheme Creditors are unable to do so for any reason.

即使是有意于线下亲身（或如为公司，通过获正式授权的代表）参与相关协议安排会议并投票的协议安排债权人，也鼓励其无论如何委派一名代理人（不论是主席或是协议安排债权人选择的其他能够参与相关协议安排会议的个人），以免该等协议安排债权人因任何原因无法线下参与并投票。

The Existing Notes Trustee, the Existing Notes Depositary, China Construction Bank (Asia) Corporation Limited and Guotai Junan Securities Co., Ltd. as trustee under the Dongpo Notes, Lake Notes and/or RMB Bonds and the Existing Agents are each Scheme Creditors, but will not be permitted to vote in respect of the Existing Notes, the Dongpo Notes, and//or the Lake Notes (as applicable) at the Scheme Meetings (to avoid double counting). Guotai Junan Securities Co., Ltd. as trustee under the RMB Bonds may be instructed to vote at the Class C Scheme Meetings when duly instructed to do so pursuant to the terms of the RMB Bond (if applicable)."

现有票据托管人(Existing Notes Trustee)、现有票据保管人(Existing Notes Depositary)、眉山项目票据(Dongpo Notes)与湘阴项目票据(Lake Notes) 和/或人民币债券 (RMB Bonds) 项下作为托管人的中国建设银行（亚洲）股份有限公司及国泰君安证券股份有限公司以及现有代理人，各为协议安排债权人，但将不被允许就现有票据、眉山项目票据和/或湘阴项目票据（如适用）在协议安排会议上投票（以避免重复投票）。国泰君安证券股份有限公司作为人民币债券的信托人，根据人民币债券条款（如适用）获得正式指示后，可经指示在 C 类协议安排会议上投票。

**Completion and deadline for submitting voting forms**

**投票表格的完成及提交截止时间**

The "**Voting Record Time**" for the Schemes, being the deadline for the submission of the relevant forms in order to vote on the Schemes and attend the relevant Scheme Meetings, is **5:00 p.m. (Hong Kong time) on 18 August 2023, the equivalent time being 4:00 a.m. (Cayman Islands time) on 18 August 2023**.

协议安排的 "**投票记录时间**"，即为就协议安排投票并参与相关协议安排会议提交相关表格的截止时间，为 **2023 年 8 月 18 日下午 5 时（香港时间）与 2023 年 8 月 18 日上午 4 时（开曼群岛时间）**。

In order to vote on the Schemes and attend the relevant Scheme Meetings (in person, by a duly authorised representative (if a corporation) or by proxy), a Scheme Creditor must ensure that:

为就协议安排投票并参与相关协议安排会议（亲身，通过获正式授权的代表（如为公司）或通过代理人），协议安排债权人必须确认：

(i)   in the case of a Class A Noteholder, a Dongpo Noteholder or a Lake Noteholder that is not a Blocked Scheme Creditor:

在 A 类票据持有人、眉山项目票据持有人或湘阴票据持有人（非受阻协议安排债权人）的情况下：

a.   a Custody Instruction is submitted on their behalf via the relevant Clearing System by the **Custody Instruction Deadline** (being 5:00 p.m. (Hong Kong time) / 4:00 a.m.. (Cayman Islands time) on 15 August 2023) in accordance with the instructions set out in the Account Holder Letter and the remainder of the Solicitation Packet; and

根据账户持有人信函及征求文件集其余部分所列指示，在**保管人指示截止日期** (Custody Instruction Deadline)（2023 年 8 月 15 日下午 5 时（香港时间）/上午 4

时（开曼群岛时间））前通过相关结算系统代表他们提交保管人指示(Custody Instruction)；以及

b. Parts 1, 2 and 3 of the Account Holder Letter have been validly completed and submitted to and received by the Information Agent via the Portal by no later than the **<u>Voting Record Time</u>** in accordance with the instructions set out in the Account Holder Letter and the remainder of the Solicitation Packet (allowing sufficient time for their respective Account Holders to give instructions to the Clearing Systems, in accordance with the procedures established between them, to ensure that the Account Holder Letter is submitted to and received online by the Voting Record Time);

根据账户持有人信函及征求文件集其余部分所列指示，不晚于**投票记录时间**，有效完成、通过门户网站提交并由信息代理人收到账户持有人信函第 1、2、3 部分（根据他们之间所设立的程序，给予他们各自的账户持有人充足的时间向结算系统提供指示，以确保账户持有人信函在投票记录时间之前完成线上提交及收集）；

(ii) in the case of a Class A Private Lender:

在 A 类私募出借人的情况下：

a. Sections 2 to 6 of the Class A Private Lender Proxy Form have been validly completed and submitted to and received by the Information Agent via the Portal by no later than the **<u>Voting Record Time</u>** in accordance with the instructions set out in the Class A Private Lender Proxy Form and the rest of the Solicitation Packet, including supporting evidence of the Class A Private Lender's identity, its status as a Scheme Creditor, and the value of its holding of the Class A Debts;

根据 A 类私募出借人代理表格及征求文件集其余部分所列指示，不晚于**投票记录时间**，有效完成、通过门户网站提交并由信息代理人收到 A 类私募出借人代理表格第 2 至 6 节，包括证明 A 类私募出借人身份、其作为协议安排债权人的身份及其持有 A 类债务数额价值的支持性证据；

(iii) in the case of a Class C Scheme Creditor that is not a Dongpo Noteholder, a Lake Noteholder or a Blocked Scheme Creditor:

在 C 类协议安排债权人（非眉山项目票据持有人、湘阴项目票据持有人或受阻协议安排债权人）的情况下：

a. Sections 2 to 6 of the Class C Scheme Creditor Proxy Form have been validly completed and submitted to and received by the Information Agent via the Portal by no later than the **<u>Voting Record Time</u>** in accordance with the instructions set out in the Class C Scheme Creditor Proxy Form and the rest of the Solicitation Packet, including supporting evidence of the Class C Scheme Creditor's identity, its status as a Scheme Creditor, and the value of its holding of the Class C Debts; and

根据 C 类协议安排债权人代理表格及征求文件集其余部分所列指示，不晚于**投票记录时间**，有效完成、通过门户网站提交并由信息代理人收到 C 类协议安排债权人代理表格第 2 至 6 节，包括证明 C 类协议安排债权人身份、其作为协议安排债权人的身份及其持有 C 类债务数额价值的支持性证据；以及

(iv) in the case of a Blocked Scheme Creditor:

14

在受阻协议安排债权人的情况下：

    a.  Sections 2 to 6 of the Blocked Scheme Creditor Form have been validly completed and submitted to and received by GLAS via email by no later than the **<u>Voting Record Time</u>** in accordance with the instructions set out in the Blocked Scheme Creditor Form and the remainder of the Solicitation Packet, including supporting evidence of the Blocked Scheme Creditor's identity, its status as a Scheme Creditor, and the value of its holding of the Existing Debts.

根据受阻协议安排债权人代理表格及征求文件集其余部分所列指示，不晚于**<u>投票记录时间</u>**，有效完成、通过电邮提交并由信息代理人收到受阻协议安排债权人代理表格第 2 至 6 节，包括证明受阻协议安排债权人身份、其作为协议安排债权人的身份及其持有现有债务数额价值的支持性证据。

**Registration prior to Scheme Meetings**

**协议安排会议前的登记**

Each Scheme Creditor (or, if a corporation, its duly authorised representative) or its proxy intending to attend the Scheme Meeting will be required to register its attendance at the relevant Scheme Meeting no later than 15 minutes prior to the scheduled start time of the relevant Scheme Meeting.

有意于参与协议安排会议的各协议安排债权人（或若为公司，则获正式授权的代表人）或其代理人，需要在相关协议安排会议预计开始时间前至少 15 分钟，在相关协议安排会议登记其参与会议。

Any Scheme Creditor or its proxy, attending the Scheme Meeting in person must produce the following documents upon registration:

任何线下参与协议安排会议的协议安排债权人及其代理人都需于登记时提供以下文件：

- a duplicate copy of the Account Holder Letter, Class A Private Lender Proxy Form, Class C Scheme Creditor Proxy Form or Blocked Scheme Creditor Form (as applicable), that has been validly completed and submitted electronically by or on behalf of that Scheme Creditor, and (where relevant) authorising the proxy to act as such on behalf of that Scheme Creditor;

  账户持有人信函、A 类私募出借人代理表格、C 类协议安排债权人代理表格或受阻协议安排债权人表格（如适用）的副本，并且该等文件已被有效完成并通过电子方式自行或代表协议安排债权人提交予信息代理人，（如相关）授权代理人代表协议安排债权人行动；

- evidence of personal identity with photo identification (for example, a valid original passport, or other original government-issued photographic identification); and

  附带照片的个人身份证明（如有效的护照原件或其他政府出具的身份证件原件）；以及

- in the case of a corporation, evidence of corporate authority (for example, a valid power of attorney and/or board resolutions).

  如为公司，则公司授权证明（如有效的授权委托书和/或董事会决议）。

If appropriate personal identification or evidence of authority is not produced, that person will only be permitted to attend and vote at the relevant Scheme Meeting at the discretion of the Chairperson.

如果合适的个人身份证明或授权证据未被提供，该等个人仅可经主席酌情决定被允许参与并在相关协议安排会议上投票。

**Chairperson**

**主席**

Pursuant to the Scheme Convening Orders, the Cayman Court and the Hong Kong Court appointed Patrick Cowley of KPMG Advisory (Hong Kong) Limited ("**KPMG**") in his capacity as Scheme Administrator to act as the Chairperson of the Scheme Meetings, or failing that, another representative of KPMG nominated by him, and directed the Chairperson to report the results of the Scheme Meetings to the Cayman Court and Hong Kong Court. The results of the Scheme Meetings will also be made available on the Transaction Website, the Company's website and by a public announcement published on the HKEXnews website of the SEHK and the website of the SGX-ST.

根据协议安排召集命令 (Scheme Convening Order)，香港法院任命毕马威咨询（香港）有限公司（"**KPMG**"）的 Patrick Cowley，以其协议安排管理人的身份作为协议安排会议的主席，如果其无法担任主席一职，则由其提名的另一位 KPMG 的代表作为主席，并指示其向开曼法院与香港法院汇报协议安排结果。协议安排结果亦将可见于交易网站、公司网站以及 SEHK 披露易网站与 SGX-ST 网站上所公示的公告。

**Scheme Sanction Hearing**

**协议安排批准聆讯**

The Schemes, if approved at the Scheme Meetings, will be subject to the subsequent approval and sanction of the Cayman Court and the Hong Kong Court. The Cayman Scheme Sanction Hearing is presently scheduled to take place at 10.00 a.m. Cayman Islands time (11.00 p.m. Hong Kong time) on 1 September 2023. The Hong Kong Scheme Sanction Hearing is presently scheduled to take place at 10:00 a.m. Hong Kong time on 5 and 6 September 2023 (to be fixed by the Hong Kong Court) (9:00 p.m. Cayman Islands time on 4 and 5 September 2023).  Any Scheme Creditor is entitled (but not obliged) to attend the Scheme Sanction Hearings, through legal counsel, to support or oppose the approval and sanction of the Schemes.

协议安排如在协议安排会议上被批准，将需获得开曼法院与香港法院随后的通过与批准。开曼协议安排批准聆讯 (Cayman Scheme Sanction Hearing) 现定为 2023 年 9 月 1 日开曼群岛时间上午 10 时（香港时间晚上 11 时）。香港协议安排批准聆讯 (Hong Kong Scheme Sanction Hearing) 现定为 2023 年 9 月 5 日及 6 日香港时间上午 10 时（待香港法院确认）（开曼群岛时间 2023 年 9 月 4 日及 5 日晚上 9 时）。任何协议安排债权人有权（但无义务）通过法律顾问出席批准聆讯，以支持或反对协议安排的通过和批准。

**SCHEME CREDITORS (OTHER THAN BLOCKED SCHEME CREDITORS[3]) REQUIRING ASSISTANCE SHOULD CONTACT:**

---

[3] as defined in the Explanatory Statement and the Schemes.

需要协助的协议安排债权人（受阻协议安排债权人[4]除外）应联络：

**Morrow Sodali Limited**

| | |
|---|---|
| Telephone: | in Hong Kong +852 2319 4130; in London +44 20 4513 6933 |
| 电话： | 香港：+852 2319 4130; 伦敦：+44 20 4513 6933 |
| Email: | evergrande@investor.morrowsodali.com |
| 电邮： | |
| Attention: | Debt Services Team |
| 收件人： | |
| Transaction Website: | https://projects.morrowsodali.com/evergrande |
| 交易网站： | |
| Portal: | https://portal.morrowsodali.com/EvergrandeScheme |
| 门户网站： | |

**ANY BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:**
任何需要协助的受阻协议安排债权人应联络：

**GLAS Specialist Services Limited**

| | |
|---|---|
| Email: | lm@glas.agency |
| 电邮： | |
| Attention: | Liability Management Team |
| 收件人： | |

**FOR COMPANY ANNOUNCEMENTS REGARDING THIS SCHEME (INCLUDING THOSE RELEVANT TO BLOCKED SCHEME CREDITORS)**

**与本协议安排有关的公司公告（包括有关于受阻协议安排债权人的公告）**

Company's Website:  www.evergrande.com
公司网站：

HKEXnews website of the SEHK: https://www.hkexnews.hk/
SEHK的披露易网站：

SGX-ST website: https://www.sgx.com/
SGX-ST网站：

**CHINA EVERGRANDE GROUP (中國恒大集團)**
中国恒大集团

Dated: 31 July 2023

---
[4] 定义见说明陈述及协议安排。

日期：2023 年 7 月 31 日

# SCHEDULE 6

## VALUATION AND ADJUDICATION FLOW CHART



253



14 days
Does Scheme Adjudicator Require Further Evidence or Information?
No
Scheme Adjudicator Determines Referred Scheme Claim
Scheme Creditor Paid Adjudicated Value of Scheme Creditor's Entitlement on Final Distribution Date Provided that the Scheme Adjudicator has Determined the Referred Scheme Claim by the Final Distribution Date and, if not, As Soon As Reasonably Practicable After the Scheme Adjudicator has Determined the Referred Scheme Claim (subject to Reserve)
If Request for Further Evidence
Yes
Scheme Adjudicator Shall Have the Power to (1) Make Directions, (2) Extend Prescribed Timeframes, and/or (3) Adopt Procedures Appropriate for Providing Fair, Efficient and Expeditious Adjudication of the Referred Scheme Claim. The Specific Powers that the Scheme Adjudicator Has are Further Set Out in the Schemes.
Scheme Adjudicator Issues Notice for Further Evidence to Relevant Party(ies)
42 days
14 days
Has Party Provided Further Evidence Within Deadline?
No
14 days
Scheme Adjudicator Will Determine Referred Scheme Claim without Further Evidence
Scheme Creditor Paid Adjudicated Value of Scheme Creditor's Entitlement on Final Distribution Date Provided that the Scheme Adjudicator has Determined the Referred Scheme Claim by the Final Distribution Date and, if not, As Soon As Reasonably Practicable After the Scheme Adjudicator has Determined the Referred Scheme Claim (subject to Reserve)
Yes
14 days
Scheme Adjudicator Determines Referred Scheme Claim
Scheme Creditor Paid Adjudicated Value of Scheme Creditor's Entitlement on Final Distribution Date Provided that the Scheme Adjudicator has Determined the Referred Scheme Claim by the Final Distribution Date and, if not, As Soon As Reasonably Practicable After the Scheme Adjudicator has Determined the Referred Scheme Claim (subject to Reserve)

**SCHEDULE 7**

**SCHEME MEETING CONVENING ORDER**

**HCMP 1091 / 2023**

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

MISCELLANEOUS PROCEEDINGS NO. 1091 OF 2023



27 JUL 2023

IN THE MATTER of CHINA EVERGRANDE GROUP 中國恒大集團

and

IN THE MATTER of Section 670 of the Companies Ordinance (Cap. 622)

---

**BEFORE THE HONOURABLE MADAM JUSTICE LINDA CHAN IN CHAMBERS**

**ORDER**

UPON THE APPLICATION of the above named China Evergrande Group 中國恒大集團 (the "**Company**") by way of *Ex Parte* Originating Summons filed herein on 12 July 2023 ("**Originating Summons**").

AND UPON READING the Originating Summons, the Affirmation of Hui Ka Yan filed herein on 20 July 2023 together with the exhibits referred to therein, including but not limited to the draft explanatory statement for the Scheme ("**Explanatory Statement**"), the Affirmation of Neil Edward McGregor McDonald filed herein on 21 July 2023 together with the exhibits referred to therein, and the Affirmation of Wu Tin Long filed herein on 24 July 2023 together with the exhibits referred to therein.

AND UPON HEARING leading counsel for the Company and counsel for the ad hoc group of creditors of the Company.

IT IS ORDERED that:-

1.      The Company be at liberty to convene, for the purposes of the proposed scheme of

arrangement under sections 670, 673 and 674 of the Companies Ordinance (Cap. 622) (the "**Scheme**") to be made between the Company and the Scheme Creditors (as defined under the Scheme), the following meetings of its Scheme Creditors each for the purpose of considering and, if thought fit, approving (with or without modification) the Scheme:

    a.  one meeting of the Class A Scheme Creditors (as defined in the Scheme) (the "**Class A Hong Kong Scheme Meeting**")

    b.  one meeting of the Class C Scheme Creditors (as defined in the Schemes) (the "**Class C Hong Kong Scheme Meeting**", together with the Class A Hong Kong Scheme Meeting, the "**Scheme Meetings**", and each a "**Scheme Meeting**"),

2.    The Scheme Meetings will be held on 23 August 2023 in Hong Kong at 39/F, Two International Finance Centre, 8 Finance Street, Central, Hong Kong (subject to any adjournment as my be approved by the chairperson of the Scheme Meetings ("**Chairperson**")) as follows:

    a.  The Class A Hong Kong Scheme Meeting will commence at 8:00 p.m. (Hong Kong time).

    b.  The Class C Hong Kong Scheme Meeting will commence at 9:30 pm (Hong Kong time).

3.    Scheme Creditors be able to attend the applicable Scheme Meeting(s) to vote in respect of the Scheme, in person, by a duly authorised representative (if a corporation) or by proxy, including via video conference.

4.    In respect of attendance by video conference:

    a.  For Scheme Creditors who are not Blocked Scheme Creditors (as defined in the Scheme), video conferencing details will be published on https://projects.morrowsodali.com/evergrande (the "**Transaction Website**") at least 21 days before the day appointed for the Scheme Meetings and the passcode notified to individual Scheme Creditors by Morrow Sodali Limited as the information agent in respect of the Scheme (the "**Information Agent**") at least 2 business days before the day appointed for the Scheme Meetings.

b.  For Blocked Scheme Creditors, GLAS Specialist Services Limited ("**GLAS**") will provide Blocked Scheme Creditors with the details of how to attend and vote at the Scheme Meetings at least 21 days before the day appointed for the Scheme Meetings and will notify Blocked Scheme Creditors of the meeting passcode at least 2 business days before the day appointed for the Scheme Meetings.

5.  The Chairperson may require Scheme Creditors attending the Scheme Meetings by video conference to turn on their camera throughout the Scheme Meetings and log on to the video conference using their full name (as registered with the Information Agent) and the creditor identifier number provided to them by the Information Agent prior to the Scheme Meetings.

6.  At least 21 days before the day appointed for the Scheme Meetings, a copy of the notice of the Scheme Meetings (the "**Notice of Scheme Meetings**"), together with any forms required for voting purposes (the "**Scheme Creditor Voting Forms**"), shall be circulated to the Scheme Creditors by:

(a)  publication on the Transaction Website;

(b)  publication by way of public announcement by the Company on the HKEXnews website of The Stock Exchange of Hong Kong Limited at http://www.hkexnews.hk;

(c)  publication by way of public announcement by China Evergrande Group on the website of the Singapore Exchange Limited at https://www.sgx.com/;

(d)  publication on the website of the Company at http://www.evergrande.com;

(e)  by causing the Information Agent to send via electronic mail to each person who the Company believes is or may be a Scheme Creditor, and for whom the Company has a valid e-mail address; and

(f)  distribution via Euroclear Bank SA/NV and/or Clearstream Banking S.A.

7.  GLAS shall circulate copies of the Notice of Scheme Meetings and the Scheme Creditor Voting Forms to any Blocked Scheme Creditors by email not less than 21 days before the Scheme Meetings.

8.  When providing the Notice of Scheme Meetings in accordance with paragraphs 6 and 7 above, the Information Agent or GLAS (as applicable) shall provide copies of the following documents (or a link to the Transaction Website to enable the Scheme Creditors to access electronic copies of the following documents):

    (a)  the Scheme;

    (b)  the Explanatory Statement; and

    (c)  the Solicitation Packet (as defined in the Explanatory Statement), being instructions as to the registration of claims and voting procedures for the purposes of the Scheme Meetings including the Scheme Creditor Voting Forms.

9.  The accidental omission to serve any Scheme Creditor with the Notice of Scheme Meetings, or the non-receipt by any Scheme Creditor of the Notice of Scheme Meetings, shall not invalidate the proceedings at the Scheme Meetings.

10. At least 21 days before the day appointed for the Scheme Meetings, the Company shall place an advertisement substantially in the form of the draft hereby approved in (1) *The Standard*, which is an English language newspaper, and (2) a Traditional and Simplified Chinese translation thereof in *Hong Kong Economic Times*, which is a Chinese language newspaper in circulation in Hong Kong, and (3) a Simplified Chinese translation thereof in "*Nanfang Daily*" and "*Securities Times*" both of which are Chinese language newspapers in circulation in the PRC.

11. Certified Chinese translation of the Notice of Scheme Meetings and the proposed advertisement in newspapers be dispensed with.

12. An affirmation is to be filed by a solicitor of Sidley Austin who is fluent in both English and Chinese languages confirming the accuracy of the Chinese translation of the Notice of Scheme Meetings and the proposed advertisement in newspapers.

13. The Chairperson be permitted to declare and announce the results of the Scheme Creditors' votes in respect of the Scheme, either during the Scheme Meetings or after the conclusion of the Scheme Meetings.

14. The substantive hearing of the petition at which the Court will determine whether or not to sanction the Scheme shall be heard at 10:00 a.m. (Hong Kong time) on 5 and 6 September 2023 (subject to the Court's further directions) before the Honourable Madam Justice Linda Chan.

15. There be liberty to apply generally.

AND THE COURT HEREBY APPROVES the:-

1. Notice of Scheme Meetings substantially in the form of Annexure 1 hereto; and

2. Notice of Scheme Meetings to be advertised on newspapers in the aforesaid manner substantially in the form of Annexure 2 hereto.

AND THE COURT HEREBY APPOINTS Mr. Patrick Cowley of KPMG Advisory (Hong Kong) Limited ("**KPMG**") or, failing Mr. Cowley, another representative of KPMG nominated by him, as the Chairperson of the Scheme Meetings on behalf of the Company.

AND THE COURT ORDERS that the Chairperson do report the results of the Scheme Meetings to the Court.

Dated this 24th day of July 2023.

Registrar

## ANNEXURE 1

### Notice of the Scheme Meetings

IN THE HIGH COURT OF THE HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE

HCMP 1091 OF 2023

IN THE MATTER OF SECTIONS 670, 673 & 674 OF THE COMPANIES ORDINANCE,
CHAPTER 622 OF THE LAWS OF HONG KONG

AND

IN THE MATTER OF CHINA EVERGRANDE GROUP (中國恒大集團)

---

NOTICE OF SCHEME MEETINGS

---

Unless otherwise defined herein, terms used in this Notice have the same meanings as in the explanatory statement (the "**Explanatory Statement**") relating to the proposed schemes of arrangement between China Evergrande Group (中國恒大集團) (the "**Company**") and the Scheme Creditors (as defined therein) under section 86 of the Companies Act (2023 Revision) (the "**Cayman Scheme**") and section 670 of the Companies Ordinance (Cap. 622) (the "**Hong Kong Scheme**").

Copies of the Scheme, the Explanatory Statement and the Solicitation Packet (including the documentation to be completed by or on behalf of Scheme Creditors in order to vote and/or receive Scheme Consideration) are available to download from the Transaction Website (https://projects.morrowsodali.com/evergrande), save for voting forms for Blocked Scheme Creditors, which are available (along with any other relevant scheme documents or from the Company's website (www.evergrande.com).

**NOTICE IS HEREBY GIVEN** that by orders of the Grand Court of the Cayman Islands (the "**Cayman Court**") and the High Court of the Hong Kong Special Administrative Region Court of First Instance (the "**Hong Kong Court**"), dated 25 July 2023 and 24 July 2023 respectively (the "**Scheme Convening Orders**"), meetings of Scheme Creditors (the "**Scheme Meetings**") be convened for the purpose of considering and, if thought fit, approving (with or without modification) the Cayman Scheme and Hong Kong Scheme (together the "**Schemes**") proposed by the Company.

**Venue, times and video conference availability for the Scheme Meetings**

The Scheme Meetings will be held on 23 August 2023 in Hong Kong at the offices of Sidley Austin at 39/F, Two International Finance Centre, 8 Finance St, Central, Hong Kong as follows:

1. Hong Kong Scheme – The Class A Scheme Meeting will commence at 8:00 p.m. (Hong Kong time) / 7:00 a.m. (Cayman Islands time);

2. Cayman Scheme - The Class A Scheme Meeting will commence at 8:45 p.m. (Hong Kong time) / 7:45 a.m. (Cayman Islands time) / (or, if later, as soon as the Class A Scheme Meeting for the Hong Kong Scheme has concluded);

3. Hong Kong Scheme – The Class C Scheme Meeting will commence at 9:30 pm (Hong Kong time) / 8:30 a.m. (Cayman Islands time); and

4.  Cayman Scheme – The Class C Scheme Meeting will commence at 10:15 pm (Hong Kong time) / 9:15 a.m. (Cayman Islands time) / (or, if later, as soon as the Class C Scheme Meeting for the Hong Kong Scheme has concluded),

with any adjournment as may be necessary or appropriate, and subject to applicable COVID-19 restrictions, policies or guidance then in force in Hong Kong, and in which case any changes in arrangements relating to the Scheme Meetings shall be communicated to Scheme Creditors in advance of the Scheme Meetings on the Transaction Website, the Company's website, and by a public announcement published on the HKEXnews website of The Stock Exchange of Hong Kong Limited (the "**SEHK**") and the website of the Singapore Exchange Securities Trading Limited (the "**SGX-ST**").

A video conferencing facility will be made available. Scheme Creditors will be able to obtain the relevant dial-in details for the Scheme Meetings from the Transaction Website, the Company's website, and by written request from the Information Agent (if you are a Scheme Creditor who is not a Blocked Scheme Creditor), or GLAS Specialist Services Limited ("**GLAS**") (if you are a Blocked Scheme Creditor).

Scheme Creditors who attend the Scheme Meetings in person, or by video conference, will be able to vote (and to change their vote, if they wish).

**Methods of voting**

In order to vote at the relevant Scheme Meeting, a Scheme Creditor must either vote itself (if an individual), appoint a duly authorised corporate representative (if a corporation), or appoint a proxy (which must be an individual).

Scheme Creditors may appoint a proxy to vote at the relevant Scheme Meeting by completing and returning a validly completed and signed Account Holder Letter, Class A Private Lender Proxy Form, or Class C Scheme Creditor Proxy Form (as applicable) to the Information Agent via the Portal. All Blocked Scheme Creditor Forms must be returned to GLAS by email at lm@glas.agency.

**Scheme Creditors are strongly encouraged to appoint a proxy (either the Chairperson or another individual of their own choice who is willing and able to attend the relevant Scheme Meeting) by indicating their choice of proxy in the relevant section of the relevant form.**

Scheme Creditors wanting to attend the relevant Scheme Meeting in person are encouraged to appoint a proxy even if they intend to attend and vote in person, in case such Scheme Creditors are unable to do so for any reason.

The Existing Notes Trustee, the Existing Notes Depositary, China Construction Bank (Asia) Corporation Limited and Guotai Junan Securities Co., Ltd. as trustee under the Dongpo Notes, Lake Notes and/or RMB Bonds and the Existing Agents are each Scheme Creditors, but will not be permitted to vote in respect of the Existing Notes, the Dongpo Notes, the Lake Notes and/or the RMB Bonds (as applicable) at the Scheme Meetings (to avoid double counting).

**Completion and deadline for submitting voting forms**

The "**Voting Record Time**" for the Schemes, being the deadline for the submission of the relevant forms in order to vote on the Schemes and attend the relevant Scheme Meetings, is **5:00 p.m. (Hong Kong time) on 18 August 2023, the equivalent time being 4:00 a.m. (Cayman Islands time) on 18 August 2023.**

In order to vote on the Schemes and attend the relevant Scheme Meetings (in person, by a duly authorised representative (if a corporation) or by proxy), a Scheme Creditor must ensure that:

(i)  in the case of a Class A Noteholder, a Dongpo Noteholder or a Lake Noteholder that is not a Blocked Scheme Creditor:

    a.  a Custody Instruction is submitted on their behalf via the relevant Clearing System by the **Custody Instruction Deadline** (being 5:00 p.m. (Hong Kong time) / 4:00 a.m.. (Cayman Islands time) on 15 August 2023) in accordance with the instructions set out in the Account Holder Letter and the remainder of the Solicitation Packet; and

    b.  Parts 1, 2 and 3 of the Account Holder Letter have been validly completed and submitted to and received by the Information Agent via the Portal by no later than the **Voting Record Time** in accordance with the instructions set out in the Account Holder Letter and the remainder of the Solicitation Packet (allowing sufficient time for their respective Account Holders to give instructions to the Clearing Systems, in accordance with the procedures established between them, to ensure that the Account Holder Letter is submitted to and received online by the Voting Record Time);

(ii)  in the case of a Class A Private Lender:

    a.  Sections 2 to 6 of the Class A Private Lender Proxy Form have been validly completed and submitted to and received by the Information Agent via the Portal by no later than the **Voting Record Time** in accordance with the instructions set out in the Class A Private Lender Proxy Form and the rest of the Solicitation Packet, including supporting evidence of the Class A Private Lender's identity, its status as a Scheme Creditor, and the value of its holding of the Class A Debts;

(iii) in the case of a Class C Scheme Creditor that is not a Dongpo Noteholder, a Lake Noteholder or a Blocked Scheme Creditor:

    a.  Sections 2 to 6 of the Class C Scheme Creditor Proxy Form have been validly completed and submitted to and received by the Information Agent via the Portal by no later than the **Voting Record Time** in accordance with the instructions set out in the Class C Scheme Creditor Proxy Form and the rest of the Solicitation Packet, including supporting evidence of the Class C Scheme Creditor's identity, its status as a Scheme Creditor, and the value of its holding of the Class C Debts; and

(iv) in the case of a Blocked Scheme Creditor:

    a.  Sections 2 to 6 of the Blocked Scheme Creditor Form have been validly completed and submitted to and received by GLAS via email by no later than the **Voting Record Time** in accordance with the instructions set out in the Blocked Scheme Creditor Form and the remainder of the Solicitation Packet, including supporting evidence of the Blocked Scheme Creditor's identity, its status as a Scheme Creditor, and the value of its holding of the Existing Debts.

**Registration prior to Scheme Meetings**

Each Scheme Creditor (or, if a corporation, its duly authorised representative) or its proxy intending to attend the Scheme Meeting will be required to register its attendance at the relevant Scheme Meeting no later than 15 minutes prior to the scheduled start time of the relevant Scheme Meeting.

Any Scheme Creditor. or its proxy, attending the Scheme Meeting in person must produce the following documents upon registration:

- a duplicate copy of the Account Holder Letter, Class A Private Lender Proxy Form, Class C Scheme Creditor Proxy Form or Blocked Scheme Creditor Form (as applicable), that has been

validly completed and submitted electronically by or on behalf of that Scheme Creditor, and (where relevant) authorising the proxy to act as such on behalf of that Scheme Creditor;

- evidence of personal identity with photo identification (for example, a valid original passport, or other original government-issued photographic identification); and

- in the case of a corporation, evidence of corporate authority (for example, a valid power of attorney and/or board resolutions).

If appropriate personal identification or evidence of authority is not produced, that person will only be permitted to attend and vote at the relevant Scheme Meeting at the discretion of the Chairperson.

**Chairperson**

Pursuant to the Scheme Convening Orders, the Cayman Court and the Hong Kong Court appointed Patrick Cowley of KPMG Advisory (Hong Kong) Limited (**"KPMG"**) in his capacity as Scheme Administrator to act as the Chairperson of the Scheme Meetings, or failing that, another representative of KPMG nominated by him, and directed the Chairperson to report the results of the Scheme Meetings to the Cayman Court and Hong Kong Court. The results of the Scheme Meetings will also be made available on the Transaction Website, the Company's website, and by a public announcement published on the HKEXnews website of the SEHK and the website of the SGX-ST.

**Scheme Sanction Hearing**

The Schemes, if approved at the Scheme Meetings, will be subject to the subsequent approval and sanction of the Cayman Court and the Hong Kong Court. The Cayman Scheme Sanction Hearing is presently scheduled to take place at 10.00 a.m. Cayman Islands time (11.00 p.m. Hong Kong time) on 1 September 2023. The Hong Kong Scheme Sanction Hearing is presently scheduled to take place at 10:00 a.m. Hong Kong time on 5 and 6 September 2023 (to be fixed by the Hong Kong Court) (9:00 p.m. Cayman Islands time 4 and 5 September 2023). Any Scheme Creditor is entitled (but not obliged) to attend the Scheme Sanction Hearings, through legal counsel, to support or oppose the approval and sanction of the Schemes.

**SCHEME CREDITORS OTHER THAN BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:**

**Morrow Sodali Limited**

| | |
|---|---|
| Telephone: | in Hong Kong +852 2319 4130; in London +44 20 4513 6933 |
| Email: | evergrande@investor.morrowsodali.com |
| Attention: | Debt Services Team |
| Transaction Website: | https://projects.morrowsodali.com/evergrande |
| Portal: | https://portal.morrowsodali.com/EvergrandeScheme |

**ANY BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:**

**GLAS Specialist Services Limited**

| | |
|---|---|
| Email: | lm@glas.agency |
| Attention: | Liability Management Team |

4

**FOR COMPANY ANNOUNCEMENTS REGARDING THIS SCHEME (INCLUDING THOSE
RELEVANT TO BLOCKED SCHEME CREDITORS)**

Company's Website: www.evergrande.com

HKEXnews website of the SEHK: https://www.hkexnews.hk/

SGX-ST website: https://www.sgx.com/

**CHINA EVERGRANDE GROUP (中國恒大集團)**

Dated: [*] 2023

5

<u>**ANNEXURE 2**</u>

**Proposed advertisement in newspapers**

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

FSD 89 OF 2023(IKJ)

IN THE MATTER OF SECTION 86 OF THE COMPANIES ACT (2022 REVISION)
AND IN THE MATTER OF CHINA EVERGRANDE GROUP (中國恒大集團)

and

IN THE HIGH COURT OF THE HONG KONG SPECIAL ADMINISTRATIVE
REGION COURT OF FIRST INSTANCE

HCMP 1091/ 2023

IN THE MATTER OF CHINA EVERGRANDE GROUP 中國恒大集團 AND IN THE
MATTER OF SECTION 670 OF THE COMPANIES ORDINANCE (CAP 622)

---

Unless otherwise defined herein, terms used in this Notice have the same meanings as in the explanatory statement (the "**Explanatory Statement**") relating to the proposed schemes of arrangement between China Evergrande Group (中國恒大集團) (the "**Company**") and the Scheme Creditors (as defined in the Explanatory Statement) under section 86 of the Cayman Islands Companies Act (2023 Revision) (the "**Cayman Scheme**") and section 670 of the Hong Kong Companies Ordinance (Cap. 622) (the "**Hong Kong Scheme**", and together with the Cayman Scheme, the "**Schemes**").

Copies of the Scheme, the Explanatory Statement and the Solicitation Packet (including the documentation to be completed by or on behalf of Scheme Creditors in order to vote and/or receive Scheme Consideration) are available to download from the Transaction Website (https://projects.morrowsodali.com/evergrande) save for voting forms for Blocked Scheme Creditors which are available (along with any other relevant scheme documents) from the Company's website (www.evergrande.com).

**NOTICE IS HEREBY GIVEN** that by orders of the Grand Court of the Cayman Islands (the "**Cayman Court**") and the High Court of the Hong Kong Special Administrative Region Court of First Instance (the "**Hong Kong Court**"), dated 25 July 2023 and 24 July 2023 respectively, meetings of Scheme Creditors (the "**Scheme Meetings**") for the purpose of considering and, if thought fit, approving (with or without modification) each of the Schemes, will be convened.

The Scheme Meetings will be held at the offices of Sidley Austin, at 39/F, Two International Finance Centre, Central, Hong Kong, on 23 August 2023 with any adjournment as may be necessary or appropriate, at the following times:

- Hong Kong Scheme – Class A Creditors Scheme Meeting: at 8:00 pm Hong Kong time.
- Cayman Scheme – Class A Creditors Scheme Meeting: at 8:45 pm Hong Kong time, the equivalent time being 7:45 am Cayman Islands time (or immediately following the conclusion of the (Hong Kong Scheme) Class A Creditors Scheme Meeting, if later).
- Hong Kong Scheme – Class C Creditors Scheme Meeting: at 9:30 pm Hong Kong time (or immediately following the conclusion of the (Cayman Scheme) Class A Creditors Scheme Meeting, if later).
- Cayman Scheme – Class C Creditors Scheme Meeting: at 10:15 pm Hong Kong time, the equivalent time being 9:15 am Cayman Islands time (or immediately following the conclusion of the (Hong Kong Scheme) Class C Creditors Scheme Meeting, if later).

All Scheme Creditors are requested to attend and vote at the relevant Scheme Meeting(s). Attendance and voting at the Scheme Meetings can be in person or by proxy in accordance with the voting instructions set out in the Explanatory Statement. A video-conference facility will be made available for any Scheme Creditors who wish to attend and vote remotely.

Scheme Creditors who wish to vote at one or more of the Scheme Meetings should carefully read the Explanatory Statement and follow the instructions contained therein. Scheme Creditors should take particular note that the Voting Record Time, being the deadline for voting, is **5:00 pm Hong Kong time/ 4:00 am Cayman Islands time on 18 August 2023**.

**NOTICE IS FURTHER GIVEN** that, if the Schemes are approved at the Scheme Meetings, the Schemes will be subject to a subsequent hearing in each of the Cayman Court and the Hong Kong Court, at which the Company will seek the Courts' sanction of the Schemes ("the **Sanction Hearings**"). The Sanction Hearing before the Cayman Court will take place on 1 September 2023. The Sanction Hearing before the Hong Kong Court will take place on 5 and 6 September 2023 (to be fixed by the Hong Kong Court). Any Scheme Creditor is entitled (but not obliged) to attend the Sanction Hearings, through legal counsel, to support or oppose the approval and sanction of the Schemes.

### SCHEME CREDITORS OTHER THAN BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:

#### Morrow Sodali Limited

| | |
|---|---|
| Telephone: | in Hong Kong +852 2319 4130; in London +44 20 4513 6933 |
| Email: | evergrande@investor.morrowsodali.com |
| Attention: | Debt Services Team |
| Transaction Website: | https://projects.morrowsodali.com/evergrande |
| Portal: | https://portal.morrowsodali.com/EvergrandeScheme |

### ANY BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:

#### GLAS Specialist Services Limited

| | |
|---|---|
| Email: | lm@glas.agency |
| Attention: | Liability Management Team |

Dated the        day of July 2023

**China Evergrande Group (中國恒大集團)**

HCMP 1091 / 2023

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
MISCELLANEOUS PROCEEDINGS NO. 1091 OF 2023

IN THE MATTER OF CHINA
EVERGRANDE GROUP 中國恒大集團

and

IN THE MATTER OF SECTION 670 OF
THE COMPANIES ORDINANCE (CAP.
622)

---

**ORDER**

---

Filed this 27th day of July 2023

**SIDLEY AUSTIN**
Solicitors for China Evergrande Group
Level 39, Two International Finance Centre
8 Finance Street, Central
Hong Kong
Tel: 2509 7888
Fax: 2509 3110
Ref: DA/ST/DW/033817-30390



IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

In Chambers
25 July 2023
Before the Honourable Justice Kawaley

<div align="right">CAUSE NO: FSD 89 OF 2023 (IKJ)</div>

IN THE MATTER OF SECTION 86 OF THE COMPANIES ACT (2023 REVISION)

AND

IN THE MATTER OF CHINA EVERGRANDE GROUP

---

### ORDER

---

**UPON** the application of China Evergrande Group (the "**Company**") by its summons dated 12 April 2023, and its further summons dated 18 July 2023 (the "**Further Summons**")

**AND UPON** reading the petition dated 12 April 2023 (the "**Petition**"), and the amended petition dated 18 July 2023 attached to the Further Summons (the "**Amended Petition**")

**AND UPON** reading the First Affirmation of Hui Ka Yan, the First Affirmation of Jacqueline Yorke, the First Affidavit of Damian Watkin, the First Affirmation of Cheng Chung Hon, the First Affirmation of Rajan Menon Smitha, the First Affidavit of Rachel Catherine Baxendale and the exhibits thereto

**AND UPON** hearing Leading Counsel for the Company and Leading Counsel for the CEG AHG

This ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103)

**AND UPON** the basis that all capitalised terms not otherwise defined in this Order shall have the meaning given to them in the draft scheme of arrangement (the "**Scheme**") and the draft explanatory statement in relation to the Scheme (the "**Explanatory Statement**"), in the form exhibited in Exhibit HKY-1 to the First Affirmation of Hui Ka Yan

**AND IT IS HEREBY ORDERED AND DIRECTED THAT**:

1      The Company has leave to amend the Petition in the terms set out in the Amended Petition annexed to this Order.

2      The Company has permission to convene one meeting of the Class A Scheme Creditors (the "**Class A Cayman Scheme Meeting**") and one meeting of the Class C Scheme Creditors (the "**Class C Cayman Scheme Meeting**") (each a "**Scheme Meeting**") each for the purpose of considering and, if thought fit, approving (with or without modification) the Scheme.

3      The Class A Cayman Scheme Meeting will take place at 7:45am (Cayman Islands time) / 8:45pm (Hong Kong time) (or, if later, as soon as the Class A scheme meeting for the Company's Hong Kong scheme of arrangement has concluded) on 23 August 2023 at the offices of Sidley Austin LLP at 39/F, Two International Finance Centre, 8 Finance St, Central, Hong Kong.

4      The Class C Cayman Scheme Meeting will take place at 9:15am (Cayman Islands time) / 10:15pm (Hong Kong time) (or, if later, as soon as the Class C scheme meeting for the Company's Hong Kong scheme of arrangement has concluded) on 23 August 2023 at the offices of Sidley Austin LLP at 39/F, Two International Finance Centre, 8 Finance St, Central, Hong Kong.

5      Attendance and voting at the Scheme Meetings will also be possible by video conference, using details which will be published on the Transaction Website at least 21 days before the day appointed for the Scheme Meetings and the meeting passcode notified to Scheme Creditors who are not Blocked Scheme Creditors by the Information Agent at least 2 business days before the day appointed for the Scheme Meetings.

6    GLAS Specialist Services Limited ("**GLAS**") will provide Blocked Scheme Creditors with the details of how to attend and vote at the Scheme Meetings as soon as reasonably practicable once the Company becomes aware of any such creditor and will notify such Blocked Scheme Creditors of the meeting passcode at least 2 business days before the day appointed for the Scheme Meetings.

7    The Chairperson (as defined in paragraph 17 below) may require Scheme Creditors attending the Scheme Meetings by video conference to turn on their camera throughout the Scheme Meetings and to log on to the video conference using their full name (as registered with the Information Agent) and the creditor identifier number provided to them by the Information Agent prior to the Scheme Meetings.

8    The Company has permission to set a record time of 4:00 a.m. (Cayman Islands time) / 5:00 p.m. (Hong Kong time) on 18 August 2023 (the "**Voting Record Time**") for the purpose of determining each Scheme Creditor's Voting Scheme Claim. The Voting Scheme Claims as at the Voting Record Time determine the number of votes to be assigned to a Scheme Creditor when voting on the Scheme at the applicable Scheme Meeting.

9    The Company has permission to set the Voting Record Time as the latest time by which (a) the Information Agent must receive a valid Non-Blocked Scheme Creditor Form (as defined in paragraph 14.1 below) from Scheme Creditors who are not Blocked Scheme Creditors, and (b) GLAS must receive a valid Blocked Scheme Creditor Form (as defined in paragraph 14.2 below) from Blocked Scheme Creditors in order for the Scheme Creditors' voting instructions to be taken into account for the purposes of the Scheme Meetings.

10    Notice of the Scheme Meetings ("**Scheme Meetings Notice**") shall be given to Scheme Creditors not less than 21 days before the Scheme Meetings:

(a)    by the Information Agent posting the notice on the Transaction Website;

(b)    by announcement on the HKEXnews website of The Stock Exchange of Hong Kong Limited;

(c)    by announcement on the website of the Singapore Exchange Limited;

(d)    by advertisement in newspapers in Hong Kong (The Standard and Hong Kong Economic Times) and the People's Republic of China (Securities Times and Nanfang Daily);

(e)    for certain Scheme Creditors identified in the First Affidavit of Damian Watkin, by the Information Agent giving notice through the Clearing Systems in accordance with the procedures described therein; and

(f)    by the Information Agent sending the notice via email to each person who the Company believes is or may be a Scheme Creditor (other than Blocked Scheme Creditors), and for whom the Company has a valid e-mail address.

11    GLAS will give a Schemes Meeting Notice to any Blocked Scheme Creditors by email (i) not less than 21 days before the Scheme Meetings to the extent the Company is aware of any Blocked Scheme Creditors and their email addresses at that time; or (ii) as soon as reasonably practicable after the Company becomes aware of the existence of a Blocked Scheme Creditor and their email details.

12    The Scheme Meetings Notice shall be in substantially the same form as appended to the Explanatory Statement exhibited in Exhibit HKY-1 to the First Affirmation of Hui Ka Yan.

13    When distributing the Scheme Meetings Notice in accordance with paragraphs 10 and 11 above, the Information Agent (or GLAS, in the case of Blocked Scheme Creditors) shall also include a copy of the final form of the Explanatory Statement (or a link to the Transaction Website where it and other relevant documents can be accessed), which contains, amongst other things, the Scheme at Schedule 4.

14    On the same date as distributing the Scheme Meetings Notice in accordance with paragraph 10 above, the Information Agent shall post a Solicitation Packet including:

14.1    the Account Holder Letter, Class A Private Lender Proxy Form, and Class C Scheme Creditor Proxy Form (each a "**Non-Blocked Scheme Creditor Form**"), including the forms of proxy and appendices contained therein; and

14.2    the "**Blocked Scheme Creditor Form**", including the form of proxy contained therein,

This ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103)

on the Transaction Website together with copies of any other relevant documents.

15    The final form of the Explanatory Statement and its schedules shall be substantially in the form exhibited in Exhibit HKY-1 to the First Affirmation of Hui Ka Yan (save for where the schedules were not available at the time of the First Affirmation of Hui Ka Yan).

16    The accidental omission to serve any Scheme Creditor with the Scheme Meetings Notice, or the non-receipt by any Scheme Creditor of the Scheme Meetings Notice, shall not invalidate the proceedings at the Scheme Meetings.

17    Patrick Cowley of KPMG, in his capacity as Scheme Administrator, or, failing that, another representative of KPMG nominated by him, be appointed Chairperson of the Scheme Meetings ("**Chairperson**") on behalf of the Company.

18    The Chairperson be entitled to accept, without further investigation, the signature on any Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable, as being genuine and as authority of the signatory to cast the votes in accordance with the instructions outlined in the Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable, and the Solicitation Packet.

19    The Chairperson be responsible for determining, in accordance with the relevant provisions in the Explanatory Statement, the Voting Scheme Claim of any Scheme Creditor and the validity of the appointment of any person permitted to act as proxy for a Scheme Creditor by reference to the information provided in each Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable.

20    The Chairperson be at liberty to accept any Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable, and the amount of a Voting Scheme Claim in respect of which a Scheme Creditor seeks to vote, notwithstanding that such form has not been completed or submitted in accordance with any instructions contained therein or has been submitted after the Voting Record Time, provided that the Chairperson considers that the information contained therein is sufficient to establish that Scheme Creditor's Voting Scheme Claim.

This ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103)

21      Any person validly appointed as proxy for a Scheme Creditor in accordance with the instructions set out in the Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable, and the Solicitation Packet may attend and speak at the Class A Cayman Scheme Meeting or the Class C Cayman Scheme Meeting, as applicable.

22      The Chairperson be at liberty to adjourn either or both of the Scheme Meetings, or terminate either or both of the Scheme Meetings and adjourn to a later date, in their sole discretion provided that, if adjourned, the Scheme Meeting(s) will recommence as soon as reasonably practicable thereafter. In the event that the Chairperson considers in their sole discretion that it is necessary or appropriate to adjourn either or both of the Scheme Meetings, the Company shall cause the Scheme Creditors to be notified that there is an adjournment of the Scheme Meeting(s) and as to the time of the adjourned Scheme Meeting(s) as soon as practicable and in the same manner as notice was given to the Scheme Creditors pursuant to paragraph 10.

23      The Chairperson be permitted to declare and announce the results of the Scheme Creditors' votes in respect of the Scheme, either during the Scheme Meetings or as soon as reasonably possible after the conclusion of the Scheme Meetings.

24      Within seven days after the Scheme Meetings have been held, the Company must file an affidavit sworn by the Chairperson verifying that notice was duly sent in accordance with this Order; that the Scheme Meetings were duly held; and giving particulars of the results.

25      The Petition (as amended pursuant to paragraph 1) be listed to be heard on 1 September 2023 at 10am (Cayman Islands time).

This ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103)

26      There be liberty to apply generally.

DATED this 25  day of July 2023

FILED this 26  day of July 2023

**The Honourable Justice Kawaley**

**JUDGE OF THE GRAND COURT**

This ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103)

## ANNEXURE 1: AMENDED PETITION

This ORDER is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103)



IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 89 OF 2023 (IKJ)

IN THE MATTER OF SECTION 86 OF THE COMPANIES ACT (2023 REVISION)
AND
IN THE MATTER OF CHINA EVERGRANDE GROUP

---

### AMENDED PETITION

---

**To the Grand Court**

This humble amended petition (the "Amended Petition") of China Evergrande Group (the "**Scheme Company**" or "**CEG**"), of PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, shows that:

**INTRODUCTION**

1       The Scheme Company was incorporated in the Cayman Islands under the Companies Act (2023 Revision) (the "**Companies Act**") on 26 June 2006 as an exempted company with

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)

limited liability (registration number 169971).

2       The Scheme Company's registered office is at Maples Corporate Services Limited, PO Box
        309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.

3       The Scheme Company envisages proposing entry into a scheme of arrangement (the
        "**Scheme**") between ~~it and certain of its creditors~~ the Class A Scheme Creditors and Class C
        Scheme Creditors (defined in paragraphs 36 and 41 respectively) (together, the "**Scheme
        Creditors**") pursuant to section 86 of the Companies Act. The object of this Amended Petition
        is to seek the sanction of this Honourable Court pursuant to section 86 of the Companies Act
        of the Scheme between the Scheme Company and its Scheme Creditors. A copy of the
        Scheme will be exhibited to an affirmation made by a director or an authorised representative
        of the Scheme Company (the "**Company Affirmation**"), which will be filed with this Honourable
        Court.

4       A scheme of arrangement in effectively identical terms as the Scheme will also be filed with
        the High Court of Hong Kong (the "**Hong Kong Scheme**", and together with the Scheme, the
        "**Schemes**"), and implementation of the Scheme will be linked to and inter-conditional upon
        the court approval to the Hong Kong Scheme and vice versa. ~~The Scheme Company
        anticipates amending this Petition in good time prior to the first hearing in these proceedings,
        so as to include such further details as are necessary and appropriate.~~

**THE SCHEME COMPANY**

5       The Scheme Company was incorporated in the Cayman Islands under the name "Evergrande
        Real Estate Group Limited".

6       At an Annual General Meeting of the shareholders of the Scheme Company held on 16 June
        2016, a special resolution was passed providing that the Scheme Company's name be

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the
Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-
1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/~~741421467~~5109215)                    2

changed from "Evergrande Real Estate Group Limited" to "China Evergrande Group".

7    The shares of the Scheme Company have been listed on the main board of the Stock Exchange of Hong Kong ("**SEHK**") since 5 November 2009, with Stock Code 3333. Trading in the Scheme Company's shares was suspended on 21 March 2022 and remains suspended as at the date of this Amended Petition.

8    As at the date of this Amended Petition, the Scheme Company has 13,204,300,900 shares in issue, all of which are fully paid up. The authorised share capital of the Scheme Company is US$1,000,000,000 divided into 100,000,000,000 shares of a nominal or par value of US$0.01 each.

9    The objects for which the Scheme Company was established are unrestricted as set out in its Amended and Restated Memorandum and Articles of Association (which were adopted on 21 June 2016).

**BUSINESS OF THE GROUP**

10    The Scheme Company is the ultimate holding company of a group of approximately 3,500 companies (together, the "**Group**"). The Scheme Company also serves as one of the main financing platforms for the Group outside the People's Republic of China (the "**PRC**", which for the purpose of this Amended Petition does not include Hong Kong Special Administrative Region ("**Hong Kong SAR**"), Macau Special Administrative Region or Taiwan), raising offshore capital to support its subsidiaries' operations through capital investment and shareholder loans.

11    The Group is headquartered in Guangzhou, PRC. The Group is principally engaged in property development, property investment and property management in the PRC. The Group's business operations are primarily based in the PRC, where the majority of the Group's assets

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/~~7414214~~675109215)    3

– which are property development projects – are located. The Group companies are incorporated in the PRC, the British Virgin Islands (the "**BVI**"), the Cayman Islands, Hong Kong SAR, and Bermuda. A summary of the Group's three key business segments is set out below:

11.1    Property development business: The property development business is the main business line of the Group. Most of the Group's property development projects are directly or indirectly owned by Hengda Real Estate Group Co Ltd ("**Hengda**", a PRC-incorporated company), while Tianji Holding Limited ("**Tianji**") – another subsidiary of the Scheme Company – also holds equity interests in approximately 30 projects located in the PRC. As at the date of this Amended Petition, Hengda is the 100% controlling shareholder of Tianji, and the Scheme Company indirectly holds approximately a 60% equity interest in Hengda.

11.2    Property management business: The property management business of the Group is operated through Evergrande Property Services Group Limited ("**EVPS**", a Cayman Islands incorporated company). EVPS provides property management services primarily to real estate projects developed by the Group's property development business. EVPS has also been contracted to manage other types of properties such as theme parks, industrial parks, healthcare complexes, themed towns and schools, among others. EVPS has been listed on the SEHK since 2 December 2020, with Stock Code 6666, however trading in EVPS' shares was suspended on 21 March 2022, and remains suspended as at the date of this Amended Petition. The Scheme Company holds a 51.6% equity interest in EVPS as at the date of this Amended Petition.

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)                    4

11.3     New energy vehicle and battery business: China Evergrande New Energy Vehicle Group Limited ("**NEV**", a Hong Kong incorporated company) conducts the Group's new energy vehicle and battery businesses. NEV is also listed on the SEHK under Stock Code 0708, however trading in NEV's shares was suspended on 1 April 2022, and remains suspended as at the date of this Amended Petition. The Scheme Company holds a 58.5% equity interest in NEV as at the date of this Amended Petition.

**THE FINANCIAL POSITION OF THE SCHEME COMPANY AND THE GROUP**

*Assets*

12     As the ultimate holding company of the Group, the Scheme Company's principal assets are its ownership interests in its subsidiaries. All other companies in the Group are, directly or indirectly, either wholly owned, or controlled and majority-owned, by the Scheme Company. The Scheme Company has no other material assets.

13     As at 31 December 2022, on a standalone basis the Scheme Company's total current assets were approximately RMB 98.8 billion (US$ 14.32 billion) and total non-current assets (consisting primarily of property, plant and equipment) were approximately RMB 1 million (US$ 0.14 million). Key items of the Scheme Company's current assets include the following:

13.1     amounts due from subsidiaries of approximately RMB 98.4 billion (US$ 14.27 billion); and

13.2     other receivables of approximately RMB 0.4 billion (US$ 0.06 billion).

14     At the Group level, the current assets of the Group on a consolidated basis as at 31 December 2022 amounted to approximately RMB 1,665.2 billion (US$ 241.41 billion). This includes:

14.1     trade and other receivables of approximately RMB 228.9 billion (US$ 33.18 billion);

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)

5

14.2   properties under development for sale of approximately RMB 1,136.1 billion (US$ 164.7 billion); and

14.3   properties held for sale of approximately RMB 102.9 billion (US$ 14.92 billion).

15   The majority of the Group's current assets cannot be collected or converted into cash immediately. As at 31 December 2022, these assets were located in the PRC and certain of the assets were pledged to secure certain banking and other facilities granted to the Group and mortgage loans granted to buyers of sold properties.

16   As at 31 December 2022, the Group's non-current assets totalled approximately RMB 173.2 billion (US$ 25.11 billion). This includes:

16.1   property, plant and equipment of approximately RMB 56.4 billion (US$ 8.18 billion);

16.2   investment properties of approximately RMB 63.1 billion (US$ 9.15 billion); and

16.3   other investments accounted for using the equity method of approximately RMB 25.9 billion (US$ 3.75 billion).

*Liabilities*

17   As at 31 December 2022, the Scheme Company's total liabilities were approximately RMB 198.3 billion (US$ 28.75 billion), which include:

17.1   current borrowings of RMB 2.3 billion (US$ 0.33 billion);

17.2   non-current borrowings of RMB 99.6 billion (US$ 14.4 billion);

17.3   amounts due to subsidiaries of RMB 94.8 billion (US$ 13.74 billion); and

17.4   dividend payable of RMB 1.7 billion (US$ 0.25 billion).

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)          6

18      The Scheme Company is insolvent. As outlined later in this Amended Petition from paragraph 21, it was unable to repay certain sums due under the Existing Notes and remains unable to do so.

19      At the Group level, as at 31 December 2022, the Group had total indebtedness of RMB 2,437.4 billion (US$ 353.35 billion), primarily including:

19.1      current borrowings of RMB 587.1 billion (US$ 85.11 billion);

19.2      non-current borrowings of RMB 25.3 billion (US$ 3.67 billion);

19.3      trade and other payables of RMB 1,002.3 billion (US$ 145.31 billion);

19.4      contract liabilities of RMB 721 billion (US$ 104.52 billion);

19.5      deferred income tax liabilities of RMB 47.9 billion (US$ 6.94 billion); and

19.6      other payable of RMB 11.3 billion (US$ 1.64 billion).

20      Certain of the Scheme Company's major offshore and onshore liabilities (excluding its intercompany liabilities) are proposed to be restructured by way of the Scheme. Those liabilities are detailed in paragraphs 29, 34, 37 and 38 of this Amended Petition.

**BACKGROUND TO THE RESTRUCTURING**

21      Since the second half of 2021, the Scheme Company's transactions in the domestic PRC real estate market have slipped, and the area sold and amount of sales have drastically reduced, and the overall scale of financing continued to shrink. The Group has also experienced a noticeable decline in its aggregate contracted sales. Against the backdrop of these adverse market conditions, the Group has also experienced liquidity pressures due to limited access to offshore capital to refinance its existing indebtedness and reduced cash generated from sales.

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)                    7

22    Notwithstanding the Group's efforts, some of the Scheme Company's debts became overdue, which led to a significant drop in sales, and further limited the Scheme Company's access to financing. As a result of this increased financial pressure, the Scheme Company has defaulted on several obligations, in particular:

(a)    The Scheme Company's liquid assets have been insufficient to pay the outstanding principal and interest owing under the Existing Notes and the Class A Private Loan (defined below at paragraph 34);

(b)    The Scheme Company has failed to comply with a demand to perform its obligations under a guarantee in the amount of approximately US$ 260 million regarding the Lake Notes (defined below at paragraph 38.1), which itself constituted events of default under the indentures governing the Existing Notes; and

(c)    The Scheme Company has since ceased to make payments for the principal and interest amounts due under the Existing Notes and the Class A Private Loan.

23    There have been other payment defaults, cross defaults and/or other events in relation to the Class C Debts (defined below at paragraph 37). Further, certain creditors of Class C Debts have sought to enforce the relevant security, including by appointing receivers and/or enforcing share charges, as provided for under the relevant transaction documents. The Scheme Company and other obligors under the Class C Debts have not made full payment of all outstanding principal, interest and other amounts due under such Class C Debts.

24    Since 2021, several enforcement actions, including court proceedings and arbitration proceedings, have been taken by various parties against the Scheme Company or other members of the Group. In particular, winding up proceedings were commenced against the

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)                    8

Scheme Company in the Hong Kong High Court (HCCW 220 of 2022), by Top Shine Global Limited in respect of its investment in Fangchebao Group Co. Ltd, a company within the Group. The proceedings were filed on 24 June 2022 in connection with a debt of HK$ 862.5 million (approximately US$ 110.39 million). At the latest hearing held on 20 March 2023, the Honourable Madam Justice Linda Chan approved the Scheme Company's application to adjourn the winding up petition until 31 July 2023. At that next hearing, the Scheme Company intends to seek a further adjournment to allow sufficient time for the Schemes to progress and become effective.

25    The above events of default and enforcement actions, as well as other enforcement actions taken against the Scheme Company and other members of the Group, will be further explained in the Company Affirmation.

26    During this period, the Group has been actively engaging with its customers, suppliers, creditors and shareholders to stabilise its credit lines and day-to-day operations. The Group has launched online sales of its development properties, offering significant discounts and advertising heavily, and has also taken steps to dispose of or restructure a number of its assets to alleviate the Group's working capital pressure. It has also reduced capital expenditure and other expenses such as management remuneration, and commenced discussions with an ad hoc group of certain Scheme Creditors to explore a restructuring plan that will support an orderly recovery of the Group's operations and maximise returns for all stakeholders.

27    As at the date of this Amended Petition:

27.1    Class A Noteholders and Class A Lenders (both defined below at paragraph 35) holding approximately 86.44% of the aggregate outstanding principal amount of the Class A Debts (defined below at paragraph 28.1) have entered into, or acceded to, a Restructuring Support Agreement in respect of the Class A Debts (the "**Class A RSA**"),

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)                              9

FSD2023-0089
Page 10 of 32
2023-07-18

which appended a term sheet setting out the terms of the proposed restructuring (the "**Restructuring**").

27.2    Noteholders and lenders holding approximately 39.60% of the aggregate outstanding principal amount of the Class C Debts have entered into, or acceded to, a Restructuring Support Agreement in respect of the Class C Debts (the "**Class C RSA**", together with the Class A RSA, the "**RSAs**"), which appended a term sheet setting out the terms of the Restructuring.

## TYPES OF DEBTS SUBJECT TO THE SCHEME

28    The Scheme relates to the compromise of debts owed and/or guaranteed by the Scheme Company, which are split into two classes:

28.1    The "**Class A Debts**", which comprise the Existing Notes and the Class A Private Loan; and

28.2    The "**Class C Debts**", which comprise the debts set out below at paragraph 37 and in Schedule 1 to this Amended Petition

(together, the "**Existing Debts**").

## CLASS A DEBTS

29    The Scheme Company has issued certain senior notes or convertible bonds which are – subject to paragraph 30 of this Amended Petition – publicly traded on the Singapore Stock Exchange ("**SGX**"), and which are listed in the table below (together, the "**Existing Notes**").

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/~~744421146~~75109215)          10

FSD2023-0089
Page 10 of 32
2023-07-18

| Notes | Outstanding Principal | Interest Rate (per annum) | Maturity Date |
|---|---|---|---|
| a) CEG Existing January 2022 Notes (ISIN: XS1991102846, Common Code: 19911028) | US$ 300 million | 9.5% | 30 January 2022 |
| b) CEG Existing March 2022 Notes (ISIN: XS1580431143, Common Code: 158043114) | US$ 2,022 million | 8.25% | 23 March 2022 |
| c) CEG Existing April 2022 Notes (ISIN: XS1982036961, Common Code: 198203696) | US$ 1,450 million | 9.5% | 11 April 2022 |
| d) CEG Existing January 2023 Notes (ISIN: XS2106834299, Common Code: 210683429) | US$ 998.8 million | 11.5% | 22 January 2023 |
| e) CEG Existing February 2023 Bonds (ISIN: XS1767800961, Common Code: 176780096) | HK$ 81 million (US$ 10.37 million) | 4.25% | 14 February 2023 |
| f) CEG Existing April 2023 Notes (ISIN: XS1982037779, Common Code: 198203777) | US$ 834.2 million | 10.0% | 11 April 2023 |

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)            11

FSD2023-0089
FSD2023-0089
Page 20 of 40
Page 12 of 32
2023-07-26
2023-07-18

| | | | |
|---|---|---|---|
| g) | CEG Existing June 2023 Notes (ISIN: XS1627599498, Common Code: 162759949) | US$ 1,331.5 million | 7.5% | 28 June 2023 |
| h) | CEG Existing January 2024 Notes (ISIN: XS2106834372, Common Code: 210683437) | US$ 995 million | 12.0% | 22 January 2024 |
| i) | CEG Existing March 2024 Notes (ISIN: XS1587867539, Common Code: 158786753) | US$ 951 million | 9.5% | 29 March 2024 |
| j) | CEG Existing April 2024 Notes (ISIN: XS1982040641, Common Code: 198204064) | US$ 690.8 million | 10.5% | 11 April 2024 |
| k) | CEG Existing June 2025 Notes (ISIN: XS1627599654, Common Code: 162759965) | US$ 4,649.2 million | 8.75% | 28 June 2025 |

30    The CEG Existing January 2022 Notes listed above at (a) have never been listed on the SGX.

31    The Existing Notes are guaranteed by certain direct and indirect subsidiaries of the Scheme Company (the "**CEG Subsidiary Guarantors**"). The CEG Subsidiary Guarantors are incorporated under the laws of the Cayman Islands, the BVI or Hong Kong. Further, the shares of the CEG Subsidiary Guarantors held by the Scheme Company or by other CEG Subsidiary Guarantors are pledged for the benefit of the Class A Noteholders to secure the Scheme Company's payment obligations under the Existing Notes (the "**Subsidiary Pledges**").

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)                 12

FSD2023-0089
FSD2023-0089
Page 20 of 40
Page 12 of 32
2023-07-26
2023-07-18

However, the Subsidiary Pledges have no material value as each of the relevant subsidiary companies is insolvent.

32    Each of the Existing Notes indentures or trust deed (as applicable) are governed by the laws of the state of New York, except for the CEG Existing February 2023 Bonds, which are governed by English law.

33    Interest payments are payable by the Scheme Company pursuant to the terms of the Existing Notes indentures or trust deed, and interest payments are generally made semi-annually.

34    In addition to the Existing Notes, the Scheme Company (together with its subsidiary, Treasure Glory Global Limited) entered into a US$ 100,000,000 15% loan due July 2022 (the "**Class A Private Loan**"). The Class A Private Loan is also guaranteed by the CEG Subsidiary Guarantors. It is not publicly traded or listed on any exchange. The Scheme Company originally granted a Hong Kong law governed pledge over the shares in Treasure Glory Global Limited for the Scheme Company's liability under the Class A Private Loan. However, this pledge has since been enforced and the creditor's appointed security agent has become the registered shareholder.

35    In this Amended Petition:

35.1    the persons with an economic or beneficial interest as principal in any of the Existing Notes held in global form or global restricted form through the Clearing Systems as at the "**Voting Record Time**" (to be set by this Honourable Court) in respect of voting purposes at the Scheme Meetings (defined at paragraph 47.2 below) and/or the "**Entitlement Record Time**" (in respect of determining such persons' entitlements to Scheme Consideration (defined at paragraph 45.1 below)), each of whom has a right, upon satisfaction of certain conditions, to be issued definitive registered notes in accordance with the terms of the Existing Notes and their respective indentures or trust

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/~~7414214~~675109215)    13

FSD2023-0089
FSD2023-0089
Page 22 of 40
Page 14 of 32
2023-07-26
2023-07-18

deed (as applicable), and (but without double counting in each case) the depositary and trustee of the Existing Notes, are referred to as **"Class A Noteholders"**; and

35.2   the persons with a legal interest as principal in the Class A Private Loan as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of determining such persons' entitlements to Scheme Consideration) are referred to as **"Class A Lenders"**.

36   Together, the Class A Noteholders and the Class A Lenders comprise the **"Class A Scheme Creditors"**.

## CLASS C DEBTS

37   The **"Class C Debts"** are the offshore financial unsecured indebtedness, obligations and other liabilities owed by the Scheme Company listed in Schedule 1 to this Amended Petition, all of which are governed by either Hong Kong law or PRC law.  There are 117 Class C Debts, and the approximate total principal outstanding on these Class C Debts, as at 31 December 2022, is US$ 13.445 billion.

38   The Class C Debts include, inter alia, the following:

38.1   a guarantee in relation to US$ 260 million senior notes issued by Jumbo Fortune Enterprises Limited (the **"Lake Notes"**);

38.2   a guarantee in relation to US$ 424 million senior notes issued by Great Courage Global Limited (the **"Dongpo Notes"**); and

38.3   a put option in relation to RMB 8.2 billion (US$ 1.19 billion) corporate bonds issued by Hengda (the **"RMB Bonds"**).

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)                    14

FSD2023-0089
FSD2023-0089
Page 22 of 40
Page 14 of 32
2023-07-26
2023-07-18

FSD2023-0089                                    Page 23 of 40                                    2023-07-26
FSD2023-0089                                    Page 13 of 32                                    2023-07-18

39      Each of the Class C Debts is guaranteed and/or secured or benefits from another type of credit support by various different Group (and some cases, non-Group) entities.

40      In this Amended Petition:

40.1    the persons with an economic or beneficial interest as principal in the Dongpo Notes or Lake Notes held in global form or global restricted form through the Clearing Systems as at  the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of determining such persons' entitlements to Scheme Consideration), each of whom has a right, upon satisfaction of certain conditions, to be issued definitive registered notes in accordance with the terms of the Dongpo Notes or the Lake Notes (as applicable) and their respective trust deeds, and (but without double counting in each case) any depositary or trustee of the Dongpo Notes or the Lake Notes, are referred to as "**Dongpo Noteholders**" and "**Lake Noteholders**" respectively, or together the "**Class C Noteholders**"; and

40.2    the persons with a legal interest as principal in any other Class C Debts (excluding the Dongpo Notes and the Lake Notes but including the RMB Bonds) as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of determining such persons' entitlements to Scheme Consideration), and (but without double counting) the arranger, trustee, security agent, principal paying agent, transfer agent and registrar of the Dongpo Notes, the notes trustee, security trustee, settlement agent, principal agent, transfer agent, calculation agent, registrar, and original account bank in respect of the Lake Notes, the trustee of the RMB Bonds, and certain other facility and security agents in respect of certain other Class C Debts, are referred to as "**Other Class C Scheme Creditors**".

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/~~7414214~~675109215)                          15

41    Together, the Class C Noteholders and the Other Class C Scheme Creditors comprise the "**Class C Scheme Creditors**".

## OBJECTS AND MECHANICS OF THE SCHEME AND THE RESTRUCTURING

42    The purpose of the Restructuring is threefold:

42.1    To avoid the Scheme Company and other members of the Group potentially entering into insolvent liquidation in the near future, as a result of which the anticipated recoveries for the Scheme Creditors may be significantly less than if the Restructuring were to be completed successfully;

42.2    To provide the Group with a more stable capital structure, which will enable the Group to comply with its obligations and liabilities following the Restructuring, and gradually return to stable operations; and

42.3    To increase the prospect of delivering long-term value for the Scheme Creditors and all of the other stakeholders of the Scheme Company.

43    The Restructuring is intended to be implemented through the Schemes, both of which will affect the rights of the Class A Scheme Creditors and the Class C Scheme Creditors (as applicable). In summary, pursuant to the terms of the Schemes, the Scheme Creditors will agree to release in full all claims under and in connection with the Existing Debts against the Scheme Company, the Subsidiary Guarantors, their respective affiliates and personnel, and other persons in return for receiving (or being entitled to receive) certain consideration (the "**Scheme Consideration**").

44    For the purposes of voting at the Scheme Meetings, all Scheme Creditors will have their claims admitted at the full value of the relevant Class A Debt or Class C Debt – therefore, unlike the manner in which their entitlement to Scheme Consideration will be determined, a Class C

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)    16

Scheme Creditor's claims for voting purposes will not be assessed on a "deficiency basis" (which is described at paragraph 45.5 below). Any such claims will be admitted without double counting, and without permitting duplicative claims or portions of claims against the Scheme Company other than for US$1, and in any event subject to the discretion of the chairperson of the Scheme Meetings.

45    The Scheme Consideration to which a Scheme Creditor may be entitled depends upon the class of debt being schemed:

*Class A*

45.1    Class A Scheme Creditors will be entitled to elect one of two options in receiving Scheme Consideration under the Schemes:

(a)    Under Option 1, Class A Scheme Creditors can elect to receive new notes to be issued by the Scheme Company at a 1:1 conversion ratio of their entitlement to Scheme Consideration (the "**A1 Notes**"). The A1 Notes will comprise three tranches, with a tenor of 10 to 12 years, and will be repaid over time at interest rates of between 2.0% p.a. and 3.0% p.a. The A1 Notes will be issued pursuant to and governed by indentures which will be governed by New York law.

(b)    Under Option 2, Class A Scheme Creditors can elect to convert their entitlements into:

(i)    New notes to be issued by the Scheme Company with a tenor of 5 to 8 years (the "**A2 Notes**");

(ii)    A package of five equity-linked instruments, which are either secured over, linked to, mandatorily exchangeable into, or mandatorily

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/~~7414214~~675109215)                    17

FSD2023-0089
FSD2023-0089
Page 26 of 40
Page 18 of 32
2023-07-26
2023-07-18

convertible into (as applicable) listed shares of the Scheme Company, EVPS or NEV (together, the "**A2 Package**"); or

(iii)    A combination of the A2 Notes, and the A2 Package,

subject to adjustment and reallocation in accordance with the terms of the Schemes.

(c)    In addition to their entitlement to Scheme Consideration under the Schemes, Scheme Creditors who elect to receive the A2 Package may also receive "**TJ Scheme Consideration**" (scheme consideration in the form of notes payable under a related, but not inter-conditional scheme of arrangement before the High Court of Hong Kong) pursuant to the terms of the Schemes.

45.2    The Scheme Consideration to which a Class A Scheme Creditor will be entitled will be distributed to the Class A Scheme Creditor pursuant to the terms of the Schemes. In summary, a Class A Scheme Creditor's entitlement to Scheme Consideration will be calculated on the basis of (i) the full outstanding principal amount (or in the case of a put option or repurchase obligation, the price amount) of the Class A Debt owed to such Class A Scheme Creditor as at the Entitlement Record Time, and (ii) the accrued and unpaid interest on such Class A Debt up to (but excluding) the earlier of 1 October 2023, and the Entitlement Record Time.

*Class C*

45.3    Class C Scheme Creditors (including the Class C Noteholders) will be entitled to elect one of two options in receiving Scheme Consideration under the Schemes:

(a)    Under Option 1, they can elect to receive new notes to be issued by the Scheme Company at a 1:1 conversion ratio of its entitlement to Scheme Consideration

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)    18

FSD2023-0089
FSD2023-0089
Page 26 of 40
Page 18 of 32
2023-07-26
2023-07-18

FSD2022-0089    Page 27 of 92    2023-07-18

(the "**C1 Notes**"). The C1 Notes will comprise three tranches, with a tenor of between 10 to 12 years, and will be repaid over time at interest rates of between 2.0% p.a. and 3.0% p.a. The C1 Notes will be issued pursuant to and governed by indentures which will be governed by New York law.

(b)    Under Option 2, they can elect to convert its entitlements into:

    (i)    New notes to be issued by the Scheme Company with a tenor of 7 to 9 years (the "**C2 Notes**");

    (ii)    A package of five equity-linked instruments, which are either secured over, linked to, mandatorily exchangeable into, or mandatorily convertible into (as applicable) listed shares of the Scheme Company, EVPS or NEV (together, the "**C2 Package**"); or

    (iii)    A combination of the C2 Notes, and the C2 Package,

subject to adjustment and reallocation in accordance with the terms of the Schemes.

(c)    In addition to their entitlement to Scheme Consideration under the Schemes, Scheme Creditors who elect to receive the C2 Package may also receive TJ Scheme Consideration pursuant to the terms of the Schemes.

45.4    The Scheme Consideration to which a Class C Scheme Creditor (including any Class C Noteholder) will be entitled will be distributed to the Class C Scheme Creditor pursuant to the terms of the Schemes.

45.5    For the purposes of distribution, the Scheme Consideration to which a Class C Scheme Creditor (including Class C Noteholders) will be entitled shall be determined on a

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)    19

"deficiency basis" whereby the value of any such Class C Scheme Creditor's claims against any third party (i.e. any party other than the Scheme Company) in respect of the Class C Debt will be deducted from the sum of (i) the full outstanding principal amount (or in the case of a put option or repurchase obligation, the price amount) of the Class C Debt owed to such Class C Scheme Creditor as at the Entitlement Record Time, and (ii) the accrued and unpaid interest on such Class C Debt up to (but excluding) the earlier of 1 October 2023 and the Entitlement Record Time. The balance shall be the value of the Class C Scheme Creditor's entitlement to Scheme Consideration.

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/~~7414214~~675109215)          20

*Consent fee*

46   In addition to the above Scheme Consideration, the Scheme Company will, subject to certain conditions specified in the RSAs and the Scheme, pay each Scheme Creditor who complied with the consent fee provisions of the relevant RSA by the "**Consent Fee Deadline**" of 5:00pm Hong Kong time on 18 May 2023 (each a "**Participating Creditor**"), a "**Consent Fee**" in an amount equal to 0.25 per cent of the outstanding principal amount of the Existing Debts held by such Participating Creditor as of the Voting Record Time.  The Consent Fee will be paid in kind by way of new notes to be issued by the Scheme Company in connection with the Restructuring.

## ORDERS AND DIRECTIONS

5 47   The Scheme Company intends to make an application for, among other things, orders and directions:

5.1   As to the listing for hearing of this Petition;

5.2 47.1   As to That the relevant classes of Scheme Creditors affected by the Scheme are those referred to in paragraph 3 above;

5.3 47.2   That the Scheme Company be at liberty to convene one or more two meetings of Scheme Creditors (together, the "**Scheme Meetings**") for the purpose of considering and, if thought fit, approving (with or without modification) the Scheme;

5.4   That the resolution intended to be put to the Scheme Creditors at the Scheme Meeting is:

"*THAT the Scheme of Arrangement, a copy of which has been tabled at this Scheme Meeting, be approved subject to any modification, addition or condition*

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)                21

*that the Grand Court of the Cayman Islands may think fit to approve or impose, which would not directly or indirectly have a material adverse effect on the rights of the Scheme Creditors".*

5.5 47.3    As to the mode of delivery of a scheme document (which includes an explanatory statement and notice of the Scheme Meetings) to the Scheme Creditors and that a record date be set for the purposes of voting at the Scheme Meetings;

5.6 47.4    As to the appointment of a chairperson of the Scheme Meetings, including directions that the chairperson report the result thereof to the Court; and

47.5    That the resolution intended to be put to the Scheme Creditors at the Scheme Meetings is:

> "*THAT the Scheme of Arrangement, a copy of which has been tabled at this Scheme Meeting, be approved subject to any modification, addition or condition that the Grand Court of the Cayman Islands may think fit to approve or impose, which would not directly or indirectly have a material adverse effect on the rights of the Scheme Creditors";* and

5.7    As to the advertisement of this Petition.

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/74142146 75109215)                    22

**YOUR PETITIONER THEREFORE HUMBLY PRAYS THAT:**

(1)     The Scheme may be sanctioned by the Court so as to be binding on each party thereto in accordance with its terms.

(2)     To this end, all necessary inquiries may be made and directions may be made and given.

(3)     Such further or other relief may be granted as the Court sees fit.

Dated the 12th day of April 2023

Amended the 18th day of July 2023

*Maples and Calder (Cayman) LLP*

**Maples and Calder (Cayman) LLP**

**Attorneys-at-Law for the Scheme Company**

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)                23

## SCHEDULE 1

## CLASS C DEBTS

*All values below are for reference, indicative only, and subject to change. To the extent a balance of the principal is referred to, it is as at 31 December 2022. For items 16 to 116, the value refers to the principal amount as at 30 June 2023.*

1.  Amounts on-lent to CEG pursuant to the loan agreement relating to the provision of the Class A Private Loan

2.  CEG guarantee of the US$260 million 8.5% senior notes due October 3, 2021 (ISIN: XS2054446617, Common Code: 205444661) issued by Jumbo Fortune Enterprises Limited;

3.  CEG guarantee of the US$424 million 9.5% senior notes due January 22, 2023 (ISIN: XS2290369128, Common Code: 229036912) issued by Great Courage Global Limited;

4.  US$116 million put option granted by CEG in relation to certain Dongpo Notes;

5.  US$110 million put option granted by CEG in relation to shares of Graceful Court Limited;

6.  CEG guarantee of the HK$160 million margin loan borrowed by New Chic Global Limited;

7.  CEG guarantee of the HK$575 million put option in respect of shares of Clear Star Investments Limited;

8.  HK$1.2 billion loan borrowed by CEG due 2 January 2022;

9.  HK$600 million loan borrowed by CEG due 7 January 2022;

10. CEG guarantee of the US$20 million structured loan borrowed by Rainbow Ever Limited;

11. CEG guarantee of the US$355 million structured sale and purchase agreement of shares in Rainbow Ever Limited;

12. CEG guarantee of the HK$7.6 billion loan borrowed by Tianji pursuant to facilities agreement dated 21 November 2020;

13. US$712 million repurchase obligations of CEG in respect of Fangchebao Group Co. Ltd.;

14. Repurchase obligation of CEG in relation to the RMB Bonds;

15. CEG guarantee Guangzhou Kailong Real Estate Company Limited's RMB5 billion repurchase obligation of shares in Hengda, together with interest and costs, which was awarded in an Arbitration Award rendered by the Shenzhen Court of International Arbitration where CEG,

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)    24

Guangzhou Kailong Real Estate Company Limited, and the Chairman of CEG (Mr. Hui Ka Yan) were responsible for the repayment accordingly;

16. CEG guarantee of the RMB1.29 billion loan borrowed by Tianjin Hengda Guorui New Energy Technology Co., Ltd;

17. CEG guarantee of the RMB788 million loan borrowed by Evergrande New Energy Automotive Investment Holdings Group Co. Ltd.;

18. CEG guarantee of the RMB664.4 million loan borrowed by Evergrande Financial Holding Group (Shenzhen) Co., Ltd.;

19. CEG guarantee of the RMB440 million loan borrowed by Evergrande Tourism Operation Management Group Co., Ltd.;

20. CEG guarantee of the RMB294 million loan borrowed by Evergrande New Energy Automotive Investment Holdings Group Co. Ltd;

21. CEG guarantee of the RMB1.2676 billion loan borrowed by Zhoushan Yinyi Real Estate Development Co., Ltd.;

22. CEG guarantee of the RMB400 million loan borrowed by Tianjin Evergrande Guorui New Energy Technology Co., Ltd (RMB227 million) and Junfang Material Equipment (Guangdong) Co., Ltd. (RMB173 million);

23. CEG guarantee of the RMB180.5 million loan borrowed by Guiyang Evergrande Tongmeng Tiandi Tourism Development Co., Ltd.;

24. CEG guarantee of the RMB150 million loan borrowed by Evergrande High-Tech Group Co. Ltd.;

25. CEG guarantee of the RMB1,399,833,998 loan borrowed by Evergrande Intelligent Vehicle (Guangdong) Co., Ltd.;

26. CEG guarantee of the RMB324,960,454.47 loan borrowed by Cangzhou Yiju Real Estate Development Co., Ltd.;

27. CEG guarantee of the RMB85 million loan borrowed by Jurong Hengyi Tourism Development Co., Ltd.;

28. CEG guarantee of the RMB229,989,971.35 loan borrowed by Xi'an Tianhong Tourism Development Co., Ltd.;

29. CEG guarantee of the RMB136.5 million loan borrowed by Taicang Yutai Tourism Development Co., Ltd.;

30. CEG guarantee of the RMB138.03 million loan borrowed by Wuhan Chushui Yunshan Agricultural Development Co., Ltd.;

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/~~7414214~~675109215)

25

31. CEG guarantee of the RMB1.805 billion loan borrowed by Evergrande Fairyland Group Limited;

32. CEG guarantee of the RMB1.71 billion loan borrowed by Evergrande Health Industry Group Co., Ltd.;

33. CEG guarantee of the RMB1,659,649,830.75 loan borrowed by Wuhan Baden City Investment Co., Ltd.;

34. CEG guarantee of the RMB710 million loan borrowed by Yunnan Yuxing Zhongtian Real Estate Development Co., Ltd.;

35. CEG guarantee of the RMB115 million loan borrowed by Yunnan Yuxing Zhongtian Real Estate Development Co., Ltd.;

36. CEG guarantee of the RMB962.38 million loan borrowed by Hainan Boao Evergrande International Hospital Co., Ltd.;

37. CEG guarantee of the RMB296 million loan borrowed by Gui'an Xinqu Evergrande Huading Tourism Development Co., Ltd.;

38. CEG guarantee of the RMB70 million loan borrowed by Qidong Yuhao Real Estate Co., Ltd.;

39. CEG guarantee of the RMB12.54 million loan borrowed by Gui'an Xinqu Evergrande Huading Tourism Development Co., Ltd.;

40. CEG guarantee of the RMB1.13 billion loan borrowed by Guangdong Maoqi Investment Co., Ltd.;

41. CEG guarantee of the RMB650 million loan borrowed by Wuhan Baden City Investment Co., Ltd.;

42. CEG guarantee of the RMB600 million loan borrowed by Zhengzhou Hengzetong Health Real Estate Co., Ltd.;

43. CEG guarantee of the RMB450 million loan borrowed by Zhengzhou Hengzetong Health Real Estate Co., Ltd.;

44. CEG guarantee of the RMB440 million loan borrowed by Wuhan Baden City Investment Co., Ltd.;

45. CEG guarantee of the RMB350 million loan borrowed by Zhengzhou Hengzetong Health Real Estate Co., Ltd.;

46. CEG guarantee of the RMB937.106 million loan borrowed by Evergrande New Energy Vehicle (Guangdong) Co., Ltd.;

47. CEG guarantee of the RMB549 million loan borrowed by Changsha Evergrande Fairyland Tourism Development Co., Ltd.;

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)    26

48.    CEG guarantee of the RMB435 million loan borrowed by Qidong Evergrande Hot Spring City Development Co., Ltd.;

49.    CEG guarantee of the RMB214,603,797.65 loan borrowed by Hubei Hengxiang Tourism Development Co., Ltd.;

50.    CEG guarantee of the RMB150,473,333.33 loan borrowed by Shaanxi Haishen Construction Engineering Co., Ltd.;

51.    CEG guarantee of the RMB150.4 million loan borrowed by Kaifeng Kaize Tourism Development Co., Ltd.;

52.    CEG guarantee of the RMB1,638,803,164.71 loan borrowed by Kunming Jialize Tourism Culture Co., Ltd.;

53.    CEG guarantee of the RMB1.3 billion loan borrowed by Kunming Jialize Tourism Culture Co., Ltd.;

54.    CEG guarantee of the RMB1 billion loan borrowed by Yangzhong Hengrui Real Estate Co., Ltd.;

55.    CEG guarantee of the RMB176,117,602.18 loan borrowed by Evergrande Fairyland Group Limited;

56.    CEG guarantee of the RMB1,042,069,759.76 loan borrowed by Wuhan Chushui Yunshan Agricultural Development Co., Ltd;

57.    CEG guarantee of the RMB120 million loan borrowed by Chongqing Hengjin Health Industry Co., Ltd.;

58.    CEG guarantee of the RMB800 million loan borrowed by Evergrande Fairyland Group Limited;

59.    CEG guarantee of the RMB272 million loan borrowed by Guangxi Fusui Hengli Health Industry Development Co., Ltd.;

60.    CEG guarantee of the RMB203,023,644.35 loan borrowed by Wuzhou Hengmei Health Industry Co., Ltd.;

61.    CEG guarantee of the RMB410,046,058.86 loan borrowed by Hubei Herui Tourism Development Co., Ltd.;

62.    CEG guarantee of the RMB272,422,383.12 loan borrowed by Wuhan Chushui Yunshan Agricultural Development Co., Ltd;

63.    CEG guarantee of the RMB180 million loan borrowed by Evergrande Ruibo Power Technology (Shenzhen) Co., Ltd.;

64.    CEG guarantee of the RMB445,633,820.41 loan borrowed by Evergrande New Energy Technology Group Co., Ltd.;

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)    27

65.    CEG guarantee of the RMB256,674,595.17 loan borrowed by China Evergrande New Energy Vehicle Investment Holding Group Limited;

66.    CEG guarantee of the RMB62.54 million loan borrowed by Meishan Longhe Tourism Development Co., Ltd.;

67.    CEG guarantee of the RMB359,472,266.26 loan borrowed by Taicang Yutai Tourism Development Co., Ltd.;

68.    CEG guarantee of the RMB381 million loan borrowed by Evergrande New Energy Technology Group Co., Ltd.;

69.    CEG guarantee of the RMB68.3 million loan borrowed by Cangzhou Yiju Real Estate Development Co., Ltd.;

70.    Guarantee in relation to RMB147.2 million loan borrowed by Nanjing Hengkang Real Estate Co., Ltd.;

71.    CEG guarantee of the RMB999 million loan borrowed by Evergrande Fairyland Group Limited;

72.    CEG guarantee of the RMB499,357,862.03 loan borrowed by Danzhou Hengle Culture Development Co., Ltd.;

73.    CEG guarantee of the RMB485,885,774.81 loan borrowed by Jurong Fairyland Tourism Development Co., Ltd.;

74.    CEG guarantee of the RMB217,198,571.40 loan borrowed by Changsha Evergrande Fairyland Tourism Development Co., Ltd.;

75.    CEG guarantee of the RMB200 million loan borrowed by Cangzhou Fairyland Tourism Development Co., Ltd.;

76.    CEG guarantee of the RMB200 million loan borrowed by Danzhou Zhiyuan Tourism Development Co., Ltd.;

77.    CEG guarantee of the RMB200 million loan borrowed by Danzhou Yibei Tourism Development Co., Ltd.;

78.    CEG guarantee of the RMB200 million loan borrowed by Danzhou Shengbang Tourism Development Co., Ltd.;

79.    CEG guarantee of the RMB388,418,616.68 loan borrowed by Qianhai Jiesuan Commercial Factoring (Shenzhen) Co., Ltd;

80.    CEG guarantee of the RMB280 million loan borrowed by Hainan Boao Evergrande International Hospital Co., Ltd.;

81.    CEG guarantee of the RMB244 million loan borrowed by Shenzhen Qianhai Xingbang Commercial Factoring Co., Ltd.;

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/~~74142146~~75109215)

28

82.    CEG guarantee of the RMB200 million loan borrowed by Hainan Hengqian Material Equipment Co., Ltd.;

83.    CEG guarantee of the RMB159,999,090.88 loan borrowed by Xi'an Changde Tourism Development Co., Ltd.;

84.    CEG guarantee of the RMB126,998,890.81 loan borrowed by Kaifeng Fairyland Development Co., Ltd.;

85.    CEG guarantee of the RMB120 million loan borrowed by Jurong Fairyland Tourism Development Co., Ltd.;

86.    CEG guarantee of the RMB64 million loan borrowed by Kaifeng Shengbang Tourism Development Co., Ltd.;

87.    CEG guarantee of the RMB11 million loan borrowed by Kaifeng Shengbang Tourism Development Co., Ltd.;

88.    CEG guarantee of the RMB98,245,776.78 loan borrowed by Guiyang Evergrande Tongmeng Tiandi Tourism Development Co., Ltd.;

89.    CEG guarantee of the RMB62,030,672.18 loan borrowed by Guiyang Evergrande Tongmeng Tiandi Tourism Development Co., Ltd.;

90.    CEG guarantee of the RMB55,104,092.72 loan borrowed by Changsha Evergrande Fairyland Tourism Development Co., Ltd.;

91.    CEG guarantee of the RMB35 million loan borrowed by Xi'an Evergrande Fairyland Tourism Development Co., Limited;

92.    CEG guarantee of the RMB35 million loan borrowed by Xi'an Evergrande Fairyland Tourism Development Co., Limited;

93.    CEG guarantee of the RMB897.5 million loan borrowed by Danzhou Jiayuan Tourism Development Co., Ltd.;

94.    CEG guarantee of the RMB386.2 million loan borrowed by Danzhou Ruifeng Tourism Development Co., Ltd.;

95.    CEG guarantee of the RMB378.4 million loan borrowed by Qidong Tongyu Real Estate Co., Ltd.;

96.    CEG guarantee of the RMB210.4 million loan borrowed by Qidong Baofeng Real Estate Co., Ltd.;

97.    CEG guarantee of the RMB85 million loan borrowed by Danzhou Dongtuo Tourism Development Co., Ltd.;

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)    29

FSD2023-0089
FSD2023-0089

Page 38 of 49
Page 30 of 32

2023-07-26
2023-07-18

98.    CEG guarantee of the RMB22 million loan borrowed by Danzhou Shengbang Tourism Development Co., Ltd.;

99.    CEG guarantee of the RMB710 million loan borrowed by NEV;

100.    CEG guarantee of the RMB1.4 billion loan borrowed by Hengning Health Industry Nanjing Co., Ltd.;

101.    CEG guarantee of the RMB540 million loan borrowed by Xianning Hengchen Real Estate Co., Ltd.;

102.    CEG guarantee of the RMB200 million loan borrowed by Hohhot Hengpeng Health Industry Co., Ltd.;

103.    CEG guarantee of the RMB200 million loan borrowed by Hengpeng Health Industry Liaoning Co., Ltd.;

104.    CEG guarantee of the RMB103,135,896.70 loan borrowed by Xianning Hengyang Real Estate Co., Ltd.;

105.    CEG guarantee of the RMB600 million loan borrowed by Jiangyin Hengpeng Real Estate Co., Ltd.;

106.    CEG guarantee of the RMB2,982,370,000 loan borrowed by Grandland Holding Group Co., Ltd.;

107.    CEG guarantee of the RMB2.8 billion loan borrowed by Renhe Investment Holding Co., Ltd.;

108.    CEG guarantee of the RMB2.6 billion loan borrowed by Harbin Jurong New Energy Co., Ltd.;

109.    CEG guarantee of the RMB1,734,928,916.67 loan borrowed by Sichuan Juhe Ecological Agriculture Development Co., Ltd.;

110.    CEG guarantee of the RMB2.1 billion loan borrowed by Chengdu Jiacheng Tianxia Public Facilities Co., Ltd.;

111.    CEG guarantee of the RMB1.5 billion loan borrowed by Shenzhen Construction Engineering Co., Ltd.;

112.    CEG guarantee of the RMB1 billion loan borrowed by Shenzhen Construction Engineering Co., Ltd.;

113.    CEG guarantee of the RMB480 million loan borrowed by Liaoning Donglin Reinas Co., Ltd.;

114.    CEG guarantee of the RMB336,809,471.63 loan borrowed by Shenzhen Grandland Hi-Tech New Material Co., Ltd.;

115.    CEG guarantee of the RMB110,919,594.87 loan borrowed by Liaoning Hengyang Health Real Estate Co., Ltd.;

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)    30

FSD2023-0089
FSD2023-0089

Page 38 of 49
Page 30 of 32

2023-07-26
2023-07-18

116.    CEG guarantee of the RMB100 million loan borrowed by Shenzhen Grandland Hi-Tech New Material Co., Ltd; and

117.    Any other unsecured liability of CEG arising under a guarantee, indemnity, put option, repurchase obligation, judgment, arbitration, or other obligation or liability arising in connection with the liabilities of the entities identified in 16 to 116 of this Schedule.

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)                    31

**ENDORSEMENT**

This Amended Petition has been presented to the Grand Court of the Cayman Islands on the     day of April 2023 and will be heard by the Grand Court of the Cayman Islands on the             day of             2023 at     a.m. / p.m. in the fore/after noon (or as soon thereafter as the Amended Petition can be heard).

This AMENDED PETITION is filed by Maples and Calder (Cayman) LLP, Attorneys-at-Law for the Scheme Company, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: JSE/NHL/NDS/621262.103/7414214675109215)                    32

**SCHEDULE 8**

**SUMMARY OF TERMS OF THE NEW INSTRUMENTS**

## SCHEDULE 8

## SUMMARY OF TERMS OF THE NEW INSTRUMENTS

*Note:*

*The amount of A1 Notes, C1 Notes, Plain A2 Notes and Forced A2 Notes issued is subject to adjustment and reallocation based on the election of Option 1 and Option 2 by CEG Scheme Creditors, respectively, where all notes will be allocated in sequential order by maturity date starting from Tranche A of the corresponding instrument.*

*The amount of EVPS MEBs, NEV MEBs, CEG MCBs, EVPS SLNs and NEV SLNs issued will be subject to adjustment and reallocation based on the election of Option 1 and Option 2 by CEG Scheme Creditors along with the final result of the Class C deficiency claims.*

*All amounts that are shown for illustrative purposes are subject to the terms of the New Notes Documents.*

<u>Part A – A1 Notes</u>

| **Principal Terms of the A1 Notes** |
| --- |

| A1 Notes | |
|---|---|
| **Issuer / Company** | China Evergrande Group (3333.HK) |
| **Original Issue Date** | The Restructuring Effective Date. |
| **Principal Amount** | A1 Notes shall comprise three tranches as follows, with the following maximum aggregate principal amounts:<br><br>(a) Tranche A: the aggregate Class A Scheme Creditor's Entitlement's proportion in Option 1 multiplied by US$3,000 million;<br><br>(b) Tranche B: the aggregate Class A Scheme Creditor's Entitlement's proportion in Option 1 multiplied by US$3,000 million; and<br><br>(c) Tranche C: the aggregate Class A Scheme Creditor's Entitlement under Option 1 minus the sum of the principal amounts of A1 Notes Tranche A and B.<br><br>Subject to election of Option 1 by Class A Scheme Creditors and adjustment and reallocation, Class A Scheme Creditor's Entitlement under Option 1 will be allocated to A1 Notes in sequential order by maturity date starting from A1 Notes Tranche A. |
| **Maturity** | (a) Tranche A: 10 years from the Reference Date;<br><br>(b) Tranche B: 11 years from the Reference Date; and<br><br>(c) Tranche C: 12 years from the Reference Date.<br><br>With respect to each tranche of the A1 Notes, any outstanding principal amount under such A1 Notes shall be repaid on maturity, together with any accrued but unpaid interest. |
| **Interest**[1] | Interest on the outstanding principal amount of the A1 Notes shall be paid in cash or in kind, at the election of the Company.<br><br>Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the A1 Notes at the following interest rates with respect to each interest payment period:<br><br>(a) Tranche A: 2.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 3.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); |

---

[1] For illustration purposes only, assuming all of the Class A Scheme Creditors elect Option 1 and each tranche of the A1 Notes will be issued at the maximum amount indicated above, the maximum amount of interest that the Company may elect to pay in kind will be as follows:

(a)    Tranche A: approximately US$1,040,565,028;
(b)    Tranche B: approximately US$1,394,186,136; and
(c)    Tranche C: approximately US$5,547,125,476.

(b) Tranche B: 2.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 3.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); and

(c) Tranche C: 3.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 4.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind). All interest paid in kind with respect to any tranche of the A1 Notes will be added to the then current outstanding principal amount of such tranche of the A1 Notes.

If the Company pays cash interest under any tranche of the A1 Notes with respect to any interest payment period, it shall also pay cash interest under all other outstanding tranches of the A1 Notes, Plain A2 Notes, C1 Notes, C2 Notes and Forced A2 Notes with respect to such interest payment period. The amount of such cash payments shall be allocated among the A1 Notes, Plain A2 Notes, C1 Notes, C2 Notes and (with respect to any interest payment period ending after the Final Distribution Date) Forced A2 Notes (and among each tranche of such instruments) on a pro rata basis by each tranche's outstanding principal amount at the time of the payment (subject to relevant provisions in the indentures for the Forced A2 Notes).

| | |
|---|---|
| **Guarantees** | The initial New Instruments Subsidiary Guarantors of the A1 Notes are listed in Annex A to this Schedule.<br><br>The New Instruments Subsidiary Guarantees of the A1 Notes shall be subordinated to the New Instruments Subsidiary Guarantees of the Plain A2 Notes, A2 EVPS SLNs, A2 NEV SLNs and Forced A2 Notes. |
| **Optional Redemption** | With respect to each tranche of the A1 Notes, at any time during the tenor of such A1 Notes, the Company has the right to redeem such A1 Notes, in whole or in part, at par plus any accrued and unpaid cash interest on such redeemed A1 Notes up to but excluding the relevant redemption date, subject to certain conditions. |
| **Amendments with Consent of Holders** | Amendment provisions will be similar to those in the Existing Notes, save that amendments, modifications or waivers that require the consent of each holder in the Existing Notes would not require the consent of each holder of the relevant tranche of the A1 Notes then outstanding. |
| **Covenants** | The New Instruments Documents will contain covenants, subject to certain exceptions, limiting the ability of the Company and its restricted subsidiaries to, among other things:<br><br>(i)     incur or guarantee additional indebtedness and issue disqualified or preferred stock;<br><br>(ii)     make investments or specified restricted payments; |

(iii)    declare dividends on capital stock or purchase or redeem capital stock;

(iv)    issue or sell capital stock of restricted subsidiaries;

(v)    guarantee indebtedness;

(vi)    sell, lease or transfer assets;

(vii)    create liens;

(viii)    enter into sale and leaseback transactions;

(ix)    engage in any business other than permitted businesses;

(x)    enter into agreements that restrict the restricted subsidiaries' ability to pay dividends, transfer assets or make intercompany loans;

(xi)    enter into transactions with shareholders or affiliates;

(xii)    effect a consolidation, merger or sale of assets;

(xiii)    designate unrestricted subsidiaries;

(xiv)    layer debt between senior and subordinated debt; and

(xv)    pay consideration as inducement to any consent, waiver or amendment of terms to certain holders of notes.

The New Instruments Documents will contain covenants requiring the Company and its restricted subsidiaries to, among other things:

(i)    provide financial statements and reports;

(ii)    maintain certain offices or agencies;

(iii)    maintain necessary governmental approvals and licenses and comply with applicable laws;

(iv)    pay applicable taxes and other claims;

(v)    pay customary additional amounts to gross-up withholding taxes or deductions on payments due under the notes; and

(vi)    authorize the trustee to provide certain information to holders of the notes upon request.

| **Auditor** | The Company will engage a Whitelist Auditor to audit its annual financial statements by no later than the audit of the fiscal year ending 31 December 2023. |

The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms:

(i)  Baker Tilly International

(ii) BDO

(iii) Crowe Global

(iv) Deloitte

(v)  Ernst & Young

(vi) Grant Thornton

| | |
|---|---|
| | (vii)  KPMG |
| | (viii)  Mazars |
| | (ix) Moore Global |
| | (x)  Prism; and |
| | (xi) RSM International |
| **Transfer Restrictions** | The A1 Notes and the related New Instruments Subsidiary Guarantees will not be registered under the US Securities Act or any securities law of any state or other jurisdiction of the United States, and may not be offered or sold within the United States (as defined in Regulation S under the US Securities Act) except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the US Securities Act. |
| **Form, Denomination and Registration** | The A1 Notes will be issued only in fully registered form and each tranche of the A1 Notes will be initially represented by one or more Global Certificates. |
| **Listing** | The Company will use best efforts to obtain the listing of the A1 Notes on an internationally recognized stock exchange and maintain such listing as long as any A1 Notes remain outstanding. |
| **Governing Law of the A1 Notes Indentures** | The laws of the State of New York |

Part B – C1 Notes

| **Principal Terms of the C1 Notes** |
|---|

| C1 Notes | |
|---|---|
| **Issuer / Company** | China Evergrande Group (3333.HK) |
| **Original Issue Date** | The Restructuring Effective Date. |
| **Principal Amount** | C1 Notes shall comprise three tranches as follows, with the following maximum aggregate principal amounts:<br><br>(a) Tranche A: the aggregate Class C Scheme Creditor's Entitlement's proportion in Option 1 multiplied by US$3,000 million;<br><br>(b) Tranche B: the aggregate Class C Scheme Creditor's Entitlement's proportion in Option 1 multiplied by US$3,000 million; and<br><br>(c) Tranche C: the aggregate Class C Scheme Creditor's Entitlement under Option 1 minus the sum of the principal amounts of C1 Notes Tranche A and B.<br><br>Subject to election of Option 1 by Class C Scheme Creditors and adjustment and reallocation, Class C Scheme Creditor's Entitlement under Option 1 will be allocated to C1 Notes in sequential order by maturity date starting from A1 Notes Tranche A. |
| **Maturity** | (a) Tranche A: 10 years from the Reference Date;<br><br>(b) Tranche B: 11 years from the Reference Date; and<br><br>(c) Tranche C: 12 years from the Reference Date;<br><br>With respect to each tranche of the C1 Notes, any outstanding principal amount under such C1 Notes shall be repaid on maturity, together with any accrued but unpaid interest. |
| **Interest[2]** | Interest on the outstanding principal amount of the C1 Notes shall be paid in cash or in kind, at the election of the Company.<br><br>Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the C1 Notes at the following interest rates with respect to each interest payment period:<br><br>(a) Tranche A: 2.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 3.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); |

---

[2] For illustration purposes only, assuming all of the Class C Scheme Creditors elect Option 1 and each tranche of the C1 Notes will be issued at the maximum amount indicated above, the maximum amount of interest that the Company may elect to pay in kind will be as follows:

(a) Tranche A: approximately US$1,040,565,028;
(b) Tranche B: approximately US$1,394,186,136; and
(c) Tranche C: approximately US$5,767,032,988.

|  | (b) Tranche B: 2.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 3.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); and |
|--|--|
|  | (c) Tranche C: 3.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 4.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind). |

All interest paid in kind with respect to any tranche of the C1 Notes will be added to the then current outstanding principal amount of such tranche of the C1 Notes.

If the Company pays cash interest under any tranche of the C1 Notes with respect to any interest payment period, it shall also pay cash interest under all other outstanding tranches of the A1 Notes, Plain A2 Notes, C1 Notes, C2 Notes and Forced A2 Notes with respect to such interest payment period. The amount of such cash payments shall be allocated among the A1 Notes, Plain A2 Notes, C1 Notes, C2 Notes and (with respect to any interest payment period ending after the Final Distribution Date) Forced A2 Notes (and among each tranche of such instruments) on a pro rata basis by each tranche's outstanding principal amount at the time of the payment (subject to relevant provisions in the indentures for the Forced A2 Notes).

| **Optional Redemption** | With respect to each tranche of the C1 Notes, at any time during the tenor of such C1 Notes, the Company has the right to redeem such C1 Notes, in whole or in part, at par plus any accrued and unpaid cash interest on such redeemed C1 Notes up to but excluding the relevant redemption date, subject to certain conditions. |
|--|--|
| **Amendments with Consent of Holders** | Amendment provisions will be similar to those in the Existing Notes, save that amendments, modifications or waivers that require the consent of each holder in the Existing Notes would not require the consent of each holder of the relevant tranche of the C1 Notes then outstanding. |
| **Covenants** | The New Instruments Documents will contain covenants, subject to certain exceptions, limiting the ability of the Company and its restricted subsidiaries to, among other things: |

(i)      incur or guarantee additional indebtedness and issue disqualified or preferred stock;

(ii)     make investments or specified restricted payments;

(iii)    declare dividends on capital stock or purchase or redeem capital stock;

(iv)    issue or sell capital stock of restricted subsidiaries;

(v)     guarantee indebtedness;

(vi)    sell, lease or transfer assets;

(vii)    create liens;

(viii)    enter into sale and leaseback transactions;

(ix)    engage in any business other than permitted businesses;

(x)    enter into agreements that restrict the restricted subsidiaries' ability to pay dividends, transfer assets or make intercompany loans;

(xi)    enter into transactions with shareholders or affiliates;

(xii)    effect a consolidation, merger or sale of assets;

(xiii)    designate unrestricted subsidiaries;

(xiv)    layer debt between senior and subordinated debt; and

(xv)    pay consideration as inducement to any consent, waiver or amendment of terms to certain holders of notes.

The New Instruments Documents will contain covenants requiring the Company and its restricted subsidiaries to, among other things:

(i)    provide financial statements and reports;

(ii)    maintain certain offices or agencies;

(iii)    maintain necessary governmental approvals and licenses and comply with applicable laws;

(iv)    pay applicable taxes and other claims;

(v)    pay customary additional amounts to gross-up withholding taxes or deductions on payments due under the notes; and

(vi)    authorize the trustee to provide certain information to holders of the notes upon request.

| | |
|---|---|
| **Auditor** | The Company will engage a Whitelist Auditor to audit its annual financial statements by no later than the audit of the fiscal year ending 31 December 2023.

The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms:

(i) Baker Tilly International

(ii) BDO

(iii) Crowe Global

(iv) Deloitte

(v) Ernst & Young

(vi) Grant Thornton

(vii)    KPMG

(viii)    Mazars

(ix) Moore Global

(x) Prism; and |

|  | (xi) RSM International |
|---|---|
| **Transfer Restrictions** | The C1 Notes will not be registered under the US Securities Act or any securities law of any state or other jurisdiction of the United States, and may not be offered or sold within the United States (as defined in Regulation S under the US Securities Act) except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the US Securities Act. |
| **Form, Denomination and Registration** | The C1 Notes will be issued only in fully registered form and each tranche of the C1 Notes will be initially represented by one or more Global Certificates. |
| **Listing** | The Company will use best efforts to obtain the listing of the C1 Notes on an internationally recognized stock exchange and maintain such listing as long as any C1 Notes remain outstanding. |
| **Governing Law of the C1 Notes Indentures** | The laws of the State of New York |

Part C – Equity-Linked Instruments

Part C1 – EVPS MEBs

**Principal Terms of the EVPS MEBs**

| EVPS MEBs | |
|---|---|
| **Issuer / Company** | China Evergrande Group (3333.HK) |
| **Original Issue Date** | The Restructuring Effective Date. |
| **Exchangeable Bonds to be Issued** | EVPS MEBs exchangeable into EVPS Shares. |
| **Exchange Property** | The Exchange Property will comprise 2,331,985,700 EVPS Shares. |
| **Principal Amount** | The EVPS MEBs shall comprise one tranche, with a maximum aggregate principal amount of approximately HK$5,364 million. |
| **Maturity** | 24 months from the Reference Date. The outstanding principal amount of the EVPS MEBs shall be mandatorily exchanged into EVPS Shares at maturity. All exchanges shall be settled in EVPS Shares (and not in cash). |
| **Security** | Charge of securities account holding the Exchange Property of the EVPS MEBs with enforcement trigger events being (i) the Company failing to perform its exchange obligations within an agreed grace period under the EVPS MEBs, (ii) any insolvency (or similar) of, or insolvency (or similar) proceedings being brought against, the Company or chargor (*i.e.* account holder) (excluding any frivolous or vexatious winding-up petition being discharged, stayed or dismissed within an agreed time period) and (iii) other agreed events in the indenture, subject to (a) agreed release under customary circumstances and (b) agreed non-petition and limited recourse provisions. |
| **Exchange Period** | From the later of (i) 41 days after the Original Issue Date and (ii) the date upon which the EVPS Shares have resumed trading on the HKEX to 10 trading days prior to maturity. |
| | Exchanges of the EVPS MEBs to EVPS Shares during any calendar month shall not exceed one-third (1/3) of the aggregate principal amount of the EVPS MEBs that have been issued from (and including) the Original Issue Date and up to the last issue date of the EVPS MEBs. |
| | All exchanges shall be settled in EVPS Shares (and not in cash). |
| **Exchange Price** | HK$2.30 per share subject to adjustment in the manner provided in the Trust Deed. |
| **Events of Default** | Customary events of default. Remedy limited to exchange rights for EVPS MEBs. |

| | |
|---|---|
| **Auditor** | The Company will engage a Whitelist Auditor to audit its annual financial statements by no later than the audit of the fiscal year ending 31 December 2023. |
| | The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms: |
| | (i)  Baker Tilly International |
| | (ii) BDO |
| | (iii) Crowe Global |
| | (iv) Deloitte |
| | (v)  Ernst & Young |
| | (vi) Grant Thornton |
| | (vii)    KPMG |
| | (viii)    Mazars |
| | (ix) Moore Global |
| | (x)  Prism; and |
| | (xi) RSM International |
| **Transfer Restrictions** | The EVPS MEBs will not be registered under the US Securities Act or any securities law of any state or other jurisdiction of the United States, and may not be offered or sold within the United States (as defined in Regulation S under the US Securities Act) except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the US Securities Act. |
| **Form, Denomination and Registration** | The EVPS MEBs will be issued only in fully registered form and initially represented by one or more global certificates. |
| **Listing** | The Company will use best efforts to obtain the listing of the EVPS MEBs on an internationally recognized stock exchange and maintain such listing as long as any EVPS MEBs remain outstanding. |
| **Governing Law of the EVPS MEBs Trust Deeds** | The laws of Hong Kong |

Part C2 – NEV MEBs

**Principal Terms of the NEV MEBs**

| NEV MEBs | |
|---|---|
| **Issuer / Company** | China Evergrande Group (3333.HK) |
| **Original Issue Date** | The Restructuring Effective Date. |
| **Exchangeable Bonds to be Issued** | NEV MEBs exchangeable into NEV Shares. |
| **Exchange Property** | The Exchange Property will comprise (i) 3,094,810,100 NEV Shares and (ii) Converted NEV MEB Shares (as defined below).<br><br>A portion of the NEV Shares converted per the Conversion of Shareholders' Loans to NEV Shares will be deposited into the A2 NEV Custody Accounts (as defined below) and the C2 NEV Custody Accounts (as defined below) on a pro rata basis such that the A2 NEV Custody Accounts and C2 NEV Custody Accounts will together hold 30% NEV Shares representing approximately 30% of the total issued NEV Shares immediately after such Conversion of Shareholders' Loans to NEV Shares assuming there are no other changes to the share capital of NEV since the date hereof. The remaining NEV Shares so converted will be added to the Exchange Property ("**Converted NEV MEB Shares**"). |
| **Principal Amount** | The NEV MEBs shall comprise one tranche, with a maximum aggregate principal amount of approximately HK$24,310 million. |
| **Maturity** | 24 months from the Reference Date. The outstanding principal amount of the NEV MEBs shall be mandatorily exchanged into NEV Shares at maturity. All exchanges shall be settled in NEV Shares (and not in cash). |
| **Security** | Charge of securities account holding the Exchange Property of the NEV MEBs with enforcement trigger events being (i) the Company failing to perform its exchange obligations within an agreed grace period under the NEV MEBs, (ii) any insolvency (or similar) of, or insolvency (or similar) proceedings being brought against, the Company or chargor (*i.e.* account holder) (excluding any frivolous or vexatious winding-up petition being discharged, stayed or dismissed within an agreed time period) and (iii) other agreed events in the indenture, subject to (a) agreed release under customary circumstances and (b) agreed non-petition and limited recourse provisions. |
| **Exchange Period** | From the later of (i) 41 days after the Original Issue Date and (ii) the date upon which the NEV Shares have resumed trading on the HKEX to 10 trading days prior to maturity. |

| | Exchanges of the NEV MEBs to NEV Shares during any calendar month shall not exceed one-third (1/3) of the aggregate principal amount of the NEV MEBs that have been issued from (and including) the Original Issue Date and up to the last issue date of the NEV MEBs. |
| --- | --- |
| | All exchanges shall be settled in NEV Shares (and not in cash). |
| **Exchange Price** | HK$3.84 per share subject to adjustment in the manner provided in the Trust Deed. |
| **Events of Default** | Customary events of default. Remedy limited to exchange rights for NEV MEBs. |
| **Auditor** | The Company will engage a Whitelist Auditor to audit its annual financial statements by no later than the audit of the fiscal year ending 31 December 2023. |
| | The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms: |
| |     (i)  Baker Tilly International |
| |     (ii)  BDO |
| |     (iii) Crowe Global |
| |     (iv) Deloitte |
| |     (v)  Ernst & Young |
| |     (vi) Grant Thornton |
| |     (vii)   KPMG |
| |     (viii)   Mazars |
| |     (ix) Moore Global |
| |     (x)  Prism; and |
| |     (xi) RSM International |
| **Transfer Restrictions** | The NEV MEBs will not be registered under the US Securities Act or any securities law of any state or other jurisdiction of the United States, and may not be offered or sold within the United States (as defined in Regulation S under the US Securities Act) except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the US Securities Act. |
| **Form, Denomination and Registration** | The NEV MEBs will be issued only in fully registered form and initially represented by one or more global certificates. |
| **Listing** | The Company will use best efforts to obtain the listing of the NEV MEBs on an internationally recognized stock exchange and |

| | |
|---|---|
| | maintain such listing as long as any NEV MEBs remain outstanding. |
| **Governing Law of the NEV MEBs Trust Deeds** | The laws of Hong Kong |

Part C3 – CEG MCBs

**Principal Terms of the CEG MCBs**

| CEG MCBs | |
|---|---|
| **Issuer / Company** | China Evergrande Group (3333.HK) |
| **Original Issue Date** | The Restructuring Effective Date. |
| **Convertible Bonds to be Issued** | CEG MCBs convertible into CEG Shares listed on the HKEX. |
| **Principal Amount** | The CEG MCBs shall comprise one tranche, with a maximum aggregate principal amount equal to approximately HK$3,253 million. |
| **Maturity** | Five (5) years from the Reference Date. The outstanding principal amount of the CEG MCBs shall be mandatorily converted into the CEG Shares at maturity. All conversions shall be settled in CEG Shares (and not in cash). |
| **Conversion Period** | From the later of (i) 41 days after the Original Issue Date and (ii) the date upon which the CEG Shares have resumed trading on the HKEX to 10 trading days prior to maturity.<br><br>Conversions of the CEG MCBs to CEG Shares during any calendar month shall not exceed one-third (1/3) of the aggregate principal amount of the CEG MCBs that have been issued from (and including) the Original Issue Date and up to the last issue date of the CEG MCBs.<br><br>All conversions shall be settled in CEG Shares (and not in cash). |
| **Conversion Price** | HK$0.5775 per share subject to adjustment in the manner provided in the Trust Deed. |
| **Events of Default** | Customary events of default. Remedy limited to conversion rights for CEG MCBs. |
| **Auditor** | The Company will engage a Whitelist Auditor to audit its annual financial statements by no later than the audit of the fiscal year ending 31 December 2023.<br><br>The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms:<br><br>(i)  Baker Tilly International<br>(ii) BDO<br>(iii) Crowe Global<br>(iv) Deloitte<br>(v)  Ernst & Young |

|  | (vi) Grant Thornton |
|  | (vii)   KPMG |
|  | (viii)   Mazars |
|  | (ix) Moore Global |
|  | (x)  Prism; and |
|  | (xi) RSM International |
| **Transfer Restrictions** | The CEG MCBs will not be registered under the US Securities Act or any securities law of any state or other jurisdiction of the United States, and may not be offered or sold within the United States (as defined in Regulation S under the US Securities Act) except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the US Securities Act. |
| **Form,    Denomination and Registration** | The CEG MCBs will be issued only in fully registered form and initially represented by one or more global certificates. |
| **Listing** | The Company will use best efforts to obtain the listing of the CEG MCBs on an internationally recognized stock exchange and maintain such listing as long as any CEG MCBs remain outstanding. |
| **Governing Law of the CEG MCBs Trust Deeds** | The laws of Hong Kong |

<u>Part D – SLNs</u>

Part D1 – A2 EVPS SLNs

| **Principal Terms of the A2 EVPS SLNs** |
| --- |

| A2 EVPS SLNs | |
|---|---|
| **Issuer / Company** | China Evergrande Group (3333.HK) |
| **Original Issue Date** | The Restructuring Effective Date. |
| **Principal Amount** | A2 EVPS SLNs shall comprise two tranches as follows, with the following maximum aggregate principal amounts:<br><br>(a)  Tranche A: US$550 million; and<br><br>(b)  Tranche B: US$550 million. |
| **Maturity** | (a)  Tranche A: 5 years from the Reference Date; and<br><br>(b)  Tranche B: 6 years from the Reference Date.<br><br>With respect to each tranche of the A2 EVPS SLNs, any outstanding principal amount under such A2 EVPS SLNs shall be repaid on maturity, together with any accrued but unpaid interest. |
| **Interest[3]** | Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the A2 EVPS SLNs at the following interest rates with respect to each interest payment period:<br><br>(a)  Tranche A: 5.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 6.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); and<br><br>(b)  Tranche B: 5.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 6.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind).<br><br>Interest on the outstanding principal amount of the A2 EVPS SLNs shall be paid in the following manner:<br><br>(i)  For the first two and a half years after the Reference Date: interest may be paid in cash or in kind, at the election of the Company;<br><br>(ii)  From the 31st month to the 36th month after the Reference Date: interest in an amount equal to at least 0.5% of the outstanding principal amount of each tranche of the A2 EVPS SLNs shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company; |

---

[3] For illustration purposes only, assuming all of the Class A Scheme Creditors elect Option 2 and each tranche of the A2 EVPS SLNs will be issued at the maximum amount indicated above, the maximum amount of interest that the Company may elect to pay in kind will be as follows:

(a)  Tranche A: approximately US$ 123,294,032; and
(b)  Tranche B: approximately US$ 136,536,545.

(iii) For the fourth year after the Reference Date: interest in an amount equal to at least 3.0% p.a. of the outstanding principal amount of each tranche of the A2 EVPS SLNs shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company; and

(iv) Starting from the fifth year after the Reference Date: interest shall be paid in cash.

All interest paid in kind with respect to any tranche of the A2 EVPS SLNs will be added to the then current outstanding principal amount of such tranche of the A2 EVPS SLNs.

If the Company pays cash interest under any tranche of the A2 EVPS SLNs with respect to any interest payment period in an amount greater than the amount of cash interest required to be paid on such tranche with respect to such interest payment period, it shall also pay additional cash interest under all other outstanding tranches of the A2 EVPS SLNs, A2 NEV SLNs, Plain A2 Notes, C2 EVPS SLNs, C2 NEV SLNs, C2 Notes and Forced A2 Notes. The amount of such additional cash payments shall be allocated among each of the A2 EVPS SLNs, A2 NEV SLNs, Plain A2 Notes, C2 EVPS SLNs, C2 NEV SLNs, C2 Notes and (with respect to any interest payment period ending after the Final Distribution Date) Forced A2 Notes (and among each tranche of such instruments) on a pro rata basis by outstanding principal amount (subject to relevant provisions in the indentures for the Forced A2 Notes).

| | |
|---|---|
| **Guarantees** | The initial New Instruments Subsidiary Guarantors of the A2 EVPS SLNs are listed in Annex A to this Schedule. |
| | The New Instruments Subsidiary Guarantees of the A1 Notes shall be subordinated to the New Instruments Subsidiary Guarantees of the A2 EVPS SLNs. |
| **Share Security** | 2,493,778,025 (final amount to be confirmed) EVPS Shares will be charged for securing the A2 EVPS SLNs (the "**A2 EVPS Shares Charges**"). For each tranche of A2 EVPS SLNs, EVPS Shares in corresponding proportion of such tranche's principal amount over the aggregate principal amount of A2 EVPS SLNs will be charged to secure such tranche of A2 EVPS SLNs. |
| | EVPS Shares subject to an A2 EVPS Shares Charge may be released in accordance with the indenture. |
| | Subject to the terms of the indenture, prior consultation or approval will not be required from the New Instruments Trustee, Collateral Agent or any noteholder for releasing EVPS Shares for sale to a strategic investor so long as the net proceeds of such sale are not lower than the A2 EVPS Redemption Amount and are used to redeem the A2 EVPS SLN as aforesaid (in accordance with the indenture). Any sale of EVPS Shares to a strategic investor made in accordance with the indenture shall be made on a pro rata basis between the A2 EVPS SLNs on the one hand and the C2 EVPS SLNs on the other hand. |

| | |
|---|---|
| | An A2 EVPS Share Charge shall become enforceable only upon (i) failure to pay principal of or interest on the A2 EVPS SLN secured by such charge, (ii) failure to apply the net proceeds from the sale of such EVPS Shares to redeem such A2 EVPS SLN, or (iii) with respect to A2 EVPS SLN Tranche A, failure to pay principal of or interest on C2 EVPS SLN Tranche A, and with respect to A2 EVPS SLN Tranche B, failure to pay principal of or interest on C2 EVPS SLN Tranche B, as set forth in the indenture. |
| | Cash dividends received from EVPS Shares under an A2 EVPS Shares Charge shall be applied to redeem on a pro rata basis the A2 EVPS SLN secured by such charge at par plus accrued and unpaid interest. |
| **Asset Security** | The Company will charge or cause the Asset List 1 Holding Subsidiary Pledgors to charge, as the case may be, the capital stock owned directly by the Company or the Asset List 1 Holding Subsidiary Pledgors of each Asset List 1 Holding Subsidiary (the "**Asset List 1 Collateral**") in favor of the Collateral Agent to secure each tranche of A2 EVPS SLNs (the "**A2 EVPS SLNs Asset List 1 Charges**"). Asset List 1 Holding Subsidiaries are the Subsidiaries named in Annex B to this Schedule which hold the Relevant Asset listed on Asset List 1. |
| | Subject to the Asset List 1 Intercreditor Agreement, security interests over the Asset List 1 Collateral are to be shared among the A2 EVPS SLNs and A2 NEV SLNs. |
| | The Company will charge or cause the Asset List 2 Holding Subsidiary Pledgors to charge, as the case may be, the capital stock owned directly by the Company or the Asset List 2 Holding Subsidiary Pledgors of each Asset List 2 Holding Subsidiary, and assign by way of security certain receivables owed to the Company by Shengyu (BVI) Limited as set forth under Annex C to this Schedule (such receivables, together with such capital stock owned directly by the Company or the Asset List 2 Holding Subsidiary Pledgors of each Asset List 2 Holding Subsidiary, the "**Asset List 2 Collateral**"), in favor of the Collateral Agent to secure each tranche of A2 EVPS SLNs (the "**A2 EVPS SLNs Asset List 2 Charges**"). Asset List 2 Holding Subsidiaries are the Subsidiaries named in Annex C to this Schedule which hold the Relevant Asset listed on Asset List 2. |
| | Subject to the Asset List 2 Intercreditor Agreement, security interests over the Asset List 2 Collateral are to be shared among the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs and C2 NEV SLNs. |
| | A2 EVPS SLNs Asset List 1 Charges or A2 EVPS SLNs Asset List 2 Charges will be released in accordance with the indenture. |
| **Mandatory Redemption** | The Company shall use the net proceeds from the sale of any asset listed in Asset List 1 (or the shares of the Asset List 1 Holding Subsidiaries) to purchase, by way of reverse Dutch auction, any of the A2 EVPS SLNs and A2 NEV SLNs at a minimum purchase |

price equal to the then current market price plus a premium of US$0.1 per US$1 of principal amount, plus accrued and unpaid interest (but in any event the purchase price shall not exceed 100% of the principal amount plus accrued and unpaid interest), within 45 business days of its receipt of such net proceeds. If any net proceeds from such sale remains unused after such reverse Dutch auction, the Company shall redeem the security with the shortest maturity among the A2 EVPS SLNs and A2 NEV SLNs at par plus accrued and unpaid interest.

The Company shall use the net proceeds from the sale of any asset listed in Asset List 2 (or the shares of the Asset List 2 Holding Subsidiaries) to purchase or redeem, by way of reverse Dutch auction, any of the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, and C2 NEV SLNs at a minimum purchase price equal to the then current market price plus a premium of US$0.1 per US$1 of principal amount, plus accrued and unpaid interest (but in any event the purchase price shall not exceed 100% of the principal amount plus accrued and unpaid interest), within 45 business days of its receipt of such net proceeds, provided that the net proceeds shall be allocated for such purchase between A2 EVPS SLNs and the A2 NEV SLNs on the one hand and the C2 EVPS SLNs and C2 NEV SLNs on the other hand on a pro rata basis according to their aggregate outstanding principal amounts. If any net proceeds from such sale remains unused after such reverse Dutch auction, the Company shall redeem the security with the shortest maturity among the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, and C2 NEV SLNs at par plus accrued and unpaid interest.

All securities so purchased or redeemed shall be cancelled.

| | |
|---|---|
| **Optional Redemption** | With respect to each tranche of the A2 EVPS SLNs, at any time during the tenor of such A2 EVPS SLNs, the Company has the right to redeem such A2 EVPS SLNs, in whole or in part, at par plus any accrued and unpaid cash interest on such redeemed A2 EVPS SLNs up to but excluding the relevant redemption date, subject to certain conditions. |
| **Amendments with Consent of Holders** | Amendment provisions will be similar to those in the Existing Notes, save that amendments, modifications or waivers that require the consent of each holder in the Existing Notes would not require the consent of each holder of the relevant tranche of the A2 EVPS SLNs then outstanding. |
| **Covenants** | The New Instruments Documents will contain covenants, subject to certain exceptions, limiting the ability of the Company and its restricted subsidiaries to, among other things: |

(i)      incur or guarantee additional indebtedness and issue disqualified or preferred stock;

(ii)     make investments or specified restricted payments;

(iii)    declare dividends on capital stock or purchase or redeem capital stock;

(iv)    issue or sell capital stock of restricted subsidiaries;

(v)    guarantee indebtedness;

(vi)    sell, lease or transfer assets;

(vii)    create liens;

(viii)    enter into sale and leaseback transactions;

(ix)    engage in any business other than permitted businesses;

(x)    enter into agreements that restrict the restricted subsidiaries' ability to pay dividends, transfer assets or make intercompany loans;

(xi)    enter into transactions with shareholders or affiliates;

(xii)    effect a consolidation, merger or sale of assets;

(xiii)    designate unrestricted subsidiaries;

(xiv)    layer debt between senior and subordinated debt; and

(xv)    pay consideration as inducement to any consent, waiver or amendment of terms to certain holders of notes.

The New Instruments Documents will contain covenants requiring the Company and its restricted subsidiaries to, among other things:

(i)    provide financial statements and reports;

(ii)    maintain certain offices or agencies;

(iii)    maintain necessary governmental approvals and licenses and comply with applicable laws;

(iv)    pay applicable taxes and other claims;

(v)    pay customary additional amounts to gross-up withholding taxes or deductions on payments due under the notes; and

(vi)    authorize the trustee to provide certain information to holders of the notes upon request.

| **Auditor** | The Company will engage a Whitelist Auditor to audit its annual financial statements by no later than the audit of the fiscal year ending 31 December 2023. |

The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms:

(i) Baker Tilly International

(ii) BDO

(iii) Crowe Global

(iv) Deloitte

(v) Ernst & Young

(vi) Grant Thornton

|  | (vii)   KPMG |
|---|---|
|  | (viii)  Mazars |
|  | (ix) Moore Global |
|  | (x)  Prism; and |
|  | (xi) RSM International |
| **Transfer Restrictions** | The A2 EVPS SLNs and the related New Instruments Subsidiary Guarantees will not be registered under the US Securities Act or any securities law of any state or other jurisdiction of the United States, and may not be offered or sold within the United States (as defined in Regulation S under the US Securities Act) except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the US Securities Act. |
| **Form,    Denomination and Registration** | The A2 EVPS SLNs will be issued only in fully registered form and each tranche of the A2 EVPS SLNs will be initially represented by one or more global certificates. |
| **Listing** | The Company will use best efforts to obtain the listing of the A2 EVPS SLNs on an internationally recognized stock exchange and maintain such listing as long as any A2 EVPS SLNs remain outstanding. |
| **Governing Law of the A2    EVPS    SLNs Indentures** | The laws of the State of New York |

Part D2 – A2 NEV SLNs

**Principal Terms of the A2 NEV SLNs**

| A2 NEV SLNs | |
|---|---|
| **Issuer / Company** | China Evergrande Group (3333.HK) |
| **Original Issue Date** | The Restructuring Effective Date. |
| **Principal Amount** | A2 NEV SLNs shall comprise two tranches as follows, with the following maximum aggregate principal amounts:<br><br>(a) Tranche A: US$600 million; and<br><br>(b) Tranche B: US$750 million. |
| **Maturity** | (a) Tranche A: 5 years from the Reference Date; and<br><br>(b) Tranche B: 6 years from the Reference Date.<br><br>With respect to each tranche of the A2 NEV SLNs, any outstanding principal amount under such A2 NEV SLNs shall be repaid on maturity, together with any accrued but unpaid interest. |
| **Interest**[4] | Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the A2 NEV SLNs at the following interest rates with respect to each interest payment period:<br><br>(a) Tranche A: 5.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 6.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); and<br><br>(b) Tranche B: 5.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 6.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind).<br><br>Interest on the outstanding principal amount of the A2 NEV SLNs shall be paid in the following manner:<br><br>(i) For the first two and a half years after the Reference Date: interest may be paid in cash or in kind, at the election of the Company;<br><br>(ii) From the 31st month to the 36th month after the Reference Date: interest in an amount equal to at least 0.5% of the outstanding principal amount of each tranche of the A2 NEV SLNs shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company;<br><br>(iii) For the fourth year after the Reference Date: interest in an amount equal to at least 3.0% p.a. of the outstanding |

---

[4] For illustration purposes only, assuming all of the Class A Scheme Creditors elect Option 2 and each tranche of the A2 NEV SLNs will be issued at the maximum amount indicated above, the maximum amount of interest that the Company may elect to pay in kind will be as follows:

    (a)    Tranche A: approximately US$134,502,579; and
    (b)    Tranche B: approximately US$186,186,196.

|  | principal amount of each tranche of the A2 NEV SLNs shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company; and |
|  | (iv) Starting from the fifth year after the Reference Date: interest shall be paid in cash. |

All interest paid in kind with respect to any tranche of the A2 NEV SLNs will be added to the then current outstanding principal amount of such tranche of the A2 NEV SLNs.

If the Company pays cash interest under any tranche of the A2 NEV SLNs with respect to any interest payment period in an amount greater than the amount of cash interest required to be paid on such tranche with respect to such interest payment period, it shall also pay additional cash interest under all other outstanding tranches of the A2 EVPS SLNs, A2 NEV SLNs, Plain A2 Notes, C2 EVPS SLNs, C2 NEV SLNs, C2 Notes and Forced A2 Notes with respect to such interest payment period. The amount of such additional cash payments shall be allocated among the A2 EVPS SLNs, A2 NEV SLNs, Plain A2 Notes, C2 EVPS SLNs, C2 NEV SLNs, C2 Notes and (with respect to any interest payment period ending after the Final Distribution Date) Forced A2 Notes (and among each tranche of such instruments) on a pro rata basis by outstanding principal amount (subject to relevant provisions in the indentures for the Forced A2 Notes).

| **Guarantees** | The initial New instruments Subsidiary Guarantors of the A2 NEV SLNs are listed in Annex A to this Schedule. |
|  | The New Instruments Subsidiary Guarantees of the A1 Notes shall be subordinated to the New Instruments Subsidiary Guarantees of the A2 NEV SLNs. |
| **Custody Arrangement** | Deposit of (i) 1,749,634,360 (final amount to be confirmed) NEV Shares and (ii) Converted A2 NEV SLN Shares (as defined below) into custody accounts (the "**A2 NEV Custody Accounts**") of an independent bank in the name of the Company or an agreed offshore subsidiary of the Company, subject to a custody agreement between the Company or such subsidiary as account holder and such independent bank. A separate custody account for each tranche of A2 NEV SLNs holding NEV Shares in corresponding proportion of such tranche's principal amount over the aggregate principal amount of A2 NEV SLNs will be subject to custody arrangement for such tranche of A2 NEV SLNs. |
|  | A portion of the NEV Shares converted per the Conversion of Shareholders' Loans to NEV Shares will be deposited into the A2 NEV Custody Accounts ("**Converted A2 NEV SLN Shares**") and the C2 NEV Custody Accounts (as defined below) on a pro rata basis such that the A2 NEV Custody Accounts and C2 NEV Custody Accounts will together hold NEV Shares representing approximately 30% of the total issued NEV Shares immediately after such Conversion of Shareholders' Loans to NEV Shares assuming there are no other changes to the share capital of NEV |

since the date hereof. The remaining NEV Shares so converted will be added to the Exchange Property under the NEV MEBs.

NEV Shares held under the A2 NEV Custody Accounts may be released in accordance with the indenture.

Subject to the terms of the indenture, prior consultation or approval will not be required from the Trustee, Collateral Agent or any noteholder for releasing NEV Shares for sale to a strategic investor so long as the net proceeds of such sale are not lower than the A2 NEV Redemption Amount and are used to redeem the A2 NEV SLN as aforesaid in accordance with the indenture. Any sale of NEV Shares to a strategic investor shall be made on a pro rata basis between the A2 NEV SLNs on the one hand and the C2 NEV SLNs on the other hand.

An A2 NEV Custody Account shall become enforceable only upon (i) failure to pay principal of or interest on the A2 NEV SLN linked to such custody arrangement, (ii) failure to apply the net proceeds from the sale of such NEV Shares to redeem such A2 NEV SLN, or (iii) with respect to A2 NEV SLN Tranche A, failure to pay principal of or interest on C2 NEV SLN Tranche A, and with respect to A2 NEV SLN Tranche B, failure to pay principal of or interest on C2 NEV SLN Tranche B, as set forth in the indenture.

Cash dividends received from NEV Shares under an A2 NEV Custody Account shall be applied to redeem the A2 NEV SLNs linked to such custody arrangement at par plus accrued and unpaid interest.

The Company or its subsidiary, as applicable, shall maintain the signatories nominated by the trustee in respect of the custody account at all times.

Prior to the occurrence of any enforcement trigger under the custody agreement, the trustee shall have joint signatory rights with the Company or its subsidiary, as applicable, in relation to any withdrawal or transfer from, and any closure of, the custody account. The Company or its subsidiary, as applicable, shall not withdraw or transfer from the custody account except in circumstances to be agreed.

Upon the occurrence of any enforcement trigger under the custody agreement, the Company or its subsidiary, as applicable, shall immediately cease to have any rights with respect to the operation of the account and the trustee shall have the right to deliver a notice of control to the account bank and shall have sole signatory rights in relation to any withdrawal or transfer from, and any closure of, the custody account, without any need for the signatory of the Company or its subsidiary, as applicable, to co-sign.

The trustee nominated signatory shall have been deemed to have consented or signed, as applicable, if it does not object within three (3) business days upon request to act or sign, as applicable, in relation to transfers, withdrawals and other actions expressly permitted under the indenture and the security documents.

| | |
|---|---|
| | *Note: the above custodial arrangements remain subject to discussions with the custodian.* |
| **Asset Security** | The Company will charge or cause the Asset List 1 Holding Subsidiary Pledgors to charge, as the case may be, the capital stock owned directly by the Company or the Asset List 1 Holding Subsidiary Pledgors of each Asset List 1 Holding Subsidiary (the "**Asset List 1 Collateral**") in favor of the Collateral Agent to secure each tranche of A2 NEV SLNs (the "**A2 NEV SLNs Asset List 1 Charges**"). Asset List 1 Holding Subsidiaries are the Subsidiaries named in Annex B to this Schedule which hold the Relevant Asset listed on Asset List 1. |
| | Subject to the Asset List 1 Intercreditor Agreement, security interests over the Asset List 1 Collateral are to be shared among the A2 EVPS SLNs and A2 NEV SLNs. |
| | The Company will charge or cause the Asset List 2 Holding Subsidiary Pledgors to charge, as the case may be, the capital stock owned directly by the Company or the Asset List 2 Holding Subsidiary Pledgors of each Asset List 2 Holding Subsidiary, and assign by way of security certain receivables owed to the Company by Shengyu (BVI) Limited as set forth under Annex C to this Schedule (such receivables, together with such capital stock owned directly by the Company or the Asset List 2 Holding Subsidiary Pledgors of each Asset List 2 Holding Subsidiary, the "**Asset List 2 Collateral**"), in favor of the Collateral Agent to secure each tranche of A2 NEV SLNs (the "**A2 NEV SLNs Asset List 2 Charges**"). Asset List 2 Holding Subsidiaries are the Subsidiaries named in Annex C to this Schedule which hold the Relevant Asset listed on Asset List 2. |
| | Subject to the Asset List 2 Intercreditor Agreement, security interests over the Asset List 2 Collateral are to be shared among the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs and C2 NEV SLNs. |
| | A2 NEV SLNs Asset List 1 Charges or A2 NEV SLNs Asset List 2 Charges will be released in accordance with the indenture. |
| **Mandatory Redemption** | The Company shall use the net proceeds from the sale of any asset listed in Asset List 1 (or the shares of the Asset List 1 Holding Subsidiaries) to purchase, by way of reverse Dutch auction, any of the A2 EVPS SLNs and A2 NEV SLNs at a minimum purchase price equal to the then current market price plus a premium of US$0.1 per US$1 of principal amount, plus accrued and unpaid interest (but in any event the purchase price shall not exceed 100% of the principal amount plus accrued and unpaid interest), within 45 business days of its receipt of such net proceeds. If any net proceeds from such sale remains unused after such reverse Dutch auction, the Company shall redeem the security with the shortest maturity among the A2 EVPS SLNs and A2 NEV SLNs at par plus accrued and unpaid interest. |

|  | The Company shall use the net proceeds from the sale of any asset listed in Asset List 2 (or the shares of the Asset List 2 Holding Subsidiaries) to purchase or redeem, by way of reverse Dutch auction, any of the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, and C2 NEV SLNs at a minimum purchase price equal to the then current market price plus a premium of US$0.1 per US$1 of principal amount, plus accrued and unpaid interest (but in any event the purchase price shall not exceed 100% of the principal amount plus accrued and unpaid interest), within 45 business days of its receipt of such net proceeds, provided that the net proceeds shall be allocated for such purchase between A2 EVPS SLNs and the A2 NEV SLNs on the one hand and the C2 EVPS SLNs and C2 NEV SLNs on the other hand on a pro rata basis according to their aggregate outstanding principal amounts. If any net proceeds from such sale remains unused after such reverse Dutch auction, the Company shall redeem the security with the shortest maturity among the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, and C2 NEV SLNs at par plus accrued and unpaid interest.<br><br>All securities so purchased or redeemed shall be cancelled. |
|---|---|
| **Optional Redemption** | With respect to each tranche of the A2 NEV SLNs, at any time during the tenor of such A2 NEV SLNs, the Company has the right to redeem such A2 NEV SLNs, in whole or in part, at par plus any accrued and unpaid cash interest on such redeemed A2 NEV SLNs up to but excluding the relevant redemption date, subject to certain conditions. |
| **Amendments with Consent of Holders** | Amendment provisions will be similar to those in the Existing Notes, save that amendments, modifications or waivers that require the consent of each holder in the Existing Notes would not require the consent of each holder of the relevant tranche of the A2 NEV SLNs then outstanding. |
| **Covenants** | The New Instruments Documents will contain covenants, subject to certain exceptions, limiting the ability of the Company and its restricted subsidiaries to, among other things:<br><br>(i)     incur or guarantee additional indebtedness and issue disqualified or preferred stock;<br><br>(ii)     make investments or specified restricted payments;<br><br>(iii)     declare dividends on capital stock or purchase or redeem capital stock;<br><br>(iv)     issue or sell capital stock of restricted subsidiaries;<br><br>(v)     guarantee indebtedness;<br><br>(vi)     sell, lease or transfer assets;<br><br>(vii)     create liens;<br><br>(viii)     enter into sale and leaseback transactions;<br><br>(ix)     engage in any business other than permitted businesses; |

(x)    enter into agreements that restrict the restricted subsidiaries' ability to pay dividends, transfer assets or make intercompany loans;

(xi)    enter into transactions with shareholders or affiliates;

(xii)    effect a consolidation, merger or sale of assets;

(xiii)    designate unrestricted subsidiaries;

(xiv)    layer debt between senior and subordinated debt; and

(xv)    pay consideration as inducement to any consent, waiver or amendment of terms to certain holders of notes.

The New Instruments Documents will contain covenants requiring the Company and its restricted subsidiaries to, among other things:

(i)    provide financial statements and reports;

(ii)    maintain certain offices or agencies;

(iii)    maintain necessary governmental approvals and licenses and comply with applicable laws;

(iv)    pay applicable taxes and other claims;

(v)    pay customary additional amounts to gross-up withholding taxes or deductions on payments due under the notes; and

(vi)    authorize the trustee to provide certain information to holders of the notes upon request.

| Auditor | The Company will engage a Whitelist Auditor to audit its annual financial statements by no later than the audit of the fiscal year ending 31 December 2023. |
| --- | --- |

The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms:

(i) Baker Tilly International

(ii) BDO

(iii) Crowe Global

(iv) Deloitte

(v) Ernst & Young

(vi) Grant Thornton

(vii)    KPMG

(viii)    Mazars

(ix) Moore Global

(x) Prism; and

(xi) RSM International

| Transfer Restrictions | The A2 NEV SLNs and the related New Instruments Subsidiary Guarantees will not be registered under the US Securities Act or |
| --- | --- |

| | |
|---|---|
| | any securities law of any state or other jurisdiction of the United States, and may not be offered or sold within the United States (as defined in Regulation S under the US Securities Act) except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the US Securities Act. |
| **Form, Denomination and Registration** | The A2 NEV SLNs will be issued only in fully registered form and each tranche of the A2 NEV SLNs will be initially represented by one or more Global Certificates. |
| **Listing** | The Company will use best efforts to obtain the listing of the A2 NEV SLNs on an internationally recognized stock exchange and maintain such listing as long as any A2 NEV SLNs remain outstanding. |
| **Governing Law of the A2 NEV SLNs Indentures** | The laws of the State of New York |

Part D3 – C2 EVPS SLNs

**Principal Terms of the C2 EVPS SLNs**

| C2 EVPS SLNs | |
| --- | --- |
| **Issuer / Company** | China Evergrande Group (3333.HK) |
| **Original Issue Date** | The Restructuring Effective Date. |
| **Principal Amount** | C2 EVPS SLNs shall comprise two tranches as follows, with the following maximum aggregate principal amounts: <br><br> (a) Tranche A: US$150 million; and <br><br> (b) Tranche B: US$150 million. |
| **Maturity** | (a) Tranche A: 7 years from the Reference Date; and <br><br> (b) Tranche B: 8 years from the Reference Date. <br><br> With respect to each tranche of the C2 EVPS SLNs, any outstanding principal amount under such C2 EVPS SLNs shall be repaid on maturity, together with any accrued but unpaid interest. |
| **Interest[5]** | Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the C2 EVPS SLNs at the following interest rates with respect to each interest payment period: <br><br> (a) Tranche A: 6.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); and <br><br> (b) Tranche B: 6.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind). <br><br> Interest on the outstanding principal amount of the C2 EVPS SLNs shall be paid in the following manner: <br><br> (i) For the first two and a half years after the Reference Date: interest may be paid in cash or in kind, at the election of the Company; <br><br> (ii) From the 31st month to the 36th month after the Reference Date: interest in an amount equal to at least 0.5% of the outstanding principal amount of each tranche of the C2 EVPS SLNs shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company; |

---

[5] For illustration purposes only, assuming all of the Class C Scheme Creditors elect Option 2 and each tranche of the C2 EVPS SLNs will be issued at the maximum amount indicated above, the maximum amount of interest that the Company may elect to pay in kind will be as follows:

(a)    Tranche A: approximately US$40,910,837; and
(b)    Tranche B: approximately US$44,647,347.

(iii) For the fourth year after the Reference Date: interest in an amount equal to at least 3.0% p.a. of the outstanding principal amount of each tranche of the C2 EVPS SLNs shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company; and

(iv) Starting from the fifth year after the Reference Date: interest shall be paid in cash.

All interest paid in kind with respect to any tranche of the C2 EVPS SLNs will be added to the then current outstanding principal amount of such tranche of the C2 EVPS SLNs.

If the Company pays cash interest under any tranche of the C2 EVPS SLNs with respect to any interest payment period in an amount greater than the amount of cash interest required to be paid on such tranche with respect to such interest payment period, it shall also pay additional cash interest under all other outstanding tranches of the A2 EVPS SLNs, A2 NEV SLNs, F, C2 EVPS SLNs, C2 NEV SLNs and C2 Notes with respect to such interest payment period. The amount of such additional cash payments shall be allocated among the A2 EVPS SLNs, A2 NEV SLNs, Plain A2 Notes, C2 EVPS SLNs, C2 NEV SLNs, C2 Notes and  (with respect to any interest payment period ending after the Final Distribution Date) Forced A2 Notes (and among each tranche of such instruments) on a pro rata basis by outstanding principal amount (subject to relevant provisions in the indentures for the Forced A2 Notes).

**Share Security**

749,465,275 (final amount to be confirmed) EVPS Shares will be charged for securing the C2 EVPS SLNs (the "**C2 EVPS Shares Charges**"). For each tranche of C2 EVPS SLNs, EVPS Shares in corresponding proportion of such tranche's principal amount over the aggregate principal amount of C2 EVPS SLNs will be charged to secure such tranche of C2 EVPS SLNs.

EVPS Shares subject to a C2 EVPS Shares Charge may be released in accordance with the indenture.

Subject to the indenture, prior consultation or approval will not be required from the Trustee, Collateral Agent or any noteholder for releasing EVPS Shares for sale to a strategic investor so long as the net proceeds of such sale are not lower than the C2 EVPS Redemption Amount and are used to redeem the C2 EVPS SLN as aforesaid in accordance with the indenture. Any sale of EVPS Shares to a strategic investor shall be made on a pro rata basis between the A2 EVPS SLNs on the one hand and the C2 EVPS SLNs on the other hand.

A C2 EVPS Shares Charge shall become enforceable only upon (i) failure to pay principal of or interest on the C2 EVPS SLN secured by such charge, (ii) failure to apply the net proceeds from the sale of such EVPS Shares to redeem such C2 EVPS SLN, or (iii) with respect to C2 EVPS SLN Tranche A, failure to pay principal of or interest on A2 EVPS SLN Tranche A, and with respect to C2 EVPS SLN Tranche B, failure to pay principal of or interest on A2 EVPS SLN Tranche B, as set forth in the indenture.

| | |
|---|---|
| | Cash dividends received from EVPS Shares under a C2 EVPS Shares Charge shall be applied to redeem on a pro rata basis the C2 EVPS SLN secured by such charge at par plus accrued and unpaid interest. |
| **Asset Security** | The Company will charge or cause the Asset List 2 Holding Subsidiary Pledgors to charge, as the case may be, the capital stock owned directly by the Company or the Asset List 2 Holding Subsidiary Pledgors of each Asset List 2 Holding Subsidiary, and assign by way of security certain receivables owed to the Company by Shengyu (BVI) Limited as set forth under Annex C to this Schedule (such receivables, together with such capital stock owned directly by the Company or the Asset List 2 Holding Subsidiary Pledgors of each Asset List 2 Holding Subsidiary, the "**Asset List 2 Collateral**"), in favor of the Collateral Agent to secure each tranche of C2 EVPS SLNs (the "**C2 EVPS SLNs Asset List 2 Charges**"). Asset List 2 Holding Subsidiaries are the Subsidiaries named in Annex C to this Schedule which hold the Relevant Asset listed on Asset List 2.<br><br>Subject to the Asset List 2 Intercreditor Agreement, security interests over the Asset List 2 Collateral are to be shared among the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs and C2 NEV SLNs.<br><br>C2 EVPS SLNs Asset List 2 Charges will be released in accordance with the indenture. |
| **Mandatory Redemption** | The Company shall use the net proceeds from the sale of any asset listed in Asset List 2 (or the shares of the Asset List 2 Holding Subsidiaries) to purchase or redeem, by way of reverse Dutch auction, any of the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, and C2 NEV SLNs at a minimum purchase price equal to the then current market price plus a premium of US$0.1 per US$1 of principal amount, plus accrued and unpaid interest (but in any event the purchase price shall not exceed 100% of the principal amount plus accrued and unpaid interest), within 45 business days of its receipt of such net proceeds, provided that the net proceeds shall be allocated for such purchase between A2 EVPS SLNs and the A2 NEV SLNs on the one hand and the C2 EVPS SLNs and C2 NEV SLNs on the other hand on a pro rata basis according to their aggregate outstanding principal amounts. If any net proceeds from such sale remains unused after such reverse Dutch auction, the Company shall redeem the security with the shortest maturity among the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, and C2 NEV SLNs at par plus accrued and unpaid interest.<br><br>All securities so purchased or redeemed shall be cancelled. |
| **Optional Redemption** | With respect to each tranche of the C2 EVPS SLNs, at any time during the tenor of such C2 EVPS SLNs, the Company has the right to redeem such C2 EVPS SLNs, in whole or in part, at par plus any accrued and unpaid cash interest on such redeemed C2 |

| | |
|---|---|
| | EVPS SLNs up to but excluding the relevant redemption date, subject to certain conditions. |
| **Amendments with Consent of Holders** | Amendment provisions will be similar to those in the Existing Notes, save that amendments, modifications or waivers that require the consent of each holder in the Existing Notes would not require the consent of each holder of the relevant tranche of the C2 EVPS SLNs then outstanding. |
| **Covenants** | The New Instruments Documents will contain covenants, subject to certain exceptions, limiting the ability of the Company and its restricted subsidiaries to, among other things: |

The New Instruments Documents will contain covenants, subject to certain exceptions, limiting the ability of the Company and its restricted subsidiaries to, among other things:

(i)     incur or guarantee additional indebtedness and issue disqualified or preferred stock;

(ii)    make investments or specified restricted payments;

(iii)   declare dividends on capital stock or purchase or redeem capital stock;

(iv)    issue or sell capital stock of restricted subsidiaries;

(v)     guarantee indebtedness;

(vi)    sell, lease or transfer assets;

(vii)   create liens;

(viii)  enter into sale and leaseback transactions;

(ix)    engage in any business other than permitted businesses;

(x)     enter into agreements that restrict the restricted subsidiaries' ability to pay dividends, transfer assets or make intercompany loans;

(xi)    enter into transactions with shareholders or affiliates;

(xii)   effect a consolidation, merger or sale of assets;

(xiii)  designate unrestricted subsidiaries;

(xiv)   layer debt between senior and subordinated debt; and

(xv)    pay consideration as inducement to any consent, waiver or amendment of terms to certain holders of notes.

The New Instruments Documents will contain covenants requiring the Company and its restricted subsidiaries to, among other things:

(i)     provide financial statements and reports;

(ii)    maintain certain offices or agencies;

(iii)   maintain necessary governmental approvals and licenses and comply with applicable laws;

(iv)    pay applicable taxes and other claims;

(v)     pay customary additional amounts to gross-up withholding taxes or deductions on payments due under the notes; and

| | |
|---|---|
| | (vi)    authorize the trustee to provide certain information to holders of the notes upon request. |
| **Auditor** | The Company will engage a Whitelist Auditor to audit its annual financial statements by no later than the audit of the fiscal year ending 31 December 2023. |
| | The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms: |
| | (i)   Baker Tilly International |
| | (ii)  BDO |
| | (iii) Crowe Global |
| | (iv) Deloitte |
| | (v)  Ernst & Young |
| | (vi) Grant Thornton |
| | (vii)    KPMG |
| | (viii)   Mazars |
| | (ix) Moore Global |
| | (x)  Prism; and |
| | (xi) RSM International |
| **Transfer Restrictions** | The C2 EVPS SLNs will not be registered under the US Securities Act or any securities law of any state or other jurisdiction of the United States, and may not be offered or sold within the United States (as defined in Regulation S under the US Securities Act) except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the US Securities Act. |
| **Form, Denomination and Registration** | The C2 EVPS SLNs will be issued only in fully registered form and each tranche of the C2 EVPS SLNs will be initially represented by one or more Global Certificates. |
| **Listing** | The Company will use best efforts to obtain the listing of the C2 EVPS SLNs on an internationally recognized stock exchange and maintain such listing as long as any C2 EVPS SLNs remain outstanding. |
| **Governing Law of the C2 EVPS SLNs Indentures** | The laws of the State of New York |

Part D4 – C2 NEV SLNs

| **Principal Terms of the C2 NEV SLNs** |
| --- |

| C2 NEV SLNs | |
|---|---|
| **Issuer / Company** | China Evergrande Group (3333.HK) |
| **Original Issue Date** | The Restructuring Effective Date. |
| **Principal Amount** | C2 NEV SLNs shall comprise two tranches as follows, with the following maximum aggregate principal amounts:<br><br>(a) Tranche A: US$500 million; and<br><br>(b) Tranche B: US$650 million. |
| **Maturity** | (a) Tranche A: 7 years from the Reference Date; and<br><br>(b) Tranche B: 8 years from the Reference Date.<br><br>With respect to each tranche of the C2 NEV SLNs, any outstanding principal amount under such C2 NEV SLNs shall be repaid on maturity, together with any accrued but unpaid interest. |
| **Interest**[6] | Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the C2 NEV SLNs at the following interest rates with respect to each interest payment period:<br><br>(a) Tranche A: 6.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); and<br><br>(b) Tranche B: 6.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind).<br><br>Interest on the outstanding principal amount of the C2 NEV SLNs shall be paid in the following manner:<br><br>(i) For the first two and a half years after the Reference Date: interest may be paid in cash or in kind, at the election of the Company;<br><br>(ii) From the 31st month to the 36th month after the Reference Date: interest in an amount equal to at least 0.5% of the outstanding principal amount of each tranche of the C2 NEV SLNs shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company; |

---

[6] For illustration purposes only, assuming all of the Class C Scheme Creditors elect Option 2 and each tranche of the C2 NEV SLNs will be issued at the maximum amount indicated above, the maximum amount of interest that the Company may elect to pay in kind will be as follows:

    (a)    Tranche A: approximately US$136,369,451; and
    (b)    Tranche B: approximately US$193,471,822.

|  | (iii) For the fourth year after the Reference Date: interest in an amount equal to at least 3.0% p.a. of the outstanding principal amount of each tranche of the C2 NEV SLNs shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company; and |
|---|---|

(iv) Starting from the fifth year after the Reference Date: interest shall be paid in cash.

All interest paid in kind with respect to any tranche of the C2 NEV SLNs will be added to the then current outstanding principal amount of such tranche of the C2 NEV SLNs.

If the Company pays cash interest under any tranche of the C2 NEV SLNs with respect to any interest payment period in an amount greater than the amount of cash interest required to be paid on such tranche with respect to such interest payment period, it shall also pay additional cash interest under all other outstanding tranches of the A2 EVPS SLNs, A2 NEV SLNs, Plain A2 Notes, C2 EVPS SLNs, C2 NEV SLNs, C2 Notes and Forced A2 Notes with respect to such interest payment period. The amount of such additional cash payments shall be allocated among the A2 EVPS SLNs, A2 NEV SLNs, Plain A2 Notes, C2 EVPS SLNs, C2 NEV SLNs, C2 Notes and (with respect to any interest payment period ending after the Final Distribution Date) Forced A2 Notes (and among each tranche of such instruments) on a pro rata basis by outstanding principal amount (subject to relevant provisions in the indentures for the Forced A2 Notes).

| **Custody Arrangement** | Deposit of (i) 1,503,503,540 (final amount to be confirmed) NEV Shares and (ii) Converted C2 NEV SLN Shares (as defined below) into custody accounts (the "**C2 NEV Custody Accounts**") of an independent bank in the name of the Company or an agreed offshore subsidiary of the Company, subject to a custody agreement between the Company or such subsidiary as account holder and such independent bank. A separate custody account for each tranche of C2 NEV SLNs holding NEV Shares in corresponding proportion of such tranche's principal amount over the aggregate principal amount of C2 NEV SLNs will be subject to custody arrangement for such tranche of C2 NEV SLNs. |
|---|---|

A portion of the NEV Shares converted per the Conversion of Shareholders' Loans to NEV Shares will be deposited into the A2 NEV Custody Accounts and the C2 NEV Custody Accounts ("**Converted C2 NEV SLN Shares**") on a pro rata basis such that the A2 NEV Custody Accounts and C2 NEV Custody Accounts will together hold NEV Shares representing approximately 30% of the total issued NEV Shares immediately after such Conversion of Shareholders' Loans to NEV Shares assuming there are no other changes to the share capital of NEV since the date hereof. The remaining NEV Shares so converted will be added to the Exchange Property under the NEV MEBs.

NEV Shares held under the C2 NEV Custody Accounts may be released from the security in accordance with the indenture.

Subject to the terms of the indenture, prior consultation or approval will not be required from the Trustee, Collateral Agent or any noteholder for releasing NEV Shares for sale to a strategic investor so long as the net proceeds of such sale are not lower than the C2 NEV Redemption Amount and are used to redeem the C2 NEV SLN as aforesaid in accordance with the indenture. Any sale of NEV Shares to a strategic investor shall be made on a pro rata basis between the A2 NEV SLNs on the one hand and the C2 NEV SLNs on the other hand.

A C2 NEV Custody Account shall become enforceable only upon (i) failure to pay principal of or interest on the C2 NEV SLN linked to such custody arrangement, (ii) failure to apply the net proceeds from the sale of such NEV Shares to redeem such C2 NEV SLN, or (iii) with respect to C2 NEV SLN Tranche A, failure to pay principal of or interest on A2 NEV SLN Tranche A, and with respect to C2 NEV SLN Tranche B, failure to pay principal of or interest on A2 NEV SLN Tranche B, as set forth in the indenture.

Cash dividends received from NEV Shares under a C2 NEV Custody Account shall be applied to redeem the C2 NEV SLN linked to such custody arrangement at par plus accrued and unpaid interest.

The Company or its subsidiary, as applicable, shall maintain the signatories nominated by the trustee in respect of the custody account at all times.

Prior to the occurrence of any enforcement trigger under the custody agreement, the trustee shall have joint signatory rights with the Company or its subsidiary, as applicable, in relation to any withdrawal or transfer from, and any closure of, the custody account. The Company or its subsidiary, as applicable, shall not withdraw or transfer from the custody account except in circumstances to be agreed.

Upon the occurrence of any enforcement trigger under the custody agreement, the trustee shall have the right to deliver a notice of control to the account bank and shall have sole signatory rights in relation to any withdrawal or transfer from, and any closure of, the custody account, without any need for the signatory of the Company or its subsidiary, as applicable, to co-sign.

The trustee nominated signatory shall have been deemed to have consented or signed, as applicable, if it does not object within three (3) business days upon request to act or sign, as applicable, in relation to transfers, withdrawals and other actions expressly permitted under the indenture and the security documents.

*Note: the above custodial arrangements remain subject to discussions with the custodian.*

| | |
|---|---|
| **Asset Security** | The Company will charge or cause the Asset List 2 Holding Subsidiary Pledgors to charge, as the case may be, the capital stock owned directly by the Company or the Asset List 2 Holding Subsidiary Pledgors of each Asset List 2 Holding Subsidiary, and assign by way of security certain receivables owed to the Company |

by Shengyu (BVI) Limited as set forth under Annex C to this Schedule (such receivables, together with such capital stock owned directly by the Company or the Asset List 2 Holding Subsidiary Pledgors of each Asset List 2 Holding Subsidiary, the "**Asset List 2 Collateral**"), in favor of the Collateral Agent to secure each tranche of C2 NEV SLNs (the "**C2 NEV SLNs Asset List 2 Charges**"). Asset List 2 Holding Subsidiaries are the Subsidiaries named in Annex C to this Schedule which hold the Relevant Asset listed on Asset List 2.

Subject to the Asset List 2 Intercreditor Agreement, security interests over the Asset List 2 Collateral are to be shared among the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs and C2 NEV SLNs.

C2 NEV SLNs Asset List 2 Charges will be released in accordance with the indenture.

| | |
|---|---|
| **Mandatory Redemption** | The Company shall use the net proceeds from the sale of any asset listed in Asset List 2 (or the shares of the Asset List 2 Holding Subsidiaries) to purchase or redeem, by way of reverse Dutch auction, any of the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, and C2 NEV SLNs at a minimum purchase price equal to the then current market price plus a premium of US$0.1 per US$1 of principal amount, plus accrued and unpaid interest (but in any event the purchase price shall not exceed 100% of the principal amount plus accrued and unpaid interest), within 45 business days of its receipt of such net proceeds, provided that the net proceeds shall be allocated for such purchase between A2 EVPS SLNs and the A2 NEV SLNs on the one hand and the C2 EVPS SLNs and C2 NEV SLNs on the other hand on a pro rata basis according to their aggregate outstanding principal amounts. If any net proceeds from such sale remains unused after such reverse Dutch auction, the Company shall redeem the security with the shortest maturity among the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs, and C2 NEV SLNs at par plus accrued and unpaid interest. <br><br> All securities so purchased or redeemed shall be cancelled. |
| **Optional Redemption** | With respect to each tranche of the C2 NEV SLNs, at any time during the tenor of such C2 NEV SLNs, the Company has the right to redeem such C2 NEV SLNs, in whole or in part, at par plus any accrued and unpaid cash interest on such redeemed C2 NEV SLNs up to but excluding the relevant redemption date, subject to certain conditions. |
| **Amendments with Consent of Holders** | Amendment provisions will be similar to those in the Existing Notes, save that amendments, modifications or waivers that require the consent of each holder in the Existing Notes would not require the consent of each holder of the relevant tranche of the C2 NEV SLNs then outstanding. |

| | |
|---|---|
| **Covenants** | The New Instruments Documents will contain covenants, subject to certain exceptions, limiting the ability of the Company and its restricted subsidiaries to, among other things: |
| | (i)    incur or guarantee additional indebtedness and issue disqualified or preferred stock; |
| | (ii)    make investments or specified restricted payments; |
| | (iii)    declare dividends on capital stock or purchase or redeem capital stock; |
| | (iv)    issue or sell capital stock of restricted subsidiaries; |
| | (v)    guarantee indebtedness; |
| | (vi)    sell, lease or transfer assets; |
| | (vii)    create liens; |
| | (viii)    enter into sale and leaseback transactions; |
| | (ix)    engage in any business other than permitted businesses; |
| | (x)    enter into agreements that restrict the restricted subsidiaries' ability to pay dividends, transfer assets or make intercompany loans; |
| | (xi)    enter into transactions with shareholders or affiliates; |
| | (xii)    effect a consolidation, merger or sale of assets; |
| | (xiii)    designate unrestricted subsidiaries; |
| | (xiv)    layer debt between senior and subordinated debt; and |
| | (xv)    pay consideration as inducement to any consent, waiver or amendment of terms to certain holders of notes. |
| | The New Instruments Documents will contain covenants requiring the Company and its restricted subsidiaries to, among other things: |
| | (i)    provide financial statements and reports; |
| | (ii)    maintain certain offices or agencies; |
| | (iii)    maintain necessary governmental approvals and licenses and comply with applicable laws; |
| | (iv)    pay applicable taxes and other claims; |
| | (v)    pay customary additional amounts to gross-up withholding taxes or deductions on payments due under the notes; and |
| | (vi)    authorize the trustee to provide certain information to holders of the notes upon request. |
| **Auditor** | The Company will engage a Whitelist Auditor to audit its annual financial statements by no later than the audit of the fiscal year ending 31 December 2023. |
| | The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms: |

|  | |
|---|---|
|  | (i)   Baker Tilly International |
|  | (ii)  BDO |
|  | (iii) Crowe Global |
|  | (iv) Deloitte |
|  | (v)  Ernst & Young |
|  | (vi) Grant Thornton |
|  | (vii)    KPMG |
|  | (viii)   Mazars |
|  | (ix) Moore Global |
|  | (x)  Prism; and |
|  | (xi) RSM International |
| **Transfer Restrictions** | The C2 NEV SLNs will not be registered under the US Securities Act or any securities law of any state or other jurisdiction of the United States, and may not be offered or sold within the United States (as defined in Regulation S under the US Securities Act) except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the US Securities Act. |
| **Form,   Denomination and Registration** | The C2 NEV SLNs will be issued only in fully registered form and each tranche of the C2 NEV SLNs will be initially represented by one or more Global Certificates. |
| **Listing** | The Company will use best efforts to obtain the listing of the C2 NEV SLNs on an internationally recognized stock exchange and maintain such listing as long as any C2 NEV SLNs remain outstanding. |
| **Governing Law of the C2    NEV    SLNs Indentures** | The laws of the State of New York |

<u>Part E – A2 Notes</u>

Part E1 – Plain A2 Notes

**Principal Terms of the Plain A2 Notes**

| Plain A2 Notes | |
|---|---|
| **Issuer / Company** | China Evergrande Group (3333.HK) |
| **Original Issue Date** | The Restructuring Effective Date. |
| **Principal Amount** | Plain A2 Notes shall comprise four tranches as follows, with the following maximum aggregate principal amounts:<br><br>(a) Tranche A: US$500 million * [(Total Entitlements to be distributed as Plain A2 Notes / (Total Entitlements to be distributed as Plain A2 Notes + Total Entitlements to be distributed as Forced A2 Notes)];<br><br>(b) Tranche B: US$650 million * [(Total Entitlements to be distributed as Plain A2 Notes / (Total Entitlements to be distributed as Plain A2 Notes + Total Entitlements to be distributed as Forced A2 Notes)];<br><br>(c) Tranche C: US$3,800 million * [(Total Entitlements to be distributed as Plain A2 Notes / (Total Entitlements to be distributed as Plain A2 Notes + Total Entitlements to be distributed as Forced A2 Notes)]; and<br><br>(d) Tranche D: Total Entitlements to be distributed as Plain A2 Notes minus the principal amounts of Plain A2 Notes Tranches A, B and C.<br><br>Details of the allocation and distribution of the Plain A2 Notes and Forced A2 Notes are set out in clause 16.8 of the CEG Scheme.<br><br>Subject to election of Option 2 by Class A Scheme Creditors and adjustment and reallocation, Class A Scheme Creditor's Entitlement under Option 2 will be allocated to Plain A2 Notes in sequential order by maturity date starting from Plain A2 Notes Tranche A. |
| **Maturity** | (a) Tranche A: 5 years from the Reference Date;<br><br>(b) Tranche B: 6 years from the Reference Date;<br><br>(c) Tranche C: 7 years from the Reference Date; and<br><br>(d) Tranche D: 8 years from the Reference Date.<br><br>With respect to each tranche of the Plain A2 Notes, any outstanding principal amount under such Plain A2 Notes shall be repaid on maturity, together with any accrued but unpaid interest. |
| **Interest**[7] | Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the |

---

[7] For illustration purposes only, assuming all of the Class A Scheme Creditors elect Option 2 and each tranche of the Plain A2 Notes will be issued at the maximum amount indicated above, the maximum amount of interest that the Company may elect to pay in kind will be as follows:

(a) Tranche A: approximately US$ 112,085,483 * [(Total Entitlements to be distributed as Plain A2 Notes / (Total Entitlements to be distributed as Plain A2 Notes + Total Entitlements to be distributed as Forced A2 Notes)];

(b) Tranche B: approximately US$ 161,361,371 * [(Total Entitlements to be distributed as Plain A2 Notes / (Total Entitlements to be distributed as Plain A2 Notes + Total Entitlements to be distributed as Forced A2 Notes)];

Plain A2 Notes at the following interest rates with respect to each interest payment period:

(a) Tranche A: 5.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 6.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind);

(b) Tranche B: 5.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 6.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind);

(c) Tranche C: 6.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); and

(d) Tranche D: 6.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind).

Interest on the outstanding principal amount of the Plain A2 Notes shall be paid in the following manner:

(i) For the first two and a half years after the Reference Date: interest may be paid in cash or in kind, at the election of the Company;

(ii) From the 31st month to the 36th month after the Reference Date: interest in an amount equal to at least 0.5% of the outstanding principal amount of each tranche of the Plain A2 Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company;

(iii) For the fourth year after the Reference Date: interest in an amount equal to at least 3.0% p.a. of the outstanding principal amount of each tranche of the Plain A2 Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company; and

(iv) Starting from the fifth year after the Reference Date: interest shall be paid in cash.

All interest paid in kind with respect to any tranche of the Plain A2 Notes will be added to the then current outstanding principal amount of such tranche of the Plain A2 Notes.

If the Company pays cash interest under any tranche of the Plain A2 Notes with respect to any interest payment period in an amount greater than the amount of cash interest required to be paid on such tranche with respect to such interest payment period, it shall also pay additional cash interest under all other tranches of the A2 EVPS

(c) Tranche C: approximately US$ 1,036,407,813* [(Total Entitlements to be distributed as Plain A2 Notes / (Total Entitlements to be distributed as Plain A2 Notes + Total Entitlements to be distributed as Forced A2 Notes)]; and
(d) Tranche D: approximately US$2,171,693,067* [(Total Entitlements to be distributed as Plain A2 Notes / (Total Entitlements to be distributed as Plain A2 Notes + Total Entitlements to be distributed as Forced A2 Notes)].

|  | SLNs, A2 NEV SLNs, Plain A2 Notes, C2 EVPS SLNs, C2 NEV SLNs, C2 Notes and Forced A2 Notes. The amount of such additional cash payments shall be allocated among each of the A2 EVPS SLNs, A2 NEV SLNs, Plain A2 Notes, C2 EVPS SLNs, C2 NEV SLNs, C2 Notes and (with respect to any interest payment period ending after the Final Distribution Date) Forced A2 Notes (and among each tranche of such instruments) on a pro rata basis by outstanding principal amount at the time of the payment (subject to relevant provisions in the indentures for the Forced A2 Notes). |
|---|---|
| **Guarantees** | The initial New Instruments Subsidiary Guarantors of the Plain A2 Notes are listed in Annex A to this Schedule.<br><br>The New Instruments Subsidiary Guarantees of the A1 Notes shall be subordinated to the New Instruments Subsidiary Guarantees of the Plain A2 Notes. |
| **Optional Redemption** | With respect to each tranche of the Plain A2 Notes, at any time during the tenor of such Plain A2 Notes, the Company has the right to redeem such Plain A2 Notes, in whole or in part, at par plus any accrued and unpaid cash interest on such redeemed Plain A2 Notes up to but excluding the relevant redemption date, subject to certain conditions. |
| **Amendments with Consent of Holders** | Amendment provisions will be similar to those in the Existing Notes, save that amendments, modifications or waivers that require the consent of each holder in the Existing Notes would not require the consent of each holder of the relevant tranche of the Plain A2 Notes then outstanding. |
| **Covenants** | The New Instruments Documents will contain covenants, subject to certain exceptions, limiting the ability of the Company and its restricted subsidiaries to, among other things:<br><br>(i)    incur or guarantee additional indebtedness and issue disqualified or preferred stock;<br><br>(ii)    make investments or specified restricted payments;<br><br>(iii)    declare dividends on capital stock or purchase or redeem capital stock;<br><br>(iv)    issue or sell capital stock of restricted subsidiaries;<br><br>(v)    guarantee indebtedness;<br><br>(vi)    sell, lease or transfer assets;<br><br>(vii)    create liens;<br><br>(viii)    enter into sale and leaseback transactions;<br><br>(ix)    engage in any business other than permitted businesses;<br><br>(x)    enter into agreements that restrict the restricted subsidiaries' ability to pay dividends, transfer assets or make intercompany loans; |

(xi)    enter into transactions with shareholders or affiliates;

(xii)    effect a consolidation, merger or sale of assets;

(xiii)    designate unrestricted subsidiaries;

(xiv)    layer debt between senior and subordinated debt; and

(xv)    pay consideration as inducement to any consent, waiver or amendment of terms to certain holders of notes.

The New Instruments Documents will contain covenants requiring the Company and its restricted subsidiaries to, among other things:

(i)    provide financial statements and reports;

(ii)    maintain certain offices or agencies;

(iii)    maintain necessary governmental approvals and licenses and comply with applicable laws;

(iv)    pay applicable taxes and other claims;

(v)    pay customary additional amounts to gross-up withholding taxes or deductions on payments due under the notes; and

(vi)    authorize the trustee to provide certain information to holders of the notes upon request.

| | |
|---|---|
| **Auditor** | The Company will engage a Whitelist Auditor to audit its annual financial statements by no later than the audit of the fiscal year ending 31 December 2023. |
| | The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms: |
| | (i)  Baker Tilly International |
| | (ii)  BDO |
| | (iii) Crowe Global |
| | (iv) Deloitte |
| | (v)  Ernst & Young |
| | (vi) Grant Thornton |
| | (vii)    KPMG |
| | (viii)    Mazars |
| | (ix) Moore Global |
| | (x)  Prism; and |
| | (xi) RSM International |
| **Transfer Restrictions** | The Plain A2 Notes and the related New Instruments Subsidiary Guarantees will not be registered under the US Securities Act or any securities law of any state or other jurisdiction of the United States, and may not be offered or sold within the United States (as defined in Regulation S under the US Securities Act) except |

| | |
|---|---|
| | pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the US Securities Act. |
| **Form, Denomination and Registration** | The Plain A2 Notes will be issued only in fully registered form and each tranche of the Plain A2 Notes will be initially represented by one or more Global Certificates. |
| **Listing** | The Company will use best efforts to obtain the listing of the Plain A2 Notes on an internationally recognized stock exchange and maintain such listing as long as any Plain A2 Notes remain outstanding. |
| **Governing Law of the Plain A2 Notes Indentures** | The laws of the State of New York |

Part E2 – Forced A2 Notes

**Principal Terms of the Forced A2 Notes**

| Forced A2 Notes | |
|---|---|
| **Issuer / Company** | China Evergrande Group (3333.HK) |
| **Original Issue Date** | The Restructuring Effective Date. |
| **Principal Amount** | Forced A2 Notes shall comprise four tranches as follows, with the following maximum aggregate principal amounts:<br><br>(a) Tranche A: US$500 million * [(Total Entitlements to be distributed as Forced A2 Notes / (Total Entitlements to be distributed as Forced A2 Notes + Total Entitlements to be distributed as Plain A2 Notes)];<br><br>(b) Tranche B: US$650 million * [(Total Entitlements to be distributed as Forced A2 Notes / (Total Entitlements to be distributed as Forced A2 Notes + Total Entitlements to be distributed as Plain A2 Notes)];<br><br>(c) Tranche C: US$3,800 million * [(Total Entitlements to be distributed as Forced A2 Notes / (Total Entitlements to be distributed as Forced A2 Notes + Total Entitlements to be distributed as Plain A2 Notes)]; and<br><br>(d) Tranche D: [Total Entitlements to be distributed as Forced A2 Notes minus the principal amounts of Forced A2 Notes Tranches A, B and C.<br><br>Details of the allocation and distribution of the Plain A2 Notes and Forced A2 Notes are set out in clause 16.8 of the CEG Scheme.<br><br>Subject to election of Option 2 by Class A Scheme Creditors and adjustment and reallocation, Class A Scheme Creditor's Entitlement under Option 2 will be allocated to Forced A2 Notes in sequential order by maturity date starting from Forced A2 Notes Tranche A. |
| **Maturity** | (a) Tranche A: 5 years from the Reference Date;<br><br>(b) Tranche B: 6 years from the Reference Date;<br><br>(c) Tranche C: 7 years from the Reference Date; and<br><br>(d) Tranche D: 8 years from the Reference Date.<br><br>With respect to each tranche of the Forced A2 Notes, any outstanding principal amount under such Forced A2 Notes shall be repaid on maturity, together with any accrued but unpaid interest. |
| **Interest[8]** | Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the |

---

[8] For illustration purposes only, assuming all of the Class A Scheme Creditors elect Option 2 and each tranche of the Forced A2 Notes will be issued at the maximum amount indicated above, the maximum amount of interest that the Company may elect to pay in kind will be as follows:

(a) Tranche A: approximately US$ 112,085,483 * [(Total Entitlements to be distributed as Forced A2 Notes / (Total Entitlements to be distributed as Forced A2 Notes + Total Entitlements to be distributed as Plain A2 Notes)];

(b) Tranche B: approximately US$ 161,361,371 * [(Total Entitlements to be distributed as Forced A2 Notes / (Total Entitlements to be distributed as Forced A2 Notes + Total Entitlements to be distributed as Plain A2 Notes)];

Forced A2 Notes at the following interest rates with respect to each interest payment period:

(a) Tranche A: 5.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 6.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind);

(b) Tranche B: 5.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 6.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind);

(c) Tranche C: 6.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); and

(d) Tranche D: 6.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind).

Interest on the outstanding principal amount of the Forced A2 Notes shall be paid in the following manner:

(i) For the first two and a half years after the Reference Date: interest may be paid in cash or in kind, at the election of the Company;

(ii) From the 31st month to the 36th month after the Reference Date: interest in an amount equal to at least 0.5% of the outstanding principal amount of each tranche of the Forced A2 Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company;

(iii) For the fourth year after the Reference Date: interest in an amount equal to at least 3.0% p.a. of the outstanding principal amount of each tranche of the Forced A2 Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company; and

(iv) Starting from the fifth year after the Reference Date: interest shall be paid in cash.

All interest paid in kind with respect to any tranche of the Forced A2 Notes will be added to the then current outstanding principal amount of such tranche of the Forced A2 Notes.

If the Company pays cash interest under any tranche of the Forced A2 Notes with respect to any interest payment period in an amount greater than the amount of cash interest required to be paid on such tranche with respect to such interest payment period, it shall also pay

(c) Tranche C: approximately US$ 1,036,407,813* [(Total Entitlements to be distributed as Forced A2 Notes / (Total Entitlements to be distributed as Forced A2 Notes + Total Entitlements to be distributed as Plain A2 Notes)]; and

(d) Tranche D: approximately US$2,171,693,067* [(Total Entitlements to be distributed as Forced A2 Notes / (Total Entitlements to be distributed as Forced A2 Notes + Total Entitlements to be distributed as Plain A2 Notes)].

|  | additional cash interest under all other tranches of the A2 EVPS SLNs, A2 NEV SLNs, Plain A2 Notes, C2 EVPS SLNs, C2 NEV SLNs, C2 Notes and Forced A2 Notes. The amount of such additional cash payments shall be allocated among each of the A2 EVPS SLNs, A2 NEV SLNs, Plain A2 Notes, C2 EVPS SLNs, C2 NEV SLNs, C2 Notes and  (with respect to any interest payment period ending after the Final Distribution Date) Forced A2 Notes (and among each tranche of such instruments) on a pro rata basis by outstanding principal amount at the time of the payment (subject to relevant provisions in the indentures for the Forced A2 Notes). |
|---|---|
| **Mandatory Exchange** | On the Final Distribution Date (and the Interim Distribution Date, if applicable), Forced A2 Notes with a principal amount equivalent to the amount of C2 Unadmitted Portion will be exchanged into the C2 Package Unadmitted Portion, starting from the tranche with the longest maturity and in reverse chronological order, on a pro rata basis amongst holders of Forced A2 Notes.<br><br>Any remaining Forced A2 Notes that are not exchanged into the C2 Package Unadmitted Portion will remain as Forced A2 Notes. |
| **Interest Payment** | Interest payment under the Forced A2 Notes will be suspended until the Final Distribution Date.<br><br>For any Forced A2 Notes that are exchanged into the C2 Unadmitted Portion, accrued and unpaid interest up to (but not including) the exchange date shall be forfeited on the exchange date.<br><br>For any Forced A2 Notes that are not exchanged into the C2 Unadmitted Portion and will remain as Forced A2 Notes after the Final Distribution Date, accrued and unpaid interest from and including the Reference Date to but excluding the last scheduled interest payment date will be paid on the Final Distribution Date. If the Company elects to pay such interest in kind, it shall deliver a notice in writing to the Trustee, the Paying and Transfer Agent and the Holders on or before the Final Distribution Date, in accordance with the indentures governing the Forced A2 Notes. |
| **Guarantees** | The initial New Instruments Subsidiary Guarantors of the Forced A2 Notes are listed in Annex A to this Schedule.<br><br>The New Instruments Subsidiary Guarantees of the A1 Notes shall be subordinated to the New Instruments Subsidiary Guarantees of the Forced A2 Notes. |
| **Optional Redemption** | With respect to each tranche of the Forced A2 Notes, at any time during the tenor of such Forced A2 Notes, the Company has the right to redeem such Forced A2 Notes, in whole or in part, at par plus any accrued and unpaid cash interest on such redeemed Forced A2 Notes up to but excluding the relevant redemption date, subject to certain conditions. |

| | |
|---|---|
| **Amendments with Consent of Holders** | Amendment provisions will be similar to those in the Existing Notes, save that amendments, modifications or waivers that require the consent of each holder in the Existing Notes would not require the consent of each holder of the relevant tranche of the Forced A2 Notes then outstanding. |
| **Covenants** | The New Instruments Documents will contain covenants, subject to certain exceptions, limiting the ability of the Company and its restricted subsidiaries to, among other things:<br><br>(i)    incur or guarantee additional indebtedness and issue disqualified or preferred stock;<br><br>(ii)    make investments or specified restricted payments;<br><br>(iii)    declare dividends on capital stock or purchase or redeem capital stock;<br><br>(iv)    issue or sell capital stock of restricted subsidiaries;<br><br>(v)    guarantee indebtedness;<br><br>(vi)    sell, lease or transfer assets;<br><br>(vii)    create liens;<br><br>(viii)    enter into sale and leaseback transactions;<br><br>(ix)    engage in any business other than permitted businesses;<br><br>(x)    enter into agreements that restrict the restricted subsidiaries' ability to pay dividends, transfer assets or make intercompany loans;<br><br>(xi)    enter into transactions with shareholders or affiliates;<br><br>(xii)    effect a consolidation, merger or sale of assets;<br><br>(xiii)    designate unrestricted subsidiaries;<br><br>(xiv)    layer debt between senior and subordinated debt; and<br><br>(xv)    pay consideration as inducement to any consent, waiver or amendment of terms to certain holders of notes.<br><br>The New Instruments Documents will contain covenants requiring the Company and its restricted subsidiaries to, among other things:<br><br>(i)    provide financial statements and reports;<br><br>(ii)    maintain certain offices or agencies;<br><br>(iii)    maintain necessary governmental approvals and licenses and comply with applicable laws;<br><br>(iv)    pay applicable taxes and other claims;<br><br>(v)    pay customary additional amounts to gross-up withholding taxes or deductions on payments due under the notes; and<br><br>(vi)    authorize the trustee to provide certain information to holders of the notes upon request. |

| | |
|---|---|
| **Auditor** | The Company will engage a Whitelist Auditor to audit its annual financial statements by no later than the audit of the fiscal year ending 31 December 2023.<br><br>The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms:<br><br>(i) Baker Tilly International<br><br>(ii) BDO<br><br>(iii) Crowe Global<br><br>(iv) Deloitte<br><br>(v) Ernst & Young<br><br>(vi) Grant Thornton<br><br>(vii)  KPMG<br><br>(viii)  Mazars<br><br>(ix) Moore Global<br><br>(x) Prism; and<br><br>(xi) RSM International |
| **Transfer Restrictions** | The Forced A2 Notes and the related New Instruments Subsidiary Guarantees will not be registered under the US Securities Act or any securities law of any state or other jurisdiction of the United States, and may not be offered or sold within the United States (as defined in Regulation S under the US Securities Act) except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the US Securities Act. |
| **Form, Denomination and Registration** | The Forced A2 Notes will be issued only in fully registered form and each tranche of the Forced A2 Notes will be initially represented by one or more Global Notes. |
| **Listing** | The Company will use best efforts to obtain the listing of the Forced A2 Notes on an internationally recognized stock exchange and maintain such listing as long as any Forced A2 Notes remain outstanding. |
| **Governing Law of the Forced A2 Notes Indentures** | The laws of the State of New York |

Part F – C2 Notes

**Principal Terms of the C2 Notes**

| C2 Notes | |
|---|---|
| **Issuer / Company** | China Evergrande Group (3333.HK) |
| **Original Issue Date** | The Restructuring Effective Date. |
| **Principal Amount** | C2 Notes shall comprise three tranches as follows, with the following maximum aggregate principal amounts:<br><br>  (a)  Tranche A: US$200 million;<br><br>  (b)  Tranche B: US$2,740 million; and<br><br>  (c)  Tranche C: the aggregate Class C Scheme Creditor's Entitlement under Option 2 minus (i) Class C Scheme Creditor's Entitlement's portion of the principal amount of the EVPS MEBs, the NEV MEBs and CEG MCBs, and (ii) the principal amount of C2 EVPS SLNs, C2 NEV SLNs and C2 Notes Tranches A and B.<br><br>Subject to election of Option 2 by Class C Scheme Creditors and adjustment and reallocation, Class C Scheme Creditor's Entitlement under Option 2 will be allocated to C2 Notes in sequential order by maturity date starting from C2 Notes Tranche A. |
| **Maturity** |   (a)  Tranche A: 7 years from the Reference Date;<br><br>  (b)  Tranche B: 8 years from the Reference Date; and<br><br>  (c)  Tranche C: 9 years from the Reference Date.<br><br>With respect to each tranche of the C2 Notes, any outstanding principal amount under such C2 Notes shall be repaid on maturity, together with any accrued but unpaid interest. |
| **Interest**[9] | Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the C2 Notes at the following interest rates with respect to each interest payment period:<br><br>  (a)  Tranche A: 6.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind);<br><br>  (b)  Tranche B: 6.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); and |

---

[9] For illustration purposes only, assuming all of the Class C Scheme Creditors elect Option 2 and each tranche of the C2 Notes will be issued at the maximum amount indicated above, the maximum amount of interest that the Company may elect to pay in kind will be as follows:

  (a)  Tranche A: approximately US$54,547,782;
  (b)  Tranche B: approximately US$815,558,135; and
  (c)  Tranche C: approximately US$3,039,053,676.

    (c) Tranche C: 7.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 8.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind).

Interest on the outstanding principal amount of the C2 Notes shall be paid in the following manner:

    (i) For the first two and a half years after the Reference Date: interest may be paid in cash or in kind, at the election of the Company;

    (ii) From the 31st month to the 36th month after the Reference Date: interest in an amount equal to at least 0.5% of the outstanding principal amount of each tranche of the C2 Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company;

    (iii) For the fourth year after the Reference Date: interest in an amount equal to at least 3.0% p.a. of the outstanding principal amount of each tranche of the C2 Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company; and

    (iv) Starting from the fifth year after the Reference Date: interest shall be paid in cash.

All interest paid in kind with respect to any tranche of the C2 Notes will be added to the then current outstanding principal amount of such tranche of the C2 Notes.

If the Company pays cash interest under any tranche of the C2 Notes with respect to any interest payment period in an amount greater than the amount of cash interest required to be paid on such tranche with respect to such interest payment period, it shall also pay additional cash interest under all other tranches of the A2 EVPS SLNs, A2 NEV SLNs, Plain A2 Notes, C2 EVPS SLNs, C2 NEV SLNs, C2 Notes and and Forced A2 Notes. The amount of such additional cash payments shall be allocated among each of the A2 EVPS SLNs, A2 NEV SLNs, Plain A2 Notes, C2 EVPS SLNs, C2 NEV SLNs, C2 Notes and (with respect to any interest payment period ending after the Final Distribution Date) Forced A2 Notes (and among each tranche of such instruments) on a pro rata basis by outstanding principal amount at the time of the payment (subject to relevant provisions in the indentures for the Forced A2 Notes).

| | |
|---|---|
| **Optional Redemption** | With respect to each tranche of the C2 Notes, at any time during the tenor of such C2 Notes, the Company has the right to redeem such C2 Notes, in whole or in part, at par plus any accrued and unpaid cash interest on such redeemed C2 Notes up to but excluding the relevant redemption date, subject to certain conditions. |
| **Amendments with Consent of Holders** | Amendment provisions will be similar to those in the Existing Notes, save that amendments, modifications or waivers that |

| | |
|---|---|
| | require the consent of each holder in the Existing Notes would not require the consent of each holder of the relevant tranche of the C2 Notes then outstanding. |
| **Covenants** | The New Instruments Documents will contain covenants, subject to certain exceptions, limiting the ability of the Company and its restricted subsidiaries to, among other things:<br><br>(i)  incur or guarantee additional indebtedness and issue disqualified or preferred stock;<br><br>(ii)  make investments or specified restricted payments;<br><br>(iii)  declare dividends on capital stock or purchase or redeem capital stock;<br><br>(iv)  issue or sell capital stock of restricted subsidiaries;<br><br>(v)  guarantee indebtedness;<br><br>(vi)  sell, lease or transfer assets;<br><br>(vii)  create liens;<br><br>(viii)  enter into sale and leaseback transactions;<br><br>(ix)  engage in any business other than permitted businesses;<br><br>(x)  enter into agreements that restrict the restricted subsidiaries' ability to pay dividends, transfer assets or make intercompany loans;<br><br>(xi)  enter into transactions with shareholders or affiliates;<br><br>(xii)  effect a consolidation, merger or sale of assets;<br><br>(xiii)  designate unrestricted subsidiaries;<br><br>(xiv)  layer debt between senior and subordinated debt; and<br><br>(xv)  pay consideration as inducement to any consent, waiver or amendment of terms to certain holders of notes.<br><br>The New Instruments Documents will contain covenants requiring the Company and its restricted subsidiaries to, among other things:<br><br>(i)  provide financial statements and reports;<br><br>(ii)  maintain certain offices or agencies;<br><br>(iii)  maintain necessary governmental approvals and licenses and comply with applicable laws;<br><br>(iv)  pay applicable taxes and other claims;<br><br>(v)  pay customary additional amounts to gross-up withholding taxes or deductions on payments due under the notes; and<br><br>(vi)  authorize the trustee to provide certain information to holders of the notes upon request. |

| | |
|---|---|
| **Auditor** | The Company will engage a Whitelist Auditor to audit its annual financial statements by no later than the audit of the fiscal year ending 31 December 2023. |
| | The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms: |
| | (i) Baker Tilly International |
| | (ii) BDO |
| | (iii) Crowe Global |
| | (iv) Deloitte |
| | (v) Ernst & Young |
| | (vi) Grant Thornton |
| | (vii) KPMG |
| | (viii) Mazars |
| | (ix) Moore Global |
| | (x) Prism; and |
| | (xi) RSM International |
| **Transfer Restrictions** | The C2 Notes will not be registered under the US Securities Act or any securities law of any state or other jurisdiction of the United States, and may not be offered or sold within the United States (as defined in Regulation S under the US Securities Act) except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the US Securities Act. |
| **Form, Denomination and Registration** | The C2 Notes will be issued only in fully registered form and each tranche of the C2 Notes will be initially represented by one or more Global Certificates. |
| **Listing** | The Company will use best efforts to obtain the listing of the C2 Notes on an internationally recognized stock exchange and maintain such listing as long as any C2 Notes remain outstanding. |
| **Governing Law of the C2 Notes Indentures** | The laws of the State of New York |

Part G

**Corporate Governance Term Sheet**

| Corporate Governance Term Sheet | |
|---|---|
| **Director Nomination on the Restructuring Effective Date** | The appointment of person(s) nominated by the CEG AHG as director(s) of EVPS and NEV, as the case may be (each, an "**AHG Director**"), as set out below shall be effective on the Restructuring Effective Date, *provided* that the nomination of the AHG Director shall be made and submitted by the CEG AHG to CEG not less than 15 calendar days prior to the Restructuring Effective Date and such person shall satisfy the Creditor Director Qualification Requirement (as defined below). Any person nominated by the CEG AHG shall (i) satisfy all applicable requirements under the Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited (as amended, supplemented or otherwise modified from time to time, the "**Listing Rules**") and applicable legal requirements for such directorship, and (ii) possess Chinese language capabilities (collectively, the "**Creditor Director Qualification Requirement**"). |

| Company | Number of AHG Director | Nomination Right |
|---|---|---|
| EVPS | 1 | CEG AHG |
| NEV | 1 | |

| | |
|---|---|
| | On or prior to the Restructuring Effective Date, CEG shall use best efforts to procure EVPS and NEV, as the case may be, to provide the payment of customary remuneration and directors' and officers' liability insurance for the respective AHG Directors, in each case, consistent with market practice. CEG shall use best efforts to procure the engagement of an executive search firm proposed by the CEG AHG on reasonable terms to be agreed by the CEG AHG, with fees of such search firm to be borne by CEG and/or EVPS and NEV, as applicable. |
| **Director Nomination after the Restructuring Effective Date and upon the Exit of the AHG Director for EVPS – EVPS SLNs, A2 Notes and C2 Notes** | The indentures for the EVPS SLNs, the A2 Notes and the C2 Notes shall contain an undertaking by CEG that CEG shall, after the AHG Director appointed by the CEG AHG to the board of EVPS ceases to be a director of EVPS or if the CEG-EVPS Creditors Committee (as defined below) would like to nominate a replacement,<br><br>(a) exercise its voting rights at the relevant shareholders' meeting without violating mandatory requirements under any applicable laws, regulations or listing rules, to vote for, and<br><br>(b) use best effort to direct the director(s) nominated by it to the board of EVPS to vote for (subject to compliance with mandatory requirements under any |

applicable laws, regulations, listing rules, and such director(s)' fiduciary duties),

the appointment of **one (1)** person nominated by the trustee in accordance with the instructions (if any) of the CEG-EVPS Creditors Committee (as defined below) as a director of EVPS (the "**EVPS Creditor Director**"), *provided* that the nomination of the EVPS Creditor Director shall be made and submitted by the trustee to CEG sufficiently in advance of the relevant shareholders' meeting or board meeting, as the case may be, and such person shall satisfy the Creditor Director Qualification Requirement. The indentures for the EVPS SLNs, the A2 Notes and the C2 Notes shall also contain an undertaking by CEG to use best efforts to procure EVPS to provide the payment of customary remuneration and directors' and officers' liability insurance for the EVPS Creditor Director, in each case, consistent with market practice.

If CEG does not receive such instruction from the CEG-EVPS Creditors Committee at least three (3) Business Days prior to the relevant shareholders' meeting or at least two (2) Business Days prior to the relevant directors' meeting, as the case may be, CEG shall be free to vote at such shareholders' meeting or direct its nominee(s) its nominee(s) to act at such directors' meeting, as the case may be, in its sole discretion.

EVPS may expand its board of directors as long as the number of non-EVPS Creditor Director and EVPS Creditor Director on its board increases proportionately, with the number of EVPS Creditor Director rounded down to the nearest whole number.

The "**CEG-EVPS Creditors Committee**" shall comprise the five largest holders in outstanding principal amount of (1) the EVPS SLNs or (2) the A2 Notes and the C2 Notes, as applicable, as set out below who have notified the relevant trustee of their wish to be part of the CEG-EVPS Creditors Committee, subject to the mechanism on change of committee composition as set out below:

(a) the EVPS SLNs; and
(b) if less than US$15 million in aggregate principal amount of the EVPS SLNs are outstanding, the A2 Notes and the C2 Notes.

The indentures for the EVPS SLNs, the A2 Notes and the C2 Notes shall contain provisions for the formation of the initial CEG-EVPS Creditor Committee within 30 days from the Restructuring Effective Date and shall also contain provisions relating to the changes to the composition of the CEG-EVPS Creditors Committee. At any time following the formation of the CEG-EVPS Creditors Committee, if (a) any holder of the EVPS SLNs or the A2 Notes and the C2 Notes, as applicable, eligible to be part of the CEG-EVPS Creditors Committee (a "**CEG-EVPS Eligible Holder**") notifies the relevant trustee that it wishes to be part of the CEG-EVPS Creditors

Committee and (b) its holding in outstanding principal amount of the EVPS SLNs or the A2 Notes and the C2 Notes, as applicable, is larger than a current member of the CEG-EVPS Creditors Committee, such CEG-EVPS Eligible Holder shall be entitled to become a member of the CEG-EVPS Creditors Committee to replace the current member of the CEG-EVPS Creditors Committee with the lowest holding. CEG shall bear no responsibility or liability whatsoever as to the formation or changes to the composition of the CEG-EVPS Creditors Committee.

With respect to the A2 Notes and the C2 Notes, the abovementioned provisions in the indentures governing these notes shall only become effective upon the aggregate outstanding principal amount of the EVPS SLNs falling below US$15 million.

---

**Director Nomination after the Restructuring Effective Date and upon the Exit of the AHG Director for NEV – NEV SLNs, A2 Notes and C2 Notes**

The indentures for the NEV SLNs, the A2 Notes and the C2 Notes shall contain an undertaking by CEG that, CEG shall, after the AHG Director appointed by CEG AHG to the board of NEV ceases to be a director of NEV or if the CEG-NEV Creditors Committee (as defined below) would like to nominate a replacement,

(a) exercise its voting rights at the relevant shareholders' meeting without violating mandatory requirements under any applicable laws, regulations or listing rules, to vote for, and

(b) use best effort to direct the director(s) nominated by it to the board of NEV to vote for (subject to compliance with mandatory requirements under any applicable laws, regulations, listing rules, and such director(s)' fiduciary duties),

the appointment of **one (1)** person nominated by the trustee in accordance with the instructions (if any) of the CEG-NEV Creditors Committee (as defined below) as a director of NEV (the "**NEV Creditor Director**"), *provided* that the nomination of the NEV Creditor Director shall be made and submitted by the trustee to CEG sufficiently in advance of the relevant shareholders' meeting or board meeting, as the case may be, and such person shall satisfy the Creditor Director Qualification Requirement. The indentures for the NEV SLNs, the A2 Notes and the C2 Notes shall also contain an undertaking by CEG to use best efforts to procure NEV to provide the payment of customary remuneration and directors' and officers' liability insurance for the NEV Creditor Director, in each case, consistent with market practice.

If CEG does not receive such instruction from the CEG-NEV Creditors Committee at least three (3) Business Days prior to the relevant shareholders' meeting or at least two (2) Business Days prior to the relevant directors' meeting, as the case may

be, CEG shall be free to vote at such shareholders' meeting or direct its nominee(s) its nominee(s) to act at such directors' meeting, as the case may be, in its sole discretion.

NEV may expand its board of directors as long as the number of non-NEV Creditor Director and NEV Creditor Director on its board increases proportionately, with the number of NEV Creditor Director rounded down to the nearest whole number.

The "**CEG-NEV Creditors Committee**" shall comprise the five largest holders in outstanding principal amount of (1) the NEV SLNs or (2) the A2 Notes and the C2 Notes, as applicable, as set out below who have notified the relevant trustee of their wish to be part of the CEG-NEV Creditors Committee, subject to the mechanism on change of committee composition as set out below:

(a) the NEV SLNs; and
(b) if less than US$15 million in aggregate principal amount of the NEV SLNs are outstanding, the A2 Notes and the C2 Notes.

The indentures for the NEV SLNs, the A2 Notes and the C2 Notes shall contain provisions for the formation of the initial CEG-NEV Creditor Committee within 30 days from the Restructuring Effective Date and shall also contain provisions relating to the changes to the composition of the CEG-NEV Creditors Committee. At any time following the formation of the CEG-NEV Creditors Committee, if (a) any holder of the NEV SLNs or the A2 Notes and the C2 Notes, as applicable, eligible to be part of the CEG-NEV Creditors Committee (a "**CEG-NEV Eligible Holder**") notifies the relevant trustee that it wishes to be part of the CEG-NEV Creditors Committee and (b) its holding in outstanding principal amount of the NEV SLNs or the A2 Notes and the C2 Notes, as applicable, is larger than a current member of the CEG-NEV Creditors Committee, such CEG-NEV Eligible Holder shall be entitled to become a member of the CEG-NEV Creditors Committee to replace the current member of the CEG-NEV Creditors Committee with the lowest holding. CEG shall bear no responsibility or liability whatsoever as to the formation or changes to the composition of the CEG-NEV Creditors Committee.

With respect to the A2 Notes and the C2 Notes, the abovementioned provisions in the indentures governing these notes shall only become effective upon the aggregate outstanding principal amount of the NEV SLNs falling below US$15 million.

| | |
|---|---|
| **Anti-Dilution Protection – CEG MCBs** | The trust deed for the CEG MCBs shall contain a covenant restricting CEG's ability to issue any additional shares unless:<br><br>(a) if the new shares are issued for cash consideration, new shares are issued at an issue price per share |

|  | which does not represent a discount of 20% or more to the benchmarked price (as defined under Rule 13.36(5) of the Listing Rules), or |
|  | (b) new shares are issued pursuant to securities which satisfy the immediately preceding paragraph (a) as if the securities were converted into new shares at the time when the securities are issued. |
| **Anti-Dilution Protection – EVPS MEBs** | The trust deed for the EVPS MEBs shall contain an undertaking by CEG to exercise its voting rights with respect to such EVPS Shares securing the EVPS MEBs at the relevant shareholders' meeting without violating mandatory requirements under any applicable laws, regulations or listing rules with respect to any issuance of shares which require specific mandate from the shareholders, in accordance with the instructions of the trustee (if any). |
|  | For so long as CEG holds any shares in EVPS, CEG shall notify the trustee of the EVPS MEBs each time EVPS convenes a shareholders' meeting referred to in the immediately preceding paragraph and supply to the trustee as soon as practicable after receipt by CEG, copies of all documents dispatched by EVPS to its shareholders. The trustee shall provide such information to the holders of the EVPS MEBs and seek their instructions on whether to instruct CEG to vote in favor of or against any resolution discussed in such shareholders' meeting. The trustee shall then instruct CEG if it receives instructions from the simple majority (in principal amount) of holders of EVPS MEBs who vote at such instruction event and provide any clarification to CEG at CEG's reasonable request. If CEG does not receive such instruction from the trustee at least three (3) Business Days prior to the relevant shareholders' meeting, CEG shall be free to vote at such shareholders' meeting in its sole discretion. |
| **Anti-Dilution Protection – EVPS SLNs** | The indentures for EVPS SLNs shall contain an undertaking by CEG to exercise its voting rights with respect to such EVPS Shares securing the EVPS SLNs at the relevant shareholders' meeting, without violating mandatory requirements under any applicable laws, regulations or listing rules, with respect to any issuance of shares which require specific mandate from the shareholders (an "**EVPS Share Issuance**"), in accordance with the instructions of the trustee (if any). |
|  | For so long as CEG holds any shares in EVPS, CEG shall notify the trustee of the EVPS SLNs each time EVPS convenes a shareholders' meeting referred to in the immediately preceding paragraph and supply to the trustee as soon as practicable after receipt by CEG, copies of all documents dispatched by EVPS to its shareholders. The trustee shall provide such information to the holders of the EVPS SLNs and seek their responses on |

| | |
|---|---|
| | whether to instruct CEG to vote in favor of or against the EVPS Share Issuance at such shareholders' meeting. The trustee shall instruct CEG only if it receives responses from holders of EVPS SLNs holding a simple majority in aggregate outstanding principal amount of the EVPS SLNs to object to the EPVS Share Issuance. If CEG does not receive such instruction from the trustee at least three (3) Business Days prior to the relevant shareholders' meeting, CEG shall be free to vote at such shareholders' meeting in its sole discretion. |
| **Anti-Dilution Protection – NEV MEBs** | The trust deed for the NEV MEBs shall contain an undertaking by CEG to exercise its voting rights with respect to such NEV Shares securing the NEV MEBs at the relevant shareholders' meeting without violating mandatory requirements under any applicable laws, regulations or listing rules with respect to any issuance of shares which require specific mandate from the shareholders, in accordance with the instructions of the trustee (if any). |
| | For so long as CEG holds any shares in NEV, CEG shall notify the trustee of the NEV MEBs each time NEV convenes a shareholders' meeting referred to in the immediately preceding paragraph and supply to the trustee as soon as practicable after receipt by CEG, copies of all documents dispatched by NEV to its shareholders. The trustee shall provide such information to the holders of the NEV MEBs and seek their instructions on whether to instruct CEG to vote in favor of or against any resolution discussed in such shareholders' meeting. The trustee shall then instruct CEG if it receives instructions from the simple majority (in principal amount) of holders of NEV MEBs who vote at such instruction event and provide any clarification to CEG at CEG's reasonable request. If CEG does not receive such instruction from the trustee at least three (3) Business Days prior to the relevant shareholders' meeting, CEG shall be free to vote at such shareholders' meeting in its sole discretion. |
| **Anti-Dilution Protection – NEV SLNs[1]** | The indentures for NEV SLNs shall contain an undertaking by CEG to exercise its voting rights with respect to such NEV Shares supporting the NEV SLNs at the relevant shareholders' meeting, without violating mandatory requirements under any applicable laws, regulations or listing rules, with respect to any issuance of shares which require specific mandate from the shareholders (an "**NEV Share Issuance**"), in accordance with the instructions of the trustee (if any). |
| | For so long as CEG holds any shares in NEV, CEG shall notify the trustee of the NEV SLNs each time NEV convenes a |

---

[1] The effectiveness of this section is subject to the approval (if applicable) from any potential strategic investors prior to the Restructuring Effective Date.

shareholders' meeting referred to in the immediately preceding paragraph and supply to the trustee as soon as practicable after receipt by CEG, copies of all documents dispatched by NEV to its shareholders. The trustee shall provide such information to the holders of the NEV SLNs and seek their responses on whether to instruct CEG to vote in favor of or against the NEV Share Issuance at such shareholders' meeting. The trustee shall instruct CEG only if it receives responses from holders of NEV SLNs holding a simple majority in aggregate outstanding principal amount of the NEV SLNs to object to the NEV Share Issuance. If CEG does not receive such instruction from the trustee at least three (3) Business Days prior to the relevant shareholders' meeting, CEG shall be free to vote at such shareholders' meeting in its sole discretion.

| **Realisation of Asset List 1 Non-Core Assets – A2 EVPS SLNs and A2 NEV SLNs** | "**Asset List 1 Non-Core Assets**" means the assets set out as Relevant Assets held by each Asset List 1 Holding Subsidiary in Annex 2 to this Schedule in respect of the A2 EVPS SLNs and A2 NEV SLNs.

The indentures for the A2 EVPS SLNs and A2 NEV SLNs shall contain an undertaking by CEG that it and its Restricted Subsidiaries will use its best efforts to take all actions necessary to realise the Asset List 1 Non-Core Assets in accordance with the realisation plan set out in Annex 4 to this Schedule, subject to an amendment mechanism as set forth below (the "**Realisation Plan**"). CEG shall undertake to, and shall procure its Restricted Subsidiaries to, use best efforts to comply with the Realisation Plan and for the avoidance of doubt, CEG and its Restricted Subsidiaries shall not be entitled to, or take any actions to, dispose of the Asset List 1 Non-Core Assets unless such disposal is permitted under the indentures for the A2 EVPS SLNs and A2 NEV SLNs, as applicable.

Any amendment to or deviation from the Realisation Plan in respect of Asset List 1 Non-Core Assets shall be approved by CEG and the Asset List 1 Creditors Committee (as defined below).

The "**Asset List 1 Creditors Committee**" shall comprise the five largest holders in outstanding principal amount of (1) the A2 EVPS SLNs and the A2 NEV SLNs or (2) the A2 Notes, as applicable, as set out below, who have notified the relevant trustee of their wish to be part of the Asset List 1 Creditors Committee, subject to the mechanism on change of committee composition as set out below:

(a) the A2 EVPS SLNs and the A2 NEV SLNs; and
(b) if less than US$15 million in aggregate principal amount of the A2 EVPS SLNs and the A2 NEV SLNs are outstanding, the A2 Notes.

The indentures for the A2 EVPS SLNs, the A2 NEV SLNs and the A2 Notes shall contain provisions for the formation of the initial Asset List 1 Creditor Committee within 30 days from the

Sch 8 (G)-7

Restructuring Effective Date and shall also contain provisions relating to the changes to the composition of the Asset List 1 Creditors Committee. At any time following the formation of the Asset List 1 Creditors Committee, if (a) any holder of the A2 EVPS SLNs and the A2 NEV SLNs or the A2 Notes, as applicable, eligible to be part of the Asset List 1 Creditors Committee (an "**Asset List 1 Eligible Holder**") notifies the relevant trustee that it wishes to be part of the Asset List 1 Creditors Committee and (b) its holding in outstanding principal amount of the A2 EVPS SLNs and the A2 NEV SLNs or the A2 Notes, as applicable, is larger than a current member of the Asset List 1 Creditors Committee, such Asset List 1 Eligible Holder shall be entitled to become a member of the Asset List 1 Creditors Committee to replace the current member of the Asset List 1 Creditors Committee with the lowest holding. CEG shall bear no responsibility or liability whatsoever as to the formation or changes to the composition of the Asset List 1 Creditors Committee.

The indentures for the A2 EVPS SLNs, the A2 NEV SLNs and the A2 Notes shall contain a covenant by CEG to deliver semi-annual updates regarding the disposal status of the Asset List 1 Non-Core Assets to the relevant trustee. To the extent any such information constitutes material non-public information, price-sensitive information or inside information, which possession would restrict, prevent or prohibit any recipient from trading in securities under applicable securities laws and regulations of the People's Republic of China, the United States, Hong Kong, Singapore and/or other jurisdictions, CEG shall promptly release such information or announce publicly a cleansing statement in accordance with applicable rules or laws such that such information no longer constitutes material non-public information, price-sensitive information or inside information in the relevant jurisdictions.

With respect to the A2 Notes, the abovementioned provisions in the indentures governing these notes shall only become effective upon the aggregate outstanding principal amount of the A2 EVPS SLNs and A2 NEV SLNs falling below US$15 million.

| | |
|---|---|
| **Realisation of Asset List 2 Non-Core Assets – A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs and C2 NEV SLNs** | "**Asset List 2 Non-Core Assets**" means the assets set out as Relevant Assets held by each Asset List 2 Holding Subsidiary in Annex 3 to this Schedule (for the avoidance of doubt, excluding the intercompany receivables owed to CEG by Shengyu (BVI) Limited (盛譽(BVI)有限公司) in the amount of approximately US$217 million) in respect of the A2 EVPS SLNs, the C2 EVPS SLNs, the A2 NEV SLNs and the C2 NEV SLNs (the Asset List 2 Non-Core Assets, together with the Asset List 1 Non-Core Assets, the "**Non-Core Assets**").<br><br>The indentures for the A2 EVPS SLNs, the C2 EVPS SLNs, the A2 NEV SLNs and the C2 NEV SLNs shall contain an |

peace

undertaking by CEG that it and its Restricted Subsidiaries will use its best efforts to take all actions necessary to realise the Asset List 2 Non-Core Assets in accordance with the Realisation Plan. CEG shall undertake to, and shall procure its Restricted Subsidiaries to, use best efforts to comply with the Realisation Plan and for the avoidance of doubt, CEG and its Restricted Subsidiaries shall not be entitled to, or take any actions to, dispose of the Asset List 2 Non-Core Assets unless such disposal is permitted under the indentures for the A2 EVPS SLNs, the C2 EVPS SLNs, the A2 NEV SLNs and the C2 NEV SLNs, as applicable.

Any amendment to or deviation from the Realisation Plan in respect of Asset List 2 Non-Core Assets shall be approved by CEG and the Asset List 2 Creditors Committee (as defined below).

The "**Asset List 2 Creditors Committee**" shall comprise the five largest holders in outstanding principal amount of (1) the A2 EVPS SLNs, the C2 EVPS SLNs, the A2 NEV SLNs and the C2 NEV SLNs or (2) the A2 Notes and the C2 Notes, as applicable, as set out below who have notified the relevant trustee of their wish to be part of the Asset List 2 Creditors Committee, subject to the mechanism on change of committee composition as set out below:

(a) the A2 EVPS SLNs, the C2 EVPS SLNs, the A2 NEV SLNs and the C2 NEV SLNs; and

(b) if less than US$15 million in aggregate principal amount of the A2 EVPS SLNs, the C2 EVPS SLNs, the A2 NEV SLNs and the C2 NEV SLNs are outstanding, the A2 Notes and the C2 Notes.

The indentures for the A2 EVPS SLNs, the C2 EVPS SLNs, the A2 NEV SLNs, the C2 NEV SLNs, the A2 Notes and the C2 Notes shall contain provisions for the formation of the initial Asset List 2 Creditor Committee within 30 days from the Restructuring Effective Date and shall also contain provisions relating to the changes to the composition of the Asset List 2 Creditors Committee. At any time following the formation of the Asset List 2 Creditors Committee, if (a) any holder of the A2 EVPS SLNs, the C2 EVPS SLNs, the A2 NEV SLNs and the C2 NEV SLNs or the A2 Notes and the C2 Notes, as applicable, eligible to be part of the Asset List 2 Creditors Committee (an "**Asset List 2 Eligible Holder**") notifies the relevant trustee that it wishes to be part of the Asset List 2 Creditors Committee and (b) its holding in outstanding principal amount of the A2 EVPS SLNs, the C2 EVPS SLNs, the A2 NEV SLNs and the C2 NEV SLNs or the A2 Notes and the C2 Notes, as applicable, is larger than a current member of the Asset List 2 Creditors Committee, such Asset List 2 Eligible Holder shall be entitled to become a member of the Asset List 2 Creditors Committee to replace the current member of the Asset List 2 Creditors Committee with the lowest holding. CEG shall bear no responsibility or liability whatsoever as to the formation

or changes to the composition of the Asset List 2 Creditors Committee.

The indentures for the A2 EVPS SLNs, the C2 EVPS SLNs, the A2 NEV SLNs, the C2 NEV SLNs, the A2 Notes and the C2 Notes shall contain a covenant by CEG to deliver semi-annual updates regarding the disposal status of the Asset List 2 Non-Core Assets to the relevant trustee. To the extent any such information constitutes material non-public information, price-sensitive information or inside information, which possession would restrict, prevent or prohibit any recipient from trading in securities under applicable securities laws and regulations of the People's Republic of China, the United States, Hong Kong, Singapore and/or other jurisdictions, CEG shall promptly release such information or announce publicly a cleansing statement in accordance with applicable rules or laws such that such information no longer constitutes material non-public information, price-sensitive information or inside information in the relevant jurisdictions.

With respect to the A2 Notes and the C2 Notes, the abovementioned provisions in the indentures governing these notes shall only become effective upon the aggregate outstanding principal amount of the A2 EVPS SLNs, A2 NEV SLNs, C2 EVPS SLNs and C2 NEV SLNs falling below US$15 million.

| | |
|---|---|
| **Consequences of Non-Compliance** | It shall constitute an "**Asset Package Step-In Event**", if:<br><br>(a) with respect to the EVPS SLNs, the A2 Notes and the C2 Notes, the Creditor Director is not appointed on the board of EVPS due to a breach by CEG of its undertaking under the section entitled "Director Nomination after the Restructuring Effective Date and upon the Exit of the AHG Director for EVPS – EVPS SLNs, A2 Notes and C2 Notes" above;<br><br>(b) with respect to the NEV SLNs, the A2 Notes and the C2 Notes, the Creditor Director is not appointed on the board of NEV due to a breach by CEG of its undertaking under the section entitled "Director Nomination after the Restructuring Effective Date and upon the Exit of the AHG Director for NEV – NEV SLNs, A2 Notes and C2 Notes" above;<br><br>(c) with respect to CEG MCBs, a breach by CEG of the covenants under the section entitled "Anti-Dilution Protection – CEG MCBs" above;<br><br>(d) with respect to EVPS MEBs, a breach by CEG of the covenants under the section entitled "Anti-Dilution Protection – EVPS MEBs" above;<br><br>(e) with respect to EVPS SLNs, a breach by CEG of the covenants under the section entitled "Anti-Dilution Protection – EVPS SLNs" above |

(f) with respect to NEV MEBs, a breach by CEG of the covenants under the section entitled "Anti-Dilution Protection – NEV MEBs" above; or

(g) with respect to NEV SLNs, a breach by CEG of the covenants under the section entitled "Anti-Dilution Protection – NEV SLNs" above[2].

Upon the occurrence of an Asset Package Step-In Event, the collateral agent shall be authorised to take steps to take control, possess and/or dispose of the Non-Core Assets pursuant to the terms of the relevant New Instrument Documents.

It shall constitute a "**Specific Asset Step-In Event**",

(a) under the indentures for the A2 EVPS SLNs and A2 NEV SLNs, if a Relevant Asset of the Asset List 1 Non-Core Assets is not realised in accordance with the Realisation Plan due to a breach by CEG of its undertaking under the section entitled "Realisation of Asset List 1 Non-Core Assets – A2 EVPS SLNs and A2 NEV SLNs"; or

(b) under the indentures for the A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs and C2 NEV SLNs, if a Relevant Asset of the Asset List 2 Non-Core Assets is not realised in accordance with the Realisation Plan due to a breach by CEG of its undertaking under the section entitled "Realisation of Asset List 2 Non-Core Assets – A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs and C2 NEV SLNs".

Upon the occurrence of a Specific Asset Step-In Event, the collateral agent shall be authorised to take steps to take control, possess and/or dispose of the Relevant Asset pursuant to the terms of the relevant New Instrument Documents.

The relevant New Instrument Documents will also contain provisions with respect to the ability of the collateral agent to reserve certain realisation proceeds for the purposes of ongoing recovery of the assets.

---

[2] The effectiveness of this sub-paragraph (g) is subject to the approval (if applicable) from any potential strategic investors prior to the Restructuring Effective Date.

**Annex A**

**LIST OF INITIAL SUBSIDIARY GUARANTORS**

| | |
|---|---|
| 1. | Anji (BVI) Limited 安基(BVI)有限公司 |
| 2. | Billion Mark Limited |
| 3. | Fengyu (BVI) Limited 丰域(BVI)有限公司 |
| 4. | Full Hill Limited |
| 5. | Goldbridge Limited |
| 6. | Honour Oasis Limited |
| 7. | Jiading Holdings Limited 嘉鼎控股有限公司 |
| 8. | Jiajian (BVI) Limited 嘉建(BVI)有限公司 |
| 9. | Jiaying Holdings Limited 嘉穎控股有限公司 |
| 10. | Jiayu Holdings Limited 嘉譽控股有限公司 |
| 11. | Pyramid Wealth Holdings Limited |
| 12. | Value Depot Holdings Limited |
| 13. | Yitong (BVI) Limited 億通(BVI)有限公司 |
| 14. | Fast Talent Investment Limited 迅傑投資有限公司 |
| 15. | Investor Network Global Limited |
| 16. | Global Power Development Holdings Limited |
| 17. | Just Brilliant Global Limited |
| 18. | Able Luck Asia Pacific Limited 德福亞太有限公司 |
| 19. | Brocade New Developments Limited |
| 20. | Extreme Bright Investments Limited 泰暉投資有限公司 |
| 21. | Evergrande Fairyland Group Limited 恒大童世界集團有限公司 |
| 22. | View Joy Global Limited 景樂環球有限公司 |
| 23. | Prestige Win Investments Limited 御凱投資有限公司 |
| 24. | Earn Success Development Limited 成得發展有限公司 |
| And other Initial Subsidiary Guarantors, if any, to be set forth in the New Instruments Documents | |

**Annex B**

**LIST OF ASSET LIST 1 HOLDING SUBSIDIARIES AND ASSET LIST 1 HOLDING SUBSIDIARY PLEDGORS**

| No. | Name of Asset List 1 Holding Subsidiary Pledgors | Name of Asset List 1 Holding Subsidiaries | Relevant Assets held by Respective Asset List 1 Holding Subsidiary |
|---|---|---|---|
| 1. | Anji (BVI) Limited (安基(BVI)有限公司) | Fine Propitious Limited (瑞佳有限公司) | Equity interest in Greater Bay Area Homeland Development Fund LP held by Fine Propitious Limited (瑞佳有限公司) |
| 2. | Anji (BVI) Limited (安基(BVI)有限公司) | Jiajian (BVI) Limited (嘉建(BVI)有限公司) | Equity interest in Pacific Venture Opportunity Fund I, L.P. held by Jiajian (BVI) Limited (嘉建 (BVI) 有限公司) |
| 3. | Anji (BVI) Limited (安基(BVI)有限公司) | Jiajian (BVI) Limited (嘉建(BVI)有限公司) | Equity interest in PPLive Corporation Limited held by Jiajian (BVI) Limited (嘉建 (BVI) 有限公司) |
| 4. | Anji (BVI) Limited (安基(BVI)有限公司) | Jiajian (BVI) Limited (嘉建(BVI)有限公司) | Equity interest in Suning Sports Group Limited held by Jiajian (BVI) Limited (嘉建 (BVI) 有限公司) |
| 5. | Anji (BVI) Limited (安基(BVI)有限公司) | Jiajian (BVI) Limited (嘉建(BVI)有限公司) | Equity interest in Satinu Resources Group Ltd held by Jiajian (BVI) Limited (嘉建 (BVI) 有限公司) |
| 6. | Anji (BVI) Limited (安基 (BVI) 有限公司) | Millennium Golden Jiachen International Hotels Group Ltd | Equity interest in Millennium Golden Jiachen Hotel Holdings Ltd, a Canada company, held by Millennium Golden Jiachen International Hotels Group Ltd |
| Updates, if any, to the above subsidiaries and assets to be reflected in the New Instruments Documents. | | | |

**Annex C**

**LIST OF ASSET LIST 2 HOLDING SUBSIDIARIES AND ASSET LIST 2 HOLDING
SUBSIDIARY PLEDGORS**

| No. | The Company or the Name of Asset List 2 Holding Subsidiary Pledgors | The Asset List 2 Holding Subsidiaries | Relevant Assets held by the Company or Respective Asset List 2 Holding Subsidiary |
|---|---|---|---|
| 1. | Peace Top Limited | Solution Key Holdings Limited | Shareholder loan owed to Solution Key Holdings Limited from China Ruyi Holdings Limited in the amount of RMB1,847,784,000 |
| 2. | Peace Top Limited | Solution Key Holdings Limited | Receivables owed to Solution Key Holdings Limited by (i) Pumpkin Films Limited in the amount of approximately RMB1,579,682,000 and (ii) Ocean Fund SPC in the amount of approximately RMB527,938,000 |
| 3. | Pine Sky Holdings Limited | Rosy Sage Investments Limited | Equity interest in Xinsheng Preference Electronic Business Limited held by Rosy Sage Investments Limited |
| 4. | China Evergrande Group | New Chic Global Limited | Equity interest in Bank of Jinzhou Co., Ltd held by New Chic Global Limited |
| 5. | Humphrey Global Limited | Water Shine Holdings Limited | Equity interest in Butterfly Hop Holdings Limited held by Water Shine Holdings Limited |
| 6. | View Joy Global Limited 景樂環球有限公司 | Global Power Development Holdings Limited | Equity interest in Integra Wealth Investments Limited held by Global Power Development Holdings Limited |
| 7. | Firestone Global Limited | Smart Range Investments Limited | Shares in Solar Power, Inc. held by Smart Range Investments Limited |
| 8. | China Evergrande Group | N/A | Receivables owed to China Evergrande Group by Shengyu (BVI) Limited (盛譽(BVI)有限公司) in the amount of approximately US$217 million |

Updates, if any, to the above subsidiaries and assets to be reflected in the New Instruments Documents.

**Annex D**

**REALISATION PLAN OF RELEVANT ASSETS UNDER ASSET LIST 1 AND
ASSET LIST 2**

## REALISATION PLAN OF RELEVANT ASSETS UNDER ASSET LIST 1

| | Next Steps | Estimated Timeframe | Predetermined Minimum Valuation |
|---|---|---|---|
| Equity interest in Greater Bay Area Homeland Development Fund LP | • To seek buyer for the stake through an auction | | |
| Equity interest in Pacific Venture Opportunity Fund I, L.P. | • Liquidation & Dissolve | | |
| Equity interest in PPLive Corporation Limited | • To take further legal action | | |
| Equity interest in Suning Sports Group Limited | • To take further legal action | | |



| | |
|---|---|
| Equity interest in Satinu Resources Group Ltd | • To liquidate & dissolve; or<br>• To sell to other shareholders |
| Equity interest in Millennium Golden Jiachen Hotel Holdings Ltd | • To seek buyer for this assets and potentially dispose through auction<br>• Net proceeds shall be the attributable portion (i.e. 50%) of the value of the property, including any transactional costs |

## REALISATION PLAN OF RELEVANT ASSETS UNDER ASSET LIST 2

| | Next Steps | Estimated Timeframe | Predetermined Minimum Valuation |
|---|---|---|---|
| **Shareholder loan owed to Solution Key Holdings Limited from China Ruyi Holdings Limited** | • To negotiate for early repayment<br>• To take legal action if the shareholder loan could not be repaid at maturity, i.e. August 2026 | | |
| **Receivables owed to Solution Key Holdings Limited by Pumpkin Films Limited** | • To negotiate for a repayment plan and collect repayment proceeds<br>• To take legal action if a repayment plan cannot be agreed | | |
| **Receivables owed to Solution Key Holdings Limited by Ocean Fund SPC** | • To negotiate for a repayment plan and collect repayment proceeds<br>• To take legal action if a repayment plan cannot be agreed | | |
| **Equity interest in Xinsheng Preference** | • To seek buyer for this asset or to exit in next round of capital raise | | |

| Asset | Disposal Strategy |
|---|---|
| **Electronic Business Limited** | ████ |
| **Equity interest in Bank of Jinzhou Co., Ltd** | • To dispose in secondary market ████ |
| **Equity interest in Butterfly Hop Holdings Limited** | • To dispose through auction at designated auction house(s) that are internationally recognized which includes:<br>  ○ Sotheby's<br>  ○ Christie's<br>  ○ Phillips ████ |
| **Equity interest in Integra Wealth Investments Limited** | • To seek buyer for this asset ████ |
| **Shares in Solar Power, Inc.** | • To dispose in secondary market ████ |

**SCHEDULE 9**

**GROUP STRUCTURE CHART**





The Company
NEW GARLAND LIMITED (BVI)
Global Development Limited (Cayman Islands)
Acelin Global Limited (BVI)
Evergrande Health Industry Holdings Limited 恒大健康產業控股有限公司 (BVI)
China Evergrande New Energy Vehicle Group Limited 中國恒大新能源汽車集團有限公司 (HK)
Intermediary holding company(ies) and subsidiary(ies)
CEG Holdings (BVI) Limited (BVI)
TREASURE GLORY GLOBAL LIMITED 寶榮環球有限公司 (BVI)**
Eagleville Holdings Limited (BVI)
State Charm Holdings Limited (BVI)
Empire Choice Investments Limited (BVI)
Evergrande Property Service Group Limited 恒大物業集團有限公司 (Cayman Islands)
ALPHA BEAUTY LIMITED 領美有限公司 (BVI)
New Gains Group Limited 新得集團有限公司 (Cayman Islands)
ULTRA EASE LIMITED (BVI)
NICE DRAGON CAPITAL INVESTMENT LIMITED (HK)
Shenzhen Yimao Investment Co., Ltd. 深圳市益貿投資有限公司 (PRC)
Fangchebao Group Co. Ltd 房車寶集團股份有限公司 (PRC)
Millennium Golden Jiachen International Hotels Group Ltd (HK)
NEW CHIC GLOBAL LIMITED (BVI)
FINE PROPITIOUS LIMITED 瑞佳有限公司 (BVI)
ANJI (BVI) Limited 安基（BVI）有限公司* (BVI)
PYRAMID WEALTH HOLDINGS LIMITED* (BVI)
Jiaying Holdings Limited 嘉穎控股有限公司 (HK)
Guangzhou Chaofeng Land Company Limited 廣州市超豐置業有限公司 (PRC)
Guangzhou Kailong Real Estate Company Limited 廣州市凱隆置業有限公司 (PRC)
Hengda Real Estate Group Co. Ltd. 恒大地產集團有限公司 (PRC)
HONOUR OASIS LIMITED (BVI)
Fengyu (BVI) Limited 豐域（BVI）有限公司* (BVI)
GOLDBRIDGE LIMITED (Cayman Islands)
BILLION MARK LIMITED (BVI)
FULL HILL LIMITED (BVI)
VALUE DEPOT HOLDINGS LIMITED (BVI)*
Jiayu Holdings Limited 嘉譽控股有限公司 (HK)
Jiajian (BVI) Limited 嘉建（BVI）有限公司 (BVI)
Shengjian (BVI) Limited 盛建（BVI）有限公司 (BVI)
RAINBOW EVER LIMITED (BVI)
Tianji Holding Limited 天基控股有限公司 (HK)
SCENERY JOURNEY LIMITED 景程有限公司 (BVI)
FORTUNE WALKER LIMITED (BVI)
Jumbo Fortune Enterprises Limited (BVI)
Yitong (BVI) Limited 億通（BVI）有限公司 (BVI)*
Jiading Holdings Limited 嘉鼎控股有限公司 (HK)
PINE SKY HOLDINGS LIMITED (BVI)
ROSY SAGE INVESTMENTS LIMITED (BVI)
JUST BRILLIANT GLOBAL LIMITED (BVI)
NEW WARD INVESTMENTS LIMITED (BVI)
FIRESTONE GLOBAL LIMITED (Cayman Islands)
SMART RANGE INVESTMENTS LIMITED (BVI)
CHILLMILL LIMITED (BVI)
HUMPHREY GLOBAL LIMITED (Cayman Islands)
WATER SHINE HOLDINGS LIMITED (BVI)
Subsidiary(ies)
UNIVERSAL STAR GLOBAL LIMITED (BVI)
PEACE TOP LIMITED (Cayman Islands)
SOLUTION KEY HOLDINGS LIMITED (BVI)
Offshore
Onshore
Shareholding of entities that are subsidiaries of the Company as at the date of the Explanatory Statement
Shareholding of subsidiaries which have been pledged and enforced as at the date of the Explanatory Statement
Issuer of the New Instruments
* Existing Notes Subsidiary Pledgor
** Pledged company under Class A Private Loan
New Instruments Subsidiary Guarantor (subject to the New Instruments Documents)

THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION

_____

SUPPLEMENTARY EXPLANATORY STATEMENT IN RELATION TO SCHEMES OF ARRANGEMENT

BETWEEN

CHINA EVERGRANDE GROUP

中國恒大集團

AND

THE SCHEME CREDITORS

(as defined in the Explanatory Statement issued on 31 July 2023)

16 AUGUST 2023

This document comprises a supplementary explanatory statement in relation to linked and inter-conditional schemes of arrangement proposed by China Evergrande Group (中國恒大集團) ("**CEG**" or the "**Company**") provided pursuant to Section 86 of the Cayman Companies Act (2023 Revision) and Section 671 of the Companies Ordinance (Cap. 622 of the Laws of Hong Kong) (the "**Supplementary Explanatory Statement**"). Reference is made to the definitions set out in Schedule 1 (*Definitions and Interpretation*) to the Explanatory Statement in relation to the Schemes issued on 31 July 2023.

This Supplementary Explanatory Statement is being transmitted to persons who it is believed are or may be Scheme Creditors as at the date of this Supplementary Explanatory Statement. If you have assigned, sold, or otherwise transferred your interests in the Existing Debts you must forward this Supplementary Explanatory Statement and the accompanying documents at once to the person or persons to whom you have assigned, sold or otherwise transferred your interests in the Existing Debts.

This Supplementary Explanatory Statement has been distributed in an electronic form. You are advised that documents transmitted in electronic form may be altered or changed during the process of transmission and consequently none of the Company, its advisers, the Information Agent, the Existing Notes Trustee, the Existing Agent, the Dongpo Notes Trustee and Existing Agents, the Lake Notes Trustee and Existing Agent, the RMB Bonds Trustee nor any of their respective Affiliates, directors, officers or employees, accept any liability or responsibility whatsoever in respect of any difference between the Supplementary Explanatory Statement distributed to you in electronic format and the version available to you for inspection on the Transaction Website.

**WARNING** – The contents of this Supplementary Explanatory Statement have not been reviewed by any regulatory authority in the Cayman Islands, Hong Kong, the British Virgin Islands, Singapore or in any other jurisdiction. Neither the US Securities and Exchange Commission ("**SEC**") nor any United States state securities commission has approved or disapproved of the Scheme Consideration or determined if this Supplementary Explanatory Statement is truthful or complete. Any representation to the contrary is a criminal offence. You are strongly encouraged to exercise caution in relation to any offer pursuant to the schemes of arrangement set out in the Explanatory Statement and this Supplementary Explanatory Statement.

**You are recommended to seek your own independent financial, legal and/or tax advice immediately from your financial, legal and/or tax adviser with respect to the contents of the Explanatory Statement, this Supplementary Explanatory Statement or the documents that accompany either of them or what action you should take.**

This Supplementary Explanatory Statement does not constitute an offer to sell or the solicitation of an offer to buy any securities. None of the securities referred to in this Supplementary Explanatory Statement may be sold, issued or transferred in any jurisdiction in contravention of applicable law. The securities proposed to be issued pursuant to the Schemes will not be registered with the SEC under the US Securities Act of 1933, as amended (the "**US Securities Act**"), or the securities law of any state or other jurisdiction, and are being transferred and delivered in reliance upon certain exemptions from the registration requirements of the US Securities Act. The securities proposed to be issued pursuant to the Schemes will be issued and delivered only (i) in the United States to "qualified institutional buyers" ("**QIBs**") as defined in Rule 144A under the US Securities Act ("**Rule 144A**") and institutional "accredited investors" ("**Accredited Investors**") as defined in Rule 501(a)(1), (2),

4893-7399-7174v.12

(3) or (7) of Regulation D under the US Securities Act ("**Regulation D**"); and (ii) outside the United States to non-US persons in offshore transactions, in reliance on Regulation S under the US Securities Act ("**Regulation S**").

An application will be made for the listing and quotation of the New Instruments on the Singapore Exchange Securities Trading Limited ("**SGX-ST**"). The SGX-ST assumes no responsibility for the correctness of any of the statements made or opinions expressed or reports contained herein. Approval in-principle for the listing and quotation of the New Instruments on the SGX-ST is not to be taken as an indication of the merits of the New Instruments or of the issuers of them, any guarantees, any guarantors, their respective subsidiaries (if any), their respective associated companies (if any) or their respective joint venture companies (if any). For so long as such New Instruments are listed on the SGX-ST and the rules of the SGX-ST so require, such New Instruments will be traded on the SGX-ST in a minimum board lot size of at least S\$200,000 (or its equivalent in foreign currencies). To the extent that CEG is required to disclose additional information solely for the purposes of the application to list the New Instruments on the SGX-ST, such information will be made available to Scheme Creditors on the Transaction Website (where legally and commercially permissible).

**Section 309B(1) Notification**—In connection with Section 309B of the Securities and Futures Act, Chapter 289 of Singapore, as modified or amended from time to time (the "**SFA**") and the Securities and Futures (Capital Markets Products) Regulations 2018 (the "**CMP Regulations 2018**"), we have determined, and hereby notify all relevant persons (as defined in Section 309A(1) of the SFA) that the New Instruments are prescribed capital markets products (as defined in the CMP Regulations 2018) and Excluded Investment Products (as defined in MAS Notice SFA 04-N12: Notice on the Sale of Investment Products and MAS Notice FAA-N16: Notice on Recommendations on Investment Products).

This Supplementary Explanatory Statement should be read carefully with the Explanatory Statement, Solicitation Packet, which is also available on the Transaction Website for Scheme Creditors to download.

All Scheme Creditors (and Designated Recipients, if applicable) will need to hold an account (directly or indirectly through the intermediary chain) with an account holder or custodian which itself holds an account with Euroclear or Clearstream in order to receive the New Instruments, the TJ Scheme Consideration (if applicable) and the Consent Fee (if applicable). To the extent that they do not already have such an account, all Class A Lenders and Class C Scheme Creditors who are not Dongpo Noteholders or Lake Noteholders, and Designated Recipients (if applicable) are advised to open an account (directly or indirectly through the intermediary chain) with an account holder or custodian which itself holds an account with Euroclear (if possible) or Clearstream (including many custodian banks and certain other financial institutions) and provide the Information Agent with the required details of such account (as required in the relevant Scheme Creditor Forms) as soon as possible, and in any event, by the relevant Bar Date. If you do not have such an account and are unable to open such an account and are not a Sanctions-Affected Scheme Creditor, please contact the Information Agent immediately.

The Information Agent provides the contact for Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) in relation to questions the Scheme Creditors have in relation to the Explanatory Statement, this Supplementary Explanatory Statement, the Solicitation Packet, the Schemes or the Restructuring. The Information Agent will be assisting the Chairperson in co-ordinating the voting process for the Schemes, including (a) creating and managing the

Transaction Website and the Portal, (b) communicating with Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) regarding voting in the Schemes, in particular via the Transaction Website, (c) communicating with the Clearing Systems (where relevant) regarding voting in the Schemes (for further distribution to Scheme Creditors (who are not Sanctions-Affected Scheme Creditors)), and (d) assisting the Chairperson in checking the voting values of each Scheme Creditor (who is not a Sanctions-Affected Scheme Creditor) for/at the Scheme Meetings against the relevant Custodian Instructions or, as the case may be, the records supplied by the Company. GLAS will be managing the voting process for the Schemes for Blocked Scheme Creditors.

Queries from Scheme Creditors (who are not Blocked Scheme Creditors) in relation to this Supplementary Explanatory Statement should be directed to the Information Agent as follows:

**Morrow Sodali Limited**
Telephone: in Hong Kong +852 2319 4130; in London: +44 20 4513 6933
Email: evergrande@investor.morrowsodali.com
Transaction Website (document posting website):
https://projects.morrowsodali.com/evergrande
Portal (form submission website): https://portal.morrowsodali.com/EvergrandeScheme
Attention: Debt Services Team

**Blocked Scheme Creditors should direct any questions in relation to this Supplementary Explanatory Statement, the Blocked Scheme Creditor Form, the Schemes or the Restructuring to:**

**GLAS Specialist Services Limited**
Email: lm@glas.agency
Attention: Liability Management Team

**For submitting Blocked Scheme Creditor Forms**

please refer to the Solicitation Packet

**For Company announcements regarding the Schemes, including those relevant for Blocked Scheme Creditors**

**http://www.evergrande.com/**

4893-7399-7174v.12

# CONTENTS

**Clause**                                                                             **Page**

1.      OUTLINE..................................................................................................................1

2.      EXPECTED TIMETABLE OF PRINCIPAL EVENTS................................................2

3.      SUPPLEMENTS TO EXPLANATORY STATEMENT ..............................................4

4.      IMPORTANT SECURITIES LAW NOTICES ..........................................................5

5.      LETTER FROM THE BOARD TO THE SCHEME CREDITORS ............................6

APPENDIX 1 DEFINITIONS ...............................................................................................10

4893-7399-7174v.12

1.    **OUTLINE**

1.1    The purpose of this Supplementary Explanatory Statement is to inform Scheme Creditors of certain updates related to information disclosed in the Explanatory Statement. The reason for the supplements and further details are set out at Section 2.1 (*Supplements to Explanatory Statement*) below.

1.2    So as to provide Scheme Creditors with sufficient time to consider the latest information and the opportunity to amend their vote in respect of the Schemes, the Scheme Meetings are intended to be adjourned from 23 August 2023 to 28 August 2023 at the following times:

    (a)    **Hong Kong Scheme – Class A Scheme Meeting:** 8:00 p.m. Hong Kong time on 28 August 2023, the equivalent time being 7:00 a.m. Cayman Islands time on 28 August 2023;

    (b)    **Cayman Scheme – Class A Scheme Meeting:** 8:45 p.m. Hong Kong time on 28 August 2023, the equivalent time being 7:45 a.m. Cayman Islands time on 28 August 2023 (or, if later, as soon as the Class A Scheme Meeting for the Hong Kong Scheme has concluded);

    (c)    **Hong Kong Scheme – Class C Scheme Meeting:** 9:30 p.m. Hong Kong time on 28 August 2023, the equivalent time being 8:30 a.m. Cayman Islands time on 28 August 2023 (or, if later, as soon as the Class A Scheme Meeting for the Cayman Scheme has concluded); and

    (d)    **Cayman Scheme – Class C Scheme Meeting:** 10:15 p.m. Hong Kong time on 28 August 2023, the equivalent time being 9:15 a.m. Cayman Islands time on 28 August 2023(or, if later, as soon as the Class C Scheme Meeting for the Hong Kong Scheme has concluded).

1.3    It is not currently anticipated that the Scheme Sanction Hearings, the Scheme Effective Date, the Restructuring Effective Date or any later principal event will be amended. The revised expected timetable of principal events for the proposed Schemes is set out in Clause 2 (*Expected timetable of principal events*) below.

1.4    Scheme Creditors who have already submitted a duly completed Scheme Creditor Form or Blocked Scheme Creditor Form (as applicable) are not required to resubmit the relevant form to the Information Agent or GLAS respectively as a result of the supplements set out in this Supplementary Explanatory Statement unless they wish to make changes to the information submitted in the Scheme Creditor Form or Blocked Scheme Creditor Form (as applicable), including changing their vote as a result of the additional information provided in this Supplementary Explanatory Statement.

1

2.      **EXPECTED TIMETABLE OF PRINCIPAL EVENTS**[1]

| Event | | Expected date | Cayman Islands time | Hong Kong time |
|---|---|---|---|---|
| **Custody Instruction Deadline** The latest time for Account Holders to submit Custody Instructions to block Existing Notes, Lake Notes or Dongpo Notes (as applicable) held with Euroclear or Clearstream. | | 21 August 2023 being two (2) Business Days prior to the Voting Record Time | 4:00 a.m. on 21 August 2023 | 5:00 p.m. on 21 August 2023 |
| **Voting Record Time** | The latest time for Scheme Creditors to lodge Account Holder Letters or Proxy Voting Forms (as applicable) with the Information Agent for the purpose of voting at the Scheme Meetings.[2] | 23 August 2023 | 4:00 a.m. on 23 August 2023 | 5:00 p.m. on 23 August 2023 |
| | The time on which all Voting Scheme Claims are determined as at the Voting Record Time.[3] | Following the close of business and cessation of trading on the Clearing Systems on 23 August 2023. | | |

---

[1] The dates in this timetable and those mentioned throughout this Supplementary Explanatory Statement assume that none of the Court hearings or Scheme Meetings are further adjourned or delayed. It is also possible that the drawing up or registration of the Scheme Sanction Orders may be delayed if any person appeals the order.

[2] Scheme Creditors should confirm as early as possible with their Account Holders and/or Intermediaries (as applicable) whether there are any applicable deadlines to ensure that their Account Holder Letter is returned online via the Portal to the Information Agent prior to the Voting Record Time in order to vote.

[3] All Scheme Claims for voting purposes are determined as at the Voting Record Time. The Chairperson shall be under no obligation to recognize any assignment or transfer of rights, benefits or interests in the Scheme Claims after the Voting Record Time for the purposes of calculating the value of Scheme Claims for voting nor Entitlements to receive Scheme Consideration and has no obligations hereunder to any Person other than the Scheme Creditors, provided that, where the Chairperson has received from the relevant parties notice in writing of such assignment or transfer prior to the Restructuring Effective Date, the Chairperson may, in its sole discretion and subject to the production of such other evidence in relation to such assignment or transfer as it may reasonably require and to any other terms and conditions which the Chairperson and/or Scheme Administrator may consider necessary or desirable, agree to recognize such assignment or transfer for the purposes of the Scheme Administrators calculating Entitlements to receive Scheme Consideration under the Schemes.

2

| Event | Expected date | Cayman Islands time | Hong Kong time |
|-------|---------------|---------------------|----------------|
| **Adjourned Class A Hong Kong Scheme Meeting**[4] | 28 August 2023 | 7:00 a.m. on 28 August 2023 | 8:00 p.m. on 28 August 2023 |
| **Adjourned Class A Cayman Scheme Meeting**[5] | 28 August 2023 | 7:45 a.m. on 28 August 2023 | 8:45 p.m. on 28 August 2023 |
| **Adjourned Class C Hong Kong Scheme Meeting**[6] | 28 August 2023 | 8:30 a.m. on 28 August 2023 | 9:30 p.m. on 28 August 2023 |
| **Adjourned Class C Cayman Adjourned Scheme Meeting**[7] | 28 August 2023 | 9:15 a.m. on 28 August 2023 | 10:15 p.m. on 28 August 2023 |
| **Cayman Scheme Sanction Hearing**[8]<br>This is the hearing at the Cayman Court where the Court will hear the petition in respect of sanctioning the Cayman Scheme. | 1 September 2023 | 10:00 a.m. on 1 September 2023 | 11:00 p.m. on 1 September 2023 |
| **Hong Kong Scheme Sanction Hearing**[9]<br>This is the hearing at the Hong Kong Court where the Court will hear the petition in respect of sanctioning the Hong Kong Scheme. | 5 and/or 6 September 2023 | 9:00 p.m. on 4 and/or 5 September 2023 | 10:00 a.m. on 5 and/or 6 September 2023 |

---

[4] The Adjourned Class A Hong Kong Scheme Meeting will commence at the time stated, as a reconvened meeting of the initial Class A Hong Kong Scheme Meeting which will be opened on 23 August at 8:00 p.m. (Hong Kong time) / 7:00 a.m. (Cayman Islands time) and immediately adjourned (the "**Initial Class A Hong Kong Scheme Meeting**").

[5] The Adjourned Class A Cayman Scheme Meeting will commence at the time stated (or, if later, as soon as the Class A Scheme Meeting for the Hong Kong Scheme has concluded), as a reconvened meeting of the initial Class A Cayman Scheme Meeting which will be opened on 23 August at 7:45 a.m. (Cayman Islands time) / 8:45 p.m. (Hong Kong time) and immediately adjourned (the "**Initial Class A Cayman Scheme Meeting**").

[6] The Adjourned Class C Hong Kong Scheme Meeting will commence at the time stated (or, if later, as soon as the Class A Scheme Meeting for the Cayman Scheme has concluded), as a reconvened meeting of the initial Class C Hong Kong Scheme Meeting which will be opened on 23 August at 9:30 p.m. (Hong Kong time) / 8:30 a.m. (Cayman Islands time) and immediately adjourned (the "**Initial Class C Hong Kong Scheme Meeting**").

[7] The Adjourned Class C Cayman Scheme Meeting will commence at the time stated (or, if later, as soon as the Class C Scheme Meeting for the Hong Kong Scheme has concluded), as a reconvened meeting of the initial Class C Cayman Scheme Meeting which will be opened on 23 August at 9:15 a.m. (Cayman Islands time) / 10:15 p.m. (Hong Kong time) and immediately adjourned (the "**Initial Class C Cayman Scheme Meeting**").

[8] Notice will be provided to all Scheme Creditors if the dates of the Scheme Sanction Hearings change.

[9] Notice will be provided to all Scheme Creditors if the dates of the Scheme Sanction Hearings change.

2.1    The Initial Scheme Meetings are to be opened and commenced as a formality to allow the Chairperson to adjourn each Initial Scheme Meeting to a later date as specified above. All relevant formal business to be conducted at the Scheme Meetings will be addressed at the Adjourned Scheme Meetings. Therefore, while Scheme Creditors are still entitled to attend the Initial Scheme Meetings, there is no practical purpose in doing so. Scheme Creditors who wish to attend and vote at the relevant Scheme Meeting(s) are instead encouraged to attend and vote at the relevant Adjourned Scheme Meeting(s).

2.2    Any Scheme Creditor that wishes to attend the Adjourned Scheme Meetings in person should produce a duplicate copy of the Account Holder Letter or Proxy Voting Form (as applicable) that was executed and delivered on their behalf, evidence of personal identity (for example, a passport or other picture identification) and, in the case of a corporation, evidence of corporate authority (for example, a valid power of attorney and/or board minutes) at the registration desk by no later than 15 minutes before the scheduled time of the Adjourned Scheme Meetings. The Chairperson of the Adjourned Scheme Meetings may at his or her sole discretion allow a Scheme Creditor to provide the relevant documents up to the time of the commencement of the relevant Scheme Meeting. These will apply to those attending by video as well and there may be a virtual registration desk.

3.    **SUPPLEMENTS TO EXPLANATORY STATEMENT**

**This section contains a number of important notices to Scheme Creditors. Scheme Creditors are strongly encouraged to carefully review the notices in this section and, if necessary, seek and obtain independent legal and/or financial advice.**

3.1    **Defined terms**

Unless expressly defined within this Supplementary Explanatory Statement or the context otherwise requires, all capitalised terms used in this Supplementary Explanatory Statement shall have the meanings set out in Schedule 1 (*Definitions and Interpretation*) to the Explanatory Statement issued on 31 July 2023.

3.2    **Miscellaneous amendments**

Various minor miscellaneous amendments have been made to the Explanatory Statement as a result of queries put forward by Scheme Creditors or their advisers and representatives since the publication date of the Explanatory Statement.

3.3    **Notice to Scheme Creditors etc**

Section 3.2 (*Information*) to Section 3.9 (*Summary only*) of the Explanatory Statement are repeated in full as if a reference to the Explanatory Statement were instead a reference to the Supplementary Explanatory Statement.

3.4    **Conflicts**

In the event of a conflict between the information and terms described in:

(a)    this Supplementary Explanatory Statement;

(b)    the Explanatory Statement; and

4

(c)      the Schemes or the Restructuring Documents;

the terms of the Schemes and the Restructuring Documents shall prevail.

3.5     **Forward-looking Statements**

Nothing in this Supplementary Explanatory Statement shall be deemed to be a forecast, projection or estimate of the future financial performance of CEG and/or any member of the Group except where otherwise specifically stated.

This Supplementary Explanatory Statement contains statements, estimates, opinions and projections with respect to the Company and the Group and certain plans and objectives of the Company and the Group. These forward-looking statements can be identified by the fact that they do not relate only to historical or current facts. Forward-looking statements often use words such as "*anticipate*", "*target*", "*expect*", "*estimate*", "*intend*", "*plan*", "*goal*", "*believe*", "*will*", "*may*", "*should*", "*would*", "*could*" or other words of similar import. These statements are based on numerous assumptions and assessments made by the Company as appropriate in light of their experience and perception of historical trends, current conditions, expected future developments and other factors which they believe appropriate. No assurance can be given that such expectations will prove to be correct. Forward-looking statements involve significant risks and uncertainties, should not be read as guarantees of future performance or results, and will not necessarily be accurate indications of whether or not such results will be achieved. Such forward-looking statements only speak as at the date of this Supplementary Explanatory Statement. A number of factors could cause actual results to differ materially from the results discussed in the forward-looking statements, including, but not limited to, the factors and uncertainties set out in Section 28 (*Risk Factors*) of the Explanatory Statement. Each Scheme Creditor is urged to make its own assessment of the validity of such forward-looking statements and their underlying assumptions and no liability is accepted by the Company in respect of the achievement or failure thereof of such forward-looking statements and assumptions. Without limiting the above, none of the boards of the directors of the companies within the Group assumes any obligation to update or correct any forward-looking statements contained in this Supplementary Explanatory Statement to reflect any change of expectations with respect thereto or any change in event, situation or circumstances on which any such forward-looking statement was based.

3.6     **Legal, tax and financial advice**

Section 3.13 (*Legal, tax and financial advice*) of the Explanatory Statement is repeated in full as if a reference to the Explanatory Statement were instead a reference to the Supplementary Explanatory Statement.

4.      **IMPORTANT SECURITIES LAW NOTICES**

**This Supplementary Explanatory Statement does not constitute an offer to sell or a solicitation of an offer to buy any securities in any jurisdiction in contravention of applicable law. None of the securities referred to in this Supplementary Explanatory Statement shall be sold, issued or transferred in any jurisdiction in contravention of applicable law.**

5

The securities law notices set out in Section 2 (*Important Securities Law Notices*) of the Explanatory Statement are repeated in full as if a reference to the Explanatory Statement were instead a reference to the Supplementary Explanatory Statement.

5.    **LETTER FROM THE BOARD TO THE SCHEME CREDITORS**

16 August 2023

Dear Scheme Creditor,

**CHINA EVERGRANDE GROUP 中國恒大集團**

1.    **INTRODUCTION**

The Board refers to the Explanatory Statement issued on 31 July 2023 in relation to the schemes of arrangement proposed by the Company pursuant to: (i) Section 86 of the Cayman Companies Act; and (ii) Sections 670, 673 and 674 of the Hong Kong Companies Ordinance. Unless otherwise specified, capitalised words or phrases used in this letter have the meanings attributed to them in Schedule 1 (*Definitions and Interpretation*) to the Explanatory Statement.

The Board writes to you in your capacity as a Person who is, or appears to be, a Scheme Creditor. This letter forms part of the Supplementary Explanatory Statement for the Schemes proposed by the Company as part of the Restructuring, the details of which are explained in the Explanatory Statement. Please note that the information in this letter is not intended to be exhaustive or complete. Scheme Creditors should read this Supplementary Explanatory Statement and the Explanatory Statement as a whole, in conjunction with the documents that accompany them.

2.    **THE PURPOSE OF THE SUPPLEMENTARY EXPLANATORY STATEMENT**

The purpose of this Supplementary Explanatory Statement is to inform Scheme Creditors of:

(a)    Updates in relation to the strategic investment as mentioned in Section 8.10(iii) (*Business Operations of the Group*) and Section 28.3 (t) to (v) (*Risks following the implementation of the Schemes*) of the Explanatory Statement and the impact of the strategic investment on certain elements of the Scheme Consideration, namely the NEV MEBs and the NEV SLNs; and

(b)    an extension of the Custody Instruction Deadline and the Voting Record Time (and the timing of the Adjourned Scheme Meetings) to provide Scheme Creditors with sufficient time to consider the supplements set out in this Supplementary Explanatory Statement and the opportunity to amend their vote in respect of the Schemes.

4893-7399-7174v.12

3.      **BACKGROUND TO THE SUPPLEMENTS**

Since the date that the Explanatory Statement was published, the Company has made further progress in relation to the Group's and NEV's efforts to seek strategic investors' investment in NEV in order to inject cash capital to sustain NEV's business as a going concern. As stated in the Explanatory Statement, in the absence of new funding, NEV will face the risk of shutdown.

4.      **SUPPLEMENTS TO THE EXPLANATORY STATEMENT**

*Overview of the strategic investment in NEV*

As announced by CEG and NEV on 14 August 2023, CEG, NEV, the Chairman and NWTN Inc. (the "**Strategic Investor**") entered into, among others, the Share Subscription Agreement, pursuant to which NEV conditionally agreed to allot and issue, and the Strategic Investor conditionally agreed to subscribe for 6,177,106,404 new NEV shares. The Share Subscription by the Strategic Investor would result in the Strategic Investor holding approximately 27.50% of the total number of issued NEV shares as enlarged by the issue of new NEV shares upon completion of the Loan Conversion and the Share Subscription (assuming that there is no other issue of new NEV shares and the grantees under the Share Option Scheme do not exercise any share options from the date of the Share Subscription Agreement to the Closing Date), for a total consideration of HK\$3,889,723,903 (equivalent to approximately US\$500 million), implying the Subscription Price of HK\$0.6297 per Subscription Share. NEV intends to use the net proceeds from the Share Subscription for the research and development, manufacturing of and sales services in respect of vehicles of the NEV Group and repayment of the Transitional Support Amount (further described below). CEG will not receive any proceeds from the Share Subscription.

To support business recovery and growth of NEV and its subsidiaries, on 14 August 2023, NWTN (Zhejiang) Automobile Co., Ltd.* (a subsidiary of the Strategic Investor) and Evergrande Kailong Intelligent Automobile Group Co., Ltd.* (a subsidiary of NEV) entered into a Transitional Funding Support Agreement, pursuant to which the Fund Provider shall, subject to the satisfaction of conditions precedent in that agreement, provide an interest-free secured transitional funding in the amount of RMB600 million in three equal tranches to the Fund Recipient for the research and development, manufacturing of and sales services in respect of vehicles of the NEV Group.

Further details regarding the strategic investment in NEV (including the conditions aforementioned) are set out in:

a) the announcements made by NEV on 14 August 2023, which are available at:

- https://www1.hkexnews.hk/listedco/listconews/sehk/2023/0814/2023081401547.pdf;

7

- https://www1.hkexnews.hk/listedco/listconews/sehk/2023/0814/2023081401537.pdf; and

b) the announcements made by CEG on 14 August 2023, which are available at:

- https://www1.hkexnews.hk/listedco/listconews/sehk/2023/0814/2023081401581.pdf;

- https://www1.hkexnews.hk/listedco/listconews/sehk/2023/0814/2023081401531.pdf.

***Impact on the recovery to Scheme Creditors under the Schemes***

The strategic investment represents positive news to the Scheme Creditors. Principally, as disclosed in the Explanatory Statement, due to the tight liquidity situation and in order to maintain business operations, NEV has taken initiatives to cut costs, such as reducing its workforce headcount. In the absence of new funding, e.g. the strategic investment, NEV will face the risk of shutdown.

The difference between the Subscription Price (HKD 0.6297 per share) and the NEV MEBs conversion price set out in the Scheme Recovery Analysis (RMB 0.69 per share) is not considered material. The slight difference in the prices is due to there being a discount applied to the value of the NEV shares subject to the strategic investment, which is common in most distressed situations. While the new investment helps NEV in operations, financially speaking since the per share price is similar to the NEV MEBs conversion price assumed in the Scheme Recovery Analysis (i.e. the estimated value of the NEV shares in the Scheme Recovery Analysis), and that the share count in the NEV MEBs (i.e. the number of shares in the NEV MEBs inclusive of the Loan Conversion) stays constant, there is no material impact in recovery for Class A and Class C Scheme Creditors. The transaction is, qualitatively, beneficial to Scheme Creditors as it enables NEV to have better business prospects going forward, but the quantitative impacts are challenging to quantify. Given the similarity in the two prices (the Subscription Price by the Strategic Investor and the estimated value of the NEV shares to be exchanged from the NEV MEBs set out in the Scheme Recovery Analysis), the dilution effect of NEV MEB holders' percentage holding in NEV's equity is in principle offset by the amount of the new investment. Since the number of shares in the NEV MEBs, and for that matter the number of shares in the NEV SLNs, stays the same (the strategic investment is made by way of issuing new shares), from a pure financial perspective there is not a quantitative uplift or decrease to the recovery of Scheme Creditors pursuant to the Schemes.

8

*Impact on the NEV MEBs and the NEV SLNs*

As disclosed in Section 28.3 (t) to (v) of the Explanatory Statement, any strategic investment in NEV could result in additional dilution to the stakeholders of the shares of NEV.

To illustrate the impact of the strategic investment on the NEV MEBs and the NEV SLNs, the following table provides an indicative-only illustrative summary of:

a) the Scheme Creditors' shareholding in NEV following the full exchange of the NEV MEBs in accordance with the terms of the NEV MEBs; and

b) the shareholding in NEV that is represented by the underlying shares in the custodial account(s) under the NEV SLNs.

| Percentage / number of shares | As implied in the Explanatory Statement issued on 31 July 2023 – *i.e. without* strategic investment (and exclusive of Loan Conversion) | Immediately after the Loan Conversion – *i.e. without* strategic investment (and inclusive of Loan Conversion) | Immediately after the strategic investment – *i.e. including* strategic investment (and inclusive of Loan Conversion) |
|---|---|---|---|
| **Impact in respect of NEV MEBs** | | | |
| **Shareholding percentage** | 28.54% | 38.87% | 28.18% |
| **Number of shares represented by the percentage** | 3,094,810,100 | 6,330,807,426** | 6,330,807,426** |
| **Total number of shares from which the percentage is derived** | 10,843,793,000 | 16,285,098,702** | 22,462,205,106** |
| **Impact in respect of underlying shares in NEV SLNs custodial account** | | | |
| **Shareholding percentage** | 30.00% | 30.00% | 21.75% |
| **Number of shares represented by the percentage** | 3,253,137,900 | 4,885,529,610** | 4,885,529,610** |
| **Total number of shares from which the percentage is derived** | 10,843,793,000 | 16,285,098,702** | 22,462,205,106** |

*\*\* The share count (inclusive of Loan Conversion) remains constant.*

Additionally, following the Loan Conversion and the strategic investment, NEV will cease to be a non-wholly owned subsidiary of the Company.

9

###### 6.    DIRECTOR'S RECOMMENDATION

The Board has reviewed this Supplementary Explanatory Statement and the documents referred to in it and approves the form and content of this Supplementary Explanatory Statement. The Board retains its strong recommendation that the Scheme Creditors vote in favour of the Schemes at the Scheme Meetings.

Yours faithfully,

Hui Ka Yan
Chairman
for and on behalf of the Board of
China Evergrande Group
中國恒大集團

**APPENDIX 1**

**DEFINITIONS**

In this Supplementary Explanatory Statement, unless expressly defined below or the context otherwise requires, all capitalised terms used shall have the meanings set out in Schedule 1 (*Definitions and Interpretation*) to the Explanatory Statement issued on 31 July 2023:

| | |
|---|---|
| **"Adjourned Scheme Meetings"** | means, together, the Adjourned Class A Hong Kong Scheme Meeting, the Adjourned Class C Hong Kong Scheme Meeting, the Adjourned Class A Cayman Scheme Meeting and the Adjourned Class C Cayman Scheme Meeting and "**Adjourned Scheme Meeting**" shall be construed accordingly. |
| **"Closing Date"** | means the date of the completion of the Share Subscription pursuant to the terms and conditions of the Share Subscription Agreement, details of which are set out in the section headed "Proposed Issue of New Shares Under Specific Mandate - Closing" in the announcement made by NEV on 14 August 2023, available at: https://www1.hkexnews.hk/listedco/listconews/sehk/2023/0814/2023081401547.pdf. |
| **"Explanatory Statement"** | means the explanatory statement in relation to linked and inter-conditional schemes of arrangement proposed by the Company pursuant to Section 86 of the Cayman Companies Act (2023 Revision) and Section 671 of the Companies Ordinance (Cap. 622 of the Laws of Hong Kong), first issued on 31 July 2023, as amended and restated from time to time, and is available for inspection on the Transaction Website. |
| **"Fund Provider"** | NWTN (Zhejiang) Automobile Co., Ltd.* (纽顿（浙江）汽车有限公司), a subsidiary of the Strategic Investor. |
| **"Fund Recipient"** | Evergrande Kailong Intelligent Automobile Group Co., Ltd.* (恒大凯隆智能汽车集团有限公司), a subsidiary of NEV. |
| **"Initial Class A Hong Kong Scheme Meeting"** | has the meaning set out in Section 2 of this Supplementary Explanatory Statement. |
| **"Initial Class A Cayman Scheme Meeting"** | has the meaning set out in Section 2 of this Supplementary Explanatory Statement. |
| **"Initial Class C Hong Kong Scheme Meeting"** | has the meaning set out in Section 2 of this Supplementary Explanatory Statement. |
| **"Initial Class C Cayman Scheme Meeting"** | has the meaning set out in Section 2 of this Supplementary Explanatory Statement. |
| **"Initial Scheme Meetings"** | means, together, the Initial Class A Hong Kong Scheme Meeting, the Initial Class C Hong Kong Scheme Meeting, |

11

the Initial Class A Cayman Scheme Meeting and the Initial Class C Cayman Scheme Meeting and "**Initial Scheme Meeting**" shall be construed accordingly.

**"Loan Conversion"** means the conversion of (a) loans provided by CEG, Mr. Hui, Xin Xin (BVI) Limited, Ms. Ding Yumei and Good Bond Limited with the aggregate outstanding principal amount and (b) (in respect of the shareholder's loan provided by CEG to NEV only) the interest accrued upon such loan up to and including 14 August 2023, with an aggregate amount of HK$20,894,613,901.15, into 5,441,305,702 new NEV shares issued and allotted by NEV, details of which are set out in the announcement of CEG dated 22 March 2023, available at: https://www1.hkexnews.hk/listedco/listconews/sehk/2023/0322/2023032201427.pdf and the announcement of NEV dated 14 August 2023, available at: https://www1.hkexnews.hk/listedco/listconews/sehk/2023/0814/2023081401537.pdf.

**"Share Option Scheme"** means the share option scheme of NEV adopted on 6 June 2018.

**"Share Subscription Agreement"** means the share subscription agreement dated 14 August 2023 and entered into among NEV, the Strategic Investor, CEG and Mr. Hui in relation to the Share Subscription.

**"Share Subscription"** means the subscription of the Subscription Shares by the Strategic Investor pursuant to the terms and conditions of the Share Subscription Agreement.

**"Strategic Investor"** has the meaning set out in paragraph 4 of Section 5 of this Supplementary Explanatory Statement.

**"Subscription Price"** means the subscription price of HK$0.6297 per Subscription Share.

**"Subscription Shares"** means 6,177,106,404 new NEV shares to be allotted and issued by NEV to the Strategic Investor pursuant to the Share Subscription Agreement.

**"Supplementary Explanatory Statement"** means this additional composite document dated 16 August 2023 of the Company addressed to Scheme Creditors containing, among other things, a supplementary explanatory statement of the Company in compliance with the Cayman Companies Act and the Hong Kong Companies Ordinance respectively.

**"Transitional Funding Support Agreement"** means the transitional funding support agreement dated 14 August 2023 and entered into between the Fund Provider and the Fund Recipient in relation to the provision of loan in the principal amount of the Transitional Support Amount.

12

| | |
|---|---|
| **"Transitional Support Amount"** | means the transitional funding in the amount of RMB600 million to be provided by the Fund Provider to the Fund Recipient pursuant to the terms of the Transitional Funding Support Agreement. |

*\* For identification purpose only*

13

14

4893-7399-7174v.12

**Exhibit D.2**

**Tianji Explanatory Statement**

**THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION**

**EXPLANATORY STATEMENT IN RELATION TO THE SCHEME OF ARRANGEMENT**
**(pursuant to Sections 670, 673 and 674 of the Companies Ordinance (Cap. 622 of the Laws of Hong Kong))**
**between**

**TIANJI HOLDING LIMITED**
**天基控股有限公司**
**(a company incorporated with limited liability under the laws of Hong Kong with registration number 1339269)**

**and**

**THE SCHEME CREDITORS**
**(as defined in this Explanatory Statement)**

**in the High Court of Hong Kong**

**31 July 2023**

This document comprises an explanatory statement in relation to the scheme of arrangement proposed by Tianji Holding Limited (天基控股有限公司) ("**Tianji**" or the "**Company**") pursuant to Sections 670, 673, and 674 of the Companies Ordinance (Cap. 622 of the Laws of Hong Kong) and provided pursuant to Section 671 of the Companies Ordinance (Cap. 622 of the Laws of Hong Kong) (this "**Explanatory Statement**"). Reference is made to the definitions set out in Schedule 1 (*Definitions and Interpretation*) to this Explanatory Statement.

This Explanatory Statement is being sent to persons who it is believed are or may be Scheme Creditors as at the date of this Explanatory Statement. If you have assigned, sold, or otherwise transferred your interests in the Existing Debts you must forward this Explanatory Statement and the accompanying documents at once to the person or persons to whom you have assigned, sold or otherwise transferred your interests in the Existing Debts.

This Explanatory Statement has been sent to you in an electronic form. You are advised that documents transmitted in electronic form may be altered or changed during the process of transmission and consequently none of the Company, the Information Agent, the SJ Notes Trustee, the Lake Notes Trustee and Agent, the Existing Agents, nor any of their respective Affiliates, directors, officers or employees, accept any liability or responsibility whatsoever in respect of any difference between the Explanatory Statement distributed to you in electronic format and the version available to you for inspection on the Transaction Website.

<u>WARNING</u> – The contents of this Explanatory Statement have not been reviewed by any regulatory authority in the Cayman Islands, Hong Kong, the British Virgin Islands, Singapore or in any other jurisdiction. Neither the US Securities and Exchange Commission ("**SEC**") nor any United States state securities commission has approved or disapproved of the Scheme Consideration or determined if this Explanatory Statement is truthful or complete. Any representation to the contrary is a criminal offence. You are strongly encouraged to exercise caution in relation to any offer pursuant to the scheme of arrangement set out in this Explanatory Statement.

<u>**You are recommended to seek your own independent financial, legal and/or tax advice immediately from your financial, legal and/or tax adviser with respect to the contents of this Explanatory Statement or the documents that accompany it or what action you should take.**</u>

This Explanatory Statement does not constitute an offer to sell or the solicitation of an offer to buy any securities. None of the securities referred to in this Explanatory Statement may be sold, issued or

transferred in any jurisdiction in contravention of applicable law. The securities proposed to be issued pursuant to the Scheme will not be registered with the SEC under the US Securities Act of 1933, as amended (the "**US Securities Act**"), or the securities law of any state or other jurisdiction, and are being transferred and delivered in reliance upon certain exemptions from the registration requirements of the US Securities Act. The securities proposed to be issued pursuant to the Scheme will be issued and delivered only (i) in the United States to "qualified institutional buyers" ("**QIBs**") as defined in Rule 144A under the US Securities Act ("**Rule 144A**") and institutional "accredited investors" ("**Accredited Investors**") as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the US Securities Act ("**Regulation D**"); and (ii) outside the United States to non- US persons in offshore transactions, in reliance on Regulation S under the US Securities Act ("**Regulation S**").

An application will be made for the listing and quotation of the New Instruments on the Singapore Exchange Securities Trading Limited ("**SGX-ST**"). The SGX-ST assumes no responsibility for the correctness of any of the statements made or opinions expressed or reports contained herein. Approval in-principle for the listing and quotation of the New Instruments on the SGX-ST is not to be taken as an indication of the merits of the New Instruments or of the issuers of them, any guarantees, any guarantors, their respective subsidiaries (if any), their respective associated companies (if any) or their respective joint venture companies (if any). For so long as such New Instruments are listed on the SGX-ST and the rules of the SGX-ST so require, such New Instruments will be traded on the SGX-ST in a minimum board lot size of at least S$200,000 (or its equivalent in foreign currencies). To the extent that Tianji is required to disclose additional information solely for the purposes of the application to list the New Instruments on the SGX-ST, such information will be made available to Scheme Creditors on the Transaction Website (where legally and commercially permissible).

**Section 309B(1) Notification**—In connection with Section 309B of the Securities and Futures Act, Chapter 289 of Singapore, as modified or amended from time to time (the "**SFA**") and the Securities and Futures (Capital Markets Products) Regulations 2018 (the "**CMP Regulations 2018**"), we have determined, and hereby notify all relevant persons (as defined in Section 309A(1) of the SFA) that the New Instruments are prescribed capital markets products (as defined in the CMP Regulations 2018) and Excluded Investment Products (as defined in MAS Notice SFA 04-N12: Notice on the Sale of Investment Products and MAS Notice FAA-N16: Notice on Recommendations on Investment Products).

This Explanatory Statement should be read carefully with the Solicitation Packet which is available on the Transaction Website for Scheme Creditors to download.

The Solicitation Packet contains: (i) the Account Holder Letter (for SJ Notes Scheme Creditors and the Lake Noteholders who are not Sanctions-Affected Scheme Creditors), (ii) the Proxy Form (for the Other Debt Scheme Creditors (other than the Lake Noteholders)), and (iii) the Blocked Scheme Creditor Form (for Blocked Scheme Creditors), all of which also encloses the Designated Recipient Form and the Distribution Confirmation Deed (if applicable), and instructions and guidance for Scheme Creditors and any Person with an interest in the Existing Debts as to how to complete the required documents.

All Scheme Creditors (and Designated Recipients, if applicable) will need to hold an account (directly or indirectly through the intermediary chain) with an account holder or custodian which itself holds an account with Euroclear or Clearstream in order to receive the New Instruments and the Consent Fee (if applicable). To the extent that they do not already have such an account, all Other Debt Scheme Creditors who are not noteholders, and Designated Recipients (if applicable), are advised to open an account (directly or indirectly through the intermediary chain) with an account holder or custodian which itself holds an account with Euroclear (if possible) or Clearstream (including many custodian banks and certain other financial institutions) and provide the Information Agent with the required details of such account (as required in the relevant Scheme Creditor Forms) as soon as possible, and in any event, by the Bar Date. If you do not have such an account and are unable to open such an account and are not a Sanctions-Affected Scheme Creditor, please contact the Information Agent immediately.

Further important information is set out under Section 2 (*Important Securities Law Notices*) and Section 3 (*Important Notices to Scheme Creditors*) of this Explanatory Statement.

The Information Agent provides the contact for Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) in relation to questions the Scheme Creditors have in relation to this Explanatory Statement, the Solicitation Packet, the Scheme or the Restructuring. The Information Agent will be assisting the Chairperson in co-ordinating the voting process for the Scheme, including (a) creating and managing the Transaction Website and the Portal, (b) communicating with Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) regarding voting in the Scheme, in particular via the Transaction Website, (c) communicating with the Clearing Systems (where relevant) regarding voting in the Scheme (for further distribution to Scheme Creditors (who are not Sanctions-Affected Scheme Creditors)), and (d) assisting the Chairperson in checking the voting values of each Scheme Creditor (who is not a Sanctions-Affected Scheme Creditor) for/at the Scheme Meeting against the relevant Custodian Instructions or, as the case may be, the records supplied by the Company. GLAS will be managing the voting process for the Scheme for Blocked Scheme Creditors.

Queries in relation to this Explanatory Statement or the completion of an Account Holder Letter or Proxy Form (as applicable) should be directed to the Information Agent as follows:

**Morrow Sodali Limited**
Telephone: in Hong Kong +852 2319 4130; in London: +44 20 4513 6933
Email: evergrande@investor.morrowsodali.com
Transaction Website (document posting website): https://projects.morrowsodali.com/evergrande
Portal (form submission website): https://portal.morrowsodali.com/EvergrandeScheme
Attention: Debt Services Team

**Blocked Scheme Creditors should direct any questions in relation to this Explanatory Statement, the Blocked Scheme Creditor Form, the Scheme or the Restructuring to:**

**GLAS Specialist Services Limited**
Email: lm@glas.agency
Attention: Liability Management Team

**For submitting Blocked Scheme Creditor Forms**

please refer to the Solicitation Packet

**For Company announcements regarding the Scheme, including those relevant for Blocked Scheme Creditors**

**http://www.evergrande.com/**

31 July 2023

**TABLE OF CONTENTS**

1.      EXPECTED TIMETABLE OF KEY EVENTS ........................................................................ 1

2.      IMPORTANT SECURITIES LAW NOTICES ..................................................................... 4

3.      IMPORTANT NOTICES TO SCHEME CREDITORS ........................................................ 10

4.      QUESTIONS AND ANSWERS ........................................................................................ 18

5.      SUMMARY OF ACTIONS TO BE TAKEN BY SCHEME CREDITORS .......................... 26

6.      SUMMARY EXPLANATION OF THE SCHEME ............................................................. 46

7.      LETTER FROM THE BOARD TO THE SCHEME CREDITORS ...................................... 51

8.      BACKGROUND TO TIANJI AND THE RESTRUCTURING ............................................ 57

9.      EFFECT OF THE SCHEME ............................................................................................ 67

10.     DISTRIBUTION OF SCHEME CONSIDERATION ......................................................... 75

11.     JURISDICTION OF THE COURT PURSUANT TO THE RESTRUCTURING ................. 81

12.     SCHEME CLASS ........................................................................................................... 82

13.     THE SCHEME MEETING ............................................................................................... 85

14.     ASSESSMENT OF SCHEME CLAIMS FOR VOTING PURPOSES ................................. 85

15.     SCHEME SANCTION HEARING ................................................................................... 86

16.     RESTRUCTURING EFFECTIVE DATE ......................................................................... 87

17.     AUTHORITY AND INSTRUCTIONS ............................................................................. 87

18.     FOREIGN RECOGNITION OF THE SCHEME ............................................................... 93

19.     HOLDING PERIOD TRUST ........................................................................................... 94

20.     SUCCESSOR ESCROW ACCOUNT ............................................................................... 94

21.     STAY OF PROCEEDINGS ............................................................................................. 95

22.     MODIFICATIONS TO THE RESTRUCTURING DOCUMENTS ..................................... 95

23.     GOVERNING LAW AND JURISDICTION ...................................................................... 96

24.     RESTRUCTURING DOCUMENTS ................................................................................. 96

25.     SUMMARY OF THE NEW INSTRUMENTS .................................................................. 101

26.     RISK FACTORS ............................................................................................................ 101

27.     TAXATION .................................................................................................................... 118

SCHEDULE 1 DEFINITIONS AND INTERPRETATION

SCHEDULE 2 LIQUIDATION ANALYSIS

SCHEDULE 3 SCHEME RECOVERY ANALYSIS

SCHEDULE 4 THE SCHEME

SCHEDULE 5 NOTICE OF SCHEME MEETING

SCHEDULE 6 VALUATION AND ADJUDICATION FLOW CHART

SCHEDULE 7 GROUP STRUCTURE CHART

SCHEDULE 8 SCHEME MEETING CONVENING ORDER

SCHEDULE 9 SUMMARY OF TERMS OF THE NEW INSTRUMENTS

1.      **EXPECTED TIMETABLE OF KEY EVENTS[1]**

| Event | | Expected date | Hong Kong time |
|---|---|---|---|
| **Custody Instruction Deadline** | The latest time for Account Holders to submit Custody Instructions to block SJ Notes and Lake Notes held with Euroclear or Clearstream in order to vote on this Scheme and, in respect of SJ Notes Scheme Creditors (who are not Sanctions-Affected Scheme Creditors), receive Scheme Consideration on the Restructuring Effective Date, and in respect of the Lake Noteholders (who are not Sanctions-Affected Creditors) receive the Consent Fee only on the Restructuring Effective Date and Scheme Consideration on the Final Distribution Date. | 15 August 2023 being three (3) Business Days prior to the Voting Record Time | 5.00 p.m. on 15 August 2023 |
| **Voting Record Time** | The latest time for Scheme Creditors to lodge Account Holder Letters or Proxy Forms (as applicable) with the Information Agent for the purpose | 18 August 2023 | 5.00 p.m. on 18 August 2023 |

---

[1]The dates in this timetable and those mentioned throughout this Explanatory Statement assume that none of the Court hearings or the Scheme Meeting are adjourned or delayed. It is also possible that the drawing up or registration of the Scheme Sanction Order may be delayed if any person appeals the order (other events may delay the registration of the Scheme Sanction Order). If there is any change to the date or time listed in this timetable, the revised date or time will be announced as soon as practicable when it is known to Tianji.

| Event | | Expected date | Hong Kong time |
|---|---|---|---|
| | of voting at the Scheme Meeting.[2] | | |
| | The time on which all Voting Scheme Claims are determined as at the Voting Record Time.[3] | Following the close of business and cessation of trading on the Clearing Systems on 18 August 2023. | |
| **Scheme Meeting for Scheme Creditors[4]** | This is the meeting of the Scheme Creditors for the purpose of considering and, if thought fit, approving the Scheme. | 22 August 2023 | 8.00 p.m. on 22 August 2023 |
| **Scheme Sanction Hearing[5]** | This is the hearing at the Hong Kong Court where the Court will hear the petition in respect of sanctioning the Scheme. | 5 and 6 September 2023 | 10.00 a.m on 5 and 6 September 2023 |
| **SJ RED Distribution Deadline** | The latest time for SJ Notes Scheme Creditors to submit the Scheme Creditor Forms to receive the Scheme Consideration on the | The date which is 14 calendar days after the Scheme Effective Date, to be announced by the Company. | |

---

[2]Scheme Creditors should confirm as early as possible with their Account Holders and/or Intermediaries (as applicable) whether there are any applicable deadlines to ensure that their Account Holder Letter is returned online via the Portal to the Information Agent prior to the Voting Record Time in order to vote.

[3]All Scheme Claims for voting purposes are determined as at the Voting Record Time. The Chairperson shall be under no obligation to recognize any assignment or transfer of rights, benefits or interests in the Scheme Claims after the Voting Record Time for the purposes of calculating the value of Scheme Claims for voting nor Entitlements to receive Scheme Consideration and has no obligations hereunder to any Person other than the Scheme Creditors, provided that, where the Chairperson has received from the relevant parties notice in writing of such assignment or transfer prior to the Restructuring Effective Date, the Chairperson may, in its sole discretion and subject to the production of such other evidence in relation to such assignment or transfer as it may reasonably require and to any other terms and conditions which the Chairperson and/or Scheme Administrator may consider necessary or desirable, agree to recognize such assignment or transfer for the purposes of the Scheme Administrators calculating Entitlements to receive Scheme Consideration under the Scheme.

[4]The Scheme Meeting will commence at the time stated. Any Scheme Creditor that wishes to attend the Scheme Meetings in person should produce a duplicate copy of the Account Holder Letter or Proxy Form (as applicable) that was executed and delivered on their behalf, evidence of personal identity (for example, a passport or other picture identification) and, in the case of a corporation, evidence of corporate authority (for example, a valid power of attorney and/or board minutes) at the registration desk by no later than 15 minutes before the scheduled time of the Scheme Meetings. The Chairperson of the Scheme Meeting may at his or her sole discretion allow a Scheme Creditor to provide the relevant documents up to the time of the commencement of the Scheme Meeting. These will apply to those attending by video as well and there may be a virtual registration desk.

[5]Notice will be provided to all Scheme Creditors if the date of the Scheme Sanction Hearing changes.

2

| Event | | Expected date | Hong Kong time |
|---|---|---|---|
| | Restructuring Effective Date. | | |
| **Entitlement Record Time** | Irrespective of when the Scheme Creditors submit the required documents, this is the time when their Entitlements to Scheme Consideration will be determined. The Valuation and Adjudication Procedure for Scheme Creditors taking place after the Restructuring Effective Date can still take into account prevailing circumstances at such time. | Restructuring Effective Date. | |
| **Restructuring Effective Date[6]** | The date after all Restructuring Effective Date conditions have been satisfied or waived (as the case may be). | To be announced by the Company. | |
| **First issuance of Estimation Notice** | This is the target date on which the Scheme Administrators will start issuing Estimation Notices. | The date which is no later than 30 calendar days after: (a) the Restructuring Effective Date, for Scheme Claims submitted before the Restructuring Effective Date; and (b) the Distribution Confirmation Deed is received by the Scheme Administrators, for Scheme Claims submitted (i) on or after the Restructuring Effective Date, but (ii) on or before the Bar Date. | |
| **Holding Period Custody Instruction Deadline** | The latest time for Account Holders to submit Custody Instructions to block SJ Notes and Lake Notes held with Euroclear or Clearstream, in order to receive Scheme | The date which is five (5) Business Days prior to the Bar Date. | |

---

[6]This is also an estimated date and will depend upon when conditions precedent to the Restructuring Effective Date have been satisfied or waived.

| Event | | Expected date | Hong Kong time |
|---|---|---|---|
| | Consideration on the Final Distribution Date. | | |
| **Bar Date** | This is the last day for Scheme Creditors, that did not participate before the Bar Date, to submit the necessary documentation in order to receive Scheme Consideration on the Final Distribution Date. | The date which is 135 calendar days after the Restructuring Effective Date. | |
| **Completion of the Valuation and Adjudication Procedure** | This is the target date on which the Valuation and Adjudication Procedure for Other Debt Scheme Creditors (as applicable) is completed. | The date which is 295 calendar days after the Restructuring Effective Date. | |
| **Final Distribution Date** | The final date on which the Scheme Consideration shall be distributed to Scheme Creditors (that are not Sanctions-Affected Scheme Creditors) or to the Successor Escrow Agent on behalf of the Blocked Scheme Creditors. | The date which is 30 calendar days after the completion of the Valuation and Adjudication Procedure. | |

2.      **IMPORTANT SECURITIES LAW NOTICES**

**This Explanatory Statement does not constitute an offer to sell or the solicitation of an offer to buy any securities in any jurisdiction in contravention of applicable law. None of the securities referred to in this Explanatory Statement shall be sold, issued or transferred in any jurisdiction in contravention of applicable law.**

2.1    **General**

(a)     The distribution of this Explanatory Statement and the offering, sale or delivery of the New Instruments are subject to restrictions and may not be made except pursuant to registration with or authorisation by the relevant securities regulatory authorities or an

4

exemption therefrom. Therefore, Persons who may come into possession of this Explanatory Statement are advised to consult with their own legal advisers as to what restrictions may be applicable to them and to observe such restrictions. This Explanatory Statement may not be used for the purpose of an offer or invitation in any circumstances in which such offer or invitation is not authorised.

(b)     No action has been or will be taken in any jurisdiction by the Company that would or is intended to permit a public offering, or any other offering under circumstances not permitted by applicable law, of the New Instruments. Persons into whose hands this Explanatory Statement comes are required by the Company and the Group to comply with all applicable laws and regulations in each country or jurisdiction in which they purchase, offer, sell or deliver New Instruments or have in their possession, distribute or publish this Explanatory Statement or any other materials relating to the New Instruments, in all cases at their own expense.

(c)     Each Scheme Creditor will be required to submit the validly completed Scheme Creditor Forms and Blocked Scheme Creditor Forms (as applicable) in order to receive the New Instruments.

## 2.2     US securities law considerations

(a)     The New Instruments have not been and will not be registered under the US Securities Act or with any securities regulatory authority of any state of the United States.

(b)     In connection with the issue of the New Instruments, the Distribution Confirmation Deed will require each Scheme Creditor (or its Designated Recipient) who wishes to receive its New Instruments to confirm, amongst other things, that it (or its Designated Recipient) is an Eligible Person and will require any Scheme Creditor (or its Designated Recipient) who is located in the United States or who is a US person (as defined in Regulation S) and intends to receive its New Instruments to make certain representations and covenants in the Distribution Confirmation Deed. If the confirmations, the representations and the covenants required by the Distribution Confirmation Deed cannot be or are not given by a Scheme Creditor (or its Designated Recipient), such Scheme Creditor (or its Designated Recipient) will not be eligible to receive the relevant New Instruments.

(c)     Unless otherwise approved by the Company, the New Instruments will be transferred and delivered within the United States solely to QIBs and Accredited Investors. Outside the United States, the New Instruments will be transferred and delivered solely to non-US persons in offshore transactions in reliance on Regulation S.

(d)     If you are a US person, or are located in the United States, but you are not a QIB or an Accredited Investor, you are eligible to receive this Explanatory Statement and to participate in the Scheme and the meetings described herein but you will not be eligible to receive any New Instruments.

(e)     The New Instruments will not be listed on any US securities exchange or with any inter-dealer quotation system in the United States. The Company does not intend to take action to facilitate a market of the New Instruments in the United States. Consequently, the Company believes that it is unlikely that an active trading market in the United States will develop for such Notes.

**The New Instruments have not been and will not be registered with the SEC or any US federal, state or other securities commission or regulatory authority and neither the SEC nor any US federal, state or other securities commission or regulatory authority has**

**approved or disapproved this Explanatory Statement. Any representation to the contrary is a criminal offence in the United States.**

**Scheme Creditors who are citizens or residents of the United States should consult their own legal, financial and tax advisers with respect to the legal, financial and tax consequences of the Scheme in their particular circumstances.**

2.3     **European Economic Area**

(a)     The New Instruments are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the European Economic Area ("**EEA**"). For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU ("**MiFID II**"); or (ii) a customer within the meaning of Directive 2002/92/EC (as amended or superseded), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II. Consequently, no key information document required by Regulation (EU) No 1286/2014 (the "**PRIIPs Regulation**") for offering or selling the New Instruments or otherwise making it available to retail investors in the EEA has been prepared and therefore offering or selling the New Instruments or otherwise making it available to any retail investor in the EEA may constitute a breach of the PRIIPs Regulation.

(b)     In addition, this Explanatory Statement has been prepared on the basis that all offers of the New Instruments in the EEA will be made pursuant to an exemption under Regulation (EU) 2017/1129 (the "**Prospectus Regulation**"), from the requirement to produce a prospectus for offers of the New Instruments. Accordingly, any person making or intending to make any offer within the EEA of the New Instruments should only do so in circumstances in which no obligation arises for the Company to produce a prospectus for such offer. The Company has not authorised and does not authorise the making of an offer of any of the New Instruments through any financial intermediary.

(c)     In relation to each member state of the EEA ("**Member State**"), no offer of New Instruments to the public in that Member State may be made other than to any legal entity which is a qualified investor as defined in the Prospectus Regulation (an "**EEA Qualified Investor**") or in any other circumstances falling within Article 1(3) or Article 1(4) of the Prospectus Regulation, provided that no such offer of New Instruments shall require the Company to publish a prospectus pursuant to Article 3(1) or Article 3(3) of the Prospectus Regulation.

(d)     In connection with the issue of the New Instruments, the Distribution Confirmation Deed will require each Scheme Creditor (or its Designated Recipient) who wishes to receive its Scheme Consideration to confirm, amongst other things, that it (or its Designated Recipient) is an Eligible Person and will require any Scheme Creditor (or its Designated Recipient) who is located in the UK and intends to receive its New Instruments to make certain representations and covenants in the Distribution Confirmation Deed, including that it is a UK Qualified Investor. If the confirmations, the representations and the covenants required by the Distribution Confirmation Deed cannot be or are not given by a Scheme Creditor (or its Designated Recipient), such Scheme Creditor (or its Designated Recipient) will not be eligible to receive the relevant New Instruments.

(e)     For the purposes of this provision, the expression an "offer to the public" in relation to the New Instruments in any Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the New

6

Instruments to be offered so as to enable an investor to decide to purchase or subscribe for the New Instruments, as the same may be varied in that Member State by any measure adopted in that Member State pursuant to the Prospectus Regulation (and amendments thereto).

2.4    **United Kingdom**

(a)    The New Instruments are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the United Kingdom ("**UK**"). For these purposes, a retail investor is defined in the UK PRIIPs Regulation to include a client or customer which is not a professional client within the meaning of UK MiFID II. Consequently, no key information document required by the UK PRIIPs Regulation for offering or selling the New Instruments or otherwise making it available to retail investors in the UK has been prepared and therefore offering or selling the New Instruments or otherwise making it available to any retail investor in the UK may constitute a breach of the UK PRIIPs Regulation.

(b)    In addition, this Explanatory Statement has been prepared on the basis that all offers of the New Instruments in the UK will be made pursuant to an exemption under the UK Prospectus Regulation from the requirement to produce a prospectus for offers of the New Instruments. Accordingly, any person making or intending to make any offer in the UK of the New Instruments should only do so in circumstances in which no obligation arises for the Company to produce a prospectus for such offer. The Company has not authorised and does not authorise the making of an offer of any of the New Instruments through any financial intermediary.

(c)    No offer of New Instruments to the public in the UK may be made other than to any legal entity which is a qualified investor as defined in the UK Prospectus Regulation (a "**UK Qualified Investor**") or in any other circumstances falling within Article 1(3) or Article 1(4) of the UK Prospectus Regulation, provided that no such offer of New Instruments shall require the Company to publish a prospectus pursuant to Article 3(1) or Article 3(3) of the UK Prospectus Regulation.

(d)    In connection with the issue of the New Instruments, the Distribution Confirmation Deed will require each Scheme Creditor (or its Designated Recipient) who wishes to receive its Scheme Consideration to confirm, amongst other things, that it (or its Designated Recipient) is an Eligible Person and will require any Scheme Creditor (or its Designated Recipient) who is located in the UK and intends to receive their New Instruments to make certain representations and covenants in the Distribution Confirmation Deed, including that it is a UK Qualified Investor. If the confirmations required by the Distribution Confirmation Deed cannot be or are not given by a Scheme Creditor (or its Designated Recipient), such Scheme Creditor (or its Designated Recipient) will not be eligible to receive the relevant New Instruments.

(e)    For the purposes of this provision, the expression an "offer to the public" in relation to the New Instruments in the UK means the communication in any form and by any means of sufficient information on the terms of the offer and the New Instruments to be offered so as to enable an investor to decide to purchase or subscribe for the New Instruments.

(f)    For the purposes of paragraphs (a) to (e) above, "**UK PRIIPs Regulation**" is defined to mean the PRIIPS Regulation as retained as UK law by the European (Withdrawal) Act 2018 ("**EUWA**") and as amended by UK domestic law; "**UK Prospectus Regulation**" means the Prospectus Regulation as retained as UK law by EUWA and

as amended by UK domestic law; and "**UK MiFID II**" means MiFID II as retained as UK law by EUWA and as amended by UK domestic law.

(g)    This Explanatory Statement has not been approved by an authorised person for the purposes of Section 21 of the UK Financial Services and Markets Act 2000 ("**FSMA**"). Accordingly, this Explanatory Statement is not being distributed to, and must not be passed on to, the general public in the UK. In the UK, this Explanatory Statement is for distribution only to  persons who: (i) are investment professionals, as it is defined in Article 19(5) of the Financial Promotion Order; (ii) are persons falling within Article 49(2)(a) to (d) (high net-worth companies, unincorporated associations, etc.), of the Financial Promotion Order; or (iii) are persons to whom this Explanatory Statement may be provided pursuant to Section 4.12 of the Conduct of Business Sourcebook of the UK Financial Conduct Authority (all such persons together being referred to as "**Relevant Persons**"). This Explanatory Statement is directed only at Relevant Persons and must not be acted on or relied on by persons who are not Relevant Persons. Any investment or investment activity to which this Explanatory Statement relates is available only to Relevant Persons and will be engaged in only with Relevant Persons.

## 2.5    Hong Kong

This Explanatory Statement has not been and will not be registered with the Securities and Futures Commission of Hong Kong or the Hong Kong Companies Registrar. The New Instruments have not been and will not be offered or sold in Hong Kong, by means of any document, other than: (a) to Professional Investors; or (b) in other circumstances which do not result in the document being a "prospectus" as defined in the C(WUMP)O or which do not constitute an offer to the public within the meaning of C(WUMP)O. No advertisement, invitation or document relating to the New Instruments may be issued or may be in the possession of any person other than with respect to the New Instruments which are or are intended to be disposed of only to persons outside Hong Kong or only to Professional Investors.

## 2.6    PRC

This Explanatory Statement, if circulated or distributed in the PRC, shall be for information purposes only, and no securities will be offered or sold directly or indirectly to any resident of the PRC, or offered or sold to any person for reoffering or resale directly or indirectly to any resident of the PRC except pursuant to applicable laws and regulations of the PRC. Accordingly, no offer, promotion, solicitation for sales or sale of or for, as the case may be, any New Instruments in the PRC will be made, except where permitted by the China Securities Regulatory Commission or where the activity otherwise is permitted under the laws of the PRC.

## 2.7    Singapore

(a)    This Explanatory Statement has not been and will not be registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this Explanatory Statement and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of New Instruments may not be circulated or distributed, nor may New Instruments be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to any person in Singapore other than:

(i)    to an institutional investor (as defined in Section 4A of the SFA) pursuant to Section 274 of the SFA;

(ii)   to a relevant person (as defined in Section 275(2) of the SFA) pursuant to Section 275(1) of the SFA, or any person pursuant to Section 275(1A) of the

SFA, and in accordance with the conditions specified in Section 275 of the SFA and (where applicable) Regulation 3 of the Securities and Futures (Classes of Investors) Regulations 2018; or

(iii)    otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

(b)    Where New Instruments are subscribed or purchased under Section 275 of the SFA by a relevant person which is:

(i)    a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(ii)    a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor,

(iii)    securities or securities-based derivatives contracts (each term as defined in Section 2(1) of the SFA) of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the New Instruments pursuant to an offer made under Section 275 of the SFA except:

(A)    to an institutional investor, or to a relevant person, or to any person arising from an offer referred to in Section 275(1A) or Section 276(4)(i)(B) of the SFA;

(B)    where no consideration is or will be given for the transfer;

(C)    where the transfer is by operation of law;

(D)    as specified in Section 276(7) of the SFA; or

(E)    as specified in Regulation 37A of the Securities and Futures (Offers of Investments) (Securities and Securities-based Derivatives Contracts) Regulations 2018.

(c)    Any reference to the SFA is a reference to the Securities and Futures Act, Chapter 289 of Singapore and a reference to any term as defined in the SFA or any provision in the SFA is a reference to that term or provision as modified or amended from time to time including by such of its subsidiary legislation as may be applicable at the relevant time.

2.8    **Cayman Islands**

There is no registration required or made under the Securities Investment Business Act in the Cayman Islands or with the Cayman Islands Monetary Authority in relation to this Explanatory Statement and this Explanatory Statement is only distributed to Scheme Creditors such that it does not represent an offer to the public in the Cayman Islands under any law in the Cayman Islands.

2.9 **British Virgin Islands**

This Explanatory Statement has not been and will not be registered with the British Virgin Islands Financial Services Commission. No security is or shall be offered to the public in the British Virgin Islands for purchase or subscription for the purposes of the Securities and Investment Business Act, 2010 (as amended).

2.10 **Scheme Creditor who is not an Eligible Person**

(a)    Without limiting the information set out in this Section 2 (*Important Securities Law Notices*), the New Instruments will not be issued to a Scheme Creditor pursuant to the Scheme where such Scheme Creditor is not an Eligible Person.

(b)    However, a Scheme Creditor who is not an Eligible Person may designate a Designated Recipient (who itself must be an Eligible Person) to receive the Scheme Consideration, *provided, however*, that when designating a Designated Recipient, a Scheme Creditor will be required to represent and warrant to the Company that it will retain no beneficial interest in the New Instruments designated to be held by the Designated Recipient.

(c)    If a Scheme Creditor is not an Eligible Person and fails to designate a Designated Recipient on or before the Bar Date, the Scheme Creditor's rights under the Scheme shall be extinguished and such Scheme Creditor will have no further rights with respect to the Scheme Consideration.

3.    **IMPORTANT NOTICES TO SCHEME CREDITORS**

**This section contains a number of important notices to Scheme Creditors. Scheme Creditors are strongly encouraged to carefully review the notices in this section and, if necessary, seek and obtain independent legal, tax and/or financial advice.**

3.1 **Defined terms**

Unless the context otherwise requires, all capitalised terms used in this Explanatory Statement shall have the meanings set out in Schedule 1 (*Definitions and Interpretation*) to this Explanatory Statement.

3.2 **Information**

This Explanatory Statement has been prepared in connection with the scheme of arrangement proposed by Tianji pursuant to Sections 670, 673 and 674 of the Hong Kong Companies Ordinance in relation to the Scheme between Tianji and the Scheme Creditors, and has been prepared solely for the purpose of providing information to Scheme Creditors in relation to the Scheme.

Nothing in this Explanatory Statement or any other document issued with or appended to it should be relied on for any purpose other than for Scheme Creditors to make a decision on the Scheme. In particular and without limitation, nothing in this Explanatory Statement should be relied on in connection with the purchase or acquisition of any Scheme Claim or any other financial instruments, securities, assets or liabilities of Tianji or any other member of the Group.

Nothing contained in this Explanatory Statement constitutes a recommendation, or the giving of advice, by the Board, Tianji or any other member of the Group, or the Information Agent to take a particular course of action or to exercise any right conferred by the Existing Debts in relation to, buying, selling, subscribing for, exchanging, redeeming, holding, underwriting,

10

disposing of, or converting Existing Debts or any other financial instruments, securities, assets, claims, property interests or liabilities of Tianji or any other member of the Group.

3.3    **Financial statements**

3.4    The financial information in this Explanatory Statement for the Group is from the audited consolidated financial results for the year ended 31 December 2021 (the **"FY21 Audited Group Consolidated Financial Results"**) and 31 December 2022 (the "**FY22 Audited Group Consolidated Financial Results**") which informed (respectively) the 'Announcement of Results for the Year Ended 31 December 2021' and the 'Announcement of Results for the Year Ended 31 December 2022' of CEG published on CEG's website (http://www.evergrande.com) and the website of the HKEX (https://www.hkexnews.hk) on 17 July 2023. The auditor provided a disclaimer of opinion for the results contained in the announcements and noted that there are material uncertainties related to the going concern basis of the Group.

3.5    The financial information in this Explanatory Statement where it relates to the TJ Group only is from the audited consolidated financial statements for the TJ Group for the year ended 31 December 2022 (the "**FY22 TJ Group Financial Statements**"). The FY22 TJ Group Financial Statements are available on the Transaction Website. Standalone financial information for TJ is also included in the FY22 TJ Group Financial Statements. The auditor for the FY22 TJ Group Financial Statements provided a disclaimer of opinion for the results contained therein and noted that there are material uncertainties related to the going concern basis of the TJ Group.

3.6    Once published, the Annual Reports for the Group for FY21 (containing the FY21 Audited Group Consolidated Financial Results in full) and FY22 (containing the FY22 Audited Group Consolidated Financial Results) will also be made available on the Transaction Website.

3.7    **Scheme Creditors**

This Explanatory Statement is to be distributed to all Persons who, according to Tianji's records, are believed to be or may be Scheme Creditors as at the date of this Explanatory Statement. Information on the actions that Scheme Creditors are required to take under the Scheme is set out in Section 5 (*Summary of Actions to be taken by Scheme Creditors*), of this Explanatory Statement and set out in the Solicitation Packet.

3.8    **Blocked Scheme Creditors**

Blocked Scheme Creditors are Scheme Creditors (other than  Sanctioned Scheme Creditors) who are not entitled, able or permitted (whether directly or through a custodian) to submit instructions or settle though the Clearing Systems as a result of Applicable Sanctions affecting the Scheme Creditor or its custodian. In these circumstances, the issue may be caused by the technical application of Applicable Sanctions to the Blocked Scheme Creditor's custodian. Whilst Applicable Sanctions remain in place in respect of Blocked Scheme Creditors, such Blocked Scheme Creditors will not be entitled, able or permitted to (i) submit Account Holder Letters or have a Custody Instruction submitted on its behalf (if applicable) through the Clearing Systems or to the Information Agent in the Scheme, or (ii) receive the Scheme Consideration. It is not possible for the custodian of a Blocked Scheme Creditor to be bypassed by the Company, as to do so would be a breach of the anti-circumvention measures imposed by Applicable Sanctions.

As a result, the Blocked Scheme Creditors must submit (or procure the submission of, as applicable) a Blocked Scheme Creditor Form, together with supporting evidence and other materials as required, to GLAS in order to vote on the Scheme. Sanctioned Scheme Creditors will not be entitled to vote on the Scheme.

11

An SJ Notes Scheme Creditor or Lake Noteholder who is a Blocked Scheme Creditor must ensure that a validly completed and executed Blocked Scheme Creditor Form, together with supporting evidence is received by GLAS by:

(a)     the Voting Record Time in order to vote on the Scheme (and be entitled to receive the Scheme Consideration on the Final Distribution Date or the lifting of Applicable Sanctions, whichever is later); or

(b)     the Bar Date, in order to receive the Scheme Consideration on the Final Distribution Date or the lifting of Applicable Sanctions, whichever is later,

subject to the further provisions in this Section 3.8 below.

A Blocked Scheme Creditor that submits a Blocked Scheme Creditor Form must provide sufficient supporting evidence to allow GLAS to reliably establish that Blocked Scheme Creditor's identity, status as a Scheme Creditor and the value of its relevant holding. GLAS will review each Blocked Scheme Creditor Form and the accompanying evidence submitted by the Voting Record Time to assess whether the Blocked Scheme Creditor Form has been completed correctly and whether there is sufficient evidence to reliably establish the Blocked Scheme Creditor's identity, status as a Scheme Creditor and the value of its holding.[7]

For the avoidance of doubt, Blocked Scheme Creditors will not be able to receive the Scheme Consideration on the Restructuring Effective Date and/or the Final Distribution Date if the Applicable Sanctions remain in place and the Blocked Scheme Creditors remain subject to such Applicable Sanctions. Instead, on the Restructuring Effective Date, any Scheme Consideration and any Consent Fee (if applicable) to which Blocked Scheme Creditors may be entitled on the Restructuring Effective Date will be issued to and held by the Holding Period Trustee on trust under the Holding Period Trust Deed for the benefit of such Blocked Scheme Creditors during the Holding Period.

If the Applicable Sanctions are still in place upon the expiration of the Holding Period, Tianji will appoint the Successor Escrow Agent to hold the Blocked Assets for the Blocked Scheme Creditors as described in Section 20 (*Successor Escrow Account*) below, and further in accordance with the terms of the Scheme.

The inability of Blocked Scheme Creditors to receive their portion of the Scheme Consideration until the Applicable Sanctions are lifted is due to their own personal circumstances and is not considered by the Company to give rise to any difference, or any material difference, in their rights as Scheme Creditors under the Scheme as compared with Scheme Creditors who are not Blocked Scheme Creditors. The Company considers that restrictions on the ability of Blocked Scheme Creditors to receive their portion of the Scheme Consideration is due to the current regulatory environment and is not connected to their treatment under the Scheme or their rights against Tianji. Blocked Scheme Creditors have the same Entitlement to the Scheme Consideration as Scheme Creditors who are not Blocked Scheme Creditors.

For further details about the arrangements for the Blocked Scheme Creditors, please read this Explanatory Statement carefully as a whole, in particular Section 5 (*Summary of Actions to be taken by Scheme Creditors*) and Section 6 (*Summary Explanation of the Scheme*) of this Explanatory Statement.

---

[7]SJ Notes Scheme Creditors and Lake Noteholders, who are Blocked Scheme Creditors, do not need to submit a Custody Instruction because their SJ Notes or Lake Notes (as applicable) are already blocked from trading as their accounts were blocked by the Clearing Systems at the time the Applicable Sanctions were put in place. As such, Blocked Scheme Creditors would be unable to submit instructions to the Clearing Systems.

3.9    **Sanctioned Scheme Creditors**

Sanctioned Scheme Creditors must contact the Company in writing pursuant to the notice details set out in Clause 37 (*Notice*) to the Scheme to bring its status as a Sanctioned Scheme Creditor to the attention of the Company on or before the Bar Date. Any Sanctioned Scheme Creditor that fails to comply with this Section 3.9 (*Sanctioned Scheme Creditors*) shall have its rights under the Scheme extinguished, including any right which it may have to receive Scheme Consideration under the Scheme.

3.10    **Notice to Scheme Creditors**

Without prejudice to any representations and warranties to be given by Tianji in the Restructuring Documents, nothing contained in this Explanatory Statement shall constitute a representation, warranty, undertaking or guarantee of any kind, express or implied, nor any admission of any fact or liability on the part of Tianji or any other member of the Group with respect to any asset to which it may be entitled or any claim against it. Without prejudice to the generality of the foregoing, nothing in this Explanatory Statement or the distribution thereof evidences to any person, or constitutes any admission by Tianji or any other member of the Group, that a liability is owed to any person in respect of any claim (including without limitation any Scheme Claim) or that any person is or may be a Scheme Creditor. The failure to distribute this Explanatory Statement to any Scheme Creditor shall not constitute an admission or determination by Tianji or any other member of the Group that such person is not a Scheme Creditor.

No person has been authorised by Tianji to give any information or make any representations concerning the Restructuring Documents or the Scheme which is/are inconsistent with this Explanatory Statement and, if made, such representations shall not be relied upon as having been so authorised.

The information contained in this Explanatory Statement has been prepared based upon information available to Tianji prior to the date of this Explanatory Statement. The delivery of this Explanatory Statement does not imply that the information herein is correct as at any time subsequent to the date hereof. To the best of Tianji's knowledge, information and belief, the information contained in this Explanatory Statement is in accordance with the facts and does not omit anything likely to affect the import of such information, each in a material respect. Tianji has taken all reasonable steps to ensure that this Explanatory Statement contains the information reasonably necessary and material to enable Scheme Creditors to make an informed decision about how the Scheme and Restructuring affects them.

None of Tianji's advisers have verified that the information contained in this Explanatory Statement is materially in accordance with facts and does not omit anything likely to affect the import of such information in any material way, and each of those persons expressly disclaims responsibility for such information.

This Explanatory Statement has not been reviewed, verified or approved by any rating agency or any regulatory authority. Without prejudice to any representations and warranties to be given by Tianji or any other member of the Group in the Restructuring Documents, to the fullest extent permitted by law, Tianji and any other member of the Group will have no tortious, contractual or any other liability to any person in connection with the use of this Explanatory Statement and Tianji and any other member of the Group will not accept any liability whatsoever to any person, regardless of the form of action, for any lost profits or lost opportunity, or for any indirect, special, consequential, incidental or punitive damages arising from any use of this Explanatory Statement, its contents or preparation or otherwise in connection with it, even if Tianji or any other member of the Group has been advised of the possibility of such damages.

13

3.11    **Restrictions**

The distribution of this Explanatory Statement to or in certain jurisdictions may be restricted by law or regulation and persons into whose possession this Explanatory Statement comes are requested to inform themselves about, and to observe, any such restrictions. Failure to comply with any such restrictions could result in a violation of the laws of such jurisdictions.

3.12    **Summary only**

The summary of the principal provisions of the Scheme contained in this Explanatory Statement is subject to the terms of the Scheme itself. The full text of the Scheme is set out in Schedule 4 (*The Scheme*) to this Explanatory Statement. Each Scheme Creditor is strongly encouraged to read and consider the text of the Scheme carefully. This Explanatory Statement has been prepared solely to assist Scheme Creditors in respect of voting on the Scheme.

3.13    **Conflicts**

In the event of a conflict between the information and terms described in:

(a)      this Explanatory Statement; and

(b)      the Restructuring Documents (other than this Explanatory Statement);

the terms of the Restructuring Documents shall prevail.

Subject to the terms of the RSA, any order of the Court, the Scheme and applicable law, Tianji reserves the right to take steps, subject to obtaining the written consent of the Majority TJ AHG (where the TJ AHG holds the Minimum TJ AHG Threshold), to modify the Scheme, or to propose a different scheme or scheme of arrangement, at any time prior to sanction of the Scheme and delivery of the Scheme Sanction Order to the Hong Kong Companies Registrar. The Court may also impose modifications, additions or conditions on the Scheme.

3.14    **Forward-looking statements**

**Nothing in this Explanatory Statement shall be deemed to be a forecast, projection or estimate of the future financial performance of Tianji and/or any member of the Group except where otherwise specifically stated.**

**This Explanatory Statement contains statements, estimates, opinions and projections with respect to Tianji and the Group and certain plans and objectives of Tianji and the Group. These forward-looking statements can be identified by the fact that they do not relate only to historical or current facts. Forward-looking statements often use words such as "*anticipate*", "*target*", "*expect*", "*estimate*", "*intend*", "*plan*", "*goal*", "*believe*", "*will*", "*may*", "*should*", "*would*", "*could*" or other words of similar import. These statements are based on numerous assumptions and assessments made by Tianji as appropriate in light of their experience and perception of historical trends, current conditions, expected future developments and other factors which they believe appropriate. No assurance can be given that such expectations will prove to be correct. Forward-looking statements involve significant risks and uncertainties, should not be read as guarantees of future performance or results, and will not necessarily be accurate indications of whether or not such results will be achieved. Such forward-looking statements only speak as at the date of this Explanatory Statement. A number of factors could cause actual results to differ materially from the results discussed in the forward-looking statements, including, but not limited to, the factors and uncertainties set out in Section 26 (*Risk Factors*) of this Explanatory Statement. Each Scheme Creditor is urged to make its own assessment of the**

14

**validity of such forward-looking statements and their underlying assumptions and no liability is accepted by Tianji in respect of the achievement or failure thereof of such forward-looking statements and assumptions. Without limiting the above, none of the boards of directors of Tianji and other companies within the Group assumes any obligation to update or correct any forward-looking statements contained in this Explanatory Statement to reflect any change of expectations with respect thereto or any change in event, situation or circumstances on which any such forward-looking statement was based.**

3.15    **Risk factors**

Scheme Creditors' attention is drawn to certain risks and uncertainties associated with the Restructuring that are set out in Section 26 (*Risk Factors*) of this Explanatory Statement.

These important risk factors could cause Tianji's and the Group's actual results and future prospects to differ materially from those expressed in this Explanatory Statement (including any forward-looking statements).

**Each Scheme Creditor should carefully read and analyse such risk factors and uncertainties, and fully understand their impact, which may be material and adverse, on its financial condition and prospects. The statement of risk factors is not and is not intended to be an exhaustive statement of such factors or of all possible factors which might influence the decision of Scheme Creditors as regards the Scheme or any investment decision.**

3.16    **Disclaimer regarding preparation of the Liquidation Analysis and Scheme Recovery Analysis**

(a)    Deloitte Advisory (Hong Kong) Limited ("**Deloitte**") was engaged by CEG, SJ and Tianji to prepare: (i) a report analyzing the recovery rates for the creditors of CEG, SJ and Tianji under a hypothetical liquidation scenario of the Group as at 1 January 2023 ("**Liquidation Analysis**") and (ii) a report analyzing the recovery rates for the scheme creditors of CEG, SJ and Tianji under the Restructuring ("**Scheme Recovery Analysis**", together with the Liquidation Analysis, the "**Reports**"). Copies of the Reports are set out in this Explanatory Statement at Schedule 2 (*Liquidation Analysis*) and Schedule 3 (*Scheme Recovery Analysis*), respectively.

(b)    As explained below in paragraph 8 (*What happens if the Restructuring Fails?*) of Section 7 (*Letter from the Board to the Scheme Creditors*), the Director believes that the most likely outcome in the event that the Restructuring were not to go ahead would be for the Company to be placed into insolvent liquidation, and that this would result in a substantially lower return to creditors of the Company than if the Restructuring were approved and successfully implemented as proposed.

(c)    By reviewing the Reports, the Scheme Creditors and any other party who gains access to the Reports shall be deemed to have read, and to have irrevocably acknowledged and agreed to comply with, the following contents of this disclaimer:

(i)    the Reports were prepared solely for the benefit of CEG, SJ and Tianji and, save in respect of CEG, SJ and Tianji, Deloitte accepts no duty of care or liability to any other party regardless of whether or not a party was shown or gained access to any of the Reports, or is a Scheme Creditor placing any reliance on any of the Reports;

15

(ii)     with respect to dealing in shares, the Reports may contain material non-public information of CEG. Thus, any disclosure, copying, or distribution of the Reports or the taking of any action based on them, which would constitute insider dealing with respect to shares in CEG, is strictly prohibited;

(iii)    the Reports were prepared for indicative and illustrative purposes only.  In respect of the Liquidation Analysis, the actual recoveries may vary subject to, among other things, the actual proceeds of realisation of the assets, the costs and expenses actually incurred incidental to the liquidation/disposal and the amounts of the claims submitted and ultimately admitted as claims against the Company and its subsidiaries. In respect of the Scheme Recovery Analysis, the actual recoveries may vary subject to, among other things, the ability of the Company to fulfill the repayment obligations under the Restructuring and the amounts of claims submitted and ultimately admitted as claims under the Schemes. Thus, the actual recoveries could be materially different from the estimated recoveries set out in the Reports.

(iv)    the Liquidation Analysis and the Scheme Recovery Analysis were prepared on the basis of information, including unaudited information, received by Deloitte up to 14 July 2023 and 20 July 2023 respectively, and Deloitte has not updated the Reports since the respective dates.  Deloitte relied on the financials and other information provided to it and on representations made to it by management of CEG and CEG's subsidiaries, and the relevant companies' respective staff and advisors. Deloitte did not audit or verify the correctness and accuracy of the information provided to it and Deloitte does not express an audit opinion on its findings and analysis. Deloitte accepts no responsibility for the reliability of such information to the extent it is inaccurate, incomplete or misleading;

(v)     the Reports may not contain all facts and information that a Scheme Creditor may regard as relevant or potentially relevant; and

(vi)    finally, the Scheme Creditors and any other party who gains access to the Reports shall refer to the full disclaimers, limitations, source of information, and terms and conditions therein.

(d)    As outlined in this Section 3 (*Important Notices to Scheme Creditors),* each Scheme Creditor should examine, conduct and make its own assessment in relation to this Explanatory Statement, including the Reports.

3.17    **Legal, tax and financial advice**

**Without limiting any of the above, Scheme Creditors should not construe the contents of this Explanatory Statement or any other document in connection with the Restructuring as legal, tax and/or financial advice.**

This Explanatory Statement has been prepared without taking into account the objectives, financial or tax situation or needs of any particular recipient of it, and consequently, the information contained in this Explanatory Statement may not be sufficient or appropriate for the purposes for which a recipient might use it. Each Scheme Creditor should conduct its own due diligence and consider the information in this Explanatory Statement having regard to its own objectives, financial situations and needs. Scheme Creditors are also recommended to consult their own professional advisers as to legal, tax, financial or other aspects relevant to any action Scheme Creditors might take in relation to the Scheme and the Restructuring, or the implications or consequences of such action.

This Explanatory Statement is addressed to Scheme Creditors for their information only and no Person should rely on it in formulating or reaching any investment decision other than for Scheme Creditors to make a decision whether or not to approve the Scheme. **Scheme Creditors must rely on their own due diligence and their professional advisers in their decisions with respect to the Scheme and the Restructuring.**

3.18    **Other jurisdictions**

The implications of the Restructuring for Scheme Creditors who are residents or citizens of jurisdictions other than  Hong Kong may be affected by the laws of other relevant jurisdictions. Such overseas Scheme Creditors should inform themselves about and observe any applicable legal requirements in their respective jurisdictions. Any person outside of Hong Kong who is resident in, or who has a registered address in, or is a citizen of, an overseas jurisdiction should consult independent professional advisers and satisfy themselves as to the full observance of the laws of the relevant jurisdiction in connection with the Scheme and the Restructuring, including obtaining any requisite governmental or other consents, observing any other requisite formalities and paying any issue, transfer or other taxes due in such jurisdiction.

3.19    **The SJ Notes Trustee**

Neither the SJ Notes Trustee nor any of its directors, officers, employees, agents, affiliates or advisers is acting for, or owes any duty to, any Scheme Creditor, nor will any of them be responsible for providing any advice to any Scheme Creditor in relation to the terms of the New Instruments. Accordingly, neither the SJ Notes Trustee nor any of its directors, officers, employees, agents, affiliates or advisers make any recommendations as to whether any Scheme Creditor should take any of the actions contemplated in the Scheme. The SJ Notes Trustee expresses no opinion on the merits of the Scheme and the terms of the New Instruments. The SJ Notes Trustee has not been involved in negotiating or determining the terms of the Scheme and makes no representation that all relevant information has been disclosed to the Scheme Creditors in or pursuant to the Scheme.

The SJ Notes Trustee shall not be responsible for calculating, verifying or paying any amounts payable in relation to the Scheme, including but not limited to, amount of the New Instruments to be issued, Scheme Claims or any accrued and unpaid interest. The SJ Notes Trustee shall not be required to take any steps to ascertain whether a Scheme Creditor is eligible to receive any Consent Fee or Scheme Consideration. The SJ Notes Trustee and the New Instruments Trustee will not be responsible for determining or verifying the claims of any Scheme Creditor to receive the New Instruments.

The SJ Notes Trustee has not determined or verified the eligibility of Scheme Creditors, Account Holders or Designated Recipients for the purposes of the Scheme nor has the SJ Notes Trustee reviewed the Account Holder Letters, Distribution Confirmation Deeds, Custody Instructions or Designated Recipient Form.

The SJ Notes Trustee shall not be responsible for monitoring the Scheme and shall not be required to take any steps to monitor or ascertain whether any event that triggers the termination of the RSA has occurred and will not be responsible to the Scheme Creditors or any other person for any loss arising from any failure to do so.

The SJ Notes Trustee is a Scheme Creditor however, they shall not be entitled to vote at the Scheme Meeting or receive Scheme Consideration and will only be required to take actions expressly required or permitted under the Scheme and described herein. Notwithstanding the foregoing, the SJ Notes Trustee may attend the Scheme Meeting as an observer.

3.20    **The Information Agent**

Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers is acting for, or owes any duty to, any Scheme Creditor, nor will any of them be responsible for providing any advice to any Scheme Creditor in relation to the Scheme. Accordingly, neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers make any recommendations as to whether any Scheme Creditor should take any of the actions contemplated in the Scheme. The Information Agent expresses no opinion on the merits of the Scheme or the terms of the New Instruments. The Information Agent has not been involved in negotiating or determining the terms of the Scheme and makes no representation that all relevant information has been disclosed to the Scheme Creditors in or pursuant to the Scheme. Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers has verified, determined or calculated, or assumes any responsibility or liability for the accuracy or completeness of any of the information concerning the Scheme, or any factual statements contained in, or the effect or effectiveness of, the Scheme. Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers will have any tortious, contractual or any other liability to any person in connection with the determination of whether a Scheme Creditor is a Blocked Scheme Creditor or a Sanctioned Scheme Creditor. Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers will accept any liability whatsoever to any person, regardless of the form of action, for any lost profits or lost opportunity, or for any indirect, special, consequential, incidental or punitive damages arising from the determination of whether a Scheme Creditor is a Blocked Scheme Creditor or a Sanctioned Scheme Creditor, even if the Information Agent or any of its directors, officers, employees, agents, affiliates or advisers have been advised of the possibility of such damages.

Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers is obliged, under the terms of the Scheme or otherwise, to engage in any transaction or conduct that may give rise to a liability under or in connection with Applicable Sanctions and/or may result in any person becoming targeted by Applicable Sanctions.

If compliance with any obligations under the terms of the Scheme or otherwise would result in the Information Agent or any of its directors, officers, employees, agents, affiliates or advisers breaching the Blocking Regulation, that obligation need not be complied with (but only to the extent of the breach).

Under no circumstances will the Information Agent be required to verify or determine the eligibility of any Scheme Creditor in relation to the Scheme. The Information Agent will check Scheme Claims against Custody Instructions and against the records of Scheme Creditors provided to the Information Agent by the Company. The Information Agent will assist the Company and the Chairperson in checking the voting values of each Scheme Creditor (who is not a Sanctions-Affected Scheme Creditor) based on such information.

Each Scheme Creditor and/or Account Holder will, in accordance with the Scheme, unconditionally and irrevocably waive and release any claims which may arise against the Information Agent from all actual or potential liability, arising directly or indirectly, in each case, in relation to the Information Agent's performance of its roles and all other accounts which they may take in connection with the Scheme, save for any liability resulting from the Information Agent's own fraud or wilful misconduct.

4.    **QUESTIONS AND ANSWERS**

*This overview is intended to be a high-level summary for reference only.*

4.1    **What is the purpose of the Explanatory Statement and the Scheme?**

The purpose of the Explanatory Statement is to explain the key aspects of the Scheme to Scheme Creditors, and to provide sufficient information to them to enable them to make a reasonable judgment as to whether the proposed Scheme is in their commercial interests or not. It also sets out the expected timetable for the Scheme process. The Scheme as appended at Schedule 4 (*The Scheme*) to this Explanatory Statement is the document which gives legal effect to the contemplated compromises or arrangements.

4.2    **What is a Scheme of Arrangement?**

A scheme of arrangement is a compromise or arrangement between a company and its creditors (or a class of them) in respect of that company's debts and/or obligations owed to those creditors. As part of the Restructuring, Tianji has proposed the Scheme in Hong Kong.

A scheme of arrangement becomes legally binding on its creditors if such an arrangement is sanctioned by the Court pursuant to certain criteria being met, including at least a majority in number of the relevant creditors, holding at least seventy-five per cent (75%) in value of claims, present and voting (either in person or by proxy) at the scheme meeting, voting in favour of the scheme of arrangement.

If a scheme of arrangement becomes effective, it will bind the company and all creditors to whom it applies, being in this case Tianji and the Scheme Creditors respectively under the Scheme, whether or not each creditor voted (in favour of or against the Scheme).

4.3    **How many classes of Scheme Creditors are there?**

The Scheme will proceed on the basis that the Scheme Creditors constitute a single class of creditors of Tianji, in respect of the Existing Debts. The Existing Debts consist of: (i) four series of USD senior notes that have been guaranteed by Tianji, (ii) certain private loans that have been guaranteed by Tianji, (iii) certain put options provided by Tianji, and (iv) an intercompany claim of CEG against Tianji (note that CEG will be entitled to receive Scheme Consideration in respect of the Intercompany Claim but will not vote).

Tianji has obtained the Scheme Convening Order, which is an order from the Court granting permission to convene the Scheme Meeting for the Scheme Creditors to consider and vote on the Scheme. A copy of the Scheme Convening Order (regarding the convening of such meeting of Scheme Creditors) is reproduced in Schedule 8 (*Scheme Meeting Convening Order*) to this Explanatory Statement.

4.4    **Who is a Blocked Scheme Creditor?**

A Blocked Scheme Creditor is a Scheme Creditor (other than a Sanctioned Scheme Creditor) that is not entitled, able or permitted (whether directly or through a custodian) to submit instructions or settle through the Clearing Systems as a result of Applicable Sanctions affecting such Scheme Creditor or their custodian as determined by the Clearing Systems.

As Blocked Scheme Creditors are unable to receive Scheme Consideration through the Clearing Systems, the Scheme Consideration and any Consent Fee in which Blocked Scheme Creditors may be entitled to shall be paid to the Holding Period Trustee (where the relevant Blocked Scheme Creditor is otherwise entitled to such amounts the relevant Blocked Scheme Creditor prior to the Final Distribution Date), or, where Applicable Sanctions remain in place in respect of Blocked Scheme Creditors on the Holding Period Expiry Date, to be held by the Successor Escrow Agent thereafter.

4.5     **What is the purpose and effect of the Scheme?**

The purpose of the Scheme and the Restructuring of which the Scheme is a part is to stabilise the financial position of Tianji to allow it to continue as a going concern, with a significantly healthier balance sheet. In particular, in relation to the Scheme Claims of the Existing Debts:

(a)     Scheme Creditors' Scheme Claims against Tianji in respect of the Existing Debts will be fully released pursuant to the Scheme.

(b)     The Scheme will not release the Excluded Liabilities and Excluded Collateral (i.e. the rights held by the Scheme Creditors in respect of the Existing Debts against any persons other than the Company, for example, claims of the SJ Notes Scheme Creditors against SJ or the SJ Notes Subsidiary Guarantors, or claims of the Other Debt Scheme Creditor's against other obligors under the Other Debts (such persons being 'Excluded Liabilities Party Persons')).

(c)     As a result, for the purpose of determining Entitlement to Scheme Consideration, Scheme Claims will be determined on a Deficiency Basis (deducting the value of the rights left in place from the Scheme Creditor's Scheme Claim calculated on a Full Accrued Claim Basis), such that no Scheme Consideration shall be payable in respect of the Excluded Liabilities or Excluded Collateral. Entitlement to Scheme Consideration on a Deficiency Basis is determined by the Scheme Administrators.

**Why has the Deficiency Basis been adopted?**

The Deficiency Basis has been adopted:

(a)     to ensure an equal treatment of Scheme Creditors and to prevent an unmanageable number of scheme creditor classes, thus rendering a restructuring practically impossible. The discharge of all Scheme Claims (which does not include the Excluded Liabilities and the Excluded Collateral) will considerably improve and stabilize the financial health of Tianji; and

(b)     Scheme Creditors will continue to be able to recover their Existing Debts against the Excluded Liabilities Party Persons. Hence, it is appropriate for the value of those claims to be taken into account for the purposes of calculating Entitlement to Scheme Consideration. Otherwise Scheme Creditors would be potentially overcompensated in respect of the compromise of their claims because they would receive Scheme Consideration from the Company as if the full accrued value of their Existing Debts was being released when, in fact, some or all of that value will remain recoverable from Excluded Liabilities Party Persons.

4.6     **What are the actions that a Scheme Creditor needs to take?**

(a)     **Forms to be submitted to vote at the Scheme Creditor Meetings:** Scheme Creditors must submit the following validly completed and executed Scheme Creditor Forms, as applicable, and further pursuant to the terms of the Scheme, by the Voting Record Time:

(i)     SJ Notes Scheme Creditors and Lake Noteholders (who are not Sanctions-Affected  Scheme Creditors): (1) Custody Instructions to be submitted via the Clearing Systems prior to the submission of the Account Holder Letter (and in any case by the Custody Instruction Deadline) and (2) Account Holder Letter

via the Portal to the Information Agent by no later than the Voting Record Time.

(ii)     <u>Other Debt Scheme Creditors (who are not Lake Noteholders and who are not Sanctions-Affected Scheme Creditors)</u>: Proxy Form, together with supporting evidence via the Portal to the Information Agent in accordance with the instructions set out therein.

(iii)    <u>Blocked Scheme Creditors:</u> Blocked Scheme Creditor Form to GLAS.

(b)     **To receive the Consent Fee:** Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) must submit their relevant Scheme Creditor Forms via the Portal to the Information Agent by no later than the Voting Record Time to receive the Consent Fee (if applicable). Blocked Scheme Creditors must submit their Blocked Scheme Creditor Form to GLAS via the submission methods described in the Solicitation Packet by no later than the Voting Record Time to receive the Consent Fee (if applicable).

(c)     **To nominate a Designated Recipient to receive your Scheme Consideration:** Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) who wish to nominate a Designated Recipient to receive the Scheme Consideration on their behalf, should submit a validly completed and executed Designated Recipient Form, along with the other documents noted above, via the Portal to the Information Agent, by:

(i)      the Voting Record Time in order to vote on the Scheme,

(ii)     in respect of SJ Notes Scheme Creditors, either the SJ RED Distribution Deadline or the Bar Date in order to be able to receive the Scheme Consideration on the Restructuring Effective Date or Final Distribution Date (as applicable) on their behalf. If those materials are submitted after the SJ RED Distribution Deadline but before the Bar Date, SJ Notes Scheme Creditors will only be entitled to receive Scheme Consideration on the Final Distribution Date; and

(iii)    in respect of Other Debt Scheme Creditors, (x) the Voting Record Time in order to be able to receive the Consent Fee on the Restructuring Effective Date, or (y) the Bar Date in order to be able to receive the Scheme Consideration on the Final Distribution Date on their behalf.

(d)     **To receive Scheme Consideration:**

(i)      <u>SJ Notes Scheme Creditors (who are not Sanctions-Affected Scheme Creditors):</u> must submit their relevant Scheme Creditor Forms via the Portal to the Information Agent by no later than the SJ RED Distribution Deadline in order to be entitled to receive any Scheme Consideration on the Restructuring Effective Date or, alternatively by the Bar Date in order to receive Scheme Consideration on the Final Distribution Date. pursuant to the terms of the Scheme.

(ii)     <u>Other Debt Scheme Creditors and Lake Noteholders (who are not Sanctions-Affected Scheme Creditors):</u> must submit their relevant Scheme Creditor Forms via the Portal to the Information Agent by no later than the Bar Date (i.e. 135 days after the Restructuring Effective Date) in order to be entitled to receive any Scheme Consideration on the Final Distribution Date pursuant to the terms of the Scheme.

(iii)    <u>Bar Date</u>: For the avoidance of doubt, Scheme Creditors that fail to submit their Distribution Confirmation Deeds via the Portal to the Information Agent by the Bar Date will not be entitled to receive any Scheme Consideration and will have their Scheme Claims released and extinguished in accordance with Clause 24 (*Releases*) of the Scheme.

4.7    **How do Scheme Creditors Vote?**

(a)    Scheme Creditors may nominate a proxy to vote on the Scheme Creditor's behalf at the Scheme Meeting. Such nomination is made within the Account Holder Letter, Proxy Form, or Blocked Scheme Creditor Form (as applicable) and must be submitted to the Information Agent or (in respect of the Blocked Scheme Creditor Form only) GLAS within the applicable deadline described in the response at Section 4.6 above.

(b)    Alternatively, Scheme Creditors (other than Sanctioned Scheme Creditors) may attend (by indicating their intention to attend in the applicable Scheme Creditor Form) and vote at the Scheme Meeting at 8.00 p.m. Hong Kong time on 22 August 2023.

(c)    Further details of the Scheme Meeting, including instructions on how each Scheme Creditor may vote are set out in Section 13 (*The Scheme Meeting)* of this Explanatory Statement.

4.8    **How is the value of a Scheme Creditor's claim for voting purposes at the Scheme Meeting determined?**

For the purpose of voting at the Scheme Meeting, the Voting Scheme Claim for each Scheme Creditor at Tianji is to be determined on a Full Accrued Claim Basis, based on the amount up to the Voting Record Time (i.e. generally the outstanding principal amount of the Existing Debts *plus* any accrued and unpaid interest (if applicable)), subject to the Chairperson's discretion.

4.9    **How is a Scheme Creditor's Entitlement determined?**

(a)    Scheme Creditor's Entitlement at Tianji will be based on the Deficiency Basis, as determined by the Scheme Administrator, as set out in more detail in Sections 9.10 and 9.24 below. As the starting principle, the Deficiency Basis has been adopted to reflect the fact that Scheme Consideration will only be provided in respect of the Company's obligations to the Existing Debts, with no Scheme Consideration to be paid in respect of the Excluded Liabilities or the Excluded Collateral (both of which are left in place by the Scheme).

(i)    The SJ Notes Scheme Creditors Entitlement will take into account the value of recoveries that SJ Notes Scheme Creditors are expected to receive in respect of their other rights (i.e. other than against Tianji) under the SJ Notes compromised pursuant to the terms of the SJ Scheme (in respect of the principal debt, as well as all subsidiary guarantors and the keepwell, i.e. the Excluded Liabilities and Excluded Collateral).

(ii)    Other Debt Scheme Creditor's Entitlement will be determined through the Valuation and Adjudication Procedure taking into account the other rights (not against TJ under the Other Debts which remain in place. Specifically on the Valuation and Adjudication Procedure, further details are set out in Sections 9.25 to 9.42 in this Explanatory Statement as well as Clauses 34 to 36 of the Scheme. To further illustrate the process of the Valuation and Adjudication

Procedure, there is also a flow-chart set out at Schedule 6 (*Valuation and Adjudication Flow Chart*).

4.10    **What will Scheme Creditors receive as part of Scheme Consideration?**

If the Scheme is sanctioned, Scheme Creditors who are Eligible Creditors will receive their Scheme Consideration in the form of the New Instruments consisting of TJ New Notes to be issued by Tianji in the total principal amount of US$800 million, to be shared pro rata amongst the Entitlement of the Scheme Creditors.

4.11    **When are the distribution dates?**

(a)    Subject to paragraph (b) below, broadly speaking there are two distribution dates:

(i)    <u>Initial Distribution on Restructuring Effective Date</u>: This will be available to SJ Notes Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) and who have validly submitted the required Scheme Creditor Form(s) by the SJ RED Distribution Deadline, either directly or to a Designated Recipient (if applicable), or, in respect of Blocked Scheme Creditors who are SJ Notes Scheme Creditors, to the Holding Period Trustee.

(ii)    <u>Final Distribution on the Final Distribution Date</u>: This will be a date after the completion of the Valuation and Adjudication Procedure, to Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) who have validly submitted their relevant Scheme Creditor Forms by the Bar Date or the Successor Escrow Agent (for the Blocked Scheme Creditors).

(b)    There may be a distribution between the Initial Distribution and Final Distribution in the event that the Valuation and Adjudication Procedure is delayed. If the Final Distribution does not occur on the date ending 295 calendar days after the Restructuring Effective Date, there will be an interim distribution of Scheme Consideration on the date ending 295 calendar days after the Restructuring Effective Date (the "**Interim Distribution Date**").

4.12    **What is being distributed on the respective distribution dates?**

(a)    On the Restructuring Effective Date, all of the Scheme Consideration shall be issued and an Initial Distribution of that Scheme Consideration shall be made to:

(i)    the SJ Notes Scheme Creditors (who are not Sanctions-Affected Scheme Creditors), where such SJ Notes Scheme Creditors have submitted the required Scheme Creditor Forms before the SJ RED Distribution Deadline; and

(ii)    the Holding Period Trustee, in respect of (i) any Scheme Consideration which is not distributed to SJ Notes Scheme Creditors on the Restructuring Effective Date, and (ii) any Consent Fee (if applicable) to which Blocked Scheme Creditors may be entitled.

(b)    The Consent Fee (if applicable) shall also be issued to eligible Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) on the Restructuring Effective Date.

(c)    The Initial Distribution made to SJ Notes Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) on the Restructuring Effective Date shall comprise part of the Scheme Consideration to which such SJ Notes Scheme Creditors are entitled, in order for sufficient Scheme Consideration to be issued to and held by the Holding

Period Trustee to distribute Scheme Consideration to the other Scheme Creditors on a pro rata basis after the completion of the Valuation and Adjudication Procedure. SJ Notes Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) who receive part of their Scheme Consideration on the Restructuring Effective Date shall receive the remainder of their Scheme Consideration on the Final Distribution Date.

(d)     The interim distribution made to Scheme Creditors shall be taken into account for the purposes of calculating the Final Distribution, such that each Scheme Creditor shall receive a pro rata share of the Scheme Consideration in respect of the value of its Entitlement relative to the Entitlement of all Scheme Creditors who validly claim Scheme Consideration.

4.13    **When will the Consent Fee be paid?**

The Consent Fee will be paid to the Scheme Creditors who vote in favour of the Scheme and that are Eligible Participating Creditors (or to the Holding Period Trustee or Successor Escrow Agent, in respect of any Consent Fee to which Blocked Scheme Creditors may be entitled) on the Restructuring Effective Date subject to such Scheme Creditors also validly completing and submitting the required forms by the Voting Record Time as set out in Section 5 (*Summary of Actions to be taken by Scheme Creditors*) below.

Notwithstanding the foregoing, Blocked Scheme Creditors (who are not Sanctioned Scheme Creditors), who are Eligible Participating Creditors, will receive the Consent Fee on the Final Distribution Date, subject to the lifting of Applicable Sanctions no longer preventing such payment.

4.14    **Overview on distribution**

The New Instruments forming the Scheme Consideration will be issued on the Restructuring Effective Date. Any Scheme Consideration not distributed on the Restructuring Effective Date (i.e., Residual New Instruments) will be issued to the Holding Period Trustee to be held in the Holding Period Trust and distributed in accordance with the distribution dates set out above at Section 4.11.

| SJ Notes Scheme Creditors | Other Debt Scheme Creditors | Holding Period Trustee/Successor Escrow Agent | |
|---|---|---|---|
| | | **To be held on trust or in escrow for Blocked Scheme Creditors** | **To be held on trust or in escrow for all Scheme Creditors** |
| **Restructuring Effective Date** | | | |
| 1. Initial Distribution of New Instruments<br><br>2. Consent Fee (for Eligible Participating Creditors) | 1. Consent Fee (for Eligible Participating Creditors) | 1. Distribution of Residual New Instruments in respect of SJ Notes Scheme Creditors who have not submitted the required Scheme Creditor Forms by the SJ RED Distribution Deadline<br><br>2. Distribution of New Instruments to which | 1. Distribution of Residual New Instruments |

24

| SJ Notes Scheme Creditors | Other Debt Scheme Creditors | Holding Period Trustee/Successor Escrow Agent | |
| | | To be held on trust or in escrow for Blocked Scheme Creditors | To be held on trust or in escrow for all Scheme Creditors |
|---|---|---|---|
| | | SJ Notes Scheme Creditors who are Blocked Scheme Creditors may be entitled<br><br>3. Consent Fee to which Scheme Creditors who are Blocked Scheme Creditors (for Eligible Participating Creditors) may be entitled | |
| **Interim distribution, in the event that Final Distribution does not occur within 295 calendar days after Restructuring Effective Date** | | | |
| Distribution will be the same as if the Final Distribution Date save that the Company shall reserve a maximum amount of Scheme Consideration for those Other Debt Scheme Creditors whose Entitlements are not fully determined (as if the Entitlement of such Other Debt Scheme Creditors were calculated on a Full Accrued Claim Basis) | | Relevant distribution to Blocked Scheme Creditors | No distribution |
| **Final Distribution Date** | | | |
| 1. Distribution of Residual New Instruments (in accordance with Section 10.10 below) | 1. Distribution of Residual New Instruments (in accordance with Section 10.11 below) | If the Applicable Sanctions are still in place:<br><br>1. Residual New Instruments to which Blocked Scheme Creditors are entitled will be transferred from the Holding Period Trust to the Successor Escrow Account<br><br>2. Consent Fee for Blocked Scheme Creditors (who are Eligible Participating Creditors) will be transferred from the Holding Period Trust | No distribution |

25

| SJ Notes Scheme Creditors | Other Debt Scheme Creditors | Holding Period Trustee/Successor Escrow Agent | |
| | | To be held on trust or in escrow for Blocked Scheme Creditors | To be held on trust or in escrow for all Scheme Creditors |
| --- | --- | --- | --- |
| | | to the Successor Escrow Account | |

4.15    **Where is the Transaction Website?**

The Transaction Website can be found at https://projects.morrowsodali.com/evergrande. The Transaction Website will contain documents which are substantially in the form of such Restructuring Documents as are to be made available at the Transaction Website.

4.16    **Request for Information**

Any request for information can be directed to:

(a)    **The Information Agent (if from a party other than the Sanctions-Affected Scheme Creditors)**: evergrande@investor.morrowsodali.com

(b)    **GLAS, in respect of Blocked Scheme Creditor queries**: lm@glas.agency

(c)    **Houlihan Lokey, in its capacity as offshore restructuring financial advisor to the Scheme:** Evergrande@HL.com

(d)    **Moelis & Company, in its capacity as the TJ AHG's financial advisor:** Project_Evergrande_Ext@moelis.com

5.    **SUMMARY OF ACTIONS TO BE TAKEN BY SCHEME CREDITORS**

5.1    Scheme Creditors will be required to take certain actions in respect of their specific interests in the Scheme Claims, which will be dependent on the type of indebtedness applicable to each Scheme Creditor (including those who are Blocked Scheme Creditors).

The following Persons have interests in the Existing Debts (for the avoidance of doubt, but without double counting in each case):

A.    **Scheme Creditors**

You are a "**SJ Notes Scheme Creditor**" or a "**Lake Noteholder**" (for the purpose of voting) if you have an economic or beneficial interest as principal in the SJ Notes or Lake Notes (as applicable) held in global form or global restricted form through the Clearing Systems as at the Voting Record Time (for the purposes of voting at the Scheme Meeting, or, if you are a Eligible Participating Creditor, determining your entitlements to the Consent Fee) or as at the Entitlement Record Time (for the purposes of determining your Entitlements to the Scheme Consideration). Each SJ Notes Scheme Creditor and Lake Noteholder will need to give instructions to its Account Holder(s) as to voting, as further set out in Sections 5.1 to 5.53 (*Summary of Actions to be taken by Scheme Creditors*) below.

You are an "**Other Debt Scheme Creditor**" (for the purpose of voting) if you have a beneficial interest and/or legal interest as principal in the Other Debts (other than the Lake Notes) and have provided evidence (including all supporting documentation) of your interest which has been verified by the Company, in consultation with the Information Agent and/or the Scheme Administrators as at the Voting Record Time (for the purposes of voting at the Scheme Meeting, or if you are an Eligible Participating Creditor, determining your entitlement to the Consent Fee) or as at the Entitlement Record Time (for the purposes of determining such persons' Entitlements the Scheme Consideration).

B.      **Blocked Scheme Creditors**

SJ Notes Scheme Creditors and the Lake Noteholders who are also Blocked Scheme Creditors, by definition, will not be able to access the Clearing Systems. They will therefore be unable to submit an Account Holder Letter or receive Scheme Consideration in the same way as SJ Notes Scheme Creditors and the Lake Noteholders who are not Blocked Scheme Creditors, whilst Applicable Sanctions remain in place.

C.      **Account Holders**

You are an "**Account Holder**" of either of the SJ Notes Scheme Creditors or Lake Noteholders if you are recorded directly in the books or other records maintained by the Clearing Systems as holding an interest at the Voting Record Time (for the purpose of voting) in the SJ Notes or the Lake Notes (as applicable). For example, a bank or brokerage house, with a securities account at a Clearing System. For the avoidance of doubt, an Account Holder is <u>not</u> a Scheme Creditor unless and to the extent that they are noteholders of the SJ Notes or the Lake Notes. Notwithstanding the foregoing sentence, the assistance of Account Holders will be required to submit on behalf of the SJ Notes Scheme Creditors or Lake Noteholders, Custody Instructions via the Clearing Systems by the Custody Instruction Deadline and relevant Scheme Creditor Form via the Portal by the relevant deadlines, in accordance with the instructions contained in this Explanatory Statement. For the avoidance of doubt, Custody Instructions may only be submitted in principal amounts of US$1,000 and integral multiples of US$1,000 in excess thereof for all notes.

D.      **Intermediaries**

You are an "**Intermediary**" of a Scheme Creditor if you hold an interest at the Voting Record Time in the SJ Notes or the Lake Notes (as applicable) on behalf of another Person or other Persons and you do not hold that interest as an Account Holder. An Intermediary is commonly a bank or a brokerage house which does not have an account with any of the Clearing Systems.

E.      <u>**The SJ Notes Depositary (and its nominee), the SJ Notes Trustee, the Lake Notes Trustee and Agent and the Existing Agents**</u>

For the avoidance of doubt, (i) the SJ Notes Trustee and the SJ Notes Depositary in respect of the SJ Notes; (ii) the Lake Notes Trustee and Agent in respect of the Lake Notes, and (iii) the Existing Agents in respect of the applicable Other Debts:

  (a)   are each Scheme Creditors, however, they will not be entitled to vote at the Scheme Meeting (to avoid double counting); and

  (b)   will further not be entitled to receive any Scheme Consideration under the Scheme,

        unless otherwise agreed by the Company.

A diagrammatic representation of the SJ Notes Depositary, the SJ Notes Trustee and Intermediaries in their various capacities in relation to the SJ Notes Scheme Creditors with debts held in global note form, in respect of the SJ Notes, is set out below to assist your understanding of the structure of the SJ Notes and the Clearing Systems. A similar structure would apply for the Lake Notes Trustee and Agent in relation to Lake Noteholders in respect of the Lake Notes held within the Clearing Systems.



* In respect of interests in the SJ Notes held at the Record Time.

5.2     If you are a **SJ Note Scheme Creditor or Lake Noteholder**, please read Sections 5.4 – 5.53 below for the required actions to be taken pursuant to the Scheme.

5.3     If you are an **Other Debt Scheme Creditor (other than a Lake Noteholder)**, please read Sections 5.54 – 5.82 below for the required actions to be taken pursuant to the Scheme.

**SCHEME CREDITORS NEED TO CAREFULLY REVIEW THE BELOW ACTIONS TO BE TAKEN DEPENDING UPON WHAT TYPE OF SCHEME CREDITOR THEY ARE.**

5.4    **ACTIONS REQUIRED FOR SJ NOTES SCHEME CREDITORS AND LAKE NOTEHOLDERS**

*Summary of Actions Table*

5.5    The table below is designed to be a *summary only* of the key actions that all SJ Notes Scheme Creditors and Lake Noteholders should and/or are required to take for the purposes of attending and voting at the Scheme Meeting and claiming their Scheme Consideration and the relevant deadlines. The table should be read in conjunction with the detailed explanations below at Section 5.6 onwards relevant to SJ Notes Scheme Creditors and Lake Noteholders and in the Solicitation Packet to be made available on the Transaction Website.

| Actions to be taken | Deadline |
|---|---|
| **To vote at the Scheme Meeting** | |
| **SJ Notes Scheme Creditors and Lake Noteholders (who are <u>not</u> Sanctions-Affected Scheme Creditors)[8]** | |
| ☐  Custody Instructions to be submitted via the Clearing Systems prior to the submission of the Account Holder Letter and in any case by the Custody Instruction Deadline | ☐  <u>**Custody Instruction Deadline 5:00 p.m. Hong Kong time on 15 August 2023**[9]</u> |
| ☐  The Account Holder Letter, including Custody Instruction Reference Number and Voting Instructions, to be signed and submitted via the Portal by the Voting Record Time | ☐  <u>**Voting Record Time 5.00 p.m. Hong Kong time on 18 August 2023**</u> |
| **SJ Notes Scheme Creditors and Lake Noteholders (who <u>are</u> Blocked Scheme Creditors)** | |
| ☐  The Blocked Scheme Creditor Form, including supporting evidence and Voting Instructions, to be signed and submitted to GLAS by any submission method(s) described in the Solicitation Packet by the Voting Record Time | ☐  <u>**Voting Record Time 5.00 p.m. Hong Kong time on 18 August 2023**</u> |
| **Actions required by SJ Notes Scheme Creditors and Lake Noteholders (who are Eligible Participating Creditors) to be entitled to receive the Consent Fee *only* on the Restructuring Effective Date (or, in respect of Blocked Scheme Creditors, to have the Consent Fee paid to the Holding Period Trustee)** | |

---

[8] In relation to SJ Notes Scheme Creditors and Lake Noteholders who are not Sanctions-Affected Scheme Creditors, all documents must be submitted to the Information Agent via the Portal by Account Holders. In relation to Blocked Scheme Creditors, the Blocked Scheme Creditor Form and supporting evidence must be submitted to GLAS by any submission method(s) described in the Solicitation Packet.

[9] SJ Notes Scheme Creditors and Lake Noteholders who are not Blocked Scheme Creditors are required to contact Account Holders / Intermediaries (where relevant) to ensure that their SJ Notes or Lake Notes are blocked and that their instructions are received with sufficient time to enable the Account Holder Letter to be submitted to the Portal and received by the Information Agent by the applicable deadline.

29

| Actions to be taken | Deadline |
|---|---|
| **SJ Notes Scheme Creditors and Lake Noteholders (who are <u>not</u> Sanctions-Affected Scheme Creditors)** | |
| ☐ Custody Instructions (including the Accession Code) to be submitted via the Clearing Systems prior to the submission of the Account Holder Letter and in any case by the Custody Instruction Deadline by the Voting Record Time | ☐ **<u>Custody Instruction Deadline 5:00 p.m. Hong Kong time on 15 August 2023</u>** |
| ☐ The Account Holder Letter (including the Accession Code, in addition to voting in favour of the Scheme and other conditions) signed and submitted via the Portal by the Voting Record Time (in addition to voting in favour of the Scheme and other conditions) in order to receive the Consent Fee | ☐ **<u>Voting Record Time 5.00 p.m. Hong Kong time on 18 August 2023</u>** |
| ☐ Distribution Confirmation Deed executed and submitted via the Portal by the Voting Record Time | |
| ☐ (optional) Designated Recipient Form (for either a Scheme Creditor who is not an Eligible Person or who wishes to appoint a Designated Recipient to receive the Scheme Consideration) submitted via the Portal by the Voting Record Time | |
| **SJ Notes Scheme Creditors and Lake Noteholders (who <u>are</u> Blocked Scheme Creditors)[10]** | |
| ☐ The Blocked Scheme Creditor Form, including supporting evidence, and the Accession Code (if relevant, in addition to voting in favour of the Scheme and other conditions) signed and submitted to GLAS by any submission method(s) described in the Solicitation Packet by the Voting Record Time | ☐ **<u>Voting Record Time 5.00 p.m. Hong Kong time on 18 August 2023</u>** |
| **Actions required by SJ Notes Scheme Creditors only to be entitled to receive the Scheme Consideration on the Restructuring Effective Date** | |
| **SJ Notes Scheme Creditors (who are <u>not</u> Sanctions-Affected Scheme Creditors)** | |

---

[10] To be entitled to receive the Consent Fee upon the Final Distribution Date or the lifting of Applicable Sanctions (whichever is later) from either (i) the Holding Period Trust, if within the Holding Period or (ii) the Successor Escrow Account, if during the Perpetuity Period.

| Actions to be taken | Deadline |
|---|---|
| ☐ Custody Instructions to be submitted via the Clearing Systems prior to the submission of the Account Holder Letter and in any case by the Custody Instruction Deadline | ☐ **Custody Instruction Deadline 5:00 p.m. Hong Kong time on 15 August 2023** |
| ☐ The Account Holder Letter submitted via the Portal by the SJ RED Distribution Deadline | ☐ **SJ RED Distribution Deadline, being the date which is 14 days after the Scheme Effective Date** |
| ☐ Distribution Confirmation Deed executed and submitted via the Portal by the SJ RED Distribution Deadline | |
| ☐ (optional) Designated Recipient Form (for either a Scheme Creditor who is not an Eligible Person or who wishes to appoint a Designated Recipient to receive the Scheme Consideration) submitted via the Portal by SJ RED Distribution Deadline | |
| **Actions required by SJ Notes Scheme Creditors _and_ Lake Noteholders to be entitled to receive the Scheme Consideration on the Final Distribution Date** | |
| **SJ Notes Scheme Creditors and Lake Noteholders (who are _not_ Sanctions-Affected Scheme Creditors)[11]** | |
| ☐ Custody Instructions to be submitted via the Clearing Systems prior to the submission of the Account Holder Letter and in any case by the Holding Period Custody Instruction Deadline | ☐ **Holding Period Custody Instruction Deadline 5:00 p.m. Hong Kong time on the date which is five (5) Business Days prior to the Bar Date.** |
| ☐ The Account Holder Letter signed and submitted via the Portal by the Bar Date | ☐ **Bar Date, being the date which is 135 days after the Restructuring Effective Date** |
| ☐ Distribution Confirmation Deed executed and submitted via the Portal by the Bar Date | |

---

[11] To be entitled to receive Scheme Consideration upon the Final Distribution Date or the lifting of Applicable Sanctions (whichever is later) from either (i) the Holding Period Trust, if within the Holding Period or (ii) the Successor Escrow Account, if during the Perpetuity Period.

| Actions to be taken | Deadline |
|---|---|
| ☐ (optional) Designated Recipient Form (for either a Scheme Creditor who is not an Eligible Person or who wishes to appoint a Designated Recipient to receive the Scheme Consideration) submitted via the Portal by the Bar Date | |
| **SJ Notes Scheme Creditors and Lake Noteholders (who <u>are</u> Blocked Scheme Creditors)[12]** | |
| ☐ The Blocked Scheme Creditor Form, including supporting evidence submitted to the Company, and the Accession Code (if relevant) signed and submitted to GLAS by any submission method(s) described in the Solicitation Packet by the Bar Date | ☐ <u>**Bar Date, being the date which is 135 days after the Restructuring Effective Date**</u> |

*General Instructions*

5.6    SJ Notes Scheme Creditors and Lake Noteholders (including Blocked Scheme Creditors) and any Persons with an interest in the SJ Notes, the Lake Notes, Account Holder or Intermediary (as applicable) should read the full instructions set out in the Solicitation Packet as to be made available on the Transaction Website and should read this Explanatory Statement as a whole, in conjunction with the Solicitation Packet. More specifically:

(a)    If you are an SJ Notes Scheme Creditor or Lake Noteholder (including a Blocked Scheme Creditor), you should read this Explanatory Statement carefully and should take the appropriate actions described in this Section 5 (*Summary of Actions to be taken by Scheme Creditors*) and throughout this Explanatory Statement and the Solicitation Packet.

(b)    If you are an SJ Notes Scheme Creditor or Lake Noteholder who is not an Account Holder and who is not a Sanctions-Affected Scheme Creditor, you should contact your Account Holder (through any Intermediaries, if applicable) to ensure that your Account Holder takes appropriate action(s) described in this Explanatory Statement and the Solicitation Packet.

(c)    It will be the responsibility of Account Holders, who are not SJ Notes Scheme Creditors or Lake Noteholders, to obtain from the SJ Notes Scheme Creditor or Lake Noteholder (through any Intermediaries if applicable) on whose behalf they are acting, in accordance with the procedures established between them, whatever information or instructions they may require to identify the relevant SJ Notes Scheme Creditor or Lake Noteholder in an Account Holder Letter (as applicable) and to provide the information, instructions and confirmations required by the Account Holder Letter. None of the Company, the Information Agent or any other Person will be responsible for any loss or liability incurred by an SJ Notes Scheme Creditor or Lake Noteholder as a result of any determination by the Information Agent that an Account Holder Letter contains an error or is incomplete, even if this is subsequently shown not to have been the case.

---

[12]To be entitled to receive Scheme Consideration upon the Final Distribution Date or the lifting of Applicable Sanctions (whichever is later) from either (i) the Holding Period Trust, if within the Holding Period or (ii) the Successor Escrow Account, if during the Perpetuity Period.

5.7    **If you are an SJ Notes Scheme Creditor or Lake Noteholder (who is not a Sanctions-Affected Scheme Creditor):**

(a)    please give ample time to allow your Account Holder and/or Intermediary (as applicable) to process your instructions and submit the required Scheme Creditor Forms (and any other documentation as may be requested) on your behalf. To ensure timely submission of your Account Holder Letter in accordance with the timetable set out in this Section 5, please check with your Account Holder (if applicable) for clarification as to the processing time required and deliver the appropriate materials well before that time; and

(b)    please note that the Clearing System, Account Holder and/or Custodian through which your interest in the SJ Notes or Lake Notes (as applicable) is held may impose an earlier deadline for the submission of Custody Instructions. To ensure timely submission of your Custody Instructions, and Account Holder Letter, please ask your Account Holder to check with the relevant Clearing System, Account Holders and/or Custodian as to whether any earlier deadline is applicable and ensure your Custody Instructions are submitted well before any applicable deadlines.

5.8    An SJ Notes Scheme Creditor or Lake Noteholder that fails to validly submit the required documentation prior to the relevant deadlines as set out above will not be entitled to vote at the Scheme Meeting.

5.9    An SJ Notes Scheme Creditor will further be bound by the terms of the Scheme in the event that the Scheme and the inter-conditional SJ Scheme become effective and any SJ Notes held by such SJ Notes Scheme Creditor will be cancelled on the Restructuring Effective Date in accordance with the terms of the SJ Scheme.

***Relevant documents to be completed by each SJ Notes Scheme Creditor and Lake Noteholder***

5.10    Each Scheme Creditor will be required to submit the relevant Scheme Creditor Forms (as applicable) in order to receive the Scheme Consideration, pursuant further to the terms of the Scheme. A summary of each relevant document pertaining to each SJ Notes Scheme Creditor or Lake Noteholder is set out below, including the consequences of failing to submit such documents in accordance with the requirements under the Scheme.

A.    <u>**SJ Notes Scheme Creditor and Lake Noteholders - Account Holder Letter**</u>

5.11    Among other things, the Account Holder Letter is the document that allows SJ Notes Scheme Creditors or Lake Noteholders (who are not Sanctions-Affected Scheme Creditors) to vote on the Scheme and to become eligible to receive Scheme Consideration on the occurrence of the Restructuring Effective Date.

5.12    A failure by such SJ Notes Scheme Creditor or Lake Noteholders to validly submit, or a failure by such SJ Notes Scheme Creditor or Lake Noteholder to procure that its Account Holder validly submits on its behalf (if applicable), the Account Holder Letter via the Portal such that it is received by the Voting Record Time will mean that the voting instructions contained in that Account Holder Letter will be disregarded for the purposes of voting at the Scheme Meeting and the relevant SJ Notes Scheme Creditor or Lake Noteholder will, subject to the Chairperson's discretion, not be entitled to vote at the Scheme Meeting.

5.13    SJ Notes Scheme Creditors and Lake Noteholders (who are not Sanctions-Affected Scheme Creditors) (or their Account Holders on their behalf as agent, if applicable) will be required to submit an instruction to block the SJ Notes via the Clearing Systems (the "*Custody*

*Instruction*"), prior to submitting the Account Holder Letter, and in any case prior to the Custody Instruction Deadline.

5.14    A failure by a SJ Notes Scheme Creditor or Lake Noteholder (who is an Eligible Participating Creditor) to validly submit, or a failure by a SJ Notes Scheme Creditor or Lake Noteholder to procure that its Account Holder validly submits on its behalf (if applicable), the Account Holder Letter via the Portal such that it is received by the Voting Record Time will mean that such SJ Notes Scheme Creditor or Lake Noteholder will not be eligible to receive the Consent Fee (if applicable) on the Restructuring Effective Date.

5.15    A failure by a SJ Notes Scheme Creditor or Lake Noteholder to validly submit, or a failure by a SJ Notes Scheme Creditor or Lake Noteholder to procure that its Account Holder validly submits on its behalf (if applicable), the Account Holder Letter via the Portal such that it is received by either the (i) SJ RED Distribution Deadline or (ii) the Bar Date, as applicable, will also mean that such SJ Notes Scheme Creditor or Lake Noteholder will not be eligible to participate in the distribution of the New Instruments on the Restructuring Effective Date or the Final Distribution Date, respectively.

**B.    SJ Notes Scheme Creditors and Lake Noteholders - Distribution Confirmation Deed**

5.16    The Distribution Confirmation Deed is a document that SJ Notes Scheme Creditors and Lake Noteholders (who are not Sanctions-Affected Scheme Creditors) (or their Account Holder on their behalf as their agent, as applicable) must complete in order to confirm, among other things, that such SJ Notes Scheme Creditors or Lake Noteholders (or its Designated Recipient (if applicable)) may lawfully be issued the New Instruments. Please refer to the instructions above for the relevant deadlines required to submit a Distribution Confirmation Deed along with the other documents required to be submitted.

**C.    SJ Notes Scheme Creditors and Lake Noteholders - Designated Recipient Form**

5.17    The Designated Recipient Form is an optional form that SJ Notes Scheme Creditors and Lake Noteholders (who are not Sanctions-Affected Scheme Creditors) may complete in order to appoint, should they wish, a Designated Recipient to be the recipient of some or all of the New Instruments that would otherwise be issued to such SJ Notes Scheme Creditor or Lake Noteholder. The Designated Recipient Form is appended to the Account Holder Letter.

5.18    For SJ Notes Scheme Creditors and Lake Noteholders, who are not Sanctions-Affected Scheme Creditors, if you wish to nominate a Designated Recipient to receive any New Instruments (in the case of SJ Notes Scheme Creditors) or the Consent Fee (in the case of the Lake Noteholders) on the Restructuring Effective Date or the Final Distribution Date must ensure that a validly completed and executed Designated Recipient Form is also submitted online via the Portal, alongside the applicable documents noted above, to be submitted to the Information Agent by the relevant deadlines set out in Section 5.5 above.

5.19    For the avoidance of doubt, an SJ Notes Scheme Creditor or a Lake Noteholder may nominate more than one (1) Designated Recipient to receive a portion of the New Instruments that would otherwise be issued to such SJ Notes Scheme Creditor or Lake Noteholder, with the approval of the Company (its agent or person instructed by it).

**D.    Blocked Scheme Creditor Form**

5.20    The Blocked Scheme Creditor Form is the document that allows SJ Notes Scheme Creditors and Lake Noteholders who are Blocked Scheme Creditors to (i) vote on the Scheme at the Scheme Meeting, and (ii) to become eligible to receive the relevant Scheme Consideration if

Applicable Sanctions in respect of them are lifted should the Scheme be approved, in accordance with the terms of the Scheme. A failure by a Blocked Scheme Creditor to submit, or a failure by a Blocked Scheme Creditor to procure the submission of, the Blocked Scheme Creditor Form to GLAS by any submission method(s) described in the Solicitation Packet as set out in the instructions to the Solicitation Packet such that it is received by the Voting Record Time will mean that the voting instructions contained in that Blocked Scheme Creditor Form will be disregarded for the purposes of voting at the Scheme Meeting and the relevant Blocked Scheme Creditor will, subject to the Chairperson's discretion, not be entitled to vote at the Scheme Meeting.

E.    **SUBMISSION OF COMPLETED FORMS BY SJ NOTES SCHEME CREDITORS AND LAKE NOTEHOLDERS:**

*Actions to be taken by a SJ Notes Scheme Creditor and Lake Noteholder*

A.    **Actions to be taken before the Voting Record Time**

5.21    SJ Notes Scheme Creditors or Lake Noteholders should further refer to Section 1 (*Expected Timetable of Key Events*) for the key expected timings of the Scheme and Section 5 (*Summary of Actions to be taken by Scheme Creditors*) when reviewing this section.

5.22    If you are an SJ Notes Scheme Creditor or Lake Noteholder (who is not a Sanctions-Affected Scheme Creditor) who is not an Account Holder, you should contact your Account Holder (through any Intermediaries, if applicable) to ensure that your Account Holder takes the appropriate action(s). Such SJ Notes Scheme Creditors and Lake Noteholders must also ensure that a Custody Instruction is submitted via the Clearing Systems prior to the Custody Instruction Deadline.

5.23    SJ Notes Scheme Creditors and Lake Noteholders (who are not Sanctions-Affected Scheme Creditors) who wish to vote in respect of the Scheme at the Scheme Meeting must ensure the actions and Scheme Creditor Forms (as applicable) as set out in Section (B) below, are validly completed and executed and received by the Information Agent via the Portal or GLAS (in respect of Blocked Scheme Creditor Forms) by any submission method(s) described in the Solicitation Packet by the Voting Record Time.

5.24    Whether the required Scheme Creditor Forms have been duly completed shall be determined by the Information Agent or by GLAS (in respect of Blocked Scheme Creditor Forms) at their discretion, provided that, if the Information Agent and/or GLAS (in respect of Blocked Scheme Creditor Forms) consider any such document not to have been validly completed, they shall promptly:

(a)    prepare a written statement of its reasons for that conclusion; and

(b)    send that written statement via the Portal (in respect of the Information Agent) or by any submission method(s) described in the Solicitation Packet (in respect of GLAS) to the party that provided the relevant document.

5.25    Where a Scheme Creditor Form is considered not to have been validly completed, and the Bar Date has not yet occurred at the time of such determination, the relevant Scheme Creditor may resubmit the Scheme Creditor Form.

5.26    None of the Company, the Information Agent, GLAS, or any other person will be responsible for any loss or liability incurred by a SJ Notes Scheme Creditor as a result of any determination by the Information Agent or GLAS.

B. **To vote at the Scheme Meeting**

5.27   SJ Notes Scheme Creditors and Lake Noteholders will be entitled to attend and vote in person or by proxy at the Scheme Meeting. If you are an SJ Notes Scheme Creditor or Lake Noteholder, you should read this Explanatory Statement and the Solicitation Packet carefully. In order to vote on the Scheme, attend the Scheme Meeting and be eligible to receive Scheme Consideration, it is of the utmost importance that Scheme Creditor (including Blocked Scheme Creditors) ensure that they follow the voting and other documentary instructions set out below and throughout this Explanatory Statement.

5.28   For the purpose of voting at the Scheme Meeting, the value of each SJ Notes Scheme Creditor's and Lake Noteholder's Scheme Claim shall be an amount equal to its Voting Scheme Claim. For completeness, the Voting Scheme Claim shall be the sum calculated on a Full Accrued Claim Basis, in accordance with the calculation of the SJ Notes Trustee or Lake Notes Trustee and Agent, subject to the Information Agent's reconciliation of the Custody Instruction reference number specified in the Account Holder Letter submitted by or on behalf of such SJ Notes Scheme Creditor or Lake Noteholder with the records of the Clearing Systems, at the Voting Record Time, subject to the Chairperson's discretion.

5.29   As noted above at paragraph (E) of Section 5.1, the SJ Notes Trustee, the SJ Notes Depositary (and its nominee) and the Lake Notes Trustee and Agent are Scheme Creditors; however, they shall not be entitled to vote at the Scheme Meeting to avoid double counting.

5.30   SJ Notes Scheme Creditors and Lake Noteholders (who are not Sanctions-Affected Scheme Creditors) who wish to vote in respect of the Scheme are requested to ensure that the relevant Custody Instruction is submitted via the Clearing Systems prior to the Custody Instruction Deadline and the applicable Scheme Creditor Form is duly completed, executed and returned in accordance with the instructions set out therein so that it is submitted to and received by the Information Agent via the Portal by the Voting Record Time being no later than 5.00 p.m. Hong Kong time on 18 August 2023.

5.31   SJ Notes Scheme Creditors and Lake Noteholders, who are Blocked Scheme Creditors, who wish to vote in respect of the Scheme, are requested to ensure that the Blocked Scheme Creditor Form (including any other evidence) is duly completed, executed and returned in accordance with the instructions set out therein so that it is submitted to and received by GLAS by any submission method(s) described in the Solicitation Packet by the Voting Record Time, being no later than 5.00 p.m. Hong Kong time on 18 August 2023.

C. **Custody Instructions and Undertaking not to Transfer for SJ Notes Scheme Creditors (who are not Sanctions-Affected Scheme Creditors)**

5.32   Custody Instructions are irrevocable instructions which prevent transfers of the SJ Notes until the Restructuring Effective Date, or until the SJ Notes are unblocked in accordance with Section 5.38 below. These restrictions are necessary to prevent the same holding of SJ Notes being voted on at the Scheme Meeting more than once. A separate Custody Instruction must be submitted on behalf of each SJ Notes Scheme Creditor. An SJ Notes Scheme Creditor need only submit a single Custody Instruction in respect of their SJ Notes for both the SJ Scheme and this Scheme.

5.33   Any SJ Notes Scheme Creditor that procures the submission of an Account Holder Letter to vote at the Scheme Meeting must block its SJ Notes. To do this, SJ Notes Scheme Creditors must ensure that their Account Holder, prior to delivering the Account Holder Letter to the Information Agent, submits a Custody Instruction to Euroclear or Clearstream (as applicable) to block its SJ Notes held with Euroclear or Clearstream by the Custody Instruction Deadline. SJ Notes Scheme Creditors must include in the relevant Account Holder Letter reference to the

Custody Instruction Reference Number. An Account Holder Letter that does not contain reference to a valid Custody Instruction Reference Number will not be valid for the purposes of voting at the Scheme Meeting or receiving the Scheme Consideration on the Restructuring Effective Date, and the Company reserves the right to reject any such Account Holder Letter. An SJ Notes Scheme Creditor need only submit a single set of Scheme Creditor Forms in respect of their SJ Notes for both the SJ Scheme and this Scheme (such that an SJ Noteholder is not required to submit one set of Scheme Creditor Forms for this Scheme and a separate set of Scheme Creditor Forms for the SJ Scheme to the Information Agent or GLAS (as applicable)).

5.34    By completion of the Account Holder Letter with inclusion of the Custody Instruction Reference Number, the SJ Notes Scheme Creditor will be deemed to have given the undertaking that it will not, from the date of delivery of its Account Holder Letter, sell, transfer, assign or otherwise dispose of its interest in all or any part of its specified SJ Notes until the Restructuring Effective Date, or until the SJ Notes are unblocked in accordance with Section 5.38 below.

5.35    For the avoidance of doubt, all SJ Notes (even those in respect of which no Custody Instructions were given) will be blocked from trading by the Clearing Systems on or around five (5) Business Days prior to the Restructuring Effective Date.

5.36    If the Restructuring Effective Date occurs before the Longstop Date, in addition to the restructuring effective date occurring in relation to the inter-conditional SJ Scheme before its respective longstop date (pursuant to the terms of the SJ Scheme), all of the SJ Notes will be cancelled in the Clearing Systems on the Restructuring Effective Date, in accordance with the terms of the SJ Scheme and thereafter will not be capable of being traded in the Clearing Systems.

5.37    Any documentation and relevant Custody Instruction submitted by or on behalf of an SJ Notes Scheme Creditor shall be irrevocable for all purposes in connection with the Scheme unless and until Company has provided an irrevocable unblock instruction to the Information Agent in accordance with Section 5.38 below.

5.38    The Company shall provide an irrevocable instruction to the Information Agent to immediately cause the SJ Notes to be unblocked within two (2) Business Days after one of the circumstances below occurs:

(a)    the Scheme is not approved by the requisite majorities of the Scheme Creditors at the Scheme Meeting, is withdrawn or is terminated in accordance with terms of the Scheme;

(b)    the Scheme is not sanctioned by a final and unappealable order of the Court;

(c)    the Restructuring does not become effective by the Longstop Date; or

(d)    the Company at its sole discretion consents to unblock the SJ Notes.

5.39    If the Restructuring Effective Date occurs before the Longstop Date, the Scheme Claims will be irrevocably released and cancelled in full in accordance with the Scheme in consideration for which the Eligible Creditors and Designated Recipients (if applicable) will receive the New Instruments and the Scheme Creditors will receive the Scheme Consideration, all in accordance with the terms of the Scheme.

5.40    For the avoidance of doubt, the SJ Notes will be cancelled in the Clearing Systems on the Restructuring Effective Date and will not be capable of being traded in the Clearing Systems after the Restructuring Effective Date.

5.41    For the avoidance of doubt, the Lake Notes will not be cancelled in the Clearing Systems on the Restructuring Effective Date and will be capable of being traded in the Clearing Systems after the Restructuring Effective Date.

5.42    Where the Lake Notes are sold, assigned or transferred by a Lake Noteholder after the Restructuring Effective Date, the Lake Noteholder as at the Entitlement Record Time shall remain entitled to receive the Scheme Consideration pursuant to the terms of the Scheme (rather than the assignee, purchaser or transferee of the relevant Lake Notes).

**D.      To receive the Consent Fee (if applicable) on the Restructuring Effective Date**

5.43    SJ Notes Scheme Creditors and Lake Noteholders (who are not Sanctions-Affected Scheme Creditors), who are also Eligible Participating Creditors and who have voted in support of the Scheme, are entitled to receive the Consent Fee on the Restructuring Effective Date if they have validly completed and submitted the relevant Scheme Creditor Forms (as set out above in Section 5.4) via the Portal and received by the Voting Record Time.

**E.      To receive your Entitlement to the Scheme Consideration on the Restructuring Effective Date or Final Distribution Date (as applicable)**

*On the Restructuring Effective Date*

5.44    If you are an SJ Notes Scheme Creditor (and are not a Sanctions-Affected Scheme Creditor) and wish to receive your Entitlement to the Scheme Consideration on the Restructuring Effective Date, in accordance with the terms of the Scheme, please ensure that the Custody Instruction is submitted via the Clearing Systems, by the Custody Instruction Deadline, prior to the Account Holder Letter being submitted and, for receiving New Instruments, the Distribution Confirmation Deed is validly completed, executed and returned online via the Portal in accordance with the instructions set forth therein so that they are submitted to and received by the Information Agent by the SJ RED Distribution Deadline.

*On the Final Distribution Date*

5.45    If you are an SJ Notes Scheme Creditor (and are not a Sanctions-Affected Scheme Creditor), and received the Initial Distribution of Scheme Consideration on the Restructuring Effective Date, you shall receive the remainder of your Scheme Consideration on the Final Distribution Date. If, alternatively, you are an SJ Notes Scheme Creditor (and are not a Sanctions-Affected Scheme Creditor) who has failed to submit the relevant Scheme Creditor Forms by the SJ RED Distribution Deadline, and still wish to receive your Entitlement to the Scheme Consideration on the Final Distribution Date, in accordance with the terms of the Scheme, please ensure that the Custody Instruction is submitted via the Clearing Systems, by the Holding Period Custody Instruction Deadline, prior to the Account Holder Letter being submitted and, for receiving New Instruments, the Distribution Confirmation Deed is validly completed, executed and returned online via the Portal in accordance with the instructions set forth therein so that they are submitted to and received by the Information Agent by the Bar Date.

*If you are a Lake Noteholder (and are not a Sanctions-Affected Scheme Creditor) and wish to receive your Entitlement to the Scheme Consideration on Final Distribution Date, in accordance with the terms of the Scheme, please ensure that the Custody Instruction is submitted via the Clearing Systems, by the Custody Instruction Deadline, prior to the Account Holder Letter being submitted and, for receiving New Instruments, the Distribution Confirmation Deed is validly completed, executed and returned online via the Portal in*

23-11332-mew    Doc 9    Filed 08/17/23    Entered 08/17/23 21:56:28    Main Document
Pg 1166 of 1553

*accordance with the instructions set forth therein so that they are submitted to and received by the Information Agent by the Bar Date.Appointment of a Designated Recipient*

5.46    If you are not an Eligible Person (i.e. a person who cannot make affirmative securities law confirmations set out in the Distribution Confirmation Deed) nor a Sanctions-Affected Scheme Creditor, you may designate a Designated Recipient who is an Eligible Person in order to receive your Entitlement to the Scheme Consideration by submission of a Designated Recipient as described below at Section (F), to be read with the instructions set forth in the Solicitation Packet to be made available on the Transaction Website.

*Blocked Scheme Creditors*

5.47    If you are an SJ Notes Scheme Creditor or Lake Noteholder who is a Blocked Scheme Creditor, by definition, you will be unable to receive your Entitlement to the Scheme Consideration on the Restructuring Effective Date. If the Applicable Sanctions are still in place upon the Final Distribution Date, the Company will appoint the Successor Escrow Agent to hold in the Successor Escrow Account any Blocked Assets to which SJ Notes Scheme Creditors or Lake Noteholders who are Blocked Scheme Creditors would otherwise be entitled on the Final Distribution Date, until the earlier of (i) the expiry of the Perpetuity Period, or (ii) the lifting of Applicable Sanctions with the Blocked Scheme Creditors being given a reasonable period of time thereafter to recover their Entitlement to the Scheme Consideration in accordance with the terms of the Successor Escrow Agreement.

5.48    Blocked Scheme Creditors need to submit the Blocked Scheme Creditor Form to GLAS by any submission method(s) described in the Solicitation Packet by the Voting Record Time in order to vote and be eligible to receive the Consent Fee to be paid to the Holding Period Trustee on the Restructuring Effective Date (if applicable)), or by the Bar Date in order to be eligible to receive the Scheme Consideration upon the Final Distribution Date or the lifting of the Applicable Sanctions, whichever is later, further pursuant to the terms of the Scheme. Upon the lifting of all Applicable Sanctions, such Blocked Scheme Creditors will cease to be considered Blocked Scheme Creditors for the purposes of the Scheme, and then would be able to, and required to, validly complete and submit the relevant documents as further described in the Solicitation Packet to be made available on the Transaction Website.

F.      **To nominate a Designated Recipient to receive your Scheme Consideration**

5.49    For SJ Notes Scheme Creditors and Lake Noteholders, who are not Sanctions-Affected Scheme Creditors, if you wish to nominate a Designated Recipient to receive your Scheme Consideration on the Restructuring Effective Date or the Final Distribution Date, to which you may be entitled, please ensure that a duly completed and executed Designated Recipient Form is also submitted online via the Portal with an Account Holder Letter and a Distribution Confirmation Deed to be submitted to the Information Agent by the Voting Record Time (in order to vote on the Scheme and receive the Consent Fee (if eligible)), by the SJ RED Distribution Deadline (to receive Scheme Consideration on the Restructuring Effective Date, in respect of SJ Notes Scheme Creditors), or by the Bar Date (to receive Scheme Consideration on the Final Distribution Date, in respect of SJ Notes Scheme Creditors and Lake Noteholders), respectively.

G.      **Upload of documents**

5.50    All completed documents should be submitted online via the Portal (https://portal.morrowsodali.com/EvergrandeScheme) to the Information Agent (for SJ Notes Scheme Creditors and Lake Noteholders who are not Sanctions-Affected Scheme Creditors) or by any submission method(s) described in the Solicitation Packet to GLAS (for Blocked Scheme Creditors), with full supporting evidence before the important deadlines set out above

and further detailed in this Explanatory Statement and the Solicitation Packet, as set out in the Solicitation Packet to be made available on the Transaction Website.

5.51    The Company would encourage all SJ Notes Scheme Creditors and Lake Noteholders (including Blocked Scheme Creditors) to start the process for submitting their votes for the Scheme Meeting and submitting the documentation required to participate in a distribution of Scheme Consideration as soon as possible.

5.52    If you are in any doubt as to what action you should take in connection with this Explanatory Statement and/or the Scheme, the proposals contained in them or the documents that accompany them, you are recommended to:

(a)    contact the Information Agent (for SJ Notes Scheme Creditors and Lake Noteholders who are not Sanctions-Affected Scheme Creditors);

(b)    contact GLAS (for Blocked Scheme Creditors): and

(c)    seek your own independent advice immediately from your legal, financial, tax or other independent adviser.

5.53    All documents relevant to the Scheme such as this Explanatory Statement, the Scheme, the Solicitation Packet and all relevant announcements will be available online at the Transaction Website.

**ANY SJ NOTES SCHEME CREDITOR OR LAKE NOTEHOLDER (WHO IS NOT A SANCTIONS-AFFECTED SCHEME CREDITOR) THAT FAILS TO ENSURE THAT A VALIDLY COMPLETED AND EXECUTED ACCOUNT HOLDER LETTER, DISTRIBUTION CONFIRMATION DEED AND, IF APPLICABLE, DESIGNATED RECIPIENT FORM ARE SUBMITTED TO AND RECEIVED BY THE INFORMATION AGENT VIA THE PORTAL BY NO LATER THAN THE DEADLINES SET OUT IN THE SOLICITATION PACKET TO BE MADE AVAILABLE ON THE TRANSACTION WEBSITE AND IN ACCORDANCE WITH THE INSTRUCTIONS SET OUT THEREIN SHALL NOT RECEIVE ANY SCHEME CONSIDERATION OR ANY OTHER BENEFITS UNDER THE TERMS OF THE SCHEME BUT SHALL HAVE ITS SCHEME CLAIMS RELEASED IN ACCORDANCE WITH THE TERMS OF THE SCHEME.**

5.54    **ACTIONS REQUIRED BY OTHER DEBT SCHEME CREDITORS (OTHER THAN LAKE NOTEHOLDERS)**

*Summary of Actions Table*

5.55    The table below is designed to be a *summary only* of the key actions that all Other Debt Scheme Creditors (other than Lake Noteholders) should and/or are required to take for the purposes of attending and voting at the Scheme Meeting and claim their Scheme Consideration and relevant deadlines. The table should be read in conjunction with the detailed explanations below at Section 5.56 onwards relevant to Other Debt Scheme Creditors (other than Lake Noteholders) and in the Solicitation Packet to be made available on the Transaction Website.

| Actions to be taken | Deadline |
| --- | --- |
| **To vote at the Scheme Meeting** | |

| Actions to be taken | Deadline |
|---|---|
| **Other Debt Scheme Creditors (who are not Sanctioned Scheme Creditors)[13]** | |
| ☐ The Proxy Form, including supporting evidence and Voting Instructions, signed and submitted via the Portal by the Voting Record Time | ☐ <u>**Voting Record Time 5.00 p.m. Hong Kong time on 18 August 2023**</u> |
| **Actions required by Other Debt Scheme Creditors (who are Eligible Participating Creditors) to be able to receive the Consent Fee *only* on the Restructuring Effective Date (or, in respect of Blocked Scheme Creditors, to have the Consent Fee paid to the Holding Period Trustee)** | |
| **Other Debt Scheme Creditors (who are not Sanctioned Scheme Creditors)** | |
| ☐ The Proxy Form, including supporting evidence and Accession Code (in addition to voting in favour of the Scheme and other conditions), signed and submitted via the Portal by the Voting Record Time | ☐ <u>**Voting Record Time 5.00 p.m. Hong Kong time on 18 August 2023**</u> |
| ☐ Distribution Confirmation Deed executed and submitted via the Portal by the Voting Record Time | |
| ☐ (optional) Designated Recipient Form (for either a Scheme Creditor who is not an Eligible Person or who wishes to appoint a Designated Recipient to receive the Scheme Consideration) submitted via the Portal by the Voting Record Time | |
| **Actions required by Other Debt Scheme Creditors to be entitled to receive Scheme Consideration on the Final Distribution Date** | |
| **Other Debt Scheme Creditors (who are not Sanctioned Scheme Creditors)** | |
| ☐ The Proxy Form, including supporting evidence and Voting Instructions, signed and submitted via the Portal by the Bar Date | ☐ <u>**Bar Date, being the date which is 135 days after the Restructuring Effective Date**</u> |
| ☐ Distribution Confirmation Deed to be executed and submitted via the Portal by the Bar Date | |
| ☐ (optional) Designated Recipient Form (for either a Scheme Creditor who is not an Eligible Person or who wishes to appoint a Designated Recipient to receive the | |

---

[13]In relation to Other Debt Scheme Creditors, other than Lake Noteholders, all documents must be submitted to the Information Agent via the Portal.

| Actions to be taken | Deadline |
|---|---|
| Scheme Consideration) submitted via the Portal by the Bar Date | |

*General Instructions*

5.56    Other Debt Scheme Creditors (including Sanctions-Affected Scheme Creditors) and any Persons with an interest in the Other Debts (whether as an Other Debt Scheme Creditor or Intermediary) should read the full instructions set out in the Solicitation Packet and should read the Explanatory Statement as a whole, in conjunction with the Solicitation Packet. More specifically:

   (a)    If you are an Other Debt Scheme Creditor (including a Blocked Scheme Creditor), you should read this Explanatory Statement carefully.

   (b)    Any Other Debt Scheme Creditor that fails to validly submit required documentation prior to the deadlines as set out above will not be entitled to vote at the Scheme Meeting. Such Other Debt Scheme Creditor will, however, be bound by the terms of the Scheme in the event that it becomes effective and any Scheme Claims held by such Other Debt Scheme Creditor will be released on the Restructuring Effective Date in accordance with the terms of the Scheme.

*Relevant documents to be completed by each Other Debt Scheme Creditor*

5.57    Each Other Debt Scheme Creditor will be required to submit the relevant Scheme Creditor Forms (as applicable) in order to receive the Scheme Consideration, pursuant further to the terms of the Scheme. A summary of each relevant document pertaining to each Other Debt Scheme Creditor is set out below, including the consequences of failing to submit such documents in accordance with the requirements under the Scheme.

   A.    **Other Debt Scheme Creditors - Distribution Confirmation Deed**

5.58    The Distribution Confirmation Deed is a document that Other Debt Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) (or their Account Holder on their behalf as their agent, as applicable) must complete in order to confirm, among other things, that such Other Debt Scheme Creditors (or its Designated Recipient (if applicable)) may lawfully be issued the New Instruments. Please refer to the instructions above for the relevant deadlines required to submit a Distribution Confirmation Deed along with the other documents required to be submitted.

   B.    **Other Debt Scheme Creditors - Designated Recipient Form**

5.59    The Designated Recipient Form is an optional form that Other Debt Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) may complete in order to appoint, should they wish, a Designated Recipient to be the recipient of some or all of the New Instruments that would otherwise be issued to such Other Debt Scheme Creditors. The Designated Recipient Form is appended to the Proxy Form.

5.60    For Other Debt Scheme Creditors, who are not Sanctions-Affected Scheme Creditors, if you wish to nominate a Designated Recipient to receive any New Instruments to which you may be entitled, please ensure that a validly completed and executed Designated Recipient Form is also submitted online via the Portal, alongside the applicable documents noted above, to be

submitted to the Information Agent by the relevant deadlines set out in this Section 5 (*Summary of Actions to be taken by Scheme Creditors*).

5.61    For the avoidance of doubt, an Other Debt Scheme Creditor may nominate more than one (1) Designated Recipient to receive a portion of the New Instruments that would otherwise be issued to such SJ Notes Scheme Creditor, with the approval of the Company (its agent or person instructed by it).

### C.    Blocked Scheme Creditor Form

5.62    The Blocked Scheme Creditor Form is the document that allows Other Debt Scheme Creditors in respect of the Lake Noteholders who are Blocked Scheme Creditors to (i) vote on the Scheme at the Scheme Meeting, and (ii) to become eligible to receive the relevant Scheme Consideration if Applicable Sanctions in respect of them are lifted and should the Scheme be approved, in accordance with the terms of the Scheme. A failure by a Blocked Scheme Creditor to submit, or a failure by a Blocked Scheme Creditor to procure the submission of, the Blocked Scheme Creditor Form to GLAS by any submission method(s) described in the Solicitation Packet such that it is received by the Voting Record Time will mean that the voting instructions contained in that Blocked Scheme Creditor Form will be disregarded for the purposes of voting at the Scheme Meeting and the relevant Blocked Scheme Creditor will, subject to the Chairperson's discretion, not be entitled to vote at the Scheme Meeting.

5.63    A failure by a Blocked Scheme Creditor to submit, or procure the submission of, the Blocked Scheme Creditor Form to GLAS by any submission method(s) described in the Solicitation Packet such that it is received by the Bar Date will mean that such Blocked Scheme Creditor (or the Successor Escrow Agent, if Applicable Sanctions remain in place on the Final Distribution Date) will not be eligible to participate in the distribution of the New Instruments on the Final Distribution Date and will have its rights under this Scheme extinguished.

### SUBMISSION OF COMPLETED FORMS BY OTHER DEBT SCHEME CREDITORS:

***Actions to be taken by an Other Debt Scheme Creditor***

### E.    Actions to be taken before the Voting Record Time

5.64    Other Debt Scheme Creditors should further refer to Section 1 (*Expected Timetable of Key Events*) for the key expected timings of the Scheme and Section 5 (*Summary of Actions to be taken by Scheme Creditors*) when reviewing this section.

5.65    Other Debt Scheme Creditors who wish to vote in respect of the Scheme at the Scheme Meeting must ensure the actions and Scheme Creditor Forms (as applicable) as set out in Section (B) below, are validly completed and executed and received by the Information Agent via the Portal or GLAS (in respect of Blocked Scheme Creditor Forms) by any submission method(s) described in the Solicitation Packet by the Voting Record Time.

5.66    Whether the required Scheme Creditor Forms have been validly completed shall be determined by the Information Agent and/or GLAS (in respect of Blocked Scheme Creditor Forms) at their discretion, provided that, if the Information Agent and/or GLAS considers any such document not to have been validly completed, it shall promptly:

(a)    prepare a written statement of its reasons for that conclusion; and

(b)    send that written statement via the Portal (in respect of the Information Agent) or by any submission method(s) described in the Solicitation Packet (in respect of GLAS) to the party that provided the relevant document.

43

5.67    Where a Scheme Creditor Form is considered not to have been validly completed, and the Bar Date has not yet occurred at the time of such determination, the relevant Scheme Creditor may resubmit the Scheme Creditor Form.

5.68    None of the Company, the Information Agent, GLAS, or any other person will be responsible for any loss or liability incurred by a Other Debt Scheme Creditor as a result of any determination by the Information Agent or GLAS.

**F.    To vote at the Scheme Meeting**

5.69    Other Debt Scheme Creditors (other than Sanctioned Scheme Creditors) will be entitled to attend and vote in person or by proxy at the Scheme Meeting. If you are an Other Debt Scheme Creditor, you should read this Explanatory Statement and the Solicitation Packet carefully. In order to vote on the Scheme, attend the Scheme Meeting and be eligible to receive Scheme Consideration, it is of the utmost importance that Scheme Creditor (including Blocked Scheme Creditors) ensure that they follow the voting and other documentary instructions set out below and throughout this Explanatory Statement.

5.70    For the purpose of voting at the Scheme Meeting, the value of each Other Debt Scheme Creditor's Scheme Claim shall be an amount equal to its Voting Scheme Claim. For completeness, the Voting Scheme Claim shall be the sum, together in aggregate, of:

(a)    the outstanding principal amount of the Other Debts held by each Other Debt Scheme Creditor at the Voting Record Time; *plus*

(b)    all accrued and unpaid interest on the Other Debts (if applicable) up to the Voting Record Time, based on the Chairperson's fair and reasonable discretion.

5.71    In respect of the Castle Loan Put Option, it is the intended approach of the Chairperson to allow this claim for a nominal amount of US$1 as its Voting Scheme Claim. The Castle Loan Put Option is considered to be duplicative of a portion of the Cash Share Put Option and substantially the same debt owed by the Company.  The Castle Loan Put Option, being the secondary claim, is therefore considered to be of no value in a liquidation of the Company due to the rule against 'double proof' and/or on a contractual basis.

5.72    For the avoidance of doubt, and notwithstanding any other provision in this Explanatory Statement, CEG, as an Other Debt Scheme Creditor in respect of the Intercompany Claim, will not be entitled to vote at the Scheme Meeting.

5.73    As noted above at paragraph (F) of Section 5.1, the Existing Agents are Scheme Creditors; however, they shall not be entitled to vote in respect of the Other Debts at the Scheme Meeting, and accordingly they will not vote at such meeting to avoid double counting.

**G.    To receive the Consent Fee (if applicable) on the Restructuring Effective Date**

5.74    Other Debt Scheme Creditors (who are not Sanctions-Affected Scheme Creditors), who are also Eligible Participating Creditors, are entitled to receive the Consent Fee on the Restructuring Effective Date if they have validly completed and submitted the relevant Scheme Creditor Forms (as set out in this Section 5 (*Summary of Actions to be taken by Scheme Creditors*)) via the Portal and received by the Voting Record Time.

**H.    To receive your Entitlement to the Scheme Consideration on the Final Distribution Date**

*Final Distribution*

44

5.75    If you are an Other Debt Scheme Creditor and wish to receive the Scheme Consideration on the Final Distribution Date, in accordance with the terms of the Scheme, please ensure that the Account Holder Letter or Other Debt Scheme Creditor Proxy Form (as applicable) and, for receiving New Instruments, Distribution Confirmation Deed are validly completed, executed and returned online via the Portal in accordance with the instructions set forth therein so that they are submitted to and received by the Information Agent by the Bar Date.

*Appointment of a Designated Recipient*

5.76    If you are not an Eligible Person (i.e. a person who cannot make affirmative securities law confirmations set out in the Distribution Confirmation Deed) nor a Sanctions-Affected Scheme Creditor, you may designate a Designated Recipient who is an Eligible Person in order to receive your Entitlement to the Scheme Consideration by submission of a Designated Recipient Form, in accordance with the terms of the Scheme, as described below at Section (F), to be read with the instructions set forth in the Solicitation Packet, to be made available on the Transaction Website.

*Blocked Scheme Creditors*

5.77    Blocked Scheme Creditors need to submit the Blocked Scheme Creditor Form to GLAS by any submission method(s) described in the Solicitation Packet by the Voting Record Time in order to vote and be eligible to receive the Consent Fee (if an Eligible Participating Creditor) (to be paid to the Holding Period Trustee on the Restructuring Effective Date (if applicable)), or by the Bar Date in order to be eligible to receive the Scheme Consideration upon the Final Distribution Date or the lifting of the Applicable Sanctions, whichever is later, further pursuant to the terms of the Scheme. Upon the lifting of all Applicable Sanctions, such Blocked Scheme Creditors will cease to be considered Blocked Scheme Creditors for the purposes of the Scheme, and then would be able to, and required to, validly complete and submit the relevant documents as further described in the Solicitation Packet, to be made available on the Transaction Website.

**I.    <u>To nominate a Designated Recipient to receive your Scheme Consideration</u>**

5.78    For Other Debt Scheme Creditors, who are not Sanctions-Affected Scheme Creditors, if you wish to nominate a Designated Recipient to receive your Scheme Consideration on the Final Distribution Date, to which you may be entitled, please ensure that a validly completed and executed Designated Recipient Form is also submitted online via the Portal with an Account Holder Letter or a Other Debt Scheme Creditor Proxy Form (as applicable) and a Distribution Confirmation Deed to be submitted to the Information Agent by the Voting Record Time (in order to vote on the Scheme) or by the Bar Date (to receive Scheme Consideration on the Final Distribution Date), respectively.

**J.    <u>Upload of documents</u>**

5.79    All completed documents should be submitted online via the Portal (https://portal.morrowsodali.com/EvergrandeScheme) to the Information Agent (for Other Debt Scheme Creditors who are not Sanctions-Affected Scheme Creditors) or by any submission method(s) described in the Solicitation Packet to GLAS (for Blocked Scheme Creditors) with full supporting evidence before the important deadlines set out above and further detailed in this Explanatory Statement and the Solicitation Packet to be made available on the Transaction Website.

5.80    The Company would encourage all Other Debt Scheme Creditors (including Blocked Scheme Creditors) to start the process for submitting their votes for the Scheme Meeting and submitting the documentation required to participate in a distribution of Scheme Consideration as soon as possible.

45

5.81    If you are in any doubt as to what action you should take in connection with this Explanatory Statement and/or the Scheme, the proposals contained in them or the documents that accompany them, you are recommended to:

(a)    contact the Information Agent (for Other Debt Scheme Creditors who are not Sanctions-Affected Scheme Creditors);

(b)    contact GLAS (for Blocked Scheme Creditors): and

(c)    seek your own independent advice immediately from your legal, financial, tax or other independent adviser.

5.82    All documents relevant to the Scheme such as this Explanatory Statement, the Scheme, the Solicitation Packet and all relevant announcements will be available online at the Transaction Website.

**ANY OTHER DEBT SCHEME CREDITOR (WHO IS NOT A SANCTIONS-AFFECTED SCHEME CREDITOR) THAT FAILS TO ENSURE THAT A VALIDLY COMPLETED AND EXECUTED PROXY FORM, DISTRIBUTION CONFIRMATION DEED AND, IF APPLICABLE, DESIGNATED RECIPIENT FORM ARE SUBMITTED TO AND RECEIVED BY THE INFORMATION AGENT VIA THE PORTAL BY NO LATER THAN THE DEADLINES SET OUT IN THE SOLICITATION PACKET TO BE MADE AVAILABLE ON THE TRANSACTION WEBSITE AND IN ACCORDANCE WITH THE INSTRUCTIONS SET OUT THEREIN SHALL NOT RECEIVE ANY SCHEME CONSIDERATION OR ANY OTHER BENEFITS UNDER THE TERMS OF THE SCHEME BUT SHALL HAVE ITS SCHEME CLAIMS RELEASED IN ACCORDANCE WITH THE TERMS OF THE SCHEME.**

6.    **SUMMARY EXPLANATION OF THE SCHEME**

This section contains a brief overview of the Scheme. The summary information contained herein does not purport to be complete and should be read in conjunction with, and is qualified in its entirety by references to, the more detailed information presented elsewhere in this Explanatory Statement and by the full text of the Scheme (as set out in Schedule 4 (*The Scheme*) to this Explanatory Statement).

6.1    **Structure and objectives of the Scheme**

(a)    A scheme of arrangement enables a company to propose to its creditors, or one or more classes of its creditors, a compromise or arrangement in respect of its debts or obligations owed to those creditors. The Court will consider whether it is appropriate to convene a meeting of a class or meetings of classes of creditors and, if so, the composition of the class or classes necessary so as to ensure that the meeting(s) consists of creditors whose rights against the Company which are to be compromised are not so dissimilar as to make it impossible for them to consult together with a view to their common interest.

(b)    As part of the Restructuring, the Scheme is proposed in order to restructure the Liabilities of the Company under and/or in connection with the Existing Debts and the Existing Debt Instruments. The Scheme is inter-conditional with the SJ Scheme, which shall restructure the Liabilities of SJ, particularly under and/or in connection with the SJ Notes and the SJ Notes Documents including the SJ Notes Subsidiary Guarantors and keepwell. Additionally, scheme of arrangements in the Cayman Islands and Hong Kong are also proposed as part of the Restructuring in order to restructure the Liabilities of CEG.

46

(c)    The principal compromise and arrangement to be given effect to by the Scheme is the release in full of all the Scheme Claims of the Scheme Creditors against TJ, and in exchange, the Eligible Creditors and/or their Designated Recipients, as applicable, will be entitled to receive the Scheme Consideration in accordance with the terms of the Scheme.

6.2    **What is required for a scheme of arrangement to be effective?**

In Hong Kong, a scheme of arrangement requires the following to occur in order for it to become legally binding:

(a)    the convening of a meeting of the Company's creditors or meetings of classes of its creditors who are proposed to be bound by the scheme of arrangement in accordance with directions given by the Court;

(b)    at each such meeting the approval of at least a majority in number representing 75% or more in value of the relevant creditors of the Company present in person or by proxy and voting at the meeting;

(c)    the approval of the Scheme by the Court by the making of an order sanctioning the scheme of arrangement; and

(d)    the registration of an office copy of the order of the Court sanctioning the scheme of arrangement by the Hong Kong Companies Registrar.

The Scheme will not be sanctioned by the Court unless it is satisfied, among other things, that:

(e)    the Scheme Meeting was summoned and held in accordance with the Scheme Convening Order;

(f)    the Scheme was approved by the requisite majorities of those who voted at the Scheme Meeting in person or by proxy; and

(g)    the Scheme is such as an intelligent and honest man, a member of the class concerned and acting in respect of his interest, might reasonably approve.

The Courts will consider whether:

(h)    the class of creditors have been properly constituted;

(i)    the provisions of the applicable statute and any applicable subsidiary rules have been complied with;

(j)    each class was fairly represented by those who attended the meeting and the statutory majority were acting bona fide and were not coercing the minority in order to promote interests adverse to those of the class whom they purport to represent; and

(k)    there is any blot on the scheme of arrangement.

If the Scheme is approved by the requisite majorities of creditors at the Scheme Meeting and sanctioned by the Court, and the Scheme Sanction Order is delivered (or registered, as appropriate) to the Hong Kong Companies Registrar as set out above, the Scheme will bind all Scheme Creditors, including those creditors who voted in favour of the Scheme, those creditors who voted against it, and those creditors who did not vote at all.

6.3    **Are you a "Scheme Creditor" for the purposes of the Scheme Meeting?**

47

Information on which persons constitute Scheme Creditors and on the actions that Scheme Creditors are required to take under the Scheme is set out in the following sections:

(a)     Section 5 (*Summary of Actions to be taken by Scheme Creditors*) of this Explanatory Statement; and

(b)     the Solicitation Packet, which can be found to be made available on the Transaction Website.

6.4    **Determination of Voting Scheme Claims**

(a)     All Voting Scheme Claims for voting purposes will be determined as at the Voting Record Time.

(b)     Scheme Creditors should refer to the detailed instructions in relation to voting at the Scheme Meeting in Section 5 (*Summary of Actions to be taken by Scheme Creditors*) and the Solicitation Packet to be made available on the Transaction Website.

(c)     Pursuant to the Scheme:

**_SJ Notes Scheme Creditors and Lake Noteholders (who are not Sanctions-Affected Scheme Creditors)_**

(i)     For SJ Notes Scheme Creditors and Lake Noteholders (who are not Sanctions-Affected Scheme Creditors):

(A)     Scheme Creditors will acknowledge and agree that the Chairperson shall use the Account Holder Letter submitted by or on behalf of each of the Scheme Creditors, in accordance with the calculation of either the SJ Notes Trustee or Lake Notes Trustee and Agent (as applicable), as checked by the Information Agent against the Custody Instructions submitted through the Clearing Systems (i.e. reconciliation of the Custody Instruction reference number specified in the Account Holder Letter) and, if applicable, the accession records, at the Voting Record Time, to determine the Voting Scheme Claims and any such determination by the Chairperson shall (in the absence of wilful default, wilful misconduct or fraud) be conclusive and binding on such Scheme Creditors and the Company; and

(B)     The Chairperson and the Information Agent will use reasonable endeavours to review each Account Holder Letter promptly after receipt. Notwithstanding the foregoing it is the responsibility of each SJ Notes Scheme Creditors and Lake Noteholder to ensure that any Account Holder Letter submitted in respect of its Scheme Claim has been validly completed. Furthermore, each SJ Notes Scheme Creditor and Lake Noteholder acknowledges that the Information Agent is an agent of the Company, and owes no duty or responsibility towards any SJ Notes Scheme Creditor and Lake Noteholder

**_Other Debt Scheme Creditors (other than Lake Noteholders)_**

(ii)     For Other Debt Scheme Creditors (other than Lake Noteholders):

(A)     Scheme Creditors will acknowledge and agree that the Chairperson shall use the Proxy Form submitted by or on behalf of each Scheme

48

Creditor, as checked by the Information Agent against the books and records supplied by the Company at the Voting Record Time, to determine the Voting Scheme Claims and any such determination by the Chairperson shall (in the absence of wilful default, wilful misconduct or fraud) be conclusive and binding on such Scheme Creditors and the Company; and

(B)    The Chairperson and the Information Agent will use reasonable endeavours to review each Proxy Form promptly after receipt. Notwithstanding the foregoing it is the responsibility of each Other Debt Scheme Creditors (other than Lake Noteholders) to ensure that any Proxy Form submitted in respect of its Scheme Claim has been validly completed. Furthermore, each Other Debt Scheme Creditor acknowledges that the Information Agent is an agent of the Company, and owes no duty or responsibility towards any Other Debt Scheme Creditor.

### *SJ Notes Scheme Creditors and Lake Noteholders (who are Blocked Scheme Creditors)*

(iii)    For Blocked Scheme Creditors:

(A)    all Persons claiming to be Blocked Scheme Creditors must submit to (or procure the submission on their behalf) GLAS a validly completed Blocked Scheme Creditor Form, together with supporting evidence and other materials as required, in respect of their Scheme Claims;

(B)    the Chairperson shall assess Voting Scheme Claims for the purposes of determining the number of votes to be assigned to a Blocked Scheme Creditor by reference to the outstanding principal amount of SJ Notes or Lake Notes in which the relevant Blocked Scheme Creditor held the beneficial interest as at the Voting Record Time as verified by GLAS in consultation with the Company against all supporting evidence provided by the relevant Blocked Scheme Creditor; and

(C)    the Chairperson, with the support of the Company (its agent or person instructed by it) and GLAS, shall use the Blocked Scheme Creditor Form submitted by or on behalf of a Scheme Creditor, as verified against the records of the Company, including any additional evidence as required by GLAS and requested from the Blocked Scheme Creditor to be provided in relation to its Scheme Claim, to determine the Voting Scheme Claims and the Scheme Claim of each Blocked Scheme Creditor, and any such determinations shall (in the absence of wilful default, wilful misconduct or fraud) be conclusive and binding on the Blocked Scheme Creditors and the Company.

### *Discretion of the Chairperson*

(iv)    The Chairperson shall have absolute discretion (in the absence of wilful default, wilful misconduct or fraud) to permit any Scheme Creditor to vote at the Scheme Meeting, notwithstanding that the Account Holder Letter, Proxy Form, or Blocked Scheme Creditor Form (as applicable) had not been validly completed in accordance with the instructions set out in the Solicitation Packet to be made available on the Transaction Website or has been submitted to the

Information Agent or the Company (as applicable) after the Voting Record Time, provided that the Chairperson considers that the information contained therein is sufficient to establish the right of the Scheme Creditor to vote at the Scheme Meeting.

6.5    **Assignments or transfers of Scheme Claims**

(a)    Subject to paragraph 6.5 below, the Scheme Administrators shall not be under any obligation to recognise any sale, assignment or transfer of any Scheme Claim after the Entitlement Record Time for the purposes of determining the Entitlement of each Scheme Creditor (and/or their Designated Recipient, as applicable) under the Scheme. The Scheme Administrators may, in their sole discretion and subject to the production of such evidence as they may reasonably require and to any other terms and conditions which the Scheme Administrators may consider necessary or desirable, agree to recognise such assignment or transfer for the purposes of determining Entitlements to Scheme Consideration under the Scheme.

(b)    Any assignee or transferee of a Scheme Creditor so recognised by the Scheme Administrators shall be bound by the terms of the Scheme in the event that they become effective as if it were a Scheme Creditor and shall produce such evidence as the Scheme Administrators may reasonably require to confirm that it has agreed to be bound by the terms of the Scheme. None of the SJ Notes Trustee, the SJ Notes Paying and Transfer Agent and Registrar or the Lake Notes Trustee and Agent (as applicable) will be responsible for confirming SJ Notes Scheme Creditors or Lake Noteholders as at the Voting Record Time or the Entitlement Records Time or for monitoring, acknowledging or processing any assignments that occur after the Entitlement Record Time.

(c)    Other Debt Scheme Creditors are not prevented by the Scheme from selling, assigning or transferring any Excluded Liability or Excluded Collateral after the Restructuring Effective Date. Where the Other Debts are sold, assigned or transferred by an Other Debt Scheme Creditor, after the Restructuring Effective Date, the Other Debt Scheme Creditors as at the Entitlement Record Time shall remain entitled to receive the Scheme Consideration pursuant to the terms of this Scheme (rather than the assignee, purchaser or transferee of the relevant Other Debts). Notwithstanding the foregoing, any sold, assigned or transferred Excluded Liability or Excluded Collateral shall be disclosed to the Scheme Administrators and/or the Scheme Adjudicator (as applicable) in accordance with the terms of the Scheme, and shall be taken into account for the purpose of calculating the Assessed Value when determining the relevant Other Debt Scheme Creditor's Entitlement. Notwithstanding the foregoing, any sold, assigned or transferred Excluded Liability or Excluded Collateral shall be disclosed to the Scheme Administrators and/or the Scheme Adjudicator (as applicable) in accordance with the terms of the Scheme, and shall be taken into account for the purpose of calculating the Assessed Value when determining the relevant Other Debt Scheme Creditor's Entitlement.

6.6    **Third parties**

(a)    By no later than the Scheme Sanction Hearing, each of the Deed of Undertaking Parties, which may include (where possible) any relevant Excluded Party Persons who will, if it is legally and practically permissible to do so, provide a release of any and all claims of contribution, subrogation, reimbursement, indemnity, set-off or payment of any kind howsoever arising against the Company in connection with the Other Debts , shall enter into the Deed of Undertaking (in substantially the form to be made available on the Transaction Website) pursuant to which they will:

(i)   undertake to the Scheme Creditors, the Company and the Court to be bound by the terms of the Scheme, in such form as may be sanctioned by the Court as applicable; and

(ii)  agree, upon instructions by the Company or, if applicable, the Information Agent, to execute and do or procure to be executed and done all such documents, acts or things as may be necessary or desirable to be executed or done by them for the purposes of giving effect to the terms of the Scheme that apply to them.

7.    **LETTER FROM THE BOARD TO THE SCHEME CREDITORS**

31 July 2023

Dear Scheme Creditor,

**TIANJI HOLDING LIMITED 天基控股有限公司**

1.    **INTRODUCTION**

The Board writes to you in your capacity as a Person who is, or appears to be, a Scheme Creditor. This letter forms part of this Explanatory Statement for the Scheme proposed by Tianji as part of the Restructuring, the details of which are explained below. Unless otherwise specified, capitalised words or phrases used in this letter have the meanings attributed to them in Schedule 1 (*Definitions and Interpretation*) to this Explanatory Statement.

2.    **THE SCHEME PROPOSED BY THE COMPANY**

As you may be aware, Tianji plans to implement the Restructuring to support an orderly recovery of the TJ Group's operations and maximise returns for all stakeholders of Tianji and the TJ Group. The Restructuring will be implemented by, among other things, the Scheme in Hong Kong at Tianji. This is part of the larger restructuring of the Group.

A scheme of arrangement is an arrangement entered into between a company and its creditors, as provided for under Sections 670, 673 and 674 of the Hong Kong Companies Ordinance. A scheme of arrangement becomes legally binding on all holders of claims subject to the scheme, including both those who voting against the scheme of arrangement and those not voting, if at least a majority in number of the relevant creditors, holding at least seventy-five per cent (75%) in value of claims, present and voting (either in person or by proxy) at the scheme meeting, vote in favour of the scheme of arrangement, the Court then sanctions it and the scheme is delivered to the Hong Kong Companies Registrar with a copy of the Court order sanctioning the scheme.

A scheme of arrangement will be sanctioned by the relevant Court if it is satisfied that, among other things, (i) Sections 670, 673 and 674 of the Hong Kong Companies Ordinance have been complied with; and (ii) the terms of the scheme of arrangement are such that an intelligent and honest creditor, a member of the class concerned and acting in respect of its own interest, might reasonably vote in favour of it.

3.    **THE PURPOSE OF THE EXPLANATORY STATEMENT**

The Explanatory Statement, which is provided pursuant to Section 671 of the Hong Kong Companies Ordinance and is distributed for the purpose of providing Scheme Creditors with all the information reasonably necessary to enable the Scheme Creditors to make an informed decision on whether to approve the Scheme. A short explanation of the reasons for the Restructuring and the proposed Scheme is included below, as part of this letter.

51

4.      **ADVISORS**

Houlihan Lokey, CICC and BOCI are acting as financial advisors, Sidley Austin, Maples and Calder, and Commerce & Finance Law Offices are acting as legal advisors, in relation to the Scheme and the Restructuring. Morrow Sodali Limited is acting as the Information Agent.

5.      **FINANCIAL POSITION OF GROUP, TIANJI AND THE TJ GROUP**

Due to, among other factors, unfavourable market conditions of the PRC real estate industry and capital markets during the second half of 2021 and the adverse impact of the COVID-19 pandemic on macroeconomic conditions and certain credit events in 2022, the Group, along with other Chinese property developers, has experienced significant liquidity pressures due to limited access to external capital to refinance its existing indebtedness and reduced cash generated from contracted sales. Against this backdrop, the Group has been working closing with its stakeholders, onshore as well as offshore creditors to formulate a holistic restructuring. Following extensive and thorough consideration, consultation and negotiation, the board of directors of CEG and Tianji have determined that the Restructuring, is in the best interests of Tianji and those with an economic interest in Tianji, including, in particular, the Scheme Creditors.

Further, Tianji believes that the Restructuring will provide the necessary conditions for Tianji to resume business operations, thereby facilitating the orderly resumption of the TJ Group's business operations.

6.      **OVERVIEW OF THE RESTRUCTURING**

The Restructuring comprises the restructuring of Tianji's existing offshore indebtedness under the Existing Debts. The Restructuring will take place under and pursuant to the Scheme and the Restructuring Documents.

The Restructuring envisages that Scheme Creditors will release their Scheme Claims in return for receiving (or being entitled to receive) Scheme Consideration (comprising the relevant portion of the rights and interests in the New Instruments) in accordance with the terms of the Scheme.

The Restructuring is part of a wider plan to comprehensively restructure the offshore indebtedness of the Group. In addition to the Scheme, the Group is intending to implement further restructurings via:

    i.      a scheme of arrangement in the BVI to be proposed by a direct subsidiary of Tianji, Scenery Journey Limited ("**SJ**") (the "**SJ Scheme**"). The Scheme and the SJ Scheme are inter-conditional as between themselves which means that the effectiveness of this Scheme shall depend on effectiveness of the SJ Scheme, and vice versa; and

    ii.     parallel schemes of arrangement to be proposed by CEG, the ultimate holding company of the Group, in the Cayman Islands and Hong Kong (the "**CEG Schemes**"). The CEG Schemes are not inter-conditional with either this Scheme or the SJ Scheme.

7.      **CREDITOR SUPPORT FOR THE RESTRUCTURING**

On 3 April 2023, the Company and certain Scheme Creditors entered into the RSA under which the parties agreed to cooperate in order to facilitate the implementation of the Restructuring. Details regarding the RSA are set out in Section 24.2 (*Summary of the RSAs*) of this Explanatory Statement. In addition, a copy of the execution version of the RSA is available on the Transaction Website.

Additionally, on 3 April 2023, CEG and SJ also announced the launch of the restructuring support agreements for the CEG Schemes and SJ Scheme.

The entering into of the RSA is typical in financial restructurings such as the Restructuring and helps to secure a critical mass of creditor support to enable the successful implementation of the Restructuring. As at the date of this Explanatory Statement, certain Scheme Creditors holding an aggregate principal amount of approximately US$5.2 billion of Existing Debts (representing approximately 71.66% of the aggregate outstanding principal amount of all Existing Debts) had acceded to the RSA, meaning that the holders of such Existing Debts are obliged to vote their holdings of such Existing Debts in favour of the Scheme, subject to the terms of the RSA.

Under the terms of the RSA, Tianji has agreed to pay the Consent Fee to those Scheme Creditors who are Eligible Participating Creditors who became party to the RSA by the Consent Fee Deadline (strictly in accordance with the terms of the RSA). The Consent Fee is payable by way of payment-in-kind new notes to be issued by Tianji. Full details of the Consent Fee and the conditions to be satisfied in order for Scheme Creditors to be entitled to the payment of the Consent Fee are set out in Section 24.2 (*Summary of the RSAs*) of this Explanatory Statement.

Scheme Creditors who are not already party to the RSA may no longer accede to it in order to receive the Consent Fee because the Consent Fee Deadline has now passed. However, that is without prejudice to the rights of Eligible Participating Creditors (that is, Participating Creditors who hold, at the Voting Record Time, Existing Debts which validly became Eligible Restricted Debts before the Consent Fee Deadline (as applicable) to receive any portion of the Consent Fee remaining unpaid in accordance with the terms of the RSA).

## 8.    WHAT HAPPENS IF THE RESTRUCTURING FAILS?

As explained above, in light of the unfavourable market conditions of the PRC real estate industry and capital markets during the second half of 2021 and the adverse impact of the COVID-19 pandemic on macroeconomic conditions and certain credit events in 2022, the Board believes that should the Scheme not proceed, Tianji will be unable to comply with its obligations under the Existing Debts as well as in connection with the other outstanding indebtedness of the Group. In those circumstances, there is a material risk that certain of the Scheme Creditors as well as onshore and offshore lenders of the Group will pursue Enforcement Actions against Tianji and/or the SJ Notes Subsidiary Guarantors and/or any other subsidiary of Tianji in respect of their outstanding obligations. This is especially the case given the prevailing conditions in the property industry and wider economic environment. In these circumstances, the Board would seek to maximise recoveries for creditors as best as it can, but anticipates that members of the Group would likely be required to make, or cause Tianji to make, an application to the Court, or courts in other relevant jurisdictions, as applicable, to place Tianji and/or certain other members of the Group into liquidation or other appropriate Insolvency Proceedings to facilitate an orderly winding-up and realisation of their assets for the benefit of the creditors of Tianji and/or the relevant members of the Group.

Accordingly, the Board believes that an insolvent liquidation of Tianji and some or all members of the Group is the most likely alternative outcome if the Restructuring fails.

Such an insolvent liquidation is likely to result in lower recoveries to creditors of Tianji (including the Scheme Creditors) than if the Restructuring is approved and implemented. The estimated recoveries for Scheme Creditors in such scenario are described in the Liquidation Analysis prepared by Deloitte (see Schedule 2 (*Liquidation Analysis*) to this Explanatory Statement).

The recovery range outlined in the Liquidation Analysis should be compared with the anticipated recovery rates to Scheme Creditors if the Restructuring is completed successfully as outlined in the Scheme Recovery Analysis (see Schedule 3 (*Scheme Recovery Analysis*) to this Explanatory Statement). In this regard, we note as follows:

A. **Estimated Recovery on an Insolvent Liquidation**: Based on the Company's financial position as at 31 December 2022 and the assumptions set out in the Liquidation Analysis, the estimated total recovery to Scheme Creditors upon an insolvent liquidation of the Company and other members of the Group based on the Liquidation Analysis is as follows:

| Class D Scheme Creditors (non-put option) | Estimated recovery in liquidation from Tianji | Estimated recovery in liquidation from obligors other than Tianji† | Estimated total recovery in liquidation |
|---|---|---|---|
| SJ Existing Notes | 2.31% | 14.40% | 16.71% |
| Lake Notes | 2.31% | 6.60% | 8.91% |
| Hero Loan | 2.31% | 51.37% | 53.68% |
| CEG-Tianji Intercompany Balance | 2.31% | N/A | 2.31% |

† *For the avoidance of doubt, the rights of Class D Scheme Creditors against non-scheme company obligors are not compromised by the Schemes.*

| Class D Scheme Creditors (put option) | Estimated recovery from unreturned securities subject to put option | Claim in liquidation against Tianji (deficiency) | Estimated recovery in liquidation from Tianji* | Estimated recovery in liquidation from obligors other than Tianji† | Estimated total recovery in liquidation |
|---|---|---|---|---|---|
|  | A | B = (100% - A) | C | D | E = A + (B x C) + D |
| Clear Star Put Option | 0.00% | 100.00% | 2.31% | 2.26% | 4.57% |
| Castle Loan Put Option | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Castle Share Put Option | 0.43% | 99.57% | 2.31% | 0.05% | 2.79% |
| Tuen Mun Put Options | 50.76% | 49.24% | 2.31% | 0.00% | 51.90% |

† *For the avoidance of doubt, the rights of Class D Scheme Creditors against non-scheme company obligors are not compromised by the Schemes.*

\* *With respect to the put options, the claim at Tianji is for a deficiency amount, accounting for the value of the securities subject to the put option not being returned.*

B.    **Estimated Recovery following the Restructuring:** Under the Proposed Restructuring, Scheme Creditors will be allocated with instruments including new notes of various tenors. Assuming that the Restructuring Effective Date occurs on 31 December 2022 and the Group would continue to operate as a going concern, the recoveries of Scheme Creditors are calculated as the net present value of the future cashflows associated with the new notes allocated to each respective creditor by applying a discount to the face value of future cashflows. A discount rate of 25.5% was adopted by considering the yields of CEG's USD bonds prior to defaults, adjusting for changes in risk-free market rates and credit spread over the period; and then adding an additional premium which could be demanded by investors in instruments issued by CEG/SJ/Tianji after considering factors including (but not limited to) changes in the PRC real estate industry, the latest published financial information of the Group and the Group (including onshore operations) undergoing a restructuring. Further information on the basis of estimation of scheme recoveries can be found in the sections 'Calculation Methodology' and 'Scheme Recovery Analysis Assumptions' in the Scheme Recovery Analysis.

| Class D Scheme Creditors | Estimated recovery in the Scheme from Tianji (deficiency claim) | Estimated recovery on the deficiency claim in the Scheme from Tianji (against the accrued claim) | Estimated recovery from obligors other than Tianji (third-party rights) | Estimated total recovery in the Restructuring |
|---|---|---|---|---|
| | A | B = (100% - C) x A | C | D = B + C |
| SJ Existing Notes | 3.1% | 1.9% | 39.9[†]% | 41.8% |
| Lake Notes | 3.1% | 2.4% | 23.1[↓]% | 25.5% |
| Clear Star Put Option | 3.1% | 2.5% | 19.6[↓]% | 22.2% |
| Castle Share Put Option | 3.1% | 3.1% | 0.5% | 3.6% |
| Castle Loan Put Option | 3.1% | 3.1% | 0.0% | 3.1% |
| Hero Loan | 3.1% | 1.3% | 59.2[↓]% | 60.4% |
| Tuen Mun Put Options | 3.1% | 1.6% | 50.8% | 52.3% |
| CEG-Tianji Intercompany Balance | 3.1% | 3.1% | N/A | 3.1% |

† *Figure includes recoveries from scheme consideration received pursuant to the SJ Scheme.*
↓ *Figure includes recoveries from scheme consideration received pursuant to the CEG Schemes.*

The actual recoveries from non-scheme company obligors may be greater given any recoveries from such companies could be on a 'going-concern' basis rather than on a discounted 'fire-sale' basis.

The Liquidation Analysis and the Scheme Recovery Analysis were prepared using audited consolidated financial statements of the Group as at 31 December 2022, subject to the limitations as set out in the section 'Limitations' of the Reports. In the event of inconsistency between the estimated recoveries shown in the tables above and the Reports, the estimated recoveries in the Scheme Recovery Analysis shall prevail. All figures shown in the tables above are subject to rounding.

As anticipated, it is estimated that all Scheme Creditors will receive better recoveries upon the successful implementation of the Restructuring than in the alternative of an insolvent liquidation of Tianji and other members of the Group. Accordingly, the Directors believe that the Scheme offers the Scheme Creditors a better estimated recovery in light of the potential economic consequences of insolvency.

## 9.    LISTING REQUIREMENTS – SINGAPORE

It is anticipated that the New Instruments will be listed on the SGX-ST. To the extent that the Company is required to disclose additional information solely for the purposes of the application to list the New Instruments on the SGX-ST, such information will be made available to Scheme Creditors on the Transaction Website.

## 10.    THE DIRECTORS AND THE EFFECTS OF THE SCHEME ON THEIR INTERESTS

The current Board of Tianji consists of one Director. The details of the Director and their interests are listed in Section 8 (*Background to Tianji and the Restructuring*) of this Explanatory Statement.

## 11.    SHAREHOLDERS

Tianji is a wholly owned subsidiary of Hengda Real Estate Group Co. Ltd, which in turn is an indirect majority-owned subsidiary of CEG. CEG is the ultimate holding company of the Group, that carries on business primarily in the PRC through operating subsidiaries in the PRC. Tianji is a holding company of the TJ Group and is a majority owned indirect subsidiary of CEG.

## 12.    RISK FACTORS

Tianji and the Group of which it is a part, like many in the same industry in the current business environment, are faced with significant business risks. Since Tianji is the holding company of the TJ Group (which forms part of the wider Group), its financial condition and operations are necessarily affected by the operations and financial conditions of its subsidiaries on a consolidated basis. In addition to the risks associated with the implementation of the Restructuring, Tianji has identified a number of factors that may affect the Group's operating results, liquidity and financial condition. Tianji believes that the successful implementation of the Restructuring is a key step towards mitigating these risks and will allow the Group to focus on its operations and principal business activities.

Certain principal risk factors that Tianji and the TJ Group (which forms part of the wider Group) will likely face in connection with and following the Restructuring are set out in Section 26 (*Risk Factors*) of this Explanatory Statement. However, those risk factors are not an exhaustive list of all the potential risks and uncertainties which may be involved.

## 13.    DIRECTORS' RECOMMENDATION

In relation to the New Instruments, the Company's first required cash interest payment occurs 3 years from the Reference Date and the first principal repayment occurs 5 years from the Reference Date under the terms of the New Instruments. The Company envisages servicing its debt through multiple sources, including residual cash flows from its projects, if in the next 3 years, TJ can raise an additional RMB1 billion to RMB2 billion in financing, TJ estimates that from 2026 to 2036, the annual unlevered free cash flow will be approximately RMB 4 billion to RMB 6 billion on average. It should be noted that the aforementioned cash flow has not yet taken into account the repayment of existing debt at the project level and repayment of the SJ Restructuring Consideration. There is also uncertainty as to whether TJ can raise new funding. Most of the Group's onshore projects face debt default and litigation risk, which may cause additional cash flow losses to the Company in the future, and may hinder projects' normal development progress. In addition, the TJ New Notes has certain share charges over material non-core offshore assets and certain intercompany receivables, the proceeds of which will be a source of

repayment for the TJ New Notes. As a result, it is the management's opinion that, subject to the uncertainties set out above, the above sources of funds ought to be used to repay its near and longer term liabilities under the TJ New Notes.

The Board has reviewed this Explanatory Statement and the documents referred to in it and approves the form and content of this Explanatory Statement. For the reasons set out in this letter and this Explanatory Statement, the Board also believes that the Scheme and the Restructuring are in the best interests of the Scheme Creditors and the Company and its creditors as a whole. Accordingly, the Board strongly recommend that the Scheme Creditors vote in favour of the Scheme at the Scheme Meeting.

Yours faithfully,

Chen Daiping
Director

for and on behalf of the Board of
Tianji Holding Limited
(天基控股有限公司)

8.    **BACKGROUND TO TIANJI AND THE RESTRUCTURING**

8.1    Tianji

*Background of the Scheme Company*

(a)    Tianji was incorporated in Hong Kong under Part XI of the predecessor Companies Ordinance (Cap. 32 of the Laws of Hong Kong) as a limited liability company (registration number 1339269).

(b)    Tianji is a limited liability company incorporated under the laws of Hong Kong on 19 May 2009 under Part XI of the predecessor Companies Ordinance (Cap. 32 of the Laws of Hong Kong) (registration number 1339269). The authorized share capital of Tianji is HK$10,000.00 divided into 10,000 shares of HK$1.00 each.

(c)    As at the date of the Scheme, the authorized share capital of Tianji is HK$10,000.00 divided into 10,000 shares of HK$1.00 each.

(d)    Tianji's principal place of business in Hong Kong is located at 15th Floor, YF Life Centre, 38 Gloucester Road, Wanchai, Hong Kong.

(e)    Tianji is the borrower, put option provider and/or guarantor of the Other Debts. Tianji is also a guarantor of the SJ Notes issued by Scenery Journey Limited, a wholly-owned subsidiary of Tianji. Pursuant to such guarantee, Tianji and the SJ Notes Subsidiary Guarantors have jointly and severally guaranteed to each SJ Notes Scheme Creditor all of the obligations of SJ to pay the principal, premium (if any), and interest under each of the SJ Notes.

(f)    When Tianji guaranteed the Existing Debts, its advisors were based in Hong Kong. Tianji's sole director is located in Hong Kong and its current sole director has signed written board resolutions in HK. Further, Tianji is a Hong Kong tax resident with most of its administrative functions conducted in Hong Kong. The auditor who has prepared Tianji's accounts was based in Hong Kong in conformity with Hong Kong Financial Reporting Standards, and the audit of Tianji's stand-alone accounts has been prepared in Hong Kong. Several of the subsidiaries owned by Tianji hold interests in real property in Hong Kong. Tianji has bank accounts in Hong Kong, which it uses to pay

its creditors (including historical payments to SJ Notes Scheme Creditors) and service providers.

(g)    Further details of the TJ Group, including its business operations, indebtedness and financial condition are set out at Sections 8.2 to 8.10 below whilst additional information can be found on CEG's website at: www.evergrande.com.

### Director of Tianji

8.2    Tianji's Board consists of one Director. As of the date of this Explanatory Statement, Tianji's Board is comprised as follows:

| Name | Position |
|------|----------|
| Chen Daiping | Director |

No recent changes to the Board of directors have taken place.

### Director's interests in the Group and the Restructuring

8.3    As at the date of this Explanatory Statement, the sole Director of Tianji, Chen Daiping, holds no interests or short positions in CEG.

8.4    Further, the sole Director, Chen Daiping, has no direct, indirect or non-beneficial interest in the Shares of CEG, Tianji or in the shares of any of Tianji's subsidiaries. Further, the Director has no material interest (whether as a director, member, creditor or otherwise) in the Scheme, except as disclosed in this Explanatory Statement.

### Director's Confirmations

8.5    The Director has provided confirmation that he:

(a)    is not subject to any unspent convictions relating to indictable offences;

(b)    has not been declared bankrupt or has not been the subject of any voluntary arrangement or like proceeding;

(c)    has not been convicted in relation to a fraudulent offence;

(d)    has not been associated with any bankruptcy, receivership, insolvent liquidation, voluntary agreement or any composition or arrangement with creditors generally or any class of creditors of such company while acting in the capacity of a member of the administrative, management or supervisory body or as senior manager of any company;

(e)    has not been subject to any official public incrimination and/or sanction by statutory or regulatory authorities (including designated professional bodies); and

(f)    has not been disqualified by a court from acting as a member of the administrative, management or supervisory bodies of any company.

### Structure of the Group

8.6    A simplified Group structure chart showing the relationship between certain key members of the Group as at the date of this Explanatory Statement is set out in Schedule 7 (*Group Structure Chart*).

58

*Tianji*

8.7    **Financial Indebtedness and Assets of Tianji**

(a)    As at 31 December 2022, Tianji had total liabilities of RMB19.9 billion on a stand-alone basis;

(b)    The non-current assets of Tianji on a stand-alone basis as at 31 December 2022 amounted to approximately RMB3.3 billion. As of 31 December 2022, key items of the Tianji's non-current assets on a stand-alone basis consist of the following:

    (i)    Investments accounted for using equity method of approximately RMB1.9 billion;

    (ii)    Investments in subsidiaries of approximately RMB1.0 billion;

    (iii)    Amounts due from related parties of approximately RMB0.3 billion; and

    (iv)    Deferred income tax assets of approximately RMB0.5 million.

(c)    The current assets of Tianji on a stand-alone basis as at 31 December 2022 amounted to approximately RMB0.9 billion. As at 31 December 2022, key items of Tianji's current assets on a stand-alone basis consist of the following:

    (i)    Amount due from related parties of approximately RMB0.7 billion;

    (ii)    Amounts due from third parties of approximately RMB0.1 billion; and

    (iii)    Cash and cash equivalents of approximately RMB4.3 million.

8.8    **Business Operation of the TJ Group**

(a)    Most of CEG's projects are held under Hengda Real Estate Group Co. Ltd, being the direct shareholder of the Company, while the Company also indirectly holds equity interests in approximately 30 projects located in Chinese mainland, including approximately 20 projects in which the Company held the majority equity interests .

(b)    In 2022, the TJ Group had contracted sales of approximately RMB4,332 million (or approximately RMB2,756 million after deducting properties transferred to construction companies or suppliers for payment in kind) and contracted sales area of approximately 428 thousand square meters of GFA. During January to 2023, the Group had contracted sales of approximately RMB1,460.7 million (or approximately RMB608.8 million after deducting properties transferred to construction companies or suppliers for payment in kind) and contracted sales area of approximately 231 thousand square meters of GFA.

(c)    The TJ Group's revenue for the year ended 31 December 2021 and 2022 amounted to RMB10.9 billion and RMB6.4 billion, respectively. The TJ Group recorded loss for the year ended 31 December 2021 and 2022 of RMB40.3 billion and RMB13.6 billion, respectively.

8.9    **Financial Indebtedness of the TJ Group**

(a)    As at 31 December 2022, the TJ Group had total liabilities of RMB225.4 billion, including:

(i)      non-current liabilities of RMB10.5 billion; and

(ii)     current liabilities of RMB214.9 billion.

(b)     In relation to the current liabilities, as at 31 December 2022 the TJ Group's borrowings were approximately RMB66.5 billion and trade and other payables was approximately RMB114.9 billion.

(c)     Furthermore, the current liabilities of the TJ Group comprise the principal amount owing under the SJ Notes, representing a book value of US$5,226 million as of 31 December 2022. Interest continues to accrue on the principal amount owing under the SJ Notes in accordance with the terms of the SJ Notes Indentures. The Group has no other material liabilities.

(d)     Tianji's liabilities in respect of the Existing Debts aggregate US$12,176 million as of 31 December 2022 (calculated based on the USD/HKD exchange rate at 7.8016 as of 31 December 2022).

8.10   **Assets of the TJ Group**

(a)     The non-current assets of the TJ Group on a consolidated basis as at 31 December 2022 amounted to approximately RMB10.9 billion. As of 31 December 2022, key items of the TJ Group's non-current assets consist of the following:

(i)      Property, plant and equipment of approximately RMB1.9 billion;

(ii)     Right-of-use assets of approximately RMB1.1 billion;

(iii)    Investment properties of approximately RMB2.2 billion;

(iv)    Trade and other receivables of approximately RMB0.5 billion;

(v)     Prepayments of approximately RMB8.9 million; and

(vi)    Investments accounted for using equity method of approximately RMB4.1 billion; and

(vii)   Deferred income tax of approximately RMB1.1 billion.

(b)     The current assets of the TJ Group on a consolidated basis as at 31 December 2022 amounted to approximately RMB159.7 billion.

(c)     The majority of the TJ Group's current assets cannot be collected or converted into cash immediately. As of 31 December 2022, these assets were located in the PRC and certain of the assets were pledged to secure certain banking and other facilities granted to the TJ Group and mortgage loans granted to buyers of sold properties. As of 31 December 2022, key items of the TJ Group's current assets consist of the following:

(i)      Properties under development of approximately RMB66.3 billion;

(ii)     Completed properties held for sale of approximately RMB3.5 billion;

(iii)    Trade and other receivables of approximately RMB80.3 billion;

(iv)    Prepayments of approximately RMB5.5 billion;

(v)      Income tax recoverable of approximately RMB3.4 billion;

(vi)     Financial assets at fair value through profit or loss of approximately RMB0.2 billion;

(vii)    Restricted cash of approximately RMB259.0 million; and

(viii)   Cash and cash equivalents of approximately RMB270.2 million.

(d)     Further details regarding the assets of the TJ Group are set out in the Liquidation Analysis at Schedule 2 (*Liquidation Analysis*) to this Explanatory Statement.

(e)     As at 31 December 2022, the consolidated cash balance of the TJ Group was approximately RMB529.2 million, of which approximately RMB259.0 million was restricted cash and approximately RMB270.2 million was unrestricted cash.

### *CEG Group*

**8.11**   **Business Operations of the Group**

(a)     The Group is a conglomerate principally engaged in property development, property investment, property management, new energy vehicle development and production, and cultural tourism business in the PRC.

(b)     The Group's revenue for the year ended 31 December 2021 and 2022 amounted to RMB250.0 billion and RMB230.1 billion, respectively. The Group recorded loss for the year ended 31 December 2021 and 2022 of RMB686.2 billion and RMB125.8 billion, respectively.

(c)     A summary of the Group's three key business segments is set out below:

(i)     **Property development business:** The property development business is the main business line of the Group. In 2021, the Group had contracted sales of approximately RMB443 billion and contracted sales area of approximately 54.3 million square meters of gross floor area. In 2022, the Group had contracted sales of approximately RMB31.7 billion (or approximately RMB19.6 billion after deducting properties transferred to construction companies or suppliers for payment in kind) and contracted sales area of approximately 3.9 million square meters of gross floor area. During January to May 2023, the Group had contracted sales of approximately RMB33.8 billion (or approximately RMB20.1 billion after deducting properties transferred to construction companies or suppliers for payment in kind) and contracted sales area of approximately 4.9 million square meters of gross floor area.

(ii)    **Property management business:** The property management business of the Group is operated through EVPS. EVPS provides property management services primarily to real estate projects developed by the Group's property development business. As at 31 May 2023, approximately 71.5% of properties under management by EVPS are properties developed by the Group. CEG holds approximately 51.7% equity interest in EVPS as at the date of this Explanatory Statement.

As at 31 May 2023, EVPS and its subsidiaries had approximately 2,759 projects under management with total area under management of approximately 506 million square meters, providing property management

61

services to more than 2.3 million property owners. These projects under management covered 22 provinces, 5 autonomous regions, 4 municipalities and Hong Kong. As at 31 May 2023, EVPS and its subsidiaries' total contracted area was approximately 817 million square meters of gross floor area, with a total of approximately 3,152 contracted projects.

Among the total area under management and total contracted area of EVPS and its subsidiaries as at 31 May 2023, approximately 362 million square meters of gross floor area and 623 million square meters of gross floor area, respectively, were developed by the Group. EVPS and its subsidiaries continue to seek engagement for property management contracts in relation to property projects developed by independent third-party property developers. During the five months ended 31 May 2023, EVPS and its subsidiaries obtained 100 projects under management developed by independent third-party property developers with the area under management of approximately 6.1 million square meters of gross floor area, and 122 contracted projects developed by independent third-party property developers with contracted area of approximately 10.9 million square meters of gross floor area.

(iii)    **New energy vehicle business:** NEV conducts industrial park development and health management businesses, as well as the new energy vehicle and battery businesses. CEG holds approximately 58.5% equity interest in NEV as at the date of this Explanatory Statement.

The mass production of Hengchi 5, one of the Hengchi vehicle series, officially started on 16 September 2022 with delivery of the first batch of production vehicles having begun on 29 October 2022. As at 31 May 2023, NEV has and its subsidiaries had delivered over 1,000 units of Hengchi 5.

Currently, NEV and its subsidiaries are still facing shortage of funds. NEV's management has been continuously promoting cost-saving measures, actively expanding financing channel and doing their best to maintain the business operations.

As NEV announced on 24 April 2023, NEV entered into a sale and purchase agreement (the "**NEV Disposal Agreement**") with Anxin Holding Limited ("**Anxin**"), a subsidiary of the Company, and the Company, pursuant to which Anxin conditionally agreed to purchase and NEV conditionally agreed to sell as the beneficial owner (the "**NEV Disposal**"), the entire issued share capital of Assemble Guard Limited (薈保有限公司) ("**Assemble Guard**") and Flaming Ace Limited ("**Flaming Ace**"), subject to the terms and conditions thereunder. Assemble Guard and Flaming Ace were wholly-owned subsidiaries of NEV and collectively held 47 existing health and living projects directly or indirectly at the time of the NEV Disposal Agreement. The NEV Disposal is subject to reporting, announcement, circular and independent shareholders' approval requirements under the Listing Rules, and is also conditioned upon the satisfaction or waiver, if applicable, of certain conditions precedent. After the completion of the NEV Disposal, NEV would become a company purely focusing on research, development and production of new energy vehicle businesses, save that NEV will continue to hold two residential and property development projects in the short term. In view of the significant capital commitment required by technology research and development and manufacturing of, and sales services in respect of new energy vehicles business segment of NEV (the "**NEV Segment**"), and having considered the current resources, NEV is of the view that committing further resources in health and

living projects would not be in line with its overall strategy to de-leverage and may pose limitations to the development of the NEV Segment.

Due to the tight liquidity situation and in order to maintain basic business operations, NEV has taken initiatives to cut costs, such as reducing its workforce headcount. As at 31 May 2023, NEV had a total of 2,169 employees (including 531 employees that have suspended work, of which 233 are in the new energy vehicle segment and 298 are in the battery segment), compared to 3,742 as at 30 June 2022.

8.12    **The Financial indebtedness and assets of the Group**

(a)    As at 31 December 2022, the Group had total liabilities of RMB2,437.4 billion, primarily including:

    (i)    current borrowings of RMB587.1 billion;

    (ii)    non-current borrowings of RMB25.3 billion;

    (iii)    trade and other payables of RMB1,002.3 billion;

    (iv)    contract liabilities of RMB721.0 billion;

    (v)    deferred income tax liabilities of RMB47.9 billion; and

    (vi)    other payable of RMB11.3 billion.

(b)    Furthermore, the current liabilities of the Group comprise the principal amount owing under the Class A Debts under the CEG Scheme, representing a book value of US$14,242 million as at 31 December 2022. Interest continues to accrue on the principal amount owing under the Class A Debts in accordance with the terms of the Class A Debts.

(c)    CEG's liabilities in respect of the Class C Debts under the CEG Scheme are approximately US$13,445 million in principal amount as at 31 December 2022 (calculated based on the FX rate as at 31 December 2022).

(d)    The non-current assets of the Group on a consolidated basis as at 31 December 2022 amounted to approximately RMB173.1 billion. As at 31 December 2022, key items of the Group's non-current assets consist of the following:

    (i)    Property, plant and equipment of approximately RMB56.4 billion;

    (ii)    Right-of-use assets of approximately RMB14.5 billion;

    (iii)    Investment properties of approximately RMB63.1 billion;

    (iv)    Goodwill of approximately RMB1.1 billion;

    (v)    Trade and other receivables of approximately RMB1.3 billion;

    (vi)    Prepayments of approximately RMB0.4 billion;

    (vii)    Investments accounted for using equity method of approximately RMB25.9 billion;

(viii)    Financial assets at fair value through other comprehensive income of approximately RMB1.3 billion;

(ix)    Financial assets at fair value through profit or loss of approximately RMB3.0 billion; and

(x)    Deferred income tax assets of approximately RMB66 million.

(e)    Based on the Company's financial data, the current assets of the Group on a consolidated basis as at 31 December 2022 amounted to approximately RMB1,665.2 billion.

(f)    The majority of the Group's current assets cannot be collected or converted into cash immediately. As at 31 December 2022, these assets were located in the PRC and certain of the assets were pledged to secure certain banking and other facilities granted to the Group and mortgage loans granted to buyers of sold properties. As at 31 December 2022, key items of the Group's current assets consist of the following:

(i)    Inventory of approximately RMB0.5 billion;

(ii)    Properties under development for sale of approximately RMB1,136.1 billion;

(iii)    Completed properties held for sale of approximately RMB102.9 billion;

(iv)    Trade and other receivables of approximately RMB228.9 billion;

(v)    Restricted cash of approximately RMB10.0 billion (or approximately RMB8.1 billion if the restricted cash held by the listed subsidiaries of the Company, EVPS and NEV, and their respective subsidiaries were excluded); and

(vi)    Cash and cash equivalents of approximately RMB4.3 billion (or approximately RMB2.5 billion if the bank balances and cash held by the listed subsidiaries of CEG, EVPS and NEV, and their respective subsidiaries were excluded).

(g)    Further details regarding the assets of the Group are set out in the Liquidation Analysis at Schedule 2 (*Liquidation Analysis*) to this Explanatory Statement.

8.13    **The Group's deteriorating financial condition and mitigating actions taken**

(a)    During the second half of 2021, Chinese property developers and the capital markets that have funded growth and development of the sector experienced an inflection point. Reduced bank lending for real estate development resulted in reduced access by property developers to onshore capital. In addition, reduced bank lending for mortgage finance for buyers, as well as concerns of buyers about the ability of property developers to complete projects, resulted in reduced consumer spending and therefore property sales. Further, adverse reaction to these onshore events by offshore capital markets has limited the Group's funding sources to address upcoming maturities.

(b)    Since the beginning of 2022, the property sector in China has continued to experience volatility. Reduced bank lending for real estate development, coupled with the adverse impact of the COVID-19 pandemic on macroeconomic conditions and certain negative credit events, have intensified market concerns over the operations of Chinese property developers. As a result, the pre-sales of properties by Chinese developers has generally decreased. The Group has also experienced a noticeable decline in its aggregate contracted sales as a result. Even after the COVID-19 pandemic, bank lending for real

64

estate development continues to be weak and the debt crisis faced by the property industry continues to affect many property developers in the PRC. Against the backdrop of these adverse market conditions, the Group has also experienced liquidity pressures due to limited access to external capital to refinance its existing indebtedness and reduced cash generated from contracted sales. As announced by the Company on 30 June 2022, as at the end of May 2023, Hengda Real Estate's unpaid debts due amounted to approximately RMB277.7 billion, and Hengda Real Estate's overdue commercial bills amounted to approximately RMB245.4 billion. Hengda Real Estate is a principal subsidiary of the Company and its indebtedness accounts for a significant share of the Group's total indebtedness. As at 31 May 2023, the principal amount of the matured and unpaid debts of the Group amounted to approximately US$67.3 billion. These amounts remain unpaid as at the date of this Explanatory Statement.

(c)    Since then, the Group has been actively engaging with its customers, suppliers, creditors and shareholders to stabilise its credit lines and day-to-day operations. It implemented further measures by reducing capital expenditure and other expenses such as management remuneration.

(d)    Since December 2021, CEG has introduced several initiatives to reduce operational costs and increase efficiency. These initiatives included streamlining the organisation and consolidating job posts. As at 31 May 2023: (1) job posts at every entity within the Group have been redesignated and restructured; (2) the number of headquarter departments at the Group level has been reduced from 31 to 11; (3) the number of headquarter personnel has been reduced from 2,176 to 617, representing a cumulative reduction of 71.6%; (4) the number of mid-to-senior level employees in the headquarters of the provincial offices has been reduced from 1,706 to 780, representing a cumulative reduction of 54.3%; and (5) the Group's salary expenses have been reduced significantly in an effort to reduce management costs.

(e)    CEG has since prioritised the resumption of construction and production, in order to ensure the delivery of property units.  To facilitate these efforts, CEG has maintained close communication with upstream and downstream business partners as well as relevant creditors, and has received significant support.  As at 31 May 2023, more than 6,800 construction companies and 385 material suppliers  are involved in CEG's efforts at resumption of construction and production.  Further, as of 30 September 2022, the Group's pre-sold and undelivered projects within Chinese mainland had resumed work, with 270,000 constructions workers being involved in such projects at the peak of these efforts.  Since July 2021 and up to May 2023, the Group has completed the delivery of 509,000 units and 58.86 million square meters in gross floor area for 557 projects.  Of these 509,000 units and 58.86 million square meters in gross floor area that have been delivered, 423,000 units and 48.22 million square meters in gross floor area were delivered between January 2022 and May 2023, while 122,000 units and 13.89 million square meters were delivered between January 2023 and May 2023.

(f)    The Group and the Company also promptly commenced discussions with the TJ AHG to explore a consensual resolution for the Lake Notes Events of Default (as defined below).

(g)    From September 2021 (marking the appointment of financial and legal advisers for the restructuring), restructuring negotiations became Tianji's dominant activity. As a holding company, Tianji had few or no operational activities outside of Hong Kong after restructuring activities began. The advisors to Tianji each have Hong Kong offices and are led by Hong Kong-situated personnel. Meetings were held in Hong Kong or virtually with significant participation by Hong Kong parties. The TJ AHG comprises 22 members, seven of which are based in Hong Kong.

65

8.14    **Events of Default**

*Lake Notes*

On 2 December 2021, the Company received a demand to perform its obligations under a guarantee in the amount of approximately US$260 million in relation to the Lake Notes, with which the Company failed to comply. The Company's failure to perform its obligations under this guarantee constituted events of default under the indentures governing the Lake Notes (the "**Lake Notes Events of Default**"). The Company has since ceased to make payments for the principal and interest amounts due under the Lake Notes.

*Other Debts*

There have been payment defaults, cross defaults and/or other events of default in relation to the Other Debts. Further, certain creditors of the Other Debts have sought to enforce their relevant security, including by appointing receivers and/or enforcing share charges, as provided for under the relevant transaction documents. The Company and other obligors under the Other Debts have not made full repayment of all outstanding principal, interest and other amounts due under such Other Debts.

***Additional information on the Company and related to the Scheme***

**Listing of the SJ Notes on the SGX-ST**

8.15    All SJ Notes are listed on the SGX-ST.

8.16    Following the Restructuring Effective Date and the cancellation of the SJ Notes, the SGX-ST will de-list the SJ Notes. SJ will inform the issuer services team at the SGX-ST of the cancellation and ask it to confirm that the de-listing has taken place.

**Material Contracts**

8.17    There are no contracts, other than contracts entered into in the ordinary course of business, to which the Company is party, for the two years immediately preceding the date of this Explanatory Statement, which contain any provisions under which the Company has any obligation or entitlement material to it as at the date hereof.

8.18    Additionally, as at the date of this Explanatory Statement, a number of material contracts have been entered into in furtherance of the Restructuring, including without limitation the RSA as described at Section 24.2 of this Explanatory Statement. The occurrence of the Restructuring Effective Date is an automatic termination event under the RSA.

**Costs of the Restructuring**

8.19    Pursuant to Clause 26 (*Costs and Indemnity*) of the Scheme, Tianji has agreed to meet certain costs, charges, expenses and disbursements reasonably incurred by the Advisors, Deloitte, the Information Agent, the SJ Notes Trustee, the SJ Notes Depositary, the SJ Notes Paying and Transfer Agent and Registrar, the New Instruments Trustee, the New Instruments Depositary, the New Instruments Collateral Agent and all other professional advisor fees including, but not limited to, the TJ AHG Legal Fees and the AHG Financial Advisor Fees, in connection with any and/or all actions taken pursuant to the negotiation, preparation and implementation of the Scheme, in each case as respectively agreed with CEG in separate arrangements.

**Proceedings**

66

8.20    In September 2022, Mr. Wang Yun and Mr. Law Chup Shing Daniel commenced litigation proceedings against Shengyu (BVI) Limited and Chengdu Xinyi Real Estate Development Co. Ltd. (indirect subsidiaries of Tianji) before the Hong Kong Court (HCA 1151 / 2022). The plaintiffs claim for, among other things, alleged unpaid sums of RMB65,000,000 under an agreement for the sale and purchase of shares in a Hong Kong company, which in turn indirectly holds a real estate project in the PRC. The defendants' case is (among other things) that the alleged unpaid sums were withheld for PRC tax withholding purposes. The litigation proceedings are ongoing as at the date of this Explanatory Statement.

8.21    A number of onshore creditors have taken legal action against the Group, involving disputes mainly related to financial loans and other borrowings, construction and other service contracts, share transfer and other cooperation transactions. As at 6 July 2023, the number of pending court cases of the Group involving amounts over RMB100 million exceeds 680, involving a total of approximately RMB240.8 billion, and the number of pending arbitration cases is 37, involving a total of approximately RMB55.5 billion. In particular, as announced by CEG on 30 June 2023, Hengda Real Estate had a total of 1,601 pending litigation cases which involved more than RMB30 million each, and the total amount involved was approximately RMB382.94 billion as at the end of May 2023.

8.22    To the best of the Director's knowledge and belief, as at the date of this Explanatory Statement and except for the proceedings that have been announced by Tianji, the Director is of the view that, as at the date of this Explanatory Statement, there is no litigation, arbitration or administrative proceeding pending or threatened against Tianji which, on a standalone basis, would have a material adverse effect on the business, financial condition or results or operations of the TJ Group and/or implementation of the Restructuring, taken as a whole.

9.    **EFFECT OF THE SCHEME**

9.1    The principal object and purpose of the Scheme is to effect a compromise and arrangement between the Company and the Scheme Creditors so as to implement a financial restructuring of the Liabilities of the Company under and/or in respect of the Existing Debts and the SJ Notes Documents, as well as considerably improve and stabilise the financial health of the Group.

A.    **Release of Claims**

9.2    Broadly, subject to the terms of the Scheme, the effect of the Scheme will be to release, excluding the Excluded Liabilities and the Excluded Collateral, the Released Claims, specifically:

(a)    the Scheme Claims;

(b)    the Released Persons from any Ancillary Claims; and

(c)    the Released Persons from any Restructuring Claims,

of Scheme Creditors in return for which Scheme Creditors will be entitled to receive distributions of Scheme Consideration in accordance with the terms of the Scheme and Restructuring Documents.

This is described more fully in Section 17.6 below.

B.    **Form of Scheme Consideration**

9.3    The Scheme Consideration will constitute New Instruments in the form of the TJ New Notes, i.e. four tranches of new notes to be issued by the Company, in an aggregate principal amount

equal to US$ 800,000,000. The Scheme Consideration is to be shared on a pro rata basis based on the Scheme Creditor's Entitlement.

9.4  A summary of the terms of the New Instruments available to be distributed to Scheme Creditors can be found at Schedule 9 (*Summary of Terms of the New Instruments*) of this Explanatory Statement.

9.5  Each Scheme Creditor and/or Designated Recipient (if applicable), and/or the Holding Period Trustee on behalf of certain Scheme Creditors (if applicable), shall be entitled to be issued a pro rata portion of the New Instruments and/or Residual New Instruments (as applicable) (pro-rated across each of the four tranches of the New Instruments) with the relevant Scheme Creditor's Entitlement calculated in accordance with Part D and Part E of the Scheme.

9.6  New Instruments and Consent Fee to which Blocked Scheme Creditors may be entitled shall be issued to and held by the Holding Period Trustee and/or the Successor Escrow Agent on behalf of such Blocked Scheme Creditors in accordance with the terms of this Scheme, the RSA and Applicable Sanctions.

### C.    Effect on the SJ Notes Scheme Creditors

*Entitlement to receive Scheme Consideration*

9.7  If you are an SJ Notes Scheme Creditor (who is not a Sanctions-Affected Scheme Creditor) and you wish to receive the Scheme Consideration on the Restructuring Effective Date, in accordance with the terms of the Scheme, please ensure that the required documents set out in Section 5 (*Summary of Actions to be taken by Scheme Creditors*) above are validly completed, executed and returned online via the Portal in accordance with the instructions set forth therein so that they are submitted to and received by the Information Agent by the SJ RED Distribution Deadline.

9.8  If you are not an Eligible Person (i.e. a person who cannot make affirmative securities law confirmations set out in the Distribution Confirmation Deed) and not a Blocked Scheme Creditor, you may designate a Designated Recipient who is an Eligible Person in order to receive your New Instruments by submission of a Designated Recipient Form in accordance with the terms of the Scheme and the instructions set forth contained therein.

9.9  The Scheme Consideration (except for the Blocked Assets) will be distributed through Euroclear and Clearstream. If details of a Euroclear or Clearstream account are not provided before the Final Distribution Date, the Scheme Creditor, on whose behalf the Account Holder Letter is being submitted, will not be entitled to receive any share of the Scheme Consideration.

*Calculation of SJ Notes Scheme Creditor's Entitlement*

9.10  SJ Notes Scheme Creditors who are not Sanctioned Scheme Creditors will be entitled to receive (or have the Holding Period Trustee or the Successor Escrow Agent receive on its behalf, if applicable) a pro rata share of the Scheme Consideration, in respect of the value of its "**Entitlement**" relative to the Entitlement of all Scheme Creditors who validly claim Scheme Consideration.

9.11  Each SJ Notes Scheme Creditor's Entitlement to the Scheme Consideration shall be calculated on a "**Deficiency Basis**" in accordance with the following formula:

"**SJ Notes Scheme Creditor's Entitlement**"    $=$    $A - B$

where:

**A** = the value of the SJ Notes Scheme Creditor's Scheme Claims calculated on a Full Accrued Claim Basis by reference to the records of the SJ Notes Trustee subject to reconciliation of the Custody Instruction submitted by or on behalf of such SJ Notes Scheme Creditor with the records of the Clearing Systems.

**B** = the NPV of the SJ New Notes received by such SJ Notes Scheme Creditor under the SJ Scheme as determined by the Scheme Administrators (the "**NPV Amount**"). The Scheme Administrators will: (i) in consultation with the Company and/or the Information Agent in the Scheme Administrators' sole discretion, calculate the amount of SJ New Notes received by such SJ Notes Scheme Creditors based on the information provided by the SJ Scheme Administrators; and (ii) determine the NPV on the Scheme Effective Date, taking into account, among other factors:

1.  market bond yields for issuers that has a comparable profile in terms of location(s) of risk, leverage, scale and industry, as per implied by the average closing bond price prior to the date of determination;

2.  coupon rate of new bond issuance with similar credit quality in terms of location(s) of risk, leverage, scale and industry, as per implied by the average closing bond price prior to the date of determination;

3.  projected cashflow to be generated by the obligors under the SJ New Notes in consultation with the Group's management; and

4.  assessed value and/or the projected cash flow for the underlying assets to support repayment of the SJ New Notes to the extent provided in consultation with the Group's management.

### *Reasons for adopting the Deficiency Basis approach*

9.12   In summary, the Deficiency Basis takes account of the value of the scheme consideration issued to the SJ Notes Scheme Creditors in the SJ Scheme in determining the SJ Notes Scheme Creditors' Entitlement. This reflects the fact that the SJ Scheme will release the SJ Notes Scheme Creditors' other rights (namely, principal, subsidiary guarantees, and keepwell) in relation to the SJ Notes against SJ, while this Scheme will release the guarantee rights against Tianji in respect of the guarantee provided by Tianji in connection with the SJ Notes.

9.13   In order to assess the value of the Deficiency Claim of SJ Notes Scheme Creditors under the Scheme, the NPV Amount will be determined by the Scheme Administrators, in his or her sole discretion, after the sanction of the Scheme in consideration of the guiding principles as set out in Section 9.11 of this Explanatory Statement.

### D.    Effect on the Other Debt Scheme Creditors

### *Entitlement to receive Scheme Consideration*

9.14   If you are an Other Debt Scheme Creditor (who is not a Sanctions-Affected Scheme Creditor) and you wish to receive the Scheme Consideration on the Final Distribution Date, in accordance with the terms of the Scheme, please ensure that the required documents set out in Section 5 (*Summary of Actions to be taken by Scheme Creditors*) above are validly completed, executed and returned online via the Portal in accordance with the instructions set forth therein so that they are submitted to and received by the Information Agent by the Bar Date.

9.15    If you are not an Eligible Person (i.e. a person who cannot make affirmative securities law confirmations set out in the Distribution Confirmation Deed) and not a Blocked Scheme Creditor, you may designate a Designated Recipient who is an Eligible Person in order to receive your New Instruments by submission of a Designated Recipient Form in accordance with the terms of the Scheme and the instructions set forth contained therein.

9.16    The Scheme Consideration (except for the Blocked New Instruments) will be distributed through Euroclear and Clearstream. All Scheme Creditors (and Designated Recipients, if applicable) will need to hold an account (directly or indirectly through the intermediary chain) with an account holder or custodian which itself holds an account with Euroclear or Clearstream in order to receive Scheme Consideration and the Consent Fee (if applicable). To the extent that you do not already have such an account, all Other Debt Scheme Creditors who are not Lake Noteholders, and Designated Recipients (if applicable) are advised to open an account (directly or indirectly through the intermediary chain) with an account holder or custodian which itself holds an account with Euroclear or Clearstream (including many custodian banks and certain other financial institutions) and provide the Information Agent with the required details of such account (as required in the relevant Scheme Creditor Forms) as soon as possible, and in any event, by the relevant Bar Date. If you do not have such an account and are unable to open such an account and are not a Sanctions-Affected Scheme Creditor, please contact the Information Agent immediately. If details of a Euroclear or Clearstream account are not provided before the Final Distribution Date, the Scheme Creditor will not be entitled to receive any Scheme Consideration.

### *Calculation of Other Debt Scheme Creditor's Entitlement*

9.17    Other Debt Scheme Creditors who are not Sanctioned Scheme Creditors will be entitled to receive (or have the Holding Period Trustee or the Successor Escrow Agent receive on its behalf, if applicable) a pro rata share of the Scheme Consideration in respect of the value of its "**Entitlement**" relative to the Entitlement of all Scheme Creditors who validly claim Scheme Consideration.

9.18    If an Other Debt Scheme Creditor is not a Sanctioned Scheme Creditor as at the Voting Record Time, and becomes a Sanctioned Scheme Creditor after that date and prior to receiving Scheme Consideration in respect of all of its Entitlement, that Other Debt Scheme Creditor shall cease to hold any interest (beneficial or otherwise) with respect to any Scheme Consideration. Any Scheme Consideration which has not yet been distributed to it to which it would otherwise be entitled to (but for Applicable Sanctions) shall be null and void and extinguished and the Company shall not be liable to pay any Scheme Consideration to such Other Debt Scheme Creditor.

9.19    Each Other Debt Scheme Creditor's Entitlement to the Scheme Consideration shall be calculated on a "**Deficiency Basis**" in accordance with the following formula:

"**Other Debt Scheme Creditor's Entitlement**"        $=$        $A - B - C$

where:

> **A** = the value of the Other Debt Scheme Creditors' Scheme Claims, as at the Entitlement Record Time, calculated on a Full Accrued Claim Basis.

> **B** = the Assessed Value of any Excluded Liabilities and Excluded Collateral, as determined in accordance with the Valuation and Adjudication Procedure described in Part E of the Scheme.

**C** = in respect of a put option and/or repurchase obligation, the Assessed Value of any securities retained by the put option holder and/or the creditor of the repurchase obligation to which the put option and/or the repurchase obligation relates, as determined in accordance with the Valuation and Adjudication Procedure described in Part E of the Scheme.

### *Reasons for adopting the Deficiency Basis approach*

9.20    In summary, the Deficiency Basis takes account of the value of Other Debt Scheme Creditors' claims against any Excluded Liabilities Party Person (i.e. any party other than the Company) in respect of the relevant Existing Debts when determining Other Debt Scheme Creditors' Entitlements to Scheme Consideration. This reflects the fact that the Scheme will release the Claims of Other Debt Scheme Creditors against the Company, but will not release any Other Debt Scheme Creditor's claims against the Excluded Liabilities Party Person.

9.21    The Deficiency Basis has been adopted as a matter of fairness and practicality. The rights that the Scheme Creditors have against third party obligors under the Existing Debts, namely the Excluded Liabilities, will not be released pursuant to the Scheme. Scheme Creditors will not be restricted by the terms of the Scheme from recovering their claims (or the balance thereof) from such third parties. To reflect this, the Deficiency Basis operates so that Other Debt Scheme Creditors will not receive Scheme Consideration in respect of the value of the claims which can be recovered from those third parties.

9.22    The Other Debt Scheme Creditors hold different rights against third parties (i.e. other group companies) in respect of the Other Debts, being the Excluded Liabilities. The Other Debts comprise of (i) selected private debts where Tianji is a guarantor; (ii) selected private debts where Tianji has provided a put option to a creditor, the creditor being able to "put" the shares or securities to Tianji; and (iii) an intercompany loan owed by Tianji to CEG. Moreover, the Other Debt Scheme Creditors hold different rights against third parties (i.e. other group companies) in respect of their relevant Other Debts. The Deficiency Basis has been adopted as a practical measure so as to prevent differences in Other Debt Scheme Creditors' rights against third parties from requiring an unmanageable number of classes, thereby rendering the Scheme unworkable.

9.23    In addition to practicality, the Deficiency Basis has also been adopted because such an approach gives rise to substantive fairness. Specifically, the rights that the Other Debt Scheme Creditors have against third parties, namely the Excluded Liabilities, will deliberately not be released pursuant to the Scheme. Instead, under the Deficiency Basis, no Scheme Consideration shall be payable in respect of the Excluded Liabilities and each Scheme Creditor shall be entitled to receive the same Scheme Consideration as each other Scheme Creditor in respect of its Scheme Claim. In other words, in accordance with general principles of fairness, this approach ensures that all Scheme Creditors are treated in the same way under the Scheme and makes the Restructuring practically achievable.

9.24    Notwithstanding the foregoing, if any Scheme Creditor's Entitlement calculated based on the relevant formulas set out in Sections 9.11 and 9.19 above by the Scheme Administrators is less than nil, such Scheme Creditor's Entitlement shall be deemed to be nil. For avoidance of doubt, such Scheme Creditor will be entitled to receive the Consent Fee on the Restructuring Effective Date in accordance with the terms of the RSA and terms of the Scheme.

### E.    <u>Valuation and Adjudication Procedure</u>

9.25    As noted above, the Deficiency Basis has been adopted in order to take into account the value of (i) the NPV Amount of the SJ New Notes that the SJ Notes Scheme Creditor received under the SJ Scheme, and (ii) Other Debt Scheme Creditors' claims against any third party (i.e. any

party other than Tianji) in respect of the relevant Other Debts, *inter alia*, the Assessed Value determined by the Scheme Administrators or the Scheme Adjudicator (as applicable). In order to assess the value of each Other Debt Scheme Creditor's Entitlement, the Scheme contains a Valuation Procedure and an Adjudication Procedure (together, the "**Valuation and Adjudication Procedure**"). That procedure is set out in Parts D and E of the Scheme (and is summarised below).

9.26    Pursuant to Clause 8 (*Entitlement Record Time and Scheme Claims*) of the Scheme, all Scheme Creditor's Entitlement will be valued as at the Entitlement Record Time.

**Valuation Procedure for the Other Debts Scheme Creditors**

9.27    The Scheme Administrators, each as an independent third party, shall assess each Other Debt Scheme Creditor's Entitlements by taking into account the value of any Excluded Liabilities, Excluded Collateral and, in the case of a put option / repurchase obligation, the value of any retained securities (such value being the Assessed Value estimated by independent Scheme Administrators, by reference to the formulae set out in Clause 12 (*Calculation of a Scheme Creditor's Entitlement*) of the Scheme (the "**Scheme Administrator Estimate**").

9.28    Further details of the procedure carried out by the Scheme Administrators in determining the Scheme Administrator Estimate can be found in Clause 34 (*Valuation Procedure*) of the Scheme.

9.29    The Scheme Administrators shall issue an Estimation Notice to each Scheme Creditor who has submitted its Scheme Claim notifying them of their Scheme Administrator Estimate, and enclosing a blank Scheme Administration Estimate Acceptance or Rejection Form and any materials which the Scheme Administrators in their sole discretion consider necessary to allow that Other Debt Scheme Creditor to consider and evaluate the Scheme Administrator Estimate.

9.30    The Estimation Notice will be issued within either: (i) for Scheme Claims submitted before the Restructuring Effective Date, within thirty (30) calendar days after the Restructuring Effective Date; or (ii) for Scheme Claims submitted on or after the Restructuring Effective Date and on or before the Bar Date, thirty (30) calendar days after the Distribution Confirmation Deed was received by the Scheme Administrators.

9.31    Each Other Debt Scheme Creditor shall have thirty (30) calendar days from the date of the Estimation Notice to either accept or reject the Scheme Administrator Estimate by way of submitting to the Scheme Administrators a completed Scheme Administrator Estimate Acceptance or Rejection Form. The Scheme Administrator Estimate Acceptance or Rejection Form must provide, with reasonably sufficient information, an explanation on reasons for rejecting the Scheme Administrator Estimate and submit all credible evidence to support the Other Debt Scheme Creditor's position If the Scheme Administrator Estimate Acceptance or Rejection Form, in the sole opinion of the Scheme Administrators, failed to enclose reasonably sufficient information and credible evidence, the Scheme Administrators will notify the Other Debt Scheme Creditor as soon as reasonably practicable specifying the deficiencies in the information and evidence provided by the Other Debt Scheme Creditor and the additional information and evidence required.

9.32    If an Other Debt Scheme Creditor accepts the Scheme Administrator Estimate within the time specified, the amount of the Scheme Administrator Estimate will be the final and binding value of that Other Debt Scheme Creditor's Entitlement. If an Other Debt Scheme Creditor fails to submit either a Scheme Administrator Estimate Acceptance or Rejection Form within the thirty (30) days' timeframe described above, that Other Debt Scheme Creditor will be deemed to

have accepted the Scheme Administrator Estimate and therefore the amount of the Scheme Administrator Estimate will be that Other Debt Scheme Creditor's Entitlement.

9.33    Upon the acceptance of the Scheme Administrator Estimate (or failure to submit a Scheme Administrator Estimate Acceptance or Rejection Form) within the specified time period under the Scheme, the Scheme Administrators will then send the relevant Other Debt Scheme Creditor a Deed of Agreed Valuation to be executed by such Other Debt Scheme Creditor as a condition precedent to receiving Scheme Consideration.

9.34    If an Other Debt Scheme Creditor rejects the Scheme Administrator Estimate within the time period under the Scheme, such Other Debt Scheme Creditor and the Scheme Administrators shall seek to agree the value of the Other Debt Scheme Creditor's Entitlement by agreement during the Consultation Period, pursuant to the terms of the Scheme.

9.35    Further details as to the process and obligations performed as part of the Valuation Procedure of the Scheme Administrators, the Company and the relevant Other Debt Scheme Creditors, can be found in Clause 34 (*Valuation Procedure*) of the Scheme.

**Adjudication Procedure for the Other Debt Scheme Creditors**

9.36    If, following the Consultation Period, the Scheme Administrator Estimate is not agreed or remains disputed, the relevant Scheme Claim will be referred to the Adjudication Procedure (such a claim being a "**Referred Scheme Claim**"). The Scheme Administrators are required promptly to refer any such Referred Scheme Claim and the relevant Estimation Notice (together with all supporting documents provided to or by the Scheme Creditor, and other relevant valuation evidence exchanged by the Scheme Administrators and the Other Debt Scheme Creditor during the Consultation Period), to a Scheme Adjudicator for review.

9.37    The Scheme Administrators will assign a Scheme Adjudicator to each Referred Scheme Claim, pursuant to the terms of the Scheme. The Scheme Adjudicator will be selected from a group of appointed individuals comprising independent senior barristers and retired senior judges. The appointed Scheme Adjudicator will then review the Referred Scheme Claim and relevant evidence before him/her and decide whether to:

(a)    make a final and binding adjudication on the Referred Scheme Claim; or

(b)    request further evidence from the Other Debt Scheme Creditor and/or the Scheme Administrators.

9.38    Pursuant to the Scheme, the Scheme Adjudicator shall have discretion to extend the appointed timeframes and/or adopt procedures (including, without limitation, requesting written submissions and further evidence from the parties, requesting oral hearings and/or the provision of expert evidence) as he or she considers appropriate for the purposes of providing a fair, efficient and expeditious means for the final resolution of the Referred Scheme Claim.

9.39    Once a Scheme Adjudicator has determined the value of a Referred Scheme Claim, that determination will be final and binding (absent any fraud / wilful misconduct) and the relevant Other Debt Scheme Creditor will be sent a Deed of Agreed Valuation recording its Entitlement. Each Scheme Creditor will need to execute the Deed of Agreed Valuation as a condition of receiving Scheme Consideration.

9.40    The costs of the Adjudication Procedure (including the costs of the Scheme Adjudicator and any legal and other expenses incurred by the Company and the relevant Other Debt Scheme Creditor) are matters within the discretion of the Scheme Adjudicator. In exercising his/ her discretion as to costs the Scheme Adjudicator shall:

(a)    as a starting point, be guided by the principle that costs follow the event; and

(b)    have regard to the principles applied by the Court in respect of costs orders from time to time.

9.41    Payment to the Company in full of any such costs ordered against the Other Debt Scheme Creditor is a condition precedent to that Other Debt Scheme Creditor's Entitlement to and receipt of its allotted Scheme Consideration.

9.42    Further details as to the process and obligations performed as part of the Adjudication Procedure of the Scheme Adjudicators, the Scheme Administrators, the Company and the Other Debt Scheme Creditors, can be found in Clause 36 (*Adjudication Procedure*) of the Scheme.

**E.    Effect on the Blocked Scheme Creditors**

9.43    Blocked Scheme Creditors are <u>not</u> a separate class of Scheme Creditors and their rights against Tianji are not treated any differently to Scheme Creditors who are not Blocked Scheme Creditors. However whilst Applicable Sanctions remain in place, an affected Blocked Scheme Creditors will not be entitled, able or permitted to (i) submit Account Holder Letters or have a Custody Instruction submitted on its behalf (if applicable) through the Clearing Systems or to the Information Agent, or (ii) receive the Scheme Consideration on the Restructuring Effective Date or the Final Distribution Date, as further described below.

9.44    As a result, Blocked Scheme Creditors must submit (or procure the submission of, as applicable) a Blocked Scheme Creditor Form, together with supporting evidence and other materials as required, to GLAS in order to vote on the Scheme.

9.45    Blocked Scheme Creditors must ensure that validly completed and executed Blocked Scheme Creditor Forms, together with supporting evidence, is received by the Company in accordance with Section 5 (*Summary of Actions to be taken by Scheme Creditors*).

9.46    A Blocked Scheme Creditor that submits a Blocked Scheme Creditor Form must provide sufficient supporting evidence to allow GLAS to reliably establish that Blocked Scheme Creditor's identity, status as a Scheme Creditor and the value of its relevant holding. GLAS will review each Blocked Scheme Creditor Form and the accompanying evidence submitted by the Voting Record Time to assess whether the Blocked Scheme Creditor Form has been completed correctly and whether there is sufficient evidence to reliably establish the Blocked Scheme Creditor's identity, status as a Scheme Creditor and the value of its holding.[14]

9.47    For the avoidance of doubt, SJ Notes Scheme Creditors who are Blocked Scheme Creditors will not be able to receive the Scheme Consideration on the Restructuring Effective Date if the Applicable Sanctions remain in place and the Blocked Scheme Creditors remain subject to such Applicable Sanctions. Instead, on the Restructuring Effective Date, any Scheme Consideration and any Consent Fee (if applicable) to which Blocked Scheme Creditors may be entitled will be issued to and held by the Holding Period Trustee on trust under the Holding Period Trust Deed for the benefit of such Blocked Scheme Creditors during the Holding Period.

9.48    If the Applicable Sanctions are still in place upon the expiration of the Holding Period, the Company will appoint the Successor Escrow Agent to hold the Blocked Assets for the Blocked

---

[14] Blocked Scheme Creditors do not need to submit a Custody Instruction because their SJ Notes are already blocked from trading as their accounts were blocked by the Clearing Systems at the time the Applicable Sanctions were put in place. As such, Blocked Scheme Creditors are unable to submit instructions to the Clearing Systems.

Scheme Creditors as described in Section 19 (*Holding Period Trust*) below, and further in accordance with the terms of the Scheme.

9.49    Any Residual Instruments that are transferred to the Holding Period Trust to be held by the Holding Period Trustee (and to the Successor Escrow Account to be held by the Successor Escrow Agent as Blocked Assets, if applicable) for the benefit of the Blocked Scheme Creditors will accrue interest from the Reference Date. Blocked Scheme Creditors will therefore be entitled to interest from the Reference Date (notwithstanding that the New Instruments may be distributed at a later date), ensuring that such Blocked Scheme Creditors are no worse off as compared with Scheme Creditors who are not Blocked Scheme Creditors.

9.50    For further details about the arrangements for the Blocked Scheme Creditors, please read this Explanatory Statement carefully as a whole, in particular Section 6 (*Explanation of the Scheme*) and Section 5 (*Summary of Actions to be taken by Scheme Creditors*) of this Explanatory Statement.

10.    **DISTRIBUTION OF SCHEME CONSIDERATION**

**Overview on distribution of Scheme Consideration**

10.1    Each Scheme Creditor, regardless of whether an SJ Notes Scheme Creditors or an Other Debt Scheme Creditor, is given the same form of Scheme Consideration. The Scheme Consideration represents a fixed amount of new notes to be shared pro-rata based on the Scheme Creditors' Entitlement relative to the Entitlement of all Scheme Creditors who validly claim Scheme Consideration.

10.2    The Other Debt Scheme Creditors' Entitlements, which are determined on a Deficiency Basis, will be determined through the Valuation and Adjudication Procedure. The Valuation and Adjudication Procedure is anticipated to be concluded approximately 9.5 months after the Restructuring Effective Date. As such, the Other Debt Scheme Creditors will receive their pro-rata share of the Scheme Consideration on the Final Distribution Date (or Interim Distribution Date, if applicable).

10.3    On the other hand, for the SJ Notes Scheme Creditors, while the SJ Notes Scheme Creditors' Entitlements are also determined on a Deficiency Basis, the determination is not subject to the Valuation and Adjudication Procedure. Rather, the SJ Notes Scheme Creditors' Entitlements are determined before the Restructuring Effective Date, by deducing the net present value of the consideration that the SJ Notes Scheme Creditors received under the SJ Scheme. As such, the SJ Notes Scheme Creditors will be distributed:

(a)    an initial amount of their Scheme Consideration on the Restructuring Effective Date, and;

(b)    a "true-up" amount of their Scheme Consideration on the Final Distribution Date (or Interim Distribution Date, if applicable).

10.4    Broadly, such initial amount to be distributed to the SJ Notes Scheme Creditors on the Restructuring Effective Date is determined by reserving a maximum amount of Scheme Consideration that may need to be shared with the Other Debt Scheme Creditors (who will only receive their pro-rata share of the Scheme Consideration), by assuming that (a) Scheme Creditors who have yet to submit their Scheme Creditors Forms before the Restructuring Effective Date will do so before the Bar Date; and (b) the Other Debt Scheme Creditors' Entitlement will be on a Full Accrued Claim Basis, (rather than on a Deficiency Basis).

75

10.5    The "true-up" amount, to be distributed on Final Distribution Date, will reflect the actual amount of the Scheme Consideration that the SJ Notes Scheme Creditors will receive, after (a) the total number of eligible Scheme Creditors are ascertained following the Bar Date; and (b) the Other Debt Scheme Creditors' Entitlements are determined following the conclusion of the Valuation and Adjudication Procedure.

10.6    If you are a SJ Notes Scheme Creditor, please see Section 10.8, below.

10.7    If you are a Other Debt Scheme Creditor, please see Section 10.12, below.

10.8    **Distribution of Scheme Consideration to SJ Notes Scheme Creditors**

*Initial Distribution*

(a)    On the Restructuring Effective Date:

   (i)    the Company shall make the Initial Distribution to SJ Notes Scheme Creditors who are not Sanctions-Affected Scheme Creditors where such SJ Notes Scheme Creditors have submitted the required Scheme Creditor Forms by the SJ RED Distribution Deadline pursuant to Clause 10 (*Deadlines and Bar Dates*) of the Scheme;

   (ii)    the Company shall issue and distribute the Residual New Instruments to and held by the Holding Period Trustee on trust for the benefit of Scheme Creditors (including Blocked Scheme Creditors)), in accordance with the terms of the Holding Period Trust Deed, during the Holding Period subject to and in accordance with Part D (*Scheme Consideration*); and

   (iii)    the Company shall issue the New Instruments in accordance with the terms of the New Instruments Documents in global registered form in the name of the New Instruments Depositary or its nominee.

(b)    The Initial Distribution to be made to the SJ Notes Scheme Creditors shall be calculated by the Scheme Administrators in accordance with the steps and formula set out below:

**Step 1**: calculate the aggregate principal amount of the New Instruments to be issued to a SJ Notes Scheme Creditor on the Restructuring Effective Date in accordance with the formula below:

$$E = \frac{A}{B + C} \times D$$

where:

   A =    the Entitlement of SJ Notes Scheme Creditors who have submitted the required Scheme Creditor Forms by the SJ RED Distribution Deadline to the Information Agent, pursuant to this Scheme..

   B =    the total aggregate Entitlement of all SJ Notes Scheme Creditors including those who have not submitted the required Scheme Creditor Forms by the SJ RED Distribution Deadline..

   C =    Other Debt Scheme Creditors' Scheme Claims, as at the Entitlement Record Time, calculated on a Full Accrued Claim Basis.

76

> **D** = US $800,000,000, being the aggregate principal amount of the New Instruments to be issued to Scheme Creditors as Scheme Consideration.
>
> **E** = the aggregate principal amount of the New Instruments to be issued to such eligible SJ Notes Scheme Creditor on the Restructuring Effective Date.

**Step 2**: calculate the aggregate principal amount of each tranche of the New Instruments to be issued to the relevant SJ Notes Scheme Creditor. For every US$100,000 of the Entitlement converted to the New Instruments, the SJ Notes Scheme Creditor shall receive:

> (c) US$12,500 of the Tranche A Notes;
>
> (d) US$25,000 of the Tranche B Notes;
>
> (e) US$37,500 of the Tranche C Notes; and
>
> (f) US$25,000 of the Tranche D Notes.

***Final Distribution to SJ Notes Scheme Creditors***

10.9 The amount of the Scheme Consideration that an SJ Notes Scheme Creditor will receive on Final Distribution Date will depend on whether the SJ Notes Scheme Creditors submit the relevant Scheme Creditors Forms before the SJ RED Distribution Deadline, namely, if an SJ Notes Scheme Creditor has submitted the relevant Scheme Creditor Forms before the SJ RED Distribution Deadline and thus has received an Initial Distribution on the Restructuring Effective Date, such amount of the Initial Distribution that the Scheme Creditor has received will be deducted from the actual pro-rata amount of Scheme Consideration that such Scheme Creditor is entitled to receive.

10.10 The Final Distribution for SJ Notes Scheme Creditors, ***who validly submitted their forms before the SJ RED Distribution Deadline***, shall be calculated by the Scheme Administrators in accordance with the steps and the formula set out below:

**Step 1**: calculate the aggregate principal amount of the New Instruments to be distributed to a SJ Notes Scheme Creditor on the Final Distribution Date in accordance with the formula below:

$$F = \left(\frac{A}{B + C} \times D\right) - E$$

where:

> **A** = the SJ Notes Scheme Creditors' Entitlement.
>
> **B** = the total aggregate Entitlement of SJ Notes Scheme Creditors who validly submitted the required Scheme Creditor Forms before the Bar Date pursuant to the Scheme.
>
> **C** = the total aggregate Entitlement of Other Debt Scheme Creditors who validly submitted the required Scheme Creditor Forms before the Bar Date pursuant to the Scheme.
>
> **D** = US$ 800,000,000, being the aggregate principal amount of the New Instruments to be issued to Scheme Creditors as Scheme Consideration.

77

       **E** =      the Initial Distribution made to such eligible SJ Notes Scheme Creditors on the Restructuring Effective Date.

       **F** =      the aggregate principal amount of the New Instruments to be distributed to such SJ Notes Scheme Creditor on the Final Distribution Date.

**Step 2**: calculate the aggregate principal amount of each tranche of the New Instruments to be issued to such SJ Notes Scheme Creditor. For each US$100,000 of the Entitlement to the New Instruments, a SJ Notes Scheme Creditor shall receive:

(a)  US$12,500 of the Tranche A Notes;

(b)  US$25,000 of the Tranche B Notes;

(c)  US$37,500 of the Tranche C Notes; and

(d)  US$25,000 of the Tranche D Notes.

10.11    The Final Distribution for SJ Notes Scheme Creditors, ***who validly submitted their forms after the SJ RED Distribution Deadline but before the Bar Date***, shall be calculated by the Scheme Administrators in accordance with the steps and formula set out below:

**Step 1**: calculate the aggregate principal amount of the New Instruments to be distributed to a SJ Notes Scheme Creditor on the Final Distribution Date in accordance with the formula below:

$$E = \left( \frac{A}{B + C} \times D \right)$$

where:

       **A** =      such SJ Notes Scheme Creditor's Entitlement.

       **B** =      the aggregate Entitlement of SJ Notes Scheme Creditors who validly submitted the required Scheme Creditor Forms before the Bar Date pursuant to the Scheme.

       **C** =      the aggregate Entitlement of Other Debt Scheme Creditors who validly submitted the required Scheme Creditor Forms before the Bar Date pursuant to the Scheme.

       **D** =      US $800,000,000, being the aggregate principal amount of the New Instruments to be issued to Scheme Creditors as Scheme Consideration.

       **E** =      the aggregate principal amount of the New Instruments to be distributed to such SJ Notes Scheme Creditor on the Final Distribution Date.

**Step 2**: calculate the aggregate principal amount of each tranche of the New Instruments to be issued to such SJ Notes Scheme Creditor. For each US$100,000 of the Entitlement to the New Instruments, a SJ Notes Scheme Creditor shall receive:

(a)  US$12,500 of the Tranche A Notes;

(b)  US$25,000 of the Tranche B Notes;

(c)  US$37,500 of the Tranche C Notes; and

(d)  US$25,000 of the Tranche D Notes.

10.12  **Distribution of Scheme Consideration to Other Debt Scheme Creditors**

*Final Distribution to Other Debt Scheme Creditors*

(a)  Other Debt Scheme Creditors and Blocked Scheme Creditors will not receive an Initial Distribution of the Scheme Consideration on the Restructuring Effective Date.

(b)  On the Final Distribution Date:

   (i)  the Holding Period Trustee shall make the Final Distribution to Other Debt Scheme Creditors who are not Sanctions-Affected Scheme Creditors where such Scheme Creditors have submitted the required Scheme Creditor Forms by the Bar Date pursuant to Clause 10 (*Deadlines and Bar Dates*) of the Scheme; and

   (ii)  in relation to Blocked Scheme Creditors who have submitted the required Scheme Creditor Forms by the Bar Date pursuant to Clause 10 (*Deadlines and Bar Dates*) of the Scheme:

      (A)  the Holding Period Trustee shall make the Final Distribution to the Blocked Scheme Creditors where the Applicable Sanctions no longer prevent the payment of Scheme Consideration to such creditors; or

      (B)  where the Applicable Sanctions continue to prevent the payment of Scheme Consideration to Blocked Scheme Creditors, the Holding Period Trustee shall make the Final Distribution to which Blocked Scheme Creditors are entitled to the Successor Escrow Agent, to be held in escrow under the terms of the Successor Escrow Agreement.

(c)  The Final Distribution for Other Debt Scheme Creditors shall be calculated by the Scheme Administrators in accordance with the steps and formula set out below:

**Step 1**: calculate the aggregate principal amount of the Residual New Instruments to be distributed to an Other Debt Scheme Creditor on the Final Distribution Date in accordance with the formula below:

$$E = \left( \frac{A}{B \ + \ C} \times D \right)$$

where:

**A** =  such Other Debt Scheme Creditor's Entitlement.

**B** =  the total aggregate Entitlement of Other Debt Scheme Creditors who validly submitted the required Scheme Creditor Forms before the Bar Date pursuant to the Scheme.

**C** =  the total aggregate Entitlement of SJ Notes Scheme Creditors who validly submitted the required Scheme Creditor Forms before the Bar Date pursuant to the Scheme.

**D** =  US $800,000,000, being the aggregate principal amount of the New Instruments to be issued to Scheme Creditors as Scheme Consideration.

79

**E** =    the aggregate principal amount of the Residual New Instruments to be distributed to such Other Debt Scheme Creditor on the Final Distribution Date.

**Step 2**: calculate the aggregate principal amount of each tranche of the New Instruments to be issued to such Other Debt Scheme Creditor. For each US$100,000 of the Entitlement converted to the New Instruments, an Other Debt Scheme Creditor shall receive:

(a)  US$12,500 of the Tranche A Notes;

(b)  US$25,000 of the Tranche B Notes;

(c)  US$37,500 of the Tranche C Notes; and

(d)  US$25,000 of the Tranche D Notes.

**Distribution of Consent Fee**

10.13    Subject to the Notes Minimum Denomination (which is set out at Clause 21.2 of the Scheme), the Company shall pay the Consent Fee, in accordance with the terms of the RSA, to the Eligible Participating Creditors who hold the Eligible Restricted Debts and who voted in favour of the Scheme in accordance with the terms of the RSA and the Scheme.

10.14    For the avoidance of doubt, the notes to be issued as a Consent Fee in accordance with the terms of the RSA are additional notes and form the same series of notes in the form of Tranche A Notes and will not impact the number of New Instruments to be received by Scheme Creditors as Scheme Consideration in accordance with their Entitlement.

**Interim Distribution**

10.15    Where the Final Distribution Date has not taken place within 295 calendar days after the Restructuring Effective Date, there will be an interim distribution of Scheme Consideration. The amount of the interim distribution to be provided shall be determined by reserving a maximum amount of Scheme Consideration for those Other Debt Scheme Creditors whose Entitlements are not fully determined (as if the Entitlement of such Other Debt Scheme Creditors Scheme Creditors were calculated on a Full Accrued Claim Basis).

**Fractional adjustments to Scheme Consideration**

10.16    Notwithstanding any other provision of this Scheme, the aggregate number of New Instruments to which an Eligible Creditor is entitled shall be rounded down to the nearest whole number.

10.17    If the allocation of the New Instruments in accordance with this Scheme would result in any Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee receiving less than US$500 (the "**Notes Minimum Denomination**") of any tranche of any series of the Tranche A Notes, Tranche B Notes, Tranche C Notes and Tranche D Notes, then such Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee would instead receive an allocation in one or more of tranches of any other series of the New Instruments, as determined by the Company (in consultation with the Information Agent and/or the Scheme Administrator in its discretion in good faith and based on information provided and reviewed against the records of the Clearing Systems or the Company's books and records, as applicable, by the Information Agent (including accounting for the weighted average maturity of the Scheme Considerations), to ensure that such Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee holds at least the Notes

Minimum Denomination for at least one tranche of any series of the New Instruments, provided that:

(a)    any fraction of any tranche of the Tranche A Notes, Tranche B Notes, Tranche C Notes and Tranche D Notes that is remaining after the adjustment set out above will be forfeited;

(b)    the interests in the global certificates for the New Instruments to which a Scheme Creditor is entitled under the terms of this Scheme will be credited to the Clearing System account in which that Scheme Creditor held its interests in the SJ Notes at the Entitlement Record Time (through the relevant Account Holder where applicable); and

(c)    the interests in the New Instruments will be recorded in the New Instruments register by the New Instruments Paying and Transfer Agent and Registrar.

10.18    Notwithstanding Section 10.17, the factors to be taken into consideration is subject to change depending on a number of variables, including the number of Eligible Creditors as well as the size of their respective position of the SJ Notes, and the size of each tranche of each series of the New Instruments to be issued. It is possible that the New Instruments payable to each Eligible Creditor may not be allocated to each tranche of each series of the New Instruments, as set out in the terms of this Scheme, on a pro rata basis based on their respective aggregate principal amount on the Restructuring Effective Date.

**Summary of Distribution of Scheme Consideration**

10.19    Unless otherwise agreed with the Company, Scheme Creditors who are the SJ Notes Depositary, the SJ Notes Trustee, the Lake Notes Trustee and Agent or Existing Agents shall not be entitled to receive any Scheme Consideration.

## 11.    JURISDICTION OF THE COURT PURSUANT TO THE RESTRUCTURING

11.1    Tianji is a company incorporated with limited liability under the laws of Hong Kong and the Hong Kong Court has jurisdiction to sanction a scheme in relation to any "company" within the meaning of Sections 670, 673 and 674 of the Hong Kong Companies Ordinance.

11.2    In respect of Sections 670, 673 and 674 of the Hong Kong Companies Ordinance, a "company" refers to a company liable to be wound up under the C(WUMP)O.

11.3    Tianji considers that the Hong Kong Court has jurisdiction to convene the Scheme Meeting and that it has a sufficient connection to Hong Kong for the Hong Kong Court to exercise its discretion to sanction the Scheme for the reasons outlined in Section 8 (*Background to Tianji and the Restructuring*) above.

11.4    In respect of the New York-law governed indebtedness of Tianji, in the event the Scheme is sanctioned, the Recognition Filings will be made by Tianji, which shall include a petition for recognition of the Scheme under Chapter 15 of the US Bankruptcy Code and a request to grant the Chapter 15 Recognition Order to recognise the Scheme as a foreign main proceeding and to give effect to certain aspects of the compromise and arrangement set out in the Scheme. On a Chapter 15 Recognition Order being made by the US Bankruptcy Court in respect of the Scheme, the indebtedness of Tianji which is governed by New York law will be effectively compromised and/or released as a matter of federal and New York law on the terms set out in the Scheme.

11.5    The effect of the Scheme, together with the Recognition Filings, will be the effective compromise and/or release and discharge (as applicable) of all of the Scheme Claims.

12.    **SCHEME CLASS**

12.1    It is the responsibility of Tianji to determine whether more than one meeting of creditors is required and, if so, to ensure that the meeting(s) is/are properly constituted. Each class of creditors must be properly constituted so that any meeting of that class comprises creditors whose rights against Tianji are not so dissimilar as to make it impossible for them to consult together with a view to their common interest. If the rights of Scheme Creditors in a class are so different or would be affected so differently by the Scheme as to make it impossible for them to consult together with a view to their common interest, they must be divided into separate classes and a separate scheme meeting must be held for each class of creditor.

12.2    Tianji has considered the present rights of each of the Scheme Creditors and the way in which those rights will be affected under the Scheme and, having taken into account the previous decisions of the Court, has concluded that the Scheme Creditors constitute a single class for the purposes of the Scheme.

12.3    In reaching the decision of a single class to be constituted, Tianji has considered if the rights of the creditors are so different, or would be affected so differently, under the Scheme as to make it impossible for them to consult together with a view to their common interest, as to require them to be divided into separate classes for the purposes of voting on the Scheme, pursuant further to the factors set out below:

(a)    Whilst the Scheme Creditors hold different rights against third party obligors (i.e. other group companies) in respect of the SJ Notes and Other Debts (as applicable), being the Excluded Liabilities and/or the Excluded Collateral, the Scheme will not release the Excluded Liabilities or the Excluded Collateral. Instead, the Scheme Claims of each of the Scheme Creditors are being admitted on a Deficiency Basis, such that no Scheme Consideration shall be payable in respect of the Excluded Liabilities or the Excluded Collateral and each Scheme Creditor shall be entitled to receive the same Scheme Consideration as each other Scheme Creditor in respect of its unsecured Scheme Claim at TJ.

(b)    All Scheme Claims against the Company are unsecured claims, and would rank pari passu as between themselves in a liquidation of the Tianji. Accordingly, Tianji considers that, because all Scheme Creditors' Scheme Claims are admitted on a Deficiency Basis, the rights of the Scheme Creditors are not so dissimilar as to make it impossible for them to consult together with a view to their common interest.

(c)    Tianji does not consider the:

(i)    difference in timing to distribute Scheme Consideration to be material between the SJ Notes Scheme Creditors (i.e., SJ Notes Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) may receive an Initial Distribution of Scheme Consideration on the Restructuring Effective Date  while Other Debt Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) may only receive Scheme Consideration on the Final Distribution Date (subject to the Valuation and Adjudication Procedure) that there remain more substantial factors to unite than to divide the single class of Scheme Creditors; and

(ii)    differing treatment of the Blocked Scheme Creditors and those Scheme Creditors that are unaffected by Applicable Sanctions makes it impossible for such Scheme Creditors to vote together in the same class. This is because the reason that the Blocked Scheme Creditors are unable to receive their Scheme Consideration on the Restructuring Effective Date or the Final Distribution Date (as applicable) is due to their own personal circumstances rather than their

rights as Scheme Creditors under the Scheme. The Scheme is providing the same consideration to all Scheme Creditors. The fact that the Blocked Scheme Creditors cannot receive that consideration at this point in time is due to the current regulatory environment and is not connected to their treatment under the Scheme or their rights against the Tianji.

(d)     As described at Section 12.6 below, the Company does not consider that there is an impact on the constitution of the class of Scheme Creditors through the payment of the Consent Fee to eligible Scheme Creditors, pursuant to the terms of the Scheme, as to make it impossible for those eligible Scheme Creditors to vote together with the other Scheme Creditors in the same class.

12.4    **AHG Fees**

(a)     The Company notes that certain Scheme Creditors shall, in addition to the Consent Fee, benefit from additional advisor fee payments in respect of the restructuring of the Group (which includes the CEG Schemes and the SJ Scheme) which shall be made on or prior to the Restructuring Effective Date:

    (i)     the "**AHG Advisor Fees**", being the reasonable fees, costs and expenses of the legal and financial advisers to the TJ AHG which shall be paid by the CEG in accordance with the terms set out in the relevant letter agreements between the CEG and the AHG Advisors; and

    (ii)     the "**AHG Work Fee**", shall be paid in accordance with the terms set out in the restructuring support agreement in respect of the SJ Scheme dated 3 April 2023 and a letter dated 20 March 2023 between the Chairman and the SJ AHG. The AHG Work Fee will be an amount estimated to represent approximately 1% of the SJ AHG's holding of the principal amount of the SJ Notes.

(b)     The Company does not consider that the effect of the payments listed in 12.4(a) above (either taken alone or cumulatively) makes it impossible for members of the TJ AHG to vote together with the other Scheme Creditors in the same class. This is because:

    (i)     The payment of the AHG Advisor Fees does not confer net a benefit upon a member of the TJ AHG but instead represents a payment of costs necessarily incurred by them in undertaking that role and which would not otherwise have been incurred. The Company further considers that the arrangement is typical and proportionate for a transaction of this kind. Further, the obligation on the Company to pay these fees is not conditional on the sanction of the Scheme;

    (ii)     Payment of the AHG Work Fee represents recompense for the time and effort expended by the SJ AHG in assisting with formulation of the Term Sheet and the Scheme in the interests of all Scheme Creditors and again does not confer any net benefit or disguised consideration on the members of the TJ AHG; and

    (iii)     It is unlikely that a Scheme Creditor who considered the substantive aspects of the Schemes to be against their interests would be persuaded by payment of either or both the AHG Advisor Fees and the AHG Work Fee to vote in favour of the Scheme. This is because in the alternative to the Scheme, being an insolvent liquidation, the Scheme Creditors would receive returns that are lower than the anticipated returns under the Scheme. The AHG Work Fee is not therefore a material factor which would influence a creditor's decision in relation to the Scheme.]

12.5    **Corporate Governance**

Please refer to Part B of Schedule 9 (*Summary of Terms of the New Instruments*) for certain terms in relation to corporate governance as set out in a term sheet therein.

12.6    **Consent Fee**

(a)    Under the terms of the RSA and the Term Sheet, Tianji has undertaken to pay, or procure the payment of, the Consent Fee to:

(i)    Eligible Participating Creditors (who are not Sanctions-Affected Scheme Creditors), who hold Eligible Restricted Debts at the Voting Record time and fulfil the conditions in accordance with the terms of the RSA; and

(ii)    the Holding Period Trustee, to be held on trust for Eligible Participating Creditors who are Blocked Scheme Creditors and who hold Eligible Restricted Debts at the Voting Record time and fulfil the condition in accordance with the terms of the RSA, under the terms of the Holding Period Trust Deed.

(b)    It is a term of the RSA that each Scheme Creditor who:

(i)    entered into and/or acceded to the RSA, by executing and delivering the requisite documents specified in the RSA to the Information Agent in respect of all of its Existing Debts before 5:00 p.m. (Hong Kong time) on the Consent Fee Deadline (thereby making them Eligible Restricted Debts);

(ii)    votes in favour of the Scheme at the Scheme Meeting; and

(iii)    has not exercised its rights to terminate the RSA and has not breached any provision of it (including terms relating to the restriction on transfer of the Eligible Restricted Debts) in any material respect,

shall be an Eligible Participating Creditor entitled to receive the Consent Fee pursuant to the terms of the RSAs.

(c)    Subject to the terms of the RSA, the Consent Fee payable to the Scheme Creditors is 0.25% of the outstanding principal amount of Existing Debts held by such Scheme Creditors at the Voting Record Time. The Consent Fee will be paid by way of payment-in-kind ("**PIK**") new notes to be issued by the Tianji in the form of Tranche A of TJ New Notes.

(d)    Prior to the Consent Fee Deadline, Tianji received Accession Letters from Scheme Creditors holding approximately US$ 5,103,227,000 in aggregate principal amount of the SJ Notes and approximately US$ 94,923,077 in aggregate principal amount of the Other Debts.

(e)    For completeness, the Board has considered whether the payment of the Consent Fee to Eligible Participating Scheme Creditors has an impact on the constitution of the class of Scheme Creditors for the purposes of the Scheme, and has concluded that it does not, for the following reasons:

(i)    the existence and terms of the RSA were made publicly available to all Scheme Creditors and all Scheme Creditors were given an equal opportunity to accede to the RSA and therefore to become entitled to receive the Consent Fee on an equal basis, provided that they became a party to the RSA and therefore to

become entitled to receive the Consent Fee on an equal basis, provided that they became a party to the RSA as a Participating Creditor by the relevant dedlines stated therein and vote in favour of the Scheme at the Scheme Meeting; and

(ii)     it is unlikely that a Scheme Creditor who is not eligible to receive an Consent Fee would be persuaded to vote against (or a Scheme Creditor who is eligible to receive an Consent Fee would be persuaded to vote for) the Scheme by reason of the existence of the Consent Fee because: (a) the Consent Fee only represents approximately 0.25% of the aggregate outstanding principal amount of the Existing Debts; and (b) in the alternative to the Scheme (an insolvent liquidation) the Scheme Creditors would receive returns that are significantly lower than the anticipated returns under the Scheme. In this context, the Board does not consider the Consent Fee a material factor which would influence a Scheme Creditor's decision in relation to the Scheme.

13.     **THE SCHEME MEETING**

13.1    The Scheme will proceed on the basis that Scheme Creditors constitute a single class of creditors of the Company. The Court has given permission to the Company to convene the Scheme Meeting, that is a meeting of: (i) the SJ Notes Scheme Creditors; and (ii) the Other Debt Scheme Creditors, to consider and vote on the Scheme.

13.2    Formal notices convening the Scheme Meeting are set out at Schedule 5 (*Notice of Scheme Meeting*) to this Explanatory Statement.

13.3    The Company has obtained the Scheme Convening Order, which is an order from the Court granting permission to convene the Scheme Meeting for the Scheme Creditors to consider and vote on the Scheme. A copy of the Scheme Convening Order (regarding the convening of such meeting of Scheme Creditors) is at Schedule 8 (*Scheme Meeting Convening Order*) to this Explanatory Statement.

13.4    Details of the Scheme Meeting are set out as follows:

(a)     The Scheme Meeting will be chaired by Mr P Cowley, or, failing him, another representative of KPMG Advisory (Hong Kong) Limited.

(b)     The Scheme Meeting will be held at Sidley Austin at 39th Floor, Two International Finance Centre, 8 Finance Street, Central, Hong Kong with any adjournment as may be appropriate, at 8.00 p.m. on 22 August 2023 Hong Kong time.

13.5    The date referred to in Section 13.4 above is subject to the assumption that the Scheme Meeting will not be adjourned or delayed.

13.6    Any Scheme Creditor that wishes to attend the Scheme Meeting in person by a duly authorised representative (if a corporation) or by proxy should review the information regarding the attending of the Scheme Meeting set out in the Solicitation Packet to be made available on the Transaction Websiteand in the respective formal notices convening the Scheme Meeting set out in Schedule 5 (*Notice of Scheme Meeting*) to this Explanatory Statement.

14.     **ASSESSMENT OF SCHEME CLAIMS FOR VOTING PURPOSES**

14.1    The relevant majorities required to approve the Scheme at the Scheme Meeting is that at least a majority in number representing 75 per cent (by value) or more of the Voting Scheme Claims

of the Scheme Creditors present and voting (whether in person or by proxy) at the Scheme Meeting have voted to approve the Scheme.

14.2    The assessment of Voting Scheme Claims for voting purposes shall be carried out by the Chairperson:

(a)    in respect of Scheme Creditors (who are not Sanctions-Affected Scheme Creditors), by relying on the relevant Scheme Creditor Forms submitted by the Scheme Creditors, as verified by the Chairperson, in consultation with the Company and/or the Information Agent against the books and records of the Clearing Systems and all supporting evidence provided by the relevant Scheme Creditor, respectively; and

(b)    in respect of all Blocked Scheme Creditors, by relying on the relevant Blocked Scheme Creditor Forms submitted by the Blocked Scheme Creditors, as verified by GLAS against the Company's records, including all supporting evidence provided by the relevant Blocked Scheme Creditor.

14.3    The Chairperson may reject a Voting Scheme Claim for voting purposes in whole or in part if he or she considers that (i) it does not constitute a fair and reasonable assessment of the relevant sums or (ii) if the relevant Scheme Creditor has not complied with the applicable procedures pursuant to the terms of the Scheme.

14.4    If the Voting Scheme Claim of a Scheme Creditor is unascertained, contingent or disputed (in part) but the Chairperson is able to estimate a minimum value of the Voting Scheme Claim, the Chairperson may nonetheless, in his or her sole discretion, admit the Scheme Claim for voting purposes at such minimum value.

14.5    If the Chairperson is unable to place a minimum value on a Voting Scheme Claim, it shall be rejected by the Chairperson in its entirety for voting purposes.

14.6    The Voting Scheme Claims admitted for voting purposes by the Chairperson will be notified to the Scheme Creditors at the Scheme Meeting, but such notification does not (of itself) constitute an admission of the existence or amount of any liability of any member of the Group.

14.7    The Chairperson will be entitled to defer the announcement of the result of the vote until after the Scheme Meeting should the Chairperson consider it appropriate to do so (in his or her sole discretion).

14.8    The Chairperson shall report to the Court at the Scheme Sanction Hearing, if so requested to by the Court, his or her decision to reject any Voting Scheme Claims for voting purposes and provide the relevant Court with details of such Voting Scheme Claims and the reasons for rejection.

15.    **SCHEME SANCTION HEARING**

15.1    After the requisite majorities of the Scheme Creditors vote to approve the Scheme at the Scheme Meeting, the Scheme Sanction Hearing will then be required in respect of the sanction of the Scheme by the Court.

15.2    Scheme Creditors are entitled (but not obliged) to attend the Scheme Sanction Hearing by their appointed legal counsel, to support or oppose the sanction of the Scheme.`

*The Scheme Effective Date*

15.3   As soon as reasonably practicable after receiving the Scheme Sanction Order, Tianji intends to deliver the Scheme Sanction Order to the Hong Kong Companies Registrar.

15.4   Upon the delivery of the Scheme Sanction Order to the Hong Kong Companies Registrar, the Scheme will take effect in accordance with their terms and become binding on all Scheme Creditors, wherever they are and regardless of whether they have voted for or against the Scheme or whether they have voted at all.

15.5   For the avoidance of doubt, the key provisions of the Scheme that serve to compromise the Scheme Creditors' Scheme Claims will not become effective until the Restructuring Effective Date has occurred in accordance with the terms of the Scheme.

16.    **RESTRUCTURING EFFECTIVE DATE**

16.1   The Company shall announce and specify the Restructuring Effective Date in a notice confirming satisfaction of the above steps and the Restructuring Effective Date Conditions, and enclosing a copy of the Scheme Sanction Order and the Chapter 15 Recognition Order in accordance with Clause 6.1 of the Scheme (the "**Completion Notice**"), to Scheme Creditors, the SJ Notes Trustee and the New Instruments Trustee as soon as reasonably practicable after satisfaction of the Restructuring Effective Date Conditions.

16.2   The Restructuring Effective Date shall occur after satisfaction or waiver (to the extent permitted by law and the RSA  mutatis mutandis), of the Restructuring Effective Date Conditions set out in Schedule 3 to the Scheme, which include, among others, the satisfaction of the Scheme Conditions, and the occurrence of the Scheme Effective Date.

16.3   On the Restructuring Effective Date, the Company shall, among others things, make the Initial Distribution in accordance with Clauses 13 (*Initial Distribution*) and 14 (*Distribution to Holding Period Trustee*) (as applicable) of the Scheme.

16.4   Following the Restructuring Effective Date, the Company shall take steps to satisfy the Restructuring Effective Date Conditions Subsequent, unless waived to the extent permitted by law and the RSA (applied mutatis mutandis), which include, among others, completion of the Valuation and Adjudication Procedure in respect of each Other Debt Scheme Creditor's Entitlement under the Scheme and the distribution of Scheme Consideration to Scheme Creditors in accordance with Part D (*Scheme Consideration*).

17.    **AUTHORITY AND INSTRUCTIONS**

17.1   With effect from the Scheme Effective Date, in consideration of the rights provided to the Scheme Creditors under the Scheme and solely for the purposes of giving effect to the terms of the Scheme, each Scheme Creditor appoints the Company as its attorney and agent and irrevocably authorises, directs, instructs and empowers the Company (represented by any duly authorised representative) to, as applicable:

(a)    enter into, execute and deliver (whether as a deed or otherwise) for and on behalf of that Scheme Creditor, in its capacity as a Scheme Creditor, including any Person, successor, assignee or transferee, to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time (to the extent applicable) sufficient original copies of (as agreed between the parties thereto):

(i)    the Restructuring Documents (in each case in the Agreed Form)  to which such Scheme Creditor is a party, each substantially in the form attached to the Scheme or this Explanatory Statement (as applicable) or otherwise in the form circulated to Scheme Creditors or otherwise made available to them including

87

on the Transaction Website, subject to any non-material modification approved or imposed by the Courts in accordance with the Scheme; and

(ii)     any and all such other documents (in each case in the Agreed Form) that the Company and the TJ AHG reasonably consider necessary to give effect to the terms of the Scheme,

in each case to be held to the order of the relevant parties thereto (for the avoidance of doubt, to the order of the Company on behalf of each Scheme Creditor) until the Restructuring Effective Date, in accordance with the Scheme Steps for the purposes of giving effect to the terms of the Scheme.

(b)     take or carry out any other step or procedure reasonably required to effect the settlement of the Scheme; and

(c)     to the extent applicable, in respect of Existing Debts, instruct each of the Existing Agents and the Lake Notes Trustee and Agent, acting in their capacity as Existing Agent or the Lake Notes Trustee and Agent (as appropriate) and each of their employees and agents to promptly take or carry out any step, procedure or execute and comply with any Restructuring Documents reasonably required to give effect to the terms of the Scheme.

17.2   On or as soon as possible after the Scheme Effective Date, as applicable:

(a)     the Company shall carry out the steps set out in Section 17.1 above acting on the instructions and pursuant to the authority of the Scheme Creditors; and the Company, each SJ Notes Subsidiary Guarantor, each New Instruments Pledgor (other than the Company), the SJ Notes Trustee, the New Instruments Trustee, the SJ Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the SJ Notes Depositary, the Existing Agents, the Lake Notes Trustee and Agent, the New Instruments Depositary, the New Instruments Collateral Agent and the Holding Period Trustee and the Information Agent] shall enter into, execute and deliver (whether as a deed or otherwise) sufficient original copies of (as agreed between the parties thereto):

(i)      the Restructuring Documents (in each case in the Agreed Form) to which the Company, such SJ Notes Subsidiary Guarantor, such New Instruments Pledgors (other than the Company), the SJ Notes Trustee, the Existing Agents, the Lake Notes Trustee and Agent, the New Instruments Trustee, the SJ Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the SJ Notes Depositary, the New Instruments Depositary, the New Instruments Collateral Agent and the Holding Period Trustee and the Information Agent is a party, each substantially in the form attached to the relevant Scheme or the Explanatory Statement (as applicable) or otherwise in the form circulated to Scheme Creditors including on the Transaction Website or otherwise made available to them, subject to any non-material modification approved or imposed by the Court in accordance with the Scheme; and

(ii)     any and all such other documents (in each case in the Agreed Form) that the Company and the TJ AHG reasonably consider necessary to give effect to the terms of the Scheme,

in each case to be held to the order of the relevant parties thereto until the Restructuring Effective Date, in accordance with the Scheme Steps for the purposes of giving effect to the terms of the Scheme.

17.3    On the Restructuring Effective Date, each Scheme Creditor irrevocably authorises and instructs, as applicable:

(a)    the Company, the SJ Notes Trustee, the SJ Notes Depositary, the SJ Notes Paying and Transfer Agent and Registrar, and the Information Agent to take all such actions as may be necessary or appropriate to release the guarantee of the SJ Notes by the Company endorsed on the Global Certificates and all obligations of the Company under or in respect of the SJ Notes Documents and otherwise give effect to the terms of the Scheme including without limitation the delivery by the Company (for and on behalf of the Scheme Creditors) of the SJ Notes Trustee Instruction to the SJ Notes Trustee at the time prescribed in the Scheme Steps;

(b)    the Company as its attorney and agent and irrevocably authorises, directs, instructs and empowers the Company (represented by any authorised representative) to in respect of the SJ Notes, instruct the New Instruments Collateral Agent, acting in its capacity as New Instruments Collateral Agent and each of its employees and agents to promptly take or carry out any step, procedure or execute and comply with any Restructuring Documents reasonably required to give effect to the terms of the Scheme;

(c)    the SJ Notes Trustee, the SJ Notes Paying and Transfer Agent and Registrar, the SJ Notes Depositary and the New Instruments Collateral Agent to act and rely upon the SJ Notes Trustee Instruction and the provisions of the Scheme, without any duty to investigate further and without incurring any liability for doing so (other than any liability arising as a result of the fraud, wilful default or wilful misconduct of the SJ Notes Trustee, the SJ Notes Paying and Transfer Agent and Registrar, the SJ Notes Depositary or the New Instruments Collateral Agent); and

(d)    the SJ Notes Depositary, the New Instruments Depositary, and the Information Agent to rely upon the provisions of the Scheme, without any duty to investigate further and without incurring any liability for doing so (other than any liability arising as a result of the fraud, wilful default or wilful misconduct of the SJ Notes Depositary or the actual fraud, wilful default or wilful misconduct of the Information Agent).

17.4    The authority granted under Sections 17.1 to 17.3 above (inclusive) shall be treated, for all purposes whatsoever and without limitation, as having been granted by deed and the Company shall be entitled to delegate the authority granted and conferred by this Section 17.4 to any duly authorized officer or agent of the Company as necessary.

17.5    Each Scheme Creditor (for itself and, if applicable, for its Designated Recipient and any person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time) on and from the Scheme Effective Date and on and from the Restructuring Effective Date, irrevocably ratifies and confirms any act or omission done, caused or purported to be done by:

(a)    the Company and the Information Agent, or any of their respective directors, managers, officers, partners or Affiliates, pursuant to or for the purposes of giving effect to the Scheme, other than any act or omission done or made as a result of fraud, wilful default or wilful misconduct; and

(b)    the SJ Notes Trustee, the New Instruments Trustee, the Existing Agents, the Lake Notes Trustee and Agent, the SJ Notes Paying and Transfer Agent and Registrar, the

New Instruments Paying and Transfer Agent and Registrar, the SJ Notes Depositary, the New Instruments Depositary, the New Instruments Collateral Agent, the Holding Period Trustee, or any of their respective directors, managers, officers, partners or Affiliates, pursuant to or for the purposes of giving effect to the Scheme, other than any act or omission done or made as a result of fraud, wilful default or wilful misconduct.

17.6    **Releases**

(a)    In consideration for the Entitlement to the Scheme Consideration, on and from the Restructuring Effective Date, each Scheme Creditor will be required to give the undertakings, releases and waivers set out in this Section 17.6 and in accordance with Clause 24 (*Releases*) of the Scheme (the "**Releases**").

(b)    Broadly, the effect of the Releases will mean that, following the completion of the Restructuring:

(i)    the guarantee granted by the Company with respect to the SJ Notes will be released;

(ii)    the Company's obligations under the Other Debts, these being a mixture of different obligations including guarantee, put and repurchase obligations, will have been fully and finally discharged and released; however,

(iii)    where there are other obligors under the Other Debts, the Scheme release will not release them from their obligations or Liabilities under the Other Debts (such obligors are referred to 'Excluded Liabilities Party Persons'). This is in keeping with the Deficiency Basis explained in the Section 4.5 in connection with valuing Scheme Claims for Scheme Consideration.

(c)    To achieve the post-Restructuring position contemplated at paragraph (b) above, pursuant to the terms of the Scheme and the Deeds of Release (in each case in Agreed Form), with immediate effect on and from the Restructuring Effective Date, each of the Scheme Creditors on behalf of itself and each of its predecessors, successors and assigns (including any Person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time), as relevant, (collectively, the "**Scheme Creditor Releasing Parties**") shall and shall be deemed to completely, forever, irrevocably and unconditionally:

(i)    release, waive, void, acquit, forgive, extinguish and discharge (and to the fullest extent permitted by law) each of the Released Persons from the relevant Released Claims, specifically:

(A)    'Scheme Claims': broadly, this captures claims against the Company under both SJ Notes and Other Debts;

(B)    'Ancillary Claims': the release in respect of Ancillary Claims is intended to capture any claim against Released Person as a result of the effecting, adhering to or complying with the releases to be effected in relation to the Scheme Claims (discussed above); and

(C)    'Restructuring Claims': the release in respect of Restructuring Claims releases the Released Persons from, broadly, any claim in relation to the preparation, negotiation or implementation of the Restructuring,

90

in each case, as discussed more fully below, the foregoing releases do not apply to any Excluded Liabilities or Excluded Collateral;

(ii)   release, forfeit, waive, void, acquit, forgive, extinguish and discharge (and to the fullest extent permitted by law) any and all Relevant Collateral (to the extent not already covered by (a) above);

(iii)   ratify and confirm everything which any Released Person may lawfully do or cause to be done in accordance with any authority conferred by the Scheme and agrees not to challenge:

(A)   the validity of any act done or omitted to be done as permitted by the terms of the Scheme; or

(B)   the exercise or omission to exercise of any power conferred in accordance with the provisions of the Scheme,

in each case in good faith by any Released Person; and

(iv)   acknowledge and agree that all powers of attorney granted by the Company under any Existing Debt Instruments are revoked.

(d)   Pursuant to the terms of the Scheme, each of the Scheme Creditors will appoint the Company as its attorney and agent and irrevocably authorizes, directs, instructs and empowers the Company (represented by any duly authorized representative), on and from the Restructuring Effective Date, to (i) enter into, execute and deliver as a deed on behalf of each Scheme Creditor and any person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time or who acquires any interest in or arising out of a Scheme Claim after the Voting Record Time, the Deeds of Release whereby any and all Released Claims, and any and all Relevant Collateral, referred to in paragraph 17.6(c) above shall be waived and released fully and absolutely from the Restructuring Effective Date, and (ii) do all such acts and/or execute all such documents (including without limitation, assignments, transfers, notices, instructions, supplements and amendments) as the Company may consider necessary or desirable to effect the release of any and all Released Claims and any Relevant Collateral (other than the Excluded Liabilities and Excluded Collateral) referred to in paragraph 17.6(c) above.

(e)   The Deeds of Release (in each case in the Agreed Form) are to be approved and executed pursuant to the authority conferred by Clause 24 (*Releases*) of the Scheme and each will be substantially in the forms to be made available on the Transaction Website subject to any modifications required or approved by the Court and each shall take effect in relation to such Claims and Liabilities on the Restructuring Effective Date.

(f)   Each Scheme Creditor will acknowledge and agree on its own behalf and on behalf of its Scheme Creditor Releasing Parties that:

(i)   it may later discover facts in addition to or different from those which it presently knows or believes to be true with respect to the subject matter of the Scheme;

(ii)   it is its intention to fully, and finally forever settle and release any and all matters, disputes and differences, whether known or unknown, suspected or unsuspected, which presently exist, may later exist or may previously have

existed between it and the Released Persons in respect of all Released Claims or any past, present and/or future Claim which is released by the Releases provided in Clause 24 (*Releases*) of the Scheme and by the Deeds of Release; and

(iii)     in furtherance of this intention, the waivers, releases and discharges given in the Scheme shall be and shall remain in effect as full and complete general waivers, releases and discharges notwithstanding the discovery or existence of any such additional or different facts.

(g)     Each Scheme Creditor and/or Account Holder will, in accordance with the Scheme, unconditionally and irrevocably waive and release any claims which may arise against the Information Agent from all actual or potential liability, arising directly or indirectly, in each case, in relation to the Information Agent's performance of its roles and all other actions which they may take in connection with the Scheme, save for any liability resulting from the Information Agent's own fraud or wilful misconduct.

(h)     The Scheme only purports to release the Company's obligations and Liabilities under the Other Debts. Where there are Excluded Liabilities Party Persons, the Scheme does not purport to release such persons from their Liabilities or obligations under the Other Debts (however, please consider the risk factor at 26.1(l) on pro-tanto release in connection with this point). The Excluded Liabilities and Excluded Collateral are excluded from the releases described at paragraph 17.6(c) above. This is in keeping with the Deficiency Basis (described more fully at paragraph 4.5) whereby Scheme Consideration will only be provided in respect of the Company's Liabilities and obligations which are being released, and not in respect of the Liabilities and obligations of the Excluded Liabilities Party Person's as their Liabilities and obligations under the Other Debts are not purported to be released under the Scheme.

(i)     Therefore, notwithstanding any other provision in this Explanatory Statement, the effect of the Restructuring under the terms of the Scheme will not waive, release, impair or otherwise compromise any of the Excluded Liabilities or any of the Excluded Collateral.

(j)     Further, the effect of the Restructuring under the terms of the Scheme shall not:

(i)     prejudice or impair any right or benefit of any Scheme Creditor Releasing Party:

(A)     created under the Restructuring Documents including without limitation any right to commence and/or continue and/or instruct any other Person to commence or continue any Proceeding to enforce its rights under or in relation to the New Instruments Documents; or

(B)     which arises as a result of a failure by the Company or any other Released Person to comply with the terms of any Restructuring Document; and

(ii)     prejudice or impair Claims against the Company or any other Released Person arising from fraud, wilful default or wilful misconduct.

(k)     As well as the releases being provided by the Scheme Creditors pursuant to the terms of the Scheme detailed in paragraph 17.6(c), the following intra-Group releases are being effected as part of the Restructuring:

92

(i) the release of the Company by companies within the Group of as many as possible of any 'ricochet' intra-Group Liabilities that may arise (whether by indemnity, contribution, subrogation or similar) in connection with the Scheme Claims that are being released through the Scheme; and

(ii) the release of as many as possible, taking into account all the circumstances, of the intra-Group Liabilities owed by the Company to other companies within the Group.

(l) The purposes of the releases described at paragraph 17.6 (k) above include helping to ensure that the Scheme is substantially effective and to reduce the Company's actual and contingent debts, in each case for the benefit of its creditors as a whole. These releases will be implemented as a step of the Scheme and in accordance with the Deeds of Release, in circumstances where the relevant alternative is a value destructive Group insolvency.

## 18.    FOREIGN RECOGNITION OF THE SCHEME

18.1    The director of the Company is appointed as the Company's foreign representative, authorised to act as such for the purposes of any proceedings commenced under Chapter 15 of the US Bankruptcy Code and such other relief as the Court may deem appropriate, in the United States or elsewhere under the relevant local laws (the "**Foreign Representative**"). The Foreign Representative will be authorised on behalf of the Company to take any and all steps deemed necessary or desirable to carry out the purpose and intent of the Scheme including filing the Recognition Filings and any petition or other request for relief intended to be filed under Chapter 15 of the US Bankruptcy Code and/or under other relevant local laws.

18.2    Chapter 15 of the US Bankruptcy Code is intended to give, as a matter of US law, effect to a foreign court's decision approving a scheme or similar plan by recognizing and enforcing the terms of such scheme or plan and applicable orders of the foreign court – including, for instance, by giving effect to a discharge of indebtedness, pursuant to such scheme or plan, of any debts governed by **US** law that were subject to the foreign proceeding.

18.3    If the Scheme is sanctioned by the Court, the Company intends to seek the recognition of the Scheme as a foreign main proceeding (or in the alternative, a foreign nonmain proceeding) under Chapter 15 of the US Bankruptcy Code by making the Recognition Filings. No creditor has raised issues about the propriety of Hong Kong as the center of main interests ("**COMI**") of Tianji or about any actions of management in proffering a Hong Kong COMI and establishment in Hong Kong. The Company intends to request, upon notice to parties with an interest in the relief sought and after the opportunity for such parties to be heard, that the US Bankruptcy Court makes an order that recognizes and enforces the Scheme and the Scheme Sanction Order and thus confirms that the existing New York law debt is discharged in accordance with its governing law. The Company intends to request that the US Bankruptcy Court order be made shortly following the granting of the Scheme Sanction Order.

18.4    Provided the Chapter 15 Recognition Order is granted and the Hong Kong Scheme is recognized and enforced as a matter of New York and federal law, the Company is advised that the Scheme will likely be given effect in the United States, further to a legal opinion obtained from an independent expert.

18.5    Any director of the Company (whether holding office now or in the future) shall be authorised to act as the representative of the Company on and in connection with any application for recognition and assistance in relation to the Scheme in any jurisdiction and under whatever law, including (without limitation) Chapter 15 of the US Bankruptcy Code, Part XIX of the BVI

Insolvency Act, 2003 as amended and any other law derived from or similar to the UNCITRAL Model Law on Cross-Border Insolvency Proceedings.

19. **HOLDING PERIOD TRUST**

19.1    On the Restructuring Effective Date, the Holding Period Trust will come into effect pursuant to the terms of the Holding Period Trust Deed to be entered into between the Company and the Holding Period Trustee.

19.2    The Holding Period Trust is a trust account which shall hold certain Scheme Consideration and Consent Fees which (i) cannot be distributed to the Other Debt Scheme Creditors under the Scheme until either the Interim Distribution Date (if applicable) or the Final Distribution Date when the relevant Entitlements of such Scheme Creditors have been determined; (ii) constitutes, following the Initial Distribution on the Restructuring Effective Date, Residual New Instruments beneficially owned by the SJ Notes Scheme Creditors under the Scheme, which shall be distributed on the Final Distribution Date to SJ Notes Scheme Creditors; or (iii) is unable to be distributed as the Scheme Creditor entitled to it is a Blocked Scheme Creditor and a distribution shall only be made to them if they are no longer subject to the Applicable Sanctions on the Final Distribution Date.

19.3    The Holding Period Trust will expire at the end of the Holding Period (i.e. one Business Day following the Final Distribution Date). If, upon the expiration of the Holding Period, Blocked Scheme Creditors remain affected by Applicable Sanctions, their Blocked Assets will be transferred to the Successor Escrow Agent on the Final Distribution Date pursuant to the terms of the Scheme and the Successor Escrow Agreement. Thereafter, the Holding Period Trust will be wound up in accordance with the terms of the Holding Period Trust Deed.

20. **SUCCESSOR ESCROW ACCOUNT**

20.1    Upon the expiration of the Holding Period, if Applicable Sanctions continue to prevent the payment of Scheme Consideration, in the form of Blocked Assets (as applicable), to Blocked Scheme Creditors, the Successor Escrow Account will come into effect pursuant to the terms of the Successor Escrow Agreement to be entered into between the Company and the Successor Escrow Agent.

20.2    The Successor Escrow Account is an escrow account designed to hold any Scheme Consideration, in the form of Blocked Assets, unable to be distributed prior to the expiration of the Holding Period to Blocked Scheme Creditors, who have validly submitted a Blocked Scheme Creditor Form together with supporting evidence to GLAS prior to the Bar Date that remain affected by the Applicable Sanctions. For the avoidance of doubt, the Information Agent will not be performing any services in relation to the Successor Escrow Account, and any ongoing communications between the Company and Scheme Creditors (as the case may be) from the expiry of the Holding Period Trust should be directed to GLAS.

20.3    Following the expiration of the Holding Period, such Blocked Assets (as applicable) will be issued to the Successor Escrow Agent to be held in escrow under the terms of the Successor Escrow Agreement.

20.4    Blocked Scheme Creditors will be notified of the terms of the Successor Escrow Account and the process and conditions for distribution on, or immediately after, the expiration of the Holding Period on the Transaction Website and/or through other such public medium as may be appropriate at that time.

*Termination of the Successor Escrow Account*

20.5    The Blocked Assets will be held on escrow until either: (i) the Perpetuity Period expires, this being a period of 21 years following the date that the Successor Escrow Account is established; or (ii) the Applicable Sanctions are lifted, whichever date is first. If the Applicable Sanctions are lifted prior to the expiry of the Perpetuity Period,, the Blocked Scheme Creditors will be given a reasonable period of time to recover their Entitlement to the Blocked Assets in accordance with the terms of both the Successor Escrow Account and the Scheme.

20.6    Upon expiry of the Perpetuity Period, and subject to any action necessary to ensure compliance with Applicable Sanctions by the Company or the Successor Escrow Agent, any Scheme Consideration and any Consent Fee (if applicable) which remains unable to be paid to Blocked Scheme Creditors in compliance with Applicable Sanctions will be returned to the Company in accordance with the terms of the Escrow Account Agreement. The rights of Blocked Scheme Creditors under the Scheme shall be extinguished on the return of such Blocked Assets to the Company, including any rights of Blocked Scheme Creditors to payment of any Scheme Consideration and any Consent Fee.

21.    **STAY OF PROCEEDINGS**

(a)    The Scheme will provide that:

(i)    from the Scheme Effective Date, no Scheme Creditor Releasing Party, nor any party on behalf of a Scheme Creditor Releasing Party shall be entitled to commence, continue, instruct, direct, permit or authorise any other Person to commence or continue, any Proceeding, whether directly or indirectly, against any of the Released Persons or in respect of any property of any of the Released Persons in respect of Claims or Liabilities that are to be released in accordance with the Scheme; and

(ii)    subject to any existing contractual restrictions, a Scheme Creditor Releasing Party may commence a Proceeding against the Released Person after the Restructuring Effective Date in respect of Claims or Liabilities that are not to be released in accordance with the Scheme.

22.    **MODIFICATIONS TO THE RESTRUCTURING DOCUMENTS**

22.1    Further pursuant to Clause 27 (*Modifications to the Scheme and the Restructuring Documents*) of the Scheme, Tianji may, before or at any hearing before the Court to sanction the Scheme, and subject to obtaining the written consent of the Majority TJ AHG (where the TJ AHG holds the Minimum TJ AHG Threshold), consent on behalf of all Scheme Creditors to any modifications of the Restructuring Documents or any additional terms or conditions including those which the Court may think fit to approve or impose, which would not directly or indirectly have a material adverse effect on the rights of the Scheme Creditors.

22.2    On the identification of a Sanctioned Scheme Creditor, including where a Scheme Creditor becomes a Sanctioned Scheme Creditor while this Scheme is in effect:

(a)    the Company may modify the Restructuring Documents to the extent reasonably necessary and in a manner to ensure that the Scheme is not contrary to Applicable Sanctions; and

(b)    each of the New Instruments Trustees and New Instruments Paying and Transfer Agent and Registrar is authorized to make any amendment to the New Instruments Documents and take any action necessary or desirable to give effect to a modification to such New Instruments Documents on and following receipt of an officers' certificate from the Company that such modification is reasonably

necessary to ensure that the Scheme is not contrary to Applicable Sanctions, which the New Instruments Trustees and New Instruments Paying and Transfer Agent and Registrar are entitled to rely on conclusively.

22.3    Where the Company reasonably considers that the Scheme is at risk of being contrary to Applicable Sanctions:

(a)    the Company may modify the Scheme and/or the Restructuring Documents to the extent reasonably necessary and in a manner to ensure that the Scheme is not contrary to Applicable Sanctions; and

(b)    each of the New Instruments Trustees and New Instruments Paying and Transfer Agents and Registrars is authorized to make any amendment to the New Instruments Documents and take any action necessary or desirable to give effect to a modification to such New Instruments Documents on and following receipt of an officers' certificate from the Company that such modification is reasonably necessary to ensure that the Scheme will not be contrary to the Applicable Sanctions in whatever form that they may apply to the Scheme, which the New Instruments Trustee and New Instruments Paying and Transfer Agents and Registrars are entitled to rely on conclusively.

22.4    The Scheme Administrators may, on or after the Restructuring Effective Date, modify the Scheme in respect of the Valuation and Adjudication Procedure to the extent reasonably necessary for the Scheme to achieve its purpose, and provided that any such modifications have no material prejudicial effect on Scheme Creditors.

22.5    Nothing in the Scheme shall prevent the modification of any executed Restructuring Document in accordance with its terms, including, but not limited to, minor or technical modifications to correct manifest or proven error or to comply with mandatory provisions of law.

## 23.    GOVERNING LAW AND JURISDICTION

23.1    The Scheme and any non-contractual obligations arising out of or in connection with the Scheme shall be governed by, and construed in accordance with, the laws of the Hong Kong and the Company and the Scheme Creditors will agree that the courts of Hong Kong shall have exclusive jurisdiction to hear and determine any Proceeding and to settle any dispute which arises out of or is connected with the terms of the Scheme or its implementation or out of any Proceeding taken or omitted to be taken under the Scheme or in connection with the administration of the Scheme and for such purposes, each of Tianji and the Scheme Creditors irrevocably submit to the jurisdiction of the courts of Hong Kong, *provided, however*, that nothing shall affect the validity of other provisions determining governing law and jurisdiction as between Tianji and any of the Scheme Creditors whether contained in any contract or for any other purpose, including, but not limited to, submission and/or enforcement under the jurisdiction of the US Bankruptcy Court in relation to the Chapter 15 Recognition Proceeding, including (but not limited to) the Recognition Filings and the Chapter 15 Recognition Order.

23.2    The terms of the Scheme and the obligations imposed on CEG under them shall take effect subject to any prohibition or condition imposed by any applicable law.

## 24.    RESTRUCTURING DOCUMENTS

This Section 24 (*Restructuring Documents*) lists the principal Restructuring Documents and directs all Scheme Creditors to view copies of the same on the Transaction Website.

24.1    **The Restructuring Documents**

(a)    The Restructuring Documents comprise all documents, agreements, instruments, board resolutions, shareholder approvals, releases, notices and legal opinions necessary to implement or consummate the Restructuring in accordance with the terms of the Scheme.

(b)    The Restructuring Documents, which will be made available (in substantially final form) on the Transaction Website, include, but are not limited to, the following principal documents:

(i)    the Scheme;

(ii)    this Explanatory Statement;

(iii)    the Deeds of Release;

(iv)    the Deed of Undertaking;

(v)    the New Instruments Documents;

(vi)    the Security Documents;

(vii)    the Holding Period Trust Deed;

(viii)    the Intercreditor Agreement; and

(ix)    all other documents, agreements, instruments, board resolutions, shareholder approvals, releases, and notices necessary to implement or consummate the Restructuring in accordance with the terms of the RSA and Scheme, in each case as amended, supplemented, extended, restated or novated from time to time, or any document or instrument creating or evidencing any security interest or guarantee, any fee letter, intercreditor agreement or similar documents under or in connection with the New Instruments and/or the Security Documents in each case in the Agreed Form. For the avoidance of doubt, any documents and accompanying evidence (including, but not limited to, foreign law expert opinions and all other affidavit evidence filed by the Company in respect of the Proceedings before the Court to convene the Scheme Meeting and/or to sanction this Scheme) specifically required as part of the Court's proceedings are not included.

(c)    Copies of all of the above listed principal Restructuring Documents will be available for viewing on the Transaction Website. All Scheme Creditors are strongly encouraged to review the detailed terms of the Restructuring Documents in full and are recommended to seek their own independent financial, legal and/or tax advice from their financial, legal and/or tax adviser with respect to the contents of the same.

(d)    Nothing in the Scheme shall prevent the modification of any executed Restructuring Document in accordance with its terms, including, but not limited to, formal, but not limited to, formal, minor or technical modifications to correct manifest or proven error or to comply with mandatory provisions of law.

***Summary of the RSAs***

24.2    On 3 April 2023, Tianji entered into the RSA with, among others, members of the TJ AHG and launched the RSA, providing that the Participating Creditors under the RSA undertake that they shall use its beneficial interest in its Existing Debts to approve and support the Proposed Restructuring (as defined therein) on the terms and conditions of the RSA. Other <u>key</u> provisions of the RSA include:

24.3    **Tianji's undertakings under the RSA**

(a)    Subject to the provisions of the RSA, Tianji shall and shall procure that each Subsidiary Guarantor (as applicable) will, among other things:

(i)    pay or procure payment of the Consent Fee;

(ii)    implement the Restructuring and the Scheme in the manner envisaged by, and materially on the terms and conditions set out in, the respective RSA including the Term Sheet;

(iii)    in respect of TJ only, perform and comply with all obligations and undertakings (i) in respect of the disposal of the offshore assets of the Group and the Designated Restructuring Account, in accordance with the terms and conditions of the Restructuring Account Deed Poll and (ii) in accordance with the Undertakings (as defined therein);

(iv)    perform all actions as are reasonably necessary in order to support, facilitate, implement or otherwise give effect to the Restructuring (provided that such action is consistent in all material respects with the Term Sheet) as soon as reasonably practicable;

(v)    upon the Restructuring Documents being finalized and in Agreed Form, file and pursue expeditiously any legal process or proceedings contemplated by or required to implement the Restructuring, including (without limitation) the Scheme;

(vi)    take any actions pursuant to any order of, or sanction by, any courts (including, without limitation, the Court as defined herein) as may be required or necessary to implement or give effect to the Restructuring;

(vii)    perform all actions as are reasonably necessary to procure that: (i) each Scheme Effective Date occurs; and (ii) the Restructuring Effective Date occurs as soon as practicable following the occurrence of all the Scheme Effective Dates and on or before the Longstop Date;

(viii)    convene all meetings of the shareholders and/or creditors of any member of the Group (as applicable) which are required to consider any resolutions and/or decisions in relation to the Restructuring;

(ix)    obtain, using all reasonable endeavours, any necessary regulatory or statutory approval required to permit or facilitate the Restructuring (including, without limitation, any approval of the CSRC, the NDRC, the HKEX, the SGX-ST or any Clearing Systems as may be required);

(x)    keep the Participating Creditors reasonably informed in relation to the status and progress of the Restructuring, including following a reasonable request by any advisor to the Participating Creditors via the Information Agent or Tianji's advisors; and

(xi)    notify the Participating Creditors of any matter or thing that would be reasonably likely to be a material impediment to the implementation of the Restructuring promptly upon becoming aware of the same.

24.4    **Participating Creditors' undertakings under the RSA**

(a)    Subject to the provisions of the RSA and the compliance by Tianji with its/their respective obligations under the RSA, each Scheme Creditor who has acceded to the respective RSA will:

(i)    use all commercially reasonable endeavours in order to support, facilitate, implement or otherwise give effect to the Restructuring (provided that such action is consistent in all material respects with the Term Sheet) as soon as reasonably practicable;

(ii)    review, negotiate and finalise (as applicable), in good faith, the Restructuring Documents (as applicable to such Participating Creditor) as soon as practicable. such that they are consistent in all material respects with the terms of this Agreement, the terms set out in the Term Sheet, and in order to ensure that the Restructuring Documents are in the Agreed Form;

(iii)    progress and implement the Restructuring in accordance with the terms set out in the RSA;

(iv)    support any actions taken by the Tianji to obtain recognition or protection of the Restructuring in any court of any jurisdiction (including any Recognition Filing) and take all other commercially reasonable actions reasonably requested by Tianji to implement or protect the Restructuring;

(v)    if any Insolvency Proceeding is commenced in respect of any member of the Group in any jurisdiction, take all commercially reasonable actions reasonably requested by Tianji to implement or protect the Restructuring through the relevant Insolvency Proceedings;

(vi)    take all such actions as are necessary to:

(A)    validly establish its standing to vote at each Scheme Meeting by causing its Account Holder (if applicable) to submit to the Information Agent a validly completed Account Holder Letter including a valid Accession Code and (with respect to holders of SJ Notes only) any other documentation required by the Information Agent, in respect of the outstanding principal amount of the Existing Debts in which it holds a beneficial and/or legal interest (as applicable) as principal for the purposes of voting its holdings at the Voting Record Time for each Scheme by the relevant deadline;

(B)    attend each Scheme Meeting either in person or by proxy; and

(C)    vote and deliver within any applicable time periods any proxies, instructions, directions or consents in respect of all Restricted Debts in which it holds a beneficial and/or legal interest (as applicable) as principal to vote in favour of each Scheme in respect of the aggregate outstanding principal amount of all Restricted Debts in which it holds a beneficial and/or legal interest (as applicable) as principal at the Voting Record Time at each Scheme Meeting;

(vii)   use commercially reasonable endeavours to prepare, file, make or otherwise support CEG in any application in a legal or regulatory process or proceeding that is reasonably requested by CEG and necessary to give effect to the Restructuring (including, without limitation, each Scheme) or oppose any legal process or proceedings that may negatively impact the Restructuring ;

(viii)  provide commercially reasonable support and assistance to Tianji as reasonably requested by Tianji to prevent the occurrence of an Insolvency Proceeding in respect of Tianji (other than the Scheme or any Recognition Filing or similar recognition, moratorium or protection proceedings in Hong Kong, United States or elsewhere);

(ix)    not:

    (A)   object to or challenge the Scheme (or any application made by Tianji in respect of the Scheme), or

    (B)   otherwise commence, join, support or assist any proceedings to oppose or alter any Restructuring Document filed by Tianji in connection with the confirmation of the Restructuring,

    in each case, provided that the Restructuring and/or any such Restructuring Document are consistent in all material respects with the terms as set out in the Term Sheet;

(x)     not take any actions inconsistent with, or that would, or are intended to, or would be likely to delay approval or confirmation of, the Restructuring or any of the Restructuring Documents, provided that the Restructuring and/or any of the Restructuring Documents are consistent in all material respects with the terms set out in the RSA including the Term Sheet;

(xi)    not formulate, encourage, procure or otherwise support any alternative proposal or alternate offer for the implementation of the Restructuring other than those contemplated by the Term Sheet or to otherwise engage in any such discussions or take any action which would delay or impede any approvals for the Restructuring, provided that the Restructuring and/or any of the Restructuring Documents are consistent in all material respects with the terms as set out in the Term Sheet;

(xii)   not take, commence or continue any Enforcement Action, whether directly or indirectly, to delay any Scheme Effective Date, interfere with the implementation of the Restructuring and/or the Scheme, or the consummation of the transactions contemplated thereby; and

(xiii)  not sell, assign, novate, sub-participate or otherwise transfer or dispose of (whether directly or indirectly), or instruct any Account Holder or Intermediary that holds an interest in the Restricted Debts on its behalf to sell, transfer or otherwise dispose, all or any part of its legal or beneficial interests, rights, benefits or obligations under or in respect of any of the Restricted Debts held by it or implement any transaction of a similar or equivalent economic effect (collectively, a "**Transfer**") after the date of this Agreement or its Accession Letter (as applicable) unless the Transfer has been made in accordance with the RSA.

25.    **SUMMARY OF THE NEW INSTRUMENTS**

25.1    The Company shall issue the New Instruments as Scheme Consideration to be distributed to each Eligible Creditor under and pursuant to the terms of this Scheme.

25.2    **Summary of the New Instruments**

(a)    The terms of the New Instruments will be set out in the New Instruments Documents.

(b)    A summary of the key commercial terms of each of the New Instruments Documents is set out in Schedule 9 (*Summary of Terms of the New Instruments*). A substantially final form of the indentures or trust deeds for the TJ New Notes will be to be made available on the Transaction Website. Unless otherwise indicated, all capitalised terms used in the following summary shall have the meanings assigned to those terms in the relevant New Instruments Documents.

(c)    No cash proceeds will be received by the Company in consideration for the issuance of the New Instruments.

(d)    In the event that any New Instruments, which will be issued exclusively in global form, are exchanged for definitive notes or certificates:

(i)    for so long as the New Instruments are listed on the SGX-ST and the rules of the SGX-ST so require, the Company shall appoint and maintain a paying agent in Singapore, where the New Instruments may be presented or surrendered for payment or redemption; and

(ii)    an announcement of such exchange shall be made by or on behalf of the Company through the SGX-ST, and such announcement shall include all material information with respect to the delivery of such definitive notes or certificates, including details of the paying agent in Singapore.

For so long as such New Instruments are listed on the SGX-ST and the rules of the SGX-ST so require, such New Instruments will be traded on the SGX-ST in a minimum board lot size of at least S$200,000 (or its equivalent in foreign currencies). For so long as any of such New Instruments remain outstanding, each series of such New Debt Instruments shall only be offered, traded and/or transferred (whether on an exchange or otherwise) in a minimum aggregate principal amount of US$200,000.

With respect to the New Instruments, Madison Pacific Trust Limited is to be appointed to act as trustee and various agent roles pending completion of the "know-your-client" process.

26.    **RISK FACTORS**

**The following summarises some of the principal risks and uncertainties that may arise in connection with the Scheme. It should be read in conjunction with all of the other information contained in this Explanatory Statement. Additional risks and uncertainties not presently known to Tianji or that Tianji currently deems immaterial may become material and have a material adverse effect on the business, financial condition or results of operations of the Group. This Explanatory Statement also contains forward-looking statements, which involve risks and uncertainties of their own. Actual results may differ materially from those anticipated in these forward-looking statements as a result of various factors and circumstances, including the risks and uncertainties described in this Explanatory Statement.**

For ease of reference only, the risk factors set out below have been grouped into the following categories:

(a)     risks relating to the implementation of the Scheme;

(b)     risks relating to a failure to implement or a delay in implementing the Scheme;

(c)     risks following the implementation of the Scheme;

(d)     risks relating to the New Instruments; and

(e)     risks relating to the Collateral.

In addition, Scheme Creditors are liable for any taxes that may arise in respect of such Scheme Creditor as a result of the Scheme and the Restructuring, and shall have no recourse to the New Instruments Pledgors, the New Instruments Trustee, the Information Agent or any other person in respect of such taxes or any filing obligation with respect thereto.

26.1    **Risks relating to the implementation of the Scheme**

*Scheme Creditors may not approve the Scheme*

(a)     In order for the Scheme to become effective, the Scheme must be approved by a majority in number representing 75% or more in value of the Scheme Creditors present, in person or by proxy, and voting at the Scheme Meeting. If the requisite majorities of Scheme Creditors do not vote in favour of the Scheme at the Scheme Meeting, then the Restructuring will not be undertaken pursuant to the Scheme or possibly at all.

(b)     Under the RSA, some Scheme Creditors have given undertakings to vote in favour of the Scheme; however, such undertakings may cease to be binding in certain circumstances under the terms of the RSA or if the RSA are terminated.

*Even if the Scheme Creditors approve the Scheme, the Scheme may not be approved by the Court*

(c)     In order for the Scheme to become effective under Hong Kong law, the Court must sanction the Scheme. The Court has discretion whether or not to sanction the Scheme and will need to be satisfied that, among other matters: (i) the meeting of Scheme Creditors was convened and held in accordance with the Scheme Convening Order, (ii) the Scheme was approved by the requisite majorities of those Scheme Creditors who voted at the Scheme Meeting in person or by proxy; and (iii) the Scheme is such as an intelligent and honest man, a member of the class concerned and acting in respect of his interest, might reasonably approve. Among other factors, the Court is likely to have regard to whether (1) the class of Scheme Creditors voting in respect of the Scheme has been properly constituted, (2) the provisions of the Hong Kong Companies Ordinance and related subsidiary legislation have been complied with, and (3) the class was fairly represented by those who attended the meeting and the statutory majority are acting bona fide and are not coercing the minority in order to promote interests adverse to those of the class whom they purport to represent.

(d)     Even if the Scheme is approved at the Scheme Meeting, any Scheme Creditor who voted (or gave instructions to someone to vote on their behalf) at the Scheme Meeting may appear by counsel at the Scheme Sanction Hearing in order to make representations that the Scheme should not be approved and to object to the granting of the Scheme Sanction Order. The Court may also be prepared to hear such

representations and objections by counsel for any other person whom they are satisfied has a substantial economic interest in the Scheme. Therefore, it is possible that objections will be made at or before the Scheme Sanction Hearing and that any such objections will delay or possibly prevent the Scheme from being sanctioned and becoming effective.

(e)    There can be no assurance that the Court will approve the Scheme. If the Court does not approve the Scheme, or approves it subject to conditions or amendments which (i) Tianji deems unacceptable or (ii) would have (directly or indirectly) a material adverse effect on the interests of any Scheme Creditors and such conditions and amendments are not approved by the Scheme Creditors, the Scheme will remain ineffective.

(f)    Further, even if the Court approves the Scheme, it is possible for any person who opposed the sanctioning of the Scheme at the Scheme Sanction Hearing to appeal against the granting of the Scheme Sanction Order. Any such appeals and/or subsequent litigation could delay the Scheme becoming effective or possibly prevent the Scheme from becoming effective at all.

*The Scheme may not be recognized by the US Bankruptcy Court*

(g)    Likewise, there can be no assurance that the US Bankruptcy Court will recognize the Scheme or enter the Chapter 15 Recognition Order. If the US Bankruptcy Court does not recognize the Scheme and does not enter the Chapter 15 Recognition Order, the terms and effect of the Scheme, including the discharge of the US law-governed debt, may not be given effect or binding in the US.

*Even if the Scheme is approved by the Courts in Hong Kong, there is no guarantee that the Schemes will be recognized by courts in other jurisdictions, including the PRC.*

(h)    Even if the Scheme becomes effective under Hong Kong law, it may not be recognized by courts in other jurisdictions, including the PRC. According to a guidance issued by the Supreme Court of China, PRC courts would recognize insolvency proceedings approved by the Hong Kong High Court with respect to, among others, compulsory winding-ups, voluntary winding-ups initiated by creditors, and debt restructuring procedures proposed by a liquidator or provisional liquidator. It is uncertain whether the Scheme falls under such scope of recognition, given that the Scheme is initiated by the Company itself in the relevant jurisdiction.

*The implementation of the Scheme and the Restructuring may result in adverse and/or complex tax consequences to Scheme Creditors*

(i)    The Company is not providing tax advice to any Scheme Creditor in connection with the Restructuring, and each Scheme Creditor should consult its own tax adviser regarding tax consequences of the Restructuring in any relevant jurisdiction.

*Risk relating to the effect of the Scheme*

(j)    The claims of Other Debt Scheme Creditors against Excluded Liabilities Party Persons are expressly not released under the Scheme and, as a result, Other Debt Scheme Creditors are not receiving any consideration under the Scheme in respect of any claims they may have against Excluded Liabilities Party Persons.

(k)    An Excluded Liabilities Party Person is an obligor, guarantor, security or collateral pledgor or other credit support provider of or in respect of an Other Debt owed to an Other Debt Scheme Creditor. The claims of Other Debt Scheme Creditors against

Excluded Liabilities Party Persons are estimated under the Scheme to arrive at that Other Debt Scheme Creditor's claims on a Deficiency Basis (being, in broad terms, the total outstanding amount of principal and interest owed to the Other Debt Scheme Creditor under its Other Debt less the estimated amount of its recoveries from Excluded Liabilities Party Persons) which forms the basis for its Entitlement for Scheme Consideration.

(l)     Other Debt Scheme Creditors should be aware that by operation of law receipt of the Scheme Consideration may result in a pro tanto release of the relevant Excluded Liabilities Party Persons. However, whether that is the case is likely to depend on the operative law and the relevant contractual terms. Further, as a general principle it may be the case that an Other Debt Scheme Creditor will not be able to recover more than 100% of the value of its debt in total from the Company and the Excluded Liabilities Party Persons.

*The Company has short-term funding needs to continue operations till the implementation of the Scheme and the Restructuring*

(m)     While Management believes that its cash position should suffice to continue operations until the implementation of the Scheme and the Restructuring, there may be unforeseen circumstances, including a delay in the implementation of the Scheme, which may cause the Company to require additional short-term funding. If the Company is unable to obtain, at favourable rates or at all, such additional short-term funding, it may be unable to implement the Scheme and the Restructuring.

*The allocation of the New Instruments to Scheme Creditors may be subject to adjustments as provided in the Term Sheet and/or at the discretion of the Company (its agent or person instructed by it).*

(n)     If the allocation of the New Instruments in accordance with the Scheme would result in any Eligible Creditor, Designated Recipient or the Holding Period Trustee receiving less than the Notes Minimum Denomination of any series of the New Instruments, then such Eligible Creditor, Designated Recipient or the Holding Period Trustee would instead receive an allocation in one or more of the other series of the New Instruments, as determined by the Company (its agent or person instructed by it) in its discretion in good faith, to ensure that such Eligible Creditor, Designated Recipient or the Holding Period Trustee holds at least the Minimum Denomination for at least one series of the New Instruments, in accordance to the Scheme.

(o)     As such, the final allocation of the New Instruments is subject to adjustments at the Company's (its agent or person instructed by it) discretion in order to satisfy the requirements for the Minimum Denomination. The factors to be taken into consideration are subject to change depending on a number of variables, including the number of Eligible Creditors as well as the size of their respective position of the SJ Notes, and the size of each tranche of each series of the New Instruments. It is possible that the New Instruments payable to each Scheme Creditor may not be allocated to each tranche of each series of the New Instruments on a pro rata basis based on their respective aggregate principal amount on the Restructuring Effective Date.

26.2     **Risks relating to a failure to implement or a delay in implementing the Scheme**

*The Restructuring may not be completed in accordance with the timeline envisaged by this Explanatory Statement*

(a)     Factors unknown to the Company as at the date of this Explanatory Statement may result in delays to the completion of the Restructuring. There is no guarantee that the Restructuring Effective Date will occur by the Longstop Date, at which time those Scheme Creditors who are parties to the relevant RSA will no longer be bound by their obligations under the relevant RSA to support the Restructuring and not to take action against the Company and/or any member of the Group, and the Scheme will lapse, respectively.

(b)     The Longstop Date may, however, be extended in accordance with the terms of the Scheme and the RSA.

*Insolvency Proceedings if the Restructuring is not implemented promptly*

(c)     The maturity dates of the SJ Notes have passed and, therefore, the Company is currently obliged to repay the principal amount and accrued but unpaid interest thereon under the SJ Notes.

(d)     The Company currently has limited available cash and, should the Restructuring not proceed, would be unable to repay its overdue indebtedness under and in connection with the Existing Indebtedness.

(e)     If Tianji and other members of the Group are placed into a formal insolvency procedure, the proceeds available to Scheme Creditors will likely be reduced to a level that is materially lower than the potential value of the consideration they would receive under the Scheme (as per the Liquidation Analysis summarised in Section 8 (*Background to Tianji and the Restructuring*) and set out in Schedule 2 (*Liquidation Analysis*).

26.3    **Risks following the implementation of the Scheme**

*The New Instruments received by Scheme Creditors as Scheme Consideration are subject to certain risks*

(a)     There may be no market for the New Instruments or any securities issued in exchange thereof. To the extent any such securities become tradable, the price and trading volume thereof may be highly volatile. Factors such as variations in the Group's revenues, earnings and cash flows, proposals for new investments, strategic alliances and/or acquisitions, changes in interest rates, fluctuations in price for comparable companies, government regulations and changes thereof applicable to the Group's industry and general economic conditions nationally or internationally could cause the price of such securities to change. Any such developments may result in large and sudden changes in the trading volume and price of such securities. There can be no assurance that these developments will not occur in the future. Each Scheme Creditor should conduct its own due diligence and consider the appropriateness of the information in this Explanatory Statement having regard to its own objectives, financial situations and needs. Scheme Creditors are also recommended to consult their own professional advisers as to legal, tax, financial or other aspects relevant to any action Scheme Creditors might take in relation to the Scheme and the Restructuring, or the implications/consequences of such action.

*Tianji may be subject to PRC withholding taxes on interest it pays on the New Instruments.*

(b)     According to relevant PRC laws and regulations, if the PRC tax authorities consider Tianji to be a PRC tax resident enterprise, any gain realised by a non PRC resident enterprise or a non PRC resident individual holder from the transfer of the New

Instruments would be regarded as being derived from sources within the PRC and would accordingly be subject to PRC income tax at the rate of 20% (or lower treaty rate, if any).

*Tianji's financial performance and business operations have been and may continue to be affected by adverse market conditions, and the Company may not be able to generate sufficient cash to fully address its financial commitments.*

(c)    Beginning in the second half of 2021 and continuing into 2023, Chinese property developers and the capital markets that have funded growth and development of the sector have experienced an inflection point characterized by a number of adverse developments, including the following:

    (i)    reduced bank lending for real estate development adversely affected access by property developers to onshore capital;

    (ii)    reduced bank lending for mortgage finance for buyers, combined with buyers' concerns towards the ability of property developers to complete projects, has adversely affected property sales;

    (iii)    tightened restrictions on the use of pre-sale proceeds under the applicable PRC law; and

    (iv)    more recently, a material decrease in aggregate contracted sales and a substantial reduction in prices for residential units across the sector.

(d)    The negative news relating to certain Chinese property companies including defaults on their indebtedness have had a further negative impact on, and resulted in increased volatility in, the property sector in China. Such recent defaults make it difficult for Chinese property developers, management companies and potential property purchasers to obtain onshore and offshore financing, and result in very low market confidence in and very low demand for China real estate and increased market volatility.

(e)    Reduced bank lending for real estate development, coupled with certain negative credit events, has intensified market concerns over the operations of Chinese property developers. As a result, pre-sales of properties by Chinese developers have generally decreased. The Group has also experienced a noticeable decline in its aggregate contracted sales in recent months. Against the backdrop of the adverse market conditions, the Group has experienced liquidity pressures due both to its limited access to external capital to refinance its existing indebtedness and the reduction in cash generated from contracted sales. As a result, the repayment arrangements of the principal and interest amount of the SJ Notes due. These amounts remain unpaid as at the date of this Explanatory Statement.

(f)    Since then, the Group has been actively engaging with its customers, suppliers, creditors and shareholders in stabilising its credit lines and day-to-day operations. It implemented further measures in reducing capital expenditure and other expenses such as management remuneration. The Group also commenced discussions with the Ad Hoc Group representing certain Scheme Creditors in exploring a consensual resolution for the Events of Default for the SJ Notes and the Other Debts.

(g)    However, the Company cannot assure you that these efforts will be successful. Even if the Scheme is successful, the Group will still have indebtedness in the PRC that is either in default or faces an imminent risk of default. The Group's operation may

continue to be affected by the decrease in sales and property price, suspension on construction work, restraints on obtaining new financing, ongoing and potential disputes with creditors, business partners, customers and others, volatility in the property sector and the capital markets and other factors. In particular, the viable financing alternatives available to the Group have been significantly impacted by unfavourable changes to lending and investment policies by financial institutions and capital markets investors. The Group's reduced cash generated from operations and its existing level of indebtedness and obligations may give rise to investors' and market's doubt about its ability to continue operating as a going concern. The Group's ability to continue its operations, to realize the carrying value of its assets, and to discharge its liabilities in the normal course of business are dependent upon its ability to raise new capital sufficient to fund its commitments and on continuously generating profitable operations.

*The Group's operations are subject to China's and global economic and social condition and extensive governmental policies and regulations in the PRC.*

(h)     Substantially all of the Group's business and operations are conducted in the PRC. Accordingly, the Group's business, financial condition, results of operations and prospects are, to a significant degree, subject to economic, political and social developments in the PRC.

(i)     The economy of the PRC differs from the economies of most developed countries in many respects, including but not limited to structure, level of government involvement, level of development, growth rate, control of foreign exchange, and allocation of resources. The PRC economy has grown significantly in recent decades, but there can be no assurance that this growth will continue or continue at the same pace.

(j)     Geo-political conflicts also negatively impacted on the global economy. For example, the recent conflict between Russia and Ukraine is still evolving and the impact of such geo-political conflicts on global economy is still unclear. China's economic condition, and the property sector in the PRC and hence our business, results of operations, financial condition and prospects may be materially and adversely affected by such geo-political conflicts and changes in global macro-economic environment.

(k)     In addition, demand for the Group's services and its business, financial position and results of operations may be adversely affected by (i) changes in laws, regulations or policies or the interpretation of laws, regulations or policies and social conditions in the PRC; (ii) measures which may be introduced to control inflation or deflation; (iii) changes in the rate or method of taxation; and (iv) imposition of additional restrictions on currency conversion and remittances abroad.

(l)     Moreover, sustainable growth and success of the Group's business significantly depend on its ability to continue acquiring additional land reserves in desirable locations at commercially reasonable prices that are suitable for the residential and commercial development. Its ability to acquire land depends on a variety of factors, some of which are beyond its control, such as overall economic conditions, availability of land parcels provided by the PRC government and competition for land parcels which are suitable for development. Any increase in its land cost resulting from any reason, such as shortages of supply or our inability to acquire suitable land parcels at commercially acceptable prices could have a material and adverse effect on the Group's business, financial condition, result of operations and prospects. Even if the Scheme is successful, in the foreseeable future, it may be difficult for the Group to acquire additional land reserves due to many factors affecting the Group's operation results and financial performance, including the decrease in sales and property price, suspension

on construction work, restraints on obtaining new financing, ongoing and potential disputes with creditors, business partners, customers and others, volatility in the property sector and the capital markets and other factors.

*The Group is involved from time to time in disputes and administrative, legal and other proceedings arising out of its operations and may face significant liabilities as a result.*

(m)     The Group is involved in disputes with various parties arising out of its operations, including but not limited to its customers, contractors, construction workers, tenants, business partners, creditors and administrative and regulatory bodies, or other third parties. These disputes may lead to legal or other proceedings and may result in damage to the Group's reputation, the incurrence of substantial costs and the diversion of resources and management's attention.

(n)     The Group has received, and may continue to receive, claims from its customers, suppliers and/or creditors and Enforcement Actions from its creditors in respect of its financial and other obligations. As a result of these events, the Group may be involved in more disputes with various parties such as its customers, suppliers and creditors. Although the Group has been actively engaging with its customers, suppliers, creditors and shareholders in stabilising its credit lines and day-to-day operations, there is no assurance that the Group will not be subject to any additional disputes and administrative, legal and other proceedings arising out of its operations, that the Group will successfully resolve such disputes and proceedings to its satisfaction, or that any judgment or ruling in respect of such disputes and proceedings would be in favour of the Group. Any involvement in these disputes may materially and adversely affect the Group's business, financial condition and results of operation.

(o)     Although the Group strives to maintain proper internal control, there is no assurance that its internal control measures will be effective and there will not be any non-compliance incidents in the future. The Group has been involved in certain investigations into its internal control and may be involved in such potential investigations by regulatory bodies in the PRC, Hong Kong and other applicable jurisdictions in the future. Such investigations may result in fines, financial and business losses, reputational damages and other material adverse effect on the Group's business operation and financial performance.

(p)     Since the recent downturn of the Chinese property sector, the applicable laws and regulations in relation to the property industry have been closely enforced by the regulatory bodies in order to stabilise the market and promote a healthy recovery of the industry. The Group cannot assure you that it has been, or will be, in strict compliance with all applicable laws and regulations. In addition, PRC laws, rules or regulations governing the real estate industry have been evolving rapidly, and there can be no assurance that the Group will not be subject to fines or penalties arising from non-compliance incidents if it fails to adapt to the new regulatory regime in a timely manner, or at all, which may have a material adverse effect on its business, financial condition and results of operations.

(q)     As of the date of this Explanatory Statement, a number of creditors have initiated legal proceedings or enforcement actions against the Group and its assets. It is possible that more legal proceedings, enforcement actions or  winding-up petitions may be filed against any member of the Group, including the Company.

**26.4    Risks Relating to the New Instruments**

*The Company is a holding company and payments with respect to the New Instruments are structurally subordinated to liabilities, contingent liabilities and obligations of the Company's subsidiaries which are not providing guarantees under the New Instruments.*

(a)     The Company is a holding company with no material operations. The Company conducts its operations primarily through its subsidiaries. The New Instruments will not be guaranteed by any subsidiaries. The Company's primary assets are ownership interests in its PRC subsidiaries, which are primarily held through the offshore subsidiaries. Accordingly, the Company's ability to pay principal and interest on the New Instruments will depend upon their receipt of principal and interest payments on the intercompany loans and distributions of dividends from the Company's subsidiaries, including the PRC subsidiaries. If the Company or its offshore subsidiaries experience difficulties in receiving funds from the PRC subsidiaries, due to regulatory or other reasons, the Company may in turn experience difficulties in servicing its offshore debt, including but not limited to the New Instruments.

(b)     Creditors, including trade creditors of the non-guarantor subsidiaries and any holders of preferred shares in such entities, would have a claim on such subsidiaries' assets that would be prior to the claims of holders of the New Instruments (other than assets pledged by the New Instruments Pledgors to secure the New Instruments as applicable). As a result, the Company's payment obligations under the New Instruments will be effectively subordinated to all existing and future obligations of such subsidiaries, and all claims of creditors of the non-guarantor subsidiaries will have priority as to the assets of such entities over the Company's claims and those of the Company's creditors, including holders of the New Instruments. The New Instruments and the New Instruments Documents permit the Company and the subsidiaries to incur additional indebtedness and issue additional guarantees, subject to certain limitations. In addition, the Company's secured creditors would have priority as to our assets to the extent pledged to secure their obligations over claims of holders of the New Instruments.

*The Group has substantial indebtedness and may incur substantial additional indebtedness in the future, which could adversely affect the Group's financial health and its ability to generate sufficient cash to satisfy its outstanding and future debt obligations, including the New Instruments.*

(c)     The Group now has incurred, and may continue to incur after the Restructuring, a substantial amount of indebtedness. As summarised in Section 8 (*Background to Tianji and the Restructuring*) of this Explanatory Statement, the Group's total borrowings as of 31 December 2022 was approximately RMB612.4 billion. See Section 8.12 (*Financial Indebtedness*). The Group's substantial indebtedness could have important consequences to a holder of the New Instruments. For example, it could:

(i)     limit the Company's ability to satisfy its obligations under the New Instruments and other debt;

(ii)    increase its vulnerability to adverse general economic and industry conditions;

(iii)   require it to dedicate a substantial portion of its cash flow from operations to servicing and repaying its indebtedness, thereby reducing the availability of its cash flow to fund working capital, capital expenditures and for other general corporate purposes;

(iv)    limit its flexibility in planning for or reacting to changes in its businesses and the industry in which it operates;

(v)     limit, along with the financial and other restrictive covenants of its indebtedness, its ability to borrow additional funds; and

(vi)     increase the cost of additional financing.

(d)     As part of the Group, the TJ Group may from time to time incur additional indebtedness and contingent liabilities. Although the New Instruments Documents restrict the Company and the Restricted Subsidiaries (as defined in the New Instruments Documents) from incurring additional debt and contingent liabilities, these restrictions are subject to important exceptions and qualifications. If the TJ Group incurs additional debt, the risks that it faces as a result of its existing indebtedness and leverage could intensify.

(e)     Prism does not express an opinion on the consolidated financial statements of the Group or the TJ Group in the audited reports for the year ended 31 December 2021 and 2022, and states that the TJ Group's financial conditions, along with other matters, indicate the existence of material uncertainties which may cast significant doubt about the TJ Group's ability to continue as a going concern. If the TJ Group's operations continue to deteriorate and its financial pressures cannot be effectively relieved, risks associated with the TJ Group's capacity for sustained operations may be aggravated.

(f)     Furthermore, the successful implementation of the Restructuring to a large extent is contingent on the orderly resumption of the TJ Group's (as part of the wider Group) onshore business operation. However, the TJ Group's onshore business operation is subject to uncertainties caused by various factors, including China's and global economic and social conditions, extensive governmental policies and regulatory environment and market conditions. In the event that the TJ Group is unable to orderly resume its business operation, that may affect its ability to pay its debt from both onshore and offshore sectors, which would in turn have material adverse effect on the implementation of the Restructuring.

(g)     In addition, the terms of the New Instruments Documents prohibit the Company and the Restricted Subsidiaries from incurring additional indebtedness unless they are able to meet certain applicable restrictions. Their ability to meet such applicable restrictions may be affected by events beyond their control. Such restrictions in the New Instruments and the other financing arrangements may impair the TJ Group's ability to react to changes in market conditions, take advantage of business opportunities it believes to be desirable, obtain future financing, fund required capital expenditures or withstand a continuing or future downturn in its business. Any of these factors could materially and adversely affect the Company's ability to satisfy its obligations under the New Instruments and other debt.

*Servicing the Group's indebtedness, including the New Instruments, will require a significant amount of cash and its ability to generate cash depends on many factors beyond its control.*

(h)     The Group's ability to make payments on and to refinance its indebtedness, including these New Instruments, and to fund planned capital expenditures and project development will depend on its ability to generate cash. This, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond the Group's control, which may result in uncertainties in the TJ Group's (as part of the wider Group) ability to repay its indebtedness, including these New Instruments.

(i)     The Group's business might not generate cash flow from operations in an amount sufficient to enable it to pay its indebtedness, including the New Instruments, or to fund

its other liquidity needs. The Group's operation, financial performance and ability to service its indebtedness may continue to be affected by the decrease in sales and property price, suspension on construction work, restraints on obtaining new financing, ongoing and potential disputes with creditors, business partners, customers and others, volatility in the property sector and the capital markets and other factors. The Group may need to refinance all or a portion of its indebtedness (some of which matures prior to the New Instruments), including the New Instruments, on or before maturity. The Group might not be able to refinance any of its indebtedness on commercially reasonable terms or at all.

(j)     If the Company or a Restricted Subsidiary (as defined in the New Instruments Documents) is unable to comply with the terms in the New Instruments Documents or its existing or future debt obligations and other agreements, there could be a default under those agreements. If that occurs, the holders of the debt could accelerate repayment of the debt and declare all outstanding amounts due and payable or terminate the agreements, as the case may be. Furthermore, the New Instruments Documents contain, and the Group's future debt agreements are likely to contain, cross-acceleration and cross-default provisions. As a result, the default of the Company or any of the Restricted Subsidiaries under one debt agreement may cause the acceleration of repayment of not only such debt but also other debt, including the New Instruments, or result in a default under the Group's other debt agreements, including the New Instruments Documents. If any of these events occur, the Group's assets and cash flow might not be sufficient to repay in full all of its indebtedness that has been accelerated and it might not be able to find alternative financing to repay such indebtedness on commercially reasonable terms or at all.

*Issuance of the New Instruments is subject to approvals from the PRC regulators.*

(k)     The issuance of the New Instruments by the Company is subject to approvals and filings from the PRC regulators, including without limitation, the approval of National Development and Reform Commission and filing with the China Securities Regulatory Commission. However, as of the date of this Explanatory Statement, all the necessary approvals for the issuance of the New Instruments from the PRC regulators have not been received. There is no assurance that the Company will be able to obtain such approvals in a timely manner, and as a result, the issuance of the New Instruments may be delayed.

*The TJ Group's operations are restricted by the terms of the New Instruments, which could limit its ability to plan for or to react to market conditions or meet its capital needs, which could increase the credit risk of a holder of these New Instruments.*

(l)     The New Instruments Documents include a number of significant restrictive covenants. These covenants restrict, among other things, the Company's ability and/or the ability of the Restricted Subsidiaries, to:

(i)     incur or guarantee additional indebtedness and issue disqualified or preferred stock;

(ii)    make investments or specified restricted payments;

(iii)   declare dividends on Capital Stock or purchase or redeem Capital Stock;

(iv)    issue or sell Capital Stock of Restricted Subsidiaries;

(v)     guarantee indebtedness;

(vi)  sell, lease or transfer assets;

(vii)  create liens;

(viii)  enter into sale and leaseback transactions;

(ix)  enter into agreements that restrict the Restricted Subsidiaries' ability to pay dividends, transfer assets or make intercompany loans;

(x)  enter into transactions with shareholders or affiliates; and

(xi)  effect a consolidation or merger.

(m)  These covenants could limit the Group's ability to plan for or react to market conditions or to meet its capital needs. The Group's ability to comply with these covenants may be affected by events beyond its control, and it may have to curtail some of its operations and growth plans to maintain compliance.

*The Company may be able to redeem all or any part of the New Instruments prior to maturity.*

(n)  The Company may be able to redeem all or any part of the New Instruments at its option on a date prior to the maturity date. The optional redemption feature of the New Instruments may limit the market value of such New Instruments. During any period when the Company may elect to redeem the New Instruments, the market value of the New Instruments may not rise substantially above the price at which they can be redeemed. This may also be true prior to any redemption period.

(o)  The Company may also be expected to redeem the New Instruments with optional redemption feature when its cost of borrowing is lower than the interest rate on the New Instruments. At those times, an investor may not be able to reinvest the redemption proceeds at an effective interest rate as high as the interest rate on the New Instruments being redeemed and may only be able to do so at a significantly lower rate. Potential investors should consider reinvestment risk in light of other investments available at that time.

*The liquidity and price of the New Instruments following the Restructuring may be volatile.*

(p)  The price and trading volume of the New Instruments may be highly volatile. Factors such as variations in the Group's revenues, earnings and cash flows and proposals for new investments, strategic alliances and acquisitions, interest rates, the general state of the securities market and fluctuations in price for comparable companies could cause the price of the New Instruments to change. Any such developments may result in large and sudden changes in the trading volume and price of the New Instruments. There is no assurance that these developments will not occur in the future.

*A trading market for the New Instruments may not develop, and there are restrictions on the resale of some of the New Instruments.*

(q)  The New Instruments are a new issue of securities for which there is currently no trading market. While application will be made for the listing and quotation of the New Instruments on the SGX-ST, there is no assurance that the Company will be able to obtain or maintain a listing on the SGX-ST or on any other recognized securities exchange and, even if listed, a liquid trading market might not develop. If no active trading market develops, a holder of the New Instruments may not be able to resell its New Instruments at their fair market value or at all. Future trading prices of the New

112

Instruments will depend on many factors, including prevailing interest rates, the Group's operating results and the market for similar securities, which may be beyond the Group's control. In addition, the New Instruments are being offered pursuant to exemptions from registration under the US Securities Act and, as a result, a holder of the New Instruments will only be able to resell its New Instruments in transactions that have been registered under the US Securities Act or in transactions not subject to or exempt from registration under the US Securities Act. It cannot be predicted whether an active trading market for the New Instruments will develop or be sustained. If an active trading market for the New Instruments does not develop or is not sustained, the market price and liquidity of the New Instruments may be adversely affected.

*The transfer of the New Instruments may be restricted, which may adversely affect their liquidity and the price at which they may be sold.*

(r)     The New Instruments have not been registered under, and the Company is not obligated and does not plan to register the New Instruments under, the US Securities Act or the securities laws of any other jurisdiction. The New Instruments, unless so registered, may not be offered or sold except pursuant to an exemption from, or a transaction not subject to, the registration requirements of the US Securities Act and any other applicable laws. See "Important Securities Law Notices" at Section 2 (*Important Securities Law Notices*) of this Explanatory Statement. The Group has not agreed to or otherwise undertaken to register the New Instruments with the SEC or the securities regulatory authority of any other jurisdiction, and the Group has no intention of doing so.

*The New Instruments will initially be held in book-entry form, and therefore a holder of the New Instruments must rely on the procedures of the relevant clearing systems to exercise any rights and remedies.*

(s)     The New Instruments will initially only be issued in global certificated form and held through Euroclear and Clearstream. Interests in one or more global New Instruments representing the New Instruments will trade in book-entry form only, and New Instruments in definitive registered form will be issued in exchange for book-entry interests only in very limited circumstances. Owners of book-entry interests will not be considered owners or holders of the New Instruments for purposes of the New Instruments Documents. The nominee for the New Instruments Depositary will be the sole registered holder of the global New Instruments. Accordingly, a holder of the New Instruments must rely on the procedures of Euroclear or Clearstream, and if the holder is not a participant in Euroclear or Clearstream, on the procedures of the participant through which it owns its interest to exercise any rights and obligations of a holder of the New Instruments under the New Instruments Documents. Upon the occurrence of an event of default under the New Instruments Documents, unless and until definitive registered New Instruments are issued with respect to all book-entry interests, if a holder of the New Instruments owns a book-entry interest, it will be restricted to acting through Euroclear or Clearstream. The procedures to be implemented through Euroclear and Clearstream may not be adequate to ensure the timely exercise of rights under the New Instruments.

*The Company will follow the applicable corporate disclosure standards for debt securities listed on the SGX-ST, which standards may be different from those applicable to debt securities listed in certain other countries.*

(t)     The Company will be subject to reporting obligations in respect of the New Instruments to be listed on the SGX-ST. The disclosure standards imposed by the SGX-ST may be different from those imposed by securities exchanges in other countries such as the

United States or Hong Kong. As a result, the level of information that is available may not correspond to what investors in the New Instruments are accustomed to.

*Disclosure standards that apply to the Group may differ from those in the United States or other jurisdictions.*

(u)    The Group's consolidated financial information is prepared in accordance with IFRS, which differs in certain respects from US GAAP. As a result, the Group's consolidated financial information and reported earnings could be significantly different if they were prepared in accordance with US GAAP. No attempt has been made to quantify the impact of those differences. This Explanatory Statement does not contain reconciliation of the Group's consolidated financial information to US GAAP, and there is no assurance that such reconciliation would not reveal material differences. Potential investors should consult their own professional advisers for an understanding of the differences between IFRS and US GAAP, and how these differences might affect the financial information herein.

*An investment in the New Instruments is subject to exchange rate risks, and exchange controls may result in a Holder receiving less interest or principal than expected.*

(v)    The Company will pay principal and interest on the New Instruments in US dollars. This presents certain risks relating to currency conversions if a holder's financial activities are denominated principally in a currency or currency unit (the "**Investor's Currency**") other than US dollars. These include the risk that exchange rates may significantly change (including changes due to devaluation of the US dollar or revaluation of the Investor's Currency) and the risk that authorities with jurisdiction over the Investor's Currency may impose or modify exchange controls. An appreciation in the value of the Investor's Currency relative to the US dollar would decrease (i) the Investor's Currency equivalent yield on the New Instruments; (ii) the Investor's Currency equivalent value of the principal payable on the New Instruments; and (iii) the Investor's Currency equivalent market value of the New Instruments. Governments and monetary authorities may impose (as some have done in the past) exchange controls that could adversely affect an applicable exchange rate. As a result, a holder of the New Instruments may receive less interest or principal (in terms of the Investor's Currency) than expected.

*Certain major terms of the New Instruments Documents may be modified, amended or waived without the consent of each holder being affected, which may adversely affect the interest of the holders of such series of New Instruments and increase the credits risks of such series of New Instruments.*

(w)    Certain major terms of the SJ Notes Indentures may only be modified, amended or waived with the consent of each holder being affected. However, as part of the purpose of the Scheme is to improve the Group's overall financial condition, the indentures governing the TJ New Notes allow modification, amendments or waivers of certain major terms to be made with the consent of holders of not less than 80% in aggregate principal amount of the relevant series of outstanding New Instruments, including the waiver of payment defaults, the reduction of the principal amount of, or premium, if any, or interest on, any relevant New Note, and the release of any relevant guarantee (if any) or security, as the case may be, except as provided in the relevant New Instruments Documents.

*The New Instruments Trustee may request that the holders of the New Instruments provide an indemnity and/or security and/or prefunding to its satisfaction.*

114

(x)     In certain circumstances, the New Instruments Trustee may (at its sole and absolute discretion) request the holders of the New Instruments to provide an indemnity and/or security and/or prefunding to its satisfaction before it takes actions and/or steps and/or institute proceeding on behalf of holders of the New Instruments. The New Instruments Trustee shall not be obliged to take any such actions and/or steps and/or institute proceeding if not indemnified and/or secured and/or prefunded to its satisfaction. Negotiating and agreeing to any indemnity and/or security and/or prefunding can be a lengthy process and may impact on when such actions can be taken. The New Instruments Trustee may not be able to take actions and/or steps and/or institute proceeding notwithstanding the provision of an indemnity and/or security and/or prefunding to it, in breach of the terms of the New Instruments Documents and in circumstances where there is uncertainty or dispute as to the applicable laws or regulations and, to the extent permitted by the agreements and the applicable law, it will be for the holders of New Instruments to take such actions and/or steps and/or institute proceeding directly.

*Cross default or final judgments or orders in connection with event or circumstance existing as of the Original Issue Date will not be an Event of Default under the New Instruments Documents.*

(y)     Certain of the New Instruments Documents will provide that the Event of Default triggered by cross default, final judgments or orders, involuntary or voluntary cases, other proceedings or orders under any applicable bankruptcy, insolvency or other similar law, consents to the appointment of or taking possession by a receiver, liquidator or similar official or general assignment for the benefit of creditors shall not apply to any cross default, final judgments or orders, involuntary or voluntary cases, other proceedings or orders under any applicable bankruptcy, insolvency or other similar law, consents to the appointment of or taking possession by a receiver, liquidator or similar official or general assignment for the benefit of creditors arising or resulting from or related to any event or circumstance existing as of the Original Issue Date. Please refer to the events of defaults provisions of Schedule 9 (*Summary of Terms of the New Instruments*) for further details.

### 26.5   Risks Relating to the Subsidiary Guarantees and the Collateral

*There are no initial New Instruments Subsidiary Guarantors.*

(a)     The New Instruments are not guaranteed by any subsidiary of the Company or other entity. As a result, the New Instruments will effectively be subordinated to all the debt and other obligations of the subsidiaries of the Company and a number of the Company's subsidiaries will have significant assets and operations and will be able to incur potentially significant indebtedness within the limits provided in the New Instruments Documents.

*We cannot assure you that there will be New Instruments Subsidiary Guarantors in the future and if so, that they will have the funds necessary to satisfy the Company's financial obligations under the New Instruments if the Company is unable to do so.*

(b)     There are no initial New Instruments Subsidiary Guarantors. The Company cannot assure you that there will be New Instruments Subsidiary Guarantors guaranteeing the New Instruments in the future. If any New Instruments Subsidiary Guarantees are given in the future, they may be challenged under applicable financial assistance, insolvency, corporate benefit or fraudulent transfer or unfair preference laws, which could impair the enforceability of such New Instruments Subsidiary Guarantee.

(c)     Under bankruptcy laws, insolvency laws, fraudulent transfer laws, corporate benefit, financial assistance, insolvency or unfair preference or similar laws in the British Virgin Islands, Hong Kong, or other jurisdictions where future New Instruments Subsidiary Guarantors (if any) may be established, a guarantee could be voided, or claims in respect of a guarantee could be subordinated to all other debts of that New Instruments Subsidiary Guarantor if, among other things, the New Instruments Subsidiary Guarantor, at the time it incurred the indebtedness evidenced by, or when it gives its guarantee:

  (i)     incurred the debt with the intent to hinder, delay or defraud creditors or was influenced by a desire to put the beneficiary of the New Instruments Subsidiary Guarantee in a position which, in the event of the guarantor's insolvency, would be better than the position the beneficiary would have been in had the New Instruments Subsidiary Guarantee not been given;

  (ii)    received less than the reasonably equivalent value or fair consideration for the incurrence of such New Instruments Subsidiary Guarantee and/or there was otherwise an absence of or insufficient corporate benefit under applicable laws;

  (iii)   was, by entering into the New Instruments Subsidiary Guarantee, agreeing a transaction that requires grossly exorbitant payments;

  (iv)    was insolvent or rendered insolvent by reason of such incurrence;

  (v)     was engaged in a business or transaction for which the New Instruments Subsidiary Guarantor's (if any) remaining assets constituted unreasonably small capital; or

  (vi)    intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature.

(d)     The measure of insolvency for purposes of the foregoing will vary depending on the law of the jurisdiction which is being applied. A New Instruments Subsidiary Guarantor (if any) would commonly be considered insolvent at a particular time if it is unable to pay its debts as they fall due.

(e)     If a New Instruments Subsidiary Guarantee (if any) is voided or is subordinated to other indebtedness of the New Instruments Subsidiary Guarantor, or held unenforceable for any other reason, holders of the New Instruments would, among other things, cease to have a claim against that New Instruments Subsidiary Guarantor based upon such guarantee or would be subject to the prior payment of all liabilities (including trade payables) and any preferred stock of such New Instruments Subsidiary Guarantor and would solely be creditors of us and any remaining New Instruments Subsidiary Guarantors. We cannot assure you that, after the voiding or subordination of any New Instruments Subsidiary Guarantee, the Company and any remaining New Instruments Subsidiary Guarantees will be able to satisfy the claims of holders of the New Instruments in full.

*The pledges of certain Collateral may in some circumstances be voidable and may be subject to third-party consent.*

(f)     The pledge of the Collateral may be voidable as a preference under insolvency or fraudulent transfer or similar laws of Hong Kong or the British Virgin Islands if the creation of the pledge takes place at any time within six months prior to the onset or insolvency or, under some circumstances, within a longer period. Pledges of future

116

assets may also be voidable as a preference under relevant insolvency or fraudulent transfer or similar laws. If the pledge of any Collateral was to be voided for any reason, holders of the relevant New Instruments will face increasing credit risks. If the pledges of all Collateral were to be voided for any reason, holders of the New Instruments would have only an unsecured claim against us, the New Instruments Pledgors. In addition, the pledge of certain Collateral may be subject to the consent of third parties as a result of their existing rights on the relevant Collateral, and such rights or any third-party acts may adversely affect the value of the Collateral at any time.

*The Collateral may be released.*

(g)    The Collateral will consist only of the assets subject to the Share Charges as described in Schedule 9 (*Summary of Terms of the New Instruments*). The security interest in respect of certain Collateral may be released upon the disposition of such Collateral in compliance with the covenants under the New Instruments Documents.

*The value of the Collateral is unlikely to be sufficient to satisfy our obligations under the New Instruments.*

(h)    The ability of the New Instruments Collateral Agent, on behalf of the New Instruments Trustee, to foreclose on the Collateral upon the occurrence of an Event of Default or otherwise, will be subject in certain instances to perfection and priority issues. Although procedures will be undertaken to support the validity and enforceability of the security interests, we cannot assure you that the New Instruments Collateral Agent, the New Instruments Trustee or holders of the New Instruments will be able to enforce the security interest.

(i)    The value of the Collateral in the event of a liquidation will depend upon market and economic conditions, the availability of buyers and similar factors. No independent appraisals of any of the Collateral have been prepared by or on behalf of us in connection with the New Instruments. Accordingly, we cannot assure you that the proceeds of any sale of the Collateral following an acceleration of the New Instruments would be sufficient to satisfy, or would not be substantially less than, amounts due and payable on the New Instruments. By their nature, some or all of the Collateral may be illiquid and may have no readily ascertainable market value. Likewise, we cannot assure you that the Collateral will be saleable or, if saleable, that there will not be substantial delays in its liquidation.

*We will in certain cases have certain degrees of control over the Collateral.*

(j)    Although the New Instruments Documents, the Security Documents and the Intercreditor Agreement provide restrictions on selling, transferring, disposing of the Collateral, these documents may still permit the New Instruments Pledgors and other obligors and us to remain in possession of, to retain certain degrees of control over, to operate, and/or to collect, invest and/or dispose of any income from, the Collateral under certain circumstances, subject to the provisions of the New Instruments Documents, the Security Documents and the Intercreditor Agreement. These rights may adversely affect the value of the Collateral at any time.

*It may be difficult to realise the value of the Collateral.*

(k)    The security interest of the New Instruments Collateral Agent may be subject to practical problems generally associated with the realization of security interests in the Collateral. For example, the New Instruments Collateral Agent may need the cooporatoin of third parties to obtain the consent of a third-party or governmental

agency to obtain or enforce a security interest in a license or contract or to otherwise dispose of the Collateral. We cannot assure you that the New Instruments Collateral Agent will be able to obtain any such cooperation or consent. If the New Instruments Collateral Agent exercises its rights to foreclose on certain assets, transferring required government approvals to, or obtaining new approvals by, a purchaser of assets may require cooperation from third parties or governmental proceedings with consequent delays.

(l)      In addition, the New Instruments Collateral Agent may need to evaluate the impact of potential liabilities before determining to foreclose on the Collateral. In this regard, the New Instruments Collateral Agent may decline to foreclose on the Collateral or exercise remedies available if it does not receive indemnification to its satisfaction from the holders of the New Instruments.

*Rights of holders of the New Instruments in the Collateral may be adversely affected by the failure to perfect the security interests.*

(m)     The New Instruments Collateral Agent's ability to foreclose on the Collateral may be subject to restrictions, including but not limited to priority issues, state and provincial law requirements, applicable bankruptcy law, prior liens and practical problems associated with the realization of the New Instruments Collateral Agent's lien on the Collateral, including cure rights, foreclosing on the Collateral within the time periods permitted by third parties or prescribed by laws, obtaining third-party consents, making additional filings, statutory rights of redemption and the effect of the order of foreclosure. There can be no assurance that the consents of any third parties and approvals by governmental entities or courts of competent jurisdiction will be given when required to facilitate a foreclosure on such assets or that foreclosure on the Collateral will be sufficient to make all payments on the New Instruments.

27.      **TAXATION**

**Overview**

The Company has not analysed, and this Explanatory Statement does not discuss, the tax consequences to any Scheme Creditor of the Restructuring. Such tax consequences may be complex and each Scheme Creditor is urged to consult its own tax adviser with respect to the tax consequences of the Restructuring in light of such person's particular circumstances, including the tax consequences in any jurisdiction of the exchange of interests in the SJ Notes for any Scheme Consideration, and the receipt, ownership and disposition of such Scheme Consideration. Scheme Creditors are liable for any taxes that may arise in respect of such Scheme Creditor as a result of the Scheme and the Restructuring, and shall have no recourse to the Company, the Group, the SJ Notes Subsidiary Guarantors, the SJ Notes Trustee, the Information Agent or any other person in respect of such taxes or any filing obligation with respect thereto.

## SCHEDULE 1

## DEFINITIONS AND INTERPRETATION

1.      **Definitions**

In this Explanatory Statement:

| | |
|---|---|
| "**Accession Code**" | means a unique code provided by the Information Agent to a Scheme Creditor following its valid accession to the RSA, and which must be included by such Scheme Creditor within the relevant Scheme Creditor Form in its voting instructions in respect of the Scheme. |
| "**Accession Letter**" | means a letter substantially in the form set out in Schedule 3 (*Form of Accession Letter and Restricted Debts Notice*) to the RSA. |
| "**Account Holder**" | means any Person who is recorded in the books of a Clearing System as being a holder of a book-entry interest in the SJ Notes or the Lake Notes in an account with that Clearing System or, as the context may require, is or was recorded in such books as being such a holder of SJ Notes or the Lake Notes in such an account at the Voting Record Time (in respect of voting purposes at the Scheme Meeting) and/or the Entitlement Record Time (in respect of receiving Scheme Consideration). |
| "**Account Holder Letter**" | means substantially in the form of account holder letter which is appended to the Solicitation Packet, to be made available on the Transaction Website. |
| "**Adjudication Procedure**" | means the procedure for the resolution of a Referred Scheme Claim as set out in Clause 36 (*Adjudication Procedure*) of the Scheme. |
| "**Ad Hoc Group**" | means the ad hoc group of Participating Creditors or investment managers or investment advisors to such Participating Creditors, who (i) have been constituted from time to time and as notified to Tianji (subject to and in accordance with the transfer provisions under the RSA); and (ii) are advised by the AHG Advisors from time to time and which such Participating Creditors, as at the date of the RSA, include the Initial Participating Creditors. |
| "**Advisors**" | means (i) Sidley Austin, (ii) Houlihan Lokey, (iii) Maples and Calder, (iv) BOCI Asia Limited (v) CICC and Commerce & Finance Law Offices. |
| "**Affiliate**" | means, with respect to any Person, any other Person: (a) directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person; or (b) who is a director or officer of such Person or any Subsidiary of such Person or of any Person referred to in |

119

clause (a) of this definition and with respect to any Participating Creditor, any of its managers, investment manager or investment advisors, and any entity managed or advised by that manager, investment manager or investment advisor. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

**"Agreed Form"**    means in the form agreed in writing between:

(a)    the Company (or the Company's Advisors acting on its behalf);

(b)    Majority TJ AHG (or the AHG Advisors acting on their behalf);

(c)    in relation to the New Instruments Documents, the New Instruments Trustee; and

(d)    only in relation to the Holding Period Trust Deed and any other documents to which the Holding Period Trustee is party, the Holding Period Trustee,

in each case acting reasonably.

**"AHG Advisors"**    means Moelis & Company Asia Limited, Kirkland & Ellis, Harney Westwood & Riegels, Fangda Partners, and other professional advisors as the Ad Hoc Group may appoint from time to time.

**"AHG Financial Advisor Fees"**    means the reasonable fees, costs and expenses of the financial advisor (Moelis & Company Asia Limited) to the TJ AHG that CEG has agreed to pay in accordance with the terms set out in the fee letter agreement dated 6 April 2022.

**"Ancillary Claim"**    means any Claim by a Scheme Creditor against a Released Person under or in respect of the Existing Debt Instruments arising as a result of effecting, adhering to or complying with the releases in Clause 24.2(a)(i) (*Releases*) of the Scheme (excluding for the avoidance of doubt any Claim in respect of any Liability (i) of any Released Person which arises as a result of a failure to comply with any of the terms of this Scheme or any Restructuring Document (including but not limited to the New Instruments Documents) and (ii) arising from or in connection with any Excluded Liability or Excluded Collateral..

120

| | |
|---|---|
| **"Applicable Sanctions"** | means laws, regulations, rules and/or orders relating to economic, financial or trade sanctions, restrictive measures or embargoes administered, enacted, maintained and/or enforced by any Governmental Entity of the United States of America (including by the US Office of Foreign Assets Control or the US Department of State), the European Union, the United Kingdom and the British Overseas Territories (including, for the avoidance of doubt, The Russia (Sanctions) (EU Exit) Regulations 2019, as amended from time to time and as applicable in the Cayman Islands pursuant to The Russia (Sanctions) (Overseas Territories) Order 2020 (as amended). |
| **"Applicable Sanctions List"** | means each of: |

(a) the lists of Specially Designated Nationals and Blocked Persons or "Foreign Sanctions Evaders" or any other list of Persons subject to, or targeted by, similar sanctions as administered, maintained and/or enforced by the Office of Foreign Assets Control of the US Treasury, the US Department of Commerce, the US Department of State and any other Governmental Entity of the United States;

(b) the Consolidated List of Persons, Groups and Entities Subject to EU Financial Sanctions maintained by the European Commission, Annex XIX of Regulation (EU) No 833/2014, or any other list of Persons subject to, or targeted by, similar sanctions as administered, maintained and/or enforced by the European Union or any Governmental Entity in any Member State of the European Union; or

(c) the Consolidated List of Financial Sanctions Targets in the United Kingdom maintained by the Office of Financial Sanctions Implementation, His Majesty's Treasury of the United Kingdom, the United Kingdom Sanctions List maintained by the Foreign, Commonwealth and Development Office, or any other list of Persons subject to, or targeted by, similar sanctions administered, maintained and/or enforced by any Governmental Entity of the United Kingdom or the Cayman Islands,

or any other similar sanctions list of persons and entities subject to a prohibition to transact with, that is developed, maintained and published by any Governmental Entity of the United States of America (including by the U.S. Office of Foreign Assets Control or the U.S. Department of State), the European Union, the United Kingdom and the British Overseas Territories in connection with Sanctions, in each case as amended, supplemented or substituted from time to time, and "Applicable

Sanctions Lists" includes, collectively, (a), (b) and (c) of this definition.

**"Assessed Value"**    means an amount equal to the value recoverable by an Other Debt Scheme Creditor in respect of the relevant Excluded Liabilities, Excluded Collateral, put option and/or repurchase obligation as determined by the Scheme Administrators (or, if applicable, the Scheme Adjudicator) in accordance with the terms of the Scheme and set out in the Deed of Agreed Valuation.

**"Authorisation"**    means:

(a) an authorisation, consent, approval, resolution, license, exemption, filing, notarisation, lodgment or registration; or

(b) in relation to anything that will be fully or partly prohibited or restricted by law if a Governmental Agency intervenes or acts in any way within a specified period after lodgment, filing, registration or notification, the expiry of that period without intervention or action.

**"Bar Date"**    means the date which is 135 days after the Restructuring Effective Date.

**"Blocked Assets"**    means, collectively, the Blocked New Instruments and any Consent Fee to which Blocked Scheme Creditors may be entitled in accordance with the terms of the Scheme and Applicable Sanctions.

**"Blocked New Instruments"**    means the Residual New Instruments to which Blocked Scheme Creditors are entitled in accordance with the terms of the Scheme and Applicable Sanctions.

**"Blocked Scheme Creditor"**    means a Scheme Creditor (other than a Sanctioned Scheme Creditor) that is not entitled, able or permitted (whether directly or through a custodian) to submit instructions or settle through the Clearing Systems as a result of Applicable Sanctions affecting the Scheme Creditor or its custodian as reasonably determined by the Clearing Systems, and which does not have a sanctions licence in respect of the Applicable Sanctions which would allow that Scheme Creditor to freely deal in the Scheme Consideration and submit instructions or settle through the Clearing Systems.

**"Blocked Scheme Creditor Form"**    means a form from a Blocked Scheme Creditor substantially in the form of the blocked scheme creditor form appended to the Solicitation Packet, to be made available on the Transaction Website.

**"Blocking Regulation"**    means:

122

        (a) Council Regulation (EC) No 2271/1996 of 22 November 1996 (as amended) and/or any applicable national law or regulation relating to it;

        (b) Council Regulation (EC) No 2271/1996 of 22 November 1996 (as amended) as it forms part of domestic law of the United Kingdom by virtue of the European Union (Withdrawal) Act 2018; or

        (c) The Protection of Trading Interests Act 1980 of the United Kingdom.

| | |
|---|---|
| **"Board"** | means the board of Directors. |
| **"BOCI"** | means BOCI Asia Limited, in their capacity as advisers to the Company. |
| **"Business Day"** | means any day which is not a Saturday, Sunday, legal holiday or other day on which banking institutions in the City of New York, the City of London, the BVI, the Cayman Islands, Hong Kong or the PRC are authorised or required by law or governmental regulation (as applicable) to close. |
| **"BVI"** | means the British Virgin Islands. |
| **"CEG"** | means China Evergrande Group, an exempted company incorporated with limited liability under the laws of the Cayman Islands with registration number 169971 and having its registered office at P.O. Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands and the shares of which are listed on the Main Board of the Hong Kong Stock Exchange. |
| **"Capital Stock"** | means, with respect to any Person, any and all shares, interests (including partnership interests), rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting) equity of such Person. |
| **"Castle Loan Put Option"** | means the US$258 million put option granted by the Company in relation to private loan borrowed by Sky Joy Holdings Limited. |
| **"CICC"** | means China International Capital Corporation Hong Kong Securities Limited, in their capacity as adviser to the Scheme. |
| **"Chairman"** | means Professor. Hui Ka Yan. |
| **"Chairperson"** | means the chairperson of the Scheme Meeting. |
| **"Change of Control"** | has the meaning given to that term under the New Instruments Documents. |
| **"Chapter 15 Recognition Order"** | means an order or orders of the US Bankruptcy Court recognising the Scheme as a foreign main proceeding (or |

123

in the alternative, a foreign non-main proceeding) and giving effect to certain aspects of the compromise and arrangement set out in the Scheme, including the Releases under Clause 24 (*Releases*) of the Scheme.

**"Chapter 15 Recognition Proceeding"**    The recognition proceeding before the US Bankruptcy Court to recognize the Scheme pursuant to chapter 15 of the United States Bankruptcy Code.

"**Claim**"    means all and any present and future Liabilities together with any refinancing, novation, deferral or extensions relating to or arising in respect of those Liabilities, actions, causes of action, claims, counterclaims, suits, debts, set-offs, sums of money, accounts, contracts, agreements, promises, contribution, subrogation, indemnification, damages, judgments, executions, court or arbitration awards, demands or rights whatsoever or howsoever arising, whether present, future, prospective or contingent, known or unknown, whether directly or indirectly, whether in person or through another Person, whether or not for a fixed or unliquidated amount, whether or not involving the payment of money or the performance of an act or obligation or any failure to perform any obligation or any omission, whether arising at common law, in equity or by statute in or under the laws of the Cayman Islands, the BVI, Hong Kong, PRC, New York or under any other law or in any other jurisdiction howsoever arising and "**Claims**" shall be construed accordingly.

"**Class A Debts**"    has the meaning given to it in the CEG Schemes.

"**Class C Debts**"    has the meaning given to it in the CEG Schemes.

"**Clearing Systems**"    means Euroclear and Clearstream, as applicable, and any successor thereto.

"**Clearstream**"    means Clearstream Banking S.A.

"**CMP Regulations 2018**"    means the Securities and Futures (Capital Markets Products) Regulations 2018.

"**Collateral**"    means all collateral securing, or purported to be securing, directly or indirectly, the New Instruments, and initially consisting of the assets subject to the Share Charges, in accordance with the Security Documents, substantially in the form to be made available on the Transaction Website which shall be in the Agreed Form.

"**Company**"    means Tianji.

"**Company Information**"    means information in the possession or control of the Company or the Group that the Scheme Administrators consider in their sole discretion relevant to evaluate the Other Debt Scheme Creditors' Entitlements.

124

| | |
|---|---|
| "**Completion Notice**" | has the meaning given in Clause 6.1 of the Scheme. |
| "**Consent Fee**" | means, with respect to each Participating Creditor and subject to and in accordance with Clause 5 *(Consent Fee)* of the RSA, an amount equal to 0.25% of the outstanding principal amount of the Eligible Restricted Debts held by such Participating Creditor as of the Voting Record Time, payable in kind in the form of Tranche A Notes to be issued by the Company in accordance with the section headed "Consent Fee" in the Term Sheet. |
| "**Consent Fee Deadline**" | means 5:00 p.m. Hong Kong time, with the original date on 27 April 2023 and subsequently extended to 5:00 p.m. Hong Kong time on 18 May 2023. |
| "**Consultation Period**" | means the thirty (30) calendar day period commencing on and from the date that an Other Debt Scheme Creditor submits the Scheme Administrator Estimate Acceptance or Rejection Form to the Scheme Administrators rejecting the Scheme Administrator Estimate, unless extended by the Scheme Administrators in accordance with Clause 34.8(c) of the Scheme. |
| "**Court**" | means the High Court of Hong Kong and any court capable of hearing appeals therefrom. |
| "**Credit Support**" | means any security, encumbrance, collateral, guarantee, bond, indemnity, repurchase obligation, put option, assumption of any Liability or other form of credit support or assurance or arrangement having the same economic effect. |
| "**Credit Support Document**" | means any document or instrument documenting or constituting or purporting to document or constitute any Credit Support (howsoever described), as amended, varied and supplemented from time to time. |
| "**Custody Instruction**" | means an instruction to the relevant Clearing System to block the SJ Notes or the Lake Notes (up to the Restructuring Effective Date) from trading in the relevant Clearing System or, in respect of the Lake Notes on or after the Restructuring Effective Date, to verify the Scheme Claims in respect of the Lake Notes of the Lake Noteholder. |
| "**Custody Instruction Deadline**" | means 5:00 p.m. (Hong Kong time) on the 15 August 2023. |
| "**Custody Instruction Reference Number**" | means, the unique reference provided by Euroclear or Clearstream, following an instruction from an Account Holder to block the relevant SJ Notes in accordance with the instructions contained in this Explanatory Statement. |
| "**C(WUMP)O**" | means the Companies (Winding Up and Miscellaneous Provisions) Ordinance (Cap. 32 of the Laws of Hong |

|                                    | Kong), as amended, modified or re-enacted from time to time. |
|------------------------------------|--------------------------------------------------------------|
| **"Deed of Agreed Valuation"**     | means a deed to be entered into between an Other Debt Scheme Creditor, the Scheme Administrators and the Company recording (i) the Other Debt Scheme Creditor's Entitlement as determined by the Scheme Administrators or, if required, the Scheme Adjudicator and (ii) a release of the relevant Other Debt Scheme Creditor's Scheme Claim pursuant to the governing law of the underlying Existing Debt Instruments (as applicable), pursuant to the terms of the Scheme which shall be in Agreed Form. |
| **"Deeds of Release"**             | shall include the form of (i) New York law governed global deed of release in respect of, among other things, the SJ Notes; and (ii) Hong Kong law governed deed of release in respect of, among other things, the Other Debts, each of which shall be executed pursuant to the authority conferred by Clause 24 (*Releases*) of the Scheme in respect of, among other things, the relevant Scheme Creditors in substantially the form to be made available on the Transaction Website and which shall be in the Agreed Form, subject to any modifications required or approved in accordance with Clause 27 (*Modifications to the Scheme and the Restructuring Documents*) of the Scheme. |
| **"Deed of Undertaking"**          | means a deed of undertaking substantially in the form as published on the Transaction Website which shall be in the Agreed Form. |
| **"Deed of Undertaking Parties"**  | means the parties to the Deed of Undertaking, which it is intended shall include: the SJ Notes Subsidiary Guarantors, the New Instruments Pledgors, the New Instruments Subsidiary Guarantors, the SJ Notes Trustee, the New Instruments Trustee, the SJ Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the SJ Notes Depositary, the New Instruments Collateral Agent, the Chairman (and any of the Chairman's entities) required to perform obligations as part of the Restructuring, holding entities within the Group providing security (to the extent they are not New Instruments Subsidiary Guarantors) the Scheme Administrators, and the Information Agent and such other additional parties to the Deed of Undertaking (which shall be in the Agreed Form). |
| **"Deloitte"**                     | means Deloitte Advisory (Hong Kong) Limited. |
| **"Deficiency Basis"**             | has the meaning set out in Section 4.5 of this Explanatory Statement. |
| **"Designated Recipient"**         | means in relation to any Scheme Creditor (who is not a Sanctions-Affected Scheme Creditor or a Sanctioned |

Scheme Creditor) that can make affirmative Sanctions Law Representations by submission of a validly completed Distribution Confirmation Deed, any entity that is designated as such by a Scheme Creditor in accordance with a valid Designated Recipient Form as the recipient of the New Instruments to be issued to such Scheme Creditor as Scheme Consideration, subject to limitations in accordance with applicable securities laws and provided that (i) the Designated Recipient shall only be validly designated if it or an Account Holder on its behalf has submitted a Distribution Confirmation Deed and/or any other applicable forms that its designating Scheme Creditor is required to submit pursuant to the Scheme; (ii) a Scheme Creditor may designate one or more such entity and if such entity is a nominee holder it may only hold on behalf of one beneficial holder; and (iii) the Designated Recipient is an Eligible Person.

"**Designated Recipient Form**"

means the form attached to the Account Holder Letter and/or the Proxy Form (as applicable) and substantially in the form to be made available on the Transaction Website by which a Scheme Creditor may appoint one or more Designated Recipients to be the recipients of all or part of the New Instruments that would otherwise be issued to that Scheme Creditor as Scheme Consideration or as any Consent Fee payable to that Scheme Creditor.

"**Director(s)**"

means the director(s) of the Company from time to time.

"**Distribution Confirmation Deed**"

means the form of deed attached to the Account Holder Letter and/or the Proxy Form (as applicable) and substantially in the form to be made available on the Transaction Website confirming amongst other things that the Eligible Creditor or the Designated Recipient may lawfully be issued the New Instruments as Scheme Consideration which shall be in the Agreed Form.

"**EEA**"

means the European Economic Area.

"**EEA Qualified Investor**"

has the meaning given to it at Section 2.3 (*European Economic Area*) of this Explanatory Statement.

"**Eligible Creditor**"

means a Scheme Creditor who is an Eligible Person and who has submitted or caused to be submitted the Scheme Creditor Forms, as applicable, such that they are submitted and received by the Information Agent in accordance with the terms of the Scheme, before the applicable deadlines set out in the Solicitation Packet to be made available on the Transaction Website.

"**Eligible Participating Creditors**"

means Participating Creditors who hold, at the Voting Record Time, Existing Debts which validly became Eligible Restricted Debts before the Consent Fee Deadline (as applicable) in accordance to the terms of the RSA, and

among other conditions, and who vote in favour of the Schemes at the relevant Scheme Meeting..

"**Eligible Person**"

means a Person who has provided affirmative Securities Law Representations and Sanctions Law Representations to the Information Agent before the applicable deadlines set out in the Solicitation Packet to be made available on the Transaction Website.

"**Eligible Restricted Debts**"

means a Restricted Debt which was made subject to the terms of the RSA by a Participating Creditor on or prior to the Consent Fee Deadline; and "**Eligible Restricted Debts**" means all of them.

"**Enforcement Action**"

means:

(a) the acceleration of any sum payable or the making of any declaration that any sum payable is due and payable or payable on demand;

(b) the making of any demand against any member of the Group under any guarantee or surety provided by that member of the Group;

(c) the suing for, commencing, or joining of any legal or arbitration proceedings against any member of the Group to recover any sums payable or under any guarantee or surety provided by any member of the Group;

(d) the taking of any steps to enforce or require the enforcement of any security granted by any member of the Group;

(e) the levying of any attachment, garnishment, sequestration or other legal process over or in respect of any assets of the Group;

(f) the petitioning, applying, or voting for any Insolvency Proceedings in relation to any member of the Group;

(g) the commencing or continuation of any legal action or other proceedings against any member of the Group (or any director or officer thereof) or any of their respective assets;

(h) joining any other entity or person in the exercise of any of the foregoing rights;

(i) exercising any right, power, privilege or remedy in connection with the foregoing; or

(j) directing any trustee or agent to do any of the foregoing,

other than (x) as contemplated by the Restructuring, and (y) any action falling within (a) to (j) above which is necessary, but only to the extent necessary, to preserve the validity, existence, or priority of claims in respect of the SJ Notes, including the registration of such claims before any court or governmental authority and the bringing, supporting or joining of proceedings to prevent the loss of the right to bring, support, or join proceedings by reason of applicable limitation periods.

| | |
|---|---|
| "**Entitlement**" | has the meaning given to it in Section 5 (*Summary of Actions to be taken by Scheme Creditors*) of this Explanatory Statement. |
| "**Entitlement Record Time**" | means the Restructuring Effective Date. This is the time designated by the Company for the determination of Entitlements of the Scheme Creditors for the purposes of distribution of Scheme Consideration (for the avoidance of doubt, this shall not prevent the Valuation and Adjudication Procedure from taking place after the Restructuring Effective Date and/or taking into account prevailing circumstances at such time, including without limitation the release or extinguishment of rights or benefits of any Excluded Collateral or Excluded Liabilities resulting in a reduction of the relevant Assessed Value as applicable). |
| "**Estimation Notice**" | means a notice from the Scheme Administrators to each Other Debt Scheme Creditor notifying such Other Debt Scheme Creditor of the Scheme Administrator Estimate. |
| "**Euroclear**" | means Euroclear Bank SA/NV. |
| "**EUWA**" | means the European (Withdrawal) Act 2018. |
| "**Event of Default**" | has the meaning given to that term under the New Instruments Documents. |
| "**EVPS**" | Evergrande Property Services Group Limited, a subsidiary of CEG the shares of which are listed on the HKEX (Stock Code: 6666). |
| "**Excluded Collateral**" | means any security, collateral, guarantee, bond, indemnity, keepwell agreement or other form of assurance granted by an Excluded Liabilities Party Person for the purpose of securing and/or guaranteeing against and/or supporting of the SJ Notes or any Other Debt. |
| "**Excluded Liabilities**" | means any Liability of an Excluded Liabilities Party Person. |
| "**Excluded Liabilities Party Person**" | means certain Persons other than the Company who is an obligor , guarantor, security or collateral pledgor or other |

or Credit Support provider of or in respect of the SJ Notes or the Other Debts.

**"Existing Debts"** means, collectively, the SJ Notes and the Other Debts.

**"Existing Agents"** means the Existing Facility Agents and the Existing Security Agents.

**"Existing Debt Instruments"** means, collectively, the SJ Notes Documents and the financing documents and any document or instrument documenting or constituting or purporting to document or constitute any Other Debts and any Credit Support Document entered into in respect of the SJ Notes and the Other Debts, as amended, varied and supplemented from time to time.

**"Existing Facility Agents"** means:

(a) China Construction Bank (Asia) Corporation Limited, in its capacity as (i) agent and (ii) account bank under the Castle Loan Put Option;

(b) (i) China CITIC Bank International Limited; (ii) China Everbright Bank Co., Ltd. Hong Kong Branch and (iii) Tai Fung Bank Limited, in their capacity as arrangers under the Hero Loan; and

(c) China CITIC Bank International Limited, in its capacity as (i) agent and (ii) account bank under the Hero Loan.

**"Existing Security Agents"** means:

(a) China CITIC Bank International Limited, in its capacity as security agent under the Hero Loan; and

(b) China Construction Bank (Asia) Corporation Limited, in its capacity as security agent of the Castle Loan Put Option.

**"Explanatory Statement"** means the composite document addressed to Scheme Creditors in relation to the Scheme pursuant to Section 671 of the Hong Kong Companies Ordinance.

**"Final Distribution"** means the Scheme Consideration to be distributed on the Final Distribution Date from the Residual New Instruments to each Scheme Creditor that is not a Santions-Affected Scheme Creditor (or, in respect of

Blocked Scheme Creditors, to the Successor Escrow Agent) that is a Participating Creditor or to a Designated Recipient (if applicable), in each case in accordance with their respective Entitlements and the terms under the Scheme (and, without double counting any Initial Distribution received, if applicable).

**"Final Distribution Date"**

means the final date on which the Scheme Consideration shall be distributed to Scheme Creditors (that are not a Sanctions-Affected Scheme Creditor) and that are entitled to a portion of the Residual New Instruments or to the Successor Escrow Agent on behalf of the Blocked Scheme Creditors, in accordance with the terms of the Restructuring Documents, within thirty (30) calendar days of the completion of the finalisation of the Valuation and Adjudication Procedure carried out pursuant to Clauses 34 (*Valuation Procedure*) and 36 (*Adjudication Procedure*). Of the Scheme. Such date is to be designated by the Company and communicated to the Scheme Creditors in writing via the Transaction Website and/or through such public medium as may be appropriate at the time The Final Distribution Date will be a date after the conclusion of the Valuation and Adjudication Procedure.

**"Financial Promotion Order"**

means the UK Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (as amended).

**"Full Accrued Claim Basis"**

means the calculation of a Scheme Creditor's Scheme Claims based on a full accrued claim basis at the relevant time (as applicable, depending on whether this is looking to scheme consideration or voting purposes) of:

(a) the outstanding principal amount or (in the case of a put option or repurchase obligation) price amount of a Scheme Creditor's Scheme Claims at the Entitlement Record Time or Voting Record Time (as applicable), without permitting duplicative claims or portions of claims against the Company other than for $1, as determined by the Scheme Administrators or the Chairperson (as applicable); and

(b) all accrued but unpaid interest on such Scheme Claims up to (but excluding) the Reference Date or Voting Record Time or (as applicable), as determined by the Scheme Administrators or the Chairperson (as applicable).

**"FSMA"**

means the UK Financial Services and Markets Act 2000.

**"FY2021"**

means the year ended 31 December 2021.

**"FY2022"**

means the year ended 31 December 2022.

131

**"GLAS"**                      means GLAS Specialist Services Limited, who the Company has appointed to liaise with Blocked Scheme Creditor including the processing of any Blocked Scheme Creditor Forms, under the Scheme.

**"Global Certificates"**       means the global certificates evidencing the SJ Notes.

**"Governmental Entity"**       means any federal, national or local government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal or judicial body of Hong Kong, the PRC, the United States of America, the European Union, the United Kingdom, the British Overseas Territories, the Cayman Islands or any other relevant jurisdiction.

**"Group"**                     means CEG and its subsidiaries from time to time.

**"Hengda Real Estate"**        means Hengda Real Estate Group Co., Ltd. (恒大地产集团有限公司), company incorporated with limited liability under the laws of the PRC.

**"Hero Loan"**                 means HK$7.6 billion loan borrowed by the Company pursuant to facilities agreement dated 21 November 2020.

**"HKEX"**                      means The Stock Exchange of Hong Kong Limited.

**"Holding Period"**            means the period from the Restructuring Effective Date up to and including one Business Day after the Final Distribution Date.

**"Holding Period Custody Instruction Deadline"**  means 5:00 p.m. (Hong Kong time) on the date which is five (5) Business Days prior to the Bar Date.

**"Holding Period Trust"**      means the holding period trust constituted pursuant to the Holding Period Trust Deed.

**"Holding Period Trust Deed"** means the holding period trust deed to be entered into between, among others, Scenery Journey, Tianji and the Holding Period Trustee, in substantially the form to be made available on the Transaction Website subject to any modifications required or approved in accordance with Clause 27 (*Modifications to the Scheme and the Restructuring Documents*) of the Scheme which shall be in the Agreed Form.

**"Holding Period Trustee"**    means GLAS Trustees Limited holding the relevant Scheme Consideration and any Consent Fee (if applicable), for and on behalf of the Scheme Creditors, in accordance with the Restructuring Documents, or any additional or replacement trustee at any time..

**"Hong Kong"**                 means the Hong Kong Special Administrative Region of the PRC.

132

| | |
|---|---|
| **"Hong Kong Companies Ordinance"** | means the Companies Ordinance (Cap. 622 of the Laws of Hong Kong), as amended, modified or re-enacted from time to time. |
| **"Hong Kong Companies Registrar"** | means the Hong Kong Registrar of Companies appointed under the Hong Kong Companies Ordinance. |
| **"Houlihan Lokey"** | means Houlihan Lokey (China) Limited. |
| **"IFRS"** | means the International Financial Reporting Standards. |
| **"Indenture"** | means each of: |

(a) the indenture dated January 24, 2020, as amended, supplemented or otherwise modified from time to time, between SJ, the Company, Hengda Real Estate, the SJ Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the SJ Existing October 2022 Notes;

(b) the indenture dated November 6, 2018, as amended, supplemented or otherwise modified from time to time, between SJ, the Company, Hengda Real Estate, the SJ Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the SJ Existing November 2022 Notes;

(c) the indenture dated January 24, 2020, as amended, supplemented or otherwise modified from time to time, between SJ, the Company, Hengda Real Estate, the SJ Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the SJ Existing October 2023 Notes; and

(d) the indenture dated November 6, 2018, as amended, supplemented or otherwise modified from time to time, between SJ, the Company, Hengda Real Estate, the SJ Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the SJ Existing November 2023 Notes,

and collectively, the "**Indentures**", each governed by and construed in accordance with the laws of the State of New York.

| | |
|---|---|
| **"Information Agent"** | means Morrow Sodali Limited in its capacity as Tianji's information agent. |
| **"Initial Distribution"** | means the initial portion of the Scheme Consideration to be distributed on the Restructuring Effective Date to SJ Notes Scheme Creditors (and/or their Designated Recipients (if applicable)) who have submitted the required Scheme Creditor Form(s) by the SJ RED |

Distribution Deadline, and the Holding Period Trustee, in each case in accordance with the terms of this Scheme.

**"Initial Participating Creditors"** means the list of initial participating creditors listed in Schedule 1 (*The Initial Participating Creditors*) of the RSA.

**"Insolvency Event"** means a court of competent jurisdiction granting an order to commence any Insolvency Proceedings.

**"Insolvency Proceeding"** means, in any jurisdiction:

(a) the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration, bankruptcy, provisional supervision or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Company;

(b) a composition or arrangement with any creditor of any Obligor, or an assignment for the benefit of creditors generally of the Company or a class of such creditors;

(c) the appointment of a liquidator, receiver, administrator, administrative receiver, compulsory manager, provisional liquidator, provisional supervisor or other similar officer in respect of the Company or any of its assets (other than the shares of an Unrestricted Subsidiary or as required to implement the Restructuring);

(d) enforcement of any security over any assets of the Company (other than the shares of an Unrestricted Subsidiary); or

(e) any procedure or step taken in any jurisdiction analogous to those set out in paragraphs (a) to (d) above.

**"Intercompany Claim"** means the intercompany claim of CEG against the Company as listed in Schedule 2 to the Scheme.

**"Intercreditor Agreement"** means an intercreditor agreement to be entered into between, among others, the Company, the New Instruments Trustee, and the New Instruments Collateral Agent, in substantially the form to be made available on the Transaction Website subject to any modifications required or approved in accordance with Clause 27 (*Modifications to the Scheme and the Restructuring Documents*) of the Scheme which shall be in the Agreed Form.

**"Intermediary"** means a Person (other than an Account Holder) who holds an interest in the SJ Notes on behalf of another Person or other Persons.

| | |
|---|---|
| **"Investor's Currency"** | has the meaning given to it in Section 26.4 (*Risks Relating to the New Instruments*) of this Explanatory Statement. |
| **"Lake Noteholders"** | means Persons with an economic or beneficial interest as principal in the Lake Notes held in global form or global restricted form through the Clearing Systems as at the Voting Record Time (in respect of voting purposes at the Scheme Meeting) and/or the Entitlement Record Time (in respect of the determination of such persons' Entitlements), each of whom has a right, upon satisfaction of certain conditions, to be issued definitive registered notes in accordance with the terms of the Lake Notes and the Lake Notes Trust Deed, and (but without double counting in each case) any depository or trustee of the Lake Notes. |
| **"Lake Notes Events of Default"** | has the meaning given to it in Section 8.14 (Events of Default" to this Explanatory Statement. |
| **"Lake Notes"** | means the 8.5% senior notes due October 3, 2021 (ISIN: XS2054446617, Common Code: 205444661) issued by Jumbo Fortune Enterprises Limited and guaranteed by the Company. |
| **"Lake Notes Trustee and Agent"** | means China Construction Bank (Asia) Corporation Limited in its various capacities as (i) notes trustee and security trustee, (ii) settlement agent, (iii) principal agent, transfer agent, calculation agent, registrar and (iv) original account bank under the Lake Notes. |
| **"Liability"** | means any debt, liability or obligation whatsoever, whether it is present, future, prospective or contingent, whether directly or indirectly, whether or not its amount is fixed or undetermined, whether or not it involves the payment of money or the performance of an act or obligation, and whether arising at common law, in equity or by statute in or under the laws of the BVI, the Cayman Islands, Hong Kong, PRC, New York or under any other law or in any other jurisdiction howsoever arising and "**Liabilities**" shall be construed accordingly. |
| **"Liquidation Analysis"** | means the liquidation analysis report prepared by Deloitte as set out in Schedule 2 (*Liquidation Analysis*) to this Explanatory Statement. |
| **"Listing Rules"** | means the Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited. |
| **"Longstop Date"** | means 15 December 2023 unless extended pursuant to Clause 3.6 (*Application and Effectiveness of this Scheme*) of the Scheme. |
| **"Majority TJ AHG"** | has the meaning given to it in the RSA. |
| **"Majority Participating Creditors"** | means, at any time, Participating Creditors who hold (beneficially, as principal) in aggregate more than 50% of |

135

|  | the outstanding principal amount of the Restricted Debts held in aggregate by all Participating Creditors at that time (for the avoidance of doubt, excluding the SJ Notes beneficially and/or legally (as applicable) held by the Chairman, and/or Xin (BVI) Limited and his or its (as applicable) Affiliates which are in the aggregate amount of US$600,000,000 as at the date of the RSA. |
|---|---|
| **"Management"** | means key management personnel of the Group, including the Board. |
| **"Maples and Calder"** | means Maples and Calder (Hong Kong) LLP, Maples and Calder (Cayman) LLP, and Maples and Calder (BVI), in their capacity as advisors to the Company as to matters of Cayman Islands law and British Virgin Islands law. |
| **"Member States"** | means a member state of the EEA. |
| **"MiFID II"** | means Directive 2014/65/EU. |
| **"Minimum TJ AHG Threshold"** | means an aggregate outstanding principal amount of the Restricted Debts (as defined in the RSA) constituting at least 10% of the outstanding principal amount of the Existing Debt Instruments (excluding the Intercompany Claim), in accordance with the terms of the RSA. |
| **"NEV"** | means China Evergrande New Energy Vehicle Group Limited, a subsidiary of the Company the shares of which are listed on the HKEx (Stock Code: 708). |
| **"New Instruments"** | means the TJ New Notes. |
| **"New Instruments Collateral Agent"** | means the collateral agent or any successor collateral agent under the New Instruments Documents and with respect to the Security Documents. |
| **"New Instruments Depositary"** | means the common depositary for the Clearing Systems, acting through its nominee as registered holder of the New Instruments, as set forth in the New Instruments Documents. |
| **"New Instruments Documents"** | means any indenture or relevant documents in respect of the New Instruments (in each case in the Agreed Form) to be issued pursuant to the Restructuring, which will be made available substantially in the form to be made available on the Transaction Website which shall substantially reflect the commercial terms of each of the New Instruments Documents appended at Schedule 9 (*Summary of Terms of New Instruments Documents*) to the Explanatory Statement (as may be amended and supplemented by the longform documents to be made available on the Transaction Website). |
| **"New Instruments Paying and Transfer Agent and Registrar"** | means the paying agent, transfer agent, and/or registrar or any successor paying agent, transfer agent, and/or |

136

|  | registrar in respect of and as set forth in the New Instruments Documents. |
|---|---|
| **"New Instruments Pledgors"** | means such Persons who will provide and/or grant Security in respect of the obligations of the Company and/or other obligors in respect of the applicable New Instruments pursuant to the relevant New Instruments Documents as at the Restructuring Effective Date and any other relevant parties set out in the Security Documents, each of which shall be in the Agreed Form. |
| **"New Instruments Subsidiary Guarantees"** | means such guarantees by the New Instruments Subsidiary Guarantors in respect of the New Instruments pursuant to the relevant New Instruments Documents. There will be no initial New Instruments Subsidiary Guarantees at the issuance of the New Instruments. |
| **"New Instruments Subsidiary Guarantors"** | means such Persons who guarantee Tianji's obligations in respect of the New Instruments pursuant to the New Instruments Documents, as set forth in the New Instruments Documents. There will be no initial New Instruments Subsidiary Guarantors at the issuance of the New Instruments. |
| **"New Instruments Trustee"** | means the Person appointed as trustee or any successor trustee under and as set forth in the New Instruments Documents. |
| **"NPV"** | means the net present value as determined by the Scheme Administrators prior to the Restructuring Effective Date in accordance with Clause 12.2 of the Scheme. |
| **"NPV Amount"** | means the meaning given to it in Section 4.5(a) of this Explanatory Statement. |
| **"Valuer"** | means a suitably qualified and experienced valuer(s) (in the reasonable opinion of the Scheme Administrators) specialising in the valuation of onshore real estate projects and the companies associated with such projects and engaged by the Scheme Administrators to assist in the valuation of Other Debt Scheme Creditor's Scheme Entitlements. |
| **"Original Issue Date"** | has the meaning given to it in Schedule 9 (*Summary of Terms of the New Instruments*) of this Explanatory Statement. |
| **"Other Debts"** | means the offshore financial indebtedness of the Company listed in Schedule 2 to the Scheme (including any related Credit Support provided by the Company) or in connection or in respect thereof, arising therefrom or relating thereto. |

| | |
|---|---|
| **"Other Debts Document"** | means any document or instrument documenting or constituting or purporting to document or constitute any Other Debt (other than the Lake Notes). |
| **"Other Debt Scheme Creditors"** | means a Person holding an economic, beneficial interest and/or legal interest as principal (as applicable) in any of the Other Debts as at (1) the Voting Record Time (in respect of voting purposes at the Scheme Meeting) and/or (2) the Entitlement Record Time (in respect of the determination of such persons' Entitlements, as applicable, under the terms of the Scheme), including (but without double counting in each case) (a) the Lake Notes Trustee and Agent; and (b) the Existing Agents], and "**Other Debt Scheme Creditor**" means one of the Other Debt Scheme Creditors. |
| **"Other Debt Scheme Creditor's Entitlement"** | has the meaning set out in Clause 12.2 of the Scheme. |
| **"Participating Creditor"** | means a Scheme Creditor who has agreed to be bound by the RSA as a Participating Creditor in accordance with the terms of the RSA. |
| **"Perpetuity Period"** | means the period from the date the Successor Escrow Account is established until 21 years after that date, or such further period as the Successor Escrow Agent determines in its sole discretion (and without any obligation to do so). |
| **"Person"** | means any natural person, corporation, limited or unlimited liability company, trust, joint venture, association, corporation, partnership, Governmental Entity or other entity whatsoever. |
| **"Personnel"** | means, in relation to any Person, its current and former officers, partners, directors, employees, staff, agents, counsel and other representatives. |
| **"Portal"** | means https://portal.morrowsodali.com/EvergrandeScheme. |
| **"PRC"** | means the People's Republic of China, which for the purposes of this Scheme, excludes Taiwan, Hong Kong, and the Macao Special Administrative Region of the PRC. |
| **"PRIIPs Regulation"** | means Regulation (EU) No 1286/2014. |
| **"Prism"** | means Prism Hong Kong and Shanghai Limited, in their capacity as auditor of the Company. |
| **"Proceeding"** | means any process, suit, action, legal or other legal proceeding including without limitation any arbitration, mediation, alternative dispute resolution, judicial review, adjudication, demand, statutory demand, execution, distraint, forfeiture, re-entry, seizure, lien, |

enforcement of judgment, enforcement of any security or Insolvency Proceedings in any jurisdiction.

| | |
|---|---|
| "**Prospectus Regulation**" | means Regulation (EU) 2017/1129. |
| "**Proxy Form**" | means a proxy form submitted for an Other Debt Scheme Creditor which is appended to the Solicitation Packet, substantially in the form to be made available on the Transaction Website. |
| "**QIBs**" | means "**qualified institutional buyers**" as defined in Rule 144A under the US Securities Act. |
| "**Recognition Filings**" | means (i) the filing of a petition for recognition of the Scheme under Chapter 15 of the US Bankruptcy Code and (ii) the filing of a request for the US Bankruptcy Court to grant a Chapter 15 Recognition Order and (iii) any other filings submitted in the US Bankruptcy Court that are necessary to effectuate the Chapter 15 Recognition Proceeding. |
| "**Record Date Balance**" | means a credit balance created by the Clearing Systems and maintained in the records of the Clearing Systems and SJ Notes Depositary in favour of those SJ Notes Scheme Creditors at the Entitlement Record Time, who did not submit or did not have submitted on their behalf Custody Instructions by the Custody Instruction Deadline and/or a validly completed Account Holder Letter, Distribution Confirmation Deed and, if applicable, Designated Recipient Form by the Voting Record Time. |
| "**Reference Date**" | means the earlier of 1 October 2023 and the Restructuring Effective Date. |
| "**Referred Scheme Claim**" | has the meaning given to it in Section 9.36 of this Explanatory Statement. |
| "**Regulation D**" | means Regulation D under the US Securities Act. |
| "**Regulation S**" | means Regulation S under the US Securities Act. |
| "**Releases**" | has the meaning given to it in Section 17.6(a) of this Explanatory Statement. |
| "**Released Claims**" | means any of the (i) Scheme Claims, (ii) Ancillary Claims, or (iii) Restructuring Claims. |
| "**Released Persons**" | means (i) the Company, (ii) the SJ Notes Trustee, the SJ Notes Depositary, and the SJ Notes Paying and Transfer Agent and Registrar, (iii) the Lake Notes Trustee and Agent and Existing Agents; (iv) the New Instruments Depositary, the New Instruments Paying and Transfer Agent and Registrar, and the New Instruments Trustee and the New Instruments Collateral Agent, (v) the Holding Period Trustee, (vi) the Information Agent, (vii) the Scheme |

139

Administrators, (viii) the Scheme Adjudicator, (ix) the Advisors, (x) each member of the AHG and any of its respective managers and investment managers' and investment advisors' respective Affiliates and funds) (in each case, including any of its respective directors, managers or officers), (xi) the AHG Advisors; and, regarding each of the above, includes each of their respective predecessors, successors and assigns (where applicable) and their respective Personnel, and their respective advisors and in their capacities as such, and "**Released Person**" shall be construed accordingly.

"**Relevant Collateral**"

means any security, collateral, guarantee, bond, indemnity or other form of assurance granted by the Company for the purpose of securing and/or guaranteeing any of the Other Debt.

"**Relevant Persons**"

has the meaning given to it in Section 2 (*Important Securities Law Notices*) of this Explanatory Statement.

"**Residual New Instruments**"

means the New Instruments issued to and held by the Holding Period Trustee on trust for the benefit of the Scheme Creditors (including Blocked Scheme Creditors) and/or Designated Recipients (as applicable) after the distribution of Scheme Consideration on the Restructuring Effective Date, in accordance with the terms of the Holding Period Trust Deed and the Scheme.

"**Restricted Debts**"

means, with respect to a Participating Creditor at any time, the aggregate outstanding principal amount of Existing Debts set out in the Restricted Debts Notice (as defined in the RSA) then most recently delivered by that Participating Creditor, as modified from time to time by any Transfer Notices (as defined in the RSA) (as applicable) delivered by Participating Creditors to the Information Agent, subject to evidence satisfactory to the Information Agent having been provided in accordance with Clause 6 (*Accession, Transfer and Purchase, and Aggregate Position Disclosure to the Information Agent*) of the RSA; and "**Restricted Debt**" means any portion of the Restricted Debts.

"**Restricted Subsidiaries**"

has the meaning given to that term under the New Instruments Documents.

"**Restructuring**"

means the restructuring of the debt and other offshore financial obligations of Tianji as contemplated by, *inter alia*, the Restructuring Documents.

"**Restructuring Claims**"

means any Claim by a Scheme Creditor against a Released Person in respect of: (A) the preparation, negotiation, execution, sanction or implementation of this Scheme and/or the Restructuring and/or the Restructuring Documents; and/or (B) the execution of the Restructuring Documents and the carrying out of the steps and transactions contemplated therein in accordance with their

terms, but, in each case, excluding for the avoidance of doubt, any Claim in respect of any Liability (i) of any Released Person which arises as a result of a failure to comply with any of the terms of this Scheme or any Restructuring Document (including but not limited to the New Instruments Documents) and (ii) arising from or in connection with any Excluded Liability or Excluded Collateral, and "Restructuring Claims" shall be construed accordingly.

| | |
|---|---|
| **"Restructuring Documents"** | means the documents to be entered into by certain parties to implement the terms of the Restructuring including, but not limited to, those documents listed at Section 24 (*Restructuring Documents*) of this Explanatory Statement in each case shall be in the Agreed Form, substantially in the form to be made available on the Transaction Website. |
| **"Restructuring Effective Date"** | means the date on which the Restructuring Effective Date Conditions have been satisfied or waived (as the case may be). |
| **"Restructuring Effective Date Conditions"** | means the conditions set out in Schedule 3 of the Scheme. |
| **"Restructuring Effective Date Conditions Subsequent"** | means the conditions set out in Section 6.6 (*Scheme Steps*) of the Scheme. |
| **"RSA"** | means the restructuring support agreement dated 3 April 2023 between, among others, the Company and the Initial Participating Creditors, as amended or varied from time to time, including by the accession or cessation of parties thereto. |
| **"Rule 144A"** | means Rule 144A under the US Securities Act. |
| **"Sanctioned Country"** | means any country or territory that is the target of any comprehensive country or territory-wide Applicable Sanctions (being, as at the date of the Explanatory Statement, the territories of Crimea, Donetsk and Luhansk, and the countries of Cuba, Iran, North Korea and Syria). |
| **"Sanctioned Scheme Creditor"** | means a Scheme Creditor that is: |

(a) designated on any Applicable Sanctions List;

(b) resident in, ordinarily located in, or incorporated or domiciled under the laws of any Sanctioned Country;

(c) in the aggregate, 50 percent or greater owned, directly or indirectly, or otherwise controlled, directly or indirectly, (in each case with reference to Applicable Sanctions) by any Person or Persons described in (a) or (b) above of this definition; or

(d) acting on behalf of or at the direction of any Person or Persons described in (a) or (b) above of this definition,

and which does not have a sanctions licence in respect of the Applicable Sanctions which would allow that Scheme Creditor to freely deal in the Scheme Consideration and submit instructions or settle through the Clearing Systems.

"**Sanctions-Affected Scheme Creditor**"

means a Blocked Scheme Creditor or a Sanctioned Scheme Creditor.

"**Sanctions Law Representations**"

means the sanctions law confirmations and undertakings as set out in the Distribution Confirmation Deed.

"**Scheme**"

means the scheme of arrangement to be effected pursuant to Sections 670, 673 and 674 of the Hong Kong Companies Ordinance between the Company and the Scheme Creditors, in its present form or with or subject to any non-material modifications, additions or conditions that the Court may think fit to approve or impose and agreed to by the Company and the Majority TJ AHG (provided that the TJ AHG satisfies the Minimum TJ AHG Threshold),

"**Scheme Adjudicator**"

means an adjudicator appointed by the Company under Clause 35 (*The Scheme Adjudicator*) of the Scheme.

"**Scheme Administrators**"

means Mr P. Cowley, Ms Y.M. Lui and Mr C. Ball of KPMG Advisory (Hong Kong) Limited or any individual who is appointed Scheme Administrator under Clause 33 (*The Scheme Administrators*) of the Scheme and each a "**Scheme Administrator**".

"**Scheme Administrator Estimate**"

has the meaning given to it under Section 9.27 of this Explanatory Statement.

"**Scheme Administrator Estimate Acceptance or Rejection Form**"

means the form to be submitted by a Other Debt Scheme Creditor in response to the Scheme Administrator Estimate pursuant to Clause 34.3 of the Scheme.

"**Scheme Claim**"

means any Claim by a Scheme Creditor against Tianji under or in respect of the Existing Debt Instruments whether at, before or after the Voting Record Time (including, for the avoidance of doubt, all accrued and unpaid interest on the Existing Debt Instruments up to (but excluding) the Restructuring Effective Date, or accretions arising in respect of, such Claims before, at or after the Voting Record Time but, excluding for the avoidance of doubt (i) any Claim in respect of any Liability of Tianji which arises as a result of a failure to comply with any of the terms of any Restructuring Document (including but not limited to the New Instruments Documents), or (ii) any Claim by a Scheme Creditor not against Tianji arising from or in connection with any Excluded Liabilities or Excluded Collateral. For the avoidance of doubt, in respect of SJ

142

Notes Scheme Creditors, any direct Claim in connection to SJ, and the SJ Notes Subsidiary Guarantors shall be excluded.

**"Scheme Conditions"**                means:

(a)    the sanction with or without modification (but subject to any such modification being acceptable to the Company and in accordance with the terms of the Scheme) of the Scheme by the Court;

(b)    the delivery of the Scheme Sanction Order to the Hong Kong Companies Registrar;

(c)    the sanction with or without modification (but subject to any such modification being acceptable to SJ and in accordance with the terms of the SJ Scheme) of the SJ Scheme by the BVI Court; and

(a)    the delivery of the SJ Scheme Sanction Order to the BVI Registrar of Corporate Affairs.

**"Scheme Consideration"**           means the relevant portion of the rights and interests in the New Instruments to be distributed to Scheme Creditors (and/or their Designated Recipients, as applicable) under and pursuant to the terms of the Scheme (and, without double counting, any Residual New Instruments and Blocked New Instruments).

**"Scheme Convening Hearing"**    means the hearing before the Court following which the Court issued the Scheme Convening Order.

**"Scheme Convening Order"**       means the order of the Court dated 24 July 2023 ordering, amongst other things, that Tianji be at liberty to convene a single meeting of Scheme Creditors for the purpose of considering and, if thought fit, approving the Scheme.

**"Scheme Creditors"**                 means, collectively, the SJ Notes Scheme Creditors and the Other Debt Scheme Creditors, and **"Scheme Creditor"** means one of the Scheme Creditors.

**"Scheme Creditor Forms"**          means:

(a) in respect of the SJ Notes Scheme Creditors and Lake Noteholders (who are not Sanctions-Affected Scheme Creditors), a validly completed Account Holder Letter;

(b) in respect of the Other Debt Scheme Creditors other than Lake Noteholders (who are not Sanctions-Affected Scheme Creditors), a validly completed Proxy Form; and

143

(c) in respect of Blocked Scheme Creditors, a validly completed Blocked Scheme Creditor Form,

in each case (other than for Blocked Scheme Creditors) together with a validly completed Distribution Confirmation Deed and Designated Recipient Form (if applicable).

**"Scheme Creditor Releasing Parties"**     has the meaning given to it in Section 17.6(c) of this Explanatory Statement.

**"Scheme Effective Date"**     means the date on which all of the Scheme Conditions are satisfied and the Scheme becomes effective, as specified in the Scheme Effective Date Notice.

**"Scheme Effective Date Notice"**     means the notice to be issued by the Company and delivered to the Information Agent in accordance with Clause 7 (*Notices to Scheme Creditors and Others*) of the Scheme confirming satisfaction of the Scheme Conditions and specifying the Scheme Effective Date.

**"Scheme Meeting"**     means the meeting of the Scheme Creditors in relation to the Scheme as convened by an order of the Court for the purpose of considering and, if thought fit, approving, with or without modification, the Scheme, and any adjournment thereof.

**"Scheme Recovery Analysis"**     means the scheme recoveries analysis report prepared by Deloitte set out in Schedule 3 (*Scheme Recovery Analysis*) to this Explanatory Statement.

**"Scheme Sanction Hearing"**     means the hearing at the Court of the petition in respect of the sanctioning of the Scheme.

**"Scheme Sanction Order"**     means the sealed copy of the order of the Court sanctioning the Scheme.

**"Scheme Steps"**     means the steps to be taken in accordance with the Restructuring Documents for the purposes of giving effect to the terms of the Scheme as set out in Section 16 (*Restructuring Effective Date*) of this Explanatory Statement.

**"SEC"**     means the United States Securities and Exchange Commission.

**"Securities Law Representations"**     means the securities law confirmations and undertakings set out in Annex B to the Distribution Confirmation Deed appended to the Solicitation Packet, substantially in the form to be made available on the Transaction Website.

**"Security"**     means the security constituted pursuant to the Security Documents.

144

| | |
|---|---|
| **"Security Documents"** | means the security documents, each of which shall be in the Agreed Form, to be entered into in connection with granting security interests over the Collateral securing the New Instruments, initially consisting of the Share Charges, substantially in the form to be made available on the Transaction Website. |
| **"SFA"** | means the Securities and Futures Act, Chapter 289 of Singapore, as modified or amended from time to time. |
| **"SFO"** | means the Securities and Futures Ordinance (Cap. 571 of the Laws of Hong Kong), as modified or amended from time to time. |
| **"SGX-ST"** | means Singapore Exchange Securities Trading Limited. |
| **"Share Charges"** | means the share charges in favour of the New Instruments Collateral Agent in respect of the New Instruments in accordance with the Security Documents which shall be in the Agreed Form, including but not limited to: |

    a)  by Assemble Harmony Limited over the shares of Greet Delight Limited;

    b)  by Tianji over the shares of All Peace Investments Limited;

    c)  by Tianji over the Class F shares held by Tianji in Nexus Emerging Opportunities Fund Property SP; and

    d)  by Central Sino Global Limited over shares of Jovial Idea Developments Limited.

| | |
|---|---|
| **"Shares"** | means the ordinary shares of the Company. |
| **"Singapore"** | means the Republic of Singapore. |
| **"SJ"** | means Scenery Journey Limited. |
| **"SJ Existing November 2022 Notes"** | means the 13.0% senior notes in the aggregate principal amount of US$645,000,000 due November 6, 2022 (ISIN: XS1903671854, Common Code: 190367185). |
| **"SJ Existing November 2023 Notes"** | means the 13.75% senior notes in the aggregate principal amount of US$590,000,000 due November 6, 2023 (ISIN: XS1903671938, Common Code: 190367193). |
| **"SJ Existing October 2022 Notes"** | means the 11.5% senior notes in the aggregate principal amount of US$2,000,000,000 due October 24, 2022 (ISIN: XS2109191986, Common Code: 10919198). |

| | |
|---|---|
| **"SJ Existing October 2023 Notes"** | means the 12.0% senior notes in the aggregate principal amount of US$2,000,000,000 due October 24, 2023 (ISIN: XS2109192109, Common Code: 210919210). |
| **"SJ Notes"** | means, collectively, the SJ Existing October 2022 Notes, the SJ Existing November 2022 Notes, the SJ Existing October 2023 Notes and the SJ Existing November 2023 Notes. |
| **"SJ Notes Depositary"** | means Citibank Europe plc as common depositary for the Clearing Systems, acting through its nominee as registered holder of the SJ Notes, Citivic Nominees Limited. |
| **"SJ New Notes"** | means the senior notes to be issued by SJ in accordance with the SJ Scheme. |
| **"SJ Notes Documents"** | means the Indentures and any other documents entered into by the Company or any other person guaranteeing or securing liabilities due under or in respect of the SJ Notes. |
| **"SJ Notes Paying and Transfer Agent and Registrar"** | means Citibank N.A., London Branch in its capacity as paying agent, transfer agent, and registrar in respect of the SJ Notes. |
| **"SJ Notes Subsidiary Guarantors"** | means the entities listed in Schedule 4 (*SJ Notes Subsidiary Guarantors*) to the Scheme. |
| **"SJ Notes Scheme Creditors"** | means Persons with an economic or beneficial interest as principal in the SJ Notes held in global form or global restricted form through the Clearing Systems as at (1) the Voting Record Time (in respect of voting purposes at the Scheme Meeting) and/or (2) the Entitlement Record Time (the determination of such persons' Entitlements, as applicable, under the terms of the Scheme), each of whom has a right, upon satisfaction of certain conditions, to be issued definitive registered notes in accordance with the terms of the SJ Notes and the Indentures, and (but without double counting in each case) the SJ Notes Depositary and the SJ Notes Trustee. |
| **"SJ Notes Trustee"** | means Citicorp International Limited solely in its capacity as trustee under the Indentures. |
| **"SJ Notes Trustee Instruction"** | means an instruction to the SJ Notes Trustee substantially in the form to be made available on the Transaction Website. |
| **"SJ Restructuring Support Agreement"** | means the restructuring support agreement dated 3 April 2022 entered into between, among others, Tianji Holding Limited, Scenery Journey Limited and the AHG (as defined in the SJ Restructuring Support Agreement). |

146

**"SJ RED Distribution Deadline"**     means the date which is fourteen (14) calendar days after the Scheme Effective Date which will be the final date by which SJ Notes Scheme Creditors must submit all relevant forms in order to receive Scheme Consideration on the Restructuring Effective Date in accordance with the terms of the Restructuring Documents.

**"SJ Scheme Administrators"**     has the meaning given to the term "Scheme Administrators" in the SJ Scheme.

**"Solicitation Packet"**     means the packet of materials, including the Account Holder Letter and accompanying instructions, the Designated Recipient Form, the Distribution Confirmation Deed, the Proxy Form, and the Blocked Scheme Creditor Form, all of which are available to Scheme Creditors through publishment on the Transaction Website.

**"Successor Escrow Account"**     means an escrow account to be established for the Perpetuity Period or until Applicable Sanctions no longer apply with respect to all Blocked Scheme Creditors, whichever is earlier, by an agent to be appointed by the Company pursuant to the Successor Escrow Agreement for the purposes of holding the Blocked Assets after the expiration of the Holding Period for the Blocked Scheme Creditors who have submitted a validly completed Blocked Scheme Creditor Form together with supporting evidence to the Company prior to the Bar Date.

**"Successor Escrow Agent"**     means the Person to be appointed by the Company as escrow agent for the Successor Escrow Account.

**"Successor Escrow Agreement"**     means the agreement providing for the creation of the Successor Escrow Account, under which the Successor Escrow Agent shall hold the Blocked Assets for the Company, in a form approved by the Successor Escrow Agent.

**"Term Sheet"**     means the restructuring term sheet in respect of the Company's offshore indebtedness dated 20 March 2023 between (among others) the Company and the TJ AHG, as amended, restated and/or supplemented from time to time. A redacted copy of the Term Sheet as of the date of the RSA, incorporating amendments made by Tianji to cure certain defects and omissions in accordance with the terms thereto, can be found on the transaction website specified in CEG's announcement on the HKEX at: https://www1.hkexnews.hk/listedco/listconews/sehk/2023/0403/2023040304093.pdf.

**"Tianji"**     means Tianji Holding Limited (天基控股有限公司), a company incorporated with limited liability under the laws of Hong Kong with company number 1339269 and having its registered office at 15th Floor, YF Life Centre, 38 Gloucester Road, Wanchai, Hong Kong.

147

| | |
|---|---|
| **"TJ AHG"** | means the ad hoc group of Participating Creditors or investment managers or investment advisors to such Participating Creditors, who: (i) have been constituted from time to time and as notified to Tianji (subject to and in accordance with the transfer provisions under the RSA); and (ii) are advised, by the AHG's Advisors from time to time and which such Participating Creditors, as at the date of the RSA, include the Initial Participating Creditors. |
| **"TJ AHG Legal Fees"** | means the reasonable fees, costs and expenses of the legal advisors (including local counsel and barristers) to the TJ AHG that CEG has agreed to pay in accordance with the terms set out in the following: |

(a)    the fee letter agreement dated 4 April 2022 between CEG and Kirkland & Ellis;

(b)    the fee letter agreement dated 6 March 2023 between CEG and Harney Westwood & Riegels; and

the fee letter agreement dated 6 March 2023 between CEG and Fangda Partners.

| | |
|---|---|
| **"TJ Group"** | means Tianji and its subsidiaries from time to time. |
| **"TJ New Notes"** | means the Tranche A Notes, the Tranche B Notes, the Tranche C Notes and the Tranche D Notes, which shall be in the Agreed Form, substantially in the form to be made available on the Transaction Website. |
| **"TJ Restricted Assets"** | means: |

(a)  the Collateral; and

(b)  any other asset as listed in the section titled "Mandatory Redemption" in Schedule 3 of the Term Sheet, the disposal of which would require an offer to purchase or redeem TJ New Notes (as defined in the Term Sheet) pursuant to the terms set out in the section titled "Mandatory Redemption" in Schedule 3 of the Term Sheet (as if such terms were in effect from the date of the RSA).

| | |
|---|---|
| **"Tranche A Notes"** | means the 6.0% / 7.0% variable rate notes due 2028 with an aggregate principal amount of up to US$100 million to be issued by TJ and in accordance with the relevant Restructuring Documents, in substantially the form to be made available on the Transaction Website. |
| **"Tranche B Notes"** | means the 6.5% / 7.5% variable rate notes due 2029 with an aggregate principal amount of up to US$200 million to be issued by TJ and in accordance with the relevant |

|  |  |
|---|---|
|  | Restructuring Documents, in substantially the form to be made available on the Transaction Website. |
| "**Tranche C Notes**" | means the 7.0% / 8.0% variable rate notes due 2030 with an aggregate principal amount of up to US$300 million to be issued by TJ and in accordance with the relevant Restructuring Documents in substantially the form to be made available on the Transaction Website. |
| "**Tranche D Notes**" | means the 7.5% / 8.5% variable rate notes due 2031 with an aggregate principal amount of up to US$200 million to be issued by TJ and in accordance with the relevant Restructuring Documents in substantially the form to be made available on the Transaction Website. |
| "**Transaction Website**" | means https://projects.morrowsodali.com/evergrande. |
| "**UK**" | means the United Kingdom. |
| "**UK MiFIR**" | means Regulation (EU) 600/2014 as retained by UK law by EUWA and as amended by UK domestic law. |
| "**UK PRIIPs Regulation**" | means Regulation (EU) No 1286/2014 as retained as UK law by EUWA and as amended by the UK Prospectus Regulation. |
| "**UK Prospectus Regulation**" | means Regulation (EU) 2017/1129 as retained as UK law by EUWA and as amended by UK domestic law. |
| "**UK Qualified Investor**" | has the meaning given to it at Section 2.4(a) (*United Kingdom*) of this Explanatory Statement. |
| "**United States**" or "**US**" | means the United States of America. |
| "**Unrestricted Subsidiary**" | means (1) any subsidiary of Tianji that at the time of determination shall be designated an Unrestricted Subsidiary by the Board in the manner provided in the Indentures; and (2) any subsidiary of an Unrestricted Subsidiary. |
| "**US Bankruptcy Court**" | means the United States Bankruptcy Court for the Southern District of New York. |
| "**US Bankruptcy Code**" | means Title 11 of the United States Code, as in effect on the date of the Recognition Filings. |
| "**US GAAP**" | means the United States Generally Accepted Accounting Principles |
| "**US Securities Act**" | means the United States Securities Act of 1933, as amended, including the rules and regulations promulgated by the SEC thereunder. |
| "**US$**" | the lawful currency for the time being of the United States. |

| | |
|---|---|
| "**Valuer**" | means a suitably qualified and experienced valuer(s) (in the reasonable opinion of the Scheme Administrators), specialising in the valuation of onshore real estate projects and the companies associated with such projects and engaged by the Scheme Administrators to assist in the valuation of Other Debt Scheme Creditor's Scheme Entitlements. |
| "**Valuation and Adjudication Procedure**" | means, together, the Valuation Procedure and Adjudication Procedure. |
| "**Valuation Procedure**" | means the procedure for determining the value of an Other Debt Scheme Creditor's Entitlement, as set out in Clause 34 (*Valuation Procedure*) of the Scheme. |
| "**Voting Record Time**" | means 5.00 p.m. Hong Kong time on 18 August 2023. |
| "**Voting Requirements**" | means the requirements that a Scheme Creditor submits a validly completed Account Holder Letter, Blocked Scheme Creditor Form and/or Proxy Form (as applicable) and any other documentation required under the terms of the Restructuring Documents to the Information Agent or GLAS (in respect of Blocked Scheme Creditors) by the Voting Record Time. |
| "**Voting Scheme Claims**" | means, for assessing a Scheme Creditor's Scheme Claims for voting purposes at the Voting Record Time, (without double-counting, and without permitting duplicative claims or portions of claims against the Company other than for US$1): |

generally, in respect of SJ Notes Scheme Creditors or Other Debt Scheme Creditors, a value equal to the sum of (i) the outstanding principal amount or (in the case of a put option) price amount of the relevant Existing Debts, and (ii) all accrued and unpaid interest relating to such debts up to (but excluding) the Voting Record Time, subject to the Chairperson's discretion;

(a)    in respect of the SJ Notes and Lake Notes, the amount in which each SJ Notes Scheme Creditor and Lake Noteholder respectively held an economic or beneficial interest as principal at the Voting Record Time (without double counting), determined in accordance with the typical calculations of the SJ Notes Trustee or the Lake Notes Trustee and Agent, and subject to the Information Agent's reconciliation of the Account Holder Letters with any blocking instructions recorded by the Clearing Systems and the Chairperson's discretion;

(b) in respect of the Other Debts (save for the Lake Notes), subject to paragraph (c) below, a value equal to the amount which the Chairperson, based on information provided by the Company (its agent

or Person instructed by it) (as relevant), considers is a fair and reasonable assessment of the Scheme Claim of such Scheme Creditor at the Voting Record Time without deducting any amount for the value of the Excluded Liabilities and Excluded Collateral; and

(c) in respect of an Other Debt relating to a put option, without deducting any amount for the value of any securities retained by the holder to which the put option relates.

## 2.    Interpretation

2.1    In this Explanatory Statement, unless the context otherwise requires or otherwise expressly provided:

(a)    words denoting the singular number only shall include the plural number also and vice versa;

(b)    words denoting one gender only shall include the other genders;

(c)    words denoting persons only shall include firms and corporations and vice versa;

(d)    references to an agreement, deed or document shall be deemed also to refer to such agreement, deed or document as amended, supplemented, restated, verified, replaced and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto;

(e)    references to any statutory provision shall be deemed also to refer to any statutory modification or re-enactment thereof or any statutory instrument, order or regulation made thereunder or under any such re-enactment;

(f)    unless expressed otherwise:

(i)    references to US dollars or US$ are references to the currency of the United States of America; and

(ii)    references to Hong Kong dollars or HK$ are references to the currency of Hong Kong;

(g)    any reference in this Schedule 1 (*Definitions and Interpretation*) to any document whose meaning is stated to be the meaning given to a document as defined in this Explanatory Statement shall be construed as a reference to that document as amended, varied, novated, restated, modified, supplemented or re-enacted or replaced prior to the date of this Explanatory Statement;

(h)    the words "**include**" and "**including**" are to be construed without limitation, general words introduced by the word "**other**" are not to be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things and general words are not to be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words; clause, section and schedule headings are for ease of reference only;

(i)     a company is a "**subsidiary**" of another company, its "**holding company**", if that other company: (a) holds a majority of the voting rights in it; (b) is a member of it and has the right to appoint or remove a majority of its board of directors; or (c) is a member of it and controls alone, pursuant to an agreement with other members, a majority of the voting rights in it, or, if it is a subsidiary of a company that is itself a subsidiary of that other company;

(j)     an "**undertaking**" means a body corporate or partnership; or an unincorporated association carrying on a trade or business, with or without a view to profit; and an undertaking is a parent undertaking in relation to another undertaking, a "**subsidiary undertaking**", if: (a) it holds the majority of voting rights in the undertaking; (b) it is a member of the undertaking and has the right to appoint or remove a majority of its board of directors; (c) it has the right to exercise a dominant influence over the undertaking: (i) by virtue of provisions contained in the undertaking's articles; or (ii) by virtue of a control contract; or (d) it is a member of the undertaking and controls alone, pursuant to an agreement with other shareholders or members, a majority of the voting rights in the undertaking;

(k)     clause, section and schedule headings are for ease of reference only;

(l)     the word "c." denotes an approximation of a figure;

(m)     unless otherwise stated, a reference to a time of day shall be construed as a reference to Hong Kong time;

(n)     any formulas, numbers, calculation methodology may have accounted for and/or is subject to rounding;

(o)     a reference to this Explanatory Statement includes a reference to the preliminary sections and schedules of this Explanatory Statement; and

(p)     references to any person shall include references to its successors, transferees and assigns and any Person deriving title under or through it.

**SCHEDULE 2**

**LIQUIDATION ANALYSIS**







China Evergrande Group
Liquidation Analysis Report

**17 July 2023**

Deloitte.

2

# Deloitte.

德勤

Deloitte Financial Advisory Services
A division of Deloitte Advisory
(Hong Kong) Limited
35/F One Pacific Place
88 Queensway
Hong Kong

Tel: +852 2852 1600
Fax: +852 2541 1911
Email: enquiry@deloitte.com.hk
www.deloitte.com/cn

**Glen Ho**
Engagement Partner
+852 2852 1643
gleho@deloitte.com.hk

**Cindy Sun**
Engagement Partner
+86 755 33538380
xysun@deloitte.com.cn

**Karen Chu**
Engagement Partner
+852 2852 1680
karchu@deloitte.com.hk

**Kevin Feng**
Engagement Director
+86 755 33538038
kevfeng@deloitte.com.cn

China Evergrande Group
15th Floor, YF Life Centre
38 Gloucester Road
Wanchai, Hong Kong

Scenery Journey Limited
15th Floor, YF Life Centre
38 Gloucester Road
Wanchai, Hong Kong

Tianji Holding Limited
15th Floor, YF Life Centre
38 Gloucester Road
Wanchai, Hong Kong

Dear Sirs,

**RE: Liquidation Analysis Report**

We enclose our report (the "**Report**") in connection with the limited scope liquidation analysis of the offshore debts of China Evergrande Group ("**CEG**", the "**Company**"), Scenery Journey Limited ("**SJ**") and Tianji Holding Limited ("**Tianji**") on an entity-by-entity basis based on a hypothetical liquidation scenario in accordance with our engagement letter dated 15 July 2022, the first supplementary agreement dated 20 June 2023 and the second supplementary agreement dated 17 July 2023 (collectively referred to as the "**Agreement**").

The Report was prepared solely for the benefit of the Company, SJ and Tianji only. No other party is entitled to rely on the Report for any purpose whatsoever and we accept no duty of care or liability to any other party who is shown or gains access to the Report.

The Report has been prepared based on the limited information provided to Deloitte Advisory (Hong Kong) Limited ("**DAHK**"). The scenarios presented in the Report involve extensive use of estimates and assumptions, which are inherently subject to uncertainties and contingencies beyond the control of the Group, its management and advisors. The assumptions will need to be reviewed and revised to reflect any future changes in the circumstances of any of the companies or the underlying assets. We draw your attention to the "Disclaimers" (page3) and the sections titled "Scope of Work" (page 11), "Sources of Information" (page 9), "Limitations" (pages 41-42) of the Report.

The Report is prepared based on information received up to 14 July 2023 ("**Cut-Off Date**"), we have not updated our work since then.

Yours faithfully,
For and on behalf of
**Deloitte Advisory (Hong Kong) Limited**

© 2023. For information, contact Deloitte China.

# Disclaimers

- This Report (the **"Report"**) was prepared in connection with the results of the limited scope analysis on the estimated recoveries of certain debts of China Evergrande Group (the **"Company"** or **"CEG"**), Scenery Journey Limited (**"SJ"**) and Tianji Holding Limited (**"Tianji"**) on an entity-by-entity basis under a hypothetical liquidation scenario of CEG and its subsidiaries (the **"Group"**) as at 1 January 2023 (the **"Liquidation Analysis"**) in accordance with the terms of the engagement agreement dated 15 July 2022, the first supplementary agreement dated 20 June 2023 and the second supplementary agreement dated 17 July 2023 entered into between the Company, SJ, Tianji and Deloitte Advisory (Hong Kong) Limited (**"DAHK"** or **"we"** or **"us"**).

- Information contained in the Report is subject to the disclaimers, scope of work, sources of information, assumptions and limitations set out herein.

- By reviewing the Report, the creditors of the schemes of arrangement of CEG, SJ and Tianji (the **"Scheme Creditors"**) and other party who gains access to the Report shall be deemed to have read, and to have irrevocably acknowledged and agreed to comply with, the following contents of this disclaimer:

  - The Report was prepared solely for the benefit of the Company, SJ and Tianji and, save in respect of the Company, SJ and Tianji, we accept no duty of care or liability to any other party regardless of whether or not a party was shown or gained access to the Report, or is a Scheme Creditor placing reliance on the Report;

  - With respect to dealing in shares, the Report may contain material non-public information of the Company. Thus, any disclosure, copying, or distribution of the Report or the taking of any action based on it, which would constitute insider dealing with respect to shares in the Company, is strictly prohibited;

  - The Liquidation Analysis was prepared for indicative and illustrative purposes only. The actual recoveries may vary subject to, among other things, the actual proceeds of realisation of the assets, the costs and expenses actually incurred incidental to the liquidation/ disposal and the amounts of the claims submitted and ultimately admitted as claims against the Company and its subsidiaries. Thus, the actual recoveries could be materially different from the estimated recoveries set out in the Report;

  - The Report was prepared on the basis of information, including unaudited information, received by DAHK up to 14 July 2023 and DAHK has not updated the Report since that date. DAHK relied on the financials and other information provided to it and on representations made to it by management of the Group, and the relevant companies' respective staff and advisors. DAHK did not audit or verify the correctness and accuracy of the information provided to it and DAHK does not express an audit opinion on its findings and analysis. DAHK accepts no responsibility for the reliability of such information to the extent it is inaccurate, incomplete or misleading;

  - The Report may not contain all facts and information that a Scheme Creditor may regard as relevant or potentially relevant; and

  - Finally, the Scheme Creditors and any other party who gains access to the Report shall refer to the full disclaimers, limitations, sources of information set out herein.

© 2023. For information, contact Deloitte China.

# Content

| Section | Page |
| --- | --- |
| Glossary of Terms | 4 |
| Scope of Work | 8 |
| Sources of Information | 10 |
| Overview of Financial Position as at 31 December 2022 | 12 |
| Liquidation Analysis | 18 |
| - Methodology | |
| - Key Assumptions | |
| - Entity-by-entity Liquidation Analysis – Payment Waterfall | |
| - Estimated liquidation analysis for CEG, SJ and Tianji | |
| - Limitations | |
| Appendices | 43 |

| Appendices | Page |
| --- | --- |
| List of Subject Entities | 43 |
| Estimated Recoveries of Offshore Debts | 58 |
| List of Subsequent Events Considered | 64 |
| Scenario Analysis | 66 |

© 2023. For information, contact Deloitte China.

# Glossary of Terms

| Abbreviations | Definition |
|---|---|
| approx. | approximately |
| Auditor | Prism Hong Kong and Shanghai Limited (the auditor of the Company) |
| B/b | Billion |
| CEG/ Company | China Evergrande Group, a company listed on the SEHK with stock code 3333.hk |
| CEG Group/ 3333 Group | CEG and its subsidiaries, for the purpose of this Liquidation Analysis, excluding Evergrande Property Group and Evergrande Auto Group |
| CEG Existing Notes | Loan No.1 – 11 as referred in Glossary of Terms - Definition of Offshore Debts (page6) |
| CFO | Chief Financial Officer |
| CIP | Construction in progress |
| Encumbered Assets | Pre-sale proceeds restricted accounts, unpledged deposits, PHS, PUD, Properties and CIP of PRC companies |
| ERV | Estimated realizable value (under a forced-sale scenario) |
| Evergrande Auto | China Evergrande New Energy Vehicle Group Limited, a company listed on the SEHK with stock code 708.hk |
| Evergrande Auto Group / 708 Group | Evergrande Auto and its subsidiaries |
| Evergrande Property Group | Evergrande Property Services Group Limited, a company listed on the SEHK with stock code 6666.hk |
| Evergrande Property Group/ 6666 Group | Evergrande Property and its subsidiaries |
| Group | CEG and its subsidiaries |
| Hengda Real Estate | Hengda Real Estate Group Company Limited |
| Hengten Networks | Hengten Networks Group Limited, a company listed on the SEHK with stock code 136.hk (currently known as China Ruyi Holdings Limited) |
| HKD | Hong Kong Dollars, the lawful currency of Hong Kong |
| Hong Kong | Hong Kong Special Administrative Region |
| IP(s) | Investment property(ies) |
| Lei Shing Hong Loan | HK$236.5 million loan borrowed by Profit Concept Finance Limited |
| M/ m | Million |
| Management Account(s) | Entity-level unaudited management account of CEG and 3,523 subsidiaries of the Group as at 31 December 2022 as provided by management of the Group |
| Maples | Legal advisors of the Company in respect of laws of Cayman Islands and British Virgin Islands |
| NAV | Net asset value |
| NBV | Net book value |

| Abbreviations | Definition |
|---|---|
| Obligor(s) | Borrower(s)/ Issuer(s), guarantor(s), put option obligor(s), security provider(s) of the Offshore Debts (including share chargor(s), entity(ies) where shares are pledged, debenture provider(s), mortgagor(s), assignor(s) of receivables, etc.), as set out in Appendix 1 |
| Offshore Debts | Debts of CEG, SJ and Tianji as set out on pages 6-7 |
| Out-scope Entity(ies) | Entity(ies) of the Group which are not Subject Entities |
| PHS | Properties held for sale |
| PPE | Property, plant and equipment |
| PRC | The People's Republic of China, which for the purpose of the Report, excludes Hong Kong and Macau Special Administrative Region |
| PUD | Properties under development |
| RMB | Renminbi, the lawful currency of the PRC |
| RMB Bonds | 15 Hengda 03 RMB bond issued by Hengda Real Estate and listed in the Shanghai Stock Exchange, in which the Company guaranteed the repurchase of the RMB bond at the Redemption Date (as defined in the 15 Hengda 03 RMB bond indenture) if Hengda Real Estate failed to ensure sufficient funds in the bank account to repay the RMB Bondholders 3 business days prior to the Redemption Date and the RMB Bondholders so demanded.  The outstanding principal of the 15 Hengda 03 RMB bond is RMB8.2 billion. |
| SAFE | State Administration for Foreign Exchange, the PRC |
| SEHK | Stock Exchange of Hong Kong |
| Sidley Austin | Legal advisors of the Company in respect of Hong Kong laws and English laws |
| SJ | Scenery Journey Limited |
| SJ Existing Notes | Loan No.13 – 16 as referred in Glossary of Terms - Definition of Offshore Debts (page6) |
| Sqm | Square meter |
| Subject Entity(ies) | Entity(ies) of the Group that are included in the entity-by-entity Liquidation Analysis as set out in Appendix 1 |
| Subsequent Events | Events after 31 December 2022 |
| Tianji | Tianji Holding Limited |
| Type 1 Guarantee | A certain category of offshore guarantee provided by CEG for onshore debts of non-Group entities, which requires the lender to exhaust its rights of recovery against the primary obligor before it can claim against a guarantor (i.e. CEG) |
| USD | United States Dollar, the lawful currency of the United States of America |

© 2023. For information, contact Deloitte China.

# Glossary of Terms – Definition of Offshore Debts

| No. | Class | Terms | Definition |
|---|---|---|---|
| 1 | A | CEG Existing March 2022 Notes | 8.25% senior notes due March 23, 2022 (ISIN: XS1580431143, Common Code: 158043114) |
| 2 | A | CEG Existing April 2022 Notes | 9.5% senior notes due April 11, 2022 (ISIN: XS1982036961, Common Code: 198203696) |
| 3 | A | CEG Existing January 2023 Notes | 11.5% senior notes due January 22, 2023 (ISIN: XS2106834299, Common Code: 210683429) |
| 4 | A | CEG Existing February 2023 Bonds | 4.25% convertible bonds due February 14, 2023 (ISIN: XS1767800961, Common Code: 176780096) |
| 5 | A | CEG Existing April 2023 Notes | 10.0% senior notes due April 11, 2023 (ISIN: XS1982037779, Common Code: 198203777) |
| 6 | A | CEG Existing June 2023 Notes | 7.5% senior notes due June 28, 2023 (ISIN: XS1627599498, Common Code: 162759949) |
| 7 | A | CEG Existing January 2024 Notes | 12.0% senior notes due January 22, 2024 (ISIN: XS2106834372, Common Code: 210683437) |
| 8 | A | CEG Existing March 2024 Notes | 9.5% senior notes due March 29, 2024 (ISIN: XS1587867539, Common Code: 158786753) |
| 9 | A | CEG Existing April 2024 Notes | 10.5% senior notes due April 11, 2024 (ISIN: XS1982040641, Common Code: 198204064) |
| 10 | A | CEG Existing June 2025 Notes | 8.75% senior notes due June 28, 2025 (ISIN: XS1627599654, Common Code: 162759965) |
| 11 | A | CEG Existing January 2022 Notes | 9.5% senior notes due January 30, 2022 (ISIN: XS1991102846, Common Code: 199110284) |
| 12 | A | Class A Private Loan | Private loan of US$100,000,000 with 15% interest p.a. due January 2022 owed by the Company |
| 13 | B, D | SJ Existing October 2022 Notes | 11.5% senior notes due October 24, 2022 (ISIN: XS2109191986, Common Code: 10919198) |
| 14 | B, D | SJ Existing November 2022 Notes | 13.0% senior notes due November 6, 2022 (ISIN: XS1903671854, Common Code: 190367185) |
| 15 | B, D | SJ Existing October 2023 Notes | 12.0% senior notes due October 24, 2023 (ISIN: XS2109192109, Common Code: 210919210) |
| 16 | B, D | SJ Existing November 2023 Notes | 13.75% senior notes due November 6, 2023 (ISIN: XS1903671938, Common Code: 190367193) |
| 17 | C, D | Lake Notes | US$260 million 8.5% senior notes due October 3, 2021 (ISIN: XS2054446617, Common Code: 205444661) issued by Jumbo Fortune Enterprises Limited |
| 18 | C | Dongpo Notes | US$424 million 9.0% senior notes due January 22, 2023 (ISIN: XS2290369128, Common Code: 229036912) issued by Great Courage Global Limited |
| 19 | C | Dongpo Put Option | US$116 million put option granted by CEG in relation to certain Dongpo Notes |
| 20 | C | Graceful Court Put Option | US$110 million put option granted by CEG in relation to shares of Graceful Court Limited |
| 21 | C | New Chic Margin Loan | HK$160 million margin loan borrowed by New Chic Global Limited |
| 22 | C, D | Clear Star Put Option | HK$575 million put option granted by Tianji in respect of shares of Clear Star Investments Limited |
| 23 | C | CEG Loan 1 | HK$1.2 billion loan borrowed by CEG due 2 January 2022 |
| 24 | C | CEG Loan 2 | HK$600 million loan borrowed by CEG due 7 January 2022 |

© 2023. For information, contact Deloitte China.
China Evergrande Group | Liquidation Analysis Report

6

# Glossary of Terms – Definition of Offshore Debts (cont'd)

| No. | Class | Terms | Definition |
|-----|-------|-------|------------|
| 25 | C | Venice Loan | US$20 million structured loan borrowed by Rainbow Ever Limited |
| 26 | C | Venice SPA | US$355 million structured sale and purchase agreement of shares in Rainbow Ever Limited |
| 27 | C, D | Hero Loan | HK$7.6 billion loan borrowed by Tianji pursuant to facilities agreement dated 21 November 2020 |
| 28 | C | FCB Put Option | US$712 million repurchase obligations granted by CEG, Alpha Beauty Limited and New Gains Group Limited in respect of Fangchebao Group Co. Ltd |
| 29 | C | RMB Bond Put Option | Repurchase obligations of CEG in relation to the RMB Bond |
| 30 | C | CEG Guarantees of PRC Liabilities | Unsecured liabilities of CEG arising in connection with the liabilities of entities incorporated the PRC |
| 31 | C | Kailong Arbitration Award | Arbitration award rendered by the Shenzhen Court of International Arbitration where CEG, Guangzhou Kailong Real Estate Company Limited, and the Chairman of CEG (Mr. Hui Ka Yan) were responsible for the repayment accordingly |
| 32 | C | On-Lent Loan | Amounts on-lent to CEG pursuant to the loan agreement relating to the provision of the Class A Private Loan |
| 33 | D | Castle Loan Put Option | US$258 million put option granted by Tianji in relation to a private loan borrowed by Sky Joy Holdings Limited |
| 34 | D | Castle Share Put Option | US$258 million put option granted by the Tianji in relation to shares of Sky Joy Holdings Limited |
| 35 | D | Tuen Mun Put Options | HK$1.4 billion put options granted by Tianji in relation to a project located in Tuen Mun, Hong Kong |
| 36 | D | CEG-Tianji Intercompany Balance | Intercompany balance owed by the Tianji to CEG which on 31 December 2022 was in an amount equal to approximately US$5.03 billion |

No.1 – 11 are collectively referred to as CEG Existing Notes while No. 13–16 are collectively referred to as SJ Existing Notes in this Report

© 2023. For information, contact Deloitte China.

# Content

| Section | Page |
| --- | --- |
| Glossary of Terms | 4 |
| Scope of Work | 8 |
| Sources of Information | 10 |
| Overview of Financial Position as at 31 December 2022 | 12 |
| Liquidation Analysis | 18 |
| - Methodology | |
| - Key Assumptions | |
| - Entity-by-entity Liquidation Analysis – Payment Waterfall | |
| - Estimated liquidation analysis for CEG, SJ and Tianji | |
| - Limitations | |
| Appendices | 43 |

| Appendices | Page |
| --- | --- |
| List of Subject Entities | 43 |
| Estimated Recoveries of Offshore Debts | 58 |
| List of Subsequent Events Considered | 64 |
| Scenario Analysis | 66 |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

## Scope of Work

- The Liquidation Analysis provides estimates of recoveries to creditors holding the Offshore Debts in respect of their various rights against the Obligors including CEG, SJ and Tianji and all other entities of the Group (as relevant) that have provided credit enhancement (including guarantees, share charges, mortgages and pledges or other security), should the restructuring fail and the Group be liquidated. The analysis has been conducted on an entity-by-entity basis, i.e. assets and liabilities of each entity have been assessed individually in arriving at the estimated recoveries to unsecured creditors and shareholders of an entity, to the extent possible.

- Funds available for distribution to creditors/ shareholders of an Obligor in the event of a Group-wide liquidation would depend on the recoveries from, *inter alia*, its intercompany receivables or equity investments, which would in turn depend on the estimated distributions by the respective group debtors/ subsidiaries of the Obligor based on their respective assets (including intercompany receivables from and equity investments in other Group entities) and liabilities (including intercompany payables to other Group entities).

- The Liquidation Analysis, in respect of the Offshore Debts, shall take account of the recoveries to the Obligors from their inter-company receivables and equity investments.

- Given the size of the Group and the information and time constraints, it was agreed with the Company and advisors that the entity-by-entity Liquidation Analysis would not cover all subsidiaries of the Group, instead it would cover subsidiaries that might affect the prospect of material recoveries to the Obligors through intercompany balances or equity investments. A top-down approach from the perspective of the Obligors, subject to a threshold amount of RMB1b, was adopted in setting the scope of the Group's entities to be subject to the entity-by-entity Liquidation Analysis (the "Subject Entities"), i.e. assets and liabilities of the Subject Entities would be individually assessed in arriving at the estimated recoveries to unsecured creditors of each of these entities.

- The following entities of the Group were included in the Liquidation Analysis. A list of Subject Entities is set out in Appendix 1.



**794** Subject Entities with combined NAV of RMB 1,101b, representing over 80% of the combined NAV of the Group [1]

......until the NAV (in the case of investment) or the receivables (in the case of Group debtors) is less than RMB1b

Subsidiaries of the Group which hold PHS or PUD jointly with the Subject Entities

Subsidiaries with NAV >= RMB1b

Group debtors with receivables >= RMB1b

Subsidiaries with NAV >= RMB1b

Group debtors with receivables >= RMB1b

Subsidiaries with NAV >= RMB1b

Group debtors with receivables >= RMB1b

All Obligors

1. Only subsidiaries with positive NAV were considered in arriving at the coverage of the Subject Entities' combined NAV to the Group's combined NAV.

© 2023. For information, contact Deloitte China.

9

# Content

| Section | Page |
| --- | --- |
| Glossary of Terms | 4 |
| Scope of Work | 8 |
| **Sources of Information** | **10** |
| Overview of Financial Position as at 31 December 2022 | 12 |
| Liquidation Analysis | 18 |
| - Methodology | |
| - Key Assumptions | |
| - Entity-by-entity Liquidation Analysis – Payment Waterfall | |
| - Estimated liquidation analysis for CEG, SJ and Tianji | |
| - Limitations | |
| Appendices | 43 |

| Appendices | Page |
| --- | --- |
| List of Subject Entities | 43 |
| Estimated Recoveries of Offshore Debts | 58 |
| List of Subsequent Events Considered | 64 |
| Scenario Analysis | 66 |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

# Sources of Information

Information used in the Liquidation Analysis

| | | |
|---|---|---|
| 🔗 | **Group Structure** | • List of entities of the Group, their respective shareholders (with % of shareholding), and their respective places of incorporation and nature of business |
| 〰️ | **Financial information** | • Management accounts of Subject Entities and consolidated balance sheet of the Group (including entity-level balance sheets) as at 31 December 2022 provided by the Company and the Auditor (received up to 4 July 2023)<br>• Entity-level breakdown of assets and liabilities of the Subject Entities (received up to 4 July 2023)<br>• Working schedules of audit adjustments and consolidation adjustments as at 31 December 2022 provided by the Company and the Auditor (received up to 4 July 2023) |
| 🏠 | **IP, PHS & PUD** | • List of PHS and PUD of the Group showing information on area, status of delivery, status of sale, management/ independent valuer's estimates on selling price per sqm, indebtedness, management estimates on cost to completion and management estimates on future expenditure (sales and marketing, taxes). |
| 🗂️ | **Indebtedness and security package schedule** | • Information and representations from the management of CEG in relation to the onshore interest-bearing borrowings and their security packages (including guarantees, security and pledges)<br>• Information from the Company or its advisors in relation to the Offshore Debts and their security packages (including guarantees, security and pledges). For the avoidance of doubt, information on guarantees provided by offshore entities were provided by the management of CEG |
| 📎 | **Payment waterfall** | • Analysis from Maples and Sidley Austin on the treatment of guarantees in favor of holders of Offshore Debts (excluding guarantees in respect of debts of onshore entities) and put option obligations in the liquidation of offshore Obligors<br>• Analysis from PRC legal advisors in relation to the payment priority pursuant to the relevant PRC bankruptcy laws for the real estate industry and treatment of guarantees in favor of the holders of onshore debts |
| 🔊 | **Management representation & assumption** | • During our work, we interviewed and held discussions with the following members of management team of the Group to obtain an understanding of the nature, quality of various assets held by the Subject Entities and estimated recoveries from the same.<br>➢ PAN Darong, former Executive Director and CFO (up to 22 July 2022)<br>➢ QIAN Cheng, Executive Director and CFO<br>➢ LIN Xiaobin, General Manager, Finance<br>➢ WU Rundong, Manager, Finance<br>➢ BAI Chaoyang, Manager, Finance<br>➢ Peng Zhenan, Manager, Accounting<br>➢ Chen Daiping, Manager, Accounting<br>➢ Wang Jing, Deputy Manager, Finance |

© 2023. For information, contact Deloitte China.

# Content

| Section | Page |
| --- | --- |
| Glossary of Terms | 4 |
| Scope of Work | 8 |
| Sources of Information | 10 |
| **Overview of Financial Position as at 31 December 2022** | **12** |
| Liquidation Analysis | 18 |
| - Methodology | |
| - Key Assumptions | |
| - Entity-by-entity Liquidation Analysis – Payment Waterfall | |
| - Estimated liquidation analysis for CEG, SJ and Tianji | |
| - Limitations | |
| Appendices | 43 |

| Appendices | Page |
| --- | --- |
| List of Subject Entities | 43 |
| Estimated Recoveries of Offshore Debts | 58 |
| List of Subsequent Events Considered | 64 |
| Scenario Analysis | 66 |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

# Overview of Financial Position as at 31 December 2022

## CEG

- CEG is listed on the Main Board of the SEHK. It is principally engaged in investment holding, whilst its subsidiaries are principally engaged in property development.
- CEG Group holds 51.7% of Evergrande Property and 58.5% of Evergrande Auto, of which CEG directly holds 1.9% of Evergrande Property and 1.2% of Evergrande Auto.
- Major assets of CEG are amounts due from group companies and dividends receivable.
- Major liabilities of CEG are borrowings, amounts due to group companies, guarantees granted by CEG in relation to indebtedness of its subsidiaries and put option obligations.

| Adjusted Balance Sheet of CEG as at 31 December 2022 | NBV for |
|---|---|
| RMB million | Liquidation Analysis |
| **Assets** | |
| Cash and cash equivalents | 7 |
| Dividends receivable | 59,080 |
| Other receivables and prepayment (including receivables from Out-Scope Entities) | 6,787 |
| Intercompany receivables from Subject Entities | 106,486 |
| Long-term equity investments | 4,727 |
| Fixed assets | 1 |
| **Total assets** | **177,088** |
| **Liabilities** | |
| Borrowings (interest inclusive) | (2,276) |
| Notes payable (interest inclusive) | (111,904) |
| Intercompany payables to Subject Entities | (83,380) |
| Other liabilities (including payables to Out-Scope Entities) | (1,828) |
| Contingent liabilities - put option obligations | (21,362) |
| Contingent liabilities - guarantees | (81,336) |
| Dividends payable | (1,652) |
| **Total liabilities** | **(303,738)** |
| **Net liabilities** | **(126,650)** |

*Source: Management Account of CEG as at 31 December 2022 and supporting schedules provided by management and the Auditor*

### Dividends receivable

- A summary of dividends receivable is as follows:

| Company | As at 31 Dec 2022 RMB million | Obligor? | Relevant Obligation |
|---|---|---|---|
| ANJI (BVI) Limited安基(BVI)有限公司 | 45,750 | Y | Offshore Debts under Class A |
| FENGYU (BVI) Limited丰域(BVI)有限公司 | 210 | Y | Offshore Debts under Class A |
| UNIVERSAL STAR GLOBAL LIMITED | 4,000 | N | |
| LIONFORT INVESTMENTS LIMITED | 320 | N | |
| NEW GARLAND LIMITED | 8,800 | N | |
| **Grand Total** | **59,080** | | |

### Intercompany receivables from Subject Entities

- A summary of intercompany receivables due from Subject Entities is as follows, a majority of which are Obligors.

| Name of Group Companies | As at 31 Dec 2022 RMB million | Obligor? | Relevant Obligation |
|---|---|---|---|
| 1. Tianji | 39,076 | Y | Offshore Debts under Class D |
| 2. Evergrande Auto | 13,673 | N | |
| 3. BILLION MARK LIMITED | 10,905 | Y | Offshore Debts under Class A |
| 4. 恒大集团有限公司 | 8,311 | N | |
| 5. STATE HERO HOLDINGS LIMITED 国雄控股有限公司 | 6,265 | N | |
| 6. JIAJIAN (BVI) LIMITED 嘉健(BVI)有限公司 | 5,882 | Y | Offshore Debts under Class A |
| 7. NICE DRAGON CAPITAL INVESTMENT LIMITED 丽阳创富有限公司 | 3,115 | N | |
| 8. WELLY GOLD LIMITED 世盛有限公司 | 3,103 | N | |
| 9. YITONG (BVI) LIMITED 亿通(BVI)有限公司 | 2,949 | Y | Offshore Debts under Class A |
| 10. NOBLE BEAUTY LIMITED 贵美有限公司 | 2,582 | N | |
| 11. Obligors with individual balance less than RMB2.5b | 4,094 | Y | Various |
| 12. Other entities of the Group with individual balance less than RMB2.5b | 6,531 | N | |
| **Grand Total** | **106,486** | | |

© 2023. For information, contact Deloitte China.

# Overview of Financial Position as at 31 December 2022

## CEG (con't)

| Adjusted Balance Sheet of CEG as at 31 December 2022 | |
|---|---|
| RMB million | NBV for Liquidation Analysis |
| **Assets** | |
| Cash and cash equivalents | 7 |
| Dividends receivable | 59,080 |
| Other receivables and prepayment (including receivables from Out-Scope Entities) | 6,787 |
| Intercompany receivables from Subject Entities | 106,486 |
| Long-term equity investments | 4,727 |
| Fixed assets | 1 |
| **Total assets** | **177,088** |
| **Liabilities** | |
| Borrowings (interest inclusive) | (2,276) |
| Notes payable (interest inclusive) | (111,904) |
| Intercompany payables to Subject Entities | (83,380) |
| Other liabilities (including payables to Out-Scope Entities) | (1,828) |
| Contingent liabilities – put option obligations | (21,362) |
| Contingent liabilities – guarantees | (81,336) |
| Dividends payable | (1,652) |
| **Total liabilities** | **(303,738)** |
| **Net liabilities** | **(126,650)** |

*Source: Management Account of CEG as at 31 December 2022 and supporting schedules provided by management and the Auditor*

## Borrowings, notes payable and contingent liabilities

- CEG's indebtedness included offshore senior notes, private debts and guarantees granted in respect of indebtedness of subsidiaries and obligations arising from various put options

| No. | Category | Tranche | Outstanding amount as at 31 Dec 2022 | | |
|---|---|---|---|---|---|
| | | | Principal RMB million | Interest RMB million | Principal + Interest RMB million |
| 1 | Borrowings | Class A Private Loan | (65) | (22) | (87) |
| 2 | Borrowings | CEG Loan 1 | (1,071) | (389) | (1,460) |
| 3 | Borrowings | CEG Loan 2 | (536) | (193) | (729) |
| | | **Total borrowings** | **(1,672)** | **(604)** | **(2,276)** |
| 4 | Notes payable | CEG Existing Notes | (99,126) | (12,778) | (111,904) |
| | | **Total notes payable** | **(99,126)** | **(12,778)** | **(111,904)** |
| 5 | Put option obligations | Dongpo Put Option | (808) | (193) | (1,001) |
| 6 | Put option obligations | Graceful Court Put Option | (766) | (73) | (838) |
| 7 | Put option obligations | FCB Put Option | (4,957) | - | (4,957) |
| 8 | Put option obligations | RMB Bond Put Option | (8,200) | (560) | (8,760) |
| 9 | Put option obligations | Kailong Arbitration Award | (5,000) | (805) | (5,805) |
| | | **Total put option obligations** | **(19,731)** | **(1,631)** | **(21,362)** |
| 10 | Guarantees | Various debts under the Offshore Debts | (14,812) | (2,034) | (16,846) |
| 11 | Guarantees | CEG Guarantees of PRC Liabilities | (56,818) | (7,672) | (64,490) |
| | | **Total guarantees** | **(71,630)** | **(9,706)** | **(81,336)** |

© 2023. For information, contact Deloitte China.

# Overview of Financial Position as at 31 December 2022

## SJ

- SJ is the issuer of 4 series of USD senior notes.
- SJ does not have any subsidiaries and its major assets are amounts due from group companies.
- Major liabilities of SJ are the USD senior notes issued and interest accrued.

### Adjusted Balance Sheet of SJ as at 31 December 2022

| RMB million | NBV for Liquidation Analysis |
|---|---|
| **Assets** | |
| Intercompany receivables from Subject Entities | 25,780 |
| **Total assets** | **25,780** |
| | |
| **Liabilities** | |
| Notes payable (interest inclusive) | (42,994) |
| **Total liabilities** | **(42,994)** |
| | |
| **Net liabilities** | **(17,214)** |

Source: *Management Account of SJ and supporting schedules as at 31 December 2022 provided by the management of the Group and the Auditor*

### Intercompany receivables from Subject Entities

- The below receivables represent all assets of SJ

| Company | As at 31 Dec 2022 RMB million | Obligor? | Relevant Obligation |
|---|---|---|---|
| 1. Shengyu (BVI) Limited 盛譽(BVI)有限公司 | 15,044 | Yes | SJ Existing Notes |
| 2. Tianji | 10,736 | Yes | SJ Existing Notes and various private debts |
| **Grand Total** | **25,780** | | |

### Notes payable

- Notes payable represent SJ Existing Notes

| Tranche | Outstanding amount as at 31 Dec 2022 | | |
|---|---|---|---|
| | Principal RMB million | Interest RMB million | Principal + Interest RMB million |
| SJ Existing October 2022 Notes | (13,922) | (2,304) | (16,226) |
| SJ Existing November 2022 Notes | (4,485) | (964) | (5,449) |
| SJ Existing October 2023 Notes | (13,887) | (2,398) | (16,285) |
| SJ Existing November 2023 Notes | (4,102) | (932) | (5,034) |
| **Grand Total** | **(36,396)** | **(6,598)** | **(42,994)** |

© 2023. For information, contact Deloitte China.

# Overview of Financial Position as at 31 December 2022
## Tianji

- Tianji is principally engaged in investment holding, whilst its subsidiaries are principally engaged in property development.
- Major assets of Tianji are amounts due from group companies and investments in subsidiaries.
- Major liabilities of Tianji are amounts due to group companies, guarantees granted by Tianji in relation to indebtedness of the Group (including SJ Existing Notes) and put option obligations

### Adjusted Balance Sheet of Tianji as at 31 December 2022

| RMB million | NBV for Liquidation Analysis |
|---|---|
| **Assets** | |
| Cash and cash equivalents | 4 |
| Accounts receivable | 21 |
| Prepayment | 120 |
| Other receivables (including receivables from Out-scope Entities) | 3,870 |
| Intercompany receivables from Subject Entities | 97,493 |
| Long-term equity investments | 2,862 |
| **Total assets** | **104,370** |
| **Liabilities** | |
| Long-term borrowings (interest inclusive) | (6,922) |
| Intercompany payables to Subject Entities | (109,884) |
| Other liabilities (including payables to Out-scope Entities) | (1,986) |
| Contingent liabilities - put option obligations | (4,236) |
| Contingent liabilities - guarantees | (45,121) |
| **Total liabilities** | **(168,149)** |
| **Net liabilities** | **(63,779)** |

*Source: Management Account of Tianji and supporting schedules as at 31 December 2022 provided by the management of the Group and the Auditor*

### Long-term equity investments
Major investees of Tianji are as follows:

| Name of Subsidiaries | NAV of investee as at 31 Dec 2022 RMB million | Obligor? | Relevant Obligation |
|---|---|---|---|
| 1. EVER GRACE GROUP LIMITED恒嘉集团有限公司 | 6,612 | Yes | SJ Existing Notes |
| 2. Fortune Walker Limited | 1,030 | Yes | Lake Notes |

### Intercompany receivables from Subject Entities
A majority of the key Group debtors of Tianji are Obligors

| Name of Group Companies | As at 31 Dec 2022 RMB million | Obligor? | Relevant Obligation |
|---|---|---|---|
| 1. Shengyu (BVI) Limited 盛誉(BVI)有限公司 | 54,151 | Yes | SJ Existing Notes |
| 2. EV Wanchai 1 Holdings Limited | 11,609 | No | |
| 3. EV Wanchai 1 Land Holdings Limited | 6,608 | Yes | Hero Loan |
| 4. LOFTY REAP LIMITED 上丰有限公司 | 4,640 | Yes | Castle Loan Put Option & Castle Share Put Option |
| 5. LAGUNA HEIGHTS LIMITED | 4,179 | No | |
| 6. URBAN EAGLE LIMITED | 3,989 | No | |
| 7. Shengtong Holding Limited 盛通控股有限公司 | 3,026 | Yes | SJ Existing Notes |
| 8. Greet Delight Limited 迎悦有限公司 | 2,680 | No | |
| 9. JOVIAL IDEA DEVELOPMENTS LIMITED乐意发展有限公司 | 1,714 | No | |
| 10. More Hero Limited添英有限公司 | 1,198 | No | |
| 11. Other Obligors with individual balance less than RMB 1b | 2,083 | Yes | Various |
| 12. Other entities of the Group with individual balance less than RMB 1b | 1,616 | No | |
| **Grand Total** | **97,493** | | |

© 2023. For information, contact Deloitte China.

# Overview of Financial Position as at 31 December 2022

## Tianji (con't)

### Adjusted Balance Sheet of Tianji as at 31 December 2022

| RMB million | NBV for Liquidation Analysis |
|---|---|
| **Assets** | |
| Cash and cash equivalents | 4 |
| Accounts receivable | 21 |
| Prepayment | 120 |
| Other receivables (including receivables from Out-scope Entities) | 3,870 |
| Intercompany receivables from Subject Entities | 97,493 |
| Long-term equity investments | 2,862 |
| **Total assets** | 104,370 |
| | |
| **Liabilities** | |
| Long-term borrowings (interest inclusive) | (6,922) |
| Intercompany payables to Subject Entities | (109,884) |
| Other liabilities (including payables to Out-scope Entities) | (1,986) |
| Contingent liabilities - put option obligations | (4,236) |
| Contingent liabilities - guarantees | (45,121) |
| **Total liabilities** | (168,149) |
| | |
| **Net liabilities** | (63,779) |

### Long-term borrowings and contingent liabilities

- Long-term borrowings mainly represented Hero Loan while contingent liabilities included guarantees granted by Tianji in respect of indebtedness of Group companies, and obligations arising from various put options

| | | | Outstanding amounts as at 31 Dec 2022 | | |
|---|---|---|---|---|---|
| No. | Category | Tranche | Principal RMB million | Interest RMB million | Principal + Interest RMB million |
| 1 | Long-term borrowings | Hero Loan | (6,785) | (137) | (6,922) |
| | | **Total long-term borrowings** | (6,785) | (137) | (6,922) |
| 2 | Put option obligations | Clear Star Put Option | (513) | - | (513) |
| 3 | Put option obligations | Castle Share Put Option | (1,797) | (363) | (2,160) |
| 4 | Put option obligations | Tuen Mun Put Options | (1,258) | (305) | (1,563) |
| | | **Total put option obligations** | (3,568) | (668) | (4,236) |
| 5 | Guarantees | SJ Existing Notes | (36,396) | (6,598) | (42,994) |
| 6 | Guarantees | Lake Notes | (1,810) | (240) | (2,050) |
| 7 | Guarantees | Lei Shing Hong Loan[1] | (77) | - | (77) |
| | | **Total guarantees** | (38,283) | (6,838) | (45,121) |

Note 1: The facility has been fully repaid by the borrower in January 2023, please refer to Appendix 3 for details.

Source: Management Account of Tianji and supporting schedules as at 31 December 2022 provided by the management of the Group and the Auditor

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

# Content

| Section | Page |
|---|---|
| Glossary of Terms | 4 |
| Scope of Work | 8 |
| Sources of Information | 10 |
| Overview of Financial Position as at 31 December 2022 | 12 |
| **Liquidation Analysis** | **18** |
| - Methodology | |
| - Key assumptions | |
| - Entity-by-entity Liquidation Analysis – Payment Waterfall | |
| - Estimated liquidation analysis for CEG, SJ and Tianji | |
| - Limitations | |
| Appendices | 43 |

| Appendices | Page |
|---|---|
| List of Subject Entities | 43 |
| Estimated Recoveries of Offshore Debts | 58 |
| List of Subsequent Events Considered | 64 |
| Scenario Analysis | 66 |

© 2023. For information, contact Deloitte China.

# Illustration of Methodology

The Liquidation Analysis has been prepared on the assumptions that every entity of the Group would be put into liquidation, such that assets of each entity would be realized under a forced-sale scenario for distribution to creditors and shareholders, after taking account of secured claims/ priority claims over its assets (for its own obligations or obligations of other entities) with any shortfall ranking *pari passu* with other unsecured claims of the entity. Proceeds from forced-sale of the remaining unsecured assets (including any surplus from secured assets) would be distributed first to preferential creditors and then to general unsecured creditors (including any deficiency of secured/ priority claims) of that entity on a *pari passu* basis. Any surplus after settling general unsecured claims would first be used to settle dividends declared but not paid, and then distributed to the shareholders of that entity.

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

19

# Key Assumptions

## General Assumptions

| General principles | • Each entity of the Group would be placed into liquidation where |
|---|---|
| | • Assets of each Subject Entity would be realized under a forced-sale scenario for distribution to its creditors, taking account of the super priority claims over Encumbered Assets and the relevant security provided by the Subject Entity (for its own indebtedness and indebtedness of other companies) with any shortfall of its secured indebtedness ranking *pari passu* with other unsecured creditors of the respective entity. |
| | • Proceeds from realization of the remaining unsecured assets of the entity (including any surplus from the secured assets) would be distributed according to the stipulated preferential order. |
| | • Any remaining proceeds from realization would be distributed to unsecured creditors (including deficiency of secured and priority claims, intercompany claims and corporate guarantee claims) on a *pari passu* basis. |
| | • Any surplus after settling unsecured creditors would first be used to settle dividends payable, and then be distributed to shareholder(s) of the entity. |

| Liquidation Process | • All entities of the Group are assumed to be put into insolvent liquidation on 1 January 2023. Subsequent Events and their possible impacts on the financial position, including accrual of interest subsequent to 31 December 2022, are not considered, except for those events set out in Appendix 3. |
|---|---|
| | • The liquidation process is assumed to be conducted on an entity-by-entity basis in accordance with the rules and regulations of the respective jurisdiction, with no consolidation of bankruptcy proceedings or coordination between liquidators/ administrators. |
| | • Assets of companies in liquidation would be realized under a distressed sale. Estimated realization rates (see pages 26 to 30)  shall be applied to different types of assets of the Group to reflect the discount in value of assets under a forced-sale scenario. |
| | • Assets of PRC entities in liquidation would be realised through a court controlled auction process, which would be in the form of a distressed sale. |
| | • It was assumed that recorded liabilities of the Group are valid and would be admitted in full by liquidators/ administrators. |

# Key Assumptions

## General Assumptions

| | |
|---|---|
| **Inter-company Balances (including inter-company interests)** | *Validity and ranking of intercompany payables*<br>• Intercompany liabilities are assumed to be valid and would be admitted in full by liquidators/ administrators after set-off.<br>• Interests were properly charged and recorded and would be admitted in full by liquidators/ administrators.<br>• Save for the cases of subordination which are assumed to be valid and enforceable, intercompany payables would rank *pari passu* with other unsecured claims.<br><br>*Reconciliation and adjustment of intercompany balance matrix*<br>• We noted from the intercompany balance matrix that there were certain differences in balances between entities of the Group.<br>• In cases of unreconciled difference in intercompany balances between two entities of the Group, a higher absolute amount would be adopted in the Liquidation Analysis.<br>• If both entities record a receivable due from the other, it is assumed that the one with higher amount of receivable would be the creditor and the amount would be adopted in the Liquidation Analysis. If both entities record a payable due to the other, it is assumed the one with higher amount of payable would be the debtor and the amount would be adopted in the Liquidation Analysis.<br><br>*Estimating recoveries from intercompany receivables*<br>• Estimated recoveries from intercompany receivables from the Subject Entities are computed based on the estimated return of each Subject Entity to its unsecured creditors.<br>• The limited scope entity-by-entity Liquidation Analysis does not cover all entities of the Group. In order to account for the potential recoveries from the Out-scope Entities (either through intercompany receivables or equity investments in the Out-scope Entities), reference was made to the estimated recoveries to unsecured creditors of the Subject Entities which represented majority of the Group's assets. As the estimated recoveries to unsecured claims of majority of the Subject Entities are within 0 to 5%, a nominal recovery rate of 5% is applied to estimate recoveries from intercompany receivables from the Out-scope Entities. |
| **Dividends** | • Any dividend payables recorded on the balance sheet of the Subject Entities are assumed to be duly declared but unpaid.<br>• Dividends payable would rank after general unsecured claims of the respective subsidiary.<br>• In the case where the dividends receivable and the dividends payable did not reconcile, a lower absolute amount would be adopted in the Liquidation Analysis. |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

21

# Key Assumptions

## General Assumptions

**Guarantee, put option obligations and contingent liabilities**

*Validity and ranking of guarantee and put option obligations*

- Guarantee and put option obligations are assumed to be valid and enforceable, and rank *pari passu* with other unsecured claims.
- Save and except for guarantee claims and put option obligations, it is assumed that there is no other contingent liabilities (e.g. claims for breach of contracts) which would otherwise further reduce the recoveries to unsecured creditors.

*Amount of guarantee claims and put option obligations*

- A creditor (onshore debts and Offshore Debts) would claim in full in respect of guarantee(s) granted by any of the Group entities, except for guarantee provided for certain onshore debts of non-Group entities ("Type 1 Guarantee") where creditors would need to exhaust recoveries from principal obligors and security before claiming against guarantors.
- The amount of claims against guarantors would be reduced by amounts of realisations from borrowers and security only if the realizations were made prior to the date of submission of claims against guarantors. For the purpose of this Liquidation Analysis, since it is assumed all entities would be put into liquidation on 1 January 2023, therefore creditors, with the view to maximize recoveries, would claim against guarantors for 100% of the debts without deducting any recoveries from borrowers and security.
- As borrowers and security of Type 1 Guarantee are outside the Group, relevant information for assessing recoveries from borrowers and security are not available. A scenario analysis, i.e. 0% (base case), 50%, 75% or 100% recoveries from the borrowers and security to pay off the debts respectively, would be performed.
- In the event that a guarantor also provided security for an Offshore Debt, the creditor could realize recoveries on the security provided by the guarantor and claim the deficiency against the guarantor as an unsecured claim. For onshore debts, the amount of unsecured claim against the guarantor would not be reduced by the amount of recoveries on security provided by that guarantor.
- In relation to put option obligations in Offshore Debts, i.e. the Obligors are obliged to acquire assets (mainly shares of the Group entities and notes issued by the Group entities), it is assumed that the put option holders (i.e. the creditors) would realize the assets (on behalf of the Group, without transferring the assets to the Group) under a forced-sale scenario and claim against the put option Obligors for the shortfall (i.e. put option exercise price plus agreed return minus estimated realizable value of the assets under a forced-sale scenario).

*Estimating recoveries from guarantee*

- Unless and until the debt is fully repaid, the Obligors of an Offshore Debt do not have and may not file proof for subrogation claims or other potential claims against borrowers or other obligors. As such it is uncertain that any such claims would be claimed or materially impact the analysis. For the purpose of this Liquidation Analysis, we adopted a similar approach in certain other entity-priority-models to assume that there was no subrogation claims or similar claims against borrowers or other obligors, except if an Offshore Debt had been fully repaid, it is assumed that the other Obligors would claim against the principal borrower for security/guarantees provided.
- The limited scope entity-by-entity Liquidation Analysis does not cover all entities of the Group. In order to account for the potential recoveries from guarantees provided by the Out-scope Entities, reference was made to the estimated recoveries to unsecured creditors of the Subject Entities which represented majority of the Group's assets. As the estimated recoveries to unsecured claims of majority of the Subject Entities are within 0 to 5%, a nominal recovery rate of 5% is applied to estimate recoveries from guarantee in respect of onshore debts provided by the Out-scope Entities (i.e. general unsecured claims).

# Key Assumptions

## General Assumptions

| | |
|---|---|
| | - Secured creditors of Subject Entities would enforce all security granted to them or make claims at all security providers, including assets owned by the Out-scope Entities.<br>- Due to limitation in information in respect of the ranking of onshore secured indebtedness, it is assumed that all secured claims in respect of a secured asset shall rank *pari passu*, i.e. estimated realization from the secured asset would be distributed to the secured creditors pro-rata to their claims.<br>- Secured assets of the borrower would be realized to settle the secured indebtedness. Any shortfall (i.e. secured indebtedness minus estimated realizable value of the secured assets of the borrower) would become unsecured claims of the borrower. Any surplus would be made available for distribution to unsecured creditors of the borrower.<br>- Secured assets of other security providers would be realized to settle the secured indebtedness. Any surplus after deducting the secured indebtedness would be made available for distribution to unsecured creditors of the security provider.<br><br>*Circumstances where indebtedness is fully secured and/or guaranteed*<br>- For indebtedness that are fully secured with multiple assets and guarantees (i.e. > 100% recovery of debts), creditors are entitled to recover outstanding amounts only and any surplus will be made available for distribution to unsecured creditors of the respective security providers/ guarantors.<br>- As there is no specific rules on order of security to be realized, it is assumed that the creditors would recover from:<br>    • First, secured assets of the borrower.<br>    • Second, in the case of onshore debts, secured assets of Out-scope Entities. If there are multiple Out-scope Entities providing security, it is assumed that all security of the Out-scope Entities would be realized for distribution to the secured creditors and any surplus would be made available to the respective Out-scope Entities pro-rata to the estimated realizable value of the secured assets.<br>    • Third, assets secured by Subject Entities. If there are multiple Subject Entities providing security, it is assumed that all security of the Subject Entities would be realized for distribution to secured creditors and any surplus would be made available to the respective Subject Entities pro-rata to the estimated realizable value of the secured assets.<br>    • Fourth, guarantees. Full amount of the debts (i.e. before deducting any realization from security and guarantees) shall be claimed and admitted as unsecured claims against the guarantors' liquidation estate. Any distribution from guarantors in excess of the secured indebtedness would become unsecured assets of guarantors. |
| **Secured claims** | |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

23

# Key Assumptions

## General Assumptions

| | |
|---|---|
| **PUD, PHS & pre-sale proceeds** | • Sale and purchase agreements of property units would be terminated upon liquidation. Accordingly, legal titles of PUD and PHS are assumed to be retained with the Group for disposal via tender process upon liquidation.<br>• Funds in pre-sale proceeds restricted accounts would be returned to property buyers.<br>• Property buyers are assumed to be natural persons who purchased the properties for living purposes and settled purchase consideration in full, and therefore, would satisfy the criteria of holding priority claims.<br>• According to the Reply on Commodity Housing Consumer Protection issued by The Supreme People's Court of the PRC on 20 April 2023 and the analysis from the PRC legal advisors, claims from qualified property buyers would rank before claims from contractors, secured indebtedness and other creditors. There was no express provision set out in the aforesaid Reply on whether the priority claims of qualified property buyers would cover all assets of an entity.<br>• For the purpose of this Liquidation Analysis, in view of the general practice of courts to protect property buyers, it is assumed that property buyers would have first priority (before construction payables and secured claims) over unpledged deposits and realization from PUD and PHS.<br>• Receivables from banks (arose due to delay in release of mortgage loan(s) by relevant financial institutions) are assumed to be non-recoverable, as legal titles of properties are yet to be passed to property buyers and would be retained in the Group for disposal. |
| **Government Relief Loans** | • We noted that certain onshore project companies of the Group had recorded liabilities in respect of relief loans advanced by local governments specifically for ensuring completion and delivery of properties. Generally, funds advanced were kept in specific accounts maintained by local governments and could only be drawn to settle construction-related expenses.<br>• It is assumed that unsecured portion of the government relief loans would be preferential unsecured claims. |
| **Tax / SAFE** | • For purpose of this Liquidation Analysis, the realization of assets in the course of the liquidation of the Group is assumed to have no tax impact. In the event any disposal would give rise to tax liability, the return to creditors would be lower than that of the current scenario.<br>• For purpose of this Liquidation Analysis, it is assumed that there is no withholding tax payable on distribution. In the event any distribution would give rise to tax liability, the return to creditors would be lower than that of the current scenario.<br>• This Liquidation Analysis has considered recorded tax liabilities (after deducting tax recoverable) and deferred tax liabilities (after deducting deferred tax assets) and it is assumed that there is no unrecorded tax liabilities which would otherwise further reduce recovery to unsecured creditors.<br>• Proceeds arising from the realisation of assets in the PRC are assumed to be able to remit to offshore creditors smoothly, without SAFE issues. |

# Key Assumptions

## General Assumptions

| | |
|---|---|
| **Costs** | • Liquidation costs of each Subject Entity of the Group, including liquidators' fees and remuneration, legal costs and costs and expenses incidental to the disposal (except for tax expense) are assumed to be paid in priority (i) in the case of a Subject Entity in the PRC, at 0.8% of estimated realizable value of unsecured assets (including surplus from secured assets) by reference to the guidance issued by The Supreme People's Court of the PRC; and (ii) in the case of a Subject Entity outside the PRC, at 5% of estimated realizable value of unsecured assets (including surplus from secured assets), which is within the reasonable range of liquidation costs observed in the market. |
| | • The Group principally operates in the PRC. According to the Article 47 of the Labour Contract Law of the PRC, upon redundancy, an employee would be entitled to financial compensation on the basis of the number of years he/ she has worked in a unit, the rate being one month's salary for the work of one full year. After taking into account of the average years of service of the employees of the Group, preferential remuneration / retrenchment costs of the Subject Entities in CEG Group, Evergrande Property Group and Evergrande Auto Group are computed at 5.8 times, 3.7 times and 3.2 times of current employees' monthly wages respectively. |
| **Exchange rate** | • The exchange rates adopted for purpose of this analysis are HKD/RMB: 0.8933 and USD/RMB: 6.9646, being the published rates as at 30 December 2022 as set out on the SAFE official website. |
| **Others** | • Time value of money is not considered for purpose of this Liquidation Analysis. |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

25

# Key Assumptions

## Asset-specific Assumptions

The table below sets out assumptions on each key line item of assets under a liquidation scenario, based on discussions with the management of the Group and having regard to experience from previous liquidations:

| Assets | Estimated Realisation Rate | Remarks |
|---|---|---|
| Cash and bank balances (excluding balances in pre-sale proceed accounts and guaranteed deposits) | 100% | - Guaranteed deposits would be utilized by financial institutions to settle bills payable<br>- Pre-sale proceeds restricted balances would be returned to property buyers<br>- Property buyers would have first priority over unpledged deposits |
| Unlisted equity investments (not including investments in subsidiaries) | 20% | - Lower of (i) NBV of the investments and (ii) NAV of the investee attributable to the % held by the Subject Entity based on management account of the investee as at 31 December 2022, if available |
| Listed equity investments (not including Evergrande Property and Evergrande Auto) | 80% | - Market value as at 31 December 2022 |
| Investments in funds | 80% | - NBV |
| Bills receivable from third parties | Various | - Bank's acceptance bills: 100%<br>- Commercial acceptance bills: 30% for due receivables and 50% for current receivables |
| Accounts receivable from third parties | Various based on aging | - These mainly represent receivables from sale of construction materials and property management fee receivables. Estimated realization on NBV will depend on aging:<br>- Within 1 year: 50% (3333 Group & 708 Group); 80% (6666 Group)<br>- 1-2 years: 30%<br>- 2-3 years: 10%<br>- Above 3 years: 0% |

© 2023. For information, contact Deloitte China.

# Key Assumptions

## Asset-specific Assumptions

The table below sets out assumptions on each key line item of assets under a liquidation scenario, based on discussions with the management of the Group and having regard to experience from previous liquidations:

| Assets | Estimated Realisation Rate | Remarks |
|---|---|---|
| Receivables from banks regarding mortgage proceeds | 0% | - It is assumed that pre-sale proceeds from property sale would be refunded to property buyers and the relevant properties (with legal titles retained with the Group) would be disposed by auction. As no properties would be delivered to property buyers, the Group could not receive the receivables from banks |
| Prepayments for acquisition of land use rights | 0% | - The Group would not continue to perform the contractual obligations and might be liable of contractual claims<br>- No information on whether the relevant contracts are assignable or whether the prepayments are refundable<br>- It is expected that these prepayments would have no recovery value |
| Prepaid taxes | 0% | - Advised by the Group's management that prepaid taxes could only be utilised by the relevant Subject Entities and could not be refunded, transferred or assigned. Accordingly, it is assumed that the realisable value of prepaid taxes would be nil under a liquidation scenario |
| Construction-related prepayments | 0% | - These represent prepayments made to contractors and suppliers of construction materials. As the Group would fail to continue to perform the contractual obligations and might become liable of contractual claims, it is expected that these prepayments would have no recovery value |
| Prepayments to property agencies | 0% | - As the Group would cease its business of sale of properties upon liquidation, it would fail to continue to perform the contractual obligations and might become liable of contractual claims, it is expected that these prepayments would have no recovery value |
| Deposits for acquisition of equity investments | 10% | - It includes deposits paid for acquisition of equity investments<br>- No information on whether the relevant contracts are assignable or whether the deposits are refundable. The Group would not continue to perform the share acquisition agreements under a liquidation scenario. It is assumed that these deposits would not be recoverable |

© 2023. For information, contact Deloitte China.

# Key Assumptions

## Asset-specific Assumptions

The table below sets out assumptions on each key line item of assets under a liquidation scenario, based on discussions with the management of the Group and having regard to experience from previous liquidations:

| Assets | Estimated Realisation Rate | Remarks |
|---|---|---|
| Other deposits | 10% | - These represent mainly rental deposit and deposits paid to relevant government authorities in respect of real estate development<br>- The Group would cease its business of real estate development upon liquidation, it is expected that deposits paid to relevant government authorities for real estate development would not be returned<br>- Rental deposits might be forfeited for early termination of rental agreements upon liquidation |
| Other receivables from third parties | Various | - Receivables from Hengten Networks (including the receivables from the disposal of the Group's interest in Hengten Networks) and other receivables in relation to financing provided to individual home purchasers in Hong Kong are assumed to be fully recoverable<br>- Certain other receivables represented pre-sale proceeds and government relief loan proceeds which are kept in escrow accounts in the name of non-Group entities. These other receivables are cash in nature and are assumed to be fully recoverable<br>- For the remaining other receivables from third parties, estimated realization on NBV would depend on aging<br>  - Within 1 year: 20%<br>  - 1-2 years: 10%<br>  - Over 2 years: 0% |
| Intercompany receivables | Various | - Including accounts receivable/ payable, bills receivable/ payable, prepayments, deposits, interests and dividends<br>- From Subject Entities: estimated recovery rate of unsecured claims of the respective Group debtor<br>- Out-scope Entities: 5% |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

28

# Key Assumptions

## Asset-specific Assumptions

The table below sets out assumptions on each key line item of assets under a liquidation scenario, based on discussions with the management of the Group and having regard to experience from previous liquidations:

| Assets | Estimated Realisation Rate | Remarks |
|---|---|---|
| Investments in joint ventures | 10% | - Investments in joint ventures are recognized at cost and adjusted thereafter for the Group's share of post-acquisition profits or losses.<br>- Joint ventures are mainly engaged in real estate development. With the Group being put into liquidation, it is expected that the Group would no longer fund the joint ventures. Unless the joint ventures have sufficient assets or the joint venture partners agree to provide funding (which might dilute the Group's interests in joint ventures), it is likely that the joint ventures would need to be liquidated. Given the current real estate market condition in the PRC, it is unlikely that the joint ventures would realize sufficient assets to repay liabilities and have surplus assets for distribution to the Group in the event of liquidation. After considering the above, it is assumed that only 10% of NBV would be realized. |
| Investment properties in PRC | Various | - Investment properties of Subject Entities consist of offices and shopping malls in the PRC held for rental and capital appreciation<br>- They are recorded at fair value which represent market value based on independent valuation determined at each reporting date, i.e. 31 December 2022.<br>- Various recovery rates, depending on the location of the property, are applied to the fair value of investment properties as estimated by the management of the Group,<br>  - 1st tier cities: 55%<br>  - 2nd tier cities: 35%<br>  - 3rd tier cities: 25%<br>  - Below 3rd tier cities: 15% |
| Land use rights | 30% | - NBV representing costs of acquiring the rights to use certain land for self-use buildings/ properties |
| Other intangible assets | 20% | - Mainly represents capitalized research and development costs, and patent/ proprietary technology rights of Evergrande Auto |

# Key Assumptions

## Asset-specific Assumptions

The table below sets out assumptions on each key line item of assets under a liquidation scenario, based on discussions with the management of the Group and having regard to experience from previous liquidations:

| Assets | Estimated Realisation Rate | Remarks |
|---|---|---|
| Inventories of PRC real estate projects (including PHS and PUD) | Various | - Various recovery rates, depending on the location of the projects, are applied to (i) the net realizable value of real estate projects as estimated by the management of the Group; (ii) independent valuation on the fair value of the PHS or PUD; or (iii) net book value of PHS or PUD if (i) and (ii) are not available<br>  - 1st tier cities: 60%<br>  - 2nd tier cities: 40%<br>  - 3rd tier cities:  30%<br>  - Below 3rd tier cities: 20%<br>- Net realizable value of a real estate project is estimated by the management of the Group based on<br>  (i)  estimated sales proceeds = area available for sale (based on revenue recognition policies) multiplied by sqm market price of comparable developments (independent valuation were performed on the average selling price of certain projects)<br>  Less:<br>  (i)  Unpaid land cost and construction costs<br>  (ii) Costs to complete construction (i.e. total construction contract value x management estimate on % of incomplete portion x 10-15% buffer on cost adjustments)<br>  (iii) Estimated tax expenses<br>  (iv) Estimated selling and administrative expenses<br>- Without any independent valuation on the Group's PHS and PUD, we consider the net realizable value of a project could be an alternative estimate of the fair value of the PHS/PUD as the net realizable value represents approximate value of what willing buyers would pay for an incomplete project, i.e. estimated sales proceeds less estimated costs to completion (which reflect the status of completion) |
| Inventories of Hong Kong real estate projects (PHS) | 80% | - NBV |
| Inventories of Evergrande Auto Group | 10% | - NBV |

© 2023. For information, contact Deloitte China.

# Illustration of Payment Waterfall of a PRC Company

## 1. PRC Real Estate Projects Specific Waterfall – Super Priority Claims and Encumbered Assets

Pre-sale proceeds restricted accounts (1st)

Unpledged deposits (2nd)

PUD & PHS (secured & unsecured) (3rd)

Pre-sale proceeds (assumed criteria for classifying as priority claims being satisfied)

Surplus PUD & PHS (after pre-sale proceeds)

Properties of PPE (secured & unsecured)

CIP (secured & unsecured)

Priority Construction Payables

Deficiencies will be treated as unsecured claims

Deficiencies will be treated as unsecured claims

## 2. Secured Liabilities

Surplus of secured PUD, PHS, Properties and CIP (after pre-sale proceeds & priority construction payables)

Guaranteed deposits & other secured assets

Secured liabilities

Surplus of Encumbered Assets (secured)

Surplus of Encumbered Assets (unsecured)

Deficiencies will be treated as unsecured claims of the borrower

## 3. Unsecured Liabilities

### Unsecured Assets

Surplus of secured assets

Surplus of unsecured Encumbered Assets (after pre-sale proceeds & construction payables)

Surplus of secured assets

General unsecured assets

Intercompany receivables

Return from investment in solvent subsidiaries

### Preferential Claims

Liquidation costs

Government Relief Loans (unsecured)

Employees claims

Tax payables

*Iterative distribution process through matrices of intercompany balances, dividends & shareholding*

### Unsecured Claims

General unsecured claims

Guarantee claims (full except Type 1 Guarantee)

Deficiencies of priority claims

Intercompany Payables

Dividend Payables

Residual to shareholders (if the entity is solvent)

### Legend

Distribution
Source of distribution
Deficiencies
Intercompany related
Proceeds from realization of Encumbered Assets
Proceeds from asset realization
Liabilities
Surplus net of priority claims
Deficiency claims

China Evergrande Group | Liquidation Analysis Report

31

© 2023. For information, contact Deloitte China.

# Illustration of Payment Waterfall of an Offshore Entity

## 1. Secured Liabilities

Secured assets

Secured liabilities

Surplus of secured assets

Deficiencies will be treated as unsecured claims of the borrower

### Unsecured Claims

- General unsecured claims
- Guarantee claims (full except Type 1 Guarantee) and put option obligation (deficiency)
- Deficiencies of secured claims
- Intercompany Payables
- Dividend Payables
- Residual to shareholders (if the entity is solvent)

### Preferential Claims

- Liquidation costs
- Employees claims
- Tax payables

### Unsecured Assets

- Surplus of secured assets
- General unsecured assets
- Intercompany receivables
- Return from investment in solvent subsidiaries

*Iterative distribution process through matrices of intercompany balances, dividends & shareholding*

## 2. Unsecured Liabilities

- Distribution
- Source of distribution
- Deficiencies
- Intercompany related
- Proceeds from asset realization
- Liabilities
- Surplus net of priority claims
- Deficiency claims

China Evergrande Group | Liquidation Analysis Report

32

© 2023. For information, contact Deloitte China.

# Estimated Liquidation Analysis for CEG

| RMB in million | Adjusted NBV as at 31 Dec 2022 | ERV | Average realization rate |
|---|---|---|---|
| **Unencumbered current assets:** | | | |
| Cash and cash equivalents | 7 | 7 | 100% |
| Dividends receivable | 59,080 | 3,277 | 6% |
| Other receivables and prepayment (including receivables from Out-scope Entities) | 6,787 | 264 | 4% |
| Intercompany receivables from Subject Entities | 106,486 | 3,600 | 3% |
| Distribution from CEG in excess of guaranteed liabilities | - | 21 | |
| **Total unencumbered current assets** | 172,360 | 7,169 | |
| | | | |
| **Unencumbered non-current assets:** | | | |
| Long-term equity investments | 4,727 | - | - |
| Fixed assets | 1 | 0 | 20% |
| **Total unencumbered non-current assets** | 4,728 | 0 | |
| | | | |
| **Total unencumbered assets** | 177,088 | 7,169 | |
| | | | |
| **Preferential claims** | | | |
| 1.Liquidation costs | (358) | | |
| 2.Employee claims | (4) | | |
| 3.Tax payables | - | | |
| **Estimated surplus available for unsecured claims** | 6,807 | | |
| | | | |
| Unsecured interest-bearing liabilities | - | | |
| Intercompany payables to Subject Entities | (83,380) | | |
| Other liabilities | (1,828) | | |
| Deficiencies of secured claims & put option obligations | (135,134) | | |
| *Secured liabilities/put option obligations* | (135,542) | | |
| *Less recoveries from secured assets/unreturned security under put options* | 408 | | |
| **Total liabilities, excluding dividend payables** | (220,342) | | |
| | | | |
| Contingent liabilities- *Guarantees* | (81,336) | | |
| **Total obligations, excluding dividend payables** | (301,678) | | |
| | | | |
| **Estimated recovery rate of CEG's unsecured creditors** | **2.26%** | | |

| Estimated Recoveries of CEG Existing Notes | Estimated distribution to noteholders (RMB in million) |
|---|---|
| **From CEG** (estimated recovery of unsecured claims of CEG) | 2,523 |
| | |
| **From Guarantors** | |
| ANJI (BVI) Limited安基(BVI)有限公司 | 556 |
| Jiajian (BVI) Limited嘉建(BVI)有限公司 | 453 |
| Billion Mark Limited | 90 |
| YITONG (BVI) Limited亿通(BVI)有限公司 | 69 |
| FENGYU (BVI) Limited丰域(BVI)有限公司 | 23 |
| Others | 21 |
| | 1,212 |
| | |
| **From share pledge** | - |
| | |
| **Total estimated distribution** | 3,735 |
| | |
| **Total CEG Existing Notes** | 111,904 |
| | |
| **Estimated recovery rate under the CEG Existing Notes** | 3.34% |

| | |
|---|---|
| **Estimated recovery rate for CEG Existing Notes at CEG and all Obligors** | **3.34%** |

Notes: Figures above are subject to rounding. NBV, ERV and average realization rate that are less than RMB1m/1% may be illustrated as "0"/"0%". The use of "-" will be present to illustrate no monetary amount.

© 2023. For information, contact Deloitte China.

# Estimated Liquidation Analysis for SJ

| RMB in million | Adjusted NBV as at 31 Dec 2022 | ERV | Average realization rate | | Estimated distribution to noteholders (RMB in million) |
|---|---|---|---|---|---|
| **Unencumbered current assets:** | | | | | |
| Intercompany receivables from Subject Entities | 25,780 | 734 | 3% | From SJ (estimated recovery from unsecured claims of SJ) | 69 |
| **Total unencumbered current assets** | 25,780 | 734 | | **From Guarantors** | |
| | | | | Shengyu (BVI) Limited盛誉(BVI)有限公司 | 1,389 |
| | | | | Tianji | 989 |
| **Total unencumbered assets** | 25,780 | 734 | | Win Peak Group Limited嬴峰集团有限公司 | 547 |
| | | | | Marche Limited丽来富华集团有限公司 | 356 |
| **Preferential claims** | | | | Shengtong Holding Limited盛通控股有限公司 | 114 |
| 1.Liquidation costs | | (37) | | Ever Grace Group Limited恒укам集团有限公司 | 110 |
| 2.Employee claims | | - | | Joy Wealthy Investment Limited悦才投资有限公司 | 105 |
| 3.Tax payables | | - | | South Honest Limited诚善有限公司 | 84 |
| **Estimated surplus available for unsecured claims** | | 697 | | Spread Glory Investments Limited广先弦波有限公司 | 8 |
| | | | | Rise Eagle Worldwide Limited振鹰环球有限公司 | 5 |
| | | | | Others | 202 |
| Unsecured interest-bearing liabilities | | (42,994) | | **Total estimated distribution from SJ and guarantors** | 4,479 |
| Intercompany payables to Subject Entities | | - | | | |
| Other liabilities | | - | | **From Keepwell Provider: Hengda Real Estate** | 8 |
| Deficiencies of secured claims | | - | | | |
| **Total liabilities** | | (42,994) | | **Total estimated distribution (assuming keepwell was valid)** | 7,188 |
| | | | | **Total SJ Existing Notes** | 42,990 |
| Contingent liabilities | | - | | Estimated recovery rate under the SJ Existing Notes (assuming keepwell was invalid) | 12.37% |
| **Total obligations** | | (42,994) | | Estimated recovery rate under the SJ Existing Notes (assuming keepwell was valid) | 16.71% |

| | |
|---|---|
| **Estimated recovery rate of SJ's unsecured creditors** | **1.62%** |
| **Estimated recovery rate for SJ Existing Notes at SJ and all Obligors (assuming keepwell was invalid)** | **12.37%** |
| **Estimated recovery rate for SJ Existing Notes at SJ and all Obligors (assuming keepwell was valid)** | **16.71%** |

Notes: Figures above are subject to rounding. NBV, ERV and average realization rate that are less than RMB1m/ 1% may be illustrated as "0"/ "0%". The use of "-" will be present to illustrate no monetary amount.

© 2023. For information, contact Deloitte China.

# Estimated Liquidation Analysis for Tianji

| RMB in million | Adjusted NBV as at 31 Dec 2022 | ERV | Average realization rate |
|---|---|---|---|
| **Unencumbered current assets:** | | | |
| Cash and cash equivalents | 4 | 4 | 100% |
| Accounts receivable | 21 | 6 | 30% |
| Prepayment | 120 | - | - |
| Other receivables (including receivables from Out-scope Entities) | 3,870 | 826 | 21% |
| Intercompany receivables from Subject Entities | 97,493 | 3,234 | 3% |
| Distribution by Tianji in excess of guaranteed liabilities | - | 2 | - |
| **Total unencumbered current assets** | 101,508 | 4,072 | |
| | | | |
| **Unencumbered non-current assets:** | | | |
| Long-term equity investment | 2,862 | - | - |
| **Total unencumbered non-current assets** | 2,862 | - | |
| | | | |
| **Total unencumbered assets** | 104,370 | 4,072 | |
| | | | |
| **Preferential claims** | | | |
| 1.Liquidation costs | | (204) | |
| 2.Employee claims | | - | |
| 3.Tax payables | | - | |
| **Estimated surplus available for unsecured claims** | | 3,868 | |
| | | | |
| Unsecured interest-bearing liabilities | | - | |
| Intercompany payables to Subject Entities | | (109,884) | |
| Other liabilities | | (1,986) | |
| Deficiencies of secured claims/ put option obligations | | (10,355) | |
| *-Secured liabilities/ put option obligations* | | (11,158) | |
| *-Less recoveries from secured assets/ unreturned security under put options* | | 803 | |
| **Total liabilities** | | (122,225) | |
| | | | |
| Contingent liabilities-Guarantees | | (45,121) | |
| **Total obligations** | | (167,346) | |

**Estimated recovery rate of Tianji's unsecured creditors** — 2.31%

Notes: Figures above are subject to rounding. NBV, ERV and average realization rate that are less than RMB1m/ 1% may be illustrated as "0"/ "0%". The use of "-" will be present to illustrate no monetary amount.

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

# Estimated Liquidation Analysis for Hengda Real Estate

| RMB in million | Adjusted NBV as at 31 Dec 2022 | ERV | Average realization rate |
|---|---|---|---|
| **Unencumbered current assets:** | | | |
| Cash and cash equivalents | 1,073 | 1,073 | 100% |
| Financial assets held for trading | 138 | 28 | 20% |
| Accounts receivable, prepayment and other receivables (including receivables from Out-scope Entities) | 37,773 | 2,300 | 6% |
| Dividends receivable | 74,159 | 349 | 0% |
| Intercompany receivables from Subject Entities | 258,744 | 25,375 | 10% |
| Distribution by Hengda Real Estate in excess of guaranteed liabilities | - | 474 | |
| **Total unencumbered current assets** | 371,887 | 29,599 | |
| | | | |
| **Unencumbered non-current assets:** | | | |
| Debt investments and equity investments | 471 | 94 | 20% |
| Long-term equity investments | 105,284 | 355 | 0% |
| PUD, PHS, PPE and CIP | 2,021 | 565 | 28% |
| IP, intangible asset and others | 1,545 | 826 | 53% |
| Surplus of secured assets | - | 1,870 | |
| **Total unencumbered non-current assets** | 109,321 | 3,710 | |
| | | | |
| **Total unencumbered assets** | 481,208 | 33,309 | |
| | | | |
| **Preferential claims** | | | |
| 1.Bankruptcy expenses | (266) | | |
| 2.Employee claims | (74) | | |
| 3.Tax payables | (1,165) | | |
| **Estimated surplus available for unsecured claims** | 31,804 | | |
| | | | |
| Unsecured interest-bearing liabilities | (49,737) | | |
| Intercompany payables to Subject Entities | (149,401) | | |
| Other liabilities | (125,410) | | |
| Deficiencies of secured claims | (18,480) | | |
| *-Secured liabilities* | (19,865) | | |
| *-Less recoveries from secured assets* | 1,385 | | |
| **Total liabilities, excluding dividend payables** | (343,028) | | |

| RMB in million | NBV as at 31 Dec 2022 | ERV | Average realization rate |
|---|---|---|---|
| **Contingent liabilities** | | | |
| -Full guarantees | (389,191) | (344,147) | |
| *-Keepwell Deed* | | (45,044) | |
| **Total obligations, excluding dividend payables** | | (732,219) | |
| | | | |
| Estimated recovery rate of  Hengda Real Estate's unsecured creditors | | | 4.34% |

Notes: Figures above are subject to rounding. NBV, ERV and average realization rate that are less than RMB1m/ 1% may be illustrated as "0"/ "0%". The use of "-" will be present to illustrate no monetary amount.

© 2023. For information, contact Deloitte China.

# Major Offshore Assets as at 31 December 2022
Unsecured

* Obligors

| Category | Details | Owner | NBV RMB million | ERV RMB million | Assumption for estimating ERV (please refer to pages 26-30) |
|---|---|---|---|---|---|
| | China Evergrande New Energy Vehicle Group Ltd. (708.HK) | Evergrande Health Industry Holdings Limited | 17,778.8 (closing price before suspension of trading) | Nil | Estimated return to shareholders of 708 Group based on this Liquidation Analysis |
| | | China Evergrande Group* | 367.0 (closing price before suspension of trading) | Nil | |
| | | 708 Sub-total: | 18,145.8 | Nil | |
| | Evergrande Property Services Group Limited (6666.HK) | China Evergrande Group* | 425.6 (closing price before suspension of trading) | Nil | Estimated return to shareholders of 6666 Group based on this Liquidation Analysis |
| | | CEG Holdings (BVI) Limited | 11,060.0 (closing price before suspension of trading) | Nil | |
| | | 6666 Sub-total: | 11,485.6 | Nil | |
| Financial assets – listed equity investments | Bank of Jinzhou Co., Ltd. (416.HK) | New Chic Global Limited* | 46.0 (market value based on Closing price) | 36.8 | 80% of market value as of 31 December 2022 |
| | Faraday Future Intelligent Electric Inc. (FFIE, NASDAQ) | Season Smart Limited | 134.3 (market value based on Closing price) | 107.4 | |
| | E-House (China) Enterprise Holdings Limited (2048.HK) | Jovial Idea Developments Limited | 96.6 (market value based on Closing price) | 77.3 | |
| | | Listed equity investments sub-total: | 29,908.3 | 221.5 | |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

# Major Offshore Assets as at 31 December 2022

## Unsecured

* Obligors

| Category | Details | Owner | NBV RMB million | ERV RMB million | Assumption for estimating ERV (please refer to pages 26-30) |
|---|---|---|---|---|---|
| Financial assets – unlisted equity investments | Seekers Partners Limited (formerly known as Satinu Resources Group Ltd.) | Jiajian (BVI) Limited* | 1,285.1 | 257.0 | 20% of NBV |
| | Cordoba Homes Limited | Greet Delight Limited | 2,598.3 | 519.7 | 20% of NBV |
| | | Unlisted equity investments Sub-total: | 3,883.4 | 776.7 | |
| Financial assets – unlisted funds investment | Pacific Venture Opportunity Fund I,L.P. | Jiajian (BVI) Limited* | 306.8 | 245.5 | 80% of NBV |
| Loans & proceeds from disposal of HengTen Networks Group Limited (136.HK) | Hengten Networks Group Limited | | 1,698.6 | 1,698.6 | Fully recoverable based on discussion with the management |
| | Pumpkin Films Limited | Solution Key Holdings Limited | 1,452.1 | 1,452.1 | |
| | Ocean Fund SPC-Lakers Fund SP | | 485.3 | 485.3 | |
| | | HengTen Network related Sub-total: | 3,636.0 | 3,636.0 | |
| Other Receivables | Yingjia International Properties Limited | State Hero Holdings Limited | 4,466.4 | 446.6 | 10% of NBV (aging within 1-2 years) |
| | Victoria Fortune Group (China) Investment Limited | | 1,786.5 | 178.7 | |
| | | Other receivables Sub-total: | 6,252.9 | 625.3 | |

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

38

# Major Offshore Assets as at 31 December 2022

Unsecured

* Obligors

| Category | Details | Owner | NBV RMB million | ERV RMB million | Assumption for estimating ERV (please refer to pages 26-30) |
|---|---|---|---|---|---|
| Property project – Emerald Bay | Investment costs in OCI Investment Fund SPC | Tianji Holding Limited* | 855.8 | Nil | Estimated residual value based on the Liquidation Analysis |
| | Due from Fortune Choice Development Limited (project company) | Tianji Holding Limited* | 359.2 | 226.3 | Estimated recovery to unsecured creditors of Fortune Choice based on the Liquidation Analysis. |
| | Due from Fortune Choice Development Limited (project company) | Profit Concept Finance Limited* | 152.7 | 96.2 | Estimated recovery based on the Liquidation Analysis |
| | Due from OCI Investment Fund SPC | All Peace Investments Limited* | 929.0 | Nil | |
| | Emerald Bay related Sub-total: | | 2,296.7 | 322.5 | |
| Other receivables in Property projects - Emerald Bay & The Vertex | Other receivables in relation to financing provided to individual home purchasers (业主款) | Profit Concept Finance Limited* | 259.2 | 259.2 | Fully recoverable based on discussion with the management |
| Others | Art collections | Butterfly Hop Holdings Limited | 405.2 | 81.0 | 20% of NBV |
| | Total: | | 46,948.5 | 6,167.7 | |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

39

# Major Offshore Assets as at 31 December 2022
## Secured

* Obligors

| Category | Details | Owner | NBV RMB million | ERV RMB million | Assumption (page refer to pages 26-30) |
|---|---|---|---|---|---|
| Financial assets – listed equity investments | China Bohai Bank Co., Ltd. (9668.HK) | New Chic Global Limited* | 49.8 (market value based on closing price) | 39.9 | 80% of market value as of 31 Dec 2022 |
| | Evergrande Property Services Group Limited (6666.HK) | New Chic Global Limited* | 24.6 (closing price before suspension of trading) | Nil | Estimated return to shareholders of 6666 Group based on the Liquidation Analysis |
| | | State Charm Holdings Limited[1] | 410.9 (closing price before suspension of trading) | Nil | |
| | | Eagleville Holdings Limited[2] | 308.2 (closing price before suspension of trading) | Nil | |
| | | Empire Choice Investments Limited[3] | 719.2 (closing price before suspension of trading) | Nil | |
| | | Listed equity investments Sub-total: | 1,512.7 | 39.9 | |
| YF Life Centre (formerly known as China Evergrande Center) | Investment property located at Wanchai, Hong Kong | Pioneer Time Investment Limited*# | 5,506.5 | 3,303.9 | 60% of NBV |
| | | Total: | 7,019.2 | 3,343.8 | |

Notes:
1. State Charm Holdings Limited ceased to be a member of the Group and an obligor following the transfer of shares in State Charm in connection with CEG Loan 2 during 2022.
2. Eagleville Holdings Limited ceased to be a member of the Group and an obligor following the transfer of shares in Eagleville in connection with the Clear Star Put Option during 2022.
3. Empire Choice Investments Limited ceased to be a member of the Group and an obligor following the transfer of shares in Empire Choice in connection with CEG Loan 1 during 2022.

© 2023. For information, contact Deloitte China.

# Limitations

## Limited scope analysis

- Given the size of the Group and availability of information, it was agreed that the Liquidation Analysis would cover Subject Entities which represent possible material recovery (intercompany balances/ equity) to the Obligors.

- Without information on the financial position of the Out-scope Entities and without an analysis of the estimated realizations of their assets in the event of liquidation, the Liquidation Analysis assumes that there is nil recovery from equity investments in Out-scope Entities and there is 5% recovery from receivables due from Out-scope Entities. Should the financial positions of the Out-scope entities be individually considered, the estimated return to creditors might change.

## Accuracy and completeness of information

- We relied heavily upon the accuracy, validity and completeness of the financial and other information provided to us by the Company, its staff and advisors. We have not sought to audit or independently verify the information provided to us. Where information has been provided to us, we have assumed that it is accurate and current.

- In particular, known liabilities are assumed to be properly recorded and guarantees are properly identified. The actual claims and debts admitted in liquidation proceedings could be different from those adopted in the Liquidation Analysis.

- Balance sheets of certain Subject Entities are not available due to enforcement action by creditors (including appointment of receivers).

## Subsequent events are not considered

- Events after 31 December 2022 were not considered, except for those set out in Appendix 3.
- Interest and default interest were accrued up to 31 December 2022.
- Returns to creditors might change if account is taken of the above.

## Audit and consolidation adjustments

- The Liquidation Analysis has been conducted on an entity-by-entity basis, i.e. based on standalone balance sheets of Subject Entities.

- We noted that certain audit adjustments and consolidation adjustments were made to the figures for assets and liabilities of the Group recorded in the books. In this Liquidation Analysis, we have taken account of audit adjustments and consolidation adjustments that were provided to us on or before 4 July 2023 and if (i) the adjustment can be attributed to the entity-level balance sheet based on discussions with the Auditor; and (ii) impacts of the adjustment on the assets or the liabilities of the Group is larger than the threshold of RMB1b.

- Should account be taken of all the audit adjustments and consolidation adjustments included in the published audited consolidated financial statements of the Group, the recoveries to creditors may change.

## Use of estimates and assumptions

- This Liquidation Analysis involved extensive use of estimates and assumptions, which are inherently subject to uncertainties and contingencies beyond the control of the Company, its management and advisors. As a result, the actual recovery from the liquidation could be materially different from the estimated recovery set forth in the liquidation scenario.

## Intercompany balances

- Differences in intercompany balances were noted and we sought further clarification from the Company on discrepancies in intercompany balances between Subject Entities (of RMB1b and above). There remained unreconciled differences which were adjusted as set out in detail in the Key Assumptions, for the purpose of the Liquidation Analysis.

- Should the difference be fully reconciled by the Company, there could be changes in the assets and liabilities of Subject Entities, and ultimately the expected returns to creditors.

# Limitations

## Valuation

- We were not provided with independent valuations of the forced-sale values of all properties (including PHS and PUD) and investments, which are the major assets of the Group.

- We understand from the management that independent valuations were performed in respect of certain properties (including IPs, PHS and PUD) of Subject Entities. We have not received the relevant valuation reports as of the Cut-off Date and we have relied on certain valuation schedules provided by the management of the Group containing information on the fair value as assessed by independent valuers.

- For properties (including PHS and PUD) for which independent valuations were not available, we have relied on management estimates of the forced-sale value of properties. Results of the Liquidation Analysis in respect of these properties may be different if independent valuations on forced-sale values were available.

## Remittance of funds from the PRC

- We have assumed that all proceeds (if any) generated from realisation of assets of the Group including intercompany balances can be remitted to creditors outside PRC under a liquidation scenario. Should the assumption be invalid, the estimated recoveries may be higher than those which would actually be received.

## Taking possession and realization of assets

- A majority of the Group's fixed assets are located in the PRC. Experience suggests that in the event of a liquidation, it may take extra time and effort to effect the transfer of assets located in the PRC and complications may arise in transferring the title of assets in PRC, and effort to transfer assets located in the PRC may or may not be successful.

## Security provided by third parties

- Due to unavailability of information, the Liquidation Analysis has not taken account of possible recoveries from realization of security granted in respect of indebtedness of Subject Entities by parties outside the Group.

- Expected return to creditors could increase if realizable values of the security provided by third parties were included in the analysis.

## Tax issues

- It is assumed that all proposed disposal of fixed assets of the Group and distribution are not subject to payment of any taxes; however, in certain cases, disposal and distribution may give rise to tax liability. If tax liability should arise, expected return to the creditors would decrease.

## Contingent liabilities

- Given the scope of our work has been limited by the information made available to us, we have not taken account of any other contingent liabilities of the Group, save for the known corporate guarantees on borrowings and put option obligations

## Guarantee claims

- Please refer to the section "General Assumptions" for treatment of guarantee.

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

# Appendix 1 – List of Subject Entities

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|---|---|---|---|
| 1 | Forbidden City Culture Co., Limited紫禁城弘业文化有限公司 | Offshore | 3333 Group |
| 2 | EVER SURE INDUSTRIES LIMITED永诚实业有限公司 | Offshore | 3333 Group |
| 3 | China Evergrande Group中国恒大集团 | Offshore | 3333 Group |
| 4 | ANJI (BVI) Limited安基(BVI)有限公司 | Offshore | 3333 Group |
| 5 | Shengjian (BVI) Limited盛建(BVI)有限公司 | Offshore | 3333 Group |
| 6 | SUCCESS WILL GROUP LIMITED建立集团有限公司 | Offshore | 6666 Group |
| 7 | Shengyu (BVI) Limited盛豫(BVI)有限公司 | Offshore | 3333 Group |
| 8 | Jiajian (BVI) Limited嘉建(BVI)有限公司 | Offshore | 3333 Group |
| 9 | FENGYU (BVI) Limited丰域(BVI)有限公司 | Offshore | 3333 Group |
| 10 | YITONG (BVI) Limited亿通(BVI)有限公司 | Offshore | 3333 Group |
| 11 | LANBOWAN (BVI) Limited兰博湾(BVI)有限公司 | Offshore | 3333 Group |
| 12 | CHUANGFENG (BVI) Limited创丰(BVI)有限公司 | Offshore | 3333 Group |
| 13 | ACELIN GLOBAL LIMITED | Offshore | 3333 Group |
| 14 | GLOBAL POWER LIMITED | Offshore | 3333 Group |
| 15 | NEW CHIC GLOBAL LIMITED | Offshore | 3333 Group |
| 16 | WELLY GOLD LIMITED世鑫有限公司 | Offshore | 3333 Group |
| 17 | Shengtong (BVI) Limited盛通(BVI)有限公司 | Offshore | 3333 Group |
| 18 | Universal Star Global Limited | Offshore | 3333 Group |
| 19 | Peace Top Limited | Offshore | 3333 Group |
| 20 | Solution Key Holdings Limited | Offshore | 3333 Group |
| 21 | Shengtong Holding Limited盛通控股有限公司 | Offshore | 3333 Group |
| 22 | Evergrande Health Industry Holdings Limited恒大健康产业控股有限公司 | Offshore | 0708 Group |
| 23 | 中国恒大新能源汽车集团有限公司 | Offshore | 0708 Group |
| 24 | Tianji Holding Limited天基控股有限公司 | Offshore | 3333 Group |
| 25 | XING HONG HOLDINGS LIMITED兴鸿控股有限公司 | Offshore | 3333 Group |
| 26 | ROSY DYNASTY LIMITED源郡有限公司 | Offshore | 3333 Group |
| 27 | Starthigh International Limited高原国际有限公司 | Offshore | 3333 Group |
| 28 | Lucky Benefit Limited | Offshore | 3333 Group |
| 29 | Loyal Power Investments Limited旺权投资有限公司 | Offshore | 3333 Group |
| 30 | Rising Sheen Limited升亮有限公司 | Offshore | 3333 Group |
| 31 | City Faith Limited都信有限公司 | Offshore | 3333 Group |
| 32 | South Honest Limited诚南有限公司 | Offshore | 3333 Group |
| 33 | EVER GRACE GROUP LIMITED恒露集团有限公司 | Offshore | 3333 Group |
| 34 | MINSIN INTERNATIONAL (HOLDINGS) LIMITED明诚国际(集团)有限公司 | Offshore | 3333 Group |
| 35 | Merry Full Investments Limited怡满投资有限公司 | Offshore | 3333 Group |
| 36 | Million Castle Investments Limited | Offshore | 3333 Group |
| 37 | Accord Sino Group Limited怡华集团有限公司 | Offshore | 3333 Group |
| 38 | Benefit East Investments Limited益东投资有限公司 | Offshore | 3333 Group |
| 39 | Champion Globe Limited冠天有限公司 | Offshore | 3333 Group |
| 40 | Champion King Investments Limited必康投资有限公司 | Offshore | 3333 Group |
| 41 | Champion Glory Holdings Limited必康集团有限公司 | Offshore | 3333 Group |
| 42 | LUCKYUP GROUP LIMITED昇祺集团有限公司 | Offshore | 3333 Group |
| 43 | First Key Investments Limited元基投资有限公司 | Offshore | 3333 Group |
| 44 | Pioneer Time Investment Limited | Offshore | 3333 Group |
| 45 | GREAT COURAGE GLOBAL LIMITED | Offshore | 3333 Group |
| 46 | CHARM WEALTH ASIA PACIFIC LIMITED宝耀亚太有限公司 | Offshore | 3333 Group |
| 47 | INVESTOR NETWORK GLOBAL LIMITED | Offshore | 3333 Group |
| 48 | FAST TALENT INVESTMENT LIMITED迅杰投资有限公司 | Offshore | 3333 Group |
| 49 | WELL GLORY HOLDINGS LIMITED好耀控股有限公司 | Offshore | 3333 Group |
| 50 | Butterfly Hop Holdings Limited | Offshore | 3333 Group |
| 51 | Dragon Joy (China) Limited龙悦(中国)有限公司 | Offshore | 3333 Group |
| 52 | White Heron Limited | Offshore | 3333 Group |
| 53 | Superb Capital Enterprises Limited | Offshore | 3333 Group |
| 54 | Dragon Fortune Ltd. | Offshore | 3333 Group |
| 55 | Palm Island Resort Limited棕榈岛度假村有限公司 | Offshore | 3333 Group |
| 56 | Lucky Grow Holdings Limited智盛控股有限公司 | Offshore | 3333 Group |
| 57 | FORTUNE LUCK CORPORATION LIMITED顺利有限公司 | Offshore | 3333 Group |
| 58 | SHUI WAH INVESTMENT LIMITED瑞华投资有限公司 | Offshore | 3333 Group |
| 59 | WISDOM GAIN GROUP LIMITED智盈集团有限公司 | Offshore | 3333 Group |
| 60 | GROW RISING INVESTMENT LIMITED晋廷投资有限公司 | Offshore | 3333 Group |

*Obligor*

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|---|---|---|---|
| 61 | Marche Limited恒泽富华集团有限公司 | Offshore | 3333 Group |
| 62 | Baojun Limited保骏有限公司 | Offshore | 3333 Group |
| 63 | Perfect Vantage Investments Limited万冠投资有限公司 | Offshore | 3333 Group |
| 64 | Ace Score Holdings Limited | Onshore | 3333 Group |
| 65 | S.I. FengTao Properties (BVI) Limited上实丰涛置业(BVI)有限公司 | Offshore | 3333 Group |
| 66 | S.I. Feng Tao Properties Limited上实丰涛置业有限公司 | Offshore | 3333 Group |
| 67 | Charisma City Limited | Offshore | 3333 Group |
| 68 | S.I. Feng Shun Properties (BVI) Limited上实丰顺置业(BVI)有限公司 | Offshore | 3333 Group |
| 69 | Jiayu Holdings Limited嘉睿控股有限公司 | Offshore | 3333 Group |
| 70 | Ever Shiny International Limited | Offshore | 3333 Group |
| 71 | Future Lead Enterprises Limited天华企业有限公司 | Offshore | 3333 Group |
| 72 | Hinto Developments Limited | Offshore | 3333 Group |
| 73 | SPREAD GLORY INVESTMENTS LIMITED广亮达投资有限公司 | Offshore | 3333 Group |
| 74 | Triumph Hero International Limited胜祖国际有限公司 | Offshore | 3333 Group |
| 75 | Rise Eagle Worldwide Limited瑞鹰环球有限公司 | Offshore | 3333 Group |
| 76 | Jiaying Holdings Limited嘉颖控股有限公司 | Offshore | 3333 Group |
| 77 | Jiashi Holdings Limited嘉誓控股有限公司 | Offshore | 3333 Group |
| 78 | New Insight Holdings Limited创见控股有限公司 | Offshore | 3333 Group |
| 79 | Easy Gain Investment Holdings Limited盈润投资控股有限公司 | Offshore | 3333 Group |
| 80 | Starlet Development Limited星皇发展有限公司 | Offshore | 3333 Group |
| 81 | Honor Business Investment Limited荣商投资有限公司 | Offshore | 3333 Group |
| 82 | Honour In Investments Limited诚然投资有限公司 | Offshore | 3333 Group |
| 83 | Link Care Limited环照有限公司 | Offshore | 3333 Group |
| 84 | Grace Target Holdings Limited嘉志集团有限公司 | Offshore | 3333 Group |
| 85 | Jiading Holdings Limited嘉鼎控股有限公司 | Offshore | 3333 Group |
| 86 | Menkia Holdings Limited万家控股有限公司 | Offshore | 3333 Group |
| 87 | Glory Sign Development Limited皇志荣发展有限公司 | Offshore | 3333 Group |
| 88 | Vast Wheel Company Limited沛霖有限公司 | Offshore | 3333 Group |
| 89 | Prosper Power Development Limited盛晟发展有限公司 | Offshore | 3333 Group |
| 90 | Reego Group Limited悦高集团有限公司 | Offshore | 3333 Group |

*Obligor*

| No. | Company name | On/Offshore | Group |
|---|---|---|---|
| 91 | Sharp Goal Investments Limited铭怡投资有限公司 | Offshore | 3333 Group |
| 92 | On Lucky Holdings Limited安利达控股有限公司 | Offshore | 3333 Group |
| 93 | Pacific Plus Enterprises Limited汇太企业有限公司 | Offshore | 3333 Group |
| 94 | Silver Opportunity Investment Limited银机投资有限公司 | Offshore | 3333 Group |
| 95 | Prime Light Holdings Limited柏庆集团有限公司 | Offshore | 3333 Group |
| 96 | Full Hill Limited | Offshore | 3333 Group |
| 97 | Dragon Charm Investments Limited龙创投资有限公司 | Offshore | 3333 Group |
| 98 | Crown Wise Investment Limited冠惠投资有限公司 | Offshore | 3333 Group |
| 99 | Luck Fortune Holdings Limited | Offshore | 3333 Group |
| 100 | Upper East Property Holdings Company Limited上东置业控股有限公司 | Offshore | 3333 Group |
| 101 | Full Jolly Investments Limited满怡投资有限公司 | Offshore | 3333 Group |
| 102 | Win Harbour Investments Limited凯港投资有限公司 | Offshore | 3333 Group |
| 103 | Joy Wealthy Investment Limited悦之丰投资有限公司 | Offshore | 3333 Group |
| 104 | JICHENG INTERNATIONAL (HK) LIMITED集成国际(香港)有限公司 | Offshore | 3333 Group |
| 105 | Billion Mark Limited | Offshore | 3333 Group |
| 106 | Healthy Time International Limited健时国际有限公司 | Offshore | 3333 Group |
| 107 | Oriental Fame Holdings Limited东荣控股有限公司 | Offshore | 3333 Group |
| 108 | Goldbridge Limited | Offshore | 3333 Group |
| 109 | Sunny Net Development Limited日讯发展有限公司 | Offshore | 3333 Group |
| 110 | Cheer Champ Investment Limited志昂投资有限公司 | Offshore | 3333 Group |
| 111 | Cheer Motion Development Limited致能发展有限公司 | Offshore | 3333 Group |
| 112 | Opal House Development Limited | Offshore | 3333 Group |
| 113 | Gold Ascot Limited金土耀有限公司 | Offshore | 3333 Group |
| 114 | East Best Investments Limited乐卓投资有限公司 | Offshore | 3333 Group |
| 115 | Trend Rich Investment Limited趋富投资有限公司 | Offshore | 3333 Group |
| 116 | JIA SHAN HOLDINGS LIMITED嘉善控股有限公司 | Onshore | 3333 Group |
| 117 | BAI CHANG LIMITED百昌有限公司 | Onshore | 3333 Group |
| 118 | CENTRALSINO GLOBAL LIMITED中华环球有限公司 | Onshore | 3333 Group |
| 119 | JOVIAL IDEA DEVELOPMENTS LIMITED乐意发展有限公司 | Offshore | 3333 Group |
| 120 | Billion Sino Investments Limited亿中投资有限公司 | Offshore | 3333 Group |

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|---|---|---|---|
| 121 | Allwing Investments Limited荣邦投资有限公司 | Offshore | 3333 Group |
| 122 | California Place Dalian Limited加州豪庭大连有限公司 | Offshore | 3333 Group |
| 123 | Win Peak Group Limited凯通集团有限公司 | Offshore | 3333 Group |
| 124 | CHINA AGRICULTURE TECHNOLOGY LIMITED中国农业科技有限公司 | Offshore | 3333 Group |
| 125 | Dragon Pioneer Development Limited龙志发展有限公司 | Offshore | 3333 Group |
| 126 | Goldenway Land Development Limited全道置业有限公司 | Offshore | 3333 Group |
| 127 | China Sea Group (Hong Kong) Investment Limited中海集团(香港)投资有限公司 | Offshore | 3333 Group |
| 128 | EXCEL SKY (HONG KONG) LIMITED俊天(香港)有限公司 | Offshore | 3333 Group |
| 129 | GOOD WAVE INTERNATIONAL LIMITED佳涛国际有限公司 | Offshore | 3333 Group |
| 130 | INFINITY REAL ESTATE HOLDINGS PTE | Offshore | 3333 Group |
| 131 | Fortune Ascent Property Management Limited升裕物业管理有限公司 | Offshore | 6666 Group |
| 132 | INSTANT CHOICE DEVELOPMENT LTD. | Offshore | 3333 Group |
| 133 | LUCKY UNIVERSE HOLDING LIMITED瑞宇集团有限公司 | Offshore | 3333 Group |
| 134 | SCENERY JOURNEY LIMITED景程有限公司 | Offshore | 3333 Group |
| 135 | Faith Honor Group Limited信荣集团有限公司 | Offshore | 3333 Group |
| 136 | Shiny Profit Enterprises Limited(BVI) | Offshore | 3333 Group |
| 137 | LEADING VIEW INTERNATIONAL LIMITED | Offshore | 3333 Group |
| 138 | EASE TRIUMPH INTERNATIONAL LIMITED拓业国际有限公司 | Offshore | 3333 Group |
| 139 | EV Wanchai 1 Holdings Limited | Offshore | 3333 Group |
| 140 | EV Wanchai 1 Land Holdings Limited | Offshore | 3333 Group |
| 141 | THOUSAND GRAND HOLDING LIMITED千恋控股有限公司 | Offshore | 3333 Group |
| 142 | SEASON SMART LIMITED时颖有限公司 | Offshore | 0708 Group |
| 143 | PRIME SUN HOLDING LIMITED盛日控股有限公司 | Offshore | 3333 Group |
| 144 | Evergrande New Energy Automotive Holdings (Hong Kong) Limited | Offshore | 0708 Group |
| 145 | Solution King Investments Limited | Offshore | 3333 Group |
| 146 | Mini Minor Limited | Offshore | 3333 Group |
| 147 | TOTAL ACCORD LIMITED鹰全有限公司 | Offshore | 0708 Group |
| 148 | ASSEMBLE GUARD LIMITED汇汇有限公司 | Offshore | 0708 Group |
| 149 | AMPLE TREASURE HOLDING LIMITED宝丰集团控股有限公司 | Offshore | 3333 Group |
| 150 | FLOURISHING FILL LIMITED股盛有限公司 | Offshore | 0708 Group |
| 151 | Kind World Corporation Limited良世有限公司 | Offshore | 0708 Group |
| 152 | GODSIB LIMITED | Offshore | 3333 Group |
| 153 | LAGUNA HEIGHTS LIMITED | Offshore | 3333 Group |
| 154 | URBAN EAGLE LIMITED | Offshore | 3333 Group |
| 155 | CHANG XING HOLDINGS LIMITED昌兴控股有限公司 | Offshore | 3333 Group |
| 156 | NOBLE BEAUTY LIMITED | Offshore | 3333 Group |
| 157 | STATE HERO HOLDINGS LIMITED | Offshore | 3333 Group |
| 158 | CHEUNGFU DEPARTMENT STORE ENTERPRISE LIMITED象富百货集团有限公司 | Offshore | 3333 Group |
| 159 | NICE DRAGON CAPITAL INVESTMENT LIMITED | Offshore | 3333 Group |
| 160 | Profit Concept Finance Limited创盈财务有限公司 | Offshore | 3333 Group |
| 161 | A476 National Electric Vehicle Sweden AB | Offshore | 0708 Group |
| 162 | AMPLE TREASURE GROUP LIMITED宝丰集团有限公司 | Offshore | 3333 Group |
| 163 | All Peace Investments Limited谐通投资有限公司 | Offshore | 3333 Group |
| 164 | LUCKY UNIVERSE ENTERPRISES LIMITED瑞宇企业有限公司 | Offshore | 3333 Group |
| 165 | Greet Delight Limited迎悦有限公司 | Offshore | 3333 Group |
| 166 | PRIME SUN ENTERPRISES LIMITED盛日企业有限公司 | Offshore | 3333 Group |
| 167 | LOFTY REAP LIMITED上丰有限公司 | Offshore | 3333 Group |
| 168 | More Hero Limited添英有限公司 | Offshore | 3333 Group |
| 169 | NEW GAINS GROUP LIMITED新得集团有限公司 | Offshore | 3333 Group |
| 170 | ALPHA BEAUTY LIMITED领美有限公司 | Offshore | 3333 Group |
| 171 | ACE PERFECTION GLOBAL LIMITED | Offshore | 708 Group |
| 172 | MEGA WISE INTERNATIONAL LIMITED | Offshore | 0708 Group |
| 173 | PROMINENT TEAM LIMITED | Offshore | 0708 Group |
| 174 | Best Wealth Investments Limited佳裕投资有限公司 | Offshore | 3333 Group |
| 175 | Rise Gain Development Limited昇益发展有限公司 | Offshore | 3333 Group |
| 176 | CEG Holdings (BVI) Limited | Offshore | 3333 Group |
| 177 | Eagle Investment (BVI) Limited | Offshore | 6666 Group |
| 178 | Knight Honour Global Limited | Offshore | 6666 Group |
| 179 | Stay Wealth Limited保荣有限公司 | Offshore | 3333 Group |
| 180 | Oceanic Hero Holdings Limited英海控股有限公司 | Offshore | 3333 Group |

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

Obligor

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|---|---|---|---|
| 181 | Global City Development Ltd | Offshore | 3333 Group |
| 182 | Profit Point Enterprises Limited盈利企业有限公司 | Offshore | 3333 Group |
| 183 | Flying Bloom Investments Limited飞廷投资有限公司 | Offshore | 3333 Group |
| 184 | Evergrande Property Services Group Limited | Offshore | 6666 Group |
| 185 | CITY EXPERT LIMITED城博有限公司 | Offshore | 3333 Group |
| 186 | CAPTAIN CHEER LIMITED | Offshore | 3333 Group |
| 187 | KEY ALLIANCE INVESTMENTS LIMITED建联投资有限公司 | Offshore | 3333 Group |
| 188 | Rainbow Ever Limited | Offshore | 3333 Group |
| 189 | 恒大陷地新能源汽车空股（香港）有限公司 | Offshore | 0708 Group |
| 190 | Sky Joy Holdings Limited悦天控股有限公司 | Offshore | 3333 Group |
| 191 | Earn Success Development Limited成得发展有限公司 | Offshore | 3333 Group |
| 192 | RAY SHINE GROUP LIMITED利辉集团有限公司 | Offshore | 3333 Group |
| 193 | IDEAL MARKET HOLDINGS LIMITED恒智控股有限公司 | Offshore | 3333 Group |
| 194 | FORTUNE WALKER有限公司 | Offshore | 3333 Group |
| 195 | JUMBO FORTUNE ENTERPRISES LIMITED | Offshore | 3333 Group |
| 196 | Garden Blossom Limited | Offshore | 3333 Group |
| 197 | METRO WISDOM LIMITED慧都有限公司 | Offshore | 3333 Group |
| 198 | HONOUR OASIS LIMITED | Offshore | 3333 Group |
| 199 | MARVEL FIRST DEVELOPMENTS LIMITED | Offshore | 3333 Group |
| 200 | PYRAMID WEALTH HOLDINGS LIMITED | Offshore | 3333 Group |
| 201 | VALUE DEPOT HOLDINGS LIMITED | Offshore | 3333 Group |
| 202 | JI FENG LIMITED吉丰有限公司 | Offshore | 3333 Group |
| 203 | Fortune Star International Investment Limited福星国际投资有限公司 | Offshore | 3333 Group |
| 204 | JOY VISION HOLDINGS LIMITED乐景控股有限公司 | Offshore | 3333 Group |
| 205 | SANLI (CHINA) HOLDINGS LIMITED三立(中国)控股有限公司 | Offshore | 3333 Group |
| 206 | ABLE KEY DEVELOPMENT LIMITED能俊发展有限公司 | Onshore | 3333 Group |
| 207 | NEW GARLAND LIMITED | Onshore | 3333 Group |
| 208 | GLOBAL DEVELOPMENT LIMITED | Offshore | 3333 Group |
| 209 | Eagleville Holdings Limited | Offshore | 3333 Group |
| 210 | Empire Choice Investments Limited | Offshore | 3333 Group |
| 211 | Max Lead Corporation Limited | Offshore | 3333 Group |
| 212 | State Charm Holdings Limited | Offshore | 3333 Group |
| 213 | TREASURE GLORY GLOBAL LIMITED | Offshore | 3333 Group |
| 214 | 恒大地产集团有限公司 | Onshore | 3333 Group |
| 215 | 恒大地产集团武汉有限公司 | Onshore | 3333 Group |
| 216 | 恒大地产集团重庆有限公司 | Onshore | 3333 Group |
| 217 | 恒大地产集团成都有限公司 | Onshore | 3333 Group |
| 218 | 广州市超丰置业有限公司 | Onshore | 3333 Group |
| 219 | 广州市凯隆置业有限公司 | Onshore | 3333 Group |
| 220 | 恒大地产集团山东彤山有限公司 | Onshore | 3333 Group |
| 221 | 恒大长基（沈阳）置业有限公司 | Onshore | 3333 Group |
| 222 | 恒大鑫丰（东山）置业有限公司 | Onshore | 3333 Group |
| 223 | 清远市俊鑫房地产开发有限公司 | Onshore | 3333 Group |
| 224 | 启东睿赛置业有限公司 | Onshore | 3333 Group |
| 225 | 启东欢华置业有限公司 | Onshore | 3333 Group |
| 226 | 启东盛耀置业有限公司 | Onshore | 3333 Group |
| 227 | 启东隽黄置业有限公司 | Onshore | 3333 Group |
| 228 | 启东鑫华置业有限公司 | Onshore | 3333 Group |
| 229 | 启东通鑫置业有限公司 | Onshore | 3333 Group |
| 230 | 启东宝丰置业有限公司 | Onshore | 3333 Group |
| 231 | 重庆恒大美爹置业有限公司 | Onshore | 3333 Group |
| 232 | 恒大地产集团郑州有限公司 | Onshore | 3333 Group |
| 233 | 金碧物业有限公司 | Onshore | 3333 Group |
| 234 | 广州市碧轩房物业有限公司 | Onshore | 6666 Group |
| 235 | 广州市金碧世家物业服务有限公司 | Onshore | 6666 Group |
| 236 | 恒大地产集团西安有限公司 | Onshore | 3333 Group |
| 237 | 恒大地产集团洛阳有限公司 | Onshore | 3333 Group |
| 238 | 恒大地产集团南宁有限公司 | Onshore | 3333 Group |
| 239 | 恒大地产集团贵阳置业有限公司 | Onshore | 3333 Group |
| 240 | 恒大地产集团合肥有限公司 | Onshore | 3333 Group |

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|-----|-------------|-------------|-------|
| 241 | 恒大地产集团长沙置业有限公司 | Onshore | 3333 Group |
| 242 | 恒大园林集团有限公司 | Onshore | 3333 Group |
| 243 | 恒大地产集团广东房地产开发有限公司 | Onshore | 3333 Group |
| 244 | 陕西金运投资有限公司 | Onshore | 3333 Group |
| 245 | 恒大集团（南昌）有限公司 | Onshore | 3333 Group |
| 246 | 恒大地产集团石家庄有限公司 | Onshore | 3333 Group |
| 247 | 恒大地产集团济南置业有限公司 | Onshore | 3333 Group |
| 248 | 恒大地产集团天津有限公司 | Onshore | 3333 Group |
| 249 | 江西省彩林山庄有限公司 | Onshore | 3333 Group |
| 250 | 恒大地产集团上海盛建置业有限公司 | Onshore | 3333 Group |
| 251 | 恒大地产集团海南有限公司 | Onshore | 3333 Group |
| 252 | 天津沛盟丽湖投资有限公司 | Onshore | 3333 Group |
| 253 | 天津汇琪创展置业有限公司 | Onshore | 3333 Group |
| 254 | 沈阳悦趣置业有限公司 | Onshore | 3333 Group |
| 255 | 贵州广聚源房地产开发有限公司 | Onshore | 3333 Group |
| 256 | 恒大地产集团大邑有限公司 | Onshore | 3333 Group |
| 257 | 上海穗华置业有限公司 | Onshore | 3333 Group |
| 258 | 恒大地产集团兰州置业有限公司 | Onshore | 3333 Group |
| 259 | 恒大地产集团（沈阳）投资有限公司 | Onshore | 3333 Group |
| 260 | 辽阳恒盛置业有限公司 | Onshore | 3333 Group |
| 261 | 儋州恒大海湾投资有限公司 | Onshore | 3333 Group |
| 262 | 恒大地产集团昆明有限公司 | Onshore | 3333 Group |
| 263 | 沈阳盛同置业有限公司 | Onshore | 3333 Group |
| 264 | 鞍山惠瑞置业有限公司 | Onshore | 3333 Group |
| 265 | 恒大地产集团呼和浩特有限公司 | Onshore | 3333 Group |
| 266 | 盘锦鼎鼎置业有限公司 | Onshore | 3333 Group |
| 267 | 重庆坤茂置业有限公司 | Onshore | 3333 Group |
| 268 | 合肥孝宁置业有限公司 | Onshore | 3333 Group |
| 269 | 天津山水城投资有限公司 | Onshore | 3333 Group |
| 270 | 恒大地产集团哈尔滨开发有限公司 | Onshore | 3333 Group |

| No. | Company name | On/Offshore | Group |
|-----|-------------|-------------|-------|
| 271 | 儋州恒大椰岛投资开发有限公司 | Onshore | 3333 Group |
| 272 | 恒大地产集团南京置业有限公司 | Onshore | 3333 Group |
| 273 | 天津永济投资有限公司 | Onshore | 3333 Group |
| 274 | 哈尔滨市恒大伟业房地产开发有限公司 | Onshore | 3333 Group |
| 275 | 清远市银湖湖投资有限公司 | Onshore | 3333 Group |
| 276 | 海南世纪诚投资有限公司 | Onshore | 3333 Group |
| 277 | 恒大地产集团乌鲁木齐有限公司 | Onshore | 3333 Group |
| 278 | 五家渠卓越启房地产开发有限公司 | Onshore | 3333 Group |
| 279 | 阳江市鼎丰实业有限公司 | Onshore | 3333 Group |
| 280 | 资阳万城置业有限公司 | Onshore | 3333 Group |
| 281 | 恒大地产集团（深圳）有限公司 | Onshore | 3333 Group |
| 282 | 南昌中电投房新置业有限公司 | Onshore | 3333 Group |
| 283 | 恒大足球学校 | Onshore | 3333 Group |
| 284 | 济南恒大翡翠华庭置业有限公司 | Onshore | 3333 Group |
| 285 | 恩平市鹏尚房地产开发有限公司 | Onshore | 3333 Group |
| 286 | 天津金潮投资有限公司 | Onshore | 3333 Group |
| 287 | 自贡鑫茂置业有限公司 | Onshore | 3333 Group |
| 288 | 诚博（宁波）置业有限公司 | Onshore | 3333 Group |
| 289 | 宁波御城置业有限公司 | Onshore | 3333 Group |
| 290 | 无锡盛东房产开发有限公司 | Onshore | 3333 Group |
| 291 | 儋州兴合投资有限公司 | Onshore | 3333 Group |
| 292 | 儋州诺亚投资有限公司 | Onshore | 3333 Group |
| 293 | 儋州军宏投资有限公司 | Onshore | 3333 Group |
| 294 | 儋州辉镀投资有限公司 | Onshore | 3333 Group |
| 295 | 儋州祥都投资有限公司 | Onshore | 3333 Group |
| 296 | 海口外滩诚房地产有限公司 | Onshore | 3333 Group |
| 297 | 上海颖骏投资管理有限公司 | Onshore | 3333 Group |
| 298 | 衢州恒大盛建置业有限公司 | Onshore | 3333 Group |
| 299 | 哈尔滨实业房地产开发有限公司 | Onshore | 3333 Group |
| 300 | 林芝恒大旅游发展有限公司 | Onshore | 3333 Group |

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|-----|--------------|-------------|-------|
| 301 | 广州敏捷房地产有限责任公司 | Onshore | 3333 Group |
| 302 | 广州市鑫盛置业有限公司 | Onshore | 3333 Group |
| 303 | 重庆恒大鑫岳置业有限公司 | Onshore | 3333 Group |
| 304 | 恒大地产集团大连有限公司 | Onshore | 3333 Group |
| 305 | 合肥畅城置业有限公司 | Onshore | 3333 Group |
| 306 | 合肥琳置业有限公司 | Onshore | 3333 Group |
| 307 | 合肥睿静商业运营管理有限公司 | Onshore | 3333 Group |
| 308 | 合肥嵘黎置业有限公司 | Onshore | 3333 Group |
| 309 | 合肥嵘商商业运营管理有限公司 | Onshore | 3333 Group |
| 310 | 合肥丰冀置业有限公司 | Onshore | 3333 Group |
| 311 | 恒大产业集团北京有限公司 | Onshore | 3333 Group |
| 312 | 南宁恒大城市建设有限公司 | Onshore | 3333 Group |
| 313 | 柳州大金碧置业有限公司 | Onshore | 3333 Group |
| 314 | 杭州穆千置业有限公司 | Onshore | 3333 Group |
| 315 | 南京美地房地产开发有限公司 | Onshore | 3333 Group |
| 316 | 呼和浩特市金碧天下房地产开发有限公司 | Onshore | 3333 Group |
| 317 | 北京恒泰盛房地产开发有限公司 | Onshore | 3333 Group |
| 318 | 恒大产业集团福州有限公司 | Onshore | 3333 Group |
| 319 | 深圳市厦村科房地产开发有限公司 | Onshore | 3333 Group |
| 320 | 广州市鑫源投资有限公司 | Onshore | 3333 Group |
| 321 | 广州市鑫通投资有限公司 | Onshore | 3333 Group |
| 322 | 广州市欣盛投资有限公司 | Onshore | 3333 Group |
| 323 | 深圳市国香置业有限公司 | Onshore | 3333 Group |
| 324 | 深圳市华超实业有限公司 | Onshore | 3333 Group |
| 325 | 深圳市国超投资有限公司 | Onshore | 3333 Group |
| 326 | 深圳市雷房地产开发有限公司 | Onshore | 3333 Group |
| 327 | 深圳市三溪房地产开发有限公司 | Onshore | 3333 Group |
| 328 | 广州隆通投资有限公司 | Onshore | 3333 Group |
| 329 | 上海金碧置业有限公司 | Onshore | 3333 Group |
| 330 | 上海悦安置业有限公司 | Onshore | 3333 Group |
| 331 | 上海耸普置业有限公司 | Onshore | 3333 Group |
| 332 | 天津咨秀房地产开发有限公司 | Onshore | 3333 Group |
| 333 | 恒大集团投资有限公司 | Onshore | 3333 Group |
| 334 | 广州市悦朗投资有限公司 | Onshore | 3333 Group |
| 335 | 广州市昱博投资有限公司 | Onshore | 3333 Group |
| 336 | 广州市奕辉投资有限公司 | Onshore | 3333 Group |
| 337 | 广州市朗析投资有限公司 | Onshore | 3333 Group |
| 338 | 深圳市鑫起投资有限公司 | Onshore | 3333 Group |
| 339 | 太原盈世恒房地产开发有限公司 | Onshore | 3333 Group |
| 340 | 北京恒世投资有限公司 | Onshore | 3333 Group |
| 341 | 北京崇置业有限公司 | Onshore | 3333 Group |
| 342 | 郑州恒林置业有限公司 | Onshore | 3333 Group |
| 343 | 济南东进企鼎置业有限公司 | Onshore | 3333 Group |
| 344 | 成都恒大东城置业有限公司 | Onshore | 3333 Group |
| 345 | 东莞市鸿远房地产开发有限公司 | Onshore | 3333 Group |
| 346 | 莆田金碧置业有限公司 | Onshore | 3333 Group |
| 347 | 广州市慧宇贸易有限公司 | Onshore | 0708 Group |
| 348 | 恒大健康云集团有限公司 | Onshore | 0708 Group |
| 349 | 前海君拓实业发展（深圳）有限公司 | Onshore | 3333 Group |
| 350 | 张家港盛盈置业有限公司 | Onshore | 3333 Group |
| 351 | 恒大鑫世界集团有限公司 | Onshore | 3333 Group |
| 352 | 四川若愚房地产开发有限公司 | Onshore | 3333 Group |
| 353 | 厦门恒大置业有限公司 | Onshore | 3333 Group |
| 354 | 宁波沂拓置业有限公司 | Onshore | 3333 Group |
| 355 | 中山长佳置业房地产有限公司 | Onshore | 3333 Group |
| 356 | 佛山市长欣宏龙房地产有限公司 | Onshore | 3333 Group |
| 357 | 广东恒琪投资有限公司 | Onshore | 3333 Group |
| 358 | 海南名鸿投资有限公司 | Onshore | 3333 Group |
| 359 | 海南鼎昌投资有限公司 | Onshore | 3333 Group |
| 360 | 北京恒隆兴置业有限公司 | Onshore | 3333 Group |

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group | No. | Company name | On/Offshore | Group |
|---|---|---|---|---|---|---|---|
| 361 | 昆明恒翔置业有限公司 | Onshore | 3333 Group | 391 | 南京临江珈景房地产开发有限公司 | Onshore | 3333 Group |
| 362 | 武汉区大金碧房地产开发有限公司 | Onshore | 3333 Group | 392 | 恒大地产集团粤东有限公司 | Onshore | 3333 Group |
| 363 | 大连恒创房地产有限公司 | Onshore | 3333 Group | 393 | 杭州晶立业有限公司 | Onshore | 3333 Group |
| 364 | 大连恒科房地产有限公司 | Onshore | 3333 Group | 394 | 贵阳新世界房地产有限公司 | Onshore | 3333 Group |
| 365 | 恒大置业（深圳）有限公司 | Onshore | 3333 Group | 395 | 武汉新世界雅居发展有限公司 | Onshore | 3333 Group |
| 366 | 儋州盛邦旅游开发有限公司 | Onshore | 3333 Group | 396 | 上海丰顺置业有限公司 | Onshore | 3333 Group |
| 367 | 儋州赛云岭旅游开发有限公司 | Onshore | 3333 Group | 397 | 上海丰潇置业有限公司 | Onshore | 3333 Group |
| 368 | 儋州中海旅游开发有限公司 | Onshore | 3333 Group | 398 | 恒大地产集团珠三角地产开发有限公司 | Onshore | 3333 Group |
| 369 | 儋州信恒旅游开发有限公司 | Onshore | 3333 Group | 399 | 恒大大方抚资管理有限公司 | Onshore | 3333 Group |
| 370 | 怀来恒天房地产开发有限公司 | Onshore | 3333 Group | 400 | 恒大互联网集团有限公司 | Onshore | 3333 Group |
| 371 | 重庆翼展房地产有限公司 | Onshore | 3333 Group | 401 | 鼎宇投资管理（深圳）有限公司 | Onshore | 3333 Group |
| 372 | 儋州润丰旅游开发有限公司 | Onshore | 3333 Group | 402 | 青岛金湾置业有限公司 | Onshore | 3333 Group |
| 373 | 恒大金融控股集团（深圳）有限公司 | Onshore | 3333 Group | 403 | 佛山市顺德区西亚方舟地产有限公司 | Onshore | 3333 Group |
| 374 | 恒大融融投资（深圳）有限公司 | Onshore | 3333 Group | 404 | 北京丽来房地产开发有限公司 | Onshore | 3333 Group |
| 375 | 儋州嘉伟旅游开发有限公司 | Onshore | 3333 Group | 405 | 儋州恒乐文化发展有限公司 | Onshore | 3333 Group |
| 376 | 儋州春和投资有限公司 | Onshore | 3333 Group | 406 | 儋州恒悦文化投资有限公司 | Onshore | 3333 Group |
| 377 | 儋州城筑旅游开发有限公司 | Onshore | 3333 Group | 407 | 深圳市心怡房地产有限公司 | Onshore | 3333 Group |
| 378 | 儋州宜信旅游开发有限公司 | Onshore | 3333 Group | 408 | 柳州御景龙恒房地产开发有限公司 | Onshore | 3333 Group |
| 379 | 儋州昇旺投资有限公司 | Onshore | 3333 Group | 409 | 佛山市裕朗置房地产开发有限公司 | Onshore | 3333 Group |
| 380 | 儋州范合投资有限公司 | Onshore | 3333 Group | 410 | 太原恒大盛腾房地产开发有限公司 | Onshore | 3333 Group |
| 381 | 儋州名骏旅游开发有限公司 | Onshore | 3333 Group | 411 | 沈阳春兴置业有限公司 | Onshore | 3333 Group |
| 382 | 儋州长宇旅游开发有限公司 | Onshore | 3333 Group | 412 | 河南恒池置业有限公司 | Onshore | 3333 Group |
| 383 | 儋州智源旅游开发有限公司 | Onshore | 3333 Group | 413 | 大连安兴投资有限公司 | Onshore | 3333 Group |
| 384 | 儋州东拓旅游开发有限公司 | Onshore | 3333 Group | 414 | 莆田恒晟置业有限公司 | Onshore | 3333 Group |
| 385 | 儋州胜伦旅游开发有限公司 | Onshore | 3333 Group | 415 | 哈尔滨浩营置业有限公司 | Onshore | 3333 Group |
| 386 | 儋州明良旅游开发有限公司 | Onshore | 3333 Group | 416 | 哈尔滨盛庭置业有限公司 | Onshore | 3333 Group |
| 387 | 恒大璟水牛栏置业（深圳）有限公司 | Onshore | 3333 Group | 417 | 哈尔滨渥邸置业有限公司 | Onshore | 3333 Group |
| 388 | 深圳市鸿腾投资管理有限公司 | Onshore | 3333 Group | 418 | 济南聚馨置业有限公司 | Onshore | 3333 Group |
| 389 | 南宁融壮龙庭房地产开发有限公司 | Onshore | 3333 Group | 419 | 济南红树林置业有限公司 | Onshore | 3333 Group |
| 390 | 海南恒乾材料设备有限公司 | Onshore | 3333 Group | 420 | 济南鑫隆置业有限公司 | Onshore | 3333 Group |

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|-----|--------------|-------------|-------|
| 421 | 株洲湘楚房地产开发有限公司 | Onshore | 3333 Group |
| 422 | 南京恒仁融益业管置有限公司 | Onshore | 3333 Group |
| 423 | 成都卓宇置业有限公司 | Onshore | 3333 Group |
| 424 | 沈阳惠风置业有限公司 | Onshore | 3333 Group |
| 425 | 沈阳慕尚置业有限公司 | Onshore | 3333 Group |
| 426 | 东莞市翠曦实业有限公司 | Onshore | 3333 Group |
| 427 | 启东宏冬温泉城开发有限公司 | Onshore | 3333 Group |
| 428 | 常州恒运房地产开发有限公司 | Onshore | 3333 Group |
| 429 | 湖南沃成投资有限公司 | Onshore | 3333 Group |
| 430 | 珠海市娜翻疆业有限公司 | Onshore | 3333 Group |
| 431 | 梅州大百汇品牌产业图有限公司 | Onshore | 3333 Group |
| 432 | 乌鲁木齐市恒新佳境房地产开发有限公司 | Onshore | 3333 Group |
| 433 | 成都熙华置业有限公司 | Onshore | 3333 Group |
| 434 | 广东莱廷峰房地产开发有限公司 | Onshore | 3333 Group |
| 435 | 肇庆高尔夫发展有限公司 | Onshore | 3333 Group |
| 436 | 广东莱廷峰酒店有限公司 | Onshore | 3333 Group |
| 437 | 宁波渤都置业有限公司 | Onshore | 3333 Group |
| 438 | 绍兴永恒置业有限公司 | Onshore | 3333 Group |
| 439 | 汕头恒信合置业有限公司 | Onshore | 3333 Group |
| 440 | 天津凯房房地产开发有限公司 | Onshore | 3333 Group |
| 441 | 重庆慕晟实业有限公司 | Onshore | 3333 Group |
| 442 | 苏州诀相建业有限公司 | Onshore | 3333 Group |
| 443 | 苏州盛建置业有限公司 | Onshore | 3333 Group |
| 444 | 苏州恒大房产开发有限公司 | Onshore | 3333 Group |
| 445 | 肇庆双声硕科技术材料有限公司 | Onshore | 3333 Group |
| 446 | 长沙恒大雅世界旅游开发有限公司 | Onshore | 3333 Group |
| 447 | 重庆凯锦企业管理有限公司 | Onshore | 3333 Group |
| 448 | 南京胜誉商贸有限公司 | Onshore | 3333 Group |
| 449 | 武汉市锦江鸿房地产开发有限公司 | Onshore | 3333 Group |
| 450 | 成都万浩置业有限公司 | Onshore | 3333 Group |
| 451 | 重庆和生裕房地产开发有限公司 | Onshore | 3333 Group |
| 452 | 贵阳恒大盛世烂旅游开发有限公司 | Onshore | 3333 Group |
| 453 | 贵阳佳鑫文旅旅游开发有限公司 | Onshore | 3333 Group |
| 454 | 贵阳安佳盛鑫旅游开发有限公司 | Onshore | 3333 Group |
| 455 | 无锡盛建置业有限公司 | Onshore | 3333 Group |
| 456 | 大原恒林势地产开发有限公司 | Onshore | 3333 Group |
| 457 | 深圳市荟华松投资有限公司 | Onshore | 3333 Group |
| 458 | 广州恒大房地产开发有限公司 | Onshore | 3333 Group |
| 459 | 成都荣盛置业有限公司 | Onshore | 3333 Group |
| 460 | 上海佳琦投资有限公司 | Onshore | 3333 Group |
| 461 | 天津景秀置业投资有限公司 | Onshore | 3333 Group |
| 462 | 重庆顶渊置业有限公司 | Onshore | 3333 Group |
| 463 | 重庆同景置业有限公司 | Onshore | 3333 Group |
| 464 | 重庆联星投资有限公司 | Onshore | 3333 Group |
| 465 | 恒大地产集团滨平有限公司 | Onshore | 3333 Group |
| 466 | 宁波城市之光置业有限公司 | Onshore | 3333 Group |
| 467 | 西安耀凯置业有限公司 | Onshore | 3333 Group |
| 468 | 山东华前置地有限公司 | Onshore | 3333 Group |
| 469 | 上海景麟昕房地产开发有限公司 | Onshore | 3333 Group |
| 470 | 深圳市佛莱汀堡房地产开发有限公司 | Onshore | 3333 Group |
| 471 | 沈阳金道绿合房地产开发有限公司 | Onshore | 3333 Group |
| 472 | 沈阳金道房地产开发有限公司 | Onshore | 3333 Group |
| 473 | 靖江新时代房地产开发有限公司 | Onshore | 3333 Group |
| 474 | 河北鼎馨琪项地产开发有限公司 | Onshore | 3333 Group |
| 475 | 重庆川景博达置地有限公司 | Onshore | 3333 Group |
| 476 | 肇庆市团昆房地产开发有限公司 | Onshore | 3333 Group |
| 477 | 汕头市恒明房地产开发有限公司 | Onshore | 3333 Group |
| 478 | 南昌恒腾置业有限公司 | Onshore | 3333 Group |
| 479 | 佛山市三水区帆高置业投资有限公司 | Onshore | 3333 Group |
| 480 | 恒大地产集团山西有限公司 | Onshore | 3333 Group |

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group | No. | Company name | On/Offshore | Group |
|---|---|---|---|---|---|---|---|
| 481 | 扬州盛基房地产开发有限公司 | Onshore | 3333 Group | 511 | 句容恒歆旅游开发有限公司 | Onshore | 3333 Group |
| 482 | 安庆岳骏置业有限公司 | Onshore | 3333 Group | 512 | 句容恒瑞旅游开发有限公司 | Onshore | 3333 Group |
| 483 | 肇庆鼎润园星置业投资有限公司 | Onshore | 3333 Group | 513 | 句容恒远旅游开发有限公司 | Onshore | 3333 Group |
| 484 | 四川川大科技园（绵区）开发有限公司 | Onshore | 3333 Group | 514 | 贵阳恒大美梦天地旅游发展有限公司 | Onshore | 3333 Group |
| 485 | 深圳市万京投资有限公司 | Onshore | 3333 Group | 515 | 贵阳恒大韵源旅游开发有限公司 | Onshore | 3333 Group |
| 486 | 佛山市三水区能润雅地房地产开发有限公司 | Onshore | 3333 Group | 516 | 贵阳恒大美臻旅游开发有限公司 | Onshore | 3333 Group |
| 487 | 佛山市西明南协和地产开发有限公司 | Onshore | 3333 Group | 517 | 贵阳恒大美瑞旅游开发有限公司 | Onshore | 3333 Group |
| 488 | 佛山市南海南力房地产开发有限公司 | Onshore | 3333 Group | 518 | 贵阳恒大裕畅旅游开发有限公司 | Onshore | 3333 Group |
| 489 | 句容大潮世界旅游开发有限公司 | Onshore | 3333 Group | 519 | 贵阳恒大潮祥旅游开发有限公司 | Onshore | 3333 Group |
| 490 | 大仓恒大置世界旅游开发有限公司 | Onshore | 3333 Group | 520 | 贵阳恒大宏钧旅游开发有限公司 | Onshore | 3333 Group |
| 491 | 太原恒钩润房地产开发有限公司 | Onshore | 3333 Group | 521 | 贵安新区恒大华鼎旅游开发有限公司 | Onshore | 3333 Group |
| 492 | 沧州恒祥房地产开发有限公司 | Onshore | 3333 Group | 522 | 沧州恒大童世界旅游开发有限公司 | Onshore | 3333 Group |
| 493 | 无锡振瑞置业有限公司 | Onshore | 3333 Group | 523 | 沧州益骏房地产开发有限公司 | Onshore | 3333 Group |
| 494 | 肇庆鼎润园星房地产开发有限公司 | Onshore | 3333 Group | 524 | 沧州傅凯房地产开发有限公司 | Onshore | 3333 Group |
| 495 | 郑州恒昌置业有限公司 | Onshore | 3333 Group | 525 | 沧州元傅房地产开发有限公司 | Onshore | 3333 Group |
| 496 | 杭州沣潇置业有限公司 | Onshore | 3333 Group | 526 | 沧州凯进房地产开发有限公司 | Onshore | 3333 Group |
| 497 | 福州金鼎置业有限公司 | Onshore | 3333 Group | 527 | 沧州沛安房地产开发有限公司 | Onshore | 3333 Group |
| 498 | 恒大虹口半岛置业（深圳）有限公司 | Onshore | 3333 Group | 528 | 沧州昌捷房地产开发有限公司 | Onshore | 3333 Group |
| 499 | 哈尔滨西腾业房地产开发有限公司 | Onshore | 3333 Group | 529 | 沧州丰汇房地产开发有限公司 | Onshore | 3333 Group |
| 500 | 哈尔滨市祥业房地产开发有限公司 | Onshore | 3333 Group | 530 | 沧州瑞丰房地产开发有限公司 | Onshore | 3333 Group |
| 501 | 哈尔滨市娱业房地产开发有限公司 | Onshore | 3333 Group | 531 | 沧州庆和房地产开发有限公司 | Onshore | 3333 Group |
| 502 | 恒大地产集团（江西）有限公司 | Onshore | 3333 Group | 532 | 沧州通广房地产开发有限公司 | Onshore | 3333 Group |
| 503 | 温州悦安置业有限公司 | Onshore | 3333 Group | 533 | 沧州长弥房地产开发有限公司 | Onshore | 3333 Group |
| 504 | 连平县森林房地产有限公司 | Onshore | 3333 Group | 534 | 沧州裕宝房地产开发有限公司 | Onshore | 3333 Group |
| 505 | 珠海卓禹置业有限公司 | Onshore | 3333 Group | 535 | 沧州源美房地产开发有限公司 | Onshore | 3333 Group |
| 506 | 深圳鑫宜投资咨询有限公司 | Onshore | 3333 Group | 536 | 沧州长鑫房地产开发有限公司 | Onshore | 3333 Group |
| 507 | 镇江盛福房地产开发有限公司 | Onshore | 3333 Group | 537 | 成都鑫景置业有限公司 | Onshore | 3333 Group |
| 508 | 句容开润旅游开发有限公司 | Onshore | 3333 Group | 538 | 泰州恒骏通房地产开发有限公司 | Onshore | 3333 Group |
| 509 | 句容盛世界旅游发展有限公司 | Onshore | 3333 Group | 539 | 湖州恒跃房地产开发有限公司 | Onshore | 3333 Group |
| 510 | 句容恒发旅游开发有限公司 | Onshore | 3333 Group | 540 | 三亚华创七星房地产开发有限公司 | Onshore | 3333 Group |

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|---|---|---|---|
| 541 | 三亚森特房地产开发有限公司 | Onshore | 3333 Group |
| 542 | 佛山市旗湖房地产开发有限公司 | Onshore | 3333 Group |
| 543 | 沈阳恒亘置业有限公司 | Onshore | 3333 Group |
| 544 | 杭州盛捷置业有限公司 | Onshore | 3333 Group |
| 545 | 峨眉山阳光绿源农业科技有限公司 | Onshore | 3333 Group |
| 546 | 四川峨眉山宏远实业有限公司 | Onshore | 3333 Group |
| 547 | 四川恒德集团文化旅游投资发展有限公司 | Onshore | 3333 Group |
| 548 | 上海鹏仓置业有限公司 | Onshore | 3333 Group |
| 549 | 上海鹏力置业有限公司 | Onshore | 3333 Group |
| 550 | 温州国鹏翼业有限公司 | Onshore | 3333 Group |
| 551 | 宜昌科科房地产开发有限公司 | Onshore | 3333 Group |
| 552 | 深圳市建业房地产开发有限公司 | Onshore | 3333 Group |
| 553 | 深圳市聚熙投资有限公司 | Onshore | 3333 Group |
| 554 | 太原恒天鸿腾房地产开发有限公司 | Onshore | 3333 Group |
| 555 | 福鼎恒大高业有限公司 | Onshore | 3333 Group |
| 556 | 成都炜宁置业有限公司 | Onshore | 3333 Group |
| 557 | 宁波鹏华置业有限公司 | Onshore | 3333 Group |
| 558 | 安吉建鹏置业有限公司 | Onshore | 3333 Group |
| 559 | 肇庆市高新区恒裕酒房地产业有限公司 | Onshore | 3333 Group |
| 560 | 湖南恒盛盛健房产业有限公司 | Onshore | 0708 Group |
| 561 | 太仓锦泰旅游开发有限公司 | Onshore | 3333 Group |
| 562 | 太仓恒隆旅游开发有限公司 | Onshore | 3333 Group |
| 563 | 太仓锦泰旅游开发有限公司 | Onshore | 3333 Group |
| 564 | 太仓恒赛旅游开发有限公司 | Onshore | 3333 Group |
| 565 | 太仓隆赛旅游开发有限公司 | Onshore | 3333 Group |
| 566 | 太仓裕赛旅游开发有限公司 | Onshore | 3333 Group |
| 567 | 湖北恒大量世界旅游开发有限公司 | Onshore | 3333 Group |
| 568 | 鄂州朗恒旅游开发有限公司 | Onshore | 3333 Group |
| 569 | 太仓富广文化产业发展有限公司 | Onshore | 3333 Group |
| 570 | 鄂州碧桐旅游开发有限公司 | Onshore | 3333 Group |
| 571 | 鄂州腾翔旅游开发有限公司 | Onshore | 3333 Group |
| 572 | 鄂州童梦乐四旅游发展有限公司 | Onshore | 3333 Group |
| 573 | 鄂州信佳旅游开发有限公司 | Onshore | 3333 Group |
| 574 | 启东欢泰旅游开发有限公司 | Onshore | 3333 Group |
| 575 | 鄂州裕禧旅游开发有限公司 | Onshore | 3333 Group |
| 576 | 鄂州佳裕旅游开发有限公司 | Onshore | 3333 Group |
| 577 | 鄂州弘隆旅游开发有限公司 | Onshore | 3333 Group |
| 578 | 武汉瑞恒旅游开发有限公司 | Onshore | 3333 Group |
| 579 | 鄂州裕恒旅游开发有限公司 | Onshore | 3333 Group |
| 580 | 恒大现代农业集团有限公司 | Onshore | 3333 Group |
| 581 | 山东恒大童世界旅游开发有限公司 | Onshore | 3333 Group |
| 582 | 眉山恒大童世界旅游开发有限公司 | Onshore | 3333 Group |
| 583 | 眉山恒和旅游开发有限公司 | Onshore | 3333 Group |
| 584 | 眉山嘉恒旅游开发有限公司 | Onshore | 3333 Group |
| 585 | 眉山嘉泰旅游开发有限公司 | Onshore | 3333 Group |
| 586 | 眉山裕和旅游开发有限公司 | Onshore | 3333 Group |
| 587 | 眉山誉信旅游开发有限公司 | Onshore | 3333 Group |
| 588 | 眉山润隆旅游开发有限公司 | Onshore | 3333 Group |
| 589 | 眉山泽瑞旅游开发有限公司 | Onshore | 3333 Group |
| 590 | 武汉巴登城旅游开发有限公司 | Onshore | 3333 Group |
| 591 | 西安恒大童世界旅游开发有限公司 | Onshore | 3333 Group |
| 592 | 扬中市恒骥置业有限公司 | Onshore | 0708 Group |
| 593 | 深圳市永福置业有限公司 | Onshore | 3333 Group |
| 594 | 绵阳市永合万盈置业有限公司 | Onshore | 3333 Group |
| 595 | 湖南恒辰置业有限公司 | Onshore | 3333 Group |
| 596 | 太原领恒地产开发有限公司 | Onshore | 3333 Group |
| 597 | 常州恒荣企业管理有限公司 | Onshore | 3333 Group |
| 598 | 成都青凌昌心房地产开发有限责任公司 | Onshore | 3333 Group |
| 599 | 佛山市恒璟地产开发有限公司 | Onshore | 3333 Group |
| 600 | 贵阳恒大尚云房地产开发有限公司 | Onshore | 3333 Group |

© 2023. For information, contact Deloitte China.
China Evergrande Group | Liquidation Analysis Report    53

# List of Subject Entities

| No. | Company name | On/Offshore | Group | No. | Company name | On/Offshore | Group |
|---|---|---|---|---|---|---|---|
| 601 | 深圳市飞速投投资有限公司 | Onshore | 3333 Group | 631 | 恒鹏健康产业有限公司 | Onshore | 0708 Group |
| 602 | 重庆瑞林企业管理咨询有限公司 | Onshore | 3333 Group | 632 | 眉山盛世怀旅游开发有限公司 | Onshore | 3333 Group |
| 603 | 深圳市潭琥投投资有限公司 | Onshore | 3333 Group | 633 | 恒鹏健康产业湖南有限公司 | Onshore | 0708 Group |
| 604 | 肇庆市文耀绵投资有限公司 | Onshore | 3333 Group | 634 | 陕西恒鹏健康产业有限公司 | Onshore | 0708 Group |
| 605 | 肇庆博博贸易有限公司 | Onshore | 3333 Group | 635 | 四川恒鹏健康产业有限公司 | Onshore | 0708 Group |
| 606 | 重庆恒永房地产开发有限公司 | Onshore | 3333 Group | 636 | 恒大旅游运营管理集团有限公司 | Onshore | 3333 Group |
| 607 | 溧阳恒路房地产开发有限责任公司 | Onshore | 3333 Group | 637 | 恒大恒牧业有限公司 | Onshore | 6666 Group |
| 608 | 沈阳鑫盈置业有限公司 | Onshore | 3333 Group | 638 | 恒大禾彩农业（沈阳）有限公司 | Onshore | 3333 Group |
| 609 | 成都恒凰置业有限公司 | Onshore | 3333 Group | 639 | 恒大现代新城房地产开发（沈阳）有限公司 | Onshore | 3333 Group |
| 610 | 沈阳鑫漂置业有限公司 | Onshore | 3333 Group | 640 | 常州江恒房地产开发有限公司 | Onshore | 3333 Group |
| 611 | 贵州尚明房地产开发有限公司 | Onshore | 3333 Group | 641 | 佛山市顺德区怡创房地产有限公司 | Onshore | 3333 Group |
| 612 | 成都赛丽置业有限公司 | Onshore | 3333 Group | 642 | 佛山市怡御贸有限公司 | Onshore | 3333 Group |
| 613 | 成都津瑞置业有限公司 | Onshore | 3333 Group | 643 | 广州曙瑞峰商务服务有限公司 | Onshore | 3333 Group |
| 614 | 成都心漂置业有限公司 | Onshore | 3333 Group | 644 | 贵阳恒大云栋房地产开发有限公司 | Onshore | 3333 Group |
| 615 | 郑州祥非置业有限公司 | Onshore | 3333 Group | 645 | 清远市恒爵房地产开发有限公司 | Onshore | 3333 Group |
| 616 | 成都锦远恒域城市建设有限公司 | Onshore | 3333 Group | 646 | 太原恒彬房地产开发有限公司 | Onshore | 3333 Group |
| 617 | 柳州恒天璟峰房地产开发有限公司 | Onshore | 3333 Group | 647 | 太原恒琅房地产开发有限公司 | Onshore | 3333 Group |
| 618 | 深圳市恒宁商业发展有限公司 | Onshore | 3333 Group | 648 | 太原恒珀房地产开发有限公司 | Onshore | 3333 Group |
| 619 | 西安长缘旅游开发有限公司 | Onshore | 3333 Group | 649 | 北京东方嘉禾建筑材料有限公司 | Onshore | 3333 Group |
| 620 | 西安曦世界旅游发展有限公司 | Onshore | 3333 Group | 650 | 美丽之冠（黄山）文化旅游发展有限公司 | Onshore | 3333 Group |
| 621 | 西安凯秀旅游开发有限公司 | Onshore | 3333 Group | 651 | 赤峰市恒领房地产开发有限公司 | Onshore | 3333 Group |
| 622 | 西安优合旅游开发有限公司 | Onshore | 3333 Group | 652 | 南宁悦龙天瑞房地产开发有限公司 | Onshore | 3333 Group |
| 623 | 西安榛枫旅游开发有限公司 | Onshore | 3333 Group | 653 | 重庆天利辉利置业有限公司 | Onshore | 3333 Group |
| 624 | 西安腾飞旅游开发有限公司 | Onshore | 3333 Group | 654 | 广州同创新域城池有限公司 | Onshore | 3333 Group |
| 625 | 西安汇鸿旅游开发有限公司 | Onshore | 3333 Group | 655 | 重庆同创家园企业管理有限公司 | Onshore | 3333 Group |
| 626 | 西安旧晨旅游开发有限公司 | Onshore | 3333 Group | 656 | 重庆兴至道实业有限公司 | Onshore | 3333 Group |
| 627 | 西安城格旅游开发有限公司 | Onshore | 3333 Group | 657 | 恒大禾彩科技集团有限公司 | Onshore | 3333 Group |
| 628 | 西安瑞源旅游开发有限公司 | Onshore | 0708 Group | 658 | 广州恒馥设备科技有限公司 | Onshore | 3333 Group |
| 629 | 恒大时代新城开发（武汉）有限公司 | Onshore | 3333 Group | 659 | 吉林省恒大世界旅游开发有限公司 | Onshore | 0708 Group |
| 630 | 南京恒康置业有限公司 | Onshore | 0708 Group | 660 | 公主岭桥泽旅游开发有限公司 | Onshore | 3333 Group |

China Evergrande Group | Liquidation Analysis Report
© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|---|---|---|---|
| 661 | 公主岭爱众旅游开发有限公司 | Onshore | 3333 Group |
| 662 | 公主岭金慧旅游开发有限公司 | Onshore | 3333 Group |
| 663 | 眉山冰泽旅游开发有限公司 | Onshore | 3333 Group |
| 664 | 眉山冰源旅游开发有限公司 | Onshore | 3333 Group |
| 665 | 眉山俊博旅游开发有限公司 | Onshore | 3333 Group |
| 666 | 南京浩长湖商科技农业有限公司 | Onshore | 3333 Group |
| 667 | 眉山西质旅游开发有限公司 | Onshore | 3333 Group |
| 668 | 眉山恒宇旅游开发有限公司 | Onshore | 3333 Group |
| 669 | 广州冀茂企业管理咨询有限公司 | Onshore | 3333 Group |
| 670 | 恒大租赁住房一号第一期私募投资基金 | Onshore | 3333 Group |
| 671 | 恒大智隆智能汽车集团有限公司 | Onshore | 0708 Group |
| 672 | 贵阳恒大观云房地产开发有限公司 | Onshore | 3333 Group |
| 673 | 昆明恒腾房地产开发有限公司 | Onshore | 3333 Group |
| 674 | 嵊州中楷鼎床房地产开发有限公司 | Onshore | 3333 Group |
| 675 | 嵊州中楷国丰房地产开发有限公司 | Onshore | 3333 Group |
| 676 | 南京沾海企业管理有限公司 | Onshore | 3333 Group |
| 677 | 嵊州中楷骏房地产开发有限公司 | Onshore | 3333 Group |
| 678 | 嵊州中楷广睿地产房地产开发有限公司 | Onshore | 3333 Group |
| 679 | 嵊州中楷旷达房地产开发有限公司 | Onshore | 3333 Group |
| 680 | 云南德麟房地产开发有限公司 | Onshore | 3333 Group |
| 681 | 昆明嵘荣科技有限公司 | Onshore | 3333 Group |
| 682 | 深圳市保通达投资咨询有限责任公司 | Onshore | 3333 Group |
| 683 | 重庆五陆投资发展有限公司 | Onshore | 3333 Group |
| 684 | 河源市元翔投资发展有限公司 | Onshore | 3333 Group |
| 685 | 西安盛恒置业有限公司 | Onshore | 3333 Group |
| 686 | 重庆熙金企业管理有限公司 | Onshore | 3333 Group |
| 687 | 重庆泽闽企业管理有限公司 | Onshore | 3333 Group |
| 688 | 重庆腾岳企业管理有限公司 | Onshore | 3333 Group |
| 689 | 舟山市新诚鸿丰房地产开发有限公司 | Onshore | 3333 Group |
| 690 | 恒大新能源汽车（广东）有限公司 | Onshore | 0708 Group |
| 691 | 恒大新能源科技集团有限公司 | Onshore | 0708 Group |
| 692 | 恒大凯浓投资（深圳）有限公司 | Onshore | 0708 Group |
| 693 | 天津恒大国瑞新能源科技有限责任公司 | Onshore | 0708 Group |
| 694 | 国能汽车技术开发有限责任公司 | Onshore | 0708 Group |
| 695 | 恒大恒驰新能源汽车（上海）有限公司 | Onshore | 0708 Group |
| 696 | 恒大新能源汽车（陕西）有限公司 | Onshore | 708 Group |
| 697 | 金驰生活服务（河南）有限公司 | Onshore | 0708 Group |
| 698 | 恒大新能源汽车（辽宁）有限公司 | Onshore | 0708 Group |
| 699 | 恒大汽车产业园投资（深圳）集团有限公司 | Onshore | 0708 Group |
| 700 | 恒大瑞博动力科技（深圳）有限公司 | Onshore | 0708 Group |
| 701 | 沈阳智慧农业汽车业开发有限公司 | Onshore | 3333 Group |
| 702 | 恒大恒驰新能源汽车研究院（上海）有限公司 | Onshore | 708 Group |
| 703 | 郑州超益生活服务有限公司 | Onshore | 0708 Group |
| 704 | 郑州超玹生活服务有限公司 | Onshore | 0708 Group |
| 705 | 郑州超悦生活服务有限公司 | Onshore | 0708 Group |
| 706 | 扬中市恒润置业有限公司 | Onshore | 3333 Group |
| 707 | 湖北恒祥地产开发有限公司 | Onshore | 3333 Group |
| 708 | 南京恒茗地块房产开发有限公司 | Onshore | 3333 Group |
| 709 | 深圳市宝腾实业投资有限公司 | Onshore | 3333 Group |
| 710 | 大风风驰动力科技（深圳）有限公司 | Onshore | 0708 Group |
| 711 | 河北恒大高科农业开发有限公司 | Onshore | 3333 Group |
| 712 | 元氏县恒成房地产开发有限公司 | Onshore | 3333 Group |
| 713 | 内蒙古恒大旅游开发有限公司 | Onshore | 3333 Group |
| 714 | 内蒙古旅游旅游开发有限公司 | Onshore | 3333 Group |
| 715 | 武汉黎水云山农业开发有限公司 | Onshore | 3333 Group |
| 716 | 昆明赛丽泽特色小镇置业有限公司 | Onshore | 0708 Group |
| 717 | 昆明募丽泽旅游文化有限公司 | Onshore | 0708 Group |
| 718 | 佛州一帆旅游运营管理有限公司 | Onshore | 3333 Group |
| 719 | 匀碧恒朗旅游开发有限公司 | Onshore | 3333 Group |
| 720 | 沧州国恒企业管理咨询中心（有限合伙） | Onshore | 0708 Group |

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|-----|--------------|-------------|-------|
| 721 | 温州盛壹置业有限公司 | Onshore | 3333 Group |
| 722 | 佛山市禅城区恒创威房地产开发有限公司 | Onshore | 3333 Group |
| 723 | 大厨恒悦房地产开发有限公司 | Onshore | 3333 Group |
| 724 | 哈尔滨市都源房地产开发有限公司 | Onshore | 3333 Group |
| 725 | 宁波熙顺置业有限公司 | Onshore | 3333 Group |
| 726 | 毅县（沈阳）房地产开发有限公司 | Onshore | 3333 Group |
| 727 | 北京戴寰中传科技投资有限公司 | Onshore | 3333 Group |
| 728 | 宁波御峰置业有限公司 | Onshore | 3333 Group |
| 729 | 公主岭裕源房地产开发有限公司 | Onshore | 3333 Group |
| 730 | 公主岭铭辉房地产开发有限公司 | Onshore | 3333 Group |
| 731 | 航发投资管理有限公司 | Onshore | 3333 Group |
| 732 | 北京航信投资发展有限公司 | Onshore | 3333 Group |
| 733 | 北京志舟投资管理有限公司 | Onshore | 3333 Group |
| 734 | 深圳市富铭投资发展有限公司 | Onshore | 3333 Group |
| 735 | 厦门富铭浩博置业有限公司 | Onshore | 3333 Group |
| 736 | 厦门富铭九天湖置业有限公司 | Onshore | 3333 Group |
| 737 | 中航富铭（厦门）置业有限公司 | Onshore | 3333 Group |
| 738 | 沈阳航远置业有限公司 | Onshore | 3333 Group |
| 739 | 重庆威际房地产开发有限公司 | Onshore | 3333 Group |
| 740 | 重庆航悦置业有限公司 | Onshore | 3333 Group |
| 741 | 重庆航立置业有限公司 | Onshore | 3333 Group |
| 742 | 重庆江航投资有限公司 | Onshore | 3333 Group |
| 743 | 新世界中国地产（海口）有限公司 | Onshore | 3333 Group |
| 744 | 深圳市瑾嘉实业有限公司 | Onshore | 3333 Group |
| 745 | 贵州裕泓房地产开发有限公司 | Onshore | 3333 Group |
| 746 | 南宁弘基房地产开发有限公司 | Onshore | 3333 Group |
| 747 | 昆明恒盈置业有限公司 | Onshore | 3333 Group |
| 748 | 恒大华维实业（深圳）有限公司 | Onshore | 3333 Group |
| 749 | 广州市番禺区瑞益房地产开发有限公司 | Onshore | 3333 Group |
| 750 | 广州市番禺区瑞铉地产开发有限公司 | Onshore | 3333 Group |

| No. | Company name | On/Offshore | Group |
|-----|--------------|-------------|-------|
| 751 | 广州市番禺区瑞络房地产开发有限公司 | Onshore | 3333 Group |
| 752 | 广州市番禺区瑞森体育有限公司 | Onshore | 3333 Group |
| 753 | 扬中恒鹏置业有限公司 | Onshore | 0708 Group |
| 754 | 扬中恒源置业有限公司 | Onshore | 0708 Group |
| 755 | 扬中恒惠置业有限公司 | Onshore | 0708 Group |
| 756 | 三亚云云文化投资有限公司 | Onshore | 3333 Group |
| 757 | 贵阳恒大森上房地产开发有限公司 | Onshore | 3333 Group |
| 758 | 中山市悦彦地产开发有限公司 | Onshore | 3333 Group |
| 759 | 广州市裕拓房地产开发有限公司 | Onshore | 3333 Group |
| 760 | 北京恒云盛置业有限公司 | Onshore | 3333 Group |
| 761 | 福州恒腾盛晟置业有限公司 | Onshore | 3333 Group |
| 762 | 重庆航辉房地产开发有限公司 | Onshore | 3333 Group |
| 763 | 北京恒房兴置业有限公司 | Onshore | 3333 Group |
| 764 | 北京恒房置业有限公司 | Onshore | 3333 Group |
| 765 | 贵阳恒大鑫瑞房地产开发有限公司 | Onshore | 3333 Group |
| 766 | 广州裕荣通企业管理有限公司 | Onshore | 3333 Group |
| 767 | 湖北台瑞旅游开发有限公司 | Onshore | 3333 Group |
| 768 | 深圳市盈创投资有限公司 | Onshore | 3333 Group |
| 769 | 房车宝集团股份有限公司 | Onshore | 3333 Group |
| 770 | 深圳市房宝宝网售有限公司 | Onshore | 3333 Group |
| 771 | 太仓晟泰文化产业发展有限公司 | Onshore | 3333 Group |
| 772 | 沈阳恒达房地产开发有限公司 | Onshore | 3333 Group |
| 773 | 太仓祥黎旅游开发有限公司 | Onshore | 3333 Group |
| 774 | 恒大恒驰新能源汽车科技（广东）有限公司 | Onshore | 0708 Group |
| 775 | 广州市南沙区领驰企业咨询有限公司 | Onshore | 3333 Group |
| 776 | 宁波泰化恒聚置业有限公司 | Onshore | 3333 Group |
| 777 | 眉山恒慧旅游开发有限公司 | Onshore | 3333 Group |
| 778 | 眉山恒慧思旅游开发有限公司 | Onshore | 3333 Group |
| 779 | 武汉恒投文化开发有限公司 | Onshore | 3333 Group |
| 780 | 内蒙古恒悦旅游开发有限公司 | Onshore | 3333 Group |

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group | No. | Company name | On/Offshore | Group | Obligor |
|-----|--------------|-------------|-------|-----|--------------|-------------|-------|---------|
| 781 | 福州金融投资有限公司 | Onshore | 3333 Group | | | | | |
| 782 | 恒大恒驰新能源汽车（广东）有限公司 | Onshore | 0708 Group | | | | | |
| 783 | 房车宝信息技术（深圳）有限公司 | Onshore | 3333 Group | | | | | |
| 784 | 济南市恒凯投资管理有限公司 | Onshore | 3333 Group | | | | | |
| 785 | 金碧恒康物业（北京）有限公司 | Onshore | 6666 Group | | | | | |
| 786 | 惠安弘鼎置业有限公司 | Onshore | 3333 Group | | | | | |
| 787 | 眉山瑞旅旅游开发有限公司 | Onshore | 3333 Group | | | | | |
| 788 | 广州恒疆投资有限公司 | Onshore | 3333 Group | | | | | |
| 789 | 内蒙古恒鑫旅游开发有限公司 | Onshore | 3333 Group | | | | | |
| 790 | 深圳市恒恒实业有限责任公司 | Onshore | 3333 Group | | | | | |
| 791 | 内蒙古恒荣旅游开发有限公司 | Onshore | 3333 Group | | | | | |
| 792 | 湖南金盈置业有限公司 | Onshore | 3333 Group | | | | | |
| 793 | 广州恒湖南企业信息咨询有限公司 | Onshore | 3333 Group | | | | | |
| 794 | 恒大新能源汽车投资控股集团有限公司 | Onshore | 0708 Group | | | | | |

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

# Appendix 2 – Estimated Recoveries of Offshore Debts

## Estimated Recoveries of the Offshore Debts (Liquidation Scenario) – Class A

RMB in million

| Ref No. | Tranche | Accrued claims as of 31 December 2022 | Estimated Realization | | | | Total recovery amount E=A+B+C+D | Recovery amount from CEG | Recovery amount from Tianji | Recovery rate |
| | | | From security (assets/ shares/ intercompany receivables) A | From unencumbered assets of principal obligors/ From guarantors B | From guarantors C | From keepwell provider D | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | CEG Existing March 2022 Notes | 15,560 | - | 351 | 168 | - | 519 | 351 | | 3.34% |
| 2 | CEG Existing April 2022 Notes | 11,271 | - | 254 | 122 | - | 376 | 254 | | 3.34% |
| 3 | CEG Existing January 2023 Notes | 8,110 | - | 183 | 88 | - | 271 | 183 | | 3.34% |
| 4 | CEG Existing February 2023 Bonds | 76 | - | 2 | 1 | - | 3 | 2 | | 3.34% |
| 5 | CEG Existing April 2023 Notes | 6,520 | - | 147 | 71 | - | 218 | 147 | | 3.34% |
| 6 | CEG Existing June 2023 Notes | 10,323 | - | 233 | 112 | - | 345 | 233 | | 3.34% |
| 7 | CEG Existing January 2024 Notes | 8,129 | - | 183 | 88 | - | 271 | 183 | | 3.34% |
| 8 | CEG Existing March 2024 Notes | 7,413 | - | 167 | 80 | - | 247 | 167 | | 3.34% |
| 9 | CEG Existing April 2024 Notes | 5,429 | - | 122 | 59 | - | 181 | 122 | | 3.34% |
| 10 | CEG Existing June 2025 Notes | 36,653 | - | 826 | 397 | - | 1,223 | 826 | | 3.34% |
| 11 | CEG Existing January 2022 Notes | 2,420 | - | 55 | 26 | - | 81 | 55 | | 3.34% |
| 12 | Class A Private Loan | 87 | - | 2 | 1 | - | 3 | 2 | | 3.34% |
| | Class A Total: | 111,991 | - | 2,525 | 1,213 | - | 3,738 | 2,525 | | 3.34% |

*Note: Figures above are subject to rounding.*

© 2023. For information, contact Deloitte China.

# Estimated Recoveries of the Offshore Debts (Liquidation Scenario) – Class B

RMB in million

| Ref No. | Tranche | Accrued claims as of 31 December 2022 | Estimated Realization | | | | Total recovery amount | Recovery amount from CEG | Recovery amount from Tianji | Recovery rate |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | From security (assets/shares/intercompany receivables) | From unencumbered assets of principal obligors | From guarantors | From keepwell provider | | | | |
| | | | A | B | C | D | E=A+B+C+D | | | |
| 1 | SJ Existing October 2022 Notes | 16,226 | - | 263 | 1,744 | 705 | 2,712 | - | 373 | 16.71% |
| 2 | SJ Existing November 2022 Notes | 5,449 | - | 88 | 586 | 237 | 911 | - | 125 | 16.71% |
| 3 | SJ Existing October 2023 Notes | 16,285 | - | 264 | 1,751 | 707 | 2,722 | - | 375 | 16.71% |
| 4 | SJ Existing November 2023 Notes | 5,034 | - | 82 | 541 | 219 | 842 | - | 116 | 16.71% |
| | Class B Total: | 42,994 | - | 697 | 4,622 | 1,868 | 7,187 | - | 989 | 16.71% |

*Note: Figures above are subject to rounding.*

© 2023. For information, contact Deloitte China.

# Estimated Recoveries of the Offshore Debts (Liquidation Scenario) – Class C

RMB in million

| Ref No. | Tranche | Accrued claims as of 31 December 2022 | Estimated Realization | | | | Total recovery amount E=A+B+C+D | Recovery amount from CEG | Recovery amount from Tianji | Recovery rate |
| | | | From security (assets/shares/intercompany receivables) A | From unencumbered assets of principal obligors B | From guarantors C | From keepwell provider D | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Lake Notes | 2,050 | - | - | 94 | 89 | 183 | 46 | 47 | 8.91% |
| 2 | Dongpo Notes | 3,070 | 8 | - | 69 | - | 77 | 69 | | 2.52% |
| 3 | Dongpo Put Option | 1,001 | 15 | 22 | - | - | 37 | 22 | | 3.76% |
| 4 | Graceful Court Put Option | 839 | 13 | 19 | - | - | 32 | 19 | | 3.76% |
| 5 | New Chic Margin Loan | 138 | 30 | 6 | 3 | - | 39 | 3 | | 28.48% |
| 6 | Clear Star Put Option | 513 | - | 12 | 12 | - | 24 | 12 | 12 | 4.57% |
| 7 | CEG Loan 1 | 1,460 | - | 33 | - | - | 33 | 33 | | 2.26% |
| 8 | CEG Loan 2 | 729 | - | 16 | - | - | 16 | 16 | | 2.26% |
| 9 | Venice Loan | 173 | 102 | - | 4 | - | 106 | 4 | | 61.25% |
| 10 | Venice SPA | 3,979 | 2,348 | - | 90 | - | 2,438 | 90 | | 61.28% |
| 11 | Hero Loan | 6,922 | 3,400 | 160 | 156 | - | 3,716 | 156 | 160 | 53.68% |
| 12 | FCB Put Option | 4,957 | - | 1,157 | - | - | 1,157 | 112 | | 23.33% |

*Note: Figures above are subject to rounding.*

© 2023. For information, contact Deloitte China.

# Estimated Recoveries of the Offshore Debts (Liquidation Scenario) – Class C (cont'd)

RMB in million

| Ref No. | Tranche | Accrued claims as of 31 December 2022 | Estimated Realization | | | | Total recovery amount | Recovery amount from CEG | Recovery amount from Tianji | Recovery rate |
| | | | From security (assets/shares/intercompany receivables) A | From unencumbered assets of principal obligors B | From guarantors C | From keepwell provider D | E=A+B+C+D | | | |
| 13 | RMB Bond Put Option | 8,760 | 380 | 189 | - | - | 569 | 189 | - | 6.50% |
| 14 | CEG Guarantees of PRC Liabilities | 64,490 | 2,934 | 3,680 | 4,160 | - | 10,774 | 1,395 | - | 16.71% |
| 15 | Kailong Arbitration Award | 5,805 | - | 131 | - | - | 131 | 131 | - | 2.26% |
| 16 | On-Lent Loan | -[2] | -[2] | -[2] | -[2] | -[2] | -[2] | -[2] | -[2] | |
| | **Class C Total:** | **104,886** | **9,230** | **5,425** | **4,588** | **89** | **19,332** | **2,297** | **219** | **18.43%** |

Notes:
1. *Figures above are subject to rounding.*
2. *The On-Lent Loan and Class A Private Loan are considered to be duplicative and substantially the same debt owed by CEG. Therefore, the On-Lent Loan is considered to be of no value in a liquidation of CEG due to the rule against 'double proof' and/or on a contractual basis*

© 2023. For information, contact Deloitte China.

## Estimated Recoveries of the Offshore Debts (Liquidation Scenario) – Class D

RMB in million

| Ref No. | Tranche | Accrued claims as of 31 December 2022 | Estimated Realization | | | | Total recovery amount E=A+B+C+D | Recovery amount from CEG | Recovery amount from Tianji | Recovery rate |
| | | | From security (assets/ shares/ intercompany receivables)/ principal obligors A | From unencumbered assets of guarantors B | From guarantors C | From keepwell provider D | | | | |
| 1 | SJ Existing October 2022 Notes | 16,226 | - | 263 | 1,744 | 705 | 2,712 | - | 373 | 16.71% |
| 2 | SJ Existing November 2022 Notes | 5,449 | - | 88 | 586 | 237 | 911 | - | 125 | 16.71% |
| 3 | SJ Existing October 2023 Notes | 16,285 | - | 264 | 1,751 | 707 | 2,722 | - | 375 | 16.71% |
| 4 | SJ Existing November 2023 Notes | 5,034 | - | 82 | 541 | 219 | 842 | - | 116 | 16.71% |
| 5 | Lake Notes | 2,050 | - | - | 94 | 89 | 183 | 46 | 47 | 8.91% |
| 6 | Clear Star Put Option | 513 | - | 12 | 12 | - | 24 | 12 | 12 | 4.57% |
| 7 | Castle Share Put Option | 2,160 | 9 | 50 | 1 | - | 60 | - | 50 | 2.79% |
| 8 | Hero Loan | 6,922 | 3,400 | 160 | 156 | - | 3,716 | 156 | 160 | 53.68% |
| 9 | Tuen Mun Put Options | 1,563 | 793 | 18 | - | - | 811 | - | 18 | 51.90% |
| 10 | CEG-Tianji Intercompany Balance | 35,065 | - | 811 | - | - | 811 | - | 811 | 2.31% |
| 11 | Castle Loan Put Option | -² | -² | -² | -² | -² | -² | -² | -² | -² |
| | Class D Total: | 91,267 | 4,202 | 1,748 | 4,885 | 1,957 | 12,792 | 214 | 2,087 | 13.99% |

Notes:
1. Figures above are subject to rounding.
2. The Castle Loan Put Option is considered to be duplicative of a portion of the Castle Share Put Option and substantially the same debt owed by Tianji. Therefore, the Castle Loan Put Option is considered to be of no value in a liquidation of Tianji due to (i) the risk against "double proof" and/or (ii) on a contractual basis
© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

63

# Appendix 3 – List of Subsequent Events considered

# List of Subsequent Events considered

For the purpose of the Liquidation Analysis, we have considered the following Subsequent Events based on the Company's announcements or information provided by management:

1. **Disposal of subsidiaries of 708 Group**

On April 24, 2023, Evergrande Auto entered into a Sale and Purchase Agreement with Anxin Holding Limited ("Anxin") and CEG, where Anxin (a wholly-owned subsidiary of CEG) will acquire the entire issued share capital of Assemble Guard Limited and Flaming Ace Limited for a consideration of RMB2 (subject to consideration adjustment).

Flaming Ace Limited is an Out-scope Entity. By reference to the selection criteria set out on page 9, it is unlikely that there are material recoveries from Flaming Ace Limited and its subsidiaries to CEG in terms of shareholder value.

Based on the Liquidation Analysis, the return to the shareholder of Assemble Guard Limited is estimated to be nil.

2. **Arbitral award against certain entities of 3333 Group**

On 12 May 2023, the Company announced that it had received an enforcement notice issued by the Guangzhou Intermediate People's Court of Guangdong Province (the "Enforcement Notice") in relation to the arbitral award of the Shenzhen Court of International Arbitration (the "Arbitral Award") against the Company and its subsidiary Guangzhou Kailong Real Estate Company Limited ("Guangzhou Kailong"), arising from repurchase obligation of the Company, Hengda Real Estate and Guangzhou Kailong in respect of the capital increase and other relevant matters of Hengda Real Estate.

The obligations of the Company and Guangzhou Kailong under the Arbitral Award were considered in the Liquidation Analysis.

3. **Full repayment of Lei Shing Hong Loan**

As at 31 December 2022, Profit Concept Finance Limited ("Profit Concept"), an indirect subsidiary of Tianji, had an outstanding secured liabilities in the sum of approx. HK$77m under the Lei Shing Hong Loan which was guaranteed by Tianji. The amount has been fully repaid by Profit Concept in January 2023.

© 2023. For information, contact Deloitte China.

# Appendix 4 – Scenario Analysis

## Scenario Analysis | Treatment of CEG's Onshore Debt Guarantee & Keepwell Agreement of SJ Existing Notes

Scenario analysis was performed to estimate recoveries to the Offshore Debts under different possible outcomes in respect of (i) the Keepwell arrangement of the SJ Existing Notes; and (ii) potential recoveries from primary obligors and security to debts relating to Type 1 Guarantee.

### Keepwell Agreement

Considering that there remains uncertainty as to if the keepwell arrangement provided by Hengda Real Estate is enforceable and at the time of the preparation of the Liquidation Analysis, there are a number of on-going court cases in this regard, scenario analysis was performed by assuming (i) the keepwell arrangement was valid and the claim would be admitted into the bankruptcy of Hengda Real Estate; and (ii) the keepwell arrangement was invalid.

### Type 1 Guarantee

In relation to Type 1 Guarantee provided by CEG in respect of debts of non-Group entities, based on the analysis from the PRC legal advisors, creditors would need to exhaust recoveries from principal obligors and security before claiming against CEG, i.e. creditors could claim against CEG for the deficiency only. As borrowers and security of Type 1 Guarantee are outside the Group, no information was available for assessing recoveries from borrowers and security. Scenario analysis were performed by assuming there were **0%, 50%, 75% or 100%** recoveries from the principal obligors and security.

### The Liquidation Analysis

Estimated recoveries set out on pages 33-36 and 59-63 were computed based on (i) the keepwell arrangement was valid and the claim would be admitted into bankruptcy of Hengda Real Estate; and (ii) there were 0% recovery from the primary obligors and security in respect of onshore debts under Type 1 Guarantee so that 100% of the guaranteed debts would be claimed and admitted in the liquidation of CEG.

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

## Scenario Analysis | Treatment of CEG's Onshore Debt Guarantee & Keepwell Agreement of SJ Existing Notes

| Scenario | Assumptions | Recovery of CEG Existing Notes | Recovery of SJ Existing Notes | Recovery for CEG's unsecured creditors | Recovery for TJ's unsecured creditors |
|---|---|---|---|---|---|
| 1 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): <u>100% Claim</u><br>• CEG's Type1 Guarantee : <u>100% Claim</u><br>• Keepwell : <u>100% Valid</u> | 3.34% | 16.71% | 2.26% | 2.31% |
| 2 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): <u>100% Claim</u><br>• CEG's Type1 Guarantee : <u>50% Claim</u><br>• Keepwell : <u>100% Valid</u> | 3.44% | 16.71% | 2.32% | 2.31% |
| 3 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): <u>100% Claim</u><br>• CEG's Type1 Guarantee : <u>100% Claim</u><br>• Keepwell : <u>0% Valid  (i.e Invalid)</u> | 3.34% | 12.37% | 2.26% | 2.31% |
| 4 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): <u>100% Claim</u><br>• CEG's Type1 Guarantee : <u>50% Claim</u><br>• Keepwell : <u>0% Valid  (i.e Invalid)</u> | 3.43% | 12.37% | 2.32% | 2.31% |
| 5 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): <u>50% Claim</u><br>• CEG's Type1 Guarantee : <u>50% Claim</u><br>• Keepwell : <u>100% Valid</u> | 3.61% | 16.71% | 2.48% | 2.31% |
| 6 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): <u>50% Claim</u><br>• CEG's Type1 Guarantee : <u>50% Claim</u><br>• Keepwell : <u>0% Valid  (i.e Invalid)</u> | 3.61% | 12.37% | 2.48% | 2.31% |
| 7 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): <u>25% Claim</u><br>• CEG's Type1 Guarantee : <u>25% Claim</u><br>• Keepwell : <u>100% Valid</u> | 3.86% | 16.71% | 2.68% | 2.31% |
| 8 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): <u>25% Claim</u><br>• CEG's Type1 Guarantee : <u>25% Claim</u><br>• Keepwell : <u>0% Valid  (i.e Invalid)</u> | 3.86% | 12.37% | 2.68% | 2.31% |
| 9 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): <u>0% Claim</u><br>• CEG's Type1 Guarantee : <u>0% Claim</u><br>• Keepwell : <u>100% Valid</u> | 4.22% | 16.71% | 2.98% | 2.31% |
| 10 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): <u>0% Claim</u><br>• CEG's Type1 Guarantee : <u>0% Claim</u><br>• Keepwell : <u>0% Valid  (i.e Invalid)</u> | 4.22% | 12.37% | 2.98% | 2.31% |

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

68

**Deloitte.**



MAKING AN
IMPACT THAT
MATTERS Since 1845

About Deloitte

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited ("DTTL"), its global network of member firms, and their related entities (collectively, the "Deloitte organization"). DTTL (also referred to as "Deloitte Global") and each of its member firms and related entities are legally separate and independent entities, which cannot obligate or bind each other in respect of third parties. DTTL and each DTTL member firm and related entity is liable only for its own acts and omissions, and not those of each other. DTTL does not provide services to clients. Please see www.deloitte.com/about to learn more.

Deloitte is a leading global provider of audit and assurance, consulting, financial advisory, risk advisory, tax and related services. Our global network of member firms and related entities in more than 150 countries and territories (collectively, the "Deloitte organization") serves four out of five Fortune Global 500® companies. Learn how Deloitte's approximately 345,000 people make an impact that matters at www.deloitte.com.

Deloitte Asia Pacific Limited is a company limited by guarantee and a member firm of DTTL. Members of Deloitte Asia Pacific Limited and their related entities, each of which are separate and independent legal entities, provide services from more than 100 cities across the region, including Auckland, Bangkok, Beijing, Hanoi, Hong Kong, Jakarta, Kuala Lumpur, Manila, Melbourne, Osaka, Seoul, Shanghai, Singapore, Sydney, Taipei and Tokyo.

The Deloitte brand entered the China market in 1917 with the opening of an office in Shanghai. Today, Deloitte China delivers a comprehensive range of audit & assurance, consulting, financial advisory, risk advisory and tax services to local, multinational and growth enterprise clients in China. Deloitte China has also made—and continues to make—substantial contributions to the development of China's accounting standards, taxation system and professional expertise. Deloitte China is a locally incorporated professional services organization, owned by its partners in China. To learn more about how Deloitte makes an impact that Matters in China, please connect with our social media platforms at www2.deloitte.com/cn/en/social-media.

This communication contains general information only, and none of Deloitte Touche Tohmatsu Limited ("DTTL"), its global network of member firms or their related entities (collectively, the "Deloitte organization") is, by means of this communication, rendering professional advice or services. Before making any decision or taking any action that may affect your finances or your business, you should consult a qualified professional adviser.

No representations, warranties or undertakings (express or implied) are given as to the accuracy or completeness of the information in this communication, and none of DTTL, its member firms, related entities, employees or agents shall be liable or responsible for any loss or damage whatsoever arising directly or indirectly in connection with any person relying on this communication. DTTL and each of its member firms, and their related entities, are legally separate and independent entities.

© 2023. For information, contact Deloitte China.

**SCHEDULE 3**

**SCHEME RECOVERY ANALYSIS**







# China Evergrande Group

*Scheme Recovery Analysis Report*

**21 July 2023**

**Deloitte.**

# Deloitte.

德勤

Deloitte Financial Advisory Services
A division of Deloitte Advisory
(Hong Kong) Limited
35/F One Pacific Place
88 Queensway
Hong Kong

Tel: +852 2852 1600
Fax: +852 2541 1911
Email: enquiry@deloitte.com.hk
www.deloitte.com/cn

**Glen Ho**
Engagement Partner
+852 2852 1643
gleho@deloitte.com.hk

**Karen Chu**
Engagement Partner
+852 2852 1680
karchu@deloitte.com.hk

**Cyrus Ng**
Engagement Partner
+852 2852 1024
cyng@deloitte.com.hk

**Andre Davidovic**
Engagement Director
+852 2852 6432
andavidovic@deloitte.com.hk

China Evergrande Group
15th Floor, YF Life Centre
38 Gloucester Road
Wanchai, Hong Kong

Scenery Journey Limited
15th Floor, YF Life Centre
38 Gloucester Road
Wanchai, Hong Kong

Tianji Holding Limited
15th Floor, YF Life Centre
38 Gloucester Road
Wanchai, Hong Kong

Dear Sirs,

**RE: Scheme Recovery Analysis Report**

We enclose our report (the "**Report**") in connection with the high-level scheme recovery analysis of the offshore debts of China Evergrande Group ("**CEG**", the "**Company**"), Scenery Journey Limited ("**SJ**") and Tianji Holding Limited ("**Tianji**") under the proposed scheme terms as announced by the Company on 22 March 2023 in accordance with our engagement letter dated 15 July 2022, the first supplementary agreement dated 20 June 2023 and the second supplementary agreement dated 17 July 2023 (collectively referred to as the "**Agreement**").

The Report was prepared solely for the benefit of the Company, SJ and Tianji only. No other party is entitled to rely on the Report for any purpose whatsoever and we accept no duty of care or liability to any other party who is shown or gains access to the Report.

The Report has been prepared based on limited information provided to Deloitte Advisory (Hong Kong) Limited ("**DAHK**"). The scenarios presented in the Report involve extensive use of estimates and assumptions, which are inherently subject to uncertainties and contingencies beyond the control of the Group, its management and advisors. The assumptions will need to be reviewed and revised to reflect any future changes in the circumstances of any of the Company and its subsidiaries. We draw your attention to the sections titled "Disclaimers" (page 2) and "Limitations" (page 3) of the Report.

The Report is prepared based on information received up to 20 July 2023 ("**Cut-Off Date**"), we have not updated our work since then.

Yours faithfully,
For and on behalf of
**Deloitte Advisory (Hong Kong) Limited**



© 2023 Deloitte China.

# Disclaimers

- The Scheme Recovery Analysis Report (the "Report", "Scheme Recovery Analysis") has been prepared in connection with the results of the high-level analysis on the estimated recoveries of certain debts of China Evergrande Group (the "Company" or "CEG"), Scenery Journey Limited ("SJ") and Tianji Holding Limited ("Tianji") under the proposed restructuring of the offshore debts of the Company and its subsidiaries (collectively the "Group") as announced by the Company on 22 March 2023 (the "Restructuring") in accordance with the terms of the engagement agreement dated 15 July 2022, the first supplementary agreement dated 20 June 2023 and the second supplementary agreement on or around 17 July 2023 entered into between the Company, SJ, Tianji and Deloitte Advisory (Hong Kong) Limited ("DAHK" or "we" or "us") (collectively referred to as the "Agreement").

- Information contained in the Report is subject to the disclaimers, sources of information, assumptions and limitations set out herein.

- By reviewing the Report, the creditors of the schemes of CEG, SJ and Tianji ("Scheme Creditors") and any other party who gains access to the Report shall be deemed to have read, and to have irrevocably acknowledged and agreed to comply with, the following contents of this disclaimer:

(i)     the Report was prepared solely for the benefit of CEG, SJ and Tianji and, save in respect of CEG, SJ and Tianji, DAHK accepts no duty of care or liability to any other party regardless of whether or not a party was shown or gained access to the Report, or is a Scheme Creditor placing any reliance on the Report;

(ii)    With respect to dealing in shares, the Report may contain material non-public information of CEG. Thus, any disclosure, copying, or distribution of the Report or the taking of any action based on it, which would constitute insider dealing with respect to shares in CEG, is strictly prohibited;

(iii)   the Report was prepared for indicative and illustrative purposes only. The actual recoveries may vary subject to, among other things, the ability of the Company to fulfil the repayment obligations under the Restructuring and the amounts of claims submitted and ultimately admitted as claims under the respective scheme of arrangement of the Company, SJ and Tianji. Thus the actual recoveries could be materially different from the estimated recoveries set out in the Report;

(iv)   the Report was prepared on the basis of information, including unaudited information, received by DAHK up to 20 July 2023 and DAHK has not updated the Report since that date.  DAHK relied on the financials and other information provided to it and on representations made to it by management of CEG and CEG's subsidiaries, and the relevant companies' respective staff and advisors. DAHK did not audit or verify the correctness and accuracy of the information provided to it and DAHK does not express an audit opinion on its findings and analysis. DAHK accepts no responsibility for the reliability of such information to the extent it is inaccurate, incomplete or misleading;

(v)    the Report may not contain all facts and information that a Scheme Creditor may regard as relevant or potentially relevant; and

(vi)   the Scheme Creditors and any other party who gains access to the Report shall refer to the disclaimers, limitations and sources of information set out herein.

© 2023 Deloitte China.



# Limitations

## Limited scope Scheme Recovery Analysis under the assumption that the Group would operate as a going concern

- The Scheme Recovery Analysis set out estimates of the recoveries to Class A Scheme Creditors, Class B Scheme Creditors, Class B (SJ) Scheme Creditors and Class D (TI) Scheme Creditors under the terms of the Proposed Restructuring set out in the Restructuring Announcements.
- The analysis was performed on the following principal assumptions:

(i)   that the Group would operate as a going concern;

(ii)  that the Group would have sufficient financial resources to meet all obligations under the Proposed Restructuring;

(iii) that there would not be any restrictions on the Group remitting funds offshore; and

(iv) that the Proposed Restructuring would be successfully implemented.

- An assessment of the capacity of the Group to adhere to and implement the Proposed Restructuring, including an assessment of the Group's ability to generate sufficient cash flow to meet debt servicing and maturity obligations has not been considered because it is outside of our high level analysis.

## Subsequent events were not considered

- Events after 31 December 2022 were not taken account of, except for those set out in the section "Adjustments to FY22 Accounts" on page 32.
- Interest and default interest was accrued up to 31 December 2022.

## Use of estimates and assumptions

- Preparation of the Scheme Recovery Analysis involved extensive use of estimates and assumptions, which are inherently subject to uncertainties and contingencies beyond the control of the Company, its management and advisors. As a result, the actual recoveries from the Schemes could be materially different from the estimated recoveries set forth in the Scheme Recovery Analysis.

## Accuracy and completeness of information

- We relied heavily upon the accuracy, validity and completeness of the financial and other information provided to us by the Company, its staff and advisors. We have not sought to audit or independently verify the information provided to us. Where information has been provided to us, we have assumed that it is accurate and current.
- In particular, we have assumed that known liabilities have been fully and properly recorded and all guarantees have been identified and properly accounted for. The actual claims and debts finally admitted in the respective Schemes could be different from those estimated in the Scheme Recovery Analysis.
- Details of balances of claims against CEG/SJ/Tianji and relevant exchange rates were provided by the Company and were adopted in the Scheme Recovery Analysis.

## Estimated recoveries from Third-Party Rights

- Class B (SJ) Debts, Class C Debts and Class D (TI) Debts were to be admitted to the SJ Scheme, the CEG Scheme, and the Tianji Scheme for the deficiency amounts only, i.e. after deducting estimated recoveries from Third-Party Rights.
- We are not provided with independent valuation on the fair value of Third-Party Rights in relation to Class C Debts and Class D (TI) Debts. We adopted the estimated realizable value of the Third-Party Rights as estimated by the Liquidation Analysis (i.e. under a hypothetical liquidation scenario) in estimating the deficiency claims of Class C Scheme Creditors and Class D (TI) Scheme Creditors to be admitted in the CEG Schemes and the Tianji Scheme.
- Should there be independent valuation of the fair value of the Third-Party Rights prepared on the basis of the Schemes had become effective and the Group had continued as a going concern, the actual recoveries of creditors under the respective Schemes might be different.

## Tax issues

- It is assumed that distributions to Scheme Creditors would not be subject to payment of any taxes. Should distributions to Scheme Creditors give rise to tax obligations, the actual recoveries would be lower than those set forth in the Scheme Recovery Analysis.

China Evergrande Group | Scheme Recovery Analysis Report

3

© 2023 Deloitte China.




# Glossary of terms

| Abbreviations | Definition |
| --- | --- |
| A1 Notes | CEG New Notes to be issued to Class A Scheme Creditors electing Option 1 |
| A2 Notes | CEG New Notes to be issued to Class A Scheme Creditors electing Option 2 |
| A2 Package | Equity Package to be issued to Class A Scheme Creditors electing Option 2 |
| approx. | approximately |
| Auditor | Prism Hong Kong and Shanghai Limited, the auditor of the Company |
| B/b | Billion |
| C1 Notes | CEG New Notes to be issued to Class C Scheme Creditors electing Option 1 |
| C2 Notes | CEG New Notes to be issued to Class C Scheme Creditors electing Option 2 |
| C2 Package | Equity Package to be issued to Class C Scheme Creditors electing Option 2 |
| CEG / Company | China Evergrande Group, a company listed on the SEHK with stock code 3333.hk |
| CEG New Notes | New notes to be issued by CEG under the Proposed Restructuring |
| CEG Schemes | The schemes of arrangement to be entered into between CEG and its creditors in relation to Class A Debts and Class C Debts |
| CEG Scheme Creditors | Class A Scheme Creditors and Class C Scheme Creditors |
| Class A Scheme Creditors | Scheme Creditors holding Class A Debts |
| Class A Debts | Certain debts of CEG, consisting of the public notes issued by CEG, the convertible bonds issued by CEG and Class A Private Loan, as set out on pages 6 - 7 |
| Class B (SJ) Scheme Creditors | Scheme Creditors holding Class B (SJ) Debts |
| Class B (SJ) Debts | Debts of SJ, as set out on pages 6 - 7 |
| Class C Scheme Creditors | Scheme Creditors holding Class C Debts |
| Class C Debts | Certain debts of CEG, consisting of the private debt obligations of CEG (except the Class A Private Loan), put option obligations of CEG and debts guaranteed by CEG, as set out on pages 6 - 7 |
| Class D (TJ) Scheme Creditors | Scheme Creditors holding Class D (TJ) Debts |
| Class D (TJ) Debts | Debts of Tianji, as set out on pages 6 - 7 |

| Abbreviations | Definition |
| --- | --- |
| EBITDA | Earnings before interest, tax, depreciation and amortisation |
| Equity Package | a package of five equity-linked instruments, which are either secured over, linked to, mandatorily exchangeable into, or mandatorily convertible into (as applicable) listed shares of EVPS, NEV, or the Company |
| EV | Enterprise value |
| EVPS | Evergrande Property Services Group Limited, a company listed on the SEHK with stock code 6666.hk |
| FY22 Accounts | Audited financial information of CEG for the year ended 31 December 2022 |
| Evergrande Property Group/ 6666 Group | Evergrande Property and its subsidiaries |
| Group | CEG and its subsidiaries |
| Hengda Real Estate | Hengda Real Estate Group Company Limited |
| HKD | Hong Kong Dollars, the lawful currency of Hong Kong |
| Hong Kong | Hong Kong Special Administrative Region |
| Liquidation Analysis | Analysis performed by DAHK in estimating recoveries to certain offshore debts of CEG, SJ and Tianji under a hypothetical liquidation scenario of the Group as at 1 January 2023 |
| M/m | Million |
| Management | Management of the Group |
| Maples | Legal advisors of the Company in respect of laws of Cayman Islands and British Virgin Islands |
| MCBs | Mandatory convertible bonds |
| MEBs | Mandatory exchangeable bonds |
| NEV | China Evergrande New Energy Vehicle Group Limited, a company listed on the SEHK with stock code 708.hk |
| New Notes | CEG New Notes, SJ New Notes, and TJ New Notes |
| Offshore Debts | Debts of CEG, SJ and Tianji as set out on pages 6 - 7 |
| Option 1 | An option under which CEG Scheme Creditors would receive CEG New Notes (a tenor of 10 to 12 years) at a 1:1 conversion ratio of their claims |
| Option 2 | An option under which CEG Scheme Creditors would elect to convert their entitlements into (1) CEG New Notes (a tenor of five to nine years) on a 1:1 conversion ratio of their claims ; (2) Equity Package; or (3) a combination of (1) and (2) |

© 2023 Deloitte China.



# Glossary of terms

| Abbreviations | Definition |
| --- | --- |
| PRC | The People's Republic of China, which for the purpose of the Report, excludes Hong Kong and Macau Special Administrative Region |
| Proposed Restructuring | The proposed restructuring of the indebtedness of CEG, SJ and Tianji by way of schemes of arrangement as set out in the Restructuring Announcements |
| PIK | Payment in kind |
| Reference Date | Restructuring effective date. For the purpose of this Scheme Recovery Analysis, it is assumed to be 31 December 2022 |
| Restructuring Announcements | Announcements of CEG dated 22 March 2023 and 3 April 2023 |
| Restructuring Consideration | The notes or equities to be offered to the Scheme Creditors in exchange for the Scheme Creditors releasing their claims against CEG/ SJ/ Tianji under the Proposed Restructuring |
| RMB | Renminbi, the lawful currency of the PRC |
| RMB Bonds | 15 Hengda 03 RMB bond issued by Hengda Real Estate and listed in the Shanghai Stock Exchange, in which the Company guaranteed the repurchase of the RMB bond at the Redemption Date (as defined in the 15 Hengda 03 RMB bond indenture) if Hengda Real Estate failed to ensure sufficient funds in the bank account to repay the RMB Bondholders 3 business days prior to the Redemption Date and the RMB Bondholders so demanded. The outstanding principal of the 15 Hengda 03 RMB bond is RMB8.2 billion |
| SAFE | State Administration for Foreign Exchange, the PRC |
| Scheme Creditors | Creditors of any of the CEG Schemes, the SJ Scheme and the Tianji Scheme |
| Schemes | Collectively the CEG Schemes, the SJ Scheme and the Tianji Scheme |
| SEHK | Stock Exchange of Hong Kong |
| Sidley Austin | Legal advisors of the Company in respect of Hong Kong laws and English laws |
| SJ | Scenery Journey Limited |
| SJ New Notes | New Notes to be issued to Class B (SJ) Scheme Creditors |
| SJ Scheme | the scheme of arrangement to be entered into between SJ and its creditors in relation to Class B (SJ) Debts |
| SLNs | Security-linked notes |
| Subsequent Events | Events after 31 December 2022 |

| Abbreviations | Definition |
| --- | --- |
| Tianji / TJ | Tianji Holding Limited |
| TJ New Notes | New Notes to be issued to Class D (TJ) Scheme Creditors |
| Tianji Scheme/TJ Scheme | The scheme of arrangement to be entered into between Tianji and its creditors, in relation to Class D (TJ) Debts |
| Third-Party Rights | Rights against any person other than CEG, SJ and/or Tianji (as applicable) who is an obligor, guarantor, security or provider of any other credit support (including where applicable, Restructuring Consideration received from the CEG Schemes, SJ Scheme or TJ Scheme (as applicable)) |
| USD | United States Dollar, the lawful currency of the United States of America |
| VDate | Valuation date being 31 December 2022 |

China Evergrande Group | Scheme Recovery Analysis Report

© 2023 Deloitte China.



# Glossary Definition of Offshore Debts

| Class | Terms | Definition |
|---|---|---|
| A | CEG Existing March 2022 Notes | 8.25% senior notes due March 23, 2022 (ISIN: XS1580431143, Common Code: 158043114) |
| A | CEG Existing April 2022 Notes | 9.5% senior notes due April 11, 2022 (ISIN: XS1982036961, Common Code: 198203696) |
| A | CEG Existing January 2023 Notes | 11.5% senior notes due January 22, 2023 (ISIN: XS2106834299, Common Code: 210683429) |
| A | CEG Existing February 2023 Bonds | 4.25% convertible bonds due February 14, 2023 (ISIN: XS1767800961, Common Code: 176780096) |
| A | CEG Existing April 2023 Notes | 10.0% senior notes due April 11, 2023 (ISIN: XS1982037779, Common Code: 198203777) |
| A | CEG Existing June 2023 Notes | 7.5% senior notes due June 28, 2023 (ISIN: XS1627599498, Common Code: 162759949) |
| A | CEG Existing January 2024 Notes | 12.0% senior notes due January 22, 2024 (ISIN: XS2106834372, Common Code: 210683437) |
| A | CEG Existing March 2024 Notes | 9.5% senior notes due March 29, 2024 (ISIN: XS1587867539, Common Code: 158786753) |
| A | CEG Existing April 2024 Notes | 10.5% senior notes due April 11, 2024 (ISIN: XS1982040641, Common Code: 198204064) |
| A | CEG Existing June 2025 Notes | 8.75% senior notes due June 28, 2025 (ISIN: XS1627599654, Common Code: 162759965) |
| A | CEG Existing January 2022 Notes | 9.5% senior notes due January 30, 2022 (ISIN: XS1991102846, Common Code: 199110284) |
| A | Class A Private Loan | Private loan of US$100,000,000 with 15% interest p.a. due January 2022 owed by the Company |
| B, D | SJ Existing October 2022 Notes | 11.5% senior notes due October 24, 2022 (ISIN: XS2109191986, Common Code: 10919198) |
| B, D | SJ Existing November 2022 Notes | 13.0% senior notes due November 6, 2022 (ISIN: XS1903671854, Common Code: 190367185) |
| B, D | SJ Existing October 2023 Notes | 12.0% senior notes due October 24, 2023 (ISIN: XS2109192109, Common Code: 210919210) |
| B, D | SJ Existing November 2023 Notes | 13.75% senior notes due November 6, 2023 (ISIN: XS1903671938, Common Code: 190367193) |
| C, D | Lake Notes | US$260 million 8.5% senior notes due October 3, 2021 (ISIN: XS2054446617, Common Code: 205444661) issued by Jumbo Fortune Enterprises Limited |
| C | Dongbo Notes | US$424 million 9.0% senior notes due January 22, 2023 (ISIN: XS2290369128, Common Code: 229036912) issued by Great Courage Global Limited |
| C | Dongbo Put Option | US$116 million put option granted by CEG in relation to certain Dongbo Notes |
| C | Graceful Court Put Option | US$110 million put option granted by CEG in relation to shares of Graceful Court Limited |
| C | New Chic Margin Loan | HK$160 million margin loan borrowed by New Chic Global Limited |

© 2023 Deloitte China.

China Evergrande Group | Scheme Recovery Analysis Report

6




# Glossary Definition of Offshore Debts

| Class | Terms | Definition |
|---|---|---|
| C, D | Clear Star Put Option | HK$575 million put option granted by Tianji in respect of shares of Clear Star Investments Limited |
| C | CEG Loan 1 | HK$1.2 billion loan borrowed by CEG due 2 January 2022 |
| C | CEG Loan 2 | HK$600 million loan borrowed by CEG due 7 January 2022 |
| C | Venice Loan | US$20 million structured loan borrowed by Rainbow Ever Limited |
| C | Venice SPA | US$355 million structured sale and purchase agreement of shares in Rainbow Ever Limited |
| C, D | Hero Loan | HK$7.6 billion loan borrowed by Tianji pursuant to facilities agreement dated 21 November 2020 |
| C | FCB Put Option | US$712 million repurchase obligations granted by CEG, Alpha Beauty Limited and New Gains Group Limited in respect of Fangchebao Group Co. Ltd |
| C | RMB Bond Put Option | Repurchase obligations of CEG in relation to the RMB Bond |
| C | CEG Guarantees of PRC Liabilities | Unsecured liabilities of CEG arising in connection with the liabilities of entities incorporated the PRC |
| C | Kailong Arbitration Award | Arbitration award rendered by the Shenzhen Court of International Arbitration where CEG, Guangzhou Kailong Real Estate Company Limited, and the Chairman of CEG (Mr. Hui Ka Yan) were responsible for the repayment accordingly |
| C | On-Lent Loan | Amounts on-lent to CEG pursuant to the loan agreement relating to the provision of the Class A Private Loan |
| D | Castle Loan Put Option | US$258 million put option granted by Tianji in relation to a private loan borrowed by Sky Joy Holdings Limited |
| D | Castle Share Put Option | US$258 million put option granted by Tianji in relation to shares of Sky Joy Holdings Limited |
| D | Tuen Mun Put Options | HK$1.4 billion put options granted by Tianji in relation to a project located in Tuen Mun, Hong Kong |
| D | CEG-Tianji Intercompany Balance | Intercompany balance owed by the Tianji to CEG which on 31 December 2022 was in an amount equal to approximately US$5.03 billion |

© 2023 Deloitte China.



# Basis of our analysis
## Source of information

| Key information / documents obtained | We have obtained the following information from the Management, their advisors or public domain as the basis of our Scheme Recovery Analysis up to the Cut-Off Date: |
|---|---|
| | • Announcement dated 22 March 2023 issued by CEG in relation to the Proposed Restructuring of Offshore Debts |
| | • Presentation material dated 3 April 2023 issued by CEG in relation to the Offshore Restructuring Proposal |
| | • Presentation material dated 3 April 2023 issued by SJ/ Tianji in relation to the Restructuring Proposal |
| | • Announcement dated 3 April 2023 issued by CEG in relation to the Proposed Restructuring of Offshore Debts |
| | • Announcement dated 24 April 2023 issued by CEG in relation to the Restructuring of the Target Group |
| | • Circular dated 25 April 2023 issued by NEV in relation to the disposal of NEV's healthcare segment |
| | • CEG Annual Report for the year ended 31 December 2020 |
| | • CEG Interim Report for the six months ended 30 June 2021 |
| | • Results announcements of CEG for the years ended 31 December 2021 and 2022 |
| | • Results announcements of CEG for the six months ended 30 June 2022 |
| | • NEV Annual Report for the year ended 31 December 2020 |
| | • NEV Interim Report for the six months ended 30 June 2021 |
| | • EVPS Annual Reports for the years ended 31 December 2020, 2021 and 2022 |
| | • Consolidated financial statements (including entity-level balance sheets) of CEG (including the listed groups of NEV and EVPS) as at 31 December 2021 and 31 December 2022 and working schedules provided by Management and the Auditor |
| | • Information on Offshore Debts claim as at 31 December 2022 |
| | • Peer financial metrics as at 31 December 2022 extracted from CapitalIQ |

China Evergrande Group | Scheme Recovery Analysis Report

8

© 2023 Deloitte China.

9

China Evergrande Group | Scheme Recovery Analysis Report

**Summary of scheme recoveries by class**    **09**

Proposed Restructuring    11

Scheme Recovery Analysis scenarios    14

Calculation methodology    21

Scheme Recovery Analysis assumptions    25

Estimated recoveries    33

Appendices    41

© 2023 Deloitte China.



# Summary of Scheme Recoveries by Class

**Estimated recoveries to Scheme Creditors**

Under the Proposed Restructuring, CEG Scheme Creditors are entitled to elect one of two options with respect to the treatment of their entitlement to distribution. Each option features different Restructuring Consideration and as such, returns to CEG Scheme Creditors will not be known until final selections are made upon the Schemes becoming effective.

Based on the assumptions that the Group would operate as going concern and be able to honor its payment obligations, we have estimated recoveries to the Schemes Creditors based on the calculation methodology (pages 22 − 24), assumptions (pages 26 − 32) and different scenarios on the options to be elected by CEG Scheme Creditors (pages 15 − 18).

The three scenarios presented as below represent the scenarios giving the maximum, middle and minimum estimated recoveries based on different scenarios on the options to be elected by CEG Scheme Creditors.

| | Max | Base case | Min |
|---|---|---|---|
| CEG Schemes – Class A Debts | 32.5% | 22.5% | 17.7% |
| SJ Scheme – Class B (SJ) Debts | 39.9% | 39.9% | 39.9% |
| CEG Schemes – Class C Debts | 28.9% | 20.1% | 14.9% |
| TJ Scheme – Class D (TJ) Debts | 3.1% | 3.1% | 3.1% |

The above estimated recoveries to unsecured claims under the Schemes do not include recovery from Third-Party Rights such as underlying securities and guarantees which may further increase total recovery of each respective class. A full table of recoveries (based on Base Case) can be found on pages 34-40 of this Report.

**Limitations of the analysis**

The Scheme Recovery Analysis does not include an assessment of the Group's financial capacity and ability to meet its obligations under the Proposed Restructuring. The Scheme Recovery Analysis assumes the Group would continue as a going concern and have sufficient financial resources (including but not limited from onshore projects which are still undergoing restructuring) to satisfy its obligations under the Proposed Restructuring, and the Schemes would be implemented successfully. Should the assumptions not be valid, the actual recoveries may be lower than those estimated.

Our analysis was based on the latest published financial information and terms of the Proposed Restructuring. Any changes required to be made to the information provided may have an adverse impact on the Group's ability to successfully implement the proposed terms.

© 2023 Deloitte China.



| | |
|---|---|
| Summary of scheme recoveries by class | 09 |
| **Proposed Restructuring** | **11** |
| Scheme Recovery Analysis scenarios | 14 |
| Calculation methodology | 21 |
| Scheme Recovery Analysis assumptions | 25 |
| Estimated recoveries | 33 |
| Appendices | 41 |

China Evergrande Group | Scheme Recovery Analysis Report

© 2023 Deloitte China.



# Proposed Restructuring

## CEG Schemes

**Class A Debts:**

☐ 10 public notes issued by CEG, 1 private note and 1 private loan

- Claims in this class include claims against _CEG and 13 subsidiary guarantors;_
- Estimated accrued claims of USD 16,080m

**Class C Debts:**

☐ Guarantees, repurchase obligations and private debts at CEG

- Class C Debts only include unsecured claims against CEG. Third-Party Rights to remain in place and not compromised in the scheme
- _Class C Debts will be admitted to the CEG Schemes on a deficiency claim basis (i.e., accrued claims minus valuation of Third-Party Rights),_ which is subject to an independent valuation and adjudication process to be set out in the scheme documents

☐ Class C Debts do not have claims against any subsidiary guarantors and thus will be allocated longer dated CEG New Notes under Option 2

**MEBs, MCBs, and SLNs:**

- EVPS MEBs: bonds exchangeable into shares of EVPS within 24 months from the Reference Date
- NEV MEBs: bonds exchangeable into shares of NEV within 24 months from the Reference Date
- CEG MCBs: bonds convertible into shares of CEG within 5 years from the Reference Date
- EVPS SLNs: new notes with tenor of 5 to 8 years, interest rate of 5.0% to 6.5% p.a., 1.0% PIK penalty and charge of securities account holding shares of EVPS, amongst other credit enhancements
- NEV SLNs: new notes with tenor of 5 to 8 years, interest rate of 5.0% to 6.5% p.a., 1.0% PIK penalty and linked to a custody account containing shares of NEV, amongst other credit enhancements

## Restructuring Consideration

At election of Class A Scheme Creditors and Class C Scheme Creditors

Option 1 :

- CEG New Notes (A1/C1 Notes): tenor of 10 to 12 years and interest rate of 2.0% to 3.0% p.a., 1.0% PIK penalty
- _Option 1 is the default option for CEG Scheme Creditors who have not made their elections in their submission of claims before the relevant deadline._

Option 2:

- CEG Scheme Creditors can choose to receive 1) CEG New Notes (A2/C2 Notes), 2) Equity Package (A2/C2 Package), or 3) a combination of both
- CEG New Notes (A2/C2 Notes): tenor of 5 to 9 years and interest rate of 5.0% to 7.0% p.a., 1.0% PIK penalty
- Equity Package (A2/C2 Package): bundle of 3 types of equity-linked instruments – MEBs, MCBs and SLNs
- There is a minimum debt for equity conversion in the CEG Schemes, i.e., at least USD 4,245m of claims need to be allocated to Equity Package. _If such conversion is not met, CEG Scheme Creditors who elect Option 2 New Notes (A2/C2 Notes) may be mandatorily allocated with the MEBs and MCBs to fill the shortfall_
- In addition, any consideration received by CEG as part of the Tianji Scheme shall be distributed to creditors electing Equity Package on a pro-rata basis (without offsetting any claims)

© 2023 Deloitte China.



# Proposed Restructuring

SJ & TJ Schemes

Existing SJ Noteholders will participate in both the SJ Scheme and the TJ Scheme. Certain debts borrowed by TJ and creditors who benefit from guarantees and/or put options provided by TJ ("TJ Other Existing Debt Instruments") will participate in the TJ Scheme.

Existing SJ Noteholders will receive Restructuring Consideration from both the SJ Scheme and TJ Scheme on a deficiency claim basis, while creditors of TJ Other Existing Debt Instruments will only receive Restructuring Consideration from TJ Scheme on a deficiency claim basis.

**Existing SJ Noteholders**

1) SJ as borrower
2) 103 subsidiary guarantors,
3) Keepwell agreement from Hengda Real Estate, and
4) Guarantee from TJ

**TJ Other Existing Debt Instruments**

1) Debts borrowed by TJ,
2) Guarantees provided by TJ (other than Existing SJ Notes)
3) Other obligations of TJ

**Under SJ Scheme**

Class B (SJ) Debts

| SJ New Notes | | |
|---|---|---|
| (USDm) | Tenor | Principal |
| SJ Tranche A | 4 years | 300 |
| SJ Tranche B | 5 years | 1,100 |
| SJ Tranche C | 6 years | 1,100 |
| SJ Tranche D | 7 years | 1,200 |
| SJ Tranche E | 8 years | 2,800 |
| Total | | 6,500 |

**Under TJ Scheme**

Class D (TJ) Debts

| TJ New Notes | | |
|---|---|---|
| (USDm) | Tenor | Principal |
| TJ Tranche A | 5 years | 100 |
| TJ Tranche B | 6 years | 200 |
| TJ Tranche C | 7 years | 300 |
| TJ Tranche D | 8 years | 200 |
| Total | | 800 |

China Evergrande Group | Scheme Recovery Analysis Report

13

© 2023 Deloitte China.

| Summary of scheme recoveries by class | 09 |
| Proposed Restructuring | 11 |
| **Scheme Recovery Analysis scenarios** | **14** |
| Calculation methodology | 21 |
| Scheme Recovery Analysis assumptions | 25 |
| Estimated recoveries | 33 |
| Appendices | 41 |

© 2023 Deloitte China.



# Scheme Recovery Analysis scenarios

Election of Option 1 and Option 2 under the CEG Schemes

**Overview of the recovery scenarios**

The returns to Scheme Creditors are influenced by, inter alia, the final allocations of the Restructuring Consideration. Two key factors that determine the allocations are: (1) the election of Option 1 and Option 2 by CEG Scheme Creditors and (2) the value of the deficiency claims by Class C Scheme Creditors and Class D (TI) Scheme Creditors.

As the election of Option 1 or Option 2 by CEG Scheme Creditors is unknown at the time of preparing the Scheme Recovery Analysis, to demonstrate a range of potential recoveries, we have conducted the Scheme Recovery Analysis based on seven scenarios illustrating how CEG Scheme Creditors may elect among Option 1 and Option 2.

The election of Option 1 or Option 2 is subject to a minimum claim when selecting the Equity Package, as illustrated on page 20.



© 2023 Deloitte China.



# Scheme Recovery Analysis scenarios

Election of Option 1 and Option 2 under the CEG Schemes

**Overview of the recovery scenarios**

The scenarios seek to demonstrate the range of potential recoveries starting with full allocation of claims to Option 1 (i.e. CEG New Notes only), a combination of Option 1 and Option 2 (i.e. a combination of CEG New Notes and Equity Package), and to full allocation to the Option 2 (i.e Equity Package only). If no election is made, claims under the CEG Schemes will by default be allocated to Option 1.

In the following table, we have outlined these seven scenarios and the reallocation treatment if there are under or over subscription for the Equity Package in the CEG Schemes based on the reallocation mechanism set out in the Restructuring Announcements.

Under all the scenarios, it is assumed that Class A Scheme Creditors and Class C Scheme Creditors will elect the same options.

**Election of Option 1 and Option 2 by CEG Scheme Creditors**

| # | Election (%) | Reallocation for over/under subscription of Equity Package |
|---|---|---|
| 1.0 | 100% Option 1 (A1/C1 Notes) | The Equity Package under Option 2 would be undersubscribed, and claims elected for Option 1 would be reallocated to Equity Package under Option 2 on a pro-rata basis. |



© 2023 Deloitte China.

# Scheme Recovery Analysis scenarios

## Election of Option 1 and Option 2 under the CEG Schemes

**Election of Option 1 and Option 2 by CEG Scheme Creditors**

| # | Election (%) | Reallocation for over/under subscription of Equity Package |
|---|---|---|
| 2.1 | 50% Option 1 A1/C1 Notes, 50% Option 2 A2/C2 Notes | The Equity Package would be undersubscribed. Part of the claims selecting Option 2 A2/C2 Notes would be reallocated to the Equity Package on a pro-rata basis. |
| | | An underutilised adjusted portion of the A2 Package will be allocated to the respective pools of the underlying shares for the A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs and C2 NEV SLNs. |
| 2.2 | 50% Option 1 A1/C1 Notes, 25% Option 2 A2/C2 Notes, 25% Option 2 Equity Package | The Equity Package would be undersubscribed for Class A and oversubscribed for Class C. Option 2 A2/C2 Notes will be reallocated to address the over/under subscription of the respective classes. |
| | | An underutilised adjusted portion of the A2 Package will be allocated to the respective pools of the underlying shares for the A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs and C2 NEV SLNs. |
| 2.3 | 50% Option 1 A1/C1 Notes, 50% Option 2 Equity Package | A 50% equity allocation would exceed the Equity Package allocation and the oversubscription would be transferred to Option 2 A2/C2 Notes. |
| | | The unadmitted portion of the C2 Package will be reallocated to the A2 Package. |

© 2023 Deloitte China.



# Scheme Recovery Analysis scenarios

Election of Option 1 and Option 2 under the CEG Schemes

**Election of Option 1 and Option 2 by CEG Scheme Creditors**

| # | Election (%) | Reallocation for over/under subscription of Equity Package |
|---|---|---|
| 3.1 | 100% Option 2 A2/C2 Notes | The Equity Package would be undersubscribed for both classes and part of Option 2 A2/C2 Notes allocation would be reallocated to the equity instruments under Option 2 on a pro-rata basis. |
| | | An underutilised adjusted portion of the A2 Package will be allocated to the respective pools of the underlying shares for the A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs and C2 NEV SLNs. |
| 3.2 | 50% Option 2 A2/C2 Notes, 50% Option 2 Equity Package | A 50% equity allocation would exceed the Equity Package allocation and the oversubscription would be transferred to Option 2 A2/C2 Notes. |
| | | The unadmitted portion of the C2 Package will be reallocated to the A2 Package. |
| 3.3 | 100% Option 2 Equity Package | A 100% equity allocation would exceed the Equity Package allocation and the oversubscription would be transferred to Option 2 A2/C2 Notes. |
| | | The unadmitted portion of the C2 Package will be reallocated to the A2 Package. |

China Evergrande Group | Scheme Recovery Analysis Report

18



© 2023 Deloitte China.

# Scheme Recovery Analysis scenarios

## Deficiency claims in the Schemes

### Value of the deficiency claims by Class B (SJ) Debts, Class C Debts and Class D (TJ) Debts creditors

Class B (SJ) Debts, Class C Debts and Class D (TJ) Debts are to be admitted to the respective Schemes on a deficiency basis, i.e. accrued claims minus value of Third-Party Rights. In the absence of independent valuation on the Third-Party Rights, to calculate the deficiency amount, the Scheme Recovery Analysis has adopted the estimated recoveries from Third-Party Rights from the Liquidation Analysis (i.e. assuming the Group, including the security providers, put option obligors and guarantors, would be put into liquidation and their assets would be realised under a forced-sale scenario).

We note that the adoption of the Liquidation Analysis assumption in estimating the value of Third-Party Rights may present a conservative case in the Scheme Recovery Analysis. Under the scenario of successfully implementing the Schemes, the deficiency claims under Class C Debts and Class D (TJ) Debts may be lower and an overall improvement in the unsecured recovery under the Schemes could be expected for the following reasons:

- Realisation of the underlying security would be higher under a going concern (i.e., under the Scheme Recovery Analysis) compared to a forced sale environment; and
- The deficiency calculation only took account of security from entities subject to the Liquidation Analysis. Additional recoveries might be available from entities outside of the Liquidation Analysis scope, thereby reducing the deficiency claim.

### Other deficiency claim adjustments for cross-Schemes claims

Existing SJ Noteholders will also participate in the TJ Scheme as a Class D (TJ) Scheme Creditors through the guarantee provided by TJ. The deficiency claim of the Existing SJ Notes in the TJ Scheme is calculated as the accrued claims as at 31 December 2022 minus the estimated recovery from Class B (SJ) Debts in the SJ Scheme. Further, the deficiency claim of the Existing SJ Notes in the SJ Scheme is calculated as the accrued claims as at 31 December 2022 minus the estimated recovery from the TJ Scheme.

The Class C Hero Loan will also participate in the TJ Scheme as a Class D (TJ) Scheme Creditor through the guarantee provided by TJ. This facility will participate on a deficiency basis after subtracting the assumed value of its Third-Party Rights (adopted from the Liquidation Analysis) and their recoveries as a Class C Scheme Creditor.

The Class C Lake Notes and Clear Star Put Option will also participate in the TJ Scheme as a Class D (TJ) Scheme Creditor claiming through the guarantee provided by TJ. These two facilities will participate on a deficiency basis after subtracting the assumed value of its Third-Party Rights and their recoveries as a Class C Scheme Creditor.

© 2023 Deloitte China.



# Scheme Recovery Analysis scenarios

## Class A and C allocations

### Summary of Class A and C Allocations (USD'm)

After taking account of the deficiency adjustments and reallocating claims into different options to ensure the required amount of Equity Package has been met, the final allocations to the respective CEG New Notes or Equity Package under each of the seven scenario has been estimated below.

| # | Scenario | Class A Allocation | | | | Class C Allocation | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | A1 Notes | A2 Notes | A2 Equity | C1 Notes | C2 Notes | C2 Equity | | |
| 1.0 | 100% Option 1 Notes | 11,272 | - | 4,808 | 9,841 | - | 2,798 | | |
| 2.1 | 50% Option 1 Notes, 50% Option 2 Notes | 8,040 | 3,232 | 4,808 | 6,320 | 3,522 | 2,798 | | |
| 2.2 | 50% Option 1 Notes, 25% Option 2 Notes, 25% Option 2 Equity | 8,040 | 3,232 | 4,808 | 6,320 | 3,522 | 2,798 | | |
| 2.3 | 50% Option 1 Notes, 50% Option 2 Equity | 8,040 | 2,693 | 5,347 | 6,320 | 3,522 | 2,798 | | |
| 3.1 | 100% Option 2 Notes | - | 11,272 | 4,808 | - | 9,844 | 2,799 | | |
| 3.2 | 50% Option 2 Notes, 50% Option 2 Equity | - | 10,734 | 5,346 | - | 9,844 | 2,799 | | |
| 3.3 | 100% Option 2 Equity | - | 10,734 | 5,346 | - | 9,844 | 2,799 | | |

Notes
1. Under the scenario where C's do not have any deficiency and A's all elect A2 Notes, the minimum equitization amount would be USD 2,358m



© 2023 Deloitte China.

Summary of scheme recoveries by class          09

Proposed Restructuring          11

Scheme Recovery Analysis scenarios          14

**Calculation methodology**          **21**

Scheme Recovery Analysis assumptions          25

Estimated recoveries          33

Appendices          41

China Evergrande Group | Scheme Recovery Analysis Report



© 2023 Deloitte China.

# Calculation methodology

Discounted Cash Flow

**Scheme recovery calculation**

Scheme Creditors' recoveries are estimated based on the net present value of the cashflows associated with New Notes and/or Equity Package allocated to each respective creditor as part of the Restructuring Consideration. To model the cashflows, the following steps were taken:

1) **Claim amounts determined** – The accrued claim amounts as at 31 December 2022 were used for Class A Debts. The deficiency claim (i.e. accrued claims as at 31 December 2022 minus estimated value of Third-Party Rights) was calculated for Class B (SJ) Debts, Class C Debts and Class D (TI) Debts.

2) **Restructuring Consideration allocated to Scheme Creditors** – The amount of New Notes or Equity Package allocated to the respective classes is calculated according to the terms of Restructuring Proposal. Class A Debts and Class C Debts may be subject to a reallocation between CEG New Notes and Equity Package to address any under or over subscription of Equity Package. The estimated allocations for the seven scenarios in the Scheme Recovery Analysis have been included on page 20 of this Report.

3) **Cash flows calculated** – The cash flows for each tranche of New Notes are calculated separately according to the amount allocated from the previous step and an assumption on when cash interest payments will be made as detailed on page 29 of this report. The exchange of scheme claims into MEBs and MCBs was calculated in accordance with the prices set out in the Restructuring Announcements and an assumption was made on the conversion date and prices as detailed on pages 28, 30 - 32 of this Report. Aggregate cash flows from New Notes and Equity Package were then discounted to calculate a net present value return for each instrument and class.

4) **Recovery calculation** – The net present value of each instrument and class is measured against the claim amounts determined based on point 1 above, to produce an estimated recovery rate for unsecured claims. In addition, the assumed value of Third-Party Rights is added to the scheme recovery amount to calculate a total recovery when measured against the accrued claim as at 31 December 2022. For further detail please refer to pages 34-40 and appendix 1.

China Evergrande Group | Scheme Recovery Analysis Report

22



© 2023 Deloitte China.

## Calculation methodology

Valuation

| | |
|---|---|
| **MEBs and MCBs conversion price valuation methodology** | To estimate a conversion price for converting the respective MEBs and MCBs into equity of CEG/ EVPS/ NEV (the "Issuers"), the Guideline Companies Method under a market approach was adopted.<br><br>An Enterprises Value ("EV") multiple was applied based on sales/ EBITDA given the Issuers were loss making in the past year.<br><br>Financial metrics of comparable companies were used to understand how the Issuers were performing relative to their peers, thereby benchmarking their market position in order to select an appropriate market multiple. A valuation date of 31 December 2022 ("VDate") was set.<br><br>To estimate a conversion price, the following methodology was followed:<br>1) The closing prices of the respective Issuers as at 18 March 2022 (i.e. last trading day) ("Day 1") were taken as the starting point of the valuation analysis. Based on our proposed valuation framework, we first back tested the model to ensure our proposed valuation framework could reconcile to the market capitalisation of respective Issuers as at Day 1 (which allowed us to consider the appropriateness of our approach and valuation parameters).<br>2) Then, we compared the market positioning of each respective Issuer on Day 1 relative to its peer - whether historically it had been trading below or above its peers and where it should be as at the VDate given its performance comparing to its peers.<br>3) Taking into account the performance (i.e. revenue growth, margin growth, changes in assets value) of each respective Issuer during the recent financial year and comparing that to its market peers (i.e. benchmarking analysis), we considered whether any change regarding the market positioning of the respective Issuer relative to peers was needed. Then, an appropriate multiple was selected and an EV of the respective Issuer as at VDate was derived. |



© 2023 Deloitte China.

# Calculation
# methodology
## Valuation

**MEBs and MCBs conversion price valuation methodology (cont'd)**

4) Based on the value derived in point 3 and regarding the value changes between Day 1 and VDate, such movements were also cross checked with the change in market capitalisation of comparable companies between Day 1 and VDate to further assess the reasonableness of the concluded results.

5) EV of each respective Issuer was adjusted for cash, debts, non-operating assets, non-operating liabilities, minority interests in arriving at the equity value of each respective Issuer.

6) Conversion price was then calculated by dividing the equity value of each respective Issuer with the corresponding enlarged share capital.

As the market capitalisation of CEG includes EVPS and NEV and the main business under CEG is property development, in order to derive an appropriate value for the property development segment of CEG as at Day 1 and value of CEG as a whole as at the VDate, a sum-of-parts analysis was performed (as standalone value of EVPS and NEV were concluded).

We note that the conversion of MEBs and MCBs may only happen in year 2 and 5. In theory, a future unit price of a company (not fair value) can be calculated with the assistance of financial forecasts and a supporting business plan. In the absence of such information, it is assumed that the unit value of the respective Issuers at conversion timing (i.e. year 2 or 5) will remain the same as that as of VDate, with the assumption that the capitalisation of the loans due by NEV to CEG and issuance of new shares (see page 32) were completed as of VDate.

We note that the financial information received from public announcements and that from Management have significant differences in the balance and classification of the items. No reconciliation was available at the time of the analysis. As such, our analysis was primarily performed based on public announcements of EVPS, NEV and CEG.

Further, the equity value of the respective Issuers might be subject to discount due to a lack of marketability as they remained suspended as at the VDate, as compared to other trading listed companies referenced in the valuation.

© 2023 Deloitte China.

25

China Evergrande Group | Scheme Recovery Analysis Report

Summary of scheme recoveries by class — 09

Proposed Restructuring — 11

Scheme Recovery Analysis scenarios — 14

Calculation methodology — 21

**Scheme Recovery Analysis assumptions** — **25**

Estimated recoveries — 33

Appendices — 41



© 2023 Deloitte China.

# Scheme Recovery Analysis assumptions

| | |
|---|---|
| **Discount Rate** | 25.5% is used to discount cash flows in the Scheme Recovery Analysis under the assumption that CEG, SJ and Tianji will fully honor the payment obligations as rescheduled during the tenor. |

Relevant cash flows include:

- Principal payments upon maturity of the respective instruments;
- Proceeds from disposal of equity; and
- Cash payment of interest.

The discount rate for an instrument is typically assessed by making reference to the risk-free market rate and adjusting for the risks of the instrument which could in turn be affected by the overall industry environment, its marketability, the projections regarding cash flows (e.g. timing and amount of repayment), risks of the issuer in terms of its performance and leverage as compared to the industry.

Based on the assumptions that the Schemes would come into effect on 31 December 2022 and CEG would continue as a going concern and be able to meet the repayment obligations under the Proposed Restructuring, reference was made to CEG's bond yields before the crisis (i.e. assuming a return to normal operations upon implementation of the Schemes) in assessing the discount rate. It was noted that CEG's commercial bills were first overdue in November 2020. After rumors of financial difficulties surfaced in the summer of 2021, CEG first announced such overdue events on 7 June 2021 and the relevant bond prices plummeted.

Based on the above, a yield between 20% to 21% ("Range") was derived after making reference to the average spread (over the risk free rate) of the USD bonds issued by CEG in the first quarter of 2021 (i.e. the last quarter before the announcement of defaults) and adjusting for the movements in risk-free rate and credit spread from the first quarter of 2021 to December 2022.

Due to limitation of data, no further comment could be made regarding the yield differential between unsecured bonds and secured bonds with real assets as collateral.

© 2023 Deloitte China.



# Scheme Recovery
## Analysis assumptions

**Discount Rate (Cont.)**

Compared to the mid-point of the Range, the discount rate of 25.5% would indicate an additional premium of 5 percentage points ("Additional Premium").

An Additional Premium may be demanded by investors for instruments to be issued by CEG/ SJ/ Tianji, even upon the Schemes becoming effective, after considering factors including but not limited to:

- The PRC real estate industry has undergone a drastic change and the industry outlook remains uncertain.
- The latest published financial information of the Group indicated a notable increase in liabilities and a substantial net liabilities position.
- The Group (including onshore operations) is undergoing restructuring.

However, it is worth noting that:-

- The level of Additional Premium to be applied in this case is very subjective in nature;
- Given the scale of the real estate crisis in China is unprecedented, there is no readily available reference to use in assess the appropriate discount rate;
- Some of the other real estate developers in China are currently undergoing debt restructurings, which are at various stages of implementation, and none of which have been completed. The yield to maturity ("YTM") observed on comparable issuers' bonds varies widely. The appropriateness of direct reference to comparable issuers' data is matter to be carefully considered; and
- Existing YTM primarily reflect bond yields based on the bonds' existing terms (including but not limited to tenor, etc). In theory, with longer maturities (such as in the Proposed Restructuring which has tenors of up to 12 years), and with all else being the same (i.e. coupon rate, overall bond price, etc.), the implied YTM for the extended maturity instruments would normally be lower than the current YTM.

A discount rate of 25.5% (with an implied 5 percentage points Additional Premium over the mid-point of the Range) may not be considered unreasonable, to reflect CEG's unique circumstances and varying expectations of different creditors regarding the Additional Premium (which depend on the respective creditor's individual specific circumstances).

The above discount rate analysis is based on the material assumption that CEG will fully meet its debt servicing and maturity obligations, and an assessment of the appropriateness of this assumption is outside the scope of our analysis.

China Evergrande Group | Scheme Recovery Analysis Report    27

© 2023 Deloitte China.



# Scheme Recovery Analysis assumptions

| | |
|---|---|
| **Exchange rates** | USD/HKD 7.8016, USD/RMB 6.8986 and RMB/HKD 1.0805. |
| | The existing debt instruments are denominated in USD, HKD and RMB. To convert into USD claim amounts, the Scheme Recovery Analysis uses the above exchange rate assumptions. |
| | The USD/HKD is also used in the Scheme Recovery Analysis to calculate the number of shares available to recipients of the MEBs and MCBs by converting the HKD conversion price into a USD price. |
| | The RMB/HKD is used to convert the calculated equity value of CEG, NEV and EVPS into a HKD conversion price. |
| **Redemptions for SLNs and TJ/SJ New Notes** | No disposals are assumed for the collateral pledged to the SLNs or TJ New Notes. |
| | The Issuer shall purchase or redeem the SLNs or TJ New Notes upon disposal of their respective collateral under the Proposed Restructuring terms. |
| | In the Scheme Recovery Analysis, we have assumed there are no disposals and therefore no redemptions are modelled into the recovery calculations. |
| **Equity conversion dates** | No exchanges or conversions for the MEBs and MCBs until the mandatory exchange and conversion dates. |
| | Holders of the respective MEBs and MCBs can elect during any calendar month to exchange or convert up to one-third (1/3) of the aggregate principal amount of the instrument that were originally issued. |
| | In the Scheme Recovery Analysis, it is assumed that holders of the instruments will not convert their instruments until the mandatory dates of 2 years for the EVPS MEBs and NEV MEBs and 5 years for the CEG MCBs. |

China Evergrande Group | Scheme Recovery Analysis Report

28



© 2023 Deloitte China.

# Scheme Recovery Analysis assumptions

| | |
|---|---|
| **Cash payment election – CEG Schemes – Option 1 A1/C1 Notes** | Cash payment of interest commences in year 9. <br><br> CEG can elect to PIK interest at 1.00% higher than the cash interest rate for the entirety of the A1/C1 Notes. <br><br> In the Scheme Recovery Analysis, we have assumed that CEG will elect to PIK interest for the first 8 years and cash payments will commence in year 9 and continue until the maturity of the notes. We note that the final maturity for A2/C2 Notes is in year 9 and we consider it is reasonable to assume CEG may elect to pay cash interest on A1/C1 Notes from year 9 onwards. |
| **Cash payment election – CEG Schemes – Option 2 SLN, A2/C2 Notes** | Cash payment of interest partially commences in year 3 with full payment commencing from year 5 onwards. <br><br> CEG can elect PIK interest for the first 4 years, with a minimum level of cash paid in year 3 and 4. <br><br> In the Scheme Recovery Analysis, we have assumed the issuer will elect to PIK interest until year 4 and pay the minimum required amount of 0.50% from the 31st month to the 36th month and 3.00% in year 4. |
| **Cash payment election – SJ/TJ Scheme – SJ New Notes and TJ New Notes** | Cash payment of interest partially commences in year 3 with full payment commencing from year 5 onwards. <br><br> SJ/Tianji can elect PIK interest for the first 4 years, with a minimum level of cash paid in year 3 and 4. <br><br> In the Scheme Recovery Analysis, we have assumed the issuer will elect to PIK interest until year 4 and pay the minimum required amount of 0.70% from the 31st month to the 36th month and 3.00% in year 4. |

China Evergrande Group | Scheme Recovery Analysis Report



© 2023 Deloitte China.

# Scheme Recovery
## Analysis assumptions

**EVPS MEBs conversion price**

<u>Equity is converted at a price of RMB1.54 per share at the conversion date.</u>

As at VDate, an EV/EBITDA of 8.0x was adopted (mean of the market range, consistent with that implied from Day 1 calibration). An EV was estimated based on the EBITDA provided. The EV was then adjusted for debt, cash, minority interest, non-operating assets and non-operating liabilities in arriving at the estimated equity value of RMB 16,666 million. Market capitalization would drop 17.6% from Day 1 to Vdate, which fell between the lower quartile to median of the market range. The number of outstanding shares would remain unchanged between Day 1 and VDate, as such, price per share was estimated to be RMB1.54.

**NEV MEBs conversion price**

<u>Equity is converted at a price of RMB0.69 per share at the conversion date.</u>

As at VDate, EV/Sales of 1.9x was adopted (mean of the market range). An EV was estimated based on the sales provided. The EV was then adjusted for debt (adjusted for the capitalization of loans due by NEV to CEG), cash, minority interest, non-operating assets and non-operating liabilities in deriving at the estimated equity value. The number of outstanding shares as at the VDate would increase due to the capitalization of loans due by NEV to CEG of US$2,704 million (debt would decrease with new shares issued), as such, price per share was estimated to be RMB0.69.

© 2023 Deloitte China.



# Scheme Recovery
## Analysis assumptions

| | |
|---|---|
| **CEG MCBs conversion price** | No value is ascribed to equity at the conversion date. |
| | CEG's market capitalization would consist of (i) the equity value of the property development segment of CEG; (ii) the equity value of the healthcare segment to be transferred from NEV to CEG; and (iii) CEG's holdings in EVPS and NEV after considering the impacts of the capitalisation of loans due from NEV to CEG and the conversion of MCBs and MEBs. |
| | The implied market capitalisation of the property development segment of CEG at Day 1 was obtained after deducting the respective share of market capitalisation of NEV and EVPS from CEG's market capitalisation. We note that, historically, the property development segment had a negative market capitalisation. |
| | Similarly, the financial information of property development segment were extracted by deducting those of EVPS and NEV (with certain assumptions made given no full set of 2022 balance sheet was available) from CEG's financial information. |
| | As at VDate, EV of each of the property development segment and the healthcare segment was estimated based on EV/Sales multiple of 1.8x (average of median and low quartile of the market range) and 0.1x (minimum of market range) respectively. The EVs were then adjusted for debts, cash, minority interests, non-operating assets and non-operating liabilities in order to deriving the respective equity values of the two segments. |
| | Adding the value of CEG's holdings in EVPS and NEV (after considering the impacts of the capitalization of loans due from NEV to CEG and the conversion of MCBs and MEBs), equity value of CEG would remain negative, primarily due to the significant debt balance. |

© 2023 Deloitte China.



# Scheme Recovery
## Analysis assumptions

| | |
|---|---|
| **Adjustments to FY22 Accounts** | In calculating the estimated conversion price for the MEBs and MCBs, consideration was given to significant announcements after the valuation date and the following adjustments were made:<br><br>• CEG – Issuance and conversion of EVPS MEBs, NEV MEBs and CEG MCBs were considered, as such, CEG's debts would be reduced by RMB29,546 million; 5,632 million CEG new shares would be issued, 2,332 million EVPS shares and 6,357 million NEV shares held by CEG would be given to CEG's creditors such that CEG holdings of EVPS and NEV would decrease to 30%.<br><br>• NEV – (1) Loans with CEG amounting to approximately US$2,704 million (including accrued interest up to 1 October 2023) would be converted into new shares in NEV; (2) Healthcare segment would be excluded due to the proposed disposal to CEG and 3) construction in progress was considered as a non-operating asset as we understand the financial metrics used in determining the EV cannot properly reflect such value.<br><br>• EVPS – Additional consideration/adjustment in the analysis: significant one-off impairment loss in financial assets incurred in 2022 was normalised to analyse EVPS performance vs comparable companies. |

© 2023 Deloitte China.

China Evergrande Group | Scheme Recovery Analysis Report

Summary of scheme recoveries by class   09

Proposed Restructuring   11

Scheme Recovery Analysis scenarios   14

Calculation methodology   21

Scheme Recovery Analysis assumptions   25

**Estimated recoveries**   **33**

Appendices   41

© 2023 Deloitte China.



# Estimated recoveries

## Scheme recovery range

### Scheme Recovery Range Estimates

Class A and C Scheme Creditors may elect to receive (i) A1/C1 Notes; (ii) A2/C2 Notes or A2/C2 Package or a combination of both. We have assessed recovery by discounting the cash flow from each of the respective options. As each option offers different instruments, with different returns and maturities, the estimated recoveries for Class A Debts and Class C Debts vary according to the creditors' option selection.

The minimum and maximum scheme recoveries have been calculated by discounting the cash flows for each creditor class under the seven scenarios as illustrated below. The recoveries in the table below are calculated as the discounted cash flow value of the Restructuring Consideration divided by the accrued claim for Class A or deficiency claim for Classes B, C and D.

| # Scenario | Class A | Class B | Class C | Class D |
|---|---|---|---|---|
| 1.0 100% Option 1 Notes | 17.7% | 39.9% | 14.9% | 3.1% |
| 2.1 50% Option 1 Notes, 50% Option 2 Notes | 22.5% | 39.9% | 20.1% | 3.1% |
| 2.2 50% Option 1 Notes, 25% Option 2 Notes, 25% Option 2 Equity | 22.5% | 39.9% | 20.1% | 3.1% |
| 2.3 50% Option 1 Notes, 50% Option 2 Equity | 21.7% | 39.9% | 20.1% | 3.1% |
| 3.1 100% Option 2 Notes | 32.5% | 39.9% | 28.9% | 3.1% |
| 3.2 50% Option 2 Notes, 50% Option 2 Equity | 31.8% | 39.9% | 28.9% | 3.1% |
| 3.3 100% Option 2 Equity | 31.8% | 39.9% | 28.9% | 3.1% |

### Selection of a Base Case scenario

For the purposes of demonstrating estimated recovery for each class and providing a comparison to recoveries under the Liquidation Analysis, we have selected scenario 2.2 as the base case scenario.

Under Scenario 2.2, 50% of CEG Scheme Creditors elect Option 1 Notes, 25% in Option 2 Notes and 25% in Option 2 Equity Package. The estimated recoveries for Class A Debts and Class C Debts under scenario 2.2 represent the mid-range of the above seven scenarios.

| | Class A | Class B | Class C | Class D |
|---|---|---|---|---|
| 3.1 Max | 32.5% | 39.9% | 28.9% | 3.1% |
| 2.2 Base case | 22.5% | 39.9% | 20.1% | 3.1% |
| 1.0 Min | 17.7% | 39.9% | 14.9% | 3.1% |

China Evergrande Group | Scheme Recovery Analysis Report

© 2023 Deloitte China.



# Estimated recoveries

## Recovery tables

### Scheme Recovery Range Estimates

The estimated recoveries to creditors from the Schemes and creditors' total recovery have been calculated for each class of creditors by reference to the accrued claim or deficiency claim. Consideration has also been given to the Third-Party Rights to calculate the total recovery for each respective claimant and the creditor's unsecured recovery under a liquidation scenario.

**Scheme Recovery**

Accrued Claim - The sum of the outstanding principal amount of the relevant debt instrument and accrued and unpaid interest on such debt instrument as at 31 December 2022.

Third-Party Rights - The estimated value based on the Liquidation Analysis of any related rights including any underlying security, guarantees or keepwell, except when pursuant to the Schemes (from the perspective of the scheme companies) is being released under the Schemes.

Deficiency Claim – The Accrued Claim minus the assumed value from the Liquidation Analysis of Third-Party Rights valid under the scheme and cross scheme recovery where applicable.

Recovery is illustrated first in the amount of USD distributed to each claimant under column D, followed by the % recovery from the deficiency claim if applicable in column E and the % recovery on a full claim or accrued claim basis in column F. Contribution of Third-Party Rights to recovery by % is then illustrated in column G, and total recovery in USD and % calculated on a full claim basis in columns H and I respectively.

**Liquidation Recovery**

Liquidation recovery and Third-Party Rights values have been extracted from the Liquidation Analysis for illustration purposes.

Note: Unsecured recovery is measured on a full claim or accrued claim basis. Some claimants will claim on a deficiency basis. As a result, unsecured recovery may differ within the same class.

China Evergrande Group | Scheme Recovery Analysis Report

35

© 2023 Deloitte China.



# Estimated recoveries

## CEG Scheme – Class A Creditors

**Class A Recovery Estimate under Base Case (USD'm)**

| # | Facility/Instrument | Accrued Claim | Scheme Recovery | | | | | | | | Liquidation Recovery | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Third-Party Rights | Deficiency Claim¹ | Unsecured Recovery | Deficiency | Accrued Deficiency | Third-Party Rights | Total Recovery | | Unsecured Recovery | | Third-Party Rights | Total Recovery | |
| | | A | B | C=A-B | D | E=D/C | F=D/A | G=B/A | H=B+D | I=H/A | J | K=J/A | L | M=J+L | N=M/A |
| 1 | CEG Existing March 2022 Notes | 2,234 | - | - | 502.7 | - | 22.5% | - | 502.7 | 22.5% | 50.8 | 2.3% | 24.2 | 75.0 | 3.4% |
| 2 | CEG Existing April 2022 Notes | 1,618 | - | - | 364.1 | - | 22.5% | - | 364.1 | 22.5% | 36.8 | 2.3% | 17.5 | 54.3 | 3.4% |
| 3 | CEG Existing January 2023 Notes | 1,164 | - | - | 262.0 | - | 22.5% | - | 262.0 | 22.5% | 26.5 | 2.3% | 12.6 | 39.1 | 3.4% |
| 4 | CEG Existing February 2023 Bonds | 11 | - | - | 2.5 | - | 22.5% | - | 2.5 | 22.5% | 0.2 | 2.3% | 0.1 | 0.4 | 3.4% |
| 5 | CEG Existing April 2023 Notes | 936 | - | - | 210.6 | - | 22.5% | - | 210.6 | 22.5% | 21.3 | 2.3% | 10.1 | 31.4 | 3.4% |
| 6 | CEG Existing June 2023 Notes | 1,482 | - | - | 333.5 | - | 22.5% | - | 333.5 | 22.5% | 33.7 | 2.3% | 16.0 | 49.7 | 3.4% |
| 7 | CEG Existing January 2024 Notes | 1,167 | - | - | 262.6 | - | 22.5% | - | 262.6 | 22.5% | 26.5 | 2.3% | 12.6 | 39.2 | 3.4% |
| 8 | CEG Existing March 2024 Notes | 1,064 | - | - | 239.5 | - | 22.5% | - | 239.5 | 22.5% | 24.2 | 2.3% | 11.5 | 35.7 | 3.4% |
| 9 | CEG Existing April 2024 Notes | 779 | - | - | 175.4 | - | 22.5% | - | 175.4 | 22.5% | 17.7 | 2.3% | 8.4 | 26.2 | 3.4% |
| 10 | CEG Existing June 2025 Notes | 5,263 | - | - | 1,184.0 | - | 22.5% | - | 1,184.0 | 22.5% | 119.7 | 2.3% | 56.9 | 176.6 | 3.4% |
| 11 | CEG Existing January 2022 Notes | 348 | - | - | 78.2 | - | 22.5% | - | 78.2 | 22.5% | 7.9 | 2.3% | 3.8 | 11.7 | 3.4% |
| 12 | Class A Private Loan | 13 | - | - | 2.8 | - | 22.5% | - | 2.8 | 22.5% | 0.3 | 2.3% | 0.1 | 0.4 | 3.4% |
| | **Total** | **16,080** | **-** | **-** | **3,618** | **-** | **22.5%** | **-** | **3,618** | **22.5%** | **366** | **2.3%** | **174** | **540** | **3.4%** |

*Notes*

1. As Class A Debts will be admitted on an accrued basis, the deficiency claim column C is not populated.
2. All figures shown in the table above are subject to rounding.



© 2023 Deloitte China.

# Estimated recoveries

## CEG Scheme – Class C Creditors

### Class C Recovery Estimate under Base Case (USD'm)

| # | Facility/Instrument | Accrued Claim A | Third-Party Rights B | Deficiency Claim C=A-B | Unsecured Recovery D | Deficiency E=D/C | Accrued Deficiency F=D/A | Third-Party Rights G=B/A | Total Recovery H=B+D | Total Recovery[1] I=H/A | Unsecured Recovery[2] J | K=J/A | Third-Party Rights L | Total Recovery M=J+L | N=M/A |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **Scheme Recovery** | | | | | | **Liquidation Recovery** | | | |
| 13 | Lake Notes[1] | 294 | 19.8 | 275 | 55.3 | 20.1% | 18.8% | 6.8% | 75.2 | 25.5% | 6.6 | 2.3% | 19.6 | 26.2 | 8.9% |
| 14 | Dongpo Notes | 441 | 1.2 | 440 | 88.6 | 20.1% | 20.1% | 0.3% | 89.7 | 20.4% | 9.9 | 2.3% | 1.2 | 11.1 | 2.5% |
| 15 | Dongpo Put Option | 144 | 2.2 | 141 | 28.5 | 20.1% | 19.8% | 1.5% | 30.7 | 21.4% | 3.2 | 2.2% | 2.2 | 5.4 | 3.x% |
| 16 | Graceful Court Put Option | 120 | 1.9 | 119 | 23.9 | 20.1% | 19.8% | 1.5% | 25.8 | 21.4% | 2.7 | 2.2% | 1.9 | 4.5 | 3.x% |
| 17 | New Chic Margin Loan | 20 | 5.2 | 15 | 2.9 | 20.1% | 14.9% | 26.2% | 8.2 | 41.1% | 0.4 | 2.3% | 5.2 | 5.6 | 28.x% |
| 18 | Clear Star Put Option[1] | 74 | 1.8 | 72 | 14.5 | 20.1% | 19.6% | 2.5% | 16.3 | 22.2% | 1.7 | 2.3% | 1.7 | 3.4 | 4.x% |
| 19 | CEG Loan 1 | 210 | - | 210 | 42.2 | 20.1% | 20.1% | - | 42.2 | 20.1% | 4.7 | 2.3% | - | 4.7 | 2.x% |
| 20 | CEG Loan 2 | 105 | - | 105 | 21.1 | 20.1% | 20.1% | - | 21.1 | 20.1% | 2.4 | 2.3% | - | 2.4 | 2.x% |
| 21 | Venice Loan | 25 | 14.7 | 10 | 2.1 | 20.1% | 8.3% | 59.0% | 16.7 | 67.3% | 0.6 | 2.3% | 14.7 | 15.2 | 61.3% |
| 22 | Venice SPA | 571 | 337.2 | 234 | 47.2 | 20.1% | 8.3% | 59.0% | 384.4 | 67.3% | 12.9 | 2.3% | 337.2 | 350.1 | 61.3% |

Notes

1. Third-Party Rights column B for the Lake Notes, Clear Star Put Option and Hero Loan claims include recoveries from TJ Scheme.

2. Under the liquidation scenario, put option obligations of CEG would be admitted on a deficiency basis. CEG's guarantee of PRC liabilities would be admitted on a full claim, but subject to the maximum limit of CEG's obligation under respective guarantees. As column K measures unsecured recovery on a full claim or accrued basis, therefore the recovery rates for the put options and CEG's guarantee of PRC liabilities shown in column K will differ from the recovery rate of other claimants.

3. All figures shown in the table above are subject to rounding.

© 2023 Deloitte China.

China Evergrande Group | Scheme Recovery Analysis Report



# Estimated recoveries

## CEG Scheme – Class C Creditors (cont.)

### Class C Recovery Estimate under Base Case (USD'm)

| # | Facility/Instrument | Accrued Claim | Scheme Recovery | | | | | | | | Liquidation Recovery | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Third-Party Rights | Deficiency Claim | Unsecured Recovery | Deficiency Recovery | Accrued Deficiency | Third-Party Rights | Total Recovery | | Unsecured Recovery[2] | | Third-Party Rights | Total Recovery | |
| | | A | B | C=A-B | D | E=D/C | F=D/A | G=B/A | H=B+D | I=H/A | J | K=J/A | L | M=J+L | N=M/A |
| 23 | Hero Loan[1] | 994 | 501.5 | 492 | 99.2 | 20.1% | 10.0% | 50.5% | 600.7 | 60.4% | 22.4 | 2.3% | 511.1 | 533.5 | 53.7% |
| 24 | FCB Put Option | 712 | 150.0 | 562 | 113.2 | 20.1% | 15.9% | 21.1% | 263.2 | 37.0% | 16.0 | 2.3% | 150.0 | 166.1 | 23.3% |
| 25 | RMB Bond Put Option | 1,311 | 57.0 | 1,255 | 252.7 | 20.1% | 19.3% | 4.3% | 309.7 | 23.6% | 28.3 | 2.2% | 57.0 | 85.2 | 6.5% |
| 26 | CEG Guarantees of PRC Liabilities | 9,221 | 1,341.1 | 7,880 | 1,587.4 | 20.1% | 17.2% | 14.5% | 2,928.6 | 31.8% | 199.5 | 2.2% | 1,341.1 | 1,540.6 | 16.7% |
| 27 | Kailong Arbitration Award | 834 | - | 834 | 167.9 | 20.1% | 20.1% | - | 167.9 | 20.1% | 18.8 | 2.3% | - | 18.8 | 2.3% |
| 28 | On-Lent Loan | 0 | - | 0 | 0.0 | 20.1% | 20.1% | - | 0.0 | 20.1% | - | - | - | - | - |
| | Total | 15,075 | 2,434 | 12,641 | 2,547 | 20.1% | 16.9% | 16.1% | 4,980 | 33.0% | 330 | 2.2% | 2,443 | 2,764 | 18.4% |

Notes

1. Third-Party Rights column B for the Lake Notes, Clear Star Put Option and Hero Loan claims include recoveries from TJ Scheme.

2. Under the liquidation scenario, put option obligations of CEG would be admitted on a deficiency basis. CEG's guarantee of PRC liabilities would be admitted on a full claim, but subject to the maximum limit of CEG's obligation under respective guarantees. As column K measures unsecured recovery on a full claim or accrued basis, therefore the recovery rates for the put options and CEG's guarantee of PRC liabilities shown in column K will differ from the recovery rate of other claimants.

3. USD'm are used in the above table, claims or recoveries that are less than USD1m may be illustrated by 0. The use of "-" will be present to illustrate no monetary amount.

4. All figures shown in the table above are subject to rounding.

© 2023 Deloitte China.

China Evergrande Group | Scheme Recovery Analysis Report

38



# Estimated recoveries

SJ Scheme – Class B Creditors

Class B Recovery Estimate under Base Case (USD'm)

| # | Facility/Instrument | Accrued Claim | Third-Party Rights | Deficiency Claim | Scheme Recovery | | | | | | Liquidation Recovery | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Unsecured Recovery | Accrued | Third-Party Rights | Total Recovery[1] | | | Unsecured Recovery | | Third-Party Rights | Total Recovery | |
| | | A | B | C=A-B | D | F=D/A | G=B/A | H=B+D | I=H/A | | J | K=J/A | L | M=J+L | N=M/A |
| 29 | SJ Existing October 2022 Notes | 2,330 | 44.1 | 2,286 | 929.2 | 39.9% | 1.89% | 973.4 | 41.8% | | 37.7 | 1.6% | 351.6 | 389.3 | 16.7% |
| 30 | SJ Existing November 2022 Notes | 782 | 14.8 | 768 | 312.1 | 39.9% | 1.89% | 326.9 | 41.8% | | 12.7 | 1.6% | 118.1 | 130.7 | 16.7% |
| 31 | SJ Existing October 2023 Notes | 2,338 | 44.3 | 2,294 | 932.6 | 39.9% | 1.89% | 976.9 | 41.8% | | 37.9 | 1.6% | 352.9 | 390.8 | 16.7% |
| 32 | SJ Existing November 2023 Notes | 723 | 13.7 | 709 | 288.3 | 39.9% | 1.89% | 302.0 | 41.8% | | 11.7 | 1.6% | 109.1 | 120.8 | 16.7% |
| | Total | 6,173 | 117 | 6,056 | 2,462 | 39.9% | 1.89% | 2,579 | 41.8% | | 100 | 1.6% | 932 | 1,032 | 16.7% |

Notes
1.  Third-Party Rights column B for the SJ Existing Notes claims include from recoveries from TJ Scheme.
2.  All figures shown in the table above are subject to rounding.




China Evergrande Group | Scheme Recovery Analysis Report

© 2023 Deloitte China.

# Estimated recoveries

## TJ Scheme – Class D Creditors

**Class D Recovery Estimate under Base Case (USD'm)**

| # | Facility/Instrument | Accrued Claim | Third-Party Rights | Deficiency Claim | Unsecured Recovery | Deficiency Recovery | Accrued | Third-Party Rights | Total Recovery[1,2] | | Unsecured Recovery[3] | | Third-Party Rights | Total Recovery | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | **Liquidation Recovery** | | | | |
| | | A | B | C=A-B | D | E=D/C | F=D/A | G=B/A | H=B+D | I=H/A | J | K=J/A | L | M=J+L | N=M/A |
| 33 | SJ Existing October 2022 Notes | 2,330 | 929.2 | 1,401 | 44.1 | 3.1% | 1.9% | 39.9% | 973.4 | 41.8% | 53.6 | 2.3% | 335.5 | 389.1 | 16.7% |
| 34 | SJ Existing November 2022 Notes | 782 | 312.1 | 470 | 14.8 | 3.1% | 1.9% | 39.9% | 326.9 | 41.8% | 18.0 | 2.3% | 112.7 | 130.7 | 16.7% |
| 35 | SJ Existing October 2023 Notes | 2,338 | 932.6 | 1,406 | 44.3 | 3.1% | 1.9% | 39.9% | 976.9 | 41.8% | 53.8 | 2.3% | 336.7 | 390.5 | 16.7% |
| 36 | SJ Existing November 2023 Notes | 723 | 288.3 | 435 | 13.7 | 3.1% | 1.9% | 39.9% | 302.0 | 41.8% | 16.6 | 2.3% | 104.1 | 120.7 | 16.7% |
| 37 | Lake Notes | 294 | 68.1 | 226 | 7.1 | 3.1% | 2.4% | 23.1% | 75.2 | 25.5% | 6.8 | 2.3% | 19.4 | 26.2 | 8.9% |
| 38 | Clear Star Put Option | 74 | 14.5 | 59 | 1.9 | 3.1% | 2.5% | 19.6% | 16.3 | 22.2% | 1.7 | 2.3% | 1.7 | 3.4 | 4.6% |
| 39 | Castle Share Put Option | 310 | 1.5 | 309 | 9.7 | 3.1% | 3.1% | 0.5% | 11.2 | 3.6% | 7.1 | 2.3% | 1.5 | 8.6 | 2.8% |
| 40 | Castle Loan Put Option | 0 | - | 0 | 0.0 | 3.1% | 3.1% | - | 0.0 | 3.1% | 0.0 | 0.0% | - | - | - |
| 41 | Hero Loan | 994 | 587.9 | 406 | 12.8 | 3.1% | 1.3% | 59.2% | 600.7 | 60.4% | 22.9 | 2.3% | 510.5 | 533.4 | 53.7% |
| 42 | Tuen Mun Put Options | 224 | 113.9 | 111 | 3.5 | 3.1% | 1.6% | 50.8% | 117.4 | 52.3% | 2.5 | 1.1% | 113.9 | 116.5 | 51.9% |
| 43 | CEG-Tianji Intercompany Balance | 5,035 | - | 5,035 | 158.6 | 3.1% | 3.1% | - | 158.6 | 3.1% | 115.8 | 2.3% | - | 115.8 | 2.3% |
| | **Total** | **13,105** | **3,248** | **9,857** | **310** | **3.1%** | **2.4%** | **24.8%** | **3,559** | **27.2%** | **299** | **2.3%** | **1,536** | **1,835** | **14.0%** |

### Notes

1. Total scheme recovery for the SJ Existing Notes include recoveries from SJ Scheme.
2. Third-Party Rights column B for Lake Notes, Clear Star Put Option and Hero Loan claims include recoveries from CEG Schemes.
3. Under the liquidation scenario, put option obligations of CEG would be admitted on a deficiency basis. As column K measures unsecured recovery on a full claim or accrued basis, therefore the recovery rates for the put options and CEG's guarantee of PRC liabilities shown in column K will differ from the recovery rate of other claimants.
4. USD'm are used in the above table, claims or recoveries that are less than USD1m may be illustrated by 0. The use of "-" will be present to illustrate no monetary amount.
5. All figures shown in the table above are subject to rounding.

China Evergrande Group | Scheme Recovery Analysis Report

Summary of scheme recoveries by class    09

Proposed Restructuring    11

Scheme Recovery Analysis scenarios    14

Calculation methodology    21

Scheme Recovery Analysis assumptions    25

Estimated recoveries    33

**Appendices**    **41**

© 2023 Deloitte China.



# Appendix 1

Sources of Recovery - CEG Scheme – Class A Creditors

## Class A Sources of Recovery under Base Case (USD'm)

| # | Facility/Instrument | Accrued Claim | Third-Party Rights | Estimated Recoveries | | | | | | Total Recovery |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | A1 Notes | A2 Notes | MEBs / MCBs | EVPS SLNs | NEV SLNs | TJ intercom | |
| 1 | CEG Existing March 2022 Notes | 2,234 | - | 129 | 162 | 63 | 62 | 75 | 12 | 503 |
| 2 | CEG Existing April 2022 Notes | 1,618 | - | 93 | 117 | 45 | 45 | 54 | 9 | 364 |
| 3 | CEG Existing January 2023 Notes | 1,164 | - | 67 | 84 | 33 | 32 | 39 | 6 | 262 |
| 4 | CEG Existing February 2023 Bonds | 11 | - | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| 5 | CEG Existing April 2023 Notes | 936 | - | 54 | 68 | 26 | 26 | 31 | 5 | 211 |
| 6 | CEG Existing June 2023 Notes | 1,482 | - | 85 | 108 | 42 | 41 | 50 | 8 | 333 |
| 7 | CEG Existing January 2024 Notes | 1,167 | - | 67 | 85 | 33 | 32 | 39 | 6 | 263 |
| 8 | CEG Existing March 2024 Notes | 1,064 | - | 61 | 77 | 30 | 29 | 36 | 6 | 239 |
| 9 | CEG Existing April 2024 Notes | 779 | - | 45 | 57 | 22 | 22 | 26 | 4 | 175 |
| 10 | CEG Existing June 2025 Notes | 5,263 | - | 303 | 382 | 148 | 145 | 177 | 29 | 1,184 |
| 11 | CEG Existing January 2022 Notes | 348 | - | 20 | 25 | 10 | 10 | 12 | 2 | 78 |
| 12 | Class A Private Loan | 13 | - | 1 | 1 | 0 | 0 | 0 | 0 | 3 |
| | **Total** | **16,080** | - | **927** | **1,167** | **452** | **444** | **541** | **89** | **3,618** |

*Notes*
1. *All figures shown in the table above are subject to rounding.*
2. *Claims or recoveries that are less than USD1m may be illustrated by 0. The use of "-" will be present to illustrate no monetary amount.*

© 2023 Deloitte China.

China Evergrande Group | Scheme Recovery Analysis Report



# Appendix 1

## Sources of Recovery - CEG Scheme – Class C Creditors

**Class C Sources of Recovery under Base Case (USD'm)**

| # Facility/Instrument | Accrued Claim | Estimated Recoveries | | | | | | | Total Recovery |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Third-Party Rights | C1 Notes | C2 Notes | MEBs / MCBs | EVPS SLNs | NEV SLNs | TJ Intercom | |
| 13 Lake Notes | 294 | 20 | 16 | 24 | 4 | 2 | 8 | 2 | 75 |
| 14 Dongpo Notes | 441 | 1 | 25 | 38 | 7 | 3 | 13 | 2 | 90 |
| 15 Dongpo Put Option | 144 | 2 | 8 | 12 | 2 | 1 | 4 | 1 | 31 |
| 16 Graceful Court Put Option | 120 | 2 | 7 | 10 | 2 | 1 | 3 | 1 | 26 |
| 17 New Chic Margin Loan | 20 | 5 | 1 | 1 | 0 | 0 | 0 | 0 | 8 |
| 18 Clear Star Put Option | 74 | 2 | 4 | 6 | 1 | 1 | 2 | 0 | 16 |
| 19 CEG Loan 1 | 210 | - | 12 | 18 | 3 | 2 | 6 | 1 | 42 |
| 20 CEG Loan 2 | 105 | - | 6 | 9 | 2 | 1 | 3 | 1 | 21 |
| 21 Venice Loan | 25 | 15 | 1 | 1 | 0 | 0 | 0 | 0 | 17 |
| 22 Venice SPA | 571 | 337 | 13 | 20 | 4 | 2 | 7 | 1 | 384 |
| 23 Hero Loan | 994 | 502 | 28 | 42 | 8 | 4 | 14 | 3 | 601 |
| 24 FCB Put Option | 712 | 150 | 32 | 48 | 9 | 4 | 16 | 3 | 263 |
| 25 RMB Bond Put Option | 1,311 | 57 | 72 | 108 | 19 | 10 | 37 | 7 | 310 |
| 26 CEG Guarantees of PRC Liabilities | 9,221 | 1,341 | 454 | 678 | 121 | 60 | 230 | 44 | 2,929 |
| 27 Kailong Arbitration Award | 834 | - | 48 | 72 | 13 | 6 | 24 | 5 | 168 |
| 28 On-Lent Loan | 0 | - | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 15,075 | 2,434 | 728 | 1,087 | 195 | 97 | 370 | 70 | 4,980 |

Notes
1. All figures shown in the table above are subject to rounding.
2. Claims or recoveries that are less than USD1m may be illustrated by 0. The use of "-" will be present to illustrate no monetary amount.

China Evergrande Group | Scheme Recovery Analysis Report

© 2023 Deloitte China.

**Appendix 2**

Debt Schedule - CEG Scheme – Class A Creditors

| # | Offshore Debt Schedule – Class A (USD'm)<br>Facility/Instrument | Principal O/S<br>As of Dec 2022 | Accrued Claims<br>As of Dec 2022 | Value of Third Party Rights<br>As of Dec 2022 |
|---|---|---|---|---|
| 1 | CEG Existing March 2022 Notes | 2,022 | 2,234 | - |
| 2 | CEG Existing April 2022 Notes | 1,450 | 1,618 | - |
| 3 | CEG Existing January 2023 Notes | 999 | 1,164 | - |
| 4 | CEG Existing February 2023 Bonds | 10 | 11 | - |
| 5 | CEG Existing April 2023 Notes | 834 | 936 | - |
| 6 | CEG Existing June 2023 Notes | 1,332 | 1,482 | - |
| 7 | CEG Existing January 2024 Notes | 995 | 1,167 | - |
| 8 | CEG Existing March 2024 Notes | 951 | 1,064 | - |
| 9 | CEG Existing April 2024 Notes | 691 | 779 | - |
| 10 | CEG Existing June 2025 Notes | 4,649 | 5,263 | - |
| 11 | CEG Existing January 2022 Notes | 300 | 348 | - |
| 12 | Class A Private Loan | 9 | 13 | - |
| | **Total** | **14,242** | **16,080** | **-** |

*Notes*
1.  *All figures shown in the table above are subject to rounding.*

China Evergrande Group | Scheme Recovery Analysis Report




44

© 2023 Deloitte China.

## Appendix 2

Debt Schedule - CEG Scheme – Class C Creditors

Offshore Debt Schedule – Class C Creditors (USD'm)

| # Facility/Instrument | Principal O/S As of Dec 2022 | Accrued Claims As of Dec 2022 | Value of Third Party Rights As of Dec 2022 | Deficiency Claims As of Dec 2022 |
|---|---|---|---|---|
| 13 Lake Notes | 260 | 294 | 20 | 274 |
| 14 Dongpo Notes | 424 | 441 | 1 | 440 |
| 15 Dongpo Put Option | 116 | 144 | 2 | 141 |
| 16 Graceful Court Put Option | 110 | 120 | 2 | 119 |
| 17 New Chic Margin Loan | 20 | 20 | 5 | 15 |
| 18 Clear Star Put Option | 74 | 74 | 2 | 72 |
| 19 CEG Loan 1 | 154 | 210 | - | 210 |
| 20 CEG Loan 2 | 77 | 105 | - | 105 |
| 21 Venice Loan | 20 | 25 | 15 | 10 |
| 22 Venice SPA | 355 | 571 | 337 | 234 |
| 23 Hero Loan | 974 | 994 | 502 | 492 |
| 24 FCB Put Option | 712 | 712 | 150 | 562 |
| 25 RMB Bond Put Option | 1,189 | 1,311 | 57 | 1,255 |
| 26 CEG Guarantees of PRC Liabilities | 8,961 | 9,221 | 1,341 | 7,880 |
| 27 Kailong Arbitration Award | | 834 | - | 834 |
| 28 On-Lent Loan | 0 | 0 | - | 0 |
| **Total** | **13,445** | **15,075** | **2,434** | **12,641** |

*Notes*
1. *All figures shown in the table above are subject to rounding.*

© 2023 Deloitte China.

China Evergrande Group | Scheme Recovery Analysis Report

45




## Appendix 2

Debt Schedule - SJ Scheme – Class B Creditors

### Offshore Debt Schedule – Class B Creditors (USD'm)

| # | Facility/Instrument | Principal O/S As of Dec 2022 | Accrued Claims As of Dec 2022 | Value of Third Party Rights As of Dec 2022 | Deficiency Claims As of Dec 2022 |
|---|---|---|---|---|---|
| 29 | SJ Existing October 2022 Notes | 1,999 | 2,330 | 44 | 2,286 |
| 30 | SJ Existing November 2022 Notes | 644 | 782 | 15 | 768 |
| 31 | SJ Existing October 2023 Notes | 1,994 | 2,338 | 44 | 2,294 |
| 32 | SJ Existing November 2023 Notes | 589 | 723 | 14 | 709 |
| | **Total** | **5,226** | **6,173** | **117** | **6,056** |

China Evergrande Group | Scheme Recovery Analysis Report

46

*Notes*
1. *All figures shown in the table above are subject to rounding.*



© 2023 Deloitte China.



# Appendix 2

## Debt Schedule - TJ Scheme – Class D Creditors

| # | Offshore Debt Schedule – Class D (USD'm)<br>Facility/Instrument | Principal O/S<br>As of Dec 2022 | Accrued Claims<br>As of Dec 2022 | Value of Third Party Rights<br>As of Dec 2022 | Deficiency Claims<br>As of Dec 2022 |
|---|---|---|---|---|---|
| 33 | SJ Existing October 2022 Notes | 1,999 | 2,330 | 929 | 1,401 |
| 34 | SJ Existing November 2022 Notes | 644 | 782 | 312 | 470 |
| 35 | SJ Existing October 2023 Notes | 1,994 | 2,338 | 933 | 1,406 |
| 36 | SJ Existing November 2023 Notes | 589 | 723 | 288 | 435 |
| 37 | Lake Notes | 260 | 294 | 68 | 226 |
| 38 | Clear Star Put Option | 74 | 74 | 14 | 59 |
| 40 | Castle Share Put Option | 258 | 310 | 1 | 309 |
| 39 | Castle Loan Put Option | 0 | 0 | - | 0 |
| 41 | Hero Loan | 974 | 994 | 588 | 406 |
| 42 | Tuen Mun Put Options | 181 | 224 | 114 | 111 |
| 43 | CEG-Tianji Intercompany Balance | 5,035 | 5,035 | - | 5,035 |
| | **Total** | **12,008** | **13,105** | **3,248** | **9,857** |

*Notes*
1. *All figures shown in the table above are subject to rounding.*

© 2023 Deloitte China.

**About Deloitte**

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited ("DTTL"), its global network of member firms, and their related entities (collectively, the "Deloitte organization"). DTTL (also referred to as "Deloitte Global") and each of its member firms and related entities are legally separate and independent entities, which cannot obligate or bind each other in respect of third parties. DTTL and each DTTL member firm and related entity is liable only for its own acts and omissions, and not those of each other. DTTL does not provide services to clients. Please see www.deloitte.com/about to learn more.

Deloitte is a leading global provider of audit and assurance, consulting, financial advisory, risk advisory, tax and related services. Our global network of member firms and related entities in more than 150 countries and territories (collectively, the "Deloitte organization") serves four out of five Fortune Global 500® companies. Learn how Deloitte's approximately 345,000 people make an impact that matters at www.deloitte.com.

Deloitte Asia Pacific Limited is a company limited by guarantee and a member firm of DTTL. Members of Deloitte Asia Pacific Limited and their related entities, each of which are separate and independent legal entities, provide services from more than 100 cities across the region, including Auckland, Bangkok, Beijing, Hanoi, Hong Kong, Jakarta, Kuala Lumpur, Manila, Melbourne, Osaka, Seoul, Shanghai, Singapore, Sydney, Taipei and Tokyo.

The Deloitte brand entered the China market in 1917 with the opening of an office in Shanghai. Today, Deloitte China delivers a comprehensive range of audit & assurance, consulting, financial advisory, risk advisory and tax services to local, multinational and growth enterprise clients in China. Deloitte China has also made—and continues to make—substantial contributions to the development of China's accounting standards, taxation system and professional expertise. Deloitte China is a locally incorporated professional services organization, owned by its partners in China. To learn more about how Deloitte makes an impact that Matters in China, please connect with our social media platforms at www2.deloitte.com/cn/en/social-media.

This communication contains general information only, and none of Deloitte Touche Tohmatsu Limited ("DTTL"), its global network of member firms or their related entities (collectively, the "Deloitte organization") is, by means of this communication, rendering professional advice or services. Before making any decision or taking any action that may affect your finances or your business, you should consult a qualified professional adviser.

No representations, warranties or undertakings (express or implied) are given as to the accuracy or completeness of the information in this communication, and none of DTTL, its member firms, related entities, employees or agents shall be liable or responsible for any loss or damage whatsoever arising directly or indirectly in connection with any person relying on this communication. DTTL and each of its member firms, and their related entities, are legally separate and independent entities.

© 2023. For information, contact Deloitte China.



**SCHEDULE 4**

**THE SCHEME**

**IN THE HIGH COURT OF THE**

**HONG KONG SPECIAL ADMINISTRATIVE REGION**

**HCMP 1090 OF 2023**

**IN THE MATTER OF SECTIONS 670, 673 AND 674 OF THE COMPANIES ORDINANCE (CAP. 622)**

**AND**

**IN THE MATTER OF TIANJI HOLDING LIMITED**

———————————————————————————

**SCHEME OF ARRANGEMENT**

*(under sections 670, 673 and 674 of the Companies Ordinance (Cap. 622) of Hong Kong)*

———————————————————————————

**BETWEEN**

**TIANJI HOLDING LIMITED**

天基控股有限公司

*(a private company incorporated with limited liability under the laws of Hong Kong with company number 1339269)*

**AND**

**THE SCHEME CREDITORS**

*(as herein defined)*

**TABLE OF CONTENTS**

1.    DEFINITIONS AND INTERPRETATION ............................................................... 1

2.    INTERPRETATION.......................................................................................... 25

3.    APPLICATION AND EFFECTIVENESS OF THIS SCHEME............................................ 27

4.    COMPROMISE AND ARRANGEMENT WITH THE SCHEME CREDITORS ................ 28

5.    AUTHORITY AND INSTRUCTIONS.................................................................... 29

6.    SCHEME STEPS ........................................................................................... 31

7.    NOTICES TO SCHEME CREDITORS AND OTHERS ................................................ 34

8.    ENTITLEMENT RECORD TIME AND SCHEME CLAIMS ............................................ 35

9.    ACCEPTANCE OF DOCUMENTATION ................................................................ 36

10.   DEADLINES AND BAR DATES ......................................................................... 36

11.   ASSIGNMENTS OR TRANSFERS OF SCHEME CLAIMS ........................................... 38

12.   CALCULATION OF A SCHEME CREDITOR'S ENTITLEMENT ............................... 39

13.   INITIAL DISTRIBUTION ................................................................................. 40

14.   DISTRIBUTION TO THE HOLDING PERIOD TRUSTEE .................................... 42

15.   FINAL DISTRIBUTION TO SCHEME CREDITORS ......................................... 42

16.   DISTRIBUTION TO THE SUCCESSOR ESCROW ACCOUNT FOR BLOCKED SCHEME
      CREDITORS ............................................................................................. 45

17.   INTERIM DISTRIBUTION ............................................................................... 46

18.   CONSENT FEE .......................................................................................... 46

19.   ISSUANCE OF THE NEW INSTRUMENTS ...................................................... 47

20.   RESTRICTIONS .......................................................................................... 48

21.   FRACTIONAL ADJUSTMENTS........................................................................ 48

22.   MODIFICATIONS OF THE RIGHTS ATTACHING TO THE NEW INSTRUMENTS
      .............................................................................................................. 49

23.   SECURITIES LAW CONSIDERATIONS .......................................................... 49

24.   RELEASES.................................................................................................. 49

25.   STAY OF PROCEEDINGS ............................................................................. 51

26.    COSTS AND INDEMNITY.................................................................................. 51

27.    MODIFICATIONS TO THE SCHEME AND THE RESTRUCTURING DOCUMENTS
.................................................................................................................. 52

28.    OBLIGATIONS ON DATES OTHER THAN A BUSINESS DAY ...................................... 53

29.    NO ADMISSION OF LIABILITY ........................................................................ 53

30.    THE INFORMATION AGENT ............................................................................ 53

31.    THE HOLDING PERIOD TRUSTEE ..................................................................... 54

32.    THE SUCCESSOR ESCROW AGENT .................................................................... 55

33.    THE SCHEME ADMINISTRATORS ...................................................................... 56

34.    VALUATION PROCEDURE ............................................................................... 59

35.    THE SCHEME ADJUDICATOR ........................................................................... 62

36.    ADJUDICATION PROCEDURE ........................................................................... 64

37.    NOTICE ...................................................................................................... 69

38.    INTERCONDITIONALITY OF THE SCHEME .......................................................... 70

39.    APPLICATION TO THE COURT FOR DIRECTIONS .................................................. 70

40.    FOREIGN REPRESENTATIVE ........................................................................... 70

41.    THIRD PARTIES ........................................................................................... 70

42.    TERMINATION OF THIS SCHEME ..................................................................... 70

43.    CONFLICT AND INCONSISTENCY ..................................................................... 71

44.    SEVERABILITY ............................................................................................ 71

45.    GOVERNING LAW AND JURISDICTION .............................................................. 71

SCHEDULE 1 RESTRUCTURING DOCUMENTS

SCHEDULE 2 OTHER DEBTS

SCHEDULE 3 RESTRUCTURING EFFECTIVE DATE CONDITIONS

SCHEDULE 4 SJ NOTES SUBSIDIARY GUARANTORS

SCHEDULE 5 COURT ORDER

## PART A
## PRELIMINARY

1.   **DEFINITIONS AND INTERPRETATION**

In this Scheme, unless the context otherwise requires or unless otherwise expressly provided for, the following capitalised expressions shall bear the following meanings:

**"Accession Code"**   means a unique code provided by the Information Agent to a Scheme Creditor following its valid accession to the RSA, and which must be included by such Scheme Creditor in its voting instructions within the relevant Scheme Creditor Form in respect of this Scheme.

**"Account Holder"**   means any Person who is recorded in the books of a Clearing System as being a holder of a book-entry interest in the SJ Notes or the Lake Notes in an account with that Clearing System or, as the context may require, is or was recorded in such books as being such a holder of SJ Notes or the Lake Notes in such an account at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of receiving Scheme Consideration).

**"Account Holder Letter"**   means the form of account holder letter which is appended to the Solicitation Packet, to be made available on the Transaction Website.

**"Adjudication Procedure"**   means the procedure for the resolution of a Referred Scheme Claim as set out in Clause 36 (*Adjudication Procedure*) of this Scheme.

**"Advisors"**   means (i) Sidley Austin, (ii) Houlihan Lokey, (iii) Maples and Calder, (iv) BOCI Asia Limited (v) China International Capital Corporation Hong Kong Securities Limited, and (vi) Commerce & Finance Law Offices.

**"Affiliate"**   means, with respect to any Person, any other Person: (a) directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person; or (b) who is a director or officer of such Person or any Subsidiary of such Person or of any Person referred to in clause (a) of this definition and with respect to any Participating Creditor, any of its managers, investment manager or investment advisors, and any entity managed or advised by that manager, investment manager or investment advisor. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

**"Agreed Form"**   means in the form agreed in writing between:

(a)   the Company (or the Advisors acting on its behalf);

(b)   Majority TJ AHG (or the AHG Advisors acting on their behalf);

(c)   only in relation to the New Instruments Documents, the New Instruments Trustee; and

1

|                        |                                                                                                                                                                                                                                                                                 |
|------------------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|

(d)   only in relation to the Holding Period Trust Deed and any other documents to which the Holding Period Trustee is party, the Holding Period Trustee,

in each case each acting reasonably.

| **"AHG"** | means, collectively, the CEG AHG and the TJ AHG. |
|---|---|

| **"AHG Advisors"** | means Kirkland & Ellis, Moelis & Company Asia Limited, Harney Westwood & Riegels, Fangda Partners, and other professional advisors as the AHG may appoint from time to time. |
|---|---|

| **"AHG Financial Advisor Fees"** | means the reasonable fees, costs and expenses of the financial advisor (Moelis & Company Asia Limited) to the TJ AHG that CEG has agreed to pay in accordance with the terms set out in the fee letter agreement dated 4 April 2023. |
|---|---|

| **"Ancillary Claim"** | means any Claim by a Scheme Creditor against a Released Person under or in respect of the Existing Debt Instruments arising as a result of effecting, adhering to or complying with the releases in Clause 24.2(a)(i) (*Releases*) (excluding for the avoidance of doubt any Claim in respect of any Liability (i) of any Released Person which arises as a result of a failure to comply with any of the terms of this Scheme or any Restructuring Document (including but not limited to the New Instruments Documents) and (ii) arising from or in connection with any Excluded Liability or Excluded Collateral. |
|---|---|

| **"Applicable Sanctions"** | means laws, regulations, rules and/or orders relating to economic, financial or trade sanctions, restrictive measures or embargoes administered, enacted, maintained and/or enforced by any Governmental Entity of the United States of America (including by the US Office of Foreign Assets Control or the US Department of State), the European Union, the United Kingdom and the British Overseas Territories (including, for the avoidance of doubt, The Russia (Sanctions) (EU Exit) Regulations 2019, as amended from time to time and as applicable in the Cayman Islands pursuant to The Russia (Sanctions) (Overseas Territories) Order 2020 (as amended)). |
|---|---|

| **"Applicable Sanctions List"** | means each of: |
|---|---|

(a)   the lists of Specially Designated Nationals and Blocked Persons or "Foreign Sanctions Evaders" or any other list of Persons subject to, or targeted by, similar sanctions as administered, maintained and/or enforced by the Office of Foreign Assets Control of the US Treasury, the US Department of Commerce, the US Department of State and any other Government Entity of the United States;

(b)   the Consolidated List of Persons, Groups and Entities Subject to EU Financial Sanctions maintained by the European Commission, Annex XIX of Regulation (EU) No 833/2014, or any other list of Persons subject to, or targeted by, similar sanctions as administered, maintained and/or enforced by the European Union or any Governmental Entity in any Member State of the European Union; or

(c)   the Consolidated List of Financial Sanctions Targets in the United Kingdom maintained by the Office of Financial Sanctions Implementation, His Majesty's Treasury of the United Kingdom, the

2

United Kingdom Sanctions List maintained by the Foreign, Commonwealth and Development Office, or any other list of Persons subject to, or targeted by similar sanctions administered, maintained and/or enforced by any Governmental Entity of the United Kingdom or the Cayman Islands,

or any other similar sanctions list of persons and entities subject to a prohibition to transact with, that is developed, maintained and published by any Governmental Entity of the United States of America (including by the U.S. Office of Foreign Assets Control or the U.S. Department of State), the European Union, the United Kingdom and the British Overseas Territories in connection with Sanctions, in each case as amended, supplemented or substituted from time to time, and "Applicable Sanctions Lists" includes, collectively, (a), (b) and (c) of this definition.

**"Asserted Amount"** has the meaning given to it in Clause 36.17(b)(i)(A) of this Scheme.

**"Assessed Value"** means an amount equal to the value recoverable by an Other Debt Scheme Creditor in respect of the relevant Excluded Liabilities, Excluded Collateral, put option and/or repurchase obligation as determined by the Scheme Administrators (or, if applicable, a Scheme Adjudicator) in accordance with the terms of this Scheme and set out in the Deed of Agreed Valuation.

**"Bar Date"** means the date which is 135 days after the Restructuring Effective Date.

**"Blocked Assets"** means, collectively, the Blocked New Instruments and any Consent Fee to which Blocked Scheme Creditors may be entitled to in accordance with the RSA and Applicable Sanctions.

**"Blocked New Instruments"** means the Residual New Instruments to which Blocked Scheme Creditors are entitled in accordance with the terms of the Scheme and Applicable Sanctions.

**"Blocked Scheme Creditor"** means a Scheme Creditor (other than a Sanctioned Scheme Creditor) that is not entitled, able or permitted (whether directly or through a custodian) to submit instructions or settle through the Clearing Systems as a result of Applicable Sanctions affecting the Scheme Creditor or its custodian as reasonably determined by the Clearing Systems, and which does not have a sanctions licence in respect of the Applicable Sanctions which would allow that Scheme Creditor to freely deal in the Scheme Consideration and submit instructions or settle through the Clearing Systems.

**"Blocked Scheme Creditor Form"** means a form from a Blocked Scheme Creditor substantially in the form of the blocked scheme creditor form set out in the Solicitation Packet.

**"Blocking Regulation"** means:

(a) Council Regulation (EC) No. 2271/1996 of 22 November 1996 (as amended) and/or any applicable national law or regulation relating to it;

(b) Council Regulation (EC) No. 2271/1996 of 22 November 1996 (as amended) as it forms part of domestic law of the United Kingdom by virtue of the European Union (Withdrawal) Act 2018; or

3

(c) The Protection of Trading Interests Act 1980 of the United Kingdom.

**"Board"**      means the board of Directors.

**"Business Day"**      means any day which is not a Saturday, Sunday, legal holiday or other day on which banking institutions in the City of New York, the City of London, the BVI, the Cayman Islands, Hong Kong or the PRC are authorised or required by law or governmental regulation (as applicable) to close.

**"BVI"**      means the British Virgin Islands.

**"BVI Companies Act"**      means the BVI Business Companies Act as amended, modified or re-enacted from time to time.

**"BVI Court"**      means the Eastern Caribbean Supreme Court, High Court of Justice, British Virgin Islands and any court capable of hearing appeals therefrom.

**"BVI Registrar of Corporate Affairs"**      means the Registrar of Corporate Affairs (including any deputy registrar and/or assistant registrar or similar) appointed under the BVI Companies Act in the BVI.

**"Capital Stock"**      means, with respect to any Person, any and all shares, interests (including partnership interests), rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting) equity of such Person.

**"Castle Loan Put Option"**      has the meaning given to it in Schedule 2 of this Scheme.

**"CEG"**      means China Evergrande Group, an exempted company incorporated with limited liability under the laws of the Cayman Islands with registration number 169971 and having its registered office at P.O. Box 309, Ugland House, Grand Cayman, KY1 1104, the Cayman Islands and the shares of which are listed on the Main Board of the HKEX.

**"CEG Schemes"**      means the schemes of arrangement proposed by CEG, the ultimate holding company of the Group, in the Cayman Islands and Hong Kong to effect the restructuring of certain indebtedness of the Group.

**"CEG AHG"**      means the ad hoc group of Participating Creditors (as defined under the Class A RSA) or investment managers or investment advisors to such Participating Creditors (as defined under the Class A RSA), who: (i) have been constituted from time to time and as notified to CEG (subject to and in accordance with the transfer provisions under the Class A RSA) and (ii) are advised, by the AHG Advisors from time to time.

**"Chairman"**      means Mr Hui Ka Yan.

4

| | |
|---|---|
| "**Chapter 15 Recognition Order**" | means an order or orders of the US Bankruptcy Court recognising this Scheme as a foreign main proceeding (or in the alternative, a foreign non-main proceeding) and giving effect to certain aspects of the compromise and arrangement set out in this Scheme, including the Releases under Clause 24 (*Releases*) of this Scheme. |
| "**Chapter 15 Recognition Proceedings**" | means the recognition proceeding before a US Bankruptcy Court to recognize the Scheme pursuant to chapter 15 of the United States Bankruptcy Code. |
| "**Claim**" | means all and any present and future Liabilities together with any refinancing, novation, deferral or extensions relating to or arising in respect of those Liabilities, actions, causes of action, claims, counterclaims, suits, debts, set-offs, sums of money, accounts, contracts, agreements, promises, contribution, subrogation, indemnification, damages, judgments, executions, court or arbitration awards demands or rights whatsoever or howsoever arising, whether present, future, prospective or contingent, known or unknown, whether directly or indirectly, whether in person or through another Person, whether or not for a fixed or unliquidated amount, whether or not involving the payment of money or the performance of an act or obligation or any failure to perform any obligation or any omission, whether arising at common law, in equity or by statute in or under the laws of the Cayman Islands, BVI, Hong Kong, PRC, New York or under any other law or in any other jurisdiction howsoever arising and "**Claims**" shall be construed accordingly. |
| "**Class A RSA**" | means the restructuring support agreement dated 3 April 2023 between, among others, CEG and the Initial Participating Creditors (as defined in the Class A RSA), as amended or varied from time to time, including by the accession or cessation of parties thereto. |
| "**Clearing Systems**" | means Euroclear and Clearstream, as applicable, and any successor thereto. |
| "**Clearing System Instruction**" | means an instruction to each of the Clearing Systems in relation to the Restructuring Effective Date. |
| "**Clearstream**" | means Clearstream Banking S.A. |
| "**Collateral**" | all collateral securing, or purported to be securing, directly or indirectly, the New Instruments, any New Instruments Subsidiary Guarantee (as applicable) pursuant to the Security Documents, which shall, in each case, be in the Agreed Form. |
| "**Company Information**" | means information in the possession or control of the Company or the Group that the Scheme Administrators consider in their sole discretion relevant to evaluate the Other Debt Scheme Creditors' Entitlements. |
| "**Company Website**" | means www.evergrande.com. |
| "**Completion Notice**" | has the meaning given to it in Clause 6.1 of this Scheme. |

5

| | |
|---|---|
| **"Consent Fee"** | means, with respect to each Participating Creditor and subject to and in accordance with Clause 5 *(Consent Fee)* of the RSA, an amount equal to 0.25% of the outstanding principal amount of the Eligible Restricted Debts held by such Participating Creditor as of the Voting Record Time, payable in kind in the form of Tranche A Notes to be issued by the Company in accordance with the section headed "Consent Fee" in the Term Sheet. |
| **"Consent Fee Deadline"** | means 5:00 p.m. Hong Kong time, with the original date on 27 April 2023 and subsequently extended to 5:00 p.m. Hong Kong time on 18 May 2023. |
| **"Consultation Period"** | means the thirty (30) calendar day period commencing on and from the date that an Other Debt Scheme Creditor submits the Scheme Administrator Estimate Acceptance or Rejection Form to the Scheme Administrators rejecting the Scheme Administrator Estimate, unless extended by the Scheme Administrators in accordance with Clause 34.8(c). |
| **"Court"** | means the High Court of Hong Kong, and any court capable of hearing appeals therefrom. |
| **"Credit Support"** | means any security, encumbrance, collateral, guarantee, bond, indemnity, repurchase obligation, put option, assumption of any Liability or other form of credit support or assurance or arrangement having the same economic effect. |
| **"Credit Support Document"** | means any document or instrument documenting or constituting or purporting to document or constitute any Credit Support (howsoever described), as amended, varied and supplemented from time to time. |
| **"Custody Instruction"** | means an instruction to the relevant Clearing System to block the SJ Notes or the Lake Notes (up to the Restructuring Effective Date) from trading in the relevant Clearing System or, in respect of the Lake Notes on or after the Restructuring Effective Date, to verify the Scheme Claims in respect of the Lake Notes of the Lake Noteholder. |
| **"Custody Instruction Deadline"** | means 5:00 p.m. on 15 August 2023 (Hong Kong time). |
| **"Deed of Agreed Valuation"** | means a deed to be entered into between an Other Debt Scheme Creditor, the Scheme Administrators and the Company recording: (i) the Other Debt Scheme Creditor's Entitlement as determined by the Scheme Administrators or, if required, the Scheme Adjudicator and (ii) a release of the relevant Other Debt Scheme Creditor's Scheme Claim pursuant to the governing law of the underlying Existing Debt Instruments (as applicable), pursuant to the terms of this Scheme. |
| **"Deeds of Release"** | shall include the form of (i) New York law governed global deed of release in respect of, among other things, the SJ Notes; and (ii) Hong Kong law governed deed of release in respect of, among other things, the Other Debts, each of which shall be in the Agreed Form and be executed pursuant to the authority conferred by Clause 24 (*Releases*) of this Scheme in respect of, among other things, the relevant Scheme Creditors in substantially the form to be made available on the Transaction Website and which shall be in the Agreed Form, subject to any modifications required or approved in |

6

<table>
<tbody>
<tr><td></td><td>accordance with Clause 27 (*Modifications to the Scheme and the Restructuring Documents*) of this Scheme.</td></tr>
<tr><td>**"Deed of Undertaking"**</td><td>means a deed of undertaking substantially in the form to be made available on the Transaction Website which shall be in the Agreed Form.</td></tr>
<tr><td>**"Deed of Undertaking Parties"**</td><td>means the parties to the Deed of Undertaking, which it is intended shall include: the SJ Notes Subsidiary Guarantors, the New Instruments Pledgors, the New Instruments Subsidiary Guarantors, the SJ Notes Trustee, the New Instruments Trustee, the SJ Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the SJ Notes Depositary, the New Instruments Collateral Agent, the Chairman (and any of the Chairman's entities) required to perform obligations as part of the Restructuring, holding entities within the Group providing security (to the extent they are not New Instruments Subsidiary Guarantors) the Scheme Administrators, and the Information Agent and such other additional parties to the Deed of Undertaking (which shall be in the Agreed Form).</td></tr>
<tr><td>**"Deficiency Basis"**</td><td>has the meaning set out in Clause 12 (*Calculation of a Scheme Creditor's Entitlement*) of this Scheme.</td></tr>
<tr><td>**"Designated Recipient"**</td><td>means in relation to any Scheme Creditor (who is not a Sanctions-Affected Scheme Creditor) that can make affirmative Sanctions Law Representations by submission of a validly completed Distribution Confirmation Deed, any entity that is designated as such by a Scheme Creditor in accordance with a valid Designated Recipient Form as the recipient of the New Instruments to be issued to such Scheme Creditor as Scheme Consideration, subject to limitations in accordance with applicable securities laws and provided that (i) the Designated Recipient shall only be validly designated if it or an Account Holder on its behalf has submitted a Distribution Confirmation Deed and/or any other applicable forms that its designating Scheme Creditor is required to submit pursuant to this Scheme; (ii) a Scheme Creditor may designate one or more such entity and if such entity is a nominee holder it may only hold on behalf of one beneficial holder; and (iii) the Designated Recipient is an Eligible Person.</td></tr>
<tr><td>**"Designated Recipient Form"**</td><td>means the form enclosed with the Solicitation Packet and made available on the Transaction Website by which a Scheme Creditor may appoint one or more Designated Recipients to be the recipients of all or part of the New Instruments that would otherwise be issued to that Scheme Creditor as Scheme Consideration or as any Consent Fee payable to that Scheme Creditor.</td></tr>
<tr><td>**"Director(s)"**</td><td>means the director(s) of the Company from time to time.</td></tr>
<tr><td>**"Distribution Confirmation Deed"**</td><td>means the form of deed enclosed with the Solicitation Packet and made available on the Transaction Website confirming amongst other things that the Eligible Creditor or the Designated Recipient may lawfully be issued the New Instruments as Scheme Consideration.</td></tr>
<tr><td>**"Eligible Creditor"**</td><td>means a Scheme Creditor who is an Eligible Person and who has submitted or caused to be submitted the Scheme Creditor Forms, as applicable, such that</td></tr>
</tbody>
</table>

7

they are submitted and received by the Information Agent in accordance with the terms of this Scheme, before the applicable deadline set out in the Solicitation Packet to be made available on the Transaction Website.

**"Eligible Participating Creditors"**    means Participating Creditors who hold, at the Voting Record Time, Existing Debts which validly became Eligible Restricted Debts before the Consent Fee Deadline (as applicable) in accordance to the terms of the RSA.

**"Eligible Person"**    means a Person who has provided affirmative Securities Law Representations and Sanctions Law Representations to the Information Agent before the applicable deadlines set out in the Solicitation Packet to be made available on the Transaction Website.

**"Eligible Restricted Debt"**    means a Restricted Debt which was made subject to the terms of the RSA by a Participating Creditor on or prior to the Consent Fee Deadline; and "**Eligible Restricted Debts**" means all of them.

**"Entitlement"**    has the meaning given to it in Clause 12 (*Calculation of a Scheme Creditor's Entitlement*) of this Scheme.

**"Entitlement Record Time"**    means the Restructuring Effective Date. This is the time designated by the Company for the determination of Entitlements of the Scheme Creditors for the purposes of distribution of Scheme Consideration (for the avoidance of doubt, this shall not prevent the Valuation and Adjudication Procedure from taking place after the Restructuring Effective Date and/or taking into account prevailing circumstances at such time, including without limitation the release or extinguishment of rights or benefits of any Excluded Collateral or Excluded Liabilities resulting in a reduction of the relevant Assessed Value as applicable).

**"Estimation Notice"**    means a notice from the Scheme Administrators to each Other Debt Scheme Creditor notifying such Other Debt Scheme Creditor of the Scheme Administrator Estimate.

**"Euroclear"**    means Euroclear Bank SA/NV.

**"Excluded Collateral"**    means any security, collateral, guarantee, bond, indemnity, keepwell agreement or other form of assurance granted by an Excluded Liabilities Party Person for the purpose of securing and/or guaranteeing against and/or supporting any Other Debt.

**"Excluded Liabilities"**    means any Liability of an Excluded Liabilities Party Person.

**"Excluded Liabilities Party Person"**    means certain Persons other than the Company who is an obligor, guarantor, security or collateral pledgor or other Credit Support provider of or in respect of the SJ Notes or the Other Debts.

**"Existing Agents"**    means the Existing Facility Agents and the Existing Security Agents.

| | |
|---|---|
| **"Existing Debts"** | means, collectively, the SJ Notes and the  Other Debts. |

**"Existing Facility Agents"** means:

(a)   China Construction Bank (Asia) Corporation Limited, in its capacity as (i) agent and (ii) account bank under the Castle Loan Put Option;

(b)   (i) China CITIC Bank International Limited; (ii) China Everbright Bank Co., Ltd. Hong Kong Branch and (ii) Tai Fung Bank Limited, in their capacity as arrangers under the Hero Loan; and

(c)   China CITIC Bank International Limited, in its capacity as (i) agent and (ii) account bank under the Hero Loan.

**"Existing Debt Instruments"** means, collectively, the SJ Notes Documents and the financing documents and any document or instrument documenting or constituting or purporting to document or constitute any Other Debts and any Credit Support Document entered into in respect of the SJ Notes and the Other Debts, as amended, varied and supplemented from time to time.

**"Existing Security Agents"** means:

(a)   China Construction Bank (Asia) Corporation Limited, in its capacity as security agent of the Castle Loan Put Option, and

(b)   China CITIC Bank International Limited, in its capacity as security agent under the Hero Loan.

**"Explanatory Statement"** means the composite document addressed to Scheme Creditors in relation to this Scheme pursuant to section 671 of the Hong Kong Companies Ordinance.

"**Final Distribution**" means the Scheme Consideration to be distributed on the Final Distribution Date from the Residual New Instruments to each Scheme Creditor that is not a Sanctions-Affected Scheme Creditor (or, in respect of Blocked Scheme Creditors, to the Successor Escrow Agent) or to a Designated Recipient (if applicable), in each case in accordance with their respective entitlements and the terms under the Schemes (and, without double counting any Initial Distribution received, if applicable).

**"Final Distribution Date"** means the final date on which the Scheme Consideration shall be distributed to Scheme Creditors (that are not a Sanctions-Affected Scheme Creditor) that are entitled to a portion of the Residual New Instruments, or to the Successor Escrow Agent on behalf of the Blocked Scheme Creditors, in accordance with the terms of the Scheme and Restructuring Documents, within  thirty (30) calendar days of the completion of the finalisation of the Valuation and Adjudication Procedure carried out pursuant to Clauses 34 (*Valuation Procedure*) and 36 (*Adjudication Procedure*). This date is to be designated by the Company and communicated to the Scheme Creditors in writing via the Transaction Website and/or through such public medium as may be

appropriate at the time. The Final Distribution Date will be a date after the conclusion of the Valuation and Adjudication Procedure.

| | |
|---|---|
| **"Full Accrued Claim Basis"** | means: |

    (a)  the outstanding principal amount or in the case of a put option or repurchase obligation, the price amount, of a Scheme Creditor's Scheme Claims at the Entitlement Record Time, without permitting duplicative claims or portions of claims against the Company other than for US$1, as determined by the Company (in consultation with the Information Agent and/or the Scheme Administrator); and

    (b)  all accrued but unpaid interest on such Scheme Claims up to (but excluding) the Reference Date, as determined by the Company (in consultation with the Information Agent and/or the Scheme Administrator).

| | |
|---|---|
| **"Further Documentation"** | has the meaning given to it in Clause 36.5(a)(i) of this Scheme. |
| **"GLAS"** | means GLAS Specialist Services Limited, who the Company has appointed to liaise with Blocked Scheme Creditor including the processing of any Blocked Scheme Creditor Forms, under the Scheme. |
| **"Global Certificates"** | means the global certificates evidencing the SJ Notes. |
| **"Governmental Entity"** | means any federal, national or local government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal or judicial body of Hong Kong, the PRC, the United States of America, the European Union, the United Kingdom, the British Overseas Territories, the Cayman Islands or any other relevant jurisdiction. |
| **"Group"** | means CEG and its offshore subsidiaries from time to time. |
| **"Hero Loan"** | has the meaning given to it in Schedule 2 of this Scheme. |
| **"HKEX"** | means The Stock Exchange of Hong Kong Limited. |
| **"Holding Period"** | means the period from the Restructuring Effective Date, up to and including one Business Day after the Final Distribution Date. |
| **"Holding Period Custody Instruction Deadline"** | means five Business Days prior to the Bar Date. |
| **"Holding Period Trust"** | means the holding period trust constituted pursuant to the Holding Period Trust Deed. |
| **"Holding Period Trust Deed"** | means the holding period trust deed to be entered into between, among others, TJ, SJ and the Holding Period Trustee, in substantially the form to be made available on the Transaction Website subject to any modification required or approved in accordance with Clause 27 (*Modifications to the* |

10

*Scheme and the Restructuring Documents*) of this Scheme which shall be in Agreed Form.

| | |
|---|---|
| **"Holding Period Trustee"** | means GLAS Trustees Limited, holding the relevant Scheme Consideration and any Consent Fee (if applicable), for and on behalf of the Scheme Creditors, in accordance with this Scheme and the Restructuring Documents, or any additional or replacement trustee at any time. |
| **"Hong Kong"** | means the Hong Kong Special Administrative Region of the PRC. |
| **"Hong Kong Companies Ordinance"** | means the Companies Ordinance (Cap. 622 of the Laws of Hong Kong), as amended, modified or re-enacted from time to time. |
| **"Hong Kong Companies Registrar"** | means the Hong Kong Registrar of Companies appointed under the Hong Kong Companies Ordinance. |
| **"Houlihan Lokey"** | means Houlihan Lokey (China) Limited. |
| **"Indemnified Party"** | has the meaning given to it in Clause 26.1 (*Costs and Indemnity*) of this Scheme. |
| **"Indentures"** | means each of: |

(a) the indenture dated January 24, 2020, as amended, supplemented or otherwise modified from time to time, between SJ, the Company, Hengda Real Estate Group Co., Ltd., the SJ Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the SJ Existing October 2022 Notes;

(b) the indenture dated November 6, 2018, as amended, supplemented or otherwise modified from time to time, between  SJ, the Company, Hengda Real Estate Group Co., Ltd., the SJ Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the SJ Existing November 2022 Notes;

(c) the indenture dated January 24, 2020, as amended, supplemented or otherwise modified from time to time, between  SJ, the Company, Hengda Real Estate Group Co., Ltd., the SJ Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the SJ Existing October 2023 Notes; and

(d) the indenture dated November 6, 2018, as amended, supplemented or otherwise modified from time to time, between  SJ, the Company, Hengda Real Estate Group Co., Ltd., the SJ Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the SJ Existing November 2023 Notes,

and collectively, the "**Indentures**", each governed by and construed in accordance with the laws of the State of New York.

| | |
|---|---|
| **"Information Agent"** | means Morrow Sodali Limited in its capacity as the Company's information agent. |
| "**Initial Distribution**" | means the initial portion of the Scheme Consideration to be distributed on the Restructuring Effective Date to SJ Notes Scheme Creditors (and/or their Designated Recipients (if applicable)) who have submitted the required Scheme Creditor Form(s) by the SJ RED Distribution Deadline, and the Holding Period Trustee, in each case in accordance with the terms of this Scheme. |
| **"Initial Participating Creditors"** | means the list of initial participating creditors listed in Schedule 1 (*The Initial Participating Creditors)* in the RSA. |
| **"Intercompany Claim"** | means the intercompany claim of CEG against the Company as listed in Schedule 2 to this Scheme. |
| **"Intercreditor Agreement"** | means an intercreditor agreement to be entered into between, among others, the Company, the New Instruments Trustee, and the New Instruments Collateral Agent, in substantially the form to be made available on the Transaction Website, subject to any modifications required or approved in accordance with Clause 27 (*Modifications to the Scheme and the Restructuring Documents*) of the Scheme which shall be in Agreed Form. |
| **"Lake Noteholders"** | means persons with an economic or beneficial interest as principal in the Lake Notes held in global form or global restricted form through the Clearing Systems as at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of the determination of such persons' Entitlements), each of whom has a right, upon satisfaction of certain conditions, to be issued definitive registered notes in accordance with the terms of the Lake Notes and the Lake Notes Trust Deed and (but without double counting in each case) any depository or trustee of the Lake Notes. |
| **"Lake Notes"** | means the US$260 million 8.5% senior notes due October 3, 2021 (ISIN: XS2054446617, Common Code: 205444661) issued by Jumbo Fortune Enterprises Limited. |
| **"Lake Notes Trust Deed"** | means the trust deed dated 3 October 2019, as amended, supplemented or otherwise modified from time to time, between Jumbo Fortune Enterprises Limited, CEG, Tianji and China Construction Bank (Asia) Corporation Limited as trustee governing the Lake Notes. |
| **"Lake Notes Trustee and Agent"** | means China Construction Bank (Asia) Corporation Limited in its various capacities as (i) notes trustee and security trustee, (ii) settlement agent, (iii) principal agent, transfer agent, calculation agent, registrar and (iv) original account bank under the Lake Notes. |
| **"Liability"** | means any debt, liability or obligation whatsoever, whether it is present, future, prospective or contingent, whether directly or indirectly, whether or not |

12

its amount is fixed or undetermined, whether or not it involves the payment of money or the performance of an act or obligation, and whether arising at common law, in equity or by statute in or under the laws of the BVI, the Cayman Islands, Hong Kong, PRC, New York or under any other law or in any other jurisdiction howsoever arising and "**Liabilities**" shall be construed accordingly.

| | |
|---|---|
| **"Longstop Date"** | means 15 December 2023, unless extended pursuant to Clause 3.6 (*Application and Effectiveness of this Scheme*) of this Scheme. |
| **"Longstop Date Extension Notice"** | has the meaning given to it in Clause 3.7 of this Scheme. |
| "**Majority TJ AHG**" | means the member(s) of the TJ AHG holding a majority of the aggregate outstanding principal amount of the Restricted Debts held by the TJ AHG at the relevant time. |
| **"Majority Participating Creditors"** | means, at any time, Participating Creditors who hold (beneficially, as principal) in aggregate more than 50% of the outstanding principal amount of the Restricted Debts held in aggregate by all Participating Creditors at that time (for the avoidance of doubt, excluding the SJ Notes beneficially and/or legally (as applicable) held by the Chairman, and/or Xin Xin (BVI) Limited and his or its (as applicable) Affiliates which are in the aggregate amount of US$600,000,000 as at the date of the RSA). |
| **"Management"** | means key management personnel of the Group, including the Board. |
| "**Maples and Calder**" | means Maples and Calder (Hong Kong) LLP, Maples and Calder (Cayman) LLP, and Maples and Calder (BVI), in their capacity as advisors to the Company as to matters of Cayman Islands law and British Virgin Islands law. |
| "**Minimum TJ AHG Threshold**" | means an aggregate outstanding principal amount of the Restricted Debts (as defined in the RSA) constituting at least 10% of the outstanding principal amount of the Existing Debt Instruments (excluding the Intercompany Claim), in accordance with the terms of the RSA. |
| **"New Instruments"** | means the TJ New Notes. |
| **"New Instruments Collateral Agent"** | means the collateral agent or any successor collateral agent under the New Instruments Documents and with respect to the Security Documents. |
| **"New Instruments Depositary"** | means the common depositary for the Clearing Systems, acting through its nominee as registered holder of the New Instruments, as set forth in the New Instruments Documents. |
| **"New Instruments Documents"** | means the New York law governed indentures governing the TJ New Notes to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website, and the Security Documents. |

13

| | |
|---|---|
| **"New Instruments Pledgors"** | means such Persons who will provide and/or grant Security in respect of the obligations of the Company and/or other obligors in respect of the applicable New Instruments pursuant to the relevant New Instruments Documents as at the Restructuring Effective Date and any other relevant parties set out in the Security Documents, each of which shall be in the Agreed Form. |
| **"New Instruments Paying and Transfer Agent and Registrar"** | means the paying agent, transfer agent, and/or registrar or any successor paying agent, transfer agent, and/or registrar in respect of the New Instruments. |
| **"New Instruments Trustee"** | means the Person appointed as trustee or any successor trustee under and as defined in the New Instruments Documents. |
| **"NPV"** | means the net present value as determined by the Scheme Administrators prior to the Restructuring Effective Date in accordance with Clause 12.2 of the Scheme. |
| **"NPV Amount"** | has the meaning given to it in Clause 12.2 of the Scheme. |
| **"Other Debts"** | means the offshore financial indebtedness (including guarantees and put options) of the Company listed in Schedule 2 to this Scheme (including any related Credit Support provided by the Company) or in connection or in respect thereof, arising therefrom or relating thereto. |
| **"Other Debt Scheme Creditors"** | means (i) a person holding an economic or beneficial interest as principal in the Lake Notes or (ii) a person holding a legal interest as principal in any of the Other Debts as at (1) the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or (2) the Entitlement Record Time (in respect of the determination of such person's Entitlement), including (but without double counting in each case) (a) the Lake Notes Trustee and Agent; and (b) the Existing Agents. |
| **"Other Debt Scheme Creditor's Entitlement"** | has the meaning set out in Clause 12.2(b) of the Scheme. |
| **"Participating Creditor"** | means a Scheme Creditor who has agreed to be bound by the RSA as a Participating Creditor in accordance with the terms of the RSA. |
| **"Pending Referral Creditor"** | has the meaning set out in Clause 36.17(a) of this Scheme. |
| **"Perpetuity Period"** | means the period from the date the Successor Escrow Account is established until 21 years after that date, or such further period as the Successor Escrow Agent determines in its sole discretion (and without any obligation to do so). |
| **"Person"** | means any natural person, corporation, limited or unlimited liability company, trust, joint venture, association, corporation, partnership, Governmental Entity or other entity whatsoever. |

14

| | |
|---|---|
| **"Personnel"** | means, in relation to any Person, its current and former officers, partners, directors, employees, staff, agents, counsel and other representatives. |
| **"PRC"** | means the People's Republic of China, which for the purposes of this Scheme, excludes Taiwan, Hong Kong, and the Macao Special Administrative Region of the PRC. |
| **"Proceeding"** | means any process, suit, action, legal or other legal proceeding including without limitation any arbitration, mediation, alternative dispute resolution, judicial review, adjudication, demand, statutory demand, execution, distraint, forfeiture, re-entry, seizure, lien, enforcement of judgment, enforcement of any security or insolvency proceedings in any jurisdiction. |
| **"Proxy Form"** | means a proxy form submitted for an Other Debt Scheme Creditor which is appended to the Solicitation Packet, to be made available on the Transaction Website. |
| **"Recognition Filings"** | means (i) the filing of a petition for recognition of the Scheme under Chapter 15 of the US Bankruptcy Code; (ii) the filing of a request for the US Bankruptcy Court to grant the Chapter 15 Recognition Order; and (iii) any other filings submitted in the US Bankruptcy Court that are necessary to effectuate the Chapter 15 Recognition Proceeding. |
| **"Reference Date"** | means the earlier of 1 October 2023 and the Restructuring Effective Date. |
| **"Referred Scheme Claim"** | means an Other Debt Scheme Creditor's Entitlement that is: |

(a) not agreed by the Scheme Administrators and the Other Debt Scheme Creditor during the Consultation Period; or

(b) adjusted by the Scheme Administrators and disputed by the Other Debt Scheme Creditor pursuant to Clause 34.8 of this Scheme, and

is referred to the Scheme Adjudicator for determination in accordance with Clause 36 (*Adjudication Procedure*) of this Scheme.

| | |
|---|---|
| **"Regulation D"** | means Regulation D under the US Securities Act. |
| **"Regulation S"** | means Regulation S under the US Securities Act. |
| **"Releases"** | has the meaning given to it in Clause 24 (*Releases*) of this Scheme. |
| **"Released Claims"** | means any of the (i) Scheme Claims, (ii) Ancillary Claims, or (iii) Restructuring Claims. |
| **"Released Persons"** | means (i) the Company, (ii) the SJ Notes Trustee, the SJ Notes Depositary, and the SJ Notes Paying and Transfer Agent and Registrar, (iii) the Lake Notes Trustee and Agent and Existing Agents; (iv) the New Instruments Depositary, the New Instruments Paying and Transfer Agent and Registrar, and the New Instruments Trustee, and the New Instruments Collateral Agent, (v) the Holding Period Trustee, (vi) the Information Agent, (vii) the Scheme Administrators, (viii) the Scheme Adjudicator, (ix) each member of the AHG and any of its respective managers and investment managers' and investment |

15

advisors' respective Affiliates and funds) (in each case, including any of its respective directors, managers or officers), (x) the Advisors, and (xi) the AHG Advisors, and, regarding each of the above, includes each of their respective predecessors, successors and assigns (where applicable) and their respective Personnel, and their respective advisors and in their capacities as such, and "**Released Person**" shall be construed accordingly.

**"Relevant Collateral"**
means any security, collateral, guarantee, bond, indemnity or other form of assurance granted by the Company for the purpose of securing and/or guaranteeing any of the Other Debts.

**"Residual New Instruments"**
means the New Instruments issued to and held by the Holding Period Trustee on trust for the benefit of the Scheme Creditors and Blocked Scheme Creditors on the Restructuring Effective Date, in accordance with the terms of the Holding Period Trust Deed and this Scheme.

**"Restricted Debts"**
means, with respect to a Participating Creditor at any time, the aggregate outstanding principal amount of Existing Debts Instruments set out in the Restricted Debts Notice (as defined in the RSA) then most recently delivered by that Participating Creditor, as modified from time to time by any Transfer Notices (as defined in the RSA) (as applicable) delivered by Participating Creditors to the Information Agent, subject to evidence satisfactory to the Information Agent, having been provided in accordance with Clause 6 (*Accession, Transfer and Purchase, and Aggregate Position Disclosure to the Information Agent*) of the RSA ; and "**Restricted Debt**" means any portion of the Restricted Debts.

**"Restructuring"**
means the restructuring of the debt and other offshore financial obligations of the Company as contemplated by, *inter alia*, the Restructuring Documents and the Scheme.

**"Restructuring Claims"**
means any Claim by a Scheme Creditor against a Released Person in respect of: (A) the preparation, negotiation, execution, sanction or implementation of this Scheme and/or the Restructuring and/or the Restructuring Documents; and/or (B) the execution of the Restructuring Documents and the carrying out of the steps and transactions contemplated therein in accordance with their terms, but, in each case, excluding for the avoidance of doubt, any Claim in respect of any Liability (i) of any Released Person which arises as a result of a failure to comply with any of the terms of this Scheme or any Restructuring Document (including but not limited to the New Instruments Documents) and (ii) arising from or in connection with any Excluded Liability or Excluded Collateral, and "**Restructuring Claim**" shall be construed accordingly.

**"Restructuring Documents"**
means the documents to be entered into by certain parties to implement the terms of the Restructuring including, but not limited to, those documents listed in Schedule 1 (*Restructuring Documents*) of this Scheme in each case in Agreed Form.

**"Restructuring Effective Date"**
means the date on which the Restructuring Effective Date Conditions have been satisfied or waived (as the case may be).

**"Restructuring Effective Date Conditions"**
means the conditions set out in Schedule 3 (*Restructuring Effective Date Conditions*) of this Scheme.

16

**"Restructuring Effective Date Conditions Subsequent"**    means the conditions set out in Clause 6.6 (*Scheme Steps*) of this Scheme.

**"RSA"**    means the restructuring support agreement dated 3 April 2023 between, among others, the Company and the Initial Participating Creditors, as amended or varied from time to time, including by the accession or cessation of parties thereto.

**"Rules"**    has the meaning given to it in Clause 31.5 of this Scheme.

**"Sanctioned Scheme Creditor"**    means a Scheme Creditor that is:

    (a)    designated on any Applicable Sanctions List;

    (b)    resident in, ordinarily located in, or incorporated or domiciled under the laws of any Sanctioned Country;

    (c)    in the aggregate, 50 percent or greater owned, directly or indirectly, or otherwise controlled, directly or indirectly, (in each case with reference to Applicable Sanctions) by any Person or Persons described in (a) or (b) above of this definition; or

    (d)    acting on behalf of or at the direction of any Person or Persons described in (a) or (b) above of this definition,

and which does not have a sanctions license in respect of the Applicable Sanctions which would allow that Scheme Creditor to freely deal in the Scheme Consideration and submit instructions or settle through the Clearing Systems.

**"Sanctioned Country"**    means any country or territory that is the target of any comprehensive country or territory-wide Applicable Sanctions (being, as at the date of the Explanatory Statement, the territories of Crimea, Donetsk and Luhansk, and the countries of Cuba, Iran, North Korea and Syria).

**"Sanctions-Affected Scheme Creditor"**    means a Blocked Scheme Creditor or a Sanctioned Scheme Creditor.

**"Sanctions Law Representations"**    means the sanctions law confirmations and undertakings set out in the Distribution Confirmation Deed.

**"Scheme"**    means the scheme of arrangement to be effected pursuant to sections 670, 673 and 674 of the Hong Kong Companies Ordinance between the Company and the Scheme Creditors, in its present form or with or subject to any non-material modifications, additions or conditions that the Court may think fit to approve or impose and agreed to by the Company and the Majority TJ AHG (provided that the TJ AHG satisfies the Minimum TJ AHG Threshold).

17

| | |
|---|---|
| **"Scheme Adjudicator"** | means an adjudicator appointed by the Company under Clause 35 (*The Scheme Adjudicator*) of this Scheme. |
| **"Scheme Administrators"** | means Mr P. Cowley, Ms Y.M. Lui and Mr C. Ball of KPMG Advisory (Hong Kong) Limited or any individual who is appointed Scheme Administrator under Clause 33 (*The Scheme Administrators*) of this Scheme and each a "**Scheme Administrator**". |
| **"Scheme Administrator Estimate"** | means the Scheme Administrators' estimate of an Other Debt Scheme Creditor's Entitlement pursuant to Clause 34.1 of this Scheme. |
| **"Scheme Administrator Estimate Acceptance or Rejection Form"** | means the form to be submitted by an Other Debt Scheme Creditor in response to the Scheme Administrator Estimate, pursuant to Clause 34.5 of this Scheme. |
| **"Scheme Claim"** | means any Claim by a Scheme Creditor against Tianji under or in respect of the Existing Debt Instruments whether at, before or after the Voting Record Time (including, for the avoidance of doubt, all accrued and unpaid interest on the Existing Debt Instruments up to (but excluding) the Restructuring Effective Date, or accretions arising in respect of, such Claims before, at or after the Voting Record Time but, excluding for the avoidance of doubt (i) any Claim in respect of any Liability of Tianji which arises as a result of a failure to comply with any of the terms of this Scheme or any Restructuring Document (including but not limited to the New Instruments Documents), or (ii) any Claim by a Scheme Creditor not against Tianji arising from or in connection with any Excluded Liabilities or Excluded Collateral. For the avoidance of doubt, in respect of SJ Notes Scheme Creditors, any direct Claim in connection with SJ, and the SJ Notes Subsidiary Guarantors shall be excluded. |
| **"Scheme Conditions"** | means: |
| | (a) the sanction with or without modification (but subject to any such modification being acceptable to the Company and in accordance with the terms of this Scheme) of this Scheme by the Court; |
| | (b) the delivery of the Scheme Sanction Order to the Hong Kong Companies Registrar for registration; |
| | (c) the sanction with or without modification (but subject to any such modification being acceptable to SJ and in accordance with the terms of the SJ Scheme) of the SJ Scheme by the BVI Court; and |
| | (d) the delivery of the SJ Scheme Sanction Order to the BVI Registrar of Corporate Affairs. |
| **"Scheme Consideration"** | means the relevant portion of the rights and interests in the New Instruments to be distributed to Scheme Creditors (and/or their Designated Recipients, as applicable) under and pursuant to the terms of the Scheme (and, without double counting, any Residual New Instruments and Blocked New Instruments). |

18

| | |
|---|---|
| **"Scheme Creditors"** | means, collectively, the SJ Notes Scheme Creditors and the Other Debt Scheme Creditors, and **"Scheme Creditor"** means one of the Scheme Creditors. |
| **"Scheme Creditor Form"** | means: |

    (a) in respect of the SJ Notes Scheme Creditors and Lake Noteholders (who are not Sanctions-Affected Scheme Creditors), a validly completed Account Holder Letter;

    (b) in respect of the Other Debt Scheme Creditors other than Lake Noteholders (who are not Sanctions-Affected Scheme Creditors), a validly completed Proxy Form; and

    (c) in respect of Blocked Scheme Creditors, a validly completed Blocked Scheme Creditor Form,

in each case (other than for Blocked Scheme Creditors) together with a validly completed Distribution Confirmation Deed and Designated Recipient Form (if applicable).

| | |
|---|---|
| **"Scheme Creditor Releasing Parties"** | has the meaning given to it in Clause 24 (*Releases*) of this Scheme. |
| **"Scheme Effective Date"** | means the date on which all of the Scheme Conditions are satisfied and the Scheme becomes effective, as specified in the Scheme Effective Date Notice. |
| **"Scheme Effective Date Notice"** | means the notice to be issued by the Company and delivered to the Information Agent in accordance with Clause 7 (*Notices to Scheme Creditors and Others*) confirming satisfaction of the Scheme Conditions and specifying the Scheme Effective Date. |
| **"Scheme Meeting"** | means the meeting of the Scheme Creditors in relation to the Scheme as convened by an order of the Court for the purpose of considering and, if thought fit, approving, with or without modification, the Scheme, and any adjournment thereof. |
| **"Scheme Sanction Order"** | means the sealed copy of the order of the Court sanctioning the Scheme. |
| **"Scheme Steps"** | means the steps set out in Clause 6 (*Scheme Steps*) of this Scheme. |
| **"SEC"** | means the US Securities and Exchange Commission. |
| **"Security"** | means the security constituted pursuant to the Security Documents. |
| **"Security Documents"** | means the security documents and Share Charges to be entered into in connection with Collateral of the New Instruments substantially in the |

19

form to be made available on the Transaction Website, each of which shall be in the Agreed Form.

| | |
|---|---|
| **"Securities Law Representations"** | means the securities law confirmations and undertakings set out in the Distribution Confirmation Deed forming part of the Solicitation Packet to be made available on the Transaction Website. |
| **"SGX-ST"** | means Singapore Exchange Securities Trading Limited. |
| **"Share Charges"** | means the share charges in favour of the New Instruments Collateral Agent in respect of the New Instruments in accordance with the Security Documents which shall be in the Agreed Form, including but not limited to: |

(a) by Assemble Harmony Limited over the shares of Greet Delight Limited;

(b) by Tianji over the shares of All Peace Investments Limited;

(c) by Tianji over the Class F shares held by Tianji in Nexus Emerging Opportunities Fund Property SP; and

(d) by Central Sino Global Limited over shares of Jovial Idea Developments Limited.

| | |
|---|---|
| **"Singapore"** | means the Republic of Singapore. |
| **"SJ"** | means Scenery Journey Limited, a company incorporated with limited liability under the laws of the British Virgin Islands with company number 1970476 and having its registered office at Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola VG1110, British Virgin Islands. |
| **"SJ AHG"** | means the ad hoc group of holders of the SJ Notes or investment managers for or investment advisors to certain holders of the SJ Notes as constituted from time to time, who are advised by the AHG Advisors. The members of the SJ AHG (each an "**SJ AHG Member**", and collectively the "**SJ AHG**"). |
| **"SJ Existing October 2022 Notes"** | means the 11.5% senior notes in the aggregate principal amount of US$2,000,000,000 due October 24, 2022 (ISIN: XS2109191986, Common Code: 210919198). |
| **"SJ Existing November 2022 Notes"** | means the 13.0% senior notes in the aggregate principal amount of US$645,000,000 due November 6, 2022 (ISIN: XS1903671854, Common Code: 190367185). |
| **"SJ Existing October 2023 Notes"** | means the 12.0% senior notes in the aggregate principal amount of US$2,000,000,000 due October 24, 2023 (ISIN: XS2109192109, Common Code: 210919210). |
| **"SJ Existing November 2023 Notes"** | means the 13.75% senior notes in the aggregate principal amount of US$590,000,000 due November 6, 2023 (ISIN: XS1903671938, Common Code: 190367193). |
| **"SJ New Notes"** | means the new instruments to be issued by SJ to scheme creditors pursuant to the terms of the SJ Scheme. |

| | |
|---|---|
| **"SJ Notes"** | means, collectively, the SJ Existing October 2022 Notes, the SJ Existing November 2022 Notes, the SJ Existing October 2023 Notes, and the SJ Existing November 2023 Notes. |
| **"SJ Notes Asserted Amount**" | has the meaning given to it in Clause 36.17(c)(i) of this Scheme. |
| **"SJ Notes Depositary"** | means Citibank Europe plc as common depositary for the Clearing Systems, acting through its nominee as registered holder of the SJ Notes, Citivic Nominees Limited. |
| **"SJ Notes Documents"** | means the Indentures and any other documents entered into by the Company or any other person guaranteeing or securing liabilities due under or in respect of the SJ Notes. |
| **"SJ Notes Paying and Transfer Agent and Registrar"** | means Citibank, N.A., London Branch in its capacity as paying agent, transfer agent, and registrar in respect of the SJ Notes. |
| **"SJ Notes Scheme Creditors"** | means persons with an economic or beneficial interest as principal in the SJ Notes held in global form or global restricted form through the Clearing Systems as at (1) the Voting Record Time (in respect of voting purposes at the Scheme Meeting) and/or (2) the Entitlement Record Time (in respect of the determination of such person's Entitlement), each of whom has a right, upon satisfaction of certain conditions, to be issued definitive registered notes in accordance with the terms of the SJ Notes and the Indentures, and (but without double counting in each case) the SJ Notes Depositary and the SJ Notes Trustee. |
| **"SJ Notes Subsidiary Guarantors"** | means the entities listed in Schedule 4 (*SJ Notes Subsidiary Guarantors*) of this Scheme. |
| **"SJ Notes Trustee"** | means Citicorp International Limited solely in its capacity as trustee under the Indentures. |
| **"SJ Notes Trustee Instruction"** | means an instruction to the SJ Notes Trustee in such form as the SJ Notes Trustee may reasonably accept. |
| **"SJ RED Distribution Deadline"** | means the date which is fourteen (14) calendar days after the Scheme Effective Date, which will be the final date by which SJ Notes Scheme Creditors must submit all relevant forms in order to receive Scheme Consideration on the Restructuring Effective Date in accordance with the terms of the Scheme and the Restructuring Documents. |
| **"SJ Scheme"** | means the scheme of arrangement proposed by SJ in the British Virgin Islands to effect the restructuring of certain indebtedness of SJ, Hengda Real Estate and certain Subsidiaries of TJ. |
| **"SJ Scheme Administrators"** | has the meaning given to the term "Scheme Administrators" in the SJ Scheme. |

21

| | |
|---|---|
| **"SJ Scheme Consideration"** | means the relevant portion of the rights and interests in the SJ New Notes to be distributed by SJ under the terms of the SJ Scheme. |
| **"SJ Scheme Sanction Order"** | means the sealed copy of the order of the BVI Court sanctioning the SJ Scheme. |
| **"Solicitation Packet"** | means the packet of materials, including the Account Holder Letter and accompanying instructions, the Designated Recipient Form, the Distribution Confirmation Deed, the Proxy Forms, and the Blocked Scheme Creditor Form, all of which are available to Scheme Creditors on the Transaction Website. |
| **"Subsidiary"** | means, with respect to any Person, any corporation, association or other business entity of which more than 50% of the voting power of the outstanding Voting Stock is owned, directly or indirectly, by such Person and one or more other Subsidiaries of such Person. |
| **"Successor Escrow Account"** | means an escrow account to be established for the Perpetuity Period or until the lifting of Applicable Sanctions in respect of all Scheme Creditors, whichever is earlier, by an agent to be appointed by the Company pursuant to the Successor Escrow Agreement for the purposes of holding the Blocked Assets after the expiration of the Holding Period for the Blocked Scheme Creditors who have submitted a validly completed Blocked Scheme Creditor Form together with supporting evidence to the Company prior to the Bar Date. |
| **"Successor Escrow Agent"** | means the Person to be appointed by the Company as escrow agent for the Successor Escrow Account. |
| **"Successor Escrow Agreement"** | means the agreement providing for the creation of the Successor Escrow Account, under which the Successor Escrow Agent shall hold the Blocked Assets for the Company, in a form approved by the Successor Escrow Agent. |
| **"Super Majority Participating Creditors"** | means, at any time, Participating Creditors who hold (beneficially or legally (as applicable), as principal) in aggregate at least 66 2/3% of the outstanding principal amount of the Restricted Debts held in aggregate by all Participating Creditors at that time (for the avoidance of doubt, excluding the SJ Notes beneficially and/or legally (as applicable) held by the Chairman and/or Xin Xin (BVI) Limited and his or its (as applicable) Affiliates which are in the aggregate amount of US$600,000,000 as at the date of the RSA. |
| **"Term Sheet"** | means the restructuring term sheet in respect of the Company's offshore indebtedness dated 20 March 2023 between (among others) the Company and the TJ AHG, as amended, restated and/or supplemented from time to time. A redacted copy of the Term Sheet as of the date of this Agreement, incorporating amendments made by Tianji to cure certain defects and omissions in accordance with the terms thereto, can be found on the transaction website specified in CEG's announcement on the HKEX at: https://www1.hkexnews.hk/listedco/listconews/sehk/2023/0403/2023040304093.pdf |
| **"TJ", "Tianji" or "Company"** | means Tianji Holding Limited（天基控股有限公司）, a company incorporated with limited liability under the laws of Hong Kong with |

company number 1339269 and having its registered office at 15th Floor, YF Life Centre, 38 Gloucester Road, Wanchai, Hong Kong.

**"TJ AHG"**

means the ad hoc group of Participating Creditors or investment managers or investment advisors to such Participating Creditors, who: (i) have been constituted from time to time and as notified to the Company (subject to and in accordance with the transfer provisions under the RSA); and (ii) are advised, by the AHG Advisors from time to time and which such Participating Creditors, as at the date of the RSA, include the Initial Participating Creditors.

**"TJ AHG Legal Fees"**

means the reasonable fees, costs and expenses of the legal advisors (including local counsel and barristers) to the TJ AHG that CEG has agreed to pay in accordance with the terms set out in the following:

(a)    the fee letter agreement dated 4 April 2022 between CEG and Kirkland & Ellis;

(b)    the fee letter agreement dated 6 March 2023 between CEG and Harney Westwood & Riegels; and

(c)    the fee letter agreement dated 6 March 2023 between CEG and Fangda Partners.

**"TJ Group"**

means the Company and its subsidiaries from time to time.

**"TJ Group Entities"**

means: the Company, Ever Grace Group Limited, Shengyu (BVI) Limited, Rise Eagle Worldwide Limited, and Shui Wah Investment Limited.

**"TJ New Notes"**

means the Tranche A Notes, Tranche B Notes, Tranche C Notes and Tranche D Notes in substantially the form set out in the Transaction Website which shall be in Agreed Form.

**"Tranche A Notes"**

means the 6.0% / 7.0% variable rate notes due 2028 with an aggregate principal amount of up to US$100 million to be issued by TJ pursuant to the terms of the Term Sheet and in accordance with the relevant Restructuring Documents in substantially the form set out in the Transaction Website which shall be in Agreed Form.

**"Tranche B Notes"**

means the 6.5% / 7.5% variable rate notes due 2029 with an aggregate principal amount of up to US$200 million to be issued by TJ pursuant to the terms of the Term Sheet and in accordance with the relevant Restructuring Documents in substantially the form set out in the Transaction Website which shall be in Agreed Form.

**"Tranche C Notes"**

means the 7.0% / 8.0% variable rate notes due 2030 with an aggregate principal amount of up to US$300 million to be issued by TJ pursuant to the terms of the Term Sheet and in accordance with the relevant Restructuring Documents in substantially the form set out in the Transaction Website which shall be in Agreed Form.

**"Tranche D Notes"**

means the 7.5% / 8.5% variable rate notes due 2031 with an aggregate principal amount of up to US$200 million to be issued by TJ pursuant to

23

the terms of the Term Sheet and in accordance with the relevant Restructuring Documents in substantially the form set out in the Transaction Website which shall be in Agreed Form.

| | |
|---|---|
| **"Transaction Website"** | means https://projects.morrowsodali.com/evergrande. |
| **"United States" or "US"** | means the United States of America. |
| **"United States Code"** | means the codification by subject matter of the general and permanent laws of the United States. |
| **"US$"** | the lawful currency for the time being of the United States. |
| **"US Bankruptcy Code"** | means Title 11 of the United States Code, as in effect on the date of the Recognition Filing. |
| **"US Bankruptcy Court"** | means the United States Bankruptcy Court for the Southern District of New York. |
| **"US Securities Act"** | means the US Securities Act of 1933, as amended, including the rules and regulations promulgated by the SEC thereunder. |
| **"Valuer"** | means a suitably qualified and experienced valuer(s) (in the reasonable opinion of the Scheme Administrators) specialising in the valuation of onshore real estate projects and the companies associated with such projects who is engaged by the Scheme Administrators under Clause 33.6(f). |
| **"Valuation and Adjudication Procedure"** | means, together, the Valuation Procedure and the Adjudication Procedure in respect of Other Debt Scheme Creditors' Scheme Claims. |
| **"Valuation Procedure"** | means the procedure for determining the value of an Other Debt Scheme Creditor's Entitlement, as set out in Clause 34 (*Valuation Procedure*) of this Scheme. |
| **"VAT"** | means value added tax or any equivalent goods and services tax levied by a Governmental Entity. |
| **"Voting Record Time"** | means 5:00 p.m. Hong Kong time on 18 August 2023. |
| **"Voting Stock"** | means, with respect to any Person, Capital Stock of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person. |

|  | |
|---|---|
| **"Whitelist Scheme Administrators"** | means such persons agreed in writing by the Majority TJ AHG and the Company, including persons agreed in writing prior to the date of this Scheme. |

2.      **INTERPRETATION**

In this Scheme, unless the context otherwise requires or otherwise expressly provides:

2.1      references to Clauses are, unless otherwise stated, references to the clauses set out in Parts B to E (inclusive) of this Scheme;

2.2      references to Recitals, Parts and Schedules are, unless otherwise stated, references to the recitals, parts, and schedules respectively of or to this Scheme;

2.3      references to a "person" include references to an individual, firm, partnership, company, corporation, other legal entity, unincorporated body of persons or any state or state agency;

2.4      references to a statute or a statutory provision include the same as subsequently modified, amended or re-enacted from time to time;

2.5      references to an agreement, deed or document shall be deemed also to refer to such agreement, deed or document as amended, supplemented, restated, verified, replaced, and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto;

2.6      the singular includes the plural and vice versa and words importing one gender shall include all genders;

2.7      headings to Recitals, Parts, Clauses and Sub-Clauses are for ease of reference only and shall not affect the interpretation of this Scheme;

2.8      references to times and dates (unless stated otherwise) are to times and dates in Hong Kong;

2.9      references to "**US$**" and "**HK$**" are references to the lawful currency of the United States of America and the lawful currency of Hong Kong, respectively;

2.10     the words "**include**" and "**including**" are to be construed without limitation, general words introduced by the word "**other**" are not to be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things, and general words are not to be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words;

2.11     a company is a "**subsidiary**" of another company, its "**holding company**", if that other company (a) holds a majority of the voting rights in it; (b) is a member of it and has the right to appoint or remove a majority of its board of directors; or (c) is a member of it and controls alone, pursuant to an agreement with other members, a majority of the voting rights in it, or, if it is a subsidiary of a company that is itself a subsidiary of that other company;

2.12     an "**undertaking**" means a body corporate or partnership; or an unincorporated association carrying on a trade or business, with or without a view to profit; and an undertaking is a parent undertaking in relation to another undertaking, a "**subsidiary undertaking**", if (a) it holds the majority of voting rights in the undertaking; (b) it is a member of the undertaking and has the right to appoint or remove a majority of its board of directors; (c) it has the right to exercise a dominant influence over the undertaking (i) by virtue of provisions contained in the undertaking's articles, or (ii) by virtue of a control contract; or

25

(d) it is a member of the undertaking and controls alone, pursuant to an agreement with other shareholders or members, a majority of the voting rights in the undertaking;

2.13    to the extent that there is any conflict or inconsistency between the terms of this Scheme and the Explanatory Statement, the terms of this Scheme shall prevail; and

2.14    any formulas, numbers, calculation methodology may have accounted for and/or is subject to rounding.

**PART B**
**THE SCHEME**

**3.    APPLICATION AND EFFECTIVENESS OF THIS SCHEME**

3.1    The compromise and arrangement effected by this Scheme shall apply to all Scheme
Claims and shall be binding on the Company, the SJ Notes Subsidiary Guarantors, and all
Scheme Creditors, and their respective successors, assigns and transferees (including any
modifications to this Scheme are made in accordance with Clause 27 (*Modifications to the
Scheme and the Restructuring Documents*) of this Scheme). Subject to Clause 3.2 of this
Scheme, the Scheme Creditors shall be eligible to receive certain rights in accordance with
the terms of this Scheme in full and final settlement of their Scheme Claims.

3.2    Notwithstanding any other provisions of this Scheme, Excluded Liabilities and Excluded
Collateral shall not be subject to the compromise and arrangement effected by this Scheme. In
respect of the SJ Notes, the Excluded Liabilities shall instead be subject to the compromise and
arrangement effected by the SJ Scheme, such that this Scheme and the SJ Scheme shall together
effect an arrangement and compromise of all Claims of the SJ Notes Scheme Creditors in
respect of the SJ Notes.

3.3    The terms of this Scheme shall become effective on and from the Scheme Effective Date.

3.4    The Company or the Information Agent (acting on behalf of the Company) shall also notify the
Scheme Creditors, the SJ Notes Trustee, the New Instruments Trustee, and the New Instruments
Collateral Agent (as required), in writing that the Scheme Effective Date has occurred in
accordance with Clause 7.1 below.

3.5    If the Restructuring Effective Date has not occurred on or before the Longstop Date (as
may be extended pursuant to Clause 3.6 below), the terms of, and obligations on the parties
under or pursuant to, this Scheme shall lapse and all compromises and arrangements
provided for by this Scheme shall have no force or effect and any Restructuring Documents
held in escrow shall be promptly destroyed by or on behalf of the Company, and the rights
and obligations of the Scheme Creditors shall not be affected and shall be reinstated and
remain in full force and effect.

3.6    The Company may at any time before the occurrence of the Longstop Date (or any
extension thereof in accordance with this Clause 3.6) extend the Longstop Date until such
later date and time as the Company may elect to extend with the prior written consent of:

(a)    the Majority TJ AHG; or

(b)    (without prejudice to the foregoing) if the TJ AHG does not hold the Minimum TJ
AHG Threshold, the Majority Participating Creditors,

(a "**Longstop Date Extension**").

3.7    Subject to compliance with Clause 3.6 above, the Company shall promptly notify the
Information Agent of any Longstop Date Extension by delivering a notice confirming the
Longstop Date Extension (a "**Longstop Date Extension Notice**") to the Information Agent,
and the Information Agent shall promptly notify Scheme Creditors of the Longstop Date
Extension by:

(a)    sending the Longstop Date Extension Notice to the SJ Notes Trustee and the New
Instruments Trustee;

27

(b)      circulating the Longstop Date Extension Notice to the SJ Notes Scheme Creditors via the Clearing Systems;

(c)      posting the Longstop Date Extension Notice on the Transaction Website;

(d)      posting the Longstop Date Extension Notice on the Company Website;

(e)      sending the Longstop Date Extension Notice via email to each Person who the Company believes may be a Scheme Creditor who has been registered as a Scheme Creditor (other than Blocked Scheme Creditors) with the Information Agent or has otherwise notified the Company or the Information Agent of its valid electronic mail address. GLAS is responsible for sending the Longstop Date Extension Notice via electronic email to Blocked Scheme Creditors for whom they have a valid email address; and

(f)      publishing an announcement of the Longstop Date Extension on the respective websites of HKEX and SGX-ST.

3.8      On and following the Restructuring Effective Date, the Scheme Claims of each Scheme Creditor, and any Person, including a successor, assignee or transferee, who acquires any interest in or arising out of a Scheme Claim after the Voting Record Time, shall be subject to the compromises and arrangements set out in this Scheme, including without limitation Clause 4 (*Compromise and Arrangement with the Scheme Creditors*) below.

3.9      The Restructuring Effective Date of this Scheme shall be on the same date as the "Restructuring Effective Date" (as defined in the SJ Scheme) of the SJ Scheme.

**4.      COMPROMISE AND ARRANGEMENT WITH THE SCHEME CREDITORS**

4.1      On the Restructuring Effective Date:

(a)      the Company shall, for and on behalf of each Scheme Creditor, execute the Deeds of Release; and

(b)      the respective rights and obligations of the Scheme Creditors (including, for the avoidance of doubt, any Person, including a successor, assignee or transferee, that acquires an interest in the Existing Debt Instruments after the Voting Record Time) the Company, the Existing Agents, the Lake Notes Trustee and Agent, and, in respect of the SJ Notes Scheme Creditors, the SJ Notes Trustee, and the SJ Notes Depositary, towards one another under the Existing Debt Instruments and in respect of any other Scheme Claim (except for the Excluded Liabilities and Excluded Collateral) will terminate and be discharged,

in consideration for which the Company shall issue the Scheme Consideration to the Scheme Creditors (other than to the Sanctions-Affected Scheme Creditors, the Existing Agents, and the Lake Notes Trustee and Agent), the Designated Recipients and/or to the Holding Period Trustee to be held on trust for and on behalf of such relevant Blocked Scheme Creditors during the Holding Period, subject to Clause 21 (*Fractional Adjustments*) and the terms of Part D (*Scheme Consideration*) below.

4.2      Each Scheme Creditor hereby acknowledges and agrees that any action taken by the Company in accordance with this Scheme or the Restructuring Documents will not constitute a breach of or any default (howsoever described) under the SJ Notes Documents or any other agreement or document governing the terms of the Other Debts or any Scheme Claim and irrevocably waives and releases any such breach or default.

28

5.        **AUTHORITY AND INSTRUCTIONS**

5.1      With effect from the Scheme Effective Date, in consideration of the rights provided to the Scheme Creditors under this Scheme and solely for the purposes of giving effect to the terms of this Scheme, each Scheme Creditor hereby appoints the Company as its attorney and agent and irrevocably authorizes, directs, instructs and empowers the Company (represented by any duly authorized representative) to, as applicable:

(a)      enter into, execute and deliver (whether as a deed or otherwise) for and on behalf of that Scheme Creditor, in its capacity as a Scheme Creditor, including any Person, successor, assignee or transferee, to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time (to the extent applicable), sufficient original copies of (as agreed between the parties thereto):

(i)      the Restructuring Documents (in each case in the Agreed Form) to which such Scheme Creditor is a party, each substantially in the form attached to this Scheme or the Explanatory Statement (as applicable) or otherwise in the form circulated to Scheme Creditors or otherwise made available to them, including on the Transaction Website, subject to any non-material modification approved or imposed by the Court in accordance with Clause 27 (*Modifications to the Scheme and the Restructuring Documents*); and

(ii)     any and all such other documents (in each case in the Agreed Form) that the Company and the TJ AHG reasonably considers necessary to give effect to the terms of this Scheme,

in each case to be held to the order of the relevant parties thereto (for the avoidance of doubt, to the order of the Company on behalf of each Scheme Creditor) until the Restructuring Effective Date, in accordance with the Scheme Steps for the purposes of giving effect to the terms of this Scheme;

(b)      take or carry out any other step or procedure reasonably required to effect the settlement of the Scheme; and

(c)      to the extent applicable, in respect of Other Debts, instruct each of the Existing Agents and the Lake Notes Trustee and Agent, acting in its capacity as Existing Agent or the Lake Notes Trustee and Agent (as appropriate) and each of its employees and agents to promptly take or carry out any step, procedure or execute and comply with any Restructuring Documents reasonably required to give effect to the terms of the Scheme.

5.2      On or as soon as possible after the Scheme Effective Date:

(a)      the Company shall carry out the steps set out in Clause 5.1 and this Clause 5.2, acting on the instructions and pursuant to the authority of the Scheme Creditors; and

(b)      the Company, each SJ Notes Subsidiary Guarantor, each New Instruments Pledgor, the SJ Notes Trustee, the Existing Agents, the Lake Notes Trustee and Agent, the New Instruments Trustee, the SJ Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the SJ Notes Depositary, the New Instruments Depositary, the New Instruments Collateral Agent and the Holding Period Trustee shall enter into, execute and deliver (whether as a deed or otherwise) sufficient original copies of (as agreed between the parties thereto):

29

(i)      the Restructuring Documents (in each case in the Agreed Form) to which the Company, such SJ Notes Subsidiary Guarantor, such New Instruments Pledgor, the SJ Notes Trustee, the Existing Agents, the Lake Notes Trustee and Agent, the New Instruments Trustee, the SJ Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the SJ Notes Depositary, the New Instruments Depositary, and the New Instruments Collateral Agent is a party, each substantially in the form made available to Scheme Creditors on the Transaction Website or otherwise made available to them, subject to any non-material modification approved or imposed by the Court in accordance with Clause 27 (*Modifications to the Scheme and the Restructuring Documents*); and

(ii)     any and all such other documents (in each case in the Agreed Form) that the Company and the TJ AHG reasonably consider necessary to give effect to the terms of this Scheme,

in each case to be held to the order of the relevant parties thereto until the Restructuring Effective Date, in accordance with the Scheme Steps for the purposes of giving effect to the terms of this Scheme.

5.3     With effect from the Scheme Effective Date, each of the Scheme Creditors irrevocably authorises and instructs the SJ Notes Trustee, the Existing Agents, the Lake Notes Trustee and Agent, the New Instruments Trustee, the SJ Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, SJ Notes Depositary, the New Instruments Depositary, the New Instruments Collateral Agent and the Holding Period Trustee to enter into, execute and deliver (whether as a deed or otherwise) sufficient original copies of (as agreed between the parties thereto):

(i)      the Restructuring Documents (in each case in the Agreed Form) to which the SJ Notes Trustee, the Existing Agents, the Lake Notes Trustee and Agent, the New Instruments Trustee, SJ Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, SJ Notes Depositary, the New Instruments Depositary, the New Instruments Collateral Agent and the Holding Period Trustee is a party, each substantially in the form attached to this Scheme or the Explanatory Statement (as applicable) or otherwise in the form circulated to Scheme Creditors or otherwise made available to them including on the Transaction Website, subject to any non-material modification approved or imposed by the Court in accordance with Clause 27 (*Modifications to the Scheme and the Restructuring Documents*); and

(ii)     any and all such other documents (in each case in the Agreed Form) that the Company and the TJ AHG reasonably consider necessary to give effect to the terms of this Scheme,

in each case to be held to the order of the relevant parties thereto until the Restructuring Effective Date, in accordance with the Scheme Steps for the purposes of giving effect to the terms of this Scheme.

5.4     On the Restructuring Effective Date, each Scheme Creditor (to the extent applicable) hereby irrevocably authorizes and instructs:

(a)     the Company, the SJ Notes Trustee, the SJ Notes Depositary, the SJ Notes Paying and Transfer Agent and Registrar, and the Information Agent to take all such actions as may be necessary or appropriate to release the guarantee of the SJ Notes

by the Company endorsed on the Global Certificates and all obligations of the Company in respect of the SJ Notes Documents.

(b)     the SJ Notes Depositary, the New Instruments Depositary and the Information Agent to rely upon the provisions of this Scheme, without any duty to investigate further and without incurring any liability for doing so (other than any liability arising as a result of the fraud, wilful default or wilful misconduct of the SJ Notes Depositary or the fraud, wilful default or wilful misconduct of the Information Agent); and

(c)     the Company as its attorney and agent and irrevocably authorises, directs, instructs and empowers the Company (represented by any authorised representative) to in respect of the Other Debts, instruct each of the relevant Existing Agent and the Lake Notes Trustee and Agent, acting in its capacity as Existing Agent or the Lake Notes Trustee and Agent (as appropriate) and each of its employees and agents promptly take or carry out any step, procedure or to execute and comply with any Restructuring Documents reasonably required to give effect to the terms of this Scheme.

5.5     The authority granted under Clauses 5.1 to 5.4 (inclusive) shall be treated, for all purposes whatsoever and without limitation, as having been granted by deed and the Company shall be entitled to delegate the authority granted and conferred by this Clause 5 (*Authority and Instructions*) to any duly authorized officer or agent of the Company as necessary.

5.6     Each Scheme Creditor (for itself and, if applicable, for its Designated Recipient and any person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time) on and from the Scheme Effective Date and on and from the Restructuring Effective Date, irrevocably ratifies and confirms any act or omission done, caused or purported to be done by:

(a)     the Company, the SJ Notes Subsidiary Guarantors, the New Instruments Pledgors, the New Instruments Collateral Agent and the Information Agent or any of their respective directors, managers, officers, partners or Affiliates, pursuant to or for the purposes of giving effect to this Scheme, other than any act or omission done or made as a result of fraud, wilful default or wilful misconduct; and

(b)     the SJ Notes Trustee, the Existing Agents, the Lake Notes Trustee and Agent, the New Instruments Trustee, the SJ Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the SJ Notes Depositary, the New Instruments Depositary or any of their respective directors, managers, officers, partners or Affiliates, pursuant to or for the purposes of giving effect to this Scheme, other than any act or omission done or made as a result of fraud, wilful default or wilful misconduct.

6.      **SCHEME STEPS**

*Prior to the Restructuring Effective Date*

6.1     The Company shall announce and specify the Restructuring Effective Date in a notice confirming satisfaction of the Restructuring Effective Date Conditions and enclosing a copy of the Scheme Sanction Order and the Chapter 15 Recognition Order in accordance with Clause 7.1 (*Notices to Scheme Creditors and Others*) below to Scheme Creditors, the SJ Notes Trustee and the New Instruments Trustee as soon as reasonably practicable after satisfaction of the Restructuring Effective Date Conditions (the "**Completion Notice**").

6.2    The Restructuring Effective Date shall occur after the satisfaction or waiver (to the extent permitted by law and the RSA (applied *mutatis mutandis*)) of  the Restructuring Effective Date Conditions, on or prior to such date.

6.3    The Restructuring Documents may be executed at any time after the Scheme Effective Date, but shall only take effect in accordance with their terms and the terms of this Scheme, including the satisfaction of the Restructuring Effective Date Conditions, on the Restructuring Effective Date.

6.4    The Company (in consultation with the Information Agent and/or the Scheme Administrator) shall calculate the amount of the New Instruments to be issued and distributed to each Eligible Creditor (and/or their Designated Recipient) and the Holding Period Trustee on the Restructuring Effective Date in accordance with the terms of this Scheme and the Restructuring Documents.

*On the Restructuring Effective Date*

6.5    On the Restructuring Effective Date, the following steps shall occur (in the order set out below to the extent possible):

(a)    the duly executed Restructuring Documents (save for the Deeds of Release and the SJ Notes Trustee Instruction which are the subject of sub-clauses (f) and (h) below), and shall be released from escrow and delivered by the relevant parties or otherwise become effective in accordance with their terms;

(b)    each Scheme Creditor and each Designated Recipient (if applicable) shall, subject to Clause 21 (*Fractional Adjustments*) and the terms of Part D (*Scheme Consideration*) below, become entitled to receive its respective proportion of the Scheme Consideration as calculated and in accordance with Part D (*Scheme Consideration*) below;

(c)    the Company shall issue and distribute the New Instruments to the SJ Notes Scheme Creditors (who are Eligible Creditors), the Designated Recipients and/or the Holding Period Trustee (as applicable) in each case in accordance with their respective entitlements under the Scheme and subject to and in accordance with Part D (*Scheme Consideration*) below;

(d)    the Company shall pay the Consent Fee to each Scheme Creditor who is an Eligible Participating Creditor (and/or their Designated Recipient) who is entitled to such payment pursuant to the terms of the RSA and/or the Holding Period Trustee (for the Scheme Creditors who are Blocked Scheme Creditors);

(e)    the Residual New Instruments shall be issued to and held by the Holding Period Trustee on trust for the benefit of the Scheme Creditors and Blocked Scheme Creditors, in accordance with the terms of the Holding Period Trust Deed, during the Holding Period subject to and in accordance with Part D (*Scheme Consideration*) below;

(f)    the steps described in Clause 4 (*Compromise and Arrangement with the Scheme Creditors*) shall occur and the releases contained in Clause 24 (*Releases*) of this Scheme and the Deeds of Release shall be effective and shall be binding on all parties in accordance with their terms;

(g)    the Company via the Information Agent shall deliver the Clearing System Instruction to each of the Clearing Systems;

(h)    the Company, acting as agent for the Scheme Creditors, shall deliver the executed SJ Notes Trustee Instruction to the SJ Notes Trustee; and

(i)    the SJ Trustee and the SJ Notes Paying and Transfer Agent and Registrar shall, upon receipt of the SJ Trustee Instruction, take all such actions as may be necessary or appropriate to release the guarantee of the SJ Notes by the Company endorsed on the Global Certificates and all obligations of the Company under or in respect of the SJ Notes Documents, such that the respective rights and obligations of the SJ Notes Scheme Creditors (including, for the avoidance of doubt, any Person that acquires an interest in the SJ Notes after the Voting Record Time) and the Company towards one another in respect of the SJ Notes Documents will terminate.

*Subsequent to the Restructuring Effective Date*

6.6    Following the Restructuring Effective Date, the Company shall take steps to satisfy the Restructuring Effective Date Conditions Subsequent, unless waived to the extent permitted by law and the RSA:

(a)    the completion of the Valuation and Adjudication Procedure in respect of each Other Debt Scheme Creditor's Entitlement under the Scheme and the distribution of Scheme Consideration to Scheme Creditors in accordance with Part D (*Scheme Consideration*) below;

(b)    if applicable, the Holding Period Trustee shall make the interim distribution in accordance with Clause 17 (*Interim Distribution*);

(c)    the Holding Period Trustee shall make the Final Distribution in accordance with Clause 15 (*Final Distribution to Scheme Creditors*); and

(d)    the satisfaction of each of the specific conditions subsequent contained in each of the Restructuring Documents (in each case in the Agreed Form) and any corporate governance term sheet forming part of the Explanatory Statement.

## PART C
## NOTICES AND SCHEME CLAIMS

**7.**    **NOTICES TO SCHEME CREDITORS AND OTHERS**

7.1    The Company or the Information Agent (acting on behalf of the Company) shall promptly notify the Scheme Creditors, the SJ Notes Trustee, the New Instruments Trustee and the New Instruments Collateral Agent of:

(a)    the satisfaction of the Scheme Conditions and the occurrence of the Scheme Effective Date via a Scheme Effective Date Notice; and

(b)    the satisfaction of the Restructuring Effective Date Conditions and the designation of the Restructuring Effective Date via a Completion Notice,

by:

(i)    sending the relevant notice to the SJ Notes Trustee and the New Instruments Trustee;

(ii)    circulating the relevant notice through the Clearing Systems;

(iii)    posting the relevant notice on the Transaction Website;

(iv)    posting the relevant notice on the Company Website;

(v)    posting an announcement on the respective websites of HKEX and SGX-ST; and

(vi)    sending the relevant notice via email to each Person who the Company believes may be a Scheme Creditor (other than the Blocked Scheme Creditors) and which is registered as a Scheme Creditor with the Information Agent or has otherwise notified the Company or Information Agent of its valid electronic mail address. GLAS shall be responsible for the sending the relevant notice via electronic mail to each Person who the Company believes may be a Blocked Scheme Creditors for whom the Company or GLAS has a valid email address.

7.2    All other notices under this Clause 7 (*Notices to Scheme Creditors and Others*) to Scheme Creditors may be given by the Company in the following ways:

(a)    by notice on the Transaction Website;

(b)    by notice on the Company Website;

(c)    by notice through the Clearing Systems by the Information Agent;

(d)    by notice via email to each person who the Company believes may be a Scheme Creditor, and who has registered as a Scheme Creditor with the Company or the Information Agent or GLAS (as the case may be) or otherwise notified the Company, the Information Agent or GLAS (as the case may be) of its valid email address; and

(e)    by the publishing of an announcement on the respective websites of HKEX and SGX-ST.

34

**8.    ENTITLEMENT RECORD TIME AND SCHEME CLAIMS**

8.1    The Scheme Creditors' Entitlement shall be determined by the Scheme Administrators in accordance with their Scheme Claims as at the Entitlement Record Time.

8.2    The Scheme Creditors acknowledge and agree that the Scheme Administrators shall:

(a)    in respect of the SJ Notes Scheme Creditors and the Lake Noteholders who are not Sanctions-Affected Scheme Creditors, use the appropriate Scheme Creditor Form submitted by or on behalf of each SJ Notes Scheme Creditor or the Lake Noteholders (as applicable), as verified against the books and records of the SJ Notes Depository, the Lake Notes Trustee and Agent in its capacity as notes trustee and/or their respective nominee and the Clearing Systems in respect of the SJ Notes Scheme Creditors and the Lake Noteholders;

(b)    in respect of all other Scheme Creditors who are not Sanctions-Affected Scheme Creditors, use the appropriate Scheme Creditor Form submitted by or on behalf of each relevant Scheme Creditor, and seek to verify the relevant Scheme Creditor's identity, status as a Scheme Creditor, and value of its holding to the best of its ability based on the information provided in the respective Scheme Creditor Form; and

(c)    in respect of Blocked Scheme Creditors, use the appropriate Blocked Scheme Creditor Form submitted by or on behalf of each Blocked Scheme Creditor, as verified against the records of GLAS and the Company, including any additional evidence as reasonably required by GLAS and/or the Company and requested from the Blocked Scheme Creditor to be provided in relation to its Scheme Claim,

in each case, by the Bar Date, or, in respect of SJ Notes Scheme Creditors who qualify to receive the Initial Distribution, by the SJ RED Distribution Deadline, to determine the value of the Scheme Claims of each Scheme Creditor for the purposes of calculating their Entitlement to the Scheme Consideration (in respect of the Other Debt Scheme Creditors, as further determined by the Valuation and Adjudication Procedure), and any such determination shall (in the absence of manifest error, wilful default, wilful misconduct or fraud) be conclusive and binding on the Scheme Creditors and the Company.

8.3    The Information Agent shall use reasonable endeavours to review each Scheme Creditor Form other than Blocked Scheme Creditor Forms and all Custody Instructions (if applicable) promptly after receipt, against the records of the Clearing Systems (in respect of the SJ Noteholders and the Lake Noteholders) or the Company's books and records, in respect of the Other Debts (other than the Lake Notes) to assist the Scheme Administrators in determining each Scheme Claim. GLAS shall use reasonable endeavours to review and verify each Blocked Scheme Creditor Form promptly after receipt, to assist the Scheme Administrators in determining the Blocked Scheme Creditor's Scheme Claim. Notwithstanding the foregoing, it is the sole responsibility of each Scheme Creditor to ensure that any Scheme Creditor Form submitted in respect of its Scheme Claim has been validly completed, including the Accession Code, if applicable, and that any Custody Instruction has been validly submitted via the Clearing Systems.

8.4    Where the Information Agent reasonably considers a SJ Notes Scheme Creditor to be a Sanctions-Affected Scheme Creditor, it shall promptly refer the relevant Scheme Creditor to the Company and the relevant Scheme Creditor shall be treated and administered as if it were a Blocked Scheme Creditor or Sanctioned Scheme Creditor (as applicable) for the purposes of the Scheme.

**9.    ACCEPTANCE OF DOCUMENTATION**

9.1    Any Scheme Creditor Forms submitted, as applicable, shall be submitted in accordance with the instructions set out in the relevant Scheme Creditor Form included in the Solicitation Packet as published on the Transaction Website.

9.2    Whether a Scheme Creditor Form has been validly completed shall be determined by the Scheme Administrators, based on information checked by the Information Agent against the records of the Clearing Systems (in respect of the SJ Noteholders and the Lake Noteholders) or the Company's books and records, in respect of the Other Debts (other than the Lake Notes), or reviewed by GLAS against the Company's books and records (in respect of the Blocked Scheme Creditors'), at their discretion, provided that, if the Scheme Administrators consider any such document not to have been validly completed, the Scheme Administrators shall promptly:

(a)    prepare a written statement of their reasons for that conclusion; and

(b)    send that written statement by email to the party that provided the relevant document.

9.3    Where a Scheme Creditor Form is considered not to have been validly completed, and the Bar Date has not yet occurred at the time of such determination, the relevant Scheme Creditor may resubmit the Scheme Creditor Form. No Scheme Creditor Forms may be resubmitted after the Bar Date and Clauses 10.7 and 10.9 (*Deadlines and Bar Dates*) shall apply (as the case may be).

9.4    Except in respect of a determination made as a result of fraud, wilful default or wilful misconduct, none of the Company, the Scheme Administrators, the Information Agent, or GLAS will be responsible for any loss or liability incurred by a Scheme Creditor as a result of any determination by the Scheme Administrators, GLAS or the Information Agent (as applicable).

**10.    DEADLINES AND BAR DATES**

10.1    All Scheme Claims will be released on the Restructuring Effective Date in accordance with the terms of this Scheme.

*SJ Notes Scheme Creditors*

10.2    In addition to the documentation specified in Clause 10.3 below, an SJ Notes Scheme Creditor (other than a Sanctions-Affected Scheme Creditor) must ensure that its Account Holder submits a validly completed and executed Custody Instruction via the Clearing Systems prior to the submission of an Account Holder Letter and, in any event, before:

(a)    the Custody Instruction Deadline, in order to receive Scheme Consideration on the Restructuring Effective Date; or

(b)    the Holding Period Custody Instruction Deadline, in order to receive Scheme Consideration on the Final Distribution Date (unless a valid Custody Instruction was previously submitted by the Custody Instruction Deadline).

10.3    A SJ Notes Scheme Creditor who is not a Sanctions-Affected Scheme Creditor must ensure that:

(a)     the following Scheme Creditor Forms are received by the Information Agent in relation to the SJ Notes held by that SJ Notes Scheme Creditor:

    (i)      a validly completed and executed Account Holder Letter,

    (ii)     Distribution Confirmation Deed, and

    (iii)    Designated Recipient Form (if applicable),

by:

    (i)      the SJ RED Distribution Deadline in order to be entitled to receive Scheme Consideration on the Restructuring Effective Date; or

    (iv)     the Bar Date in order to be entitled to receive Scheme Consideration on the Final Distribution Date.

10.4    Any SJ Notes Scheme Creditor who is not a Sanctions-Affected Scheme Creditor that fails to comply with Clauses 10.2 and 10.3 shall have its rights under this Scheme extinguished and shall not be entitled to receive Scheme Consideration under this Scheme.

*Other Debt Scheme Creditors*

10.5    In addition to the documentation specified in Clause 10.6 below, a Lake Noteholder (other than a Sanctions-Affected Scheme Creditor) must ensure that its Account Holder submits a validly completed and executed Custody Instruction via the Clearing Systems prior to the submission of an Account Holder Letter and, in any event, before the Holding Period Custody Instruction Deadline, in order to receive Scheme Consideration on the Final Distribution Date.

10.6    An Other Debt Scheme Creditor who is not a Sanctions-Affected Scheme Creditor must ensure that:

(a)     in respect of Other Debt Scheme Creditors other than a Lake Noteholder, the following Scheme Creditor Forms are received by the Information Agent by (x) the Voting Record Time to receive the Consent Fee only (if applicable); or (y) the Bar Date in relation to the Other Debt Scheme Creditor's Other Debts: (i) a validly completed and executed Proxy Form, (ii) Distribution Confirmation Deed, and (iii) Designated Recipient Form (if applicable); or

(b)     in respect of Lake Noteholders, the following Scheme Creditor Forms are received by the Information Agent by (x) the Voting Record Time to receive the Consent Fee only (if applicable); or (y) the Bar Date in relation to the Lake Notes held by that Lake Noteholder: (i) a validly completed and executed Account Holder Letter, (ii) Distribution Confirmation Deed, and (iii) Designated Recipient Form (if applicable).

10.7    Any Other Debt Scheme Creditor who is not a Sanctions-Affected Scheme Creditor that fails to comply with Clauses 10.5 and 10.6 (as applicable) shall have its rights under this Scheme extinguished and shall not be entitled to receive the Scheme Consideration under this Scheme.

*Blocked Scheme Creditors*

10.8    Subject to Clauses 14 (*Distribution to the Holding Period Trustee*) and 16 (*Distribution to the Successor Escrow Account for Blocked Scheme Creditors*) below, a Blocked Scheme Creditor must ensure that a validly completed and executed Blocked Scheme Creditor Form, together with supporting evidence, is received by GLAS by (x) the Voting Record Time to have any Consent Fee (if applicable) to which it may be entitled issued to the Holding Period Trustee on the Restructuring Effective Date; or (y) the Bar Date, in order to be entitled to receive Scheme Consideration on the lifting of Applicable Sanctions.

10.9    Any Blocked Scheme Creditor that fails to comply with Clause 10.8 shall have its rights under this Scheme extinguished and shall not be entitled to receive the Scheme Consideration under this Scheme.

10.10    Sanctioned Scheme Creditors must contact the Company in writing pursuant to the notice details set out in Clause 37 (*Notice*) to bring its status as a Sanctioned Scheme Creditor to the attention of the Company on or before the Bar Date. Any Sanctioned Scheme Creditor that fails to comply with this Clause 10.10 shall have its rights under this Scheme extinguished, including any right which it may have to receive Scheme Consideration under this Scheme.

## 11.    ASSIGNMENTS OR TRANSFERS OF SCHEME CLAIMS

11.1    The Scheme Administrators shall not be under any obligation to recognise any sale, assignment or transfer of any Scheme Claim after the Entitlement Record Time for the purposes of determining the Entitlement of each Scheme Creditor (and/or their Designated Recipient, as applicable) under the Scheme. The Scheme Administrators may, in their sole discretion and subject to the production of such evidence as they may reasonably require and to any other terms and conditions which the Scheme Administrators may consider necessary or desirable, agree to recognise such assignment or transfer for the purposes of determining Entitlements to Scheme Consideration under the Scheme.

11.2    Any assignee or transferee of a Scheme Creditor so recognised by the Scheme Administrators shall be bound by the terms of the Scheme in the event that it becomes effective as if it were a Scheme Creditor and shall produce such evidence as the Scheme Administrators may reasonably require to confirm that it has agreed to be bound by the terms of the Scheme. None of the SJ Notes Trustee or the SJ Notes Paying and Transfer Agent and Registrar will be responsible for confirming SJ Notes Scheme Creditors as at the Entitlement Record Time or for monitoring, acknowledging or processing any assignments that occur after the Entitlement Record Time.

11.3    Other Debt Scheme Creditors (other than the Lake Noteholders) are not prevented by this Scheme from selling, assigning or transferring any Excluded Liability or Excluded Collateral after the Restructuring Effective Date. Where the Other Debts are sold, assigned or transferred by an Other Debt Scheme Creditor, after the Restructuring Effective Date, the Other Debt Scheme Creditors as at the Entitlement Record Time shall remain entitled to receive the Scheme Consideration pursuant to the terms of this Scheme (rather than the assignee, purchaser or transferee of the relevant Other Debts). Notwithstanding the foregoing, any sold, assigned or transferred Excluded Liability or Excluded Collateral shall be disclosed to the Scheme Administrators and/or the Scheme Adjudicator (as applicable) in accordance with the terms of the Scheme, and shall be taken into account for the purpose of calculating the Assessed Value when determining relevant Other Debt Scheme Creditor's Entitlement.

**PART D**
**SCHEME CONSIDERATION**

**12.    CALCULATION OF A SCHEME CREDITOR'S ENTITLEMENT**

12.1    Each Scheme Creditor will be entitled to receive (or have the Holding Period Trustee or the Successor Escrow Agent receive on its behalf, if applicable) a pro rata share of the Scheme Consideration in respect of the value of its "**Entitlement**" relative to the Entitlement of all Scheme Creditors who validly claim Scheme Consideration.

12.2    Each Scheme Creditor's Entitlement shall be determined by the Company (in consultation with the Information Agent and/or the Scheme Administrator) on a "**Deficiency Basis**" in accordance with the following formulas:

(a)    In respect of the SJ Notes Scheme Creditors:

"**SJ Notes Scheme Creditor's Entitlement**"  =        $A - B$

where:

**A** = the value of the SJ Notes Scheme Creditor's Scheme Claims calculated on a Full Accrued Claim Basis by reference to the records of the SJ Notes Trustee subject to reconciliation of the Custody Instruction submitted by or on behalf of such SJ Notes Scheme Creditor with the records of the Clearing Systems.

**B** = the NPV of the SJ New Notes received by such SJ Notes Scheme Creditor under the SJ Scheme as determined by the Scheme Administrators (the "**NPV Amount**"). The Scheme Administrators will: (i) in consultation with the Company and/or the Information Agent in the Scheme Administrators' sole discretion, calculate the amount of SJ New Notes received by such SJ Notes Scheme Creditors based on the information provided by the SJ Scheme Administrators; and (ii) determine the NPV on the Scheme Effective Date, taking into account, among other factors:

(1)    market bond yields for issuers that has a comparable profile in terms of location(s) of risk, leverage, scale and industry, as per implied by the average closing bond price prior to the date of determination;

(2)    coupon rate of new bond issuance with similar credit quality in terms of location(s) of risk, leverage, scale and industry, as per implied by the average closing bond price prior to the date of determination;

(3)    projected cashflow to be generated by the obligors under the SJ New Notes in consultation with the Group's management; and

(4)    assessed value and/or the projected cash flow for the underlying assets to support repayment of the SJ New Notes to the extent provided in consultation with the Group's management.

(b)    In respect of each Other Debt Scheme Creditor whose claim is against the Company under the Other Debts:

"**Other Debt Scheme Creditor's Entitlement**" =        $A - B - C$

where:

**A** = the value of the Other Debt Scheme Creditor's Scheme Claims calculated on a Full Accrued Claim Basis.

**B** = the Assessed Value of any Excluded Liabilities and Excluded Collateral, as determined in accordance with the Valuation and Adjudication Procedure described in Part E (*General Scheme Provisions*) below.

**C** = in respect of a put option and/or repurchase obligation, the Assessed Value of any securities retained by the put option holder and/or the creditor of the repurchase obligation to which the put option and/or the repurchase obligation relates, as determined in accordance with the Valuation and Adjudication Procedure described in Part E (*General Scheme Provisions*) below.

12.3   Each SJ Notes Scheme Creditor's Entitlement in respect of the SJ Notes will be determined in by the Company (in consultation with the Information Agent and/or the Scheme Administrators_ prior to the Restructuring Effective Date.

12.4   Notwithstanding the foregoing, if any Scheme Creditor's Entitlement calculated based on the relevant formulas set out in Clause 12.2 by the Company (in consultation with the Information Agent and/or the Scheme Administrators) is less than nil, such Scheme Creditor's Entitlement shall be deemed to be nil. For avoidance of doubt, such Scheme Creditor will be entitled to receive the Consent Fee on the Restructuring Effective Date in accordance with the terms of the RSA and terms of the Scheme.

12.5   The determination of the Assessed Value of each Other Debt Scheme Creditor's Entitlement in respect of the Other Debts will take place after the sanction of the Scheme by way of the Valuation and Adjudication Procedure as set out in Clauses 34 (*Valuation Procedure*) and 36 (*Adjudication Procedure*) below by the Scheme Administrators or the Scheme Adjudicator (as applicable). All Scheme Creditors' Entitlements will be valued as at the Entitlement Record Time, irrespective of when their Distribution Confirmation Deeds are submitted.

12.6   Each Scheme Creditor and/or Designated Recipient (if applicable), and/or the Holding Period Trustee on behalf of certain Scheme Creditors (if applicable), shall be entitled to be issued a pro rata portion of the New Instruments and/or Residual New Instruments (as applicable) (pro-rated across each of the four tranches of the New Instruments) with the relevant Scheme Creditor's Entitlement calculated in accordance with this Clause 12 (*Calculation of a Scheme Creditor's Entitlement*).

12.7   New Instruments and Consent Fee to which Blocked Scheme Creditors may be entitled shall be issued to and held by the Holding Period Trustee and/or the Successor Escrow Agent on behalf of such Blocked Scheme Creditors in accordance with the terms of this Scheme, the RSA and Applicable Sanctions.

12.8   For the avoidance of doubt, (i) the SJ Notes Trustee and the SJ Notes Depositary in respect of the SJ Notes; (ii) the Lake Notes Trustee and Agent in respect of the Lake Notes, and (iii) the Existing Agents in respect of the applicable Other Debts, shall not be entitled to vote at the Scheme Meeting (to avoid double counting) or receive Scheme Consideration, unless otherwise agreed by the Company.

**13.   INITIAL DISTRIBUTION**

13.1   On the Restructuring Effective Date:

(a)   the Company shall make the Initial Distribution to SJ Notes Scheme Creditors who are not Sanctions-Affected Scheme Creditors where such SJ Notes Scheme Creditors have

submitted the required Scheme Creditor Forms by the SJ RED Distribution Deadline pursuant to Clause 10 (*Deadlines and Bar Dates*);

(b)   the Company shall issue and distribute the Residual New Instruments to and held by the Holding Period Trustee on trust for the benefit of Scheme Creditors (including Blocked Scheme Creditors), in accordance with the terms of the Holding Period Trust Deed, during the Holding Period subject to and in accordance with Part D (*Scheme Consideration*); and

(c)   the Company shall issue the New Instruments in accordance with the terms of the New Instruments Documents (in each case shall be in Agreed Form) in global registered form in the name of the New Instruments Depositary or its nominee.

13.2   Other Debt Scheme Creditors and Blocked Scheme Creditors will not receive an Initial Distribution of the Scheme Consideration on the Restructuring Effective Date.

13.3   The Initial Distribution to be made to the SJ Notes Scheme Creditors shall be calculated by the Company (in consultation with the Information Agent and/or the Scheme Administrators) in accordance with the steps and formula set out below:

**Step 1**: calculate the aggregate principal amount of the New Instruments to be issued to a SJ Notes Scheme Creditor on the Restructuring Effective Date in accordance with the formula below:

$$E = \frac{A}{B + C} \times D$$

where:

**A** =   the Entitlement of SJ Notes Scheme Creditors who have submitted the required Scheme Creditor Forms by the SJ RED Distribution Deadline to the Information Agent, pursuant to this Scheme.

**B** =   the total aggregate Entitlement of all SJ Notes Scheme Creditors including those who have not submitted the required Scheme Creditor Forms by the SJ RED Distribution Deadline.

**C** =   the value of the Other Debt Scheme Creditors' Scheme Claims calculated on a Full Accrued Claim Basis.

**D** =   US $800,000,000, being the aggregate principal amount of the New Instruments to be issued to Scheme Creditors as Scheme Consideration.

**E** =   the aggregate principal amount of the New Instruments to be issued to such eligible SJ Notes Scheme Creditor on the Restructuring Effective Date.

**Step 2**: calculate the aggregate principal amount of each tranche of the New Instruments to be issued to the relevant SJ Notes Scheme Creditor. For each US$100,000 of the Entitlement converted to the New Instruments, the SJ Notes Scheme Creditor shall receive:

(a)   US$12,500 of the Tranche A Notes;

(b)   US$25,000 of the Tranche B Notes;

(c)    US$37,500 of the Tranche C Notes; and

(d)    US$25,000 of the Tranche D Notes.

13.4    For the purposes of calculating the allocation of any New Instruments to Scheme Creditors whose existing Scheme Claims are not denominated in US$, the Company shall convert any Entitlement that is in:

(a)    US$ to HK$ at an exchange rate of US$1 to HK$7.7800; and

(b)    US$ to RMB¥ at an exchange rate of US$1 to RMB¥7.1102.

## 14.    DISTRIBUTION TO THE HOLDING PERIOD TRUSTEE

14.1    The following New Instruments will be issued to and held by the Holding Period Trustee on trust under the Holding Period Trust Deed for the benefit of the Scheme Creditors during the Holding Period:

(a)    Initial Distribution of New Instruments and Consent Fee which the Blocked Scheme Creditors (who are Eligible Participating Creditors) may be entitled to; and

(b)    Residual New Instruments which would be distributed on the Final Distribution Date.

14.2    If any Scheme Creditor fails to comply with Clause 10 (*Deadlines and Bar Dates*) by submitting the required Scheme Creditor Forms on the Bar Date or fails to comply with any requirements specified in the Holding Period Trust Deed, that Scheme Creditor shall cease to hold any interest (beneficial or otherwise) with respect to the Residual New Instruments which is held by the Holding Period Trustee.

14.3    If a Scheme Creditor (who is not a Sanctions-Affected Scheme Creditor) complies with Clause 10 (*Deadlines and Bar Dates*) and any requirements specified in the Holding Period Trust Deed and by the Company, and the Scheme Administrators are satisfied that such Scheme Creditor is entitled to the Scheme Consideration, the Holding Period Trustee will issue to such Scheme Creditor or its Designated Recipient its portion of the Residual New Instruments to which it may be entitled pursuant to Part D (*Scheme Consideration*) of this Scheme.

14.4    If a Blocked Scheme Creditor who has complied with Clause 10 (*Deadlines and Bar Dates*) also complies with any requirements specified in the Holding Period Trust Deed and the Company is satisfied that such Blocked Scheme Creditor is entitled to the Scheme Consideration, and the Applicable Sanctions have been lifted, the Holding Period Trustee will issue to such Blocked Scheme Creditor or its Designated Recipient (if applicable) its portion of the Blocked Assets to which it may be entitled pursuant to Part D (*Scheme Consideration*) of this Scheme, on the Final Distribution Date.

14.5    The Company may, in its sole discretion and in consultation with the Scheme Administrators, issue any Scheme Consideration to which Scheme Creditors may be entitled to the Holding Period Trustee to hold on trust under the Holding Period Trust Deed for the benefit of the relevant Scheme Creditors during the Holding Period.

## 15.    FINAL DISTRIBUTION TO SCHEME CREDITORS

15.1    On the Final Distribution Date:

(a)    the Holding Period Trustee shall make the Final Distribution to SJ Notes Scheme Creditors who are not Sanctions-Affected Scheme Creditors and Other Debt Scheme

Creditors who are not Sanctions-Affected Scheme Creditors where such creditors have submitted the required Scheme Creditor Forms by the Bar Date pursuant to Clause 10 (*Deadlines and Bar Dates*); and

(b)     in relation to Blocked Scheme Creditors who have submitted the required Scheme Creditor Forms by the Bar Date pursuant to Clause 10 (*Deadlines and Bar Dates*):

  (i)     the Holding Period Trustee shall make the Final Distribution, and any Consent Fee to the extent such Blocked Scheme Creditor is an Eligible Participating Creditor, to the Blocked Scheme Creditors where the Applicable Sanctions no longer prevent the payment of Scheme Consideration to such creditors; or

  (ii)     where the Applicable Sanctions continue to prevent the payment of Scheme Consideration to Blocked Scheme Creditors, the Holding Period Trustee shall make the Final Distribution to which Blocked Scheme Creditors are entitled to the Successor Escrow Agent, to be held under the terms of the Successor Escrow Agreement.

*Composition of the Final Distribution*

15.2     The Final Distribution for SJ Notes Scheme Creditors, who validly submitted their forms <u>before</u> the SJ RED Distribution Deadline and who have received the Initial Distribution in accordance with Clause 13 (*Initial Distribution*) above, shall be calculated by the Company (in consultation with the Information Agent and/or the Scheme Administrators in accordance with the steps and the formula set out below:

**Step 1**: calculate the aggregate principal amount of the New Instruments to be distributed to a SJ Notes Scheme Creditor on the Final Distribution Date in accordance with the formula below:

$$F = \left( \frac{A}{B + C} \times D \right) - E$$

where:

  **A** =     the SJ Notes Scheme Creditors' Entitlement.

  **B** =     the total aggregate Entitlement of SJ Notes Scheme Creditors who validly submitted the required Scheme Creditor Forms before the Bar Date pursuant to the Scheme.

  **C** =     the total aggregate Entitlement of Other Debt Scheme Creditors who validly submitted the required Scheme Creditor Forms before the Bar Date pursuant to the Scheme.

  **D** =     US $800,000,000, being the aggregate principal amount of the New Instruments to be issued to Scheme Creditors as Scheme Consideration.

  **E** =     the Initial Distribution made to such eligible SJ Notes Scheme Creditors on the Restructuring Effective Date.

> > **F** =    the aggregate principal amount of the New Instruments to be distributed to such SJ Notes Scheme Creditor on the Final Distribution Date.

> **Step 2**: calculate the aggregate principal amount of each tranche of the New Instruments to be issued to such SJ Notes Scheme Creditor. For each US$100,000 of Entitlement converted to the New Instruments, a SJ Notes Scheme Creditor shall receive:

(a)    US$12,500 of the Tranche A Notes;

(b)    US$25,000 of the Tranche B Notes;

(c)    US$37,500 of the Tranche C Notes; and

(d)    US$25,000 of the Tranche D Notes.

15.3    The Final Distribution for SJ Notes Scheme Creditors, who validly submitted their forms <u>after</u> the SJ RED Distribution Deadline but before the Bar Date, and who have not received the Initial Distribution, shall be calculated by the Company (in consultation with the Information Agent and/or the Scheme Administrators) in accordance with the steps and formula set out below:

> **Step 1**: calculate the aggregate principal amount of the New Instruments to be distributed to a SJ Notes Scheme Creditor on the Final Distribution Date in accordance with the formula below:

$$E = \left( \frac{A}{B\ +\ C} \times D \right)$$

where:

> > **A** =    such SJ Notes Scheme Creditor's Entitlement.

> > **B** =    the aggregate Entitlement of SJ Notes Scheme Creditors who validly submitted the required Scheme Creditor Forms before the Bar Date pursuant to the Scheme.

> > **C** =    the aggregate Entitlement of Other Debt Scheme Creditors who validly submitted the required Scheme Creditor Forms before the Bar Date pursuant to the Scheme.

> > **D** =    US $800,000,000, being the aggregate principal amount of the New Instruments to be issued to Scheme Creditors as Scheme Consideration.

> > **E** =    the aggregate principal amount of the New Instruments to be distributed to such SJ Notes Scheme Creditor on the Final Distribution Date.

> **Step 2**: calculate the aggregate principal amount of each tranche of the New Instruments to be issued to such SJ Notes Scheme Creditor. For each US$100,000 of Entitlement converted to the New Instruments, a SJ Notes Scheme Creditor shall receive:

(a)    US$12,500 of the Tranche A Notes;

(b)    US$25,000 of the Tranche B Notes;

(c)    US$37,500 of the Tranche C Notes; and

    (d)     US$25,000 of the Tranche D Notes.

15.4    The Final Distribution for Other Debt Scheme Creditors shall be calculated by the Company (in consultation with the Information Agent and/or the Scheme Administrators) in accordance with the steps and formula set out below:

**Step 1**: calculate the aggregate principal amount of the Residual New Instruments to be distributed to an Other Debt Scheme Creditor on the Final Distribution Date in accordance with the formula below:

$$E = \left( \frac{A}{B + C} \times D \right)$$

where:

**A** =     such Other Debt Scheme Creditor's Entitlement.

**B** =     the total aggregate Entitlement of Other Debt Scheme Creditors who validly submitted the required Scheme Creditor Forms before the Bar Date pursuant to the Scheme.

**C** =     the total aggregate Entitlement of SJ Notes Scheme Creditors who validly submitted the required Scheme Creditor Forms before the Bar Date pursuant to the Scheme.

**D** =     US $800,000,000, being the aggregate principal amount of the New Instruments to be issued to Scheme Creditors as Scheme Consideration.

**E** =     the aggregate principal amount of the Residual New Instruments to be distributed to such Other Debt Scheme Creditor on the Final Distribution Date.

**Step 2**: calculate the aggregate principal amount of each tranche of the New Instruments to be issued to such Other Debt Scheme Creditor. For each US$100,000 of Entitlement converted to the New Instruments, an Other Debt Scheme Creditor shall receive:

(a)     US$12,500 of the Tranche A Notes;

(b)     US$25,000 of the Tranche B Notes;

(c)     US$37,500 of the Tranche C Notes; and

(d)     US$25,000 of the Tranche D Notes.

**16.**    **DISTRIBUTION TO THE SUCCESSOR ESCROW ACCOUNT FOR BLOCKED SCHEME CREDITORS**

16.1    Upon the expiration of the Holding Period, if any Applicable Sanctions are still in place in respect of any Blocked Scheme Creditors, the Company undertakes to:

(a)     appoint the Successor Escrow Agent to hold the entitlements to the Blocked Assets in the Successor Escrow Account for the Blocked Scheme Creditors who have complied with Clause 10 (*Deadlines and Bar Dates*) until the earlier of:

(i)     the expiry of the Perpetuity Period; or

(ii)    the lifting of Applicable Sanctions in respect of any Blocked Scheme Creditors,

with the Blocked Scheme Creditors being given a reasonable period of time thereafter to recover their Entitlement to the Blocked Assets in accordance with the terms of the Successor Escrow Agreement and the Scheme;

(b)    bring information relating to the Successor Escrow Account to the attention of the Blocked Scheme Creditors on, or immediately after, the expiration of the Holding Period on the Transaction Website and/or through other such public medium as the Company considers to be appropriate at that time; and

(c)    put in place a reasonable and fair process for Blocked Scheme Creditors to claim and recover their Entitlement to the Blocked Assets upon Applicable Sanctions no longer preventing the payment of such Blocked Assets to Blocked Scheme Creditors through a Successor Escrow Agreement.

16.2    Upon expiry of the Perpetuity Period, and subject to any action necessary to ensure compliance with Applicable Sanctions by the Company or the Successor Escrow Agent, any Blocked Assets, if any, which remain unable to be paid to Blocked Scheme Creditors in compliance with Applicable Sanctions will be returned to the Company in accordance with the terms of the Successor Escrow Agreement. The rights of Blocked Scheme Creditors under this Scheme shall be extinguished on the return of such Blocked Assets to the Company, including any rights of Blocked Scheme Creditors to payment of any Scheme Consideration and any Consent Fee.

## 17.    INTERIM DISTRIBUTION

17.1    Where the Final Distribution Date has not taken place within 295 calendar days after the Restructuring Effective Date, there will be an interim distribution of Scheme Consideration to the SJ Notes Scheme Creditors and the Other Debt Scheme Creditors, other than Sanctions-Affected Scheme Creditor, whose Entitlements have been determined, on the date which is 295 calendar days after the Restructuring Effective Date.

17.2    The amount of the interim distribution provided by this Clause 17 (*Interim Distribution*) shall be made to the same Persons and be of the same size as if it were the Final Distribution determined pursuant to Clause 15 (*Final Distribution to Scheme Creditors*), save that the Company shall reserve a maximum amount of Scheme Consideration for those Other Debt Scheme Creditors whose Entitlements are not fully determined (as if the Entitlement of such Other Debt Scheme Creditors were calculated on a Full Accrued Claim Basis). The amount of Scheme Consideration reserved shall reduce the size of the interim distribution to be made to Scheme Creditors on a pro rata basis.

17.3    The interim distribution made to Scheme Creditors shall be taken into account for the purposes of calculating the Final Distribution, such that each Scheme Creditor shall receive a pro rata share of the Scheme Consideration, in respect of the value of its Entitlement relative to the Entitlement of all Scheme Creditors who validly claim Scheme Consideration.

## 18.    CONSENT FEE

18.1    In addition to the Initial Distribution, on the Restructuring Effective Date, the Company shall pay the Consent Fee to:

(a)    those Scheme Creditors that are Eligible Participating Creditors (who are not Sanctions-Affected Scheme Creditors), who hold Eligible Restricted Debts in accordance with the terms of the RSA; and

(b)    in respect of Blocked Scheme Creditors that are Scheme Creditors and that are Eligible Participating Creditors who hold Eligible Restricted Debts in accordance with the terms

46

of the RSA, the Holding Period Trustee, to be held on trust under the terms of the Holding Period Trust Deed.

18.2    In addition to the Final Distribution, on the Final Distribution Date, the Holding Period Trustee shall pay the Consent Fee in respect of those Blocked Scheme Creditors that are Eligible Participating Creditors, who hold Eligible Restricted Debts in accordance with the terms of the RSA, to:

(a)    where the Applicable Sanctions continue to prevent the payment of Scheme Consideration to Blocked Scheme Creditors, to the Successor Escrow Agent, to be held under the terms of the Successor Escrow Agreement; or

(b)    where the Applicable Sanctions no longer prevent the payment of Scheme Consideration to such creditors, to the Blocked Scheme Creditors.

18.3    If the sum of the Consent Fee to be paid to a SJ Notes Scheme Creditor pursuant to Clause 18.1 for a particular series of New Instruments, together with the Initial Distribution (if any) to be made to the Scheme Creditor in respect of the Tranche A Notes (being of the same series of New Instruments as the Consent Fee), is less than the applicable Notes Minimum Denomination as described in Clause 21 (*Fractional Adjustments*), then the Consent Fee which would be issued to that Scheme Creditor shall instead be issued to the Holding Period Trustee to hold on trust for the Scheme Creditor until the Final Distribution Date. If the sum of the Consent Fee is less than the Notes Minimum Denomination, the Company in its discretion and in good faith may allocate the Consent Fee to be paid to a Scheme Creditor in one or more of the other series of the New Instruments.

18.4    For the avoidance of doubt, the notes to be issued as a Consent Fee in accordance with the terms of the RSA are additional notes and will not impact the number of New Instruments to be received as Scheme Consideration by the Scheme Creditors.

## 19.    ISSUANCE OF THE NEW INSTRUMENTS

19.1    The Scheme Consideration (except for the Blocked New Instruments) will be distributed, in accordance with the terms of this Scheme, through Euroclear and Clearstream to Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) and/or Designated Recipients (if applicable). If details of a Euroclear or Clearstream account are not provided, such Scheme Creditor, on whose behalf the Scheme Creditor Form is being submitted, will not be entitled to receive any share of the relevant Scheme Consideration.

19.2    If a Scheme Creditor is a Blocked Scheme Creditor, their Entitlement to the Scheme Consideration will be determined by reference to the principal amount of the Existing Debt Instruments outstanding and owed to that Blocked Scheme Creditor as at the Entitlement Record Time and all accrued and unpaid interest relating to such Existing Debt Instruments up to but excluding the Reference Date.

19.3    The obligations of the Company to issue the New Instruments to each Person entitled to receive them under this Scheme shall be satisfied by the Company depositing the New Instruments in global registered form with the New Instruments Depositary or its nominee with interests in the New Instruments being further credited in the relevant amounts to the accounts in the Clearing Systems designated by the Scheme Creditors in their relevant Scheme Creditor Forms.

19.4    The New Instruments (including any Blocked New Instruments, as applicable) for each Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee will be allocated to each series of the Residual New Instruments on a pro rata basis, based on

47

their respective aggregate principal amount on the following Business Day after the Restructuring Effective Date, subject to adjustments set forth in Clause 21 (*Fractional Adjustments*).

19.5    The holders of the New Instruments shall have the benefit of the new Security.

## 20.    RESTRICTIONS

20.1    The Company will not distribute an Initial Distribution on the Restructuring Effective Date to an SJ Notes Scheme Creditor (if applicable) unless that SJ Notes Scheme Creditor is also an Eligible Creditor or has nominated on or before the SJ RED Distribution Deadline a Designated Recipient, who is an Eligible Person to receive the Initial Distribution, in accordance with the terms of the Scheme. A Sanctions-Affected Scheme Creditor cannot appoint a Designated Recipient.

20.2    The Holding Period Trustee shall not distribute any Residual New Instruments as Scheme Consideration to a Scheme Creditor (if applicable) unless that Scheme Creditor is also an Eligible Creditor or has nominated on or before the Bar Date a Designated Recipient who is an Eligible Person to receive the Residual New Instruments, in accordance with the terms of the Scheme.

## 21.    FRACTIONAL ADJUSTMENTS

21.1    Notwithstanding any other provision of this Scheme, the aggregate number of New Instruments to which an Eligible Creditor is entitled shall be rounded down to the nearest whole number.

21.2    If the allocation of the New Instruments in accordance with this Scheme would result in any Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee receiving less than US$500 (the "**Notes Minimum Denomination**") of any tranche of any series of the Tranche A Notes, Tranche B Notes, Tranche C Notes and Tranche D Notes, then such Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee would instead receive an allocation in one or more of tranches of any other series of the New Instruments, as determined by the Company (in consultation with the Information Agent and/or the Scheme Administrators in its discretion in good faith and based on information provided and reviewed against the records of the Clearing Systems or the Company's books and records, as applicable, by the Information Agent (including accounting for the weighted average maturity of the Scheme Considerations), to ensure that such Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee holds at least the Notes Minimum Denomination for at least one tranche of any series of the New Instruments, provided that:

(a)    any fraction of any tranche of the Tranche A Notes, Tranche B Notes, Tranche C Notes and Tranche D Notes that is remaining after the adjustment set out above in this Clause 21.2 will be forfeited;

(b)    the interests in the global certificates for the New Instruments to which a Scheme Creditor is entitled under the terms of this Scheme will be credited to the Clearing System account in which that Scheme Creditor held its interests in the SJ Notes at the Entitlement Record Time (through the relevant Account Holder where applicable); and

(c)    the interests in the New Instruments will be recorded in the New Instruments register by the New Instruments Paying and Transfer Agent and Registrar.

PART E
GENERAL SCHEME PROVISIONS

22. **MODIFICATIONS OF THE RIGHTS ATTACHING TO THE NEW INSTRUMENTS**

On and after the Restructuring Effective Date, and/or the Final Distribution Date, nothing in this Scheme shall prevent the modification of the New Instruments in accordance with their terms.

23. **SECURITIES LAW CONSIDERATIONS**

23.1    The New Instruments will not be registered under the US Securities Act or any state or other securities laws of the United States of America or any other jurisdiction.

23.2    Accordingly, the New Instruments will be available only: (a) in the United States to "qualified institutional buyers" as defined in Rule 144A under the US Securities Act and institutional "accredited investors" as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the US Securities Act; and (b) outside the United States to non-US persons in offshore transactions, in reliance on Regulation S under the US Securities Act.

24. **RELEASES**

24.1    In consideration for the Entitlement to the Scheme Consideration, on and from the Restructuring Effective Date, each Scheme Creditor hereby gives the undertakings, releases and waivers in this Clause 24 (*Releases*) (the "**Releases**").

24.2    Subject to Clause 24.6, with immediate effect on and from the Restructuring Effective Date and pursuant to this Scheme and the Deeds of Release, each Scheme Creditor on behalf of itself and each of its predecessors, successors and assigns (including any Person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time), as relevant, (collectively, the "**Scheme Creditor Releasing Parties**"), shall and shall be deemed to completely and forever and unconditionally:

(a)    release, waive, void, acquit, forgive, extinguish and discharge (and to the fullest extent permitted by law) each of the Released Persons from the relevant Released Claims, specifically:

(i)    any and all Scheme Claims (except for fraud, wilful default or wilful misconduct) arising prior to, on or after the Restructuring Effective Date;

(ii)    to the extent not already covered in (i) above, any and all Ancillary Claims arising prior to, on or after the Restructuring Effective Date; and

(iii)    any and all Restructuring Claims arising prior to, on or after the Restructuring Effective Date;

(b)    for the avoidance of doubt and to the extent not already released under Clause 24.2(a) above, release, forfeit, waive, void, acquit, forgive, extinguish and discharge (and to the fullest extent permitted by law) any and all Relevant Collateral;

(c)    ratify and confirm everything which any Released Person may lawfully do or cause to be done in accordance with any authority conferred by the Scheme and agrees not to challenge:

49

(i)    the validity of any act done or omitted to be done as permitted by the terms of the Scheme; or

(ii)    the exercise of or omission to exercise any power conferred in accordance with the provisions of the Scheme,

in each case in good faith by any Released Person; and

(d)    acknowledge and agree that all powers of attorney granted by the Company under any Existing Debt Instruments are revoked.

24.3    Each of the Scheme Creditors hereby appoints the Company as its attorney and agent and irrevocably authorizes, directs, instructs and empowers the Company (represented by any duly authorized representative), on and from the Restructuring Effective Date, to (i) enter into, execute and deliver as a deed on behalf of each Scheme Creditor and any person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time or who acquires any interest in or arising out of a Scheme Claim after the Voting Record Time, the Deeds of Release whereby any and all Released Claims, and any and all Relevant Collateral, referred to in Clause 24.2 shall be waived and released fully and absolutely from the Restructuring Effective Date, and (ii) do all such acts and/or execute all such documents (including without limitation, assignments, transfers, notices, instructions, supplements and amendments) as the Company may consider necessary or desirable to effect the release of any and all Released Claims and any Relevant Collateral (other than the Excluded Liabilities and Excluded Collateral) referred to in Clause 24.2.

24.4    Each of the Scheme Creditors hereby approves, the Deeds of Release (and the releases therein) (in each case in the Agreed Form) to be executed pursuant to the authority and approvals conferred by this Clause 24 (*Releases*) and each shall be substantially in the form to be made available on the Transaction Website subject to any modifications required or approved by the Court, and each shall take effect in relation to such Claims and Liabilities on the Restructuring Effective Date.

24.5    Each Scheme Creditor acknowledges and agrees on its own behalf and on behalf of its Scheme Creditor Releasing Parties that:

(a)    it may later discover facts in addition to or different from those which it presently knows or believes to be true with respect to the subject matter of this Scheme;

(b)    it is its intention to fully, and finally forever settle and release any and all matters, disputes and differences, whether known or unknown, suspected or unsuspected, which presently exist, may later exist or may previously have existed between it and the Released Persons in respect of all Released Claims or any past, present and/or future Claim which is released by the Releases provided in this Clause 24 (*Releases*) and by the Deeds of Release; and

(c)    in furtherance of this intention, the waivers, releases and discharges given in this Scheme shall be and shall remain in effect as full and complete general waivers, releases and discharges notwithstanding the discovery or existence of any such additional or different facts.

24.6    Subject to Clause 24.7, notwithstanding any other provision in this Scheme, the effect of the Restructuring under the terms of the Scheme will not:

(a)    waive, release, impair or otherwise compromise any of the Excluded Liabilities or any of the Excluded Collateral;

(b)    prejudice or impair any right or benefit of any Scheme Creditor Releasing Party:

(i)    created under this Scheme or any other Restructuring Document including without limitation any right to commence and/or continue and/or instruct any other Person to commence or continue any Proceeding to enforce its rights under or in relation to the New Instruments Documents; and/or

(ii)    which arises as a result of a failure by the Company or any other Released Person to comply with the terms of this Scheme or any Restructuring Document; and

(c)    prejudice or impair Claims against the Company or any other Released Person arising from fraud, wilful default or wilful misconduct.

24.7    Each relevant Excluded Liabilities Party Person shall, to the extent legally and practically permissible, enter into any relevant Deeds of Release to release, waive, void, acquit, forgive, extinguish and discharge unconditionally (and to the fullest extent permitted by law), any and all claims of contribution, subrogation, reimbursement, indemnity, set-off or payment of any kind howsoever arising against the Company in connection with the Other Debts (including, for the avoidance of doubt, the Excluded Liabilities and the Excluded Collateral).

## 25.    STAY OF PROCEEDINGS

25.1    From the Scheme Effective Date, no Scheme Creditor Releasing Party, nor any party on behalf of a Scheme Creditor Releasing Party, shall be entitled to commence, continue or procure the commencement or continuation of any Proceeding, whether directly or indirectly, against any of the Released Persons or in respect of any property of any of the Released Persons in respect of any Claims or Liabilities that are to be released in accordance with Clause 24 (*Releases*).

25.2    Subject to any existing contractual restrictions, a Scheme Creditor Releasing Party may commence a Proceeding against a Released Person after the Restructuring Effective Date, in respect of Claims or Liabilities that are not to be released in accordance with Clause 24 (*Releases*).

## 26.    COSTS AND INDEMNITY

26.1    The Company shall pay all fees, costs and expenses properly incurred by the SJ Notes Trustee, the New Instruments Trustee, the SJ Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the SJ Notes Depositary, the New Instruments Depositary, the New Instruments Collateral Agent, the Information Agent, the Holding Period Trustee, and GLAS (each, an "**Indemnified Party**" and together the "**Indemnified Parties**"), in connection with any and/or all actions taken pursuant to this Scheme and the Restructuring, including (without limitation) any and/or all actions taken pursuant to the SJ Notes Trustee Instruction and the distribution of the Scheme Consideration, (provided that, with respect to each party, the relevant fees, costs and expenses have been incurred in accordance with the SJ Notes Documents or such other arrangement as may have been agreed between the Company and that party).

26.2    The Company shall hold each Indemnified Party harmless from, and shall indemnify such Indemnified Party from and against any claims, actions, demands, damages, charges, losses, liabilities, obligations, judgments, costs, fees, and expenses which may be incurred by, or asserted or awarded against it in taking any of the steps contemplated by the Scheme, including, without limitation, executing and delivering any documents pursuant to the SJ Notes Trustee Instruction, except to the extent that the same arises from the fraud, gross negligence or wilful misconduct of such Indemnified Party.

51

**27.    MODIFICATIONS TO THE SCHEME AND THE RESTRUCTURING DOCUMENTS**

27.1    The Company may, before or at any hearing before the Court to sanction the Scheme, and subject to obtaining the written consent of the Majority TJ AHG (where the TJ AHG holds the Minimum TJ AHG Threshold), consent on behalf of all Scheme Creditors to any modifications of the Scheme and/or the Restructuring Documents or any additional terms or conditions including those which the Court may think fit to approve or impose, which would not directly or indirectly have a material adverse effect on the rights of the Scheme Creditors.

27.2    On the identification of a Sanctioned Scheme Creditor, including where a Scheme Creditor becomes a Sanctioned Scheme Creditor while this Scheme is in effect:

(a)    the Company may modify the Scheme and/or the Restructuring Documents to the extent reasonably necessary and in a manner to ensure that the Schemes are not contrary to the Applicable Sanctions  (and is authorized to instruct the SJ Notes Trustee, Existing Agents, SJ Notes Paying and Transfer Agent and Registrar, and any other administrative party as required in order to achieve the same); and

(b)    each of the New Instruments Trustees, New Instruments Paying and Transfer Agent and Registrar, the New Instruments Collateral Agent and any other administrative party as required is authorized to make any amendment to the New Instruments Documents and take any action necessary or desirable to give effect to a modification to such New Instruments Documents on and following receipt of an officers' certificate from the Company that such modification is reasonably necessary to ensure that the Scheme is not contrary to Applicable Sanctions, which the New Instruments Trustees, New Instruments Paying and Transfer Agent and Registrar, the New Instruments Collateral Agent and any other administrative party as required are entitled to rely on conclusively.

27.3    Where the Company reasonably considers that this Scheme or the transactions contemplated by the Scheme are at risk of being contrary to Applicable Sanctions:

(a)    the Company may modify the Scheme and/or the Restructuring Documents to the extent reasonably necessary and in a manner to ensure that the Scheme is not contrary to Applicable Sanctions (and is authorized to instruct the SJ Notes Trustee, Existing Agents, SJ Notes Paying and Transfer Agent and Registrar, and any other administrative party as required in order to achieve the same); and

(b)    each of the New Instruments Trustees, New Instruments Paying and Transfer Agents and Registrars, the New Instruments Collateral Agent and any other administrative party as required  is authorized to make any amendment to the New Instruments Documents and take any action necessary or desirable to give effect to a modification to such New Instruments Documents on and following receipt of an officers' certificate from the Company that such modification is reasonably necessary to ensure that the Schemes will not be contrary to the Applicable Sanctions in whatever form that they may apply to this Scheme, which the New Instruments Trustees, New Instruments Paying and Transfer Agents and Registrars, the New Instruments Collateral Agent and any other administrative party as required are entitled to rely on conclusively.

27.4    The Scheme Administrators may, on or after the Restructuring Effective Date, modify the Scheme in respect of the Valuation and Adjudication Procedure to the extent reasonably

necessary for this Scheme to achieve its purpose, and provided that any such modifications have no material prejudicial effect on Scheme Creditors.

27.5    Nothing in this Scheme shall prevent the modification of any executed Restructuring Document in accordance with its terms, including, but not limited to, minor or technical modifications to correct manifest or proven error or to comply with mandatory provisions of law.

## 28.    OBLIGATIONS ON DATES OTHER THAN A BUSINESS DAY

If any sum is due or obligation is to be performed or the Bar Date occurs under the terms of this Scheme on a day other than a Business Day, the relevant payment shall be made, or obligation performed, or the Bar Date shall occur, on the next Business Day.

## 29.    NO ADMISSION OF LIABILITY

Save as expressly set out in this Scheme, nothing in this Scheme or the Explanatory Statement, or the circulation thereof to any Person, evidences or constitutes any admission by the Company, the Information Agent, or the Scheme Administrators, that the person is a Scheme Creditor or that a Liability is owed to any Person in respect of any Claim or right.

## 30.    THE INFORMATION AGENT

30.1    Each Scheme Creditor and/or Account Holder hereby unconditionally and irrevocably waives and releases any claims which may arise against the Information Agent from all actual or potential liability, arising directly or indirectly, in each case, in relation to the Information Agent's performance of its roles and all other actions which they may take in connection with this Scheme, save for any liability resulting from the Information Agent's own fraud or wilful misconduct.

30.2    Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers is acting for, or owes any duty to, any Scheme Creditor, nor will any of them be responsible for providing any advice to any Scheme Creditor in relation to the Scheme. Accordingly, neither the Information Agent nor any of its directors, officers, employees, affiliates or advisers make any recommendations as to whether any Scheme Creditor should take any of the actions contemplated in the Scheme. The Information Agent expresses no opinion on the merits of the Scheme or the terms of the New Instruments. The Information Agent has not been involved in negotiating or determining the terms of the Scheme and makes no representation that all relevant information has been disclosed to the Scheme Creditors in or pursuant to the Scheme. Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers has verified, or assumes any responsibility or liability for the accuracy or completeness of any of the information concerning the Scheme, or any factual statements contained in, or the effect or effectiveness of, the Scheme.

30.3    Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers will have any tortious, contractual or any other liability to any person in connection with the determination of whether a Scheme Creditor is a Sanctions-Affected Scheme Creditor. Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers will accept any liability whatsoever to any person, regardless of the form of action, for any lost profits or lost opportunity, or for any indirect, special, consequential, incidental or punitive damages arising from the determination of whether a Scheme Creditor is a Sanctions-Affected Scheme Creditor, even if the Information Agent or any of its directors, officers, employees, agents, affiliates or advisers have been advised of the possibility of such damages.

30.4    Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers is obliged, under the terms of the Scheme or otherwise, to engage in any transaction or conduct that may give rise to a liability under or in connection with Applicable Sanctions and/or may result in any person becoming targeted by Applicable Sanctions.

30.5    If compliance with any obligations under the terms of the Scheme or otherwise would result in the Information Agent or any of its directors, officers, employees, agents, affiliates or advisers breaching the Blocking Regulation, that obligation need not be complied with (but only to the extent of the breach).

30.6    Under no circumstances will the Information Agent be required to verify or determine the eligibility of any Scheme Creditor in relation to the Scheme. The Information Agent will check Scheme Claims against Custody Instructions and against the records of Scheme Creditors provided to the Information Agent by the Company. The Information Agent will assist the Company and the Chairperson in checking the voting values of each Scheme Creditor (who is not a Blocked Scheme Creditor) based on such information.

## 31.    THE HOLDING PERIOD TRUSTEE

31.1    The duties, rights, responsibilities and interests of the Holding Period Trustee shall be governed by the Holding Period Trust Deed and nothing in this Clause 31 (*The Holding Period Trustee*) shall in any way amend, alter, or override the Holding Period Trust Deed.

31.2    The Holding Period Trustee's role will be solely mechanical and administrative in nature. As such, in accepting its appointment, the Holding Period Trustee will act only as the bare trustee of the Holding Period Trust and not in any other capacity. In this regard, the Holding Period Trustee will not be permitted to sell, pledge, re-hypothecate, assign, invest, use, commingle, dispose of, or otherwise use in its business, any of the Residual New Instruments or Blocked Assets held by it, except as permitted pursuant to the Holding Period Trust Deed.

31.3    The Holding Period Trustee will have no economic or beneficial interest in the Residual New Instruments or Blocked Assets it holds and shall not, except as set out in the Holding Period Trust Deed, permit any other Person to have any interest, estate, right, title or benefit in the Residual New Instruments or Blocked Assets.

31.4    The Holding Period Trustee shall be provided with any information it reasonably requires to satisfy itself that any action it chooses to take, or not take, shall be in compliance with any applicable laws. The Holding Period Trustee shall not be responsible for determining the status of a Sanctions-Affected Scheme Creditor.

31.5    The Holding Period Trustee shall not be required to perform any of its obligations under the Holding Period Trust Deed if it is prevented from so doing by the occurrence of any event due to any cause beyond its control or if such performance would result in the Holding Period Trustee or its Affiliates being in breach of any law, regulation, ordinance, rule, directive, judgment, order or decree (collectively, the "**Rules**") binding on the Holding Period Trustee or its property or on any of its Affiliates (including but not limited to Rules relating to money laundering, bribery and corruption, prevention of tax evasion, financial or economic sanctions, trade and export controls, supply chain transparency, blocking regulations or anti-boycott requirements). The Holding Period Trustee may act or refrain from acting under the Holding Period Trust Deed and may do anything which in its reasonable opinion is necessary to comply with such Rules. The Holding Period Trustee is not required to take any action or step (including by omission) which would cause or create a risk of liability under the Blocked Regulation.

31.6    The Holding Period Trustee shall bear no responsibility for any action it does, or does not, take in circumstances where a Scheme Creditor, or the Company, does not provide sufficient

54

information to enable the Holding Period Trustee to adequately assess the extent to which any of the Rules as set out in Clause 31.5 may be breached either by the action, or inaction, of the Holding Period Trustee.

31.7    The Holding Period Trustee shall bear no responsibility with regards to any deficiency which might arise because of the Holding Period Trustee or by virtue of any tax which may be payable (i) in respect of the Residual New Instruments or Blocked Assets, (ii) any income which may arise therefrom or (iii) any proceeds which may arise thereof.

## 32.    THE SUCCESSOR ESCROW AGENT

32.1    The duties, rights, responsibilities and interests of the Successor Escrow Agent shall be governed by the Successor Escrow Agreement and nothing in this Clause 32 (*The Successor Escrow Agent*) shall in any way amend, alter, or override the Successor Escrow Agreement.

32.2    The Successor Escrow Agent's role will be solely mechanical and administrative in nature. As such, in accepting its appointment, the Successor Escrow Agent will act only as a bare agent of the Successor Escrow Account and not in any other capacity. In this regard, the Successor Escrow Agent will not be permitted to sell, pledge, re-hypothecate, assign, invest, use, commingle, dispose of, or otherwise use in its business, any of the Blocked Assets, except as permitted pursuant to the Successor Escrow Agreement.

32.3    The Successor Escrow Agent will have no economic or beneficial interest in the Blocked Trust Assets it holds and shall not, except as set out in the Successor Escrow Agreement, permit any other Person to have any interest, estate, right, title or benefit in the Blocked Assets.

32.4    The Successor Escrow Agent will be afforded the right to be provided with, and request, any information it requires to satisfy itself that any action it chooses to take, not note take shall be in compliance with any applicable laws. The Successor Escrow Agent shall not, however, be responsible for determining the status of a Sanctions-Affected Scheme Creditor.

32.5    The Successor Escrow Agent shall not be required to perform any of its obligations under the Successor Escrow Agreement or any other Restructuring Documents if it is prevented from so doing by the occurrence of any event due to any cause beyond its control or if such performance would result in the Successor Escrow Agent or its Affiliates being in breach of any Rules binding on the Successor Escrow Agent or its property or on its Affiliates (including but not limited to Rules relating to money laundering, bribery and corruption, prevention of tax evasion, financial or economic sanctions, trade and export controls, supply chain transparency, blocking regulations or anti-boycott requirements). The Successor Escrow Agent may act or refrain from acting under the Successor Escrow Agreement and may do anything which in its reasonable opinion is necessary to comply with such Rules. The Successor Escrow Agent is not required to take any action or step (including by omission) which would cause or create a risk of liability under the Blocked Regulation.

32.6    The Successor Escrow Agent shall bear no responsibility for any action it does, or does not, take in circumstances where a Blocked Scheme Creditor, or the Company, does not provide sufficient information to enable the Successor Escrow Agent to adequately assess the extent to which any of the Rules as set out in Clause 32.5 may be breached either by the action, or inaction, of the Successor Escrow Agent.

32.7    The Successor Escrow Agent shall bear no responsibility with regards to any deficiency which might arise because of the Successor Escrow Agent or by virtue of any tax which may be payable (i) in respect of the Blocked Assets, (ii) any income which may arise therefrom or (iii) any proceeds which may arise thereof.

**33.    THE SCHEME ADMINISTRATORS**

*Appointment and removal*

33.1    In consideration for each Scheme Creditor granting the releases pursuant to Clause 24 (*Releases*) and the Deeds of Release, each Other Debt Scheme Creditor shall be entitled to have its Entitlement determined by the Scheme Administrators and, if applicable, the Scheme Adjudicator.

33.2    On the Scheme Effective Date, the Company shall appoint the Scheme Administrators, with the powers, rights, duties and functions conferred upon the Scheme Administrators by this Scheme.

33.3    The office of a Scheme Administrators shall be vacated if the holder of such office becomes subject to any conflict of interest which would impact in any way his/her ability to perform the functions of Scheme Administrator as set out in this Scheme, dies, is convicted of an indictable offence, resigns from his/her office (which shall be permissible and effective only if he/she gives at least two (2) months' written notice to the Company prior to such resignation), becomes bankrupt, is disqualified from membership of a professional body of which he/she is a member, or becomes mentally disordered or incapacitated.

33.4    In the event of a vacancy in the office of a Scheme Administrator (unless there is no further work to be done by the Scheme Administrator under the Scheme), the Company shall in its sole discretion promptly appoint an alternative person from the Whitelist Scheme Administrators who must be a fit and proper person and be able to adequately discharge the function of a Scheme Administrator under this Scheme.

33.5    The Scheme Administrators have agreed to be bound by this Scheme, and have executed, the Deed of Undertaking.

*Functions, powers and rights*

33.6    The Scheme Administrators (in their own name or as agents of the Company) shall have the power to act on behalf of the Company in relation to all matters relating to each Scheme Creditor's Entitlement.  In carrying out their duties and functions under this Scheme, the Scheme Administrators shall (pursuant to the terms of this Scheme) be empowered to:

(a)    make a determination on the Scheme Effective Date of the NPV Amount to be used in the calculation of each SJ Notes Scheme Creditor's Entitlement (Clause 12.2 (*Calculation of a Scheme Creditor's Entitlement*).

(b)    make a determination of each Scheme Creditor's Scheme Claim and Entitlement for distribution purposes under this Scheme;

(c)    have full access to the Company Information and to receive full cooperation from the Management , on any reasonable requests for finance documents or other information or documents in the possession or control of the  Company or the Group;

(d)    where reasonably appropriate to employ and remunerate accountants, actuaries, lawyers and other professional advisors (including their partners and the partners and staff of all associated firms, associations and companies or successors or any of them) in connection with the evaluation of each Scheme Creditor's Entitlement and the costs and expenses of such engagement shall form part of the costs and

expenses incurred by the Scheme Administrators for the purposes of Clause 33.15(b);

(e)    to delegate in writing to any person qualified as set out in paragraph (d) above all or any of the powers and discretion conferred upon the Scheme Administrators under this Scheme, and from time to time to revoke any such delegation, provided that the Scheme Administrators shall be personally responsible for any act or omission of any such delegate to the same extent as if they had expressly authorised it;

(f)    to employ and remunerate Valuer(s) and experts (appointed by the Scheme Adjudicator pursuant to Clause 36.4(d) and the costs and expenses of such engagement shall form part of the costs and expenses incurred by the Scheme Administrators for the purposes of Clause 33.15(b);

(g)    to nominate a replacement or additional Scheme Adjudicator in accordance with Clauses 35.3 and 35.7;

(h)    to do all acts and to execute in the name of and, insofar as permitted by law, on behalf of the Company, any deed, transfer, instrument, cheque, bill of exchange, receipt or other document which may be necessary for or incidental to the full and proper implementation of this Scheme;

(i)    to make any payments and distributions which are necessary for or incidental to the Scheme Administrators' performance of their functions under this Scheme;

(j)    to open, maintain and operate bank accounts in the name of the Company and/or in the name of the Scheme Administrators, as required or convenient under or in connection with this Scheme and to close any such bank account;

(k)    to receive and review all information provided by each Other Debt Scheme Creditor as part of the Valuation Procedure;

(l)    to communicate with and seek further information from each Scheme Creditor and the Management to assist with the evaluation of each Scheme Creditor's Entitlement;

(m)    to extend the timetable for the determination of each Scheme Creditor's Entitlement;

(n)    to refer and assign an Other Debt Scheme Creditor's Referred Scheme Claim (as applicable) to a Scheme Adjudicator to be further determined pursuant to the Adjudication Procedure;

(o)    to apply to the Court for directions in relation to any particular matter arising under, or in the course of the operation of, this Scheme;

(p)    to do all such acts and make all such decisions in connection with or for the purposes of making distributions and reservations of the Scheme Consideration to the Scheme Creditors;

(q)    to do all other things incidental to the exercise of the foregoing powers; and

(r)    to exercise any other powers necessary for or incidental to the full and proper implementation of his/her obligations under this Scheme,

provided that the Scheme Administrators cannot and shall not exercise any power that would result in them assuming control of any of the Company's business or affairs.

33.7    The Scheme Administrators (in their capacity as such):

(a)    shall have only those duties and responsibilities expressly specified in this Scheme, and shall not have any implied duties or responsibilities whatsoever; and

(b)    may refrain from doing anything which would or might in their opinion be contrary to any law, directive or regulation of any applicable jurisdiction and may do anything which is, in their opinion, necessary to comply with any such law, directive or regulation and such Scheme Administrator shall not be liable for any loss occasioned thereby.

33.8    In exercising their his/her powers and carrying out their his/her duties and functions under this Scheme, each the Scheme Administrators shall be independent and impartial, shall act in good faith and with due care and diligence, and shall exercise his/her their powers under this Scheme for the purpose of ensuring that this Scheme is implemented in compliance with its terms and in the interests of the Scheme Creditors as a whole.

33.9    The Scheme Administrators are obliged, and agree, to report to the Scheme Creditors via publication on the Transaction Website and/or the Company Website on a quarterly basis up until the conclusion of the Valuation and Adjudication Procedure, on the completion and results of the Valuation and Adjudication Procedure, including the aggregate Entitlement determined for the Other Debt Scheme Creditors.

33.10    Except in the case of actual fraud or wilful default, the Scheme Administrators will not be liable to the Company or any Scheme Creditor for any act or omission by the Scheme Administrators in the performance or purported performance of their powers, rights, duties and functions under this Scheme.

33.11    Except to the extent required by law, no Scheme Creditor shall be entitled to challenge the validity of (a) any act done or omitted to be done in good faith by any of the Scheme Administrators; or (b) the exercise by the Scheme Administrators in good faith of any power conferred upon them, if such act, omission or exercise of power is in accordance with, and to implement, the provisions of this Scheme.

33.12    The Company agrees to indemnify the Scheme Administrators out of the property of the Company for:

(a)    the costs, fees and expenses incurred and payable by the Scheme Administrators in accordance with Clause 33.15; and

(b)    any liability incurred by the Scheme Administrators as a result of any act or omission in carrying out their functions other than such liability (if any) that the Scheme Administrators may incur by their own actual fraud or wilful default,

in connection with this Scheme, and their role as Scheme Administrators. The Scheme Administrators shall not be found to have committed actual fraud or wilful default unless or until a court of competent jurisdiction has made a finding to that effect.

33.13    The indemnity set out in Clause 33.12 shall take effect on and from the Scheme Effective Date and shall endure without limitation as to time for the benefit of the Scheme Administrators notwithstanding:

      (a)      the termination of this Scheme for any reason whatsoever;

      (b)      the removal or replacement of a Scheme Administrator; or

      (c)      the invalidity of or any defect whatsoever in the appointment of a Scheme Administrator.

33.14   Each Scheme Administrator's right of indemnity conferred by Clause 33.12 has priority over the Scheme Claims and the Scheme Creditors generally and ranks equally to any claims for indemnity by the other Scheme Administrators and the Scheme Adjudicators.

33.15   The Scheme Administrators shall be:

      (a)      remunerated in respect of any work done by the Scheme Administrators and any agent, partner or employee of the Scheme Administrators acting on behalf of the Scheme Administrators, in connection with the exercise of their powers and discretions and the performance of their duties, obligations and responsibilities as Scheme Administrators under this Scheme on a time-cost basis unless otherwise agreed; and

      (b)      reimbursed in respect of all costs, fees, disbursements, taxation liabilities (including VAT), and expenses incurred in connection with the performance of their duties, obligations and responsibilities as Scheme Administrators under this Scheme, including but not limited to the fees of any accountants, actuaries, lawyers and other professional advisors or agents engaged by the Scheme Administrators pursuant to Clause 33.6(d) and the fees of the Valuer(s) and experts pursuant to Clause 33.6(f).

33.16   Fees and expenses incurred by the Scheme Administrators shall be invoiced monthly (or such other period as the Company and the Scheme Administrators may determine) to the Company and shall be paid in full promptly.

## 34.    VALUATION PROCEDURE

34.1    The Scheme Administrators shall assess each Other Debt Scheme Creditor's Entitlement for the purpose of estimating the Assessed Value on a Deficiency Basis by reference to the formulae set out in Clause 12 (*Calculation of a Scheme Creditor's Entitlement*) of this Scheme.

34.2    The Scheme Administrators shall comply with the following procedure in ascertaining the Scheme Administrator Estimate:

      (a)      the Scheme Administrator Estimate will be based on the evidence available to the Scheme Administrators including, among other things and as they deem applicable, any Company Information provided to them, a valuation report prepared by a Valuer (if applicable) and/or a liquidation analysis;

      (b)      where appropriate (and among other things) the Scheme Administrators may:

            (i)      discount future claims to their present value (with the discount rate to be used to be agreed between Houlihan Lokey, Moelis & Company Asia Limited and the Scheme Administrators and such rate is to be used as consistently as reasonably possible);

            (ii)     estimate contingent or unascertained claims;

(iii)    convert foreign currency claims (if any) to US$ applying the foreign currency exchange rates set out in Clause 13.4; and

(iv)    take into account the rules of the relevant jurisdiction (being the jurisdiction in which the relevant Excluded Liabilities Party Person is wound up) in respect of set-off;

(c)    the Scheme Administrator Estimate shall be determined in good faith, to the best of the Scheme Administrators' ability based on the information available to the Scheme Administrators; and

(d)    the Scheme Administrator Estimate shall be determined as quickly and efficiently as possible with the aim of ensuring that the valuation of each Other Debt Scheme Creditor's Entitlement is completed and agreed or adjudicated as expeditiously as possible and in accordance with the timetable set out in this Scheme.

34.3    The Scheme Administrators shall issue an Estimation Notice to each Other Debt Scheme Creditor who has submitted its Scheme Claim notifying it of the Scheme Administrator Estimate and enclosing a blank Scheme Administrator Estimate Acceptance or Rejection Form and any materials which the Scheme Administrators in their sole discretion consider necessary to allow that Other Debt Scheme Creditor to consider and evaluate the Scheme Administrator Estimate.

34.4    The Estimation Notice will be issued within either: (i) for Scheme Claims submitted before the Restructuring Effective Date, within thirty (30) calendar days after the Restructuring Effective Date; or (ii) for Scheme Claims submitted on or after the Restructuring Effective Date and on or before the Bar Date, thirty (30) calendar days after the Distribution Confirmation Deed was received by the Scheme Administrators.

34.5    Each Other Debt Scheme Creditor shall have thirty (30) calendar days from the date of the Estimation Notice to either accept or reject the Scheme Administrator Estimate by submitting a completed Scheme Administrator Estimate Acceptance or Rejection Form to the Scheme Administrators. If the Other Debt Scheme Creditor rejects the Scheme Administrator Estimate:

(a)    the Scheme Administrator Estimate Acceptance or Rejection Form submitted by that Scheme Creditor must include an explanation of its reasons for rejecting the Scheme Administrator Estimate and all evidence which it intends to rely upon in support of its position; and

(b)    if in the sole opinion of one of the Scheme Administrators, the Scheme Administrator Estimate Acceptance or Rejection Form fails to enclose reasonably sufficient information and/or credible evidence, the Scheme Administrators will notify the Other Debt Scheme Creditor as soon as reasonably practicable specifying the deficiencies in the information and evidence provided by the Other Debt Scheme Creditor and the additional information and evidence required by the Scheme Administrators.

34.6    If an Other Debt Scheme Creditor accepts the Scheme Administrator Estimate within the time specified in Clause 34.5, the amount of the Scheme Administrator Estimate will be the final and binding value of that Other Debt Scheme Creditor's Entitlement. The Scheme Administrators will then send the Other Debt Scheme Creditor a Deed of Agreed Valuation to be executed by the Other Debt Scheme Creditor as a condition precedent to receiving Scheme Consideration.

34.7    If an Other Debt Scheme Creditor fails to submit a Scheme Administrator Estimate Acceptance or Rejection Form within the time specified in Clause 34.5, that Other Debt Scheme Creditor will be deemed to have accepted the Scheme Administrator Estimate and therefore the amount of the Scheme Administrator Estimate will be that Other Debt Scheme Creditor's Entitlement. The Scheme Administrators will then send the Other Debt Scheme Creditor a Deed of Agreed Valuation to be executed by the Other Debt Scheme Creditor as a condition precedent to receiving Scheme Consideration.

34.8    If an Other Debt Scheme Creditor rejects the Scheme Administrator Estimate within the time specified in Clause 34.5, that Other Debt Scheme Creditor and one of the Scheme Administrators shall seek to agree the value of the Other Debt Scheme Creditor's Entitlement during the Consultation Period in respect of which

(a)    If the value of the Other Debt Scheme Creditor's Entitlement is agreed during the Consultation Period, that agreed value shall be the final and binding value of that Other Debt Scheme Creditor's Entitlement. Upon such agreement, the Scheme Administrators will send the Other Debt Scheme Creditor a Deed of Agreed Valuation to be executed by the Other Debt Scheme Creditor as a condition precedent to receiving Scheme Consideration.

(b)    If the value of the Other Debt Scheme Creditor's Entitlement is not agreed during the Consultation Period, and the Scheme Administrators in their sole discretion consider that it is not appropriate to extend the Consultation Period, the Scheme Administrators must refer the Referred Scheme Claim to the Scheme Adjudicator in accordance with Clause 36 (*Adjudication Procedure*) of this Scheme.

(c)    If the value of the Other Debt Scheme Creditor's Entitlement is not agreed during the Consultation Period but in the relevant Scheme Administrators' sole opinion there is a reasonable likelihood that the Other Debt Scheme Creditor and the Scheme Administrators may reach an agreement on the value of the Other Debt Scheme Creditor's Entitlement, the Scheme Administrators may extend the Consultation Period by seven (7) calendar days in respect of which

(i)    if an agreement is ultimately reached at the end of the seven (7) day extension, that agreed value shall be the final and binding value of that Other Debt Scheme Creditor's Entitlement. The Scheme Administrators will then send the Other Debt Scheme Creditor a Deed of Agreed Valuation to be executed by the Other Debt Scheme Creditor as a condition precedent to receiving Scheme Consideration; or

(ii)   if an agreement is not reached at the end of the seven (7) day extension, the relevant Scheme Administrators must refer the Referred Scheme Claim to the Scheme Adjudicator in accordance with Clause 36 (*Adjudication Procedure*) of this Scheme.

34.9    Upon the acceptance, deemed acceptance or agreement (as the case may be) of a Scheme Creditor's Entitlement pursuant to Clauses 34.6 to 34.8, the Scheme Administrators will promptly send the Other Debt Scheme Creditor a Deed of Agreed Valuation to be executed by the Other Debt Scheme Creditor as a condition precedent to receiving the Scheme Consideration.

34.10   During the Consultation Period, either the Scheme Administrators or the Other Debt Scheme Creditor may provide additional information, further evidence and/or brief written submissions to the other or request additional information, further evidence and/or brief written submissions from the other in respect of that Other Debt Scheme Creditor's Scheme

Claim. Notwithstanding the foregoing sentence, the Scheme Administrators, in their sole discretion, acting reasonably, are only required to accede to an Other Debt Scheme Creditor's requests for additional information, further information and/or brief written submissions if they  consider it reasonable to do so and shall not be required to accede to such requests which are the same, or substantially the same, as one which has previously been responded to.

34.11   For the avoidance of doubt and without prejudice to Clauses 34.6 to 34.8, the Scheme Administrators shall, in their reasonable discretion, have the power, prior to the execution of the Deed of Agreed Valuation by the relevant Other Debt Scheme Creditor, to adjust any prior determination of that Other Debt Scheme Creditor's Entitlement based on intervening factors and/or changes in circumstance, including (but not limited to) any changes in the rights or benefits of the relevant Other Debt Scheme Creditor's Scheme Claim. The Scheme Administrators shall give notice to such Other Debt Scheme Creditor informing them of the relevant adjustment, and if disputed by the relevant Other Debt Scheme Creditor, such adjusted Entitlement will be referred to the Adjudication Procedure as a Referred Scheme Claim and as if the valuation of the relevant Other Debt Scheme Creditor's Entitlement had not been agreed or accepted.

*Company's Obligations in the Valuation Procedure*

34.12   The Company and the Group are obliged, and agree, to provide the Scheme Administrators with full access to any Company Information reasonably requested and to cooperate and comply with any reasonable requests by the Scheme Administrators for the Company Information, finance documents or other information or documents in the possession or control of the Company or the Group, unless provision of such information or documents would be contrary to any law (including for the avoidance of doubt any obligations of confidentiality imposed on the Company).

34.13   Management are obliged, and agree, to cooperate fully with the Scheme Administrators in relation to reasonable requests in respect of the Valuation Procedure.

34.14   The Company and the Group are obliged, and agree, to use their best endeavours to provide the Scheme Administrators with any information or documents reasonably requested by the Scheme Administrators which are relevant to an Other Debt Scheme Creditor's Entitlement, unless provision of such documents would be contrary to any law.

*Other Debt Scheme Creditor's Obligations in the Valuation Procedure*

34.15   Each Other Debt Scheme Creditor is obliged, and agrees, to cooperate fully with the Scheme Administrators in the Scheme Administrators' exercise of powers in assessing the value of the Other Debt Scheme Creditor's Entitlement.

34.16   Each Other Debt Scheme Creditor is obliged, and agrees, to use its best endeavours to provide the Scheme Administrators with any information or documents reasonably requested by the Scheme Administrators which are relevant to its Other Debt Scheme Creditor's Entitlement, unless provision of such documents would be contrary to any law.

**35.   THE SCHEME ADJUDICATOR**

*Qualification, appointment and removal*

35.1   On the Scheme Effective Date, the Company shall appoint individuals as Scheme Adjudicators under this Scheme, who shall initially be: Sir William Blair, Lord David Neuberger, Dame Elizabeth Gloster and Lady Mary Arden.

35.2    The office of each Scheme Adjudicator shall be vacated if the holder of such office becomes subject to any conflict of interest which would impact in any way his/her ability to perform the functions of Scheme Adjudicator as set out in this Scheme, dies, is convicted of an indictable offence, resigns from his/her office (which shall be permissible and effective only if he/she gives at least two (2) months' written notice to the Company prior to such resignation), becomes bankrupt, is disqualified from membership of a professional body of which he/she is a member, or becomes mentally disordered or incapacitated.

35.3    In the event of a vacancy in the office of any Scheme Adjudicator, the Scheme Administrators shall nominate and the Company shall appoint a replacement Scheme Adjudicator, who meets the criteria specified in Clause 35.5.

35.4    Each Scheme Adjudicator shall have the powers, duties and functions, and the rights, conferred upon him/her by this Scheme. In exercising his/her powers and carrying out his/her duties and functions under this Scheme, each Scheme Adjudicator shall be independent and impartial and shall act in good faith and with due care and diligence and shall exercise his/her powers under this Scheme for the purpose of ensuring that this Scheme is implemented in compliance with its terms and in the interests of the Scheme Creditors as a whole.

35.5    In the event that a replacement or additional Scheme Adjudicator is required pursuant to Clause 35.2 or 35.7 he/she shall be (a) a senior barrister, or a retired judge of a court of England and Wales or the Court, or such other individuals of comparable qualification, and (b) independent and impartial from the Company and the Scheme Administrators.

35.6    Each Scheme Adjudicator will agree to be bound by this Scheme.

35.7    At any given time, having regard to the number of Referred Scheme Claims which remain unresolved, the number of Scheme Adjudicators appointed and all other circumstances, the Scheme Administrators may nominate and the Company shall pursuant to the Scheme Administrators' nomination appoint one or more individuals who meet the criteria specified in Clause 35.5 as additional Scheme Adjudicator(s).

*Functions, powers and rights*

35.8    Each Scheme Adjudicator shall act as an expert and not as an arbitrator. He/she shall be responsible for the determination of Referred Scheme Claims referred to him/her under this Scheme and shall have the powers, rights, duties and functions conferred upon him/her by this Scheme.

35.9    The Scheme Adjudicators shall review all the available evidence to determine the value of the Referred Scheme Claim.

35.10    Except in the case of actual fraud or wilful default, none Scheme Adjudicators will be liable to the Scheme Administrators, the Company or any Scheme Creditor for any act or omission by the relevant Scheme Adjudicator in the performance or purported performance of his/her powers, rights, duties and functions under this Scheme.

35.11    The Company agrees to indemnify each Scheme Adjudicator out of the property of the Company for:

(a)    the costs, fees and expenses incurred and payable by the Scheme Adjudicator in accordance with Clause 35.14; and

(b)    any liability incurred by the Scheme Adjudicator as a result of any act or omission in carrying out his/her functions other than such liability (if any) that the Scheme Adjudicator may incur by his/her own actual fraud or wilful default,

in connection with this Scheme, and his/her role as Scheme Adjudicator. None of the Scheme Adjudicators shall be found to have committed actual fraud or wilful default unless or until a court of competent jurisdiction has made a finding to that effect.

35.12    The indemnity set out in Clause 35.11 shall take effect on and from the Scheme Effective Date and shall endure without limitation as to time for the benefit of each Scheme Adjudicator notwithstanding:

(a)    the termination of this Scheme for any reason whatsoever;

(b)    the removal or replacement of the Scheme Adjudicator; or

(c)    the invalidity of or any defect whatsoever in the appointment of the Scheme Adjudicator.

35.13    Each Scheme Adjudicator's right to indemnity conferred by Clause 35.11 has priority over the Scheme Claims and the Scheme Creditors generally and ranks equally to any claims for indemnity by the Scheme Administrators and each other Scheme Adjudicator.

35.14    Each Scheme Adjudicator shall be:

(a)    remunerated in respect of any work done by the Scheme Adjudicator and any agent, partner or employee of the Scheme Adjudicator acting on behalf of the Scheme Adjudicator, in connection with the exercise of his/her powers and discretions and the performance of his/her duties, obligations and responsibilities as Scheme Adjudicator under this Scheme on a time-cost basis; and

(b)    reimbursed in respect of all costs, fees, disbursements, taxation liabilities (including VAT), and expenses incurred in connection with the performance of his/her duties, obligations and responsibilities as Scheme Adjudicator under this Scheme,.

35.15    Fees and expenses incurred by the Scheme Adjudicators shall be invoiced monthly (or such other period as the Scheme Administrators and the Scheme Adjudicators may determine) to the Scheme Administrators and, following the approval by the Scheme Administrators of such fees and expenses, shall be paid in full by the Company within one calendar month of the Scheme Administrators' approval.

**36.    ADJUDICATION PROCEDURE**

36.1    When the Scheme Administrators are obliged to refer a Referred Scheme Claim to the Scheme Adjudicator pursuant to Clause 34.8(b), 34.8(c) or 34.11 they shall promptly refer the Referred Scheme Claim (together with the relevant Estimation Notice, all supporting documents provided to or by the Other Debt Scheme Creditor, and all other relevant valuation evidence exchanged between the Scheme Administrators and the Other Debt Scheme Creditor during the Consultation Period), to a Scheme Adjudicator for review.

36.2    The Scheme Administrators shall refer each Referred Scheme Claim to a Scheme Adjudicator.  The Referred Scheme Claims shall be assigned to a Scheme Adjudicator according to the alphabetical order of the Scheme Adjudicators' surnames (such that the first Referred Scheme Claim shall be assigned to the Scheme Adjudicator whose surname

appears first in the alphabet, and this process shall be repeated until all Referred Scheme Claims have been assigned. Notwithstanding the aforesaid:

(a)    The Scheme Administrators may consider, in their sole discretion, to select a different Scheme Adjudicator to determine a Referred Scheme Claim because of practicality or efficiency reasons, for example, when the Referred Scheme Claim involves a commonality of issues with another Referred Scheme Claim that has been, or is being, determined by that Scheme Adjudicator, and subject to that Scheme Adjudicator confirming with the Scheme Administrators that he/she has no conflict of interest in respect of adjudicating the second Referred Scheme Claim. For the purpose of this paragraph (a), the Scheme Adjudicator shall endeavor to complete such conflicts checks within three (3) Business Days of receipt of the second Referred Scheme Claim.

(b)    Where a Scheme Adjudicator has been unable to accept a Referred Scheme Claim due to a conflict of interest, that Scheme Adjudicator will be approached first in respect of the next Referred Scheme Claim.

36.3    The Scheme Adjudicator shall review the Referred Scheme Claim and relevant evidence before him/her and decide whether to:

(a)    make a final and binding adjudication on the Referred Scheme Claim; or

(b)    request further evidence from the Other Debt Scheme Creditor and/or the Scheme Administrators.

36.4    The Scheme Adjudicator shall have the power to make directions, extend the prescribed timeframes and/or adopt procedures as he or she considers appropriate for the purposes of providing a fair, efficient and expeditious means for the adjudication of the Referred Scheme Claim. Specifically, the Scheme Adjudicator may, in his/her sole discretion:

(a)    provide directions on the overall conduct of the Adjudication Procedure;

(b)    provide additional directions to the relevant Other Debt Scheme Creditor, the Company, the Excluded Liabilities Party Person (to the extent relevant and where the Company possesses the direct contact details for such person) and/or the Scheme Administrators to submit written submissions and/or further evidence;

(c)    convene an oral hearing and make directions as to the date, form, content, procedure and time limits of such hearing, provided that each of the relevant Other Debt Scheme Creditor, the Company, the Scheme Administrators and any other participating party is given reasonable notice in writing of any such hearing;

(d)    appoint one or more experts (who shall be and remain impartial and independent of the Company and the relevant Other Debt Scheme Creditor and shall be engaged by the Scheme Administrators) to report in writing to him/her on specific issues relating to the Referred Scheme Claim;

(e)    extend the timetable set out in Clause 36.5; and

(f)    make an order as to costs against either the Company or the Other Debt Scheme Creditor.

36.5    If a Referred Scheme Claim is referred to the Scheme Adjudicator, the following timetable shall apply:

(a) within fourteen (14) calendar days of the Scheme Adjudicator receiving and being assigned the Referred Scheme Claim:

(i) the Scheme Adjudicator may request the Scheme Administrators, the Company, the Excluded Liabilities Party Person (to the extent relevant and where the Company possesses the direct contact details for such person) and/or the relevant Other Debt Scheme Creditor to produce any further documents or other information which he/she deems necessary (the "**Further Documentation**"); or

(ii) if the Scheme Adjudicator does not require any Further Documentation, he/she shall provide the Scheme Administrators, the Company and the relevant Other Debt Scheme Creditor with a copy of his/her written decision setting out the adjudicated value of that Other Debt Scheme Creditor's Entitlement, which shall be final and binding on that Other Debt Scheme Creditor, the Scheme Administrators and the Company, insofar as the law allows.

(b) if such Further Documentation is not received (in full or in part) within fourteen (14) calendar days from the date of the Scheme Adjudicator's request, the Scheme Adjudicator shall make his/her determination on the basis of the documents provided to him/her; and

(c) within fourteen (14) calendar days of: (i) receipt of the Further Documentation; or (ii) the expiry of the period provided for in paragraph (b) above, the Scheme Adjudicator shall provide the Scheme Administrators, the Company and the relevant Other Debt Scheme Creditor with a copy of his/her written decision setting out the adjudicated value of that Other Debt Scheme Creditor's Entitlement, which shall be final and binding on that Other Debt Scheme Creditor, the Scheme Administrators and the Company, insofar as the law allows.

36.6 Upon receipt of the Scheme Adjudicator's decision as set out in Clause 36.5, the Scheme Administrators will send the Other Debt Scheme Creditor a Deed of Agreed Valuation to be executed by the Other Debt Scheme Creditor as a condition precedent to receiving the Scheme Consideration.

36.7 The costs of the Adjudication Procedure (including the costs of the Scheme Adjudicator and any legal and other expenses incurred by the Company and the relevant Other Debt Scheme Creditor) are matters within the discretion of the Scheme Adjudicator. In exercising his/ her discretion as to costs the Scheme Adjudicator shall:

(a) as a starting point, be guided by the principle that costs follow the event; and

(b) have regard to the principles applied by the Court in respect of costs orders from time to time.

36.8 Payment to the Company in full of any costs ordered against an Other Debt Scheme Creditor shall be a condition precedent to that Other Debt Scheme Creditor's entitlement to and receipt of its Scheme Consideration.

36.9 Communications between the Scheme Adjudicator, the Scheme Administrators, the Company and the relevant Other Debt Scheme Creditor shall be conducted by email and in English or Chinese, as the Scheme Adjudicator or the Scheme Administrators (as applicable) in their sole discretion deem appropriate, taking into consideration the needs of

the Other Debt Scheme Creditor. The Scheme Adjudicator may also, at his or her discretion, direct oral submissions to be made in either English or Chinese.

36.10    The Adjudication Procedure shall be conducted in English or Chinese, as directed by the Scheme Adjudicator in their sole discretion. The relevant Other Debt Scheme Creditor shall ensure that all documents submitted to the Scheme Adjudicator (or the relevant parts of those documents) are in English or accompanied by an English translation at the Other Debt Scheme Creditor's expense, if so required by the Scheme Adjudicator.

*Company's Obligations in the Adjudication Procedure*

36.11    Management are obliged, and agree, to cooperate fully with the Scheme Adjudicator in relation to any reasonable requests in respect of the Adjudication Procedure.

36.12    The Deed of Undertaking Parties, the Company and the Group are obliged, and agree, to use their best endeavours to provide the Scheme Adjudicator with any information or documents reasonably requested by the Scheme Adjudicator which are relevant to a Referred Scheme Claim, unless provision of such documents would be contrary to any law.

*Other Debt Scheme Creditor's Obligations in the Adjudication Procedure*

36.13    Each Other Debt Scheme Creditor is obliged, and agrees, to cooperate fully with the Scheme Adjudicator in relation to the Adjudication Procedure.

36.14    Each Other Debt Scheme Creditor is obliged, and agrees, to use its best endeavours to provide the Scheme Adjudicator with any information or documents reasonably requested by the Scheme Adjudicator which are relevant to its Referred Scheme Claim, unless provision of such documents would be contrary to any law.

*Scheme Administrators' obligations in the Adjudication Procedure*

36.15    The Scheme Administrators are obliged, and agree, to cooperate fully with the Scheme Adjudicator in relation to the Adjudication Procedure.

36.16    The Scheme Administrators are obliged, and agree, to use their best endeavours to provide the Scheme Adjudicator with any information or documents reasonably requested by the Scheme Adjudicator which are relevant to a Referred Scheme Claim, unless provision of such documents would be contrary to any law.

*Reserving process*

36.17    Notwithstanding any other provision of this Scheme:

(a)    the Company and the Scheme Administrators are not required to postpone any payment or distribution to the Scheme Creditors (excluding any Other Debt Scheme Creditor, whose Referred Scheme Claim has not been finally determined pursuant to the Adjudication Procedure (a "**Pending Referral Creditor**")), on the Final Distribution Date, in the event that any Referred Scheme Claim has not been finally determined by the Scheme Adjudicator prior to the Final Distribution Date;

(b)    where an adjudication of a Pending Referral Creditor's Referred Scheme Claim is underway and the Scheme Adjudicator's decision in respect of that Referred Scheme Claim is pending as at the Final Distribution Date:

(i)    the Company, the Holding Period Trustee and the Scheme Administrators shall:

  (A)    solely for the purposes of calculating the amount distributable to the Scheme Creditors, treat the value of the Pending Referral Creditor's Entitlement as being equal to the value being proposed by that Pending Referral Creditor in the Adjudication Procedure (the "**Asserted Amount**");

  (B)    not make any distribution to the Pending Referral Creditor pending conclusion of the Adjudication Procedure; but reserve the Asserted Amount, or such greater amount, of the relevant Scheme Consideration as the Scheme Administrators consider necessary;

  (C)    as soon as reasonably practicable after the Scheme Adjudicator concludes the adjudication of the Referred Scheme Claim of the Pending Referral Creditor make a catch-up payment to the Pending Referral Creditor calculated by reference to the adjudicated value of that Pending Referral Creditor's Entitlement;

(ii)    to the extent the amount reserved under Clause 36.17(b)(i)(B) is greater than the amount to which the Pending Referral Creditor is actually entitled, the Company shall on the instruction of the Scheme Administrators distribute the excess amount to the Scheme Creditors entitled to receive Scheme Consideration on a pro-rata basis; and

(c)    where an SJ Notes Scheme Creditor commences a Proceeding in a court against the Company or the Scheme Administrators to dispute the determination of its Entitlement:

  (i)    the Company and the Scheme Administrators may:

    (A)    solely for the purposes of calculating the amount distributable to other Scheme Creditors, treat the value of the relevant SJ Notes Scheme Creditor's Entitlement as being equal to the value being proposed by that SJ Notes Scheme Creditor in the Proceeding ("**SJ Notes Asserted Amount**");

    (B)    not make any distribution to the relevant SJ Notes Scheme Creditor pending conclusion of the Proceeding; but reserve the SJ Notes Asserted Amount, or such greater amount, of the relevant Scheme Consideration as the Scheme Administrators consider necessary;

    (C)    as soon as reasonably practicable after the Proceeding is fully and finally determined (and not subject to any appeal) or settled, make a catch-up payment if required to the relevant SJ Notes Scheme Creditor calculated by reference to the value of its Entitlement as determined in the Proceeding or agreed under the settlement agreement;

  (ii)    if no amount is reserved under Clause 36.17(c)(i), and a catch-up payment is required pursuant to Clause 36.17(c)(i)(C), the Company shall issue the Scheme Consideration on a dollar-for-dollar basis to the relevant SJ Notes Scheme Creditor in respect of any Entitlement for which it has not received Scheme Consideration; and

(iii)    to the extent the amount reserved under Clause 36.17(c)(i) is greater than the amount to which the relevant SJ Notes Scheme Creditor is actually entitled, the Company shall extinguish the reserved Scheme Consideration.

## 37.    NOTICE

37.1    Any notice or other written communication to be given under or in relation to this Scheme shall be given in writing and shall be deemed to have been duly given if it is delivered by hand, or sent by courier, post, fax or email to:

(a)    in the case of the Company:

(i)    by courier or registered post to Tianji Holding Limited, 15th Floor, YF Life Centre, 38 Gloucester Road, Wanchai, Hong Kong;

(ii)    for the attention of: Jimmy Fong; and

(iii)    by email to jfong@evergrande.com;

(b)    in the case of the Scheme Administrators, by email to: evergrande.scheme@kpmg.com;

(c)    in the case of a Scheme Creditor, its last known address, fax number or email according to the records of the Company or the Information Agent or by corporate action notice through the Clearing Systems (i.e., the SJ Notes Depository or New Instruments Depository, as applicable); and

(d)    in the case of any other person, any address set forth for that person in any agreement entered into in connection with this Scheme or the last known address according to the Company or by fax to its last known fax number according to the Company.

37.2    Any notice or other written communication to be given under this Scheme shall be deemed to have been served:

(a)    if delivered by hand or courier, on the first Business Day following delivery;

(b)    if sent by post, on the second Business Day after posting if the recipient is in the country of dispatch, otherwise on the tenth Business Day after posting; and

(c)    if by fax or email, on the Business Day sent.

37.3    In proving service, it shall be sufficient proof in the case of a notice sent by post that the envelope was properly stamped, addressed and placed in the post.

37.4    The accidental omission to send any notice, written communication or other document in accordance with this Clause 37 (*Notice*) or the non-receipt of any such notice by any Scheme Creditor, shall not affect the provisions of this Scheme.

37.5    The Company shall not be responsible for any loss or delay in the transmission of any notices, other documents or payments posted by or to any Scheme Creditors which shall be posted at the risk of such Scheme Creditors.

37.6    This Clause 37 (*Notice*) shall not apply to the documents comprising the Solicitation Packet as published on the Transaction Website, which should be completed and returned in accordance with the instructions set out therein.

38.    **INTERCONDITIONALITY OF THE SCHEME**

For the avoidance of doubt, the implementation of this Scheme shall be dependent on the implementation of the SJ Scheme, in order to implement the restructuring of Liabilities in respect of the SJ Notes which are being compromised under both this Scheme and the SJ Scheme.

39.    **APPLICATION TO THE COURT FOR DIRECTIONS**

Without prejudice to any rights that the Company might otherwise have in connection with this Scheme or any aspect of it, the Company shall be entitled to make an application to the Court for directions at any time in connection with any matter arising under or in relation to this Scheme.

40.    **FOREIGN REPRESENTATIVE**

Each Director or person appointed by resolution of the Directors may be authorised or ratified to act as the representative of the Company on and in connection with any application for recognition and assistance in relation to this Scheme in any jurisdiction and under whatever law, including (without limitation) Chapter 15 of the US Bankruptcy Code and any other law derived from or similar to the UNCITRAL Model Law on Cross-Border Insolvency Proceedings.

41.    **THIRD PARTIES**

41.1    Subject to Clause 41.2 of this Scheme, no Person who is not a party to this Scheme has any right under the Contracts (Rights of Third Parties) Ordinance (Cap. 623) (as amended) to enforce any of the terms of this Scheme.

41.2    The Released Persons may enforce the relevant terms of this Scheme in accordance with the Contracts (Rights of Third Parties) Ordinance (Cap. 623) (as amended). For these purposes, the parties to this Scheme agree that the Contracts (Rights of Third Parties) Ordinance (Cap. 623) (as amended) shall be deemed to apply to this Scheme.

42.    **TERMINATION OF THIS SCHEME**

42.1    The Company may terminate this Scheme at any time prior to the Restructuring Effective Date, by notice to the Scheme Creditors, provided that:

(a)    SJ exercises its right to terminate the SJ Scheme; and

(b)    written consent for the termination is obtained by the Company from:

(i)    the Majority TJ AHG; or

(ii)    (without prejudice to the foregoing) if the TJ AHG does not hold the Minimum TJ AHG Threshold, the Super Majority Participating Creditors.

42.2    In the event that this Scheme is terminated pursuant to the terms of this Clause 42 (*Termination of this Scheme*), each Scheme Creditor shall be entitled to exercise any and all of its rights, powers and remedies against the Company under the terms and conditions of the documents governing the Existing Debt Instruments as though the Scheme had never been contemplated or implemented.

42.3    This Scheme shall terminate automatically, and be of no further force and effect in the event that the Restructuring Effective Date, including each of the Scheme Steps outlined in paragraphs (a) to 6.5(i) of Clause 6.5 of this Scheme, has not occurred by the Longstop Date.

**43.    CONFLICT AND INCONSISTENCY**

In the case of a conflict or inconsistency between the terms of this Scheme and the terms of the Explanatory Statement, the terms of this Scheme will prevail.

**44.    SEVERABILITY**

If at any time any provision of this Scheme, the Restructuring Documents (or any other document to be executed under or in accordance with this Scheme) is or becomes illegal, invalid or unenforceable in any respect under the laws of any jurisdiction, such provision shall be severed from this Scheme or such Restructuring Document or such other document (as the case may be) and neither the legality, validity or enforceability under the law of any other jurisdiction of that or any provision of this Scheme shall be affected or impaired.

**45.    GOVERNING LAW AND JURISDICTION**

45.1    This Scheme and any non-contractual obligations arising out of or in connection with this Scheme shall be governed by, and construed in accordance with, the laws of Hong Kong.

45.2    The Company and the Scheme Creditors hereby agree that the courts of Hong Kong shall have exclusive jurisdiction to hear and determine any Proceeding and to settle any dispute which arises out of or is connected with the terms of this Scheme or its implementation or out of any Proceeding taken or omitted to be taken under this Scheme or in connection with the administration of this Scheme.

45.3    For the purposes set out in Clause 45.2, each of the Company and the Scheme Creditors irrevocably submit to the jurisdiction of the courts of Hong Kong, *provided, however*, that nothing in this Clause 45 (*Governing Law and Jurisdiction*) shall affect the validity of other provisions determining governing law and jurisdiction as between the Company and any of the Scheme Creditors whether contained in any contract or for any other purpose including, but not limited to, submission and/or enforcement under the jurisdiction of the US Bankruptcy Court in relation to the Chapter 15 Recognition Proceeding, including (but not limited to) the Recognition Filings and the Chapter 15 Recognition Order.

45.4    The terms of this Scheme and the obligations imposed on the Company hereunder shall take effect subject to any prohibition or condition imposed by any applicable law.

**SCHEDULE 1**

**RESTRUCTURING DOCUMENTS**

1.      the Scheme;

2.      the Explanatory Statement;

4.      Deeds of Release;

5.      Deed of Undertaking;

6.      New Instrument Documents;

7.      Security Documents;

8.      Holding Period Trust Deed;

10.     New Intercreditor Agreements; and

11.     all other documents, agreements, instruments, board resolutions, shareholder approvals, releases, and notices necessary to implement or consummate the Restructuring in accordance with the terms of the RSA and this Scheme, in each case as amended, supplemented, extended, restated or novated from time to time, or any document or instrument creating or evidencing any security interest or guarantee, any fee letter, intercreditor agreement or similar documents under or in connection with the New Instruments and/or the Security Documents in each case in the Agreed Form. For the avoidance of doubt, any documents and accompanying evidence (including, but not limited to, foreign law expert opinions and all other affidavit evidence filed by the Company in respect of the Proceedings before the Court to convene the Scheme Meeting and/or to sanction this Scheme) specifically required as part of the Court's proceedings are not included.

**SCHEDULE 2**

**OTHER DEBTS**

*All values below are for reference, indicative only and subject to change. To the extent a balance of the principle is referred to, it is as at 31 December 2022.*

1. Tianji guarantee of US$260 million 8.5% senior notes due October 3, 2021 (ISIN: XS2054446617, Common Code: 205444661) issued by Jumbo Fortune Enterprises Limited;

2. HK$575 million put option granted by the Tianji in relation to shares of Clear Star Investments Limited.

3. US$258 million put option granted by the Tianji in relation to shares of Sky Joy Holdings Limited

4. US$258 million put option granted by Tianji in relation to private loan borrowed by Sky Joy Holdings Limited (the "**Castle Loan Put Option**").

5. HK$7.6 billion loan borrowed by the Tianji pursuant to facilities agreement dated 21 November 2020 (the "**Hero Loan**").

6. Approximately HK$1.4 billion put options granted by the Tianji in relation to a project located in Tuen Mun, Hong Kong.

7. Intercompany balance owed by the Tianji to CEG which on 31 December 2022 was in an amount equal to approximately US$5.03 billion.

## SCHEDULE 3

## RESTRUCTURING EFFECTIVE DATE CONDITIONS

1.  **Satisfaction of Scheme Conditions:** the satisfaction of the Scheme Conditions, and the occurrence of the Scheme Effective Date.

2.  **Relevant approvals of Scheme Consideration:** the delivery of all relevant approvals, pre-approvals or consents, as applicable, in connection with the Restructuring having been obtained, including:

    (a)  delivery of respective court orders in respect of the Schemes and Chapter 15 Recognition Proceeding (and in the case of Chapter 15 unless waived by the Company);

    (b)  approval in-principle for the listing and quotation of the New Instruments on the SGX-ST;

    (c)  approval by the Board of the Company for the issuance of the New Instruments;

    (d)  any required governmental or regulatory approval, filings or registration (including but not limited to any procedures required by the NDRC in connection with the issuance of the New Instruments) in connection with the Restructuring and with respect to the execution, delivery or performance of the Restructuring Documents under any applicable PRC laws, regulations, orders and decrees of any PRC Governmental Entities has been obtained and made. This condition is unable to be waived; and

    (e)  publication of announcements of the Company on the issuance of the New Instruments.

3.  **Payment of fees:** settlement of all professional fees associated with the Restructuring that the Company has agreed to pay and that have been duly invoiced to the Company namely (i) the TJ AHG Legal Fees and the AHG Financial Advisor Fees, (ii) the fees, costs and expenses of all of its Affiliates, the Advisors, the Information Agent, the Scheme Administrators, the Holding Period Trustee, (ii) the fees, costs and expenses of the SJ Notes Trustee, , the SJ Notes Depositary, the SJ Notes Paying and Transfer Agent and Registrar, and (iii) the fees, costs and expenses of the New Instruments Depositary, the New Instruments Paying and Transfer Agent and Registrar, the New Instruments Trustee and the New Instruments Collateral Agent.

4.  **Other conditions:**

    (a)  the receipt of written confirmation from (A) Kirkland & Ellis (on behalf of the TJ AHG); and (B) Sidley Austin (on behalf of Tianji) that each Restructuring Document is in Agreed Form;

    (b)  the execution of all necessary corporate authorisations to implementation of the Restructuring and entry into the relevant Restructuring Documents by the relevant parties thereto (not otherwise included in (1)-(3) above); and

    (c)  the satisfaction of each of the specific conditions precedent contained in each of the Restructuring Documents (in each case in the Agreed Form) and any corporate governance term sheet forming part of the Explanatory Statement.

**SCHEDULE 4**

**SJ NOTES SUBSIDIARY GUARANTORS**

1. Ever Grace Group Limited (恒善集团有限公司)

2. Ample Treasure Group Limited (宝丰集团有限公司)

3. Luckyup Group Limited (升祺/昇祺集团有限公司)

4. Instant Choice Development Ltd.

5. Ample Treasure Holding Limited (宝丰集团控股有限公司)

6. Will Glory Holdings Limited (好耀控股有限公司)

7. Forbidden City Culture Co., Limited (紫禁城弘华文化有限公司)

8. Ever Sure Industries Limited (永瑞实业有限公司)

9. Shui Wah Investment Limited (穗华投资有限公司)

10. Shengtong Holding Limited (盛通控股有限公司)

11. Wisdom Gain Group Limited (智盈集团有限公司)

12. Grow Rising Investment Limited (晋廷投资有限公司)

13. Accord Sino Group Limited (协华集团有限公司)

14. Merry Full Investments Limited (怡满投资有限公司)

15. Million Castle Investments Limited

16. Benefit East Investments Limited (益东投资有限公司)

17. Champion Glory Holdings Limited (卓康集团有限公司)

18. Champion Globe Limited (特灵有限公司)

19. Champion King Investments Limited (彩侨投资有限公司)

20. Fortune Luck Corporation Limited (顺利有限公司)

21. Cheung Fu Department Store Enterprise Limited (象富百货集团有限公司)

22. China Agriculture Technology Limited (中国农业科技有限公司)

23. Baojun Limited (保骏有限公司)

24. Perfect Vantage Investments Limited (历冠投资有限公司)

25. Bai Chang Limited (百昌有限公司)

26.     Minsin International (Holdings) Limited (明诚国际(集团)有限公司)

27.     Billion Sino Investments Limited (亿中投资有限公司)

28.     Allywing Investments Limited (荣邦投资有限公司)

29.     California Place Dalian Limited (加州豪庭大连有限公司)

30.     Fortune Star International Investment Limited (福星国际投资有限公司)

31.     Xing Hong Holdings Limited (兴鸿控股有限公司)

32.     Rosy Dynasty Limited (翠御有限公司)

33.     Joy Vision Holdings Limited (乐景控股有限公司)

34.     Sanli (China) Holdings Limited (三立(中国)控股有限公司)

35.     Metro Wisdom Limited (慧都有限公司)

36.     Ji Feng Limited (吉丰有限公司)

37.     Rise Eagle Worldwide Limited (振鹰环球有限公司)

38.     Jicheng International (HK) Limited (集成国际(香港)有限公司)

39.     Lucky Benefit Limited

40.     Loyal Power Investments Limited (旺权投资有限公司)

41.     Rising Sheen Limited (升亮有限公司)

42.     City Faith Limited (都信有限公司)

43.     South Honest Limited (诚南有限公司)

44.     First Key Investments Limited (元基投资有限公司)

45.     Hinto Developments Limited

46.     Triumph Hero International Limited (胜雄国际有限公司)

47.     Spread Glory Investments Limited (广亮投资有限公司)

48.     New Insight Holdings Limited (创见控股有限公司)

49.     Easy Gain Investment Holdings Limited (盈润投资控股有限公司)

50.     Honor Business Investment Limited (荣商投资有限公司)

51.     Link Care Limited (环照有限公司)

52.     Cheer Motion Development Limited (致能发展有限公司)

53.    China Sea Group (Hong Kong) Investment Limited (中海集团(香港)投资有限公司)

54.    Crown Wise Investment Limited (冠惠投资有限公司)

55.    Dragon Joy (China) Limited (龙悦(中国)有限公司)

56.    Dragon Pioneer Development Limited (龙添发展有限公司)

57.    Excel Sky (Hong Kong) Limited (俊天(香港)有限公司)

58.    Future Lead Enterprises Limited (天领企业有限公司)

59.    Glory Sign Development Limited  (皇志发展有限公司)

60.    Gold Ascot Limited (金士福有限公司)

61.    Grace Target Holdings Limited (喜志集团有限公司)

62.    Honour In Investments Limited  (诚然投资有限公司)

63.    Jiazhi Holdings Limited (嘉智控股有限公司)

64.    Joy Wealthy Investment Limited (悦才投资有限公司)

65.    Lucky Universe Holding Limited (瑞宇集团有限公司)

66.    Pacific Plus Enterprises Limited (汇太企业有限公司)

67.    Palm Island Resort Limited (棕榈岛渡假村有限公司)

68.    Prime Light Holdings Limited (柏天集团有限公司)

69.    Prime Sun Holding Limited (盛日控股有限公司)

70.    Prosper Power Development Limited (能昌发展有限公司)

71.    Sharp Goal Investments Limited (锐怡投资有限公司)

72.    Starlet Development Limited (星能发展有限公司)

73.    Sunny Net Development Limited (日讯发展有限公司)

74.    Thousand Grand Holding Limited (千宏控股有限公司)

75.    Trend Rich Investment Limited (毅富投资有限公司)

76.    Chang Xing Holdings Limited (昌兴控股有限公司)

77.    Cheer Champ Investment Limited (志昌投资有限公司)

78.    Dragon Charm Investments Limited (龙创投资有限公司)

79.    Dragon Fortune Limited

80.     East Best Investments Limited (东卓投资有限公司)

81.     Ever Shiny International Limited

82.     Full Jolly Investments Limited (满怡投资有限公司)

83.     Good Wave International Limited (佳涛国际有限公司)

84.     Healthy Time International Limited

85.     Luck Fortune Holdings Limited

86.     Lucky Universe Enterprises Limited (瑞宇企业有限公司)

87.     Marche Limited

88.     Marvel First Developments Limited

89.     Menkia Holdings Limited (万家控股有限公司)

90.     On Lucky Holdings Limited (安利达控股有限公司)

91.     Opal House Development Limited

92.     Oriental Fame Holdings Limited (东荣控股有限公司)

93.     Prime Sun Enterprises Limited (盛日企业有限公司)

94.     Reego Group Limited (锐高集团有限公司)

95.     Silver Opportunity Investment Limited (银机投资有限公司)

96.     Superb Capital Enterprises Limited

97.     Upper East Property Holdings Company Limited (上东置业控股有限公司)

98.     Vast Wheel Company Limited (浩轮有限公司)

99.     White Heron Limited

100.    Win Harbour Investments Limited (凯港投资有限公司)

101.    Win Peak Group Limited (凯峰集团有限公司)

102.    Shengtong (BVI) Limited (盛通(BVI)控股有限公司)

103.    Shengyu (BVI) Limited (盛誉(BVI)有限公司)

104.    Any other SJ Notes Subsidiary Guarantors set out in the New Instruments Document which shall be in the Agreed Form

**SCHEDULE 5**

**COURT ORDER**

**HCMP 1090 / 2023**

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

MISCELLANEOUS PROCEEDINGS NO. 1090 OF 2023



27 JUL 2023

IN THE MATTER of TIANJI HOLDING LIMITED

天基控股有限公司

and

IN THE MATTER of Section 670 of the Companies
Ordinance (Cap. 622)

**BEFORE THE HONOURABLE MADAM JUSTICE LINDA CHAN IN CHAMBERS**

**ORDER**

UPON THE APPLICATION of the above named Tianji Holding Limited 天基控股有
限公司 (the "**Company**") by way of *Ex Parte* Originating Summons filed herein on 12 July
2023 ("**Originating Summons**").

AND UPON READING the Originating Summons, the Affirmation of Hui Ka Yan
filed herein on 20 July 2023 together with the exhibits referred to therein, including but not
limited to the draft explanatory statement for the Scheme ("**Explanatory Statement**"), the
Affirmation of Neil Edward McGregor McDonald filed herein on 21 July 2023 together with
the exhibits referred to therein, and the Affirmation of Wu Tin Long filed herein on 24 July
2023 together with the exhibits referred to therein.

AND UPON HEARING leading counsel for the Company and counsel for the ad hoc
group of creditors of the Company.

IT IS ORDERED that:-

1.      The Company be at liberty to convene a meeting of the Scheme Creditors ("**Scheme**

Meeting") for the purpose of considering and, if thought fit, approving (with or without modification) a scheme of arrangement (the "**Scheme**") proposed to be made between the Company and its Scheme Creditors under sections 670, 673 and 674 of the Companies Ordinance (Cap. 622).

2.    The Scheme Meeting will be held in Hong Kong at 39/F, Two International Finance Centre, 8 Finance Street, Central, Hong Kong on 22 August 2023 at 8:00 p.m. (Hong Kong time), subject to any adjournment as my be approved by the chairperson of the Scheme Meetings ("**Chairperson**").

3.    Scheme Creditors be able to attend the Scheme Meeting to vote in respect of the Scheme, in person, by a duly authorised representative (if a corporation) or by proxy, including via video conference.

4.    In respect of attendance by video conference:

    a.  For Scheme Creditors who are not Blocked Scheme Creditors (as defined in the Scheme), dial-in details will be published on https://projects.morrowsodali.com/evergrande (the "**Transaction Website**") at least 21 days before the day appointed for the Scheme Meeting and the passcode notified to individual Scheme Creditors by Morrow Sodali Limited as the information agent in respect of the Scheme (the "**Information Agent**") at least 2 business days before the day appointed for the Scheme Meeting.

    b.  For Blocked Scheme Creditors, GLAS Specialist Services Limited ("**GLAS**") will provide Blocked Scheme Creditors with the details of how to attend and vote at the Scheme Meeting at least 21 days before the day appointed for the Scheme Meeting and will notify Blocked Scheme Creditors of the meeting passcode at least 2 business days before the day appointed for the Scheme Meeting.

5.    The Chairperson may require Scheme Creditors attending the Scheme Meeting by video conference to turn on their camera throughout the Scheme Meeting and log on to the video conference using their full name (as registered with the Information Agent) and the creditor identifier number provided to them by the Information Agent prior to the Scheme Meeting.

6.    At least 21 days before the day appointed for the Scheme Meeting, a copy of the notice of the Scheme Meeting (the "**Notice of Scheme Meeting**"), together with any forms required for voting purposes (the "**Scheme Creditor Voting Forms**"), shall be circulated to the Scheme Creditors by:

(a)    publication on the Transaction Website;

(b)    publication by way of public announcement by China Evergrande Group (stock code 3333) on the HKEXnews website of The Stock Exchange of Hong Kong Limited at http://www.hkexnews.hk;

(c)    publication by way of public announcement by China Evergrande Group on the website of the Singapore Exchange Limited at https://www.sgx.com/;

(d)    publication on the website of China Evergrande Group at http://www.evergrande.com;

(e)    by causing the Information Agent to send via electronic mail to each person who the Company believes is or may be a Scheme Creditor, and for whom the Company has a valid e-mail address; and

(f)    distribution via Euroclear Bank SA/NV and/or Clearstream Banking S.A.

7.    GLAS shall circulate copies of the Notice of Scheme Meeting and the Scheme Creditor Voting Forms to any Blocked Scheme Creditors by email not less than 21 days before the Scheme Meeting.

8.    When providing the Notice of Scheme Meeting in accordance with paragraphs 6 and 7 above, the Information Agent or GLAS (as applicable) shall provide copies of the following documents (or a link to the Transaction Website to enable the Scheme Creditors to access electronic copies of the following documents):

(a)    the Scheme;

(b)    the Explanatory Statement; and

(c)    the Solicitation Packet (as defined in the Explanatory Statement) being instructions as to the registration of claims and voting procedures for the

purposes of the Scheme Meeting including the Scheme Creditor Voting Forms.

9.      The accidental omission to serve any Scheme Creditor with the Notice of Scheme
        Meeting, or the non-receipt by any Scheme Creditor of the Notice of Scheme Meeting,
        shall not invalidate the proceedings at the Scheme Meeting.

10.     At least 21 days before the day appointed for the Scheme Meeting, the Company shall
        place an advertisement substantially in the form of the draft hereby approved in (1) *The
        Standard*, which is an English language newspaper, and (2) a Traditional and Simplified
        Chinese translation thereof in *Hong Kong Economic Times*, which is a Chinese
        language newspaper in circulation in Hong Kong, and (3) a Simplified Chinese
        translation thereof in "*Nanfang Daily*" and "*Securities Times*" both of which are
        Chinese language newspapers in circulation in the PRC.

11.     Certified Chinese translation of the Notice of Scheme Meeting and the proposed
        advertisement in newspapers be dispensed with.

12.     An affirmation is to be filed by a solicitor of Sidley Austin who is fluent in both English
        and Chinese languages confirming the accuracy of the Chinese translation of the Notice
        of Scheme Meeting and the proposed advertisement in newspapers.

13.     The Chairperson be permitted to declare and announce the results of the Scheme
        Creditors' votes in respect of the Scheme, either during the Scheme Meeting or after
        the conclusion of the Scheme Meeting.

14.     The substantive hearing of the petition at which the Court will determine whether or
        not to sanction the Scheme shall be heard at 10:00 a.m. (Hong Kong time) on 5 and 6
        September 2023 (subject to the Court's further directions) before the Honourable
        Madam Justice Linda Chan.

15.     There be liberty to apply generally.

        AND THE COURT HEREBY APPROVES the:-

        1.      Notice of Scheme Meeting substantially in the form of Annexure 1 hereto; and

        2.      Notice of Scheme Meeting to be advertised on newspapers in the aforesaid
                manner substantially in the form of Annexure 2 hereto.

AND THE COURT HEREBY APPOINTS Mr. Patrick Cowley of KPMG Advisory (Hong Kong) Limited ("**KPMG**"), or, failing Mr. Cowley, another representative of KPMG nominated by him, as the Chairperson of the Scheme Meetings on behalf of the Company.

AND THE COURT ORDERS that the Chairperson do report the results of the Scheme Meeting to the Court.

Dated this 24th day of July 2023.

Registrar

**ANNEXURE 1**

**Notice of the Scheme Meeting**

IN THE HIGH COURT OF THE HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE

HCMP 1090 OF 2023

IN THE MATTER OF SECTIONS 670, 673 & 674 OF THE COMPANIES ORDINANCE,
CHAPTER 622 OF THE LAWS OF HONG KONG

AND

IN THE MATTER TIANJI HOLDING LIMITED (天基控股有限公司)

---

## NOTICE OF SCHEME MEETING

---

Unless otherwise defined herein, terms used in this Notice have the same meanings as in the explanatory statement (the "**Explanatory Statement**") relating to the proposed scheme of arrangement between Tianji Holding Limited (the "**Company**") and the Scheme Creditors (as defined therein) under section 670 of the Companies Ordinance (Cap. 622) (the "**Scheme**").

Copies of the Scheme, the Explanatory Statement and the Solicitation Packet (including the documentation to be completed by or on behalf of Scheme Creditors in order to vote and/or receive Scheme Consideration) are available to download from the Transaction Website (https://projects.morrowsodali.com/evergrande), or from CEG's website (www.evergrande.com).

**NOTICE IS HEREBY GIVEN** that by order of the High Court of the Hong Kong Special Administrative Region Court of First Instance (the "**Hong Kong Court**"), dated 24 July 2023 ("**Convening Order**"), meeting of Scheme Creditors (the "**Scheme Meeting**") be convened for the purpose of considering and, if thought fit, approving (with or without modification) the Scheme proposed by the Company.

**Venue, times and video conference availability for the Scheme Meeting**

The Scheme Meeting will be held on 22 August 2023 at 8:00 p.m. (Hong Kong time) at the offices of Sidley Austin at 39/F, Two International Finance Centre, 8 Finance St, Central, Hong Kong, with any adjournment as may be necessary or appropriate, and subject to applicable COVID-19 restrictions, policies or guidance then in force in Hong Kong, and in which case any changes in arrangements relating to the Scheme Meeting shall be communicated to Scheme Creditors in advance of the Scheme Meeting on the Transaction Website, CEG's website, and by a public announcement published on the HKEXnews website of The Stock Exchange of Hong Kong Limited (the "**SEHK**") and the website of the Singapore Exchange Securities Trading Limited (the "**SGX-ST**").

A video conferencing facility will be made available. Scheme Creditors will be able to obtain the relevant dial-in details for the Scheme Meeting from the Transaction Website, and by written request from the Information Agent (if you are a Scheme Creditor who is not a Blocked Scheme Creditor), or GLAS Specialist Services Limited ("**GLAS**") (if you are a Blocked Scheme Creditor).

Scheme Creditors who attend the Scheme Meeting in person, or by video conference, will be able to vote (and to change their vote, if they wish).

**Methods of voting**

In order to vote at the relevant Scheme Meeting, a Scheme Creditor must either vote itself (if an individual), appoint a duly authorised corporate representative (if a corporation), or appoint a proxy (which must be an individual).

Scheme Creditors may appoint a proxy to vote at the relevant Scheme Meeting by completing and returning a validly completed and signed Account Holder Letter and/or Other Debt Scheme Creditor Proxy Form to the Information Agent via the Portal. All Blocked Scheme Creditor Forms must be returned to GLAS by email at lm@glas.agency.

**Scheme Creditors are strongly encouraged to appoint a proxy (either the Chairperson or another individual of their own choice who is willing and able to attend the relevant Scheme Meeting) by indicating their choice of proxy in the relevant section of the relevant form.**

Scheme Creditors wanting to attend the relevant Scheme Meeting in person are encouraged to appoint a proxy even if they intend to attend and vote in person, in case such Scheme Creditors are unable to do so for any reason.

**Completion and deadline for submitting voting forms**

The "**Voting Record Time**" for the Scheme, being the deadline for the submission of the relevant forms in order to vote on the Scheme and attend the relevant Scheme Meeting, is **5:00 p.m. (Hong Kong Time) on 18 August 2023**.

In order to vote on the Scheme and attend the relevant Scheme Meeting (in person, by a duly authorised representative (if a corporation) or by proxy), a Scheme Creditor must ensure that the following validly completed and executed Scheme Creditor Forms, as applicable, and further pursuant to the terms of the Schemes, must be submitted by the Voting Record Time:

- SJ Notes Scheme Creditors and Lake Noteholders (who are not Blocked Scheme Creditors): (1) Custody Instructions to be submitted via the Clearing Systems prior to the submission of the Account Holder Letter (and in any case by the Custody Instruction Deadline) and (2) Account Holder Letter via the Portal to the Information Agent by no later than the Voting Record Time.

- Other Debt Scheme Creditors (who are not Lake Noteholders): Other Debt Scheme Creditor Proxy Form, together with supporting evidence via the Portal to the Information Agent in accordance with the instructions set out therein.

- Blocked Scheme Creditors: Blocked Scheme Creditor Form to GLAS.

**Registration prior to Scheme Meeting**

Each Scheme Creditor (or, if a corporation, its duly authorised representative) or its proxy intending to attend the Scheme Meeting will be required to register its attendance at the relevant Scheme Meeting no later than 15 minutes prior to the scheduled start time of the relevant Scheme Meeting.

On registration at the Scheme Meeting, a Scheme Creditor attending the Scheme Meeting in person should produce a duplicate copy of:

- the applicable Scheme Creditor Form that was executed and delivered by it or on its behalf via https://portal.morrowsodali.com/TJScheme (the "**Portal**") to the Information Agent;

- evidence of personal identity with photo identification (for example, a passport, driving license

2

or other photo identification); and

- in the case of a corporation, evidence of corporate authority (for example, a valid power of attorney and/or board minutes).

Similarly, where a proxy other than the Chairperson is appointed, the proxy must also produce, on registration at the relevant Scheme Meeting:

- a copy of the Scheme Creditor Form of the Scheme Creditor who appointed him or her as proxy, having been validly completed, signed and submitted to the Information Agent via the Portal, authorising him or her to act as proxy on behalf of the Scheme Creditor; and

- evidence of personal identity with photo identification (for example, a passport, driving license or other photo identification).

If appropriate personal identification or evidence of authority is not produced, that person will only be permitted to attend and vote at the relevant Scheme Meeting at the discretion of the Chairperson.

### Chairperson

Pursuant to the Scheme Convening Order, the Hong Kong Court appointed Patrick Cowley of KPMG Advisory (Hong Kong) Limited ("**KPMG**") in his capacity as Scheme Administrator to act as the Chairperson of the Scheme Meeting, or failing that, another representative of KPMG nominated by him, and directed the Chairperson to report the results of the Scheme Meeting to the Hong Kong Court. The results of the Scheme Meeting will also be made available on the Transaction Website, CEG's website, and by a public announcement published on the HKEXnews website of the SEHK and the website of the SGX-ST.

### Scheme Sanction Hearing

The Scheme, if approved at the Scheme Meeting, will be subject to the subsequent approval and sanction of the Hong Kong Court. The Scheme Sanction Hearing is presently scheduled to take place at 10:00 a.m. Hong Kong time on 5 and 6 September 2023 (to be fixed by the Hong Kong Court). Any Scheme Creditor is entitled (but not obliged) to attend the Scheme Sanction Hearings, through legal counsel, to support or oppose the approval and sanction of the Scheme.

**SCHEME CREDITORS OTHER THAN BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:**

**Morrow Sodali Limited**

| | |
|---|---|
| Telephone: | in Hong Kong +852 2319 4130; in London +44 20 4513 6933 |
| Email: | evergrande@investor.morrowsodali.com |
| Attention: | Debt Services Team |
| Transaction Website: | https://projects.morrowsodali.com/evergrande |
| Portal: | https://portal.morrowsodali.com/EvergrandeScheme |

**ANY BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:**

**GLAS Specialist Services Limited**

| | |
|---|---|
| Email: | lm@glas.agency |
| Attention: | Liability Management Team |

3

<u>**FOR CEG ANNOUNCEMENTS REGARDING THIS SCHEME (INCLUDING THOSE
RELEVANT TO BLOCKED SCHEME CREDITORS)**</u>

| | |
|---|---|
| CEG's Website: | www.evergrande.com |
| HKEXnews website of the SEHK: | https://www.hkexnews.hk/ |
| SGX-ST website: | https://www.sgx.com/ |

**TIANJI HOLDING LIMITED 天基控股有限公司**

Date: [*] 2023

4

**ANNEXURE 2**

**Proposed advertisement in newspapers**

**IN THE HIGH COURT OF THE HONG KONG SPECIAL ADMINISTRATIVE REGION COURT OF FIRST INSTANCE**

HCMP 1090/ 2023

**IN THE MATTER OF TIANJI HOLDING LIMITED (天基控股有限公司)**

**AND IN THE MATTER OF SECTION 670 OF THE COMPANIES ORDINANCE (CAP 622)**

---

Unless otherwise defined herein, terms used in this Notice have the same meanings as in the explanatory statement (the "**Explanatory Statement**") relating to the proposed scheme of arrangement between Tianji Holding Limited (天基控股有限公司)(the "**Company**") and the Scheme Creditors (as defined in the Explanatory Statement) under section 670 of the Hong Kong Companies Ordinance (Cap. 622) (the "**Scheme**").

Copies of the Scheme, the Explanatory Statement and the Solicitation Packet (including the documentation to be completed by or on behalf of Scheme Creditors in order to vote and/or receive Scheme Consideration) are available to download from the Transaction Website (https://projects.morrowsodali.com/evergrande) save for voting forms for Blocked Scheme Creditors which are available (along with any other relevant scheme documents) from the Company's website (www.evergrande.com).

**NOTICE IS HEREBY GIVEN** that by order of the High Court of the Hong Kong Special Administrative Region Court of First Instance (the "**Hong Kong Court**") dated 24 July 2023, a meeting of Scheme Creditors (the "**Scheme Meeting**") for the purpose of considering and, if thought fit, approving (with or without modification) the Scheme, will be convened.

The Scheme Meeting will be held at the offices of Sidley Austin, at 39/F, Two International Finance Centre, Central, Hong Kong, on 22 August 2023 with any adjournment as may be necessary or appropriate, at 8:00 pm Hong Kong time.

All Scheme Creditors are requested to attend and vote at the Scheme Meeting. Attendance and voting at the Scheme Meeting can be in person or by proxy in accordance with the voting instructions set out in the Explanatory Statement. A video-conference facility will be made available for any Scheme Creditors who wish to attend and vote remotely.

Scheme Creditors who wish to vote at the Scheme Meeting should carefully read the Explanatory Statement and follow the instructions contained therein. Scheme Creditors should take particular note that the Voting Record Time, being the deadline for voting, is **5:00 pm Hong Kong time/ 4:00 am Cayman Islands time on 18 August 2023**.

**NOTICE IS FURTHER GIVEN** that, if the Scheme is approved at the Scheme Meeting, the Scheme will be subject to a subsequent hearing in the Hong Kong Court, at which the Company will seek the Hong Kong Court's sanction of the Scheme (the "**Sanction Hearing**"). The Sanction Hearing before the Hong Kong Court will take place on 5 and 6 September 2023 (to be fixed by the Hong Kong Court).  Any Scheme Creditor is entitled (but not obliged) to attend the Sanction Hearing, through legal counsel, to support or oppose the approval and sanction of the Scheme.

**SCHEME CREDITORS OTHER THAN BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:**

**Morrow Sodali Limited**

| | |
|---|---|
| Telephone: | in Hong Kong +852 2319 4130; in London +44 20 4513 6933 |
| Email: | evergrande@investor.morrowsodali.com |
| Attention: | Debt Services Team |
| Transaction Website: | https://projects.morrowsodali.com/evergrande |
| Portal: | https://portal.morrowsodali.com/EvergrandeScheme |

**ANY BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:**

**GLAS Specialist Services Limited**

| | |
|---|---|
| Email: | lm@glas.agency |
| Attention: | Liability Management Team |

Dated the        day of July 2023

**Tianji Holding Limited (天基控股有限公司)**

HCMP 1090 / 2023

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
MISCELLANEOUS PROCEEDINGS NO. 1090 OF 2023

IN THE MATTER OF TIANJI HOLDING

LIMITED 天基控股有限公司

and

IN THE MATTER OF SECTION 670 OF
THE COMPANIES ORDINANCE (CAP.
622)

---

**ORDER**

---

Filed this 27th day of July 2023

**SIDLEY AUSTIN**
Solicitors for Tianji Holding Limited
Level 39, Two International Finance Centre
8 Finance Street, Central
Hong Kong
Tel: 2509 7888
Fax: 2509 3110
Ref: DA/ST/DW/033817-30390

**SCHEDULE 5**

**NOTICE OF SCHEME MEETING**

**IN THE HIGH COURT OF THE HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE**

香港特别行政区高等法院原讼法庭

**HCMP 1090 OF 2023**

**IN THE MATTER OF SECTIONS 670, 673 & 674 OF THE COMPANIES ORDINANCE,
CHAPTER 622 OF THE LAWS OF HONG KONG**

香港法例第 622 章公司条例第 670、673 及 674 条事宜

**AND**

及

**IN THE MATTER TIANJI HOLDING LIMITED (天基控股有限公司)**

天基控股有限公司事宜

---

**NOTICE OF SCHEME MEETING**

协议安排会议通知

---

Unless otherwise defined herein, terms used in this Notice have the same meanings as in the explanatory statement (the "**Explanatory Statement**") relating to the proposed scheme of arrangement between Tianji Holding Limited (the "**Company**") and the Scheme Creditors (as defined therein) under section 670 of the Companies Ordinance (Cap. 622) (the "**Scheme**").

除非本通知另有定义，否则本通知所使用的术语与天基控股有限公司（"**公司**"）和协议安排债权人（Scheme Creditors）（定义于说明陈述）之间根据香港公司条例（第 622 章）第 670 条的拟议协议安排（"**协议安排**"）有关的说明陈述（"**说明陈述**"）的含义相同。

Copies of the Scheme, the Explanatory Statement and the Solicitation Packet (including the documentation to be completed by or on behalf of Scheme Creditors in order to vote and/or receive Scheme Consideration) are available to download from the Transaction Website (https://projects.morrowsodali.com/evergrande). The scheme creditor forms (for voting purposes) are also available to download from the CEG's website (www.evergrande.com).

协议安排、说明陈述和征求文件集 (Solicitation Packet) 的副本（包括由协议安排债权人或其代表完成的文件，以便投票和/或获得协议安排对价 (Scheme Consideration)）可从交易网站 (Transaction Website)（https://projects.morrowsodali.com/evergrande）下载。协议安排债权人的投票表格（为投票的目的）还可从 CEG 网站（www.evergrande.com）下载。

**NOTICE IS HEREBY GIVEN** that by order of the High Court of the Hong Kong Special Administrative Region Court of First Instance (the "**Hong Kong Court**"), dated 24 July 2023 ("**Convening Order**"), meeting of Scheme Creditors (the "**Scheme Meeting**") be convened for the purpose of considering and, if thought fit, approving (with or without modification) the Scheme proposed by the Company.

**兹通知**，根据香港特别行政区高等法院原讼法庭（"**香港法院**"）于 2023 年 7 月 24 日的命令（"**召集命令**"），将召开一次协议安排债权人会议（"**协议安排会议**"），以在认为合适的情况下审议并批准（不论是否修改）该协议安排。

**Venue, times and video conference availability for the Scheme Meeting**

**协议安排会议的方式、时间及视讯会议可行性**

The Scheme Meeting will be held on 22 August 2023 at 8:00 p.m. (Hong Kong time) at the offices of Sidley Austin at 39/F, Two International Finance Centre, 8 Finance St, Central, Hong Kong, with any adjournment as may be necessary or appropriate, and subject to applicable COVID-19 restrictions, policies or guidance then in force in Hong Kong, and in which case any changes in arrangements relating to the Scheme Meeting shall be communicated to Scheme Creditors in advance of the Scheme Meeting on the Transaction Website, CEG's website, and by a public announcement published on the HKEXnews website of The Stock Exchange of Hong Kong Limited (the "**SEHK**") and the website of the Singapore Exchange Securities Trading Limited (the "**SGX-ST**").

协议安排会议将于 2023 年 8 月 22 日晚上 8 时（香港时间），在香港中环国际金融中心二期 39 楼盛德律师事务所办公室召开。如有需要或适当并受限于香港届时有效的新冠疫情限制、政策或指引，会议所作的任何延期以及在该等情况下任何有关于协议安排会议安排的变化，都应当在协议安排债权人会议之前，在交易网站以及 CEG 网站向协议安排债权人传达，并在香港联合交易所有限公司（"**SEHK**"）的披露易网站以及新加坡交易所证券交易有限公司（"**SGX-ST**"）的网站上发布公告。

A video conferencing facility will be made available. Scheme Creditors will be able to obtain the relevant dial-in details for the Scheme Meeting from the Transaction Website, and by written request from the Information Agent (if you are a Scheme Creditor who is not a Blocked Scheme Creditor), or GLAS Specialist Services Limited ("**GLAS**") (if you are a Blocked Scheme Creditor).

视讯会议设备将被设置。协议安排债权人将能够从交易网站上，以及通过信息代理人（如果您是协议安排债权人且并非受阻协议安排债权人）或通过向 GLAS Specialist Services Limited（"**GLAS**"）（如果您是受阻协议安排债权人）书面请求，获得协议安排会议的相关拨入信息详情。

Scheme Creditors who attend the Scheme Meeting in person, or by video conference, will be able to vote (and to change their vote, if they wish).

通过线下或视讯会议方式参与协议安排会议的协议安排债权人都将可以投票（或变更投票，如有意愿）。

**Methods of voting**

**投票方式**

In order to vote at the relevant Scheme Meeting, a Scheme Creditor must either vote itself (if an individual), appoint a duly authorised corporate representative (if a corporation), or appoint a proxy (which must be an individual), by validly completing, signing and submitting an Account Holder Letter and/or Other Debt Scheme Creditor Proxy Form to the Information Agent via the Portal. All Blocked Scheme Creditor Forms must be returned to GLAS by email at lm@glas.agency.

为在相关协议安排会议上投票，协议安排债权人必须通过有效完成，签署及通过门户网站提交账户持有人信函 (Account Holder Letter) 和/或其他债务协议安排债权人代理表格 (Other Debt Scheme Creditor Proxy Form)（如适用）予信息代理人以自行投票（如为个人），或委派获得正式

授权的公司代表（如为公司），或委派一名代理人（必须为个人）。所有受阻协议安排债权人表格都必须通过电邮发送予 GLAS 的邮箱地址：lm@glas.agency。

**Scheme Creditors are strongly encouraged to appoint a proxy (either the Chairperson or another individual of their own choice who is willing and able to attend the relevant Scheme Meeting) by indicating their choice of proxy in the relevant section of the relevant form.**

**强烈建议协议安排债权人在相关表格的相关章节，通过展示其对代理人的选择，委派一名代理人（不论是主席或是协议安排债权人选择的其他能够参与相关协议安排会议的个人）。**

Scheme Creditors wanting to attend the relevant Scheme Meeting in person are encouraged to appoint a proxy (either the Chairperson or someone of their choice who would be willing to attend the Scheme Meeting) in any event, even if they intend to attend and vote in person or, if a corporation, by a duly authorized representative, in case such Scheme Creditors are unable to do so for any reason.

即使是有意于线下亲身（或如为公司，通过获正式授权的代表）参与相关协议安排会议并投票的协议安排债权人，也鼓励其无论如何委派一名代理人（不论是主席或是协议安排债权人选择的其他能够参与相关协议安排会议的个人），以免该等协议安排债权人因任何原因无法线下参与并投票。

**Completion and deadline for submitting voting forms**

**投票表格的完成及提交截止时间**

The "**Voting Record Time**" for the Scheme, being the deadline for the submission of the relevant forms in order to vote on the Scheme and attend the relevant Scheme Meeting, is **5:00 p.m. (Hong Kong Time) on 18 August 2023**.

协议安排的"**投票记录时间**"，即为就协议安排投票并参与相关协议安排会议提交相关表格的截止时间，为**2023 年 8 月 18 日下午 5 时（香港时间）**。

In order to vote on the Scheme and attend the relevant Scheme Meeting (in person, by a duly authorised representative (if a corporation) or by proxy), a Scheme Creditor must ensure that the following validly completed and executed Scheme Creditor Forms, as applicable, and further pursuant to the terms of the Schemes, must be submitted by the Voting Record Time:

为就协议安排投票并参与相关协议安排会议（亲身，通过获正式授权的代表（如为公司）或通过代理人），协议安排债权人必须确认下述协议安排债权人表格有效完成并签署（如适用），并进一步根据协议安排的条款，必须于投票记录时间前提交：

- SJ Notes Scheme Creditors and Lake Noteholders (who are not Blocked Scheme Creditors): (1) Custody Instructions to be submitted via the Clearing Systems prior to the submission of the Account Holder Letter (and in any case by the Custody Instruction Deadline, 5:00 p.m. (Hong Kong Time) on 15 August 2023) and (2) Account Holder Letter via the Portal to the Information Agent by no later than the Voting Record Time.

  SJ票据协议安排债权人以及湘阴项目票据持有人（如非受阻协议安排债权人）：（1）在账户持有人信函提交前（并无论如何在保管人指示截止日期2023年8月15日（香港时间）下午5时前（Custody Instruction Deadline）），通过结算系统提交保管人指示(Custody Instruction)，以及（2）在不晚于投票记录时间前通过门户网站向信息代理人提交账户持有人信函。

- Other Debt Scheme Creditors (who are not Lake Noteholders): Other Debt Scheme Creditor

Proxy Form, together with supporting evidence via the Portal to the Information Agent in accordance with the instructions set out therein.

其他债务协议安排债权人（非湘阴项目票据持有人）：根据协议安排债权人代理人表格中所列指示，通过门户网站向信息代理人提交其他债务协议安排债权人代理人表格及支持证据。

- Blocked Scheme Creditors: Blocked Scheme Creditor Form to GLAS.

  受阻协议安排债权人：向GLAS提交受阻协议安排债权人表格。

**Registration prior to Scheme Meeting**

**协议安排会议前的登记**

Each Scheme Creditor (or, if a corporation, its duly authorised representative) or its proxy intending to attend the Scheme Meeting will be required to register its attendance at the relevant Scheme Meeting no later than 15 minutes prior to the scheduled start time of the relevant Scheme Meeting.

有意于参与协议安排会议的各协议安排债权人（或若为公司，则获正式授权的代表人）或其代理人，需要在相关协议安排会议预计开始时间前至少 15 分钟，在相关协议安排会议登记其参与会议。

On registration at the Scheme Meeting, a Scheme Creditor attending the Scheme Meeting in person should produce a duplicate copy of:

在协议安排会议登记时，有意于线下参与协议安排会议的协议安排债权人需要提供以下文件的副本：

- the applicable Scheme Creditor Form that was executed and delivered by it or on its behalf via https://portal.morrowsodali.com/EvergrandeScheme (the "**Portal**") to the Information Agent;

  协 议 安 排 债 权 人 本 身 或 代 表 其 签 署 并 通 过 https://portal.morrowsodali.com/EvergrandeScheme（"**门户网站**"）向信息代理人送达的适用的协议安排债权人表格；

- evidence of personal identity with photo identification (for example, a passport, driving license or other photo identification); and

  附带照片的个人身份证明（如护照、驾照或其他照片证明）；以及

- in the case of a corporation, evidence of corporate authority (for example, a valid power of attorney and/or board resolutions).

  如为公司，则公司授权证明（如有效的授权委托书和/或董事会决议）。

Similarly, where a proxy other than the Chairperson is appointed, the proxy must also produce, on registration at the relevant Scheme Meeting:

类似的，如果委任了主席以外的代理人，则代理人必须在相关协议安排会议登记时提供：

- a copy of the Scheme Creditor Form of the Scheme Creditor who appointed him or her as proxy, having been validly completed, signed and submitted to the Information Agent via the Portal,

authorising him or her to act as proxy on behalf of the Scheme Creditor; and

委派了他或她作为代理人的协议安排债权人的协议安排债权人表格副本，并且该协议安排债权人表格已被有效完成、签署并通过门户网站提交予信息代理人，授权他或她代表协议安排债权人作为代理人行动；以及

- evidence of personal identity with photo identification (for example, a passport, driving license or other photo identification).

  附带照片的个人身份证明（如护照、驾照或其他照片证明）。

If appropriate personal identification or evidence of authority is not produced, that person will only be permitted to attend and vote at the relevant Scheme Meeting at the discretion of the Chairperson.

如果合适的个人身份证明或授权证据未被提供，该等个人仅可经主席酌情决定被允许参与并在相关协议安排会议上投票。

**Chairperson**

**主席**

Pursuant to the Scheme Convening Order, the Hong Kong Court appointed Patrick Cowley of KPMG Advisory (Hong Kong) Limited ("**KPMG**") in his capacity as Scheme Administrator to act as the Chairperson of the Scheme Meeting, or failing that, another representative of KPMG nominated by him, and directed the Chairperson to report the results of the Scheme Meeting to the Hong Kong Court. The results of the Scheme Meeting will also be made available on the Transaction Website, CEG's website, and by a public announcement published on the HKEXnews website of the SEHK and the website of the SGX-ST.

根据协议安排召集命令 (Scheme Convening Order)，香港法院任命毕马威咨询（香港）有限公司（"**KPMG**"）的 Patrick Cowley，以其协议安排管理人的身份作为协议安排会议的主席，如果其无法担任主席一职，则由其提名的另一位 KPMG 的代表作为主席，并指示其向香港法院汇报协议安排结果。协议安排结果亦将可见于交易网站、CEG 网站以及 SEHK 披露易网站与 SGX-ST 网站上所公示的公告。

**Scheme Sanction Hearing**

**协议安排批准聆讯**

The Scheme, if approved at the Scheme Meeting, will be subject to the subsequent approval and sanction of the Hong Kong Court. The Scheme Sanction Hearing is presently scheduled to take place at 10:00 a.m. Hong Kong time on 5 and 6 September 2023 (to be fixed by the Hong Kong Court). Any Scheme Creditor is entitled (but not obliged) to attend the Scheme Sanction Hearings, through legal counsel, to support or oppose the approval and sanction of the Scheme.

协议安排如在协议安排会议上被批准，将需获得香港法院随后的通过与批准。协议安排批准聆讯 (Scheme Sanction Hearing) 现定为 2023 年 9 月 5 日和 6 日上午 10 时（香港时间）（待香港法院确认）。任何协议安排债权人有权（但无义务）通过法律顾问出席批准聆讯，以支持或反对协议安排的通过和批准。

**SCHEME CREDITORS (OTHER THAN BLOCKED SCHEME CREDITORS[1]) REQUIRING ASSISTANCE SHOULD CONTACT:**
需要协助的协议安排债权人（受阻协议安排债权人[2]除外）应联络：

**Morrow Sodali Limited**

| | |
|---|---|
| Telephone: | in Hong Kong +852 2319 4130; in London +44 20 4513 6933 |
| 电话： | 香港：+852 2319 4130；伦敦：+44 20 4513 6933 |
| Email: | evergrande@investor.morrowsodali.com |
| 电邮： | |
| Attention: | Debt Services Team |
| 收件人 | |
| Transaction Website: | https://projects.morrowsodali.com/evergrande |
| 交易网站 | |
| Portal: | https://portal.morrowsodali.com/EvergrandeScheme |
| 门户网站： | |

**ANY BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:**
任何需要协助的受阻协议安排债权人应联络：

**GLAS Specialist Services Limited**

| | |
|---|---|
| Email: | lm@glas.agency |
| 电邮： | |
| Attention: | Liability Management Team |
| 收件人 | |

**FOR CEG ANNOUNCEMENTS REGARDING THIS SCHEME (INCLUDING THOSE RELEVANT TO BLOCKED SCHEME CREDITORS)**

与本协议安排有关的 CEG 公告（包括有关于受阻协议安排债权人的公告）

| | |
|---|---|
| CEG's Website: | www.evergrande.com |
| CEG网站 | |
| HKEXnews website of the SEHK: | https://www.hkexnews.hk/ |
| SEHK的披露易网站： | |
| SGX-ST website: | https://www.sgx.com/ |
| SGX-ST网站： | |

**TIANJI HOLDING LIMITED 天基控股有限公司**

Date: 31 July 2023

日期：2023 年 7 月 31 日

---

[1] as defined in the Explanatory Statement and the Schemes.

[2] 定义见说明陈述及协议安排。

**SCHEDULE 6**

**VALUATION AND ADJUDICATION FLOW CHART**



157



14 days
Does Scheme Adjudicator Require Further Evidence or Information?
No
Scheme Adjudicator Determines Referred Scheme Claim
Scheme Creditor Paid Adjudicated Value of Scheme Creditor's Entitlement on Final Distribution Date Provided that the Scheme Adjudicator has Determined the Referred Scheme Claim by the Final Distribution Date and, if not, As Soon As Reasonably Practicable After the Scheme Adjudicator has Determined the Referred Scheme Claim (subject to Reserve)
If Request for Further Evidence
Scheme Adjudicator Shall Have the Power to (1) Make Directions, (2) Extend Prescribed Timeframes, and/or (3) Adopt Procedures Appropriate for Providing Fair, Efficient and Expeditious Adjudication of the Referred Scheme Claim. The Specific Powers that the Scheme Adjudicator Has are Further Set Out in the Scheme.
Yes
Scheme Adjudicator Issues Notice for Further Evidence to Relevant Party(ies)
14 days
42 days
Has Party Provided Further Evidence Within Deadline?
No
14 days
Scheme Adjudicator Will Determine Referred Scheme Claim without Further Evidence
Scheme Creditor Paid Adjudicated Value of Scheme Creditor's Entitlement on Final Distribution Date Provided that the Scheme Adjudicator has Determined the Referred Scheme Claim by the Final Distribution Date and, if not, As Soon As Reasonably Practicable After the Scheme Adjudicator has Determined the Referred Scheme Claim (subject to Reserve)
Yes
14 days
Scheme Adjudicator Determines Referred Scheme Claim
Scheme Creditor Paid Adjudicated Value of Scheme Creditor's Entitlement on Final Distribution Date Provided that the Scheme Adjudicator has Determined the Referred Scheme Claim by the Final Distribution Date and, if not, As Soon As Reasonably Practicable After the Scheme Adjudicator has Determined the Referred Scheme Claim (subject to Reserve)

**SCHEDULE 7**

**GROUP STRUCTURE CHART**











Tianji Holding Limited 天基控股有限公司 (HK)
CENTRAL SINO GLOBAL LIMITED 中華環球有限公司 (BVI)
Ridge Sincere Limited 領誠有限公司 (BVI)
ALL PEACE INVESTMENTS LIMITED (泰通投資有限公司) (BVI)
Ever Grace Group Limited 恒善集團有限公司 (BVI)
Scenery Journey Limited 景程有限公司 (BVI)
Intermediary holding company(ies) and subsidiary(ies)
JOVIAL IDEA DEVELOPMENTS LIMITED 乐意发展有限公司 (BVI)
EVERGRANDE INDUSTRIAL HOLDINGS LIMITED 恒大實業控股有限公司 (HK)
AMPLE TREASURE GROUP LIMITED 寶豐集團有限公司 (BVI)
Luckyup Group Limited 昇祺集團有限公司 (BVI)
Instant Choice Development Ltd (BVI)
Shui Wah Investment Limited 穗華投資有限公司 (HK)
SHENGTONG (BVI) LIMITED (BVI)
PRIME SUN ENTERPRISES LIMITED 盛日企業有限公司 (BVI)
Chang Xing Holdings Limited 昌興控股有限公司 (BVI)
Lucky Universe Enterprises Limited 瑞宇企業有限公司 (BVI)
MARVEL FIRST DEVELOPMENTS LIMITED (BVI)
大美环球有限公司 Great Beauty Global Limited (BVI)
Shengyu (BVI) Limited 盛譽有限公司 (BVI)
Jiashan Holdings Limited 嘉善控股有限公司 (HK)
Stay Wealth Limited 保裕有限公司 (BVI)
AMPLE TREASURE HOLDING LIMITED 寶豐集團控股有限公司 (HK)
WILL GLORY HOLDINGS LIMITED 好耀控股有限公司 (HK)
Forbidden City Culture Co., Limited 紫禁城弘華文化有限公司 (HK)
Shengtong Holding Limited 盛通控股有限公司 (HK)
Prime Sun Holding Limited 盛日控股有限公司 (HK)
Thousand Grand Holding Limited 千宏控股有限公司 (HK)
LUCKY UNIVERSE HOLDING LIMITED 瑞宇集團有限公司 (HK)
Jiazhi Holdings Limited 嘉智控股有限公司 (HK)
Flying Bloom Investments Limited 飞旺投资有限公司 (BVI)
CHINA AGRICULTURE TECHNOLOGY LIMITED (BVI)
Fortune Walker Limited (BVI)
Sky Joy Holdings Limited 悅天控股有限公司 (BVI)
Ever Sure Industries Limited 永瑞實業有限公司 (HK)
EASE TRIUMPH INTERNATIONAL LIMITED 拓美國際有限公司 (HK)
GRANDDAY GROUP LIMITED 朝隆集團有限公司 (BVI)
Jumbo Fortune Enterprises Limited (BVI)
Oceanic Hero Holdings Limited 英海控股有限公司 (BVI)
LUCKY GROW HOLDINGS LIMITED 智煌控股有限公司 (HK)
PROFIT POINT ENTERPRISES LIMITED 盈邦企业有限公司 (HK)
Hengda Real Estate Group Co., Ltd. 恒大地产集团有限公司 (PRC)
Onshore subsidiary(ies)
100%
99%
69%
31%
Offshore
Onshore
Shareholding of entities that are subsidiaries of the CEG Group as at the date of the Explanatory Statement
Shareholding of subsidiaries which have been pledged and enforced as at the date of the Explanatory Statement
Issuer of TJ New Notes & Parent Guarantor of SJ New Notes
Issuer of SJ New Notes
Subsidiary Guarantor of SJ New Notes (subject to the New Instruments Documents)
Keepwell Provider of SJ New Notes

100%
ASSEMBLE HARMONY LIMITED
聚和有限公司
(BVI)
100%
Greet Delight Limited
(BVI)
100%
WISDOM GAIN GROUP LIMITED
智盈集團有限公司
(BVI)
100%
GROW RISING INVESTMENT LIMITED
晉廷投資有限公司
(HK)
100%
BAI CHANG LIMITED
百昌有限公司
(BVI)
100%
BILLION SINO INVESTMENTS LIMITED
億中投資有限公司
(BVI)
100%
ALLYWING INVESTMENTS LIMITED
榮邦投資有限公司
(BVI)
100%
FORTUNE STAR INTERNATIONAL INVESTMENT LIMITED
福星國際投資有限公司
(HK)
100%
XING HONG HOLDINGS LIMITED
興鴻控股有限公司
(BVI)
100%
ROSY DYNASTY LIMITED
翠御有限公司
(HK)
100%
JOY VISION HOLDINGS LIMITED
樂景控股有限公司
(BVI)
100%
SANLI (CHINA) HOLDINGS LIMITED
三立(中國)控股有限公司
(HK)
100%
METRO WISDOM LIMITED
慧都有限公司
(HK)
100%
JI FENG LIMITED
吉豐有限公司
(BVI)
100%
RISE EAGLE WORLDWIDE LIMITED
(BVI)
100%
JICHENG INTERNATIONAL (HK) LIMITED
集成國際(香港)有限公司
(HK)
100%
BAOJUN LIMITED
保駿有限公司
(BVI)
100%
PERFECT VANTAGE INVESTMENTS LIMITED
歷冠投資有限公司
100%
MINSIN INTERNATIONAL (HOLDINGS) LIMITED
明誠國際（集團）有限公司
(HK)
100%
LUCKY BENEFIT LIMITED
(BVI)
100%
LOYAL POWER INVESTMENTS LIMITED
旺權投資有限公司
(HK)
100%
FIRST KEY INVESTMENTS LIMITED
元基投資有限公司
(BVI)
100%
FULL JOLLY INVESTMENTS LIMITED
滿怡投资有限公司
(BVI)
85%
15%
WIN HARBOUR INVESTMENTS LIMITED
凱港投資有限公司
(BVI)
100%
JOY WEALTHY INVESTMENT LIMITED
悅才投資有限公司
(HK)
Onshore subsidiary(ies)
Onshore subsidiary(ies)
Onshore subsidiary(ies)
Onshore subsidiary(ies)
Onshore subsidiary(ies)
Onshore subsidiary(ies)
Onshore subsidiary(ies)
Onshore subsidiary(ies)

California Place Dalian Ltd. 加州豪庭大連有限公司 (HK)
HINTO DEVELOPMENTS LIMITED (BVI)
RISING SHEEN LIMITED 升亮有限公司 (BVI)
Triumph Hero International Limited 勝雄國際有限公司 (BVI)
New Insight Holdings Limited 創見控股有限公司 (BVI)
China Sea Group (Hong Kong) Investment Limited 中海集團(香港)投資有限公司 (HK)
CITY FAITH LIMITED 都信有限公司 (HK)
SOUTH HONEST LIMITED 誠南有限公司 (HK)
SPREAD GLORY INVESTMENTS LIMITED 廣亮投資有限公司 (HK)
ON LUCKY HOLDINGS LIMITED 安利達控股有限公司 (BVI)
EASY GAIN INVESTMENT HOLDINGS LIMITED 盈潤投資控股有限公司 (BVI)
HONOR BUSINESS INVESTMENT LIMITED 榮商投資有限公司 (BVI)
LINK CARE LIMITED 環照有限公司 (BVI)
DRAGON CHARM INVESTMENTS LIMITED 龍創投資有限公司 (BVI)
MENKIA HOLDINGS LIMITED 萬家控股有限公司 (BVI)
SILVER OPPORTUNITY INVESTMENT LIMITED 銀機投資有限公司 (BVI)
VAST WHEEL COMPANY LIMITED 浩輪有限公司 (BVI)
REEGO GROUP LIMITED 銳高集團有限公司 (BVI)
Pacific Plus Enterprises Limited 匯太企業有限公司 (HK)
STARLET DEVELOPMENT LIMITED 星能發展有限公司 (HK)
HONOUR IN INVESTMENTS LIMITED 誠然投資有限公司 (HK)
GRACE TARGET HOLDINGS LIMITED 喜志集團有限公司 (HK)
CROWN WISE INVESTMENT LIMITED 冠惠投資有限公司 (HK)
GLORY SIGN DEVELOPMENT LIMITED 皇誌發展有限公司 (HK)
PRIME LIGHT HOLDINGS LIMITED 柏天集團有限公司 (HK)
PROSPER POWER DEVELOPMENT LIMITED 能昌發展有限公司 (HK)
SHARP GOAL INVESTMENTS LIMITED 銳怡投資有限公司 (HK)
100%
Onshore subsidiary(ies)
Onshore subsidiary(ies)

Marche Limited (BVI)
100%
Onshore subsidiary(ies)
GOOD WAVE INTERNATIONAL LIMITED 佳濤國際有限公司 (BVI)
100%
Excel Sky (Hong Kong) Limited 俊天(香港)有限公司 (HK)
SUPERB CAPITAL ENTERPRISES LIMITED (BVI)
Intermediary holding company(ies)
WIN PEAK GROUP LIMITED 凱峰集團有限公司 (BVI)
DRAGON PIONEER DEVELOPMENT LIMITED 龍添發展有限公司 (HK)
DRAGON JOY (CHINA) LIMITED 龍悅(中國)有限公司 (HK)
Onshore subsidiary(ies)
WHITE HERON LIMITED (BVI)
6%
94%
DRAGON FORTUNE LTD. (BVI)
FORTUNE LEADER INVESTMENT LIMITED 廣盛投資有限公司 (HK)
Palm Island Resort Limited 棕櫚島渡假村有限公司 (HK)
Intermediary holding company(ies)
Onshore subsidiary(ies)
Ever Shiny International Limited (BVI)
FUTURE LEAD ENTERPRISES LIMITED 天領企業有限公司 (HK)
Luck Fortune Holdings Limited (BVI)
UPPER EAST PROPERTY HOLDINGS COMPANY LIMITED 上東置業控股有限公司 (HK)
HEALTHY TIME INTERNATIONAL LIMITED 健時國際有限公司 (BVI)
ORIENTAL FAME HOLDINGS LIMITED 東榮控股有限公司 (BVI)
SUNNY NET DEVELOPMENT LIMITED 日訊發展有限公司 (HK)
CHEER CHAMP INVESTMENT LIMITED 誌昌投資有限公司 (BVI)
CHEER MOTION DEVELOPMENT LIMITED 致能發展有限公司 (HK)
OPAL HOUSE DEVELOPMENT LIMITED (BVI)
GOLD ASCOT LIMITED 金士福有限公司 (HK)
EAST BEST INVESTMENTS LIMITED 東卓投資有限公司 (BVI)
TREND RICH INVESTMENT LIMITED 毅富投資有限公司 (HK)
Harmony Aurora Limited 怡晨有限公司 (BVI)
WINGGO LIMITED 穎高有限公司 (BVI)
ANGEL FAY LIMITED (BVI)
Onshore subsidiary(ies)
CHAMPION CONCEPT LIMITED (BVI)
HIGH CONCEPT LIMITED 高建有限公司 (HK)
Onshore subsidiary(ies)
GODSIB LIMITED (BVI)
Onshore subsidiary(ies)

FORTUNE LUCK CORPORATION LIMITED
順利有限公司
(HK)
100%
Subsidiary(ies)
CHEUNG FU DEPARTMENT STORE ENTERPRISE LIMITED
象富百貨集團有限公司
(HK)
100%
VAST OMEN LIMITED
泓兆有限公司
(BVI)
100%
MORE HERO LIMITED
添英有限公司
(HK)
100%
PACIFIC GLOBE GROUP LIMITED
(BVI)
100%
Faith Honor Group Limited
信荣集团有限公司
(BVI)
100%
SHINY PROFIT ENTERPRISES LIMITED
(BVI)
100%
STAR RIVER PROFITS LIMITED
(BVI)
100%
PROSPER TRADE INVESTMENTS LIMITED
興業投資有限公司
(BVI)
100%
FORTEX DEVELOPMENT LIMITED
嘉達發展有限公司
(HK)
100%
Joyful Glee Holdings Limited
高怡控股有限公司
(BVI)
100%
DELIGHT UNIVERSE LIMITED
(BVI)
100%
WINNER JOY DEVELOPMENT LIMITED
勝欣發展有限公司
(HK)
100%
50%
ACCORD SINO GROUP LIMITED
協華集團有限公司
(BVI)
100%
MERRY FULL INVESTMENTS LIMITED
怡滿投資有限公司
(BVI)
100%
25%
MILLION CASTLE INVESTMENTS LIMITED
(BVI)
100%
25%
BENEFIT EAST INVESTMENTS LIMITED
益東投資有限公司
(BVI)
CHAMPION GLORY HOLDINGS LIMITED
卓康集團有限公司
(HK)
100%
CHAMPION GLOBE LIMITED
特靈有限公司
(HK)
100%
CHAMPION KING INVESTMENTS LIMITED
彩僑投資有限公司
(HK)
100%
Intermediary holding company(ies) and subsidiary(ies)
Onshore subsidiary(ies)
Onshore subsidiary(ies)
Onshore subsidiary(ies)
Onshore subsidiary(ies)
Onshore subsidiary(ies)
Onshore subsidiary(ies)
Offshore
Onshore

**SCHEDULE 8**

**SCHEME MEETING CONVENING ORDER**

HCMP 1090 / 2023

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

MISCELLANEOUS PROCEEDINGS NO. 1090 OF 2023



IN THE MATTER of TIANJI HOLDING LIMITED
天基控股有限公司

and

IN THE MATTER of Section 670 of the Companies
Ordinance (Cap. 622)

**BEFORE THE HONOURABLE MADAM JUSTICE LINDA CHAN IN CHAMBERS**

**ORDER**

UPON THE APPLICATION of the above named Tianji Holding Limited 天基控股有限公司 (the "**Company**") by way of *Ex Parte* Originating Summons filed herein on 12 July 2023 ("**Originating Summons**").

AND UPON READING the Originating Summons, the Affirmation of Hui Ka Yan filed herein on 20 July 2023 together with the exhibits referred to therein, including but not limited to the draft explanatory statement for the Scheme ("**Explanatory Statement**"), the Affirmation of Neil Edward McGregor McDonald filed herein on 21 July 2023 together with the exhibits referred to therein, and the Affirmation of Wu Tin Long filed herein on 24 July 2023 together with the exhibits referred to therein.

AND UPON HEARING leading counsel for the Company and counsel for the ad hoc group of creditors of the Company.

IT IS ORDERED that:-

1. The Company be at liberty to convene a meeting of the Scheme Creditors ("**Scheme**

**Meeting**") for the purpose of considering and, if thought fit, approving (with or without modification) a scheme of arrangement (the "**Scheme**") proposed to be made between the Company and its Scheme Creditors under sections 670, 673 and 674 of the Companies Ordinance (Cap. 622).

2.   The Scheme Meeting will be held in Hong Kong at 39/F, Two International Finance Centre, 8 Finance Street, Central, Hong Kong on 22 August 2023 at 8:00 p.m. (Hong Kong time), subject to any adjournment as my be approved by the chairperson of the Scheme Meetings ("**Chairperson**").

3.   Scheme Creditors be able to attend the Scheme Meeting to vote in respect of the Scheme, in person, by a duly authorised representative (if a corporation) or by proxy, including via video conference.

4.   In respect of attendance by video conference:

a.   For Scheme Creditors who are not Blocked Scheme Creditors (as defined in the Scheme), dial-in details will be published on https://projects.morrowsodali.com/evergrande (the "**Transaction Website**") at least 21 days before the day appointed for the Scheme Meeting and the passcode notified to individual Scheme Creditors by Morrow Sodali Limited as the information agent in respect of the Scheme (the "**Information Agent**") at least 2 business days before the day appointed for the Scheme Meeting.

b.   For Blocked Scheme Creditors, GLAS Specialist Services Limited ("**GLAS**") will provide Blocked Scheme Creditors with the details of how to attend and vote at the Scheme Meeting at least 21 days before the day appointed for the Scheme Meeting and will notify Blocked Scheme Creditors of the meeting passcode at least 2 business days before the day appointed for the Scheme Meeting.

5.   The Chairperson may require Scheme Creditors attending the Scheme Meeting by video conference to turn on their camera throughout the Scheme Meeting and log on to the video conference using their full name (as registered with the Information Agent) and the creditor identifier number provided to them by the Information Agent prior to the Scheme Meeting.

6.    At least 21 days before the day appointed for the Scheme Meeting, a copy of the notice of the Scheme Meeting (the "**Notice of Scheme Meeting**"), together with any forms required for voting purposes (the "**Scheme Creditor Voting Forms**"), shall be circulated to the Scheme Creditors by:

(a)    publication on the Transaction Website;

(b)    publication by way of public announcement by China Evergrande Group (stock code 3333) on the HKEXnews website of The Stock Exchange of Hong Kong Limited at http://www.hkexnews.hk;

(c)    publication by way of public announcement by China Evergrande Group on the website of the Singapore Exchange Limited at https://www.sgx.com/;

(d)    publication on the website of China Evergrande Group at http://www.evergrande.com;

(e)    by causing the Information Agent to send via electronic mail to each person who the Company believes is or may be a Scheme Creditor, and for whom the Company has a valid e-mail address; and

(f)    distribution via Euroclear Bank SA/NV and/or Clearstream Banking S.A.

7.    GLAS shall circulate copies of the Notice of Scheme Meeting and the Scheme Creditor Voting Forms to any Blocked Scheme Creditors by email not less than 21 days before the Scheme Meeting.

8.    When providing the Notice of Scheme Meeting in accordance with paragraphs 6 and 7 above, the Information Agent or GLAS (as applicable) shall provide copies of the following documents (or a link to the Transaction Website to enable the Scheme Creditors to access electronic copies of the following documents):

(a)    the Scheme;

(b)    the Explanatory Statement; and

(c)    the Solicitation Packet (as defined in the Explanatory Statement) being instructions as to the registration of claims and voting procedures for the

purposes of the Scheme Meeting including the Scheme Creditor Voting Forms.

9.     The accidental omission to serve any Scheme Creditor with the Notice of Scheme Meeting, or the non-receipt by any Scheme Creditor of the Notice of Scheme Meeting, shall not invalidate the proceedings at the Scheme Meeting.

10.    At least 21 days before the day appointed for the Scheme Meeting, the Company shall place an advertisement substantially in the form of the draft hereby approved in (1) *The Standard*, which is an English language newspaper, and (2) a Traditional and Simplified Chinese translation thereof in *Hong Kong Economic Times*, which is a Chinese language newspaper in circulation in Hong Kong, and (3) a Simplified Chinese translation thereof in "*Nanfang Daily*" and "*Securities Times*" both of which are Chinese language newspapers in circulation in the PRC.

11.    Certified Chinese translation of the Notice of Scheme Meeting and the proposed advertisement in newspapers be dispensed with.

12.    An affirmation is to be filed by a solicitor of Sidley Austin who is fluent in both English and Chinese languages confirming the accuracy of the Chinese translation of the Notice of Scheme Meeting and the proposed advertisement in newspapers.

13.    The Chairperson be permitted to declare and announce the results of the Scheme Creditors' votes in respect of the Scheme, either during the Scheme Meeting or after the conclusion of the Scheme Meeting.

14.    The substantive hearing of the petition at which the Court will determine whether or not to sanction the Scheme shall be heard at 10:00 a.m. (Hong Kong time) on 5 and 6 September 2023 (subject to the Court's further directions) before the Honourable Madam Justice Linda Chan.

15.    There be liberty to apply generally.

AND THE COURT HEREBY APPROVES the:-

1.     Notice of Scheme Meeting substantially in the form of Annexure 1 hereto; and

2.     Notice of Scheme Meeting to be advertised on newspapers in the aforesaid manner substantially in the form of Annexure 2 hereto.

AND THE COURT HEREBY APPOINTS Mr. Patrick Cowley of KPMG Advisory (Hong Kong) Limited ("**KPMG**"), or, failing Mr. Cowley, another representative of KPMG nominated by him, as the Chairperson of the Scheme Meetings on behalf of the Company.

AND THE COURT ORDERS that the Chairperson do report the results of the Scheme Meeting to the Court.

Dated this 24th day of July 2023.

Registrar

## ANNEXURE 1

**Notice of the Scheme Meeting**

IN THE HIGH COURT OF THE HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE

HCMP 1090 OF 2023

IN THE MATTER OF SECTIONS 670, 673 & 674 OF THE COMPANIES ORDINANCE,
CHAPTER 622 OF THE LAWS OF HONG KONG

AND

IN THE MATTER TIANJI HOLDING LIMITED (天基控股有限公司)

---

### NOTICE OF SCHEME MEETING

---

Unless otherwise defined herein, terms used in this Notice have the same meanings as in the explanatory statement (the "**Explanatory Statement**") relating to the proposed scheme of arrangement between Tianji Holding Limited (the "**Company**") and the Scheme Creditors (as defined therein) under section 670 of the Companies Ordinance (Cap. 622) (the "**Scheme**").

Copies of the Scheme, the Explanatory Statement and the Solicitation Packet (including the documentation to be completed by or on behalf of Scheme Creditors in order to vote and/or receive Scheme Consideration) are available to download from the Transaction Website (https://projects.morrowsodali.com/evergrande), or from CEG's website (www.evergrande.com).

**NOTICE IS HEREBY GIVEN** that by order of the High Court of the Hong Kong Special Administrative Region Court of First Instance (the "**Hong Kong Court**"), dated 24 July 2023 ("**Convening Order**"), meeting of Scheme Creditors (the "**Scheme Meeting**") be convened for the purpose of considering and, if thought fit, approving (with or without modification) the Scheme proposed by the Company.

**Venue, times and video conference availability for the Scheme Meeting**

The Scheme Meeting will be held on 22 August 2023 at 8:00 p.m. (Hong Kong time) at the offices of Sidley Austin at 39/F, Two International Finance Centre, 8 Finance St, Central, Hong Kong, with any adjournment as may be necessary or appropriate, and subject to applicable COVID-19 restrictions, policies or guidance then in force in Hong Kong, and in which case any changes in arrangements relating to the Scheme Meeting shall be communicated to Scheme Creditors in advance of the Scheme Meeting on the Transaction Website, CEG's website, and by a public announcement published on the HKEXnews website of The Stock Exchange of Hong Kong Limited (the "**SEHK**") and the website of the Singapore Exchange Securities Trading Limited (the "**SGX-ST**").

A video conferencing facility will be made available. Scheme Creditors will be able to obtain the relevant dial-in details for the Scheme Meeting from the Transaction Website, and by written request from the Information Agent (if you are a Scheme Creditor who is not a Blocked Scheme Creditor), or GLAS Specialist Services Limited ("**GLAS**") (if you are a Blocked Scheme Creditor).

Scheme Creditors who attend the Scheme Meeting in person, or by video conference, will be able to vote (and to change their vote, if they wish).

**Methods of voting**

In order to vote at the relevant Scheme Meeting, a Scheme Creditor must either vote itself (if an individual), appoint a duly authorised corporate representative (if a corporation), or appoint a proxy (which must be an individual).

Scheme Creditors may appoint a proxy to vote at the relevant Scheme Meeting by completing and returning a validly completed and signed Account Holder Letter and/or Other Debt Scheme Creditor Proxy Form to the Information Agent via the Portal. All Blocked Scheme Creditor Forms must be returned to GLAS by email at lm@glas.agency.

**Scheme Creditors are strongly encouraged to appoint a proxy (either the Chairperson or another individual of their own choice who is willing and able to attend the relevant Scheme Meeting) by indicating their choice of proxy in the relevant section of the relevant form.**

Scheme Creditors wanting to attend the relevant Scheme Meeting in person are encouraged to appoint a proxy even if they intend to attend and vote in person, in case such Scheme Creditors are unable to do so for any reason.

**Completion and deadline for submitting voting forms**

The "**Voting Record Time**" for the Scheme, being the deadline for the submission of the relevant forms in order to vote on the Scheme and attend the relevant Scheme Meeting, is **5:00 p.m. (Hong Kong Time) on 18 August 2023**.

In order to vote on the Scheme and attend the relevant Scheme Meeting (in person, by a duly authorised representative (if a corporation) or by proxy), a Scheme Creditor must ensure that the following validly completed and executed Scheme Creditor Forms, as applicable, and further pursuant to the terms of the Schemes, must be submitted by the Voting Record Time:

- SJ Notes Scheme Creditors and Lake Noteholders (who are not Blocked Scheme Creditors): (1) Custody Instructions to be submitted via the Clearing Systems prior to the submission of the Account Holder Letter (and in any case by the Custody Instruction Deadline) and (2) Account Holder Letter via the Portal to the Information Agent by no later than the Voting Record Time.

- Other Debt Scheme Creditors (who are not Lake Noteholders): Other Debt Scheme Creditor Proxy Form, together with supporting evidence via the Portal to the Information Agent in accordance with the instructions set out therein.

- Blocked Scheme Creditors: Blocked Scheme Creditor Form to GLAS.

**Registration prior to Scheme Meeting**

Each Scheme Creditor (or, if a corporation, its duly authorised representative) or its proxy intending to attend the Scheme Meeting will be required to register its attendance at the relevant Scheme Meeting no later than 15 minutes prior to the scheduled start time of the relevant Scheme Meeting.

On registration at the Scheme Meeting, a Scheme Creditor attending the Scheme Meeting in person should produce a duplicate copy of:

- the applicable Scheme Creditor Form that was executed and delivered by it or on its behalf via https://portal.morrowsodali.com/TJScheme (the "**Portal**") to the Information Agent;

- evidence of personal identity with photo identification (for example, a passport, driving license

or other photo identification); and

- in the case of a corporation, evidence of corporate authority (for example, a valid power of attorney and/or board minutes).

Similarly, where a proxy other than the Chairperson is appointed, the proxy must also produce, on registration at the relevant Scheme Meeting:

- a copy of the Scheme Creditor Form of the Scheme Creditor who appointed him or her as proxy, having been validly completed, signed and submitted to the Information Agent via the Portal, authorising him or her to act as proxy on behalf of the Scheme Creditor; and

- evidence of personal identity with photo identification (for example, a passport, driving license or other photo identification).

If appropriate personal identification or evidence of authority is not produced, that person will only be permitted to attend and vote at the relevant Scheme Meeting at the discretion of the Chairperson.

**Chairperson**

Pursuant to the Scheme Convening Order, the Hong Kong Court appointed Patrick Cowley of KPMG Advisory (Hong Kong) Limited ("**KPMG**") in his capacity as Scheme Administrator to act as the Chairperson of the Scheme Meeting, or failing that, another representative of KPMG nominated by him, and directed the Chairperson to report the results of the Scheme Meeting to the Hong Kong Court. The results of the Scheme Meeting will also be made available on the Transaction Website, CEG's website, and by a public announcement published on the HKEXnews website of the SEHK and the website of the SGX-ST.

**Scheme Sanction Hearing**

The Scheme, if approved at the Scheme Meeting, will be subject to the subsequent approval and sanction of the Hong Kong Court. The Scheme Sanction Hearing is presently scheduled to take place at 10:00 a.m. Hong Kong time on 5 and 6 September 2023 (to be fixed by the Hong Kong Court). Any Scheme Creditor is entitled (but not obliged) to attend the Scheme Sanction Hearings, through legal counsel, to support or oppose the approval and sanction of the Scheme.

### SCHEME CREDITORS OTHER THAN BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:

**Morrow Sodali Limited**

| | |
|---|---|
| Telephone: | in Hong Kong +852 2319 4130; in London +44 20 4513 6933 |
| Email: | evergrande@investor.morrowsodali.com |
| Attention: | Debt Services Team |
| Transaction Website: | https://projects.morrowsodali.com/evergrande |
| Portal: | https://portal.morrowsodali.com/EvergrandeScheme |

### ANY BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:

**GLAS Specialist Services Limited**

| | |
|---|---|
| Email: | lm@glas.agency |
| Attention: | Liability Management Team |

**FOR CEG ANNOUNCEMENTS REGARDING THIS SCHEME (INCLUDING THOSE RELEVANT TO BLOCKED SCHEME CREDITORS)**

CEG's Website:                              www.evergrande.com
HKEXnews website of the SEHK:     https://www.hkexnews.hk/
SGX-ST website:                             https://www.sgx.com/

**TIANJI HOLDING LIMITED 天基控股有限公司**

Date: [*] 2023

## ANNEXURE 2

**Proposed advertisement in newspapers**

IN THE HIGH COURT OF THE HONG KONG SPECIAL ADMINISTRATIVE
REGION COURT OF FIRST INSTANCE

HCMP 1090/ 2023

IN THE MATTER OF TIANJI HOLDING LIMITED (天基控股有限公司)

AND IN THE MATTER OF SECTION 670 OF THE COMPANIES ORDINANCE (CAP 622)

---

Unless otherwise defined herein, terms used in this Notice have the same meanings as in the explanatory statement (the "**Explanatory Statement**") relating to the proposed scheme of arrangement between Tianji Holding Limited (天基控股有限公司)(the "**Company**") and the Scheme Creditors (as defined in the Explanatory Statement) under section 670 of the Hong Kong Companies Ordinance (Cap. 622) (the "**Scheme**").

Copies of the Scheme, the Explanatory Statement and the Solicitation Packet (including the documentation to be completed by or on behalf of Scheme Creditors in order to vote and/or receive Scheme Consideration) are available to download from the Transaction Website (https://projects.morrowsodali.com/evergrande) save for voting forms for Blocked Scheme Creditors which are available (along with any other relevant scheme documents) from the Company's website (www.evergrande.com).

**NOTICE IS HEREBY GIVEN** that by order of the High Court of the Hong Kong Special Administrative Region Court of First Instance (the "**Hong Kong Court**") dated 24 July 2023, a meeting of Scheme Creditors (the "**Scheme Meeting**") for the purpose of considering and, if thought fit, approving (with or without modification) the Scheme, will be convened.

The Scheme Meeting will be held at the offices of Sidley Austin, at 39/F, Two International Finance Centre, Central, Hong Kong, on 22 August 2023 with any adjournment as may be necessary or appropriate, at 8:00 pm Hong Kong time.

All Scheme Creditors are requested to attend and vote at the Scheme Meeting. Attendance and voting at the Scheme Meeting can be in person or by proxy in accordance with the voting instructions set out in the Explanatory Statement. A video-conference facility will be made available for any Scheme Creditors who wish to attend and vote remotely.

Scheme Creditors who wish to vote at the Scheme Meeting should carefully read the Explanatory Statement and follow the instructions contained therein. Scheme Creditors should take particular note that the Voting Record Time, being the deadline for voting, is **5:00 pm Hong Kong time/ 4:00 am Cayman Islands time on 18 August 2023.**

**NOTICE IS FURTHER GIVEN** that, if the Scheme is approved at the Scheme Meeting, the Scheme will be subject to a subsequent hearing in the Hong Kong Court, at which the Company will seek the Hong Kong Court's sanction of the Scheme (the "**Sanction Hearing**"). The Sanction Hearing before the Hong Kong Court will take place on 5 and 6 September 2023 (to be fixed by the Hong Kong Court).  Any Scheme Creditor is entitled (but not obliged) to attend the Sanction Hearing, through legal counsel, to support or oppose the approval and sanction of the Scheme.

**SCHEME CREDITORS OTHER THAN BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:**

**Morrow Sodali Limited**

| | |
|---|---|
| Telephone: | in Hong Kong +852 2319 4130; in London +44 20 4513 6933 |
| Email: | evergrande@investor.morrowsodali.com |
| Attention: | Debt Services Team |
| Transaction Website: | https://projects.morrowsodali.com/evergrande |
| Portal: | https://portal.morrowsodali.com/EvergrandeScheme |

**ANY BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:**

**GLAS Specialist Services Limited**

| | |
|---|---|
| Email: | lm@glas.agency |
| Attention: | Liability Management Team |

Dated the        day of July 2023

**Tianji Holding Limited (天基控股有限公司)**

HCMP 1090 / 2023

IN THE HIGH COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
MISCELLANEOUS PROCEEDINGS NO. 1090 OF 2023

IN THE MATTER OF TIANJI HOLDING

LIMITED 天基控股有限公司

and

IN THE MATTER OF SECTION 670 OF
THE COMPANIES ORDINANCE (CAP.
622)

---

**ORDER**

---

Filed this 27th day of July 2023

**SIDLEY AUSTIN**
Solicitors for Tianji Holding Limited
Level 39, Two International Finance Centre
8 Finance Street, Central
Hong Kong
Tel: 2509 7888
Fax: 2509 3110
Ref: DA/ST/DW/033817-30390

**SCHEDULE 9**

**SUMMARY OF TERMS OF THE NEW INSTRUMENTS**

<u>Part A – TJ New Notes</u>

| **Principal Terms of the TJ New Notes** |
| --- |

| TJ New Notes | |
|---|---|
| **Issuer / Company** | Tianji Holding Limited |
| **Original Issue Date** | The Restructuring Effective Date. |
| **Principal Amount** | TJ New Notes shall comprise four tranches as follows, with the following maximum aggregate principal amounts:<br><br>(a) TJ Tranche A: US$100 million;<br><br>(b) TJ Tranche B: US$200 million;<br><br>(c) TJ Tranche C: US$300 million; and<br><br>(d) TJ Tranche D: US$200 million.<br><br>In addition, it is contemplated that the Consent Fee will be paid in the form of the notes under TJ Tranche A, which has not been reflected in the maximum principal amount above. |
| **Maturity** | (a) TJ Tranche A: 5 years from the earlier of October 1, 2023 and the Restructuring Effective Date (the "**Reference Date**");<br><br>(b) TJ Tranche B: 6 years from the Reference Date;<br><br>(c) TJ Tranche C: 7 years from the Reference Date; and<br><br>(d) TJ Tranche D: 8 years from the Reference Date.<br><br>With respect to each tranche of the TJ New Notes, any outstanding principal amount under such TJ New Notes shall be repaid on maturity, together with any accrued but unpaid interest. |
| **Interest** | Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the TJ New Notes at the following interest rates with respect to each interest payment period:<br><br>(a) TJ Tranche A: 6.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind);<br><br>(b) TJ Tranche B: 6.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind);<br><br>(c) TJ Tranche C: 7.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 8.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); and |

(d) TJ Tranche D: 7.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 8.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind).

Interest on the outstanding principal amount of the TJ New Notes shall be paid in the following manner:

(a) For the first two and a half years after the Reference Date: interest may be paid in cash or in kind, at the election of the Company;

(b) From the 31st month after the Reference Date to the 36th month after the Reference Date, interest in an amount equal to at least 0.7% of the outstanding principal amount of each tranche of the TJ New Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company;

(c) The fourth year after the Reference Date: interest in an amount equal to at least 3.0% p.a. of the outstanding principal amount of each tranche of the TJ New Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company; and

(d) Starting from the fifth year after the Reference Date: interest shall be paid in cash.[1]

All interest paid in kind with respect to the TJ New Notes will be added to the then current outstanding principal amount of the TJ New Notes.

If the Company pays cash interest under any tranche of the TJ New Notes with respect to any interest payment period in an amount greater than the amount of cash interest required to be paid on such tranche with respect to such interest payment period, it shall also pay cash interest under the other tranches of the TJ New Notes and all tranches of the SJ New Notes with respect to such interest payment period. The amount of such additional cash payments shall be allocated between SJ New Notes on the one hand and TJ New Notes on the other hand on a 90:10 basis, with adjustments, if any, to be set forth in the indenture, if the ratio of the principal amounts of the SJ New Notes and the TJ New Notes has changed from such ratio as of the Original Issue Date other than due to scheduled principal repayments. All such additional cash payments allocated to the SJ New Notes shall be applied pro rata among the tranches of the SJ New Notes based on their outstanding principal amounts and

---

[1] For illustration purposes only, assuming each tranche of the TJ New Notes will be issued at the maximum amount indicated above, the maximum amount of interest that the Company may elect to pay in kind will be as follows:

(a) Tranche A: approximately US$27,026,759;
(b) Tranche B: approximately US$59,027,073;
(c) Tranche C: approximately US$96,128,423; and
(d) Tranche D: approximately US$69,230,391.

| | all such additional cash payments allocated to the TJ New Notes shall be applied pro rata among the tranches of the TJ New Notes based on their outstanding principal amounts. |
|---|---|
| **Amendments with Consent of Holders** | Amendment provisions will be similar to those in the Existing Notes, save that amendments, modifications or waivers that require the consent of each holder in the Existing Notes would not require the consent of each holder of the relevant tranche of the TJ New Notes then outstanding. |
| **Security** | The collateral securing the TJ New Notes pursuant to share charges ("**TJ Collateral**") is listed in Annex A to this Schedule.<br><br>The security interest over any TJ Collateral will be released upon any sale or disposal of such TJ Collateral and (i) the application of the proceeds thereof in accordance with the provisions under "Mandatory Redemption" below or (ii) the deposit of such proceeds into an account charged to the benefit of the holders of the TJ New Notes, or (iii) such proceeds being subject to an escrow or other arrangement, if any, to be set forth in the indenture. |
| **Mandatory Redemption** | 1. Net consideration received by TJ and its offshore subsidiaries that is attributable to TJ from the sale of China Evergrande Centre;<br>2. Net consideration from the sale of any TJ Collateral attributable to TJ;<br>3. Dividends/distributions (if any) received by TJ from its onshore and offshore restricted subsidiaries;<br>4. Receipt by TJ of repayments of unsubordinated intercompany receivables from subsidiaries; and<br>5. Repayment received by TJ from Nexus Emerging Opportunities Fund Property SP under the HK\$521,000,000 loan owed to TJ.<br><br>Cash proceeds under clauses (1), (2) and (5) above shall be used to purchase, by way of reverse Dutch auction, within 45 business days of receipt of such cash proceeds, either or both of the two tranches of TJ New Notes with the shortest maturities at that time, provided that the purchase price is at a minimum purchase price equal to the then current market price plus a premium of US\$0.1 per US\$1 of principal amount plus accrued and unpaid interest (but in any event the purchase price shall not exceed 100% of principal amount plus accrued and unpaid interest). If any such cash proceeds remain unused after such purchase, the Company shall use such remaining proceeds to redeem the TJ New Notes by tranche in the order of maturity, at par plus accrued and unpaid interest. |

Cash proceeds under clauses (3) and (4) above shall be used to redeem either or both of the two tranches of SJ New Notes with the shortest maturities at that time and either or both of the two tranches of TJ New Notes with the shortest maturities at that time, at par plus accrued and unpaid interest, provided that 90% of such proceeds shall be allocated to purchase SJ New Notes and 10% of such proceeds shall be allocated to purchase TJ New Notes (with adjustments, if any, to be set forth in the indenture, if the ratio of the principal amounts of the SJ New Notes and the TJ New Notes has changed from such ratio as of the Original Issue Date other than due to scheduled principal repayments). If any such cash proceeds remain unused after such purchase, the Company shall use (i) 90% of such remaining proceeds to redeem the SJ New Notes by tranche in the order of maturity and (ii) 10% of such remaining proceeds to redeem the TJ New Notes by tranche in the order of maturity, at par plus accrued and unpaid interest (with adjustments, if any, to be set forth in the indenture, if the ratio of the principal amounts of the SJ New Notes and the TJ New Notes has changed from such ratio as of the Original Issue Date other than due to scheduled principal repayment).

All TJ New Notes so repurchased or redeemed shall be cancelled.

| | |
|---|---|
| **Optional Redemption** | With respect to each tranche of the TJ New Notes, at any time during the tenor of such TJ New Notes, the Company has the right to redeem such TJ New Notes, in whole or in part, at par plus any accrued and unpaid cash interest on such redeemed TJ New Notes up to but excluding the relevant redemption date, provided that if the Company redeems any tranche of TJ New Notes pursuant to this clause, it shall also redeem SJ New Notes such that the SJ New Notes and TJ New Notes so redeemed will be on a 90:10 basis (by principal amount), with adjustments, if any, to be set forth in the indenture, if the ratio of the principal amounts of the SJ New Notes and the TJ New Notes has changed from such ratio as of the Original Issue Date other than due to scheduled principal repayments. |
| **Covenants** | The New Instruments Documents will contain covenants, subject to certain exceptions, limiting the ability of the Company and its restricted subsidiaries to, among other things: |

(i)    incur or guarantee additional indebtedness and issue disqualified or preferred stock;

(ii)    make investments or specified restricted payments;

(iii)    declare dividends on capital stock or purchase or redeem capital stock;

| | |
|---|---|
| | (iv)    issue or sell capital stock of restricted subsidiaries; |
| | (v)    guarantee indebtedness; |
| | (vi)    sell, lease or transfer assets; |
| | (vii)    create liens; |
| | (viii)    enter into sale and leaseback transactions; |
| | (ix)    engage in any business other than permitted businesses; |
| | (x)    enter into agreements that restrict the restricted subsidiaries' ability to pay dividends, transfer assets or make intercompany loans; |
| | (xi)    enter into transactions with shareholders or affiliates; |
| | (xii)    effect a consolidation, merger or sale of assets; |
| | (xiii)    designate unrestricted subsidiaries; |
| | (xiv)    layer debt between senior and subordinated debt; and |
| | (xv)    pay consideration as inducement to any consent, waiver or amendment of terms to certain holders of notes. |
| | The New Instruments Documents will contain covenants requiring the Company and its restricted subsidiaries to, among other things: |
| | (i)    provide financial statements and reports; |
| | (ii)    maintain certain offices or agencies; |
| | (iii)    maintain necessary governmental approvals and licenses and comply with applicable laws; |
| | (iv)    pay applicable taxes and other claims; |
| | (v)    pay customary additional amounts to gross-up withholding taxes or deductions on payments due under the notes; and |
| | (vi)    authorize the trustee to provide certain information to holders of the notes upon request. |
| **Covenants regarding certain of TJ's onshore projects** | Cash proceeds from disposals and operations of the existing 35 onshore projects held (directly and indirectly) by TJ and cash received by TJ and its subsidiaries on repayment of intercompany receivables (as referred to in clause (4) of "Mandatory Redemption" above), including from CEG and its subsidiaries (other than TJ and its subsidiaries), dividends received by TJ and its subsidiaries from these projects (as referred to in clause (3) of "Mandatory Redemption" above), and proceeds of financial indebtedness incurred by TJ and its Subsidiaries shall be used to:<br><br>(a) discharge any onshore liabilities associated with the project disposed or required or necessary to be discharged in connection with such disposal,<br><br>(b) fund the development, operations and delivery of these projects, and/or |

| | |
|---|---|
| | (c) pay liabilities and fulfil obligations of TJ and its subsidiaries (other than intercompany payables (other than (x) non-interest bearing trade payables incurred in the ordinary course of business and consistent with past practice that are on arm's length terms and (y) repayments of intercompany financial indebtedness incurred after the date of the RSA solely for working capital, in each case that complies with the affiliate transactions covenant in the indentures) to CEG and its subsidiaries (other than TJ and its subsidiaries)), |
| | provided that such cash proceeds and cash received shall not be used to fund the investment, acquisition, development, operation or delivery of new projects, and in each case above, subject to compliance with applicable laws, regulations, rules, and policies, measures, orders or demands from judicial, regulatory or governmental bodies (provided, in the case of any demand, that TJ provides the trustee and the holders with an officer's certificate setting forth, among other things, the terms of such demand). |
| **Auditor** | The Company will engage a Whitelist Auditor to audit its annual financial statements by no later than the audit of the fiscal year ending 31 December 2023. |
| | The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms: |
| | (i) Baker Tilly International |
| | (ii) BDO |
| | (iii) Crowe Global |
| | (iv) Deloitte |
| | (v) Ernst & Young |
| | (vi) Grant Thornton |
| | (vii) KPMG |
| | (viii) Mazars |
| | (ix) Moore Global |
| | (x) Prism; and |
| | (xi) RSM International |
| **Transfer Restrictions** | The TJ New Notes and the related Subsidiary Guarantees (if any) will not be registered under the US Securities Act or any securities law of any state or other jurisdiction of the United States, and may not be offered or sold within the United States (as defined in Regulation S under the US Securities Act) except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the US Securities Act. |

| | |
|---|---|
| **Form, Denomination and Registration** | The TJ New Notes will be issued only in fully registered form and each tranche of the TJ New Notes will be initially represented by one or more Global Certificates. |
| **Listing** | The Company will use best efforts to obtain the listing of the TJ New Notes on an internationally recognized stock exchange and maintain such listing as long as any TJ New Notes remain outstanding. |
| **Governing Law of the Indentures** | The laws of the State of New York |

Part B

**TJ Collateral Realisation Term Sheet**

| TJ Collateral Realisation Term Sheet | |
|---|---|
| **Realisation of TJ Collateral Non-Core Assets – TJ New Notes** | "**TJ Collateral Non-Core Assets**" has the meaning ascribed to TJ Collateral in the RSA. |
| | The indentures for the TJ New Notes shall contain an undertaking by Tianji that it and its Restricted Subsidiaries will use its best efforts to take all actions necessary to realise the TJ Collateral Non-Core Assets in accordance with the realisation plan set out in Annex B to this Schedule, subject to an amendment mechanism (the "**Realisation Plan**"). Tianji shall undertake to, and shall procure its Restricted Subsidiaries to, use best efforts to comply with the Realisation Plan and for the avoidance of doubt, Tianji and its Restricted Subsidiaries shall not be entitled to, or take any actions to, dispose of the TJ Collateral Non-Core Assets unless such disposal is permitted under the indentures for the TJ New Notes, as applicable. |
| | Any amendment to or deviation from the Realisation Plan in respect of TJ Collateral Non-Core Assets shall be approved by Tianji and the TJ Collateral Creditors Committee (as defined below). |
| | The "**TJ Collateral Creditors Committee**" shall comprise the three largest holders in outstanding principal amount of the TJ New Notes who have notified the relevant trustee of their wish to be part of the TJ Collateral Creditors Committee, subject to the mechanism on change of committee composition as set out below. |
| | The indentures for the TJ New Notes shall contain provisions for the formation of the initial TJ Collateral Creditor Committee within 30 days from the Restructuring Effective Date and shall also contain provisions relating to the changes to the composition of the TJ Collateral Creditors Committee. At any time following the formation of the TJ Collateral Creditors Committee, if (a) any holder of the TJ New Notes eligible to be part of the TJ Collateral Creditors Committee (an "**TJ Collateral Eligible Holder**") notifies the relevant trustee that it wishes to be part of the TJ Collateral Creditors Committee and (b) its holding in outstanding principal amount of the TJ New Notes is larger than a current member of the TJ Collateral Creditors Committee, such TJ Collateral Eligible Holder shall be entitled to become a member of the TJ Collateral Creditors Committee to replace the current member of the TJ Collateral Creditors Committee with the lowest holding. Tianji shall bear no responsibility or liability whatsoever as to the formation or changes to the composition of the TJ Collateral Creditors Committee. |
| | The indentures for the TJ New Notes shall contain a covenant by Tianji to deliver semi-annual updates regarding the disposal status of the TJ Collateral Non-Core Assets to the relevant |

| | |
|---|---|
| | trustee. To the extent any such information constitutes material non-public information, price-sensitive information or inside information, which possession would restrict, prevent or prohibit any recipient from trading in securities under applicable securities laws and regulations of the People's Republic of China, the United States, Hong Kong, Singapore and/or other jurisdictions, Tianji shall promptly release such information or announce publicly a cleansing statement in accordance with applicable rules or laws such that such information no longer constitutes material non-public information, price-sensitive information or inside information in the relevant jurisdictions. |
| **Consequences of Non-Compliance** | It shall constitute a "**Specific Asset Step-In Event**" under the indentures for the TJ New Notes, if a specific asset of the TJ Collateral Non-Core Assets is not realised in accordance with the Realisation Plan due to a breach by Tianji of its undertakings under the section entitled "Realisation of TJ Collateral Non-Core Assets – TJ New Notes". |
| | Upon the occurrence of a Specific Asset Step-In Event, the collateral agent shall be authorised to take steps to take control, possess and/or dispose of the Relevant Asset pursuant to the terms of the relevant New Instrument Documents. |
| | The relevant New Instrument Documents will also contain provisions with respect to the ability of the collateral agent to reserve certain realisation proceeds for the purposes of ongoing recovery of the assets. |

**Annex A**

### LIST OF SHARE PLEDGORS

| No. | The Company or Share Pledgors | Relevant Charged Subsidiaries |
|---|---|---|
| 1. | Assemble Harmony Limited | Greet Delight Limited |
| 2. | The Company | All Peace Investments Limited |
| 3. | The Company | Nexus Emerging Opportunities Fund Property SP (Class F Shares) |
| 4. | Central Sino Global Limited | Jovia Idea Development Limited |

**Annex B**

**REALISATION PLAN OF TJ COLLATERAL**

| | Next Steps | Estimated Timeframe | Predetermined Minimum Valuation |
|---|---|---|---|
| **Equity interest in Cordoba Homes Limited** | • To seek buyer for this asset | | |
| **Equity interest in All Peace Investments Limited and Class F shares in Nexus Emerging Opportunities Fund Property SP (Tuen Mun Project)** | • To monitor the distribution of existing cash balance at Nexus Emerging Opportunities Fund Property SP and Fortune Choice and future sales proceeds from Fortune Choice to Profit Concept | | |
| **Equity interest in E-house (China) Enterprise Holdings Limited (SEHK:2048)** | • To dispose in secondary market | | |

**THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE
ATTENTION**

---

**SUPPLEMENTARY EXPLANATORY STATEMENT IN RELATION TO SCHEME
OF ARRANGEMENT**

**BETWEEN**

**TIANJI HOLDING LIMITED**

**天基控股有限公司**

**THE SCHEME CREDITORS**

(as defined in the Explanatory Statement issued on 31 July 2023)

**16 AUGUST 2023**

This document comprises a supplementary explanatory statement in relation to the scheme of arrangement proposed by Tianji Holding Limited (天基控股有限公司) ("**Tianji**" or the "**Company**") pursuant to Sections 670, 673, and 674 of the Companies Ordinance (Cap. 622 of the Laws of Hong Kong) and provided pursuant to Section 671 of the Companies Ordinance (Cap. 622 of the Laws of Hong Kong) (this "**Supplementary Explanatory Statement**"). Reference is made to the definitions set out in Schedule 1 (*Definitions and Interpretation*) to the Explanatory Statement to the Explanatory Statement in relation to the Scheme issued on 31 July 2023.

This Supplementary Explanatory Statement is being transmitted to persons who it is believed are or may be Scheme Creditors as at the date of this Supplementary Explanatory Statement. If you have assigned, sold, or otherwise transferred your interests in the Existing Debts you must forward this Supplementary Explanatory Statement and the accompanying documents at once to the person or persons to whom you have assigned, sold or otherwise transferred your interests in the Existing Debts.

This Supplementary Explanatory Statement has been distributed to you in an electronic form. You are advised that documents transmitted in electronic form may be altered or changed during the process of transmission and consequently none of the Company, the Information Agent, the SJ Notes Trustee, the Lake Notes Trustee and Agent, the Existing Agents, nor any of their respective Affiliates, directors, officers or employees, accept any liability or responsibility whatsoever in respect of any difference between the Supplementary Explanatory Statement distributed to you in electronic format and the version available to you for inspection on the Transaction Website.

<u>WARNING</u> – The contents of this Supplementary Explanatory Statement have not been reviewed by any regulatory authority in the Cayman Islands, Hong Kong, the British Virgin Islands, Singapore or in any other jurisdiction. Neither the US Securities and Exchange Commission ("**SEC**") nor any United States state securities commission has approved or disapproved of the Scheme Consideration or determined if this Supplementary Explanatory Statement is truthful or complete. Any representation to the contrary is a criminal offence. You are strongly encouraged to exercise caution in relation to any offer pursuant to the scheme of arrangement set out in this Supplementary Explanatory Statement.

**<u>You are recommended to seek your own independent financial, legal and/or tax advice immediately from your financial, legal and/or tax adviser with respect to the contents of this Supplementary Explanatory Statement or the documents that accompany it or what action you should take.</u>**

This Supplementary Explanatory Statement does not constitute an offer to sell or the solicitation of an offer to buy any securities. None of the securities referred to in this Supplementary Explanatory Statement may be sold, issued or transferred in any jurisdiction in contravention of applicable law. The securities proposed to be issued pursuant to the Scheme will not be registered with the SEC under the US Securities Act of 1933, as amended (the "**US Securities Act**"), or the securities law of any state or other jurisdiction, and are being transferred and delivered in reliance upon certain exemptions from the registration requirements of the US Securities Act. The securities proposed to be issued pursuant to the Scheme will be issued and delivered only (i) in the United States to "qualified institutional buyers" ("**QIBs**") as defined in Rule 144A under the US Securities Act ("**Rule 144A**") and institutional "accredited investors" ("**Accredited Investors**") as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the US Securities Act ("**Regulation D**"); and (ii) outside the

4860-1114-7127v.5

United States to non- US persons in offshore transactions, in reliance on Regulation S under the US Securities Act ("**Regulation S**").

An application will be made for the listing and quotation of the New Instruments on the Singapore Exchange Securities Trading Limited ("**SGX-ST**"). The SGX-ST assumes no responsibility for the correctness of any of the statements made or opinions expressed or reports contained herein. Approval in-principle for the listing and quotation of the New Instruments on the SGX-ST is not to be taken as an indication of the merits of the New Instruments or of the issuers of them, any guarantees, any guarantors, their respective subsidiaries (if any), their respective associated companies (if any) or their respective joint venture companies (if any). For so long as such New Instruments are listed on the SGX-ST and the rules of the SGX-ST so require, such New Instruments will be traded on the SGX-ST in a minimum board lot size of at least S$200,000 (or its equivalent in foreign currencies). To the extent that Tianji is required to disclose additional information solely for the purposes of the application to list the New Instruments on the SGX-ST, such information will be made available to Scheme Creditors on the Transaction Website (where legally and commercially permissible).

**Section 309B(1) Notification**—In connection with Section 309B of the Securities and Futures Act, Chapter 289 of Singapore, as modified or amended from time to time (the "**SFA**") and the Securities and Futures (Capital Markets Products) Regulations 2018 (the "**CMP Regulations 2018**"), we have determined, and hereby notify all relevant persons (as defined in Section 309A(1) of the SFA) that the New Instruments are prescribed capital markets products (as defined in the CMP Regulations 2018) and Excluded Investment Products (as defined in MAS Notice SFA 04-N12: Notice on the Sale of Investment Products and MAS Notice FAA-N16: Notice on Recommendations on Investment Products).

This Supplementary Explanatory Statement should be read carefully with the Explanatory Statement which is available on the Transaction Website for Scheme Creditors to download.

All Scheme Creditors (and Designated Recipients, if applicable) will need to hold an account (directly or indirectly through the intermediary chain) with an account holder or custodian which itself holds an account with Euroclear or Clearstream in order to receive the New Instruments and the Consent Fee (if applicable). To the extent that they do not already have such an account, all Other Debt Scheme Creditors who are not noteholders, and Designated Recipients (if applicable), are advised to open an account (directly or indirectly through the intermediary chain) with an account holder or custodian which itself holds an account with Euroclear (if possible) or Clearstream (including many custodian banks and certain other financial institutions) and provide the Information Agent with the required details of such account (as required in the relevant Scheme Creditor Forms) as soon as possible, and in any event, by the Bar Date. If you do not have such an account and are unable to open such an account and are not a Sanctions-Affected Scheme Creditor, please contact the Information Agent immediately.

The Information Agent provides the contact for Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) in relation to questions the Scheme Creditors have in relation to this Supplementary Explanatory Statement, the Solicitation Packet, the Scheme or the Restructuring. The Information Agent will be assisting the Chairperson in co-ordinating the voting process for the Scheme, including (a) creating and managing the Transaction Website and the Portal, (b) communicating with Scheme Creditors (who are not Sanctions-Affected Scheme Creditors) regarding voting in the Scheme, in particular via the Transaction Website, (c) communicating with the Clearing Systems (where relevant) regarding voting in the Scheme

(for further distribution to Scheme Creditors (who are not Sanctions-Affected Scheme Creditors)), and (d) assisting the Chairperson in checking the voting values of each Scheme Creditor (who is not a Sanctions-Affected Scheme Creditor) for/at the Scheme Meeting against the relevant Custodian Instructions or, as the case may be, the records supplied by the Company. GLAS will be managing the voting process for the Scheme for Blocked Scheme Creditors.

Queries from Scheme Creditors (who are not Blocked Scheme Creditors) in relation to this Supplementary Explanatory Statement should be directed to the Information Agent as follows:

**Morrow Sodali Limited**
Telephone: in Hong Kong +852 2319 4130; in London: +44 20 4513 6933
Email: evergrande@investor.morrowsodali.com
Transaction Website (document posting website):
https://projects.morrowsodali.com/evergrande
Portal (form submission website): https://portal.morrowsodali.com/EvergrandeScheme
Attention: Debt Services Team

**Blocked Scheme Creditors should direct any questions in relation to this Supplementary Explanatory Statement, the Blocked Scheme Creditor Form, the Scheme or the Restructuring to:**

**GLAS Specialist Services Limited**
Email: lm@glas.agency
Attention: Liability Management Team

**For submitting Blocked Scheme Creditor Forms**

please refer to the Solicitation Packet

**For Company announcements regarding the Scheme, including those relevant for Blocked Scheme Creditors**

**http://www.evergrande.com/**

# CONTENTS

**Clause**                                                                                          **Page**

1.      SUPPLEMENTS TO EXPLANATORY STATEMENT ................................................1

2.      EXPECTED TIMETABLE OF PRINCIPAL EVENTS ..............................................1

3.      NOTICES ...........................................................................................................................3

4.      IMPORTANT SECURITIES LAW NOTICES ...........................................................4

APPENDIX 1 DEFINITIONS ....................................................................................................6

4860-1114-7127v.5

1.      **SUPPLEMENTS TO EXPLANATORY STATEMENT**

1.1     The purpose of this Supplementary Explanatory Statement is to inform Scheme Creditors of adjournment of the Scheme Meeting. The reason for the adjournment of the Scheme Meeting is to align the timing of the Scheme Meeting with the timing of the adjourned scheme meetings in connection with the CEG Schemes. The adjournment of the Scheme Meeting also provide Scheme Creditors with more time to consider the information in relation to the Scheme and the opportunity to amend their vote in respect of the Scheme.

1.2     The Scheme Meeting is intended to be adjourned from 22 August 2023 to 28 August 2023 at 6:00 p.m. Hong Kong time.

1.3     It is not currently anticipated that the Scheme Sanction Hearing, the Scheme Effective Date, the Restructuring Effective Date or any later principal event will be amended. The revised expected timetable of principal events for the proposed Scheme is set out in Clause 2 (*Expected timetable of principal events*) below.

1.4     Scheme Creditors who have already submitted a duly completed Scheme Creditor Form or Blocked Scheme Creditor Form (as applicable) are not required to resubmit the relevant form to the Information Agent or GLAS respectively as a result of the supplements set out in this Supplementary Explanatory Statement unless they wish to make changes to the information submitted in the Scheme Creditor Form or Blocked Scheme Creditor Form (as applicable), including changing their vote.

2.      **EXPECTED TIMETABLE OF PRINCIPAL EVENTS**[1]

| Event | Expected date | Hong Kong time |
|---|---|---|
| **Custody Instruction Deadline** <br><br> The latest time for Account Holders to submit Custody Instructions to block SJ Notes and Lake Notes held with Euroclear or Clearstream in order to vote on this Scheme and, in respect of SJ Notes Scheme Creditors (who are not Sanctions-Affected Scheme Creditors), receive Scheme Consideration on the Restructuring Effective Date, and in respect of the Lake Noteholders (who are not Sanctions-Affected Creditors) receive the Consent Fee only on the Restructuring Effective Date and Scheme Consideration on the Final Distribution Date. | 21 August 2023 being two (2) Business Days prior to the Voting Record Time | 5:00 p.m. on 21 August 2023 |

---

[1] The dates in this timetable and those mentioned throughout this Supplementary Explanatory Statement assume that none of the Court hearing or Scheme Meeting is further adjourned or delayed. It is also possible that the drawing up or registration of the Scheme Sanction Order may be delayed if any person appeals the order.

| Event | | Expected date | Hong Kong time |
|---|---|---|---|
| **Voting Record Time** | The latest time for Scheme Creditors to lodge Account Holder Letters or Proxy Voting Forms (as applicable) with the Information Agent for the purpose of voting at the Scheme Meetings.[2] | 23 August 2023 | 5:00 p.m. on 23 August 2023 |
| | The time on which all Voting Scheme Claims are determined as at the Voting Record Time.[3] | Following the close of business and cessation of trading on the Clearing Systems on 23 August 2023. | |
| **Adjourned Scheme Meeting**[4] | | 28 August 2023 | 6:00 p.m. on 28 August 2023 |
| **Scheme Sanction Hearing**[5]  This is the hearing at the Hong Kong Court where the Court will hear the petition in respect of sanctioning the Scheme. | | 5 and/or 6 September 2023 | 10:00 a.m. on 5 and/or 6 September 2023 |

2.1    The Initial Scheme Meeting is to be opened and commenced as a formality to allow the Chairperson to adjourn the Initial Scheme Meeting to 28 August 2023, 6:00 p.m. Hong Kong time. All relevant formal business to be conducted at the Scheme Meeting will be addressed at the Adjourned Scheme Meeting. Therefore, while Scheme Creditors are still entitled to attend the Initial Scheme Meeting, there is no practical purpose in doing

---

[2]Scheme Creditors should confirm as early as possible with their Account Holders and/or Intermediaries (as applicable) whether there are any applicable deadlines to ensure that their Account Holder Letter is returned online via the Portal to the Information Agent prior to the Voting Record Time in order to vote.

[3]All Scheme Claims for voting purposes are determined as at the Voting Record Time. The Chairperson shall be under no obligation to recognize any assignment or transfer of rights, benefits or interests in the Scheme Claims after the Voting Record Time for the purposes of calculating the value of Scheme Claims for voting nor Entitlements to receive Scheme Consideration and has no obligations hereunder to any Person other than the Scheme Creditors, provided that, where the Chairperson has received from the relevant parties notice in writing of such assignment or transfer prior to the Restructuring Effective Date, the Chairperson may, in its sole discretion and subject to the production of such other evidence in relation to such assignment or transfer as it may reasonably require and to any other terms and conditions which the Chairperson and/or Scheme Administrator may consider necessary or desirable, agree to recognize such assignment or transfer for the purposes of the Scheme Administrators calculating Entitlements to receive Scheme Consideration under the Scheme.

[4]The Adjourned Scheme Meeting will commence at the time stated, as a reconvened meeting of the initial Scheme Meeting which will be opened on 22 August at 8:00 p.m. (Hong Kong time) (the "**Initial Scheme Meeting**") and immediately adjourned.

[5]Notice will be provided to all Scheme Creditors if the date of the Scheme Sanction Hearing change.

2

so. Scheme Creditors who wish to attend and vote at the Scheme Meeting are instead encouraged to attend and vote at the Adjourned Scheme Meeting.

2.2    Any Scheme Creditor that wishes to attend the Adjourned Scheme Meeting in person should produce a duplicate copy of the Account Holder Letter or Proxy Voting Form (as applicable) that was executed and delivered on their behalf, evidence of personal identity (for example, a passport or other picture identification) and, in the case of a corporation, evidence of corporate authority (for example, a valid power of attorney and/or board minutes) at the registration desk by no later than 15 minutes before the scheduled time of the Adjourned Scheme Meeting. The Chairperson of the Adjourned Scheme Meeting may at his or her sole discretion allow a Scheme Creditor to provide the relevant documents up to the time of the commencement of the relevant Scheme Meeting. These will apply to those attending by video as well and there may be a virtual registration desk.

3.    **NOTICES**

**This section contains a number of important notices to Scheme Creditors. Scheme Creditors are strongly encouraged to carefully review the notices in this section and, if necessary, seek and obtain independent legal and/or financial advice.**

3.1    **Defined terms**

Unless expressly defined within this Supplementary Explanatory Statement or the context otherwise requires, all capitalised terms used in this Supplementary Explanatory Statement shall have the meanings set out in Schedule 1 (*Definitions and Interpretation*) to the Explanatory Statement issued on 31 July 2023.

3.2    **Miscellaneous amendments**

Various other miscellaneous amendments have been made to the Explanatory Statement as a result of queries put forward by Scheme Creditors or their advisers and representatives since the publication date of the Explanatory Statement.

3.3    **Notice to Scheme Creditors etc**

Section 3.2 (*Information*) to Section 3.12 (*Summary only*) of the Explanatory Statement are repeated in full as if a reference to the Explanatory Statement were instead a reference to the Supplementary Explanatory Statement.

3.4    **Conflicts**

In the event of a conflict between the information and terms described in:

(a)    this Supplementary Explanatory Statement;

(b)    the Explanatory Statement; and

(c)    the Scheme or the Restructuring Documents;

the terms of the Scheme and the Restructuring Documents shall prevail.

3

3.5     **Forward-looking Statements**

Nothing in this Supplementary Explanatory Statement shall be deemed to be a forecast, projection or estimate of the future financial performance of the Company and/or any member of the Group except where otherwise specifically stated.

This Supplementary Explanatory Statement contains statements, estimates, opinions and projections with respect to the Company and the Group and certain plans and objectives of the Company and the Group. These forward-looking statements can be identified by the fact that they do not relate only to historical or current facts. Forward-looking statements often use words such as "*anticipate*", "*target*", "*expect*", "*estimate*", "*intend*", "*plan*", "*goal*", "*believe*", "*will*", "*may*", "*should*", "*would*", "*could*" or other words of similar import. These statements are based on numerous assumptions and assessments made by the Company as appropriate in light of their experience and perception of historical trends, current conditions, expected future developments and other factors which they believe appropriate. No assurance can be given that such expectations will prove to be correct. Forward-looking statements involve significant risks and uncertainties, should not be read as guarantees of future performance or results, and will not necessarily be accurate indications of whether or not such results will be achieved. Such forward-looking statements only speak as at the date of this Supplementary Explanatory Statement. A number of factors could cause actual results to differ materially from the results discussed in the forward-looking statements, including, but not limited to, the factors and uncertainties set out in Section 26 (*Risk Factors*) of the Explanatory Statement. Each Scheme Creditor is urged to make its own assessment of the validity of such forward-looking statements and their underlying assumptions and no liability is accepted by the Company in respect of the achievement or failure thereof of such forward-looking statements and assumptions. Without limiting the above, none of the boards of the directors of the companies within the Group assumes any obligation to update or correct any forward-looking statements contained in this Supplementary Explanatory Statement to reflect any change of expectations with respect thereto or any change in event, situation or circumstances on which any such forward-looking statement was based.

3.6     **Legal, tax and financial advice**

Section 3.17 (*Legal, tax and financial advice*) of the Explanatory Statement is repeated in full as if a reference to the Explanatory Statement were instead a reference to the Supplementary Explanatory Statement.

4.     **IMPORTANT SECURITIES LAW NOTICES**

**This Supplementary Explanatory Statement does not constitute an offer to sell or a solicitation of an offer to buy any securities in any jurisdiction in contravention of applicable law. None of the securities referred to in this Supplementary Explanatory Statement shall be sold, issued or transferred in any jurisdiction in contravention of applicable law.**

The securities law notices set out in Section 2 (*Important Securities Law Notices*) of the Explanatory Statement are repeated in full as if a reference to the Explanatory Statement were instead a reference to the Supplementary Explanatory Statement.

4

5

4860-1114-7127v.5

**APPENDIX 1**

**DEFINITIONS**

In this Supplementary Explanatory Statement, unless expressly defined below or the context otherwise requires, all capitalised terms used shall have the meanings set out in Schedule 1 (*Definitions and Interpretation*) to the Explanatory Statement issued on 31 July 2023:

| | |
|---|---|
| **"Adjourned Scheme Meeting"** | means the Scheme Meeting adjourned to 28 August 2023, 6:00 p.m. Hong Kong time. |
| **"Explanatory Statement"** | means the explanatory statement in relation to the scheme of arrangement proposed by the Company pursuant to Section 671 of the Companies Ordinance (Cap. 622 of the Laws of Hong Kong), first issued on 31 July 2023, as amended and restated from time to time, and is available for inspection on the Transaction Website. |
| **"Initial Scheme Meeting"** | has the meaning set out in Section 2 of this Supplementary Explanatory Statement. |
| **"Supplementary Explanatory Statement"** | means this additional composite document dated 16 August 2023 of the Company addressed to Scheme Creditors containing, among other things, a supplementary explanatory statement of the Company in compliance with the Hong Kong Companies Ordinance. |

6

7