**SIDLEY AUSTIN LLP**
Anthony Grossi
Ameneh Bordi
Juliana Hoffman* (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Email:    agrossi@sidley.com
             abordi@sidley.com
             jhoffman@sidley.com

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| China Evergrande Group, *et al.*[1] | Case No. 23-11332 (MEW) |
| Debtors in Foreign Proceedings. | Joint Administration Requested |

**DECLARATION OF MAPLES BVI**
**AS BRITISH VIRGIN ISLAND COUNSEL TO SCENERY JOURNEY**
**IN SUPPORT OF THE MOTION FOR (I) RECOGNITION OF FOREIGN**
**MAIN PROCEEDINGS, (II) RECOGNITION OF FOREIGN REPRESENTATIVES,**
**AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**
**WITH RESPECT TO DEBTOR SCENERY JOURNEY LIMITED**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

I, Matthew Freeman, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

---

[1] The Debtors in these Chapter 15 Cases are (i) China Evergrande Group, incorporated in the Cayman Islands as an exempted company with limited liability with the registration number 170388, with its principal place of business located at 15th Floor, YF Life Centre, 38 Gloucester Road, Wanchai, Hong Kong; (ii) Tianji Holding Limited, incorporated in Hong Kong as a limited liability company with the registration number 1339269, with its principal place of business located at 17th Floor, One Island East, Taikoo Place, 18 Westlands Road, Quarry Bay, Hong Kong; and (iii) Scenery Journey Limited, incorporated in the British Virgin Islands ("BVI") as a limited liability company with the company number 1970476, with its principal place of business located at 2nd Floor Water's Edge Building, Wickham's Cay II, Road Town, Tortola, BVI.

**INTRODUCTION**

1.      I am an attorney-at-law duly permitted to practice in the British Virgin Islands (the "<u>BVI</u>") and a partner in the Litigation and Insolvency Team of the law firm Maples and Calder located at Ritter House, Wickhams Cay, Road Town, Tortola, British Virgin Islands ("<u>Maples BVI</u>") and am duly admitted to practice in the BVI.  Maples BVI is acting as BVI counsel to Scenery Journey Limited, a limited liability company incorporated in the BVI ("<u>Scenery Journey</u>" or the "<u>Debtor</u>").[2]  China Evergrande Group ("<u>Evergrande</u>"), an exempted company with limited liability incorporated under the Cayman Companies Act of the Cayman Islands, is the ultimate holding company of a group of companies comprising Scenery Journey and certain of Evergrande's other direct and indirect subsidiaries, including, without limitation, Tianji Holding Limited ("<u>Tianji</u>", and together with Evergrande and Scenery Journey, the "<u>Debtors</u>") and certain subsidiaries who guarantee certain of the Group's existing debts (collectively, the "<u>Subsidiary Guarantors</u>") with respect to the Debtors (collectively, the "<u>Group</u>").  The Group is principally engaged in property development, property investment, property management, new energy vehicle development and production, and cultural tourism in China.

2.      I am over the age of 18 and, if called upon, could testify to all matters set forth in this declaration (this "<u>Declaration</u>").  The facts and matters contained in this Declaration are true and correct to the best of my information, knowledge, and belief.  In preparing this Declaration, I reviewed the: (a) Chapter 15 *Petition for Recognition of a Foreign Proceeding* with respect to Scenery Journey (the "<u>Chapter 15 Petition</u>"), (b) *Motion for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representatives, and (III) Related Relief under Chapter*

---

[2] Capitalized terms used in this Declaration but not defined are given their meaning in the Recognition Motion (as defined herein) or the Representative Declarations (as defined in the Recognition Motion), as applicable.

*15 of the Bankruptcy Code* (the "<u>Recognition Motion</u>"), (c) documents prepared and/or filed in connection with the Scenery Journey BVI Proceeding (as defined herein), and (d) relevant provisions of BVI Business Companies Act, 2004 (as amended, the "<u>BVI Companies Act</u>") and other provisions of BVI law as they relate to Chapter 15 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and other aspects of U.S. bankruptcy law referred to in this Declaration. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

3.      As of the date hereof, Scenery Journey is the subject of a restructuring proceeding entitled *In the Matter of Scenery Journey Limited*, concerning a scheme of arrangement (the "<u>Scenery Journey BVI Scheme</u>") between Scenery Journey and certain Scheme Creditors (as defined herein), currently pending before the High Court of the Eastern Caribbean Supreme Court (the "<u>BVI Court</u>") (Case Number BVIHCOM 2023/0076).

4.      I submit this Declaration in support of the (a) Chapter 15 Petition; (b) Recognition Motion; and (c) *Motion Pursuant to Federal Rules of Bankruptcy Procedure 2002 and 9007 Requesting Entry of an Order (I) Scheduling the Recognition Hearing, and (II) Approving the Form and Manner of Service of Notice*, each filed contemporaneously herewith.

5.      This Declaration comprises matters that are statements of my view of BVI law or statements of fact.  Where the matters stated in this Declaration are statements regarding BVI law, such statements represent my view of BVI law as a solicitor admitted and authorized to practice in the BVI.  Where the matters stated in this Declaration are statements of fact that are within my personal knowledge, they are true.  Where the matters stated in this Declaration are statements of fact that are not within my personal knowledge, they are derived, as appropriate, from documents maintained by the BVI Registry of Corporate Affairs (the "<u>BVI Registrar</u>"), from the records maintained by Maples BVI as a result of advising the Debtor in connection with the BVI Scheme,

and/or from information supplied to me by or on behalf of the Debtor and are true to the best of my knowledge, information, and belief. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## **PERSONAL BACKGROUND AND QUALIFICATIONS**

6.      I attended the College of Law (London) between September 2003 and July 2005 and duly completed the Graduate Diploma in Law (Commendation) and the Legal Practice Course (Commendation) before commencing my Training Contract (the vocational stage of qualifying as a solicitor in England and Wales) in November 2006.

7.      I qualified as a solicitor in England and Wales in November 2008 and practiced as a solicitor in the Litigation and Insolvency Teams of a number of firms in England. During my time in England, I advised clients on restructurings, arrangements and insolvency proceedings as well as litigation matters involving contract and company/shareholder disputes.

8.      I relocated to the BVI in March 2015 and was called to the Eastern Caribbean Supreme Court (Virgin Islands) that year. During my time in the BVI, I worked for Lennox Paton (now Holman Fenwick Willan) and Campbells before taking a partnership position at Maples BVI in August 2021.

9.      Since moving to the BVI, I have worked in litigation, insolvency, and restructuring teams and a large majority of my work focuses on advising companies experiencing financial distress and assisting them in implementing a restructuring of their debts or commencing insolvency proceedings.

10.     I, together with other partners and associates at Maples BVI, have been advising the Group on all the BVI legal aspects of the Group's restructuring, conduct of the BVI Scheme, and the extraterritorial effects and recognition of the same since August 2022.

11.     Although I am not admitted in the United States, I am familiar with the provisions of Chapter 15 of title 11 of the United States Code (the "Bankruptcy Code") as a consequence of my BVI practice specifically arising from my involvement with other BVI schemes of arrangement that have required recognition proceedings under Chapter 15 of the Bankruptcy Code.

<p align="center">**STATEMENTS OF BVI LAW AND PRACTICE**</p>

I.     **Sources of Law of the BVI**

12.     The BVI is an Overseas Territory of the United Kingdom.  The legal system of the BVI is an English-style common-law system based upon the doctrine of precedent.  The Common Law (Declaration of Application) Act (Cap 13) extends the common law of England to the BVI.  Equitable principles of English jurisprudence also apply in the BVI.  It follows that the common law of the BVI is largely identical to that of England (except insofar as modified by statute, or BVI jurisprudence).

13.     Decisions by the Judicial Committee of the Privy Council in the United Kingdom are binding on the BVI courts.  Decisions from other United Kingdom courts are highly persuasive and are routinely followed.  In the absence of any authority from the BVI courts on any issue of law, which is often the case, decisions of other common law courts, and in particular decisions of the English courts, are of strong persuasive authority.

14.     The BVI has its own legislature called the House of Assembly, which enacts statutory legislation.   The United Kingdom, however, retains the power to adopt legislation for the BVI and maintains the ability to extend the implementation of international treaties to the BVI.   Therefore, certain legislation and treaties adopted by the United Kingdom form part of

<p align="center">5</p>

the laws of the BVI.

## II.    The BVI Court System

15.    The Eastern Caribbean Supreme Court (the "<u>Eastern Caribbean Supreme Court</u>")

is the superior court of record and a court of unlimited jurisdiction for nine member jurisdictions:

the BVI; Antigua and Barbuda; Dominica; Grenada; St. Kitts-Nevis; St. Lucia; St. Vincent and the

Grenadines; Anguilla; and Montserrat (each, a "<u>Member State</u>").  The Eastern Caribbean Supreme

Court consists of two divisions, a Court of Appeal (the "<u>Court of Appeal</u>") and a High Court of

Justice, where the Scenery Journey BVI Proceeding is being heard.  The Court of Appeal is

itinerant, traveling to each Member State, where it sits at various specified dates during the year

to hear appeals from the decisions of their respective High Courts and Magistrates Courts in both

civil and criminal matters.

16.    The Court of Appeal hears appeals from all subordinate courts (high courts,

Magistrates Courts, and the Industrial Court in Antigua and Barbuda).   Appeals from the

Magistrates Courts might be heard from "any judgment, decree, sentence or order of a Magistrate

in all proceedings."  Eastern Caribbean Supreme Court (Virgin Islands) Ordinance, (1969) Ch. 80,

§ 29(1).

17.    In respect of the BVI Court, which is the High Court division of the Eastern

Caribbean Supreme Court, the Court of Appeal has jurisdiction to hear and determine "any matter

in any civil proceedings upon a case stated, or upon a question of law reserved by the High Court

or by a [j]udge."  *Id.*, § 30(1)(a).  This is, however, subject to "any power conferred in that behalf

by a law in operation in the [t]erritory."  *Id.*  Subject to certain exceptions, the Court of Appeal is

empowered to "hear and determine the appeal from any judgment or Order of the High Court in

all civil proceedings." *Id.* For the purposes of determining any issues incidental to an appeal and the remedies, execution, and enforcement of any judgment or order made thereto, the Court of Appeal is endowed with "all the powers, authority and jurisdiction of the High Court." *Id.*, § 30(1)(b).

18.    In addition, the Commercial Division of the BVI Court was established to determine commercial disputes with a minimum value in the sum of US$500,000 (although it will hear complex commercial cases with a lower value in certain circumstances), although most cases are considerably larger than that.

## III.    Overview of BVI Law Governing the Debtor's Scheme Proceeding

19.    Scenery Journey was incorporated in the British Virgin Islands under the BVI Companies Act as a limited liability company on February 12, 2018.

20.    The BVI Companies Act provides for two mechanisms for achieving a wide range of corporate restructurings by way of court approval: (1) schemes of arrangement, which are equivalent to those available in England and (2) plans of arrangement, which I understand to be similar to those available in U.S. jurisdictions. Both mechanisms provide for compromises to be reached between a BVI company and its creditors or members (or a class of them). These mechanisms are available when directors do not have sufficient creditor or member support to carry out a proposed action, or where it is otherwise desirable to "wrap" an action in a court approved plan or scheme of arrangement. These arrangements provide a mechanism for BVI companies to address dissenting voices and result in an arrangement that binds the company and creditors and/or members (or a class of them).

21.    A scheme of arrangement is a BVI Court supervised process under the BVI

7

Companies Act. The process is commenced by an application to the BVI Court, made under a Fixed Date Claim Form. Once the BVI Court sanctions or approves the BVI scheme, the scheme will become effective when the company files the sanction order with the BVI Registrar. As set forth in further detail below, the vast majority of the Debtor's creditors support the entry of the Debtor into a scheme of arrangement to restructure its debt under the Scenery Journey Existing Notes.

**A.    Summary of the Requirements of Duly-Approved BVI Schemes of Arrangement**

22.    A scheme of arrangement is a statutory procedure under the laws of the BVI that allows a court to sanction a "compromise or arrangement," which has been voted on by the relevant class of creditor or member and approved by the requisite majorities in a collective proceeding; it is more akin to a debt restructuring procedure rather than an insolvency procedure. The statutory framework for a scheme of arrangement under BVI law was derived from, and remains substantially similar to, schemes of arrangement permitted under English law. Schemes of arrangement are particularly useful in circumstances in which hold-out creditors seek an advantage as against similarly ranked creditors in work-out negotiations because they enable companies and their creditors in certain instances to obtain court approval to effect restructuring measures without having to obtain approval from one hundred percent (100%) of the affected creditors.

23.    Section 179A of the BVI Companies Act permits a "compromise or arrangement" (commonly, a "scheme of arrangement" or "scheme") to be proposed between a company and its creditors or any class of creditors. Schemes can be proposed by, inter alia, the company, a creditor to the company, a member or shareholder of the company, or liquidator in an insolvency

proceeding.  When a court issues an order with respect to a company under section 179A of the

BVI Companies Act, section 179 of the BVI Companies Act, which protects the right of objecting

shareholders, does not apply.

24.    Under BVI law, companies generally take the following steps to implement a

scheme of arrangement:

(a)    Pass board resolutions approving the commencement of a scheme of arrangement, and issue a "practice statement letter" to scheme creditors to inform them of the details of the scheme and the company's plans to restructure pursuant to the scheme;

(b)    File a claim with the proper court for permission to convene a meeting(s) of the class or classes of creditors whose rights will be affected by the scheme of arrangement to consider and vote on whether to approve the scheme with or without modification;

(c)    Provide a copy of the scheme and an "explanatory statement" to the affected creditors explaining the effect of the scheme of arrangement and addressing certain other statutory requirements;

(d)    Notify creditors of the date and time of the court-directed scheme meeting(s);

(e)    Receive approval of the scheme of arrangement by more than fifty percent (50%) in number of creditors present and voting at the scheme meeting either in person or by proxy, representing at least seventy-five percent (75%) in value of the relevant creditors of the company present and voting at the meeting in person or by proxy;

(f)    Receive sanction of the scheme of arrangement by the court at a hearing convened for this purpose at which the court will consider, amongst other things, whether the scheme is fair and reasonable; and

(g)    Deliver an official, sealed copy of the order of the court sanctioning the scheme to and filed with the BVI Registrar.

25.    Absent the court's sanction of a scheme, a company cannot implement the scheme.

If the scheme of arrangement becomes effective, it will bind the company and all the members of

each class of creditors that the scheme purports to affect in accordance with its terms, including

those creditors who did not vote on the scheme or who voted against it.

26.    The Debtor's various actions to seek approval and sanction of the Scenery Journey BVI Scheme are described in detail in the final section of this Declaration.

### B.    Board Resolutions and Convening Order

27.    The scheme approval process commences by the company passing a resolution to propose a scheme of arrangement to its creditors, and sending a practice statement letter to affected creditors.  The purpose of a practice statement letter is to inform the creditors subject to the scheme of (i) the company's intention to promote a scheme, (ii) the purpose that the scheme is designed to achieve, (iii) the class composition of the creditors subject to the scheme for the purpose of voting on the scheme at the scheme meeting(s), and (iv) a company's intention to apply to the court to seek an order to convene a meeting or meetings of the creditors (or members) subject to the scheme for the purpose of voting on the scheme.

28.    After passing its board resolutions approving the initiation of the scheme process, a company must file an application with the court to request a meeting of creditors, or a scheme meeting, and scheduling a convening hearing to consider the application.  At the convening hearing, the court sets the date, time, and location of the scheme meeting and prescribes the notice procedures to be followed.  Creditors in the same class will be convened to the same scheme meeting.  The court's entry of a convening order providing for a single voting class of creditors signals that any differences in their legal rights with respect to the company, both before and after the effectiveness of the scheme, did not make it impossible for them to consult together in relation to the proposed compromise or arrangement with a view to their common interest, as required by the BVI Companies Act.

10

29.     The court may also appoint the foreign representative at the convening hearing to authorize and commence a Chapter 15 filing.

30.     The court also appoints a person to convene and chair the scheme meeting.

**C.     Notice of and Voting at the Scheme Meeting**

31.     Pursuant to the convening order, the company is directed to provide notice to creditors regarding the upcoming scheme meeting.  Moreover, notice must be accompanied by access to an explanatory statement that contains sufficient information regarding the company and explaining the effect of the scheme of arrangement following consummation, so as to allow a typical creditor to (a) "exercise a reasonable judgement on whether the scheme is in his interest or not"; and (b) "reach a sensible decision on the pros and cons of the scheme." Re Heron International NV and others [1994] BCLC 667 of 675.  In particular, it must set out information regarding the proposals for the scheme, the affected creditors, the constitution of the creditor class or classes, the scheme meeting or meetings, voting, and guidance on how scheme creditors may participate in the scheme of arrangement.  I understand and have been advised by the Debtor's U.S. counsel, Sidley Austin LLP ("Sidley"), that an explanatory statement is comparable to the disclosure statement required under section 1125 of the Bankruptcy Code for solicitation of votes on a Chapter 11 plan.  Creditors are entitled to attend the scheme meeting in person, by authorized representative (if a corporate entity), or by proxy, and may ask the scheme chairperson questions regarding the proposed scheme of arrangement.

32.     On the appointed day, the scheme chairperson convenes the scheme meeting. All scheme creditors have the opportunity to attend and vote at the scheme meeting, subject to compliance with the applicable procedures specified in the convening order and the explanatory

statement.   For a scheme to be approved by the court, it must be approved by more than fifty

percent (50% + 1) in number, representing seventy-five percent (75%) in value of the creditors or

class of creditors or members or class of members present and voting either in person or by

proxy at the meeting.   Those who attend the scheme meeting have an opportunity to ask

questions and make representations.

33.     Once a scheme is duly approved by creditors at the scheme meeting, the next

step is to obtain court sanction or approval of the scheme at the sanction hearing.  While the

sanction hearing appears in the court list and persons with a legitimate interest can attend and

make representations to the court, the BVI Companies Act does not require that scheme

creditors be served with notice of the outcome of the scheme meeting or the listing of the

sanction hearing.  A company, however, will usually want to provide notice to its scheme

creditors to keep them apprised of the status of the scheme proceeding and the upcoming

sanction hearing.

34.     At the sanction hearing, the court's role is not to assess the commercial benefits

of the scheme, nor is court approval of a scheme of arrangement a "rubber stamp" exercise.

The court retains discretion as to whether or not to sanction the scheme.  It can hear arguments

at this stage both from the scheme creditors whose rights would be directly affected by the

scheme and from other persons whose rights would not be directly affected but who claim

they would be prejudiced by the scheme if it were sanctioned.

35.     At the sanction hearing, the applicant must demonstrate (usually through an

affidavit of the scheme chairperson) that: (i) the relevant statutory requirements under the BVI

Companies Act have been satisfied through the compliance of the terms of the convening

order; (ii) the classes of creditors were properly identified; (iii) each class was fairly represented by those attending the scheme meeting and the statutory majority was acting bona fide in the interests of the class; (iv) the arrangement is such that an intelligent and honest person, and a member of the class of scheme creditors concerned and acting in respect of their own interest, might reasonably approve; and (v) there is no defect in the scheme.

36.    When considering whether to sanction the scheme, the court will not substitute its own commercial view on the terms of the scheme for the views of the scheme creditors. The court considers that such commercial decisions are best made by those whose commercial interests are at stake, but the court will be concerned as to whether the terms are such that scheme creditors could reasonably approve them. If the court believes that ulterior motives influenced the approval, it may decide not to sanction the scheme. If the scheme appears to the court to be ostensibly fair, then the court will not otherwise judge its commercial merit. Scheme creditors and other creditors have the opportunity to seek the assistance of the court by raising objections at the sanction hearing. As such, creditors attending these proceedings will have a full and fair opportunity to vote on and be heard in connection with the scheme, in a manner that Sidley has advised me is consistent with U.S. standards of due process.

37.    Once the court holds the sanction hearing and if it approves the scheme, the court enters the sanction order. Once the court sanctions the scheme, the company is required to file it with the BVI Registrar. A scheme will become effective upon such filing under BVI law, subject to certain other conditions that may be negotiated amongst the affected creditors and the company detailed in the scheme of arrangement.

## THE BVI SCHEME

38.    I respectfully refer the Court to the Recognition Motion and the Representative

13

Declaration of Ms. Anna Silver, filed contemporaneously herewith, for a description of the history and business of the Debtor, the events leading up to filing the Scheme Petition (as defined herein) in the BVI, and the terms of the BVI Scheme.

**THE DEBTOR'S SCENERY JOURNEY BVI PROCEEDING**

39.    The Scenery Journey BVI Scheme provides that BVI courts, including the BVI Court, will have exclusive jurisdiction to hear and determine any suit, action, or proceeding, and to settle any dispute that arises out of or in connection with the terms of the Scenery Journey BVI Scheme or its implementation, or out of any action taken or omitted to be taken under the Scenery Journey BVI Scheme or in connection with the administration of the Scenery Journey BVI Scheme.

40.    On April 26, 2023, the Debtor filed a Fixed Date Claim Form with the BVI Court, a true and correct copy of which is attached hereto as **Exhibit A** (the "Scheme Petition"), commencing the Scenery Journey BVI Scheme in the BVI Court (the "Scenery Journey BVI Proceeding").

41.    Under the "Fixed Date Claim" regime, the BVI Court is required to list a first hearing of the Scheme Petition (the "First Hearing").  At the First Hearing, the BVI Court may list a convening hearing (the "Convening Hearing") and set down directions, including the preparation of written evidence and submissions, in advance of the Convening Hearing.  The First Hearing took place on June 1, 2023, upon which the BVI Court scheduled the Convening Hearing for July 24, 2023 at 10:00 am (prevailing BVI Time).  A true and correct copy of the BVI Court's First Hearing order (the "First Hearing Order") is attached hereto as **Exhibit B**.

42.    On July 14, 2023, the Debtor issued a practice statement letter to the relevant Scheme Creditors, informing such Scheme Creditors that the Debtor had filed the Scheme Petition

14

and that the Convening Hearing had been scheduled for July 24, 2023 (the "**Practice Statement Letter**"). The Practice Statement Letter is attached hereto as **Exhibit C**.

43.      The Convening Hearing occurred on July 24, 2023. It was possible for Scheme Creditors to instruct legal representatives to attend, and make submissions during, the Convening Hearing.   At the Convening Hearing, the BVI Court made, among other things, an order (the "Convening Order") (i) scheduling a meeting for a single class of creditors of the Debtor whose rights will be affected by the Scenery Journey BVI Scheme (the "Scheme Meeting") for August 22, 2023;[3] and (ii) scheduling the hearing to sanction the Scenery Journey BVI Scheme for September 4, 2023 at 10:00 a.m. (prevailing BVI time) (the "Sanction Hearing"). The Convening Order is attached hereto as **Exhibit D**.

44.      In accordance with the Convening Order, applicable notice of the Scheme Meeting, the Scenery Journey BVI Scheme, an explanatory statement (as supplemented from time to time, the "Explanatory Statement"),[4] and applicable solicitation materials were provided to the applicable Scheme Creditors by Morrow Sodali Limited, in its capacity as the Debtor's notification and information agent for the Scenery Journey BVI Scheme ("Morrow Sodali") and to Blocked Scheme Creditors (as defined in the Scenery Journey BVI Scheme) by GLAS Trustees Limited ("GLAS"). Such documents were provided or made available: (a) on the following website maintained by Morrow Sodali: https://projects.morrowsodali.com/evergrande (the "Morrow Sodali Case Website"); (b) on Evergrande's website: https://www.evergrande.com; (c) through the

---

[3] As described in the supplemented Explanatory Statement (as defined herein) provided to the Scheme Creditors on August 16, 2023, Scenery Journey announced that the Scheme Meeting is intended to be adjourned upon commencement thereof to August 28, 2023.

[4] The Explanatory Statement was made available to the Scheme Creditors on July 31, 2023 and  supplemented on August 16, 2023.

15

Euroclear Bank SA/NV and Clearstream Banking S.A. clearing systems, as applicable; and (d) by causing Morrow Sodali to send the notice via electronic mail to each Scheme Creditor for whom Morrow Sodali has contact information or by causing GLAS to send the notice via electronic mail to each Blocked Scheme Creditor.  In addition, Scheme Creditors were notified of the Scheme Meeting through announcements on the Main Board of The Stock Exchange of Hong Kong Limited and the Singapore Exchange Securities Trading Limited.  FFP will provide an additional contact point in the BVI for certain Scheme Creditors to obtain information regarding the Scenery Journey BVI Scheme or the Restructuring on non-voting related matters (in addition to other services it will provide to Scenery Journey).  A copy of Scenery Journey's Explanatory Statement is attached hereto as **<u>Exhibit E</u>**.

45.     In this instance, the BVI Court authorized and appointed Anna Silver of FFP (BVI) Limited, the Debtor's authorized foreign representative, as the individual to convene the Scheme Meeting (the "<u>Scheme Chairperson</u>").  Convening Order, ¶ 15.

46.     At the Scheme Meeting, a vote will be held to determine whether the relevant Scheme Creditors that are present and voting in person or by proxy approve the Scenery Journey BVI Scheme by a greater than fifty percent (50% + 1) majority in number, representing at least seventy-five percent (75%) in value of the Scheme Creditors present and voting with respect to the Scenery Journey BVI Scheme.

47.     Further, if the Scenery Journey BVI Scheme is approved at the Scheme Meeting, the Debtor, through Morrow Sodali, will provide notice to the applicable Scheme Creditors, informing them that the Scenery Journey BVI Scheme was approved and an upcoming Sanction Hearing is scheduled for September 4, 2023.  These Scheme Creditors will also be informed that they can attend and raise any issues or objections at the Sanction Hearing.  In anticipation of the

Sanction Hearing, the Scheme Chairperson will file a report on the Scheme Meeting.

48.     If sanctioned by the BVI Court, the Scenery Journey BVI Scheme will become effective on its terms once copies of the BVI Court's sealed orders approving the Scenery Journey BVI Scheme have been filed with the BVI Registrar and in accordance with the provisions of the Scenery Journey BVI Scheme itself.  Each of the relevant Scheme Creditors will be bound by the Scenery Journey BVI Scheme, whether or not a particular Scheme Creditor participated in the Scheme Meeting or voted in favor of the Scenery Journey BVI Scheme.  Accordingly, the Debtor will cause the Scenery Journey BVI Scheme to be filed with the BVI Registrar after obtaining the Sanction Order from the BVI Court, upon which filing the Scenery Journey BVI Scheme and satisfaction of conditions precedent (as set forth in relevant Explanatory Statement) will become effective.

49.     As the Scenery Journey BVI Proceeding is ongoing in parallel to these Chapter 15 Cases and the Scheme Meeting and Sanction Hearing are scheduled for August 22 and 28, 2023 and September 4, 2023, respectively, a supplemental declaration will be filed to update the Court on the status of the Scenery Journey BVI Scheme and the outcome of the Scheme meeting and the Sanction Hearing, as applicable, in advance of the Recognition Hearing.

*[Remainder of page intentionally left blank.]*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 17, 2023

                                           */s/ Matthew Freeman*
                                           Matthew Freeman
                                           Maples and Calder

**<u>Exhibit A</u>**

**Scheme Petition**



FILED
HIGH COURT
TERRITORY OF
THE VIRGIN ISLANDS

**THE EASTERN CARIBBEAN SUPREME COURT**

**IN THE HIGH COURT OF JUSTICE**

**BRITISH VIRGIN ISLANDS**

**COMMERCIAL DIVISION**

**CLAIM NO.:  NEW CLAIM**

**IN THE MATTER OF SCENERY JOURNEY LIMITED**

**AND IN THE MATTER OF S. 179A OF THE BVI BUSINESS COMPANIES ACT 2004**

**Submitted Date:26/04/2023 13:57**

**Filed Date:26/04/2023 13:57**

**Fees Paid:811.84**

**BETWEEN:**

<div align="center">

**SCENERY JOURNEY LIMITED**

<u>Claimant</u>

**and**

**SCENERY JOURNEY LIMITED**

<u>Defendant</u>

</div>

---

<div align="center">

**FIXED DATE CLAIM FORM**

</div>

---

The Claimant, Scenery Journey Limited ("**SJ**"), a company incorporated with limited liability under the laws of the British Virgin Islands with company no. 1970476, whose address for service is that of its legal practitioners, Maples and Calder, 5th Floor, Ritter House, PO Box 173, Road Town, Tortola, British Virgin Islands envisages proposing entry into a scheme of arrangement (the "**Scheme**") between it and certain of its creditors (the "**Scheme Creditors**"), pursuant to s. 179A of the BVI Business Companies Act, 2004 (the "**Act**"). SJ applies by way of fixed date claim form for the following relief:

1      an order pursuant to s. 179A of the Act that SJ may convene one or more meetings of Scheme Creditors with such meeting(s) to be held at such time, date and place as the court thinks fit (the "**Scheme Meeting**"), for the purpose of considering and, if thought fit, approving (with or without modification) the Scheme between the Scheme Company and the Scheme Creditors.

2           Directions for the method of convening the Scheme Meeting and such further or other directions as the Court thinks fit.

3.          Directions as to the mode of delivery of a scheme document (which includes an explanatory statement and notice of the Scheme Meeting) to the Scheme Creditors and that a record date be set for the purpose of voting at the Scheme Meeting.

4           An order as to the relevant classes of Scheme Creditors affected by the Scheme.

5           An order fixing the date for the convening hearing of the Scheme.

6           An order to adjourn this claim, pending the holding of the Scheme Meeting, to a further hearing for the Court to consider the sanction of the Scheme and, if the requisite majority approve the Scheme at the Scheme Meeting, then an order of the Court to sanction the Scheme or further or other relief as appropriate and as the Court thinks fit.

7           Directions be made for the appointment of a chairperson of the Scheme Meeting, including directions that the chairperson report the result thereof to the Court.

8           An order that the general notice period pursuant to CPR 27.2(4) for the first hearing in respect of the Fixed Date Claim Form be abridged if necessary.

9           An order that all hearings on this matter be conducted via video link or virtually.

10         Liberty to apply.

11         Such further or other relief as the Court considers appropriate.

This application is supported by the affidavit of Chen Daiping together with its exhibit CD-1 both dated 26 April 2023. A draft of the Order sought is attached.

The value of the subject matter to which this claim relates is in excess of US$500,000 pursuant to CPR 69A.1(3) and CPR 69A.5.

The grounds upon which SJ seeks the order are more fully set out in the First Affirmation of Chen Daiping sworn on 26 April 2023.

**NOTICE TO THE DEFENDANT**

**The first hearing of this claim will take place before the Commercial Court Judge in Chambers on**

**………..……………, day of ………………………. 20[ ] at ……………….. am / pm with a time estimate of 30 minutes.**

If you do not attend at the hearing, judgment may be entered against you in accordance with the claim.

If you do attend, the Judge may:
- (a) deal with the claim, or
- (b) give directions for the preparation of the case for a further hearing.

A Statement of Claim or an Affidavit giving full details of the Claimant's Claim should be served on you with this Claim Form. If not and there is no order permitting the Claimant not to serve the Statement of Claim or Affidavit you should contact the Court Office immediately.

You should complete the Form of Acknowledgement of Service served on you with this Claim Form and deliver or send it to the Court Office (address below) so that they receive it within 14 days of service of the Claim Form on you. The Form of Acknowledgement of Service may be completed by you or by the Legal Practitioner acting for you.

3

**You should consider obtaining legal advice with regard to this claim**

**See the Notes.**

This Claim Form has no validity if it is not served within 6 months of the date below unless it is accompanied by an Order extending that time.

Dated this 26th day of April 2023

**Matthew Freeman - Partner**

Maples and Calder

Legal Practitioners for the Claimant

## CERTIFICATE OF TRUTH

I, **Stuart Rau**, certify that I believe that the facts stated in this Fixed Date Claim Form are true.

Dated this 26th day of April 2023

Name: Stuart Rau
Position: Counsel
For and on behalf of the Claimant

Legal Practitioners for the Claimant, whose address for service is c/o Maples and Calder, 5th Floor, Ritter House, Road Town, Tortola, British Virgin Islands.   Ref: MFX621262 - 000107 Telephone number: +1 284 852 3000, Fax number: +1 284 852 3097.

The Court Office is at Sakal Building, Road Town, Tortola, British Virgin Islands.
Telephone number: +1 (284) 468 5001/5153, Fax number.:+1 (284) 468 2729. The Court Office is open between 9:00 a.m. and 3:00 p.m. Monday to Friday except public holidays.

4

## NOTES FOR DEFENDANT

The Claimant is seeking an Order from the Court as set out in the Claim Form on the basis of the facts or evidence set out in the Statement of Claim or Affidavit served with it.  The Claimant will not be entitled to enter judgment against you without a hearing.

You May:

| A.    Admit the Claim |
|---|

If so, you should complete and return the Form of Acknowledgement of Service to the Court Office within **14 days** stating this.  You may attend the first hearing if you wish to do so.

| B.    Dispute the Claim |
|---|

If so, you should complete and return the Form of Acknowledgement of Service as under A.  You should also file at the Court Office and serve on the Claimant's Legal Practitioners (or the Claimant if the Claimant has no Legal Practitioner):

(a)    a Defence if the Claim Form was accompanied by the Claimant's Statement of Claim;

OR

(b)    an Affidavit in answer if the Claim Form was accompanied by an Affidavit sworn by or on behalf of the Claimant

within **28 days** of the day on which the Claim Form was served on you.  Your Defence or Affidavit must set out briefly ALL the facts on which you will rely to dispute the claim made against you.

**You should also attend the first hearing.  If you do not, the Judge may deal with the claim in your absence.**

| C. | Make a Claim against the Claimant |
|---|---|

If so, you should complete and return the Form of Acknowledgement of Service as under A.  You must file a Statement of Claim (a Counterclaim) setting out full details of what you claim against the Claimant and the facts on which you will rely.  This must be done within **28 days** of the date on which the Claim Form was served on you.  The Statement of Claim should set out ALL the facts on which you rely in disputing any part of the Claimant's claim against you.

**You should also attend the first hearing.  If you do not, the Judge may deal with the claim in your absence.**

**THE EASTERN CARIBBEAN SUPREME COURT**

**IN THE HIGH COURT OF JUSTICE**

**BRITISH VIRGIN ISLANDS**

**COMMERCIAL DIVISION**

**Claim No:  NEW CLAIM**

**IN THE MATTER OF SCENERY JOURNEY LIMITED**

**AND IN THE MATTER OF AND IN THE MATTER OF S. 179A OF THE BVI BUSINESS COMPANIES ACT 2004**

**BETWEEN:**

**SCENERY JOURNEY LIMITED**

<u>Claimant</u>

and

**SCENERY JOURNEY LIMITED**

<u>Defendant</u>

---

**FIXED DATE CLAIM FORM**

---

**Maples and Calder**

5th Floor
Ritter House
PO Box 173
Road Town, Tortola
British Virgin Islands
(Ref:MFX/621262/000107)
Tel: +1 284-852-3000
Fax: +1 284-852-3097

<u>Legal Practitioners for the Claimant</u>

## Exhibit B

**First Hearing Order**

**Case Number :BVIHCOM2023/0076**



**FILED
HIGH COURT
TERRITORY OF
THE VIRGIN ISLANDS**

THE EASTERN CARIBBEAN SUPREME COURT

IN THE HIGH COURT OF JUSTICE

BRITISH VIRGIN ISLANDS

COMMERCIAL DIVISION

CLAIM NO.:  BVIHCOM2023/0076

IN THE MATTER OF SCENERY JOURNEY LIMITED

**Submitted Date:02/06/2023 15:40**

**Filed Date:02/06/2023 15:40**

**Fees Paid:72.59**

AND IN THE MATTER OF S. 179A OF THE BVI BUSINESS COMPANIES ACT 2004

BETWEEN:

SCENERY JOURNEY LIMITED

<u>Claimant</u>

and

SCENERY JOURNEY LIMITED

<u>Defendant</u>

---

ORDER

---

BEFORE:    The Honourable Justice Ingrid Mangatal (Ag)

DATED:    1 June 2023

ENTERED:    2 June 2023

UPON THE FIXED DATE CLAIM of Scenery Journey Limited (the "**Scheme Company**") by Fixed Date Claim Form dated 26 April 2023 (the "**Claim**")

AND UPON HEARING Leading Counsel, Mr Tom Smith KC for the Scheme Company and Peter Ferrer of Harneys representing an ad hoc group of creditors of the Scheme Company.

**AND UPON** the Court being satisfied that it has jurisdiction in relation to the Scheme (as defined below) on the basis that the Scheme Company is a "company" within section 179A of the BVI Business Companies Act 2004 (the "**Act**")

**IT IS ORDERED AND DIRECTED THAT:**

*Sealing*

1. That all witness evidence and any documents exhibited thereto be sealed by the Registrar.

2. The Scheme Company is at liberty to share any documents under seal with (1) China Evergrande Group ("**CEG**") and its legal and financial advisors, (2) CEG's creditors and their financial and legal advisors and (3) the Scheme Company's creditors and their legal and financial advisors for the purpose of discussing with them the implementation of a scheme of arrangement pursuant to section 179A of the Act (the "**Scheme**").

*Hearings*

3. This claim be adjourned and relisted for a hearing on 24 July 2023 at 10:00 a.m. with a time estimate of two hours (the "**Convening Hearing**") for the purposes of considering the Scheme Company's request to convene a meeting of the Scheme Creditors (the "**Scheme Meeting**") for the purpose of considering and, if thought fit, approving (with or without modification) the Scheme between the Scheme Company and the Scheme Creditors.

4. A further hearing be listed on 4 September 2023 at 10 am with a time estimate of three hours to consider the sanction of the Scheme, if the requisite majority approve the Scheme at the Scheme Meeting.

5. All hearings for this matter be conducted virtually by video link.

*Directions*

6. The Scheme Company shall file with the Court on or before 4 pm on 10 July 2023 an affidavit/affirmation to update the Court on any progress made with the Scheme Creditors in relation to the Scheme.

7. The Scheme Company shall file with the Court on before 4 pm on 17 July 2023 written submissions in relation to the Convening Hearing.

8. The Scheme Company shall lodge with the Court on or before 4 pm on 19 July 2023 a hearing bundle.

*Liberty to apply*

9.    There be liberty to apply.

_____

BY THE REGISTRAR

THE EASTERN CARIBBEAN SUPREME COURT

IN THE HIGH COURT OF JUSTICE

BRITISH VIRGIN ISLANDS

COMMERCIAL DIVISION

Claim No:  BVIHCOM2023/0076

IN THE MATTER OF SCENERY JOURNEY LIMITED

AND IN THE MATTER OF AND IN THE MATTER OF S.

179A OF THE BVI BUSINESS COMPANIES ACT 2004


BETWEEN:

SCENERY JOURNEY LIMITED

<u>Claimant</u>

and

SCENERY JOURNEY LIMITED

<u>Defendant</u>

---

### ORDER

---

**Maples and Calder**

5th Floor

Ritter House

PO Box 173

Road Town, Tortola

British Virgin Islands

(Ref:MFX/621262/000107)

Tel: +1 284-852-3000

Fax: +1 284-852-3097


<u>Legal Practitioners for the Claimant</u>

**<u>Exhibit C</u>**

**Practice Statement Letter**

**THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION**

**This Letter contains important information that is of interest to Scheme Creditors (as defined herein), and contains matters which may affect their legal rights and entitlements. Scheme Creditors are recommended to consult their own professional advisers as to legal, tax, financial or other aspects relevant to any action they might take in relation to contents of this letter. All depositories, custodians and other intermediaries receiving this letter are requested to expedite re-transmittal to the Scheme Creditors in a timely manner.**

**This Letter does not constitute an offer to sell or the solicitation of an offer to buy any securities. None of the securities referred to in this Letter may be sold, issued or transferred in any jurisdiction to or from any person to whom it is unlawful to make such an offer or invitation or solicitation in such jurisdiction, or in contravention of applicable law.**

**Nothing contained in this Letter constitutes a recommendation, or the giving of advice, by the Company (as defined herein) or any other member of the Group (as defined herein) or the Information Agent (as defined herein to take a particular course of action or to exercise any right conferred by the Scheme Debts (as defined herein) in relation to, buying, selling, subscribing for, exchanging, redeeming, holding, underwriting, disposing of, or converting Scheme Debts or any other financial instruments, securities, assets or liabilities of the Company or any other member of the Group.**

———————————————

| **From:** | Scenery Journey Limited (the "**Company**") |
| **To:** | The Scheme Creditors (defined in paragraph 3.7 below); |
| **To:** | Citicorp International Limited, in its capacity as the trustee in respect of the Existing Notes (defined in paragraph 3.2 below) (the "**Existing Notes Trustee**"); |
| **To:** | Citibank Europe plc in its capacity as the common depositary for the clearing systems, acting through its nominee as registered holder of the Existing Notes(the "**Existing Notes Depositary**"); |
| **To:** | Morrow Sodali Limited, in its capacity as information agent in respect of the Scheme (the "**Information Agent**"); and |
| **To:** | FFP (BVI) Limited, in its capacity as a BVI-based information agent in respect of the Scheme ("**FFP**") |

14 July 2023

Dear Sir/Madam

**Proposed scheme of arrangement in relation to the Company pursuant to section 179A of the BVI Business Companies Act, 2004 (as amended) (the "BCA")**

1   **PURPOSE OF THIS LETTER**

1.1   The Company is proposing a scheme of arrangement with the Scheme Creditors (as defined below) in the British Virgin Islands (the "**BVI**") pursuant to section 179A of the BCA (the "**Scheme**").

1.2    You have received this letter because we believe you are a Scheme Creditor (as defined below). The purposes of this Letter is to:

    (a)    inform you that the Company intends formally to propose the Scheme;

    (b)    set out the objectives that the Scheme is designed to achieve and its effects;

    (c)    give notice to Scheme Creditors that the Company intends to apply to the Eastern Caribbean Supreme Court in the High Court of Justice, BVI (the "**BVI Court**") at a court hearing (the "**Convening Hearing**") to be held on 24 July 2023 at 10 a.m. (BVI time), for an order granting certain directions in relation to the Scheme, including permission to convene a meeting of Scheme Creditors to consider and, if thought fit, approve the Scheme (the "**Scheme Meeting**");

    (d)    explain why the Company considers the Scheme Creditors form a single class; and

    (e)    set out why the Company considers that the BVI Court has jurisdiction to sanction the Scheme.

## 2    WHAT IS A SCHEME OF ARRANGEMENT?

2.1    A scheme of arrangement is an arrangement entered into between a company and its creditors, as provided for under section 179A of the BCA.  A scheme of arrangement becomes legally binding on all holders of a class of claims subject to the scheme, including both those voting against the scheme of arrangement and those not voting, if at least a majority in number of the relevant creditors, holding at least seventy-five per cent (75%) in value of claims, present and voting (either in person or by proxy) at the scheme meeting, vote in favour of the scheme of arrangement, the BVI Court then sanctions it and the scheme is delivered to the BVI Registrar of Corporate Affairs with a copy of the BVI Court order sanctioning the scheme.

2.2    A scheme of arrangement may be sanctioned by the BVI Court if it is satisfied, among other things, that: (i) the relevant provisions of section 179A of the BCA have been complied with, and (ii) the terms of the scheme of arrangement are such that an intelligent and honest creditor, a member of the class concerned and acting in respect of its own interest, might reasonably vote in favour of it.

## 3    INTRODUCTION TO THE PROPOSED SCHEME CREDITORS

3.1    For the reasons explained below, you have been identified as a person who may be a Scheme Creditor. If you are a Scheme Creditor, your legal rights and entitlements will be affected by the proposed Scheme (if approved by the requisite statutory majorities of the Scheme Creditors at the Scheme Meeting and then sanctioned by the BVI Court).

*The Scheme Debts*

3.2    The Company has incurred indebtedness (the "**Scheme Debts**") under the terms of the following instruments traded on the Singapore Stock Exchange ("**SGX**"):

    (a)    Existing November 2022 Notes- being the 13.0% senior notes due November 6, 2022 (ISIN: XS1903671854, Common Code: 190367185);

2

(b)      Existing November 2023 Notes- being the 13.75% senior notes due November 6, 2023 (ISIN: XS1903671938, Common Code: 190367193);

(c)      Existing October 2022 Notes- being the 11.5% senior notes due October 24, 2022 (ISIN: XS2109191986, Common Code: 210919198); and

(d)      Existing October 2023 Notes- being the 12.0% senior notes due October 24, 2023 (ISIN: XS2109192109, Common Code: 210919210),

(together, the "**Existing Notes**").

3.3      Interest payments are payable by the Company in relation to the Existing Notes pursuant to the terms of the indentures (the "**Company Indentures**") relating to the Existing Notes. The aggregate outstanding principal amount of the SJ Notes is approximately US$5.2 billion as at 31 December 2022. The total accrued but unpaid interest as of 30 June 2022 for the Existing Notes was approximately US$ 629 million.

3.4      The Existing Notes are governed by New York law. The payment obligations under each series of Existing Notes are guaranteed by Tianji Holding Limited ("**TJ**"), the Company's parent and 103 of China Evergrande Group's ("**CEG**") subsidiaries incorporated under the laws of the BVI or Hong Kong (the "**Existing Notes Guarantors**").

3.5      In addition, TJ's immediate holding company, Hengda Real Estate Group Co, Ltd ("**Hengda**"), entered into a keepwell and equity interest purchase agreement in respect of each series of the Existing Notes (the "**Keepwell and EIPU Agreements**"). The Keepwell and EIPU Agreements are governed by New York law.

3.6      The Company is proposing a scheme of arrangement with holders of the Scheme Debts, being the "Scheme" described at paragraph 1.1 above.

*Are you a Scheme Creditor?*

3.7      "**Scheme Creditors**" means a person holding an economic or beneficial interest as principal in the Existing Notes (the "**Noteholders**") held in global form or global restricted form through Euroclear Bank SA/NV and/or Clearstream Banking S.A., or any applicable successor thereto (the "**Clearing Systems**") as at (A) the Voting Record Time for voting purposes at the Scheme Meeting and/or (B) the Entitlement Record Time (defined below) for being eligible to receive consideration under the Scheme.

3.8      A time and date (the "**Voting Record Time**") will be fixed for the purpose of identifying Scheme Creditors entitled to attend and vote at the Scheme Meeting. Details of the Voting Record Time will be set out in the Explanatory Statement (defined below).

3.9      The Existing Notes Trustee and Existing Notes Depositary are Scheme Creditors for the purpose of being bound to the Scheme, however, they will not entitled to vote at the Scheme Meeting (to avoid double counting).

3.10      If you have assigned, sold or otherwise transferred your interests in any Scheme Debts or intend to do so, you should forward a copy of this Letter immediately to the person or persons to whom you have assigned, sold or otherwise transferred such interests or to the proposed assignee and/or

transferee.  If you remain a beneficial holder as principal of the Existing Notes, and will be such as at the Voting Record Time, you will be the person entitled to vote at the Scheme Meeting and should read this letter and the Explanatory Statement (when available).

## 4    BACKGROUND TO THE COMPANY AND THE GROUP

*CEG*

4.1    CEG was incorporated in the Cayman Islands under the Cayman Companies Act on 26 June 2006 as an exempted company with limited liability (registration number 169971). CEG's shares have been listed on the Main Board of the Stock Exchange of Hong Kong Limited ("**SEHK**") since 5 November 2009 with the stock code 3333.

4.2    CEG is the ultimate holding company of a group of companies comprising CEG and its subsidiaries, including the Company and the Existing Notes Guarantors (as defined above) (the "**Group**"). The Group (formerly known as Evergrande Real Estate Group) was founded in 1996 and it is now headquartered in Guangzhou City, Guangdong Province, the People's Republic of China (the "**PRC**"). The Group was originally a property development company and remains principally engaged in the development, investment and management of property in the PRC. The Group's business operations are primarily based in the PRC, where the majority of the Group's assets, being property development projects, are located.  In recent years, the Group has diversified into various other sectors, including new energy vehicle development and production, and the cultural tourism industry. The Group had also spun-off its property management services business into a listed company in Hong Kong.

*The Company*

4.3    The Company was incorporated to raise funding for the Group and specifically targeted investment from outside of the PRC.

4.4    This was done by issuing the Existing Notes which are the four series of US dollar denominated senior notes detailed at paragraph 3.1 above.

## 5    BACKGROUND TO THE RESTRUCTURING

*Financial Position of the Company and the Group*

5.1    In recent years, the Group has been growing its real estate development business while at the same time seeking to diversify its business. To fund the Group's expanding business operations, the Group's interest-bearing borrowings increased to approximately RMB799.9 billion (US$119.21 billion) as of 31 December 2019, compared to RMB535.1 billion (US$79.74 billion) as of 31 December 2016.

5.2    For property development companies such as the Group, raising capital through financial instruments is a key source of cash flow to support continuing operations. CEG's last issuance of offshore notes occurred in January 2020. CEG has not been able to issue any new notes offshore since 2021. Financial institutions also reduced the number of loans granted to CEG's onshore subsidiaries. However, the Group made more than US$9.98 billion in principal repayments and US$4.09 billion in interest payments from March 2020 to June 2021 in relation to the Existing Notes, which consequently tightened CEG's cash flow.

4

5.3    In response to the market slow-down, the Group launched online sales of its houses, offering significant discounts and advertising heavily. The Group prioritised maintaining revenue and cash flow ahead of making profits to ensure the continuation of its operations. In 2020, the Group's average per square meter selling price for property fell significantly, from RMB10,281/sqm (US$1,532.21) in 2019, to RMB8,945/sqm (US$1,333.10) in 2020. In the first half of 2021, the Group's contracted sales decreased and the contracted sales area fell (with a lower average selling price per square meter).

5.4    In the second half of 2021, the Group's liquidity situation declined significantly, and the Group suffered a serious operational crisis, as explained in CEG's SEHK announcement dated 14 September 2021. Adverse reaction to unfavourable market conditions by offshore capital markets has limited the Group's funding sources to address upcoming maturities.  As a result, not only did CEG's financing become restricted, its debts also gradually became overdue. In addition, the impact from the slowdown in sales resulted in a decline in creditworthiness, which further restricted the Group's financing.  These strains on CEG's operations have continued through 2022 and into 2023.

5.5    Owing to these factors, CEG and the Company have been unable to meet their ongoing debt maturities despite the best efforts of the Group. This includes being unable to meet the principal amounts of the Existing Notes listed in sub paragraphs 3.2(a) to 3.2(d) above (and accrued but unpaid interest thereon) by their respective maturity dates. These amounts remain unpaid as of the date of this Letter. The Company is therefore insolvent.

5.6    On 2 December 2021, CEG received a demand to perform its obligations under a guarantee in the amount of approximately US$260 million, with which CEG failed to comply. CEG's failure to perform its obligations under this guarantee constituted events of default under the Company Indentures. The Company has since ceased to make payments for the principal and interest amounts due under the Existing Notes.

*Appointment of financial advisor and discussions with the Ad Hoc Group*

5.7    Since 2021, Houlihan Lokey (China) Ltd ("**Houlihan Lokey**") has been acting as the financial advisor to evaluate the Group's capital structure, liquidity position, to explore options for a restructuring of the Group's liabilities, and to assist CEG and the Group in its debt restructuring negotiations with the Scheme Creditors. China International Capital Corporation Hong Kong Securities Limited ("**CICC**") and BOCI Asia Limited ("**BOCI**") have also been acting as advisers to the Schemes (together with Houlihan Lokey, (the "**Advisers**")).

5.8    CEG and the Company, together with the Advisers and their legal advisers, have been involved in extensive negotiations and discussions with a group of Noteholders holding approximately US$1.9 billion of the principal amount of the Existing Notes, representing approximately 36.7% of the aggregate outstanding principal amount of the Existing Notes as at the date of this letter (the "**Ad Hoc Group**") and their financial and legal advisers regarding the restructuring of the Group's offshore liabilities.  As a result of such negotiations, on 20 March 2023, the Company and the Ad Hoc Group agreed to the terms of the proposed restructuring (the "**Term Sheet**"). A copy of the Term Sheet is appended to this Letter as "Appendix 1".

5.9    In order to facilitate a full and open communication with all Scheme Creditors and to address the Group's liquidity issue in an efficient and fair way, on 22 March 2023, CEG announced on the website of the SGX a proposed restructuring plan in connection with the Existing Notes (the

5

"**Restructuring**"). The announcement enclosed the Term Sheet and was followed by a further announcement on 3 April 2023 whereby the Company provided instructions to Scheme Creditors to visit a website created to communicate with the Scheme Creditors (the "**Transaction Website**") in order to access a restructuring support agreement signed by the Company and certain holders of the Existing Notes including the Ad Hoc Group in respect of Scheme Debt (the "**RSA**").

5.10    In the announcement published by CEG on 3 April 2023, each Scheme Creditor was invited to agree and support the proposed Restructuring (i.e. the Scheme) by acceding to the RSA as soon as possible. A further announcement was made by CEG on 27 April 2023 whereby it was confirmed that holders holding more than 91% of the outstanding principal amount of the Existing Notes have submitted letters to accede to the RSA.

5.11    As at the date of this Letter, Scheme Creditors holding over approximately 98% of the aggregate outstanding principal amount of the Existing Notes have entered into or acceded to the RSA.

5.12    The Scheme Creditors who have acceded to the RSA have agreed, *inter alia*, that they will:

(a)    use all commercially reasonable endeavours in order to support, facilitate, implement or otherwise give effect to the Restructuring as soon as reasonably practicable, including voting in favour of the Scheme at the Scheme Meeting;

(b)    not take any step that may interfere with or delay the Scheme including making any application to the Court to object to or challenge the Scheme or commencing any Enforcement Action (as defined in the RSA);

(c)    provide commercially reasonable support and assistance to the Company to prevent the occurrence of an Insolvency Proceeding (as defined in the RSA); and

(d)    not formulate, encourage, procure or otherwise support any alternative proposal or alternate offer for the implementation of the Restructuring other than those contemplated by the Term Sheet.

6    **JURISDICTION OF THE BVI COURT**

6.1    The Company considers that the BVI Court has jurisdiction in relation to the Scheme and jurisdiction to convene the Scheme Meeting in respect of the Company, on the basis that the Company is an incorporated and registered company in the BVI.

7    **PURPOSE OF THE SCHEME AND THE RESTRUCTURING**

7.1    The purpose of the Scheme and the Restructuring is to:

(a)    avoid the Company and other members of the Group entering into insolvent liquidation in the near future, as a result of which the anticipated recoveries for Scheme Creditors would likely be significantly less than if the Restructuring were to be completed successfully;

(b)    provide the Group with a more stable capital structure, which will enable the Group to comply with its obligations and liabilities following the Restructuring, to continue to trade on a going concern basis and to recover as the PRC property market stabilises; and

(c)     increase the prospect of delivering long-term value for all of the Scheme Creditors and all of the other stakeholders of the Company.

8       **OVERVIEW OF THE SCHEME AND THE RESTRUCTURING**

8.1     The Restructuring in respect of the Company shall be implemented through the Scheme. The Scheme will affect the rights of the Scheme Creditors under the Existing Notes.

8.2     The Scheme is part of a wider restructuring to comprehensively restructure the offshore indebtedness of the Group. In addition to the Scheme, the Group is intending to implement the restructuring via:

(a)     a scheme of arrangement in Hong Kong to be proposed by TJ (the "**TJ Scheme**"). The TJ Scheme and the Scheme are inter-conditional as between themselves which means that the effectiveness of the Scheme shall depend on the effectiveness of the TJ Scheme, and vice versa; and

(b)     linked and inter-conditional schemes of arrangement to be proposed by CEG, the ultimate holding company of the Group, in the Cayman Islands and Hong Kong (the "**CEG Schemes**").  The CEG Schemes are not inter-conditional with either the Scheme or the TJ Scheme but the CEG Schemes are inter-conditional between themselves.

8.3     The Scheme will compromise the Scheme Creditors' claims under the Existing Notes against the Company, Hengda and all the Existing Notes Guarantors <u>apart from TJ</u>. The Scheme Creditors' claims under the Existing Notes guarantees against TJ shall be compromised under the TJ Scheme.

*Scheme Consideration*

8.4     Under the terms of the Scheme, each Scheme Creditor will be entitled to receive a pro rata portion of the Scheme Consideration, pro-rated across five tranches of new notes which to be issued by the Company in an aggregate principal amount equal to US$6,500 million (the "**New Instruments**") based on its Entitlement (defined below).

8.5     The terms of the New Instruments are detailed in Schedule 2 of the Term Sheet. A summary of the terms of each of the New Instruments will also be set out in the Explanatory Statement and copies of the New Instruments documentation will be available on the Transaction Website.

8.6     The Scheme Consideration is in consideration for the Scheme Creditors' compromise and release of their claims under the Existing Notes against the Company, Hengda and all the Existing Notes Guarantors other than TJ. The Scheme Creditors will receive separate consideration under the TJ Scheme in return for their compromise and release of their claims against TJ pursuant to the terms of the TJ Scheme.

*Scheme Creditors' Entitlement to Scheme Consideration*

8.7     Each Scheme Creditor will be entitled to receive Scheme Consideration which is equal to the value of its "**Entitlement**".

7

8.8    Each Scheme Creditor's Entitlement shall be determined on a **"Deficiency Basis"** which in broad terms means that a deduction is made for the recoveries that Scheme Creditor will be entitled to receive for the compromise of their claims against TJ under the TJ Scheme.

8.9    The Deficiency Basis will be calculated as follows:

$$A - ((\frac{A}{B + C}) \times D)$$

**A** = the full accrued claims for the particular Scheme Creditor (being the outstanding principal amount of the Existing Notes held by the Scheme Creditor at the Restructuring Effective Date and accrued and unpaid interest on such Existing Notes up to (but excluding) the earlier of 1 October 2023 and the Restructuring Effective Date);

**B** = total aggregate full accrued claims of all Scheme Creditors (being the outstanding principal amount of the Existing Notes held by the Scheme Creditors at the Entitlement Record Time (currently anticipated to be the Restructuring Effective Date), including those Scheme Creditors who have not submitted their Scheme Creditor Forms (defined below) at all, and accrued and unpaid interest on such Existing Notes up to (but excluding) the earlier of 1 October 2023 and Restructuring Effective Date);

**C** = total aggregate of the full accrued claims of the creditors under the TJ Scheme that do not arise from the Existing Notes as at the Restructuring Effective Date, including the claims of those creditors who have not submitted their Scheme Creditor Forms in the TJ Scheme, and accrued and unpaid interest on such claims up to (but excluding) the earlier of 1 October 2023 and Restructuring Effective Date);

**D** = the net present value (as determined by the Scheme Administrators (defined below) who may take into account the guiding principles set out in the Scheme) of the US$800 million TJ New Notes (being the total consideration available under the TJ Scheme).

8.10    On the Restructuring Effective Date (the determination of each Scheme Creditor's Entitlement for the purposes of distribution of the Scheme Consideration will occur at the "**Entitlement Record Time**"), the Company shall issue the New Instruments to Scheme Creditors (other than Blocked Scheme Creditors and Sanctioned Scheme Creditors (as described below)) who have submitted the required Scheme Creditor Forms by the "Bar Date", being 14 calendar days after the Scheme becomes effective, calculated in accordance with the following formula:

$$\frac{A}{B} \times C$$

**A** = value of a Scheme Creditor's Entitlement;

**B** = total aggregate value of the Entitlement of all Scheme Creditors who have submitted the required Scheme Creditor Forms by the Bar Date; and

**C**= US$6,500 million of the New Instruments (being the total Scheme Consideration).

8.11    The determination of a Scheme Creditor's claims in the Scheme and its Entitlement shall be undertaken by independent and experienced scheme administrators appointed under the terms of

the Scheme. The Company is proposing that Mr Patrick Cowley, Ms Rosalie Lui and Mr Christopher Ball of KPMG Advisory (Hong Kong) Limited be appointed as the scheme administrators (the "**Scheme Administrators**").

8.12   Notwithstanding paragraphs 8.8 to 8.10 above, the Scheme Consideration (being US6,500 million in aggregate principal amount of the New Instruments) will be distributed and allocated to the Scheme Creditors who submit the requisite Scheme Creditor Forms by the Bar Date on a pro rata basis with respect to their respective full accrued claims as at the Entitlement Record Time (currently anticipated to be the Restructuring Effective Date) under the Existing Notes.

*Releases*

8.13   With effect from the Restructuring Effective Date, each Scheme Creditor, in consideration for its Entitlement to the Scheme Consideration, shall release:

(a)   all claims it has against, among others, the Company, the Existing Notes Guarantors and Hengda under the Existing Notes (and the Keepwell and EIPU Agreements) and the Information Agent but excluding any claim it has against TJ under the Existing Notes guarantees; and

(b)   all claims (except for fraud, wilful default and wilful misconduct) against, among others, the Company, its directors, officers, employees, the Information Agent, and certain advisors (including the Ad Hoc Group's advisors) in respect of: (i) the preparation and negotiation of the Scheme and the Restructuring and (ii) the implementation of the Scheme and the Restructuring.

9   **VOTING AND CLAIMING SCHEME CONSIDERATION**

For the avoidance of doubt, Scheme Creditors will have their claims admitted at full value for the purposes of voting on the Scheme at the Scheme Meeting (without double counting, and without permitting duplicative claims or portions of claims against the Company other than for US$1, and in any event subject to the discretion of the chairperson of the Scheme Meeting). This means that a Scheme Creditor's claim will in principle be admitted for voting purposes at a value of: (a) the outstanding principal amount of the Scheme Debt in which each Scheme Creditor held an economic or beneficial interest and/or legal interest (as applicable) as principal at the Voting Record Time; plus (b) all accrued and unpaid interest relating to such Scheme Debt up to (but excluding) the Voting Record Time.

*Scheme Creditors (other than Blocked Scheme Creditors or Sanctioned Scheme Creditors)*

9.1   **To vote**: a Scheme Creditor (other than a Blocked Scheme Creditor and Sanctioned Scheme Creditors) must validly complete and submit to the Information Agent through the Clearing Systems an Account Holder Letter that will be included in the solicitation packet available with the Explanatory Statement (the "**Solicitation Packet**"). This must be received by the Information Agent by the Voting Record Time that will be detailed in the Explanatory Statement.

9.2   Votes of a Scheme Creditor will be admitted at the Scheme Meeting (subject to the discretion of the chairperson) at a value equal to the: (a) outstanding principal amount, plus (b) all accrued and unpaid interest on the Scheme Debts as at the Voting Record Time in accordance with the calculation of the Existing Notes Trustee. This will be subject to the Information Agent's

reconciliation of the custody instructions reference number specified in the Account Holder Letter submitted by or on behalf of such Scheme Creditor with the records of the clearing systems.

9.3     **To receive Scheme Consideration**: Scheme Claim Forms must be submitted to the Information Agent by no later than the Bar Date to be entitled to receive Scheme Consideration.

*Blocked Scheme Creditors*

9.4     There are also specific arrangements relating to voting and the distribution of Scheme Consideration to any "Blocked Scheme Creditors", being any Scheme Creditor (who other than any Sanctioned Scheme Creditors, as described below) that is not entitled, able or permitted (whether directly or through a custodian) to submit instructions or settle through the Clearing Systems as a result of certain laws, regulations and/or orders relating to economic, financial or trade sanctions imposed with respect to Russia[1] ("**Applicable Sanctions**") affecting the Scheme Creditor or its custodian, as determined by the Clearing Systems.

9.5     Blocked Scheme Creditors will not be entitled, able or permitted to (i) submit voting instructions through the Clearing Systems or to the Information Agent on the Scheme or (ii) receive the Scheme Consideration on the Restructuring Effective Date (or such later date as is permitted under the Scheme) due to the Applicable Sanctions.

9.6     **To vote**: a Blocked Scheme Creditors must submit a validly completed "**Blocked Scheme Creditor Form**", which will be included in the Solicitation Packet, by the Voting Record Time. These forms must be submitted to GLAS Specialist Services Limited ("**GLAS**"), who the Company has appointed to liaise with the Blocked Scheme Creditors. The Information Agent will not accept forms from the Blocked Scheme Creditors.

9.7     **To receive Scheme Consideration**: the Scheme Consideration to which Blocked Scheme Creditors would otherwise be entitled on the Restructuring Effective Date, will first be held on trust (the "**Holding Period Trust**") pursuant to a Holding Period Trust Deed until the expiry of the Holding Period Trust (the "**Holding Period Expiry Date**"). If the Applicable Sanctions are not lifted or otherwise not applicable in respect of Blocked Scheme Creditors by the Holding Period Expiry Date, the Scheme Consideration payable to Blocked Scheme Creditors who have submitted their Blocked Scheme Creditor Form and supporting evidence by the Bar Date (including interest accrued on such Scheme Consideration) (the "**Blocked Entitlements**") will be distributed to an escrow agent (the "**Successor Escrow Agent**") to hold on escrow until the earlier of (i) 21 years from the Holding Period Expiry Date, and (ii) the lifting of all applicable sanctions that restrict the Blocked Scheme Creditor from receiving its entitlement, with the Blocked Scheme Creditors thereafter given a reasonable period to recover from the Escrow Account the Blocked Entitlements to which they are entitled.

*Sanctioned Scheme Creditors*

10      Any Scheme Creditors who are the target of "full asset freeze", "full blocking" or similar Applicable Sanctions will be a "**Sanctioned Scheme Creditor**". Sanctioned Scheme Creditors will not be entitled to vote on the Scheme.

---

[1] including, laws, regulations and/or orders relating to economic, financial or trade sanctions, restrictive measures or embargoes administered, maintained and/or enforced by the European Union, United States of America, the United Kingdom and the British Overseas Territories (including the BVI).

11      As of the date of this Letter, the Company is not aware of any Sanctioned Scheme Creditors or Blocked Scheme Creditors, but it is possible that there are Sanctioned Scheme Creditors or Blocked Scheme Creditors given the difficulty of determining whether any Scheme Creditors are Sanctioned Scheme Creditors or Blocked Scheme Creditors until they try to submit their voting instructions.

12      **CONSTITUTION OF CLASSES**

12.1    It is the responsibility of the Company to determine whether more than one meeting of creditors is required and, if so, to ensure that the meeting(s) is/are properly constituted. Each class of creditors must be properly constituted so that any meeting of that class comprises creditors whose rights against the Company are not so dissimilar as to make it impossible for them to consult together with a view to their common interest. If the rights of Scheme Creditors in a class are so different or would be affected so differently by the Scheme as to make it impossible for them to consult together with a view to their common interest, they must be divided into separate classes and a separate scheme meeting must be held for each class of creditor.

12.2    For the purposes of assessing class, the Court considers the similarities and differences in (i) the existing rights of Scheme Creditors against the Company which are to be released or varied under the Scheme; and (ii) the new rights which the Scheme gives to Scheme Creditors by way or compromise or arrangement. When assessing the existing rights of Scheme Creditors, the Court considers the rights they would have in the applicable alternative scenario in the event that the Scheme is not sanctioned.

12.3    The Company has considered the existing rights of each of the Scheme Creditors against the Company and the way in which those rights would be affected by the Scheme. The existing rights of Scheme Creditors have been assessed on the basis that the alternative to the Scheme being sanctioned is a liquidation of the Group (as further explained in paragraph 14 below).

12.4    The Company has concluded that the Scheme Creditors fall into a single class for the purposes of voting on the Scheme for the reasons explained below.

*The terms of the Existing Notes*

(a)     All the Existing Notes are unsecured.

(b)     Although the interest rates and maturity dates are different under each series of the Existing Notes, in the event the Scheme fails, it is likely that the Company will enter into liquidation. In those circumstances, the claims of all Scheme Creditors will become immediately due and payable and the rights of all Scheme Creditors against the Company would rank *pari passu* as between themselves. All Scheme Creditors would have the same rights to have their claims determined through a proof of debt process or by way of a challenge to the liquidator's decision on a proof or debt or the liquidator permitting the continuation of extant court proceedings.

(c)     If the Scheme becomes effective, all Scheme Creditors have the same right to receive the same Scheme Consideration, calculated in the same way, as one another (i.e. they will receive the same treatment and rights under the Scheme).

11

12.5   As a result, the Company does not consider that the difference in rights between the different series of the Existing Notes makes it impossible for such Scheme Creditors to vote together in the same class.

*Blocked Scheme Creditors*

12.6   The Company has considered whether Blocked Scheme Creditors ought to be placed into a separate class for voting purposes. The Company has concluded that they should not be for the following reasons:

   (a)   Blocked Scheme Creditors have the same entitlements to the Scheme Consideration as Scheme Creditors who are not Blocked Scheme Creditors.

   (b)   Blocked Scheme Creditors are restricted from receiving their portion of the Scheme Consideration until any Applicable Sanctions affecting them have been lifted.

   (c)   The Company considers that those restrictions are due to Blocked Scheme Creditors' own personal circumstances in the current regulatory environment and is not the result of their treatment under the Scheme or their rights against the Company. Under the terms of the Scheme Blocked Scheme Creditors have the same ultimate entitlement to receive Scheme Consideration as other Scheme Creditors.

   (d)   Accordingly, the Company does not consider that there is any difference, or any material difference, in the rights of Blocked Scheme Creditors as compared with Scheme Creditors who are not Blocked Scheme Creditors.

*The Ad Hoc Group*

12.7   The Company notes that certain Scheme Creditors in their capacity as members of the Ad Hoc Group shall benefit from two additional fee payments in respect of the restructuring of the Group (which includes the CEG Scheme and the TJ Scheme) which shall be made on or prior to the Restructuring Effective Date:

   (a)   The "**AHG Work Fee**", which shall be paid in accordance with the terms set out in the RSA and the letter agreement dated 20 March 2023 between the CEG's Chairman and the members of the Ad Hoc Group (the "**AHG Work Fee Lette**r").  The AHG Work Fee will be an amount estimated to represent approximately 1% of the Ad Hoc Group's holding of the principal amount of the Existing Notes; and

   (b)   The "**AHG Advisor Fees**", being the reasonable fees, costs and expenses of the legal and financial advisers to the Ad Hoc Group which shall be paid by the Company in accordance with the terms set out in the relevant letter agreements between the Company and the legal and financial advisers to the Ad Hoc Group.

12.8   .

12.9   The Company does not consider that the effect of these payments (either taken alone or cumulatively) makes it impossible for members of the Ad Hoc Group to vote together with the other Scheme Creditors in the same class. This is because:

12

(a)     The payment of the AHG Advisor Fees does not confer a net benefit upon a member of the Ad Hoc Group, but instead represents a payment of costs necessarily incurred by them in undertaking that role and which would not otherwise have been incurred. The Company further considers that the arrangement is typical and proportionate for a transaction of this kind. Further, the obligation on the Company to pay the AHG Advisor Fees is not conditional on the sanction of the Scheme.

(b)     Payment of the AHG Work Fee represents recompense for the time and effort expended by the Ad Hoc Group in assisting with formulation of the Term Sheet and the Scheme in the interests of all Scheme Creditors and again does not confer any net benefit or disguised consideration on the members of the Ad Hoc Group; and

(c)     It is unlikely that a Scheme Creditor who considered the substantive aspects of the Schemes to be against their interests would be persuaded by payment of either or both the AHG Advisor Fees and the AHG Work Fee to vote in favour of the Scheme. This is because in the alternative to the Schemes, being an insolvent liquidation, the Scheme Creditors would receive returns that are lower than the anticipated returns under the Schemes. The AHG Work Fee is not therefore a material factor which would influence a Scheme Creditor's decision in relation to the Scheme.

## 13    SCHEME MEETING

13.1   The Company intends to hold the Scheme Meeting for the Scheme at the offices of Maples and Calder (BVI) at Ritter House Road Town Tortola, VG1110, British Virgin Islands.  Virtual attendance will be possible for any Scheme Creditors who are unable to attend in person.  Full details will be provided to the Scheme Creditors if, at the Convening Hearing, the Court grants an order convening the Scheme Meeting.

## 14    RESTRUCTURING EFFECTIVE DATE

14.1   The Scheme Consideration is provided to the Scheme Creditors who have submitted the relevant Scheme Creditor Forms by the applicable deadlines upon the Restructuring Effective Date in exchange for each Scheme Creditor agreeing that it shall fully release all of its claims against the Company in respect of the Existing Notes, the RSA and/or the Restructuring (subject to carve-outs for fraud, wilful default and wilful misconduct).

14.2   The "Restructuring Effective Date" shall occur after all of the conditions precedent to the Restructuring Effective Date have been satisfied or waived (as the case may be), including but not limited to the following:

(a)     the obtaining of all relevant approvals, pre-approvals or consents including, without limitation, delivery of respective court orders in respect of the Scheme and Chapter 15 Proceedings (as described in paragraph 18 below), and approval in principle for the listing and quotation of the New Instruments on the SGX-ST;

(b)     the settlement of all professional fees associated with the Restructuring that the Company has agreed to pay and that have been duly invoiced to the Company (including, but not limited to, the AHG Advisor Fees);

(c)     the payment of the AHG Work Fee; and

(d)     the satisfaction of each of the other specific conditions precedent contained in each of the relevant Restructuring Documents (as defined in the RSA) including the Scheme.

14.3    As at the date of this Letter, the Restructuring Effective Date is expected to occur on 2 October 2023, provided always that such date shall be no later than the longstop date (15 December) (the "**Longstop Date**"). If the Restructuring Effective Date has not occurred by the Longstop Date (being 15 December 2023, unless extended) the terms of the Scheme shall lapse and all compromises and arrangements provided by the Scheme shall have no force or effect.

## 15    HOW CREDITORS WILL BE AFFECTED BY THE SCHEME

15.1    If the Scheme becomes effective, all Scheme Creditors will be bound by the terms of the Scheme (whether or not they voted for or against the Scheme or at all).

15.2    The terms of the Scheme (including the documentation referred to in this Letter) will be included with the Scheme Documents (as defined in paragraph 19.1 below).

## 16    CONSEQUENCES IF THE SCHEME IS NOT SUCCESSFUL

16.1    Deloitte Advisory (Hong Kong) Limited ("**Deloitte**") has been engaged by the Company to carry out a detailed analysis that estimates the likely returns to Scheme Creditors should the Company be placed into liquidation proceedings (which in turn would trigger a Group-wide liquidation) (the "**Liquidation Analysis**"). This is considered by the Company to be the likely alternative in the event that the Schemes are unsuccessful. This is in light of the fact that the Company is insolvent.

16.2    If the Scheme is not implemented in accordance with its terms, the Company and other members of the Group are likely to be required to enter into liquidation proceedings.

16.3    The Liquidation Analysis outlines the estimated total recovery to the Scheme Creditors in the event of a liquidation of the Company and liquidations of other members of the Group in that scenario in order to meet the claims of Scheme Creditors.  The Liquidation Analysis will be made available to Scheme Creditors on the Transaction Website should the Court grant the order convening the Scheme Meeting.

16.4    For the avoidance of doubt, the returns to Scheme Creditors in a liquidation scenario are expected to be worse that what is being offered to Scheme Creditors pursuant to the terms of the Scheme.

## 17    COURT HEARINGS AND SCHEME CREDITORS' RIGHTS

17.1    As noted at paragraph 1.1 above, the Company intends to apply to the Court at the Convening Hearing to be held before the BVI Court on 24 July 2023 at 10 a.m. (BVI time) for an order granting directions in relation to the Scheme, including permission to convene a single meeting of Scheme Creditors for the purpose of considering and, if thought fit, approving, the Scheme.

17.2    Scheme Creditors, including Blocked Scheme Creditors, have the right to attend in person or through counsel[2] and make representations at the Convening Hearing, although they are not obliged to do so. Scheme Creditors (other than Blocked Scheme Creditors or Sanctioned Scheme

---

[2] Please note that a Scheme Creditor that is a company must be represented by a legal representative qualified to give BVI law advice.

14

Creditors) who wish to attend the Convening Hearing in person or through counsel should in the first instance contact the Information Agent (using the contact details below) to obtain instructions for attending the Convening Hearing preferably at least forty eight (48) hours prior to it. Blocked Scheme Creditors who wish to attend the Convening Hearing in person or through counsel should in the first instance contact GLAS (using the contact details below) to obtain instructions for attending the Convening Hearing preferably at least forty eight (48) hours prior to it. At the Convening Hearing, the Company will also draw to the Court's attention any material issues raised by Scheme Creditors in response to this Letter.

17.3    If the Scheme is approved by the requisite majorities at the Scheme Meeting, there will be a second and final Court hearing for the Scheme at which the Court will decide whether to exercise its discretion to sanction the Scheme. This second hearing is currently listed to be held on 4 September 2023 at 10 a.m. (BVI time) (the "**Sanction Hearing**").

17.4    Scheme Creditors will also have the opportunity to raise objections at the Sanction Hearing (if the Scheme is approved at the Scheme Meeting by the requisite majorities).

17.5    This letter is intended to provide Scheme Creditors with sufficient information regarding the Scheme and the Restructuring so that, should they wish to raise issues that relate to the jurisdiction of the Court to sanction the Scheme, or to argue that the proposals outlined above for the convening of the Scheme Meeting are inappropriate, or to raise any other issue in relation to the constitution of the Scheme Meeting, they may attend and be represented before the BVI Court at the Convening Hearing.

17.6    Issues which as to the proposed constitution of the Scheme Meeting or which otherwise affect the conduct of that meeting ("**Meeting Issues**") or which affect the jurisdiction of the Court to sanction the Scheme should be raised at the Convening Hearing. If they are not raised then, then if the such issues are sought to be raised at the Sanction Hearing, the Court may require good reason to be shown as why such issues were not raised at the Convening Hearing. Scheme Creditors should therefore raise any Meeting Issues or jurisdictional issues at the Convening Hearing.

17.7    **IMPORTANT: If any Scheme Creditor (with the exception of Blocked Scheme Creditors or Sanctioned Scheme Creditors) has comments as to the constitution of the Scheme Meeting which is proposed, wishes to raise any other issues with the Court, or wishes to participate at the Convening Hearing and, for that purpose, obtain a copy of the relevant Court papers, they should in the first instance contact the Information Agent using the contact details set out below as soon as possible.  Blocked Scheme Creditors should contact GLAS using the contact details set out below as soon as possible.**

18    **THE TRANSACTION WEBSITE, SCHEME INFORMATION AND COMMUNICATIONS WITH SCHEME CREDITORS**

18.1    Communications with Scheme Creditors will take place via the Transaction Website maintained by the Information Agent at https://projects.morrowsodali.com/evergrande.

18.2    The Information Agent has set up the Transaction Website to disseminate information in relation to the Scheme and to help facilitate the implementation of the Scheme. Scheme Creditors may download documents relating to the Scheme from the Transaction Website once they have registered their details via the registration page.

15

18.3    Scheme Creditors are encouraged to register their details on the Transaction Website so that they can receive notices from the Information Agent relating to the Scheme Meeting and other communications relating to the Scheme. Further, in the event that the Scheme will no longer proceed or will not become effective, Scheme Creditors will be notified by way of a notice published on the Scheme Website.

18.4    In addition to this Letter being delivered to the Clearing Systems for further distribution to the Scheme Creditors, the Information Agent will also make available an electronic copy of this Letter to all Scheme Creditors on the Transaction Website. Likewise, the Company will also make available an electronic copy of this Letter to all Scheme Creditors by announcement on CEG's website. The Company will also make an announcement on the HKEX news website of the SEHK with a link to the Transaction Website where this Letter can be accessed.

18.5    GLAS will send this Letter and all other communications directly to any known Blocked Scheme Creditors by email where the Company is in possession of their email addresses. The Company is not currently aware of any Blocked Scheme Creditors or Sanctioned Scheme Creditors.

18.6    You are advised that documents transmitted in electronic form may be altered or changed during the process of transmission and consequently the Information Agent nor any of its respective affiliates, directors, officers or employees, accept any liability or responsibility whatsoever in respect of any difference between the documents sent to you in electronic format and the version available to you for inspection on the Transaction Website.

18.7    Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers is acting for, or owes any duty to, any Scheme Creditor, nor will any of them be responsible for providing any advice to any Scheme Creditor in relation to the Scheme. Accordingly, neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers make any recommendations as to whether any Scheme Creditor should take any of the actions contemplated in the Scheme. The Information Agent expresses no opinion on the merits of the Scheme. The Information Agent has not been involved in negotiating or determining the terms of the Scheme and makes no representation that all relevant information has been disclosed to the Scheme Creditors in or pursuant to the Scheme. Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers has verified, or assumes any responsibility or liability for the accuracy or completeness of any of the information concerning the Scheme, or any factual statements contained in, or the effect or effectiveness of, the Scheme.

18.8    Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers will have any tortious, contractual or any other liability to any person in connection with the determination of whether a Scheme Creditor is a Blocked Scheme Creditor. Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers will accept any liability whatsoever to any person, regardless of the form of action, for any lost profits or lost opportunity, or for any indirect, special, consequential, incidental or punitive damages arising from the determination of whether a Scheme Creditor is a Blocked Scheme Creditor, even if the Information Agent or any of its directors, officers, employees, agents, affiliates or advisers have been advised of the possibility of such damages.

18.9    Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers is obliged, under the terms of the Scheme or otherwise, to engage in any transaction or conduct that may give rise to a liability under or in connection with Applicable Sanctions and/or may result in any person becoming a sanctioned person.

18.10   If compliance with any obligations under the terms of the Scheme or otherwise would result in the Information Agent or any of its directors, officers, employees, agents, affiliates or advisers breaching Applicable Sanctions, that obligation need not be complied with (but only to the extent of the breach).

18.11   Under no circumstances will the Information Agent be required to verify or determine the eligibility of any Scheme Creditor in relation to the Scheme. The Information Agent will check Scheme Claims against Custody Instructions and against the records of Scheme Creditors provided to the Information Agent by the Company. The Information Agent will assist the Company and the chairperson in checking the voting values of each Scheme Creditor (who is not a Blocked Scheme Creditor) based on such information.

## 19   APPOINTMENT OF FFP (BVI) LIMITED

19.1   On 26 June 2023, the Company appointed FFP to act in connection with the Scheme and the Restructuring. This role includes acting as the Company's BVI information agent (the "**BVI Information Agent**"), receiving notices on behalf of the Company.

19.2   For the avoidance of doubt, Morrow Sodali as the Information Agent provides the primary contact for Scheme Creditors seeking information in relation to the Explanatory Statement, the Scheme, or the Restructuring. Morrow Sodali will be managing the voting process for the Scheme. FFP's appointment as BVI Information Agent provides an additional point of contact in the BVI and during BVI working hours for Scheme Creditors to obtain information regarding the Scheme and the Restructuring on non-voting related matters.

19.3   Also as part of FFP's role, Anna Silver, a BVI resident licensed insolvency practitioner, will act as a contractually appointed scheme supervisor (the "**Scheme Supervisor**"). The Scheme Supervisor will chair the Scheme Meeting, be granted a limited Power of Attorney for the purpose of executing the Deed of Release on behalf of the Scheme Creditors and act as the Company's Foreign Representative in relation to cross-border recognition of the Scheme in the United States.

## 20   CROSS-BORDER RECOGNITION

20.1   The Company, pursuant to the Scheme, will appoint the Scheme Supervisor on and in connection with an application for recognition and assistance in relation to the Scheme in the United States of America Bankruptcy Court pursuant to Chapter 15 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended) (the "**Chapter 15 Proceedings**").  The Chapter 15 Proceedings are necessary in order to ensure the discharge of the Company's New York law governed Scheme Debts as a matter of New York law.  The Company does not currently intend to seek recognition of the Scheme in any other jurisdictions, but this may be subject to change in future.

## 21   NEXT STEPS

21.1   If permission to convene the Scheme Meeting is granted by the Court at the Convening Hearing, the Information Agent will make available to you via the Transaction Website the following important documents in electronic format:

(a)   a notice convening the Scheme Meeting;

(b)   the Explanatory Statement;

17

(c)      the relevant "**Scheme Creditor Forms**" will be available for reference, although all Scheme Creditors (who are not Blocked Scheme Creditors or Sanctioned Scheme Creditors) must complete the applicable Scheme Creditor Forms online via the Portal (defined below) being –

(i)      in respect of Scheme Creditors that are not Blocked Scheme Creditors or Sanctioned Scheme Creditors, an "Account Holder Letter" containing, amongst other things, a form of proxy and a voting form to vote on the Scheme, and a securities confirmation form for the Noteholders to confirm their eligibility to receive the New Notes; and

(ii)     in respect of Blocked Scheme Creditors, a "Blocked Scheme Creditor Form" being the form to permit Blocked Scheme Creditors to vote on the Scheme and claim Scheme Consideration,

in each case (other than for Blocked Scheme Creditors) together with a distribution confirmation deed and designated recipient form (if applicable) (all such forms set out in this section will be included with the Solicitation Packet); and

(d)      the Scheme and any accompanying documents,

(together, the "**Scheme Documents**").

21.2    If you are a Scheme Creditor (who is neither a Blocked Scheme Creditor nor a Sanctioned Scheme Creditor) and wish to attend the Convening Hearing, or have any questions in relation to this Letter or the Scheme, you should, in the first instance, contact the Information Agent (or failing that the BVI Information Agent) preferably at least 48 hours prior to it using the contact details below:

| | |
|---|---|
| Name: | **Morrow Sodali** |
| Attention: | Debt Services Team |
| Telephone: | in Hong Kong +852 2319 4130; in London: +44 20 4513 6933 |
| Email: | evergrande@investor.morrowsodali.com |
| Transaction Website: | https://projects.morrowsodali.com/evergrande |
| Portal: | https://portal.morrowsodali.com/EvergrandeScheme |

All Scheme Creditors (and designated recipients, if applicable) will need to hold an account (directly or through the intermediary chain) with an account holder or custodian which itself holds an account  with the Clearing Systems in order to receive the New Notes and the Consent Fee (if applicable). To the extent that they do not already have such an account, all Scheme Creditors, and designated recipients (if applicable) are advised to open an account with the Euroclear (if possible) or Clearstream (including many custodian banks and certain other financial institutions) as soon as possible, and in any event, by the relevant Bar Date. If you are unable to open a Clearing Systems account and are not a Blocked Scheme Creditor or Sanctioned Scheme Creditor, please contact the Information Agent immediately.

**FFP (BVI) Limited**

| Address: | 2nd Floor Water's Edge, Wickhams Cay II, Road Town, Tortola, British Virgin Islands |
|---|---|
| Attention: | Anna Silver/Bjorn Bullock |
| Telephone: | +1 284 494 2715 |
| Email: | info-sceneryjourney@ffp.vg |

21.3    If you are a Blocked Scheme Creditor and wish to attend the Convening Hearing or have any questions in relation to this Letter or the Scheme, you should, in the first instance, contact GLAS preferably at least forty eight (48) hours prior to the Convening Hearing using the contact details below:

| Name: | GLAS Specialist Services Limited |
|---|---|
| Address: | 55 Ludgate Hill, Level 1, West, London, EC4M 7JW |
| Email: | lm@glas.agency |
| Attention: | Liability Management Team |

21.4    The Company considers that the Scheme is in the best interests of the Scheme Creditors. As explained above, any failure to conclude the Scheme is likely, in the view of the Company's board of directors, to force the Company and other the companies within the Group to enter into an insolvency procedure in the near future.

21.5    For this reason, all Scheme Creditors are encouraged to support and vote in favour of the Scheme.


Yours faithfully,

…………………………………………………

Authorised Signatory of the Company

19

**APPENDIX 1**

**Execution Version**
签署版本

**Scenery Journey Limited**

景程有限公司

**("SJ")**

（"景程"）

**Restructuring Term Sheet**

重组条款清单

**20 March 2023 (as amended to the date of the Restructuring Support Agreement)**

**2023 年 3 月 20 日（经修订至重组支持协议之日）**

This term sheet ("**this SJ Term Sheet**") signed and dated 20 March 2023, between SJ and the SJ AHG (together, the "**Parties**"), sets forth certain material terms and conditions in connection with the proposed restructuring of the SJ Existing Notes which will be consistent in all material respects with this SJ Term Sheet (the "**Restructuring**").

本条款清单（"**本景程条款清单**"）的签署日期为2023年3月20 日，由景程和景程持有人特别团体（统称为"**当事方**"）签署，列明了与将在所有重大方面与本景程条款清单一致的景程现有票据的拟议重组（"**重组**"）有关的某些重大条款和条件。

The execution of this SJ Term Sheet by the Parties signifies a substantial positive milestone in achieving the Restructuring and is representative of the Parties' significant practical progress towards achieving the Restructuring.

当事方签署本景程条款清单，标志着重组实现了重大而积极的里程碑，代表着当事方在实现重组方面取得了重大的实际进展。

This SJ Term Sheet forms the basis of the agreement between the Parties and the Parties accordingly agree and undertake to work together in good faith and use best endeavours to (a) agree further detailed terms in the restructuring support agreement (the "**RSA**"), and (b) subsequently conclude further agreements and scheme documentation as necessary to effect the Restructuring, such that they are consistent in all material respects with this SJ Term Sheet (though this shall not require a creditor who is a Party to make any payment or incur out of pocket expenses). The Parties acknowledge and agree that this SJ Term Sheet records certain key agreed commercial provisions only, and that no other terms and conditions should be implied. It is intended that the Restructuring shall be facilitated by way of the RSA and subsequent further agreements and scheme documentation as necessary to effect the Restructuring. SJ will procure TJ and the subsidiary guarantors (the "**SJ Subsidiary Guarantors**") of the SJ Existing Notes to comply with this SJ Term Sheet in connection with the Restructuring.

本景程条款清单构成当事方之间协议的基础，因此，当事方同意并承诺真诚合作并尽最大努力，以（a）在重组支持协议（"**重组支持协议**"）中商定更详细的条款，并（b）随后签署实行重组所需的进一步协议和协议安排文件，以使其在所有重大方面与本景程条款清单保持一致（但这不应要求作为当事方的债权人支付任何款项或产生开支）。当事方承认

并同意，本景程条款清单仅记录某些经商定的关键商业条款，不应暗示其他任何条款和条件。重组旨在通过重组支持协议及随后为实现重组所需的进一步协议及协议安排文件来促进。景程将促使天基和景程现有票据的担保子公司（"**景程担保子公司**"）在重组中遵守本景程条款清单。

This SJ Term Sheet does not constitute an offer to sell or a solicitation of an offer to buy any securities in the United States or any other jurisdiction. No securities may be offered or sold in the United States absent registration or an applicable exemption from registration requirements. Any public offering of securities to be made in the United States will be made by means of a prospectus. Such prospectus will contain detailed information about SJ, TJ and their management, as well as financial statements. No public offer of securities is to be made by SJ and TJ or any of the SJ Subsidiary Guarantors in the United States.

本景程条款清单并不构成在美国或任何其他司法管辖区销售任何证券的要约或对购买任何证券的要约的招揽。如果没有登记或没有适用的对登记要求的豁免，不得在美国发行或销售证券。任何在美国进行的证券公开发售都将以证券发行说明书的形式进行。此种证券发行说明书书将包含有关景程和天基及其各自管理层的详细信息及财务报表。景程和天基或任何景程担保子公司将不会在美国公开发售证券。

This SJ Term Sheet is not a prospectus for the purposes of Regulation (EU) 2017/1129, including as it forms part of domestic law in the United Kingdom by virtue of the European Union (Withdrawal) Act 2018, as amended by the European Union (Withdrawal Agreement) Act 2020.

本景程条款清单并不是针对第2017/1129号条例（EU）（包括根据《2018年欧盟（退出）法案》（经《2020年欧盟（退出协议）法案》修订）构成英国国内法律的一部分）而言的证券发行说明书。

## PART A: PRINCIPAL TERMS OF THE SJ PROPOSED RESTRUCTURING
### A 部分：景程拟议重组的主要条款

| GENERAL INFORMATION<br>一般信息 | |
|---|---|
| **TJ**<br>天基 | "**TJ**" means Tianji Holding Limited, a company incorporated in Hong Kong with limited liability.<br>"**天基**"指天基控股有限公司，一家在香港注册的有限责任公司。 |
| **SJ**<br>景程 | "**SJ**" means Scenery Journey Limited, a company incorporated in the British Virgin Islands with limited liability.<br>"**景程**"指景程有限公司，一家在英属维尔京群岛注册的有限责任公司。 |
| **CEG**<br>恒大 | "**CEG**" means China Evergrande Group, an exempted company incorporated in the Cayman Islands with limited liability.<br>"**恒大**"指中国恒大集团，一家在开曼群岛注册成立的获豁免有限公司。 |
| **Group**<br>集团 | "**Group**" means TJ and its subsidiaries from time to time.<br>"**集团**"指天基及其各时期下的子公司。 |
| **AHG**<br>持有人特别团体 | "**AHG**" means the ad hoc group of holders of the SJ Existing Notes or the offshore notes issued by CEG or investment managers for or investment advisers to certain holders of the SJ Existing Notes or the offshore notes issued by CEG as constituted from time to time, who are advised by the AHG Advisers.<br>"**持有人特别团体**"指景程现有票据持有人或恒大发行的境外票据持有人，或某些景程现有票据持有人或恒大发行的境外票据持有人的投资经理或投资顾问，在各时组成的特别团体，且该特别团体由持有人特别团体顾问提供建议。 |
| **AHG Advisers**<br>持有人特别团体顾问 | "**AHG Advisers**" means Moelis & Company, Kirkland & Ellis and other professional advisers as the AHG may appoint from time to time.<br>"**持有人特别团体顾问**"指美驰、凯易和持有人特别团体各时任命的其他专业顾问。 |
| **SJ AHG**<br>景程持有人特别团体 | "**SJ AHG**" means the ad hoc group of holders of the SJ Existing Notes or investment managers for or investment advisers to certain holders of the SJ Existing Notes as constituted from time to time, who are advised by the AHG Advisers. The members of the SJ |

| | |
|---|---|
| | AHG (each an "**SJ AHG Member**", and collectively the "**SJ AHG Members**") as of the date of this SJ Term Sheet are listed in Schedule 1 (*SJ AHG*).<br><br>"**景程持有人特别团体**" 指由景程现有票据持有人或某些景程现有票据持有人的投资经理或投资顾问各时期组成的特别团体，且该团体由持有人特别团体顾问提供建议。截至本景程条款清单之日的景程持有人特别团体成员（每一位均为"**景程持有人特别团体成员**"，统称"**景程持有人特别团体成员**"）列表见附表 1（*景程持有人特别团体*）。 |
| **SJ PROPOSED RESTRUCTURING**<br><br>景程拟议重组 | |
| **SJ Proposed Restructuring**<br><br>景程拟议重组 | The "**SJ Proposed Restructuring**" is expected to involve a compromise of all claims against (among others) SJ, the SJ Subsidiary Guarantors and their respective subsidiaries, shareholders (excluding TJ and its shareholders), officers, directors, advisers, representatives and office-holders under, or in connection with, the SJ Existing Notes, in exchange for the SJ Restructuring Consideration in accordance with the terms of the composite documents to be circulated by SJ and/or TJ to the SJ Scheme Creditors in relation to the SJ Scheme(s) (which will include (among other things) an explanatory statement and the terms of the SJ Scheme(s)) (collectively, the "**Scheme Documents**") (subject to carve outs for fraud, dishonesty, wilful default and wilful misconduct). For the avoidance of doubt, all claims against TJ under the SJ Existing Notes will not be released under the SJ Proposed Restructuring.<br><br>"**景程拟议重组**" 预计将涉及妥协基于或与景程现有票据相关的针对景程、景程担保子公司及其各自的子公司、股东（天基及其股东除外）、高管、董事、顾问、代表和高管人员（及其他）的所有索偿，以换取根据景程和/或天基将分发给景程协议安排债权人的与景程协议安排有关的汇总文件（其中将包括解释性声明和景程协议安排的条款（及其他））（统称为"**协议安排文件**"）的条款所设定的景程重组对价（受限于欺诈、不诚实、故意违约和故意不当行为的例外情况）。为避免疑义，景程现有票据下所有对天基的索偿不会在景程拟议重组下得到解除。<br><br>SJ plans to implement the SJ Proposed Restructuring through, *inter alia*, a scheme of arrangement in the British Virgin Islands and/or other applicable jurisdictions (each an "**SJ Scheme**"). |

|  | 景程计划通过，*其中包括*，在英属维尔京群岛和/或其他适用的司法管辖区的协议安排实施景程拟议重组（"**景程协议安排**"）。 |
|---|---|
|  | The British Virgin Islands scheme of arrangement will be governed by the laws of British Virgin Islands and subject to the exclusive jurisdiction of the courts of British Virgin Islands. A scheme of arrangement in any other jurisdiction will be governed by the laws of such jurisdiction and subject to the exclusive jurisdiction of the courts in that jurisdiction. |
|  | 英属维尔京群岛的重组协议将适用英属维尔京群岛法律，并受英属维尔京群岛法院的专属管辖。任何其他司法管辖区的重组协议将适用该司法管辖区的法律，并受该司法管辖区法院的专属管辖。 |
| **SJ Existing Notes**<br>**景程现有票据** | All of the following notes, which are governed by New York law, issued by SJ and unconditionally and irrevocably guaranteed by TJ and the SJ Subsidiary Guarantors (collectively, the "**SJ Existing Notes**"): |
|  | 适用纽约法律，由景程发行，并由天基和景程担保子公司无条件且不可撤销地担保的以下所有票据（统称为"**景程现有票据**"）： |
|  | (a) The 11.5% senior notes due October 24, 2022 (the "**SJ Existing October 2022 Notes**") (ISIN: XS2109191986, Common Code: 210919198). As of the date of this SJ Term Sheet, the aggregate principal amount of the SJ Existing October 2022 Notes outstanding is US$1,999,000,000; |
|  | 2022 年 10 月 24 日到期的 11.5% 优先票据（"**景程现有2022 年 10 月票据**"）（ISIN：XS2109191986，通用代码：210919198）。截至本景程条款清单之日，景程现有 2022 年 10 月票据的未偿还本金总额为 1,999,000,000 美元； |
|  | (b) The 13.0% senior notes due November 6, 2022 (the "**SJ Existing November 2022 Notes**") (ISIN: XS1903671854, Common Code: 190367185). As of the date of this SJ Term Sheet, the aggregate principal amount of the SJ Existing November 2022 Notes outstanding is US$644,000,000; |
|  | 2022 年 11 月 6 日到期的 13.0% 优先票据（"**景程现有2022 年11月票据**"）（ISIN：XS1903671854，通用代码：190367185）。截至本景程条款清单之日，景程现有 2022 年 11 月票据的未偿还本金总额为 644,000,000 美元； |

| | |
|---|---|
| | (c) The 12.0% senior notes due October 24, 2023 (the "**SJ Existing October 2023 Notes**") (ISIN: XS2109192109, Common Code: 210919210). As of the date of this SJ Term Sheet, the aggregate principal amount of the SJ Existing October 2023 Notes outstanding is US$1,994,000,000; and |
| | 2023 年 10 月 24 日到期的 12.0% 优先票据（"**景程现有 2023 年 10 月票据**"）（ISIN：XS2109192109，通用代码：210919210）。 截至本景程条款清单之日，景程现有 2023 年 10 月票据的未偿还本金总额为 1,994,000,000 美元；及 |
| | (d) The 13.75% senior notes due November 6, 2023 (the "**SJ Existing November 2023 Notes**") (ISIN: XS1903671938, Common Code: 190367193). As of the date of this SJ Term Sheet, the aggregate principal amount of the SJ Existing November 2023 Notes outstanding is US$589,000,000. |
| | 2023 年 11 月 6 日到期的 13.75%优先票据（"**景程现有 2023 年 11 月票据**"）（ISIN：XS1903671938，通用代码：190367193）。 截至本景程条款清单之日，景程现有 2023 年 11 月票据的未偿还本金总额为 589,000,000 美元。 |
| **SJ Scheme Creditors (and each, an SJ Scheme Creditor)** 景程协议安排债权人（且每位均为，景程协议安排债权人） | "**SJ Scheme Creditors**" means the persons holding beneficial interests as principal in any of the SJ Existing Notes as at the SJ Voting Record Time. "**景程协议安排债权人**" 指截至景程投票记录时间，以主体身份持有任何景程现有票据实益权益者。 "**SJ Voting Record Time**" means the time designated by SJ for the determination of the claims of the SJ Scheme Creditors for the purposes of voting at the SJ Scheme Creditors' meeting in respect of the SJ Scheme convened pursuant to orders of the court(s) (and any adjournment of such meetings). "景程投票记录时间" 指景程为确定景程协议安排债权人的索偿而指定的时间，其用意是在根据法院命令召集有关景程协议安排的景程债权人会议（以及该等会议的任何延期会议）上进行投票。 |
| **SJ Scheme Creditors' Voting Claims and SJ Scheme Creditor's Entitlement** 景程协议安排债权人的表决权和景程协议安排债权人的可获偿金额 | For the purpose of voting on the SJ Scheme(s) at the SJ Scheme Creditors' meetings convened pursuant to orders of the court(s) (and any adjournment of such meetings), the value of each "**SJ Scheme Creditor's Voting Claim**", shall be the sum of: 为了在根据法院命令召开的景程协议安排债权人会议（以及这些会议的任何延期会议）上对景程协议安排进行投票表 |

决，每项 "**景程协议安排债权人的表决权**" 的价值，应是以下各项的总和：

(a) the outstanding principal amount of the SJ Existing Notes held by the SJ Scheme Creditor at the SJ Voting Record Time; and

景程协议安排债权人截至景程投票记录时间所持有的景程现有票据的未偿还本金金额；和

(b) all accrued and unpaid interests on the SJ Existing Notes held by the SJ Scheme Creditors up to (but excluding) the SJ Voting Record Time.

由景程协议安排债权人持有的景程现有票据的截至（但不包括）景程投票记录时间所有应计且未付利息。

<u>Determining SJ Restructuring Considerations for an SJ Scheme Creditor</u>
<u>确定景程协议安排债权人的景程重组对价</u>

For the purpose of <u>distribution</u> of the SJ Restructuring Consideration, the principles for determining the value of each "**SJ Scheme Creditor's Entitlement**" shall be on a "**Deficiency Basis**" with regard to the third-party (i.e., non-scheme company) rights relating to the debt. To illustrate, an SJ Scheme Creditor's Entitlement shall be in an amount equal to: (x) the sum of (1) the outstanding principal amount of the SJ Existing Notes held by the SJ Scheme Creditor at the SJ Entitlement Record Time, and (2) accrued and unpaid interest on such SJ Existing Notes up to (but excluding) the RED; minus (y) the assessed value of any related rights (whether principal, guarantee or collateral support) which are: (i) against any party who is not SJ, SJ Subsidiary Guarantor or keepwell provider but is an obligor or provides credit support; and (ii) in connection with such SJ Existing Notes. Each SJ Scheme Creditor will receive a pro rata portion of the SJ Restructuring Consideration (pro-rated across each of the five tranches of the SJ New Notes) based on its SJ Scheme Creditor's Entitlement.

为<u>分配</u>景程重组对价，每位 "**景程协议安排债权人的可获偿金额**" 的价值的确认原则应根据针对与债务相关之第三方（即非协议安排公司）权利的 "**差额基础**" 来确认。示例而言，一位景程协议安排债权人的可获偿金额应等于：（x）（1）截至景程可获偿金额记录时间景程协议安排债权人持有的景程现有票据的未偿还本金金额，及（2）截至（但不包括）重组生效日景程现有票据的应计且未付利息之和；减去（y）任何相关权利（无论是本金、担保或质押物支持）

|  | 的估值，这些权利：（i）针对任何景程、景程担保子公司或维好提供者之外的义务人或提供信贷支持的一方；以及（ii）与该等景程现有票据有关。每位景程协议安排债权人将根据景程协议安排债权人的可获偿金额，按比例获得景程重组对价（五笔景程新票据的每一笔都按比例分配）的一部分。 |
|  | The determination of an SJ Scheme Creditor's Entitlement can take place after the sanction of the SJ Scheme(s) by way of a valuation and adjudication procedure to be agreed and set out in the Scheme Documents (involving, as applicable, sufficiently independent scheme administrator and an independent adjudicator in case of objection to be agreed between SJ and the SJ AHG). |
|  | 景程协议安排债权人的可获偿金额，可在协议安排获得批准后，通过协议安排文件中商定和规定的估值和裁决程序进行确认（按所适用的，将包含由景程和景程持有人特别团体商定一位充分独立的协议安排管理人及在出现反对意见的情况下，一位独立裁决人）。 |
|  | "**SJ Entitlement Record Time**" means the 'as of' time designated by SJ for the determination of entitlements of the SJ Scheme Creditors for the purposes of distribution of consideration after sanction of the SJ Scheme(s) on or prior to the RED. |
|  | "**景程可获偿金额记录时间**"指在协议安排批准后，重组生效日当日或之前，景程为确定债权人的可获偿金额以分配对价而指定的'截止时间'。 |

| **SJ RESTRUCTURING CONSIDERATION** | |
| **景程重组对价** | |

| SJ **Restructuring** **Consideration**<br><br>景程重组对价 | "**SJ Restructuring Consideration**" means the five tranches of new notes to be issued by SJ in an aggregate principal amount equal to US$6,500 million (the "**SJ New Notes**"), the terms of which as set forth in Schedule 2 (*SJ New Notes Short Form Term Sheet*).<br><br>"**景程重组对价**"指景程所发行的五笔新票据，其本金总额为65亿美元（"**景程新票据**"），其条款如附表2（*景程新票据简版条款清单*）所载。 |
| **AHG Advisers Fee**<br><br>持有人特别团体顾问费用 | All fees, costs and expenses incurred by each AHG Adviser are to be paid to such adviser in accordance with the terms set out in the relevant fee letter(s) entered into between such adviser and CEG. |

| | |
|---|---|
| | 每位持有人特别团体顾问产生的所有费用、成本和支出将根据该顾问和恒大之间签订的相关费用函中规定的条款支付给该顾问。 |
| **SJ AHG Work Fee**<br>景程持有人特别团体工作费 | To be set out in a separate SJ AHG work fee letter.<br>将在另外的景程持有人特别团体工作费用函中列出。 |
| **SUPPORT FOR RESTRUCTURING**<br>对重组的支持 | |
| **Support**<br>支持 | Subject to the Limitations and the terms of the RSA, SJ and each SJ Scheme Creditor acceding to the RSA (the "**SJ Participating Creditors**") intend to, with respect to the SJ Existing Notes, among other things:<br>受限于限制和重组支持协议的条款，就景程现有票据而言，景程和每位加入重组支持协议的景程协议安排债权人（"**景程参与债权人**"）的意图为（以及其他事项）：<br><br>(a) assist, cooperate and take all steps as may be necessary or desirable to implement or consummate the SJ Proposed Restructuring in a timely manner;<br>协助、合作并采取一切可能必要或适宜的步骤，及时实施或完成景程拟议重组；<br>(b) not take, encourage, assist or support (or procure that any other person takes, encourages, assists or supports) any action which would, or would reasonably be expected to, breach or be inconsistent with this SJ Term Sheet taken as a whole, or delay, impede or prevent the implementation or consummation of the SJ Proposed Restructuring;<br>不采取、鼓励、协助或支持（或促使任何其他人采取、鼓励、协助或支持）任何会或合理预期会违反或不符合本景程条款清单整体的行动，或拖延、阻碍或阻止景程拟议重组的实施或完成；<br>(c) in the case of SJ, procure that each other member of the Group does the same in respect of clauses (a) and (b) above;<br>就景程而言，促使集团的其他每一位成员对上述第（a）和（b）项采取同样的措施；<br>(d) not solicit, encourage, facilitate, consent to or enter into any proposal or transaction for the restructuring of the SJ Existing Notes other than the SJ Proposed Restructuring; and<br>不征求、鼓励、促进、同意或进行除景程拟议重组以外的有关景程现有票据的重组的任何方案或交易；及 |

| | |
|---|---|
| | (e) in the case of each SJ Participating Creditor, provide reasonable assistance to SJ and any other member of the Group (in each case, at SJ's cost) in defending against any adverse action taken by another creditor which may delay, impede or prevent the implementation or consummation of the SJ Proposed Restructuring, including without limitation: (i) confirming that such SJ Participating Creditor supports the SJ Proposed Restructuring; and (ii) preparing and filing any submission or appearing at any court proceeding which is reasonably requested by any member of the Group and is necessary or desirable to support, facilitate, implement, consummate or otherwise give effect to the SJ Proposed Restructuring. <br><br> 就每一位景程参与债权人而言，向景程和集团的任何其他成员提供合理的协助（在每种情况下，都由景程承担费用），以抵御其他债权人采取的可能延迟、阻碍或阻止景程拟议重组的实施或完成的任何不利行动，包括但不限于：（i）确认该景程参与债权人支持景程拟议重组；以及（ii）准备和提交集团任何成员合理要求的对支持、促进、实施、完成或以其他方式实现景程拟议重组而言必要或可取的任何呈件或出席任何法院程序。 |
| **Limitations** <br><br> 限制 | Nothing in this SJ Term Sheet shall, among others: <br><br> 本景程条款清单中的任何内容均不得，包括以下及其他： <br><br> (a) require either SJ, any other member of the Group, or any SJ Participating Creditor (or any of their, and/or their respective managers' or investment advisers', respective affiliates or funds) to take any action which would breach any legal or regulatory requirement beyond its control or any order or direction of any relevant court or governmental body, and which impediment cannot be avoided or removed by taking reasonable steps; <br><br> 要求景程、集团的任何其他成员或任何景程参与债权人（或任何他们的，和/或他们各自的管理人或投资顾问的，各自的关联人士或基金）采取任何行动，违反任何在其控制之外的法律或监管规定或任何有关法院或政府机构的任何命令或指示，并且该障碍无法通过采取合理措施来避免或消除； <br><br> (b) restrict, or attempt to restrict, any officer of any member of the Group from complying with any legal or fiduciary duty or obligation to commence insolvency proceedings in respect of that entity; |

<table>
<tr>
<td></td>
<td>限制或试图限制集团任何成员的任何职员遵守任何法律或信托责任或义务，对该实体启动破产程序；</td>
</tr>
<tr>
<td></td>
<td>(c) require SJ, any other member of the Group, or any SJ Participating Creditor (or any of their, and/or their respective managers' or investment advisers', respective affiliates or funds) to make any payment or incur or take any action that would result in it incurring any out-of-pocket expense or other financial obligation, or to incur any liability to any person other than as expressly set out in this SJ Term Sheet; or

除了本景程条款清单中明确规定的，要求景程、集团的任何其他成员或任何景程参与债权人（或任何他们的，和/或他们各自的管理人或投资顾问的，各自的关联人士或基金）支付任何款项或招致或采取任何行动，导致其产生任何实付费用或其他财务义务，或对任何人产生任何责任；或

(d) require SJ or any SJ Participating Creditor (or any of their, and/or their respective managers' or investment advisers', respective affiliates or funds) to make any additional equity or debt financing available to any member of the Group other than as expressly set out in this SJ Term Sheet,

除了本景程条款清单中明确规定的，要求景程或任何景程参与债权人（或任何他们的，和/或他们各自的管理人或投资顾问的，各自的关联人士或基金）向集团的任何成员提供任何额外的股权或债务融资，

(each a "**Limitation**" and together the "**Limitations**").

（各自为一项"**限制**"，统称"**限制**"）。</td>
</tr>
<tr>
<td colspan="2">**MILESTONES AND RESTRUCTURING EFFECTIVE DATE**
里程碑与重组生效日期</td>
</tr>
<tr>
<td>**Milestones**
里程碑</td>
<td>SJ shall ensure or procure that each of the following conditions are satisfied on or before the specified date below (each of the following, a "**Restructuring Milestone**"):

景程应确保或促使以下各项条件在以下指定日期当日或之前得到满足（以下各项皆为一项"**重组里程碑**"）：

(a) By no later than 22 March 2023, unless otherwise agreed between SJ and the SJ AHG (which can be by email through their respective advisers), CEG to publish a cleansing statement containing Sufficient Disclosure (including with respect to (i) (if agreed) the restructuring term sheets relating to the offshore indebtedness of CEG; (ii) this SJ Term Sheet; (iii) (if agreed) the restructuring term sheet relating to TJ's</td>
</tr>
</table>

|  | offshore indebtedness and (iv) any other relevant information received by the SJ AHG). For the purpose of this provision, "**Sufficient Disclosure**" has the meaning given to it in the non-disclosure agreements dated 6 December 2022 and 9 January 2023 entered into between CEG and certain members of the AHG (the "**NDA**" which continues in full force and effect in accordance with the terms of the NDA). 不迟于 2023 年 3 月 22 日，除非景程与景程持有人特别团体双方另有约定（可通过各自的顾问以电子邮件的方式进行），恒大发布一份包含充分披露的脱敏声明（包括有关（i）（如已商定）有关恒大境外负债的重组条款清单；（ii）本景程条款清单；（iii）（如已商定）有关天基境外负债的重组条款清单；以及（iv）景程持有人特别团体收到的任何其他相关信息）。就本条款而言，"**充分披露**"的定义依据恒大与持有人特别团体某些成员于 2022 年 12 月 6 日和 2023 年 1 月 9 日签订的保密协议（"**保密协议**"，根据保密协议条款继续完全有效）。 |
| (b) | By no later than 31 March 2023 (provided that no additional or long-form term sheet (other than this SJ Term Sheet) is required), SJ and other relevant members of the Group to (i) enter into an RSA in form and substance satisfactory to the SJ AHG (acting reasonably) with the SJ AHG in relation to the restructuring of the offshore indebtedness of the Group and (ii) announce the signed RSA to the market on the website of The Stock Exchange of Hong Kong Limited and through the clearing systems. 不迟于 2023 年 3 月 31 日（前提是不需要额外的或长版条款清单（除本景程条款清单之外）），景程和集团的其他相关成员（i）就重组集团的境外债务与景程持有人特别团体签订形式和内容令景程持有人特别团体（在合理行事之下）满意的重组支持协议，以及（ii）在香港联合交易所有限公司网站并通过清算系统向市场发布公告已签署的重组支持协议。 |
| (c) | By no later than 31 March 2023, SJ to reach a written agreed general position or schedule with the SJ AHG on (i) a whitelist of potential scheme administrators and adjudicators; and (ii) high-level principles and high-level process relating to the valuation and adjudication in respect of the SJ Scheme, in each case, in form and substance satisfactory to the SJ AHG and SJ, both acting reasonably (with the details to be agreed in the Scheme Documents). 不迟于 2023 年 3 月 31 日，景程与景程持有人特别团体就（i）潜在的协议安排管理人和裁决人的白名单；以及 |

|  | （ii）有关景程协议安排的评估和裁决的概括性原则和概括性程序在书面上达成大致立场或时间表的协议，两者的形式和内容均应令景程持有人特别团体和景程都在合理行事之下满意（细节将在协议安排文件中商定）。<br><br>Each of the Restructuring Milestones can be extended with the written agreement of the SJ AHG (which can be by email through its advisers).<br><br>每项重组里程碑都可在景程持有人特别团体的书面同意下延长（可通过其顾问以电子邮件的方式进行）。 |
|---|---|
| **Conditions Precedent**<br>**前提条件** | The following conditions must be satisfied or waived by the relevant regulator or court, the recipients of the relevant fees or the SJ AHG (acting reasonably), as applicable, prior to or on the RED:<br>以下条件必须在重组生效日之前或当日得到满足或由相关监管机构或法院或相关费用的接收方或在合理行事之下的景程持有人特别团体（按所适用的）予以豁免：<br><br>(a) the delivery by the relevant members of the Group of corporate authorisations in respect of the SJ Proposed Restructuring and their entry into the Scheme Documents to which they are a party;<br>集团的相关成员就景程拟议重组交付公司授权书，并签署其作为一方的协议安排文件；<br><br>(b) the obtaining, if and as applicable, of all relevant regulatory approvals or other consents (including, without limitation, delivery of relevant court sanction orders in respect of the SJ Scheme(s), any relevant shareholders' approval, and the Singapore Stock Exchange's or another internationally recognized exchange's approvals in-principle for the listing of and permission to deal in each of the SJ Restructuring Consideration (where applicable);<br>获得所有适用及相关的监管批准或其他同意（包括但不限于交付有关景程协议安排的相关法院批准令、任何相关股东的批准，以及新加坡交易所或另一个国际公认的交易所对每项景程重组对价（按所适用的）的上市和交易许可的原则性批准）；<br><br>(c) the obtaining of the relevant court sanction order(s) in respect of the TJ Scheme and the TJ Scheme becoming effective in accordance with the terms of the TJ Scheme;<br>获得关于天基协议安排的相关法院批准令，且天基协议安排按照天基协议安排的条款生效；<br><br>(d) the settlement in full of all fees and expenses (including, without limitation, the AHG Advisers Fee and the SJ AHG |

| | |
|---|---|
| | Work Fee) payable under contracts or other arrangements entered into by any member of the Group or CEG with financial or legal advisers, members of the SJ AHG or other professional parties for their work or services rendered in relation to the SJ Proposed Restructuring; |
| | 全额结清集团任何成员或恒大与财务或法律顾问、景程持有人特别团体或其他专业人士就其提供的与景程拟议重组有关的工作或服务所签订的合同或其他安排下的所有应付费用和开支（包括但不限于，持有人特别团体顾问费用及景程持有人特别团体工作费）； |
| | (e) each key document (scope to be agreed in the RSA) to be entered into by certain parties to implement the terms of the SJ Proposed Restructuring are in the form agreed in writing between SJ and the SJ AHG (or the AHG Advisers expressly on their behalf), each acting reasonably; and |
| | 某些当事方为实施景程拟议重组条款而订立的每份关键文件（范围有待于在重组支持协议中商定），均采用景程和景程持有人特别团体（或明确代表他们的持有人特别团体顾问）各自合理行事所书面商定的形式；及 |
| | (f) other conditions precedent to be further agreed / satisfaction of each of the other conditions precedent contained in the Scheme Documents. |
| | 其他前提条件有待进一步商定/ 协议安排文件中所载的每个其他前提条件得到满足。 |
| **Restructuring Effective Date**<br>重组生效日期 | The Restructuring Effective Date (the "**RED**") shall occur as soon as reasonably practicable and after the Conditions Precedent have been satisfied or waived and anticipated to be 1 October 2023, provided that it shall be no later than 15 December 2023 (or such other date as agreed in writing between SJ and the SJ AHG) (the "**Longstop Date**"). |
| | 重组生效日期（"**重组生效日**"），应在前提条件得到满足或豁免后，在合理可行的情况下尽快发生，预计为 2023 年 10 月 1 日，前提是不迟于 2023 年 12 月 15 日（或经景程和景程持有人特别团体书面商定的其他日期）（"**最后期限日**"）。 |
| | In the event that the RED is at a date which is later than 1 October 2023: |
| | 若重组生效日为 2023 年 10 月 1 日之后的某一天： |
| | (a) the interests on the SJ New Notes shall begin to accrue on 1 October 2023; and |
| | 景程新票据的利息应于 2023 年 10 月 1 日开始计息；以及 |

| | |
|---|---|
| | (b) the repayment and amortisation schedules of the SJ New Notes shall remain the same as if the RED were 1 October 2023, |
| | 景程新票据的偿付和摊销时间表应按照如同重组生效日仍为 2023 年 10 月 1 日而保持不变， |
| | notwithstanding that any such SJ New Notes may be issued at a later date. |
| | 尽管任何该等景程新票据可能会在之后的日期发行。 |
| | In light of the above, the interests on the SJ Existing Notes will only accrue up to (and excluding) 1 October 2023 (for the purpose of calculating entitlement to distribution). |
| | 鉴于上述情况，景程现有票据的利息将只计至（且不包括）2023 年 10 月 1 日（出于待分配的可获偿金额的目的）。 |
| | On the RED, |
| | 在重组生效日当日， |
| | (a) any fees (including but not limited to the SJ AHG Work Fee and the AHG Advisers Fee) not paid prior to the RED shall be paid to the relevant recipients; and |
| | 在重组生效日前未支付的任何费用（包括但不限于景程持有人特别团体工作费和持有人特别团体顾问费）应支付给相关接收方；以及 |
| | (b) the SJ New Notes shall be issued by SJ in accordance with the terms of the Scheme Documents. |
| | 景程新票据应由景程根据协议安排文件的条款发行。 |
| **Inter-conditionality of Schemes**<br><br>协议安排的相互条件性 | Effectiveness of SJ Scheme shall depend on effectiveness of the TJ Scheme (as defined in the restructuring term sheet for the TJ Scheme). |
| | 景程协议安排的有效性应取决于天基协议安排的有效性（见其天基重组条款清单中的定义）。 |
| **OPERATIVE TERMS OF THIS SJ TERM SHEET**<br>本景程条款清单的执行条款 | |
| **Confidentiality**<br><br>保密 | SJ agrees that it shall not, and it shall cause the Group and their respective Affiliates not to, in any event disclose Schedule 1 (*SJ AHG*) to this SJ Term Sheet or any of its content or any signature or identity of the SJ AHG Members to any person (other than the Group's legal and financial advisers or such information or other agent for the purposes of the Restructuring) without the prior |

written consent of the SJ AHG, *provided* that SJ may disclose such information:

景程同意，在任何情况下，未经持有人特别团体的事先书面同意，其不得且应促使集团及其各自的关联人士不得，向任何人士（不包括出于重组目的披露集团的法律或财务顾问或该等信息或其他代理）披露本景程条款清单的附表 1（*景程持有人特别团体*）或其任何内容或景程持有人特别团体成员的任何签名或身份，*前提*是景程可在以下情况披露该等信息：

(a) to the extent requested or required (as applicable) by any court or regulatory body or by any applicable rule or law;

在任何法院或监管机构或任何适用规则或法律所要求或规定（按所适用的）的范围内；

(b) to any of its Affiliates provided that any such information is shared on a confidential basis and SJ is responsible for any contravention of this section by its Affiliates;

披露给其任何关联人士，只要任何该等信息是在保密的基础上提供的，并且景程对其关联人士违反本节的任何行为负责；

(c) to the extent such information has been disclosed by a member of the SJ AHG or its Affiliates to any Court, Regulatory Body, or to a relevant participating party (other than on a without prejudice basis) in a legal, regulatory or security enforcement proceeding or process (other than any proceedings arising from any breach of this section by SJ), against any member of the Group or its Affiliates commenced or supported by a member of the SJ AHG or its Affiliates;

如果在由某位景程持有人特别团体成员或其关联人士启动或支持的针对集团或其关联人士的法律、监管或执行质押的程序或过程（不包括因景程违反本节规定而产生的任何程序）中，该等信息已由某位景程持有人特别团体成员或其关联人士向任何法院、监管机构或相关参与方披露（在无损权益基础上披露的除外）；

(d) to the extent such information has been disclosed in the public domain other than in the contravention of this section;

如果此信息已经在公共领域被披露，违反本节规定的披露除外；

(e) with the written permission of the SJ AHG;

得到景程持有人特别团体的书面允许；

| | |
|---|---|
| | (f) at any time after the end of one year from the date of this SJ Term Sheet.<br><br>在本景程重组条款清单签署之日起一年结束后的任何时间。<br><br>Capitalised terms used in this section but not defined in this section or this SJ Term Sheet have the meanings given to them, *mutatis mutandis*, in the NDA.<br>本节中使用但未在本节或本景程条款清单中定义的大写术语，其意义依据保密协议对其的定义（经必要的修改）。 |
| **Variation and Termination**<br><br>变更和终止 | This SJ Term Sheet ceases to bind:<br><br>在下列情况下，本景程条款清单对下列人士不再有约束力：<br><br>(a) any member of the SJ AHG, if (i) any Restructuring Milestone is not satisfied (save that failure to meet the RSA milestone may be cured within 3 Business Days), or (ii) SJ fails to comply with any material provision of this SJ Term Sheet (and such failure to comply is not remedied within 5 Business Days); or<br><br>景程持有人特别团体的任何成员，如果（i）任何重组里程碑未得到满足（但是未满足重组支持协议里程碑之行为可在 3 个工作日内得到补救除外）；或 （ii）景程未遵守本景程条款清单的任何重要规定（且该未遵守之行为未在 5 个工作日内得到补救）；或<br><br>(b) SJ, if any member of the SJ AHG (such creditor being a "**Default Creditor**") fails to comply with any material provision of this SJ Term Sheet (and such failure to comply is not remedied within 5 Business Days), provided that the effect of termination shall only apply to SJ's obligations to such Default Creditor and does not impact its obligations to other SJ AHG members under this SJ Term Sheet.<br><br>景程，如果任何景程持有人特别团体成员（该等债权人称为"**违约债权人**"）未能遵守本景程条款清单的任何重要规定（且该未遵守之行为未在 5 个工作日内得到补救），前提是约束力的终止仅适用于景程对该违约债权人的义务，不影响在本景程条款清单下景程对其他景程持有人特别团体成员的义务。<br><br>This SJ Term Sheet ceases to bind any Party automatically at the earlier of: (i) the Longstop Date; and (ii) the termination of RSA |

| | |
|---|---|
| | (if entered into between, among others, SJ and the SJ AHG) in accordance with the terms of the RSA. |
| | 本景程条款清单在以下时间中较早的时间自动停止对任何当事方的约束：（i）最后期限日；和（ii）根据重组支持协议的条款，终止重组支持协议（如果景程和景程持有人特别团体之间达成协议）。 |
| | Any term of this SJ Term Sheet may be amended, varied or waived in writing by SJ and the SJ AHG. Notwithstanding the foregoing, SJ may amend, vary or waive any terms of this SJ Term Sheet (including any terms of any Schedule hereto) at its sole discretion (but without any obligation to do so) to: (a) cure any ambiguity, defect, omission or inconsistency in this SJ Term Sheet; or (b) make any other change to this SJ Term Sheet that is beneficial to the rights of the SJ AHG, provided that in each of the foregoing case there is no material adverse effect on, the rights of the SJ AHG when compared to the terms then in effect. Such amendments, variations or waivers shall be binding on all the Parties. |
| | 本景程条款清单的任何条款可由景程和景程持有人特别团体以书面形式修改、变更或豁免。尽管有上述规定，景程可自行决定修改、变更或放弃本景程条款清单的任何条款（包括任何附表的任何条款）（但无任何义务这样做）以：（a）纠正本景程条款清单的任何模糊、缺陷、遗漏或不一致之处；以及（b）对本景程条款清单作出有利于景程持有人特别团体的任何其他修改，前提是，以上所述的各项更改与当时有效的条款相比，对景程持有人特别团体的权利没有重大不利影响。此种修改、变更或豁免对所有当事方都有约束力。 |
| | "**Business Day**" means any day which is not a Saturday, Sunday, legal holiday or other day on which banking institutions in the City of New York, London, Cayman Islands, British Virgin Islands, Hong Kong or the PRC are authorised or required by law or governmental regulation to close. |
| | "工作日"指周六、周日、法定节假日或法律或政府法规授权或要求纽约、伦敦、开曼群岛、英属维尔京群岛、香港或中国银行机构停业的其他日期以外的任何一天。 |
| **Governing Law**<br>适用法律 | This SJ Term Sheet will be governed by and construed in accordance with Hong Kong law.<br>本景程条款清单将适用香港法律，并根据香港法律进行解释。 |

| | |
|---|---|
| | The courts of Hong Kong are to have exclusive jurisdiction to settle any disputes that may arise out of or in connection with this SJ Term Sheet.<br><br>香港法院拥有专属管辖权，以解决可能因本景程条款清单而产生的或与之相关的任何争议。 |
| **Language**<br>语言 | The Chinese provisions of this SJ Term Sheet are for reference only. If there is any inconsistency between the English and Chinese provisions of this SJ Term Sheet, the English provisions shall govern.<br>本景程条款清单的中文条款仅供参考。 如果本景程条款清单的中英文条款存在任何不一致之处，应以英文条款为准。 |

**Schedule 1**

<u>附表 1</u>

**SJ AHG**

**景程持有人特别团体**



**Schedule 2**
**SJ New Notes Short Form Term Sheet**

| Principal Terms of the Scenery Journey New Notes ("SJ New Notes")<br>景程新票据（"景程新票据"）的主要条款 | |
|---|---|
| **Issuer**<br>发行人 | Scenery Journey Limited, a company incorporated with limited liability under the laws of the British Virgin Islands<br><br>景程有限公司，一家根据英属维京群岛法律注册成立的有限责任公司 |
| **Principal Amount**<br>本金金额 | The SJ New Notes shall comprise five tranches as follows, with the following maximum principal amounts:<br><br>景程新票据应包括以下五笔，最大本金金额如下：<br><br>1.  SJ Tranche A: US$300 million;<br><br>    景程票据 A: 3 亿美元；<br><br>2.  SJ Tranche B: US$1,100 million;<br><br>    景程票据 B: 11 亿美元；<br><br>3.  SJ Tranche C: US$1,100 million;<br><br>    景程票据 C: 11 亿美元；<br><br>4.  SJ Tranche D: US$1,200 million; and<br><br>    景程票据 D: 12 亿美元；及<br><br>5.  SJ Tranche E: US$2,800 million.<br><br>    景程票据 E: 28 亿美元。 |
| **Maturity Dates /<br>Principal<br>Repayment**<br>到期日/本金偿付 | 1.  SJ Tranche A: four (4) years from the earlier of October 1, 2023 and the RED (the "**Reference Date**");<br><br>    景程票据 A: 自 2023 年 10 月 1 日和重组生效日中较早的日期（"**参考日期**"）起四（4）年；<br><br>2.  SJ Tranche B: five (5) years from the Reference Date;<br><br>    景程票据 B: 自参考日期起五（5）年；<br><br>3.  SJ Tranche C: six (6) years from the Reference Date;<br><br>    景程票据 C: 自参考日期起六（6）年；<br><br>4.  SJ Tranche D: seven (7) years from the Reference Date; and<br><br>    景程票据 D: 自参考日期起七（7）年；及<br><br>5.  SJ Tranche E: eight (8) years from the Reference Date.<br><br>    景程票据 E: 自参考日期起八（8）年。<br><br>The outstanding principal amount of each tranche shall be repaid at maturity, together with any accrued and unpaid interest. |

| | 每一笔的未偿还本金应在上述到期日当日连同任何应计及未付利息一起偿还。 |
|---|---|
| **Interest (PIK and cash)**<br><br>**利息（实物付息和现金）** | Interest will be payable semi-annually in arrears on the outstanding principal amount of the SJ New Notes at the following interest rates with respect to each interest payment period:<br><br>景程新票据的未偿还本金金额将于每半年期末支付一次利息，每个付息期的利率如下：<br><br>  1.  SJ Tranche A: 5.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 6.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind);<br><br>     景程票据 A：每年 5.5%（如果与该付息期相关的所有利息均以现金支付）或每年 6.5%（如果与该付息期相关的任何部分利息以实物支付）；<br><br>  2.  SJ Tranche B: 6.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind);<br><br>     景程票据 B：每年 6.0%（如果与该付息期相关的所有利息均以现金支付）或每年 7.0%（如果与该付息期相关的任何部分利息以实物支付）；<br><br>  3.  SJ Tranche C: 6.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind);<br><br>     景程票据 C：每年 6.5%（如果与该付息期相关的所有利息均以现金支付）或每年 7.5%（如果与该付息期相关的任何部分利息以实物支付）；<br><br>  4.  SJ Tranche D: 7.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 8.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); and<br><br>     景程票据 D：每年 7.0%（如果与该付息期相关的所有利息均以现金支付）或每年 8.0%（如果与该付息期相关的任何部分利息以实物支付）；及<br><br>  5.  SJ Tranche E: 7.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 8.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind).<br><br>     景程票据 E：每年 7.5%（如果与该付息期相关的所有利息均以现金支付）或每年 8.5%（如果与该付息期相关的任何部分利息以实物支付）。<br><br>Interest on the outstanding principal amount of the SJ New Notes shall be paid in the following manner: |

景程新票据未偿还本金的利息应按以下方式支付：

1. For the first two and a half years after the Reference Date: interest may be paid in cash or in kind, at the election of the Issuer;

   对于参考日期后的最初的 2.5 年：可由发行人选择用现金或实物支付利息；

2. From the 31st month after the Reference Date to the 36th month after the Reference Date, interest in an amount equal to at least 0.7% of the outstanding principal amount of each tranche of the SJ New Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Issuer;

   对于参考日期后的第 31 个月至第 36 个月：应以现金支付相当于各笔景程新票据未偿本金的至少 0.7%的利息；其余部分的利息可由发行人选择以现金或实物支付；

3. For the fourth year after the Reference Date: interest in an amount equal to at least 3.0% p.a. of the outstanding principal amount of each tranche of the SJ New Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Issuer; and

   对于参考日期后的第四年：应以现金支付相当于各笔景程新票据未偿本金的至少每年 3.0%的利息；其余部分的利息可由发行人选择以现金或实物支付；及

4. Starting from the fifth year after the Reference Date: interest shall be paid in cash.

   对于从参考日期后的第五年开始：利息应以现金支付。

All interest paid in kind with respect to the SJ New Notes will be added to the then current outstanding principal amount of the SJ New Notes.

所有景程新票据以实物支付的利息均计入届时景程新票据的未偿还本金金额。

If the Issuer pays cash interest under any tranche of the SJ New Notes with respect to any interest payment period in an amount greater than the amount of cash interest required to be paid on such tranche with respect to such interest payment period, it shall also pay additional cash interest under the other tranches of the SJ New Notes and all tranches of the TJ New Notes. The amount of such additional cash payments shall be allocated between SJ New Notes on the one hand and TJ New Notes on the other hand on a 90:10 basis, with adjustments to be agreed if the ratio of the principal amounts of the SJ New Notes and the TJ New Notes has changed from such ratio as of the Original Issue Date other than due to scheduled principal repayments. All such additional cash payments allocated to the SJ New Notes shall be applied pro rata among the tranches of the SJ New Notes based on their outstanding principal amounts and all such additional cash payments allocated to the TJ New Notes shall be applied pro rata among the tranches of the TJ New Notes based on their outstanding principal amounts.

如果发行人就景程新票据的任何一笔就任何付息期支付的现金利息大于该票据在该付息期所需支付的现金利息金额，则发行人还应就

| | |
|---|---|
| | 景程新票据的其他笔债券和天基新票据的所有笔债券支付额外的现金利息。该等额外现金支付的金额应按 90：10 的比例在景程新票据和天基新票据之间进行分配，但如果景程新票据和天基新票据的本金金额比率相比于截至初始发行日期时有变化（由于按计划的本金偿付之外的原因），则该比例有待商定调整。所有分配给景程新票据的该等额外现金支付应根据其未偿还本金金额按比例应用于各笔景程新票据，而分配给天基新票据的该等额外现金支付应根据其未偿还本金金额按比例应用于各笔天基新票据。 |
| **Guarantees / Keepwell**<br><br>担保/维好 | (i) The same parent guarantor (*i.e.* Tianji Holding Limited, hereinafter "**TJ**") and subsidiary guarantors as those currently guaranteeing the SJ Existing Notes, other than those to be deregistered prior to the Original Issue Date or excluded, and (ii) other offshore subsidiaries of TJ set forth in Annex A hereto (the "**SJ Additional Guarantors**, and collectively with TJ, the "**SJ Notes Guarantors**").<br><br>（ⅰ） 担保母公司（即天基控股有限公司，以下简称 "**天基**"）及担保子公司与目前为景程现有票据提供担保的母公司和担保子公司相同，但不包括那些待（发行人和景程持有人特别团体）商定后在初始发行日期前注销或排除的子公司，以及 （ⅱ） 附件 A 中列出的其他天基境外子公司（"**景程额外担保公司**"，与天基统称 "**景程票据担保公司**"）。<br><br>A keepwell arrangement to be provided by Hengda Real Estate Group Co., Ltd (恒大地产集团有限公司) ("**Hengda**") with detailed terms to be agreed between Hengda and SJ AHG.<br><br>由恒大地产集团有限公司（"**恒大地产**"）提供一份维好安排，详细条款由恒大地产和景程持有人特别团体商定。 |
| **Security**<br><br>质押 | **Collateral for SJ New Notes ("SJ Collateral"):**<br><br>**景程新票据的质押物（"景程质押物"）：**<br><br>1.  Share charge given by TJ and TJ's offshore subsidiaries over shares they hold in the SJ Notes Guarantors listed in Annex B hereto.<br><br>    天基和天基的境外子公司对其所持本文附件 B 所列的景程票据担保公司的股份作出质押。<br><br>2.  Charge over certain intercompany receivables owed to certain existing SJ Notes Guarantors to be agreed.<br><br>    对应付给现有景程票据担保公司的某些公司间应收款作出质押，有待商定。<br><br>The security interest over any SJ Collateral will be released upon any sale or disposal of such SJ Collateral and (i) the application of the proceeds thereof in accordance with the provisions under "Mandatory Redemption" below or (ii) the deposit of such proceeds into an account charged to the benefit of the holders of the SJ New Notes, or (iii) such proceeds being subject to an escrow or other arrangement to be agreed.<br><br>当根据下文 "强制赎回" 的条款对任何景程质押物进行任何出售或处置时，该景程质押物上的质押权益将被解除，并且，（ⅰ）将根据 |

| | |
|---|---|
| | 下文"强制赎回"的条款来应用该所得款，或（ii）将该所得款存入一个以景程新票据持有人为受益人的质押账户，或（iii）该所得款将受限于待经商定的托管或其他安排。 |
| **Mandatory Redemption**<br>强制赎回 | 1.  Net consideration received by TJ and its offshore subsidiaries that is attributable to any SJ Notes Guarantor from the sale of any SJ Collateral;<br><br>任何景程质押物出售给天基及其境外子公司收到的归属于任何景程票据担保公司的净对价；<br><br>2.  Dividends/distributions (if any) received by TJ from its onshore and offshore restricted subsidiaries; and<br><br>天基收到的其境内外受限子公司产生的分红/分配（如有）；和<br><br>3.  Receipt by TJ of repayments of unsubordinated intercompany receivables from subsidiaries.<br><br>天基收到的子公司归还的非次级公司间往来应收款。<br><br>Cash proceeds under clause (1) above shall be used to redeem either or both of the two tranches of SJ New Notes with the shortest maturities at that time, at par plus accrued and unpaid interest. If any such cash proceeds remain unused after such redemptions, the Issuer shall use remaining proceeds to redeem the SJ New Notes by tranche in the order of maturity, at par plus accrued and unpaid interest.<br><br>上述第（1）项下所收到的款项将用于按票面价值并加上应计及未付利息赎回景程新票据中届时最快到期的两笔中的其中一笔或全部两笔。如果在该等赎回后仍有任何未使用的该等现金所得款，发行人应用剩余的所得款按票面价值加应计及未付利息按到期顺序分批赎回景程新票据。<br><br>Cash proceeds under clause (2) and (3) above shall be used to redeem either or both of the two tranches of SJ New Notes with the shortest maturities at that time and either or both of the two tranches of TJ New Notes with the shortest maturities at that time, at par plus accrued and unpaid interest, provided that 90% of such proceeds shall be allocated to redeem SJ New Notes and 10% of such proceeds shall be allocated to redeem TJ New Notes (with adjustments to be agreed if the ratio of the principal amounts of the SJ New Notes and the TJ New Notes has changed from such ratio as of the Original Issue Date other than due to scheduled principal repayments). If any such cash proceeds remain unused after such redemptions, the Issuer shall use (i) 90% of such remaining proceeds to redeem the SJ New Notes by tranche in the order of maturity and (ii) 10% of such remaining proceeds to redeem the TJ New Notes by tranche in the order of maturity, in each case at par plus accrued interest (with adjustments to be agreed if the ratio of the principal amounts of the SJ New Notes and the TJ New Notes has changed from such ratio as of the Original Issue Date other than due to scheduled principal repayments).<br><br>上述第（2）和（3）项下的现金所得款将用于按票面价值并加上应计及未付利息赎回景程新票据中届时最快到期的两笔中的其中一笔或全部两笔以及天基新票据中届时最快到期的两笔中的其中一笔或 |

| | |
|---|---|
| | 全部两笔，前提是该等所得款的 90% 应分配用于赎回景程新票据，而该所得款的 10% 应分配用于赎回天基新票据（如果景程新票据和天基新票据的本金金额比率相比于截至初始发行日期时有变化（由于按计划的本金偿付之外的原因），则该比例有待商定调整）。 如果该等赎回后仍有未使用的该所得款，发行人应按票面价值并加上应计及未付利息将 （i）该剩余所得款的 90%用于按到期顺序分批赎回景程新票据并将（ii）该剩余所得款的 10%用于按到期顺序分批赎回天基新票据（如果景程新票据和天基新票据的本金金额比率相比于截至初始发行日期时有变化（由于按计划的本金偿付之外的原因），则该比例有待商定调整）。 |
| | All SJ New Notes and TJ New Notes so repurchased or redeemed shall be cancelled. |
| | 所有以这样方式回购或赎回的景程新票据和天基新票据应被注销。 |
| **Covenant**<br>**限制** | Cash proceeds from disposals (as referred to in clause (1) of "Mandatory Redemption" above) and operations of the existing 35 onshore projects held (directly and indirectly) by TJ and cash received by TJ and its subsidiaries on repayment of intercompany receivables (as referred to in clause (3) of "Mandatory Redemption" above), including from CEG and its subsidiaries (other than TJ and its subsidiaries) and dividends received by TJ and its subsidiaries from these projects (as referred to in clause (2) of "Mandatory Redemption" above), shall be used to: |
| | 天基（直接或间接）所持的现有 35 个境内项目的处置及运营的现金所得款（如上文 "强制赎回"第（1）项所述），以及天基及其子公司收到的公司间应收款现金（如上文 "强制赎回"第（3）项所述），包括恒大及其子公司（天基及其子公司除外）所偿付的，以及天基及其子公司从这些项目中收到的分红（如上文 "强制赎回"第（2）项所述），应用于： |
| | (i)    discharge any onshore liabilities associated with the project disposed or required or necessary to be discharged in connection with such disposal, |
| |      解除与处置的项目相关的任何境内负债，或与进行该等处置相关所需要或必须解除的负债， |
| | (ii)    fund the development, operations and delivery of these projects, and/or |
| |      为这些项目的开发、运营和交付提供资金，及/或 |
| | (iii)    pay liabilities and fulfil obligations of TJ and its subsidiaries (other than intercompany payables (other than non-interest-bearing trade payables incurred in the ordinary course of business and consistent with past practice that are on arm's length terms and otherwise comply with the affiliate |

| | |
|---|---|
| | transactions covenant in the indentures) to CEG and its subsidiaries (other than TJ and its subsidiaries)), |
| | 支付天基及其子公司的负债并履行天基及其子公司的义务（不包括对恒大及其子公司（天基及其子公司除外）的公司间应付款（不包括在正常业务过程中产生且符合过去惯例，符合公平交易，以及符合债券契约中的关联交易条款的无息贸易应付款项））， |
| | provided that such cash proceeds and cash received shall not be used to fund the investment, acquisition, development, operation or delivery of new projects, and in each case above, subject to compliance with applicable laws, regulations, rules, and policies, measures, orders or demands from judicial, regulatory or governmental bodies (provided, in the case of any demand, that TJ provides the trustee and the holders with an officer's certificate setting forth, among other things, the terms of such demand). |
| | 前提是该等现金所得款和收到的现金不得用于资助新项目的投资、收购、开发、运营或交付，并且在上述每种情况下，均须遵守司法、监管或政府机构的适用法律、法规、规则和政策、措施、命令或要求（前提是如有任何要求，天基需向信托人和持有人提供一份高管证书，列明包括但不限于该要求的条款）。 |
| **Auditor**<br>审计师 | TJ will engage a Whitelist Auditor to audit its annual financial statements starting no later than the audit of the fiscal year ending December 31, 2023. |
| | 天基将聘请一家白名单审计师对其年度财务报表进行审计，开始时间不晚于截至 2023 年 12 月 31 日止的财务年度审计。 |
| | The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms: |
| | "**白名单审计师**"应为以下任何会计师事务所或其各自的关联所或成员所： |
| | (a)  Baker Tilly International; |
| | 天职国际； |
| | (b)  BDO; |
| | 立信； |
| | (c)  Crowe Global; |
| | 国富浩华； |
| | (d)  Deloitte; |
| | 德勤； |
| | (e)  Ernst & Young; |

|  |  |
|---|---|
|  | 安永； |
|  | (f)  Grant Thornton; |
|  | 致同； |
|  | (g)  KPMG; |
|  | 毕马威； |
|  | (h)  Mazars; |
|  | 中审众环； |
|  | (i)  Moore Global; |
|  | 大华国际； |
|  | (j)  Prism; and |
|  | 上会栢诚；和 |
|  | (k)  RSM International. |
|  | RSM 国际。 |
| **Trustee**<br>信托人 | Madison Pacific or another internationally recognized financial institution as agreed between the Issuer and the SJ AHG.<br><br>Madison Pacific 或由发行人和景程持有人特别团体商定的另一家国际公认的金融机构。 |
| **General**<br>一般 | The Issuer and the SJ AHG will discuss and agree additional covenants and other provisions to be included under the SJ New Notes and the related legal documentation, including among others, related to (i) restrictions on indebtedness, restricted payments, liens, affiliate transactions, asset sales, open market and other repurchases and other actions, (ii) the timing, manner and other aspects of sales of assets referred to under "Mandatory Redemption", (iii) events of default (and any applicable default interest), (iv) the rights of holders of, and owners of beneficial interests in, the SJ New Notes (a) to obtain periodic financial and other information and documents from the trustee and the collateral agent, (b) to appoint or replace trustee, and (c) to direct the trustee and collateral agent and to enforce remedies, and (v) the listing of the SJ New Notes.<br><br>发行人和景程持有人特别团体将讨论并商定将纳入景程新票据的额外限制和其他条款以及相关法律文件，包括但不限于（i）对负债、受限支付、质押权、关联交易、资产出售、公开市场和其他回购和其他行动的限制，（ii）"强制赎回"中提到的资产出售的时间安排、方式和其他方面；（iii） 违约事件（及任何适用的违约利息），（iv）景程新票据持有人和实益权益持有人的权利，包括：（a）从信托人和质押物代理人获得定期财务和其他信息和文件的权利，（b）任命或更换信托人的权利，和（c）指示信托人和质押物代理人以及执行救济措施的权利，以及（v）景程新票据的上市。 |

| | |
|---|---|
| **Language**<br>语言 | The Chinese provisions contained herein are for reference only. If there is any inconsistency between the English and Chinese provisions, the English provisions shall prevail.<br>此处的中文条款仅作参考。如英文和中文条款有任何不一致之处，应以英文条款为准。 |

**Annex A**[1]

**附件 A**

1. Angel Fay Limited
2. Charm Best Investment Limited 优俊投资有限公司
3. EASE TRIUMPH INTERNATIONAL LIMITED 拓业国际有限公司
4. EAST GROUP INTERNATIONAL HOLDINGS LIMITED 东盟国际控股有限公司
5. Fortune Leader Investment Limited 广盛投资有限公司
6. GODSIB LIMITED
7. High Concept Limited 高建有限公司
8. Idea Valley No.2 Company Limited 慧谷二号有限公司
9. Lucky Grow Holdings Limited 智煌控股有限公司
10. More Hero Limited 添英有限公司
11. Pacific Globe Group Limited
12. Rising Peak Golf and Property Development Company Limited 聚廷峰高尔夫房地产开发有限公司
13. S. I. Feng Tao Properties Limited 上实丰涛置业有限公司
14. Shiny Profit Enterprises Limited
15. STAR RIVER PROFITS LIMITED
16. 嘉达发展有限公司
17. Rising Peak Hotel Company Limited（HK）
18. CBI Investment Limited（HK）CBI 投资有限公司
19. Winner Joy Development Limited 胜欣发展有限公司

---

1 This list may be modified as agreed between the Issuer and the SJ AHG.
该清单可由发行人和景程持有人特别团体商定修改。

**Annex B[2]**

**附件 B**

| | |
|---|---|
| 1 | Rising Peak Golf and Property Development Company Limited（HK）聚廷峰高尔夫房地产开发有限公司 |
| 2 | High Concept Limited 高建有限公司 |
| 3 | Idea Valley No.2 慧谷二号有限公司 |
| 4 | Marche Limited 丽来富华集团有限公司 |
| 5 | S. I. Feng Tao Properties Limited 上实丰涛置业有限公司 |
| 6 | SANLI (CHINA) HOLDINGS LIMITED 三立(中国)控股有限公司 |
| 7 | 嘉达发展有限公司 |
| 8 | SHUI WAH INVESTMENT LIMITED 穗华投资有限公司 |
| 9 | SHENGYU (BVI) LIMITED 盛誉(BVI)有限公司 |
| 10 | More Hero Limited 添英有限公司 |
| 11 | LUCKY GROW HOLDINGS LIMITED 智煌控股有限公司 |
| 12 | LUCKY UNIVERSE HOLDING LIMITED 瑞宇集团有限公司 |
| 13 | PRIME SUN HOLDING LIMITED 盛日控股有限公司 |
| 14 | GODSIB LIMITED |
| 15 | FIRST KEY INVESTMENTS LIMITED 元基投资有限公司 |
| 16 | Pacific Globe Group Limited |
| 17 | Shiny Profit Enterprises Limited |
| 18 | Champion Glory Holdings Limited 卓康集团有限公司 |
| 19 | Champion Globe Limited 特灵有限公司 |
| 20 | Champion King Investments Limited 彩侨投资有限公司 |
| 21 | Star River Profits Limited |
| 22 | Charm Best Investment Limited 优俊投资有限公司 |
| 23 | Angel Fay Limited |
| 24 | Hinto Developments Limited |
| 25 | China Sea Group (Hong Kong) Investment Limited 中海集团(香港)投资有限公司 |
| 26 | EASE TRIUMPH INTERNATIONAL LIMITED 拓业国际有限公司 |
| 27 | EAST GROUP INTERNATIONAL HOLDINGS LIMITED 东盟国际控股有限公司 |
| 28 | Fortune Leader Investment Limited 广盛投资有限公司 |
| 29 | Rising Peak Hotel Company Limited（HK） |
| 30 | CBI InvestmentLimited（HK）CBI 投资有限公司 |
| 31 | ROSY DYNASTY LIMITED 翠御有限公司 |
| 32 | Rise Eagle Worldwide Limited 振鹰环球有限公司 |
| 33 | Winner Joy Development Limited 胜欣发展有限公司 |
| 34 | Dragon Joy (China) Limited 龙悦（中国）有限公司 |

---

2 This list may be modified as agreed between the Issuer and the SJ AHG.
该清单可由发行人和景程持有人特别团体商定修改。

## Exhibit D

## Convening Order

**Case Number :BVIHCOM2023/0076**

FILED
HIGH COURT
TERRITORY OF
THE VIRGIN ISLANDS

THE EASTERN CARIBBEAN SUPREME COURT

IN THE HIGH COURT OF JUSTICE

BRITISH VIRGIN ISLANDS

COMMERCIAL DIVISION

CLAIM NO.:  BVIHCOM2023/0076

IN THE MATTER OF SCENERY JOURNEY LIMITED

**Submitted Date:02/08/2023 10:41**

**Filed Date:02/08/2023 10:41**

**Fees Paid:72.59**

AND IN THE MATTER OF S. 179A OF THE BVI BUSINESS COMPANIES ACT 2004

BETWEEN:

<div align="center">

**SCENERY JOURNEY LIMITED**

<u>Claimant</u>

**and**

**SCENERY JOURNEY LIMITED**

<u>Defendant</u>

</div>

<div align="center">

**CONVENING DIRECTIONS ORDER**

</div>

**BEFORE:**    The Honourable Justice Ingrid Mangatal (Ag)

**DATED:**    24 July 2023

**ENTERED:**    ~~July~~ 2023

**UPON** the claim of Scenery Journey Limited (the "**Company**") by Fixed Date Claim Form dated 26 April 2023 (the "**Claim**")

**AND UPON** reading the First Affirmation of Chen Daiping and the First Affirmation of Hui Ka Yan, and the exhibits thereto

**AND UPON HEARING** Leading Counsel, Mr Tom Smith KC, for the Company, and with him Paul Fradley and Henry Phillips of counsel, and Matthew Freeman and Scott Tolliss of Maples and Calder; and Leading Counsel, David Allison KC, for the Ad Hoc Group of creditors, and with him Peter Ferrer of Harneys

<div align="center">1</div>

**AND UPON** the Court being satisfied that it has jurisdiction in relation to the Scheme (as defined below) on the basis that the Company is a "company" within section 179A of the BVI Business Companies Act 2004

**AND UPON** the basis that all capitalised terms not otherwise defined in this Order shall have the meaning given to them in the draft scheme of arrangement (the **"Scheme"**) and the draft explanatory statement in relation to the Scheme (the **"Explanatory Statement"**), in the form exhibited in Exhibit HKY-1 to the First Affirmation of Hui Ka Yan

**IT IS HEREBY ORDERED AND DIRECTED THAT:**

1.  The Company has permission to convene a single meeting (the **"Scheme Meeting"**) of certain of its creditors (the "**Scheme Creditors**") for the purpose of considering and, if thought fit, approving the Scheme.

2.  The Scheme Meeting will take place at 9 am (BVI time) on 22 August 2023 at the offices of Maples and Calder, 5th Floor, Ritter House, Road Town, Tortola, British Virgin Islands.

3.  Attendance and voting at the Scheme Meeting will also be possible by video conference, using details which will be published on the Transaction Website at least 21 days before the day appointed for the Scheme Meeting and the meeting passcode notified to Scheme Creditors who are not Blocked Scheme Creditors by the Information Agent at least 2 business days before the day appointed for the Scheme Meeting.

4.  GLAS Specialist Services Limited] (**"GLAS"**) will provide Blocked Scheme Creditors with the details of how to attend and vote at the Scheme Meeting as soon as reasonably practicable once the Company becomes aware of any such creditor and will notify such Blocked Scheme Creditors of the meeting passcode at least 2 business days before the day appointed for the Scheme Meeting.

5.  The Chairperson (as defined below) may require Scheme Creditors attending the Scheme Meeting by video conference to turn on their camera throughout the Scheme Meeting and to log on to the video conference using their full name (as registered with the Information Agent) and the creditor identified number provided to them by the Information Agent prior to the Scheme Meeting.

2

6. The Company has permission to set a record time of 5 am (BVI time) on 18 August 2023 (the **"Voting Record Time"**) for the purpose of determining each Scheme Creditor's Voting Scheme Claim. The Voting Scheme Claims as at the Voting Record Time determine the number of votes to be assigned to a Scheme Creditor when voting on the Scheme at the Scheme Meeting.

7. The Company has permission to set the Voting Record Time as the latest time by which (a) the Information Agent must receive a valid Non-Blocked Scheme Creditor Form (as defined below) from Scheme Creditors who are not Blocked Scheme Creditors, and (b) GLAS must receive a valid Blocked Scheme Creditor Form (as defined below) from Blocked Scheme Creditors in order for the Scheme Creditors' voting instructions to be taken into account for the purposes of the Scheme Meeting.

8. Notice of the Scheme Meeting (**"Scheme Meeting Notice"**) shall be given to Scheme Creditors not less than 21 days before the Scheme Meeting:

   a. by notice on the Transaction Website;
   b. by announcement on the website of The Stock Exchange of Singapore Limited;
   c. for certain Scheme Creditors identified in the First Affidavit of Damian Watkin, by the Information Agent giving notice through the Clearing Systems in accordance with the procedures described therein; and
   d. by the Information Agent sending the notice via email to each person who the Company believes is or may be a Scheme Creditor (other than Blocked Scheme Creditors), and for whom the Company has a valid e-mail address.

9. GLAS will give a Scheme Meeting Notice to any Blocked Scheme Creditors by email (i) not less than 21 days before the Scheme Meeting to the extent the Company is aware of any Blocked Scheme Creditors and their email addresses at that time or (ii) as soon as reasonably practicable after the Company becomes aware of the existence of a Blocked Scheme Creditor and their email details.

10. The Scheme Meeting Notice shall be in substantially the same form as that appended to the Explanatory Statement exhibited in Exhibit HKY-1 to the First Affirmation of Hui Ka Yan.

11. When distributing the Scheme Meeting Notice in accordance with paragraphs 8 and 9 above, the Information Agent (or GLAS, in the case of Blocked Scheme Creditors) shall also include a copy of the final form of the Explanatory Statement (or links to the Transaction Website where it can be accessed), which contains, amongst other things, the Scheme at Schedule 4.

12. On the same date as distributing the Scheme Meeting Notice in accordance with paragraph 8 above, the Information Agent shall post a Solicitation Packet including:

    a. the Account Holder Letter and a Scheme Creditor Proxy Form (each a "**Non-Blocked Scheme Creditor Form**"), including the forms of proxy and appendices contained therein; and

    b. the "**Blocked Scheme Creditor Form**", including the form of proxy contained therein,

on the Transaction Website together with copies of any other relevant documents.

13. The final form of the Explanatory Statement and its schedules shall be substantially in the same form exhibited in Exhibit HKY-1 to the First Affirmation of Hui Ka Yan (save for where the schedules were not available at the time of the First Affirmation of Hui Ka Yan).

14. The accidental omission to serve any Scheme Creditor with the Scheme Meeting Notice, or the non-receipt by any Scheme Creditor of the Scheme Meeting Notice, shall not invalidate the proceedings at the Scheme Meeting.

15. Miss Anna Silver, in her capacity as Scheme Supervisor, or, failing that, another representative of FFP (BVI) Limited nominated by her, be appointed Chairperson of the Scheme Meeting (the **"Chairperson"**) on behalf of the Company.

16. The Chairperson be entitled to accept, without further investigation, the signature on any Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable, as being genuine and as authority of the signatory to cast the votes in accordance with the instructions outlined in the Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable, and the Solicitation Packet.

17. The Chairperson be responsible for determining, in accordance with the relevant provisions in the Explanatory Statement, the Voting Scheme Claim of any Scheme

Creditor and the validity of the appointment of any person permitted to act as proxy for a Scheme Creditor by reference to the information provided in each Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable.

18. The Chairperson be at liberty to accept any Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable, and the amount of a Voting Scheme Claim in respect of which a Scheme Creditor seeks to vote, notwithstanding that such form has not been completed or submitted in accordance with any instructions contained therein or has been submitted after the deadline provided for by paragraph 7, provided that the Chairperson considers that the information contained therein is sufficient to admit that Scheme Creditor's Voting Scheme Claim for voting purposes.

19. Any person validly appointed as proxy for a Scheme Creditor in accordance with the instructions set out in the Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable, and the Solicitation Packet may attend and speak at Scheme Meeting.

20. The Chairperson be at liberty to adjourn the Scheme Meeting, or terminate the Scheme Meeting and adjourn to a later date, in his or her sole discretion, provided that, if adjourned, the Scheme Meeting will recommence as soon as reasonably practicable thereafter. In the event that the Chairperson considers in her sole discretion that it is necessary or appropriate to adjourn the Scheme Meeting, the Company shall cause the Scheme Creditors to be notified that there is an adjournment of the Scheme Meeting and as to the time of the adjourned Scheme Meeting as soon as practicable and in the same manner as notice was given to the Scheme Creditors pursuant to paragraph 8.

21. The Chairperson be permitted to declare and announce the results of the Scheme Creditors' votes in respect of the Scheme, either during the Scheme Meeting or as soon as reasonably possible after the conclusion of the Scheme Meeting.

22. Within seven days of the Scheme Meeting, the Chairperson shall provide to the Court a report on the proceedings at and the result of the Scheme Meeting.

23. If the Scheme is approved at the Scheme Meeting by the required statutory majorities, the Claim is adjourned to a further hearing on 4 September 2023 at 10 am for the Court to consider the sanction of the Scheme.

24. There shall be liberty to apply generally.

BY THE REGISTRAR

**THE EASTERN CARIBBEAN SUPREME COURT**

**IN THE HIGH COURT OF JUSTICE**

**BRITISH VIRGIN ISLANDS**

**COMMERCIAL DIVISION**

**Claim No:  BVIHCOM2023/0076**

**IN THE MATTER OF SCENERY JOURNEY LIMITED**

**AND IN THE MATTER OF AND IN THE MATTER OF S. 179A OF THE BVI BUSINESS COMPANIES ACT 2004**

**BETWEEN:**

**SCENERY JOURNEY LIMITED**

<u>Claimant</u>

and

**SCENERY JOURNEY LIMITED**

<u>Defendant</u>

---

**CONVENING ORDER**

---

**Maples and Calder**

5th Floor

Ritter House

PO Box 173

Road Town, Tortola

British Virgin Islands

(Ref:MFX/621262/000107)

Tel: +1 284-852-3000

Fax: +1 284-852-3097

<u>Legal Practitioners for the Claimant</u>

7

**Exhibit E**

**Explanatory Statement**

**THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION**

**EXPLANATORY STATEMENT IN RELATION TO THE SCHEME OF ARRANGEMENT**
**(pursuant to section 179A of the BVI Business Companies Act)**

**between**

**SCENERY JOURNEY LIMITED**
**景程有限公司**
**(incorporated in the British Virgin Islands with limited liability with company number 1970476)**

**and**

**THE SCHEME CREDITORS**
**(as defined in this Explanatory Statement)**

**in the Eastern Caribbean Supreme Court in the High Court of Justice, British Virgin Islands**

**31 July 2023**

This document comprises an explanatory statement in relation to the scheme of arrangement proposed by Scenery Journey Limited (景程有限公司) ("**SJ**" or the "**Company**") pursuant to section 179A of the BVI Business Companies Act (this "**Explanatory Statement**"). Reference is made to the definitions set out in Schedule 1 (*Definitions and Interpretation*) to this Explanatory Statement.

This Explanatory Statement is being sent to persons who it is believed are or may be Scheme Creditors as at the date of this Explanatory Statement. If you have assigned, sold, or otherwise transferred your interests in the Existing Notes you must forward this Explanatory Statement and the accompanying documents at once to the person or persons to whom you have assigned, sold or otherwise transferred your interests in the Existing Notes.

This Explanatory Statement has been sent to you in an electronic form.  You are advised that documents transmitted in electronic form may be altered or changed during the process of transmission and consequently none of the Company, the Information Agent, the BVI Information Agent, the Existing Notes Trustee, nor any of their respective Affiliates, directors, officers or employees, accept any liability or responsibility whatsoever in respect of any difference between the Explanatory Statement distributed to you in electronic format and the version available to you for inspection on the Transaction Website.

<u>**WARNING**</u> – The contents of this Explanatory Statement have not been reviewed by any regulatory authority in Hong Kong, the British Virgin Islands, Singapore or in any other jurisdiction. Neither the US Securities and Exchange Commission ("**SEC**") nor any United States state securities commission has approved or disapproved of the Scheme Consideration or determined if this Explanatory Statement is truthful or complete. Any representation to the contrary is a criminal offence. You are strongly encouraged to exercise caution in relation to any offer pursuant to the scheme of arrangement set out in this Explanatory Statement.

<u>**You are recommended to seek your own independent financial, legal and/or tax advice immediately from your financial, legal and/or tax advisor with respect to the contents of this Explanatory Statement or the documents that accompany it or what action you should take.**</u>

This Explanatory Statement does not constitute an offer to sell or the solicitation of an offer to buy any securities. None of the securities referred to in this Explanatory Statement may be sold, issued or transferred in any jurisdiction in contravention of applicable law.  The securities proposed to be issued pursuant to the BVI Scheme will not be registered with the SEC under the US Securities Act of 1933, as amended (the "**US Securities Act**"), or the securities law of any state or other jurisdiction, and are

being transferred and delivered in reliance upon certain exemptions from the registration requirements of the US Securities Act. The securities proposed to be issued pursuant to the BVI Scheme will be issued and delivered only (i) in the United States to "qualified institutional buyers" ("**QIBs**") as defined in Rule 144A under the US Securities Act ("**Rule 144A**") and institutional "accredited investors" ("**Accredited Investors**") as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the US Securities Act ("**Regulation D**"); and (ii) outside the United States to non-US persons in offshore transactions, in reliance on Regulation S under the US Securities Act ("**Regulation S**").

An application will be made for the listing and quotation of the New Instruments on the Singapore Exchange Securities Trading Limited ("**SGX-ST**"). The SGX-ST assumes no responsibility for the correctness of any of the statements made or opinions expressed or reports contained herein. Approval in-principle for the listing and quotation of the New Instruments on the SGX-ST is not to be taken as an indication of the merits of the New Instruments or of the issuers of them, any guarantees, any guarantors, their respective subsidiaries (if any), their respective associated companies (if any) or their respective joint venture companies (if any). For so long as such New Instruments are listed on the SGX-ST and the rules of the SGX-ST so require, such New Instruments will be traded on the SGX-ST in a minimum board lot size of at least S$200,000 (or its equivalent in foreign currencies). To the extent that the Company is required to disclose additional information solely for the purposes of the application to list the New Instruments on the SGX-ST, such information will be made available to Scheme Creditors on the Transaction Website (where legally and commercially permissible).

**Section 309B(1) Notification**—In connection with Section 309B of the Securities and Futures Act, Chapter 289 of Singapore, as modified or amended from time to time (the "**SFA**") and the Securities and Futures (Capital Markets Products) Regulations 2018 (the "**CMP Regulations 2018**"), we have determined, and hereby notify all relevant persons (as defined in Section 309A(1) of the SFA) that the New Instruments are prescribed capital markets products (as defined in the CMP Regulations 2018) and Excluded Investment Products (as defined in MAS Notice SFA 04-N12: Notice on the Sale of Investment Products and MAS Notice FAA-N16: Notice on Recommendations on Investment Products).

This Explanatory Statement should be read carefully with the Solicitation Packet which is available on the Transaction Website for Scheme Creditors to download.

The Solicitation Packet contains (1) the Account Holder Letter for the Scheme Creditors other than the Sanctions Affected Scheme Creditors, which encloses the Designated Recipient Form and the Distribution Confirmation Deed, and (2) Blocked Scheme Creditor Form (for Blocked Scheme Creditors), and instructions and guidance for Scheme Creditors and any Person with an interest in the Existing Notes as to how to complete the required documents.

Further important information is set out under Section 2 (*Important Securities Law Notices*) and Section 3 (*Important Notices to Scheme Creditors*) of this Explanatory Statement.

The Information Agent provides the primary contact for Scheme Creditors (who are not Sanctions Affected Scheme Creditors) in relation to questions the Scheme Creditors have in relation to this Explanatory Statement, the Solicitation Packet, the BVI Scheme or the Restructuring. The Information Agent will be assisting the Chairperson in co-ordinating the voting process for the BVI Scheme, including (a) creating and managing the Transaction Website and the Portal, (b) communicating with Scheme Creditors (who are not Sanctions Affected Scheme Creditors) regarding voting in the BVI Scheme, in particular via the Transaction Website, (c) communicating with Clearing Systems regarding voting in the BVI Scheme (for further distribution to Scheme Creditors (who are not Sanctions Affected Scheme Creditors)), and (d) assisting the Chairperson in checking the voting values of each Scheme Creditor (who is not a Blocked Scheme Creditor) for/at the BVI Scheme Meeting against the relevant

Custody Instructions or, as the case may be, the records supplied by the Company.  GLAS will be managing the voting process of the Schemes for Blocked Scheme Creditors.

FFP (BVI) Limited (the "**BVI Information Agent**") will provide an additional contact point in the BVI for Scheme Creditors (who are not Sanctions Affected Scheme Creditors) to obtain information regarding the BVI Scheme or the Restructuring on non-voting related matters (in addition to other services it will provide to the Company).

Queries in relation to this Explanatory Statement or the completion of an Account Holder Letter should be directed to the Information Agent or alternatively, the BVI Information Agent, as follows:

**Morrow Sodali Limited**
Telephone: in Hong Kong +852 2319 4130; in London: +44 20 4513 6933
Email: evergrande@investor.morrowsodali.com
Transaction Website (document posting website): https://projects.morrowsodali.com/evergrande
Portal (form submission website): https://portal.morrowsodali.com/EvergrandeScheme
Attention: Debt Services Team

**FFP (BVI) Limited**
Telephone: (+1 284) 494 2715
Email: sceneryjourney@ffp.vg

**Blocked Scheme Creditors should direct any questions in relation to this Explanatory Statement, the Blocked Scheme Creditor Form, the Scheme or the Restructuring to:**

**GLAS Specialist Services Limited**
Email: lm@glas.agency
Attention: Liability Management Team
Blocked Scheme Creditor Forms to be submitted via the methods set out in the Solicitation Packet.

**For Company Announcements regarding the BVI Scheme, including those relevant for Blocked Scheme Creditors**

**http://www.evergrande.com/**

31 July 2023

**TABLE OF CONTENTS**

1.    EXPECTED TIMETABLE OF PRINCIPAL EVENTS ........................................................... 6

2.    IMPORTANT SECURITIES LAW NOTICES ......................................................................... 8

3.    IMPORTANT NOTICES TO SCHEME CREDITORS .......................................................... 14

4.    SUMMARY OF ACTIONS TO BE TAKEN BY SCHEME CREDITORS ........................... 24

5.    LETTER FROM THE BOARD TO THE SCHEME CREDITORS ....................................... 36

6.    BACKGROUND TO THE RESTRUCTURING .................................................................... 41

7.    KEY ELEMENTS OF THE BVI SCHEME – HOW DOES IT BECOME EFFECTIVE? .... 52

8.    KEY ELEMENTS OF THE SCHEME – RELEASES AND ENTITLEMENT TO RECEIVE
      SCHEME CONSIDERATION ................................................................................................ 56

9.    KEY ELEMENTS OF THE BVI SCHEME – DISTRIBUTION OF THE SCHEME
      CONSIDERATION ................................................................................................................ 63

10.   SUMMARY OF THE SCHEME - THE SCHEME ADMINISTRATORS ............................ 65

11.   SUMMARY OF THE BVI SCHEME – THE HOLDING PERIOD TRUSTEE AND THE
      SUCCESSOR ESCROW AGENT ......................................................................................... 69

12.   SUMMARY OF THE BVI SCHEME – OTHER MATTERS ................................................ 72

13.   CERTAIN LEGAL ASPECTS OF THE BVI SCHEME ....................................................... 76

14.   RESTRUCTURING DOCUMENTS ...................................................................................... 80

15.   SUMMARY OF THE NEW INSTRUMENTS ....................................................................... 81

16.   RISK FACTORS .................................................................................................................... 82

17.   TAXATION .......................................................................................................................... 103

SCHEDULE 1 DEFINITIONS AND INTERPRETATION

SCHEDULE 2 LIQUIDATION ANALYSIS

SCHEDULE 3 RECOVERY ANALYSIS

SCHEDULE 4 [BLANK]

SCHEDULE 5 [BLANK]

SCHEDULE 6 THE BVI SCHEME

SCHEDULE 7  GROUP STRUCTURE CHART

SCHEDULE 8  NOTICE OF SCHEME MEETING

SCHEDULE 9  SCHEME MEETING CONVENING ORDER

SCHEDULE 10  SUMMARY OF THE TERMS OF THE NEW INSTRUMENTS

## 1.    EXPECTED TIMETABLE OF PRINCIPAL EVENTS[1]

1.1    Key events took place *before* the date of this Explanatory Statement are set out below, marked with an asterisk* and are for information purposes only.

| Event | | BVI time | HK time (as reference) |
|---|---|---|---|
| **Date of the RSA*** | | 3 April 2023 | |
| **Court hearing for leave to convene the BVI Scheme Meeting*** | | 2:00 p.m. on 24 July 2023 | 2:00 a.m. on 25 July 2023 |
| **Custody Instruction Deadline** | The latest time for Account Holders to submit Custody Instructions to block Existing Notes held with Euroclear or Clearstream | 5:00 a.m. on 15 August 2023 | 5:00 p.m. on 15 August 2023 |
| **Voting Record Time[2]** | The latest time for lodging Account Holder Letters via the Portal, and emailing the Blocked Scheme Creditor Form with GLAS for the purpose of voting at the BVI Scheme Meeting | 5:00 a.m. on 18 August 2023 | 5:00 p.m. on 18 August 2023 |
| **BVI Scheme Meeting for Scheme Creditors[3]** | The meeting of the Scheme Creditors for the purpose of considering, and if thought fit, approving the BVI Scheme. | 9:00 a.m. on 22 August 2023 | 9:00 p.m. on 22 August 2023 |
| **Scheme Sanction Hearing[4]** | | 10:00 a.m. on 4 September 2023 | 10:00 p.m. on 4 September 2023 |

[1] The dates in this timetable and those mentioned throughout this Explanatory Statement assume that none of the Court hearings or the BVI Scheme Meeting are adjourned or delayed. It is also possible that the drawing up or registration of the Scheme Sanction Order may be delayed if any person appeals the order (other events may delay the registration of the Scheme Sanction Order). If there is any change to the date or time listed in this timetable, the revised date or time will be announced as soon as practicable when it is known to the Company.

[2] Scheme Creditors should confirm as early as possible with their Account Holders and/or Intermediaries (as applicable) whether there are any applicable deadlines to ensure that their Scheme Creditor Forms is returned online via the Portal to the Information Agent prior to the Voting Record Time in order to vote.

[3] The BVI Scheme Meeting will commence at the time stated. Any Scheme Creditor that wishes to attend the BVI Scheme Meeting in person should produce a duplicate copy of the Account Holder Letter or Blocked Scheme Creditor Form that was executed and delivered on their behalf, evidence of personal identity (for example, a passport or other picture identification) and, in the case of a corporation, evidence of corporate authority (for example, a valid power of attorney and/or board minutes) at the registration desk by no later than one hour before the scheduled time of the BVI Scheme Meeting. The Chairperson of the BVI Scheme Meeting may at his or her sole discretion allow a Scheme Creditor to provide the relevant documents up to the time of the commencement of the BVI Scheme Meeting. These will apply to those attending by video as well and there may be a virtual registration desk.

[4] Notice will be provided to all Scheme Creditors if the date of the Scheme Sanction Hearing changes.

| Event | | BVI time | HK time (as reference) |
|---|---|---|---|
| **Scheme Effective Date** | The date on which all of the Scheme Conditions are satisfied, and the BVI Scheme becomes effective. | 5 September 2023 or as soon as after that. | |
| **Bar Date** | The last day for the Scheme Creditors to submit the Scheme Creditor Forms in order to receive or be entitled to receive the Scheme Consideration. | The date falling fourteen (14) calendar days after the Scheme Effective Date | |
| **Restructuring Effective Date / Entitlement Record Time** | The date on which all conditions precedent to the Restructuring have been satisfied or waived (as the case may be). | To be announced by the Company | |
| **Longstop Date** | The date on which the RSA will terminate automatically and immediately. | 15 December 2023 (or such date as amended in accordance to the RSA) | |

**2.      IMPORTANT SECURITIES LAW NOTICES**

**This Explanatory Statement does not constitute an offer to sell or the solicitation of an offer to buy any securities in any jurisdiction in contravention of applicable law. None of the securities referred to in this Explanatory Statement shall be sold, issued or transferred in any jurisdiction in contravention of applicable law.**

2.1    **General**

(a)    The distribution of this Explanatory Statement and the offering, sale or delivery of the New Instruments are subject to restrictions and may not be made except pursuant to registration with or authorisation by the relevant securities regulatory authorities or an exemption therefrom. Therefore, Persons who may come into possession of this Explanatory Statement are advised to consult with their own legal advisors as to what restrictions may be applicable to them and to observe such restrictions. This Explanatory Statement may not be used for the purpose of an offer or invitation in any circumstances in which such offer or invitation is not authorised.

(b)    No action has been or will be taken in any jurisdiction by the Company that would or is intended to permit a public offering, or any other offering under circumstances not permitted by applicable law, of the New Instruments. Persons into whose hands this Explanatory Statement comes are required by the Company and the Group[5] to comply with all applicable laws and regulations in each country or jurisdiction in which they purchase, offer, sell or deliver New Instruments or have in their possession, distribute or publish this Explanatory Statement or any other materials relating to the New Instruments, in all cases at their own expense.

(c)    Each Scheme Creditor will be required to submit the validly completed Account Holder Letter or Blocked Scheme Creditor Form (as applicable) in order to receive the New Instruments.

2.2    **US securities law considerations**

(a)    The New Instruments have not been and will not be registered under the US Securities Act of 1993, as amended (the "**US Securities Act**") or with any securities regulatory authority of any state of the United States.

(b)    In connection with the issue of the New Instruments, the Distribution Confirmation Deed will require each Scheme Creditor (or its Designated Recipient) who wishes to receive its New Instruments to confirm, amongst other things, that it (or its Designated Recipient) is an Eligible Person and will require any Scheme Creditor (or Designated Recipient) who is located in the United States or who is a US person (as defined in Regulation S) and intends to receive their New Instruments to make certain representations and covenants in the Distribution Confirmation Deed. If the confirmations required by the Distribution Confirmation Deed cannot be or are not given by a Scheme Creditor (or its Designated Recipient), such Scheme Creditor (or its Designated Recipient) will not be eligible to receive the relevant New Instruments.

(c)    Unless otherwise approved by the Company, the New Instruments will be transferred and delivered within the United States solely to QIBs and Accredited Investors and to US persons who are QIBs and Accredited Investors only. Outside the United States,

---

[5] which includes NEV, Evergrande PSG, Hengda Real Estate, Tianji, the Company, and the Existing Notes Subsidiary Guarantors (hereafter referred to simply as the "**Group**").

the New Instruments will be transferred and delivered solely to non-US persons in offshore transactions in reliance on Regulation S.

(d)     If you are a US person, or are located in the United States, but you are not a QIB or an Accredited Investor, you are eligible to receive this Explanatory Statement and to participate in the BVI Scheme and the meetings described herein but you will not be eligible to receive any New Instruments.

(e)     The New Instruments will not be listed on any US securities exchange or with any inter-dealer quotation system in the United States.  The Company does not intend to take action to facilitate a market of the New Instruments in the United States. Consequently, the Company believes that it is unlikely that an active trading market in the United States will develop for such Notes.

**The New Instruments have not been and will not be registered with the SEC or any US federal, state or other securities commission or regulatory authority and neither the SEC nor any US federal, state or other securities commission or regulatory authority has approved or disapproved this Explanatory Statement.  Any representation to the contrary is a criminal offence in the United States.**

**Scheme Creditors who are citizens or residents of the United States should consult their own legal, financial and tax advisors with respect to the legal, financial and tax consequences of the BVI Scheme in their particular circumstances.**

2.3     **European Economic Area**

(a)     The New Instruments are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the European Economic Area ("**EEA**").  For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU ("**MiFID II**"); or (ii) a customer within the meaning of Directive 2002/92/EC (as amended or superseded), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II. Consequently, no key information document required by Regulation (EU) No 1286/2014 (the "**PRIIPs Regulation**") for offering or selling the New Instruments or otherwise making it available to retail investors in the EEA has been prepared and therefore offering or selling the New Instruments or otherwise making it available to any retail investor in the EEA may constitute a breach of the PRIIPs Regulation.

(b)     In addition, this Explanatory Statement has been prepared on the basis that all offers of the New Instruments in the EEA will be made pursuant to an exemption under Regulation (EU) 2017/1129 (the "**Prospectus Regulation**"), from the requirement to produce a prospectus for offers of the New Instruments.  Accordingly, any person making or intending to make any offer within the EEA of the New Instruments should only do so in circumstances in which no obligation arises for the Company to produce a prospectus for such offer.  The Company has not authorised and does not authorise the making of an offer of any of the New Instruments through any financial intermediary.

(c)     In relation to each member state of the EEA ("**Member State**"), no offer of New Instruments to the public in that Member State may be made other than to any legal entity which is a qualified investor as defined in the Prospectus Regulation (an "**EEA Qualified Investor**") or in any other circumstances falling within Article 1(3) or Article 1(4) of the Prospectus Regulation, provided that no such offer of New

9

Instruments shall require the Company to publish a prospectus pursuant to Article 3(1) or Article 3(3) of the Prospectus Regulation.

(d)    In connection with the issue of the New Instruments, the Distribution Confirmation Deed will require each Scheme Creditor (or its Designated Recipient) who wishes to receive its Scheme Consideration to confirm, amongst other things, that it (or its Designated Recipient, as applicable) is an Eligible Person and will require any Scheme Creditor (or its Designated Recipient, as applicable) who is located in a Member State and intends to receive their New Instruments to make certain representations and covenants in the Distribution Confirmation Deed, including that it is an EEA Qualified Investor.  If the confirmations required by the Distribution Confirmation Deed cannot be or are not given by a Scheme Creditor (or its Designated Recipient, as applicable), such Scheme Creditor (or its Designated Recipient, as applicable) will not be eligible to receive the relevant New Instruments and will not be treated as an Eligible Person.

(e)    For the purposes of this provision, the expression an "offer to the public" in relation to the New Instruments in any Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the New Instruments to be offered so as to enable an investor to decide to purchase or subscribe for the New Instruments, as the same may be varied in that Member State by any measure adopted in that Member State pursuant to the Prospectus Regulation (and amendments thereto).

### 2.4    United Kingdom

(a)    The New Instruments are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the United Kingdom ("**UK**").  For these purposes, a retail investor is defined in the UK PRIIPs Regulation to include a client or customer which is not a professional client within the meaning of UK MiFID II.  Consequently, no key information document required by the UK PRIIPs Regulation for offering or selling the New Instruments or otherwise making it available to retail investors in the UK has been prepared and therefore offering or selling the New Instruments or otherwise making it available to any retail investor in the UK may constitute a breach of the UK PRIIPs Regulation.

(b)    In addition, this Explanatory Statement has been prepared on the basis that all offers of the New Instruments in the UK will be made pursuant to an exemption under the UK Prospectus Regulation from the requirement to produce a prospectus for offers of the New Instruments.  Accordingly, any person making or intending to make any offer in the UK of the New Instruments should only do so in circumstances in which no obligation arises for the Company to produce a prospectus for such offer.  The Company has not authorised and does not authorise the making of an offer of any of the New Instruments through any financial intermediary.

(c)    No offer of New Instruments to the public in the UK may be made other than to any legal entity which is a qualified investor as defined in the UK Prospectus Regulation (a "**UK Qualified Investor**") or in any other circumstances falling within Article 1(3) or Article 1(4) of the UK Prospectus Regulation, provided that no such offer of New Instruments shall require the Company to publish a prospectus pursuant to Article 3(1) or Article 3(3) of the UK Prospectus Regulation.

(d)    In connection with the issue of the New Instruments, the Distribution Confirmation Deed will require each Scheme Creditor (or its Designated Recipient) who wishes to receive its Scheme Consideration to confirm, amongst other things, that it (or its Designated Recipient) is an Eligible Person and will require any Scheme Creditor (or

Designated Recipient) who is located in the UK and intends to receive their New Instruments to make certain representations and covenants in the Distribution Confirmation Deed, including that it is a UK Qualified Investor.  If the confirmations required by the Distribution Confirmation Deed cannot be or are not given by a Scheme Creditor (or its Designated Recipient), such Scheme Creditor (or its Designated Recipient) will not be eligible to receive the relevant New Instruments.

(e)     For the purposes of this provision, the expression an "offer to the public" in relation to the New Instruments in the UK means the communication in any form and by any means of sufficient information on the terms of the offer and the New Instruments to be offered so as to enable an investor to decide to purchase or subscribe for the New Instruments.

(f)     For the purposes of paragraphs (a) to (e) above, "**UK PRIIPs Regulation**" is defined to mean the PRIIPS Regulation as retained as UK law by the European (Withdrawal) Act 2018 ("**EUWA**") and as amended by UK domestic law; "**UK Prospectus Regulation**" means the Prospectus Regulation as retained as UK law by EUWA and as amended by UK domestic law; and "**UK MiFID II**" means MiFID II as retained as UK law by EUWA and as amended by UK domestic law.

(g)     This Explanatory Statement has not been approved by an authorised person for the purposes of section 21 of the UK Financial Services and Markets Act 2000 ("**FSMA**"). Accordingly, this Explanatory Statement is not being distributed to, and must not be passed on to, the general public in the UK.  In the UK, this Explanatory Statement is for distribution only to  persons who: (i) are investment professionals, as it is defined in Article 19(5) of the Financial Promotion Order; (ii) are persons falling within Article 49(2)(a) to (d) (high net-worth companies, unincorporated associations, etc.), of the Financial Promotion Order; or (iii) are persons to whom this Explanatory Statement may be provided pursuant to Section 4.12 of the Conduct of Business Sourcebook of the UK Financial Conduct Authority (all such persons together being referred to as "**Relevant Persons**"). This Explanatory Statement is directed only at Relevant Persons and must not be acted on or relied on by persons who are not Relevant Persons. Any investment or investment activity to which this Explanatory Statement relates is available only to Relevant Persons and will be engaged in only with Relevant Persons.

2.5     **Hong Kong**

This Explanatory Statement has not been and will not be registered with the SFC or the Hong Kong Companies Registrar.  The New Instruments have not been and will not be offered or sold in Hong Kong, by means of any document, other than: (a) Professional Investors; or (b) in other circumstances which do not result in the document being a "prospectus" as defined in the C(WUMP)O or which do not constitute an offer to the public within the meaning of C(WUMP)O.  No advertisement, invitation or document relating to the New Instruments may be issued or may be in the possession of any person other than with respect to the New Instruments which are or are intended to be disposed of only to persons outside Hong Kong or only to Professional Investors.

2.6     **PRC**

The New Instruments have not been and will not be registered under the relevant laws of the PRC.  Accordingly, no offer, promotion, solicitation for sales or sale of or for, as the case may be, any New Instruments in the PRC will be made, except where permitted by the China Securities Regulatory Commission or where the activity otherwise is permitted under the laws of the PRC.

2.7    **Singapore**

(a)    This Explanatory Statement has not been and will not be registered as a prospectus with the Monetary Authority of Singapore.  Accordingly, this Explanatory Statement and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of New Instruments may not be circulated or distributed, nor may New Instruments be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to any person in Singapore other than:

(i)    to an institutional investor (as defined in Section 4A of the SFA) pursuant to Section 274 of the SFA;

(ii)    to a relevant person (as defined in Section 275(2) of the SFA) pursuant to Section 275(1) of the SFA, or any person pursuant to Section 275(1A) of the SFA, and in accordance with the conditions specified in Section 275 of the SFA and (where applicable) Regulation 3 of the Securities and Futures (Classes of Investors) Regulations 2018; or

(iii)    otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

(b)    Where New Instruments are subscribed or purchased under Section 275 of the SFA by a relevant person which is:

(i)    a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(ii)    a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor,

(iii)    securities or securities-based derivatives contracts (each term as defined in Section 2(1) of the SFA) of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the New Instruments pursuant to an offer made under Section 275 of the SFA except:

(A)    to an institutional investor, or to a relevant person, or to any person arising from an offer referred to in Section 275(1A) or Section 276(4)(i)(B) of the SFA;

(B)    where no consideration is or will be given for the transfer;

(C)    where the transfer is by operation of law;

(D)    as specified in Section 276(7) of the SFA; or

(E)    as specified in Regulation 37A of the Securities and Futures (Offers of Investments) (Securities and Securities-based Derivatives Contracts) Regulations 2018.

12

(c)     Any reference to the SFA is a reference to the Securities and Futures Act, Chapter 289 of Singapore and a reference to any term as defined in the SFA or any provision in the SFA is a reference to that term or provision as modified or amended from time to time including by such of its subsidiary legislation as may be applicable at the relevant time.

## 2.8     Cayman Islands

There is no registration required or made under the Securities Investment Business Act in the Cayman Islands or with the Cayman Islands Monetary Authority in relation to this Explanatory Statement and this Explanatory Statement is only distributed to Scheme Creditors such that it does not represent an offer to the public in the Cayman Islands under any law in the Cayman Islands.

## 2.9     British Virgin Islands

This Explanatory Statement has not been and will not be registered with the British Virgin Islands Financial Services Commission.  No security is or shall be offered to the public in the British Virgin Islands for purchase or subscription for the purposes of the Securities and Investment Business Act (As Amended).

## 2.10     Scheme Creditor who is not an Eligible Person

(a)     Without limiting the information set out in this Section 2 (*Important Securities Law Notices*), the New Instruments will not be issued to a Scheme Creditor pursuant to the BVI Scheme where such Scheme Creditor is not an Eligible Person.

(b)     However, a Scheme Creditor who is not an Eligible Person may designate a Designated Recipient (who itself must be an Eligible Person) to receive the Scheme Consideration, *provided, however*, that when designating a Designated Recipient, a Scheme Creditor will be required to represent and warrant to the Company that it will retain no beneficial interest in the New Instruments designated to be held by the Designated Recipient.

(c)     If a Scheme Creditor is not an Eligible Person and fails to designate a Designated Recipient on or before the Bar Date, the Scheme Creditor's rights under the Scheme shall be extinguished and such scheme Creditor will have no further rights with respect to the Scheme Consideration.

13

3.      **IMPORTANT NOTICES TO SCHEME CREDITORS**

**This section contains a number of important notices to Scheme Creditors. Scheme Creditors are strongly encouraged to carefully review the notices in this section and, if necessary, seek and obtain independent legal, tax and/or financial advice.**

3.1    **Defined terms**

Unless the context otherwise requires, all capitalised terms used in this Explanatory Statement shall have the meanings set out in Schedule 1 (*Definitions and Interpretation*) to this Explanatory Statement.

3.2    **Information**

(a)    This Explanatory Statement has been prepared in connection with the scheme of arrangement proposed by the Company pursuant to section 179A of the BVI Business Companies Act in relation to the BVI Scheme between the Company and the Scheme Creditors, and has been prepared solely for the purpose of providing information to Scheme Creditors in relation to the BVI Scheme.

(b)    Nothing in this Explanatory Statement or any other document issued with or appended to it should be relied on for any purpose other than for Scheme Creditors to make a decision on the BVI Scheme. In particular and without limitation, nothing in this Explanatory Statement should be relied on in connection with the purchase or acquisition of any Scheme Claim or any other financial instruments, securities, assets or liabilities of the Company or any other member of the Group.

(c)    Nothing contained in this Explanatory Statement constitutes a recommendation, or the giving of advice, by the Board, the Company or any other member of the Group or the Information Agent to take a particular course of action or to exercise any right conferred by the Existing Notes in relation to, buying, selling, subscribing for, exchanging, redeeming, holding, underwriting, disposing of, or converting Existing Notes or any other financial instruments, securities, assets, claims, property interests or liabilities of the Company or any other member of the Group.

3.3    **Financial statements**

(a)    The financial information in this Explanatory Statement for the Group is from the audited consolidated financial results for the year ended 31 December 2021 (the "**FY21 Audited Group Consolidated Financial Results**") and 31 December 2022 (the "**FY22 Audited Group Consolidated Financial Results**") which informed (respectively) the 'Announcement of Results for the Year Ended 31 December 2021' and the 'Announcement of Results for the Year Ended 31 December 2022' of CEG published on CEG's website (http://www.evergrande.com) and the website of the HKEX (https://www.hkexnews.hk) on 17 July 2023. The auditor provided a disclaimer of opinion for the results contained in the announcements and noted that there are material uncertainties related to the going concern basis of the Group.

(b)    The financial information in this Explanatory Statement where it relates to the TJ Group only is from the audited consolidated financial statements for the TJ Group for the year ended 31 December 2022 (the "**FY22 TJ Group Financial Statements**"). The FY22 TJ Group Financial Statements are available on the Transaction Website. The auditor for the FY22 TJ Group Financial Statements provided a disclaimer of opinion for the results contained therein and noted that there are material uncertainties related to the going concern basis of the TJ Group.

(c)     The financial information in this Explanatory Statement where it relates to the Company only is from the audited standalone financial statements for the Company for the year ended 31 December 2022 (the "**FY22 SJ Standalone Financial Statements**"). The FY22 SJ Standalone Financial Statements are available on the Transaction Website. The auditor for the FY22 SJ Standalone Financial Statements provided a disclaimer of opinion for the results contained therein and noted that there are material uncertainties related to the going concern basis of the Company.

(d)     Once published, the Annual Reports for the Group for FY21 (containing the FY21 Audited Group Consolidated Financial Results in full) and FY22 (containing the FY22 Audited Group Consolidated Financial Results in full) will also be made available on the Transaction Website.

3.4     **Scheme Creditors**

This Explanatory Statement is to be distributed to persons who, according to the Company's records, are believed are or may be Scheme Creditors as at the date of this Explanatory Statement.  Information on the actions that Scheme Creditors are required to take under the BVI Scheme is set out in Section 4 (*Summary of Actions to be Taken by Scheme Creditors*) of this Explanatory Statement and also in the Solicitation Packet available on the Transaction Website.

3.5     **Blocked Scheme Creditors**

(a)     Blocked Scheme Creditors are Scheme Creditors who are not entitled, able or permitted (whether directly or through a custodian) to submit instructions or settle though the Clearing Systems as a result of Applicable Sanctions affecting the Scheme Creditor or its custodian. Whilst Applicable Sanctions remain in place in respect of Blocked Scheme Creditors, such Blocked Scheme Creditors will not be entitled, able or permitted to (i) submit Account Holder Letters or have a Custody Instruction submitted on its behalf (if applicable) through the Clearing Systems or to the Information Agent in the BVI Scheme, or (ii) receive the Scheme Consideration.

(b)     As a result, the Blocked Scheme Creditors must submit (or procure the submission of, as applicable) a Blocked Scheme Creditor Form, together with supporting evidence and other materials as required, to GLAS in order to vote on the BVI Scheme.

(c)     A Blocked Scheme Creditor that submits a Blocked Scheme Creditor Form must provide sufficient supporting evidence to allow GLAS to reliably establish that Blocked Scheme Creditor's identity, status as a Scheme Creditor and the value of its relevant holding.  GLAS will review each Blocked Scheme Creditor Form and the accompanying evidence submitted by the Voting Record Time to assess whether the form has been completed correctly and whether there is sufficient evidence to establish reliably the Blocked Scheme Creditor's identity, its status as a Scheme Creditor and the value of its holding.[1]  The Clearing Systems (as applicable) will not assist GLAS with the review of this evidence and therefore GLAS will be entirely reliant on the evidence provided by the Blocked Scheme Creditor to ascertain its identity, its status as a Scheme Creditor and the value of its holding.

(d)     For the avoidance of doubt, Blocked Scheme Creditors will not be able to receive the Scheme Consideration on the Restructuring Effective Date if the Applicable Sanctions remain in place.  Instead, on the Restructuring Effective Date, the Blocked New

---

[1] Blocked Scheme Creditors do not need to submit a Custody Instruction because their Existing Notes are already blocked from trading as their accounts were blocked by the Clearing Systems at the time the Applicable Sanctions were put in place. As such, Blocked Scheme Creditors are unable to submit instructions to the Clearing Systems.

Instruments to which each Blocked Scheme Creditor is entitled will be paid to the Holding Period Trustee to be held on trust under the terms of the Holding Period Trust Deed until the expiration of the Holding Period.

(e)     If the Applicable Sanctions are still in place upon the expiration of the Holding Period, the Company will appoint a Successor Trustee to hold the Blocked New Instruments for the Blocked Scheme Creditors until the earlier of (i) the expiry of the Perpetuity Period, or (ii) the lifting of Applicable Sanctions with the Blocked Scheme Creditors being given a reasonable period of time thereafter to claim their entitlement to the Scheme Consideration in accordance with the terms of the Successor Escrow Account  The terms of this Successor Escrow Account and the process and conditions for distribution will be notified to the Blocked Scheme Creditors on or immediately after the Holding Period Expiry Date on CEG's website and/or through other such public medium as may be appropriate at that time.

(f)     If the Information Agent becomes aware during its dealing with the Scheme Creditors that certain Scheme Creditors are affected by the Applicable Sanctions and therefore are Blocked Scheme Creditors, the Information Agent will refer such Blocked Scheme Creditors to GLAS.  Even if GLAS then determines that any of such Scheme Creditors are not Blocked Scheme Creditors, such Scheme Creditor will still be subject to the procedure for Blocked Scheme Creditor.

(g)     The inability of Blocked Scheme Creditors to receive the Scheme Consideration at the same time as the Scheme Creditors who are not Sanctions Affected Scheme Creditors is due to the current regulatory environment and is not connected to their treatment under the BVI Scheme or their rights against the Company.  In particular, the Blocked Scheme Creditors are entitled to the Scheme Consideration on an equal footing to the Scheme Creditors who are not Sanctions Affected Scheme Creditors and, therefore, Blocked Scheme Creditors are not being disadvantaged under the terms of the BVI Scheme.

(h)     For further details about the arrangements for the Blocked Scheme Creditors, please read this Explanatory Statement carefully as a whole, in particular Section 4 (*Summary of Actions to be Taken by Scheme Creditors*) and Section 11 (*Summary of the BVI Scheme – the Holding Period Trustee and the Successor Escrow Agent*) of this Explanatory Statement.

3.6     **Sanctioned Scheme Creditor**

(a)     A Sanctioned Scheme Creditor is a Scheme Creditor who is designated on any Applicable Sanctions List or in aggregate, 50 per cent or greater owned, directly or indirectly, or otherwise controlled, directly or indirectly (in each case with reference to Applicable Sanctions) by any Person or Persons designated per any Applicable Sanctions List.

(b)     Sanctioned Scheme Creditors must contact the Company in writing pursuant to the notice details set out in Clause 7 (*Notice to Scheme Creditors and Others*) of the BVI Scheme to bring their status as a Sanctioned Scheme Creditors to the attention of the Company on or before the Bar Date.  Any Sanctioned Scheme Creditor that fails to comply with this notice requirement shall have its rights under this Scheme extinguished, including any right which it may have to receive Scheme Consideration under this Scheme.

(c)     Where the Information Agent reasonably considers a Scheme Creditor to be a Sanctions Affected Scheme Creditor, it shall refer the relevant Scheme Creditor to the Company.

If the Company agrees that the relevant Scheme Creditor is a Sanctioned Scheme Creditor, that Scheme Creditor shall not be entitled to vote on the BVI Scheme or receive Scheme Consideration.  Otherwise, if the Company considers that the relevant Scheme Creditor is not a Sanctioned Scheme Creditor, the relevant Scheme Creditor shall be treated and administered as if it were a Blocked Scheme Creditor for the purposes of the BVI Scheme.

3.7     **Notice to Scheme Creditors**

(a)     Without prejudice to any representations and warranties to be given by the Company in the Restructuring Documents, nothing contained in this Explanatory Statement shall constitute a representation, warranty, undertaking or guarantee of any kind, express or implied, nor any admission of any fact or liability on the part of the Company or any other member of the Group with respect to any asset to which it may be entitled or any claim against it.  Without prejudice to the generality of the foregoing, nothing in this Explanatory Statement or the distribution thereof evidences to any person, or constitutes any admission by the Company or any other member of the Group, that a liability is owed to any person in respect of any claim (including without limitation any Scheme Claim) or that any person is or may be a Scheme Creditor.  The failure to distribute this Explanatory Statement to any Scheme Creditor shall not constitute an admission or determination by the Company or any other member of the Group that such person is not a Scheme Creditor.

(b)     No person has been authorised by the Company to give any information or make any representations concerning the Restructuring Documents or the BVI Scheme which is/are inconsistent with this Explanatory Statement and, if made, such representations shall not be relied upon as having been so authorised.

(c)     The information contained in this Explanatory Statement has been prepared based upon information available to the Company prior to the date of this Explanatory Statement. The delivery of this Explanatory Statement does not imply that the information herein is correct as at any time subsequent to the date hereof.  To the best of the Company's knowledge, information and belief, the information contained in this Explanatory Statement is in accordance with the facts and does not omit anything likely to affect the import of such information, each in a material respect.  The Company has taken all reasonable steps to ensure that this Explanatory Statement contains the information reasonably necessary and material to enable Scheme Creditors to make an informed decision about how the Restructuring affects them.

(d)     None of the advisors have verified that the information contained in this Explanatory Statement is materially in accordance with facts and does not omit anything likely to affect the import of such information in any material way, and each of those Persons expressly disclaims responsibility for such information.

(e)     This Explanatory Statement has not been reviewed, verified or approved by any rating agency or any regulatory authority.  Without prejudice to any representations and warranties to be given by the Company or any other member of the Group in the Restructuring Documents, to the fullest extent permitted by law, the Company and any other member of the Group will have no tortious, contractual or any other liability to any person in connection with the use of this Explanatory Statement and the Company and any other member of the Group will not accept any liability whatsoever to any Person, regardless of the form of action, for any lost profits or lost opportunity, or for any indirect, special, consequential, incidental or punitive damages arising from any use of this Explanatory Statement, its contents or preparation or otherwise in

connection with it, even if the Company or any other member of the Group has been advised of the possibility of such damages.

3.8    **Restrictions**

The distribution of this Explanatory Statement to or in certain jurisdictions may be restricted by law or regulation and persons into whose possession this Explanatory Statement comes are requested to inform themselves about, and to observe, any such restrictions.  Failure to comply with any such restrictions could result in a violation of the laws of such jurisdictions.

3.9    **Summary only**

The summary of the principal provisions of the BVI Scheme contained in this Explanatory Statement is qualified in its entirety by reference to the BVI Scheme itself.  The full text of the BVI Scheme is set out in Schedule 6 (*The BVI Scheme*) to this Explanatory Statement.  Each Scheme Creditor is strongly encouraged to read and consider carefully the text of the BVI Scheme.  This Explanatory Statement has been prepared solely to assist Scheme Creditors in respect of voting on the BVI Scheme.

3.10    **Conflicts**

(a)    In the event of a conflict between the information and terms described in:

(i)    this Explanatory Statement; and

(ii)    the Restructuring Documents (other than the Explanatory Statement);

the terms of the BVI Scheme or the Restructuring Documents shall prevail.

(b)    Subject to the terms of the RSA, any order of the Court, the BVI Scheme and applicable law, the Company shall be at liberty to, subject to obtaining the written consent of the Majority SJ AHG (where the SJ AHG holds the Minimum SJ AHG Threshold), modify the BVI Scheme, or to propose a different scheme or scheme of arrangement, at any time prior to sanction of the BVI Scheme and delivery of the Scheme Sanction Order to the BVI Registrar of Corporate Affairs.  The Company shall enjoy such liberty notwithstanding any actions in reliance on the BVI Scheme or this Explanatory Statement by a Scheme Creditor or any other person.  The Court may also impose modifications, additions or conditions on the BVI Scheme.

3.11    **Forward-looking statements**

(a)    **Nothing in this Explanatory Statement shall be deemed to be a forecast, projection or estimate of the future financial performance of the Company and/or any member of the Group except where otherwise specifically stated.**

(b)    **This Explanatory Statement contains statements, estimates, opinions and projections with respect to the Company and the Group and certain plans and objectives of the Company and the Group.  These forward-looking statements can be identified by the fact that they do not relate only to historical or current facts.  Forward-looking statements often use words such as "*anticipate*", "*target*", "*expect*", "*estimate*", "*intend*", "*plan*", "*goal*", "*believe*", "*will*", "*may*", "*should*", "*would*", "*could*" or other words of similar import.  These statements are based on numerous assumptions and assessments made by the Company as appropriate in light of their experience and perception of historical trends, current conditions, expected future developments and other factors which they**

**believe appropriate. No assurance can be given that such expectations will prove to be correct. Forward-looking statements involve significant risks and uncertainties, should not be read as guarantees of future performance or results, and will not necessarily be accurate indications of whether or not such results will be achieved. Such forward-looking statements only speak as at the date of this Explanatory Statement. A number of factors could cause actual results to differ materially from the results discussed in the forward-looking statements, including, but not limited to, the factors and uncertainties set out in section 16 (*Risk Factors*) of this Explanatory Statement. Each Scheme Creditor is urged to make its own assessment of the validity of such forward-looking statements and their underlying assumptions and no liability is accepted by the Company in respect of the achievement or failure thereof of such forward-looking statements and assumptions. Without limiting the above, none of the boards of directors of the Company and other companies within the Group assumes any obligation to update or correct any forward-looking statements contained in this Explanatory Statement to reflect any change of expectations with respect thereto or any change in event, situation or circumstances on which any such forward-looking statement was based.**

3.12    **Risk factors**

(a)    Scheme Creditors' attention is drawn to certain risks and uncertainties associated with the Restructuring that are set out in section 16 (*Risk Factors*) of this Explanatory Statement.

(b)    These important risk factors could cause the Company's and the Group's actual results and future prospects to differ materially from those expressed in this Explanatory Statement (including any forward-looking statements).

(c)    **Each Scheme Creditor should carefully read and analyse such risk factors and uncertainties, and fully understand their impact, which may be material and adverse, on its financial condition and prospects. The statement of risk factors is not and is not intended to be an exhaustive statement of such factors or of all possible factors which might influence the decision of Scheme Creditors as regards the BVI Scheme or any investment decision.**

3.13    **Disclaimer regarding preparation of the Liquidation Analysis and Scheme Recovery Analysis**

(a)    Deloitte Advisory (Hong Kong) Limited ("**Deloitte**") was engaged by CEG, the Company and TJ to prepare: (i) a report analyzing the recovery rates for the creditors of CEG, the Company and TJ under a hypothetical liquidation scenario of the Group as at 1 January 2023 ("**Liquidation Analysis**") and (ii) a report analyzing the recovery rates for the scheme creditors of CEG, the Company and TJ under the Restructuring ("**Scheme Recovery Analysis**", together with the Liquidation Analysis, the **"Reports"**). Copies of the Reports are set out in this Explanatory Statement at Schedule 2 (*Liquidation Analysis*) and Schedule 3 (*Scheme Recovery Analysis*), respectively.

(b)    As explained below in paragraph 5.9 (*What happens if the Restructuring Fails*) of Section 5 (*Letter from the Board to Scheme Creditors*), the Director believes that the most likely outcome in the event that the Restructuring were not to go ahead would be for the Company to be placed into insolvent liquidation, and that this would result in a substantially lower return to creditors of the Company than if the Restructuring were approved and successfully implemented as proposed.

(c)     By reviewing the Reports, the Scheme Creditors and any other party who gains access to the Reports shall be deemed to have read, and to have irrevocably acknowledged and agreed to comply with, the following contents of this disclaimer:

(i)     the Reports were prepared solely for the benefit of CEG, the Company and TJ and, save in respect of CEG, the Company and TJ, Deloitte accepts no duty of care or liability to any other party regardless of whether or not a party was shown or gained access to any of the Reports, or is a Scheme Creditor placing any reliance on any of the Reports;

(ii)    with respect to dealing in shares, the Reports may contain material non-public information of CEG. Thus, any disclosure, copying, or distribution of the Reports or the taking of any action based on them, which would constitute insider dealing with respect to shares in CEG, is strictly prohibited;

(iii)   the Reports were prepared for indicative and illustrative purposes only.  In respect of the Liquidation Analysis, the actual recoveries may vary subject to, among other things, the actual proceeds of realisation of the assets, the costs and expenses actually incurred incidental to the liquidation/disposal and the amounts of the claims submitted and ultimately admitted as claims against the Company and its subsidiaries.  In respect of the Scheme Recovery Analysis, the actual recoveries may vary subject to, among other things, the ability of the Company to fulfill the repayment obligations under the Restructuring and the amounts of claims submitted and ultimately admitted as claims under the Schemes. Thus, the actual recoveries could be materially different from the estimated recoveries set out in the Reports.

(iv)    the Liquidation Analysis and the Scheme Recovery Analysis were prepared on the basis of information, including unaudited information, received by Deloitte up to 14 July 2023 and 20 July 2023 respectively, and Deloitte has not updated the Reports since the respective dates.  Deloitte relied on the financials and other information provided to it and on representations made to it by management of CEG and CEG's subsidiaries, and the relevant companies' respective staff and advisors.  Deloitte did not audit or verify the correctness and accuracy of the information provided to it and Deloitte does not express an audit opinion on its findings and analysis.  Deloitte accepts no responsibility for the reliability of such information to the extent it is inaccurate, incomplete or misleading;

(v)     the Reports may not contain all facts and information that a Scheme Creditor may regard as relevant or potentially relevant; and

(vi)    finally, the Scheme Creditors and any other party who gains access to the Reports shall refer to the full disclaimers, limitations, source of information, and terms and conditions therein.

(d)     As outlined in this Section 3 (*Important Notices to Scheme Creditors),* each Scheme Creditor should examine, conduct and make its own assessment in relation to this Explanatory Statement, including the Reports.

3.14    **Legal, tax and financial advice**

**Without limiting any of the above, Scheme Creditors should not construe the contents of this Explanatory Statement or any other document in connection with the Restructuring as legal, tax and/or financial advice.**

(a)     This Explanatory Statement has been prepared without taking into account the objectives, financial or tax situation or needs of any particular recipient of it, and consequently, the information contained in this Explanatory Statement may not be sufficient or appropriate for the purposes for which a recipient might use it.  Each Scheme Creditor should conduct its own due diligence and consider the appropriateness of the information in this Explanatory Statement having regard to its own objectives, financial situations and needs.   Scheme Creditors are also recommended to consult their own professional advisors as to legal, tax, financial or other aspects relevant to any action Scheme Creditors might take in relation to the BVI Scheme and the Restructuring, or the implications or consequences of such action.

(b)     This Explanatory Statement is addressed to the Scheme Creditors for their information only and no Person should rely on it in formulating or reaching any investment decision other than for the Scheme Creditors to make a decision whether or not to approve the BVI Scheme.  **Scheme Creditors must rely on their own due diligence and their professional advisors in their decisions with respect to the BVI Scheme and the Restructuring.**

## 3.15    Other jurisdictions

The implications of the Restructuring for Scheme Creditors who are residents or citizens of jurisdictions other than BVI may be affected by the laws of other relevant jurisdictions.  Such overseas Scheme Creditors should inform themselves about and observe any applicable legal requirements in their respective jurisdictions.  Any person outside of BVI who is resident in, or who has a registered address in, or is a citizen of, an overseas jurisdiction should consult independent professional advisors and satisfy themselves as to the full observance of the laws of the relevant jurisdiction in connection with the BVI Scheme and the Restructuring, including obtaining any requisite governmental or other consents, observing any other requisite formalities and paying any issue, transfer or other taxes due in such jurisdiction.

## 3.16    The Existing Notes Trustee

(a)     Neither the Existing Notes Trustee nor any of its directors, officers, employees, agents, affiliates or advisors is acting for, or owes any duty to, any Scheme Creditor, nor will any of them be responsible for providing any advice to any Scheme Creditor in relation to the terms of the New Instruments.  Accordingly, neither the Existing Notes Trustee nor any of its directors, officers, employees, agents, affiliates or advisors make any recommendations as to whether any Scheme Creditor should take any of the actions contemplated in the BVI Scheme.  The Existing Notes Trustee expresses no opinion on the merits of the BVI Scheme and the terms of the New Instruments.  The Existing Notes Trustee has not been involved in negotiating or determining the terms of the BVI Scheme and makes no representation that all relevant information has been disclosed to the Scheme Creditors in or pursuant to the BVI Scheme.  The Existing Notes Trustee has confirmed to the Company that it will not exercise any voting rights in respect of the Existing Notes at the BVI Scheme Meeting unless instructed to do so by the holders of the Existing Notes (if applicable).

(b)     The Existing Notes Trustee shall not be responsible for calculating, verifying or paying any amounts payable in relation to the BVI Scheme, including but not limited to, amount of the New Instruments to be issued, Scheme Claims or any accrued and unpaid interest.  The Existing Notes Trustee shall not be required to take any steps to ascertain whether a Scheme Creditor is eligible to receive any Scheme Consideration.  The Existing Notes Trustee and the New Instruments Trustee will not be responsible for determining or verifying the claims of any Scheme Creditor to receive the Blocked New Instruments.

(c)     The Existing Notes Trustee has not determined or verified the eligibility of Scheme Creditors, Account Holders or Designated Recipients for the purposes of the BVI Scheme nor has the Existing Notes Trustee reviewed the Account Holder Letters, Distribution Confirmation Deeds, Custody Instructions or Designated Recipient Form.

(d)     The Existing Notes Trustee shall not be responsible for monitoring the BVI Scheme and shall not be required to take any steps to monitor or ascertain whether any event that triggers the termination of the RSA has occurred and will not be responsible to the Scheme Creditors or any other person for any loss arising from any failure to do so.

(e)     The Existing Notes Trustee is not a "Scheme Creditor" and therefore the Existing Notes Trustee shall not be entitled to vote at the BVI Scheme Meeting and will only be required to take actions expressly permitted under the BVI Scheme and described herein.  Notwithstanding the foregoing, the Existing Notes Trustee may attend the BVI Scheme Meeting as an observer.

### 3.17    The Information Agent

(a)     Each Scheme Creditor and/or Account Holder hereby unconditionally and irrevocably waives and releases any claims which may arise against the Information Agent from all actual or potential liability, arising directly or indirectly, in each case, in relation to the Information Agent's performance of its roles and all other actions which they may take in connection with the BVI Scheme, save for any liability resulting from the Information Agent's own fraud or wilful misconduct.

(b)     Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers is acting for, or owes any duty to, any Scheme Creditor, nor will any of them be responsible for providing any advice to any Scheme Creditor in relation to the BVI Scheme.  Accordingly, neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers make any recommendations as to whether any Scheme Creditor should take any of the actions contemplated in the BVI Scheme.  The Information Agent expresses no opinion on the merits of the BVI Scheme or the terms of the New Instruments.  The Information Agent has not been involved in negotiating or determining the terms of the BVI Scheme and makes no representation that all relevant information has been disclosed to the Scheme Creditors in or pursuant to the BVI Scheme.  Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers has verified, or assumes any responsibility or liability for the accuracy or completeness of any of the information concerning the BVI Scheme, or any factual statements contained in, or the effect or effectiveness of, the BVI Scheme.

(c)     Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers will have any tortious, contractual or any other liability to any person in connection with the determination of whether a Scheme Creditor is a Sanctions Affected Scheme Creditor.  Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers will accept any liability whatsoever to any person, regardless of the form of action, for any lost profits or lost opportunity, or for any indirect, special, consequential, incidental or punitive damages arising from the determination of whether a Scheme Creditor is a Sanctions Affected Scheme Creditor, even if the Information Agent or any of its directors, officers, employees, agents, affiliates or advisers have been advised of the possibility of such damages.

(d)     Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers is obliged, under the terms of the BVI Scheme or otherwise, to

engage in any transaction or conduct that may give rise to a liability under or in connection with Applicable Sanctions and/or may result in any person becoming targeted by Applicable Sanctions.

(e)     If compliance with any obligations under the terms of the BVI Scheme or otherwise would result in the Information Agent or any of its directors, officers, employees, agents, affiliates or advisers breaching the Blocking Regulation, that obligation need not be complied with (but only to the extent of the breach).

(f)     Under no circumstances will the Information Agent be required to verify or determine the eligibility of any Scheme Creditor in relation to the Scheme.   The Information Agent will check Scheme Claims against Custody Instructions and against the records of Scheme Creditors provided to the Information Agent by the Company.   The Information Agent will assist the Company and the chairperson of the Scheme Meeting in checking the voting values of each Scheme Creditor (who is not a Blocked Scheme Creditor) based on such information.

4.      **SUMMARY OF ACTIONS TO BE TAKEN BY SCHEME CREDITORS**

4.1     **Scheme Creditors, Account Holders and Intermediaries**

(a)     A Scheme Creditor may or may not also be an Account Holder.  Account Holders are those persons who are recorded in the books or other records maintained by the Clearing System as being a holder of Existing Notes in an account with such Clearing System at the Voting Record Time.  Each Account Holder may be holding its interests in the Existing Notes on behalf of one or more Scheme Creditors.  For the avoidance of doubt, an Account Holder may also be a Scheme Creditor but only if it has an economic or beneficial interest as principal in the Existing Notes held in global form or global restricted form through the Clearing Systems as at the Voting Record Time and has a right, upon satisfaction of certain conditions, to be issued definitive notes in accordance with the terms of the Existing Notes and the Indentures.

(b)     Notwithstanding the foregoing sentence, the assistance of Account Holders will be required to submit on behalf of the Scheme Creditors (who are not Sanctions Affected Scheme Creditors), the Custody Instructions via the Clearing Systems by the Custody Instruction Deadline and relevant Scheme Creditor Form via the Portal by the relevant deadlines, in accordance with the instructions contained in this Explanatory Statement. Custody Instructions may only be submitted in principal amounts of US$1,000 and integral multiples of US$1,000 in excess thereof.

(c)     You are an Intermediary of a Scheme Creditor if you hold an interest at the Voting Record Time in any Existing Notes on behalf of another Person or other Persons and you do not hold that interest as an Account Holder.  An Intermediary is commonly a bank or a brokerage house which does not have an account with any of the Clearing Systems.

(d)     For the avoidance of doubt, the Existing Notes Depositary and the Existing Notes Trustee are each Scheme Creditors, however, neither will be entitled to vote at the BVI Scheme Meeting.

(e)     A diagrammatic representation of the Existing Notes Depositary, the Existing Notes Trustee and Intermediaries in their various capacities in relation to the Existing Noteholders with debts held in global note form, in respect of the Existing Notes, is set out below to assist your understanding of the structure of the Existing Notes and the Clearing Systems.   For avoidance of doubt, Scheme Creditors who are Blocked Scheme Creditors will not be able to access the Clearing Systems.



\* In respect of interests in the Existing Notes held at the Record Time.

**(f)** **Scheme Creditors and any Persons with an interest in the Existing Notes, Account Holder or Intermediary (as applicable) should read the full instructions set out in the Solicitation Packet available on the Transaction Website and should read the Explanatory Statement as a whole, in conjunction with the Solicitation Packet. More specifically:**

(i)     **if you are a Scheme Creditor (who is not a Sanction Affected Scheme Creditor) who is an Account Holder, you should take the appropriate action as described below and contact the Information Agent for any questions;**

(ii)     **if you are a Scheme Creditor (who is not a Sanction Affected Scheme Creditor) who is not an Account Holder, you should contact your Account Holder (through any Intermediaries, if applicable) to ensure that your Account Holder takes appropriate action(s) described in the Explanatory Statement and the Solicitation Packet;**

(iii)    **if you are a Blocked Scheme Creditor, you should follow the instruction for Blocked Scheme Creditor in this Explanatory Statement and contact GLAS for any questions;**

4.2     **Summary of Action Table**

(a)     The table below is designed to be a *summary only* of the key actions and relevant deadlines that all Scheme Creditors should and/or are required to take for the purposes of attending and voting at the BVI Scheme Meeting and for receiving Scheme Consideration.  The table should be read in conjunction with the Solicitation Packet available on the Transaction Website.

| Action | Actions to be taken | BVI time | HK time (as reference) |
|---|---|---|---|
| **To vote at the BVI Scheme Meeting** | | | |
| For Scheme Creditors who are not Sanctions Affected Scheme Creditors: <br><br> To vote at the BVI Scheme Meeting | • Custody Instructions to be submitted via the Clearing Systems prior to the Custody Instruction Deadline | 5:00 a.m. on 15 August 2023 | 5:00 p.m. on 15 August 2023 |
| | • Part 1 and Part 2 of the Account Holder Letter, including Voting Instructions, signed and submitted via the Portal. | 5:00 a.m. on 18 August 2023 | 5:00 p.m. on 18 August 2023 |
| For Scheme Creditors who are Blocked Scheme Creditors: <br><br> To vote at the BVI Scheme Meeting | • Sections 2 to 5 of the Blocked Scheme Creditor Form, including supporting evidence and Voting Instructions, signed and submitted to GLAS by email | 5:00 a.m. on 18 August 2023 | 5:00 p.m. on 18 August 2023 |
| **BVI Scheme Meeting** | | | |

| Action | Actions to be taken | BVI time | HK time (as reference) |
|---|---|---|---|
| For Scheme Creditors including the Blocked Scheme Creditors | Attending the BVI Scheme Meeting in person, by video or by proxy. | 9:00 a.m. on 22 August 2023 | 9:00 p.m. on 22 August 2023 |
| **To receive Scheme Consideration on the Restructuring Effective Date** | | | |
| For Scheme Creditors who are not Sanctions Affected Scheme Creditors:<br><br>To receive Scheme Consideration on the Restructuring Effective Date | • Part 1 of the Account Holder Letter signed and submitted via the Portal.<br><br>• Appendix 1 of the Account Holder Letter (*Designated Recipient Form*) (if a Scheme Creditor who is not an Eligible Person and/or who wishes to appoint a Designated Recipient to receive the Scheme Consideration) signed and submitted via the Portal.<br><br>• Appendix 2 of the Account Holder Letter (*Distribution Confirmation Deed*) executed and submitted via the Portal. | the date falling fourteen (14) calendar days after the Scheme Effective Date | |
| For Scheme Creditors who are Blocked Scheme Creditors: | • Sections 2 – 6 of the Blocked Scheme Creditor Form, signed and submitted to GLAS by email | the date falling fourteen (14) calendar days after the Scheme Effective Date | |
| To be entitled to receive the Scheme Consideration upon the lifting of Applicable Sanctions | • Distribution Confirmation Deed executed and submitted to GLAS. | **• A reasonable period of time after the Applicable Sanctions are lifted** | |

4.3    **Meeting of Scheme Creditors**

(a) On 24 July 2023, the Court ordered that a meeting of the Scheme Creditors be convened at 9:00 a.m BVI time on 22 August at the offices of Maples and Calder, 5th Floor, Ritter House, Wickhams Cay II, Road Town, British Virgin Islands (the "**BVI Scheme Meeting**").

(b) Formal notice convening the BVI Scheme Meeting is set out at schedule 8 (*Notices of BVI Scheme Meeting*) of the Explanatory Statement.

(c) The BVI Scheme Meeting is to consider and, if thought fit, approve the BVI Scheme, with or without modification.

(d) Scheme Creditors (including Blocked Scheme Creditors but not Sanctioned Scheme Creditors) will be able to attend the BVI Scheme Meeting in person or by a duly authorised representative (if a corporation) or by proxy. Scheme Creditors (including Blocked Scheme Creditors) will also be able to attend the BVI Scheme Meeting by video conference using dial-in details obtained on request from the Information Agent or the Company.

4.4 **Relevant documents to be completed by each Scheme Creditor**

(a) Each Scheme Creditor will be required to submit the relevant Scheme Creditor Forms in order to vote at the BVI Scheme Meeting and receive the Scheme Consideration, pursuant further to the terms of the BVI Scheme.

(b) A summary of each relevant document pertaining to each Scheme Creditor is set out below, including the consequences of failing to submit such documents in accordance with the requirements under the BVI Scheme

***Custody Instruction*** *(for Scheme Creditors who are not Sanctions Affected Scheme Creditors)*

(c) Custody Instructions are irrevocable instructions which prevent transfers of the Existing Notes until the Restructuring Effective Date, or until the Existing Notes are unblocked in accordance with Section 4.8(f) below. These restrictions are necessary to prevent the same holding of the Existing Notes from being counted more than once at the BVI Scheme Meeting.

(d) Any Scheme Creditor (who is not a Blocked Scheme Creditor) that procures the submission of an Account Holder Letter to vote at the Scheme Meeting must block its Existing Notes. To do this, Scheme Creditors (who are not Sanctions Affected Scheme Creditors) must ensure that their Account Holder, prior to delivering the Account Holder Letter to the Information Agent, submits a Custody Instruction to block its Existing Notes held with Euroclear or Clearstream by the Custody Instruction Deadline.

(e) Any Scheme Creditor (who is not a Blocked Scheme Creditor) must include in its Account Holder Letter reference to the Custody Instruction Reference Number. An Account Holder Letter that does not contain reference to a valid Custody Instruction Reference Number will not be valid for the purposes of voting at the BVI Scheme Meeting.

***Account Holder Letter*** *(for Scheme Creditors who are not Sanctions Affected Scheme Creditors)*

(f) Among other things, the Account Holder Letter is the document that allows a Scheme Creditor (who is not a Sanctions Affected Scheme Creditor) to vote on the BVI Scheme

and/or to become eligible to receive Scheme Consideration on the occurrence of the Restructuring Effective Date.

(g)    A failure by such Scheme Creditor to submit, or a failure by such Scheme Creditor to procure that its Account Holder submits on its behalf (if applicable), the Account Holder Letter via the Portal  by the Voting Record Time will mean that the voting instructions contained in that Account Holder Letter will be disregarded for the purposes of voting at the BVI Scheme Meeting and the relevant Scheme Creditors will, subject to the Chairperson's discretion, not be entitled to vote at the BVI Scheme Meeting.

(h)    A failure by a Scheme Creditor to submit, or a failure by a Scheme Creditor to procure that its Account Holder submits on its behalf (if applicable), the Account Holder Letter via the Portal and received by the Bar Date will mean that such Scheme Creditor will not be eligible to receive Scheme Consideration, in the Form of the New Instruments, on the Restructuring Effective Date but will have its Scheme Claims released and extinguished in accordance with clause 10 of the BVI Scheme.

### Designated Recipient Form *(Appendix 1 of the Account Holder Letter)*

(i)    The Designated Recipient Form is a form that Scheme Creditors (who are not Sanctions Affected Scheme Creditors) may complete in order to appoint, should they wish, a Designated Recipient to be the recipient of some or all of the New Instruments that would otherwise be issued to such Scheme Creditor.

(j)    If a Scheme Creditor is a not an Eligible Person (i.e. a person who cannot make affirmative securities law confirmations set out in Annex B to the Distribution Confirmation Deed), it must appoint a Designated Recipient who is an Eligible Person to have its pro-rata amount of the New Instruments issued to a Designated Recipient and it must therefore complete and return a Designated Recipient Form before the Bar Date.

(k)    The Designated Recipient Form is appended to the Account Holder Letter.

### Distribution Confirmation Deed *(Appendix 2 of the Account Holder Letter)*

(l)    The Distribution Confirmation Deed is a document that Scheme Creditors (who are not Sanctions Affected Scheme Creditors) (or their Account Holder on their behalf as their agent) must complete in order to confirm, among other things, that the Scheme Creditor or its Designated Recipient may lawfully be issued the New Instruments.  Failure to submit a Distribution Confirmation Deed by the Bar Date will result in no New Instruments being issued to the Scheme Creditor or its Designated Recipient.  The Distribution Confirmation Deed is appended to the Account Holder Letter.

### Blocked Scheme Creditor Form

(m)    The Blocked Scheme Creditor Form is the document that allows the Scheme Creditors, who are Blocked Scheme Creditors, to (i) vote on the BVI Scheme at the BVI Scheme Meeting, and (ii) to become eligible to receive the relevant Scheme Consideration should the BVI Scheme be approved, in accordance with the terms of the BVI Scheme. A failure by such Blocked Scheme Creditor to submit, or a failure by such Blocked Scheme Creditor to procure the submission of, the Blocked Scheme Creditor Form to GLAS by email as set out in the instructions to the Solicitation Packet to be received by the Voting Bar Date will mean that the Blocked Scheme Creditor will not be able to vote at the BVI Scheme Meeting unless otherwise approves to do so by the Chairperson

29

at his/her own discretion.  GLAS has been appointed by the Company to liaise with Blocked Scheme Creditors.

4.5 **Actions to be taken by Scheme Creditors before the Voting Record Time**

(a) Scheme Creditors should further refer to Section 1 (*Expected Timetable of Principal Events*) for the key expected timings of the BVI Scheme and this Section 4 (*Summary of Actions Table by Scheme Creditors*) when reviewing this section.

(b) Scheme Creditors who wish to vote in respect of the BVI Scheme at the BVI Scheme Meeting must ensure the actions and Scheme Creditor Forms (as applicable) are validly completed and executed and received by the Information Agent via the Portal by the Voting Record Time.

(c) Whether the required Scheme Creditor Forms have been validly completed shall be determined by the Information Agent and/or GLAS at their discretion, provided that, if the Information Agent and/or GLAS consider any such document not to have been validly completed, they shall promptly:

(i) prepare a written statement of its reasons for that conclusion; and

(ii) send that written statement by email to the party that provided the relevant document.

(d) Where a Scheme Creditor Form is considered not to have been validly completed, and the Bar Date has not yet occurred at the time of such determination, the relevant Scheme Creditor may resubmit the Scheme Creditor Form.

(e) None of GLAS, the Information Agent, or any other person will be responsible for any loss or liability incurred by a Scheme Creditor as a result of any determination by the Information Agent or GLAS.

4.6 **To vote at the BVI Scheme Meeting**

(a) Scheme Creditors will be entitled to attend and vote in person or by proxy at the BVI Scheme Meeting.  If you are a Scheme Creditor, you should read this Explanatory Statement and the Solicitation Packet available on the Transaction Website carefully. In order to attend the BVI Scheme Meeting and vote on the BVI Scheme, it is of the utmost importance that Scheme Creditors (including Sanctions Affected Scheme Creditors) ensure that they follow the voting and other documentary instructions set out below and throughout the Explanatory Statement.

(b) For the purpose of voting at the BVI Scheme Meeting, the Voting Scheme Claim shall be an amount equal to a value equal to the sum of (i) outstanding principal amount of the Existing Notes in which each Scheme Creditor held an economic or beneficial interest as principal at the Voting Record Time (without double counting), and (ii) all accrued and unpaid interest relating to such Existing Notes up to (but excluding) the Voting Record Time.

(c) As noted above at Section 4 (*Summary of Actions to be Taken by Scheme Creditors*) the Existing Notes Trustee and the Existing Notes Depositary (and its nominee) are not Scheme Creditors and shall not be entitled to vote in respect of the Existing Notes at the BVI Scheme Meeting and accordingly they will not vote at such meeting.

(d)     Scheme Creditors (who are not Sanctions Affected Scheme Creditors) who wish to vote in respect of the BVI Scheme are requested to ensure that the Custody Instruction is submitted via the Clearing Systems prior to the Custody Instruction Deadline and the Account Holder Letter is validly completed, executed and returned in accordance with the instructions set out therein so that it is submitted to and received by the Information Agent via the Portal by the Voting Record Time.

(e)     Blocked Scheme Creditors who wish to vote in respect of the BVI Scheme should ensure that the Blocked Scheme Creditor Form together with any other evidence is validly completed, executed and returned to GLAS by the Voting Record Time.

(f)     Sanctioned Scheme Creditors are not entitled to vote at the BVI Scheme Meeting due to the requirements of the Applicable Sanctions.  As such, any Scheme Creditor Form submitted by the Sanctioned Scheme evidence should be disregarded.

(g)     For the avoidance of doubt, the Chairperson has discretion to accept Scheme Creditors (including the Blocked Scheme Creditors but not including the Sanctioned Scheme Creditors) who fail to submit the validly completed and executed Scheme Creditor Forms to vote at the BVI Scheme Meeting, provided that the Chairperson considers that the information contained therein is sufficient to establish the right of the Scheme Creditor to vote at the BVI Scheme Meeting.

(h)     All Voting Scheme Claims for voting purposes will be determined as at the Voting Record Time.

### 4.7    Establishing the value of a Voting Scheme Claim

(a)     For the purpose of voting at the BVI Scheme Meeting, the value of each Scheme Creditor's Voting Scheme Claims shall be determined by reference to the records of the Existing Notes Trustee subject to reconciliation of the Custody Instruction submitted by or on behalf of such Scheme Creditor with the records of the Clearing Systems, as the sum of:

(i)     the outstanding principal amount of the Existing Notes held by the Scheme Creditor at the Voting Record Time; and

(ii)     accrued and unpaid interest on such accrued and unpaid interest on such Existing Notes up to the Voting Record Time.

(b)     For Scheme Creditors who are not Sanctions Affected Scheme Creditors:

(i)     they will have their claims admitted at full value for the purposes of voting on the Scheme at the Scheme Meeting.

(ii)     **To vote**: a Scheme Creditor (other than a Blocked Scheme Creditor) must submit a Custody Instruction (including the Accession Code) via the Clearing Systems by the Custody Instruction Deadline and validly complete and submit to the Information Agent via the Portal an Account Holder Letter that will be included in the solicitation packet available on the Transaction Website.  This must be received by the Information Agent by the Voting Record Time that will be detailed in the Explanatory Statement.

(iii)     **To receive Scheme Consideration**: the Custody Instructions via the Clearing Systems must be submitted by the relevant deadline and Scheme Creditor

31

Forms must be submitted to the Information Agent by no later than the Bar Date to be entitled to receive Scheme Consideration.

(iv)    they will acknowledge and agree that the Chairperson shall use the Account Holder Letter submitted by or on behalf of each of the Scheme Creditors, as checked by the Information Agent against the Custody Instructions submitted through the Clearing Systems (i.e. reconciliation of the Custody Instruction reference number specified in the Account Holder Letter) and, if applicable, the accession records, at the Voting Record Time, to determine the Voting Scheme Claims and any such determination by the Chairperson shall (in the absence of wilful default, wilful misconduct or fraud) be conclusive and binding on the Scheme Creditors and the Company

(c)    For Blocked Scheme Creditors:

(i)    they acknowledge that GLAS shall use the Blocked Scheme Creditor Form submitted by or on behalf of a Scheme Creditor, as verified against all supporting evidence provided with the Blocked Scheme Creditor Form, to assist the Chairperson in establishing the Voting Scheme Claims as at the Voting Record Date.

(ii)    GLAS shall will use reasonable endeavours to review each Blocked Scheme Creditor Form promptly after receipt. Notwithstanding the foregoing it is the responsibility of each Blocked Scheme Creditor to ensure that its Blocked Scheme Creditor Form submitted in respect of its Scheme Claim has been validly completed.

(d)    Any dispute over the value of a Voting Scheme Claim shall be determined by the Chairperson and such determination shall be binding.

(e)    The Chairperson may reject a Voting Scheme Claim for voting purposes in whole or in part if he or she considers that (i) it does not constitute a fair and reasonable assessment of the relevant sums or (ii) if the relevant Scheme Creditor has not complied with the applicable procedures pursuant to the terms of the BVI Scheme.

(f)    If the Voting Scheme Claim of a Scheme Creditor is unascertained, contingent or disputed (in part) but the Chairperson is able to estimate a minimum value of the Voting Scheme Claim, the Chairperson may nonetheless, in his or her sole discretion, admit the Scheme Claim for voting purposes at such minimum value.

(g)    If the Chairperson is unable to place a minimum value on a Voting Scheme Claim, it shall be rejected by the Chairperson in its entirety for voting purposes.

(h)    The Voting Scheme Claims admitted for voting purposes by the Chairperson will be notified to the Scheme Creditors at the BVI Scheme Meeting, but such notification does not (of itself) constitute an admission of the existence or amount of any liability of any member of the Group.

(i)    The Chairperson will be entitled to defer the announcement of the result of the vote until after the BVI Scheme Meeting should the Chairperson consider it appropriate to do so (in his or her sole discretion).

(j)    The Chairperson shall report to the BVI Courts at the Scheme Sanction Hearings, if so requested to by the BVI Court, his or her decision to reject any Voting Scheme Claims

for voting purposes and provide the BVI Court with details of such Voting Scheme Claims and the reasons for rejection.

4.8     **Custody Instructions and Undertaking not to Transfer for Existing Noteholders (who are not Sanctions Affected Scheme Creditors)**

(a)     Custody Instructions are irrevocable instructions which prevent transfers of the Existing Notes until the Restructuring Effective Date, or until the Existing Notes are unblocked in accordance with sub-paragraph (f) below. These restrictions are necessary to prevent the same holding of Existing Notes being voted on at the BVI Scheme Meeting more than once.

(b)     Any Scheme Creditor (other than a Sanctions Affected Scheme Creditor) who intends to submit an Account Holder Letter for the purpose of voting at the BVI Scheme Meeting must block its Existing Notes. To do this, a Scheme Creditor must submit, itself or via its Account Holder as the case may be, a Custody Instruction to block its Existing Notes held with Euroclear or Clearstream by the Custody Instruction Deadline. The Scheme Creditor must then include the Custody Instruction Reference Number assigned to it when submitting the Custody Instruction in its Account Holder Letter. An Account Holder Letter that does not contain reference to a valid Custody Instruction Reference Number will not be valid for the purposes of voting at the BVI Scheme Meeting, and the Company reserves the right to reject any such Account Holder Letter.

(c)     The Scheme Creditor will be deemed to have given a undertaking as soon as the Custody Instruction is submitted that it will not sell, transfer, assign or otherwise dispose of its interest in all or any part of its specified Existing Notes until the Restructuring Effective Date, or until the Existing Notes are unblocked in accordance with Section 4.8(f) below.

(d)     For the avoidance of doubt, all Existing Notes will be blocked from trading by the Clearing Systems on or around five (5) Business Days prior to the Restructuring Effective Date, regardless of whether a Custody Instruction has been submitted.

(e)     If the Restructuring Effective Date occurs before the Longstop Date, all of the Existing Notes will be cancelled in the Clearing Systems on the Restructuring Effective Date, in accordance with the BVI Scheme and thereafter will not be capable of being traded in the Clearing Systems.

(f)     The Company shall provide an irrevocable instruction to the Information Agent to immediately cause the Existing Notes to be unblocked within two (2) Business Days after one of the circumstances below occurs:

(i)     the BVI Scheme is not approved by the requisite majorities of the Scheme Creditors at the BVI Scheme Meeting, is withdrawn or is terminated in accordance with terms of the BVI Scheme;

(ii)    the BVI Scheme is not sanctioned by the BVI Court;

(iii)   the Restructuring does not become effective by the Longstop Date; or

(iv)    subject to sub-paragraph (d) above, the Company at its sole discretion consents to unblock the Existing Notes.

(g) On Restructuring Effective Date all of the Scheme Claims will be irrevocably released and cancelled in full in exchange for the Scheme Considerations to be paid to the Eligible Creditors, the Designated Recipient or the Holding Period Trustee, as the case may be. The Existing Notes will be cancelled.

4.9 **Distribution of Scheme Consideration on the Restructuring Effective Date**

(a) For Scheme Creditors (who are not Sanctions Affected Scheme Creditors), in order to receive the New Instruments on the Restructuring Effective Date, as applicable, please ensure that the Account Holder Letter, Distribution Confirmation Deed and Designated Recipient Form (if applicable) are validly completed, executed, submitted and received by the Information Agent via the Portal by the Bar Date, being no later than 14 calendar days after the Scheme Effective Date.

(b) Any Scheme Creditor (who is not a Sanctions Affected Scheme Creditor) who is not an Eligible Creditor, must appoint at least one Eligible Person to act as its Designated Recipient to receive the New Instruments on its behalf. Such Scheme Creditor must complete and submit a Designated Recipient Form by the Bar Date.

(c) Any Scheme Creditors (who is not a Blocked Scheme Creditor), who is an Eligible Creditor, may also nominate at least one Designated Recipient to receive the Scheme Consideration on the Restructuring Effective Date. Such Scheme Creditor can do so by completing and submitting the Designated Recipient Form via the Portal with its Account Holder Letter by the Bar Date, the latest.

(d) For Blocked Scheme Creditors, who are unable to receive the New Instruments on the Restructuring Effective Date, their Entitlements will be paid to the Holding Period Trustee to hold on trust until the expiration of the Holding Period. If the Applicable Sanctions are still in place on the expiration of the Holding Period, the Company will appoint a Successor Escrow Agent to hold in the Successor Escrow Account such New Instruments until the earlier of (i) the expiry of the Perpetuity Period, or (ii) the lifting of Applicable Sanctions with the Blocked Scheme Creditors being given a reasonable period of time thereafter to recover their Entitlements to the Scheme Consideration in accordance with the terms of the Successor Escrow Account Agreement. If the Applicable Sanctions are no longer in place or no longer apply to a Blocked Scheme Creditor on the expiration of the Holding Period, that Blocked Scheme Creditor will be given a reason a reasonable period of time to recover their Entitlement to the Scheme Consideration.

(e) The Scheme Consideration will be distributed through Euroclear and Clearstream. If details of a Euroclear or Clearstream account are not provided, the Scheme Creditor, on whose behalf the Account Holder Letter is being submitted, will not be entitled to receive any share of the Scheme Consideration.

4.10 **Upload of documents**

(a) If you are a Scheme Creditor (who is not a Sanctions Affected Scheme Creditor), you should submit your completed Account Holder Letter, Distribution Confirmation Deed and Designated Recipient Form online at the Portal (https://projects.morrowsodali.com/EvergrandeScheme) to the Information Agent before the important deadlines set out above and further detailed in the Explanatory Statement and the Solicitation Packet.

(b) If you are a Blocked Scheme Creditor, you should submit your Blocked Scheme Creditor Form and supporting evidence to GLAS by the important deadlines set out above and further detailed in the Explanatory Statement and the Solicitation Packet.

(c) The Company would encourage all Scheme Creditors to start the process for submitting their votes for the BVI Scheme Meeting and submitting the documentation required to participate in the distribution of Scheme Consideration as soon as possible.

(d) If you are in any doubt as to what action you should take in connection with the Explanatory Statement and/or the BVI Scheme, the proposals contained in them or the documents that accompany them, you are recommended to:

   (i) contact the Information Agent (for Scheme Creditors who are not Sanctions Affected Scheme Creditors

   (ii) contact GLAS (for Blocked Scheme Creditors); and

   (iii) seek your own independent advice immediately from your legal, financial, tax or other independent advisor.

(e) **ANY SCHEME CREDITOR (WHO IS NOT A BLOCKED SCHEME CREDITOR) THAT FAILS TO ENSURE THAT A VALIDLY COMPLETED AND EXECUTED ACCOUNT HOLDER LETTER, DISTRIBUTION CONFIRMATION DEED AND, IF APPLICABLE, DESIGNATED RECIPIENT FORM ARE SUBMITTED TO AND RECEIVED BY THE INFORMATION AGENT BY THE BAR DATE SHALL NOT RECEIVE ANY SCHEME CONSIDERATION UNDER THE TERMS OF THE BVI SCHEME BUT SHALL HAVE ITS SCHEME CLAIMS RELEASED IN ACCORDANCE WITH THE TERMS OF THE BVI SCHEME.**

(f) **ANY BLOCKED SCHEME CREDITOR THAT FAILS TO ENSURE THAT ITS BLOCKED SCHEME CREDITOR FORM AND ALL SUPPORTING EVIDENCE IS SUBMITED AND RECEIVED BY GLAS BY THE BAR DATE SHALL NOT RECEIVE ANY SCHEME CONSIDERATION UNDER THE TERMS OF THE BVI SCHEME BUT SHALL HAVE ITS SCHEME CLAIMS RELEASED IN ACCORDANCE WITH THE TERMS OF THE BVI SCHEME.**

**5.    LETTER FROM THE BOARD TO THE SCHEME CREDITORS**

31 July 2023

Dear Scheme Creditor,

**SCENERY JOURNEY LIMITED (景程有限公司)**

5.1    **Introduction**

The Board writes to you in your capacity as a person who is, or appears to be, a Scheme Creditor. This letter forms part of the Explanatory Statement for the BVI Scheme proposed by the Company as part of the Restructuring, the details of which are explained below. Unless otherwise specified, capitalised words or phrases used in this letter have the meanings attributed to them in Schedule 1 (*Definitions and Interpretation*) to the Explanatory Statement.

5.2    **Director's interest in the Restructuring**

(a)    Mr Daiping Chen, sole Director of the Company declared that he has no direct, indirect or non-beneficial interest in the Shares of CEG or in the shares of any of CEG's subsidiaries. Further, Mr Chen has no material interest (whether as director, member, creditor or otherwise) in the BVI Scheme, TJ Scheme, CEG HK Scheme or CEG Cayman Scheme, except as serving as the Director of the Company and the sole director of TJ, and the foreign representative of the TJ Scheme.

5.3    **The Restructuring and the proposed BVI Scheme**

(a)    The Company plans to implement the Restructuring to support an orderly recovery of the Group's operations and maximise returns for all stakeholders of the Company and the Group.  Following extensive negotiations with the SJ AHG and discussions with other stakeholders, the Company has determined that the Restructuring is in the best interests of the Company and those with an economic interest in the Company and the Group, including, in particular, the Scheme Creditors.

(b)    A scheme of arrangement, in this context, is a compromise or an arrangement entered into between a company and its creditors, as provided for under section 179A of the BVI Business Companies Act.  A scheme of arrangement becomes legally binding on all creditors, including those who have voted for it, those who have voted against it and those who have not voted, if at least a majority in number of creditors, representing seventy-five per cent (75%) or more in value of creditors, present and voting (either in person or by proxy) at each scheme meeting, vote in favour of the scheme of arrangement and the Court then sanctions it.

(c)    The Explanatory Statement is distributed for the purpose of providing Scheme Creditors with all the information reasonably necessary to enable them to make an informed decision on whether to approve the BVI Scheme.  A short explanation of the reasons for the Restructuring and the proposed BVI Scheme is included below, as part of this letter.

5.4    **Advisors**

Houlihan Lokey, CICC and BOCI are acting as financial advisors, Sidley Austin, Maples and Calder and Commerce & Finance Law Offices are acting as legal advisors in relation to the Scheme and the Restructuring. Morrow Sodali Limited is acting as the Information Agent and FFP (BVI) Limited is acting as the BVI Information Agent.

5.5     **Financial Position of the Company and the Group**

(a)     Due to, among other factors, unfavourable market conditions of the PRC real estate industry and capital markets during the second half of 2021 and the adverse impact of the COVID-19 pandemic on macroeconomic conditions and certain credit events in 2022, the Group, along with other Chinese property developers, experienced significant liquidity pressures due to limited access to external capital to refinance its existing indebtedness and reduced cash generated from contracted sales.  Against this backdrop, the Company and the Group has been working closing with its stakeholders to formulate a holistic restructuring. Following extensive and thorough consideration, consultation and negotiation, the Board has determined that the Restructuring is in the best interests of the Company and those with an economic interest in the Company, including, in particular, the Scheme Creditors.

(b)     For detailed information about the Company and the Group's financial situation, please refer to Section 6 (*Background to the Restructuring*).

5.6     **Overview of the Restructuring**

(a)     The Restructuring comprises the restructuring of the Company's existing offshore indebtedness under the Existing Notes pursuant to the terms of the BVI Scheme.

(b)     The Restructuring envisages that Scheme Creditors will release their Scheme Claims in return for receiving (or being entitled to receive) Scheme Consideration (comprising the rights and interests in the New Instruments) in accordance with the terms of the BVI Scheme.

(c)     The Scheme Creditors consist of the Persons with an economic or beneficial interest as principal in the Existing Notes held in global form or global restricted form through the Clearing Systems as at the Voting Record Time.

(d)     The Restructuring is part of a wider plan to comprehensively restructure the offshore indebtedness of the Group.  In addition to the Restructuring and the BVI Scheme, the Group is intending to implement the following further restructurings:

(i)     a scheme of arrangement in Hong Kong to be proposed by the sole shareholder of the Company, Tianji Holdings Limited ("**TJ**" and the "**TJ Scheme**").  The BVI Scheme and the TJ Scheme are inter-conditional as between themselves, which means that the effectiveness of the BVI Scheme shall depend on the effectiveness of the TJ Scheme, and vice versa; and

(ii)     linked and inter-conditional schemes of arrangement to be proposed by CEG, the ultimate holding company of the Group, in the Cayman Islands and Hong Kong (respectively, the "**CEG Cayman Scheme**" and the "**CEG HK Scheme**", and collectively the "**CEG Schemes**").  The CEG Schemes are not inter-conditional with either the BVI Scheme or the TJ Scheme, but the CEG Schemes are inter-conditional between themselves.

5.7     **The RSA**

(a)     On 3 April 2023, the Company and certain Scheme Creditors entered into the RSA under which the parties agreed to cooperate in order to facilitate the implementation of the Restructuring. Copies of the execution version of the RSA is available on the Transaction Website.

(b)    The entering into of the RSA is typical in financial restructurings such as the Restructuring and helps to secure a critical mass of creditor support to implement the Restructuring.  As at 14 July 2023, Scheme Creditors holding an aggregate principal amount of approximately US$5.1 billion of the Existing Notes (representing approximately 97.43% of the aggregate outstanding principal amount of all Existing Notes) have acceded to the RSA, meaning that the holders of such Existing Notes are obliged to vote their holdings of such Existing Notes in favour of the BVI Scheme, subject to the terms of the RSA.

5.8    **Ability of the Company to pay the New Instruments**

In relation to the Scheme Consideration, the Company's first required cash interest payment occurs 3 years from the Reference Date (as defined in the Explanatory Statement) and the first principal repayment occurs 4 years from the Reference Date.  The Company envisages servicing its debt through multiple sources, including residual cash flows from projects under TJ. If in the next 3 years, TJ can raise an additional RMB1 billion to RMB2 billion in financing, TJ estimates that from 2026 to 2036, the annual unlevered free cash flow will be approximately RMB 4 billion to RMB 6 billion on average.  It should be noted that the aforementioned cash flow has not yet taken into account the repayment of existing debt at the project level and the repayment of the scheme consideration payable by TJ under the TJ Scheme. There is also uncertainty as to whether TJ can raise new funding. Most of the Group's onshore projects face debt default and litigation risk, which may cause additional cash flow losses to the Company in the future, and may hinder projects' normal development progress. In addition, SJ New Instruments consists of certain share charges of offshore subsidiaries and certain intercompany receivables, the proceeds of which will be a source of repayment for the SJ New Instruments. It is the management's opinion that, subject to the uncertainties aforementioned, the above sources of funds may be available to be used to repay the New Instruments in 3 years' time.

5.9    **What Happens if the Restructuring Fails?**

(a)    The Board believes that, should the BVI Scheme not proceed, the Company will be unable to comply with its obligations under the Existing Notes. In those circumstances, there is a material risk that certain Scheme Creditors will pursue Enforcement Actions against the Company, TJ, the Keepwell Provider, and/or the Existing Notes Subsidiary Guarantors in respect of their outstanding obligations.  This is especially the case given the prevailing conditions in the property industry and wider economic environment. Accordingly, the Board believes that an insolvent liquidation of the Company is the most likely alternative outcome if the Restructuring fails.

(b)    Such an insolvent liquidation is likely to result in a materially lower return to the Scheme Creditors than if the Restructuring is approved and implemented.  The estimated recoveries for Scheme Creditors in such scenario are described in the Liquidation Analysis prepared by Deloitte (see Schedule 2 (*Liquidation Analysis*) to this Explanatory Statement).

(c)    The recovery range outlined in the Liquidation Analysis should be compared with the anticipated recovery rates to Scheme Creditors if the Restructuring is completed successfully as outlined in the Scheme Recovery Analysis (see Schedule 3 (*Scheme Recovery Analysis*) to this Explanatory Statement). In this regard, we note as follows:

(i)    **Estimated Recovery on an Insolvent Liquidation:** Based on the Company's financial position as at 31 December 2022 and the assumptions set out in the Liquidation Analysis, and assuming the entire Group was placed into liquidation on 1 January 2023, the estimated total recovery to Scheme Creditors based on the Liquidation Analysis is as follows:

38

|  | Estimated recovery in liquidation (valid keepwell) | Estimated recovery in liquidation (invalid Keepwell) |
|---|---|---|
| SJ Existing Notes | 16.71% | 12.37% |

(ii)  **Estimated Recovery following the Restructuring:** Under the Proposed Restructuring, Scheme Creditors will be allocated with instruments including new notes of various tenors.  Assuming that the Restructuring Effective Date occurs on 31 December 2022 and the Group would continue to operate as a going concern, the recoveries of Scheme Creditors are calculated as the net present value of the future cashflows associated with the new notes allocated to each respective creditor by applying a discount to the face value of future cashflows. A discount rate of 25.5% was adopted by considering the yields of CEG's USD bonds prior to defaults, adjusting for changes in risk-free market rates and credit spread over the period; and then adding an additional premium which could be demanded by investors in instruments issued by CEG/the Company/TJ after considering factors including (but not limited to) changes in the PRC real estate industry, the latest published financial information of the Group and the Group's (including onshore operations) undergoing of a restructuring. Further information on the basis of the estimation of the scheme recoveries can be found in the sections 'Calculation Methodology' and 'Scheme Recovery Analysis Assumptions' in the Scheme Recovery Analysis.

|  | Estimated recovery in the BVI Scheme |
|---|---|
| Existing Notes | 39.9[†] % |

*† Figure does not account for scheme consideration received pursuant to the TJ Scheme. Accounting for scheme consideration received in the TJ Scheme, the total estimated recoveries in the Restructuring are 41.8%.*

(d)  The Liquidation Analysis and the Scheme Recovery Analysis were prepared using audited consolidated financial statements of the Group as at 31 December 2022, subject to the limitations set out in the section 'Limitations' of the Reports. In the event of inconsistency between the estimated recoveries shown in the tables above and the Reports, the estimated recoveries in the Scheme Recovery Analysis shall prevail. All figures shown in the tables above are subject to rounding.

(e)  As anticipated, the estimated recovery to Scheme Creditors upon the successful implementation of the Restructuring is considerably higher than the estimated recovery to Scheme Creditors upon an insolvent liquidation of the Company and other members of the Group.  Accordingly, the Directors believe that the BVI Scheme offers the Scheme Creditors a better estimated recovery in light of the potential economic consequences of insolvency.

5.10    **Listing Requirements – Singapore**

It is anticipated that the New Instruments will be listed on the SGX-ST.  To the extent that the Company is required to disclose additional information solely for the purposes of the application to list the New Instruments on the SGX-ST, such information will be made available to Scheme Creditors on the Transaction Website.

5.11    **Risk Factors**

(a)    The Company and the Group of which it is a part, like many in the same industry in the current business environment, are faced with significant business risks.  Since the Company is only an issuing company, its financial condition and operations are necessarily affected by the operations and financial conditions of the other Group companies.   In addition to the risks associated with the implementation of the Restructuring, the Company has identified a number of factors that may affect the Group's operating results, liquidity and financial condition.  The Company believes that the successful implementation of the Restructuring is a key step towards mitigating these risks and will allow the Group to focus on its operations and principal business activities.

(b)    Certain principal risk factors that the Company and the Group will likely face in connection with and following the Restructuring are set out in Section 16 (Risk Factors) of this Explanatory Statement.   However, those risk factors are not an exhaustive list of all the potential risks and uncertainties which may be involved.

5.12    **The Board's recommendation**

(a)    The Board is confident that the revised capital structure will create a more stable platform to allow the Company to meet its ongoing and longer term liabilities under the New Instruments.

(b)    For the reasons set out in this letter and the Explanatory Statement, the Board believes that the BVI Scheme and the Restructuring are in the best interests of the Scheme Creditors, the Company and its creditors as a whole.  Accordingly, the Board strongly recommends that the Scheme Creditors vote in favour of the BVI Scheme at the BVI Scheme Meeting.

Yours faithfully,

Scenery Journey Limited (景程有限公司)

40

6.      **BACKGROUND TO THE RESTRUCTURING**

6.1    **The Company**

(a)    The Company was incorporated in the BVI under the BVI Companies Act as a limited liability company (registration number 1970476) on 12 February 2018.   The Company's registered office is at Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, BVI. As at the date of this Explanatory Statement, the number of authorised shares of the Company is 1 of par value US$1.00.

(b)    The Company is an issuer company incorporated solely for the purpose of issuing the Existing Notes. Apart from being an issuer company of the Existing Notes, and therefore engaging in restructuring activities in connection with the Existing Notes, the Company does not conduct any business of its own.

(c)    The Company is a part of the Group and is a direct subsidiary of TJ and an indirect subsidiary of CEG. The Company was incorporated to raise funding for the Group and specifically targeted investment from outside of the PRC.

(d)    The company had only one director at all times. The incumbent director of the Company is Mr Daiping Chen and, before him, it was Mr Hanling Pan.

(e)    The Existing Notes are guaranteed by TJ and the Existing Notes Subsidiary Guarantors.

(f)    In addition, TJ's immediate holding company, the Keepwell Provider, entered into Keepwell Agreements in respect of each series of the Existing Notes. The Keepwell Agreements are governed by New York law. Pursuant to the terms of the Keepwell Agreements, the Keepwell Provider undertakes to:

(i)    cause TJ to have a consolidated net worth of at least RMB 1.0 billion  at all times;

(ii)    cause the Company and each of the Existing Notes Subsidiary Guarantors to have a consolidated net worth of at least US$ 1.00 at all times;

(iii)    cause TJ and the Existing Notes Subsidiary Guarantors to have sufficient liquidity to ensure timely payment by such entity of any amounts payable in respect of the relevant Existing Notes and the relevant guarantee under the Existing Notes in accordance with their terms of payment as and when due;

(iv)    cause each of TJ, the Company and the Existing Notes Subsidiary Guarantors to remain solvent and a going concern at all times under the laws of their respective jurisdictions of incorporation or applicable accounting standards;

(v)    upon the occurrence of an event of default under the relevant Company Indenture, purchase, by itself or its subsidiary, equity interests in one or more subsidiaries of TJ; and

41

(vi)    upon the occurrence of an event of default under the relevant Company Indenture, invest, by itself or through its PRC incorporated subsidiaries, in TJ and/or other non-PRC subsidiaries of TJ.

6.2    **Background of CEG and the Group**

(a)    CEG was incorporated in the Cayman Islands under the Cayman Companies Act on 26 June 2006, as an exempted company with limited liability (registration number KY1 1104).

(b)    CEG is also registered in Hong Kong as a non-Hong Kong Company under Part XVI of the Hong Kong Companies Ordinance.  CEG's principal place of business in Hong Kong is located at 15th Floor, YF Life Centre, 38 Gloucester Road, Wanchai, Hong Kong.  Meanwhile, the Group's headquarters in the PRC is located at No. 1126, Haide 3rd Road, Nanshan District, Shenzhen, Guangdong Province, PRC.

**(c)**    CEG Shares have been listed on the Main Board of the HKEX since 5 November 2009 with the stock code 3333.  As at the date of this Explanatory Statement, CEG has 13,204,300,900 shares in issue, all of which are fully paid up and the authorised share capital of CE is US$1,000,000,000 divided into 100,000,000,000 shares of par value US$0.01 each.

(d)    CEG is the ultimate holding company of the Group that carries on business offshore and in the PRC.  CEG has no material operations and derives its income exclusively from dividend payments by its subsidiaries in order to service its offshore debts.

6.3    **Business operations of the Group**

(a)    The Group is a conglomerate principally engaged in property development, property investment, property management, new energy vehicle development and production, and cultural tourism business in the PRC.

(b)    The Group's revenue for the year ended 31 December 2021 and 2022 amounted to RMB250 billion and RMB230.1 billion, respectively. The Group recorded loss for the year ended 31 December 2021 and 2022 of RMB686.2 billion and RMB125.8 billion, respectively.

(c)    A summary of the Group's three key business segments is set out below:

(i)    **Property development business:** The property development business is the main business line of the Group. In 2021, the Group had contracted sales of approximately RMB443 billion and contracted sales area of approximately 54.3 million square meters of gross floor area. In 2022, the Group had contracted sales of approximately RMB31.7 billion (or approximately RMB19.6 billion after deducting properties transferred to construction companies or suppliers for payment in kind) and contracted sales area of approximately 3.9 million square meters of gross floor area. During January to May 2023, the Group had contracted sales of approximately RMB33.8 billion (or approximately RMB20.1 billion after deducting properties

42

transferred to construction companies or suppliers for payment in kind) and contracted sales area of approximately 4.9 million square meters of gross floor area.

(ii)   **Property management business:** The property management business of the Group is operated through EVPS. EVPS provides property management services primarily to real estate projects developed by the Group's property development business. As at 31 May 2023, approximately 71.5% of properties under management by EVPS are properties developed by the Group. The Company holds approximately 51.7% equity interest in EVPS as at the date of this Explanatory Statement.

As at 31 May 2023, EVPS and its subsidiaries had approximately 2,759 projects under management with total area under management of approximately 506 million square meters, providing property management services to more than 2.3 million property owners. These projects under management covered 22 provinces, 5 autonomous regions, 4 municipalities and Hong Kong. As at 31 May 2023, EVPS and its subsidiaries' total contracted area was approximately 817 million square meters of gross floor area, with a total of approximately 3,152 contracted projects.

Among the total area under management and total contracted area of EVPS and its subsidiaries as at 31 May 2023, approximately 362 million square meters of gross floor area and 623 million square meters of gross floor area, respectively, were developed by the Group. EVPS and its subsidiaries continue to seek engagement for property management contracts in relation to property projects developed by independent third-party property developers. During the five months ended 31 May 2023, EVPS and its subsidiaries obtained 100 projects under management developed by independent third-party property developers with the area under management of approximately 6.1 million square meters of gross floor area, and 122 contracted projects developed by independent third-party property developers with contracted area of approximately 10.9 million square meters of gross floor area.

(iii)   **New energy vehicle business:** NEV conducts industrial park development and health management businesses, as well as the new energy vehicle and battery businesses. The Company holds approximately 58.5% equity interest in NEV as at the date of this Explanatory Statement.

The mass production of Hengchi 5, one of the Hengchi vehicle series, officially started on 16 September 2022 with delivery of the first batch of production vehicles having begun on 29 October 2022. As at 31 May 2023, NEV has and its subsidiaries had delivered over 1,000 units of Hengchi 5.

Currently, NEV and its subsidiaries are still facing shortage of funds. NEV's management has been continuously promoting cost-saving measures, actively expanding financing channel and doing their best to maintain the business operations.

43

As NEV announced on 24 April 2023, NEV entered into a sale and purchase agreement (the "**NEV Disposal Agreement**") with Anxin Holding Limited ("**Anxin**"), a subsidiary of the Company, and the Company, pursuant to which Anxin conditionally agreed to purchase and NEV conditionally agreed to sell as the beneficial owner (the "**NEV Disposal**"), the entire issued share capital of Assemble Guard Limited (薈保有限公司) ("**Assemble Guard**") and Flaming Ace Limited ("**Flaming Ace**"), subject to the terms and conditions thereunder. Assemble Guard and Flaming Ace were wholly-owned subsidiaries of NEV and collectively held 47 existing health and living projects directly or indirectly at the time of the NEV Disposal Agreement. The NEV Disposal is subject to reporting, announcement, circular and independent shareholders' approval requirements under the Listing Rules, and is also conditioned upon the satisfaction or waiver, if applicable, of certain conditions precedent. After the completion of the NEV Disposal, NEV would become a company purely focusing on research, development and production of new energy vehicle businesses, save that NEV will continue to hold two residential and property development projects in the short term. In view of the significant capital commitment required by technology research and development and manufacturing of, and sales services in respect of new energy vehicles business segment of NEV (the "**NEV Segment**"), and having considered the current resources, NEV is of the view that committing further resources in health and living projects would not be in line with its overall strategy to de-leverage and may pose limitations to the development of the NEV Segment.

Due to the tight liquidity situation and in order to maintain basic business operations, NEV has taken initiatives to cut costs, such as reducing its workforce headcount. As at 31 May 2023, NEV had a total of 2,169 employees (including 531 employees that have suspended work, of which 233 are in the new energy vehicle segment and 298 are in the battery segment), compared to 3,742 as at 30 June 2022. The Group and NEV are actively seeking potential strategic investors' investment in NEV in order to inject cash capital to sustain NEV's business as a going concern. However, the Company cannot assure that such efforts will be successful. In the absence of new funding, NEV will face the risk of shutdown.

6.4    **The Financial indebtedness and assets of the Group**

*Financial indebtedness*

(a)    As at 31 December 2022, the Group had total liabilities of RMB2,437.4 billion, including:

(i)    current borrowings of RMB587.1 billion;

(ii)    non-current borrowings of RMB25.3 billion;

(iii)    trade and other payables of RMB1,002.3 billion;

    (iv)      contract liabilities of RMB721.0 billion;

    (v)      deferred income tax liabilities of RMB47.9 billion; and

    (vi)      other payable of RMB11.3 billion.

*Assets*

(b)      The non-current assets of the Group on a consolidated basis as at 31 December 2022 amounted to approximately RMB173.1 billion. As at 31 December 2022, key items of the Group's non-current assets consist of the following:

    (i)      Property, plant and equipment of approximately RMB56.4 billion;

    (ii)      Right-of-use assets of approximately RMB14.5 billion;

    (iii)      Investment properties of approximately RMB63.1 billion;

    (iv)      Goodwill of approximately RMB1.1 billion;

    (v)      Trade and other receivables of approximately RMB1.3 billion;

    (vi)      Prepayments of approximately RMB0.4 billion

    (vii)      Investments accounted for using equity method of approximately RMB25.9 billion;

    (viii)      Financial assets at fair value through other comprehensive income of approximately RMB1.3 billion;

    (ix)      Financial assets at fair value through profit or loss of approximately RMB3.0 billion; and

    (x)      Deferred income tax assets of approximately RMB66 million.

(c)      Based on the Company's financial data, the current assets of the Group on a consolidated basis as at 31 December 2022 amounted to approximately RMB1,665.2 billion.

(d)      The majority of the Group's current assets cannot be collected or converted into cash immediately. As at 31 December 2022, these assets were located in the PRC and certain of the assets were pledged to secure certain banking and other facilities granted to the Group and mortgage loans granted to buyers of sold properties. As at 31 December 2022, key items of the Group's current assets consist of the following:

    (i)      Inventory of approximately RMB0.5 billion;

    (ii)      Properties under development for sale of approximately RMB1,136.1 billion;

    (iii)      Completed properties held for sale of approximately RMB102.9 billion;

(iv)    Trade and other receivables of approximately RMB228.9 billion;

(v)    Restricted cash of approximately RMB10.0 billion (or approximately RMB8.1 billion if the restricted cash held by the listed subsidiaries of the Company, EVPS and NEV, and their respective subsidiaries were excluded); and

(vi)    Cash and cash equivalents of approximately RMB4.3 billion (or approximately RMB2.5 billion million if the bank balances and cash held by the listed subsidiaries of the Company, EVPS and NEV, and their respective subsidiaries were excluded).

(e)    Further details regarding the assets of the Group are set out in the FY22 Audited Group Consolidated Financial Results available on CEG's Website and the website of the HKEX.

6.5    **Business operations of the TJ Group**

(a)    Most of CEG's projects are held under the Keepwell Provider, being the direct shareholder of TJ, while TJ also indirectly holds equity interests in approximately 30 projects located in Chinese mainland, including approximately 20 projects in which TJ held the majority equity interests .

(b)    In 2022, the TJ Group had contracted sales of approximately RMB4,332 million (or approximately RMB2,756 million after deducting properties transferred to construction companies or suppliers for payment in kind) and contracted sales area of approximately 428 thousand square meters of gross floor area ("**GFA**"). During January to 2023, the Group had contracted sales of approximately RMB1,460.7 million    (or approximately RMB608.8 million after deducting properties transferred to construction companies or suppliers for payment in kind) and contracted sales area of approximately 231 thousand square meters of GFA.

**(c)**    The TJ Group's revenue for the year ended 31 December 2021 and 2022 amounted to 10.9 billion and RMB6.4 billion, respectively. The TJ Group recorded loss for the year ended 31 December 2021 and 2022 of RMB40.3 billion and RMB13.6 billion, respectively.

6.6    **The financial indebtedness and assets of the TJ Group**

*Financial indebtedness*

(a)    The TJ Group had total liabilities of RMB225.36 billion, including:

(i)    non-current liabilities  of RMB10.5 billion; and

(ii)    current liabilities of RMB214.9 billion.

(b)    In relation to the current liabilities, the TJ Group's borrowings were approximately RMB66.5 billion and trade and other payables was approximately RMB114.9 billion.

46

*Assets*

(c)    The non-current assets of the TJ Group on a consolidated basis as at 31 December 2022 amounted to approximately RMB10.9 billion. As of 31 December 2022, key items of the TJ Group's non-current assets consist of the following,

    (i)    Property, plant and equipment of approximately RMB1.9 billion;

    (ii)    Right-of-use assets of approximately RMB1.1billion;

    (iii)    Investment properties of approximately RMB2.2 billion;

    (iv)    Trade and other receivables of approximately RMB0.5 billion;

    (v)    Intangible assets of approximately RMB0.09 billion;

    (vi)    Prepayments of approximately RMB8.9 million; and

    (vii)    Investments accounted for using equity method of approximately RMB4.1 billion; and

    (viii)    Deferred income tax of approximately RMB1.1 billion.

(d)    The majority of the TJ Group's current assets cannot be collected or converted into cash immediately.  As of 31 December 2022, these assets were located in the PRC and certain of the assets were pledged to secure certain banking and other facilities granted to the TJ Group and mortgage loans granted to buyers of sold properties. As of 31 December 2022, key items of the TJ Group's current assets consist of the following:

    (i)    RMB66.3 billion properties under development;

    (ii)    RMB3.5 billion completed properties held for sale;

    (iii)    RMB80.3 billion trade and other receivables;

    (iv)    RMB0.003 billion contract acquisition costs;

    (v)    RMB5.5 billion prepayments;

    (vi)    RMB3.4 billion income tax recoverable;

    (vii)    RMB0.2 billion financial assets at fair value through profit or loss;

    (viii)    RMB0.3 billion restricted cash; and

    (ix)    RMB0.3 billion cash and cash equivalents.

47

(e)     As at 31 December 2022, the consolidated cash balance of the TJ Group was approximately RMB529.2 million, of which approximately RMB259.0 million was restricted cash and approximately RMB270.2 million was unrestricted cash.

(f)     Further details regarding the assets of the TJ Group are set out on the Transaction Website available to the Scheme Creditors.

## 6.7    Indebtedness and assets of the Company

(a)     The Company is an issuer company incorporated for the sole purpose of issuing the Existing Notes.  As at 31 December 2022, the Company had four series of Existing Notes outstanding with the principal amount being a book value of US$5.23 billion as at 31 December 2022.  Interest continues to accrue on the principal amount owing under the Existing Notes in accordance with the terms of the Existing Notes Documents.  These four series of Existing Notes are:

(i)      SJ Existing October 2022 Notes, which is the 11.5% senior notes due October 24, 2022 (ISIN: XS2109191986, Common Code: 210919198) issued by the Company;

(ii)     SJ Existing November 2022 Notes, the 13.0% senior notes due November 6, 2022 (ISIN: XS1903671854, Common Code: 190367185) issued by the Company;

(iii)    the SJ Existing October 2023 Notes, which is the 12.0% senior notes due October 24, 2023 (ISIN: XS2109192109, Common Code: 210919210) issued by the Company; and

(iv)    the SJ Existing November 2023 Notes, which is the 13.75% senior notes due November 6, 2023 (ISIN: XS1903671938, Common Code: 190367193) issued by the Company

(b)     As at 31 December 2022, the Company has RMB42 billion current liabilities and RMB16.2 billion current assets.

## 6.8    Financial difficulties of the Group

### The Group

(a)     During the second half of 2021, Chinese property developers and the capital markets that have funded growth and development of the sector experienced an inflection point.  Reduced bank lending for real estate development resulted in reduced access by property developers to onshore capital. In addition, reduced bank lending for mortgage finance for buyers, as well as concerns of buyers about the ability of property developers to complete projects, resulted in reduced consumer spending and therefore property sales.  Further, adverse reaction to these onshore events by offshore capital markets has limited the Group's funding sources to address upcoming maturities.

48

(b)     Adverse reaction to the above onshore events by offshore capital markets has further limited the Group's funding sources to address maturities. Since January 2020, CEG had not been able to issue any new notes offshore. Financial institutions also reduced the number of loans granted to CEG's onshore subsidiaries.

(c)     Since then, the Group has been actively engaging with its customers, suppliers, creditors and shareholders to stabilise its credit lines and day-to-day operations. It implemented further measures by reducing capital expenditure and other expenses such as management remuneration.

(d)     Notwithstanding Group's efforts, a portion of CEG's debts became overdue which caused hesitation among property buyers who were looking to purchase Group's development projects, in turn leading to a significant drop in sales. The unease of the real estate capital markets increased, in turn limiting Group's access to funding and refinancing options via domestic and foreign capital markets.

(e)     Therefore, not only did Group's financing become restricted, its debts also gradually became overdue. In addition, the impact from the slowdown in sales resulted in a decline in creditworthiness, which further restricted the Group's financing. The Group was caught in a vicious cycle.

(f)     On 14 September 2021, CEG issued an announcement on the SEHK informing the investors of its liquidity issues.

(g)     On 2 December 2021, CEG received a demand to perform its obligations under a guarantee in the amount of approximately US$260 million in relation to the 8.5% notes due 2021 issued by Jumbo Fortune Enterprises Limited, with which CEG failed to comply. CEG's failure to perform its obligations under this guarantee constituted events of default under the indentures governing the CEG Notes. The Company has since eased to make payments for the principal and interest amounts due under the Existing Notes Documents.

(h)     CEG has since ceased to make payments for the principal and interest amounts due under the CEG Existing Notes and the other offshore debts.

(i)     Due to the drastic changes in CEG's operational environment since the second half of 2021, the auditor has added a large number of additional audit procedures for 2022, which coupled with the effect caused by the COVID-19 outbreak, CEG was not able to complete its audit procedures on time. This led to a trading halt of shares of CEG since 18 March 2022.

### The Keepwell Provider

(j)     Hengda Real Estate Group Co., Ltd, the Keepwell Provider, is also in financial difficulties, making it impossible to perform its obligations under the Keepwell Agreements to the Scheme Creditors. According to CEG's announcement on 30 June 2023, as of the end of May 2023, the Keepwell Provider had a total of 1,601 pending litigation cases which involved more than RMB30 million each, and the total amount involved was approximately RMB382.94 billion. As of the end of May 2023, the Keepwell Provider's unpaid debts due amounted to approximately RMB277.688

billion and its overdue commercial bills amounted to approximately RMB245.418 billion.

6.9     **Mitigation Actions Taken**

(a)     Since December 2021, the Group has introduced several initiatives to reduce operational costs and increase efficiency. These initiatives included streamlining the organisation and consolidating job posts. As of 31 May 2023: (1) job posts at CEG and its Subsidiaries have been redesignated and restructured; (2) the number of headquarter departments has been reduced from 31 to 11; (3) the number of headquarter personnel has been reduced from 2,176 to 617, representing a cumulative reduction of 71.6%; (4) the number of mid-to-senior level employees in the headquarters of the provincial offices has been reduced from 1,706 to 780, representing a cumulative reduction of 54.3%; and (5) CEG's and its Subsidiaries' salary expenses have been reduced significantly in an effort to reduce management costs.

(b)     To help stabilise the entire real estate market in the PRC, which in turn also benefits the Group, the Group had also prioritised the resumption of construction and production, to ensure the delivery of property units. To facilitate these efforts, CEG has maintained close communication with upstream and downstream business partners as well as relevant creditors, and has received significant support. As at 31 May 2023, more than 6,800 construction companies and 385 material suppliers are involved in CEG's efforts at resumption of construction and production. Further, as of 30 September 2022, Group's pre-sold and undelivered projects within Chinese mainland have resumed work, with 270,000construction workers being involved in such projects at the peak of these efforts. Since July 2021 and up to May 2023, CEG completed the delivery of 509,000 units and 58.86 million square meters in gross floor area for 557 projects. Of these 509,000 units and 58.86 million square meters in gross floor area that have been delivered, 423,000 units and 48.22 million square meters in gross floor area were delivered between January 2022 and May 2023, while 122,000 units and 13.89 million square meters were delivered between January 2023 and May 2023.

(c)     CEG had also engaged the Advisors to help with its Restructuring, to present a workable solution to the creditors of the offshore entities of the Group, and to negotiate with the AHG, as described in Section 5.4 (*Advisors*).

(d)     On 29 September 2021, CEG received a letter from Kirkland & Ellis with regard to the formation of the AHG and the AHG Advisors. According to the letter, the AHG comprised large international investors together holding (in aggregate) approximately US$2.5 billion in outstanding principal amount of the CEG Existing Notes and the Existing Notes, and the AHG Advisors were also in close contact with other holders of approximately US$5 billion CEG Existing Notes and the Existing Notes.

(e)     Since the engagement of the Advisors, CEG and the Company, together with the Advisors, had been involved in extensive negotiations and discussions with the majority holders of the Existing Notes and their financial and legal advisors (including the SJ AHG) in relation to the restructuring of the Company's offshore liabilities. As a result of such negotiations, the RSA was entered into on 3 April 2023 between the

50

Company and certain Scheme Creditors setting out the terms of the Restructuring.  As of 18 May 2023, 97.43% of the Scheme Creditors agreed to support the BVI Scheme by signing up to the RSA.

**7.    KEY ELEMENTS OF THE BVI SCHEME – HOW DOES IT BECOME EFFECTIVE?**

7.1    **Introduction**

(a)    The BVI Scheme is set out in Schedule 6 (*The Scheme*) of this Explanatory Statement.

(b)    This Explanatory Statement should not be relied upon as a substitute for reading the BVI Scheme itself.  If there is any inconsistency between the terms of the BVI Scheme or any Restructuring Document and this Explanatory Statement, the terms of the BVI Scheme and/or the Restructuring Documents (as applicable) shall prevail.

(c)    This Section 7 and Sections 8, 9 and 10 provide a summary of the BVI Scheme and how it will effect Scheme Creditors

7.2    **What is required for the BVI Scheme to be effective?**

(a)    In the BVI, a scheme of arrangement requires the following events, relevantly, to occur in order for it to become legally binding:

(i)     the convening of a meeting of the Company's creditors intended to be bound by the scheme of arrangement in accordance with directions given by the BVI Court;

(ii)    at such meeting the approval of at least a majority in number representing 75% or more in value of the relevant creditors of the Company present in person or by proxy and voting at the meeting;

(iii)   the approval of the BVI Court by the making of an order sanctioning the scheme of arrangement; and

(iv)    the filing of the Scheme Sanction Order with the BVI Registrar of Corporate Affairs.

(b)    The BVI Scheme will not be sanctioned by the BVI Court unless it is satisfied, among other things, that:

(i)     the BVI Scheme Meeting was convened and held in accordance with the directions given by the BVI Court;

(ii)    the BVI Scheme was approved by the requisite majorities of those who voted at the BVI Scheme Meeting in person or by proxy; and

(iii)   the BVI Scheme is such as an intelligent and honest person, a member of the class concerned and acting in respect of their interest, might reasonably approve.

(c)    The BVI Court will have regard to the fact that: (i) the class of creditors has been properly constituted; (ii) the provisions of the applicable statute have been complied with; (iii) the class was fairly represented by those who attended the meeting and the statutory majority are acting bona fide and are not coercing the minority in order to

52

promote interests adverse to those of the class whom they purport to represent; and (iv) there is no blot on the scheme of arrangement.

(d)    Upon the BVI Scheme becoming effective, it will bind all Scheme Creditors, irrespective of how they voted or whether they voted at all.

**7.3    How does the Restructuring become effective?**

(a)    The Restructuring shall become effective on the Restructuring Effective Date after a number of conditions are satisfied (or if applicable, waived) including:

(i)    the satisfaction of the Scheme Conditions, and the occurrence of the Scheme Effective Date;

(ii)    obtaining the relevant approvals and consents including:

(A)    delivery of respective court orders in respect of the BVI Scheme and Chapter 15 Recognition Order (and in the case of Chapter 15 unless waived by the Company);

(B)    approval in-principle for the listing and quotation of the New Instruments on the SGX-ST;

(C)    approval by the Board of the Company for the issuance of the New Instruments; and

(D)    publication of announcements of the Company on the issuance of the New Instruments.

(iii)    the execution of all necessary corporate authorisations to implementation of the Restructuring and entry into the relevant Restructuring Documents by the relevant parties thereto;

(iv)    settlement of all professional fees associated with the Restructuring that the Company has agreed to pay and that have been duly invoiced to the Company, namely (i) the AHG Advisor Fees, (ii) the fees, costs and expenses of all of its Affiliates, the Advisors, the Information Agent, the Scheme Administrators, the Holding Period Trustee (ii) the fees, costs and expenses of the Existing Notes Trustee, the Existing Notes Depositary, the Existing Notes Paying and Transfer Agent and Registrar, and (iii) the fees, costs and expenses of the New Instruments Depositary, the New Instruments Paying and Transfer Agent and Registrar, the New Instruments Trustee and the Collateral Agent;

(v)    the payment of the AHG Work Fee; and

(vi)    the satisfaction of each of the specific conditions precedent contained in each of the Restructuring Documents.

53

(b)     The Restructuring Documents may be executed at any time after the Scheme Effective Date, but shall only take effect in accordance with their terms and the terms of the BVI Scheme, including the satisfaction of the conditions set out in Clause 6.6 (*Scheme Steps*) of the BVI Scheme, on the Restructuring Effective Date.

## 7.4     Restructuring Effective Date

(a)     On and following the Restructuring Effective Date, the Scheme Claims of each Scheme Creditor, and any Person, including a successor, assignee or transferee, who acquires any interest in or arising out of a Scheme Claim after the Voting Record Time, shall be subject to the compromises and arrangements set out in the BVI Scheme.

**(b)**     The Restructuring Effective Date of the BVI Scheme shall be on the same date as the "Restructuring Effective Date" (as defined in the TJ Scheme) of the TJ Scheme

## 7.5     Longstop Date

(a)     If the Restructuring Effective Date has not occurred on or before the Longstop Date, which is 15 December 2023, the terms of, and obligations on the parties under or pursuant to, the BVI Scheme shall lapse and all compromises and arrangements provided by the BVI Scheme shall have no force or effect, and any Restructuring Documents held in escrow shall be promptly destroyed by or on behalf of the Company.

(b)     The Company may at any time before the occurrence of the Longstop Date (or any extension thereof) extend the Longstop Date until such later date and time as the Company may elect to extend with the prior written consent of:

(i)     the Majority SJ AHG; or

(ii)     (without prejudice to the foregoing) if the SJ AHG does not hold the Minimum SJ AHG Threshold, the Majority SJ Participating Creditors,

(a "**Longstop Date Extension**").

(c)     The Company shall promptly notify the Information Agent of any Longstop Date Extension by delivering a notice confirming the Longstop Date Extension (a "**Longstop Date Extension Notice**") to the Information Agent, and for the Information Agent to promptly notify the Scheme Creditors of the Longstop Date Extension by:

(i)     sending the Longstop Date Extension Notice to the Existing Notes Trustee and the New Instruments Trustee;

(ii)     circulating the Longstop Date Extension Notice to Scheme Creditors via the Clearing Systems;

(iii)     posting the Longstop Date Extension Notice on the Transaction Website and the Company Website;

54

(iv)    sending the Longstop Date Extension Notice via email to each Person who the Company believes may be a Scheme Creditor who has been registered as a Scheme Creditor (other than Sanctions Affected Scheme Creditors) with the Information Agent or has otherwise notified the Company or the Information Agent of its valid email address. GLAS is responsible for sending the Longstop Date Extension Notice via email to Blocked Scheme Creditors for whom they have a valid email address; and

(d)    The Company shall also promptly deliver the Longstop Date Extension Notice to GLAS and GLAS is responsible for sending the Longstop Date Extension Notice via email to Blocked Scheme Creditors for whom they have a valid email address.

8. **KEY ELEMENTS OF THE SCHEME – RELEASES AND ENTITLEMENT TO RECEIVE SCHEME CONSIDERATION**

8.1 **Overview**

(a) The principal object and purpose of the BVI Scheme is to effect a compromise and arrangement between the Company and the Scheme Creditors so as to implement a financial restructuring of the Liabilities of the Company under the Existing Notes Documents.

(b) On 14 July 2023, the Company entered into a BVI law governed Deed of Indemnity with the Keepwell Provider of the Existing Notes, under which the Company undertook to indemnify the Keepwell Provider in full in respect of any present and future claim or liability the Keepwell Provider may incur to the Existing Noteholders pursuant to the Keepwell Agreements.

(c) On and following the Restructuring Effective Date:

(i) all of the rights, title and interest of the Scheme Creditors (and any Person, including a successor, assignee or transferee, who acquires any interest in or arising out of a Scheme Claim after the Voting Record Time) in respect of the Scheme Claims, save as set out in Clause 21 (*Releases*) of the BVI Scheme, shall be subject to the compromises and arrangements set out in Clause 4 (*Compromise and Arrangement with the Scheme Creditors*) of the BVI Scheme;

(ii) the Scheme Creditors (other than the Sanctions Affected Scheme Creditors) shall be paid the Scheme Consideration in accordance with the terms of the BVI Scheme;

(iii) the Blocked Scheme Creditors shall have their Entitlement to Scheme Consideration transferred to the Holding Period Trust; and

(iv) the Company and the Released Persons shall be released subject to and in accordance with the terms of the BVI Scheme.

8.2 **Release**

(a) To achieve the post-Restructuring position contemplated at 8.1 above, with immediate effect on and from the Restructuring Effective Date and pursuant to the BVI Scheme and the Deeds of Release, each Scheme Creditor on behalf of itself and each of its predecessors, successors and assigns (including any Person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time), as relevant, (collectively, the "**Scheme Creditor Releasing Parties**"), shall and shall be deemed to completely and forever and unconditionally:

(i) release, waive, void, acquit, forgive, extinguish and discharge (and to the fullest extent permitted by law) each of the Released Persons (which includes the Keepwell Provider) from (as applicable):

56

(A)     'Scheme Claims': this captures claims against the Company and the Existing Subsidiary Guarantors under the Existing Notes;

(B)     'Ancillary Claims': the release in respect of Ancillary Claims is intended to capture any claim against Released Person as a result of the effecting, adhering to or complying with the releases to be effected in relation to the Scheme Claims (discussed above); and

(C)     'Restructuring Claims': the release in respect of Restructuring Claims releases the Released Persons from, broadly, any claim in relation to the negotiation or implementation of the Restructuring,

in each case, as discussed more fully below, the foregoing releases do not apply to any Excluded Liabilities;

(ii)    release, forfeit, waive, void, acquit, forgive, extinguish and discharge (and to the fullest extent permitted by law) any and all Relevant Collateral (to the extent not covered by (i) above);

(iii)   ratify and confirm everything which any Released Person may lawfully do or cause to be done in accordance with any authority conferred by the BVI Scheme and agrees not to challenge:

(A)     the validity of any act done or omitted to be done as permitted by the terms of the BVI Scheme; or

(B)     the exercise of or omission to exercise any power conferred in accordance with the provisions of the BVI Scheme,

in each case in good faith by any Released Person;

(iv)    acknowledge and agree that all powers of attorney granted under any Existing Notes Documents are revoked; and

(v)     authorise the Company to release the Keepwell Provider from any Claim arising under or in respect of the Keepwell Agreements.

(b)     Pursuant to the terms of the Schemes, each Scheme Creditor will appoint the Company as its attorney and agent and irrevocably authorizes, directs, instructs and empowers the Company (represented by the Scheme Supervisor or any duly authorized representative), on and from the Restructuring Effective Date, to (i) enter into, execute and deliver as a deed on behalf of each Scheme Creditor and any person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time or who acquires any interest in or arising out of a Scheme Claim after the Voting Record Time, the Deeds of Release whereby any and all Released Claims referred to in Clause 21 (*Releases*) of this BVI Scheme shall be waived and released fully and absolutely from the Restructuring Effective Date, other than the Excluded Liabilities, and (ii) do all such acts and/or execute all such documents (including without limitation, assignments, transfers, notices, instructions, supplements and amendments) as the

57

Company may consider necessary or desirable to effect the release of any and all the Released Claims (other than the Excluded Liabilities) referred to in Clause 21 (Releases).

(c)     The Deeds of Release (in the Agreed Form) are to be approved and executed pursuant to the approvals and authority conferred by Clause 21 (*Releases*) and shall be substantially in the forms published on the Transaction Website subject to any modifications required or approved by the BVI Court, and each shall take effect in relation to such Claims and Liabilities on the Restructuring Effective Date.

(d)     Each Scheme Creditor will acknowledge and agree on its own behalf and on behalf of its Scheme Creditor Releasing Parties that:

(i)     it may later discover facts in addition to or different from those which it presently knows or believes to be true with respect to the subject matter of this BVI Scheme;

(ii)     it is its intention to fully, and finally forever settle and release any and all matters, disputes and differences, whether known or unknown, suspected or unsuspected, which presently exist, may later exist or may previously have existed between it and the Released Persons in respect of all Released Claims or any past, present and/or future Claim which is released by the Releases provided in Clause 21 (*Releases*) of this BVI Scheme and by the Deed of Release; and

(iii)     in furtherance of this intention, the waivers, releases and discharges given in this BVI Scheme shall be and shall remain in effect as full and complete general waivers, releases and discharges notwithstanding the discovery or existence of any such additional or different facts.

(e)     The Scheme does not purport to release TJ's obligations and Liabilities under the Existing Notes. The Liabilities of TJ are described as 'Excluded Liabilities': they are excluded from the releases described at paragraph 8.2(a) above. This is in keeping with the Deficiency Basis (described more fully at paragraph 8.3).

(f)     Therefore, notwithstanding any other provision in this Explanatory Statement, the effect of the Restructuring under the terms of the BVI Scheme will not waive, release, impair or otherwise compromise any of the Excluded Liabilities.

(g)     Further, the effect of the Restructuring under the terms of the BVI Scheme will not:

(i)     waive, release, impair or otherwise compromise any of the Excluded Liabilities;

(ii)     prejudice or impair any right or benefit of any Scheme Creditor Releasing Party:

(A)     created under the BVI Scheme or other Restructuring Document including without limitation any right to commence and/or continue

58

and/or instruct any other Person to commence or continue any Proceeding to enforce its rights under or in relation to the New Instruments Documents; and/or

(B)    which arises as a result of a failure by the Company or any other Released Person to comply with the terms of this BVI Scheme or any Restructuring Document; and

(iii)    prejudice or impair Claims against the Company or any other Released Person arising from actual fraud, gross negligence or wilful misconduct.

(h)    The Company, on behalf of itself and each of its predecessors, successors and assigns, will provide an undertaking to each Released Person that it shall irrevocably and unconditionally:

(i)    completely and forever fully and finally release, waive, void, acquit, forgive, extinguish and discharge unconditionally (and to the fullest extent permitted by law), any and all Claims and/or Liabilities, in each case that it ever had, may have or hereafter can, shall or may have, against any Released Person under or pursuant to terms of the Existing Notes Documents and the Existing Notes (including, for the avoidance of doubt, subrogation or ricochet claims arising by operation of law);

(ii)    not commence, join or continue any claim, counterclaim or proceeding against any Released Person in respect of any Claims and/or Liabilities waived, released or discharged under and other matters referred to in Clause 21 (*Releases*) of the BVI Scheme;

(iii)    not seek any compensation, contribution, subrogation, reimbursement, indemnity, set-off or payment of any kind from any Released Person in respect of the Excluded Liabilities; and

(iv)    do all other acts and execute all such documents (including without limitation, assignments, transfers, notices, instructions, supplements and amendments) as any Released Person may consider necessary or desirable to effect the release and other matters referred to in paragraphs (i) to (iii) above.

(i)    As well as the releases being provided by the Scheme Creditors pursuant to the terms of the Scheme detailed in paragraph 8.2(a), the release of as many as possible, taking into account all the circumstances, of the intra-Group Liabilities owed by the Company and the subsidiary obligors to other companies within the Group are to be effected as part of the Restructuring. The purpose of these releases include helping to ensure that the Scheme is substantially effective and to reduce the Company's and the subsidiary obligors' actual and contingent debts, in each case for the benefit of their creditors as a whole.  These releases will be implemented as a step of the Scheme and in accordance with the Deeds of Release, in circumstances where the relevant alternative is a value destructive Group insolvency.

8.3    **Entitlement to receive Scheme Consideration**

59

(a)     Each Scheme Creditor will be entitled to receive (or have the Holding Period Trustee receive on its behalf, if applicable) Scheme Consideration which is equal to the value of its "**Entitlement**".

(b)     Each Scheme Creditor's Entitlement shall be determined by the Company (in consultation with the Information Agent) or the Scheme Administrators on a "**Deficiency Basis**" in accordance with the formula below. The value of the Scheme Creditor's Scheme Claims calculated on a Deficiency Basis being a "**Scheme Creditor's Deficiency Claims**":

$$A - ((\frac{A}{B + C}) \times D)$$

**A** = the value of the Scheme Creditor's Scheme Claims calculated on a Full Accrued Claim Basis by reference to the records of the Existing Notes Trustee subject to reconciliation of the Custody Instruction submitted by or on behalf of such Scheme Creditor with the records of the Clearing Systems;

**B** = total aggregate value of all Scheme Creditors' Scheme Claims (including those Scheme Creditors who have not submitted their forms at all) on a Full Accrued Claim Basis by reference to the records of the Existing Notes Trustee;

**C** = total aggregate of the TJ Other Debt Instruments Scheme Creditors' Scheme Claims (as defined in the TJ Scheme) calculated on a Full Accrued Claim Basis (as defined in the TJ Scheme) including, for the avoidance of doubt, those TJ Scheme Creditors who have not submitted their forms at all as determined by the Scheme Administrators by reference to the information provided to the TJ Scheme Administrator;

**D** = the NPV of the US$800 million of the TJ New Notes (being the total TJ Scheme Consideration) as determined by the Scheme Administrators (the "**NPV Amount**"). who may take into account, among other factors:

(i)     market bond yields for issuers that has a comparable profile in terms of location(s) of risk, leverage, scale and industry, as per implied by the average closing bond price prior to the date of determination;

(ii)    coupon rate of new bond issuance with similar credit quality in terms of location(s) of risk, leverage, scale and industry, as per implied by the average closing bond price prior to the date of determination;

(iii)   projected cashflow to be generated by the obligors under the TJ New Notes in consultation with the Group's management; and

(iv)    assessed value and/or the projected cash flow for the underlying assets to support repayment of the TJ New Notes to the extent provided in consultation with the Group's management.

60

(c)    For the avoidance of doubt and despite the Deficiency Basis of the calculation, each Scheme Creditor's Entitlement will be the same as his/her pro-rata share of the SJ Restructuring Consideration, calculated by each Scheme Creditor's Full Accrued Claims divided by the sum of the Full Accrued Claims of all Scheme Creditors who have completed the relevant Scheme Creditor Forms by the Bar Date times the SJ Restructuring Consideration.

8.4    **New Instruments**

(a)    Each Eligible Creditor and/or Designated Recipient, and/or the Holding Period Trustee on behalf of Blocked Scheme Creditors, shall be entitled to be issued a pro rata amount of the New Instruments or Blocked New Instruments (as applicable) and will receive this through the Clearing Systems and/or from the Holding Period Trustee, with the relevant Scheme Creditor's Entitlement to the New Instruments or Blocked New Instruments (as applicable) calculated in accordance with the formula in Section 8.3(c) above.

(b)    The terms of the New Instruments will be set out in the New Instruments Documents. A summary of the terms of each of the New Instruments Documents is set out in Schedule 10 (*Summary of the terms of the New Instruments*). Scheme Creditors are urged to refer to the form of the New Instruments Documents as made available on the Transaction Website.

8.5    **Effect on the Blocked Scheme Creditor**

(a)    Blocked Scheme Creditors are not a separate class of Scheme Creditors and their rights against the Company are not treated any differently to Scheme Creditors who are not Sanctions Affected Scheme Creditors. However, whilst Applicable Sanctions remain in place, an affected Blocked Scheme Creditor will not be entitled, able or permitted to (i) submit Account Holder Letters or have an Account Holder Letter submitted on its behalf (if applicable) through the Clearing Systems or to the Information Agent in the BVI Scheme, or (ii) receive the Scheme Consideration on the Restructuring Effective Date.

(b)    As a result, Blocked Scheme Creditors must submit (or procure the submission of, as applicable) a Blocked Scheme Creditor Form, together with supporting evidence and other materials as required, in accordance with Section 4 (*Summary of Actions to be Taken by Scheme Creditors*), to GLAS in order to vote on the BVI Scheme.

(c)    Blocked Scheme Creditors must ensure that validly completed and executed Blocked Scheme Creditor Forms, together with supporting evidence, is received by GLAS in accordance with Section 4 (*Summary of Actions to be Taken by Scheme Creditors*).

(d)    A Blocked Scheme Creditor that submits a Blocked Scheme Creditor Form must provide sufficient supporting evidence to allow GLAS to reliably establish that Blocked Scheme Creditor's identity, status as a Scheme Creditor and the value of its relevant holding. GLAS will review each Blocked Scheme Creditor Form and the accompanying evidence submitted by the Voting Record Time to assess whether the Blocked Scheme Creditor Form has been completed correctly and whether there is

sufficient evidence to reliably establish the Blocked Scheme Creditor's identity, status as a Scheme Creditor and the value of its holding.[7]

(e)     For the avoidance of doubt, Blocked Scheme Creditors will not be able to receive the Scheme Consideration on the Restructuring Effective Date if they remain subject to the Applicable Sanctions.   Instead, on the Restructuring Effective Date, the Entitlements of the Block Scheme Creditors will be issued to the Holding Period Trust.

(f)     If the Applicable Sanctions are still in place upon the expiration of the Holding Period, the Company will appoint a Successor Escrow Agent to hold the Entitlements to the Blocked Trust Assets for the Blocked Scheme Creditors as described in Section  12.1 (*Holding Period Trust*) below, and further in accordance with the terms of the BVI Scheme.

---

[7] Blocked Scheme Creditors do not need to submit a Custody Instruction because their Existing Notes are already blocked from trading as their accounts were blocked by the Clearing Systems at the time the Applicable Sanctions were put in place. As such, Blocked Scheme Creditors are unable to submit instructions to the Clearing Systems.

9.    **KEY ELEMENTS OF THE BVI SCHEME – DISTRIBUTION OF THE SCHEME CONSIDERATION**

9.1    **Distribution of the Scheme Consideration**

(a)    On the Restructuring Effective Date, the Company shall issue the New Instruments to Scheme Creditors who have submitted the required Scheme Creditor Forms by the Bar Date pursuant to Clause 10 (*Deadlines and the Bar Date*) of the BVI Scheme, and/or Designated Recipients (if applicable), and/or the Holding Period Trustee on behalf of the Blocked Scheme Creditors (if applicable) calculated by the Company (in consultation with the Information Agent) and/ or the Scheme Administrators in accordance with the following steps and formula:

(b)    **Step 1**: calculate the aggregate principal amount of the New Instruments to be issued to a Scheme Creditor on the Restructuring Effective Date in accordance with the formula below:

$$\frac{A}{B} \times C$$

**A** = value of a Scheme Creditor's Entitlement who have submitted the required Scheme Creditor Forms by the Bar Date to the Information Agent, pursuant to the BVI Scheme;

**B** = total aggregate value of the Entitlement of all Scheme Creditors who have submitted the required Scheme Creditor Forms by the Bar Date pursuant to Clause 10 (*Deadlines and the Bar Date*) of the BVI Scheme as determined by the Scheme Administrators; and

**C**= US$6,500 million, being the aggregate principal amount of the New Instruments (being the total Scheme Consideration).

(c)    **Step 2**: calculate the aggregate principal amount of each tranche of the New Instruments to be issued to the relevant Scheme Creditor. For each US$100,000 of the Entitlements converted to the New Instruments, a Scheme Creditor shall receive:

(i)    US$4,615.38 of the New SJ Tranche A Notes;

(ii)    US$16,923.08 of the New SJ Tranche B Notes;

(iii)    US$16,923.08 of the New SJ Tranche C Notes;

(iv)    US$18,461.54 of the New SJ Tranche D Notes; and

(v)    US$43,076.92 of the New SJ Tranche E Notes.

(d)    For the avoidance of doubt, the effect of Section 8.3 and 9.1 is that the Scheme Consideration (being US$6,500 million in aggregate principal amount of the New Instruments) will be distributed and allocated to the Scheme Creditors (or the Holding Period Trustee, as applicable) who submit the relevant Scheme Creditor Forms by the

Bar Date on a pro rata basis with respect to their respective Scheme Claims on a Full Accrued Claim Basis.

9.2     **Fractional Adjustments**

(a)     Notwithstanding any other provision in the BVI Scheme, the aggregate number of New Instruments to which an Eligible Creditor is entitled shall be rounded down to the nearest whole number.

(b)     If the allocation of the New Instruments in accordance with the BVI Scheme would result in any Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee receiving less than S\$500 (the "**Notes Minimum Denomination**") of any tranche of any series of the New Instruments, then such Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee would instead receive an allocation in one or more tranches of any series of the New Instruments, as determined by the Company (in consultation with the Information Agent and/or the Scheme Administrators, in its discretion in good faith and based on information provided and reviewed against the records of the Clearing Systems or the Company's books and records, as applicable by the Information Agent (including accounting for the weighted average maturity of the Scheme Considerations), to ensure that such Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee holds at least the Notes Minimum Denomination for at least one tranche of any series of the New Instruments, provided that:

(i)     any fraction of New Instruments that is remaining after the adjustment set out above in sub-Section 9.2(b) will be forfeited;

(ii)     the interests in the global certificates for the New Instruments to which a Scheme Creditor is entitled under the terms of this BVI Scheme will be credited to the Clearing System account in which that Scheme Creditor held its interests in the Existing Notes at the Entitlement Record Time (through the relevant Account Holder where applicable); and

(iii)     the interests in the New Instruments will be recorded in the New Instruments register by the New Instruments Paying and Transfer Agent and Registrar.

(c)     Notwithstanding sub-section (b) above, the factors to be taken into consideration is subject to change depending on a number of variables, including the number of Eligible Creditors as well as the size of their respective position of the Existing Notes, and the size of each tranche of each series of the New Instruments to be issued. It is possible that the New Instruments payable to each Eligible Creditor may not be allocated to each tranche of each series of the New Instruments, as set out in the terms of the BVI Scheme, on a pro rata basis based on their respective aggregate principal amount on the Restructuring Effective Date.

**10.    SUMMARY OF THE SCHEME - THE SCHEME ADMINISTRATORS**

10.1    **Appointment and removal**

(a)    In consideration for each Scheme Creditor granting the releases pursuant to Clause 21 (*Release*) of the BVI Scheme and the Deeds of Release, each Scheme Creditor shall be entitled to have its Entitlement determined by the Scheme Administrators.

(b)    On the Scheme Effective Date, the Company shall appoint the Scheme Administrators, with the powers, rights, duties and functions conferred upon the Scheme Administrators by the BVI Scheme.

(c)    The office of Scheme Administrators shall be vacated if the holder of such office becomes subject to any conflict of interest which would impact in any way in his/her ability to perform the functions of Scheme Administrators as set out in the BVI Scheme, dies, is convicted of an indictable offence, resigns his/her office (which shall be permissible and effective only if he/she gives at least two (2) months' notice to SJ prior to such resignation), becomes bankrupt, is disqualified from membership of a professional body of which he/she is a member, or becomes mentally disordered or incapacitated.

(d)    In the event of a vacancy in the office of any of the Scheme Administrators (unless there is no further work to be done by the Scheme Administrators under the BVI Scheme), the Company shall in its sole discretion promptly appoint an alternative person from the Whitelist Scheme Administrators who must be a fit and proper person and be able to adequately discharge the function of the Scheme Administrators under the BVI Scheme.

(e)    Each Scheme Administrator has agreed to be bound by the BVI Scheme and agreed to the terms of the Deed of Undertaking, as made available on the Transaction Website.

10.2    **Functions, powers and rights**

(a)    Each Scheme Administrator (in his/her own name or as agent of the Company) shall have the power to act on behalf of the Company in relation to all matters relating to each Scheme Creditor's Entitlement. In carrying out his/her duties and functions under the BVI Scheme, each Scheme Administrator shall (pursuant to the terms of the Scheme) be empowered to:

(i)    make a determination on the Scheme Effective Date of the NPV Amount to be used in the calculation of each Scheme Creditor's Entitlement;

(ii)    make a determination of each Scheme Creditor's Scheme Claim and Entitlement for distribution purposes under the BVI Scheme;

(iii)    have full access to the Company Information and to receive full cooperation from the Management, on any reasonable requests for finance documents or other information or documents in the possession or control of the Company or the Group;

65

(iv)   where reasonably appropriate to employ and remunerate accountants, actuaries, lawyers and other professional advisors (including their partners and the partners and staff of all associated firms, associations and companies or successors or any of them) in connection with the evaluation of each Scheme Creditor's Entitlement and the costs and expenses of such engagement shall form part of the costs and expenses incurred by the Scheme Administrators for the purposes of Clause 27.13;

(v)   to delegate in writing to any person qualified as set out in paragraph (d) above all or any of the powers and discretion conferred upon the Scheme Administrators under the BVI Scheme, and from time to time to revoke any such delegation, provided that the Scheme Administrators shall be personally responsible for any act or omission of any such delegate to the same extent as if he/she had expressly authorised it;

(vi)   to do all acts and to execute in the name of and, insofar as permitted by law, on behalf of the Company, any deed, transfer, instrument, cheque, bill of exchange, receipt or other document which may be necessary for or incidental to the full and proper implementation of the BVI Scheme;

(vii)   to make any payments and distributions which are necessary for or incidental to the Scheme Administrators' performance of his/her functions under the BVI Scheme;

(viii)   to open, maintain and operate bank accounts in the name of the Company and/or in the name of the Scheme Administrators, as required or convenient under or in connection with the BVI Scheme and to close any such bank account;

(ix)   to receive and review all information provided by each Scheme Creditor to assist in determining that Scheme Creditor's Scheme Claim and Entitlement;

(x)   to communicate with and seek further information from each Scheme Creditor and the Management to assist with the evaluation of each Scheme Creditor's Entitlement;

(xi)   to apply to the BVI Court for directions in relation to any particular matter arising under, or in the course of the operation of, the BVI Scheme;

(xii)   to do all such acts and make all such decisions in connection with or for the purposes of making distributions of the Scheme Consideration to the Scheme Creditors

(xiii)   to do all other things incidental to the exercise of the foregoing powers; and

(xiv)   to exercise any other powers necessary for or incidental to the full and proper implementation of his/her obligations under the BVI Scheme,

provided that the Scheme Administrators cannot and shall not exercise any power that would result in them assuming control of any of the Company's business or affairs.

(b)     The Scheme Administrators (in their capacity as such):

    (i)     shall have only those duties and responsibilities expressly specified in the BVI Scheme for the purpose of ensuring that the BVI Scheme is implemented in compliance with its terms and in the interests of the Scheme Creditors as a whole and shall not have any implied duties or responsibilities whatsoever; and

    (ii)    may refrain from doing anything which would or might in their opinion be contrary to any law, directive or regulation of any applicable jurisdiction and may do anything which is, in their opinion, necessary to comply with any such law, directive or regulation and such Scheme Administrator shall not be liable for any loss occasioned thereby.

(c)     In exercising their powers and carrying out their duties and functions under the BVI Scheme, the Scheme Administrators shall be independent and impartial, shall act in good faith and with due care and diligence, and shall exercise their powers under the BVI Scheme for the purpose of ensuring that the BVI Scheme is implemented in compliance with its terms and in the interests of the Scheme Creditors as a whole.

(d)     Except in the case of fraud or wilful default, the Scheme Administrators will not be liable to the Company or any Scheme Creditor for any act or omission by the Scheme Administrators in the performance or purported performance of their powers, rights, duties and functions under the BVI Scheme.

(e)     Except to the extent required by law, no Scheme Creditor shall be entitled to challenge the validity of: (a) any act done or omitted to be done in good faith by any of the Scheme Administrators; or (b) the exercise by the Scheme Administrators in good faith of any power conferred upon them, if such act, omission or exercise is in accordance with, and to implement, the provisions of the BVI Scheme.

(f)     The Company agrees to indemnify the Scheme Administrators out of the property of the Company for:

    (i)     the costs, fees and expenses incurred and payable by the Scheme Administrators in accordance with sub-section (h) below; and

    (ii)    any liability incurred by the Scheme Administrators as a result of any act or omission in carrying out their functions other than such liability (if any) that the Scheme Administrators may incur by their own fraud or wilful default,

in connection with the BVI Scheme, and their role as Scheme Administrator. The Scheme Administrators shall not be found to have committed actual fraud or

67

wilful default unless or until a court of competent jurisdiction has made a finding to that effect.

(g)    The indemnity set out in sub-section (f) shall take effect on and from the Scheme Effective Date and shall endure without limitation as to time for the benefit of the Scheme Administrators notwithstanding:

  (i)    the termination of the BVI Scheme for any reason whatsoever;

  (ii)   the removal or replacement of a Scheme Administrator; or

  (iii)  the invalidity of or any defect whatsoever in the appointment of the Scheme Administrator.

(h)    Each Scheme Administrator's right of indemnity conferred by sub-section (f) has priority over the Scheme Claims and the Scheme Creditors generally and ranks equally to any claims for indemnity by the other Scheme Administrators.

(i)    The Scheme Administrators shall be:

  (i)    remunerated in respect of any work done by the Scheme Administrators and any agent, partner or employee of the Scheme Administrators acting on behalf of the Scheme Administrators, in connection with the exercise of their powers and discretions and the performance of their duties, obligations and responsibilities as Scheme Administrators under the BVI Scheme on a time-cost basis, unless otherwise agreed; and

  (ii)   reimbursed in respect of all costs, fees, disbursements, taxation liabilities (including VAT), and expenses incurred in connection with the performance of their duties, obligations and responsibilities as Scheme Administrators under the BVI Scheme, including but not limited to the fees of any accountants, actuaries, lawyers and other professional advisors or agents engaged by the Scheme Administrator pursuant to Clause (a).

(j)    Fees and expenses incurred by the Scheme Administrators shall be invoiced monthly (or such other period as the Company and the Scheme Administrators may determine) to the Company and shall be paid in full promptly.

68

**11.    SUMMARY OF THE BVI SCHEME – THE HOLDING PERIOD TRUSTEE AND THE SUCCESSOR ESCROW AGENT**

11.1    **The Holding Period Trustee**

(a)    The duties, rights, responsibilities and interests of the Holding Period Trustee shall be governed by the Holding Period Trust Deed and nothing in this Section 11.1 (*The Holding Period Trustee*) shall in any way amend, alter, or override the Holding Period Trust Deed.

(b)    The Holding Period Trustee's role will be solely mechanical and administrative in nature.  As such, in accepting its appointment, the Holding Period Trustee will act only as the bare trustee of the Holding Period Trust and not in any other capacity.  In this regard, the Holding Period Trustee will not be permitted to sell, pledge, re-hypothecate, assign, invest, use, commingle, dispose of, or otherwise use in its business, any of the Blocked New Instruments held by it, except as permitted pursuant to the Holding Period Trust Deed.

(c)    The Holding Period Trustee will have no economic or beneficial interest in the Blocked New Instruments it holds and shall not, except as set out in the Holding Period Trust Deed, permit any other Person to have any interest, estate, right, title or benefit in the Blocked New Instruments.

(d)    The Holding Period Trustee shall be provided with any information it reasonably requires to satisfy itself that any action it chooses to take, or not take, shall be in compliance with any applicable laws.  The Holding Period Trustee shall not be responsible for determining the status of a Sanctions-Affected Scheme Creditor.

(e)    The Holding Period Trustee shall not be required to perform any of its obligations under the Holding Period Trust Deed if it is prevented from so doing by the occurrence of any event due to any cause beyond its control or if such performance would result in the Holding Period Trustee or its Affiliates being in breach of any law, regulation, ordinance, rule, directive, judgment, order or decree (collectively, the "**Rules**") binding on the Holding Period Trustee or its property or on any of its Affiliates (including but not limited to Rules relating to money laundering, bribery and corruption, prevention of tax evasion, financial or economic sanctions, trade and export controls, supply chain transparency, blocking regulations or anti-boycott requirements).  The Holding Period Trustee may act or refrain from acting under the Holding Period Trust Deed and may do anything which in its reasonable opinion is necessary to comply with such Rules.  The Holding Period Trustee is not required to take any action or step (including by omission) which would cause or create a risk of liability under the Blocked Regulation.

(f)    The Holding Period Trustee shall bear no responsibility for any action it does, or does not, take in circumstances where a Scheme Creditor, or the Company, does not provide sufficient information to enable the Holding Period Trustee to adequately assess the extent to which any of the Rules as set out in Clause 28.6 may be breached either by the action, or inaction, of the Holding Period Trustee.

(g)    The Holding Period Trustee shall bear no responsibility with regards to any deficiency which might arise because of the Holding Period Trustee or by virtue of any tax which may be payable (i) in respect of the Blocked New Instruments, (ii) any income which may arise therefrom or (iii) any proceeds which may arise thereof.

11.2    **The Successor Escrow Agent**

(a)    The duties, rights, responsibilities and interests of the Successor Escrow Agent shall be governed by the Successor Escrow Agreement and nothing in this Section 11.2 (*The Successor Escrow Agent*) shall in any way amend, alter, or override the Successor Escrow Agreement.

(b)    The Successor Escrow Agent's role will be solely mechanical and administrative in nature.  As such, in accepting its appointment, the Successor Escrow Agent will act only as a bare agent of the Successor Escrow Account and not in any other capacity. In this regard, the Successor Escrow Agent will not be permitted to sell, pledge, re-hypothecate, assign, invest, use, commingle, dispose of, or otherwise use in its business, any of the Blocked New Instruments, except as permitted pursuant to the Successor Escrow Agreement.

(c)    The Successor Escrow Agent will have no economic or beneficial interest in the Blocked New Instruments it holds and shall not, except as set out in the Successor Escrow Agreement, permit any other Person to have any interest, estate, right, title or benefit in the Blocked New Instruments.

(d)    The Successor Escrow Agent will be afforded the right to be provided with, and request, any information it requires to satisfy itself that any action it chooses to take, not note take shall be in compliance with any applicable laws.  The Successor Escrow Agent shall not, however, be responsible for determining the status of a Sanctions-Affected Scheme Creditor.

(e)    The Successor Escrow Agent shall not be required to perform any of its obligations under the Successor Escrow Agreement or any other Restructuring Documents if it is prevented from so doing by the occurrence of any event due to any cause beyond its control or if such performance would result in the Successor Escrow Agent or its Affiliates being in breach of any Rules binding on the Successor Escrow Agent or its property or on its Affiliates (including but not limited to Rules relating to money laundering, bribery and corruption, prevention of tax evasion, financial or economic sanctions, trade and export controls, supply chain transparency, blocking regulations or anti-boycott requirements).  The Successor Escrow Agent may act or refrain from acting under the Successor Escrow Agreement and may do anything which in its reasonable opinion is necessary to comply with such Rules.  The Successor Escrow Agent is not required to take any action or step (including by omission) which would cause or create a risk of liability under the Blocked Regulation.

(f)    The Successor Escrow Agent shall bear no responsibility for any action it does, or does not, take in circumstances where a Blocked Scheme Creditor, or the Company, does not provide sufficient information to enable the Successor Escrow Agent to adequately assess the extent to which any of the Rules as set out in Clause 29.5 of the

70

BVI Scheme may be breached either by the action, or inaction, of the Successor Escrow Agent.

(g)    The Successor Escrow Agent shall bear no responsibility with regards to any deficiency which might arise because of the Successor Escrow Agent or by virtue of any tax which may be payable (i) in respect of the Blocked Assets, (ii) any income which may arise therefrom or (iii) any proceeds which may arise thereof.

**12.**      **SUMMARY OF THE BVI SCHEME – OTHER MATTERS**

12.1    **Assignments and transfers of Scheme Claims after the Voting Record Time**

(a)      Neither GLAS nor the Information Agent shall be under any obligation to recognise any sale, assignment or transfer of any Scheme Claim after the Voting Record Time and the Entitlement of each Scheme Creditor (and/or their Designated Recipient, as applicable) under the BVI Scheme shall be determined as at the Entitlement Record Time, provided that GLAS or the Information Agent may, in its sole discretion and subject to the production of such evidence as it may reasonably require and to any other terms and conditions which GLAS or the Information Agent may consider necessary or desirable, agree to recognise such assignment or transfer for the purposes of determining entitlements to Scheme Consideration under the BVI Scheme.

(b)      Any assignee or transferee of a Scheme Creditor so recognised by GLAS shall be bound by the terms of the BVI Scheme in the event it becomes effective as if it were a Scheme Creditor and shall produce such evidence as GLAS or the Information Agent may reasonably require to confirm that it has agreed to be bound by the terms of the BVI Scheme.  None of the Existing Notes Trustee or the Existing Notes Paying and Transfer Agent and Registrar will be responsible for confirming Scheme Creditors as at the Voting Record Time or for monitoring, acknowledging or processing any assignments that occur after the Voting Record Time.

12.2    **Third parties**

(a)      By no later than the BVI Scheme Sanction Hearing, each of the Deed of Undertaking Parties shall enter into the Deed of Undertaking in the Agreed Form as available on the Transaction Website, pursuant to which they will:

(i)      undertake to the Scheme Creditors, the Company and the BVI Court to be bound by the terms of the BVI Scheme, in such form as may be sanctioned by the BVI Court as applicable; and

(ii)      agree, upon instructions by the Company or, if applicable, the Information Agent, to execute and do or procure to be executed and done all such documents, acts or things as may be necessary or desirable to be executed or done by them for the purposes of giving effect to the terms of the BVI Scheme that apply to them.

12.3    **Appointment of the BVI Information Agent in relation to the BVI Scheme and the Restructuring**

(a)      In June 2023, SJ engaged FPP (BVI) Limited (**"FFP"**), to assist with restructuring activities, which are currently SJ's dominant activities.  SJ licensed office space from FFP for use in connection with the restructuring, which will be recorded as SJ's principal place of business.  An employee of FFP, Anna Silver who is a BVI resident licensed insolvency practitioner, will be specifically designated to act as SJ's Scheme Supervisor and Foreign Representative in the Scheme.  The Scheme Supervisor will

72

chair the BVI Scheme Meeting, be granted a limited Power of Attorney for the purpose of executing the Deeds of Release on behalf of the Scheme Creditors and act as the Company's Foreign Representative in relation to cross-border recognition of the BVI Scheme in the United States.

(b)     FFP also acts as SJ's information agent, in addition to Morrow Sodali, in the Scheme. SJ's primary legal advisors with respect to the SJ Scheme are located in BVI, with additional assistance in the restructuring by Hong Kong based advisors.

(c)     For the avoidance of doubt, Morrow Sodali as the Information Agent provides the primary contact for Scheme Creditors seeking information in relation to the Explanatory Statement, the BVI Scheme, or the Restructuring. Morrow Sodali will be assisting the Chairperson in managing the voting process of the BVI Scheme. The appointment of the BVI Information Agent provides an additional point of contact in the BVI and during the BVI working hours for the Scheme Creditors to obtain information regarding the BVI Scheme and the Restructuring on non-voting related matters.

12.4    **Exercise of discretion**

Where under any provision of the BVI Scheme, a matter is to be determined by the Scheme Administrators, it shall be determined by them in their discretion in such manner as they may consider fair and reasonable.

12.5    **Modifications to the BVI Scheme and the Restructuring Documents**

(a)     The Company may before or at any hearing before the BVI Court to sanction the BVI Scheme, and subject to obtaining the written consent of the Majority SJ AHG (where the SJ AHG holds the Minimum SJ AHG Threshold) consent on behalf of all Scheme Creditors to any modifications of the BVI Scheme and/or the Restructuring Documents or any additional terms or conditions including those which the BVI Court may think fit to approve or impose, which would not directly or indirectly have a material adverse effect on the rights of the Scheme Creditors.

(b)     On the identification of a Sanctioned Scheme Creditor including where a Scheme Creditor becomes a Sanctioned Scheme Creditor while this Scheme is in effect:

(i)      the Company may modify the Scheme and/or the Restructuring Documents to the extent reasonably necessary and in a manner to ensure that any Sanctioned Scheme Creditor is treated fairly in relation to their Entitlement to Scheme Consideration while continuing to comply with all Applicable Sanctions (and is authorized to instruct the Existing Notes Trustee, Existing Notes Paying and Transfer Agent and Registrar, or any other administrative party in order to achieve the same); and

(ii)     each of the New Instruments Trustees and New Instruments Paying and Transfer Agent and Registrar, the Collateral Agent and any other administrative party as required is authorized to make any amendment to the New Instruments Documents and take any action necessary or desirable to give effect to a modification to such New Instruments

73

Documents on and following receipt of an officers' certificate from the Company that such modification is reasonably necessary to ensure that the Scheme is not contrary to Applicable Sanctions, which the New Instruments Trustees, New Instruments Paying and Transfer Agent and Registrar, the Collateral Agent and any other administrative party as required are entitled to rely on conclusively.

(c)     Where the Company reasonably considers that the BVI Scheme is at risk of being contrary to Applicable Sanctions:

(i)     the Company may modify the Scheme and/or the Restructuring Documents to the extent reasonably necessary and in a manner to ensure that the Scheme is not contrary to Applicable Sanctions (and is authorized to instruct the Existing Notes Trustee, Existing Notes Paying and Transfer Agent and Registrar, or any other administrative party in order to achieve the same); and

(ii)    each of the New Instruments Trustees, New Instruments Paying and Transfer Agents and Registrars, the Collateral Agent and any other administrative party as required is authorized to make any amendment to the New Instruments Documents and take any action necessary or desirable to give effect to a modification to such New Instruments Documents on and following receipt of an officers' certificate from the Company that such modification is reasonably necessary to ensure that the Scheme will not be contrary to the Applicable Sanctions in whatever form that they may apply to this Scheme, which the New Instruments Trustees, New Instruments Paying and Transfer Agents and Registrars, the Collateral Agent and any other administrative party as required are entitled to rely on conclusively.

(d)     Nothing in the BVI Scheme shall prevent the modification of any executed Restructuring Document in accordance with its terms, including, but not limited to minor or technical modifications to correct manifest or proven error or to comply with mandatory provisions of law.

12.6    **Stay of legal proceedings**

(a)     The BVI Scheme will provide that:

(i)     from the Scheme Effective Date, no Scheme Creditor Releasing Party, nor any party on behalf of a Scheme Creditor Releasing Party shall be entitled to commence, continue, or procure the commencement or continuation of any Proceedings whether directly or indirectly against any of the Released Persons or in respect of any property of any of the Released Persons in respect of any Claims or Liabilities that are to be released in accordance with Clause 21 (*Release*) of the BVI Scheme;

(ii)    subject to any existing contractual restrictions, a Scheme Creditor Releasing Party may commence a Proceeding against a Released Person after the Restructuring Effective Date, in respect of Claims or Liabilities

74

that are not to be released in accordance with Clause 21 (*Release*) of the BVI Scheme.

**12.7**    **Governing law and jurisdiction**

(a)    The BVI Scheme and any non-contractual obligations arising out of or in connection with the BVI Scheme shall be governed by, and construed in accordance with, the laws of the BVI.

(b)    The Company and the Scheme Creditors will agree that the courts of the BVI shall have exclusive jurisdiction to hear and determine any Proceeding and to settle any dispute that arises out of or is connected with the terms of the BVI Scheme or its implementation or out of any action taken or omitted to be taken under the BVI Scheme or in connection with the administration of the BVI Scheme.

(c)    For such purposes the Company and the Scheme Creditors irrevocably submit to the jurisdiction of the courts of the BVI, provided, however, such submission shall not affect the validity of other provisions determining governing law and jurisdiction as between the Company and any of the Scheme Creditors whether contained in any contract or for any other purpose including, but not limited to, submission and/or enforcement under the jurisdiction of the US Bankruptcy Court in relation to the Recognition Filings and the Chapter 15 Recognition Order.

(d)    The terms of the BVI Scheme and the obligations imposed on the Company under them shall take effect subject to any prohibition or condition imposed by any applicable law.

**13.**     **CERTAIN LEGAL ASPECTS OF THE BVI SCHEME**

13.1    **Scheme Class**

(a)    It is the responsibility of the Company to determine whether more than one meeting of creditors is required and, if so, to ensure that the meeting(s) is/are properly constituted. Each class of creditors must be properly constituted so that any meeting of that class comprises creditors whose rights against the Company are not so dissimilar as to make it impossible for them to consult together with a view to their common interest. If the rights of Scheme Creditors in a class are so different or would be affected so differently by the BVI Scheme as to make it impossible for them to consult together with a view to their common interest, they must be divided into separate classes and a separate scheme meeting must be held for each class of creditor.

(b)    The Company has considered the current rights of each of the Scheme Creditors against the Company and the way in which those rights would be affected by the BVI Scheme. The Company has concluded that the Scheme Creditors fall into one class, for the purposes of voting on the BVI Scheme and the BVI Court has seen fit to convene the BVI Scheme Meeting on this basis.

(c)    The Company has concluded that the Scheme Creditors fall into one class because:

(i)    The interest rates and maturity dates are different under each series of the Existing Notes. However, in the event the BVI Scheme fails, it is likely that the Company will enter into liquidation and, in those circumstances, the rights of all Scheme Creditors against the Company would rank *pari passu* as between themselves. They will have the same rights to have their claims determined through a proof of debt process or by way of a challenge to the liquidator's decision on a proof or debt or the liquidator permitting the continuation of extant court proceedings.

(ii)    In addition, if the BVI Scheme becomes effective, the Scheme Creditors' rights will be compromised in exactly the same way as between themselves (i.e. they will receive the same treatment and rights under the BVI Scheme).

(iii)    As a result, the Company does not consider that the difference in rights between the different series of the Existing Notes makes it impossible for such Scheme Creditors to vote together in the same class.

(d)    The Company notes that certain Scheme Creditors in their capacity as members of the SJ AHG shall benefit from two additional fee payments in respect of the restructuring of the Group (which includes the CEG Schemes and the TJ Scheme), which shall be made on or prior to the Restructuring Effective Date:

(i)    The "**AHG Work Fee**", which shall be paid by CEG's Chairman (Mr. Hui Ka Yan) in accordance with the terms set out in the RSA and the letter agreement dated 20 March 2023 between CEG's Chairman and the members of the AHG (the "**AHG Work Fee Letter**"). The AHG Work Fee will be an amount estimated to represent approximately 1% of the AHG's holding of the principal amount of the Existing Notes; and

76

(ii)     The "**AHG Advisor Fees**", being the reasonable fees, costs and expenses of the legal and financial advisors to the SJ AHG which shall be paid by the Company in accordance with the terms set out in the relevant letter agreements between the Company and the legal and financial advisers to the Ad Hoc Group.

(iii)    The Company does not consider that the effect of these payments (either taken alone or cumulatively) makes it impossible for members of the SJ AHG to vote together with the other Scheme Creditors in the same class.  This is because:

(A)    The payment of the AHG Advisor Fees does not confer a net benefit upon a member of the AHG, but instead represents a payment of costs necessarily incurred by them in undertaking that role and which would not otherwise have been incurred. The Company further considers that the arrangement is typical and proportionate for a transaction of this kind. Further, the obligation on the Company to pay the AHG Advisor Fees is not conditional

(B)    Payment of the AHG Work Fee represents recompense for the time and effort expended by the AHG in assisting with formulation of the Term Sheet and the Scheme in the interests of all Scheme Creditors and again does not confer any net benefit or disguised consideration on the members of the AHG; and

(C)    It is unlikely that a Scheme Creditor who considered the substantive aspects of the Schemes to be against their interests would be persuaded by payment of either or both the AHG Advisor Fees and the AHG Work Fee to vote in favour of the Scheme.  This is because in the alternative to the BVI Schemes, being an insolvent liquidation, the Scheme Creditors would receive returns that are lower than the anticipated returns under the Schemes. The AHG Work Fee is not therefore a material factor which would influence a Scheme Creditor's decision in relation to the BVI Scheme.

(e)     In addition, the Company does not consider that the differing treatment of the Blocked Scheme Creditors and those Scheme Creditors that are unaffected by Applicable Sanctions makes it impossible for such Scheme Creditors to vote together in the same class.  This is because the reason that the Blocked Scheme Creditors are unable to receive their Scheme Consideration on the Restructuring Effective Date is due to their own personal circumstances rather than their rights as Scheme Creditors under the BVI Scheme.  The Blocked Scheme Creditor can still attend and vote at the BVI Scheme Meeting and the BVI Scheme is providing the same consideration to all Scheme Creditors.  The fact that the Blocked Scheme Creditors cannot be dealt with by the Information Agent and cannot receive their Scheme Considerations at the Restructuring Effective Date is due to the current regulatory environment and is not connected to their treatment under the BVI Scheme or their rights against the Company.

13.2    **BVI Scheme Meeting**

(a)    The BVI Scheme will proceed on the basis that Scheme Creditors constitute one class of creditors of the Company.  The BVI Court has given permission to the Company to convene one meeting of the Scheme Creditors to consider considering and, if thought fit, approving, with or without modification, the BVI Scheme.

13.3    **BVI Scheme Sanction Hearing**

(a)    After the requisite majorities of the Scheme Creditors vote to approve the BVI Scheme at the BVI Scheme Meeting, the BVI Scheme Sanction Hearing will then be required in respect of the sanction of the BVI Scheme by the BVI Court.

(b)    Scheme Creditors are entitled (but not obliged) to attend the BVI Scheme Sanction Hearings by their appointed legal counsel, to support or oppose the sanction of the BVI Schemes.   Scheme Creditors should be aware that they were afforded an opportunity to raise any issues in relation to the constitution of the class of Scheme Creditors at the Scheme Convening Hearings, as stated in the practice statement letter dated 14 July 2023 sent to the Scheme Creditors.  If Scheme Creditors have not already raised any such issues, the BVI Courts will expect any Scheme Creditor who wishes to do so at the BVI Scheme Sanction Hearing to show a good reason why such issues were not raised at the Scheme Convening Hearing.

*Dates of the Scheme Sanction Hearings*

(c)    The BVI Scheme Sanction Hearing is presently scheduled to take place on 4 September 2023 at the BVI Court at 10.00 a.m. BVI time.  This is assumes that the BVI Scheme Sanction Hearing will not be adjourned or delayed.

*The Scheme Effective Date*

(d)    As soon as reasonably practicable after receiving the Scheme Sanction Order, the Company intends to deliver the Scheme Sanction Order to the BVI Registrar of Corporate Affairs.

(e)    Upon the delivery of the Scheme Sanction Order to the BVI Registrar of Corporate Affairs, the BVI Scheme will take effect in accordance with its terms and become binding on all Scheme Creditors, wherever they are and regardless of whether they have voted for or against the BVI Scheme or whether they have voted at all.

(f)    For the avoidance of doubt, the key provisions of the BVI Scheme that serve to compromise the Scheme Creditors' Scheme Claims will not become effective until the Restructuring Effective Date has occurred in accordance with the terms of the BVI Scheme.

13.4    **Foreign Recognition of the Schemes**

*Foreign Representative*

(a)    The Scheme Supervisor shall be authorised to act as the representative of the Company on and in connection with any application for recognition and assistance in relation to the BVI Scheme in any jurisdiction and under whatever law, including

78

(without limitation) Chapter 15 of the US Bankruptcy Code and any other law derived from or similar to the UNCITRAL Model Law on Cross-Border Insolvency Proceedings (the "**Foreign Representative**").

*Purpose of the foreign recognition*

(b)     Chapter 15 of the US Bankruptcy Code is intended to give as a matter of US law, effect to a foreign court's decision approving a scheme or similar plan by recognizing and enforcing the terms of such scheme or plan and applicable orders of the foreign court – including, for instance, by giving effect to a discharge of indebtedness, pursuant to such scheme or plan, of any debts governed by US law that were subject to the foreign proceeding.

(c)     If the BVI Scheme is sanctioned by the BVI Court, the Company intends to seek the recognition of the BVI Scheme as a foreign main proceeding under Chapter 15 of the US Bankruptcy Code by making the Recognition Filings.   No creditor has raised issues about the propriety of BVI as the centre of main interests (**"COMI"**) of the Company or about any actions of management in proffering the BVI. The Company intends to request, upon notice to parties with an interest in the relief sought and after the opportunity for such parties to be heard, that the US Bankruptcy Court makes an order that recognizes and enforces the BVI Scheme and the Scheme Sanction Order and thus confirms that the Existing Notes, which are governed by the New York law, are discharged.  The Company intends to request that the US Bankruptcy Court order be made shortly following the granting of the Scheme Sanction Orders.

(d)     Provided that the relevant Chapter 15 Recognition Order is granted and the BVI Scheme is recognized and enforced as a matter of federal and New York law and that the relevant Chapter 15 Recognition Order is granted, the Company is advised that the BVI Scheme and the releases of the Existing Notes Subsidiary Guarantors pursuant to the BVI Scheme will likely be given effect in the US.

(e)     Per the Hong Kong legal opinion, provided by Mr Ian Roger De Witt of Tanner De Witt, the discharge of the Company and the Existing Notes Subsidiary Guarantors' obligations in the Existing Notes Indenture by way of the operation of the BVI Scheme and its subsequent Chapter 15 recognition should be given effect to as a matter of Hong Kong law.

79

14.    **RESTRUCTURING DOCUMENTS**

This section lists the principal Restructuring Documents and directs all Scheme Creditors to view copies of the same on the Transaction Website.

14.1    **The Restructuring Documents**

(a)    The Restructuring Documents comprise all documents, agreements, instruments, board resolutions, shareholder approvals, releases, notices and legal opinions necessary to implement or consummate the Restructuring in accordance with the terms of the BVI Scheme.

(b)    The Restructuring Documents include, but are not limited to, the following principal documents:

(i)    the BVI Scheme;

(ii)    this Explanatory Statement;

(iii)    the Existing Notes Trustee Instruction;

(iv)    the Deeds of Release;

(v)    the Deed of Undertaking;

(vi)    the New Instruments Documents;

(vii)    the Security Documents, and New Instrument Keepwell Deed;

(viii)    the Holding Period Trust Deed;

(ix)    the Intercreditor Agreement; and

(x)    all other documents, agreements, instruments, board resolutions, shareholder approvals, releases, notices and legal opinions necessary to implement or consummate the Restructuring in accordance with the terms of the RSA and the BVI Scheme, in each case as amended, supplemented, extended, restated or novated from time to time, or any document or instrument creating or evidencing any security interest or guarantee, any fee letter, intercreditor agreement or similar documents under or in connection with the New Instruments and/or the Security Documents, in each case in the Agreed Form. For the avoidance of doubts, any documents specifically required as part of the Court's proceedings are not included.

(c)    Copies of all of the above listed principal Restructuring Documents will be available for viewing on the Transaction Website.  All Scheme Creditors are strongly encouraged to review the detailed terms of the Restructuring Documents in full and are recommended to seek their own independent financial, legal and/or tax advice from their financial, legal and/or tax Advisor with respect to the contents of the same.

80

15.    **SUMMARY OF THE NEW INSTRUMENTS**

The Company shall issue the New Instruments as Scheme Consideration to be distributed to each Eligible Creditor under and pursuant to the terms of the BVI Scheme.  A   summary of the New Instruments together with its Annex is in Schedule 10 *(Summary of the Terms of the New Instruments)*.   The New Instruments in their Agreed Form will be available on the Transaction Website.

16.    **RISK FACTORS**

**The following summarises some of the principal risks and uncertainties that may arise in connection with the BVI Scheme. It should be read in conjunction with all of the other information contained in this Explanatory Statement.   Additional risks and uncertainties not presently known to the Company or that the Company currently deems immaterial may become material and have a material adverse effect on the business, financial condition or results of operations of the CEG Group.   This Explanatory Statement also contains forward-looking statements, which involve risks and uncertainties of their own.   Actual results may differ materially from those anticipated in these forward-looking statements as a result of various factors and circumstances, including the risks and uncertainties described in this Explanatory Statement.**

16.1    **For ease of reference only, the risk factors set out below have been grouped into the following categories:**

(a)    risks relating to the implementation of the BVI Scheme;

(b)    risks relating to a failure to implement or a delay in implementing the BVI Scheme;

(c)    risks following the implementation of the BVI Scheme;

(d)    risks relating to the New Instruments;

(e)    risks relating to the New Instruments Subsidiary Guarantees and the Collateral; and

(f)    risks relation to the New Instruments Keepwell Provider

In addition, Scheme Creditors are liable for any taxes that may arise in respect of such Scheme Creditor as a result of the BVI Scheme and the Restructuring, and shall have no recourse to the Company, the New Instruments Subsidiary Guarantors, the New Instruments Trustee, the Information Agent or any other person in respect of such taxes or any filing obligation with respect thereto.

16.2    **Risks relating to the implementation of the BVI Scheme**

*Scheme may be delayed due to necessary modifications to the BVI Scheme or the Restructuring Documents*

(a)    The BVI Scheme and the Restructuring is structured on the basis that no Scheme Creditor is a Sanctioned Scheme Creditor.  However, if after the launch of the BVI Scheme, it has come to the Company's attention that any Scheme Creditor is a Sanctioned Scheme Creditors, the Company may need to make necessary modifications to the mechanism of the BVI Scheme or the Restructuring Documents, which may lead to delay on implementing the Restructuring.

*Scheme Creditors may not approve the BVI Scheme*

(b)    In order for the BVI Scheme to become effective, the BVI Scheme must be approved by a majority in number representing 75% or more in value of the Scheme Creditors

82

present, in person or by proxy, and voting at the BVI Scheme Meeting. If the requisite majorities of Scheme Creditors do not vote in favour of the BVI Scheme at the BVI Scheme Meeting, then the Restructuring will not be undertaken pursuant to the BVI Scheme or possibly at all.

(c)     Under the RSA, around 98% Scheme Creditors have given undertakings to vote in favour of the BVI Scheme; however, such undertakings may cease to be binding in certain circumstances under the terms of the RSA or if the RSA is terminated.

***Even if the Scheme Creditors approve the Scheme, the Scheme may not be approved by the Court***

(d)     In order for the BVI Scheme to become effective under the BVI law, the BVI Court must sanction the BVI Scheme. The BVI Court has discretion whether or not to sanction the BVI Scheme and will need to be satisfied that, among other matters: (i) the meeting of Scheme Creditors was convened and held in accordance with the Scheme Convening Order, (ii) the BVI Scheme was approved by the requisite majorities of those Scheme Creditors who voted at the BVI Scheme Meeting in person or by proxy; and (iii) the BVI Scheme is such as an intelligent and honest man, a member of the class concerned and acting in respect of his interest, might reasonably approve. Among other factors, the BVI Court is likely to have regard to whether (1) the class of Scheme Creditors voting in respect of the BVI Scheme has been properly constituted, (2) the provisions of the BVI Business Companies Act and any related subsidiary legislation have been complied with, and (3) the class was fairly represented by those who attended the meeting and the statutory majority are acting bona fide and are not coercing the minority in order to promote interests adverse to those of the class whom they purport to represent.

(e)     Even if the BVI Scheme is approved at the BVI Scheme Meeting, any Scheme Creditor who voted (or gave instructions to someone to vote on their behalf) at the BVI Scheme Meeting may appear by counsel at the Scheme Sanction Hearing in order to make representations that the BVI Scheme should not be approved and to object to the granting of the Scheme Sanction Order. The Court may also be prepared to hear such representations and objections by counsel for any other person whom they are satisfied has a substantial economic interest in the BVI Scheme. Therefore, it is possible that objections will be made at or before the Scheme Sanction Hearing and that any such objections will delay or possibly prevent the BVI Scheme from being sanctioned and becoming effective.

(f)     There can be no assurance that the Court will approve the BVI Scheme. If the Court does not approve the BVI Scheme, or approves it subject to conditions or amendments which (i) the Company deems unacceptable or (ii) would have (directly or indirectly) a material adverse effect on the interests of any Scheme Creditors and such conditions and amendments are not approved by the Scheme Creditors, the BVI Scheme will remain ineffective.

(g)     Further, even if the Court approves the BVI Scheme, it is possible for any person who opposed the sanctioning of the BVI Scheme at the Scheme Sanction Hearing to appeal against the granting of the Scheme Sanction Order. Any such appeals and/or

83

subsequent litigation could delay the BVI Scheme becoming effective or possibly prevent the BVI Scheme from becoming effective at all.

***The Scheme may not be recognized by the US Bankruptcy Court***

(h)    Likewise, there can be no assurance that the US Bankruptcy Court will recognize the Scheme or enter the Chapter 15 Recognition Order.  If the US Bankruptcy Court does not recognize the Scheme and does not enter the Chapter 15 Recognition Order, the terms and effect of the Scheme, including the discharge of the US law-governed debt, may not be given effect or binding in the US.

***The implementation of the BVI Scheme and the Restructuring may result in adverse and/or complex tax consequences to Scheme Creditors***

(i)    The Company is not providing tax advice to any Scheme Creditor in connection with the Restructuring, and each Scheme Creditor should consult its own tax Advisor regarding tax consequences of the Restructuring in any relevant jurisdiction.

***The Company has short-term funding needs to continue operations till the implementation of the BVI Scheme and the Restructuring***

(j)    As at 31 December 2022, the CEG Group had RMB1,665.2 billion as current assets. While Management believes that its cash position should suffice to continue operations until the implementation of the Scheme and the Restructuring, there may be unforeseen circumstances, including a delay in the implementation of this BVI Scheme, which may cause the Company to require additional short-term funding. If the Company is unable to obtain, at favourable rates or at all, such additional short-term funding, it may be unable to implement this BVI Scheme and the Restructuring.

***The allocation of the New Instruments to Scheme Creditors may be subject to adjustments as provided in the Term Sheet and/or at the discretion of the Company (its agent or person instructed by it)***

(k)    If the allocation of the New Instruments in accordance with the BVI Scheme would result in any Eligible Creditor, Designated Recipient or the Holding Period Trustee receiving less than the Notes Minimum Denomination of any series of the New Instruments, then such Eligible Creditor, Designated Recipient or the Holding Period Trustee would instead receive an allocation in one or more of the other series of the New Instruments, as determined by the Company (or its agent or person instructed by it) in its discretion in good faith, to ensure that such Eligible Creditor, Designated Recipient or the Holding Period Trustee holds at least the Notes Minimum Denomination for at least one series of the New Instruments, in accordance with the BVI Scheme.

(l)    As such, the final allocation of the New Instruments is subject to adjustments at the discretion of the Company (or its agent or person instructed by it) in order to satisfy the requirements for the Notes Minimum Denomination.  The factors to be taken into consideration is subject to change depending on a number of variables, including the number of Eligible Creditors as well as the size of their respective position of the SJ Notes, and the size of each tranche of each series of the New Instruments.  It is

84

possible that the New Instruments payable to each Scheme Creditor may not be allocated to each tranche of each series of the New Instruments on a pro rata basis based on their respective aggregate principal amount on the Restructuring Effective Date.

16.3    **Risks relating to a failure to implement or a delay in implementing the BVI Scheme**

*The Restructuring may not be completed because the Chairman is unable to pay the AHG Work Fee*

(a)    One of the condition precedent for the Restructuring to come to the effect is the payment of the AHG Work Fees by the Chairman.  This is beyond the Company's control.

*The Restructuring may not be completed because the TJ Scheme is not sanctioned or cannot become effective for reasons other than the effectiveness of the BVI Scheme.*

(b)    The effectiveness of the TJ Scheme is a Restructuring Effective Date Condition.

(c)    If the TJ Scheme is not approved by the respective scheme creditors, the TJ Scheme is not sanctioned by the Hong Kong Court or the condition precedents, other than the effectiveness of the BVI Scheme, for the TJ Scheme are not satisfied, the TJ Scheme will not become effective.

(d)    In those circumstances, the Restructuring Effective Date under the BVI Scheme will not occur.

*The Restructuring may not be completed in accordance with the timeline envisaged by this Explanatory Statement*

(e)    Factors unknown to the Company as at the date of this Explanatory Statement may result in delays to the completion of the Restructuring. There is no guarantee that the Restructuring Effective Date will occur by the Longstop Date, at which time those Scheme Creditors who are parties to the RSA will no longer be bound by its obligations under the RSA to support the Restructuring and not to take action against the Company and/or any member of the CEG Group, and the BVI Scheme will lapse.

(f)    The Longstop Date may, however, be extended in accordance with the terms of the Scheme and the RSA.

*Insolvency Proceedings if the Restructuring is not implemented promptly*

(g)    The maturity dates for two series of the Existing Notes have passed and, therefore, the Company is currently obliged to repay the principal amount and accrued but unpaid interest thereon under the Existing Notes.

(h)    The Company currently has limited available cash and, should the Restructuring not proceed, would be unable to repay its overdue indebtedness under and in connection with the Existing Notes.

85

(i)       If the Company, TJ, CEG and/or other members of the CEG Group are placed into a formal insolvency procedure, the proceeds available to Scheme Creditors will likely be reduced to a level that is materially lower than the potential value of the consideration they would receive under the BVI Scheme (as per the Liquidation Analysis summarised in Section 5 (*Letter from the Board to the Scheme Creditors*) and set out in Schedule 2 (*Liquidation Analysis*).

16.4    **Risks following the implementation of the BVI Scheme**

*The New Instruments received by Scheme Creditors as Scheme Consideration are subject to certain risks*

(a)       There may be no market for the New Instruments or any securities issued in exchange thereof.  To the extent any such securities become tradable, the price and trading volume thereof may be highly volatile.  Factors such as variations in the CEG Group's revenues, earnings and cash flows, proposals for new investments, strategic alliances and/or acquisitions, changes in interest rates, fluctuations in price for comparable companies, government regulations and changes thereof applicable to the CEG Group's industry and general economic conditions nationally or internationally could cause the price of such securities to change.  Any such developments may result in large and sudden changes in the trading volume and price of such securities.  There can be no assurance that these developments will not occur in the future.  Each Scheme Creditor should conduct its own due diligence and consider the appropriateness of the information in this Explanatory Statement having regard to its own objectives, financial situations and needs.  Scheme Creditors are also recommended to consult their own professional advisors as to legal, tax, financial or other aspects relevant to any action Scheme Creditors might take in relation to the BVI Scheme and the Restructuring, or the implications/consequences of such action.

*The Company may be subject to PRC withholding taxes on interest it pays on the New Instruments.*

(b)       According to relevant PRC laws and regulations, if the PRC tax authorities consider the Company to be a PRC tax resident enterprise, any gain realised by a non PRC resident enterprise or a non PRC resident individual holder from the transfer of the New Instruments would be regarded as being derived from sources within the PRC and would accordingly be subject to PRC income tax at the rate of 20% (or lower treaty rate, if any).

*The Group's financial performance and business operations have been and may continue to be affected by adverse market conditions, and the Company may not be able to generate sufficient cash to fully address its financial commitments.*

(c)       Beginning in the second half of 2021 and continuing into 2023, Chinese property developers and the capital markets that have funded growth and development of the sector have experienced an inflection point characterized by a number of adverse developments, including the following:

86

(i)     reduced bank lending for real estate development adversely affected access by property developers to onshore capital;

(ii)    reduced bank lending for mortgage finance for buyers, combined with buyers' concerns towards the ability of property developers to complete projects, has adversely affected property sales;

(iii)   tightened restrictions on the use of pre-sale proceeds under the applicable PRC law; and

(iv)    more recently, a material decrease in aggregate contracted sales and a substantial reduction in prices for residential units across the sector.

(d)     The negative news relating to certain Chinese property companies including defaults on their indebtedness have had a further negative impact on, and resulted in increased volatility in, the property sector in China. Such recent defaults make it difficult for Chinese property developers, management companies and potential property purchasers to obtain onshore and offshore financing, and result in very low market confidence in and very low demand for China real estate and increased market volatility.

(e)     Reduced bank lending for real estate development, coupled with certain negative credit events, has intensified market concerns over the operations of Chinese property developers. As a result, pre-sales of properties by Chinese developers have generally decreased. The Group has also experienced a noticeable decline in its aggregate contracted sales in recent months. Against the backdrop of the adverse market conditions, the Group has experienced liquidity pressures due both to its limited access to external capital to refinance its existing indebtedness and the reduction in cash generated from contracted sales. As a result, the repayment arrangements of the principal and interest amount of certain of the Existing Notes have passed their respective maturity dates. These amounts remain unpaid as at the date of this Explanatory Statement.

(f)     Since then, the Group has been actively engaging with its customers, suppliers, creditors and shareholders in stabilising its credit lines and day-to-day operations. It implemented further measures in reducing capital expenditure and other expenses such as management remuneration. The Group also commenced discussions with the AHG representing certain Scheme Creditors in exploring a consensual resolution for the event of defaults of the Group.

(g)     However, the Company cannot assure you that these efforts will be successful. Even if the BVI Scheme is successful, the Group will still have indebtedness in the PRC that is either in default or faces an imminent risk of default. The Group's operation may continue to be affected by the decrease in sales and property price, suspension on construction work, restraints on obtaining new financing, ongoing and potential disputes with creditors, business partners, customers and others, volatility in the property sector and the capital markets and other factors. In particular, the viable financing alternatives available to the Group have been significantly impacted by unfavourable changes to lending and investment policies by financial institutions and capital markets investors. The Group's reduced cash generated from operations

87

and its existing level of indebtedness and obligations may give rise to investors' and market's doubt about its ability to continue operating as a going concern. The Group's ability to continue its operations, to realize the carrying value of its assets, and to discharge its liabilities in the normal course of business are dependent upon its ability to raise new capital sufficient to fund its commitments and on continuously generating profitable operations.

***The Group's operations are subject to China's and global economic and social condition and extensive governmental policies and regulations in the PRC.***

(h)     Substantially all of the Group's business and operations are conducted in the PRC. Accordingly, the Group's business, financial condition, results of operations and prospects are, to a significant degree, subject to economic, political and social developments in the PRC.

(i)     The economy of the PRC differs from the economies of most developed countries in many respects, including but not limited to structure, level of government involvement, level of development, growth rate, control of foreign exchange, and allocation of resources. The PRC economy has grown significantly in recent decades, but there can be no assurance that this growth will continue or continue at the same pace.

(j)     Geo-political conflicts also negatively impacted on the global economy. For example, the recent conflict between Russia and Ukraine is still evolving and the impact of such geo-political conflicts on global economy is still unclear. China's economic condition, and the property sector in the PRC and hence our business, results of operations, financial condition and prospects may be materially and adversely affected by such geo-political conflicts and changes in global macro-economic environment.

(k)     In addition, demand for the Group's services and its business, financial position and results of operations may be adversely affected by (i) changes in laws, regulations or policies or the interpretation of laws, regulations or policies and social conditions in the PRC; (ii) measures which may be introduced to control inflation or deflation; (iii) changes in the rate or method of taxation; and (iv) imposition of additional restrictions on currency conversion and remittances abroad.

(l)     Moreover, sustainable growth and success of the Group's business significantly depend on its ability to continue acquiring additional land reserves in desirable locations at commercially reasonable prices that are suitable for the residential and commercial development. Its ability to acquire land depends on a variety of factors, some of which are beyond its control, such as overall economic conditions, availability of land parcels provided by the PRC government and competition for land parcels which are suitable for development. Any increase in its land cost resulting from any reason, such as shortages of supply or our inability to acquire suitable land parcels at commercially acceptable prices could have a material and adverse effect on the Group's business, financial condition, result of operations and prospects. Even if the BVI Scheme is successful, in the foreseeable future, it may be difficult for the Group to acquire additional land reserves due to many factors affecting the Group's operation results and financial performance, including the

88

decrease in sales and property price, suspension on construction work, restraints on obtaining new financing, ongoing and potential disputes with creditors, business partners, customers and others, volatility in the property sector and the capital markets and other factors.

***The Group is involved from time to time in disputes and administrative, legal and other proceedings arising out of its operations and may face significant liabilities as a result.***

(m)    The Group is involved in disputes with various parties arising out of its operations, including but not limited to its customers, contractors, construction workers, tenants, business partners, creditors and administrative and regulatory bodies, or other third parties.  These disputes may lead to legal, administrative or other proceedings and investigations and may result in damage to the Group's reputation, incurrence of substantial costs and diversion of resources and management's attention.

(n)    The Group has received, and may continue to receive, claims from its customers, suppliers and/or creditors and Enforcement Actions from its creditors in respect of its financial and other obligations. As a result of these events, the Group may be involved in more disputes with various parties such as its customers, suppliers and creditors. Although the Group has been actively engaging with its customers, suppliers, creditors and shareholders in stabilising its credit lines and day-to-day operations, there is no assurance that the Group will not be subject to any additional disputes and administrative, legal and other proceedings arising out of its operations, that the Group will successfully resolve such disputes and proceedings to its satisfaction, or that any judgment or ruling in respect of such disputes and proceedings would be in favour of the Group. Any involvement in these disputes may materially and adversely affect the Group's business, financial condition and results of operation.

(o)    Although the Group strives to maintain proper internal control, there is no assurance that its internal control measures will be effective and there will not be any non-compliance incidents in the future. The Group has been involved in certain investigations into its internal control and may be involved in such potential investigations by regulatory bodies in the PRC, Hong Kong and other applicable jurisdictions in the future. Such investigations may result in fines, financial and business losses, reputational damages and other material adverse effect on the Group's business operation and financial performance.

(p)    Since the recent downturn of the Chinese property sector, the applicable laws and regulations in relation to the property industry have been closely enforced by the regulatory bodies in order to stabilise the market and promote a healthy recovery of the industry.  The Group cannot assure you that it has been, or will be, in strict compliance with all applicable laws and regulations.  In addition, PRC laws, rules or regulations governing the real estate industry have been evolving rapidly, and there can be no assurance that the Group will not be subject to fines or penalties arising from non-compliance incidents if it fails to adapt to the new regulatory regime in a timely manner, or at all, which may have a material adverse effect on its business, financial condition and results of operations.

16.5    **Risks Relating to the New Instruments**

***Issuance of the New Instruments may be subject to approvals from the PRC regulators.***

(a)     The issuance of the New Instruments by the Company is subject to approvals and filings of the PRC regulators, including without limitation, the approval of National Development and Reform Commission and the filing with China Securities Regulatory Commission.  However, as of the date of this Explanatory Statement, all the necessary approvals for the issuance of the New Instruments from the PRC regulators have not been received. There is no assurance that the Company will be able to obtain such approvals in a timely manner which may lead to delay in the issuance of the New Instruments.

***The Company is an issuer company and payments with respect to the New Instruments are structurally subordinated to liabilities, contingent liabilities and obligations of the Group, which are not providing guarantees under the New Instruments.***

(b)     The Company is an issuer company incorporated for the sole purpose of issuing the Existing Notes and, after the Restructuring Effective Date, the New Instruments. Therefore, the Company does not have its own financial resources for the repayment but rather, relies on the Group for the payment under the New Instruments.  The Company's parent company, TJ, is a holding company and payments with respect to the New Instruments are structurally subordinated to liabilities, contingent liabilities and obligations of the TJ's subsidiaries which are not providing guarantees under the New Instruments.

(c)     TJ conducts its operations primarily through its subsidiaries.  The New Instruments will not be guaranteed by any subsidiaries.  TJ's primary assets are ownership interests in its PRC subsidiaries, which are primarily held through the offshore subsidiaries. Accordingly, the Company's ability to pay principal and interest on the New Instruments will depend upon their receipt of principal and interest payments on the intercompany loans and distributions of dividends from TJ's subsidiaries, including the PRC subsidiaries. If TJ or its offshore subsidiaries experience difficulties in receiving funds from the PRC subsidiaries, due to regulatory or other reasons, TJ may in turn experience difficulties in servicing its offshore debt, including but not limited to the New Instruments.

(d)     Creditors, including trade creditors of the non-guarantor subsidiaries and any holders of preferred shares in such entities, would have a claim on such subsidiaries' assets that would be prior to the claims of holders of the New Instruments (other than assets pledged by the New Instruments Pledgors to secure the New Instruments as applicable).  As a result, TJ's payment obligations under the New Instruments will be effectively subordinated to all existing and future obligations of such subsidiaries, and all claims of creditors of the non-guarantor subsidiaries will have priority as to the assets of such entities over TJ's claims and those of TJ's creditors, including holders of the New Instruments.  The New Instruments and the New Instruments Documents permit TJ and the subsidiaries to incur additional indebtedness and issue additional guarantees, subject to certain limitations.  In addition, TJ's secured creditors would have priority as to TJ's assets to the extent pledged to secure their obligations over claims of holders of the New Instruments.

***The Group has substantial indebtedness and may incur substantial additional indebtedness in the future, which could adversely affect the Group's financial health and its ability to generate sufficient cash to satisfy the Group's outstanding and future debt obligations, including the New Instruments.***

(e)     The CEG Group now has incurred, and may continue to incur after the Restructuring, a substantial amount of indebtedness.  The CEG Group's total financial indebtedness as of 31 December 2022 was RMB612.4 billion. See section 6.4 (*The Financial indebtedness and assets of the Group*) of this Explanatory Statement.  The CEG Group's substantial indebtedness could have important consequences to a holder of the New Instruments.  For example, it could:

      (i)     limits the Company's ability to satisfy its obligations under the New Instruments;

      (ii)    increases its vulnerability to adverse general economic and industry conditions; and

      (iii)   increases the cost of additional financing.

(f)     The Group may from time to time incur additional indebtedness and contingent liabilities.  Although the New Instruments Documents restrict the Company and the Restricted Subsidiaries (as defined in the New Instruments Documents) from incurring additional debt and contingent liabilities, these restrictions are subject to important exceptions and qualifications.  If the Group incurs additional debt, the risks that it faces as a result of its existing indebtedness and leverage could intensify.

(g)     Prism does not express an opinion on the consolidated financial statements of the Group in the audited reports for the year ended 31 December 2021 and 2022, and states that the Group's financial conditions, along with other matters, indicate the existence of material uncertainties which may cast significant doubt about the Group's ability to continue as a going concern. If the Group's operations continue to deteriorate and its financial pressures cannot be effectively relieved, risks associated with the Group's capacity for sustained operations may be aggravated.

(h)     Furthermore, the successful implementation of the Restructuring to a large extent is contingent on the orderly resumption of the Group's onshore business operation. However, the Group's onshore business operation is subject to uncertainties caused by various factors, including China's and global economic and social conditions, extensive governmental policies and regulatory environment and market conditions. In the event that the Group is unable to orderly resume its business operation, that may affect its ability to pay its debt from both onshore and offshore sectors, which would in turn have material adverse effect on the implementation of the Restructuring.

(i)     In addition, the terms of the New Instruments Documents prohibit the Company, TJ and the Restricted Subsidiaries from incurring additional indebtedness unless they are able to meet certain applicable restrictions.  Their ability to meet such applicable restrictions may be affected by events beyond their control.  Such restrictions in the New Instruments and the other financing arrangements may impair the Group's ability to react to changes in market conditions, take advantage of business opportunities it

91

believes to be desirable, obtain future financing, fund required capital expenditures or withstand a continuing or future downturn in its business.  Any of these factors could materially and adversely affect the Company's ability to satisfy its obligations under the New Instruments and other debt.

***Servicing the CEG Group's indebtedness will require a significant amount of cash and its ability to generate cash depends on many factors beyond its control.***

(j)      The CEG Group's ability to make payments on and to refinance its indebtedness, including these New Instruments, and to fund planned capital expenditures and project development will depend on its ability to generate cash.  This, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond the Group's control.

(k)      The CEG Group's business might not generate cash flow from operations in an amount sufficient to enable it to pay its indebtedness, including the New Instruments, or to fund its other liquidity needs.  The CEG Group's operation, financial performance and ability to service its indebtedness may continue to be affected by the decrease in sales and property price, suspension on construction work, restraints on obtaining new financing, ongoing and potential disputes with creditors, business partners, customers and others, volatility in the property sector and the capital markets and other factors.  The CEG Group may need to refinance all or a portion of its indebtedness (some of which matures prior to the New Instruments), including the New Instruments, on or before maturity.  The CEG Group might not be able to refinance any of its indebtedness on commercially reasonable terms or at all.

(l)      If the Company, TJ or a Restricted Subsidiary (as defined in the New Instruments Documents) is unable to comply with the terms in the New Instruments Documents or its existing or future debt obligations and other agreements, there could be a default under those agreements.  If that occurs, the holders of the New Instruments could accelerate repayment of the New Instruments and declare all outstanding amounts due and payable or terminate the New Instruments Documents, as the case may be.  Furthermore, the New Instruments Documents contain, and the CEG Group's future debt agreements are likely to contain, cross-acceleration and cross-default provisions.  As a result, the default of the Company, TJ or any of the Restricted Subsidiaries under one debt agreement may cause the acceleration of repayment of not only such debt but also the New Instruments, or result in a default under the CEG Group's other debt agreements.  If any of these events occur, the Group's assets and cash flow might not be sufficient to repay in full all of its indebtedness that has been accelerated and it might not be able to find alternative financing to repay such indebtedness on commercially reasonable terms or at all.

***The Group's operations are restricted by the terms of the New Instruments, which could limit its ability to plan for or to react to market conditions or meet its capital needs, which could increase the credit risk of a holder of these New Instruments.***

(m)      The New Instruments Documents include a number of significant restrictive covenants.  These covenants restrict, among other things, the ability of the Company, TJ and/or the Restricted Subsidiaries, to, among others:

92

(i)      incur or guarantee additional indebtedness and issue disqualified or preferred stock;

(ii)     make investments or specified restricted payments;

(iii)    declare dividends on capital stock or purchase or redeem capital stock;

(iv)    issue or sell capital stock of Restricted Subsidiaries;

(v)     guarantee indebtedness;

(vi)    sell, lease or transfer assets;

(vii)   create liens;

(viii)  enter into sale and leaseback transactions;

(ix)    engage in any business other than permitted business;

(x)     enter into agreements that restrict the Restricted Subsidiaries' ability to pay dividends, transfer assets or make intercompany loans;

(xi)    enter into transactions with shareholders or affiliates; and

(xii)   effect a consolidation or merger.

(n)    These covenants could limit the Group's ability to plan for or react to market conditions or to meet its capital needs. The Group's ability to comply with these covenants may be affected by events beyond its control, and it may have to curtail some of its operations and growth plans to maintain compliance.

***The Company is permitted to redeem all or any part of the New Instruments prior to maturity.***

(o)    The Company is permitted to redeem all or any part of the New Instruments at its option on a date prior to the maturity date. The optional redemption feature of the New Instruments may limit the market value of such New Instruments. During any period when the Company may elect to redeem the New Instruments, the market value of the New Instruments may not rise substantially above the price at which they can be redeemed. This may also be true prior to any redemption period.

(p)    The Company may also be expected to redeem the New Instruments with optional redemption feature when its cost of borrowing is lower than the interest rate on the New Instruments. At those times, an investor may not be able to reinvest the redemption proceeds at an effective interest rate as high as the interest rate on the New Instruments being redeemed and may only be able to do so at a significantly lower rate. Potential investors should consider reinvestment risk in light of other investments available at that time.

93

***The liquidity and price of the New Instruments following the Restructuring may be volatile.***

(q)     The price and trading volume of the New Instruments may be highly volatile. Factors such as variations in the CEG Group's revenues, earnings and cash flows and proposals for new investments, strategic alliances and acquisitions, interest rates, the general state of the securities market and fluctuations in price for comparable companies could cause the price of the New Instruments to change. Any such developments may result in large and sudden changes in the trading volume and price of the New Instruments. There is no assurance that these developments will not occur in the future.

***A trading market for the New Instruments may not develop, and there are restrictions on the resale of some of the New Instruments.***

(r)     The New Instruments are a new issue of securities for which there is currently no trading market. While application will be made for the listing and quotation of the New Instruments on the SGX-ST, there is no assurance that the Company will be able to obtain or maintain a listing on the SGX-ST or on any other recognized securities exchange and, even if listed, a liquid trading market might not develop. If no active trading market develops, a holder of the New Instruments may not be able to resell its New Instruments at their fair market value or at all. Future trading prices of the New Instruments will depend on many factors, including prevailing interest rates, the Group's operating results and the market for similar securities, which may be beyond the Group's control. In addition, the New Instruments are being offered pursuant to exemptions from registration under the US Securities Act and, as a result, a holder of the New Instruments will only be able to resell its New Instruments in transactions that have been registered under the US Securities Act or in transactions not subject to or exempt from registration under the US Securities Act. It cannot be predicted whether an active trading market for the New Instruments will develop or be sustained. If an active trading market for the New Instruments does not develop or is not sustained, the market price and liquidity of the New Instruments may be adversely affected.

***The transfer of the New Instruments may be restricted, which may adversely affect their liquidity and the price at which they may be sold.***

(s)     The New Instruments have not been registered under, and the Company is not obligated and does not plan to register the New Instruments under, the US Securities Act or the securities laws of any other jurisdiction. The New Instruments, unless so registered, may not be offered or sold except pursuant to an exemption from, or a transaction not subject to, the registration requirements of the US Securities Act and any other applicable laws. See "Important Securities Law Notices" at section 3 (*Important Securities Law Notices*) of this Explanatory Statement. The Group has not agreed to or otherwise undertaken to register the New Instruments with the SEC or the securities regulatory authority of any other jurisdiction, and the Group has no intention of doing so.

***The New Instruments will initially be held in book-entry form, and therefore a holder of the New Instruments must rely on the procedures of the relevant clearing systems to exercise any rights and remedies.***

94

(t)    The New Instruments will initially only be issued in global certificated form and held through Euroclear and Clearstream.  Interests in one or more global New Instruments representing the New Instruments will trade in book-entry form only, and New Instruments in definitive registered form will be issued in exchange for book-entry interests only in very limited circumstances.  Owners of book-entry interests will not be considered owners or holders of the New Instruments for purposes of the New Instruments Documents.  The nominee for the New Instruments Depositary will be the sole registered holder of the global New Instruments.  Accordingly, a holder of the New Instruments must rely on the procedures of Euroclear or Clearstream, and if the holder is not a participant in Euroclear or Clearstream, on the procedures of the participant through which it owns its interest to exercise any rights and obligations of a holder of the New Instruments under the New Instruments Documents.  Upon the occurrence of an event of default under the New Instruments Documents, unless and until definitive registered New Instruments are issued with respect to all book-entry interests, if a holder of the New Instruments owns a book-entry interest, it will be restricted to acting through Euroclear or Clearstream.  The procedures to be implemented through Euroclear and Clearstream may not be adequate to ensure the timely exercise of rights under the New Instruments.

***The Company will follow the applicable corporate disclosure standards for debt securities listed on the SGX-ST, which standards may be different from those applicable to debt securities listed in certain other countries.***

(u)    The Company will be subject to reporting obligations in respect of the New Instruments to be listed on the SGX-ST.  The disclosure standards imposed by the SGX-ST may be different from those imposed by securities exchanges in other countries such as the United States or Hong Kong.  As a result, the level of information that is available may not correspond to what investors in the New Instruments are accustomed to.

***Disclosure standards that apply to the CEG Group may differ from those in the United States or other jurisdictions.***

(v)    The Group's consolidated financial information is prepared in accordance with IFRS, which differs in certain respects from US GAAP.  As a result, the Group's consolidated financial information and reported earnings could be significantly different if they were prepared in accordance with US GAAP.  No attempt has been made to quantify the impact of those differences.  This Explanatory Statement does not contain reconciliation of the Group's consolidated financial information to US GAAP, and there is no assurance that such reconciliation would not reveal material differences.  Potential investors should consult their own professional advisors for an understanding of the differences between IFRS and US GAAP, and how these differences might affect the financial information herein.

***An investment in the New Instruments is subject to exchange rate risks, and exchange controls may result in a Holder receiving less interest or principal than expected.***

(w)    The Company will pay principal and interest, on the New Instruments in US dollars.  This presents certain risks relating to currency conversions if a holder's financial activities are denominated principally in a currency or currency unit (the "**Investor's**

95

**Currency**") other than US dollars. These include the risk that exchange rates may significantly change (including changes due to devaluation of the US dollar or revaluation of the Investor's Currency) and the risk that authorities with jurisdiction over the Investor's Currency may impose or modify exchange controls. An appreciation in the value of the Investor's Currency relative to the US dollar would decrease (i) the Investor's Currency equivalent yield on the New Instruments; (ii) the Investor's Currency equivalent value of the principal payable on the New Instruments; and (iii) the Investor's Currency equivalent market value of the New Instruments. Governments and monetary authorities may impose (as some have done in the past) exchange controls that could adversely affect an applicable exchange rate. As a result, a holder of the New Instruments may receive less interest or principal (in terms of the Investor's Currency) than expected.

***Certain major terms of the New Instruments Documents may be modified, amended or waived without the consent of each holder being affected, which may adversely affect the interest of the holders of such series of New Instruments and increase the credits risks of such series of New Instruments.***

(x)     Certain major terms of the New Instruments Documents may only be modified, amended or waived with the consent of each holder being affected. However, as part of the purpose of the BVI Scheme is to improve the Group's overall financial condition, the New Instruments Documents governing the Company's New Instruments may allow modification, amendments or waivers of certain major terms to be made with the consent of holders of not less than 80% in aggregate principal amount of the relevant series of outstanding New Instruments, including the waiver of payment defaults, the reduction of the principal amount of, or premium, if any, or interest on, any relevant New Instruments, and the release of any relevant New Instruments Subsidiary Guarantors from the relevant New Instruments Subsidiary Guarantees, as the case may be, except as provided in the relevant New Instruments Documents.

***The New Instruments Trustee may request that the holders of the New Instruments provide an indemnity and/or security and/or prefunding to its satisfaction.***

(y)     In certain circumstances, the New Instruments Trustee may (at its sole and absolute discretion) request the holders of the New Instruments to provide an indemnity and/or security and/or prefunding to its satisfaction before it takes actions and/or steps and/or institute proceeding on behalf of holders of the New Instruments. The New Instruments Trustee shall not be obliged to take any such actions and/or steps and/or institute proceeding if not indemnified and/or secured and/or prefunded to its satisfaction. Negotiating and agreeing to any indemnity and/or security and/or prefunding can be a lengthy process and may impact on when such actions can be taken. The New Instruments Trustee may not be able to take actions and/or steps and/or institute proceeding notwithstanding the provision of an indemnity and/or security and/or prefunding to it, in breach of the terms of the New Instruments Documents and in circumstances where there is uncertainty or dispute as to the applicable laws or regulations and, to the extent permitted by the agreements and the applicable law, it will be for the holders of New Instruments to take such actions and/or steps and/or institute proceeding directly.

96

*Cross default or final judgments or orders in connection with event or circumstance existing as of the Original Issue Date will not be an Event of Default under the New Instruments Documents.*

(z)      The New Instruments Documents will provide that the Event of Default triggered by cross default, final judgments or orders, involuntary or voluntary cases, other proceedings or orders under any applicable bankruptcy, insolvency or other similar law, consents to the appointment of or taking possession by a receiver, liquidator or similar official or general assignment for the benefit of creditors shall not apply to any cross default, final judgments or orders, involuntary or voluntary cases, other proceedings or orders under any applicable bankruptcy, insolvency or other similar law, consents to the appointment of or taking possession by a receiver, liquidator or similar official or general assignment for the benefit of creditors arising or resulting from or related to any event or circumstance existing as of the Original Issue Date.

16.6   **Risks Relating to the New Instruments Subsidiary Guarantees and the Collateral**

*There are initial New Instruments Subsidiary Guarantors do not currently have significant operations.*

(a)      Certain subsidiaries of the Group are not providing subsidiary guarantees. Certain subsidiaries accounting for a de minimis portion of the Group's total assets and any subsidiaries that are Exempted Subsidiaries or designated Unrestricted Subsidiaries in accordance with the New Instruments Documents will not be required to provide subsidiary guarantees.   As a result, the New Instruments will effectively be subordinated to all the debt and other obligations, including contingent obligations and trade payables, of the subsidiaries of the Group that are not New Instruments Subsidiary Guarantors, and a number of such subsidiaries will have significant assets and operations and will be able to incur potentially significant indebtedness within the limits provided in the New Instruments Documents.

*Certain of the initial New Instruments Subsidiary Guarantors do not have significant operations.*

(b)      We cannot assure you that the initial New Instruments Subsidiary Guarantors or any subsidiaries that may become New Instruments Subsidiary Guarantors in the future will have the funds necessary to satisfy the Company's financial obligations under the New Instruments if the Company is unable to do so.

*The New Instruments Subsidiary Guarantees may be challenged under applicable financial assistance, insolvency, corporate benefit or fraudulent transfer or unfair preference laws, which could impair the enforceability of the New Instruments Subsidiary Guarantees.*

(c)      Under bankruptcy laws, insolvency laws, fraudulent transfer laws, corporate benefit, financial assistance, insolvency or unfair preference or similar laws in the British Virgin Islands, Hong Kong, or other jurisdictions where future New Instruments Subsidiary Guarantors may be established, a guarantee could be voided, or claims in respect of a guarantee could be subordinated to all other debts of that New Instruments Subsidiary Guarantor if, among other things, the New Instruments Subsidiary

Guarantor, at the time it incurred the indebtedness evidenced by, or when it gives its guarantee:

(i) incurred the debt with the intent to hinder, delay or defraud creditors or was influenced by a desire to put the beneficiary of the New Instruments Subsidiary Guarantee in a position which, in the event of the guarantor's insolvency, would be better than the position the beneficiary would have been in had the New Instruments Subsidiary Guarantee not been given;

(ii) received less than the reasonably equivalent value or fair consideration for the incurrence of such New Instruments Subsidiary Guarantee and/or there was otherwise an absence of or insufficient corporate benefit under applicable laws;

(iii) was, by entering into the New Instruments Subsidiary Guarantee, agreeing a transaction that requires grossly exorbitant payments

(iv) was insolvent or rendered insolvent by reason of such incurrence;

(v) was engaged in a business or transaction for which the New Instruments Subsidiary Guarantor's remaining assets constituted unreasonably small capital; or

(vi) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature.

(d) The measure of insolvency for purposes of the foregoing will vary depending on the law of the jurisdiction which is being applied. A New Instruments Subsidiary Guarantor would commonly be considered insolvent at a particular time if it is unable to pay its debts as they fall due.

(e) If a New Instruments Subsidiary Guarantee is voided or is subordinated to other indebtedness of the New Instruments Subsidiary Guarantor, or held unenforceable for any other reason, holders of the New Instruments would, among other things, cease to have a claim against that New Instruments Subsidiary Guarantor based upon such guarantee or would be subject to the prior payment of all liabilities (including trade payables) and any preferred stock of such New Instruments Subsidiary Guarantor and would solely be creditors of us and any remaining New Instruments Subsidiary Guarantors. We cannot assure you that, after the voiding or subordination of any New Instruments Subsidiary Guarantee, the Company and any remaining New Instruments Subsidiary Guarantees will be able to satisfy the claims of holders of the New Instruments in full.

**The pledges of certain Collateral may in some circumstances be voidable.**

(f) The pledge of the Collateral may be voidable as a preference under insolvency or fraudulent transfer or similar laws of the British Virgin Islands if the creation of the pledge takes place at any time within six months prior to the onset or insolvency or, under some circumstances, within a longer period Pledges of future assets may also be voidable as a preference under relevant insolvency or fraudulent transfer or similar

98

laws.  If the pledge of any Collateral was to be voided for any reason, holders of the relevant New Instruments will face increasing credit risks.  If the pledges of the Collateral were to be voided for any reason, holders of the New Instruments would have only an unsecured claim against us and the Subsidiary Guarantor Pledgor.

***The Collateral may be released.***

(g)    The Collateral will consist only of the capital stock of the Share Charge and the Receivable Charge.  The security interest in respect of certain Collateral may be released upon the disposition of such Collateral in compliance with the covenants under the New Instruments Documents.

***The value of the Collateral is unlikely to be sufficient to satisfy our obligations under the New Instruments.***

(h)    The ability of the Collateral Agent, on behalf of the New Instruments Trustee, to foreclose on the Collateral upon the occurrence of an Event of Default or otherwise, will be subject in certain instances to perfection and priority issues.  Although procedures will be undertaken to support the validity and enforceability of the security interests, we cannot assure you that the Collateral Agent, the New Instruments Trustee or holders of the New Instruments will be able to enforce the security interest.

(i)    The value of the Collateral in the event of a liquidation will depend upon market and economic conditions, the availability of buyers and similar factors. No independent appraisals of any of the Collateral have been prepared by or on behalf of us in connection with the New Instruments.  Accordingly, we cannot assure you that the proceeds of any sale of the Collateral following an acceleration of the New Instruments would be sufficient to satisfy, or would not be substantially less than, amounts due and payable on the New Instruments.  By their nature, some or all of the Collateral may be illiquid and may have no readily ascertainable market value. Likewise, we cannot assure you that the Collateral will be saleable or, if saleable, that there will not be substantial delays in its liquidation.

***We will in most cases have control over the Collateral.***

(j)    The Security Documents will generally permit the New Instruments Subsidiary Pledgors and us to remain in possession of, to retain exclusive control over, to freely operate, and to collect, invest and dispose of any income from, the Collateral. These rights may adversely affect the value of the Collateral at any time.

***It may be difficult to realise the value of the Collateral.***

(k)    The security interest of the Collateral Agent may be subject to practical problems generally associated with the realization of security interests in the Collateral.  For example, the Collateral Agent may need to obtain the consent of a third-party or Governmental Entity to obtain or enforce a security interest in a license or contract or to otherwise dispose of the Collateral.  We cannot assure you that the Collateral Agent will be able to obtain any such consent. If the Collateral Agent exercises its rights to foreclose on certain assets, transferring required government approvals to, or

99

obtaining new approvals by, a purchaser of assets may require governmental proceedings with consequent delays.

(l)     In addition, the Collateral Agent may need to evaluate the impact of potential liabilities before determining to foreclose on the Collateral.  In this regard, the Collateral Agent may decline to foreclose on the Collateral or exercise remedies available if it does not receive indemnification to its satisfaction from the holders of the New Instruments.

***Rights of holders of the New Instruments in the Collateral may be adversely affected by the failure to perfect the security interests.***

(m)     The Collateral Agent's ability to foreclose on the Collateral may be subject to restrictions, including but not limited to priority issues, state and provincial law requirements, applicable bankruptcy law, prior liens and practical problems associated with the realization of the Collateral Agent's lien on the Collateral, including cure rights, foreclosing on the Collateral within the time periods permitted by third parties or prescribed by laws, obtaining third-party consents, making additional filings, statutory rights of redemption and the effect of the order of foreclosure. There can be no assurance that the consents of any third parties and approvals by governmental entities or courts of competent jurisdiction will be given when required to facilitate a foreclosure on such assets or that foreclosure on the Collateral will be sufficient to make all payments on the New Instruments and/or the New Instruments Subsidiary Guarantees.

16.7    **Risks Relating to the New Instruments Keepwell Deed**

***The New Instruments Keepwell Deed is not a guarantee of the payment obligations under the New Instruments, the New Instruments Subsidiary Guarantees and performance by the New Instruments Keepwell Provider of its obligations under the New Instruments Keepwell Deed is subject to the approvals of the relevant authorities.***

(a)     The New Instruments Keepwell Provider will enter into the New Instruments Keepwell Deed in relation to the New Instruments.  Pursuant to the terms of the New Instruments Keepwell Deed, the New Instruments Trustee may take action against the New Instruments Keepwell Provider to enforce the provisions of the New Instruments Keepwell Deed.  However, neither the New Instruments Keepwell Deed nor any actions taken under the New Instruments Keepwell Deed can be deemed as a guarantee by the New Instruments Keepwell Provider of the payment obligation of the Company under the New Instruments or the payment obligation of the New Instruments Subsidiary Guarantors under the relevant New Instruments Documents. Accordingly, the New Instruments Keepwell Provider will be obliged to cause the Company and the New Instruments Guarantors to obtain, before the due date of the relevant payment obligations, funds sufficient to enable the Company and/or the New Instruments Guarantors to pay such payment obligations in full as they fall due and to maintain a certain consolidated net worth, rather than assume the payment obligation as would be the case for a guarantee.

(b)     In addition, under the New Instruments Keepwell Deed, upon the occurrence of an Event of Default, the New Instruments Keepwell Provider agrees to purchase from TJ

100

or any of its subsidiaries, equity interest in subsidiaries held by the New Instruments Keepwell Provider or such subsidiaries (the "**Purchase**") at a purchase price based on the terms of such New Instruments Keepwell Deed.  In case the Purchase is conducted at a price below an amount determined in accordance with the terms of the New Instruments Keepwell Deed, the New Instruments Keepwell Provider also agrees to make either (i) a loan to TJ or any of its subsidiaries incorporated outside the PRC; or (ii) an investment in TJ or any of its subsidiaries incorporated outside the PRC, in each case with a loan amount or an investment amount, as the case may be, calculated as set forth in the New Instruments Keepwell Deed.

(c)     Furthermore, even if the New Instruments Keepwell Provider intends to perform its obligations under the New Instruments Keepwell Deed, depending on the manner in which the New Instruments Keepwell Provider performs its obligations under the New Instruments Keepwell Deed in causing TJ or New Instruments Subsidiary Guarantors to obtain, before the due date of the relevant payment obligations, funds sufficient to meet TJ or New Instruments Subsidiary Guarantors' obligations under the relevant guarnatees, such performance may be subject to obtaining prior consent, approvals, registration and/or filings from relevant governmental authorities, including but not limited to Ministry of Finance, China Securities Regulatory Commission, National Development and Reform Commission, the Ministry of Commerce, State Administration of Foreign Exchange and State-owned Assets Administration Commission (where applicable).  Although the Company is required to use all reasonable efforts to obtain any required consents and approvals in order to fulfil its obligations under the New Instruments Keepwell Deed, there is no assurance that such consents or approvals will be obtained in a timely manner or at all.  Recent Hong Kong case law has suggested that although keepwell obligations generally are enforceable contractual obligations under Hong Kong law, a keepwell provider may be relieved of its keepwell obligations if it could prove on the balance of probabilities that despite using its best efforts it could not have obtained the necessary regulatory approvals that are needed for it to comply with its keepwell obligations.

(d)     Furthermore, depending on the manner of the performance of the New Instruments Keepwell Deed, the New Instruments Keepwell Provider, TJ, the Company, the New Instruments Subsidiary Guarantors and the PRC subsidiaries may be subject to PRC tax, such as income tax, withholding tax, transfer tax, stamp tax or other taxes under applicable PRC Laws.

(e)     In addition, any claim by the Company, TJ, the New Instruments Subsidiary Guarantors, the Trustee and/or holders of New Instruments against the New Instruments Keepwell Provider in relation to the New Instruments Keepwell Deed will be effectively subordinated to all existing and future obligations of the New Instruments Keepwell Provider's subsidiaries that do not guarantee the New Instruments, particularly some PRC operating subsidiaries of the New Instruments Keepwell Provider, and all claims by creditors of such subsidiaries will have priority to the assets of such entities over the claims of the Company, TJ, the New Instruments Subsidiary Guarantors, the New Instruments Trustee and/ or holders of New Instruments under the New Instruments Keepwell Deed.

101

***Performance by the New Instruments Keepwell Provider of its undertaking under the New Instruments Keepwell Deed may be subject to consent from third party creditors and shareholders, and may also be restricted if any of the equity interests are secured in favor of third party creditors.***

(f)    Under the New Instruments Keepwell Deed, the New Instruments Keepwell Provider agrees to purchase from TJ or its subsidiaries, the equity interest in subsidiaries held by TJ or its subsidiaries.  The ability of the New Instruments Keepwell Provider to perform this undertaking may be affected by its present or future financing agreements of TJ and its subsidiaries:

   (i)    in the event that such financial agreements contain non-disposal or other restrictive covenants that would prevent the sale of an equity interest by TJ or its subsidiaries, TJ or such subsidiary would need to obtain the consent from the third party creditor before it is able to proceed with the sale of such equity interest; and

   (ii)    in the event that certain equity interests have been secured in favor of third party creditors, TJ or its subsidiaries would need to arrange for these security interests to be released before it is able to proceed with the sale of such equity interests.

(g)    In addition, the sale of the equity interests in certain non-wholly-owned companies may be subject to pre-emptive rights or other restrictions in such company's articles of association, shareholders' agreement or otherwise that would require the selling shareholder to obtain consent or waiver from other third party shareholders before any equity interest can be sold to the New Instruments Keepwell Provider.  Any sale of the equity interests would also require independent shareholders' approval and compliance with other requirements, if any, under the Listing Rules.  In the event the obligation to purchase under the New Instruments Keepwell Deed becomes effective there is no assurance that any required consents or waivers can be obtained from third party shareholders in a timely manner or at all.

***There is no guarantee that the New Instruments Keepwell Provider will be able to perform its keepwell obligation when triggered.***

(h)    As of the end of May 2023, the New Instruments Keepwell Provider had a total of 1,601 pending litigation cases involved more than RMB30 million each, and the total amount involved was approximately RMB382.94 billion.

(i)    As of the end of May 2023, the New Instruments Keepwell Provider had unpaid debts due amounted to approximately RMB277.7 billion. In addition, as of the end of May 2023, New Instruments Keepwell Provider's overdue commercial bills amounted to approximately RMB245.4 billion.

(j)    In light of the overall indebtedness of the New Instruments Keepwell Provider, there is no guarantee that the it will be able to perform its keepwell obligation when triggered.

102

**17.    TAXATION**

17.1    **Overview**

The Company has not analysed, and this Explanatory Statement does not discuss, the tax consequences to any Scheme Creditor of the Restructuring.  Such tax consequences may be complex and each Scheme Creditor is urged to consult its own tax Advisor with respect to the tax consequences of the Restructuring in light of such person's particular circumstances, including the tax consequences in any jurisdiction of the exchange of interests in the Existing Notes for any Scheme Consideration, and the receipt, ownership and disposition of such Scheme Consideration.  Scheme Creditors are liable for any taxes that may arise in respect of such Scheme Creditor as a result of the BVI Scheme and the Restructuring, and shall have no recourse to the Company, the Group, the Existing Notes Subsidiary Guarantors, the Existing Notes Trustee, the Information Agent or any other person in respect of such taxes or any filing obligation with respect thereto.

**SCHEDULE 1**

**DEFINITIONS AND INTERPRETATION**

1.    **DEFINITIONS**

In this Explanatory Statement:

| | |
|---|---|
| **"Accession Code"** | means a unique code provided by the Information Agent to a Scheme Creditor following its valid accession to the RSA, and which must be included by such Scheme Creditor in its voting instructions within the relevant Scheme Creditor Form in respect of the BVI Scheme. |
| **"Account Holder"** | means any Person who is recorded in the books of a Clearing System as being a holder of a book-entry interest in the Existing Notes in an account with that Clearing System or, as the context may require, is or was recorded in such books as being such a holder of Existing Notes in such an account at the Voting Record Time. |
| **"Account Holder Letter"** | means the form of account holder letter which is appended to the Solicitation Packet, to be made available on the Transaction Website. |
| **"Advisors"** | means (i) Sidley Austin, (ii) Houlihan Lockey, (iii) Maples and Calder, (iv) BOCI Asia Limited, (v) CICC, and (vi) Commerce & Finance Law Offices. |
| **"Affiliate"** | means, with respect to any Person, any other Person: (a) directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person; or (b) who is a director or officer of such Person or any Subsidiary of such Person or of any Person referred to in clause (a) of this definition and with respect to any Participating Creditor, any of its managers, investment manager or investment advisors, and any entity managed or advised by that manager, investment manager or investment advisor. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. |
| **"Agreed Form"** | means in the form agreed in writing between:<br><br>(a)    the Company (or the Advisors acting on its behalf);<br><br>(b)    Majority SJ AHG (or the AHG Advisors acting on their behalf); |

104

(c)   only in relation to the New Instruments Documents, the New Instruments Trustee; and

(d)   only in relation to the Holding Period Trust Deed and any other documents to which the Holding Period Trustee is party, the Holding Period Trustee,

in each case each acting reasonably.

| | |
|---|---|
| **"AHG"** | means, collectively, the CEG AHG and the SJ AHG. |
| **"AHG Advisors"** | means Kirkland & Ellis, Moelis & Company Asia Limited, Harney Westwood & Riegels, Fangda Partners, and other professional advisors as the SJ AHG may appoint from time to time. |

**"AHG Advisors' Fee"**   means the reasonable fees, costs and expenses of the financial advisor (Moelis & Company Asia Limited) and the legal advisors (Kirkland & Ellis, Harney Westwood & Riegels, Fangda Partners and the barrister) to the SJ AHG that CEG has agreed to pay in accordance with the terms set out in the following:

(a)   the fee letter agreement dated 4 April 2022 between CEG and the Kirkland & Ellis;

(b)   the fee letter agreement dated 6 March 2023 between CEG and Harney Westwood & Riegels, and CEG and Moelis & Company Asia Limited; and

(c)   the fee letter agreement dated 6 March 2023 between CEG and Fangda Partners.

| | |
|---|---|
| **"AHG Work Fee"** | Means the **"Work Fee"** as defined in the AHG Work Fee Letter. |
| **"AHG Work Fee Letter"** | means the letter dated 20 March 2023 from the Chairman to the members of the SJ AHG in connection with payment of the AHG Work Fee. |

**"Ancillary Claim"**   means any Claim by a Scheme Creditor against a Released Person under or in respect of the Existing Notes arising as a result of effecting, adhering to or complying with the releases in Clause 21.2(a)(i) (*Releases*) (excluding for the avoidance of doubt any Claim in respect of any Liability (i) of any Released Person which arises as a result of a failure to comply with any of the terms of the BVI Scheme or any Restructuring Document (including but not limited to the New Instruments Documents) and (ii) arising from or in connection with any Excluded Liability.

**"Applicable Sanctions"**   means laws, regulations, rules and/or orders relating to economic, financial or trade sanctions, restrictive measures or embargoes

administered, enacted, maintained and/or enforced by any Governmental Entity of the United States of America (including by the US Office of Foreign Assets Control or the US Department of State), the European Union, the United Kingdom and the British Overseas Territories (including, for the avoidance of doubt, The Russia (Sanctions) (EU Exit) Regulations 2019, as amended from time to time and as applicable in the BVI pursuant to The Russia (Sanctions) (Overseas Territories) Order 2020 (as amended).

means each of:

    (a) the lists of Specially Designated Nationals and Blocked Persons or "Foreign Sanctions Evaders" or any other list of Persons subject to, or targeted by, similar sanctions as administered, maintained and/or enforced by the Office of Foreign Assets Control of the US Treasury, the US Department of Commerce, the US Department of State and any other Government Entity of the United States;

    (b) the Consolidated List of Persons, Groups and Entities Subject to EU Financial Sanctions maintained by the European Commission, Annex XIX of Regulation (EU) No 833/2014, or any other list of Persons subject to, or targeted by, similar sanctions as administered, maintained and/or enforced by the European Union or any Governmental Entity in any Member State of the European Union; or

"Applicable Sanctions List"

    (c) the Consolidated List of Financial Sanctions Targets in the United Kingdom maintained by the Office of Financial Sanctions Implementation, His Majesty's Treasury of the United Kingdom, the United Kingdom Sanctions List maintained by the Foreign, Commonwealth and Development Office, or any other list of Persons subject to, or targeted by, similar sanctions administered, maintained and/or enforced by any Governmental Entity of the United Kingdom or the BVI,

or any other similar sanctions list of persons and entities subject to a prohibition to transact with, that is developed, maintained and published by any Governmental Entity of the United States of America (including by the U.S. Office of Foreign Assets Control or the U.S. Department of State), the European Union, the United Kingdom and the British Overseas Territories in connection with Sanctions, in each case as amended, supplemented or substituted from time to time, and "Applicable Sanctions Lists" includes, collectively, (a), (b) and (c) of this definition.

106

| | |
|---|---|
| **"Authorised Signatory"** | means Anna Silver of FFP (BVI) Limited as Scheme Supervisor. |
| **"Bar Date"** | means the date falling fourteen (14) calendar days after the Scheme Effective Date. |
| **"Blocked New Instruments"** | means the New Instruments to which Blocked Scheme Creditors are entitled in accordance with the terms of the BVI Scheme and the Holding Period Trust Deed and, subject to Applicable Sanctions being in place on or around the expiration of the Holding Period. |
| **"Blocked Scheme Creditor"** | means a Scheme Creditor (other than a Sanctioned Scheme Creditor) that is not entitled, able or permitted (whether directly or through a custodian) to submit instructions or settle through the Clearing Systems as a result of Applicable Sanctions affecting the Scheme Creditor or its custodian as reasonably determined by the Clearing Systems, and which does not have a sanctions license in respect of the Applicable Sanctions which would allow that Scheme Creditor to freely deal in the Scheme Consideration and submit instructions or settle through the Clearing Systems. |
| **"Blocked Scheme Creditor Form"** | means a form from a Blocked Scheme Creditor substantially in the form of the Blocked Scheme Creditor form set out in the Solicitation Packet available on the Transaction Website. |

"Blocking Regulation" means:

(a) Council Regulation (EC) No. 2271/1996 of 22 November 1996 (as amended) and/or any applicable national law or regulation relating to it;

(b) Council Regulation (EC) No. 2271/1996 of 22 November 1996 (as amended) as it forms part of domestic law of the United Kingdom by virtue of the European Union (Withdrawal) Act 2018; or

(c) The Protection of Trading Interests Act 1980 of the United Kingdom.

| | |
|---|---|
| **"Board"** | means the board of Directors. |
| **"BOCI"** | means BOCI Asia Limited, in its capacity as advisor to the Scheme. |
| **"Business Day"** | means any day which is not a Saturday, Sunday, legal holiday or other day on which banking institutions in the City of New York, the City of London, the BVI, the Cayman Islands, Hong Kong or the PRC are authorised or required by law or governmental regulation (as applicable) to close. |

107

| | |
|---|---|
| **"BVI"** | means the British Virgin Islands. |
| **"BVI Companies Act"** | means the BVI Business Companies Act as amended, modified or re-enacted from time to time. |
| **"BVI Court"** | means the Eastern Caribbean Supreme Court, High Court of Justice, BVI and any court capable of hearing appeals therefrom. |
| **"BVI Court Order"** | means the order of the BVI Court sanctioning the BVI Scheme. |
| **"BVI Information Agent"** | means FFP (BVI) Limited in its capacity as the Company's information agent in the BVI. |
| **"BVI Registrar of Corporate Affairs"** | means the Registrar of Corporate Affairs (including any deputy registrar and/or assistant registrar or similar) appointed under the BVI Companies Act in the BVI. |
| **"BVI Scheme"** | means this scheme of arrangement effected pursuant to section 179A of the BVI Companies Act between the Company and the Scheme Creditors, in its present form or with or subject to any non-material modifications, additions or conditions that the BVI Court may think fit to approve or impose and agreed to by the Company and the Majority SJ AHG (provided that the SJ AHG satisfies the Minimum SJ AHG Threshold).. |
| **"BVI Scheme Meeting"** | means the meeting of the Scheme Creditors in relation to the BVI Scheme as convened by an order of the BVI Court for the purpose of considering and, if thought fit, approving, with or without modification, the BVI Scheme, and any adjournment thereof. |
| **"BVI Scheme Sanction Hearing"** | means the hearing at the BVI Court of the Fixed Date Claim Form filed with the BVI Court on 26 April 2023 in respect of the sanctioning of the BVI Scheme. |
| **"Capital Stock"** | means, with respect to any Person, any and all shares, interests (including partnership interests), rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting) equity of such Person. |
| **"CEG"** | means China Evergrande Group, an exempted company incorporated with limited liability under the laws of the Cayman Islands with registration number 169971 and having its registered office at P.O. Box 309, Ugland House, Grand Cayman, KY1-1104, the Cayman Islands and the shares of which are listed on the Main Board of the HKEX.. |

108

| | |
|---|---|
| **"CEG Cayman Scheme"** | means a scheme of arrangement in the Cayman Islands to be proposed by the Company's indirect parent company, CEG. |
| **"CEG HK Scheme"** | means a scheme of arrangement in Hong Kong to be proposed by the Company's indirect parent company, CEG. |
| **"CEG Existing Notes"** | means the ten series of US$ denominated notes issued by CEG. |
| **"CEG Shares"** | means the ordinary shares of CEG. |
| **"Chairman"** | means Mr Hui Ka Yan. |
| **"Chairperson"** | means the chairperson of the BVI Scheme Meeting. |
| **"Chapter 15 Recognition Order"** | means an order or orders of the US Bankruptcy Court recognising the BVI Scheme as a foreign main proceeding (or in the alternative, a foreign non-main proceeding) and giving effect to certain aspects of the compromise and arrangement set out in the BVI Scheme, including the Releases under Clause 21 (*Releases*) of the BVI Scheme. |
| **"Chapter 15 Recognition Proceeding"** | means the recognition proceeding before a US Bankruptcy Court to recognize the Scheme pursuant to Chapter 15 of the United States Bankruptcy Code. |
| **"CICC"** | means China International Capital Corporation Hong Kong Securities Limited, in its capacity as advisor to the Scheme. |
| **"Claim"** | means all and any present and future Liabilities together with any refinancing, novation, deferral or extensions relating to or arising in respect of those Liabilities, actions, causes of action, claims, counterclaims, suits, debts, set-offs, sums of money, accounts, contracts, agreements, promises, contribution, subrogation, indemnification, damages, judgments, executions, court or arbitration awards, demands or rights whatsoever or howsoever arising, whether present, future, prospective or contingent, known or unknown, whether directly or indirectly, whether in person or through another Person, whether or not for a fixed or unliquidated amount, whether or not involving the payment of money or the performance of an act or obligation or any failure to perform any obligation or any omission, whether arising at common law, in equity or by statute in or under the laws of the Cayman Islands, BVI, Hong Kong, PRC, New York or under any other law or in any other jurisdiction howsoever arising and **"Claims"** shall be construed accordingly. |

109

| | |
|---|---|
| **"Class A RSA"** | means the restructuring support agreement dated 3 April 2023 between, among others, CEG and the Initial Participating Creditors (as defined in the Class A RSA), as amended or varied from time to time, including by the accession or cessation of parties thereto. |
| **"Clearing Systems"** | means Euroclear and Clearstream, as applicable, and any successor thereto. |
| **"Clearing System Instruction"** | means an instruction to each of the Clearing Systems in relation to the Restructuring Effective Date |
| **"Clearstream"** | means Clearstream Banking S.A. |
| **"Collateral"** | all collateral securing, or purported to be securing, directly or indirectly, the New Instruments, or any New Instruments Subsidiary Guarantee (as applicable), pursuant to the Security Documents, each of which shall in each case, be in the Agreed Form. |
| **"Collateral Agent"** | means the collateral agent or any successor collateral agent under the New Instruments Documents and with respect to the Security Documents, each of which shall be in the Agreed Form. |
| **"Company Information"** | means information in the possession or control of the Company or the Group that the Scheme Administrators consider in their sole discretion relevant to evaluate the Scheme Creditors' Entitlements. |
| **"Company Website"** | means https://mobilesite.evergrande.com/en/news.aspx. |
| **"Companies Ordinance"** | means the Companies Ordinance (Cap. 622 of the Laws of Hong Kong), as amended, modified or re-enacted from time to time. |
| **"Completion Notice"** | has the meaning given to it in Clause 6.1 (*Scheme Steps*) of the BVI Scheme. |
| **"Custody Instruction"** | means an instruction to the relevant Clearing System to block the Existing Notes (up to the Restructuring Effective Date) from trading in the relevant Clearing System. |
| **"Custody Instruction Deadline"** | means 5:00 a.m. on 15 August 2023 (BVI time). |
| **"Custody Instruction Reference Number"** | means, the unique reference provided by Euroclear or Clearstream, following an instruction from an Account Holder to block the relevant Existing Notes in accordance with the instructions contained in this Explanatory Statement. |

110

| | |
|---|---|
| **"C(WUMP)O"** | means the Companies (Winding Up and Miscellaneous Provisions) Ordinance (Cap. 32 of the Laws of Hong Kong), as amended, modified or re-enacted from time to time. |
| **"Deed of Indemnity"** | means a BVI law governed deed of indemnity between the Company and the Keepwell Provider entered into on 14 July 2023. The Company is obligated to pay the Keepwell Provider within five (5) business days after receiving a deed of release fro the Keepwell Provider. |
| **"Deed of Release"** | shall include the form of New York law governed global deed of release in respect of, among other things, the Existing Notes, in the Agreed Form and be executed pursuant to the authority conferred by Clause 21 (*Releases*) of the BVI Scheme in respect of, among other things, the relevant Scheme Creditors in substantially the form to be made available on the Transaction Website and which wshall be in the Agreed Form, subject to any modifications required or approved in accordance with  Clause 24 (*Modifications to the Scheme and the Restructuring Documents*) of the BVI Scheme. |
| **"Deed of Undertaking"** | means a deed of undertaking substantially in the form to be made available on the Transaction Website, which shall be in the Agreed Form. |
| **"Deed of Undertaking Parties"** | means the Existing Notes Subsidiary Guarantors, the New Instruments Subsidiary Pledgors, the New Instruments Subsidiary Guarantors, the Existing Notes Trustee, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the Collateral Agent, the Holding Period Trustee, the Scheme Supervisor, the Chairman (and any of the Chairman's entities) required to perform obligations as part of the Restructuring, holding entities within the Group providing security (to the extent they are not New Instruments Subsidiary Guarantors) the Scheme Administrators, the Information Agent and any other additional parties to the Deed of Undertaking (which shall be in Agreed Form). |
| **"Deficiency Basis"** | has the meaning set out in Clause 12.1 (*Calculation of a Scheme Creditor's Entitlement*) of the BVI Scheme. |
| **"Deloitte"** | means Deloitte Advisory (Hong Kong) Limited. |
| **"Designated Recipient"** | means, in relation to any Scheme Creditor (who is not a Sanctions Affected Scheme Creditor) that can make affirmative Sanctions Law |

111

Representations by submission of a validly completed Distribution Confirmation Deed, any entity that is designated as such by a Scheme Creditor in accordance with a valid Designated Recipient Form as the recipient of the New Instruments to be issued to such Scheme Creditor as Scheme Consideration, subject to limitations in accordance with applicable securities laws and provided that (i) the Designated Recipient shall only be validly designated if it or an Account Holder on its behalf has submitted a Distribution Confirmation Deed and/or any other applicable forms that its designating Scheme Creditor is required to submit pursuant to the BVI Scheme; (ii) a Scheme Creditor may designate one or more such entity and if such entity is a nominee holder it may only hold on behalf of one beneficial holder; and (iii) the Designated Recipient is an Eligible Person.

| | |
|---|---|
| **"Designated Recipient Form"** | means the form enclosed with the Solicitation Packet and made available on the Transaction Website by which a Scheme Creditor may appoint one or more Designated Recipients to be the recipients of all or part of the New Instruments that would otherwise be issued to that Scheme Creditor as Scheme Consideration. |
| **"Director(s)"** | means the director(s) of the Company from time to time. |
| **"Distribution Confirmation Deed"** | means the form of deed enclosed with the Solicitation Packet and made available on the Transaction Website confirming amongst other things that the Eligible Creditor or the Designated Recipient may lawfully be issued the New Instruments as Scheme Consideration. |
| **"EEA"** | means the European Economic Area. |
| **"EEA Qualified Investor"** | has the meaning given to it at Section 2.3 (*European Economic Area*) of this Explanatory Statement. |
| **"Eligible Creditor"** | means a Scheme Creditor who is an Eligible Person and who has submitted or caused to be submitted the Scheme Creditor Forms, as applicable, such that they are submitted and received by the Information Agent in accordance with the terms of the BVI Scheme, before the applicable deadline set out in the Solicitation Packet to be made available on the Transaction Website. |
| **"Eligible Person"** | means a Person who has provided affirmative Securities Law Representations and Sanctions Law Representations to the Information Agent before the applicable deadlines set out in the Solicitation Packet, to be made available on the Transaction Website. |
| **"Enforcement Action"** | means, in relation to any of the Existing Notes or the Existing Notes Documents: |

112

(a) the acceleration of any sum payable or the making of any declaration that any sum payable is due and payable or payable on demand;

(b) the making of any demand against any member of the Group under any guarantee or surety provided by that member of the Group;

(c) the suing for, commencing or joining of any legal or arbitration proceedings against any member of the Group to recover any sums payable or under any guarantee or surety provided by any member of the Group;

(d) the taking of any steps to enforce or require the enforcement of any security granted by any member of the Group;

(e) the levying of any attachment, garnishment, sequestration or other legal process over or in respect of any assets of the Group;

(f) the petitioning, applying or voting in relation to any Insolvency Proceedings in respect of an Obligor;

(g) the commencing or continuation of any legal action or other proceedings against any member of the Group (or any director or officer of such member of the Group solely in its capacity as director or officer thereof) or any of their respective assets;

(h) joining any other entity or person in the exercise of any of the foregoing rights;

(i) exercising any right, power, privilege or remedy in connection with the foregoing; or

(j) directing any trustee or agent to do any of the foregoing,

except that the following shall not constitute Enforcement Action:

(a) any action as contemplated by the Restructuring;

(b) any action falling within (a) to (j) above that is necessary, but only to the extent necessary, to preserve the validity, existence or priority of claims in respect of the Existing Notes, including the registration of such claims before any court of Governmental Agency and the bringing, supporting or joining of proceedings to prevent the loss of the right to bring, support or join proceedings by reason of applicable limitation periods;

(c) a Participating Creditor (or any trustee or agent acting on its behalf) taking any step required to ensure that such Participating Creditor (or any such trustee or agent) is able to and/or entitled to participate and/or vote in respect of the

113

Existing Notes in any Insolvency Proceedings in respect of an Obligor; and/or

(d) a Participating Creditor (or any trustee or agent acting on its behalf) taking any step that it reasonably determines is required to comply with its obligations under the RSA.

| | |
|---|---|
| **"Entitlement"** | has the meaning given to it in Clause 12 (*Calculation of a Scheme Creditor's Entitlement*) of the BVI Scheme. |
| **"Entitlement Record Time"** | means the Restructuring Effective Date. |
| **"EVPS"** | means Evergrande Property Service Group Limited, a subsidiary of CEG, the shares of which are listed on the HKEX (Stock Code: 6666). |
| **"EVPS Shares"** | means shares of EVPS, listed on HEX. |
| **"Estimation Notice"** | means a notice from the Scheme Administrators to each Scheme Creditor notifying such Scheme Creditor of the Scheme Administrator's Estimate. |
| **"Euroclear"** | means Euroclear Bank SA/NV. |
| **"EUWA"** | means the European (Withdrawal) Act 2018. |
| **"Excluded Liabilities"** | means any Liability of TJ at the Entitlement Record Time under or in connection with the Existing Notes. |
| **"Existing Notes"** | means the SJ Existing October 2022 Notes, the SJ Existing November 2022 Notes, the SJ Existing October 2023 Notes and the SJ Existing November 2023 Notes. |
| **"Existing Notes Depositary"** | means Citibank Europe plc as common depositary for the Clearing Systems, acting through its nominee as registered holder of the Existing Notes, Citivic Nominees Limited. |
| **"Existing Notes Documents"** | means the Indentures and any other documents entered into by the Company or any other person guaranteeing or securing liabilities due under or in respect of the Existing Notes. |
| **"Existing Notes Paying and Transfer Agent and Registrar"** | means Citibank N.A., London Branch in its capacity as paying agent, transfer agent, and registrar in respect of the Existing Notes. |
| **"Existing Notes Subsidiary Guarantors"** | means the entities listed in Schedule 2 of the BVI Scheme. |

114

| | |
|---|---|
| **"Existing Notes Trustee"** | means Citicorp International Limited in its capacity as trustee under the Indentures. |
| **"Existing Notes Trustee Instruction"** | means an instruction to the Existing Notes Trustee substantially in the form published on the Transaction Website or such other form as the Existing Notes Trustee may reasonably accept. |
| **"Explanatory Statement"** | means this composite document addressed to Scheme Creditors in relation to the BVI Scheme. |
| **"Financial Promotion Order"** | means the UK Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (as amended). |

**"Full Accrued Claim Basis"** means:

(a) the outstanding principal amount or in the case of a put option or repurchase obligation, the price amount, of a Scheme Creditor's Scheme Claims at the Entitlement Record Time, without permitting duplicative claims or portions of claims against the Company other than for US$1, as determined by the Company (in consultation with the Information Agent and/or the Scheme Administrators); and

(b) all accrued but unpaid interest on such Scheme Claims up to (but excluding) the Reference Date, as determined by the Company (in consultation with the Information Agent and/or the Scheme Administrators).

| | |
|---|---|
| **"FSMA"** | means the UK Financial Services and Markets Act 2000. |
| **"GLAS"** | means GLAS Trustees Limited, who the Company has appointed to liaise with Blocked Scheme Creditors including the processing of any Blocked Scheme Creditor Forms, under the BVI Scheme. |
| **"Global Certificates"** | means the global certificates evidencing the Existing Notes. |
| **"Governmental Entity"** | means any federal, national or local government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal or judicial body of Hong Kong, the PRC, the United States of America, the European Union, the United Kingdom, the BVI, the Cayman Islands or any other relevant jurisdiction. |
| **"Group"** | means CEG and its offshore subsidiaries from time to time. |
| **"HKEX"** | means The Stock Exchange of Hong Kong Limited. |

| | |
|---|---|
| **"Holding Period"** | means the period from the Restructuring Effective Date up to and including one Business Day after the TJ Final Distribution Date. |
| **"Holding Period Trust"** | means the holding period trust constituted pursuant to the Holding Period Trust Deed. |
| **"Holding Period Trust Deed"** | means the holding period trust deed to be entered into between, among others, the Company, TJ and the Holding Period Trustee, in substantially the form to be made available on the Transaction Website, subject to any modification required or approved in accordance with Clause 24 (*Modifications to the Scheme and the Restructuring Documents*) of the BVI Scheme, which shall be in Agreed Form. |
| **"Holding Period Trustee"** | means GLAS Trustees Limited holding the Blocked New Instruments for and on behalf of the Blocked Scheme Creditors in accordance with the BVI Scheme and the Restructuring Documents or any additional or replacement trustee at any time. |
| **"Hong Kong"** | means the Hong Kong Special Administrative Region of the PRC. |
| **"Hong Kong Court"** | means the High Court of Hong Kong and any court capable of hearing appeals therefrom. |
| **"Hong Kong Companies Registrar"** | means the Hong Kong Registrar of Companies appointed under the Companies Ordinance (Cap 622 of the Laws of Hong Kong) as amended, modified or re-enacted from time to time. |
| **"Houlihan Lokey"** | means Houlihan Lokey (China) Limited. |
| **"Indemnified Party"** | has the meaning given to it in Clause 23.1 (*Costs and Indemnity*) of the BVI Scheme. |
| **"Indenture"** | means each of:<br><br>(a) the indenture dated January 24, 2020, as amended, supplemented or otherwise modified from time to time, between the Company, TJ, the Keepwell Provider, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the SJ Existing October 2022 Notes;<br><br>(b) the indenture dated November 6, 2018, as amended, supplemented or otherwise modified from time to time, between the Company, TJ, the Keepwell Provider, the Existing Notes Subsidiary Guarantors and Citicorp International |

Limited as trustee governing the SJ Existing November 2022 Notes;

(c) the indenture dated January 24, 2020, as amended, supplemented or otherwise modified from time to time, between the Company, TJ, the Keepwell Provider, the Existing Subsidiary Guarantors and Citicorp International Limited as trustee governing the SJ Existing October 2023 Notes;

(d) the indenture dated November 6, 2018, as amended, supplemented or otherwise modified from time to time, between the Company, TJ, Keepwell Provider, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the SJ Existing November 2023 Notes;

and collectively, the "**Indentures**", each governed by and construed in accordance with the laws of the State of New York.

**"Information Agent"**    means Morrow Sodali Limited in its capacity as the Company's information agent.

means, in any jurisdiction:

(a) the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration, bankruptcy, provisional supervision or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Company;

(b) a composition or arrangement with any creditor of the Company, or an assignment for the benefit of creditors generally of the Company or a class of such creditors;

**"Insolvency Proceeding"**

(c) the appointment of a liquidator, receiver, administrator, administrative receiver, compulsory manager, provisional liquidator, provisional supervisor, restructuring officer or other similar officer in respect of the Company or any obligor or any of its assets (other than the shares of a Subsidiary of the Company or as required to implement the Restructuring);

(d) enforcement of any security over any assets of the Company (other than the shares of a Subsidiary of the Company); or

(e) any procedure or step taken in any jurisdiction analogous to those set out in paragraphs (a) to (d) above.

**"Intermediary"**    means a Person (other than an Account Holder) who holds an interest in the Existing Notes on behalf of another Person or other Persons.

| | |
|---|---|
| **"Investor's Currency"** | has the meaning given to it in Section 16.5 (*Risks Relating to the New Instruments*) of this Explanatory Statement. |
| **"Keepwell Agreements"** | means the keepwell agreements entered into between, amongst others, the Keepwell Provider, TJ and the Company, in connection with the Existing Notes. |
| **"Keepwell Provider"** or **"New Instruments Keepwell Provider"** | means Hengda Real Estate Group Co., Ltd., in its capacity as keepwell provider under the terms of the Keepwell Agreements. |
| **"Liability"** | means any debt, liability or obligation whatsoever, whether it is present, future, prospective or contingent, whether directly or indirectly, whether or not its amount is fixed or undetermined, whether or not it involves the payment of money or the performance of an act or obligation, and whether arising at common law, in equity or by statute in or under the laws of the BVI, the Cayman Islands, Hong Kong, PRC, New York or under any other law or in any other jurisdiction howsoever arising and **"Liabilities"** shall be construed accordingly. |
| **"Liquidation Analysis"** | means the liquidation analysis prepared by Deloitte as set out in Schedule 2 (*Liquidation Analysis*) to this Explanatory Statement. |
| **"Listing Rules"** | means the Rules Governing the Listing of Securities on HKEX. |
| **"Longstop Date"** | means 15 December 2023, unless extended pursuant to Clause 3 (*Application and Effectiveness of the BVI Scheme*) of the BVI Scheme. |
| **"Longstop Date Extension Notice"** | has the meaning given to it in Clause 3 (*Application and Effectiveness of the BVI Scheme*) of the BVI Scheme. |
| **"Majority Participating Creditors"** | means, at any time, Participating Creditors who hold (beneficially, as principal) in aggregate more than 50% of the outstanding principal amount of the Restricted Debts held in aggregate by all Participating Creditors at that time (for the avoidance of doubt, excluding the Existing Notes beneficially and/or legally (as applicable) held by the Chairman, and/or Xin Xin (BVI) Limited and his or its (as applicable) Affiliates which are in the aggregate amount of US$600,000,000 as at the date of the RSA). |
| **"Majority SJ AHG"** | means the members of the SJ AHG holding a majority of the aggregate outstanding principal amount of the Restricted Debts held by the SJ AHG at the relevant time |

118

| | |
|---|---|
| **"Management"** | means the key management personnel of the Group, including the board of directors of CEG. |
| **"Maples and Calder"** | means Maples and Calder (Hong Kong) LLP, Maples and Calder (Cayman) LLP, and Maples and Calder (BVI), in their capacity as advisors to the Company as to matters of Cayman Islands law and BVI law. |
| **"Member States"** | means a member state of the EEA. |
| **"MiFID II"** | means Directive 2014/65/EU. |
| **"Minimum SJ AHG Threshold"** | means an aggregate outstanding principal amount of the Restricted Debts (as defined in the RSA) constituting at least 10% of the outstanding principal amount of the Existing Notes in accordance with the terms of the RSA. |
| **"NEV"** | means China Evergrande New Energy Vehicle Group Limited, a subsidiary of CEG the shares of which are listed on the HKEX (Stock Code: 708). |
| **"New Instruments"** | means the New SJ Tranche A Notes, New SJ Tranche B Notes, New SJ Tranche C Notes, New SJ Tranche D Notes and New SJ Tranche E Notes, as further summarised in Schedule 10 of this Explanatory Statement. |
| **"New Instruments Depositary"** | means the common depositary for the Clearing Systems, acting through its nominee as registered holder of the New Instruments as set forth in the New Instruments Documents. |
| **"New Instruments Documents"** | means the New York law governed indentures governing the New Instruments to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website, and the Security Documents. |
| **"New Instruments Keepwell Deed"** | means the keepwell deed to be entered into between, among others, the New Instruments Keepwell Provider and the Company in connection with the New Instruments, which shall be in the Agreed Form. |
| **"New Instruments Paying and Transfer Agent and Registrar"** | means a corporation with limited liability, in its capacity as paying agent, transfer agent, and/or registrar or any successor paying agent, transfer agent, and/or registrar in respect of the New Instruments. |

119

| | |
|---|---|
| **"New Instruments Subsidiary Guarantees"** | means such guarantees by the New Instruments Subsidiary Guarantors in respect of the New Instruments pursuant to the relevant New Instruments Documents, each of which shall be in the Agreed Form. |
| **"New Instruments Subsidiary Guarantors"** | means such persons who will guarantee the obligations of the Company and/or other obligors in respect of the New Instruments pursuant to the New Instruments Documents as at the Restructuring Effective Date listed the New Instruments Documents, which shall be in Agreed Form. |
| **"New Instruments Subsidiary Pledgors"** | means such Persons who will provide and/or grant Security in respect of the obligations of the Company and/or other obligors in respect of the applicable New Instruments pursuant to the relevant New Instruments Documents as at the Restructuring Effective Date, each of which shall be in the Agreed Form. |
| **"New Instruments Trustee"** | means the trustee or any successor trustee under and as defined in the New Instruments Documents. |
| **"New SJ Tranche A Notes"** | means the US$300 million 5.5% / 6.5% variable rate notes to be issued by the Company due 2027 pursuant to the indenture substantially in the form set out in the Transaction Website which shall be in the Agreed Form. |
| **"New SJ Tranche B Notes"** | means the US$1,100 million 6.0% / 7.0% variable rate notes to be issued by the Company due 2028 pursuant to the indenture substantially in the form of the indenture in relation to the New SJ Tranche A Notes as set out in the Transaction Website, save for the modifications required to reflect the different terms of the New SJ Tranche B Notes as set out in the Explanatory Statement, which shall be in the Agreed Form. |
| **"New SJ Tranche C Notes"** | means the US$1,100 million 6.5% / 7.5% variable rate notes to be issued by the Company due 2029 pursuant to the indenture substantially in the form of the indenture in relation to the New SJ Tranche A Notes as set out in the Transaction Website save for the modifications required to reflect the different terms of the New SJ Tranche C Notes as set out in the Explanatory Statement, which shall be in the Agreed Form. |
| **"New SJ Tranche D Notes"** | means the US$1,200 million 7.0% / 8.0% variable rate notes to be issued by the Company due 2030 pursuant to the indenture substantially in the form of the indenture in relation to the New SJ Tranche A Notes as set out in the Transaction Website save for the |

| | |
|---|---|
| | modifications required to reflect the different terms of the New SJ Tranche D Notes as set out in the Explanatory Statement, which shall be in the Agreed Form. |
| **"New SJ Tranche E Notes"** | means the US$2,800 million 7.5% / 8.5% variable rate notes to be issued by the Company due 2031 pursuant to the indenture substantially in the form of the indenture in relation to the New SJ Tranche A Notes as set out in the Transaction Website save for the modifications required to reflect the different terms of the New SJ Tranche E Notes as set out in the Explanatory Statement, which shall be in the Agreed Form. |
| **"NPV"** | means the net present value as determined by the Scheme Administrators prior to the Restructuring Effective Date in accordance with Clause 12.2 (*Calculation of a Scheme Creditor's Entitlement*) of the BVI Scheme. |
| **"NPV Amount"** | has the meaning given to it in Clause 12.2 (*Calculation of a Scheme Creditor's Entitlement*) of the BVI Scheme. |
| **"Obligors"** | means, collectively, the Company, the Existing Notes Subsidiary Guarantors and the Keepwell Provider under the Existing Notes; and **"Obligor"** means any one of them. |
| **"Other Debts"** | means the offshore financial indebtedness (including guarantees and put options) of TJ listed in Schedule 2 to the TJ Term Sheet. |
| **"Participating Creditor"** | means a Scheme Creditor who has agreed to be bound by the RSA as a Participating Creditor in accordance with the terms of the RSA. |
| **"Perpetuity Period"** | means the period from the date the Successor Escrow Account is established until 21 years after that date, or such further period as the Successor Escrow Agent determines in its sole discretion (and without any obligation to do so). |
| **"Person"** | means any natural person, corporation, limited or unlimited liability company, trust, joint venture, association, corporation, partnership, Governmental Entity or other entity whatsoever. |
| **"Personnel"** | means, in relation to any Person, its current and former officers, partners, directors, employees, staff, agents, counsel and other representatives. |
| **"Portal"** | means https://portal.morrowsodali.com/EvergrandeScheme |

121

| | |
|---|---|
| **"PRC"** | means the People's Republic of China, which for the purposes of the BVI Scheme excludes Taiwan, Hong Kong Special Administrative Region and the Macao Special Administrative Region. |
| **"Proceeding"** | means any process, suit, action, legal or other legal proceeding including without limitation any arbitration, mediation, alternative dispute resolution, judicial review, adjudication, demand, statutory demand, execution, distraint, forfeiture, re-entry, seizure, lien, enforcement of judgment, enforcement of any security or insolvency proceedings in any jurisdiction. |
| **"PRIIPs Regulation"** | means Regulation (EU) No 1286/2014. |
| **"Prism"** | means Prism Hong Kong and Shanghai Limited, in their capacity as auditor of the Company. |
| **"Prospectus Regulation"** | means Regulation (EU) 2017/1129. |
| **"QIBs"** | means **"qualified institutional buyers"** as defined in Rule 144A under the US Securities Act. |
| **"Quasi-Security"** | means an arrangement or transaction under which any member of the Group will:<br><br>(a) sell, transfer or otherwise dispose of any of its assets on terms whereby they are or may be leased to or re-acquired by any other member of the Group;<br>(b) sell, transfer or otherwise dispose of any of its receivables on recourse terms;<br>(c) enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or<br>(d) enter into any other preferential arrangement having a similar effect,<br><br>in circumstances where the arrangement or transaction is entered into primarily as a method of raising any indebtedness or of financing the acquisition of an asset. |
| **"Recognition Filing"** | means (i) the filing of a petition for recognition of the BVI Scheme under Chapter 15 of the US Bankruptcy Code; and (ii) the filing of a request for the US Bankruptcy Court to grant the Chapter 15 Recognition Order; and (iii) any other filings submitted in the US Bankruptcy Court that are necessary to effectuate the Chapter 15 Recognition Proceeding. |

122

| | |
|---|---|
| **"Record Date Balance"** | means a credit balance created by the Clearing Systems and maintained in the records of the Clearing Systems and Existing Notes Depositary in favour of those Existing Notes Scheme Creditors who did not submit or did not have submitted on their behalf Custody Instructions by the Custody Instruction Deadline and/or a validly completed Account Holder Letter, Distribution Confirmation Deed and, if applicable, Designated Recipient Form by the Voting Record Time. |
| **"Reference Date"** | means the earlier of October 1, 2023 and the Restructuring Effective Date. |
| **"Regulation D"** | means Regulation D under the US Securities Act. |
| **"Regulation S"** | means Regulation S under the US Securities Act. |
| **"Releases"** | has the meaning given to it in Clause 21 (*Releases*) of the BVI Scheme. |
| **"Released Claims"** | means any (i) Scheme Claims, (ii) Ancillary Claims or (iii) Restructuring Claims; |
| **"Released Persons"** | means (i) the Company, the Existing Notes Subsidiary Guarantors and the Group, (ii) the Existing Notes Trustee, the Existing Notes Depositary, the Existing Notes Paying and Transfer Agent and Registrar, (iii) the New Instruments Depositary, the New Instruments Paying and Transfer Agent and Registrar, the Collateral Agent and the New Instruments Trustee, (iv) the Keepwell Provider, (v) the Holding Period Trustee, (v) the Information Agent, (vi) the Scheme Administrators, (vii) the Scheme Supervisor, (viii) the Advisors, (ix) the SJ AHG (including each SJ AHG member's respective managers and investment managers' and investment advisors' respective, Affiliates and funds and in each case, including any of its respective directors, managers or officers), (x) the AHG Advisors; and (xi) the Advisors and, regarding each of the above, includes each of their respective predecessors, successors and assigns (where applicable), their respective Personnel, and their respective advisors and in their capacities as such, and **"Released Person"** shall be construed accordingly. |
| **"Relevant Collateral"** | means any security, collateral, guarantee, bond, indemnity or other form of assurance granted for the purpose of securing and/or guaranteeing the Existing Notes (including the Keepwell Agreements) other than any granted by TJ (for the avoidance of doubt, TJ is not a grantor of collateral under the Keepwell Agreements). |

123

| | |
|---|---|
| **"Relevant Persons"** | means (i) the Company, the Existing Notes Subsidiary Guarantors and the Group, (ii) the Existing Notes Trustee, the Existing Notes Depositary, the Existing Notes Paying and Transfer Agent and Registrar, (iii) the New Instruments Depositary, the New Instruments Paying and Transfer Agent and Registrar, and the New Instruments Trustee, (iv) the Keepwell Provider, (v) the Holding Period Trustee, (vi) the Information Agent, (vii) the Scheme Administrators, (viii) the Scheme Supervisor, (ix) the Advisors and (x) the AHG Advisors; and, regarding each of the above, includes each of their respective predecessors, successors and assigns (where applicable), their respective Personnel, and their respective advisors and in their capacities as such, and "Released Person" shall be construed accordingly. |
| **"Restricted Debts"** | means, with respect to a Participating Creditor at any time, the aggregate outstanding principal amount of Existing Notes set out in the Restricted Debts Notice (as defined in the RSA) then most recently delivered by that Participating Creditor, as modified from time to time by any Transfer Notices (as defined in the RSA) (as applicable) delivered by Participating Creditors to the Information Agent, subject to evidence satisfactory to the Information Agent, having been provided in accordance with the terms of the RSA; and **"Restricted Debt"** means any portion of the Restricted Debts. |
| **"Restricted Subsidiaries"** | has the meaning given to that term under the New Instruments Documents. |
| **"Restructuring"** | means the restructuring of the debt and other offshore financial obligations of the Company as contemplated by, *inter alia*, the Restructuring Documents and the BVI Scheme. |
| **"Restructuring Claims"** | means any Claim by a Scheme Creditor against a Released Person in respect of: (A) the preparation, negotiation, execution, sanction or implementation of the BVI Scheme and/or the Restructuring and/or the Restructuring Documents; and/or (B) the execution of the Restructuring Documents and the carrying out of the steps and transactions contemplated therein in accordance with their terms, but, in each case, excluding for the avoidance of doubt, any Claim in respect of any Liability (i) of any Released Person which arises as a result of a failure to comply with any of the terms of the BVI Scheme or any Restructuring Document (included but not limited to the New Instruments Documents) and (ii) arising from or in connection with any Excluded Liability or Excluded Collateral, and "**Restructuring Claim**" shall be construed accordingly. |

124

| | |
|---|---|
| **"Restructuring Documents"** | means the documents to be entered into by certain parties to implement the terms of the Restructuring including, but not limited to those documents listed in Schedule 1 (*Restructuring Documents*) of the BVI Scheme, in each case in the Agreed Form. |
| **"Restructuring Effective Date"** | means the date on which the Restructuring Effective Date Conditions have been satisfied or waived (as the case may be). |
| **"Restructuring Effective Date Conditions"** | means the conditions set out in Schedule 3 of the BVI Scheme. |
| **"Restructuring Effective Date Conditions Subsequent"** | means the conditions set out in Clause 6.6 (*Scheme Steps*) of the BVI Scheme |
| **"RSA"** | means the restructuring support agreement dated 3 April 2023 between, among others, the Company and the Initial Participating Creditors, as amended or varied from time to time, including by the accession or cessation of parties thereto. |
| **"Rule 144A"** | means Rule 144A under the US Securities Act. |
| **"Rules"** | has the meaning given to it in Clause 28.5 of the Scheme. |
| **"Sanctions Affected Scheme Creditor"** | means a Blocked Scheme Creditor or a Sanctioned Scheme Creditor. |
| **"Sanctioned Country"** | means any country or territory that is the target of any comprehensive country or territory-wide Applicable Sanctions (being, as at the date of the Explanatory Statement, the territories of Crimea, Donetsk and Luhansk, and the countries of Cuba, Iran, North Korea and Syria). |
| **"Sanctioned Scheme Creditor"** | means a Scheme Creditor that is:<br><br>(a) designated on any Applicable Sanctions List;<br>(b) resident in, ordinarily located in, or incorporated or domiciled under the laws of any Sanctioned Country;<br>(c) in the aggregate, 50 percent or greater owned, directly or indirectly, or otherwise controlled, directly or indirectly, (in each case with reference to Applicable Sanctions) by any Person or Persons described in (a) or (b) above of this definition; or<br>(d) acting on behalf of or at the direction of any Person or Persons described in (a) or (b) above of this definition, |

125

and which does not have a sanctions license in respect of the Applicable Sanctions which would allow that Scheme Creditor to freely deal in the Scheme Consideration and submit instructions or settle through the Clearing Systems.

**"Sanctions Law Representations"**  means the sanction law confirmations and undertakings set out in the Distribution Confirmation Deed.

**"Scheme Administrators"**  means Mr P Cowley, Ms Y M Lui and Mr C Ball of KPMG Advisory (Hong Kong) Limited or any individual who is appointed Scheme Administrators under Clause 28 (The Scheme Administrators) of the BVI Scheme and each a **"Scheme Administrator"**.

**"Scheme Claim"**  means any Claim by a Scheme Creditor against the Company, any Existing Notes Subsidiary Guarantor or the Keepwell Provider under or in respect of the Existing Notes Documents whether at, before or after the Voting Record Time (including, for the avoidance of doubt, all accrued and unpaid interest on the Existing Notes up to (but excluding) the Restructuring Effective Date, or accretions arising in respect of, such Claims before, at or after the Voting Record Time but, excluding for the avoidance of doubt, (i) any Claim in respect of any Liability of the Company, any member of the Group, any Existing Notes Subsidiary Guarantor or the Keepwell Provider which arises as a result of a failure to comply with any of the terms of the BVI Scheme or any Restructuring Document (including but not limited to the New Instruments Documents), or (ii) any Claim by a Scheme Creditor not against the Company arising from or in connection with any Excluded Liabilities

**"Scheme Consideration"**  means the relevant portion of the rights and interests in the New Instruments to be distributed to the Scheme Creditors (and/or their Designated Recipients, as applicable) under and pursuant to the terms of the BVI Scheme (and, without double counting, any Blocked New Instruments).

**"Scheme Convening Hearing"**  means the hearing before the BVI Court following which the BVI Court issued the Scheme Convening Order.

**"Scheme Convening Order"**  means the order of the BVI Court dated 24 July 2023 ordering, amongst other things, that the Company be at liberty to convene a single meeting of Scheme Creditors for the purpose of considering and, if thought fit, approving, with or without modification, the BVI Scheme.

**"Scheme Creditor"**  means persons with an economic or beneficial interest as principal in the Existing Notes held in global form or global restricted form

126

through the Clearing Systems as at (1) the Voting Record Time (in respect of voting purposes at the BVI Scheme Meeting) and/or (2) the Entitlement Record Time (in respect of the determination of such Entitlements), each of whom has a right, upon satisfaction of certain conditions, to be issued definitive registered notes in accordance with the terms of the Existing Notes and the Indentures, and (but without double counting in each case) the Existing Notes Depositary and the Existing Notes Trustee.

|  | |
|---|---|
| **"Scheme Creditor Form"** | means:<br><br>(a) in respect of the Scheme Creditors (who are not Sanctions Affected Scheme Creditors), a validly completed Account Holder Letter together with a validly completed Distribution Confirmation Deed and Designated Recipient Form (if applicable); and<br><br>(b) in respect of Blocked Scheme Creditors, a validly completed Blocked Scheme Creditor Form. |
| **"Scheme Creditor Releasing Parties"** | has the meaning given to it in Clause 21 (*Release*) of the BVI Scheme. |
| **"Scheme Creditor's Entitlement"** | has the meaning given to it in Clause 12 of the BVI Scheme. |
| **"Scheme Effective Date"** | means the date on which all of the Scheme Conditions are satisfied and the Scheme becomes effective, as specified in the Scheme Effective Date Notice. |
| **"Scheme Effective Date Notice"** | means the notice to be issued by the Company and delivered to the Information Agent in accordance with Clause 7.1 (*Notices to Scheme Creditors and Others*) of the BVI Scheme confirming satisfaction of the Scheme Conditions and specifying the Scheme Effective Date. |
| **"Scheme Meeting"** | means the meeting of the Scheme Creditors in relation to the Scheme as convened by an order of the BVI Court for the purpose of considering and, if thought fit, approving, with or without modification, the BVI Scheme, and any adjournment thereof. |
| **"Scheme Recovery Analysis"** | means the recovery analysis prepared by Deloitte as set out in Schedule 3 (*Scheme Recovery Analysis*) to this Explanatory Statement. |
| **"Scheme Sanction Hearing"** | means the hearing of the BVI Court of the application in respect of the sanctioning of the BVI Scheme. |

| | |
|---|---|
| **"Scheme Sanction Order"** | means the sealed copy of the order of the BVI Court sanctioning the BVI Scheme. |
| **"Scheme Steps"** | means the steps set out in Clause 6 (*Scheme Steps*) of the BVI Scheme. |
| **"Scheme Supervisor"** | means Anna Silver of FFP (BVI) Limited, who will act as (i) Chairperson, and (ii) foreign representative (court appointed) for the Recognition Filings. |
| **"SEC"** | means the US Securities and Exchange Commission. |
| **"Security"** | means the security constituted pursuant to the Security Documents. |
| **"Security Documents"** | means the security documents and share charges to be entered into in connection with Collateral of the New Instruments substantially in the form to be made available on the Transaction Website, each of which shall be in the Agreed Form. |
| **"Securities Law Representations"** | means the securities law confirmations and undertakings set out in the Distribution Confirmation Deed forming part of the Solicitation Packet, to be made available on the Transaction Website. |
| **"SFA"** | means the Securities and Futures Act, Chapter 289 of Singapore, as modified or amended from time to time. |
| **"SFO"** | means the Securities and Futures Ordinance (Cap. 571 of the Laws of Hong Kong), as modified or amended from time to time. |
| **"SGX-ST"** | means Singapore Exchange Securities Trading Limited. |
| **"SJ"** or **"Company"** | means Scenery Journey Limited, a company incorporated with limited liability under the laws of the BVI with company number 1970476 and having its registered office at Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola VG1110, BVI. |
| **"SJ AHG"** | means the ad hoc group of holders of the Existing Notes or investment managers for or investment advisors to certain holders of the Existing Notes as constituted from time to time, who are advised by the AHG Advisors. The members of the SJ AHG (each an **"SJ AHG Member"**, and collectively the **"SJ AHG"**). |
| **"SJ Existing November 2022 Notes"** | means the 13.0% senior notes due November 6, 2022 (ISIN: XS1903671854, Common Code: 190367185) issued by the Company. |

128

| | |
|---|---|
| **"SJ Existing November 2023 Notes"** | means the 13.75% senior notes due November 6, 2023 (ISIN: XS1903671938, Common Code: 190367193) issued by the Company. |
| **"SJ Existing October 2022 Notes"** | means the 11.5% senior notes due October 24, 2022 (ISIN: XS2109191986, Common Code: 210919198) issued by the Company. |
| **"SJ Existing October 2023 Notes"** | means the 12.0% senior notes due October 24, 2023 (ISIN: XS2109192109, Common Code: 210919210) issued by the Company. |
| **"SJ Restructuring Consideration"** | means the face value of the sum of the New Instruments, i.e. US$6,500 million. |
| **"Solicitation Packet"** | means the packet of materials, including the Account Holder Letter and accompanying instructions, the Designated Recipient Form, the Distribution Confirmation Deed, the Proxy Forms and the Blocked Scheme Creditor Form, all of which are available to Scheme Creditors on the Transaction Website. |
| **"Subsidiary"** | means, with respect to any Person, any corporation, association or other business entity of which more than 50% of the voting power of the outstanding Voting Stock is owned, directly or indirectly, by such Person and one or more other Subsidiaries of such Person. |
| **"Successor Escrow Account"** | means an escrow account to be established for the Perpetuity Period or until the lifting of the Applicable Sanctions in respect of all Blocked Scheme Creditors, whichever is earlier, by an agent to be appointed by the Company pursuant to the Successor Escrow Agreement for the purposes of holding the Blocked New Instruments after the expiration of the Holding Period for the Blocked Scheme Creditors who have submitted a validly completed Blocked Scheme Creditor Form together with supporting evidence to the Company prior to the Bar Date. |
| **"Successor Escrow Agent"** | means the Person to be appointed by the Company as escrow agent for the Successor Escrow Account. |
| **"Successor Escrow Agreement"** | means the agreement providing for the creation of the Successor Escrow Account, under which the Successor Escrow Agent shall hold the Blocked New Instruments for the Company, in a form approved by the Successor Escrow Agent. |

129

| | |
|---|---|
| "**Super Majority SJ Participating Creditors**" | means, at any time, Participating Creditors who hold (beneficially or legally (as applicable), as principal) in aggregate at least 66 2/3% of the outstanding principal amount of the Restricted Debts held in aggregate by all Participating Creditors at that time (for the avoidance of doubt, excluding the Existing Notes beneficially and/or legally (as applicable) held by the Chairman and/or Xin Xin (BVI) Limited and his or its (as applicable) Affiliates which are in the aggregate amount of US$600,000,000 as at the date of the RSA). |
| "**Term Sheet**" | means the restructuring term sheet in respect of the Company's offshore indebtedness dated 20 March 2023 between (among others) the Company and the SJ AHG, as amended, restated and/or supplemented from time to time. A redacted copy of the Term Sheet as of the date of the BVI Scheme, incorporating amendments made by the Company to cure certain defects and omissions in accordance with the terms thereto, can be found on the transaction website specified in CEG's announcement on the HKEX at: https://www1.hkexnews.hk/listedco/listconews/sehk/2023/0403/2023040304093.pdf. |
| "**TJ**" | means Tianji Holding Limited (天基控股有限公司), a company incorporated with limited liability under the laws of Hong Kong with company number 1339269 and having its registered office at 17th One Island East, Taikoo Place, 18 Westlands Road, Quarry Bay, Hong Kong. |
| "**TJ Final Distribution Date**" | is the "Final Distribution Date" under the TJ Scheme which shall be a date designated by TJ no later than one month of the completion of the claims determination, valuation and adjudication procedures under that TJ Scheme. |
| "**TJ Group**" | means TJ and its subsidiaries from time to time. |
| "**TJ New Notes**" | means Tranche A Notes, Tranche B Notes, Tranche C Notes and Tranche D Notes. |
| "**TJ Other Debt Instruments Scheme Creditors**" | means a person holding an economic or beneficial interest and/or legal interest as principal (as applicable) in any of the Other Debts as at the Voting Record Time, and "**TJ Other Debt Instruments Scheme Creditor**" means one of the TJ Other Debt Instruments Scheme Creditors. |
| "**TJ Scheme**" | means a scheme of arrangement in Hong Kong to be proposed by the Company's direct parent company, TJ. |

| | |
|---|---|
| **"TJ Scheme Administrators"** | has the meaning given to the term "Scheme Administrator" in the TJ Scheme. |
| **"TJ Scheme Consideration"** | means the relevant portion of the rights and interests in the TJ New Notes as elected by the relevant TJ Scheme Creditor to be distributed to TJ Scheme Creditors under and pursuant to the terms of the TJ Scheme. |
| **"TJ Scheme Creditor"** | means the Scheme Creditors and the Other Debt Scheme Creditors. |
| **"TJ Term Sheet"** | means the restructuring term sheet in respect of TJ's offshore indebtedness dated 20 March 2023. |
| **"Tranche A Notes"** | means the 6.0% / 7.0% variable rate notes due 2028 with an aggregate principal amount of up to US$100 million to be issued by TJ pursuant to the terms of the Term Sheet and in accordance with the relevant Restructuring Documents in substantially the form set out in the Transaction Website which shall be in Agreed Form. |
| **"Tranche B Notes"** | means the 6.5% / 7.5% variable rate notes due 2029 with an aggregate principal amount of up to US$200 million to be issued by TJ pursuant to the terms of the Term Sheet and in accordance with the relevant Restructuring Documents in substantially the form set out in the Transaction Website which shall be in Agreed Form. |
| **"Tranche C Notes"** | means the 7.0% / 8.0% variable rate notes due 2030 with an aggregate principal amount of up to US$300 million to be issued by TJ pursuant to the terms of the Term Sheet and in accordance with the relevant Restructuring Documents in substantially the form set out in the Transaction Website which shall be in Agreed Form. |
| **"Tranche D Notes"** | means the 7.5% / 8.5% variable rate notes due 2030 with an aggregate principal amount of up to US$200 million to be issued by TJ pursuant to the terms of the Term Sheet and in accordance with the relevant Restructuring Documents in substantially the form set out in the Transaction Website which shall be in Agreed Form. |
| **"Transaction Website"** | means https://projects.morrowsodali.com/evergrande. |
| **"UK"** | means the United Kingdom. |
| **"UK MiFIR"** | means Regulation (EU) 600/2014 as retained by UK law by EUWA and as amended by UK domestic law. |

131

| | |
|---|---|
| **"UK PRIIPs Regulation"** | means Regulation (EU) No 1286/2014 as retained as UK law by EUWA and as amended by the UK Prospectus Regulation. |
| **"UK Prospectus Regulation"** | means Regulation (EU) 2017/1129 as retained as UK law by EUWA and as amended by UK domestic law. |
| **"UK Qualified Investor"** | has the meaning given to it at section 3.4(c) (United Kingdom) of this Explanatory Statement. |
| **"United States"** or **"US"** | means the United States of America. |
| **"United States Code"** | means the codification by subject matter of the general and permanent laws of the United States. |
| **"US Bankruptcy Code"** | means Title 11 of the United States Code, as in effect on the date of the Recognition Filing. |
| **"US Bankruptcy Court"** | means the United States Bankruptcy Court for the Southern District of New York. |
| **"US GAAP"** | means the United States Generally Accepted Accounting Principles |
| **"US Securities Act"** | means the US Securities Act of 1933, as amended, including the rules and regulations promulgated by the SEC thereunder. |
| **"US$"** | the lawful currency for the time being of the United States. |
| **"VAT"** | means value added tax or any equivalent goods and services tax levied by a Government Entity; |
| **"Voting Scheme Claim"** | means, for assessing a Scheme Creditor's Scheme Claims for voting purposes at the Voting Record Time, (without double-counting, and without permitting duplicative claims or portions of claims against the Company other than for US$1): |
| **"Voting Record Time"** | means 5:00 a.m. BVI time on 18 August 2023, which is the latest date and time for delivery of a validly completed Account Holder Letter or Blocked Scheme Creditor Form (as applicable) to vote at the BVI Scheme Meeting. |
| **"Voting Requirements"** | means the requirements that a Scheme Creditor submits a validly completed Account Holder Letter and/or Blocked Scheme Creditor Form (as applicable) and any other documentation required under the terms of the Restructuring Documents to the Information Agent and/or GLAS (as applicable) by the Voting Record Time. |

132

| | |
|---|---|
| **"Voting Stock"** | means with respect to any Person, Capital Stock of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person. |
| **"Whitelist Scheme Administrators"** | means such persons agreed in writing by the Majority SJ AHG and the Company, including persons agreed upon in writing to the date of the BIV Scheme. |

2.    **INTERPRETATION**

2.1    In this Explanatory Statement:

(a)    words denoting the singular number only shall include the plural number also and vice versa;

(b)    words denoting one gender only shall include the other genders;

(c)    words denoting persons only shall include firms and corporations and vice versa;

(d)    references to any statutory provision shall be deemed also to refer to any statutory modification or re-enactment thereof or any statutory instrument, order or regulation made thereunder or under any such re-enactment;

(e)    unless expressed otherwise:

(i)    references to US dollars or US$ are references to the currency of the United States of America; and

(ii)    references to Hong Kong dollars or HK$ are references to the currency of Hong Kong;

(f)    any reference in this Schedule 1 (*Definitions and Interpretation*) to any document whose meaning is stated to be the meaning given to a document as defined in this Explanatory Statement shall be construed as a reference to that document as amended, varied, novated, restated, modified, supplemented or re-enacted or replaced prior to the date of this Explanatory Statement;

(g)    clause, section and schedule headings are for ease of reference only;

(h)    unless otherwise stated, a reference to a time of day shall be construed as a reference to Hong Kong time;

(i)    a reference to this Explanatory Statement includes a reference to the preliminary sections and appendices of this Explanatory Statement; and

(j)    references to any person shall include references to his successors, transferees and assigns and any person deriving title under or through him.

133

**SCHEDULE 2**

**LIQUIDATION ANALYSIS**







China Evergrande Group
Liquidation Analysis Report

17 July 2023

**Deloitte.**

2

# Deloitte.

Deloitte Financial Advisory Services
A division of Deloitte Advisory
(Hong Kong) Limited
35/F One Pacific Place
88 Queensway
Hong Kong

Tel: +852 2852 1600
Fax: +852 2541 1911
Email: enquiry@deloitte.com.hk
www.deloitte.com/cn

德勤

**Glen Ho**
Engagement Partner
+852 2852 1643
gleho@deloitte.com.hk

**Cindy Sun**
Engagement Partner
+86 755 33538380
xysun@deloitte.com.cn

**Karen Chu**
Engagement Partner
+852 2852 1680
karchu@deloitte.com.hk

**Kevin Feng**
Engagement Director
+86 755 33538038
kevfeng@deloitte.com.cn

China Evergrande Group
15th Floor, YF Life Centre
38 Gloucester Road
Wanchai, Hong Kong

Scenery Journey Limited
15th Floor, YF Life Centre
38 Gloucester Road
Wanchai, Hong Kong

Tianji Holding Limited
15th Floor, YF Life Centre
38 Gloucester Road
Wanchai, Hong Kong

Dear Sirs,

**RE: Liquidation Analysis Report**

We enclose our report (the "**Report**") in connection with the limited scope liquidation analysis of the offshore debts of China Evergrande Group ("**CEG**", the "**Company**"), Scenery Journey Limited ("**SJ**") and Tianji Holding Limited ("**Tianji**") on an entity-by-entity basis based on a hypothetical liquidation scenario in accordance with our engagement letter dated 15 July 2022, the first supplementary agreement dated 20 June 2023 and the second supplementary agreement dated 17 July 2023 (collectively referred to as the "**Agreement**").

The Report was prepared solely for the benefit of the Company, SJ and Tianji only. No other party is entitled to rely on the Report for any purpose whatsoever and we accept no duty of care or liability to any other party who is shown or gains access to the Report.

The Report has been prepared based on the limited information provided to Deloitte Advisory (Hong Kong) Limited ("**DAHK**"). The scenarios presented in the Report involve extensive use of estimates and assumptions, which are inherently subject to uncertainties and contingencies beyond the control of the Group, its management and advisors. The assumptions will need to be reviewed and revised to reflect any future changes in the circumstances of any of the companies or the underlying assets. We draw your attention to the "Disclaimers" (page3) and the sections titled "Scope of Work" (page 9), "Sources of Information" (page 11) and "Limitations" (pages 41-42) of the Report.

The Report is prepared based on information received up to 14 July 2023 ("**Cut-Off Date**"), we have not updated our work since then.

Yours faithfully,
For and on behalf of
**Deloitte Advisory (Hong Kong) Limited**

© 2023. For information, contact Deloitte China.

# Disclaimers

- This Report (the **"Report"**) was prepared in connection with the results of the limited scope analysis on the estimated recoveries of certain debts of China Evergrande Group (the **"Company"** or **"CEG"**), Scenery Journey Limited (**"SJ"**) and Tianji Holding Limited (**"Tianji"**) on an entity-by-entity basis under a hypothetical liquidation scenario of CEG and its subsidiaries (the **"Group"**) as at 1 January 2023 (the **"Liquidation Analysis"**) in accordance with the terms of the engagement agreement dated 15 July 2022, the first supplementary agreement dated 20 June 2023 and the second supplementary agreement dated 17 July 2023 entered into between the Company, SJ, Tianji and Deloitte Advisory (Hong Kong) Limited (**"DAHK"** or **"we"** or **"us"**).

- Information contained in the Report is subject to the disclaimers, scope of work, sources of information, assumptions and limitations set out herein.

- By reviewing the Report, the creditors of the schemes of arrangement of CEG, SJ and Tianji (the **"Scheme Creditors"**) and other party who gains access to the Report shall be deemed to have read, and to have irrevocably acknowledged and agreed to comply with, the following contents of this disclaimer:

  - The Report was prepared solely for the benefit of the Company, SJ and Tianji and, save in respect of the Company, SJ and Tianji, we accept no duty of care or liability to any other party regardless of whether or not a party was shown or gained access to the Report, or is a Scheme Creditor placing reliance on the Report;

  - With respect to dealing in shares, the Report may contain material non-public information of the Company. Thus, any disclosure, copying, or distribution of the Report or the taking of any action based on it, which would constitute insider dealing with respect to shares in the Company, is strictly prohibited;

  - The Liquidation Analysis was prepared for indicative and illustrative purposes only. The actual recoveries may vary subject to, among other things, the actual proceeds of realisation of the assets, the costs and expenses actually incurred incidental to the liquidation/ disposal and the amounts of the claims submitted and ultimately admitted as claims against the Company and its subsidiaries. Thus, the actual recoveries could be materially different from the estimated recoveries set out in the Report;

  - The Report was prepared on the basis of information, including unaudited information, received by DAHK up to 14 July 2023 and DAHK has not updated the Report since that date. DAHK relied on the financials and other information provided to it and on representations made to it by management of the Group, and the relevant companies' respective staff and advisors. DAHK did not audit or verify the correctness and accuracy of the information provided to it and DAHK does not express an audit opinion on its findings and analysis. DAHK accepts no responsibility for the reliability of such information to the extent it is inaccurate, incomplete or misleading;

  - The Report may not contain all facts and information that a Scheme Creditor may regard as relevant or potentially relevant; and

  - Finally, the Scheme Creditors and any other party who gains access to the Report shall refer to the full disclaimers, limitations, sources of information set out herein.

© 2023. For information, contact Deloitte China.

# Content

| Section | Page |
| --- | --- |
| Glossary of Terms | 4 |
| Scope of Work | 8 |
| Sources of Information | 10 |
| Overview of Financial Position as at 31 December 2022 | 12 |
| Liquidation Analysis | 18 |
| - Methodology | |
| - Key Assumptions | |
| - Entity-by-entity Liquidation Analysis – Payment Waterfall | |
| - Estimated liquidation analysis for CEG, SJ and Tianji | |
| - Limitations | |
| Appendices | 43 |

| Appendices | Page |
| --- | --- |
| List of Subject Entities | 43 |
| Estimated Recoveries of Offshore Debts | 58 |
| List of Subsequent Events Considered | 64 |
| Scenario Analysis | 66 |

© 2023. For information, contact Deloitte China.

# Glossary of Terms

| Abbreviations | Definition |
|---|---|
| approx. | approximately |
| Auditor | Prism Hong Kong and Shanghai Limited (the auditor of the Company) |
| B/b | Billion |
| CEG/ Company | China Evergrande Group, a company listed on the SEHK with stock code 3333.hk |
| CEG Group/ 3333 Group | CEG and its subsidiaries, for the purpose of this Liquidation Analysis, excluding Evergrande Property Group and Evergrande Auto Group |
| CEG Existing Notes | Loan No.1 – 11 as referred in Glossary of Terms - Definition of Offshore Debts (page6) |
| CFO | Chief Financial Officer |
| CIP | Construction in progress |
| Encumbered Assets | Pre-sale proceeds restricted accounts, unpledged deposits, PHS, PUD, Properties and CIP of PRC companies |
| ERV | Estimated realizable value (under a forced-sale scenario) |
| Evergrande Auto | China Evergrande New Energy Vehicle Group Limited, a company listed on the SEHK with stock code 708.hk |
| Evergrande Auto Group/ 708 Group | Evergrande Auto and its subsidiaries |
| Evergrande Property Group | Evergrande Property Services Group Limited, a company listed on the SEHK with stock code 6666.hk |
| Evergrande Property Group/ 6666 Group | Evergrande Property and its subsidiaries |
| Group | CEG and its subsidiaries |
| Hengda Real Estate | Hengda Real Estate Group Company Limited |
| Hengten Networks | Hengten Networks Group Limited, a company listed on the SEHK with stock code 136.hk (currently known as China Ruyi Holdings Limited) |
| HKD | Hong Kong Dollars, the lawful currency of Hong Kong |
| Hong Kong | Hong Kong Special Administrative Region |
| IP(s) | Investment property(ies) |
| Lei Shing Hong Loan | HK$236.5 million loan borrowed by Profit Concept Finance Limited |
| M/ m | Million |
| Management Account(s) | Entity-level unaudited management account of CEG and 3,523 subsidiaries of the Group as at 31 December 2022 as provided by management of the Group |
| Maples | Legal advisors of the Company in respect of laws of Cayman Islands and British Virgin Islands |
| NAV | Net asset value |
| NBV | Net book value |

| Abbreviations | Definition |
|---|---|
| Obligor(s) | Borrower(s)/ Issuer(s), guarantor(s), put option obligor(s), security provider(s) of the Offshore Debts (including share chargor(s), entity(ies) where shares are pledged, debenture provider(s), mortgagor(s), assignor(s) of receivables, etc.), as set out in Appendix 1 |
| Offshore Debts | Debts of CEG, SJ and Tianji as set out on pages 6-7 |
| Out-scope Entity(ies) | Entity(ies) of the Group which are not Subject Entities |
| PHS | Properties held for sale |
| PPE | Property, plant and equipment |
| PRC | The People's Republic of China, which for the purpose of the Report, excludes Hong Kong and Macau Special Administrative Region |
| PUD | Properties under development |
| RMB | Renminbi, the lawful currency of the PRC |
| RMB Bonds | 15 Hengda 03 RMB bond issued by Hengda Real Estate and listed in the Shanghai Stock Exchange, in which the Company guaranteed the repurchase of the RMB bond at the Redemption Date (as defined in the 15 Hengda 03 RMB bond indenture) if Hengda Real Estate failed to ensure sufficient funds in the bank account to repay the RMB Bondholders 3 business days prior to the Redemption Date and the RMB Bondholders so demanded. The outstanding principal of the 15 Hengda 03 RMB bond is RMB8.2 billion. |
| SAFE | State Administration for Foreign Exchange, the PRC |
| SEHK | Stock Exchange of Hong Kong |
| Sidley Austin | Legal advisors of the Company in respect of Hong Kong laws and English laws |
| SJ | Scenery Journey Limited |
| SJ Existing Notes | Loan No.13 – 16 as referred in Glossary of Terms - Definition of Offshore Debts (page6) |
| Sqm | Square meter |
| Subject Entity(ies) | Entity(ies) of the Group that are included in the entity-by-entity Liquidation Analysis as set out in Appendix 1 |
| Subsequent Events | Events after 31 December 2022 |
| Tianji | Tianji Holding Limited |
| Type 1 Guarantee | A certain category of offshore guarantee provided by CEG for onshore debts of non-Group entities, which requires the lender to exhaust its rights of recovery against the primary obligor before it can claim against a guarantor (i.e. CEG) |
| USD | United States Dollar, the lawful currency of the United States of America |

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

# Glossary of Terms – Definition of Offshore Debts

| No. | Class | Terms | Definition |
|---|---|---|---|
| 1 | A | CEG Existing March 2022 Notes | 8.25% senior notes due March 23, 2022 (ISIN: XS1580431143, Common Code: 158043114) |
| 2 | A | CEG Existing April 2022 Notes | 9.5% senior notes due April 11, 2022 (ISIN: XS1982036961, Common Code: 198203696) |
| 3 | A | CEG Existing January 2023 Notes | 11.5% senior notes due January 22, 2023 (ISIN: XS2106834299, Common Code: 210683429) |
| 4 | A | CEG Existing February 2023 Bonds | 4.25% convertible bonds due February 14, 2023 (ISIN: XS1767800961, Common Code: 176780096) |
| 5 | A | CEG Existing April 2023 Notes | 10.0% senior notes due April 11, 2023 (ISIN: XS1982037779, Common Code: 198203777) |
| 6 | A | CEG Existing June 2023 Notes | 7.5% senior notes due June 28, 2023 (ISIN: XS1627599498, Common Code: 162759949) |
| 7 | A | CEG Existing January 2024 Notes | 12.0% senior notes due January 22, 2024 (ISIN: XS2106834372, Common Code: 210683437) |
| 8 | A | CEG Existing March 2024 Notes | 9.5% senior notes due March 29, 2024 (ISIN: XS1587867539, Common Code: 158786753) |
| 9 | A | CEG Existing April 2024 Notes | 10.5% senior notes due April 11, 2024 (ISIN: XS1982040641, Common Code: 198204064) |
| 10 | A | CEG Existing June 2025 Notes | 8.75% senior notes due June 28, 2025 (ISIN: XS1627599654, Common Code: 162759965) |
| 11 | A | CEG Existing January 2022 Notes | 9.5% senior notes due January 30, 2022 (ISIN: XS1991102846, Common Code: 199110284) |
| 12 | A | Class A Private Loan | Private loan of US$100,000,000 with 15% interest p.a. due January 2022 owed by the Company |
| 13 | B, D | SJ Existing October 2022 Notes | 11.5% senior notes due October 24, 2022 (ISIN: XS2109191986, Common Code: 10919198) |
| 14 | B, D | SJ Existing November 2022 Notes | 13.0% senior notes due November 6, 2022 (ISIN: XS1903671854, Common Code: 190367185) |
| 15 | B, D | SJ Existing October 2023 Notes | 12.0% senior notes due October 24, 2023 (ISIN: XS2109192109, Common Code: 210919210) |
| 16 | B, D | SJ Existing November 2023 Notes | 13.75% senior notes due November 6, 2023 (ISIN: XS1903671938, Common Code: 190367193) |
| 17 | C, D | Lake Notes | US$260 million 8.5% senior notes due October 3, 2021 (ISIN: XS2054446617, Common Code: 205444661) issued by Jumbo Fortune Enterprises Limited |
| 18 | C | Dongpo Notes | US$424 million 9.0% senior notes due January 22, 2023 (ISIN: XS2290369128, Common Code: 229036912) issued by Great Courage Global Limited |
| 19 | C | Dongpo Put Option | US$116 million put option granted by CEG in relation to certain Dongpo Notes |
| 20 | C | Graceful Court Put Option | US$110 million put option granted by CEG in relation to shares of Graceful Court Limited |
| 21 | C | New Chic Margin Loan | HK$160 million margin loan borrowed by New Chic Global Limited |
| 22 | C, D | Clear Star Put Option | HK$575 million put option granted by Tianji in respect of shares of Clear Star Investments Limited |
| 23 | C | CEG Loan 1 | HK$1.2 billion loan borrowed by CEG due 2 January 2022 |
| 24 | C | CEG Loan 2 | HK$600 million loan borrowed by CEG due 7 January 2022 |

© 2023. For information, contact Deloitte China.

# Glossary of Terms – Definition of Offshore Debts (cont'd)

| No. | Class | Terms | Definition |
|-----|-------|-------|------------|
| 25 | C | Venice Loan | US$20 million structured loan borrowed by Rainbow Ever Limited |
| 26 | C | Venice SPA | US$355 million structured sale and purchase agreement of shares in Rainbow Ever Limited |
| 27 | C, D | Hero Loan | HK$7.6 billion loan borrowed by Tianji pursuant to facilities agreement dated 21 November 2020 |
| 28 | C | FCB Put Option | US$712 million repurchase obligations granted by CEG, Alpha Beauty Limited and New Gains Group Limited in respect of Fangchebao Group Co. Ltd |
| 29 | C | RMB Bond Put Option | Repurchase obligations of CEG in relation to the RMB Bond |
| 30 | C | CEG Guarantees of PRC Liabilities | Unsecured liabilities of CEG arising in connection with the liabilities of entities incorporated the PRC |
| 31 | C | Kailong Arbitration Award | Arbitration award rendered by the Shenzhen Court of International Arbitration where CEG, Guangzhou Kailong Real Estate Company Limited, and the Chairman of CEG (Mr. Hui Ka Yan) were responsible for the repayment accordingly |
| 32 | C | On-Lent Loan | Amounts on-lent to CEG pursuant to the loan agreement relating to the provision of the Class A Private Loan |
| 33 | D | Castle Loan Put Option | US$258 million put option granted by Tianji in relation to a private loan borrowed by Sky Joy Holdings Limited |
| 34 | D | Castle Share Put Option | US$258 million put option granted by the Tianji in relation to shares of Sky Joy Holdings Limited |
| 35 | D | Tuen Mun Put Options | HK$1.4 billion put options granted by Tianji in relation to a project located in Tuen Mun, Hong Kong |
| 36 | D | CEG-Tianji Intercompany Balance | Intercompany balance owed by the Tianji to CEG which on 31 December 2022 was in an amount equal to approximately US$5.03 billion |

No.1 – 11 are collectively referred to as CEG Existing Notes while No. 13–16 are collectively referred to as SJ Existing Notes in this Report

China Evergrande Group | Liquidation Analysis Report

7

© 2023. For information, contact Deloitte China.

# Content

| Section | Page |
| --- | --- |
| Glossary of Terms | 4 |
| Scope of Work | 8 |
| Sources of Information | 10 |
| Overview of Financial Position as at 31 December 2022 | 12 |
| Liquidation Analysis | 18 |
| - Methodology | |
| - Key Assumptions | |
| - Entity-by-entity Liquidation Analysis – Payment Waterfall | |
| - Estimated liquidation analysis for CEG, SJ and Tianji | |
| - Limitations | |
| Appendices | 43 |

| Appendices | Page |
| --- | --- |
| List of Subject Entities | 43 |
| Estimated Recoveries of Offshore Debts | 58 |
| List of Subsequent Events Considered | 64 |
| Scenario Analysis | 66 |

© 2023. For information, contact Deloitte China.

# Scope of Work

- The Liquidation Analysis provides estimates of recoveries to creditors holding the Offshore Debts in respect of their various rights against the Obligors including CEG, SJ and Tianji and all other entities of the Group (as relevant) that have provided credit enhancement (including guarantees, share charges, mortgages and pledges or other security), should the restructuring fail and the Group be liquidated. The analysis has been conducted on an entity-by-entity basis, i.e. assets and liabilities of each entity have been assessed individually in arriving at the estimated recoveries to unsecured creditors and shareholders of an entity, to the extent possible.

- Funds available for distribution to creditors/ shareholders of an Obligor in the event of a Group-wide liquidation would depend on the recoveries from, *inter alia*, its intercompany receivables or equity investments, which would in turn depend on the estimated distributions by the respective group debtors/ subsidiaries of the Obligor based on their respective assets (including intercompany receivables from and equity investments in other Group entities) and liabilities (including intercompany payables to other Group entities).

- The Liquidation Analysis, in respect of the Offshore Debts, shall take account of the recoveries to the Obligors from their inter-company receivables and equity investments.

- Given the size of the Group and the information and time constraints, it was agreed with the Company and advisors that the entity-by-entity Liquidation Analysis would not cover all subsidiaries of the Group, instead it would cover subsidiaries that might affect the prospect of material recoveries to the Obligors through intercompany balances or equity investments. A top-down approach from the perspective of the Obligors, subject to a threshold amount of RMB1b, was adopted in setting the scope of the Group's entities to be subject to the entity-by-entity Liquidation Analysis (the "Subject Entities"), i.e. assets and liabilities of the Subject Entities would be individually assessed in arriving at the estimated recoveries to unsecured creditors of each of these entities.

- The following entities of the Group were included in the Liquidation Analysis. A list of Subject Entities is set out in Appendix 1.

1. Only subsidiaries with positive NAV were considered in arriving at the coverage of the Subject Entities' combined NAV to the Group's combined NAV.

© 2023. For information, contact Deloitte China.

# Content

| Section | Page |
| --- | --- |
| Glossary of Terms | 4 |
| Scope of Work | 8 |
| **Sources of Information** | **10** |
| Overview of Financial Position as at 31 December 2022 | 12 |
| Liquidation Analysis | 18 |
| - Methodology | |
| - Key Assumptions | |
| - Entity-by-entity Liquidation Analysis – Payment Waterfall | |
| - Estimated liquidation analysis for CEG, SJ and Tianji | |
| - Limitations | |
| Appendices | 43 |

| Appendices | Page |
| --- | --- |
| List of Subject Entities | 43 |
| Estimated Recoveries of Offshore Debts | 58 |
| List of Subsequent Events Considered | 64 |
| Scenario Analysis | 66 |

© 2023. For information, contact Deloitte China.

# Sources of Information

Information used in the Liquidation Analysis

| | | |
|---|---|---|
| ⬡ | **Group Structure** | • List of entities of the Group, their respective shareholders (with % of shareholding), and their respective places of incorporation and nature of business |
| 〰 | **Financial information** | • Management accounts of Subject Entities and consolidated balance sheet of the Group (including entity-level balance sheets) as at 31 December 2022 provided by the Company and the Auditor (received up to 4 July 2023)<br>• Entity-level breakdown of assets and liabilities of the Subject Entities (received up to 4 July 2023)<br>• Working schedules of audit adjustments and consolidation adjustments as at 31 December 2022 provided by the Company and the Auditor (received up to 4 July 2023) |
| ⬡ | **IP, PHS & PUD** | • List of PHS and PUD of the Group showing information on area, status of delivery, status of sale, management/ independent valuer's estimates on selling price per sqm, indebtedness, management estimates on cost to completion and management estimates on future expenditure (sales and marketing, taxes). |
| ⬡ | **Indebtedness and security package schedule** | • Information and representations from the management of CEG in relation to the onshore interest-bearing borrowings and their security packages (including guarantees, security and pledges)<br>• Information from the Company or its advisors in relation to the Offshore Debts and their security packages (including guarantees, security and pledges). For the avoidance of doubt, information on guarantees provided by offshore entities in respect of debts of onshore entities were provided by the management of CEG |
| ⬡ | **Payment waterfall** | • Analysis from Maples and Sidley Austin on the treatment of guarantees in favor of holders of Offshore Debts (excluding guarantees in respect of debts of onshore entities) and put option obligations in the liquidation of offshore Obligors<br>• Analysis from PRC legal advisors in relation to the payment priority pursuant to the relevant PRC bankruptcy laws for the real estate industry and treatment of guarantees in favor of the holders of onshore debts |
| ⬡ | **Management representation & assumption** | • During our work, we interviewed and held discussions with the following members of management team of the Group to obtain an understanding of the nature, quality of various assets held by the Subject Entities and estimated recoveries from the same.<br>  ➢ PAN Darong, former Executive Director and CFO (up to 22 July 2022)<br>  ➢ QIAN Cheng, Executive Director and CFO<br>  ➢ LIN Xiaobin, General Manager, Finance<br>  ➢ WU Rundong, Manager, Finance<br>  ➢ BAI Chaoyang, Manager, Finance<br>  ➢ Peng Zhenan, Manager, Accounting<br>  ➢ Chen Daiping, Manager, Accounting<br>  ➢ Wang Jing, Deputy Manager, Finance |

# Content

| Section | Page |
| --- | --- |
| Glossary of Terms | 4 |
| Scope of Work | 8 |
| Sources of Information | 10 |
| **Overview of Financial Position as at 31 December 2022** | **12** |
| Liquidation Analysis | 18 |
| - Methodology | |
| - Key Assumptions | |
| - Entity-by-entity Liquidation Analysis – Payment Waterfall | |
| - Estimated liquidation analysis for CEG, SJ and Tianji | |
| - Limitations | |
| Appendices | 43 |

| Appendices | Page |
| --- | --- |
| List of Subject Entities | 43 |
| Estimated Recoveries of Offshore Debts | 58 |
| List of Subsequent Events Considered | 64 |
| Scenario Analysis | 66 |

© 2023. For information, contact Deloitte China.

# Overview of Financial Position as at 31 December 2022

## CEG

- CEG is listed on the Main Board of the SEHK. It is principally engaged in investment holding, whilst its subsidiaries are principally engaged in property development.
- CEG Group holds 51.7% of Evergrande Property and 58.5% of Evergrande Auto, of which CEG directly holds 1.9% of Evergrande Property and 1.2% of Evergrande Auto.
- Major assets of CEG are amounts due from group companies and dividends receivable.
- Major liabilities of CEG are borrowings, amounts due to group companies, guarantees granted by CEG in relation to indebtedness of its subsidiaries and put option obligations.

| Adjusted Balance Sheet of CEG as at 31 December 2022 | |
|---|---|
| RMB million | NBV for Liquidation Analysis |
| **Assets** | |
| Cash and cash equivalents | 7 |
| Dividends receivable | 59,080 |
| Other receivables and prepayment (including receivables from Out-Scope Entities) | 6,787 |
| Intercompany receivables from Subject Entities | 106,486 |
| Long-term equity investments | 4,727 |
| Fixed assets | 1 |
| **Total assets** | **177,088** |
| **Liabilities** | |
| Borrowings (interest inclusive) | (2,276) |
| Notes payable (interest inclusive) | (111,904) |
| Intercompany payables to Subject Entities | (83,380) |
| Other liabilities (including payables to Out-Scope Entities) | (1,828) |
| Contingent liabilities - put option obligations | (21,362) |
| Contingent liabilities – guarantees | (81,336) |
| Dividends payable | (1,652) |
| **Total liabilities** | **(303,738)** |
| **Net liabilities** | **(126,650)** |

*Source: Management Account of CEG as at 31 December 2022 and supporting schedules provided by management and the Auditor*

### Dividends receivable

- A summary of dividends receivable is as follows:

| Company | As at 31 Dec 2022 RMB million | Obligor? | Relevant Obligation |
|---|---|---|---|
| ANJI (BVI) Limited安基(BVI)有限公司 | 45,750 | Y | Offshore Debts under Class A |
| FENGYU (BVI) Limited丰瑜(BVI)有限公司 | 210 | Y | Offshore Debts under Class A |
| UNIVERSAL STAR GLOBAL LIMITED | 4,000 | N | |
| LIONFORT INVESTMENTS LIMITED | 320 | N | |
| NEW GARLAND LIMITED | 8,800 | N | |
| **Grand Total** | **59,080** | | |

### Intercompany receivables from Subject Entities

- A summary of intercompany receivables due from Subject Entities is as follows, a majority of which are Obligors.

| Name of Group Companies | As at 31 Dec 2022 RMB million | Obligor? | Relevant Obligation |
|---|---|---|---|
| 1. Tianji | 39,076 | Y | Offshore Debts under Class D |
| 2. Evergrande Auto | 13,673 | N | |
| 3. BILLION MARK LIMITED | 10,905 | Y | Offshore Debts under Class A |
| 4. 恒大集团有限公司 | 8,311 | N | |
| 5. STATE HERO HOLDINGS LIMITED 国豪控股有限公司 | 6,265 | N | |
| 6. JIAJIAN (BVI) LIMITED 嘉建(BVI)有限公司 | 5,882 | Y | Offshore Debts under Class A |
| 7. NICE DRAGON CAPITAL INVESTMENT LIMITED 丽龙创富有限公司 | 3,115 | N | |
| 8. WELLY GOLD LIMITED 世盈有限公司 | 3,103 | N | |
| 9. YITONG (BVI) LIMITED 亿通(BVI)有限公司 | 2,949 | Y | Offshore Debts under Class A |
| 10. NOBLE BEAUTY LIMITED 贵美有限公司 | 2,582 | N | |
| 11. Obligors with individual balance less than RMB2.5b | 4,094 | Y | Various |
| 12. Other entities of the Group with individual balance less than RMB2.5b | 6,531 | N | |
| **Grand Total** | **106,486** | | |

© 2023. For information, contact Deloitte China.

# Overview of Financial Position as at 31 December 2022

## CEG (con't)

| Adjusted Balance Sheet of CEG as at 31 December 2022 | NBV for Liquidation Analysis |
| --- | --- |
| **RMB million** | |
| **Assets** | |
| Cash and cash equivalents | 7 |
| Dividends receivable | 59,080 |
| Other receivables and prepayment (including receivables from Out-Scope Entities) | 6,787 |
| Intercompany receivables from Subject Entities | 106,486 |
| Long-term equity investments | 4,727 |
| Fixed assets | 1 |
| **Total assets** | **177,088** |
| | |
| **Liabilities** | |
| Borrowings (interest inclusive) | (2,276) |
| Notes payable (interest inclusive) | (111,904) |
| Intercompany payables to Subject Entities | (63,380) |
| Other liabilities (including payables to Out-Scope Entities) | (1,828) |
| Contingent liabilities - put option obligations | (21,362) |
| Contingent liabilities – guarantees | (81,336) |
| Dividends payable | (1,652) |
| | |
| **Total liabilities** | **(303,738)** |
| | |
| **Net liabilities** | **(126,650)** |

*Source: Management Account of CEG as at 31 December 2022 and supporting schedules provided by management and the Auditor*

### Borrowings, notes payable and contingent liabilities

- CEG's indebtedness included offshore senior notes, private debts and guarantees granted in respect of indebtedness of subsidiaries and obligations arising from various put options

| No. | Category | Tranche | Outstanding amount as at 31 Dec 2022 | | |
| --- | --- | --- | --- | --- | --- |
| | | | Principal RMB million | Interest RMB million | Principal + Interest RMB million |
| 1 | Borrowings | Class A Private Loan | (65) | (22) | (87) |
| 2 | Borrowings | CEG Loan 1 | (1,071) | (389) | (1,460) |
| 3 | Borrowings | CEG Loan 2 | (536) | (193) | (729) |
| | | **Total borrowings** | **(1,672)** | **(604)** | **(2,276)** |
| 4 | Notes payable | CEG Existing Notes | (99,126) | (12,778) | (111,904) |
| | | **Total notes payable** | **(99,126)** | **(12,778)** | **(111,904)** |
| 5 | Put option obligations | Dongpo Put Option | (808) | (193) | (1,000) |
| 6 | Put option obligations | Graceful Court Put Option | (766) | (73) | (839) |
| 7 | Put option obligations | FCB Put Option | (4,957) | - | (4,957) |
| 8 | Put option obligations | RMB Bond Put Option | (8,200) | (560) | (8,760) |
| 9 | Put option obligations | Kailong Arbitration Award | (5,000) | (805) | (5,805) |
| | | **Total put option obligations** | **(19,731)** | **(1,631)** | **(21,362)** |
| 10 | Guarantees | Various debts under the Offshore Debts | (14,812) | (2,034) | (16,846) |
| 11 | Guarantees | CEG Guarantees of PRC Liabilities | (56,818) | (7,672) | (64,490) |
| | | **Total guarantees** | **(71,630)** | **(9,706)** | **(81,336)** |

© 2023. For information, contact Deloitte China.

# Overview of Financial Position as at 31 December 2022

## SJ

- SJ is the issuer of 4 series of USD senior notes.
- SJ does not have any subsidiaries and its major assets are amounts due from group companies.
- Major liabilities of SJ are the USD senior notes issued and interest accrued.

### Adjusted Balance Sheet of SJ as at 31 December 2022

| RMB million | NBV for Liquidation Analysis |
|---|---|
| **Assets** | |
| Intercompany receivables from Subject Entities | 25,780 |
| **Total assets** | **25,780** |
| | |
| **Liabilities** | |
| Notes payable (interest inclusive) | (42,994) |
| **Total liabilities** | **(42,994)** |
| | |
| **Net liabilities** | **(17,214)** |

*Source: Management Account of SJ and supporting schedules as at 31 December 2022 provided by the management of the Group and the Auditor*

### Intercompany receivables from Subject Entities

- The below receivables represent all assets of SJ

| Company | As at 31 Dec 2022 RMB million | Obligor? | Relevant Obligation |
|---|---|---|---|
| 1. Shengyu (BVI) Limited 盛譽 (BVI)有限公司 | 15,044 | Yes | SJ Existing Notes |
| 2. Tianji | 10,736 | Yes | SJ Existing Notes and various private debts |
| **Grand Total** | **25,780** | | |

### Notes payable

- Notes payable represent SJ Existing Notes

| Tranche | Outstanding amount as at 31 Dec 2022 | | |
|---|---|---|---|
| | Principal RMB million | Interest RMB million | Principal + Interest RMB million |
| SJ Existing October 2022 Notes | (13,922) | (2,304) | (16,226) |
| SJ Existing November 2022 Notes | (4,485) | (964) | (5,449) |
| SJ Existing October 2023 Notes | (13,887) | (2,398) | (16,285) |
| SJ Existing November 2023 Notes | (4,102) | (932) | (5,034) |
| **Grand Total** | **(36,396)** | **(6,598)** | **(42,994)** |

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

15

# Overview of Financial Position as at 31 December 2022

## Tianji

- Tianji is principally engaged in investment holding, whilst its subsidiaries are principally engaged in property development.
- Major assets of Tianji are amounts due from group companies and investments in subsidiaries.
- Major liabilities of Tianji are amounts due to group companies, guarantees granted by Tianji in relation to indebtedness of the Group (including SJ Existing Notes) and put option obligations

| Adjusted Balance Sheet of Tianji as at 31 December 2022 | |
|---|---|
| RMB million | NBV for Liquidation Analysis |
| **Assets** | |
| Cash and cash equivalents | 4 |
| Accounts receivable | 21 |
| Prepayment | 120 |
| Other receivables (including receivables from Out-scope Entities) | 3,870 |
| Intercompany receivables from Subject Entities | 97,493 |
| Long-term equity investments | 2,862 |
| **Total assets** | **104,370** |
| **Liabilities** | |
| Long-term borrowings (interest inclusive) | (6,922) |
| Intercompany payables to Subject Entities | (109,884) |
| Other liabilities (including payables to Out-scope Entities) | (1,986) |
| Contingent liabilities - put option obligations | (4,236) |
| Contingent liabilities - guarantees | (45,121) |
| **Total liabilities** | **(168,149)** |
| **Net liabilities** | **(63,779)** |

*Source: Management Account of Tianji and supporting schedules as at 31 December 2022 provided by the management of the Group and the Auditor*

### Long-term equity investments

- Major investees of Tianji are as follows:

| Name of Subsidiaries | NAV of investee as at 31 Dec 2022 RMB million | Obligor? | Relevant Obligation |
|---|---|---|---|
| 1. EVER GRACE GROUP LIMITED恒盛集团有限公司 | 6,612 | Yes | SJ Existing Notes |
| 2. Fortune Walker Limited | 1,030 | Yes | Lake Notes |

### Intercompany receivables from Subject Entities

- A majority of the key Group debtors of Tianji are Obligors

| Name of Group Companies | As at 31 Dec 2022 RMB million | Obligor? | Relevant Obligation |
|---|---|---|---|
| 1. Shengyu (BVI) Limited 盛誉(BVI)有限公司 | 54,151 | Yes | SJ Existing Notes |
| 2. EV Wanchai 1 Holdings Limited | 11,609 | No | |
| 3. EV Wanchai 1 Land Holdings Limited | 6,608 | Yes | Hero Loan |
| 4. LOFTY REAP LIMITED 上丰有限公司 | 4,640 | Yes | Castle Loan Put Option & Castle Share Put Option |
| 5. LAGUNA HEIGHTS LIMITED | 4,179 | No | |
| 6. URBAN EAGLE LIMITED | 3,989 | No | |
| 7. Shengtong Holding Limited 盛通控股有限公司 | 3,026 | Yes | SJ Existing Notes |
| 8. Greet Delight Limited 迎悦有限公司 | 2,680 | No | |
| 9. JOVIAL IDEA DEVELOPMENTS LIMITED乐意发展有限公司 | 1,714 | No | |
| 10. More Hero Limited添英有限公司 | 1,198 | No | |
| 11. Other Obligors with individual balance less than RMB 1b | 2,083 | Yes | Various |
| 12. Other entities of the Group with individual balance less than RMB 1b | 1,616 | No | |
| **Grand Total** | **97,493** | | |

© 2023. For information, contact Deloitte China.

# Overview of Financial Position as at 31 December 2022

## Tianji (con't)

**Adjusted Balance Sheet of Tianji as at 31 December 2022**

| RMB million | NBV for Liquidation Analysis |
|---|---|
| **Assets** | |
| Cash and cash equivalents | 4 |
| Accounts receivable | 21 |
| Prepayment | 120 |
| Other receivables (including receivables from Out-scope Entities) | 3,870 |
| Intercompany receivables from Subject Entities | 97,493 |
| Long-term equity investments | 2,862 |
| **Total assets** | **104,370** |
| **Liabilities** | |
| Long-term borrowings (interest inclusive) | (6,922) |
| Intercompany payables to Subject Entities | (109,884) |
| Other liabilities (including payables to Out-scope Entities) | (1,986) |
| Contingent liabilities - put option obligations | (4,236) |
| Contingent liabilities - guarantees | (45,121) |
| **Total liabilities** | **(168,149)** |
| **Net liabilities** | **(63,779)** |

**Long-term borrowings and contingent liabilities**

- Long-term borrowings mainly represented Hero Loan while contingent liabilities included guarantees granted by Tianji in respect of indebtedness of Group companies, and obligations arising from various put options

| No. | Category | Tranche | Outstanding amounts as at 31 Dec 2022 | | |
|---|---|---|---|---|---|
| | | | Principal RMB million | Interest RMB million | Principal + Interest RMB million |
| 1 | Long-term borrowings | Hero Loan | (6,785) | (137) | (6,922) |
| | **Total long-term borrowings** | | **(6,785)** | **(137)** | **(6,922)** |
| 2 | Put option obligations | Clear Star Put Option | (513) | - | (513) |
| 3 | Put option obligations | Castle Share Put Option | (1,797) | (363) | (2,160) |
| 4 | Put option obligations | Tuen Mun Put Options | (1,258) | (305) | (1,563) |
| | **Total put option obligations** | | **(3,568)** | **(668)** | **(4,236)** |
| 5 | Guarantees | SI Existing Notes | (36,396) | (6,598) | (42,994) |
| 6 | Guarantees | Lake Notes | (1,810) | (240) | (2,050) |
| 7 | Guarantees | Lei Shing Hong Loan[1] | (77) | - | (77) |
| | **Total guarantees** | | **(38,283)** | **(6,838)** | **(45,121)** |

*Note 1: The facility has been fully repaid by the borrower in January 2023, please refer to Appendix 3 for details.*

*Source: Management Account of Tianji and supporting schedules as at 31 December 2022 provided by the management of the Group and the Auditor*

© 2023. For information, contact Deloitte China.

# Content

| Section | Page |
| --- | --- |
| Glossary of Terms | 4 |
| Scope of Work | 8 |
| Sources of Information | 10 |
| Overview of Financial Position as at 31 December 2022 | 12 |
| **Liquidation Analysis** | **18** |
| - Methodology | |
| - Key assumptions | |
| - Entity-by-entity Liquidation Analysis – Payment Waterfall | |
| - Estimated liquidation analysis for CEG, SJ and Tianji | |
| - Limitations | |
| Appendices | 43 |

| Appendices | Page |
| --- | --- |
| List of Subject Entities | 43 |
| Estimated Recoveries of Offshore Debts | 58 |
| List of Subsequent Events Considered | 64 |
| Scenario Analysis | 66 |

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

# Illustration of Methodology

The Liquidation Analysis has been prepared on the assumptions that every entity of the Group would be put into liquidation, such that assets of each entity would be realized under a forced-sale scenario for distribution to creditors and shareholders, after taking account of secured claims/ priority claims over its assets (for its own obligations or obligations of other entities) with any shortfall ranking *pari passu* with other unsecured claims of the entity. Proceeds from forced-sale of the remaining unsecured assets (including any surplus from secured assets) would be distributed first to preferential creditors and then to general unsecured creditors (including any deficiency of secured/ priority claims) of that entity on a *pari passu* basis. Any surplus after settling general unsecured claims would first be used to settle dividends declared but not paid, and then distributed to the shareholders of that entity.



China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

# Key Assumptions

## General Assumptions

**General principles**

- Each entity of the Group would be placed into liquidation where
  - Assets of each Subject Entity would be realized under a forced-sale scenario for distribution to its creditors, taking account of the super priority claims over Encumbered Assets and the relevant security provided by the Subject Entity (for its own indebtedness and indebtedness of other companies) with any shortfall of its secured indebtedness ranking *pari passu* with other unsecured creditors of the respective entity.
  - Proceeds from realization of the remaining unsecured assets of the entity (including any surplus from the secured assets) would be distributed according to the stipulated preferential order.
  - Any remaining proceeds from realization would be distributed to unsecured creditors (including deficiency of secured and priority claims, intercompany claims and corporate guarantee claims) on a *pari passu* basis.
  - Any surplus after settling unsecured creditors would first be used to settle dividends payable, and then be distributed to shareholder(s) of the entity.

**Liquidation Process**

- All entities of the Group are assumed to be put into insolvent liquidation on 1 January 2023. Subsequent Events and their possible impacts on the financial position, including accrual of interest subsequent to 31 December 2022, are not considered, except for those events set out in Appendix 3.
- The liquidation process is assumed to be conducted on an entity-by-entity basis in accordance with the rules and regulations of the respective jurisdiction, with no consolidation of bankruptcy proceedings or coordination between liquidators/ administrators.
- Assets of companies in liquidation would be realized under a distressed sale. Estimated realization rates (see pages 26 to 30) shall be applied to different types of assets of the Group to reflect the discount in value of assets under a forced-sale scenario.
- Assets of PRC entities in liquidation would be realised through a court controlled auction process, which would be in the form of a distressed sale.
- It was assumed that recorded liabilities of the Group are valid and would be admitted in full by liquidators/ administrators.

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

20

# Key Assumptions

## General Assumptions

| | |
|---|---|
| **Inter-company Balances (including inter-company interests)** | *Validity and ranking of intercompany payables*<br>• Intercompany liabilities are assumed to be valid and would be admitted in full by liquidators/ administrators after set-off.<br>• Interests were properly charged and recorded and would be admitted in full by liquidators/ administrators.<br>• Save for the cases of subordination which are assumed to be valid and enforceable, intercompany payables would rank *pari passu* with other unsecured claims.<br><br>*Reconciliation and adjustment of intercompany balance matrix*<br>• We noted from the intercompany balance matrix that there were certain differences in balances between entities of the Group.<br>• In cases of unreconciled difference in intercompany balances between two entities of the Group, a higher absolute amount would be adopted in the Liquidation Analysis.<br>• If both entities record a receivable due from the other, it is assumed that the one with higher amount of receivable would be the creditor and the amount would be adopted in the Liquidation Analysis. If both entities record a payable due to the other, it is assumed the one with higher amount of payable would be the debtor and the amount would be adopted in the Liquidation Analysis.<br><br>*Estimating recoveries from intercompany receivables*<br>• Estimated recoveries from intercompany receivables from the Subject Entities are computed based on the estimated return of each Subject Entity to its unsecured creditors.<br>• The limited scope entity-by-entity Liquidation Analysis does not cover all entities of the Group. In order to account for the potential recoveries from the Out-scope Entities (either through intercompany receivables or equity investments in the Out-scope Entities), reference was made to the estimated recoveries to unsecured creditors of the Subject Entities which represented majority of the Group's assets. As the estimated recoveries to unsecured claims of majority of the Subject Entities are within 0 to 5%, a nominal recovery rate of 5% is applied to estimate recoveries from intercompany receivables from the Out-scope Entities. |
| **Dividends** | • Any dividend payables recorded on the balance sheet of the Subject Entities are assumed to be duly declared but unpaid.<br>• Dividends payable would rank after general unsecured claims of the respective subsidiary.<br>• In the case where the dividends receivable and the dividends payable did not reconcile, a lower absolute amount would be adopted in the Liquidation Analysis. |

# Key Assumptions

## General Assumptions

**Guarantee, put option obligations and contingent liabilities**

### *Validity and ranking of guarantee and put option obligations*

- Guarantee and put option obligations are assumed to be valid and enforceable, and rank *pari passu* with other unsecured claims.
- Save and except for guarantee claims and put option obligations, it is assumed that there is no other contingent liabilities (e.g. claims for breach of contracts) which would otherwise further reduce the recoveries to unsecured creditors.

### *Amount of guarantee claims and put option obligations*

- A creditor (onshore debts and Offshore Debts) would claim in full in respect of guarantee(s) granted by any of the Group entities, except for guarantee provided for certain onshore debts of non-Group entities ("Type 1 Guarantee") where creditors would need to exhaust recoveries from principal obligors and security before claiming against guarantors.
- The amount of claims against guarantors would be reduced by amounts of realisations from borrowers and security only if the realizations were made prior to the date of submission of claims against guarantors. For the purpose of this Liquidation Analysis, since it is assumed all entities would be put into liquidation on 1 January 2023, therefore creditors, with the view to maximize recoveries, would claim against guarantors for 100% of the debts without deducting any recoveries from borrowers and security.
- As borrowers and security of Type 1 Guarantee are outside the Group, relevant information for assessing recoveries from borrowers and security are not available. A scenario analysis, i.e. 0% (base case), 50%, 75% or 100% recoveries from the borrowers and security to pay off the debts respectively, would be performed.
- In the event that a guarantor also provided security for an Offshore Debt, the creditor could realize recoveries on the security provided by the guarantor and claim the deficiency against the guarantor as an unsecured claim. For onshore debts, the amount of unsecured claim against the guarantor would not be reduced by the amount of recoveries on security provided by that guarantor.
- In relation to put option obligations in Offshore Debts, i.e. the Obligors are obliged to acquire assets (mainly shares of the Group entities and notes issued by the Group entities), it is assumed that the put option holders (i.e. the creditors) would realize the assets (on behalf of the Group, without transferring the assets to the Group) under a forced-sale scenario and claim against the put option Obligors for the shortfall (i.e. put option exercise price plus agreed return minus estimated realizable value of the assets under a forced-sale scenario).

### *Estimating recoveries from guarantee*

- Unless and until the debt is fully repaid, the Obligors of an Offshore Debt do not have and may not file proof for subrogation claims or other potential claims against borrowers or other obligors. As such it is uncertain that any such claims would be claimed or materially impact the analysis. For the purpose of this Liquidation Analysis, we adopted a similar approach in certain other entity-priority-models to assume that there was no subrogation claims or similar claims against borrowers or other obligors, except if an Offshore Debt had been fully repaid, it is assumed that the other Obligors would claim against the principal borrower for security/guarantees provided.
- The limited scope entity-by-entity Liquidation Analysis does not cover all entities of the Group. In order to account for the potential recoveries from guarantees provided by the Out-scope Entities, reference was made to the estimated recoveries to unsecured creditors of the Subject Entities which represented majority of the Group's assets. As the estimated recoveries to unsecured claims of majority of the Subject Entities are within 0 to 5%, a nominal recovery rate of 5% is applied to estimate recoveries from guarantee in respect of onshore debts provided by the Out-scope Entities (i.e. general unsecured claims).

# Key Assumptions

## General Assumptions

|  |  |
|---|---|
| **Secured claims** | <ul><li>Secured creditors of Subject Entities would enforce all security granted to them or make claims at all security providers, including assets owned by the Out-scope Entities.</li><li>Due to limitation in information in respect of the ranking of onshore secured indebtedness, it is assumed that all secured claims in respect of a secured asset shall rank *pari passu*, i.e. estimated realization from the secured asset would be distributed to the secured creditors pro-rata to their claims.</li><li>Secured assets of the borrower would be realized to settle the secured indebtedness. Any shortfall (i.e. secured indebtedness minus estimated realizable value of the secured assets of the borrower) would become unsecured claims of the borrower. Any surplus would be made available for distribution to unsecured creditors of the borrower.</li><li>Secured assets of other security providers would be realized to settle the secured indebtedness. Any surplus after deducting the secured indebtedness would be made available for distribution to unsecured creditors of the security provider.</li></ul>*Circumstances where indebtedness is fully secured and/or guaranteed*<ul><li>For indebtedness that are fully secured with multiple assets and guarantees (i.e. > 100% recovery of debts), creditors are entitled to recover outstanding amounts only and any surplus will be made available for distribution to unsecured creditors of the respective security providers/ guarantors.</li><li>As there is no specific rules on order of security to be realized, it is assumed that the creditors would recover from:</li></ul><ul><li>First, secured assets of the borrower.</li><li>Second, in the case of onshore debts, secured assets of Out-scope Entities. If there are multiple Out-scope Entities providing security, it is assumed that all security of the Out-scope Entities would be realized for distribution to the secured creditors and any surplus would be made available to the respective Out-scope Entities pro-rata to the estimated realizable value of the secured assets.</li><li>Third, assets secured by Subject Entities. If there are multiple Subject Entities providing security, it is assumed that all security of the Subject Entities would be realized for distribution to secured creditors and any surplus would be made available to the respective Subject Entities pro-rata to the estimated realizable value of the secured assets.</li><li>Fourth, guarantees. Full amount of the debts (i.e. before deducting any realization from security and guarantees) shall be claimed and admitted as unsecured claims against the guarantors' liquidation estate. Any distribution from guarantors in excess of the secured indebtedness would become unsecured assets of guarantors.</li></ul> |

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

# Key Assumptions
## General Assumptions

| | |
|---|---|
| **PUD, PHS & pre-sale proceeds** | • Sale and purchase agreements of property units would be terminated upon liquidation. Accordingly, legal titles of PUD and PHS are assumed to be retained with the Group for disposal via tender process upon liquidation.<br>• Funds in pre-sale proceeds restricted accounts would be returned to property buyers.<br>• Property buyers are assumed to be natural persons who purchased the properties for living purposes and settled purchase consideration in full, and therefore, would satisfy the criteria of holding priority claims.<br>• According to the Reply on Commodity Housing Consumer Protection issued by The Supreme People's Court of the PRC on 20 April 2023 and the analysis from the PRC legal advisors, claims from qualified property buyers would rank before claims from contractors, secured indebtedness and other creditors. There was no express provision set out in the aforesaid Reply on whether the priority claims of qualified property buyers would cover all assets of an entity.<br>• For the purpose of this Liquidation Analysis, in view of the general practice of courts to protect property buyers, it is assumed that property buyers would have first priority (before construction payables and secured claims) over unpledged deposits and realization from PUD and PHS.<br>• Receivables from banks (arose due to delay in release of mortgage loan(s) by relevant financial institutions) are assumed to be non-recoverable, as legal titles of properties are yet to be passed to property buyers and would be retained in the Group for disposal. |
| **Government Relief Loans** | • We noted that certain onshore project companies of the Group had recorded liabilities in respect of relief loans advanced by local governments specifically for ensuring completion and delivery of properties. Generally, funds advanced were kept in specific accounts maintained by local governments and could only be drawn to settle construction-related expenses.<br>• It is assumed that unsecured portion of the government relief loans would be preferential unsecured claims. |
| **Tax / SAFE** | • For purpose of this Liquidation Analysis, the realization of assets in the course of the liquidation of the Group is assumed to have no tax impact. In the event any disposal would give rise to tax liability, the return to creditors would be lower than that of the current scenario.<br>• For purpose of this Liquidation Analysis, it is assumed that there is no withholding tax payable on distribution. In the event any distribution would give rise to tax liability, the return to creditors would be lower than that of the current scenario.<br>• This Liquidation Analysis has considered recorded tax liabilities (after deducting tax recoverable) and deferred tax liabilities (after deducting deferred tax assets) and it is assumed that there is no unrecorded tax liabilities which would otherwise further reduce recovery to unsecured creditors.<br>• Proceeds arising from the realisation of assets in the PRC are assumed to be able to remit to offshore creditors smoothly, without SAFE issues. |

© 2023. For information, contact Deloitte China.

# Key Assumptions

## General Assumptions

| | |
|---|---|
| **Costs** | • Liquidation costs of each Subject Entity of the Group, including liquidators' fees and remuneration, legal costs and costs and expenses incidental to the disposal (except for tax expense) are assumed to be paid in priority (i) in the case of a Subject Entity in the PRC, at 0.8% of estimated realizable value of unsecured assets (including surplus from secured assets) by reference to the guidance issued by The Supreme People's Court of the PRC; and (ii) in the case of a Subject Entity outside the PRC, at 5% of estimated realizable value of unsecured assets (including surplus from secured assets), which is within the reasonable range of liquidation costs observed in the market. |
| | • The Group principally operates in the PRC. According to the Article 47 of the Labour Contract Law of the PRC, upon redundancy, an employee would be entitled to financial compensation on the basis of the number of years he/ she has worked in a unit, the rate being one month's salary for the work of one full year. After taking into account of the average years of service of the employees of the Group, preferential remuneration / retrenchment costs of the Subject Entities in CEG Group, Evergrande Property Group and Evergrande Auto Group are computed at 5.8 times, 3.7 times and 3.2 times of current employees' monthly wages respectively. |
| **Exchange rate** | • The exchange rates adopted for purpose of this analysis are HKD/RMB: 0.8933 and USD/RMB: 6.9646, being the published rates as at 30 December 2022 as set out on the SAFE official website. |
| **Others** | • Time value of money is not considered for purpose of this Liquidation Analysis. |

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

# Key Assumptions

## Asset-specific Assumptions

The table below sets out assumptions on each key line item of assets under a liquidation scenario, based on discussions with the management of the Group and having regard to experience from previous liquidations:

| Assets | Estimated Realisation Rate | Remarks |
|---|---|---|
| Cash and bank balances (excluding balances in pre-sale proceed accounts and guaranteed deposits) | 100% | - Guaranteed deposits would be utilized by financial institutions to settle bills payable<br>- Pre-sale proceeds restricted balances would be returned to property buyers<br>- Property buyers would have first priority over unpledged deposits |
| Unlisted equity investments (not including investments in subsidiaries) | 20% | - Lower of (i) NBV of the investments and (ii) NAV of the investee attributable to the % held by the Subject Entity based on management account of the investee as at 31 December 2022, if available |
| Listed equity investments (not including Evergrande Property and Evergrande Auto) | 80% | - Market value as at 31 December 2022 |
| Investments in funds | 80% | - NBV |
| Bills receivable from third parties | Various | - Bank's acceptance bills: 100%<br>- Commercial acceptance bills: 30% for due receivables and 50% for current receivables |
| Accounts receivable from third parties | Various based on aging | - These mainly represent receivables from sale of construction materials and property management fee receivables. Estimated realization on NBV will depend on aging:<br>  - Within 1 year: 50% (3333 Group & 708 Group); 80% (6666 Group)<br>  - 1-2 years: 30%<br>  - 2-3 years: 10%<br>  - Above 3 years: 0% |

© 2023. For information, contact Deloitte China.

# Key Assumptions

## Asset-specific Assumptions

The table below sets out assumptions on each key line item of assets under a liquidation scenario, based on discussions with the management of the Group and having regard to experience from previous liquidations:

| Assets | Estimated Realisation Rate | Remarks |
|---|---|---|
| Receivables from banks regarding mortgage proceeds | 0% | - It is assumed that pre-sale proceeds from property sale would be refunded to property buyers and the relevant properties (with legal titles retained with the Group) would be disposed by auction. As no properties would be delivered to property buyers, the Group could not receive the receivables from banks |
| Prepayments for acquisition of land use rights | 0% | - The Group would not continue to perform the contractual obligations and might be liable of contractual claims<br>- No information on whether the relevant contracts are assignable or whether the prepayments are refundable<br>- It is expected that these prepayments would have no recovery value |
| Prepaid taxes | 0% | - Advised by the Group's management that prepaid taxes could only be utilised by the relevant Subject Entities and could not be refunded, transferred or assigned. Accordingly, it is assumed that the realisable value of prepaid taxes would be nil under a liquidation scenario |
| Construction-related prepayments | 0% | - These represent prepayments made to contractors and suppliers of construction materials. As the Group would fail to continue to perform the contractual obligations and might become liable of contractual claims, it is expected that these prepayments would have no recovery value |
| Prepayments to property agencies | 0% | - As the Group would cease its business of sale of properties upon liquidation, it would fail to continue to perform the contractual obligations and might become liable of contractual claims, it is expected that these prepayments would have no recovery value |
| Deposits for acquisition of equity investments | 10% | - It includes deposits paid for acquisition of equity investments<br>- No information on whether the relevant contracts are assignable or whether the deposits are refundable. The Group would not continue to perform the share acquisition agreements under a liquidation scenario. It is assumed that these deposits would not be recoverable |

© 2023. For information, contact Deloitte China.

# Key Assumptions

## Asset-specific Assumptions

The table below sets out assumptions on each key line item of assets under a liquidation scenario, based on discussions with the management of the Group and having regard to experience from previous liquidations:

| Assets | Estimated Realisation Rate | Remarks |
|---|---|---|
| Other deposits | 10% | - These represent mainly rental deposit and deposits paid to relevant government authorities in respect of real estate development<br>- The Group would cease its business of real estate development upon liquidation, it is expected that deposits paid to relevant government authorities for real estate development would not be returned<br>- Rental deposits might be forfeited for early termination of rental agreements upon liquidation |
| Other receivables from third parties | Various | - Receivables from Hengten Networks (including the receivables from the disposal of the Group's interest in Hengten Networks) and other receivables in relation to financing provided to individual home purchasers in Hong Kong are assumed to be fully recoverable<br>- Certain other receivables represented pre-sale proceeds and government relief loan proceeds which are kept in escrow accounts in the name of non-Group entities. These other receivables are cash in nature and are assumed to be fully recoverable<br>- For the remaining other receivables from third parties, estimated realization on NBV would depend on aging<br>  - Within 1 year: 20%<br>  - 1-2 years: 10%<br>  - Over 2 years: 0% |
| Intercompany receivables | Various | - Including accounts receivable/ payable, bills receivable/ payable, prepayments, deposits, interests and dividends<br>- From Subject Entities: estimated recovery rate of unsecured claims of the respective Group debtor<br>- Out-scope Entities: 5% |

© 2023. For information, contact Deloitte China.

# Key Assumptions

## Asset-specific Assumptions

The table below sets out assumptions on each key line item of assets under a liquidation scenario, based on discussions with the management of the Group and having regard to experience from previous liquidations:

| Assets | Estimated Realisation Rate | Remarks |
|---|---|---|
| Investments in joint ventures | 10% | - Investments in joint ventures are recognized at cost and adjusted thereafter for the Group's share of post-acquisition profits or losses.<br>- Joint ventures are mainly engaged in real estate development. With the Group being put into liquidation, it is expected that the Group would no longer fund the joint ventures. Unless the joint ventures have sufficient assets or the joint venture partners agree to provide funding (which might dilute the Group's interests in joint ventures), it is likely that the joint ventures would need to be liquidated. Given the current real estate market condition in the PRC, it is unlikely that the joint ventures would realize sufficient assets to repay liabilities and have surplus assets for distribution to the Group in the event of liquidation. After considering the above, it is assumed that only 10% of NBV would be realized. |
| Investment properties in PRC | Various | - Investment properties of Subject Entities consist of offices and shopping malls in the PRC held for rental and capital appreciation<br>- They are recorded at fair value which represent market value based on independent valuation determined at each reporting date, i.e. 31 December 2022.<br>- Various recovery rates, depending on the location of the property, are applied to the fair value of investment properties as estimated by the management of the Group,<br>  - 1st tier cities: 55%<br>  - 2nd tier cities: 35%<br>  - 3rd tier cities: 25%<br>  - Below 3rd tier cities: 15% |
| Land use rights | 30% | - NBV representing costs of acquiring the rights to use certain land for self-use buildings/ properties |
| Other intangible assets | 20% | - Mainly represents capitalized research and development costs, and patent/ proprietary technology rights of Evergrande Auto |

© 2023. For information, contact Deloitte China.

# Key Assumptions

## Asset-specific Assumptions

The table below sets out assumptions on each key line item of assets under a liquidation scenario, based on discussions with the management of the Group and having regard to experience from previous liquidations:

| Assets | Estimated Realisation Rate | Remarks |
|---|---|---|
| Inventories of PRC real estate projects (including PHS and PUD) | Various | - Various recovery rates, depending on the location of the projects, are applied to (i) the net realizable value of real estate projects as estimated by the management of the Group; (ii) independent valuation on the fair value of the PHS or PUD; or (iii) net book value of PHS or PUD if (i) and (ii) are not available<br>  - 1st tier cities: 60%<br>  - 2nd tier cities: 40%<br>  - 3rd tier cities: 30%<br>  - Below 3rd tier cities: 20%<br>- Net realizable value of a real estate project is estimated by the management of the Group based on<br>  (i) estimated sales proceeds = area available for sale (based on revenue recognition policies) multiplied by sqm market price of comparable developments (independent valuation were performed on the average selling price of certain projects)<br>  Less:<br>  (ii) Unpaid land cost and construction costs<br>  (iii) Costs to complete construction (i.e. total construction contract value x management estimate on % of incomplete portion x 10-15% buffer on cost adjustments)<br>  (iii) Estimated tax expenses<br>  (iv) Estimated selling and administrative expenses<br>- Without any independent valuation on the Group's PHS and PUD, we consider the net realizable value of a project could be an alternative estimate of the fair value of the PHS/PUD as the net realizable value represents approximate value of what willing buyers would pay for an incomplete project, i.e. estimated sales proceeds less estimated costs to completion (which reflect the status of completion) |
| Inventories of Hong Kong real estate projects (PHS) | 80% | - NBV |
| Inventories of Evergrande Auto Group | 10% | - NBV |

© 2023. For information, contact Deloitte China.

# Illustration of Payment Waterfall of a PRC Company

## 1. PRC Real Estate Projects Specific Waterfall – Super Priority Claims and Encumbered Assets

Deficiencies will be treated as unsecured claims

Deficiencies will be treated as unsecured claims

Deficiencies will be treated as unsecured claims of the borrower

| | | |
|---|---|---|
| 1st | Pre-sale proceeds restricted accounts | |
| 2nd | Unpledged deposits | |
| 3rd | PUD & PHS (secured & unsecured) | |

Pre-sale proceeds (assumed criteria for classifying as priority claims being satisfied)

Surplus PUD & PHS (after pre-sale proceeds)

Properties of PPE (secured & unsecured)

CIP (secured & unsecured)

Priority Construction Payables

## 2. Secured Liabilities

Surplus of secured PUD, PHS, Properties and CIP (after pre-sale proceeds & priority construction payables)

Guaranteed deposits & other secured assets

Secured liabilities

Surplus of Encumbered Assets (secured)

Surplus of Encumbered Assets (unsecured)

Surplus of secured assets

## 3. Unsecured Liabilities

**Unsecured Assets**

Surplus of unsecured Encumbered Assets (after pre-sale proceeds & construction payables)

Surplus of secured assets

General unsecured assets

Intercompany receivables

Return from investment in solvent subsidiaries

**Preferential Claims**

Liquidation costs

Government Relief Loans (unsecured)

Employees claims

Tax payables

*Iterative distribution process through matrices of intercompany balances, dividends & shareholding*

**Unsecured Claims**

General unsecured claims

Guarantee claims (full except Type 1 Guarantee)

Deficiencies of priority claims

Intercompany Payables

Dividend Payables

Residual to shareholders (if the entity is solvent)

### Legend

| | |
|---|---|
| | Distribution |
| | Source of distribution |
| | Deficiencies |
| | Intercompany related |
| | Proceeds from realization of Encumbered Assets |
| | Proceeds from asset realization |
| | Liabilities |
| | Surplus net of priority claims |
| | Deficiency claims |

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

31

# Illustration of Payment Waterfall of an Offshore Entity

**1. Secured Liabilities**

**2. Unsecured Liabilities**

Deficiencies will be treated as unsecured claims of the borrower

**Unsecured Claims**

- General unsecured claims
- Guarantee claims (full except Type 1 Guarantee) and put option obligation (deficiency)
- Deficiencies of secured claims
- Intercompany Payables
- Dividend Payables
- Residual to shareholders (if the entity is solvent)

**Preferential Claims**

- Liquidation costs
- Employees claims
- Tax payables

*Iterative distribution process through matrices of intercompany balances, dividends & shareholding*

**Unsecured Assets**

- Surplus of secured assets
- General unsecured assets
- Intercompany receivables
- Return from investment in solvent subsidiaries

Secured liabilities

Surplus of secured assets

Secured assets

**Legend:**
- Distribution
- Source of distribution
- Deficiencies
- Intercompany related
- Proceeds from asset realization
- Liabilities
- Surplus net of priority claims
- Deficiency claims

China Evergrande Group | Liquidation Analysis Report    32

© 2023. For information, contact Deloitte China.

# Estimated Liquidation Analysis for CEG

| RMB in million | Adjusted NBV as at 31 Dec 2022 | ERV | Average realization rate |
|---|---|---|---|
| **Unencumbered current assets:** | | | |
| Cash and cash equivalents | 7 | 7 | 100% |
| Dividends receivable | 59,080 | 3,277 | 6% |
| Other receivables and prepayment (including receivables from Out-scope Entities) | 6,787 | 264 | 4% |
| Intercompany receivables from Subject Entities | 106,486 | 3,600 | 3% |
| Distribution from CEG in excess of guaranteed liabilities | - | 21 | |
| **Total unencumbered current assets** | 172,360 | 7,169 | |
| | | | |
| **Unencumbered non-current assets:** | | | |
| Long-term equity investments | 4,727 | - | - |
| Fixed assets | 1 | 0 | 20% |
| **Total unencumbered non-current assets** | 4,728 | 0 | |
| | | | |
| **Total unencumbered assets** | 177,088 | 7,169 | |
| | | | |
| **Preferential claims** | | | |
| 1.Liquidation costs | | (358) | |
| 2.Employee claims | | (4) | |
| 3.Tax payables | | - | |
| **Estimated surplus available for unsecured claims** | | 6,807 | |
| | | | |
| Unsecured interest-bearing liabilities | | - | |
| Intercompany payables to Subject Entities | | (83,380) | |
| Other liabilities | | (1,828) | |
| Deficiencies of secured claims & put option obligations | | (135,134) | |
| *Secured liabilities/put option obligations* | | (135,542) | |
| *-Less recoveries from secured assets/unreturned security under put options* | | 408 | |
| **Total liabilities, excluding dividend payables** | | (220,342) | |
| | | | |
| Contingent liabilities- *Guarantees* | | (81,336) | |
| **Total obligations, excluding dividend payables** | | (301,678) | |
| | | | |
| **Estimated recovery rate of CEG's unsecured creditors** | | 2.26% | |

| Estimated Recoveries of CEG Existing Notes | Estimated distribution to noteholders (RMB in million) |
|---|---|
| From CEG  (estimated recovery of unsecured claims of CEG) | 2,523 |
| | |
| **From Guarantors** | |
| ANJI (BVI) Limited安基(BVI)有限公司 | 556 |
| Jiajian (BVI) Limited嘉建(BVI)有限公司 | 453 |
| Billion Mark Limited | 90 |
| YITONG (BVI) Limited亿通(BVI)有限公司 | 69 |
| FENGYU (BVI) Limited丰域(BVI)有限公司 | 23 |
| Others | 21 |
| | 1,212 |
| | |
| From share pledge | - |
| | |
| **Total estimated distribution** | 3,735 |
| | |
| **Total CEG Existing Notes** | 111,904 |
| | |
| **Estimated recovery rate under the CEG Existing Notes** | 3.34% |

**Estimated recovery rate for CEG Existing Notes at CEG and all Obligors**    3.34%

Notes: Figures above are subject to rounding. NBV, ERV and average realization rate that are less than RMB1m / 1% may be illustrated as "0"/ "0%". The use of "-" will be present to illustrate no monetary amount.

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

# Estimated Liquidation Analysis for SJ

| RMB in million | Adjusted NBV as at 31 Dec 2022 | ERV | Average realization rate | Estimated Recoveries of SJ Existing Notes | Estimated distribution to noteholders (RMB in million) |
|---|---|---|---|---|---|
| Unencumbered current assets: | | | | | |
| Intercompany receivables from Subject Entities | 25,780 | 734 | 3% | From SJ (estimated recovery from unsecured claims of SJ) | 69 |
| Total unencumbered current assets | 25,780 | 734 | | | |
| | | | | | |
| Total unencumbered assets | 25,780 | 734 | | | |
| | | | | From Guarantors | |
| | | | | Shengyu (BVI) Limited盛誉(BVI)有限公司 | 1,38? |
| | | | | Tianji 天机 | 989 |
| | | | | Win Peak Group Limited卿峰集团有限公司 | 544 |
| | | | | Marche Limited丽英富华镇银行有限公司 | 35? |
| Preferential claims | | | | Shengtong Holding Limited盛通控股有限公司 | 11 |
| 1.Liquidation costs | (37) | | | Ever Grace Group Limited恒惠集团有限公司 | 11? |
| 2.Employee claims | - | | | Joy Wealthy Investment Limited悦才投资有限公司 | 10? |
| 3.Tax payables | - | | | South Honest Limited诚南有限公司 | 9? |
| Estimated surplus available for unsecured claims | 697 | | | Spread Glory Investments Limited广兆投资有限公司 | 9? |
| | | | | Rise Eagle Worldwide Limited辰鹰环球有限公司 | 7? |
| | | | | Others 其他 | |
| | | | | | |
| Unsecured interest-bearing liabilities | (42,994) | | | Total estimated distribution from SJ and guarantors | 4? |
| Intercompany payables to Subject Entities | - | | | From Keepwell Provider: Hengda Real Estate | 67? |
| Other liabilities | - | | | | |
| Deficiencies of secured claims | - | | | Total estimated distribution (assuming keepwell was valid) | 7,18? |
| Total liabilities | (42,994) | | | Total SJ Existing Notes | 42,994 |
| | | | | | |
| Contingent liabilities | - | | | Estimated recovery rate under the SJ Existing Notes (assuming keepwell was invalid) | 12.37% |
| | | | | | |
| Total obligations | (42,994) | | | Estimated recovery rate under the SJ Existing Notes (assuming keepwell was valid) | 16.71% |

| | | | |
|---|---|---|---|
| Estimated recovery rate of SJ's unsecured creditors | | | 1.62% |

| | | | |
|---|---|---|---|
| Estimated recovery rate for SJ Existing Notes at SJ and all Obligors (assuming keepwell was invalid) | | | 12.37% |

| | | | |
|---|---|---|---|
| Estimated recovery rate for SJ Existing Notes at SJ and all Obligors (assuming keepwell was valid) | | | 16.71% |

Notes: Figures above are subject to rounding. NBV, ERV and average realization rate that are less than RMB1m / 1% may be illustrated as "0"/ "0%". The use of "-" will be present to illustrate no monetary amount.

© 2023. For information, contact Deloitte China.

# Estimated Liquidation Analysis for Tianji

| RMB in million | Adjusted NBV as at 31 Dec 2022 | ERV | Average realization rate |
|---|---|---|---|
| **Unencumbered current assets:** | | | |
| Cash and cash equivalents | 4 | 4 | 100% |
| Accounts receivable | 21 | 6 | 30% |
| Prepayment | 120 | - | - |
| Other receivables (including receivables from Out-scope Entities) | 3,870 | 826 | 21% |
| Intercompany receivables from Subject Entities | 97,493 | 3,234 | 3% |
| Distribution by Tianji in excess of guaranteed liabilities | - | 2 | |
| **Total unencumbered current assets** | 101,508 | 4,072 | |
| | | | |
| **Unencumbered non-current assets:** | | | |
| Long-term equity investment | 2,862 | - | - |
| **Total unencumbered non-current assets** | 2,862 | - | |
| | | | |
| **Total unencumbered assets** | 104,370 | 4,072 | |
| | | | |
| **Preferential claims** | | | |
| 1.Liquidation costs | | (204) | |
| 2.Employee claims | | - | |
| 3.Tax payables | | - | |
| **Estimated surplus available for unsecured claims** | | 3,868 | |
| | | | |
| Unsecured interest-bearing liabilities | | - | |
| Intercompany payables to Subject Entities | | (109,884) | |
| Other liabilities | | (1,986) | |
| Deficiencies of secured claims/ put option obligations | | (10,355) | |
| *Secured liabilities/ put option obligations* | | (11,158) | |
| *Less recoveries from secured assets/ unreturned security under put options* | | 803 | |
| **Total liabilities** | | (122,225) | |
| | | | |
| Contingent liabilities-*Guarantees* | | (45,121) | |
| **Total obligations** | | (167,346) | |
| | | | |
| **Estimated recovery rate of Tianji's unsecured creditors** | | 2.31% | |

Notes: Figures above are subject to rounding. NBV, ERV and average realization rate that are less than RMB1m/ 1% may be illustrated as "0"/ "0%". The use of "-" will be present to illustrate no monetary amount.

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

# Estimated Liquidation Analysis for Hengda Real Estate

| RMB in million | Adjusted NBV as at 31 Dec 2022 | ERV | Average realization rate |
|---|---|---|---|
| **Unencumbered current assets:** | | | |
| Cash and cash equivalents | 1,073 | 1,073 | 100% |
| Financial assets held for trading | 138 | 28 | 20% |
| Accounts receivable, prepayment and other receivables (including receivables from Out-scope Entities) | 37,773 | 2,300 | 6% |
| Dividends receivable | 74,159 | 349 | 0% |
| Intercompany receivables from Subject Entities | 258,744 | 25,375 | 10% |
| Distribution by Hengda Real Estate in excess of guaranteed liabilities | - | 474 | |
| **Total unencumbered current assets** | 371,887 | 29,599 | |
| | | | |
| **Unencumbered non-current assets:** | | | |
| Debt investments and equity investments | 471 | 94 | 20% |
| Long-term equity investments | 105,284 | 355 | 0% |
| PUD, PHS, PPE and CIP | 2,021 | 565 | 28% |
| IP, intangible asset and others | 1,545 | 826 | 53% |
| Surplus of secured assets | - | 1,870 | |
| **Total unencumbered non-current assets** | 109,321 | 3,710 | |
| | | | |
| **Total unencumbered assets** | 481,208 | 33,309 | |
| | | | |
| **Preferential claims** | | | |
| 1.Bankruptcy expenses | (266) | | |
| 2.Employee claims | (74) | | |
| 3.Tax payables | (1,165) | | |
| **Estimated surplus available for unsecured claims** | 31,804 | | |
| | | | |
| Unsecured interest-bearing liabilities | (49,737) | | |
| Intercompany payables to Subject Entities | (149,401) | | |
| Other liabilities | (125,410) | | |
| Deficiencies of secured claims | (18,480) | | |
| *Secured liabilities* | (19,865) | | |
| *Less recoveries from secured assets* | 1,385 | | |
| **Total liabilities, excluding dividend payables** | (343,028) | | |

| RMB in million | NBV as at 31 Dec 2022 | ERV | Average realization rate |
|---|---|---|---|
| **Contingent liabilities** | | | |
| Full guarantees | (389,191) | (344,147) | |
| *Keepwell Deed* | | (45,044) | |
| **Total obligations, excluding dividend payables** | | (732,219) | |
| | | | |
| Estimated recovery rate of Hengda Real Estate's unsecured creditors | | 4.34% | |

Notes: Figures above are subject to rounding. NBV, ERV and average realization rate that are less than RMB1m / 1% may be illustrated as "0" / "0%". The use of "-" will be present to illustrate no monetary amount.

© 2023. For information, contact Deloitte China.

# Major Offshore Assets as at 31 December 2022

Unsecured

\* Obligors

| Category | Details | Owner | NBV RMB million | ERV RMB million | Assumption for estimating ERV (please refer to pages 26-30) |
|---|---|---|---|---|---|
| Financial assets – listed equity investments | China Evergrande New Energy Vehicle Group Ltd. (708.HK) | Evergrande Health Industry Holdings Limited | 17,778.8 (closing price before suspension of trading) | Nil | Estimated return to shareholders of 708 Group based on this Liquidation Analysis |
| | | China Evergrande Group* | 367.0 (closing price before suspension of trading) | Nil | |
| | | **708 Sub-total:** | **18,145.8** | **Nil** | |
| | Evergrande Property Services Group Limited (6666.HK) | China Evergrande Group* | 425.6 (closing price before suspension of trading) | Nil | Estimated return to shareholders of 6666 Group based on this Liquidation Analysis |
| | | CEG Holdings (BVI) Limited | 11,060.0 (closing price before suspension of trading) | Nil | |
| | | **6666 Sub-total:** | **11,485.6** | **Nil** | |
| | Bank of Jinzhou Co., Ltd. (416.HK) | New Chic Global Limited* | 46.0 (market value based on Closing price) | 36.8 | 80% of market value as of 31 December 2022 |
| | Faraday Future Intelligent Electric Inc. (FFIE. NASDAQ) | Season Smart Limited | 134.3 (market value based on Closing price) | 107.4 | |
| | E-House (China) Enterprise Holdings Limited (2048.HK) | Jovial Idea Developments Limited | 96.6 (market value based on Closing price) | 77.3 | |
| | | **Listed equity investments sub-total:** | **29,908.3** | **221.5** | |

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

37

# Major Offshore Assets as at 31 December 2022
Unsecured

* Obligors

| Category | Details | Owner | NBV RMB million | ERV RMB million | Assumption for estimating ERV (please refer to pages 26-30) |
|---|---|---|---|---|---|
| Financial assets – unlisted equity investments | Seekers Partners Limited (formerly known as Satinu Resources Group Ltd.) | Jiajian (BVI) Limited* | 1,285.1 | 257.0 | 20% of NBV |
| | Cordoba Homes Limited | Greet Delight Limited | 2,598.3 | 519.7 | 20% of NBV |
| | Unlisted equity investments Sub-total: | | 3,883.4 | 776.7 | |
| Financial assets – unlisted funds investment | Pacific Venture Opportunity Fund I,L.P. | Jiajian (BVI) Limited* | 306.8 | 245.5 | 80% of NBV |
| Loans & proceeds from disposal of HengTen Networks Group Limited (136.HK) | Hengten Networks Group Limited | | 1,698.6 | 1,698.6 | |
| | Pumpkin Films Limited | Solution Key Holdings Limited | 1,452.1 | 1,452.1 | Fully recoverable based on discussion with the management |
| | Ocean Fund SPC-Lakers Fund SP | | 485.3 | 485.3 | |
| | HengTen Network related Sub-total: | | 3,636.0 | 3,636.0 | |
| Other Receivables | Yingjia International Properties Limited | State Hero Holdings Limited | 4,466.4 | 446.6 | 10% of NBV (aging within 1-2 years) |
| | Victoria Fortune Group (China) Investment Limited | | 1,786.5 | 178.7 | |
| | Other receivables Sub-total: | | 6,252.9 | 625.3 | |

# Major Offshore Assets as at 31 December 2022

Unsecured

* Obligors

| Category | Details | Owner | NBV RMB million | ERV RMB million | Assumption for estimating ERV (please refer to pages 26-30) |
|---|---|---|---|---|---|
| **Property project – Emerald Bay** | Investment costs in OCI Investment Fund SPC | Tianji Holding Limited* | 855.8 | Nil | Estimated residual value based on the Liquidation Analysis |
| | Due from Fortune Choice Development Limited (project company) | Tianji Holding Limited* | 359.2 | 226.3 | Estimated recovery to unsecured creditors of Fortune Choice based on the Liquidation Analysis. |
| | Due from Fortune Choice Development Limited (project company) | Profit Concept Finance Limited* | 152.7 | 96.2 | |
| | Due from OCI Investment Fund SPC | All Peace Investments Limited* | 929.0 | Nil | Estimated recovery based on the Liquidation Analysis |
| | Emerald Bay related Sub-total: | | 2,296.7 | 322.5 | |
| **Other receivables in Property projects - Emerald Bay & The Vertex** | Other receivables in relation to financing provided to individual home purchasers (业主款) | Profit Concept Finance Limited* | 259.2 | 259.2 | Fully recoverable based on discussion with the management |
| **Others** | Art collections | Butterfly Hop Holdings Limited | 405.2 | 81.0 | 20% of NBV |
| | Total: | | 46,948.5 | 6,167.7 | |

China Evergrande Group | Liquidation Analysis Report

39

© 2023. For information, contact Deloitte China.

# Major Offshore Assets as at 31 December 2022
## Secured

* Obligors

| Category | Details | Owner | NBV RMB million | ERV RMB million | Assumption (page refer to pages 26-30) |
|---|---|---|---|---|---|
| **Financial assets – listed equity investments** | China Bohai Bank Co., Ltd. (9668.HK) | New Chic Global Limited* | 49.8 (market value based on closing price) | 39.9 | 80% of market value as of 31 Dec 2022 |
| | Evergrande Property Services Group Limited (6666.HK) | New Chic Global Limited* | 24.6 (closing price before suspension of trading) | Nil | Estimated return to shareholders of 6666 Group based on the Liquidation Analysis |
| | | State Charm Holdings Limited[1] | 410.9 (closing price before suspension of trading) | Nil | |
| | | Eagleville Holdings Limited[2] | 308.2 (closing price before suspension of trading) | Nil | |
| | | Empire Choice Investments Limited[3] | 719.2 (closing price before suspension of trading) | Nil | |
| | | **Listed equity investments Sub-total:** | **1,512.7** | **39.9** | |
| **YF Life Centre (formerly known as China Evergrande Center)** | Investment property located at Wanchai, Hong Kong | Pioneer Time Investment Limited*# | **5,506.5** | **3,303.9** | 60% of NBV |
| | | **Total:** | **7,019.2** | **3,343.8** | |

Notes:
1. State Charm Holdings Limited ceased to be a member of the Group and an obligor following the transfer of shares in State Charm in connection with CEG Loan 2 during 2022.
2. Eagleville Holdings Limited ceased to be a member of the Group and an obligor following the transfer of shares in Eagleville in connection with the Clear Star Put Option during 2022.
3. Empire Choice Investments Limited ceased to be a member of the Group and an obligor following the transfer of shares in Empire Choice in connection with CEG Loan 1 during 2022.

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

40

# Limitations

**Limited scope analysis**

- Given the size of the Group and availability of information, it was agreed that the Liquidation Analysis would cover Subject Entities which represent possible material recovery (intercompany balances/ equity) to the Obligors.

- Without information on the financial position of the Out-scope Entities and without an analysis of the estimated realizations of their assets in the event of liquidation, the Liquidation Analysis assumes that there is nil recovery from equity investments in Out-scope Entities and there is 5% recovery from receivables due from Out-scope Entities. Should the financial positions of the Out-scope entities be individually considered, the estimated return to creditors might change.

**Accuracy and completeness of information**

- We relied heavily upon the accuracy, validity and completeness of the financial and other information provided to us by the Company, its staff and advisors. We have not sought to audit or independently verify the information provided to us. Where information has been provided to us, we have assumed that it is accurate and current.

- In particular, known liabilities are assumed to be properly recorded and guarantees are properly identified. The actual claims and debts admitted in liquidation proceedings could be different from those adopted in the Liquidation Analysis.

- Balance sheets of certain Subject Entities are not available due to enforcement action by creditors (including appointment of receivers).

**Subsequent events are not considered**

- Events after 31 December 2022 were not considered, except for those set out in Appendix 3.
- Interest and default interest were accrued up to 31 December 2022.
- Returns to creditors might change if account is taken of the above.

**Audit and consolidation adjustments**

- The Liquidation Analysis has been conducted on an entity-by-entity basis, i.e. based on standalone balance sheets of Subject Entities.

- We noted that certain audit adjustments and consolidation adjustments were made to the figures for assets and liabilities of the Group recorded in the books. In this Liquidation Analysis, we have taken account of audit adjustments and consolidation adjustments that were provided to us on or before 4 July 2023 and if (i) the adjustment can be attributed to the entity-level balance sheet based on discussions with the Auditor; and (ii) impacts of the adjustment on the assets or the liabilities of the Group is larger than the threshold of RMB1b.

- Should account be taken of all the audit adjustments and consolidation adjustments included in the published audited consolidated financial statements of the Group, the recoveries to creditors may change.

**Use of estimates and assumptions**

- This Liquidation Analysis involved extensive use of estimates and assumptions, which are inherently subject to uncertainties and contingencies beyond the control of the Company, its management and advisors. As a result, the actual recovery from the liquidation could be materially different from the estimated recovery set forth in the liquidation scenario.

**Intercompany balances**

- Differences in intercompany balances were noted and we sought further clarification from the Company on discrepancies in intercompany balances between Subject Entities (of RMB1b and above). There remained unreconciled differences which were adjusted as set out in detail in the Key Assumptions, for the purpose of the Liquidation Analysis.

- Should the difference be fully reconciled by the Company, there could be changes in the assets and liabilities of Subject Entities, and ultimately the expected returns to creditors.

© 2023. For information, contact Deloitte China.

# Limitations

### Valuation

- We were not provided with independent valuations of the forced-sale values of all properties (including PHS and PUD) and investments, which are the major assets of the Group.

- We understand from the management that independent valuations were performed in respect of certain properties (including IPs, PHS and PUD) of Subject Entities. We have not received the relevant valuation reports as of the Cut-off Date and we have relied on certain valuation schedules provided by the management of the Group containing information on the fair value as assessed by independent valuers.

- For properties (including PHS and PUD) for which independent valuations were not available, we have relied on management estimates of the forced-sale value of properties. Results of the Liquidation Analysis in respect of these properties may be different if independent valuations on forced-sale values were available.

### Remittance of funds from the PRC

- We have assumed that all proceeds (if any) generated from realisation of assets of the Group including intercompany balances can be remitted to creditors outside PRC under a liquidation scenario. Should the assumption be invalid, the estimated recoveries may be higher than those which would actually be received.

### Taking possession and realization of assets

- A majority of the Group's fixed assets are located in the PRC. Experience suggests that in the event of a liquidation, it may take extra time and effort to effect the transfer of assets located in the PRC and complications may arise in transferring the title of assets in PRC, and effort to transfer assets located in the PRC may or may not be successful.

### Security provided by third parties

- Due to unavailability of information, the Liquidation Analysis has not taken account of possible recoveries from realization of security granted in respect of indebtedness of Subject Entities by parties outside the Group.

- Expected return to creditors could increase if realizable values of the security provided by third parties were included in the analysis.

### Tax issues

- It is assumed that all proposed disposal of fixed assets of the Group and distribution are not subject to payment of any taxes; however, in certain cases, disposal and distribution may give rise to tax liability. If tax liability should arise, expected return to the creditors would decrease.

### Contingent liabilities

- Given the scope of our work has been limited by the information made available to us, we have not taken account of any other contingent liabilities of the Group, save for the known corporate guarantees on borrowings and put option obligations

### Guarantee claims

- Please refer to the section "General Assumptions" for treatment of guarantee.

© 2023. For information, contact Deloitte China.

# Appendix 1 – List of Subject Entities

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|---|---|---|---|
| 1 | Forbidden City Culture Co., Limited紫禁城景弘华文化有限公司 | Offshore | 3333 Group |
| 2 | EVER SURE INDUSTRIES LIMITED永固实业有限公司 | Offshore | 3333 Group |
| 3 | China Evergrande Group中国恒大集团 | Offshore | 3333 Group |
| 4 | ANJI (BVI) Limited安基(BVI)有限公司 | Offshore | 3333 Group |
| 5 | Shengjian (BVI) Limited盛建(BVI)有限公司 | Offshore | 3333 Group |
| 6 | SUCCESS WILL GROUP LIMITED璀立集团有限公司 | Offshore | 6666 Group |
| 7 | Shenyu (BVI) Limited盛誉(BVI)有限公司 | Offshore | 3333 Group |
| 8 | Jiajian (BVI) Limited嘉建(BVI)有限公司 | Offshore | 3333 Group |
| 9 | FENGYU (BVI) Limited丰域(BVI)有限公司 | Offshore | 3333 Group |
| 10 | YITONG (BVI) Limited亿通(BVI)有限公司 | Offshore | 3333 Group |
| 11 | LANBOWAN (BVI) Limited兰博湾(BVI)有限公司 | Offshore | 3333 Group |
| 12 | CHUANGFENG (BVI) Limited创丰(BVI)有限公司 | Offshore | 3333 Group |
| 13 | ACELIN GLOBAL LIMITED | Offshore | 3333 Group |
| 14 | GLOBAL POWER LIMITED | Offshore | 3333 Group |
| 15 | NEW CHIC GLOBAL LIMITED | Offshore | 3333 Group |
| 16 | WEILY GOLD LIMITED世鑫有限公司 | Offshore | 3333 Group |
| 17 | Shengtong (BVI) Limited盛通(BVI)有限公司 | Offshore | 3333 Group |
| 18 | Universal Star Global Limited | Offshore | 3333 Group |
| 19 | Peace Top Limited | Offshore | 3333 Group |
| 20 | Solution Key Holdings Limited | Offshore | 3333 Group |
| 21 | Shengteng Holding Limited盛腾控股有限公司 | Offshore | 3333 Group |
| 22 | Evergrande Health Industry Holdings Limited恒大健康产业集团有限公司 | Offshore | 0708 Group |
| 23 | 中国恒大新能源汽车集团有限公司 | Offshore | 0708 Group |
| 24 | Tianji Holding Limited天基控股有限公司 | Offshore | 3333 Group |
| 25 | XING HONG HOLDINGS LIMITED兴鸿控股有限公司 | Offshore | 3333 Group |
| 26 | ROSY DYNASTY LIMITED盛朝有限公司 | Offshore | 3333 Group |
| 27 | Starthigh International limited高原国际有限公司 | Offshore | 3333 Group |
| 28 | Lucky Benefit Limited | Offshore | 3333 Group |
| 29 | Loyal Power Investments Limited旺权投资有限公司 | Offshore | 3333 Group |
| 30 | Rising Sheen Limited升亮有限公司 | Offshore | 3333 Group |
| 31 | City Faith Limited都信有限公司 | Offshore | 3333 Group |
| 32 | South Honest Limited诚南有限公司 | Offshore | 3333 Group |
| 33 | EVER GRACE GROUP LIMITED恒霈集团有限公司 | Offshore | 3333 Group |
| 34 | MINSIN INTERNATIONAL (HOLDINGS) LIMITED明诚国际(集团)有限公司 | Offshore | 3333 Group |
| 35 | Merry Full Investments Limited怡满投资有限公司 | Offshore | 3333 Group |
| 36 | Million Castle Investments Limited | Offshore | 3333 Group |
| 37 | Accord Sino Group Limited协华集团有限公司 | Offshore | 3333 Group |
| 38 | Benefit East Investments Limited益东投资有限公司 | Offshore | 3333 Group |
| 39 | Champion Globe Limited优天有限公司 | Offshore | 3333 Group |
| 40 | Champion King Investments Limited必康投资有限公司 | Offshore | 3333 Group |
| 41 | Champion Glory Holdings Limited必康控股有限公司 | Offshore | 3333 Group |
| 42 | LUCKYUP GROUP LIMITED昇祥集团有限公司 | Offshore | 3333 Group |
| 43 | First Key Investments Limited元基投资有限公司 | Offshore | 3333 Group |
| 44 | Pioneer Time Investment Limited | Offshore | 3333 Group |
| 45 | GREAT COURAGE GLOBAL LIMITED | Offshore | 3333 Group |
| 46 | CHARM WEALTH ASIA PACIFIC LIMITED宝曜亚太有限公司 | Offshore | 3333 Group |
| 47 | INVESTOR NETWORK GLOBAL LIMITED | Offshore | 3333 Group |
| 48 | FAST TALENT INVESTMENT LIMITED迅杰投资有限公司 | Offshore | 3333 Group |
| 49 | EVER GLORY HOLDINGS LIMITED好耀控股有限公司 | Offshore | 3333 Group |
| 50 | Butterfly Hop Holdings Limited | Offshore | 3333 Group |
| 51 | Dragon Joy (China) Limited龙悦（中国）有限公司 | Offshore | 3333 Group |
| 52 | White Heron Limited | Offshore | 3333 Group |
| 53 | Superb Capital Enterprises Limited | Offshore | 3333 Group |
| 54 | Dragon Fortune Ltd. | Offshore | 3333 Group |
| 55 | Palm Island Resort Limited棕榈岛度假村有限公司 | Offshore | 3333 Group |
| 56 | Lucky Goo Holdings Limited智谷控股有限公司 | Offshore | 3333 Group |
| 57 | FORTUNE LUCK CORPORATION LIMITED鸿利有限公司 | Offshore | 3333 Group |
| 58 | SHUI WAH INVESTMENT LIMITED瑞华投资有限公司 | Offshore | 3333 Group |
| 59 | WISDOM GAIN GROUP LIMITED智盈集团有限公司 | Offshore | 3333 Group |
| 60 | GROW RISING INVESTMENT LIMITED晋廷投资有限公司 | Offshore | 3333 Group |

Obligor

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group | No. | Company name | On/Offshore | Group *(Obligor)* |
|---|---|---|---|---|---|---|---|
| 61 | Marche Limited恒溙嘉华集团有限公司 | Offshore | 3333 Group | 91 | Sharp Goal Investments Limited铠怡投资有限公司 | Offshore | 3333 Group |
| 62 | Baojun Limited保骏有限公司 | Offshore | 3333 Group | 92 | On Lucky Holdings Limited安利运控股有限公司 | Offshore | 3333 Group |
| 63 | Perfect Vantage Investments Limited万冠投资有限公司 | Offshore | 3333 Group | 93 | Pacific Plus Enterprises Limited汇太企业有限公司 | Offshore | 3333 Group |
| 64 | Ace Score Holdings Limited | Offshore | 3333 Group | 94 | Silver Opportunity Investment Limited银机投资有限公司 | Offshore | 3333 Group |
| 65 | S.I. FengTao Properties (BVI) Limited上奕丰溙霸业(BVI)有限公司 | Offshore | 3333 Group | 95 | Prime Light Holdings Limited柏火集团有限公司 | Offshore | 3333 Group |
| 66 | S.I. Feng Tao Properties Limited上奕丰溙霸业有限公司 | Offshore | 3333 Group | 96 | Full Hill Limited | Offshore | 3333 Group |
| 67 | Charisma City Limited | Offshore | 3333 Group | 97 | Dragon Charm Investments Limited龙创投资有限公司 | Offshore | 3333 Group |
| 68 | S.I. Feng Shun Properties (BVI) Limited上奕丰凯霸业(BVI)有限公司 | Offshore | 3333 Group | 98 | Crown Wise Investment Limited冠惠投资有限公司 | Offshore | 3333 Group |
| 69 | Jiayu Holdings Limited嘉誉控股有限公司 | Offshore | 3333 Group | 99 | Luck Fortune Holdings Limited | Offshore | 3333 Group |
| 70 | Ever Shiny International Limited | Offshore | 3333 Group | 100 | Upper East Property Holdings Company Limited上东置业控股有限公司 | Offshore | 3333 Group |
| 71 | Future Lead Enterprises Limited天华企业有限公司 | Offshore | 3333 Group | 101 | Full Jolly Investments Limited满怡投资有限公司 | Offshore | 3333 Group |
| 72 | Hinto Developments Limited | Offshore | 3333 Group | 102 | Win Harbour Investments Limited凯港投资有限公司 | Offshore | 3333 Group |
| 73 | SPREAD GLORY INVESTMENTS LIMITED广高益投资有限公司 | Offshore | 3333 Group | 103 | Joy Wealthy Investment Limited悦才发富有限公司 | Offshore | 3333 Group |
| 74 | Triumph Hero International Limited胜祖国际有限公司 | Offshore | 3333 Group | 104 | JICHENG INTERNATIONAL (HK) LIMITED积成国际(香港)有限公司 | Offshore | 3333 Group |
| 75 | Rise Eagle Worldwide Limited振鹰环球有限公司 | Offshore | 3333 Group | 105 | Billion Mark Limited | Offshore | 3333 Group |
| 76 | Jiaying Holdings Limited嘉颖控股有限公司 | Offshore | 3333 Group | 106 | Healthy Time International Limited健时国际有限公司 | Offshore | 3333 Group |
| 77 | Jiazhi Holdings Limited嘉智控股有限公司 | Offshore | 3333 Group | 107 | Oriental Fame Holdings Limited东荣控股有限公司 | Offshore | 3333 Group |
| 78 | New Insight Holdings Limited创见控股有限公司 | Offshore | 3333 Group | 108 | Goldbridge Limited | Offshore | 3333 Group |
| 79 | Easy Gain Investment Holdings Limited盈润投资控股有限公司 | Offshore | 3333 Group | 109 | Sunny Net Development Limited日讯发展有限公司 | Offshore | 3333 Group |
| 80 | Starlet Development Limited星盈发展有限公司 | Offshore | 3333 Group | 110 | Cheer Champ Investment Limited志昌投资有限公司 | Offshore | 3333 Group |
| 81 | Honor Business Investment Limited荣商投资有限公司 | Offshore | 3333 Group | 111 | Cheer Motion Development Limited致能发展有限公司 | Offshore | 3333 Group |
| 82 | Honour In Investments Limited诚然投资有限公司 | Offshore | 3333 Group | 112 | Opal House Development Limited | Offshore | 3333 Group |
| 83 | Link Care Limited环煦有限公司 | Offshore | 3333 Group | 113 | Gold Ascot Limited金土耀有限公司 | Offshore | 3333 Group |
| 84 | Grace Target Holdings Limited嘉志集团有限公司 | Offshore | 3333 Group | 114 | East Best Investments Limited乐卓投资有限公司 | Offshore | 3333 Group |
| 85 | Jiading Holdings Limited嘉鼎控股有限公司 | Offshore | 3333 Group | 115 | Trend Rich Investment Limited骏富投资有限公司 | Offshore | 3333 Group |
| 86 | Menkia Holdings Limited万家控股有限公司 | Offshore | 3333 Group | 116 | JIA SHAN HOLDINGS LIMITED嘉善控股有限公司 | Onshore | 3333 Group |
| 87 | Glory Sign Development Limited皇志荣发展有限公司 | Offshore | 3333 Group | 117 | BAI CHANG LIMITED百昌有限公司 | Onshore | 3333 Group |
| 88 | Vast Wheel Company Limited沄爾有限公司 | Offshore | 3333 Group | 118 | CENTRALSINO GLOBAL LIMITED中华环球有限公司 | Offshore | 3333 Group |
| 89 | Prosper Power Development Limited鼎晟发展有限公司 | Offshore | 3333 Group | 119 | JOVIAL IDEA DEVELOPMENTS LIMITED乐意发展有限公司 | Offshore | 3333 Group |
| 90 | Reego Group Limited悦高集团有限公司 | Offshore | 3333 Group | 120 | Billion Sino Investments Limited亿中投资有限公司 | Offshore | 3333 Group |

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|-----|--------------|-------------|-------|
| 121 | Allywing Investments Limited荣邦投资有限公司 | Offshore | 3333 Group |
| 122 | California Place Dalian Limited加州豪庭大连有限公司 | Offshore | 3333 Group |
| 123 | Win Peak Group Limited凯盛集团有限公司 | Offshore | 3333 Group |
| 124 | CHINA AGRICULTURE TECHNOLOGY LIMITED中国农业科技有限公司 | Offshore | 3333 Group |
| 125 | Dragon Pioneer Development Limited龙盎发展有限公司 | Offshore | 3333 Group |
| 126 | Goldenway Land Development Limited金道置业有限公司 | Offshore | 3333 Group |
| 127 | China Sea Group (Hong Kong) Investment Limited中海集团(香港)投资有限公司 | Offshore | 3333 Group |
| 128 | EXCEL SKY (HONG KONG) LIMITED悦天(香港)有限公司 | Offshore | 3333 Group |
| 129 | GOOD WAVE INTERNATIONAL LIMITED佳涛国际有限公司 | Offshore | 3333 Group |
| 130 | INFINITY REAL ESTATE HOLDINGS PTE | Offshore | 3333 Group |
| 131 | Fortune Ascent Property Management Limited升裕物业管理有限公司 | Offshore | 6666 Group |
| 132 | INSTANT CHOICE DEVELOPMENT LTD. | Offshore | 3333 Group |
| 133 | LUCKY UNIVERSE HOLDING LIMITED瑞宇集团有限公司 | Offshore | 3333 Group |
| 134 | SCENERY JOURNEY LIMITED景程有限公司 | Offshore | 3333 Group |
| 135 | Faith Honor Group Limited信荣集团有限公司 | Offshore | 3333 Group |
| 136 | Shiny Profit Enterprises Limited(BVI) | Offshore | 3333 Group |
| 137 | LEADING VIEW INTERNATIONAL LIMITED | Offshore | 3333 Group |
| 138 | EASE TRIUMPH INTERNATIONAL LIMITED拓业国际有限公司 | Offshore | 3333 Group |
| 139 | EV Wanchai 1 Holdings Limited | Offshore | 3333 Group |
| 140 | EV Wanchai 1 Land Holdings Limited | Offshore | 3333 Group |
| 141 | THOUSAND GRAND HOLDING LIMITED千宏控股有限公司 | Offshore | 3333 Group |
| 142 | SEASON SMART LIMITED时颖有限公司 | Offshore | 0708 Group |
| 143 | PRIME SUN HOLDING LIMITED盛日控股有限公司 | Offshore | 3333 Group |
| 144 | Evergrande New Energy Automotive Holdings  (Hong Kong)  Limited | Offshore | 0708 Group |
| 145 | Solution King Investments Limited | Offshore | 0708 Group |
| 146 | Mini Minor Limited | Offshore | 0708 Group |
| 147 | TOTAL ACCORD LIMITED展全有限公司 | Offshore | 0708 Group |
| 148 | ASSEMBLE GUARD LIMITED保汇有限公司 | Offshore | 0708 Group |
| 149 | AMPLE TREASURE HOLDING LIMITED宝生集团控股有限公司 | Offshore | 3333 Group |
| 150 | FLOURISHING FILL LIMITED股盛有限公司 | Offshore | 0708 Group |
| 151 | Kind World Corporation Limited良世有限公司 | Offshore | 0708 Group |
| 152 | GODSIB LIMITED | Offshore | 3333 Group |
| 153 | LAGUNA HEIGHTS LIMITED | Offshore | 3333 Group |
| 154 | URBAN EAGLE LIMITED | Offshore | 3333 Group |
| 155 | CHANG XING HOLDINGS LIMITED昌兴控股有限公司 | Offshore | 3333 Group |
| 156 | NOBLE BEAUTY LIMITED | Offshore | 3333 Group |
| 157 | STATE HERO HOLDINGS LIMITED | Offshore | 3333 Group |
| 158 | CHEUNGFU DEPARTMENT STORE ENTERPRISE LIMITED象富百货集团有限公司 | Offshore | 3333 Group |
| 159 | NICE DRAGON CAPITAL INVESTMENT LIMITED | Offshore | 3333 Group |
| 160 | Profit Concept Finance Limited创盈财务有限公司 | Offshore | 3333 Group |
| 161 | A476 National Electric Vehicle Sweden AB | Offshore | 0708 Group |
| 162 | AMPLE TREASURE GROUP LIMITED宝生集团有限公司 | Offshore | 3333 Group |
| 163 | All Peace Investments Limited誉通投资有限公司 | Offshore | 3333 Group |
| 164 | LUCKY UNIVERSE ENTERPRISES LIMITED瑞宇企业有限公司 | Offshore | 3333 Group |
| 165 | Greet Delight Limited迎悦有限公司 | Offshore | 3333 Group |
| 166 | PRIME SUN ENTERPRISES LIMITED盛日企业有限公司 | Offshore | 3333 Group |
| 167 | LOFTY REAP LIMITED上丰有限公司 | Offshore | 3333 Group |
| 168 | More Hero Limited添英有限公司 | Offshore | 3333 Group |
| 169 | NEW GAINS GROUP LIMITED新裕集团有限公司 | Offshore | 3333 Group |
| 170 | ALPHA BEAUTY LIMITED创美有限公司 | Offshore | 3333 Group |
| 171 | ACE PERFECTION GLOBAL LIMITED | Offshore | 708 Group |
| 172 | MEGA WISE INTERNATIONAL LIMITED | Offshore | 0708 Group |
| 173 | PROMINENT TEAM LIMITED | Offshore | 0708 Group |
| 174 | Best Wealth Investments Limited佳裕投资有限公司 | Offshore | 3333 Group |
| 175 | Rise Gain Development Limited昇益发展有限公司 | Offshore | 3333 Group |
| 176 | CEG Holdings (BVI) Limited | Offshore | 3333 Group |
| 177 | Eagle Investment (BVI) Limited | Offshore | 6666 Group |
| 178 | Knight Honour Global Limited | Offshore | 6666 Group |
| 179 | Stay Wealth Limited恒保有限公司 | Offshore | 3333 Group |
| 180 | Oceanic Hero Holdings Limited英海控股有限公司 | Offshore | 3333 Group |

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|---|---|---|---|
| 181 | Global City Development Ltd | Offshore | 3333 Group |
| 182 | Profit Point Enterprises Limited盈利企业有限公司 | Offshore | 3333 Group |
| 183 | Flying Bloom Investments Limited飞腾投资有限公司 | Offshore | 3333 Group |
| 184 | Evergrande Property Services Group Limited | Offshore | 6666 Group |
| 185 | CITY EXPERT LIMITED城博有限公司 | Offshore | 3333 Group |
| 186 | CAPTAIN CHEER LIMITED | Offshore | 3333 Group |
| 187 | KEY ALLIANCE INVESTMENTS LIMITED建冕联盟投资有限公司 | Offshore | 3333 Group |
| 188 | Rainbow Ever Limited | Offshore | 3333 Group |
| 189 | 恒大恒通新能源汽车集团（香港）有限公司 | Offshore | 0708 Group |
| 190 | Sky Joy Holdings Limited悦天空控股有限公司 | Offshore | 3333 Group |
| 191 | Earn Success Development Limited成得发展有限公司 | Offshore | 3333 Group |
| 192 | RAY SHINE GROUP LIMITED利辉集团有限公司 | Offshore | 3333 Group |
| 193 | IDEAL MARKET HOLDINGS LIMITED港智控股有限公司 | Offshore | 3333 Group |
| 194 | FORTUNE WALKER LIMITED | Offshore | 3333 Group |
| 195 | JUMBO FORTUNE ENTERPRISES LIMITED | Offshore | 3333 Group |
| 196 | Garden Blossom Limited | Offshore | 3333 Group |
| 197 | METRO WISDOM LIMITED慧都有限公司 | Offshore | 3333 Group |
| 198 | HONOUR OASIS LIMITED | Offshore | 3333 Group |
| 199 | MARVEL FIRST DEVELOPMENTS LIMITED | Offshore | 3333 Group |
| 200 | PYRAMID WEALTH HOLDINGS LIMITED | Offshore | 3333 Group |
| 201 | VALUE DEPOT HOLDINGS LIMITED | Offshore | 3333 Group |
| 202 | JI FENG LIMITED吉丰有限公司 | Offshore | 3333 Group |
| 203 | Fortune Star International Investment Limited福星国际投资有限公司 | Offshore | 3333 Group |
| 204 | JOY VISION HOLDINGS LIMITED乐景控股有限公司 | Offshore | 3333 Group |
| 205 | SANLI (CHINA) HOLDINGS LIMITED三立(中国)控股有限公司 | Offshore | 3333 Group |
| 206 | ABLE KEY DEVELOPMENT LIMITED启能发展有限公司 | Offshore | 3333 Group |
| 207 | NEW GARLAND LIMITED | Offshore | 3333 Group |
| 208 | GLOBAL DEVELOPMENT LIMITED | Offshore | 3333 Group |
| 209 | Eagleville Holdings Limited | Offshore | 3333 Group |
| 210 | Empire Choice Investments Limited | Offshore | 3333 Group |

| No. | Company name | On/Offshore | Obligor Group |
|---|---|---|---|
| 211 | Max Lead Corporation Limited | Offshore | 3333 Group |
| 212 | State Charm Holdings Limited | Offshore | 3333 Group |
| 213 | TREASURE GLORY GLOBAL LIMITED | Offshore | 3333 Group |
| 214 | 恒大地产集团有限公司 | Onshore | 3333 Group |
| 215 | 恒大地产集团武汉有限公司 | Onshore | 3333 Group |
| 216 | 恒大地产集团重庆有限公司 | Onshore | 3333 Group |
| 217 | 恒大地产集团成都有限公司 | Onshore | 3333 Group |
| 218 | 广州市超祥置业有限公司 | Onshore | 3333 Group |
| 219 | 广州市凯鹏置业有限公司 | Onshore | 3333 Group |
| 220 | 恒大地产集团佛山市彤山有限公司 | Onshore | 3333 Group |
| 221 | 恒大长基（沈阳）置业有限公司 | Onshore | 3333 Group |
| 222 | 恒大鑫丰（鞍山）置业有限公司 | Onshore | 3333 Group |
| 223 | 清远市俊鑫房地产开发有限公司 | Onshore | 3333 Group |
| 224 | 启东赛赛置业有限公司 | Onshore | 3333 Group |
| 225 | 启东双庆置业有限公司 | Onshore | 3333 Group |
| 226 | 启东勤盛置业有限公司 | Onshore | 3333 Group |
| 227 | 启东隽颐置业有限公司 | Onshore | 3333 Group |
| 228 | 启东鑫华置业有限公司 | Onshore | 6666 Group |
| 229 | 启东通诚置业有限公司 | Onshore | 3333 Group |
| 230 | 启东宝丰置业有限公司 | Onshore | 3333 Group |
| 231 | 重庆恒大基亚置业有限公司 | Onshore | 3333 Group |
| 232 | 恒大地产集团郑州有限公司 | Onshore | 3333 Group |
| 233 | 金碧物业有限公司 | Onshore | 6666 Group |
| 234 | 广州市金碧华府物业有限公司 | Onshore | 6666 Group |
| 235 | 广州市金碧世家物业服务有限公司 | Onshore | 6666 Group |
| 236 | 恒大地产集团西安有限公司 | Onshore | 3333 Group |
| 237 | 恒大地产集团浩阳有限公司 | Onshore | 3333 Group |
| 238 | 恒大地产集团南宁有限公司 | Onshore | 3333 Group |
| 239 | 恒大地产集团贵阳置业有限公司 | Onshore | 3333 Group |
| 240 | 恒大地产集团合肥有限公司 | Onshore | 3333 Group |

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group | No. | Company name | On/Offshore | Group |
|---|---|---|---|---|---|---|---|
| 241 | 恒大地产集团长沙置业有限公司 | Onshore | 3333 Group | 271 | 儋州恒大翡翠岛投资开发有限公司 | Onshore | 3333 Group |
| 242 | 恒大园林集团有限公司 | Onshore | 3333 Group | 272 | 恒大地产集团固海汆置业有限公司 | Onshore | 3333 Group |
| 243 | 恒大地产集团广东房地产开发有限公司 | Onshore | 3333 Group | 273 | 天津滨湖投资有限公司 | Onshore | 3333 Group |
| 244 | 陕西金远投资有限公司 | Onshore | 3333 Group | 274 | 哈尔滨恒大怡业房地产开发有限公司 | Onshore | 3333 Group |
| 245 | 恒大集团（南昌）有限公司 | Onshore | 3333 Group | 275 | 清远市银湖城投资有限公司 | Onshore | 3333 Group |
| 246 | 恒大地产集团石家庄有限公司 | Onshore | 3333 Group | 276 | 海南世纪诚投资有限公司 | Onshore | 3333 Group |
| 247 | 恒山地产集团济南置业有限公司 | Onshore | 3333 Group | 277 | 恒大地产集团乌鲁木齐有限公司 | Onshore | 3333 Group |
| 248 | 恒大地产集团江天津有限公司 | Onshore | 3333 Group | 278 | 五家渠卓越房地产开发有限公司 | Onshore | 3333 Group |
| 249 | 江西省森林山庄有限公司 | Onshore | 3333 Group | 279 | 阳江市鑫丰实业有限公司 | Onshore | 3333 Group |
| 250 | 恒大地产集团上海盛建置业有限公司 | Onshore | 3333 Group | 280 | 资阳万城置业有限公司 | Onshore | 3333 Group |
| 251 | 恒大地产集团海南有限公司 | Onshore | 3333 Group | 281 | 恒大地产集团（深圳）有限公司 | Onshore | 3333 Group |
| 252 | 天津津淮丽湖投资有限公司 | Onshore | 3333 Group | 282 | 南昌中电投恒新置业有限公司 | Onshore | 3333 Group |
| 253 | 天津汇联创展置业有限公司 | Onshore | 3333 Group | 283 | 恒大足球学校 | Onshore | 3333 Group |
| 254 | 沈阳悦盛置业有限公司 | Onshore | 3333 Group | 284 | 济南恒大翡翠华庭置业有限公司 | Onshore | 3333 Group |
| 255 | 贵州广聚源房地产开发有限公司 | Onshore | 3333 Group | 285 | 恩平市翩尚房地产开发有限公司 | Onshore | 3333 Group |
| 256 | 恒大地产集团大邑有限公司 | Onshore | 3333 Group | 286 | 天津金碧投资有限公司 | Onshore | 3333 Group |
| 257 | 上海穗恒置业有限公司 | Onshore | 3333 Group | 287 | 自贡鑫茂置业有限公司 | Onshore | 3333 Group |
| 258 | 恒大地产集团兰州置业有限公司 | Onshore | 3333 Group | 288 | 城博（宁波）置业有限公司 | Onshore | 3333 Group |
| 259 | 恒大地产集团（沈阳）投资有限公司 | Onshore | 3333 Group | 289 | 宁波御城置业有限公司 | Onshore | 3333 Group |
| 260 | 辽阳恒盛置业有限公司 | Onshore | 3333 Group | 290 | 无锡盛东房产开发有限公司 | Onshore | 3333 Group |
| 261 | 儋州恒大沐海投资有限公司 | Onshore | 3333 Group | 291 | 儋州兴合谷投资有限公司 | Onshore | 3333 Group |
| 262 | 恒大地产集团昆明投资有限公司 | Onshore | 3333 Group | 292 | 儋州诺亚投资有限公司 | Onshore | 3333 Group |
| 263 | 沈阳盛明置业有限公司 | Onshore | 3333 Group | 293 | 儋州军茂投资有限公司 | Onshore | 3333 Group |
| 264 | 鞍山慧瑞置业有限公司 | Onshore | 3333 Group | 294 | 儋州辉望投资有限公司 | Onshore | 3333 Group |
| 265 | 恒大地产集团呼和浩特有限公司 | Onshore | 3333 Group | 295 | 儋州祥都投资有限公司 | Onshore | 3333 Group |
| 266 | 盘锦鼎鼎置业有限公司 | Onshore | 3333 Group | 296 | 海口外滩诚房地产有限公司 | Onshore | 3333 Group |
| 267 | 重庆坤茂置业有限公司 | Onshore | 3333 Group | 297 | 上海颖骏资产管理有限公司 | Onshore | 3333 Group |
| 268 | 合肥秉宇置业有限公司 | Onshore | 3333 Group | 298 | 衢州恒大盛建置业有限公司 | Onshore | 3333 Group |
| 269 | 天津山水绿投资有限公司 | Onshore | 3333 Group | 299 | 哈尔滨创业房地产开发有限公司 | Onshore | 3333 Group |
| 270 | 恒大地产集团哈尔滨尔滨有限公司 | Onshore | 3333 Group | 300 | 林芝恒大旅游发展有限公司 | Onshore | 3333 Group |

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|-----|--------------|-------------|-------|
| 301 | 广州毅坚房地产有限（责任）公司 | Onshore | 3333 Group |
| 302 | 广州市鑫玺置业有限公司 | Onshore | 3333 Group |
| 303 | 重庆恒大鑫泉置业有限公司 | Onshore | 3333 Group |
| 304 | 恒大地产集团大连有限公司 | Onshore | 3333 Group |
| 305 | 合肥晴诚置业有限公司 | Onshore | 3333 Group |
| 306 | 合肥耕祥置业有限公司 | Onshore | 3333 Group |
| 307 | 合肥耕祥商业运营管理有限公司 | Onshore | 3333 Group |
| 308 | 合肥峰誉置业运营管理有限公司 | Onshore | 3333 Group |
| 309 | 合肥峰誉商业运营管理有限公司 | Onshore | 3333 Group |
| 310 | 合肥耆丰翼业有限公司 | Onshore | 3333 Group |
| 311 | 恒大广州集团北京科园有限公司 | Onshore | 3333 Group |
| 312 | 南宁恒大城市建设有限公司 | Onshore | 3333 Group |
| 313 | 柳州大金鑫置业有限公司 | Onshore | 3333 Group |
| 314 | 杭州穗丰置业有限公司 | Onshore | 3333 Group |
| 315 | 南京美地房地产开发有限公司 | Onshore | 3333 Group |
| 316 | 呼和浩特市金碧天下房地产开发有限公司 | Onshore | 3333 Group |
| 317 | 北京恒兴盛房地产开发有限公司 | Onshore | 3333 Group |
| 318 | 恒大地产集团福州有限公司 | Onshore | 3333 Group |
| 319 | 深圳市厦村民房地产开发有限公司 | Onshore | 3333 Group |
| 320 | 广州市鑫源投资有限公司 | Onshore | 3333 Group |
| 321 | 广州市鑫连投资有限公司 | Onshore | 3333 Group |
| 322 | 广州市欣盛投资有限公司 | Onshore | 3333 Group |
| 323 | 深圳市国睿翼业有限公司 | Onshore | 3333 Group |
| 324 | 深圳市华超实业有限公司 | Onshore | 3333 Group |
| 325 | 深圳市国超投资有限公司 | Onshore | 3333 Group |
| 326 | 深圳市置颐房地产开发有限公司 | Onshore | 3333 Group |
| 327 | 深圳市三溪房地产开发有限公司 | Onshore | 3333 Group |
| 328 | 广州市隆通投资有限公司 | Onshore | 3333 Group |
| 329 | 上海金碧置业有限公司 | Onshore | 3333 Group |
| 330 | 上海悦安置业有限公司 | Onshore | 3333 Group |
| 331 | 上海增善置业有限公司 | Onshore | 3333 Group |
| 332 | 天津宇泰房地产开发有限公司 | Onshore | 3333 Group |
| 333 | 恒大集团有限公司 | Onshore | 3333 Group |
| 334 | 广州市悦朗投资有限公司 | Onshore | 3333 Group |
| 335 | 广州市昱博投资有限公司 | Onshore | 3333 Group |
| 336 | 广州市奕博投资有限公司 | Onshore | 3333 Group |
| 337 | 广州市朗怀投资有限公司 | Onshore | 3333 Group |
| 338 | 深圳市鑫玥投资有限公司 | Onshore | 3333 Group |
| 339 | 太原金世恒房地产开发有限公司 | Onshore | 3333 Group |
| 340 | 北京恒世投资有限公司 | Onshore | 3333 Group |
| 341 | 北京崇玺置业有限公司 | Onshore | 3333 Group |
| 342 | 郑州恒林置业有限公司 | Onshore | 3333 Group |
| 343 | 济南东滏沙鼎置业有限公司 | Onshore | 3333 Group |
| 344 | 成都恒大世茂城建置业有限公司 | Onshore | 3333 Group |
| 345 | 东莞市鸿远房地产开发有限公司 | Onshore | 3333 Group |
| 346 | 莆田金碧置业有限公司 | Onshore | 3333 Group |
| 347 | 广州市慧宇贸易有限公司 | Offshore | 0708 Group |
| 348 | 恒大健康云集团有限公司 | Onshore | 0708 Group |
| 349 | 前海君创实业发展（深圳）有限公司 | Onshore | 3333 Group |
| 350 | 张家港盛盛置业有限公司 | Onshore | 3333 Group |
| 351 | 恒大寰世界集团有限公司 | Onshore | 3333 Group |
| 352 | 四川若愚房地产开发有限公司 | Onshore | 3333 Group |
| 353 | 厦门大凝业有限公司 | Onshore | 3333 Group |
| 354 | 宁波开拓置业有限公司 | Onshore | 3333 Group |
| 355 | 中山长信金晟房地产有限公司 | Onshore | 3333 Group |
| 356 | 佛山市长欣宏龙房地产有限公司 | Onshore | 3333 Group |
| 357 | 广东恒琪投资有限公司 | Onshore | 3333 Group |
| 358 | 海南名鸿投资有限公司 | Onshore | 3333 Group |
| 359 | 海南鼎昌投资有限公司 | Onshore | 3333 Group |
| 360 | 北京恒隆兴置业有限公司 | Onshore | 3333 Group |

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | Group | On/Offshore |
|---|---|---|---|
| 361 | 昆明恒翰置业有限公司 | 3333 Group | Onshore |
| 362 | 武汉恒大金碧房地产开发有限公司 | 3333 Group | Onshore |
| 363 | 大连恒创房地产有限公司 | 3333 Group | Onshore |
| 364 | 大连恒科房地产有限公司 | 3333 Group | Onshore |
| 365 | 恒大置业（深圳）有限公司 | 3333 Group | Onshore |
| 366 | 儋州盛邦旅游开发有限公司 | 3333 Group | Onshore |
| 367 | 儋州勇云旅游开发有限公司 | 3333 Group | Onshore |
| 368 | 儋州中润旅游开发有限公司 | 3333 Group | Onshore |
| 369 | 儋州信恒旅游开发有限公司 | 3333 Group | Onshore |
| 370 | 怀来恒天房地产开发有限公司 | 3333 Group | Onshore |
| 371 | 重庆公观房地产有限公司 | 3333 Group | Onshore |
| 372 | 儋州丰旭旅游开发有限公司 | 3333 Group | Onshore |
| 373 | 恒大金融控股集团（深圳）有限公司 | 3333 Group | Onshore |
| 374 | 恒大融融投资（深圳）有限公司 | 3333 Group | Onshore |
| 375 | 儋州嘉伟旅游开发有限公司 | 3333 Group | Onshore |
| 376 | 儋州睿和投资有限公司 | 3333 Group | Onshore |
| 377 | 儋州威焕旅游开发有限公司 | 3333 Group | Onshore |
| 378 | 儋州宜馆旅游开发有限公司 | 3333 Group | Onshore |
| 379 | 儋州昇投资有限公司 | 3333 Group | Onshore |
| 380 | 儋州范合投资有限公司 | 3333 Group | Onshore |
| 381 | 儋州名雅旅游开发有限公司 | 3333 Group | Onshore |
| 382 | 儋州长宇旅游开发有限公司 | 3333 Group | Onshore |
| 383 | 儋州智源旅游开发有限公司 | 3333 Group | Onshore |
| 384 | 儋州东拓旅游开发有限公司 | 3333 Group | Onshore |
| 385 | 儋州隆伦旅游开发有限公司 | 3333 Group | Onshore |
| 386 | 儋州明良旅游开发有限公司 | 3333 Group | Onshore |
| 387 | 恒大戴发半栖置业（深圳）有限公司 | 3333 Group | Onshore |
| 388 | 深圳市鸿腾投资管理有限公司 | 3333 Group | Onshore |
| 389 | 南宁盛龙庭房地产开发有限公司 | 3333 Group | Onshore |
| 390 | 海南恒敛材料设备有限公司 | 3333 Group | Onshore |
| 391 | 南京临江御景房地产开发有限公司 | 3333 Group | Onshore |
| 392 | 恒大地产集团粤东有限公司 | 3333 Group | Onshore |
| 393 | 杭州晶立置业有限公司 | 3333 Group | Onshore |
| 394 | 贵阳新世界地产有限公司 | 3333 Group | Onshore |
| 395 | 武汉新世界居居发展有限公司 | 3333 Group | Onshore |
| 396 | 上海丰顺置业有限公司 | 3333 Group | Onshore |
| 397 | 上海丰瀛置业有限公司 | 3333 Group | Onshore |
| 398 | 恒大地产集团珠三角地产开发有限公司 | 3333 Group | Onshore |
| 399 | 恒大方拓资管理有限公司 | 3333 Group | Onshore |
| 400 | 恒大互联网集团投资有限公司 | 3333 Group | Onshore |
| 401 | 宸宇投资管理（深圳）有限公司 | 3333 Group | Onshore |
| 402 | 青岛金湾置业有限公司 | 3333 Group | Onshore |
| 403 | 佛山市顺德区西亚方舟地产有限公司 | 3333 Group | Onshore |
| 404 | 北京丽都房地产开发有限公司 | 3333 Group | Onshore |
| 405 | 儋州恒乐文化发展有限公司 | 3333 Group | Onshore |
| 406 | 儋州恒裕文化发展有限公司 | 3333 Group | Onshore |
| 407 | 深圳市心怡房地产有限公司 | 3333 Group | Onshore |
| 408 | 柳州御景龙恒房地产开发有限公司 | 3333 Group | Onshore |
| 409 | 佛山市裕朗房地产开发有限公司 | 3333 Group | Onshore |
| 410 | 太原恒大盛腾房地产开发有限公司 | 3333 Group | Onshore |
| 411 | 沈阳嘉兴置业有限公司 | 3333 Group | Onshore |
| 412 | 河南恒兆置业有限公司 | 3333 Group | Onshore |
| 413 | 大连安兴投资有限公司 | 3333 Group | Onshore |
| 414 | 莆田恒晟置业有限公司 | 3333 Group | Onshore |
| 415 | 哈尔滨荟馨置业有限公司 | 3333 Group | Onshore |
| 416 | 哈尔滨盛冠置业有限公司 | 3333 Group | Onshore |
| 417 | 哈尔滨诺邦置业有限公司 | 3333 Group | Onshore |
| 418 | 济南契馨投资有限公司 | 3333 Group | Onshore |
| 419 | 济南红树林置业有限公司 | 3333 Group | Onshore |
| 420 | 济南嘉隆置业有限公司 | 3333 Group | Onshore |

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|-----|--------------|-------------|-------|
| 421 | 株洲湘楷房地产开发有限公司 | Onshore | 3333 Group |
| 422 | 南京恒仕融企业管理有限公司 | Onshore | 3333 Group |
| 423 | 成都卓宇置业有限公司 | Onshore | 3333 Group |
| 424 | 沈阳惠风置业有限公司 | Onshore | 3333 Group |
| 425 | 沈阳赛尚置业有限公司 | Onshore | 3333 Group |
| 426 | 东莞市辉睐实业有限公司 | Onshore | 3333 Group |
| 427 | 启东宏大温泉城开发有限公司 | Onshore | 3333 Group |
| 428 | 常州恒运房地产开发有限公司 | Onshore | 3333 Group |
| 429 | 湖南沄成投资有限公司 | Onshore | 3333 Group |
| 430 | 珠海市翻翻置业有限公司 | Onshore | 3333 Group |
| 431 | 梅州大吉石工品牌产业园有限公司 | Onshore | 3333 Group |
| 432 | 乌鲁木齐市恒新佳域房地产开发有限公司 | Onshore | 3333 Group |
| 433 | 成都鄂华置业有限公司 | Onshore | 3333 Group |
| 434 | 广东莱廷峰房地产开发有限公司 | Onshore | 3333 Group |
| 435 | 肇庆高尔夫发展有限公司 | Onshore | 3333 Group |
| 436 | 广东莱廷峰酒店有限公司 | Onshore | 3333 Group |
| 437 | 宁波御都置业有限公司 | Onshore | 3333 Group |
| 438 | 绍兴永恒置业有限公司 | Onshore | 3333 Group |
| 439 | 汕头市恒谷置业有限公司 | Onshore | 3333 Group |
| 440 | 天津恒房房地产开发有限公司 | Onshore | 3333 Group |
| 441 | 重庆慕威实业有限公司 | Onshore | 3333 Group |
| 442 | 苏州汉相置业有限公司 | Onshore | 3333 Group |
| 443 | 苏州盛建置业有限公司 | Onshore | 3333 Group |
| 444 | 苏州恒元房产开发有限公司 | Onshore | 3333 Group |
| 445 | 肇庆茵声缚科技术材料有限公司 | Onshore | 3333 Group |
| 446 | 长沙恒大雅世界旅游开发有限公司 | Onshore | 3333 Group |
| 447 | 重庆昭锦企业管理有限公司 | Onshore | 3333 Group |
| 448 | 南京胜智商贸有限公司 | Onshore | 3333 Group |
| 449 | 武汉市铜江鸿房地产开发有限公司 | Onshore | 3333 Group |
| 450 | 成都万浩置业有限公司 | Onshore | 3333 Group |

| No. | Company name | On/Offshore | Group |
|-----|--------------|-------------|-------|
| 451 | 重庆和生裕房地产开发有限公司 | Onshore | 3333 Group |
| 452 | 贵阳恒大雅世界旅游开发有限公司 | Onshore | 3333 Group |
| 453 | 贵阳佳鑫义旅游开发有限公司 | Onshore | 3333 Group |
| 454 | 贵阳安佳盛鑫旅游开发有限公司 | Onshore | 3333 Group |
| 455 | 无锡盛建置业有限公司 | Onshore | 3333 Group |
| 456 | 太原恒林势地产开发有限公司 | Onshore | 3333 Group |
| 457 | 广州湘行房地产开发有限公司 | Onshore | 3333 Group |
| 458 | 宁河湘翔势地产开发有限公司 | Onshore | 3333 Group |
| 459 | 成都莱盛置业有限公司 | Onshore | 3333 Group |
| 460 | 上海佳靖投资有限公司 | Onshore | 3333 Group |
| 461 | 天津景秀置业投资有限公司 | Onshore | 3333 Group |
| 462 | 重庆顶添置业有限公司 | Onshore | 3333 Group |
| 463 | 重庆同景置业有限公司 | Onshore | 3333 Group |
| 464 | 重庆联星投资有限公司 | Onshore | 3333 Group |
| 465 | 恒大地产集团滨平有限公司 | Onshore | 3333 Group |
| 466 | 宁波城市之光置业有限公司 | Onshore | 3333 Group |
| 467 | 西安翻凯置业有限公司 | Onshore | 3333 Group |
| 468 | 山东丰前置地有限公司 | Onshore | 3333 Group |
| 469 | 上海景麒房地产开发有限公司 | Onshore | 3333 Group |
| 470 | 深圳市佳茂汀堡房地产开发有限公司 | Onshore | 3333 Group |
| 471 | 沈阳金道旅合房地产开发有限公司 | Onshore | 3333 Group |
| 472 | 沈阳金道旅房地产开发有限公司 | Onshore | 3333 Group |
| 473 | 靖江新时代房地产开发有限公司 | Onshore | 3333 Group |
| 474 | 河北鼎慕琪琪地产开发有限公司 | Onshore | 3333 Group |
| 475 | 重庆同景博达置地有限公司 | Onshore | 3333 Group |
| 476 | 肇庆市团建房地产开发有限公司 | Onshore | 3333 Group |
| 477 | 汕头市恒明房地产开发有限公司 | Onshore | 3333 Group |
| 478 | 南昌恒腾置业有限公司 | Onshore | 3333 Group |
| 479 | 佛山市三水帆高置业投资有限公司 | Onshore | 3333 Group |
| 480 | 恒大地产集团山西有限公司 | Onshore | 3333 Group |

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|---|---|---|---|
| 481 | 扬州盛基房地产开发有限公司 | Onshore | 3333 Group |
| 482 | 安庆粤盛置业有限公司 | Onshore | 3333 Group |
| 483 | 肇庆鼎峰园星玺置业投资有限公司 | Onshore | 3333 Group |
| 484 | 四川川大科技园（绵区）开发有限公司 | Onshore | 3333 Group |
| 485 | 深圳市万东投资有限公司 | Onshore | 3333 Group |
| 486 | 佛山三水区能润雅地房地产开发有限公司 | Onshore | 3333 Group |
| 487 | 佛山市英明商协和地产开发有限公司 | Onshore | 3333 Group |
| 488 | 佛山市南海南力房地产开发有限公司 | Onshore | 3333 Group |
| 489 | 句容市大鼎世界旅游开发有限公司 | Onshore | 3333 Group |
| 490 | 大仓区大鼎世界旅游开发有限公司 | Onshore | 3333 Group |
| 491 | 大原恒佛润房地产开发有限公司 | Onshore | 3333 Group |
| 492 | 沧州恒祥房地产开发有限公司 | Onshore | 3333 Group |
| 493 | 无锡恒瑞置业有限公司 | Onshore | 3333 Group |
| 494 | 肇庆鼎峰园星玺地房地产开发有限公司 | Onshore | 3333 Group |
| 495 | 郑州恒启嘉置业有限公司 | Onshore | 3333 Group |
| 496 | 杭州沸蕾置业有限公司 | Onshore | 3333 Group |
| 497 | 福州金鑫置业有限公司 | Onshore | 3333 Group |
| 498 | 恒大蛇口半岛置业（深圳）有限公司 | Onshore | 3333 Group |
| 499 | 哈尔滨沛腾置业开发有限公司 | Onshore | 3333 Group |
| 500 | 哈尔滨祥业房地产开发有限公司 | Onshore | 3333 Group |
| 501 | 哈尔滨市置业房地产开发有限公司 | Onshore | 3333 Group |
| 502 | 恒大地产集团（江西）有限公司 | Onshore | 3333 Group |
| 503 | 温州悦安置业有限公司 | Onshore | 3333 Group |
| 504 | 连平县麟林房地产置业有限公司 | Onshore | 3333 Group |
| 505 | 珠海泰禾置业有限公司 | Onshore | 3333 Group |
| 506 | 深圳鑫信投资咨询有限公司 | Onshore | 3333 Group |
| 507 | 镇江盛曦房地产开发有限公司 | Onshore | 3333 Group |
| 508 | 句容开润旅游开发有限公司 | Onshore | 3333 Group |
| 509 | 句容盛世界旅游开发景区有限公司 | Onshore | 3333 Group |
| 510 | 句容恒发旅游开发有限公司 | Onshore | 3333 Group |
| 511 | 句容恒歆旅游开发有限公司 | Onshore | 3333 Group |
| 512 | 句容恒琦旅游开发有限公司 | Onshore | 3333 Group |
| 513 | 句容恒远旅游开发有限公司 | Onshore | 3333 Group |
| 514 | 贵阳恒大雄梦天地旅游发展有限公司 | Onshore | 3333 Group |
| 515 | 贵阳恒大初源旅游开发有限公司 | Onshore | 3333 Group |
| 516 | 贵阳恒大舜馨旅游开发有限公司 | Onshore | 3333 Group |
| 517 | 贵阳恒大裕明旅游开发有限公司 | Onshore | 3333 Group |
| 518 | 贵阳恒大裕新旅游开发有限公司 | Onshore | 3333 Group |
| 519 | 贵阳恒大鼎祥旅游开发有限公司 | Onshore | 3333 Group |
| 520 | 贵阳恒大宏域旅游开发有限公司 | Onshore | 3333 Group |
| 521 | 贵安新区恒大华鼎旅游开发有限公司 | Onshore | 3333 Group |
| 522 | 沧州恒大世界旅游开发有限公司 | Onshore | 3333 Group |
| 523 | 沧州益聚房地产开发有限公司 | Onshore | 3333 Group |
| 524 | 沧州璟凯房地产开发有限公司 | Onshore | 3333 Group |
| 525 | 沧州元瑞房地产开发有限公司 | Onshore | 3333 Group |
| 526 | 沧州凯进房地产开发有限公司 | Onshore | 3333 Group |
| 527 | 沧州沸安房地产开发有限公司 | Onshore | 3333 Group |
| 528 | 沧州昌捷房地产开发有限公司 | Onshore | 3333 Group |
| 529 | 沧州丰汇房地产开发有限公司 | Onshore | 3333 Group |
| 530 | 沧州璟丰房地产开发有限公司 | Onshore | 3333 Group |
| 531 | 沧州庆和房地产开发有限公司 | Onshore | 3333 Group |
| 532 | 沧州通广房地产开发有限公司 | Onshore | 3333 Group |
| 533 | 沧州长房房地产开发有限公司 | Onshore | 3333 Group |
| 534 | 沧州裕宝房地产开发有限公司 | Onshore | 3333 Group |
| 535 | 沧州源美房地产开发有限公司 | Onshore | 3333 Group |
| 536 | 沧州长鑫房地产开发有限公司 | Onshore | 3333 Group |
| 537 | 成都鑫景置业有限公司 | Onshore | 3333 Group |
| 538 | 泰州恒璐通房地产开发有限公司 | Onshore | 3333 Group |
| 539 | 湖州恒跃房地产开发有限公司 | Onshore | 3333 Group |
| 540 | 三亚华创七星房地产开发有限公司 | Onshore | 3333 Group |

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group | No. | Company name | On/Offshore | Group |
|-----|--------------|-------------|-------|-----|--------------|-------------|-------|
| 541 | 三亚森特房地产开发有限公司 | Onshore | 3333 Group | 571 | 鄂州腾翔旅游开发有限公司 | Onshore | 3333 Group |
| 542 | 佛山市琴湖房地产开发有限公司 | Onshore | 3333 Group | 572 | 鄂州蜜梦乐四旅游发展有限公司 | Onshore | 3333 Group |
| 543 | 沈阳恒宜置业有限公司 | Onshore | 3333 Group | 573 | 鄂州信佳旅游开发有限公司 | Onshore | 3333 Group |
| 544 | 杭州盛捷置业有限公司 | Onshore | 3333 Group | 574 | 启东渼蓉旅游开发有限公司 | Onshore | 3333 Group |
| 545 | 峨眉山阳光绿源农业科技有限公司 | Onshore | 3333 Group | 575 | 鄂州裕娓旅游开发有限公司 | Onshore | 3333 Group |
| 546 | 四川峨眉山宏远实业有限公司 | Onshore | 3333 Group | 576 | 鄂州佳裕旅游开发有限公司 | Onshore | 3333 Group |
| 547 | 四川德胜集团汶化旅游投资发展有限公司 | Onshore | 3333 Group | 577 | 鄂州弘隆旅游开发有限公司 | Onshore | 3333 Group |
| 548 | 上海鹏仓置业有限公司 | Onshore | 3333 Group | 578 | 武汉瑞恒旅游开发有限公司 | Onshore | 3333 Group |
| 549 | 上海鹏力置业有限公司 | Onshore | 3333 Group | 579 | 鄂州裕恒旅游开发有限公司 | Onshore | 3333 Group |
| 550 | 温州国鹏翼业有限公司 | Onshore | 3333 Group | 580 | 恒大现代农业集团有限公司 | Onshore | 3333 Group |
| 551 | 宜昌科柘房地产开发有限公司 | Onshore | 3333 Group | 581 | 山东恒大童世界旅游开发有限公司 | Onshore | 3333 Group |
| 552 | 深圳市建定房地产开发有限公司 | Onshore | 3333 Group | 582 | 眉山恒大童世界旅游开发有限公司 | Onshore | 3333 Group |
| 553 | 深圳市寨熙投资有限公司 | Onshore | 3333 Group | 583 | 眉山恒和旅游开发有限公司 | Onshore | 3333 Group |
| 554 | 太原乐天鸿博房地产开发有限公司 | Onshore | 3333 Group | 584 | 眉山嘉恒旅游开发有限公司 | Onshore | 3333 Group |
| 555 | 福鼎恒大置业有限公司 | Onshore | 3333 Group | 585 | 眉山嘉泰旅游开发有限公司 | Onshore | 3333 Group |
| 556 | 成都华宇置业有限公司 | Onshore | 3333 Group | 586 | 眉山裕和旅游开发有限公司 | Onshore | 3333 Group |
| 557 | 宁波穗华置业有限公司 | Onshore | 3333 Group | 587 | 眉山睿信旅游开发有限公司 | Onshore | 3333 Group |
| 558 | 安吉建置置业有限公司 | Onshore | 3333 Group | 588 | 眉山润隆旅游开发有限公司 | Onshore | 3333 Group |
| 559 | 肇庆市高新区恒裕通房地产开发有限公司 | Onshore | 3333 Group | 589 | 眉山泽瑞旅游开发有限公司 | Onshore | 3333 Group |
| 560 | 湖南恒盛健康产业有限公司 | Onshore | 0708 Group | 590 | 武汉巴登特旅游有限公司 | Onshore | 3333 Group |
| 561 | 太仓穗泰旅游开发有限公司 | Onshore | 3333 Group | 591 | 西安恒大童世界旅游开发有限公司 | Onshore | 3333 Group |
| 562 | 太仓明泰旅游开发有限公司 | Onshore | 3333 Group | 592 | 扬中市恒骥置业有限公司 | Onshore | 0708 Group |
| 563 | 太仓穗泰旅游开发有限公司 | Onshore | 3333 Group | 593 | 深圳市永e置业有限公司 | Onshore | 3333 Group |
| 564 | 太仓恒泰旅游开发有限公司 | Onshore | 3333 Group | 594 | 绵阳市永合万宏置业有限公司 | Onshore | 3333 Group |
| 565 | 太仓隆泰旅游开发有限公司 | Onshore | 3333 Group | 595 | 湖南辰宸置业有限公司 | Onshore | 3333 Group |
| 566 | 太仓裕泰旅游开发有限公司 | Onshore | 3333 Group | 596 | 太原领创房地产开发有限公司 | Onshore | 3333 Group |
| 567 | 湖北大重世界旅游开发有限公司 | Onshore | 3333 Group | 597 | 常州恒宸企业管理有限公司 | Onshore | 3333 Group |
| 568 | 鄂州朗恒旅游开发有限公司 | Onshore | 3333 Group | 598 | 成都神凌昌心房地产开发有限责任公司 | Onshore | 3333 Group |
| 569 | 太仓瑷宇文化产业发展有限公司 | Onshore | 3333 Group | 599 | 佛山市恒创房地产开发有限公司 | Onshore | 3333 Group |
| 570 | 鄂州裕恒旅游开发有限公司 | Onshore | 3333 Group | 600 | 贵阳恒大岷云岭房地产开发有限公司 | Onshore | 3333 Group |

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|-----|--------------|-------------|-------|
| 601 | 深圳市飞速投投资有限公司 | Onshore | 3333 Group |
| 602 | 重庆腾林企业管理咨询有限公司 | Onshore | 3333 Group |
| 603 | 深圳市潼珽投投资有限公司 | Onshore | 3333 Group |
| 604 | 肇庆市文耀绵投投资有限公司 | Onshore | 3333 Group |
| 605 | 肇庆博博贸易有限公司 | Onshore | 3333 Group |
| 606 | 重庆恒永房地产开发有限公司 | Onshore | 3333 Group |
| 607 | 溧阳恒扬房地产开发有限责任公司 | Onshore | 6666 Group |
| 608 | 沈阳朦盈置业有限公司 | Onshore | 3333 Group |
| 609 | 成都筣凯置业有限公司 | Onshore | 3333 Group |
| 610 | 沈阳朦源置业有限公司 | Onshore | 3333 Group |
| 611 | 贵州尚明房地产开发有限公司 | Onshore | 3333 Group |
| 612 | 成都津瑞置业有限公司 | Onshore | 3333 Group |
| 613 | 成都心澜置业有限公司 | Onshore | 3333 Group |
| 614 | 成都心澜置业有限公司 | Onshore | 3333 Group |
| 615 | 郑州诚丰置业有限公司 | Onshore | 3333 Group |
| 616 | 成都锦运恒域地产建设有限公司 | Onshore | 3333 Group |
| 617 | 柳州恒大璟瑞房地产开发有限公司 | Onshore | 3333 Group |
| 618 | 深圳市恒宁商业发展有限公司 | Onshore | 3333 Group |
| 619 | 西安长缘旅游开发有限公司 | Onshore | 3333 Group |
| 620 | 西安疆世界旅游发展有限公司 | Onshore | 3333 Group |
| 621 | 西安凯秦旅游开发有限公司 | Onshore | 3333 Group |
| 622 | 西安优合旅游开发有限公司 | Onshore | 3333 Group |
| 623 | 西安锥枫旅游开发有限公司 | Onshore | 3333 Group |
| 624 | 西安腾飞旅游开发有限公司 | Onshore | 3333 Group |
| 625 | 西安艺鸿旅游开发有限公司 | Onshore | 3333 Group |
| 626 | 西安阳盾旅游开发有限公司 | Onshore | 3333 Group |
| 627 | 西安诚格旅游开发有限公司 | Onshore | 3333 Group |
| 628 | 西安瑞路旅游开发有限公司 | Onshore | 3333 Group |
| 629 | 恒大时代新城开发（武汉）有限公司 | Onshore | 0708 Group |
| 630 | 南京恒臻置业有限公司 | Onshore | 0708 Group |

| No. | Company name | On/Offshore | Group |
|-----|--------------|-------------|-------|
| 631 | 恒鹏健康产业有限公司 | Onshore | 0708 Group |
| 632 | 眉山盛世界旅游开发有限公司 | Onshore | 3333 Group |
| 633 | 恒鹏健康产业湖南有限公司 | Onshore | 0708 Group |
| 634 | 陕西恒鹏健康产业有限公司 | Onshore | 0708 Group |
| 635 | 四川恒鹏健康产业有限公司 | Onshore | 3333 Group |
| 636 | 恒大旅游运营管理集团有限公司 | Onshore | 3333 Group |
| 637 | 恒大恒牧业有限公司 | Onshore | 3333 Group |
| 638 | 恒大禹禾农业（沈阳）有限公司 | Onshore | 3333 Group |
| 639 | 恒大现代城房地产开发（沈阳）有限公司 | Onshore | 3333 Group |
| 640 | 常州江恒房地产开发有限公司 | Onshore | 3333 Group |
| 641 | 佛山市顺德区怡怡创房地产有限公司 | Onshore | 3333 Group |
| 642 | 佛山市怡创贸有限公司 | Onshore | 3333 Group |
| 643 | 广州曦曦峰商务服务有限公司 | Onshore | 3333 Group |
| 644 | 贵阳恒大云栖房地产开发有限公司 | Onshore | 3333 Group |
| 645 | 清远市恒霞地产开发有限公司 | Onshore | 3333 Group |
| 646 | 太原恒彬房地产开发有限公司 | Onshore | 3333 Group |
| 647 | 太原恒城房地产开发有限公司 | Onshore | 3333 Group |
| 648 | 大原恒珀地产有限公司 | Onshore | 3333 Group |
| 649 | 北京东方慕禾建筑材料有限公司 | Onshore | 3333 Group |
| 650 | 美丽之冠（黄山）文化旅游发展有限公司 | Onshore | 3333 Group |
| 651 | 赤峰市恒钿房地产开发有限公司 | Onshore | 3333 Group |
| 652 | 南宁悦龙珊房地产开发有限公司 | Onshore | 3333 Group |
| 653 | 重庆英利辉利置业有限公司 | Onshore | 3333 Group |
| 654 | 广州恒创新区园城改改有限公司 | Onshore | 3333 Group |
| 655 | 重庆坝泉企业管理有限公司 | Onshore | 3333 Group |
| 656 | 重庆正至道实业有限公司 | Onshore | 3333 Group |
| 657 | 恒大禹科技集团有限公司 | Onshore | 3333 Group |
| 658 | 广州恒隆设备科技有限公司 | Onshore | 0708 Group |
| 659 | 吉林省恒大世界旅游开发有限公司 | Onshore | 3333 Group |
| 660 | 公主岭恒泽旅游开发有限公司 | Onshore | 3333 Group |

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|-----|-------------|-------------|-------|
| 661 | 公主岭碧桂汉旅游开发有限公司 | Onshore | 3333 Group |
| 662 | 公主岭金慧旅游开发有限公司 | Onshore | 3333 Group |
| 663 | 眉山沪泽旅游开发有限公司 | Onshore | 3333 Group |
| 664 | 眉山沪清旅游开发有限公司 | Onshore | 3333 Group |
| 665 | 眉山恒博旅游开发有限公司 | Onshore | 3333 Group |
| 666 | 南充沛杉湖畔科技农业有限公司 | Onshore | 3333 Group |
| 667 | 眉山恩照旅游开发有限公司 | Onshore | 3333 Group |
| 668 | 眉山恩旅游开发有限公司 | Onshore | 3333 Group |
| 669 | 广州溪冕企业管理咨询有限公司 | Onshore | 3333 Group |
| 670 | 恒大租赁住房一号第一期私募投资基金 | Onshore | 3333 Group |
| 671 | 恒大凯隆智能汽车集团有限公司 | Onshore | 0708 Group |
| 672 | 贵阳匹大观云房地产开发有限公司 | Onshore | 3333 Group |
| 673 | 昆明恒腾房地产开发有限公司 | Onshore | 3333 Group |
| 674 | 嵩明中楼鼎床花房地产开发有限公司 | Onshore | 3333 Group |
| 675 | 嵩明中楼园丰房地产开发有限公司 | Onshore | 3333 Group |
| 676 | 南京沛海企业管理有限公司 | Onshore | 3333 Group |
| 677 | 嵩明中楼商骏房地产开发有限公司 | Onshore | 3333 Group |
| 678 | 嵩明中楼广镨房地产开发有限公司 | Onshore | 3333 Group |
| 679 | 嵩明中楼旷达房地产开发有限公司 | Onshore | 3333 Group |
| 680 | 云南德融房地产开发有限公司 | Onshore | 3333 Group |
| 681 | 昆明榛桨科技有限公司 | Onshore | 3333 Group |
| 682 | 深圳市保通远投资咨询有限责任公司 | Onshore | 3333 Group |
| 683 | 重庆五格投资有限责任公司 | Onshore | 3333 Group |
| 684 | 河源东瑞投资发展有限公司 | Onshore | 3333 Group |
| 685 | 西安盛都置业有限公司 | Onshore | 3333 Group |
| 686 | 重庆熙金企业管理有限公司 | Onshore | 3333 Group |
| 687 | 重庆沛润企业管理有限公司 | Onshore | 3333 Group |
| 688 | 重庆腾岳企业管理有限公司 | Onshore | 3333 Group |
| 689 | 舟山市际诚调丰房地产开发有限公司 | Onshore | 3333 Group |
| 690 | 恒大新能源汽车（广东）有限公司 | Onshore | 0708 Group |

| No. | Company name | On/Offshore | Group |
|-----|-------------|-------------|-------|
| 691 | 恒大新能源科技集团有限公司 | Onshore | 0708 Group |
| 692 | 恒大凯旅交汽有限公司 | Onshore | 0708 Group |
| 693 | 天津恒大瑞新能源科技有限服发限公司 | Onshore | 0708 Group |
| 694 | 国能汽车技术开发有限责任公司 | Onshore | 0708 Group |
| 695 | 恒大恒驰新能源汽车（上海）有限公司 | Onshore | 0708 Group |
| 696 | 恒大新能源汽车（陕西）有限公司 | Onshore | 0708 Group |
| 697 | 金驰生活服务（河南）有限公司 | Onshore | 708 Group |
| 698 | 恒大新能源汽车（辽宁）有限公司 | Onshore | 0708 Group |
| 699 | 恒大汽产业园投资（深圳）集团有限公司 | Onshore | 0708 Group |
| 700 | 恒大瑞博动力科技（深圳）有限公司 | Onshore | 0708 Group |
| 701 | 沈阳智慧农业开发有限公司 | Onshore | 3333 Group |
| 702 | 恒大恒驰新能源汽车研究院（上海）有限公司 | Onshore | 708 Group |
| 703 | 郑州超盈生活服务有限公司 | Onshore | 708 Group |
| 704 | 郑州超欣生活服务有限公司 | Onshore | 708 Group |
| 705 | 郑州超悦生活服务有限公司 | Onshore | 708 Group |
| 706 | 扬州市恒和置业有限公司 | Onshore | 3333 Group |
| 707 | 湖北恒祥旅游开发有限公司 | Onshore | 3333 Group |
| 708 | 南京恒恳房地产开发有限公司 | Onshore | 3333 Group |
| 709 | 深圳市宝鹰实业投资有限公司 | Onshore | 3333 Group |
| 710 | 恒大风驰动力科技（深圳）有限公司 | Onshore | 0708 Group |
| 711 | 河北恒大科农农业开发有限公司 | Onshore | 3333 Group |
| 712 | 元氏县恒成房地产开发有限公司 | Onshore | 3333 Group |
| 713 | 内蒙古恒大旅游开发有限公司 | Onshore | 3333 Group |
| 714 | 内蒙古恒门旅游开发有限公司 | Onshore | 3333 Group |
| 715 | 武汉楚水云山实业开发管理有限公司 | Onshore | 3333 Group |
| 716 | 昆明赛丽湾特色小镇置业有限公司 | Onshore | 0708 Group |
| 717 | 昆明嘉丽泽旅游文化有限公司 | Onshore | 0708 Group |
| 718 | 佛州一帆滋游运营管理有限公司 | Onshore | 3333 Group |
| 719 | 句容恒朗旅游开发有限公司 | Onshore | 3333 Group |
| 720 | 沧州国恒企业管理咨询中心（有限合伙） | Onshore | 3333 Group |

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group |
|-----|--------------|-------------|-------|
| 721 | 温州盛建置业有限公司 | Onshore | 3333 Group |
| 722 | 佛山市禅城区恒盛成房地产开发有限公司 | Onshore | 3333 Group |
| 723 | 太原恒园房地产开发有限公司 | Onshore | 3333 Group |
| 724 | 哈尔滨市都源房地产开发有限公司 | Onshore | 3333 Group |
| 725 | 宁波炜颐置业有限公司 | Onshore | 3333 Group |
| 726 | 毅昌（沈阳）房地产发展有限公司 | Onshore | 3333 Group |
| 727 | 北京嘉寰中传科技投资有限公司 | Onshore | 3333 Group |
| 728 | 宁波钿峰置业有限公司 | Onshore | 3333 Group |
| 729 | 公主岭裕恒房地产开发有限公司 | Onshore | 3333 Group |
| 730 | 公主岭恒房地产开发有限公司 | Onshore | 3333 Group |
| 731 | 航发投资管理有限公司 | Onshore | 3333 Group |
| 732 | 北京航信投资发展有限公司 | Onshore | 3333 Group |
| 733 | 北京志舟投资管理有限公司 | Onshore | 3333 Group |
| 734 | 深圳市富铭投资博晟发展有限公司 | Onshore | 3333 Group |
| 735 | 厦门富铭吾博置业有限公司 | Onshore | 3333 Group |
| 736 | 厦门富铭达天溪置业有限公司 | Onshore | 3333 Group |
| 737 | 中航富铭（厦门）置业有限公司 | Onshore | 3333 Group |
| 738 | 沈阳航远置业有限公司 | Onshore | 3333 Group |
| 739 | 重庆成环房地产开发有限公司 | Onshore | 3333 Group |
| 740 | 重庆航恒置业有限公司 | Onshore | 3333 Group |
| 741 | 重庆航茂置业有限公司 | Onshore | 3333 Group |
| 742 | 重庆江航投资发展有限公司 | Onshore | 3333 Group |
| 743 | 新世界中国地产（海口）有限公司 | Onshore | 3333 Group |
| 744 | 深圳市臻峰实业有限公司 | Onshore | 3333 Group |
| 745 | 贵州南海房地产开发有限公司 | Onshore | 3333 Group |
| 746 | 南宁弘基房地产开发有限公司 | Onshore | 3333 Group |
| 747 | 昆明恒盛置业有限公司 | Onshore | 3333 Group |
| 748 | 恒大半地实业（深圳）有限公司 | Onshore | 3333 Group |
| 749 | 广州市番禺区瑞畲房地产开发有限公司 | Onshore | 3333 Group |
| 750 | 广州市番禺区瑞焱房地产开发有限公司 | Onshore | 3333 Group |

| No. | Company name | On/Offshore | Group |
|-----|--------------|-------------|-------|
| 751 | 广州市番禺区瑞添房地产开发有限公司 | Onshore | 3333 Group |
| 752 | 广州市番禺区瑞森体育有限公司 | Onshore | 3333 Group |
| 753 | 扬中恒鹏置业有限公司 | Onshore | 0708 Group |
| 754 | 扬中恒源置业有限公司 | Onshore | 0708 Group |
| 755 | 扬中恒嘉置业有限公司 | Onshore | 0708 Group |
| 756 | 三亚汉云天文投资有限公司 | Onshore | 3333 Group |
| 757 | 贵阳恒大森上房地产开发有限公司 | Onshore | 3333 Group |
| 758 | 中山市悦房地产开发有限公司 | Onshore | 3333 Group |
| 759 | 广州市裕恒房地产开发有限公司 | Onshore | 3333 Group |
| 760 | 北京恒云盛置业有限公司 | Onshore | 3333 Group |
| 761 | 福州恒腾晟置业有限公司 | Onshore | 3333 Group |
| 762 | 重庆航墉房地产开发有限公司 | Onshore | 3333 Group |
| 763 | 北京恒房兴置业有限公司 | Onshore | 3333 Group |
| 764 | 北京恒房兴置业有限公司 | Onshore | 3333 Group |
| 765 | 贵阳恒大嘉瑞房地产开发有限公司 | Onshore | 3333 Group |
| 766 | 广州前荣通企业管理有限公司 | Onshore | 3333 Group |
| 767 | 湖北台瑞旅游开发有限公司 | Onshore | 3333 Group |
| 768 | 深圳市盈智投资有限公司 | Onshore | 3333 Group |
| 769 | 房车宝集团股份有限公司 | Onshore | 3333 Group |
| 770 | 深圳市房牛宝销售有限公司 | Onshore | 3333 Group |
| 771 | 太仓晟泰文化产业发展有限公司 | Onshore | 3333 Group |
| 772 | 沈阳恒达房地产开发有限公司 | Onshore | 3333 Group |
| 773 | 太仓祥泰旅游开发有限公司 | Onshore | 3333 Group |
| 774 | 恒大恒驰新能源汽车科技（广东）有限公司 | Onshore | 0708 Group |
| 775 | 广州市南沙区领驰企业咨询有限公司 | Onshore | 3333 Group |
| 776 | 宁波泰化恒慧置业有限公司 | Onshore | 3333 Group |
| 777 | 眉山恒慧旅游开发有限公司 | Onshore | 3333 Group |
| 778 | 眉山恒思旅游开发有限公司 | Onshore | 3333 Group |
| 779 | 武汉恒投文旅开发有限公司 | Onshore | 3333 Group |
| 780 | 内蒙古恒悦旅游开发有限公司 | Onshore | 3333 Group |

© 2023. For information, contact Deloitte China.

# List of Subject Entities

| No. | Company name | On/Offshore | Group | No. | Company name | On/Offshore | Group |
|-----|--------------|-------------|-------|-----|--------------|-------------|-------|
| 781 | 福州金麒投资有限公司 | Onshore | 3333 Group | | | | |
| 782 | 恒大恒驰新能源汽车（广东）有限公司 | Onshore | 0708 Group | | | | |
| 783 | 房车宝汽信息技术（深圳）有限公司 | Onshore | 3333 Group | | | | |
| 784 | 济南市恒凯投资管理有限公司 | Onshore | 3333 Group | | | | |
| 785 | 金麒栢康物业（北京）有限公司 | Onshore | 6666 Group | | | | |
| 786 | 惠安弘康置业有限公司 | Onshore | 3333 Group | | | | |
| 787 | 眉山瀛旅旅游开发有限公司 | Onshore | 3333 Group | | | | |
| 788 | 广州恒疆投资有限公司 | Onshore | 3333 Group | | | | |
| 789 | 内蒙古恒鑫旅游开发有限公司 | Onshore | 3333 Group | | | | |
| 790 | 深圳市钜恒实业有限责任公司 | Onshore | 3333 Group | | | | |
| 791 | 内蒙古恒荣旅游开发有限公司 | Onshore | 3333 Group | | | | |
| 792 | 湖南金盈置业有限公司 | Onshore | 3333 Group | | | | |
| 793 | 广州恒湘商业信息咨询有限公司 | Onshore | 3333 Group | | | | |
| 794 | 恒大新能源汽车投资控股集团有限公司 | Onshore | 0708 Group | | | | |

© 2023. For information, contact Deloitte China.

# Appendix 2 – Estimated Recoveries of Offshore Debts

# Estimated Recoveries of the Offshore Debts (Liquidation Scenario) – Class A

RMB in million

| Ref No. | Tranche | Accrued claims as of 31 December 2022 | Estimated Realization | | | | Total recovery amount | Recovery amount from CEG | Recovery amount from Tianji | Recovery rate |
| | | | From security (assets/ shares/ receivables)/intercompany A | From unencumbered assets of principal obligors B | From guarantors C | From keepwell provider D | E=A+B+C+D | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | CEG Existing March 2022 Notes | 15,560 | - | 351 | 168 | - | 519 | 351 | | 3.34% |
| 2 | CEG Existing April 2022 Notes | 11,271 | - | 254 | 122 | - | 376 | 254 | | 3.34% |
| 3 | CEG Existing January 2023 Notes | 8,110 | - | 183 | 88 | - | 271 | 183 | | 3.34% |
| 4 | CEG Existing February 2023 Bonds | 76 | - | 2 | 1 | - | 3 | 2 | | 3.34% |
| 5 | CEG Existing April 2023 Notes | 6,520 | - | 147 | 71 | - | 218 | 147 | | 3.34% |
| 6 | CEG Existing June 2023 Notes | 10,323 | - | 233 | 112 | - | 345 | 233 | | 3.34% |
| 7 | CEG Existing January 2024 Notes | 8,129 | - | 183 | 88 | - | 271 | 183 | | 3.34% |
| 8 | CEG Existing March 2024 Notes | 7,413 | - | 167 | 80 | - | 247 | 167 | | 3.34% |
| 9 | CEG Existing April 2024 Notes | 5,429 | - | 122 | 59 | - | 181 | 122 | | 3.34% |
| 10 | CEG Existing June 2025 Notes | 36,653 | - | 826 | 397 | - | 1,223 | 826 | | 3.34% |
| 11 | CEG Existing January 2022 Notes | 2,420 | - | 55 | 26 | - | 81 | 55 | | 3.34% |
| 12 | Class A Private Loan | 87 | - | 2 | 1 | - | 3 | 2 | | 3.34% |
| | Class A Total: | 111,991 | - | 2,525 | 1,213 | - | 3,738 | 2,525 | | 3.34% |

*Note: Figures above are subject to rounding.*

© 2023. For information, contact Deloitte China.

# Estimated Recoveries of the Offshore Debts (Liquidation Scenario) – Class B

RMB in million

| Ref No. | Tranche | Accrued claims as of 31 December 2022 | Estimated Realization | | | | Total recovery amount | Recovery amount from CEG | Recovery amount from Tianji | Recovery rate |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | From security (assets/shares/intercompany receivables) | From unencumbered assets of principal obligors | From guarantors | From keepwell provider | | | | |
| | | | A | B | C | D | E=A+B+C+D | | | |
| 1 | SJ Existing October 2022 Notes | 16,226 | - | 263 | 1,744 | 705 | 2,712 | - | 373 | 16.71% |
| 2 | SJ Existing November 2022 Notes | 5,449 | - | 88 | 586 | 237 | 911 | - | 125 | 16.71% |
| 3 | SJ Existing October 2023 Notes | 16,285 | - | 264 | 1,751 | 707 | 2,722 | - | 375 | 16.71% |
| 4 | SJ Existing November 2023 Notes | 5,034 | - | 82 | 541 | 219 | 842 | - | 116 | 16.71% |
| | Class B Total: | 42,994 | - | 697 | 4,622 | 1,868 | 7,187 | - | 989 | 16.71% |

*Note: Figures above are subject to rounding.*

China Evergrande Group | Liquidation Analysis Report

60

© 2023. For information, contact Deloitte China.

# Estimated Recoveries of the Offshore Debts (Liquidation Scenario) – Class C

RMB in million

| Ref No. | Tranche | Accrued claims as of 31 December 2022 | Estimated Realization | | | | Total recovery amount E=A+B+C-D | Recovery amount from CEG | Recovery amount from Tianji | Recovery rate |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | From security (assets/ shares/ receivables) A | From unencumbered assets of principal obligors B | From guarantors C | From keepwell provider D | | | | |
| 1 | Lake Notes | 2,050 | - | - | 94 | 89 | 183 | 46 | 47 | 8.91% |
| 2 | Dongpo Notes | 3,070 | 8 | - | 69 | - | 77 | 69 | - | 2.52% |
| 3 | Dongpo Put Option | 1,001 | 15 | 22 | - | - | 37 | 22 | - | 3.76% |
| 4 | Graceful Court Put Option | 839 | 13 | 19 | - | - | 32 | 19 | - | 3.76% |
| 5 | New Chic Margin Loan | 138 | 30 | 6 | 3 | - | 39 | 3 | - | 28.48% |
| 6 | Clear Star Put Option | 513 | - | 12 | 12 | - | 24 | 12 | 12 | 4.57% |
| 7 | CEG Loan 1 | 1,460 | - | 33 | - | - | 33 | 33 | - | 2.26% |
| 8 | CEG Loan 2 | 729 | - | 16 | - | - | 16 | 16 | - | 2.26% |
| 9 | Venice Loan | 173 | 102 | - | 4 | - | 106 | 4 | - | 61.25% |
| 10 | Venice SPA | 3,979 | 2,348 | - | 90 | - | 2,438 | 90 | - | 61.28% |
| 11 | Hero Loan | 6,922 | 3,400 | 160 | 156 | - | 3,716 | 156 | 160 | 53.68% |
| 12 | FCB Put Option | 4,957 | - | 1,157 | - | - | 1,157 | 112 | 160 | 23.33% |

Note: Figures above are subject to rounding.

© 2023. For information, contact Deloitte China.

# Estimated Recoveries of the Offshore Debts (Liquidation Scenario) – Class C (cont'd)

RMB in million

| Ref No. | Tranche | Accrued claims as of 31 December 2022 | Estimated Realization | | | | Total recovery amount | Recovery amount from CEG | Recovery amount from Tianji | Recovery rate |
| | | | From security (assets/ shares/ intercompany receivables) | From unencumbered assets of principal obligors | From guarantors | From keepwell provider | | | | |
| | | | A | B | C | D | E=A+B+C+D | | | |
| 13 | RMB Bond Put Option | 8,760 | 380 | 189 | - | - | 569 | 189 | - | 6.50% |
| 14 | CEG Guarantees of PRC Liabilities | 64,490 | 2,934 | 3,680 | 4,160 | - | 10,774 | 1,395 | - | 16.71% |
| 15 | Kailong Arbitration Award | 5,805 | - | 131 | - | - | 131 | 131 | - | 2.26% |
| 16 | On-Lent Loan | _2 | _2 | _2 | _2 | _2 | _2 | _2 | _2 | - |
| | Class C Total: | 104,886 | 9,230 | 5,425 | 4,588 | 89 | 19,332 | 2,297 | 219 | 18.43% |

Notes:
1. Figures above are subject to rounding.
2. The On-Lent Loan and Class A Private Loan are considered to be duplicative and substantially the same debt owed by CEG. Therefore, the On-Lent Loan is considered to be of no value in a liquidation of CEG due to the rule against 'double proof' and/or on a contractual basis

China Evergrande Group | Liquidation Analysis Report

© 2023. For information, contact Deloitte China.

# Estimated Recoveries of the Offshore Debts (Liquidation Scenario) – Class D

RMB in million

| Ref No. | Tranche | Accrued claims as of 31 December 2022 | Estimated Realization | | | | Total recovery amount | Recovery amount from CEG | Recovery amount from Tianji | Recovery rate |
| | | | From security (assets/shares/intercompany receivables) | From unencumbered assets of principal obligors | From guarantors | From keepwell provider | | | | |
| | | | A | B | C | D | E=A+B+C+D | | | |
| 1 | SJ Existing October 2022 Notes | 16,226 | - | 263 | 1,744 | 705 | 2,712 | - | 373 | 16.71% |
| 2 | SJ Existing November 2022 Notes | 5,449 | - | 88 | 586 | 237 | 911 | - | 125 | 16.71% |
| 3 | SJ Existing October 2023 Notes | 16,285 | - | 264 | 1,751 | 707 | 2,722 | - | 375 | 16.71% |
| 4 | SJ Existing November 2023 Notes | 5,034 | - | 82 | 541 | 219 | 842 | - | 116 | 16.71% |
| 5 | Lake Notes | 2,050 | - | - | 94 | 89 | 183 | 46 | 47 | 8.91% |
| 6 | Clear Star Put Option | 513 | - | 12 | 12 | - | 24 | 12 | 12 | 4.57% |
| 7 | Castle Share Put Option | 2,160 | 9 | 50 | 1 | - | 60 | - | 50 | 2.79% |
| 8 | Hero Loan | 6,922 | 3,400 | 160 | 156 | - | 3,716 | 156 | 160 | 53.68% |
| 9 | Tuen Mun Put Options | 1,563 | 793 | 18 | - | - | 811 | - | 18 | 51.90% |
| 10 | CEG-Tianji Intercompany Balance | 35,065 | - | 811 | - | - | 811 | - | 811 | 2.31% |
| 11 | Castle Loan Put Option | -[2] | -[2] | -[2] | -[2] | -[2] | -[2] | -[2] | -[2] | -[2] |
| | Class D Total: | 91,267 | 4,202 | 1,748 | 4,885 | 1,957 | 12,792 | 214 | 2,087 | 13.99% |

Notes:
1. Figures above are subject to rounding.
2. The Castle Loan Put Option is considered to be duplicative of a portion of the Castle Share Put Option and substantially the same debt owed by Tianji. Therefore, the Castle Loan Put Option is considered to be of no value in a liquidation of Tianji due to the rule against 'double proof' and/or on a contractual basis.

© 2023. For information, contact Deloitte China.

# Appendix 3 – List of Subsequent Events considered

# List of Subsequent Events considered

For the purpose of the Liquidation Analysis, we have considered the following Subsequent Events based on the Company's announcements or information provided by management:

1. **Disposal of subsidiaries of 708 Group**

On April 24, 2023, Evergrande Auto entered into a Sale and Purchase Agreement with Anxin Holding Limited ("Anxin") and CEG, where Anxin (a wholly-owned subsidiary of CEG) will acquire the entire issued share capital of Assemble Guard Limited and Flaming Ace Limited for a consideration of RMB2 (subject to consideration adjustment).

Flaming Ace Limited is an Out-scope Entity. By reference to the selection criteria set out on page 9, it is unlikely that there are material recoveries from Flaming Ace Limited and its subsidiaries to CEG in terms of shareholder value.

Based on the Liquidation Analysis, the return to the shareholder of Assemble Guard Limited is estimated to be nil.

2. **Arbitral award against certain entities of 3333 Group**

On 12 May 2023, the Company announced that it had received an enforcement notice issued by the Guangzhou Intermediate People's Court of Guangdong Province (the "Enforcement Notice") in relation to the arbitral award of the Shenzhen Court of International Arbitration (the "Arbitral Award") against the Company and its subsidiary Guangzhou Kailong Real Estate Company Limited ("Guangzhou Kailong"), arising from repurchase obligation of the Company, Hengda Real Estate and Guangzhou Kailong in respect of the capital increase and other relevant matters of Hengda Real Estate.

The obligations of the Company and Guangzhou Kailong under the Arbitral Award were considered in the Liquidation Analysis.

3. **Full repayment of Lei Shing Hong Loan**

As at 31 December 2022, Profit Concept Finance Limited ("Profit Concept"), an indirect subsidiary of Tianji, had an outstanding secured liabilities in the sum of approx. HK$77m under the Lei Shing Hong Loan which was guaranteed by Tianji. The amount has been fully repaid by Profit Concept in January 2023.

© 2023. For information, contact Deloitte China.

China Evergrande Group | Liquidation Analysis Report

65

# Appendix 4 – Scenario Analysis

## Scenario Analysis | Treatment of CEG's Onshore Debt Guarantee & Keepwell Agreement of SJ Existing Notes

Scenario analysis was performed to estimate recoveries to the Offshore Debts under different possible outcomes in respect of (i) the Keepwell arrangement of the SJ Existing Notes; and (ii) potential recoveries from primary obligors and security to debts relating to Type 1 Guarantee.

**Keepwell Agreement**

Considering that there remains uncertainty as to if the keepwell arrangement provided by Hengda Real Estate is enforceable and at the time of the preparation of the Liquidation Analysis, there are a number of on-going court cases in this regard, scenario analysis was performed by assuming (i) the keepwell arrangement was valid and the claim would be admitted into the bankruptcy of Hengda Real Estate; and (ii) the keepwell arrangement was invalid.

**Type 1 Guarantee**

In relation to Type 1 Guarantee provided by CEG in respect of debts of non-Group entities, based on the analysis from the PRC legal advisors, creditors would need to exhaust recoveries from principal obligors and security before claiming against CEG, i.e. creditors could claim against CEG for the deficiency only. As borrowers and security of Type 1 Guarantee are outside the Group, no information was available for assessing recoveries from borrowers and security. Scenario analysis were performed by assuming there were **0%, 50%, 75% or 100%** recoveries from the principal obligors and security.

**The Liquidation Analysis**

Estimated recoveries set out on pages 33-36 and 59-63 were computed based on (i) the keepwell arrangement was valid and the claim would be admitted into bankruptcy of Hengda Real Estate; and (ii) there were 0% recovery from the primary obligors and security in respect of onshore debts under Type 1 Guarantee so that 100% of the guaranteed debts would be claimed and admitted in the liquidation of CEG.

© 2023. For information, contact Deloitte China.

# Scenario Analysis | Treatment of CEG's Onshore Debt Guarantee & Keepwell Agreement of SJ Existing Notes

| Scenario | Assumptions | Recovery of CEG Existing Notes | Recovery of SJ Existing Notes | Recovery for CEG's unsecured creditors | Recovery for TJ's unsecured creditors |
|---|---|---|---|---|---|
| 1 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): <u>100% Claim</u><br>• CEG's Type1 Guarantee : <u>100% Claim</u><br>• Keepwell : <u>100% Valid</u> | 3.34% | 16.71% | 2.26% | 2.31% |
| 2 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): <u>100% Claim</u><br>• CEG's Type1 Guarantee : <u>50% Claim</u><br>• Keepwell : <u>100% Valid</u> | 3.44% | 16.71% | 2.32% | 2.31% |
| 3 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): <u>100% Claim</u><br>• CEG's Type1 Guarantee : <u>100% Claim</u><br>• Keepwell : <u>0% Valid (i.e Invalid)</u> | 3.34% | 12.37% | 2.26% | 2.31% |
| 4 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): <u>100% Claim</u><br>• CEG's Type1 Guarantee : <u>50% Claim</u><br>• Keepwell : <u>0% Valid (i.e Invalid)</u> | 3.43% | 12.37% | 2.32% | 2.31% |
| 5 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): <u>50% Claim</u><br>• CEG's Type1 Guarantee : <u>50% Claim</u><br>• Keepwell : <u>100% Valid</u> | 3.61% | 16.71% | 2.48% | 2.31% |
| 6 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): <u>50% Claim</u><br>• CEG's Type1 Guarantee : <u>50% Claim</u><br>• Keepwell : <u>0% Valid (i.e Invalid)</u> | 3.61% | 12.37% | 2.48% | 2.31% |
| 7 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): <u>25% Claim</u><br>• CEG's Type1 Guarantee : <u>25% Claim</u><br>• Keepwell : <u>100% Valid</u> | 3.86% | 16.71% | 2.68% | 2.31% |
| 8 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): <u>25% Claim</u><br>• CEG's Type1 Guarantee : <u>25% Claim</u><br>• Keepwell : <u>0% Valid (i.e Invalid)</u> | 3.86% | 12.37% | 2.68% | 2.31% |
| 9 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): <u>0% Claim</u><br>• CEG's Type1 Guarantee : <u>0% Claim</u><br>• Keepwell : <u>100% Valid</u> | 4.22% | 16.71% | 2.98% | 2.31% |
| 10 | • CEG Onshore Guarantee Debts (Exclude Type1 Guarantee): <u>0% Claim</u><br>• CEG's Type1 Guarantee : <u>0% Claim</u><br>• Keepwell : <u>0% Valid (i.e Invalid)</u> | 4.22% | 12.37% | 2.98% | 2.31% |

China Evergrande Group | Liquidation Analysis Report

68

© 2023. For information, contact Deloitte China.



**Deloitte.**



About Deloitte

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited ("DTTL"), its global network of member firms, and their related entities (collectively, the "Deloitte organization"). DTTL (also referred to as "Deloitte Global") and each of its member firms and related entities are legally separate and independent entities, which cannot obligate or bind each other in respect of third parties. DTTL and each DTTL member firm and related entity is liable only for its own acts and omissions, and not those of each other. DTTL does not provide services to clients. Please see www.deloitte.com/about to learn more.

Deloitte is a leading global provider of audit and assurance, consulting, financial advisory, risk advisory, tax and related services. Our global network of member firms and related entities in more than 150 countries and territories (collectively, the "Deloitte organization") serves four out of five Fortune Global 500® companies. Learn how Deloitte's approximately 345,000 people make an impact that matters at www.deloitte.com.

Deloitte Asia Pacific Limited is a company limited by guarantee and a member firm of DTTL. Members of Deloitte Asia Pacific Limited and their related entities, each of which are separate and independent legal entities, provide services from more than 100 cities across the region, including Auckland, Bangkok, Beijing, Hanoi, Hong Kong, Jakarta, Kuala Lumpur, Manila, Melbourne, Osaka, Seoul, Shanghai, Singapore, Sydney, Taipei and Tokyo.

The Deloitte brand entered the China market in 1917 with the opening of an office in Shanghai. Today, Deloitte China delivers a comprehensive range of audit & assurance, consulting, financial advisory, risk advisory and tax services to local, multinational and growth enterprise clients in China. Deloitte China has also made—and continues to make—substantial contributions to the development of China's accounting standards, taxation system and professional expertise. Deloitte China is a locally incorporated professional services organization, owned by its partners in China. To learn more about how Deloitte makes an Impact that Matters in China, please connect with our social media platforms at www2.deloitte.com/cn/en/social-media.

This communication contains general information only, and none of Deloitte Touche Tohmatsu Limited ("DTTL"), its global network of member firms or their related entities (collectively, the "Deloitte organization") is, by means of this communication, rendering professional advice or services. Before making any decision or taking any action that may affect your finances or your business, you should consult a qualified professional adviser.

No representations, warranties or undertakings (express or implied) are given as to the accuracy or completeness of the information in this communication, and none of DTTL, its member firms, related entities, employees or agents shall be liable or responsible for any loss or damage whatsoever arising directly or indirectly in connection with any person relying on this communication. DTTL and each of its member firms, and their related entities, are legally separate and independent entities.

© 2023. For information, contact Deloitte China.

**SCHEDULE 3**

**RECOVERY ANALYSIS**







**China Evergrande Group**

*Scheme Recovery Analysis Report*

**21 July 2023**

**Deloitte.**

# Deloitte.

德勤

Deloitte Financial Advisory Services
A division of Deloitte Advisory
(Hong Kong) Limited
35/F One Pacific Place
88 Queensway
Hong Kong

Tel: +852 2852 1600
Fax: +852 2541 1911
Email: enquiry@deloitte.com.hk
www.deloitte.com/cn

**Glen Ho**
Engagement Partner
+852 2852 1643
gleho@deloitte.com.hk

**Karen Chu**
Engagement Partner
+852 2852 1680
karchu@deloitte.com.hk

**Cyrus Ng**
Engagement Partner
+852 2852 1024
cyng@deloitte.com.hk

**Andre Davidovic**
Engagement Director
+852 2852 6432
andavidovic@deloitte.com.hk

China Evergrande Group
15th Floor, YF Life Centre
38 Gloucester Road
Wanchai, Hong Kong

Scenery Journey Limited
15th Floor, YF Life Centre
38 Gloucester Road
Wanchai, Hong Kong

Tianji Holding Limited
15th Floor, YF Life Centre
38 Gloucester Road
Wanchai, Hong Kong

Dear Sirs,

**RE:  Scheme Recovery Analysis Report**

We enclose our report (the "**Report**") in connection with the high-level scheme recovery analysis of the offshore debts of China Evergrande Group ("**CEG**", the "**Company**"), Scenery Journey Limited ("**SJ**") and Tianji Holding Limited ("**Tianji**") under the proposed scheme terms as announced by the Company on 22 March 2023 in accordance with our engagement letter dated 15 July 2022, the first supplementary agreement dated 20 June 2023 and the second supplementary agreement dated 17 July 2023 (collectively referred to as the "**Agreement**").

The Report was prepared solely for the benefit of the Company, SJ and Tianji only. No other party is entitled to rely on the Report for any purpose whatsoever and we accept no duty of care or liability to any other party who is shown or gains access to the Report.

The Report has been prepared based on limited information provided to Deloitte Advisory (Hong Kong) Limited ("**DAHK**"). The scenarios presented in the Report involve extensive use of estimates and assumptions, which are inherently subject to uncertainties and contingencies beyond the control of the Group, its management and advisors.  The assumptions will need to be reviewed and revised to reflect any future changes in the circumstances of any of the Company and its subsidiaries.  We draw your attention to the sections titled "Disclaimers" (page 2) and "Limitations" (page 3) of the Report.

The Report is prepared based on information received up to 20 July 2023 ("**Cut-Off Date**"), we have not updated our work since then.

Yours faithfully,
For and on behalf of
**Deloitte Advisory (Hong Kong) Limited**

China Evergrande Group | Scheme Recovery Analysis Report

© 2023 Deloitte China.

# Disclaimers

- The Scheme Recovery Analysis Report (the "Report", "Scheme Recovery Analysis") has been prepared in connection with the results of the high-level analysis on the estimated recoveries of certain debts of China Evergrande Group (the "Company" or "CEG"), Scenery Journey Limited ("SJ") and Tianji Holding Limited ("Tianji") under the proposed restructuring of the offshore debts of the Company and its subsidiaries (collectively the "Group") as announced by the Company on 22 March 2023 (the "Restructuring") in accordance with the terms of the engagement agreement dated 15 July 2022, the first supplementary agreement dated 20 June 2023 and the second supplementary agreement on or around 17 July 2023 entered into between the Company, SJ, Tianji and Deloitte Advisory (Hong Kong) Limited ("DAHK" or "we" or "us") (collectively referred to as the "Agreement").

- Information contained in the Report is subject to the disclaimers, sources of information, assumptions and limitations set out herein.

- By reviewing the Report, the creditors of the schemes of CEG, SJ and Tianji ("Scheme Creditors") and any other party who gains access to the Report shall be deemed to have read, and to have irrevocably acknowledged and agreed to comply with, the following contents of this disclaimer:

(i)    the Report was prepared solely for the benefit of CEG, SJ and Tianji and, save in respect of CEG, SJ and Tianji, DAHK accepts no duty of care or liability to any other party regardless of whether or not a party was shown or gained access to the Report, or is a Scheme Creditor placing any reliance on the Report;

(ii)   With respect to dealing in shares, the Report may contain material non-public information of CEG. Thus, any disclosure, copying, or distribution of the Report or the taking of any action based on it, which would constitute insider dealing with respect to shares in CEG, is strictly prohibited;

(iii)  the Report was prepared for indicative and illustrative purposes only. The actual recoveries may vary subject to, among other things, the ability of the Company to fulfil the repayment obligations under the Restructuring and the amounts of claims submitted and ultimately admitted as claims under the respective scheme of arrangement of the Company, SJ and Tianji. Thus the actual recoveries could be materially different from the estimated recoveries set out in the Report;

(iv)   the Report was prepared on the basis of information, including unaudited information, received by DAHK up to 20 July 2023 and DAHK has not updated the Report since that date. DAHK relied on the financials and other information provided to it and on representations made to it by management of CEG and CEG's subsidiaries, and their relevant companies' respective staff and advisors. DAHK did not audit or verify the correctness and accuracy of the information provided to it and DAHK does not express an audit opinion on its findings and analysis. DAHK accepts no responsibility for the reliability of such information to the extent it is inaccurate, incomplete or misleading;

(v)    the Report may not contain all facts and information that a Scheme Creditor may regard as relevant or potentially relevant; and

(vi)   the Scheme Creditors and any other party who gains access to the Report shall refer to the disclaimers, limitations and sources of information set out herein.

© 2023 Deloitte China.



# Limitations

## Limited scope Scheme Recovery Analysis under the assumption that the Group would operate as a going concern

- The Scheme Recovery Analysis set out estimates of the recoveries to Class A Scheme Creditors, Class C Scheme Creditors, Class B (SJ) Scheme Creditors and Class D (TI) Scheme Creditors under the terms of the Proposed Restructuring set out in the Restructuring Announcements.

- The analysis was performed on the following principal assumptions:

  (i) that the Group would operate as a going concern;

  (ii) that the Group would have sufficient financial resources to meet all obligations under the Proposed Restructuring;

  (iii) that there would not be any restrictions on the Group remitting funds offshore; and

  (iv) that the Proposed Restructuring would be successfully implemented.

- An assessment of the capacity of the Group to adhere to and implement the Proposed Restructuring, including an assessment of the Group's ability to generate sufficient cash flow to meet debt servicing and maturity obligations has not been considered because it is outside of our high level analysis.

## Subsequent events were not considered

- Events after 31 December 2022 were not taken account of, except for those set out in the section "Adjustments to FY22 Accounts" on page 32.

- Interest and default interest was accrued up to 31 December 2022.

## Use of estimates and assumptions

- Preparation of the Scheme Recovery Analysis involved extensive use of estimates and assumptions, which are inherently subject to uncertainties and contingencies beyond the control of the Company, its management and advisors. As a result, the actual recoveries from the Schemes could be materially different from the estimated recoveries set forth in the Scheme Recovery Analysis.

## Accuracy and completeness of information

- We relied heavily upon the accuracy, validity and completeness of the financial and other information provided to us by the Company, its staff and advisors. We have not sought to audit or independently verify the information provided to us. Where information has been provided to us, we have assumed that it is accurate and current.

- In particular, we have assumed that known liabilities have been fully and properly recorded and all guarantees have been identified and properly accounted for. That actual claims and debts finally admitted in the respective Schemes could be different from those estimated in the Scheme Recovery Analysis.

- Details of balances of claims against CEG/SJ/Tianji and relevant exchange rates were provided by the Company and were adopted in the Scheme Recovery Analysis.

## Estimated recoveries from Third-Party Rights

- Class B (SJ) Debts, Class C Debts and Class D (TI) Debts were to be admitted to the Scheme, the CEG Scheme, and the Tianji Scheme for the deficiency amounts only, i.e. after deducting estimated recoveries from Third-Party Rights.

- We are not provided with independent valuation on the fair value of Third-Party Rights in relation to Class C Debts and Class D (TI) Debts. We adopted the estimated realizable value of the Third-Party Rights as estimated by the Liquidation Analysis (i.e. under a hypothetical liquidation scenario) in estimating the deficiency claims of Class C Scheme Creditors and Class D (TI) Scheme Creditors to be admitted in the CEG Schemes and the Tianji Scheme.

- Should there be independent valuation of the fair value of the Third-Party Rights prepared on the basis of the Schemes had become effective and the Group has continued as a going concern, the actual recoveries of creditors under the respective Schemes might be different.

## Tax issues

- It is assumed that distributions to Scheme Creditors would not be subject to payment of any taxes. Should distributions to Scheme Creditors give rise to tax obligations, the actual recoveries would be lower than those set forth in the Scheme Recovery Analysis.

© 2023 Deloitte China.




# Glossary of terms

| Abbreviations | Definition |
|---|---|
| A1 Notes | CEG New Notes to be issued to Class A Scheme Creditors electing Option 1 |
| A2 Notes | CEG New Notes to be issued to Class A Scheme Creditors electing Option 2 |
| A2 Package | Equity Package to be issued to Class A Scheme Creditors electing Option 2 |
| approx. | approximately |
| Auditor | Prism Hong Kong and Shanghai Limited, the auditor of the Company |
| B/b | Billion |
| C1 Notes | CEG New Notes to be issued to Class C Scheme Creditors electing Option 1 |
| C2 Notes | CEG New Notes to be issued to Class C Scheme Creditors electing Option 2 |
| C2 Package | Equity Package to be issued to Class C Scheme Creditors electing Option 2 |
| CEG / Company | China Evergrande Group, a company listed on the SEHK with stock code 3333.hk |
| CEG New Notes | New notes to be issued by CEG under the Proposed Restructuring |
| CEG Schemes | The schemes of arrangement to be entered into between CEG and its creditors in relation to Class A Debts and Class C Debts |
| CEG Scheme Creditors | Class A Scheme Creditors and Class C Scheme Creditors |
| Class A Scheme Creditors | Scheme Creditors holding Class A Debts |
| Class A Debts | Certain debts of CEG, consisting of the public notes issued by CEG, the convertible bonds issued by CEG and Class A Private Loan, as set out on pages 6 - 7 |
| Class B (SJ) Scheme Creditors | Scheme Creditors holding Class B (SJ) Debts |
| Class B (SJ) Debts | Debts of SJ, as set out on pages 6 - 7 |
| Class C Scheme Creditors | Scheme Creditors holding Class C Debts |
| Class C Debts | Certain debts of CEG, consisting of the private debt obligations of CEG (except the Class A Private Loan), put option obligations of CEG and debts guaranteed by CEG, as set out on pages 6 - 7 |
| Class D (TJ) Scheme Creditors | Scheme Creditors holding Class D (TJ) Debts |
| Class D (TJ) Debts | Debts of Tianji, as set out on pages 6 - 7 |

| Abbreviations | Definition |
|---|---|
| EBITDA | Earnings before interest, tax, depreciation and amortisation |
| Equity Package | a package of five equity-linked instruments, which are either secured over, linked to, mandatorily exchangeable into, or mandatorily convertible into (as applicable) listed shares of EVPS, NEV, or the Company |
| EV | Enterprise value |
| EVPS | Evergrande Property Services Group Limited, a company listed on the SEHK with stock code 6666.hk |
| FY22 Accounts | Audited financial information of CEG for the year ended 31 December 2022 |
| Evergrande Property Group/ 6666 Group | Evergrande Property and its subsidiaries |
| Group | CEG and its subsidiaries |
| Hengda Real Estate | Hengda Real Estate Group Company Limited |
| HKD | Hong Kong Dollars, the lawful currency of Hong Kong |
| Hong Kong | Hong Kong Special Administrative Region |
| Liquidation Analysis | Analysis performed by DAHK in estimating recoveries to certain offshore debts of CEG, SJ and Tianji under a hypothetical liquidation scenario of the Group as at 1 January 2023 |
| M/m | Million |
| Management | Management of the Group |
| Maples | Legal advisors of the Company in respect of laws of Cayman Islands and British Virgin Islands |
| MCBs | Mandatory convertible bonds |
| MEBs | Mandatory exchangeable bonds |
| NEV | China Evergrande New Energy Vehicle Group Limited, a company listed on the SEHK with stock code 708.hk |
| New Notes | CEG New Notes, SJ New Notes, and TJ New Notes |
| Offshore Debts | Debts of CEG, SJ and Tianji as set on pages 6 - 7 |
| Option 1 | An option under which CEG Scheme Creditors would receive CEG New Notes (a tenor of 10 to 12 years) at a 1:1 conversion ratio of their claims |
| Option 2 | An option under which CEG Scheme Creditors would elect to convert their entitlements into (1) CEG New Notes (a tenor of five to nine years) on a 1:1 conversion ratio of their claims ; (2) Equity Package; or (3) a combination of (1) and (2) |

© 2023 Deloitte China.

China Evergrande Group | Scheme Recovery Analysis Report    4



# Glossary of terms

| Abbreviations | Definition |
|---|---|
| PRC | The People's Republic of China, which for the purpose of the Report, excludes Hong Kong and Macau Special Administrative Region |
| Proposed Restructuring | The proposed restructuring of the indebtedness of CEG, SJ and Tianji by way of schemes of arrangement as set out in the Restructuring Announcements |
| PIK | Payment in kind |
| Reference Date | Restructuring effective date. For the purpose of this Scheme Recovery Analysis, it is assumed to be 31 December 2022 |
| Restructuring Announcements | Announcements of CEG dated 22 March 2023 and 3 April 2023 |
| Restructuring Consideration | The notes or equities to be offered to the Scheme Creditors in exchange for the Scheme Creditors releasing their claims against CEG/ SJ/ Tianji under the Proposed Restructuring |
| RMB | Renminbi, the lawful currency of the PRC |
| RMB Bonds | 15 Hengda 03 RMB bond issued by Hengda Real Estate and listed in the Shanghai Stock Exchange, in which the Company guaranteed the repurchase of the RMB bond at the Redemption Date (as defined in the 15 Hengda 03 RMB bond indenture) if Hengda Real Estate failed to ensure sufficient funds in the bank account to repay the RMB Bondholders 3 business days prior to the Redemption Date and the RMB Bondholders so demanded. The outstanding principal of the 15 Hengda 03 RMB bond is RMB8.2 billion |
| SAFE | State Administration for Foreign Exchange, the PRC |
| Scheme Creditors | Creditors of any of the CEG Schemes, the SJ Scheme and the Tianji Scheme |
| Schemes | Collectively the CEG Schemes, the SJ Scheme and the Tianji Scheme |
| SEHK | Stock Exchange of Hong Kong |
| Sidley Austin | Legal advisors of the Company in respect of Hong Kong laws and English laws |
| SJ | Scenery Journey Limited |
| SJ New Notes | New Notes to be issued to Class B (SJ) Scheme Creditors |
| SJ Scheme | the scheme of arrangement to be entered into between SJ and its creditors in relation to Class B (SJ) Debts |
| SLNs | Security-linked notes |
| Subsequent Events | Events after 31 December 2022 |

| Abbreviations | Definition |
|---|---|
| Tianji / TJ | Tianji Holding Limited |
| TJ New Notes | New Notes to be issued to Class D (TJ) Scheme Creditors |
| Tianji Scheme/TJ Scheme | The scheme of arrangement to be entered into between Tianji and its creditors, in relation to Class D (TJ) Debts |
| Third-Party Rights | Rights against any person other than CEG, SJ and/or Tianji (as applicable) who is an obligor, guarantor, security or provider of any other credit support (including where applicable, Restructuring Consideration received from the CEG Schemes, SJ Scheme or TJ Scheme (as applicable)) |
| USD | United States Dollar, the lawful currency of the United States of America |
| VDate | Valuation date being 31 December 2022 |

© 2023 Deloitte China.

China Evergrande Group | Scheme Recovery Analysis Report



## Glossary Definition of Offshore Debts

| Class | Terms | Definition |
|---|---|---|
| A | CEG Existing March 2022 Notes | 8.25% senior notes due March 23, 2022 (ISIN: XS1580431143, Common Code: 158043114) |
| A | CEG Existing April 2022 Notes | 9.5% senior notes due April 11, 2022 (ISIN: XS1982036961, Common Code: 198203696) |
| A | CEG Existing January 2023 Notes | 11.5% senior notes due January 22, 2023 (ISIN: XS2106834299, Common Code: 210683429) |
| A | CEG Existing February 2023 Bonds | 4.25% convertible bonds due February 14, 2023 (ISIN: XS1767800961, Common Code: 176780096) |
| A | CEG Existing April 2023 Notes | 10.0% senior notes due April 11, 2023 (ISIN: XS1982037779, Common Code: 198203777) |
| A | CEG Existing June 2023 Notes | 7.5% senior notes due June 28, 2023 (ISIN: XS1627599498, Common Code: 162759949) |
| A | CEG Existing January 2024 Notes | 12.0% senior notes due January 22, 2024 (ISIN: XS2106834372, Common Code: 210683437) |
| A | CEG Existing March 2024 Notes | 9.5% senior notes due March 29, 2024 (ISIN: XS1587867539, Common Code: 158786753) |
| A | CEG Existing April 2024 Notes | 10.5% senior notes due April 11, 2024 (ISIN: XS1982040641, Common Code: 198204064) |
| A | CEG Existing June 2025 Notes | 8.75% senior notes due June 28, 2025 (ISIN: XS1627599654, Common Code: 162759965) |
| A | CEG Existing January 2022 Notes | 9.5% senior notes due January 30, 2022 (ISIN: XS1991102846, Common Code: 199110284) |
| A | Class A Private Loan | Private loan of US$100,000,000 with 15% interest p.a. due January 2022 owed by the Company |
| B, D | SJ Existing October 2022 Notes | 11.5% senior notes due October 24, 2022 (ISIN: XS2109191986, Common Code: 10919198) |
| B, D | SJ Existing November 2022 Notes | 13.0% senior notes due November 6, 2022 (ISIN: XS1903671854, Common Code: 190367185) |
| B, D | SJ Existing October 2023 Notes | 12.0% senior notes due October 24, 2023 (ISIN: XS2109192109, Common Code: 210919210) |
| B, D | SJ Existing November 2023 Notes | 13.75% senior notes due November 6, 2023 (ISIN: XS1903671938, Common Code: 190367193) |
| C, D | Lake Notes | US$260 million 8.5% senior notes due October 3, 2021 (ISIN: XS2054446617, Common Code: 205444661) issued by Jumbo Fortune Enterprises Limited |
| C | Dongpo Notes | US$424 million 9.0% senior notes due January 22, 2023 (ISIN: XS2290369128, Common Code: 229036912) issued by Great Courage Global Limited |
| C | Dongpo Put Option | US$116 million put option granted by CEG in relation to certain Dongpo Notes |
| C | Graceful Court Put Option | US$110 million put option granted by CEG in relation to shares of Graceful Court Limited |
| C | New Chic Margin Loan | HK$160 million margin loan borrowed by New Chic Global Limited |

China Evergrande Group | Scheme Recovery Analysis Report

© 2023 Deloitte China.




# Glossary Definition of Offshore Debts

| Class | Terms | Definition |
|---|---|---|
| C, D | Clear Star Put Option | HK$575 million put option granted by Tianji in respect of shares of Clear Star Investments Limited |
| C | CEG Loan 1 | HK$1.2 billion loan borrowed by CEG due 2 January 2022 |
| C | CEG Loan 2 | HK$600 million loan borrowed by CEG due 7 January 2022 |
| C | Venice Loan | US$20 million structured loan borrowed by Rainbow Ever Limited |
| C | Venice SPA | US$355 million structured sale and purchase agreement of shares in Rainbow Ever Limited |
| C, D | Hero Loan | HK$7.6 billion loan borrowed by Tianji pursuant to facilities agreement dated 21 November 2020 |
| C | FCB Put Option | US$712 million repurchase obligations granted by CEG, Alpha Beauty Limited and New Gains Group Limited in respect of Fangchebao Group Co. Ltd |
| C | RMB Bond Put Option | Repurchase obligations of CEG in relation to the RMB Bond |
| C | CEG Guarantees of PRC Liabilities | Unsecured liabilities of CEG arising in connection with the liabilities of entities incorporated the PRC |
| C | Kailong Arbitration Award | Arbitration award rendered by the Shenzhen Court of International Arbitration where CEG, Guangzhou Kailong Real Estate Company Limited, and the Chairman of CEG (Mr. Hui Ka Yan) were responsible for the repayment accordingly |
| C | On-Lent Loan | Amounts on-lent to CEG pursuant to the loan agreement relating to the provision of the Class A Private Loan |
| D | Castle Loan Put Option | US$258 million put option granted by Tianji in relation to a private loan borrowed by Sky Joy Holdings Limited |
| D | Castle Share Put Option | US$258 million put option granted by Tianji in relation to shares of Sky Joy Holdings Limited |
| D | Tuen Mun Put Options | HK$1.4 billion put options granted by Tianji in relation to a project located in Tuen Mun, Hong Kong |
| D | CEG-Tianji Intercompany Balance | Intercompany balance owed by the Tianji to CEG which on 31 December 2022 was in an amount equal to approximately US$5.03 billion |

© 2023 Deloitte China.



# Basis of our analysis
## Source of information

| Key information / documents obtained | We have obtained the following information from the Management, their advisors or public domain as the basis of our Scheme Recovery Analysis up to the Cut-Off Date: |
| --- | --- |
| | • Announcement dated 22 March 2023 issued by CEG in relation to the Proposed Restructuring of Offshore Debts |
| | • Presentation material dated 3 April 2023 issued by CEG in relation to the Offshore Restructuring Proposal |
| | • Presentation material dated 3 April 2023 issued by SJ/ Tianji in relation to the Restructuring Proposal |
| | • Announcement dated 3 April 2023 issued by CEG in relation to the Proposed Restructuring of Offshore Debts |
| | • Announcement dated 24 April 2023 issued by CEG in relation to the Restructuring of the Target Group |
| | • Circular dated 25 April 2023 issued by NEV in relation to the disposal of NEV's healthcare segment |
| | • CEG Annual Report for the year ended 31 December 2020 |
| | • CEG Interim Report for the six months ended 30 June 2021 |
| | • Results announcements of CEG for the years ended 31 December 2021 and 2022 |
| | • Results announcements of CEG for the six months ended 30 June 2022 |
| | • NEV Annual Report for the year ended 31 December 2020 |
| | • NEV Interim Report for the six months ended 30 June 2021 |
| | • EVPS Annual Reports for the years ended 31 December 2020, 2021 and 2022 |
| | • Consolidated financial statements (including entity-level balance sheets) of CEG (including the listed groups of NEV and EVPS) as at 31 December 2021 and 31 December 2022 and working schedules provided by Management and the Auditor |
| | • Information on Offshore Debts claim as at 31 December 2022 |
| | • Peer financial metrics as at 31 December 2022 extracted from CapitalIQ |

China Evergrande Group | Scheme Recovery Analysis Report

© 2023 Deloitte China.

China Evergrande Group | Scheme Recovery Analysis Report

**Summary of scheme recoveries by class** — **09**

Proposed Restructuring — 11

Scheme Recovery Analysis scenarios — 14

Calculation methodology — 21

Scheme Recovery Analysis assumptions — 25

Estimated recoveries — 33

Appendices — 41

© 2023 Deloitte China.



# Summary of Scheme Recoveries by Class

**Estimated recoveries to Scheme Creditors**

Under the Proposed Restructuring, CEG Scheme Creditors are entitled to elect one of two options with respect to the treatment of their entitlement to distribution. Each option features different Restructuring Consideration and as such, returns to CEG Scheme Creditors will not be known until final selections are made upon the Schemes becoming effective.

Based on the assumptions that the Group would operate as a going concern and be able to honor its payment obligations, we have estimated recoveries to the Schemes Creditors based on the calculation methodology (pages 22 – 24), assumptions (pages 26 – 32) and different scenarios on the options to be elected by CEG Scheme Creditors (pages 15 – 18).

The three scenarios presented as below represent the scenarios giving the maximum, middle and minimum estimated recoveries based on different scenarios on the options to be elected by CEG Scheme Creditors.

| | Max | Base case | Min |
|---|---|---|---|
| CEG Schemes – Class A Debts | 32.5% | 22.5% | 17.7% |
| SJ Scheme – Class B (SJ) Debts | 39.9% | 39.9% | 39.9% |
| CEG Schemes – Class C Debts | 28.9% | 20.1% | 14.9% |
| TJ Scheme – Class D (TJ) Debts | 3.1% | 3.1% | 3.1% |

The above estimated recoveries to unsecured claims under the Schemes do not include recovery from Third-Party Rights such as underlying securities and guarantees which may further increase total recovery of each respective class. A full table of recoveries (based on Base Case) can be found on pages 34-40 of this Report.

**Limitations of the analysis**

The Scheme Recovery Analysis does not include an assessment of the Group's financial capacity and ability to meet its obligations under the Proposed Restructuring. The Scheme Recovery Analysis assumes the Group would continue as a going concern and have sufficient financial resources (including but not limited from onshore projects which are still undergoing restructuring) to satisfy its obligations under the Proposed Restructuring, and the Schemes would be implemented successfully. Should the assumptions not be valid, the actual recoveries may be lower than those estimated.

Our analysis was based on the latest published financial information and terms of the Proposed Restructuring. Any changes required to be made to the information provided may have an adverse impact on the Group's ability to successfully implement the proposed terms.

China Evergrande Group | Scheme Recovery Analysis Report    10

© 2023 Deloitte China.



11

Summary of scheme recoveries by class    09

**Proposed Restructuring**    **11**

Scheme Recovery Analysis scenarios    14

Calculation methodology    21

Scheme Recovery Analysis assumptions    25

Estimated recoveries    33

Appendices    41

China Evergrande Group | Scheme Recovery Analysis Report

© 2023 Deloitte China.



# Proposed Restructuring

CEG Schemes

**Class A Debts:**

☐ 10 public notes issued by CEG, 1 private note and 1 private loan

- Claims in this class include claims against *CEG and 13 subsidiary guarantors;*

- Estimated accrued claims of USD 16,080m

**Class C Debts:**

☐ Guarantees, repurchase obligations and private debts at CEG

- Class C Debts only include unsecured claims against CEG. Third-Party Rights to remain in place and not compromised in the scheme

☐ *Class C Debts will be admitted to the CEG Schemes on a deficiency claim basis (i.e., accrued claims minus valuation of Third-Party Rights),* which is subject to an independent valuation and adjudication process to be set out in the scheme documents

☐ Class C Debts do not have claims against any subsidiary guarantors and thus will be allocated longer dated CEG New Notes under Option 2

## Restructuring Consideration

At election of Class A Scheme Creditors and Class C Scheme Creditors

Option 1 :

- CEG New Notes (A1/C1 Notes): tenor of 10 to 12 years and interest rate of 2.0% to 3.0% p.a., 1.0% PIK penalty

- *Option 1 is the default option for CEG Scheme Creditors who have not made their elections in their submission of claims before the relevant deadline.*

Option 2:

- CEG Scheme Creditors can choose to receive 1) CEG New Notes (A2/C2 Notes), 2) Equity Package (A2/C2 Package), or 3) a combination of both

- CEG New Notes (A2/C2 Notes): tenor of 5 to 9 years and interest rate of 5.0% to 7.0% p.a., 1.0% PIK penalty

- Equity Package (A2/C2 Package): bundle of 3 types of equity-linked instruments – MEBs, MCBs and SLNs

- There is a minimum debt for equity conversion in the CEG Schemes, i.e., at least USD 4,245m of claims need to be allocated to Equity Package. *If such conversion is not met, CEG Scheme Creditors who elect Option 2 New Notes (A2/C2 Notes) may be mandatorily allocated with the MEBs and MCBs to fill the shortfall*

- In addition, any consideration received by CEG as part of the Tianji Scheme shall be distributed to creditors electing Equity Package on a pro-rata basis (without offsetting any claims)

**MEBs, MCBs, and SLNs:**

- EVPS MEBs: bonds exchangeable into shares of EVPS within 24 months from the Reference Date

- NEV MEBs: bonds exchangeable into shares of NEV within 24 months from the Reference Date

- CEG MCBs: bonds convertible into shares of CEG within 5 years from the Reference Date

- EVPS SLNs: new notes with tenor of 5 to 8 years, interest rate of 5.0% to 6.5% p.a., 1.0% PIK penalty and charge of securities account holding shares of EVPS, amongst other credit enhancements

- NEV SLNs: new notes with tenor of 5 to 8 years, interest rate of 5.0% to 6.5% p.a., 1.0% PIK penalty and linked to a custody account containing shares of NEV, amongst other credit enhancements

© 2023 Deloitte China.



# Proposed Restructuring

SJ & TJ Schemes

Existing SJ Noteholders will participate in both the SJ Scheme and the TJ Scheme. Certain debts borrowed by TJ and creditors who benefit from guarantees and/or put options provided by TJ ("TJ Other Existing Debt Instruments") will participate in the TJ Scheme.

Existing SJ Noteholders will receive Restructuring Consideration from both the SJ Scheme and TJ Scheme on a deficiency claim basis, while creditors of TJ Other Existing Debt Instruments will only receive Restructuring Consideration from TJ Scheme on a deficiency claim basis.

**Existing SJ Noteholders**

1) SJ as borrower
2) 103 subsidiary guarantors,
3) Keepwell agreement from Hengda Real Estate, and
4) Guarantee from TJ

**TJ Other Existing Debt Instruments**

1) Debts borrowed by TJ,
2) Guarantees provided by TJ (other than Existing SJ Notes)
3) Other obligations of TJ

**Under SJ Scheme**

Class B (SJ) Debts

### SJ New Notes

| (USDm) | Tenor | Principal |
|---|---|---|
| SJ Tranche A | 4 years | 300 |
| SJ Tranche B | 5 years | 1,100 |
| SJ Tranche C | 6 years | 1,100 |
| SJ Tranche D | 7 years | 1,200 |
| SJ Tranche E | 8 years | 2,800 |
| Total | | 6,500 |

**Under TJ Scheme**

Class D (TJ) Debts

### TJ New Notes

| (USDm) | Tenor | Principal |
|---|---|---|
| TJ Tranche A | 5 years | 100 |
| TJ Tranche B | 6 years | 200 |
| TJ Tranche C | 7 years | 300 |
| TJ Tranche D | 8 years | 200 |
| **Total** | | **800** |

China Evergrande Group | Scheme Recovery Analysis Report

13



© 2023 Deloitte China.

Summary of scheme recoveries by class — 09

Proposed Restructuring — 11

**Scheme Recovery Analysis scenarios** — **14**

Calculation methodology — 21

Scheme Recovery Analysis assumptions — 25

Estimated recoveries — 33

Appendices — 41

China Evergrande Group | Scheme Recovery Analysis Report

14

© 2023 Deloitte China.



# Scheme Recovery Analysis scenarios

## Election of Option 1 and Option 2 under the CEG Schemes

**Overview of the recovery scenarios**

The returns to Scheme Creditors are influenced by, inter alia, the final allocations of the Restructuring Consideration. Two key factors that determine the allocations are: (1) the election of Option 1 and Option 2 by CEG Scheme Creditors and (2) the value of the deficiency claims by Class C Scheme Creditors and Class D (TI) Scheme Creditors.

As the election of Option 1 or Option 2 by CEG Scheme Creditors is unknown at the time of preparing the Scheme Recovery Analysis, to demonstrate a range of potential recoveries, we have conducted the Scheme Recovery Analysis based on seven scenarios illustrating how CEG Scheme Creditors may elect among Option 1 and Option 2.

The election of Option 1 or Option 2 is subject to a minimum claim when selecting the Equity Package, as illustrated on page 20.



© 2023 Deloitte China.



# Scheme Recovery Analysis scenarios

## Election of Option 1 and Option 2 under the CEG Schemes

### Overview of the recovery scenarios

The scenarios seek to demonstrate the range of potential recoveries starting with full allocation of claims to Option 1 (i.e. CEG New Notes only), a combination of Option 1 and Option 2 (i.e. a combination of CEG New Notes and Equity Package), and to full allocation to the Option 2 (i.e Equity Package only). If no election is made, claims under the CEG Schemes will by default be allocated to Option 1.

In the following table, we have outlined these seven scenarios and the reallocation treatment if there are under or over subscription for the Equity Package in the CEG Schemes based on the reallocation mechanism set out in the Restructuring Announcements.

Under all the scenarios, it is assumed that Class A Scheme Creditors and Class C Scheme Creditors will elect the same options.

### Election of Option 1 and Option 2 by CEG Scheme Creditors

| # | Election (%) | Reallocation for over/under subscription of Equity Package |
|---|---|---|
| 1.0 | 100% Option 1 (A1/C1 Notes) | The Equity Package under Option 2 would be undersubscribed, and claims elected for Option 1 would be reallocated to Equity Package under Option 2 on a pro-rata basis. |

© 2023 Deloitte China.



# Scheme Recovery Analysis scenarios

## Election of Option 1 and Option 2 under the CEG Schemes

### Election of Option 1 and Option 2 by CEG Scheme Creditors

| # | Election (%) | Reallocation for over/under subscription of Equity Package |
|---|---|---|
| 2.1 | 50% Option 1 A1/C1 Notes, 50% Option 2 A2/C2 Notes | The Equity Package would be undersubscribed. Part of the claims selecting Option 2 A2/C2 Notes would be reallocated to the Equity Package on a pro-rata basis. |
| | | An underutilised adjusted portion of the A2 Package will be allocated to the respective pools of the underlying shares for the A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs and C2 NEV SLNs. |
| 2.2 | 50% Option 1 A1/C1 Notes, 25% Option 2 A2/C2 Notes, 25% Option 2 Equity Package | The Equity Package would be undersubscribed for Class A and oversubscribed for Class C. Option 2 A2/C2 Notes will be reallocated to address the over/under subscription of the respective classes. |
| | | An underutilised adjusted portion of the A2 Package will be allocated to the respective pools of the underlying shares for the A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs and C2 NEV SLNs. |
| 2.3 | 50% Option 1 A1/C1 Notes, 50% Option 2 Equity Package | A 50% equity allocation would exceed the Equity Package allocation and the oversubscription would be transferred to Option 2 A2/C2 Notes. |
| | | The unadmitted portion of the C2 Package will be reallocated to the A2 Package. |

© 2023 Deloitte China.



# Scheme Recovery Analysis scenarios

## Election of Option 1 and Option 2 under the CEG Schemes

**Election of Option 1 and Option 2 by CEG Scheme Creditors**

| # | Election (%) | Reallocation for over/under subscription of Equity Package |
|---|---|---|
| 3.1 | 100% Option 2 A2/C2 Notes | The Equity Package would be undersubscribed for both classes and part of Option 2 A2/C2 Notes allocation would be reallocated to the equity instruments under Option 2 on a pro-rata basis. |
| | | An underutilised adjusted portion of the A2 Package will be allocated to the respective pools of the underlying shares for the A2 EVPS SLNs, C2 EVPS SLNs, A2 NEV SLNs and C2 NEV SLNs. |
| 3.2 | 50% Option 2 A2/C2 Notes, 50% Option 2 Equity Package | A 50% equity allocation would exceed the Equity Package allocation and the oversubscription would be transferred to Option 2 A2/C2 Notes. |
| | | The unadmitted portion of the C2 Package will be reallocated to the A2 Package. |
| 3.3 | 100% Option 2 Equity Package | A 100% equity allocation would exceed the Equity Package allocation and the oversubscription would be transferred to Option 2 A2/C2 Notes. |
| | | The unadmitted portion of the C2 Package will be reallocated to the A2 Package. |

© 2023 Deloitte China.



# Scheme Recovery Analysis scenarios

## Deficiency claims in the Schemes

**Value of the deficiency claims by Class B (SJ) Debts, Class C Debts and Class D (TJ) Debts creditors**

Class B (SJ) Debts, Class C Debts and Class D (TJ) Debts are to be admitted to the respective Schemes on a deficiency basis, i.e. accrued claims minus value of Third-Party Rights. In the absence of independent valuation on the Third-Party Rights, to calculate the deficiency amount, the Scheme Recovery Analysis has adopted the estimated recoveries from Third-Party Rights from the Liquidation Analysis (i.e. assuming the Group, including the security providers, put option obligors and guarantors, would be put into liquidation and their assets would be realised under a forced-sale scenario).

We note that the adoption of the Liquidation Analysis assumption in estimating the value of Third-Party Rights may present a conservative case in the Scheme Recovery Analysis. Under the scenario of successfully implementing the Schemes, the deficiency claims under Class C Debts and Class D (TJ) Debts may be lower and an overall improvement in the unsecured recovery under the Schemes could be expected for the following reasons:

- Realisation of the underlying security would be higher under a going concern (i.e., under the Scheme Recovery Analysis) compared to a forced sale environment; and
- The deficiency calculation only took account of security from entities subject to the Liquidation Analysis. Additional recoveries might be available from entities outside of the Liquidation Analysis scope, thereby reducing the deficiency claim.

**Other deficiency claim adjustments for cross-Schemes claims**

Existing SJ Noteholders will also participate in the TJ Scheme as a Class D (TJ) Scheme Creditors through the guarantee provided by TJ. The deficiency claim of the Existing SJ Notes in the TJ Scheme is calculated as the accrued claims as at 31 December 2022 minus the estimated recovery from Class B (SJ) Debts in the SJ Scheme. Further, the deficiency claim of the Existing SJ Notes in the SJ Scheme is calculated as the accrued claims as at 31 December 2022 minus the estimated recovery from the TJ Scheme.

The Class C Hero Loan will also participate in the TJ Scheme as a Class D (TJ) Scheme Creditor through the guarantee provided by TJ. This facility will participate on a deficiency basis after subtracting the assumed value of its Third-Party Rights (adopted from the Liquidation Analysis) and their recoveries as a Class C Scheme Creditor.

The Class C Lake Notes and Clear Star Put Option will also participate in the TJ Scheme as a Class D (TJ) Scheme Creditor claiming through the guarantee provided by TJ. These two facilities will participate on a deficiency basis after subtracting the assumed value of its Third-Party Rights and their recoveries as a Class C Scheme Creditor.

© 2023 Deloitte China.



# Scheme Recovery Analysis scenarios

## Class A and C allocations

### Summary of Class A and C Allocations (USD'm)

After taking account of the deficiency adjustments and reallocating claims into different options to ensure the required amount of Equity Package has been met, the final allocations to the respective CEG New Notes or Equity Package under each of the seven scenario has been estimated below.

| # | Scenario | Class A Allocation | | | Class C Allocation | | | |
|---|----------|---------|---------|----------|----------|----------|----------|----------|
| | | A1 Notes | A2 Notes | A2 Equity | C1 Notes | C2 Notes | C2 Equity |
| 1.0 | 100% Option 1 Notes | 11,272 | - | 4,808 | 9,841 | - | 2,798 |
| 2.1 | 50% Option 1 Notes, 50% Option 2 Notes | 8,040 | 3,232 | 4,808 | 6,320 | 3,522 | 2,798 |
| 2.2 | 50% Option 1 Notes, 25% Option 2 Notes, 25% Option 2 Equity | 8,040 | 3,232 | 4,808 | 6,320 | 3,522 | 2,798 |
| 2.3 | 50% Option 1 Notes, 50% Option 2 Equity | 8,040 | 2,693 | 5,347 | 6,320 | 3,522 | 2,798 |
| 3.1 | 100% Option 2 Notes | - | 11,272 | 4,808 | - | 9,844 | 2,799 |
| 3.2 | 50% Option 2 Notes, 50% Option 2 Equity | - | 10,734 | 5,346 | - | 9,844 | 2,799 |
| 3.3 | 100% Option 2 Equity | - | 10,734 | 5,346 | - | 9,844 | 2,799 |

Notes
1. Under the scenario where C's do not have any deficiency and A's all elect A2 Notes, the minimum equitization amount would be USD 2,358m

China Evergrande Group | Scheme Recovery Analysis Report



© 2023 Deloitte China.

Summary of scheme recoveries by class — 09

Proposed Restructuring — 11

Scheme Recovery Analysis scenarios — 14

**Calculation methodology** — **21**

Scheme Recovery Analysis assumptions — 25

Estimated recoveries — 33

Appendices — 41



© 2023 Deloitte China.

# Calculation methodology

Discounted Cash Flow

**Scheme recovery calculation**

Scheme Creditors' recoveries are estimated based on the net present value of the cashflows associated with New Notes and/or Equity Package allocated to each respective creditor as part of the Restructuring Consideration. To model the cashflows, the following steps were taken:

1) **Claim amounts determined** – The accrued claim amounts as at 31 December 2022 were used for Class A Debts. The deficiency claim (i.e. accrued claims as at 31 December 2022 minus estimated value of Third-Party Rights) was calculated for Class B (SJ) Debts, Class C Debts and Class D (TJ) Debts.

2) **Restructuring Consideration allocated to Scheme Creditors** – The amount of New Notes or Equity Package allocated to the respective classes is calculated according to the terms of Restructuring Proposal. Class A Debts and Class C Debts may be subject to a reallocation between CEG New Notes and Equity Package to address any under or over subscription of Equity Package. The estimated allocations for the seven scenarios in the Scheme Recovery Analysis have been included on page 20 of this Report.

3) **Cash flows calculated** – The cash flows for each tranche of New Notes are calculated separately according to the amount allocated from the previous step and an assumption on when cash interest payments will be made as detailed on page 29 of this report. The exchange of scheme claims into MEBs and MCBs was calculated in accordance with the prices set out in the Restructuring Announcements and an assumption was made on the conversion date and prices as detailed on pages 28, 30 - 32 of this Report. Aggregate cash flows from New Notes and Equity Package were then discounted to calculate a net present value return for each instrument and class.

4) **Recovery calculation** – The net present value of each instrument and class is measured against the claim amounts determined based on point 1 above, to produce an estimated recovery rate for unsecured claims. In addition, the assumed value of Third-Party Rights is added to the scheme recovery amount to calculate a total recovery when measured against the accrued claim as at 31 December 2022. For further detail please refer to pages 34-40 and appendix 1.

China Evergrande Group | Scheme Recovery Analysis Report

© 2023 Deloitte China.



# Calculation methodology

Valuation

China Evergrande Group | Scheme Recovery Analysis Report

| MEBs and MCBs conversion price valuation methodology | To estimate a conversion price for converting the respective MEBs and MCBs into equity of CEG/ EVPS/ NEV (the "Issuers"), the Guideline Companies Method under a market approach was adopted. |
| --- | --- |
| | An Enterprises Value ("EV") multiple was applied based on sales/ EBITDA given the Issuers were loss making in the past year. |
| | Financial metrics of comparable companies were used to understand how the Issuers were performing relative to their peers, thereby benchmarking their market position in order to select an appropriate market multiple. A valuation date of 31 December 2022 ("VDate") was set. |
| | To estimate a conversion price, the following methodology was followed: |
| | 1) The closing prices of the respective Issuers as at 18 March 2022 (i.e. last trading day) ("Day 1") were taken as the starting point of the valuation analysis. Based on our proposed valuation framework, we first back tested the model to ensure our proposed valuation framework could reconcile to the market capitalisation of respective Issuers as at Day 1 (which allowed us to consider the appropriateness of our approach and valuation parameters). |
| | 2) Then, we compared the market positioning of each respective Issuer on Day 1 relative to its peer - whether historically it had been trading below or above its peers and where it should be as at the VDate given its performance comparing to its peers. |
| | 3) Taking into account the performance (i.e. revenue growth, margin growth, changes in assets value) of each respective Issuer during the recent financial year and comparing that to its market peers (i.e. benchmarking analysis), we considered whether any change regarding the market positioning of the respective Issuer relative to peers was needed. Then, an appropriate multiple was selected and an EV of the respective Issuer as at VDate was derived. |

© 2023 Deloitte China.



# Calculation methodology

## Valuation

**MEBs and MCBs conversion price valuation methodology (cont'd)**

4) Based on the value derived in point 3 and regarding the value changes between Day 1 and VDate, such movements were also cross checked with the change in market capitalisation of comparable companies between Day 1 and VDate to further assess the reasonableness of the concluded results.

5) EV of each respective Issuer was adjusted for cash, debts, non-operating assets, non-operating liabilities, minority interests in arriving at the equity value of each respective Issuer.

6) Conversion price was then calculated by dividing the equity value of each respective Issuer with the corresponding enlarged share capital.

As the market capitalisation of CEG includes EVPS and NEV and the main business under CEG is property development, in order to derive an appropriate value for the property development segment of CEG as at Day 1 and value of CEG as a whole as at the VDate, a sum-of-parts analysis was performed (as standalone value of EVPS and NEV were concluded).

We note that the conversion of MEBs and MCBs may only happen in year 2 and 5. In theory, a future unit price of a company (not fair value) can be calculated with the assistance of financial forecasts and a supporting business plan. In the absence of such information, it is assumed that the unit value of the respective Issuers at conversion timing (i.e. year 2 or 5) will remain the same as that as of VDate, with the assumption that the capitalisation of the loans due by NEV to CEG and issuance of new shares (see page 32) were completed as of VDate.

We note that the financial information received from public announcements and that from Management have significant differences in the balance and classification of the items. No reconciliation was available at the time of the analysis. As such, our analysis was primarily performed based on public announcements of EVPS, NEV and CEG.

Further, the equity value of the respective Issuers might be subject to discount due to a lack of marketability as they remained suspended as at the VDate, as compared to other trading listed companies referenced in the valuation.

© 2023 Deloitte China.



China Evergrande Group | Scheme Recovery Analysis Report

Summary of scheme recoveries by class — 09

Proposed Restructuring — 11

Scheme Recovery Analysis scenarios — 14

Calculation methodology — 21

**Scheme Recovery Analysis assumptions** — **25**

Estimated recoveries — 33

Appendices — 41

© 2023 Deloitte China.



# Scheme Recovery
## Analysis assumptions

| | |
|---|---|
| **Discount Rate** | 25.5% is used to discount cash flows in the Scheme Recovery Analysis under the assumption that CEG, SJ and Tianji will fully honor the payment obligations as rescheduled during the tenor. |
| | Relevant cash flows include: |
| | • Principal payments upon maturity of the respective instruments; |
| | • Proceeds from disposal of equity; and |
| | • Cash payment of interest. |
| | The discount rate for an instrument is typically assessed by making reference to the risk-free market rate and adjusting for the risks of the instrument which could in turn be affected by the overall industry environment, its marketability, the projections regarding cash flows (e.g. timing and amount of repayment), risks of the issuer in terms of its performance and leverage as compared to the industry. |
| | Based on the assumptions that the Schemes would come into effect on 31 December 2022 and CEG would continue as a going concern and be able to meet the repayment obligations under the Proposed Restructuring, reference was made to CEG's bond yields before the crisis (i.e. assuming a return to normal operations upon implementation of the Schemes) in assessing the discount rate. It was noted that CEG's commercial bills were first overdue in November 2020. After rumors of financial difficulties surfaced in the summer of 2021, CEG first announced such overdue events on 7 June 2021 and the relevant bond prices plummeted. |
| | Based on the above, a yield between 20% to 21% ("Range") was derived after making reference to the average spread (over the risk free rate) of the USD bonds issued by CEG in the first quarter of 2021 (i.e. the last quarter before the announcement of defaults) and adjusting for the movements in risk-free rate and credit spread from the first quarter of 2021 to December 2022. |
| | Due to limitation of data, no further comment could be made regarding the yield differential between unsecured bonds and secured bonds with real assets as collateral. |

© 2023 Deloitte China.



# Scheme Recovery
## Analysis assumptions

| Discount Rate (Cont.) | |
|---|---|

Compared to the mid-point of the Range, the discount rate of 25.5% would indicate an additional premium of 5 percentage points ("Additional Premium").

An Additional Premium may be demanded by investors for instruments to be issued by CEG/ SJ/ Tianji, even upon the Schemes becoming effective, after considering factors including but not limited to:

- The PRC real estate industry has undergone a drastic change and the industry outlook remains uncertain.
- The latest published financial information of the Group indicated a notable increase in liabilities and a substantial net liabilities position.
- The Group (including onshore operations) is undergoing restructuring.

However, it is worth noting that:-

- The level of Additional Premium to be applied in this case is very subjective in nature;
- Given the scale of the real estate crisis in China is unprecedented, there is no readily available reference to use to assess the appropriate discount rate;
- Some of the other real estate developers in China are currently undergoing debt restructurings, which are at various stages of implementation, and none of which have been completed. The yield to maturity ("YTM") observed of comparable issuers' bonds varies widely. The appropriateness of direct reference to comparable issuers' data is a matter to be carefully considered; and
- Existing YTM primarily reflect bond yields based on the bonds' existing terms (including but not limited to tenor, etc). In theory, with longer maturities (such as in the Proposed Restructuring which has tenors of up to 12 years), and with all else being the same (i.e. coupon rate, overall bond price, etc.), the implied YTM for the extended maturity instruments would normally be lower than the current YTM.

A discount rate of 25.5% (with an implied 5 percentage points Additional Premium over the mid-point of the Range) may not be considered unreasonable, to reflect CEG's unique circumstances and varying expectations of different creditors regarding the Additional Premium (which depend on the respective creditor's individual specific circumstances).

The above discount rate analysis is based on the material assumption that CEG will fully meet its debt servicing and maturity obligations, and an assessment of the appropriateness of this assumption is outside the scope of our analysis.

© 2023 Deloitte China.



## Scheme Recovery
## Analysis assumptions

| | |
|---|---|
| **Exchange rates** | USD/HKD 7.8016, USD/RMB 6.8986 and RMB/HKD 1.0805. |
| | The existing debt instruments are denominated in USD, HKD and RMB. To convert into USD claim amounts, the Scheme Recovery Analysis uses the above exchange rate assumptions. |
| | The USD/HKD is also used in the Scheme Recovery Analysis to calculate the number of shares available to recipients of the MEBs and MCBs by converting the HKD conversion price into a USD price. |
| | The RMB/HKD is used to convert the calculated equity value of CEG, NEV and EVPS into a HKD conversion price. |
| **Redemptions for SLNs and TJ/SJ New Notes** | No disposals are assumed for the collateral pledged to the SLNs or TJ New Notes. |
| | The Issuer shall purchase or redeem the SLNs or TJ New Notes upon disposal of their respective collateral under the Proposed Restructuring terms. |
| | In the Scheme Recovery Analysis, we have assumed there are no disposals and therefore no redemptions are modelled into the recovery calculations. |
| **Equity conversion dates** | No exchanges or conversions for the MEBs and MCBs until the mandatory exchange and conversion dates. |
| | Holders of the respective MEBs and MCBs can elect during any calendar month to exchange or convert up to one-third (1/3) of the aggregate principal amount of the instrument that were originally issued. |
| | In the Scheme Recovery Analysis, it is assumed that holders of the instruments will not convert their instruments until the mandatory dates of 2 years for the EVPS MEBs and NEV MEBs and 5 years for the CEG MCBs. |



© 2023 Deloitte China.

## Scheme Recovery Analysis assumptions

| | |
|---|---|
| **Cash payment election – CEG Schemes – Option 1 A1/C1 Notes** | Cash payment of interest commences in year 9. <br><br> CEG can elect to PIK interest at 1.00% higher than the cash interest rate for the entirety of the A1/C1 Notes. <br><br> In the Scheme Recovery Analysis, we have assumed that CEG will elect to PIK interest for the first 8 years and cash payments will commence in year 9 and continue until the maturity of the notes. We note that the final maturity for A2/C2 Notes is in year 9 and we consider it is reasonable to assume CEG may elect to pay cash interest on A1/C1 Notes from year 9 onwards. |
| **Cash payment election – CEG Schemes – Option 2 SLN, A2/C2 Notes** | Cash payment of interest partially commences in year 3 with full payment commencing from year 5 onwards. <br><br> CEG can elect PIK interest for the first 4 years, with a minimum level of cash paid in year 3 and 4. <br><br> In the Scheme Recovery Analysis, we have assumed the issuer will elect to PIK interest until year 4 and pay the minimum required amount of 0.50% from the 31st month to the 36th month and 3.00% in year 4. |
| **Cash payment election – SJ/TJ Scheme – SJ New Notes and TJ New Notes** | Cash payment of interest partially commences in year 3 with full payment commencing from year 5 onwards. <br><br> SJ/Tianji can elect PIK interest for the first 4 years, with a minimum level of cash paid in year 3 and 4. <br><br> In the Scheme Recovery Analysis, we have assumed the issuer will elect to PIK interest until year 4 and pay the minimum required amount of 0.70% from the 31st month to the 36th month and 3.00% in year 4. |

© 2023 Deloitte China.



# Scheme Recovery Analysis assumptions

**EVPS MEBs conversion price**

Equity is converted at a price of RMB1.54 per share at the conversion date.

As at VDate, an EV/EBITDA of 8.0x was adopted (mean of the market range, consistent with that implied from Day 1 calibration). An EV was estimated based on the EBITDA provided. The EV was then adjusted for debt, cash, minority interest, non-operating assets and non-operating liabilities in arriving at the estimated equity value of RMB 16,666 million. Market capitalization would drop 17.6% from Day 1 to Vdate, which fell between the lower quartile to median of the market range. The number of outstanding shares would remain unchanged between Day 1 and VDate, as such, price per share was estimated to be RMB1.54.

**NEV MEBs conversion price**

Equity is converted at a price of RMB0.69 per share at the conversion date.

As at VDate, EV/Sales of 1.9x was adopted (mean of the market range). An EV was estimated based on the sales provided. The EV was then adjusted for debt (adjusted for the capitalization of loans due by NEV to CEG), cash, minority interest, non-operating assets and non-operating liabilities in deriving at the estimated equity value. The number of outstanding shares as at the VDate would increase due to the capitalization of loans due by NEV to CEG of US$2,704 million (debt would decrease with new shares issued), as such, price per share was estimated to be RMB0.69.

© 2023 Deloitte China.



# Scheme Recovery
# Analysis assumptions

| | |
|---|---|
| **CEG MCBs conversion price** | No value is ascribed to equity at the conversion date.<br><br>CEG's market capitalization would consist of (i) the equity value of the property development segment of CEG; (ii) the equity value of the healthcare segment to be transferred from NEV to CEG; and (iii) CEG's holdings in EVPS and NEV after considering the impacts of the capitalisation of loans due from NEV to CEG and the conversion of MCBs and MEBs.<br><br>The implied market capitalisation of the property development segment of CEG at Day 1 was obtained after deducting the respective share of market capitalisation of NEV and EVPS from CEG's market capitalisation. We note that, historically, the property development segment had a negative market capitalisation.<br><br>Similarly, the financial information of property development segment were extracted by deducting those of EVPS and NEV (with certain assumptions made given no full set of 2022 balance sheet was available) from CEG's financial information.<br><br>As at VDate, EV of each of the property development segment and the healthcare segment was estimated based on EV/Sales multiple of 1.8x (average of median and low quartile of the market range) and 0.1x (minimum of market range) respectively. The EVs were then adjusted for debts, cash, minority interests, non-operating assets and non-operating liabilities in order to deriving the respective equity values of the two segments.<br><br>Adding the value of CEG's holdings in EVPS and NEV (after considering the impacts of the capitalization of loans due from NEV to CEG and the conversion of MCBs and MEBs), equity value of CEG would remain negative, primarily due to the significant debt balance. |

China Evergrande Group | Scheme Recovery Analysis Report



© 2023 Deloitte China.

# Scheme Recovery Analysis assumptions

| Adjustments to FY22 Accounts | In calculating the estimated conversion price for the MEBs and MCBs, consideration was given to significant announcements after the valuation date and the following adjustments were made: |
|---|---|
| | • CEG – Issuance and conversion of EVPS MEBs, NEV MEBs and CEG MCBs were considered, as such, CEG's debts would be reduced by RMB29,546 million; 5,632 million CEG new shares would be issued, 2,332 million EVPS shares and 6,357 million NEV shares held by CEG would be given to CEG's creditors such that CEG holdings of EVPS and NEV would decrease to 30%.

• NEV – (1) Loans with CEG amounting to approximately US$2,704 million (including accrued interest up to 1 October 2023) would be converted into new shares in NEV; (2) Healthcare segment would be excluded due to the proposed disposal to CEG and 3) construction in progress was considered as a non-operating asset as we understand the financial metrics used in determining the EV cannot properly reflect such value.

• EVPS – Additional consideration/adjustment in the analysis: significant one-off impairment loss in financial assets incurred in 2022 was normalised to analyse EVPS performance vs comparable companies. |

© 2023 Deloitte China.



33

Summary of scheme recoveries by class    09

Proposed Restructuring    11

Scheme Recovery Analysis scenarios    14

Calculation methodology    21

Scheme Recovery Analysis assumptions    25

**Estimated recoveries**    **33**

Appendices    41

China Evergrande Group | Scheme Recovery Analysis Report

© 2023 Deloitte China.



# Estimated recoveries

## Scheme recovery range

### Scheme Recovery Range Estimates

Class A and C Scheme Creditors may elect to receive (i) A1/C1 Notes; (ii) A2/C2 Notes or A2/C2 Package or a combination of both. We have assessed recovery by discounting the cash flow from each of the respective options. As each option offers different instruments, with different returns and maturities, the estimated recoveries for Class A Debts and Class C Debts vary according to the creditors' option selection.

The minimum and maximum scheme recoveries have been calculated by discounting the cash flows for each creditor class under the seven scenarios as illustrated below. The recoveries in the table below are calculated as the discounted cash flow value of the Restructuring Consideration divided by the accrued claim for Class A or deficiency claim for Classes B, C and D.

| # | Scenario | Class A | Class B | Class C | Class D |
|---|----------|---------|---------|---------|---------|
| 1.0 | 100% Option 1 Notes | 17.7% | 39.9% | 14.9% | 3.1% |
| 2.1 | 50% Option 1 Notes, 50% Option 2 Notes | 22.5% | 39.9% | 20.1% | 3.1% |
| 2.2 | 50% Option 1 Notes, 25% Option 2 Notes, 25% Option 2 Equity | 22.5% | 39.9% | 20.1% | 3.1% |
| 2.3 | 50% Option 1 Notes, 50% Option 2 Equity | 21.7% | 39.9% | 20.1% | 3.1% |
| 3.1 | 100% Option 2 Notes | 32.5% | 39.9% | 28.9% | 3.1% |
| 3.2 | 50% Option 2 Notes, 50% Option 2 Equity | 31.8% | 39.9% | 28.9% | 3.1% |
| 3.3 | 100% Option 2 Equity | 31.8% | 39.9% | 28.9% | 3.1% |

### Selection of a Base Case scenario

For the purposes of demonstrating estimated recovery for each class and providing a comparison to recoveries under the Liquidation Analysis, we have selected scenario 2.2 as the base case scenario.

Under Scenario 2.2, 50% of CEG Scheme Creditors elect Option 1 Notes, 25% in Option 2 Notes and 25% in Option 2 Equity Package. The estimated recoveries for Class A Debts and Class C Debts under scenario 2.2 represent the mid-range of the above seven scenarios.

| | Class A | Class B | Class C | Class D |
|---|---------|---------|---------|---------|
| 3.1 Max | 32.5% | 39.9% | 28.9% | 3.1% |
| 2.2 Base case | 22.5% | 39.9% | 20.1% | 3.1% |
| 1.0 Min | 17.7% | 39.9% | 14.9% | 3.1% |

China Evergrande Group | Scheme Recovery Analysis Report

34



© 2023 Deloitte China.

# Estimated recoveries

## Recovery tables

Scheme Recovery Range Estimates

The estimated recoveries to creditors from the Schemes and creditors' total recovery have been calculated for each class of creditors by reference to the accrued claim or deficiency claim. Consideration has also been given to the Third-Party Rights to calculate the total recovery for each respective claimant and the creditor's unsecured recovery under a liquidation scenario.

**Scheme Recovery**

Accrued Claim - The sum of the outstanding principal amount of the relevant debt instrument and accrued and unpaid interest on such debt instrument as at 31 December 2022.

Third-Party Rights - The estimated value based on the Liquidation Analysis of any related rights including any underlying security, guarantees or keepwell, except when pursuant to the Schemes (from the perspective of the scheme companies) is being released under the Schemes.

Deficiency Claim – The Accrued Claim minus the assumed value from the Liquidation Analysis of Third-Party Rights valid under the scheme and cross scheme recovery where applicable.

Recovery is illustrated first in the amount of USD distributed to each claimant under column D, followed by the % recovery from the deficiency claim if applicable in column E and the % recovery on a full claim or accrued claim basis in column F. Contribution of Third-Party Rights to recovery by % is then illustrated in column G, and total recovery in USD and % calculated on a full claim basis in columns H and I respectively.

**Liquidation Recovery**

Liquidation recovery and Third-Party Rights values have been extracted from the Liquidation Analysis for illustration purposes.

Note: Unsecured recovery is measured on a full claim or accrued claim basis. Some claimants will claim on a deficiency basis. As a result, unsecured recovery may differ within the same class.

China Evergrande Group | Scheme Recovery Analysis Report

35



© 2023 Deloitte China.

# Estimated recoveries

## CEG Scheme – Class A Creditors

**Class A Recovery Estimate under Base Case (USD'm)**

| # | Facility/Instrument | Accrued Claim | Third-Party Rights | Deficiency Claim[1] | Scheme Recovery | | | | | | Liquidation Recovery | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Unsecured Recovery | Deficiency | Accrued | Third-Party Rights | Total Recovery | | Unsecured Recovery | | Third-Party Rights | Total Recovery | |
| | | A | B | C=A-B | D | E=D/C | F=D/A | G=B/A | H=B+D | I=H/A | J | K=J/A | L | M=J+L | N=M/A |
| 1 | CEG Existing March 2022 Notes | 2,234 | - | - | 502.7 | - | 22.5% | - | 502.7 | 22.5% | 50.8 | 2.3% | 24.2 | 75.0 | 3.4% |
| 2 | CEG Existing April 2022 Notes | 1,618 | - | - | 364.1 | - | 22.5% | - | 364.1 | 22.5% | 36.8 | 2.3% | 17.5 | 54.3 | 3.4% |
| 3 | CEG Existing January 2023 Notes | 1,164 | - | - | 262.0 | - | 22.5% | - | 262.0 | 22.5% | 26.5 | 2.3% | 12.6 | 39.1 | 3.4% |
| 4 | CEG Existing February 2023 Bonds | 11 | - | - | 2.5 | - | 22.5% | - | 2.5 | 22.5% | 0.2 | 2.3% | 0.1 | 0.4 | 3.4% |
| 5 | CEG Existing April 2023 Notes | 936 | - | - | 210.6 | - | 22.5% | - | 210.6 | 22.5% | 21.3 | 2.3% | 10.1 | 31.4 | 3.4% |
| 6 | CEG Existing June 2023 Notes | 1,482 | - | - | 333.5 | - | 22.5% | - | 333.5 | 22.5% | 33.7 | 2.3% | 16.0 | 49.7 | 3.4% |
| 7 | CEG Existing January 2024 Notes | 1,167 | - | - | 262.6 | - | 22.5% | - | 262.6 | 22.5% | 26.5 | 2.3% | 12.6 | 39.2 | 3.4% |
| 8 | CEG Existing March 2024 Notes | 1,064 | - | - | 239.5 | - | 22.5% | - | 239.5 | 22.5% | 24.2 | 2.3% | 11.5 | 35.7 | 3.4% |
| 9 | CEG Existing April 2024 Notes | 779 | - | - | 175.4 | - | 22.5% | - | 175.4 | 22.5% | 17.7 | 2.3% | 8.4 | 26.2 | 3.4% |
| 10 | CEG Existing June 2025 Notes | 5,263 | - | - | 1,184.0 | - | 22.5% | - | 1,184.0 | 22.5% | 119.7 | 2.3% | 56.9 | 176.6 | 3.4% |
| 11 | CEG Existing January 2022 Notes | 348 | - | - | 78.2 | - | 22.5% | - | 78.2 | 22.5% | 7.9 | 2.3% | 3.8 | 11.7 | 3.4% |
| 12 | Class A Private Loan | 13 | - | - | 2.8 | - | 22.5% | - | 2.8 | 22.5% | 0.3 | 2.3% | 0.1 | 0.4 | 3.4% |
| | Total | 16,080 | - | - | 3,618 | - | 22.5% | - | 3,618 | 22.5% | 366 | 2.3% | 174 | 540 | 3.4% |

*Notes*
1. As Class A Debts will be admitted on an accrued basis, the deficiency claim column C is not populated.
2. All figures shown in the table above are subject to rounding.



© 2023 Deloitte China.

## Estimated recoveries

### CEG Scheme – Class C Creditors

**Class C Recovery Estimate under Base Case (USD'm)**

| # | Facility/Instrument | Accrued Claim | Third-Party Rights | Deficiency Claim | Unsecured Recovery | Deficiency | Accrued Deficiency | Third-Party Rights | Total Recovery[1] | | Unsecured Recovery[2] | | Third-Party Rights | Total Recovery | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | **Liquidation Recovery** | | | | |
| | | A | B | C=A-B | D | E=D/C | F=D/A | G=B/A | H=B+D | I=H/A | J | K=J/A | L | M=J+L | N=M/A |
| 13 | Lake Notes[1] | 294 | 19.8 | 275 | 55.3 | 20.1% | 18.8% | 6.8% | 75.2 | 25.5% | 6.6 | 2.3% | 19.6 | 26.2 | 8.9% |
| 14 | Dongpo Notes | 441 | 1.2 | 440 | 88.6 | 20.1% | 20.1% | 0.3% | 89.7 | 20.4% | 9.9 | 2.3% | 1.2 | 11.1 | 2.5% |
| 15 | Dongpo Put Option | 144 | 2.2 | 141 | 28.5 | 20.1% | 19.8% | 1.5% | 30.7 | 21.4% | 3.2 | 2.2% | 2.2 | 5.4 | 3.8% |
| 16 | Graceful Court Put Option | 120 | 1.9 | 119 | 23.9 | 20.1% | 19.8% | 1.5% | 25.8 | 21.4% | 2.7 | 2.2% | 1.9 | 4.5 | 3.8% |
| 17 | New Chic Margin Loan | 20 | 5.2 | 15 | 2.9 | 20.1% | 14.9% | 26.2% | 8.2 | 41.1% | 0.4 | 2.3% | 5.2 | 5.6 | 28.2% |
| 18 | Clear Star Put Option[1] | 74 | 1.8 | 72 | 14.5 | 20.1% | 19.6% | 2.5% | 16.3 | 22.2% | 1.7 | 2.3% | 1.7 | 3.4 | 4.6% |
| 19 | CEG Loan 1 | 210 | - | 210 | 42.2 | 20.1% | 20.1% | - | 42.2 | 20.1% | 4.7 | 2.3% | - | 4.7 | 2.2% |
| 20 | CEG Loan 2 | 105 | - | 105 | 21.1 | 20.1% | 20.1% | - | 21.1 | 20.1% | 2.4 | 2.3% | - | 2.4 | 2.3% |
| 21 | Venice Loan | 25 | 14.7 | 10 | 2.1 | 20.1% | 8.3% | 59.0% | 16.7 | 67.3% | 0.6 | 2.3% | 14.7 | 15.2 | 61.3% |
| 22 | Venice SPA | 571 | 337.2 | 234 | 47.2 | 20.1% | 8.3% | 59.0% | 384.4 | 67.3% | 12.9 | 2.3% | 337.2 | 350.1 | 61.3% |

*Notes*

1. Third-Party Rights column B for the Lake Notes, Clear Star Put Option and Hero Loan claims include recoveries from TJ Scheme.
2. Under the liquidation scenario, put option obligations of CEG would be admitted on a deficiency basis. CEG's guarantee of PRC liabilities would be admitted on a full claim, but subject to the maximum limit of CEG's obligation under respective guarantees. As column K measures unsecured recovery on a full claim or accrued basis, therefore the recovery rates for the put options and CEG's guarantee of PRC liabilities shown in column K will differ from the recovery rate of other claimants.
3. All figures shown in the table above are subject to rounding.

© 2023 Deloitte China.



# Estimated recoveries

## CEG Scheme – Class C Creditors (cont.)

### Class C Recovery Estimate under Base Case (USD'm)

| # | Facility/Instrument | Accrued Claim | Third-Party Rights | Deficiency Claim | Unsecured Recovery | Scheme Recovery | | | | | Liquidation Recovery | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Deficiency Recovery | Accrued | Third-Party Rights | Total Recovery[1] | | Unsecured Recovery[2] | | Third-Party Rights | Total Recovery | |
| | | A | B | C=A-B | D | E=D/C | F=D/A | G=B/A | H=B+D | I=H/A | J | K=J/A | L | M=J+L | N=M/A |
| 23 | Hero Loan[1] | 994 | 501.5 | 492 | 99.2 | 20.1% | 10.0% | 50.5% | 600.7 | 60.4% | 22.4 | 2.3% | 511.1 | 533.5 | 53.7% |
| 24 | FCB Put Option | 712 | 150.0 | 562 | 113.2 | 20.1% | 15.9% | 21.1% | 263.2 | 37.0% | 16.0 | 2.3% | 150.0 | 166.1 | 23.3% |
| 25 | RMB Bond Put Option | 1,311 | 57.0 | 1,255 | 252.7 | 20.1% | 19.3% | 4.3% | 309.7 | 23.6% | 28.3 | 2.2% | 57.0 | 85.2 | 6.5% |
| 26 | CEG Guarantees of PRC Liabilities | 9,221 | 1,341.1 | 7,880 | 1,587.4 | 20.1% | 17.2% | 14.5% | 2,928.6 | 31.8% | 199.5 | 2.2% | 1,341.1 | 1,540.6 | 16.6% |
| 27 | Kailong Arbitration Award | 834 | - | 834 | 167.9 | 20.1% | 20.1% | - | 167.9 | 20.1% | 18.8 | 2.3% | - | 18.8 | 2.3% |
| 28 | On-Lent Loan | 0 | - | 0 | 0.0 | 20.1% | 20.1% | - | 0.0 | 20.1% | - | - | - | - | - |
| | Total | 15,075 | 2,434 | 12,641 | 2,547 | 20.1% | 16.9% | 16.1% | 4,980 | 33.0% | 330 | 2.2% | 2,443 | 2,764 | 18.% |

*Notes*

1. *Third-Party Rights column B for the Lake Notes, Clear Star Put Option and Hero Loan claims include recoveries from TJ Scheme.*
2. *Under the liquidation scenario, put option obligations of CEG would be admitted on a deficiency basis. CEG's guarantee of PRC liabilities would be admitted on a full claim, but subject to the maximum limit of CEG's obligation under respective guarantees. As column K measures unsecured recovery on a full claim or accrued basis, therefore the recovery rates for the put options and CEG's guarantee of PRC liabilities shown in column K will differ from the recovery rate of other claimants.*
3. *USD'm are used in the above table, claims or recoveries that are less than USD1m may be illustrated by 0. The use of "-" will be present to illustrate no monetary amount.*
4. *All figures shown in the table above are subject to rounding.*

© 2023 Deloitte China.




# Estimated recoveries

## SJ Scheme – Class B Creditors

### Class B Recovery Estimate under Base Case (USD'm)

| # | Facility/Instrument | Accrued Claim | Third-Party Rights | Deficiency Claim | Scheme Recovery | | | | | Liquidation Recovery | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Unsecured Recovery | Accrued | Third-Party Rights | Total Recovery[1] | | Unsecured Recovery | | Third-Party Rights | Total Recovery | |
| | | A | B | C=A-B | D | F=D/A | G=B/A | H=B+D | I=H/A | J | K=J/A | L | M=I+L | N=M/A |
| 29 | SJ Existing October 2022 Notes | 2,330 | 44.1 | 2,286 | 929.2 | 39.9% | 1.89% | 973.4 | 41.8% | 37.7 | 1.6% | 351.6 | 389.3 | 16.7% |
| 30 | SJ Existing November 2022 Notes | 782 | 14.8 | 768 | 312.1 | 39.9% | 1.89% | 326.9 | 41.8% | 12.7 | 1.6% | 118.1 | 130.7 | 16.7% |
| 31 | SJ Existing October 2023 Notes | 2,338 | 44.3 | 2,294 | 932.6 | 39.9% | 1.89% | 976.9 | 41.8% | 37.9 | 1.6% | 352.9 | 390.8 | 16.7% |
| 32 | SJ Existing November 2023 Notes | 723 | 13.7 | 709 | 288.3 | 39.9% | 1.89% | 302.0 | 41.8% | 11.7 | 1.6% | 109.1 | 120.8 | 16.7% |
| | Total | 6,173 | 117 | 6,056 | 2,462 | 39.9% | 1.89% | 2,579 | 41.8% | 100 | 1.6% | 932 | 1,032 | 16.7% |

Notes
1. Third-Party Rights column B for the SJ Existing Notes claims include from recoveries from TJ Scheme.
2. All figures shown in the table above are subject to rounding.

© 2023 Deloitte China.



# Estimated recoveries

## TJ Scheme – Class D Creditors

### Class D Recovery Estimate under Base Case (USD'm)

| # | Facility/Instrument | Accrued Claim (A) | Third-Party Rights (B) | Deficiency Claim (C=A-B) | Scheme Recovery — Unsecured Recovery (D) | Deficiency (E=D/C) | Accrued (F=D/A) | Third-Party Rights (G=B/A) | Total Recovery[1,2] (H=B+D) | (I=H/A) | Liquidation Recovery — Unsecured Recovery[3] (J) | (K=J/A) | Third-Party Rights (L) | Total Recovery (M=J+L) | (N=M/A) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 33 | SJ Existing October 2022 Notes | 2,330 | 929.2 | 1,401 | 44.1 | 3.1% | 1.9% | 39.9% | 973.4 | 41.8% | 53.6 | 2.3% | 335.5 | 389.1 | 16.7% |
| 34 | SJ Existing November 2022 Notes | 782 | 312.1 | 470 | 14.8 | 3.1% | 1.9% | 39.9% | 326.9 | 41.8% | 18.0 | 2.3% | 112.7 | 130.7 | 16.7% |
| 35 | SJ Existing October 2023 Notes | 2,338 | 932.6 | 1,406 | 44.3 | 3.1% | 1.9% | 39.9% | 976.9 | 41.8% | 53.8 | 2.3% | 336.7 | 390.5 | 16.7% |
| 36 | SJ Existing November 2023 Notes | 723 | 288.3 | 435 | 13.7 | 3.1% | 1.9% | 39.9% | 302.0 | 41.8% | 16.6 | 2.3% | 104.1 | 120.7 | 16.7% |
| 37 | Lake Notes | 294 | 68.1 | 226 | 7.1 | 3.1% | 2.4% | 23.1% | 75.2 | 25.5% | 6.8 | 2.3% | 19.4 | 26.2 | 8.9% |
| 38 | Clear Star Put Option | 74 | 14.5 | 59 | 1.9 | 3.1% | 2.5% | 19.6% | 16.3 | 22.2% | 1.7 | 2.3% | 1.7 | 3.4 | 4.6% |
| 39 | Castle Share Put Option | 310 | 1.5 | 309 | 9.7 | 3.1% | 3.1% | 0.5% | 11.2 | 3.6% | 7.1 | 2.3% | 1.5 | 8.6 | 2.8% |
| 40 | Castle Loan Put Option | 0 | - | 0 | 0.0 | 3.1% | 3.1% | - | 0.0 | 3.1% | 0.0 | 0.0% | - | - | - |
| 41 | Hero Loan | 994 | 587.9 | 406 | 12.8 | 3.1% | 1.3% | 59.2% | 600.7 | 60.4% | 22.9 | 2.3% | 510.5 | 533.4 | 53.7% |
| 42 | Tuen Mun Put Options | 224 | 113.9 | 111 | 3.5 | 3.1% | 1.6% | 50.8% | 117.4 | 52.3% | 2.5 | 1.1% | 113.9 | 116.5 | 51.9% |
| 43 | CEG-Tianji Intercompany Balance | 5,035 | - | 5,035 | 158.6 | 3.1% | 3.1% | - | 158.6 | 3.1% | 115.8 | 2.3% | - | 115.8 | 2.3% |
| | **Total** | **13,105** | **3,248** | **9,857** | **310** | **3.1%** | **2.4%** | **24.8%** | **3,559** | **27.2%** | **299** | **2.3%** | **1,536** | **1,835** | **14.0%** |

Notes
1. Total scheme recovery for the SJ Existing Notes include recoveries from SJ Scheme.
2. Third-Party Rights column B for Lake Notes, Clear Star Put Option and Hero Loan claims include recoveries from CEG Schemes.
3. Under the liquidation scenario, put option obligations of CEG would be admitted on a deficiency basis. As column K measures unsecured recovery on a full claim or accrued basis, therefore the recovery rates for the put options and CEG's guarantee of PRC liabilities shown in column K will differ from the recovery rate of other claimants.
4. USD'm are used in the above table, claims or recoveries that are less than USD1m may be illustrated by 0. The use of "-" will be present to illustrate no monetary amount.
5. All figures shown in the table above are subject to rounding.

© 2023 Deloitte China.

China Evergrande Group | Scheme Recovery Analysis Report

40

| | |
|---|---|
| Summary of scheme recoveries by class | 09 |
| Proposed Restructuring | 11 |
| Scheme Recovery Analysis scenarios | 14 |
| Calculation methodology | 21 |
| Scheme Recovery Analysis assumptions | 25 |
| Estimated recoveries | 33 |
| **Appendices** | **41** |

© 2023 Deloitte China.



# Appendix 1

## Sources of Recovery - CEG Scheme – Class A Creditors

### Class A Sources of Recovery under Base Case (USD'm)

| # | Facility/Instrument | Accrued Claim | Third-Party Rights | Estimated Recoveries | | | | | | Total Recovery |
| | | | | A1 Notes | A2 Notes | MEBs / MCBs | EVPS SLNs | NEV SLNs | TJ intercom | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | CEG Existing March 2022 Notes | 2,234 | - | 129 | 162 | 63 | 62 | 75 | 12 | 503 |
| 2 | CEG Existing April 2022 Notes | 1,618 | - | 93 | 117 | 45 | 45 | 54 | 9 | 364 |
| 3 | CEG Existing January 2023 Notes | 1,164 | - | 67 | 84 | 33 | 32 | 39 | 6 | 262 |
| 4 | CEG Existing February 2023 Bonds | 11 | - | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| 5 | CEG Existing April 2023 Notes | 936 | - | 54 | 68 | 26 | 26 | 31 | 5 | 211 |
| 6 | CEG Existing June 2023 Notes | 1,482 | - | 85 | 108 | 42 | 41 | 50 | 8 | 333 |
| 7 | CEG Existing January 2024 Notes | 1,167 | - | 67 | 85 | 33 | 32 | 39 | 6 | 263 |
| 8 | CEG Existing March 2024 Notes | 1,064 | - | 61 | 77 | 30 | 29 | 36 | 6 | 239 |
| 9 | CEG Existing April 2024 Notes | 779 | - | 45 | 57 | 22 | 22 | 26 | 4 | 175 |
| 10 | CEG Existing June 2025 Notes | 5,263 | - | 303 | 382 | 148 | 145 | 177 | 29 | 1,184 |
| 11 | CEG Existing January 2022 Notes | 348 | - | 20 | 25 | 10 | 10 | 12 | 2 | 78 |
| 12 | Class A Private Loan | 13 | - | 1 | 1 | 0 | 0 | 0 | 0 | 3 |
| | **Total** | **16,080** | - | **927** | **1,167** | **452** | **444** | **541** | **89** | **3,618** |

*Notes*
1. *All figures shown in the table above are subject to rounding.*
2. *Claims or recoveries that are less than USD1m may be illustrated by 0. The use of "-" will be present to illustrate no monetary amount.*

© 2023 Deloitte China.

China Evergrande Group | Scheme Recovery Analysis Report



## Appendix 1

## Sources of Recovery - CEG Scheme – Class C Creditors

**Class C Sources of Recovery under Base Case (USD'm)**

| # Facility/Instrument | Accrued Claim | Third-Party Rights | Estimated Recoveries | | | | | | Total Recovery |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | C1 Notes | C2 Notes | MEBs / MCBs | EVPS SLNs | NEV SLNs | TJ Intercom | |
| 13 Lake Notes | 294 | 20 | 16 | 24 | 4 | 2 | 8 | 2 | 75 |
| 14 Dongpo Notes | 441 | 1 | 25 | 38 | 7 | 3 | 13 | 2 | 90 |
| 15 Dongpo Put Option | 144 | 2 | 8 | 12 | 2 | 1 | 4 | 1 | 31 |
| 16 Graceful Court Put Option | 120 | 2 | 7 | 10 | 2 | 1 | 3 | 1 | 26 |
| 17 New Chic Margin Loan | 20 | 5 | 1 | 1 | 0 | 0 | 0 | 0 | 8 |
| 18 Clear Star Put Option | 74 | 2 | 4 | 6 | 1 | 1 | 2 | 0 | 16 |
| 19 CEG Loan 1 | 210 | - | 12 | 18 | 3 | 2 | 6 | 1 | 42 |
| 20 CEG Loan 2 | 105 | - | 6 | 9 | 2 | 1 | 3 | 1 | 21 |
| 21 Venice Loan | 25 | 15 | 1 | 1 | 0 | 0 | 0 | 0 | 17 |
| 22 Venice SPA | 571 | 337 | 13 | 20 | 4 | 2 | 7 | 1 | 384 |
| 23 Hero Loan | 994 | 502 | 28 | 42 | 8 | 4 | 14 | 3 | 601 |
| 24 FCB Put Option | 712 | 150 | 32 | 48 | 9 | 4 | 16 | 3 | 263 |
| 25 RMB Bond Put Option | 1,311 | 57 | 72 | 108 | 19 | 10 | 37 | 7 | 310 |
| 26 CEG Guarantees of PRC Liabilities | 9,221 | 1,341 | 454 | 678 | 121 | 60 | 230 | 44 | 2,929 |
| 27 Kailong Arbitration Award | 834 | - | 48 | 72 | 13 | 6 | 24 | 5 | 168 |
| 28 On-Lent Loan | 0 | - | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **15,075** | **2,434** | **728** | **1,087** | **195** | **97** | **370** | **70** | **4,980** |

*Notes*
1. *All figures shown in the table above are subject to rounding.*
2. *Claims or recoveries that are less than USD1m may be illustrated by 0. The use of " - " will be present to illustrate no monetary amount.*

© 2023 Deloitte China.



**Appendix 2**

Debt Schedule - CEG Scheme – Class A Creditors

### Offshore Debt Schedule – Class A (USD'm)

| # | Facility/Instrument | Principal O/S As of Dec 2022 | Accrued Claims As of Dec 2022 | Value of Third Party Rights As of Dec 2022 |
|---|---|---|---|---|
| 1 | CEG Existing March 2022 Notes | 2,022 | 2,234 | - |
| 2 | CEG Existing April 2022 Notes | 1,450 | 1,618 | - |
| 3 | CEG Existing January 2023 Notes | 999 | 1,164 | - |
| 4 | CEG Existing February 2023 Bonds | 10 | 11 | - |
| 5 | CEG Existing April 2023 Notes | 834 | 936 | - |
| 6 | CEG Existing June 2023 Notes | 1,332 | 1,482 | - |
| 7 | CEG Existing January 2024 Notes | 995 | 1,167 | - |
| 8 | CEG Existing March 2024 Notes | 951 | 1,064 | - |
| 9 | CEG Existing April 2024 Notes | 691 | 779 | - |
| 10 | CEG Existing June 2025 Notes | 4,649 | 5,263 | - |
| 11 | CEG Existing January 2022 Notes | 300 | 348 | - |
| 12 | Class A Private Loan | 9 | 13 | - |
| | **Total** | **14,242** | **16,080** | **-** |

*Notes*
1. *All figures shown in the table above are subject to rounding.*

China Evergrande Group | Scheme Recovery Analysis Report

44

© 2023 Deloitte China.




# Appendix 2

## Debt Schedule - CEG Scheme – Class C Creditors

### Offshore Debt Schedule – Class C Creditors (USD'm)

| # Facility/Instrument | Principal O/S As of Dec 2022 | Accrued Claims As of Dec 2022 | Value of Third Party Rights As of Dec 2022 | Deficiency Claims As of Dec 2022 |
|---|---|---|---|---|
| 13 Lake Notes | 260 | 294 | 20 | 274 |
| 14 Dongpo Notes | 424 | 441 | 1 | 440 |
| 15 Dongpo Put Option | 116 | 144 | 2 | 141 |
| 16 Graceful Court Put Option | 110 | 120 | 2 | 119 |
| 17 New Chic Margin Loan | 20 | 20 | 5 | 15 |
| 18 Clear Star Put Option | 74 | 74 | 2 | 72 |
| 19 CEG Loan 1 | 154 | 210 | - | 210 |
| 20 CEG Loan 2 | 77 | 105 | - | 105 |
| 21 Venice Loan | 20 | 25 | 15 | 10 |
| 22 Venice SPA | 355 | 571 | 337 | 234 |
| 23 Hero Loan | 974 | 994 | 502 | 492 |
| 24 FCB Put Option | 712 | 712 | 150 | 562 |
| 25 RMB Bond Put Option | 1,189 | 1,311 | 57 | 1,255 |
| 26 CEG Guarantees of PRC Liabilities | 8,961 | 9,221 | 1,341 | 7,880 |
| 27 Kailong Arbitration Award | 834 | 834 | - | 834 |
| 28 On-Lent Loan | 0 | 0 | - | 0 |
| **Total** | **13,445** | **15,075** | **2,434** | **12,641** |

*Notes*
1. *All figures shown in the table above are subject to rounding.*

China Evergrande Group | Scheme Recovery Analysis Report

© 2023 Deloitte China.

45

**Appendix 2**

Debt Schedule - SJ Scheme – Class B Creditors

### Offshore Debt Schedule – SJ Scheme – Class B Creditors (USD'm)

| # Facility/Instrument | Principal O/S As of Dec 2022 | Accrued Claims As of Dec 2022 | Value of Third Party Rights As of Dec 2022 | Deficiency Claims As of Dec 2022 |
|---|---|---|---|---|
| 29 SJ Existing October 2022 Notes | 1,999 | 2,330 | 44 | 2,286 |
| 30 SJ Existing November 2022 Notes | 644 | 782 | 15 | 768 |
| 31 SJ Existing October 2023 Notes | 1,994 | 2,338 | 44 | 2,294 |
| 32 SJ Existing November 2023 Notes | 589 | 723 | 14 | 709 |
| **Total** | **5,226** | **6,173** | **117** | **6,056** |

*Notes*
1. *All figures shown in the table above are subject to rounding.*




© 2023 Deloitte China.

China Evergrande Group | Scheme Recovery Analysis Report

46

**Appendix 2**

Debt Schedule - TJ Scheme – Class D Creditors

### Offshore Debt Schedule – Class D (USD'm)

| # Facility/Instrument | Principal O/S As of Dec 2022 | Accrued Claims As of Dec 2022 | Value of Third Party Rights As of Dec 2022 | Deficiency Claims As of Dec 2022 |
|---|---|---|---|---|
| 33 SJ Existing October 2022 Notes | 1,999 | 2,330 | 929 | 1,401 |
| 34 SJ Existing November 2022 Notes | 644 | 782 | 312 | 470 |
| 35 SJ Existing October 2023 Notes | 1,994 | 2,338 | 933 | 1,406 |
| 36 SJ Existing November 2023 Notes | 589 | 723 | 288 | 435 |
| 37 Lake Notes | 260 | 294 | 68 | 226 |
| 38 Clear Star Put Option | 74 | 74 | 14 | 59 |
| 40 Castle Share Put Option | 258 | 310 | 1 | 309 |
| 39 Castle Loan Put Option | 0 | 0 | - | 0 |
| 41 Hero Loan | 974 | 994 | 588 | 406 |
| 42 Tuen Mun Put Options | 181 | 224 | 114 | 111 |
| 43 CEG-Tianji Intercompany Balance | 5,035 | 5,035 | - | 5,035 |
| **Total** | **12,008** | **13,105** | **3,248** | **9,857** |

*Notes*
1.   *All figures shown in the table above are subject to rounding.*



© 2023 Deloitte China.

China Evergrande Group | Scheme Recovery Analysis Report

47







**Deloitte.**

About Deloitte

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited ("DTTL"), its global network of member firms, and their related entities (collectively, the "Deloitte organization"). DTTL (also referred to as "Deloitte Global") and each of its member firms and related entities are legally separate and independent entities, which cannot obligate or bind each other in respect of third parties. DTTL and each DTTL member firm and related entity is liable only for its own acts and omissions, and not those of each other. DTTL does not provide services to clients. Please see www.deloitte.com/about to learn more.

Deloitte is a leading global provider of audit and assurance, consulting, financial advisory, risk advisory, tax and related services. Our global network of member firms and related entities in more than 150 countries and territories (collectively, the "Deloitte organization") serves four out of five Fortune Global 500® companies. Learn how Deloitte's approximately 345,000 people make an impact that matters at www.deloitte.com.

Deloitte Asia Pacific Limited is a company limited by guarantee and a member firm of DTTL. Members of Deloitte Asia Pacific Limited and their related entities, each of which are separate and independent legal entities, provide services from more than 100 cities across the region, including Auckland, Bangkok, Beijing, Hanoi, Hong Kong, Jakarta, Kuala Lumpur, Manila, Melbourne, Osaka, Seoul, Shanghai, Singapore, Sydney, Taipei and Tokyo.

The Deloitte brand entered the China market in 1917 with the opening of an office in Shanghai. Today, Deloitte China delivers a comprehensive range of audit & assurance, consulting, financial advisory, risk advisory and tax services to local, multinational and growth enterprise clients in China. Deloitte China has also made—and continues to make—substantial contributions to the development of China's accounting standards, taxation system and professional expertise. Deloitte China is a locally incorporated professional services organization, owned by its partners in China. To learn more about how Deloitte makes an impact that Matters in China, please connect with our social media platforms at www2.deloitte.com/cn/en/social-media.

This communication contains general information only, and none of Deloitte Touche Tohmatsu Limited ("DTTL"), its global network of member firms or their related entities (collectively, the "Deloitte organization") is, by means of this communication, rendering professional advice or services. Before making any decision or taking any action that may affect your finances or your business, you should consult a qualified professional adviser.

No representations, warranties or undertakings (express or implied) are given as to the accuracy or completeness of the information in this communication, and none of DTTL, its member firms, related entities, employees or agents shall be liable or responsible for any loss or damage whatsoever arising directly or indirectly in connection with any person relying on this communication. DTTL and each of its member firms, and their related entities, are legally separate and independent entities.

© 2023. For information, contact Deloitte China.

**SCHEDULE 4**

**[BLANK]**

**SCHEDULE 5**

**[BLANK]**

## SCHEDULE 6

## THE BVI SCHEME

**IN THE EASTERN CARIBBEAN SUPREME COURT**

**IN THE HIGH COURT OF JUSTICE**

**BRITISH VIRGIN ISLANDS**

**COMMERCIAL DIVISION**

**CLAIM NO. BVIHC (COM) 0076 of 2023**

**IN THE MATTER OF SCENERY JOURNEY**

**AND IN THE MATTER OF SECTION 179A OF THE BVI BUSINESS COMPANIES ACT 2004**

---

## SCHEME OF ARRANGEMENT

*(under section 179A of the BVI Business Companies Act (As Amended))*

---

**BETWEEN**

***SCENERY JOURNEY LIMITED***

*(景程有限公司)*

*(a BVI Business Company incorporated with limited liability under the laws of the British Virgin Islands with company number 1970476, and its registered office at Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, British Virgin Islands)*

**AND**

**THE SCHEME CREDITORS**

*(as herein defined)*

TABLE OF CONTENTS

1.      DEFINITIONS AND INTERPRETATION.............................................................4

2.      INTERPRETATION.....................................................................................24

3.      APPLICATION AND EFFECTIVENESS OF THIS BVI SCHEME ..................26

4.      COMPROMISE AND ARRANGEMENT WITH THE SCHEME CREDITORS .....27

5.      AUTHORITY AND INSTRUCTIONS .....................................................28

6.      SCHEME STEPS ........................................................................................31

7.      NOTICES TO SCHEME CREDITORS AND OTHERS .......................................33

8.      ENTITLEMENT RECORD TIME AND SCHEME CLAIMS.............................34

9.      ACCEPTANCE OF DOCUMENTATION..............................................................34

10.     DEADLINES AND THE BAR DATE....................................................................35

11.     ASSIGNMENTS OR TRANSFERS OF SCHEME CLAIMS AFTER THE
        VOTING RECORD TIME ............................................................................36

12.     CALCULATION OF A SCHEME CREDITOR'S ENTITLEMENT ..................37

13.     DISTRIBUTION OF THE SCHEME CONSIDERATION ...................................38

14.     DISTRIBUTION TO HOLDING PERIOD TRUSTEE ................................38

15.     DISTRIBUTION TO THE SUCCESSOR ESCROW ACCOUNT FOR BLOCKED
        SCHEME CREDITORS ...............................................................................39

16.     ISSUANCE OF THE NEW INSTRUMENTS .....................................................40

17.     RESTRICTIONS.........................................................................................40

18.     FRACTIONAL ADJUSTMENTS ..........................................................................40

19.     MODIFICATIONS OF THE RIGHTS ATTACHING TO THE NEW
        INSTRUMENTS ...........................................................................................42

20.     SECURITIES LAW CONSIDERATIONS ...................................................42

21.     RELEASES...................................................................................................42

22.     STAY OF PROCEEDINGS ...............................................................................44

23.     COSTS AND INDEMNITY ................................................................................45

24.    MODIFICATIONS TO THE SCHEME AND THE RESTRUCTURING
       DOCUMENTS ....................................................................................................45

25.    OBLIGATIONS ON DATES OTHER THAN A BUSINESS DAY ....................46

26.    NO ADMISSION OF LIABILITY.............................................................................46

27.    THE INFORMATION AGENT ................................................................................46

28.    THE HOLDING PERIOD TRUSTEE......................................................................47

29.    THE SUCCESSOR ESCROW AGENT......................................................................48

30.    THE SCHEME ADMINISTRATORS ......................................................................49

31.    NOTICE ......................................................................................................................52

32.    INTERCONDITIONALITY OF THE SCHEME......................................................53

33.    APPLICATION TO THE BVI COURT FOR DIRECTIONS ...............................53

34.    TERMINATION OF THIS BVI SCHEME ..............................................................53

35.    CONFLICT AND INCONSISTENCY ....................................................................54

36.    SEVERABILITY ........................................................................................................54

37.    FOREIGN REPRESENTATIVE ..............................................................................54

38.    GOVERNING LAW AND JURISDICTION ..........................................................54

SCHEDULE 1 RESTRUCTURING DOCUMENTS

SCHEDULE 2 EXISTING NOTES SUBSIDIARY GUARANTORS

SCHEDULE 3 RESTRUCTURING EFFECTIVE DATE CONDITIONS

SCHEDULE 4 COURT ORDER

## PART A
## PRELIMINARY

1.      **DEFINITIONS AND INTERPRETATION**

In this BVI Scheme, unless the context otherwise requires or unless otherwise expressly provided for, the following capitalised expressions shall bear the following meanings:

| | |
|---|---|
| **"Accession Code"** | means a unique code provided by the Information Agent to a Scheme Creditor following its valid accession to the RSA, and which must be included by such Scheme Creditor in its voting instructions within the relevant Scheme Creditor Form in respect of this BVI Scheme. |
| **"Account Holder"** | means any Person who is recorded in the books of a Clearing System as being a holder of a book-entry interest in the Existing Notes in an account with that Clearing System or, as the context may require, is or was recorded in such books as being such a holder of Existing Notes in such an account at the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or the Entitlement Record Time (in respect of receiving Scheme Consideration). |
| **"Account Holder Letter"** | means the form of account holder letter which is appended to the Solicitation Packet, to be made available on the Transaction Website. |
| **"Advisors"** | means (i) Sidley Austin, (ii) Houlihan Lokey, (iii) Maples and Calder, (iv) BOCI Asia Limited (v) China International Capital Corporation Hong Kong Securities Limited; and (vi) Commerce & Finance Law Offices. |
| **"Affiliate"** | means, with respect to any Person, any other Person: (a) directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person; or (b) who is a director or officer of such Person or any Subsidiary of such Person or of any Person referred to in clause (a) of this definition and with respect to any Participating Creditor, any of its managers, investment manager or investment advisors, and any entity managed or advised by that manager, investment manager or investment advisor. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. |
| **"Agreed Form"** | means in the form agreed in writing between |
| | (a)      the Company (or the Advisors acting on its behalf); |
| | (b)      Majority SJ AHG (or the AHG Advisors acting on their behalf); |
| | (c)      only in relation to the New Instruments Documents, the New Instruments Trustee; and |

4

(d)    only in relation to the Holding Period Trust Deed and any other documents to which the Holding Period Trustee is party, the Holding Period Trustee,

in each case each acting reasonably.

| | |
|---|---|
| **"AHG Advisors"** | means Kirkland & Ellis, Moelis & Company Asia Limited, Harney Westwood & Riegels, Fangda Partners, and other professional advisors as the SJ AHG may appoint from time to time. |
| **"AHG Financial Advisor Fees"** | means the reasonable fees, costs and expenses of the financial advisor (Moelis & Company Asia Limited) to the SJ AHG that CEG has agreed to pay in accordance with the terms set out in the fee letter agreement dated 6 April 2022. |
| **"AHG Legal Advisor Fees"** | means the reasonable fees, costs and expenses of the legal advisors (Kirkland & Ellis, Harney Westwood & Riegels, Fangda Partners and barrister(s)) to the SJ AHG that CEG has agreed to pay in accordance with the terms set out in the following: |

    (a)    the fee letter agreement dated 4 April 2022 between CEG and the Kirkland & Ellis;

    (b)    the fee letter agreement dated 6 March 2023 between CEG and Harney Westwood & Riegels, and the Company and Moelis & Company Asia Limited; and

    (c)    the fee letter agreement dated 6 March 2023 between CEG and Fangda Partners.

| | |
|---|---|
| **"AHG Work Fee"** | means the "**Work Fee**" as defined in the AHG Work Fee Letter. |
| **"AHG Work Fee Letter"** | means the letter dated 20 March 2023 from the Chairman to the members of the SJ AHG in connection with payment of the AHG Work Fee. |
| **"Ancillary Claim"** | means any Claim by a Scheme Creditor against a Released Person under or in respect of the Existing Notes arising as a result of effecting, adhering to or complying with the releases in Clause 21.2(a)(i) (*Releases*) (excluding for the avoidance of doubt any Claim in respect of any Liability (i) of any Released Person which arises as a result of a failure to comply with any of the terms of this Scheme or any Restructuring Document (including but not limited to the New Instruments Documents) and (ii) arising from or in connection with any Excluded Liability. |
| **"Applicable Sanctions"** | means laws, regulations, rules and/or orders relating to economic, financial or trade sanctions, restrictive measures or embargoes administered, enacted, maintained and/or enforced by any Governmental Entity of the United States of America (including by the US. Office of Foreign Assets Control or the US. Department of State), the European Union, the United Kingdom and the British Overseas Territories (including, for the avoidance of doubt, The Russia (Sanctions) (EU Exit) Regulations 2019, as amended from time to time |

5

and as applicable in the BVI pursuant to The Russia (Sanctions) (Overseas Territories) Order 2020) (as amended).

**"Applicable Sanctions List"**   means each of:

    (a) the lists of Specially Designated Nationals and Blocked Persons or "Foreign Sanctions Evaders" or any other list of Persons subject to, or targeted by, similar sanctions as administered, maintained and/or enforced by the Office of Foreign Assets Control of the US Treasury, the US Department of Commerce, the US Department of State and any other Government Entity of the United States;

    (b) the Consolidated List of Persons, Groups and Entities Subject to EU Financial Sanctions maintained by the European Commission, Annex XIX of Regulation (EU) No 833/2014, or any other list of Persons subject to, or targeted by, similar sanctions as administered, maintained and/or enforced by the European Union or any Governmental Entity in any Member State of the European Union; or

    (c) the Consolidated List of Financial Sanctions Targets in the United Kingdom maintained by the Office of Financial Sanctions Implementation, His Majesty's Treasury of the United Kingdom, the United Kingdom Sanctions List maintained by the Foreign, Commonwealth and Development Office, or any other list of Persons subject to, or targeted by, similar sanctions administered, maintained and/or enforced by any Governmental Entity of the United Kingdom or the BVI,

or any other similar sanctions list of persons and entities subject to a prohibition to transact with, that is developed, maintained and published by any Governmental Entity of the United States of America (including by the U.S. Office of Foreign Assets Control or the U.S. Department of State), the European Union, the United Kingdom and the British Overseas Territories in connection with Sanctions, in each case as amended, supplemented or substituted from time to time, and "Applicable Sanctions Lists" includes, collectively, (a), (b) and (c) of this definition.

**"Authorised Signatory"**   means Anna Silver of FFP (BVI) Limited as Scheme Supervisor.

**"Bar Date"**   means the date falling fourteen (14) calendar days after the Scheme Effective Date.

**"Blocked New Instruments"**   means the New Instruments to which Blocked Scheme Creditors are entitled in accordance with the terms of the BVI Scheme and the Holding Period Trust Deed and, subject to Applicable Sanctions being in place on or around the expiration of the Holding Period.

**"Blocked Scheme Creditor"**   means a Scheme Creditor (other than a Sanctioned Scheme Creditor) that is not entitled, able or permitted (whether directly or through a custodian) to submit instructions or settle through the Clearing Systems as a result of Applicable Sanctions affecting the Scheme Creditor or its custodian as reasonably determined by the Clearing Systems, and which

does not have a sanctions licence in respect of the Applicable Sanctions which would allow that Scheme Creditor to freely deal in the Scheme Consideration and submit instructions or settle through the Clearing Systems.

| | |
|---|---|
| **"Blocked Scheme Creditor Form"** | means a form from a Blocked Scheme Creditor substantially in the form of the Blocked Scheme Creditor form set out in the Solicitation Packet available on the Transaction Website. |

**"Blocking Regulation"**     means:

(a) Council Regulation (EC) No. 2271/1996 of 22 November 1996 (as amended) and/or any applicable national law or regulation relating to it;

(b) Council Regulation (EC) No. 2271/1996 of 22 November 1996 (as amended) as it forms part of domestic law of the United Kingdom by virtue of the European Union (Withdrawal) Act 2018; or

(c) The Protection of Trading Interests Act 1980 of the United Kingdom.

**"Board"**     means the board of Directors.

**"Business Day"**     means any day which is not a Saturday, Sunday, legal holiday or other day on which banking institutions in the City of New York, the City of London, the BVI, the Cayman Islands, Hong Kong or the PRC are authorised or required by law or governmental regulation (as applicable) to close.

**"BVI"**     means the British Virgin Islands.

**"BVI Companies Act"**     means the BVI Business Companies Act as amended, modified or re-enacted from time to time.

**"BVI Court"**     means the Eastern Caribbean Supreme Court, High Court of Justice, BVI and any court capable of hearing appeals therefrom.

**"BVI Court Order"**     means the order of the BVI Court sanctioning this BVI Scheme.

**"BVI Registrar of Corporate Affairs"**     means the Registrar of Corporate Affairs (including any deputy registrar and/or assistant registrar or similar) appointed under the BVI Companies Act in the BVI.

**"BVI Scheme"**     means this scheme of arrangement effected pursuant to section 179A of the BVI Companies Act between the Company and the Scheme Creditors, in its present form or with or subject to any non-material modifications, additions or conditions that the BVI Court may think fit to approve or impose and agreed to by the Company and the Majority SJ AHG (provided that the SJ AHG satisfies the Minimum SJ AHG Threshold).

7

| | |
|---|---|
| **"BVI Scheme Meeting"** | means the meeting of the Scheme Creditors in relation to the BVI Scheme as convened by an order of the BVI Court for the purpose of considering and, if thought fit, approving, with or without modification, the BVI Scheme, and any adjournment thereof. |
| **"Capital Stock"** | means, with respect to any Person, any and all shares, interests (including partnership interests), rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting) equity of such Person. |
| **"CEG"** | means China Evergrande Group, an exempted company incorporated with limited liability under the laws of the Cayman Islands with registration number 169971 and having its registered office at P.O. Box 309, Ugland House, Grand Cayman, KY1-1104, the Cayman Islands and the shares of which are listed on the Main Board of the HKEX. |
| **"Chairman"** | means Mr Hui Ka Yan. |
| **"Chairperson"** | means the chairperson of the BVI Scheme Meeting. |
| **"Chapter 15 Recognition Order"** | means an order or orders of the US Bankruptcy Court recognising this BVI Scheme as a foreign main proceeding (or in the alternative, a foreign non-main proceeding) and giving effect to certain aspects of the compromise and arrangement set out in this BVI Scheme, including the Releases under Clause 21 (*Releases*) of this BVI Scheme. |
| **"Chapter 15 Recognition Proceedings"** | means the recognition proceeding before a US Bankruptcy Court to recognize the Scheme pursuant to chapter 15 of the United States Bankruptcy Code, |
| **"Claim"** | means all and any present and future Liabilities together with any refinancing, novation, deferral or extensions relating to or arising in respect of those Liabilities, actions, causes of action, claims, counterclaims, suits, debts, set-offs, sums of money, accounts, contracts, agreements, promises, contribution, subrogation, indemnification, damages, judgments, executions, court or arbitration awards, demands or rights whatsoever or howsoever arising, whether present, future, prospective or contingent, known or unknown, whether directly or indirectly, whether in person or through another Person, whether or not for a fixed or unliquidated amount, whether or not involving the payment of money or the performance of an act or obligation or any failure to perform any obligation or any omission, whether arising at common law, in equity or by statute in or under the laws of the Cayman Islands, Hong Kong, PRC, New York or under any other law or in any other jurisdiction howsoever arising and **"Claims"** shall be construed accordingly. |
| **"Class A RSA"** | means the restructuring support agreement dated 3 April 2023 between, among others, CEG and the Initial Participating Creditors (as defined in the Class A RSA), as amended or varied from time to time, including by the accession or cessation of parties thereto. |

8

| | |
|---|---|
| **"Clearing Systems"** | means Euroclear and Clearstream, as applicable, and any successor thereto. |
| **"Clearing System Instruction"** | means an instruction to each of the Clearing Systems in relation to the Restructuring Effective Date. |
| **"Clearstream"** | means Clearstream Banking S.A. |
| **"Collateral"** | all collateral securing, or purported to be securing, directly or indirectly, the New Instruments, or any New Instruments Subsidiary Guarantee (as applicable), pursuant to the Security Documents, each of which shall in each case, be in the Agreed Form. |
| **"Collateral Agent"** | means the collateral agent or any successor collateral agent under the New Instruments Documents and with respect to the Security Documents, each of which shall be in the Agreed Form. |
| **"Company Information"** | means information in the possession or control of the Company or the Group that the Scheme Administrators consider in their sole discretion, relevant to evaluate the Scheme Creditors' Entitlements. |
| **"Company Website"** | means https://mobilesite.evergrande.com/en/news.aspx. |
| **"Completion Notice"** | has the meaning given to it in Clause 6.1 (*Scheme Steps*) of this BVI Scheme. |
| **"Custody Instruction"** | means an instruction to the relevant Clearing System to block the Existing Notes (up to the Restructuring Effective Date) from trading in the relevant Clearing System. |
| **"Custody Instruction Deadline"** | means 5:00 am on 15 August 2023 (BVI time). |
| **"Deed of Release"** | shall include the form of New York law governed global deed of release in respect of the Existing Notes, in the Agreed Form and be executed pursuant to the authority conferred by Clause 21 (*Releases*) of this Scheme in respect of, among other things, the relevant Scheme Creditors in substantially the form to be made available on the Transaction Website and which shall be in the Agreed Form, subject to any modifications required or approved in accordance with Clause 24 (*Modifications to the Scheme and the Restructuring Documents*) of this BVI Scheme. |
| **"Deed of Undertaking"** | means a deed of undertaking substantially in the form to be made available on the Transaction Website, which shall be in the Agreed Form. |
| **"Deed of Undertaking Parties"** | means the Existing Notes Subsidiary Guarantors, the New Instruments Subsidiary Pledgors, the New Instruments Subsidiary Guarantors, the Existing Notes Trustee, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the Collateral Agent, the Holding Period Trustee, |

the Scheme Supervisor, the Chairman (and any of the Chairman's entities) required to perform obligations as part of the Restructuring, holding entities within the Group providing security (to the extent they are not New Instruments Subsidiary Guarantors), the Scheme Administrators, the Information Agent and any other additional parties to the Deed of Undertaking (which shall be in Agreed Form).

| | |
|---|---|
| **"Deficiency Basis"** | has the meaning set out in Clause 12.1 (*Calculation of a Scheme Creditor's Entitlement*) of this BVI Scheme. |
| **"Designated Recipient"** | means, in relation to any Scheme Creditor (who is not a Sanctions Affected Scheme Creditor) that can make affirmative Sanctions Law Representations by submission of a validly completed Distribution Confirmation Deed, any entity that is designated as such by a Scheme Creditor in accordance with a valid Designated Recipient Form as the recipient of the New Instruments to be issued to such Scheme Creditor as Scheme Consideration, subject to limitations in accordance with applicable securities laws and provided that (i) the Designated Recipient shall only be validly designated if it or an Account Holder on its behalf has submitted a Distribution Confirmation Deed and/or any other applicable forms that its designating Scheme Creditor is required to submit pursuant to this BVI Scheme; (ii) a Scheme Creditor may designate one or more such entity and if such entity is a nominee holder it may only hold on behalf of one beneficial holder; and (iii) the Designated Recipient is an Eligible Person. |
| **"Designated Recipient Form"** | means the form enclosed with the Solicitation Packet and made available on the Transaction Website by which a Scheme Creditor may appoint one or more Designated Recipients to be the recipients of all or part of the New Instruments that would otherwise be issued to that Scheme Creditor as Scheme Consideration. |
| **"Director(s)"** | means the director(s) of the Company from time to time. |
| **"Distribution Confirmation Deed"** | means the form of deed enclosed with the Solicitation Packet and made available on the Transaction Website confirming amongst other things that the Eligible Creditor or the Designated Recipient may lawfully be issued the New Instruments as Scheme Consideration. |
| **"Eligible Creditor"** | means a Scheme Creditor who is an Eligible Person and who has submitted or caused to be submitted the Scheme Creditor Forms, as applicable, such that they are submitted and received by the Information Agent in accordance with the terms of this BVI Scheme, before the applicable deadline set out in the Solicitation Packet to be made available on the Transaction Website. |
| **"Eligible Person"** | means a Person who has provided affirmative Securities Law Representations and Sanctions Law Representations to the Information Agent before the applicable deadlines set out in the Solicitation Packet, to be made available on the Transaction Website. |
| **"Entitlement"** | has the meaning given to it in Clause 12 (*Calculation of a Scheme Creditor's Entitlement*) of this BVI Scheme. |

10

| | |
|---|---|
| **"Entitlement Record Time"** | means the Restructuring Effective Date. |
| **"Euroclear"** | means Euroclear Bank SA/NV. |
| **"Excluded Liabilities"** | means any Liability of TJ at the Entitlement Record Time under or in connection with the Existing Notes. |
| **"Existing Notes"** | means the SJ Existing October 2022 Notes, the SJ Existing November 2022 Notes, the SJ Existing October 2023 Notes and the SJ Existing November 2023 Notes. |
| **"Existing Notes Depositary"** | means Citibank Europe plc as common depositary for the Clearing Systems, acting through its nominee as registered holder of the Existing Notes, Citivic Nominees Limited. |
| **"Existing Notes Documents"** | means the Indentures and any other documents entered into by the Company or any other person guaranteeing or securing liabilities due under or in respect of the Existing Notes. |
| **"Existing Notes Paying and Transfer Agent and Registrar"** | means Citibank N.A., London Branch in its capacity as paying agent, transfer agent, and registrar in respect of the Existing Notes. |
| **"Existing Notes Subsidiary Guarantors"** | means the entities listed in Schedule 2 of this BVI Scheme. |
| **"Existing Notes Trustee"** | means Citicorp International Limited in its capacity as trustee under the Indentures. |
| **"Existing Notes Trustee Instruction"** | means an instruction to the Existing Notes Trustee substantially in the form published on the Transaction Website or such other form as the Existing Notes Trustee may reasonably accept. |
| **"Explanatory Statement"** | means the composite document addressed to Scheme Creditors in relation to this BVI Scheme. |
| **"Full Accrued Claim Basis"** | means: |

(a) the outstanding principal amount or in the case of a put option or repurchase obligation, the price amount, of a Scheme Creditor's Scheme Claims at the Entitlement Record Time, without permitting duplicative claims or portions of claims against the Company other than for US$1, as determined by the Company (in consultation with the Information Agent and/or the Scheme Administrators); and

(b) all accrued but unpaid interest on such Scheme Claims up to (but excluding) the Reference Date, as determined by the Company (in consultation with the Information Agent and/or the Scheme Administrators).

11

| | |
|---|---|
| **"GLAS"** | means GLAS Specialist Services Limited, who the Company has appointed to liaise with Blocked Scheme Creditors including the processing of any Blocked Scheme Creditor Forms, under the BVI Scheme. |
| **"Global Certificates"** | means the global certificates evidencing the Existing Notes. |
| **"Governmental Entity"** | means any federal, national or local government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal or judicial body of Hong Kong, the PRC, the United States of America, the European Union, the United Kingdom, the BVI, the Cayman Islands or any other relevant jurisdiction. |
| **"Group"** | means CEG and its offshore subsidiaries from time to time. |
| **"HKEX"** | means The Stock Exchange of Hong Kong Limited. |
| **"Holding Period"** | means the period from the Restructuring Effective Date up to and including one Business Day after the TJ Final Distribution Date. |
| **"Holding Period Trust"** | means the holding period trust constituted pursuant to the Holding Period Trust Deed. |
| **"Holding Period Trust Deed"** | means the holding period trust deed to be entered into between, among others, the Company, TJ and the Holding Period Trustee, in substantially the form to be made available on the Transaction Website, subject to any modification required or approved in accordance with Clause 24 (*Modifications to the Scheme and the Restructuring Documents*) of this BVI Scheme, which shall be in Agreed Form |
| **"Holding Period Trustee"** | means GLAS Trustees Limited holding the Blocked New Instruments for and on behalf of the Blocked Scheme Creditors in accordance with this BVI Scheme and the Restructuring Documents or any additional or replacement trustee at any time. |
| **"Hong Kong"** | means the Hong Kong Special Administrative Region of the PRC. |
| **"Hong Kong Court"** | means the High Court of Hong Kong and any court capable of hearing appeals therefrom. |
| **"Hong Kong Companies Registrar"** | means the Hong Kong Registrar of Companies appointed under the Companies Ordinance (Cap. 622 of the Laws of Hong Kong), as amended,modified or re-enacted from time to time |
| **"Houlihan Lokey"** | means Houlihan Lokey (China) Limited. |
| **"Indemnified Party"** | has the meaning given to it in Clause 23.1 (*Costs and Indemnity*) of this BVI Scheme. |
| **"Indentures"** | means each of: |

(a) the indenture dated January 24, 2020, as amended, supplemented or otherwise modified from time to time, between the Company, TJ, the Keepwell Provider, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the SJ Existing October 2022 Notes;

(b) the indenture dated November 6, 2018, as amended, supplemented or otherwise modified from time to time, between the Company, TJ, the Keepwell Provider, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the SJ Existing November 2022 Notes;

(c) the indenture dated January 24, 2020, as amended, supplemented or otherwise modified from time to time, between the Company, TJ, the  Keepwell Provider, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the SJ Existing October 2023 Notes;

(d) the indenture dated November 6, 2018, as amended, supplemented or otherwise modified from time to time, between the Company, TJ,  Keepwell Provider, the Existing Notes Subsidiary Guarantors and Citicorp International Limited as trustee governing the SJ Existing November 2023 Notes;

and collectively, the "**Indentures**", each governed by and construed in accordance with the laws of the State of New York.

| | |
|---|---|
| **"Information Agent"** | means Morrow Sodali Limited in its capacity as the Company's information agent. |
| **"Keepwell Agreements"** | means the keepwell agreements entered into between, amongst others, the Keepwell Provider, TJ and the Company, in connection with the Existing Notes. |
| **"Keepwell Provider" or "New Instruments Keepwell Provider"** | means Hengda Real Estate Group Co., Ltd., in its capacity as keepwell provider under the terms of the Keepwell Agreements. |
| **"Liability"** | means any debt, liability or obligation whatsoever, whether it is present, future, prospective or contingent, whether directly or indirectly, whether or not its amount is fixed or undetermined, whether or not it involves the payment of money or the performance of an act or obligation, and whether arising at common law, in equity or by statute in or under the laws of the BVI, the Cayman Islands, Hong Kong, PRC, New York or under any other law or in any other jurisdiction howsoever arising and "**Liabilities**" shall be construed accordingly. |
| **"Longstop Date"** | means 15 December 2023, unless extended pursuant to Clause 3.6 (*Application and Effectiveness of this BVI Scheme*) of this BVI Scheme. |

| | |
|---|---|
| **"Longstop Date Extension Notice"** | has the meaning given to it in Clause 3.7 (*Application and Effectiveness of this BVI Scheme*) of this BVI Scheme. |
| **"Majority Participating Creditors"** | means, at any time, Participating Creditors who hold (beneficially, as principal) in aggregate more than 50% of the outstanding principal amount of the Restricted Debts held in aggregate by all Participating Creditors at that time (for the avoidance of doubt, excluding the Existing Notes beneficially and/or legally (as applicable) held by the Chairman, and/or Xin Xin (BVI) Limited and his or its (as applicable) Affiliates which are in the aggregate amount of US$600,000,000 as at the date of the RSA). |
| **"Majority SJ AHG"** | means the members of the SJ AHG holding a majority of the aggregate outstanding principal amount of the Restricted Debts held by the SJ AHG at the relevant time |
| **"Management"** | means the key management personnel of the Group, including the Board. |
| **"Maples and Calder"** | means Maples and Calder (Hong Kong) LLP, Maples and Calder (Cayman) LLP, and Maples and Calder (BVI), in their capacity as advisors to the Company as to matters of Cayman Islands law and BVI law. |
| **"Minimum SJ AHG Threshold"** | means an aggregate outstanding principal amount of the Restricted Debts (as defined in the RSA) constituting at least 10% of the outstanding principal amount of the Existing Notes in accordance with the terms of the RSA. |
| **"New Instruments"** | means the New SJ Tranche A Notes, New SJ Tranche B Notes, New SJ Tranche C Notes, New SJ Tranche D Notes and New SJ Tranche E Notes, as further summarised in the Explanatory Statement. |
| **"New Instruments Depositary"** | means the common depositary for the Clearing Systems, acting through its nominee as registered holder of the New Instruments as set forth in the New Instruments Documents**.** |
| **"New Instruments Documents"** | means the New York law governed indentures governing the New Instruments  to be entered into between the Company and the New Instruments Trustee substantially in the form to be made available on the Transaction Website, and the Security Documents. |
| **" New Instruments Keepwell Deed"** | means the keepwell deed to be entered into between, among others, the New Instruments Keepwell Provider and the Company in connection with the New Instruments, which shall be in the Agreed Form. |
| **"New Instruments Paying and Transfer Agent and Registrar"** | means a corporation with limited liability, in its capacity as paying agent, transfer agent, and/or registrar or any successor paying agent, transfer agent, and/or registrar in respect of the New Instruments. |

| | |
|---|---|
| **"New Instruments Subsidiary Guarantees"** | means such guarantees by the New Instruments Subsidiary Guarantors in respect of the New Instruments pursuant to the relevant New Instruments Documents, each of which shall be in the Agreed Form. |
| **"New Instruments Subsidiary Guarantors"** | means such persons who will guarantee the obligations of the Company and/or other obligors in respect of the New Instruments pursuant to the New Instruments Documents as at the Restructuring Effective Date listed the New Instruments Documents, which shall be in Agreed Form. |
| **"New Instruments Subsidiary Pledgors"** | means such Persons who will provide and/or grant Security in respect of the obligations of the Company and/or other obligors in respect of the applicable New Instruments pursuant to the relevant New Instruments Documents as at the Restructuring Effective Date, each of which shall be in the Agreed Form. |
| **"New Instruments Trustee"** | means the trustee or any successor trustee under and as defined in the New Instruments Documents. |
| **"New SJ Tranche A Notes"** | means the US$300 million 5.5% / 6.5% variable rate notes to be issued by the Company due 2027 pursuant to the indenture substantially in the form set out in the Transaction Website which shall be in Agreed Form. |
| **"New SJ Tranche B Notes"** | means the US$1,100 million 6.0% / 7.0% variable rate notes to be issued by the Company due 2028 pursuant to the indenture substantially in the form of the indenture in relation to the New SJ Tranche A Notes as set out in the Transaction Website save for the modifications required to reflect the different terms of the New SJ Tranche B Notes as set out in the Explanatory Statement, which shall be in the Agreed Form. |
| **"New SJ Tranche C Notes"** | means the US$1,100 million 6.5% / 7.5% variable rate notes to be issued by the Company due 2029 pursuant to the indenture substantially in the form of the indenture in relation to the New SJ Tranche A Notes as set out in the Transaction Website save for the modifications required to reflect the different terms of the New SJ Tranche C Notes as set out in the Explanatory Statement, which shall be in the Agreed Form. |
| **"New SJ Tranche D Notes"** | means the US$1,200 million 7.0% / 8.0% variable rate notes to be issued by the Company due 2030 pursuant to the indenture substantially in the form of the indenture in relation to the New SJ Tranche A Notes as set out in the Transaction Website, save for the modifications required to reflect the different terms of the New SJ Tranche D Notes as set out in the Explanatory Statement, which shall be in the Agreed Form. |
| **"New SJ Tranche E Notes"** | means the US$2,800 million 7.5% / 8.5% variable rate notes to be issued by the Company due 2031 pursuant to the indenture substantially in the form of the indenture in relation to the New SJ Tranche A Notes as set out in the Transaction Website, save for the modifications required to reflect the different terms of the New SJ |

15

Tranche E Notes as set out in the Explanatory Statement, which shall be in the Agreed Form.

**"NPV"**  means the net present value as determined by the Scheme Administrators prior to the Restructuring Effective Date in accordance with Clause 12.2 (*Calculation of a Scheme Creditor's Entitlement*) of this BVI Scheme.

**"NPV Amount"**  has the meaning given to it in  Clause 12.2 (*Calculation of a Scheme Creditor's Entitlement*) of this BVI Scheme

**"Obligors"**  means, collectively, SJ, the Existing Notes Subsidiary Guarantors and the Keepwell Provider under the Existing Notes; and **"Obligor"** means any one of them.

**"Other Debts"**  means the offshore financial indebtedness (including guarantees and put options) of TJ listed in Schedule 2 to the TJ Term Sheet.

**"Participating Creditor"**  means a Scheme Creditor who has agreed to be bound by the RSA as a Participating Creditor in accordance with the terms of the RSA.

**"Perpetuity Period"**  means the period from the date the Successor Escrow Account is established until 21 years after that date, or such further period as the Successor Escrow Agent determines in its sole discretion (and without any obligation to do so).

**"Person"**  means any natural person, corporation, limited or unlimited liability company, trust, joint venture, association, corporation, partnership, Governmental Entity or other entity whatsoever.

**"Personnel"**  means, in relation to any Person, its current and former officers, partners, directors, employees, staff, agents, counsel and other representatives.

**"PRC"**  means the People's Republic of China, which for the purposes of this BVI Scheme excludes Taiwan, Hong Kong Special Administrative Region and the Macao Special Administrative Region.

**"Proceeding"**  means any process, suit, action, legal or other legal proceeding including without limitation any arbitration, mediation, alternative dispute resolution, judicial review, adjudication, demand, statutory demand, execution, distraint, forfeiture, re-entry, seizure, lien, enforcement of judgment, enforcement of any security or insolvency proceedings in any jurisdiction.

**"Recognition Filings"**  means (i) the filing of a petition for recognition of the BVI Scheme under Chapter 15 of the US Bankruptcy Code; (ii) the filing of a request for the US Bankruptcy Court to grant the Chapter 15 Recognition Order;and (iii)  any other filings submitted in the US Bankruptcy Court that are necessary to effectuate the Chapter 15 Recognition Proceeding.

**"Record Date Balance"**  means a credit balance created by the Clearing Systems and maintained in the records of the Clearing Systems and Existing Notes Depositary in favour of those Existing Notes Scheme Creditors who did not submit or did not have submitted on their behalf Custody

16

|  | Instructions by the Custody Instruction Deadline and/or a validly completed Account Holder Letter, Distribution Confirmation Deed and, if applicable, Designated Recipient Form by the Entitlement Record Time. |
|---|---|
| **"Reference Date"** | means the earlier of October 1, 2023 and the Restructuring Effective Date. |
| **"Regulation D"** | means Regulation D under the US Securities Act. |
| **"Regulation S"** | means Regulation S under the US Securities Act. |
| **"Releases"** | has the meaning given to it in Clause 21 (*Releases*) of this BVI Scheme. |
| **"Released Claims"** | means any of the (i) Scheme Claims, (ii) Ancillary Claims or (iii) Restructuring Claims. |
| **"Released Persons"** | means (i) the Company, the Existing Notes Subsidiary Guarantors and the Group, (ii) the Existing Notes Trustee, the Existing Notes Depositary, the Existing Notes Paying and Transfer Agent and Registrar, (iii) the New Instruments Depositary, the New Instruments Paying and Transfer Agent and Registrar, the Collateral Agent and the New Instruments Trustee, (iv) the Keepwell Provider, (v) the Holding Period Trustee, (v) the Information Agent, (vi) the Scheme Administrators, (vii) the Scheme Supervisor, (viii) the Advisors, (ix) the SJ AHG (including each SJ AHG member's respective managers and investment managers' and investment advisors' respective Affiliates and funds and in each case, including any of its respective directors, managers or officers), (x) the AHG Advisors; and (xi) the Advisors and, regarding each of the above, includes each of their respective predecessors, successors and assigns (where applicable), their respective Personnel, and their respective advisors and in their capacities as such, and **"Released Person"** shall be construed accordingly. |
| **"Relevant Collateral"** | means any security, collateral, guarantee, bond, indemnity or other form of assurance granted for the purpose of securing and/or guaranteeing the Existing Notes (including the Keepwell Agreements) other than any granted by TJ (for the avoidance of doubt, TJ is not a grantor of collateral under the Keepwell Agreements). |
| **"Restricted Debts"** | means, with respect to a Participating Creditor at any time, the aggregate outstanding principal amount of Existing Notes set out in the Restricted Debts Notice (as defined in the RSA) then most recently delivered by that Participating Creditor, as modified from time to time by any Transfer Notices (as defined in the RSA) (as applicable) delivered by Participating Creditors to the Information Agent, subject to evidence satisfactory to the Information Agent, having been provided in accordance with the terms of the RSA; and **"Restricted Debt"** means any portion of the Restricted Debts. |
| **"Restricted Subsidiaries"** | has the meaning given to that term under the New Instruments Documents. |

17

| **"Restructuring"** | means the restructuring of the debt and other offshore financial obligations of the Company as contemplated by, *inter alia*, the Restructuring Documents and this BVI Scheme. |
|---|---|
| **"Restructuring Claims"** | means any Claim by a Scheme Creditor against a Released Person in respect of: (A) the preparation, negotiation, execution, sanction or implementation of this Scheme and/or the Restructuring and/or the Restructuring Documents; and/or (B) the execution of the Restructuring Documents and the carrying out of the steps and transactions contemplated therein in accordance with their terms, but, in each case, excluding for the avoidance of doubt, any Claim in respect of any Liability (i) of any Released Person which arises as a result of a failure to comply with any of the terms of this Scheme or any Restructuring Document (included but not limited to the New Instruments Documents) and (ii) arising from or in connection with any Excluded Liability or Excluded Collateral, and "**Restructuring Claim**" shall be construed accordingly. |
| **"Restructuring Documents"** | means the documents to be entered into by certain parties to implement the terms of the Restructuring including, but not limited those documents listed in Schedule 1 (*Restructuring Documents*) of this BVI Scheme, in each case in the Agreed Form. |
| **"Restructuring Effective Date"** | means the date on which the Restructuring Effective Date Conditions have been satisfied or waived (as the case may be). |
| **"Restructuring Effective Date Conditions"** | means the conditions set out in Schedule 3 of this BVI Scheme. |
| **"Restructuring Effective Date Conditions Subsequent"** | means the conditions set out in Clause 6.6 (*Scheme Steps*) of this BVI Scheme. |
| **"RSA"** | means the restructuring support agreement dated 3 April 2023 between, among others, the Company and the Initial Participating Creditors, as amended or varied from time to time, including by the accession or cessation of parties thereto. |
| **"Rules"** | has the meaning given to it in Clause 28.5 of this Scheme. |
| **"Sanctioned Country"** | means any country or territory that is the target of any comprehensive country or territory-wide Applicable Sanctions (being, as at the date of the Explanatory Statement, the territories of Crimea, Donetsk and Luhansk, and the countries of Cuba, Iran, North Korea and Syria). |
| **"Sanctions Affected Scheme Creditor"** | means a Blocked Scheme Creditor or a Sanctioned Scheme Creditor. |
| **"Sanctions Law Representations"** | means the sanctions law confirmations and undertakings set out in the Distribution Confirmation Deed. |

18

| | |
|---|---|
| **"Sanctioned Scheme Creditor"** | means a Scheme Creditor that is: |

(a) designated on any Applicable Sanctions List;

(b) resident in, ordinarily located in, or incorporated or domiciled under the laws of any Sanctioned Country;

(c) in the aggregate, 50 percent or greater owned, directly or indirectly, or otherwise controlled, directly or indirectly, (in each case with reference to Applicable Sanctions) by any Person or Persons described in (a) or (b) above of this definition; or

(d) acting on behalf of or at the direction of any Person or Persons described in (a) or (b) above of this definition,

and which does not have a sanctions license in respect of the Applicable Sanctions which would allow that Scheme Creditor to freely deal in the Scheme Consideration and submit instructions or settle through the Clearing Systems.

| | |
|---|---|
| **"Scheme Administrators"** | means Mr P Cowley, Ms Y M Lui and Mr C Ball of KPMG Advisory (Hong Kong) Limited or any individual who is appointed Scheme Administrator under Clause 30.2 of this BVI Scheme and each a **"Scheme Administrator"**. |
| **"Scheme Claim"** | means any Claim by a Scheme Creditor against the Company, any Existing Notes Subsidiary Guarantor or the Keepwell Provider under or in respect of the Existing Notes Documents whether at, before or after the Voting Record Time (including, for the avoidance of doubt, all accrued and unpaid interest on the Existing Notes up to (but excluding) the Restructuring Effective Date, or accretions arising in respect of, such Claims before, at or after the Voting Record Time but, excluding for the avoidance of doubt, (i) any Claim in respect of any Liability of the Company, any member of the Group, any Existing Notes Subsidiary Guarantor or the Keepwell Provider which arises as a result of a failure to comply with any of the terms of this BVI Scheme or any Restructuring Document (including but not limited to the New Instruments Documents), or (ii) any Claim by a Scheme Creditor not against the Company arising from or in connection with any Excluded Liabilities. |
| **"Scheme Conditions"** | means: |

(a) the sanction with or without modification (but subject to any such modification being acceptable to the Company and in accordance with the terms of this BVI Scheme) of this BVI Scheme by the BVI Court;

(b) the delivery of the Scheme Sanction Order to the BVI Registrar of Corporate Affairs for registration;

(c) the sanction with or without modification (but subject to any such modification being acceptable to TJ and in accordance

with the terms of the TJ Scheme) of the TJ Scheme by the Hong Kong Court; and

(d) the delivery of the TJ Scheme Sanction Order to the Hong Kong Companies Registrar for registration

| | |
|---|---|
| **"Scheme Consideration"** | means the relevant portion of the rights and interests in the New Instruments to be distributed to Scheme Creditors (and/or their Designated Recipients, as applicable) under and pursuant to the terms of this BVI Scheme (and, without double counting, any Blocked New Instruments). |
| **"Scheme Creditor"** | means persons with an economic or beneficial interest as principal in the Existing Notes held in global form or global restricted form through the Clearing Systems as at (1) the Voting Record Time (in respect of voting purposes at the Scheme Meeting) and/or (2) the Entitlement Record Time (in respect of the determination of such Entitlements), each of whom has a right, upon satisfaction of certain conditions, to be issued definitive registered notes in accordance with the terms of the Existing Notes and the Indentures, and (but without double counting in each case) the Existing Notes Depositary and the Existing Notes Trustee. |
| **"Scheme Creditor Form"** | means: |
| | (a) in respect of the Scheme Creditors (who are not Sanctions Affected Scheme Creditors), a validly completed Account Holder Letter together with a validly completed Distribution Confirmation Deed and Designated Recipient Form (if applicable); and |
| | (b) in respect of Blocked Scheme Creditors, a validly completed Blocked Scheme Creditor Form. |
| **"Scheme Meeting"** | means the meeting of the Scheme Creditors in relation to the BVI Scheme as convened by an order of the BVI Court for the purpose of considering and, if thought fit, approving, with or without modification, the Scheme, and any adjournment thereof. |
| **"Scheme Creditor Releasing Parties"** | has the meaning given to it in Clause 21.2 (*Releases*) of this BVI Scheme. |
| **"Scheme Effective Date"** | means the date on which all of the Scheme Conditions are satisfied and the Scheme becomes effective, as specified in the Scheme Effective Date Notice. |
| **"Scheme Effective Date Notice"** | means the notice to be issued by the Company and delivered to the Information Agent in accordance with Clause 7.1 (*Notices to Scheme Creditors and Others*) confirming satisfaction of the Scheme Conditions and specifying the Scheme Effective Date. |
| **"Scheme Meeting"** | means the meeting of the Scheme Creditors in relation to the Scheme as convened by an order of the BVI Court for the purpose of |

considering and, if thought fit, approving, with or without modification, the BVI Scheme, and any adjournment thereof.

| | |
|---|---|
| **"Scheme Sanction Order"** | means the sealed copy of the order of the BVI Court sanctioning this BVI Scheme. |
| **"Scheme Steps"** | means the steps set out in Clause 6 (*Scheme Steps*) of this BVI Scheme. |
| **"Scheme Supervisor"** | means Anna Silver of FFP (BVI) Limited, who will act as (i) Chairperson, and (ii) foreign representative (court appointed) for the Recognition Filings. |
| **"SEC"** | means the US Securities and Exchange Commission. |
| **"Security"** | means the security constituted pursuant to the Security Documents. |
| **"Security Documents"** | means the security documents and Share Charges to be entered into in connection with Collateral of the New Instruments substantially in the form to be made available on the Transaction Website, each of which shall be in the Agreed Form. |
| **"Securities Law Representations"** | means the securities law confirmations and undertakings set out in the Distribution Confirmation Deed forming part of the Solicitation Packet, to be made available on the Transaction Website. |
| **"SGX-ST"** | means Singapore Exchange Securities Trading Limited. |
| **"SJ"** or **"Company"** | means Scenery Journey Limited, a company incorporated with limited liability under the laws of the BVI with company number 1970476 and having its registered office at Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola VG1110, BVI. |
| **"SJ AHG"** | means the ad hoc group of holders of the Existing Notes or investment managers for or investment advisors to certain holders of the Existing Notes as constituted from time to time, who are advised by the AHG Advisors. The members of the SJ AHG (each an **"SJ AHG Member"**, and collectively the **"SJ AHG"**). |
| **"SJ Existing November 2022 Notes"** | means the 13.0% senior notes due November 6, 2022 (ISIN: XS1903671854, Common Code: 190367185) issued by the Company. |
| **"SJ Existing November 2023 Notes"** | means the 13.75% senior notes due November 6, 2023 (ISIN: XS1903671938, Common Code: 190367193) issued by the Company. |
| **"SJ Existing October 2022 Notes"** | means the 11.5% senior notes due October 24, 2022 (ISIN: XS2109191986, Common Code: 10919198) issued by the Company. |
| **"SJ Existing October 2023 Notes"** | means the 12.0% senior notes due October 24, 2023 (ISIN: XS2109192109, Common Code: 210919210) issued by the Company. |

| | |
|---|---|
| **"Solicitation Packet"** | means the packet of materials, including the Account Holder Letter and accompanying instructions, the Designated Recipient Form, the Distribution Confirmation Deed, the Proxy Forms and the Blocked Scheme Creditor Form, all of which are available to Scheme Creditors on the Transaction Website. |
| **"Subsidiary"** | means, with respect to any Person, any corporation, association or other business entity of which more than 50% of the voting power of the outstanding Voting Stock is owned, directly or indirectly, by such Person and one or more other Subsidiaries of such Person. |
| **"Successor Escrow Account"** | means an escrow account to be established for the Perpetuity Period or until the lifting of the Applicable Sanctions in respect of all Blocked Scheme Creditors, whichever is earlier, by an agent to be appointed by the Company pursuant to the Successor Escrow Agreement for the purposes of holding the Blocked New Instruments after the expiration of the Holding Period for the Blocked Scheme Creditors who have submitted a validly completed Blocked Scheme Creditor Form together with supporting evidence to the Company prior to the Bar Date. |
| **"Successor Escrow Agent"** | means the Person to be appointed by the Company as escrow agent for the Successor Escrow Account. . |
| **"Successor Escrow Agreement"** | means the agreement providing for the creation of the Successor Escrow Account, under which the Successor Escrow Agent shall hold the Blocked New Instruments for the Company, in a form approved by the Successor Escrow Agent. |
| **"Super Majority SJ Participating Creditors"** | means, at any time, Participating Creditors who hold (beneficially or legally (as applicable), as principal) in aggregate at least 66 2/3% of the outstanding principal amount of the Restricted Debts  held in aggregate by all Participating Creditors  at that time (for the avoidance of doubt, excluding the Existing Notes beneficially and/or legally (as applicable) held by  the Chairman and/or Xin Xin (BVI) Limited and his or its (as applicable) Affiliates which are in the aggregate amount of US$600,000,000 as at the date of the RSA). |
| **"Term Sheet"** | means the restructuring term sheet in respect of the Company's offshore indebtedness dated 20 March 2023 between (among others) the Company and the SJ AHG, as amended, restated and/or supplemented from time to time. A redacted copy of the Term Sheet as of the date of this BVI Scheme, incorporating amendments made by the Company to cure certain defects and omissions in accordance with the terms thereto, can be found on the transaction website specified in CEG's announcement on the HKEX at: https://www1.hkexnews.hk/listedco/listconews/sehk/2023/0403/2023040304093.pdf. |
| **"TJ"** | means Tianji Holding Limited (天基控股有限公司), a company incorporated with limited liability under the laws of Hong Kong with company number 1339269 and having its registered office at 17th Floor, |

22

|  | One Island East Taikoo Place, 18 Westlands Road, Quarry Bay, Hong Kong. |
|---|---|
| **"TJ Final Distribution Date"** | is the "Final Distribution Date" under the TJ Scheme which shall be a date designated by TJ no later than one month of the completion of the claims determination, valuation and adjudication procedures under that TJ Scheme. |
| **"TJ Group"** | Means TJ and it subsidiaries from time to time. |
| **"TJ New Notes"** | means Tranche A Notes, Tranche B Notes, Tranche C Notes and Tranche D Notes. |
| **"TJ Other Debt Instruments Scheme Creditors"** | means (i) a person holding an economic or beneficial interest as principal in the Lake Notes; or (ii) a person holding a legal interest as principal in any of the other TJ Other Debts as at: (1) the Voting Record Time (in respect of voting purposes at the Scheme Meetings) and/or (2) the Entitlement Record Time (in respect of the determination of such person's entitlement to scheme consideration under the terms of the TJ Scheme), and **"TJ Other Debt Instruments Scheme Creditor"** means one of the TJ Other Debt Instruments Scheme Creditors |
| **"TJ Scheme"** | means a scheme of arrangement in Hong Kong to be proposed by the Company's direct parent company, TJ. |
| **"TJ Scheme Administrators"** | has the meaning given to the term "Scheme Administrators" in the TJ Scheme. |
| **"TJ Scheme Consideration"** | means the relevant portion of the rights and interests in the TJ New Notes as elected by the relevant TJ Scheme Creditor to be distributed to TJ Scheme Creditors under and pursuant to the terms of the TJ Scheme |
| **" TJ Scheme Creditor"** | means the Scheme Creditors and the Other Debt Scheme Creditors. |
| **"TJ Term Sheet"** | means the restructuring term sheet in respect of TJ's offshore indebtedness dated 20 March 2023. |
| **"Tranche A Notes"** | means the 6.0% / 7.0% variable rate notes due 2028 with an aggregate principal amount of up to US$100 million to be issued by TJ pursuant to the terms of the Term Sheet and in accordance with the relevant Restructuring Documents in substantially the form set out in the Transaction Website which shall be in Agreed Form. |
| **"Tranche B Notes"** | means the 6.5% / 7.5% variable rate notes due 2029 with an aggregate principal amount of up to US$200 million to be issued by TJ pursuant to the terms of the Term Sheet and in accordance with the relevant Restructuring Documents in substantially the form set out in the Transaction Website which shall be in Agreed Form. |
| **"Tranche C Notes"** | means the 7.0% / 8.0% variable rate notes due 2030 with an aggregate principal amount of up to US$300 million to be issued by TJ pursuant to the terms of the Term Sheet and in accordance with the relevant Restructuring Documents in substantially the form set out in the Transaction Website which shall be in Agreed Form. |

23

| | |
|---|---|
| **"Tranche D Notes"** | means the 7.5% / 8.5% variable rate notes due 2030 with an aggregate principal amount of up to US$200 million to be issued by TJ pursuant to the terms of the Term Sheet and in accordance with the relevant Restructuring Documents in substantially the form set out in the Transaction Website which shall be in Agreed Form. |
| **"Transaction Website"** | means https://projects.morrowsodali.com/evergrande. |
| **"United States" or "US"** | means the United States of America. |
| **"United States Code"** | means the codification by subject matter of the general and permanent laws of the United States. |
| **"US Bankruptcy Code"** | means Title 11 of the United States Code, as in effect on the date of the Recognition Filing. |
| **"US Bankruptcy Court"** | means the United States Bankruptcy Court for the Southern District of New York. |
| **"US Securities Act"** | means the US Securities Act of 1933, as amended, including the rules and regulations promulgated by the SEC thereunder. |
| **"US$"** | the lawful currency for the time being of the United States. |
| **"VAT"** | means value added tax or any equivalent goods and services tax levied by a Governmental Entity. |
| **"Voting Record Time"** | means 5:00 a.m. BVI time on 18 August 2023. |
| **"Voting Stock"** | means, with respect to any Person, Capital Stock of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person. |
| **"Whitelist Scheme Administrators"** | means such persons agreed in writing by the Majority SJ AHG and the Company, including persons agreed upon in writing prior to the date of this BVI Scheme. |

2.    **INTERPRETATION**

In this BVI Scheme, unless the context otherwise requires or otherwise expressly provides:

2.1    references to Clauses are, unless otherwise stated, references to the clauses set out in Parts B to E (inclusive) of this BVI Scheme;

2.2    references to Recitals, Parts and Schedules are, unless otherwise stated, references to the recitals, parts and schedules respectively of or to this BVI Scheme;

2.3    references to a "person" include references to an individual, firm, partnership, company, corporation, other legal entity, unincorporated body of persons or any state or state agency;

2.4     references to a statute or a statutory provision include the same as subsequently modified, amended or re-enacted from time to time;

2.5     references to an agreement, deed or document shall be deemed also to refer to such agreement, deed or document as amended, supplemented, restated, verified, replaced, and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto;

2.6     the singular includes the plural and vice versa and words importing one gender shall include all genders;

2.7     headings to Recitals, Parts, Clauses and Sub-Clauses are for ease of reference only and shall not affect the interpretation of this BVI Scheme;

2.8     references to times and dates (unless stated otherwise) are to times and dates in the BVI;

2.9     references to "**US\$**" and "**HK\$**" are references to the lawful currency of the United States of America and the lawful currency of Hong Kong, respectively;

2.10    the words "**include**" and "**including**" are to be construed without limitation, general words introduced by the word "**other**" are not to be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things, and general words are not to be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words;

2.11    a company is a "**subsidiary**" of another company, its "**holding company**", if that other company (a) holds a majority of the voting rights in it; (b) is a member of it and has the right to appoint or remove a majority of its board of directors; or (c) is a member of it and controls alone, pursuant to an agreement with other members, a majority of the voting rights in it, or, if it is a subsidiary of a company that is itself a subsidiary of that other company;

2.12    an "**undertaking**" means a body corporate or partnership; or an unincorporated association carrying on a trade or business, with or without a view to profit; and an undertaking is a parent undertaking in relation to another undertaking, a "**subsidiary undertaking**", if (a) it holds the majority of voting rights in the undertaking; (b) it is a member of the undertaking and has the right to appoint or remove a majority of its board of directors; (c) it has the right to exercise a dominant influence over the undertaking (i) by virtue of provisions contained in the undertaking's articles, or (ii) by virtue of a control contract; or (d) it is a member of the undertaking and controls alone, pursuant to an agreement with other shareholders or members, a majority of the voting rights in the undertaking;

2.13    to the extent that there is any conflict or inconsistency between the terms of this BVI Scheme and the Explanatory Statement, the terms of this BVI Scheme shall prevail; and

2.14    any formulas, numbers, calculation methodology may have accounted for and/or is subject to rounding.

**PART B**

**THE BVI SCHEME**

3.     **APPLICATION AND EFFECTIVENESS OF THIS BVI SCHEME**

3.1     The compromise and arrangement effected by this BVI Scheme shall apply to all Scheme Claims and shall be binding on the Company, the Existing Notes Subsidiary Guarantors, the Keepwell Provider, and all Scheme Creditors, and their respective successors, assigns and transferees (including any modifications to this BVI Scheme are made in accordance with Clause 24 (*Modifications to the Scheme and the Restructuring Documents*) of this BVI Scheme). Subject to Clause 3.2 (*Application and Effectiveness of this BVI Scheme*) of this BVI Scheme, the Scheme Creditors shall be eligible to receive certain rights in accordance with the terms of this BVI Scheme in full and final settlement of their Scheme Claims.

3.2     Notwithstanding any other provisions of this BVI Scheme, Excluded Liabilities shall not be subject to the compromise and arrangement effected by this BVI Scheme. The Excluded Liabilities shall instead be subject to the compromise and arrangement effected by the TJ Scheme, such that this BVI Scheme and the TJ Scheme shall together effect an arrangement and compromise of all Claims of Scheme Creditors in respect of the Existing Notes.

3.3     The terms of this BVI Scheme shall become effective on and from the Scheme Effective Date.

3.4     The Company or the Information Agent (acting on behalf of the Company) shall also notify the Scheme Creditors, the Existing Notes Trustee, the New Instruments Trustee and the Collateral Agent in writing that the Scheme Effective Date has occurred in accordance with Clause 12.1.

3.5     If the Restructuring Effective Date has not occurred on or before the Longstop Date (as may be extended pursuant to Clause 3.6 (*Application and Effectiveness of this BVI Scheme*) below), the terms of, and obligations on the parties under or pursuant to, this BVI Scheme shall lapse and all compromises and arrangements provided for by this BVI Scheme shall have no force or effect, and any Restructuring Documents held in escrow shall be promptly destroyed by or on behalf of the Company and the rights and obligations of the Scheme Creditors shall not be affected and shall be reinstated and remain in full force and effect.

3.6     The Company may at any time before the occurrence of the Longstop Date (or any extension thereof in accordance with this Clause) extend the Longstop Date until such later date and time as the Company may elect to extend with the prior written consent of:

(a)     the Majority SJ AHG; or

(b)     (without prejudice to the foregoing) if the SJ AHG does not hold the Minimum SJ AHG Threshold, the Majority Participating Creditors,

(a "**Longstop Date Extension**").

3.7     Subject to compliance with Clause 3.6 (*Application and Effectiveness of this BVI Scheme*) above, the Company shall promptly notify the Information Agent of any Longstop Date Extension by delivering a notice confirming the Longstop Date Extension (a "**Longstop Date Extension Notice**") to the Information Agent, and the Information Agent shall promptly notify Scheme Creditors of the Longstop Date Extension by:

(a)    sending the Longstop Date Extension Notice to the Existing Notes Trustee and the New Instruments Trustee;

(b)    circulating the Longstop Date Extension Notice to Scheme Creditors via the Clearing Systems;

(c)    posting the Longstop Date Extension Notice on the Transaction Website and the Company Website;

(d)    sending the Longstop Date Extension Notice via email to each Person who the Company believes may be a Scheme Creditor who has been registered as a Scheme Creditor (other than Blocked Scheme Creditors) with the Information Agent or has otherwise notified the Company or the Information Agent of its valid email address. GLAS is responsible for sending the Longstop Date Extension Notice via electronic email to Blocked Scheme Creditors for whom they have a valid mail address; and

(e)    publishing an announcement of the Longstop Date Extension on the respective websites of HKEX and SGX-ST.

3.8    On and following the Restructuring Effective Date, the Scheme Claims of each Scheme Creditor, and any Person, including a successor, assignee or transferee, who acquires any interest in or arising out of a Scheme Claim after the Voting Record Time, shall be subject to the compromises and arrangements set out in this BVI Scheme.

3.9    The Restructuring Effective Date of this BVI Scheme shall be on the same date as the "Restructuring Effective Date" (as defined in the TJ Scheme) of the TJ Scheme.

4.    **COMPROMISE AND ARRANGEMENT WITH THE SCHEME CREDITORS**

4.1    On the Restructuring Effective Date:

(a)    in respect of the Scheme Creditors, the Company shall ensure that the Global Certificates representing the Existing Notes are cancelled by the Existing Notes Depositary and shall give all such instructions as are required to be given by it (or for and on behalf of each Scheme Creditor) to the Existing Notes Trustee and/or the Existing Notes Depositary for such purpose;

(b)    the Company shall, for and on behalf of each Scheme Creditor, execute the Deed of Release; and

(c)    the respective rights and obligations of the Scheme Creditors (including, for the avoidance of doubt, any Person, including a successor, assignee or transferee, that acquires an interest in the Existing Notes after the Voting Record Time), the Company, the Existing Notes Subsidiary Guarantors, the Existing Notes Trustee and the Existing Notes Depositary, towards one another under the Existing Notes Documents and in respect of any other Scheme Claim (except for the Excluded Liabilities) will terminate and be discharged,

in consideration for which the Company shall issue the Scheme Consideration to the Scheme Creditors (other than to the Sanctions-Affected Scheme Creditors), the Designated Recipients and/or to the Holding Period Trustee to be held on trust for and on behalf of such relevant Blocked Scheme Creditors during the Holding Period, and/or to the Successor Escrow Agent subject to Clause 18 (*Fractional Adjustments*) and the terms of Part D (*Scheme Consideration*) below.

27

4.2    Each Scheme Creditor hereby acknowledges and agrees that any action taken by the Company in accordance with this BVI Scheme or the Restructuring Documents will not constitute a breach of or any default (howsoever described) under the Existing Notes Documents or any other agreement or document governing the terms of any Scheme Claim and irrevocably waives and releases any such breach or default.

5.    **AUTHORITY AND INSTRUCTIONS**

5.1    With effect from the Scheme Effective Date, in consideration of the rights provided to the Scheme Creditors under this BVI Scheme and solely for the purposes of giving effect to the terms of this BVI Scheme, each Scheme Creditor hereby appoints the Company as its attorney and agent and irrevocably authorizes, directs, instructs and empowers the Company (by the Scheme Supervisor or represented by any duly authorized representative) to, as applicable:

(a)    enter into, execute and deliver (whether as a deed or otherwise) for and on behalf of that Scheme Creditor, in its capacity as a Scheme Creditor, including any Person, successor, assignee or transferee, to whom a Scheme Creditor has transferred its rights in respect of its BVI Scheme Claim after the Voting Record Time (to the extent applicable), sufficient original copies of (as agreed between the parties thereto):

(i)    the Restructuring Documents (in each case in the Agreed Form) to which such Scheme Creditor is a party, each substantially in the form attached to this BVI Scheme or the Explanatory Statement (as applicable) or otherwise in the form circulated to Scheme Creditors or otherwise made available to them, including on the Transaction Website, subject to any non-material modification approved or imposed by the BVI Court in accordance with Clause 24 (*Modifications to the Scheme and the Restructuring Documents*); and

(ii)    any and all such other documents (in each case in the Agreed Form) that the Company and the SJ AHG reasonably considers necessary to give effect to the terms of this BVI Scheme,

in each case to be held to the order of the relevant parties thereto (for the avoidance of doubt, to the order of the Company on behalf of each Scheme Creditor) until the Restructuring Effective Date in accordance with the Scheme Steps for the purposes of giving effect to the terms of this BVI Scheme; and

(b)    take or carry out any other step or procedure reasonably required to effect the settlement of the BVI Scheme.

5.2    On or as soon as possible after the Scheme Effective Date:

(a)    the Company shall carry out the steps set out in Clause 5.1 and this Clause 5.2 (*Authority and Instructions*), acting on the instructions and pursuant to the authority of the Scheme Creditors; and

(b)    the Company, each Existing Notes Subsidiary Guarantor, each New Instruments Subsidiary Pledgor, each New Instruments Subsidiary Guarantor, the Existing Notes Trustee, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary, and the Collateral Agent, the Holding Period Trustee, the Scheme Supervisor and the

Information Agent shall enter into, execute and deliver (whether as a deed or otherwise) sufficient original copies of (as agreed between the parties thereto):

(i)     the Restructuring Documents (in each case in the Agreed Form) to which the Company, such Existing Notes Subsidiary Guarantor, such New Instruments Subsidiary Pledgor, such New Instruments Subsidiary Guarantor, the Existing Notes Trustee, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary, and the Collateral Agent is a party, each substantially in the form made available to Scheme Creditors on the Transaction Website, or otherwise made available to them, subject to any non-material modification approved or imposed by the BVI Court in accordance with Clause 24 (*Modifications to the Scheme and the Restructuring Documents*); and

(ii)    any and all such other documents (in each case in the Agreed Form) that the Company and the SJ AHG reasonably consider necessary to give effect to the terms of this BVI Scheme,

in each case to be held to the order of the relevant parties thereto until the Restructuring Effective Date in accordance with the Scheme Steps for the purposes of giving effect to the terms of this BVI Scheme.

5.3    With effect from the Scheme Effective Date, each of the Scheme Creditors irrevocably authorises and instructs the Existing Notes Trustee, the New Instruments Paying and Transfer Agent and Registrar the New Instruments Trustee, the Existing Notes Depositary, the Scheme Supervisor, the New Instruments Depositary, the Collateral Agent and the Holding Period Trustee to enter into, execute and deliver (whether as a deed or otherwise) sufficient original copies of (as agreed between the parties thereto):

(a)    the Restructuring Documents (in each case in the Agreed Form) to which the Existing Notes Trustee, the New Instruments Paying and Transfer Agent and Registrar the New Instruments Trustee, the Existing Notes Depositary, the Scheme Supervisor, the New Instruments Depositary, the Collateral Agent and the Holding Period Trustee is a party, each substantially in the form attached to this BVI Scheme or the Explanatory Statement (as applicable) or otherwise in the form circulated to Scheme Creditors or otherwise made available to them including on the Transaction Website, subject to any non-material modification approved or imposed by the BVI Court in accordance with Clause 24 (*Modifications to the Scheme and the Restructuring Documents*); and

(b)    any and all such other documents (in each case in the Agreed Form) that the Company and the SJ AHG reasonably consider necessary to give effect to the terms of this BVI Scheme,

in each case to be held to the order of the relevant parties thereto until the Restructuring Effective Date, in accordance with the Scheme Steps for the purposes of giving effect to the terms of this BVI Scheme.

5.4    On the Restructuring Effective Date, each Scheme Creditor (to the extent applicable) hereby irrevocably authorizes and instructs:

(a)    the Company, the Existing Notes Trustee, the Existing Notes Depositary, the Existing Notes Paying and Transfer Agent and Registrar and the Information Agent

29

to take all such actions as may be necessary or appropriate to deliver, cancel, mark down and discharge the Global Certificates, terminate and discharge Existing Notes Documents and otherwise give effect to the terms of this Scheme including without limitation the delivery by the Company (for and on behalf of the Scheme Creditors) of the Existing Notes Trustee Instruction to the Existing Notes Trustee at the time prescribed in the Scheme Steps, save that the Excluded Liability shall not be discharged and released where the Restructuring Effective Date of this Scheme occurs prior to the "Restructuring Effective Date" for the TJ Scheme;

(b)     the Existing Notes Trustee and the Existing Notes Paying and Transfer Agent and Registrar to act and rely upon the Existing Notes Trustee Instruction and the provisions of this BVI Scheme, without any duty to investigate further and without incurring any liability for doing so (other than any liability arising as a result of the fraud, wilful default or wilful misconduct of the Existing Notes Trustee, or the Existing Notes Paying and Transfer Agent and Registrar or the Existing Notes Depositary); and

(c)     the Existing Notes Depositary, the New Instruments Depositary and the Information Agent to rely upon the provisions of this BVI Scheme, without any duty to investigate further and without incurring any liability for doing so (other than any liability arising as a result of the fraud, wilful default or wilful misconduct of the Existing Notes Depositary or the fraud, wilful default or wilful misconduct of the Information Agent).

5.5     The authority granted under Clauses 5.1 to 5.4 (*Authority and Instructions*) (inclusive) shall be treated, for all purposes whatsoever and without limitation, as having been granted by deed and the Company shall be entitled to delegate the authority granted and conferred by this Clause 5 (*Authority and Instructions*) to any duly authorized officer or agent of the Company as necessary.

5.6     Each Scheme Creditor (for itself and, if applicable, for its Designated Recipient and any person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time) on and from the Scheme Effective Date and on and from the Restructuring Effective Date, irrevocably ratifies and confirms any act or omission done, caused or purported to be done by:

(a)     the Company, the Existing Notes Subsidiary Guarantors, the New Instruments Subsidiary Guarantors, the New Instruments Pledgors, the Collateral Agent, the Scheme Supervisor and the Information Agent or any of their respective directors, managers, officers, partners or Affiliates, pursuant to or for the purposes of giving effect to this BVI Scheme, other than any act or omission done or made as a result of fraud, wilful default or wilful misconduct; and

(b)     the Existing Notes Trustee, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary or any of their respective directors, managers, officers, partners or Affiliates, pursuant to or for the purposes of giving effect to this BVI Scheme, other than any act or omission done or made as a result of fraud, wilful default or wilful misconduct.

6.      **SCHEME STEPS**

*Prior to the Restructuring Effective Date*

6.1     The Company shall announce and specify the Restructuring Effective Date in a notice confirming satisfaction of the Restructuring Effective Date Conditions and enclosing a copy of the Scheme Sanction Order and the Chapter 15 Recognition Order in accordance with Clause 3.4 below to Scheme Creditors, the Existing Notes Trustee and the New Instruments Trustee as soon as reasonably practicable after satisfaction of the Restructuring Effective Date Conditions (the "**Completion Notice**").

6.2     The Restructuring Effective Date shall occur after the satisfaction or waiver (to the extent permitted by law and the RSA (applied *mutatis mutandis*)) of the Restructuring Effective Date Conditions, on or prior to such date.

6.3     The Restructuring Documents may be executed at any time after the Scheme Effective Date, but shall only take effect in accordance with their terms and the terms of this BVI Scheme, including the satisfaction of the Restructuring Effective Date Conditions, on the Restructuring Effective Date.

6.4     The Company (in consultation with the Information Agent and/or the Scheme Administrators) shall calculate the amount of the New Instruments to be issued and distributed to each Eligible Creditor (and/or their Designated Recipient) and the Holding Period Trustee on the Restructuring Effective Date in accordance with the terms of this BVI Scheme and the Restructuring Documents.

*On the Restructuring Effective Date*

6.5     On the Restructuring Effective Date, the following steps shall occur (in the order set out below to the extent possible):

(a)      the duly executed Restructuring Documents (save for the Deeds of Release and the Existing Notes Trustee Instructions which are the subject of sub clauses (e) and (g)) shall be released from escrow and delivered by the relevant parties or otherwise become effective in accordance with their terms;

(b)      each Scheme Creditor and each Designated Recipient (if applicable) shall, subject to Clause 18 (*Fractional Adjustments*) and the terms of Part D (*Scheme Consideration*) below, become entitled to receive its respective proportion of the Scheme Consideration as calculated and in accordance with Part D (*Scheme Consideration*) below;

(c)      the Company shall issue and distribute the New Instruments to the Scheme Creditors (who are Eligible Creditors), the Designated Recipients and/or the Holding Period Trustee (as applicable) in each case in accordance with their respective entitlements under this BVI Scheme and subject to and in accordance with Part D (*Scheme Consideration*) below;

(d)      any Blocked New Instruments shall be issued to and held by the Holding Period Trustee on trust for the benefit of those Blocked Scheme Creditors who have submitted a validly completed Blocked Scheme Creditor Form to the GLAS together with supporting evidence prior to the Bar Date in accordance with the terms of the Holding Period Trust Deed, during the Holding Period subject to and in accordance with Part D (*Scheme Consideration*) below;

(e)     the steps described in Clause 4.1 (*Compromise and Arrangement with the Scheme Creditors*) shall occur and the releases contained in Clause 21 (*Releases*) of this BVI Scheme and the Deed of Release shall be effective and shall be binding on all parties in accordance with their terms;

(f)     the Company via the Information Agent shall deliver the Clearing System Instruction to each of the Clearing Systems;

(g)     the Company, acting as agent for the Scheme Creditors, shall deliver the executed Existing Notes Trustee Instruction to the Existing Notes Trustee;

(h)     the Existing Notes Trustee and the Existing Notes Paying and Transfer Agent and Registrar shall, upon receipt of the Existing Notes Trustee Instruction, cancel the Existing Notes and take such other actions as may be necessary or appropriate to effect the cancellation, mark-down and discharge of the Existing Notes under the Existing Notes Documents (save for in respect of the Excluded Liability, where the Restructuring Effective Date for this Scheme occurs prior to the "Restructuring Effective Date" for the TJ Scheme), such that the respective rights and obligations of the Scheme Creditors (including, for the avoidance of doubt, any Person that acquires an interest in the Existing Notes after the Voting Record Time), the Company, the Existing Notes Trustee, the Existing Notes Paying and Transfer Agent and the Existing Depositary towards one another in respect of the Existing Notes Documents will terminate;

(i)     the Existing Notes Depositary shall take such action as may be required to credit the Record Date Balance in the records of the Clearing Systems in favour of those Scheme Creditors who did not submit, or did not have submitted on their behalf, Custody Instructions by the Custody Instruction Deadline and/or a validly completed Account Holder Letter, Distribution Confirmation Deed and, if applicable, Designated Recipient Form by the Voting Record Time; and

(j)     any Blocked New Instruments will be issued to and held by the Holding Period Trustee/ on trust for the benefit of Blocked Scheme Creditors who have submitted a validly completed Blocked Scheme Creditor Form to GLAS together with supporting evidence prior to the Voting Record Time, in accordance with the terms of the Holding Period Trust Deed, during the Holding Period subject to and in accordance with Part D (*Scheme Consideration*) below.

*Subsequent to the Restructuring Effective Date*

6.6     Following the Restructuring Effective Date, the Company shall take steps to satisfy (unless waived to extent permitted by law and the RSA) each of the specific conditions subsequent contained in each of the Restructuring Documents (in each case in the Agreed Form) and any corporate governance term sheet forming part of the Explanatory Statement.

**PART C**

**NOTICES AND SCHEME CLAIMS**

7.    **NOTICES TO SCHEME CREDITORS AND OTHERS**

7.1    The Company or the Information Agent (acting on behalf of the Company) shall promptly notify the Scheme Creditors, the Existing Notes Trustee, the New Instruments Trustee and the Collateral Agent of:

(a)    the satisfaction of the Scheme Conditions and the occurrence of the Scheme Effective Date via a Scheme Effective Date Notice; and

(b)    the satisfaction of the Restructuring Effective Date Conditions and the designation of the Restructuring Effective Date via a Completion Notice,

by:

(i)    sending the relevant notice to the Existing Notes Trustee and the New Instruments Trustee;

(ii)    circulating the relevant notice through the Clearing Systems;

(iii)    posting the relevant notice on the Transaction Website;

(iv)    posting the relevant notice on the Company Website;

(v)    posting an announcement on the respective websites of the SGX-ST and the HKEX; and

(vi)    sending the relevant notice via email to each Person who the Company believes may be a Scheme Creditor (other than the Blocked Scheme Creditors) and which is registered as a Scheme Creditor with the Information Agent or has otherwise notified the Company or Information Agent of its valid electronic mail address. GLAS shall be responsible for the sending the relevant notice via electronic mail to each Person who the Company believes may be a Blocked Scheme Creditors for whom the Company or GLAS has a valid email address.

7.2    All other notices under this Clause 7 (*Notices to Scheme Creditors and Others*) to Scheme Creditors may be given by the Company in the following ways:

(a)    by notice on the Transaction Website;

(b)    by notice on the Company Website;

(c)    by notice through the Clearing Systems by the Information Agent;

(d)    by notice via email to each person who the Company believes may be a Scheme Creditor, and who has registered as a Scheme Creditor with the Company or the Information Agent or GLAS (as the case may be) or otherwise notified the Company, the Information Agent or GLAS (as the case may be) of its valid email address; and

(e)    by the publishing of an announcement on the respective websites of the HKEX and the SGX-ST.

33

8.    **ENTITLEMENT RECORD TIME AND SCHEME CLAIMS**

8.1    The Scheme Creditors' Entitlement shall be determined by the Scheme Administrators in accordance with the Scheme Creditors' Scheme Claims as at the Entitlement Record Time.

8.2    The Scheme Creditors acknowledge and agree that the Scheme Administrators shall:

(a)    in respect of Scheme Creditors, who are not Sanctions Affected Scheme Creditors, use the appropriate Scheme Creditor Form submitted by or on behalf of each Scheme Creditor, as verified against the books and records of the Existing Notes Depository (or its nominee) and/or the Clearing Systems in respect of the Scheme Creditors;

(b)    in respect of Blocked Scheme Creditors, use the appropriate Blocked Scheme Creditor Form submitted by or on behalf of each Blocked Scheme Creditor, as verified against the records of GLAS and the Company, including any additional evidence as reasonably required by GLAS and/or the Company and requested from the Blocked Scheme Creditor to be provided in relation to its Scheme Claim,

in each case, by the Bar Date, to determine the value of the Scheme Claims of each Scheme Creditor for the purposes of calculating their Entitlement to the Scheme Consideration, and any such determination shall (in the absence of manifest error, wilful default, wilful misconduct or fraud) be conclusive and binding on the Scheme Creditors and the Company.

8.3    The Information Agent shall use reasonable endeavours to review each Scheme Creditor Form other than Blocked Scheme Creditor Forms and all Custody Instructions (if applicable) promptly after receipt, against the records of the Clearing Systems to assist the Scheme Administrators in determining each Scheme Claim. GLAS shall use reasonable endeavours to review and verify each Blocked Scheme Creditor Form promptly after receipt, to assist the Scheme Administrators in determining the Blocked Scheme Creditor's Scheme Claim. Notwithstanding the foregoing it is the sole responsibility of each Scheme Creditor to ensure that any Scheme Creditor Form submitted in respect of its Scheme Claim has been validly completed, including the Accession Code, if applicable and that any Custody Instruction has been validly submitted via the Clearing Systems.

8.4    Where the Information Agent reasonably considers a Scheme Creditor to be a Sanctions Affected Scheme Creditor or Sanctioned Scheme Creditor, it shall promptly refer the relevant Scheme Creditor to the Company and the relevant Scheme Creditor shall be treated and administered as if it were a Blocked Scheme Creditor or Sanctioned Scheme Creditor (as applicable) for the purposes of the Scheme.

9.    **ACCEPTANCE OF DOCUMENTATION**

9.1    Any Scheme Creditor Forms submitted, as applicable, shall be submitted in accordance with the instructions set out in the relevant Scheme Creditor Form included in the Solicitation Packet, as published on the Transaction Website.

9.2    Whether a Scheme Creditor Form has been validly completed shall be determined by the Scheme Administrators, based on information checked by the Information Agent/GLAS against the records of the Clearing Systems, at their discretion, provided that, if the Scheme Administrators considers any such document not to have been validly completed, the Scheme Administrators shall promptly:

(a)    prepare a written statement of its reasons for that conclusion; and

(b)     send that written statement by email to the party that provided the relevant document.

9.3    Where a Scheme Creditor Form is considered not to have been validly completed, and the Bar Date has not yet occurred at the time of such determination, the relevant Scheme Creditor may resubmit the Scheme Creditor Form. No Scheme Creditor Forms may be resubmitted after the Bar Date and Clauses 10.4 and 10.5 (*Deadlines and the Bar Date*) shall then apply (as the case may be).

9.4    Except in respect of a determination made as a result of fraud, wilful default or wilful misconduct, none of the Company, the Scheme Administrators, the Information Agent or GLAS will be responsible for any loss or liability incurred by a Scheme Creditor as a result of any determination by the Scheme Administrators, GLAS or the Information Agent (as applicable).

10.    **DEADLINES AND THE BAR DATE**

10.1    All Scheme Claims will be released on the Restructuring Effective Date in accordance with the terms of this BVI Scheme.

10.2    A Scheme Creditor who is not a Sanctions Affected Scheme Creditor must ensure that

(a)    its Account Holder submits a validly completed and executed Custody Instruction via the Clearing Systems prior to the submission of an Account Holder Letter and, in any event, by no later than five Business Days before the Bar Date; and

(b)    the following Scheme Creditor Forms are received by the Information Agent in relation the Existing Notes held by that Scheme Creditor by no later than the Bar Date: (i) a validly completed and executed Account Holder Letter, (ii) a Distribution Confirmation Deed, and (iii) Designated Recipient Form (if applicable),

in order to be entitled to receive Scheme Consideration.

10.3    Any Scheme Creditor who is not a Sanctions Affected Scheme Creditor that fails to comply with Clause 10.2 (*Deadlines and the Bar Date*) above shall have its rights under this BVI Scheme extinguished and shall not be entitled to receive any Scheme Consideration under this BVI Scheme.

*Blocked Scheme Creditors*

10.4    Subject to Clause 14 (*Distribution to Holding Period Trustee*) and Clause 15 (*Distribution to Successor Escrow Account*), a Blocked Scheme Creditor must ensure that a validly completed and executed Blocked Scheme Creditor Form, together with supporting evidence is received by GLAS by the Bar Date, in order to be entitled to receive Scheme Consideration on the lifting of Applicable Sanctions.

10.5    Any Blocked Scheme Creditor that fails to comply with Clause 10.4 shall have its rights under this BVI Scheme extinguished and shall not be entitled to receive the Scheme Consideration under this BVI Scheme.

10.6    Sanctioned Scheme Creditors must contact the Company in writing pursuant to the notice details set out in Clause 31(*Notice*) to bring its status as a Sanctioned Scheme Creditor to the attention of the Company on or before the Bar Date. Any Sanctioned Scheme Creditor that fails to comply with this Clause 10.6 shall have its rights under this Scheme

extinguished, including any right which it may have to receive Scheme Consideration under this Scheme.

11.    **ASSIGNMENTS OR TRANSFERS OF SCHEME CLAIMS AFTER THE VOTING RECORD TIME**

11.1    The Scheme Administrators shall not be under any obligation to recognise any sale, assignment or transfer of any Scheme Claim after the Entitlement Record Time for the purposes of determining the Entitlement of each Scheme Creditor (and/or their Designated Recipient, as applicable) under this BVI Scheme. The Scheme Administrators may, in their sole discretion and subject to the production of such evidence as they may reasonably require and to any other terms and conditions which the Scheme Administrators may consider necessary or desirable, agree to recognise such assignment or transfer for the purposes of determining Entitlements to Scheme Consideration under the BVI Scheme.

11.2    Any assignee or transferee of a Scheme Creditor so recognised by the Scheme Administrators shall be bound by the terms of this BVI Scheme in the event that it becomes effective as if it were a Scheme Creditor and shall produce such evidence as the Scheme Administrators may reasonably require to confirm that it has agreed to be bound by the terms of this BVI Scheme. None of the Existing Notes Trustee or the Existing Notes Paying and Transfer Agent and Registrar will be responsible for confirming Scheme Creditors as at the Entitlement Record Time or for monitoring, acknowledging or processing any assignments that occur after the Entitlement Record Time.

## PART D

## SCHEME CONSIDERATION

12.     **CALCULATION OF A SCHEME CREDITOR'S ENTITLEMENT**

12.1    Each Scheme Creditor will be entitled to receive (or have the Holding Period Trustee or the Successor Escrow Agent receive on its behalf, if applicable) Scheme Consideration which is equal to the value of its "**Entitlement**".

12.2    Each Scheme Creditor's Entitlement shall be determined by the Company (in consultation with the Information Agent) or the Scheme Administrators on a "**Deficiency Basis**" in accordance with the formula below. The value of the Scheme Creditor's Scheme Claims calculated on a Deficiency Basis being a "**Scheme Creditor's Deficiency Claims**":

$$A - ((\frac{A}{B + C}) \times D)$$

**A** = the value of the Scheme Creditor's Scheme Claims calculated on a Full Accrued Claim Basis by reference to the records of the Existing Notes Trustee subject to reconciliation of the Custody Instruction submitted by or on behalf of such Scheme Creditor with the records of the Clearing Systems;

**B** = total aggregate value of all Scheme Creditors' Scheme Claims (including those Scheme Creditors who have not submitted their forms at all) on a Full Accrued Claim Basis by reference to the records of the Existing Notes Trustee;

**C** = total aggregate of the TJ Other Debt Instruments Scheme Creditors' Scheme Claims (as defined in the TJ Scheme) calculated on a Full Accrued Claim Basis (as defined in the TJ Scheme) including, for the avoidance of doubt, those TJ Scheme Creditors who have not submitted their forms at all as determined by the TJ Scheme Administrators by reference to the information provided by the TJ Scheme Administrators;

**D** = the NPV of the US$800 million of the TJ New Notes (being the total TJ Scheme Consideration) as determined by the Scheme Administrators (the "**NPV Amount**") who may take into account, among other factors:

(i)    market bond yields for issuers that has a comparable profile in terms of location(s) of risk, leverage, scale and industry, as per implied by the average closing bond price prior to the date of determination;

(ii)   coupon rate of new bond issuance with similar credit quality in terms of location(s) of risk, leverage, scale and industry, as per implied by the average closing bond price prior to the date of determination;

(iii)  projected cashflow to be generated by the obligors under the TJ New Notes in consultation with the Group's management; and

(iv)   assessed value and/or the projected cash flow for the underlying assets to support repayment of the TJ New Notes to the extent provided in consultation with the Group's management.

37

13.    **DISTRIBUTION OF THE SCHEME CONSIDERATION**

13.1    On the Restructuring Effective Date, the Company shall issue the New Instruments to Scheme Creditors who have submitted the required Scheme Creditor Forms by the Bar Date pursuant to Clause 10 (*Deadlines and the Bar Date*), and/or Designated Recipients (if applicable), and/or the Holding Period Trustee on behalf of the Blocked Scheme Creditors (if applicable) calculated by the Company (in consultation with the Information Agent) and/or the Scheme Administrators in accordance with the following steps and formula:

**Step 1**: calculate the aggregate principal amount of the New Instruments to be issued to a Scheme Creditor on the Restructuring Effective Date in accordance with the formula below:

$$\frac{A}{B} \times C$$

**A** = value of a Scheme Creditor's Entitlement who have submitted the required Scheme Creditor Forms by the Bar Date to the Information Agent, pursuant to this Scheme;

**B** = total aggregate value of the Entitlement of all Scheme Creditors who have submitted the required Scheme Creditor Forms by the Bar Date pursuant to Clause 10 (*Deadlines and the Bar Date*) as determined by the Scheme Administrators; and

**C**= US$6,500 million, being the aggregate principal amount of the New Instruments (being the total Scheme Consideration).

**Step 2**: calculate the aggregate principal amount of each tranche of the New Instruments to be issued to the relevant Scheme Creditor. For each US$100,000 of the Entitlement converted to the New Instruments, a Scheme Creditor shall receive:

    (a)    US$4,615.38 of the New SJ Tranche A Notes;

    (b)    US$16,923.08 of the New SJ Tranche B Notes;

    (c)    US$16,923.08 of the New SJ Tranche C Notes;

    (d)    US$18,461.54 of the New SJ Tranche D Notes; and

    (e)    US$43,076.92 of the New SJ Tranche E Notes.

13.2    For the avoidance of doubt, the effect of Clauses 12 and 13 is that the Scheme Consideration (being US$6,500 million in aggregate principal amount of the New Instruments) will be distributed and allocated to the Scheme Creditors (or the Holding Period Trustee, as applicable) who submit the relevant Scheme Creditor Forms by the Bar Date on a pro rata basis with respect to their respective Scheme Claims on a Full Accrued Claim Basis.

14.    **DISTRIBUTION TO HOLDING PERIOD TRUSTEE**

14.1    Blocked New Instruments to which the Blocked Scheme Creditors are entitled to claim will be issued to and held by the Holding Period Trustee on trust under the Holding Period Trust Deed for the benefit of such Scheme Creditors during the Holding Period.

14.2    Any Blocked Scheme Creditor who fails to comply with Clause 10.4 (*Deadlines and the Bar Date*) or with any requirements specified in the Holding Period Trust Deed, that Blocked

Scheme Creditor shall cease to hold any interest (beneficial or otherwise) with respect to the Blocked New Instruments which is held by the Holding Period Trustee.

14.3    If a Blocked Scheme Creditor who has complied with Clause 10.4 (*Deadlines and the Bar Date*) also complies with any requirements specified in the Holding Period Trust Deed and the Company is satisfied that such Blocked Scheme Creditor is entitled to the Scheme Consideration, and the Applicable Sanctions have been lifted, the Holding Period Trustee will, as soon as practicable at the expiration of the Holding Period, issue to such Blocked Scheme Creditor or its Designated Recipient (if applicable) its portion of the Blocked New Instruments to which it may be entitled pursuant to Part D (*Scheme Consideration*) of this BVI Scheme.

14.4    The Company may, in its sole discretion and in consultation with the Scheme Administrators, issue any Scheme Consideration to which Scheme Creditors may be entitled to the Holding Period Trustee to hold on trust under the Holding Period Trust Deed for the benefit of the relevant Scheme Creditors during the Holding Period.

15.    **DISTRIBUTION TO THE SUCCESSOR ESCROW ACCOUNT FOR BLOCKED SCHEME CREDITORS**

15.1    Upon the expiration of the Holding Period, if any Applicable Sanctions are still in place in respect of any Blocked Scheme Creditors, the Company undertakes to:

(a)    appoint the Successor Escrow Agent to hold the entitlements to the Blocked New Instruments in the Successor Escrow Account for the Blocked Scheme Creditors who have complied with Clause 10 (*Deadlines and the Bar Date*) until the earlier of:

(i)    the expiry of the Perpetuity Period; or

(ii)    the lifting of Applicable Sanctions in respect of any Blocked Scheme Creditors,

with the Blocked Scheme Creditors being given a reasonable period of time thereafter to recover their Entitlement to the Blocked New Instruments in accordance with the terms of the Successor Escrow Agreement and this BVI Scheme;

(b)    bring information relating to the Successor Escrow Account to the attention of the Blocked Scheme Creditors on, or immediately after, the expiration of the Holding Period on the Transaction Website and/or through other such public medium as the Company considers to be appropriate at that time; and

(c)    put in place a reasonable and fair process for Blocked Scheme Creditors to claim and recover their Entitlement to the Blocked New Instruments upon Applicable Sanctions no longer preventing the payment of such Scheme Consideration to Blocked Scheme Creditors through a Successor Escrow Agreement.

15.2    Upon expiry of the Perpetuity Period, and subject to any action necessary to ensure compliance with Applicable Sanctions by the Company or the Successor Escrow Agent, any Blocked New Instruments, if any, which remain unable to be paid to Blocked Scheme Creditors in compliance with Applicable Sanctions will be returned to the Company in accordance with the terms of the Successor Escrow Agreement. The rights of Blocked Scheme Creditors under this BVI Scheme shall be extinguished on the return of such Blocked New Instruments to the Company, including any rights of Blocked Scheme Creditors to payment of any Scheme Consideration.

16.    **ISSUANCE OF THE NEW INSTRUMENTS**

16.1    The Scheme Consideration (except for the Sanctions Affected New Instruments) will be distributed, in accordance with the terms of this BVI Scheme, through Euroclear and Clearstream to Eligible Creditors (who are not Sanctions Affected Scheme Creditors) and/or Designated Recipients (if applicable). If details of a Euroclear or Clearstream account are not provided, such Scheme Creditor, on whose behalf the Scheme Creditor Form is being submitted, will not be entitled to receive any share of the relevant Scheme Consideration.

16.2    If a Scheme Creditor is a Blocked Scheme Creditor, their Entitlement to the Scheme Consideration will be determined by reference to the principal amount of the Existing Notes outstanding and owed to that Blocked Scheme Creditor as at the Entitlement Record Time and all accrued and unpaid interest relating to such Existing Notes up to but excluding the Reference Date.

16.3    The obligations of the Company to issue the New Instruments to each Person entitled to receive them under this BVI Scheme shall be satisfied by the Company depositing the New Instruments in global registered form with the New Instruments Depositary or its nominee with interests in the New Instruments being further credited in the relevant amounts to the accounts in the Clearing Systems designated by the Scheme Creditors in their relevant Scheme Creditor Forms.

16.4    The New Instruments (including any Blocked New Instruments, as applicable) for each Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee will be allocated to each series of the Blocked New Instruments on a pro rata basis, based on their respective aggregate principal amount on the following Business Day after Restructuring Effective Date, subject to adjustments set forth in Clause 18 (*Fractional Adjustments*).

16.5    The holders of the New Instruments shall have the benefit of the new Security.

17.    **RESTRICTIONS**

17.1    The Company will not distribute any New Instruments as Scheme Consideration on the Restructuring Effective Date to a Scheme Creditor unless that Scheme Creditor is also an Eligible Creditor or has nominated on or before the Bar Date a Designated Recipient who is an Eligible Person to receive the New Instruments, in accordance with the terms of the BVI Scheme. A Sanctions Affected Scheme Creditor cannot appoint a Designated Recipient.

18.    **FRACTIONAL ADJUSTMENTS**

18.1    Notwithstanding any other provision of this BVI Scheme, the aggregate number of New Instruments to which an Eligible Creditor is entitled shall be rounded down to the nearest whole number.

18.2    If the allocation of the New Instruments in accordance with this BVI Scheme would result in any Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee receiving less than US$500 (the "**Notes Minimum Denomination**") of any tranche of any series of the New Instruments, then such Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee would instead receive an allocation in one or more tranches of any other series of the New Instruments, as determined by the Company (in consultation with the Information Agent and/or the Scheme Administrators, in its discretion in good faith and based on information provided and reviewed against the records of the Clearing Systems or the Company's books and records, as applicable by the Information Agent (including accounting

for the weighted average maturity of the Scheme Considerations), to ensure that such Eligible Creditor, Designated Recipient (if applicable) or the Holding Period Trustee holds at least the Notes Minimum Denomination for at least one tranche of any series of the New Instruments, provided that:

(a)     any fraction of New Instruments that is remaining after the adjustment set out above in this Clause 18.2 (*Fractional Adjustments*) will be forfeited;

(b)     the interests in the global certificates for the New Instruments to which a Scheme Creditor is entitled under the terms of this BVI Scheme will be credited to the Clearing System account in which that Scheme Creditor held its interests in the Existing Notes at the Entitlement Record Time (through the relevant Account Holder where applicable); and

(c)     the interests in the New Instruments will be recorded in the New Instruments register by the New Instruments Paying and Transfer Agent and Registrar.

18.3    Notwithstanding Clause 18.2 (*Fractional Adjustments*), the factors to be taken into consideration is subject to change depending on a number of variables, including the number of Eligible Creditors as well as the size of their respective position of the Existing Notes, and the size of each tranche of each series of the New Instruments to be issued. It is possible that the New Instruments payable to each Eligible Creditor may not be allocated to each tranche of each series of the New Instruments, as set out in the terms of this BVI Scheme, on a pro rata basis based on their respective aggregate principal amount on the Restructuring Effective Date.

## PART E
## GENERAL SCHEME PROVISIONS

19. **MODIFICATIONS OF THE RIGHTS ATTACHING TO THE NEW INSTRUMENTS**

On and after the Restructuring Effective Date, nothing in this BVI Scheme shall prevent the modification of the New Instruments in accordance with their terms.

20. **SECURITIES LAW CONSIDERATIONS**

20.1    The New Instruments will not be registered under the US Securities Act or any state or other securities laws of the United States of America or any other jurisdiction.

20.2    Accordingly, the New Instruments will be available only: (a) in the United States to "qualified institutional buyers" as defined in Rule 144A under the US Securities Act and institutional "accredited investors" as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the US Securities Act; and (b) outside the United States to non-US persons in offshore transactions, in reliance on Regulation S under the US Securities Act.

21. **RELEASES**

21.1    In consideration for its Entitlement to the Scheme Consideration on and from the Restructuring Effective Date, each Scheme Creditor hereby gives the undertakings, releases and waivers in this Clause 21 (*Releases*) (the "**Releases**").

21.2    Subject to Clause 21.6, with immediate effect on and from the Restructuring Effective Date and pursuant to this BVI Scheme and the Deeds of Release, each Scheme Creditor on behalf of itself and each of its predecessors, successors and assigns (including any Person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time), as relevant, (collectively, the "**Scheme Creditor Releasing Parties**"), shall and shall be deemed to completely and forever and unconditionally:

(a)    release, waive, void, acquit, forgive, extinguish and discharge (and to the fullest extent permitted by law) each of the Released Persons from the relevant Released Claims, specifically:

(i)    any and all Scheme Claims (except for fraud, wilful default or wilful misconduct) arising prior to, on or after the Restructuring Effective Date;

(ii)    to the extent not already covered in (i) above, the Released Persons from any Ancillary Claims arising prior to, on or after the Restructuring Effective Date; and

(iii)    the Released Persons from any Restructuring Claims arising prior to, on or after the Restructuring Effective Date;

(b)    for the avoidance of doubt to the extent not already released under (a) above, release, forfeit, waive, void, acquit, forgive, extinguish and discharge (and to the fullest extent permitted by law) any and all Relevant Collateral;

(c)    ratify and confirm everything which any Released Person may lawfully do or cause to be done in accordance with any authority conferred by this BVI Scheme and agrees not to challenge:

42

> (i)     the validity of any act done or omitted to be done as permitted by the terms of the BVI Scheme; or

> (ii)     the exercise of or omission to exercise any power conferred in accordance with the provisions of this BVI Scheme,

> in each case in good faith by any Released Person;

(d)     acknowledge and agree that all powers of attorney granted under any Existing Finance Documents are revoked;  and

(e)     authorise the Company to release the Keepwell Provider from any Claim arising under or in respect of the Keepwell Agreement.

21.3     Each of the Scheme Creditors hereby appoints the Company as its attorney and agent and irrevocably authorizes, directs, instructs and empowers the Company (represented by the Scheme Supervisor or any duly authorized representative), on and from the Restructuring Effective Date, to (i) enter into execute and deliver as a deed on behalf of each Scheme Creditor and any person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Voting Record Time or who acquires any interest in or arising out of a Scheme Claim after the Voting Record Time, the Deed of Release whereby any and all Released Claims and Relevant Collateral referred to in in Clause 21.2 shall be waived and released fully and absolutely from the Restructuring Effective Date, and (ii) do all such acts and/or execute all such documents (including without limitation, assignments, transfers, notices, instructions, supplements and amendments) as the Company may consider necessary or desirable to effect the release of any and all Released Claims and any Relevant Collateral (other than the Excluded Liabilities) referred to in Clause 21 (*Releases*).

21.4     Each Scheme Creditor  hereby approves the Deed of Release (and the releases therein) (in each case in the Agreed Form) is to be executed pursuant to the authority and approvals conferred by this Clause 21 (*Releases*) and each shall be substantially in the form to be made available on the Transaction Website subject to any modifications required or approved by the BVI Court and each shall take effect in relation to such Claims and Liabilities on the Restructuring Effective Date.

21.5     Each Scheme Creditor acknowledges and agrees on its own behalf and on behalf of its Scheme Creditor Releasing Parties that:

(a)     it may later discover facts in addition to or different from those which it presently knows or believes to be true with respect to the subject matter of this BVI Scheme;

(b)     it is its intention to fully, and finally forever settle and release any and all matters, disputes and differences, whether known or unknown, suspected or unsuspected, which presently exist, may later exist or may previously have existed between it and the Released Persons in respect of all Released Claims or any past, present and/or future Claim which is released by the Releases provided in this Clause 21 (*Releases*) and by the Deed of Release; and

(c)     in furtherance of this intention, the waivers, releases and discharges given in this BVI Scheme shall be and shall remain in effect as full and complete general waivers, releases and discharges notwithstanding the discovery or existence of any such additional or different facts.

21.6    Subject to Clause 21.7, notwithstanding any other provision in this BVI Scheme the effect of the Restructuring under the terms of this BVI Scheme will not:

(a)    waive, release, impair or otherwise compromise any of the Excluded Liabilities;

(b)    prejudice or impair any right or benefit of any Scheme Creditor Releasing Party:

   (i)    created under this BVI Scheme or any other Restructuring Document including without limitation any right to commence and/or continue and/or instruct any other Person to commence or continue any Proceeding to enforce its rights under or in relation to the New Instruments Documents; and/or

   (ii)    which arises as a result of a failure by the Company or any other Released Person to comply with the terms of this BVI Scheme or any Restructuring Document; and

(c)    prejudice or impair Claims against the Company or any other Released Person arising from fraud, wilful default or wilful misconduct.

21.7    The Company (on behalf of itself and each of its predecessors, successors and assigns) has provided an undertaking to each Released Person that it shall irrevocably and unconditionally:

(a)    completely and forever fully and finally release, waive, void, acquit, forgive, extinguish and discharge unconditionally (and to the fullest extent permitted by law), any and all Claims and/or Liabilities, in each case that it ever had, may have or hereafter can, shall or may have, against any Released Person under or pursuant to terms of the Existing Notes Documents and the Existing Notes (including, for the avoidance of doubt, subrogation or ricochet claims arising by operation of law);

(b)    not commence, join or continue any claim, counterclaim or proceeding against any Released Person in respect of any Claims and/or Liabilities waived, released or discharged under and other matters referred to in this Clause 21.7 (*Releases*);

(c)    not seek any compensation, contribution, subrogation, reimbursement, indemnity, set-off or payment of any kind from any Released Person in respect of the Excluded Liabilities; and

(d)    do all other acts and execute all such documents (including without limitation, assignments, transfers, notices, instructions, supplements and amendments) as any Released Person may consider necessary or desirable to effect the release and other matters referred to in paragraphs (a) to (c) above

22.    **STAY OF PROCEEDINGS**

22.1    From the Scheme Effective Date, no Scheme Creditor Releasing Party, nor any party on behalf of a Scheme Creditor Releasing Party, shall be entitled to commence, continue or procure the commencement or continuation of any Proceeding whether directly or indirectly against any of the Released Persons or in respect of any property of any of the Released Persons in respect of any Claims or Liabilities that are to be released in accordance with Clause 21 (*Releases*).

22.2    Subject to any existing contractual restrictions, a Scheme Creditor Releasing Party may commence a Proceeding against a Released Person after the Restructuring Effective Date, in respect of Claims or Liabilities that are not to be released in accordance with Clause 21.2(*Releases*).

23.    **COSTS AND INDEMNITY**

23.1    The Company shall pay all fees, costs and expenses properly incurred by the Existing Notes Trustee, the New Instruments Trustee, the Existing Notes Paying and Transfer Agent and Registrar, the New Instruments Paying and Transfer Agent and Registrar, the Existing Notes Depositary, the New Instruments Depositary, the Collateral Agent, the Holding Period Trustee, GLAS and the Information Agent (each, an **"Indemnified Party"** and together the **"Indemnified Parties"**), in connection with any and/or all actions taken pursuant to this BVI Scheme and the Restructuring, including (without limitation) any and/or all actions taken pursuant to the Existing Notes Trustee Instruction and the distribution of the Scheme Consideration, (provided that, with respect to each party, the relevant fees, costs and expenses have been incurred in accordance with the Existing Notes Documents or such other arrangement as may have been agreed between the Company and that party).

23.2    The Company shall hold each Indemnified Party harmless from, and shall indemnify such Indemnified Party from and against any claims, actions, demands, damages, charges, losses, liabilities, obligations, judgments, costs, fees, and expenses which may be incurred by, or asserted or awarded against it in taking any of the steps contemplated by this BVI Scheme, including, without limitation, executing and delivering any documents pursuant to the Existing Notes Trustee Instruction and cancelling the Global Certificates, except to the extent that the same arises from the fraud, gross negligence or wilful misconduct of such Indemnified Party.

24.    **MODIFICATIONS TO THE SCHEME AND THE RESTRUCTURING DOCUMENTS**

24.1    The Company may before or at any hearing before the BVI Court to sanction this BVI Scheme, and subject to obtaining the written consent of the Majority SJ AHG (where the SJ AHG holds the Minimum SJ AHG Threshold) consent on behalf of all Scheme Creditors to any modifications of the BVI Scheme and/or the Restructuring Documents or any additional terms or conditions including those which the BVI Court may think fit to approve or impose, which would not directly or indirectly have a material adverse effect on the rights of the Scheme Creditors.

24.2    On the identification of a Sanctioned Scheme Creditor, including where a Scheme Creditor becomes a Sanctioned Scheme Creditor while this Scheme is in effect:

(a)    the Company may modify the Scheme and/or the Restructuring Documents to the extent reasonably necessary and in a manner to ensure that any Sanctioned Scheme Creditor is treated fairly in relation to their Entitlement to Scheme Consideration while continuing to comply with all Applicable Sanctions (and is authorized to instruct the Existing Notes Trustee, Existing Notes Paying and Transfer Agent and Registrar, or any other administrative party in order to achieve the same); and

(b)    each of the New Instruments Trustees and New Instruments Paying and Transfer Agent and Registrar, the Collateral Agent and any other administrative party as required is authorized to make any amendment to the New Instruments Documents and take any action necessary or desirable to give effect to a modification to such New Instruments Documents on and following receipt of an officers' certificate from the Company that such modification is reasonably necessary to ensure that the Scheme is not contrary to Applicable Sanctions, which the New Instruments Trustees, New Instruments Paying and Transfer Agent and Registrar, the Collateral Agent and any other administrative party as required are entitled to rely on conclusively.

24.3    Where the Company reasonably considers that this Scheme or the transactions contemplated by the Scheme are at risk of being contrary to Applicable Sanctions:

(a)    the Company may modify the Scheme and/or the Restructuring Documents to the extent reasonably necessary and in a manner to ensure that the Scheme is not contrary to Applicable Sanctions (and is authorized to instruct the Existing Notes Trustee, Existing Notes Paying and Transfer Agent and Registrar, or any other administrative party in order to achieve the same); and

(b)    each of the New Instruments Trustees, New Instruments Paying and Transfer Agents and Registrars, the Collateral Agent and any other administrative party as required is authorized to make any amendment to the New Instruments Documents and take any action necessary or desirable to give effect to a modification to such New Instruments Documents on and following receipt of an officers' certificate from the Company that such modification is reasonably necessary to ensure that the Scheme will not be contrary to the Applicable Sanctions in whatever form that they may apply to this Scheme, which the New Instruments Trustees, New Instruments Paying and Transfer Agents and Registrars, the Collateral Agent and any other administrative party as required are entitled to rely on conclusively.

24.4    Nothing in this BVI Scheme shall prevent the modification of any executed Restructuring Document in accordance with its terms, including, but not limited to minor or technical modifications to correct manifest or proven error or to comply with mandatory provisions of law.

25.    **OBLIGATIONS ON DATES OTHER THAN A BUSINESS DAY**

If any sum is due or obligation is to be performed or the Bar Date occurs under the terms of this BVI Scheme on a day other than a Business Day, the relevant payment or Bar Date shall be made, or obligation performed, or the Bar Date shall occur, on the next Business Day.

26.    **NO ADMISSION OF LIABILITY**

Save as expressly set out in this BVI Scheme, nothing in this BVI Scheme or the Explanatory Statement, or the circulation thereof to any Person, evidences or constitutes any admission by the Company, the Information Agent, or the Scheme Administrator, that the Person is a Scheme Creditor or that a Liability is owed to any Person in respect of any Claim or right.

27.    **THE INFORMATION AGENT**

27.1    Each Scheme Creditor and/or Account Holder hereby unconditionally and irrevocably waives and releases any claims which may arise against the Information Agent from all actual or potential liability, arising directly or indirectly, in each case, in relation to the Information Agent's performance of its roles and all other actions which they may take in connection with this Scheme, save for any liability resulting from the Information Agent's own fraud or wilful misconduct.

27.2    Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers is acting for, or owes any duty to, any Scheme Creditor, nor will any of them be responsible for providing any advice to any Scheme Creditor in relation to the Scheme. Accordingly, neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers make any recommendations as to whether any Scheme Creditor should take any of the actions contemplated in the Scheme. The Information Agent expresses no

opinion on the merits of the Scheme or the terms of the New Instruments. The Information Agent has not been involved in negotiating or determining the terms of the Scheme and makes no representation that all relevant information has been disclosed to the Scheme Creditors in or pursuant to the Scheme. Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers has verified, or assumes any responsibility or liability for the accuracy or completeness of any of the information concerning the Scheme, or any factual statements contained in, or the effect or effectiveness of, the Scheme.

27.3   Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers will have any tortious, contractual or any other liability to any person in connection with the determination of whether a Scheme Creditor is a Sanctions Affected Scheme Creditor. Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers will accept any liability whatsoever to any person, regardless of the form of action, for any lost profits or lost opportunity, or for any indirect, special, consequential, incidental or punitive damages arising from the determination of whether a Scheme Creditor is a Sanctions Affected Scheme Creditor, even if the Information Agent or any of its directors, officers, employees, agents, affiliates or advisers have been advised of the possibility of such damages.

27.4   Neither the Information Agent nor any of its directors, officers, employees, agents, affiliates or advisers is obliged, under the terms of the Scheme or otherwise, to engage in any transaction or conduct that may give rise to a liability under or in connection with Applicable Sanctions and/or may result in any person becoming targeted by Applicable Sanctions.

27.5   If compliance with any obligations under the terms of the Scheme or otherwise would result in the Information Agent or any of its directors, officers, employees, agents, affiliates or advisers breaching the Blocking Regulation, that obligation need not be complied with (but only to the extent of the breach).

27.6   Under no circumstances will the Information Agent be required to verify or determine the eligibility of any Scheme Creditor in relation to the Scheme. The Information Agent will check Scheme Claims against Custody Instructions and against the records of Scheme Creditors provided to the Information Agent by the Company. The Information Agent will assist the Company and the chairperson of the Scheme Meeting in checking the voting values of each Scheme Creditor (who is not a Blocked Scheme Creditor) based on such information.

28.   **THE HOLDING PERIOD TRUSTEE**

28.1   The duties, rights, responsibilities and interests of the Holding Period Trustee shall be governed by the Holding Period Trust Deed and nothing in this Clause 28 (*The Holding Period Trustee*) shall in any way amend, alter, or override the Holding Period Trust Deed.

28.2   The Holding Period Trustee's role will be solely mechanical and administrative in nature. As such, in accepting its appointment, the Holding Period Trustee will act only as the bare trustee of the Holding Period Trust and not in any other capacity. In this regard, the Holding Period Trustee will not be permitted to sell, pledge, re-hypothecate, assign, invest, use, commingle, dispose of, or otherwise use in its business, any of the Blocked New Instruments held by it, except as permitted pursuant to the Holding Period Trust Deed.

28.3   The Holding Period Trustee will have no economic or beneficial interest in the Blocked New Instruments it holds and shall not, except as set out in the Holding Period Trust Deed, permit any other Person to have any interest, estate, right, title or benefit in the Blocked New Instruments.

28.4   The Holding Period Trustee shall be provided with any information it reasonably requires to satisfy itself that any action it chooses to take, or not take, shall be in compliance with any

applicable laws. The Holding Period Trustee shall not be responsible for determining the status of a Sanctions-Affected Scheme Creditor.

28.5    The Holding Period Trustee shall not be required to perform any of its obligations under the Holding Period Trust Deed if it is prevented from so doing by the occurrence of any event due to any cause beyond its control or if such performance would result in the Holding Period Trustee or its Affiliates being in breach of any law, regulation, ordinance, rule, directive, judgment, order or decree (collectively, the "**Rules**") binding on the Holding Period Trustee or its property or on any of its Affiliates (including but not limited to Rules relating to money laundering, bribery and corruption, prevention of tax evasion, financial or economic sanctions, trade and export controls, supply chain transparency, blocking regulations or anti-boycott requirements). The Holding Period Trustee may act or refrain from acting under the Holding Period Trust Deed and may do anything which in its reasonable opinion is necessary to comply with such Rules. The Holding Period Trustee is not required to take any action or step (including by omission) which would cause or create a risk of liability under the Blocked Regulation.

28.6    The Holding Period Trustee shall bear no responsibility for any action it does, or does not, take in circumstances where a Scheme Creditor, or the Company, does not provide sufficient information to enable the Holding Period Trustee to adequately assess the extent to which any of the Rules as set out in Clause 28.6 may be breached either by the action, or inaction, of the Holding Period Trustee.

28.7    The Holding Period Trustee shall bear no responsibility with regards to any deficiency which might arise because of the Holding Period Trustee or by virtue of any tax which may be payable (i) in respect of the Blocked New Instruments, (ii) any income which may arise therefrom or (iii) any proceeds which may arise thereof.

29.    **THE SUCCESSOR ESCROW AGENT**

29.1    The duties, rights, responsibilities and interests of the Successor Escrow Agent shall be governed by the Successor Escrow Agreement and nothing in this Clause 29 shall in any way amend, alter, or override the Successor Escrow Agreement.

29.2    The Successor Escrow Agent's role will be solely mechanical and administrative in nature. As such, in accepting its appointment, the Successor Escrow Agent will act only as a bare agent of the Successor Escrow Account and not in any other capacity. In this regard, the Successor Escrow Agent will not be permitted to sell, pledge, re-hypothecate, assign, invest, use, commingle, dispose of, or otherwise use in its business, any of the Blocked New Instruments, except as permitted pursuant to the Successor Escrow Agreement.

29.3    The Successor Escrow Agent will have no economic or beneficial interest in the Blocked New Instruments it holds and shall not, except as set out in the Successor Escrow Agreement, permit any other Person to have any interest, estate, right, title or benefit in the Blocked New Instruments.

29.4    The Successor Escrow Agent will be afforded the right to be provided with, and request, any information it requires to satisfy itself that any action it chooses to take, not note take shall be in compliance with any applicable laws. The Successor Escrow Agent shall not, however, be responsible for determining the status of a Sanctions-Affected Scheme Creditor.

29.5    The Successor Escrow Agent shall not be required to perform any of its obligations under the Successor Escrow Agreement or any other Restructuring Documents if it is prevented from so doing by the occurrence of any event due to any cause beyond its control or if such performance would result in the Successor Escrow Agent or its Affiliates being in breach of any Rules binding on the Successor Escrow Agent or its property or on its Affiliates (including but not

limited to Rules relating to money laundering, bribery and corruption, prevention of tax evasion, financial or economic sanctions, trade and export controls, supply chain transparency, blocking regulations or anti-boycott requirements). The Successor Escrow Agent may act or refrain from acting under the Successor Escrow Agreement and may do anything which in its reasonable opinion is necessary to comply with such Rules. The Successor Escrow Agent is not required to take any action or step (including by omission) which would cause or create a risk of liability under the Blocked Regulation.

29.6    The Successor Escrow Agent shall bear no responsibility for any action it does, or does not, take in circumstances where a Blocked Scheme Creditor, or the Company, does not provide sufficient information to enable the Successor Escrow Agent to adequately assess the extent to which any of the Rules as set out in Clause 29.5 may be breached either by the action, or inaction, of the Successor Escrow Agent.

29.7    The Successor Escrow Agent shall bear no responsibility with regards to any deficiency which might arise because of the Successor Escrow Agent or by virtue of any tax which may be payable (i) in respect of the Blocked Assets, (ii) any income which may arise therefrom or (iii) any proceeds which may arise thereof.

30.    **THE SCHEME ADMINISTRATORS**

*Appointment and removal*

30.1    In consideration for each Scheme Creditor granting the releases pursuant to Clause 21(*Releases*) and the Deed of Release, each Scheme Creditor shall be entitled to have its Entitlement determined by the Scheme Administrators.

30.2    On the Scheme Effective Date, the Company shall appoint the Scheme Administrators with the powers, rights, duties and functions conferred upon the Scheme Administrators by this BVI Scheme.

30.3    The office of each Scheme Administrator shall be vacated if the holder of such office becomes subject to any conflict of interest which would impact in any way his/her ability to perform the functions of Scheme Administrators as set out in this BVI Scheme, dies, is convicted of an indictable offence, resigns from his/her office (which shall be permissible and effective only if he/she gives at least two (2) months' written notice to the Company prior to such resignation), becomes bankrupt, is disqualified from membership of a professional body of which he/she is a member, or becomes mentally disordered or incapacitated.

30.4    In the event of a vacancy in the office of any Scheme Administrator (unless there is no further work to be done by the Scheme Administrators under this BVI Scheme), the Company shall in its sole discretion promptly appoint an alternative person from the Whitelist Scheme Administrators who must be a fit and proper person and be able to adequately discharge the function of a Scheme Administrator under this BVI Scheme.

30.5    The Scheme Administrators have agreed to be bound by this BVI Scheme, and have executed, the Deed of Undertaking, as provided for and published on the Transaction Website.

*Functions, powers and rights*

30.6    The Scheme Administrators (in their own name or as agents of the Company) shall have the power to act on behalf of the Company in relation to all matters relating to each Scheme Creditor's Entitlement. In carrying out their  duties and functions under this BVI Scheme,

49

the Scheme Administrators shall (pursuant to the terms of this BVI Scheme) be empowered to:

(a)    make a determination on the Scheme Effective Date of the NPV Amount to be used in the calculation of each Scheme Creditor's Entitlement (Clause 12.2 (*Calculation of a Scheme Creditor's Entitlement*).

(b)    make a determination of each Scheme Creditor's Scheme Claim and Entitlement for distribution purposes under the BVI Scheme;

(c)    have full access to the Company Information and to receive full cooperation from the Management, on any reasonable requests for finance documents or other information or documents in the possession or control of the Company or the Group;

(d)    where reasonably appropriate to employ and remunerate accountants, actuaries, lawyers and other professional advisors (including their partners and the partners and staff of all associated firms, associations and companies or successors or any of them) in connection with the evaluation of each Scheme Creditor's Entitlement and the costs and expenses of such engagement shall form part of the costs and expenses incurred by the Scheme Administrators for the purposes of Clause 30.13;

(e)    to delegate in writing to any person qualified as set out in paragraph (d) above all or any of the powers and discretion conferred upon the Scheme Administrators under this BVI Scheme, and from time to time to revoke any such delegation, provided that the Scheme Administrators shall be personally responsible for any act or omission of any such delegate to the same extent as if they had expressly authorised it;

(f)    to do all acts and to execute in the name of and, insofar as permitted by law, on behalf of the Company, any deed, transfer, instrument, cheque, bill of exchange, receipt or other document which may be necessary for or incidental to the full and proper implementation of this BVI Scheme;

(g)    to make any payments and distributions which are necessary for or incidental to the Scheme Administrators' performance of their  functions under this BVI Scheme;

(h)    to open, maintain and operate bank accounts in the name of the Company and/or in the name of the Scheme Administrator, as required or convenient under or in connection with this BVI Scheme and to close any such bank account;

(i)    to receive and review all information provided by each Scheme Creditor to assist in determining that Scheme Creditor's Scheme Claim and Entitlement;

(j)    to communicate with and seek further information from each Scheme Creditor and the Management to assist with the evaluation of each Scheme Creditor's Entitlement;

(k)    to apply to the BVI Court for directions in relation to any particular matter arising under, or in the course of the operation of, this BVI Scheme;

(l)    to do all such acts and make all such decisions in connection with or for the purposes of making distributions and reservations of the Scheme Consideration to the Scheme Creditors

50

(m)    to do all other things incidental to the exercise of the foregoing powers; and

(n)    to exercise any other powers necessary for or incidental to the full and proper implementation of his/her obligations under this BVI Scheme,

provided that the Scheme Administrators cannot and shall not exercise any power that would result in them assuming control of any of the Company's business or affairs.

30.7    The Scheme Administrators (in their capacity as such):

(a)    shall have only those duties and responsibilities expressly specified in this BVI Scheme for the purpose of ensuring that this Scheme is implemented in compliance with its terms and in the interests of the Scheme Creditors as a whole and shall not have any implied duties or responsibilities whatsoever; and

(b)    may refrain from doing anything which would or might in their opinion be contrary to any law, directive or regulation of any applicable jurisdiction and may do anything which is, in their opinion, necessary to comply with any such law, directive or regulation and such Scheme Administrator shall not be liable for any loss occasioned thereby.

30.8    In exercising their powers and carrying out their duties and functions under this BVI Scheme, the Scheme Administrators shall be independent and impartial, shall act in good faith and with due care and diligence, and shall exercise their powers under this BVI Scheme for the purpose of ensuring that this BVI Scheme is implemented in compliance with its terms and in the interests of the Scheme Creditors as a whole.

30.9    Except in the case of actual fraud or wilful default, the Scheme Administrators will not be liable to the Company or any Scheme Creditor for any act or omission by the Scheme Administrators in the performance or purported performance of their powers, rights, duties and functions under this BVI Scheme.

30.10    Except to the extent required by law, no Scheme Creditor shall be entitled to challenge the validity of: (a) any act done or omitted to be done in good faith by any of the Scheme Administrators; or (b) the exercise by the Scheme Administrators in good faith of any power conferred upon them, if such act, omission or exercise of power is in accordance with, and to implement, the provisions of this BVI Scheme.

30.11    The Company agrees to indemnify the Scheme Administrators out of the property of the Company for:

(a)    the costs, fees and expenses incurred and payable by the Scheme Administrators in accordance with Clause 30.13; and

(b)    any liability incurred by the Scheme Administrators as a result of any act or omission in carrying out their functions other than such liability (if any) that the Scheme Administrators may incur by their own actual fraud or wilful default,

in connection with this BVI Scheme, and their role as Scheme Administrator.  The Scheme Administrators shall not be found to have committed actual fraud or wilful default unless or until a court of competent jurisdiction has made a finding to that effect.

30.12    The indemnity set out in Clause 30.11 shall take effect on and from the Scheme Effective Date and shall endure without limitation as to time for the benefit of the Scheme Administrators notwithstanding:

(a)    the termination of this BVI Scheme for any reason whatsoever;

(b)    the removal or replacement of a Scheme Administrator; or

(c)    the invalidity of or any defect whatsoever in the appointment of the Scheme Administrator.

30.13    Each Scheme Administrator's right of indemnity conferred by Clause 30.11 has priority over the Scheme Claims and the Scheme Creditors generally and ranks equally to any claims for indemnity by the other Scheme Administrators.

30.14    The Scheme Administrators shall be:

(a)    remunerated in respect of any work done by the Scheme Administrators and any agent, partner or employee of the Scheme Administrators acting on behalf of the Scheme Administrators, in connection with the exercise of their powers and discretions and the performance of their duties, obligations and responsibilities as Scheme Administrators under this BVI Scheme on a time-cost basis, unless otherwise agreed; and

(b)    reimbursed in respect of all costs, fees, disbursements, taxation liabilities (including VAT), and expenses incurred in connection with the performance of their duties, obligations and responsibilities as Scheme Administrators under this BVI Scheme, including but not limited to the fees of any accountants, actuaries, lawyers and other professional advisors or agents engaged by the Scheme Administrators pursuant to Clause 30.6.

30.15    Fees and expenses incurred by the Scheme Administrators shall be invoiced monthly (or such other period as the Company and the Scheme Administrators may determine) to the Company and shall be paid in full promptly

31.    **NOTICE**

31.1    Any notice or other written communication to be given under or in relation to this BVI Scheme shall be given in writing and shall be deemed to have been duly given if it is delivered by hand, or sent by courier, post, fax or email to:

(a)    in the case of the Company:

(i)    by courier or registered post to 15/F, YF Life Centre, 38 Gloucester Road, Wan Chai, Hong Kong;

(ii)    for the attention of: Jimmy Fong; and

(iii)    by email to jfong@evergrande.com;

(b)    in the case of the Scheme Administrators, by email to: evergrande.scheme@kpmg.com;

(c)    in the case of a Scheme Creditor, its last known address, fax number or email according to the records of the Company or the Information Agent or by corporate action notice through the Clearing Systems (i.e. the Existing Notes Depository or New Instruments Depository, as applicable); and

(d)     in the case of any other person, any address set forth for that person in any agreement entered into in connection with this BVI Scheme or the last known address according to the Company or by fax to its last known fax number according to the Company.

31.2   Any notice or other written communication to be given under this BVI Scheme shall be deemed to have been served:

(a)     if delivered by hand or courier, on the first Business Day following delivery;

(b)     if sent by post, on the second Business Day after posting if the recipient is in the country of dispatch, otherwise on the tenth Business Day after posting; and

(c)     if by fax or email, on the Business Day sent.

31.3   In proving service, it shall be sufficient proof in the case of a notice sent by post that the envelope was properly stamped, addressed and placed in the post.

31.4   The accidental omission to send any notice, written communication or other document in accordance with this Clause 36 (*Notice*) or the non-receipt of any such notice by any Scheme Creditor, shall not affect the provisions of this BVI Scheme.

31.5   The Company shall not be responsible for any loss or delay in the transmission of any notices, other documents or payments posted by or to any Scheme Creditors which shall be posted at the risk of such Scheme Creditors.

31.6   This Clause 31 (*Notice*) shall not apply to the documents comprising the Solicitation Packet, as published on the Transaction Website, which should be completed and returned in accordance with the instructions set out therein.

## 32.    INTERCONDITIONALITY OF THE SCHEME

For the avoidance of doubt, the implementation of this BVI Scheme shall be dependent on the implementation of the TJ Scheme, in order to implement the restructuring of Liabilities in respect of the Existing Notes which are being compromised under both this BVI Scheme and the TJ Scheme.

## 33.    APPLICATION TO THE BVI COURT FOR DIRECTIONS

Without prejudice to any rights that the Company might otherwise have in connection with this BVI Scheme or any aspect of it, the Company shall be entitled to make an application to the BVI Court for directions at any time in connection with any matter arising under or in relation to this BVI Scheme.

## 34.    TERMINATION OF THIS BVI SCHEME

34.1   The Company may terminate this BVI Scheme at any time prior to the Restructuring Effective Date, by notice to the Scheme Creditors, provided that:

(a)     TJ also exercises its right to terminate the TJ Scheme;

(b)     written consent for the termination is obtained by the Company from:

(i)      the Majority SJ AHG; or

(ii)    (without prejudice to the foregoing) if the SJ AHG does not hold the Minimum SJ AHG Threshold, the Super Majority SJ Participating Creditors.

34.2    In the event that this BVI Scheme is terminated pursuant to the terms of this Clause 34 (*Termination of this BVI Scheme*), each Scheme Creditor shall be entitled to exercise any and all of its rights, powers and remedies against the Company under the terms and conditions of the documents governing the Existing Notes as though the BVI Scheme had never been contemplated or implemented.

34.3    This BVI Scheme shall terminate automatically, and be of no further force and effect in the event that the Restructuring Effective Date, including each of the steps outlined in paragraphs (a) to (h) of Clause 6.4 (*Scheme Steps*) of this BVI Scheme, has not occurred by the Longstop Date.

35.    **CONFLICT AND INCONSISTENCY**

In the case of a conflict or inconsistency between the terms of this BVI Scheme and the terms of the Explanatory Statement, the terms of this BVI Scheme will prevail.

36.    **SEVERABILITY**

If at any time any provision of this BVI Scheme or, the Restructuring Documents (or any other document to be executed under or in accordance with this BVI Scheme) is or becomes illegal, invalid or unenforceable in any respect under the laws of any jurisdiction, such provision shall be severed from this BVI Scheme or such Restructuring Document or such other document (as the case may be) and neither the legality, validity or enforceability under the law of any other jurisdiction of that or any provision of this BVI Scheme shall be affected or impaired.

37.    **FOREIGN REPRESENTATIVE**

The Scheme Supervisor shall be authorised to act as the representative of the Company on and in connection with any application for recognition and assistance in relation to this BVI Scheme in any jurisdiction and under whatever law, including (without limitation) Chapter 15 of the US Bankruptcy Code and any other law derived from or similar to the UNCITRAL Model Law on Cross-Border Insolvency Proceedings.

38.    **GOVERNING LAW AND JURISDICTION**

38.1    This BVI Scheme and any non-contractual obligations arising out of or in connection with this BVI Scheme shall be governed by, and construed in accordance with, the laws of the BVI.

38.2    The Company and the Scheme Creditors hereby agree that the BVI Court shall have exclusive jurisdiction to hear and determine any Proceeding and to settle any dispute which arises out of or is connected with the terms of this BVI Scheme or its implementation or out of any Proceeding taken or omitted to be taken under this BVI Scheme or in connection with the administration of this BVI Scheme.

38.3    For the purposes set out in Clause 38.2 (*Governing Law and Jurisdiction*), each of the Company and the Scheme Creditors irrevocably submit to the jurisdiction of the BVI Court, *provided, however*, that nothing in this Clause 38 (*Governing Law and Jurisdiction*) shall affect the validity of other provisions determining governing law and jurisdiction as between the Company and any of the Scheme Creditors whether contained in any contract or for any other purpose including, but not limited to, submission and/or enforcement under

the jurisdiction of the US Bankruptcy Court in relation to the Chapter 15 Recognition Proceeding including (but not limited to) the Recognition Filings and the Chapter 15 Recognition Order.

38.4    The terms of this BVI Scheme and the obligations imposed on the Company hereunder shall take effect subject to any prohibition or condition imposed by any applicable law.

## SCHEDULE 1

### RESTRUCTURING DOCUMENTS

1.    the Scheme;

2.    the Explanatory Statement;

3.    Existing Notes Trustee Instruction;

4.    Deed of Release;

5.    Deed of Undertaking;

6.    New Instrument Documents;

7.    Security Documents and New Instrument Keepwell Deed;

8.    Holding Period Trust Deed;

9.    New Intercreditor Agreements; and

10.    all other documents, agreements, instruments, board resolutions, shareholder approvals, releases and notices necessary to implement or consummate the Restructuring in accordance with the terms of the RSA and this BVI Scheme, in each case as amended, supplemented, extended, restated or novated from time to time, or any document or instrument creating or evidencing any security interest or guarantee, any fee letter, intercreditor agreement or similar documents under or in connection with the New Instruments and/or the Security Documents, in each case in the Agreed Form. For the avoidance of doubt, any documents and accompanying evidence (including, but not limited to, foreign law expert opinions and all other affidavit evidence filed by the Company in respect of the Proceedings before the BVI Court to convene the BVI Scheme Meeting and/or to sanction this BVI Scheme) specifically required as part of the BVI Court's proceedings are not included.

## SCHEDULE 2

### EXISTING NOTES SUBSIDIARY GUARANTORS

1) EVER GRACE GROUP LIMITED (恒善集团有限公司)

2) AMPLE TREASURE GROUP LIMITED (宝丰集团有限公司)

3) LUCKYUP GROUP LIMITED (升祺/昇祺集团有限公司)

4) INSTANT CHOICE DEVELOPMENT LTD.

5) AMPLE TREASURE HOLDING LIMITED (宝丰集团控股有限公司)

6) WILL GLORY HOLDINGS LIMITED (好耀控股有限公司)

7) FORBIDDEN CITY CULTURE CO., LIMITED (紫禁城弘华文化有限公司)

8) EVER SURE INDUSTRIES LIMITED (永瑞实业有限公司)

9) SHUI WAH INVESTMENT LIMITED (穗华投资有限公司)

10) SHENGTONG HOLDING LIMITED (盛通控股有限公司)

11) WISDOM GAIN GROUP LIMITED (智盈集团有限公司)

12) GROW RISING INVESTMENT LIMITED (晋廷投资有限公司)

13) ACCORD SINO GROUP LIMITED (协华集团有限公司)

14) MERRY FULL INVESTMENTS LIMITED (怡满投资有限公司)

15) MILLION CASTLE INVESTMENTS LIMITED

16) BENEFIT EAST INVESTMENTS LIMITED (益东投资有限公司)

17) CHAMPION GLORY HOLDINGS LIMITED (卓康集团有限公司)

18) CHAMPION GLOBE LIMITED (特灵有限公司)

19) CHAMPION KING INVESTMENTS LIMITED (彩侨投资有限公司)

20) FORTUNE LUCK CORPORATION LIMITED (顺利有限公司)

21) CHEUNG FU DEPARTMENT STORE ENTERPRISE LIMITED (象富百货集团有限公司)

22) CHINA AGRICULTURE TECHNOLOGY LIMITED (中国农业科技有限公司)

23) BAOJUN LIMITED (保骏有限公司)

24) PERFECT VANTAGE INVESTMENTS LIMITED (历冠投资有限公司)

25) BAI CHANG LIMITED (百昌有限公司)

26) MINSIN INTERNATIONAL (HOLDINGS) LIMITED (明诚国际(集团)有限公司)

27) BILLION SINO INVESTMENTS LIMITED (亿中投资有限公司)

28) ALLYWING INVESTMENTS LIMITED (荣邦投资有限公司)

29) CALIFORNIA PLACE DALIAN LIMITED (加州豪庭大连有限公司)

30) FORTUNE STAR INTERNATIONAL INVESTMENT LIMITED (福星国际投资有限公司)

31) XING HONG HOLDINGS LIMITED (兴鸿控股有限公司)

32) ROSY DYNASTY LIMITED (翠御有限公司)

33) JOY VISION HOLDINGS LIMITED (乐景控股有限公司)

34) SANLI (CHINA) HOLDINGS LIMITED (三立(中国)控股有限公司)

35) METRO WISDOM LIMITED (慧都有限公司)

36) JI FENG LIMITED (吉丰有限公司)

37) RISE EAGLE WORLDWIDE LIMITED (振鹰环球有限公司)

38) JICHENG INTERNATIONAL (HK) LIMITED (集成国际(香港)有限公司)

39) LUCKY BENEFIT LIMITED

40) LOYAL POWER INVESTMENTS LIMITED (旺权投资有限公司)

41) RISING SHEEN LIMITED (升亮有限公司)

42) CITY FAITH LIMITED (都信有限公司)

43) SOUTH HONEST LIMITED (诚南有限公司)

44) FIRST KEY INVESTMENTS LIMITED (元基投资有限公司)

45) HINTO DEVELOPMENTS LIMITED

46) TRIUMPH HERO INTERNATIONAL LIMITED (胜雄国际有限公司)

47) SPREAD GLORY INVESTMENTS LIMITED (广亮投资有限公司)

48) NEW INSIGHT HOLDINGS LIMITED (创见控股有限公司)

49) EASY GAIN INVESTMENT HOLDINGS LIMITED (盈润投资控股有限公司)

50) HONOR BUSINESS INVESTMENT LIMITED (荣商投资有限公司)

51) LINK CARE LIMITED (环照有限公司)

52) CHEER MOTION DEVELOPMENT LIMITED (致能发展有限公司)

53) CHINA SEA GROUP (HONG KONG) INVESTMENT LIMITED (中海集团(香港)投资有限
公司)

54) CROWN WISE INVESTMENT LIMITED (冠惠投资有限公司)

55) DRAGON JOY (CHINA) LIMITED (龙悦(中国)有限公司)

56) DRAGON PIONEER DEVELOPMENT LIMITED (龙添发展有限公司)

57) EXCEL SKY (HONG KONG) LIMITED (俊天(香港)有限公司)

58) FORTUNE ASCENT PROPERTY MANAGEMENT LIMITED (升裕物业管理有限公司)
(formerly known as Fortune Ascent Limited (升裕有限公司))

59) FUTURE LEAD ENTERPRISES LIMITED (天领企业有限公司)

60) GLORY SIGN DEVELOPMENT LIMITED ( 皇志发展有限公司)

61) GOLD ASCOT LIMITED (金士福有限公司)

62) GRACE TARGET HOLDINGS LIMITED (喜志集团有限公司)

63) HONOUR IN INVESTMENTS LIMITED ( 诚然投资有限公司)

64) JIAZHI HOLDINGS LIMITED (嘉智控股有限公司)

65) JOY WEALTHY INVESTMENT LIMITED (悦才投资有限公司)

66) LUCKY UNIVERSE HOLDING LIMITED (瑞宇集团有限公司)

67) PACIFIC PLUS ENTERPRISES LIMITED (汇太企业有限公司)

68) PALM ISLAND RESORT LIMITED (棕榈岛渡假村有限公司)

69) PRIME LIGHT HOLDINGS LIMITED (柏天集团有限公司)

70) PRIME SUN HOLDING LIMITED (盛日控股有限公司)

71) PROSPER POWER DEVELOPMENT LIMITED (能昌发展有限公司)

72) SHARP GOAL INVESTMENTS LIMITED (锐怡投资有限公司)

73) STARLET DEVELOPMENT LIMITED (星能发展有限公司)

74) SUNNY NET DEVELOPMENT LIMITED (日讯发展有限公司)

75) THOUSAND GRAND HOLDING LIMITED (千宏控股有限公司)

76) TREND RICH INVESTMENT LIMITED (毅富投资有限公司)

77) CHANG XING HOLDINGS LIMITED (昌兴控股有限公司)

78) CHEER CHAMP INVESTMENT LIMITED (志昌投资有限公司)

79) DRAGON CHARM INVESTMENTS LIMITED (龙创投资有限公司)

80) DRAGON FORTUNE LIMITED

81) EAST BEST INVESTMENTS LIMITED (东卓投资有限公司)

82) EVER SHINY INTERNATIONAL LIMITED

83) FULL JOLLY INVESTMENTS LIMITED (满怡投资有限公司)

84) GOOD WAVE INTERNATIONAL LIMITED (佳涛国际有限公司)

85) HEALTHY TIME INTERNATIONAL LIMITED

86) LUCK FORTUNE HOLDINGS LIMITED

87) LUCKY UNIVERSE ENTERPRISES LIMITED (瑞宇企业有限公司)

88) MARCHE LIMITED

89) MARVEL FIRST DEVELOPMENTS LIMITED

90) MENKIA HOLDINGS LIMITED (万家控股有限公司)

91) ON LUCKY HOLDINGS LIMITED (安利达控股有限公司)

92) OPAL HOUSE DEVELOPMENT LIMITED

93) ORIENTAL FAME HOLDINGS LIMITED (东荣控股有限公司)

94) PRIME SUN ENTERPRISES LIMITED (盛日企业有限公司)

95) REEGO GROUP LIMITED (锐高集团有限公司)

96) SILVER OPPORTUNITY INVESTMENT LIMITED (银机投资有限公司)

97) SUPERB CAPITAL ENTERPRISES LIMITED

98) UPPER EAST PROPERTY HOLDINGS COMPANY LIMITED (上东置业控股有限公司)

99) VAST WHEEL COMPANY LIMITED (浩轮有限公司)

100)    WHITE HERON LIMITED

101)    WIN HARBOUR INVESTMENTS LIMITED (凯港投资有限公司)

102)    WIN PEAK GROUP LIMITED (凯峰集团有限公司)

103)    SHENGTONG (BVI) LIMITED (盛通(BVI)控股有限公司)

104)    SHENGYU (BVI) LIMITED (盛誉(BVI)有限公司)

**SCHEDULE 3**

**RESTRUCTURING EFFECTIVE DATE CONDITIONS**

1.    **Satisfaction of Scheme Conditions:** the satisfaction of the Scheme Conditions, and the occurrence of the Scheme Effective Date.

2.    **Relevant approvals of Scheme Consideration:** the delivery of all relevant approvals, pre-approvals or consents, as applicable, in connection with the Restructuring having been obtained, including:

   (a)    delivery of respective court orders in respect of the Schemes and Chapter 15 Recognition Order (and in the case of Chapter 15 unless waived by the Company);

   (b)    approval in-principle for the listing and quotation of the New Instruments on the SGX-ST;

   (c)    approval by the Board of the Company for the issuance of the New Instruments;

   (d)    any required governmental or regulatory approval, filings or registration (including but not limited to any procedures required by the NDRC in connection with the issuance of the New Instruments) in connection with the Restructuring and with respect to the execution, delivery or performance of the Restructuring Documents under any applicable PRC laws, regulations, orders and decrees of any PRC Governmental Entities has been obtained and made. This condition is unable to be waived; and

   (e)    publication of announcements of the Company on the issuance of the New Instruments.

3.    **Payment of fees:**

   (a)    settlement of all professional fees associated with the Restructuring that the Company has agreed to pay and that have been duly invoiced to the Company namely (i) the AHG Legal Advisor Fees and the AHG Financial Advisor Fees, (ii) the fees, costs and expenses of all of its Affiliates, the Advisors, the Information Agent, the Scheme Administrators, the Holding Period Trustee, (ii) the fees, costs and expenses of the SJ Notes Trustee, the SJ Notes Collateral Agent, the SJ Notes Depositary, the SJ Notes Paying and Transfer Agent and Registrar, and (iii) the fees, costs and expenses of the New Instruments Depositary, the New Instruments Paying and Transfer Agent and Registrar, the New Instruments Trustee and the Collateral Agent.

   (b)    payment in full of the AHG Work Fee (subject to the AHG Work Fee Letter).

4.    **Other conditions:**

   (a)    the receipt of written confirmation from (A) Kirkland & Ellis (on behalf of the TJ AHG); and (B) Sidley Austin (on behalf of the Company and Tianji) that each Restructuring Document is in Agreed Form;

   (b)    the execution of all necessary corporate authorisations to implementation of the Restructuring and entry into the relevant Restructuring Documents by the relevant parties thereto (not otherwise included in (1)-(3) above); and

   (c)    the satisfaction of each of the specific conditions precedent contained in each of the Restructuring Documents (in each case in the Agreed Form) and any corporate governance term sheet forming part of the Explanatory Statement.

**SCHEDULE 4**

**COURT ORDER**

- **NOTE: THIS IS THE DRAFT CONVENING ORDER SUBMITTED TO THE BVI COURT FOLLOWING THE CONVENING HEARING ON 24 JULY 2023.**
- **AS AT THE DATE OF PUBLICATION ON THE TRANSACTION WEBSITE, THIS DRAFT IS STILL PENDING APPROVAL OR MODIFICATION BY PRESIDING JUDGE, THE HONOURABLE JUSTICE INGRID MANGATAL (AG).**
- **THIS DRAFT WILL BE REMOVED AND REPLACED BY THE SEALED CONVENING ORDER ONCE IT BECOMES AVAILABLE.**

**THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**BRITISH VIRGIN ISLANDS**
**COMMERCIAL DIVISION**
**CLAIM NO.: BVIHCOM2023/0076**
**IN THE MATTER OF SCENERY JOURNEY LIMITED**


**AND IN THE MATTER OF S. 179A OF THE BVI BUSINESS COMPANIES ACT 2004**


**BETWEEN:**

**SCENERY JOURNEY LIMITED**

<u>Claimant</u>

**and**

**SCENERY JOURNEY LIMITED**

<u>Defendant</u>

_____

**CONVENING DIRECTIONS ORDER**

_____


**BEFORE:**    The Honourable Justice Ingrid Mangatal (Ag)
**DATED:**    24 July 2023
**ENTERED:**    July 2023


**UPON** the claim of Scenery Journey Limited (the "**Company**") by Fixed Date Claim Form dated 26 April 2023 (the "**Claim**")

**AND UPON** reading the First Affirmation of Chen Daiping and the First Affirmation of Hui Ka Yan, and the exhibits thereto

**AND UPON HEARING** Leading Counsel, Mr Tom Smith KC, for the Company, and with him Paul Fradley and Henry Phillips of counsel, and Matthew Freeman and Scott Tolliss of Maples and Calder; and Leading Counsel, David Allison KC, for the Ad Hoc Group of creditors, and with him Peter Ferrer of Harneys

**AND UPON** the Court being satisfied that it has jurisdiction in relation to the Scheme (as defined below) on the basis that the Company is a "company" within section 179A of the BVI Business Companies Act 2004

**AND UPON** the basis that all capitalised terms not otherwise defined in this Order shall have the meaning given to them in the draft scheme of arrangement (the **"Scheme"**) and the draft explanatory statement in relation to the Scheme (the **"Explanatory Statement"**), in the form exhibited in Exhibit HKY-1 to the First Affirmation of Hui Ka Yan

**IT IS HEREBY ORDERED AND DIRECTED THAT:**

1. The Company has permission to convene a single meeting (the **"Scheme Meeting"**) of certain of its creditors (the "**Scheme Creditors**") for the purpose of considering and, if thought fit, approving the Scheme.

2. The Scheme Meeting will take place at 9 am (BVI time) on 22 August 2023 at the offices of Maples and Calder, 5th Floor, Ritter House, Road Town, Tortola, British Virgin Islands.

3. Attendance and voting at the Scheme Meeting will also be possible by video conference, using details which will be published on the Transaction Website at least 21 days before the day appointed for the Scheme Meeting and the meeting passcode notified to Scheme Creditors who are not Blocked Scheme Creditors by the Information Agent at least 2 business days before the day appointed for the Scheme Meeting.

4. GLAS Specialist Services Limited] (**"GLAS"**) will provide Blocked Scheme Creditors with the details of how to attend and vote at the Scheme Meeting as soon as reasonably practicable once the Company becomes aware of any such creditor and will notify such Blocked Scheme Creditors of the meeting passcode at least 2 business days before the day appointed for the Scheme Meeting.

5.  The Chairperson (as defined below) may require Scheme Creditors attending the Scheme Meeting by video conference to turn on their camera throughout the Scheme Meeting and to log on to the video conference using their full name (as registered with the Information Agent) and the creditor identified number provided to them by the Information Agent prior to the Scheme Meeting.

6.  The Company has permission to set a record time of 5 am (BVI time) on 18 August 2023 (the **"Voting Record Time"**) for the purpose of determining each Scheme Creditor's Voting Scheme Claim. The Voting Scheme Claims as at the Voting Record Time determine the number of votes to be assigned to a Scheme Creditor when voting on the Scheme at the Scheme Meeting.

7.  The Company has permission to set the Voting Record Time as the latest time by which (a) the Information Agent must receive a valid Non-Blocked Scheme Creditor Form (as defined below) from Scheme Creditors who are not Blocked Scheme Creditors, and (b) GLAS must receive a valid Blocked Scheme Creditor Form (as defined below) from Blocked Scheme Creditors in order for the Scheme Creditors' voting instructions to be taken into account for the purposes of the Scheme Meeting.

8.  Notice of the Scheme Meeting (**"Scheme Meeting Notice"**) shall be given to Scheme Creditors not less than 21 days before the Scheme Meeting:

    a.  by notice on the Transaction Website;
    b.  by announcement on the website of The Stock Exchange of Singapore Limited;
    c.  for certain Scheme Creditors identified in the First Affidavit of Damian Watkin, by the Information Agent giving notice through the Clearing Systems in accordance with the procedures described therein; and
    d.  by the Information Agent sending the notice via email to each person who the Company believes is or may be a Scheme Creditor (other than Blocked Scheme Creditors), and for whom the Company has a valid e-mail address.

9.  GLAS will give a Scheme Meeting Notice to any Blocked Scheme Creditors by email (i) not less than 21 days before the Scheme Meeting to the extent the Company is aware of any Blocked Scheme Creditors and their email addresses at that time or (ii) as soon as

reasonably practicable after the Company becomes aware of the existence of a Blocked Scheme Creditor and their email details.

10. The Scheme Meeting Notice shall be in substantially the same form as that appended to the Explanatory Statement exhibited in Exhibit HKY-1 to the First Affirmation of Hui Ka Yan.

11. When distributing the Scheme Meeting Notice in accordance with paragraphs 8 and 9 above, the Information Agent (or GLAS, in the case of Blocked Scheme Creditors) shall also include a copy of the final form of the Explanatory Statement (or links to the Transaction Website where it can be accessed), which contains, amongst other things, the Scheme at Schedule 4.

12. On the same date as distributing the Scheme Meeting Notice in accordance with paragraph 8 above, the Information Agent shall post a Solicitation Packet including:

   a. the Account Holder Letter and a Scheme Creditor Proxy Form (each a "**Non-Blocked Scheme Creditor Form**"), including the forms of proxy and appendices contained therein; and

   b. the "**Blocked Scheme Creditor Form**", including the form of proxy contained therein,

   on the Transaction Website together with copies of any other relevant documents.

13. The final form of the Explanatory Statement and its schedules shall be substantially in the same form exhibited in Exhibit HKY-1 to the First Affirmation of Hui Ka Yan (save for where the schedules were not available at the time of the First Affirmation of Hui Ka Yan).

14. The accidental omission to serve any Scheme Creditor with the Scheme Meeting Notice, or the non-receipt by any Scheme Creditor of the Scheme Meeting Notice, shall not invalidate the proceedings at the Scheme Meeting.

15. Miss Anna Silver, in her capacity as Scheme Supervisor, or, failing that, another representative of FFP (BVI) Limited nominated by her, be appointed Chairperson of the Scheme Meeting (the **"Chairperson"**) on behalf of the Company.

16. The Chairperson be entitled to accept, without further investigation, the signature on any Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable, as being genuine and as authority of the signatory to cast the votes in accordance with the instructions outlined in the Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable, and the Solicitation Packet.

17. The Chairperson be responsible for determining, in accordance with the relevant provisions in the Explanatory Statement, the Voting Scheme Claim of any Scheme Creditor and the validity of the appointment of any person permitted to act as proxy for a Scheme Creditor by reference to the information provided in each Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable.

18. The Chairperson be at liberty to accept any Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable, and the amount of a Voting Scheme Claim in respect of which a Scheme Creditor seeks to vote, notwithstanding that such form has not been completed or submitted in accordance with any instructions contained therein or has been submitted after the deadline provided for by paragraph 7, provided that the Chairperson considers that the information contained therein is sufficient to admit that Scheme Creditor's Voting Scheme Claim for voting purposes.

19. Any person validly appointed as proxy for a Scheme Creditor in accordance with the instructions set out in the Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable, and the Solicitation Packet may attend and speak at Scheme Meeting.

20. The Chairperson be at liberty to adjourn the Scheme Meeting, or terminate the Scheme Meeting and adjourn to a later date, in his or her sole discretion, provided that, if adjourned, the Scheme Meeting will recommence as soon as reasonably practicable thereafter. In the event that the Chairperson considers in her sole discretion that it is necessary or appropriate to adjourn the Scheme Meeting, the Company shall cause the Scheme Creditors to be notified that there is an adjournment of the Scheme Meeting and as to the time of the adjourned Scheme Meeting as soon as practicable and in the same manner as notice was given to the Scheme Creditors pursuant to paragraph 8.

21. The Chairperson be permitted to declare and announce the results of the Scheme Creditors' votes in respect of the Scheme, either during the Scheme Meeting or as soon as reasonably possible after the conclusion of the Scheme Meeting.

22. Within seven days of the Scheme Meeting, the Chairperson shall provide to the Court a report on the proceedings at and the result of the Scheme Meeting.

23. If the Scheme is approved at the Scheme Meeting by the required statutory majorities, the Claim is adjourned to a further hearing on 4 September 2023 at 10 am for the Court to consider the sanction of the Scheme.

24. There shall be liberty to apply generally.

_____

**BY THE REGISTRAR**

6

**THE EASTERN CARIBBEAN SUPREME**
**COURT**
**IN THE HIGH COURT OF JUSTICE**
**BRITISH VIRGIN ISLANDS**
**COMMERCIAL DIVISION**
**Claim No:  BVIHCOM2023/0076**
**IN THE MATTER OF SCENERY JOURNEY**
**LIMITED**
**AND IN THE MATTER OF AND IN THE**
**MATTER OF S. 179A OF THE BVI BUSINESS**
**COMPANIES ACT 2004**

**BETWEEN:**

**SCENERY JOURNEY LIMITED**

<u>Claimant</u>

and

**SCENERY JOURNEY LIMITED**

<u>Defendant</u>

_____

**DRAFT CONVENING ORDER**

_____

**Maples and Calder**

5th Floor

Ritter House

PO Box 173

Road Town, Tortola

British Virgin Islands

(Ref:MFX/621262/000107)

Tel: +1 284-852-3000

Fax: +1 284-852-3097

<u>Legal Practitioners for the Claimant</u>

7

**SCHEDULE 7**

**GROUP STRUCTURE CHART**











Tianji Holding Limited 天基控股有限公司 (HK)
CENTRAL SINO GLOBAL LIMITED 中華環球有限公司 (BVI)
Ridge Sincere Limited 領誠有限公司 (BVI)
ALL PEACE INVESTMENTS LIMITED (泰通投資有限公司) (BVI)
Ever Grace Group Limited 恒善集團有限公司 (BVI)
Scenery Journey Limited 景程有限公司 (BVI)
Intermediary holding company(ies) and subsidiary(ies)
JOVIAL IDEA DEVELOPMENTS LIMITED 乐意发展有限公司 (BVI)
EVERGRANDE INDUSTRIAL HOLDINGS LIMITED 恒大實業控股有限公司 (HK)
AMPLE TREASURE GROUP LIMITED 寶豐集團有限公司 (BVI)
Luckyup Group Limited 昇祺集團有限公司 (BVI)
Instant Choice Development Ltd (BVI)
Shui Wah Investment Limited 穗華投資有限公司 (HK)
SHENGTONG (BVI) LIMITED (BVI)
PRIME SUN ENTERPRISES LIMITED 盛日企業有限公司 (BVI)
Chang Xing Holdings Limited 昌興控股有限公司 (BVI)
Lucky Universe Enterprises Limited 瑞宇企業有限公司 (BVI)
MARVEL FIRST DEVELOPMENTS LIMITED (BVI)
大美环球有限公司 Great Beauty Global Limited (BVI)
Shengyu (BVI) Limited 盛譽有限公司 (BVI)
Jiashan Holdings Limited 嘉善控股有限公司 (HK)
Stay Wealth Limited 保裕有限公司 (BVI)
AMPLE TREASURE HOLDING LIMITED 寶豐集團控股有限公司 (HK)
WILL GLORY HOLDINGS LIMITED 好耀控股有限公司 (HK)
Forbidden City Culture Co., Limited 紫禁城弘華文化有限公司 (HK)
Shengtong Holding Limited 盛通控股有限公司 (HK)
Prime Sun Holding Limited 盛日控股有限公司 (HK)
Thousand Grand Holding Limited 千宏控股有限公司 (HK)
LUCKY UNIVERSE HOLDING LIMITED 瑞宇集團有限公司 (HK)
Jiazhi Holdings Limited 嘉智控股有限公司 (HK)
Flying Bloom Investments Limited 飞旺投资有限公司 (BVI)
CHINA AGRICULTURE TECHNOLOGY LIMITED (BVI)
Fortune Walker Limited (BVI)
Sky Joy Holdings Limited 悅天控股有限公司 (BVI)
Ever Sure Industries Limited 永瑞實業有限公司 (HK)
EASE TRIUMPH INTERNATIONAL LIMITED 拓業國際有限公司 (HK)
GRANDDAY GROUP LIMITED 朝隆集團有限公司 (BVI)
Jumbo Fortune Enterprises Limited (BVI)
Oceanic Hero Holdings Limited 英海控股有限公司 (BVI)
LUCKY GROW HOLDINGS LIMITED 智煌控股有限公司 (HK)
PROFIT POINT ENTERPRISES LIMITED 盈邦企业有限公司 (HK)
Hengda Real Estate Group Co., Ltd. 恒大地产集团有限公司 (PRC)
Onshore subsidiary(ies)
100%
99%
69%
31%
Offshore
Onshore
Shareholding of entities that are subsidiaries of the CEG Group as at the date of the Explanatory Statement
Shareholding of subsidiaries which have been pledged and enforced as at the date of the Explanatory Statement
Issuer of TJ New Notes & Parent Guarantor of SJ New Notes
Issuer of SJ New Notes
Subsidiary Guarantor of SJ New Notes (subject to the New Instruments Documents)
Keepwell Provider of SJ New Notes

ASSEMBLE HARMONY LIMITED
聚和有限公司
(BVI)
100%
Greet Delight Limited
(BVI)
100%
WISDOM GAIN GROUP LIMITED
智盈集團有限公司
(BVI)
100%
GROW RISING INVESTMENT LIMITED
晉廷投資有限公司
(HK)
100%
BAI CHANG LIMITED
百昌有限公司
(BVI)
100%
BILLION SINO INVESTMENTS LIMITED
億中投資有限公司
(BVI)
100%
ALLYWING INVESTMENTS LIMITED
榮邦投資有限公司
(BVI)
100%
FORTUNE STAR INTERNATIONAL INVESTMENT LIMITED
福星國際投資有限公司
(HK)
100%
XING HONG HOLDINGS LIMITED
興鴻控股有限公司
(BVI)
100%
ROSY DYNASTY LIMITED
翠御有限公司
(HK)
100%
JOY VISION HOLDINGS LIMITED
樂景控股有限公司
(BVI)
100%
SANLI (CHINA) HOLDINGS LIMITED
三立(中國)控股有限公司
(HK)
100%
METRO WISDOM LIMITED
慧都有限公司
(HK)
100%
JI FENG LIMITED
吉豐有限公司
(BVI)
100%
RISE EAGLE WORLDWIDE LIMITED
(BVI)
100%
JICHENG INTERNATIONAL (HK) LIMITED
集成國際(香港)有限公司
(HK)
100%
BAOJUN LIMITED
保駿有限公司
(BVI)
100%
PERFECT VANTAGE INVESTMENTS LIMITED
歷冠投資有限公司
100%
MINSIN INTERNATIONAL (HOLDINGS) LIMITED
明誠國際（集團）有限公司
(HK)
100%
LUCKY BENEFIT LIMITED
(BVI)
100%
LOYAL POWER INVESTMENTS LIMITED
旺權投資有限公司
(HK)
100%
FIRST KEY INVESTMENTS LIMITED
元基投資有限公司
(BVI)
100%
FULL JOLLY INVESTMENTS LIMITED
滿怡投資有限公司
(BVI)
85%
WIN HARBOUR INVESTMENTS LIMITED
凱港投資有限公司
(BVI)
15%
100%
JOY WEALTHY INVESTMENT LIMITED
悅才投資有限公司
(HK)
Onshore subsidiary(ies)
Onshore subsidiary(ies)
Onshore subsidiary(ies)
Onshore subsidiary(ies)
Onshore subsidiary(ies)
Onshore subsidiary(ies)
Onshore subsidiary(ies)
Onshore subsidiary(ies)

California Place Dalian Ltd.
加州豪庭大連有限公司
(HK)
100%
HINTO DEVELOPMENTS LIMITED
(BVI)
100%
Onshore subsidiary(ies)
RISING SHEEN LIMITED
升亮有限公司
(BVI)
100%
CITY FAITH LIMITED
都信有限公司
(HK)
100%
SOUTH HONEST LIMITED
誠南有限公司
(HK)
100%
Triumph Hero International Limited
勝雄國際有限公司
(BVI)
100%
SPREAD GLORY INVESTMENTS LIMITED
廣亮投資有限公司
(HK)
100%
New Insight Holdings Limited
創見控股有限公司
(BVI)
ON LUCKY HOLDINGS LIMITED
安利達控股有限公司
(BVI)
100%
Pacific Plus Enterprises Limited
匯太企業有限公司
(HK)
100%
EASY GAIN INVESTMENT HOLDINGS LIMITED
盈潤投資控股有限公司
(BVI)
100%
STARLET DEVELOPMENT LIMITED
星能發展有限公司
(HK)
100%
HONOR BUSINESS INVESTMENT LIMITED
榮商投資有限公司
(BVI)
100%
HONOUR IN INVESTMENTS LIMITED
誠然投資有限公司
(HK)
100%
LINK CARE LIMITED
環照有限公司
(BVI)
100%
GRACE TARGET HOLDINGS LIMITED
喜志集團有限公司
(HK)
100%
DRAGON CHARM INVESTMENTS LIMITED
龍創投資有限公司
(BVI)
100%
CROWN WISE INVESTMENT LIMITED
冠惠投資有限公司
(HK)
100%
MENKIA HOLDINGS LIMITED
萬家控股有限公司
(BVI)
100%
GLORY SIGN DEVELOPMENT LIMITED
皇誌發展有限公司
(HK)
100%
SILVER OPPORTUNITY INVESTMENT LIMITED
銀機投資有限公司
(BVI)
100%
PRIME LIGHT HOLDINGS LIMITED
柏天集團有限公司
(HK)
100%
VAST WHEEL COMPANY LIMITED
浩輪有限公司
(BVI)
100%
PROSPER POWER DEVELOPMENT LIMITED
能昌發展有限公司
(HK)
100%
REEGO GROUP LIMITED
銳高集團有限公司
(BVI)
100%
SHARP GOAL INVESTMENTS LIMITED
銳怡投資有限公司
(HK)
100%
China Sea Group (Hong Kong) Investment Limited
中海集團(香港)投資有限公司
(HK)
100%
Onshore subsidiary(ies)

100%
Marche Limited (BVI)
GOOD WAVE INTERNATIONAL LIMITED 佳濤國際有限公司 (BVI)
SUPERB CAPITAL ENTERPRISES LIMITED (BVI)
WIN PEAK GROUP LIMITED 凱峰集團有限公司 (BVI)
DRAGON JOY (CHINA) LIMITED 龍悅(中國)有限公司 (HK)
WHITE HERON LIMITED (BVI)
Ever Shiny International Limited (BVI)
Luck Fortune Holdings Limited (BVI)
HEALTHY TIME INTERNATIONAL LIMITED 健時國際有限公司 (BVI)
Harmony Aurora Limited 怡晨有限公司 (BVI)
GODSIB LIMITED (BVI)
Excel Sky (Hong Kong) Limited 俊天(香港)有限公司 (HK)
Intermediary holding company(ies)
DRAGON PIONEER DEVELOPMENT LIMITED 龍添發展有限公司 (HK)
6%
94%
DRAGON FORTUNE LTD. (BVI)
FUTURE LEAD ENTERPRISES LIMITED 天領企業有限公司 (HK)
UPPER EAST PROPERTY HOLDINGS COMPANY LIMITED 上東置業控股有限公司 (HK)
ORIENTAL FAME HOLDINGS LIMITED 東葵控股有限公司 (BVI)
CHEER CHAMP INVESTMENT LIMITED 誌昌投資有限公司 (BVI)
OPAL HOUSE DEVELOPMENT LIMITED (BVI)
EAST BEST INVESTMENTS LIMITED 東卓投資有限公司 (BVI)
WINGGO LIMITED 穎高有限公司 (BVI)
FORTUNE LEADER INVESTMENT LIMITED 廣盛投資有限公司 (HK)
SUNNY NET DEVELOPMENT LIMITED 日凱發展有限公司 (HK)
CHEER MOTION DEVELOPMENT LIMITED 致德發展有限公司 (HK)
GOLD ASCOT LIMITED 金士福有限公司 (HK)
TREND RICH INVESTMENT LIMITED 駿富投資有限公司 (HK)
ANGEL FAY LIMITED (BVI)
CHAMPION CONCEPT LIMITED (BVI)
Palm Island Resort Limited 棕櫚島渡假村有限公司 (HK)
Intermediary holding company(ies)
HIGH CONCEPT LIMITED 高建有限公司 (HK)
Onshore subsidiary(ies)
Onshore subsidiary(ies)
Onshore subsidiary(ies)
Onshore subsidiary(ies)
Onshore subsidiary(ies)
Onshore subsidiary(ies)

FORTUNE LUCK CORPORATION LIMITED (HK)
CHEUNG FU DEPARTMENT STORE ENTERPRISE LIMITED (HK)
VAST OMEN LIMITED (BVI)
PACIFIC GLOBE GROUP LIMITED (BVI)
Faith Honor Group Limited (BVI)
STAR RIVER PROFITS LIMITED (BVI)
PROSPER TRADE INVESTMENTS LIMITED (BVI)
Joyful Glee Holdings Limited (BVI)
ACCORD SINO GROUP LIMITED (BVI)
MERRY FULL INVESTMENTS LIMITED (BVI)
MILLION CASTLE INVESTMENTS LIMITED (BVI)
Intermediary holding company(ies) and subsidiary(ies)
Subsidiary(ies)
MORE HERO LIMITED (HK)
SHINY PROFIT ENTERPRISES LIMITED (BVI)
FORTEX DEVELOPMENT LIMITED (HK)
DELIGHT UNIVERSE LIMITED (BVI)
BENEFIT EAST INVESTMENTS LIMITED (BVI)
WINNER JOY DEVELOPMENT LIMITED (HK)
CHAMPION GLORY HOLDINGS LIMITED (HK)
CHAMPION GLOBE LIMITED (HK)
CHAMPION KING INVESTMENTS LIMITED (HK)
100%
50%
25%
25%
Offshore
Onshore
Onshore subsidiary(ies)

**SCHEDULE 8**

**NOTICE OF SCHEME MEETING**

**IN THE EASTERN CARIBBEAN SUPREME COURT**
东加勒比海法院
**IN THE HIGH COURT OF JUSTICE**
高等法院
**BRITISH VIRGIN ISLANDS**
英属维尔京群岛
**COMMERCIAL DIVISION**
商事庭
**CLAIM NO. BVIHC (COM) 0076 of 2023**
案件号 BVIHC (COM) 0076 of 2023

**IN THE MATTER OF SECTION 179A OF THE BVI BUSINESS COMPANIES ACT (as amended)**
关于商业公司法（不时修订）第 179A 条
**AND**
以及
**IN THE MATTER OF SCENERY JOURNEY LIMITED**
关于景程有限公司

**NOTICE OF SCHEME MEETINGS**
协议安排会议通知

Unless otherwise defined herein, terms used in this Notice have the same meanings as in the explanatory statement (the "**Explanatory Statement**") relating to the proposed scheme of arrangement between Scenery Journey Limited (景程有限公司) (the "**Company**") and the Scheme Creditors (as defined therein) under section 179A of the BVI Business Companies Act (as amended) (the "**Scheme**").

除非本通知另有定义，否则本通知所使用的术语与景程有限公司（"**公司**"）和协议安排债权人 (Scheme Creditors)（定义见说明陈述）之间根据英属维尔京群岛商业公司法（经修订）第 179A 条的拟议协议安排 ("**协议安排**")有关的说明陈述（"**说明陈述**"）的含义相同。

Copies of the Scheme, the Explanatory Statement and the Solicitation Packet (including the documentation to be completed by or on behalf of Scheme Creditors in order to vote and/or receive Scheme Consideration) are available to download from the Transaction Website (https://projects.morrowsodali.com/evergrande). The scheme creditor forms (for voting purposes) are also available to download from the Company's website (www.evergrande.com).

协议安排、说明陈述和征求文件集 (Solicitation Packet) 的副本（包括由协议安排债权人或其代表完成的文件，以便投票和/或获得协议安排对价 (Scheme Consideration) ）可从交易网站(Transaction Website)（https://projects.morrowsodali.com/evergrande）下载。协议安排债权人的投票表格 （为投票的目的）还可从公司网站（www.evergrande.com）下载。

**NOTICE IS HEREBY GIVEN** that, by an order of the Commercial Division of the High Court of the British Virgin Islands (the "**BVI Court**"), dated 24 July 2023 (the "**Convening Order**"), a single meeting of Scheme Creditors (the "**Scheme Meeting**") be convened for the purpose of considering and, if thought fit, approving (with or without modification) the Scheme proposed by the Company.

**兹通知**，根据英属维尔京群岛高等法院商事庭（"**英属维京群岛法院**"）于 2023 年 7 月 24 日的命令（"**召集命令**"），将召开一次协议安排债权人会议（"**协议安排会议**"），以审议并在认为合适的情况下批准（不论是否修改）该协议安排。

**Venue, times and video conference availability for the Scheme Meetings**

协议安排会议的方式、时间及可使用的视讯会议

The Scheme Meeting will be held on 22 August 2023 at 9.00 a.m. (British Virgin Islands ("**BVI**") time) / 9.00 p.m. (Hong Kong time) at the offices of Maples and Calder, 5th Floor, Ritter House, Wickhams Cay II, Road Town, British Virgin Islands, with any adjournment as may be necessary or appropriate, and subject to applicable COVID-19 restrictions, policies or guidance then in force in the BVI, and in which case any changes in arrangements relating to the Scheme Meeting shall be communicated to Scheme Creditors in advance of the Scheme Meeting on the Transaction Website, CEG's website, by a public announcement published on the HKEXnews website of the SEHK and the website of the SGX-ST.

协议安排会议将于 2023 年 8 月 22 日英属维尔京群岛（"**英属维京群岛**"）时间上午 9 时（英属维尔京群岛时间）/晚上 9 时（香港时间）在英属维京群岛 Road Town, Wickhams Cay II, Ritter House 5 楼迈普达律师事务所办公室召开（如有需要或合适，会议可作任何延期）。协议安排会议须遵守英属维尔京群岛当时有效和适用的 COVID-19 限制、政策或指引，在这种情况下，与协议安排会议有关的安排的任何变更均应在协议安排会议召开之前通过交易网站、中国恒大集团的网站，以及香港联交所披露易网站和新交所网站上发布的公告中公布。

A video conferencing facility will be made available. Scheme Creditors will be able to obtain the relevant dial-in details for the Scheme Meetings from the Transaction Website, and by written request from the Information Agent (if you are a Scheme Creditor who is not a Blocked Scheme Creditor), or GLAS Specialist Services Limited ("**GLAS**") (if you are a Blocked Scheme Creditor).
视讯会议设备将被设置。协议安排债权人将能够从交易网站上，以及通过信息代理人（如果您是协议安排债权人且并非受阻协议安排债权人）或通过向 GLAS Specialist Services Limited（"**GLAS**"）（如果您是受阻协议安排债权人）书面请求，获得协议安排会议的相关拨入信息详情。

Scheme Creditors who attend the Scheme Meeting in person, or by video conference, will be able to vote (and to change their vote, if they wish).

通过线下或视讯会议方式参与协议安排会议的协议安排债权人都将可以投票（或如果其有意愿的话，变更投票）。

**Methods of voting**

投票方式

In order to vote at the Scheme Meeting, a Scheme Creditor must either vote itself (if an individual), appoint a duly authorised corporate representative (if a corporation), or appoint a proxy (which must be an individual), by validly completing, signing and submitting an Account Holder Letter to the Information Agent via the Portal. All Blocked Scheme Creditor Forms must be returned to GLAS by email at lm@glas.agency.

2

为在协议安排会议上投票，协议安排债权人必须透过一份有效完成、签署及通过表格网站提交的账户持有人信函 (Account Holder Letter)予信息代理人以亲身投票（如为个人），或委派获正式授权的公司代表（如为公司），或委派一名代理人（必须为个人）。所有受阻协议安排债权人表格都必须通过电子邮件发送予 GLAS 的邮箱地址：lm@glas.agency。

**Scheme Creditors are strongly encouraged to appoint a proxy (either the Chairperson or another individual of their own choice who is willing to attend the Scheme Meeting) by indicating their choice of proxy in the relevant section of the relevant form.**

**强烈建议协议安排债权人通过填写相关表格的相关章节，以委派一名代理人（可以是会议主席或其他由协议安排债权人自行选择的愿意亲身出席并且能够参与协议安排会议的个人）。**

Scheme Creditors wanting to attend the Scheme Meeting in person are encouraged to appoint a proxy (either the Chairperson or someone of their choice who would be willing to attend the Scheme Meeting) in any event, even if they intend to attend and vote in person or, if a corporation, by a duly authorized representative, in case such Scheme Creditors are unable to do so for any reason.

即使是有意于线下亲身（或如为公司, 通过获正式授权的代表）参与协议安排会议并投票的协议安排债权人，也鼓励其无论如何委派一名代理人（可以是会议主席或其他由协议安排债权人自行选择的愿意亲身出席并且能够参与协议安排会议的个人），以免该等协议安排债权人因任何原因无法线下参与并投票。

**Completion and deadline for submitting voting forms**

**投票表格的完成及提交截止时间**

The "**Voting Record Time**" for the Scheme, being the deadline for the submission of the relevant forms in order to vote on the Scheme and attend the Scheme Meeting, is **5.00 a.m. (BVI Time) / 5.00 p.m. (Hong Kong Time) on 18 August 2023**.

协议安排的"**投票记录时间**"，即为就协议安排投票并参与协议安排会议提交相关表格的截止时间，为**2023 年 8 月 18 日上午 5 时（英属维尔京群岛时间）/下午 5 时（香港时间）**。

In order to vote on the Scheme and attend the Scheme Meeting (in person, by a duly authorised representative (if a corporation) or by proxy), a Scheme Creditor must ensure that the following validly completed and executed Scheme Creditor Forms, as applicable, and further pursuant to the terms of the Scheme, be submitted by the Voting Record Time:

为就协议安排投票并参与协议安排会议（亲身，通过获正式授权的代表（如为公司）或通过代理人），协议安排债权人必须确认下述协议安排债权人表格有效完成并签署（如适用），并进一步根据协议安排的条款，必须于投票记录时间前提交：

(i)    in the case of a Scheme Creditor that is not a Blocked Scheme Creditor:

对于不是受阻协议安排债权人的协议安排债权人：

3

a.  a Custody Instruction is submitted on their behalf via the relevant Clearing System by the **Custody Instruction Deadline** (being 5.00 a.m. (BVI time) / 5.00 p.m. (Hong Kong time) on 15 August 2023) in accordance with the instructions set out in the Account Holder Letter and the remainder of the Solicitation Packet; and

根据账户持有人信函及征求文件集其余部分所列指示，在**保管人指示截止日期**(Custody Instruction Deadline)（2023 年 8 月 15 日上午 5 时（英属维京群岛时间）/下午 5 时（香港时间）前通过相关结算系统代表他们提交保管人指示(Custody Instruction)；以及

b.  Parts 1and 2 of the Account Holder Letter have been validly completed and submitted to by the Account Holder and received by the Information Agent via the Portal by no later than the **Voting Record Time** in accordance with the instructions set out in the Account Holder Letter and the remainder of the Solicitation Packet (allowing sufficient time for their respective Account Holders to give instructions to the Clearing Systems, in accordance with the procedures established between them, to ensure that the Account Holder Letter is validly submitted to and received online by the Voting Record Time);

根据账户持有人信函及征求文件集其余部分所列指示，不晚于**投票记录时间**，有效通过表格网站完成、提交并由信息代理人收到账户持有人信函第 1、2 部分（根据他们之间所设立的程序，给予他们各自的账户持有人充足的时间向结算系统提供指示，以确保账户持有人信函在投票记录时间之前有效完成线上提交及收集）；

(ii) in the case of a Blocked Scheme Creditor:

在受阻协议安排债权人的情况下：

a.  Sections 2 to 6 of the Blocked Scheme Creditor Form have been validly completed and submitted to and received by GLAS via email by no later than the **Voting Record Time** in accordance with the instructions set out in the Blocked Scheme Creditor Form and the remainder of the Solicitation Packet, including supporting evidence of the Blocked Scheme Creditor's identity, its status as a Scheme Creditor, and the value of its holding of the Existing Debts.

根据受阻协议安排债权人代理表格及征求文件集其余部分所列指示，不晚于**投票记录时间**，有效完成、通过电邮提交并由 GLAS 收到受阻协议安排债权人代理表格第 2 至 6 节，包括证明受阻协议安排债权人身份、其作为协议安排债权人的身份及其持有现有债务数额价值的支持性证据。

**Registration prior to Scheme Meeting**

协议安排会议前的登记

Each Scheme Creditor (or, if a corporation, its duly authorised representative) or its proxy intending to attend the Scheme Meeting will be required to register its attendance at the Scheme Meeting no later than 15 minutes prior to the scheduled start time of the Scheme Meeting.

有意于参与协议安排会议的各协议安排债权人（或若为公司，则获正式授权的代表人）或其代理人，需要在协议安排会议计划开始时间前至少 15 分钟，登记其参与协议安排会议。

On registration at the Scheme Meeting, a Scheme Creditor attending the Scheme Meeting in person should produce a duplicate copy of:

在协议安排会议登记时，有意于线下参与协议安排会议的协议安排债权人需要提供以下文件的副本：

- the applicable Scheme Creditor Form that was executed and delivered by it or on its behalf via https://portal.morrowsodali.com/EvergrandeScheme (the "**Portal**") to the Information Agent;

  协议安排债权人本身或代表其签署并通过 https://portal.morrowsodali.com/EvergrandeScheme （"**表格网站**"）向信息代理人送达的适用的协议安排债权人表格；

- evidence of personal identity with photo identification (for example, a passport, driving license or other photo identification); and

  附带照片的个人身份证明（如护照、驾照或其他照片证明）；以及

- in the case of a corporation, evidence of corporate authority (for example, a valid power of attorney and/or board resolutions).

  如为公司，则公司授权证明（如有效的授权委托书和/或董事会决议）。

Similarly, where a proxy other than the Chairperson is appointed, the proxy must also produce, on registration at the Scheme Meeting:

类似的，如果委任了会议主席以外的代理人，则代理人必须在相关协议安排会议登记时提供：

- a copy of the Scheme Creditor Form of the Scheme Creditor who appointed him or her as proxy, having been validly completed, signed and submitted to the Information Agent via the Portal, authorising him or her to act as proxy on behalf of the Scheme Creditor; and

  委派了他或她作为代理人的协议安排债权人的协议安排债权人表格副本，并且该协议安排债权人表格已被有效完成、签署并通过表格网站提交予信息代理人，授权他或她代表协议安排债权人作为代理人行动；以及

- evidence of personal identity with photo identification (for example, a passport, driving license or other photo identification).

  附带照片的个人身份证明（如护照、驾照或其他照片证明）。

If appropriate personal identification or evidence of authority is not produced, that person will only be permitted to attend and vote at the Scheme Meeting at the discretion of the Chairperson.

5

如果合适的个人身份证明或授权证据未被提供，该等个人仅可经主席酌情决定被允许参与并在协议安排会议上投票。

**Chairperson**

**会议主席**

Pursuant to the Scheme Convening Order, the BVI Court appointed Anna Silver of FFP (BVI) Limited to act as the Chairperson of the Scheme Meeting, or failing her, another representative of FFP (BVI) Limited nominated by her, and directed the Chairperson to report the results of the Scheme Meeting to the BVI Court. The results of the Scheme Meetings will also be made available on the Transaction Website, the Company's website, and by a public announcement published on the HKEXnews website of the SEHK and the website of the SGX-ST.

根据协议安排召集命令，英属维京群岛法院任命 FFP (BVI) Limited 的 Anna Silver 担任协议安排会议主席，如果她不担任主席，则任命由她提名的另一位 FFP (BVI) Limited 代表，召集命令并指示主席向英属维京群岛法院汇报协议安排会议的结果。协议安排会议的结果还将在交易网站、公司网站以及香港联交所披露易网站和新交所网站上发布的公告中公布。

**Scheme Sanction Hearing**

**协议安排批准聆讯**

The Scheme, if approved at the Scheme Meeting, will be subject to the subsequent approval and sanction of the BVI Court. The Scheme Sanction Hearing is presently scheduled to take place on 4 September 2023 at the BVI Court at 10.00 a.m. (BVI time) / 10.00 p.m. (Hong Kong time). Any Scheme Creditor is entitled (but not obliged) to attend the Scheme Sanction Hearing, through legal counsel, to support or oppose the approval and sanction of the Scheme.

该协议安排，如在协议安排会议上获得批准，将须经英属维京群岛法院随后的批准和认可。协议安排批准聆讯目前定于 2023 年 9 月 4 日上午 10 时（英属维京群岛时间）/晚上 10 时（香港时间）在英属维京群岛法院举行。任何协议安排债权人均有权（但无义务）通过其法律顾问出席协议安排批准聆讯，以支持或反对协议安排的批准和认可。

**SCHEME CREDITORS (OTHER THAN BLOCKED SCHEME CREDITORS[1]) REQUIRING ASSISTANCE SHOULD CONTACT:**

**需要协助的协议安排债权人（受阻协议安排债权人[2]除外）应联络：**

**Morrow Sodali Limited**

| | |
|---|---|
| Telephone: | in Hong Kong +852 2319 4130; in London +44 20 4513 6933 |
| 电话： | 香港：+852 2319 4130；伦敦：+44 20 4513 6933 |
| Email: | evergrande@investor.morrowsodali.com |
| 电邮： | |

---

[1] As defined in the Explanatory Statement and the Schemes.

[2] 定义见说明陈述及协议安排。

| | |
|---|---|
| Attention:<br>收件人 | Debt Services Team |
| Transaction Website:<br>交易网站 | https://projects.morrowsodali.com/evergrande |
| Portal:<br>表格网站： | https://portal.morrowsodali.com/EvergrandeScheme |

**FFP (BVI) Limited**

| | |
|---|---|
| Telephone:<br>电话： | +1 284 494 2715 |
| Email:<br>电邮： | info-sceneryjourney@ffp.vg |
| Attention:<br>收件人： | Anna Silver and Bijorn Bullock |

**ANY BLOCKED SCHEME CREDITORS REQUIRING ASSISTANCE SHOULD CONTACT:**
**任何需要协助的受阻协议安排债权人应联络：**

**GLAS Specialist Services Limited**

| | |
|---|---|
| Email:<br>电邮： | lm@glas.agency |
| Attention:<br>收件人 | Liability Management Team |

**SCENERY JOURNEY LIMITED (景程有限公司)**
Dated: 31 July 2023
日期：2023 年 7 月 31 日

7

**SCHEDULE 9**

**SCHEME MEETING CONVENING ORDER**

- **NOTE: THIS IS THE DRAFT CONVENING ORDER SUBMITTED TO THE BVI COURT FOLLOWING THE CONVENING HEARING ON 24 JULY 2023.**
- **AS AT THE DATE OF PUBLICATION ON THE TRANSACTION WEBSITE, THIS DRAFT IS STILL PENDING APPROVAL OR MODIFICATION BY PRESIDING JUDGE, THE HONOURABLE JUSTICE INGRID MANGATAL (AG).**
- **THIS DRAFT WILL BE REMOVED AND REPLACED BY THE SEALED CONVENING ORDER ONCE IT BECOMES AVAILABLE.**

**THE EASTERN CARIBBEAN SUPREME COURT**
**IN THE HIGH COURT OF JUSTICE**
**BRITISH VIRGIN ISLANDS**
**COMMERCIAL DIVISION**
**CLAIM NO.:  BVIHCOM2023/0076**
**IN THE MATTER OF SCENERY JOURNEY LIMITED**

**AND IN THE MATTER OF S. 179A OF THE BVI BUSINESS COMPANIES ACT 2004**

**BETWEEN:**

**SCENERY JOURNEY LIMITED**

<u>Claimant</u>

**and**

**SCENERY JOURNEY LIMITED**

<u>Defendant</u>

_____

**CONVENING DIRECTIONS ORDER**

_____

**BEFORE:**    The Honourable Justice Ingrid Mangatal (Ag)
**DATED:**    24 July 2023
**ENTERED:**    July 2023

**UPON** the claim of Scenery Journey Limited (the "**Company**") by Fixed Date Claim Form dated 26 April 2023 (the "**Claim**")

**AND UPON** reading the First Affirmation of Chen Daiping and the First Affirmation of Hui Ka Yan, and the exhibits thereto

**AND UPON HEARING** Leading Counsel, Mr Tom Smith KC, for the Company, and with him Paul Fradley and Henry Phillips of counsel, and Matthew Freeman and Scott Tolliss of Maples and Calder; and Leading Counsel, David Allison KC, for the Ad Hoc Group of creditors, and with him Peter Ferrer of Harneys

**AND UPON** the Court being satisfied that it has jurisdiction in relation to the Scheme (as defined below) on the basis that the Company is a "company" within section 179A of the BVI Business Companies Act 2004

**AND UPON** the basis that all capitalised terms not otherwise defined in this Order shall have the meaning given to them in the draft scheme of arrangement (the **"Scheme"**) and the draft explanatory statement in relation to the Scheme (the **"Explanatory Statement"**), in the form exhibited in Exhibit HKY-1 to the First Affirmation of Hui Ka Yan

**IT IS HEREBY ORDERED AND DIRECTED THAT:**

1. The Company has permission to convene a single meeting (the **"Scheme Meeting"**) of certain of its creditors (the "**Scheme Creditors**") for the purpose of considering and, if thought fit, approving the Scheme.

2. The Scheme Meeting will take place at 9 am (BVI time) on 22 August 2023 at the offices of Maples and Calder, 5th Floor, Ritter House, Road Town, Tortola, British Virgin Islands.

3. Attendance and voting at the Scheme Meeting will also be possible by video conference, using details which will be published on the Transaction Website at least 21 days before the day appointed for the Scheme Meeting and the meeting passcode notified to Scheme Creditors who are not Blocked Scheme Creditors by the Information Agent at least 2 business days before the day appointed for the Scheme Meeting.

4. GLAS Specialist Services Limited] (**"GLAS"**) will provide Blocked Scheme Creditors with the details of how to attend and vote at the Scheme Meeting as soon as reasonably practicable once the Company becomes aware of any such creditor and will notify such Blocked Scheme Creditors of the meeting passcode at least 2 business days before the day appointed for the Scheme Meeting.

5. The Chairperson (as defined below) may require Scheme Creditors attending the Scheme Meeting by video conference to turn on their camera throughout the Scheme Meeting and to log on to the video conference using their full name (as registered with the Information Agent) and the creditor identified number provided to them by the Information Agent prior to the Scheme Meeting.

6. The Company has permission to set a record time of 5 am (BVI time) on 18 August 2023 (the **"Voting Record Time"**) for the purpose of determining each Scheme Creditor's Voting Scheme Claim. The Voting Scheme Claims as at the Voting Record Time determine the number of votes to be assigned to a Scheme Creditor when voting on the Scheme at the Scheme Meeting.

7. The Company has permission to set the Voting Record Time as the latest time by which (a) the Information Agent must receive a valid Non-Blocked Scheme Creditor Form (as defined below) from Scheme Creditors who are not Blocked Scheme Creditors, and (b) GLAS must receive a valid Blocked Scheme Creditor Form (as defined below) from Blocked Scheme Creditors in order for the Scheme Creditors' voting instructions to be taken into account for the purposes of the Scheme Meeting.

8. Notice of the Scheme Meeting (**"Scheme Meeting Notice"**) shall be given to Scheme Creditors not less than 21 days before the Scheme Meeting:

    a. by notice on the Transaction Website;
    b. by announcement on the website of The Stock Exchange of Singapore Limited;
    c. for certain Scheme Creditors identified in the First Affidavit of Damian Watkin, by the Information Agent giving notice through the Clearing Systems in accordance with the procedures described therein; and
    d. by the Information Agent sending the notice via email to each person who the Company believes is or may be a Scheme Creditor (other than Blocked Scheme Creditors), and for whom the Company has a valid e-mail address.

9. GLAS will give a Scheme Meeting Notice to any Blocked Scheme Creditors by email (i) not less than 21 days before the Scheme Meeting to the extent the Company is aware of any Blocked Scheme Creditors and their email addresses at that time or (ii) as soon as

reasonably practicable after the Company becomes aware of the existence of a Blocked Scheme Creditor and their email details.

10. The Scheme Meeting Notice shall be in substantially the same form as that appended to the Explanatory Statement exhibited in Exhibit HKY-1 to the First Affirmation of Hui Ka Yan.

11. When distributing the Scheme Meeting Notice in accordance with paragraphs 8 and 9 above, the Information Agent (or GLAS, in the case of Blocked Scheme Creditors) shall also include a copy of the final form of the Explanatory Statement (or links to the Transaction Website where it can be accessed), which contains, amongst other things, the Scheme at Schedule 4.

12. On the same date as distributing the Scheme Meeting Notice in accordance with paragraph 8 above, the Information Agent shall post a Solicitation Packet including:

    a. the Account Holder Letter and a Scheme Creditor Proxy Form (each a "**Non-Blocked Scheme Creditor Form**"), including the forms of proxy and appendices contained therein; and

    b. the "**Blocked Scheme Creditor Form**", including the form of proxy contained therein,

on the Transaction Website together with copies of any other relevant documents.

13. The final form of the Explanatory Statement and its schedules shall be substantially in the same form exhibited in Exhibit HKY-1 to the First Affirmation of Hui Ka Yan (save for where the schedules were not available at the time of the First Affirmation of Hui Ka Yan).

14. The accidental omission to serve any Scheme Creditor with the Scheme Meeting Notice, or the non-receipt by any Scheme Creditor of the Scheme Meeting Notice, shall not invalidate the proceedings at the Scheme Meeting.

15. Miss Anna Silver, in her capacity as Scheme Supervisor, or, failing that, another representative of FFP (BVI) Limited nominated by her, be appointed Chairperson of the Scheme Meeting (the **"Chairperson"**) on behalf of the Company.

16. The Chairperson be entitled to accept, without further investigation, the signature on any Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable, as being genuine and as authority of the signatory to cast the votes in accordance with the instructions outlined in the Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable, and the Solicitation Packet.

17. The Chairperson be responsible for determining, in accordance with the relevant provisions in the Explanatory Statement, the Voting Scheme Claim of any Scheme Creditor and the validity of the appointment of any person permitted to act as proxy for a Scheme Creditor by reference to the information provided in each Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable.

18. The Chairperson be at liberty to accept any Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable, and the amount of a Voting Scheme Claim in respect of which a Scheme Creditor seeks to vote, notwithstanding that such form has not been completed or submitted in accordance with any instructions contained therein or has been submitted after the deadline provided for by paragraph 7, provided that the Chairperson considers that the information contained therein is sufficient to admit that Scheme Creditor's Voting Scheme Claim for voting purposes.

19. Any person validly appointed as proxy for a Scheme Creditor in accordance with the instructions set out in the Non-Blocked Scheme Creditor Form or Blocked Scheme Creditor Form, as applicable, and the Solicitation Packet may attend and speak at Scheme Meeting.

20. The Chairperson be at liberty to adjourn the Scheme Meeting, or terminate the Scheme Meeting and adjourn to a later date, in his or her sole discretion, provided that, if adjourned, the Scheme Meeting will recommence as soon as reasonably practicable thereafter. In the event that the Chairperson considers in her sole discretion that it is necessary or appropriate to adjourn the Scheme Meeting, the Company shall cause the Scheme Creditors to be notified that there is an adjournment of the Scheme Meeting and as to the time of the adjourned Scheme Meeting as soon as practicable and in the same manner as notice was given to the Scheme Creditors pursuant to paragraph 8.

21. The Chairperson be permitted to declare and announce the results of the Scheme Creditors' votes in respect of the Scheme, either during the Scheme Meeting or as soon as reasonably possible after the conclusion of the Scheme Meeting.

22. Within seven days of the Scheme Meeting, the Chairperson shall provide to the Court a report on the proceedings at and the result of the Scheme Meeting.

23. If the Scheme is approved at the Scheme Meeting by the required statutory majorities, the Claim is adjourned to a further hearing on 4 September 2023 at 10 am for the Court to consider the sanction of the Scheme.

24. There shall be liberty to apply generally.

_____

**BY THE REGISTRAR**

**THE EASTERN CARIBBEAN SUPREME**

**COURT**

**IN THE HIGH COURT OF JUSTICE**

**BRITISH VIRGIN ISLANDS**

**COMMERCIAL DIVISION**

**Claim No:  BVIHCOM2023/0076**

**IN THE MATTER OF SCENERY JOURNEY**

**LIMITED**

**AND IN THE MATTER OF AND IN THE**

**MATTER OF S. 179A OF THE BVI BUSINESS**

**COMPANIES ACT 2004**


**BETWEEN:**

        **SCENERY JOURNEY LIMITED**

<u>Claimant</u>

and

        **SCENERY JOURNEY LIMITED**

<u>Defendant</u>

_____

**DRAFT CONVENING ORDER**

_____

**Maples and Calder**

5th Floor

Ritter House

PO Box 173

Road Town, Tortola

British Virgin Islands

(Ref:MFX/621262/000107)

Tel: +1 284-852-3000

Fax: +1 284-852-3097


<u>Legal Practitioners for the Claimant</u>

7

**SCHEDULE 10**

**SUMMARY OF TERMS OF THE NEW INSTRUMENTS**

Part A – SJ New Notes

**Principal Terms of the SJ New Notes**

| SJ New Notes | |
|---|---|
| **Issuer / Company** | Scenery Journey Limited |
| **Original Issue Date** | The Restructuring Effective Date. |
| **Principal Amount** | The SJ New Notes shall comprise five tranches as follows, with the following maximum principal amounts:<br><br>1. <u>SJ Tranche A</u>: US$300 million;<br><br>2. <u>SJ Tranche B</u>: US$1,100 million;<br><br>3. <u>SJ Tranche C</u>: US$1,100 million;<br><br>4. <u>SJ Tranche D</u>: US$1,200 million; and<br><br>5. <u>SJ Tranche E</u>: US$2,800 million. |
| **Maturity** | 1. <u>SJ Tranche A</u>: four (4) years from the earlier of October 1, 2023 and the RED (the "**Reference Date**");<br><br>2. <u>SJ Tranche B</u>: five (5) years from the Reference Date;<br><br>3. <u>SJ Tranche C</u>: six (6) years from the Reference Date;<br><br>4. <u>SJ Tranche D</u>: seven (7) years from the Reference Date; and<br><br>5. <u>SJ Tranche E</u>: eight (8) years from the Reference Date.<br><br>The outstanding principal amount of each tranche shall be repaid at maturity, together with any accrued and unpaid interest. |
| **Interest** | Interest will start to accrue on the Reference Date and will be payable semi-annually in arrears on the outstanding principal amount of the SJ New Notes at the following interest rates with respect to each interest payment period:<br><br>1. <u>SJ</u> Tranche A: 5.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 6.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind);<br><br>2. <u>SJ</u> Tranche B: 6.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind);<br><br>3. <u>SJ</u> Tranche C: 6.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 7.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind);<br><br>4. <u>SJ</u> Tranche D: 7.0% p.a. (if all interest with respect to such interest payment period is paid in cash) or 8.0% p.a. (if any portion of interest with respect to such interest payment period is paid in kind); and |

5.  SJ Tranche E: 7.5% p.a. (if all interest with respect to such interest payment period is paid in cash) or 8.5% p.a. (if any portion of interest with respect to such interest payment period is paid in kind).

Interest on the outstanding principal amount of the SJ New Notes shall be paid in the following manner:

1.  For the first two and a half years after the Reference Date: interest may be paid in cash or in kind, at the election of the Company;

2.  From the 31st month after the Reference Date to the 36th month after the Reference Date, interest in an amount equal to at least 0.7% of the outstanding principal amount of each tranche of the SJ New Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company;

3.  For the fourth year after the Reference Date: interest in an amount equal to at least 3.0% p.a. of the outstanding principal amount of each tranche of the SJ New Notes shall be paid in cash; the remaining portion of interest may be paid in cash or in kind, at the election of the Company; and

4.  Starting from the fifth year after the Reference Date: interest shall be paid in cash.[1]

All interest paid in kind with respect to the SJ New Notes will be added to the then current outstanding principal amount of the SJ New Notes.

If the Company pays cash interest under any tranche of the SJ New Notes with respect to any interest payment period in an amount greater than the amount of cash interest required to be paid on such tranche with respect to such interest payment period, it shall also pay additional cash interest under the other tranches of the SJ New Notes and all tranches of the TJ New Notes. The amount of such additional cash payments shall be allocated between SJ New Notes on the one hand and TJ New Notes on the other hand on a 90:10 basis, with adjustments, if any, to be set forth in the indenture, if the ratio of the principal amounts of the SJ New Notes and the TJ New Notes has changed from such ratio as of the Original Issue Date other than due to scheduled principal repayments. All such additional cash payments allocated to the SJ New Notes shall be applied pro rata among the tranches of the SJ New Notes based on their outstanding principal amounts and all such additional cash payments allocated to the TJ New Notes shall be applied pro rata among the tranches of the TJ New Notes based on their outstanding principal amounts.

---

[1] For illustration purposes only, assuming each tranche of the SJ New Notes will be issued at the maximum amount indicated above, the maximum amount of interest that the Company may elect to pay in kind will be as follows:

(a)   Tranche A: approximately US$73,745,577;
(b)   Tranche B: approximately US$297,294,319;
(c)   Tranche C: approximately US$324,648,884;
(d)   Tranche D: approximately US$384,513,688;
(e)   Tranche E: approximately US$969,225,445.

| | |
|---|---|
| **Amendments with Consent of Holders** | Amendment provisions will be similar to those in the Existing Notes, save that amendments, modifications or waivers that require the consent of each holder in the Existing Notes would not require the consent of each holder of the relevant tranche of the SJ New Notes then outstanding. |
| **Guarantees and Keepwell** | The parent guarantor (i.e. TJ) and the initial subsidiary guarantors in Annex A to this Schedule will be the initial guarantors of the SJ New Notes. |
| | A keepwell arrangement is to be provided by Hengda Real Estate Group Co., Ltd. |
| **Security** | The collateral securing the SJ New Notes pursuant to share charges and assignments of receivables ("**SJ Collateral**") is listed in Annex B to this Schedule. |
| | The security interest over any SJ Collateral will be released upon any sale or disposal of such SJ Collateral and (i) the application of the proceeds thereof in accordance with the provisions under "Mandatory Redemption" below or (ii) the deposit of such proceeds into an account charged to the benefit of the holders of the SJ New Notes, or (iii) such proceeds being subject to an escrow or other arrangement, if any, to be set forth in the indenture. |
| **Mandatory Redemption** | 1.  Net consideration received by TJ and its offshore subsidiaries that is attributable to any SJ Notes Guarantor from the sale of any SJ Collateral; |
| | 2.  Dividends/distributions (if any) received by TJ from its onshore and offshore restricted subsidiaries; and |
| | 3.  Receipt by TJ of repayments of unsubordinated intercompany receivables from subsidiaries. |
| | Cash proceeds under clause (1) above shall be used to redeem either or both of the two tranches of SJ New Notes with the shortest maturities at that time, at par plus accrued and unpaid interest. If any such cash proceeds remain unused after such redemptions, the Company shall use remaining proceeds to redeem the SJ New Notes by tranche in the order of maturity, at par plus accrued and unpaid interest. |
| | Cash proceeds under clause (2) and (3) above shall be used to redeem either or both of the two tranches of SJ New Notes with the shortest maturities at that time and either or both of the two tranches of TJ New Notes with the shortest maturities at that time, at par plus accrued and unpaid interest, provided that 90% of such proceeds shall be allocated to redeem SJ New Notes and 10% of such proceeds shall be allocated to redeem TJ New Notes (with adjustments, if any, to be set forth in the indenture, if the ratio of the principal amounts of the SJ New Notes and the TJ New Notes has changed from such ratio as of the Original Issue Date other than due to scheduled principal repayments). If any such cash proceeds remain unused after such redemptions, the Company shall use (i) |

| | |
|---|---|
| | 90% of such remaining proceeds to redeem the SJ New Notes by tranche in the order of maturity and (ii) 10% of such remaining proceeds to redeem the TJ New Notes by tranche in the order of maturity, in each case at par plus accrued interest (with adjustments, if any, to be set forth in the indenture, if the ratio of the principal amounts of the SJ New Notes and the TJ New Notes has changed from such ratio as of the Original Issue Date other than due to scheduled principal repayments).<br><br>All SJ New Notes and TJ New Notes so repurchased or redeemed shall be cancelled. |
| **Optional Redemption** | With respect to each tranche of the SJ New Notes, at any time during the tenor of such SJ New Notes, the Company has the right to redeem such SJ New Notes, in whole or in part, at par plus any accrued and unpaid cash interest on such redeemed SJ New Notes up to but excluding the relevant redemption date, provided that if the Company redeems any tranche of SJ New Notes pursuant to this clause, it shall also redeem TJ New Notes such that the SJ New Notes and TJ New Notes so redeemed will be on a 90:10 basis (by principal amount) (with adjustments, if any, to be set forth in the indenture, if the ratio of the principal amounts of the SJ New Notes and the TJ New Notes has changed from such ratio as of the Original Issue Date other than due to scheduled principal repayments). |
| **Covenants** | The New Instruments Documents will contain covenants, subject to certain exceptions, limiting the ability of the New Instruments Keepwell Provider and its restricted subsidiaries, including TJ and the Company, to, among other things:<br><br>(i)  incur or guarantee additional indebtedness and issue disqualified or preferred stock;<br><br>(ii)  make investments or specified restricted payments;<br><br>(iii)  declare dividends on capital stock or purchase or redeem capital stock;<br><br>(iv)  issue or sell capital stock of restricted subsidiaries;<br><br>(v)  guarantee indebtedness;<br><br>(vi)  sell, lease or transfer assets;<br><br>(vii)  create liens;<br><br>(viii)  enter into sale and leaseback transactions;<br><br>(ix)  engage in any business other than permitted businesses;<br><br>(x)  enter into agreements that restrict the restricted subsidiaries' ability to pay dividends, transfer assets or make intercompany loans;<br><br>(xi)  enter into transactions with shareholders or affiliates;<br><br>(xii)  effect a consolidation, merger or sale of assets;<br><br>(xiii)  designate unrestricted subsidiaries; |

(xiv)    layer debt between senior and subordinated debt; and

(xv)    pay consideration as inducement to any consent, waiver or amendment of terms to certain holders of notes.

The New Instruments Documents will contain covenants requiring the New Instruments Keepwell Provider and its restricted subsidiaries, including TJ and the Company, to, among other things:

(i)    provide financial statements and reports;

(ii)    maintain certain offices or agencies;

(iii)    maintain necessary governmental approvals and licenses and comply with applicable laws;

(iv)    pay applicable taxes and other claims;

(v)    pay customary additional amounts to gross-up withholding taxes or deductions on payments due under the notes; and

(vi)    authorize the trustee to provide certain information to holders of the notes upon request.

| | |
|---|---|
| **Covenants regarding certain of Tianji's onshore projects** | Cash proceeds from disposals and operations of the existing 35 onshore projects held (directly and indirectly) by TJ and cash received by TJ and its subsidiaries on repayment of intercompany receivables (as referred to in clause (3) of "Mandatory Redemption" above), including from CEG and its subsidiaries (other than Tianji and its subsidiaries), dividends received by Tianji and its subsidiaries from these projects (as referred to in clause (2) of "Mandatory Redemption" above), and proceeds of financial indebtedness incurred by TJ and its Subsidiaries, shall be used to:<br><br>(a)    discharge any onshore liabilities associated with the project disposed or required or necessary to be discharged in connection with such disposal,<br><br>(b)    fund the development, operations and delivery of these projects, and/or<br><br>(c)    pay liabilities and fulfil obligations of TJ and its subsidiaries (other than intercompany payables (other than (x) non-interest bearing trade payables incurred in the ordinary course of business and consistent with past practice that are on arm's length terms and (y) repayments of intercompany financial indebtedness incurred after the date of the RSA solely for working capital, in each case that complies with the affiliate transactions covenant in the indentures) to CEG and its subsidiaries (other than Tianji and its subsidiaries)),<br><br>provided that such cash proceeds and cash received shall not be used to fund the investment, acquisition, development, operation or delivery of new projects, and in each case above, subject to compliance with applicable laws, regulations, rules, and policies, measures, orders or demands from judicial, regulatory or governmental bodies (provided, in the case of any demand, that TJ |

|  | provides the trustee and the holders with an officer's certificate setting forth, among other things, the terms of such demand). |
|---|---|
| **Auditor** | TJ will engage a Whitelist Auditor to audit its annual financial statements starting no later than the audit of the fiscal year ending December 31, 2023. |
|  | The "**Whitelist Auditor**" shall be any of the following auditors, or their respective affiliates or member firms: |
|  | (a)  Baker Tilly International; |
|  | (b)  BDO; |
|  | (c)  Crowe Global; |
|  | (d)  Deloitte; |
|  | (e)  Ernst & Young; |
|  | (f)  Grant Thornton; |
|  | (g)  KPMG; |
|  | (h)  Mazars; |
|  | (i)  Moore Global; |
|  | (j)  Prism; and |
|  | (k)  RSM International. |
| **Transfer Restrictions** | The SJ New Notes and the related Subsidiary Guarantees (if any) will not be registered under the US Securities Act or any securities law of any state or other jurisdiction of the United States, and may not be offered or sold within the United States (as defined in Regulation S under the US Securities Act) except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the US Securities Act. |
| **Form, Denomination and Registration** | The SJ New Notes will be issued only in fully registered form and each tranche of the SJ New Notes will be initially represented by one or more Global Certificates. |
| **Listing** | The Company will use best efforts to obtain the listing of the TJ New Notes on an internationally recognized stock exchange and maintain such listing as long as any TJ New Notes remain outstanding. |
| **Governing Law of the Indentures** | The laws of the State of New York |

**Annex A**

**LIST OF INITIAL SUBSIDIARY GUARANTORS**

|  | Company Name |
|---|---|
| 1. | Ever Grace Group Limited (恒善集團有限公司) |
| 2. | Ample Treasure Group Limited (寶豐集團有限公司) |
| 3. | Luckyup Group Limited (昇祺集團有限公司) |
| 4. | Instant Choice Development Ltd. |
| 5. | Ample Treasure Holding Limited (寶豐集團控股有限公司) |
| 6. | Will Glory Holdings Limited (好耀控股有限公司) |
| 7. | Forbidden City Culture Co., Limited (紫禁城弘華文化有限公司) |
| 8. | Ever Sure Industries Limited (永瑞實業有限公司) |
| 9. | Shui Wah Investment Limited (穗華投資有限公司) |
| 10. | Shengtong Holding Limited (盛通控股有限公司) |
| 11. | Wisdom Gain Group Limited (智盈集團有限公司) |
| 12. | Grow Rising Investment Limited (晉廷投資有限公司) |
| 13. | Accord Sino Group Limited (協華集團有限公司) |
| 14. | Merry Full Investments Limited (怡滿投資有限公司) |
| 15. | Million Castle Investments Limited |
| 16. | Benefit East Investments Limited (益東投資有限公司) |
| 17. | Champion Glory Holdings Limited (卓康集團有限公司) |
| 18. | Champion Globe Limited (特靈有限公司) |
| 19. | Champion King Investments Limited (彩僑投資有限公司) |
| 20. | Fortune Luck Corporation Limited (順利有限公司) |
| 21. | Cheung Fu Department Store Enterprise Limited (象富百貨集團有限公司) |
| 22. | China Agriculture Technology Limited |
| 23. | Baojun Limited (保駿有限公司) |

| 24. | Perfect Vantage Investments Limited (歷冠投資有限公司) |
|---|---|
| 25. | Bai Chang Limited (百昌有限公司) |
| 26. | Minsin International (Holdings) Limited (明誠國際（集團）有限公司) |
| 27. | Billion Sino Investments Limited (億中投資有限公司) |
| 28. | Allywing Investments Limited (榮邦投資有限公司) |
| 29. | California Place Dalian Limited (加州豪庭大連有限公司) |
| 30. | Shengtong (BVI) Limited |
| 31. | Shengyu (BVI) Limited (盛譽(BVI)有限公司) |
| 32. | Fortune Star International Investment Limited   (福星國際投資有限公司) |
| 33. | Xing Hong Holdings Limited (興鴻控股有限公司) |
| 34. | Rosy Dynasty Limited (翠御有限公司) |
| 35. | Joy Vision Holdings Limited (樂景控股有限公司) |
| 36. | Sanli (China) Holdings Limited (三立(中國)控股有限公司) |
| 37. | Metro Wisdom Limited (慧都有限公司) |
| 38. | Ji Feng Limited (吉豐有限公司) |
| 39. | Rise Eagle Worldwide Limited |
| 40. | Jicheng International (HK) Limited (集成國際(香港)有限公司) |
| 41. | Lucky Benefit Limited |
| 42. | Loyal Power Investments Limited (旺權投資有限公司) |
| 43. | Rising Sheen Limited (升亮有限公司) |
| 44. | City Faith Limited (都信有限公司) |
| 45. | South Honest Limited (誠南有限公司) |
| 46. | First Key Investments Limited (元基投資有限公司) |
| 47. | Hinto Developments Limited |
| 48. | Triumph Hero International Limited (勝雄國際有限公司) |
| 49. | Spread Glory Investments Limited (廣亮投資有限公司) |
| 50. | New Insight Holdings Limited (創見控股有限公司) |

| 51. | Easy Gain Investment Holdings Limited (盈潤投資控股有限公司) |
| 52. | Honor Business Investment Limited (榮商投資有限公司) |
| 53. | Link Care Limited (環照有限公司) |
| 54. | Cheer Motion Development Limited (致能發展有限公司) |
| 55. | China Sea Group (Hong Kong) Investment Limited (中海集團(香港)投資有限公司) |
| 56. | Crown Wise Investment Limited   (冠惠投資有限公司) |
| 57. | Dragon Joy (China) Limited   (龍悅(中國)有限公司) |
| 58. | Dragon Pioneer Development Limited (龍添發展有限公司) |
| 59. | Excel Sky (Hong Kong) Limited (俊天(香港)有限公司) |
| 60. | Future Lead Enterprises Limited   (天領企業有限公司) |
| 61. | Glory Sign Development Limited   (皇誌發展有限公司) |
| 62. | Gold Ascot Limited (金士福有限公司) |
| 63. | Grace Target Holdings Limited (喜志集團有限公司) |
| 64. | Honour In Investments Limited (誠然投資有限公司) |
| 65. | Jiazhi Holdings Limited (嘉智控股有限公司) |
| 66. | Joy Wealthy Investment Limited (悅才投資有限公司) |
| 67. | Lucky Universe Holding Limited (瑞宇集團有限公司) |
| 68. | Pacific Plus Enterprises Limited (匯太企業有限公司) |
| 69. | Palm Island Resort Limited (棕櫚島渡假村有限公司) |
| 70. | Prime Light Holdings Limited   (柏天集團有限公司) |
| 71. | Prime Sun Holding Limited (盛日控股有限公司) |
| 72. | Prosper Power Development Limited (能昌發展有限公司) |
| 73. | Sharp Goal Investments Limited (銳怡投資有限公司) |
| 74. | Starlet Development Limited (星能發展有限公司) |
| 75. | Sunny Net Development Limited (日訊發展有限公司) |
| 76. | Thousand Grand Holding Limited (千宏控股有限公司) |

| 77. | Trend Rich Investment Limited (毅富投資有限公司) |
|---|---|
| 78. | Chang Xing Holdings Limited (昌興控股有限公司 ) |
| 79. | Cheer Champ Investment Limited (誌昌投資有限公司) |
| 80. | Dragon Charm Investments Limited (龍創投資有限公司) |
| 81. | Dragon Fortune Ltd. |
| 82. | East Best Investments Limited (東卓投資有限公司) |
| 83. | Ever Shiny International Limited |
| 84. | Full Jolly Investments Limited  (滿怡投資有限公司) |
| 85. | Good Wave International Limited (佳濤國際有限公司) |
| 86. | Healthy Time International Limited (健時國際有限公司) |
| 87. | Luck Fortune Holdings Limited |
| 88. | Lucky Universe Enterprises Limited (瑞宇企業有限公司) |
| 89. | Marche Limited |
| 90. | Marvel First Developments Limited |
| 91. | Menkia Holdings Limited (萬家控股有限公司) |
| 92. | On Lucky Holdings Limited (安利達控股有限公司) |
| 93. | Opal House Development Limited |
| 94. | Oriental Fame Holdings Limited (東榮控股有限公司) |
| 95. | Prime Sun Enterprises Limited (盛日企業有限公司) |
| 96. | Reego Group Limited (銳高集團有限公司) |
| 97. | Silver Opportunity Investment Limited (銀機投資有限公司) |
| 98. | Superb Capital Enterprises Limited |
| 99. | Upper East Property Holdings Company Limited  (上東置業控股有限公司) |
| 100. | Vast Wheel Company Limited (浩輪有限公司) |
| 101. | White Heron Limited |
| 102. | Win Harbour Investments Limited (凱港投資有限公司) |
| 103. | Win Peak Group Limited (凱峰集團有限公司) |

| 104. | Angel Fay Limited |
|------|-------------------|
| 105. | Ease Triumph International Limited (拓業國際有限公司) |
| 106. | Fortune Leader Investment Limited (廣盛投資有限公司) |
| 107. | Godsib Limited |
| 108. | High Concept Limited (高建有限公司) |
| 109. | Lucky Grow Holdings Limited (智煌控股有限公司) |
| 110. | More Hero Limited (添英有限公司) |
| 111. | Pacific Globe Group Limited |
| 112. | Shiny Profit Enterprises Limited |
| 113. | Star River Profits Limited |
| 114. | Fortex Development Limited (嘉達發展有限公司) |
| 115. | Winner Joy Development Limited (勝欣發展有限公司) |
| And other initial subsidiary guarantors, if any, to be set forth in the New Instruments Documents | |

**Annex B**

**PART I**

**LIST OF SUBSIDIARY PLEDGORS**

| No. | The Parent Or Subsidiary Pledgors | Relevant Subsidiary Guarantors |
|---|---|---|
| 1. | Winggo Limited (穎高有限公司) | Angel Fay Limited |
| 2. | Benefit East Investments Limited (益東投資有限公司) | Champion Globe Limited (特靈有限公司) |
| 3. | Benefit East Investments Limited (益東投資有限公司) | Champion Glory Holdings Limited (卓康集團有限公司) |
| 4. | Benefit East Investments Limited (益東投資有限公司) | Champion King Investments Limited (彩僑投資有限公司) |
| 5. | Shengyu (BVI) Limited (盛譽 (BVI) 有限公司) | China Sea Group (Hong Kong) Investment Limited (中海集團(香港)投資有限公司) |
| 6. | Shengyu (BVI) Limited (盛譽 (BVI) 有限公司) | Dragon Joy (China) Limited (龍悅(中國)有限公司) |
| 7. | Shengtong Holding Limited (盛通控股有限公司 | Ease Triumph International Limited (拓業國際有限公司) |
| 8. | Shengyu (BVI) Limited (盛譽 (BVI) 有限公司) | First Key Investments Limited (元基投資有限公司) |
| 9. | Dragon Fortune Ltd. | Fortune Leader Investment Limited (廣盛投資有限公司) |
| 10. | Shengyu (BVI) Limited (盛譽 (BVI) 有限公司) | Godsib Limited |
| 11. | Champion Concept Limited | High Concept Limited (高建有限公司) |
| 12. | Shengyu (BVI) Limited (盛譽 (BVI) 有限公司) | Hinto Developments Limited |
| 13. | Grandday Group Limited (朝隆集團有限公司) | Lucky Grow Holdings Limited (智煌控股有限公司) |
| 14. | Lucky Universe Enterprises Limited (瑞宇企業有限公司) | Lucky Universe Holding Limited (瑞宇集團有限公司) |
| 15. | Shengyu (BVI) Limited (盛譽 (BVI) 有限公司) | Marche Limited |
| 16. | Vast Omen Limited (泓兆有限公司) | More Hero Limited (添英有限公司) |
| 17. | Shengyu (BVI) Limited (盛譽 (BVI) 有限公司) | Pacific Globe Group Limited |
| 18. | Prime Sun Enterprises Limited (盛日企業有限公司) | Prime Sun Holding Limited (盛日控股有限公司) |
| 19. | Shengyu (BVI) Limited (盛譽 (BVI) 有限公司) | Rise Eagle Worldwide Limited |
| 20. | Xing Hong Holdings Limited (興鴻控股有限公司) | Rosy Dynasty Limited (翠御有限公司) |
| 21. | Shengyu (BVI) Limited (盛譽 (BVI) 有限公司) | Sanli (China) Holdings Limited (三立(中國)控股有限公司) |

| | | |
|---|---|---|
| 22. | Ever Grace Group Limited (恒善集團有限公司) | Shengyu (BVI) Limited (盛譽 (BVI) 有限公司) |
| 23. | Faith Honor Group Limited (信荣集团有限公司) | Shiny Profit Enterprises Limited |
| 24. | Ever Grace Group Limited (恒善集團有限公司) | Shui Wah Investment Limited (穗華投資有限公司) |
| 25. | Shengyu (BVI) Limited (盛譽 (BVI) 有限公司) | Star River Profits Limited |
| 26. | Delight Universe Limited | Winner Joy Development Limited (勝欣發展有限公司) |
| 27. | Shengyu (BVI) Limited (盛譽 (BVI) 有限公司) | Fortex Development Limited (嘉達發展有限公司) |
| Other Subsidiary Pledgors and/or relevant Subsidiary Guarantors, if any, may be set forth in the New Instruments Documents. | | |

## PART II
## LIST OF RECEIVABLE PLEDGORS AND RELEVANT RECEIVABLES

| No. | Receivable Pledgors | Relevant Receivables held by the Receivable Pledgors |
|---|---|---|
| 1. | Assignments, if any, of intra-group receivables held by Receivable Pledgors to be set forth in the New Instruments Documents | |

**THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION**

---

**SUPPLEMENTARY EXPLANATORY STATEMENT IN RELATION TO SCHEME OF ARRANGEMENT**

**BETWEEN**

**SCENERY JOURNEY LIMITED**
景程有限公司

**THE SCHEME CREDITORS**
(as defined in the Explanatory Statement issued on 31 July 2023)

**16 AUGUST 2023**

This document comprises a supplementary explanatory statement in relation to the scheme of arrangement proposed by Scenery Journey Limited (景程有限公司) ("**SJ**" or the "**Company**") pursuant to section 179A of the BVI Business Companies Act (this "**Supplementary Explanatory Statement**"). Reference is made to the definitions set out in Schedule 1 (*Definitions and Interpretation*) to the Explanatory Statement in relation to the Scheme issued on 31 July 2023.

This Supplementary Explanatory Statement is being transmitted to persons who it is believed are or may be Scheme Creditors as at the date of this Supplementary Explanatory Statement. If you have assigned, sold, or otherwise transferred your interests in the Existing Notes you must forward this Supplementary Explanatory Statement and the accompanying documents at once to the person or persons to whom you have assigned, sold or otherwise transferred your interests in the Existing Notes.

This Supplementary Explanatory Statement has been distributed to you in an electronic form. You are advised that documents transmitted in electronic form may be altered or changed during the process of transmission and consequently none of the Company, the Information Agent, the BVI Information Agent, the Existing Notes Trustee, nor any of their respective Affiliates, directors, officers or employees, accept any liability or responsibility whatsoever in respect of any difference between the Supplementary Explanatory Statement distributed to you in electronic format and the version available to you for inspection on the Transaction Website.

**WARNING** – The contents of this Supplementary Explanatory Statement have not been reviewed by any regulatory authority in Hong Kong, the British Virgin Islands, Singapore or in any other jurisdiction. Neither the US Securities and Exchange Commission ("**SEC**") nor any United States state securities commission has approved or disapproved of the Scheme Consideration or determined if this Supplementary Explanatory Statement is truthful or complete. Any representation to the contrary is a criminal offence. You are strongly encouraged to exercise caution in relation to any offer pursuant to the scheme of arrangement set out in this Supplementary Explanatory Statement.

**You are recommended to seek your own independent financial, legal and/or tax advice immediately from your financial, legal and/or tax adviser with respect to the contents of this Supplementary Explanatory Statement or the documents that accompany it or what action you should take.**

This Supplementary Explanatory Statement does not constitute an offer to sell or the solicitation of an offer to buy any securities. None of the securities referred to in this Supplementary Explanatory Statement may be sold, issued or transferred in any jurisdiction in contravention of applicable law. The securities proposed to be issued pursuant to the BVI Scheme will not be registered with the SEC under the US Securities Act of 1933, as amended (the "**US Securities Act**"), or the securities law of any state or other jurisdiction, and are being transferred and delivered in reliance upon certain exemptions from the registration requirements of the US Securities Act. The securities proposed to be issued pursuant to the BVI Scheme will be issued and delivered only (i) in the United States to "qualified institutional buyers" ("**QIBs**") as defined in Rule 144A under the US Securities Act ("**Rule 144A**") and institutional "accredited investors" ("**Accredited Investors**") as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the US Securities Act ("**Regulation D**"); and (ii) outside the United States to non-US persons in offshore transactions, in reliance on Regulation S under the US Securities Act ("**Regulation S**").

i

An application will be made for the listing and quotation of the New Instruments on the Singapore Exchange Securities Trading Limited ("**SGX-ST**"). The SGX-ST assumes no responsibility for the correctness of any of the statements made or opinions expressed or reports contained herein. Approval in-principle for the listing and quotation of the New Instruments on the SGX-ST is not to be taken as an indication of the merits of the New Instruments or of the issuers of them, any guarantees, any guarantors, their respective subsidiaries (if any), their respective associated companies (if any) or their respective joint venture companies (if any). For so long as such New Instruments are listed on the SGX-ST and the rules of the SGX-ST so require, such New Instruments will be traded on the SGX-ST in a minimum board lot size of at least S$200,000 (or its equivalent in foreign currencies). To the extent that the Company is required to disclose additional information solely for the purposes of the application to list the New Instruments on the SGX-ST, such information will be made available to Scheme Creditors on the Transaction Website (where legally and commercially permissible).

**Section 309B(1) Notification**—In connection with Section 309B of the Securities and Futures Act, Chapter 289 of Singapore, as modified or amended from time to time (the "**SFA**") and the Securities and Futures (Capital Markets Products) Regulations 2018 (the "**CMP Regulations 2018**"), we have determined, and hereby notify all relevant persons (as defined in Section 309A(1) of the SFA) that the New Instruments are prescribed capital markets products (as defined in the CMP Regulations 2018) and Excluded Investment Products (as defined in MAS Notice SFA 04-N12: Notice on the Sale of Investment Products and MAS Notice FAA-N16: Notice on Recommendations on Investment Products).

This Supplementary Explanatory Statement should be read carefully with the Explanatory Statement and the Solicitation Packet which is available on the Transaction Website for Scheme Creditors to download.

The Information Agent provides the primary contact for Scheme Creditors (who are not Sanctions Affected Scheme Creditors) in relation to questions the Scheme Creditors have in relation to this Supplementary Explanatory Statement, the Solicitation Packet, the BVI Scheme or the Restructuring. The Information Agent will be assisting the Chairperson in co-ordinating the voting process for the BVI Scheme, including (a) creating and managing the Transaction Website and the Portal, (b) communicating with Scheme Creditors (who are not Sanctions Affected Scheme Creditors) regarding voting in the BVI Scheme, in particular via the Transaction Website, (c) communicating with Clearing Systems regarding voting in the BVI Scheme (for further distribution to Scheme Creditors (who are not Sanctions Affected Scheme Creditors)), and (d) assisting the Chairperson in checking the voting values of each Scheme Creditor (who is not a Blocked Scheme Creditor) for/at the BVI Scheme Meeting against the relevant Custody Instructions or, as the case may be, the records supplied by the Company. GLAS will be managing the voting process of the Scheme for Blocked Scheme Creditors.

FFP (BVI) Limited (the "**BVI Information Agent**") will provide an additional contact point in the BVI for Scheme Creditors (who are not Sanctions Affected Scheme Creditors) to obtain information regarding the BVI Scheme or the Restructuring on non-voting related matters (in addition to other services it will provide to the Company).

Queries in relation to this Supplementary Explanatory Statement or the completion of an Account Holder Letter should be directed to the Information Agent or alternatively, the BVI Information Agent, as follows:

**Morrow Sodali Limited**
Telephone: in Hong Kong +852 2319 4130; in London: +44 20 4513 6933
Email: evergrande@investor.morrowsodali.com
Transaction Website (document posting website):
https://projects.morrowsodali.com/evergrande
Portal (form submission website): https://portal.morrowsodali.com/EvergrandeScheme
Attention: Debt Services Team

**Blocked Scheme Creditors should direct any questions in relation to this Supplementary Explanatory Statement, the Blocked Scheme Creditor Form, the BVI Scheme or the Restructuring to:**

**GLAS Specialist Services Limited**
Email: lm@glas.agency
Attention: Liability Management Team

**For submitting Blocked Scheme Creditor Forms**

please refer to the Solicitation Packet

**For Company announcements regarding the Scheme, including those relevant for Blocked Scheme Creditors**

**http://www.evergrande.com/**

4893-8140-2231v.3

## CONTENTS

**Clause**                                                                                          **Page**

1.      SUPPLEMENTS TO EXPLANATORY STATEMENT ...............................................1

2.      EXPECTED TIMETABLE OF PRINCIPAL EVENTS...............................................1

3.      NOTICES ...................................................................................................................2

4.      IMPORTANT SECURITIES LAW NOTICES ............................................................4

APPENDIX 1 DEFINITIONS ....................................................................................................5

iv

1.      **SUPPLEMENTS TO EXPLANATORY STATEMENT**

1.1     The purpose of this Supplementary Explanatory Statement is to inform Scheme Creditors of adjournment of the BVI Scheme Meeting. The reason for the adjournment of the BVI Scheme Meeting is to align the timing of the BVI Scheme Meeting with the timing of the adjourned scheme meetings in connection with the CEG Schemes. The adjournment of the BVI Scheme Meeting also provide Scheme Creditors with more time to consider the information in relation to the BVI Scheme and the opportunity to amend their vote in respect of the BVI Scheme.

1.2     The BVI Scheme Meeting is intended to be adjourned from 22 August 2023 to 28 August 2023, 7:00 a.m. BVI time / 7:00 p.m. Hong Kong time.

1.3     It is not currently anticipated that the BVI Scheme Sanction Hearing, the Scheme Effective Date, the Restructuring Effective Date or any later principal event will be amended. The revised expected timetable of principal events for the proposed Scheme is set out in Clause 2 (*Expected timetable of principal events*) below.

1.4     Scheme Creditors who have already submitted a duly completed Scheme Creditor Form or Blocked Scheme Creditor Form (as applicable) are not required to resubmit the relevant form to the Information Agent or GLAS respectively as a result of the supplements set out in this Supplementary Explanatory Statement unless they wish to make changes to the information submitted in the Scheme Creditor Form or Blocked Scheme Creditor Form (as applicable), including changing their vote.

2.      **EXPECTED TIMETABLE OF PRINCIPAL EVENTS**[1]

| Event | BVI time | Hong Kong time |
|---|---|---|
| **Custody Instruction Deadline** <br><br> The latest time for Account Holders to submit Custody Instructions to block Existing Notes held with Euroclear or Clearstream | 5:00 a.m. on 21 August 2023 | 5:00 p.m. on 21 August 2023 |
| **Voting Record Time** <br><br> The latest time for lodging Account Holder Letters via the Portal, and emailing the Blocked Scheme Creditor Form with GLAS for the purpose of voting at the BVI Scheme Meeting.[2] | 5:00 a.m. on 23 August 2023 | 5:00 p.m. on 23 August 2023 |

---

[1] The dates in this timetable and those mentioned throughout this Supplementary Explanatory Statement assume that none of the Court hearing or Scheme Meeting is further adjourned or delayed. It is also possible that the drawing up or registration of the Scheme Sanction Order may be delayed if any person appeals the order.

[2] Scheme Creditors should confirm as early as possible with their Account Holders and/or Intermediaries (as applicable) whether there are any applicable deadlines to ensure that their Account Holder Letter is returned online via the Portal to the Information Agent prior to the Voting Record Time in order to vote.

| Event | BVI time | Hong Kong time |
|---|---|---|
| **Adjourned BVI Scheme Meeting**[3] | 7:00 a.m. on 28 August 2023 | 7:00 p.m. on 28 August 2023 |
| **BVI Scheme Sanction Hearing**[4] | 10:00 a.m. on 4 September 2023 | 10:00 p.m. on 4 September 2023 |

2.1    The Initial BVI Scheme Meeting is to be opened and commenced as a formality to allow the Chairperson to adjourn the Initial BVI Scheme Meeting to 28 August 2023, 7:00 a.m. BVI time / 7:00 p.m. Hong Kong time. All relevant formal business to be conducted at the BVI Scheme Meeting will be addressed at the Adjourned BVI Scheme Meeting. Therefore, while Scheme Creditors are still entitled to attend the Initial BVI Scheme Meeting, there is no practical purpose in doing so. Scheme Creditors who wish to attend and vote at the BVI Scheme Meeting are instead encouraged to attend and vote at the Adjourned BVI Scheme Meeting.

2.2    Any Scheme Creditor that wishes to attend the Adjourned BVI Scheme Meeting in person should produce a duplicate copy of the Account Holder Letter that was executed and delivered on their behalf, evidence of personal identity (for example, a passport or other picture identification) and, in the case of a corporation, evidence of corporate authority (for example, a valid power of attorney and/or board minutes) at the registration desk by no later than 15 minutes before the scheduled time of the Adjourned BVI Scheme Meetings. The Chairperson of the Adjourned BVI Scheme Meeting may at his or her sole discretion allow a Scheme Creditor to provide the relevant documents up to the time of the commencement of the relevant Scheme Meeting. These will apply to those attending by video as well and there may be a virtual registration desk.

3.    **NOTICES**

   **This section contains a number of important notices to Scheme Creditors. Scheme Creditors are strongly encouraged to carefully review the notices in this section and, if necessary, seek and obtain independent legal and/or financial advice.**

3.1    **Defined terms**

   Unless expressly defined within this Supplementary Explanatory Statement or the context otherwise requires, all capitalised terms used in this Supplementary Explanatory Statement shall have the meanings set out in Schedule 1 (*Definitions and Interpretation*) to the Explanatory Statement issued on 31 July 2023.

---

[3]The Adjourned Scheme Meeting will commence at the time stated, as a reconvened meeting of the initial BVI Scheme Meeting which will be opened on 22 August at 9:00 a.m. (BVI time) / 9:00 p.m. (Hong Kong time) (the "**Initial BVI Scheme Meeting**"), and immediately adjourned.

[4]Notice will be provided to all Scheme Creditors if the date of the Scheme Sanction Hearing change.

3.2    **Notice to Scheme Creditors etc**

Section 3.2 (*Information*) to Section 3.9 (*Summary only*) of the Explanatory Statement are repeated in full as if a reference to the Explanatory Statement were instead a reference to the Supplementary Explanatory Statement.

3.3    **Conflicts**

In the event of a conflict between the information and terms described in:

(a)    this Supplementary Explanatory Statement;

(b)    the Explanatory Statement; and

(c)    the Scheme or the Restructuring Documents;

the terms of the Scheme and the Restructuring Documents shall prevail.

3.4    **Forward-looking Statements**

Nothing in this Supplementary Explanatory Statement shall be deemed to be a forecast, projection or estimate of the future financial performance of the Company and/or any member of the Group except where otherwise specifically stated.

This Supplementary Explanatory Statement contains statements, estimates, opinions and projections with respect to the Company and the Group and certain plans and objectives of the Company and the Group. These forward-looking statements can be identified by the fact that they do not relate only to historical or current facts. Forward-looking statements often use words such as "*anticipate*", "*target*", "*expect*", "*estimate*", "*intend*", "*plan*", "*goal*", "*believe*", "*will*", "*may*", "*should*", "*would*", "*could*" or other words of similar import. These statements are based on numerous assumptions and assessments made by the Company as appropriate in light of their experience and perception of historical trends, current conditions, expected future developments and other factors which they believe appropriate. No assurance can be given that such expectations will prove to be correct. Forward-looking statements involve significant risks and uncertainties, should not be read as guarantees of future performance or results, and will not necessarily be accurate indications of whether or not such results will be achieved. Such forward-looking statements only speak as at the date of this Supplementary Explanatory Statement. A number of factors could cause actual results to differ materially from the results discussed in the forward-looking statements, including, but not limited to, the factors and uncertainties set out in Section 16 (*Risk Factors*) of the Explanatory Statement. Each Scheme Creditor is urged to make its own assessment of the validity of such forward-looking statements and their underlying assumptions and no liability is accepted by the Company in respect of the achievement or failure thereof of such forward-looking statements and assumptions. Without limiting the above, none of the boards of the directors of the companies within the Group assumes any obligation to update or correct any forward-looking statements contained in this Supplementary Explanatory Statement to reflect any change of expectations with respect thereto or any change in event, situation or circumstances on which any such forward-looking statement was based.

3

3.5     **Legal, tax and financial advice**

Section 3.14 (*Legal, tax and financial advice*) of the Explanatory Statement is repeated in full as if a reference to the Explanatory Statement were instead a reference to the Supplementary Explanatory Statement.

4.      **IMPORTANT SECURITIES LAW NOTICES**

**This Supplementary Explanatory Statement does not constitute an offer to sell or a solicitation of an offer to buy any securities in any jurisdiction in contravention of applicable law. None of the securities referred to in this Supplementary Explanatory Statement shall be sold, issued or transferred in any jurisdiction in contravention of applicable law.**

The securities law notices set out in Section 2 (*Important Securities Law Notices*) of the Explanatory Statement are repeated in full as if a reference to the Explanatory Statement were instead a reference to the Supplementary Explanatory Statement.

4893-8140-2231v.3

# APPENDIX 1

## DEFINITIONS

In this Supplementary Explanatory Statement, unless expressly defined below or the context otherwise requires, all capitalised terms used shall have the meanings set out in Schedule 1 (*Definitions and Interpretation*) to the Explanatory Statement issued on 31 July 2023:

| | |
|---|---|
| **"Adjourned BVI Scheme Meeting"** | Means the BVI Scheme Meeting adjourned to 28 August 2023, 7:00 a.m. BVI time / 7:00 p.m. Hong Kong time. |
| **"Explanatory Statement"** | means the explanatory statement in relation to the scheme of arrangement proposed by the Company pursuant to section 179A of the BVI Business Companies Act, first issued on 31 July 2023, as amended and restated from time to time, and is available for inspection on the Transaction Website. |
| **"Initial BVI Scheme Meeting"** | has the meaning set out in Section 2 of this Supplementary Explanatory Statement. |
| **"Supplementary Explanatory Statement"** | means this additional composite document dated 16 August 2023 of the Company addressed to Scheme Creditors containing, among other things, a supplementary explanatory statement of the Company in compliance with the BVI Business Companies Act. |

5

6